1  LOUIS R. MILLER (State Bar No. 54141)
   smiller@millerbarondess.com
2  DAVID W. SCHECTER (State Bar No. 296251)
   dschecter@millerbarondess.com
3  MILLER BARONDESS, LLP
   1999 Avenue of the Stars, Suite 1000
4  Los Angeles, California 90067
   Telephone:  (310) 552-4400
5  Facsimile:   (310) 552-8400

6  Attorneys for Plaintiffs

7

8              UNITED STATES DISTRICT COURT

   CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
9

10

11 ENTERTAINMENT STUDIOS          CASE NO. 2:21-cv-04972-FMO-MAA
   NETWORKS, INC., a California    Assigned for all purposes to the Hon.
12 corporation; WEATHER GROUP,     Fernando M. Olguin
   LLC, a Delaware limited liability
13 company,                        FIRST AMENDED COMPLAINT
                                   FOR:
14         Plaintiffs,
                                      1) RACIAL DISCRIMINATION
15                                       IN CONTRACTING IN
16                                       VIOLATION OF 42 U.S.C. §
                                         1981; AND
17    v.
                                      2) VIOLATION OF THE
18                                       CALIFORNIA UNRUH CIVIL
19                                       RIGHTS ACT (CAL. CIVIL
                                         CODE § 51.5)
20 McDONALD'S CORPORATION, a
   Delaware corporation,            JURY TRIAL DEMANDED
21
           Defendant.
22
23
24                                  Complaint Filed:    May 20, 2021
                                    Case Removed:       June 18, 2021
25

26

27

28

524426.1

FIRST AMENDED COMPLAINT

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

Plaintiffs Entertainment Studios Networks, Inc. ("Entertainment Studios") and Weather Group, LLC ("Weather Group") (together "Plaintiffs"), by and through their undersigned counsel, hereby allege as follows:

## INTRODUCTION

1.     This is a civil rights lawsuit brought by African American-owned media companies against Defendant McDonald's Corporation ("McDonald's") for racial discrimination in contracting in violation of the Civil Rights Act of 1866, codified at 42 U.S.C. § 1981, and the California Unruh Civil Rights Act, California Civil Code § 51.5.

2.     Section 1981, in particular, broadly prohibits racial discrimination in contracting.  The statute grants all persons the same right to make and enforce contracts, including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  As the late Justice Ruth Bader Ginsburg explained in a 2020 concurring opinion, section 1981 "covers the entirety of the contracting process," including "earlier stages of the contract-formation process."

3.     This case involves both a racially discriminatory contracting process and refusals to advertise on Plaintiffs' networks on the basis of race.

4.     Plaintiff Entertainment Studios is an African American-owned media company that owns and operates high-definition lifestyle networks that are widely distributed throughout the country.  Entertainment Studios also produces television programming that runs on Entertainment Studios' lifestyle networks and in broadcast syndication.  Entertainment Studios is solely owned by Byron Allen, an African American media entrepreneur.

5.     McDonald's is one of the largest corporations in the world, with over 39,000 stores worldwide generating over $100 billion in annual sales.  With African Americans representing approximately 40% of fast food consumers, it is estimated that McDonald's stores earn billions of dollars each year from African American

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    consumers.  This money is taken out of the African American community but not re-

2    invested in any meaningful way.

3        6.      McDonald's has a massive annual advertising budget.  McDonald's

4    spent approximately $1.6 billion in television advertising in the United States in

5    2019.  On information and belief, less than $5 million (0.31%) of that budget was

6    spent on African American-owned media.  In fact, McDonald's spending on African

7    American-owned media is less than half of what it pays its CEO, whose

8    compensation in 2020 exceeded $10 million.

9        7.      McDonald's has followed this same pattern with respect to

10   Entertainment Studios.  McDonald's has refused to advertise on Entertainment

11   Studios' lifestyle networks since they were launched in 2009.  Yet, during this same

12   period, McDonald's purchased significant advertising on similarly situated, white-

13   owned networks.

