LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
DAVID W. SCHECTER (State Bar No. 296251)
dschecter@millerbarondess.com
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Telephone: (310) 552-4400
Facsimile: (310) 552-8400

Attorneys for Plaintiffs

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

ENTERTAINMENT STUDIOS NETWORKS, INC., a California corporation; WEATHER GROUP, LLC, a Delaware limited liability company,

Plaintiffs,

v.

McDONALD'S USA, LLC, a Delaware limited liability company,

Defendant.

**CASE NO. 2:21-cv-04972-FMO-MAA**

**PLAINTIFFS ENTERTAINMENT STUDIOS NETWORKS, INC. AND WEATHER GROUP, LLC'S THIRD AMENDED COMPLAINT FOR:**

1) **RACIAL DISCRIMINATION IN CONTRACTING IN VIOLATION OF 42 U.S.C. § 1981; AND**

2) **VIOLATION OF THE CALIFORNIA UNRUH CIVIL RIGHTS ACT (CAL. CIVIL CODE § 51.5)**

**JURY TRIAL DEMANDED**

Assigned for all purposes to the Hon. Fernando M. Olguin

Complaint Filed: May 20, 2021
Case Removed: June 18, 2021
Trial Date: Jan. 10, 2023

Plaintiffs Entertainment Studios Networks, Inc. ("Entertainment Studios") and Weather Group, LLC ("Weather Group") (together "Plaintiffs"), by and through their undersigned counsel, hereby allege as follows:

**INTRODUCTION**

**A. McDonald's Racist Culture**

1. This is a civil rights lawsuit brought by African American-owned media companies against Defendant McDonald's USA, LLC ("McDonald's") for racial discrimination in contracting in violation of the Civil Rights Act of 1866, codified at 42 U.S.C. § 1981, and the California Unruh Civil Rights Act, California Civil Code § 51.5.

2. McDonald's has a long and troubled history with racial discrimination directed towards African Americans, and this corporate culture continues to exist today. Currently, prominent civil rights groups are demanding that McDonald's fire its CEO, Chris Kempczinski, over a racist, ignorant and unacceptable text message he sent to Chicago Mayor Lori Lightfoot.

3. In the text, Kempczinski blamed the parents of a young African American girl who was tragically shot by a third party while sitting in a McDonald's parking lot. He also blamed the parents of a young Hispanic boy who was shot and killed by the police.

4. Civil rights groups have called for boycotts and protests in response to this racist text message. U.S. Representative Bobby Rush of Illinois also advocated for Kempczinski to be removed as CEO. Congressman Rush stated about the text message: "This is a deplorable message, and one that is completely unacceptable for the CEO of a powerful multinational corporation—let alone a corporation that markets aggressively to communities of color and publicly proclaims that 'Black Lives Matter'—to espouse."

5. In addition, an adviser to union pension funds that hold approximately 2.5 million shares of McDonald's stock formally asked the Board of Directors to

Miller Barondess, LLP
Attorneys at Law
1999 Avenue of the Stars, Suite 1000 Los Angeles, California 90067
Tel: (310) 552-4400 Fax: (310) 552-8400

retain an independent, third party to conduct an audit of the entire organization to discover the full extent of its treatment of African American employees, executives, suppliers, franchisees and vendors.

6. Kempczinski's racially derogatory comment is even more shocking given that McDonald's was named recently in two prominent racial discrimination lawsuits. Last year, former African American senior executives sued McDonald's for racial discrimination and retaliation in *Victoria Guster-Hines and Domineca Neal v. McDonald's USA, LLC, et al.* (N.D. Ill. Case No. 1:20-cv-00117). In that lawsuit, the former executives claim that Kempczinski told them, in a 2019 meeting about the lack of African American representation in senior management, that the "numbers [of African Americans] don't matter." The executives also claim that McDonald's labeled them as "Angry Black Women."

7. Also in 2020, former African American franchisees sued McDonald's for racial discrimination in *Christine Crawford, et al. v. McDonald's USA, LLC, et al.*, (N.D. Ill. Case No. 1:20-cv-05132). The lawsuit details McDonald's history of discrimination against African American franchisees, including: (1) denying entry to African American franchisees from 1955 to 1968 following the assassination of Dr. Martin Luther King, Jr.; (2) boycotts by African Americans to force further admission for African American franchisees in certain cities; and (3) forcing African American franchisees to open in unfavorable locations with racially discriminatory restrictions for expansion and success.

8. Recently, McDonald's paid $33.5 million to settle a case brought by an African American business owner alleging racial discrimination in contracting in violation of 42 U.S.C. § 1981. In that case, *Washington v. McDonald's USA, LLC*, Case No. 4:21-cv-00367 (N.D. Ohio), Herbert L. Washington ("Washington") claimed that McDonald's admitted to a discriminatory racial-steering policy which intentionally deprived African Americans from operating franchise stores in prime locations. Washington also alleged that, as a result of McDonald's racist policies,

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

African American owners of franchise stores earned on average $700,000 less in annual sales per store as compared to White owners.

9. This is the same racist corporate culture that has caused Plaintiffs the injuries alleged herein. Per these lawsuits and the allegations set forth herein, McDonald's has a pattern and practice of discriminating against African Americans in contracting in violation of 42 U.S.C. § 1981.

**B. <u>McDonald's Racism Here</u>**

10. Plaintiff Entertainment Studios is an African American-owned media company that owns and operates high-definition lifestyle networks that are widely distributed throughout the country. Entertainment Studios also produces television programming that runs on Entertainment Studios' lifestyle networks and in broadcast syndication. Entertainment Studios is solely owned by Byron Allen, an African American media entrepreneur.

