1  LOUIS R. MILLER (State Bar No. 54141)
   smiller@millerbarondess.com
2  DAVID W. SCHECTER (State Bar No. 296251)
   dschecter@millerbarondess.com
3  MURAD SALIM (State Bar No. 342747)
   msalim@millerbarondess.com
4  MILLER BARONDESS, LLP
   2121 Avenue of the Stars, Suite 2600
5  Los Angeles, California 90067
   Telephone:  (310) 552-4400
6  Facsimile:  (310) 552-8400

7  Attorneys for PLAINTIFFS

8

   **UNITED STATES DISTRICT COURT**

9

   **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

10

11

12  ENTERTAINMENT STUDIOS          **CASE NO. 2:21-cv-04972-FMO-MAA**
    NETWORKS, INC., a California
13  corporation; WEATHER GROUP,     **DECLARATION OF DAVID W.**
    LLC, a Delaware limited liability  **SCHECTER IN SUPPORT OF**
14  company                        **PLAINTIFFS' REPLY IN SUPPORT**
                                   **OF THEIR MOTION FOR**
15           Plaintiff,            **LIMITED EXTENSION OF FACT**
                                   **DISCOVERY DEADLINE**
16       v.

17  McDONALD'S CORPORATION, a
    Delaware corporation
18
             Defendant.           Assigned to: Hon. Fernando M. Olguin;
19                                Hon. Maria A. Audero

20                                Complaint Filed:   May 20, 2021
                                  Case Removed:      June 18, 2021
21                                Discovery Cut-Off:  Feb. 13, 2023
                                  Final PTC:         Sept. 1, 2023
22                                Trial Date:        Sept. 19, 2023

23

24

25

26

27

28

600942.1

DECLARATION OF DAVID W. SCHECTER IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR
MOTION FOR LIMITED EXTENSION OF FACT DISCOVERY DEADLINE

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

## DECLARATION OF DAVID W. SCHECTER

I, David W. Schecter, declare as follows:

1.      I am an attorney duly admitted to practice before this Court.  I am a Partner with Miller Barondess, LLP, counsel of record for Plaintiffs.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify to all of said facts.  I make this declaration in support of Plaintiffs' Reply in Support of Their Motion for Limited Extension of Fact Discovery Deadline.

### Plaintiffs' Corporate Culture Allegations

2.      A true and correct copy of the Second Amended Complaint in *Washington, et al. v. McDonald's USA, LLC, et al.*, Case No. 4:21-cv-00367-BYP, is attached hereto as **Exhibit A**.

3.      A true and correct copy of the Complaint in *Peaster v. McDonald's Corp., et al.*, Case No. 1:22-cv-07037, is attached hereto as **Exhibit B**.

### Plaintiffs' Diligence

4.      On February 10, 2023, Plaintiffs completed the deposition of Morgan Flatley, the Global CMO of McDonald's Corp.

5.      On February 14, 2023, the parties completed the deposition of third-party witness Lynnwood Bibbens.

6.      Plaintiffs and counsel have been diligently working to meet the February 21, 2023 deadline for expert disclosures.  Plaintiffs and counsel have devoted significant time and resources to meet this deadline.

7.      After the January 17, 2023, informal discovery conference with Judge Audero, I met and conferred with counsel for McDonald's over e-mail and by phone.  These meet and confer efforts took place over several weeks.  Some of that correspondence is attached to the Declaration of Amy Andrews filed in support of McDonald's Opposition.  I do not recall counsel for McDonald's claiming prejudice generally, or specifically regarding the expert disclosure deadline or summary

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1   judgment deadline, during those meet and confer discussions.

2       8.      In addition to that correspondence, on January 31, 2023 McDonald's

3   counsel Amy Andrews and I communicated via e-mail regarding the deposition of

4   Christopher Kempczinski and the transfer of the Northern District of Illinois matter

5   to this Court. A true and correct copy of this January 31, 2023 email is attached

6   hereto as **Exhibit C**.

7       9.      During this period, Plaintiffs retained counsel in Chicago to represent

8   them in the open miscellaneous action pending between the parties in the Northern

9   District of Illinois.  The Northern District of Illinois has assigned the Honorable

10  Martha M. Pacold to the case, and she has set a briefing schedule on McDonald's

11  motion to quash. A true and correct copy of this January 30, 2023 Order is attached

12  hereto as **Exhibit D**.  Plaintiffs are on track to file an opposition to that motion,

13  along with a motion to compel and motion to transfer, on or before the February 21

14  deadline.

15      I declare under penalty of perjury under the laws of the United States of

16  America that the foregoing is true and correct.

17      Executed on this 16th day of February, 2023, at Los Angeles, California.

18

19

20

21

22

23  _____
    David W. Schecter

24

25

26

27

28

600942.1

2

DECLARATION OF DAVID W. SCHECTER IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR LIMITED EXTENSION OF FACT DISCOVERY DEADLINE

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

## INDEX OF EXHIBITS TO THE DECLARATION OF DAVID W. SCHECTER

| Exhibit No. | Description | Pg. No. |
|---|---|---|
| A. | *Washington, et al. v. McDonald's USA, LLC, et. al*, Complaint, Case No. 4:21-cv-00367-BYP, Filed May 26, 2021 | 4-102 |
| B. | *Michael Peaster v. McDonald's Corporation and Christopher Kempczinski*, Complaint, Case No. 1:22-cv-07037, Filed December 14, 2022 | 103-137 |
| C. | January 31, 2023 Email from Amy Andrews to David W. Schecter, Subject ESN, et al. v. McDonald's USA | 138-140 |
| D. | Minute Entry re Movants' Motion to Quash or Otherwise Prevent the Enforcement of a Subpoena, Case No. 1:23-cv-00529, Filed January 30, 2023 | 141-142 |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

600942.1

3

DECLARATION OF DAVID W. SCHECTER IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR LIMITED EXTENSION OF FACT DISCOVERY DEADLINE

Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

<table>
<tr><td>

**WASHINGTON,** *ET AL.*

    *Plaintiffs,*

v.

**MCDONALD'S USA, LLC,** *ET AL.,*

    *Defendants.*

</td><td>

Case No. 4:21-cv-367

Judge Benita Y. Pearson

Magistrate Judge Kathleen B. Burke

</td></tr>
</table>

**SECOND AMENDED COMPLAINT WITH JURY DEMAND**

### NATURE OF ACTION

1.    Plaintiffs Herbert L. Washington, HLW Fast Track, Inc., HLW Fast Track PA, LLC, and Air Arch, Inc. bring this civil-rights action to hold McDonald's, the world's largest franchisor, accountable for its racial discrimination and retaliation against Mr. Washington as a Black franchisee.

2.    In his four decades in the McDonald's system, Mr. Washington has suffered deplorable treatment as compared with White franchisees. As but one example discussed below, McDonald's purposefully steered Mr. Washington into stores in distressed, predominantly Black neighborhoods, which—as McDonald's well knew— yield considerably less profit than stores in more affluent communities.

3.    When Mr. Washington spoke up for himself and other Black franchisees, McDonald's told him to sit down and be quiet. McDonald's then discriminated further against Mr. Washington for daring to stand up for himself and to challenge McDonald's racial discrimination. And McDonald's has continued to lash out at Mr.

**Exhibit A
Page 5**

Washington for filing this case, tarnishing his well-earned reputation as an outstanding McDonald's operator with baseless criticisms of his business acumen.

4.     McDonald's acknowledged its discriminatory racial-steering policy decades ago and promised to ensure parity for its Black franchisees. Black franchisees like Mr. Washington relied on these promises from McDonald's in deciding to remain in the system and continue to operate their restaurants. But the discriminatory policies did not cease, and the promised parity remains unfulfilled. Indeed, from the time McDonald's admitted its discriminatory racial-steering policy, the profitability gap between White and Black franchisees has grown and Black franchise ownership has plummeted.

5.     In addition to redlining Black franchisees into largely low-volume stores in impoverished communities, McDonald's has consistently discriminated against Black franchisees. Black owners average around $700,000 less in annual sales per store than White owners. This is not a coincidence. Nor is it because Black franchisees are comparatively worse at running businesses. The precipitous decline in Black franchisees and persistent disparity in cash flow are the direct and proximate result of McDonald's ongoing policies of racially disparate treatment.

6.     Black franchise ownership was already in decline when Steven Easterbrook and Chris Kempczinski entered senior leadership as the CEO and president of Defendants McDonald's Corporation and president of McDonald's USA, LLC, respectively. Mr. Easterbrook took over at McDonald's Corporation when Don Thompson retired in 2015. Mr. Kempczinski assumed the position of president of

**Exhibit A
Page 6**

McDonald's USA, LLC when Mike Andres retired in 2016. These new executives' hostility toward Black individuals in positions of power and authority was clear to those in the C-suite immediately. And that hostility trickled down through the organization to the field offices. Since Messrs. Easterbrook and Kempczinski took the reins, there has not been a single Black executive in the Columbus field office, the regional office with authority over Mr. Washington's operation. The Easterbrook-Kempczinski regime intensified the push to reduce Black franchise ownership, resulting in the all-time low that exists today.

7.      While McDonald's has joined the chorus of brands releasing hollow solidarity statements in support of Black Lives Matter and has launched a marketing campaign to profit from that movement, it has done nothing to change its own internal policies that perpetuate systemic racism by disadvantaging and squeezing out its Black franchise owners.

8.      Just a few years ago, Mr. Washington was McDonald's largest Black franchisee in the nation. As part of its effort to reduce Black ownership in its system, McDonald's targeted Mr. Washington for unfair grading and assessments designed to render him ineligible to continue to operate his restaurants. It did so to force him to sell numerous stores to White franchisees. McDonald's coupled these efforts with demands for him to make massive capital investments into the same restaurants it was working to take from him: expenditures that would inure to the benefit of the White franchisees in whose hands McDonald's would approve his stores to land. Each of the restaurants McDonald's forced Mr. Washington to sell has been transferred to a White franchisee.

McDonald's created the disparities between White and Black franchisees and is now manipulating those disparities to drive Black franchisees, including Mr. Washington, from the McDonald's system and create the illusion of parity in earnings.

9.      When Mr. Washington protested the discriminatory treatment he was enduring—telling McDonald's **"I am not a house negro and will not be treated like one"**—McDonald's intensified its campaign to drive him from its system in retaliation for his opposition to the discrimination.

10.     One store at a time, McDonald's continues to deprive Mr. Washington of the fruits of his lifetime of labor. He brings this action to end the unequal treatment, stop the retaliation, and recover damages for the discrimination he has endured.

### PARTIES

11.     Plaintiff Herbert L. Washington is a resident of Mahoning County, Ohio. He is Black.

12.     Plaintiff HLW Fast Track, Inc. is incorporated under the laws of the state of New York, licensed to do business in Ohio, and is the assignee of certain of the rights in the franchise agreements that Mr. Washington entered with McDonald's regarding stores in Ohio. Mr. Washington is the president and sole owner of HLW Fast Track, Inc. Its office is in Mahoning County, Ohio.

13.     Plaintiff HLW Fast Track PA, LLC is a Pennsylvania limited liability company and is the assignee of certain of the rights in the franchise agreements that Mr. Washington entered with McDonald's regarding stores in Pennsylvania. Mr. Washington is the president and sole owner of HLW Fast Track PA, LLC. Its office is in Mahoning County, Ohio.

14.     Plaintiff Air Arch, Inc. is an Ohio corporation and was the assignee of certain of the rights in the franchise agreement that Mr. Washington entered with McDonald's regarding a store located at 8210 Euclid Avenue, Cleveland, Ohio ("Beacon Place store"). Mr. Washington is the president and primary shareholder of Air Arch, Inc. Its office is in Mahoning County, Ohio. Mr. Washington and his corporate entities are referred to collectively as "Plaintiffs" or "Mr. Washington."

15.     Defendant McDonald's Corporation is a publicly traded Delaware corporation. Its wholly owned subsidiary, Defendant McDonald's USA, LLC, is a Delaware limited liability company that is the franchisor of McDonald's restaurants in the United States. In recognition of the fact that they essentially function as a single entity for present purposes, they are referred to collectively as "McDonald's" throughout this complaint. Their principal place of business is in Illinois.

### JURISDICTION & VENUE

16.     Jurisdiction is asserted under 28 U.S.C. § 1343(a)(4) because this action seeks to recover damages and secure equitable relief under an act of Congress providing for the protection of civil rights. Jurisdiction also exists under 28 U.S.C. § 1331, as well as 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds $75,000 (exclusive of interest and costs). Jurisdiction over state-law claims is asserted under 28 U.S.C. § 1367.

17.     The Court has personal jurisdiction over Defendants and venue is proper here under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district and most of the property that is the subject of the action is situated here.

**Exhibit A**
**Page 9**

### FACTUAL BACKGROUND

18.   Plaintiff Herbert L. Washington has been a McDonald's franchisee for 40 years. He was born in 1951 in Mississippi. He grew up in Flint, Michigan, where his parents were union automotive workers.

19.   Before becoming a McDonald's franchisee, Mr. Washington was a world-class athlete. He attended Michigan State University on a track scholarship. He was a four-time All-American, won seven Big Ten Titles and an NCAA championship, and narrowly missed the 1972 Olympic track team.

20.   In 1972, Mr. Washington participated in a protest at a Michigan State men's basketball game over the lack of Black coaches and officials in the Big Ten. As a scholarship athlete, it was a huge risk for Mr. Washington to take. But he believed then, as he believes now, in standing up to injustice. The following season, Tom Rucker became the first Black men's basketball official in the Big Ten. Five decades later, there is just one Black men's basketball head coach in the entire conference (Juwan Howard, at the University of Michigan).

21.   After graduating from Michigan State, Mr. Washington played for the Oakland Athletics professional baseball team from 1974–75. Four years later, he became a McDonald's franchisee. Since then, he has been the victim of McDonald's predatory, racially biased steering practices and other disparate treatment, as well as retaliation for his opposition to the discrimination Black franchisees have long endured in the McDonald's system.

**The unequal power balance in the franchisor-franchisee relationship**

22.    McDonald's is the world's largest franchisor and one of the largest owners of commercial real estate on the planet. While it owns and operates certain of its restaurants through its wholly owned subsidiary, McOpCo, most stores are owned by individual franchisees. McDonald's business model consists of charging fees to franchisees for the right to operate a restaurant, typically on land and in buildings owned by McDonald's and leased by franchisees.

23.    When franchisees buy into the McDonald's system, they become captive tenants, under a 20-year franchise agreement with McDonald's. An example of the standard franchise agreement and operator's lease is attached as Exhibit 1. Mr. Washington has signed many such contracts with McDonald's in the past 40 years. In each of those contracts, McDonald's had far greater bargaining power than Mr. Washington.

24.    Per the franchise agreements, the franchisee pays initial fees to McDonald's for the right to operate a McDonald's restaurant at that location for a 20-year period. At the end of the 20-year term, the lease must be renewed for the franchisee to continue operating the store. There are minimum monthly base rent payments, in addition to rent payments calculated based on a percentage of gross sales revenue. Those percentages vary from store to store and are in McDonald's sole control to adjust. McDonald's grants rent relief to the franchisees it chooses and denies it to others (disproportionately assisting White franchisees and refusing similar requests from Black franchisees). There are monthly services fees, contributions for collective

**Exhibit A
Page 11**

advertising, and other fees and royalties similarly calculated based on percentages of gross sales revenue.

25.     Franchisees are responsible for all operational costs, including insurance, maintenance, security, and property taxes. Franchisees must purchase corporate-supplied or approved equipment and food; submit to site inspections and monitoring; and follow McDonald's policies for training, accounting, human resources, and all other aspects of operation. Franchisees must also perform improvements, renovations, and rebuilds as directed by McDonald's and on the timetables McDonald's sets. These costly reinvestments are required at the sole expense of the franchisee.

26.     Owning multiple stores is the key to success in the McDonald's system. It allows a franchisee to maintain sufficient cash flow across all stores to weather unexpected expenses at any one location and to make customary investments in facilities and equipment. Owning many stores also allows franchisees to absorb the financial impact of McDonald's initiatives and mandates, from offering certain products to overhauling the entire physical appearance of the store.

27.     Under the standard franchise agreement, McDonald's agrees to make available to all franchisees the additional services, facilities, rights, and privileges relating to the operation of a restaurant that McDonald's makes generally available to all its franchisees. Whereas McDonald's fulfilled that obligation to its White franchisees, it violated this provision as to Mr. Washington due to his race.

**Exhibit A
Page 12**

28.     The franchisor-franchisee relationship is not an equal one. McDonald's tightly controls who may enter its system, which store(s) they may purchase, and how they must operate.

29.     McDonald's wields its extreme power to keep franchisees compliant.

30.     McDonald's alone determines whether franchisees are eligible for growth (whether they can acquire new stores) and rewrite (whether they will be granted a new lease to continue operating their existing stores when their 20-year terms expire). Eligibility for growth and renewal depends on the periodic assessments that McDonald's conducts of a franchisee's organization. At the term's conclusion, McDonald's maintains the discretion to enter a new lease with the franchisee, select a different franchisee, or close the store. Franchisees must strictly adhere to McDonald's dictates or risk being deemed ineligible and losing everything.

31.     Under McDonald's rewrite policy, the process begins three years before the franchise term expires. McDonald's exercises complete and unfettered discretion to unilaterally deny a franchisee a renewed franchise term through a variety of subjective metrics (such as whether a franchisee has a good attitude or is cooperative). These assessments are conducted by the local field office as part of bi-annual assessments of a franchisee's organization.

32.     The local field office makes recommendations to the Rewrite Committee, which—on information and belief—are almost always followed. The Rewrite Committee's decisions are final. If the committee denies a rewrite, the franchisee has no recourse. The franchisee must sell the store, inevitably at a loss, if McDonald's will

**Exhibit A
Page 13**

Case 2:21-cv-04972-FMO-MAA   Document 106-1   Filed 02/16/23   Page 15 of 145   Page ID
#:1921
Case: 4:21-cv-00367-BYP   Doc #: 33   Filed:  05/26/21   10 of 54.   PageID #: 1234

approve someone to buy it. McDonald's dictates to whom such a sale can be made and on what terms. Franchisees have no opportunity to sell their restaurants on the open market to ascertain fair market value. McDonald's fully controls the exiting process.

33.    Even through the exiting process, McDonald's exercises various tactics to manipulate franchisees such as cutting sales volume by encroaching on their territory or altering advertising to skew against a franchisee's customer base. Such tactics depress resale value as they are being forced out. Franchisees must comply with McDonald's directives or risk financial ruin.

### McDonald's longstanding and demonstrable policy of discrimination

34.    When the McDonald's franchise system was established in 1955, its restaurants were located only in White neighborhoods and owned exclusively by White franchisees. McDonald's permitted its franchisees to enforce segregation in its restaurants and even to take legal action against the NAACP and the Student Non-Violent Coordinating Committee when they protested this discrimination.

35.    During the 1960s, White flight to the suburbs led to changing neighborhood demographics, with McDonald's locations once in predominantly White neighborhoods now located in predominantly Black ones.

36.    In the wake of the assassination of Dr. Martin Luther King, Jr., in April 1968, and the civil unrest that followed over that summer, McDonald's finally opened its franchising operations to some Black entrepreneurs. Herman Petty became the first Black owner-operator of a McDonald's, on December 21, 1968. His store was in inner-city Chicago. Four years later, Mr. Petty co-founded the National Black McDonald's Operators Association (NBMOA).

**Exhibit A
Page 14**

37.    But the admission of Black franchisees into the McDonald's system was not on equal terms with White franchisees. McDonald's began the practice of so-called "zebra" or "salt-and-pepper" partnerships in predominantly Black neighborhoods. In these "partnerships," Black co-owners were figureheads who managed a store's day-to-day operations while White investors reaped profits as silent partners.

38.    In Cleveland, local Black businessman Ernest Hilliard wanted to purchase a McDonald's franchise. He made a deal with Orville Benson, a White McDonald's franchisee, to purchase a store Mr. Benson owned on Cleveland's East Side. But McDonald's refused to approve the deal. Community leaders met with McDonald's to urge approval. Just before a second meeting with McDonald's leadership was scheduled to take place, Mr. Hilliard was murdered in front of his Warrensville Heights home. His murder remains unsolved.

39.    After Mr. Hilliard's murder, Operation Black Unity—a coalition of local churches and civil-rights groups co-chaired by Reverend Donald S. Jacobs, Reverend Jonathan Ealy, and William O. Walker—led a boycott of four White-owned McDonald's restaurants in predominantly Black neighborhoods on Cleveland's East Side for more than a month in the summer of 1969. The boycott led to the four stores—at 13705 Euclid Avenue, 10411 St. Clair Avenue, 14235 Kinsman, and 9101 Kinsman—temporarily closing for a month as the NAACP, the Urban League, and the Southern Christian Leadership Conference supported the effort.

40.    Negotiations throughout the summer were unsuccessful. Even as White franchisees expressed their willingness to sell, McDonald's would not relent.

**Exhibit A
Page 15**

Cleveland Mayor Carl Stokes—the nation's first Black mayor of a major city—stepped in to mediate and finally convinced McDonald's to agree to permit Black ownership at those four stores.

41.     Unable to continue restricting franchise ownership to Whites, McDonald's began targeted marketing campaigns in the Black community and enticed Black entrepreneurs into its system as part of a growth strategy designed to expand its customer base and prey on aspiring businessowners. McDonald's steered Black would-be franchisees into Black neighborhoods with low-volume sales and disproportionately high overhead costs. This discriminatory company policy allowed McDonald's to capitalize on the lower real-estate prices in disadvantaged areas and increase sales in the Black community, while shifting the costs and risks to Black franchisees relegated to those urban areas. The stores McDonald's approves Black franchisees to own require consistently higher proportional investment of time, effort, and money to operate given the myriad challenges of successfully operating a business is communities with high crime and poverty rates.

42.     These underperforming stores to which McDonald's limited Black franchisees were often the oldest stores in the geographic area and in need of substantial reinvestment. McDonald's demanded that the reinvestment be completed on a swift timetable despite knowing that the franchisees would not reap the return on such investments. White entrepreneurs were customarily offered newer and safer stores with higher volume than the stores McDonald's permitted Black entrepreneurs to acquire.

43.     This policy of steering Black franchisees into underperforming stores allowed McDonald's to reap the benefits (rent payments and service fees deducted off each store's gross sales) of operating stores in predominantly minority communities while keeping Black franchisees trapped in a lower tier of success than its White owners who were not similarly steered. McDonald's makes money no matter where a store is located, or how much a franchisee must spend to operate the store after McDonald's cut is deducted from the gross sales. Putting Black franchisees into the most difficult and challenging locations allowed McDonald's to profit from the stores' continuous revenues while allowing McDonald's to save its best and most profitable locations for its White owners.

44.     In addition to redlining Black franchisees into low-volume stores in predominantly Black communities, McDonald's has consistently discriminated against Black franchisees in other respects—treating them differently from White franchisees. Some examples include: denying reasonable requests for financial assistance (such as permanent rent relief) and restructuring plans for Black franchisees to remedy the injuries caused by relegating them to substandard locations; denying impact relief and other financial support; targeting Black franchisees for harsh and unreasonable site inspections as a means of harassing and pressuring Black franchisees to exit the system (particularly if they objected to the endless discrimination they endured). On more than one occasion, field office personnel have been instructed to "go find something" to criticize a disfavored franchisee. Harshly evaluating a franchisee's performance at a store in a

disadvantaged community is particularly unfair given the inherent challenges faced by all business owners in poor communities. White franchisees did not endure this treatment.

45.     McDonald's does not welcome criticism of its racially biased policies or the unfair outcomes they cause. McDonald's uses its renewal power as a tool to stifle dissent and continue its discriminatory treatment of Black franchisees. That power— to deprive a franchisee of not only the right to do business going forward but to leverage total forfeiture of a franchisee's investment of time and resources— facilitates discrimination in perpetuity. Most Black franchisees were and remain afraid to publicly object to the ongoing disparate treatment they endure.

46.     Some Black franchisees nonetheless have publicly objected to McDonald's racist steering and otherwise discriminatory policies. In 1983, McDonald's sued a Black franchisee in Los Angeles, Charles Griffis, claiming that he was in violation of his franchise agreement because his wife operated a Popeye's Fried Chicken. Mr. Griffis countersued McDonald's for race discrimination, alleging he had been steered into "hellholes" and denied the chance to purchase a store in a "good neighborhood." McDonald's general counsel publicly characterized Mr. Griffis's race-discrimination claims as "bogus," but the company nevertheless paid him $4.7 million to settle the dispute.

47.     Unlike Mr. Griffis, most Black franchisees were fearful of publicly calling out McDonald's for its racist steering practices and other discriminatory treatment. They advocated for fairness through the NBMOA. In the years following the Griffis lawsuit,

the NBMOA continuously objected to the fact that McDonald's confined Black franchisees to poor neighborhoods and did not permit them to expand on equal terms with their White counterparts.

48.    In 1996, McDonald's admitted its policy of racial steering, with Executive Vice President Thomas S. Dentice writing to the NBMOA: "for business reasons we thought valid at the time, the Company has placed many Black Franchisees in restaurants that have not allowed them to achieve the same level of economic success as their peers." He promised to "create and implement a strategy designed to achieve parity for African American franchisees."

49.    The NBMOA continued to advocate for the promised parity in the coming years. Mr. Washington was deeply involved in that effort as the NBMOA's vice president and a board member working to obtain commitments from McDonald's to level the playing field for Black and White owners to remedy the company's longstanding and demonstrable practice of discriminatory racial steering.

50.    McDonald's continued to lead the NBMOA and its members to believe that McDonald's was committed to remedying the discriminatory practices of the past and ensuring that they did not continue. Mr. Washington reasonably relied on McDonald's promises to achieve parity for Black franchisees. But McDonald's promises of parity turned out to be empty. McDonald's never ceased the disparate treatment that continues to injure Black franchisees despite its repeated promises to do so. During the decade after McDonald's promised to achieve parity, Black franchise ownership plummeted. That trend did not abate despite having a Black chief

**Exhibit A
Page 19**

executive, Don Thompson, for three years (2012–15). And the mass exodus of Black owners accelerated when Steven Easterbrook replaced Mr. Thompson in 2015.

51.     The Easterbrook administration took the McDonald's enterprise from bad to worse in terms of intentional race discrimination. Mr. Easterbrook and his right-hand man, Mr. Kempczinski, continued the past practices of denying Black franchisees equal opportunities for growth and renewal, rejecting requests for equal rent relief, and confining Black franchisees to low-volume stores in predominantly Black neighborhoods. They also implemented remodeling initiatives that were designed to force Black franchisees out of the McDonald's system.

52.     McDonald's implemented these remodeling initiatives in a manner designed to make it impossible for Black franchisees to comply on McDonald's unreasonable timetables, given that they were generally confined to low-volume stores without the cash flow for mandated capital investments. Through these intentional policies and practices, Mr. Easterbrook and Mr. Kempczinski successfully tripled the cash-flow gap between Black and White franchisees and continued the trend of driving Black owners out while insisting that they pour cash into bad locations. These initiatives were a pretext for forcing Black franchisees out of the system—particularly long-term franchisees like Mr. Washington, who managed through his hard work to achieve and maintain liquidity despite the acknowledged lack of parity over his career—for the benefit of the predominantly White franchisees who would scoop up the stores as Black franchisees were squeezed out by design. Having steered Black franchisees to older restaurants, McDonald's knew it would be more difficult (if not impossible) for

them to meet McDonald's remodeling demands than it would be for the White franchisees selected for safer and more profitable locations. Had McDonald's allowed Black franchisees to grow and expand on equal terms with its White franchisees, Mr. Washington would have been in an equal position to absorb the costs of these initiatives. But by McDonald's design, he was not.

53.     Mr. Easterbrook and Mr. Kempczinski also reversed the trend of the Black community being overrepresented in the McDonald's customer base by decreasing the advertising designed to attract Black patrons. As a result, the low-volume stores in predominantly Black neighborhoods to which so many Black franchisees had been relegated saw further decrease in their revenues *by design*.

54.     McDonald's disparate treatment of Black personnel permeated the C-suite. Accomplished Black senior executives internally opposed these racist policies under the Easterbrook-Kempczinski regime and suffered swift retaliation. During the Easterbrook-Kempczinski years, McDonald's reduced its total Black officers (vice president or higher) from 42 to 7. This was not a coincidence. The local field offices took their cues from the top brass and relations deteriorated with Black franchisees.

55.     As increasing hostility within the McDonald's organization permeated from the top down, the NBMOA continued to advocate internally for Black franchisees. In a March 12, 2019 letter, the NMBOA complained about the "hostile" treatment of Black franchisees and how it was negatively impacting sales in the Black community.

56.     On November 3, 2019, McDonald's board of directors fired Mr. Easterbrook. He was not fired for implementing a racist agenda but because he "demonstrated poor

judgment involving a recent consensual relationship with an employee." More specifically, McDonald's claimed he engaged in inappropriate sexual relationships with subordinates, lied about some of those relationships, and destroyed evidence of those liaisons.

