LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
DAVID W. SCHECTER (State Bar No. 296251)
dschecter@millerbarondess.com
MURAD SALIM (State Bar No. 342747)
msalim@millerbarondess.com
MILLER BARONDESS, LLP
2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067
Telephone:  (310) 552-4400
Facsimile:  (310) 552-8400

*Attorneys for PLAINTIFFS*

Patricia Brown Holmes (*pro hac vice*)
Amy Andrews (*pro hac vice*)
Shalem Massey (SBN 143281)
Jennifer Steeve (SBN 308082)
RILEY SAFER HOLMES & CANCILA LLP
100 Spectrum Center Drive, Suite 440
Irvine, CA  92618
smassey@rshc-law.com
jsteeve@rshc-law.com

Loretta E. Lynch (*pro hac vice*)
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
lelynch@paulweiss.com

John C. Hueston (SBN 164921)
Moez M. Kaba (SBN 257456)
HUESTON HENNIGAN LLP
523 West 6th Street, Suite 400
Los Angeles, CA 90014
jhueston@hueston.com
mkaba@hueston.com

*Attorneys for Defendant McDonald's USA, LLC*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENTERTAINMENT STUDIOS NETWORKS, INC., a California corporation; WEATHER GROUP, LLC, a Delaware limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>McDONALD'S USA, LLC, a Delaware limited liability company,<br><br>Defendant. | Case No. 2:21-cv-04972-FMO-MAA<br><br>**JOINT MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Assigned to the:<br>Hon. Fernando M. Olguin<br><br>Complaint Filed: May 20, 2021<br>Trial Date: To be determined<br><br>Date:      October 19, 2023<br>Time:      10:00 a.m.<br>Location: Courtroom 690 |

# TABLE OF CONTENTS

Page

I.  INTRODUCTIONS TO PLAINTIFFS' PARTIAL MOTION
FOR SUMMARY JUDGMENT ..................................................................... 1

    A.  Plaintiffs' Introduction ............................................................... 1

    B.  McDonald's Introduction ........................................................... 1

II. INTRODUCTIONS TO MCDONALD'S MOTION FOR
SUMMARY JUDGMENT ............................................................................ 5

    A.  McDonald's Introduction ........................................................... 5

    B.  Plaintiffs' Introduction ............................................................... 9

III. FACTUAL BACKGROUND RELEVANT TO PLAINTIFFS'
PARTIAL MOTION FOR SUMMARY JUDGMENT ................................ 10

    A.  Plaintiffs' Statement of Undisputed Facts ............................... 10

        1.  Entertainment Studios Is a General Market Media
Company .......................................................................... 10

        2.  McDonald's Use of Ad Agencies to Deploy Its Ad
Budgets ............................................................................ 12

        3.  McDonald's Relegated Entertainment Studios to
Burrell ............................................................................. 14

    B.  McDonald's Statement of Facts Relevant to Plaintiffs'
Motion for Partial Summary Judgment ..................................... 16

IV. FACTUAL BACKGROUND RELEVANT TO MCDONALD'S
MOTION FOR SUMMARY JUDGMENT ................................................ 19

    A.  McDonald's Statement of Facts In Support of Motion for
Summary Judgment ................................................................... 19

        1.  McDonald's Inter-Agency Advertising Team ........................... 19

        2.  McDonald's History Advertising with Allen's
Properties ........................................................................ 20

    B.  Plaintiffs' Summary of Disputed Facts in McDonald's
Factual Summary ...................................................................... 23

V.  ARGUMENTS WITH RESPECT TO PLAINTIFFS' PARTIAL
MOTION FOR SUMMARY JUDGMENT ................................................ 25

    A.  McDonald's Relegated Entertainment Studios to a Less-
Favorable Contracting Tier in Violation of Section 1981 .................. 25

## TABLE OF CONTENTS (cont.)

Page

1.  Section 1981 .................................................................. 25

2.  McDonald's Violated Section 1981 by Relegating
    Entertainment Studios to McDonald's Black Ad
    Agency .......................................................................... 26

    (a) Entertainment Studios Is African American
        Owned ................................................................... 26

    (b) McDonald's Relegated Entertainment Studios
        to McDonald's Black Agency Because It Is
        African American-Owned ...................................... 27

    (c) McDonald's Relegation of Entertainment
        Studios to McDonald's Black Agency Was
        Intentional ............................................................ 28

B.  Plaintiffs' Relegation Theory Fails ....................................... 29

    1.  Plaintiffs Lack Factual Proof of Relegation .............................. 29

        (a) Plaintiffs Cannot Establish that ESN Has
            "Widespread Appeal" in the "General
            Market." ............................................................... 30

        (b) Plaintiffs Cannot Prove That ESN Was
            "Placed" With Burrell To The Exclusion of
            Other Agencies .................................................... 32

        (c) Plaintiffs Cannot Prove that ESN Was "Shut
            Out" from Consideration by the General
            Market Agencies ................................................. 34

        (d) Plaintiffs Cannot Prove that Any "Relegation"
            was "Because of" Allen's Race ........................... 36

    2.  Plaintiffs' Relegation Theory Lacks Any Basis in the
        Law ........................................................................... 41

    3.  Plaintiffs' Relegation Theory Is Time-Barred ........................ 45

VI. ARGUMENTS WITH RESPECT TO MCDONALD'S MOTION
    FOR SUMMARY JUDGMENT ...................................................... 46

    A.  Plaintiffs' Claims Fail Because They Cannot Establish
        Intentional Discrimination ............................................ 47

        1.  McDonald's Position ................................................. 47

        2.  Plaintiffs' Position .................................................. 50

- ii -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS (cont.)

Page

(a) Hatred Is Not An Element of Plaintiffs' Claims ................................................................. 51

(b) McDonald's Relegated Entertainment Studios to Burrell .............................................. 51

(i) McDonald's "Additional Opportunity" Argument .................................................. 51

(ii) McDonald's Spending with Others Is Irrelevant ............................................... 52

(c) McDonald's "Favorable Treatment" Argument ............. 54

B. Plaintiffs' Claims Fail for Lack of Suitable Comparators ................... 56

1. McDonald's Position ................................................. 56

2. Plaintiffs' Position ................................................ 58

(a) Plaintiffs Have Identified Sufficient Comparators ............................................... 59

(b) McDonald's Other Arguments Are Meritless ................. 61

C. Plaintiffs' Claims Fail Because McDonald's Had Multiple Legitimate Business Reasons for its Decisions ................................... 61

1. McDonald's Position ................................................. 61

2. Plaintiffs' Position ................................................ 63

D. Plaintiffs' Claims Fail for Lack of Causation ....................................... 65

1. McDonald's Position ................................................. 65

2. Plaintiffs' Position ................................................ 68

E. Plaintiffs' Claims are Barred By the Statute of Limitations ............... 70

1. McDonald's Position ................................................. 70

2. Plaintiffs' Position ................................................ 72

(a) Plaintiffs' Relegation Claim Has a Four Year SOL ............................................... 72

(b) Plaintiffs' Unruh Act Claim Has a Three Year SOL ............................................... 72

(c) Plaintiffs' Claims Are Not Time Barred ...................... 73

TABLE OF CONTENTS (cont.)

Page

F.    Plaintiffs Lack Standing to Assert Claims Based on AMG's Syndicated Programming and JusticeCentral.TV ................................ 74

        1.    McDonald's Position .................................................. 74

        2.    Plaintiffs' Position ..................................................... 76

               (a)    McDonald's Is Raising a Real-Party-In-Interest Issue ................................................... 77

               (b)    ESN Has Constitutional Standing .................................. 78

               (c)    ESN Has Standing By Virtue Of Valid Assignments ...................................................... 80

G.    Plaintiff Weather Group's Claims Fail for Two Separate Reasons ................................................................................. 81

        1.    McDonald's Position .................................................. 81

        2.    Plaintiffs' Position ..................................................... 83

VII.   CONCLUSIONS TO PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT ................................................. 83

        1.    Plaintiffs' Conclusion ................................................ 83

        2.    McDonald's Conclusion ............................................. 83

VIII.  CONCLUSIONS TO MCDONALD'S MOTION FOR SUMMARY JUDGMENT ................................................. 84

        1.    McDonald's Conclusion ............................................. 84

        2.    Plaintiffs' Conclusion ................................................ 84

# TABLE OF AUTHORITIES

Page(s)

## **Cases**

*303 Creative LLC v. Elenis*,
    143 S. Ct. 2298 (June 30, 2023) ................................................................. 82, 83

*Addax Energy SA v. M/V Yasa H. Mulla*,
    987 F.3d 80 (4th Cir. 2021) ............................................................................. 79

*Ajwani v. Hanmi Bank*,
    2016 WL 3901773 (C.D. Cal. July 18, 2016) ................................................. 42

*Allen v. Wright*,
    468 U.S. 737 (1984) ........................................................................................ 80

*Alozie v. Arizona Bd. of Regents*,
    431 F. Supp. 3d 1100 (D. Ariz. 2020) ............................................................ 47

*Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court*,
    46 Cal. 4th 993 (2009) .................................................................................... 80

*Anders v. Waste Mgmt. of Wisconsin*,
    463 F.3d 670 (7th Cir. 2006) ........................................................................... 57

*Anderson v. City & Cnty. of San Francisco*,
    169 F. Supp. 3d 995 (N.D. Cal. 2016) ........................................................... 66

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................. 29, 40

*Anthoine v. N. Cent. Counties Consortium*,
    605 F.3d 740 (9th Cir. 2010) ........................................................................... 68

*Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252 ................................................................................................... 79

*Ballentine v. Tucker*,
    28 F.4th 54 (9th Cir. 2022) ....................................................................... 68, 69

*Bartell v. JPMorgan Chase Bank, NA*,
    607 F. App'x 731 (9th Cir. 2015) ................................................................... 42

1

## TABLE OF AUTHORITIES (cont.)

2

Page(s)

3

*Beck v. United Food & Commercial Workers Union, Local 99*,

4

 506 F.3d 874 .................................................................................. 59

5

*Bianco v. H.F. Ahmanson & Co.*,

6

 897 F. Supp. 433 (C.D. Cal. 1995) ................................................. 29

7

*Bieghler v. Kleppe*,

 633 F.2d 531 (9th Cir. 1980) ........................................................... 61

8

*Black Educ. Network, Inc. v. AT&T Broadband, LLC*,

9

 154 F. App'x 33 (10th Cir. 2005) .................................................... 58

10

*BNT Ad Agency v. City of Greensboro*,

11

 837 F. App'x 962 (4th Cir. 2020) .................................................... 58

12

*Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*,

13

 869 F.3d 381 (5th Cir. 2017) ........................................................... 82

14

*Bostock v. Clayton County, Georgia*,

15

 140 S. Ct. 1731 (2020) ..................................................................... 68

16

*Bowden v. Potter*,

17

 308 F. Supp. 2d 1108 (N.D. Cal. 2004) .......................................... 58

18

*Bradley v. Harcourt, Brace and Co.*,

19

 104 F.3d 267 (9th Cir. 1996) ........................................................... 55

20

*C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.*,

 213 F.3d 474 (9th Cir. 2000) ............................................................. 5

21

*Carter v. Atrium,*

22

 *Hosp.*, 997 F.3d 803 (8th Cir. 2021) ................................................ 49

23

*CBOCS W., Inc. v. Humphries*,

24

 553 U.S. 442 (2008) .................................................................. 25, 72

25

*Circle City Broad. I, LLC v. DISH Network, LLC*,

26

 2023 WL 2742323 (S.D. Ind. Mar. 31, 2023) ................................ 58

27

*City of Los Angeles v. San Pedro Boat Works*,

28

 2008 WL 11334051 (C.D. Cal. Apr. 28, 2008) ............................... 30

JOINT MPA REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT

1

## TABLE OF AUTHORITIES (cont.)

2

Page(s)

3
*Coburn v. PN II, Inc.*,
4
   372 Fed. Appx. 796 (9th Cir. Mar. 31, 2010) ................................................ 55

5
*Coghlan v. Am. Seafoods Co. LLC.*,
6
   413 F.3d 1090 (9th Cir. 2005)........................................................... 45, 48, 55

7
*Coleman v. Donahoe*,
   667 F.3d 835 (7th Cir. 2012)............................................................................ 59
8

9
*Coleman v. Texaco Marine Servs., Inc.*,
   108 F.3d 1384 (9th Cir. 1997)........................................................................ 68

10
*Comcast v. Nat'l Ass'n of African American-Owned Media*,
11
   140 S. Ct. 1009 (2020) ............................................................... 26, 47, 65, 72

12
*Cont'l Lab'y Prod., Inc. v. Medax Int'l, Inc.*,
13
   114 F. Supp. 2d 992 (S.D. Cal. 2000) ........................................................... 40

14
*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*,
15
   6 F.4th 1247 (11th Cir. 2021)........................................................................ 82

16
*Country Mut. Ins. Co. v. Martinez*,
   2019 WL 1787313 (D. Ariz. Apr. 24, 2019) ................................................ 34
17

18
*Crowell v. Shell Oil Co.*,
   481 F. Supp. 2d 797 (S.D. Tex. 2007) ........................................................... 34
19

20
*Curtis v. Kellogg & Andelson*,
   73 Cal. App. 4th 492 (1999)........................................................................... 76

21
*Dameron Hosp. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
22
   2012 WL 4038449 (E.D. Cal. Sept. 10, 2012).............................................. 75

23
*D'Angelo v. WellStar Med. Grp., LLC*,
24
   2019 WL 3006625 (N.D. Ga. May 3, 2019) ................................................. 66

25
*Dawson v. Washington Gas Light Co.*,
26
   2021 WL 2935326 (4th Cir. July 13, 2021) .................................................. 57

27
*DeLaw v. Adamson*,
   293 Fed. App'x 504 (9th Cir. 2008)............................................................... 60
28

JOINT MPA REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT

## TABLE OF AUTHORITIES (cont.)

Page(s)

*Delaware State Coll. v. Ricks*,
   449 U.S. 250 (1980) ............................................................... 45, 70

*Department of Commerce v. U.S. House of Representatives*,
   525 U.S. 316 (1999) ..................................................................... 79

*Desert Palace, Inc. v. Costa*,
   539 U.S. 90 (2003) ................................................................ 50, 52

*Director, Office of Workers' Compensation Programs v. Perini North
   River Associates*,
   459 U.S. 297 (1983) ..................................................................... 79

*Disorderly Kids, LLC v. Dollar*,
   2015 WL 11117074 n.12 (C.D. Cal. Nov. 10, 2015) .................... 42

*Doe v. Kamehameha Sch./Bernice Pauahi Bishop Est.*,
   470 F.3d 827 (9th Cir. 2006) ....................................................... 44

*Domino's Pizza, Inc. v. McDonald*,
   546 U.S. 470 (2006) ........................................................ 25, 26, 76

*Est. of Barton v. ADT Sec. Servs. Pension Plan*,
   820 F.3d 1060 (9th Cir. 2016) ..................................................... 32

*Etmatboly v. Arizona State University*,
   297 Fed. App'x 654 (9th Cir. 2008) ............................................. 72

*Ferrill v. Parker Group, Inc.*,
   168 F.3d 468 (11th Cir. 1999) ...................................................... 51

*First American Title Insurance Company v. Northwest Title Insurance
   Agency*,
   906 F.3d 884 (10th Cir. 2018) ................................................ 77, 80

*Foxworth v. Am. Bible Soc.*,
   2005 WL 1837504 (S.D.N.Y. July 28, 2005) ............................... 43

*France v. Johnson*,
   795 F.3d 1170 (9th Cir. 2015) ..................................................... 50

TABLE OF AUTHORITIES (cont.)

Page(s)

*Garcia v. City of King City,*
    2015 WL 1737936 (N.D. Cal. Apr. 8, 2015) .................................................. 66

*Gatto v. County of Sonoma,*
    98 Cal.App.4th 744 (Cal. Ct. App. 2002) .................................................. 70, 73

*Gay v. Waiters' & Dairy Lunchmen's Union, Loc. No. 30,* 694 F.2d 531,
    (9th Cir. 1982) .................................................................................. 36, 37, 47

*Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania,*
    458 U.S. 375 (1982) ............................................................................... 37

*Gibbs v. Deere & Co.,*
    2022 WL 731503 (C.D. Ill. Mar. 10, 2022) .................................................. 57

*Goodley,*
    62 Cal. App. 3d ..................................................................................... 81

*Goodman v. Lukens Steel Co.,*
    482 U.S. 656 (1987) ........................................................................... 51, 76

*Grant v. Starbucks Corp.,*
    2019 WL 8112465 (C.D. Cal. 2019) ........................................................... 65

*Great Am. Ins. Co. v. Sequoia Ins. Co.,*
    2016 WL 844819 (C.D. Cal. Mar. 1, 2016) .................................................. 75

*Greg Young Publishing, Inc. v. Zazzle, Inc.,*
    2017 WL 2729584 (C.D. Cal. May 1, 2017) ................................................. 77

*Harris v. City of Santa Monica,*
    56 Cal. 4th 203 (2013) ....................................................................... 68, 69

*Humphries v. CBOCS W., Inc.,*
    474 F.3d 387 (7th Cir. 2007) .................................................................... 59

*Ismay v. Bank of America NA,*
    2017 WL 10636685 (D. Ariz. Mar. 15, 2017) .............................................. 55

*Jackson v. Geithner,*
    2011 WL 2181394 (E.D. Cal. June 3, 2011) ................................................ 65

TABLE OF AUTHORITIES (cont.)

Page(s)

*Jackson v. Volvo Trucks N. Am., Inc.,*
    462 F.3d 1234 (10th Cir. 2006).......................................................................... 77

*Jim 72 Properties, LLC v. Montgomery Clearners,*
    151 F. Supp. 3d 1092 (C.D. Cal. Dec. 16, 2015) ........................................... 81

*Jones v. Alfred H. Mayer Co.,*
    392 U.S. 409 (1968) ...................................................................................... 25

*Jones v. R.R. Donnelly & Sons Co.,*
    541 U.S. 369 (2004) ...................................................................................... 72

*Jurado v. Eleven-Fifty Corp.,*
    813 F.2d 1406 (9th Cir. 1987).......................................................... 4, 41, 43, 45

*Kaplan v. Multimedia Ent., Inc.,*
    2005 WL 2837561 (W.D.N.Y. Oct. 27, 2005)................................................ 62

*Kinlow v. City of Milwaukee,*
    2 F. App'x 581 (7th Cir. 2001) ........................................................................ 57

*Kocienski v. NRT Technologies, Inc.,*
    787 Fed. Appx. 411 (9th Cir. Dec. 11, 2019)................................................ 55

*Kotev v. First Colony Life Ins. Co.,*
    927 F. Supp. 1316 (C.D. Cal. 1996)............................................................. 71

*Kwesele v. King Cnty.,*
    804 F. App'x 726 (9th Cir. 2020)........................................................... 65, 69

*Lam v. University of Hawai'i,*
    40 F.3d 1551 (9th Cir. 1994).......................................................................... 50

*Lindsey v. SLT Los Angeles, LLC,*
    447 F.3d 1138 (9th Cir. 2006)........................................................... 56, 61, 63

*Lively v. WAFRA Inv. Advisory Grp., Inc.,*
    6 F.4th 293 (2d Cir. 2021)............................................................................. 48

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ...................................................................................... 76

JOINT MPA REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT

TABLE OF AUTHORITIES (cont.)

Page(s)

*Lukovsky v. City & Cnty. of San Francisco*,
535 F.3d 1044 (9th Cir. 2008).................................................................. 45, 70

*Mackey v. Bd. of Trustees of California State Univ.*,
31 Cal. App. 5th 640 (2019)....................................................................... 36, 47

*Maduk v. CVS Pharmacy, Inc.*,
2023 WL 3272406 (C.D. Cal. Feb. 9, 2023)...................................... 47, 50, 51

*Marks v. New York Life Ins. Co.*,
2020 WL 5752852 (S.D. Ala. Sept. 25, 2020).............................................. 48

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ...................................................................................... 76

*Merrick v. Hilton Worldwide, Inc.*,
867 F.3d 1139 (9th Cir. 2017)....................................................................... 45

*Mitchell v. Sung*,
816 F. Supp. 597 (N.D. Cal. 1993)............................................................... 76

*Montanile v. Nat'l Broad. Co.*,
211 F. Supp. 2d 481 (S.D.N.Y. 2002).......................................................... 48

*Mullen v. Wells Fargo Bank, N.A.*,
2021 WL 4453604 (E.D. Pa. Sept. 29, 2021)............................................... 44

*Nat'l Comm. of Reform Party of U.S. v. Democratic Nat. Comm.*,
168 F.3d 360 (9th Cir. 1999)......................................................................... 45

*Nat'l R.R. Passenger Corp. v. Morgan*,
536 U.S. 101 (2002) ........................................................................ 27, 71, 73

*Ndulue v. Fremont-Rideout Health Grp.*,
2008 WL 11512296 (E.D. Cal. Nov. 5, 2008) .............................................. 27

*Newman v. Piggie Park Enters., Inc.*,
390 U.S. 400 (1968) ...................................................................................... 83

*Norris v. Causey*,
869 F.3d 360 (5th Cir. 2017)................................................................... 78, 80

TABLE OF AUTHORITIES (cont.)

Page(s)

*O'Neal v. Sideshow, Inc.*,
   583 F. Supp. 3d 1282 (C.D. Cal. 2022) ....................................................... 9, 42

*Pacific Shores Properties, LLC v. City of Newport Beach*,
   730 F.3d 1142 (9th Cir. 2013) ......................................................................... 50

*Patino Garcia v. Barr*,
   830 F. App'x 989 (9th Cir. 2020) ................................................................... 53

*Patterson v. McLean Credit Union*,
   491 U.S. 164 (1989) ................................................................................... 26, 72

*Peterson v. Hewlett-Packard Co.*,
   358 F.3d 599 (9th Cir. 2004) ....................................................................... 4, 44

*Polakoff v. Am. Airlines, Inc.*,
   2002 WL 1579247 (N.D. Cal. July 11, 2002) ................................................. 71

*Pony v. Cnty. of Los Angeles*,
   433 F.3d 1138 (9th Cir. 2006) ................................................................... 76, 80

*Pounds v. Bd. of Trustees*,
   215 F.3d 1320 (Table) (4th Cir. 2000) ............................................................ 41

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ......................................................................... 60

*Quidel Corporation v. Siemens Medical Solutions USA, Inc.*,
   2021 WL 4622504 (9th Cir. Oct. 7, 2021) ..................................................... 40

*Rai v. IBM Credit Corp.*,
   2002 WL 1808741 (N.D. Cal. Aug. 1, 2002) ............................................ 46, 71

*Rey v. C & H Sugar Co.*,
   609 F. App'x 923 (9th Cir. 2015) ................................................................... 82

*Ries v. Arizona Beverages USA LLC*,
   2013 WL 1287416 (N.D. Cal. Mar. 28, 2013) ................................................ 34

*Riley v. Shinseki*,
   2009 WL 2957793 (W.D. Pa. Sept. 10, 2009) ................................................ 66

JOINT MPA REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT

1

## TABLE OF AUTHORITIES (cont.)

2

Page(s)

3
4
*Rivers v. Roadway Express, Inc.*,
  511 U.S. 298 (1994) .................................................................................. 26

5
6
*Robinson v. York*,
  566 F.3d 817 (9th Cir. 2009) .................................................................... 68

7
8
*Rogers v. Samedan Oil Corp.*,
  308 F.3d 477 ............................................................................................. 78

9
*Rubert v. King*,
  2020 WL 5751513 (S.D.N.Y. Sept. 25, 2020) ......................................... 63

10
11
*Rued v. Cooper*,
  109 Cal. App. 682 (1893) ......................................................................... 81

12
13
*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
  547 U.S. 47 (2006) .................................................................................... 83

14
15
*Runyon v. McCrary*,
  427 U.S. 160 (1976) .................................................................................. 25

16
17
*San Diego Cnty. Gun Rights Comm. v. Reno*,
  98 F.3d 1121 (9th Cir. 1996) .................................................................... 79

18
19
*Semler v. GE Cap. Corp.*,
  196 Cal. App. 4th 1380 (2011) ................................................................. 72

20
*Shah v. Cnty. of L.A. Dep't of Health Servs.*,
  2008 WL 11333940 (C.D. Cal. Mar. 26, 2008) ............................ 27, 71, 73

21
22
*Sierra Club v. Morton*,
  405 U.S. 727 (1972) .................................................................................. 79

23
24
*Sigma Fin. Corp. v. Gotham Ins. Co.*,
  2016 WL 7508172 (C.D. Cal. Sept. 22, 2016) ......................................... 74

25
26
*Simpson v. Kay Jewelers, Div. of Sterling, Inc.*,
  142 F.3d 639 (3d Cir. 1998) ..................................................................... 68

27
28
*Slack v. United Airlines, Inc.*,
  2021 WL 982317 (D. Nev. Mar. 15, 2021) .............................................. 47

<u>TABLE OF AUTHORITIES (cont.)</u>

<u>Page(s)</u>

*Snoqualmie Indian Tribe v. City of Snoqualmie,*
　　186 F. Supp. 3d 1155 (W.D. Wash. 2016) ...................................... 69

*Sooner v. Schwabe North America, Inc.,*
　　911 F.3d 989 (9th Cir. 2018) ........................................................... 61

*Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona,
　　Inc.,*
　　770 F.3d 1282 (9th Cir. 2014) ........................................................ 80

*Spokeo, Inc. v. Robins,*
　　578 U.S. 330 (2016) ........................................................................ 79

*Spreter v. AmerisourceBergen Corp.,*
　　2014 WL 5512150 (D.N.J. Oct. 30, 2014) ...................................... 65

*St. Mary's Honor Ctr. v. Hicks,*
　　509 U.S. 502 (1993) ........................................................................ 45

*Thompson v. Stanford Univ.,*
　　2017 WL 7050673 (N.D. Cal. Nov. 3, 2017) .................................. 27

*Tillman v. Wheaton-Haven Recreation Ass'n, Inc.,*
　　410 U.S. 431 (1973) ........................................................................ 25

*U.S. Equal Emp. Opportunity Comm'n v. Chapman Univ.,*
　　2012 WL 12888840 (C.D. Cal. Apr. 5, 2012) ................................. 48

*U.S. v. HVI Cat Canyon, Inc.,*
　　2016 WL 11683593 (C.D. Cal. Oct. 28, 2016) ............................... 52

*Ua Cruadhlaoich v. Pritzker,*
　　2014 WL 12687445 (N.D. Cal. May 27, 2014) ............................... 65

*U-Haul Int'l, Inc. v. Jartran, Inc.,*
　　793 F.2d 1034 (9th Cir. 1986) ........................................................ 77

*Vermont Agency of Natural Resources v. U.S. ex rel. Stevens,*
　　529 U.S. 765 (2000) ........................................................................ 80

*Vickers v. U.S.,*
　　228 F.3d 944 (9th Cir. 2000) .......................................................... 68

TABLE OF AUTHORITIES (cont.)