14       8.      McDonald's racial discrimination against Entertainment Studios is the

15   result of racial animus and racial stereotyping.  McDonald's uses a multi-tiered

16   approach to purchase advertising.  In the "general market" tier, McDonald's

17   contracts with an advertising agency to act as its intermediary to allocate its budget

18   among large, publicly-owned media companies.  The vast majority of McDonald's

19   television advertising budget is spent in this "general market" tier.

20       9.      But McDonald's has another tier reserved for media companies that

21   produce content "targeted" to an African American audience.  McDonald's contracts

22   with a different advertising agency for this African American tier.  McDonald's

23   advertising budget for the African American tier is much smaller than the general

24   market (i.e. white-owned media) budget which is not spent on African American-

25   owned media.

26       10.     This structural racism is pernicious and deplorable in its own right, but

27   McDonald's adds insult to injury by falsely labeling Entertainment Studios as an

28   African America media company that produces content for African American

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

1  audiences.  In doing so, McDonald's shut the door on Entertainment Studios for

2  McDonald's general market budget.

3      11.    This is intentional racial stereotyping and discrimination.  Several years

4  ago, before launching its own networks, Entertainment Studios produced some

5  programming that was targeted to an African American audience, and McDonald's

6  advertised on those shows in broadcast syndication.  During this period,

7  McDonald's pigeonholed Entertainment Studios as an African American media

8  company.

9      12.    McDonald's continued to stereotype Allen's Entertainment Studios in

10  this fashion even as Allen grew Entertainment Studios into larger, more-dynamic

11  media empire.  McDonald's continued to shut out Entertainment Studios.

12      13.    Entertainment Studios' lifestyle networks are not targeted to an African

13  American audience.  They feature cooking shows, celebrity interviews, court

14  television, comedy and other general market lifestyle programming that compete

15  against white-owned lifestyle networks, such as Animal Planet, Cooking Channel,

16  Comedy Central, Destination America, E!, Food Network, Motor Trend, Travel

17  Channel and many others.

18      14.    McDonald's advertises on these white-owned networks through its

19  general market advertising budget, but refuses to advertise on the Entertainment

20  Studios lifestyle networks because they are owned by an African American.

21  McDonald's is interested in whether Allen's Entertainment Studios can deliver an

22  African American audience, assuming that, because Allen is African American, his

23  content must target that audience.  That is a false assumption and is blatant racism.

24      15.    This racial stereotyping and discrimination continued even after Allen

25  acquired Weather Group in 2018.  Weather Group owns and operates the well-

26  known cable news network The Weather Channel.   The Weather Channel is not an

27  African American targeted network.

28      16.    But after Allen acquired the network, McDonald's refused to contract

with Weather Group while at the same time advertising on similarly situated, white-owned networks in the general market tier.

17.     Television companies like Entertainment Studios and Weather Group depend on advertising revenue to survive.  It is the lifeblood of their business.  By depriving access to one of the largest advertising budgets in the world, McDonald's discriminatory treatment of Entertainment Studios and Weather Group has caused, and continues to cause, significant damage.

18.     McDonald's racist treatment of Entertainment Studios and Weather Group is also hypocritical.  McDonald's receives billions from African American consumers who patronize its restaurants.  Indeed, McDonald's specifically targets African American consumers through its tiered advertising structure, demonstrating McDonald's conscious and deliberate efforts to keep African Americans buying McDonald's high calorie, high sugar, high fat and high sodium food products while at the same time depriving African American-owned businesses—like Entertainment Studios and Weather Group—from contracting like it does with white-owned networks.

19.     McDonald's, like much of corporate America these days, publicly touts its commitment to diversity and inclusion, but this is nothing more than empty rhetoric as shown by the racial discrimination in contracting herein.