11. McDonald's and its parent corporation are one of the largest organizations in the world, with over 39,000 stores worldwide generating over $100 billion in annual sales. In 2019, McDonald's spent approximately $1.6 billion in television advertising in the United States. On information and belief, less than $5 million (0.31%) of that budget was spent on African American-owned media. In fact, McDonald's spending on African American-owned media is less than half of what it pays its CEO, whose compensation in 2020 exceeded $10 million.

12. With African Americans representing approximately 40% of fast food consumers, it is estimated that McDonald's stores earn billions of dollars each year from African Americans. This money is taken out of the African American community but not re-invested in any meaningful way.

13. McDonald's has followed this same pattern with respect to Entertainment Studios. McDonald's has refused to advertise on Entertainment Studios' lifestyle networks since they were launched in 2009. Yet, during this same period, McDonald's purchased significant advertising on similarly situated, white-

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

owned networks.

14. McDonald's racial discrimination against Entertainment Studios is the result of racial animus and racial stereotyping. McDonald's uses a multi-tiered approach to purchase advertising. In the "general market" tier, McDonald's contracts with an advertising agency to act as its intermediary to allocate its budget among white-owned media companies. The vast majority of McDonald's television advertising budget is spent in this "general market" tier.

15. But McDonald's has another tier reserved for media companies that produce content "targeted" to an African American audience. McDonald's contracts with a different advertising agency for this African American tier. McDonald's advertising budget for the African American tier is much smaller than the general market (i.e. white-owned media) budget which is not spent on African American-owned media.

16. These two tiers are separate but not equal. The African American agency budget is *de minimis* as compared to the general market budget.

17. While pernicious and deplorable in its own right, McDonald's adds insult to injury by falsely labeling Entertainment Studios as a media company that produces content solely for African American audiences. In doing so, McDonald's shut the door on Entertainment Studios for McDonald's general market budget.

18. This is intentional racial stereotyping and discrimination. Several years ago, before launching its own networks, Entertainment Studios produced some programming that was targeted to African American audiences, and McDonald's advertised on those shows in broadcast syndication. During this period, McDonald's pigeonholed Entertainment Studios as a media company producing African American content.

19. McDonald's continued to stereotype Allen's Entertainment Studios in this fashion even as Allen grew Entertainment Studios into a larger, broader media company, whose channels have widespread appeal among all races and do not target

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

just African Americans.

20. Entertainment Studios' lifestyle networks are not targeted to African American audiences. They feature cooking shows, celebrity interviews, court television, comedy and other general market lifestyle programming that compete against white-owned lifestyle networks, such as Animal Planet, Cooking Channel, Comedy Central, Destination America, E!, Food Network, HLN, Motor Trend, Oxygen, Travel Channel and many others.

21. McDonald's advertises on these white-owned networks through its general market advertising budget, but refuses to advertise on the Entertainment Studios lifestyle networks because they are owned by an African American. McDonald's is interested in whether Allen's Entertainment Studios can deliver an African American audience, assuming that, because Allen is African American, his content must target that audience. That is a false assumption and is blatant racism.

22. This racial stereotyping and discrimination continued even after Allen acquired Weather Group in 2018. Weather Group owns and operates the well-known cable news network The Weather Channel. The Weather Channel is not an African American targeted network.

23. But after Allen acquired the network, McDonald's refused to contract with Weather Group while at the same time advertising on similarly situated, white-owned networks in the general market tier.

24. Television companies like Entertainment Studios and Weather Group depend on advertising revenue to survive. It is the lifeblood of their business. By depriving access to one of the largest advertising budgets in the world, McDonald's discriminatory treatment of Entertainment Studios and Weather Group has caused, and continues to cause, significant damage.

25. McDonald's racist treatment of Entertainment Studios and Weather Group is also hypocritical. McDonald's receives billions from African American consumers who patronize its restaurants. Indeed, McDonald's specifically targets

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

African American consumers through its tiered advertising structure, demonstrating McDonald's conscious and deliberate efforts to keep African Americans buying McDonald's high calorie, high sugar, high fat and high sodium food products while at the same time depriving African American-owned businesses—like Entertainment Studios and Weather Group—from contracting like it does with white-owned networks.

26. As explained in detail below, the white-owned networks that McDonald's does contract with are similarly situated with Entertainment Studios' networks and The Weather Channel, as they have similar distribution, similar programming, and target and reach similar demographic groups, including their ability to reach fast food consumers, in particular.

27. McDonald's, like much of corporate America these days, publicly touts its commitment to diversity and inclusion, but this is nothing more than empty rhetoric as shown by the racial discrimination in contracting herein.

28. Racial discrimination in contracting is prohibited by the Civil Rights Act of 1866, codified at 42 U.S.C. § 1981, and the California Unruh Civil Rights Act. Section 1981, in particular, ensures that all people have the same right to make and enforce contracts "as is enjoyed by white citizens." The statute was enacted right after the Civil War to provide economic inclusion for freed slaves by eradicating racial discrimination in contracting.

29. Sadly, in the 150 years since this statute was enacted, African American businesses, and African American-owned media in particular, still have not been able to contract and achieve economic inclusion as enjoyed by white citizens and white-owned businesses.

30. By and through this action, Plaintiffs demand that McDonald's remedy the civil rights violations alleged herein and compensate Plaintiffs for the harm caused thereby as permitted by law, which is estimated to be in excess of $10 billion.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

**PARTIES**

31. Plaintiff Entertainment Studios is a California corporation headquartered in Los Angeles, California.

32. Plaintiff Weather Group is a Delaware limited liability company headquartered in Atlanta, Georgia.

33. Defendant McDonald's is a Delaware limited liability company headquartered in Chicago, Illinois. On information and belief, McDonald's is wholly owned by McDonald's Corporation, a Delaware corporation headquartered in Oakbrook, Illinois, just outside Chicago.