57.    After Mr. Easterbrook was fired, his hand-picked successor, Mr. Kempczinski, assumed the role of president and CEO of McDonald's Corporation. Nothing changed in terms of McDonald's disparate treatment of Black franchisees. The NBMOA continued to advocate for an end to McDonald's ongoing race discrimination against Black franchisees. And McDonald's continued to promise to solve the problem of rampant disparity, inducing Mr. Washington and other Black franchisees to continue to operate within McDonald's intentionally discriminatory system. Such promises remain unfulfilled as, one by one, Black franchisees are pushed out of the McDonald's system and those remaining continue to earn vastly less than White franchisees because of McDonald's longstanding and demonstrable disparate treatment of Black franchisees.

### McDonald's racially discriminatory corporate policies continue to inflict injuries on Black franchisees, driving many from the system entirely.

58.    For decades, McDonald's has profited from its policy of steering Black franchisees into low-volume stores. Black franchisees like Mr. Washington are required to work harder and bear greater operational costs for less profit than their White counterparts who were not relegated to underperforming markets based on their race.

Exhibit A
Page 22

59.    McDonald's fees and profits are based on gross—not net—revenues. The operational costs of a specific store do not impact McDonald's revenue stream. By design, the gross sales on which the percentage payments under the franchise agreements are based do not account for the higher cost to operate restaurants in areas where insurance costs, security costs, and employee-turnover costs are consistently higher. By relegating Black owners to the oldest stores in the toughest neighborhoods, McDonald's ensured that Black franchisees would never achieve the levels of success that White franchisees could expect and would always remain more financially vulnerable. Black franchisees must spend more to operate their stores while White franchisees get to realize the full benefit of their labors. Because the percentages McDonald's charges franchisees are calculated based on gross sales, McDonald's revenues are not affected by how much more Black franchisees must spend to run the stores McDonald's has allowed them to purchase. Black franchisees must work harder to earn less, and thus subsidize everyone else's profits by contributing a disproportionately greater share of their revenues to McDonald's. McDonald's artificially capped Black franchisees' opportunity to profit from their work and kept them operating at lower profit margins than White franchisees. McDonald's made a value judgment about which of its franchisees it wanted to favor and privilege by allowing them to purchase the most profitable locations, consistently reserving the best stores for White owners and relegating Black franchisees to a second tier of success.

60.     Many Black franchisees failed to overcome the disadvantages inherent in underperforming stores. They were forced out of the system, with McDonald's retaining the properties—and the improvements the Black franchisees had paid for—without compensation.

61.     For Black franchisees who were able to successfully operate low-volume stores at a profit, the Easterbrook-Kempczinski mandate to quickly modernize stores forced them to take on increasing debt, which was unsustainable given the growing cash-flow gap. Most White franchisees who sought more time to complete these required renovations were accommodated, while most Black franchisees (including Mr. Washington) were not. McDonald's used the failure to complete these remodels as an excuse to deem Black franchisees ineligible for expansion and renewal. And for the Black franchisees who did acquiesce to McDonald's demands to pour financial resources into substandard locations, including through the recent remodeling projects, their compliance triggered economic duress that resulted in McDonald's being able to cycle them out of the system at a lower buy-back price.

62.     McDonald's allocated resources in a discriminatory manner to favor White franchisees. Examples include granting White owners permanent rent relief, impact funding, more time to complete massive renovation projects, and more meaningful financial support to overcome hardships, while denying the same to Black franchisees including Mr. Washington.

63.     During the decades it has been profiting from its intentional race discrimination against Black franchisees, McDonald's worked to position itself

**Exhibit A
Page 24**

publicly as a friend of the Black community and targeted Black Americans with advertising campaigns featuring Black icons. These efforts were tailored not only to convince Black patrons that McDonald's valued racial diversity, but to encourage Black franchisees to remain in the system to cater to this customer demographic.

64.     McDonald's efforts to rehabilitate its image in the Black community continue. In the wake of George Floyd's murder and Black Lives Matter protests in the summer of 2020, McDonald's sought to portray that it stood in solidarity with the protesters and with victims of police violence.

65.     Yet McDonald's has never treated its Black and White franchisees equally. It has systematically and intentionally steered Black franchisees into high-crime areas riddled with poverty while making more profitable locations available to White franchisees. McDonald's claimed to care about injustice, but it kept unjust policies in place while stringing Black franchisees along with promises of parity. McDonald's offered a publicly-facing anti-racist message, but its race-based steering policies hamstrung Black franchisees and prevented them from ever achieving equality with their White counterparts. Those policies and practices continue to injure Black franchisees to this day as they struggle to remain viable businessowners in the face of McDonald's unreasonable demands. Now McDonald's is driving Black franchisees from its system by exploiting the very inequalities its longstanding discriminatory practices have caused.

66.     In 1998, there were 377 Black franchisees in the McDonald's system. Now there are 186. During that same time frame, its total number of stores has more than

**Exhibit A
Page 25**

doubled, from 15,086 to 38,999. These numbers are not a coincidence; they are the result of McDonald's intentionally racist policies and practices toward Black franchisees.

67.    Between 2010 and 2019, NBMOA data show that the cash-flow gap between White and Black franchisees has more than tripled. Black owners average around $700,000 less in annual sales per store than White owners. This, too, is not a coincidence. Nor is it because Black franchisees are comparatively worse at running businesses. The precipitous decline in Black franchisees and persistent disparity in cash flow are the direct and proximate result of McDonald's intentional racist conduct.

68.    In response to persistent objections from Black franchisees about the worsening cash-flow gap, McDonald's sought to manipulate the numbers proving the disparity by forcing Black franchisees (including Mr. Washington) to sell low-volume stores to White franchisees. This deprives Black franchisees of their stores to create the illusion of parity. Even low-volume stores can be profitable, so McDonald's efforts to narrow the cash-flow gap on paper by singling out Black franchisees to divest them of stores is racially disparate treatment that inures to the benefit of White franchisees.

69.    As McDonald's has systematically eliminated Black franchisees from its operations, it has ensured that those stores go to White owners. McDonald's carefully curates its approved list of buyers. McDonald's restricts those opportunities and

**Exhibit A**
**Page 26**

Case 2:21-cv-04972-FMO-MAA   Document 106-1   Filed 02/16/23   Page 28 of 145   Page ID
#:1934
Case: 4:21-cv-00367-BYP   Doc #: 33   Filed:  05/26/21   23 of 54.   PageID #: 1247

carefully controls transfers and sales. As a result, the demographics of the current franchisee population are exactly what McDonald's intentionally selected.

70.    Mr. Washington was among the most successful Black franchisees in the McDonald's system. He has managed to achieve success despite McDonald's longstanding history of racial discrimination. But now he, too, is marked for extinction, in part because of McDonald's historic and ongoing discrimination against all Black franchisees and in part because Mr. Washington opposed the discrimination he faced, resulting in McDonald's retaliation.

### Mr. Washington's history as a McDonald's franchisee

71.    Mr. Washington became a McDonald's franchisee in 1980, at the age of 29. His first store was in inner-city Rochester, New York. It was next to a housing project called Fight Square.

72.    Mr. Washington spent most of his life in Michigan and had no prior connection to Rochester. McDonald's steered him to this store in a distressed, predominantly Black neighborhood, giving him no other option to enter the McDonald's system.

73.    As he would do for each store he purchased, Mr. Washington personally entered a franchise agreement with McDonald's and then assigned the agreement to a corporate entity of which he was the sole owner or primary shareholder (Plaintiffs HLW Fast Track, Inc., HLW Fast Track PA, LLC, or Air Arch, Inc.), remaining personally obligated under the franchise agreements jointly and severally with his corporation. A representative example of the standard assignment is included in Exhibit 1.

74.     Six months later, McDonald's steered Mr. Washington into another inner-city store in Rochester. It was next to a housing project called Fight Village.

75.     Mr. Washington developed a track record of succeeding in these difficult stores. He wanted to grow to include more stores. He saw White franchisees in the Rochester area granted a new store each year by McDonald's. But for years McDonald's limited him to just two. It was not until the mid-1980s that McDonald's approved his acquisition of a third store.

76.     Mr. Washington wanted to continue to grow. In the early 1990s, stores became available in suburban areas of Rochester, including Dansville and Geneva. Mr. Washington struck a deal with the White owner to purchase the suburban stores. But McDonald's blocked the sale, exercising its right of first refusal to purchase the stores and selling them to a White owner rather than to Mr. Washington. A representative sample of the contract language describing McDonald's veto power over every sale— is included in Exhibit 1. *See* Franchise Agreement at ¶ 15(c) ("First Option to Purchase") *and* ¶ 15(d) ("Franchisee shall not sell, transfer, or assign this Franchise to any person or persons without McDonald's prior written consent."). It would not be the last time McDonald's chose to steer an available store to a White franchisee to Mr. Washington's detriment. The field-office executive who blocked the sale, Mr. Andres, went on to become president of McDonald's USA and was Mr. Kempczinski's immediate predecessor.

77.     Mr. Washington was recognized as a strong and engaged community leader in the Rochester area. He was appointed chairman of the board of the Buffalo Federal

**Exhibit A
Page 28**

Reserve Bank and later was appointed to the New York branch of the Federal Reserve Bank.

78.     Mr. Washington remained successful in the few stores McDonald's had allowed him to purchase. He continued to want to increase the number of his franchise stores. But after 20 years in Rochester, he had just five stores. White owners operating successfully for that same amount of time had more stores than he did. At the time, he was serving as the elected president of the local co-op, which included other franchisees and corporate representatives. He began looking for opportunities to purchase a package of stores that would allow him to build his business and leave an enduring legacy for his family.

79.     In the late 1990s, Sam Covelli was one of the largest franchisees of McDonald's restaurants, owning 50 restaurants in Ohio and Pennsylvania. But Covelli Enterprises had started franchising Panera Bread restaurants—a competing business and in direct violation of the standard McDonald's noncompete clause in every franchise agreement. Rather than sue Mr. Covelli for violating the noncompete—as it did when Mr. Griffis's wife franchised a Popeye's Chicken Restaurant in 1983—McDonald's instead helped Mr. Covelli secure top dollar for his McDonald's stores from Mr. Washington.

80.     In 1998, Mr. Washington sold his stores in New York and purchased 19 stores from Mr. Covelli's in the greater Youngstown area. He purchased another six stores from Mr. Covelli six months later. Mr. Washington became the largest Black franchise owner in the nation.

81.    But the transition to Ohio was rocky. Covelli Enterprises began pirating managers and employees from Mr. Washington's new stores in violation of the purchase agreements. The dispute dragged on for 15 years with the arbitrator ruling in Mr. Washington's favor. McDonald's offered Mr. Washington no support or assistance as he battled to succeed while Covelli Enterprises hired away the star talent from his stores to work at Panera. A White franchisee facing the same unfair competition and unlawful solicitation of employees would have received assistance from McDonald's in the form of rent relief or other financial support (such as assistance with necessary repairs to stores that Mr. Covelli had sold him). Yet McDonald's denied that support to Mr. Washington because of his race.

82.    Mr. Washington devoted his time not only to developing his own stores but to corporate affairs. He served as an operator's advocate in cases in the corporate ombudsman's office. He traveled to different regions to meet with operators to help improve their operations. He spoke at the McDonald's worldwide convention and served on the planning committee. During corporate events, Mr. Washington was consistently held up as a McDonald's success story, with the company urging other operators to aspire to emulate him.

83.    Despite the success Mr. Washington had achieved and his contributions to the corporate enterprise, he had not been allowed to expand his organization as he wished. Given McDonald's continuing inclination to limit the growth and expansion of Black franchisees in suburban markets, he began to expand into the Cleveland area, purchasing three stores on the City's East Side in 2007. The field office vice

**Exhibit A
Page 30**

president at the time, Shirley Rogers-Reece, specifically asked him to purchase these stores because the previous owner was having problems and disclosed that the company was not going to rewrite him.

84.     McDonald's raised the rents immediately when Mr. Washington took over the three East Side stores. When he protested, McDonald's said he could run low volumes better than anyone and didn't need help. Mr. Washington consistently had less revenue per store than the national averages because McDonald's pigeonholed him in this way because of his race. McDonald's expected Mr. Washington to be content to earn only what McDonald's was willing to allow, which was perpetually a lower percentage than McDonald's was willing to let White franchisees earn.

85.     Mr. Washington continued to expand his organization in the Cleveland area, acquiring more stores over the next several years in the inner-city neighborhoods where McDonald's would approve him to acquire stores. These stores were predominantly older stores in Black neighborhoods on the East Side with low-volume sales.

86.     In approximately 2011, Mr. Washington was awarded a store in the East Side suburb of University Heights. The store was near the site of a new shopping center, including a Whole Foods. According to 2010 Census data, the community is approximately 70% White. Mr. Washington had finalized the deal—and had selected the equipment and décor package for the store—when McDonald's abruptly intervened and awarded the store to a White operator, Dave Stiles.

**Exhibit A
Page 31**

87.     Mr. Washington complained to McDonald's chief operating officer that Mr. Stiles was a racist. The COO responded: "I know." But the company allowed Mr. Stiles to expand his organization in the suburbs while keeping Mr. Washington out. The situation with Mr. Stiles being awarded the University Heights store was an exercise in McDonald's using its veto power to ensure its favored White operators acquire prime locations.

88.     Nor did the company act when Mr. Washington protested to McDonald's that all Black-owned stores were segregated on the City's East Side (and not in the suburban areas). He repeatedly identified this continued limitation on Black ownership as "redlining" in complaints to McDonald's personnel. He wanted to be permitted to purchase higher-volume stores in safer communities as his White colleagues were permitted to do. But McDonald's refused to allow him to purchase a store on Cleveland's West Side. He complained to numerous McDonald's executives that he had been on the front lines running low-volume stores for decades and deserved to acquire some better stores. McDonald's never permitted Mr. Washington to purchase a West Side store on account of his race. And it consistently prevented him from acquiring the better stores that his White colleagues were permitted to buy that consistently required less work and yielded greater profits.

89.     After the Easterbrook-Kempczinski regime opted to reduce advertising to the Black community, Mr. Washington repeatedly objected that the collective advertising—which he was expected to regularly contribute a percentage of his gross sales toward nationally and locally—was not reaching his customer base. He was

ignored. The franchise agreements precluded him from using advertising or promotional materials or programs not provided or approved by McDonald's. In other words, he had no recourse for the company's decision to stop advertising to a large swath of his customer base, and the resulting impact on his sales.

90.    He was also denied requested resources for "activations"—efforts to initiate customer patronage—in the Black community. McDonald's discontinued a program that allowed Black teenagers to visit Historically Black Colleges and Universities (HBCU) over Mr. Washington's objection.

91.    Mr. Washington continued to complain—including directly to the then-president of McDonald's USA Mike Andres—that inner-city stores were losing value while suburban store value continued to rise. McDonald's chose not to take action in response to this significant problem that was entirely of McDonald's making.

92.    When Mr. Washington complained about how Black franchisees' stores were being graded unfairly within a corporate franchising committee, he was quickly removed from the committee.

93.    In 2018, Mr. Washington and other Black franchisees in Ohio complained about McDonald's racial discrimination toward Black franchisees, objecting that McDonald's was not permitting the children of Black franchisees to enter the McDonald's system on equal terms with the children of White franchisees through McDonald's Next Generation Training Program. McDonald's touts the NextGen program as a way for franchisees "to bring their qualified family members into the business, to build their own McDonald's legacy." When Mr. Washington complained

about the preferential treatment being given to White franchisees' children in the NextGen program, then-field-office vice president, Gregg Ereio, told Mr. Washington and the other Black franchisees at the meeting: "If you want your kid to get a restaurant, you should sell him one of yours," or words to that effect. Mr. Ereio's message was clear: McDonald's would not allow Black franchisees' children to enter the McDonald's system on equal terms with the children of White owners.

94.    During an NBMOA meeting in 2018, Mr. Ereio promised that in one year, he would "close the gap" between Black and White operators in terms of cash flow. (McDonald's has acknowledged that this cash-flow gap is approximately $700,000 annually per store.) The plan, apparently, was to force the transfer of low-volume stores from Black franchisees to White franchisees to create the appearance of relative equity in revenue. But all this scheme has done is redistribute wealth from Black franchisees to White owners.

95.    Mr. Washington remained in the McDonald's system because McDonald's continued to promise that it would end its history of discrimination and achieve parity. He reasonably believed that once parity was achieved, the revenue and profitability numbers McDonald's touts would finally be obtainable for him. While he has been waiting for fair and equal treatment, McDonald's has enjoyed a steady stream of rent and fees from Mr. Washington's efforts and success under racially discriminatory circumstances. Now, McDonald's is working to dismantle his life's work to create the illusion of parity in cash flow between White and Black franchisees.

**Exhibit A
Page 34**

And it is targeting Mr. Washington because of his opposition to the relentless discrimination he has endured in the McDonald's system.

### McDonald's begins pushing Mr. Washington out as part of its effort to reduce Black ownership in the McDonald's system and in retaliation for his opposition to discrimination.

96.    Today, Mr. Washington owns 14 McDonald's restaurants: six in Mahoning County, one in Trumbull County, three in Cuyahoga County, and four in Mercer County. This is down from 23 restaurants in 2017, when McDonald's began its campaign to drive Mr. Washington from its system and deprive him of his life's work.

97.    Until October 2017, Mr. Washington was rated as eligible for growth and rewrite. Being eligible for growth and rewrite meant that he could continue to expand within the McDonald's system. He hoped to acquire some higher-volume stores to offset the astronomical costs of the remodeling initiatives that McDonald's was rolling out in the Easterbrook-Kempczinski administration.

98.    But in October 2017, McDonald's suddenly announced that Mr. Washington was no longer eligible for growth and rewrite. Nothing had changed about how Mr. Washington ran his stores. He continued to turn a profit in the stores McDonald's allowed him to own, including a disproportionate share of low-volume stores in poor communities. An experienced franchisee with decades in the McDonald's system did not suddenly become a terrible operator. Consistent with its general practices toward Black franchisees, particularly during the Easterbrook-Kempczinski regime, McDonald's subjected Mr. Washington to targeted and unreasonable inspections and

**Exhibit A
Page 35**

harsh grading on account of his race and opposition to discrimination, which McDonald's then used as pretext to dismantle Mr. Washington's business.

99.   McDonald's insisted that he divest of his stores in the Youngstown market and consolidate in the Cleveland market, or else be denied rewrite on his stores approaching the end of the 20-year lease. To encourage him to acquiesce to this unwanted downsizing, McDonald's initially proposed that Mr. Washington purchase four company-owned (McOpCo) stores in Wooster, Ohio, which is in the Cleveland TV market. According to 2010 Census data, Wooster is 90% White. At the time, McDonald's was moving away from company ownership of the McOpCo stores, which are typically in prime locations and perform well. The Wooster stores were no exception.

100.   Mr. Washington had no choice but to acquiesce to McDonald's demands, and agreed to downsize and consolidate his operations in the Cleveland TV market. He knew that the revenues from these high-volume Wooster stores would offset the ongoing injuries from the lower-volume restaurants to which McDonald's had largely limited him and make progress toward remedying the historically negative sales and cash-flow gaps he endured as a Black operator. This would have positioned him to better weather McDonald's demands for massive capital investments at all stores.

101.   But in reality, McDonald's had no intention of permitting Mr. Washington to acquire four high-volume stores in a predominantly White community. It subsequently rejected his acquiring the Wooster stores. Nothing had changed since

Case 2:21-cv-04972-FMO-MAA   Document 106-1   Filed 02/16/23   Page 38 of 145   Page ID
#:1944
Case: 4:21-cv-00367-BYP   Doc #: 33   Filed:  05/26/21   33 of 54.   PageID #: 1257

the early 1990s, when McDonald's blocked his efforts to purchase stores in suburban areas.

102.   Despite refusing to let him purchase the Wooster stores, McDonald's continued to insist that Mr. Washington downsize to remain eligible for growth. During a conversation in late November 2017, Dave Garcia (Vice President of Operations and Franchising for the Ohio Region) and Mr. Washington (despite not wanting to sell the stores) agreed that he would sell ten stores by June 2018 to remain eligible for growth and rewrite. But in follow-up correspondence, McDonald's insisted he complete the sales by March 1, 2018, and gave no assurances about his eligibility.

103.   Mr. Washington remained at McDonald's mercy as it continued to move the goal posts. He should not have been subjected to a requirement to downsize, and only suffered that indignity because he was a Black franchisee and he dared to oppose race discrimination. Anything he proposed that would have led to a fair and equitable solution—where he would have been treated equally with the White franchisees— McDonald's either rejected outright or agreed to and then reneged on. McDonald's was determined to dismantle Mr. Washington's organization due to his race.

104.   McDonald's presented Mr. Washington with approved buyers for his stores it was requiring him to sell. All were White.

105.   At McDonald's insistence, Mr. Washington sold four of his Youngstown-market stores to Tom Locke, a White franchisee. Mr. Washington did not want to sell these stores. He did so only because McDonald's demanded it.

106.    In the meantime, McDonald's harangued him about investing in remodeling projects, *including for stores it was requiring him to sell*. On February 16, 2018, Mr. Garcia wrote to Mr. Washington—two weeks before the deadline to sell the remaining six stores—saying it was "imperative that you review this information and respond quickly with your choice of décor package, as well as with the required deposits, in order to move forward on these projects." McDonald's was demanding that Mr. Washington subsidize his own demise by pouring resources into these properties as they were ripped from his hands.

107.    Despite Mr. Washington's best efforts, he could not find a buyer for the remaining six stores. Two of the locations (on the Ohio Turnpike, where McDonald's had denied Mr. Washington impact-relief sought due to road construction and exit closures on the highway—the kind of relief that it regularly granted to White operators in similar circumstances) were set to be closed in May of 2020 because the leases were not being renewed through the Ohio Turnpike Commission, leaving Mr. Washington with four stores to sell per McDonald's then-current demands.

108.    Mr. Washington advised McDonald's of the dearth of interest approved buyers were showing in purchasing the stores it was forcing him to sell. Mr. Washington referenced Turan Strange, a Black operator with three stores in Cleveland who took a year and a half to sell his inner-city stores just two years earlier as he was trying to retire. Mr. Washington said he turned down the opportunity to purchase those stores because he had enough inner-city stores. He expressed his view that "this is a system wide problem and will need the system to fix. Most people do not want to deal

Page **34** of **54**

with the stress and danger of running these stores based on low volume." McDonald's was well aware of the unreasonableness of making such demands of Mr. Washington under the circumstances and has never treated a White franchisee similarly.

109.   Mr. Washington was unable to secure an agreement with an approved operator to purchase his stores for a fair price within McDonald's deadlines. As McDonald's continued to pressure him to sell to a White operator (John House) who was not interested in fairly compensating Mr. Washington for the stores, Mr. Washington pushed back, asking why Mr. House would buy Mr. Washington's inner-city stores when Mr. House recently bought three other McDonald's with both higher sales volume and in better communities. Mr. Washington reported communicating with nine potential (McDonald's approved, White) buyers; only two even asked for a price. Mr. Washington reported to McDonald's: "None of the other 7 potential buyers were even interested in visiting my stores in the hood. No owner operator wants low volume stores in the hood." Yet these were the stores to which McDonald's largely confined Mr. Washington.

110.   Mr. Washington also complained that McDonald's tipped off other owner-operators (*i.e.*, the potential buyers for Mr. Washington's stores) that the company wanted him out: he reported to McDonald's that another owner had alerted him that "everyone knows the company wants you to sell or they are going to take away your stores one by one at rewrite." (This was consistent with the then-vice president of the field office tipping off Mr. Washington that McDonald's was not going to rewrite the owner of the three East Side stores Mr. Washington purchased a decade earlier.) Mr.

**Exhibit A**
**Page 39**

Washington expressed that, given this information being shared with other franchisees, it seemed that potential buyers would rather wait him out while McDonald's dwindled his organization to nothing.

111.   Mr. Washington also complained that McDonald's rejected his—but not many White franchisees'—repeated requests for more time to complete the mandated remodeling projects.

112.   McDonald's retaliated, threatening to revoke a rewrite offer that already had been extended for Mr. Washington's Kinsman location and deny him rewrites on the six stores in the upcoming rewrite window if he did not comply with McDonald's demands.

113.   On July 23, 2018, McDonald's, through Mario Barbosa, president of the East Zone (of which the Ohio Region is a part), insisted that Mr. Washington sell four Cleveland stores (Euclid Avenue, Kinsman, Buckeye, and Beacon Place) for $200,000 if he wanted to be eligible for growth and rewrite. Mr. Washington had just acquiesced to McDonald's demand that he invest nearly $400,000 in a remodeling project at the Kinsman store, based on the unequivocal promise that he would recoup that investment. This deal would have allowed a White buyer to scoop up Mr. Washington's stores for less than the cost of the equipment they contained and with the benefit of the costly improvements Mr. Washington had just completed.

114.   In August 2018, Mr. Washington offered to *give* McDonald's or another operator two of the four restaurants it was requiring him to sell (Buckeye and Beacon Place—where the volume was so low that he was operating them at a loss) because

**Exhibit A
Page 40**

no one wanted them. He wrote: "It would be unconscionable for McDonald's to deny me rewrite on my other restaurants because I could not divest of these unsalable, even for free, restaurants." But McDonald's refused to allow Mr. Washington to give away the two low-volume restaurants and insisted he package them with his profitable stores for sale, saying: "it is necessary for a seller to package higher-valued restaurants with lower-valued restaurants in order to make a multiple-restaurant package appealing to buyers." McDonald's was insisting that Mr. Washington relinquish more profitable stores that he did not want to sell, meaning Mr. Washington's few higher-volume stores in the Cleveland area would be transferred to a White franchisee. McDonald's knew that by stripping Mr. Washington of his few high-volume locations, it was crippling his organization and precluding him from offsetting the losses that McDonald's was forcing on him, which was intentional based on his race and protected activity opposing discrimination.

115.   McDonald's then reversed course in 2019, urging Mr. Washington to further downsize his operations and consolidate in the *Youngstown* market instead. Having sold four Youngstown stores to Mr. Locke as part of McDonald's initial demand that he consolidate in the *Cleveland* market, this request was unfair and moved the goal posts yet again. McDonald's was ensuring that a Black franchisee could never own only high-volume restaurants, even after a career of being expected to succeed in low-volume stores. McDonald's held the threat of rewrite denial over Mr. Washington's head if he did not relent to this new demand.

116.   Mr. Washington protested, saying he did not want to sell two of his Cleveland stores, which had higher volume and better cashflow. He again offered to *give away* the two lowest-volume stores (Buckeye and Beacon Place)—with compensation for equipment only—and to sell four additional stores. McDonald's refused, giving him 60 days to present a signed purchase agreement for the six stores it now demanded that he sell.

117.   Mr. Washington pleaded with McDonald's, saying its latest demand would set him up for failure. He objected to being bullied into selling his most profitable stores. Yet he continued to try to work with McDonald's to meet its ever-changing demands in a way that would give him some security. He agreed to sell four Cleveland stores right away, and then to sell the two highest-volume Cleveland stores after he was rewritten on the Youngstown stores in the rewrite window.

118.   McDonald's responded with a faux acceptance: requiring Mr. Washington to complete the sales all on his own and on a rapid timetable. McDonald's does not ask White franchisees to transact the sales of their properties without assistance. Yet, on account of his race, this is precisely what McDonald's was now demanding that Mr. Washington do, while still not giving him any assurance that it would not further diminish his holdings by demanding even more sales or denying rewrites.

119.   When Mr. Washington objected, McDonald's briefly relented, proposing an offer to purchase three restaurants (Buckeye, Beacon Place, and Kinsman) for $250,000 (up from $200,000) with Mr. Washington to sell the remaining (Euclid Avenue) store unassisted. The three-store package included the Kinsman restaurant

where Mr. Washington had just made a large capital investment for required remodeling that McDonald's demanded. But now McDonald's was not offering to permit him to retain his eligibility, but rather to delay his next rewrite decision (without any assurance that these mandated sales would protect his remaining stores).

120.   McDonald's had promised Mr. Washington that if he invested the $380,000 for remodeling at the Kinsman location, he would expect to recoup that investment. He would never have made that capital expenditure without that promise. He offered to sell McDonald's the three stores for $380,000—essentially giving them away after his recent remodeling investment at Kinsman. And if he was unable to sell the Euclid Avenue store on his own, he proposed McDonald's buy it from him at the low end of fair market value.

121.   McDonald's refused. In a March 22, 2019 letter from Mr. Garcia, McDonald's reverted to its previous demand that Mr. Washington sell all his Cleveland restaurants or face immediate denial of rewrite on his six stores in the window.