Page(s)

*Villiarimo v. Aloha Island Air, Inc.,*
    281 F.3d 1054 (9th Cir. 2002) .................................................. 40, 44

*Weeks v. ARA Servs.,*
    869 F. Supp. 194 (S.D.N.Y. 1994) ................................................. 30

*Weisbein v. Allergan, Inc.,*
    2022 WL 1288222 n.2 (C.D. Cal. Mar. 28, 2022) .......................... 43

*Whelan v. Abell,*
    953 F.2d 663 (D.C. Cir. 1992) ................................................ 78, 80

*White v. Tavel,*
    2020 WL 2804282 n.1 (S.D. Ind. May 29, 2020) .......................... 41

*Williams v. Hous. Opportunities for Persons with Exceptionalities,*
    777 F. App'x 451 (11th Cir. 2019) ................................................ 48

*Yi Tai Shao v. McManis Faulkner, LLP,*
    2014 WL 4773981 (N.D. Cal. Sept. 22, 2014) .......................... 70, 72

*Zhang v. Nevada,*
    2008 WL 2390773 (D. Nev. June 9, 2008) .................................... 67

**Statutes**

28 U.S.C. § 1658 .......................................................................... 72

42 U.S.C. § 1981 ................................................... 1, 25, 26, 27

42 U.S.C. § 1981(a) ..................................................................... 25

42 U.S.C. § 1981(b) ..................................................................... 26

Cal. Civ. Proc. Code § 335.1 ................................................. 70, 72

California Civil Code § 51.5 ................................................... 72, 73

**Rules**

Rule 56(a) of the Federal Rules of Civil Procedure ......................... 1

Fed.R.Civ.P. 30(b)(6) ................................................................. 38

1

<u>TABLE OF AUTHORITIES (cont.)</u>

2

<u>Page(s)</u>

3   Fed. R. Civ. P. 37(c)(1) .................................................................................. 30

4   Fed. R. Evid. 602 ..................................................................................... 24, 25

5   Fed. R. Evid. 702, 802 ................................................................................... 53

6
7   Federal Rule of Evidence 803(6) .................................................................. 53

8   **<u>Other Authorities</u>**

9   13A Charles Alan Wright et al., Federal Practice & Procedure § 3531, at

10      1, 23 (3d ed. 2008) .................................................................................. 78

11   H.R. Rep. No. 102-40 .................................................................................... 26

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I. INTRODUCTIONS TO *PLAINTIFFS'* MOTION FOR PARTIAL SUMMARY JUDGMENT

## A. Plaintiffs' Introduction

This motion is based on undisputed material facts.  It is undisputed that McDonald's USA, LLC ("McDonald's") has a two tier system for its national advertising budget.  One tier, comprising over 92 percent of its ad spend, goes to general market media companies through McDonald's general market advertising agency.  The balance, less than eight percent, is deployed through separate agencies who specialize in content targeted to racial minorities.

The issue in this case is that Entertainment Studios is African American-*owned* but its programming and networks are not African American-*targeted*.  The content is targeted to general audiences.  Nevertheless, because Entertainment Studios is African American-owned, McDonald's relegates Entertainment Studios to McDonald's African American ad agency and its miniscule ad budget.

We know this because it's been going on for years and was testified to in deposition by McDonald's, by McDonald's African American ad agency and by Plaintiffs.  All parties agree.  There's no dispute of material fact on this issue.  Accordingly, summary judgment on this critical issue is appropriate pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, and the jury should be so instructed.

This is Plaintiffs' core theory of liability.  It's tantamount to corporate Jim Crow and, as such, violates the prohibition in 42 U.S.C. § 1981 on discrimination in contracting and the contracting process.  Plaintiffs acknowledge that there are other issues for trial, such as damages.  Granting this motion will save time in trial and conserve resources.

## B. McDonald's Introduction

Faced with undisputed evidence disproving their allegations of invidious discrimination, Plaintiffs have been forced to pivot.  Plaintiffs now stake their case on a "core theory" that cynically misrepresents a single aspect of McDonald's media

buying process: McDonald's use of Burrell Communications ("Burrell")—a preeminent Black-owned and Black-run advertising agency—to develop advertising that more effectively connects with the Black community and the African American consumer market ("AACM").  Seemingly intent on proving the adage that "no good deed goes unpunished," Plaintiffs try to paint these efforts as some discriminatory scheme.

The evidence proves otherwise.  While Plaintiffs theorize that they were "relegated" to working with Burrell because of Mr. Allen's race and consequently "shut out" from working with McDonald's general consumer market (GCM) firm, OMD, that speculation has been put to rest by those who know best: OMD and Burrell.  Two former OMD executives, in sworn declarations, denied that they were ever instructed not to consider Allen's companies.  (Ex. U - Innes Decl. ¶ 5; Ex. T - Geraci Decl. ¶ 4.)  To the contrary, they explained that Plaintiffs' poorly rated networks simply failed to "meet McDonald's GCM requirements" that OMD implements, so they directed Plaintiffs to Burrell as an "*additional* opportunity" to compete for McDonald's advertising dollars.  (Ex. U - Innes Decl. ¶ 8 (emphasis added); *see also* Ex. T - Geraci Decl. ¶ 6.)  As for Burrell, its representative explained that no agency is "the only point person for [any] media partner"; rather, each agency is "looking at the media partners to see if they match the criteria of what it is . . . looking at to achieve."  (Ex. M - Burrell 30(b)(6) Tr. at 98:12-19.)

Plaintiffs have no answer for this evidence, which addresses and refutes their "relegation" theory head on.  The OMD Declarations in particular have been studiously avoided by Plaintiffs.  Despite receiving those declarations on May 30, Plaintiffs did not address them in their initial supplemental brief.  (*See* Dkt. 124.)  Nor did Plaintiffs mention the OMD Declarations in their re-filed motion, choosing instead to stick their heads in the sand and re-file the same stale allegations.  (*See generally infra* Sections III.A.3, III.A.2.)

1    And that's only the beginning of the evidence that Plaintiffs have not and cannot
2  explain.  The following stubborn facts remain unaddressed in Plaintiffs' motion—
3  despite McDonald's having prominently raised them in the parties' first set of
4  summary judgment briefing (Dkt. 129 at 3-4).  Each one refutes Plaintiffs' baseless
5  theory that McDonald's "relegates" "Black owned" media companies to Burrell:

6    • Plaintiff Weather Group, LLC ("Weather Group"), another media property
7      fully owned by Byron Allen, does not—and indeed cannot—join Plaintiff
8      Entertainment Studios Network, Inc.'s ("ESN") motion.  *That's because the*
9      *Black-owned Weather Group consistently met with OMD—an agency that*
10     *was supposedly reserved for "white-owned" media.*  (TAC ¶¶ 77–82.)  ESN
11     fails to even mention its co-plaintiff in its motion, let alone explain why—if
12     Allen's race dictated which media agency his companies were permitted to
13     work with—Allen's own Weather Group would be an exception.

14   • OMD and Starcom (the agencies that allegedly could only deal with "white-
15     owned" media) have in fact made *multiple* purchases with Black-owned
16     media companies on behalf of McDonald's.  (Statement of Genuine Disputes
17     of Material Fact ("SMF") D44-46; Ex. P(10), AOE2629-30; Ex. N - Bibbens
18     Tr. 85:4-8; 53:6-15.)

19   • In 2021, ESN *itself* secured purchases through OMD for its digital property
20     theGrio.  (SMF D131; Ex. O(70), AOE1817-23.)

21   • Burrell (which was supposedly assigned only to "Black-owned" media) has
22     purchased advertising on behalf of McDonald's from multiple companies
23     that are *not* Black-owned.  (Ex. P(10), AOE2630.)

24  In short, both documents and testimony demonstrate unequivocally that Plaintiffs are
25  wrong.  While their accusations of a "corporate Jim Crow" (*supra* at 1) are full of
26  sound and fury, they signify nothing.  Indeed, the problems with Plaintiffs'
27  "relegation" theory are manifold.

28

*First*, it is soundly refuted by the factual record. As they describe it, Plaintiffs' theory is that even though ESN is a "a general market media company," "McDonald's placed Entertainment Studios with Burrell because it is African American-owned." (*Infra* at 11, 29.)  By Plaintiffs' own lights, this theory requires proof of at least four threshold facts: (1) that ESN's offerings in fact have "widespread appeal" in the "general market" (TAC ¶¶ 19, 21); (2) McDonald's nevertheless "placed" ESN with Burrell, the agency responsible for targeting the AACM, to the exclusion of other agencies (*infra* Section V.A.2.c); (3) because ESN had been "placed" ESN with Burrell, ESN "was shut out" from consideration for the GCM (*see* TAC ¶ 58); (4) that McDonald's did this because ESN's owner is Black (*infra* Section V.A.2.b).  None of these finds any support in the record.  Instead, the undisputed evidence affirmatively shows that ESN did *not* have widespread appeal, as demonstrated by their miniscule Nielsen ratings. (*See generally* McDonald's Motion, *infra* Section IV.A.2). Likewise, OMD and Burrell confirm that McDonald's did not "place" ESN with Burrell or prevent OMD from considering it.  And even if Plaintiffs could overcome these obstacles, there is not an iota of competent evidence suggesting that any of this occurred in order to harm Allen because of his race.

*Second,* McDonald's process—which is considered best practice for large advertisers seeking to reach under-served audiences—is not discriminatory as a matter of law.  Companies have long marketed their products to "particular ethnic, racial, or social groups" without fear of violating any civil rights. *Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1410 (9th Cir. 1987).  Companies likewise have the "right to promote diversity," and programs doing so have been recognized by the Ninth Circuit as "good business practices." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 608 (9th Cir. 2004).  Plaintiffs, for their part, once again cite "literally" no case law in support of their theory (Dkt. 129 at 6).  After multiple opportunities to fill this gap since the parties' initial summary judgment briefing, the inescapable implication of Plaintiffs' silence is that they have no answer.

*Third*, ESN's motion and supporting evidence prove one of the bases for *McDonald's* motion for summary judgment: ESN's discrimination claims are time-barred.  (*See infra* Section VI.E.)  ESN admits that McDonald's supposed racially discriminatory "relegation" was perpetrated well outside the two-year limitations period for Section 1981 and Unruh Act claims.  ESN offers no explanation for why, despite its belief that this "relegation" has "been going on **for years**" (*supra* at 1 (emphasis added)), it waited to file suit until May 2021—more than 6 years later.  The legal effect of Plaintiffs' failure to timely act is clear: ESN's "core theory of liability" is time-barred as a matter of law, and summary judgment should be granted in favor of McDonald's.

Thus, neither the law nor the factual record lends any credence to Plaintiffs' "core theory."  Plaintiffs' motion not only fails to meet their burden to "come forward with evidence which would entitle [them] to a directed verdict if the evidence went uncontroverted at trial," *C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000), it confirms that summary judgment should be awarded in favor of McDonald's.

## II. INTRODUCTIONS TO *MCDONALD'S* MOTION FOR SUMMARY JUDGMENT

### A. McDonald's Introduction

Presented to this Court as a racial discrimination action, Plaintiffs' complaint has proven to be a bill of goods.  Two years ago, the Court initially dismissed Plaintiffs' complaint due to implausible claims that McDonald's had an "intent to discriminate;" insufficient "comparator" allegations; and a failure to demonstrate "causation." (Dkt. 38 at 2–3.)  Plaintiffs ultimately pleaded around this threat of early dismissal by doubling down on baseless accusations of "racial animus" and "intentional racial discrimination." (Dkt. 56 at 6, 13.)

But after two years of discovery, Plaintiffs' allegations of racism have been disproven and their accusations of racial animus have all but disappeared.  Though

Plaintiffs once claimed that McDonald's "refused" to advertise on their media properties because their owner Byron Allen is Black (*see* Dkt. 45 [Third Amended Complaint, or "TAC"] ¶¶ 53, 67), the undisputed evidence shows that McDonald's *did, in fact, advertise* with Allen's companies before, during, and after the relevant time period. (SMF D48, D51, D56, D68, D131.) Far from treating Allen unfairly, McDonald's was *for years* one of his companies' biggest advertising spenders. (SMF D48, D51-D53.) Moreover, both of McDonald's agencies consistently met with Allen's companies to discuss potential advertising deals. (*See, e.g.*, TAC ¶¶ 77-82; SMF D49-D50.) McDonald's even continues to place advertisements with Allen's companies today, despite this lawsuit and accompanying public smear campaign. (Ex. I – Allen Tr. 147:6-9.)

Just one of these facts would render implausible Plaintiffs' claim that McDonald's has acted out of some invidious hatred of Black people by refusing to spend more with Plaintiffs. Collectively, the facts establish definitively that Allen's accusations of intentional discrimination have no merit whatsoever. Indeed, with the dust now settled, it has become clear this case was never about racial discrimination at all. It is and always has been about one thing: Byron Allen's scheme to line his own pockets. Plaintiffs' specific networks—the so-called Lifestyle Networks and The Weather Channel ("TWC"), which are part of Allen's conglomerate, Allen Media Company ("AMG") (*see* SMF D1-D3)—suffer from virtually nonexistent viewership, declining advertising revenues, and staggering debts. Faced with these realities, Byron Allen in 2020 launched what he termed the "Black Owned Media Initiative," or "BOM." (Ex. I - Allen Tr. 312:11-19; Ex. G - Bekkedahl Tr. 101:25-102:5; 103:25-104:9.) The actions of the BOM never matched its noble name. Through the BOM, Allen indiscriminately accused dozens of advertisers (including McDonald's) of the same, boilerplate civil rights violations and demanded that each advertiser devote a full 2% of their advertising budgets to AMG's slate of networks. (Ex. O(72), AOE1833, AOE1856; Ex. O(74), AOE1874-1914; Ex. O(80), AOE1949; Ex. I - Allen

1  Tr. 399:3-400:3; 408:21-410:9; 411:17-413:24.)

2      Had they not been coupled with threats of public accusations of racism,

3  Plaintiffs' demands for tens of millions of dollars would have been laughable.

4  Plaintiffs' networks have never been in the same stratosphere as the networks that

5  command the sort of advertising dollars Plaintiffs demanded.  For instance, Comedy

6  Central—a mid-sized national network—averages about 125,000 viewers during

7  prime time from the key age 18-49 demographic.  (SMF D114, D116, Ex. Q(1) at

8  ¶ 31.)  Plaintiff ESN's Comedy.TV averaged 266 viewers.  (*Id.*)  Not two-hundred-

9  sixty-six *thousand* viewers; two-hundred sixty-six *total* individuals in the United

10 States.

11     Despite his networks' last-place ratings, Allen made these audacious demands

12 because he knew timing was in favor.  Following the 2020 murder of George Floyd,

13 Allen hijacked the nationwide momentum for long overdue racial justice reform to

14 enrich himself.[1]  Allen, his sales team, and his lawyers threatened advertisers who did

15 not "lean in" and spend more money with AMG with a barrage of reputational "call

16 outs" in the press and accusations of racism.  (Ex. O(76), AOE1921 ("shout-outs" for

17 upcoming webinar); Ex. O(78), AOE1928 (seeding quotes to press); Ex. L - OMD

18 30(b)(6) Tr. 105:15-106:8 (recounting that Allen had told him, an OMD representative

19 working on the McDonald's account, that Allen "has ruined the careers of people in

20 situations like mine…it scared me a little…I'd never been spoken to that way."); Ex.

21 I - Allen Tr. 332:13-333:13.)  But within AMG, the BOM has always been recognized

22 as serving Allen himself.  (Ex. O(77), AOE1923-1926 (tracking "Top 100 at 2%"

23 revenue from BOM.)) As one of Allen's former advertising executives put it, Allen

24 _____

25 [1] During the same period, McDonald's announced an industry-leading plan to
   increase its spend with Black-owned media companies, production houses and

26 content creators from 2% to 5% of national advertising spend.  (*See* Ex. AAA, Ex. 7,
   AOE4837)  Plaintiffs have sued McDonald's, claiming that this aspiration is an

27 enforceable promise and that they relied to their detriment on that promise—despite
   admissions of AMG's Chief Accounting Officer to the contrary.  (*See* Ex. Y - Karras

28 Vol. 2 Tr. 114:21-115:19.)

1  would invoke the BOM to "dial us up some more dollars" for AMG.  (Ex. O(79),
2  AOE1932.)

3      This lawsuit is just one more part of Allen's scheme; after filing, Allen's team
4  brandished their complaint against McDonald's to other major advertisers as a threat
5  of what would occur if they refused to give in.  In fact, Allen openly admits he is using
6  litigation against McDonald's to send a message to "every corporation in America."[2]
7  And he admits that he uses indiscriminate threats of litigation as a blunt-forced means
8  to a financial end: "My guess is that we'll have to sue about another 20 or 30
9  corporations and then the market will correct itself."  (*Id.*)

10     Allen's scheme has worked – at least in part.  As a direct result of the BOM
11  campaign, AMG's revenue increased substantially, a fact that he cynically touts in
12  AMG's quarterly reporting to AMG's numerous creditors.  (Ex. O(2), AOE0688; Ex.
13  O(67) (November 22, 2022 ESN and Weather Response to RFA Nos. 26 and 27,
14  AOE1782-83); Ex. I - Allen Tr. 414:13-415:16; Ex. J - Karras Tr. 103:1-22; 105:13-
15  24; 108:20-109:18.)  But the one thing Allen couldn't strong-arm with litigation threats
16  was more viewers for his networks.  So even as their ad revenue spiked, Plaintiffs'
17  ratings failed to improve and, in many instances, actually *dropped*.  (SMF D79, D83-
18  D85, D91-D100, D102, D104-D105, D107, D109-D110, D113-D118; Ex. O(61).)  In
19  other words, while Allen may have succeeded in bullying advertisers, the proof about
20  Plaintiffs' networks remained in the pudding: they don't have and can't get viewers.

21     But while filing lawsuits is easy, proving them is not.  At the motion to dismiss
22  stage, Plaintiffs repeatedly emphasized that their "allegations must be assumed true"
23  because "[t]his is not a summary judgment motion."  (Dkt. 56 at 8.)  But this now is.
24  Seeking to win this case with headlines rather than evidence,[3] Plaintiffs arrive at

---

[2] TheGrio, *Byron Allen Opens Up About $10B Lawsuit Against McDonald's*, Youtube (May 25, 2021)) ("This isn't just McDonald's. This is every corporation.").

[3] *See* Editorial, *Byron Allen's Big Mac Attack*, Wall St. J. (June 15, 2023) ("When McDonald's refused to surrender [in this lawsuit], Allen trashed the company in the
(Continued...)

summary judgment with shocking failures of proof.  In a case alleging that "McDonald's employees or officers made[] decisions not to contract with Plaintiffs" in favor of similar "white-owned competitors" (TAC ¶¶ 88-89), Plaintiffs still cannot answer basic questions about their legal theory.  Who, exactly, do Plaintiffs contend made these illegal decisions?  On what basis do Plaintiffs categorize the purported comparator networks—most of which are owned by large, publicly traded organizations—as having a "white" corporate identity?  More than two years after filing their complaint, Plaintiffs have not bothered to answer these basic threshold questions.  *See, e.g.*, *O'Neal v. Sideshow, Inc.*, 583 F. Supp. 3d 1282, 1287 n.2 (C.D. Cal. 2022) ("It is not [the] Court's role to research independently and develop answers to legal questions that the parties have not adequately addressed").

Now more than ever, with the full context of Plaintiffs' conduct properly before the Court, it is clear that Plaintiffs' claims fail for the core reasons identified two years ago in the Court's initial dismissal: (1) Plaintiffs have no proof of intentional discrimination; (2) Plaintiffs' networks are objectively inferior to their purported "comparators"; (3) McDonald's has legitimate business reasons for its decisions; and (4) Plaintiffs cannot establish causation.  (Dkt. 38 at 2-3.)  While any of those reasons is sufficient to dispose of Plaintiffs' claims entirely, Plaintiffs' admissions during discovery also show that: (5) Plaintiffs' claims are time-barred; (6) Plaintiffs lack standing to pursue many of their claims; and (7) Plaintiff Weather Group's claims fail for the additional reasons that: (*i*) they are barred by the First Amendment; and (*ii*) causation is defeated by evidence specific to Weather Group.

## B.   **Plaintiffs' Introduction**

McDonald's motion for summary judgment is not well-taken.  The motion relies on facts that are sharply disputed by the parties.  McDonald's claims it gave

---

media. In May 2021, he wrote an open letter . . . accusing the company of . . . [being] 'racist and very toxic.' . . . His brand assassination has intensified in recent months as McDonald's has resisted pressure to settle his lawsuit."); *see also* Dkt. 112.

Entertainment Studios favorable treatment in prior years, was one of its top advertisers nearly a decade ago, and now advertises on a limited set of Plaintiffs' properties.  But the evidence shows that McDonald's spent with Entertainment Studios while McDonald's was led by Don Thompson, the African American, former CEO.  When Thompson left in 2015, McDonald's dramatically reduced spending and took Plaintiffs to $0 in 2019 and continued to spend $0 in 2020.  This occurred under McDonald's post-Thompson regimes of Steve Easterbrook and Chris Kempczinski.  McDonald's only resumed spending after Plaintiffs put McDonald's on notice of their claims and McDonald's knew that it needed to spend something to improve its litigation position.

McDonald's also largely ignores Plaintiffs' core theory of liability.  To distract from its failure to justify racial segregation of Entertainment Studios, McDonald's proceeds to assail Plaintiffs' owner, Byron Allen, with ad hominem attacks that are unfounded and irrelevant.  But McDonald's goes further.  Out of desperation to avoid trial, McDonald's quotes from a Wall Street Journal op-ed piece published during this litigation that discusses McDonald's own positions in this lawsuit.  This article is clearly inadmissible hearsay and has no evidentiary value.

The purpose of summary judgment is to narrow issues for trial by resolving issues that can be resolved in a party's favor as a matter of law because there are no genuine issues of material fact.  Summary judgment is not an opportunity for McDonald's to conduct a *de facto* bench trial on a voluminous evidentiary record replete with disputed facts.  McDonald's motion should be denied in full.

## III.    FACTUAL BACKGROUND FOR *PLAINTIFFS'* MOTION FOR PARTIAL SUMMARY JUDGMENT

### A.    Plaintiffs' Statement of Undisputed Facts

#### 1.    Entertainment Studios Is a General Market Media Company

Entertainment Studios[4] is an African American-owned media company that owns and operates cable tv networks.   (Joint Statement of Uncontroverted Facts ("SMF") P1; Appendix of Evidence ("AOE") Ex. I (Byron Allen Depo.) at 14:19-22, 41:2-14; AOE Ex. F (Darren Galatt[5] Depo.) at 88:24-89:20, 91:8-92:13, 174:3-12; AOE Ex. H (Cynthia Kelly[6] Depo.) at 13:9-14:8.)

The cable tv networks feature courtroom drama, entertainment, comedy, travel, food, pets and automotive content that is targeted to general audiences.   (SMF P2; AOE Ex. F (Darren Galatt Depo.) at 11:4-24, 88:24-89:20, 91:8-92:13, 179:5-180:8, 268:13-19 (Entertainment Studios' offerings include general market syndicated programming, and lifestyle networks focused on cars, travel, pets, and cooking, all of which are aimed at a general audience); AOE Ex. H (Cynthia Kelly Depo.) at 17:19-18:17, 23:16-20, 31:24-32:2; 34:21-35:12 (Entertainment Studios' cable tv networks feature lifestyle programming with "something for everyone," from pets to comedy to travel to cooking); AOE Ex. M (Donna Hodge[7] Depo.) at 53:1-54:24 (Entertainment Studios' channels are general lifestyle channels that do not target African American audiences).)

Entertainment Studios also owns programming that it licenses to broadcast affiliate tv stations to run in syndication.   (SMF P2; AOE Ex. F (Darren Galatt Depo.)

---

[4] Entertainment Studios is the public-facing brand for the cable tv networks and syndicated programming owned by Plaintiff Entertainment Studios Networks, Inc. ("ESN") and its affiliated company CF Entertainment, Inc. ("CFE").   (AOE Ex. H (Cynthia Kelly Depo.) at 23:16-20, 28:18-29:14, 32:6-22, 33:7-11;  AOE Ex. ZZ(4) (Kelly Depo. Ex. 87), AOE4247; AOE Ex. DDD(1) (Assignment of Claims), AOE5254-5255.)

[5] Darren Galatt is Chief Revenue Officer at Allen Media Group and has worked at the company for over 20 years.  (AOE Ex. F (Darren Galatt Depo.) at 7:11-21.)

[6] Cynthia Kelly served as President of Advertising Sales for Entertainment Studios for six years until February 2022.  (AOE Ex. H (Cynthia Kelly Depo.) at 11:6-12:14.)

[7] Donna Hodge is the Senior Vice President of Media on the McDonald's account at Burrell, a role she has held since December 2021.  (AOE Ex. M (Donna Hodge Depo.) at 15:7-17.)  In that role, she is responsible for leading the African American media investment for McDonald's.  (*Id*. 17:20-23.)

at 11:4-24, 91:8-92:13.)  The syndicated programming also features courtroom drama, entertainment, comedy, travel, food, pets and automotive content that is targeted general audiences.  (SMF P2-P3; AOE Ex. H (Cynthia Kelly Depo.) at 28:18-29:14, 32:6-22, 33:7-11; AOE Ex. F (Darren Galatt Depo.) at 11:4-24, 91:8-92:13 (listing ESN's general market syndicated programming).)

Entertainment Studios' networks and syndicated programming do not primarily target African American audiences.  (SMF P3; AOE Ex. F (Darren Galatt Depo.) at 11:4-24, 88:24-89:20, 91:8-92:13, 179:5-180:8, 268:13-19; AOE Ex. H (Cynthia Kelly Depo.) at 23:16-20; AOE Ex. M (Donna Hodge Depo.) at 53:1-54:24 (Entertainment Studios' channels are general lifestyle channels that do not target African American audiences); AOE Ex. L (Geoff Calabrese[8] Depo.) at 53:14-54:14 (admitting that Entertainment Studios' programming is general audience, such as the lifestyle networks and comedy game shows).)

## 2.    McDonald's Use of Ad Agencies to Deploy Its Ad Budgets

McDonald's is one of the largest corporations and brands in the world.  McDonald's spends several hundred million dollars each year to advertise in national media to promote its products.  (AOE Ex. ZZ(1) (Alycia Mason Depo. Ex. 2), AOE4243-46; AOE Ex. 1 (Alycia Mason[9] Depo.) at 29:17-31:8 (confirming the numbers in AOE Ex. ZZ(1)).)  The vast majority of McDonald's national ad budget is spent on media that targets general audiences.  (SMF P10; AOE Ex. C (Jennifer

---

[8] Geoff Calabrese is currently Chief Investment Officer at OMD's holding company, Omnicom Media Group, a role he has held since September 2020.  (AOE Ex. L (Calabrese Depo.) at 8:18-9:14.)  He oversaw upfront investment for years 2021 and 2022, which included supervising employees who worked on the McDonald's account.  (*Id*. 9:17-10:15.)

[9] Alycia Mason is currently the US Chief Customer Experience Officer at McDonald's, a role she has held since March 2022.  (AOE Ex. A (Alycia Mason Depo.) at 10:9-19, 13:21-23.)  Prior to this role, Ms. Mason was Vice President of Media and Customer Relationship Management and VP of Digital Customer Experience and Media.  (*Id*. 13:21-14:24.)  In her VP roles, Ms. Mason oversaw the deployment of McDonald's national media budget.  (*Id*. 15:25-16:4.)

Feldman[10] Depo.) at 174:4-175:1; AOE Ex. A (Alycia Mason Depo.) at 29:17-31:8; AOE Ex. ZZ(1), AOE4245-46 (confirming that McDonald's general media ad agency was responsible for $391 million out of a national advertising budget of $416 million in 2019 and $416 million out of a national advertising budget of $451 million in 2020).)

From 2006 to 2021, OMD served as McDonald's general market media planning and buying agency.  (SMF P5; AOE Ex. C (Jennifer Feldman Depo.) at 10:10-14 (OMD was McDonald's general market ad agency as far back as 2006); AOE Ex. L (Geoff Calabrese Depo.) at 10:16-11:11, 15:15-22 (OMD was responsible for recommending general audience content to McDonald's for advertising until 2021).)

The rest of McDonald's national ad budget is spent on media that targets specific racial demographic audiences, such as the African American Consumer Market ("AACM"), the Asian Consumer Market ("ACM") and the Hispanic Consumer Market ("HCM").  (AOE Ex. B (Sheila Hamilton[11] Depo.) at 70:5-23; AOE Ex. D (Carroll Depo.) at 47:19-48:8 (confirming that in addition to the African American Consumer market, McDonald's also targets the Hispanic and Asian Consumer markets).)  McDonald's relies on separate media agencies for these markets.  (SMF P4; AOE Ex. D (Carroll Depo.) at 19:16-20:2 (confirming McDonald's use of separate agencies for different consumer markets); AOE Ex. B (Sheila Hamilton Depo.) at 9:20-10:2 (listing various agencies McDonald's worked with.)