20.     Racial discrimination in contracting is prohibited by the Civil Rights Act of 1866, codified at 42 U.S.C. § 1981, and the California Unruh Civil Rights Act.  Section 1981, in particular, ensures that all people have the same right to make and enforce contracts "as is enjoyed by white citizens."  The statute was enacted right after the Civil War to provide economic inclusion for freed slaves by eradicating racial discrimination in contracting.

21.     Sadly, in the 150 years since this statute was enacted, African American businesses, and African American-owned media in particular, still have not been able to contract and achieve economic inclusion as enjoyed by white

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

citizens and white-owned businesses.

22.     By and through this action, Plaintiffs demand that McDonald's remedy the civil rights violations alleged herein and compensate Plaintiffs for the harm caused thereby as permitted by law, which is estimated to be in excess of $10 billion.

## PARTIES

23.     Plaintiff Entertainment Studios is a California corporation headquartered in Los Angeles, California.

24.     Plaintiff Weather Group is a Delaware limited liability company headquartered in Atlanta, Georgia.

25.     Defendant McDonald's is a Delaware corporation headquartered in Oakbrook, Illinois, just outside Chicago.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this controversy under 28 U.S.C. § 1331 and 28 U.S.C. § 1367.  This Court has personal jurisdiction over McDonald's under the specific jurisdiction doctrine as the claims asserted herein arose out of McDonald's contacts with the forum state, and because McDonald's waived any personal jurisdiction challenge by removing this action to this Court and making  a general appearance by way of a Rule 12(b)(6) motion to dismiss.

27.     Venue is proper in this Court pursuant to 28 U.S.C. §  1391(b)(2) as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.

## FACTS COMMON TO ALL CAUSES OF ACTION

28.     Plaintiff Entertainment Studios was founded in 1993 by Byron Allen, an African-American actor, comedian and media entrepreneur.  Allen is the sole owner of Entertainment Studios.

29.     Allen first made his mark in the television world in 1979 as the youngest comedian ever to appear on "The Tonight Show Starring Johnny Carson."

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

He thereafter served as the co-host of NBC's "Real People," one of the first reality shows on television.

30.     Alongside his "on-screen" career, Allen developed a keen understanding of the "behind the scenes" television business.   Allen used his industry knowledge to build Entertainment Studios into an independent, global media company.

**A.     <u>Allen Grows Entertainment Studios</u>**

31.     Initially, Entertainment Studios produced non-fiction television shows, including interview series (such as *Entertainers with Byron Allen*) and court television.  These shows were distributed via broadcast syndication, which is the process of licensing shows to local broadcast affiliates without the need to contract with a broadcast network.

32.     Entertainment Studios' television shows had general audience appeal, in that they did not specifically target any particular demographic group as the core audience.  For example, the interview series *Entertainers with Byron Allen* features interviews of prominent celebrities (such as George Clooney, Tom Cruise, Julia Roberts, among many others) on the red carpet and gives the audience a behind-the-scenes look into blockbuster films featuring A-list stars.

33.     Some of Entertainment Studios' other programming targeted African American audiences.

34.     Entertainment Studios did not own or operate networks during this early period, and so its programming ran on local broadcast networks in syndication.

35.     In 2009, Entertainment Studios launched six high-definition television networks:  Comedy.TV; Recipe.TV; MyDestination.TV; ES.TV; Pets.TV; and Cars.TV.  In 2012, Entertainment Studios launched its seventh network, JusticeCentral.TV.  These seven networks are referred to herein as the "ESN Lifestyle Networks."

36.     The ESN Lifestyle Networks feature lifestyle programming with

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

general audience appeal.  The networks do not specifically target any racial demographic; they are not African American networks like, for example, Black Entertainment Television.