**JURISDICTION AND VENUE**

34. This Court has subject matter jurisdiction over this controversy under 28 U.S.C. § 1331 and 28 U.S.C. § 1367. This Court has personal jurisdiction over McDonald's under the specific jurisdiction doctrine as the claims asserted herein arose out of McDonald's contacts with the forum state.

35. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.

**FACTS COMMON TO ALL CAUSES OF ACTION**

36. Plaintiff Entertainment Studios was founded in 1993 by Byron Allen, an African American actor, comedian and media entrepreneur. Allen is the sole owner of Entertainment Studios.

37. Allen first made his mark in the television world in 1979 as the youngest comedian ever to appear on "The Tonight Show Starring Johnny Carson." He thereafter served as the co-host of NBC's "Real People," one of the first reality shows on television.

38. Alongside his "on-screen" career, Allen developed a keen understanding of the "behind the scenes" television business. Allen used his industry knowledge to build Entertainment Studios into an independent, global

media company.

**A. Allen Grows Entertainment Studios**

39. Initially, Entertainment Studios produced non-fiction television shows, including interview series (such as *Entertainers with Byron Allen*) and court television. These shows were distributed via broadcast syndication, which is the process of licensing shows to local broadcast affiliates without the need to contract with a broadcast network.

40. Entertainment Studios' television shows had general audience appeal, in that they did not specifically target any particular demographic group as the core audience. For example, the interview series *Entertainers with Byron Allen* features interviews of prominent celebrities (such as George Clooney, Tom Cruise, Julia Roberts, among many others) on the red carpet and gives the audience a behind-the-scenes look into blockbuster films featuring A-list stars.

41. Entertainment Studios did not own or operate networks during this early period, and so its programming ran on local broadcast networks in syndication.

42. In 2009, Entertainment Studios launched six high-definition television networks: Comedy.TV; Recipe.TV; MyDestination.TV; ES.TV; Pets.TV; and Cars.TV. In 2012, Entertainment Studios launched its seventh network, JusticeCentral.TV. These seven networks are referred to herein as the "ESN Lifestyle Networks."

43. The ESN Lifestyle Networks feature lifestyle programming with general audience appeal. The networks do not specifically target any racial demographic; they are not African American networks like, for example, Black Entertainment Television.

44. The ESN Lifestyle Networks feature content that has been nominated for, and won, Emmy® Awards.

45. These networks are widely distributed and have high viewer demand. By 2020, Entertainment Studios secured carriage contracts with more than 60 multi-

Miller Barondess, LLP
Attorneys at Law
1999 Avenue of the Stars, Suite 1000 Los Angeles, California 90067
Tel: (310) 552-4400 Fax: (310) 552-8400

channel video programming distributors ("MVPD"), including the largest MVPDs in the nation such as Comcast, AT&T U-Verse, Charter/Spectrum, DirecTV, AT&T TV Now, DISH Network, VerizonFIOS, Mediacom, Frontier Communications and RCN.  These MVPDs distribute the ESN Lifestyle Networks to over 180 million cumulative subscribers in all 50 states.

46.    In 2018, Allen, through Allen Media Group, a company he founded and solely owns, purchased Weather Group, the parent company that owns and operates The Weather Channel.

47.    For nearly four decades, The Weather Channel has been the leader in weather coverage, providing the most comprehensive analysis of any media outlet. For ten years in a row, Harris Poll has ranked The Weather Channel as the "TV News Brand of the Year," recognizing The Weather Channel as the most trusted brand in cable news for the past decade.

**B.    <u>McDonald's Pigeonholes Entertainment Studios as Black-Targeted</u>**

48.    McDonald's and its parent corporation are the world's leading global foodservice retailers with over 39,000 locations in over 100 countries.  In 2019, McDonald's worldwide stores generated over $100 billion in revenue.

49.    In 2019, McDonald's spent approximately $1.6 billion advertising on television in the United States.  Of that budget, McDonald's spent less than $5 million on African American-owned media companies.  To put that into perspective, McDonald's paid its CEO double that amount, more than $10 million, in 2020.

50.    For television advertising, McDonald's contracts with advertising agencies as intermediaries to facilitate buying advertising time on television networks.  These ad agencies are merely intermediaries.  McDonald's makes the ultimate decision whether to contract.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

51.    The typical contracting process for McDonalds's is as follows:  (1) the agency will submit a request for proposal ("RFP")[1] to the media company (here, Plaintiffs); (2) the media company will then present opportunities to advertise to the advertising agency; (3) the agency will present this opportunity to McDonald's; (4) McDonald's will decide whether it intends to offer a contract to the media company and, if so, on what terms; and (5) the agency will communicate that contract offer to the media company.  If an offer is made, it is either accepted or the parties will enter into negotiations.

52.    The media companies do not offer contracts to the agency or McDonald's.  Rather, in this industry, it is the opposite.  Media companies do not present deal terms, such as total amount of ad spend, pricing, and number of available ad spots.  Media companies present opportunities and McDonald's will make an offer to spend a certain amount of money at certain prices on certain media properties.

53.    McDonald's here refused to offer to contract with Plaintiffs to advertise on their networks and syndicated programming.  Plaintiffs repeatedly presented their advertising opportunities to McDonald's ad agencies, but McDonald's refused to offer advertising contracts on any terms for Plaintiffs' networks or broadcast syndicated programming.

54.    McDonald's also employs a "tiered" structure for advertising spending that explicitly differentiates on the basis of race.  For "general market" media companies (i.e. white-owned media companies), McDonald's contracts with a general market advertising agency who works with non-African American-owned

---

[1] In recent years, the RFP submitted by McDonald's general market agency is not a written RFP.  Rather, it is a video presentation.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

media companies to allocate McDonald's annual advertising budget.

55. But McDonald's has a different tier for African American media. For the McDonald's African American advertising budget—which is *de minimis* compared to the general market budget—McDonald's contracts with a different advertising agency. McDonald's African American advertising agency is Burrell Communications ("Burrell").