122.   Mr. Washington responded opposing his discriminatory mistreatment in no uncertain terms. Sadly (and illegally), McDonald's retaliated against him as a result. He told Mr. Garcia that his March 22 letter "showed the arrogance of a slave master speaking to one of his slaves." Mr. Washington said: "I am not a house negro and will not be treated like one." He expressed his frustration with McDonald's unreasonable position regarding the low-volume stores that no one wanted to buy. Just as McDonald's had always done, McDonald's continued to deny Mr. Washington rent

**Exhibit A
Page 43**

relief or other financial support it customarily offers to White franchisees to mitigate the ongoing losses.

123.    In response, McDonald's escalated its efforts to divest Mr. Washington of his stores. Rather than addressing the underlying concerns, McDonald's took issue with Mr. Washington's statement that he was being treated unfairly because of his race, saying they were "deeply offended" by his accusation. McDonald's insisted that Mr. Washington sell all his Cleveland restaurants, though it agreed to increase the offer for the three restaurants to $380,000 from $250,000, with Mr. Washington required to sell the fourth on his own. If he did not comply, he would lose seven stores in the rewrite window. If he acquiesced, the field office would not make any recommendations to the Rewrite Committee before Mr. Washington's next scheduled assessment in December 2020.

124.    On May 6, 2019, field office vice president William Armstrong wrote: "If you do not complete the sale of the four restaurants by July 30, however, then McDonald's will immediately proceed with its recommendation to the Rewrite Committee that it deny rewrites for the seven franchises in the rewrite window (NSNs 467, 3737, 26709, 26708, 27375, 28166 and 27397)."

125.    Mr. Washington endeavored, as he had been for many months, to comply with McDonald's latest demands on the unfair terms it was unilaterally dictating to him (terms to which McDonald's would never subject a White franchisee). He spoke to all the approved buyers that McDonald's identified, but not one was interested in purchasing the stores based solely on location. Price was never even discussed.

126.   In other words, McDonald's pigeonholed Mr. Washington into low-volume stores in distressed neighborhoods, and then blamed him when no one wanted to buy them.

127.   A few weeks before its latest deadline to sell, McDonald's notified Mr. Washington that John House, a White franchisee, would purchase the Kinsman, Buckeye, and Beacon Place stores for $380,000. At McDonald's insistence, Mr. Washington was forced to sell the Kinsman store—one of the four stores boycotted in 1969—back to a White owner. And Mr. Washington was still required to sell the Euclid Avenue store with no assistance. McDonald's demanded that these transactions be completed by September 30, 2019.

128.   Meanwhile, Susan Montgomery, the franchise business partner assigned to Mr. Washington through the field office, began reaching out to Mr. Washington in August 2019 about scheduling his next performance assessment (which it had agreed not to conduct until late 2020 if he complied with the demands to sell by September 30, 2019). This further made clear to Mr. Washington that McDonald's had no intention of abiding by its agreement, but he had no choice but to continue the mandated downsizing because of the unequal power dynamic McDonald's enjoys in the franchisor-franchisee relationship.

129.   Mr. Washington sold the three stores to Mr. House by McDonald's deadline, but remained unable to locate a buyer for the Euclid Avenue store.

130.   McDonald's offered Mr. House extensive incentives—$3 million according to McDonald's—to purchase the three Cleveland stores. But it never offered those kinds

of incentives or financial support to Mr. Washington to allow him to succeed in those substandard locations. To this day, McDonald's remains willing to support White franchisees in ways that it refuses to support Black franchisees, especially Black franchisees who complain about race discrimination.

131.   When Mr. Washington was unable to sell the Euclid Avenue store by McDonald's deadline, it gave him an ultimatum to sell it within two weeks or lose seven additional stores. Mr. Armstrong delivered that threat on McDonald's behalf on October 2, 2019. McDonald's did not make such threats to White franchisees.

132.   Mr. Washington remained unable to secure a buyer. On October 21, 2019, after Mr. Washington had jumped through one hoop after another (sold four stores, then three stores, and done his best to sell the Euclid store)—Mr. Armstrong, on behalf of McDonald's Columbus field office, recommended to the Rewrite Committee that Mr. Washington be denied rewrite on the stores in the rewrite window. There were six stores impacted by this recommendation, given that he had recently sold one of the stores (Kinsman) in the window.

133.   Mr. Washington wrote to the Rewrite Committee on November 14, 2019, to request a new evaluation of his organization before the Committee decided his fate. He explained that his organization had not been assessed since 2017 and those data were skewed by the negative impact of the low-volume stores in increasingly distressed areas on Cleveland's East Side. The data were also skewed by the subjective metrics designed to allow for negative grading of franchisees like Mr. Washington whom the company wants to force out, consistent with the longstanding

**Exhibit A
Page 46**

policies of discrimination that the Easterbrook-Kempczinski regime continued as a means of pushing Black franchisees out of McDonald's system. Mr. Washington submitted extensive information demonstrating his organization's compliance with the governing standards and requirements and identified problems with the field office's approach to assessing his stores.

134.   The very next day, the Rewrite Committee rubberstamped the field office's recommendation and denied Mr. Washington rewrite on six franchises. The Committee insisted on proceeding with the inaccurate, skewed, subjective, two-year-old data the field office provided. The Committee could not possibly have carefully reviewed all of the information Mr. Washington submitted in that single day. The rewrite denial was a foregone conclusion from the moment the field office sent its recommendation to the Committee. Despite his extended efforts to appease and comply with McDonald's shifting demands, McDonald's opted to further decimate his organization.

135.   On information and belief, the Rewrite Committee has never denied rewrite to a White franchisee based on clearly outdated information or without carefully considering the information the franchisee provided.

136.   On November 22, 2019, McDonald's warned Mr. Washington to promptly sell the six stores on which it denied rewrite. McDonald's made clear that it was his responsibility to find a purchaser whom McDonald's would approve. McDonald's warned that Mr. Washington would "have nothing to sell" if he did not complete the sales before the franchise terms expired.

137.    McDonald's also retaliated against Mr. Washington because he complained about race discrimination by categorically denying his son the opportunity to become a franchisee. Mr. Washington's son completed the process to become a McDonald's franchisee through the NextGen Training Program. But once McDonald's branded Mr. Washington ineligible for growth and rewrite, McDonald's deemed his son ineligible to purchase *any* stores (Mr. Washington's or anyone else's). Punishing Mr. Washington's son for Mr. Washington's opposition to McDonald's racism is retaliatory and interferes with the transfer of intergenerational wealth in the Black community.

138.    McDonald's campaign to drive Mr. Washington from the system continues. In response to a draft assessment sent to him in early 2020, Mr. Washington identified substantial errors and serious concerns with the contents. He questioned how McDonald's manipulated his scores, noting the racialized element of McDonald's decision making. He also pointed out the unfairness of the consultant grading his stores being the son-in-law of one of the White owners most likely to benefit from further forced sales by Mr. Washington. Seeing the writing on the wall, he noted that this was "a way for black owners to leave with less money as white owners buy their restaurants McDonald's forces them to sell." He also again lodged his objection to McDonald's slashing advertising expenditures in the Black community and the obvious impact on his stores.

139.  Justifiably fearful that McDonald's would continue to decimate his organization one store at a time, Mr. Washington made the reasonable request to

Case 2:21-cv-04972-FMO-MAA   Document 106-1   Filed 02/16/23   Page 50 of 145   Page ID
#:1956
Case: 4:21-cv-00367-BYP   Doc #: 33   Filed:  05/26/21   45 of 54.  PageID #: 1269

have legal counsel or at least a business advisor with him at his next review meeting. McDonald's refused.

140.   In continued retaliation for his ongoing criticism of the racist policies and practices of McDonald's and consistent with its general approach to treating Black owners less favorably than White owners, McDonald's continued to grade Mr. Washington as ineligible for growth and rewrite following its assessment of his organization in early 2020. McDonald's also continued to harangue Mr. Washington to pour resources into the remodeling projects at the stores it was forcing him to sell, insisting that he move up the completion dates for two of his stores (that it was requiring him to sell) from 2021 to 2020. Such expenditures would inure to the benefit of the (inevitably White) operator whom McDonald's approves to purchase these stores at fire-sale prices. McDonald's has threatened to continue to grade Mr. Washington as ineligible for growth and rewrite (and thus at risk of losing more stores) if he does not comply with these demands. This will also continue to block Mr. Washington's son from becoming a franchisee.

141.   McDonald's also criticized Mr. Washington for not being sufficiently "positive" and "collaborative" in his interactions with the company. These criticisms are in retaliation for Mr. Washington's opposition to the race discrimination he continues to face.

142.   Beyond the extensive economic damage that McDonald's has caused Mr. Washington and his company by its continuing race-based discrimination against him, he has sustained incalculable injury to his dignity. Mr. Washington has had to

**Exhibit A
Page 49**

devote substantial time, energy, effort, and resources to dealing with McDonald's ever-shifting expectations and demands and responding to unfair and unjustified criticism. He has had to suffer the anxiety of watching a powerful corporation steadily dismantle his life's work. Devoting time to urgently striving to meet McDonald's ever-shifting demands took time away from Mr. Washington's ability to run his stores, resulting in decreased cash flow and business value in his corporate entities (Plaintiffs HLW Fast Track, Inc., HLW Fast Track PA, LLC, and Air Arch, Inc.).

143.    McDonald's does not treat White franchisees the way it has treated Mr. Washington. White franchisees are not pigeonholed into substandard locations and then penalized for the inevitable low performance inherent in underperforming stores. Nor are they driven out of the system after decades of profitable service to the company.

144.    When Mr. Covelli breached his franchise agreement by entering a competing business (Panera Bread), McDonald's facilitated an agreeable exit on his terms and did not raise a finger when he poached Mr. Washington's employees. McDonald's refused to give Mr. Washington the type of financial and other relief that it generally makes available to White owners and did nothing as Mr. Covelli damaged the business he had just sold to Mr. Washington.

145.    On information and belief, McDonald's treated White owners, including Russell Ellis, Daniel Carreon, and others, much more favorably that Mr. Washington because of his race and opposition to discrimination, helping them grow their businesses after they experienced significant operational challenges.

146. Mr. Washington was injured and continues to be injured by McDonald's discriminatory race-based practices in terms of lower cash flow and decreased equity in his existing stores, in addition to diminished returns on his investments in the stores he has been forced to relinquish. McDonald's refusal to permit him to purchase stores in predominantly White communities—most recently University Heights and Wooster—is further proof that its longstanding racial-steering practices persist. Having set up Black franchisees for limited success compared with White franchisees, McDonald's is now stacking the deck to allow White franchisees to profit from Black franchisees' demise, redistributing their wealth to White franchisees.

147. But for Mr. Washington's race and/or opposition to race discrimination, McDonald's would not have steered him into unequal franchising opportunities compared to his White counterparts; artificially capped his growth opportunities and profits; required him to incur disproportionately high operational costs and low sales volume; engaged in disparate resource allocation (temporary and permanent rent relief, impact relief, advertising, or assistance with mandated initiatives); subjected him to rigged and unfair assessments; blamed him for problems at stores that predated his ownership and no owner could remedy without substantial support from McDonald's; targeted him for extinction as a franchisee; or otherwise denied Mr. Washington the same opportunities and treatment that White franchisees enjoy, including as to the creation, performance, and maintenance of their contracts. As detailed above, White franchisees like Mr. Locke, Mr. House, Mr. Stiles, Mr. Ellis, and Mr. Carreon have benefitted and continue to benefit from McDonald's persistent

**Exhibit A
Page 51**

Case 2:21-cv-04972-FMO-MAA   Document 106-1   Filed 02/16/23   Page 53 of 145   Page ID
#:1959
Case: 4:21-cv-00367-BYP   Doc #: 33   Filed:  05/26/21   48 of 54.  PageID #: 1272

and intentional policies of race discrimination against Black franchisees, including Mr. Washington—all to the detriment of Mr. Washington and other Black franchisees.

### Continued retaliation following filing of complaint

148.   After filing this action on February 16, 2021, McDonald's retaliated against Mr. Washington by falsely accusing him of "years of mismanagement" of his stores.

149.   McDonald's also misled the public through media comments by pretending that franchisees buy and sell locations on the open market when McDonald's maintains tight control over the process through its prerogative to approve every sale and its power to purchase any store being transferred and sell it to whomever McDonald's chooses (as it did repeatedly to Mr. Washington when he tried to purchase higher-volume stores in better neighborhoods from White owners willing to sell to him).

150.   By attempting to cast its 40-year history of discriminating against Mr. Washington as "mismanagement" by him, McDonald's retaliated against Mr. Washington for standing up for himself in this lawsuit. Other Black franchisees who have experienced the same racist discrimination that Mr. Washington has endured are dissuaded from bringing claims on their own behalf or otherwise opposing the discrimination because they fear similar mistreatment by McDonald's—which for years has held up Mr. Washington as the type of franchisee others should seek to emulate.

### CLAIM 1: 42 U.S.C. § 1981
### RACE DISCRIMINATION IN CONTRACTING

151.   Plaintiffs incorporate all allegations of this complaint.

152.   As detailed above, McDonald's has consistently violated Mr. Washington's right to equal treatment in making and enforcing contracts, including enjoying all benefits, privileges, terms, and conditions of the contractual relationship under the Civil Rights Act of 1866, 42 U.S.C. §§ 1981(a) and 1981(b), as amended in 1991. McDonald's consistently privileged White franchisees over Black franchisees, including in the ways described above.

153.   Plaintiff HLW Fast Track, Inc. is jointly and severally obligated under the franchise agreements with Mr. Washington for the Ohio stores (other than the Beacon Place store) and is entitled to enforce its contractual rights under the respective assignments.

154.   Plaintiff HLW Fast Track PA, LLC is jointly and severally obligated under the franchise agreements with Mr. Washington for the Pennsylvania stores and is entitled to enforce its contractual rights under the respective assignments.

155.   Plaintiff Air Arch, Inc. was jointly and severally obligated under the franchise agreements with Mr. Washington for the Beacon Place store and is entitled to enforce its contractual rights under the assignment.

156.   Each day that Mr. Washington operates the stores that McDonald's approved him to purchase, under the disparate conditions it dictates, he and his company continue to be injured by McDonald's longstanding and demonstrable history of disparate treatment of Black franchisees described above. Had McDonald's ceased these wrongful practices as promised, at least some of Plaintiffs' injuries could have been avoided.

157.   But for Mr. Washington's race, he and his company would not have experienced the disparate treatment to which McDonald's has subjected them.

158.   As a direct and proximate result of McDonald's illegal, intentional, and persistent race discrimination against Mr. Washington as a Black franchisee, Plaintiffs have suffered and continue to suffer substantial economic and non-economic damages.

159.   McDonald's acts were intentional, malicious, and demonstrate reckless indifference to Plaintiffs' rights. They are entitled to recover punitive damages.

### CLAIM 2:  42 U.S.C. § 1981
### RETALIATION FOR OPPOSING RACE DISCRIMINATION IN CONTRACTING

160.   Plaintiffs incorporate all allegations of this complaint.

161.   As detailed above, Mr. Washington complained about race discrimination in contracting and was retaliated against because of his opposition to discrimination.

162.   But for Mr. Washington's opposition to race discrimination, he and his companies would not have experienced the retaliation to which McDonald's has subjected them.

163.   As a direct and proximate result of Mr. Washington's opposition to discrimination in contracting, including filing this lawsuit, Plaintiffs have suffered and continue to suffer economic and non-economic damages.

164.   McDonald's acts were intentional, malicious, and demonstrate reckless indifference to Plaintiffs' rights. They are entitled to recover punitive damages.

### CLAIM 3: 42 U.S.C. § 1982
### RACE DISCRIMINATION IN SALE OR LEASE OF PROPERTY

165.   Plaintiffs incorporate all allegations of this complaint.

166.    As detailed above, McDonald's racially motivated decisions interfered with Plaintiffs' property rights on the basis of Mr. Washington's race.

167.    Plaintiff HLW Fast Track, Inc. is jointly and severally obligated under the franchise agreements with Mr. Washington and is entitled to enforce its property rights under the respective assignments.

168.    Plaintiff HLW Fast Track PA, LLC is jointly and severally obligated under the franchise agreements with Mr. Washington for the Pennsylvania stores and is entitled to enforce its property rights under the respective assignments.

169.    Plaintiff Air Arch, Inc. was jointly and severally obligated under the franchise agreements with Mr. Washington for the Beacon Place store and is entitled to enforce its property rights under the assignment.

170.    As detailed above, McDonald's has consistently violated Mr. Washington's right to equal treatment in the sale and lease of property under the Civil Rights Act of 1866, 42 U.S.C. § 1982. McDonald's consistently privileged White franchisees over Black franchisees, including in the ways described above.

171.    Each day that Mr. Washington operates the stores that McDonald's approved him to purchase, under the disparate conditions it dictates, he and his company continue to be injured by McDonald's disparate treatment of Black franchisees described above. Had McDonald's ceased these wrongful practices as promised, at least some of Plaintiffs' injuries could have been avoided.

172.    But for Mr. Washington's race, he and his companies would not have experienced the disparate treatment to which McDonald's has subjected them.

**Exhibit A
Page 55**

173.   As a direct and proximate result of McDonald's illegal, intentional, and persistent race discrimination against Mr. Washington as a Black franchisee, Plaintiffs have suffered and continue to suffer substantial economic and non-economic damages.

174.   McDonald's acts were intentional, malicious, and demonstrate reckless indifference to Plaintiffs' rights. They are entitled to recover punitive damages.

### CLAIM 4: 42 U.S.C. § 1982
#### RETALIATION FOR OPPOSING RACE DISCRIMINATION IN SALE OR LEASE OF PROPERTY

175.   Plaintiffs incorporate all allegations of this complaint.

176.   As detailed above, Mr. Washington complained about race discrimination in the sale and lease of property and was retaliated against because of his opposition to discrimination.

177.   But for Mr. Washington's opposition to race discrimination in the sale and lease of property, he and his companies would not have experienced the retaliation to which McDonald's has subjected them.

178.   As a direct and proximate result of his opposition to discrimination, including filing this lawsuit, Plaintiffs have suffered and continue to suffer economic and non-economic damages.

179.   McDonald's acts were intentional, malicious, and demonstrate reckless indifference to Plaintiffs' rights. They are entitled to recover punitive damages.

### CLAIM 5: BREACH OF CONTRACT

180.   Plaintiffs incorporate all allegations of this complaint.

181.   Mr. Washington and McDonald's entered many contracts over the past 40 years, an example of which is attached as Exhibit 1. Mr. Washington and/or his companies (HLW Fast Track, Inc., HLW Fast Track PA, LLC, and Air Arch, Inc.), substantially performed his obligations under each of those franchise agreements.

182.   In various franchise agreements with Mr. Washington, McDonald's promised to "make available to [Mr. Washington] all additional services, facilities, rights, and privileges relating to the operation of the Restaurant which McDonald's makes generally available, from time to time, to all its franchisees operating McDonald's restaurants." McDonald's violated this provision with respect to Mr. Washington and his companies.

183.   McDonald's repeatedly breached its contractual obligations to Plaintiffs by making the promised benefits of the franchise agreements *un*equally available based on the race of the franchisee, giving preferential treatment to White franchisees to Plaintiffs' detriment.

184.   McDonald's repeatedly breached its contractual obligations to Plaintiffs by acting in bad faith to force the sale of multiple stores to White owners.

185.   As a direct and proximate result of McDonald's breach of its contracts with Mr. Washington and his company, they have suffered and continues to suffer damages.

### PRAYER FOR RELIEF

Plaintiffs respectfully request the following relief:

- Declare that Defendants' acts and conduct violate federal and state law;

- Enter judgment in Plaintiffs' favor on all claims for relief;

- Award Plaintiffs full compensatory damages, economic and non-economic, including, but not limited to, damages for pain, suffering, mental anguish,

Page 53 of 54

emotional distress, humiliation, and inconvenience that they have suffered and are reasonably certain to suffer in the future;

- Award Plaintiffs equitable remedies including injunctive relief as appropriate;

- Award Plaintiffs their reasonable attorneys' fees and all other costs of this suit under 42 U.S.C. § 1988;

- Award pre- and post-judgment interest at the highest lawful rate;

- Award all other relief in law or equity to which one or more Plaintiffs are entitled and that the Court deems equitable, just, or proper.

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues within this complaint.

Respectfully submitted,

*s/ Ashlie Case Sletvold*
Joseph C. Peiffer
Kevin P. Conway (*pro hac vice*)
David M. Abdullah (*pro hac vice*)
**PEIFFER WOLF CARR KANE & CONWAY, LLP**
1519 Robert C. Blakes Sr. Drive
New Orleans, Louisiana 70130
(504) 523-2434 (p) / (504) 608-1465 (f)
jpeiffer@peifferwolf.com
kconway@peifferwolf.com
dabdullah@peifferwolf.com

Ashlie Case Sletvold (OH 0079477)
**PEIFFER WOLF CARR KANE & CONWAY, LLP**
1422 Euclid Avenue, Suite 1610
Cleveland, Ohio 44115
(216) 260-0808 (p) / (504) 608-1465 (f)
asletvold@peifferwolf.com

*Counsel for Plaintiffs*

Case 2:21-cv-04972-FMO-MAA   Document 106-1   Filed 02/16/23   Page 60 of 145   Page ID
#:1966
Case: 4.21-cv-00367-BYP   Doc #: 33-1   Filed: 05/26/21   1 of 44.   PageID #: 1279

BOARDMAN, OHIO
22 Boardman Canfield Road
L/C: 034-1791
File #: 44672

## FRANCHISE AGREEMENT

**THIS FRANCHISE AGREEMENT** ("Franchise") made this 16th day of February, 2012, for the operation of a McDonald's restaurant located at 22 Boardman Canfield Road, BOARDMAN, OHIO (the "Restaurant") by and between:

**McDONALD'S USA, LLC,**

a Delaware limited liability company,

("McDonald's")

and

Herbert Washington

("Franchisee")

for the purpose of granting the Franchisee the rights necessary to operate the Restaurant.

In consideration of the mutual rights and obligations contained herein McDonald's and Franchisee agree as follows:

1.  *Nature and Scope of Franchise.*

    (a)    McDonald's operates a restaurant system ("McDonald's System"). The McDonald's System is a comprehensive system for the ongoing development, operation, and maintenance of McDonald's restaurant locations which have been selected and developed for the retailing of a limited menu of uniform and quality food products, emphasizing prompt and courteous service in a clean, wholesome atmosphere which is intended to be attractive to children and families and includes proprietary rights in certain valuable trade names, service marks, and trademarks, including the trade names "McDonald's" and "McDonald's Hamburgers," designs and color schemes for restaurant buildings, signs, equipment layouts, formulas and specifications for certain food products, methods of inventory and operation control, bookkeeping and accounting, and manuals covering business practices and policies. The McDonald's System is operated and is advertised widely within the United States of America and in certain foreign countries.

    (b)    McDonald's holds the right to authorize the adoption and use of the McDonald's System at the Restaurant. The rights granted to the Franchisee to operate the Restaurant are set forth in this Franchise, including the Operator's Lease ("Lease") which is attached hereto as Exhibit A, incorporated in this Franchise.

EXHIBIT 1

(c)     The foundation of the McDonald's System and the essence of this Franchise is the adherence by Franchisee to standards and policies of McDonald's providing for the uniform operation of all McDonald's restaurants within the McDonald's System including, but not limited to, serving only designated food and beverage products; the use of only prescribed equipment and building layout and designs; strict adherence to designated food and beverage specifications and to McDonald's prescribed standards of Quality, Service, and Cleanliness in the Restaurant operation.  Compliance by Franchisee with the foregoing standards and policies in conjunction with the McDonald's trademarks and service marks provides the basis for the valuable goodwill and wide family acceptance of the McDonald's System.  Moreover, the establishment and maintenance of a close personal working relationship with McDonald's in the conduct of Franchisee's McDonald's restaurant business, Franchisee's accountability for performance of the obligations contained in this Franchise, and Franchisee's adherence to the tenets of the McDonald's System constitute the essence of this Franchise.

(d)     The provisions of this Franchise shall be interpreted to give effect to the intent of the parties stated in this paragraph 1 so that the Restaurant shall be operated in conformity to the McDonald's System through strict adherence to McDonald's standards and policies as they exist now and as they may be from time to time modified.

(e)     Franchisee acknowledges Franchisee's understanding of McDonald's basic business policy that McDonald's will grant franchises only to those individuals who live in the locality of their McDonald's restaurant, actually own the entire equity interest in the business of the Restaurant and its profits, and who will work full time at their McDonald's restaurant business.  Franchisee represents, warrants, and agrees that Franchisee actually owns the complete equity interest in this Franchise and the profits from the operation of the Restaurant, and that Franchisee shall maintain such interest during the term of this Franchise except only as otherwise permitted pursuant to the terms and conditions of this Franchise.  Franchisee agrees to furnish McDonald's with such evidence as McDonald's may request, from time to time, for the purpose of assuring McDonald's that Franchisee's interest remains as represented herein.

(f)     Franchisee agrees to pay to McDonald's all required payments under this Franchise, including, without limitation, the payments set forth in paragraphs 8 and 9 herein and paragraph 3.01 of the Lease. All payments hereby required constitute a single financial arrangement between Franchisee and McDonald's which, taken as a whole and without regard to any designation or descriptions, reflect the value of the authorization being made available to the Franchisee by McDonald's in this Franchise and the services rendered by McDonald's during the term hereof.

2.     *Franchise Grant and Term.*

(a)     McDonald's grants to Franchisee for the following stated term the right, license, and privilege:

(i)     to adopt and use the McDonald's System at the Restaurant;

**Exhibit A
Page 60**

(ii)    to advertise to the public that Franchisee is a franchisee of McDonald's;

(iii)    to adopt and use, but only in connection with the sale of those food and beverage products which have been designated by McDonald's at the Restaurant, the trade names, trademarks, and service marks which McDonald's shall designate, from time to time, to be part of the McDonald's System; and

(iv)    to occupy the Restaurant as provided herein.

The rights granted under this Franchise are limited to the Restaurant's location only.

(b)    The term of this Franchise shall begin on the opening date of the Restaurant and end twenty (20) years thereafter, but in no event later than March 1, 2033, unless terminated prior thereto pursuant to the provisions hereof.

3.    *General Services of McDonald's*.  McDonald's shall advise and consult with Franchisee periodically in connection with the operation of the Restaurant and also, upon Franchisee's request, at other reasonable times.  McDonald's shall communicate to Franchisee know-how, new developments, techniques, and improvements in areas of restaurant management, food preparation, and service which are pertinent to the operation of a restaurant using the McDonald's System.  The communications shall be accomplished by visits by operations consultants, printed and filmed reports, seminars, and newsletter mailings.  McDonald's shall also make available to Franchisee all additional services, facilities, rights, and privileges relating to the operation of the Restaurant which McDonald's makes generally available, from time to time, to all its franchisees operating McDonald's restaurants.

4.    *Manuals*.  McDonald's shall provide Franchisee with the business manuals prepared for use by franchisees of McDonald's restaurants similar to the Restaurant.  The business manuals contain detailed information including: (a) required operations procedures; (b) methods of inventory control; (c) bookkeeping and accounting procedures; (d) business practices and policies; and (e) other management and advertising policies.  Franchisee agrees to promptly adopt and use exclusively the formulas, methods, and policies contained in the business manuals, now and as they may be modified from time to time.  Franchisee acknowledges that McDonald's or its affiliates own all proprietary rights in and to the McDonald's System and that the information revealed in the business manuals, in their entirety, constitute confidential trade secrets.  Without the prior written consent of McDonald's, Franchisee shall not disclose the contents of the business manuals to any person, except employees of Franchisee for purposes related solely to the operation of the Restaurant, nor shall Franchisee reprint or reproduce the manuals in whole or in part for any purpose except in connection with instruction of employees in the operation of the Restaurant.  Such manuals, as modified from time to time, and the policies contained therein, are incorporated in this Franchise by reference.

5.    *Advertising*.  McDonald's employs both public relations and advertising specialists who formulate and carry out national and local advertising programs for the McDonald's System.

Franchisee shall use only advertising and promotional materials and programs provided by McDonald's or approved in advance, in writing, by McDonald's. Neither the approval by McDonald's of Franchisee's advertising and promotional material nor the providing of such material by McDonald's to Franchisee shall, directly or indirectly, require McDonald's to pay for such advertising or promotion.

Franchisee shall expend during each calendar year for advertising and promotion of the Restaurant to the general public an amount which is not less than four percent (4%) of Gross Sales (as that term is defined in paragraph 7) for such year. Expenditures by Franchisee to national and regional cooperative advertising and promotion of the McDonald's System, or to a group of McDonald's restaurants which includes the Restaurant, shall be a credit against the required minimum expenditures for advertising and promotion to the general public.