---

[10] Jennifer Feldman is McDonald's Senior Director of Marketing Operations and Enablement, a role she has held since February 2020.  (AOE Ex. C (Jennifer Feldman Depo.) at 8:17-23.)  Prior to that, she worked with McDonald's ad agencies to develop recommended media strategies and investment for the national advertising budget.  (*Id*. 9:16-10:18.)

[11] Sheila Hamilton is currently McDonald's Director of Digital Strategy and Enablement, and was its Director of US Media from December 2019 until April 2022. (AOE Ex. B (Hamilton Depo.) at 7:23-9:12.)  As Director of US Media, she oversaw McDonald's national media planning and buying, including placing advertisements on cable tv.  (*Id*. 8:23-9:5.)

Burrell Communications ("Burrell") serves as McDonald's AACM media planning and buying agency.  (SMF P8; AOE Ex. C (Jennifer Feldman Depo.) at 168:15-169:7 (Burrell has expertise in reaching the African American audience and it helps McDonald's reach that audience); AOE Ex. M (Donna Hodge Depo.) at 38:5-19 (McDonald's relies on Burrell to reach the African American audience).)

The vast majority of McDonald's national advertising budget is deployed through OMD, while Burrell deploys a small fraction of McDonald's national media budget.  (SMF P10; AOE Ex. C (Jennifer Feldman Depo.) at 174:4-175:1 (admitting that OMD deployed a "significant" part of McDonald's budget which was between 60-70%); AOE Ex. A (Alycia Mason Depo.) at 109:6-9 (OMD placed the "majority" of the national ad spend); AOE Ex. ZZ(1), AOE4245-46.)

In 2019, McDonald's spent $416 million of its national advertising budget through its agencies.  (AOE Ex. ZZ(1), AOE4245-46 (Alycia Mason Depo Ex. 2); AOE Ex. A (Alycia Mason Depo.) at 29:17-31:19 (confirming the numbers in AOE Ex. ZZ(1)).)  OMD was the agency of record for $391 million (94%) of that spend.  (*Id.*)  Burrell was the agency of record for $16 million (3.8%) of that spend.  (*Id.*)

In 2020, McDonald's spent $451 million of its national advertising budget through its agencies.  (AOE Ex. ZZ(1), AOE4245-46 (Alycia Mason Depo Ex. 2); AOE Ex. A (Alycia Mason Depo.) at 29:17-31:19 (confirming the numbers in AOE Ex. 11).)  OMD was the agency of record for $416 million (92.2%) of that spend.  (*Id.*)  Burrell was the agency of record for $23 million (5%) of that spend.  (*Id.*)

### 3. McDonald's Relegated Entertainment Studios to Burrell

Entertainment Studios' networks and syndicated programming features entertainment, comedy, cooking, travel, automotive and pets content that has general audience appeal.  (SMF P2; AOE Ex. L (Geoff Calabrese Depo.) at 53:14-54:14 (admitting that Entertainment Studios' programming is general audience, such as the lifestyle networks and comedy game shows).)  The networks target general audiences and, as such, should go through McDonald's general market agency.  (SMF P2-3; AOE

Ex. M (Donna Hodge Depo.) at 53:25-54:24 (conceding that Entertainment Studios'
networks feature general market content that should be evaluated by the general market
agency); AOE Ex. F (Darren Galatt Depo.) at 184:13-185:6; AOE Ex. H (Cynthia
Kelly Depo.) at 34:21-35:12, 78:13-79:20, 80:9-15, 80:21-23, 81:11-13 (describing
Entertainment Studios' general market content).)

Entertainment Studios made "annual plea[s]" to pitch to McDonald's general
market ad agency, OMD, but McDonald's forced Entertainment Studios to deal with
Burrell. (SMF P12-14; AOE Ex. F (Darren Galatt Depo.) at 179:5-21.) Entertainment
Studios wanted to pitch to OMD because Entertainment Studios' content is not African
American-targeted and because OMD had a much larger share of McDonald's ad
budget, but OMD told Entertainment Studios "consistently that [it] had to go and deal
with Burrell." (*Id.* 180:19-20; *see also id.* 100:7-15 (Entertainment Studios "was
relegated to a very small subset of the investment at Burrell, which did not include,
you know, the expansive McDonald's budgets, which the lion's share, as I said, went
to OMD"), 179:5-21 (McDonald's "made the decision to put us through Burrell, which
was a small fraction of the budget versus the huge budgets that were being contracted
at OMD, and regardless of an annual plea to be taken and considered out of OMD, we
were forced into a relationship with the black agency, even though we were not
exclusively black targeted").)

McDonald's made the decision for Burrell to be the agency of record for
Entertainment Studios. (SMF P12; AOE Ex. D (Anja Carroll[12] Depo.) at 164:6-14
(admitting that it was "McDonald's decision to have Burrell be the agency that buys
Entertainment Studios and CF Entertainment's content"), 171:4-8 ("I don't actually
understand your question because OMD wasn't the agency of record for Entertainment

---

[12] Anja Carroll worked at McDonald's from April 2000 until July 2022, when she
retired. (AOE Ex. D (Anja Carroll Depo.) at 11:18-19, 17:1-11.) Ms. Carroll started
as McDonald's Manager of U.S. Media, was promoted to Director of U.S. Media prior
to 2004, Director of Global Media and Digital Marketing in 2011, and Vice President
of U.S. Marketing in 2014, which role she held until her retirement. (*Id.* 11:18-18:11.)

Studios for us . . . .  It was Burrell."); AOE Ex. ZZ(3), AOE4257 (Alycia Mason Depo. Ex. 10) (February 29, 2016 e-mail from Debbie Innes (OMD) to Darren Galatt stating "Just a reminder that Burrell is the agency of record for McDonald's and Entertainment Studios").)

McDonald's relegated Entertainment Studios to Burrell because it is African American-owned, not because Entertainment Studios' content is Black targeted. Burrell's representative on the McDonald's account admitted that she is responsible for deploying McDonald's ad budget for African American-targeted *and African American-owned media*.  (AOE Ex. M (Donna Hodge Depo.) at 12:1-12.)

McDonald's did the same thing to at least one other African American-owned media company.  Reach TV is a general audience network that is broadcast on airport tv monitors in the largest airports in the United States.  (AOE Ex. N (Lynnwood Bibbens Depo.) at 22:12-24:7.)  Reach TV is owned by African American media entrepreneur Lynnwood Bibbens.  (*Id.* 12:11-13, 20:3-21:10, 53:4-10, 69:3-14.) Reach TV features general market content, such as sports and cooking shows.  (*Id.* 22:12-24:7, 67:17-68:15.)  Its target demo is adults age 25-54 in upper income brackets.  (*Id.* 35:8-21)  Reach TV is not Black-targeted.  (*Id.* 67:15-69:14.)

When Reach TV acquired the Airport Network from CNN—not an African American-owned company—it went to McDonald's general market ad agency to secure ad revenue.  (*Id.* 51:6-52:13, 74:16-75:4.)  McDonald's general market ad agency pushed Reach TV to Burrell.  (*Id.*)   The general market agency brought in Burrell because Burrell was focused on McDonald's "black owned media partners." (*Id.* 53:4-10.)  McDonald's advertised on the Airport Network when it was owned by CNN.  (*Id.* 55:12-56:4.)  CNN did not contract through McDonald's African American agency to receive that revenue.  (*Id.* 77:7-14.)

**B.**   **McDonald's Statement of Facts Relevant to Plaintiffs' Motion for Partial Summary Judgment**[13]

McDonald's is one of the largest restaurant companies in the world, serving millions of customers every day across more than 40,000 restaurants globally.  (Ex. O(86) – 10K, AOE2199-2272.)  To maintain and grow its diverse consumer base, McDonald's invests hundreds of millions of dollars each year into national media marketing campaigns.  (Ex. D - Carroll Tr. at 112:23 – 113:2.)

McDonald's, like many large advertisers, works with several external advertising agencies to help develop and execute its marketing strategy.  (Ex. S(1) – Lynch Expert Report ¶¶ 21-24.)  These agencies bring expertise in the media habits and buying power of consumers, as well as the various tools and channels in the media landscape.  (*Id.*)  Agencies also give advertisers superior negotiating power with potential media partners because of their buying volume.  (*Id.* ¶ 23.)  McDonald's agencies work together as a collaborative team (called the Inter-Agency team, or "IAT") to plan and implement McDonald's national advertising strategy.  (SMF D25; *see generally* McDonald's Motion, *infra* Section IV.A.1.)  Through that process, members of the IAT negotiate media deals with prospective media companies, like ESN, based on the audience segment that each company can most effectively reach with its offerings.  (SMF D23, D25, D43.)

Two of McDonald's agencies are at issue here: OMD and Burrell. OMD was the agency responsible for (among other things) the general consumer market, which includes consumers of all demographics, including African American consumers. (SMF D24, D26, Ex. P(2)).  Additionally, in order to develop culturally relevant advertising, most companies with multicultural audiences engage agencies with specialized knowledge and expertise in marketing to such audiences.  (Ex. S(1) –

---

[13] McDonald's also incorporates by reference its statement of facts in support of its motion for summary judgment.

Lynch Expert Report ¶¶ 50-51).  During the relevant period, McDonald's engaged Burrell to develop and execute McDonald's advertising strategy focused on the AACM (SMF D24, D27, Ex. P(3), AOE2346-2394).  Far from being a "second tier" agency, Burrell is preeminent.  (Ex. S(1) – Lynch Expert Report ¶ 24.)  Through Burrell, McDonald's devotes incremental media dollars to specifically target the AACM.    Burrell's 30(b)(6) representative, testified that in her experience, "McDonald's actually has one of . . . the largest budgets specifically allocated to this African American consumer."  (Ex. M - Burrell 30(b)(6) Tr. at 114:11-17.)

At no point were prospective media companies like ESN "allocated" to media partners based on the race of the owner, nor were there ever any instructions given by McDonald's to OMD that its representatives may not engage with Allen or any of the companies he owns through the Allen Media Group ("AMG") umbrella.  (Ex. T - Geraci Decl. ¶¶ 4-5; Ex. U - Innes Decl. ¶¶ 5-6; Ex. A - Mason Tr. 98:1-10; 100:10-25; 127:10-15; Ex. C - Feldman Tr. at 177:12-178:6; 179:9-20.; Ex. M - Burrell 30(b)(6) Tr. at 98:12-19).  And no one at McDonald's ever told OMD that it must "force" ESN, any of AMG's other subsidiaries, or Allen to "deal only" with Burrell. (*Id.*)  To the contrary, OMD consistently and regularly met with ESN's ad sales representatives to evaluate all of AMG's portfolio during the relevant time period, including the following: <u>April 2016</u> (Ex. O(33), AOE1467-68); <u>March 2017</u> (Exs. O(34), AOE1471; O(35), AOE1473-76); <u>September 2017</u> (Ex. O(36), AOE1478-83); <u>November 2019</u> (Ex. O(37), AOE1485); <u>December 2019</u> (Ex. O(21), AOE1250-51); <u>March 2020</u> (Ex. O(38), AOE1487-88); <u>October 2020</u> (Ex. O(39), AOE1490-91); <u>November 2020</u> (Ex. O(40), AOE1494-95); and <u>April 2021</u> (Ex. O(41), AOE1497-98). (*See also* Ex. T - Geraci Decl.; Ex. U - Innes Decl.)

Through such evaluation, it became clear that ESN's Lifestyle Networks could not—and still cannot—effectively reach a GCM audience.  (*See* McDonald's Motion, *infra* Sections IV.A.2, VI.C.1; Ex. U - Innes Decl. ¶¶ 7-8; Ex. Q(1) - Blasius Expert Report, Amended App'x 3, AOE3473; SMF D89-118.)  As a result, OMD naturally

declined to recommend purchasing advertising on those networks on McDonald's behalf (SMF D130; Ex. L - OMD 30(b)(6) Tr. 112:14-115:3, 117:20-23, 118:14-119:1, 116:19-117:11 (on whether Plaintiffs' 2021 proposal to advertise across their portfolios was reasonable, "[t]he answer was – was no. That's why we didn't make that recommendation.").)

At times, though, other subsidiaries of AMG did perform well with African American viewers, and were therefore selected by Burrell as part of McDonald's AACM strategy. (*See* SMF D48, D51-56.) In particular, nonparty CF Entertainment, Inc., d/b/a Entertainment Studios, Inc.'s ("ES") syndicated properties, at times, indexed well among African American viewers. (SMF D48; D55; Ex. P(16), AOE2668.) ES's syndicated properties did not, however, perform well with broader GCM audiences, as Nielsen ratings demonstrated. (Ex. P(16), AOE2668 (GCM syndication average 1.6, AMG GCM syndication range from only 0.3-0.8).) ES knew this, and proudly touted its content's ability to effectively reach the AACM to McDonald's and other advertisers. (SMF D47; Ex. O(26), AOE1320-26; Ex. O(27), AOE1357; Ex. O(28), AOE1389 (self-describing ES as African-American targeted); Ex. O(29), AOE1427-29 (ES/Weather Group National Sales Conference slide deck); Ex. O(83), AOE1971.) Though McDonald's stopped spending with ES in 2019, both OMD and Burrell continued to meet with and evaluate all of AMG's portfolio throughout 2019, 2020, and 2021. (*See generally* McDonald's Motion, *infra* Section IV.A.2; SMF D72-73; Exs. O(21), AOE1250-51; O(36)-O(41), AOE1478-98; Ex. L - OMD 30(b)(6) Tr. 112:14-115:3; 117:20-23; 118:14-119:1; 116:19-117:11).)

## IV.  FACTUAL BACKGROUND FOR *MCDONALD'S* MOTION FOR SUMMARY JUDGMENT

### A.  McDonald's Statement of Facts In Support of Motion for Summary Judgment

McDonald's incorporates Defendant's facts laid out by Defendant in the SMF and the documents in the Parties' Joint Evidentiary Appendix ("Ex.").

### 1. **McDonald's Inter-Agency Advertising Team**

McDonald's, a wholly owned subsidiary of nonparty McDonald's Corporation, operates, franchises and services a vast restaurant system in the United States. (Ex. O(85), AOE1986.) In 2022, approximately 95% of the McDonald's domestic restaurants were owned and operated by franchisees, while the remaining 5% were owned by the Company. (Ex. O(85), at AOE1995.)  All of McDonald's domestic restaurants (franchised and Company-owned) contribute a portion of their annual gross sales to both local advertising cooperatives as well as the national advertising fund, administered by a separate entity known as OPNAD. (SMF D20-D21; Ex. O(85), AOE2018-19.)  McDonald's, working with outside advertising agencies, develops advertising and marketing programs for McDonald's restaurants (*id.*), and presents these to OPNAD for final approval of the overall marketing plan. (SMF D22, D23, D24; Ex. O(85), AOE2006, 2019-20.)

Like other nationally recognizable brands, McDonald's employs a sophisticated national advertising strategy to draw consumers into its restaurants. A significant portion of this strategy is devoted to reaching the African-American consumer market (the "AACM"), an important part of McDonald's customer base. To that end, during the relevant time period, McDonald's hired Burrell, a preeminent marketing and advertising agency with expertise in reaching the AACM through national advertising. (SMF D24; Ex. P(3), AOE2346-95.)  Burrell's role in this regard was not unusual—Burrell is well-known in the advertising world as a preeminent multicultural marketing and advertising agency, and many large advertisers turn to Burrell to lead their marketing efforts in this space. (SMF D27; Ex. S(1) at ¶ 24, AOE3630.) McDonald's also hired additional advertising agencies to reach various other segments of the market, including OMD, which was responsible for effectively and efficiently reaching the general consumer market ("GCM").  (SMF D26.)  These agencies work jointly as part of an Inter-Agency Team ("IAT") to annually develop, negotiate, and purchase advertising on McDonald's behalf.  (SMF D25-D27, D30, D43.)

## 2.  McDonald's History Advertising with Allen's Properties.

Plaintiffs' relationship with McDonald's began with non-party CF Entertainment, Inc., d/b/a Entertainment Studios, Inc. ("ES"), a separate AMG company. (SMF D12-D13.)  ES sells television programming in broadcast syndication, and at times, some of those shows indexed well among AACM viewers. (SMF D15, D39, D55; Ex. P(16), AOE2668.)  Those same shows did not, however, index well with broader GCM audiences, as the Nielsen ratings clearly demonstrated. (SMF D55; Ex. P(16), AOE2596.)  ES knew this, and prominently and proudly touted to McDonald's and other advertisers its content's ability to effectively reach the AACM. (SMF D47; Ex. O(26), AOE1320-26; Ex. O(27), AOE1357; Ex. O(28), AOE1389; Ex. O(29), AOE1427-29; Ex. O(83), AOE1971.)  Because ES's programs fit into McDonald's broader strategy to target the AACM adult audience, McDonald's purchased advertising on those syndicated properties through Burrell, its AACM agency of record. (*See* SMF D62-D63.)  And because those properties delivered a specialized audience, McDonald's paid ES a premium to advertise on them. (SMF D45.)  McDonald's spent tens of millions of dollars on ES's properties, and for many years was one of its top ten advertisers.  (SMF D52-D53; Ex. O(31), AOE1460.) McDonald's continued to advertise on ES's syndicated properties until 2019 (SMF D48, Ex. O(30), AOE1452, Ex. O(31), AOE1460), only ending its investment as part of a broader decision to move away from *all* broadcast syndication, consistent with consumer and industry trends.[14]  (SMF D60-D61, D71, D73-D74; Ex. O(53), AOE1568-71; Ex. P(13), AOE2639-54;  Ex. P(25), AOE2892.)

But while non-party ES's syndicated properties had limited success, Plaintiff ESN's seven "Lifestyle Networks" never have.  (SMF D4-D6.)  From their launch in

---

[14] Thereafter, OMD and Burrell continued to meet with and evaluate all of AMG's portfolio throughout 2019, 2020, and 2021. (*See* D44, D49-D50; Exs. O(21), AOE1250-51; O(36)-(O41), AOE1478-1498; Ex. L - OMD 30(b)(6) Tr. 112:14-115:3; 117:20-23; 118:14-119:1; 116:19-117:11).)

2009 through October 2017, *none* of ESN's networks were rated by Nielsen. (SMF D89-93, D95, D98, D101, D103, D106, D108, D111; Ex. O(65), AOE1740-42.) And since 2017, only 2 of the 7 networks (Comedy.TV and Justice Central.TV) have had enough viewers to *generate* ratings – which only further confirmed ESN's failure to generate viewer interest. (SMF D92-D93 (showing that Comedy.TV and JusticeCentral.TV have consistently fallen in the bottom ten of all networks), D119 (the other 5 networks are rated on a cumulative basis only).)

McDonald's, like many advertisers, seeks to reach as many potential consumers as possible, as well as a guaranteed audience within a specific demographic. (SMF D37.) During the relevant time period, ESN's Lifestyle Networks, Weather Group's TWC, and ES's Syndicated Programming were each evaluated and given due consideration by McDonald's IAT, through their standard evaluation process, which annually assessed whether any of these media offerings were able to deliver on McDonald's overall media plan, and specifically, against McDonald's targeted demographic of adults aged 18-49 (and younger subset of adults 18-34). (SMF D29-D30, D32-D40.) But the ESN Lifestyle Networks delivered audience sizes well below McDonald's usual threshold of 60 million viewers (SMF D87-D88; Ex. O(63), AOE1734-35; Ex. O(2), AOE0618; *see also* SMF D66; Ex. O(50), AOE1553). Similarly, TWC does not perform well among McDonald's customers, ran afoul of McDonald's "no news" restriction for its product advertisement placements, and consistently attracted an older audience than McDonald's target demographic. (SMF D42, D77-D78, D82; Ex. P(9), AOE2627; Ex. L - OMD 30(b)(6) Tr. at 47:6-11; 98:4-20; Ex. A - Mason Tr. 141:15-16; Ex. O(23), AOE1274; Ex. P(26), AOE2903, 2906; Ex. R(1) at ¶¶ 37, 47-48, AOE3521, 3526-27; Ex. S(1) at ¶27, AOE3659.)

In the fall of 2020, faced with declining advertising revenues on TWC, nearly non-existent advertising on the ESN Lifestyle Networks by large brands like McDonald's, and a broader trend of advertisers moving away from linear video offerings such as TWC and the Lifestyle Networks, Allen and his sales team conceived

1    of and launched what they would come to call the Black Owned Media initiative. (Ex.
2    I - Allen Tr. 312:11-19.)  The premise of the BOM was always self-serving: identify
3    the "top" advertisers, and demand that they "lean in" – *i.e.*, allocate at least 2% of their
4    annual national advertising spending to AMG. (Ex. O(72), AOE1830, 1832-33; Ex.
5    O(73), AOE1864.)  Advertisers that did so were praised.  Those, however, that failed
6    to meet AMG's unilateral demands – meticulously tracked by Plaintiffs' ad sales team
7    in color-coded internal spreadsheets (*see* Ex. O(31)) – were subjected to public "call
8    outs" by Allen, and ultimately, letters from AMG's counsel threatening litigation.[15]
9    (Ex. O(74); Ex. O(81).)

10    Despite being subjected to these threats, McDonald's and its advertising
11    agencies continued to engage with AMG in good faith to try to find ways to do
12    business. And they succeeded: in early 2021, through OMD and Burrell, McDonald's
13    purchased advertising with two of Plaintiffs' newest digital properties, TheGrio and
14    Local Now.  (SMF D130-D131.)  Unsatisfied with these investments, Allen continued
15    his public campaign threatening reputational and economic harm against McDonald's,
16    including but not limited to threats to publicly proclaim that McDonald's and its
17    executives are racist and to file a lawsuit for intentional discrimination litigation.  (Ex.
18    G - Bekkedahl Tr. 136:7-13; 192:25-193:25.)  In May 2021, after McDonald's refused
19    to cave to Allen's threats, Plaintiffs filed this lawsuit.

20    **B.**     **Plaintiffs' Summary of Disputed Facts in McDonald's Factual**
21           **Summary**

22    McDonald's summary of the evidence is rife with disputed facts.  For example,
23    McDonald's claims Entertainment Studios knew its content targets African American

---

[15] These letters were intentionally timed to coincide with the buying "upfronts,"
when advertisers like McDonald's decide how to allocate their advertising budgets.
(Ex. I - Allen Tr. 366:10-367:11 ("The up-fronts begin in January, February, and
March. That's when you present who you are and what you have to offer. And then
in April, May, June, advertisers allocate their money."); 368:22-369:5 ("We wanted a
letter to be out there that basically said, as you do your budgets, don't exclude us.").)

1  audiences and touted this fact in requesting advertising from McDonald's. (Br. at 21.)

2  But McDonald's agencies admit that Entertainment Studios' content targets and

3  appeals to general audiences. (SMF P2; AOE Ex. M (Donna Hodge Depo.) at 53:1-

4  54:24 (Entertainment Studios' networks do not target African American audiences);

5  AOE Ex. L (Geoff Calabrese Depo.) at 53:14-54:14 (Entertainment Studios' content

6  does not target African American audiences).) Plaintiffs testified similarly. (SMF P2;

7  AOE Ex. F (Darren Galatt Depo.) at 11:4-24, 88:24-89:20, 91:8-92:13, 179:5-180:8,

8  268:13-19 (Entertainment Studios' programming is general market); AOE Ex. H

9  (Cynthia Kelly Depo.) at 17:19-18:17, 23:16-20, 31:24-32:2; 34:21-35:12

10 (Entertainment Studios' networks are general market).) McDonald's only "evidence"

11 is a handful of presentations Entertainment Studios made to Burrell. (Plaintiffs'

12 Motion at § III(A)(1); SMF P12-14; AOE Ex. F (Darren Galatt Depo.) at 179:5-21.)

13 Entertainment Studios was trying to secure advertising support through McDonald's

14 racially segregated process, but it was pleading for McDonald's to grant access to

15 McDonald's general market ad agency. (*Id.*)

16      McDonald's claims it paid a premium to advertise on Entertainment Studios'

17 programs. (Br. at 21 (citing SMF D45).) McDonald's submits no evidence to support

18 this claim. (*See generally id.*) The only "evidence" concerns McDonald's spending

19 on *The Steve Harvey Show*. (*Id.*) *The Steve Harvey Show* is not affiliated with

20 Plaintiffs in any way. (*See* SMF D45; AOE Ex. P(10), AOE2630 (listing Related

21 Media as the vendor for *The Steve Harvey Show*).)

22      McDonald's claims it stopped spending on Entertainment Studios' syndicated

23 properties "as part of a broader decision to move away from all broadcast syndication,

24 consistent with consumer and industry trends." (SMF D60-61, D71, D73-74.) But

25 McDonald's advertised through OMD in syndication during this period. (SMF D71;

26 Ex. FFF (Nunan Decl.) ¶¶ 12-22, AOE45362-64; Ex. EEE (Restivo Decl.) at Ex. 3,

27 AOE5358; AOE Ex. SS, AOE4125; AOE Ex. WW, AOE4185 (McDonald's spent

28 over $4 million in syndication from 2019 to 2021.)

McDonald's claims it did not relegate Entertainment Studios to Burrell because, according to McDonald's, Entertainment Studios' content was "evaluated and given due consideration by McDonald's [Interagency Team], through their standard evaluation process." (Br. at 22.) The evidence cited by McDonald's only describes this Interagency Team ("IAT") at a high level. (Br. at 22 (citing SMF D29-30, D32-40).)[16] McDonald's does not show that this IAT ever evaluated Entertainment Studios' content. (*Id.*) Of course, Plaintiffs have contrary evidence. (SMF P12-14; AOE Ex. F (Darren Galatt Depo.) at 100:7-15, 179:5-21, 180:19-20.)

## V.   ARGUMENTS WITH RESPECT TO *PLAINTIFFS'* MOTION FOR PARTIAL SUMMARY JUDGMENT

### A.   Plaintiff's Position: McDonald's Relegated Entertainment Studios to a Less-Favorable Contracting Tier in Violation of Section 1981

#### 1.   Section 1981

Enacted as part of the Civil Rights Act of 1866, section 1981[17] is a "longstanding civil rights law," that was designed to "guarantee the then newly freed slaves the same legal rights that other citizens enjoy." *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 445, 448 (2008); *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474-75 (2006). With section 1981, Congress intended not just to eradicate overtly racist laws enacted in the Confederate States following the Civil War (i.e., the "Black Codes"). *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 422 (1968). Congress also "was moved by a larger objective—that of giving real content to the freedom guaranteed by the Thirteenth

---

[16] McDonald's relies on deposition testimony from Geoff Calabrese (OMD) and Donna Hodge (Burrell). (See SMF D25, 44, 49-50.) Mr. Calabrese "never worked on [McDonald's] account directly" and only oversaw the account starting in 2021. (AOE Ex. L (Geoff Calabrese Depo.) at 9:19-10:3.) Donna Hodge began working on the McDonald's account in December 2021. (AOE Ex. M (Donna Hodge Depo.) at 16:9-15.) To the extent they testified as to what happened in 2020 and earlier, such testimony lacks foundation and is speculative. Fed. R. Evid. 602.

[17] Section 1981 reads, in relevant part:  "All persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a).

Amendment." *Id.* at 433.  Thus, in section 1981, "Congress meant exactly what it said"—prohibiting "*all* racially motivated deprivations of the rights enumerated in the statute." *Id.* at 422, 426.

It is now well settled that section 1981 "prohibits racial discrimination in the making and enforcement of private contracts." *Runyon v. McCrary*, 427 U.S. 160, 168 (1976) (private, commercially operated school committed a "classic violation" of section 1981 by denying admission to African Americans); *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.*, 410 U.S. 431, 439-40 (1973) (private swimming association violated section 1981 by excluding African Americans from its membership).