37.     The ESN Lifestyle Networks feature content that has been nominated for, and won, Emmy® Awards.

38.     These networks are widely distributed and have high viewer demand. By 2020, Entertainment Studios secured carriage contracts with more than 60 multi-channel video programming distributors ("MVPD"), including the largest MVPDs in the nation such as Comcast, AT&T U-Verse, Charter/Spectrum, DirecTV, AT&T TV Now, DISH Network, VerizonFIOS, Mediacom, Frontier Communications and RCN.  These MVPDs distribute the ESN Lifestyle Networks to over 180 million cumulative subscribers in all 50 states.

39.     In 2018, Allen, through Allen Media Group, a company he founded and solely owns, purchased Weather Group, the parent company that owns and operates The Weather Channel.

40.     For nearly four decades, The Weather Channel has been the leader in weather coverage, providing the most comprehensive analysis of any media outlet. For ten years in a row, Harris Poll has ranked The Weather Channel as the "TV News Brand of the Year," recognizing The Weather Channel as the most trusted brand in cable news for the past decade.

**B.     McDonald's Pigeonholes Entertainment Studios as Black-Targeted**

41.     McDonald's is one of the largest corporations in the world.  It is the world's leading global foodservice retailer with over 39,000 locations in over 100 countries.  In 2019, its worldwide stores generated over $100 billion in revenue.

42.     McDonald's spends over $1 billion per year advertising on content produced and distributed by media companies in the United States.  In 2019, McDonald's spent approximately $1.6 billion advertising on television in the United States.  Of that budget, McDonald's spent less than $5 million on African

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

American-owned media companies.  To put that into perspective, McDonald's paid its CEO double that amount, more than $10 million, in 2020.

43.     For television advertising, McDonald's contracts with advertising agencies as intermediaries to facilitate buying advertising time on television networks.  These ad agencies are merely intermediaries.  McDonald's makes the ultimate decision whether to contract.

44.     McDonald's employs a "tiered" structure for advertising spending that explicitly differentiates on the basis of race.  For "general market" media companies (i.e. white-owned media companies), McDonald's contracts with a general market advertising agency who works with non-African American-owned media companies to allocate McDonald's billion-dollar, annual advertising budget.

45.     The general market advertising agency distributes a general market Request for Proposal ("RFP") each year to non-African American-owned companies, who then submit proposals for McDonald's and its general market advertising agency's review.

46.     But McDonald's has a different tier for African American media.  For the McDonald's African American advertising budget—which is *de minimis* compared to the general market budget—McDonald's contracts with a different advertising agency.  McDonald's African American advertising agency is Burrell Communications ("Burrell").  Burrell distributes African American RFPs to Entertainment Studios and other "African American" media companies.

47.     The African American tier is less favorable than the general market tier.  On information and belief, McDonald's pays lower prices for African American advertising.  McDonald's uses the Cost Per Thousand ("CPM") pricing mechanism to buy advertising time.  On information and belief, McDonald's pays higher prices (higher CPMs) for general market media companies, but forces African American media companies to pitch for business using McDonald's lower CPM for African American content.  This enables McDonald's to buy more

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    advertising time for less money to reach African American audiences.

2        48.    McDonald's also requires African American media companies to agree

3    to contract guarantees in terms of reaching an African American audience.  Thus,

4    even if McDonald's agrees to purchase advertising time, McDonald's can refuse to

5    spend the contract amount or force African American media companies to provide

6    additional advertising for free if they do not hit the contract guarantees.

7        49.    Entertainment Studios was shut out of the general market tier and

8    forced to bid for advertising in the less favorable African American tier.  Initially,

9    McDonald's purchased advertising on Entertainment Studios' African American

10   shows that ran in broadcast syndication.  In doing so, McDonald's stereotyped the

11   entire company as an African American media company.

12       50.    For over two decades, McDonald's classified Entertainment Studios as

13   a media company that owns and produces African American content, even though

14   the ESN Lifestyle Networks have general audience appeal—they are not African

15   American networks.  McDonald's viewed Entertainment Studios as an African

16   American media company because Entertainment Studios is owned by an African

17   American.

18       51.    Entertainment Studios raised these issues with McDonald's, but

19   nothing changed.  Allen spoke directly with McDonald's former Chief Marketing

20   Officer, Deborah Wahl, while she was CMO, and told her that McDonald's was

21   discriminating against African American-owned media, and Entertainment Studios

22   in particular.  Ms. Wahl did not fix these issues and McDonald's continued

23   discriminating against African American-owned media.