56. The African American tier is less favorable than the general market tier. McDonald's pays lower prices for African American advertising. McDonald's uses the Cost Per Thousand ("CPM") pricing mechanism to buy advertising time. McDonald's pays higher prices (higher CPMs) for general market media companies, but forces African American media companies to pitch for business using McDonald's lower CPM for African American content. This enables McDonald's to buy more advertising time for less money to reach African American audiences.

57. McDonald's also requires African American media companies to agree to contract guarantees in terms of reaching an African American audience. Thus, even if McDonald's agrees to purchase advertising time, McDonald's can refuse to spend the contract amount or force African American media companies to provide additional advertising for free if they do not hit the contract guarantees.

58. Entertainment Studios was shut out of the general market tier and forced to bid for advertising in the less favorable African American tier. Initially, McDonald's purchased advertising on Entertainment Studios' African American shows that ran in broadcast syndication. In doing so, McDonald's stereotyped the entire company as an African American media company.

59. For over two decades, McDonald's classified Entertainment Studios as a media company that owns and produces African American content, even though the ESN Lifestyle Networks have general audience appeal—they are not African American networks. McDonald's viewed Entertainment Studios as an African American media company because Entertainment Studios is owned by an African

American.

60. Entertainment Studios raised these issues with McDonald's, but nothing changed. Allen spoke directly with McDonald's former Chief Marketing Officer, Deborah Wahl, while she was CMO, and told her that McDonald's was discriminating against African American-owned media, and Entertainment Studios in particular. Ms. Wahl did not fix these issues and McDonald's continued discriminating against African American-owned media.

**C. McDonald's Continues Its Racial Stereotyping After Allen Acquires Weather Group**

61. McDonald's continued to label Entertainment Studios as an African American media company even after Allen acquired Weather Group in 2018. Allen acquired Weather Group for $300 million, and invested considerably in The Weather Channel. This has led to remarkable success, as The Weather Channel continues to be recognized as the most trusted brand in cable news.

62. The Weather Channel has broad, general audience appeal. It is not an African American network.

63. Yet, McDonald's shut out The Weather Channel from its general market advertising budget while, at the same time, advertising considerably out of its general market budget with similarly situated, white-owned channels. This is blatant racial discrimination, denying Plaintiffs the same right to make and enforce contracts as is enjoyed by white citizens, in violation of § 1981.

64. Since Allen acquired Weather Group, marketing representatives for Weather Group have pitched The Weather Channel to McDonald's ad agency. These presentations are made twice a year. One presentation is made in the Spring and another is made in the Fall.

65. These presentations showcase the significant advertising opportunities that are available for McDonald's on The Weather Channel. The presentations are updated to show how The Weather Channel is well suited to execute on a

Miller Barondess, LLP
Attorneys at Law
1999 Avenue of the Stars, Suite 1000 Los Angeles, California 90067
Tel: (310) 552-4400 Fax: (310) 552-8400

McDonald's specific ad campaign. Yet McDonald's refused to purchase any ad time on the network following each presentation. Weather Group asked for feedback from McDonald's, and McDonald's either did not give an explanation for its refusal to contract or gave a pretextual excuse.

66. In fact, McDonald's refused to contract with Weather Group to purchase advertising time on The Weather Channel each year since Allen acquired it in 2018, while at the same time contracting with white-owned media companies to advertise on similarly situated networks.

**D. <u>Plaintiffs Are Repeatedly Denied an Advertising Contract</u>**

67. McDonald's discriminatory treatment of Plaintiffs has been ongoing and pervasive for over a decade. Since the launch of Entertainment Studios' networks in 2009, ESN has made multiple offers each year to enter into a contract with McDonald's whereby McDonald's purchases advertising time on the networks. McDonald's has refused to contract.

68. Entertainment Studios has repeatedly sought to contract with McDonald's through its general tier advertising agency, OMD Worldwide ("OMD"). McDonald's has blocked these efforts to contract for several years.

69. OMD has confirmed that McDonald's will not even consider advertising with Entertainment Studios through OMD. This is racial discrimination that directly harms Entertainment Studios. OMD is the gatekeeper to McDonald's much larger general market advertising budget. By shutting Entertainment Studios out from OMD, McDonald's has effectively shut Entertainment Studios out from its general market advertising budget.

70. On June 18, 2012, OMD representative, Chris Geraci ("Geraci"), told Entertainment Studios' Darren Galatt ("Galatt"), that OMD would try to get Entertainment Studios more business with McDonald's. After speaking with McDonald's, Geraci told Galatt that McDonald's will not consider advertising with Entertainment Studios through OMD.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

71. Entertainment Studios continued to press in the hopes that McDonald's would change its mind and allow Entertainment Studios to pitch for business through OMD. As Entertainment Studios launched new networks and added more content that was not African American targeted, Entertainment Studios diligently tried to contract with McDonald's through OMD.

72. But McDonald's shut the door. On February 29, 2016, Debbie Innes ("Innes") of OMD expressly told Galatt that Burrell is the agency of record for McDonald's and Entertainment Studios.

73. McDonald's has recently claimed that OMD is responsible for making advertising decisions on behalf of McDonald's, but as the above shows, that is not true. Indeed, OMD's other clients, such as Pepsi and Hershey's, grant Entertainment Studios access to their general market advertising budgets through OMD.

74. Adding insult to injury, McDonald's refused to contract to advertise on Entertainment Studios' networks through its African American advertising agency. Entertainment Studios pressed for answers, but McDonald's would not explain the reasons for its refusals to contract.

75. Patrick Olson ("Olson"), Burrell's Associate Buying Director, admitted Burrell could not even get an explanation from McDonald's. Olson wrote to Galatt on January 25, 2019, stating Burrell is "constantly asking for feedback from McD's, radio silence. We'll advise when/if we hear anything, nothing we can share at the moment."