6.     *Training*. McDonald's shall make available to Franchisee the services of Hamburger University, the international training center for the McDonald's System. Franchisee acknowledges the importance of quality of business operation among all restaurants in the McDonald's System and agrees to enroll Franchisee and Franchisee's managers, present and future, at Hamburger University or at such other training center as may be designated by McDonald's from time to time. McDonald's shall bear the cost of maintaining Hamburger University and any other training centers, including the overhead costs of training, staff salaries, materials, and all technical training tools, and agrees to provide to Franchisee both basic and advanced instruction for the operation of a McDonald's System restaurant. Franchisee shall pay all traveling, living, compensation, or other expenses incurred by Franchisee and Franchisee's employees in connection with attendance at Hamburger University or such other training centers.

7.     *Gross Sales*. For the purposes of this Franchise, the term "Gross Sales" shall mean all revenues from sales of the Franchisee based upon all business conducted upon or from the Restaurant, whether such sales be evidenced by check, cash, credit, charge account, exchange, or otherwise, and shall include, but not be limited to, the amounts received from the sale of goods, wares, and merchandise, including sales of food, beverages, and tangible property of every kind and nature, promotional or otherwise, and for services performed from or at the Restaurant, together with the amount of all orders taken or received at the Restaurant, whether such orders be filled from the Restaurant or elsewhere. Gross Sales shall not include sales of merchandise for which cash has been refunded, provided that such sales shall have previously been included in Gross Sales. There shall be deducted from Gross Sales the price of merchandise returned by customers for exchange, provided that such returned merchandise shall have been previously included in Gross Sales, and provided that the sales price of merchandise delivered to the customer in exchange shall be included in Gross Sales. Gross Sales shall not include the amount of any sales tax imposed by any federal, state, municipal, or other governmental authority directly on sales and collected from customers, provided that the amount thereof is added to the selling price or absorbed therein and actually paid by the Franchisee to such governmental authority. Each charge or sale upon credit shall

**Exhibit A Page 62**

be treated as a sale for the full price in the month during which such charge or sale shall be made, irrespective of the time when the Franchisee shall receive payment (whether full or partial) therefor.

8.    (a)    *Service Fee*. Franchisee shall pay a monthly service fee on or before the tenth (10th) day of the following month in an amount equal to four percent (4.0%) of the Gross Sales of the Restaurant for the preceding month immediately ended.

(b)    *Method of Payment*. Franchisee shall at all times participate in the McDonald's automatic debit/credit transfer program as specified by McDonald's from time to time for the payment of all amounts due McDonald's pursuant to this Franchise. Franchisee shall execute and deliver to McDonald's such documents and instruments as may be necessary to establish and maintain said automatic debit/credit transfer program.

(c)    *Interest on Delinquencies*. In the event that the Franchisee is past due on the payment of any amount due McDonald's under this Franchise, including accrued interest, the Franchisee shall be required, to the extent permitted by law, to pay interest on the past due amount to McDonald's for the period beginning with the original due date for payment to the date of actual payment at an annual rate equal to the highest rate allowed by law or, if there is no maximum rate permitted by law, then fifteen percent (15%). Such interest will be calculated on the basis of monthly compounding and the actual number of days elapsed divided by 365.

9.    *Initial Fee*. Franchisee acknowledges that: (a) the initial grant of this Franchise constitutes the sole consideration for the payment of an Initial Fee of Forty-Five Thousand Dollars ($45,000.00) to be paid by Franchisee to McDonald's; (b) the Initial Fee has been earned by McDonald's; (c) the Franchisee is being given a credit of $17,969.00 reducing the Initial Fee payment due to McDonald's to $27,031.00; and (d) Franchisee shall pay the reduced Initial Fee to McDonald's on the first of the month following the end of the seventh year after the opening date of the Restaurant.

10.    *Reports*. On or before 11:00 a.m. Central Standard Time on the first business day of each month, Franchisee shall render, in a manner specified by McDonald's, a statement, in such form as McDonald's shall reasonably require from time to time, of all receipts from the operation of the Restaurant for the preceding month immediately ended. On or before the twenty-fifth (25th) day of each month Franchisee shall submit to McDonald's an operating statement and a statistical report for the previous month in form satisfactory to McDonald's. Franchisee shall keep and preserve full and complete records of Gross Sales for at least three (3) years in a manner and form satisfactory to McDonald's and shall also deliver such additional financial and operating reports and other information as McDonald's may reasonably request on the forms and in the manner prescribed by McDonald's. Franchisee further agrees to submit within ninety (90) days following the close of each fiscal year of the Restaurant's operation, a profit and loss statement covering operations during such fiscal year and a balance sheet taken as of the close of such fiscal year, all prepared in accordance with generally accepted accounting principles. The profit and loss statement and the balance sheet shall, if McDonald's shall

**Exhibit A**
**Page 63**

request certification, be certified by a certified public accountant.  Franchisee shall at Franchisee's expense cause Franchisee's public accountant and certified public accountant, if any, to consult with McDonald's concerning such statement and balance sheet.  The original of each such report required by this paragraph 10 shall be mailed to McDonald's at the address indicated in paragraph 22 herein.

McDonald's shall have the right to inspect and/or audit Franchisee's accounts, books, records, and tax returns at all reasonable times to ensure that Franchisee is complying with the terms of this Franchise.  If such inspection discloses that Gross Sales actually exceeded the amount reported by Franchisee as Gross Sales by an amount equal to two percent (2%) or more of Gross Sales originally reported to McDonald's, Franchisee shall bear the cost of such inspection and audit.

11.      *Restrictions*.  Franchisee agrees and covenants as follows:

(a)      During the term of this Franchise, Franchisee shall not, without the prior written consent of McDonald's, directly or indirectly, engage in, acquire any financial or beneficial interest (including interests in corporations, partnerships, trusts, unincorporated associations, or joint ventures) in, or become a landlord for any restaurant business, which is similar to the Restaurant.

(b)      Franchisee shall not, for a period of eighteen (18) months after termination of this Franchise for any reason or the sale of the Restaurant, directly or indirectly, engage in or acquire any financial or beneficial interest (including any interest in corporations, partnerships, trusts, unincorporated associations, or joint ventures) in, or become a landlord of any restaurant business which is similar to the Restaurant within a ten-mile radius of the Restaurant.

(c)      Franchisee shall not appropriate, use, or duplicate the McDonald's System, or any portion thereof, for use at any other self-service, carry-out, or other similar restaurant business.

(d)      Franchisee shall not disclose or reveal any portion of the McDonald's System to a non-franchisee other than to Franchisee's Restaurant employees as an incident of their training.

(e)      Franchisee shall acquire no right to use, or to license the use of, any name, mark, or other intellectual property right granted or to be granted herein, except in connection with the operation of the Restaurant.

The restrictions contained in paragraphs 11(a) and 11(b) herein shall not apply to ownership of less than two percent (2%) of the shares of a company whose shares are listed and traded on a national or regional securities exchange.

12.      *Compliance With Entire System*.  Franchisee acknowledges that every component of the McDonald's System is important to McDonald's and to the operation of the Restaurant as a McDonald's restaurant, including a designated menu of food and beverage products; uniformity of food specifications, preparation methods, quality, and appearance; and uniformity of facilities and service.

**Exhibit A
Page 64**

McDonald's shall have the right to inspect the Restaurant at all reasonable times to ensure that Franchisee's operation thereof is in compliance with the standards and policies of the McDonald's System.

Franchisee shall comply with the entire McDonald's System, including, but not limited to, the following:

(a)     Operate the Restaurant in a clean, wholesome manner in compliance with prescribed standards of Quality, Service, and Cleanliness; comply with all business policies, practices, and procedures imposed by McDonald's; serve at the Restaurant only those food and beverage products now or hereafter designated by McDonald's; and maintain the building, fixtures, equipment, signage, seating and decor, and parking area in a good, clean, wholesome condition and repair, and well lighted and in compliance with designated standards as may be prescribed from time to time by McDonald's;

(b)     Purchase kitchen fixtures, lighting, seating, signs, and other equipment in accordance with the equipment specifications and layout initially designated by McDonald's and, promptly after notice from McDonald's that the Restaurant premises are ready for occupancy, cause the installation thereof;

(c)     Keep the Restaurant constructed and equipped in accordance with the building blueprints and equipment layout plans that are standard in the McDonald's System or as such blueprints and plans may be reasonably changed from time to time by McDonald's;

(d)     Franchisee shall not, without the prior written consent of McDonald's:  (i) make any building design conversion or (ii) make any alterations, conversions, or additions to the building, equipment, or parking area;

(e)     Make repairs or replacements required:  (i) because of damage or wear and tear or (ii) in order to maintain the Restaurant building and parking area in good condition and in conformity to blueprints and plans;

(f)     Where parking is provided, maintain the parking area for the exclusive use of Restaurant customers;

(g)     Operate the Restaurant seven (7) days per week throughout the year and at least during the hours from 7:00 a.m. to 11:00 p.m., or such other hours as may from time to time be prescribed by McDonald's (except when the Restaurant is untenantable as a result of fire or other casualty), maintain sufficient supplies of food and paper products, and employ adequate personnel so as to operate the Restaurant at its maximum capacity and efficiency;

(h)     Cause all employees of Franchisee, while working in the Restaurant, to:  (i) wear uniforms of such color, design, and other specifications as McDonald's may designate from time to time; (ii) present a neat and clean appearance; and (iii) render competent and courteous service to Restaurant customers;

(i)     In the dispensing and sale of food products:  (i) use only containers, cartons, bags, napkins, other paper goods, and packaging bearing the approved trademarks and which meet the McDonald's

Exhibit A
Page 65

System specifications and quality standards which McDonald's may designate from time to time; (ii) use only those flavorings, garnishments, and food and beverage ingredients which meet the McDonald's System specifications and quality standards which McDonald's may designate from time to time; and (iii) employ only those methods of food handling and preparation which McDonald's may designate from time to time;

(j)     To make prompt payment in accordance with the terms of invoices rendered to Franchisee on Franchisee's purchase of fixtures, signs, equipment, and food and paper supplies; and

(k)     At Franchisee's own expense, comply with all federal, state, and local laws, ordinances, and regulations affecting the operation of the Restaurant.

13.     *Best Efforts*.  Franchisee shall diligently and fully exploit the rights granted in this Franchise by personally devoting full time and best efforts and, in case more than one individual has executed this Franchise as the Franchisee, then Herbert Washington shall personally devote full time and best efforts to the operation of the Restaurant.  Franchisee shall keep free from conflicting enterprises or any other activities which would be detrimental to or interfere with the business of the Restaurant.

14.     *Interference With Employment Relations of Others*.  During the term of this Franchise, Franchisee shall not employ or seek to employ any person who is at the time employed by McDonald's, any of its subsidiaries, or by any person who is at the time operating a McDonald's restaurant or otherwise induce, directly or indirectly, such person to leave such employment.  This paragraph 14 shall not be violated if such person has left the employ of any of the foregoing parties for a period in excess of six (6) months.

15.     *Assignment*.  Without the prior written consent of McDonald's, Franchisee's interest in this Franchise shall not be assigned or otherwise transferred in whole or in part (whether voluntarily or by operation of law) directly, indirectly, or contingently, and then only in accordance with the terms of this paragraph 15.

(a)     Death or Permanent Incapacity of Franchisee.  Upon the death or permanent incapacity of Franchisee, the interest of Franchisee in this Franchise may be assigned either pursuant to the terms of paragraph 15(d) herein or to one or more of the following persons:  Franchisee's spouse, heirs, or nearest relatives by blood or marriage, subject to the following conditions: (i) if, in the sole discretion of McDonald's, such person shall be capable of conducting the Restaurant business in accordance with the terms and conditions of this Franchise and (ii) if such person shall also execute an agreement by which the person personally assumes full and unconditional liability for and agrees to perform all the terms and conditions of this Franchise to the same extent as the original Franchisee.  If, in McDonald's sole discretion, such person cannot devote full time and best efforts to the operation of the Restaurant or lacks the capacity to operate the Restaurant in accordance with this Franchise, McDonald's shall have an option to operate and/or manage the Restaurant for the account of Franchisee or of Franchisee's estate until the deceased or incapacitated Franchisee's interest is transferred to another party acceptable to McDonald's in accordance with the terms and conditions of this Franchise.  However, in no event shall such McDonald's operation and management of the Restaurant continue for a period in excess of

**Exhibit A
Page 66**

twelve (12) full calendar months without the consent of Franchisee or Franchisee's estate.  In the event that McDonald's so operates and/or manages the Restaurant, McDonald's shall make a complete account to and return the net income from such operation to the Franchisee or to Franchisee's estate, less a reasonable management fee and expenses.  If the disposition of the Restaurant to a party acceptable to McDonald's has not taken place within twelve (12) months from the date that McDonald's has commenced the operation or management of the Restaurant on behalf of the deceased or incapacitated Franchisee, then, in that event, McDonald's shall have the option to purchase the Restaurant at fair market value for cash or its common stock at its option.

      (b)      Assignment to Franchisee's Corporation.  Upon Franchisee's compliance with such requirements as may from time to time be prescribed by McDonald's, including a Stockholders Agreement in the form prescribed by McDonald's, McDonald's shall consent to an assignment to a corporation whose shares are wholly owned and controlled by Franchisee.  The corporate name of the corporation shall not include any of the names or trademarks granted by this Franchise.  Any subsequent assignment or transfer, either voluntarily or by operation of law, of all or any part of said shares shall be made in compliance with the terms and conditions set forth in paragraphs 15(a) and 15(d) herein.

      (c)      First Option to Purchase.  Franchisee or Franchisee's representative shall, at least twenty (20) days prior to the proposed effective date, give McDonald's written notice of intent to sell or otherwise transfer this Franchise pursuant to paragraph 15(d).  The notice shall set forth the name and address of the proposed purchaser and all the terms and conditions of any offer.  McDonald's shall have the first option to purchase the Restaurant by giving written notice to Franchisee of its intention to purchase on the same terms as the offer within ten (10) days following McDonald's receipt of such notice.  However, if McDonald's fails to exercise its option and the Restaurant is not subsequently sold to the proposed purchaser for any reason, McDonald's shall continue to have, upon the same conditions, a first option to purchase the Restaurant upon the terms and conditions of any subsequent offer.

      (d)      Other Assignment.  In addition to any assignments or contingent assignments contemplated by the terms of paragraphs 15(a) and 15(b), Franchisee shall not sell, transfer, or assign this Franchise to any person or persons without McDonald's prior written consent.  Such consent shall not be arbitrarily withheld.

      In determining whether to grant or to withhold such consent, McDonald's shall consider of each prospective transferee, by way of illustration, the following:  (i) work experience and aptitude, (ii) financial background, (iii) character, (iv) ability to personally devote full time and best efforts to managing the Restaurant, (v) residence in the locality of the Restaurant, (vi) equity interest in the Restaurant, (vii) conflicting interests, and (viii) such other criteria and conditions as McDonald's shall then apply in the case of an application for a new franchise to operate a McDonald's restaurant.  McDonald's consent shall also be conditioned each upon such transferee's execution of an agreement by which transferee personally assumes full and unconditional

**Exhibit A
Page 67**

liability for and agrees to perform from the date of such transfer all obligations, covenants, and agreements contained in this Franchise to the same extent as if transferee had been an original party to this Franchise. Franchisee and each transferor shall continue to remain personally liable for all affirmative obligations, covenants, and agreements contained herein for the full term of this Franchise or for such shorter period as McDonald's may, in its sole discretion, determine. Upon each assignment or other transfer of this Franchise to any person or persons under the terms and conditions of this paragraph 15(d), the percentage service fee charge owing to McDonald's after the date of such assignment or transfer shall be automatically adjusted to the then prevailing percentage service fee charge required under new Franchises issued by McDonald's for similar McDonald's restaurants at the time of such assignment or transfer.

16.   *Franchisee Not an Agent of McDonald's.*   Franchisee shall have no authority, express or implied, to act as agent of McDonald's or any of its affiliates for any purpose. Franchisee is, and shall remain, an independent contractor responsible for all obligations and liabilities of, and for all loss or damage to, the Restaurant and its business, including any personal property, equipment, fixtures, or real property connected therewith, and for all claims or demands based on damage or destruction of property or based on injury, illness, or death of any person or persons, directly or indirectly, resulting from the operation of the Restaurant. Further, Franchisee and McDonald's are not and do not intend to be partners, associates, or joint employers in any way and McDonald's shall not be construed to be jointly liable for any acts or omissions of Franchisee under any circumstances.

17.   *Insurance.*   Franchisee shall, upon taking possession of the Restaurant, acquire and maintain in effect such insurance with such coverages as may be required by the terms of any lease of the Restaurant premises to McDonald's, and in any event, Franchisee shall acquire and maintain in effect not less than the following coverages in the following minimum amounts:

(a)   Worker's Compensation insurance prescribed by law in the state in which the Restaurant is located and Employer's Liability Insurance with $100,000/$500,000/$100,000 minimum limit. If the state in which the Restaurant is located allows the option of not carrying Worker's Compensation Insurance, and Franchisee chooses to exercise that option, Franchisee shall nonetheless carry and maintain other insurance with coverage and limits as approved by McDonald's.

(b)   Commercial general liability insurance in a form approved by McDonald's with a limit of $5,000,000 per occurrence/$5,000,000 aggregate.

(c)   All such insurance as may be required under the Lease.

All insurance policies required to be carried hereunder shall name McDonald's and any party designated by McDonald's as additional insureds, as their interests may appear in this Franchise. All policies shall be effective on or prior to the date Franchisee is given possession of the Restaurant premises for the purpose of installing equipment or opening the Restaurant, whichever occurs first, and evidence of payment of

**Exhibit A
Page 68**

premiums and duplicate copies of policies of the insurance required herein shall be delivered to McDonald's at least thirty (30) days prior to the date that Franchisee opens for business and/or thirty (30) days prior to the expiration date of an existing policy of insurance. All policies of insurance shall include a provision prohibiting cancellations or material changes to the policy thereof until thirty (30) days prior written notice has been given to McDonald's.

In the event Franchisee shall fail to obtain the insurance required herein, McDonald's may, but is not obligated to, purchase said insurance, adding the premiums paid to Franchisee's monthly rent. (Franchisee may authorize McDonald's to purchase and to administer the required minimum insurance on Franchisee's behalf. However, McDonald's, by placement of the required minimum insurance, assumes no responsibility for premium expense nor guarantees payment for any losses sustained by Franchisee.) McDonald's may relieve itself of all obligations with respect to the purchase and administration of such required insurance coverage by giving ten (10) days written notice to Franchisee.

All insurance shall be placed with a reputable insurance company licensed to do business in the state in which the Restaurant is located and having a Financial Size Category equal to or greater than IX and Policyholders Rating of "A+" or "A", as assigned by Alfred M. Best and Company, Inc., unless otherwise approved by McDonald's.

18.   *Material Breach*.   The parties agree that the happening of any of the following events shall constitute a material breach of this Franchise and violate the essence of Franchisee's obligations and, without prejudice to any of its other rights or remedies at law or in equity, McDonald's, at its election, may terminate this Franchise upon the happening of any of the following events:

(a)   Franchisee shall fail to maintain and operate the Restaurant in a good, clean, wholesome manner and in compliance with the standards prescribed by the McDonald's System;

(b)   Franchisee shall be adjudicated a bankrupt, become insolvent, or a receiver, whether permanent or temporary, for all or substantially all of Franchisee's property, shall be appointed by any court, or Franchisee shall make a general assignment for the benefit of creditors, or a voluntary or involuntary petition under any bankruptcy law shall be filed with respect to Franchisee and shall not be dismissed within thirty (30) days thereafter;

(c)   Any payment owing to McDonald's is not paid within thirty (30) days after the date such payment is due;

(d)   Any judgment or judgments aggregating in excess of $5,000.00 against Franchisee or any lien in excess of $5,000.00 against Franchisee's property shall remain unsatisfied or unbonded of record in excess of thirty (30) days;

**Exhibit A
Page 69**

(e)     Franchisee shall cause, suffer, or permit (voluntarily or involuntarily) Franchisee's right of possession as lessee or sublessee of the premises on which the Restaurant is located to be terminated prematurely for any cause whatever;

(f)     Franchisee shall acquire any interest in a business in violation of paragraph 11(a);

(g)     Franchisee shall duplicate the McDonald's System in violation of paragraph 11(c);

(h)     Franchisee shall make or cause a disclosure of any portion of the McDonald's System in violation of paragraph 11(d) or shall make or cause a disclosure of part of the McDonald's System business manuals;

(i)     Franchisee shall violate paragraph 11(e) by use of any name, trademark, service mark, or other intellectual property right exceeding the restrictions of said paragraph 11;

(j)     Franchisee shall knowingly sell food or beverage products other than those designated by McDonald's or which fail to conform to McDonald's System specifications for those products, or which are not prepared in accordance with the methods prescribed by McDonald's, or fail to sell products designated by McDonald's;

(k)     Any assignment or other transfer of any interest of the Franchisee in this Franchise shall occur in violation of paragraph 15(d) herein;

(l)     Franchisee shall deny McDonald's the right to inspect the Restaurant at reasonable times;

(m)    Franchisee shall fail to make or make repeated delays in the prompt payment of undisputed invoices from suppliers or in the remittance of payments as required by this Franchise;

(n)     Franchisee makes any misrepresentations to McDonald's relating to the acquisition and/or ownership of this Franchise;

(o)     Franchisee engages in public conduct which reflects materially and unfavorably upon the operation of the Restaurant, the reputation of the McDonald's System, or the goodwill associated with the McDonald's trademarks; provided that engaging in legitimate political activity (including testifying, lobbying, or otherwise attempting to influence legislation) shall not be grounds for termination;

(p)     Franchisee is convicted of, pleads guilty or no contest to a felony, or any other crime that is reasonably likely to adversely affect the McDonald's System, the Restaurant, or the goodwill associated with the McDonald's trademarks; or

(q)     Franchisee intentionally understates Gross Sales reported to McDonald's.

19.    *Other Breaches*. If Franchisee fails in the performance of any of the terms and conditions of this Franchise (other than performance of the terms and conditions listed in paragraph 18), Franchisee shall be guilty of a breach of this Franchise which shall not (except in the case of repeated breaches of the same or of different terms and conditions of this Franchise) constitute grounds for termination of this Franchise.  McDonald's shall have the right to seek judicial enforcement of its rights and remedies, including, but not limited to, injunctive

Exhibit A
Page 70

relief, damages, or specific performance.   Notwithstanding any of the provisions of this paragraph 19, any uncured breach of the terms of this Franchise (whether of paragraph 18 or 19) shall be sufficient reason for McDonald's to withhold approval of its consent to any assignment or transfer of Franchisee's interest in this Franchise provided for herein.

20.   *Effect of Termination.*

(a)   In the event of any material breach of this Franchise, McDonald's shall have an immediate right to enter and take possession of the Restaurant in order to maintain continuous operation of the Restaurant, to provide for orderly change of management and disposition of personal property, and to otherwise protect McDonald's interest.

(b)   Upon termination of this Franchise due to any breach or breaches, Franchisee shall not, without the prior written consent of McDonald's, remove any furniture, fixtures, signs, equipment, other property, or leasehold improvements from the premises either prior to or for a period of thirty (30) days following such termination.  McDonald's shall have the option for thirty (30) days following any such termination to purchase Franchisee's furniture, fixtures, signs, equipment, other property, and leasehold improvements or any portion thereof for a sum equal to the fair market value of such property.  In the event of such a termination, there shall be no payment by McDonald's for intangible assets of Franchisee.

(c)   Upon termination of this Franchise due to the expiration of its term or as a result of any eminent domain proceedings affecting the premises upon which the Restaurant is situated, Franchisee shall not remove any furniture, fixtures, signs, equipment, other property, or leasehold improvements within sixty (60) days prior to the date specified for termination or the date specified for takeover by any public authority.  McDonald's shall, upon written notice of its intention to purchase said property at least thirty (30) days prior to such date of termination, have the option to purchase Franchisee's furniture, fixtures, signs, equipment, other property, and leasehold improvements or any portion thereof for a sum equal to the fair market value of such property.  In the event of such a termination, there shall be no payment by McDonald's for intangible assets of Franchisee.

(d)   Upon termination or expiration of this Franchise, Franchisee shall: (i) forthwith return to McDonald's the business manuals furnished to Franchisee, together with all other material containing trade secrets, operating instructions, or business practices; (ii) discontinue the use of the McDonald's System and its associated trade names, service marks, and trademarks or the use of any and all signs and printed goods bearing such names and marks, or any reference to them; (iii) not disclose, reveal, or publish all or any portion of the McDonald's System; and (iv) not thereafter use any trade name, service mark, or trademark similar to or likely to be confused with any trade name, service mark, or trademark used at any time in the McDonald's System.

21.   *Effect of Waivers.*   No waiver by McDonald's or any breach or a series of breaches of this Franchise shall constitute a waiver of any subsequent breach or waiver of the terms of this Franchise.

**Exhibit A
Page 71**

22.    *Notices.*  Any notice hereunder shall be in writing and shall be delivered by personal service or by United States certified or registered mail, with postage prepaid, addressed to Franchisee at the Restaurant or to McDonald's at **ONE McDONALD'S PLAZA, OAK BROOK, ILLINOIS 60523**.  Either party, by a similar written notice, may change the address to which notices shall be sent.

23.    *Cost of Enforcement.*  If McDonald's institutes any action at law or in equity against Franchisee to secure or protect McDonald's rights under or to enforce the terms of this Franchise, in addition to any judgment entered in its favor, McDonald's shall be entitled to recover such reasonable attorneys' fees as may be allowed by the court together with court costs and expenses of litigation.

24.    *Indemnification.*  If McDonald's shall be subject to any claim, demand, or penalty or become a party to any suit or other judicial or administrative proceeding by reason of any claimed act or omission by Franchisee or Franchisee's employees or agents, or by reason of any act occurring on the Restaurant premises, or by reason of an omission with respect to the business or operation of the Restaurant, Franchisee shall indemnify and hold McDonald's harmless against all judgments, settlements, penalties, and expenses, including attorneys' fees, court costs, and other expenses of litigation or administrative proceeding, incurred by or imposed on McDonald's in connection with the investigation or defense relating to such claim, litigation, or administrative proceeding and, at the election of McDonald's, Franchisee shall also defend McDonald's.

25.    *Construction and Severability.*  All references in this Franchise to the singular shall include the plural where applicable.  If any part of this Franchise for any reason shall be declared invalid, such decision shall not affect the validity of any remaining portion, which shall remain in full force and effect.  In the event that any material provision of this Franchise shall be stricken or declared invalid, McDonald's reserves the right to terminate this Franchise.

26.    *Scope and Modification of Franchise.*  This Franchise (including Exhibit A and any riders hereto) constitutes the entire agreement between the parties and supersedes all prior and contemporaneous, oral or written, agreements or understandings of the parties.  Nothing in this Franchise or in any related agreement, however, is intended to disclaim the representations made in the Franchise Disclosure Document furnished to Franchisee.  No interpretation, change, termination, or waiver of any of the provisions hereof shall be binding upon McDonald's unless in writing signed by an officer or franchising director of McDonald's, and which is specifically identified as an amendment hereto.  No modification, waiver, termination, rescission, discharge, or cancellation of this Franchise shall affect the right of any party hereto to enforce any claim or right hereunder, whether or not liquidated, which occurred prior to the date of such modification, waiver, termination, rescission, discharge, or cancellation.

27.    *Governing Laws.*  The terms and provisions of this Franchise shall be interpreted in accordance with and governed by the laws of the state of Illinois.

**Exhibit A
Page 72**

28.  *Acknowledgment.* Franchisee acknowledges that:

(a)     The term of this Franchise is set forth in paragraph 2(b) hereof with no promise or representation as to the renewal of this Franchise or the grant of a new franchise;

(b)     Franchisee hereby represents that Franchisee has received a copy of this Franchise, has read and understands all obligations being undertaken, and has had an opportunity to consult with Franchisee's attorney with respect thereto at least seven (7) calendar days prior to execution;

(c)     No representation has been made by McDonald's as to the future profitability of the Restaurant;

(d)     Prior to the execution of this Franchise, Franchisee has worked at a McDonald's restaurant and has had ample opportunity to contact existing franchisees of McDonald's and to investigate all representations made by McDonald's relating to the McDonald's System;

(e)     This Franchise establishes the Restaurant at the location specified on page 1 hereof only and that no "exclusive," "protected," or other territorial rights in the contiguous market area of such Restaurant is hereby granted or inferred;

(f)     This Franchise supersedes any and all other agreements and representations respecting the Restaurant and contains all the terms, conditions, and obligations of the parties with respect to the grant of this Franchise; however, nothing in this Franchise or in any related agreement is intended to disclaim the representations made in the Franchise Disclosure Document furnished to Franchisee;

(g)     McDonald's or its affiliates are the sole owner(s) of the trademarks, trade names, service marks, and goodwill associated therewith, respectively, and Franchisee acquires no right, title, or interest in those names and marks other than the right to use them only in the manner and to the extent prescribed and approved by McDonald's;

(h)     No future franchise or offers of franchises for additional McDonald's restaurants, other than this Franchise, have been promised to Franchisee and any other franchise offer shall only be in writing, executed by an officer or franchising director of McDonald's, and identified as a Franchise Agreement or Rewrite (New Term) Commitment Letter;

(i)     Neither McDonald's nor anyone acting on its behalf has made any representations, inducements, promises, or agreements, orally or otherwise, respecting the subject matter of this Franchise, which is not embodied herein or set forth in the Franchise Disclosure Document; and

(j)     This Franchise is offered to Franchisee personally and to no others, and may not be accepted by any other person, partnership, or corporation, or transferred by assignment, will, or operation of law.