In 1991, Congress expanded the reach of section 1981 to "include[] the *making*, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b) (emphasis added).  This expanded definition ensures that section 1981 "applies to all phases and incidents of the contractual relationship." *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 302 (1994); *see also* H.R. Rep. No. 102-40, pt. 2, at 37 (1991) ("The Committee intends this provision to bar all racial discrimination in contracts.  This list is intended to be illustrative and not exhaustive.").

Congress added this language in response to *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), where "the Court 'rea[d] § 1981 not as a general proscription of racial discrimination in all aspects of contract relations, but as limited to' certain narrow 'enumerated rights.'" *Comcast v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1021 (2020) (Ginsburg, J., concurring) (alteration in original) (quoting *Patterson*, 491 U.S. at 181).  Given the expansion of section 1981 to prohibit racial discrimination in the "making" of contracts and the legislative history of the 1991 Civil Rights Act, "the word 'making' is most sensibly read to capture the entire *process* by which the contract is formed." *Id.* at 1020 (Ginsburg, J., concurring) (citing dictionary definitions from 1989 and 1992 which define "making" to mean the process of being made).

### 2. **McDonald's Violated Section 1981 by Relegating Entertainment Studios to McDonald's Black Ad Agency**

To establish that McDonald's violated section 1981, ESN must prove (a) that it is African American owned, (b) that McDonald's discriminated against ESN on account of race and (c) the discrimination was intentional. *Domino's Pizza, Inc.*, 546 U.S. 470, 473 n.1 (noting "that the Courts of Appeals to have considered the issue have concluded that corporations may raise § 1981 claims").

#### (a) **Entertainment Studios Is African American Owned**

Entertainment Studios is African American owned. (SMF P1; AOE Ex. F (Darren Galatt Depo.) at 174:3-12; AOE Ex. I (Byron Allen Depo.) at 14:19-22, 41:2-14.)

#### (b) **McDonald's Relegated Entertainment Studios to McDonald's Black Agency Because It Is African American-Owned**

McDonald's relegated Entertainment Studios to McDonald's African American agency, Burrell. (SMF P12; AOE Ex. F (Darren Galatt Depo.) at 100:7-15 (Entertainment Studios "was relegated to a very small subset of the investment at Burrell, which did not include, you know, the expansive McDonald's budgets, which the lion's share, as I said, went to OMD"), *id* 179:5-21 (McDonald's "made the decision to put us through Burrell, which was a small fraction of the budget versus the huge budgets that were being contracted at OMD, and regardless of an annual plea to be taken and considered out of OMD, we were forced into a relationship with the black agency, even though we were not exclusively black targeted"), 180:19-20 (OMD told Entertainment Studios "consistently that [it] had to go and deal with Burrell"); AOE Ex. ZZ(3), AOE4257 (Alycia Mason Depo. Ex. 10) (February 29, 2016 e-mail from

1   Debbie Innes (OMD) to Darren Galatt stating "Just a reminder that Burrell is the
2   agency of record for McDonald's and Entertainment Studios").)[18]

3      McDonald's relegation was discriminatory.  Burrell is responsible for a small
4   fraction of McDonald's national ad budget.  (SMF P11; AOE Ex. C (Jennifer Feldman
5   Depo.) at 174:4-175:1 (admitting that OMD deployed a "significant" part of
6   McDonald's budget); AOE Ex. A (Alycia Mason Depo.) at 109:6-9 (OMD placed the
7   "majority" of the national ad spend); AOE Ex. ZZ(1), AOE4243-46 (Alycia Mason
8   Depo. Ex. 2) (In 2019, OMD was the agency of record for $391 million (94%) while
9   Burrell was the agency of record for $16 million (3.8%) of that spend.); *id.* (In 2020,
10  OMD was the agency of record for $416 million (92.2%) while Burrell was the agency
11  of record for $23 million (5%) of that spend.).)

12     Entertainment Studios' content is not African American-targeted and should
13  have gone through McDonald's general market ad agency.  (SMF P3; AOE Ex. M
14  (Donna Hodge Depo.) at 53:25-54:24; AOE Ex. F (Darren Galatt Depo.) at 184:13-
15  185:6; AOE Ex. H (Cynthia Kelly Depo.) at 34:21-35:12, 78:13-79:20, 80:9-15, 80:21-
16  23, 81:11-13.)

17         **(c)      McDonald's Relegation of Entertainment Studios to**

18

19  _____

[18] Entertainment Studios continued to seek access to McDonald's general market
20  budget through OMD after 2016 but McDonald's forced Entertainment Studios to go
    through Burrell.  (SMF P14; AOE Ex. F (Darren Galatt Depo.) at 179:5-21 (confirming
21  that Entertainment Studios made "an annual plea" to be considered by OMD, but was
    repeatedly funneled to Burrell instead), 184:13-185:6 (confirming that Entertainment
22  Studios made "annual pleas to pitch the general audience agency").  *See Shah v. Cnty.*
    *of L.A. Dep't of Health Servs.*, 2008 WL 11333940, at *9 (C.D. Cal. Mar. 26, 2008);
23  *Thompson v. Stanford Univ.*, 2017 WL 7050673, at *3 (N.D. Cal. Nov. 3, 2017)
    (confirming that a section 1981 plaintiff may rely on "prior acts as background
24  evidence in support of a timely claim," so long as they set forth "discriminatory acts
    within the limitations period" (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536
25  U.S. 101, 113 (2002))); *Ndulue v. Fremont-Rideout Health Grp.*, 2008 WL 11512296,
    at *4 (E.D. Cal. Nov. 5, 2008) ("Accordingly, since at least some of the alleged
26  discriminatory conduct falls within the limitations period, the court will deny
    defendant's motion to dismiss plaintiff's § 1981 claim as barred by the statute of
27  limitations.").)
28

**McDonald's Black Agency Was Intentional**

McDonald's admits that it made the decision to place Entertainment Studios with Burrell.  (SMF P12; AOE Ex. D (Anja Carroll Depo.) at 164:6-14 (admitting that it was "McDonald's decision to have Burrell be the agency that buys Entertainment Studios and CF Entertainment's content"), 171:4-8 ("I don't actually understand your question because OMD wasn't the agency of record for Entertainment Studios for us . . . It was Burrell."); AOE Ex. C (Jennifer Feldman Depo.) at 172:2-22 (Anja Carroll was communicating with OMD regarding which agency should place ad revenue on which media partner).)

McDonald's placed Entertainment Studios with Burrell because it is African American-owned.  (SMF P13; AOE Ex. M (Donna Hodge Depo.) at 12:1-12 (Burrell is McDonald's African American agency and is responsible for placing advertisements on African American-targeted and African American-owned media); AOE Ex. N (Lynnwood Bibbens Depo.) at   51:6-52:13, 74:16-75:4 (Reach TV is African American owned and after it acquired the Airport Network from CNN, Reach TV wanted to get ad revenue from McDonald's, but McDonald's general market ad agency (Starcom) pushed him to Burrell.), *id.* 53:4-10 (Starcom brought in Burrell because Burrell was focused on McDonald's "black owned media partners").)

**B.    McDonald's Position: Plaintiffs' Relegation Theory Fails.**

**1.    Plaintiffs Lack Factual Proof of Relegation.**

Because Plaintiffs have the burden of proof at trial, they "must make a showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party," "view[ing] the evidence . . . 'through the prism of the substantive evidentiary burden.'"  *Bianco v. H.F. Ahmanson & Co.*, 897 F. Supp. 433, 437 (C.D. Cal. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Plaintiffs cannot even come close to meeting their burden.  To the contrary, there is no genuine dispute of material fact that McDonald's *does not* operate a "two tier" agency

1   system based on the race of media company owners, entitling McDonald's to summary
2   judgment as to Plaintiffs' relegation theory.

3        There is conclusive evidence that ESN was never "relegated" to one agency
4   (Burrell) to the exclusion of the other (OMD) (*supra* Section III.A.3): the agencies
5   themselves deny it.   Debbie Innes and Chris Geraci of OMD stated in sworn
6   declarations that McDonald's never prevented them from working with ESN or Allen,
7   never "forced" Allen's companies to work only with Burrell, and did not assign media
8   companies to one agency or another based on the owner's race.  (Ex. T ¶¶ 4-5; Ex. U
9   ¶¶ 5-6.)  Burrell's corporate representative likewise rejected the idea that any agency
10  serves as "the only point person for [any] media partner," explaining that each agency
11  is "looking at the media partners to see if they match the criteria of what it is . . .
12  looking at to achieve."  (Ex. M - Burrell 30(b)(6) Tr. 98:12-19.)

13       Even construing every inference in Plaintiffs' favor, Plaintiffs' theory fails on
14  its own terms.  Plaintiffs' theory that McDonald's wrongfully "relegated" them to
15  "African American ad agency and its miniscule ad budget" (*supra* at 1) depends upon
16  proof of four things: (1) ESN's offerings in fact have "widespread appeal" in the
17  "general market" (TAC ¶¶ 19, 21); (2) McDonald's nevertheless "placed" ESN with
18  Burrell, the agency responsible for targeting the AACM, to the exclusion of other
19  agencies (*supra* Section V.A.2.c); (3) because ESN had been "placed" ESN with
20  Burrell, ESN "was shut out" from consideration for the GCM (*see* TAC ¶ 58); (4) that
21  McDonald's did this because ESN's owner is Black (*supra* Section V.A.2.b).  Because
22  each of these premises is affirmatively refuted by the record, each is independently
23  fatal to ESN's claim.  *See, e.g.*, *City of Los Angeles v. San Pedro Boat Works*, 2008
24  WL 11334051, at *11 (C.D. Cal. Apr. 28, 2008), *aff'd*, 635 F.3d 440 (9th Cir. 2011)
25  (granting summary judgment for defendant where plaintiff failed to show what "its
26  own theory requires").

27              **(a)    Plaintiffs Cannot Establish that ESN Has "Widespread**
28                      **Appeal" in the "General Market."**

- 30 -

ESN has failed to establish that its networks have "widespread appeal *among all races*" (TAC ¶ 19), such that it plausibly should have been considered for the GCM. Despite years of fact and expert discovery—and unfettered access to its own internal demographic data and ratings—ESN has produced no proof on this critical claim of broad, cross-demographic appeal.  Even Allen admits that his networks cannot demonstrate widespread appeal, as measured by industry-standard Nielsen ratings. (*See* Ex. I - Allen Tr. 90:7-9 (Q. "So high viewer demand, as used in the complaint, doesn't mean that they have high Nielsen ratings? A. No, no, no, no, no, no.").)  Given this failure of proof, the Court should not only find that ESN failed to meet its affirmative evidentiary burden, but also properly infer that ESN's demographic data would *disprove* its claim of appeal with all races.  *Weeks v. ARA Servs.*, 869 F. Supp. 194, 195 (S.D.N.Y. 1994) ("Where relevant information . . . is in the possession or control of one party and not provided, then an adverse inference may be drawn that such information would be harmful."); FED. R. CIV. P. 37(c)(1).

But Plaintiffs do not merely lack evidence: objective data show that the ESN Lifestyle Networks have extremely low and, in most cases, literally no measurable viewership across general audiences.  (*See generally* McDonald's Motion, *infra* Section IV.A.2; SMF D90-D111; Ex. O(65), AOE1739-42.)  They were not rated by Nielsen at all until October 1, 2017.  (SMF D95-D111; Ex. O(5), AOE0992-AOE1014 (ESN contract with Nielsen)).   And at the time of the filing of the complaint, 5 of the 7 ESN Lifestyle Networks *still* did not have enough viewership to generate individual Nielsen ratings.   (SMF D91; Ex. O(65)-O(66), AOE1740-1751.)   Such paltry viewership does not constitute "widespread appeal" from an advertiser's perspective. Indeed, as explained in McDonald's motion for summary judgment, McDonald's GCM strategy targeted programs with viewership exceeding 60 million households— significantly higher than that of ESN's networks.  (*See* McDonald's Motion, *infra* Section IV.A.2, n.37; SMF D87-D88; Ex. O(63), AOE1734-35; Ex. O(2), AOE0618; *see also* SMF D66; Ex. O(50), AOE1551-54.)

ESN tries to sidestep this objective data by claiming its networks are subjectively "targeted" to general audiences. (*Supra* at 1; Section III.A.1.) Though Plaintiffs avoided dismissal by alleging that its properties have actual "appeal," including "higher ratings than networks McDonald's pays to advertise on" (Dkt. 51 at 19), Plaintiffs have since admitted that this claim was based purely on their subjective view that the type of "content" that ESN broadcasts—namely, "courtroom drama, entertainment, comedy, travel, food, pets and automotive content"—covers topics that "everyone" would like to watch. (*Supra* Section III.A.1; *see also* SMF P2, P16.) But as ESN's own Rule 30(b)(6) witness testified, what matters to an advertiser is not who a network intends to "target"—which cannot be measured—but who is *actually watching*. (*See* Ex. K - Restivo Tr. 45:20-46:15 ("[T]here's no way for someone on the outside to know who someone on the inside is targeting"); *see also* Ex. Q(1) - Blasius Expert Report ¶ 47, AOE3460; Ex. Q(2) - Blasius Expert Rebuttal Report ¶ 22, AOE3489.).)   In any event, ESN's subjective opinion about the audience it "targets" fails at summary judgment given the total lack of objective data supporting it.  *See Est. of Barton v. ADT Sec. Servs. Pension Plan*, 820 F.3d 1060, 1069 (9th Cir. 2016) (explaining that a plaintiff's mere assertion "does not always create a genuine issue of fact"; rather, "a plaintiff must put forth objective proof").

## (b)   Plaintiffs Cannot Prove That ESN Was "Placed" With Burrell To The Exclusion of Other Agencies.

The undisputed evidence also refutes ESN's claim that it was "placed" with Burrell, which assumes that only one agency can evaluate any given media company. As explained above, McDonald's IAT works jointly and collaboratively to review, consider, plan, and implement McDonald's national media strategy.  Through the IAT model, McDonald's agencies were to "[i]nstill integrated and collaborative processes and deliverables with partner agencies," "[i]dentify and implement efficiencies to workflow and document collaboration," and "[d]ocument process and workflow across partner agencies to define roles & responsibilities and key points of

1  integration." (Ex. P(2), AOE2318.) Thus, McDonald's agencies were not cordoned
2  off from one another, working in siloes; they all worked *together* to devise and
3  implement the most effective national advertising strategy possible.

4      Plaintiffs make much of references to Burrell as "the agency of record for
5  Entertainment Studios" by McDonald's witness Anja Carroll and OMD representative
6  Debbie Innes. (*See supra* Section III.A.3.) Plaintiffs speculate that the phrase "agency
7  of record" must mean "the only agency permitted to consider ESN's offerings." But
8  both witnesses directly contradict this interpretation. Nowhere does Ms. Carroll
9  suggest that Burrell's role as "agency of record" prevented other agencies from
10 evaluating ESN. Instead, she explained that McDonald's had the sensible and
11 nondiscriminatory practice of having a single agency handle *negotiations* with media
12 entities whenever possible, as it maximizes McDonald's buying leverage and
13 maintains "clean lines of accountability" among its many agency-media partner
14 relationships. (Ex. D - Carroll Tr. 161:8-24; 163:21-164:5; 164:13-14 (providing
15 example of ESPN, which provides content that reaches both GCM and AACM, and
16 explaining "I wouldn't have Burrell buy NBA on ESPN when OMD is negotiating the
17 rest of my ESPN buy. I'm going to have one agency in charge of leveraging all my
18 dollars across the single entity.") Indeed, the agency agreement with OMD *requires*
19 negotiations to occur in accordance with this practice. (*See* Ex. P(2), AOE2314 ("In
20 purchasing media, target and seek to obtain the most advantageous buying conditions
21 in both media pricing and campaign execution and actively seeks, evaluates and
22 recommends any cross-platform opportunities offered by media vendors in line with
23 agreed trading and media strategy.").)

24     Ms. Innes has made clear that ESN has similarly mischaracterized her 2016
25 email to support its baseless relegation theory. Notably, though this email was
26 specifically called out in Plaintiffs' complaint, and Plaintiffs listed Ms. Innes on their
27 Rule 26 disclosures, they never attempted to depose her, and thus have only their *ipse*
28

1  *dixit* as to the meaning of her email.[19]  But the sworn declaration of Ms. Innes exposes

2  ESN's mischaracterization of her email.  Ms. Innes states that McDonald's "never

3  prevented [her] from working with ESN or Mr. Allen for *any* reason, let alone because

4  of Mr. Allen's race. Nor did McDonald's ever instruct [her] to direct ESN or Mr. Allen

5  to work exclusively with Burrell."  (Ex. U – Innes Decl. ¶ 5.)   In fact, her email

6  actually shows that she and her team "*did* meet with the Entertainment Studios ad sales

7  team as they requested, and we *did* consider their portfolio offerings."  (*Id*. ¶ 7.)  As

8  for the phrase that Plaintiffs pick out, Ms. Innes explained that Entertainment Studios

9  had frequently boasted its ability to reach an AACM audience and, as a result, Burrell

10  had previously bought advertising from them on McDonald's behalf.  (*Id*. ¶ 8.)  Ms.

11  Innes's "statement was therefore meant to communicate that if Entertainment Studios

12  would like to pitch its programming to reach an AACM audience, as it had done in

13  years prior, then those discussions should continue to include Burrell. In other words,

14  while ESN did not meet McDonald's GCM requirements that we assessed at OMD,

15  [she] was directing ESN to an additional opportunity with Burrell."  (*Id*.).

16     In the face of such unequivocal testimony, Plaintiffs' baseless interpretation of

17  the phrase "agency of record" does not suffice to create a genuine dispute of fact that

18  ESN was "placed" with Burrell to the exclusion of other agencies.  *See Crowell v. Shell*

19  *Oil Co.*, 481 F. Supp. 2d 797, 813 (S.D. Tex. 2007), *aff'd*, 541 F.3d 295 (5th Cir. 2008)

20  (rejecting Plaintiffs' "contrary interpretation of . . . emails" in the face of deposition

21

---

22  [19] The same is true of another email cited by Plaintiffs in their SMF but not discussed in their brief.  (*See* SMF P12 (citing Ex. ZZ - First Schecter Decl. at Ex. 2).)  And like

23  Ms. Innes, Mr. Geraci rejects Plaintiffs' mischaracterization of his words.  He explains: "[t]he email was not meant to communicate to Entertainment Studios that OMD had

24  not evaluated and considered Entertainment Studios' syndication programming for investment on the McDonald's GCM plan, or that it would not do so in the future.

25  Rather, it was meant to communicate that Entertainment Studios' syndication programming would be considered for investment on a specific part of McDonald's

26  media plan, for which OMD did not have buying responsibility. Far from 'blocking' plaintiffs from opportunities to negotiate, I was explaining to Entertainment Studios

27  that it would be given an additional opportunity to pitch for McDonald's investment." (Ex. T - Geraci Decl. ¶ 6.)

28

- 34 -

1   testimony by the author that plaintiffs "misinterpreted" her statement); *Country Mut.*
2   *Ins. Co. v. Martinez*, 2019 WL 1787313, at *10 (D. Ariz. Apr. 24, 2019) (finding there
3   was "no genuine dispute of fact that the email was not a within-policy-limits offer"
4   where "Lewis—the author of the email—admitted during his deposition that it was not
5   meant as a within-policy-limits offer").  There is no dispute of material fact that to the
6   extent Burrell served as "agency of record" for ESN, it did not preclude consideration
7   by McDonald's other agencies.  *See Ries v. Arizona Beverages USA LLC*, 2013 WL
8   1287416, at *7 (N.D. Cal. Mar. 28, 2013) (granting defendant's motion for summary
9   judgment where testimony was "ambiguous at best, even when read in the light most
10   favorable to plaintiffs").

11           **(c)**      **Plaintiffs Cannot Prove that ESN Was "Shut Out" from**
12                   **Consideration by the General Market Agencies.**

13          Even if ESN was somehow "placed" with Burrell—whatever that means—there
14   is no evidence that ESN was "shut out" from consideration by OMD for the GCM (*see*
15   TAC ¶ 58).  In fact, the opposite is true: AMG's ad sales team presented the company's
16   entire portfolio[20]—including ESN's properties—to OMD numerous times over the
17   years, and OMD duly considered those properties but simply deemed them
18   inappropriate to carry out McDonald's GCM media plan.  Undisputed evidence shows
19   that OMD met with and considered AMG's offerings regularly, including April 2016
20   (Ex. O(33), AOE1467-68); March 2017 (Exs. O(34), AOE1471, O(35), AOE1473-
21   76); September 2019 (Ex. O(36), AOE1478-83); November 2019 (Ex. O(37),
22   AOE1485); December 2019 (Ex. O(21), AOE1250-51); March 2020 (Ex. O(38),
23   AOE1487-88); October 2020 (Ex. O(39), AOE1490-91); November 2020 (Ex. O(40),

24   _____

25   [20] AMG ad sales representatives often presented properties across the entire AMG
26   portfolio together. *See* ESN's Ex. 13 (Mason Depo. Tr. Ex. 10) (pitching ES syndicated
programs together with ESN's "growing" (but not yet Nielsen rated) Lifestyle
Networks); Ex. G – Bekkedahl Tr. 244:9-11; 213:10-18 (Weather Group and ES/ESN
27   ad sales representatives were "merged as one team" by 2020).); Ex. V(1), AOE3688-
28   3731 (presenting syndication and ESN Lifestyle networks together); Ex. V(2),
AOE3733-57 (same).

AOE1494-95); and April 2021 (Ex. O(41), AOE1497-98).   Every single one of Plaintiffs' witnesses confirmed that OMD met with them and considered ESN's portfolio.   Former AMG executive Barbara Bekkedahl testified that AMG sales representatives met with OMD in 2020 to present Weather Group *and* the ESN properties, that McDonald's "didn't do anything to prevent this meeting from happening" and further that OMD was "always good about taking our meetings and learning our updates."   (Ex. G - Bekkedahl Tr. 244:7-17.)   Former ESN ad sales representative Cindy Kelly testified similarly, noting that AMG had presented the ESN portfolio "opportunities" to OMD during the 2016 upfront season. (Ex. H - Kelly Tr. 85:12-86:7.)   AMG ad sales executive Darren Galatt testified that AMG's portfolio team even had a designated representative "that called upon OMD."   (Ex. F - Galatt Tr. 112:7-113:17.)   And Allen himself confirmed: "I do know we presented to OMD." (Ex. I - Allen Tr. 262:7-18.)

Testimony from McDonald's and OMD witnesses further confirms that ESN was never prevented from accessing OMD.   McDonald's witness Alycia Mason— whose deposition ESN purports to rely upon (*see* SMF P12)— testified not only that it was untrue that ESN's "general market offerings" were required to go through Burrell, but that OMD did in fact purchase ESN's digital property in 2021.   (Ex. A - Mason Tr. 98:1-10; 100:10-25; 127:10-15.)   Finally, three representatives of OMD testified that they were never "blocked" from working with ESN.   As noted, both Ms. Innes and Mr. Geraci stated in sworn declarations that McDonald's never prevented them from working with ESN or Allen, and never instructed them to push Allen's media companies to deal only with Burrell.   (Ex. T ¶¶ 4-5; Ex. U ¶¶ 5-6.)   OMD's Rule 30(b)(6) designee, Geoff Calabrese, further confirmed that OMD evaluated AMG's portfolio offerings (which included ESN) on McDonald's behalf but ultimately decided it was not a "fit" for McDonald's business objectives.   (Ex. L - OMD 30(b)(6) Tr. 112:14-114:21; 118:14-119:1.)   And of course, OMD *did* buy two of AMG's digital

1  properties on behalf of McDonald's in April 2021—a fact conveniently omitted from
2  ESN's motion. (*See* SMF D131; Ex. O(70), AOE1817-23.)[21]

3           **(d)      Plaintiffs Cannot Prove that Any "Relegation" was
4                        "Because of" Allen's Race.**

5           Finally, even if ESN was somehow "relegated" to Burrell despite all these
6  dealings with OMD, Plaintiffs have identified no competent evidence suggesting such
7  placement was *because of* Allen's race.  To be clear: it is not enough merely to show
8  that McDonald's "made the decision" to assign ESN to an agency "responsible for a
9  small  fraction  of  McDonald's  ad  budget"  (*supra*  Sections  V.A.2.b,  V.A.2.c).
10  Discriminatory intent[22] requires  more  than  just  "intent as volition"  or  even  "as
11  awareness of consequences."  *Gay v. Waiters' & Dairy Lunchmen's Union, Loc. No.
12  30*, 694 F.2d 531, 552 (9th Cir. 1982).  It requires proof that a defendant "selected . . .
13  a particular course of action at least in part '*because of*' not merely 'in spite of,' its
14  adverse effects upon" a minority group. *Id.*; *see Gen. Bldg. Contractors Ass'n, Inc. v.
15  Pennsylvania*,  458  U.S.  375,  386  (1982)  (rejecting  theory  of  "disproportionately
16  adverse impact" and requiring proof of deliberate "discriminatory purpose").

17           Here,  the  evidence  shows  that  Burrell  frequently  worked  with  Allen's
18  companies not because of Allen's race, but because at times, they indexed well with
19  the AACM.  (*See* Ex. U – Innes Decl. ¶ 8).  It is undisputed that Burrell targeted the
20  AACM on behalf of McDonald's.  And the limited data on the racial appeal of ESN's
21  media properties show that much of their content *vastly* over-indexed with African
22  American viewers compared to the general market.  (Ex. P(16), AOE2668 (comparing

23

24  [21]  In addition to ESN, OMD also placed buys with other Black-owned media
25  companies, such as Related Media, which further undermines ESN's assertion that
    only Burrell is responsible for placing advertisements on African American-owned
26  media.  (SMF D45-D46.)
27  [22]  *Gay*, 694 F.2d at 536 ("We held nearly two years ago that section 1981 is limited to
    claims of intentional discrimination."); *Mackey v. Bd. of Trustees of California State
28  Univ.*, 31 Cal. App. 5th 640, 660 (2019) ("The Unruh Act requires proof of *intentional*
    [discrimination].").

1   AA18-49 ratings for all of ES's programming compared to GCM A18-49).)  Indeed,

2   the very same syndicated programs that ES pitched to McDonald's for their ability to

3   reach African American audiences are also broadcast on ESN's networks, and these

4   ES/ESN program offerings were often presented *together* by AMG ad sales

5   representatives (or as ESN explains, as the "public-facing brand" simply referred to

6   as, "Entertainment Studios," *see supra* note 1) to prospective advertisers, including

7   McDonald's.  (*See* Ex. V(2), AOE3741, AOE3752 (showing ES Court Combo AA HH

8   ratings and same shows run on Justice Central.TV); Ex. V(1) (showing syndicated

9   shows' AA household ratings and same shows played on ESN Lifestyle Networks).)

10       Meanwhile, there is zero evidence that Burrell was instructed to work with any

11  media company based on the race of its owner—a fact confirmed by the lengths that

12  ESN had to go in order to manufacture support for this proposition.  In its brief, ESN

13  relies principally on cherry-picked statements from the depositions of (i) Donna

14  Hodge, Burrell's Rule 30(b)(6) witness, (ii) McDonald's witness Jennifer Feldman,

15  and (iii) Lynwood Bibbens, the owner of Reach TV.  None of these supports ESN's

16  assertion that "McDonald's placed Entertainment Studios with Burrell because it is

17  African American-owned." (*Supra* at 29.)  In fact, considered in the proper context,

18  these witnesses affirmatively refute Plaintiffs' speculative and contorted interpretation

19  of McDonald's advertising process.

20       *First*, the full passage of the cited Hodge testimony is reproduced below:

21          Q. (BY MR. SCHECTER) For [FED.R.CIV.P. 30(b)(6) Notice Topic] No.

22          9, the differences in prices if any that are paid to African American

23          targeted media as opposed to white owned media companies. You are not

24          testifying on that topic in No. 9?