24   **C.**    **McDonald's Continues Its Racial Stereotyping After Allen**

25         **Acquires Weather Group**

26       52.    McDonald's continued to label Entertainment Studios as an African

27   American media company even after Allen acquired Weather Group in 2018.  Allen

28   acquired Weather Group for $300 million, and invested considerably in The

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

Weather Channel.  This has led to remarkable success, as The Weather Channel continues to be recognized as the most trusted brand in cable news.

53.  The Weather Channel has broad, general audience appeal.  It is not an African American network.

54.  Yet, McDonald's shut out The Weather Channel from its general market advertising budget while, at the same time, advertising considerably out of its general market budget with similarly situated, white-owned channels.  This is blatant racial discrimination, denying Plaintiffs the same right to make and enforce contracts as is enjoyed by white citizens, in violation of § 1981.

55.  Since Allen acquired Weather Group, marketing representatives for Weather Group have pitched The Weather Channel to McDonald's ad agency. These presentations are made twice a year.  One presentation is made in the Spring and another is made in the Fall.

56.  These presentations showcase the significant advertising opportunities that are available for McDonald's on The Weather Channel.  The presentations are updated to show how The Weather Channel is well suited to execute on McDonald's specific ad campaign.  Yet McDonald's refused to purchase any ad time on the network following each presentation, and did not give an explanation for its refusal to contract.

57.  In fact, McDonald's refused to contract with Weather Group to purchase advertising time on The Weather Channel each year since Allen acquired it in 2018, while at the same time contracting with white-owned media companies to advertise on similarly situated networks.

**D.  McDonald's Intentional Racism Has Caused Significant Damage to Entertainment Studios and Weather Group**

58.  Entertainment Studios has suffered, and continues to suffer, significant harm as a result of McDonald's racism.  Despite owning award-winning networks that are distributed by over 60 major MVPDs and reach over 180 million cumulative

subscribers in all 50 states, McDonald's refused to advertise on the ESN Lifestyle Networks.  In addition, McDonald's has not purchased advertising on The Weather Channel since Allen acquired it in 2018.

59.     While refusing to purchase advertising time on the ESN Lifestyle Networks and The Weather Channel, McDonald's advertised on similarly situated, white-owned networks, including, but not limited to, Animal Planet, Cooking Channel, Comedy Central, CNN, Destination America, E!, Food Network, HLN, Motor Trend, Travel Channel, and many others.

60.     This is textbook differential treatment on the basis of race that violates the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the California Unruh Civil Rights Act.

61.     McDonald's refusal to contract is not based on race-neutral reasons. For example, McDonald's ad agency told Weather Group that McDonald's did not purchase advertising on The Weather Channel because the network skews towards an older audience.  But McDonald's contracts with older-skewing networks, such as Destination America and HLN.  These networks have lower ratings than The Weather Channel and have less distribution, and yet McDonald's contracted to advertise on the networks but not The Weather Channel.

62.     In addition, the ESN Lifestyle Networks target similar audiences as the white-owned networks that McDonald's contracts with for advertising.  Recipe.TV, for example, features cooking shows that target similar audiences as Cooking Channel and Food Network.  MyDestination,TV features travel-related content that targets similar audiences as Travel Channel and Destination America.  Yet, McDonald's advertises on these white-owned networks but not the ESN Lifestyle Networks.