76. McDonald's has claimed in this litigation that Plaintiffs did not request a contract from McDonald's within the past two years. This claim is false.

77. Weather Group met with McDonald's agency OMD in or about November 2019 and requested McDonald's contract to advertise on The Weather Channel. Kristin Freibott, Kari Evans and Maggie Tibbitts of OMD attended the meeting. After the meeting, McDonald's did not offer to contract with Weather

Miller Barondess, LLP
Attorneys at Law
1999 Avenue of the Stars, Suite 1000 Los Angeles, California 90067
Tel: (310) 552-4400 Fax: (310) 552-8400

Group to advertise on The Weather Channel on any terms.

78. On or about April 20, 2020, Weather Group executives met with OMD representatives to request McDonald's contract to advertise on The Weather Channel. Emily Adams, Kari Evans and Maggie Tibbits of OMD attended the meeting. After the meeting, McDonald's did not offer to contract with Weather Group to advertise on The Weather Channel on any terms.

79. In or about early October 2020, Weather Group and Entertainment Studios met with OMD to request McDonald's contract to advertise on The Weather Channel and the ESN Lifestyle Networks. Entertainment Studios and Weather Group made this presentation as a portfolio group to circumvent McDonald's racial stereotyping so that OMD could finally consider Entertainment Studios' networks and other media properties. After the meeting, McDonald's did not offer to contract with Plaintiffs to advertise on The Weather Channel or the ESN Lifestyle Networks on any terms.

80. On October 28, 2020, the President (Ad Sales) of Weather Group, Barbara Bekkedahl, spoke with Chris Bocket, of OMD, to request McDonald's contract to advertise on The Weather Channel, the ESN Lifestyle Networks, and other media properties owned by Allen. After the meeting, McDonald's did not offer to contract with Plaintiffs to advertise on The Weather Channel or the ESN Lifestyle Networks on any terms.

81. On or about November 11, 2020, Weather Group met with OMD to request McDonald's contract to advertise on The Weather Channel, the ESN Lifestyle Networks, and other media properties owned by Allen. Emily Adams, Kari Evans and Maggie Tibbitts of OMD attended the meeting. After the meeting, McDonald's did not offer to contract with Plaintiffs to advertise on The Weather Channel or the ESN Lifestyle Networks on any terms.

82. On or about April 7, 2021, Weather Group and Entertainment Studios met with OMD to request McDonald's contract to advertise on The Weather

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

Miller Barondess, LLP
Attorneys at Law
1999 Avenue of the Stars, Suite 1000 Los Angeles, California 90067
Tel: (310) 552-4400 Fax: (310) 552-8400

Channel, the ESN Lifestyle Networks, and other media properties owned by Allen. Molly Nache of OMD attended the meeting. After the meeting, McDonald's did not offer to contract with Plaintiffs to advertise on The Weather Channel or the ESN Lifestyle Networks on any terms.

83. Entertainment Studios also continued to request that McDonald's contract to advertise on Entertainment Studios' programming that is distributed via broadcast syndication.

84. On July 25, 2019, Galatt submitted to Patrick Olson and Nick Violette of Burrell a request that McDonald's contract to advertise whereby McDonald's would purchase the following ad time: (1) one 30 second spot on *Funny You Should Ask* each weekday for 52 weeks at $5,000 per spot ($1.3 million total); (2) one 30 second spot on "Daily Network"[2] each weekday for 52 weeks at $10,500 per spot ($2.73 million total); and (3) ten 30 second spots on Entertainment Studios' special segments at $10,000 per spot ($100,000 total). McDonald's refused to contract.

85. Entertainment Studios continued to request an advertising contract from McDonald's for Entertainment Studios' syndicated programming in 2020 and 2021. On April 16, 2020, Galatt asked Patrick Olson of Burrell what McDonald's advertising plans were for the second half of 2020 and 2021. Galatt made this request so that Entertainment Studios and its syndicated programming would be considered for an advertising contract from McDonald's for the second half of 2020 and 2021. McDonald's refused to contract.

86. On December 9, 2020, Galatt sent a detailed presentation on behalf of

---

[2] "Daily Network" includes various syndicated programming such as *Comics Unleashed*, *America's Court w/ Judge Ross*, *Justice for All w/ Cristina Perez*, and many others.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

Entertainment Studios to Adele Lassere of Burrell in an effort to secure an advertising contract from McDonald's. McDonald's refused to contract.

87. Entertainment Studios wanted to pitch its syndicated programming to OMD so that it could potentially access McDonald's much larger general market advertising budget, but McDonald's continued to force Entertainment Studios to pitch its syndicated programming to Burrell as a result of the same racial profiling and stereotyping that McDonald's engaged in for over a decade.

88. McDonald's and its agencies did not disclose which McDonald's employees or officers made the decisions not to contract with Plaintiffs. Plaintiffs cannot allege this information without the benefit of discovery.

**E. <u>McDonald's Intentional Racism As Compared to Similarly-Situated, White-Owned Competitors</u>**

89. Entertainment Studios has suffered, and continues to suffer, significant harm as a result of McDonald's racism. Despite owning award-winning networks that are distributed by over 60 major MVPDs and reach over 180 million cumulative subscribers in all 50 states, McDonald's refused to advertise on the ESN Lifestyle Networks. In addition, McDonald's has not purchased advertising on The Weather Channel since Allen acquired it in 2018.

90. While refusing to purchase advertising time on the ESN Lifestyle Networks and The Weather Channel, McDonald's advertised on similarly situated, white-owned networks, including, but not limited to, Animal Planet, Cooking Channel, Comedy Central, CNN, Destination America, E!, Food Network, HLN, Motor Trend, Travel Channel, Oxygen, MSNBC, and many others.