**Exhibit A
Page 73**

**IN WITNESS WHEREOF**, the parties hereto set their hands and seals, in duplicate, the day and year in this instrument first above written.

McDONALD'S USA, LLC                                    Franchisee

By: _____                         _____    2/25/12
      James Wong                                      Herbert Washington              Date
      Authorized Representative

Prepared By:  Deborah A. Kern

Exhibit A
Page 74

BOARDMAN, OHIO
22 Boardman Canfield Road
L/C: 034-1791
File #: 44672

### New Restaurant Rider

This Rider is attached to and incorporated into that certain Franchise Agreement, dated February 16, 2012 ("Franchise"), by and between **McDonald's USA, LLC**, a Delaware limited liability company ("McDonald's") and **Herbert Washington** ("Franchisee").

1.      Prior to the opening date of the Restaurant, all construction extras ordered or authorized by Franchisee for which McDonald's has paid the parties constructing the Restaurant must be paid by Franchisee to McDonald's.

2.      The amount of the monthly base rental payment in the Operator's Lease (Exhibit A to this Franchise) is computed based in part on McDonald's total current real estate costs and its estimated construction costs.  If those costs increase within 180 days after the opening date of the Restaurant, the monthly base rental payment will be recomputed and increased based on the increased costs, but only to a maximum monthly base rental increase of $325.00.  The corresponding monthly base sales will be adjusted accordingly.  The effective date of the increase will be 180 days after the opening date of the Restaurant.

3.      On or before the opening date of the Restaurant, Franchisee will pay to McDonald's a one-time contribution in the amount of $1,284,255.00 toward the costs of constructing the Restaurant ("Improvement Costs").  Improvement Costs means in the aggregate any and all costs associated with the design, permitting, materials, and construction of the building and site improvements (the building and site improvements are collectively referred to in this Rider as the "Improvements"), including, but not limited to, survey and design plans; zoning, subdivision, and other land use assessments, applications, permits, and approvals; title and other legal reviews; soil borings, environmental, and other physical studies and investigations; the demolition of the existing building and site improvements and proper disposal of any resulting debris; any interest expense incurred by McDonald's; and all fees, expenses, overhead, and profit payable to outside consultants (including attorneys, architects, engineers, contractors, suppliers, etc.) for services, labor, and materials in connection with the design, permitting, and construction of the Restaurant.

4.      Franchisee and McDonald's agree that Improvements attributable to Franchisee's share of total Improvement Costs will be treated for income tax purposes as lessee improvements; that Franchisee will be entitled to any cost recovery, depreciation, or amortization deductions available under applicable income tax laws for Improvements; and that McDonald's will not claim any cost recovery, depreciation, or amortization deductions with respect to Improvements.  Franchisee and McDonald's agree that Improvements attributable to McDonald's share of total Improvement Costs will be treated for income tax purposes as owned by McDonald's; that McDonald's will be entitled to any cost recovery, depreciation, or amortization deductions available under applicable income tax laws for Improvements; and that Franchisee will not claim any cost recovery, depreciation, or amortization deductions with

dak washington (boardman) cr ri.docx (2/16/12)

**Exhibit A
Page 75**

respect to Improvements.  Franchisee and McDonald's further agree that any Franchisee's share of total Improvement Costs is not intended to be, and will not be treated as, in whole or in part, a substitute for rent.  Neither Franchisee nor McDonald's will take any position on any tax return or in any tax proceeding that is inconsistent with the tax treatment provided in this paragraph.

Franchisee and McDonald's will each be treated as incurring a pro rata portion of each cost item that constitutes an Improvement Cost.  Franchisee's pro rata portion will be equal to the ratio of Franchisee's share to total Improvement Costs.  McDonald's pro rata portion will be equal to the ratio of McDonald's share to total Improvement Costs.  If Franchisee chooses to perform a cost segregation study with respect to Franchisee's share of Improvement Costs, Franchisee will be solely responsible for all costs and expenses incurred in connection with performing the study.  Notwithstanding the preceding sentences, and except for any leasehold estate in the land granted Franchisee in connection with this Franchise, McDonald's will have the exclusive legal and equitable right, title, and interest in and to the land and Improvements.

Franchisee is solely responsible for preparing and filing all personal property, sales and use, and other tax returns and for paying all personal property, sales and use, and other taxes, if any, associated with Improvement Costs.

5.      A condition precedent to the grant of this Franchise is that Franchisee execute the Franchise Termination Agreement, dated February 16, 2012 ("Termination Agreement"), for the McDonald's restaurant located at 15 Boardman Canfield Road, Youngstown, Ohio [L/C: 034-0002], on or before the opening date of the Restaurant.  If Franchisee does not execute the Termination Agreement on or before the opening date of the Restaurant for any reason, this Franchise is null and void and McDonald's will have no further obligations or liability to Franchisee.

dak washington (boardman) cr ri.docx                    2

BOARDMAN, OHIO
22 Boardman Canfield Road
L/C:  034-1791
File #:  44672

## EXHIBIT A TO FRANCHISE AGREEMENT

## OPERATOR'S LEASE

## TABLE OF CONTENTS

| | | |
|---|---|---|
| **Article 1** | **SUMMARY OF FUNDAMENTAL LEASE PROVISIONS** | |
| Sec. | 1.01  Term | 1 |
| | 1.02  Rent | 1 |
| | 1.03  Legal Description | 1 |
| | 1.04  Liability Insurance Limits | 1 |
| | 1.05  Attachments, Exhibits and Addenda | 1 |
| | | |
| **Article 2** | **PREMISES AND TERM** | |
| Sec. | 2.01  Premises | 1 |
| | 2.02  Term | 2 |
| | 2.03  Quiet Enjoyment | 2 |
| | 2.04  Use of Premises | 2 |
| | 2.05  Rule Against Perpetuities | 2 |
| | 2.06  Construction and Delivery of Building and Other Improvements | 2 |
| | 2.07  Acceptance of Premises | 2 |
| | 2.08  Tenant's Compliance With Various Requirements | 3 |
| | | |
| **Article 3** | **RENT, TAXES, RECORDS AND REPORTS** | |
| Sec. | 3.01  Rent | 3 |
| | 3.01  (A) Basic Rent | 3 |
| | 3.01  (B) Percentage Rent | 3 |
| | 3.01  (C) Definition of 'Gross Sales' | 4 |
| | 3.01  (D) Taxes and Assessments | 4 |
| | 3.01  (E) Other Charges and Expenses | 5 |
| | 3.01  (F) Method and Proof of Payment | 5 |
| | 3.02  Records | 5 |
| | 3.03  Reports | 5 |
| | 3.03  (A) Default in Reporting | 6 |
| | 3.03  (B) Inspection of Records by Landlord | 6 |
| | 3.04  No Abatement of Rent | 6 |
| | 3.05  Interest on Delinquencies | 6 |
| | 3.06  Lien for Rent | 6 |

## TABLE OF CONTENTS (Continued)

| Article 4 | **OBLIGATIONS OF TENANT** | |
|---|---|---|
| Sec. | 4.01  Utilities | 6 |
| | 4.02  Maintenance and Repair | 7 |
| | 4.03  Alterations | 7 |
| | 4.04  Surety | 7 |
| | 4.05  Liens Against Property | 7 |
| | 4.06  Assignment by Tenant | 7 |
| | 4.07  Franchise Agreement | 8 |

| Article 5 | **FIXTURES AND EQUIPMENT** | |
|---|---|---|
| Sec. | 5.01  Fixtures | 8 |
| | 5.02  Removal of Tenant's Property | 8 |

| Article 6 | **INSURANCE AND DAMAGE TO PROPERTY** | |
|---|---|---|
| Sec. | 6.01  Liability Insurance | 8 |
| | 6.02  Rental Insurance | 8 |
| | 6.03  Property Insurance | 8 |
| | 6.04  Placement and Policies of Insurance | 9 |
| | 6.05  Repair and Replacement of Buildings | 9 |

| Article 7 | **RIGHTS OF LANDLORD** | |
|---|---|---|
| Sec. | 7.01  Inspection by Landlord | 10 |
| | 7.02  Indemnity for Litigation | 10 |
| | 7.03  Waiver of Claims | 10 |
| | 7.04  Re-entry Upon Default | 11 |
| | 7.05  Holding Over | 12 |
| | 7.06  Remedies Cumulative | 12 |
| | 7.07  Waiver | 12 |
| | 7.08  Accord and Satisfaction | 12 |
| | 7.09  Right to Perform for Tenant | 12 |
| | 7.10  Condemnation | 12 |
| | 7.11  Subordination and Non-Disturbance | 13 |

| Article 8 | **MISCELLANEOUS** | |
|---|---|---|
| Sec. | 8.01  No Agency Created | 14 |
| | 8.02  Recording of Lease | 14 |
| | 8.03  Force Majeure | 14 |
| | 8.04  Paragraph Headings | 14 |
| | 8.05  Invalidity of a Provision | 14 |
| | 8.06  Law Governing | 14 |
| | 8.07  Entire Agreement | 14 |
| | 8.08  Parties Bound | 15 |
| | 8.09  Notices or Demands | 15 |

**Exhibit A**
**Page 78**

## OPERATOR'S LEASE

**THIS LEASE** shall be considered effective the same date as the Franchise Agreement to which it is attached (the "Franchise Agreement"). The term "Landlord," when used in this Lease, shall refer to McDonald's USA, LLC, a Delaware limited liability company, and the term "Tenant," when used in this Lease, shall refer to the undersigned Tenant.

In consideration of the mutual promises contained in this Lease, the parties agree as follows:

## ARTICLE 1  SUMMARY OF FUNDAMENTAL LEASE PROVISIONS

1.01  **Term:**  (See Article 2.02)  The term of this Lease will begin on the date the McDonald's Restaurant constructed on the Premises (as defined below) opens for business and will end twenty (20) years thereafter.

1.02  **Rent:**  See Article 3.01 and Schedule B, attached.

1.03  **Legal Description:**  See Schedule A and Article 2.01.

1.04  **Liability Insurance Limits:**  $5,000,000 per occurrence/$5,000,000 aggregate.

1.05  **Attachments, Exhibits and Addenda:**   This Lease includes the following Attachments, Schedules and Addenda which will take precedence over conflicting provisions (if any) of this Lease, and they are made an integral part of this Lease and are fully incorporated into it by this reference.

    (i)    Schedule A — Legal Description

    (ii)    Schedule B — Rent

    (iii)    Schedule C — Landlord's Interest Addendum

    (iv)    Schedule D — Head Lease is the Lease dated August 17, 2011, with Amendments to Lease dated September 6, 2011 and September 12, 2011.

    (v)    Schedule E — Declaration Establishing Reciprocal Access Easements and Restrictions recorded on August 2, 2011; Amended and Restated Declaration Establishing Reciprocal Access Easements and Restrictions recorded September 2, 2011

References in this Article to the other Articles in this Lease are for convenience and to designate some of the other Articles where references to particular Fundamental Lease Provisions will be made.  If there is any conflict between a Fundamental Lease Provision and the balance of the Lease, the former will control.

## ARTICLE 2 PREMISES AND TERM

2.01  **Premises:**  Landlord leases to Tenant the real estate described in Schedule A, attached, together with all easements and appurtenances and all buildings and improvements located on the real estate (all of which are collectively referred to in this Lease as "the Premises").   The Premises are subject to any easements, conditions, encumbrances,

**Exhibit A
Page 79**

restrictions, and party wall agreements, if any, of record and roads and highways and zoning and building code restrictions existing on the date of this Lease.

2.02 **Term:**  The term of this Lease will be as indicated in Article 1.01, subject, however, to any rights set forth in this Lease for the earlier termination of the Lease term.  At the request of either party, a supplement establishing the beginning and ending dates of this Lease shall be executed.  Landlord may establish the beginning date by notifying the Tenant in writing of the date it recognizes as the beginning date of the term.

2.03 **Quiet Enjoyment:**  Landlord promises that Tenant, upon paying the rent and all other charges provided for in this Lease, and upon observing and keeping all Tenant's obligations, will lawfully and quietly hold, occupy and enjoy the Premises during the term of this Lease, without hindrance or interference by anyone claiming by, through or under Landlord, subject to the terms of this Lease and any mortgage or encumbrance now or hereafter placed on the Premises by Landlord.

2.04 **Use of Premises:**  Tenant will use and occupy the Premises solely for a McDonald's Restaurant selling only such products and operating in a manner that may be designated by McDonald's USA, LLC.  Tenant agrees to continuously occupy the Premises during the term of this Lease and agrees not to vacate them.  A breach of this provision will be deemed to be substantial.  If Tenant vacates the Premises during the term of this Lease, Landlord will have the right, in addition to its other rights and remedies, to enter the Premises for the purpose of continuing the operation of the McDonald's Restaurant; and, if Landlord so elects, Landlord shall be entitled to all profits, if any, from the operation of the restaurant.  Tenant further agrees to conduct its restaurant business in a manner that will maximize Gross Sales.  Tenant agrees to purchase, install and maintain, all at its own expense, signs and trade fixtures and equipment in accordance with the plans, specifications and layouts of McDonald's USA, LLC, or any of its subsidiaries, unless these items have been furnished by Landlord.

2.05 **Rule Against Perpetuities:**  If the term of this Lease or the accrual of rent have not commenced within one (1) year from date of execution of this Lease, this Lease will become null and void and of no further force and effect.  The sole remedy of Tenant in such case is the return of any monies paid to Landlord in anticipation of this Lease.

2.06 **Construction and Delivery of Building and Other Improvements:**  Landlord will construct or have others construct or remodel or otherwise prepare the Premises for a McDonald's Restaurant in accordance with the then current plans and specifications of McDonald's USA, LLC.  The Premises will be delivered to Tenant when they are sufficiently completed to allow Tenant to install, at Tenant's sole cost and expense, the signs, trade fixtures, equipment and other personal property and improvements necessary to complete the Premises for the operation of a McDonald's Restaurant, unless otherwise provided in Article 1.03.  Tenant will promptly and diligently perform its work in accordance with the plans and specifications previously submitted by or to Tenant and approved by Landlord and in compliance with all applicable federal, state and local statutes, codes and regulations.  Tenant will do all that is reasonably necessary to promptly open the restaurant as soon as possible after delivery of the Premises to the Tenant.

2.07 **Acceptance of Premises:**  By taking possession of the Premises, Tenant acknowledges that Tenant has inspected the Premises and the improvements thereon and found them to be in a safe, satisfactory, and completed condition, ready for occupancy and the installation of trade fixtures, equipment and signage.  All warranties as to the condition of the

dak washington (boardman) cr ls.docx

Exhibit A
Page 80

Premises or its fitness for use, either expressed or implied, are expressly waived by Tenant. Tenant may, however, receive certain warranties and guarantees, by separate agreement, from McDonald's USA, LLC or one of its subsidiaries; but those warranties will be personal covenants, only, and will not be binding upon the successors and assigns of Landlord.

2.08 **Tenant's Compliance With Various Requirements:**  Tenant may not use or permit any person to use the Premises or any part of it for any use in violation of federal, state or local laws, including, but not limited to, present and future ordinances or other regulations of any municipality in which the Premises are situated.  Tenant will not use or permit any person to use the Premises or any building thereon for the manufacture or sale of intoxicating liquor of any kind whatsoever.  Except as provided below, Tenant may not operate any coin or token operated vending or similar device for the sale of any goods, wares, merchandise, food, beverages or services, including but not limited to, pay telephones, pay lockers, pay toilets, scales, amusement devices, and machines for the sale of beverages, foods, candy, cigarettes or other commodities.  One coin operated newspaper vending machine, Playplace games and one pay telephone may be installed, if they are in compliance with Landlord's current written policy on the installation and maintenance of these items.  During the term of this Lease, Tenant will keep the Premises and all buildings in a clean and wholesome condition and repair and will maintain the Premises so that they fully comply with all lawful health and police regulations. Tenant will conduct the McDonald's Restaurant on the Premises strictly in accordance with the terms and provisions of the Franchise Agreement.  Tenant will minimize all cooking odors and smoke, maintain the highest degree of sanitation and comply with all ordinances, orders, directives, rules and regulations of all governmental bodies, bureaus and offices having jurisdiction over Tenant and over the Premises.   Landlord makes no warranties or representations as to the state of such ordinances, rules, orders and directives, regulations, and Tenant acknowledges that Tenant has independently investigated them and will comply with them.  Landlord makes no warranties or representations that the Premises, when accepted by Tenant, conform with the Federal, State or Industrial Safety Codes.  Tenant will obtain, keep in full force and effect, and strictly comply with, all governmental licenses and permits which may be required for Tenant's use and occupancy of the Premises and the operation of the McDonald's Restaurant.

## ARTICLE 3  RENT, TAXES, RECORDS AND REPORTS

3.01 **Rent:**  Tenant promises to pay rent to Landlord, without offset or deduction, as follows:

A.    **Basic Rent:**  Tenant will pay monthly to Landlord the Basic Rent indicated in Schedule B, attached.   The first Basic Rental payment will be due and payable on the commencement date of the term, and the subsequent monthly rental payments will be due thereafter, in advance, on or before the first day of every succeeding calendar month.  If the date of commencement of rent occurs on a day other than the first day of the month, the first rental payment (both of Basic Rent and Percentage Rent, if any, and the last rental payment, if applicable) will be adjusted for the proportionate fraction of the whole month so that all rental payments, other than the first, will be made and become due and payable on the first day of each month.

B.     **Percentage Rent:**  In addition to the Basic Rent, Tenant promises to pay Percentage Rent to Landlord in the amount and during the periods set forth in Schedule B, attached, on all Gross Sales from the Premises in excess of the Monthly Base Sales set forth in Schedule B, attached.  See Article 3.03 for the manner of payment of Percentage Rent.

C.  **Definition of "Gross Sales":**  For the purposes of this Lease, the term "Gross Sales" will mean all receipts (cash, cash equivalent, credit or redeemed gift certificates) or revenue from sales by Tenant, and of all others, from all business conducted upon or from the Premises, whether such sales be evidenced by check, cash, credit, charge account, exchange or otherwise, and will include, but not be limited to, the amount received from the sale of goods, wares and merchandise, including sales of food, beverages and tangible property of every kind and nature, promotional or otherwise, and for services performed at the Premises, together with the amount of all orders taken or received at the Premises, all as may be prescribed or approved by the Franchise Agreement.  Gross Sales will not include sales of merchandise for which cash has been refunded, or allowances made on merchandise claimed to be defective or unsatisfactory, provided that such returned or exchanged  merchandise will have been previously included in Gross Sales.  Gross Sales will not include the amount of any sales tax imposed by any federal, state or other governmental authority directly on sales and collected from customers, provided that the amount of the tax is added to the selling price and actually paid by Tenant to such governmental authority.  Each charge or sale upon installment or credit will be treated as a sale for the full price in the month during which such charge or sale is made irrespective of the time when Tenant receives payment (whether full or partial).  In addition, Landlord may, from time to time, permit or allow certain other items to be excluded from Gross Sales.  However, any such permission or allowance may be revoked or withdrawn at the discretion of Landlord and will not stop Landlord from requiring strict compliance with the terms of this Lease.

D.  **Taxes and Assessments:**  In addition to the Basic Rent and the Percentage Rent, Tenant will pay directly to the taxing authority, when due, all real estate taxes and special and general assessments that are levied or assessed against the Premises during the term or any extension of this Lease.  Tenant agrees to provide to Landlord, if requested, copies of paid invoices and such other documentation evidencing payment of taxes as may be reasonably requested by Landlord.  If Tenant shall default in the payment of any obligation herein required to be paid by Tenant, then Landlord may pay the same together with any penalty or interest levied on the tax bill, and Tenant will be obligated to repay Landlord on demand for such payment, together with interest on all past due obligations, including interest on the penalty and interest levied under this provision.

(a)  **First and Last Year:**  All real estate taxes and general and special assessment payments of every nature paid during the first and last year of the term of this Lease will be prorated.  This tax proration will be based upon the fiscal year of the taxing authority levying the tax, using the percentage of the taxes payable during the first or last tax fiscal year that Tenant actually occupies, or had the right to occupy, the demised Premises.  The party paying such taxes shall be entitled to reimbursement from the other party for its pro rata share upon demand and the presentation of an itemized statement with copies of all appropriate documentation evidencing payment.

(b)  **Rent Taxes:**  Tenant will also pay promptly, when due, any tax which is levied or assessed against the rental, real or tangible personal property, whether or not called a rental tax, excise tax, sales tax, gross receipts tax, tax on services or otherwise; and Tenant will promptly reimburse Landlord for any similar tax which Landlord is required to pay or, in fact, does pay.  Such payment or reimbursement will not be deducted from Gross Sales.

(c)  **Personal Property Taxes:**  Tenant agrees to pay all personal property taxes levied upon the fixtures, equipment and other improvements located on the Premises whether installed and paid for by Tenant or Landlord.  The personal property taxes for the first and

**Exhibit A
Page 82**

last year of the term of this Lease will be prorated in the same manner as the real estate taxes and assessments.

(d)   **Appeal:**  Subject to Landlord's rights, Tenant, at Tenant's sole expense, is authorized and hereby permitted to contest and appeal property tax assessments on the demised Premises, and Landlord will cooperate with and assist Tenant in any reasonable manner.

E.   **Other Charges and Expenses:**  Any other charge or expense of any nature which Landlord may be required to pay by virtue of Landlord's interest in the Premises (including, but not limited to, common area maintenance charges, merchant's association's dues, utility charges, fees and taxes and security service fees -- collectively referred to as "other charges") will be promptly paid by Tenant to the party to whom they are due as additional charges. Landlord will provide Tenant with information necessary for Tenant to pay the other charges prior to, or as soon as possible after, the commencement of the term of this Lease.  Until Tenant receives this information, Tenant will not be responsible for the other charges.

F.   **Method and Proof of Payment:**

(a)   Tenant shall, at all times, participate in Landlord's automatic debit/credit transfer program as specified by Landlord from time to time for the payment of all amounts due Landlord pursuant to this Lease.   Tenant shall execute and deliver to Landlord such documents and instruments as may be necessary to establish and maintain said automatic debit/credit transfer program.

(b)   With respect to Articles 3.01(D) and (E), above, or any other provision in this Lease which requires or contemplates Tenant first paying other charges or expenses, Landlord may, at its exclusive option, elect to make such payments directly to the taxing authority, Head Landlord (if applicable), utility company or other party due a payment for which Tenant is liable under this Lease.  If Landlord wishes to exercise this option, Landlord will notify Tenant in writing of its election.  From that time on, Landlord shall make such payments directly, and all penalties and expenses thereafter accruing shall be the responsibility of Landlord. If Landlord elects to make any payment directly, Tenant shall, nonetheless, be responsible for making payment to Landlord for any payment Landlord will make, or makes, within ten (10) days of Tenant's receipt of a billing advice from Landlord.

3.02  **Records:**  Tenant will keep and preserve upon the Premises complete written records of all Gross Sales conducted in any calendar or business year for a period of three (3) years, in a manner and form satisfactory to Landlord.   Tenant will permit Landlord or Landlord's representatives to examine or audit the records at any and all reasonable times, and will, upon Landlord's request, explain the method of keeping records.  The books and records will include cash register tapes, properly identified, over-ring slips, sales journals, general ledger, profit and loss statements, balance sheets, purchase invoices, bank statements with canceled checks and deposit advices, corporate books and records, management company books, including, but not limited to, minute books and stock certificate books, state sales tax returns, federal income tax returns, retailer's occupation tax returns or similar returns required to be filed by the state in which the Premises are located.

3.03  **Reports:**  By 11:00 a.m. Central Standard Time of the first business day of each month, Tenant will deliver to Landlord, in the manner specified by Landlord from time to time, a statement by Tenant or Tenant's authorized representative, reflecting Gross Sales during the preceding month.   Tenant will pay to Landlord on or before ten (10) days after the end of each

**Exhibit A
Page 83**

calendar month during this Lease all sums due based upon Gross Sales as shown in the statement for the period covered by the statement. Within thirty (30) days following the expiration of each calendar year of the term of this Lease, Tenant will deliver to Landlord at the place last fixed for the payment of rent, a statement of Gross Sales for the preceding calendar year (certified, at Tenant's expense, if requested by Landlord, by a Certified Public Accountant of good standing and reputation in the state in which the Premises are located) which will show Gross Sales separately for each monthly period during the preceding year.

A.   **Default in Reporting:**   Upon failure of Tenant to prepare and deliver promptly any monthly or annual statement required by this Lease or to make any required payment, Landlord may elect to treat Tenant's failure as a substantial breach of this Lease entitling Landlord to terminate this Lease and Tenant's right to possession of the Premises.

B.   **Inspection of Records by Landlord:**   If Landlord is dissatisfied with statements furnished by Tenant, Landlord may notify Tenant, and Landlord, at its option, may then examine Tenant's books or have a Certified Public Accountant selected by Landlord examine Tenant's books. If such examination discloses any underpayment of Percentage Rent, Tenant will promptly pay the deficient amount. If Tenant contests such deficiency, Landlord will then appoint an independent auditor to examine Tenant's books and records. If the independent audit confirms that there has been an underpayment exceeding two percent (2%) of the Percentage Rent, as represented by Tenant, Tenant will, in addition to the above, reimburse Landlord for the cost of the auditor's examination.

3.04 **No Abatement of Rent:**   Except as provided in this Lease, damage to or destruction of any portion or all of the buildings, structures and fixtures upon the Premises, by fire, the elements or any other cause, whether with or without fault on the part of Tenant, will not terminate this Lease or entitle Tenant to surrender the Premises or entitle Tenant to any abatement of or reduction in the rent payable, or otherwise affect the respective obligations of the parties, any present or future law to the contrary notwithstanding, subject to Article 6.05 in this Lease.

3.05 **Interest on Delinquencies:**   If the Tenant is past due on the payment of any amount due Landlord, under this Lease, including accrued interest, the Tenant shall be required, to the extent permitted by law, to pay interest on the past due amount to the Landlord for the period beginning with the original due date for payment to the date of actual payment at an annual rate equal to the highest rate allowed by law or, if there is no maximum rate permitted by law, then fifteen percent (15%). Such interest will be calculated on the basis of monthly compounding and the actual number of days elapsed divided by 365.

3.06 **Lien for Rent:**   Tenant grants to Landlord a lien upon all Tenant's property located on the Premises, from time to time, for all rent and other sums due from Tenant to Landlord under the provisions of this Lease.

## ARTICLE 4  OBLIGATIONS OF TENANT

4.01 **Utilities:**   Tenant will pay directly all charges for gas, electricity, or other utilities, sewer charges, taxes and driveway fees, if applicable, and for all water used on the Premises as such charges become due. Tenant's obligation to pay the foregoing charges will commence five (5) days after Tenant's equipment is delivered to the Premises.

**Exhibit A
Page 84**

4.02 **Maintenance and Repair:** Tenant will, at its expense, (a) keep the entire Premises, all improvements, utility lines and Tenant's or Landlord's fixtures and equipment at all times in good repair, order or condition; (b) replace all broken, damaged or missing personal property, fixtures or equipment; and (c) at the expiration of the term of this Lease, whether by lapse of time or otherwise, surrender the Premises in good repair, order and condition, ordinary wear and tear excepted, and loss by fire and other casualty excepted to the extent that provision for such exception may elsewhere be made in this Lease. Upon request of Landlord, Tenant will remove all signs and other identifying features from the Premises. Tenant's obligation to make repairs to the Premises will include all repairs, whether ordinary or extraordinary, including structural repairs to the foundation, floors, walls and roof.

4.03 **Alterations:** Tenant shall not make any change in, alteration of, or addition to any part of the Premises, or remove any of the buildings or building fixtures without, in each instance, obtaining the prior written consent of Landlord and complying with all governmental rules, ordinances and regulations.

4.04 **Surety:** Before commencement of any construction or installation of any structure, fixture, equipment or other improvement on the Premises, or of any repairs, alterations, additions, replacement or restoration in, on or about the Premises, Tenant will give Landlord written notice specifying the nature and location of the intended work and the expected date of commencement. Tenant will deposit with Landlord, if requested by Landlord, a certificate or other evidence satisfactory to Landlord that Tenant has obtained a bond or that Tenant's building contractor, if any, has furnished a bond in favor of Landlord, with a surety approved by Landlord, guaranteeing the performance and completion of all work free and clear of all liens arising from such work. Landlord reserves the right to withhold its approval of any proposed construction, improvement, repair, alteration or replacement and, without limiting the generality of the foregoing, may require as a condition of its approval that it be permitted to review and approve any contract entered into by Tenant regarding such notices as may be necessary to protect Landlord against liability for liens and claims.