25          A. That's correct.

26          Q. Okay. And why is that?

27          A. Because I have no knowledge of what is paid to White-owned media

28          companies. I'm only responsible for comp- -- for budgets in African

1    American – sorry – media companies that are targeted to or owned by
2    African Americans.

3    (Ex. M - Burrell 30(b)(6) Tr. at 12:1-12.)  ESN takes great license with Ms.
4    Hodge's testimony, asserting that this means "Burrell is McDonald's African
5    American agency and is responsible for placing advertisements on African American-
6    targeted *and African American-owned media*." (*supra* at 29) (emphasis added).

7    Not so.  Ms. Hodge simply testified that she was not prepared to offer testimony
8    on ESN's 30(b)(6) Topic No. 9, which asked for prices paid for advertising on "white-
9    owned media companies."  And it makes sense Ms. Hodge would not be prepared to
10   offer such testimony, because neither McDonald's nor its advertising agencies tracks
11   spending on so-called "white-owned media companies"; that term was concocted by
12   ESN in its complaint.  As Ms. Hodge rightly explained, however, part of McDonald's
13   IAT's responsibility *is* to track the spending with Black-owned media companies, in
14   part because McDonald's committed to increasing its spending with Black-owned
15   media companies, production houses, and content creators over the next several years.
16   (*See* Ex. P(2), AOE2313 ("In partnership with media IAT, oversight and management
17   of McDonald's DEI initiative, including monthly status updates, Quarterly Reports on
18   RFP goals and Spending . . . .)")  Consistent with that laudable goal and the scope of
19   Burrell's contractual engagement, Ms. Hodge explained that Burrell's responsibilities
20   include both "help[ing] McDonald's specifically target an African American
21   audience" as well as both tracking and reporting to McDonald's on its spending with
22   Black-owned media companies.  (Ex. M - Burrell 30(b)(6) Tr. 44:22-45:13; 38:5-19;
23   39:11-15.)    Moreover, and perhaps most importantly, Ms. Hodge contradicted
24   Plaintiffs' assertion that Burrell "is responsible for placing advertisements on . . .
25   African American-owned media," testifying that Burrell did *not* evaluate ESN's
26   Lifestyle Networks because "that's managed by the general market agency."  (*Id.* at
27   51:25-52:24; 53:4-21; 54:12-24.)

28

- 39 -

*Second,* ESN cites the testimony of McDonald's witness Jennifer Feldman (*see* SMF P13), but as with Ms. Hodge, her testimony in fact shows *the absence* of a racially motivated "relegation" of ESN to Burrell.  Ms. Feldman explained that neither ESN nor its affiliated companies were assigned to Burrell based on Allen's race; rather, McDonald's historical relationship with AMG began through purchases of syndication programming owned and sold by ESN's affiliate company, ES.  (Ex. C - Feldman Tr. 177:12-178:6.)   Because those properties over-indexed with African American audiences, Burrell bought them on McDonald's behalf for many years.  (*Id.*)  But Ms. Feldman made clear that Burrell's prior purchases of ES's syndicated programs "would not preclude consideration of [AMG's other properties via] the general market either." (*Id.* at 177:12-178:6; *see also* 179:9-20 (Ms. Feldman never told OMD or Burrell that ESN "should go through Burrell"; rather, "[t]o that point all of our investment had been through Burrell so they would have been point to do that" but, again, that "would not preclude OMD from analyzing that as a property and making a recommendation. It is more who would negotiate with that vendor.").)

*Third*, Plaintiffs provide a single example of an African American-owned media company that was allegedly "pushed" to Burrell: Reach TV.  (*See supra* Section III.A.3.)  But again, ESN plays fast-and-loose with the testimony of Mr. Bibbens, the owner of Reach TV.  With full context, Mr. Bibbens's testimony provides no support to Plaintiffs' theory.  What Mr. Bibbens *actually* said is that when he was discussing a potential advertising deal between his company and McDonald's in 2022, *both* Burrell *and* Starcom[23] were working together as a combined agency team, but that he ultimately contracted with Starcom, not Burrell.  (Ex. N - Bibbens Tr. 53:4-15; 85:4-8.)   This testimony is not only perfectly consistent with Burrell's and OMD's collaborative relationship as part of the IAT, it also undercuts ESN's theory that Black-

---

[23] Starcom replaced OMD as McDonald's general consumer market agency of record in 2021.

1   owned media companies are not permitted to make advertising deals with McDonald's
2   general market agency (*see supra* Section III.A.3).

3      Even the most charitable interpretation of these out-of-context scraps of
4   deposition testimony provide only a mere "scintilla of evidence" that Allen's race
5   played any role in which agency or agencies worked with ESN. *Bund v. Safeguard*
6   *Props. LLC*, at *4 (W.D. Wash. Jan. 12, 2018) (quoting *Liberty Lobby*, 477 U.S. at
7   252); *see also Quidel Corporation v. Siemens Medical Solutions USA, Inc.*, 2021 WL
8   4622504, at *1 (9th Cir. Oct. 7, 2021) ("Quidel's cherry-picking of isolated and
9   selective quotes from Dr. Silberman's testimony . . . does not establish a genuine issue
10  of material fact . . . .").

11     All that remains is ESN's own speculation as to the reason it found itself
12  working with Burrell, which ESN introduces through the testimony of its corporate
13  designee, Darren Galatt. (*See supra* Section V.A.2.b; SMF P13-P14). But courts have
14  repeatedly held that such "uncorroborated and self-serving" testimony about a
15  defendant's discriminatory motive is insufficient to create a genuine dispute of fact.
16  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *see also*
17  *Cont'l Lab'y Prod., Inc. v. Medax Int'l, Inc.*, 114 F. Supp. 2d 992, 1006 (S.D. Cal.
18  2000) (finding that affidavit from Plaintiff's employee could not "defeat summary
19  judgment"). Moreover, such "evidence"—thin as it is—must be viewed in light of
20  Plaintiffs' past history of making similar accusations—including accusations of
21  "relegation"— against other companies.[24]  The "frequency and varying contexts in

22  _____

23  [24] *See* Case 2:15-cv-01239 (C.D. Cal.), Dkt. 1 ("Comcast Compl.") ¶¶ 11-13 ("By
24  relegating 100% African American-owned media to the MOU/Minority Process, Comcast thereby affords them inferior or no contracting opportunities. . . . Comcast
25  has, in essence, created a 'Jim Crow' process with respect to licensing channels from 100% African-American media."); Case 2:16-cv-00609 (C.D. Cal.), Dkt. 1 ("Charter
26  Compl.") ¶¶ 28-30 ("[Charter's President and CEO] Rutledge does not meet with African American-owned programmers, like Entertainment Studios. . . . Charter's
27  business model is to engage in economic exclusion of African American–owned media companies by 'buying' the support of an African American shill ([Reverend Al]
28  (Continued...)

1 which [Allen] alleges the existence of discriminatory intent" undermines the

2 plausibility of his claim here. *White v. Tavel*, 2020 WL 2804282, at *2 n.1 (S.D. Ind.

3 May 29, 2020); *see also Pounds v. Bd. of Trustees*, 215 F.3d 1320 (Table) (4th Cir.

4 2000) (prior claims of racial discrimination against two previous employers admissible

5 as impeachment evidence at trial to show bias or motive).

6 Accordingly, McDonald's is entitled to summary judgment on ESN's claim of

7 discriminatory intent.

8 **2.      Plaintiffs' Relegation Theory Lacks Any Basis in the Law.**

9 Given Plaintiffs' inability to prove their own factual allegations, the Court need

10 hardly look to precedent to reject Plaintiffs' theory.  Yet the relevant case law makes

11 it even more clear that summary judgment should be granted in McDonald's favor.

12 Plaintiffs' theory has no support in the law, which recognizes that companies can and

13 often do appeal to "particular ethnic, racial, or social groups" due to legitimate

14 "marketing, ratings, and demographic concerns." *Jurado*, 813 F.2d at 1410.

15 *First,* despite characterizing relegation as its "core theory of liability," (*supra* at

16 1), ESN fails to provide *any* case law establishing that such "relegation" constitutes

17 discrimination.   To be clear, the problem is not that ESN's authorities for its

18 "relegation" theory are merely weak or that McDonald's disagrees with ESN's

19 interpretation of them.  The problem is that ESN's authorities are non-existent.  After

20 McDonald's noted this absence during the parties' first round of briefing, Plaintiffs

21 essentially acknowledged the lack of legal support for their position, arguing simply

22 that it "should be obvious" that "section 1981 prohibits corporate Jim Crow."  (Dkt.

23 124 at 6).  But "[c]onclusory statements, tautologies and a couple of citations don't an

24 argument make." *Bartell v. JPMorgan Chase Bank, NA*, 607 F. App'x 731, 732 (9th

25 Cir. 2015).  No one disputes that "section 1981 prohibits corporate Jim Crow."  (Dkt.

26

27 Sharpton) to mask Charter's racist business practices." ); Case No. 2:14-cv-09256
28 (CD. Cal.), Dkt. 1 ¶ 2 ("100% African American-owned media has been substantially
shut out by AT&T and DirecTV.").

124 at 6.)  The point, instead, is that using a multicultural agency like Burrell—
something done by every sophisticated and conscientious advertiser—emphatically is
nothing like "Jim Crow."  As already discussed, the facts show the opposite—that
McDonald's use of Burrell promotes inclusion.  Plaintiffs' utter lack of relevant legal
support is reason alone to reject ESN's theory. *See, e.g.*, *Disorderly Kids, LLC v.
Dollar*, 2015 WL 11117074, at *9 n.12 (C.D. Cal. Nov. 10, 2015) (Olguin, J.)
(rejecting argument that was not "argued specifically and distinctly" in the party's
brief; although party cited case providing the general legal standard, it failed to
"explain how that [was] dispositive" on the relevant issue).

Even if the Court looks past this hole at the center of ESN's motion, ESN's
barebones argument is fatally deficient for an even simpler reason: ESN categorically
neglects to engage with the basic questions that a Section 1981 plaintiff must answer
at the summary judgment stage.  What facts support ESN's *prima facie* case?  Why
are McDonald's business justifications not legitimate?  What specific evidence can
ESN produce proving that McDonald's explanations to ESN are a mere pretext for
invidious discrimination?  *See, e.g.*, *Ajwani v. Hanmi Bank*, 2016 WL 3901773, at *3
(C.D. Cal. July 18, 2016) (Olguin, J.) (granting summary judgment for defendants in
a § 1981 case after analyzing the above questions).  ESN leaves these essential
substantive questions not only unanswered, but unasked. *See O'Neal v. Sideshow, Inc.*,
583 F. Supp. 3d 1282, 1287 n.2 (C.D. Cal. 2022) ("It is not [the] Court's role to
research independently and develop answers to legal questions that the parties have
not adequately addressed"); *Weisbein v. Allergan, Inc.*, 2022 WL 1288222, at *3 n.2
(C.D. Cal. Mar. 28, 2022) (Olguin, J.) (rejecting argument where party had improperly
left "the Court to do counsel's work—framing the argument, and putting flesh on its
bones through a discussion of the applicable law and facts.").

*Second,* while ESN's procedural errors should alone doom its motion, ESN's
"relegation" also runs headlong into Ninth Circuit precedent approving of business
initiatives analogous to those challenged here.  It is well-established that targeting

- 43 -

"particular ethnic, racial, or social groups" "does not tend to show racial animus." *Jurado*, 813 F.2d at 1410.  As the Ninth Circuit explained in *Jurado*, while this type of marketing strategy may be race *conscious*, it is plainly not racially *discriminatory*: marketing geared to specific sub-groups is legitimately "motivated by marketing, ratings, and demographic concerns." *Id.*  Given the undisputed facts, ESN's theory squarely conflicts with *Jurado.*  ESN admits that Burrell served as McDonald's AACM media planning and buying agency and was responsible for evaluating media companies for the AACM.  (*Supra* Section III.A.2.)  Thus, even if ESN *had* been assigned to work only with Burrell (which, as discussed above, is factually untrue), that assignment would not show "racial animus." *Jurado*, 813 F.2d at 1410.  While Plaintiffs may disagree with the amount of spend that McDonald's allocates to the AACM—despite the fact that McDonald's leads the industry (*see supra* Section III.B)—the Court should reject their invitation to "determine whether the [] budget . . . was 'enough.'" *Foxworth v. Am. Bible Soc.,* 2005 WL 1837504, at *7 (S.D.N.Y. July 28, 2005), *aff'd sub nom. Mitchell-Foxworth v. Am. Bible Soc.*, 180 F. App'x 294 (2d Cir. 2006) ("Businesses routinely make decisions about the appropriate allocation . . . of their resources, expanding some enterprises while reducing others, and such business judgments do not invariably provide evidence of discriminatory intent.").

Nor can ESN distort the *additional* opportunities it received through McDonald's diversity initiatives as evidence of *discriminatory* treatment.  As explained above, all competent evidence in the record confirms what should have been obvious to ESN from the beginning: that ESN was directed to Burrell not as part of some "corporate Jim Crow," but as an "additional opportunity" to compete for McDonald's advertising dollars even after failing to "meet McDonald's [standard general-consumer-market] requirements."  (Ex. U - Innes Decl. ¶ 8; *see also* Ex. T - Geraci Decl. ¶ 6.)

Federal courts are in accord that diversity-driven programs are not only legally permissible under Section 1981, but plainly effectuate the statute's purpose. *See Doe*

1  *v. Kamehameha Sch./Bernice Pauahi Bishop Est.*, 470 F.3d 827, 838 (9th Cir. 2006)
2  (upholding § 1981 challenge to race-based affirmative action program and explaining
3  that it "would indeed be…ironic if the Civil Rights Act of 1866" was interpreted to
4  prohibit "preferential treatment on the basis of race") (cleaned up).  Indeed, Supreme
5  Court and Ninth Circuit alike have "written favorably in support of private-sector
6  diversity initiatives as a legitimate business consideration." *Mullen v. Wells Fargo*
7  *Bank, N.A.*, 2021 WL 4453604, at *6 (E.D. Pa. Sept. 29, 2021); *Peterson*, 358 F.3d at
8  608 (recognizing "the company's right to promote diversity").  And the Ninth Circuit
9  has specifically warned against the sort of second-guessing of private diversity
10  initiatives that Plaintiffs advance here, stressing the importance of judicial "deference"
11  to "private business decisionmakers" and explaining that Section 1981 should be
12  interpreted "to preserve, to the maximum extent possible, the freedom and discretion
13  traditionally afforded to private businesses." *Doe*, 470 F.3d at 841.

14      *Third*, ESN's relegation theory is ultimately based on an alleged mistake:
15  viewing ESN as targeting the AACM as opposed to the GCM.  (*See, e.g.*, *supra* Section
16  III.A.1. ("Entertainment Studios is a General Market Media Company").  But even if
17  McDonald's had mistakenly "pigeonholed" ESN as targeting the AACM or wrongly
18  concluded that ESN did not reach the GCM—both of which, as discussed above, are
19  soundly refuted by the factual record—that would still not be enough to show a
20  violation of Section 1981.  The federal civil rights laws do not penalize "foolish or
21  trivial or even baseless" decisions, only discriminatory ones. *Villiarimo*, 281 F.3d at
22  1063.  The use of Burrell to target the AACM is ordinary and lawful, and Plaintiffs do
23  not argue otherwise. *See Jurado*, 813 F.2d at 1410.  Even assuming McDonald's had
24  been "unwise" or "incorrect" to contract with ESN primarily through Burrell, Plaintiffs
25  cannot convert this legitimate business decision into unlawful discrimination. *Merrick*
26  *v. Hilton Worldwide, Inc.*, 867 F.3d 1139, 1148 (9th Cir. 2017).  ESN must prove that
27  intentional and invidious racial discrimination—*harming* ESN because Allen is
28  black—"was the real reason" for McDonald's actions. *St. Mary's Honor Ctr. v. Hicks*,

509 U.S. 502, 516 (1993); *Nat'l Comm. of Reform Party of U.S. v. Democratic Nat. Comm.*, 168 F.3d 360, 366 (9th Cir. 1999) ("The term 'invidious discrimination' generally refers to treating a class differently in order to harm or repress it."). Regardless of the rhetoric ESN uses to describe Burrell's role in McDonald's advertising strategy, there is zero evidence that McDonald's used Burrell as a vehicle for intentional and invidious discrimination.[25]

### 3.    Plaintiffs' Relegation Theory Is Time-Barred.

The applicable limitations period for all of Plaintiffs' claims is two years.  (*See* McDonald's Motion, *infra* Section VI.E.1.).  This limitations period bars Plaintiffs' relegation theory.  Plaintiffs' claims accrued "upon awareness of the actual injury, [] and not when the plaintiff suspects a legal wrong."  *Lukovsky v. City & Cnty. of San Francisco*, 535 F.3d 1044, 1049 (9th Cir. 2008); *see also Delaware State Coll. v. Ricks*, 449 U.S. 250, 258-59 (1980) (holding that the limitations period for a § 1981 claim begins to run when plaintiff is informed of the allegedly discriminatory act).  Plaintiffs became aware of McDonald's alleged relegation specifically well before May 2019 (two years prior to filing suit).

It is undisputed Plaintiffs were aware of the supposed "relegation" by at least 2015.[26]  In 2015, Allen communicated to McDonald's his belief that "you should not have this separate and unequal system of Black people go to Burrell and white people

---

[25] Indeed, as explained in McDonald's motion for summary judgment, McDonald's favorable treatment of Allen's companies specifically and Black-owned media generally conclusively erases any inference of racial animus.  (*See generally* McDonald's Motion, *infra* Section VI.A.1.)   Among other things, the record demonstrates that McDonald's consistently purchased from Mr. Allen's companies and did so on favorable terms. (*See id*.)  And as Ms. Hodge testified, McDonald's is a leader in supporting diverse-owned media and in targeting diverse audiences. (Ex. M - Burrell 30(b)(6) Tr. at 114:11-21.)  Such favorable treatment makes it unlikely that the defendant was "truly biased against the [plaintiff's] class." *Coghlan v. Am. Seafoods Co. LLC.*, 413 F.3d 1090, 1097-98 (9th Cir. 2005).

[26] Allen's long-time General Counsel, Mark DeVitre, testified that Allen has voiced complaints about Entertainment Studios being "relegated to Burrell" since 2012. (Ex. HHH - DeVitre Tr. at 65:8-66:1, 69:18-71:4.)

go to OMD." (SMF D63; Ex. I - Allen Tr. 305:17-306:17).  Consistent with this belief, in 2015 he wrote to McDonald's, "[p]lease treat our African American Owned Media the same as General Market white agencies and clients. The discrimination and the numbers are indefensible.")  (*Id.*; Ex. O(28), AOE1390); SMF D57; Ex. O(43), AOE1509 (Allen "indicated that [he] would file a lawsuit against McDonald's alleging discrimination if [McDonald's] did not increase [its] media spend with [his] company").  And at deposition, Allen testified extensively to his belief that his companies had been "relegated" to Burrell at least as early as 2015, and that he "wished" he would have sued McDonald's then.  (Ex. I - Allen Tr. at 244:2-7; 67:4-8; 69:20-70:16; 172:24-174:6; 174:23-175:12; 193:12-194:4; 248:8-22; 258:7-14; 259:5-260:13; 261:21-262:3.)

Allen's unequivocal admissions that he was aware of McDonald's alleged relegation prior to May 2019 bars Plaintiffs' relegation theory in full—even as to any alleged relegation continuing past May 2019.  As explained in McDonald's motion for summary judgment, a refusal to contract (like a refusal to hire) is not a continuing violation, because "there is no reason . . . not to promptly file suit" "once a plaintiff learns the reason he was not [selected]." *Rai v. IBM Credit Corp.*, 2002 WL 1808741, at *3 (N.D. Cal. Aug. 1, 2002). (*See* McDonald's Motion, *infra* section VI.E.1.)

## VI.   **ARGUMENTS WITH RESPECT TO *MCDONALD'S* MOTION FOR SUMMARY JUDGMENT**

### A.   **Plaintiffs' Claims Fail Because They Cannot Establish Intentional Discrimination.**

#### 1.   **McDonald's Position**

After successfully opposing McDonald's motion to dismiss with specters of "intentional racial animus" (Dkt. 56 at 9), Plaintiffs fundamentally lost sight of this

essential requirement of their claims.[27]  *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1016 (2020) (explaining that § 1981 was written to "eradicate blatant deprivations of civil rights"); *Mackey v. Bd. of Trustees of California State Univ.*, 31 Cal. App. 5th 640, 660 (2019) ("The Unruh Act requires proof of *intentional* [discrimination].").  Intentional discrimination means that a party "selected a particular course of action at least in part '*because of*'"—"not merely 'in spite of'"—the "adverse effects" that action would have on a minority group.  *Gay v. Waiters' & Dairy Lunchmen's Union, Loc. No. 30*, 694 F.2d 531, 552 (9th Cir. 1982).  That means Plaintiffs must come forward with *facts* establishing that McDonald's refused to contract with them because of a "hatred for African-Americans in general." *Maduk v. CVS Pharmacy, Inc*., 2023 WL 3272406, at *8 (C.D. Cal. Feb. 9, 2023).

There is nothing even close to that in the record.  Plaintiffs have failed to marshal even the minimal evidence that is necessary (but itself insufficient) to show intentional discrimination.  For instance, Plaintiffs did not offer even basic statistical or numerical analyses of McDonald's advertising decisions.  *Cf. Gay*, 694 F.2d at 553 (holding that statistics alone are not "sufficient to demonstrate that race is the more likely explanation for an employer's conduct"); *see also Slack v. United Airlines, Inc.*, 2021 WL 982317, at *9 (D. Nev. Mar. 15, 2021), *aff'd,* 2023 WL 154960 (9th Cir. Jan. 11, 2023) (holding that plaintiffs could not "avoid summary judgment" on their discrimination claims "by relying solely on conclusory allegations that are unsupported by factual data").  Nor have Plaintiffs identified even the types of racially

---

[27] "Whether or not [the] McDonnell Douglas [burden-shifting framework] has some useful role to play in § 1981 cases," it is merely one "tool for assessing [discrimination] claims."  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).  *McDonnell Douglas* does not—and cannot—change Plaintiffs' obligations to "ultimately prove that, but for race, [they] would not have suffered the loss of a legally protected right. *Id.* at 1019; *see also Alozie v. Arizona Bd. of Regents*, 431 F. Supp. 3d 1100, 1111 n.4 (D. Ariz. 2020) (explaining that *McDonnell Douglas* can be at times be "not particularly significant" because "regardless of the approach taken," a plaintiff must come forward with "evidence establishing a dispute of fact regarding intentional discrimination").

charged comments that courts routinely dismiss as insufficient. *See U.S. Equal Emp. Opportunity Comm'n v. Chapman Univ.*, 2012 WL 12888840, at *6 (C.D. Cal. Apr. 5, 2012) (holding that statements that "We don't need diversity" and that Black professor "never should have been hired to begin with" "fall far short of statements and conduct held to constitute direct evidence of bias toward a protected class").

While Plaintiffs' failure of proof is alone fatal, McDonald's affirmative evidence even more definitively justifies summary judgment in its favor. Whether a plaintiff has shown "racial animus" is a two-sided equation: Courts consider not only plaintiffs' allegations of bad conduct, but offsetting evidence of defendants' non-discriminatory conduct. *See, e.g., Montanile v. Nat'l Broad. Co.*, 211 F. Supp. 2d 481, 486 (S.D.N.Y. 2002), *aff'd*, 57 F. App'x 27 (2d Cir. 2003) (granting summary judgment based on a lack of "circumstances that give rise to an inference of discrimination" where plaintiff "received consistently favorable treatment throughout her employment").[28] This doctrine is intuitive: after all, "a defendant's willingness to treat the plaintiff favorably" makes it unlikely that the defendant was "truly biased against the [plaintiff's] class." *Coghlan v. Am. Seafoods Co. LLC.*, 413 F.3d 1090, 1097-98 (9th Cir. 2005); *see also Marks v. New York Life Ins. Co.*, 2020 WL 5752852, at *9 (S.D. Ala. Sept. 25, 2020) (granting summary judgment on allegation that defendant "intentionally discriminated against African American agents as to training opportunities" where plaintiff "received preferential training opportunities relative to other agents"). Because the relevant question is whether a defendant is biased against Plaintiffs' racial group, even general diversity efforts not directed at a plaintiff tend to disprove a plaintiff's claim. *See Carter v. Atrium Hosp.*, 997 F.3d 803, 810 (8th Cir.

---

[28] *See also, e.g., Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 306–07 (2d Cir. 2021) (finding no causation where plaintiff "was promoted and received positive feedback" even after plaintiff was subjected to "discriminatory remarks"); *Williams v. Hous. Opportunities for Persons with Exceptionalities*, 777 F. App'x 451, 455 (11th Cir. 2019) (granting summary judgement even when decisionmaker made a racial comment because of "other evidence in the record" that defendant "filled [plaintiff's] position with people of the same race").

2021) (finding that plaintiff had failed to establish *prima facie* case where "the record shows that [defendant] has hired Black men for [plaintiff's] position in the past.")

Holistically, the record comprehensively refutes any suggestion that McDonald's harbors a hatred for Black people.  Even setting aside McDonald's industry-leading diversity initiatives and recent efforts to improve further, Plaintiffs themselves have benefited tremendously from favorable treatment from McDonald's. Such favorable treatment occurred before, during, *and* after the alleged discrimination:

- McDonald's consistently purchased ES's syndicated properties from the early 1990s through 2019.  (SMF D48, D53.)

- McDonald's paid a premium to advertise on ES's syndicated properties in order to reach AACM viewers aged 18 to 49.  (SMF D40.)

- From at least 2013 to 2016, McDonald's was one of ES's *top ten* advertisers in terms of advertising revenue.  (SMF D52, D56.)

- In 2016, McDonald's increased its spending on ES's syndication properties while "all other partners took a decrease on dollars."  (SMF D62; Ex. O(46), AOE1526.)

- In 2017, McDonald's increased the price it paid (as expressed in CPM) to ES for advertising on its syndicated properties. (SMF D64.)

- In 2018, ES was the only media partner with whom McDonald's increased its AACM spend. (SMF D67; Ex. O(48), AOE1538.)

- In 2021, McDonald's purchased advertising on both ESN's and Weather Group's digital properties. (SMF D152.)

- McDonald's agencies consistently met with Plaintiffs to discuss advertising deals. (SMF D49; Exs. O(32-41); AOE1464-1498 (showing multiple meetings from 2016 through April 2021).)

This favorable treatment extends to the very "core" of Plaintiffs' theory of the case. (Dkt. 115 at 1.)  While Plaintiffs speculate that they were unfairly "relegated" to one of McDonald's advertising agencies, those agencies confirm that the *opposite* is

true.  Plaintiffs were at times directed to submit pitches to Burrell as an "*additional opportunity*" to compete for McDonald's advertising dollars even after failing to "meet McDonald's [standard general-consumer-market] requirements."  (Ex. U at ¶ 8, AOE3677 (emphasis added); *see also* Ex. T at ¶ 6, AOE3667.)  And OMD, the very agency that Plaintiffs claim was reserved for "white-owned" companies, has purchased advertising from *multiple* Black-owned media companies.  (SMF D45-D46, D131.)

On this record, any suggestion that McDonald's refused to work with Plaintiffs "out of [a] hatred for African-Americans" is beyond implausible. *Maduk*, 2023 WL 3272406, at *8.  It has been proven false.

## 2. Plaintiffs' Position

The Ninth Circuit has "repeatedly held that it should not take much for a plaintiff in a discrimination case to overcome a summary judgment motion." *France v. Johnson*, 795 F.3d 1170, 1175 (9th Cir. 2015) (internal citations and quotation marks omitted).  "[W]e require very little evidence to survive summary judgment in a discrimination case, because the ultimate question is one that can only be resolved through a 'searching inquiry'—one that is most appropriately conducted by the factfinder, upon a full record." *Lam v. University of Hawai'i*, 40 F.3d 1551, 1564 (9th Cir. 1994) (internal citations and quotation marks omitted).