63.     McDonald's African American ad agency in the past has claimed that McDonald's did not contract to advertise on the ESN Lifestyle Networks because they were not widely distributed.  But the ESN Lifestyle Networks have

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  successfully increased their distribution over the past several years, and are now

2  distributed by all major MVPDs to over 180 million cumulative subscribers in all 50

3  states.  Entertainment Studios presented McDonald's African American ad agency

4  with this data, and yet McDonald's still refuses to contract, while at the same time

5  contracting with white-owned networks that have smaller distribution.

6        **E.**    **McDonald's Racist Corporate Culture**

7       64.    McDonald's racism and intentional discrimination with respect to

8  Entertainment Studios and Weather Group is consistent with McDonald's corporate

9  culture.

10       65.    African Americans are historically underrepresented among

11  McDonald's executive team and senior leadership, despite McDonald's earning

12  billions of dollars each year from African American consumers.  In fact,

13  McDonald's specifically targets these African American consumers based on their

14  race and yet continues to have a predominantly white executive team.  African

15  Americans are welcome to spend money in the restaurants but are blocked from

16  career opportunities within the company.

17       66.    Just last year, former African American senior executives sued

18  McDonald's for racial discrimination and retaliation in *Victoria Guster-Hines and*

19  *Domineca Neal v. McDonald's USA, LLC, et al.* (N.D. Ill. Case No. 1:20-cv-00117).

20  In that lawsuit, the former executives assert troubling allegations against

21  McDonald's former CEO Steven Easterbrook and McDonald's USA, LLC's

22  President (now the CEO) Christopher Kempczinski, such as:  (1) Mr. Easterbrook

23  stating in a 2016 meeting that by "diversity" McDonald's means women, not

24  African Americans; (2) Mr. Kempczinski stating in a 2019 meeting about the lack of

25  African American representation in senior manager that the "numbers [of African

26  Americans] don't matter"; and (3) McDonald's labeling Ms. Guster-Hines and Ms.

27  Neal as "Angry Black Women."

28       67.    In addition, in 2020, former African American franchisees sued

McDonald's for racial discrimination in *Christine Crawford, et al. v. McDonald's USA, LLC, et al.*, (N.D. Ill. Case No. 1:20-cv-05132).  These former franchisees allege that McDonald's set them up to fail by offering them unfavorable locations with higher operating costs because these franchisees are African American.  The lawsuit details McDonald's history of discrimination against African American franchisees, including: (1) denying entry to African American franchisees from 1955 to 1968 following the assassination of Dr. Martin Luther King, Jr.; (2) boycotts by African Americans to force further admission for African American franchisees in certain cities; and

(3) forcing African American franchisees to open in unfavorable locations with racially discriminatory restrictions for expansion and success.

68.     These allegations shed further light on McDonald's intentional discrimination with respect to Entertainment Studios and Weather Group.  It is this corporate culture that caused McDonald's to erect a two-tiered, race-based system and shut Plaintiffs out of the general market (i.e. white-owned media) tier.

69.     If McDonald's treated Entertainment Studios and Weather Group on a race-neutral basis, the ESN Lifestyle Networks and The Weather Channel would have received significant advertising revenue based on merit.  But McDonald's denied this opportunity to Entertainment Studios and Weather Group due to intentional racism.

## FIRST CAUSE OF ACTION
### (Violation of 42 U.S.C. § 1981)

70.     Plaintiffs incorporate each of the foregoing and subsequent paragraphs as though fully set forth herein.

71.     McDonald's has engaged in, and is engaging in, pernicious, intentional racial discrimination in contracting in violation of § 1981.  Section 1981 broadly prohibits racial discrimination in contracting.  The statute is broad, covering "the making, performance, modification, and termination of contracts, and the enjoyment

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

of all benefits, privileges, terms, and conditions of the contractual relationship."

72.     African Americans are a protected class under § 1981.  Entertainment Studios and Weather Group are members of that class because they are African American-owned companies.

73.     As alleged herein, Entertainment Studios and Weather Group attempted many times over the years to contract with McDonald's for advertising on the ESN Lifestyle Networks and The Weather Channel, but McDonald's refused.  These refusals to contract occurred within the past two years.  Yet McDonald's continued to contract with—and make itself available to contract with—similarly situated, white-owned television networks and to advertise on those networks.