91. These comparator networks are similarly situated with Plaintiffs' networks for several reasons, including that they (1) are carried by the same MVPDs and therefore reach the same subscribers, (2) feature similar content and (3) target and reach the same demographic age groups.

a. <u>The Weather Channel</u>: The Weather Channel features news and

information programming that targets and reaches the same audience as its competitor news and information networks, such as CNN, MSNBC and HLN. The Weather Channel and its competitor networks feature live news shows on weekday mornings and afternoons that target and reach the same audience. Like The Weather Channel, CNN, MSNBC and HLN also broadcast scripted news programs that feature in-depth reporting. The Weather Channel is also similar to CNN, MSNBC and HLN in that, for all four networks, over 75% of their audience is age 50 or older. From an advertiser's perspective, The Weather Channel is similarly situated in all material respects with CNN, MSNBC and HLN.

b. Cars.TV: Cars.TV features award-winning content for viewers interested in automotive content. Cars.TV broadcasts auto shows, private collections owned by celebrities (Jay Leno, Jerry Seinfeld, John Cena, and others), auto customizations and innovations, exclusive car auctions and racing content. The network Motor Trend features similar content, and it targets and reaches the same demographic age groups. From an advertiser's perspective, Cars.TV is similarly situated in all material respects with Motor Trend.

c. JusticeCentral.TV: JusticeCentral.TV is a 24-hour HD cable network that features courtroom shows that target and reach the same audience as true crime networks such as Oxygen and HLN. JusticeCentral.TV is also similar to Oxygen and HLN in that, for all three networks, over 75% of their audience is age 50 or older. From an advertiser's perspective, JusticeCentral.TV is similarly situated in all material respects with Oxygen and HLN.

d. Comedy.TV: Comedy.TV features standup comedy, comedy game shows and talk shows with comedians. Comedy.TV features similar content, and targets and reaches the same demographic age groups as Comedy Central. From an advertiser's perspective, Comedy.TV is similarly situated in all material respects with Comedy Central.

e. Recipe.TV: Recipe.TV features cooking shows that are similar

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

to, and that target and reach the same demographic age groups as, Food Network and Cooking Channel. From an advertiser's perspective, Recipe.TV is similarly situated in all material respects with Food Network and Cooking Channel.

f. MyDestination.TV: MyDestination.TV features travel-related content that is similar to, and that targets and reaches the same demographic age groups as, Destination America and Travel Channel. From an advertiser's perspective, MyDestination.TV is similarly situated in all material respects with Destination America and Travel Channel.

g. Pets.TV: Pets.TV features pet and animal-focused content that is similar to, and targets and reaches the same demographic age groups as, Animal Planet. From an advertiser's perspective, Pets.TV is similarly situated in all material respects with Animal Planet.

h. ES.TV: ES.TV features entertainment news programming, such as celebrity interviews and Hollywood news, that is similar to, and that targets and reaches the same demographic age groups as, E! From an advertiser's perspective, ES.TV is similarly situated in all material respects with E!

92. These allegations show that Plaintiffs' networks are similarly situated with white-owned networks that McDonald's advertises on. Moreover, the Ninth Circuit has held courts cannot determine on the pleadings alone that two networks are dissimilar. In *National Association of African American-Owned Media v. Charter Communications, Inc.*, 915 F.3d 617, 626 n.8 (9th Cir. 2019)[3], the Ninth Circuit held that the similarly situated inquiry with respect to television networks requires "a thorough comparison" that "would require a factual inquiry that is inappropriate in reviewing a 12(b)(6) motion." This holding is in line with federal

[3] While the Supreme Court vacated this decision, it did so on other grounds.

court decisions throughout the country.

**1. Plaintiffs' Media Properties Have Higher Ratings**

93. In this litigation, McDonald's has argued that Plaintiffs' networks and syndicated programming are not similarly situated with white-owned networks that McDonald's advertises on because Plaintiffs' networks and syndicated programming have lower viewership. This argument is unsupported and will be proven false at trial.

94. For the TV advertising market, programs and networks are similarly situated in all material respects even if they have different ratings (i.e., viewership). Differences in ratings can lead to differences in advertising revenue commitments and other contract terms, but that does not make networks dissimilar from an advertisers perspective and it does not justify a flat refusal to contract.

95. In addition, Entertainment Studios and Weather Group's networks and syndicated programming have higher viewership than networks that McDonald's paid to advertise on.

96. For example, McDonald's advertises on HLN and Destination America but not The Weather Channel. The Weather Channel has higher ratings and a wider distribution than these two networks, and yet McDonald's chooses to advertise on HLN and Destination American but not The Weather Channel.

97. In addition, Entertainment Studios' programming has higher ratings than networks that receive advertising revenue from McDonald's. Entertainment Studios packages its court drama programs. This package ("ES Court Combo") offers advertisers an opportunity to pay to advertise on these programs as they run in broadcast syndication. It grants advertisers the opportunity to reach more viewers than networks such as MSNBC, CNN, Oxygen and many other networks.

98. In 2021, ES Court Combo had an average Nielsen household rating of 0.78, which means 0.78% of households with a television watched these programs. This rating was much higher than the Nielsen household ratings for networks that

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

McDonald's pays to advertise on, such as MSNBC (0.44), CNN (0.34) and E! (0.08). ES Court Combo also had an average Nielsen rating for adults over the age of 18 of 0.42. This rating was much higher than the Nielsen adult ratings for networks that McDonald's pays to advertise on, such as MSNBC (0.25), CNN (0.19), and Oxygen (0.08).

**2. Plaintiffs' Media Properties Offer McDonald's A Better Opportunity To Reach Its Customers**

99. The ESN Lifestyle Networks and The Weather Channel are more popular with McDonald's and fast-food customers in general as compared to white-owned networks that McDonald's advertises on.