4.05 **Liens Against Property:** Nothing in this Lease will authorize Tenant to do any act which will in any way encumber the title of Landlord to the Premises. The interest or estate of Landlord or the fee owner in the Premises, if Landlord is not the fee owner, will not in any way be subject to any claim by lien or encumbrance, whether by operation of law or by virtue of any express or implied contract by Tenant. Tenant will not permit the Premises to become subject to any mechanics', laborers' or materialsmen's lien for labor or material furnished to Tenant in connection with work of any character performed or claimed to have been performed on the Premises by or at the direction of, or sufferance of, Tenant.

If any lien is filed against the Premises or Tenant's interest in this Lease, at Landlord's option, Tenant will either pay the amount of the lien in full or will, upon demand of Landlord, provide and pay for a non-cancelable bond, placed with a reputable company, approved by Landlord, in an amount deemed sufficient by Landlord, insuring the interest of Landlord and any mortgagee from any loss by reason of the filing of such lien. Tenant will immediately pursue in good faith its legal remedies to remove a lien on the Premises.

4.06 **Assignment by Tenant:** Tenant will not allow or permit any transfer of this Lease or any interest in this Lease by operation of law, or assign, convey, mortgage, pledge or encumber this Lease or any interest in this Lease, or permit the use or occupancy of the Premises or any part thereof without, in each case, obtaining Landlord's prior written consent. No assignment (with or without Landlord's consent) will release Tenant from any of its obligations in this Lease.

Notwithstanding the foregoing, Landlord shall consent to an assignment by Tenant of his rights and interest in this Lease if the Tenant complies with the terms and conditions of the Franchise Agreement pertaining to the assignment of the Franchise Agreement.

4.07 **Franchise Agreement:** Tenant will comply with and perform all covenants contained in the Franchise Agreement. Tenant's breach of any of the terms and covenants of the Franchise Agreement will also constitute a breach of this Lease. Termination, expiration, default or revocation of the Franchise Agreement for any reason, either in whole or in part, will also terminate this Lease, without further notice being required.

## ARTICLE 5  FIXTURES AND EQUIPMENT

5.01 **Fixtures:** All buildings and improvements and all plumbing, heating, lighting, electrical and air conditioning fixtures and equipment and all other articles of property which, at the date Tenant takes possession of the Premises, are the property of Landlord or of the fee owner of the Premises are and will remain a part of the real estate and be considered to be leased in this Lease. Any additions, alterations or remodeling of improvements made to the Premises will immediately become the property of Landlord and will not be removed by Tenant at the termination of this Lease by lapse of time or otherwise.

5.02 **Removal of Tenant's Property:** At or prior to the termination of this Lease, whether by lapse of time or otherwise, Tenant will, subject to any rights of Landlord under the Franchise Agreement, remove all of its personal property and trade fixtures from the Premises and will repair any damage to the Premises which may have been caused by such removal.

## ARTICLE 6  INSURANCE AND DAMAGE TO PROPERTY

6.01 **Liability Insurance:** Tenant will pay for and maintain during the entire term of this Lease the following insurance:

A. Worker's Compensation Insurance prescribed by law in the state in which the Premises are located and Employer's Liability Insurance with $100,000/$500,000/$100,000 minimum limit. If the state in which the Premises are located allows the option of carrying no Worker's Compensation, and Tenant chooses to exercise that option, Tenant shall nonetheless carry and maintain other insurance with coverage and limits as approved by the Landlord.

B. Commercial General Liability Insurance in a form approved by Landlord, on an occurrence basis, with limits as described in Article 1.04.

C. Fire Legal Liability Insurance with minimum limits of $500,000 per occurrence.

6.02 **Rental Insurance:** Tenant will maintain and keep in force rental insurance in an amount equal to not less than the total of one (1) year's Basic Rent as specified in Article 1.02 of this Lease.

6.03 **Property Insurance:** Tenant will maintain and keep in force, all risk insurance, including flood, earthquake and earth movement coverage, upon the Premises, fixtures, operational equipment, signs, furnishings, decor, plate glass and supplies, in a full replacement cost form obligating the insurer to pay the full cost of repair or replacement. It is intended that neither Landlord nor Tenant will be a co-insurer, and to that end, if the insurance proceeds are not adequate to rebuild the building or other improvements located on the Premises, Tenant will

be obligated for the difference between the proceeds obtained and the actual cost of the restoration of the Premises, fixtures, operational equipment, signs, furnishings, decor, plate glass and supplies.

6.04  **Placement and Policies of Insurance:**  All insurance policies required to be carried in this Lease will name Landlord and any party designated by Landlord as additional insured.  All policies will be effective on or prior to the date Tenant is given possession of the Premises for the purpose of installing equipment, and evidence of payment of Premiums and duplicate copies of policies of the insurance required in this Lease will be delivered to Landlord at least thirty (30) days prior to the date that Tenant opens for business or thirty (30) days prior to the expiration dates of an existing policy of insurance.  All policies of insurance will include as an additional insured any mortgagee, as its interest may appear, and will include provisions prohibiting cancellations or material changes to the policy until thirty (30) days prior written notice has been given to Landlord.

If Tenant should fail to obtain the required insurance, Landlord may, but is not obligated to, purchase the insurance, adding the premiums paid to Tenant's monthly rent.  Tenant may authorize Landlord to purchase and to administer the required minimum insurance on Tenant's behalf.  However, Landlord, by placement of the required minimum insurance, assumes no responsibility for premium expense nor guarantees payment for any losses sustained by Tenant.  Landlord may relieve itself of all obligations with respect to the purchase and administration of the required insurance coverage by giving ten (10) days written notice to Tenant.

All insurance will be placed with a reputable insurance company licensed to do business in the state in which the Premises are located and having a financial size category equal to or greater than IX and a policyholders rating of "A +" or "A", as assigned by Alfred M. Best and Company, Inc., unless otherwise approved by Landlord.  Tenant further agrees to increase the various insurance coverages specified above from time to time upon the written request of Landlord to meet changing economic conditions and requirements imposed upon Landlord under the Landlord's Head Lease (if applicable) and loan agreements, if any.

6.05  **Repair and Replacement of Buildings:**  If the building on the Premises is damaged by fire or any other casualty, Landlord will, within a reasonable time from the date of damage or destruction, repair or replace the building so that Tenant may continue in occupancy. Landlord's obligation to rebuild or restore the Premises will, however, be only to the extent of insurance proceeds recovered.  Basic Rent required to be paid in this Lease will not abate during the period of untenantability.  If the building cannot be replaced or repaired within a reasonable time due to the inability of Landlord to obtain materials and labor, or because of strikes, acts of God or governmental restrictions that would prohibit, limit or delay the construction, then the time for completion of the repair or replacement will be extended accordingly.  However, in any event, if the repair or replacement of the building has not been commenced within a period of one (1) year from the date of the damage or destruction, Tenant or Landlord may, at their option, terminate this Lease.  If any damage or destruction occurs during the last five (5) years of the term of this Lease to the extent of fifty percent (50%) or more of the insurable value of the building, Landlord may, by notice to Tenant within forty (40) days after the occurrence of the damage or destruction, in lieu of repairing or replacing the building, elect to terminate this Lease as of the date of the damage or destruction.  Tenant hereby expressly waives and releases any and all claims against Landlord for damages in case of Landlord's failure to rebuild or restore the building in accordance with the provisions of this Article.  Tenant's sole remedy for any such failure will be to elect to terminate this Lease as of

**Exhibit A
Page 87**

the date of occurrence of the damage or destruction. If the building and other improvements are not repaired, restored or replaced, for any reason, all proceeds of the all risk coverage insurance applicable to the building and other permanent improvements will be paid and given to Landlord. Tenant agrees to execute and deliver any release or other document Landlord may request to obtain the release or control of the proceeds.

If Landlord repairs and restores the Premises, as required above, Tenant agrees to promptly repair, replace, restore or rebuild Tenant's leasehold improvements, equipment and furnishings ("Tenant's Improvements") in accordance with the current standards and specifications for McDonald's Restaurants upon notice from Landlord that the Premises are ready for Tenant's Improvements. Tenant agrees to submit for Landlord's approval, all plans and specifications for Tenant's Improvements to Landlord within thirty (30) days after Landlord delivers its plans and specifications for the restored Premises to Tenant.

## ARTICLE 7  RIGHTS OF LANDLORD

7.01 **Inspection by Landlord:** Landlord or any authorized representative of Landlord may enter the Premises at all times during reasonable business hours for the purpose of inspecting the Premises.

7.02 **Indemnity for Litigation:** If Landlord becomes subject to any claim, demand or penalty or becomes a party to any suit or other judicial or administrative proceeding by reason of any act occurring on the Premises, or by reason of an omission with respect to the business or operation of the McDonald's Restaurant, Tenant will indemnify and hold Landlord harmless against all judgments, settlements, penalties, and expenses, including reasonable attorney's fees, court costs and other expenses of litigation or administrative proceeding incurred by or imposed on Landlord in connection with the investigation or defense relating to such claim or litigation or administrative proceeding. At the election of Landlord, Tenant will also defend Landlord.

Tenant will pay all costs and expenses, including reasonable attorney's fees, which may be incurred by Landlord in enforcing any of the covenants and agreements of this Lease. All such costs, expenses and attorney's fees will, if paid by Landlord, together with interest, be additional rent due on the next rent date after such payment or payments.

7.03 **Waiver of Claims:** Landlord and Landlord's agents and employees will not be liable for, and Tenant waives claims for, damage to persons or property sustained by Tenant or any person claiming through Tenant resulting from any accident or occurrence in or upon the Premises or the building of which they are a part, including, but not limited to, claims for damage resulting from: (a) equipment or appurtenances becoming out of repair; (b) Landlord's failure to keep the building or the Premises in repair; (c) injury done or occasioned by wind, water or other natural element; (d) any defect in or failure of plumbing, heating or air conditioning equipment, electric wiring or installation thereof, gas, water and steam pipes, stairs, porches, railings or walks; (e) broken glass; (f) the backing up of any sewer pipe or downspout; (g) the bursting, leaking or running of any tank, tub, washstand, water closet, waste pipe, drain or any other pipe or tank in, upon or about such building or Premises; (h) the escape of steam or hot water (it being agreed that all the foregoing are under the control of Tenant); (i) water being upon or coming through the roof, skylight, trapdoor, stairs, walks or any other place upon or near such building of the Premises or otherwise; (j) the falling of any fixture, plaster or stucco; (k) interruption of service of any utility.

**7.04 Re-entry Upon Default:** If (a) Tenant defaults in the payment of any installment of Basic Rent or Percentage Rent or any additional sum due in this Lease; (b) Tenant defaults in any of the covenants, agreements, conditions or undertakings to be performed by Tenant other than the payment of rent (Basic Rent and Percentage Rent or additional charges) and such default continues for ten (10) days after notice in writing to Tenant; (c) Tenant defaults in any of the terms of the Franchise Agreement or if the Franchise Agreement should terminate, whether by lapse of time or otherwise; (d) proceedings in bankruptcy or for liquidation, reorganization or rearrangement of Tenant's affairs are instituted by or against Tenant; (e) a receiver or trustee is appointed for all or substantially all of Tenant's business or assets on the grounds of Tenant's insolvency; (f) a trustee is appointed for Tenant after a petition has been filed for Tenant's reorganization under the Bankruptcy Act of the United States; (g) Tenant makes an assignment for the benefit of its creditors; or (h) Tenant vacates or abandons the Premises, then in any of the above events, Landlord, at its election, may declare the term of this Lease ended and, either with or without process of law, re-enter, expel, remove and put out Tenant and all persons occupying the Premises under Tenant, using such force as may be necessary in so doing, and repossess and enjoy the Premises. Such re-entry and repossession will not work a forfeiture of the rents to be paid or terminate the covenants to be performed by Tenant during the full term of this Lease.

Upon the expiration of the term of this Lease by reason of any of the events described above, or in the event of the termination of this Lease or right to possession by summary dispossession proceedings or under any provision of law now or at any time in force, whether with or without legal proceedings, Landlord may, at its option, relet the Premises or any part for the account of Tenant and collect the rents therefor, applying them first to the payment of expenses Landlord may have in recovering possession of the Premises, including legal expenses and attorney's fees, and for putting the Premises into good order or condition or preparing or altering the same for re-rental, expenses, commissions and charges paid, assumed or incurred by Landlord in reletting the Premises, and then to the fulfillment of the covenants of Tenant in this Lease. Any such reletting may be for the remainder of the term of this Lease or for a longer or shorter period. In any case and whether or not the Premises or any part thereof is relet, Tenant will pay to Landlord the Basic Rent, Percentage Rent, any additional charges, and all other charges required to be paid by Tenant up to the time of termination of this Lease, or of recovery of possession of the Premises by Landlord, as the case may be. Thereafter, Tenant covenants and agrees, if required by Landlord, to pay to Landlord, until the end of the term of this Lease, the equivalent of the amount of all the Basic Rent reserved in this Lease, Percentage Rent, and all other charges required to be paid by Tenant, less the net income of reletting, if any. These payments will be due and payable by Tenant to Landlord on the rent days above specified. In any of the circumstances described above, Landlord will have the election to recover against Tenant, as damages for loss of the bargain and not as a penalty, an aggregate sum which, at the time of such termination of this Lease, or of such recovery of possession of the Premises by Landlord, represents the then present worth of the excess, if any, of the aggregate of the Basic Rent, Percentage Rent, and all other charges payable by Tenant in this Lease that would have accrued for the balance of the term over the aggregate rental value of the Premises for the balance of the term. Percentage Rent for purposes of this Article shall be deemed to mean the Percentage Rent which Landlord can show could be generated from the Premises but in no event less than the greatest amount of Percentage Rent paid by Tenant during any year. Nothing in this Lease contained will limit or prejudice Landlord's right to prove and obtain as liquidated damages arising out of such breach or termination the maximum amount allowed by any statute or rule of law which may govern the proceeding in which such damages are to be proved.

7.05 **Holding Over:**  Tenant will not hold over beyond the expiration or sooner termination of the term of this Lease.  If Tenant does hold over, it will give rise to a tenancy at the sufferance of Landlord upon the same conditions as are provided for in this Lease with a monthly rental for the period of such holding over which is double the Basic Rent and Percentage Rent last paid by Tenant during the term of this Lease, and interest thereon, as liquidated damages, and not as a penalty.  Landlord's acceptance of any rent after holding over begins does not renew this Lease.  This provision does not waive Landlord's rights of re-entry or any other right in this Lease resulting from Tenant's breach of the covenant not to hold over or any other breach in this Lease.

7.06 **Remedies Cumulative:**  The remedies in this Lease granted to Landlord will not be exclusive or mutually exclusive, and Landlord will have such other remedies against Tenant as may be permitted in law or in equity at any time.  Any exercise of a right of termination by Landlord will not be construed to eliminate any right of Landlord to damages on account of any default of Tenant.

7.07 **Waiver:**  No delay or omission of Landlord to exercise any right or power arising from any default will impair any such right or power or will be construed to be a waiver of any such default or an acquiescence under this Lease.  No waiver of any breach of any of the covenants of this Lease will be held to be a waiver of any other breach or waiver, acquiescence in or consent to any further or subsequent breach of the same covenant.  The rights in this Lease given to receive, collect or sue for any rent, monies or payments or to enforce the terms, provisions and conditions of this Lease, or to prevent the breach or non-observance thereof, or to exercise any right or remedy in this Lease, will not in any way affect the right or power of Landlord to declare the term ended and to terminate this Lease because of any default in or breach of any of the covenants, provisions or conditions of this Lease.

7.08 **Accord and Satisfaction:**  No payment by Tenant or receipt by Landlord of a lesser amount than the monthly rent in this Lease stipulated will be deemed to be other than on account of the earliest stipulated rent, nor will any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction. Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy provided for in this Lease.

7.09 **Right to Perform for Tenant:**  If Tenant should fail to perform any of its obligations under the provisions of this Lease, Landlord, at its option, may (but will not be required to) do the same or cause the same to be done.  In addition to any and all other rights and remedies of Landlord, the cost incurred by Landlord in connection with such performance by Landlord will be an additional charge due from Tenant to Landlord, together with interest thereon at the maximum rate permitted by law in the state in which the Premises are located on the next rent date after such expenditure or, if there is no maximum rate permitted by law, at fifteen percent (15%) per annum.

7.10 **Condemnation:**  If the entire Premises are condemned under eminent domain, or acquired in lieu of condemnation, for any public or quasi-public use or purpose, all rentals and taxes or other charges will be paid to that date, and Tenant will have the right to make a claim for the value of its leasehold estate.  Tenant will, also, have the right to claim and recover such compensation as may be separately awarded for any and all damage to Tenant's business by reason of the condemnation and for any cost or loss to which Tenant might be put in removing Tenant's merchandise, furniture, equipment and other personal property.  Tenant specifically waives and releases any claim it may have, however, for the value of the building, fixtures and

**Exhibit A
Page 90**

other improvements on the Premises whether or not installed or paid for by Tenant. Tenant further agrees to subordinate any claim it may have to Landlord's claim for the value of the improvements.

If only a part of the Premises is taken or condemned and Landlord determines that the operation of a McDonald's Restaurant on the Premises is no longer economically feasible or desirable, Landlord may at any time, either prior to or within a period of sixty (60) days after the date when possession of the Premises will be required by the condemning authority, elect to terminate this Lease. If Landlord fails to exercise its option to terminate this Lease or will not have any such option, Landlord will (1) with reasonable promptness, make necessary repairs to and alterations of the improvements on the Premises for the purpose of restoring it to substantially the same use as that which was in effect immediately prior to such taking, to the extent that may be necessary by the condemnation; and (2) be entitled to the entire award for such partial taking. If Landlord does not elect to terminate this Lease, Tenant's Basic Rent will be reduced by a fraction, the numerator of which will be the total condemnation award or settlement and the denominator of which will be the fair market value of the Premises, prior to the taking, as determined by an independent appraiser selected by the Landlord.

7.11 **Subordination and Non-Disturbance:** This Lease and all of Tenant's rights, title and interest under the Lease will be subject, subordinated and inferior to the lien of any and all mortgages and to the rights of all parties under any sale and leaseback of the Premises and to any and all terms, conditions, provisions, extensions, renewals or modifications of any such mortgage or mortgages or sale and leaseback which Landlord or any grantee of Landlord (collectively hereafter called "Fee Owner") has or may place upon the Premises and the improvements thereon, in the same manner and to the same extent as if this Lease had been executed subsequent to the execution, delivery and recording of such mortgage or of the deed and lease under the sale and leaseback. This provision is intended to include the right of any grantee or Landlord under a sale and leaseback to further encumber the property with one or more mortgages, all of which are declared to be superior to the interest of Tenant in this Lease.

If a mortgagee or any other person acquires title to the Premises pursuant to the exercise of any remedy provided for in such mortgage, or in the event of the default under the Lease related to a sale and leaseback of the Premises, Tenant's right of possession will not be disturbed provided (a) Tenant is not then in default under this Lease and (b) Tenant attorns to such title holder. Tenant agrees that upon a mortgage foreclosure it will attorn to any mortgagee or assignee or any purchaser at the foreclosure sale (collectively called "Purchaser") as its Landlord and in the case of a default under the terms of the lease used in a sale and leaseback, it will attorn to the Fee Owner of the Premises as its new Landlord and, in either event, this Lease will continue in full force and effect as a direct Lease between Tenant and such party under all of the terms of this Lease. If there is a foreclosure of a mortgage placed on the property by a grantee under a sale and leaseback, such attornment will be required only if, at the time of such foreclosure, the Lease used in the sale and leaseback is also in default.

The subordination of this Lease to any mortgagee of Fee Owner provided for in this Lease or to any Lease under a sale and leaseback arrangement will be automatic and self-operative, and no special instrument of subordination will be necessary. Without limiting such automatic and self-operative subordinations, however, Tenant will, on demand, at any time or times, execute, acknowledge and deliver to Fee Owner, without expense to Fee Owner, any and all instruments that may be necessary or proper to evidence the subordination of this Lease and all rights in this Lease to the lien of any such mortgage, or to any such lease under a sale and leaseback arrangement. If Tenant fails, at any time, to execute, acknowledge and deliver any

**Exhibit A**
**Page 91**

such subordination instrument within five (5) days after receipt of the notice, in addition to any other remedies available, Landlord may execute, acknowledge and deliver the same as the attorney-in-fact on Tenant's behalf; and Tenant hereby irrevocably makes, constitutes and appoints Landlord, its successors and assigns, such attorney-in-fact for that purpose.

## ARTICLE 8  MISCELLANEOUS

8.01 **No Agency Created:**  Tenant will have no authority, express or implied, to act as agent of Landlord or any of its affiliates for any purpose.  Tenant is, and will remain, an independent contractor responsible for all obligations and liabilities of, and for all loss or damage to, the Premises, including any personal property, equipment, fixtures or real property connected with them and for all claims or demands based on damage or destruction of property or based on injury, illness or death of any person or persons, directly or indirectly, resulting from the operation of the McDonald's Restaurant located on the Premises.

8.02 **Recording of Lease:**  Tenant will not record this Lease without the written consent of Landlord.  However, upon the request of either party, the other party will join the execution of a memorandum or a so-called "short-form" of this Lease for the purpose of recordation.   The memorandum or short form of this Lease will describe the parties, the Premises and the term of this Lease and will incorporate this Lease by reference.  The party requesting execution of the memorandum will bear all costs for recording it.

8.03 **Force Majeure:**  Whenever a period of time is provided in this Lease for either party to do or perform any act or thing, except the payment of monies, neither party will be liable for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control or other causes beyond the reasonable control of the parties, and in any event the time period for the performance of an obligation in this Lease will be extended for the amount of time of the delay.  This Article will not apply to, or result in, an extension of the term of this Lease.

8.04 **Paragraph Headings:**  Headings in this Lease are for convenience only and are not to be construed as part of this Lease and will not be construed as defining or limiting in any way the scope or intent of the provisions of this Lease.

8.05 **Invalidity of a Provision:**  If any term or provision of this Lease will to any extent be held invalid or unenforceable, the remaining terms and provisions of this Lease will not be affected, but each term and provision of this Lease will be valid and be enforced to the fullest extent permitted by law.  If any material term of this Lease is stricken or declared invalid, Landlord reserves the right to terminate this Lease at its sole option.

8.06 **Law Governing:**  The terms and provisions of this Lease will be governed by the laws of the State of Illinois.

8.07 **Entire Agreement:**  This Lease and the Franchise Agreement will be deemed to include the entire agreement between the parties, and it is agreed that neither Landlord nor anyone acting in its behalf has made any statement, promise or agreement or taken upon itself any engagement whatever, verbally or in writing, in conflict with the terms of this Lease, or that in any way modifies, varies, alters, enlarges, or invalidates any of its provisions, or extends the term of this Lease, and that no obligations of Landlord will be implied in addition to the obligations expressed in this Lease.  This agreement cannot be changed orally but only by an agreement in writing signed by Landlord and Tenant.  Nothing in this Lease or in any related

**Exhibit A**
**Page 92**

agreement, however, is intended to disclaim the representations made in the Franchise Disclosure Document furnished to Tenant.

8.08 **Parties Bound:**  The terms of this Lease will extend to and be binding upon the administrators, executors, heirs, assigns and successors of the parties, subject to the terms of Article 4.06.

8.09 **Notices or Demands:**  All notices to or demands upon Landlord or Tenant given under any of the provisions of this Lease will be in writing.  Any notices or demands from Landlord to Tenant will be deemed to have been duly and sufficiently given if a copy has been delivered personally or mailed by United States registered or certified mail in an envelope properly stamped and addressed to Tenant at the address of the Premises.  Any notices or demands from Tenant to Landlord will be deemed to have been duly and sufficiently given if mailed by registered or certified mail in an envelope properly stamped and addressed to Landlord at One McDonald's Plaza, Oak Brook, Illinois 60523, Attention:  Director, U.S. Legal Department.  Mailed notices shall be deemed received three (3) business days after being deposited in the U.S. Mail.  Either party, by notice, may change the address to which notice will be sent, but all notices mailed to Tenant at the address of the restaurant on the Premises will be deemed sufficient.

**To indicate their consent** to this Operator's Lease the parties, or their authorized representatives or officers, have signed this document.

**TENANT: HERBERT WASHINGTON**

*Herb Washington*
Herbert Washington

**LANDLORD: McDONALD'S USA, LLC**

By: _____
   Catherine A. Griffin
   U.S. Vice President

Date Signed:  February 16, 2012

Location Code: 034-1791

Prepared by:  EP

**Exhibit A**
**Page 93**

Case 2:21-cv-04972-FMO-MAA   Document 106-1   Filed 02/16/23   Page 95 of 145   Page ID
#:2001
Case: 4:21-cv-00967-BYP   Doc #: 33-1   Filed: 05/28/21   36 of 44.   PageID #: 1314

Situated in the State of Ohio, County of Mahoning, Township of Boardman,
known as part of Lot 1 in the First Division of Lots in the Original Survey of said
Township and being part of the 4.764 acre tract conveyed to *Boardman Duo Associates
LLC in Official Records Volume 5909, page 1368*, all records being of the Recorder's
Office, Mahoning County, Ohio unless otherwise noted and being more particularly
described as follows:

Beginning for reference at a monument found at the southeasterly corner of said
4.764 acre tract and at the intersection of the centerline of Market Street (State Route 7)
and Boardman-Canfield Road (U.S. Route 224).

Thence, along the southerly line of said 4.764 acre tract and the centerline of said
Boardman-Canfield Road (U.S. Route 224), North 86 degrees 45 minutes 40 seconds
West, 475.00 feet to a point in the centerline of said U.S. Route 224 and at the
southwesterly corner of said 4.764 acre tract;

Thence, along the westerly line of said 4.764 acre tract, North 02 degrees 39
minutes 00 seconds East, 45.00 feet to an iron pin found in the westerly line of said 4.764
acre tract and in the northerly line of said Boardman-Canfield Road (U.S. Route 224) and
being **THE PRINCIPAL PLACE OF BEGINNING** of the herein described parcel;

Thence, along the westerly line of said 4.764 acre tract, **North 02 degrees 39
minutes 00 seconds East, 389.50 feet** to an iron pin found at the northwesterly corner of
said 4.764 acre tract and in the southerly line of Lot No. 1 of the Tavolario Plat No. 1
(Plat Volume 81, page 244);

Thence, along the northerly line of said 4.764 acre tract and the southerly line of
said Lot No. 1, **South 87 degrees 21 minutes 00 seconds East, 408.94 feet** to an iron pin
found in the northerly line of said 4.764 acre tract, at the southeasterly corner of Lot No.
2 of the Replat of Lot No. 1 of the Tavolario Plat No. 1 (Plat Volume 82, page 72) and in
the westerly line of said Market Street (State Route 7);

Thence, along the westerly line of said Market Street (State Route 7), **South 02
degrees 38 minutes 43 seconds West, 48.77 feet** to a point in the westerly line of said
Market Street (State Route 7);

Thence, across said 4.764 acre tract with the following two (2) courses:

1) **North 86 degrees 46 minutes 00 seconds West, 207.13 feet** to a point;
2) **South 03 degrees 14 minutes 00 seconds West, 344.88 feet** to a point in the
   northerly line of said Boardman-Canfield Road (U.S. Route 224);

Thence, along the northerly line of said Boardman-Canfield Road (U.S. Route
224), **North 86 degrees 46 minutes 00 seconds West, 198.32 feet** to **THE PLACE OF
BEGINNING, CONTAINING 2.022 ACRES** more or less, subject however to all legal
easements, restrictions and rights of way of record and records in their respective utility
offices.

The Premises shall not be deemed to include any transferable development rights, air
rights, mineral rights, water rights or other similar rights.

## SCHEDULE A
### Boardman, OH
### L/C: 034-1791, File #44672

**Exhibit A
Page 94**

```
          WASHINGTON, HERBERT
          H.L.W. FAST TRACK, INC.
          4900 MARKET STREET
          YOUNGSTOWN OH 44512


        STORE: 30367                        SITE  : 0341791
                22 BOARDMAN CANFIELD ROAD    FILE  : 44672
                BOARDMAN OH 44512            SEQ   : 001
                                            REGION: 061
                                            OHIO REGION


        RE:    INITIAL       PROJECTED

                                      RENT TERMS
                                      ----------

                        MONTHLY          MONTHLY
    COMMENCEMENT DATE    BASIC    PERCENT BASE      ADDL PROP  REACQUISITION  RENEGOTIATION
    EXPIRATION DATE      RENT     RENT    SALES     RENT #     RENT #         RENT #
    -----------------   -------   ------- -------   ---------  -------------  -------------
    COMMENCEMENT OF TERM  7,780    8.50   91,529.41
       121 MTHS

    122ND MTH*            8,615    8.50   101,352.94
       REMAINDER OF TERM
```

For the first 24 months after the Commencement Date, Operator shall be required to pay one-half of the Monthly Basic Rent set forth above (and Monthly Base Sales shall be reduced in half accordingly) so long as the Restaurant has sales on at least 27 days during the previous month. If the Restaurant does not have sales on at least 27 days in a month, Operator shall be required to pay the full amount of Monthly Basic Rent as set forth above, commencing with the first day of the following month. The full rent shall continue to be paid until the Restaurant reopens for business; provided however, that if the 24 month period expires while the Restaurant is closed, Operator shall continue to pay the full amount of Monthly Basic Rent thereafter.