Plaintiffs can prove their case through direct or circumstantial evidence.  *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-100 (2003) ("We have often acknowledged the utility of circumstantial evidence in discrimination cases.").  Plaintiffs are not required to prove their case through statistical analysis or overt, racially derogatory statements. *See Pacific Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1158 (9th Cir. 2013) (a plaintiff is not required to fit the evidence into any particular analytical framework).

### (a) Hatred Is Not An Element of Plaintiffs' Claims

McDonald's argues that Plaintiffs need to show that McDonald's harbored "hatred for African-Americans in general." (Br. at 51.) That is not the law. *Goodman*

1    *v. Lukens Steel Co.*, 482 U.S. 656, 668-69 (1987) (holding the defendant violated

2    section 1981 even though "there was no suggestion that the [defendant] held any racial

3    animus against or denigrated blacks generally"); *Ferrill v. Parker Group, Inc.*, 168

4    F.3d 468, 472-73 (11th Cir. 1999) ("The crucial issue is whether a defendant who acts

5    with no racial animus but makes job assignments on the basis of race can be held liable

6    for intentional discrimination under § 1981. Clearly, the answer is yes.").

7        The only case McDonald's cites is *Maduk v. CVS Pharmacy, Inc.*, 2023 WL

8    3272406, at *4 (C.D. Cal. Feb. 9, 2023) (dismissing complaint of a *pro se* plaintiff

9    who did not identify his causes of action or even set forth which defendants he wanted

10   to sue). *Maduk* did not, and could not, add an element that the Supreme Court has

11   rejected. *Goodman*, 482 U.S. at 668-69; *Ferrill*, 168 F.3d at 472-73.

12       This dispute matters for this case. McDonald's claims that it provides favorable

13   treatment to various African American businesses and employees. (Br. at 7, n.1

14   (touting its purported "industry-leading" diversity effort).) But McDonald's treatment

15   of other African American-owned businesses or individuals in other contexts is not

16   relevant. *Goodman*, 482 U.S. at 668-69; *Ferrill*, 168 F.3d at 472-73. Evidence of

17   racial hatred is relevant on the issue of punitive damages but is not required to establish

18   liability. *Ferrill*, 168 F.3d at 476-77.

19              **(b)    McDonald's Relegated Entertainment Studios to**

20                      **Burrell**

21       While Plaintiffs submit that partial summary judgment should be granted in

22   Plaintiffs' favor on the relegation theory, at a minimum, a trial is required.

23              ***(i)    McDonald's "Additional Opportunity" Argument***

24       McDonald's relies on two declarations from representatives of its former ad

25   agency to argue that Burrell was merely an "additional opportunity" to earn

26   McDonald's ad dollars. (Br. at 50-51 (citing AOE Ex. U at ¶ 8, AOE3605; Ex. T at

27   ¶ 6, AOE3595).) McDonald's is scrambling to avoid binding admissions made by its

28   corporate representative. (SMF P12; Ex. D (Anja Carroll Depo.) at 164:6-14

1  ("McDonald's deci[ded] to have Burrell be the agency that buys Entertainment Studios

2  and CF Entertainment's content")); *U.S. v. HVI Cat Canyon, Inc.*, 2016 WL 11683593,

3  at *5 (C.D. Cal. Oct. 28, 2016) ("The purpose of a Rule 30(b)(6) deposition is to

4  provide sworn corporate admissions that are binding on the corporation.").

5      Even if the Court considers the Innes and Geraci declarations,[29] they do not

6  support summary judgment *for McDonald's*.  Entertainment Studios' President of Ad

7  Sales, Darren Galatt, has direct, personal knowledge of how McDonald's dictated

8  which agency would buy from Entertainment Studios.  (AOE Ex. F (Darren Galatt

9  Depo.) at 19:21-20:17.)   He testified that Entertainment Studios tried to pitch to

10  McDonald's general market agency, but McDonald's funneled Entertainment Studios

11  to Burrell.  (SMF P12; Ex. F (Darren Galatt Depo.) at 100:7-15 (Entertainment Studios

12  "was relegated to a very small subset of the investment at Burrell"), *id* 179:5-21

13  (despite annual pleas, McDonald's forced Entertainment Studios "into a relationship

14  with the black agency, even though we were not exclusively black targeted"), 180:19-

15  20 (same).)  Moreover, the Innes and Geraci declarations are not credible because they

16  contradict their own statements in contemporaneous emails.  (Ex. BBB(1), AOE4884

17  (email confirming Burrell was Entertainment Studios' agency of record); Ex. T(1),

18  AOE3670 (email stating "McDonald's will consider [advertising], but not through

19  OMD.").)

20          ***(ii)    McDonald's Spending with Others Is Irrelevant***

21      McDonald's claims it did not relegate Entertainment Studios to Burrell because

22  it purchased ad time on other Black-owned content through OMD.  (Br. at 51.)  The

23  only evidence that McDonald's submits is a report showing that it spent approximately

24  $415,000 between 2019 and 2020 to advertise on *The Steve Harvey Show*, owned by

25

26

27

---

28  [29] McDonald's did not depose either representative to preserve their testimony for trial. Since they are outside the subpoena jurisdiction, it is unlikely they will testify at trial.

1   Related Media.[30]  (*Id*.)  McDonald's presents *no admissible evidence* that Related

2   Media is Black-owned.  (*See* SMF D45-46.)  There is no testimony from anyone with

3   personal knowledge of the ownership of Related Media.   The only evidence

4   McDonald's submits is a spreadsheet it produced in this litigation.  (AOE Ex. P(10),

5   AOE2630.)  There is no testimony from the person(s) who prepared or received this

6   document in the ordinary course of business and no testimony from anyone who can

7   attest to the accuracy of the information in the report.   The report is inadmissible

8   hearsay.[31]  Fed. R. Evid. 702, 802; *Patino Garcia v. Barr*, 830 F. App'x 989 (9th Cir.

9   2020) (unpublished) ("[A]t summary judgment, the court may not rely on evidence

10   that is based on inadmissible hearsay and which does not set forth facts that would be

11   admissible in evidence.") (cleaned up).

12         Even if the Court considers the report, the information contained therein is

13   untrustworthy.  The report mislabels several media companies as Black-owned under

14   McDonald's definition (51% owned, operated and controlled by African Americans).

15   (AOE Ex. ZZ(1) (Mason Depo. Ex. 2) at AOE4247.)  For example, Aspire is a media

16   company listed as Black-owned during 2019 and 2020.  (Ex. P(10) at AOE2630.)  At

17   deposition, McDonald's witnesses could not identify the African American owner(s)

18   of Aspire who collectively own at least 51% of the company.  (AOE Ex. B (Hamilton

19   Depo.) at 24:24-25:7 (conceding she has no knowledge regarding ownership of

20   Aspire); AOE Ex. C (Feldman Depo.) at 118:23-119:9 (conceding she does not know

21   Aspire's ownership).)  Ervin "Magic" Johnson Jr. is an African American celebrity

22   and entrepreneur who one of the several owners of Aspire.  (Ex. B (Hamilton Tr.) at

23

24   _____

25   [30] McDonald's spent over $800 million through OMD during this period. (AOE Ex. ZZ(1) (Mason Depo. Ex. 2), AOE4245-46.) $415,000 represents approximately

26   0.005% of OMD's budget.  Save for this *de minimis* spending, all of McDonald's spending through OMD was on white-owned media.  (*Id*.)

27   [31] McDonald's custodian declaration (AOE Ex. P (Strom Decl.) ¶¶ 2, 13, AOE2274-

28   76) does not lay any foundation for the document and fails to address the elements of the business record exception under Federal Rule of Evidence 803(6).

24:24-25:2.)  McDonald's top media executives did not know that he sold his entire interest in 2019.  (AOE Ex. B (Hamilton Depo.) at 24:24-25:7, 54:4-18; AOE Ex. C (Feldman Depo. at 118:23-119:12).)

Similarly, Revolt is listed as Black-owned.  (Ex. P(10) at AOE2630.)  Sean "P. Diddy" Combs is one of the owners of Revolt, but McDonald's top media executives conceded they did not know any details regarding Mr. Combs' ownership.  (Ex. B (Hamilton Tr.) at 15:21-16:3; Ex. A (Mason Tr.) at 204:25-206:12.)  The same report lists Urban One.  (Ex. P(10) at AOE2630.)  Urban One is publicly traded with shareholders Bank of America, Vanguard and others.  (Ex. B (Hamilton Tr.) at 22:16-25, 23:20-24:12.)  It is not a Black-owned company under McDonald's own definition. (AOE Ex. L (Calabrese Depo.) at 37:14-38:7 (confirming statement from internal OMD email that publicly traded companies do not qualify as minority-owned).)

As a last ditch argument, McDonald's claims that it stopped relegating Entertainment Studios *after this lawsuit was filed*.  (SMF D131 (McDonald's spent on some of Plaintiffs' properties (theGrio and Local Now) through OMD in 2021).)  This spending was designed to improve McDonald's litigation position after being put on notice of the claims.  Indeed, McDonald's agency representative admitted in internal e-mail correspondence that McDonald's only spent this amount "to calm Byron Allen down." (SMF D131; AOE Ex. CC, AOE3834.)  The fact that McDonald's recognized it had a problem and tried to cover it up does not negate the evidence showing McDonald's relegation of Plaintiffs up to the filing of this lawsuit.  (Br. at § V(A).)

### (c)  McDonald's "Favorable Treatment" Argument

There is no favorable treatment doctrine.  Rather, the Ninth Circuit has, in certain cases, applied what is known as the "same actor inference" doctrine.  This doctrine creates a presumption against discrimination in employment cases if "the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive." *Bradley v. Harcourt, Brace and Co.*, 104 F.3d 267,

270-71 (9th Cir. 1996).  The doctrine applies if the same person hired and fired the plaintiff within a short period of time.  *Kocienski v. NRT Technologies, Inc.*, 787 Fed. Appx. 411, 412 (9th Cir. Dec. 11, 2019) (unpublished) ("Because there is a disputed question of fact as to which person hired [the plaintiff], the 'same actor' inference does not apply at the summary judgment stage."); *Coburn v. PN II, Inc.*, 372 Fed. Appx. 796, 799 (9th Cir. Mar. 31, 2010) (unpublished) (the district court erred because different people were involved at the hiring and firing and the plaintiff was fired almost two years after she was hired); *Ismay v. Bank of America NA*, 2017 WL 10636685, at *7 (D. Ariz. Mar. 15, 2017) (the doctrine does not apply because the hiring occurred more than three years prior to the firing).

This is confirmed by McDonald's cases.  In *Coghlan*, the same person hired and fired the plaintiff in less than one year.  *Coghlan*, 413 F.3d at 1096-98.  Similarly, in *Wiest*, an alleged whistleblower received "praise and commendations both during and after [his] protected activity, which suggested that he was fired for other reasons."  *Id.* at 332.

McDonald's presents no evidence to support application of the "same actor inference" doctrine.  McDonald's has not even identified *the person or group of people* who purportedly treated Plaintiffs favorably in the past.  McDonald's submits no evidence that the same person(s) in charge of authorizing McDonald's to contract with Plaintiffs during this lengthy period of time is the same person(s) who made the decision to relegate Entertainment Studios to Burrell and dramatically reduced spending until ultimately taking Entertainment Studios to $0 in 2019 and 2020.  (AOE Ex. P(13), AOE2640 ($0 spent with Entertainment Studios in 2019 and 2020).)

In fact, the evidence shows that there were different people involved.  When McDonald's had an African American CEO (Don Thompson), McDonald's was one of Entertainment Studios' top advertisers, but when he was replaced by Steve Easterbrook and Chris Kempczinski, McDonald's dramatically reduced, and ultimately stopped, spending.  (SMF D52; Ex. I (Allen Tr.) at 203:12-204:8 (testifying

- 56 -

that when Don Thompson, an African American, left as McDonald's CEO, spending on Plaintiffs' properties declined), 303:4-12 (testifying that when Chris Kempczinski came in, "[t]hey took us to zero."); AOE Ex. P(13), AOE2640.)

The doctrine clearly doesn't apply as set forth above, but Plaintiffs must address factual claims made by McDonald's that are either flat wrong or taken out of context. McDonald's makes a big deal about its increase in spending with Entertainment Studios in 2018 as compared to 2017, but McDonald's ignores that it dramatically reduced spending in prior years such that the increase in 2018 was *de minimis*.  (AOE Ex. P(13), AOE2640 (reflecting that spend with Entertainment Studios went down 71% from \$674,923 to \$195,500 from 2016 to 2017).)  McDonald's also claims that it met with Plaintiffs sporadically, but that is disputed.  (SMF D49, P125; Ex. F (Galatt Tr.) at 305:6-308:3 (McDonald's senior leadership refused to meet); 314:12-20 (Entertainment Studios was relegated to Burrell).)

### B.     <u>Plaintiffs' Claims Fail for Lack of Suitable Comparators.</u>

#### 1.     <u>McDonald's Position</u>

Plaintiffs also fail to meet their burden of showing intentional discrimination because they have not identified "similarly-situated" comparators outside of their protected class.[32]  Plaintiffs cannot satisfy this requirement for three separate reasons.

*First*, Plaintiffs offer no evidence that the supposed "white-owned" comparator are actually "white owned." (TAC ¶ 90.)  Nor could they: the so-called "white owned" comparators—such as CNN, Comedy Central, Animal Planet, and others—appear to be owned by publicly-traded companies with millions of individual shareholders. Regardless, Plaintiffs' abject failure to offer "record evidence" regarding "the

---

[32] To make a *prima facie* showing of discrimination under the *McDonnell Douglas* framework, Plaintiffs must establish: (1) membership in a protected class; (2) an attempt to contract for certain services; (3) denial of the right to contract for such services because of the plaintiff's race; and (4) such services remained available to "similarly-situated" individuals who were not members of the plaintiff's protected class. *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138, 1145 (9th Cir. 2006).

1  corporate identity" of their alleged comparators is fatal. *Kinlow v. City of Milwaukee*,

2  2 F. App'x 581, 586 n.2 (7th Cir. 2001).

3      *Second*, Plaintiffs have failed to provide even the raw data necessary to conduct

4  a comparator analysis—and it is their burden to do so. *See, e.g.*, *Gibbs v. Deere & Co.*,

5  2022 WL 731503, at *7 (C.D. Ill. Mar. 10, 2022) ("If sufficient information is not

6  provided, the court cannot find employees to be comparable.").  Retreating from their

7  previous argument that Plaintiffs' networks "have *higher ratings* than . . . white-owned

8  [comparators]" (Dkt. 56 at 13), Plaintiffs do not even offer *any* analysis of ratings

9  between their networks and the so-called comparators.   Nor did Plaintiffs analyze any

10 other quantitative metrics (*e.g.*, network size, revenue, employees) that could support

11 a meaningful comparator analysis.  Put simply, because "the record is devoid of any

12 information as to the specifics" of the comparator showing, Plaintiffs' "claim of race

13 discrimination must fail." *Anders v. Waste Mgmt. of Wisconsin*, 463 F.3d 670, 677

14 (7th Cir. 2006); *see also Dawson v. Washington Gas Light Co.*, 2021 WL 2935326, at

15 *6 (4th Cir. July 13, 2021) ("Missing here is evidence—evidence [*that plaintiff*] has

16 the burden of producing—that the white employee . . . should have been [treated] in

17 the same manner as [plaintiff].").

18     *Third*, the evidence shows the obvious and enormous differences between

19 Plaintiffs' networks and their purported comparators.  For instance, Comedy Central's

20 ratings in the 18-49 demographic are 47,359% larger than Plaintiffs' Comedy.TV, and

21 HLN's ratings are 41,059% higher than JusticeCentral.TV's.  (Ex. Q(1) at ¶¶ 31-32.)

22 Indeed, by any metric, Plaintiffs networks are smaller, less established, and less

23 successful than their proposed comparators – often times by orders of magnitude.[33]  As

24

25 ─────────────────

[33] Plaintiffs' networks significantly lag behind their alleged comparators as to:

26  • Their total viewership, as measured by Nielsen ratings. (SMF D36; D83-D85,
27    D91-D94, D96-D97, D99-D100, D102, D104, D105, D107, D109-D110; Ex.
     O(67), AOE1779-82 - November 22, 2022 Responses to Request for
28    Admission Nos. 19-25; Ex. Q(1), Amended App'x 3, AOE3473.)

                                                              (Continued...)

1   Plaintiffs' own expert summarized, Plaintiffs' networks are in their "early stage [of]
2   development," *unlike* the more established "century old media companies against
3   which [they] compete[.]." (Ex. FFF, Exhibit 2, at AOE5382.)

4         Disparities far less dramatic than these routinely doom § 1981 claims.  In fact,
5   *every* single reported § 1981 case involving minority-owned media companies that has
6   reached summary judgment has been dismissed based on these or similar grounds. *See,*
7   *e.g.*, *Circle City Broad. I, LLC v. DISH Network, LLC*, 2023 WL 2742323, at *8 (S.D.
8   Ind. Mar. 31, 2023) (granting summary judgment because the Black-owned media
9   company was not comparable "in all material respects" to its proposed comparator,
10  given the "difference in size" between the companies); *Black Educ. Network, Inc. v.*
11  *AT&T Broadband, LLC*, 154 F. App'x 33, 41 (10th Cir. 2005) (affirming summary
12  judgment where, "unlike the entities that were ultimately awarded" the television
13  contracts, the Black-owned "broadcast company" did not have a "track record of
14  purchasing or operating any cable television systems"); *BNT Ad Agency v. City of*
15  *Greensboro*, 837 F. App'x 962, 973 (4th Cir. 2020) (affirming summary judgment
16  where, unlike the other companies that received loans, the Black-owned television
17  network sought a loan "outside of an existing economic development program" and
18  presented other unique risks).

19        **2.   Plaintiffs' Position**

20        McDonald's claims Plaintiffs have not identified "similarly situated"
21  comparators.  (Br. at 57-59.)  This argument does not apply to Entertainment Studios'
22  relegation theory.  It only applies to the passing over theory.

23        The "similarly situated" doctrine "does not require that the [comparators] be
24  identically situated." *Bowden v. Potter*, 308 F. Supp. 2d 1108, 1117 (N.D. Cal. 2004)
25  (denying summary judgment).  "Whether a comparator is similarly situated is 'usually

26

27  • Their viewership in McDonald's target A18-49 demographic, as measured by
28    Nielsen ratings. (SMF D112-D118; Ex. Q(1), Amended App'x 3, AOE3473;
       Ex. Q(2), App'x 3, AOE3496.)

1  a question for the fact-finder,' and summary judgment is appropriate only when 'no
2  reasonable fact-finder could find that plaintiffs have met their burden on the issue.'"
3  *Coleman v. Donahoe*, 667 F.3d 835, 846–47 (7th Cir. 2012); *see also Beck v. United*
4  *Food & Commercial Workers Union, Local 99*, 506 F.3d 874, 885 n. 5 (9th Cir. 2007)
5  (the similarly situated inquiry is "ordinarily a question of fact").

6         "The similarly situated inquiry is a flexible one that considers 'all relevant
7  factors, the number of which depends on the context of the case.'"  *Humphries v.*
8  *CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), aff'd, 553 U.S. 442 (2008).  "The
9  inquiry simply asks whether there are sufficient commonalities on the key variables
10 between the plaintiff and the would-be comparator to allow the type of comparison
11 that, taken together with the other prima facie evidence, would allow a jury to reach
12 an inference of discrimination or retaliation—recall that the plaintiff need not prove
13 anything at this stage." *Id.* at 405-06 (7th Cir. 2007).

14              **(a)     Plaintiffs Have Identified Sufficient Comparators**

15        Plaintiffs' expert, Tom Nunan, sets forth the networks that are similarly situated
16 with Plaintiffs' networks and programming.  Mr. Nunan is a professor in film,
17 television and digital media at UCLA.  (AOE Ex. FFF (Nunan Decl.) ¶ 2 & Ex. 1
18 (Nunan Resume), AOE5368-71.)  He is also a former network and studio president
19 with decades of relevant industry experience.  (*Id.*)  Mr. Nunan explains that brands
20 such as McDonald's view networks and programming as similar based on the media
21 environment and content of the network.  (*Id.* ¶¶ 12-14 (AOE5362-63) & Ex. 2,
22 AOE5381.)  By "media environment," Mr. Nunan means the extent to which the
23 content is safe for younger audiences or whether it contains more edgy or adult-themed
24 content.  (*Id.*)  By content, Mr. Nunan explains that brands group television networks
25 and programming into certain categories, such as news, lifestyle, entertainment and
26 the like.

27        Mr. Nunan opines that The Weather Channel is similarly situated to MSNBC,
28 HLN, and CNN.  (SMF D83; AOE Ex. FFF (Nunan Decl.) ¶ 14 (AOE5363) & Ex. 2,

1  AOE5383.)  These networks feature live news targeting similar audiences (information

2  junkies) and feature "breakfast hour" shows that are likely to be shown in airports,

3  waiting lounges, and other public areas people frequent.  (*Id*.)  He also opines that

4  Entertainment Studios' courtroom drama network, JusticeCentral.TV, is similarly

5  situated to true crime programming on Oxygen and HLN.  (*Id*. at AOE5384)  He also

6  opines that Entertainment Studios' syndicated programming is similarly situated with

7  WE.tv.  (AOE Ex. FFF (Nunan Decl.) ¶ 22 (AOE5364) & Ex. 2, AOE5385.)

8  McDonald's spent considerably to advertise on these similarly situated, white-

9  owned networks.  (Ex. EEE (Restivo Decl.) at Ex. 3, AOE5308-12 (HLN, Oxygen,

10  we.TV, CNN, and MSNBC); Ex. HH, AOE3960 (we.TV and Oxygen);  Ex. SS,

11  AOE4126 (Oxygen); Ex. TT, AOE4134 (we.TV); Ex. VV, AOE4171 (Oxygen); Ex.

12  KK, AOE4049 (CNN, MSNBC, and HLN); Ex. NN, AOE4077 (same), Ex. OO,

13  AOE4079 (same); Ex. QQ, AOE4083; Ex. FFF (Nunan Decl.) at ¶¶20-23 (AOE5363-

14  64) & Ex. 2, AOE5390-94.)

15  McDonald's expert agrees that media environment and content are material.

16  (AOE Ex. W (Blasius Depo.) at 77:4-8.)  Mr. Blasius claims that ratings are also

17  material.  (*Id*. at 167:14-16.)  But he concedes there is no "set formula" or written rules

18  to determine if networks are similarly situated.  (SMF D93; AOE Ex. W (Blasius

19  Depo.) at 70:6-74:20; *see also id.* 75:21-76:7 (admitting that he is relying on his

20  experience only.).)  Mr. Nunan disagrees as ratings go to the issue of *allocation*.[34]  (Ex.

21  FFF (Nunan Decl.) ¶¶ 16-18 (AOE5363) & Ex. 2, AOE5387-88.)

22  This dispute cannot be resolved on summary judgment.  "'As a general rule,

23  summary judgment is inappropriate where an expert's testimony supports the non-

24  moving party's case.'"  *DeLaw v. Adamson*, 293 Fed. App'x 504, 506 (9th Cir. 2008)

25  (quoting *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996)).  "The existence of

26

27

_____

28  [34] McDonald's cherry-picks specific comparisons (such as Comedy Central to Comedy.TV), but ignores more direct comparisons set forth in Mr. Nunan's analysis.

1  conflicting expert assessments suggests that neither party is entitled to summary

2  judgment." *Id*.  Arguments regarding which expert a jury should side with "go to the

3  weight the fact-finder should give to the evidence, an inquiry that is not proper at the

4  summary judgment stage." *Sooner v. Schwabe North America, Inc.*, 911 F.3d 989,

5  992-93 (9th Cir. 2018). *See also Bieghler v. Kleppe*, 633 F.2d 531, 534 (9th Cir. 1980).

6  **(b)   McDonald's Other Arguments Are Meritless**

7  McDonald's claims that every case involving a minority-owned media company

8  suing for racial discrimination has been dismissed on summary judgment.  (Br. at 59.)

9  These cases did not involve any of the parties here, and McDonald's makes no attempt

10  to show these out-of-circuit cases are comparable to this case.  Indeed, none of the

11  cases involved a racially segregated contracting process, as McDonald's had here.

12  McDonald's claims Plaintiffs have not offered evidence that the publicly owned

13  comparator networks are "white-owned." (Br. at 59.)  By McDonald's own admission,

14  publicly owned companies are white owned.  (Ex. III(5), AOE5483 (Calabrese Depo.

15  Ex. 38) (internal email between Burrell and OMD confirming that "[c]ompanies that

16  are publicly traded" do not qualify as minority-owned businesses); Ex. L (Geoff

17  Calabrese Depo.) at 37:14-38:7 (publicly-traded companies do not qualify as minority-

18  owned).)  Moreover, McDonald's does not list these publicly traded media companies

19  on its internal documents as being minority-owned.  (Ex. ZZ(1), AOE4248-49 (CNN,

20  MSNBC, HLN, we.TV are not listed as minority owned ).)

21  **C.   Plaintiffs' Claims Fail Because McDonald's Had Multiple**

22  **Legitimate Business Reasons for its Decisions.**

23  **1.   McDonald's Position**

24  Even if Plaintiffs could establish a *prima facie* case of discrimination, that

25  presumption of discrimination is extinguished if McDonald's presents evidence of "a

26  legitimate non-discriminatory reason" for the conduct alleged.  *Lindsey*, 447 F.3d at

27  1147.

28

1  Here, it is undisputed that Plaintiffs' networks failed to meet McDonald's

2  advertising needs for a number of reasons.  The ESN Lifestyle Networks were not

3  selected because they (1) were not Nielsen rated until 2017[35]; (2) even once rated, had

4  insufficient viewership, in both relative and absolute terms[36]; and (3) did not index

5  well with McDonald's target demographic, in both relative and absolute terms.[37]  TWC

6  was not chosen because (1) McDonald's has a "no news" restriction for its product

7  advertisement placements[38]; (2) it has low viewership except during extreme weather

8  events,[39] which run afoul of McDonald's policy against advertising next to tragic news

9  (SMF D82); (3) it did not index well with McDonald's target demographic, in both

10 relative and absolute terms.[40]  These are legitimate non-discriminatory reasons for

11

---

12 [35] Plaintiffs admit that without Nielsen ratings, an advertiser like McDonald's
13 seeking to guarantee its media buys would not consider such unrated networks. (SMF
   34-D35; D41; Ex. F - Galatt Tr. 88:11-23; 74:25-75:12; 217:9-17; Ex. G - Bekkedahl
14 Tr. 51:10-22; Ex. I - Allen Tr. 128:14-23; 131:4-20; 131:24-132:4; Ex. H - Kelly Tr.
   18:17-19; 19:21-20:6; 42:19-43:5; 90:12-16.)

15 [36] The ESN networks' ratings lagged significantly behind competitors, including
16 Plaintiffs' comparators. (*See supra* n.34.)  Moreover, McDonald's GCM advertising
   purchases targeted programs with viewership exceeding 60 million households—
17 significantly higher than that of ESN's networks. (SMF D87-D88; Ex. O(63),
   AOE1734-35; Ex. O(2), AOE0618. *See also* SMF D66; Ex. O(50), AOE1553.)
18
   [37] As is typical in the industry, McDonald's requires all media purchases to offer
19 ratings guarantees within its target demographic. (SMF D32-D33, D37; Ex. R(1), at ¶
   20, AOE3512; Ex. L - OMD 30(b)(6) Tr. 97:18-24; Ex. D - Carroll Tr. 129:24-
20 130:12; 132:20-22); *see also* Ex. I - Allen Tr. 130:22-131:3; 179:14-22.)  The ESN
21 Lifestyle Networks could not meet this requirement (SMF D90; D38, D86, D112;
   Ex. O(64), AOE1737) and had lower ratings than competitors in the target
22 demographic (*supra* n.34.).