74.     In addition, McDonald's shut the door for Entertainment Studios and Weather Group, preventing them from accessing McDonald's large, general market advertising budget.

75.     Racial discrimination is the but-for cause of McDonald's refusal to contract.  If Entertainment Studios and Weather Group were white-owned companies, they would have been able to access McDonald's large, general market advertising budget and they would have received millions of dollars each year from McDonald's in advertising revenue on the ESN Lifestyle Networks and The Weather Channel.

76.     McDonald's also subjected Plaintiffs to a racially discriminatory contracting process that is unfair and illegal.  By forcing Entertainment Studios to bid for business in the less-favorable African American tier, McDonald's forced Entertainment Studios to incur unnecessary expenses and costs.

77.     McDonald's violations of § 1981 as alleged herein caused Plaintiffs to lose advertising revenue, suffer significant lost profits, and experience a substantial diminution in the value of Plaintiffs' businesses, which will conform to proof at trial but is estimated to be $10 billion, plus punitive damages for intentional, oppressive and malicious racial discrimination.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

## SECOND CAUSE OF ACTION

### (Violation of the Unruh Civil Rights Act)

78. Plaintiffs incorporate each of the foregoing and subsequent paragraphs as though fully set forth herein.

79. The Unruh Civil Rights Act creates a cause of action for any person who is denied the right to full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever based on that person's sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status.

80. California Civil Code section 51.5, subsection (a), provides, in relevant part, that "No business establishment of any kind whatsoever shall discriminate against . . . or refuse to buy from, contract with, sell to, or trade with any person in this state on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51, or of the person's partners, members, stockholders, directors, officers, managers, superintendents, agents, employees, business associates, suppliers, or customers, because the person is perceived to have one or more of those characteristics, or because the person is associated with a person who has, or is perceived to have, any of those characteristics."

81. California Civil Code section 51, subsection (b), provides "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."

82. McDonald's has violated the California Civil Code section 51.5 by intentionally discriminating against Plaintiffs on the basis of race.

83. Plaintiffs are members of a protected class (African American-owned businesses), that were qualified to do business with McDonald's and qualified to

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

receive advertising revenue for the ESN Lifestyle Networks and The Weather Channel, but were denied the opportunity to contract with McDonald's for such revenue because they are African American-owned networks.

84.     As a result of McDonald's intentional racial discrimination, Plaintiffs are entitled to actual and treble damages in addition to attorneys' fees and costs, which all together are estimated to exceed $10 billion.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment as follows:

1.     General and special damages according to proof at trial;

2.     Punitive and exemplary damages;

3.     Treble damages under the Unruh Civil Rights Act;

4.     Attorneys' fees, costs and interests allowable under the law; and

5.     For such other relief as the Court deems just and proper.

DATED:  July 15, 2021                    MILLER BARONDESS, LLP


By:    _/s/ Louis R. Miller_____
          LOUIS R. MILLER
          Attorneys for PLAINTIFFS

# <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury on all claims so triable asserted in the Complaint.

DATED:  July 15, 2021                    MILLER BARONDESS, LLP


By: _____
        */s/ Louis R. Miller*
        LOUIS R. MILLER
        Attorneys for PLAINTIFFS

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**<u>CERTIFICATE OF SERVICE</u>**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

  At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of California.  My business address is 1999 Avenue of the Stars, Suite 1000, Los Angeles, CA 90067.

  On July 15, 2021, I served true copies of the following document(s) described as:

**FIRST AMENDED COMPLAINT**

on the interested parties in this action as follows:

  **BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

  Executed on July 15, 2021, at Los Angeles, California.

        /s/ Cindy B. Lumia
        Cindy B. Lumia

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

524426.1

FIRST AMENDED COMPLAINT