100. MRI-Simmons is the most well-known and trusted survey data provider in the television industry. Plaintiffs use MRI-Simmons survey data to better understand their audience. On information and belief, McDonald's and its advertising agencies use MRI-Simmons survey data as well.

101. Advertisers want to connect with and reach their own customers to make sure they continue to remain a customer. McDonald's is no different. MRI-Simmons survey data helps media companies and advertisers better understand how they are currently reaching their audience and where there are opportunities to grow their audience/customer base.

102. Plaintiffs' MRI-Simmons survey data shows that McDonald's customers are more likely to watch Entertainment Studios programming than Entertainment Studios' competitor networks.

103. Plaintiffs' MRI-Simmons survey data shows that a McDonald's customer over the age of 18 is fifteen percent (15%) more likely to watch Entertainment Studios programming as compared to the general population.

104. The viewers of Entertainment Studios' competitor networks, however, are much less likely to be McDonald's customers. MRI-Simmons survey data shows that McDonald's customers over the age of 18 are only:

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

a. four percent (4%) more likely to watch Animal Planet than the general population;

b. six percent (6%) more likely to watch Comedy Central than the general population;

c. two percent (2%) more likely to watch Cooking Channel than the general population;

d. five percent (5%) more likely to watch Destination America than the general population;

e. two percent (2%) more likely to watch Food Network than the general population;

f. one percent (1%) more likely to watch Motor Trend than the general population;

g. five percent (5%) more likely to watch Oxygen than the general population; and

h. four percent (4%) more likely to watch Travel Channel than the general population.

105. The same is true for The Weather Channel. McDonald's customers over the age of 18 are six percent (6%) more likely to watch The Weather Channel. Yet, McDonald's customers over the age of 18 are only one percent (1%) more likely to watch CNN, three percent (3%) more likely to watch MSNBC and four percent (4%) more likely to watch HLN.

106. Customers who eat at McDonald's regularly are even more likely to watch The Weather Channel as compared to CNN and MSNBC. McDonald's customers who eat at McDonald's four or more times a month are seventeen percent (17%) more likely to watch The Weather Channel as compared to the general population. Yet the same customers are five percent (5%) less likely to watch MSNBC and six percent (6%) less likely to watch CNN than the general population.

107. This MRI-Simmons data shows that if McDonald's were interested in

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

reaching its customers, which is a goal of nearly every advertiser, McDonald's would be more inclined to advertise on the ESN Lifestyle Networks and The Weather Channel as compared to the competitor networks.

108. Thus, The Weather Channel and the ESN Lifestyle Networks are similar—and in some cases more attractive—from an advertiser's perspective as compared to the comparator networks, and yet McDonald's chooses to spend its advertising budget on the comparator networks and not on The Weather Channel and the ESN Lifestyle Networks.

109. This is textbook differential treatment on the basis of race that violates the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the California Unruh Civil Rights Act.

**3. McDonald's Gave Plaintiffs Pretextual Excuses**

110. McDonald's refusal to contract is not based on race-neutral reasons as McDonald's claims. For example, McDonald's ad agency OMD told Weather Group that McDonald's did not purchase advertising on The Weather Channel because the network skews towards an older audience. But McDonald's contracts with older-skewing networks, such as Destination America and HLN. These networks have lower ratings than The Weather Channel and have less distribution, and yet McDonald's contracted to advertise on Destination America and HLN, but not The Weather Channel.

111. In addition, the ESN Lifestyle Networks target similar audiences as the white-owned networks that McDonald's contracts with for advertising. Recipe.TV, for example, features cooking shows that target similar audiences as Cooking Channel and Food Network. MyDestination.TV features travel-related content that targets similar audiences as Travel Channel and Destination America. Yet, McDonald's advertises on these white-owned networks but not the ESN Lifestyle Networks.

112. In the past, McDonald's African American ad agency Burrell has

claimed that McDonald's did not contract to advertise on the ESN Lifestyle Networks because they were not widely distributed. But the ESN Lifestyle Networks have successfully increased their distribution over the past several years and are now distributed by all major MVPDs to over 180 million cumulative subscribers in all 50 states. Entertainment Studios presented McDonald's African American ad agency with this data, and yet McDonald's still refuses to contract, while at the same time contracting with white-owned networks that have smaller distribution.

### F. **<u>McDonald's Racial Discrimination Is A "But For" Cause</u>**

113. The U.S. Supreme Court held in *Comcast Corp. v. National Association of African American-Owned Media*, 140 S. Ct. 1009 (2020), that, to allege "but-for" causation, plaintiffs are only required to allege that "but for race, [they] would not have suffered a loss of a legally protected right."

114. After *Comcast*, the U.S. Supreme Court in *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020), provided further guidance on the "but-for" test generally and particularly with respect to discrimination claims. The Court in *Bostock* held the "but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." The Court explained that a plaintiff does not need to prove that discrimination was the sole cause.

115. The Court in *Bostock* explained that the "but-for" test can be a "sweeping standard" because, "[o]ften, events have multiple but-for causes." The Court held that a defendant cannot avoid liability by claiming that some other factor contributed to the alleged injury. The Court held that as long as unlawful discrimination was one but-for cause, that is sufficient.

116. Here, racial discrimination was a but-for cause of the injury alleged herein under Supreme Court precedent. If Plaintiffs were white-owned, McDonald's would not have (1) forced Entertainment Studios to deal exclusively with McDonald's African American advertising agency, (2) deprived Entertainment

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

Studios access to McDonald's general market advertising budget and general market advertising agency, or (3) refused to contract to advertise on The Weather Channel, the ESN Lifestyle Networks and other non-print media owned by Allen.

117. If Plaintiffs were white-owned, Plaintiffs would have received tens of millions of dollars in advertising revenue from McDonald's on an annual basis.