7

```
# If rental amounts are shown in these columns, these amounts are to be paid monthly. This is in
   addition to Annual Basic Rent.
```

SCHEDULE B

**Exhibit A
Page 95**

BOARDMAN, OHIO
22 Boardman Canfield Road
L/C: 034-1791
File #: 44672

## LANDLORD'S INTEREST ADDENDUM
### (McDonald's USA, LLC Leased Property)

1. **LANDLORD'S INTEREST IN PREMISES:** Landlord holds a leasehold interest in the Premises or a portion of the Premises under the Head Lease described in Article 1.05.

2. **COMPLIANCE WITH HEAD LEASE:** Tenant acknowledges and agrees that the terms and conditions of this Lease are subject and subordinate to the terms and conditions of the Head Lease and any subsequent amendments to it. If there are any inconsistencies between this Lease and the Head Lease, the more restrictive obligations of the Head Lease will prevail. Tenant will not, in its use and enjoyment of the Premises, suffer or permit any condition to exist, or do, or omit to do, anything which would give rise to any right of the landlord under the Head Lease ("Head Landlord") to terminate the Head Lease or any rights of Landlord. Tenant will perform, comply with and discharge all obligations which Landlord is required to comply with and discharge under the Head Lease, including, but not limited to, payment of all charges, costs and expenses as set forth in Article 3.01 of this Lease. Such payments shall not, however, include payment of Landlord's basic monthly rental obligations under the Head Lease.

3. **TENANT'S STATEMENTS AND CERTIFICATES:** Without limiting the generality of the foregoing, Tenant agrees to promptly provide to Landlord insurance policies or certificates, off-set statements, statements of sales, mechanic's lien waivers, notices, releases and any other statement, record or document which may be required, from time to time, by the Head Landlord under the terms of the Head Lease. All certificates or policies of insurance so required will also name the Head Landlord as co-insured or additional insured, as the case may be.

4. **ENFORCEMENT OF LANDLORD'S RIGHTS UNDER HEAD LEASE:** It is acknowledged that the Head Landlord may have certain obligations under the Head Lease to maintain and repair the Premises and adjoining areas, pay real estate taxes, assessments and special charges and impositions, restore, replace or rebuild the Premises and adjoining areas in the event of damage by fire and other causes, carry and pay for certain types of insurance policies and perform other obligations set forth in the Head Lease. If these obligations exist, Landlord agrees to make a good faith effort to obtain the timely and faithful performance of Head Landlord's obligations, but Landlord will not be in default or breach of any of its covenants and duties under this Lease or be liable for any resulting loss or claim of Tenant if Landlord is not able to enforce its rights under the Head Lease. With respect to Landlord's obligation to repair and restore the Premises in the event of damage or destruction by fire or any other cause, Landlord's obligations are conditioned upon Landlord obtaining the cooperation and approval of the Head Landlord, as it may be required, and the compliance of Head Landlord with all of Head Landlord's duties under the Head Lease; and Landlord will not be liable to Tenant for any damage, claim or injury resulting from Landlord's inability to repair or restore the Premises due to a default or breach of the Head Lease by the Head Landlord.

5. **INTENT OF THE PARTIES:** It is the intent of the parties to enter into a sublease between Landlord and Tenant and not to make an assignment of the Head Lease. The parties

dak washington (boardman) cr ls.docx

**Exhibit A**
**Page 96**

further acknowledge that it is their intent that there be no merger of either Landlord's or Tenant's interest in this Lease and fee title if either party acquires a fee interest in the Premises at any time after the execution of this Lease.  In such event, this Lease will remain in full force and effect and will determine the rights, duties and obligations of the parties.

**SCHEDULE C**

dak washington (boardman) cr ls.docx

## ASSIGNMENT AND CONSENT TO ASSIGNMENT

## OF FRANCHISE TO A CORPORATION

This Assignment and Consent to Assignment of Franchise to a Corporation, dated February 16, 2012 ("Assignment"), is between **McDonald's USA, LLC**, a Delaware limited liability company ("McDonald's"); **Herbert Washington** ("Assignor"); **H.L.W. Fast Track, Inc.,** a Washington corporation ("Assignee"); and those shareholders of Assignee (individually "Shareholder" and collectively "Shareholders") listed on Exhibit A attached and incorporated into this Assignment.

### Background

A.     McDonald's or its predecessor in interest issued to Assignor or its predecessor(s) in interest a Franchise Agreement and an Operator's Lease, both dated February 16, 2012 (collectively "Franchise"), for the McDonald's restaurant located at 22 Boardman Canfield Road, BOARDMAN, OHIO [L/C: 034-1791] ("Restaurant").

B.     Assignor requests McDonald's consent to transfer the rights in the Franchise to Assignee.

C.     Assignor, Assignee, and Shareholders acknowledge that McDonald's consent to this Assignment is required under the terms of the Franchise.

### Agreement

The parties, intending to be legally bound and for good and valuable consideration, agree as follows:

1.     The effective date of this Assignment is the opening date of the Restaurant ("Effective Date").

2.     McDonald's consents to this Assignment subject to the provisions of the Franchise and this Assignment.

3.     On the Effective Date, Assignor assigns and transfers all the right, title, and interest of Assignor in the Franchise to Assignee, subject to the provisions of the Franchise.

4.     Assignee must pay all fees and perform all obligations under the Franchise.

5.     Assignor agrees to remain personally bound by, and personally liable for the breach of, each and every provision of the Franchise, both monetary obligations and obligations to take or refrain from taking specific actions or to engage or refrain from engaging in specific activities, and is not released from any obligations to McDonald's by this Assignment.  After the

dak washington (boardman) cr ac.docx (2/16/2012)

**Exhibit A
Page 98**

date of this Assignment, all references to Franchisee in the Franchise shall refer to both Assignor and Assignee both jointly and severally.

6.  Without the prior written consent of McDonald's, Assignor, Assignee, and Shareholders may not, either voluntarily or by operation of law, make or permit:

a)  any further transfer or assignment of the Franchise;

b)  any pledge or encumbrance of the Franchise;

c)  any assignment, transfer, or pledge of any equity interest in Assignee including, but not limited to, transfers in any entity that is a Shareholder;

d)  the creation of new or additional equity interests in Assignee; or

e)  any amendment of the terms of any organizational documents relating to Assignee.

Equity interests, as used in this Assignment, include direct or indirect equity or beneficial interests in Assignee and the business risks associated with the Restaurant including, but not limited to, interests stated as debt that include any type of risk-taking interest or any interest in the profits or appreciation of the Restaurant.

7.  Assignor, Assignee, and Shareholders represent and warrant that:

a)  they are the only persons or entities with equity interests in Assignee and their ownership interests are as shown on Exhibit A; and

b)  there is no obligation or intention to issue additional equity interests in Assignee.

8.  If any Shareholders are trustees or trusts:

a)  the beneficial interests in the trusts may not be assigned, transfers to successor trustees or special trustees may not be made even if the transfer is provided for in any trust agreement, and the trust agreement may not be amended without the prior written consent of McDonald's;

b)  Exhibit A lists all persons who are trustees of any nature or have beneficial interests in any Shareholder's trust(s);

c)  this Assignment is not a consent to any future transfers of equity interest(s) of Assignee to any Shareholder's trust beneficiaries based on any condition including, but not limited to, attainment of a certain age or occurrence of any event.  All future transfers or vesting of equity interest(s) of Assignee are subject to this Assignment; and

d)  McDonald's has not reviewed any trust documents of any Shareholder's trust; therefore, this Assignment does not constitute an approval by McDonald's of any documents relating to any Shareholder's trust.  If any of those documents conflict with or contradict the provisions of this Assignment or McDonald's ownership policies, McDonald's will not be bound by those documents and the provisions of this Assignment will control.

9.      McDonald's has not reviewed any of Assignee's organizational documents; therefore, this Assignment does not constitute an approval by McDonald's of any documents relating to Assignee.  If any of those documents conflict with or contradict the provisions of this Assignment or McDonald's ownership policies, McDonald's will not be bound by those documents and the provisions of this Assignment will control.

10.     Assignor, Assignee, and Shareholders acknowledge that:  (i) McDonald's has not provided any tax or other advice in connection with this Assignment; (ii) McDonald's approval of this Assignment does not constitute tax advice; and (iii) McDonald's has not reviewed or evaluated the validity of Assignee or of any trusts or entities with an equity interest in Assignee.

11.   a)   Assignor or Assignee must include the following legend on all issued and outstanding shares of stock of Assignee:

This stock may not be pledged, sold, assigned or otherwise transferred, in whole or in part, voluntarily or by operation of law, without the prior written consent of McDonald's USA, LLC.  Any and all transfers are also subject to the terms of the Franchise, including the Franchise Agreement and Operator's Lease, or other applicable agreements, for each McDonald's restaurant operated by H.L.W. Fast Track, Inc.

b)   If McDonald's requests, Assignor or Assignee must send to McDonald's a copy of all outstanding certificates of stock of Assignee.

12.     No Shareholders are granted approved owner/operator status by this Assignment.  However, Assignee and Shareholders must abide by those provisions of the Franchise relating to the maintenance and protection of the McDonald's System (as defined in the Franchise) including, but not limited to, those provisions requiring confidentiality and regulating involvement in other or similar restaurant businesses.  A breach of this covenant is a material breach of the Franchise and entitles McDonald's to enforce all remedies available including, but not limited to, the termination of the Franchise.

13.     The parties' respective successors, assigns, heirs, and personal representatives are bound by this Assignment.  All obligations, agreements, representations, and warranties made by more than one party will be joint and several even if it is not so stated in the relevant paragraph.

14.     At anytime during normal business hours, McDonald's may examine and copy any of Assignor's, Assignee's, or any Shareholder's records, books, financial records, tax returns, or other documents for the purpose of insuring compliance with the Franchise and this Assignment.

15.     If Assignor, Assignee, or any Shareholder breaches any of the conditions, representations, agreements, or warranties contained in this Assignment, McDonald's will be entitled to all relief and remedies available by law, and to all relief and remedies granted to McDonald's by the Franchise.

dak washington (boardman) cr ac.docx              3

16.    Assignor has notified all of Assignor's lien holders and lenders of this Assignment.

17.    All terms and conditions of the Franchise remain in full force and effect except as modified by this Assignment including, but not limited to, the terms and conditions of Paragraph 15(a) of the Franchise Agreement in the event of the death or permanent incapacity of Assignor. Herbert Washington must continue to personally devote full time and best efforts to the operation of the Restaurant business.

The parties have signed this Assignment evidencing that they have read, understand, and are bound by the terms of this Assignment.

McDonald's USA, LLC                                   Assignor

By: _____                          _____
    James Wong                                       Herbert Washington
    Authorized Representative


                                                     Assignee: H.L.W. Fast Track, Inc.


                                                     By: _____
                                                         Herbert Washington, individually and
                                                         as President


dak washington (boardman) cr ac.docx            4

Exhibit A
Page 101

## EXHIBIT A

### Listing of Equity Interests of Franchise

| Name | Percentage Ownership |
|------|---------------------|
| H.L.W. Fast Track, Inc. | 100% |
| Herbert Washington | 100% |

Exhibit B

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **MICHAEL PEASTER**<br><br>               **Plaintiff,**<br>**vs.**<br><br>**McDONALD'S CORPORATION, a Delaware corporation, and CHRISTOPHER KEMPCZINSKI**<br><br>               **Defendants.** | **Case No. _____**<br><br><br><br>**Jury Trial Demanded** |

## **COMPLAINT FOR DEPRIVATIONS OF CIVIL RIGHTS**

Plaintiff, Michael Peaster, by his attorneys, Carmen D. Caruso and William B. Whitner, brings suit under the Civil Rights Act of 1870 (42 U.S.C. § 1981) against Defendants McDonald's Corporation ("McDonald's" or the "Company") and Christopher Kempczinski ("Kempczinski") to redress intentional race discrimination, disparate treatment, hostile work environment, and unlawful retaliation.

## **PARTIES**

1.     Plaintiff Michael Peaster is an African American citizen and resident of the State of Illinois residing in Naperville.

2.     Defendant McDonald's Corporation is a publicly traded Delaware corporation that manages (through subsidiaries) the world-wide McDonald's restaurant system that includes both franchised and company-owned McDonald's

**Exhibit B
Page 104**

restaurants.  McDonald's has its principal place of business in Chicago, Illinois, at 110 North Carpenter Street.

3.      Defendant Christopher Kempczinski ("Kempczinski"), a White person, is the president and CEO of McDonald's.  From 2016 to in or about November of 2019, he had been the president of McDonald's USA, LLC, the subsidiary responsible for managing the McDonald's restaurant system in the United States.  On information and belief, Kempczinski resides in Chicago, Illinois and works at McDonald's headquarters in Chicago.

4.      McDonald's acts through its officers, directors, and employees.  All acts and omissions by McDonald's officers and management employees were done in McDonald's business and are imputed to McDonald's under *respondeat superior*.

## JURISDICTION AND VENUE

5.      Plaintiff brings federal claims under 42 U.S.C. § 1981 and 42 U.S.C. § 1988; and asserts pendent jurisdiction over the state law claim arising from the same facts.

6.      Venue is proper under 28 U.S.C. § 1391 because the Defendants reside in this District and the unlawful conduct occurred or was orchestrated at McDonald's headquarters within this District.

## FACTS

7.      Michael Peaster is a 35 year veteran employee of McDonald's, who worked in corporate safety, security, and intelligence.  For more than 10 years, Michael Peaster had been in charge of the Company's corporate safety, security, and

**Exhibit B
Page 105**

intelligence department.  He was responsible for protecting the Company's assets including its people, physical assets, and brand. He supervised a team of safety, security, and intelligence professionals who reported to him.

8.      On January 1, 2022, Michael Peaster was re-promoted to "Officer" status at the Company and his title was Vice-President of Global Safety, Security, and Intelligence.  His Global Safety, Security, and Intelligence department was part of the Company's Global Legal group that reported to McDonald's Corporation's General Counsel, Desiree Ralls-Morrison ("Ralls-Morrison").

9.      Being an Officer is at McDonald's is highly desirable as it positively impacts compensation, future opportunities, and stature within the Company. Peaster's re-promotion to the Officer level in 2022 was not a change in his duties. It was an affirmation by McDonald's that Peaster is a highly qualified and competent corporate security professional who deserved to be an Officer.

10.     In 2022, Peaster's direct supervisor was Malcom Hicks, who is also an attorney in McDonald's "Global Legal" Group.  However, Peaster worked directly with Ralls-Morrison, the general counsel, when it came to Peaster's responsibilities for the protection of Christopher Kempczinski, the Chief Executive Officer of McDonald's Corporation.

11.     On November 7, 2022, the Company's General Counsel, Ralls-Morrison, informed Peaster he is being terminated effective December 31, 2022. Ralls-Morrison claimed that Peaster had performed poorly as Vice-President of Global Safety, Security, and Intelligence, but the accusation of poor performance was pretextual.

**Exhibit B
Page 106**

This termination was discriminatory against Michael Peaster because of his race; it was part of hostile work environment based on his race; and it was retaliatory against Michael Peaster based on his respectful but legitimate contradiction of Kempczinski on the subject of race.

### Michael Peaster's Contradicts Kempczinski On Race

12.     In the fall of 2021, Kempczinski became the subject of substantial public outrage after the media published certain text messages he had written to the Mayor of Chicago, Lori Lightfoot, following a tragic incident in which a child was shot as she sat in her car in the drive-through service lane of a McDonald's restaurant in Chicago. In his texts to the Mayor, Kempczinski blamed the child's parents for exposing her to violence.

13.     Confronted by a hostile media storm branding his text messages to the Mayor as racist, Kempczinski publicly admitted his texts were "wrong" and reflected his "very narrow worldview." Kempczinski, supported by McDonald's, publicly campaigned to rehabilitate his image.

14.     Kempczinski also convened an in-person meeting of McDonald's employees in the corporate headquarters to discuss his racist texts.  Peaster attended. Kempczinski spoke, but Peaster believed Kempczinski was in denial as to *why* many people believed his texts were racist and were offended. When Kempczinski said he would answer questions, one employee asked Kempczinski, "What would you say to those who agreed with your comments?"  Kempczinski responded, "I would say you would have to look at your values, and then make the right decision." Peaster thought

4

Kempczinski was being evasive, or worse.  Peaster raised his hand, and, when called upon, he rebuked Kempczinski's response to the other employee's question by saying (in words or substance):

> To those employees who agreed with Christopher Kempczinski's comments, think about their fellow employees who are in the room who live in the neighborhoods being discussed.  Think about the kids who are in their homes and playing on playgrounds who are killed by stray bullets.  We cannot broad brush the violence issues in Chicago to make it appear that all parents who have children who are victims to gun violence are bad parents.  We have to have empathy and compassion for the majority of families who live in tough communities that work hard to provide for their family and keep them safe.

15.     Peaster recalls that his words were greeted with applause.  Peaster does not recall Kempczinski having any response to Peaster in the town hall.

16.     Peaster spoke these words at an open meeting of McDonald's employees after the Company invited its employees to speak out on the subject of race, as part of the Company's attempt to mitigate the harm that Kempczinski had caused with his racist texts.  Peaster spoke truth to power and for this reason he was punished as alleged below.

### Kempczinski Humiliates Peaster By Ignoring Him

17.     Defendants did not immediately retaliate against Peaster with an adverse employment action for his response to Kempczinski.  They were too clever to do that.

18.     Kempczinski never responded to Peaster's comments at the town hall, either publicly nor privately, but Kempczinski punished Peaster for publicly questioning his sincerity in purporting to apologize for his racist texts.  After  Peaster

**Exhibit B
Page 108**

spoke at the town hall, Kempczinski intentionally avoided Peaster even though, as of January 1, 2022, Peaster was an Officer of the Company and was *the* Officer responsible for Kempczonski's personal security.

19.     For the McDonald's CEO to publicly ignore and ostracize *any* McDonald's Officer would humiliate and degrade the Officer because being an Officer is supposed to confer respect on the Officer within the Company, and obvious disrespect by the CEO would send an unmistakable message that the Officer is disfavored and has no future with the Company.

20.     For Kempczinski to ostracize Peaster was even more humiliating and degrading since Peaster was in charge of Kempczinski's personal protection. Kempczinski's overt treatment of Peaster as an "Invisble Officer" was blatant disrespect inherently and intentionally humiliating to Peaster.

21.     In treating the Officer charged with his personal security as the Invisible Officer, Kempczinsi was sending an unmistakable message that all Company employees, even Officers, were to remain silent on the subject of Kempczinski's racist texts.   Peaster's voice as an African American on a vitally important social issue was intentionally stifled. This was inherently hostile to Peaster and a warning to all other employees and Officers, especially to any reasonable African Americans in Peaster's position.  This hostile work environment began in early 2022 and continued through November 7, 2022, when Ralls-Morrison told Peaster he was fired for pretextual reasons.

22.     In the first few months of 2022, Peaster tried to ignore the intentional humiliation and hoped that the situation would improve.

### McDonald's Ignores Peaster's Advice On Corporate Security

23.     In the spring of 2022, the Company, through Ralls-Morrison, instructed Peaster to provide enhanced security for its executives, especially Kempczinski, who travelled extensively.

24.     In response, Peaster agreed that security should be enhanced, and he repeated requests he had made that his department needed a budget increase to hire additional security personnel to meet the request for enhanced security. The budget increase proposed by Peaster would have been an infinitesimal fraction of the Company's revenues and a fraction of the compensation that the Company's top executives receive each year.

25.     However, the Company, through Ralls-Morrison, rejected Peaster's request to hire more security personnel but did not explain how it expected Peaster to meet the request for enhanced security on the current budget. This contradicted Company protocol. The Company did not have to accept an Officer's budget recommendation, but, typically, there would be an Officer-level *conversation* preceding an important decision. In Peaster's case, there was no conversation. The General Counsel stated a request for enhanced security that Peaster agreed with, then refused to pay for it or even discuss Peaster's proposed business solution. By June 2022, the situation was becoming unbearable for Peaster but he continued to suffer in silence.

Exhibit B
Page 110

### Kempczinski Refuses To Meet With Peaster

26.    In June 2022, Peaster sought to meet with Kempczinski to discuss corporate security and convey his intention to immediately address and rectify any concerns Kempczinski had about Peaster or Peaster's department.

27.    As an Officer of the Company, Peaster's request to meet with Kempczinski should have been routinely granted. That is one perk of being an Officer.

28.    On or about June 21, 2022, Peaster informed Ralls-Morrison that he scheduled a meeting with Kempczinski to ensure his security needs were being met and to get feedback on any additional concerns Kempczinski may have had.  In response, Ralls-Morrison told Peaster that she doubted the meeting would occur, and she was correct.  Breaking protocol, Kempczinski refused to meet with Peaster even though a meeting had been scheduled before Kempczinski or his assistant cancelled it and then cancelled a second time after Peaster tried to reschedule. Neither Kempczinski nor his assistants gave Peaster an explanation as to why his attempt to meet with Kempczinski was cancelled twice nor did Kempczinski or his assistant propose an alternative time for Peaster to meet with Kempczinski.

29.    By June 2022, or earlier, the Company's top legal officer, Ralls-Morrison, knew that Kempczinski was refusing to meet with Peaster in derogation of established custom, practice, and protocol at the Officer level. She offered no explanations and no solutions. Peaster had been naïve in believing that Ralls-Morrison would help Peaster get a meeting with Kempczinski to discuss important Company business.

**Exhibit B
Page 111**

**Kempczinski Publicly Humiliates Peaster At An Officers Meeting**

30.     On or about June 29, 2022, having been re-promoted to Vice President effective January 1, 2022, Peaster attended an Officers Meeting where Kempczinski was to welcome and congratulate the new Officers. Kempczinski did so. He recognized and congratulated all the newly promoted Officers except one: Michael Peaster. This omission was noticeable, and other persons present mentioned it to Peaster afterwards, which added to Peaster's humiliation.

31.     Kempczinski's continuing purposeful humiliation of Peaster through his conduct described above, and the lack of support from Ralls-Morrison caused Peaster to suffer severe anxiety and emotional distress that intensified as 2022 wore on.

**McDonald's Refuses To Allow Peaster To Fill Open Positions**

32.     In the summer of 2022, the Company blocked Peaster from filling open positions in his department though his peers at the Vice-President level (without limitation, his Legal Office peers included Compliance, Litigation, Labor and Employment, and US General Council), who are White, were allowed to fill open positions in their departments. Peaster informed his boss, Malcom Hicks, of this disparity but to no avail.

33.     As the most serious example of paragraph 32, but without limitation, the Company (through Ralls-Morrison) forbade Peaster from filling the position of Director of Corporate Security, a position under Peaster in charge of security at Company meetings and events and responsible for the security of the Company Headquarters in Chicago, Illinois. The individual with this job, Dennis Quiles, retired

effective August 1, 2022.  In the months before his retirement, Peaster sought permission to recruit his replacement, so the replacement could be onboarded and trained by Quiles before Quiles retired.  The Company (through Ralls-Morrison) told Peaster he could not recruit a replacement for this important position, which oversaw the security for over fifty (50) Company meetings a year (for example, the McDonald's Worldwide Convention and Leadership Meetings).

34.    The Company gave Peaster no legitimate reason why he could not fill this important position. Again, this was a departure from usual practices as the Company routinely allows Officers to fill positions in their departments; and the Company did not explain why Peaster was being treated differently.

35.    Peaster and his team were forced to split up the work and responsibilities of the open Director of Corporate Security position, but Peaster reasonably feared that leaving this position open created needless risk for Company employees and business partners.

36.    Not allowing Peaster to fill the Director of Corporate Security position, on top of not allowing him to hire more security personnel, made it difficult for Peaster to maintain the existing level of security, let alone provide the enhanced security Ralls-Morrison had requested. The Company was systematically setting Peaster up to fail so it could blame and terminate him.

37.    Kempczinski made it even harder for Peaster to provide personal security by refusing to have Executive Protection Service ("EPS") agents near him or in the room with him as Peaster recommended. Peaster was told that Kempczinski

did not like the appearance of having security, but this too made it harder for Peaster to meet the Company's directives to Peaster to increase Kempczinski's security.

38.     By the end of July 2022, Peaster feared that Kempczinski, Ralls-Morrison, and the Company were setting him up and looking for a reason to fire him. Peaster continued to do his best under increasingly hostile circumstances. Peaster's emotional distress and suffering worsened.

**The Company's Lawyers Interview Peaster as a Possible Witness
In Another Civil Rights Action Against McDonald's Based on Race**

39.     On or about July 28, 2022, the Company arranged for Peaster to be interviewed by its lawyers who are defending another civil rights lawsuit brought against the Company under Section 1981 by other former African American executives. Peaster candidly answered each question posed by the Company's lawyers.

40.     After Peaster was interviewed as a possible witness in another civil rights case against these Defendants and after the Company's other acts and omissions in 2022 as alleged above, Ralls-Morrison and Kempczinski found an occasion to criticize Peaster's job performance.

**Ralls-Morrison Refuses To Allow Peaster To Fly With Kempczinski
On The Company's Private Jet**

41.     In the summer of 2022, Ralls-Morrison and Kempczinski planned a business trip to Mexico City, Mexico and São Paulo, Brazil.  This trip occurred from August 22 to August 25, 2022.

42.     In advance of the Mexico City/São Paulo trip, Peaster informed Ralls-Morrison that, as they had previously discussed, he would personally manage their

**Exhibit B
Page 114**

security on this trip.  Peaster agreed that these destinations called for his personal involvement, and, in addition, he welcomed the opportunity to spend time with Kempczinski and Ralls-Morrison.

43.    McDonald's owns a 2017 Gulfstream Aerospace 6550 jet that its top executives use for their travel.

44.    As an Officer in the company, Peaster reasonably expected to travel on the corporate jet with Kempczinski and Ralls-Morrison on this trip. McDonald's established custom and practice is to allow its Officers to fly on the corporate jet.

45.    Furthermore, the Company would typically ask members of the executive security team to accompany its Officers on the corporate jet particularly during foreign travel.  As a passengers on the company jet,  executive security personnel  can protect the Company's top executives as they board and deplane. Non-passengers cannot provide the same level of security.

46.    Contradicting the Company's established custom and practice and despite having personally asked Peaster to accompany her and Kempczinski to Mexico City and São Paulo, Ralls-Morrison ignored Peaster when he sought to confirm that he would fly on the corporate jet with her and Kempczinski.  Peaster instead was relegated to fly commercial and met his security clients, including Ralls-Morrison and Kempczinski, in the destination cities, first Mexico City, then São Paulo. Consequently, Peaster could not personally ensure their safety as they departed and arrived on each leg of the trip.

47.     There was no valid business reason to exclude Peaster, a corporate Officer and the person in charge of protecting Kempczinski and Ralls-Morrison, from flying with his security clients on the corporate jet.

48.     On information and belief, the order to exclude Peaster came from Kempczinski, or it reflected Ralls-Morrison's desire to keep Peaster away from Kempczinski because she knew that Kempczinski did not want Peaster to be on the same plane as him. Excluding Peaster, a Company Officer, from the Company's jet was an unmistakable insult stemming from Kempczinski's animus to Peaster after Peaster's statement at the town hall meeting on race in late 2021.

49.     Making things worse, when they reached São Paulo, Ralls-Morrison criticized Peaster for inconveniences that would have been avoided had Peaster been allowed to fly with his security clients on the Company jet.

50.     After the Mexico City / São Paulo trip, Ralls-Morrison unfairly criticized Peaster, claiming that she and Kempczinski had felt unsafe in these cities, and alleging that it was Peaster's fault. These criticisms were without merit. Despite the inconveniences that resulted from Peaster having to fly commercial, Peaster and a subordinate provided adequate security on this trip.

51.     Moreover, Peaster could have provided an additional security team member, but the Company had refused his budgeting requests that would have made this possible.

52.     Ralls-Morrison's false accusation that Peaster put Kempczinski and Ralls-Morrison at risk (after refusing to discuss; let alone implement, his

13

recommedations for their protection) caused Peaster to suffer more anxiety and more emotional distress.

### Peaster Tries To Address Kempczinski's Publicly-Stated Fears  That Chicago Was In Crisis Over Crime

53.     In September 2022, Kempczinski publicly complained that crime was "seeping into every corner" of Chicago in ways that he clained were impacting the Company's restaurants and making it harder to recruit corporate talent to work at the Company's headquarters on Carpenter Street.