23 [38] TWC ran afoul of this restriction.  (SMF D42, D82; Ex. P(9) - AOE2626-27; Ex. L
   - OMD 30(b)(6) Tr. at 47:6-11; 98:4-20; Ex. A - Mason Tr. 141:15-16; Ex. O(23),
24 AOE1274; Ex. R(1) at ¶¶ 47-48, AOE3526; Ex. S(1) at ¶27, AOE3661.)

25 [39] TWC ratings are lower than competitors, including the comparators Plaintiffs
   identify.  (*See supra* n.34; SMF D83-D85.)  In addition, its volatile ratings are low
26 except during extreme weather events and have worsened every year since AMG
   acquired it. (SMF D79-D81; Ex. O(61), AOE1-1725.)

27 [40] TWC's audience skews older than McDonald's target demographic and has lower
28 ratings in that demographic than competitors. (SMF D77-D79; Ex. P(26), AOE2903,
   2906; Ex. R(1) ¶ 37, AOE3521-22; Ex. G - Bekkedahl Tr. 97:3-25; *supra* n.34.)

1  McDonald's decisions, and are fatal to Plaintiffs' claims.  *See, e.g.*, *Kaplan v.*
2  *Multimedia Ent., Inc.*, 2005 WL 2837561, at *7 (W.D.N.Y. Oct. 27, 2005), *aff'd*, 199
3  F. App'x 54 (2d Cir. 2006) (finding that defendant met its burden of showing a
4  legitimate, nondiscriminatory reason for reassigning plaintiff anchor based on
5  testimony that defendant "did not feel that plaintiff was a strong anchor, and the market
6  research confirmed his opinion"); *Rubert v. King*, 2020 WL 5751513, at *7 (S.D.N.Y.
7  Sept. 25, 2020) ("Plaintiff's affirmative acknowledgement of sufficient, non-
8  discriminatory reasons . . . is determinative.").

### 2.   Plaintiffs' Position

10  McDonald's claims there are legitimate business reasons for its refusal to
11  contract. (Br. at 62-64.)  On summary judgment, at this third prong of the *McDonnell*
12  *Douglas* test, a plaintiff must submit evidence that would create a triable issue of fact
13  that defendant's proffered reasons are false. *Lindsey,* 447 F.3d at 1148.

14  McDonald's submits no affirmative testimony from anyone with personal
15  knowledge as to what its real reasons were for not spending with Plaintiffs.  Rather,
16  McDonald's relies on several of its own, self-serving, hearsay documents to cobble
17  together *ex post facto* justifications.  The main reason offered by McDonald's is
18  essentially "low ratings."  (Br. at 63.)  McDonald's claims the Entertainment Studios
19  Lifestyle Networks were not Nielsen rated until October 2017, and thereafter generated
20  low ratings.  (*Id.*.)  But McDonald's advertised on networks that were not even rated.
21  (SMF D109; Ex. B (Hamilton Depo.) at 104:13-16 (admitting that Revolt was not
22  measured by Nielsen prior to 2022).)  McDonald's also claims that The Weather
23  Channel's ratings were too low and the network did not index well with its target
24  audience. (Br. at 63.)  But The Weather Channel generates comparable ratings to
25  similar networks that McDonald's advertises on.  (Ex. EEE(3) at AOE5329-31, 5334-
26  57 (showing that TWC generated similar ratings to HLN from 2017 through 2022,
27  including with the target 18-34 audience).)  Notably, McDonald's ignores Plaintiffs'
28  syndicated programming, which boasts higher ratings and does better with

McDonald's alleged target audience than white-owned comparators.  (SMF D61; AOE Ex. FFF (Nunan Decl.) at ¶ 22 (AOE5364) (the syndicated programming is similarly situated to WE.tv); AOE Ex. EEE (Restivo Decl.) at Exs. 2-3 (Entertainment Studios' syndicated programming has higher ratings than WE.tv), AOE5265-69 & AOE5331.)

Moreover, the claim of "insufficient ratings" was not communicated to Plaintiffs and unsupported by contemporaneous evidence.  (AOE Ex. H (Kelly Depo.) at 137:21-25 ("we just had no feedback from McDonald's at all"), Ex. BBB (7), AOE4917 (Mason Depo. Ex. 17) (Burrell telling Entertainment Studios that it is "constantly asking for feedback from McD's, radio silence").)  Indeed, no McDonald's witness testified that McDonald's has a ratings threshold or requirement.  (AOE Ex. B (Hamilton Depo.) at 104:13-16 (admitting that McDonald's advertised on Revolt without any Nielsen ratings).)

As to The Weather Channel, McDonald's also claims it did not spend due to a "no news" restriction.  But McDonald's concedes it advertised on CNN, HLN, and MSNBC, among other news networks, during the relevant period.  (SMF D42; AOE Ex. X (Hanssens Depo.) at 145:17-146:1, 220:4-6; AOE Ex. W (Blasius Depo.) at 103:10-14.)  The Weather Channel is a competitor news network that was passed over.  (SMF D85; AOE Ex. FFF (Nunan Decl.) at ¶ 20 (AOE5363) & Ex. 2, AOE5383.)  McDonald's responds by saying that its spending on CNN, MSNBC and HLN was designed to reach "opinion elites," but this too is disputed.  (AOE Ex. X (Hanssens Depo.) at 146:23-147:25 (confirming he did not "peek under the hood" and analyze whether McDonald's spend on news networks was consistent with its corporate elite campaign), 216:10-22 (admitting that he does not know how the corporate budget was spent or what the corporate campaigns were during the relevant period).)  "Opinion elites" watch The Weather Channel just as they watch CNN, MSNBC and HLN.  (AOE Ex. FFF (Nunan Decl.) at Ex. 3, AOE5401-02.)

McDonald's claims Plaintiffs' properties do not index well with its target audience of adults 18 to 34.  (Br. at 63.)  As Mr. Nunan opined, with television, that

- 65 -

JOINT MPA REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT

demographic is nearly impossible to reach and the overwhelming majority of McDonald's partners have a median age over thirty-five.  (Ex. FFF(1) (Nunan Report) at AOE5388-89.)  McDonald's spends over $100 million in cable, knowing even the younger-skewing networks have median ages above 35.  (Ex. FFF(1) (Nunan Report) at AOE5388-89; Ex. EEE (Restivo Decl.) at Exs. 2-3, AOE5265-67, 5275-78, 5314-18, 5322-25 (reflecting median ages of all networks McDonald's advertised on and affirming that Entertainment Studios' syndicated programming rated higher with Adults 18-34 than WE.tv, a white-owned network McDonald's advertises on).)  CNN, MSNBC, and HLN do not target that demographic either and have median ages comparable to The Weather Channel.  (SMF D77AOE Ex. EEE(3) (Restivo Decl. Ex. 3), AOE5322-24.)

### D.    Plaintiffs' Claims Fail for Lack of Causation.

#### 1.    McDonald's Position

A second necessary element of Plaintiffs' claims is causation: that race caused them to suffer the loss of a legally protected right. Plaintiffs must now show "specific admissible evidence" of causation. *Ua Cruadhlaoich v. Pritzker*, 2014 WL 12687445, at *4 (N.D. Cal. May 27, 2014), *aff'd sub nom. Cruadhlaoich v. Bryson*, 668 F. App'x 745 (9th Cir. 2016).  For the following reasons, Plaintiffs cannot make such a showing, under either Section 1981's "but for" causation standard, *see Comcast Corp.*, 140 S. Ct. at 1019, or the Unruh Act's "substantial reason" standard, *see Grant v. Starbucks Corp.*, 2019 WL 8112465, *6 (C.D. Cal. 2019).

*First,* Plaintiffs' causation theory does not even get off the blocks because Plaintiffs have never identified the "actor" they allege to have made the allegedly discriminatory decisions. Because a plaintiff must identify the relevant decisionmaker in order to connect the allegedly impermissible decisions with allegedly biased decisionmakers, failure to do so is a ground for summary judgment. *See, e.g., Kwesele v. King Cnty.*, 804 F. App'x 726, 728 (9th Cir. 2020) (affirming summary judgment where plaintiff "failed to demonstrate that the individual defendants participated in the

1  challenged adverse employment decisions"); *Jackson v. Geithner*, 2011 WL 2181394,

2  at \*12 (E.D. Cal. June 3, 2011) (granting summary judgment to defendant where

3  plaintiff  failed to "present evidence that any actual decision-makers" acted with

4  unlawful animus and had failed "to identify . . . the alleged decision-maker"); *Spreter*

5  *v. AmerisourceBergen Corp.*, 2014 WL 5512150, at \*8 (D.N.J. Oct. 30, 2014) (same).

6       Plaintiffs do not identify the relevant decisionmaker because they cannot even

7  prove it is McDonald's – much less an employee that "harbored discriminatory

8  animus." *Anderson v. City & Cnty. of San Francisco*, 169 F. Supp. 3d 995, 1019 (N.D.

9  Cal. 2016).  On the front end of any advertising decision, McDonald's "rel[ies] solely

10 on [its advertising] agencies" for "evaluation against the selection criteria." (SMF D23,

11 D25; Ex. B – Hamilton Tr. 29:24-30:4; Ex. D – Carroll Tr. 48:23-49:16 (explaining

12 that McDonald's role is to "work[] with the agencies to see if their buy

13 recommendations are good enough to be submitted to OPNAD").)  Plaintiffs have no

14 evidence that McDonald's third-party agencies—who repeatedly did *not* recommend

15 that McDonald's purchase advertising with Allen's companies—were motivated by

16 racial animus.  (*E.g.*, SMF D54, D68-D69, D70-D72, D130.)  And on the back end of

17 any advertising decision, OPNAD—the third-party cooperative of independent

18 McDonald's restaurant owner-operators—has the sole authority to approve all media

19 buying decisions that are paid out of the national advertising budget. (SMF D22; Ex.

20 D – Carroll Tr. 68:14-19.)  Either of these facts is sufficient to defeat any claims of

21 causation.  *See Riley v. Shinseki*, 2009 WL 2957793, at \*7 (W.D. Pa. Sept. 10, 2009),

22 *aff'd*, 2011 WL 18760 (3d Cir. Jan. 5, 2011) (granting summary judgment where

23 plaintiff had "no evidence that . . . the independent investigator who recommended

24 disciplinary action[] was motivated by retaliatory animus"); *D'Angelo v. WellStar*

25 *Med. Grp., LLC*, 2019 WL 3006625, at \*6 (N.D. Ga. May 3, 2019) ("Any causal

26 connection between Bridgeman's part in the investigation and D'Angelo's forced

27 resignation was severed by Carmichael's involvement in the investigation . . . and

28 Carmichael's ultimate role as a decisionmaker in forcing D'Angelo to resign.").

*Second*, the undisputed evidence shows that race is not even correlated with McDonald's advertising decisions, let alone their cause. *Garcia v. City of King City*, 2015 WL 1737936, at *2 (N.D. Cal. Apr. 8, 2015) ("Plaintiffs must plead some facts to show a causal link, rather than mere correlation, between Defendant's acts and the race of the individuals allegedly targeted by the scheme."). Although some of Plaintiffs' properties did not meet McDonald's advertising standards, it is undisputed that Plaintiffs' *other* properties that *did* align with McDonald's advertising strategy were selected for investment, both before and subsequent to the filing of this lawsuit.[41] Of course, those properties that were selected are also owned by Allen. This fact alone rules out Allen's race as the cause of TWC and the ESN Lifestyle Network's lack of investment. *Cf. Zhang v. Nevada*, 2008 WL 2390773, at *2 (D. Nev. June 9, 2008) (finding no likelihood of success on the merits where plaintiff "fail[ed] to demonstrate that the Board made any differentiation of race or national origin when imposing disciplinary action").

*Third*, McDonald's chose not to advertise on non-Black owned networks for the same reasons it did not advertise with Plaintiffs—namely, low ratings and poor fit with McDonald's objectives. For example, three of Plaintiffs' so-called comparators actually did not receive any spend from McDonald's during the relevant period: Motor Trend (SMF D127); Destination America (SMF D124); and Cooking Channel (SMF D123).[42] Moreover, there's no evidence that McDonald's advertised on networks with

---

[41] For example, with respect to AMG's Syndicated Programming, it is undisputed that from 1993 until 2020, McDonald's spent over $12 million on AMG's syndicated properties, which ranked fourth highest among the nation's top 100 advertisers and accounted for over 2% of McDonald's across-the-board spending on syndication. (SMF D48, D51-53; Ex. O(31), AOE1460.) McDonald's was AMG's seventh largest advertiser on Syndicated Programming in 2013, sixth largest advertiser in 2014, seventh largest advertiser in 2015, and eight largest advertiser in 2016. (SMF D52; EX. O(42), AOE1507; Ex. P(16), AOE2666-71.)

[42] It is also undisputed that McDonald's advertised with Plaintiffs' other identified comparators in some years but not others. (SMF D122, D125-D126, D128-D129).

(Continued...)

1   similarly low rankings. In 2019, for instance, Newsy, Bein Sport, and MTV Classic
2   were all ranked in the bottom ten cable networks, alongside Plaintiffs' Comedy.TV
3   and JusticeCentral.TV. (*See* Ex. O(57)). There is no evidence McDonald's advertised
4   on any of those networks. That a significant group of non-Black companies were
5   treated equally or less favorably than Plaintiffs rebuts any claim of pretext. *See*
6   *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 646 (3d Cir. 1998)
7   ("Such a pattern, in which blacks sometimes do better than whites and sometimes do
8   worse, being random with respect to race, is not evidence of racial discrimination.").

9       *Fourth,* McDonald's business decisions are not unique: it is undisputed that
10  before March 2021 (when Allen circulated a letter to major advertisers threatening to
11  sue), ***no other major brand advertised on the Lifestyle Networks***. (SMF D120-D121;
12  Ex. I - Allen Tr. 399:3-400:3; 408:21-410:9; 411:17-413:24.)  *See Coleman v. Texaco*
13  *Marine Servs., Inc.*, 108 F.3d 1384 (9th Cir. 1997) (finding a nondiscriminatory reason
14  where defendant presented evidence that it acted in accordance with "custom in the
15  maritime industry").

### 2.    <u>Plaintiffs' Position</u>

17      The "but-for test directs us to change one thing at a time and see if the outcome
18  changes.  If it does, we have found a but-for cause."  *Bostock v. Clayton County,*
19  *Georgia*, 140 S. Ct. 1731, 1739 (2020) ("but-for" causation does not mean "sole or
20  primary cause.").  The test "can be a sweeping standard" because, "[o]ften, events have
21  *multiple* but-for causes." *Id.* (emphasis added).

22      "The 'but-for causation inquiry' is 'purely a question of fact.'" *Anthoine v. N.*
23  *Cent. Counties Consortium*, 605 F.3d 740, 752 (9th Cir. 2010) (quoting *Robinson v.*
24  *York*, 566 F.3d 817, 825 (9th Cir. 2009)).  Where there are alternative explanations as
25  to the cause of a defendant's action, summary judgment on but-for causation is

26

---

27  Plaintiffs readily admit that this is not unusual in the advertising industry, and is
28  more plausibly explained by the result of routine negotiations and shifting consumer
    trends rather than race discrimination.  (SMF D31; Ex. I - Allen Tr. 169:16-170:10.)

1  improper.  *Vickers v. U.S.*, 228 F.3d 944, 955-56 (9th Cir. 2000); *see also Ballentine*
2  *v. Tucker*, 28 F.4th 54, 63 (9th Cir. 2022).

3      Causation under the Unruh Act is even less stringent.  The plaintiff can prevail
4  even if other factors provided the "sole basis" for the defendant's conduct so long as a
5  protected characteristic "constituted part of a larger mix of motivations."  *Harris v.*
6  *City of Santa Monica*, 56 Cal. 4th 203, 229 (2013).

7      As set forth in Section V(A) *supra*, race was the but-for cause for Plaintiffs
8  being relegated to Burrell.  McDonald's does not raise any argument that Plaintiffs
9  failed to establish causation on the relegation issue.  With respect to McDonald's
10  passing over Plaintiffs' properties, causation is a factual issue that must be tried.  *See*
11  *Ballentine*, 28 F.4th at 63; *Harris*, 56 Cal. 4th at 229.

12      McDonald's argues that Plaintiffs need to identify the "actor" who carried out
13  the discriminatory actions.   (Br. at 66-67.)   Like with its "hatred" argument,
14  McDonald's is asking this Court to add an element for section 1981 and Unruh Act
15  plaintiffs.  McDonald's cites no case holding that a plaintiff must identify the specific
16  persons within a corporate entity who authorized the discrimination.   Instead,
17  McDonald's cites cases dismissing claims against *individual defendants*.  (Br. at 66-
18  67 (citing *Kwesele v. King County*, 804 Fed. App'x at 727.)  In any event, Plaintiffs
19  identified several decision makers, such as Anja Carroll.  (SMF P12; AOE Ex. D (Anja
20  Carroll Depo.) at 164:6-14 (admitting that it was "McDonald's decision to have Burrell
21  be the agency that buys Entertainment Studios and CF Entertainment's content").)
22  McDonald's is just rehashing its meritless "favorable treatment" argument.  (*See* Br.
23  at 55-57.)

24      In perhaps its boldest red herring, McDonald's claims there are white-owned
25  networks—Newsy, Bein Sport, and MTV Classic—that have low ratings and
26  McDonald's does not advertise on them. So what?  A plaintiff does not have to show
27  that *every single* white person or white-owned company received favorable treatment
28

to prevail on a section 1981 claim.[43]  *See Snoqualmie Indian Tribe v. City of Snoqualmie*, 186 F. Supp. 3d 1155, 1162 (W.D. Wash. 2016) (emphasis added) ("Disparate treatment claims rest on the allegation that a defendant treated *two similarly situated individuals different*, treating *one less favorably than the other*") (emphasis added).

McDonald's claims other major brands did not spend on Plaintiffs' networks until March 2021. (Br. at 69.)  Wrong.  In 2019, Plaintiffs received advertising revenue of over $100 million from major brands such as Allstate, Allergan, AARP, Amgen, Anheuser Busch, AT&T, Bayer, Campbell's, Capital One, Colgate-Palmolive, Comcast, Dairy Queen, Disney, DISH, Dominos, General Motors, Glaxosmithkline, Geico, Hershey, Kraft, Novartis, Pepsico, and countless others.  (Ex. BBB (Galatt Decl.) at Ex. 8, AOE4921-25).)

### E.    **Plaintiffs' Claims are Barred By the Statute of Limitations.**

#### 1.    **McDonald's Position**

There can be no material dispute of fact that all refusals to contract that occurred prior to May 2019—two years prior to filing suit—are time-barred.  As Plaintiffs have previously acknowledged, the relevant statute of limitations is two years. (TAC ¶¶ 76-87 ("Plaintiffs allege that McDonald's refused to contract with them on several occasions *within the two years preceding the original complaint*.").)  Plaintiff specifically pleaded this case as a contract formation dispute. (*See* TAC ¶ 123 (Plaintiffs "attempted many times over the years to contract with McDonald's for advertising.")   And the law is clear that "claims related to conduct in contract formation" are covered by the pre-1991 version of Section 1981's two-year statute of limitations.  *Yi Tai Shao v. McManis Faulkner, LLP*, 2014 WL 4773981, at *3–4 (N.D. Cal. Sept. 22, 2014), *aff'd*, 670 F. App'x 575 (9th Cir. 2016).  As for Plaintiffs' Unruh

---

[43] These networks have never been part of this case.  They are not mentioned in the pleadings, the disclosures, the discovery responses, the deposition transcripts, or any of the expert reports in this case.

1   Act claim, the same two-year period provided by Cal. Civ. Proc. Code § 335.1 applies.
2   *See Gatto v. County of Sonoma*, 98 Cal.App.4th 744, 756 (Cal. Ct. App. 2002).

3       This two-year limitations period bars Plaintiffs' claims in their entirety.
4   Plaintiffs' claims accrued "upon awareness of the actual injury, [] and not when the
5   plaintiff suspects a legal wrong." *Lukovsky v. City & Cnty. of San Francisco*, 535 F.3d
6   1044, 1049 (9th Cir. 2008); *see also Delaware State College v. Ricks*, 449 U.S. 250,
7   258-59 (1980) (holding that the limitations period for a § 1981 claim begins to run
8   when plaintiff is informed of the allegedly discriminatory act).  In fact, Plaintiffs claim
9   to have been raising the same arguments underlying their complaint since 2012.  (SUF
10  D57-D59, D63, D65, Ex. HHH – DeVitre Tr. 68:16-69:9, 73:3-74:13; Ex. O(28),
11  AOE1390 (2015 email from Allen to McDonald's stating: "Please treat our African
12  American Owned Media the same as General Market white agencies and clients. The
13  discrimination and the numbers are indefensible.").)  At his deposition, Allen even
14  testified that he specifically believed McDonald's was violating the law as early as
15  2015: "I don't know why I didn't sue McDonald's in 2015. Honestly, I wish I had. I
16  should have sued them in 2015." (SMF D57-D59; Ex. I - Allen Tr. 244:2-7.)[44]

17      Plaintiffs apparently acknowledge that discriminatory acts pre-dating May 2019
18  are time-barred and may only be used as "background evidence in support of a timely
19  claim."  *Shah v. County of Los Angeles Dept. of Health Svcs.*, 2008 WL 11333940, at
20  *9 (C.D. Cal. Mar. 26, 2008); *see also National R.R. Passenger Corp. v. Morgan*, 536
21  U.S. 101, 114 (2002) (holding that discrete discriminatory acts are not actionable if
22  time barred, even when they are related to acts that are timely alleged).   They
23  nevertheless attempt to rely upon the continuing violation doctrine to argue that
24  discriminatory acts—*i.e.*, discriminatory refusals to contract—occurring after May

25

26  _____

27  [44] Allen threatened to file a race discrimination lawsuit against McDonald's again in
    2016-2017.  (SMF D65; Ex. O(49), AOE1548 (Byron Allen again "brought up the
28  possibility of bringing a lawsuit against McDonald's"); Ex. I - Allen Tr. 193:12-23;
    249:17-24; 254:18-22.)

JOINT MPA REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT

2019 are timely. The continuing violation doctrine does not apply, however, where a defendant's conduct "has acquired a degree of permanence such that there is no reasonable justification for an employee to delay filing suit." *Polakoff v. Am. Airlines, Inc.*, 2002 WL 1579247, at *3 (N.D. Cal. July 11, 2002) (finding no continuing violation where defendant allegedly refused to hire plaintiff twice in two and a half years); *Kotev v. First Colony Life Ins. Co.*, 927 F. Supp. 1316, 1320 (C.D. Cal. 1996) ("[A] discriminatory termination or refusal to hire is not a continuing violation"). Here, Plaintiffs believed they had been discriminated against for nearly a decade before they filed this lawsuit—and they had "no reason not to promptly file suit at that time." *Rai v. IBM Credit Corp.*, 2002 WL 1808741, at *3 (N.D. Cal. Aug. 1, 2002) ("The continuing violation doctrine has never been applied to a refusal-to-hire case simply because once a plaintiff learns the reason he was not hired there is no reason for him not to promptly file suit.").

### 2. <u>Plaintiffs' Position</u>

#### (a) **Plaintiffs' Relegation Claim Has a Four Year SOL**

"In 1990, Congress passed legislation (codified at 28 U.S.C.) providing for a statute of limitations of four years for 'civil action[s] arising under an Act of Congress [after December 1, 1990]….'" *Yi Tai Shao*, 2014 WL 4773981, at *3. The Civil Rights Act of 1991 "enlarged the category of conduct that is subject to section 1981 liability[.]" *Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369, 383 (2004). Thus, where a cause of action is "only made possible by the 1991 amendments … it would fall within the ambit of § 1658." *Etmatboly v. Arizona State University*, 297 Fed. App'x 654, 655 (9th Cir. 2008) (citing *Jones*, 541 U.S. at 374).

Prior to the Civil Rights Act of 1991, section 1981 "cover[ed] only conduct at the initial formation of the contract and conduct which impairs the right to enforce contract obligations through legal process." *Patterson v. McLean Credit Union*, 491 U.S. 164, 179 (1989), *superseded by statute*. The Civil Rights Act of 1991 expanded section 1981 to include additional claims, such as retaliation, *CBOCS West, Inc. v.*

1   *Humphries*, 553 U.S. 442, 451-52 (2008), discrimination in the contracting process,

2   *Comcast*, 140 S. Ct. at 1020 (Ginsburg, J., concurring) (citation omitted), and others.

3         Plaintiffs' relegation claim is a discriminatory contracting process claim which

4   is governed by the four-year statute of limitations in 28 U.S.C. § 1658.

5                   **(b)**     **Plaintiffs' Unruh Act Claim Has a Three Year SOL**

6         Courts are divided on whether to apply "the two-year limitations period for

7   personal injuries (Code Civ. Proc., Section 335.1) or the three-year limitations period

8   for a liability created by statute (*id.*, Section 338, subd. (a))." *Semler v. GE Cap. Corp.*,

9   196 Cal. App. 4th 1380, 187 (2011).  Because California Civil Code § 51.5 creates

10   liability by statute for refusing "to buy from, contract with, sell to or trade with"

11   persons on the basis of protected characteristics, the three-year statute of limitations

12   under C.C.P. § 338(a) applies.**[45]**

13                   **(c)**     **Plaintiffs' Claims Are Not Time Barred**

14         McDonald's entire timeliness argument is predicated on a two-year statute of

15   limitations for Plaintiffs' passing over theory under section 1981.  (Br. at 71-73.)  This

16   claim is timely.  A discrimination claim is not barred by the statute of limitations so

17   long as the plaintiff sets forth "discriminatory acts within the limitations period." *Shah*

18   *v. County of Los Angeles Dept. of Health Svcs.*, 2008 WL 11333940, at \*9 (C.D. Cal.

19   Mar. 26, 2008) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113

20   (2002)).  McDonald's continued to engage in discriminatory refusals to contract within

21   two years before the filing of the Complaint.  (SMF D73; AOE Ex. G (Bekkedahl Tr.)

22   at 36:15-37:2 (confirming that, as of May 7, 2021, McDonald's had no recent spend

23   with TWC, including 2019, 2019, 2020, and 2021); AOE Ex. F (Galatt Tr.) at 148:17-

24   149:2 (confirming McDonald's has never spent on the Entertainment Studios Lifestyle

---

26   **[45]** McDonald's cites *Gatto v. County of Sonoma* to argue for a two-year statute of
27   limitations, but that case involved a "denial of full and equal access to public
     accommodations guaranteed under section 51" of the Unruh Act--not claims for
28   refusal to contract under Section 51.5.  98 Cal. App. 4th 744, 757, 760 (2002) (limiting
     its analysis to Section 51, not 51.5).

JOINT MPA REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT

1    Networks).)    McDonald's relegation also continued up through the filing of the

2    Complaint.  (SMF P14; AOE Ex. F (Darren Galatt Depo.) at 179:5-21, 184:13-185:6;

3    AOE Ex. BBB(1), AOE4884; AOE Ex. BBB(3), AOE4892; AOE Ex. BBB(4),

4    AOE4903; AOE Ex. BBB(5), AOE4907; AOE Ex. BBB(6), AOE4910.)

5        McDonald's asserts that Plaintiffs knew in February 2019 that McDonald's

6    would stop spending based on a letter from a representative from Burrell.  This letter

7    did not say that McDonald's was shutting the door forever, which is why Plaintiffs

8    continued to pitch for ad revenue in 2019, 2020, 2021 and 2022.  (SMF D73; *see, e.g.,*

9    AOE Ex. H (Kelly Tr.) at 181:11-17 (Entertainment Studios continued to seek ad

10   revenue from McDonald's); AOE Ex. F (Galatt Tr.) at 116:25-118:12 (confirming

11   Entertainment Studios was in discussions in December 2019 with Burrell about

12   McDonald's potentially advertising on its syndicated programming in 2020).)

13       McDonald's continuing violation argument is a red herring.  Plaintiffs' claims

14   are based on discrimination within the statute of limitations.  (*See* Br. at 74-75.)