118. Plaintiffs would also have avoided the costs and burdens they were forced to incur through the racially discriminatory contracting process that McDonald's created. McDonald's forced Entertainment Studios to request advertising contracts through a two-tiered system that gave Entertainment Studios no chance of success. Under this system, it was a virtual certainty that Entertainment Studios would not get a contract from McDonald's for its networks and syndicated programming.

119. The costs, burdens and expenses that Entertainment Studios incurred trying to get a contract through this two-tiered process harmed Entertainment Studios. Entertainment Studios seeks compensatory damages and other relief as a result of this discriminatory contracting process.

Miller Barondess, LLP
Attorneys at Law
1999 Avenue of the Stars, Suite 1000 Los Angeles, California 90067
Tel: (310) 552-4400 Fax: (310) 552-8400

## FIRST CAUSE OF ACTION

## (Violation of 42 U.S.C. § 1981)

120. Plaintiffs incorporate each of the foregoing and subsequent paragraphs as though fully set forth herein.

121. McDonald's has engaged in, and is engaging in, pernicious, intentional racial discrimination in contracting in violation of § 1981. Section 1981 broadly prohibits racial discrimination in contracting. The statute is broad, covering "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

122. African Americans are a protected class under § 1981. Entertainment Studios and Weather Group are members of that class because they are African American-owned companies.

123. As alleged herein, Entertainment Studios and Weather Group attempted many times over the years to contract with McDonald's for advertising on the ESN Lifestyle Networks and The Weather Channel, but McDonald's refused. These refusals to contract occurred within the past two years. Yet McDonald's continued to contract with—and make itself available to contract with—similarly situated, white-owned television networks and to advertise on those networks.

124. In addition, McDonald's shut the door for Entertainment Studios and Weather Group, preventing them from accessing McDonald's large, general market advertising budget.

125. Racial discrimination is the but-for cause of McDonald's refusal to contract. If Entertainment Studios and Weather Group were white-owned companies, they would have been able to access McDonald's large, general market advertising budget and they would have received millions of dollars each year from McDonald's in advertising revenue on the ESN Lifestyle Networks and The Weather Channel.

126. McDonald's also subjected Plaintiffs to a racially discriminatory contracting process that is unfair and illegal. By forcing Entertainment Studios to bid for business in the less-favorable African American tier, McDonald's forced Entertainment Studios to incur unnecessary expenses and costs.

127. McDonald's violations of § 1981 as alleged herein caused Plaintiffs to lose advertising revenue, suffer significant lost profits, and experience a substantial diminution in the value of Plaintiffs' businesses, which will conform to proof at trial but is estimated to be $10 billion, plus punitive damages for intentional, oppressive and malicious racial discrimination.

## SECOND CAUSE OF ACTION

**(Violation of the Unruh Civil Rights Act)**

128. Plaintiffs incorporate each of the foregoing and subsequent paragraphs as though fully set forth herein.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

129. The Unruh Civil Rights Act creates a cause of action for any person who is denied the right to full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever based on that person's sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status.

130. California Civil Code section 51.5, subsection (a), provides, in relevant part, that "No business establishment of any kind whatsoever shall discriminate against . . . or refuse to buy from, contract with, sell to, or trade with any person in this state on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51, or of the person's partners, members, stockholders, directors, officers, managers, superintendents, agents, employees, business associates, suppliers, or customers, because the person is perceived to have one or more of those characteristics, or because the person is associated with a person who has, or is perceived to have, any of those characteristics."

131. California Civil Code section 51, subsection (b), provides "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."

132. McDonald's has violated the California Civil Code section 51.5 by intentionally discriminating against Plaintiffs on the basis of race.

133. Plaintiffs are members of a protected class (African American-owned businesses), that were qualified to do business with McDonald's and qualified to receive advertising revenue for the ESN Lifestyle Networks and The Weather Channel, but were denied the opportunity to contract with McDonald's for such revenue because they are African American-owned networks.

134. As a result of McDonald's intentional racial discrimination, Plaintiffs

Miller Barondess, LLP
Attorneys at Law
1999 Avenue of The Stars, Suite 1000 Los Angeles, California 90067
Tel: (310) 552-4400 Fax: (310) 552-8400

are entitled to actual and treble damages in addition to attorneys' fees and costs, which all together are estimated to exceed $10 billion.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment as follows:

1. General and special damages according to proof at trial;
2. Punitive and exemplary damages;
3. Treble damages under the Unruh Civil Rights Act;
4. Attorneys' fees, costs and interests allowable under the law; and
5. For such other relief as the Court deems just and proper.

DATED: December 23, 2021 MILLER BARONDESS, LLP

By: *_/s/ Louis R. Miller_*
LOUIS R. MILLER
Attorneys for PLAINTIFFS

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

29 Case No. 2:21-cv-04972-FMO-MAA
PLAINTIFFS ENTERTAINMENT STUDIOS NETWORKS, INC. AND WEATHER GROUP, LLC'S THIRD AMENDED COMPLAINT

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all claims so triable asserted in the Complaint.

DATED: December 23, 2021 MILLER BARONDESS, LLP

By: */s/ Louis R. Miller*
LOUIS R. MILLER
Attorneys for PLAINTIFFS

30 Case No. 2:21-cv-04972-FMO-MAA
PLAINTIFFS ENTERTAINMENT STUDIOS NETWORKS, INC. AND WEATHER GROUP, LLC'S THIRD AMENDED COMPLAINT

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

# CERTIFICATE OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 1999 Avenue of the Stars, Suite 1000, Los Angeles, CA 90067.

On December 23, 2021, I served true copies of the following document(s) described as:

**PLAINTIFFS ENTERTAINMENT STUDIOS NETWORKS, INC. AND WEATHER GROUP, LLC'S THIRD AMENDED COMPLAINT**

on the interested parties in this action as follows:

**BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on December 23, 2021, at Los Angeles, California.

/s/ Tisarai Johnson
Tisarai Johnson