54.     In response to media coverage over Kempczinski's fear of crime, Peaster reminded Ralls-Morrison he had been asking the Company to modestly increase its spending on security and to allow him to fill open security positions. However, Ralls-Morrison brushed Peaster off by telling him that his request(s) could be reviewed as part of budgeting for the next year.

55.     The General Counsel's response contradicted Kempczinski's public declarations of fear.

56.     Knowing that his CEO believed the Company was being adversely affected by crime in Chicago but having the General Counsel reject his proposals that were intended to enhance safety, without discussion, added to Peaster's humiliation and stress.

### Defendants' Misplaced Criticism Of Peaster After Labor Union Advocates Approach Him In New York

57.     Peaster was informed that, following a meeting at The Pierre hotel in New York City on or about October 26, 2022, Kempczinski complained that executive

14

protection had been inadequate after labor union advocates entered a ballroom while Kempczinski was present.

58.     To Peaster's knowledge, information, and belief, the labor union advocates wanted Kempczinski to hear their message they were expressing on behalf of the workers in McDonald's restaurants.  Peaster was not informed of any actual or threat of violence to Kempczinski on this occasion.

59.     Ralls-Morrison criticized Peaster and blamed him for alleged indadequate security in New York.  Peaster responded, truthfully, that this was further proof the Company needed to increase the security budget and allow him to fill open positions in his department; and that Kempczinski should accept the executive protection services Peaster had been recommending.

## Peaster Asks To Meet With Ralls-Morrison

60.     In their conversation about the New York trip, Peaster told Ralls-Morrison that they needed to align on Kempczinski's protection, but Ralls-Morrison refused to have the conversation or provide confirmation that Kempczinski would be receptive to executive protection services as recommended by the EPS Team led by Peaster.

61.     By the end of October 2022, Peaster could no longer bear the anxiety and emotional distress being inflicted upon him.  He genuinely feared for the safety of Company executives and employees and believed the Company must increase its security budget or expose the Company to unnecessary safety and security risks.  It appeared to Peaster that this was a price Kempczinski was willing to pay to get rid of him.

62.     At the end of October 2022, Peaster told Ralls-Morrison that he had reached the limits of the stress, sleepless nights, and overall anxiety and suffering he had endured in worrying not only for himself but for his Executive Protection staff and *everyone* at the Company he had sworn to protect.

63.     Ralls-Morrison agreed to meet with Peaster on November 7, 2022. Peaster attended this online meeting via WebEx. He was greeted by Ralls-Morrison and a representative of the Company's HR department.  Ralls-Morrison informed him that he was terminated effective December 31, 2022 because she had allegedly lost confidence in his ability to protect the CEO.  She then left the online meeting. The HR representative stayed on to explain the Company's severance offer, which the Company then put in writing.

64.     The Company's written severance offer was notable for its threat to retaliate against Peaster if he refused to agree not to sue the Company and not to remain silent about the Company's conduct. The Company acknowledged that Peaster had already earned the right to acquire valuable stock in the Company based on his years of loyal service, which the Company calculates based on an established protocol it calls the "Rule of 68" – but only if the departing employee agreed to remain silent and not to sue.  If an employee asserts a violation of his or her civil rights, the Company retaliates by withholding a benefit that was previously earned.

65.     The Company terminated Peaster based on phony criticisms that did not begin until after Peaster spoke out on race at the town hall meeting, after Kempczinski made it clear that he refused to have any personal relationship with

Peaster, after the Company repeatedly rejected Peaster's proposals for enhanced security without stating business reasons or proposing alternatives, and after the Company's lawyers interviewed Peaster in connection with another civil rights case.

66.     In Peaster's thirty-five (35) years of employment with McDonald's, Peaster was never rated below a "Significant Performer."  Peaster has never been on a performance improvement plan nor has he ever been written up for performance issues or performance concerns. Peaster has received numerous awards and recognition throughout his career, including the President Award. In addition, because of his consistent performance, Peaster was the National Executive Sponsor of the Working Parents, Young Professionals, and Veteran Employee Networks. Despite his accomplishments, all it took was one truthful statement in a Town Hall meeting that Kempczinski did not consider racially supportive of him to unravel and destroy Peaster's reputation and career at the Company.

67.     Further evidence contradicting the Company's stated reasons for terminating Peaster (that Ralls-Morrison had lost confidence in Peaster's ability to protect Kempczinski or other executives), includes, without limitation:

a. Following Peaster's reinstatement as a Vice President in January 2022, Peaster reported to corporate counsel Mahrukh Hussain and then to corporate counsel Malcom Hicks after Hussain's departure from the company in or about April 2022. On information and belief, Malcom Hicks was not consulted about or informed about the

**Exhibit B
Page 120**

decision to terminate Peaster, which would have been normal protocol.

b. Peaster and his team supported Kempczinski on over fifty (50) trips and events in 2022.  Of the fifty trips, Ralls-Morrison only criticized Peaster and his team's handling of two trips: the event in New York and the trip to Mexico City & São Paulo.  Ralls-Morrison's criticisms of Peaster's and his team's performance on these two trips was unjustified, and, on information and belief, Ralls-Morrison had complimented Peaster's EPS team for their work after every Board of Directors meeting; and

c. Despite being understaffed, there has been no physical harm done or significant safety threats made to executives since Peaster has led the Executive Protection Program.  The Executive Protection Team, under Peaster's leadership, mitigated many potential threats through their diligence and hard work.

### Injury

68.    Because of discrimination, hostile work environment, and unlawful retaliation, Peaster has suffered economic loss in diminished past and future earnings and benefits including lost stock in the Company, and other contractual benefits promised to Peaster, in amounts to be proven at trial.

69.     Because of discrimination, hostile work environment, and unlawful retaliation, Peaster has suffered emotional distress, humiliation, and related physical suffering.

70.     And the Company's announcement (or leak) of Peaster's termination has damaged his professional reputation and future prospects.

## **Malice & Intent**

71.     The Company's discriminatory, hostile, and retaliatory conduct towards Peaster in 2022 was perpetrated by the CEO, Kempczinski, and the General Counsel, Ralls-Morrison.   These were not the random acts of rogue managers that the Company could not control; it was literally the Company.

72.     The Defendants' discriminatory, hostile, and retaliatory conduct towards Peaster in 2022 was done with malice and must be punished and deterred by a substantial award of punitive damages.

73.     The Defendants' discriminatory, hostile, and retaliatory conduct towards Peaster in 2022 came after the Defendants were accused of civil rights violations based on race in other recent lawsuits. The Defendants are alleged serial violators of the federal civil rights law and will likely continue as violators until their conduct is adjudicated.

## **§ 1981 of the Civil Rights Act of 1870 (as amended)**

74.     § 1981 of the Civil Rights Act of 1870, 42 U.S.C. § 1981 ("§ 1981") was enacted after the Civil War to empower the newly freed slaves and their descendants

**Exhibit B
Page 122**

to participate in the American economy and other aspects of American life on equal terms with White citizens.  It provides:

    **a)**    <u>**Statement of equal rights:**</u>

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

    **b)**    <u>**"Make and enforce contracts" defined:**</u>

For this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

    **c)**    <u>**Protection against impairment:**</u>

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

75.    Peaster is a person within the jurisdiction of the United States.

76.    Peaster's employment by McDonald's is "contractual relationship" under § 1981.

77.    Under § 1981, Peaster has the same rights as White citizens to make and enforce his employment contracts with McDonald's, including the making, performance, modification, and termination of their contracts, and the enjoyment of all benefits, privileges, terms, and conditions of their employment relationships with McDonald's.

78.     Under § 1981, the Company's established customs and practices as to how Officers are treated are "benefits, privileges, terms, and conditions of their employment relationships with McDonald's."

79.     Under § 1981, the Company's established customs and practices as to "Rule of 68" calculations of the value of an employee's stock that the employee earned over the course of his or her employment are "benefits, privileges, terms, and conditions of their employment relationships with McDonald's."

80.     Under § 1981, Peaster engaged in protected activity when, without limitation, he (i) confronted Kempczinski during Kempczinski's Company town hall concerning Kempczinski's racist texts; and when (ii) he was interviewed by Company lawyers about a separate racial discrimination lawsuit.

81.     The conduct of these Defendants egregiously violates § 1981 and all other laws intended to promote racial equality in employment.  The full weight of 42 U.S.C. § 1981 must be brought to bear against these Defendants.


## COUNT I

### Michael Peaster's Claim Against All Defendants For Disparate Treatment Based Upon Race Violating 42 U.S.C. § 1981

82.     Plaintiff Michael Peaster incorporates and re-alleges paragraphs 1-81 against both Defendants as though set forth herein.

83.     As alleged in this Complaint, McDonald's Corporation and Christopher Kempczinski violated 42 U.S.C. § 1981 by engaging in disparate treatment toward Peaster compared to their treatment of White Officers regarding to his employment

**Exhibit B
Page 124**

by the Company and the "benefits, privileges, terms, and conditions" of his employment.

84.   Without limitation, the Defendants' disparate treatment of Peaster in in contrast to the respect White Officers receive at McDonald's included:

a.   Kempczinski's ongoing attempt to ostracize and ignore Peaster; his ongoing refusal to meet with Peaster; and his refusal to allow Peaster to fly with him on the corporate jet.

b.   Kempczinski's and Ralls-Morrison's continuing refusal to approve Peaster's proposals to provide enhanced security; or provide alternatives; or to even discuss the subject with Peaster, even theough they demanded that Peaster provide increased security.

c.   Kempczinski's and Ralls-Morrison's phony criticisms of Peaster's performance; and

d.   The Company's pretextual termination of Peaster.

85.   Defendant Christopher Kempczinski, who Peaster was employed to protect, is liable on Count I as he personally caused Peaster to suffer disparate treatment, acting directly or through Ralls-Morrison and/or other Company employees.

86.   Defendant McDonald's Corporation is liable for the disparate treatment against Peaster under the doctrine of *respondeat superior*.

87.   The Defendants' disparate treatment was based on Peaster's race.  The Defendants punished Peaster because he spoke out as an African American about the

harm Kempczinski caused by sending racist texts and Kempczinski's related attempt to evade responsibility for his racism.

88.     The conduct of McDonald's Corporation and Kempczinski was intentional or in reckless disregard of Peaster's civil rights.

89.     As the direct and proximate result of the Defendants' violations of § 1981 as alleged in Count I, Peaster has suffered substantial damages, including without limitation:

> a. Actual and consequential damages for economic loss in amounts to be proven at trial.
>
> b. Substantial non-economic damages, including, without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of civil rights; and
>
> c. Damage to injury and reputation.

90.     McDonald's Corporation's and Kempczinski's discriminatory conduct was intentional and malicious, making punitive or exemplary damages necessary to punish these Defendants and deter other companies and executives from similar misconduct.

### **Prayer for Relief**

WHEREFORE, on Count I under 42 U.S.C. § 1981 and 42 U.S.C. § 1988, Plaintiff Michael Peaster requests the entry of judgment against each Defendant imposing individual and joint and several liability for:

A. Actual and consequential damages, both economic and non-economic, to be proven at trial;

B. Punitive damages sufficient to punish each Defendant and deter other companies and their executives from like misconduct;

C. Costs of suit;

D. Attorneys' fees; and

E. Such other relief available under law and deemed just and proper.

## COUNT II

### Michael Peaster's Claim Against All Defendants For Hostile Work Environment Violating 42 U.S.C. § 1981

91.     Plaintiff Michael Peaster incorporates and re-alleges paragraphs 1 – 90 against Defendants McDonald's Corporation and Christopher Kempczinski as though set forth herein.

92.     McDonald's Corporation ("McDonald's") violated 42 U.S.C. § 1981 by subjecting Peaster to a hostile work environment, by allowing and fostering an intolerant atmosphere, and by failing or refusing to address blatant discrimination, disrespect, and disregard for African American and their workplace issues.

93.     Without limitation, the Defendants' acts or omissions constituting a hostile work environment include:

a. Treating Peaster as an "Invisible Officer" through Kempczinski's intentional campaign to ostracize Peaster as alleged herein.

24

b.  Overtly disregarding Peaster's status as an Officer in failing to treat him like an Officer in terms, without limitation, of allowing an Officer to manage his department, meet with the CEO, fly on the Company jet.

c.  Otherwise holding Peaster up for humiliation in the eyes of his peers.

d.  Demanding Peaster increase security for executives but simultaneously undercutting Peaster's ability to satisfy those demands.

e.  Manufacturing false criticisms of Peaster's performance about the Mexico City / São Paulo trips and the New York event; and

f.  Terminating Peaster and threatening to revoke compensation rights Peaster earned through his thirty-five (35) years of diligent employment.

94.   Defendant Christopher Kempczinski, who Peaster was employed to protect, is liable on Count II as he personally caused Peaster to suffer a hostile work environment, acting directly or through Ralls-Morrison and/or other Company employees.

95.   Defendant McDonald's Corporation is liable for the hostile work environment against Peaster under the doctrine of *respondeat superior*.

96.   The Defendants' imposed a hostile work environment on Peaster due to his race.  The Defendants punished Peaster because he spoke out as an African

25

American on the subject of Kempczinski's racist texts and Kempczinski's related attempt to evade responsibility for his racism.

97.    Peaster's work environment was both objectively and subjectively offensive. Objectively, a reasonable African American person in Peaster's position would find Peaster's work environment (one in which, without limitation, the CEO (Kempczinski) repeatedly avoided and attempted to ignore Peaster, the man in charge of executive protection), to be hostile or abusive. Subjectively, Peaster, himself, perceived the work environment to be hostile.

98.    The conduct of McDonald's Corporation and Kempczinski was intentional or in reckless disregard of Peaster's civil rights.

99.    As the direct and proximate result of the Defendants' violations of § 1981 as alleged in Count II, Peaster has suffered substantial damages, including without limitation:

    a.  Actual and consequential damages for economic loss in amounts to be proven at trial.

    b.  Substantial non-economic damages, including, without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of civil rights; and

    c.  Damage to injury and reputation.

100.    Defendants' discriminatory conduct creating a hostile environment was intentional and malicious, making punitive or exemplary damages necessary to

punish these Defendants and deter other companies and executives from similar misconduct.

### **Prayer for Relief**

WHEREFORE, on Count II under 42 U.S.C. § 1981 and 42 U.S.C. § 1988, Plaintiff Michael Peaster requests the entry of judgment against each Defendant imposing individual and joint and several liability for:

A. Actual and consequential damages, both economic and non-economic, to be proven at trial;

B. Punitive damages sufficient to punish each Defendant and deter other companies and their executives from like misconduct;

C. Costs of suit;

D. Attorneys' fees; and

E. Such other relief available under law and deemed just and proper.

### **COUNT III**

### **Michael Peaster's Claim Against All Defendants For Unlawful Retaliation Violating 42 U.S.C. § 1981**

101.   Plaintiff Michael Peaster incorporates and re-alleges paragraphs 1-100 as though set forth herein against Defendants McDonald's Corporation and Christopher Kempczinski.

102.   McDonald's termination of Peaster on November 7, 2022, effective December 31, 2022, was unlawful retaliation in violation of § 1981.

**Exhibit B
Page 130**

103.   The stated reason for Peaster's termination (that Desiree Ralls-Morrison had lost confidence in his ability to protect the CEO), was pretextual. Peaster was not guilty of poor performance, and any alleged deficiencies were the intended result of Defendants' campaign to set Peaster up to be accused of failure. Furthermore:

  a.  Peaster's supervisor – Malcom Hicks – was, on information and belief, not consulted about Peaster's termination or even told until a few days before that Peaster was being fired;

  b.  Peaster's requests to increase the budget for his EPS teams and fill open positions and for Kempczinski to accept greater personal security,were repeatedly denied or ignored;

  c.  Peaster's  EPS team supported Kempczinski on over fifty (50) trips in 2022.  Not once did Kempczinski or any other executive suffer any physical harm or face any significant safety threat; and

  d.  In Peaster's thirty-five years of employment with McDonald's, Peaster was never rated below a "Significant Performer," and McDonald's has never put Peaster on a Performance Improvement Plan or written Peaster up for performance issues or concerns.

104.   In reality, Defendants unlawfully retaliated against Peaster because he is African American, violating § 1981. Defendants feel threatened by Peaster speaking the truth on racial issues, including without limitation when Peaster spoke candidly about Kempczinski's racist texts at the town hall the Company convened

allegedly to provide a forum for this important discussion; and when Peaster spoke candidly to the Company's lawyers when he was interviewed by Company lawyers about a separate racial discrimination lawsuit.

105.   In further retaliation, McDonald's has threatened to revoke certain rights to acquire valuable stock in McDonald's that Peaster has earned based on his years of loyal service.   McDonald's threatened to withhold this earned benefit – known as the "Rule of 68" rights – in their effort to silence Peaster and dissuade him from asserting his civil rights.

106.   Defendant Christopher Kempczinski, who Peaster was employed to protect, is liable on Count III as he personally caused Peaster to suffer retaliation, acting directly or through Ralls-Morrison and/or other Company employees.

107.   Defendant McDonald's Corporation is liable for the retaliation against Peaster under the doctrine of *respondeat superior*.

108.   As the direct and proximate result of the Defendants' violations of § 1981 as alleged in Count III, Peaster has suffered substantial damages, including without limitation:

> a. Actual and consequential damages for economic loss in amounts to be proven at trial.
>
> b. Substantial non-economic damages, including, without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of civil rights; and
>
> c. Damage to injury and reputation.

Exhibit B
Page 132

109.    The conduct of McDonald's Corporation and Kempczinski was intentional or in reckless disregard of Peaster's civil rights.

110.    Defendants' unlawful and discriminatory retaliation was intentional and malicious, making punitive or exemplary damages necessary to punish these Defendants and deter other companies and executives from similar misconduct.

## **Prayer for Relief**

WHEREFORE, on Count III under 42 U.S.C. § 1981 and 42 U.S.C. § 1988, Plaintiff Michael Peaster requests the entry of judgment against each Defendant imposing individual and joint and several liability for:

    A.  Actual and consequential damages, both economic and non-economic, to be proven at trial;

    B.  Punitive damages sufficient to punish each Defendant and deter other companies and their executives from like misconduct;

    C.  Costs of suit;

    D.  Attorneys' fees; and

    E.  Such other relief available under law and deemed just and proper.

## **COUNT IV**

### **Michael Peaster's Claim Against All Defendants For Intentional Infliction Of Emotional Distress**

111.    Plaintiff Michael Peaster incorporates and re-alleges paragraphs 1—110 against both Defendants as though set forth herein.

112.    As alleged in this Complaint, Defendants committed the tort of intentional infliction of emotional distress against Plaintiff Michael Peaster.

**Exhibit B
Page 133**

113.   The Defendants' conduct towards Peaster was extreme and outrageous beyond the bounds of acceptable conduct in a civilized society and professional workplace.

114.   Peaster, while being in charge of organizing security for the Defendants, was inherently worried for his clients and *everyone* at McDonald's Corporation, including Kempczinski.

115.   Despite knowing the inherent stressors Peaster experienced from his job as Vice President of security, the Defendants, together, intentionally, and repeatedly heightened this stress by:

a. Cancelling and/or avoiding meetings with Peaster about the Company's and the Company's executives' security was to be discussed.

b. Placing the Company and Peaster's clients at high risk by refusing to increase the budget to allow for improvements to security despite Peaster's insistence.

c. Placing the Company and Peaster's clients at high risk by refusing to permit Peaster to fill open positions within his department.

d. Demanding Peaster meet certain security demands while simultaneously engaging in conduct that made it impossible for Peaster to satisfy those security demands.

    e.  Falsely criticizing Peaster about alleged security concerns in Mexico City, Mexico and São Paulo, Brazil that purportedly threatened the safety of Kempczinski, Ralls-Morrison, and other executives when no such threat(s) existed .

    f.  Terminating Peaster on the false pretense that the Company no longer had confidence in Peaster's ability to protect the CEO (Kempczinski) or General Counsel (Ralls-Morrison).

116.  Because of the increased risks to those Peaster was to protect, he suffered heightened anxiety and humiliation because he believed that others in the company perceived him as incompetent.

117.  Kempczinski was personally involved in the outrageous conduct that caused Peaster's injuries claimed here.  Kempczinski intentionally limited his interactions with Peaster, cancelled meetings with Peaster, was (on information and belief) the reason Peaster was not permitted to fly on the Company, and (on information and belief) was behind the Company's contradictory demands and conduct.

118.  McDonald's intended to humiliate Peaster and suffer emotional distress when the Company terminated him for unfounded, pretextual reasons. McDonald's threat to withhold Peaster's earned right to retain valuable stock compensation is further outrageous conduct intended to increase Peaster's anxiety.

Exhibit B
Page 135

119. The Defendants' conduct toward Peaster was intended to, and was reasonably foreseeable to, cause Peaster or any other reasonable person in her position to suffer emotional distress.

120. As the direct and proximate result of the Defendants' intentional infliction of emotional distress, Peaster has suffered substantial damages, including without limitation:

    a. Actual and consequential damages for economic loss in amounts to be proven at trial.

    b. Substantial non-economic damages, including, without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of civil rights; and

    c. Damage to injury and reputation.

121. The Defendants' conduct was intentional and malicious.

122. Punitive Damages in an amount to be determined by the jury are necessary to punish the Defendants and to deter future misconduct.

## **Prayer for Relief**

WHEREFORE, on Count IV his complaint, Plaintiff Michael Peaster requests the entry of judgment against each Defendant imposing individual and joint and several liability for:

    A. Actual and consequential damages, both economic and non-economic, to be proven at trial;

B.  Punitive damages sufficient to punish each Defendant and deter other
    companies and their executives from like misconduct;

C.  Costs of suit; and

D.  Such other relief available under law and deemed just and proper.

## JURY TRIAL DEMANDED

123.    Plaintiff Michael Peaster demands trial by jury in open court.

Dated: December 14, 2022

Respectfully submitted,

**PLAINTIFF MICHAEL PEASTER**

By:     */s/ Carmen D. Caruso*

Carmen D. Caruso (# 6189462)
cdc@cdcaruso.com
William B. Whitner(# 6331564)
wbw@cdcaruso.com

CARMEN D. CARUSO LAW FIRM
77 West Washington Street, Suite 1900
Chicago, IL 60602
(312) 626-1160

Exhibit C

Exhibit C
Page 138

| | |
|---|---|
| **From:** | Amy Andrews |
| **To:** | David W. Schecter |
| **Cc:** | Robert Foley; Murad Salim |
| **Subject:** | RE: [EXTERNAL EMAIL] ESN, et al. v. McDonald"s USA |
| **Date:** | Tuesday, January 31, 2023 3:34:47 PM |
| **Attachments:** | image001.png |

David,

I have discussed with my clients, and we do not agree to the transfer. As an initial matter, the agreement on the part of McDonald's USA and McDonald's Corp. to have the matter heard by Judge Audero was made in my June 23, 2022 letter as part of an overall proposal that Plaintiffs withdraw the subpoena and reissue it after completion of the McDonald's USA witnesses, which you did not agree to. And in any event, we have now engaged in multiple good faith efforts to get this issue resolved in the Central District of California, including participation in 3 IDCs and the extensive process of drafting and submitting a joint submission pursuant to Local Rule 37-2, none of which have been successful. We currently have jurisdiction for the issue in the Northern District of Illinois, and Judge Pacold has set a briefing schedule for the motion to quash. The subpoena has been pending since last June, and my clients are eager to reach a resolution without further delay or expense. We believe this can be done most efficiently in the current court.

Let me know if you wish to discuss further. Similarly, if you'd be agreeable to referral to Magistrate Judge Jantz, please let me know.

Thanks,

Amy

Amy C. Andrews (bio)

**Riley Safer Holmes & Cancila LLP**

70 W. Madison Street, Suite 2900

Chicago, Illinois 60602

(312) 471-8756

aandrews@rshc-law.com

www.rshc-law.com



**From:** David W. Schecter

**Sent:** Tuesday, January 31, 2023 12:37 PM

**To:** Amy Andrews

**Cc:** Robert Foley ; Murad Salim

**Subject:** [EXTERNAL EMAIL] ESN, et al. v. McDonald's USA

Amy:

We have reviewed the motion to quash filed by McDonald's Corp. and Mr. Kempczinski. Plaintiffs will seek to transfer the motion to quash to CD Cal. The basis for the transfer request is consent, in that McDonald's Corp. has already agreed to have these disputes resolved by the Central District of California. Will McDonald's Corp and Mr. Kempczinski consent to this transfer? If so, we can prepare a draft stipulation. Plaintiffs submit that transfer is also appropriate under the exceptional circumstances doctrine, but if the subpoenaed party consents, as it has here, that issue is moot.

-David

**David W. Schecter**

**Exhibit C**
**Page 139**

# M I L L E R  |  B A R O N D E S S LLP

2121 Avenue of the Stars, Suite 2600 (Please note our new address; read the Press Release)

Los Angeles, CA 90067

Main: 310-552-4400

Direct: 310-552-7567

Fax: 310-552-8400

dschecter@millerbarondess.com

www.millerbarondess.com

Biography

🌿 Please consider the environment – do you really need to print this email?

CONFIDENTIALITY NOTE: This e-mail is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this e-mail message is not the intended recipient, or the employee or agent responsible for delivery of the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have received this e-mail in error, please notify us immediately by telephone at (312) 471-8700 and also indicate the sender's name. Thank you.

> CAUTION: This email originated from outside of Miller Barondess. Do not click on any links or open any attachments unless you recognize the sender, verified the email address and know the content is safe.

**Exhibit C**
**Page 140**

Exhibit D

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF NextGen 1.6.3
### Eastern Division

Entertainment Studios Networks, Inc., et al.

Plaintiff,

v.

Case No.: 1:23–cv–00529
Honorable Martha M. Pacold

McDonald's USA, LLC

Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Monday, January 30, 2023:

MINUTE entry before the Honorable Martha M. Pacold: The court has received movants' motion to quash or otherwise prevent the enforcement of a subpoena. [1]. Response to the motion to quash is due by 2/21/202; reply is due by 3/7/2023. (rao, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

<u>**CERTIFICATE OF SERVICE**</u>

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of .  My business address is 2121 Avenue of the Stars, Suite 2600, Los Angeles, CA 90067.

On February 16, 2023, I served true copies of the following document(s) described as:

**DECLARATION OF DAVID W. SCHECTER IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR LIMITED EXTENSION OF FACT DISCOVERY DEADLINE**

on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

**BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on February 16, 2023, at Los Angeles, California.

_____
Tahira Murphy

1

DECLARATION OF DAVID W. SCHECTER IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR LIMITED EXTENSION OF FACT DISCOVERY DEADLINE

**SERVICE LIST**
**Entertainment Studios Networks, Inc. et al. v. McDonald's Corp**
**Case No. USDC Case No. 2:21-cv-04972**

| | |
|---|---|
| Shalem Massey<br>Jennifer Steeve<br>RILEY SAFER HOLMES &<br>CANCILA LLP<br>100 Spectrum Center Drive, Ste 440<br>Irvine, CA 92618 | Attorneys for MCDONALD'S USA,<br>LLC and MCDONALD'S<br>CORPORATION<br><br>Tel:     (949) 359-5515<br>Fax:    (949) 359-5501<br>Email:  smassey@rshc-law.com<br>          isteeve@rshc-law.com |
| Patricia Brown Holmes (pro hac vice)<br>Amy Andrews (pro hac vice)<br>RILEY SAFER HOLMES &<br>CANCILA LLP<br>70 W. Madison Street, Ste 2900<br>Chicago, IL 60602 | Attorneys for MCDONALD'S USA,<br>LLC and MCDONALD'S<br>CORPORATION<br><br>Tel:     (312) 471-8745<br>Fax:    (312) 471-8701<br>Email:  pholmes@rshc-law.com<br>          aandrews@rshc-law.com |
| Loretta E. Lynch (pro hac vice)<br>PAUL, WEISS, RIFKIND, WHARTON<br>& GARRISON LLP<br>1285 Avenue of the Americas<br>New York, New York 10019-6064 | Attorneys for MCDONALD'S USA,<br>LLC and MCDONALD'S<br>CORPORATION<br><br>Tel:     (212) 373-3000<br>Fax:    (212) 373-3990<br>Email:  lelynch@paulweiss.com |
| John C. Hueston<br>Moez M. Kaba<br>HUESTON HENNIGAN LLP 523 West<br>6th Street, Suite 400 Los Angeles, CA<br>90014 | Attorneys for MCDONALD'S USA,<br>LLC and MCDONALD'S<br>CORPORATION<br><br>Tel:     (212) 373-3000<br>Fax:    (212) 373-3990<br>Email:  jhueston@hueston.com<br>          mkaba@hueston.com |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400   FAX (310) 552-8400

600942.1

DECLARATION OF DAVID W. SCHECTER IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR
MOTION FOR LIMITED EXTENSION OF FACT DISCOVERY DEADLINE