15       **F.**    **Plaintiffs Lack Standing to Assert Claims Based on AMG's**

16              **Syndicated Programming and JusticeCentral.TV.**

17              **1.**    **McDonald's Position**

18       Claims arising out of AMG's syndicated programming and JusticeCentral.TV

19   (collectively, "Nonparty Media Properties") cannot be asserted by the Plaintiffs in this

20   case because they are owned by other entities.  As another court in this district warned,

21   "[i]n love, a rose by any other name may smell just as sweet, but in lawsuits, naming

22   precisely the right party can mean everything."  *Sigma Fin. Corp. v. Gotham Ins. Co.,*

23   2016 WL 7508172, at *1 (C.D. Cal. Sept. 22, 2016).  Plaintiff ESN is the wrong party

24   and cannot assert a civil rights lawsuit for *someone else's claims*.

25       It is undisputed that neither Plaintiff has any ownership interest in AMG's

26   Syndicated Programming.  AMG's syndicated programs – including, at minimum,

27   Comics Unleashed, Funny You Should Ask, Mr. Box Office, and The First Family –

28   are owned by one or multiple unnamed nonparties.  (SMF D13; Ex. HHH - DeVitre

Tr. 26:24-27:20, 30:11-14.)  It is likewise undisputed that JusticeCentral.TV is owned by nonparty Justice Central Networks, Inc.  (SMF D5, D7, D14; Ex. HHH - DeVitre Tr. 20:15-20.)  Plaintiffs thus lack standing to pursue claims related to these properties.

In an eleventh-hour attempt to salvage standing to pursue claims related to the Nonparty Media Properties, Plaintiffs produced a so-called "Assignment Agreement" executed by AMG's General Counsel, Mark DeVitre, on the eve of the parties' prior Summary Judgment filing.  (*See* Ex. DDD, Exhibit 1, AOE5254-55.)  This Agreement, produced over six months after the close of fact discovery, purports to "memorialize" an assignment of discrimination claims from ES to ESN in or around May 2021, the month this lawsuit was filed.  (*Id.*)  But DeVitre's testimony—which was compelled by the Court—not only makes clear that the "Assignment Agreement" is a sham document,[46] it also reveals a fatal, factual flaw in Plaintiffs' assignment theory: Byron Allen is the only person who could have authorized an assignment of claims, and *Allen never authorized such an assignment*. (SMF D18-D19; Ex. HHH - DeVitre Tr. 68:6-11; *id.* at 53:5-9 ("Q. You've already testified that [you] don't recall [Allen] ever authorizing an assignment, correct? A. Yes.").)  Not only did Allen never declare that he was assigning ES's rights to ESN, he did not even mention which AMG entities should be included in this case.  (*Id.* at 40:5-14, 43:6-44:6, 50:23-51:4.)

In an attempt to end run these facts, DeVitre testified that he "assum[ed]" that Allen gave "implicit" verbal authorization to an assignment of claims when Allen directed his counsel to file this lawsuit.  (*Id.* at 41:4-42:14.)  Such an assumption is insufficient to sustain a valid assignment as a matter of law.  In an action by an assignee to enforce an assigned right, "the evidence must not only be sufficient to establish the

---

[46] Neither the agreement nor the assignment of claims it purports to memorialize were even discussed by Plaintiffs until more than two years after this lawsuit was filed, and even then, only *after* McDonald's informed Plaintiffs' counsel that it intended to move for summary judgment based on lack of standing.  (Ex. HHH - DeVitre Tr. 58:2-8.) The Agreement also claims to have been made for "good and valuable consideration," a representation DeVitre admitted was false.  (*Id.* at 67:4-10.)

fact of assignment when that fact is in issue, but *the measure of sufficiency requires that the evidence of assignment be clear and positive*."  *Dameron Hosp. Ass'n v. State Farm Mut. Auto. Ins. Co*., 2012 WL 4038449, at *4 (E.D. Cal. Sept. 10, 2012) (refusing to find an assignment when "the words 'assign' or 'transfer' or some variation thereof do not appear in the text of the provision."); *Great Am. Ins. Co. v. Sequoia Ins. Co*., 2016 WL 844819, at *10 (C.D. Cal. Mar. 1, 2016) (conclusory assertions of an assignment are "[do] not constitute the 'clear and positive' evidence of [an] assignment" the law requires).

Even if Allen had clearly intended to authorize an assignment of claims, that assignment still would have been insufficient for at least two reasons.

*First,* according to the plain text of the so-called Assignment Agreement, the only assignment of claims that allegedly took place before this lawsuit was between nonparty ES and ESN. (Ex. DDD, Exhibit 1, AOE5254-55.) But ES does not own JusticeCentral.TV or the syndicated properties; those properties are owned by multiple other nonparty corporate entities that are not named anywhere in the Assignment Agreement. (Ex. HHH - DeVitre Tr. 26:24-27:20, 30:11-14.) Accordingly, the Assignment Agreement can have no effect on claims related to the Nonparty Media Properties.

*Second*, and more fundamentally, well-established Supreme Court precedent and California law prohibit the assignment of Section 1981 and Unruh Act claims as a matter of law, which are "fundamental injur[ies] to the individual rights of a person" that cannot be asserted by a third-party, like ESN here. *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 661–62 (1987); *accord Pony v. Cnty. of Los Angeles*, 433 F.3d 1138, 1143 (9th Cir. 2006); *see also Curtis v. Kellogg & Andelson*, 73 Cal. App. 4th 492, 504 (1999) (causes of action "which arise from a wrong done to the person" are non-assignable under California law); *Mitchell v. Sung*, 816 F. Supp. 597, 600–01 (N.D. Cal. 1993) ("The Unruh Act seeks to protect against personal injury."); *Domino's Pizza, Inc., v. McDonald,* 546 U.S. 470, 475 (2006) (§ 1981 was enacted to vindicate

- 77 -

1  the "right—denied in some States to blacks, as it was denied at common law to

2  children—to give and receive contractual rights on *one's own behalf*").

3  ### 2.  Plaintiffs' Position

4        This is not an Article III standing issue.  Standing serves to identify those

5  disputes which are appropriately resolved through the judicial process.  *Massachusetts*

6  *v. EPA*, 549 U.S. 497, 517 (2007) ("At bottom, the gist of the question of standing is

7  whether petitioners have such a personal stake in the outcome of the controversy as to

8  assure that concrete adverseness which sharpens the presentation of issues upon which

9  the court so largely depends for illumination."); *Lujan v. Defenders of Wildlife*, 504

10  U.S. 555, 559-60 (1992) (Article III standing "is an essential and unchanging part of

11  the case-or-controversy requirement of Article III.").   This lawsuit seeks redress for

12  economic injuries.  This is not a case where plaintiffs are presenting generalized

13  grievances about the operation of government or suffered no harm.  Plaintiffs and non-

14  parties CFE and JCN are all owned by African American media entrepreneur Byron

15  Allen and claim that McDonald's discriminated against them because they are owned

16  by an African American.  This is a dispute that is appropriately resolved through the

17  judicial process. *Jackson v. Volvo Trucks N. Am., Inc.*, 462 F.3d 1234, 1241 (10th Cir.

18  2006) (the issue of standing "is rarely implicated in private civil disputes").

19  ### (a)  McDonald's Is Raising a Real-Party-In-Interest Issue

20        McDonald's is really making a real-party-in-interest challenge under Rule

21  17(a)(1).  *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1038 (9th Cir. 1986) (the

22  real-party-in-interest doctrine is designed to ensure that the suit is maintained by the

23  entity that holds title to the claim or property involved, as opposed to others who may

24  be interested in or would benefit by the litigation); *see also Greg Young Publishing,*

25  *Inc. v. Zazzle, Inc.*, 2017 WL 2729584, at *2 (C.D. Cal. May 1, 2017).

26        The Ninth Circuit's opinion in *U-Haul Int'l, Inc. v. Jartan, Inc.* is on point.  In

27  that case, the defendant was found liable for false advertising under the Lanham Act

28  and state law.  The plaintiff was U-Haul International, Inc. ("U-Haul International"),

- 78 -

which owned the U-Haul trademark. *Id*. at 1036.  The defendant argued that "U-Haul cannot recover damages for the thousands of other members of the U-Haul System that are not parties to this action." *Id.* at 1037.  The Ninth Circuit did not view this as an Article III standing issue.  Instead, the Court recognized that U-Haul International's attempt to recover damages inflicted on all the other members of the U-Haul System raised the question of whether it was "the real-party-in-interest with respect to these damages?" *Id.* at 1038; *see also id.* at 1039 (The real-party-in-interest rule is designed to protect the defendant against a subsequent action by the party actually entitled to recover and to insure that the judgment will have proper *res judicata* effect.).

Decisions from other circuits are in accord.  *See, e.g., First American Title Insurance Company v. Northwest Title Insurance Agency*, 906 F.3d 884 (10th Cir. 2018) (holding that Article III standing was "clearly satisfied" because the plaintiff proved its business was injured by the defendants and damages would provide redress, and that while there is "some question" as to which entity speaks for the title company, that only raises a real-party-in-interest issue); *Norris v. Causey*, 869 F.3d 360, 366-67 (5th Cir. 2017) (holding that the defendants' argument that the plaintiffs' claim belonged to the bankruptcy trustee was a real-party-in-interest issue, not an Article III standing problem); *Whelan v. Abell*, 953 F.2d 663, 671-72 (D.C. Cir. 1992) (rejecting Article III standing challenge and explaining that whether the shareholders or the corporation were the proper plaintiffs was only a real-party-in-interest issue); 13A Charles Alan Wright et al., Federal Practice & Procedure § 3531, at 1, 23 (3d ed. 2008) (real-party-in-interest is a better fit than standing in the context of private disputes).

McDonald's frames this as an Article III issue because, under Rule 17(a), McDonald's was required to timely object and it did not.  *See Rogers v. Samedan Oil Corp.*, 308 F.3d 477, 483-484, and n. 4 (5th Cir. 2002) (objection must be timely raised or it is waived; the objection must be raised when joinder of the real party is "practical and convenient").  McDonald's knew which entity owned the syndicated programming during discovery, and certainly by time of the deposition of Sydnie Karras on

1   November 15, 2022.  McDonald's did not make a timely objection under Rule 17.  Any
2   such objection is waived due to McDonald's failure to timely object.

3   Even if such objection could be made, Plaintiffs submit a valid ratification under
4   Rule 17(a)(3) whereby CFE and JCN ratify ESN's prosecution of the action on its
5   behalf.  (AOE Ex. DDD (DeVitre Decl.) at ¶ 4 (AOE5252) & Ex. 2, AOE5257; AOE
6   Ex. III (Supp. Schecter Decl.) at Ex. 4, AOE5477.)  CFE and JCN have also agreed,
7   and are prepared, to join as plaintiffs under Rule 19 in the event the Court deems
8   necessary.  (*Id.*)

9                    **(b)     ESN Has Constitutional Standing**

10   Even if the Court were to entertain an Article III challenge, McDonald's
11   argument fails.  McDonald's concedes Weather Group and ESN have standing.  The
12   "presence of one party with standing assures that [the] controversy before [the] Court
13   is justiciable." *Department of Commerce v. U.S. House of Representatives*, 525 U.S.
14   316, 330 (1999); *Director, Office of Workers' Compensation Programs v. Perini North
15   River Associates*, 459 U.S. 297, 303-305 (1983) (same); *Arlington Heights v.
16   Metropolitan Housing Development Corp.*, 429 U.S. 252, 264, and n.9 (1977) (same).

17   Even if the Court were to split the claims and evaluate standing only as to lost
18   advertising revenue on the syndicated programming, ESN easily meets the Article III
19   test.  All that is required to "satisf[y] the 'irreducible constitutional minimum' of
20   Article III standing" is to show that "[plaintiff] was injured … and that this injury is
21   traceable to the defendant [] and is redressable by a favorable decision of the district
22   court." *Addax Energy SA v. M/V Yasa H. Mulla*, 987 F.3d 80, 84 (4th Cir. 2021).

23   The first element ("injury in fact") requires that the injury be "concrete and
24   particularized" as opposed to "conjectural or hypothetical."  *Spokeo, Inc. v. Robins*,
25   578 U.S. 330, 339 (2016).  Economic injury is a classic "injury in fact."  *Sierra Club
26   v. Morton*, 405 U.S. 727, 733-34 (1972) ("[P]alpable economic injuries have long been
27   recognized as sufficient to lay the basis for standing."); *San Diego Cnty. Gun Rights
28   Comm. v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996) ("Economic injury is clearly a

sufficient basis for standing.").  ESN suffered economic injury due to McDonald's refusal to advertise on the syndicated programming.  CFE and ESN are 100% owned, operated and controlled by Byron Allen.  (AOE Ex. Y (5/15/23 Karras Tr.) at 17:6-21, 28:14-17); AOE Ex. J (11/15/2022 Karras Tr.) at 37:3-20).)  ESN is unique in that, unlike most television networks, ESN does not have production costs.  (AOE Ex. Y (5/15/23 Karras Tr.) at 220:5-11.)  It gets its programming from CFE for free.  (AOE Ex. J (11/15/22 Karras Tr.) at 37:3-11, 39:24 – 40:13; AOE Ex. Y (5/15/23 Karras Tr.) at 174:16-24, 220:5-11); AOE Ex. H (Kelly Tr.) at 32:9-22, 76:2-11); Ex. F (Galatt Tr.) at 92:4-19.)  Based on this relationship, the revenue that McDonald's should have spent on the syndicated programming injured ESN's business.  The revenue would have been invested in programming that would have led to increased opportunities to earn advertising revenue for the ESN networks.  (AOE Ex. Y (5/15/23 Karras Tr.) at 18:24-19:19, 70:1-13; 83:13-18, 164:9-12, 176:25-179:11; AOE Ex. J (11/15/22 Karras Tr.) at 39:24-40:4, 98:2-13.)   This evidence satisfies the injury-in-fact requirement.  *See, e.g., First American Title Insurance Company*, 906 F.3d at 890; *Norris*, 869 F.3d at 366-67; *Whelan*, 953 F.2d at 671-72.

This same evidence also satisfies causation and redressability.  To establish standing, the "line of causation" cannot be too "attenuated," *see Allen v. Wright*, 468 U.S. 737, 757 (1984), but that is not an issue here.  The causal chain is straightforward.  Revenue paid to CFE would improve programming run on the ESN Lifestyle Networks and give ESN better opportunities to earn additional advertising revenue.  (AOE Ex. Y (5/15/23 Karras Tr.) at 18:24-19:19, 70:1-13; 83:13-18, 164:9-12, 176:25-179:11; AOE Ex. J (11/15/22 Karras Tr.) at 39:24-40:4, 98:2-13.)

### (c)   ESN Has Standing By Virtue Of Valid Assignments

ESN also has standing pursuant to a valid assignment.  (AOE Ex. BBB (DeVitre

1  Decl.) at Ex. 1, AOE5254-55.)[47]  "[I]t is black-letter law that an assignee has the same

2  injury as its assignor for purposes of Article III [standing]."  *Spinedex Physical*

3  *Therapy USA Inc. v. United Healthcare of Arizona, Inc.*, 770 F.3d 1282, 1291 (9th Cir.

4  2014) (citing *Vermont Agency of Natural Resources v. U.S. ex rel. Stevens*, 529 U.S.

5  765 (2000)).

6       The question of assignability is decided by application of "state common law,

7  as modified and changed by the constitution and statutes of the forum state[.]"  *Pony*

8  *v. City of Los Angeles*, 433 F.3d 1138, 1143 (9th Cir. 2006).  "It is well-settled in

9  California that assignability of things in action is now the rule; nonassignability the

10  exception.'"  *Jim 72 Properties, LLC v. Montgomery Clearners*, 151 F. Supp. 3d 1092,

11  1100 (C.D. Cal. Dec. 16, 2015) (cleaned up).  "Exceptions to the assignability rule

12  apply to wrongs done to a person, his reputation, his feelings, or contracts of a purely

13  personal nature such as those for marriage."  *Id* (citing *Rued v. Cooper*, 109 Cal. App.

14  682, 693 (1893)).  "However, where claims arise of out of violation of a property right

15  or a wrong involving personal or real property, the injured party may assign those

16  claims."  *Id* (citing *Goodley*, 62 Cal. App. 3d at 394).

17       This is not a case where a non-party assigned personal injury claims to an

18

19

20  [47] McDonald's tries to show the assignment was not authorized by citing one portion of Mr. DeVitre's deposition.  (Br. at 76.)  This portion is taken out of context.  At

21  deposition, counsel for McDonald's tried to sum up prior testimony in an effort to get a broader admission.  The portion at issue is the question: "You've already testified

22  that you don't recall Mr. Allen ever authorizing the assignment, correct?"  (Ex. HHH (DeVitre Depo.) at 53:5-10.)  A few lines up, McDonald's counsel asked:  "And just

23  so we're clear, you never actually recall him saying, 'I am authorizing the assignment of claims from one of my entities to another entity'; correct?"  (*Id.* at 52:2-8.)  That

24  specific quote is what counsel was referring to when he prefaced his question with "You've already testified . . . ."  (*Id.* 52:2 – 53:10.)  Mr. DeVitre testified repeatedly

25  that Mr. Allen authorized ESN to pursue all of Entertainment Studios' claims.  (*Id.* 41:4-24, 42:2 – 43:5, 49:16 – 50:22.)  Mr. Allen did not need to use specific language.

26  *Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court*, 46 Cal. 4th 993, 1002 (2009) ("An assignment requires very little by way of formalities and is

27  essentially free from substantive restrictions. . . . Generally, interests may be assigned orally . . . and assignments need not be supported by any consideration.").

28

unrelated third party.  The assignment in this case is between two, affiliated companies under common ownership who both suffered economic injury due to racial discrimination by McDonald's.  (AOE Ex. Y (5/15/23 Karras Tr.) at 17:6-21, 28:14-17); AOE Ex. J (11/15/2022 Karras Tr.) at 37:3-20).)  The assignment is valid.

### G.     Plaintiff Weather Group's Claims Fail for Two Separate Reasons

#### 1.     McDonald's Position

Weather Group's claims fail for two additional reasons: (*i*) causation is defeated by evidence specific to Weather Group; *(ii)* they are barred by the First Amendment.

As to causation, it is undisputed that McDonald's never advertised on TWC – even *before* AMG acquired TWC, when it was not Black-owned. (SMF D8-D11, D75-D76; Ex. G - Bekkedahl Tr. at 34:18-35:12.)  At the motion to dismiss stage, Plaintiffs succeeded in arguing that this was a fact issue because there were no allegations that "Weather Group pursued advertising with McDonald's prior to Allen's acquisition in 2018." (Dkt. 70 [MTD Order] at 14.)  This is now put to rest.  Weather Group's Rule 30(b)(6) witness admitted that TWC advertising sales personnel attempted to pitch McDonald's before and after the 2018 acquisition—and the result was the same before and after. (SMF D75-D76; Ex. G - Bekkedahl Tr. 37:25-39:8; 40:16-19; 43:11-17; 228:3-22; 48:14-15; Ex. O(54), AOE1573.)   More than that, TWC's ratings have *worsened* every year since AMG acquired it. (SMF D79; Ex. O(61), AOE1636-1725.) Plaintiffs have never explained how McDonald's consistent declination to advertise on TWC *before* it was Black-owned—back when it had *higher* ratings—somehow turned invidious after Allen purchased it and after its ratings had declined.  *See, e.g.*, *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 390 (5th Cir. 2017) (dismissing § 1981 claim because "Defendants refused to contract with Plaintiffs both before and after Plaintiffs complained about racial discrimination"); *Rey v. C & H Sugar Co.*, 609 F. App'x 923, 924 (9th Cir. 2015) (finding no triable issue of fact on discrimination claim where defendant asserted that it fired plaintiff based on "performance problems [that] existed both before and after the [defendant made a]

1  discriminatory comment").

2       *Second*, Weather Group's theory of liability violates the First Amendment. (*See,*

3  *e.g.*, TAC ¶¶ 95-97; 116; 125.)  McDonald's does not advertise on TWC because it

4  does not wish to associate its brand with news content—and in particular, tragic news

5  events such as extreme weather.  (Ex. R(1) at ¶¶ 36, 57; Ex. C - Feldman Deposition,

6  86:20–87:6.)  This policy makes advertising on TWC a non-starter: TWC generally

7  has low ratings, which spike *only* during extreme weather events.  (SMF D80-D82.)

8  Even Allen acknowledges the expressive nature of a "tragic news" policy.  As Allen

9  put it, "[y]ou may not as an advertiser want to buy a network that has a great deal of

10  violence on it." (Ex. I - Allen Tr. 138:20-139:6 (testifying that the "first order of

11  business" for an advertiser is the "environment" where the ad is being shown).)  But

12  as the Supreme Court recently explained, the First Amendment does not permit

13  plaintiffs to compel a defendant's "expressive activity."  *303 Creative LLC v. Elenis*,

14  143 S. Ct. 2298, 2315 (June 30, 2023); *see also Coral Ridge Ministries Media, Inc. v.*

15  *Amazon.com, Inc.*, 6 F.4th 1247, 1254-55 (11th Cir. 2021) (rejecting attempt to force

16  Amazon to include plaintiff in list of eligible charities because "Amazon's choice of

17  [eligible] charities" was protected by the First Amendment and "[a] reasonable person

18  would interpret this as Amazon conveying '*some* sort of message' about the

19  organizations it wishes to support").

20       **2.**    **Plaintiffs' Position**

21       McDonald's argument about not advertising on The Weather Channel prior to

22  2018 goes to the issue of intent and causation, which is addressed in this brief.  (

23  Sections VI(A)(2) & VI(D)(2), *supra*.)  As to McDonald's new First Amendment

24  defense,[48] that is meritless and offensive.  McDonald's does not have a First

25  Amendment right to engage in racial discrimination.  *See Rumsfeld v. Forum for Acad.*

26

27  _____

28  [48] This is the first time in this case that McDonald's raises this defense.  It is not in its
Answer asserted either as a factual or affirmative defense.

*& Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006) (racial discrimination is *conduct* that does not trigger First Amendment protection); *Newman v. Piggie Park Enters., Inc.,* 390 U.S. 400, 402-03 n.5 (1968) (same).  McDonald's cites *303 Creative LLC v. Elenis*, 143 S.Ct. 2298 (2023), where the a First Amendment defense was granted on an undisputed factual record.  It was undisputed that the web designer refused to design a wedding website for a homosexual couple because of her belief that "Biblical truth" only allows for marriage between a man and a woman.  *Id*. at 2303.  There were no factual disputes about her motives.  *Id.*  In this case, McDonald's motive is disputed. (Br. at §§ VI(B-C).)   McDonald's First Amendment defense cannot be determined on summary judgment.

## VII.   CONCLUSIONS TO *PLAINTIFFS'* PARTIAL MOTION FOR SUMMARY JUDGMENT

### 1.   Plaintiffs' Conclusion

For the foregoing reasons, the Court should grant partial summary judgment that McDonald's violated section 1981 by relegating Entertainment Studios to a less-favorable contracting tier on the basis of race.

### 2.   McDonald's Conclusion

Divorced from the facts, Plaintiffs' "core theory" of discrimination is a perversion of McDonald's efforts to promote diversity.   The Court should deny Plaintiffs' motion for summary judgment and grant summary judgment in McDonald's favor.

## VIII.   CONCLUSIONS TO *MCDONALD'S* MOTION FOR SUMMARY JUDGMENT

### 1.   McDonald's Conclusion

At the summary judgment stage, Plaintiffs must support their discrimination claims with more than just inflammatory rhetoric: actual evidence is required. None has been presented. To the contrary, the undisputed evidence proves McDonald's has consistently partnered with various AMG media properties, and continues to do so.

1  Plaintiffs may complain that McDonald's should have invested more, and specifically
2  with ESN's Lifestyle Networks and TWC, but McDonald's refusal to do so is an easily
3  defensible business decision.  For the reasons stated in McDonald's portion of the joint
4  brief, the Court should grant summary judgment in favor of McDonald's.

5           **2.     Plaintiffs' Conclusion**

6           Plaintiffs seek partial summary judgment on liability on the relegation theory
7  under section 1981.  This will streamline the issues for trial.  Plaintiffs respectfully
8  seek denial of McDonald's summary judgment motion in full.

9
10  Dated:        September 11, 2023      MILLER BARONDESS, LLP

11

12
                                        By:     /s/ *David W. Schecter*
13                                            _____
                                             DAVID W. SCHECTER
14                                           Attorneys for PLAINTIFFS

15                                           LOUIS R. MILLER (State Bar No.
16                                           54141)
                                             smiller@millerbarondess.com
17                                           DAVID W. SCHECTER (State Bar No.
18                                           296251)
                                             dschecter@millerbarondess.com
19                                           MURAD SALIM (State Bar No. 342747)
20                                           msalim@millerbarondess.com
                                             MILLER BARONDESS, LLP
21                                           2121 Avenue of the Stars, Suite 2600
22                                           Los Angeles, California 90067
                                             Telephone:  (310) 552-4400
23                                           Facsimile:   (310) 552-8400

24
                                             *Attorneys for PLAINTIFFS*
25       ///
26       ///
27       ///
28       ///

1    ///

2    Dated:        September 11, 2023      By:  _____ /s/ *Amy Andrews* _____

3                                         John C. Hueston (SBN 164921)
                                          Moez M. Kaba (SBN 257456)
4                                         Michael Todisco (SBN 315814)
                                          HUESTON HENNIGAN LLP
5                                         523 West 6th Street, Suite 400
                                          Los Angeles, CA 90014
6                                         jhueston@hueston.com
                                          mkaba@hueston.com
7                                         mtodisco@hueston.com

8

9

10                                        Patricia Brown Holmes (*pro hac vice*)
                                          Amy Andrews (*pro hac vice*)
11                                        Shalem Massey (SBN 143281)
                                          Jennifer Steeve (SBN 308082)
12                                        RILEY SAFER HOLMES & CANCILA
                                          LLP
13                                        100 Spectrum Center Drive, Suite 440
                                          Irvine, CA  92618
14                                        smassey@rshc-law.com
                                          jsteeve@rshc-law.com
15                                        Telephone: (949) 359-5515
                                          Facsimile: (949) 359-5501
16

17

18                                        Loretta E. Lynch (*pro hac vice*)
                                          PAUL, WEISS, RIFKIND,
19                                        WHARTON & GARRISON LLP
                                          1285 Avenue of the Americas
20                                        New York, New York 10019-6064
                                          lelynch@paulweiss.com
21

22                                        *Attorneys for Defendant McDonald's USA,*
23                                        *LLC*

24

25

26

27

28

JOINT MPA REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT

## **LOCAL RULE 11-6.2 CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendant McDonald's USA, LLC ("McDonald's"), certifies that McDonald's portions of this Joint Brief contain 8,258 words in opposition to Plaintiff Entertainment Studios Inc.'s Motion for Partial Summary Judgment and 8,609 in support of McDonald's Motion for Summary Judgment, which complies with the Court's Order on Summary Judgment, Dkt. No. 133 n.1, dated July 18, 2023.

*/s/ Amy Andrews*

The undersigned, counsel of record for Plaintiffs Entertainment Studios Networks, Inc. and Weather Group, LLC, certifies that Plaintiffs' portions of this Joint Brief contain 3,631 words in support of Plaintiff Entertainment Studios Inc.'s Motion for Partial Summary Judgment and 7,911 words in opposition to McDonald's Motion for Summary Judgment, which complies with the Court's Order on Summary Judgment, Dkt. No. 133 n.1, dated July 18, 2023.

*/s/ David W. Schecter*

JOINT MPA REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT