1  LOUIS R. MILLER (State Bar No. 54141)
   smiller@millerbarondess.com
2  DAVID W. SCHECTER (State Bar No. 296251)
   dschecter@millerbarondess.com
3  MURAD SALIM (State Bar No. 342747)
   msalim@millerbarondess.com
4  MILLER BARONDESS, LLP
   2121 Avenue of the Stars, Suite 2600
5  Los Angeles, California 90067
   Telephone:    (310) 552-4400
6  Facsimile:    (310) 552-8400

7  *Attorneys for PLAINTIFFS*

8  Patricia Brown Holmes (*pro hac vice*)        Loretta E. Lynch (*pro hac vice*)
   Amy Andrews (*pro hac vice*)                  PAUL, WEISS, RIFKIND,
9  Shalem Massey (SBN 143281)                    WHARTON & GARRISON LLP
   Jennifer Steeve (SBN 308082)                  1285 Avenue of the Americas
10 RILEY SAFER HOLMES &                          New York, New York 10019-6064
   CANCILA LLP                                   lelynch@paulweiss.com
11 100 Spectrum Center Drive, Suite 440
   Irvine, CA  92618                             John C. Hueston (SBN 164921)
12 smassey@rshc-law.com                          Moez M. Kaba (SBN 257456)
   jsteeve@rshc-law.com                          HUESTON HENNIGAN LLP
13                                               523 West 6th Street, Suite 400
                                                 Los Angeles, CA 90014
14                                               jhueston@hueston.com
                                                 mkaba@hueston.com
15
                    *Attorneys for Defendant McDonald's USA, LLC*
16

17                    **UNITED STATES DISTRICT COURT**
18                    **CENTRAL DISTRICT OF CALIFORNIA**

19

20 ENTERTAINMENT STUDIOS                    Case No. 2:21-cv-04972-FMO-MAA
   NETWORKS, INC., a California
21 corporation; WEATHER GROUP, LLC,         **JOINT EVIDENTIARY APPENDIX**
   a Delaware limited liability company,    **REGARDING CROSS FOR**
                                            **SUMMARY JUDGMENT**
22              Plaintiffs,
                                            Assigned to the:
23        v.                                Hon. Fernando M. Olguin

24 McDONALD'S USA, LLC, a Delaware
   limited liability company,
25                                          Date:      October 19, 2023
                Defendant.                  Time:      10:00 a.m.
26                                          Location: Courtroom 690

27

28

**JOINT EVIDENTIARY APPENDIX REGARDING CROSS FOR SUMMARY JUDGMENT**

# JOINT EVIDENTIARY APPENDIX

## VOLUME 1

| EVIDENCE | | PAGE NO |
|---|---|---|
| **Exhibit A** | (Deposition of Alycia Mason/McDonald's FRCP 30(b)(6)) | 0025-0063 |
| **Exhibit B** | (Deposition of Sheila Hamilton/McDonald's FRCP 30(b)(6)) | 0064-0104 |
| **Exhibit C** | (Deposition of Jennifer Feldman/McDonald's FRCP 30(b)(6)) | 0105-0136 |
| **Exhibit D** | (Deposition of Anja Carroll/McDonald's FRCP 30(b)(6)) | 0137-0179 |
| **Exhibit E** | (Deposition of Morgan Flatley) | 0180-0193 |
| **Exhibit F** | (Deposition of Darren Galatt/ESN's FRCP 30(b)(6)) | 0194-0259 |
| **Exhibit G** | (Deposition of Barbara Bekkedahl/Weather Group's FRCP 30(b)(6)) | 0260-0300 |
| **Exhibit H** | (Deposition of Cindy Kelly) | 0301-0350 |
| **Exhibit I** | (Deposition of Byron Allen/Plaintiffs' FRCP 30(b)(6)) | 0351-0453 |
| **Exhibit J** | (Deposition of Sydnie Karras/Plaintiffs' FRCP 30(b)(6)) | 0454-0478 |
| **Exhibit K** | (Deposition of Roy Restivo/Plaintiffs' FRCP 30(b)(6)) | 0479-0486 |
| **Exhibit L** | (Deposition of Geoff Calabrese/OMD's FRCP 30(b)(6)) | 0487-0523 |
| **Exhibit M** | (Deposition of Donna Hodge/Burrell's FRCP 30(b)(6)) | 0524-0564 |
| **Exhibit N** | (Deposition of Lynnwood Bibbens) | 0565-0588 |
| **Exhibit O** | (Declaration of Amy Andrews) | 0589-0602 |
| Exhibit O(1) | Allen Media Group Organizational Chart (DX148) | 0603-0604 |
| Exhibit O(2) | Preliminary Bond Offering Memorandum issued by Allen Media, LLC and Allen Media Co-Issuer, Inc. dated July 21, 2021 | 0605-0875 |
| Exhibit O(3) | Allen Media Holdings, LLC's 2020/2021 consolidated financial statements, bates stamped ESN0041976–42017 (DX119) | 0876-0918 |

JOINT EVIDENTIARY APPENDIX REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT

| **EVIDENCE** | | **PAGE NO** |
|---|---|---|
| Exhibit O(4) | Allen Media Holdings, LLC's 2018/2019 consolidated financial statements bates stamped ESN0041590–41632 | 0919-0962 |
| **VOLUME 2** | | |
| Exhibit O(5) | Declaration of Mark DeVitre, filed in the matter CF Entertainment, Inc. v. The Nielsen Company (US), LLC, No. 1:20-cv-2393 (N.D. Ill.) (DX121) | 0963-1018 |
| Exhibit O(6) | Allen Media Holdings, LLC's 2017/2018 consolidated financial statements, as produced by Plaintiffs, bates stamped ESN0041498–41553 | 1019-1075 |
| Exhibit O(7) | Complaint filed in the matter CF Entertainment, Inc. v. The Nielsen Company (US), LLC, No. 2022L002556 (Cook County, Illinois) (DX123) | 1076-1099 |
| Exhibit O(8) | 2014 Entertainment Studios Syndication response to an RFP for McDonald's, bates stamped ESN0023761–23766 (DX7) | 1100-1106 |
| Exhibit O(9) | 2015 Entertainment Studios Syndication response to an RFP for McDonald's, bates stamped ESN0007341–7347 (DX11) | 1107-1114 |
| Exhibit O(10) | 2016 Entertainment Studios Syndication response to an RFP for McDonald's, bates stamped ESN0012605–12615 (DX12) | 1115-1126 |
| Exhibit O(11) | 2013 Upfront Specials Contract between Burrell and CF Entertainment / Entertainment Studios, bates stamped ESN0014847–14856 (DX6) | 1127-1137 |
| Exhibit O(12) | 2015 Upfront Contract between Burrell and CF Entertainment / Entertainment Studios, bates stamped ESN0029772–29776 (DX10) | 1138-1143 |
| Exhibit O(13) | 2016 Upfront Contract between Burrell and CF Entertainment / Entertainment Studios, bates stamped ESN0032794–32800 (DX14) | 1144-1151 |
| Exhibit O(14) | 2017 Upfront Contract between Burrell and CF Entertainment / Entertainment Studios, bates stamped ESN0024645–24647 (DX17) | 1152-1155 |

**JOINT EVIDENTIARY APPENDIX REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

| EVIDENCE | PAGE NO |
|---|---|
| Exhibit O(15) Email dated October 21, 2016, bates stamped ESN0032997–33000 | 1156-1160 |
| Exhibit O(16) Presentation titled "Entertainment Studios Can Help Mc Donald's Reach More Customers!", bates stamped ESN0032717–32725 | 1161-1170 |
| **VOLUME 3** | |
| Exhibit O(17) Chart depicting ESN's financials for the years 2018 to 2021 (DX151) | 1171-1172 |
| Exhibit O(18) Chart depicting Weather Group, LLC's financials for the years 2018 to 2021 (DX156) | 1173-1174 |
| Exhibit O(19) Burrell presentation titled "21-22 Upfront Recommendation," dated August 12, 2021, bates stamped Burrell_0008646–8691 (PX25) | 1175-1221 |
| Exhibit O(20) Presentation titled "Ad Upfront Overview, Strategy and Plan Discussion," dated May 23, 2018, bates stamped ESN0003628–3653 (DX77) | 1222-1248 |
| Exhibit O(21) Email dated December 4, 2019, and attached presentation, bates stamped ESN0022535–22554 (DX93) | 1249-1269 |
| Exhibit O(22) Email dated August 6, 2019, bates stamped Burrell_0001894 | 1270-1271 |
| Exhibit O(23) Burrell Q1 2018 Post Buy Analysis, bates stamped Burrell_0006591–6625 (PX23) | 1272-1307 |
| **VOLUME 4** | |
| Exhibit O(24) May 11, 2021 email, bates stamped Burrell_0008781–8782 (PX41) | 1308-1310 |
| Exhibit O(25) ESN Bi-Weekly Sales Activity Spreadsheet, bates stamped ESN0018191 | 1311-1318 |
| Exhibit O(26) ESN Presentation titled "Reach More African-American Consumers With Entertainment Studios", bates stamped ESN0019635–19641 (DX129) | 1319-1339 |

**JOINT EVIDENTIARY APPENDIX REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

| **EVIDENCE** | **PAGE NO** |
|---|---|
| Exhibit O(27) ESN Presentation titled "Entertainment Studios April 2018," bates stamped ESN0022135–22180 (DX92) | 1340-1386 |
| Exhibit O(28) July 27, 2015 email, bates stamped ESN0002841–2850 (DX134) | 1387-1410 |
| Exhibit O(29) ESN presentation titled "2020 National Sales Conference," bates stamped ESN0012078–12100 | 1411-1434 |
| Exhibit O(30) May 2020 Burrell Minority Partner Review slide deck, bates stamped Burrell_0004911–4931 (DX3) | 1435-1456 |
| Exhibit O(31) ESN's BOM advertiser tracking spreadsheet, bates stamped ESN0019410–19411 (DX140) | 1457-1462 |
| Exhibit O(32) December 17, 2018 email, bates stamped ESN0036007–36008 | 1463-1465 |
| Exhibit O(33) April 15, 2016 email, bates stamped ESN0030244–30246 (DX95) | 1466-1469 |
| Exhibit O(34) March 16, 2017 email, as produced by Plaintiffs, bates stamped ESN0007869 | 1470-1471 |
| Exhibit O(35) May 8, 2017 email, bates stamped ESN0024759–24762 | 1472-1476 |
| **VOLUME 5** | |
| Exhibit O(36) September 10, 2019 email, bates stamped ESN0008399–8404 (DX137) | 1477-1483 |
| Exhibit O(37) November 4, 2019 email, bates stamped ESN0008425 (DX138) | 1484-1485 |
| Exhibit O(38) March 9, 2020 email, bates stamped ESN0016403–16405 (PX21) | 1486-1488 |
| Exhibit O(39) January 13, 2021 email, bates stamped ESN0037576–37578 (DX84) | 1489-1492 |
| Exhibit O(40) November 16, 2020 email, bates stamped ESN0033959–33960 | 1493-1495 |
| Exhibit O(41) April 9, 2021 email, bates stamped ESN0001106–1107 | 1496-1498 |

**JOINT EVIDENTIARY APPENDIX REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

| EVIDENCE | PAGE NO |
|---|---|
| Exhibit O(42) June 28, 2017 email and attachments, bates stamped ESN0003100–3103, ESN0003145, and ESN0003515 (DX30) | 1499-1507 |
| Exhibit O(43) July 10, 2015 email, bates stamped ESN0012580–12581 (DX37) | 1508-1510 |
| Exhibit O(44) January 27, 2015 email, bates stamped ESN0029697–29701 (DX32) | 1511-1516 |
| Exhibit O(45) Burrell Entertainment Studios Delivered Impressions spreadsheet for the time period 2016 to 2018, bates stamped Burrell_0005860 | 1517-1524 |
| Exhibit O(46) December 19, 2015 email, bates stamped ESN0032789 (DX13) | 1525-1526 |
| Exhibit O(47) February 1, 2017 email, bates stamped ESN0015477–15478 (DX135) | 1527-1536 |
| Exhibit O(48) December 11, 2017 Upfront Contract between Burrell and CF Entertainment / Entertainment Studios, bates stamped ESN0008039–8041 (DX19) | 1537-1546 |
| Exhibit O(49) February 3, 2017 email, bates stamped ESN0030314–30315 (DX110) | 1547-1549 |
| Exhibit O(50) September 1, 2017 email, bates stamped ESN0004644–4647 (DX102) | 1550-1554 |
| Exhibit O(51) August 11, 2016 email, bates stamped ESN0004319–4326 (DX15) | 1555-1563 |
| Exhibit O(52) September 11, 2020 email, as produced by Burrell, bates stamped Burrell_0005515–5517 | 1564-1567 |
| Exhibit O(53) February 6, 2019 email, bates stamped Burrell_0008194–8196 | 1568-1571 |
| Exhibit O(54) May 7, 2021 email, bates stamped ESN0029493 (DX5) | 1572-1573 |
| Exhibit O(55) October 22, 2019 email, bates stamped ESN0019112–19113 (DX58) | 1574-1576 |
| Exhibit O(56) Article titled "Most-Watched Television Networks: Ranking 2018's Winners and Losers," dated | 1577-1591 |

**JOINT EVIDENTIARY APPENDIX REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

| EVIDENCE | PAGE NO |
|---|---|
| December 27, 2018, published on Indiewire.com (DX125) | |
| Exhibit O(57) Article titled "Most-Watched Television Networks: Ranking 2019's Winners and Losers," dated December 26, 2019, published on Variety.com (DX126) | 1592-1603 |
| Exhibit O(58) Article titled "Year in Review: Most-Watched Television Networks—Ranking 2020's Winners and Losers," dated December 28, 2020, published on Variety.com (DX127) | 1604-1616 |
| Exhibit O(59) Article titled "Most-Watched Television Networks: Ranking 2021's Winners and Losers," dated December 30, 2021, published on Variety.com (DX128) | 1617-1628 |
| Exhibit O(60) July 6, 2020 email, as produced by Plaintiffs, bates stamped ESN0003806–3808 (DX54) | 1629-1633 |
| Exhibit O(61) Nielsen ratings data as produced by Plaintiffs, bates stamped ESN0044554 | 1634-1725 |
| Exhibit O(62) April 16, 2021 email, bates stamped ESN0002596–2598 (DX82) | 1726-1732 |
| Exhibit O(63) November 15, 2019 email, bates stamped ESN0010350–10351 (DX83) | 1733-1735 |
| Exhibit O(64) June 28, 2018 email, bates stamped ESN0037325–37326 (DX56) | 1736-1738 |
| Exhibit O(65) Memorandum titled "Allen Media Group Recommendation," bates stamped OMD_014109–14111 | 1739-1742 |
| Exhibit O(66) March 31, 2021 email, bates stamped OMD_001398–1401 (DX124) | 1743-1768 |
| Exhibit O(67) ESN and Weather Group, LLC's Responses to McDonald's Requests for Admission, dated November 22, 2022 | 1769-1785 |

- 7 -

| EVIDENCE | PAGE NO |
|---|---|
| Exhibit O(68) March 8, 2021 email, bates stamped OMD_014053–14059 (DX139) | 1786-1793 |
| Exhibit O(69) Vendor spend data sheet showing spending for the years 2020/2021 and 2021/2022, bates stamped Burrell_0008431 | 1794-1815 |
| **VOLUME 6** | |
| Exhibit O(70) October 7, 2021 email, bates stamped ESN0010119–10125 (DX29) | 1816-1823 |
| Exhibit O(71) April 6, 2021 email, bates stamped ESN0029459–29462 (DX28) | 1824-1828 |
| Exhibit O(72) Presentation titled "ES Syndication 2021 Ad Sales Plan," dated January 25, 2021, bates stamped ESN0028200–28228 (DX64) | 1829-1858 |
| Exhibit O(73) Presentation titled "ES Syndication 2021 Ad Sales Business Plan," dated January 21, 2021, bates stamped ESN0017961–17974 (DX63) | 1859-1573 |
| Exhibit O(74) March 2021 letters from Miller Barondess, LLP, bates stamped ESN0041641–41736 (DX146) | 1574-1914 |
| Exhibit O(75) Handwritten notes of Weather Group, LLC President Barbara Bekkedahl (DX85) | 1915-1919 |
| Exhibit O(76) February 22, 2021 email, bates stamped ESN0025910 (DX69) | 1920-1921 |
| Exhibit O(77) Spreadsheet titled "Top 100 at 2%" updated February 2021, bates stamped ESN0008768–8769 (DX44) | 1922-1926 |
| Exhibit O(78) Email dated September 2, 2020, bates stamped ESN0039183–39184 (DX108) | 1927-1929 |
| Exhibit O(79) Emails dated July 21, 2021 bates stamped ESN0019532–19533, and June 5, 2021 bates stamped ESN0002616–2629 (DX75) | 1930-1946 |
| Exhibit O(80) Email dated February 11, 2021, bates stamped ESN0010652–10656 (DX68) | 1947-1952 |

**JOINT EVIDENTIARY APPENDIX REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

| EVIDENCE | | PAGE NO |
|---|---|---|
| Exhibit O(81) | Chart summarizing recipients of a March 3, 2021 letter from Miller Barondess (DX142) | 1953-1956 |
| Exhibit O(82) | Email dated February 10, 2016 with attachments, bates stamped ESN0018661 (DX51) | 1957-1962 |
| **VOLUME 7** | | |
| Exhibit O(83) | Presentation titled "UPFRONT 2021," bates stamped ESN0002571–2589 | 1963-1982 |
| Exhibit O(84) | ES 2021 syndication slide presentation, bates stamped ESN0026076-77 | 1983-1985 |
| Exhibit O(85) | McDonald's Franchise Disclosure Document | 1986-2198 |
| Exhibit O(86) | McDonald's 2023 Annual Report | 2199-2272 |
| **Exhibit P**    (Declaration of Cheryl Strom) | | 2273-2280 |
| Exhibit P(1) | August 10, 2015 email attaching an Upfront Contract, dated February 18, 2014, between Burrell Communications Group, LLC ("Burrell") and CF Entertainment / Entertainment Studios, bates stamped McD_ESN00000698–702 (DX8) | 2281-2295 |
| Exhibit P(2) | May 4, 2021 Statement of Work between OMD USA LLC ("OMD") and McDonald's, bates stamped McD_ESN00023162–23209 | 2296-2344 |
| **VOLUME 8** | | |
| Exhibit P(3) | Amended and Restated Advertising Agency Agreement between McDonald's Corporation and Burrell, dated January 1, 2012, bates stamped McD_ESN00023113–23161 | 2345-2394 |
| Exhibit P(4) | September 4, 2020 Statement of Work between OMD and McDonald's, bates stamped McD_ESN00023295–23366 | 2395-2467 |
| Exhibit P(5) | Second Amended and Restated Global Master Media Services Agreement between McDonald's Corporation and OMD Worldwide Holdings Inc., dated August 21, 2020, bates stamped McD_ESN00023210–23294 | 2468-2553 |

**JOINT EVIDENTIARY APPENDIX REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

| EVIDENCE | | PAGE NO |
|---|---|---|
| Exhibit P(6) | Presentation titled "21-22 Initial Upfront Allocations," dated May 9, 2021, bates stamped McD_ESN00021595–21621 | 2554-2581 |
| Exhibit P(7) | Memorandum titled "Media & Budget Subcommittee 1Q'18 Post Buy Analysis All Media October 2018," bates stamped McD_ESN00006422–6456 | 2582-2617 |
| Exhibit P(8) | July 23, 2015 email, bates stamped McD_ESN00000079–83 (DX133) | 2618-2623 |
| Exhibit P(9) | Spreadsheet entitled "McDonald's Global Partner Standards," bates stamped McD_ESN00016876 (PX28) | 2624-2627 |
| Exhibit P(10) | Spreadsheet showing McDonald's 2019 Summary of Minority Owned Spending, bates stamped McD_ESN00018473 | 2628-2630 |
| Exhibit P(11) | October 15, 2020 email, bates stamped McD_ESN00012884–12886 | 2631-2634 |
| Exhibit P(12) | July 31, 2015 email, bates stamped McD_ESN00000660–661 | 2635-2637 |
| Exhibit P(13) | September 17, 2020 email, bates stamped McD_ESN00001033–1046 (PX15) | 2638-2654 |
| Exhibit P(14) | Spreadsheet showing McDonald's advertising spend with Entertainment Studios for the time period 2011 to 2014, bates stamped McD_ESN00000500 | 2655-2662 |
| Exhibit P(15) | February 20, 2015 email, bates stamped McD_ESN00000493 | 2663-2664 |
| Exhibit P(16) | 2015 presentation review of Entertainment Studios, bates stamped McD_ESN00000494–499 | 2665-2671 |
| Exhibit P(17) | Presentation titled "2021 Upfront Recap," dated January 29, 2021, bates stamped McD_ESN00015936–16019 | 2672-2756 |
| Exhibit P(18) | Presentation titled "2021 Video Strategy & Recommendation," dated September 29, 2020, bates stamped McD_ESN00011671–11712 | 2757-2799 |

**JOINT EVIDENTIARY APPENDIX REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

| EVIDENCE | | PAGE NO |
|---|---|---|
| Exhibit P(19) | Spreadsheet titled "Entertainment Studios TV – Historical Ratings & Investment," bates stamped McD_ESN00001046 (PX15) | 2800-2803 |
| Exhibit P(20) | February 26, 2015 email, bates stamped McD_ESN00000041–43 (DX131) | 2804-2807 |
| Exhibit P(21) | March 3, 2015 email, bates stamped McD_ESN00000044, and a March 17, 2015 email and attachment, bates stamped McD_ESN00000045–47 (DX132) | 2808-2820 |
| Exhibit P(22) | Presentation titled "Entertainment Studios & The Grio Review," dated September 17, 2020, bates stamped McD_ESN00001037–1045 | 2821-2830 |
| Exhibit P(23) | Spreadsheet summarizing McDonald's media buying for 2018 and 2019, bates stamped McD_ESN00009009 (PX50) | 2831-2833 |
| Exhibit P(24) | Presentation titled "National Video Upfront Update," dated August 6, 2019, bates stamped McD_ESN00008876–8927 | 2834-2886 |
| Exhibit P(25) | Burrell minority-owned overview presentation, bates stamped McD_ESN00007755–7767 | 2887-2900 |
| Exhibit P(26) | March 9, 2021 email, bates stamped McD_ESN00002176–2186 | 2901-2912 |
| Exhibit P(27) | May 4, 2020 email, bates stamped McD_ESN00012918–12921 | 2913-2917 |
| Exhibit P(28) | March 4, 2020 email, bates stamped McD_ESN00010102–10104 | 2918-2921 |
| Exhibit P(29) | February 24, 2020 email, bates stamped McD_ESN00012936–12943 | 2922-2930 |
| Exhibit P(30) | Presentation titled "2020 U.S. People Campaign Paid Media Plan," dated February 2020, bates stamped McD_ESN00010092–10101 | 2931-2941 |
| Exhibit P(31) | July 2, 2020 email, bates stamped McD_ESN00011302–11304 | 2942-2945 |

- 11 -

**JOINT EVIDENTIARY APPENDIX REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

| EVIDENCE | | PAGE NO |
|---|---|---|
| Exhibit P(32) | August 27, 2018 email, bates stamped McD_ESN00006421 | 2946-2947 |
| Exhibit P(33) | November 11, 2016 email, bates stamped McD_ESN00005085–5088 | 22948-2952 |
| Exhibit P(34) | Memorandum titled "Media & Budget Subcommittee 2016 Purchases – July 20th Webcast," bates stamped McD_ESN00004516–4531 | 2953-2969 |
| Exhibit P(35) | Presentation titled "McDonald's 2015-2016 Upfront: Target Segment Allocations," dated May 2015, bates stamped McD_ESN00002448–2466 | 2970-2989 |
| Exhibit P(36) | Spreadsheet showing McDonald's 2014/2015 vendor spending, bates stamped McD_ESN00002661 | 2990-3039 |
| **VOLUME 9** | | |
| Exhibit P(37) | Spreadsheet showing McDonald's 2015/2016 vendor spending, bates stamped McD_ESN00004108–4124 | 3040-3057 |
| Exhibit P(38) | Spreadsheet showing McDonald's 2016/2017 and 2017/2018 vendor spending, bates stamped McD_ESN00005798 | 3058-3101 |
| Exhibit P(39) | Spreadsheet showing McDonald's 2016/2017 and 2017/2018 vendor spending, bates stamped McD_ESN00005246 | 3102-3104 |
| Exhibit P(40) | Spreadsheet showing McDonald's 2018/2019 and 2019/2020 vendor spending, bates stamped McD_ESN00009590 | 3105-3123 |
| Exhibit P(41) | Spreadsheet showing McDonald's 2018/2019 and 2019/2020 vendor spending, bates stamped McD_ESN00008053 | 3124-3190 |
| Exhibit P(42) | Presentation titled "2018 Strategic Blueprint Updated May 2017," bates stamped McD_ESN00005191–5235 | 3191-3236 |
| Exhibit P(43) | Memorandum regarding 2018/2019 Long Term Purchases, bates stamped McD_ESN00006234–6245 | 3237-3249 |

**JOINT EVIDENTIARY APPENDIX REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

| EVIDENCE | | PAGE NO |
|---|---|---|
| Exhibit P(44) | Presentation titled "July MBS \| 2019 Long-Term Purchases ; National Video," dated July 12, 2019, bates stamped McD_ESN00006335–6370 | 3250-3286 |
| Exhibit P(45) | January 15, 2019 email, and attached power point, .pdf, and excel documents, bates stamped McD_ESN00007748–7780 | 3287-3320 |
| **VOLUME 10** | | |
| Exhibit P(46) | Presentation titled "Partnership Opportunities," bates stamped McD_ESN00002136–2142 | 3321-3328 |
| Exhibit P(47) | February 10, 2021 email, bates stamped McD_ESN00002118–2120 | 3329-3332 |
| Exhibit P(48) | May 7, 2021 email, bates stamped McD_ESN00002282–2283 | 3333-3335 |
| Exhibit P(49) | Spreadsheet regarding McDonald's 2021/2022 Upfront Partner allocation, bates stamped McD_ESN00021870 | 3336-3338 |
| Exhibit P(50) | May 7, 2021 email, bates stamped McD_ESN00002274–2275 | 3339-3341 |
| Exhibit P(51) | Presentation titled "21-22 Initial Upfront Allocations; 5.9.2021 w/ updates," bates stamped McD_ESN00021595–21621 | 3342-3369 |
| Exhibit P(52) | Presentation titled "Executive Summary; Partner Recommendation," dated June 6, 2019, bates stamped McD_ESN00008188–8252 | 3370-3435 |
| **Exhibit Q**  (Declaration of Lawrence Blasius) | | 3436-3440 |
| Exhibit Q(1) | February 21, 2023 Expert Report of Lawrence Blasius | 3441-3473 |
| Exhibit Q(2) | March 21, 2023 Expert Rebuttal Report of Lawrence Blasius | 3474-3496 |
| **Exhibit R**  (Declaration of Dominique Hanssens) | | 3497-3500 |
| Exhibit R(1) | February 21, 2023 Expert Report of Dominique Hanssens | 3501-3578 |

**JOINT EVIDENTIARY APPENDIX REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

| **EVIDENCE** | | **PAGE NO** |
|---|---|---|
| Exhibit R(2) | March 21, 2023 Expert Rebuttal Report of Dominique Hanssens | 3579-3617 |
| **Exhibit S** | Declaration of Adriana Lynch) | 3618-3621 |
| Exhibit S(1) | February 21, 2023 Expert Report of Adriana Lynch | 3622-3650 |
| Exhibit S(2) | March 21, 2023 Expert Rebuttal Report of Adriana Lynch | 3651-3664 |
| **Exhibit T** | Chris Geraci Declaration (with Appendix) | 3665-3674 |
| **Exhibit U** | Deborah Innes Declaration (with Appendix) | 3675-3683 |
| **Exhibit V** | (Second Declaration of Amy Andrews) | 3684-3686 |
| **VOLUME 11** | | |
| Exhibit V(1) | Entertainment Studios presentation slide deck dated 10/13/2016, bates stamped ESN0020665–20708 | 3687-3731 |
| Exhibit V(2) | Entertainment Studios presentation slide deck dated May 2016, Plaintiffs, bates stamped ESN0004248-4272 | 3732-3757 |
| **VOLUME 12** | | |
| **Plaintiffs Exhibits** | | |
| **Exhibit W** | Excerpts from deposition of Lawrence P. Blasius April 14, 2023 | 3758-3778 |
| **Exhibit X** | Excerpts from deposition of Dominique M. Hanssens, Ph.D April 4, 2023 | 3779-3791 |
| **Exhibit Y** | Excerpts from deposition of Sydnie Karras May 15, 2023 | 3792-3811 |
| **Exhibit Z** | Excerpts from deposition of Adriana Lynch April 5, 2023 | 3812-3822 |
| **Exhibit AA** | Exhibit 3 to the deposition of Alycia Mason, email dated September 20, 2020 from Alycia Mason, bates stamped McD_ESN00001047-1050 | 3823-3827 |
| **Exhibit BB** | Exhibit 6 to the deposition of Alycia Mason, letter dated March 3, 2021 from Plaintiffs' Counsel to McDonald's | 3828-3832 |

**JOINT EVIDENTIARY APPENDIX REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

| **EVIDENCE** | | **PAGE NO** |
|---|---|---|
| **Exhibit CC** | Exhibit 16 to the deposition of Alycia Mason, email dated April 22, 2021, bates stamped Burrell_0009095-9098 | 3833-3837 |
| **Exhibit DD** | Exhibit 36 to the deposition of Anja Carroll, email dated May 10, 2021, bates stamped McD_ESN00020904 | 3838-3839 |
| **Exhibit EE** | Exhibit 16 to the deposition of Dominique Hanssens, Expert Report of Dominique M. Hanssens, Ph. D., dated February 21, 2023 (PART 1) | 3840-3885 |
| **VOLUME 13** | | |
| **Exhibit EE** | Exhibit 16 to the deposition of Dominique Hanssens, Expert Report of Dominique M. Hanssens, Ph. D., dated February 21, 2023 (PART 2) | 3886-3917 |
| **Exhibit FF** | Exhibit 9 to the deposition of Lawrence P. Blasius, email dated May 4, 2020, bates stamped McD_ESN00012918-12921 | 3918-3922 |
| **Exhibit GG** | Expert Report of Lawrence Blasius, dated February 20, 2023 | 3923-3953 |
| **Exhibit HH** | Spreadsheet of 2017-2018 GCM Upfront Roll-up, bates stamped McD_ESN00005255 | 3954-3968 |
| **VOLUME 14** | | |
| **Exhibit II** | October MBS 2018 Premium Video & Print Long-Term Purchases, dated August 30, 2017, bates stamped Burrell_0007017-7062 | 3969-4015 |
| **VOLUME 15** | | |
| **Exhibit JJ** | Media & Budget Subcommittee 2Q'18 Post Buy Analysis All Media, February 2019, bates stamped Burrell_0010196-10226 | 4016-4047 |
| **Exhibit KK** | McDonald's Corporate authorization to OMD dated 8/9/17 bates stamped McD_ESN00005702 | 4048-4049 |
| **Exhibit LL** | Spreadsheet of 2016-2018 Roll-up, bates stamped McD_ESN00005703 | 4050-4066 |

**JOINT EVIDENTIARY APPENDIX REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

| EVIDENCE | | PAGE NO |
|---|---|---|
| **Exhibit MM** | Spreadsheet of 2016-2018 Roll-up, bates stamped McD_ESN00005704 | 4067-4075 |
| **Exhibit NN** | McDonald's Corporate authorization to OMD dated November 17, 2017, bates stamped McD_ESN00005799 | 4076-4077 |
| **Exhibit OO** | McDonald's Corporate authorization to OMD dated January 25, 2018, bates stamped McD_ESN00005803 | 4078-4079 |
| **Exhibit PP** | McDonald's Corporate authorization to OMD dated March 28, 2018, bates stamped McD_ESN00005986 | 4080-4081 |
| **Exhibit QQ** | McDonald's Corporate authorization to OMD dated April 4, 2018, bates stamped McD_ESN00006002 | 4082-4083 |
| **Exhibit RR** | Media & Budget Subcommittee 2Q'18 Post Buy Analysis All Media February 2019 Bates Stamped McD_ESN00007903-7934 | 4084-4116 |
| **Exhibit SS** | Spreadsheet of 2018-2020 Roll-up, bates stamped McD_ESN00009009 | 4117-4131 |
| **Exhibit TT** | Spreadsheet of 2019 – 2020 AACM Upfront Scenario, bates stamped McD_ESN00009014 | 4132-4134 |
| **VOLUME 16** | | |
| **Exhibit UU** | Media & Budget Subcommittee 4Q'19 Post Buy Analysis, June 2020 bates stamped McD_ESN00010515-10544. | 4135-4165 |
| **Exhibit VV** | Spreadsheet of 2020 – 2021 McDonalds Q4 Upfront Video Partner Detail, bates stamped McD_ESN00011474 | 4166-4178 |
| **Exhibit WW** | Spreadsheet Syndication 2019-2021, bates stamped McD_ESN00011535 | 4179-4192 |
| **VOLUME 17** | | |
| **Exhibit XX** | Media & Budget Subcommittee 1Q'20 Post Buy Analysis All Media, September 2020, bates stamped McD_ESN00012287-12316. | 4193-4223 |

**JOINT EVIDENTIARY APPENDIX REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

| **EVIDENCE** | | **PAGE NO** |
|---|---|---|
| **Exhibit YY** | Email dated August 2, 2021 from Cindy Kelly, subject McDs 2022 Brief, bates stamped ESN0023015-23027 | 4224-4237 |
| **Exhibit ZZ** | Declaration of David W. Schecter in support of Plaintiffs' motion for partial summary judgment | 4238-4241 |
| Exhibit 1 | Exhibit 2 to the deposition of Alycia Mason, Email chain dated September 14, 2020, bates stamped Burrell_0005518, McD_ESN00011590 | 4242-4249 |
| Exhibit 2 | Exhibit 9 to the deposition of Alycia Mason, Email chain dated June 18, 2012, bates stamped ESN0032298-32302 | 4250-4255 |
| Exhibit 3 | Exhibit 10 to the deposition of Alycia Mason, Email chain from Debbie Innes dated February 29, 2016, Subject: 2016 Upfront Presentation – Entertainment Studios – April 18th, bates stamped ESN0024365-24368 | 4256-4260 |
| Exhibit 4 | Exhibit 87 to the deposition of Cynthia Kelly, Email chain dated May 24, 2016, Bates number ESN0004247-4272 | 4261-4287 |
| **VOLUME 18 (AAA PART 1)** | | |
| **Exhibit AAA** | Declaration of David W. Schecter in support of Plaintiffs' opposition to McDonald's motion for summary judgment | 4288-4292 |
| Exhibit 1 | Exhibit 6 to the deposition of Alycia Mason, letter dated March 3, 2021 from Plaintiffs' counsel to McDonald's, | 4293-4297 |
| Exhibit 2 | 2022 McDonald's proxy statement | 4298-4446 |
| Exhibit 3 | 2023 McDonald's proxy statement | 4447-4567 |
| Exhibit 4 | Second Amended Complaint filed in *Washington, et al. v. McDonald's USA, LLC*, et al., Case No. 4:21-cv-367 filed in the United States District Court for the Northern District of Ohio on May 26, 2021 | 4568-4666 |
| Exhibit 5 | Third Amended Complaint filed in *Victoria Guster-Hines and Domineca Neal v. McDonald's USA, LLC*, et al., Case No. 1:20-cv-00117 filed in the United States | 4667-4683 |

- 17 -

JOINT EVIDENTIARY APPENDIX REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT

| EVIDENCE | | | PAGE NO |
|---|---|---|---|
| | | District Court for the Northern District of Illinois on July 16, 2021 | |
| **VOLUME 19 (AAA PART 2)** | | | |
| Exhibit 5 | | Third Amended Complaint filed in *Victoria Guster-Hines and Domineca Neal v. McDonald's USA, LLC*, et al., Case No. 1:20-cv-00117 filed in the United States District Court for the Northern District of Illinois on July 16, 2021 | 4684-4737 |
| **VOLUME 20 (AAA PART 3)** | | | |
| Exhibit 5 | | Third Amended Complaint filed in *Victoria Guster-Hines and Domineca Neal v. McDonald's USA, LLC*, et al., Case No. 1:20-cv-00117 filed in the United States District Court for the Northern District of Illinois on July 16, 2021 | 4738-4777 |
| Exhibit 6 | | McDonald's FOIA response that sets forth a log of text messages sent between McDonald's Corporation's CEO, Chris Kempczinski, and former Chicago Mayor Lori Lightfoot | 4778-4835 |
| Exhibit 7 | | McDonald's announcement on May 20, 2021 McDonald's Increasing Spend with Diverse-Owned Media, Content and Production Partners. | 4836-4843 |
| Exhibit 8 | | McDonald's announcement on July 28, 2020, McDonald's Reports Second Quarter 23020 Results | 4844-4859 |
| Exhibit 9 | | Plaintiffs' Memorandum in Opposition to Non-Parties' Motion to Quash Subpoenas and in Support of Motion to Transfer This Discovery Dispute to the Central District of California or, Alternatively, to Compel Discovery or for Rule to Show Cause, filed February 21, 2023, Case No. 23-CV-00529 | 4860-4878 |
| **VOLUME 21** | | | |
| **Exhibit BBB** | | Declaration of Darren Galatt in support of Plaintiffs' opposition to McDonald's motion for summary judgment | 4879-4882 |

- 18 -

| **EVIDENCE** | | **PAGE NO** |
|---|---|---|
| Exhibit 1 | E-mail from Debbie Innes on February 29, 2016, bates number ESN0024365 | 4883-4887 |
| Exhibit 2 | E-mail from Patrick Olson on July 24, 2019, bates number ESN0025450 | 4888-4890 |
| Exhibit 3 | E-mail from Darren Galatt to Adele Lassere on December 9, 2020, Bates number ESN0025826 | 4891-4901 |
| Exhibit 4 | E-mail from Patrick Olson on July 25, 2019, bates number ESN0033683 | 4902-4905 |
| Exhibit 5 | E-mail from Patrick Olson on July 31, 2019 that was produced in this case with bates number ESN0033686 | 4906-4908 |
| Exhibit 6 | E-mail sent to Patrick Olson on May 5, 2020 that was produced in this case with bates number ESN0033816 | 4909-4915 |
| Exhibit 7 | E-mail received from Patrick Olson on January 25, 2019 that was produced in this case with bates number ESN0025336 | 4916-4918 |
| Exhibit 8 | Report run by Allen Media with total spend by advertiser from 2017 through 2023, bates number ESN0044550 | 4919-5166 |
| **Exhibit CCC** | Declaration of Dennis Hardison in support of Plaintiffs' opposition to defendant's motion for summary judgment | 5167-5171 |
| Exhibit 1 | March 9, 2020 email from Kristin Maclearie to Kari Evans, bates stamped ESN0016403-16405, B. Bekkedah1 Depo. Ex. 21 | 5172-5174 |
| Exhibit 2 | January 18, 2021 email from Darren Galatt to Cindy Kelley, bates stamped ESN0025860-12252, B. Bekkedahl Depo. Ex. 80 | 5175-5189 |
| Exhibit 3 | January 13,2021 email from Cindy Kelley, bates stamped ESN0037576-37578, B. Bekkedahl Depo. Ex. 84. | 5190-5193 |
| Exhibit 4 | November 15, 2019 email from Kristin Maclearie, bates stamped ESN0010350-10351, D. Galatt Depo. Ex. 22 | 5194-5196 |

- 19 -

**JOINT EVIDENTIARY APPENDIX REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

| EVIDENCE | | PAGE NO |
|---|---|---|
| Exhibit 5 | December 9, 2020 email from Darren Galatt to Adele Laserre, bates stamped ESN0012243-12252, D. Galatt Depo. Ex. 26 | 5197-5207 |
| Exhibit 6 | April 6, 2021 email from Barbara Bekkedahl to Darren Galatt and Cindy Kelly, bates stamped ESN0029459-29462, as D. Galatt Depo. Ex. 28 | 5208-5212 |
| Exhibit 7 | December 4, 2019 email from Erik Brown to Blaze Cartelli, bates stamped ESN0022535-22554, C. Kelly Depo. Ex. 93 | 5213-5233 |
| Exhibit 8 | September 25, 2020 email from Cindy Kelly, bates stamped ESN0022707-22709, C. Kelly Depo. Ex. 104 | 5234-5237 |
| Exhibit 9 | January 11, 2021 email from Barbara Bekkedahl to Tina Gambelli, bates stamped ESN0028188-28190, C. Kelly Depo. Ex. 105 | 5238-5241 |
| Exhibit 10 | January 13, 2021 email from Cindy Kelly to Suzanne Irving, bates stamped ESN0014228-14230, C. Kelly Depo. Ex. 106 | 5242-5245 |
| Exhibit 11 | January 29, 2021 email from Cindy Kelly, bates stamped ESN0022792-22794, C. Kelly Depo. Ex. 107 | 5246-5249 |
| **Exhibit DDD** | Declaration of Mark Devitre in support of Plaintiffs' opposition to defendant's motion for summary judgment | 5250-5252 |
| Exhibit 1 | Assignment of Claims between Entertainment Studios Networks, Inc. and CF Entertainment, Inc. | 5253-5255 |
| Exhibit 2 | CF Entertainment Ratification of Entertainment Studios Network, Inc.'s claims asserted against McDonald's USA, LLC | 5256-5257 |
| **Exhibit EEE** | Declaration of Roy Restivo in support of Plaintiffs' opposition to defendant's motion for summary judgment | 5258-5261 |
| Exhibit 1 | Nielsen Report Re: FUSE and TV ONE HH Reach from 2018 – 3/16/2023 | 5262-5163 |

- 20 -

| EVIDENCE | | PAGE NO |
|---|---|---|
| Exhibit 2 | Nielsen Report Re AMG's Syndicated Programming Combos Ratings from 2017 - 2021 | 5264-5301 |
| Exhibit 3 | Data Report Re Ratings of Networks, from 2017 to 2022 | 5302-5358 |
| **Exhibit FFF** | Declaration of Tom Nunan in support of Plaintiffs' opposition to defendant's motion for summary judgment | 5359-5366 |
| Exhibit 1 | Resume of Tom Nunan | 5367-5371 |
| Exhibit 2 | Expert Report of Tom Nunan dated February 21, 2023 | 5372-5399 |
| Exhibit 3 | Supplemental Expert Report of Tom Nunan dated March 21, 2023 | 5400-5402 |
| **Exhibit GGG** | Spreadsheet McDonald's Minority Owned-Operated-Targeted Media Database, bates stamped McD_ESN00001121 | 5403-5407 |
| **VOLUME 22** | | |
| **Exhibit HHH** | Excerpts from Deposition of Mark DeVitre dated July 28, 2023 | 5408-5444 |
| **Exhibit III** | Supplemental Declaration of David W. Schecter in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment | 5445-5448 |
| Exhibit 1 | Defendant's Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(A)(1), filed October 4, 2021 | 5449-5461 |
| Exhibit 2 | Plaintiffs' Notice of Rule 30(B)(6) Deposition of Defendant McDonald's USA, LLC, served July 15, 2022 | 5462-5472 |
| Exhibit 3 | Letter from Amy C. Andrews to David W. Schecter Re: Entertainment Studios Networks v. McDonald's USA, dated August 1, 2022 | 5473-5475 |
| Exhibit 4 | Ratification between Justice Central Network, Inc and Entertainment Studios Network Inc., dated August 28, 2023 | 5476-5477 |

**JOINT EVIDENTIARY APPENDIX REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

| **EVIDENCE** | | **PAGE NO** |
|---|---|---|
| Exhibit 5 | Exhibit 38 to the deposition of Geoffrey Calabrese, email from Teccara Carmack to Adele Lassere, subject: McD + IAT Part 2: Diversity goals, process & tracking, bates stamped Burrell_0004667-4674 | 5478-5486 |

Dated: September 11, 2023

By: */s/Amy Andrews*

Shalem Massey (# 143281)
Jennifer Steeve (# 308082)
RILEY SAFER HOLMES & CANCILA LLP
100 Spectrum Center Drive, Ste 440
Irvine, CA  92618
smassey@rshc-law.com
jsteeve@rshc-law.com
Telephone:   (949) 359-5515
Facsimile:    (949) 359-5501

Patricia Brown Holmes *(pro hac vice)*
Amy Andrews *(pro hac vice)*
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison Street, Ste 2900
Chicago, IL 60602
pholmes@rshc-law.com
aandrews@rshc-law.com
Telephone:   (312) 471-8745
Facsimile:    (312) 471-8701

Loretta E. Lynch *(pro hac vice)*
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
lelynch@paulweiss.com
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Attorneys for Defendant McDonald's USA, LLC*

**JOINT EVIDENTIARY APPENDIX REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

1

2   Dated:  September 11, 2023          By:  _/s/_ David W. Schecter _____

3                                      LOUIS R. MILLER (State Bar No. 54141)
                                       DAVID W. SCHECTER (State Bar No.
4                                      296251)
                                       MILLER BARONDESS, LLP
5                                      1999 Avenue of the Stars, Suite 1000
                                       Los Angeles, California 90067
6                                      smiller@millerbarondess.com
                                       dschecter@millerbarondess.com
7                                      Telephone: (310) 552-4400
                                       Facsimile: (310) 552-8400
8
                                       Attorneys for Plaintiff
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JOINT EVIDENTIARY APPENDIX REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

# SIGNATURE ATTESTATION

I hereby attest that all signatories listed above, on whose behalf this Joint Evidentiary Appendix re Defendant's Motion for Summary Judgment, or Alternatively, Partial Summary Judgment is submitted, concur in the filing's content and have authorized the filing.

Dated: September 11, 2023          By: _____ */s/Amy Andrews* _____

Shalem Massey (# 143281)
Jennifer Steeve (# 308082)
RILEY SAFER HOLMES & CANCILA LLP
100 Spectrum Center Drive, Ste 440
Irvine, CA  92618
smassey@rshc-law.com
jsteeve@rshc-law.com
Telephone:   (949) 359-5515
Facsimile:    (949) 359-5501

Patricia Brown Holmes *(pro hac vice)*
Amy Andrews *(pro hac vice)*
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison Street, Ste 2900
Chicago, IL 60602
pholmes@rshc-law.com
aandrews@rshc-law.com
Telephone:   (312) 471-8745
Facsimile:    (312) 471-8701

Loretta E. Lynch *(pro hac vice)*
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
lelynch@paulweiss.com
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Attorneys for Defendant McDonald's USA,*
*LLC*

# EXHIBIT A

CONFIDENTIAL

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3                      WESTERN DIVISION

 4

 5    ENTERTAINMENT STUDIOS          )

      NETWORKS, INC., a              )

 6    California corporation;        )

      WEATHER GROUP, LLC, a          )

 7    Delaware limited liability     )

 8    company,                       )Case No.

 9          Plaintiffs,              )2:21-cv-04972-FMO-MAA

            -vs-                     )

10    McDONALD'S USA, LLC, a         )

11    Delaware limited liability     )

12    company,                       )

13          Defendant.               )

      _____  )

14      CONFIDENTIAL VIDEOTAPED DEPOSITION OF ALYCIA MASON

15

16       The deposition of ALYCIA MASON, called for

17    examination pursuant to the Rules of Civil Procedure for

18    the United States District Courts pertaining to the

19    taking of depositions, taken before Megan M. Bowman,

20    Certified Shorthand Reporter within and for the County

21    of Cook and State of Illinois, at Riley Safer Holmes &

22    Cancila LLP, 70 West Madison Street, Suite 2900,

23    Chicago, Illinois, on the 24th day of August, 2022, at

24    9:30 a.m.

25
```

                                                    Page 1

EXHIBIT A
AOE0026

CONFIDENTIAL

```
 1                  A P P E A R A N C E S
 2    FOR THE PLAINTIFF(S):
 3                  David W. Schecter
                    Margret Flodeen
 4                  MILLER BARONDESS, LLP
                    1999 Avenue of the Stars
 5                  Suite 1000
                    Los Angeles, CA 90067
 6                  310.552.4400
                    dschecter@millerbarondess.com
 7
 8    FOR THE DEFENDANT(S):
 9                  Amy Andrews
                    Robert Foley
10                  RILEY SAFER HOLMES & CANCILA LLP
11                  70 West Madison
                    Suite 2900
12                  Chicago, IL 60601
                    312.471.8700
13                  aandrews@rshc-law.com
14                  rfoley@rshc-law.com
15
16    ALSO PRESENT:
17    Ross Colby, videographer
      Monica Mosby, Senior Counsel, McDonald's Corporation
18
19    PRESENT VIA ZOOM:
      Licette Lozano (Veritext)
20    Byron Allen
21    Darren Galatt
22    Eric Gould
23    Jeff Mayes
24    Tom O'Brien
25    Janice Arouh
```

Page  2

EXHIBIT A
AOE0027

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | | an executive with the Plaintiffs is -- is on as |
| 2 | | well as Jeff Mayes who is an assistant general |
| 3 | | counsel for Allen Media Group.  Other client reps |
| 4 | | from Plaintiffs' side might join and I'll do my |
| 5 | | best to announce who they are and that they've |
| 6 | | entered just so you can understand who's listening |
| 7 | | in. |
| 8 | | BY MR. SCHECTER: |
| 9 | Q | Okay.  So what is your current title? |
| 10 | A | The US chief customer experience officer. |
| 11 | Q | And is that with McDonald's Corporation or -- |
| 12 | A | Yes, with McDonald's. |
| 13 | Q | So just let me finish my question.  That's okay. |
| 14 | | That's with McDonald's Corporation? |
| 15 | A | I would assume so, yes.  Yes. |
| 16 | Q | Do you not know? |
| 17 | A | The end corp, yes.  I would assume, yes, corp. |
| 18 | Q | So it's the US chief customer experience officer? |
| 19 | A | Yes. |
| 20 | Q | Do you have any other titles presently? |
| 21 | A | No. |
| 22 | Q | And what are your roles and responsibilities in |
| 23 | | that role? |
| 24 | A | I oversee all customer facing capabilities and |
| 25 | | channels. |

Veritext Legal Solutions
866 299-5127

EXHIBIT A

AOE0028

CONFIDENTIAL

```
 1            what is the function of this team?
 2    A    The paid media -- national paid media team helps
 3         oversee the paid media -- national paid media
 4         strategy and the investments of the national paid
 5         media.
 6    Q    Okay.  So, for example, McDonald's I assume has a
 7         national advertising budget each year; right?
 8    A    Yes.  There's a national advertising budget.
 9    Q    And is it the paid media team's job to oversee how
10         that money is spent?
11    A    They work with agencies as well as an independent
12         operator group to decide how the money is spent on
13         a national level.
14    Q    And that independent group, that's OPNAD?
15    A    Yes.
16    Q    Okay.  So the paid media team interfaces with ad
17         agencies?
18    A    Yes.
19    Q    And also OPNAD?
20    A    Yes.
21    Q    Okay.  How long have you been the US chief customer
22         experience officer?
23    A    Since I think it was March 2022.
24    Q    What was your title before that?
25    A    VP of digital customer engagement and media.
```

Page 13

EXHIBIT A

AOE0029

CONFIDENTIAL

1    Q    Are those two separate things, digital customer
2         experience and media?
3    A    Yes.
4    Q    Digital customer experience would include, like,
5         websites, digital platforms, streaming; is that
6         right?
7    A    No.  It would include our app, our kiosk delivery
8         channels, digital capability such as Loyalty CRM.
9    Q    And then so the media part of that job is that what
10        we've been talking about, interfacing with ad
11        agencies and OPNAD?
12   A    Yes.
13   Q    Were you essentially what Caleb is now?
14   A    No.  Caleb is a senior director.  I was a vice
15        president.
16   Q    When did you join McDonald's?
17   A    November of 2018.
18   Q    And when you joined were you the vice president,
19        digital customer experience and media?
20   A    I was the vice president of media and CRM when I
21        joined.
22   Q    When were you -- when did you get this title
23        change?
24   A    I believe it was Q2 of 2019.
25   Q    So is it fair to say that when you joined

Page 14

EXHIBIT A

AOE0030

CONFIDENTIAL

```
  1         McDonald's you were an executive with
  2         responsibility to oversee how McDonald's national
  3         advertising budget was spent?
  4     A   How McDonald's national media budget was spent.
  5     Q   Okay.  There's a difference between advertising and
  6         media?
  7     A   Yes.
  8     Q   What's the difference?
  9     A   Advertising encompasses -- the advertising budget
 10         encompasses the production dollars to create the
 11         ads and the media dollars to be placed.  I oversee
 12         the media dollars to be placed.
 13     Q   Do you -- strike that.
 14             When you were -- prior to being the US chief
 15         customer experience officer, in your vice president
 16         role, who did you report to?
 17     A   Morgan Flatley.
 18     Q   As the CMO?
 19     A   Yes.
 20     Q   So for your entire time at McDonald's you've
 21         reported directly to the CMO?
 22     A   Correct.
 23     Q   Do you report only to the CMO?
 24     A   Correct.
 25     Q   Do you work with any other senior executives I'll
```

Page 15

EXHIBIT A

AOE0031

CONFIDENTIAL

```
 1        define as the c-suite so the CEO, general counsel,
 2        things like that, CFO in your job?
 3   A    Yes.  I work with other senior executives at
 4        McDonald's.
 5   Q    In what roles -- strike that.
 6             In what sense have you worked with the CEO of
 7        McDonald's at any point since you've been there?
 8   A    Which CEO of McDonald's?
 9   Q    We can start with Mr. Easterbrook.
10   A    I've never worked with him.
11   Q    So Mr. Kempczinski then.  In what sense have you
12        worked with Mr. Kempczinski at your time at
13        McDonald's?
14   A    When he was the US president.
15   Q    And so you -- you haven't worked with
16        Mr. Kempczinki as CEO?
17   A    Nope.
18             MR. SCHECTER:  Let's mark this as Exhibit 1.
19             MS. ANDREWS:  Thanks.
20             (Deposition Exhibit 1 was marked for
21        identification.)
22   BY MR. SCHECTER:
23   Q    So, Ms. Mason, I've handed you a document that has
24        been marked Deposition Exhibit 1.
25             Have you seen it before?
```

Page 16

EXHIBIT A

AOE0032

CONFIDENTIAL

```
 1            receive it.
 2     Q      My -- my question is more along the lines of do you
 3            remember receiving it as you sit here today?
 4     A      This exact email do I remember receiving?  No.  I
 5            don't remember the exact email I received.
 6     Q      So if you look at the attachment, it's the
 7            breakdown that OMD prepared?
 8     A      Mm-hmm.
 9     Q      And if you look, the first page it's a -- this is a
10            printout of an Excel sheet.  We did each sheet --
11     A      Mm-hmm.
12     Q      -- it's own page.  So it looks like the first page
13            is a summary page.
14     A      Uh-huh.
15     Q      Do you see that?
16     A      Yes.
17     Q      Okay.  It says -- in the first box it says, "2019
18            net spend:  416."  It looks like those numbers in
19            millions.
20               Do you see that?
21     A      Yes.
22     Q      So was -- was McDonald's national advertising
23            budget around 416 million in 2019?
24     A      That number -- I don't know the exact number but
25            that number seems in the right ballpark.
```

Page 29

EXHIBIT A
AOE0033

CONFIDENTIAL

1    Q    Okay.  Then it looks like the advertising spend

2         went up in 2020 to 451 million.

3              Do you see that?

4    A    Yes.

5    Q    And if you look down to minority classification,

6         you'll see the second row under that, "African

7         American MBE," which is minority owned -- make sure

8         I get this right, use the term, minority owned

9         business enterprise?

10   A    Mm-hmm.

11   Q    Do you see that?

12   A    Yep.

13   Q    According to OMD it shows 7.7 million was spent on

14        African American minority owned business

15        enterprises in 2019.

16             Do you see that?

17   A    Yep.

18   Q    Which represented 2 percent of the 2019 net spend.

19             Do you see that?

20   A    Yes.

21   Q    Do you have any reason to doubt these figures?

22             MS. ANDREWS:  Object to the form.

23   A    No.  I have no reason to doubt the figures.

24   Q    And if you look with 2020 the net spend went up to

25        451 million but spending with African American

EXHIBIT A

AOE0034

CONFIDENTIAL

```
 1        minority owned business enterprises dropped to 6.62
 2        million.
 3            Do you see that?
 4    A   Yes.
 5    Q   That represented a 1 percent spend of the 2020 net
 6        spend.
 7            Do you see that?
 8    A   I do.
 9    Q   And according to OMD that was a 14 percent drop in
10        spending with minority-owned businesses.
11            Do you see that?
12    A   Yes.
13    Q   So when I asked you earlier as to whether you knew
14        the spending on African American-owned media and
15        you said it was in the single digits, were you
16        referring to 1 to 2 percent?
17            MS. ANDREWS:  Object to the form.
18    A   I said single digits so 1 and 2 percent would be
19        inclusive of single digits.
20    Q   When you -- try and divorce it from actually
21        looking at the document, but when you -- at some
22        point I take it whether you recall this email or
23        someone else telling it to you, you learned that
24        the spend on minority owned -- excuse me -- African
25        American-owned businesses -- African American media
```

Page 31

EXHIBIT A

AOE0035

```
 1   A   Yes.  I know she used to work on the business.

 2   Q   She was -- she worked with Burrell and Burrell was

 3       an ad agency for McDonald's; right?

 4   A   Yes.

 5   Q   Ms. -- is it Lassere?  Am I saying that correctly?

 6   A   Yes.

 7   Q   Do you know if she's knowledgeable about, from a

 8       historical perspective, issues facing black-owned

 9       media?

10           MS. ANDREWS:  Object to the form.

11   A   I cannot speak to what Adele is -- is or is not

12       familiar with.

13   Q   And isn't it true that McDonald's used Burrell as

14       an agency because of its expertise in the African

15       American consumer market?

16   A   In the African American consumer market.  Not in

17       media company ownership.

18   Q   But from your -- isn't it true though that

19       Ms. Lassere has been working in media with respect

20       to the African American consumer market for several

21       years?

22           MS. ANDREWS:  Object to the form.

23   A   I met Adele when I started working in 2018 and she

24       was working at Burrell which is known for being an

25       African American consumer ad agency.
```

Page 72

EXHIBIT A
AOE0036

CONFIDENTIAL

```
 1    Q    Did you come to form an opinion at any time whether
 2         Ms. Lassere had expertise with respect to the
 3         African American consumer market?
 4    A    I -- I don't know if I formed an opinion per se.
 5         She was the account lead.
 6    Q    Well, at any point in time, did you think that she
 7         just didn't know her stuff with respect to the
 8         African American consumer market?
 9              MS. ANDREWS:  Object to form.
10    A    Know her -- know -- "know your stuff" is a broad
11         term.
12    Q    I'm just --
13    A    Is there something specific that do I believe she
14         was a expert on?
15              Is that what you're asking?
16    Q    I'm asking if you ever in dealing with Ms. Lassere
17         came to the opinion that she did not know the
18         African American consumer market?
19              MS. ANDREWS:  Object to the form.
20    A    I can't say.  I mean, she -- I would say yes.  She
21         knew the -- knew the consumers.  She worked at
22         Burrell.
23    Q    Which is a agency with expertise in the African
24         American consumer market; right?
25    A    Yes.
```

Page 73

EXHIBIT A
AOE0037

CONFIDENTIAL

```
1    A    No, but I don't really watch linear television so
2         it's not something -- it's not part of my media
3         habits.
4    Q    Do you know if the pets network is targeted to
5         African Americans?
6    A    I don't know if they're targeted to African
7         Americans.
8    Q    Do you know one way or another if they're targeted
9         to the general audience or a particular racial
10        demographic?
11   A    My understanding is they're target to more of a
12        general market audience, but I don't have facts to
13        say that but that's my understanding of it.
14   Q    And yet you're aware that McDonald's required
15        Entertainment Studios to seek McDonald's national
16        advertising dollars through Burrell, McDonald's
17        African American ad agency; isn't that right?
18             MS. ANDREWS:  Objection to form.
19   A    No.  That's not correct.  We have placed some buys
20        with Byron Allen's general market targeted media
21        local something through OMD.  They were asked to go
22        through Burrell for the African American ones.
23        Anything that'd be general market target such as
24        The Weather Channel would have gone through OMD.
25   Q    So is it your testimony under oath that
```

Page 97

EXHIBIT A

AOE0038

CONFIDENTIAL

```
 1        Entertainment Studios' general market media did not
 2        -- was not forced to go through Burrell?
 3    A   Correct.
 4    Q   Did anyone tell you that?
 5    A   Why do you say that?
 6    Q   Well, what are you relying on to make that
 7        statement?
 8    A   I'm relying on when Byron Allen's media group would
 9        submit proposals that are broad, broad in nature,
10        that both OMD and Burrell were reviewing them.  I
11        also am going on the fact that OMD buys our general
12        market upfront buy which weather is not a part of
13        because it does not hit our media target in our
14        considerations.  So OMD would be making that
15        recommendation.
16            MR. SCHECTER:  Is this 9?
17            THE REPORTER:  9.
18            MR. SCHECTER:  Give me a second.
19            (Deposition Exhibit 9 was marked for
20        identification.)
21    BY MR. SCHECTER:
22    Q   Ms. Mason, have you ever seen Deposition Exhibit 9
23        before?
24    A   I don't believe so.
25    Q   Do you know who Chris Geraci is?
```

Page 98

EXHIBIT A
AOE0039

CONFIDENTIAL

```
 1          Allen -- "I have been trying to help to get you
 2          more business beyond Hershey and I know that
 3          PepsiCo considering.  McDonald's will consider but
 4          not through OMD."
 5              Do you see that?
 6     A    Yep.
 7     Q    You have no information that contradicts this
 8          statement; is that right?
 9              MS. ANDREWS:  Objection, form, foundation.
10     A    I have context.  I didn't write this, but the
11          properties that Byron Allen has that we would
12          consider for our general market buy do not meet the
13          criteria for our general market buy.  So we would
14          not be buying those properties through OMD who's
15          our general market buyer.  The only property that
16          we bought through them did meet the criteria was
17          the Local Now, whatever it was, because it met the
18          requirements of our national paid media buys.  The
19          areas that we had opportunity to continue buying
20          with were African American target such as TheGrio.
21              I don't know exactly what he meant when he
22          wrote that, but that is the -- of -- while -- why
23          the McDonald's investment was not increasing
24          through OMD.  It was because the media properties
25          did not align to our media strategy.
```

EXHIBIT A
AOE0040

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | | agency of record for Entertainment Studios today? |
| 2 | | MS. ANDREWS:  Objection to form. |
| 3 | A | No.  McDonald's does not see Burrell as the |
| 4 | | agency -- I don't see Burrell as the agency of |
| 5 | | record for Entertainment Studios.  Burrell is |
| 6 | | McDonald's agency of record for African American |
| 7 | | media planning and select buying. |
| 8 | Q | So McDonald's splits up its national advertising |
| 9 | | budget between different consumer markets; is that |
| 10 | | right? |
| 11 | A | Yes. |
| 12 | Q | McDonald's has a general consumer market; is that |
| 13 | | correct? |
| 14 | A | Yes. |
| 15 | Q | And the vast majority of the spend is through the |
| 16 | | general consumer market? |
| 17 | A | How would you define "vast majority"? |
| 18 | Q | Did you understand that term?  How about -- |
| 19 | A | Majority is over 51 percent.  I don't know what |
| 20 | | vast means. |
| 21 | Q | Okay.  Well, over 90 percent?  Do you know one way |
| 22 | | or another? |
| 23 | A | No.  It does not spend over 90 percent of the |
| 24 | | budgets in general market. |
| 25 | Q | It's less than 90 -- it's less than 90 percent? |

Page 105

EXHIBIT A
AOE0041

CONFIDENTIAL

```
 1    Q    So OMD places a portion of the overall budget;
 2         right?
 3    A    Correct.
 4    Q    Burrell places another portion; right?
 5    A    Yes.
 6    Q    And so OMD places a majority of the budget; right?
 7              MS. ANDREWS:  Object to the form.
 8    A    OMD would place the majority of the national ad
 9         spend, yes.
10    Q    Why have different agencies for different consumer
11         markets?
12              MS. ANDREWS:  Object to the form.
13    A    McDonald's has different agencies.  We have
14         different media, creative and communication
15         agencies in order to ensure we have the best
16         thinking across all of our segments.
17    Q    But a portion of the ad buy is to buy impressions
18         with African Americans; is that right?
19              MS. ANDREWS:  Object to the form.
20    A    Can you say that again or say it in a different
21         way?
22    Q    One of McDonald's goals in placing however you --
23         placing advertisements --
24    A    Okay.
25    Q    -- is to purchase impressions of African Americans
```

                                        Page 109

EXHIBIT A
AOE0042

CONFIDENTIAL

```
 1          market within racial demographics; right?
 2    A     Yes.  There can be, yep.
 3    Q     And Burrell creates -- I understand that they can
 4          create advertisements.  That's part of what they
 5          do.
 6    A     Mm-hmm.
 7    Q     But they also place advertisements; right?
 8    A     For some of our buy.  Not for all of it.
 9    Q     And some of their -- strike that.
10             Generally they're placing advertisements for
11          McDonald's in the African American consumer market?
12             MS. ANDREWS:  Objection to form.
13    A     Burrell and OMD -- so Burrell is 100 percent
14          responsible for planning the media buy that is
15          targeted to African Americans.  OMD and Burrell
16          shared responsibilities on who would place the buy
17          based on pricing and other things.
18    Q     Just as an aside, who determines the size of the
19          national advertising budget each year?
20    A     The McDonald's marketing team works with various
21          inputs including past performance, our business
22          objectives, based on volume.  We work with the
23          media agencies based on what is media cost for
24          different -- to reach different targets.  And then
25          we develop a budget recommendation that is approved
```

Page 112

EXHIBIT A

AOE0043

CONFIDENTIAL

```
 1          by the operator group.
 2   Q      So does -- do you work on making recommendations
 3          for the size of the budget for the next year?
 4   A      Yes.
 5   Q      And you've mentioned the operator group.  That's
 6          OPNAD?
 7   A      Mm-hmm.
 8   Q      So the -- I mean, we've been looking at Exhibit
 9          No. 2, which has national spend.
10              What portion of the national advertising budget
11          comes from fees paid by operators?
12              MS. ANDREWS:  Objection to the form and
13          foundation.
14   A      100 percent.  Oh, no, no.  I'm sorry.  That's not
15          right.  I don't know the exact number.  It would be
16          I would say over 90 percent would be the national
17          advertising.  A large number.  Sorry.  It's not 100
18          percent.
19   Q      I don't wanna use vast majority again but a large
20          amount of the national advertising budget comes
21          from operators; right?
22   A      The majority.
23   Q      You said about over 90 percent you would think?
24   A      I would think it would be close to 90 percent.
25   Q      And by --
```

Page 113

EXHIBIT A

AOE0044

CONFIDENTIAL

```
 1          budget that's used to do that?
 2   A      Yes.
 3   Q      Okay.  What is that?
 4   A      The local McDonald's operators have their own
 5          budget that they pool together and place their own
 6          media buys.
 7   Q      That doesn't run through McDonald's USA or Corp;
 8          right?
 9   A      It does not run through my McDonald's USA team, no.
10   Q      So is there another McDonald's budget that's used
11          to buy time on networks?
12   A      Occasionally there is a small budget that is used
13          to buy from a more of a corporate reputation
14          standpoint.
15   Q      What does that mean?
16   A      So, for example, we have sustainability goals.
17          When we talk about sustainability, our commitments
18          to the environment sustainability, we would have a
19          very very targeted media buy to target certain
20          audiences with that sustainability message.  It's
21          not the consumer message.  It is run by the
22          communications.
23   Q      Okay.  And that's -- do you know how large that
24          budget is?
25   A      No.  I do not know how large that budget is.
```

Page 116

EXHIBIT A
AOE0045

```
 1          best person to look at those.  But I'm not sure
 2          what proposal is attached here for $2 million.
 3     Q    So, Ms. Mason, you -- you are the representative
 4          witness on topic 17, which I'm gonna read as, "Why
 5          McDonald's chose Burrell as the agency of record
 6          for Entertainment Studios?"
 7               So I know you weren't at the company in 2015,
 8          but are you prepared to testify on behalf of the
 9          company as to this issue?
10     A    Yes, because that is not accurate that statement.
11          We are not saying that Burrell is the only agency
12          to deal with Byron Allen.
13     Q    So did you --
14     A    Because we've also placed a buy as we've said with
15          OMD.
16     Q    And that was placed in 2021?
17     A    I don't recall the exact year that it was placed.
18     Q    It wasn't placed in 2015; right?
19     A    I don't recall the exact year, but it was since my
20          time here so, no.  I'm gonna say it's not placed in
21          2015 that I'm aware of.
22     Q    And what buy are you referring to?
23     A    It's called Local Now or something.  It's one of
24          his -- it's one of his properties that -- it's like
25          more navigation in maps.  I believe it's a digital
```

Page 127

EXHIBIT A

AOE0046

CONFIDENTIAL

```
 1              MS. ANDREWS:  Okay.

 2              MR. SCHECTER:  We've been going for a little

 3         while.

 4              Do you wanna do 15?

 5              MS. ANDREWS:  Sure.

 6              THE VIDEOGRAPHER:  We'll go off the record.

 7         The time it 1:44 p.m.  This is the end of media

 8         unit three.

 9              (A recess was taken.)

10              THE VIDEOGRAPHER:  We're back on the record at

11         2:15 p.m.  This is media unit four.

12    BY MR. SCHECTER:

13    Q    So, Ms. Mason, in your time at McDonald's, is there

14         a standard process for determining how much money

15         to spend in placing advertisements on cable

16         television?

17    A    There is a process which we decide in totality with

18         the agencies then approved by the operator body of

19         how much to spend on video and then cable TV is a

20         part of that recommendation, yeah.

21    Q    And so is it that the agencies make recommendations

22         and McDonald's makes the final decision?

23    A    No.  The final decision ultimately is voted on by

24         the operators.

25    Q    So I guess walk me through that.  Is the first step
```

Page 133

EXHIBIT A
AOE0047

CONFIDENTIAL

```
 1        in the process for the agency to make a
 2        recommendation for next year's spending?
 3   A    The agency takes our media -- our medium marketing
 4        brief.  So what do we want to achieve as a company,
 5        what are the goals of that, what do we want to
 6        achieve.  We brief that to an interagency team that
 7        is a combination of creative and media and
 8        communication agencies.  The media agencies would
 9        bring back a collective POV on how to spend that
10        money.
11            Within that there would be a specific video how
12        to spend that.  Mix of video properties, etc., any
13        sponsorships.  We as McDonald's would
14        agree/disagree, get to a recommendation and then it
15        would go forth to OPNAD.
16   Q    Okay.  And in -- so high level McDonald's presents
17        its goals to a interagency team.  Those agencies
18        come up with recommendations.  McDonald's approves
19        those recommendations and they go out to the
20        operators; is that fair?
21   A    Yes.
22   Q    Okay.  In your time at McDonald's have the
23        operators failed to approve any national
24        advertising spending on video that McDonald's had
25        approved?
```

Page 134

EXHIBIT A

AOE0048

CONFIDENTIAL

```
 1   A    Have they failed to approve?  I don't recall
 2        specifics.  I -- I don't recall a time period, but
 3        I'm also not in every media budget committee that
 4        is approved so I wouldn't want to say 100 percent.
 5   Q    But just as you sit here today, you can't think of
 6        a situation where OPNAD disagreed with -- strike
 7        that.
 8            You're not -- as you sit here today, you're not
 9        aware of a situation where OPNAD did not approve
10        media spending that McDonald's had approved?
11   A    Oh, yes.  I am.  Yes.  They have approved that.
12        You asked about video specifically.  That's like
13        we're down to media play on a certain channel.
14   Q    Yeah.  Let me try again.  I do want to focus on
15        video.
16            So are you aware of any instance where OPNAD
17        disagree with any video spending that had been
18        approved by McDonald's?
19   A    I'm not aware, but as I said, I don't attend every
20        committee budget approval meeting.  So there could
21        be a time that the recommendation did not get
22        approved by the operators --
23   Q    Is -- sorry.
24   A    -- because there are times that do not -- things
25        don't get approved and we go back and rework the
```

Page 135

EXHIBIT A

AOE0049

1        plan so --

2    Q   Okay.

3    A   -- but I don't attend every meeting.

4    Q   But as you sit here today, you can't think of that

5        happening with respect to video?

6    A   Not the meetings I attended.  I want to be clear.

7        I don't attend every operator meeting.

8    Q   The interagency team that you mentioned, does that

9        include Burrell?

10   A   Yes.

11   Q   Does that include OMD?

12   A   Yes.

13           MS. ANDREWS:  At what time frame?

14   A   At what time frame?

15   Q   We can --

16   A   Sorry.  Yes.  Yeah.  It'd be --

17   Q   OMD is -- you now use a different agency for

18       general consumer market?

19   A   A different media agency for general market.

20   Q   You fired OMD; right?

21   A   We terminated our agency of record with them.

22   Q   So when OMD was McDonald's agency of record they

23       were part of the interagency team?

24   A   Correct.

25   Q   The -- the step from McDonald's initially to the

                                        Page 136

EXHIBIT A
AOE0050

CONFIDENTIAL

```
 1          interagency team, is there are -- there documents
 2          that are given to the interagency team that contain
 3          McDonald's media marketing strategy for the
 4          upcoming year?
 5     A    Yes.  We have a McDonald's issue briefing process
 6          that is standard for all of our initiatives and
 7          agencies that we provide.
 8     Q    And then the -- I guess COVID changes things, but
 9          there would be then a meeting between McDonald's
10          and the interagency team?
11     A    A lot of meetings, yes.
12     Q    A lot of meetings.  I'm sure that they used to
13          maybe -- they were in person but then virtual?
14     A    Always a combination because not everyone lives in
15          Chicago.
16     Q    Okay.  Then the -- would each agency then submit
17          their own recommendation or was it a recommendation
18          set by the interagency team in general?
19     A    A recommendation for what?  Of one plan?  A total?
20          A budget?  What specific are you -- what type of
21          recommendation?
22     Q    So McDonald's create -- has a briefing process,
23          documents are submitted, they're discussed with the
24          interagency team, interagency team makes
25          recommendations to McDonald's?
```

Page 137

EXHIBIT A

AOE0051

CONFIDENTIAL

```
 1    A    Correct.
 2    Q    Are those recommendations on an agency by agency
 3         basis or is it a combined recommendation?
 4    A    It's both.  So we get a combined deck like Exhibit
 5         11 that has all the agencies' information have put
 6         into it and are presented as some of the plan is
 7         holistic the strategy or performance and then there
 8         are specifics for the specific agencies based on
 9         their target.
10    Q    The -- the recommendations are they granular in the
11         sense that the agency makes a recommendation of a
12         particular amount of money to be spent with each,
13         say, network?
14    A    Yes.  There would be recommendations that would
15         show media spend by network, yes.  By media
16         property, sure.  I want to be clear.  Media
17         property because it's not always a network.
18    Q    And then the -- would the recommendation also
19         include things such as time slots, units, GRP
20         targets, price in terms of CPM?
21    A    It depends.  Not every recommendation would provide
22         that level of detail.  So it would depend on what
23         that recommendation is and who is looking at that
24         level of detail.
25    Q    So then once the recommendations are received by
```

Page 138

EXHIBIT A

AOE0052

CONFIDENTIAL

1     McDonald's, what are you -- what is McDonald's

2     approving?

3          Is McDonald's approving particular amounts of

4     the budget to be spent with particular media

5     properties?

6  A  We're approving is the overall plan on strategy,

7     will the overall plan deliver against the business

8     objectives and targets that we set out, does the

9     overall plan adhere to our brand safety or brand

10    standards, does it fit with the creative, does it

11    have the right level of added value.  That's --

12    those are the things -- does it meet our other

13    commitments that we have as a company.

14         Those are the things that we're looking for for

15    approval.

16  Q  I -- I understand that that's the process you go

17    through, but in terms of the actual approval, does

18    it -- are you approving specific amounts of money?

19  A  We would approve the buy-in totality, yes.  We

20    agree -- we agree -- once the back and forth, we

21    agree that this media buy will hit those objectives

22    that we have set forth.

23  Q  But just to use an example --

24  A  We -- sorry, sorry.  Just -- sorry -- a moment.  We

25    approve that we will take that forth to the

Page 139

EXHIBIT A

AOE0053

CONFIDENTIAL

```
1        operator group.
2    Q   Yeah.
3    A   The operator votes on would they approve it or not.
4    Q   Yeah.  I -- I think we're talking the same thing.
5        I just wanna confirm.
6            So the -- let's use -- let's use Comedy Central
7        as an example.
8    A   Mm-hmm.
9    Q   Okay.  So McDonald's advertises on Comedy Central?
10   A   I don't know if we do.  That level of detail -- I
11       don't have that level of detail.
12   Q   You don't know one way or another if McDonald's
13       advertises on Comedy Central?
14   A   I don't have -- what time period are you referring
15       to?
16   Q   2021, last year.
17   A   I don't know if we did on 2021.  I don't know.  Are
18       you talking linear TV or other digital properties?
19   Q   Linear TV.
20   A   I don't know if we did.
21   Q   Do you know if McDonald's advertised on CNN in
22       linear TV in 2021?
23   A   I would know from a national paid media so remember
24       the buckets we talked about, national paid media we
25       would not have advertised on CNN because we don't
```

Page 140

EXHIBIT A

AOE0054

CONFIDENTIAL

```
 1          advertise on any news properties.  It's against our
 2          brand standards.
 3     Q    The data that I have and you tell me if this is not
 4          consistent with your experience, is that McDonald's
 5          paid over $170,000 to advertise on CNN in 2020?
 6     A    So there -- as we talked about in whatever one of
 7          the last sessions, there's three different types of
 8          advertising spend.  There is national paid media,
 9          which what all these documents refer to.  There is
10          local media spend and there is that corporate
11          communications spend.  The national paid media
12          spend which these documents refer to and which I
13          oversee and which the IAT of OMD and Burrell
14          oversee, that number would not be accurate because
15          we don't buy news.  We don't buy news television.
16          We don't buy news.com or newspapers.
17     Q    Do -- so then do you know where the money came from
18          to advertise on CNN in 2020?
19     A    It would have to be from the two other buckets.  So
20          locally could be one of our 56 local co-ops decided
21          to place a buy or it could have been from a
22          corporate standpoint but, no.  I personally do not
23          know where that would have come from.  You would
24          have to look at what creative ran and then you
25          could see that.
```

Page 141

EXHIBIT A

AOE0055

CONFIDENTIAL

1    Q     So MSNBC what I have is in 2019 the data I have

2          shows over 1.5 million was spent to advertise on

3          MSNBC in 2019.

4                Are you saying that didn't come from national

5          advertising budget?

6    A     It did not come from national advertising budget.

7    Q     And the local operator spend, is that -- does

8          McDonald's have any role in making, you know, in

9          approving the placement of advertisements through

10         the local budget?

11   A     No.  McDonald's local advertisers hire their own

12         local agencies to place the media buys and approve

13         them.

14   Q     And so even though McDonald's doesn't buy news

15         through its national TV advertising budget, local

16         operators can band together and advertise on news

17         stations; is that right?

18               MS. ANDREWS:  Objection to form.

19   A     The -- we give them our brand guidelines of what we

20         do at a national level, but it's -- they -- it's

21         their dollars and they decide what to do with them.

22   Q     So in terms of your brand standards through the

23         national advertising budget, what does McDonald's

24         advertise on in terms of video?

25               MS. ANDREWS:  Objection to form.

Page 142

EXHIBIT A

AOE0056

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | | MS. ANDREWS:  Objection to form. |
| 2 | A | As Exhibit 8 shows in May of '21 we launched an |
| 3 | | overall commitment to increase our spend on |
| 4 | | minority-owned media and production and content |
| 5 | | creation producers.  So we started casting a wider |
| 6 | | net and looking at other opportunities which |
| 7 | | TheGrio and Local Now would be a part of. |
| 8 | | We also started relaxing some of our |
| 9 | | requirements around measurement knowing that that |
| 10 | | was an industry barrier and industry, you know, is |
| 11 | | helping tackle that.  So that is why that we |
| 12 | | started with advertising at this time. |
| 13 | Q | So do you know -- well, isn't it true that |
| 14 | | McDonald's only started spending on Local Now in |
| 15 | | 2021? |
| 16 | A | I don't know if we spent prior to that. |
| 17 | Q | And isn't it true that while McDonald's may have |
| 18 | | historically advertised on TheGrio, it only |
| 19 | | restarted buying ad time on TheGrio in 2021? |
| 20 | A | It aligned that timing, yes.  It aligned when we |
| 21 | | made the commitments to increase our spend.  I also |
| 22 | | believe it is the time when their viewership, their |
| 23 | | ratings started to reverse the declines. |
| 24 | Q | If you look at the first page of Exhibit 16, direct |
| 25 | | your attention to the top two emails starting with |

Page 180

EXHIBIT A

AOE0057

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   Q   So isn't true, Ms. Mason, that Mr. Olson was

2       correct when he said McDonald's agreed to spend

3       100,000 to help calm Byron Allen down?

4   A   That is --

5           MS. ANDREWS:   Objection to form.

6   A   -- not why McDonald's did that.   That is Patrick

7       Olson's opinion.

8           MR. SCHECTER:   How long have we've been going?

9       It might be a good time to take a break.

10          THE VIDEOGRAPHER:   Now we've been going for an

11      hour and 9 minutes.

12          MR. SCHECTER:   Let's -- let's take a -- we can

13      take a ten-minute break.

14          Is that all right?

15          MS. ANDREWS:   Sure.

16          THE VIDEOGRAPHER:   We'll go off the record.

17      The time is 3:25 p.m.   This is the end off media

18      unit four.

19          (A recess was taken.)

20          THE VIDEOGRAPHER:   We're back on the record at

21      3:45 p.m.   This is media unit five.

22          MR. SCHECTER:   So we're now not attorneys' eyes

23      only.

24          MS. ANDREWS:   Okay.

25          (Ending of confidential testimony.)

Page 182

EXHIBIT A

AOE0058

CONFIDENTIAL

```
 1    A    Yes.  I know who Magic Johnson is.

 2    Q    I take it you're relying on Burrell and OMD to tell

 3         you that Aspire is African American-owned?

 4    A    Yes.  I'm relying on the agencies to tell me

 5         ownership of all of these media properties, not

 6         just that particular one.

 7    Q    Do you -- are you familiar with the company called

 8         Up Entertainment, LLC?

 9    A    No.

10    Q    Are you familiar with a network the Gospel Music

11         Network?

12    A    No.

13    Q    Gospel Music Channel?  No?

14    A    No.

15    Q    Do you know -- do you know if Up Entertainment is

16         black owned?

17    A    I do not know.

18    Q    Do you know the financial firm Yucaipa Funds?

19    A    No.

20    Q    Do you know who Ron Burkle is?

21    A    No.

22    Q    Do you know if Yucaipa Funds is African

23         American-owned?

24    A    I don't know.

25    Q    You're familiar with the network Revolt?
```

Page 204

EXHIBIT A

AOE0059

CONFIDENTIAL

1    A    Yes.

2    Q    Revolt is associated with Sean Combs?

3    A    Yes.

4    Q    You know who Sean is?

5    A    Yes.

6    Q    Okay.  Again, you're relying on Burrell and OMD to

7         tell you that Revolt is African American-owned?

8    A    Yes.

9    Q    Do you know how much control Sean Combs has at

10        Revolt?

11            MS. ANDREWS:  Objection to form.

12   A    No.  I do not.

13   Q    So at Starcom, did you focus at all on the need to

14        spend with African American-owned media?

15   A    No.

16   Q    Were you a DEI Champion at Starcom?

17   A    I would not have labeled myself that.  I would have

18        labeled myself an inclusive leader.

19   Q    And inclusive leader you're referring to people on

20        your team; right?

21   A    An inclusive leader of creating in totality the

22        team but also the ads that we were producing.

23   Q    Have you taken any courses on black history?

24            MS. ANDREWS:  Objection to form.

25   A    No.  I took US History throughout my college and

Page 205

EXHIBIT A

AOE0060

CONFIDENTIAL

```
 1          high school but nothing more than what I did in

 2          university.

 3     Q    You went to Ohio State; right?

 4     A    Yes.

 5     Q    Did you take any courses in the African American

 6          studies department?

 7     A    Not that I recall.

 8     Q    At Ohio State you were a member of the Delta Delta

 9          Delta Sorority?

10     A    Correct.

11     Q    Did you have any African American sorority sisters

12          while you were at Ohio State?

13     A    I believe there were a few.

14     Q    How many?

15     A    I don't know the exact count.  I was there for --

16     Q    Do you know their names?

17     A    -- three years.

18     Q    Do you know their names?

19     A    No.

20     Q    Can you name any name?

21     A    I can only name about three names, yeah, from the

22          sorority.

23     Q    Any of them African American?

24     A    No.

25     Q    I take it though you -- you don't consider yourself
```

Page 206

EXHIBIT A

AOE0061

CONFIDENTIAL

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, Megan M. Bowman, a Certified Shorthand

 4      Reporter, do hereby certify that on August, 24,

 5      2022, the deposition of the witness, ALYCIA MASON,

 6      called by the Plaintiffs, was taken before me,

 7      reported stenographically and was thereafter

 8      reduced to typewriting through computer-aided

 9      transcription.

10          The said witness, ALYCIA MASON, was first duly

11      sworn to tell the truth, the whole truth, and

12      nothing but the truth, and was then examined upon

13      oral interrogatories.

14          I further certify that the foregoing is a true,

15      accurate and complete record of the questions asked

16      of and answers made by the said witness, at the

17      time and place hereinabove referred to.

18          The signature of the witness was requested by

19      agreement.

20          The undersigned is not interested in the within

21      case, nor of kin or counsel to any of the parties.

22

23

24

25

                                          Page  237
```

EXHIBIT A
AOE0062

CONFIDENTIAL

1          Witness my official signature on this 30th day

2      of August, 2022.

3

4

5

6

7          Megan M. Bowman, CSR

8

9          License No. 084-004916

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page  238

EXHIBIT A
AOE0063

# EXHIBIT B

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3                   WESTERN DIVISION

 4

 5    ENTERTAINMENT STUDIOS          )

 6    NETWORKS, INC., a              )

      California corporation;        )

 7    WEATHER GROUP, LLC, a          )

 8    Delaware limited liability     )

 9    company,                       )Case No.

10         Plaintiffs,               )2:21-cv-04972-FMO-MAA

           -vs-                      )

11    McDONALD'S USA, LLC, a         )

12    Delaware limited liability     )

13    company,                       )

14         Defendant.                )

      _____

15    CONFIDENTIAL VIDEOTAPED DEPOSITION OF SHEILA HAMILTON

16

17       The deposition of SHEILA HAMILTON, called for

18    examination pursuant to the Rules of Civil Procedure for

19    the United States District Courts pertaining to the

      taking of depositions, taken before Megan M. Bowman,

20    Certified Shorthand Reporter within and for the County

21    of Cook and State of Illinois, at Riley Safer Holmes &

22    Cancila LLP, 70 West Madison Street, Suite 2900,

23    Chicago, Illinois, on the 25th day of August, 2022, at

24    9:30 a.m.

25
```

                                                        Page 1

EXHIBIT B

AOE0065

CONFIDENTIAL

```
 1                    A P P E A R A N C E S
 2   FOR THE PLAINTIFF(S):
 3                David W. Schecter
                  Murad Salim
 4                MILLER BARONDESS, LLP
                  1999 Avenue of the Stars
 5                Suite 1000
                  Los Angeles, CA 90067
 6                310.552.4400
                  dschecter@millerbarondess.com
 7                msalim@millerbarondess.com
 8
 9   FOR THE DEFENDANT:
                  Amy Andrews
10                Robert Foley
                  RILEY SAFER HOLMES & CANCILA LLP
11                70 West Madison
12                Suite 2900
                  Chicago, IL 60601
13                312.471.8700
                  aandrews@rshc-law.com
14                rfoley@rshc-law.com
15
16   ALSO PRESENT:
17   Ross Colby, videographer
18   Monica Mosby, Senior Counsel, McDonald's Corporation
19
     PRESENT VIA ZOOM:
20   Byron Allen
21   Darren Galatt
22   Eric Gould
23   Jeff Mayes
24   Tom O'Brien
25   Janice Arouh
```

                                                    Page  2

EXHIBIT B
AOE0066

CONFIDENTIAL

```
1              Do you understand that?
2    A    Yes.
3    Q    I -- I don't -- I wanna get your best testimony
4         today.  I don't want you to answer questions that
5         you don't understand.  So if I ask you a question
6         and you don't understand any word that I use or
7         phrasing or anything, will you please let me know?
8    A    Yes.
9    Q    And conversely, if I ask a question and you answer
10        it, I'm gonna assume that you understood the
11        question; is that fair?
12   A    Yes.
13   Q    Your attorney Ms. Andrews will from time to time
14        make objections.  Unless Ms. Andrews instructs you
15        not to answer, you are to answer the question.
16             Do you understand that?
17   A    Yes.
18   Q    You're doing a great job so no -- all verbal
19        responses.  So no shakes of the head, uh-huhs,
20        things like that that can be ambiguous.  The court
21        reporter is trying to write everything down.  So
22        please make all your answers verbal.
23             So when did you join McDonald's?
24   A    December of 2019.
25   Q    And where did you join from?
```

Page 7

EXHIBIT B

AOE0067

CONFIDENTIAL

1    A    I was on an agency side at Starcom.

2    Q    Okay.  And what role did you start at McDonald's?

3    A    The director of US media.

4    Q    Are you in that same role today?

5    A    I am not.

6    Q    What's your title?

7    A    I'm now a director of digital strategy and

8         enablement.

9    Q    And so have you just had those two roles, director

10        of US media and then director --

11   A    Correct.

12   Q    -- of digital?  And I didn't do this but it -- it

13        works better if you let me finish my question

14        before you start to answer.  That way we can have a

15        clean record.  So I just ask that even if you know

16        the answer, don't just blurt it out.  Wait for me

17        to finish my question and I'll do my best to let

18        you finish your answer before I ask my next

19        question.

20            Okay?

21            So, again, you've only had those two roles at

22        McDonald's?

23   A    Yes.

24   Q    Okay.  So as the director of US media what were

25        your responsibilities?

Page  8

EXHIBIT B

AOE0068

CONFIDENTIAL

1    A    I oversaw all of our national media planning and

2         buying.

3    Q    Would that include placing advertisements on cable

4         television?

5    A    It would in partnership with the agencies.

6    Q    When did you -- is it a promotion to the director

7         of digital or is it just a change in roles?

8    A    It's a lateral move.

9    Q    When did that happen?

10   A    April of this year.

11   Q    Of 2022?

12   A    Correct.

13   Q    So from roughly December of 2019 to April of this

14        year you were the director of US media?

15   A    Yes.

16   Q    Who had -- was that a new title when you joined?

17   A    No.

18   Q    Who had that position previously?

19   A    Jen Feldman.

20   Q    As the director of US media would you -- which

21        agencies did you work with?

22   A    At the time we worked with OMD, Burrell.  We worked

23        with Navigation Boulevard.  That changed throughout

24        my time there.  And we worked with Admerasia.

25   Q    What is Navigation Boulevard?

EXHIBIT B

AOE0069

CONFIDENTIAL

1   A    They are a group between Lopez Negrete and Canvas

2        Worldwide.  They support our Hispanic business.

3   Q    And so as the director of US media, you have

4        knowledge of McDonald's standards with respect to

5        placing advertisements on cable television; is that

6        right?

7   A    Yes.

8   Q    Are those standards written down anywhere?

9   A    Brand safety standards exist.

10  Q    Just at a high level what are -- what are

11       McDonald's brand safety standards?

12  A    It talks about the content that we are comfortable

13       being around.  It talks about placement with

14       regards to competitors in the separation that you

15       expect.  And it talks about delivery of buys and

16       what happens if buys are not delivered as they were

17       purchased.

18  Q    So the -- I'm sorry.  What was the second one?

19  A    So it's the content, it is the -- the delivery of

20       the buys and it is the -- shoot.

21           What was the second one?

22  Q    Is it competitive?

23  A    Oh, competitive separation, yes.  Thank you.

24           MR. SCHECTER:  Just for the record, Murad Salim

25       from my office is in the room.

                                            Page 10

EXHIBIT B
AOE0070

CONFIDENTIAL

```
 1   Q    So you have -- strike that.
 2            So it's your testimony that based on data you
 3        receive from the agencies McDonald's spent about 3
 4        percent of its national TV budget with black-owned
 5        media in 2021?
 6            MS. ANDREWS:  Object to the form.
 7        Mischaracterizes her testimony.
 8   A    I -- right around 3 percent based on what I've seen
 9        from the agencies from my memory is what I believe
10        we invested in '21.
11   Q    And do you know the names of those black-owned
12        media companies?
13   A    I would -- not all of them.
14   Q    Can you name any of them?
15   A    Yes.
16   Q    Can you please name them?
17   A    Revolt.
18   Q    Any others?
19   A    Pod Digital, TheGrio, Local Now.  That's all that
20        comes to memory.
21   Q    And with respect to the company -- sorry.  With
22        respect to the black-owned media company Revolt,
23        that's the company that's associated with Sean
24        Combs?
25   A    Correct.
```

Page 15

EXHIBIT B
AOE0071

CONFIDENTIAL

1    Q    Do you know what percent ownership Mr. Combs has in

2         Revolt?

3    A    I do not.

4    Q    Isn't it true that McDonald's defines diverse-owned

5         media companies as companies with at least 51

6         percent ownership by minorities?

7    A    Correct.

8              MS. ANDREWS:   Object to the form.

9    Q    That's correct?

10   A    Correct.

11   Q    So do you know if Revolt's ownership is at least 51

12        percent owned by black individuals?

13   A    We --

14             MS. ANDREWS:   Asked and answered.

15   A    We work with our agency partners and they confirm

16        the ownership.  So the last report that we had seen

17        would have had it at 51 percent.

18   Q    Exactly at 51 percent?

19   A    51 percent or above.

20   Q    And you mentioned agencies.  Do you know if a

21        particular agency is telling you that Revolt's

22        black-owned?

23   A    We look to we call it our IAT.  It's an integrated

24        agency team.  So we work with our agencies as

25        partners.

Page 16

EXHIBIT B
AOE0072

CONFIDENTIAL

```
 1              look at the last worksheet of 2020, it's a little
 2              clunky but I can try to walk you through it.  There
 3              are -- there's a list of various -- of
 4              diverse-owned media companies and how much spend
 5              they received from McDonald's in 2020.  And if you
 6              look there's an agency on the left, OMD, Burrell
 7              and Admerasia.  So if you look at -- we can look at
 8              Urban One is about a quarter of the way down.  If
 9              you look at Burrell's TV spend on a company called
10              -- sorry.  The -- the spend on that TV network
11              called TV One.
12                  Do you see that?
13     A    Mm-hmm.  I do.
14     Q    Is TV One a network that McDonald's advertises on?
15     A    It is.
16     Q    And TV One is owned by a company called Urban One.
17              Do you see that?
18     A    Yes.
19              MS. ANDREWS:  Object to the form.
20     Q    Do you know if Urban One is African American-owned?
21              MS. ANDREWS:  Object to the form.
22     A    I believe so.
23     Q    And you believe based on the representations from
24          the agencies?
25     A    Correct.
```

Page 22

EXHIBIT B
AOE0073

CONFIDENTIAL

```
 1    Q    As McDonald's uses the term diverse-owned media
 2         company, does McDonald's include publicly traded
 3         company in that definition?
 4              MS. ANDREWS:  Object to the form.
 5    A    Can you clarify the question?
 6    Q    So there's -- I understand that McDonald's
 7         definition of diverse-owned media company is
 8         companies that have at least 51 percent diverse
 9         ownership; right?
10    A    Correct.
11    Q    My question is:  Would a publicly traded company
12         fit within the definition of diverse-owned media
13         company?
14    A    Yes.  That definition applies to both publicly and
15         -- publicly traded and private companies.
16    Q    But a publicly traded company would still need to
17         have at least 51 percent ownership by African
18         Americans; right?
19    A    Yes.
20    Q    Do you know if Urban One is publicly traded?
21    A    I do not.
22    Q    Do you know who the owners of Urban One are?
23    A    I do not.
24    Q    You're familiar with a company called Bank of
25         America?
```

Page 23

EXHIBIT B
AOE0074

CONFIDENTIAL

1   A   Yes.

2   Q   Do you know if Bank of America is African

3       American-owned?

4   A   I do not.

5   Q   Are you familiar with the mutual fund company

6       Vanguard?

7   A   Yes.

8   Q   Do you know if Vanguard is African American-owned?

9   A   I do not.

10  Q   Do you know if Vanguard or Bank of America own part

11      of Urban One?

12  A   I do not.

13  Q   If you also look at the 2020 worksheet, you'll see

14      a TV network called Aspire?

15  A   Yes.

16  Q   Is that -- is Aspire a network that McDonald's

17      advertises on?

18  A   In 2020, yes.

19  Q   Does McDonald's still advertise on that network

20      today?

21  A   I'm not aware.

22  Q   You don't know one way or another?

23  A   I do not know one way or the other.

24  Q   Got it.  So Aspire, that's a network that was

25      associated with Af- -- with Magic Johnson?

Page 24

EXHIBIT B

AOE0075

CONFIDENTIAL

```
 1              MS. ANDREWS:  Objection to form.

 2    A    It appears to be so.

 3    Q    Do you know that at all?

 4    A    I do not know that.

 5    Q    Do you know what percent ownership Mr. Johnson owns

 6         in Aspire?

 7    A    I do not.

 8    Q    So in 2020 when McDonald's decided to spend some of

 9         its national budget advertising on TV One, were you

10         involved at all in approving placing those ads?

11              MS. ANDREWS:  Object to the form.

12    A    The agency brings us recommendations that we

13         approve.

14    Q    And so my question is:  Were -- were you involved

15         in approving agency recommendations?

16    A    Yes.

17    Q    Were you involved specifically with respect to TV

18         One?

19    A    Yes.

20    Q    So can you tell me what was it about TV One that

21         led McDonald's to agree to advertise on the

22         network?

23              MS. ANDREWS:  Object to the form.

24    A    We as the clients do not get into every detail of

25         every partner but more generally how they make
```

                                              Page 25

EXHIBIT B
AOE0076

1      decisions and how we align to those decisions is a

2      scorecard is created with key criteria.  What is

3      the audience composition, what is the reach of that

4      network or any partner, what is the cost of

5      advertising with them and a number of other

6      criteria.  We use that information, the agencies

7      do, to bring a recommendation to us.  And that's

8      how we align.  We do not go partner by partner.

9  Q   So the approval process you're not going, like,

10     line by line with the recommendations?

11 A   We see it line by line, but we are not talking

12     about, say, specifically TV One in the exact

13     investment.  We look at the scorecard and the

14     grading against other partners.

15 Q   So was there -- so there was a scorecard generated

16     with respect to TV One?

17 A   There was a scorecard generated as a part of

18     strategic planning each year.  TV One would have

19     been a part of that.

20 Q   So is the scorecard across all networks?

21 A   Yes.

22 Q   So you don't have a scorecard for each network?

23 A   No.

24 Q   So as you sit here today, you can't identify

25     anything particular to TV One as to the reason why

                                                    Page 26

EXHIBIT B

AOE0077

CONFIDENTIAL

```
1    Q    So let's start with topic number 4.  So for 2020
2         and 2021 did McDonald's contract to advertise on
3         any media property owned by Entertainment Studios?
4    A    Yes.
5    Q    Which property?
6    A    TheGrio and Local Now.
7    Q    Is Local Now owned by Entertainment Studios?
8    A    That may be The Weather Group.
9    Q    The -- is it your understanding that Entertainment
10        Studios also owns lifestyle cable networks?
11   A    Yes.
12   Q    Do you know what they are?
13   A    I -- I do not know all of them.
14   Q    Do you know any of them?
15   A    I do not know many of them.
16   Q    Can you tell me why McDonald's decided not to place
17        advertisements on any of Entertainment Studios
18        lifestyle networks?
19             MS. ANDREWS:   Object to the form.
20   A    We did advertise on TheGrio.
21   Q    So other than TheGrio, there are other networks;
22        right?
23   A    Correct.
24   Q    Can you tell me why McDonald's decided not to
25        advertise on those other networks?
```

Page 29

EXHIBIT B

AOE0078

CONFIDENTIAL

1    A    It was a recommendation from our agencies.

2    Q    It was solely based on recommendation from the

3         agency?

4    A    That's how we make buying decisions.

5    Q    Which agencies are you talking about?

6    A    It was a partnership with Burrell and OMD.

7    Q    So it was Burrell and OMD recommended not to

8         advertise on those networks?

9    A    Correct.

10         MR. SCHECTER:   That was fun.

11   Q    Do you know why -- strike that.

12         Did any of the -- did Burrell or OMD give any

13        reasons as to why they weren't recommending

14        advertising on the networks?

15   A    Yes.

16   Q    What were the reasons?

17   A    The age of the viewer and the ratings.

18   Q    Is that it?

19   A    The cost associated with the ratings.

20   Q    So it -- it would cost too much to reach the

21        viewers?

22   A    Coupled with there's no one stipulation that would

23        drive a decision.  It's the combination of those

24        three.

25   Q    So it's age of the viewer, the ratings and the

EXHIBIT B
AOE0079

CONFIDENTIAL

 1       cost?

 2    A  Correct.

 3    Q  Okay.  Do you know the average age of the viewer on

 4       any of Entertainment Studios' lifestyle networks

 5       other than TheGrio?

 6    A  I know it's older, but I wouldn't know the exact

 7       age.

 8    Q  And do you know what their ratings are?

 9    A  I know they're low but I wouldn't know the exact

10       ratings.

11    Q  All right.  And cost, isn't cost something that's

12       negotiated?

13    A  It is.

14    Q  So do you know if there ever was negotiations in

15       2020 over cost to advertise on those networks?

16    A  That's something the agency would lead.

17    Q  So my question is:  Do you know if there were any

18       negotiations over costs?

19    A  When we ask for a POV, the expectation is that they

20       are having those conversations.  They being the

21       agency with a partner.

22    Q  So that's an assumption you're making?

23    A  Yes.

24    Q  Do you know whether Entertainment Studios also owns

25       syndicated programming?

                                              Page 31

EXHIBIT B

AOE0080

CONFIDENTIAL

1     networks owned by Entertainment Studios, Comedy.Tv,

2     Recipe.TV, MyDestination.TV, ES.TV, Pets.Tv and

3     Cars.TV?

4          Do you see that?

5   A   I do.

6   Q   Are those the networks you referred to that the

7       agencies recommended not to advertise because of

8       age of the viewer ratings and cost?

9   A   I don't remember these networks ever being on a

10      scorecard.

11  Q   Okay.  So these -- there's an additional one.  Have

12      you ever heard of the network Justice Central TV?

13  A   I have not.

14  Q   McDonald's doesn't have a rule against advertising

15      on courtroom drama programs; right?

16  A   Not that I'm aware of.

17  Q   Okay.  McDonald's doesn't have a rule against

18      advertising on comedy networks?

19  A   No.

20  Q   McDonald's doesn't have a rule against advertising

21      on cooking networks?

22  A   No.

23  Q   McDonald's doesn't have any rules against

24      advertising on travel networks?

25  A   No.

Page 35

EXHIBIT B

AOE0081

CONFIDENTIAL

```
1    A    It's older but I do not know the actual age.

2    Q    So why did McDonald's decide to advertise on CNN?

3    A    Any news program is for a very specific initiative,

4         often corporately funded.  So this I believe was a

5         -- an initiative to build brand trust coming out of

6         COVID.

7    Q    And this was -- and sorry.  Did McDonald's

8         advertise on CNN in 2021?

9    A    I don't believe so.

10   Q    Do you know how much money McDonald's spent to

11        advertise in 2020 on CNN?

12   A    I do not.

13   Q    So you said it came out of corporate.  Are you sure

14        about that?

15   A    Yes.

16   Q    Did McDonald's advertise on Destination America in

17        2020 or 2021?

18   A    No.

19   Q    Did McDonald's advertise on E in --

20   A    Yes.

21   Q    -- sorry -- in 2020?

22   A    Yes.

23   Q    Did it advertise on E in 2021?

24   A    Yes.

25   Q    What were the reasons why?
```

Page 38

EXHIBIT B
AOE0082

CONFIDENTIAL

```
 1          Attached, the next page, you'll see a New York
 2     Times op-ed by Byron Allen.
 3          Do you see that?
 4   A   I do.
 5   Q   Is that the op-ed you recall reading?
 6   A   I'm not sure.
 7   Q   All right.  So if you go back to -292, I can
 8     summarize it for you.  Darren's essentially raising
 9     issues but also requesting a meeting with
10     Mr. Kempczinski and Ms. Flatley.
11          Did you -- did you ever hear about any of Byron
12     Allen's companies asking for a meeting with
13     McDonald's CEO?
14   A   Yes.
15   Q   Were you involved in any discussions about whether
16     that meeting would be held?
17   A   No.
18   Q   Do you know if the meeting was held?
19   A   I do not.
20   Q   Did you talk to Ms. Mason about the potential
21     meeting?
22   A   Not that I remember.
23   Q   Do you talk to Mr. Kempczinski at McDonald's?
24   A   I do not.
25   Q   Do you talk to Ms. Flatley?
```

Page 49

EXHIBIT B
AOE0083

CONFIDENTIAL

```
 1    A     Yes.

 2    Q     Do you know who owns Gospel Music Channel?

 3    A     I do not.

 4    Q     Do you know if Magic Johnson is still affiliated

 5          with the network Aspire?

 6    A     I am not aware.

 7    Q     Have you ever -- you have access to Google; right?

 8    A     Yes.

 9    Q     Have you ever looked up Aspire's ownership?

10    A     I don't believe so.

11    Q     Do you know if you look up Aspire's ownership that

12          Magic Johnson sold his interest in Aspire in 2019?

13    A     I would -- no.  I'm not aware.

14    Q     Does McDonald's advertise on Aspire?

15    A     We did in '20.  I'm not confident on '21.

16    Q     And is spending on Aspire part of McDonald's

17          black-owned media spend?

18    A     We were counting it, yes.

19    Q     The -- so McDonald's created a four-year plan; is

20          that right?

21    A     Correct.

22    Q     There's -- there are documents available on

23          McDonald's website.

24              Is that what you're referring to as the

25          four-year plan?
```

Page 54

EXHIBIT B
AOE0084

CONFIDENTIAL

```
 1            so our expectations of our partners are that they
 2            are able to submit data at a level of granularity
 3            that we can measure it on a quarterly basis.
 4            There's not always the scale with all of our
 5            black-owned partners to do that.
 6                 And so that is an exception where if the scale
 7            is not there but they've met all the other
 8            criteria, we will work with them to get a measure
 9            on them on a bi-annual or annual basis instead of
10            quarterly.
11       Q    Can you give me examples of who fits that criteria?
12       A    Pod Digital would definitely fit that.
13       Q    Anyone else?
14       A    Revolt might even be in there.
15       Q    So OMD is no longer an ad agency working with
16            McDonald's; is that right?
17       A    Correct.
18       Q    McDonald's terminated that relationship?
19       A    Correct.
20       Q    Do you know why McDonald's terminated the
21            relationship?
22       A    Yes.
23       Q    Why?
24       A    There were a number of factors.  There were a
25            number of errors over the past couple years that
```

Page 61

EXHIBIT B

AOE0085

CONFIDENTIAL

1       had some pretty significant magnitude.  They were

2       also not able to keep pace with the changing

3       landscape in data-informed decisions.  And there's

4       the benefit of moving to Publicis who already had

5       our owned business.  They have all of our data and

6       there's also a benefit from a price standpoint.

7  Q   So the errors you mentioned, you said there were

8       several?

9  A   Yes.

10  Q   Can you describe them for me?

11  A   They were budgetary tracking issues.  Not managing

12      our buys effectively.

13  Q   So it wasn't just, like, one error in one

14      spreadsheet?

15  A   No.

16  Q   And the errors you're referring to, that didn't

17      have anything to do with accurately defining

18      black-owned media companies?

19  A   Not that's ever come to our knowledge.

20  Q   And I'm not asking for what lawyers -- you've

21      discussed with lawyers, but has anyone told you why

22      Plaintiffs are bringing this lawsuit?

23  A   I've read -- I've read the complaint.

24  Q   But other than the complaint, do you know why

25      Plaintiffs are bringing the lawsuit?

Page 62

EXHIBIT B
AOE0086

CONFIDENTIAL

```
 1          terminology of "agency of record" with any of our
 2          partners.  There are certainly partners who have
 3          stronger relationships and so they tend to lead
 4          conversations.
 5     Q    The -- why does McDonald's have a separate agency
 6          for the African American consumer market?
 7     A    We have four separate agencies.  In the intent
 8          while that structure was created before my time,
 9          the intent as I've always understood and the way
10          that I've engaged with the agencies is that they
11          are -- each agency is an expert in their specific
12          marketplace.  And so it does not mean that
13          Admerasia is the only one who can have input to our
14          Asian buys but it means that they best understand
15          that audience.  And given the importance of a
16          multicultural audience we have brought on multiple
17          agencies.
18     Q    And so with these particular consumer markets
19          you're trying to specifically reach demographic
20          groups?
21     A    Correct.
22     Q    And one of those groups is African Americans?
23     A    Correct.
24              MR. SCHECTER:  Can we do Exhibit 13?
25              (Deposition Exhibit 13 was previously marked
```

Page 70

EXHIBIT B

AOE0087

```
 1              fresh perspective on the team.  We can only give
 2              directions specific to our account.  We give no
 3              direction to the agency.
 4    Q    But do you know when that was communicated to
 5              Burrell?
 6    A    I'd have to look back through.
 7    Q    Would it have been after September of 2020?
 8    A    I believe so.
 9    Q    So McDonald's fires OMD and it wants a fresh
10              perspective with Burrell.
11                  The firing of OMD, that was in 2021?
12    A    That was the end of '21, the start of this year.
13    Q    McDonald's did that because it was unhappy with the
14              flack it was taking for its lack of spending with
15              diverse-owned companies; right?
16                  MS. ANDREWS:  Objection, form, foundation.
17    A    No.
18    Q    So it's your testimony that McDonald's wanted a
19              fresh perspective from Burrell but that had nothing
20              to do with its spending with black-owned media?
21    A    Correct.
22                  MS. ANDREWS:  Objection, form.
23    Q    What was it about -- why -- why did McDonald's
24              think it needed a fresh perspective from Burrell?
25    A    It is very common to have agency leadership
```

Page 72

EXHIBIT B

AOE0088

CONFIDENTIAL

```
 1    A    Not that I have had exposure to.

 2    Q    Have you heard anyone use racial slurs in the

 3         office?

 4    A    No.

 5    Q    Anyone use the N word?

 6    A    No.

 7    Q    The -- are you familiar with Mr. Kempczinski's text

 8         message to the mayor?

 9    A    I am.

10    Q    It's true that Mr. Kempczinski apologized to

11         McDonald's employees?

12    A    There was a town hall.

13    Q    Did you attend the town hall?

14    A    Virtually.

15    Q    How long did it last?

16    A    An hour likely.

17    Q    Did in that town hall Mr. Kempczinski apologize?

18    A    Yes.

19    Q    Do you know if any of McDonald's employees demanded

20         an apology?

21            MS. ANDREWS:  Objection to form.

22    A    I do not know.

23    Q    Have you ever seen the text message?

24    A    I have read it.

25    Q    Do you agree with his comments?
```

EXHIBIT B
AOE0089

CONFIDENTIAL

1    A    I do not.

2         MS. ANDREWS:   Object to form.

3    Q    Do you believe his comments were racist?

4         MS. ANDREWS:   Objection to form.

5    A    I do.

6    Q    The -- so are you familiar with the concept of

7         optimizers?

8    A    Can you be more specific?

9    Q    So there -- I'm -- I've been told that there are --

10        I don't even know what the right word is.  There

11        are programs that ad agencies or companies can use

12        to sort of generate an optimal media spend to meet

13        certain parameters like reaching target audiences,

14        things of that nature.

15             Have you heard of this?

16   A    I have never heard of that term but the process,

17        yes.

18   Q    You -- okay.  And do you -- how do you refer to it?

19   A    We just look at it as like a budget allocation.

20   Q    Okay.  So the -- but McDonald's has the capability

21        of using this process to create an efficient media

22        spend to best reach, let's say, 18 to 34 years

23        olds; is that right?

24        MS. ANDREWS:  Object to the form.

25   A    There are tools that our agencies use that within a

Page 87

EXHIBIT B
AOE0090

CONFIDENTIAL

```
 1          McDonald's advertises on?
 2     A    I wouldn't call it a network.  It's a digital
 3          platform.
 4     Q    There -- there is a linear television channel that
 5          Revolt owns; isn't it right?
 6     A    We partner far beyond that.
 7     Q    But McDonald's does advertise on the television
 8          channel that's owned by Revolt?
 9     A    I believe so.
10     Q    Okay.  And at least based on what the agencies are
11          telling, you Revolt is black-owned; right?
12     A    Correct.
13     Q    Isn't it true that Revolt is not measured by
14          Nielson?
15     A    They I believe are starting to be measured by
16          Nielson.
17     Q    But McDonald's has advertised on the linear network
18          Revolt prior to it being Nielson measured; isn't
19          that right?
20     A    I believe so.
21     Q    And so does McDonald's know how many 18 to 34 year
22          olds Revolt reaches?
23     A    The majority of our buy is on digital and we are
24          able to guarantee our impressions and the delivery
25          of those impressions by audience segment.
```

Page 104

EXHIBIT B

AOE0091

```
 1    A    Yes.

 2    Q    So would you agree with me -- strike that.

 3         Would you agree with Mr. Allen that McDonald's

 4         can do better?

 5    A    Yes.

 6         MS. ANDREWS:  Object to the form.

 7    Q    Is that a yes?

 8    A    Yes.

 9         MS. ANDREWS:  Same objection.

10         MR. SCHECTER:  So I don't have anymore

11         questions.  My colleague will have some questions.

12         Do you want -- do you have your microphone

13         ready?

14    REDIRECT EXAMINATION

15         QUESTIONS BY MURAD SALIM:

16    Q    Ms. Hamilton, earlier you discussed the 2020 ad buy

17         with CNN and MSNBC that was corporate funded.

18         Who on the corporate end makes the decision for

19         a campaign like that?

20    A    We follow a similar process to what we do with

21         OPNAD funding.  So the media team, which is -- was

22         led by me at the time, works with the agencies to

23         align on a recommendation.  It's where the funding

24         is coming from that differs.

25    Q    Sure.  And who approves the funding from the
```

Page 106

EXHIBIT B
AOE0092

CONFIDENTIAL

```
 1    Q    Who is Louis Carr?

 2    A    He is another media professional.

 3    Q    Okay.  And do you know which media company he's

 4         associated with?

 5    A    I cannot remember right now.

 6    Q    And if I represented that it's -- he's the

 7         president of BET, would that --

 8    A    Yes.

 9    Q    -- surprise -- you would agree with that?

10    A    Correct.

11    Q    Okay.  And did you ever discuss with Adele Lassere

12         the -- the reason she's comparing Louis Carr and

13         Byron Allen?

14    A    No.

15    Q    Did you ever discuss with Alycia Mason the reason

16         that she's comparing Byron Allen and Louis Carr?

17    A    No.  We were focused on the data within here.

18    Q    And has Adele Lassere ever identified anyone other

19         than Louis Carr and Byron Allen as being

20         challenging to negotiate with?

21             MS. ANDREWS:   Objection to form and foundation.

22    A    As I mentioned earlier, there's -- there's always

23         challenges negotiating across every type of

24         ownership within the industry.  We hear a lot from

25         the agencies of what they're pushing on.
```

Page 112

EXHIBIT B
AOE0093

1          Disney is a challenging partner and we have

2      huge agreements with them.  So it's not something

3      that's unheard of to hear, but it does not inform

4      our decisions.

5   Q   Is there a specific individual at Disney that --

6      that you would say is challenging to deal with?

7   A   No.  It's not an individual.  It's more the way

8      that the partner engages with us overall.

9   Q   And can you think of I guess just anyone else that

10      either Adele Lassere or one of your agencies or you

11      or Ms. Mason, just any individual that you would

12      say is -- is challenging at best other than

13      Mr. Allen and Mr. Carr?

14   A   I wouldn't say individuals.  I'd say partners as a

15      whole.

16          MR. SALIM:  Okay.  I got one additional

17      exhibit.

18          THE VIDEOGRAPHER:  Is this attorneys' eyes

19      only?

20          MR. SALIM:  This one is just confidential.

21      It's not attorneys' eyes only.  We go -- oh, yeah.

22          (Ending of confidential testimony.)

23          THE VIDEOGRAPHER:  We are unmute.

24          MS. ANDREWS:  Thank you.

25          Is this 17?

Page 113

EXHIBIT B
AOE0094

CONFIDENTIAL

```
 1              THE REPORTER:  19.

 2              MR. SALIM:  Oh, I have a copy.  Yeah.

 3              MS. ANDREWS:  19, okay.  Thanks.

 4              THE WITNESS:  Thank you.

 5              (Deposition Exhibit 19 was marked for

 6          identification.)

 7      BY MR. Salim:

 8      Q    Ms. Hamilton, do you recognize this email dated

 9           October 13th, 2020, that you sent?

10      A    Yes.

11      Q    Okay.  And is this a true and accurate copy of this

12           -- the email to the best of your recollection?

13      A    Yes.

14              MR. SALIM:  Okay.  Can we admit this as Exhibit

15          -- I don't know which number we're on but --

16              THE REPORTER:  19.

17              MR. SALIM:  19.  Can we admit it as Exhibit 19?

18          Okay.

19      BY MR. SALIM:

20      Q    So, Ms. Hamilton, this email chain is regarding the

21           partnership media summit for diverse-owned media

22           that McDonald's was planning; is that correct?

23      A    Yes.

24      Q    Okay.  And if you would turn to -- I think there's

25           a PDF attachment to it and if you would turn to the
```

Page 114

EXHIBIT B
AOE0095

1          Bates stamp number 1111.  It should say "Initial

2          Partner List-Day 2."

3     A    Yes.

4     Q    Okay.  And in this it mentions, "Our focus for

5          these partners is ensuring that they understand

6          that while they are not as scalable, they come with

7          a unique value proposition to deliver incremental

8          value for McDonald's that our larger partners

9          cannot."

10              What is -- if you could explain that to us a

11         little bit more in detail, what is the unique value

12         proposition that these partners present to

13         McDonald's?

14    A    So --

15              MS. ANDREWS:  Hold on.  Hold on.  Objection,

16         form and foundation.  Go ahead.

17    A    Historically we had hosted a one-day partner summit

18         and we had heard feedback from the marketplace from

19         smaller partners based on scale and size that they

20         were not comfortable asking questions with some of

21         the larger players in the room.  So we hosted a

22         second day.  And when we talk about them having a

23         unique value proposition, they create content that

24         is relevant to audiences that might not be as -- as

25         relevant as some of our larger partners that came

Page 115

EXHIBIT B
AOE0096

CONFIDENTIAL

1        on day one.

2    Q   Sure.  So the idea was to discuss with them

3        specific viewers or other value that they could

4        deliver that the larger partners could not deliver.

5            Is that --

6    A   The idea with the second day was to give them a

7        more comfortable environment where they felt they

8        could ask questions more freely than they had

9        shared with us they had felt they had been able to

10       in the past.

11   Q   And Entertainment Studios is the -- the first

12       African American consumer market partner listed on

13       this list; correct?

14   A   Correct.

15   Q   And so what would you say is it unique value

16       proposition that Entertainment Studios can deliver

17       for McDonald's?

18           MS. ANDREWS:  Objection, form and foundation.

19   A   I would say looking at the list that we had here

20       it's both from an ownership standpoint because at

21       this time we were already thinking about our

22       commitments.  And it's also about entertainment

23       properties, which are relevant to our audience.

24   Q   And so Entertainment Studios by being on this list

25       has entertainment properties that are relevant to

Page 116

EXHIBIT B
AOE0097

1      your audience?

2  A   Potentially.  This is not a guarantee.  Anybody who

3      joins the summit is not guaranteed business.

4  Q   But at the time as of October 13th, 2020, they were

5      on your radar that they could deliver some relevant

6      audience or some relevant entertainment property to

7      you?

8  A   Correct.  Based on the recommendation from the

9      agencies.

10         MR. SALIM:  I don't have any further questions.

11         MS. ANDREWS:  I have a couple questions but why

12     don't we take, like, just five minutes and then

13     we'll go.

14         THE VIDEOGRAPHER:  Okay.  We'll go off the

15     record.  The time is 1:35 p.m.

16         (A recess was taken.)

17         THE VIDEOGRAPHER:  We're back on the record at

18     1:55 p.m.

19 CROSS-EXAMINATION

20     QUESTIONS BY AMY ANDREWS:

21 Q   Ms. Hamilton, I just wanna ask you a couple

22     questions about some things that you talked about

23     earlier today.

24         Ms. Schecter asked -- Mr. Schecter, sorry,

25     asked you some questions about McDonald's

Page 117

CONFIDENTIAL

```
1    A    I do.
2    Q    Okay.  And I think you said you didn't know the
3         basis for that decision but do you have an
4         understanding of how that decision would have been
5         reached?
6    A    Yes.  It follows the same process as all of our
7         other purchasing decisions which the agencies bring
8         us a recommendation based on the data that they
9         have available.  And we align to that
10        recommendation after some feedback.
11   Q    Okay.
12   A    So while I don't remember the specific conversation
13        about -- about The Weather Channel, it would have
14        been based on the recommendation and the standard
15        process that we follow with the agencies.
16             MS. ANDREWS:  Okay.  That's it.  Thanks.
17             MR. SCHECTER:  I just have a -- a few follow-up
18        questions.  We're pretty much done.
19   REDIRECT EXAMINATION
20             QUESTIONS BY DAVID W. SCHECTER:
21   Q    So just in terms of the 18 to 34 audience,
22        McDonald's does do sponsorships; isn't that
23        correct?
24   A    Correct.
25   Q    And those sponsorships don't guarantee a particular
```

Page 120

EXHIBIT B
AOE0099

CONFIDENTIAL

```
 1          number of impressions?
 2    A     It depends on the basis of the agreement.  They
 3          would all look a little different.
 4    Q     But there are sponsorships that McDonald's does
 5          that does not guarantee certain impressions with
 6          the 18 to 34-year-old audience?
 7    A     Not every sponsorship would be built for that
 8          audience.
 9    Q     So just there are some that don't guarantee
10          impressions with the 18 to 34-year-old audience?
11    A     Correct.
12    Q     Does McDonald's place any -- or do any sponsorships
13          with black-owned media?
14    A     It would depend on how we're defining
15          "sponsorships."
16              Can you define what you mean by that?
17    Q     I think your definition is gonna be better than
18          mine.
19              How does McDonald's define sponsorships?
20    A     We have a number of different levels.  So there's
21          something if you think of what we do with, like,
22          the BET awards where we enter into as a part of the
23          upfront a larger agreement and presence across the
24          BET awards.
25              That's considered a sponsorship that would have
```

Page 121

EXHIBIT B

AOE0100

CONFIDENTIAL

```
 1            guarantees associated with it.  Something like a
 2            NASCAR partnership would have a different
 3            structure.
 4    Q       And BET is owned -- is part of Viacom; isn't that
 5            right?
 6    A       Correct.
 7    Q       Viacom is not a black-owned company?
 8    A       Correct.
 9    Q       So just can you think of any, while you were the
10            director of US media, any sponsorships that
11            McDonald's did with any black-owned media?
12    A       I don't believe while I was -- while I was director
13            with the exception of potentially The Stellar
14            Awards.
15    Q       What are The Stellar Awards?
16    A       I'm not super familiar with the -- the content.  I
17            believe they're owned by Central City Productions,
18            which is a black-owned company.  And we've had a
19            longstanding sponsorship of the awards program.
20    Q       And just -- you did a lateral move in 2022.  So
21            since that lateral move, can you think of any other
22            sponsorships McDonald's has done with black-owned
23            media?
24    A       I believe some of work that's being done with
25            Revolt is more in a sponsorship category.
```

Page 122

EXHIBIT B
AOE0101

CONFIDENTIAL

1   Q   And do you know how much money McDonald's is

2       spending on the sponsorship with Revolt?

3   A   I do not.

4   Q   So other than Revolt, can you think of any other

5       black-owned media company that McDonald's has done

6       a sponsorship with?

7   A   Not that I can think of.

8           MR. SCHECTER:  I don't have any further

9       questions.

10          MS. ANDREWS:  Okay.

11          THE VIDEOGRAPHER:  Okay.  We are going --

12      sorry.  We're going off the record.  The time is

13      2:02 p.m.  This concludes today's testimony given

14      by Sheila Hamilton.  The total number of media

15      units used was three and will be retained by

16      Veritext.

17          (Time noted:  2:02 p.m.)

18          AND FURTHER THE DEPONENT SAITH NOT.

19

20

21

22

23

24

25

                                        Page 123

EXHIBIT B
AOE0102

CONFIDENTIAL

```
 1                    REPORTER'S CERTIFICATE

 2

 3           I, Megan M. Bowman, a Certified Shorthand

 4       Reporter, do hereby certify that on August, 25,

 5       2022, the deposition of the witness,

 6       SHEILA HAMILTON, called by the Plaintiffs, was

 7       taken before me, reported stenographically and was

 8       thereafter reduced to typewriting through

 9       computer-aided transcription.

10           The said witness, SHEILA HAMILTON, was first

11       duly sworn to tell the truth, the whole truth, and

12       nothing but the truth, and was then examined upon

13       oral interrogatories.

14           I further certify that the foregoing is a true,

15       accurate and complete record of the questions asked

16       of and answers made by the said witness, at the

17       time and place hereinabove referred to.

18           The signature of the witness was requested by

19       agreement.

20           The undersigned is not interested in the within

21       case, nor of kin or counsel to any of the parties.

22

23

24

25

                                              Page  124
```

EXHIBIT B

AOE0103

CONFIDENTIAL

1        Witness my official signature on this 30th day

2     of August, 2022.

3

4

5

6

7           Megan M. Bowman, CSR

8

9           License No. 084-004916

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 125

EXHIBIT B
AOE0104

# EXHIBIT C

EXHIBIT C

AOE0105

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE CENTRAL DISTRICT OF CALIFORNIA
 2                      WESTERN DIVISION
 3    ENTERTAINMENT STUDIOS      )
      NETWORKS, INC., a          )
 4    California corporation;    )
      WEATHER GROUP, LLC, a      )
 5    Delaware limited           )
      liability company,         )
 6                               )
                 Plaintiffs,     )
 7                               )
          vs.                    ) Case No.
 8                               ) 2:21-cv-04972-FMO-MAA
      McDONALD'S USA, LLC, a     )
 9    Delaware limited           )
      liability company,         )
10                               )
                 Defendant.      )
11
12              The individual and 30(b)(6) deposition
13    of McDONALD'S CORPORATION by JENNIFER FELDMAN,
14    called for examination, taken pursuant to the
15    Federal Rules of Civil Procedure of the United
16    States District Courts pertaining to the taking of
17    depositions, taken before YVETTE BIJARRO-RODRIGUEZ,
18    CSR No. 084-003734, within and for the County of
19    Cook and State of Illinois, and a Certified
20    Shorthand Reporter of said state, at 70 West
21    Madison Street, Suite 2900, Chicago, Illinois, on
22    the 26th day of August, 2022, at 9:39 a.m.
23    REPORTED BY:  YVETTE BIJARRO-RODRIGUEZ, CSR
24    LICENSE NO.:  084-003734
```

                                              Page 1

EXHIBIT C
AOE0106

```
 1    APPEARANCES:
 2                MILLER BARONDESS, LLP
                  1999 Avenue of the Stars
 3                Suite 1000
                  Los Angeles, California 90067
 4                BY:  MR. DAVID W. SCHECTER
                        - AND -
 5                   MS. MARGRET L. FLODEEN
                  (310) 552-4400
 6                dschecter@millerbarondess.com
                  mflodeen@millerbarondess.com
 7
                        On behalf of the Plaintiff;
 8
                  RILEY SAFER HOLMES & CANCILA LLP
 9                70 West Madison Street
                  Suite 2900
10                Chicago, Illinois 60602
                  BY:  MS. AMY C. ANDREWS
11                      - AND -
                     MR. ROBERT P. FOLEY
12                (312) 471-8700
                  aandrews@rshc-law.com
13                rfoley@rshc-law.com
14                   On behalf of the Defendant.
15    ALSO PRESENT:
16    MS. MONICA MOSBY, SENIOR COUNSEL
      McDONALD'S CORPORATION
17
      MR. ROSS COLBY, VERITEXT
18    LEGAL SOLUTIONS, VIDEOGRAPHER
19    APPEARING REMOTELY VIA ZOOM:
20    MR. JEFF MAYES
      MR. TOM O'BRIEN
21    MR. BYRON ALLEN
      MS. JANICE AROUH
22    MR. DARREN GALATT
      MR. ERIC GOULD
23
24                     *   *   *   *
```

                                        Page  2

EXHIBIT C
AOE0107

```
 1          A.    Yes.
 2          Q.    I don't want you to answer a question
 3     that you do not understand.  So if I ask you a
 4     question and you don't understand a word, a phrase,
 5     the whole question, I need you to tell me that,
 6     okay?
 7          A.    Okay.
 8          Q.    If you answer a question without letting
 9     me know that you don't understand any part of it,
10     I'm going to assume that you understood the
11     question; is that fair?
12          A.    Yes.
13          Q.    You're doing great.  But just all
14     responses need to be verbal, so no shakes of the
15     head, nods.  Uh-huhs can be ambiguous in a
16     transcript, so yes, no or answer.
17                What is your current title today?
18          A.    Senior director marketing operations and
19     enablement.
20          Q.    When did you get this title?
21          A.    In 2020.
22          Q.    Do you know the month?
23          A.    February.
24          Q.    What were you before?
```

                                          Page  8

EXHIBIT C
AOE0108

```
 1          A.    Senior director U.S. Media.

 2          Q.    How long did you hold that role?

 3          A.    About 13 years.

 4          Q.    So dating back to something around 2007?

 5          A.    2006.

 6          Q.    So from 2006 to roughly February 2020,

 7     you were the senior director of U.S. Media?

 8          A.    I had been promoted in the same title.

 9          Q.    So you were a director of U.S. Media.

10     Then promoted to senior director?

11          A.    Started as manager in 2006, then

12     director, then senior director.

13          Q.    Did these promotions come with increases

14     in responsibilities?

15          A.    Yes.

16          Q.    In the manager role, manager of U.S.

17     Media, how long were you in that role?

18          A.    2006 to roughly 2014.

19          Q.    What were your duties and

20     responsibilities?

21          A.    I worked in partnership with our

22     national agencies to develop recommended media

23     strategies and investment.

24          Q.    Is that it?
```

                                              Page  9

EXHIBIT C

AOE0109

1     A.    That was the primary function of my job.

2     Q.    Anything else?

3     A.    No.  Just working internally with our

4  teams on campaign development and media deployment.

5     Q.    In terms of McDonald's budget, you're

6  referring to the national advertising budget?

7     A.    Correct.

8     Q.    Not the local budget?

9     A.    Correct.

10     Q.    From 2006 to 2014, was OMD an agency

11  that you worked with?

12     A.    Yes.

13     Q.    Was Burrell?

14     A.    Yes.

15     Q.    Would any other agency from 2006 to 2014

16  place advertisements for McDonald's in the

17  African-American consumer market?

18     A.    No.

19     Q.    Let's just focus on while you were

20  manager.  Who were your primary points of contact

21  at OMD?

22     A.    There were many.

23     Q.    Do you know their names?

24     A.    Yes.

Page 10

EXHIBIT C
AOE0110

```
 1    operated cable lifestyle networks?

 2              MS. ANDREWS:  Object to the form.

 3    BY THE WITNESS:

 4         A.   I'm sorry.  Please restate that?

 5    BY MR. SCHECTER:

 6         Q.   Are you aware that during the time frame

 7    of 2015 to 2019 Entertainment Studios owned and

 8    operated cable television networks?

 9         A.   What cable television network?

10         Q.   Just do you know that to be true or not?

11         A.   I do not know that to be true.

12         Q.   Can you name any of Entertainment

13    Studios cable networks that it owns and operates?

14         A.   I don't know which cable networks are

15    particularly owned and operated.

16         Q.   If I ask the question with respect to CF

17    Entertainment, would your answer be different?

18         A.   What cable network?  I'm not aware of

19    cable networks that they own.

20         Q.   So you can't name any of them?

21              MS. ANDREWS:  Object to form.

22    BY THE WITNESS:

23         A.   I cannot name directly their cable

24    networks.
```

Page 41

EXHIBIT C

AOE0111

```
 1    selection criteria.
 2         Q.    My question is just:  Are there
 3    selection criteria that are written down anywhere?
 4         A.    That are documented?  Yes.
 5         Q.    Correct, okay.  That's the same
 6    selection criteria you're referring to as to why
 7    McDonald's did not advertise on the Weather
 8    Channel?
 9         A.    Correct.
10         Q.    Who created the document that contains
11    the McDonald's selection criteria?
12         A.    I'm not clear on which document you're
13    referencing.
14         Q.    You said that the selection criteria
15    that McDonald's used to decide not to advertise on
16    the Weather Channel is documented, right?
17              MS. ANDREWS:  October to the form.
18    BY THE WITNESS:
19         A.    Our agencies would provide a
20    recommendation to us which also indicated the
21    selection criteria.
22    BY MR. SCHECTER:
23         Q.    So there's -- are you saying that
24    agencies are the ones who came up with the
```

Page 43

EXHIBIT C

AOE0112

```
1        Q.    Why is that?

2        A.    The safety concerns with hard news.

3        Q.    How long has that been a practice of

4    McDonald's?

5        A.    Nationally as long as I've been with the

6    company.

7        Q.    So at least since 2006?

8        A.    Correct.

9        Q.    McDonald's has advertised on CNN from

10   2006 to the present, hasn't it?

11             MS. ANDREWS:   Object to the form.

12   BY THE WITNESS:

13       A.    In particular years for very specific

14   campaigns.

15   BY MR. SCHECTER:

16       Q.    What campaigns?

17       A.    Corporate image campaigns that are

18   specifically targeted to a political mind-set.

19       Q.    So -- anything else?

20       A.    No.

21       Q.    So it's your testimony that 2006 to the

22   present the only advertisements that McDonald's out

23   of its national budget that were placed on CNN were

24   part of these, sort of, political campaigns?
```

Page 83

EXHIBIT C

AOE0113

1         A.      It was not a political campaign.   It

2    was -- they are brand trust campaigns that our key

3    audience is a political mind-set.

4         Q.      This is spending that comes from

5    corporate?

6         A.      Yes, it's corporate spending.

7         Q.      It's not from the operators?

8         A.      Correct.

9         Q.      So it's your testimony that from 2006 to

10   the present the only advertising that McDonald's

11   did on CNN came out of its corporate budget?

12        A.      2015 to 2019, correct.

13        Q.      What about from 2006 to 2015?

14        A.      That rule would still apply generally,

15   yes.

16        Q.      So from 2006 to 2015 McDonald's only

17   advertised on CNN out of its corporate budget?

18             MS. ANDREWS:   Object to form,

19   foundation.

20   BY THE WITNESS:

21        A.      Yes, I believe so.

22   BY MR. SCHECTER:

23        Q.      And McDonald's advertises on MSNBC;

24   isn't that right?

Veritext Legal Solutions
866 299-5127

EXHIBIT C

AOE0114

1       A.      Similar to CNN we would only advertise

2   on MSNBC specific for those particular campaigns.

3       Q.      Did McDonald's ever advertise on MSNBC

4   while you were at the company out of the national

5   advertising budget?

6       A.      Out of the national advertising but the

7   corporate budget is national in nature.  I'm not

8   sure what you're asking.

9       Q.      I understand.  But there's a national

10  advertising budget that comes from the operators;

11  is that right?

12      A.      There is.

13      Q.      So has McDonald's ever advertised on CNN

14  out of the operator national advertising budget?

15      A.      No.  Those would be the corporate

16  campaigns.

17      Q.      And on MSNBC since you've been with the

18  company, has McDonald's ever advertised out of the

19  operator national advertising budget?

20      A.      No, I don't believe so.

21      Q.      McDonald's advertises on HLN; isn't that

22  right?

23      A.      Similar to the two networks that you

24  just mentioned, yes, for a particular campaign.

Page 85

EXHIBIT C

AOE0115

1      Q.    So your answers are the same with

2  respect to HLN in that the money spent to advertise

3  on HLN came out of corporate?

4      A.    Correct.

5      Q.    CNN, MNSBC and HLN are news networks;

6  isn't that right?

7      A.    They are news.

8      Q.    And they sometimes will show

9  particularly graphic, violent news; isn't that

10  right?

11          MS. ANDREWS:   Objection to form.

12  BY THE WITNESS:

13      A.    I can't speak to all of the content

14  they --

15  BY MR. SCHECTER:

16      Q.    Yeah.  I'm not asking for your -- like

17  an encyclopedic knowledge of the networks.  But I

18  take it you've watched CNN; is that right?

19      A.    I have watched CNN, yes.

20      Q.    Plane crashes might be shown on CNN?

21      A.    They would.  But we would also have

22  positioning guidelines that the agency would issue

23  to the networks that would state for us not to be

24  around, kind of, tragedy, if you will, news.

Page 86

EXHIBIT C

AOE0116

1    Q.    So the corporate spend for

2    advertisements would have a guideline not to be

3    adjacent to violent content like that?

4        A.    Correct.

5        Q.    Was that the case from 2006 to 2019?

6        A.    Yes.

7        Q.    McDonald's used to advertise on

8    Entertainment Studios or CF Entertainment

9    syndicated programing; isn't that right?

10       A.    During my time, yes, we did advertise on

11    the syndicated property.

12       Q.    From -- McDonald's advertised I believe

13    on the syndicated programming from 2015 to 2018; is

14    that right?

15       A.    Yes.

16       Q.    And that was recommended by the

17    agencies; isn't that right?

18       A.    Yep.

19       Q.    Which agency recommended that syndicated

20    programming?

21       A.    Burrell.

22       Q.    And why did McDonald's -- did Burrell

23    recommend advertising on Entertainment Studios

24    syndicated programming in 2019?

Page 87

EXHIBIT C

AOE0117

```
 1    director of U.S. Media, did you receive any reports
 2    that showed McDonald's advertising on black-owned
 3    media?
 4         A.    Can you state your question again,
 5    please?
 6         Q.    Sure.  While you were -- from 2015 to
 7    2019 maybe a little spilling over into 2020 while
 8    you were the director and senior director of U.S.
 9    Media, did you ever receive reports from agencies
10    as to how much money McDonald's was spending
11    advertising with black-owned media?
12         A.    Yes.
13         Q.    Who would provide that to you?
14         A.    Our agency.
15         Q.    Any agency in particular?
16         A.    The two agencies that would have
17    supplied African-American ownership would have been
18    Burrell Communications and OMD.
19         Q.    As you sit hire today, can you recall
20    which one of them or if they sent it to you in
21    combination?
22         A.    They both did.
23         Q.    So you got a report from OMD and a
24    report from Burrell?
```

Page 105

EXHIBIT C

AOE0118

1        A.      Correct.

2        Q.      And that report included this spending

3   with black-owned media?

4        A.      They would indicate which vendors or

5   properties were diverse owned.

6        Q.      Well, do you recall -- you received

7   those reports directly; is that right?

8        A.      Correct.

9        Q.      Do you recall, let's say, in 2019 how

10   much money was spent with black-owned media?

11       A.      I can't recall with specificity.

12       Q.      Do you know trends?  Do you know if it

13   was increasing or decreasing from 2015 to 2019?

14       A.      Our intent would be to keep it.  At

15   least maintain it or grow.

16       Q.      But do you know if there was a trend one

17   way or the other?

18       A.      There should have been a trend to

19   maintain or grow.

20       Q.      But just do you know if the numbers were

21   staying the same, growing or reducing?

22       A.      I believe they were staying the same in

23   that time frame.

24       Q.      Were you -- were McDonald's trying to

Page 106

EXHIBIT C

AOE0119

1      Q.    Do you know what the particular audience

2    composition was for the selection criteria that led

3    McDonald's to agree to advertise on TV One in 2019?

4      A.    We advertised on TV One for the whole

5    time I had been at McDonald's.

6      Q.    But my question is:  Do you know what

7    the audience composition was with respect to the

8    selection criteria that --

9      A.    I do not know -- I'm sorry.

10      Q.    -- that led McDonald's to advertise on

11    TV One in 2019?

12      A.    I do not have the specifics of the

13    composition.

14      Q.    Again, you see Urban One as the

15    ownership group.  Can you go down to the next row?

16    You see Aspire.

17            Do you see that?

18      A.    I do.

19      Q.    It looks like McDonald's spend 190,000

20    advertising on Aspire in 2019.  Does that sound

21    about right?

22      A.    Sure.

23      Q.    Do you know who owns Aspire?

24      A.    I don't know the full ownership.  I do

Page 118

EXHIBIT C

AOE0120

1    believe that Magic Johnson was affiliated.  I don't

2    know the percentage ownership.

3         Q.    You're relying on the agencies to verify

4    that Aspire is black owned?

5         A.    The agencies that collect certification

6    from the vendors.

7         Q.    Do you know if Magic Johnson is still

8    affiliated with the network today?

9         A.    I do not know.

10        Q.    Did you know that Magic Johnson sold his

11   ownership interest in 2019?

12        A.    I did not know.

13        Q.    So if you take -- I can just do this

14   math for you.  Just focus on Urban One.  It looks

15   like it's 1.6 million for TV One, .98 million for

16   Reach Media and Radio.  Total is 2.58 million and

17   then 1.33 million on Digital Interactive One which

18   is $3.91 million.

19             So if Urban One is not black owned

20   the spend on African-American-owned media is under

21   $4 million; isn't that right?

22             MS. ANDREWS:  Object to the form.

23   BY THE WITNESS:

24        A.    I'm sorry.  Please restate that.

Page 119

EXHIBIT C

AOE0121

1    Q.    And so you -- McDonald's would already

2  advertise in syndication as to the media company

3  that owns the syndication rights?

4             MS. ANDREWS:   Object to the form.

5  BY THE WITNESS:

6    A.    So we would have placed a media buy to

7  purchase inventory, commercial inventory, in the

8  Stellar Awards and that would have a ratings

9  guarantee associated with it.

10 BY MR. SCHECTER:

11   Q.    I see.  So the sponsorships could be

12 agreeing to advertise on a particular syndicated

13 program, right?

14   A.    No.

15   Q.    Can you explain it to me?

16   A.    So the way I think about it a

17 sponsorship is brought to you by.  So you might

18 have a billboard, an end card, something that says

19 this program was brought to you by McDonald's.

20   Q.    Let's say with the Stellar Awards

21 McDonald's paid to sponsor the Stellar Awards,

22 right?

23   A.    We would pay for the commercials that

24 ran in the Stellar Awards and as -- sometimes added

Page 155

EXHIBIT C

AOE0122

1    value, sometimes at a smaller cost you would buy

2    "sponsorship" which would come with those assets

3    that I mentioned.

4         Q.    So it would come with ratings

5    guarantees?

6         A.    The media buy would come with a ratings

7    guarantee, yeah.

8         Q.    Can you think of any other sponsorships

9    that McDonald's placed in 2015 to 2019?

10        A.    I believe we had a handful of

11   sponsorships similar to that.

12        Q.    Can you think of anything as you sit

13   here today?

14        A.    I mean, that's probably the best example

15   of the one I just gave you.  But we could have had

16   a -- sponsored, you know, hamburger month,

17   something made up on a network or a channel.  It

18   just would depend on the strategy for that time

19   period.

20        Q.    Is there such a thing as hamburger

21   month?

22        A.    It's a social event.  Yes, there is such

23   a thing as hamburger month.

24        Q.    So would that be like -- is that like a

Page 156

EXHIBIT C

AOE0123

```
 1    been proposed by Entertainment Studios.

 2    BY MR. SCHECTER:

 3         Q.     Okay.  And that agency that you're

 4    referring to is Burrell, right?

 5         A.     Primarily, yes.

 6         Q.     You didn't have a discussion with OMD

 7    about Recipe.tv, right?

 8         A.     I don't recall a discussion with them.

 9         Q.     Do you know if there is African-American

10    content targeted on Recipe.tv?

11         A.     I don't know.

12         Q.     Do you know if there's African-American

13    targeted content on Comedy.tv?

14         A.     Can you specify targeted?

15         Q.     Well, I mean, there's -- you have an

16    agency like Burrell which is focused on the

17    African-American consumer market, right?

18         A.     They are an agency of record that is

19    focused on African-American, yes.

20         Q.     They have expertise in reaching the

21    African-American demographic viewer; isn't that

22    right?

23         A.     They have expertise in evaluating

24    properties that reach the African-American
```

Page 168

EXHIBIT C

AOE0124

1    audience, yes.

2         Q.    They help McDonald's reach the

3    African-American demographic, right?

4              MS. ANDREWS:   Object to form.

5    BY THE WITNESS:

6         A.    They help identify properties that can

7    reach the audience.

8    BY MR. SCHECTER:

9         Q.    Okay.  So just in your working with

10   Burrell, are you aware that there are just certain

11   programs and networks that have -- that skew more

12   in terms of an African-American viewer?

13        A.    Yes.

14        Q.    So my question is:  Do you know if

15   Recipe.tv has -- skews more African-American?

16        A.    I don't know.

17        Q.    Do you know if Cars.tv, Comedy.tv,

18   ES.tv, Pets.tv, JusticeCentral.tv,

19   MyDestination.tv, if any of those skew more in

20   terms of African-American viewers?

21        A.    I do not know.

22        Q.    In your experience isn't it true that

23   African-American skewing networks and programming

24   involve content that is targeted to an

                                        Page 169

EXHIBIT C

AOE0125

```
 1    BY THE WITNESS:
 2         A.    I don't know what you mean by
 3    "funneled."
 4    BY MR. SCHECTER:
 5         Q.    Well, wasn't Burrell the agency of
 6    record for Entertainment Studios?
 7              MS. ANDREWS:  Object to the form.
 8    BY THE WITNESS:
 9         A.    No.  Burrell is the agency of record for
10    McDonald's for African-American.
11    BY MR. SCHECTER:
12         Q.    Why don't we go to Deposition Exhibit 9.
13              Ms. Feldman, you've been handed an
14    exhibit that's been marked Deposition Exhibit 9.
15    It's an e-mail from Chris Geraci.
16              Have you seen it before?
17         A.    I'm not on these communications.
18         Q.    So you've never seen them before?
19         A.    No.
20         Q.    In 2012 you were a manager in U.S.
21    Media, isn't that right, at McDonald's?
22         A.    Yes.
23         Q.    And during that period of time you
24    interfaced with Mr. Geraci?
```

Page 171

EXHIBIT C
AOE0126

1        A.    Infrequently but, yes.

2        Q.    Mr. Geraci in the top e-mail he writes

3    to Darren Galatt and Byron Allen.  "I've been

4    trying to help to get you more business beyond

5    Hershey, and I know that PepsiCo is considering.

6    McDonald's will consider, but not through OMD."

7                    Do you see that?

8        A.    I do see that.

9        Q.    Did you ever tell Mr. Geraci that

10    McDonald's will not consider any of Entertainment

11    Studios programming through OMD?

12        A.    I do not recall stating that.

13        Q.    Who else at the time at McDonald's would

14    have spoken with Mr. Geraci on this topic?

15        A.    In 2012?

16        Q.    Correct.

17        A.    It could have been Anja or -- I can't

18    recall everyone on the team then.

19        Q.    As you're sitting here today, it's Anja,

20    Carroll.  Anyone else?

21        A.    I'm just thinking back to 2012.  It

22    could have been Peter Sterling.

23        Q.    Is it your testimony that you have never

24    told OMD that McDonald's will not consider

Page 172

EXHIBIT C
AOE0127

```
 1     advertising with Entertainment Studios through OMD?

 2          A.    I would not state it that way.

 3          Q.    Did you say anything similar?

 4          A.    We typically had a singular agency

 5     relationship for all of our vendors so that we

 6     don't have multiple agencies negotiating on behalf

 7     of the brand at the same time.

 8          Q.    So OMD would have a particular -- would

 9     be assigned certain vendors, right?

10          A.    Not assigned but based off of who those

11     audience reached that would help to determine the

12     agency that was best equipped to negotiate with

13     that particular vendor.

14          Q.    Got it.   And so OMD that's -- at this

15     time that was the agency responsible for making

16     recommendations on how to spend McDonald's national

17     advertising budget in the general consumer market?

18          A.    Correct.

19          Q.    And it's your understanding that the

20     budget that OMD was responsible for making

21     recommendations on is the vast majority of

22     McDonald's national advertising budget?

23                MS. ANDREWS:   Object to the form.

24
```

Page 173

EXHIBIT C
AOE0128

1    BY THE WITNESS:

2         A.    Can you state the question again?

3    BY MR. SCHECTER:

4         Q.    It's your understanding that the general

5    consumer market budget that OMD was responsible for

6    making recommendations on was the vast majority of

7    McDonald's national advertising budget?

8              MS. ANDREWS:   Object to the form.

9    BY THE WITNESS:

10        A.    OMD managed a significant portion of our

11   budget, yes.

12   BY MR. SCHECTER:

13        Q.    The vast majority of the budget, right?

14             MS. ANDREWS:   Same objection.

15   BY THE WITNESS:

16        A.    I don't know what "vast majority" means

17   to you.

18   BY MR. SCHECTER:

19        Q.    Over 80 percent?

20        A.    I don't know that it was over 80 percent

21   of the budget.

22        Q.    Over 70 percent?

23        A.    It could have been around, you know, 60

24   to 50 -- or 60 to 70 potentially at the time of

Page 174

EXHIBIT C

AOE0129

1       this.

2            Q.    If we look back to Deposition Exhibit 2.

3       I don't know if you have that in front of you.

4                    So if you look at the first

5       worksheet, the "Summary Worksheet" where it refers

6       to all agency total and it's 416 million in 2019

7       and 451 million in 2020.

8                    Do you see that?

9            A.    I do.

10           Q.    And if you look to the next box below it

11      refers to OMD 2019 to 2020 spend by minority

12      classification.

13                   Do you see that?

14           A.    I do.

15           Q.    In 2019 to 2020, OMD was McDonald's

16      agency responsible for making recommendations for

17      spending on the general consumer market; is that

18      right?

19           A.    Correct.

20           Q.    If you look the 2019 net spend for OMD

21      is $391 million.  Do you see that?

22           A.    I do.

23           Q.    And it was 416 million in 2020.  Do you

24      see that?

Page 175

EXHIBIT C

AOE0130

1    isn't that right?

2         A.    I'm not on the communications so I can

3    only rely on the information that's here.

4         Q.    If you look at the next page you see

5    Burrell.  The Burrell net spend is 16 million in

6    2019.  In 2020 it's 23 million.

7              Do you see that?

8         A.    I do.

9         Q.    And that's far less than the spend

10   through OMD; is that right?

11        A.    It is less than the spend with OMD.

12        Q.    Going back to Deposition Exhibit 9.  In

13   2012 was Entertainment Studios relegated to having

14   its relationship -- its vendor relationship with

15   Burrell?

16             MS. ANDREWS:  Object to the form.

17   BY THE WITNESS:

18        A.    I do not know what you mean by

19   "relegated."  It was not relegated.

20   BY MR. SCHECTER:

21        Q.    But you said that these agencies would

22   have certain relationships with particular vendors,

23   right?

24        A.    Yes.  And based off of the audience

Page 177

EXHIBIT C

AOE0131

1    composition, concentration, evaluation, there was

2    an overdevelopment of African-American within these

3    properties.   Therefore, Burrell would have been the

4    agency to negotiate with but that would not

5    preclude consideration as part of the general

6    market either.

7         Q.   We can move to Deposition Exhibit 10.

8    It looks like you are not on this e-mail.  Have you

9    ever seen this before?

10        A.   Only when it was shared with me during

11   prep for this.

12        Q.   You don't have to get into that.  That's

13   between you and your lawyers.

14              Other than preparing for this

15   deposition, have you seen this document before?

16        A.   I'm not on this as far as I can tell.  I

17   don't recall ever receiving this.

18        Q.   In 2016 -- if you look at the top

19   e-mail, Debbie Innes, that's someone who worked at

20   OMD at the time right?

21        A.   Correct.

22        Q.   And that's someone that you interfaced

23   with at OMD; is that right?

24        A.   Yes.

Page 178

EXHIBIT C

AOE0132

1          Q.    And Ms. Innes writes Darren Galatt

2     February 29, 2016, "Just a reminder that Burrell is

3     the agency of record for McDonald's and

4     Entertainment Studios."

5          A.    I do see that.

6          Q.    Did you ever tell Ms. Innes that Burrell

7     should be the agency of record for Entertainment

8     Studios?

9          A.    No.  I wouldn't have used the language

10    of agency of record.

11         Q.    Would you have told Burrell that the

12    vendor relationship with Entertainment Studios and

13    McDonald's should go through Burrell?

14         A.    To that point all of our investment with

15    Entertainment Studios had been through Burrell so

16    they would have been point to do that.  Again, as I

17    said before, it would not preclude OMD from

18    analyzing that as a property and making a

19    recommendation.  It is more of who would negotiate

20    with that vendor.

21         Q.    Well, here's Ms. Innes saying, you

22    should go through Burrell, right?

23              MS. ANDREWS:  Object to the form.

24

                                      Page 179

EXHIBIT C

AOE0133

1       Q.     Do you know -- did you ever speak with

2    Mr. Easterbrook as the chief executive officer

3    about opposed upfront spending?

4       A.     I never spoke with Mr. Easterbrook about

5    proposed media spending.

6       Q.     Did you speak with Mr. Easterbrook at

7    all?

8       A.     No.

9       Q.     Did you speak with Mr. Kempczinski while

10   he was president of McDonald's USA?

11      A.     Ever?

12      Q.     Ever.

13      A.     Potentially, yes.

14      Q.     About what?

15      A.     Hallway conversation, hello.

16      Q.     But nothing as part of your duties and

17   responsibilities?

18      A.     Not specific, no, to media investments.

19      Q.     Is it -- are you just saying office

20   chitchat?

21      A.     Potentially, yes.

22      Q.     Anything other than office chitchat?

23      A.     Not that I recall.

24      Q.     Do you know if the chief marketing

Page 191

EXHIBIT C

AOE0134

```
 1                  REPORTER'S CERTIFICATE

 2

 3

 4              I, Yvette Bijarro-Rodriguez, a Certified

 5      Shorthand Reporter, do hereby certify that on

 6      August 26, 2022, the deposition of the witness,

 7      JENNIFER FELDMAN, called by the Plaintiffs, was

 8      taken before me, reported stenographically and was

 9      thereafter reduced to typewriting through

10      computer-aided transcription.

11              The said witness, JENNIFER FELDMAN, was

12      first duly sworn to tell the truth, the whole

13      truth, and nothing but the truth, and was then

14      examined upon oral interrogatories.

15              I further certify that the foregoing is

16      a true, accurate and complete record of the

17      questions asked of and answers made by the said

18      witness, at the time and place hereinabove referred

19      to.

20              The signature of the witness was not

21      waived by agreement.

22              Pursuant to Rule 207(a) of the Rules of

23      the Supreme Court of Illinois if deponent fails to

24      read and sign this deposition transcript within 28
```

Page  216

EXHIBIT C

AOE0135

1     days or make other arrangements for reading and

2     signing thereof, this deposition transcript may be

3     used as fully as though signed, and the instant

4     certificate will then evidence such failure to read

5     and sign this deposition transcript as the reason

6     for signature being waived.

7              The undersigned is not interested in the

8     within case, nor of kin or counsel to any of the

9     parties.

10             Witness my official signature on this

11    29th day of August, 2022.

12

13

14                        *Yvette Bijarro Rodriguez*

15                        Yvette Bijarro-Rodriguez, CSR

                          One North Franklin Street

16                        30th Floor

                          Chicago, Illinois 60606

17

18    License No. 084-003734

19

20

21

22

23

24

                                        Page  217

EXHIBIT C
AOE0136

# EXHIBIT D

CONFIDENTIAL

```
 1                UNITED STATES DISTRICT COURT
 2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
 3
 4      ENTERTAINMENT STUDIOS NETWORKS,   )   Case No.
        INC., a California corporation;   )   2:21-cv-04972-FMO-
 5      WEATHER GROUP, LLC, a Delaware    )   MAA
        limited liability company,        )
 6                                        )
 7               Plaintiffs,              )
                                          )
 8      vs.                               )
                                          )
 9      McDONALD'S USA, LLC, a Delaware   )
        limited liability company,        )
10                                        )
11               Defendants.              )
                                          )
        _____)
12
13                          CONFIDENTIAL
14                  REMOTE PROCEEDINGS OF THE
15      VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION OF ANJA CARROLL
16                  Thursday, October 13, 2022
17                          Volume I
18
19
20
21      Reported by:
        ROCHELLE HOLMES
22      CSR No. 9482
23      Job No. 5533363
24      PAGES 1 - 179
25
```

Page 1

EXHIBIT D

AOE0138

CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT
 2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
 3
 4   ENTERTAINMENT STUDIOS NETWORKS,   )   Case No.
     INC., a California corporation;   )   2:21-cv-04972-FMO-
 5   WEATHER GROUP, LLC, a Delaware    )   MAA
     limited liability company,        )
 6                                     )
 7              Plaintiffs,            )
                                       )
 8   vs.                               )
                                       )
 9   McDONALD'S USA, LLC, a Delaware   )
     limited liability company,        )
10                                     )
11              Defendants.            )
                                       )
12   _____  )
13
14
15        Deposition of ANJA CARROLL, taken on behalf of
16   Plaintiff, via videoconference, beginning at 11:41 a.m.
17   Central Time and ending at 4:56 p.m. Central Time on
18   Thursday, October 13, 2022, before ROCHELLE HOLMES,
19   Certified Shorthand Reporter No. 9482, Certified
20   Realtime Reporter No. 0123.
21
22
23
24
25
```

Page  2

EXHIBIT D
AOE0139

CONFIDENTIAL

```
 1      REMOTE APPEARANCES:

 2

 3      For Plaintiff:

 4

 5           MILLER BARONDESS, LLP

 6           BY:  DAVID W. SCHECTER, ATTORNEY

 7           1999 Avenue of the Stars, Suite 1000

 8           Los Angeles, California 90067

 9           (310) 552-4400

10           Dschecter@millerbarondess.com

11

12      For Defendants:

13

14           RILEY SAFER HOLMES & CANCILA LLP

15           BY:  AMY ANDREWS, ATTORNEY

16                ROBERT FOLEY, ATTORNEY

17           70 W. Madison Street, Suite 2900

18           Chicago, Illinois 60602

19           (312) 471-8745

20           Aandrews@rshc-law.com

21           RFoley@rshc-law.com

22

23

24

25

                                   Page  3
```

EXHIBIT D
AOE0140

CONFIDENTIAL

```
 1     REMOTE APPEARANCES (Continued):

 2

 3     ALSO PRESENT:

 4          MARK DEVITRE

 5          JEFF MAYES

 6          JANICE AROUH

 7          DARREN GALATT

 8          ERIC GOULD

 9          MONICA MOSBY

10

11

12     VIDEOGRAPHER:  NOAH SUSZCKIEWICZ

13

14

15

16

17

18

19

20

21

22

23

24

25

                                       Page  4
```

EXHIBIT D
AOE0141

CONFIDENTIAL

```
 1          Q    Your attorney may from time to time object.

 2    Unless your attorney instructs you not to answer, you

 3    understand that you are to still answer my question.

 4               Do you understand that?

 5          A    Yes, I do.                              11:46AM

 6          Q    Is there any reason why you can't give your

 7    best testimony today?

 8          A    No.

 9          Q    When did you join -- well, before I ask

10    this.                                             11:46AM

11               So there's two entities, McDonald's USA, LLC

12    and McDonald's Corporation.  I'll -- I'll clarify if

13    the question is really directed to one of those two,

14    but I'd like to just kind of at least for background

15    use McDonald's to refer to both entities.          11:47AM

16               Is that all right?

17          A    Sure.

18          Q    When did you first join McDonald's?

19          A    April of 2000.

20          Q    What was your role when you joined?     11:47AM

21          A    I was a manager of U.S. media.

22          Q    Had you -- was that your first job in media?

23          A    No.

24          Q    Where did you work before McDonald's?

25          A    Where -- where, like location-wise?     11:47AM
```

Page 11

EXHIBIT D

AOE0142

CONFIDENTIAL

1          Q      What -- what companies?

2          A      Before?

3          Q      Before?

4          A      Before McDonald's I worked for DDB Needham,

5    an advertising agency, and Arnold Fortuna Lawner,          11:47AM

6    another advertising agency, and Martin Williams,

7    another advertising agency.

8          Q      So just to shortcut, so was it after college

9    you started working for these agencies, you worked for

10   three of them, then you joined McDonald's?               11:48AM

11         A      Correct.

12         Q      Was McDonald's your client at any of these

13   three agencies?

14         A      Yes, it was.

15         Q      At all three?                                11:48AM

16         A      No.  Just DDB.

17         Q      How long were you at -- it's DDBD or DDB?

18         A      DDB, David David Bob Needham.

19         Q      Got it.  Okay.  And how long did you work at

20   DDB?                                                      11:48AM

21         A      Well, I don't know exactly the months, but

22   it will be four or five years.

23         Q      And were you the primary person at DDB on

24   the McDonald's account?

25         A      I held several different positions because I  11:48AM

Page 12

EXHIBIT D
AOE0143

CONFIDENTIAL

1       worked on McDonald's for three years when DDB won the

2       business back in '97 before I joined McDonald's.

3       So -- but at the time that I came over to the

4       McDonald's business I was the associate media director

5       on the account.                                          11:49AM

6           Q    And associate media director, is that --

7           A    Essentially one below the person who runs

8       the entire business on the media side.

9           Q    The entire business, meaning DDB or the

10      McDonald's account?                                      11:49AM

11          A    McDonald's account.

12          Q    Got it.  Who was the person before you in

13      that regard?

14          A    There were multiple.

15          Q    Okay.                                           11:49AM

16          A    So I don't know.  I mean, at the -- at the

17      time that I had left it was Mary Hanley.

18          Q    So I understand it was a three-year period,

19      but I take it the role you were in at DDB on the

20      McDonald's account was to assist McDonald's in          11:50AM

21      selecting various media partners to advertise with?

22          A    One of the roles, yes.

23          Q    And that included cable television?

24          A    Yes.

25          Q    Why did you leave DDB and join McDonald's?     11:50AM

                                                          Page 13

EXHIBIT D
AOE0144

CONFIDENTIAL

```
 1          A    Because I had a great job offer from a great

 2    company.

 3          Q    You joined as manager of U.S. media, how

 4    long were you in that role?

 5          A    About a year.                              11:51AM

 6          Q    And just at a general level was your job

 7    basically to be on the other end of the relationship

 8    to be able to list the agency in determining media

 9    partners to advertise with?

10          A    Yes.  One of my responsibilities.          11:51AM

11          Q    And just at a high level, I don't need to go

12    into everything you did in 2000, but just sort of what

13    other job responsibilities did you have in 2000?

14          A    The governance process was the franchisees

15    is a large part of the McDonald's role.  We're not     11:51AM

16    independent decision makers, essentially we're -- I

17    guess the best way to describe it is a middleman with

18    the franchisee marketing co-op.  And --

19          Q    Sorry.  Are you finished?

20          A    Yes.                                        11:52AM

21          Q    Okay.  The governance, you're referring to

22    working with the franchisees in determining which

23    media partners to advertise with out of McDonald's

24    national TV budge -- national advertising budget,

25    excuse me?                                             11:52AM
```

Page 14

EXHIBIT D
AOE0145

CONFIDENTIAL

```
1        A    Yes.

2        Q    Anything else you were doing as manager of

3   U.S. media?

4        A    I mean, those are basically the two

5   accountabilities.                                   11:52AM

6        Q    Looks like you were promoted to director of

7   U.S. media and digital marketing; is that right?

8        A    U.S. media first, digital marketing came

9   later, yeah.

10       Q    And that was in -- so the director of U.S.   11:52AM

11  media is 2004?

12       A    No.  Before that.

13       Q    Okay.  And just with this promotion manager

14  to director, did that come with any changes in your

15  responsibilities?                                    11:52AM

16       A    Yes.  In that there were pieces of the

17  business as a manager that I was directly accountable

18  for.  And then as director you become accountable for

19  sort of all of the pieces in the function.

20       Q    Okay.  And just so as a director, what other  11:53AM

21  pieces of the business were you then responsible for,

22  other than what you have already told me as a manager?

23       A    The way we were organized was sort of

24  parceled out the kids' business in particular.  So

25  when I started I was focused on the kids' business as  11:53AM
```

Page 15

EXHIBIT D
AOE0146

CONFIDENTIAL

1      a manager.   And then obviously you have the other sort

2      of strategic targets for the business, which was

3      really just kids and adults at the time that I joined

4      the company.

5            Q    And the kids' business, is that marketing to     11:53AM

6      children?

7            A    Yes.

8            Q    Does that include cable television

9      marketing?

10           A    Yes.                                             11:54AM

11           Q    Anything else that you were responsible for

12     as the director of U.S. media?

13           A    Not at that time.

14           Q    Looks like in 2011 you were promoted to

15     senior director; is that right?                            11:54AM

16           A    Yes.

17           Q    Did that -- are you -- I just have here that

18     you're senior director of global media and digital

19     marketing, is that just now we're looking at

20     international, not just U.S.?                               11:54AM

21           A    Correct.

22           Q    And I take it as the senior director you

23     still had responsibilities you had as director of U.S.

24     media in the sense of working with franchisees to use

25     an actual advertising budget in terms of -- which         11:54AM

Page 16

EXHIBIT D
AOE0147

CONFIDENTIAL

1      included advertising on cable television?

2          A    Yes.

3          Q    And then in 2014, looks like you were

4      promoted to vice president of U.S. marketing; is that

5      right?                                              11:55AM

6          A    Yes.

7          Q    Did that come with a change in your

8      responsibilities?

9          A    Yes.

10         Q    How so?                                    11:55AM

11         A    I took on more beyond just media.  So there

12     were digital marketing, we were going into CRM, we

13     were going into I guess the broad base return on

14     marketing spend, so kind of metric modeling and

15     marketing strategy.                                 11:55AM

16         Q    As the vice president of U.S. marketing, who

17     do -- well, let's focus more on 2014.

18              So when you were promoted to vice president,

19     who did you report to?

20         A    I'm trying to remember.  Hang on.  There was  11:55AM

21     a time where we didn't have a CMO, but the position

22     reported to the CMO.  So we had an interim CMO of

23     Kevin Newell.  And I believe I was promoted after we

24     hired Deborah Wahl, but I'm not positive.  Yeah, I

25     think -- yes, I was, now that I remember.           11:56AM

Page 17

EXHIBIT D
AOE0148

CONFIDENTIAL

1        Q    So who do you report to now -- you're still

2   the vice president of U.S. marketing; is that right?

3        A    No, I'm not.

4        Q    Okay.  What's your title now?

5        A    Retired.                                    11:56AM

6        Q    Oh, congratulations.

7        A    Thank you.

8        Q    When did you retire?

9        A    July 1st.

10        Q    Of 2022?                                   11:56AM

11        A    Correct.

12        Q    Okay.  Did you retire as the vice president

13   of U.S. marketing?

14        A    I did.

15        Q    So when you retired, who did you report to?   11:56AM

16        A    Tariq Hassan.

17        Q    And that was the CMO at the time?

18        A    Uh-huh.

19        Q    So is it fair to say that during your entire

20   vice president tenure you reported to the CMO, if     11:56AM

21   there was that position filled?

22        A    Yes.

23        Q    So you have the benefit of being the fourth

24   McDonald's executive to be deposed, so some of the

25   questions might have been answered, so maybe this will   11:57AM

Page 18

EXHIBIT D
AOE0149

CONFIDENTIAL

```
 1    be more efficient.
 2             I just want to confirm how the national TV
 3    budget, what it is and how decisions are made.  And I
 4    want to focus on the 2013 to when you retired
 5    timeframe.                                       11:57AM
 6             So just at a broad level, McDonald's hires
 7    advertising agencies to help McDonald's and its
 8    franchisees make decisions on how to spend that
 9    budget; is that right?
10        A    Yes.                                    11:57AM
11             MS. ANDREWS:  Object to the form.
12        Q    BY MR. SCHECTER:  And the -- one of those
13    agencies is -- well, during that timeframe would have
14    predominantly been OMD; is that right?
15        A    Yes.                                    11:58AM
16        Q    OMD was the -- McDonald's refers to it as
17    the general consumer market agency; is that right?
18             MS. ANDREWS:  Object to the form.
19             THE WITNESS:  Yes.
20        Q    BY MR. SCHECTER:  But McDonald's also worked  11:58AM
21    with other agencies for different consumer markets;
22    isn't that right?
23        A    Yes.
24        Q    One of those advertising agencies was
25    Burrell Communications for the African-American   11:58AM
```

Page 19

Veritext Legal Solutions
866 299-5127

EXHIBIT D

AOE0150

CONFIDENTIAL

```
 1     consumer market; is that right?
 2          A    Yes.
 3          Q    So the -- just at a high level, and then
 4     I'll want to ask you some more specific questions
 5     after that, but at a high level -- well, I guess I'll    11:58AM
 6     do it this way rather than try to -- can you just at a
 7     high level walk me through a typical timeline from
 8     figuring out how much is going to be in the budget for
 9     next year, what the goals are for McDonald's, any
10     recommendations that might be made by the agencies,    11:59AM
11     when does that happen with respect to up fronts, just
12     sort of -- and then ultimately through to purchasing.
13               So if you could just give me just a general
14     timeline of sort of the steps in that process?
15          A    Sure.  So I'll start by saying it depends on    11:59AM
16     the year, because the budget is set -- has
17     historically been set on two-year cycles, sometimes
18     one year, it depends on the franchisees, right,
19     because everything is governed by the marketing co-op,
20     which is called OPNAD, so I'll use that terminology to    12:00PM
21     refer to the national marketing pot.
22               So if you're in a year where you have to
23     establish the budget, it's more of a zero-based
24     conversation.  If the budget is already established
25     it's a different conversation potentially.  So like    12:00PM
```

Page 20

EXHIBIT D

AOE0151

CONFIDENTIAL

1    most folks we would start with our business

2    objectives; right?  What do we need to accomplish for

3    the business, how much growth is marketing responsible

4    for driving.

5            And then we build our plans using the          12:00PM

6    agencies as our hired experts to provide those

7    recommendations specific to the media investment

8    strategies.  And those certainly are based on not only

9    our business objectives but our marketing objectives,

10   the customer bases that are important to our business   12:00PM

11   and that we see opportunity for growth with that year.

12   And then the agencies go and design their plans.

13           The planning process typically starts in the

14   early spring, which would be February-ish.  And the

15   bulk of the recommendation on the annual plan probably  12:01PM

16   is complete by early summer.  In each case there are

17   ongoing conversations with the franchisees throughout

18   the process so that there's a preview of early

19   strategies in the spring so that by the time that we

20   get to summer with the plan there's very little left    12:01PM

21   to the imagination.

22           And then as I think you are aware, the

23   franchisees actually govern every dollar spent.  And

24   so not only the plan but the media purchases then --

25   once the plan is approved then media purchases are the  12:01PM

Page 21

EXHIBIT D
AOE0152

CONFIDENTIAL

 1    second step in that whereby the agencies would go back

 2    and bring back the recommendations to support the plan

 3    with purchases.  And those would typically go through

 4    for approval, the OPNAD body, in either the late

 5    summer or the fall.                          12:02PM

 6              Typically there were three franchise

 7    meetings a year for the marketing co-op.  Sometimes,

 8    you know, there would be additional meetings if we

 9    needed them.  So everything was geared around that

10    schedule.  And being ready, obviously, to start with a  12:02PM

11    new marketing plan January 1st.

12         Q    Got it.

13              So I want to make sure I understand that,

14    but that was helpful.  So let's focus -- typically the

15    budget's already set?                        12:02PM

16         A    Uh-huh.

17         Q    So for -- we were talking about next

18    calendar year's advertising, McDonald's first starts

19    with its own, I guess, meetings and work to determine

20    business objectives and what the business wants to     12:02PM

21    accomplish with marketing; is that fair?

22         A    Yes.

23         Q    That happens in January of the year prior?

24         A    It probably happens the year prior, yeah.

25    It precedes.                                 12:03PM

                                                 Page 22

EXHIBIT D
AOE0153

```
 1              MS. ANDREWS:  Object to the form.

 2              THE WITNESS:  Yeah, I don't think it's that

 3      linear.  Like I said, everything's ongoing.  It's a

 4      retail business.  You get data in every day.  So it's

 5      very fluid.                                    12:14PM

 6          Q    BY MR. SCHECTER:  So is there -- does the

 7      marketing department generally start working with the

 8      agencies at the beginning of the year?

 9          A    Again, it's a daily endeavor.  And you're

10      always doing current day execution and future state.  12:15PM

11          Q    So there's business planning stage and then

12      there's actual building of plans, that's what I heard

13      you said as the next stage; is that right?

14          A    Yes.

15          Q    Can you just walk me through how that works?  12:15PM

16      Like does someone propose a plan?  Is there -- between

17      the agencies, how does that work?

18              MS. ANDREWS:  Object to the form.

19              THE WITNESS:  So typically we'll go out with

20      the growth objectives for marketing to the agencies.  12:15PM

21      So I think it's like a brief basically.  And we'll

22      brief all of the agencies, including the creative

23      agencies.  Actually, everybody what works on the

24      business from a marketing perspective.

25              And then each of the entities will work on   12:16PM
```

Page 30

EXHIBIT D
AOE0154

CONFIDENTIAL

1    their recommendations for their area of accountability

2    or remit and bring them back.  And, you know, the

3    marketing department works across the different teams

4    to pull together a cohesive annualized plan.  Again,

5    that goes through the marketing co-op, and the                12:16PM

6    marketing co-op has many subcommittees.  So.

7            The programs themselves, the actual

8    promotion programs go through some subcommittees, the

9    actual media recommendations.  So the media plan, the

10   media purchases go through the media and budget          12:16PM

11   subcommittee.  But there are other committees that

12   also touch the promotional elements of the same

13   programs.

14       Q    BY MR. SCHECTER:  Got it.  So the brief that

15   you're referring to, is that also referred to as a          12:17PM

16   brand brief?

17       A    It could be in some instances.  And a lot of

18   times in our business it wasn't necessarily done.  I

19   mean, again, it's fluid.

20       Q    Right.                                               12:17PM

21       A    So...

22       Q    Just -- you have not been deposed before and

23   you have probably not been involved in litigation, so

24   some of this is probably sounding a little bit off,

25   but it's just kind of what lawyers do, but...               12:17PM

Page 31

EXHIBIT D
AOE0155

CONFIDENTIAL

```
 1         A    Well, ultimately OPNAD, but a lot of the

 2    detail of the media plans goes to the media and budget

 3    subcommittee of OPNAD.

 4         Q    Right.  But the committee I assume has

 5    functions throughout the year, so is there like a          12:34PM

 6    specific name for it, like first OPNAD meeting, media

 7    budget subcommittee or is it nothing formal like that?

 8         A    Nothing formal.  I mean, the subcommittees

 9    meet more frequently than the full co-op, which is

10    OPNAD.                                                     12:35PM

11         Q    Okay.  So at some point, the media plans are

12    presented to the OPNAD media and budget subcommittee

13    and for I guess approval to then go forward based on

14    the media plan; is that right?

15         A    The media and budget subcommittee of OPNAD       12:35PM

16    only have endorsement powers, then the full body of

17    OPNAD must approve after the subcommittee endorses.

18         Q    You don't want to run for congress given all

19    your -- now you feel like you can handle all these

20    different things?  Nice little process.                    12:35PM

21              So endorsement, then it goes out to OPNAD,

22    larger body, okay, is that a formal meeting or is that

23    done electronically?

24         A    It could be either, but generally speaking,

25    as I said earlier, there's three formal OPNAD meetings     12:36PM
```

Page 44

EXHIBIT D

AOE0156

```
 1              Q    As you sit here today, can you think of any

 2      significant issues regarding obtaining the endorsement

 3      from the media and budget subcommittee in that 2014 to

 4      2018 timeframe?

 5                   MS. ANDREWS:  Object to the form.          12:39PM

 6                   THE WITNESS:  No, I cannot.

 7              Q    BY MR. SCHECTER:  So I assume there were

 8      some questions, but to the best of your recollection,

 9      you don't recall significant pushback from the media

10      and budget subcommittee as to media plans that were     12:39PM

11      presented to it?

12                   MS. ANDREWS:  Object to the form.

13                   THE WITNESS:  I don't recall significant

14      pushback.  Questions.  But not significant pushback.

15              Q    BY MR. SCHECTER:  Any questions related to   12:39PM

16      spending towards the African-American consumer market

17      that you can recall?

18              A    Not -- no.

19              Q    Anyone in the media and budget subcommittee

20      ask McDonald's why it wasn't spending enough money on    12:40PM

21      African-American-owned media companies?

22                   MS. ANDREWS:  Object to the form.

23                   THE WITNESS:  It could have -- actually, it

24      wouldn't have been phrased that way.  It would have

25      been a customer segment.  The question would have been   12:40PM
```

Page 47

EXHIBIT D
AOE0157

CONFIDENTIAL

1    are we spending enough against the customer segment,

2    and I'm guessing -- I don't know if -- that's a pretty

3    broad time horizon.  I'm guessing it could have come

4    up during those years.

5         Q    BY MR. SCHECTER:  And the --                12:40PM

6         A    But it would have also come up for Hispanic

7    in addition, it would have come up for Asian consumer

8    market, too.

9         Q    In this 2014 to 2018 timeframe, do you

10   recall if the media and budget subcommittee was asking   12:41PM

11   for more to be spent in the African-American consumer

12   market?

13             MS. ANDREWS:  Object to the form.

14             THE WITNESS:  I don't recall.

15        Q    BY MR. SCHECTER:  So then the endorsement    12:41PM

16   comes out of the media and budget subcommittee, it

17   goes to the whole of OPNAD for approval; is that

18   right?

19        A    Yes.

20        Q    Do you ever recall a media and budget       12:41PM

21   subcommittee endorsement not being approved?

22        A    No.

23        Q    So then after approval of the media plan,

24   what happens next?

25        A    Then the agencies go to work on putting     12:42PM

Page 48

EXHIBIT D

AOE0158

CONFIDENTIAL

1    together the buy recommendations to support the media

2    plan.

3        Q    And is McDonald's involved in that part of

4    the process?

5        A    Same level of involvement that we just          12:42PM

6    discussed with the planning process.  Because the

7    ultimate endorsement and approval comes from the U.S.

8    franchisees.

9        Q    So, generally speaking, McDonald's is

10   working with the agencies to see if their buy          12:42PM

11   recommendations are good enough to be submitted to

12   OPNAD; is that right?

13       A    Uh-huh.

14           MS. ANDREWS:  Object to the form.

15       Q    BY MR. SCHECTER:  That was a "yes"?            12:42PM

16       A    Yes.

17           MS. ANDREWS:  Same objection.

18       Q    BY MR. SCHECTER:  From 2014 to 2018

19   timeframe, were you involved in the work with the

20   agencies directly in terms of coming up with the buy    12:42PM

21   recommendations?

22       A    I could have been if there was a question

23   that was raised to me.

24       Q    Who was the primary persons or titles at

25   McDonald's who would be working directly with the       12:43PM

Page 49

EXHIBIT D
AOE0159

CONFIDENTIAL

```
 1          A    Yes.  There would definitely be a document,

 2      yes.

 3          Q    And would those media buy recommendations

 4      also be prepared by the agencies?

 5          A    Yes.                                        01:36PM

 6          Q    And would those buy recommendations be --

 7      would McDonald's receive and review those

 8      recommendations in the ordinary course of business?

 9          A    Yes.

10          Q    And it's the buy recommendations that would  01:37PM

11      evaluate potential media partners against the

12      selection criteria; is that right?

13          A    Yes.

14          Q    Okay.  So then the buy recommendations are

15      presented to OPNAD media and budget subcommittee for   01:37PM

16      endorsement to OPNAD; is that right?

17          A    Yes.

18          Q    And OPNAD would approve; is that right?

19          A    Yes.

20          Q    Can you ever think of a scenario when OPNAD   01:37PM

21      did not approve an endorsement from the subcommittee

22      as to the buy recommendations?

23          A    Not off the top of my head.

24          Q    After the buy recommendations are approved,

25      what happens next?                                    01:38PM
```

Page 68

EXHIBIT D

AOE0160

CONFIDENTIAL

```
 1          A    Then that's the formal approval to the

 2     agencies that they can actually go ahead and secure

 3     the inventory with the vendors.

 4          Q    So I take it -- would the buy

 5     recommendations have the detail in the sense of let's    01:38PM

 6     say price, CPM?

 7          A    Uh-huh.

 8          Q    Is that "yes"?

 9          A    Yes.

10          Q    So I guess let's take a step back here.         01:38PM

11          So the agencies are attending what's known

12     in the industry as up fronts; is that right?

13          A    Yes.

14          Q    Does McDonald's attend -- well, let's focus

15     on from 2014 to 2018 while you were the vice            01:38PM

16     president, did McDonald's ever attend any part of the

17     up fronts?

18          A    Yes.

19          MS. ANDREWS:  Object to the form.

20          Q    BY MR. SCHECTER:  Did you attend any of the    01:39PM

21     up fronts?

22          A    Yes.

23          Q    Do you recall -- were you the senior most

24     executive at McDonald's who attended the up fronts

25     from 2014 to 2018?                                       01:39PM
```

Page 69

EXHIBIT D

AOE0161

CONFIDENTIAL

```
 1        A    Some years, yes.  I think most years, yes.
 2        Q    From 2014 to 2018, did the chief marketing
 3   officer of McDonald's ever attend any aspect of the up
 4   fronts?
 5        A    I don't recall.                          01:39PM
 6        Q    So the -- which to the best you can recall,
 7   which parts of the up fronts did you attend from the
 8   2014 to 2018 timeframe?
 9        A    When you say "which parts," I'm not sure I
10   understand.                                         01:39PM
11        Q    So I take it that there's multiple
12   presentations by multiple media partners, so were you
13   there for every presentation that was made?
14        A    No.
15        Q    So which presentations do you recall        01:40PM
16   attending?
17        A    It differed each year.
18        Q    Off the top of your head which ones do you
19   recall attending?
20        A    Generally speaking, we would use upfront     01:40PM
21   week to go in and actually meet with key partners in
22   New York.  So it was less about their presentations
23   and it was more about meetings.
24        Q    I see.  And who were the key partners that
25   you recall meeting with as part of the up fronts from  01:40PM
```

Page 70

EXHIBIT D
AOE0162

CONFIDENTIAL

```
 1          Q     BY MR. SCHECTER:  Sure.  So when you as the
 2     vice president from 2014 to 2018, were you vice
 3     president of McDonald's USA, LLC or McDonald's
 4     Corporation?
 5          A     McDonald's USA, LLC.                      02:10PM
 6          Q     Okay.  There is a corporate advertising
 7     budget that either McDonald's corporate or McDonald's
 8     USA can use; isn't that right?
 9          A     Not necessarily.
10          Q     So I'm --                                02:10PM
11          A     I'm mean --
12          Q     Go ahead.
13          A     -- it's opportunistic.  And that's the wrong
14     term, but if we chose to spend on something from a
15     communications standpoint, we would do it if it was   02:10PM
16     important.  But we didn't always spend.
17          Q     There's been some testimony about some --
18     during COVID --
19          A     Yeah.
20          Q     -- certain buys that were placed --       02:10PM
21          A     Yeah.
22          Q     -- with media partners that's not really
23     campaign specific as to like a sandwich or something,
24     but it's more just sort of a brand message; is that
25     fair?                                                02:11PM
```

Page 89

EXHIBIT D
AOE0163

1        A     Yes.

2        Q     And those -- the money to create and then

3    run those advertisements or placements with media

4    partners came out of the corporate advertising budget;

5    isn't that correct?                              02:11PM

6        A     I believe so, during the pandemic, yes.

7        Q     Okay.  The -- were you involved in any way

8    in determining -- well, let's strike that.

9            Were you involved in any way in assisting

10   McDonald's corporate in terms of identifying media    02:11PM

11   partners that should have that content run on?

12       A     Absolutely not.

13       Q     Who was involved in that?

14       A     I have to assume it was the media team at

15   the time, but I can't say.                        02:11PM

16       Q     So do you think it was someone who -- was it

17   Sheila Hamilton?

18       A     It probably would have been whoever was

19   media director at the time, yes.

20       Q     So as best as you recall, it would have been  02:12PM

21   the marketing department U.S. media at McDonald's USA

22   that would have assisted McDonald's corporate in that

23   regard; is that right?

24       A     Yeah, but with the agencies.  Media doesn't

25   place anything directly, we place everything through  02:12PM

                                                  Page 90

EXHIBIT D
AOE0164

CONFIDENTIAL

```
 1        A    Not necessarily.  This is a backup document

 2    is the best way to describe it.

 3        Q    Okay.  So like a PowerPoint or some other

 4    presentation?

 5        A    If we needed to know how much --              03:03PM

 6             MS. ANDREWS:  Object to form.

 7             THE WITNESS:  -- we spent on a particular

 8    campaign, but we rarely looked at it that way.

 9        Q    BY MR. SCHECTER:  Okay.  So to the best of

10    your recollection, data like this would be --        03:03PM

11    McDonald's looks to its agencies to provide this data;

12    correct?

13        A    Absolutely.  Yeah.  Uh-huh.

14        Q    If you look at the media tab.  The title of

15    the tab is 2020 OPNAD Media Plan Detail.             03:04PM

16             Do you see that?

17        A    Uh-huh.

18        Q    That's the media plan that we were referring

19    to earlier that's before the buy recommendation;

20    correct?                                             03:04PM

21        A    Yes.

22             MS. ANDREWS:  Objection.

23        Q    BY MR. SCHECTER:  So if you look here, looks

24    like the grand total for the media plan is over 450

25    million.                                             03:04PM
```

Page 112

EXHIBIT D

AOE0165

CONFIDENTIAL

1              Do you see that?

2        A    Yes.

3        Q    And OMD, the general consumer market agency

4    is responsible for over 360 million of that budget?

5              MS. ANDREWS:  Not that, use the -- yeah.    03:04PM

6    There you go.

7              THE WITNESS:  Yes.

8        Q    BY MR. SCHECTER:  And if you look at the

9    detail, it has linear video is the first line item

10   under channel?                                         03:05PM

11       A    Uh-huh.

12       Q    Does linear video refer to broadcast and

13   cable television?

14       A    Yes.  And other things.

15       Q    What other things?                            03:05PM

16       A    So linear video would have been and could

17   have been, but I don't know specific to this year, it

18   could have been syndicated programming, it could have

19   been cable programming, it could have been network

20   programming.                                           03:05PM

21       Q    So as shown here on this document, the

22   largest single line item out of the $360-plus million

23   OPNAD media plan for OMD is linear video; correct?

24             MS. ANDREWS:  Object to the form.

25             THE WITNESS:  Correct.                        03:05PM

                                                  Page 113

EXHIBIT D

AOE0166

CONFIDENTIAL

```
 1          Q    But you have met her just when she was at

 2     other places?

 3          A    Yes.  Yeah.  The name is familiar.  So I

 4     don't want to guess that I have never met her.

 5          Q    And do you have an opinion of Ms. Bekkedahl?  03:28PM

 6          A    Not at all.

 7          Q    Is that someone you just don't think about?

 8          A    Exactly.

 9          Q    Isn't it true that Mr. Galatt in connection

10     with this 2015 dispute, one of the complaints was that  03:28PM

11     McDonald's and Burrell were demanding an

12     African-American demo guarantee?

13              MS. ANDREWS:  Object to the form of the

14     question.

15              THE WITNESS:  It could have been.            03:28PM

16          Q    BY MR. SCHECTER:  And just so we make sure

17     we're talking the same language, an African-American

18     demo guarantees you understand it would be a buying --

19     McDonald's is buying advertising on a particular

20     syndicated program or network with African-American    03:29PM

21     GRP such that if the show doesn't perform there needs

22     to be some sort of make good; is that correct?

23          A    Yep.  That's correct.

24          Q    And as of 2015 in the African-American

25     consumer market, McDonald's was insisting on demo       03:29PM
```

                                            Page 129

EXHIBIT D

AOE0167

CONFIDENTIAL

```
 1     guarantees; isn't that right?
 2          A    I think wherever we could we always insisted
 3     on demo guarantees, otherwise it made no sense to have
 4     a demographic target.
 5          Q    So you tried where you could, but isn't it      03:29PM
 6     true that that's what McDonald's required for the
 7     African-American consumer market at least in 2015?
 8          A    I think we required it for all consumer
 9     markets.
10          Q    Which included African-American consumer       03:29PM
11     market; correct?
12          A    Correct.
13          Q    Is -- can you -- are you aware of claims
14     that the African-American audience is more difficult
15     to measure by Nielsen than other demographic           03:30PM
16     audiences?
17               MS. ANDREWS:  Object to the form.
18               At what time?
19               THE WITNESS:  What time period are we
20     talking about?                                          03:30PM
21          Q    BY MR. SCHECTER:  Let's just -- in the past
22     decade?
23          A    So stability in bases has been an issue
24     across the board for Nielsen for a variety of things.
25     I don't think it's unique just to -- I guess my point   03:30PM
```

Page 130

EXHIBIT D

AOE0168

CONFIDENTIAL

```
 1        Q    BY MR. SCHECTER:  Do you recall ever

 2   discussing this issue with anyone at Burrell?

 3        A    I'm sure somebody on the team probably did.

 4        Q    But do you recall doing that?

 5        A    I do not recall doing that, no.          03:32PM

 6        Q    Do you recall ever speaking to anyone at

 7   Nielsen about it?

 8        A     No, I do not recall speaking to anyone at

 9   Nielsen about it, but that doesn't mean somebody from

10   the team wasn't.                                    03:32PM

11        Q    And I take it you don't -- to the extent

12   someone on your team did either of those two things,

13   you don't recall it ever coming up to your level?

14        A    Correct.

15        Q    Do you know if any other advertiser insisted 03:32PM

16   on demo guarantees in the African-American consumer

17   audience?

18        A    I don't know off the top of my head, but to

19   be honest with you, I don't know why you wouldn't,

20   meaning it's industry standard practice to get a       03:33PM

21   guarantee against your target audience, no matter what

22   that target audience is.

23        Q    Yeah.  You're retired, but you were at

24   McDonald's for over 20 years; right?

25        A    Uh-huh.  Yes.                             03:33PM
```

Page 132

EXHIBIT D
AOE0169

CONFIDENTIAL

```
 1          A    Yeah.  But again, it's -- you know.  I don't
 2    actually know that the team used this in the two to
 3    five percent because it's out of our control.
 4          Q    Yeah.  The exhibit before, we can go back,
 5    it says national investments?                      03:57PM
 6          A    Yeah.
 7          Q    But at the end of this email you write, "For
 8    your ears only timing is being driven by legal."
 9               What did you mean by that?
10          A    I don't know.  Honestly, I don't know.  I   03:57PM
11    mean, I'm sure legal said we'd really like to get it
12    by the end of the week.  And it sounds like it was a
13    very quick turn, which any request going out to local,
14    like most of our functional partners that work closely
15    with the field understand that field requests require  03:57PM
16    a lot of lead time.
17               So I think I probably flagged that it was
18    legal as a way to make sure that our team knew, like,
19    this is -- you know, this is not somebody -- we don't
20    typically work with legal, they don't understand that,  03:58PM
21    you know, requests are difficult to get out.  So I
22    think that's what I meant by that.
23          Q    And --
24          A    To Rick.  Obviously didn't say that to the
25    rest of the group.                                   03:58PM
```

Page 148

EXHIBIT D
AOE0170

CONFIDENTIAL

```
 1           Q    In this instance, there's a Black Lives

 2      Matter movement, there's George Floyd incident,

 3      there's a lot of pressure on brands for how they're

 4      going to respond to it, and this was how McDonald's

 5      was trying to respond to the issues; isn't that right?   03:59PM

 6              MS. ANDREWS:  Objection to form.

 7              THE WITNESS:  I will tell you that I believe

 8      this was part of the team's work on crafting the DEI

 9      initiative, so...

10           Q    BY MR. SCHECTER:  And the DEI initiative,      04:00PM

11      you're referring to the four-year plan that was

12      announced May 20, 2021; correct?

13           A    Correct.

14           Q    And the timing of that was being driven by

15      legal?                                                  04:00PM

16              MS. ANDREWS:  Objection to form.

17              THE WITNESS:  No.  No.  No.  The timing of

18      this particular request I cite was driven by legal.

19      Again, I don't recall specifically what this was.  But

20      I'm guessing this was potentially an attempt at input   04:00PM

21      into.

22           Q    BY MR. SCHECTER:  Right.  So when you say

23      "the timing is being driven by legal," McDonald's

24      legal department is putting deadlines on you to get

25      this information?                                       04:01PM
```

                                                    Page 150

EXHIBIT D
AOE0171

1          MS. ANDREWS:  Objection; form.

2          THE WITNESS:  Again, desired timing, because

3    it was a quick turn, I was representing to my team

4    that we had hoped to get a sense for.

5          Q    BY MR. SCHECTER:  And what you're saying          04:01PM

6    about timing is "We will need to ask for it back by

7    end of day, May 20, to have rollup by end of day,

8    May 21."

9          Do you see that?

10         A    Uh-huh.                                          04:01PM

11         Q    And that was timing driven by legal?

12         MS. ANDREWS:  Object to the form.

13         THE WITNESS:  I think like any project you

14   have timelines, you're trying to actually get things

15   done.  And so, you know, this could have been just a          04:01PM

16   question that legal had about something that they were

17   looking at, I have no idea.  I don't know what was

18   driving that timing.

19         Q    BY MR. SCHECTER:  Okay.  So your testimony

20   is you don't know what you meant by "For your ears          04:01PM

21   only timing is being driven by legal"?

22         A    I told you it was just to Rick -- it's a

23   legal deadline, which means again, it's tight, it's

24   coming from legal.  So typically other departments

25   understand when they come to the field for requests          04:02PM

Page 151

Veritext Legal Solutions
866 299-5127

EXHIBIT D
AOE0172

CONFIDENTIAL

1       they need longer time horizons.

2               Q    And just the deadline you're referring to

3       that's tight, that's the May 20, May 21 deadline?

4               A    Yes, for information.

5                    MS. ANDREWS:  Are you done with that one?    04:02PM

6                    MR. SCHECTER:  Yes.

7                    MS. ANDREWS:  Why don't we take a break.

8       It's been like an hour, ten, 15.

9                    MR. SCHECTER:  Okay.

10                   THE VIDEOGRAPHER:  Going off the record at    04:03PM

11      4:03 p.m.

12                        (A brief recess was taken.)

13                   THE VIDEOGRAPHER:  And back on the record at

14      4:22 p.m.

15              Q    BY MR. SCHECTER:  I'm put another document    04:22PM

16      in Exhibit Share, it's Tab F.  This will be

17      Exhibit 37.  This is Bates No. McD_ESN00000687.

18                   (The aforementioned document was marked as

19                   Exhibit 37 and is attached hereto.)

20              Q    BY MR. SCHECTER:  And it is an email from    04:23PM

21      you, Monday, August 3rd, 2015 to Molly Starmann.

22                   Do you see that?

23              A    I do.

24              Q    And do you recall sending this email?

25              A    Yes.                                         04:23PM

                                                        Page 152

EXHIBIT D
AOE0173

CONFIDENTIAL

```
 1            Q    So Another way to say there's over indexing?

 2            A    Sure.

 3            Q    So programs and, you know, network digital

 4      channels that over index with the African-American

 5      consumer, that's something that could be bought          04:34PM

 6      through the African-American consumer market?

 7            A    Yes.

 8            Q    There are many networks bought through the

 9      general consumer market at OMD that over index African

10      Americans; isn't that right?                             04:34PM

11            A    There are some unique instances where there

12      is a common point of leverage with another entity.  So

13      let's go back to ESPN as a great example.  I wouldn't

14      have Burrell buy NBA on ESPN when OMD is negotiating

15      the rest of my ESPN buy.  I'm going to have one agency   04:34PM

16      in charge of leveraging all of my dollars across the

17      single entity.

18            Q    What about for BET?

19            A    BET is part of Viacom.

20            Q    So why would that be bought through OMD as     04:35PM

21      opposed to Burrell?

22            A    Why would that be?  Because of what I just

23      said.  We buy a lot of other -- OMD is the agency of

24      record for all of our other Viacom networks.

25            Q    Okay.  So it's just -- again, there is no     04:35PM
```

Page 161

EXHIBIT D
AOE0174

CONFIDENTIAL

```
 1        properties from time to time.

 2             Q    Pets Unleashed, pets., that doesn't --

 3             A    Pets.TV or whatever it is.

 4             Q    Pets Unleashed or pets.TV, that doesn't have

 5        African-American content; is that right?          04:36PM

 6                  MS. ANDREWS:  Object to the form.

 7                  THE WITNESS:  I don't know how you suggest

 8        that content about pets is or isn't African-American

 9        content, I don't know how you're defining African

10        American, I think African Americans like pets, too.  04:37PM

11        So I don't --

12                  BY MR. SCHECTER:  Yeah, but there's

13        nothing -- I mean, as opposed to Animal Planet

14        purchased by McDonald's through OMD; isn't that right?

15             A    When we bought it.  I'm not sure we always  04:37PM

16        bought it.

17             Q    Right.  But there's nothing unique -- I

18        mean, African Americans watch Animal Planet, too;

19        right?

20             A    Probably, yes.                            04:37PM

21             Q    So why would McDonald's purchase Animal

22        Planet through OMD but require Entertainment Studios,

23        CF Entertainment to be purchased through Burrell?

24             A    You have to go back to the ESPN

25        conversation.  You need one point of leverage with the  04:37PM
```

Page 163

EXHIBIT D
AOE0175

CONFIDENTIAL

1   vendor, I can't have two agencies negotiating with --

2   not being able to aggregate my dollars against the

3   same vendor.  So it's because of the other properties

4   owned by Allen Media company that it was done that

5   way.                                          04:37PM

6       Q    And so I take it that it was McDonald's

7   decision to have Burrell be the agency that buys

8   Entertainment Studios and CF Entertainment's content;

9   right?

10      A    Yes.                                 04:38PM

11      Q    And that decision was made over a decade

12   ago; isn't that true?

13      A    Yeah.  We wanted to make sure that we had

14   clean lines of accountability of agencies, yes.

15      Q    I have moved in a document, it's Tab N and   04:38PM

16   it's previously marked as Deposition Exhibit 9.

17           (The aforementioned document was previously

18           marked as Exhibit 9 and is attached hereto.)

19           MR. SCHECTER:  My screen just went blank.

20   Can we take a five-minute break?                04:39PM

21           MS. ANDREWS:  Sure.

22           THE VIDEOGRAPHER:  Going off the record at

23   4:39 p.m.

24           (A brief recess was taken.)

25           THE VIDEOGRAPHER:  And back on the record at   04:43PM

                                            Page 164

EXHIBIT D

AOE0176

1    the buy recommendations with Weather Group,

2    Entertainment Studios as to The Weather Channel and

3    the digital channels; is that right?

4             MS. ANDREWS:  This specific document?

5         Q    BY MR. SCHECTER:  Not the document, just the    04:52PM

6    recommendation?

7             MS. ANDREWS:  I think she already answered

8    that question.  So objection; asked and answered.

9         Q    BY MR. SCHECTER:  Can you please answer it?

10        A    So my answer is yeah, at some point they    04:53PM

11   would have been told what we intended to purchase and

12   what we were ordering.

13        Q    I'm not referring to just the up/down,

14   yes/no answer.  I'm referring to a recommendation that

15   has some sort of analyses matched up compared against    04:53PM

16   selection criteria, anything like that.

17             Did McDonald's ever directly share that with

18   Weather Group or Entertainment Studios as to the

19   digital channels and The Weather Channel?

20             MS. ANDREWS:  Objection to form.    04:53PM

21             THE WITNESS:  Yeah, not that I recall.  That

22   would have been an agency accountability.

23        Q    BY MR. SCHECTER:  Did McDonald's ever

24   prohibit or -- I'll ask -- did McDonald's authorize

25   OMD to disclose that level of detail in a buy    04:53PM

Page 171

EXHIBIT D
AOE0177

CONFIDENTIAL

1    recommendation to Weather Group or Entertainment

2    Studios?

3            MS. ANDREWS:  Objection to form.

4            THE WITNESS:  I don't actually understand

5    your question because OMD wasn't the agency of record    04:54PM

6    for Entertainment Studios for us.

7        Q    BY MR. SCHECTER:  Okay.

8        A    It was Burrell.

9        Q    So would you -- there would be buy

10   recommendations -- there would be some analyses done    04:54PM

11   of whatever Entertainment Studios was proposing to

12   advertise on in a given year; correct?

13       A    Yes.  Of course.

14       Q    That analysis would have been done at

15   Burrell, perhaps shared with McDonald's, but either    04:54PM

16   Burrell alone or in conjunction with McDonald's is

17   doing that work; right?

18           MS. ANDREWS:  Objection to form.

19           THE WITNESS:  Yes.

20       Q    BY MR. SCHECTER:  And do you know if Burrell    04:54PM

21   was authorized to share that work with Entertainment

22   Studios?

23           MS. ANDREWS:  Objection to form.

24           THE WITNESS:  I mean, the language you're

25   using doesn't make sense to me.  Authorized?  It's    04:54PM

Page 172

EXHIBIT D
AOE0178

CONFIDENTIAL

```
 1        CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

 2            I, Rochelle Holmes, the undersigned, a Certified

 3     Shorthand Reporter of the State of California, do

 4     hereby certify:

 5            That the foregoing proceedings were taken

 6     before me via videoconference; that any witnesses in

 7     the foregoing proceedings, prior to testifying, were

 8     administered an oath; that a record of the proceedings

 9     was made by me using machine shorthand which was

10     thereafter transcribed under my direction; that the

11     foregoing transcript is a true record of the testimony

12     given.

13            Further, that if the foregoing pertains to the

14     original transcript of a deposition in a Federal Case,

15     before completion of the proceedings, review of the

16     transcript [X] was [ ] was not requested.

17            I further certify I am neither financially

18     interested in the action nor a relative or employee

19     of any attorney or any party to this action.

20            IN WITNESS WHEREOF, I have this date subscribed

21     my name.

22     Dated this 27th day of October, 2022

23

24                    Rochelle Holmes
                      _____
                      Rochelle Holmes

25                    CSR No. 9482, CCRR No. 0123
```

Page 176

EXHIBIT D
AOE0179

# EXHIBIT E

EXHIBIT E

AOE0180

CONFIDENTIAL - ATTORNEY'S EYES ONLY

```
 1            IN THE UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF CALIFORNIA

 3                    WESTERN DIVISION

 4

 5     ENTERTAINMENT STUDIOS           )

 6     NETWORKS, INC., a               )

 7     California corporation;         )

 8     WEATHER GROUP, LLC, a           )

 9     Delaware limited liability      )

10     company,                        )

11               Plaintiffs,           )

12          vs.                        ) Case No.

13     McDONALD'S USA, LLC, a          ) 2:21-cv-04972-FMO-MAA

14     Delaware limited liability      )

15     company,                        )

16               Defendant.            )

       _____)

17          CONFIDENTIAL - ATTORNEY'S EYES ONLY

18

19      VIDEOTAPED DEPOSITION OF MORGAN FLATLEY

20            FRIDAY, FEBRUARY 10, 2023

       Reported by:

21     Julie Walsh, CSR No. 084-004032

22     JOB No. 5756723

23

24     PAGES 1 - 214
```

                                              Page 1

EXHIBIT E

AOE0181

CONFIDENTIAL - ATTORNEY'S EYES ONLY

1          Videotaped deposition of MORGAN FLATLEY, called

2     for examination pursuant to the Rules of Civil

3     Procedure for the United States District Courts

4     pertaining to the taking of deposition, taken before

5     Julie Walsh, CSR, and Notary Public within and for

6     the County of Lake and State of Illinois, at 70 West

7     Madison Street, Suite 2900, Chicago, Illinois, on

8     February 10, 2023, at 10:00 o'clock A.M.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

                                                    Page  2

EXHIBIT E

AOE0182

CONFIDENTIAL ATTORNEY'S EYES ONLY

```
 1     APPEARANCES:

 2          MILLER BARONDESS, LLP

 3          BY:  MR. DAVID W. SCHECTER

 4               MR. MURAD SALIM

 5               1999 Avenue of the Stars, Suite 1000

 6               Los Angeles, California, 90067

 7               310-552-4400

 8               Dschecter@millerbarondess.com

 9               Msalim@millerbarondess.com

10

11                  Appeared via Zoom on behalf of the

12                  Plaintiffs;

13

14          RILEY SAFER HOLMES & CANCILA, LLP

15          BY:  MS. AMY ANDREWS

16               MR. ROBERT FOLEY

17               70 West Madison Street, Suite 2900

18               Chicago, Illinois, 60601

19               312-471-8700

20               Aandrews@rshc-law.com

21               Rfoley@rshc-law.com

22

23                  Appeared on behalf of the

24                  Defendant;
```

Page 3

EXHIBIT E
AOE0183

CONFIDENTIAL - ATTORNEY'S EYES ONLY

```
 1      APPEARANCES (Cont'd):

 2

 3          ALSO PRESENT:

 4               Monica Mosby, Senior Counsel, McDonald's

 5               Corporation;

 6               Nick Page, Videographer, Veritext Legal

 7               Solutions;

 8

 9          PRESENT VIA ZOOM:

10               Byron Allen

11               Darren Galatt

12               Eric Gould

13               Jeff Mayes

14               Tom O'Brien

15               Janice Arouh

16               Mark Devitre

17

18

19

20

21

22

23

24
```

Page  4

EXHIBIT E

AOE0184

CONFIDENTIAL-ATTORNEY'S EYES ONLY

```
 1   cease having various advertising agencies devoted
 2   to placing media on ethnically-targeted media?
 3        MS. ANDREWS:  Object to the form.
 4        THE WITNESS:  I don't recall that, no.
 5   BY MR. SCHECTER:
 6        Q    Do you recall ever going to OPNAD and
 7   saying we should devote more money to Burrell's
 8   budget?
 9        MS. ANDREWS:  Object to the form.
10        THE WITNESS:  I don't recall -- I don't
11   recall that, no.
12   BY MR. SCHECTER:
13        Q    And just sort of as a general way
14   McDonald's has this set up, the reason why, and
15   you can tell me if I'm wrong, the reason why
16   McDonald's had this set up this way is that it
17   wanted to use various agencies to better target
18   certain racial demographics such as African
19   Americans; is that right?
20        MS. ANDREWS:  Object to the form.
21        THE WITNESS:  Can you ask the question again
22   just so I understand?
23   BY MR. SCHECTER:
24        Q    Sure.  So the reason why McDonald's
```

Page 15

EXHIBIT E

AOE0185

CONFIDENTIAL - ATTORNEY'S EYES ONLY

1    had Burrell as one of its advertising agencies --

2    let's focus on the 2017 timeframe.  The reason

3    why McDonald's had Burrell as its advertising

4    agency was to help McDonald's with its

5    advertising target African American audiences; is

6    that right?

7         MS. ANDREWS:  Object to the form.

8         THE WITNESS:  No, I would say the reason we

9    had Burrell was to make sure in addition to the

10   dollars and our strategies through general

11   market, we were getting deep insights and

12   understanding around how to connect with our

13   African American customer and that was Burrell's

14   role.

15   BY MR. SCHECTER:

16        Q    I see.  So it's not just placing

17   advertisement, but also helping you to come up

18   with the creatives?

19        A    All -- a strategic role on all aspects

20   of our business.

21        Q    The purpose of Burrell though was not

22   as an exclusive contracting process for African

23   American-owned media; is that right?

24        MS. ANDREWS:  Object to the form.

Page 16

EXHIBIT E

AOE0186

CONFIDENTIAL ATTORNEY'S EYES ONLY

```
 1     BY MR. SCHECTER:

 2          Q     Ms. Flatley, we -- just a follow up on

 3     something we talked about in the first session

 4     about money that may have been recommended by

 5     Burrell, but placed through OMD.  Do you recall

 6     that?

 7          A     Yes.

 8          Q     The recommendations just at least, you

 9     know, your experience, knowledge as CMO at

10     McDonald's USA; Burrell's job was to make

11     recommendations about media that connects with

12     African American audiences, isn't that right?

13          A     Burrell's job was to make

14     recommendations over and above our general market

15     buys to ensure we are reaching our African

16     American consumer base.

17          Q     So just to sort of speak in laymen's

18     terms that at least I can understand.  Like

19     Burrell was not making recommendations about

20     general market media to buy, right?

21          A     I actually don't know the specifics of

22     that and how that worked between the agencies.

23          Q     Okay.  So an example that comes to

24     mind would be let's say BET which around this
```

Page 55

EXHIBIT E

AOE0187

CONFIDENTIAL - ATTORNEY'S EYES ONLY

```
 1     time would have been I believe owned by Viacom;
 2     isn't that right?
 3             MS. ANDREWS:  Objection, foundation.
 4             THE WITNESS:  Actually, yeah, I don't -- I
 5     don't know.
 6     BY MR. SCHECTER:
 7             Q     BET you -- is it your understanding
 8     that that's a network that is African American
 9     targeted?
10             A     Yes.
11             Q     Is that an example of a network that
12     would have been recommended by Burrell but placed
13     through OMD?
14             A     I do not know the specifics of how
15     that worked.
16             Q     So I understand that your media team
17     was responsible for making sure that media
18     partners were with the correct agency.  As the
19     chief marketing officer does it concern you that
20     a media partner was complaining that it was
21     improperly relegated to the wrong tier?
22             MS. ANDREWS:  Objection, form, assumes facts
23     not in evidence.
24             THE WITNESS:  I mean, I think that assumes
```

Page 56

EXHIBIT E
AOE0188

CONFIDENTIAL - ATTORNEY'S EYES ONLY

1    that somewhere we were intentionally placing

2    media partners and relegating them to different

3    groups and that was not what we were doing.

4    BY MR. SCHECTER:

5         Q    So I walked you through e-mails that

6    first session where OMD is saying McDonald's will

7    consider, but not through OMD.  There's an e-mail

8    from Ms. Ferguson saying all media inquiries

9    should go through Burrell and then there's a

10   comment from Ms. Innes who says Burrell is the

11   agency of record for McDonald's and Entertainment

12   Studios.

13        So, again, it doesn't concern you that

14   an African American-owned media company is

15   complaining that during the time you were CMO it

16   was improperly and indeed based on the race of

17   its owner not the content was relegated to

18   Burrell?

19        MS. ANDREWS:  Objection, form, foundation,

20   mischaracterizes the documents, assumes facts not

21   in evidence.  You can answer.

22        THE WITNESS:  Well, I'm not sure what the

23   question was and I do if I recall correctly most

24   of those documents were before I was at

Page 57

EXHIBIT E

AOE0189

CONFIDENTIAL ATTORNEY'S EYES ONLY

 1    aware of this issue while you were CMO.

 2              My question is a little bit different.

 3    Does it concern you as you sit here today that an

 4    African American-owned media partner is

 5    complaining during the time that you were CMO

 6    that they were improperly relegated to Burrell

 7    based on racial discrimination?

 8        MS. ANDREWS:  Same objections, asked and

 9    answered.  I don't think you have shown her

10    anything from her time as CMO that even supports

11    your assertion, but.

12        MR. SCHECTER:  Counsel, speaking objections

13    are improper.  Just make your objection for the

14    record and let the witness answer.

15        MS. ANDREWS:  That's fine, but ask her a

16    question she can answer, David.

17        THE WITNESS:  I do not believe that we were

18    characterizing media partners based on any type

19    of racial discrimination as you just said.  That

20    was not at all the practices that we had in place

21    at McDonald's at all.

22    BY MR. SCHECTER:

23        Q    How can you give that testimony if you

24    don't know?

                                        Page 60

EXHIBIT E

AOE0190

CONFIDENTIAL - ATTORNEY'S EYES ONLY

```
1      know, my scope of business was the menu, menu

2      innovation, digital strategy, insights, field

3      marketing, creative strategy.

4               So I would talk to him about, for

5      example, how are we going to increase our share

6      in chicken and what are going to be our tactics

7      to think about increasing our share in chicken.

8      It was that type of conversation.

9          Q      You wouldn't talk about media partners

10     at all?

11         A      Never, never once.

12         Q      You didn't talk about the various

13     agencies that were out there and who you were

14     working with and whether they are effectively

15     delivering on -- in support of McDonald's

16     marketing needs?

17         A      I would talk to him about our creative

18     agencies because they played a key role in our

19     creative, but I did not talk to him about our

20     various media agencies.

21         Q      Did you talk about company values in

22     terms of inclusivity?

23         A      Not specifically in my one on ones

24     with Chris, no.  We talked about the business,
```

Page 149

EXHIBIT E
AOE0191

CONFIDENTIAL - ATTORNEY'S EYES ONLY

```
 1     STATE OF ILLINOIS )

 2                      ) SS.

 3     COUNTY OF L A K E )

 4              I, JULIE WALSH, CSR, and notary public

 5     in and for the County of Lake and State of Illinois,

 6     do hereby certify that previous to the commencement

 7     of the examination, said witness was duly sworn by

 8     me to testify the truth; that the said deposition

 9     was taken at the time and place aforesaid; that the

10     testimony given by said witness was reduced to

11     writing by means of shorthand and thereafter

12     transcribed into typewritten form; and that the

13     foregoing is a true, correct, and complete

14     transcript of my shorthand notes so taken as

15     aforesaid.

16              I further certify that there were present

17     at the taking of the said deposition the persons and

18     parties as indicated on the appearance page made a

19     part of this deposition.

20              I further certify that I am not counsel

21     for nor in any way related to any of the parties to

22     this suit, nor am I in any way interested in the

23     outcome thereof.

24
```

Page  209

EXHIBIT E

AOE0192

CONFIDENTIAL - ATTORNEY'S EYES ONLY

```
1              I further certify that this certificate
2     applies to the original signed and certified
3     transcripts only.  I assume no responsibility for
4     the accuracy of any reproduced copies not made under
5     my control or direction.
6              IN TESTIMONY WHEREOF I have hereunto set
7     my hand and affixed my notarial seal this 20th day
8     of February, 2023.
9
10
11
12
13
14              Julie Walsh, CSR
15              License No. 084-004032
16
17    My Commission Expires
18    August 5, 2024
19
20
21
22
23
24
```

Page 210

EXHIBIT E

AOE0193

# EXHIBIT F

EXHIBIT F
AOE0194

Page 1

```
 1
 2              UNITED STATES DISTRICT COURT
      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
 3             Case No. 2:21-cv-04972-FMO-MAA
 4    - - - - - - - - - - - - - - - - - -x
      ENTERTAINMENT STUDIOS NETWORKS,    :
 5    INC., a California corporation;    :
      WEATHER GROUP, LLC, a Delaware     :
 6    limited liability company,         :
                                         :
 7                        Plaintiffs,    :
                                         :
 8              - vs -                    :
                                         :
 9    McDONALD'S USA, LLC, a Delaware    :
      limited liability company,         :
10                                       :
                          Defendant.    :
11    - - - - - - - - - - - - - - - - - -x
12
                                October 3, 2022
13                              9:41 a.m.
                                1285 6th Avenue
14                              New York, NY
15
16
17              ***CONFIDENTIAL***
18
19
20              VIDEOTAPED DEPOSITION UPON ORAL
21    EXAMINATION OF DARREN GALATT, held at the
22    above-mentioned time and place, before Randi
23    Friedman, a Registered Professional Reporter,
24    within and for the State of New York.
25
```

Page 2

1                  D. Galatt - Confidential
2    APPEARANCES:
3              MILLER BARONDESS, LLP
               Attorneys for Plaintiffs
4
               1999 Avenue of the Stars, Suite 1000
5              Los Angeles, California 90067
6              BY:  DAVID W. SCHECTER, ESQ.
7
8              RILEY SAFER HOLMES & CANCILA, LLP
               Attorneys for Defendant
9
               100 Spectrum Drive, Suite 400
10             Irvine, California 92618
11             BY:  AMY ANDREWS, ESQ.
                    MATTHEW KENNISON, ESQ.
12
13
               PAUL WEISS RIFKIND
14             WHARTON & GARRISON, LLP
               Attorneys for Defendant
15
               1285 Avenue of the Americas
16             New York, New York 10019
17             BY:  KERISSA N. BARRON, ESQ.
18                     * * *
     ALSO PRESENT:
19             Paul Baker - Videographer
                       * * *
20   PRESENT REMOTELY:
               Byron Allen
21             Monica Mosby
               Mark Devitre
22             Jeff Mayes
               Robert Foley
23             Terrence Hill
               Susie Kim
24             Janice Arouh
               Eric Gould
25

EXHIBIT F
AOE0196

Page 7

|    |    |    |
|----|----|----|
| 1 | D. Galatt - Confidential | |
| 2 | sworn and are under oath.  Is there any reason | 09:43:40 |
| 3 | you are not able to give truthful testimony | 09:43:43 |
| 4 | today? | 09:43:45 |
| 5 | A    No. | 09:43:45 |
| 6 | Q    What is your current address? | 09:43:48 |
| 7 | A    89 South Collinwood Road, Maplewood, | 09:43:50 |
| 8 | New Jersey, 07040. | 09:43:53 |
| 9 | Q    How long have you lived there? | 09:43:56 |
| 10 | A    12 years. | 09:43:57 |
| 11 | Q    And you have been employed at | 09:43:59 |
| 12 | Entertainment Studios or Allen Media Group since | 09:44:03 |
| 13 | approximately February of 2003; is that correct? | 09:44:06 |
| 14 | A    Yes. | 09:44:08 |
| 15 | Q    And my understanding is your current | 09:44:09 |
| 16 | title is the chief revenue officer of the Allen | 09:44:11 |
| 17 | Media Group; is that correct? | 09:44:14 |
| 18 | A    Yes. | 09:44:15 |
| 19 | Q    You started in that position in March | 09:44:21 |
| 20 | of 2022? | 09:44:22 |
| 21 | A    Correct. | 09:44:24 |
| 22 | Q    Did somebody have this role before | 09:44:26 |
| 23 | you, or was this a newly-created position for | 09:44:27 |
| 24 | you? | 09:44:30 |
| 25 | A    It was a newly-created position. | 09:44:30 |

Page 11

```
1              D. Galatt - Confidential
2    officer, do you report to Mr. Allen?        09:48:18
3         A    Yes.                              09:48:20
4         Q    And you're an employee of Allen Media   09:48:21
5    Group; is that correct?                     09:48:22
6         A    Technically, I believe so.        09:48:25
7         Q    Prior to becoming a chief revenue  09:48:40
8    officer, your title was president/advertising  09:48:42
9    sales, global syndication; is that correct?  09:48:44
10        A    Yes.                              09:48:48
11        Q    How did that role differ from the one  09:48:49
12   that you're in now?                         09:48:51
13        A    That was just specific to broadcast  09:48:52
14   syndication and didn't include any of the other  09:48:54
15   properties.                                 09:48:57
16        Q    What's encompassed in broadcast   09:49:00
17   syndication?                                09:49:02
18        A    Selling the syndicated shows that we  09:49:03
19   produce, distribute across television stations.  09:49:06
20        Q    What are those syndicated shows?  09:49:13
21        A    We have Beautiful Homes and Great  09:49:16
22   Estates.  We have Cars.TV.  We have Funny You  09:49:17
23   Should Ask.  We have a number of court shows,  09:49:20
24   etc.                                        09:49:24
25        Q    And how do those differ from what has  09:49:28
```

```
                                         Page 18
  1              D. Galatt - Confidential
  2       Q    Approximately how many employees did    09:57:31
  3   CF Entertainment have when you joined?  Was it    09:57:33
  4   you and Mr. Allen or a bigger team?              09:57:36
  5       A    No, I don't recall how many.  I mean,   09:57:38
  6   I'm not really sure how many, 'cause I was here  09:57:41
  7   in New York.  The company is based in L.A.       09:57:43
  8       Q    And the lifestyle networks that we      09:57:50
  9   were referencing earlier that I believe you said 09:57:54
 10   were the 24-hour networks, when did those become 09:57:57
 11   part of the portfolio of offerings?             09:58:01
 12       A    I believe they were launched in 2009.   09:58:05
 13       Q    When those were launched, were you      09:58:12
 14   responsible for seeking advertising revenue for  09:58:16
 15   those properties?                               09:58:18
 16       A    I was.                                  09:58:20
 17       Q    And then The Weather Channel was        09:58:30
 18   acquired by Allen Media Group in March of 2018;  09:58:31
 19   is that correct?                                09:58:35
 20       A    Yes.                                    09:58:35
 21       Q    And when The Weather Channel was        09:58:36
 22   acquired, did that fall into your area of        09:58:38
 23   responsibilities or was that somebody else?      09:58:41
 24       A    That was somebody else.                 09:58:42
 25       Q    And who was that person?  Was that      09:58:43
```

Veritext Legal Solutions
www.veritext.com
212-267-6868
516-608-2400
EXHIBIT F
AOE0199

Page 19

1              D. Galatt - Confidential

2   Ms. Bekkedahl?                              09:58:45

3        A     Yes.                             09:58:46

4        Q     Was she employed by The Weather  09:58:46

5   Channel previously?  She came with the company?  09:58:47

6        A     Yes.                             09:58:51

7        Q     I'm going to give you what we're going  09:59:01

8   to mark as Defendant's Exhibit 4.          09:59:02

9              (Exhibit Dx 4 was marked.)       09:59:17

10             Defendant's Exhibit 4, for the record,  09:59:29

11  is defendant's Rule 30(b)(6) notice to plaintiff,  09:59:31

12  Entertainment Studios Networks, Inc.        09:59:35

13             Have you seen this document before?  09:59:39

14        A     I have.                         09:59:40

15        Q     And you understand that in addition to  09:59:45

16  your personal capacity, you are here as a   09:59:47

17  corporate representative to provide testimony in  09:59:50

18  response to this deposition notice; is that  09:59:54

19  correct?                                    09:59:57

20        A     Yes.                            09:59:58

21        Q     Okay.  And if you could turn to --  09:59:59

22  starts on Page 6 under the heading Topics,  10:00:05

23  there's some enumerated topics there.  And  10:00:08

24  according to your counsel, you have been    10:00:12

25  designated as the corporate representative for  10:00:13

Page 20

D. Galatt - Confidential

| | | |
|---|---|---|
| 2 | Topics 1, including Subparts (a) and (b), and | 10:00:17 |
| 3 | Topic 2; is that your understanding? | 10:00:21 |
| 4 |     A    Yes. | 10:00:27 |
| 5 |     Q    Okay.  So you are knowledgeable and | 10:00:28 |
| 6 | will provide testimony about the actual and | 10:00:33 |
| 7 | potential contractual relationships between ESN | 10:00:36 |
| 8 | and McDonald's USA that forms the basis of the | 10:00:38 |
| 9 | claims in the Third Amended Complaint? | 10:00:42 |
| 10 |     A    Yes. | 10:00:44 |
| 11 |     Q    And the basis for each of ESN's | 10:00:44 |
| 12 | assertion that it was intentionally discriminated | 10:00:46 |
| 13 | against by McDonald's on the basis of race; | 10:00:49 |
| 14 | correct? | 10:00:51 |
| 15 |     A    Yes. | 10:00:52 |
| 16 |     Q    Including the dates of such claims? | 10:00:53 |
| 17 |     A    Yes. | 10:00:55 |
| 18 |     Q    Okay.  Is there anything that would | 10:00:56 |
| 19 | prevent you from providing testimony on those | 10:00:58 |
| 20 | topics today? | 10:01:00 |
| 21 |     A    Not that I know of. | 10:01:01 |
| 22 |     Q    Are you familiar with the Third | 10:01:07 |
| 23 | Amended Complaint that has been filed in this | 10:01:08 |
| 24 | case? | 10:01:10 |
| 25 |     A    I did read the Complaint. | 10:01:13 |

EXHIBIT F

AOE0201

```
                                              Page 23
     1              D. Galatt - Confidential
     2      Q     You don't recall?                    10:04:03
     3      A     I don't recall, because I don't recall  10:04:04
     4  this email specifically.                        10:04:05
     5      Q     Do you recall discussing this issue   10:04:07
     6  with anyone in May of 2021?                      10:04:09
     7      A     The issue of The Weather Channel      10:04:15
     8  spending?                                        10:04:18
     9      Q     By McDonald's.                         10:04:18
    10      A     No, I don't recall.                    10:04:21
    11      Q     Do you recall providing this          10:04:28
    12  information to anybody in May of 2021?           10:04:29
    13      A     No.  The Weather Channel information   10:04:33
    14  wouldn't be mine to provide.                     10:04:35
    15      Q     Do you have an understanding of why   10:04:38
    16  Ms. Bekkedahl was sending this to you, subject,  10:04:39
    17  FYI?                                             10:04:41
    18      A     No, I don't remember why.              10:04:44
    19      Q     If I wanted to know how much           10:04:52
    20  advertising, if any, McDonald's had placed on The  10:04:53
    21  Weather Channel, would Ms. Bekkedahl be the      10:04:55
    22  appropriate person to ask within the company?    10:04:59
    23      A     Yeah.  Yes.                            10:05:01
    24      Q     Do you have any basis to dispute this  10:05:02
    25  information as provided by Ms. Bekkedahl?        10:05:04
```

EXHIBIT F
AOE0202

```
                                          Page 24

 1              D. Galatt - Confidential

 2       A     No.                              10:05:08

 3              (Exhibit Dx 6 was marked.)      10:06:01

 4       Q     We've given you Defendant's Exhibit 6,  10:06:05

 5    which for the record, is a January 9, 2013 email  10:06:07

 6    from you to yourself, Bates numbered ESN0014847  10:06:14

 7    is the starting Bates number.  The subject  10:06:21

 8    matter -- there's no subject matter.  The  10:06:23

 9    attachments are listed as McDonald's 2013  10:06:25

10    contracts weekly.daily.whad.pdf.  And it's a  10:06:29

11    little out of order, in that I think each  10:06:36

12    contract is kind of in reverse order here, so  10:06:40

13    take a minute and familiarize yourself with it.  10:06:43

14              But I'll direct your attention to --  10:06:48

15    there are three signature pages here, and ask  10:06:51

16    whether this is your signature on the page --  10:06:56

17    let's just start with the page -- you know what  10:07:00

18    Bates numbers are, the numbers in the lower right  10:07:03

19    corner?                                     10:07:05

20       A     Okay.                             10:07:07

21       Q     So if you start with the Bates numbers  10:07:08

22    ending in 848, the second page of the document --  10:07:12

23       A     Okay.                             10:07:27

24       Q     -- is that your signature?        10:07:27

25       A     Yes.                              10:07:29
```

```
                                          Page 26

 1              D. Galatt - Confidential

 2   McDonald's Corporation 2013 Advertising        10:08:32

 3   Order/Confirmation; correct?                   10:08:34

 4        A    Yes.                                 10:08:36

 5        Q    So this is -- the document is titled, 10:08:37

 6   Upfront Contract; correct?                     10:08:39

 7        A    Yes.                                 10:08:41

 8        Q    Okay.  So this was an order sent to  10:08:41

 9   you by Burrell?                                10:08:44

10        A    Yes.                                 10:08:45

11        Q    For advertising by McDonald's on CF  10:08:46

12   Entertainment/Entertainment Studios' properties? 10:08:51

13        A    Correct.                             10:08:55

14        Q    And if we look down, Networks/Program, 10:08:55

15   it says Daily Network?                         10:09:00

16        A    Yes.                                 10:09:03

17        Q    What is Daily Network?               10:09:04

18        A    Daily Network is a network of a few -- 10:09:06

19   it contained a few shows of our syndicated shows. 10:09:09

20   Comics Unleashed was one, and ES.TV was one.   10:09:12

21   Recipe.TV was one.                             10:09:18

22        Q    So the .TV programming is syndicated 10:09:20

23   programming?                                   10:09:25

24        A    Yes.                                 10:09:25

25        Q    Is that still true?                  10:09:26
```

```
                                                Page 27
```

  1                  D. Galatt - Confidential

  2       A     Yes.                            10:09:26

  3       Q     So what are the lifestyle networks?   10:09:27

  4       A     Those are 24-hour cable networks.   10:09:30

  5       Q     What are those properties?       10:09:34

  6       A     Some with the same name; recipe.TV,   10:09:37

  7   ES.TV, Cars.TV.                            10:09:40

  8       Q     So just by having .TV at the end, you   10:09:42

  9   can't draw the distinction whether it's   10:09:45

 10   syndication or the 24-hour cable property; is   10:09:47

 11   that correct?                             10:09:50

 12       A     On their own they sound the same, but   10:09:51

 13   when I say Daily Network, it connotes      10:09:54

 14   syndication.                              10:09:57

 15       Q     Okay.  And down below, Terms and   10:09:58

 16   Conditions, there's an average unit rate of   10:10:04

 17   3,975, paid units 42, and then total cost   10:10:08

 18   $166,950.00.                              10:10:13

 19            What does that represent?        10:10:16

 20       A     That is the sum total of what they   10:10:19

 21   contracted for on the Daily Network.      10:10:21

 22       Q     So this represents spending of   10:10:25

 23   $166,950.00 on the Daily Network property for   10:10:27

 24   calendar year 2013; is that correct?      10:10:35

 25       A     Yes.                            10:10:37

EXHIBIT F
AOE0205

Page 28

1                    D. Galatt - Confidential

2          Q      Okay.  And then below that it states        10:10:38

3    Guarantees, and then there is AA 18 to 49 rating,        10:10:43

4    1.3.  What does that refer to?                           10:10:47

5          A      That is an African-American rating.         10:10:51

6          Q      When you say "rating," that's the           10:10:57

7    number of viewers, correct, in that demographic?         10:10:59

8          A      Yes, a percentage of viewers.               10:11:05

9          Q      1.3 percent of all African-Americans        10:11:07

10   18 to 49 you're guaranteeing will be watching the        10:11:10

11   programming that's the subject of this contract?         10:11:13

12         A      Yes.                                         10:11:15

13         Q      Okay.  So the ratings of the                10:11:15

14   programming is an element of the contract; that's        10:11:18

15   correct?                                                 10:11:21

16         A      Yes.                                         10:11:22

17         Q      And that's a guarantee that's provided      10:11:22

18   by ESN as part of the contract?                          10:11:25

19         A      Correct.                                     10:11:28

20         Q      At the bottom of that column that           10:11:28

21   we're looking at, it says Rating Source Nielsen;         10:11:31

22   do you see where I'm at?                                 10:11:33

23         A      Yes.                                         10:11:36

24         Q      What does that refer to?                    10:11:37

25         A      The currency that was used -- that is       10:11:42

```
                                              Page 29
                    D. Galatt - Confidential
 1
 2   used to contract the deal.  Nielsen ratings.      10:11:46
 3        Q     Nielsen is a service that provides     10:11:51
 4   ratings data on television programming; correct?  10:11:53
 5        A     Yes.                                    10:11:57
 6        Q     And so when you say, I'm going to       10:11:58
 7   guarantee 1.3 AA 18 to 49 Nielsen, that means      10:12:01
 8   you're using Nielsen data to guarantee that there  10:12:06
 9   will be that many viewers of that programming in   10:12:09
10   that demographic; correct?                         10:12:13
11        A     Yes.                                    10:12:14
12        Q     And that's an after the fact            10:12:14
13   guarantee; right?  The ad will run, and then you   10:12:16
14   will using the ratings data provided by Nielsen    10:12:19
15   verify that when the ad aired, there were, in      10:12:22
16   fact, that guaranteed number of viewers in that    10:12:25
17   demographic; is that correct?                      10:12:27
18        A     Yes.                                    10:12:28
19        Q     If you turn to the prior page which     10:12:37
20   ends in Bates No. 949, it says it's Page 2 of 3    10:12:41
21   of this contract, going backwards, at the very     10:12:45
22   top there it says Make Good Policy; do you see     10:12:53
23   where I'm at?                                       10:12:56
24        A     Yes.                                    10:12:58
25        Q     It says, "A post buy analysis will be   10:12:59
```

```
                                            Page 32
  1            D. Galatt - Confidential
  2    $34,200.00?                                   10:14:59
  3       A    Yes.                                  10:15:02
  4       Q    And this one says non-guaranteed.     10:15:05
  5            Does that mean that it doesn't have    10:15:07
  6    the Nielsen rating provision like we just looked 10:15:09
  7    at; is that correct?                          10:15:13
  8       A    Correct.                              10:15:13
  9       Q    So if something is non-guaranteed, if 10:15:14
 10    ratings is not an element, that is specified in 10:15:18
 11    the contract in the terms of the deal; is that 10:15:21
 12    right?                                        10:15:23
 13       A    That's correct.                       10:15:24
 14       Q    Is non-guaranteed the standard or the 10:15:25
 15    exception?                                    10:15:27
 16       A    It depends on the deal.               10:15:29
 17       Q    Specials, are they typically         10:15:37
 18    non-guaranteed?                               10:15:39
 19       A    Typically, yes.                       10:15:39
 20       Q    And an annual purchase like the first 10:15:40
 21    contract we looked at for Daily Network would 10:15:43
 22    typically be on a ratings basis; correct?     10:15:46
 23       A    Correct.                              10:15:48
 24       Q    And then the very last page of this  10:15:49
 25    document ending in 856, this is similar.  This is 10:15:52
```

EXHIBIT F

AOE0208

```
                                              Page 33

 1               D. Galatt - Confidential

 2   for the Weekly Network programming?          10:15:58

 3        A    Correct.                            10:16:01

 4        Q    And what properties are comprised in   10:16:02

 5   the Weekly Network?                           10:16:05

 6        A    There are a number of shows.  Cars.TV,   10:16:08

 7   Beautiful Homes and Great Estates.  Career Day.   10:16:10

 8   The Young Icons.  Entertainers.  Kickin' It.   10:16:14

 9        Q    And this, again, is on calendar year   10:16:19

10   2013?                                         10:16:24

11        A    Correct.                            10:16:26

12        Q    And represents a total investment of   10:16:27

13   $596,400.00?                                  10:16:29

14        A    Yes.                                10:16:32

15        Q    And then has ratings guarantees below   10:16:33

16   it like we looked at on the first contract;   10:16:36

17   correct?                                      10:16:38

18        A    Yes.                                10:16:39

19        Q    So for the calendar year 2013,      10:16:52

20   $166,950 plus 34,200 plus 596, so approximately   10:16:58

21   an 800,000 investment; is that correct?       10:17:09

22        A    Correct.                            10:17:12

23               (Exhibit Dx 7 was marked.)        10:17:13

24        Q    While you look at that, for the      10:17:55

25   record, Defendant's Exhibit 7 starts with Bates   10:17:57
```

EXHIBIT F

AOE0209

```
                                              Page 51
     1              D. Galatt - Confidential
     2    coming and saying, look at all the things we can    10:42:05
     3    bring to the table.  You know, come work with us;    10:42:06
     4    correct?                                             10:42:08
     5         A     Correct.                                  10:42:09
     6         Q     But advertisers and their agencies        10:42:09
     7    don't necessarily accept everything that you put     10:42:12
     8    in your proposal; isn't that correct?                10:42:14
     9                  MR. SCHECTER:  Objection.  Calls        10:42:16
    10         for expert testimony.  Vague and ambiguous.     10:42:17
    11         It also calls for a narrative, but you can      10:42:21
    12         answer.                                         10:42:23
    13                  THE WITNESS:  In my experience,         10:42:25
    14         the more you bring to the table, the bigger     10:42:26
    15         the investments will be.  We brought more to    10:42:29
    16         the table year after year after year.           10:42:33
    17    BY MS. ANDREWS:                                      10:42:34
    18         Q     And one way you're showing the            10:42:36
    19    advertisers what you bring to the table is by        10:42:39
    20    showing them the ratings of your properties;         10:42:42
    21    isn't that correct?                                  10:42:44
    22         A     The ratings of the properties and the     10:42:45
    23    number of properties.                                10:42:47
    24         Q     So more properties with higher ratings    10:42:49
    25    would be more interesting to a potential             10:42:51
```

EXHIBIT F

AOE0210

```
                                          Page 52
 1                  D. Galatt - Confidential
 2     advertiser?                                   10:42:54
 3        A     Yes.                                 10:42:55
 4        Q     And, in fact, during the 20 years that  10:42:57
 5     you have worked for what is now Allen Media    10:42:59
 6     Group, the number of properties has been       10:43:01
 7     increasing; correct?                           10:43:04
 8        A     Yes.                                 10:43:05
 9        Q     In an effort to create offerings that  10:43:06
10     are more attractive to potential advertisers?  10:43:09
11        A     Yes.                                 10:43:13
12        Q     We've been going about an hour if you  10:43:48
13     need a break.  I can keep going, but --        10:43:50
14                MR. SCHECTER:  What do you want to   10:43:52
15        do?                                         10:43:52
16                THE WITNESS:  We can take a break.  10:43:54
17                MS. ANDREWS:  That's fine.          10:43:55
18                MR. VIDEOGRAPHER:  Please standby.  10:43:56
19        The time is 10:44 a.m.  We are off the      10:43:56
20        record.                                     10:43:59
21                (Whereupon there was a brief         10:44:00
22        recess.)                                     10:44:01
23                (Exhibit Dx 12 was marked.)          10:58:47
24                MR. VIDEOGRAPHER:  The time is       10:59:22
25        10:59 a.m.  We are back on the record.  You  10:59:23
```

EXHIBIT F

AOE0211

```
                                          Page 68

 1                  D. Galatt - Confidential

 2    Patrick Olson dated August 11th, 2016, regarding    11:19:46

 3    the 2017 RFPs with attached RFPs for McDonald's      11:19:51

 4    2017 syndication.  And you state, "Patrick, per      11:19:58

 5    our conversation yesterday, attached is the 2017     11:20:02

 6    McDonald's syndication RFP and marketing             11:20:05

 7    partnership opportunity as we move forward with      11:20:08

 8    the launch for a new comedy game show, Funny You     11:20:10

 9    Should Ask."  And I think we've looked at a          11:20:14

10    couple of these emails now where you send the        11:20:19

11    RFP, and you typically say, "Per our conversation    11:20:22

12    yesterday."                                          11:20:26

13           Do you recall that you would discuss          11:20:26

14    these RFPs with Mr. Olson before you would email     11:20:28

15    them to him?                                         11:20:31

16       A    I don't recall the conversations, but        11:20:32

17    it may just be logistical in nature.                 11:20:35

18       Q    And, again, this is the similar             11:20:40

19    process we looked at before.  Burrell sent an        11:20:41

20    RFP, and you or someone at your behalf or at your    11:20:44

21    request on behalf of Entertainment Studios           11:20:48

22    prepared a response, and you sent it to Mr. Olson    11:20:51

23    representing Entertainment Studios' proposal for     11:20:54

24    an investment in calendar year 2017; is that         11:20:59

25    correct?                                             11:21:02
```

Page 69

```
 1                  D. Galatt - Confidential
 2      A      Yes.                                11:21:04
 3      Q      What -- you refer to this new comedy 11:21:08
 4  game show, Funny You Should Ask.               11:21:13
 5      A      This is a show that we started      11:21:15
 6  producing and still produce.   It is just that, a 11:21:19
 7  comedy game show.                              11:21:22
 8      Q      And so I don't think we've seen     11:21:25
 9  references to it before.                       11:21:27
10             This 2017 RFP would have been the  11:21:30
11  first time it was included in a proposal as a  11:21:32
12  potential investment?                          11:21:36
13      A      I believe so, yes.                  11:21:39
14      Q      It didn't exist before this time?  11:21:41
15      A      Correct.                            11:21:43
16      Q      And then the next paragraph you state, 11:21:45
17  "As well, David Blaine copied above will be    11:21:49
18  forwarding a plan that represents participation 11:21:52
19  in Entertainment Studios' suite of cable       11:21:55
20  networks," and then there's a list, "which will 11:21:59
21  be Nielsen measured starting in the fourth     11:22:01
22  quarter."                                      11:22:03
23             Who's David Blaine?                 11:22:05
24      A      He was an account executive at the  11:22:07
25  time working on the cable side of the business. 11:22:09
```

EXHIBIT F
AOE0213

Page 74

D. Galatt - Confidential

1

2      Q      And then the last part of your          11:26:10

3  paragraph here, you state that "These cable        11:26:12

4  networks will be Nielsen measured starting in the   11:26:15

5  fourth quarter."  And this email is August 2016,    11:26:19

6  so you mean fourth quarter 2016?                    11:26:24

7      A      I assume that's what it means.           11:26:27

8      Q      So prior to the fourth quarter of        11:26:31

9  2016, what we're calling the cable networks or      11:26:34

10  the lifestyle networks were not Nielsen measured;  11:26:38

11  is that accurate?                                   11:26:41

12      A      Yes.                                     11:26:42

13      Q      Okay.  And why are you telling          11:26:42

14  Mr. Olson that that you are going to be Nielsen     11:26:44

15  measured starting in fourth quarter '16?  Why is   11:26:46

16  that relevant?                                      11:26:50

17      A      That was just part of the salesmanship  11:26:55

18  to have them invest.                                11:26:58

19      Q      Well because being Nielsen rated means  11:27:00

20  it's potentially more attractive to a prospective  11:27:02

21  advertiser; correct?                                11:27:07

22      A      I don't know.  I don't know if it's     11:27:10

23  more attractive.  That would really be up to them  11:27:12

24  to answer.                                          11:27:17

25      Q      Well if an advertiser wants to know     11:27:18

212-267-6868                                    516-608-2400
EXHIBIT F
AOE0214

Page 75

D. Galatt - Confidential

```
 1
 2    how many people are watching a given show and      11:27:20
 3    it's not Nielsen rated, how are you going to let   11:27:22
 4    an advertiser know how many people have seen       11:27:26
 5    their ad?                                          11:27:29
 6        A    You wouldn't.                             11:27:30
 7        Q    You have no way to tell them that;        11:27:31
 8    correct?                                           11:27:33
 9        A    No.  That is the currency.                11:27:34
10        Q    So being Nielsen measured is a            11:27:36
11    benefit?                                           11:27:40
12        A    Yes, I guess you can say that.            11:27:43
13        Q    You're telling Mr. Olson that it would    11:27:44
14    be Nielsen measured by the end of 2016 because     11:27:47
15    you think that makes them more attractive as a     11:27:50
16    potential opportunity; correct?                    11:27:52
17        A    I was hoping to sell them the cable       11:27:54
18    networks.                                          11:27:56
19        Q    And being Nielsen measured was a          11:27:57
20    factor that you thought would be a more            11:27:59
21    attractive opportunity to his clients; correct?    11:28:02
22        A    I was hoping it would convince him to     11:28:06
23    invest.                                            11:28:08
24        Q    Okay.  If you can turn to the page        11:28:21
25    ending in Bates 321, this is a one pager,          11:28:23
```

```
                                              Page 78
 1              D. Galatt - Confidential
 2    wasn't one, or you don't remember as you sit    11:30:49
 3    here?                                           11:30:51
 4        A     I don't remember as I sit here.       11:30:52
 5        Q     Would you recall that if you had, or  11:30:55
 6    would it be unusual to obtain a multi-year deal 11:30:57
 7    like you're proposing?                          11:31:01
 8                MR. SCHECTER:  Objection; asked     11:31:02
 9        and answered.                               11:31:02
10    BY MS. ANDREWS:                                 11:31:02
11        Q     You can answer it.                    11:31:03
12        A     I'm sorry.  What was the question?    11:31:08
13        Q     We've looked at this morning, the RFP 11:31:18
14    came out on an annual basis; correct?           11:31:21
15        A     Yes.                                  11:31:23
16        Q     And then there were contracts entered 11:31:23
17    into on an annual basis; correct?               11:31:24
18        A     Yes.                                  11:31:28
19        Q     And the upfront process takes place on 11:31:28
20    an annual basis; correct?                       11:31:31
21        A     Well the upfront process isn't        11:31:33
22    necessarily connoting a year.  It's a window    11:31:35
23    where business gets done.  So whether that's one 11:31:39
24    year or it's multi-year, depending on the       11:31:42
25    business that you're doing, upfront really just 11:31:46
```

Page 79

D. Galatt - Confidential

2  is defined as here's the window that advertisers      11:31:50

3  make their commitments for a period of time.          11:31:54

4      Q      Right.  But the upfront happens every       11:31:59

5  year?                                                  11:32:01

6      A      Yes, it does.                               11:32:02

7      Q      And what we've seen in the prior RFPs      11:32:03

8  and contracts that we've looked at this morning        11:32:08

9  is that they are for a particular calendar year.       11:32:10

10  This document, which is Defendant's Exhibit 15,       11:32:16

11  contains a multi-year proposal, and my question       11:32:17

12  to you is whether you recall ever, with any           11:32:25

13  advertiser, obtaining a multi-year commitment         11:32:31

14  along the lines of this proposal?                     11:32:34

15              MR. SCHECTER:  Objection; asked           11:32:36

16      and answered.  You can answer a third time.       11:32:36

17              THE WITNESS:  I don't recall if           11:32:51

18      there were other multi-year deals, or if          11:32:51

19      this was the first one we had offered.            11:32:54

20  BY MS. ANDREWS:                                       11:32:56

21      Q      And that's about the offer.  My            11:32:58

22  question is whether you were successful in            11:33:00

23  obtaining a multi-year deal.                          11:33:02

24              MR. SCHECTER:  Objection; asked           11:33:04

25      and answered.  You can answer.                    11:33:05

Page 84

```
 1                D. Galatt - Confidential
 2    in time, TheGrio?                          11:38:10
 3        A    Yes.                              11:38:13
 4        Q    Do you have an understanding of why  11:38:18
 5    TheGrio was added to the media portfolio?  11:38:19
 6        A    I believe that -- well, I can't speak  11:38:25
 7    for Byron, necessarily, other than to say that it  11:38:29
 8    was a brand that he thought was valuable and  11:38:32
 9    wanted to develop it.                      11:38:35
10        Q    Isn't it true that you knew from your  11:38:37
11    conversations with agencies that advertisers were  11:38:38
12    moving away from linear television and into  11:38:41
13    digital properties like TheGrio?           11:38:43
14        A    I think industrywide, I suppose there  11:38:48
15    was movement from linear television to digital,  11:38:50
16    but the lion's share of dollars are spent in  11:38:55
17    linear television.                         11:39:00
18             Could I request a quick bathroom  11:40:04
19    break?                                     11:40:05
20        Q    Sure.  We have to go off the record.  11:40:06
21             MR. VIDEOGRAPHER:  Please standby.  11:40:08
22    The time is 11:40 a.m.  We are off the     11:40:08
23    record.                                    11:40:11
24             (Whereupon there was a brief       11:40:12
25    recess.)                                   11:40:13
```

EXHIBIT F

AOE0218

```
                                                    Page 85

 1                    D. Galatt - Confidential

 2                    MR. VIDEOGRAPHER:   The time is      12:02:42

 3        12:02 p.m.  We are back on the record.   You    12:02:43

 4        may proceed.                                     12:02:46

 5    BY MS. ANDREWS:                                      12:02:47

 6        Q      Okay.  Before the break, we were          12:02:47

 7    talking about Defendant's Exhibit 15, and the        12:02:50

 8    fact that the lifestyle networks would be Nielsen    12:02:55

 9    measured starting fourth quarter '16; do you         12:03:00

10    recall that?                                         12:03:05

11        A      Yes.                                      12:03:06

12        Q      Do you know, are those properties         12:03:07

13    currently Nielsen rated?                             12:03:09

14        A      Yes.                                      12:03:11

15        Q      And have they consistently been           12:03:15

16    Nielsen rated since fourth quarter '16?              12:03:17

17        A      I believe so.                             12:03:20

18        Q      Okay.  Is there a difference between      12:03:20

19    being eligibility rated and actually being rated?    12:03:24

20        A      I don't know that language.  I just       12:03:28

21    know that they're rated.                             12:03:30

22        Q      What does it mean, "that they're          12:03:31

23    rated"?                                              12:03:32

24        A      Nielsen delivers us audience from the     12:03:33

25    networks.                                            12:03:38
```

Page 88

                        D. Galatt - Confidential

1

2       Q      In your experience in the media          12:06:38

3    industry, do advertisers typically buy properties  12:06:41

4    that are unrated?                                   12:06:45

5       A      There are clients that spend a portion    12:06:48

6    of their money on unrated.                          12:06:52

7       Q      What clients?                             12:06:55

8       A      I don't know off the top of my head       12:06:57

9    who they are, but there's been measured media and   12:06:58

10   unmeasured media purchased in the industry.         12:07:02

11      Q      And isn't it true that there are          12:07:06

12   clients that only will purchase on properties       12:07:07

13   that have ratings, measured ratings?                12:07:11

14      A      I suppose there are clients that say      12:07:15

15   that.                                               12:07:17

16      Q      'Cause if you're going to have a          12:07:18

17   guarantee, you've got to have a method of           12:07:19

18   measurement; correct?                               12:07:21

19      A      Correct.                                  12:07:23

20      Q      So if you're buying on a guaranteed       12:07:23

21   basis, by definition, the ratings would have to     12:07:26

22   be associated with the property?                    12:07:28

23      A      Yes.                                      12:07:29

24      Q      And what -- so these entities that        12:07:31

25   we're looking at in these bullets in Defendant's    12:07:35

EXHIBIT F
AOE0220

```
                                              Page 89
  1                  D. Galatt - Confidential
  2      Exhibit 16 are what we've called the cable        12:07:38
  3      networks or lifestyle networks.  My understanding 12:07:42
  4      is they're distinct from a show which runs on a    12:07:45
  5      station that you've said they're 24-hour          12:07:48
  6      networks; is that correct?                         12:07:51
  7          A    Yes.                                       12:07:52
  8          Q    So there's a variety of programming       12:07:53
  9      that runs on them on, you know, day in/day out,    12:07:54
 10      24/7?                                              12:08:00
 11          A    Yes.                                       12:08:01
 12          Q    At this point in time, August 2016,       12:08:02
 13      what programming was running on these networks?    12:08:03
 14          A    Chefs making recipes on Recipe.TV.        12:08:06
 15      Entertainment programming on ES.  Pet content on   12:08:16
 16      Pets.  Automotive content on Cars.  And travel     12:08:20
 17      and home content on MyDestination.                 12:08:24
 18          Q    Is this content that was being            12:08:28
 19      developed by Entertainment Studios?                12:08:30
 20          A    Yes.                                       12:08:32
 21          Q    Let's turn in that document that's in     12:08:38
 22      front of you.  Let me start asking you this.       12:08:40
 23      Let's go to -- looks like what Mr. Blaine sent,    12:08:56
 24      there's sort of a number of attachments unique to  12:09:06
 25      each of these .TV offerings, so let's just flip    12:09:09
```

Page 91

1                 D. Galatt - Confidential

2    the folks that handle the cable sets.          12:10:54

3        Q    If you keep going through this     12:11:05

4    document, there's a deck attached to it starting  12:11:06

5    at -- ending in Bates No. 372.  There's an     12:11:11

6    Entertainment Studios slide deck.            12:11:16

7        A    Yes.                       12:11:24

8        Q    The second page of it, Entertainment  12:11:28

9    Studios Networks, seven 24-hour networks     12:11:30

10   featuring content targeted demos.          12:11:34

11        These are the cable networks we've   12:11:36

12   been discussing; correct?              12:11:38

13       A    Yes.                    12:11:39

14       Q    And if you turn to the page ending in 12:11:40

15   Bates 375, there's a slide here for Comedy.TV?  12:11:44

16       A    Yes.                    12:11:50

17       Q    So would this slide represent the   12:11:51

18   programming that would be running on Comedy.TV?  12:11:54

19       A    I assume at that time, yes.      12:12:01

20       Q    And the two entries on the right side, 12:12:03

21   First Family and Mr. Box Office, do you see   12:12:07

22   those?                               12:12:09

23       A    Yes.                    12:12:09

24       Q    These were included as part of the   12:12:10

25   syndication package that ESN was selling;    12:12:12

EXHIBIT F
AOE0222

Page 92

```
 1              D. Galatt - Confidential
 2  correct?                                        12:12:16
 3      A      Yes.                                 12:12:16
 4      Q      So the Comedy.TV offerings would be  12:12:16
 5  duplicative of the syndication?                 12:12:21
 6      A      We did this exactly like many other  12:12:25
 7  networks who run the same shows on broadcast    12:12:30
 8  television in syndication and cable television, 12:12:34
 9  so the same content runs across different       12:12:36
10  platforms, yes.                                 12:12:39
11      Q      It's just another way to access, but 12:12:40
12  it's the same content?                          12:12:42
13      A      Yes.                                 12:12:46
14      Q      But as opposed to being syndicated and 12:12:46
15  shown on Property X in, I don't know, Houston   12:12:49
16  Texas, it would be shown on this network,       12:12:52
17  Comedy.TV, which may be carried by various      12:12:55
18  providers; correct?                             12:13:00
19      A      Correct.                             12:13:01
20             (Exhibit Dx 17 was marked.)          12:13:01
21      Q      Okay.  So this is Defendant's Exhibit 12:13:01
22  17, a February 2nd, 2017 email from you to      12:14:04
23  Patrick Olson.  Subject, 2017 McDonald's        12:14:11
24  Contract.  "Patrick, please see the attached    12:14:14
25  McDonald's contract we discussed."  And attached 12:14:22
```

```
                                                    Page 100

 1                D. Galatt - Confidential
 2        A     At that time and to this day, I        12:24:11
 3    wouldn't know if it was directed at us or        12:24:13
 4    directed at the industry, cutting budgets across 12:24:15
 5    the board.                                       12:24:21
 6        Q     Well across the board --               12:24:21
 7        A     Because I was relegated to a very      12:24:24
 8    small subset of the investment at Burrell, which 12:24:27
 9    did not include, you know, the expansive         12:24:32
10    McDonald's budgets, which the lion's share, as I 12:24:35
11    said, went to OMD.  So I don't know if they were 12:24:37
12    specifically speaking to the AA targeted that I  12:24:42
13    was relegated to, or Allen Media Group or        12:24:46
14    Entertainment Studios that they were relegated to 12:24:51
15    or an investment as a whole.                     12:24:53
16        Q     Well, first of all, I don't see any    12:24:54
17    reference in here to general consumer market; do 12:24:56
18    you?                                             12:24:58
19               MR. SCHECTER:  Objection,             12:24:59
20         argumentative.  You can answer.             12:24:59
21               THE WITNESS:  No.                      12:25:05
22    BY MS. ANDREWS:                                   12:25:05
23        Q     This document doesn't say that they're 12:25:06
24    pulling money out of the African-American media  12:25:08
25    budget and moving it to the general commercial   12:25:10
```

EXHIBIT F
AOE0224

```
                                                Page 101
 1              D. Galatt - Confidential
 2   market; does it?                          12:25:12
 3       A    No.                              12:25:13
 4       Q    No, right.  Okay.  What it's telling  12:25:13
 5   you is there's been a cut and it's providing the  12:25:16
 6   justification for why, which is a change in  12:25:20
 7   strategy; correct?                        12:25:23
 8       A    I think the industry made shifts, if  12:25:31
 9   that's what you're saying.  I don't think  12:25:33
10   McDonald's is doing anything out of the ordinary  12:25:36
11   of what's being done in terms of shifting and  12:25:38
12   moving.  It's part of the industry and what's  12:25:39
13   happened over the last number of years.    12:25:41
14       Q    Right.  There's been an industry shift  12:25:43
15   away from linear video; correct?          12:25:50
16       A    I know that digital has attracted  12:25:55
17   dollars, but I know that the industry as a whole  12:25:58
18   still heavily invests in broadcast television and  12:26:01
19   linear television.                        12:26:05
20       Q    Sure.  They still invest in it, but on  12:26:06
21   a relative basis, digital is taking up a bigger  12:26:08
22   portion of the budgets than it had previously;  12:26:12
23   correct?                                  12:26:16
24       A    Than previously.                 12:26:17
25       Q    And there's been a corresponding  12:26:18
```

Page 105

```
 1              D. Galatt - Confidential
 2    contract, and then you signed and accepted on      12:31:40
 3    behalf of ESN and sent it back to him; correct?    12:31:43
 4         A     Yes.                                     12:31:46
 5         Q     Do you recall being told by Adele        12:32:26
 6    Lassere that McDonald's removed syndication from   12:32:27
 7    its media mix in 2019?                              12:32:30
 8         A     I don't recall the conversation          12:32:33
 9    specifically.                                       12:32:35
10         Q     Do you recall that McDonald's did        12:32:36
11    remove syndication as a whole from its media mix    12:32:37
12    in 2019?                                            12:32:44
13         A     I only recall that they removed it       12:32:45
14    from us.  I don't recall that they removed it in    12:32:47
15    general.                                            12:32:50
16         Q     Do you recall that Burrell told you      12:32:53
17    that there had been a major reduction of            12:32:55
18    syndication, and in particular, that the ES         12:32:57
19    proper syndication properties skewed to an older    12:33:02
20    demographic and that McDonald's target audience     12:33:05
21    consideration skewed younger?                       12:33:07
22         A     Can you repeat that for me?              12:33:15
23         Q     Do you recall being told by Burrell      12:33:28
24    that in connection with McDonald's elimination of   12:33:30
25    syndication, among the factors they considered      12:33:33
```

EXHIBIT F
AOE0226

Page 106

D. Galatt - Confidential

1

2    was that the ES syndication properties skewed to      12:33:37

3    an older demographic, and McDonald's target           12:33:41

4    audience for 2019 skews younger?                       12:33:44

5         A      Again, I don't recall the exact           12:33:47

6    conversation.                                          12:33:49

7         Q      Do you recall discussing with Mr.         12:33:51

8    Olson and Ms. Lassere McDonald's reduction or         12:33:52

9    elimination of syndication in 2019?                    12:33:57

10        A      I know that they told us they were no     12:34:00

11   longer spending, yes.                                  12:34:04

12        Q      And they told you, in fact, didn't        12:34:05

13   they, that that not unique to Entertainment            12:34:07

14   Studios.  That there was an elimination across         12:34:09

15   the board of syndication as a media partner for        12:34:11

16   McDonald's beginning in 2019; correct?                 12:34:16

17        A      I don't remember that.  I just            12:34:19

18   remember them saying that our business wasn't          12:34:21

19   going to be there for syndication, which is what       12:34:23

20   I was working on at the time.                          12:34:27

21        Q      And they explained to you that that       12:34:28

22   was a change in strategy to move away from             12:34:29

23   syndication generally and specific to ESN, due to      12:34:33

24   the fact that your syndication skewed older than       12:34:38

25   McDonald's target marketing; correct?                  12:34:43

EXHIBIT F
AOE0227

```
                                              Page 107
   1              D. Galatt - Confidential
   2        A     Can you clarify the question?  Is that   12:34:45
   3   our syndication versus others, or syndication,      12:34:46
   4   period?                                             12:34:48
   5        Q     ES syndication did well -- did better    12:34:51
   6   with an older audience and not as well -- we        12:34:54
   7   looked at those documents earlier, right, with      12:34:57
   8   the African-American, you know, 35 to 49.  They     12:34:59
   9   were higher than the 18 to 34, higher ratings       12:35:05
  10   than the older demographic; correct?                12:35:08
  11        A     Yeah.  Yes, I do remember those          12:35:10
  12   documents and, you know, I think the                12:35:15
  13   communication was in terms of audiences being       12:35:18
  14   older for syndication, you know, not just for --    12:35:22
  15   you know, not just for broadcast syndication, but   12:35:29
  16   for linear television.  So when we're talking       12:35:32
  17   about older audiences, the delivery of older --     12:35:36
  18   of linear television would be older audiences.      12:35:40
  19   It's not just syndication and it's not just us.     12:35:43
  20   It's all.                                           12:35:46
  21        Q     Sure.  That's fair, that linear          12:35:47
  22   television in general skews older; correct?         12:35:49
  23        A     Yes.                                     12:35:55
  24              (Exhibit Dx 21 was marked.)              12:37:25
  25        Q     I've given you what we've marked as      12:37:37
```

Page 112

1                    D. Galatt - Confidential

2          may proceed.                              13:54:27

3                   MS. ANDREWS:   Let's mark this as   13:54:43

4          Defendant's Exhibit 22.                    13:54:44

5                   (Exhibit Dx 22 was marked.)        13:54:47

6    BY MS. ANDREWS:                                   13:54:56

7          Q     I've given you Defendant's Exhibit 22.   13:54:56

8    It's Bates numbered ESN0010350.   The email is    13:54:58

9    from Kristin Maclearie, November 15, 2019 to a    13:55:06

10   variety of people including yourself regarding    13:55:11

11   McDonald's OMD meeting.                           13:55:15

12              Who is Ms. Maclearie?                  13:55:17

13         A     Kristin Maclearie was one of our      13:55:19

14   account executives at the time.                   13:55:23

15         Q     And what was she responsible for at   13:55:26

16   this time?                                        13:55:28

17         A     She was the account executive that    13:55:29

18   called upon OMD from the portfolio team.          13:55:32

19         Q     What does that mean, "portfolio team"?   13:55:36

20         A     The team that was selling all         13:55:38

21   properties, you know, subsequent to us joining up   13:55:41

22   with The Weather Channel in 2018.                 13:55:45

23         Q     So she was responsible for OMD, but   13:55:48

24   she had the ability to market all of the          13:55:52

25   offerings, Weather Channel, ESN; all of that?     13:55:54

Page 113

D. Galatt - Confidential

1

2      A      She was the representative who called          13:55:57

3   upon OMD.                                                13:56:00

4      Q      And OMD is the agency of record for            13:56:01

5   McDonald's for their general commercial market;         13:56:08

6   correct?                                                 13:56:10

7                 MR. SCHECTER:   Objection.   Vague         13:56:11

8      as to time.                                           13:56:12

9   BY MS. ANDREWS:                                          13:56:13

10     Q      You can answer.                                13:56:13

11     A      Yes.                                           13:56:15

12     Q      And did you have an understanding that         13:56:16

13  OMD represented other advertisers as well?              13:56:19

14     A      Yes.                                           13:56:23

15     Q      She states, "Tina, Amy and I had a             13:56:33

16  great meeting with the McDonald's buying team at        13:56:40

17  OMD NY."                                                 13:56:44

18            Does Tina refer to Tina Gambelli?              13:56:49

19     A      Yes.                                           13:56:51

20     Q      And Amy is Amy Muhlstock?                      13:56:51

21     A      Yes.                                           13:56:54

22     Q      And they were -- who were they at this         13:56:54

23  time?                                                    13:56:57

24     A      Other members of the portfolio sales           13:56:59

25  team.                                                    13:57:01

```
                                                    Page 116

  1                 D. Galatt - Confidential

  2    Burrell, "will continue to handle this piece of    13:59:31

  3    the buy"; do you see that?                          13:59:36

  4        A     Yes.                                      13:59:38

  5        Q     Do you have an understanding of what      13:59:39

  6    that refers to?                                     13:59:40

  7        A     I mean, I wasn't in the meeting, so I     13:59:51

  8    don't know the exact meaning of this.  If it        13:59:53

  9    means they are open to purchasing again, I don't    13:59:57

 10    know.  I can't tell.  I wasn't there.               14:00:00

 11        Q     The next -- the next page, the bottom     14:00:03

 12    bullet says, "Chicago to reach out to Barell for    14:00:10

 13    syndication opportunities."                         14:00:14

 14             Do you have an understanding of what       14:00:15

 15    that refers to?                                     14:00:16

 16        A     That our Chicago office should follow     14:00:20

 17    up.  I'm guessing.                                  14:00:23

 18        Q     With Burrell for syndication?             14:00:24

 19        A     Yes.                                      14:00:26

 20        Q     Do you know if that happened?             14:00:28

 21        A     I'm sure we followed up as we normally    14:00:30

 22    would regardless, but I don't know if it was        14:00:32

 23    responded to.                                       14:00:35

 24             (Exhibit Dx 23 was marked.)                14:00:35

 25        Q     I've given you Defendant's Exhibit 23,    14:01:32
```

Page 117

1                    D. Galatt - Confidential

2    ESN0043932.  This is a December 13th, 2019 email      14:01:36

3    from you to Becky MarQuardt, Will Hagerup.            14:01:44

4    Subject, McDonald's 2020 Burrell.                     14:01:51

5              Do you recall this email?                   14:01:55

6        A    I mean, I'm looking at it.  I realize        14:02:00

7    it's my email, yes.                                   14:02:04

8        Q    Okay.  So it's approximately a month         14:02:06

9    after the email we just looked at as Defendant's      14:02:08

10   Exhibit 22, which said to reach out to Burrell.       14:02:11

11   And then this is your email regarding 2020            14:02:19

12   Burrell.                                              14:02:22

13             Do you recall making a reachout to          14:02:23

14   Burrell in late 2019 about syndication?              14:02:24

15       A    I don't remember making that reachout.       14:02:30

16       Q    Okay.  And you say, "Just a quick            14:02:32

17   update from the Burrell team.  2020 McDonald's        14:02:34

18   plan for all syndication is up in the air.            14:02:37

19   Burrell recommended us, but their media plan is       14:02:40

20   still in progress."                                   14:02:42

21             Do you have any recollection of             14:02:43

22   discussing McDonald's 2020 syndication plan with      14:02:45

23   Burrell?                                              14:02:48

24       A    Honestly, no, I don't.                       14:02:52

25       Q    Do you remember being told that you          14:02:55

EXHIBIT F
AOE0232

```
                                              Page 118

    1                  D. Galatt - Confidential

    2    were recommended if there was a syndication plan?   14:02:56

    3         A     I see it here, but I don't remember       14:02:58

    4    that conversation.                                   14:03:00

    5         Q     And then you state, "If syndication       14:03:02

    6    will be on it, it will likely kick off in 2Q."      14:03:04

    7               Do you have any recollection of what      14:03:09

    8    that refers to?                                      14:03:12

    9         A     Only that it seems, as far as I can       14:03:13

   10    tell, that the buy wouldn't start in Jan, Feb,      14:03:17

   11    March.  It would start in 2Q, which would           14:03:24

   12    connote, April, May, June.                           14:03:26

   13               (Exhibit Dx 24 was marked.)               14:03:28

   14         Q     Defendant's Exhibit 24, ESN0019153,       14:04:11

   15    the initial email in the chain is from Joseph       14:04:19

   16    Sebolao at The Weather Group.  Who is he?           14:04:21

   17         A     Joe Sebolao was also a member of the     14:04:27

   18    portfolio team at the time.  Sales team.            14:04:30

   19         Q     Okay.  Assigned to OMD?                   14:04:33

   20         A     I'm not sure if he was assigned to OMD   14:04:39

   21    or if he was assigned to specific accounts.  I'm    14:04:42

   22    not sure exactly of the organizational structure   14:04:45

   23    there.                                               14:04:49

   24         Q     And the subject matter is Omnicom.       14:04:50

   25    Let me just stop there.  Omnicom and OMD are        14:04:53
```

Page 144

```
 1                  D. Galatt - Confidential

 2        A     Yes.                              14:43:59

 3        Q     And he says, "We just need to confirm   14:44:02

 4   upfront submissions across the AMG properties.    14:44:04

 5   Can you confirm the below is accurate for         14:44:07

 6   McDonald's.  Local Now, 376,118 net.  TheGrio,    14:44:10

 7   357,938.00 net"; you see that?                    14:44:16

 8        A     I see that.                        14:44:23

 9        Q     The next email in the chain is from   14:44:24

10   Mr. Tannenbaum at OMD.  "Hi, Dan.  Confirming the  14:44:26

11   below dollars are accurate"; do you see that?     14:44:30

12        A     Yes.                              14:44:32

13        Q     Okay.  Is that your understanding that   14:44:33

14   for the 2021/2022 timeframe, McDonald's made an    14:44:36

15   investment via OMD to advertise on Local Now in    14:44:43

16   the amount of $376,118.00?                        14:44:48

17        A     Yes.                              14:44:55

18        Q     Okay.  And same, they made a        14:44:56

19   357,938-dollar investment on TheGrio via OMD;     14:44:59

20   correct?                                     14:45:08

21        A     Yes.                              14:45:09

22        Q     Does your sales team work on a      14:46:10

23   commission base model?                        14:46:11

24               MR. SCHECTER:  I'm going to just   14:46:16

25        object.  Privacy.  Employee compensation is   14:46:17
```

Page 148

D. Galatt - Confidential

1

2      Q      McDonald's did advertise on          14:49:57

3    syndication?                                   14:49:58

4      A      They did advertise on syndication,    14:49:58

5    yes.                                           14:50:00

6      Q      And they advertised on the digital    14:50:00

7    properties, the Local Now and TheGrio, once those  14:50:02

8    became part of the portfolio?                  14:50:04

9      A      I think they advertised on those      14:50:06

10   platforms after we, you know, went to them and  14:50:07

11   put some pressure on them to increase spending or  14:50:14

12   spend with African-American-owned media,       14:50:17

13   inclusive of ourselves.                        14:50:21

14     Q      But they're advertising currently on  14:50:24

15   them; correct?                                 14:50:25

16     A      They are currently advertising.       14:50:26

17     Q      So you say -- the keyword in this     14:50:27

18   sentence that I read to you is the word        14:50:30

19   "networks"?  "Refused to contract to advertise on  14:50:31

20   Entertainment Studios' networks.  That refers to  14:50:36

21   what we called the lifestyle networks or the   14:50:40

22   cable networks?                                14:50:43

23     A      Right.                                14:50:43

24     Q      So those entities McDonald's has not  14:50:44

25   advertised on; correct?  That's your position?  14:50:48

EXHIBIT F
AOE0235

Page 149

D. Galatt - Confidential

1
2    A      I believe so, yeah.                    14:50:52
3    Q      What percentage of ESN's advertising   14:50:54
4  revenue is derived from advertising on the      14:50:57
5  networks, as opposed to the syndication or the  14:51:01
6  digital properties?  You're chief revenue       14:51:03
7  officer.  I presume this would be information you 14:51:05
8  would know.                                      14:51:08
9            MR. SCHECTER:  Well I'm going to       14:51:09
10      object to the last part as argumentative.   14:51:10
11      Calls for speculation.  Also, the witness is 14:51:14
12      not designated as the corporate             14:51:16
13      representative on this topic, so --          14:51:19
14            MS. ANDREWS:  He has personal          14:51:20
15      knowledge, David.  I'm entitled to ask him.  14:51:21
16      You can object to the form.  You don't need  14:51:22
17      to, like, continue to coach your witness.    14:51:24
18      He can answer the question.                  14:51:26
19  BY MS. ANDREWS:                                  14:51:27
20      Q     You can answer the question.  What     14:51:28
21  percentage --                                    14:51:28
22            MR. SCHECTER:  No, no, no,             14:51:29
23      Ms. Andrews, I was not done with my          14:51:30
24      objection.  So when you interrupt me and     14:51:32
25      then go on a diatribe of how I'm coaching my 14:51:33

```
                                              Page 154

 1              D. Galatt - Confidential

 2      Q      With a total investment of          14:57:01

 3   $1,111,066.00; do you see that?               14:57:03

 4      A      I do.                                14:57:13

 5      Q      For 2014, Progressive is the No. 1 and   14:57:15

 6   McDonald's is No. 6; correct?                 14:57:18

 7      A      Yes.                                 14:57:22

 8      Q      And for 2014, total investment by   14:57:23

 9   McDonald's of $1,072,000.00; do you see that?   14:57:27

10      A      Yes.                                 14:57:32

11      Q      2015, J&J, Johnson & Johnson, is No.   14:57:33

12   1.  McDonald's is No. 7; correct?             14:57:38

13      A      Yes.                                 14:57:44

14      Q      With an investment of $641,325.00?   14:57:45

15      A      Correct.                             14:57:51

16      Q      And 2016, the last year of data in   14:57:52

17   this sheet, again, J&J No. 1.  McDonald's is No.   14:57:55

18   8 at $674,922.30; do you see that?            14:57:58

19      A      Yes.                                 14:58:04

20      Q      And is this consistent with your    14:58:07

21   recollection that for the years 2013 through   14:58:10

22   2016, McDonald's was one of the top ten       14:58:12

23   advertisers with Entertainment Studios?       14:58:15

24      A      I never saw this sheet, so I didn't   14:58:18

25   know ranks of where folks were, but I see it   14:58:20
```

EXHIBIT F

AOE0237

Page 155

D. Galatt - Confidential

1                  D. Galatt - Confidential
2      here.                                        14:58:23
3          Q      Do you have any basis to dispute these  14:58:24
4      numbers from your controller, Ms. Logan?     14:58:26
5          A      No.                               14:58:28
6          Q      Okay.  And if you look at -- it's the  14:58:29
7      first page behind the slip sheet ending in 103.  14:58:42
8      It's the one entitled, Entertainment Studios  14:58:48
9      Consolidated Financial Statements 2012-2016; do  14:58:51
10     you see that?                                14:58:55
11         A      Yeah.                             14:58:58
12         Q      So underneath -- the top box is   14:59:14
13     consolidated; right?  This is the rollup of the  14:59:17
14     various entities; is that correct?           14:59:19
15         A      Yes.                              14:59:22
16         Q      What is CF Entertainment?  It says  14:59:24
17     Television Syndication.  This is the entity that  14:59:26
18     is receiving advertising revenue for the     14:59:29
19     syndicated properties?                       14:59:32
20         A      Yes.                              14:59:33
21         Q      And Entertainment Studios Networks,  14:59:34
22     Inc., the next box to the right, Cable Network  14:59:36
23     Summary, this is the entity that's receiving  14:59:40
24     advertising revenue for the cable network/life  14:59:43
25     style networks?                              14:59:45

EXHIBIT F
AOE0238

Page 159

D. Galatt - Confidential

1

2    before the break.  I have a couple more questions      15:26:55

3    about it.  If you could go back to the sheet we        15:26:57

4    were looking at earlier that says Consolidated         15:26:59

5    Financial Statements at the top.  Are you there?       15:27:01

6    And, again, in that upper left corner box, the CF      15:27:09

7    Entertainment Television Syndication one we were       15:27:14

8    looking at before?                                     15:27:17

9        A    Yes.                                          15:27:18

10       Q    So advertising revenue from 2013 was          15:27:18

11   $26,683,195.  And then in 2014 it was                  15:27:25

12   $22,336,074.00; do you see that?                       15:27:31

13       A    Wait a minute.  You're looking at             15:27:39

14   television syndication --                              15:27:40

15       Q    Yes.                                          15:27:41

16       A    -- advertising revenue.  Okay.                15:27:43

17       Q    Top one.                                      15:27:44

18       A    Got it.                                       15:27:45

19       Q    Do you recall that there was a                15:27:46

20   decrease in advertising revenue for the                15:27:47

21   syndication properties from 2013 to 2014?              15:27:51

22       A    Yes.                                          15:27:56

23       Q    What drove that decrease?                     15:28:01

24       A    It could be any number of things.             15:28:03

25   Advertisers shifting, moving.  You know, that          15:28:07

EXHIBIT F

AOE0239

Page 160

D. Galatt - Confidential

created that decrease.  I would say that that's        15:28:11

usually what drives it.  It's just advertisers          15:28:16

going up, down.  In this case, more down than up.       15:28:18

5    Q    Isn't it true that the decline was due        15:28:26

6    to the reduction in the ratings on the sitcoms      15:28:28

7    which resulted in lower billings?                   15:28:31

8    A    I don't know that I can directly              15:28:37

9    relate this -- you know, this loss to that and      15:28:40

10   that alone.                                          15:28:45

11   Q    Do you recall that there was a decline        15:28:46

12   in the ratings on certain of the syndicated          15:28:47

13   programming at this time which drove a decrease      15:28:51

14   in advertising revenue?                              15:28:53

15   A    Yes, I do recall a decrease in                15:28:58

16   ratings.                                             15:29:02

17   Q    And you understand that a decrease in         15:29:03

18   ratings results in reduced advertising revenue       15:29:05

19   because advertisers may choose to put their          15:29:08

20   advertising dollars elsewhere; right?                15:29:11

21            MR. SCHECTER:  Objection.                  15:29:13

22        Incomplete hypothetical.  You can answer.      15:29:14

23            THE WITNESS:  For folks that were          15:29:17

24        exposed to those programs, yes, but not the    15:29:18

25        portfolio as a whole.                           15:29:22

EXHIBIT F

AOE0240

```
                                              Page 174
 1                D. Galatt - Confidential
 2      its media properties; correct?              15:47:55
 3          A      That's correct.  But I would also say   15:47:58
 4      that the -- you know, we, Entertainment Studios   15:48:00
 5      and now Allen Media Group, represent a very large   15:48:05
 6      part of what is 100 percent black owned, so when   15:48:10
 7      you're talking about what's out there in terms of   15:48:13
 8      mass and capacity, we represent a large portion   15:48:15
 9      of it.  So if we're not getting it, it's hard for   15:48:19
10      others to represent a large increase, because we   15:48:23
11      represent most of the capacity to do business,   15:48:29
12      GRPs and such audience.                 15:48:31
13          Q      And you want 2 percent; right?   15:48:37
14          A      Originally that number was 2 percent,   15:48:39
15      but based on the fact that African-Americans make   15:48:40
16      up 14 percent of the population, we were asking   15:48:44
17      for -- you know, subsequently asking for --   15:48:46
18      between 5 and 10 percent.  Not asking for   15:48:49
19      14 percent, which would be parity, but between 5   15:48:52
20      and 10 percent as an investment to reciprocate   15:48:57
21      for the investment that the African-American   15:49:00
22      community was making with those corporations,   15:49:03
23      including inclusive of McDonald's.          15:49:05
24          Q      So it's an economical calculus;   15:49:07
25      correct?                                 15:49:09
```

Page 179

D. Galatt - Confidential

1

2     A     Well it's a number of things, many of     15:53:50

3     which we discussed this morning.   We had far more     15:53:52

4     capacity than they were using.   They could have     15:53:56

5     done more.   They made the decision to put us     15:53:57

6     through Burrell, which was a small fraction of     15:54:01

7     the budget versus the huge budgets that were     15:54:04

8     being contracted at OMD, and regardless of an     15:54:07

9     annual plea to be taken and considered out of     15:54:12

10    OMD, we were forced into a relationship with the     15:54:16

11    black agency, even though we were not exclusively     15:54:19

12    black targeted.   That is the reason for a lot of     15:54:23

13    these emails.     15:54:32

14        Q     Okay.   It was unfair that you were     15:54:33

15    limited to Burrell.   That is your position?     15:54:36

16        A     It wasn't only unfair.   It was     15:54:39

17    racially discriminatory.     15:54:40

18        Q     What's your basis for that?     15:54:42

19        A     Because we had general market content,     15:54:44

20    yet we had to pitch through Burrell, the black     15:54:47

21    agency, where they did not place money.     15:54:50

22        Q     What was the general market content?     15:54:53

23        A     Beautiful Homes and Great Estates.     15:54:56

24    Cars.TV.   Recipe.TV.   Pets.TV, so on and so on     15:54:58

25    and so on.     15:55:03

Page 180

1                   D. Galatt - Confidential

2       Q      The lifestyle networks?                15:55:04

3       A      And the syndication that has the same   15:55:05

4    content.                                          15:55:07

5       Q      Which part of the syndication?          15:55:12

6       A      Funny You Should Ask.   Comics          15:55:14

7    Unleashed.   Cars.TV.   Recipe.TV.   ES.TV.   The   15:55:16

8    lion's share of it.                               15:55:22

9       Q      But OMD evaluated those media           15:55:38

10   properties.   You knew that; right?               15:55:41

11              MR. SCHECTER:   Objection.   Vague      15:55:43

12       as to time.                                   15:55:43

13              THE WITNESS:   I need you to be         15:55:47

14       more specific.                                15:55:48

15   BY MS. ANDREWS:                                   15:55:48

16       Q      At this time, 2015 to the present, OMD  15:55:49

17   evaluated those media properties against their    15:55:52

18   screening criteria; correct?                      15:55:54

19       A      No.   OMD told us consistently that we  15:55:56

20   had to go and deal with Burrell.                  15:55:59

21       Q      Because your properties didn't meet     15:56:01

22   threshold for buying through Burrell.   You        15:56:04

23   understood that, correct, because of ratings, of   15:56:06

24   distribution, of target market?                   15:56:09

25       A      Didn't meet thresholds to transact      15:56:13

EXHIBIT F
AOE0243

Page 184

D. Galatt - Confidential

1

2    agency.  The black agency was to evaluate          15:58:45

3    black-targeted media.                              15:58:54

4        Q     And media that scores well with the      15:58:58

5    demographic that they are targeted with getting    15:59:01

6    those eyeballs onto the ads; right?  Just like      15:59:05

7    whoever is dealing with the youth demographic is    15:59:10

8    trying to find the media that gets the youth        15:59:14

9    eyeballs, right, on the ads that they're going to   15:59:14

10   run?                                               15:59:14

11       A     That's their goal, to find the folks     15:59:16

12   that they look to find.                             15:59:19

13       Q     So if something is not necessarily        15:59:20

14   targeted to a particular consumer market, but it    15:59:23

15   scores well with that consumer market, why          15:59:26

16   wouldn't you buy it to advertise to that consumer   15:59:28

17   market?                                             15:59:31

18       A     Well I would say that having              15:59:33

19   properties that focus on recipes, pets, movies,     15:59:35

20   stars and movies, homes and travel are all          15:59:40

21   general market in nature and there was no good      15:59:45

22   reason why OMD wouldn't have evaluated us or        15:59:49

23   would have screened us out, in essence, and sent    15:59:53

24   us to the black agency that evaluated only black    15:59:59

25   targeted content.  Because all of that that I       16:00:04

EXHIBIT F
AOE0244

Page 185

D. Galatt - Confidential

2    mentioned is not black targeted content, yet we      16:00:06
3    were forced to pitch only to Burrell.  Again,        16:00:09
4    with annual pleas to pitch the general audience      16:00:12
5    agency where probably if I'm to guess, 97 percent    16:00:16
6    of the dollars sat.                                  16:00:21
7        Q    What shows air on Recipe.TV?                 16:00:24
8        A    Recipe cooking shows.                        16:00:28
9        Q    Name one.  What's the name of a show?        16:00:30
10       A    Recipe.TV is a name of a show.               16:00:33
11       Q    That's the show?                             16:00:36
12       A    It's a show.  There are others that          16:00:38
13   have -- you know, that are hosted that have Irish     16:00:39
14   cooking, and also destinations to certain places.    16:00:45
15   French cooking.  We have, you know, Michael           16:00:52
16   Delling-Williams, who's a male chef who cooks         16:00:56
17   recipes, but there are countless chefs of all         16:01:01
18   kinds making recipes.                                 16:01:05
19       Q    And what are the ratings of those            16:01:06
20   shows?                                                16:01:09
21       A    I couldn't tell you exactly how many         16:01:10
22   eyeballs that they reach each, but they run as we     16:01:12
23   know both on syndication and on the cable             16:01:17
24   network.                                              16:01:20
25       Q    How do they compare to Top Chef in           16:01:21

EXHIBIT F
AOE0245

Page 217

```
                        D. Galatt - Confidential
 1
 2      Q     Right.                                17:19:37
 3      A     Correct.                              17:19:38
 4      Q     And so not being Nielsen rated would  17:19:39
 5   be a reason that an advertiser would not want to 17:19:42
 6   invest in that property; correct?             17:19:46
 7      A     Well, we had advertisers that invested 17:19:49
 8   prior to it being rated, so --               17:19:50
 9      Q     Yeah, but that's not really responsive 17:19:53
10   to my question whether or not you had         17:19:55
11   advertisers.  An advertiser might decline to  17:19:57
12   invest in any particular property, particularly 17:20:02
13   when they're seeking a guarantee when there's no 17:20:04
14   ratings data because there's no way to verify how 17:20:06
15   many people actually watched the programming;  17:20:12
16   correct?                                      17:20:14
17      A     Sure.                                 17:20:14
18      Q     And if you could pull back out        17:20:15
19   Defendant's Exhibit 9 and 10.                 17:20:18
20      A     9 and 10.                             17:20:29
21      Q     Okay.  We looked earlier; you had made 17:20:48
22   a proposal to McDonald's first for just under  17:20:49
23   5 million and then the 2 million.  McDonald's  17:20:53
24   countered with 770,000; do you recall that?   17:20:56
25      A     Yes.                                  17:21:00
```

Page 219

D. Galatt - Confidential

1

2    be -- this would be McDonald's dictation of the      17:22:24

3    resolution, so it was what they offered.            17:22:29

4        Q     And you accepted it and signed a          17:22:32

5    contract accepting that; correct?                   17:22:34

6        A     We did.                                    17:22:36

7        Q     And you knew when you accepted it,        17:22:36

8    'cause it's right here, what the investment was     17:22:37

9    and what properties they were buying on; correct?   17:22:40

10       A     Yes.                                       17:22:44

11       Q     What's the black-owned media strategy?    17:23:00

12       A     Can you tell me what you're referring     17:23:11

13   to when you say "black-owned media strategy"?       17:23:12

14       Q     I'm referring to it as it's used in       17:23:15

15   your documents, BOM, black-owned media.             17:23:17

16       A     I believe you could say that that is a    17:23:23

17   campaign to educate the market.  That they should   17:23:26

18   be -- they should lean in and spend more black on   17:23:27

19   media, BOM.                                          17:23:31

20       Q     And beginning in the fall of 2020,        17:23:42

21   September 2020, you began this black-owned media    17:23:46

22   campaign; correct?                                   17:23:53

23       A     I think there's been a black-owned        17:23:59

24   media campaign going on far longer than             17:24:01

25   September 2020, but I know that we started          17:24:04

EXHIBIT F
AOE0247

Page 220

D. Galatt - Confidential

1

2    calling it BOM at that point, yes.          17:24:08

3        Q    It became sort of an official term,    17:24:10

4    right, within the ad sales team to lean into the    17:24:16

5    BOM initiative?                              17:24:21

6        A    It's how we communicated it to folks.   17:24:22

7        Q    And that initiative was to, as you    17:24:25

8    said, communicate to ad agencies and advertisers   17:24:30

9    that they should increase the spend with Allen     17:24:34

10   Media Group as an effort to lean in to increasing  17:24:38

11   their investment with black-owned media; correct?  17:24:41

12       A    We would be one avenue of black-owned   17:24:44

13   media, yes.                                  17:24:45

14       Q    And you were tracking internally that   17:24:47

15   avenue.  You were tracking the --            17:24:49

16       A    Yes.                              17:24:52

17       Q    -- investment with your company.  Not  17:24:52

18   other companies.  Your company?             17:24:54

19       A    Correct.                          17:24:55

20       Q    And that was not limited to meeting    17:24:57

21   with advertisers; correct?  You also met with    17:25:01

22   advertising agencies?                        17:25:03

23       A    We looked to educate all folks in the   17:25:04

24   industry.                                    17:25:08

25       Q    Including the advertising agencies?    17:25:10

Page 268

D. Galatt - Confidential

1

2      A      No.  We wanted inclusion, and if we        18:57:24

3   have most of the audience in that sector, then     18:57:27

4   just assume it would be part of that receptivity   18:57:30

5   of the message.                                     18:57:35

6      Q      So inclusion is defined as including     18:57:36

7   Allen Media Group?                                  18:57:39

8      A      Inclusion has always been communicated  18:57:43

9   as black-owned media.  We obviously at the same    18:57:46

10   time communicate our properties and what they can  18:57:49

11   do to benefit these companies on the black         18:57:53

12   targeted, as well as the general targeted media.   18:57:56

13      Q      The cable networks, lifestyle networks  18:58:08

14   which I've used interchangeably today, those I     18:58:11

15   think you said are targeted to the general         18:58:15

16   commercial market; correct?                        18:58:17

17      A      What's targeted to general?              18:58:19

18      Q      The lifestyle networks.                  18:58:21

19      A      Yes.                                      18:58:28

20      Q      And we looked at the Top 100 documents  18:58:28

21   and reviewed the amount of spend in 2018 and 2019  18:58:30

22   on those properties amongst the Top 100            18:58:35

23   advertisers; right?                                18:58:37

24      A      Correct.                                  18:58:38

25      Q      It was approximately $111,000.00 over   18:58:39

EXHIBIT F
AOE0249

```
                                              Page 272
```

1              D. Galatt - Confidential

2    particularly would be interested in, whether it       19:03:06

3    be sports or entertainment or weather or             19:03:08

4    sponsorship of this, that and the other thing.        19:03:12

5        Q      The McDonald's proposal which is           19:03:15

6    contained in Exhibit 47 at page ending in 629, I     19:03:18

7    believe, is approximately a 30 million-dollar         19:03:22

8    ask; do you recall that?  That in June of 2021,       19:03:24

9    Allen Media Group made a 30 million dollar            19:03:27

10   investment ask of McDonald's?  Apologies.  It's       19:03:32

11   $32 million.                                          19:03:41

12       A      I see it.                                  19:03:58

13       Q      And looking at your Top 100 document,      19:04:00

14   I'm looking at the February 16th version that we      19:04:06

15   looked at earlier about letters approval from         19:04:09

16   McDonald's, the 2 percent number equated to           19:04:13

17   $32 million; correct?                                 19:04:15

18       A      Correct.  That's what the math was.        19:04:19

19       Q      And so what you were asking from all       19:04:23

20   of these advertisers and these two exhibits to        19:04:26

21   demonstrate that they had heard the black-owned       19:04:29

22   media initiative was to make an investment that       19:04:36

23   was at this 2 percent number; correct?                19:04:39

24       A      Initially.                                 19:04:42

25       Q      But ESN couldn't have provided this        19:04:44

EXHIBIT F

AOE0250

Page 291

```
  1                    D. Galatt - Confidential
  2    have any other face-to-face meetings with her?      19:28:34
  3         A     Not that I can recall.                    19:28:36
  4         Q     And then Morgan Flatley, have you ever    19:28:39
  5    met with her face-to-face?                           19:28:42
  6         A     I don't believe I have.                   19:28:44
  7         Q     Have you ever spoken to her on the        19:28:45
  8    phone?                                               19:28:46
  9         A     I don't remember speaking to her.         19:28:49
 10         Q     And do you know who Chris Kempczinski     19:28:51
 11    is?                                                  19:28:55
 12         A     I do.                                     19:28:56
 13         Q     Have you ever met him?                    19:28:58
 14         A     No.                                       19:28:59
 15         Q     Have you ever spoken to him on the        19:28:59
 16    phone?                                               19:29:00
 17         A     No.                                       19:29:00
 18         Q     You've emailed him.                       19:29:00
 19               Has he ever responded directly to one    19:29:02
 20    of your emails?                                      19:29:04
 21         A     I don't remember if he has.  I don't      19:29:05
 22    believe so.                                          19:29:06
 23         Q     Has he ever participated in any           19:29:07
 24    conversations you've had with anyone about          19:29:09
 25    McDonald's investment in the Allen Media Group       19:29:11
```

EXHIBIT F

AOE0251

Page 292

1                       D. Galatt - Confidential

2    media properties?                                    19:29:14

3         A     I'm sorry.  Repeat that, please.          19:29:17

4         Q     Mr. Kempczinski, has he ever              19:29:18

5    participated in any conversation that you have       19:29:21

6    had with someone regarding McDonald's investment     19:29:24

7    in the Allen Media Group media properties?           19:29:28

8         A     I don't know that he was in the room,     19:29:32

9    but I wouldn't know if I was on the phone, unless    19:29:33

10   it was a Zoom, which I don't recall.                 19:29:36

11        Q     So you're saying it's possible he was     19:29:40

12   listening in and not identifying that he was         19:29:42

13   there?                                               19:29:44

14        A     I don't know.  I mean, I can't say.       19:29:45

15        Q     Okay.  But any conversations that         19:29:47

16   you've had, he has never been identified as a        19:29:52

17   participant; is that correct?                        19:29:54

18        A     Never.                                    19:29:55

19        Q     And then prior to Mr. Kempczinski, the    19:29:57

20   CEO was Steve Easterbrook.  Same question.           19:30:00

21             If you had emailed Mr. Easterbrook,        19:30:04

22   has he ever responded directly to any of your       19:30:05

23   emails?                                              19:30:09

24        A     I don't recall.                           19:30:10

25        Q     Did you ever meet him in person at any    19:30:10

EXHIBIT F
AOE0252

Page 293

1              D. Galatt - Confidential
2      time?                                    19:30:11
3          A      Not to my knowledge.          19:30:13
4          Q      Did he ever attend any meetings to  19:30:14
5      discuss McDonald's investment in Allen Media  19:30:16
6      Group media properties?                  19:30:18
7          A      I don't remember.             19:30:22
8          Q      Attend any phone calls?       19:30:23
9          A      Not that I can recall.        19:30:25
10             MS. ANDREWS:  Why don't we take   19:30:40
11      five minutes.  I think I'm basically done.  19:30:40
12             MR. VIDEOGRAPHER:  Please standby.  19:30:43
13      The time is 7:30 p.m.  We are off the    19:30:44
14      record.                                  19:30:46
15             (Whereupon there was a brief      19:30:47
16      recess.)                                 19:30:49
17             MR. VIDEOGRAPHER:  The time is    19:40:52
18      7:40 p.m.  We are back on the record.  You  19:40:53
19      may proceed.                             19:40:57
20   BY MS. ANDREWS:                             19:40:57
21      Q     I just have a few more questions.  We  19:40:58
22   looked earlier today at the proposals that you  19:40:59
23   submitted on behalf of Entertainment Studios for  19:41:04
24   McDonald's investment; do you recall those?  19:41:09
25      A     Yes.                              19:41:11

Page 305

D. Galatt - Confidential

1

2    insulting that when you demanded a meeting from      19:54:03

3    Mr. Allen with him, that he did not agree to such    19:54:07

4    a meeting; is that correct?                          19:54:10

5         A    Can you repeat, please?                    19:54:14

6         Q    You assumed, that was your word, you       19:54:16

7    said, I assume that Mr. Kempczinski meets with       19:54:18

8    white-owned media companies based upon the size      19:54:21

9    of the company's advertising budget; right?          19:54:24

10        A    I said senior leadership, which is         19:54:28

11   inclusive of he and Ms. Flatley.                     19:54:29

12        Q    And you also said that you requested       19:54:32

13   or Allen Media Group requested that                  19:54:35

14   Mr. Kempczinski and Ms. Flatley have a meeting       19:54:38

15   with Mr. Allen and yourself; correct?               19:54:42

16        A    With Allen Media Group.                    19:54:46

17        Q    And that you were offended that that       19:54:48

18   request for a meeting was not accepted?              19:54:52

19        A    I assume if they want to be inclusive,     19:54:57

20   that they would actually sit down and speak about    19:54:59

21   it.                                                  19:55:02

22        Q    Well that's not what you said.  You        19:55:04

23   said you were offended because you assumed they      19:55:06

24   were meeting with white-owned media companies.       19:55:08

25        A    Yes.                                       19:55:11

Page 306

D. Galatt - Confidential

1

2      Q      But you have no direct knowledge of      19:55:12
3      that; correct?                                  19:55:13
4      A      No, I don't have direct knowledge of     19:55:16
5      that.                                           19:55:18
6      Q      Okay.  So based upon an assumption        19:55:19
7      that you've made, you determined that a refusal  19:55:21
8      for the CEO of a global company to sit down and  19:55:26
9      have a meeting regarding a million-dollar        19:55:30
10     investment at some point in time was             19:55:33
11     discriminatory because Mr. Allen is black; is    19:55:34
12     that your testimony?  I want to make sure I      19:55:37
13     understand what it is that you said.  Correct me 19:55:41
14     if I have any of that wrong.                     19:55:43
15     A      He has refused, you know, to give us      19:55:45
16     access to senior leadership.                     19:55:46
17     Q      Well you've reached out and you           19:55:49
18     haven't gotten a meeting; correct?               19:55:53
19     A      That is correct.                          19:55:56
20     Q      Ms. Flatley did offer to meet with Mr.    19:55:57
21     Allen in the spring of 2021, until this lawsuit  19:55:59
22     was filed; isn't that correct?                   19:56:02
23     A      I don't recall that.                       19:56:05
24     Q      Okay.  Well we could look at the          19:56:05
25     documents if you want to keep marking exhibits,  19:56:07

Page 307

1                    D. Galatt - Confidential

2   but I will represent to you that that's true.          19:56:09

3              You're not aware of that?                    19:56:13

4       A    I'm not aware of that at this moment           19:56:15

5   that she offered to meet.                               19:56:17

6       Q    And you were given meetings with              19:56:20

7   Alycia Mason; correct?                                  19:56:25

8       A    Yes, I think we had conversations.  I         19:56:28

9   don't remember meeting her.                             19:56:31

10      Q    And do you understand that she is the         19:56:32

11  senior person that oversees all U.S. media for         19:56:36

12  McDonald's?                                             19:56:39

13      A    I understand that.                             19:56:41

14      Q    That she is a decision-maker.  That           19:56:42

15  she has the ability to affect change, to use your     19:56:43

16  language; correct?                                      19:56:46

17      A    One would hope so.                             19:56:51

18      Q    So you sent your emails, and you were         19:56:52

19  given the opportunity to meet with the person          19:56:54

20  that has the ability to discuss things that you        19:56:56

21  wanted to discuss; correct?                             19:57:01

22      A    The ability to discuss and the ability        19:57:05

23  to include are different things.                        19:57:06

24      Q    Well you have to discuss first before         19:57:10

25  you can make a decision about including; correct?       19:57:12

EXHIBIT F

AOE0256

Page 308

1                    D. Galatt - Confidential

2      **A       Well we did discuss things.   We did**        19:57:14

3   **have exposure, and so -- it wasn't fruitful.**      19:57:16

4      Q       Well there were investments made;        19:57:23

5   right?   McDonald's is currently investing in the     19:57:24

6   digital properties.   We looked at those             19:57:27

7   documents.   Since 2020, they've been investing.     19:57:28

8   And prior to 2019, they regularly invested.          19:57:29

9            There was just a blip in 2019, where        19:57:33

10   there was no advertising in syndication; correct?    19:57:35

11      A       I think after this campaign started,     19:57:38

12   they decided at that point that they were going      19:57:40

13   to invest and did so in what I'll call a minimal     19:57:43

14   amount to stay under the radar, as far as I can      19:57:47

15   tell.                                                19:57:50

16      Q       Well the whole campaign was to get       19:57:51

17   companies to invest, right, wasn't that the goal?    19:57:54

18      A       The goal was to get people to get an     19:57:56

19   equitable relationship with black-owned media,       19:57:59

20   and in those minimal amounts, that's not             19:58:00

21   equitable.                                           19:58:04

22      Q       Oh, I see.   So it wasn't enough money.   19:58:04

23   That's the problem?                                  19:58:06

24            MR. SCHECTER:   Objection,                  19:58:08

25      argumentative.   Answer.                          19:58:08

EXHIBIT F

AOE0257

Page 314

D. Galatt - Confidential

2    African-American demos for black sitcoms that          20:03:03

3    weren't black owned, but they were black targeted       20:03:07

4    from white-owned companies.                             20:03:09

5         Q     Right.  But that buy goes through            20:03:16

6    Burrell; you understand that; right?  I'm sorry.        20:03:18

7    It goes through OMD, not Burrell; right?                20:03:19

8         A     Yes.                                         20:03:20

9         Q     Those are separate pools; right?             20:03:22

10        A     Yes.  OMD, precisely the folks that          20:03:23

11   we've always asked to be contracted with.               20:03:26

12        Q     Well you have contracted through OMD         20:03:28

13   and you've met with them.  We've looked at those        20:03:30

14   documents; right?                                       20:03:32

15        A     We met with them, but for years in          20:03:33

16   syndication, in every single year when we               20:03:36

17   presented in the upfront, we would ask OMD to be        20:03:38

18   considered out of their actual -- their                 20:03:41

19   significant pool of money not to be relegated to        20:03:44

20   Burrell, where there was very few dollars.              20:03:48

21        Q     But if OMD evaluated your properties         20:03:51

22   against the screening criteria that they were           20:03:54

23   using and they didn't meet the threshold, then          20:03:56

24   you would have been considered.  You just didn't        20:03:59

25   meet the cutoff; right?                                 20:04:01

EXHIBIT F
AOE0258

Page 335

1            D. Galatt - Confidential

2          C E R T I F I C A T I O N

3            I, Randi Friedman, Registered

4    Professional Reporter and Notary Public of the

5    State of New York, do hereby certify:

6        THAT, the witness whose testimony is herein

7    before set forth, was duly sworn by me, and

8    THAT, the within transcript is a true record of

9    the testimony given by said witness.

10       I further certify that I am not related

11   either by blood or marriage to any of the parties

12   to this action; and that I am in no way

13   interested in the outcome of this matter.

14       IN WITNESS WHEREOF, I have hereunto set my

15   hand this day, October 11, 2022.

16

17

18   *Randi C. Friedman*

19   Randi Friedman, RPR

20

21

22

23

24

25   *      *      *      *      *      *      *      *      *

# EXHIBIT G

EXHIBIT G
AOE0260

CONFIDENTIAL

Page 1

```
 1
 2              UNITED STATES DISTRICT COURT
      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
 3            Case No. 2:21-cv-04972-FMO-MAA
 4   - - - - - - - - - - - - - - - - - -x
      ENTERTAINMENT STUDIOS NETWORKS,     :
 5   INC., a California corporation;      :
      WEATHER GROUP, LLC, a Delaware      :
 6   limited liability company,          :
                                         :
 7                        Plaintiffs,    :
                                         :
 8            - vs -                     :
                                         :
 9   McDONALD'S USA, LLC, a Delaware     :
      limited liability company,         :
10                                       :
                         Defendant.      :
11   - - - - - - - - - - - - - - - - - -x
12
                              October 4, 2022
13                            9:09 a.m.
                              1285 6th Avenue
14                            New York, NY
15
16
17             ***CONFIDENTIAL***
18
19
20           VIDEOTAPED DEPOSITION UPON ORAL
21   EXAMINATION OF BARBARA BEKKEDAHL, held at the
22   above-mentioned time and place, before Randi
23   Friedman, a Registered Professional Reporter,
24   within and for the State of New York.
25
```

EXHIBIT G
AOE0261

CONFIDENTIAL

```
                                                    Page 2

   1               B. Bekkedahl - Confidential
   2      APPEARANCES:
   3               MILLER BARONDESS, LLP
                   Attorneys for Plaintiffs
   4
                   1999 Avenue of the Stars, Suite 1000
   5               Los Angeles, California 90067
   6               BY:  DAVID W. SCHECTER, ESQ.
   7
   8               RILEY SAFER HOLMES & CANCILA, LLP
                   Attorneys for Defendant
   9
                   100 Spectrum Drive, Suite 400
  10               Irvine, California 92618
  11               BY:  MATTHEW KENNISON
                        AMY ANDREWS, ESQ.
  12
  13
                   PAUL WEISS RIFKIND
  14               WHARTON & GARRISON, LLP
                   Attorneys for Defendant
  15
                   1285 Avenue of the Americas
  16               New York, New York 10019
  17               BY:  KERISSA N. BARRON, ESQ.
  18                        * * *
  19
  20      ALSO PRESENT:
                   Paul Baker - Videographer
  21
                            * * *
  22
  23
  24
  25      (Appearances continued.)
```

EXHIBIT G
AOE0262

CONFIDENTIAL

Page 3

1              B. Bekkedahl - Confidential

2    (Appearances continued.)

3    PRESENT REMOTELY:

4              Byron Allen

               Monica Mosby

5              Mark Devitre

               Jeff Mayes

6              Robert Foley

               Terrence Hill

7              Susie Kim

               Janice Arouh

8              Eric Gould

               Tom O'Brien

9              Darren Galatt

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT G
AOE0263

CONFIDENTIAL

Page 34

1              B. Bekkedahl - Confidential

2        Q     Through 34, thank you.

3              And then I think you mentioned

4    efficiencies.  Is that -- that's another way,

5    essentially, of talking about pricing; correct?

6        A     Yes.

7        Q     And it's also about loosely getting

8    the best bang for your buck, reaching the most

9    number of eyeballs in your target demographic for

10   the least amount of money spend?

11       A     Correct.

12       Q     Okay.  And so you worked at Weather

13   Group prior to Byron Allen's company acquiring it

14   in 2018; correct?

15       A     Yes.

16       Q     For about two years?

17       A     Yep.

18       Q     Who owned it before Byron Allen's

19   company purchased it?

20       A     It was two investment companies.  I

21   think it's Blackstone and one other, and then NBC

22   Universal owned a piece.

23       Q     Was the other one Bain Capital?

24       A     Yeah.

25       Q     And none of those entities,

EXHIBIT G
AOE0264

CONFIDENTIAL

Page 35

1              B. Bekkedahl - Confidential

2      Blackstone, Bain or Comcast, NBC Universal, are

3      Black-owned, are they?

4          A       No.

5          Q       They weren't then and they aren't now;

6      right?

7          A       No.

8          Q       So it's fair to say that The Weather

9      Channel and the Weather Group were not

10     Black-owned until Byron Allen purchased them in

11     March of 2018; correct?

12         A       Correct.

13         Q       Prior to 2018, McDonald's was not a

14     media partner with The Weather Channel; correct?

15         A       Correct.

16         Q       All right.  I'm going to -- give me

17     one second.  I'm going to hand you what's been

18     previously marked as Dx 5.

19               Do you recognize that document?

20         A       Yep.  I see it.

21         Q       This is an email from you to

22     Mr. Galatt and Melissa Squaires.  Did I say that

23     right?

24         A       Squaires.

25         Q       Squaires.  Who is Melissa Squaires?

EXHIBIT G
AOE0265

CONFIDENTIAL

Page 36

B. Bekkedahl - Confidential

1

2      A      She runs our pricing and planning, and

3  she is the person who basically handles all sorts

4  of financial and ad spend documentation.  Also

5  oversees the system that houses it, so...

6      Q      Just for the record, this is an email

7  from you to Ms. Squaires and Mr. Galatt on

8  May 7th, 2021, with a Bates number, and so you

9  know what I'm referring to as a Bates number is

10  the bottom right corner.  See the little --

11      A      Oh, okay.

12      Q      I'll be referring to that throughout

13  today as the Bates number or page number.

14      A      Okay.

15      Q      The Bates number is ESN0029493.

16              Do you know why on May 7th, 2021 you

17  were sending an email to Mr. Galatt and

18  Ms. Squaires that The Weather Channel has no

19  spending for McDonald's in the recent 10-year

20  past?

21      A      I was sending it to Darren, so while I

22  don't recall exactly why, I know he requested

23  this information.  And Melissa is copied because

24  she probably supplied me with that information.

25  So I put her on it just to, again, get the

EXHIBIT G
AOE0266

Page 37

1          B. Bekkedahl - Confidential

2    confirmation that, you know, she provided it.

3        Q     Do you know why Mr. Galatt requested

4    this information from you?

5        A     Not specifically, no.

6        Q     Wasn't it because you were getting

7    ready to sue McDonald's?

8        A     So at the time we were tracking a lot

9    of advertisers' spend, so I didn't know per se

10   that this was the purpose of that.

11       Q     Well, did you know on May 7, 2021 that

12   you were going to sue McDonald's 13 days later?

13              MR. SCHECTER:  Objection.

14       Attorney-client privilege.

15              Don't disclose anything you may

16       have heard from lawyers, but you can answer

17       the question.  Without disclosing attorney

18       communications, you can answer.

19              THE WITNESS:  I had heard there

20       was a potential, but I did not and I was not

21       involved in putting forth the suit or have

22       anything to do with that decision, so I

23       really didn't have knowledge of it.

24   BY MR. KENNISON:

25       Q     Okay.  But you have no reason to doubt

CONFIDENTIAL

Page 38

1              B. Bekkedahl - Confidential

2    the accuracy of what this email is saying here,

3    which is that The Weather Channel has no spending

4    for McDonald's from 2021 going all the way back

5    to 2011; correct?

6        A    Yeah.  We did have a systems change in

7    there, so some of our, you know, dollar pulling

8    isn't always 100 percent.  I worked here since

9    2016, and we didn't have anything.  So, yeah,

10   it's true.  I'm sure it's true.

11       Q    So that would include the year right

12   before, as well, that Byron Allen purchased The

13   Weather Channel; correct?  2017 there was no

14   spend for McDonald's?

15       A    No.

16       Q    But it wasn't for lack of trying;

17   right?  You did pitch --

18       A    Yes.

19       Q    -- to get McDonald's business;

20   correct?

21       A    Yes.

22       Q    And you did it every year; isn't that

23   right?

24       A    Yeah.  So the sales team under -- when

25   I started running the team, we would

EXHIBIT G
AOE0268

CONFIDENTIAL

Page 39

1                 B. Bekkedahl - Confidential

2    comprehensively pitch every major advertiser

3    twice a year with a comprehensive pitch,

4    providing all the value sales points, any updates

5    on programming, any new products.   And the

6    McDonald's team at OMD consistently set those

7    meetings up with us and reviewed that

8    information.

9         Q     I'm going to hand you what we're going

10   to make mark as 51.

11                   (Exhibit Dx 51 was marked.)

12                Go ahead and take a look at that

13   really quickly and then I'll ask you some

14   questions about it.

15                Are you ready?

16        A     I don't see McDonald's, so, no.

17        Q     Well, I'll point it out to you.

18        A     Okay, fine.

19        Q     The cover email is, for the record,

20   Bates numbered ESN0018661.  And it's an email

21   dated February 10th, 2016 from

22   barbara.bekkedahl.contractor@.

23   testweathergroup.net.  You see that?

24        A     Uh-huh.

25        Q     So that was you and you were still a

CONFIDENTIAL

Page 40

1          B. Bekkedahl - Confidential

2    contractor at that point; right?

3          A     Correct.

4          Q     Okay.  And you're sending this to

5    Laura Zasada, Megan Genetos.

6                Who are those folks?

7          A     At the time those were the two

8    salespeople who worked in the Chicago office.

9          Q     And did they have responsibility for

10   calling on McDonald's?

11         A     Well, they covered the McDonald's

12   client, and the agency was covered in New York by

13   a New York salesperson.

14         Q     Who was the agency in New York?

15         A     OMD.

16         Q     So you pitched to -- I'm sorry, you

17   pitched for McDonald's business through OMD at

18   this time; correct?

19         A     Correct.  But I only see McDonald's

20   under the last page.  Am I missing something?

21         Q     If you go down to the second to the

22   last page, it starts with "The Weather Channel TV

23   team - Chicago"; you see that?

24         A     Uh-huh.

25         Q     It says, "Meeting plans for first half

EXHIBIT G
AOE0270

CONFIDENTIAL

Page 43

1              B. Bekkedahl - Confidential

2      Chicago actually got to the client.  But it was

3      certainly on this list where we're outlining

4      where we want to meet with people.

5          Q      So you have no reason to doubt that

6      the meeting actually did occur, you just have no

7      way to verify it; is that fair?

8          A      For the agency, but not for the

9      client.  I would say the propensity would be we

10     didn't get the client meeting.

11         Q      Okay.  But you did pitch it to the

12     agency?

13         A      Correct.  That's what I would say.

14         Q      And the result of that was that

15     McDonald's did not invest in the Weather Group in

16     2016; correct?

17         A      Correct.

18         Q      Okay.  So was the reason that

19     McDonald's didn't purchase advertising from The

20     Weather Channel prior to 2018 because their

21     target demographic was younger than what The

22     Weather Channel could deliver?

23                MR. SCHECTER:  Objection.  Calls

24         for speculation.

25                You can answer.

EXHIBIT G

AOE0271

Page 48

1              B. Bekkedahl - Confidential

2        Q     If you go down to McDonald's, which is

3   about two-thirds of the way down, scrolling

4   across, there are zeroes all the way across

5   the --

6        A     Right.

7        Q     And so if I'm reading that right, the

8   goal for McDonald's advertising for the 2017 time

9   period talked about here was zero dollars?

10       A     That was the goal set for their comp

11  plan, yes, because the goal isn't what we want.

12  It's what we think is likely to happen or within

13  the capabilities of happening.  And we didn't

14  have a lot of confidence in McDonald's after

15  years of not getting any contract.

16       Q     Well, the reason that you didn't have

17  McDonald's on the goals here is because you

18  couldn't meet their specific media objectives;

19  correct?

20       A     No.  Again, I don't know that -- I

21  don't believe that's true, but based on their

22  inability or lack of commitment to buy us, I

23  certainly didn't want to put a goal against it

24  for an account exec.

25       Q     But you -- it's true, is it not, that

EXHIBIT G

AOE0272

CONFIDENTIAL

Page 51

```
 1              B. Bekkedahl - Confidential
 2                   MR. SCHECTER:  Objection.  Calls
 3        for speculation, incomplete hypothetical.
 4                   You can answer.
 5                   THE WITNESS:  So can you repeat
 6        the question?
 7  BY MR. KENNISON:
 8        Q    Maybe I can ask it a little
 9  differently.
10              If a advertiser says, "I want to reach
11  adults between the age of 18 and 49," and the
12  media partner says, "Well, we can't deliver on
13  that demographic exactly the way that you want,"
14  wouldn't that be a reason that the advertiser
15  would not invest with that media partner?
16                   MR. SCHECTER:  Same objections.
17                   You can answer.
18                   THE WITNESS:  They may do that,
19        but certainly there's so many attributes
20        that go into a media selection, and target
21        demographic may be one of them, depending on
22        what that marketer is looking to do.
23                   So, again, there's a myriad of
24        different resources that they look at and
25        marketing objectives each year.  So we're
```

EXHIBIT G
AOE0273

CONFIDENTIAL

Page 58

1              B. Bekkedahl - Confidential

2    BY MR. KENNISON:

3        Q     Which included all of Weather Group's

4    properties; right?

5        A     Right.

6        Q     Which includes Local Now and The

7    Weather Channel; correct?

8        A     Yes, at this time.

9        Q     Okay.  And we talked a little bit

10   earlier about a particular audience, and I think

11   you used the term "reach" or "broad reach."

12   Remember that testimony?

13       A     Yeah.

14       Q     And then reach is measured by most

15   typically Nielsen ratings; correct?

16       A     Yeah.

17       Q     And that's a factor that advertisers

18   look at when they're deciding whether or not to

19   invest with a media partner?

20       A     It's one of the factors they look at.

21   Again, depending on their strategy for that year

22   or what works for their category.

23       Q     And some advertisers won't make

24   investments with media partners if their

25   offerings are not rated or are lower rated than

Page 59

1              B. Bekkedahl - Confidential

2     others; correct?

3          A     If that happens to be one of their

4     objectives, sure, but as we mentioned, a company

5     like Rolex doesn't care about reach because they

6     don't want to waste a lot of money advertising to

7     people who have no money.  So they'll be looking

8     for very targeted, but in this case not large

9     audiences.

10         Q     Right.  But some advertisers, in fact

11    most advertisers, do care about reach; correct?

12         A     I can't tell you that for certain

13    because "most" is a lot.

14         Q     Well, it's not unusual for a national

15    advertiser to care about reach when deciding

16    whether or not to invest with a media company, is

17    it?

18         A     It could certainly be a criteria.

19         Q     Okay.

20              MR. KENNISON:  You know, why don't

21        we take five, David, right now.  We're about

22        an hour.  This is a good time to break.

23              MR. VIDEOGRAPHER:  Please stand

24        by.  The time is 10:13 a.m.  We are off the

25        record.

EXHIBIT G
AOE0275

CONFIDENTIAL

Page 70

1                    B. Bekkedahl - Confidential

2      and by attaching this file to Mr. Allen, is that

3      the ratings continue to decline at The Weather

4      Channel; is that right?   That's what she says?

5           A      I don't know why you need me to

6      confirm that, because it's right here, yes.

7           Q      So the answer is yes?

8                  And it's true, isn't it, that the

9      ratings at The Weather Channel were declining at

10     this time; wasn't it?

11          A      Not based on this information, but in

12     my recollection, yes, they were declining.

13          Q      And in fact, they've continued to

14     decline throughout 2021; isn't that right?

15          A      Correct.

16          Q      And so if -- this is 55.

17                 (Exhibit Dx 55 was marked.)

18                 This is Exhibit Dx 55, Bates No.

19     ESN001822, has a similar attachment as the

20     previous exhibit.   This is, I will represent,

21     again the comp nets tab of the attached native

22     Excel spreadsheet.

23                 So this is an email on June 1st, 2021,

24     from Reekha Gupta; is that right?

25          A      Yeah.

EXHIBIT G

AOE0276

CONFIDENTIAL

Page 89

1            B. Bekkedahl - Confidential

2       Q      And if there are high ADU's is that a

3    red flag, potentially, for an advertiser?

4       A      "High" is such a relative word.

5       Q      Let me ask it this way:  If the level

6    of ADU's for Media Company A is, you know, let's

7    say -- I'm going to use a made-up number -- ten,

8    and ADU's for Media Company B is 20, and they're

9    all otherwise materially the same, is Media

10   Company A more attractive to the advertiser than

11   Media Company B?

12      A      For that deal, yes.

13      Q      Then going back down to this email --

14   this is on Bates No. 18827 -- you say, "We can

15   consider ES studio money like a hurricane.  Nice

16   when it happens if no one dies, but not something

17   we count on"; see that?

18      A      Yes.

19      Q      What did you mean by that?

20      A      I guess I was just being funny.

21             So the syndication marketplace is

22   different than the cable marketplace and there's

23   just generally fewer advertisers participating in

24   scatter in syndication versus cable.  So it's

25   more of a, you know, unpredictable thing.  And we

CONFIDENTIAL

Page 97

```
 1              B. Bekkedahl - Confidential
 2        A     Yeah.
 3        Q     So what -- is that saying there that
 4   this tool, the TV Essentials data, is providing
 5   this information that TWC has a low index with
 6   McDonald's in the restaurant category?
 7        A     Yes.
 8        Q     This was communicated to potential
 9   advertisers in the fall presentation materials?
10        A     No.
11        Q     This was just something that was
12   reported internally?
13        A     Correct.
14        Q     So it wasn't communicated to
15   McDonald's?
16        A     No.
17        Q     Because if it was communicated to
18   McDonald's, that would be another reason not to
19   invest with The Weather Channel; correct?
20              MR. SCHECTER:  Objection.
21        Argumentative.  Calls for speculation.
22        Incomplete hypothetical.
23              But you can answer.
24              THE WITNESS:  Yes, it would not be
25        a good sales point.
```

Page 101

1                  B. Bekkedahl - Confidential

2          last question.  I want the question that I

3          just asked.

4    BY MR. KENNISON:

5          Q     You took the notes for your own

6    benefit; is that right?

7          A     I don't know what you mean.  My own

8    personal benefit or so that I can provide a

9    deposition that's helpful for the Weather Group

10   and so they can be well represented here?

11         Q     The latter.

12         A     Yes.

13         Q     Okay, thank you.  That's fine.

14                  MR. KENNISON:  We can go off the

15         record.

16                  MR. VIDEOGRAPHER:  Please stand

17         by.  The time is 11:16 a.m.  We are off the

18         record.

19                  (Whereupon there was a brief

20         recess.)

21                  MR. VIDEOGRAPHER:  The time is

22         11:38 a.m.  We are back on the record.

23                  You may proceed.

24   BY MR. KENNISON:

25         Q     What is the Black-owned media or BOM

EXHIBIT G
AOE0279

Page 102

1              B. Bekkedahl - Confidential

2    initiative?

3        A     It's an initiative that Byron

4    essentially created after the death of George

5    Floyd.  It's something he has put forth in the

6    marketplace for many years, but it sort of became

7    a label, Black-owned media, because he went to

8    the heads of all the different marketers and

9    agencies and talked about his experience as a

10   Black media owner.  He spoke about his journey.

11   He spoke about the importance of investing in

12   Black-owned media companies.  And through a

13   variety of strategies he was able to influence

14   the marketplace effectively to improve on the

15   media spend across the Black-owned media

16   landscape.

17        Q     So Mr. Allen conceived of it; correct?

18        A     He is the leader in -- not by any

19   formal designation, but he's joined by other

20   Black owners of media companies in this

21   initiative.

22        Q     Like whom?

23        A     Like Butch Graves.  I don't know all

24   the names, but they own other companies.

25        Q     Do any of them own any other media

CONFIDENTIAL

Page 103

1                    B. Bekkedahl - Confidential

2    companies?

3         A      Yes.  Yes.

4         Q      Which ones?

5         A      Black Enterprise.  Revolt.  I think

6    Ebony.

7         Q      Any others?

8         A      There are, but I just don't recall

9    them all.

10        Q      To your knowledge, does Mr. Allen meet

11   with these groups to discuss the Black-owned

12   media initiative?

13        A      Not to my knowledge.  I don't know --

14   he communicates, I'm sure, but I don't know for

15   sure.

16        Q      So the Black-owned media initiative is

17   an Allen Media Group initiative; correct?

18                    MR. SCHECTER:  Objection.

19        Misstates testimony.

20                    Answer.  You can answer.

21                    THE WITNESS:  Again, it's inspired

22        and driven by Byron, and Byron is the CEO,

23        founder and owner of Allen Media Group.

24   BY MR. KENNISON:

25        Q      And you mentioned that it kind of --

CONFIDENTIAL

Page 104

1        B. Bekkedahl - Confidential

2  the genesis was George Floyd's murder; correct?

3        A      Yeah.  Again, it was something that is

4  consistent with his beliefs and his efforts over

5  many years prior to him even buying The Weather

6  Channel.  But I do believe that the death of

7  George Floyd was a significant milestone in

8  focusing his energies and attention on this issue

9  that, after so many years, was still lacking.

10       Q      And who participated in the

11 Black-owned media initiative from Allen Media

12 Group companies?

13       A      So I was part of the team that met

14 with a lot of advertisers over the course of --

15 we're still doing it -- many years.  Darren

16 Galatt as well as Cindy Kelly.  And then we were

17 joined by other executives who joined our

18 company, so there's been many faces and many

19 people on the executive team involved.

20       Q      Okay.  Notwithstanding lots of other

21 folks involved, the core would be Mr. Allen; when

22 she was here, Ms. Kelly; you and Darren Galatt;

23 is that right?

24       A      I would say those -- especially in the

25 early year or two, those were the core.

EXHIBIT G
AOE0282

Page 123

1                    B. Bekkedahl - Confidential

2              How was this list of advertisers to be

3      covered by the BOM initiative determined?

4         A     So this is just a snapshot in time.

5      So as of November 5th, okay, these were a current

6      set of advertisers where we had had meetings,

7      where we were aiming to get meetings.  You know,

8      obviously, they're listing all the holding

9      companies, so at this point we had touched base

10     with all of the holding companies, listing those

11     individuals.  So this -- the intent of this email

12     was just to give Amy a heads-up so that she knew

13     that these meetings were taking place.  Her team

14     worked day to day on a lot of this business and

15     so it was just good for her to have that

16     heads-up.

17        Q     And what was coming out of these

18     meetings with these particular clients was to ask

19     these clients to spend more money with Allen

20     Media Group's properties; right?

21        A     One of the goals of the meeting was to

22     engage with the client on a proposal as to how

23     they could, you know, spend more on our

24     properties, learn more about the portfolio,

25     invest across the spectrum of Allen Media Group

EXHIBIT G
AOE0283

Page 124

1                B. Bekkedahl - Confidential

2     properties, which, as you know, was also

3     continuing to grow.  So that was one of the

4     outcomes of the meetings.

5         Q    Okay.  So this is kind of a snapshot

6     in time, you said, of what's happening in early

7     November 2020; correct?

8         A    Yes.

9         Q    And there are ongoing meetings with

10    those agency holding groups and -- about those

11    clients; correct?

12        A    Right.  But if you took the same

13    snapshot a month later, there would be another

14    set of advertisers on that list.

15        Q    Okay.  So the BOM initiative continued

16    from the fall of 2020 and into 2021; right?

17        A    Absolutely.

18        Q    Okay.  This will be 62.

19             (Exhibit Dx 62 was marked.)

20             This is an email from you to Tina

21    Gambelli, and cc'ing several others, on

22    January 11, 2021, bearing Bates -- beginning

23    Bates No. ESN0028188.

24             Do you recognize this email?

25        A    I don't recognize emails from 2021,

EXHIBIT G
AOE0284

CONFIDENTIAL

Page 126

1              B. Bekkedahl - Confidential

2      OMD to give them just a quick update on that

3      meeting.

4          Q      And then it says, "Update them on some

5      of the action plans of other holding companies."

6      Then it goes on.   It says, "Raise the volume on

7      their almost complete lack of investment with ES

8      - for syndication it's Pepsi and a tiny bit of

9      PHD's SCJ and I think cable is $0."

10                 You see that?

11         A      Yeah.

12         Q      So by raising the volume on their

13     almost complete lack of investment, who is the

14     "their" that you're referring to?

15         A      The agency holding company, OMD, PHD.

16         Q      And it's not their investment; right?

17     It's their clients; is that what you're meaning?

18         A      Yeah.

19         Q      So when you say "raise the volume,"

20     how are you going to do that?

21         A      Well, this is referencing a senior

22     executive presentation that Susan Irving set up

23     for our team which was all the top people at that

24     agency.   And just to raise the volume means to

25     say, you don't spend anything on or barely

CONFIDENTIAL

Page 127

1        B. Bekkedahl - Confidential

2    anything on the Entertainment Studios properties.

3    That would be represented at that time.

4        Q    Now we've gone from the -- kind of the

5    fall of 2020 time period, where meetings were

6    starting to get on calendar and being had, to now

7    January of 2021, where the Black-owned media

8    initiative is ratcheting up in intensity or

9    volume, as you put it here?

10       A    I think it was -- from my perspective,

11   it was already ratcheted in September, so this

12   has been, you know, a full-on initiative and it

13   continues today.

14       Q    Okay.  And so this involved or

15   included -- the raising the volume included

16   Mr. Allen personally calling out Eli Lilly

17   publicly; correct?

18       A    I don't recall that.

19       Q    Did it involve Mr. Allen or AMG

20   publicly calling out Eli Lilly or Pepsi for not

21   spending enough on Black-owned media?

22       A    I don't recall that.

23       Q    But he, Mr. Allen, would do those

24   kinds of things, correct, publicly -- through his

25   webinars and otherwise, publicly call out

CONFIDENTIAL

Page 128

1              B. Bekkedahl - Confidential

2      particular advertisers?

3          A      Yes.

4          Q      In fact, that was part of the

5      Black-owned media initiative plan; correct?

6          A      There is no written plan.  This is

7      what Byron did, and as part of his speech in the

8      webinars.

9          Q      This was just a regular practice of

10     what he did; correct?

11         A      Well, I mean, I don't know what you

12     mean by regular, because there have been maybe

13     six in total, and I don't know that he even

14     called someone out at each one, but perhaps he

15     did.

16         Q      Okay.

17                (Exhibit Dx 63 was marked.)

18                And this is kind of a meatier

19     document, so let me know when you've had a chance

20     to look at it.

21         A      Okay.

22         Q      All right.  The cover email for this

23     exhibit is a January 21, 2021 email from you to

24     Amy Muhlstock bearing Bates No. ESN0017961.

25         A      Looks like I forgot to copy Darren.

CONFIDENTIAL

Page 136

1              B. Bekkedahl - Confidential

2       A       There was no reference in this

3    document that implied that we were supposed to

4    tap into that.

5       Q       Sure.  I appreciate that.

6       A       Okay.

7       Q       I was asking that Mr. Allen did in

8    fact reference this litigation with the cable

9    companies in his meetings with agency holding

10   groups in the fall of 2020 and in the winter of

11   2021, did he not?

12      A       Many of the talks that he had did

13   reference it.

14      Q       And going down to starting at Bates

15   Page 17966, it starts going over what I believe

16   are specific accounts and AEs.  Do I have that

17   right?

18      A       Right.

19      Q       So the first one there is Jim

20   accounts, 230 million in annual spending.  And

21   then it lists in that box particular clients that

22   Jim handles; correct?

23      A       Yes.

24      Q       Who is Jim?

25      A       He's a salesperson.

EXHIBIT G
AOE0288

CONFIDENTIAL

Page 148

1              B. Bekkedahl - Confidential

2       A      At this time there were also other

3  properties, but it seems for the focus of this

4  game plan it did not include digital assets, like

5  TheGrio.

6       Q      Right.  And the Local Now properties

7  is digital; correct?

8       A      It is, and customarily it would have

9  been folded into this.  I'm not recalling exactly

10  why it wasn't, so --

11      Q      Okay.

12      A      I just don't recall.

13      Q      But it would be folded into this

14  because Local Now is really -- falls under The

15  Weather Channel or the Weather Group property?

16      A      Yes.

17      Q      So going down to 28226, this says,

18  "Weather Group ad sales.  Lean into BOM

19  initiative."  See that?

20      A      Yeah.

21      Q      Then it says, "Black-owned media

22  initiative, ongoing Cynopsis webinars.  Specific

23  action plans with each holding company agency.

24  Periodic check-ins and report to Byron.  Track

25  revenue success for TWC and all Allen media.  Arm

EXHIBIT G
AOE0289

Page 149

1             B. Bekkedahl - Confidential

2    sellers with specific communication points.

3    Diversity and inclusion imperative.  2 percent

4    allocation.  Specific client targets."

5             Do you see that?

6        A    Yeah.

7        Q    That pretty much sums up the BOM

8    strategy, doesn't it?

9        A    Yeah.  At that point I would say that

10   was kind of the snapshot of what kind of activity

11   we were engaging in.

12       Q    And then kind of the end goal there is

13   that bullet that says, "Track revenue success for

14   The Weather Channel and all Allen media";

15   correct?

16       A    Right.  So we worked as a team.  I

17   oversee The Weather Channel, but, you know, we're

18   looking for successes across the portfolio.  It's

19   not just limited to reporting how we're doing on

20   The Weather Channel, but how we're doing across

21   the portfolio.

22       Q    And so you were tracking revenue

23   success across the whole portfolio for AMG.  Were

24   you also tracking revenue success across all

25   Black-owned media?

EXHIBIT G

AOE0290

Page 192

1                 B. Bekkedahl - Confidential

2        A      So the Black-owned media initiative

3    was, you know, really spearheaded by Byron, and

4    we would do the webinars, we did the letters.  We

5    had a slide in our deck, which was a slide, but

6    the sales team on the street, their job was

7    building the value and the demand for the various

8    pieces in the portfolio.  Of course, everyone was

9    aware of this initiative and we did point out,

10   you know, that Byron had this initiative and what

11   the purpose was in our decks, but they weren't

12   the ones that were communicating that message.

13   That was really a role that Byron played to,

14   again, make it authentic.  You know, this was his

15   experience and his mission to improve economic

16   inclusion in the media supply chain.

17       Q      So it indicates here that there may be

18   calls needed that Byron would have to do?

19       A      Correct.  So the salespeople could set

20   up those meetings.

21       Q      But Byron wouldn't always make those

22   calls.  Sometimes he would if it was needed;

23   right?  Isn't that what this is saying?

24       A      What do you mean?

25       Q      Sometimes there were calls that Byron

CONFIDENTIAL

Page 193

1              B. Bekkedahl - Confidential

2    didn't need to be on?

3         A     No.  It's more that at this point in

4    the upfront we're looking to make sure that

5    certain clients are getting a meeting with Byron,

6    because if, for example, we might not need one

7    with the client if they're spending is healthy

8    and their partnership is on strong footing.  But

9    if they're not, that might be a good place for

10   Byron to meet with the client.

11        Q     That's exactly what I'm trying to get

12   at.  If somebody is not responding to the

13   Black-owned media initiative in a way that you

14   think they should be, Byron would give them a

15   call personally; isn't at that right?

16        A     A call would be set up to call to the

17   CMO about Black-owned media.

18        Q     By Byron Allen?

19        A     Yes.

20        Q     And he would do that so that you

21   could -- he could dial you up more dollars;

22   right?

23        A     Again, I would say this is a phrase

24   that was just a bit in the throes of the upfront,

25   so, yeah.

CONFIDENTIAL

Page 213

1              B. Bekkedahl - Confidential

2     emails?  You were on a few of them with Adele

3     Lassere at Burrell?

4        A     I was thinking of another RFP.  Okay,

5     so perhaps Cindy went to this then.

6        Q     Do you remember -- you see the deck is

7     at the end of that email chain there, right,

8     starting at Bates No. ESN0012246?

9        A     Uh-huh.

10       Q     Do you remember collaborating with

11    your other ad sales team colleagues and creating

12    this deck?

13       A     So I don't recall this one

14    specifically, but this was one that we had in the

15    marketplace that tied all of our properties

16    together, and was -- is somewhat a way to kind of

17    push forward the whole portfolio and a

18    sponsorship opportunity.

19       Q     Okay.

20              (Exhibit Dx 80 was marked.)

21              I'm handing you Dx 80.  This is a

22    Monday, January 18, 2021 email from Darren Galatt

23    to Cindy Kelly and cc'ing you and Amy Muhlstock.

24    The beginning Bates number there is ESN0025860.

25       A     Uh-huh.

EXHIBIT G
AOE0293

CONFIDENTIAL

Page 220

1              B. Bekkedahl - Confidential

2       Q       Does that indicate it's McDonald's

3    requested demographic, persons 18 through 49?

4       A       That's what the -- the demo is what

5    they are doing their buying off of.  And we

6    requested 25 to 54.

7       Q       And why did you do that?

8       A       Again, it's kind of more in our sweet

9    spot, so we tend to deliver deals better.

10      Q       So you tend to deliver deals better

11   there.  So you asked for a demo shift; correct?

12      A       For the guarantee.

13      Q       And is that because you couldn't

14   guarantee that P18 through 49?

15      A       At this time we still did accept

16   adults 18 to 49 guarantees.

17      Q       But you didn't ask for it here;

18   correct?  You didn't agree to it here?

19      A       Right.  You'll see that's a request.

20      Q       Right.  Okay.  And then your dollars

21   for 2021 were zero but you asked for a million

22   dollars in 2022; correct?

23      A       '21-'22, yes.

24      Q       '21-22 ask on a P25-54 demo?

25      A       Correct.  For The Weather Channel.

CONFIDENTIAL

Page 226

1            B. Bekkedahl - Confidential

2        Ms. Andrews.  Maybe one day you can testify

3        in on your side.

4   BY MR. KENNISON:

5        Q       Going back to the email, it says,

6   "Looking to buy with networks with a 60 MM plus

7   HH minimum."

8        A       Correct.

9        Q       What does that mean?

10       A       So they're establishing that they need

11  cable networks.  They're in 60 million

12  households, which certainly qualifies The Weather

13  Channel for.

14       Q       It doesn't qualify the ESN Lifestyle

15  networks, does it?

16       A       It doesn't, but this is more things

17  they put out there to define what they're looking

18  for, but they don't always match what they

19  actually purchase.

20       Q       Then it says, "P18 through 49.

21  Purchase based on an attribution model and

22  measurement studies."

23            Do you have an understanding of what

24  that means?

25       A       So they are giving you -- giving us

CONFIDENTIAL

Page 228

```
1              B. Bekkedahl - Confidential

2    frustrating.

3         Q     I guess what I'm asking is something

4    that you mentioned just there a moment ago is

5    that this -- this, like, frustration you are

6    experiencing with McDonald's and their agency

7    teams was something that predated Byron Allen

8    purchasing The Weather Channel, and it was

9    something you had hoped would stop when he

10   purchased The Weather Channel; is that right?

11        A     I didn't purposefully think it would

12   cure all.  But I thought there would be a bit

13   more attention paid to the value of The Weather

14   Channel.

15        Q     But it was just business as usual for

16   McDonald's and OMD after Byron Allen purchased

17   the --

18        A     If you're talking about excluding us,

19   yes.

20        Q     So they excluded you before and they

21   excluded you after?

22        A     Apparently, yes.

23        Q     There is an allegation in this lawsuit

24   about a meeting on or about April 20th, 2020

25   between Weather Group executives and OMD
```

EXHIBIT G
AOE0296

CONFIDENTIAL

Page 238

1              B. Bekkedahl - Confidential

2    you referenced, the spending reports that are

3    syndicated.

4         Q     I see.  Including, for example,

5    Nielsen Ad Intel?

6         A     Yes.

7         Q     Okay.  And do you have an

8    understanding of if McDonald's does spend from

9    their national budget on any of those three

10   networks, why they spend on those networks?

11        A     Do I?

12        Q     Yes.

13        A     No.

14        Q     Do you have an understanding of

15   whether or not the Weather Group is -- has higher

16   or lower ratings than those three networks?

17        A     I do.

18        Q     They have lower ratings?  Weather

19   Channel has lower ratings than those three

20   networks; isn't that right?

21        A     True.

22        Q     Do you know who Morgan Flatley is?  I

23   think I asked you this earlier and I'm sorry if I

24   did.

25        A     Yeah.  I believe she's the CMO of

EXHIBIT G
AOE0297

CONFIDENTIAL

Page 239

1              B. Bekkedahl - Confidential

2    McDonald's.  I don't know her.  I'm not quite

3    sure I met her.

4         Q     Do you know who Chris Kempczinski is?

5         A     Yes, he's the CEO.

6         Q     Ever meet with him?

7         A     No.

8         Q     Do you know who Steve Easterbrook is?

9         A     No.

10        Q     Have you ever discussed any aspect of

11   the Weather Channel's programming or any Allen

12   Media Group programming with Ms. Flatley or

13   Mr. Kempczinski?

14        A     No.

15        Q     And you have no direct emails with any

16   of them; correct?

17        A     No.

18        Q     We talked a little bit ago about the

19   letters that the outside lawyers for the Allen

20   Media Group sent out in March of 2021; you

21   remember that?

22        A     Uh-huh.

23        Q     That's a little bit of a hardball

24   tactic, wouldn't you say?

25                  MR. SCHECTER:  Objection.

CONFIDENTIAL

Page 244

1                 B. Bekkedahl - Confidential

2      Weather Group but the whole portfolio.

3                       MR. SCHECTER:  Okay.  Okay.  I

4          have no further questions.

5                    CONTINUED EXAMINATION

6      BY MR. KENNISON:

7          Q      So this included -- I'm sorry, The

8      Weather Channel plus ES properties; right?

9          A      Yes.  So at this time in 2020, we were

10     merged as one team, and so Kristin was just

11     running point on setting up the meeting.

12         Q      Okay.  And McDonald's didn't do

13     anything to prevent this meeting from happening,

14     did it?

15         A      No.  This was the ad agency and they,

16     you know, again, were always good about taking

17     our meetings and learning our updates.

18                      MR. KENNISON:  Okay.  Thank you.

19         Nothing further from me.

20                      MR. SCHECTER:  Before we go off

21         the record, just can I mark the transcript

22         confidential.  After we get a copy we'll

23         review and see if we can de-designate

24         portions of it, but for right now I'd ask

25         that the transcript and all exhibits be

EXHIBIT G
AOE0299

CONFIDENTIAL

Page 249

1          B. Bekkedahl - Confidential

2            C E R T I F I C A T I O N

3          I, Randi Friedman, Registered

4    Professional Reporter and Notary Public of the

5    State of New York, do hereby certify:

6        THAT, the witness whose testimony is herein

7    before set forth, was duly sworn by me, and

8    THAT, the within transcript is a true record of

9    the testimony given by said witness.

10       I further certify that I am not related

11   either by blood or marriage to any of the parties

12   to this action; and that I am in no way

13   interested in the outcome of this matter.

14       IN WITNESS WHEREOF, I have hereunto set my

15   hand this day, October 13, 2022.

16

17   *Randi C. Friedman*

18

19   Randi Friedman, RPR

20

21

22

23

24

25   *     *     *     *     *     *     *     *     *

# EXHIBIT H

EXHIBIT H
AOE0301

```
                                                    Page 1

 1

 2                  UNITED STATES DISTRICT COURT

          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3                 Case No. 2:21-cv-04972-FMO-MAA

 4        ------------------------------

          ENTERTAINMENT STUDIOS NETWORKS,

 5        INC., a California Corporation;

          WEATHER GROUP, LLC, a Delaware

 6        limited liability company,

 7                            Plaintiffs,

 8

                     vs.

 9

10        McDONALD'S USA, LLC, a Delaware

          limited liability company,

11

                            Defendants.

12        ------------------------------

13                            October 20, 2022

                                9:50 a.m.

14

15           *** C O N F I D E N T I A L ***

15        Videotaped deposition of CYNTHIA KELLY, taken

16        by Defendants, held at the offices of Paul Weiss

17        Rifkind Wharton & Garrison, LLP, 1285 Avenue of the

18        Americas, New York, New York 10019, pursuant to

19        subpoena, before Elizabeth F. Tobin, a Registered

20        Professional Reporter and Notary Public of the State

21        of New York.

22

23

24

25
```

EXHIBIT H
AOE0302

Page 2

```
 1
 2        A P P E A R A N C E S:
 3        On behalf of the Plaintiffs:
              MILLER BARONDESS, LLP
 4            1999 Avenue of the Stars, Suite 1000
              Los Angeles, California 90067
 5            310.552.4100
              BY:   DAVID W. SCHECTER, ESQ.
 6                  dschecter@millerbarondess.com
 7
 8        On behalf of the Defendant:
              RILEY SAFER HOLMES & CANCILA, LLP
 9            70 West Madison Street, Suite 2900
              Chicago, Illinois 60602
10            312.471.8700
              BY:   AMY C. ANDREWS, ESQ.
11                  aandrews@rshc-law.com
12                  - and -
13        On behalf of the Defendant:
              PAUL, WEISS, RIFKIND, WHARTON
14            & GARRISON, LLP
              1285 Avenue of the Americas
15            New York, New York 10019
              212.373.3784
16            BY:   KERISSA N. BARRON, ESQ.
                    kbarron@paulweiss.com
17
          ALSO PRESENT:
18                  MATTHEW CHIN-QUEE, VIDEOGRAPHER
19        PRESENT VIA VIDEO-TELECONFERENCE:
                    MONICA MOSBY, ESQ.
20                  MARK DEVITRE, ESQ.
                    JEFF MAYES, ESQ.
21                  ROBERT FOLEY
                    BYRON ALLEN
22                  ERIC GOULD
                    TOM O'BRIEN
23                  DARREN GALATT
24
25
```

EXHIBIT H
AOE0303

                        C. Kelly - CONFIDENTIAL

1

2        A.    Not really.  I mean, very challenging to

3     read.  I'm not a lawyer, so...

4             (Discussion held off the stenographic

5        record.)

6        Q.    You're currently employed by -- is it

7     Genius Brands International?

8        A.    Yes.

9        Q.    What's your current title?

10        A.    Co-chief revenue officer, head of ad

11     sales.

12        Q.    How long have you been in that role?

13        A.    Eight months.

14        Q.    So March of 2022?

15        A.    February 2022.

16        Q.    And you joined Genius when you left

17     Entertainment Studios; is that correct?

18        A.    Yes.

19        Q.    Can you just briefly -- I don't need the

20     specifics, but just tell me generally your duties

21     and responsibilities in your current role?

22        A.    I oversee Cartoon Channel, which is a

23     kids' app.  All of the ad sales revenue, so going to

24     agencies and going to clients.  Selling sponsorships

25     as well as video content.

Page 12

1          C. Kelly - CONFIDENTIAL

2          Q.     And that is located in New Jersey?

3          A.     Beverly Hills is the headquarters.

4          Q.     But your office is located here?

5          A.     Yes.  I work out of my home.

6          Q.     And prior to that, you were employed by

7    Entertainment Studios, you were the president of

8    advertising sales; is that correct?

9          A.     Yes.

10          Q.     And how long were you in that role?

11          A.     Six years.

12          Q.     And that was your title throughout the

13    six years?

14          A.     Yes.

15          Q.     And what were your duties and

16    responsibilities in that role?

17          A.     So, I supported the seven ES lifestyle

18    networks.  My job was to work with advertising

19    agencies and clients to sell advertising time on

20    those seven properties.

21          Q.     And the lifestyle networks, they are

22    referred to in the third amended complaint, but

23    those are generally the recipe.tv, pets.tv,

24    lifestyle.tv, cars.tv.  I think there are, like you

25    said, there's a total of seven.  That's what you're

EXHIBIT H
AOE0305

Page 13

1                C. Kelly - CONFIDENTIAL

2      referring to when you use the term "lifestyle

3      networks"; correct?

4           A.    Yes.

5           Q.    So as we use that term today, which we

6      will, I just want to be clear that those are the

7      properties that we are referring to.

8           A.    Yes.

9           Q.    In your role as president of advertising

10     sales in addition to the seven ES lifestyle

11     networks, did you have any responsibility for

12     Entertainment Studios syndicated programming?

13          A.    No.

14          Q.    Who handled that?

15          A.    Darren Galatt.

16          Q.    Did he report to you or were you equals?

17     How did that work?

18          A.    Equals.

19          Q.    Who did you report to?

20          A.    Byron.

21          Q.    By Byron, you mean Byron Allen?

22          A.    Byron Allen.  And Janice Arouh.

23          Q.    What's Ms. Arouh's title?

24          A.    She is president of distribution and

25     marketing.

Page 14

1                    C. Kelly - CONFIDENTIAL

2           Q.      And what is Mr. Allen's title?

3           A.      CEO/owner of Entertainment -- Allen Media

4    Group.

5           Q.      And Allen Media Group, as you understand

6    it, is the entity that owns Entertainment Studios,

7    among others?

8           A.      Yes.

9           Q.      How many people did you supervise in your

10   role as president of advertising sales?

11          A.      About six to eight.

12          Q.      And they were all focused on selling

13   advertising time on the lifestyle networks?

14          A.      Yes.  But we had a change in 2018 where

15   the Weather Channel sellers became the portfolio

16   sellers.  So they sold across everything; Weather

17   Channel, syndication, and ES lifestyle.

18          Q.      And 2018 is when the Allen Media Group

19   acquired the Weather Channel; correct?

20          A.      Correct.

21          Q.      So when you say there was a change,

22   explain to me what you mean by that.

23          A.      Yeah.  So we had -- when I started in

24   2016, we hired AEs to sell direct response for the

25   cable networks.  We also hired national AEs to sell

EXHIBIT H
AOE0307

Page 16

1                    C. Kelly - CONFIDENTIAL

2          A.    Yes.

3          Q.    What do you mean by direct response?

4          A.    When you're watching TV, did you ever see

5     a 1(800) ad to -- whether it's the knives or call

6     now -- most of it's law firms.  So that's direct

7     response.  So the cable networks were supported

8     about 90 percent direct response advertisers.  At

9     that time.

10         Q.    And then agencies would be the

11    traditional advertising agencies and then the

12    clients that they represent; correct?

13         A.    Correct.

14         Q.    And that was approximately 10 percent of

15    the advertising on the lifestyle networks?

16         A.    In 2018.

17         Q.    Did that allocation between direct

18    response and agency advertising change during your

19    tenure?

20         A.    Yes.

21         Q.    In what way?

22         A.    We increased more to national sales, so

23    we brought on other national advertisers.

24         Q.    And that was after 2018?

25         A.    Correct.

EXHIBIT H
AOE0308

Page 17

C. Kelly - CONFIDENTIAL

1

2          Q.     What drove that change?

3          A.     Dedicated account executives, programming

4     on the ES lifestyles networks, getting

5     Nielsen-rated, growing distribution.

6          Q.     Let's break those down.  The first thing

7     you said was dedicated AEs, and this is after 2018

8     acquisition of the Weather Channel.

9               Did those AEs come with the Weather

10    Channel?

11         A.     Yes.

12         Q.     Do you know approximately how many came

13    as part of that transaction or how big that sales

14    team was?

15         A.     I want to say six to eight maybe.

16         Q.     Those, again, they reported in to

17    Ms. Bekkedahl?

18         A.     Yes.

19         Q.     Then you said -- I think the next factor

20    you said for the increase was the programming on the

21    lifestyle networks.

22               Can you explain what you mean by that?

23         A.     So, for example, recipe.tv, we acquired

24    other chefs.  For comedy.tv, we licensed a movie

25    package and created a Friday night family movie.

1                    C. Kelly - CONFIDENTIAL

2       For Justice Central, we acquired -- we originally

3       had new originals of our court shows.

4             Q.     Anything else?

5             A.     For ES.tv, it was always movie trailers.

6       So updated movies, behind the scenes making of.

7       That's it.

8             Q.     And then I think the next factor you said

9       that increased national sales was getting

10      Nielsen-rated.

11                   Can you explain what you meant by that?

12            A.     So Byron entered into an agreement with

13      Nielsen to get the seven ES cable networks

14      Nielsen-rated.

15            Q.     Do you know when that happened?

16            A.     I want to say 2017, 2018.

17            Q.     What does it mean to be Nielsen-rated?

18            A.     It means an advertiser will support you

19      because you have ratings.

20            Q.     Ratings showing the number of people that

21      are watching the programming?

22            A.     Yes.  It also helps you to position the

23      networks.

24            Q.     What do you mean by that?

25            A.     Is it male, is it female, is it 18 plus.

EXHIBIT H
AOE0310

```
                                                   Page 19

                        C. Kelly - CONFIDENTIAL

 1

 2          Q.     So the Nielsen ratings data shows you not

 3     only the number of people who are watching but who

 4     those people are?

 5          A.     Yes.

 6          Q.     And do you recall when that Nielsen

 7     ratings data was first available for the lifestyle

 8     networks?

 9          A.     I believe you just asked me that.  2017,

10     2018.

11          Q.     Yeah.  Well, you said, I think, that

12     Byron Allen entered into an agreement with Nielsen

13     to get them rated in 2017, 2018.  My question is a

14     little bit different, and that is:  When did you

15     start to have that ratings data as part of the --

16     strike that.

17                 After that contract was signed, when was

18     that Nielsen ratings data available to the sales

19     team?

20          A.     Oh, it's immediate.  Within like 30 days.

21          Q.     I think you said one of the advantages of

22     having it is that advertisers will support your

23     properties?

24          A.     Yes.

25          Q.     What do you mean by that?
```

EXHIBIT H
AOE0311

```
                                                        Page 20

 1                    C. Kelly - CONFIDENTIAL

 2           A.      To be Nielsen-rated, you need to show an

 3      ROI on the investment.  Everything in media is

 4      guaranteed on a CPM in dollars which equals to

 5      impressions and then goes into Nielsen to generate

 6      ratings.

 7           Q.      And then I think the last factor that you

 8      referenced for the increase in national sales after

 9      2018 was growing distribution.

10                   What did you mean by that?

11           A.      So distribution is where Janice Arouh and

12      her team would go out and speak with other MVPDs.

13      So AT&T --

14                   (Court reporter requested clarification.)

15           A.      So your cable companies, Comcast, AT&T,

16      Verizon, Charter.

17           Q.      And by growing distribution, you mean

18      that the lifestyle networks began to be carried by

19      more of the cable companies; correct?

20           A.      More homes.

21           Q.      And can you explain the relationship, if

22      you will, between the distribution piece and the

23      ratings piece of it?

24           A.      The more homes you're in, the higher your

25      ratings on -- you'll achieve.
```

Page 23

1          C. Kelly - CONFIDENTIAL

2          A.    I have a family member who has cancer.  I

3     needed to slow things down and spend more time with

4     family.

5          Q.    So is your current role -- current job at

6     Genius Brands less demanding than your Entertainment

7     Studios job?

8          A.    Yes.

9          Q.    And what -- why did you join

10    Entertainment Studios in 2016?  What attracted you

11    to the role?

12         A.    Byron's vision, his passion to basically

13    take everything that I learned in the industry and

14    launch seven cable networks from traffic to

15    operations.

16         Q.    When you say Byron's vision, his passion,

17    what do you mean by that?

18         A.    I like that he had lifestyle programming,

19    something for everyone, from pets to comedy to

20    travel to cooking.

21         Q.    And you came from -- well, let me just

22    ask you.  Before you came to Entertainment Studios,

23    who were you employed by?

24         A.    Ion Media Networks.

25         Q.    And who is that or what do they do?

EXHIBIT H
AOE0313

Page 28

1                  C. Kelly - CONFIDENTIAL

2          A.    Households.

3          Q.    What does it mean to say an aggregate

4     80 million households?

5          A.    So you take all of the seven networks and

6     add up their households.  So, making it up, Justice

7     Central in 30 -- I don't know the numbers at the

8     time.  Justice Central in 30, pets in 5, this one

9     and this, and it all added up to 80 million.

10         Q.    And this is distribution, back to the

11    distinction we were talking about earlier,

12    distribution versus ratings, right, so this --

13         A.    Yes.

14         Q.    This tells you -- it's shown, and you add

15    it all up, you get 80 million homes where that

16    programming is shown?

17         A.    Yes.

18         Q.    And then the far right column it's titled

19    ES GS which is Entertainment Studios Global

20    Syndication.  This is the syndicated programming

21    that we've been referring to that Mr. Galatt was

22    responsible for?

23         A.    Yes.

24         Q.    And the programming that was -- here,

25    let's do it this way.

EXHIBIT H
AOE0314

Page 29

1          C. Kelly - CONFIDENTIAL

2              If you can turn to page 7 of the deck.

3     It's titled "Entertainment Studios Global

4     Syndication."   Yes.

5              This is an overview of the syndicated

6     programming at that time; correct?

7     A.       Correct.

8     Q.       And as I understand it, it was packaged,

9     these titles, I guess, on the left -- sitcoms, court

10    combo, ES daily network, ES weekly network -- those

11    were packages of that syndication that advertisers

12    could contract to advertise within that group of

13    programming?

14    A.       Yes.

15    Q.       And then the next slide which is entitled

16    "HH Ratings," this is household ratings?

17    A.       Yes.

18    Q.       And again broken out by court combo,

19    daily network, ES weekly network.

20              What does this slide represent?  What is

21    this telling me?

22    A.       So it's over the course of three years --

23    so January '14, '15, and '16 -- that these networks

24    are growing and it's just a household rating.

25    Q.       So when it says, for instance, on court

EXHIBIT H
AOE0315

```
                                                    Page 31

 1                  C. Kelly - CONFIDENTIAL

 2                  What does targeted demos mean in that

 3      context?

 4           A.    So, for example, cars.tv is very much a

 5      male property.  Comedy.tv is pretty much a male and

 6      female property.  ES.tv is a little bit younger

 7      audience because it's that behind-the-scenes movies.

 8      So male, female.  Pets would be more female.  Recipe

 9      probably adults.  But each one of them have

10      different target audiences.  They're not all the

11      same.

12           Q.    And then if you go starting on -- let's

13      see, it looks like slide 17 which is ending Bates

14      264, the one that's titled cars.tv, I think the next

15      probably seven pages are a review, then, of each of

16      those seven lifestyle networks; correct?

17           A.    Yes.

18           Q.    To tell you a little bit about, to your

19      point, the targeted demo?

20           A.    Yes.

21           Q.    So just taking cars.tv, for example, it

22      says here:  Cars.tv features adrenaline-pumping

23      programming about the best cars the automotive

24      industry has to offer.

25                  What programming was being shown on
```

EXHIBIT H
AOE0316

Page 32

1                    C. Kelly - CONFIDENTIAL

2        cars.tv?

3              A.    So I don't want to confuse you.  But can

4        I do an exhibit?

5              Q.    Sure.

6              A.    If you go to the syndication slide.

7              Q.    That one we looked at before?

8              A.    Yes.

9              Q.    Which is page 7, it's ending Bates 254.

10             A.    Yeah.  So the syndication programming

11       that aired in syndication then became seven unique

12       cable networks.  So when you're consistently

13       producing more shows in syndication, you're creating

14       a library.  And with that library Byron then

15       created, well, I've got MyDestination right here in

16       the ES Weekly.

17                   So he's producing all half-hour shows in

18       syndication.  He then created a cable network called

19       MyDestination.tv.  Then he's producing all of these

20       great court shows.  After time, he created Justice

21       Central.  So they premiere in syndication and then

22       they go to the cable -- respective cable network.

23             Q.    Okay.  I think you anticipated where I

24       was going.

25                   And so an advertiser could purchase

EXHIBIT H
AOE0317

Page 33

```
 1                    C. Kelly - CONFIDENTIAL
 2         advertising time on this programming in syndication?
 3              A.    Yes.  Correct.
 4              Q.    And that would be -- you said premiere,
 5         so would this be new episodes of this programming?
 6              A.    Yes.
 7              Q.    And then, at the same time, you were
 8         marketing the lifestyle networks and an advertiser
 9         could purchase time on the lifestyle networks which
10         would be the same programming that's in syndication?
11              A.    Yes.
12              Q.    But would be from the library, so not new
13         episodes?
14              A.    Correct.  The combination of new after a
15         premiere, that episode premiered in syndication.  So
16         it would be library.  And it would also be the
17         premiere.
18              Q.    So -- all right.  So if I'm trying to
19         figure out what's airing on the lifestyle networks,
20         to answer -- your answer to my question, for
21         instance, cars.tv, I can refer back here and there's
22         a cars.tv, and that was --
23                    Okay.  Great.  That's --
24                    You need to answer yes because she
25         can't --
```

EXHIBIT H
AOE0318

Page 34

1                        C. Kelly - CONFIDENTIAL

2            A.    Yes.

3            Q.    She can't take a nod.  Thanks.

4                  And just to be clear, so this programming

5      in syndication, it would run -- I don't know, like

6      Monday, Wednesday, Friday at 5:30.  But when it's

7      put in a lifestyle network, it would be a 24/7 kind

8      of program?

9            A.    So I can't answer syndication.  I'm not

10     familiar with it enough.  But what we did in the

11     cable networks is, once we saw their Nielsen ratings

12     and our audience, we would program it very

13     differently.  So we might have robust court judges

14     in prime time rather than daytime.  So we would just

15     position it differently, more strategically.  And

16     gear to the audience.

17           Q.    Right.  Because the Nielsen data not only

18     can tell you who is watching, but can also tell you

19     when they're watching; correct?

20           A.    Yes.

21           Q.    And let's just go through these because I

22     think you said they were to a targeted demo.  I just

23     want to sure we got them.  So cars.tv, do you have

24     an understanding of what a targeted demo was for

25     cars.tv?

EXHIBIT H
AOE0319

1                    C. Kelly - CONFIDENTIAL

2           A.    At this time?

3           Q.    Mm-hmm.  Yes.  2016.

4           A.    In 2016, it was probably adults 18 to 49.

5    Same thing for comedy.  And ES.tv.

6                 Justice Central was adults 25 to 54.

7    MyDestination was 25 to 54.

8           Q.    And then pets.tv?

9           A.    Probably 35 plus, although we've seen --

10   before I left, it got a lot younger with more

11   millennials, you know, rescuing pets.  And then

12   recipe is really 25 to 54.

13          Q.    And then the last slide of this deck is

14   titled Sponsorship and Integration Opportunity --

15   Opportunities, excuse me.  It says:  100 percent

16   original content allows for us to work with you on

17   customized sponsorship and integration

18   opportunities.

19                So I want to ask you a couple of

20   questions there.  By a hundred percent original

21   content, it's because Entertainment Studios was

22   producing the content that was shown on these

23   networks; is that correct?

24          A.    Yes.

25          Q.    What does it mean that we can work with

EXHIBIT H
AOE0320

Page 42

1               C. Kelly - CONFIDENTIAL

2          A.     Potentially they could.  Sometimes if

3     they're loving the property and they're getting a

4     big sponsorship, and they see it's a good

5     investment, they can do a sponsorship without being

6     Nielsen-rated.

7          Q.     And I won't go through all of them.  But

8     we've got Boehringer, need to see Nielsen data.

9               Go down a couple more, Burlington says

10    need to see Nielsen rating before they'll do

11    anything.

12              Further down, Mark, need to be

13    Nielsen-measured.

14              Novartis, need to be Nielsen-rated.

15              Pfizer, need Nielsen data.

16              So a number of advertising targets are

17    coming back with a similar message; correct?

18         A.     Mm-hmm.

19         Q.     So it was not unusual for an advertiser

20    to say, hey, this is interesting, but until we have

21    the Nielsen data, this is not something we will

22    actively consider?

23         A.     Yes.

24         Q.     In fact, that was part of the reason to

25    get the Nielsen data; correct?

Page 43

C. Kelly - CONFIDENTIAL

1

2          A.      Yes.

3          Q.      To address this issue of the national

4     advertisers?

5          A.      Yes.

6          Q.      And then, similar, we looked at Bayer

7     regarding the 50 million household threshold.

8     There's some similar feedbacks.  Chattem says they

9     do not buy nets under 50 million households.  And so

10    that was also a consideration for national

11    advertisers which is the distribution of the

12    properties; correct?

13         A.      Yes.

14         Q.      I want to stay on that just for a second.

15    I apologize.  There's a line there for McDonald's,

16    and the buying agency listed there is OMD with a

17    buying contact, Debbie Innes.

18               Do you see that?

19         A.      Yes.

20         Q.      And then the comments:  Cindy/Darren met

21    with Burrell.  W/O -- I assume that means week of --

22    9/26.  Best option for cable dollars is out of OMD.

23               Do you have an understanding of what that

24    refers to?

25         A.      Yeah.  That's from Blaine's meeting.  I'm

EXHIBIT H
AOE0322

Page 68

C. Kelly - CONFIDENTIAL

1

2       A.    I don't see them here.  I don't know why

3    they were not included.

4       Q.    Was the ratings -- were the ratings for

5    those five channels higher or lower than the ratings

6    for comedy.tv and Justice Central at this point in

7    time?

8       A.    Probably similar to comedy.tv.

9       Q.    And so just staying with the time frame

10   that we were looking at, so what does this tell me,

11   that comedy.tv is 0.0003?

12      A.    It's a small rating.

13      Q.    Okay.

14      A.    Yes.

15      Q.    Is that percent or does that --

16      A.    No.  That is just the ratings --

17      Q.    That's the Nielsen calculation?

18      A.    Mm-hmm.

19            These charts are strategy.  And

20   directional.  So that we are comparing like networks

21   and like ratings and like distribution.  These are

22   emerging platforms as well.

23      Q.    What does that mean, emerging platforms?

24      A.    So all of these networks below, you know,

25   Up, Reels, Logo, Viceland are a little bit smaller.

EXHIBIT H
AOE0323

Page 72

1          C. Kelly - CONFIDENTIAL

2     named Blaze Cartelli at Omnicom Media Group.

3               Omnicom is OMG; correct?

4          A.    Yes.

5          Q.    Do you know who Blaze Cartelli is?

6          A.    I believe he's direct response.

7          Q.    And so attached are two documents, cable

8     nets 2020 deck OMD and then OMD ES Cable One sheet.

9               And so if you turn to the page ending in

10    538, I believe this is the one-sheet attachment.

11              Again, this relates to the cable

12    portfolio which are the networks we've been talking

13    about; correct?

14         A.    Yes.

15         Q.    And the numbers, the 30 million for

16    Justice Central, 20 million comedy.tv, and then the

17    lifestyle networks, these are the distribution

18    numbers like we were talking about earlier?

19         A.    Yes.

20         Q.    Do you recall that this was the

21    distribution of these networks as of December 2019?

22         A.    I can't be sure, but yes.

23         Q.    It's what was provided to an ad agency;

24    correct?

25         A.    Yes.

EXHIBIT H
AOE0324

1              C. Kelly - CONFIDENTIAL

2        A.    It's a typical contract negotiation.

3        Q.    Is it because their distribution was low

4    relative to other offerings?

5        A.    No.  If you see, recipe grew from 8 to

6    13.  You've got a lot of cord-cutting going on the

7    industry.

8        Q.    What do you mean you say a lot of

9    cord-cutting going on in the industry?

10       A.    Shifts.  We were the only cable network

11   that was growing in distribution, while others were

12   not.  So there's just a shift of things happening in

13   the marketplace -- industry, excuse me.

14       Q.    Away from cable?

15       A.    Yes.

16       Q.    And that shift was viewers were shifting

17   and, therefore, advertisers were shifting to follow

18   the viewers; correct?

19       A.    Yes.  But still you need linear for a

20   region frequency, and they knew that.

21       Q.    If you could turn to the slide ending in

22   541 titled Justice Central.  So the programming, a

23   hundred new episodes per judge.  And then there's a

24   number of -- well, five judges and Gloria Allred,

25   the lawyer listed below.

EXHIBIT H
AOE0325

1              C. Kelly - CONFIDENTIAL

2              What does that mean in this context, a

3      hundred new episodes per judge?

4          A.    Byron was producing new shows for

5      syndication.  Once they air in syndication, then

6      they come to the cable networks.  So advertisers

7      always want to see that you're producing new shows.

8          Q.    So the new shows would be aired in

9      syndication and then they would move over to the

10     network?

11         A.    Yes.

12         Q.    And then these six bullets, this was the

13     programming that was showing on Justice Central as

14     of this point in time?

15         A.    Yes.

16         Q.    And it's a little hard to read, but this

17     blue box on the right side, I think it says, Median

18     age 58.  So this is similar to what we looked at

19     before, this is telling you the median age of the

20     viewer is 58?

21         A.    Yes.

22         Q.    And then there's a household income

23     entry.  And then underneath that, it says, Demo,

24     adults/women 35 plus.

25              What does that mean?

EXHIBIT H
AOE0326

1                    C. Kelly - CONFIDENTIAL

2          A.    That it's primarily a adult women 35

3     plus.  It's also our positioning.  We don't want us

4     to guarantee 18 to 49 or 25-54.  35 plus was how the

5     industry was moving forward and we wanted to broaden

6     that.

7          Q.    So it sounds like from what you said it's

8     twofold.  It's the demo of the viewers and it's the

9     demo of what you were willing to guarantee for

10    advertising on those networks, the Justice Central

11    network?

12         A.    No.  We were flexible with whatever

13    advertisers wanted to guarantee on.  It was our

14    recommendation to go out and sell this.  It would be

15    better for the advertiser and better for us.

16         Q.    So the advertiser that was looking for

17    women age 35 and older, you're recommending this as

18    a program for those advertisers?

19         A.    Yes.

20         Q.    And then the next page, I believe this is

21    ratings data like we looked at earlier?

22         A.    Yes.  It's just showing the top five

23    shows.

24         Q.    So the difference here on the left hand

25    again is women 35 plus versus adults 35 plus, and

EXHIBIT H
AOE0327

Page 78

1                    C. Kelly - CONFIDENTIAL

2          then the ratings for the top five shows for those

3          two different demographics?

4                  A.      Yes.

5                  Q.      The next page is comedy.tv.   Similar

6          questions.   There's a heading programming with three

7          bullets underneath.   So this is the programming that

8          was being shown on comedy.tv at this point in time?

9                  A.      Yes.   And, again, highlighting new

10         episodes.   So Funny You Should Ask, new episodes.   A

11         premiere of the World's Funniest Weather, and then

12         Comics Unleashed.

13                 Q.      And Funny You Should Ask was

14         also available -- strike that.

15                        And Funny You Should Ask was a syndicated

16         program; correct?

17                 A.      Yes.

18                 Q.      So the same thing, it would show in

19         syndication and then it would become part of the

20         comedy.tv programming?

21                 A.      Yes.

22                 Q.      And then same data in this blue box.   We

23         have the median age, demo, distribution, skew.   And

24         so the median age is 58.   And the demo here, instead

25         of women, is adults 35 plus; correct?

1                  C. Kelly - CONFIDENTIAL

2          A.     Yes.

3          Q.     So, again, the recommendation is that

4     this would be appropriate for advertisers looking

5     for adults 35 plus?

6          A.     Yes.

7          Q.     Then we have similar slides beyond that

8     for the five bundled-together lifestyle channels.

9     Same thing with the median age, the demo, and the

10    skews.  So cars.tv has a median age of 45 and a demo

11    of adults/men 35 plus?

12         A.     Yes.

13         Q.     And it also says skews 70 percent male.

14    So that's telling us that cars.tv draws primarily a

15    male audience?

16         A.     Yes.

17         Q.     Okay.  ES.tv is the next.  It has a

18    median age of 45, a demo of adults, women 35 plus;

19    correct?

20         A.     Yes.

21         Q.     And just to stop there.  The programming,

22    ES.tv delivers a daily dose of celebrity interviews,

23    news, comedy jam, and hit musical performances.

24               What is that -- what is this programming

25    that this refers to?

C. Kelly - CONFIDENTIAL

1

2          A.      Similar to ET.

3                  Do you watch Entertainment Tonight?

4          Q.      I do not.

5          A.      So it's basically what's hot in like the

6      celebrity world, upcoming movies, upcoming

7      musicians, things like that.  Current.  Hip.

8          Q.      Got it.

9                  Then we'll just do the last few for

10     completeness.  So MyDestination.tv, median age is 45

11     and the demo is adults, women 35 plus; correct?

12         A.      Yes.  Again, that's just a strategy.

13     That's not recommending that you guarantee on that.

14     You can guarantee on 18 plus, 25 plus, et cetera.

15     That was just...

16         Q.      Right.  But this is the strategy -- when

17     you say strategy, you mean for your sales teams,

18     right, this is the strategy, look for advertisers

19     that want to advertise to this demographic?

20         A.      Yes.

21         Q.      And then pets.tv is similar, it's a

22     median age of 45 and adults, women 35 plus; correct?

23         A.      Yes.

24         Q.      And I think -- correct me if I'm wrong,

25     but on pets.tv, MyDestination.tv, ES.tv, and

EXHIBIT H
AOE0330

Page 81

1                    C. Kelly - CONFIDENTIAL

2          cars.tv -- is that all of them? -- the programming

3          that is showing there is not also showing in

4          syndication; right?

5               A.    No.  It is showing in syndication.

6               Q.    Oh, it is?

7               A.    Yes.

8               Q.    Oh, that's right.  Yes.  We looked at

9          that slide this morning.

10              A.    Yes.

11              Q.    And then the last one, recipe.tv, is

12         median age 45, demo adults, women 35 plus; correct?

13              A.    Yes.

14              Q.    So on these lifestyle channels, is there

15         new programming showing there or it's similar to

16         what we talked about on Justice and comedy, that it

17         would show in syndication and then it would become

18         part of the network?

19              A.    Correct.  But there is new programming.

20         If you look at the last page for Recipe, A Taste of

21         Ireland, we have new episodes.

22                    And then we also introduced a new chef,

23         Paris Bistro Cooking with Edward Delling-Williams.

24                    MS. ANDREWS:  94.

25                    (Defendant's Exhibit 94, 4/26/21 email

Page 85

C. Kelly - CONFIDENTIAL

1

2        Q.    And if you look at the first email in the

3    chain -- so it's a page ending in 245 -- you ask

4    Mr. Galatt, What are the specific meetings for

5    Monday at OMD?

6              And then he responds, Here are the booked

7    meetings.

8              There's a number of people, including at

9    1:45 p.m., Debbie Innes, paren, McDonald's.

10             Do you see that?

11       A.    Yes.

12       Q.    Debbie Innes was the account lead at OMD

13   for the McDonald's account; correct?

14       A.    I believe so.

15       Q.    Do you recall meeting with Ms. Innes in

16   and around April 2016?

17       A.    No.  I actually had a car accident that

18   day and was not able to attend these meetings.

19       Q.    I guess you would remember that.

20       A.    Yes.

21       Q.    What was the purpose of the meeting that

22   you didn't attend but were supposed to attend, if

23   you recall?

24       A.    So, again, February, March, April upfront

25   meetings.  So it's to get in all those decks that we

EXHIBIT H
AOE0332

1                    C. Kelly - CONFIDENTIAL

2          just went through to present those types of

3          opportunities.

4                    Q.    Do you recall that that presentation was

5          made to Ms. Innes on behalf of the McDonald's

6          account?

7                    A.    I believe so, if Darren executed.

8                         (Defendant's Exhibit 96, 5/31/16 email

9                    chain with attached ASK Excel, marked for

10                   identification.)

11                   Q.    Defendant's Exhibit 96, Bates-numbered

12         ESN 0030259, a series of emails between you and

13         Mr. Galatt and Matt Gentile May 31, 2016.

14         Attachment is agency ask OMD, PHD.

15                        So OMD we've been talking about.  PHD is

16         another agency that falls under the Omnicom

17         umbrella, correct?

18                   A.    Yes.

19                   Q.    So, again, we talked about this, this

20         morning, but an ask sheet is this is our planned ask

21         that we're going to make to the agency for various

22         accounts; correct?

23                   A.    Yes.

24                   Q.    So the attachment is, for OMD, there are

25         four advertisers listed; Pepsi, McDonald's,

Page 90

1                C. Kelly - CONFIDENTIAL

2      to Burrell for McDonald's; correct?

3            A.    Yes.

4            Q.    So you say, A few questions.  We don't

5      have AA CPMs.  Is A 18 to 49 sufficient?

6                  What does that mean?

7            A.    The cable networks does not provide

8      African-American CPMs.

9            Q.    And at this point in time, it didn't have

10     ratings; correct?

11           A.    Correct.

12           Q.    Can you calculate the CPM without ratings

13     or how would you do that?

14           A.    You can't.  Again, this is for 2017, and

15     we were finalizing and getting the Nielsen contract

16     up to speed, so we would have...

17           Q.    And then your email above that one, the

18     August 9th, 10:59 a.m., you say, Do we want to pitch

19     Funny You Should Ask like we did with Pepsi?

20                 Mr. Galatt writes back, I do believe

21     that's a smart idea.  I suppose that would

22     necessitate us communicating a two-year deal.

23                 Why would pitching Funny You Should Ask

24     necessitate communicating a two-year deal?

25           A.    So, it would be for an integration

EXHIBIT H
AOE0334

Page 113

1           C. Kelly - CONFIDENTIAL

2           Q.    If you look through the slides you

3      presented, there is no ratings data provided, right,

4      it's just sort of an overview of what each network

5      offering is?

6           A.    Correct.

7           Q.    Can you tell me what the Black-owned

8      media initiative is?

9           A.    It is a strategy that we put together so

10     that we could get in front of clients and agencies

11     to talk about the initiative and passion of

12     investing and leaning into Black-owned media.

13          Q.    When you say we put it together, who's

14     the "we" that you were referring to?

15          A.    It was a collaboration with Barbara,

16     Darren, Byron.

17          Q.    And when did this initiative take shape?

18          A.    Unfortunately, February of 2020, after

19     the George Floyd situation.

20          Q.    I think that was in June 2020?

21          A.    Was it June?  I guess around that time.

22          Q.    Time's weird then because it's COVID.

23     COVID shut down was March 2020 and then I believe

24     the George Floyd murder was in June of 2020.

25          A.    So June of 2020.

Page 115

C. Kelly - CONFIDENTIAL

2          As far as leaning in, we had even heard

3     on calls some agencies and clients didn't know

4     enough about us in terms of what we had to offer.

5     So some clients were like a revelation.  Oh, wow, I

6     didn't know you had X, Y, and Z.  So it gave Byron

7     an opportunity to talk to everybody about what the

8     capabilities that we have to offer to clients.

9          And also to showcase collaboration.  You

10    know, if we were going to produce an awards show,

11    how could X client partner with us.

12         Q.    What was your role in connection with the

13    strategy?

14         A.    It was a collaborative role where we

15    would create set scheduled meetings with high agency

16    CEOs and we would reach out to get clients -- client

17    meetings.  So we just kept track of who we met with,

18    what was the feedback, what were the updates.

19         Q.    Yeah.  And I guess what I'm trying to

20    understand is, that was your job before, right, was

21    to -- or it was your account executives' jobs was to

22    reach out to advertising agencies and schedule

23    meetings and make them aware of the various media

24    offerings that Entertainment Studios had; correct?

25         A.    Yes.

1          C. Kelly - CONFIDENTIAL

2          Q.    And so that's something, right, we just

3     looked at documents about meetings that were held

4     before this time.

5               So what is the change in strategy at this

6     point in time relative to what you were doing

7     previously to educate advertising agencies and

8     potential advertisers about the media properties and

9     partnership opportunities?

10         A.    Seniority.  So you were going to media

11    buyers, media supervisors at the agencies.  So this

12    was now an opportunity for us to get with the CEOs

13    of major agency holding companies.  And that's what

14    we did.  And they took our meetings.

15         Q.    And it was an opportunity to lean in to

16    showcase we are a Black-owned media company and the

17    world right now is paying attention to racial

18    issues; is that correct?

19         A.    Educate really on the properties.  And

20    that -- yes, we were a Black-owned media company.

21         Q.    Well, you're saying meetings with the

22    CEO; right?  I mean, the CEO of Omnicom doesn't make

23    the buying decisions for any particular one of their

24    clients; correct?

25         A.    Correct.  But that should be an

EXHIBIT H
AOE0337

Page 130

C. Kelly - CONFIDENTIAL

1

2      their clients on Byron's vision, the properties.

3          Q.    And so as you're using economic inclusion

4      here what it refers to is an investment in the Allen

5      Media Group properties; correct?

6          A.    Yes.

7          Q.    So that's the Black-owned media strategy,

8      correct, this investment in the Allen Media Group

9      properties?

10         A.    Yes.  Or consideration.

11         Q.    And above that you have a paragraph that

12     says, We have been providing Byron with follow-up

13     that incorporates our agency progress and

14     executions.  With regards to Black-owned media,

15     we've been trying to include OMD.

16             What do you mean when --

17         A.    We just want to know what clients think

18     of Allen Media Group properties.  Will there be any

19     consideration set.  If they're already a client,

20     incumbent client, will they increase their revenue

21     spend with us?  Will they look at -- if they're just

22     buying one property, will they look at other

23     properties?  Will they investment in partnership

24     opportunities?  So basically looking for more

25     feedback across the board.

EXHIBIT H
AOE0338

Page 137

1            C. Kelly - CONFIDENTIAL

2     us if there was going to be any support or

3     partnerships with Allen Media Group.

4          Q.    Because simultaneously with the ad agency

5     reach-outs, there were reach-outs going directly to

6     the advertisers; correct?

7          A.    Correct.

8          Q.    And so advertisers that didn't respond to

9     that reach-out, either the one that went directly to

10    them or via their agencies were deemed to be not

11    supportive; is that correct?

12         A.    I wouldn't say deemed not supportive.  I

13    would say most clients took our calls and took the

14    time to hear Byron speak about his strategy.

15         Q.    His strategy for them to invest more in

16    his properties?

17         A.    Or to be educated on the properties as

18    well.

19         Q.    So to learn about them?

20         A.    Yeah.

21         Q.    And so McDonald's support here refers to

22    getting McDonald's to listen to that message?

23         A.    I would -- again, I do not recall.  But I

24    would say so.  That we just had no feedback from

25    McDonald's at all.

EXHIBIT H

AOE0339

Page 159

                    C. Kelly - CONFIDENTIAL

1

2       email to you?

3               A.      Yes.  Because of direct response.

4               Q.      And you say, Very concerning.  Right?

5       Because, again, it's concerning.  You're trying to

6       do a deal and you have threats of litigation being

7       thrown around; correct?

8               A.      Yes.

9               Q.      After the first paragraph in

10      Ms. Anderson's initial email she says, He then gave

11      me the green light to start selling over the pro

12      media inventory starting week of 2/13.

13                      Do you have an understanding what that

14      refers to?

15              A.      I do not.  Syndication.

16                      (Defendant's Exhibit 111, 5/20/21 email

17              chain, marked for identification.)

18              Q.      Defendant's Exhibit 111, Bates Number

19      ESN 0039301.  This is an email exchange, let's see,

20      between Jason Kern, you, Matt Gentile, Dan Wardley.

21      Subject -- dated May 20, 2021.  Subject, McDonald's

22      will more than double diverse company ad spend.  And

23      then there's a link to an Ad Age article.

24                      Who is Mr. Kern?

25              A.      Account executive for ES Cable.

EXHIBIT H
AOE0340

Page 181

1                    C. Kelly - CONFIDENTIAL

2          Q.    With Mr. Galatt?

3          A.    No.

4          Q.    With any of the members of your team that

5    reported to you?

6          A.    No.

7          Q.    With your contacts at OMD?

8          A.    No.

9          Q.    With your contacts at Burrell?

10         A.    No.

11         Q.    In -- well, you continued -- we're going

12    this the documents, but you continued -- let me for

13    the record orient you.   This lawsuit was filed the

14    day after this, May 21, 2021, and you and your sales

15    team continued in sales mode thereafter, including

16    seeking business from McDonald's; correct?

17         A.    Yes.

18         Q.    Did you have an opinion on whether a

19    lawsuit was filed would make your job easier or

20    harder?

21         A.    No.  I'm not a lawyer.  I didn't get

22    involved with any of the legalities of that.

23         Q.    Sure.  I understand that.  But I think

24    you said earlier that a lot of the business that's

25    done is relationship-based; correct?

Page 192

1              C. Kelly - CONFIDENTIAL

2       then the channel that airs the same.  So what was

3       the logic behind marketing both to the same

4       advertiser?

5              A.    Oh, completely different audience.  Cable

6       and syndication have a different audience.  It's

7       just been a different day part syndication that's

8       looked at, and it gets -- advertisers typically have

9       a cable budget, a syndication budget, a broadcast

10      budget, a streaming budget.  So it's just broken out

11      separately.  Different audience.

12             Q.    I know by this time a lot of advertisers

13      were moving away from syndication, so you might have

14      an advertiser who is not mixing in syndication but

15      this was a way to market the programming to them?

16             A.    Yes.  And cable traditionally is

17      efficient, and cable can also offer sponsorship

18      opportunities.

19             Q.    So I think if you add all of the pieces

20      of this one up, I think it comes to 32 million.

21      And, you know, if you go through the other ones,

22      they're all -- they're fairly large as well.  So

23      these represent a significant ask.  Strike that.

24             These represent a significant increase in

25      the ask over years prior; correct?

EXHIBIT H
AOE0342

1                   C. Kelly - CONFIDENTIAL

2          identification.)

3          Q.    This is Defendant's Exhibit 114,

4   ESN 0014414.  The initial email is from you

5   August 3, 2021, to Geoffrey Calabrese at OMG,

6   Courtney Maron, and then cc Mr. Allen,

7   Ms. Bekkedahl, Mr. Galatt, Mr. Gentile, and Amy

8   Muhlstock.  Subject AMG and OMG 21-22 upfront

9   incremental ask.

10              I apologize, the spreadsheet printed out

11  kind of funky, so I'll walk you through it when we

12  get there.  But it wouldn't all fit on one page.

13              But so what is this incremental ask that

14  you were sending to OMG and OMD?

15          A.    I don't recall.

16          Q.    Your cover email says, I appreciate your

17  time last week and your patience.

18              And then it says, As Byron expressed on

19  our call last week, attached are incremental asks by

20  client by AMG property.

21              Do you recall a conversation -- I guess

22  that would have been late July 2021 -- with OMG that

23  Mr. Allen participated in about incremental asks for

24  OMG's advertising clients?

25          A.    I don't recall.

EXHIBIT H
AOE0343

1                    C. Kelly - CONFIDENTIAL

2            Q.    If you look at the attachment, it's,

3      like, this, and then the next page is going to be

4      this panel here and then this panel across?

5            A.    Yes.

6            Q.    So under account, you see McDonald's.

7            A.    Yes.

8            Q.    So McDonald's is nine down.  So if we

9      track across counting down nine, that's going to be

10     McDonald's.

11                 We'll just start with the first page

12     under the box the Weather Channel.  So this is an

13     ask -- this is the overview of the negotiations for

14     Weather Channel; correct?

15           A.    Yes.

16           Q.    So 2021 column is showing zero.  So that

17     represents no spend in the prior year?

18           A.    Yes.

19           Q.    And then the next column is 21-22

20     original ask 5 million.

21                 So that represents the first ask that was

22     made by AMG is $5 million into the Weather Channel?

23           A.    Yes.

24           Q.    Next column is current registration, is

25     zero.  That means there's no business at that point?

Page 196

1                    C. Kelly - CONFIDENTIAL

2          A.     Correct.

3          Q.     And then the next column is incremental

4     ask, and this one is 4 million.

5                 So what is this incremental ask?

6          A.     I'm sorry.  Can I just back up.

7                 So the current registration means that

8     OMD registered upfront money with us already and

9     that's what they registered by clients.

10         Q.     For the upcoming year?

11         A.     Correct.

12         Q.     Not current spend?

13         A.     Correct.

14         Q.     I may have said that.

15         A.     It's okay.

16         Q.     So the 4 million incremental ask is,

17    okay, we're currently at zero.  We've asked for 6 --

18    no, I'm sorry, we asked for 5, we're currently at

19    zero, so we're coming back, how about 4 for next

20    year; right?

21                And your cover email references that

22    Mr. Allen was part of a discussion about this, but

23    you don't have any specific recollections?

24         A.     I don't.

25         Q.     Do you recall how these incremental ask

EXHIBIT H
AOE0345

Page 197

1                    C. Kelly - CONFIDENTIAL

2        numbers were calculated?

3              A.    I do not.

4              Q.    And then it keeps going across.  If you

5        look at the next page, the Weather Group Channel

6        sponsorship kind of splits between the first and the

7        second.  The next box over is syndication.  So

8        that's the ES syndicated properties?

9              A.    Yes.

10             Q.    And then the next -- the green one,

11       again, it splits across.  But that appears to be the

12       ES networks; is that correct?

13             A.    Yes.

14             Q.    So the bottom highlighted line, these are

15       the totals across these clients that we saw in the

16       first page; right?

17             A.    Yes.

18             Q.    And so I just want to make sure I'm

19       reading it correctly.  This says the 21-22 original

20       ask for the networks was 79,394,000?

21             A.    Are you all the way at the --

22             Q.    No.  I'm not.

23             A.    Sorry.

24             Q.    That's okay.  I'm on the green box on the

25       back of the first page which is the start of the

EXHIBIT H
AOE0346

1                    C. Kelly - CONFIDENTIAL

2        section for the networks.

3             A.     Okay.

4             Q.     And so the heading, the column 21-22

5        original ask, so that represented the original ask.

6        I'm just asking --

7             A.     Yes.

8             Q.     -- across all clients that totaled to the

9        79 million number down here?

10            A.     Yes.

11            Q.     And then the current registration was a

12       $300,000 commitment?

13            A.     Yes.

14            Q.     And then if you go to the next page where

15       the green box continues, you get the incremental ask

16       column --

17            A.     Yes.

18            Q.     -- which is 9 million 500.

19                   Would you have been involved with setting

20       that number for the cable network?

21            A.     I don't recall.

22            Q.     And then if you go two more pages, you

23       get to one that's got this royal blue box, account

24       totals.

25                   If these had been laid out horizontally

EXHIBIT H
AOE0347

1                    C. Kelly - CONFIDENTIAL

2        find out what next steps are.  It could be a

3        combination of things.

4              Q.    Understood.  It means you're at a level

5        of engagement; is that fair?

6              A.    Yes.

7              Q.    And so we've talked now for a while about

8        the BOM strategy, and I think you've said success or

9        leaning in was getting the meetings, being educated,

10       and then hopefully an investment; is that correct?

11             A.    Yes.

12             Q.    So the -- getting past the to be

13       scheduled and into the follow-up, that would be

14       success on one of those prongs; right?

15             A.    Yes.

16             Q.    And I think when we started talking about

17       the BOM initiative earlier this afternoon and sort

18       of what you were hoping to see -- well, I think you

19       talked about twofold.  One was bringing attention to

20       the problem and then hoping to see increased

21       investment in Black-owned media; right?

22             A.    Yes.

23             Q.    So the problem that you were seeking to

24       bring attention to was a systemic issue; right?  It

25       was an industrywide lack of investment in

EXHIBIT H
AOE0348

Page 208

1                    C. Kelly - CONFIDENTIAL
2        Black-owned media partners.
3             A.     Yes.
4             Q.     At the agency and the advertiser level?
5             A.     Yes.
6             Q.     And so the remedy, if we can use that
7        word, that you were seeking to address that address
8        that problem was systemic, was an investment
9        commitment by advertising agencies on behalf of
10       their clients who were the advertisers; is that
11       correct?
12            A.     Yes.
13            Q.     With Black-owned media partners?
14            A.     Yes.
15            Q.     I just wanted to close out one thing.  I
16       don't think I fully asked you about this morning.
17       Your current employer is -- it's Digital Media; is
18       that correct?
19            A.     Yes.  Streaming.
20            Q.     Streaming.  Is it like programming, apps,
21       games, kind of all of the above?
22            A.     It's an app of all kids' content.  So
23       kids and moms.
24            Q.     But not linear television?
25            A.     No.

EXHIBIT H
AOE0349

Page 215

1

2                        CERTIFICATE

3

4        STATE OF NEW YORK )

5                          ) ss.

6        COUNTY OF SUFFOLK)

7

8             I, Elizabeth F. Tobin, a Registered

9        Professional Reporter and Notary Public within and

10       for the State of New York, do hereby certify:

11            That Cynthia Kelly, the witness whose

12       deposition is hereinbefore set forth, was duly sworn

13       by me and that such deposition is a true record of

14       the testimony given by such witness.

15            I further certify that I am not related

16       to any of the parties to this action by blood or

17       marriage and that I am in no way interested in the

18       outcome of this matter.

19

20

21

22        ELIZABETH F. TOBIN, RPR

23

24

25

EXHIBIT H
AOE0350

# EXHIBIT I

EXHIBIT I

AOE0351

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

_____

ENTERTAINMENT STUDIOS          )
NETWORKS, INC., a California   )
corporation; WEATHER GROUP,    )
LLC, a Delaware limited        )
liability company,             )
                               )
            Plaintiffs,        )
                               ) Case No.:
vs.                            ) 2:21-cv-04972-FMO-MAA
                               )
MCDONALD'S USA, LLC, a         )
Delaware limited liability     )
company,                       )
                               )
            Defendant.         )
_____)

VOLUME I

VIDEOTAPED DEPOSITION OF BYRON ALLEN

Los Angeles, California

Wednesday, November 2, 2022

Reported by:
Kathy E. Mannlein, CSR No. 13153
Job No. 78499

EXHIBIT I

AOE0352

```
 1                  IN THE UNITED STATES DISTRICT COURT

 2              FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3                         WESTERN DIVISION

 4                     _____

 5    ENTERTAINMENT STUDIOS        )
      NETWORKS, INC., a California  )
 6    corporation; WEATHER GROUP,   )
      LLC, a Delaware limited       )
 7    liability company,            )
                                    )
 8                   Plaintiffs,    )
                                    )
 9    vs.                           ) Case No.:
                                    ) 2:21-cv-04972-FMO-MAA
10    MCDONALD'S USA, LLC, a        )
      Delaware limited liability    )
11    company,                      )
                                    )
12                   Defendant.     )
      _____)
13

14

15        The deposition of BYRON ALLEN, VOLUME I, taken on behalf

16    of the Defendant, at a remote location; commencing at

17    9:38 a.m. and ending at 6:35 p.m., on Wednesday, November 2,

18    2022, before Kathy Mannlein, a Certified Shorthand Reporter in

19    the State of California, License No. 13153.

20

21

22

23

24

25
```

EXHIBIT I

AOE0353

```
 1    APPEARANCES OF COUNSEL:

 2

 3    For the Plaintiff Entertainment Studios Networks, Inc.:

 4    MILLER BARONDESS, LLP
      BY:  LOUIS R. MILLER, Attorney at Law
 5    BY:  DAVID SCHECTER, Attorney at Law
      1999 Avenue of the Stars, Suite 1000
 6    Los Angeles, California  90067
      310-552-5251
 7    310-552-8400  Fax
      Smiller@millerbarondess.com
 8
      For the Defendant McDonald's USA, LLC:
 9
      RILEY SAFER HOLMES & CANCILA, LLP
10    BY:  MATT KENNISON, Attorney at Law
      BY:  AMY ANDREWS, Attorney at Law
11    BY:  ROB FOLEY, Attorney at Law
      100 Spectrum Center Drive, Suite 440
12    Irvine, California  92618
      949-359-5515
13    949-359-3501  Fax
      rfoley@rshc-law.com
14
      PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
15    BY:  SUSANNA M. BUERGEL, Attorney at Law
      BY:  MONICA MOSBY, Attorney at Law
16    BY:  KERISSA BARRON, Attorney at Law (Via Zoom)
      1285 Avenue of the Americas
17    New York, New York  10019
      212-373-3553
18    212-492-0553  Fax
      Sbuergel@paulweiss.com
19

20    Also present:  Josh Oshima, Videographer
                     Jeffrey Mayes, Allen Media In-House Counsel
21                   Mark Divitre, Allen Media In-House Counsel
                     Janice Arouh, President Distribution Allen
22                   Media Group
                     Eric Gould, Allen Media Group
23                   Russell King (Zoom), McDonald's In-House
                     Counsel
24

25
```

EXHIBIT I

AOE0354

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

1          But you had a question, go for it.

2      Q.  No, no problem.  I just wanted to make sure you're done

3    with your answer.

4      A.  Sure, go for it.

5      Q.  You mentioned other Black-Owned Media companies has

6    been the victim of racism by McDonald's.

7          Who are those entities?

8      A.  Oh, wow, okay, we're going to spend a lot of time here.

9          Okay.  You know, McDonald's has the equivalent of

10    corporate Jim Crow.  McDonald's has a situation where no

11    matter what it is that you own, if you're Black, you need to

12    go to the Black ad agency, Burrell, if you're Black.  So

13    McDonald's has the equivalent of separate, but not equal.

14    White people go to the general market agency, OMD, the "white

15    water fountain."  Color people go to the ad agency, Burrell,

16    the "colored water fountain."  The white water fountain has

17    nice, wonderful crisp water.  And the colored water fountain

18    has dirty water with led.

19          So by way of example, my shows are not Black target.

20    Most of our networks are not Black target.  But because I am

21    Black, McDonald's has said, you, Negro, go over here to the

22    Black ad agency because you're Black.  And by the way, that

23    Black ad agency, Burrell, doesn't have much of a budget,

24    compared to our white ad agency, at the time, OMD.

25          So you asked the question, Matt, a very good question.

EXHIBIT I

AOE0355

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

1  want them the shoot the resorts up there for our travel

2  channel, MyDestination.TV.  I want them to shoot what's going

3  on in the pet community up there for Pets.TV and shoot all the

4  movie stars that come up to this unbelievable car show, for

5  our entertainment channel, ES.TV.

6          And Verizon -- and Verizon said, you know what, we've

7  heard a lot of pitches.  That is -- that's very clever.  We're

8  not going to give you ten networks.  We're going to give you

9  six networks.  And then I went back and we did a seventh

10  network, a court show.  A 20 -- I'm the largest employer --

11  largest producer of court shows.  And so I believe we have

12  seven of them.  And I love law, and I love court shows, and I

13  love the judges, and I love their rulings, and I love how the

14  judges think.  And so we do -- we launched a 24-hour court

15  network in our 24-hour court channel.  So we have seven of

16  them.

17          And then this gentleman came to me.  And he said, can

18  we have dinner?  And I said sure.  And he said, you know,

19  before I was the -- I think CEO of this company that satellite

20  24-hour cable networks, including ours at the time -- he said,

21  I used to be the Chief Operating Officer of The Weather

22  Channel.  And he said The Weather Channel is a phenomenal

23  network.  And he said the way you think, and the way you

24  operate is far different than anybody else.  And he said

25  The Weather Channel, in your hands, you would do extremely

EXHIBIT I

AOE0356

**BYRON ALLEN, VOLUME I**

November 02, 2022

1   well with it.  He goes, you are the perfect person to own

2   The Weather Channel.  He goes, but you live here in LA.  And

3   you're not thinking about The Weather Channel because it's

4   always 80 degrees and sunny.  He goes, but you should own it.

5            And so I got into it, he told me about it.  And we won

6   the bid in March of 2018.  We bought The Weather Channel.  And

7   that's been a phenomenal business for us.  And we've launched

8   other networks along the way, and streaming platforms.  We

9   launched The Weather Channel -- very proud of this.  We

10  launched The Weather Channel in Español.  The very first

11  24-hour Spanish language weather network.  Because this is

12  important lifesaving information.  And I did not want language

13  to be a barrier as to people getting this very important

14  information.  And wouldn't you know it, this past hurricane

15  season, it kicked off in Puerto Rico, and we were the first

16  and the only in the history of media to be there, 24/7, in

17  English and in Spanish.  Could not be prouder of that.  And,

18  unfortunately, I'm losing money on that network, because

19  advertisers aren't leaning in and supporting The Weather

20  Channel in Español.

21           We have -- we've gone and we've bought something out

22  of bankruptcy called The Black News Channel.  And The Black

23  News Channel, unfortunately, went into bankruptcy, and they

24  pink slipped close to 300 people, and didn't pay them their

25  last three or four weeks, because they did not get advertising

EXHIBIT I

AOE0357

```
 1   from folks like McDonald's.  They took in approximately

 2   $2 million, non-direct response, which is shameful.  And we

 3   converted that to TheGrio, and we -- which gave us about 50

 4   million homes.  And we immediately married that with HBCU

 5   Sports.  So, now, we are helping to educate Black kids in

 6   America.

 7           And -- because, for me, this whole thing, Matt, is

 8   about the five Es.  Number one:  Make sure everybody gets a

 9   great education.  Because that's the one in America.  Number

10   two, make sure everybody has economic inclusion.  Number

11   three, make sure everybody has equal justice.  Number four,

12   make sure everyone has environmental protection.  One of the

13   main reasons I bought The Weather Channel, to help lead that

14   conversation.  And, number five, empathy.  Make sure we all

15   lean in, to make sure we stop acting like we don't see the

16   homeless, the food insecure, and the mentally ill.  And I'm a

17   firm believer that when we master these five Es, and we lean

18   in on these five Es, we can achieve one America.  And if we

19   can achieve one America, we can achieve a slice of heaven

20   right here on earth.  And that's what that one America looks

21   like for me.  That is what Coretta Scott King taught me.  That

22   is the reason Martin Luther King, Jr. died for us.  He died

23   for us, to try and achieve one America.  And we've seen what

24   it looks like when we don't have it.

25           If that George Floyd verdict had gone the wrong way,
```

EXHIBIT I

AOE0358

**BYRON ALLEN, VOLUME I**

November 02, 2022

1   this country would have gone up in smoke, because we didn't

2   have equal justice.  And we have an unbelievable unfair trade

3   balance.

4           So I built this company.  I -- you know, we've

5   invested about a billion dollars buying ABC, NBC, CBC, and Fox

6   affiliates over the last three years.  Unfortunately, I am the

7   only African American in this country that owns ABC, NBC, CBS

8   and Fox affiliates.  Unfortunately, I'm the very first Black

9   African American to own a mainstream cable news network.

10          And all of this -- and, by the way, I own my company

11  100 percent, not by design, Matt, but because no one believed

12  in me.  And like a lot of African American entrepreneurs, no

13  one would invest in me.  No one would -- would -- I mean, the

14  first 15 years of this company, I had to use Factors.  I

15  couldn't even get a bank loan.  And Factors were charging me,

16  like, 27 percent interest.

17          So the miracle of this company is how we have survived

18  lack of access to capital that's not predatory, and

19  corporations like McDonald's that minimize us and don't give

20  us fair economic inclusion.

21          So that's how I built this company over the last 30

22  years from my dining room table.  And if I don't correct the

23  economic injustice, no one will.  And I'm not going to leave

24  this for anybody to deal with.  I want everybody kid in

25  America to have access to fair economic inclusion, every kid

EXHIBIT I

AOE0359

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

1    in America.

2        Q.  So your company is kind of the next thing I want to ask

3    you about, specifically.

4        A.  Sure.

5        Q.  So when you say the company, what -- do you mean

6    Allen Media Group, like the top part of the company; correct?

7        A.  Yes, sir.

8        Q.  And you're the CEO of that --

9        A.  Yeah.

10       Q.  And the plaintiff entities in this case, Entertainment

11   Studios Networks, Inc. and Weather Group, LLC, are you also,

12   you know, an officer of those two entities?

13       A.  Yeah.  I own all of these entities, 100 percent, and

14   all of these entities are underneath me.

15       Q.  Got it.  Understand, okay.

16           So I'm going to show you today, throughout the day,

17   several documents that have been stamped confidential down in

18   the left corner, and I'll call them out for you.

19           But you understand that as an officer of the plaintiff

20   entities, that you are bound by the protective order in this

21   case that says, essentially -- I'm paraphrasing -- you can't

22   use information from confidential documents outside the

23   litigation.

24           Do you understand that?

25       A.  Sure.

EXHIBIT I

AOE0360

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

```
 1      Q.  Those are shows and also the name of networks?

 2      A.  That's exactly right.  Comedy.TV is a television show

 3   and it's the name of a network.  And it's a way for us to put

 4   it on broadcast TV to promote the 24-hour network.

 5      Q.  I see.  So that was -- you anticipated my next

 6   question.

 7          So these shows are produced for syndication?

 8      A.  Yes.

 9      Q.  And they run in syndication?

10      A.  That's right.

11      Q.  And then they rerun on the networks?

12      A.  That's right.  And we have them on broadcast television

13   stations so that you can be aware of the brand, Pets.TV.  In

14   case you don't have the cable networks, we want you to be

15   aware of the brand.  And so when you see the brand -- and you

16   are in Chicago now?  So if it ran on WMAQ or WLS in Chicago,

17   you would see the brand.  And then you'd go, oh, okay, and

18   you'd see it on your cable platform.  And you'd go, oh, I know

19   Comedy.TV, I know Pets.TV, I'm aware of Recipe.TV, and then

20   you watch it.

21      Q.  Okay.  So if you flip now to Bates Page 22144, 22144.

22      A.  Yes.

23      Q.  That slide is entitled Funny You Should Ask Growth?

24      A.  Yes.

25      Q.  All right.  So Funny You Should Ask is a comedy game
```

EXHIBIT I

AOE0361

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

1   show; right?

2       A.  That's exactly right.  And it's very funny, I might

3   add.

4       Q.  And that show is produced for syndication?

5       A.  Yes, that show is produced for syndication.  And that's

6   also on our cable network, Comedy.TV.

7       Q.  I see.  So same thing, it's produced new for

8   syndication, and then you rerun it on Comedy.TV, the network?

9       A.  That's exactly right.  That's exactly right.  And you

10  see that -- it's very common with a lot of content -- I mean,

11  I don't know how many places you see Law and Order, but good

12  look turning on the television and not finding Law and Order

13  on the TV somewhere.

14      Q.  Right.

15      A.  So there are many, many platforms.

16      Q.  So there a couple -- three line graphs.  The top one

17  says, "Up 24 percent in household rating."

18          Do you see that?

19      A.  Yes.

20      Q.  Okay.  And then below, it says the story is the same in

21  key demos.  And then it has adults 25 to 54 and women, 25 to

22  54.

23          Do you see that?

24      A.  Yes.

25      Q.  Okay.  So these are two separate ways to measure

EXHIBIT I

AOE0362

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

```
 1  demo, at these -- at these shops, these -- tends to be, you
 2  know, 18 to 49, 25 to 54, adults or women, is where it tends
 3  to be.
 4      There was an issue with Burrell that we found just
 5  excep- -- just really quite appalling; that Burrell not only
 6  was it, hey, go to the Black ad agency.  Burrell, per the
 7  instruction of McDonald's, said not only go to the Black ad
 8  agency, you have to guarantee Black demo.  And McDonald's is
 9  the only person -- only entity in -- throughout the entire
10  ecosystem to say to companies like ours, hey, it's a smaller
11  budget, and you're going to get even a smaller, smaller
12  version of that smaller version, because we're going to have
13  you guarantee a Black demo.  Good luck finding another
14  corporation making companies guarantee a Black demo.
15      Q.  And so McDonald's requires a guarantee on a Black demo
16  of all of their media partners, don't they?
17      A.  I don't know.  But if they do, they're the only ones to
18  do so.  And it's disingenuous, and it is something that hurts,
19  you know, Black-Owned Media, because -- they're the only ones
20  asking for a guarantee on a Black demo.  No one else has ever
21  asked us for that.
22      Q.  But my question is, you don't have any information, as
23  you sit here today, to suggest that they require you to
24  provide a Black demo guarantee but not others; correct?
25      A.  So here's how I would answer that, Matt, and I want to
```

EXHIBIT I

AOE0363

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

1    everybody they send to Burrell, on behalf of McDonald's, has

2    to guarantee a demo that only they request, and only they ask

3    for.  And if you want to be in business with them,

4    unfortunately, you gotta go and do this horrible, narrow demo.

5        Q.  But my question was a little bit different.

6            And that is, do you have any information to suggest,

7    for example, like BET, if they are selling a Black audience

8    that they are not also required to guarantee a delivery of

9    that black audience?  Do you know one way or the other?

10       A.  I am highly confident that when you go to OMD, you're

11   not doing a Black demo.  You're doing a -- you're doing

12   business with OMD the way you do business with OMD.  They

13   don't ask -- OMD does not ask for a Black demo.  Only

14   McDonald's asks for a black demo, through Burrell, where they

15   send all of their Black media companies.

16       Q.  And what's your basis for that belief?

17       A.  That's how they've treated us, and that is what they

18   do.

19       Q.  And when you say "they" --

20       A.  They've told us that.  Burrell has said, we make

21   everybody guarantee a Black demo.  And the only people that

22   are sent to Burrell are -- is other Black-Owned Media.

23   Burrell told us that.  We make you guarantee a Black demo.

24   Not only that, they say, by the way, we want you to go through

25   this hideous process to prove that you're black so we can get

EXHIBIT I

AOE0364

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

```
 1   credit for you being black.  So I had to go and do something

 2   my white counterparts don't do.  I had to fill out paperwork,

 3   and give them my -- literally, give them my birth certificate.

 4   They wanted my parents' birth certificates.  Give them my

 5   driver's license, my Social Security number.  They physically

 6   send someone to my office here, and took a photo of me, to

 7   make sure that I was Black.  So that they can get credit for

 8   doing business with somebody Black even though they really

 9   don't do business with us.  It's a hideous process.  It's very

10   -- it's demeaning.  And I'm, like, okay, are you serious?  And

11   so, you know, that's McDonald's.  And that's Burrell.  And

12   Burrell told us, everybody has to guarantee this Black demo.

13       Q.  And who at Burrell told you that?

14       A.  Wow, I mean, there's been so many -- I mean, I've been

15   dealing with this for almost 30 years, Matt.  I do not recall.

16   But, you know, our ad salespeople would know.

17       Q.  Okay.  Do you have a sense of the -- how the annual

18   ratings for these syndication properties have performed from

19   2016 to 2021?

20       A.  I don't have all of the data there, but we have a

21   research department that can give you all of that.  We -- you

22   know, we've garnered quite a bit of broadcast real estate.

23   We've grown our business.  Our ad revenue has gone up

24   significantly.  And it couldn't go up significantly unless we

25   were growing our audience, you know.  McDonald's is just one
```

EXHIBIT I

AOE0365

**November 02, 2022**

```
 1   more of a fair scenario, because 18 to 34 -- Black -- Black

 2   people, 18 to 34, why don't you just say, let me give you five

 3   dollars for the spot.  I mean, that's another way of saying,

 4   let me give you five dollars for the spot, instead of really

 5   working with Black-Owned Media and providing economic

 6   inclusion.

 7       Q.  Okay.  My question is different, Mr. Allen, is that you

 8   were trying to sell this demo because it would give you the

 9   chance to maximize revenue for selling this network; correct?

10       A.  Sure.

11       Q.  Okay.  That's my question, thank you.

12           And so, again, the ES court combo is essentially the

13   same lineup that's on the Justice Central TV.  You produce the

14   ES court combo shows, in broadcast syndication, and then you

15   rerun them on the network; correct?

16       A.  We produce the court shows for broadcast syndication,

17   and then we repurpose them on the broad- -- on our cable

18   network, yes.

19       Q.  Plus the Gloria Allred reruns, which are now going to

20   be the Lake show -- the new Lake show?

21       A.  That's right.  Lauren Lake, yes, that's right.  And

22   she's terrific, by the way.

23       Q.  And so if an advertiser purchased -- purchases

24   advertising on the ES court combo and, also, purchases

25   advertising on Justice Central TV, it's essentially the same
```

EXHIBIT I

AOE0366

**BYRON ALLEN, VOLUME I**

November 02, 2022

1    not in a funnel, but they're getting a lot of information, a

2    lot of data.

3        Q.  And the various studies that you just referenced, do

4    you know what those are?

5        A.  No.  I know they have multiple sources where they get

6    their information from.

7        Q.  Okay.  So high viewer demand, as used in the complaint,

8    doesn't mean that they have high Nielsen ratings?

9        A.  No, no, no, no, no, no.  I mean, listen, Nielsen does

10   not -- I mean, Nielsen is not good at what they do.  Nielsen's

11   horrible at what they do.  They're really bad at what they do.

12   Nielsen has been discredited.  They've lost their

13   accreditation.  How about that?

14       Q.  Yeah, we're going to talk about that.  I know that

15   there's litigation and --

16       A.  Yeah, I had to -- I had to sue Nielsen, because

17   everybody else was complaining.  And I said, let's not

18   complain.  Let's take action.  Nielsen has lost its

19   accreditation by the MRC.  They cannot measure people

20   properly.  And a lady -- I forget her name -- and you can

21   Google it, if you would be so kind.  The lady who ran the

22   product for Nielsen, left Nielsen, to go work, I think at NBC

23   Universal.  And she said, it's mathematically impossible for

24   this product to work.  It doesn't work, and it will never

25   work.  Okay?  She left the company -- I think she had been

EXHIBIT I

AOE0367

**BYRON ALLEN, VOLUME I**

November 02, 2022

1    saying it doesn't work, and mathematically impossible.  And

2    then she leaves the company, and then they delay the new and

3    improved by one year.

4        Q.  All right.  So I think I understand.

5            So your problem is not that the ESN Lifestyle Networks

6    have a low ratings.  They do.  The problem is that Nielsen

7    doesn't do a good job of measuring people; is that right?

8        A.  **Nielsen does a horrible job at measuring people.  And**

9    **they have admitted that.  And they've said they're going to**

10   introduce a new and improved product that they cannot get

11   launched, because it can't get accredited, and they've lost

12   their accreditation.  Nielsen is a major, major fraud.

13       Q.  Okay.  So it's also correct that the ESN Lifestyle

14   Networks were not Nielsen rated until October 1st of 2017; is

15   that right?

16       A.  **Oh, I don't know that, but I'll take your word on it.**

17       Q.  All right.  Well, let's look at a document together.

18       A.  **If you say so, but I'll look at it.**

19       Q.  I'll mark this as Defendant's 121.  This is the

20   declaration of Mark Devitre from that Nielsen litigation that

21   you were just mentioning.

22       A.  **Sure.**

23                       (Exhibit 121 marked.)

24   BY MR. KENNISON:

25       Q.  And, really, I just want to ask you about a couple of

EXHIBIT I

AOE0368

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

```
 1   paragraphs right now in this.

 2       A.  Sure.

 3       Q.  If you go to paragraph 14.  It says, "Ultimately, on

 4   August 2nd, 2017, the parties executed the global amendment to

 5   the 2007 agreement (the '2017 Amendment,' and attached as

 6   Exhibit 2.)  The 2017 Amendment provided fee schedules for a

 7   seven-year term."

 8           Do you see that?

 9       A.  Yes.

10       Q.  And then if you flip to paragraph 16, it says, it has

11   an agreement for Comedy.TV as an example.

12           Do you see that?

13       A.  Sixteen?

14       Q.  Yeah.

15       A.  Yes.

16       Q.  Okay.

17       A.  Yes.

18       Q.  And then paragraph 17 says that the 2017 Amendment went

19   into effect on October 1, 2017 and runs through

20   September 30th, 2024?

21       A.  Yes.

22       Q.  Okay.

23       A.  Thank you for this.  You brought me up to speed.

24       Q.  Sorry.  So then we can agree that the ESN Lifestyle

25   Networks, the seven of them that we've been talking about,
```

EXHIBIT I

AOE0369

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

1   didn't begin to receive Nielsen ratings until October 1, 2017;

2   correct?

3       A.  It appears that way, but it looks -- well, see -- it

4   looks like there was something in 2007.  But, yes, there's an

5   amendment in 2017.  But it looks like something was happening

6   in 2007.

7       Q.  Yeah, 2007, I believe, was your original agreement with

8   Nielsen.  And this was referencing an amendment to the 2017

9   amendment.

10      A.  Okay, yes.

11      Q.  Okay.  And so if you go to Exhibit 2, and you'll see

12  the blue -- you see the blue numbering at the top of the page

13  there.  And it says Page ID, and then it has a number?

14      A.  Yes.

15      Q.  Okay.  If you go to Page ID 75 -- that's probably the

16  easiest way to get there.

17      A.  75?

18      Q.  Yep.

19      A.  Yes.

20      Q.  Do you recognize this document?

21      A.  Yes.

22      Q.  Okay.  And that first page there, Page ID No. 76, that

23  has handwritten "BA" at the bottom, that's your initials,

24  Byron Allen?

25      A.  Yes.

EXHIBIT I

AOE0370

**BYRON ALLEN, VOLUME I**

November 02, 2022

```
 1      Q.  Okay.  So you signed this agreement; right?

 2      A.  Yes.

 3      Q.  So then if you go down to Page ID No. 87.

 4          MR. MILLER:  I'm having a trouble finding -- following

 5  you.  87?

 6          THE WITNESS:  At the top.

 7          MR. KENNISON:  The blue text, Skip, at the top.

 8          MR. MILLER:  Oh, it's at the top?  Okay, sorry.

 9          MR. KENNISON:  Yeah, these are not --

10          MR. MILLER:  Got it, okay.

11          THE WITNESS:  Yes, I'm at 87.

12  BY MR. KENNISON:

13      Q.  This is a -- it's called Schedule One Allocation Grid.

14      A.  Yes.

15      Q.  All right.  So the top left column, it lists

16  Justice Central and Comedy.TV, individually; correct?

17      A.  Yes.

18      Q.  All right.  And then -- and then it has prime network

19  number one, called Prime Network One, followed by what looks

20  like four plexus, network two, three, four, five.

21          Do you see that there?

22      A.  Yes.

23      Q.  So the -- am I right to say that Justice Central and

24  Comedy.TV were each, per this agreement, rated individually.

25  And then the other five were these labeled networks.  And they
```

EXHIBIT I

AOE0371

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

1   were given a cumulative rating for all five of them together;

2   is that right?

3       A.  That's the way this looks, yes.

4       Q.  Okay.  And, again, why -- why did you do it that way?

5       A.  Lifestyles.  It was -- you know, you had

6   Justice Central which was a court network, very different for

7   advertisers.  Then you have Comedy.TV.  Obviously, it's not

8   lifestyle.  But when you're talking about food, and travel,

9   and entertainment, it's lifestyle.  So we put the lifestyle

10  together to make it, you know, more efficient, to go into the

11  marketplace.  So here's your 24-hour court network, with all

12  of our judges and our court shows.  Here is our 24-hour comedy

13  network.  And then here's our lifestyle platform.  And our

14  passion networks, if you're passionate about pets, and food,

15  and travel.

16      Q.  I got it.  And see the red text there that says

17  multiple network discount, ten percent?

18      A.  Yes.

19      Q.  Is that a discount applied because you're bundling

20  networks?

21      A.  I'm not quite sure, but they gave a discount, and so I

22  didn't ask any questions.

23      Q.  Fair enough.  Okay.  All right.  All right.  This will

24  be DX 122.

25                       (Exhibit 122 marked.)

EXHIBIT I

AOE0372

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

1      Q.   Okay.  And so I think we talked earlier, we looked at

2   Mr. Devitre's declaration and the attachment for the Nielsen

3   amendment.

4        Do you remember that?

5   **A.  Yes.**

6      Q.   You don't need to look at it, but...

7   **A.  Yes.**

8      Q.   And so the Entertainment Studios Lifestyle Networks

9   didn't start receiving Nielsen ratings until October 1st,

10   2017; right?

11   **A.  Yes.**

12     Q.   Okay.

13   **A.   I mean, I'm assuming so, according to your document,**

14   **but, yes.**

15     Q.   And you would agree that those ESN Lifestyle Networks

16   are not very highly rated, wouldn't you?

17   **A.   I would agree -- the way we positioned those networks,**

18   it was about the environment, the engagement.  And we're not

19   going to depend on Nielsen and its fraudulent measurement

20   system.  What we'd asked folks to do, McDonald's, is to get in

21   here and -- and support this, so we can grow these networks.

22   We know people watching them, because people are calling the

23   1-800 numbers and they're ordering up the product.

24     Q.   So I want to talk to -- talk about that.  You know that

25   folks are watching your networks, because they're calling the

EXHIBIT I

AOE0373

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

1  company, is there some type of database or proprietary tool or

2  something that you use to track it?

3       A.  Well, they rebook.  They keep booking, and they come

4  back.  And these are phone calls that are happening at two,

5  three, four in the morning.  And they're not going to book you

6  again and come back unless you're delivering those sales.

7       Q.  Right.  I guess --

8       A.  Those phone calls.  You have to make the phone ring, or

9  they don't come back.

10      Q.  I guess what I'm asking is, how does ESN, or

11  Allen Media Group, keep that data, the number of folks that

12  are calling in?

13      A.  We don't get the data on who called in.  We just get

14  the fact that that owner of that Infomercial says, hey, this

15  worked for X, Y, Z dollars.  And we want to buy another half

16  hour, another five half-hours, or whatever it is, because it's

17  working.  Direct response is very easy.  They call you if it's

18  working.  And they keep buying you if it's working.

19      Q.  Okay.

20      A.  And that's -- that's a big statement, too, because

21  you're making the phones ring at two, three, four in the

22  morning.  You're selling product.

23      Q.  Is it accurate that only Justice Central and Comedy.TV

24  poll ratings from Nielsen, individually?

25      A.  Well, let's see here.  Obviously, The Weather Channel

EXHIBIT I

AOE0374

1   has a rating, Justice Central has a rating, Comedy.TV has a

2   rating.  And then the Lifestyle Networks, as you and I have

3   chatted about, together, combined cumulatively, have a rating.

4       Q.  And so you can't see what the individual networks --

5   what their ratings are, because they're too small.  So you get

6   them aggregated; correct?

7       A.  I wouldn't say they were small.  We didn't have them

8   aggregated because they're small, Matt.  We had them

9   aggregated because they're like kind.  And we call that the

10  passion network.  People are passionate about those subjects.

11  We didn't aggregate them because they're too small.  Recipe.TV

12  is doing very well.  If it was about size, we could have

13  peeled out Recipe.TV.  But quite a few people carry Recipe.TV.

14  And I think we're over 40 million subscribers with that, at

15  this point.  I think that's where we are, it has over 40

16  million subscribers.  I wouldn't call that small.

17      Then when you take Recipe.TV, and then you add the

18  others, you're well over 40 million, when you cume them

19  together.  It's something we do with our court shows; right?

20  So, Matt, if you think about our court shows, they're measured

21  together, they're cumed together, like-kind content, running

22  together, our court shows.

23      So a 30-second spot runs in each of our court shows.

24  And I believe there's -- I think there's five court shows in

25  that cume.  So instead of selling the inventory of five

EXHIBIT I

AOE0375

1  measuring properly and not charging what they contracted to

2  charge.  Nothing to do with discrimination.

3        MR. KENNISON:  All right.

4  BY MR. KENNISON:

5    Q.  If you go down to paragraph 53, to that point, it says,

6  "In 2017, Nielsen began providing ratings reports to

7  Entertainment Studios for the ESN networks."

8        That's consistent with what we've been saying; correct,

9  in 2017, that's when those ratings reports started getting

10 produced?

11   A.  Yes.

12   Q.  Okay.  "Entertainment Studios knew from its own

13 internal data that it had viewership on its networks,

14 especially during the prime advertising slots.  It expected

15 that Nielsen would capture this viewerships in its reports,

16 which should have allowed Entertainment Studios to generate

17 substantial ad revenue."

18       Correct?

19   A.  Yes, this is what it says.

20   Q.  What is the -- what is Entertainment Studios own

21 internal data that it had viewership on its networks?

22   A.  That was probably -- and I'm just guessing -- you'd

23 have to talk to our research and the ad sales team.  This is

24 probably the response on the 1-800, because there's long form

25 and short form.  When you do 1-800 spots, it's not just a

EXHIBIT I

AOE0376

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

1    half-hour Infomercial.  It's also a 60-second, a two-minute.

2    And we were doing plenty of business with the short form 1-800

3    spray-on hair.

4        Q.  Okay.  I'm sorry, go ahead.

5        A.  So you wouldn't -- so we know that we are getting, you

6    know, good viewership to make the phone ring to share -- to

7    sell the 1-800 spray-on hair.  But there may have been -- may

8    have been other data.  The platforms have set top boxes.  And

9    so it's not easy to renew -- once again, the platforms, the

10   cable operators, satellite companies, they don't care about

11   Nielsen.  They actually have a box in -- you know, in Amy's

12   home.  They knew exactly everything she's watching to the

13   second.  They have a box in Matt's home.  They have a box in

14   Chris Kempczinski's home.  They know everything he's watching

15   right to the second.  Whatever Morgan Flatley is watching,

16   they have it.  And so they won't renew with us if there's no

17   engagement.

18       Q.  So my question, though, is, this reference to its own

19   internal data, other than it might be the data that you just

20   mentioned, you don't know of any other internal data that

21   shows that it had viewership on its networks, especially

22   during the prime advertising slots?

23       A.  What comes to my mind -- and there may be other

24   reasons -- the short form 60-second, two-minute, 1-800

25   spray-on hair.

EXHIBIT I

AOE0377

1   huge numbers.

2   Q.  Okay.  I'm going to hand you what's going to be DX 124.

3        And I'm sorry, you said at this time.  What time were

4   you talking about?

5   A.  I think you were talking about 2017; right?

6   Q.  Well, 2017 is when the Nielsen agreement was signed;

7   right?

8   A.  Yeah, so when I started the company from my dining room

9   table in 1993, from '93 to today, we've mainly been talking up

10  to McDonald's about broadcast syndication.  And then it

11  became, we added cable with our Lifestyle Networks, and then

12  we added The Weather Channel.  So it became broadcast

13  syndication for most of these 30 years, then Lifestyle cable

14  networks, then The Weather Channel.

15       So -- and we have most of our gross rating points, most

16  of our audience delivery is in broadcast syndication, which is

17  where we did not get real economic inclusion.

18  Q.  Okay.  So this is going to be --

19  A.  Thank you for giving me the opportunity to bring

20  clarity on that.

21  Q.  This is going to be DX 124.

22                    (Exhibit 124 marked.)

23  BY MR. KENNISON:

24  Q.  This is a document -- excuse me -- produced by OMD in

25  this litigation, beginning Bates OMD_001398.  And it ends at

EXHIBIT I

AOE0378

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

```
 1   I think they should buy all of it.  All we're saying is, what

 2   you spend with them, you cannot count against black-owned.

 3   Spend as -- spend whatever you want to spend with whomever you

 4   want to spend it with, but whatever you spend with them, you

 5   can't count it as Black-owned.  And that's -- so we are in

 6   full support of supporting all of these platforms and then

 7   some.  Let's just not count it against Black-owned.

 8         So I just want to go on the record and be very clear,

 9   we are supportive of them, and them being a part of the

10   landscape, and provided economic inclusion.  We appreciate

11   them.  But we're getting to really being transparent about

12   what is 51 percent or greater.  There should be no

13   guesstimation, and there should be no debate.

14   Q.  Okay.

15   A.  And, unfortunately, you and I are sitting here, having

16   a debate, when there should be no debate.  It should be very

17   clear what is Black-owned.  Black Enterprise is Black-owned.

18   Allen Media is Black-owned.

19   Q.  And I want to stick with the discussion about the

20   ratings for a minute here.

21   A.  Sure.

22   Q.  When McDonald's purchases advertising time from its

23   media partners, it generally targets the adults 18 through 49

24   key demo; correct?

25   A.  That may be correct.  I don't do the direct buying, but
```

EXHIBIT I

AOE0379

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

1   that sounds correct to me.

2       Q.  All right.  If I represent that to you, would you have

3   --

4       A.  I'll accept that.

5       Q.  Okay.  And McDonald's, through their agencies, will

6   make it clear to potential media partners, hey, this is what

7   we're looking for, this is the demo we're trying to hit;

8   right?

9       A.  Sure.

10      Q.  Okay.  And so Nielsen ratings are critical in

11  determining whether or not the media company is, in fact,

12  delivering that demo, isn't it?

13      A.  I'm sorry, one more time.

14      Q.  The ratings -- the Nielsen ratings -- and I understand

15  you have a problem with them, and I'm not going to fight you

16  on that.  But they are what the industry uses to determine

17  whether or not a media partner is hitting that demo?

18      A.  Yes, that is what the majority of the industry uses.

19  Yes, Matt, you're correct.

20      Q.  Okay.  In fact, it's the currency; right?  That's what

21  Mr. Galatt called it.

22      A.  And, unfortunately, that is the case, which is why we

23  have filed two lawsuits to get them on-track.

24      Q.  Right.  So -- well, to that end, if you can go back to

25  Mr. Devitre's declaration.  It's in front of you there.

EXHIBIT I

AOE0380

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

1  which consists of data showing the number of viewers that were

2  watching the program when the advertisement aired."

3       Correct?

4  A.  Yeah.  I mean, but don't get that confused.  Proof of

5  data.  I mean, it -- that's also -- that doesn't mean proof of

6  delivery.  So when you do -- so, Matt, when you measure

7  something, you're saying, did you deliver me 100 people?

8  Q.  Uh-huh.

9  A.  Okay?  And did you guarantee me 100 people.  We

10  guaranteed you 100 people and we delivered you 100 people.

11  This is proof of performance.  Sometimes it may just be

12  running the commercial.  And we didn't guarantee you 100

13  people.  And we didn't deliver you 100 people.  So don't --

14  please don't confuse it with proof of delivery versus proof of

15  performance.  Performance may be as simple as, we ran the

16  spot, and that was it.  And we gave you an indication of how

17  many people watched it, but we didn't guarantee that 100

18  people were going to watch it.

19  Q.  So you're talking about the difference between a

20  guaranteed buy and a non-guaranteed buy?

21  A.  There it is.  There it is.  You got it, Matt.

22  Q.  Okay.  But it's industry standard to guarantee the

23  buys; correct?

24  A.  Most of the business is to be -- is to guarantee.

25  Q.  And, in fact, McDonald's buys guarantees regularly;

EXHIBIT I

AOE0381

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

```
 1   correct?

 2       A.  Yes, they do regularly, but they also do make

 3   exceptions to the rule, non-guarantee.

 4       Q.  So -- all right.  The second paragraph there, number

 5   six, the next one on the line, says, "To my knowledge, no

 6   other ratings service exists which provides the detailed

 7   ratings information Nielsen does.  Large, national advertisers

 8   who buy advertising placements from CF Entertainment, and all

 9   other broadcasters and networks, only accept Nielsen ratings

10   as proof of performance.  As a result, CF Entertainment and

11   other similar companies must have an agreement with Nielsen in

12   order to secure advertising revenue."

13           Do you agree with that?

14       A.  Yes, I do, because I have not really found -- I have

15   not found, in my 61 years on this planet, and 30 years -- or

16   more than 30 years in business -- this business started this

17   coming summer 30 years ago.  I have not found an advertiser to

18   accept another measurement service.  Except in the digital

19   platforms, they will use others.  But for television, Nielsen

20   is the Holy Grail.

21       Q.  Okay.  For better or for worse, that's the way it is

22   right now; right?

23       A.  That is correct.

24       Q.  Okay.  And so you'd agree that Nielsen ratings are

25   important to advertisers because it's the only measurement
```

EXHIBIT I

AOE0382

**BYRON ALLEN, VOLUME I**

November 02, 2022

```
 1   that they'll accept to determine whether or not a media
 2   company proved their performance here; right?
 3       A.  Yes, and others are starting a very, you know,
 4   competitive platforms and services.
 5           As a matter of fact, the lady who used to run this for
 6   Nielsen, she left to go help NBC Universal establish a
 7   measurement platform.
 8       Q.  Okay.  And so at the same time, Nielsen ratings
 9   currently are important to media companies, because it's the
10   only way --
11       A.  Yes.
12       Q.  -- that you can determine whether or not you get paid;
13   correct?
14       A.  That's exactly right, yes.
15       Q.  Okay.
16       A.  If that's the deal we make with McDonald's, if
17   McDonald's says, hey, we want a ratings guarantee on this
18   ratings.  But if McDonald's said, hey, we want to be a part of
19   your advertising and your platform, and we are willing to do a
20   non-guarantee, then -- then it's -- you just -- proof of
21   running the spot.
22       Q.  But you said earlier, even in a non-guaranteed deal,
23   you would supply the ratings detail to show who was watching,
24   even though your compensation was not dependent upon that in a
25   non-guaranteed deal; correct?
```

EXHIBIT I

AOE0383

1        MR. MILLER:  I'll give you -- if you want mine, you can

2    have it.

3        THE WITNESS:  Do I have it?  Is it Exhibit A?

4        MR. MILLER:  No.  Here, you can just take mine.

5        THE WITNESS:  Okay.  So sorry about that.  Where were

6    you now?

7        MR. KENNISON:  Paragraph 91.

8        THE WITNESS:  Okay, got it.  Okay.

9    BY MR. KENNISON:

10    Q.  And if you look at paragraph 91, it discusses your

11    networks and the proposed comparators, which the third amended

12    complaint calls the comparator networks.

13        Do you see that, in the subparagraphs of 91?

14    A.  Uh-huh.

15    Q.  It says, "The Weather Channel is" -- basically, the

16    final sentence of each one of the lettered subparagraphs,

17    starting with 91(a), "From an advertiser's perspective,

18    The Weather Channel is similarly situated in all material

19    respects with CNN, MSNBC, and HLN."

20        Do you see that?

21    A.  Are you saying 91(a)?

22    Q.  Yes, sir.

23    A.  The Weather Channel features news on information --

24    Q.  I'm just looking at the final sentence of 91(a).

25        MR. MILLER:  I think you should read the whole

EXHIBIT I

AOE0384

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

1    sentence.

2         MR. KENNISON:  No, he doesn't need to do it -- I'm

3    reading -- you can look at it, if you want.  But I'm, for the

4    record, just focusing on the final sentence.

5         MR. MILLER:  Yeah, well, for context, I think you

6    should read (a).

7         **THE WITNESS:  Okay, I got it.  Thank you, sir.**

8         **Yes.**

9    BY MR. KENNISON:

10        Q.  All right.  So I read that correctly; right?  "From an

11   advertisers's perspective, The Weather Channel is similarly

12   situated in all material respects with CNN, MSNBC and HLN."

13        Right?

14        **A.  Yes.**

15        Q.  Okay.  And then if I go to (b), 91(b), final sentence

16   there, says, "From an advertiser's perspective, Cars.TV is

17   similarly situated in all material respects with motor

18   trends."

19        Correct?

20        **A.  Yes, it says that.**

21        Q.  Okay.  And then 91(c), Justice Central TV, final

22   sentence says, "From an advertiser's perspective,

23   JusticeCentral.TV is similarly situated in all material

24   respects with Oxygen and HLN."

25        Correct?

EXHIBIT I

AOE0385

**BYRON ALLEN, VOLUME I**

November 02, 2022

1      A.   Yes, it says that.

2      Q.   Okay.  91(d), Comedy.TV, the final sentence says, "From

3   an advertiser's perspective, Comedy.TV is similarly situated

4   in all material respects with Comedy Central."

5        Correct?

6      A.   Yes.

7      Q.   Recipe.TV, in paragraph 91(d), "From an advertiser's

8   perspective, Recipe.TV is similarly situated in all material

9   respects with Food Network and Cooking channel."

10       Correct?

11     A.   Yes, yes.

12     Q.   MyDestination.TV in paragraph 91(f), final sentence

13   says, "From an advertiser's perspective, MyDestination.TV is

14   similarly situated in all material respects with Destination

15   America and Travel channel."

16       Correct?

17     A.   Correct.

18     Q.   G, paragraph 91(g, says Pets.TV, final sentence, "From

19   an advertiser's perspective, Pets.TV is similarly situated in

20   all material respects with Animal Planet."

21     A.   Yes.

22     Q.   And then the final one is 91(h), ESTV.  In that final

23   sentence, it says, "From an advertiser's perspective, ES.TV is

24   similarly situated in all material respects with (e)."

25       Correct?

EXHIBIT I

AOE0386

1      A.  Correct.

2      Q.  Okay, great.  Thank you for bearing with me on that.

3      A.  Not a problem.

4      Q.  And so my question is, is that when an advertiser is

5    considering whether or not to buy, for example -- let's take

6    Comedy.TV -- it will look at Comedy.TV's ratings and it will

7    look at Comedy Central's ratings, as one thing that it will

8    consider when deciding whether or not to pay for advertising

9    on those downloads; correct?

10     A.  Correct.

11     Q.  And you would agree that the higher the ratings,

12   particularly in a key demographics, the more likely it is that

13   you would get advertising revenue; correct?

14     A.  You're going to get more advertising revenue.  And I

15   think, just if I could bring it to the bottom line on this,

16   this was perfectly stated, what you just read.  And what was

17   stated here is that McDonald's is buying these other networks.

18   The first order of business is environment with any marketer.

19   What's the environment?

20     Q.  What do you mean by that?

21     A.  You may not as an advertiser want to buy a network that

22   has a great deal of violence on it.  And you say, okay, we

23   don't want anything to do with violence.  And you're not

24   interested in that environment.

25     Q.  I see.

EXHIBIT I

AOE0387

**BYRON ALLEN, VOLUME I**

November 02, 2022

1      A.  So the first order of business is environment.  Are you

2   comfortable with that environment?  That's very important to

3   99.9 of advertisers out there; right?

4      Q.  Uh-huh.

5      A.  They don't want their advertising around pornography.

6   You know, it's the environment.  So what was perfectly stated

7   here is, McDonald's is buying -- they're buying CNN and MSNBC

8   and Headline news.  So The Weather Channel is a similar

9   environment.  They're buying motor trend.  So Cars.TV is a

10   similar environment.  They're buying Oxygen and Headline news,

11   so Justice Central is a similar environment.  They're buying

12   Comedy Central, so Comedy.TV is a similar environment.

13   They're buying the Food Network, so Recipe.TV is a similar

14   environment.  They're buying the Travel Channel, so

15   MyDestination.TV is a similar environment.  They're buying

16   Animal Planet, so Pets.TV is a similar environment.  And

17   they're buying E, so ES.TV is a similar environment.

18          Now -- now that we've checked the most important box,

19   are you comfortable with the environment?  Let's go to the

20   next box.  The next box is, what's the rating?  That's easy.

21   If Comedy.TV, Matt, in your example, if they're doing ten

22   times the rating we're doing, or 50 times the rating we're

23   doing, they're going to be paid 50 times more than what we're

24   being paid.  Because according to Nielsen, they're doing 50

25   times more.  So all we were saying was, is that we know you

EXHIBIT I
AOE0388

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

1    buy the environment, which is usually the toughest thing to

2    achieve, because our networks are advertiser friendly, family

3    friendly -- this is a family company that owns -- this is a

4    family company, okay?  That's what this is.  So we're saying,

5    we check the most important box, the environment, and we gave

6    exception of where McDonald's has supported this environment

7    many, many times, without exception.  And now what you pay us

8    is based on what we deliver.  And if we deliver 100 people,

9    you pay us on 100 people.  And if Comedy Central's delivering

10   10,000 people, you pay them on 10,000 people.  That's what

11   we're saying that it is perfectly aligned.

12        Q.  I see.  And so you don't disagree that Comedy.TV has

13   far lower rankings than Comedy Central, do you?

14        A.  Comedy -- I'm sorry, Comedy Central is a highly rated

15   cable network.  And it is -- has a higher rating than us.

16        Q.  Uh-huh.

17        A.  We believe they should buy Comedy Central, and we

18   believe that they should buy Comedy.TV.

19        Q.  Okay.

20        A.  And they should provide economic inclusion.  Do we

21   believe we should be paid the same amount of money per

22   30-second spot as Comedy Central?  No, we don't.  We've never

23   said pay us the same 30-second spot that you pay

24   Comedy Central, because we don't, at this point, deliver

25   Comedy Central ratings.

EXHIBIT I

AOE0389

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

1   point, it isn't.

2          But the fact that, you know, you want to be, you know

3   -- you don't want to be transparent about it, why should

4   anyone trust your number?  Oh, we're spending 13 and a half

5   million.

6      Q.  So if -- if McDonald's was spending 13 or 14 million on

7   Black-Owned Media companies, including yours -- because they

8   are spending money on your company currently; correct?

9      A.  McDonald's is spending money with us currently.

10     Q.  Okay.  And if it did -- if it -- the numbers did work

11  out and show that they spent 13- to $14 million on Black-Owned

12  Media, in your mind, does that cure the discrimination

13  problem?

14     A.  No.  Once again, if we take your total budget of

15  451 million as the budget, which we do not believe is the

16  accurate number, we believe that number is higher.

17     Q.  I see.  So if it was -- I'm sorry.

18     A.  We think that number -- we think that number is higher.

19  So we'll just go with that, much higher, call it a billion,

20  plus.

21          But even if we did take your 451-, 13 and a half

22  million is only three percent.  Thirteen and a half million

23  represents three percent of 451 million.

24          No.  We've been very clear that it should be

25  15 percent, because we, as African Americans, we represent

EXHIBIT I

AOE0390

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

1   circulate that.  We want to foster competition.

2        In the broadcast syndication business, when someone

3   opens -- when someone launches a television station, we go out

4   of our way to make sure that television station succeeds.  We

5   provide them with content at low prices or no prices because

6   we want another station in that market to be healthy.  It

7   would be in McDonald's' best interest to not just have

8   Comedy Central out there, dictating the marketplace, but a

9   competitor, to Comedy Central, who can also help give them

10  competitive pricing.  It would be in McDonald's' best interest

11  not to just have Recipe.TV out there -- I'm sorry, the Food

12  Network, and the cooking channel out there, but, also, to make

13  sure Recipe.TV is doing well.  It would be in McDonald's'

14  interest not to just have Animal Planet out there, but to have

15  Pets.TV out there working, as well.

16        But you've gone to the lowest, which is what I would

17  expect you to do.  You're doing your job.  But let's be honest

18  and genuine about it.  Why are we ignoring all of the other

19  highly rated, broadcast syndicated shows?  Which generates --

20  some of our shows are in the top ten, in syndication, top ten.

21  But McDonald's can't find a way to buy those.

22        And, by the way, you know, the ebb and flow of the

23  ratings on The Weather Channel, going up or down 20 percent,

24  that has to do with weather patterns.  So when Hurricane Ian

25  came through, and it was the largest natural disaster in the

EXHIBIT I

AOE0391

**BYRON ALLEN, VOLUME I**

November 02, 2022

1    state of Florida, guess what network was the number one

2    network?  The Weather Channel.  The number one cable network,

3    the most watched cable network.  So when the weather is

4    wonderful and fantastic, the ratings are ho-hum and okay.

5    When the weather gets extreme, we are doing it very well.

6          So these -- these points that you bring out, that's,

7    you know -- they're not accurate.  You're not speak- -- you

8    grabbed the low network that's only been measured awhile -- a

9    year or two, with no financial support from McDonald's.  And

10   you're ignoring the fact that when we have huge weather events

11   that The Weather Channel is number one.  And you're also

12   ignoring all of the gross rating points that we deliver with

13   our syndicated television shows.  McDonald's has plenty of

14   opportunity to do business with us, but they choose not to do

15   business with us in a meaningful and economical way, as well

16   as other Black-Owned Media, who will be very clear with you

17   that they're unhappy with McDonald's, and their lack of ad

18   spent.

19   Q.  I see.  So let's --

20       MR. MILLER:  Let's take a bathroom break, if that's

21   okay?

22       MR. KENNISON:  Let me ask one more question and then

23   sure.

24       MR. MILLER:  Sure.

25   ///

EXHIBIT I

AOE0392

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

1   spend enormous time, energy, and resources to make sure that

2   they know it, until he is no longer working at that company,

3   and, quite frankly, working anywhere.

4       Q.  So if I understand correctly, it's that the answer to

5   my question, whether or not you have been racially

6   discriminated against by Chris Kempczinski --

7       A.  Yes, because he's created a culture at McDonald's that

8   discriminates against me.

9       Q.  I see.  And the basis for that is all the things that

10  you told me just now?

11      A.  He is their fearless, racist leader.

12      Q.  Okay.  Going back to the proposed comparators in

13  paragraph 91, I asked you if -- if you knew whether or not

14  they spent with these proposed comparative networks some

15  years, but not others.

16          So, I guess, my question is, would it surprise you,

17  given that CMOs change and McDonald's changes their buy-in, as

18  you said, would it surprise you that they do, in fact, buy

19  sometimes and not buy other times?

20      A.  No, it wouldn't surprise me, because what happens is

21  that's the -- Matt, that's the ebb and flow of negotiations.

22      Q.  Okay.

23      A.  Right?  So what happens is, some of my white

24  competitors, they get very aggressive in their pricing.  And

25  sometimes people walk away because they are too aggressive in

EXHIBIT I

AOE0393

**BYRON ALLEN, VOLUME I**

November 02, 2022

```
 1   their pricing.  And then they'll skip a year and then come

 2   back to the table.  It's a negotiation tactic.  So it wouldn't

 3   surprise me that some years they buy them and some years they

 4   don't, because that's just the ebb and flow of the negotiation

 5   of, hey, guys, you need to pump the brakes, you're too

 6   aggressive in your pricing, you're asking for too much, and

 7   we're walking away from this negotiation.  That happens all

 8   the time.

 9        Q.  Okay.

10        A.  But, you know, that's just par for the course.

11        Q.  Okay.  Are there other proposed comparators that you're

12   seeking to compare the plaintiff networks to in this case,

13   other than what we talked about in paragraph 91?

14        A.  I'll check on that.  I'll check with the research

15   department, but McDonald's -- look, they can do what they

16   want.  And this is really a -- the real question is, hey,

17   McDonald's, why -- why are you at almost zero?  Why are you at

18   one million with Black-Owned Media?  Why were you at one

19   million?  Why were you at .02 percent -- you know, .002

20   percent when we are making up, you know, 40 percent of your

21   business.  That's really -- you know, that's the real -- in my

22   humble opinion, the real issue here.  Why are you treating me,

23   as a Black person, other Black-Owned Media, differently than

24   our white counterparts?  Why do we own mainstream platforms --

25   and, you know, in the case of Lynwood Bibbens, owns the
```

EXHIBIT I

AOE0394

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

```
 1   airport network, where 40 million people -- not Black people
 2   -- 40 million people, mainly white people, are going past his
 3   monitors at the airport.  But they say, hey, you, Negro, you
 4   go see Burrell.  You go see Burrell because you are a Negro.
 5   And those white people who used to own it, CNN, they didn't
 6   have to go see Burrell.  It's just -- it's the epitome of
 7   corporate racism like we've never seen before, which is why 52
 8   percent of your stockholders have said, you need to be
 9   investigated for civil rights' violations.  And I cannot wait
10   to see that investigation, and help them with it.
11      Q.  And so my question is, are there other proposed
12   comparators that you're seeking to compare the plaintiffs to.
13   Your answer was, I would have to check with the research
14   department.
15          So, as you sit here today, you answer is you don't
16   know?
17      A.  I don't know.
18      Q.  Okay.
19      A.  I'm not sure.
20      Q.  Okay.  So it's accurate that each of the ESN Lifestyle
21   Networks, and The Weather Channel, have been lower ranked year
22   in and year out from 2015 to the present than each of their
23   respective proposed comparators in the complaint; correct?
24      A.  Hmm.  That, I cannot answer.  ESN -- did you say ESN
25   networks --
```

EXHIBIT I

AOE0395

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

1      Q.   The ESN Lifestyle Networks, the seven --

2      A.   Okay.

3      Q.   Plus --

4      A.   The entire portfolio.

5      Q.   Plus The Weather Channel --

6      A.   Yeah.

7      Q.   So the eight networks --

8      A.   Yes.

9      Q.   -- with their proposed comparators --

10     A.   Yes.

11     Q.   -- they were each lower ranked than each of their

12     proposed comparators; correct?

13     A.   Yes, yes.

14     Q.   Third amended complaint at paragraph 17, says, quote,

15     "McDonald's falsely labeled" -- ED is added, so I'll -- you

16     can look at it if you'd like.

17           But "McDonald's falsely labeled Entertainment Studios

18     as a media company that produces content solely for African

19     American audiences."

20           And then paragraph 18 says, "This is intentional racial

21     stereotyping and discrimination."

22           Correct?

23     A.   Correct.

24     Q.   When did McDonald's label Entertainment Studios as a

25     media company that produces content solely for

EXHIBIT I

AOE0396

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

1    African American audiences?

2       A.  The moment they said go to Burrell, and not go to the

3    general market audience.  I'm giving you Cars.TV, which is a

4    network that won an Emmy for producing car content.  I'm

5    giving you Pets.TV, a 24-hour network about pets.  Recipe.TV,

6    about recipes.  On and on and on.  MyDestination.TV, a travel

7    network.

8           But McDonald's says, hey, you're a Negro.  Go see

9    Burrell.  We don't care if it's general market.  Go see

10   Burrell.  Go see the Black ad agency that has a very small

11   budget.  And if you do get some of that small budget, we're

12   going to have you guarantee a Black demo that's almost

13   impossible to measure.  Go see Burrell.

14      Q.  So who from --

15      A.  Go see -- that's -- that's what McDonald's has said to

16   me and countless others.  Hey, Negroes, go see Burrell.

17      Q.  Who from McDonald's said this to you?

18      A.  McDonald's tells the ad agencies who to see and who not

19   to see.

20      Q.  But you just said that McDonald's tells you to go see

21   Burrell.

22      A.  Yes.  Because when you go -- when you go to McDonald's,

23   McDonald's says, go to Burrell.

24      Q.  Well, they say go to their agency; correct?

25      A.  No, they say Burrell.

EXHIBIT I

AOE0397

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

```
 1      Q.  And --

 2      A.  They specifically tell us to go to Burrell.  Trust me,

 3  Matt.  We -- we were trying to avoid Burrell like the plague.

 4  We were trying to avoid Burrell like the Ebola virus.  It does

 5  not have any money.  It is not designed to provide economic

 6  inclusion for Black-owned media.

 7      Q.  Okay.  So --

 8      A.  And, by the way, one of your own executives says that

 9  McDonald's decides who should go to OMD and who should go to

10  Burrell.  I -- one of the folks in your deposition said that.

11      Q.  Do you have any knowledge about whether or not your

12  media offerings met McDonald's general consumer market plan?

13      A.  They all do.

14      Q.  And what's your basis for that?

15      A.  They're a general market.

16      Q.  Is that it?  Is there anything else?

17      A.  Why would you not -- why would you send Pets.TV,

18  Recipe.TV, MyDestination.TV, Cars.TV when these networks are

19  very general market.  And, quite frankly, you barely see a

20  Black person own those networks, because they're just general

21  market networks.  So why would you send them off to the Black

22  network, other than me being Black?

23      Q.  So -- so what's your basis for sending you to Burrell

24  just because you're Black?

25      A.  That is the only reason they sent me to Burrell, is
```

EXHIBIT I

AOE0398

**BYRON ALLEN, VOLUME I**

November 02, 2022

```
 1   because I'm Black.

 2       Q.  So I'm asking what the basis for that is?

 3       A.  Their racism.  They're racist.

 4       Q.  Anything else?

 5       A.  That's more than enough.  And that's -- that's very

 6   detrimental, and that's very harmful.  Hi, you're black.  Hi,

 7   you're a Negro, you're colored, go to the Black agency.

 8       Q.  But nobody actually said those things to you; right?

 9       A.  They sent us -- they're worse.  They sent us to the

10   Black agency to get no -- to get little or no economic

11   inclusion.  And they discriminated against me and did not

12   treat me like my white counterparts.

13       Q.  And who is "they" --

14       A.  McDonald's, McDonald's.

15       Q.  Who at McDonald's?

16       A.  As far as I'm concerned, the person who runs the place.

17   Chris Kempczinski created a racist culture that does not

18   support real economic inclusion, as the lawsuit from the Black

19   executives stated.

20           He said, the number of Black people don't exist.

21   That's what this lawsuit says.  And "you're an angry Black

22   woman" for bringing it up.  That's the culture at McDonald's.

23           There's no scenario that these networks should be going

24   to Burrell.  These are general market networks:  Cars.TV,

25   Pets.TV, Recipe.TV, MyDestination.TV.  This is about as
```

EXHIBIT I

AOE0399

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

1     Q.  So going to the third amended complaint, number 57, it

2   says, "McDonald's also requires African American media

3   companies to agree to contract guarantees, in terms of

4   reaching an African American audience."

5          We talked about that before; correct?

6     **A.  Yes, that's the narrow guarantee of here's a Black --**

7   **go deliver a Black demo, yes.**

8     Q.  So my question is, what is the basis for the allegation

9   that McDonald's requires African American media companies,

10  plural, to agree to contract guarantees?  Who are the African

11  American media companies to which this allegation refers,

12  other than you?

13    **A.  You know, we talked about this earlier, and I'm happy**

14  **to repeat it.  According to Burrell, they said that McDonald's**

15  **wanted them to get an African American guarantee.  And they're**

16  **asking everybody, an African American guarantee, on the demo.**

17  **Everything goes -- went back to McDonald's and headquarters.**

18  **They set -- they set the parameters.  This is McDonald's'**

19  **capital, this is their money.  We were told by Burrell that**

20  **this is something that McDonald's wanted.  This is something**

21  **that they were insisting that they got from all of their media**

22  **partners.**  And we made this presentation to Burrell because

23  McDonald's had the door shut to us, to go to general market.

24  So we had to go and knock on the door they told us to knock

25  on.

EXHIBIT I

AOE0400

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

 1   all platforms.  That is what I'm showing.

 2       Q.  And you testified earlier that that's just not enough;

 3   correct?

 4       A.  No, what I'm testifying -- yes, what I'm testifying is

 5   that McDonald's, out of their large ad budget, they are

 6   allocating less than a quarter of a percent, half a percent to

 7   Black-Owned Media.  And that it should be significantly more

 8   if you were to treat us like our white counterparts.

 9           Is this for you?

10       Q.  You can keep that.

11       A.  I can keep it?  Okay, thank you.

12       Q.  And so are you saying that during these years,

13   McDonald's was discriminating against you, and your companies,

14   because they didn't spend enough?

15       A.  I'm saying that McDonald's did not allocate enough to

16   Black-Owned Media.  And that it was systematic discrimination,

17   and we should have been dealing with not Burrell, who had a

18   small budget, but OMD, who had a larger budget and could have

19   spent more with us, if McDonald's had not treated -- created a

20   separate and unequal process.  That separate and not equal

21   process is a huge, huge issue, in which McDonald's has

22   created.  Separate and not equal.  If you're going to separate

23   it, you need to make sure the budget is the same or better.

24           If you're going to separate it, you need to make sure

25   that the terms and conditions are the same or better.  When

EXHIBIT I

AOE0401

**BYRON ALLEN, VOLUME I**

November 02, 2022

```
 1    you separate it, and you say colored people go here and white

 2    people go here, it is the epitome of racism.  And McDonald's

 3    is the corporate unfortunate leader of that corporate -- the

 4    epitome of that racism.
```

 5    Q.  If you can go back up, in that same document there --

 6    A.  Yes.

 7    Q.  -- to the first page of the attachment.  It starts with

 8    -- or it's entitled Entertainment Studios Consolidated

 9    Financial Statements, 2012 to 2016.

10    A.  Yes.

11    Q.  And then if you look at 2012, in the CF Entertainment,

12    Inc. television syndicated box.

13        Do you see that -- the first one on the left there?

14    A.  Yes.

15    Q.  And then under revenue, on the left column there, the

16    first one there is advertising revenue?

17    A.  Yes.

18    Q.  And then you go across to the right, and it goes 2012,

19    2013, '14, '15, and '16; right?

20    A.  Yes, yes.

21    Q.  So you see 2012's revenue was just north of 25 million,

22    and then it ticked up in 2013 to 26 and a half million.  And

23    then it dropped in 2014, stayed relatively flat in 2015.  A

24    short -- a small increase there.  And then it dropped again to

25    20 million, and 20.7 million.

EXHIBIT I

AOE0402

**BYRON ALLEN, VOLUME I**

November 02, 2022

```
 1   these issues and McDonald's continued discriminating against

 2   African American-owned media."

 3        Correct?

 4   A.  Correct.

 5   Q.  So you told her in 2015 that you were being

 6   discriminated against?

 7   A.  Correct.

 8   Q.  And, in fact, you told her that you were going to file

 9   a discrimination lawsuit against McDonald's in 2015; right?

10   A.  I don't know if I communicated that.  I don't usually

11   threaten to file lawsuits.  We communicate -- usually, what I

12   would do in this situation is communicate the issue.  And if

13   there was an issue, we would just file the lawsuit.

14   Q.  Okay.

15   A.  So, I mean, look at the lawsuit that just got filed.

16   We did not call Morgan Flatley and say, we're going to file a

17   lawsuit.  We did not call anybody, in May of 2021, and say,

18   we're going to file the lawsuit.

19        What we said is, is that you're discriminating, and we

20   reserve all rights.

21   Q.  Okay.  So going back to 2015.  In fact, what happened

22   was that you weren't discriminated against.  McDonald's

23   decided to decrease their ad spend with you, and you were

24   unhappy about that.  And you and Darren Galatt sent e-mails

25   threatening to sue them, like you had sued the cable
```

EXHIBIT I

AOE0403

**BYRON ALLEN, VOLUME I**

November 02, 2022

```
 1   companies; correct?  Unless they had upped their spend with
 2   you?
 3       A.  Can I see those e-mails --
 4       Q.  I'm asking if you remember.
 5       A.  No, I'm asking to see the e-mails that we threatened.
 6       Q.  We'll get there.
 7       A.  I'd love to see.
 8       Q.  I'm asking you right now, as you sit here, is that
 9   accurate?
10       A.  I -- that's seven years ago.
11       Q.  Yep.
12       A.  So here's what is accurate, okay?  In 20- -- when I
13   said -- you showed me the top ten advertising -- can I see --
14   where's that at?  When you were showed me the top ten
15   advertising list, and I said this is bad, what I was saying to
16   you was, look at that.  This lays out the timeline of
17   discrimination.  In 2012, it was zero.  It was zero.  That's
18   what -- I mean, McDonald's was -- we were not in the top ten.
19   In 2013, '14, and '15, McDonald's had a Black CEO named
20   Don Thompson, a Black CEO.  Don was an excellent CEO.  He was
21   phenomenal.  We featured him on our shows as an example of
22   excellence that happened to be Black.  The moment Don was
23   fired, and Easterbrook came in with his sexual harassment,
24   with his protégé, Chris Kempczinski and Deborah Wahl.  The
25   moment 2015 hit, that's when you see the numbers start to
```

EXHIBIT I

AOE0404

**BYRON ALLEN, VOLUME I**

November 02, 2022

1   decline.  And that's when it kicked in really poorly.

2          Now, when Don Thompson was there, Don saw the

3   disparity and worked to close the gap, and that's why you saw

4   the numbers grow.  And then when he was forced out, and

5   Easterbrook came in, and started the sexual harassment and the

6   racism, along with coming in with the racism of

7   Chris Kempczinski and Deborah Wahl, that's when the numbers

8   declined.

9      Q.  So I want to ask you about that.

10     A.  Yeah, let's talk about that.

11     Q.  Before the break, you testified that the numbers

12  declined because of the change in programming.

13         Do you remember that?

14     A.  Yeah.

15     Q.  But then you took a break with your attorneys and you

16  suddenly remembered that Don Thompson was the CEO, and then he

17  left, and a new CEO came in?

18     A.  Yeah.

19     Q.  Okay.  So that had to do with what you talked about

20  with your lawyers at the break; right?  Your change in

21  testimony?

22         MR. MILLER:  Well, don't talk about what we talked

23  about at the break.  But any -- you can answer the question

24  without disclosing what we discussed.

25         THE WITNESS:  No.  What I said to them, is that, you

EXHIBIT I

AOE0405

**BYRON ALLEN, VOLUME I**

November 02, 2022

```
 1      A.  And, more or less, on his way out, clearly.  Look at
 2   the timeline.
 3      Q.  And so do you -- you don't recall what the point of
 4   sending the NAAAOM lawsuit blurb was?
 5      A.  We were communicating with everybody that you need to
 6   stop the discrimination and provide economic inclusion.
 7      Q.  It was a subtle threat; right?
 8      A.  No, it wasn't.  It was a clear communication.  We don't
 9   threaten.
10      Q.  What was the clear communication, if not to say, hey,
11   McDonald's, pay attention, or this could be you?
12      A.  We never said this could be you.
13      Q.  So what was the clear communication?
14      A.  The communication that was sent.
15      Q.  Well, it doesn't seem very clear to me.  It says, FYI,
16   and that's what I'm asking.
17          What was -- what was supposed to be communicated?
18      A.  Clearly what the article says, that we have filed a
19   lawsuit against DirecTV for $10 billion.  The headline says it
20   all.
21      Q.  And, McDonald's, I just want you to be aware of this?
22      A.  Yes, we want you to be aware of it.
23      Q.  So it wasn't a threat?
24      A.  It was not a threat.
25      Q.  Do you recall eventually going to Oak Brook, where
```

EXHIBIT I

AOE0406

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

1  yellow box that has the CPM --

2  A.  Yes, yes.

3  Q.  And so the African American demo, CPM for Weekly

4  Network in this proposal is $39.75?

5  A.  Yes.

6  Q.  And the adult 18 through 49 CPM is $12.01?

7  A.  Yes.

8  Q.  Okay.  And then same thing for the next page, The Daily

9  Network, which is if you flip over to the next page.  Similar

10 type thing at the bottom box there, the African American demo,

11 CPM is $39.50.  And adult demo is -- it looks like $15.67;

12 correct?

13 A.  Wow, I am not -- okay.  What did you say, $39.50 and

14 $16.67?

15 Q.  Yes, sir.

16 A.  Yep.

17 Q.  And so -- so it's accurate when McDonald's buys an

18 African American demo, you actually have to pay a premium for

19 reaching that tough-to-reach audience; right?

20 A.  We -- well, I don't know if they have to pay a premium,

21 but we project it to pay a premium, because it is tough to

22 reach.

23 Q.  Right.

24 A.  I mean, it's not -- by the way, that premium doesn't

25 cover how little the Nielsen delivers in the way of an African

EXHIBIT I

AOE0407

**BYRON ALLEN, VOLUME I**

November 02, 2022

1   American demo.  This premium does not cover that.

2       Q.  Okay.

3       A.  It's not enough to cover trying to deliver an African

4   American demo.  Once again, McDonald's, the only ones to ask

5   for this.

6       Q.  So you tell McDonald's, this audience is tough to

7   reach?

8       A.  Yes.

9       Q.  And so reaching that audience comes with a premium.  I

10  think you've told Deb Wahl that, and we'll get to the e-mail.

11          Do you remember that?

12      A.  I don't remember that.  From 17 years ago -- seven

13  years ago?  No, I do not.  But it makes sense to say, hey, you

14  are insisting on doing a demo guarantee that no one else is

15  doing on adults 18 -- Black adults 18 to 49, which is absurd

16  and ridiculous, and a Jim Crow version of tell me how many

17  jellybeans are in the jar before you can vote, Negro.

18          We said, okay, then let's go ahead and let's put a

19  premium on it.

20      Q.  Okay.  So then it's fair to say that McDonald's, if

21  they really want to reach a Black audience, at least with your

22  network, that they have to pay more --

23      A.  Can I pause right there?

24      Q.  Hold on, no.  They have to pay more in CPMs than they

25  would otherwise pay to reach the same adults in the adults 18

EXHIBIT I

AOE0408

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

```
 1      A.  Yes.

 2      Q.  And then at some point, because the deal didn't get

 3  done in the first two quarters of 2015, McDonald's prorated it

 4  to $315,000 for the remainder of the year; right?

 5      A.  Yeah.

 6      Q.  That's what she says?

 7      A.  Yeah, she -- yeah.

 8      Q.  And then in this e-mail, she said, "We've discussed

 9  further your request and are now willing to return to our

10  original offer of $771,000 gross, even though there are only

11  six months left in 2015."

12          Right?

13      A.  Uh-huh.

14      Q.  And on this call, did you threaten to file a lawsuit

15  against McDonald's?

16      A.  No, we always say we reserve our rights.  I do not

17  recall threatening her to sue McDonald's.

18      Q.  So she says, "Despite our continued interest in working

19  with you and CF Entertainment Studios, we must address the

20  fact that during our conversation, you indicated that you

21  would file a lawsuit against McDonald's, alleging

22  discrimination, if we did not increase our media spend with

23  your company."

24          She wrote that; correct?

25      A.  She wrote that.  I do not recall that, but that is, in
```

EXHIBIT I

AOE0409

1  fact, what did happen, six years later.

2     Q.  Right, okay.  All right.  So when she sent this e-mail

3  to you, did you ever correct her and say, Ms. Wahl, I never

4  said I was going to file a lawsuit?

5     A.  I don't recall.

6     Q.  Because that's what you did say; right?

7     A.  No.

8     Q.  You didn't say that?

9     A.  I do not recall saying that.

10    Q.  Well, those are two different things.  I didn't say it

11  and I don't recall are two different things.

12        So was it I don't remember and I could have said it, or

13  I definitely didn't say it?

14    A.  I don't threaten someone to say I'm going to file a

15  lawsuit.

16    Q.  Okay.

17    A.  We file the lawsuit.

18    Q.  Six years later.  But this is 2015; correct?

19    A.  In 2015, I do not recall saying to Deborah Wahl, we're

20  going to sue you.

21    Q.  Okay.

22    A.  I don't say to people, we're going to sue you.  We just

23  sue them, if there's an issue.  We communicate that there's an

24  issue.  And, once again, she may have felt threatened, because

25  we have sued other folks.  But, at the end of the day, we

EXHIBIT I

AOE0410

1      Q.  On the bottom of Page 80.

2      **A.  Okay.  Go -- go for it, go for it.**

3      Q.  And "we've been transparent on this point since our

4  original proposal and the budget allocated for this proposal

5  will not change."

6          You see that; right?

7      **A.  Yes.**

8      Q.  Okay.  And then if you skip down a little bit further

9  on Page 81, in the middle of that big paragraph, it starts

10 with "however."

11         "However, in order to finalize this matter, we are

12 willing to purchase media with respect to Daily Network

13 programming only, for the applicable time period of August 3rd

14 through December 27, 2015."

15         Correct?

16     **A.  Okay.**

17     Q.  So, again, she's agreeing here to pay $771,000 for the

18 last two quarters; right?

19     **A.  Okay.**

20     Q.  And then if you go up to 79 -- that's the first page of

21 this exhibit.  That's where you respond.

22     **A.  Yes.**

23     Q.  And then that second paragraph, it says, "Where we are

24 being devalued and discriminated against is on the CPM and

25 allocation... devaluing this highly African American targeted

EXHIBIT I

AOE0411

1   and owned media."

2        And then if you go down to -- continuing with your

3   e-mail on the top of Page 80, "McDonald's is the only client

4   buying a Black demo guarantee in our entire ecosystem...

5   delivering of a demographic this slim and volatile comes with

6   a premium."

7        Do you see that?

8   A.  Yes.

9   Q.  And that's what we talked about a minute ago --

10  A.  That's right, that's right.

11  Q.  And then you conclude with, "Please treat our African

12  American Owned Media the same as General Market white agencies

13  and clients.  The discrimination and numbers are

14  indefensible."

15  A.  Wow, thank you.  Where do I threaten to sue them?  I

16  don't.  Let's read that again.  "Please treat African American

17  Owned Media the same as General Market white agencies and

18  clients.  The discrimination and the numbers are indefensible,

19  Byron Allen."

20       Show me in this e-mail where I threaten to sue them.

21  Q.  So you believe, at this point, that McDonald's was, in

22  fact, discriminating against you based on your race; right?

23  A.  Absolutely.  And I did not threaten to sue them.  And

24  here it is in writing, my response to her -- I guess her, hey,

25  you know, you threatened to sue me.

EXHIBIT I

AOE0412

1   revenue.  But of the approximately one billion that McDonald's

2   spends annually, on advertising, less than three million, per

3   year is going to 100 percent African American-owned media.

4           Unfortunately, the diversity that McDonald's claims is

5   not reflected proportionately in McDonald's ad spend.  Even

6   one of our own executives admitted that it wasn't right, and

7   there was room for a great deal of improvement.  The

8   discrimination must stop now.  Must stop.

9           "The African American demo CPM needs to be at a

10   minimum of $30.97.  We have submitted a plan accordingly."

11           Where did we threaten to sue?

12   BY MR. KENNISON:

13      Q.  So, here, again --

14      A.  But where did we threaten to sue?  We did not threaten

15   to sue.

16      Q.  Mr. Allen, I don't answer your questions; you answer

17   mine.

18      A.  I understand.  So we can -- well, I'm also going back

19   to when you said that I was taking that position.  And that's

20   what I was offended by.

21      Q.  So you've accused McDonald's of discrimination in this

22   e-mail; correct?

23      A.  Yes.

24      Q.  Okay.  Ms. Wahl below said, it's not true, McDonald's

25   being treated differently.  That's what she says below.

EXHIBIT I

AOE0413

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

```
 1   McDonald's in 2015; right?
 2        A.  I did not sue McDonald's in 2015.
 3        Q.  And so why didn't you?
 4        A.  Why didn't I sue McDonald's in 2015?
 5        Q.  Yes.
 6        A.  I don't know why I didn't sue McDonald's in 2015.
 7   Honestly, I wish I had.  I should have sued them in 2015.  But
 8   what happened is over the years, we got even more data, and we
 9   saw more of a pattern.  And then when you start to see, you
10   know, what happens with Easterbrook with his sexual
11   harassment, and you see Deborah Wahl and her racist ways, and
12   how she treated other Black-Owned Media.  And then
13   Chris Kempczinski comes out with this horrible, deplorable
14   text, his racist text, and then enough's enough, and then you
15   file the lawsuits.
16            I mean, Easterbrook, Wahl -- Deborah Wahl --
17   Steve Easterbrook, Deborah Wahl, and Chris Kempczinski, they
18   were just -- it was just too much to bear.  The sexual
19   harassment, the way they were treating women.  You know,
20   talking about Hispanic families, talking about Black families,
21   the racist texts, the diminishing Black-Owned Media.  Enough's
22   enough, so we filed the lawsuit.  And we didn't have, you
23   know, as much proof, today, as we did back in 2015, because it
24   really -- the wheels really came off the bus when
25   Steve Easterbrook, and Deborah Wahl, and Chris Kempczinski got
```

EXHIBIT I

AOE0414

1      Q.   And then the fourth bullet is $794,000 with three

2   percent on dollars; right?

3      **A.   Yes.**

4      Q.   And then the fifth bullet says, "All other partners

5   took a decrease on dollars."

6         Correct?

7      **A.   That's what it says.**

8      Q.   All right.   And then second to the last bullet says,

9   "Adele's McDonald's GRPs down 14 percent from last year."

10        What does that mean?

11     A.   The way I'm reading that is they gave -- they gave

12   Burrell, once again, the Black ad agency, less money.

13     Q.   But --

14     A.   Her gross ratings points down 14 percent from last

15   year.  Looks like -- that's the way I'm reading.  Looks like

16   they've given her less money to work with.  And so all other

17   partners took a decrease on dollars.  It looks like her money

18   was down 14 percent.  So, once again, here's McDonald's, and

19   here is good old Deborah Wahl, with her racist ways,

20   decreasing and diminishing the Black agency, where she sends

21   the Black people, and giving them not a drop of water in their

22   swimming pool to go swimming.

23     Q.   Well, here, you got a plus five percent on CPM and plus

24   three percent on dollars while everybody else took a haircut;

25   right?

EXHIBIT I

AOE0415

**BYRON ALLEN, VOLUME I**

November 02, 2022

```
 1      A.  And what you really need to look at is how much more
 2   content that I put into the marketplace.  How many more
 3   eyeballs and market share did I grab.  So if I'm investing
 4   more money to put more shows on, to get more television real
 5   estate, to bring a bigger audience, I'm highly confident I
 6   bought a bigger -- I increased my ratings by greater than five
 7   percent on the CPM or three percent in the allocation.
 8      Q.  Where does it say that?
 9      A.  It doesn't say, but they wouldn't do that unless I
10   grew.  See, we were growing so rapidly.  When you're adding --
11   when you're pushing up 82 percent, you're growing.  Nobody's
12   investing more, at my level, in content, to create shows,
13   produce shows, and to get more real estate on broadcast
14   television stations than us.  So if you don't spend the money
15   with us, then who are you going to spend it with?  Because we
16   are investing more than anybody to grab more time periods.
17      Q.  Did you think this deal that McDonald's was offering
18   you was discriminatory?
19      A.  Absolutely.
20      Q.  Even though you got a plus five percent on a CPM and a
21   plus three on dollars?
22      A.  Remember, they decreased us the year before.
23      Q.  I'm asking about this year.
24      A.  This is discriminatory.
25      Q.  Okay.
```

EXHIBIT I

AOE0416

1    answer.  Are we driving traffic into stores?  They have

2    seemingly cut budgets drastically across the board and will

3    invest differently.

4         So they took us down by almost 70 percent, almost 70

5    percent.  And you're talking about -- at this point, this is

6    2017.  This is a year before we bought The Weather Channel.

7    They're spending, you know, whatever, a billion dollars, 500

8    million, whatever they want to call it.  And they only

9    allocated 230,000 to us.

10   Q.  And it says at the bottom bullet there that they have

11   seemingly cut budgets drastically across the board and will

12   invest differently; correct?

13   A.  That is what he stated.

14   Q.  Okay.  And that -- hold on a second.

15        And -- but that cutting the budgets drastically across

16   the board, applies to all of the media partners; right?

17   A.  Well, he's absolutely -- he's guesstimating.  He

18   doesn't know.  But what I'm saying is, is that, McDonald's,

19   they did not cut their budget 75 percent.  They took us down

20   from 794- to 230-.  McDonald's wouldn't be in business if they

21   cut their marketing budget 75 percent in 2017.  We got a

22   disproportionate cut.

23        So what we should look at, and we should look at this

24   as a collective.  What did they cut their budget?  How much of

25   a percentage did they cut their budget in 2017?  And I bet you

EXHIBIT I

AOE0417

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

1   2018, but they didn't buy us in 2019?

2       Q.  Correct.

3       A.  Okay.

4       Q.  You don't remember having a conversation with Burrell

5   for the rationale of why?

6       A.  No.

7       Q.  Okay.  Do you remember talking to Darren about that,

8   about what he said his communications with Burrell were?

9       A.  No, I mean, we've never been happy with McDonald's,

10  we've never been happy with Burrell.  We've -- it's always

11  been, you know, bad news after bad news.  No, I don't recall.

12  We have hundreds of advertisers.  We have hundreds of

13  advertisers.  McDonald's, unfortunately, is the bad character,

14  the bad actor.

15          MR. MILLER:  Did you say -- excuse me, did you say you

16  got zero in 2019?

17          THE WITNESS:  No, they -- well, you tell me, I mean --

18  BY MR. KENNISON:

19      Q.  I'm asking you, do you know?

20      A.  I don't know.

21      Q.  Okay.

22      A.  I don't know.

23      Q.  I want to go to the allegation in paragraph 68 of the

24  third amended complaint.

25      A.  Okay.  Is that yours again?

EXHIBIT I

AOE0418

**BYRON ALLEN, VOLUME I**

**November 02, 2022**

1          MR. MILLER:  68, you said?

2          MR. KENNISON:  Paragraph 68, yes.

3          **THE WITNESS:  Thank you, sir.**

4     BY MR. KENNISON:

5     Q.  "Entertainment Studios has repeatedly sought a contract

6     with McDonald's through its general tier advertising agency,

7     OMD Worldwide.  McDonald's has blocked these efforts to

8     contract for several years."

9          That's what it says; right?

10    **A.  That is what it says.**

11    Q.  So I want to know what the basis is for the allegation

12    that McDonald's, quote, "blocked those efforts"?

13    **A.  Because the agency -- the agency -- OMD said that**

14    **McDonald's wanted us to go to Burrell.  Burrell said**

15    **McDonald's wanted us to go to Burrell.**

16    Q.  Okay.

17    **A.  And we made it very clear, we don't want to go to**

18    **Burrell, where you've cut the budget 44 percent.  But you**

19    **didn't cut the budget for OMD 44 percent.  We want to go to**

20    **the bigger budget, McDonald's.  We want to go to the "white**

21    **water fountain."**

22    Q.  Isn't it accurate that OMD just didn't recommend to

23    McDonald's to buy your properties on the general consumer

24    market plan?

25    **A.  I do not know what OMD did or not do.  I don't know**

EXHIBIT I

AOE0419

1  what their recommendation was or wasn't.  But I know we were

2  told, you're Black, go to Burrell.  And here you go, the

3  budgets are cut over there.  Go talk to the ones who have a

4  much, much smaller budget.

5      Q.  And who told you that, you're Black, go to Burrell?

6      A.  McDonald's told OMD that, and McDonald's told Burrell

7  that.  And they told us -- and, also, look at the e-mails from

8  Deborah Wahl.  Get in touch with Burrell, talk to Burrell, let

9  Burrell know by "X" period of time what you're going to do.

10  Look at Deborah Wahl's e-mails, direct from Deborah Wahl.

11  Deborah Wahl is saying go to McDonald's, talk -- go to

12  Burrell, talk to Burrell.  Tell us what -- deal with Burrell.

13  Deborah Wahl is doing that.

14      Q.  So Ms. Beckville testified at her deposition, and you

15  tuned in for that; right?

16      A.  I tuned in for part of Beck- -- Ms. Beckville, yes.

17      Q.  Okay.  She testified that OMD was always good about

18  taking their meetings.

19      A.  Okay.

20      Q.  Do you remember that?

21      A.  I don't know if I was on at that point, but I'll take

22  you at your word.

23      Q.  So you pitched your stuff to OMD and they just didn't

24  buy anything; right?

25      A.  I don't know if they didn't buy anything, but we were

EXHIBIT I

AOE0420

**BYRON ALLEN, VOLUME I**

November 02, 2022

```
1    -- we were  very clear that we are general market; that our

2    shows are broad.  Our company is very inclusive, it's very

3    diverse, and the content that we produce, as you can see right

4    here, we have all of our networks in the lobby.  They're very

5    broad.

6        Q.  And, in fact, OMD, bought your Local Now program in

7    2021; right?

8        A.  They probably did.  That's our digital -- Local Now is

9    not a program.  Local Now is a --

10       Q.  Thank you.

11       A.  -- digital platform.  And Local Now is something that I

12   received when I bought The Weather Channel in March of 2018.

13   And Local Now uses artificial intelligence and proprietary

14   software to curate, aggregate, and stream super hyper local

15   news, weather, sports, and traffic, geofenced to your ZIP

16   Code.  We have over 17,500 movies, TV shows, and documentaries

17   there, and over 450 channels.  And it's a streaming platform

18   that's free.  It's absolutely free.  It's advertiser

19   supported, and it does quite well, because it's America's

20   favorite word.  It's free.

21       Q.  So can you tell me any specific conversations, e-mails,

22   communications, phone calls, where McDonald's blocked your

23   effort to contract with it through OMD?

24       A.  By sending us to Burrell, and the e-mail that

25   Deborah Wahl sent that you gave us a copy of, where
```

EXHIBIT I

AOE0421

**BYRON ALLEN, VOLUME I**

November 02, 2022

```
 1    Deborah Wahl said, go to Burrell and get in touch with
 2    Burrell.  And this is your deadline, take it or leave it,
 3    accept it or not.
 4        Q.  Okay.  Anything else that you can think of, as you sit
 5    here today?
 6        A.  That's the only thing that comes to mind right now.
 7        Q.  So it's accurate that OMD did evaluate your offerings;
 8    correct?
 9        A.  I don't know if it's accurate.  I do know we presented
10    to OMD.  Now, how they evaluated it, I don't know, but we did
11    present.
12        Q.  And so if OMD evaluated your offerings, and recommended
13    to McDonald's, we shouldn't buy this, because it doesn't fit
14    with your plan, would that -- would you dispute that that
15    could have happened?
16        A.  I don't know if that happened.
17        Q.  So it could have happened; right?
18        A.  Anything's possible.  I can't speak to that.
19        Q.  Okay.  This will be Defendant's 136.
20            MR. MILLER:  We're on 137.
21            MR. KENNISON:  How do I keep missing that?  I'll take
22    your word for it, Skip.  137, thank you.  Here you go.
23            THE WITNESS:  Thank you.
24                        (Exhibit 137 marked.)
25    ///
```

EXHIBIT I

AOE0422

```
 1   State of California      )

 2   County of LOS ANGELES    )

 3

 4        I, Kathy Mannlein, Certified Shorthand Reporter, do

 5   hereby certify:

 6        That prior to being examined, the witness in the

 7   foregoing proceeding was by me duly sworn to testify to the

 8   truth, the whole truth, and nothing but the truth;

 9        That said proceedings were taken before me at the time

10   and place therein set forth and were taken down by me in

11   shorthand and thereafter transcribed into typewriting under my

12   direction and supervision;

13        I further certify that I am neither counsel for, nor

14   related to, any parties to said proceedings, nor in anywise

15   interested in the outcome thereof.

16        In witness whereof, I have hereunto subscribed my name.

17

18

19   Dated:  November 8, 2022

20

21                          Kathy Mannlein

22                          CSR No. 13153

23

24

25
```

EXHIBIT I

AOE0423

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

_____

| | |
|---|---|
| ENTERTAINMENT STUDIOS NETWORKS, INC., a California corporation; WEATHER GROUP, LLC, a Delaware limited liability company, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) Case No.: ) 2:21-cv-04972-FMO-MAA ) |
| MCDONALD'S USA, LLC, a Delaware limited liability company, | ) ) ) ) |
| Defendant. | ) |

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF BYRON ALLEN

VOLUME II

Los Angeles, California

Thursday, November 3, 2022

REPORTED BY: KATHY E. MANNLEIN, CSR NO. 13153

JOB NO. 78513

EXHIBIT I

AOE0424

**BYRON ALLEN**

November 03, 2022

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3                      WESTERN DIVISION

 4                 _____

 5   ENTERTAINMENT STUDIOS          )
     NETWORKS, INC., a California    )
 6   corporation; WEATHER GROUP,     )
     LLC, a Delaware limited         )
 7   liability company,             )
                                     )
 8                Plaintiffs,        )
                                     )
 9   vs.                            ) Case No.:
                                     ) 2:21-cv-04972-FMO-MAA
10   MCDONALD'S USA, LLC, a          )
     Delaware limited liability     )
11   company,                       )
                                     )
12                Defendant.         )

13

14

15

16

17

18

19

20

21        The deposition of BYRON ALLEN, VOLUME II, taken on behalf

22   of the Defendant, at a remote location; commencing at

23   9:31 a.m. and ending at 2:51 p.m., on Thursday, November 3,

24   2022, before Kathy Mannlein, a Certified Shorthand Reporter in

25   the State of California, License No. 13153.
```

EXHIBIT I

AOE0425

**BYRON ALLEN**

**November 03, 2022**

```
 1    APPEARANCES OF COUNSEL:

 2    For the Plaintiff:

 3    MILLER BARONDESS, LLP
      BY:  LOUIS R. MILLER, Attorney at Law
 4    BY:  DAVID SCHECTER, Attorney at Law
      1999 Avenue of the Stars, Suite 1000
 5    Los Angeles, California  90067
      310-552-5251
 6    310-552-8400  Fax
      Smiller@millerbarondess.com
 7
      For the Defendant McDonald's USA, LLC:
 8
      RILEY SAFER HOLMES & CANCILA, LLP
 9    BY:  MATT KENNISON, Attorney at Law
      BY:  AMY ANDREWS, Attorney at Law
10    BY:  ROB FOLEY, Attorney at Law
      100 Spectrum Center Drive, Suite 440
11    Irvine, California  92618
      949-359-5515
12    949-359-3501  Fax
      rfoley@rshc-law.com
13
      PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
14    BY:  SUSANNA M. BUERGEL, Attorney at Law
      BY:  MONICA MOSBY, Attorney at Law
15    BY:  KERISSA BARRON, Attorney at Law (Via Zoom)
      1285 Avenue of the Americas
16    New York, New York  10019
      212-373-3553
17    212-492-0553  Fax
      Sbuergel@paulweiss.com
18
19    Also present:  Josh Oshima, Videographer
                     Jeffrey Mayes, Allen Media In-House Counsel
20                   Mark Divitre, Allen Media In-House Counsel
                     Janice Arouh, President Distribution Allen
21                   Media Group
                     Eric Gould, Allen Media Group
22                   Russell King (Zoom), McDonald's In-House
                     Counsel
23                   Darren Galatt
                     Sue Stopka
24                   Susie Kim
                     Terence Hill
25                   Tom O'Brien
```

EXHIBIT I

AOE0426

**BYRON ALLEN**

**November 03, 2022**

```
 1    Black-Owned Media.  Horrific.

 2      Q.  And so your example is that the culture -- I want to

 3    make sure I get it right --

 4      A.  Yes.

 5      Q.  The culture created by those three individuals at

 6    McDonald's --

 7      A.  Yes.

 8      Q.  -- starting in 2015, thereabouts, when Don Thompson

 9    went out and Easterbrook and Deb Wahl came in?

10      A.  And Chris Kempczinski.

11      Q.  And Chris Kempczinski came in, thank you.

12          That created a racist culture, which then led to a

13    standard practice of sending Black-Owned Media to one agency,

14    or one water fountain, as you said, and then everybody else to

15    the other agency, the white water fountain, as you called it.

16          Do I have that right?

17      A.  No, that's not correct.  So, Matt, I want you to

18    understand this correctly.  They, Deborah Wahl, and

19    Chris Kempczinski, and Steve Easterbrook did not establish

20    Burrell over here and OMD, white agency over here.  That was

21    established many years ago when Black people couldn't get

22    anything.  That was established many, many years ago.  So --

23    but when they came in, they -- what they did is they took that

24    system and they made a -- an unbelievable divide.  The system

25    at first was put in place to provide some economic inclusion
```

EXHIBIT I

AOE0427

**BYRON ALLEN**

November 03, 2022

1    for Black-Owned Media.  And I believe that system was probably

2    put in place back in the '70s or '80s when Black people

3    couldn't get past the receptionist.

4         When Steve Easterbrook, and Deborah Wahl, and

5    Chris Kempczinski came into power, what they did is they

6    basically shut Burrell down by reducing the budgets,

7    significantly, 44 percent, as opposed to the white

8    counterpart, OMD, not being reduced 44 percent.  And then what

9    they did is they took the CPMs and reduced them in our

10   particular case, by about 35 percent.  And when you did the

11   translation, the gap was far greater than it had ever been.

12   They took us to zero.  They took us down to zero.

13        So they didn't establish the -- the two, you know,

14   systems, separate not equal.  When it was established, it was

15   established to at least to have a pathway to get past the

16   receptionist.

17        What they did is they took it and they said, it's

18   separate and we're not going to let it be anywhere close to

19   equal.  And the numbers tell you that story clearly.

20   Q.  And when you said -- you said a few times now that the

21   Burrell budget was cut, cut by 47 percent, I think --

22   **A.  44 percent.**

23   Q.  44 -- thank you.

24        What is your basis for that statement?  Was it just the

25   e-mail that we looked at yesterday?

EXHIBIT I

AOE0428

**BYRON ALLEN**

**November 03, 2022**

```
 1   was.

 2       Q.  All right.

 3       A.  But as you have an e-mail that says, our budget's been

 4   cut 44 percent, and blah, blah, blah.  I mean, but, look,

 5   here's the good news.  That's the reason we're going through

 6   this process, so we can be 110 percent transparent and look at

 7   all the documents.  Including the documents, you know, from

 8   Chris Kempczinski and Morgan Flatley.  So when you get into

 9   all these documents from Deborah Wahl, we can now see all of

10   the numbers and we can paint a clear picture for the judge and

11   the jury.  That's -- that's what people deserve, the real

12   picture.  Everybody -- you know, don't play the games of

13   hiding information and holding back information.  Let's get

14   all the information out there.  And you will see the math, and

15   the math will tell you the truth, and show you the consistent

16   discriminatory behavior.

17       Q.  Okay.  And so is it your testimony that Burrell had

18   told you that their budgets had been cut?

19       A.  Yes.

20       Q.  Okay.  When did that happen?  When did they tell you

21   that?

22       A.  Over the years I've been here -- especially once

23   Deborah Wahl got there.

24       Q.  So multiple times?

25       A.  Their budgets have been cut from 2015 on.  I mean,
```

EXHIBIT I

AOE0429

**BYRON ALLEN**

November 03, 2022

```
 1    here, this is -- this should make real easy sense, Matt.

 2    You'll love this.

 3         If you look at our allocation -- and let's say it's

 4    about -- it's a million, two, right?  And then the next year,

 5    let's say it's 795-.  They're going to say -- what do you

 6    think Burrell is going to say?  They're going to say, hey,

 7    it's not a million, two this year, it's 795- because our

 8    budgets have been cut.  Hey, it's not 795- this year, it's

 9    230,000 this year because our budgets have been cut.  Hey,

10    it's not 230- this year, it's zero.

11         Deborah Wahl, under Steve Easterbrook, and

12    Chris Kempczinski took us to zero.  Zero.  That is

13    unbelievable and indefensible.

14         When we went, and we communicated, you should provide

15    economic inclusion for Black-Owned Media, you should not have

16    this separate and unequal system of Black people go to Burrell

17    and white people go to OMD.  And you shouldn't have a scenario

18    where you are the one and only company on Planet Earth saying,

19    I want you to guarantee a Black demo.  And in guaranteeing

20    that Black demo, it translated to us getting a fraction for

21    our rates, as opposed to our white counterparts.  Where they

22    were landing at eight to $12 on homes, McDonald's, financially

23    engineers it, with Deborah Wahl at the helm, where we're

24    getting two to three dollars on a C- -- on homes.

25    Q.  Do you recall when -- what year you were taken to zero?
```

EXHIBIT I

AOE0430

**BYRON ALLEN**

**November 03, 2022**

1    Q.  Okay.  And then the next year, there was a slight

2    increase to 794-?

**3    A.  Yes.**

4    Q.  And then -- that was 2017.  And then, 2018, it dropped

5    to 290-something?

**6    A.  71 percent.  It was cut 71 percent, to $230,000.**

7    Q.  Okay.

**8    A.  And then it went to zero.**

9    Q.  In 2019; is that right?

**10   A.  That's right.**

11   Q.  Okay.  And so Burrell told you, we're done investing

12   with your programs starting in 2019; correct?

**13   A.  Yes.**

14   Q.  Okay.  And they would have told you that when?

**15   A.  I'm assuming in 2019, when they -- when they provide**

**16   you the great news that you're not getting any economic**

**17   inclusion, Black-Owned Media.**

18   Q.  And usually those discussions happen -- because you --

19   with Burrell, you sell ads on a calendar year basis; right?

**20   A.  Correct.**

21   Q.  So they would have told you, hey, for 2019, it's zero.

22   They would have told you that sometime before 2019; right?

**23   A.  They were happening -- based on the e-mails, it looks**

**24   like those conversations were happening in December and**

**25   January -- December of '18 and January of '19.**

EXHIBIT I

AOE0431

BYRON ALLEN

November 03, 2022

1    Q.  That makes sense to me.

2    A.  Yes.

3    Q.  Okay.  All right.  All right.  Can you tell me, in your

4    words, what the Black-Owned Media initiative or BOM initiative

5    is?

6    A.  Oh, thanks for asking, Matt.

7         Real simple.  What we were saying to the ad industry is

8    that you're not spending money with Black-Owned Media.  You're

9    not doing business with Black America, the way Black America

10   is doing business with you.

11        Now, I wanted to speak on behalf of women, Hispanic

12   people, Asian people.  But my lawyers said I didn't have

13   standing, because I'm not Hispanic.

14   Q.  So -- okay.

15   A.  And I couldn't speak --

16   Q.  Hold on a second.  I don't -- I appreciate you giving

17   me a fulsome answer but you don't need to tell me anything

18   your lawyer told you.

19   A.  No, no, no, no, no, no.  No, I appreciate that.  But I

20   guess I wanted to speak on behalf of the inequity for women,

21   Hispanic people, Asian people, gay people.  And I was told I

22   don't have standing.  So I have to stay in my lane.  And so

23   they said, you're Black, you're not Hispanic, so you can't

24   speak on behalf of Hispanic people or Asian people.  You have

25   to speak on behalf of yourself, as a Black person.  So we

EXHIBIT I

AOE0432

**BYRON ALLEN**

**November 03, 2022**

```
 1   McDonald's.  It's overwhelming.  And it's, like, we're not

 2   trying to build a case.  We're just trying to state the facts

 3   and help everybody be better.  But McDonald's decided to

 4   fight.  And in fighting, it's just -- it's just a mountain of

 5   evidence just going up against you.

 6       Q.  Okay.  So going back to the beginning of your answer

 7   that we -- you know, when I asked you what the BOM Initiative

 8   is, you said "we" formed it.

 9           Who's "we"?  Do you mean your company?

10       A.  Yeah.

11       Q.  Okay.  And Ms. Bekkedahl, I think she used the term

12   spearhead.  And she said, "Byron really spearheaded this

13   effort."

14           Is that -- is that accurate?  Would you say that this

15   is really kind of your brain child?

16       A.  Yes.

17           THE REPORTER:  Your what?

18           MR. KENNISON:  Brain child, I'm sorry.

19           THE WITNESS:  Yes.

20   BY MR. KENNISON:

21       Q.  And then you said, just a minute ago that -- you know,

22   you were looking to communicate, and that McDonald's didn't

23   accept the invitation.

24           What invitation, specifically, did you make to

25   McDonald's that they did not accept?
```

EXHIBIT I

AOE0433

**BYRON ALLEN**

November 03, 2022

```
1    of 500 million, and then it's 75 million and not 150 million.

2         Q.  I see.

3         A.  So that way, if we do it based on a percentage, then

4    we're being treated the same as everyone else.  And that way

5    the discrimination would stop, because we are on the same

6    level playing field.  We're doing it based on a percentage.

7    So if your budgets are up, we go up with you.  If your budgets

8    are down, we go down, like everybody else, proportionately.

9         Q.  I see, okay.  That's --

10        A.  And so we just wanted to come up with a way to be fair

11   and equitable, and stop the disparity, and stop the -- you

12   know, the -- the -- the discrimination and just make

13   everything equal.  That was all we really wanted to do.

14        Q.  And so one of the other realities of this is that

15   McDonald's and other national advertisers, in reallocating

16   some of their spend, it may very well be the case that you're

17   going to have to take some dollars away from one company that

18   has been performing at a certain level, and devote it to maybe

19   a Black-Owned Media startup or a Black-owned company who's not

20   delivering an audience quite as efficiently yet.  But that's

21   just part of this deal, to gain economic inclusion; right?

22        A.  No, no, that's not accurate, Matt.  There are plenty of

23   Black-Owned Media companies that could easily absorb and --

24   nine million bucks from McDonald's, using their 451 million

25   and taking two percent, which is $9 million.  There are plenty
```

EXHIBIT I

AOE0434

**BYRON ALLEN**

**November 03, 2022**

```
 1        MR. KENNISON:  I'm with you, Skip.

 2        MS. ANDREWS:  I think the court reporter would have

 3   something to say about that.

 4        THE VIDEOGRAPHER:  We are now off the record.  The time

 5   is 10:38 a.m.

 6                      (Off the record.)

 7        THE VIDEOGRAPHER:  We are now on the record.  The time

 8   is 11:03 a.m.

 9   BY MR. KENNISON:

10     Q.  Mr. Allen, we were talking about the Black-Owned Media

11   initiative.

12     A.  Yes.

13     Q.  Part of that was doing webinars.  You were doing

14   webinars; correct?

15     A.  Yes.

16     Q.  And whose idea was that?

17     A.  To do the webinars?

18     Q.  Correct.

19     A.  It was -- it was a collective idea.  It was my idea to

20   do it.  But the -- the community collectively, and the press

21   said, this is important that we all come together, we identify

22   what is Black-Owned Media, and we communicate to the

23   advertisers and the corporations what's Black owned, and to be

24   clear in the communication.

25     Q.  I think you've made it perfectly clear in your multiple
```

EXHIBIT I

AOE0435

**BYRON ALLEN**

**November 03, 2022**

1    public statements, but -- so part of the webinars were sending

2    the communication that if advertisers don't commit to this

3    reallocation of funds to Black-Owned Media, you'll publicly

4    call them out for it, CDOs could lose their jobs, there might

5    be litigation, all kinds of bad things could happen; right?

6        A.  I don't say "bad things."

7        Q.  Well, how about this, that you're going to publicly

8    call companies out for its CEOs to lose their job and there

9    might be more litigation; right?

10       A.  I've made it clear that anybody who is discriminating,

11   the public should know who they are.  If anyone is not doing

12   business with Black-Owned Media, the public should know who

13   they are.  And that I -- I've been clear about, and my

14   colleagues have been clear about that, that transparency is

15   very important.  Coretta Scott King taught me that.  "The

16   truth is our greatest weapon."  "The truth is our greatest

17   weapon."  And we always bring the truth.  Here's the truth.

18   Here are the numbers.  These numbers are indefensible.  If

19   you're not doing business with us, people want to know who's

20   not doing business with their community.

21       Q.  And do you recall doing an online interview in August

22   of this year with mediavillage.com?

23       A.  I did an interview -- I've done a number of interviews

24   with them, yes, Matt.

25       Q.  Okay.  And they put out an article that was entitled

EXHIBIT I

AOE0436

**BYRON ALLEN**

November 03, 2022

1     Q.  All right.  Now, at some point, after February of 2021,

2     did you decide to step up the pressure on the advertisers?

3     A.  No.  No, Matt, it wasn't stepping us pressure.  What

4     happens is that -- you're very smart, you're very astute,

5     you've been studying the market.  But I have to stop making

6     assumptions here with you.

7         Are you familiar with the upfronts?

8     Q.  Mr. Allen, did you -- the answer is "yes" or "no."  Did

9     you step up pressure or not?

10    A.  No, we did not step up pressure.  The up-fronts begin

11    in January, February, and March.  That's when you present who

12    you are and what you have to offer.  And then in April, May,

13    June, advertisers allocate their money.  We weren't stepping

14    up our pressure.  You know, this is where I've always tried to

15    communicate that when we do something, it's demonized.  When

16    we do something, it's nefarious.  When we do something, it

17    becomes very racist that we're stepping up the pressure.  We

18    are not stepping up the pressure.  We are -- you know, we're

19    constantly being painted as the bad Black people, doing

20    something wrong.  If you understood the industry, you would

21    know that in January, February, and March, all of my white

22    counterparts throw large gallas, parties, presentations.  They

23    go to their offices and they do enormous presentations to make

24    sure that the ad community knows who they are, what they're

25    doing, what they have to offer, to get ad allocations.

EXHIBIT I

AOE0437

**BYRON ALLEN**

November 03, 2022

1          But when you're Black, you will sit here and

2     characterize me as doing something that is nefarious, and

3     wrong, such as stepping up the pressure, when my white

4     counterparts are doing the exact same thing, making

5     presentations.  That's the systemic racism that I deal with

6     every day.  That's not stepping up -- that's not stepping up

7     the pressure.  That's simply introducing Black-Owned Media to

8     agencies and Corporate America.  There's nothing, you know,

9     nefarious about that.

10          If you study the market, you'll see that's what my

11    white counterparts are doing at exactly the same timeline.

12     Q.  So this is Defendant's 142.  This is the document that

13    was handed to us by your lawyers.

14                    (Exhibit 142 marked.)

15    BY MR. KENNISON:

16     Q.  This document was prepared by your lawyer; correct?

17     A.  I believe so.

18     Q.  You didn't prepare it?

19     A.  I did not prepare it.  I am looking at this right now.

20     Q.  Okay.  And if I'm looking at this right, this shows the

21    total recipients -- I'm sorry, all of the recipients of the

22    letters that were sent out by your outside counsel,

23    Miller Barondess, and then the dates that the letters were

24    sent.

25          Is that what this document is showing?

EXHIBIT I

AOE0438

**BYRON ALLEN**

November 03, 2022

```
 1      A.  It looks like it, yes.

 2      Q.  Okay.

 3      A.  And I've been told you have copies of the letters.

 4      Q.  And so starting with Intuit/TurboTax in the second row

 5  there, and continuing for the rest of that page, and onto the

 6  second -- it looks like a wave of letters went out on

 7  March 3rd, 2021.

 8          Do you see that?

 9      A.  Yes.

10      Q.  So at some point after February -- February 2021, early

11  March of 2021, you had your lawyers send out letters to these

12  advertisers; correct?

13      A.  Correct.

14      Q.  And, in fact, you remember saying in a March 25th, 2021

15  adage public webinar, you said, quote, "Well, I've given the

16  green light to send a couple hundred letters to put everybody

17  on notice.  I have a staff of litigators who work only for me,

18  so I just said, 'Go hire litigators.'  I just created my own

19  little law firm.  And I just said, 'Start suing people.'"

20          Those are your words; correct?

21      A.  Sounds like I may have said that.

22      Q.  So is it your testimony that this was to correspond

23  with the upfront?  These letters being sent was to correspond

24  with the upfront?

25      A.  This -- these letters was to communicate that you're
```

**First Legal Depositions - Calendar@firstlegal.com**                368
**855.348.4997**

EXHIBIT I

AOE0439

**BYRON ALLEN**

November 03, 2022

1   spending zero, or nothing, and that this is discriminatory,

2   and that you should, as you do your budgets, don't

3   conveniently continue to exclude us.  So we wanted a record.

4   We wanted a letter to be out there that basically said, as you

5   do your budgets, don't exclude us.

6       Q.  And, at the same time -- about the same time, March of

7   2021 that you're sending letters directly to advertisers, you

8   were also talking to their advertising agencies; correct?

9       A.  We are in constant communication with the ad agencies.

10      Q.  And you, in particular, had calls with representatives

11  from OMD at this time period; right?

12      A.  I believe so.

13      Q.  Including Geoff Calabrese?  We mentioned his name

14  yesterday.

15      A.  Yes.

16      Q.  Okay.  Do you remember having a call with him on or

17  around March 23rd, 2021?

18      A.  No.

19      Q.  Do you remember telling him on that call, or one of

20  those calls, that he needed to go on the record and have OMD

21  support your request for two percent reallocation to

22  Black-Owned Media?

23      A.  I don't recall that, but that is not an unreasonable

24  ask, which is, hey, you are someone that they're going to look

25  to.  Are you in support of us getting economic inclusion.

EXHIBIT I

AOE0440

BYRON ALLEN

November 03, 2022

```
1    misinterpretation.

2    BY MR. KENNISON:

3       Q.  All right.  Then going to the next page, 19533.

4       A.  Okay.

5       Q.  It says, "Hi, All, I added a column to the tracker (far

6    right) to indicate what calls are needed so Byron can 'dial us

7    up' some more dollars (thank you, Byron)."

8            Do you know what that's referring to?

9       A.  I don't see that.

10           MR. MILLER:  It's on the back of the page.

11           THE WITNESS:  Oh, at the very bottom.  Okay, I'm so

12   sorry.  Okay.  It sounds like she's saying, in her own

13   whimsical way, to call advertisers and help them understand

14   that it's important to provide economic inclusion for

15   Black-Owned Media.  That's what it sounds like.  That's what

16   I'm reading.

17   BY MR. KENNISON:

18      Q.  Was she quoting you, with the "dial us up" some more

19   dollars?  Was that something you said in a meeting?

20      A.  I don't recall that.  No, that's not my vernacular.  I

21   don't say "dial us up" some dollars -- "dial us up."  That's

22   -- I don't say that.  That's not my vernacular.

23      Q.  All right.  But your understanding of calling them to

24   telling them to lean into Black-Owned Media -- I think that's

25   what you said.  I don't want to misquote you.  But that --
```

EXHIBIT I

AOE0441

**BYRON ALLEN**

November 03, 2022

 1   that was essentially the way to tell them to lean in to spend

 2   more money with Black-Owned Media, including your company;

 3   right?

 4       A.  Unfortunately, in many cases, Matt, it was just

 5   allocate some money to Black-Owned Media.  A lot of these

 6   advertisers were at zero.  It was, like, hey -- what I didn't

 7   want, and what we didn't want, is for Corporate America to

 8   play dumb.  "I didn't know."  We wanted a scenario where there

 9   was full accountability.  We're communicating, we're stating

10   the issue, and we're looking to get to a resolution where the

11   discrimination stops, and we get economic inclusion.  It was

12   nothing more than that.

13       Q.  And --

14       A.  And we just didn't want people to be able to say, well,

15   you never told me, you never communicated to me, and I never

16   heard about this.  I don't -- this is not my fault.  You know,

17   nobody told me.  And we just wanted to stop that soap opera,

18   stop those excuses, and be very transparent and open, and

19   really communicate directly with folks so they couldn't say,

20   "I didn't know."

21       Q.  And part of communication directly with folks was

22   communicating directly with CMOs and CEOs, getting those folks

23   to sit down with you; right?

24       A.  Correct, because they're the decision makers.

25       Q.  And some people -- some of those folks did and some of

EXHIBIT I

AOE0442

**BYRON ALLEN**

November 03, 2022

1    something, here's a percentage, here's a starting point.  But

2    zero is not a starting point.

3        Q.  So several other letters went to other companies;

4    correct?

5        A.  Yes.

6        Q.  Okay.  So you go back to that first letter in the

7    packet.  It's to T-Mobile.

8        A.  Yes.

9        Q.  And you recognize this as the letter that ESN's lawyer

10   sent to T-Mobile, dated the same day as the McDonald's --

11       A.  Yes.

12       Q.  -- letter?  Okay.

13       A.  Yes.

14       Q.  And other than the change of the name to T-Mobile, this

15   letter is virtually identical to the McDonald's letter;

16   correct?

17       A.  Yes.

18       Q.  And so in this letter, like the McDonald's letter, at

19   the top of Bates Page 41643, the letter asserts that T-Mobile

20   is violating 1981's prohibition on racial discrimination and

21   contracting; right?

22       A.  Yes.

23       Q.  So what are the facts supporting that allegation as to

24   T-Mobile?

25       A.  Lack of economic inclusion, no economic inclusion

EXHIBIT I

AOE0443

**BYRON ALLEN**

**November 03, 2022**

1   whatsoever.

2       Q.  From T-Mobile?

3       A.  Yes, from T-Mobile.

4       Q.  And by denying economic inclusion, lack of economic

5   inclusion, no economic inclusion whatsoever, what you mean is

6   they're not spending money on your networks; right?

7       A.  Not only our networks, broadcast syndication and other

8   platforms that we have throughout the company.

9           So to be clear, little or no economic inclusion.  They

10  may have spent $10.  I wouldn't know.  But I know a letter

11  wouldn't go out to them if there was -- if there wasn't an

12  issue with the lack of inclusion.

13      Q.  And you didn't sue T-Mobile; right?

14      A.  We did not sue T-Mobile.

15      Q.  Because after this letter, they increased their spend

16  with you?

17      A.  After this letter, they did get to the table, and we

18  did come to an agreement on a spend.

19      Q.  Okay.  I'm going to give you Exhibit 147.

20                  (Exhibit 147 marked.)

21      MR. KENNISON:  Mr. Miller, this is the document I

22  showed you at the break that's been produced by ESN and

23  stamped highly confidential.  There are only outside and

24  inside counsel here for our side, concerning you don't have

25  any objection.

EXHIBIT I

AOE0444

BYRON ALLEN

November 03, 2022

```
1    these together, because they're Lifestyle -- they're Lifestyle
2    Networks.  And you're able to buy a 30-second spot, and it
3    will run in our portfolio of Lifestyle content.  It wasn't
4    that, you know, some -- one of them, you know, that they don't
5    have massive distribution.  We do this with our court shows.
6    Our court shows, they're cleared anywhere -- they're cleared
7    quite well, you know.  Some of them well into their 80s -- 80
8    percent of the country.  And we measure them, let's get
9    together.  It's just -- it's a convenient buy.  You're going
10   to buy court shows with one buy.  You can buy five or six
11   court shows.  If you're going to buy Lifestyle Networks, with
12   one buy, you could buy five Lifestyle Networks.  We just
13   looked at it as a way to provide convenience and efficiency to
14   our media buyers.
15       Q.  Okay.  If you can go back.  You can put that one aside
16   now.
17       A.  Okay.
18       Q.  If you can go back to the bundle of letters that I
19   handed you.
20       A.  Yes.
21       Q.  If you go to the fourth letter in the grouping.  It's
22   41669.  This is the letter to Coca-Cola.
23       A.  Yes.
24       Q.  And this is sent by your lawyers to CEO James Quincey,
25   and then general counsel -- or then general counsel,
```

EXHIBIT I
AOE0445

**BYRON ALLEN**

**November 03, 2022**

```
 1    Bradley Gayton.
 2           Do you see that?
 3       A.  Yes.
 4       Q.  Have you ever met either one of them?
 5       A.  No.  I do not believe so.  I don't recall meeting them.
 6       Q.  And other than the change of the name, McDonald's, to
 7    Coca-Cola, these two letters are, again, virtually identical;
 8    correct?
 9       A.  It appears so.
10       Q.  And, again, at 41671, there's an assertion that
11    Coca-Cola is violating 1981's prohibition on racial
12    discrimination and contracting.
13           Do you see that?
14       A.  Yes.
15       Q.  So the failure -- so what are the facts supporting that
16    allegation, that they are in violation of that prohibition?
17       A.  You should -- you should talk to my lawyers about that.
18       Q.  Well, I'm asking you.
19       A.  Good.  My lawyers drafted it.  They're the experts on
20    violation of Civil Rights Act of 1866, Section 1981, and they
21    can give you far greater detail on it than I can.
22       Q.  Well, let me ask you this:  How did Coca-Cola
23    discriminate against you and your companies?  How did you
24    experience discrimination from them?
25       A.  From Coca-Cola?
```

EXHIBIT I

AOE0446

**BYRON ALLEN**

November 03, 2022

1    Q.  Yes.

2    A.  Quite simply.  Once again, very little, if any,

3    economic inclusion, compared to their budgets.  And very

4    little, if any, economic inclusion of other African

5    American-owned media companies.

6    Q.  Same as T-Mobile?

7    A.  Same as T-Mobile.

8    Q.  And same as McDonald's?

9    A.  Same as McDonald's.

10    Unfortunately, you have an industry that had no

11    pathway, and no inclusion, or any platform whatsoever to make

12    sure that there was economic inclusion for African

13    American-owned media.

14    Madison Avenue was totally just completely

15    discriminatory in terms of not providing economic inclusion

16    for Black-Owned Media.  You're literally -- had advertisers

17    out there, where the budget and the allocation to Black-Owned

18    Media was zero.  And after many years and many Black-Owned

19    Media companies going to these corporations, day after day,

20    week after week, month after month, year after year, it didn't

21    change.  Not one penny allocated.  I've watched companies go

22    out of business.  I've watched them go bankrupt, because they

23    could not get advertising.  Look at the Black News Channel.

24    Look at why I was able -- why I had to buy it out of

25    bankruptcy.  They took in less than $2 million in advertising

EXHIBIT I

AOE0447

**BYRON ALLEN**

**November 03, 2022**

```
 1    from non direct response advertisers.  They pink slipped close

 2    to 300 people, mainly Black people.  And they didn't pay them

 3    the last three to four weeks of pay, because they didn't get

 4    the ad support that they needed to keep the network going, and

 5    to hire the very smart, hard-working Black people at that

 6    company.  A lot of them really good journalists.  This was

 7    something that was a very systemic problem throughout the

 8    industry.  And I must tell you, almost without exception, most

 9    of the advertisers said, you're right, including your own

10    client, McDonald's.  You're right, you're right, you're right.

11    We can do better, and we should do better.  That is under --

12    that is on testimony with your -- in the depositions, all of

13    the young ladies that were deposed said, McDonald's can do

14    better, and we should do better.  And they're right.  And

15    that's what this lawsuit is.  And, unfortunately,

16    Madison Avenue did not include Black-Owned Media.

17         Q.  Okay.  I don't think we need to go in through any more

18    letters in detail.  We can, if you want.  But there are other

19    advertisers in there, including Macy's and Microsoft, and

20    Best Buy, and Kia, and restaurant brands, and AstraZeneca.

21             So my question is, you would agree -- first of all,

22    you would agree that those letters to those companies are

23    virtually identical to all of the letters in that packet;

24    right?

25         A.  I haven't reviewed them all, but I can't imagine why
```

EXHIBIT I

AOE0448

**BYRON ALLEN**

**November 03, 2022**

```
 1    that wouldn't be the case.
 2       Q.  Because, essentially, the claim against all of them is
 3    the same; right?  Madison Avenue is racist, and they've been
 4    racist for a long time, and their allocations are too low.
 5            MR. MILLER:  I mean, I wrote the letters.  They're not
 6    --
 7            MR. KENNISON:  Mr. Miller, please.  Mr. Miller, please.
 8    I'm asking him.
 9            MR. MILLER:  They're very similar.
10            THE WITNESS:  Yeah.
11            MR. KENNISON:  I'm asking him.
12            THE WITNESS:  Yeah.  I mean, obviously, they're not
13    identical.  But, clearly, the framework of the letters is that
14    you're not providing economic inclusion for Black-Owned Media.
15    And Black-Owned Media has been attempting for years, to work
16    with you, and to get economic inclusion, and to be treated
17    like our white counterparts.
18            And in many cases, you're not taking our phone calls,
19    you're not returning our phone calls, you're not meeting with
20    us.  There's little or no communication.  In many cases,
21    there's zero.  And zero dollars and zero communication.  It --
22    you know, listen, you know, I don't expect you to get it,
23    because you're not Black.  I don't expect you to understand,
24    because you are not Black, and you didn't start a business
25    from your dining room table, and you've never tried to go to a
```

EXHIBIT I

AOE0449

BYRON ALLEN

November 03, 2022

```
 1    white-controlled corporation and get someone at that
 2    corporation to listen to you, and to provide economic
 3    inclusion.  When it's zero economic inclusion for Black-Owned
 4    Media -- not just me, the entire landscape -- that is blatant
 5    discrimination.  There's a decision that Black-Owned Media
 6    doesn't matter.  And we are not going to support it.  And
 7    we're not going to include it.  And we're not going to treat
 8    it like its white counterpart.  And it's a problem.  And it
 9    wasn't a problem just at this company.  It was a -- it's a
10    problem at pretty much every Black-Owned Media company.
11    Because before we sent the letter out, we would poll what's
12    left of Black-Owned Media.  How are you doing with this
13    advertiser?  And without exception, it was crickets.  Nothing.
14    We hear nothing.  It's so silent, you can hear a mouse piss on
15    cotton.  Nothing.  Zero.  And after years and years and years
16    of that, Matt, of doors close shut, communication, how can we
17    work together, how do we show you value -- nothing.
18         Q.  Okay.
19         A.  To be clear, McDonald's is not the only one guilty of
20    discrimination.  There are plenty of corporations in America
21    that are guilty of excluding and not doing business with
22    Black-Owned Media, and not responding, and giving us a fair
23    opportunity, and treating us very differently from our white
24    counterparts.
25         Q.  Do you -- do you recall the spreadsheet we looked at
```

First Legal Depositions - Calendar@firstlegal.com          413
855.348.4997

EXHIBIT I

AOE0450

**BYRON ALLEN**

**November 03, 2022**

```
 1    earlier with the crazy colors on the left side?
 2       A.  Yes, of all the different colors, yes.
 3       Q.  And you recall the -- it had the AMG -- total AMG spend
 4    for 2019 and 20- -- well, I think it was -- 2019 and 2020,
 5    what they spent, total, with your company in one column.
 6          Do you remember that?
 7       A.  Yes.
 8       Q.  Do you have a sense of -- well, let me ask this first.
 9          You have no reason to believe that the numbers that
10    your folks populated in that spreadsheet for the 2019 and 2020
11    spent is not accurate, do you?
12       A.  I have no reason to believe it.
13       Q.  Okay.  Do you have a sense of what happened to your
14    advertising revenues from those letter recipients after they
15    received the letter?  Did it go up?  Did it go down?  Did it
16    stay flat?
17       A.  Are you asking overall or individually?
18       Q.  Overall.
19       A.  Overall, I believe it went up.
20       Q.  In fact, it nearly tripled, didn't it?
21       A.  Overall?
22       Q.  Yes.
23       A.  The ad spend?  It went up.
24       Q.  Do you have a sense of how much it went up?
25       A.  No.
```

**First Legal Depositions - Calendar@firstlegal.com**          **414**
**855.348.4997**

EXHIBIT I

AOE0451

BYRON ALLEN

November 03, 2022

1      Q.  If -- do you have any reason to doubt if -- my

2   statement that it tripled?

3      A.  No.

4      Q.  So it's fair to say that the Black-Owned Media

5   initiative was successful in getting folks to lean in;

6   correct?

7      A.  I would say it is fair to say that after we

8   communicated, and we showed corporations that we're claiming

9   that DE&I -- diversity, equity, and inclusion -- was important

10  to them.  And we pointed out to them, if it's so important to

11  you, why are we getting zero in the way of advertising

12  inclusion -- advertising dollars, included in your advertising

13  budgets and economic inclusion.

14         So I'm happy to report to you, most advertisers, unlike

15  McDonald's, said, you're right, let's get to the table, and

16  let's start to be good, strong partners.

17     Q.  Okay.

18     A.  You know, McDonald's, they took the position, let's

19  lawyer up, and let's fight it.  I'm, like, why are you

20  fighting these numbers?  That's ridiculous.  Why are you

21  fighting and defending taking somebody from one point --

22  almost 1.2 million to zero?  Why are you fighting and

23  defending spending a couple million dollars with Black-Owned

24  Media out of, what we believe, is well over a billion in ad

25  spend.  But McDonald's just took that very arrogant, racist

EXHIBIT I

AOE0452

```
 1    State of California      )

 2    County of LOS ANGELES    )

 3

 4        I, Kathy Mannlein, Certified Shorthand Reporter, do

 5    hereby certify:

 6        That prior to being examined, the witness in the

 7    foregoing proceeding was by me duly sworn to testify to the

 8    truth, the whole truth, and nothing but the truth;

 9        That said proceedings were taken before me at the time

10    and place therein set forth and were taken down by me in

11    shorthand and thereafter transcribed into typewriting under my

12    direction and supervision;

13        I further certify that I am neither counsel for, nor

14    related to, any parties to said proceedings, nor in anywise

15    interested in the outcome thereof.

16        In witness whereof, I have hereunto subscribed my name.

17

18

19    Dated:  November 10, 2022

20

21

22        Kathy Mannlein
          CSR No. 13153

23

24        Kathy E. Mannlein
          CSR No. 13153

25
```

EXHIBIT I

AOE0453

# EXHIBIT J

EXHIBIT J
AOE0454

CONFIDENTIAL

Page 1

1              UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    ENTERTAINMENT STUDIOS            )
     NETWORKS, INC., a California     )
5    corporation; WEATHER GROUP,      )
     LLC, a Delaware limited          )
6    liability company,               )
                                      )
7                Plaintiffs,          )
                                      )
8                vs.                  )Case No.
                                      )2:21-cv-04972-FMO-MAA
9    McDONALD'S CORPORATION, a        )
     Delaware corporation,            )
10                                    )
                 Defendant.           )
11   _____)

12

13

14        VIDEO-RECORDED REMOTE DEPOSITION OF

15      ENTERTAINMENT STUDIOS NETWORKS, INC. and

16    WEATHER GROUP LLC THROUGH THEIR 30(B)(6) WITNESS

17                   SYDNIE KARRAS

18             Tuesday, November 15, 2022

19                    Volume I

20              *** CONFIDENTIAL ***

21

22   Reported by:
     CARLA SOARES
23   CSR No. 5908

24   Job No. 5586206

25   Pages 1 - 113

EXHIBIT J
AOE0455

CONFIDENTIAL

Page 2

```
 1              UNITED STATES DISTRICT COURT

 2       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4    ENTERTAINMENT STUDIOS           )
      NETWORKS, INC., a California    )
 5    corporation; WEATHER GROUP,     )
      LLC, a Delaware limited         )
 6    liability company,              )
                                      )
 7                 Plaintiffs,        )
                                      )
 8              vs.                   )Case No.
                                      )2:21-cv-04972-FMO-MAA
 9    McDONALD'S CORPORATION, a       )
      Delaware corporation,           )
10                                    )
                   Defendant.         )
11    _____ )

12

13

14

15

16              VIDEO-RECORDED REMOTE DEPOSITION OF

17    ENTERTAINMENT STUDIOS NETWORKS, INC. and WEATHER

18    GROUP LLC THROUGH THEIR 30(B)(6) WITNESS SYDNIE

19    KARRAS, Volume I, taken on behalf of Defendant,

20    beginning at 1:23 p.m., and ending at 4:13 p.m., on

21    Tuesday, November 15, 2022, before CARLA SOARES,

22    Certified Shorthand Reporter No. 5908.

23

24

25
```

EXHIBIT J

AOE0456

CONFIDENTIAL

                                                      Page 3

1    APPEARANCES VIA VIDEOCONFERENCE:

2

3    For the Plaintiffs:

4         MILLER BARONDESS LLP

5         BY:  DAVID W. SCHECTER, Attorney at Law

6         1999 Avenue of the Stars, Suite 1000

7         Los Angeles, California 90067

8         310.552.4400

9         dschecter@millerbarondess.com

10

11

12   For the Defendant:

13        RILEY SAFER HOLMES & CANCILA LLP

14        BY:  AMY ANDREWS, Attorney at Law

15        BY:  ROBERT FOLEY, Attorney at Law

16        70 W. Madison Street, Suite 2900

17        Chicago, Illinois 60602

18        312.471.8700

19        aandrews@rshc-law.com

20

21

22

23

24

25

CONFIDENTIAL

Page 4

1    APPEARANCES VIA VIDEOCONFERENCE (Continued):

2

3    For the Defendant:

4         PAUL WEISS RIFKIND WHARTON & GARRISON LLP

5         BY:  KERISSA N. BARRON, Attorney at Law

6         1285 Avenue of the Americas

7         New York, New York 10019

8         212.373.3000

9         kbarron@paulweiss.com

10

11

12

13   ALSO PRESENT:  Mark DeVitre, General Counsel, Allen

14                 Media

15

16                 Jeff Mayes, Assistant General

17                 Counsel, Allen Media

18

19                 Miles Ledanois, Video Operator

20

21                      --o0o--

22

23

24

25

EXHIBIT J
AOE0458

CONFIDENTIAL

Page 32

1          Q    Okay.  And then below "Allen Media" -- let
2    me ask the same question about Allen Media, LLC.
3               Is there a board of directors for that
4    entity?
5          A    Not that I'm aware of.
6          Q    Are there regular meetings held for that
7    entity?
8          A    Not that I'm aware of.
9          Q    Okay.  So through the two companies above,
10   Mr. Allen is the sole owner of Allen Media, LLC?
11         A    Correct.
12         Q    And then below that, we have -- straight
13   below, "Entertainment Studios Media," but then off
14   to the right, "Entertainment Studios Networks,
15   Inc."; is that correct?
16         A    Correct.
17         Q    And so Entertainment Studios Networks,
18   Inc., that is one of the plaintiffs in this case,
19   correct?
20         A    Correct.
21         Q    And it is an LLC organized, I believe,
22   under the laws of the State of California; is that
23   correct?
24         A    I do not know.
25         Q    No, I'm sorry.  It's an Inc.  I'm sorry.

EXHIBIT J
AOE0459

CONFIDENTIAL

Page 33

1   It's a corporation, correct?  That's why it's a

2   triangle.  I was reading that wrong.

3        A   Triangles are LLC.

4        Q   Okay.  So Entertainment Studios Networks,

5   Inc., is an LLC?

6        A   Yes.

7        Q   Solely owned by Allen Media, LLC?

8        A   Correct.

9        Q   Okay.  And what is the business of

10  Entertainment Studios Networks, Inc.?

11       A   It is the operater for our eight cable

12  networks.

13       Q   Okay.  And so there's the seven cable

14  networks that are referred to in this litigation as

15  the lifestyle networks, correct?

16       A   Correct.

17       Q   And then the eighth is what?

18       A   TheGRIO network, which is new.

19       Q   Okay.  And when -- you said it was new.

20  When did that come into being?

21       A   August of '22.

22       Q   Okay.  And so my understanding was that

23  TheGRIO, at least as it initially existed, was

24  digital media.  It was a website, correct?

25       A   It still is a website as well.

CONFIDENTIAL

Page 34

1    Q    Okay.  And so the network -- TheGRIO

2    network, can you explain to me what that is?

3         A    It's a cable network in 45 million homes.

4         Q    So it's like the lifestyle networks?

5         A    I don't know what segment it will fall

6    into, but it is another cable network.

7         Q    Okay.  So going back down sort of the main

8    branch of the tree here, Entertainment Studios Media

9    Holdings, Inc., what is that company?

10        A    It's another holding company, and it is

11   the level I believe at which we complete tax

12   returns.

13        Q    What does that mean?

14        A    It's one of our main taxpayers.

15        Q    For the entities that fall below it as --

16        A    Correct.

17        Q    Okay.  What is the distinction between

18   Entertainment Studios Media and Entertainment

19   Studios Networks?

20        A    Entertainment Studios Media Holdings is a

21   holding company.  Entertainment Studios Networks is

22   an actual operating entity for the cable networks.

23        Q    Is there a board of directors for

24   Entertainment Studios Networks, Inc.?

25        A    Not that I'm aware of.

EXHIBIT J

AOE0461

CONFIDENTIAL

Page 36

1    TV Holdings 1, and the 25 percent coming from

2    TV Holdings 2, what those mean.

3         A    That would be the ownership percentage

4    that each of those entities hold in Weather Group,

5    LLC.

6         Q    And what is the basis for the split in

7    ownership between those two entities?

8         A    I don't know.

9         Q    To the right of the "TV Holdings" level is

10   "CF Entertainment Inc."

11        What is that company?

12        A    That primarily comprises our syndication

13   business --

14        Q    Okay.

15        A    -- as well as corporate cost.

16        Q    I've seen in some places references to

17   "CF Entertainment Inc."  It will then say, "d/b/a

18   Entertainment Studios Inc."

19        Have you seen that notation?

20        A    I have.

21        Q    Okay.  So does CF Entertainment Inc. do

22   business as Entertainment Studios Inc.?

23        A    It does.

24        Q    Okay.  And so Entertainment Studios Inc.

25   is a separate entity from Entertainment Studios

EXHIBIT J

AOE0462

CONFIDENTIAL

Page 37

1  Networks, Inc., correct?

2       A   Correct.

3       Q   Okay.  And just to pick up on what you

4  just said, CF Entertainment, I believe you said that

5  is where the syndication business is housed; is that

6  correct?

7       A   Correct.

8       Q   So the programming that Allen Media Group

9  owns that is distributed through syndication, that

10  business runs through CF Entertainment Inc.?

11       A   Correct.

12       Q   Is there a board of directors of

13  CF Entertainment Inc.?

14       A   Not that I'm aware of.

15       Q   Are there regular meetings of

16  CF Entertainment Inc.?

17       A   Not that I'm aware of.

18       Q   Okay.  Who is the chief executive of

19  CF Entertainment Inc.?

20       A   Byron Allen.

21       Q   Same question for Entertainment -- I'm

22  sorry -- for Weather Group, LLC.

23       Is there a board of directors?

24       A   Not that I'm aware of.

25       Q   Are there regular meetings of

www.veritext.com                                    888-391-3376
EXHIBIT J
AOE0463

CONFIDENTIAL

Page 39

1          Q    And the entities I think you said that are

2     not included on here, will they, too -- I know

3     there's been expansion into broadcast television in

4     various markets, so those entities would not be

5     included, correct?

6          A    Correct.

7          Q    Okay.  And then I think there's an entity

8     that owns movie rights and distribution and things

9     like that.  That would be an entity that's not

10    included, correct?

11         A    Correct.

12         Q    Okay.  What other entities?

13         A    It's hard to say without the org chart in

14    front of me, but the ones you named are the big

15    ones.

16         Q    And for the various entities that we've

17    reviewed going down through, I know I asked you if

18    there were boards of directors.

19              Are there corporate officers of any of

20    those entities besides Mr. Allen?

21         A    I don't know.

22         Q    Who would know the answer to that?

23         A    Our internal legal counsel would know.

24         Q    Does CF Entertainment Inc. have anything

25    to do with the operation of the cable networks?

CONFIDENTIAL

Page 40

1          A    A lot of the programming -- the original

2    programming originates in CF Entertainment Inc. and

3    is licensed to Entertainment Studios Networks, Inc.,

4    for use on the cable networks.

5          Q    Okay.  Any other relation -- strike that.

6               Any other involvement of CF Entertainment

7    Inc. in the cable networks other than licensing its

8    content for airing on the cable networks?

9          A    That's the main relationship that I can

10   think of between those two entities.

11         Q    When you say "its content," that's the

12   syndicated programming that CF Entertainment --

13         A    Correct.

14         Q    -- owns, correct?

15              Does CF Entertainment -- strike that.

16              Who produces the syndicated programming

17   owned by CF Entertainment?

18         A    A lot of it is produced in-house, with

19   some of the content licensed from third parties.

20         Q    And when you say it's produced in-house,

21   my question is sort of org-chart-specific.

22              What entity is responsible for that?

23         A    CF Entertainment Inc.

24         Q    And it owns the rights to that syndicated

25   programming?

EXHIBIT J
AOE0465

CONFIDENTIAL

Page 41

1       A    Correct.

2       Q    Okay.  The corporate structure of

3   Allen Media Group, I believe, was reorganized in

4   2018, I think, sort of in conjunction with the

5   acquisition of The Weather Channel.

6            Are you familiar with the corporate

7   structure prior to the structure that we're looking

8   at here as Defendant's Exhibit 148?

9       A    No.

10      Q    Who within the company, if you wanted to

11  understand that, would be the person that you would

12  ask?

13      A    Internal legal counsel.

14      Q    In your role as chief financial officer

15  for Allen Media, do you know how many employees the

16  company has?

17      A    I do.

18      Q    Okay.  And what is that number?

19      A    I believe 2,300.

20      Q    Are those direct employees?  Contractors?

21  A mix of both?  Do you know?

22      A    I don't know.

23      Q    Is that 2,300 employees on the payroll

24  through CF Entertainment Inc.?

25      A    No.  That's across all Allen Media

EXHIBIT J
AOE0466

CONFIDENTIAL

Page 54

1          Carrying down to the next page, there's a
2   paragraph there that starts, "Advertising revenue."
3          Do you see where that is, the first
4   paragraph?
5      A   Yes.
6      Q   Okay.  And so advertising revenue, that is
7   the revenue generated by the two plaintiffs in this
8   case, correct, Entertainment Studios Networks and
9   then the Weather Group, correct?
10     A   Both of those entities do generate
11  advertising revenue, yes.
12     Q   And as I understand it, CF Entertainment
13  also generates advertising revenue for its
14  syndication programming, correct?
15     A   Correct.
16     Q   Okay.  But that's a separate entity from
17  the two plaintiffs here, correct?
18     A   Correct.
19     Q   And I won't read this entire paragraph
20  into the record, but it is a discussion of the
21  manner in which the company recognizes advertising
22  revenue.
23          As you sit here today, is that an accurate
24  description of how the company recognizes
25  advertising revenue?

CONFIDENTIAL

Page 61

1          Q    And this was prepared at your direction?

2          A    I pulled this directly from our accounting

3     software for FY '19, FY '20, FY '21, and I requested

4     it from the controller for FY '18 because it would

5     be in a legacy system that I do not have access to.

6          Q    And so it's your testimony that this is a

7     true and accurate representation of the income

8     statement of Entertainment Studios Networks, Inc.,

9     for fiscal year 2018, 2019, 2020, and 2021?

10         A    Correct.

11         Q    And looking at the first two rows above

12    the "Income" line, there's two sources of income

13    listed there: advertising revenue and subscriber

14    fees.

15              Do you see that?

16         A    I do.

17         Q    Please explain to me the difference

18    between those two types of revenue.

19         A    Advertising revenue is revenue from

20    advertising on the cable networks.  Subscriber fees

21    are payments from the MVPDs on a per-subscriber

22    basis.

23         Q    Okay.  Are there -- well, strike that.

24              Those are the only two sources of income

25    received by Entertainment Studios Networks, Inc.,

EXHIBIT J

AOE0468

CONFIDENTIAL

Page 62

1    correct?

2         A    Correct.

3         Q    And so looking just at the top line,

4    advertising revenue for fiscal year 2018 is

5    5.8 million; 2019, 5.1 million, 2020, about

6    5.9 million, and then 2021, it's just about -- just

7    under 12 million.

8              Do you see that?

9         A    I do.

10        Q    Okay.  Do you have an understanding of

11   what caused the increase more than two-fold, you

12   know, between 2020 and 2021?

13        A    I do.

14        Q    And what is the source of that?

15        A    The Black-Owned Media Matters movement.

16        Q    I think what's also been referred to as

17   the Black-Owned Media Initiative?

18        A    Yes.

19        Q    And when you say that that was the source

20   of the increased revenue in 2021 over years prior,

21   what do you mean by that?

22        A    We had incremental national advertising

23   dollars attributed to the company in FY 2021 in

24   comparison to the prior year.

25        Q    Okay.  So when you say "incremental

EXHIBIT J

AOE0469

CONFIDENTIAL

Page 66

1          A    Promotion and advertising.

2          Q    And what is included in that bucket?

3          A    Any cost to promote or advertise the cable

4     networks.

5          Q    And that stays -- well, it decreases in

6     2019, and then it goes up in 2020, and then it goes

7     up fairly sizably by $31 million, 2020 to 2021.

8               What drove that increase?

9          A    Increase in income that we could reinvest

10    into promotion and advertising.

11         Q    What types of promotion and advertising is

12    done for the Entertainment Studios Networks media

13    properties?

14         A    Off-channel marketing campaigns.

15         Q    Anything else?

16         A    That's the main item that comes to mind.

17         Q    The next expense line item is

18    "Distributions."

19              What's included in that bucket?

20         A    Satellite distribution fees.

21         Q    And then "Brand License Fees," what's

22    that?

23         A    Those are intercompany payments from

24    Entertainment Studios Networks to CF Entertainment

25    for use of the syndicated content.

EXHIBIT J
AOE0470

CONFIDENTIAL

1      Q   Okay.  So that -- that gets back to

2   something we were talking about earlier.

3           CF Entertainment owns the syndicated

4   programming, correct?

5      A   Correct.

6      Q   That's an asset that sits on the

7   CF Entertainment balance sheet?

8      A   Correct.

9      Q   Okay.  And Entertainment Studios Networks,

10   Inc., pays CF Entertainment for the use of -- the

11   right to use that asset and broadcast it on its

12   networks, correct?

13      A   Correct.

14      Q   How is that price set?

15      A   I don't know.

16      Q   Who sets that?

17      A   I don't know.

18      Q   That's not part of your job, is to -- I

19   mean, because that number went up by $10 million.

20   So that's not something that's within your purview,

21   to analyze the basis for that increase?

22      A   It's an intercompany transaction that nets

23   out in consolidation, so it's not an area of focus

24   of mine.

25      Q   "Salaries and Labor," I know what that

CONFIDENTIAL

Page 83

1   of the deposition.  It's not Bates-numbered or

2   dated.  It's just headed "Weather Group

3   Consolidated," and it's marked "Confidential."

4          (Exhibit 156 was marked for identification

5       and is attached hereto.)

6   BY MS. ANDREWS:

7       Q   This is similar to the document we looked

8   at for Entertainment Studios Networks, Inc., but

9   this is on behalf of Weather Group; is that

10  accurate?

11      A   Correct.

12      Q   Okay.  And this -- did you prepare this

13  one yourself?

14      A   Yes.

15      Q   It covers fiscal year 2018, '19, '20, and

16  '21.

17          You prepared this for all four years?

18      A   Correct.

19      Q   And I asked you this about the

20  Entertainment Studios Networks.  I'll ask you the

21  same.

22          This represents an accurate -- well,

23  strike that.

24          This is -- you obtained this information

25  from the company's financial systems, and this is an

CONFIDENTIAL

Page 98

1    syndicated programming?

2         A    Correct.

3         Q    Okay.   But CF Entertainment also derives

4    advertising revenue, correct, for selling

5    advertising time on its syndicated programming that

6    is distributed in syndication, right?

7         A    Correct.

8         Q    Okay.   And that revenue flows -- if I

9    follow the chart, it flows up this way, correct?

10        A    Correct.

11        Q    It does not flow through Entertainment

12   Studios Networks, Inc., correct?

13        A    Correct.

14        Q    And is Weather Group a subsidiary of

15   CF Entertainment Inc.?

16        A    No.

17        Q    Weather Group is held by TV Holdings 1 and

18   TV Holdings 2, LLC, correct?

19        A    Correct.

20        Q    And then flows up into Entertainment

21   Studios Media Holdings, Inc.?

22        A    Correct.

23        Q    And so we looked at the financials that

24   were provided by your counsel for Entertainment

25   Studios Networks, LLC, and for Weather Group.

EXHIBIT J
AOE0473

CONFIDENTIAL

Page 103

```
 1      Q   Okay.  In terms of sort of your regular
 2  cadence of financial reporting, can you just sort of
 3  describe to me how that works?
 4           Is it -- you know, at what level sort of
 5  aggregated up, and who is it reported up to?
 6      A   Every quarter, we prepare a financial
 7  package that's distributed to our lenders and posted
 8  on our investor relations website.
 9           I prepare that package on a quarterly
10  basis, which involves pulling the financial results
11  from our accounting software at a
12  subsidiary-by-subsidiary level, analyzing it to make
13  sure I'm comfortable with the results, and
14  consolidating it into the reporting package.
15      Q   And you said that's done on a quarterly
16  basis?
17      A   Correct.
18      Q   To the lenders?
19      A   Correct.
20      Q   Okay.  And then I believe you said it's
21  posted on the investor relations website?
22      A   Correct.
23      Q   What is that?
24      A   We maintain a website for investors and
25  potential investors with key information about the
```

EXHIBIT J
AOE0474

CONFIDENTIAL

Page 105

1    as we've just defined, investors?

2          A    Mr. Allen owns 100 percent of the common

3    equity, and I would imagine he'll continue to do so.

4          Q    When you say it's also published for

5    "potential lenders," what do you mean by that?

6          A    Our bonds are publicly traded.

7          Q    Okay.  But this information that you post

8    is not publicly available, correct?  It's available

9    only to individuals who either currently hold your

10   bonds or lenders to the company or otherwise, like

11   prospective creditors?

12         A    Correct.  Correct.

13         Q    Are there meetings with the current or

14   prospective lenders who are provided this

15   information?

16         A    On a quarterly basis, we do hold a lender

17   call.

18         Q    Do you participate in that call?

19         A    I do.

20         Q    Are materials other than the -- well,

21   strike that.

22              So this quarterly package you prepare, is

23   that distributed in advance of the call?

24         A    It is.

25         Q    And when was the most recent?  Was it

EXHIBIT J
AOE0475

CONFIDENTIAL

Page 108

1    850 million.

2        Q    Is there other?

3        A    We have a revolver.

4        Q    And how much is that?

5        A    About 30 million of that is drawn.

6        Q    Okay.  Anything else?

7        A    Those are the major tranches of

8    third-party debt.

9        Q    Okay.  So those are the -- the holders of

10   that, either the bonds or the loans, those are the

11   ones who are invited to participate in this

12   quarterly call?

13       A    Correct.

14       Q    And do they typically?

15       A    We generally have various attendees.  I

16   don't track who attended.

17       Q    And what's the purpose of the calls?

18       A    To add an overview or color around the

19   financial results that are included in the package.

20       Q    Is the Black-Owned Media Initiative

21   something that's discussed during those calls?

22       A    It is.

23       Q    And what's the nature of those

24   discussions?

25       A    We explain the increase in our results and

CONFIDENTIAL

Page 109

1    the fact that they're attributable to the

2    Black-Owned Media Movement and any significant

3    highlights within.

4        Q   Is that tracked within the written

5    materials that are provided in advance of the

6    meeting?

7        A   The written -- so the financial report

8    does include a trend analysis which explains

9    year-over-year increases in advertising revenue.

10           The verbal commentary on the lender call

11   goes into additional detail as seen fit.

12       Q   And I think I asked you earlier what your

13   understanding of the Black-Owned Media Initiative

14   was.

15           Is that -- your understanding of it, is

16   that consistent with how it's been described on

17   these calls to lenders?

18       A   Yes.

19           MS. ANDREWS:   Okay.   I don't have anything

20   further at this time, but I'm going to restate my

21   objection that I stated at the outset in terms of

22   being provided these materials on the eve of the

23   start of the deposition.

24           We'll follow up with Mr. Schecter about

25   any areas that need further follow-up, as well as

EXHIBIT J

AOE0477

CONFIDENTIAL

Page 112

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4          That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were administered an oath; that

8     a record of the proceedings was made by me using

9     machine shorthand which was thereafter transcribed

10    under my direction; that the foregoing transcript is

11    a true record of the testimony given.

12         Further, that if the foregoing pertains to

13    the original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review

15    of the transcript [x] was [ ] was not requested.

16         I further certify I am neither financially

17    interested in the action nor a relative or employee

18    of any attorney or any party to this action.

19         IN WITNESS WHEREOF, I have this date

20    subscribed my name.

21

22    Dated: 5th day of December, 2022.

23

                    *Carla Soares*

24

25                  CARLA SOARES

                    CSR No. 5908

EXHIBIT J

AOE0478

# EXHIBIT K

EXHIBIT K
AOE0479

Page 1

1                    IN THE UNITED STATES DISTRICT COURT

2                   FOR THE CENTRAL DISTRICT OF CALIFORNIA

3                              WESTERN DISTRICT

4

5        ENTERTAINMENT STUDIOS          )
         NETWORKS, INC., A CALIFORNIA )
6        CORPORATION; WEATHER GROUP,  )
         LLC, A DELAWARE LIMITED        )
7        LIABILITY COMPANY,             )
                                        )
8                   PLAINTIFFS,         )
                                        )
9           V.                          )   NO. 2:21-CV-04972-
                                        )        FMO-MAA
10       MCDONALD'S USA, LLC, A         )
         DELAWARE LIMITED LIABILITY   )
11       COMPANY,                       )
                                        )
12                  DEFENDANTS.         )
         _____)

13

14

15

16

17                    VIDEOTAPED DEPOSITION OF ROY RESTIVO

18                        THURSDAY, MARCH 9, 2023

19

20

21

22

23

24       JOB NO. MW 5799392

25       REPORTED BY:  SAMANTHA AVENAIM, CSR 10627

Page 2

1   VIDEOTAPED DEPOSITION OF ROY RESTIVO, TAKEN ON
2   BEHALF OF THE DEFENDANT, AT 2121 AVENUE OF THE
3   STARS, SUITE 2600, LOS ANGELES, CALIFORNIA,
4   COMMENCING AT 9:41 A.M., ON THURSDAY, MARCH 9,
5   2023, BEFORE SAMANTHA AVENAIM, CSR 10627.
6
7   APPEARANCES OF COUNSEL:
8       FOR THE PLAINTIFFS:
9           MILLER BARONDESS, LLP
            BY:  DAVID W. SCHECTER, ESQ.
10          1999 AVENUE OF THE STARS
            SUITE 1000
11          LOS ANGELES, CALIFORNIA  90067
            310.552.440
12          DSCHECTER@MILLERBARONDESS.COM
13
        FOR THE DEFENDANT MCDONALD'S USA, LLC:
14
            RILEY SAFER HOLMES & CANCILA LLP
15          BY:  AMY ANDREWS, ESQ.
                 ROBERT FOLEY, ESQ.
16          100 SPECTRUM CENTER DRIVE
            SUITE 440
17          IRVINE, CALIFORNIA  92518
            949.359.5515
18          AANDREWS@RSHC-LAW.COM
            RFOLEY@RSHC-LAW.COM
19
20      ALSO PRESENT:
21          JEFFREY MAYES
22          DARREN GALATT (REMOTELY)
23          MARK DEVITRE (REMOTELY)
24          MONICA MOSBY (REMOTELY)
25          ALEX KLYUSNER, VIDEOGRAPHER

Page 45

1      A.   Again, I'm not getting your question.

2      Q.   Sure.  If I wanted to know --

3      A.   Because it's --

4      Q.   Let me ask it this way:  If I wanted to

5   know what cable networks are targeting, you know,

6   kids, how would you answer that?  How would you go

7   about answering that question?

8      A.   When you say "targeting," what do you mean

9   by "targeting"?

10      Q.   Showing programming that would appeal to

11   kids.  I mean, we know it's Nickelodeon; right?  But

12   is there data you could consult that would --

13      A.   No, there isn't.  Because you would have to

14   ask the people who are running those cable networks,

15   because even Nickelodeon, they know that it's

16   usually a parent watching with children.

17           There's a lot of co-viewing going on.

18   There isn't as -- targeting is not as exact as you

19   would think it could be.

20           And I can't guess who Nickelodeon's

21   shooting for or what age group they're shooting for.

22   That's their own corporate decisionmaking.

23           I can see who they gather more of on a

24   percentage basis, but that doesn't necessarily mean

25   that's who they were shooting for originally.

EXHIBIT K

AOE0482

Page 46

1      Q.   Fair enough.

2           So that's an internal sort of business

3   strategy --

4      A.   Correct.  So there's no way for someone on

5   the outside to know who someone on the inside is

6   targeting.  So that's why I didn't understand your

7   word "targeting."

8      Q.   But if you look at the after-the-fact data,

9   the ratings --

10     A.   Even then you can't because --

11     Q.   No, no, no.  Let me finish it.  I'm not

12  saying that you could necessarily tell who's

13  targeted, but you could tell who watched it.

14     A.   After the fact, of course, you would know

15  who watched it, yes.

16     Q.   And that might, as an outsider, inform your

17  opinion about who that programming is targeted?

18     A.   As an outsider?

19     Q.   Sure.  If I'm not within Nickelodeon.

20          I'm an advertiser.  Let's do a

21  hypothetical.  I'm an advertiser.  I'm a toy

22  company; right?  And I've created some new video

23  game, and I think it's going to do really well with

24  12-year-olds, and so I want to put it in shows that

25  are targeted to 12-year-olds.

EXHIBIT K

AOE0483

Page 93

1        A.    Yeah.   Unfortunately, it's one of Nielsen's

2    quirks.   Even a couple years back when CBS

3    syndication changed their name from CBS Distribution

4    to CBS Media Ventures in the middle of the year -- I

5    don't know why -- some of the programs of theirs,

6    Dr. Phil, et cetera, were listed under Media

7    Ventures and the half of the year under the old

8    name.   We had to just go and hand average them

9    together.   Another of the myriad of Nielsen quirks.

10       Q.    So let's close this out just so we're

11   clear, whether for 2021 it's referred to on --

12       A.    Yeah.   If we look at it, I think if you

13   check under total duration, and I'll explain to you

14   why, you'll see that there's one, two, three, four,

15   five -- the fifth line up and this fourth line up.

16       Q.    Uh-huh.

17       A.    256,000 minutes, 269,000 minutes, it looks

18   like it occurred I'd say mid June.   And that's why

19   you would mix those two back together.

20       Q.    Okay.   That makes sense to me.

21            And then let's just be clear.   So the

22   bucket that was at one time -- was at one time ESN

23   Lifestyles and then I guess became Recipe.TV?

24       A.    In mid 2021, yes.

25       Q.    Regardless of what it's titled, it includes

EXHIBIT K

AOE0484

1    Recipe.TV, Cars.TV, ES.TV, Pets.TV, and

2    MyDestination.TV?

3        A.    Correct.

4        Q.    Then one last question about this chart

5    that we have marked as Exhibit 161 that you

6    prepared.

7        A.    Yes.

8        Q.    And this was top ten distributors present

9    day; correct?

10        A.    Correct.

11        Q.    And this was prepared by you based on

12    information from Ms. Arough?

13        A.    Yes.

14        Q.    Do you know how this distribution would

15    change if we went back in time on an annual basis

16    for four years?

17        A.    I do not know.

18        Q.    And just sticking with the spreadsheet

19    again -- I'm sorry to keep bouncing back and forth.

20    You had said that the cutover between Lifestyles

21    and -- where is it?  Oh, oh, I see.

22            There was one other thing we noticed.  If

23    you look on the native, it's Rows 6 and 7 from the

24    top.

25            But the data for 2018 appears to just go

Page 98

1   STATE OF CALIFORNIA    )

2   COUNTY OF LOS ANGELES ) ss.

3

4          I, Samantha Avenaim, C.S.R. No. 10627 in

5   and for the State of California, do hereby certify:

6          That prior to being examined, the witness

7   named in the foregoing deposition was by me duly

8   sworn to testify to the truth, the whole truth, and

9   nothing but the truth;

10          That said deposition was taken down by me

11   in shorthand at the time and place therein named and

12   thereafter reduced to typewriting under my

13   direction, and the same is a true, correct, and

14   complete transcript of said proceedings;

15          That if the foregoing pertains to the

16   original transcript of a deposition in a Federal

17   Case, before completion of the proceedings, review

18   of the transcript { } was { } was not required.

19          I further certify that I am not interested

20   in the outcome of the action.

21          Witness my hand this 17th day of March,

22   2023.

23

24                          Certified Shorthand Reporter
                            For the State of California

25

                                                         EXHIBIT K
                                                         AOE0486

# EXHIBIT L

EXHIBIT L

AOE0487

```
 1               UNITED STATES DISTRICT COURT
 2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
 3
                                )
 4   ENTERTAINMENT STUDIOS      )
     NETWORKS, INC., a          )
 5   California corporation;    )
     WEATHER GROUP, LLC, a      )
 6   Delaware limited liability )
     Company,                   )
 7                              )
                  Plaintiffs,)
 8                              ) Case No.
          vs.                   ) 2:21-cv-04972-FMO-MAA
 9                              )
     McDONALD'S CORPORATION, a  )
10   Delaware corporation,      )
                                )
11                Defendant. )
12
13   _____
14
15      VIDEOTAPED DEPOSITION OF GEOFFREY CALABRESE
16                    OMD USA, LLC
17               Zoom Videoconference
18                October 17, 2022
19                    Volume I
20
21
22   Reported by:
     KAYLA M. KNOWLES
23   CSR No. 14071
24   Job No. 5533394
25   PAGES 1 - 124
```

                                              Page 1

EXHIBIT L

AOE0488

```
 1                  UNITED STATES DISTRICT COURT
 2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
 3
                                   )
 4     ENTERTAINMENT STUDIOS        )
       NETWORKS, INC., a            )
 5     California corporation;      )
       WEATHER GROUP, LLC, a        )
 6     Delaware limited liability   )
       Company,                     )
 7                                  )
                      Plaintiffs,)
 8                                  ) Case No.
               vs.                  ) 2:21-cv-04972-FMO-MAA
 9                                  )
       McDONALD'S CORPORATION, a    )
10     Delaware corporation,        )
                                    )
11                    Defendant.    )
12
13     _____
14
15            Videotaped deposition of GEOFFREY
16     CALABRESE, Volume I, taken on behalf of Plaintiffs,
17     through Zoom Videoconference, beginning at 9:19
18     a.m., and ending at 1:06 p.m., on Monday,
19     October 17, 2022, before Kayla Knowles, Certified
20     Shorthand Reporter No. 14071.
21
22
23
24
25
```

Veritext Legal Solutions
866 299-5127

EXHIBIT L
AOE0489

```
 1      APPEARANCES:
 2      For Plaintiffs:
 3        MILLER BARONDESS, LLP
          By:  DAVID SCHECTER, Attorney at Law
 4        1999 Avenue of the Stars, Suite 1000
          Los Angeles, California 90067
 5        (310) 552-4400
          Dschecter@millerbarondess.com
 6
 7      For Defendants:
 8        RILEY SAFER HOLMES & CANCILA LLP
          By:  AMY ANDREWS, Attorney at Law
 9        70 West Madison Street, Suite 2900
          Chicago, Illinois 60602
10        (312) 471-8745
          Aandrews@rshc-law.com
11
12      For the Witness:
13        DAVIS + GILBERT LLP
          By:  JOSHUA H. EPSTEIN, Attorney at Law
14        1675 Broadway
          New York, New York 10019
15        (212) 468-4869
          jepstein@dglaw.com
16
17      Also Present:
18        Noah Suszckiewicz, Videographer
19        Jeff Mayes
20        Mark DeVitre
21        Darren Galatt
22        Eric Gould
23        Janice Arouh
24
25
```

                                          Page 3

EXHIBIT L
AOE0490

```
 1      USA.

 2              MR. EPSTEIN:  And Josh Epstein of Davis &

 3      Gilbert, LLP, on behalf of the witness.

 4              THE VIDEOGRAPHER:  All right.  The court

 5      reporter may swear in the witness.              09:20:53

 6

 7                  GEOFFREY CALABRESE,

 8      having been administered an oath, was examined and

 9      testified as follows:

10                                                      09:21:09

11                      EXAMINATION

12      BY MR. SCHECTER:

13          Q    Good afternoon, sir.  As I said, I am the

14      attorney for Entertainment Studios Networks and

15      Weather Group.  Thank you for participating in   09:21:17

16      today's deposition.  I am going to try to make this

17      as efficient as possible.

18              Can you just give me the -- your title and

19      sort of your responsibilities currently?  Is it at

20      OMD or OMG?                                      09:21:33

21          A    OMG, Omnicom Media Group.  I am the chief

22      investment officer.

23          Q    And have you held that title for many

24      years?

25          A    Two years.  So I received my promotion   09:21:44
```

Page 8

EXHIBIT L

AOE0491

1    September of 2020.

2         Q    What -- what was your title before that?

3         A    President of OMnet.

4         Q    And how long were you in that role?

5         A    Five years.                                    09:22:06

6         Q    And prior to that?

7         A    Director of accountability for Omnicom

8    Media Group.

9         Q    Can you just explain to me -- I'm not

10   asking for a legal difference.                           09:22:28

11             What's the difference between OMD, as in

12   dog, and OMG, as in group?

13        A    OMG is the holding company that sits over

14   OMD and a few other agencies.

15        Q    So in OMnet, is that a subsidiary of OMG?   09:22:42

16        A    Subsidiary of Omnicom Media Company.

17        Q    So in -- this case involves advertising by

18   McDonald's.

19             Did you ever work directly on the

20   McDonald's account?                                      09:23:18

21        A    I oversaw the upfront investment, the broad

22   cash year '21 -- I'm sorry -- broad cash year '21

23   and '22.

24        Q    That's 2021.

25             So what -- did you work on the account        09:23:35

Page 9

EXHIBIT L

AOE0492

1      prior to 2021?

2          A    No.   I never worked on the account

3      directly.

4          Q    Did you supervise those who did work

5      directly on the account?                          09:23:51

6          A    Yes.

7          Q    And did you supervise those on the

8      account -- well, just give me a rough time frame for

9      when that took place.

10         A    It would have began with my appointment as   09:24:06

11     chief investment officer in September of 2020.

12         Q    So prior to September 2020, did you

13     supervise anyone who -- at OMD or OMG who was

14     working on the McDonald's account?

15         A    No.                                       09:24:27

16         Q    Do you know when -- strike that.

17              The -- was OMD the general market agency

18     for McDonald's, or was it OMG?

19         A    OMD.   We would call it the agency of

20     record.                                           09:24:56

21         Q    Do you know when OMD was first appointed

22     the agency of record for McDonald's?

23         A    I do not.

24         Q    Would it -- do you know if it's prior to

25     2015?                                             09:25:13

Page 10

EXHIBIT L
AOE0493

1        A    Yes.

2        Q    And OMD served as agency of record for

3   McDonald's until 2021?

4        A    Yes.

5        Q    When did OMD cease as the agency of record    09:25:28

6   for McDonald's?

7        A    We were let go in March of 2021, to the

8   best of my knowledge.

9        Q    Did OMD continue to work on the account

10  after March 2021 for the transition?                    09:25:52

11       A    Yes.

12       Q    Who were the -- I guess, in this 2020 to

13  2021 time frame, who were the OMD representatives

14  who were directly working on the McDonald's account?

15       A    I wouldn't know all of them.  It's Stacy      09:26:18

16  Larson -- would be chief investment officer at OMD.

17  Monica Wiedemann would have been a director of

18  investment.  And Ashwin Khanchandani, I just

19  don't -- I can't pronounce his last name.

20  Complicated.                                            09:26:49

21            MR. EPSTEIN:  It's on -- on some of the

22  e-mails that were produced to you.

23            THE WITNESS:  And there would have been

24  other people that have since left the company

25  because the positions no longer existed when they      09:26:58

Page 11

EXHIBIT L

AOE0494

1    fired us.

2    BY MR. SCHECTER:

3        Q    Who -- do you know somebody by the name

4    Chris Gracey?

5        A    I do not.                                 09:27:12

6        Q    Do you know Debbie Ennis?

7        A    No.

8        Q    I'll start again and work backwards.

9             So in the 2020 to 2021 time, where OMD is

10   the agency of record for McDonald's, what -- at a    09:27:35

11   general level, what were OMD's responsibilities?

12       A    In regards to McDonald's, we planned and

13   bought their general media; so general market media.

14       Q    And are you familiar with the national

15   TV -- national advertising budget from -- that is    09:28:02

16   referred to as opnet?

17       A    Yes.

18       Q    And OMD's -- part of its responsibilities

19   was to plan and purchase advertising from the opnet

20   budget; isn't that correct?                          09:28:19

21       A    Yes.

22       Q    I take it that, as you came on as the chief

23   investment officer in September of 2020, you had to

24   do some work to learn about the prior activities on

25   the account?                                         09:28:39

                                                        Page 12

EXHIBIT L

AOE0495

```
 1                MR. EPSTEIN:  Object -- let me just -- not

 2      to interrupt, but I assume that all objections,

 3      except as to form, are reserved until trial.

 4                MR. SCHECTER:  We're just going per -- per

 5      the rules of federal procedure.              09:28:53

 6                MR. EPSTEIN:  Okay.  So I object as to

 7      form.

 8                You can answer.

 9                THE WITNESS:  Yes.

10      BY MR. SCHECTER:                             09:29:03

11          Q    So prior to -- based on what you did to

12      prepare yourself to begin working on the account,

13      you learned that OMD was McDonald's agency of record

14      prior to 2020 with responsibility to plan and

15      purchase advertising out of the opnet budget?   09:29:19

16          A    Yes.

17          Q    Are you familiar with a term "local

18      entities" or "local franchisees" for McDonald's?

19          A    Yes.

20          Q    Isn't it true that local franchisees could  09:29:41

21      band together, put a budget together, and look to an

22      agency to help them plan and purchase their own

23      advertising?

24                MS. ANDREWS:  Object to the form.

25      ///

                                               Page 13
```

EXHIBIT L

AOE0496

```
 1              MS. ANDREWS:  Same objection.

 2       BY MR. SCHECTER:

 3           Q    Was it in excess of $100 million?

 4           A    I don't know.

 5           Q    Somewhere between 10 and $100 million each   09:31:20

 6       year?

 7              MS. ANDREWS:  Same objection.

 8              THE WITNESS:  I don't know.  I would assume

 9       so.

10       BY MR. SCHECTER:                               09:31:33

11           Q    So other than opnet and local franchisee

12       cooperative, are you familiar with McDonald's

13       corporate advertising budget?

14           A    Yes.

15           Q    Was OMD responsible for planning and       09:31:51

16       purchasing advertising out of McDonald's corporate

17       budget?

18           A    For a general market.

19           Q    And that was in the years 2020 and 2021?

20           A    Yes.                                   09:32:05

21           Q    And did that also occur prior to 2020?

22           A    Yes.

23           Q    So the local franchisee cooperative,

24       focusing on that now, how did the process work on a

25       general level from, I take it, speaking with the   09:32:45
```

Page 15

EXHIBIT L

AOE0497

```
 1              THE WITNESS:  Answer?

 2              MR. EPSTEIN:  Yes.  Unless I tell you not

 3       to.

 4              THE WITNESS:  Okay.  Yes, so both for

 5       corporate and opnet, you would get a strategy that    09:34:23

 6       was worked on with the McDonald's media team; so

 7       known as McMedia.  They would -- they would advise

 8       our planning teams as to what their key performance

 9       objectives were, so their objectives for their

10       marketing budget on an annual basis.                  09:34:43

11              We would take that information, review

12       that, and use what we would -- what we called

13       McDonald's -- it was five different -- it was a

14       five -- five-factor score card, which dealt with a

15       few things:  One would be ability to reach           09:35:02

16       McDonald's audience; two would be pricing; three

17       would be effectiveness, which was done by a third

18       party hired by McDonald's and analytics partners;

19       and four would be pricing again, as you're dealing

20       with modeling.  So you're looking at prior year      09:35:26

21       pricing, so prior performance versus what would be

22       future performance.  And then the fifth would be

23       diverse -- diverse own would gain extra; so if all

24       things being equal, the partner was diverse own,

25       they would receive the nod for -- for selection.     09:35:50
```

Page 17

EXHIBIT L

AOE0498

```
 1              We would then present that back to

 2    McDonald's.  They would provide their recommendation

 3    or changes to that.  We would then negotiate with

 4    each of the partners that we recommended.  We would

 5    present back to McDonald's the final negotiation and    09:36:11

 6    plan, and then, provided we receive approval, we

 7    would go to order.  And then the media would run

 8    throughout the broadcast year, which was Q4, in this

 9    case, Q4 of 2020 through Q3 of '21.

10    BY MR. SCHECTER:                                        09:36:35

11         Q    And thank you.

12              What you just described, that was for

13    McDonald's corporate budget; correct?

14         A    It was for all of their national media.

15         Q    The corporate budget and opnet; correct?     09:36:46

16         A    Yes.

17         Q    I take it, with respect to the corporate

18    budget, OMD did not have to make a presentation to

19    opnet to get approval for spending out of the

20    corporate budget; is that right?                        09:37:06

21         A    We would always have to present partners

22    and recommendations for all budgets.

23         Q    Even including McDonald's corporate budget?

24         A    Yes.  We're an agency of record; so

25    "agent," meaning I can't do anything without their      09:37:23
```

Page 18

EXHIBIT L

AOE0499

```
 1        "Summary" at the top, and there's an all-agency

 2    total 2020 spend by minority classification, 2019

 3    net spend of 416.  It's millions.  In 2020, net

 4    spend is 451 million.  And then there's a breakdown

 5    by agency, and OMD is the first.  Spend by minority    09:54:04

 6    classification, and there's a 2019 net spend of

 7    391 million and a 2020 net spend of 416 million.

 8    And then, if you look, there's African-American MBE,

 9    and I can represent that that refers to

10    minority-owned enterprise.  It has .32, 0.10.  Do     09:54:31

11    you see that?

12        A    Yes.

13        Q    Does -- do these numbers sound roughly

14    accurate that in 2019 OMD purchased $320,000 of

15    African-American-owned media and 100,000 of          09:54:56

16    African-American-owned media in 2020?

17        A    Purchased for whom?

18        Q    For McDonald's.

19        A    I couldn't say in 2019.

20        Q    What about in 2020?                          09:55:17

21        A    I only bought the fourth quarter of 2020.

22             So media is bought -- national media is

23    bought in a broadcast year.  So as I said earlier,

24    it would have been -- I was appointed in September;

25    so I would have bought the media for October through  09:55:43
```

                                                    Page 28

EXHIBIT L

AOE0500

1    third quarter the following year.  So this is on a

2    calendar year, it appears to me.

3        Q    Okay.  Well, does -- do you have any reason

4    to doubt the accuracy of this spreadsheet that

5    Mr. Manas sent to Ms. Mason?                          09:56:07

6        A    No.

7        Q    I need to make this larger.

8             So in -- well, I take it 2019 you don't

9    know about purchasing advertising on a station The

10   Game by a company called Related Media?              09:56:41

11       A    No.

12       Q    And you didn't purchase advertising for

13   McDonald's on the Steve Harvey show -- yeah, on the

14   Steve Harvey show in 2019?

15       A    No.                                          09:56:56

16       Q    In 2020, it looks like OMD purchased

17   $90,000 on The Black News Channel owned by Related

18   Media.  Do you see that?

19       A    Yes.

20       Q    Did -- did you -- were you on the account   09:57:16

21   when that decision was made?

22       A    I don't know.

23       Q    Do you recall placing advertisements for

24   McDonald's on The Black News Channel?

25       A    I do not, but I don't work directly on the  09:57:30

                                                    Page 29

EXHIBIT L

AOE0501

```
 1        Q    So Mr. Brockett here writes a bullet point

 2   list, and the first, Number 1, it says, "Establish

 3   goals and governance."

 4        The -- the issue here, just generally, is,

 5   when McDonald's is asking about, you know, diversity   10:10:47

 6   and supporting these efforts, it's about increasing

 7   spending with diverse-owned media partners; isn't

 8   that true?

 9        A    Yes.

10        Q    And here, what Mr. Brockett is writing,   10:10:59

11   "establishing goals and governance," he refers to

12   minority-owned certification right here?

13        A    Yes.

14        Q    He writes, "The AACM, the African-American

15   consumer market, has more MO" -- which I assume is   10:11:19

16   minority-owned -- "vendors than the Hispanic and

17   Asian consumer markets.  Nevertheless, all segments

18   find the certification process arduous.  Official

19   certification takes time, requires paying" -- I

20   think it's a $20,000 fee but can't really read   10:11:37

21   that -- "and annual renewal of status of fee."  He

22   then writes, "Companies that are publicly traded or

23   ownership is from non-US citizen entity, they don't

24   qualify."  Do you see that?

25        A    Yes.   10:11:49
```

Page 37

EXHIBIT L

AOE0502

```
 1        Q     Do you have any reason to doubt
 2   Mr. Brockett's statement that companies that are
 3   publicly traded don't qualify?
 4             MS. ANDREWS:  Objection.
 5             (Speaking simultaneously.)              10:12:01
 6             THE WITNESS:  No.  I believe that to be
 7   true.
 8   BY MR. SCHECTER:
 9        Q     Okay.  I marked another document,
10   Deposition Exhibit 39.  I'll share my screen.      10:12:47
11             (Exhibit No. 39 marked for identification.)
12   BY MR. SCHECTER:
13        Q     So this is an e-mail produced by OMD.
14   That's the Bates number.
15             Have you seen this e-mail before?        10:13:15
16        A     I think so.
17        Q     The first e-mail in the string is sent from
18   Danielle Sporkin.
19             Do you know Ms. Sporkin?
20        A     Yes, I do.                              10:13:33
21        Q     What was her role in OMD at the time in
22   March 2021?
23        A     I -- I couldn't say, but she was on the
24   strategy side; so she -- strategy, meaning planning.
25        Q     She writes to Daryl Simm.               10:13:46
```

Page 38

EXHIBIT L

AOE0503

1      Channel?

2          A     Looks that way.

3          Q     And does it also look like local groups of

4      franchisees purchased advertisement on the Weather

5      Channel in 2021?                                    10:26:28

6          A     Yes, but McDonald's has a "no news"

7      restriction.

8                (Speaking simultaneously.)

9                THE WITNESS:   Weather Channel is a --

10     considered a news channel.  So McDonald's tries to   10:26:54

11     stay away from news.

12     BY MR. SCHECTER:

13         Q     But my question, though, is just:  Based on

14     this document, is what Ms. Davis representing

15     that -- that 2021 projected spending on behalf of    10:27:06

16     local franchisees is flat in that there's no change

17     from the spending that took place in 2020 on the

18     Weather Channel?

19         A     That would be my understanding of reading

20     this.                                               10:27:26

21         Q     "Flat" is a term that you are aware is used

22     by OMD and others in the industry to indicate that

23     there's no change in year-to-year spending?

24         A     Correct.

25         Q     And I didn't do this at the outset, but did  10:27:46

                                                    Page 47

EXHIBIT L

AOE0504

```
 1      I assume that that takes place after the upfront

 2      presentations?

 3          A    Yes.

 4          Q    So is it fair to say that the termination

 5      probably happened in June of 2021 or later?        10:34:50

 6          A    Yes.

 7          Q    So Ms. Sporkin writes -- and I want to

 8      focus your attention here where she's talking about

 9      TheGrio.

10          A    Yeah.                                      10:35:07

11          Q    TheGrio is a digital property that

12      Entertainment Studios owns; isn't that right?

13          A    Yes.

14          Q    And Ms. Sporkin writes, "Since OMD is

15      already engaging with Entertainment Studios in      10:35:22

16      upfront conversation as their inventory spans GCM

17      and AACM, we spoke with Burrell and agreed it made

18      the most sense to incorporate TheGrio upfront

19      dollars, earmarking 100, into the overall OMD

20      upfront to maximize the investment."               10:35:41

21          The -- Ms. Sporkin is correct that

22      Entertainment Studios' inventory spans both the

23      general consumer market and the African-American

24      consumer market?

25          A    Yes.                                       10:35:57
```

Page 53

EXHIBIT L
AOE0505

1    Q    And the general consumer market inventory

2    that Entertainment Studios has would be programming

3    like Recipe.TV and Cars.TV?

4    A    Yes.

5    Q    Are you familiar with a -- a game show,          10:36:18

6    Funny You Should Ask?

7    A    I know of it.

8    Q    It's a -- it's a comedy game show that is

9    produced by Entertainment Studios; isn't that right?

10   A    Yes.                                              10:36:39

11   Q    And to the best of your understanding, it's

12   not targeted to the African-American consumer

13   market; right?

14   A    Not to my knowledge.

15   Q    And for a decision like this of allocating,      10:36:47

16   you know, between agencies and which budget to

17   purchase media out of, Ms. Sporkin is writing to

18   McDonald's so that McDonald's can approve this

19   decision; isn't that right?

20   A    Correct.                                         10:37:08

21        MS. ANDREWS:  Object to the form.

22   BY MR. SCHECTER:

23   Q    All right.  So I am going to share my

24   screen.  This is -- make sure I introduce this.

25   Yeah, so Deposition Exhibit 42.  This is a           10:38:05

Page 54

EXHIBIT L
AOE0506

```
1      campaign that they've named Elite, and they're

2      buying it in the scatter marketplace versus the

3      upfront, and it's prior to the news restriction, it

4      appears.

5          Q    The "opinion" part of this, is that          11:12:28

6      referring to OMD's opinion or a campaign called

7      Opinion Elite?  Do you know?

8          A    It's a campaign, Opinion Elite.  It's

9      not -- it's not -- it's not in reference to an

10     opinion we might have.  This is a recommendation; so  11:12:46

11     it's -- it's what we're telling them they should do

12     or asking them to do.

13         Q    So this is, again, a recommendation from

14     OMD; right?

15         A    Yes, because it's -- the GCM at the -- in    11:13:02

16     Comp Row 6 indicates general market; so that would

17     indicate that it's us, OMD.  And then score card

18     would have been used to identify whatever the KPIs

19     were for this campaign that these networks would be

20     chosen.                                               11:13:23

21         Q    And, again, these recommended networks --

22     CNN, Fox News, HON, MSNBC -- those were all networks

23     that, I guess, scored favorably on the McDonald's

24     score card?

25         A    For this campaign.                           11:13:43

                                                    Page 66
```

EXHIBIT L

AOE0507

1           MS. ANDREWS:   Yeah, object to the form.

2           THE WITNESS:   For this campaign.

3    BY MR. SCHECTER:

4        Q    When there's buyer recommendations and then

5    approval to go ahead and purchase certain media in        11:14:02

6    scatter, does OMD make any presentation to opnet?

7        A    They could, depending on scale.  So we

8    would be -- we would be working with the McMedia

9    team day to day, and that determination would be

10   made based on what -- what was deemed to be              11:14:29

11   necessary.

12       Q    So I take it that, for the upfront media

13   plan and the buy recommendations, that was presented

14   to opnet every time; right?

15       A    Correct.                                         11:14:48

16       Q    But for scatter, it depended on the

17   campaign?

18       A    Correct.

19       Q    Do you know if this Opinion Elite campaign

20   was presented to opnet for approval?                     11:14:57

21       A    Prior to --

22            MR. SCHECTER:  Object to the form.

23            THE WITNESS:  I don't.

24   BY MR. SCHECTER:

25       Q    Moving now to Exhibit 47.  This is Bates        11:15:11

                                                      Page 67

EXHIBIT L

AOE0508

```
 1    know -- you know, I can't recall the actual score.

 2         Q    Do you recall why Nick At Night scored

 3    favorably on McDonald's score card?

 4         A    Very high performer for McDonald's KPIs

 5    while I was in charge of the account -- or the        11:31:18

 6    investment of the account, I should say.

 7         Q    What KPIs?

 8         A    The reaching of the 18 to 49 demo and Gen Z

 9    audience, along with reaching them but reaching them

10    at delivery and at a cheap price point.              11:31:41

11              So there's a number of factors that go into

12    a partner selection that make up that score card,

13    and on-time delivery costs, being the CPM that you

14    see in Column D, and then obviously the target

15    demographic, which, for McDonald's, when I ran the   11:32:07

16    account, was always adults 18 to 49 and Gen Z, which

17    would be a subset of 18 to 49 but on the younger

18    side of that.

19         Q    And do you know why the network Oxygen

20    scored favorably on McDonald's score card?           11:32:27

21         A    I would assume the same rationale.  I

22    just -- I know Nick At Night very well because it

23    was part of the Paramount upfront, and McDonald's

24    was always heavy investors with Paramount due to the

25    makeup of their networks and ability to deliver the  11:32:49
```

Page 77

EXHIBIT L

AOE0509

```
 1              You mentioned something else earlier too

 2     when we were talking about the score card, and that

 3     was, I think, in connection with the post-buy, and

 4     that was the guarantee of the -- the media

 5     placement.                                      12:26:11

 6              Can you explain what you mean by a

 7     "guarantee"?

 8        A    It's the estimate that networks provide,

 9     which essentially is the amount of impressions or

10     GRPs that will be delivered for the amount of money  12:26:24

11     you give them.  So it's a calculation based on the

12     cost per thousand.  That essentially gives you the

13     amount of eyeballs that they believe will be

14     delivered as part of that buy.

15        Q    And that was something that McDonald's      12:26:46

16     required of its media partners; correct?

17        A    Can you repeat that, please?

18        Q    Sure.  McDonald's required a guarantee of

19     its media partners for those -- the media buys that

20     you've worked on; correct?                       12:27:03

21        A    Yes.

22        Q    Is that unusual in your experience in the

23     advertising industry?

24        A    No, that's the norm.

25        Q    It's standard operating procedure for an   12:27:12
```

Page 97

EXHIBIT L

AOE0510

1    advertiser to insist on a guarantee from a media

2    partner when it places a buy?

3        A    Yes.

4        Q    And there was some discussion earlier this

5    morning.  You said at one point that McDonald's          12:27:38

6    generally had a "no news" restriction.  Do you

7    recall that?

8        A    Yes, when I covered the account.

9        Q    Can you explain what you mean by that?

10       A    All -- yes.  They -- they would ask that        12:27:55

11   their media not be shown around news.  So as part

12   of -- part of the evaluation being done, we would --

13   we would intentionally leave off news -- news

14   channels.

15            So when I ran the account, you would very       12:28:11

16   rarely see buys around news -- surrounding news.  So

17   CNN, which was referenced in a number of -- of

18   exhibits, for instance, would not have been

19   applicable when I was on the business.  We would

20   have had very little to no investment there.          12:28:42

21       Q    And Mr. Schecter showed you some documents

22   that I believe were from 2019; so they do predate

23   your time on the account that related to

24   corporate -- to purchases out of the corporate

25   budget of CNN and other news channels.  Do you         12:29:08

                                                    Page 98

EXHIBIT L

AOE0511

```
 1      Finish.

 2          A    They're different than traditional

 3      conversations that I have with media partners, but

 4      that's -- that's okay.

 5          Q    Different in what way?              12:39:49

 6          A    Byron is very straightforward and sometimes

 7      makes you feel bad, even though you think you're

 8      doing the right things.  That's all.  And I don't

 9      know if that's his intent.  It just could be my --

10      my personal feelings.                        12:40:19

11          Q    Has he ever accused you of being racist?

12          A    I'm sorry.  What?

13          Q    Has he ever accused you of being racist?

14          A    No.

15          Q    Has he implied to you that a refusal to   12:40:32

16      increase spend with his company is somehow

17      discriminatory?

18          A    He's -- he's told me that -- in my first

19      conversation with him, which I remember vividly

20      because I was a bit shocked, he just told me that,   12:40:59

21      you know, I had the opportunity to -- to make a

22      difference and, you know, that the Madison Avenue

23      has always been prejudiced against black-owned

24      media.  And I -- you know, he -- he had -- he has

25      ruined the careers of people in situations like     12:41:24
```

Page 105

EXHIBIT L

AOE0512

```
 1    mine -- or in positions like mine.
 2             And so I was -- you know, I was new to my
 3    role; so it scared me a little.  Not because I felt
 4    like I was doing anything wrong; I just didn't
 5    know -- I'd never been spoken to that way.          12:41:43
 6      Q    He told you that he had ruined the careers
 7    of people with roles like yours?
 8      A    Yes.
 9      Q    And I think you also said he said to you
10    that Madison Avenue, which I think means the         12:42:00
11    advertising world in general, is prejudiced against
12    black-owned media?
13      A    Yes, but he said that publicly many times.
14      Q    But he's also said it to you with a veiled
15    threat that, if you didn't assist him in increasing  12:42:17
16    spend with him, he had the -- at least, in his
17    words, the ability to ruin your career?
18      A    Yeah, he -- he didn't -- he didn't say he
19    would ruin my career.  He said he's -- he's ruined
20    the careers of people in positions of mine -- or     12:42:35
21    like positions of mine.
22      Q    And I think you said that this was -- your
23    interactions with Mr. Allen are different than those
24    you've had traditionally with media partners; is
25    that correct?                                        12:42:50
```

Page 106

EXHIBIT L
AOE0513

```
 1                (Speaking simultaneously.)

 2                THE WITNESS:  Yeah, I don't have direct --

 3      I've never seen the letters directly; so I don't

 4      know who the author of them was.

 5      BY MS. ANDREWS:                          12:51:06

 6          Q    And based on your experience in the

 7      advertising industry, was this an unusual approach

 8      to find a media partner to obtain additional

 9      investment by advertisers in their property?

10          A    It was different.                12:51:27

11          Q    Aggressive?

12          A    Not for me to say.

13          Q    Did you think that -- well, strike that.

14               Are you familiar with the -- let's just

15      start with Entertainment Studios.         12:52:15

16               Are you familiar with the programming

17      offered by Entertainment Studios?

18          A    Yes.

19          Q    And so you understand they had syndicated

20      programming; correct?                     12:52:30

21          A    Yes, I'm -- in part, yes.

22          Q    And then they have a series of -- they

23      refer to them as network, which are like the

24      Recipe.TV -- there's a handful of them, which in

25      this case have been referred to as the lifestyle  12:52:47
```

Page 112

EXHIBIT L

AOE0514

1    network.  Are you familiar with those?

2        A    Yes.

3        Q    And in your -- in that -- in your

4    experience or your advertising career, have you had

5    the opportunity to evaluate the programming offered    12:53:10

6    by Entertainment Studios?

7        A    We do that as part of our daily process

8    for -- for clients.

9        Q    For all of your clients?  They would be run

10   through the screening process that we talked about    12:53:33

11   earlier?

12       A    No.  The five-point process that -- that --

13   for McDonald's is specific to McDonald's -- right?

14   -- because they use Analytics Partners as a third

15   party for modeling.                                    12:53:44

16            But a number of clients use what we call

17   MMM modeling, which is mixed media modeling, which

18   is similar to what Analytics Partners are doing.  We

19   do our own evaluations as an investment group around

20   delivery, pricing, et cetera, targetability for       12:54:01

21   specifics, guarantees, et cetera.

22       Q    And based on that -- based upon that work,

23   do you have an understanding of the -- you know, the

24   strengths, I guess is the word I'll use, of the

25   offering from Entertainment Studios as potential      12:54:29

Page 113

EXHIBIT L
AOE0515

```
 1    media investment vehicles?
 2         A    Yes, but -- but they vary by client; so you
 3    have to factor in -- with any investment decision,
 4    you have to factor in who the client is, meaning
 5    what the client KPIs are.  So, you know, what is the      12:54:46
 6    client's ultimate goal for -- for that particular
 7    campaign and those advertising dollars.
 8         Q    And relative to McDonald's target goal of
 9    adults 18 to 49 and specifically Gen Z, do you have
10    an understanding of how that -- Entertainment             12:55:12
11    Studios' programming performs relative to that
12    target?
13         A    Yes.  It -- unfortunately, it didn't match
14    for when I was running -- or when McDonald's was on
15    their -- my ultimate purview, the Entertainment          12:55:30
16    Studios properties and the Weather Channel were not
17    matches for McDonald's 18 to 49 and Gen Z because a
18    number of the networks skewed older, meaning on the
19    older side of 18 to 49, if not older.  Some of them
20    were news, like the Weather Channel; so that didn't      12:55:52
21    make the buy.
22              We made an -- Durrell made an exception
23    with Grio, which is a black news channel, which
24    McDonald's bought as well as -- local now, I recall
25    being on the buy.  But it just didn't -- didn't          12:56:13
```

Page 114

EXHIBIT L

AOE0516

 1     match for them -- or for McDonald's at that -- at

 2     that point.  There was better options for the spend,

 3     even with the extra weight for diverse-owned.

 4         Q    And -- and by "better matched," you mean

 5     when looking at all of the factors, which would          12:56:36

 6     include, you know, pricing -- you could essentially

 7     get a better, you know, bang for your buck if you

 8     invested in a different property because it -- it

 9     could deliver the demographic you were targeting at

10     a more cost-effective price.                              12:56:54

11         A    Sure.  So yeah.  So there's multiple ways

12     to look at cost-effectiveness; right?  So price --

13     price assumes all things are equal, meaning the CPM.

14     As an investment organization, we don't look at it

15     necessarily that way because you have to deliver on       12:57:11

16     time, and the -- the networks that have an ability

17     to deliver on time within a given demo is more

18     important from an OMG perspective, or at least since

19     I've been in charge of this, is how -- like, on-time

20     delivery.                                                 12:57:31

21              So, like, delivering on time, I call it

22     effective cost; right?  So what is the ability of an

23     individual network or property, because it's digital

24     as well, to deliver the media within a campaign

25     flight that's desired for that particular audience?       12:57:46

Page 115

EXHIBIT L

AOE0517

1    And so those are some of the factors that we use as

2    part of that score card and one of the things that,

3    my understanding, Analytics Partners was using as

4    well.

5            So a CPM could be cheaper, but if the          12:57:59

6    delivery isn't as good, meaning -- remember when

7    when we were looking at the networks and I

8    highlighted one that -- 99.7?  That's excellent

9    delivery because it's out of 100.  But we've seen

10   networks, like, at the 80th percentile; right?  So    12:58:13

11   they have a 20 percent on their delivery.  And even

12   though their CPM may be cheaper, the on-time

13   delivery is super important; so the effective CPM or

14   ability to deliver on time is much higher.

15           So it's -- you know, it's one of the           12:58:29

16   reasons people buy, like, the Super Bowl.  It costs

17   more than anything else, but you're -- you've got a

18   bazillion people watching it.

19       Q    And based upon your understanding of the

20   programming offered by Entertainment Studios and the  12:58:54

21   Weather Channel, relative to the $32 million ask

22   that was made of McDonald's, do you have a -- an

23   opinion on whether or not that would have been a

24   reasonable level of investment for McDonald's?

25       A    Yes.  The answer was -- was no.  That's why   12:59:12

                                              Page 116

EXHIBIT L

AOE0518

```
 1      we didn't make that recommendation.

 2              The other thing is the buy, as presented,

 3      was not guaranteed.  My recollection is it was not

 4      guaranteed at 18 to 49 for most of the networks.  It

 5      was guaranteed at 18-plus, which helps networks --    12:59:35

 6      it's not uncommon for networks to do that, but

 7      McDonald's had a strict requirement for 18 to 49, as

 8      do a lot of -- of clients, and my -- my recollection

 9      is that the majority of the properties were

10      guaranteed at 18-plus.  And when we asked for --      12:59:57

11      I'll leave it at that.

12          Q    When you asked for the 18-plus?  I think I

13      lost you.

14          A    No, I -- I said I was done.

15          Q    Oh, okay.  And I think you said you know     01:00:19

16      that the ESN and Weather Channel properties were not

17      a fit for McDonald's because they didn't, you know,

18      hit on or didn't mesh with the McDonald's screening

19      criteria during the time you were in charge of the

20      account.  I take it that means they were considered   01:00:40

21      and evaluated as to whether or not they would have

22      been a fit; correct?

23          A    Yes, of course.

24              (Speaking simultaneously.)

25      ///
```

Page 117

EXHIBIT L

AOE0519

```
 1     BY MS. ANDREWS:

 2         Q    Go ahead.

 3         A    It's probably considered more because we

 4     took Mr. Allen's offer very serious.

 5         Q    And do you know if that was the case prior    01:01:01

 6     to the time that you were involved with the

 7     McDonald's account, i.e., that they were considered,

 8     whether or not they were a fit for McDonald's

 9     advertising?

10         A    I never heard of that directly, but because   01:01:28

11     there was not a strong history of expenditure, one

12     would assume that it was -- they were not fits.

13         Q    But my question was a little bit different.

14              Do you know -- in order to decide that they

15     were not fits, they would have had to have been       01:01:35

16     evaluated; correct?

17         A    Of course.

18         Q    And my question is:  Prior to the time that

19     you were responsible for the McDonald's account, do

20     you know if they were evaluated to see whether or     01:01:47

21     not they were fit for McDonald's general consumer

22     market?

23         A    I -- I could only assume.

24         Q    Because that would be the standard

25     practice; correct?                                    01:02:08
```

                                                   Page 118

EXHIBIT L

AOE0520

```
 1          A     Correct.

 2          Q     And then I want to ask you just sort of

 3     generally -- no, not necessarily specific to

 4     McDonald's.

 5              But is it your understanding that, since   01:02:34

 6     2014, 2015 there has been a shift in advertising

 7     dollars away from traditional linear video and more

 8     into a digital or online video sphere?

 9          A     That would be very fair to say.  There's

10     been a significant shift.  You can see that both in   01:02:57

11     ad dollars spent and the behavior of ad networks; so

12     meaning ownership groups are investing more dollars

13     into digital and streaming.  And that would be true

14     with most -- most companies, including Entertainment

15     Studios.                                             01:03:26

16          Q     And -- and that's a shift by advertisers,

17     you know, that's not unique to McDonald's; correct?

18     That's been an across-the-industry phenomenon?

19          A     Yeah, it's based on consumer behavior; so

20     how -- how folks like you and I would consume media.   01:03:40

21          Q     And for the record, I am

22     definitely not going to -- my children are, but I

23     would presume, if you're trying to target Gen Z

24     consumers, that that shift has been more pronounced;

25     is that correct?                                     01:04:02
```

Page 119

EXHIBIT L

AOE0521

```
 1        A    Yes.
 2        Q    And as part of that shift, has there also
 3   been a corresponding decrease in spend on syndicated
 4   television programming?
 5        A    There has been.                          01:04:20
 6        Q    And do you know if -- specific to
 7   McDonald's investment, if they have made a decrease
 8   in their syndicated programming advertising system?
 9        A    When I was running the account, they
10   brought those budgets almost to 0.                 01:04:37
11        Q    Okay.  I don't have any further questions.
12   Thank you for your time.  I appreciate it.
13             MS. ANDREWS:  And thanks, everybody, for
14   being patient with my technical snafus.
15             MR. EPSTEIN:  All good.  Are we done?     01:05:26
16             MR. SCHECTER:  Yeah, I don't have any
17   further questions, and just subject to our, you
18   know -- for the custodian of records declaration.
19             MR. EPSTEIN:  Right.  You can -- we'll
20   discuss that, or, you know, we'll be in touch.      01:05:40
21             MR. SCHECTER:  The witnesses we've been
22   doing just, for the federal rules, 30 days review
23   and comment.
24             MR. EPSTEIN:  Okay.
25             MR. SCHECTER:  Do you guys want that?      01:05:52
```

Page 120

EXHIBIT L

AOE0522

1          I, the undersigned, a Certified Shorthand

2    Reporter of the State of California do hereby

3    certify:

4          That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were duly sworn; that a

8    verbatim record of the proceedings was made by me

9    using machine shorthand which was thereafter

10   transcribed under my direction; that the foregoing

11   transcript is an accurate transcription thereof.

12         I further certify I am neither financially

13   interested in the action nor a relative or employee

14   of any attorney or any of the parties.

15         IN WITNESS WHEREOF, I have this date

16   subscribed my name.

17

18         Dated: October 27, 2022

19

20

21

22

23         KAYLA KNOWLES

24         CSR No. 14071

25

Page 124

EXHIBIT L

AOE0523

# EXHIBIT M

CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4   ENTERTAINMENT STUDIOS NETWORKS, )

 5   INC., a California corporation; ) Case No.

 6   WEATHER GROUP, LLC, a Delaware  ) 2:21-cv-04972-FMO-MAA

 7   limited liability company,      )

 8           Plaintiffs,             )

 9               vs.                 )

10   McDONALD'S CORPORATION, a       )

11   Delaware corporation,           )

12           Defendant.              )

13   _____ )

14

15                   ***CONFIDENTIAL***

16      VIDEO DEPOSITION OF RULE 30(b)(6) BURRELL

17   COMMUNICATIONS GROUP, LLC, TESTIMONY OF DONNA HODGE

18                 September 23, 2022

19

20

21   REPORTED REMOTELY BY:

22

23   COLLEEN P. DOHERTY, CSR 345

24

25   Notary Public

                                            Page 1
```

EXHIBIT M
AOE0525

CONFIDENTIAL

```
 1              THE VIDEO DEPOSITION OF RULE 30(b)(6) BURRELL

 2    COMMUNICATIONS GROUP, LLC, TESTIMONY OF DONNA HODGE,

 3    present remotely, was taken on behalf of the Plaintiffs,

 4    located at remote locations, in California, commencing at

 5    10:06 a.m., on September 23, 2022, before Colleen P.

 6    Doherty, Certified Shorthand Reporter and Notary Public

 7    within and for the State of Idaho, in the above-entitled

 8    matter.

 9                        APPEARANCES:

10    For the Plaintiffs:

11           MILLER BARONDESS, LLP

12           BY MR. DAVID W. SCHECTER  (Present Remotely)

13           BY MR. MURAD SALIM  (Present Remotely)

14           1999 Avenue of the Stars, Suite 1000

15           Los Angeles, California  90067

16           dschecter@millerbarondess.com

17           msalim@millerbarondess.com

18    For the Defendant:

19           RILEY SAFER HOLMES & CANCILA LLP

20           BY MS. AMY ANDREWS  (Present Remotely)

21           BY MR. ROBERT FOLEY  (Present Remotely)

22           70 W. Madison Street, Suite 2900

23           Chicago, Illinois  60602

24           aandrews@rshc-law.com

25           rfoley@rshc-law.com
```

Page 2

EXHIBIT M
AOE0526

CONFIDENTIAL

```
 1                    APPEARANCES (Continued):

 2    For Burrell Communications:

 3            FREEBORN & PETERS LLP

 4            BY MR. DAVID DOYLE  (Present Remotely)

 5            311 S. Wacker Drive, Suite 3000

 6            Chicago, Illinois  60606

 7            ddoyle@freeborn.com

 8    THE VIDEOGRAPHER:  Noah Suszckiewicz (Present Remotely)

 9    ALSO PRESENT:  Monica Mosby  (Present Remotely)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT M
AOE0527

```
 1          A.  No. 1, No. 2, No. 3, No. 8, No. 10.  That's it.   10:11:14

 2          Q.  All right.  As to No. 11, you are not here       10:11:48

 3     testifying about the production of documents into         10:11:53

 4     authenticate documents?                                   10:11:56

 5          A.  That's correct.                                  10:11:58

 6          Q.  Okay.  Who is -- does Burrell have a records     10:12:00

 7     custodian?                                                10:12:05

 8          A.  No, not to my knowledge.                         10:12:07

 9          Q.  Okay.  Do you have any personal knowledge        10:12:09

10     about how documents are created and stored at Burrell?    10:12:12

11          A.  No, I don't.                                     10:12:25

12          Q.  How -- well, so for number -- let's go to        10:12:25

13     No. 4.  It says "Your evaluation of the comparator        10:12:26

14     channels."  "Your" is capitalized.  You understand        10:12:33

15     "your" refers to Burrell; right?                          10:12:37

16          A.  Correct.                                         10:12:40

17          Q.  So is there someone at Burrell who has           10:12:40

18     knowledge of Burrell's evaluation of other channels       10:12:44

19     besides those that are owned by my clients?               10:12:49

20          A.  No.  And I would like to expound?                10:12:52

21          Q.  Sure, please.                                    10:12:54

22          A.  The comparator channels are general market       10:12:56

23     networks that Burrell does not typically purchase on      10:13:01

24     behalf of its clients.                                    10:13:05

25          Q.  Okay.  So if I understand you correctly, there   10:13:06
```

                                                      Page  9

EXHIBIT M

AOE0528

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | is nobody at Burrell, and for McDonald's, there really | 10:13:10 |
| 2 | isn't anybody, because Burrell didn't do that work; is | 10:13:14 |
| 3 | that right? | 10:13:20 |
| 4 | A.   Yes, that's correct. | 10:13:20 |
| 5 | Q.   Okay.   And based on your understanding, | 10:13:20 |
| 6 | who -- was there an advertising agency that did that | 10:13:23 |
| 7 | work for McDonald's? | 10:13:26 |
| 8 | A.   Yes. | 10:13:28 |
| 9 | Q.   Which agency? | 10:13:28 |
| 10 | A.   OMD. | 10:13:30 |
| 11 | Q.   Okay.   The -- for No. 6, the reasons why | 10:13:33 |
| 12 | McDonald's did not advertise on the plaintiffs' media | 10:13:43 |
| 13 | properties.   Is there someone at Burrell to your | 10:13:48 |
| 14 | knowledge that has knowledge as to why McDonald's did | 10:13:53 |
| 15 | not advertise on my client's media properties? | 10:13:53 |
| 16 | A.   No, not currently. | 10:13:57 |
| 17 | Q.   Okay.   But there are folks who used to be | 10:13:58 |
| 18 | there? | 10:14:01 |
| 19 | A.   Yes. | 10:14:01 |
| 20 | Q.   Can you name them, please? | 10:14:02 |
| 21 | A.   Adele Lassere and Patrick Olson. | 10:14:08 |
| 22 | Q.   Are those the only two? | 10:14:19 |
| 23 | A.   To my knowledge, yes. | 10:14:20 |
| 24 | MR. DOYLE:   David, can I just intervene for a | 10:14:20 |
| 25 | minute.   I just don't want there to be any confusion.   I | 10:14:24 |

Page 10

EXHIBIT M
AOE0529

CONFIDENTIAL

```
 1        Q.  (BY MR. SCHECTER)  For No. 9, the differences    10:15:32

 2   in prices if any that are paid to African American       

 3   targeted media as opposed to white owned media           10:15:38

 4   companies.  You are not testifying on that topic in      10:15:42

 5   No. 9?                                                   10:15:45

 6        A.  That's correct.                                 10:15:46

 7        Q.  Okay.  And why is that?                         10:15:46

 8        A.  Because I have no knowledge of what is paid to  10:15:47

 9   White-owned media companies.  I'm only responsible for   10:15:51

10   comp- -- for budgets in African American -- sorry -- media 10:15:55

11   companies that are targeted to or owned by African       10:16:00

12   Americans.                                               10:16:06

13        Q.  Got it.  So you know one component, but not     10:16:06

14   the other component of this?                             10:16:13

15        A.  Correct.                                        10:16:14

16        Q.  Okay.  Okay.  So just a little background.  I    10:16:14

17   mean I can do --                                         

18        Have you ever been deposed before, Ms. Hodge?       10:16:23

19        A.  No.                                             10:16:26

20        Q.  Okay.  Well, welcome to your first experience.  10:16:27

21   So it's a question-and-answer session.  I'm sure your    10:16:35

22   attorney has briefed you on this.  It's my opportunity   10:16:39

23   on behalf of my clients to ask you, and effectively your 10:16:42

24   employer, questions that are relevant to the current     10:16:46

25   dispute between my clients and McDonald's.  The session  10:16:49
```

Page 12

EXHIBIT M
AOE0530

CONFIDENTIAL

```
 1        A.  Yes, it is.                              10:19:18

 2        Q.  Your -- Burrell's attorney, Mr. Doyle, and    10:19:19

 3   McDonald's attorney, Ms. Andrews, may from time to time  10:19:24

 4   object.  Unless someone instructs you not to answer, you 10:19:28

 5   understand that you are to answer the question; right?   10:19:33

 6        A.  Yes.                                      10:19:37

 7        Q.  So just a little bit of background about  10:19:37

 8   yourself.  When did you join Burrell?             10:19:41

 9        A.  I joined Burrell in 2024 -- I'm sorry -- 2014.  10:19:45

10   Excuse me.  I'm a little nervous.                 10:19:51

11        Q.  That's okay.                             10:19:54

12        A.  Joined in May of 2014.  I am what is called a   10:19:55

13   boomerang.  So it's not my first time at Burrell.  But in  10:19:58

14   my current role at Burrell Communications, I actually     10:20:03

15   joined, rejoined the agency on December 12th of 2021 in my  10:20:09

16   current role, which is the senior vice president of media  10:20:14

17   on the McDonald's account.                        10:20:22

18        Q.  Okay.  There is a lot there.  So let me unpack   10:20:23

19   that.  So the first time you worked for Burrell was in    10:20:26

20   2014; is that right?                              10:20:30

21        A.  No, actually, that's not correct.        10:20:31

22        Q.  Okay.                                    10:20:32

23        A.  I first joined the agency in              10:20:33

24   twenty-twenty- -- I'm sorry -- 2003.  That was my first   10:20:37

25   time with the agency.  Subsequently, I have left and come  10:20:41
```

Page 15

EXHIBIT M

AOE0531

CONFIDENTIAL

```
 1    back several times over the course of that time frame.     10:20:44

 2         Q.   Okay.  Well, let's start at 2014.  Have you      10:20:52

 3    been at Burrell continuously since 2014?                   10:20:56

 4         A.   Yes.                                             10:21:01

 5         Q.   And you are now the senior vice president at     10:21:01

 6    Burrell working on the McDonald's account; is that         10:21:05

 7    right?                                                     10:21:08

 8         A.   Yes.                                             10:21:08

 9         Q.   Have you worked on the McDonald's account from   10:21:09

10    2014 to December 2021?                                     10:21:13

11         A.   No.                                              10:21:17

12         Q.   Okay.  Did you ever assist Ms. Lassere or        10:21:21

13    Mr. Olson in working on the McDonald's account from 2014   10:21:43

14    to 2021?                                                   10:21:51

15         A.   No.                                              10:21:51

16         Q.   Do you have any knowledge of what Burrell was    10:21:52

17    doing for McDonald's from 2014 to 2021?                    10:21:55

18         A.   No.                                              10:22:03

19         Q.   Who was your primary point of contact at        10:22:13

20    McDonald's since you started working on the account?       10:22:17

21         A.   In December, Sheila Hamilton.                   10:22:21

22         Q.   Has it continued to be Ms. Hamilton?            10:22:25

23         A.   No, she has since moved off of media.           10:22:28

24         Q.   And so who is your primary contact after        10:22:32

25    Ms. Hamilton?                                              10:22:36
```

Page 16

EXHIBIT M
AOE0532

| | | |
|---|---|---|
| 1 | A.  Allison Ciccone. | 10:22:36 |
| 2 | Q.  Can you spell that last name for me? | 10:22:38 |
| 3 | A.  Gosh, I'm going to get it incorrect. | 10:22:40 |
| 4 | Q.  Okay. | |
| 5 | A.  So sorry.  C-i-c- -- | 10:22:45 |
| 6 | Q.  Okay. | |
| 7 | A.  C-i-c-c-i-o-n-e, I believe -- | 10:22:51 |
| 8 | Q.  Okay. | 10:22:52 |
| 9 | A.  -- is the spelling. | 10:22:54 |
| 10 | Q.  I'm not going to tell her.  Don't worry about | 10:22:56 |
| 11 | it. | 10:23:00 |
| 12 | Do I have -- Ms. Hamilton and Ms. Ciccone is | 10:23:01 |
| 13 | that -- those have been your primary contacts at | 10:23:06 |
| 14 | McDonald's? | 10:23:09 |
| 15 | A.  Yes. | 10:23:10 |
| 16 | Q.  Anybody else? | 10:23:11 |
| 17 | A.  Courtney Harrison. | 10:23:13 |
| 18 | Q.  Anyone else. | 10:23:17 |
| 19 | A.  No, those are the three primary contacts. | 10:23:19 |
| 20 | Q.  And since 2021, what have you been doing for | 10:23:24 |
| 21 | McDonald's generally? | 10:23:31 |
| 22 | A.  I am responsible for leading the African | 10:23:32 |
| 23 | American media investment for McDonald's. | 10:23:35 |
| 24 | Q.  Does McDonald's have an African American | 10:23:39 |
| 25 | budget? | 10:23:43 |

Page 17

EXHIBIT M

AOE0533

| | | |
|---|---|---|
| 1 | A.  Yes. | 10:23:44 |
| 2 | Q.  Okay.  And do you know how much that | 10:23:44 |
| 3 | budget -- well, I take it when you started working in | 10:23:46 |
| 4 | 2021, you are working on some spending in 2022; right? | 10:23:49 |
| 5 | A.  Yes. | 10:23:54 |
| 6 | Q.  And you are also working on a budget for 2023? | 10:23:54 |
| 7 | A.  Yes. | 10:23:58 |
| 8 | Q.  Okay.  Do you know what McDonald's 2021 | 10:24:00 |
| 9 | African American budget was, the total amount? | 10:24:06 |
| 10 | MS. ANDREWS:  Object to the form. | 10:24:09 |
| 11 | Q.  (BY MR. SCHECTER)  Do you know what McDonald's | 10:24:13 |
| 12 | total African American budget is for 2022? | 10:24:17 |
| 13 | MS. ANDREWS:  The same objection. | 10:24:22 |
| 14 | THE WITNESS:  2022 budget is 56,000,000. | 10:24:23 |
| 15 | Q.  (BY MR. SCHECTER)  And what is McDonald's | 10:24:28 |
| 16 | total African American budget for 2023? | 10:24:31 |
| 17 | MS. ANDREWS:  The same objection. | 10:24:35 |
| 18 | THE WITNESS:  64,000,000 estimated. | 10:24:37 |
| 19 | Q.  (BY MR. SCHECTER)  It's estimated because you | 10:24:40 |
| 20 | are just not sure how much of it will actually be spent? | 10:24:42 |
| 21 | MS. ANDREWS:  Object to the form. | 10:24:47 |
| 22 | Q.  (BY MR. SCHECTER)  I'm sorry.  What's the | 10:24:50 |
| 23 | answer? | 10:24:52 |
| 24 | A.  That's what the estimate is. | 10:24:52 |
| 25 | Q.  Okay. | 10:24:54 |

Page 18

EXHIBIT M
AOE0534

CONFIDENTIAL

```
 1        A.   That is what's planned.                    10:24:55

 2        Q.   Is Burrell responsible for making          10:24:57

 3   recommendations for how McDonald's should spend the  10:25:03

 4   entire $56,000,000 2022 African American budget?     10:25:08

 5        A.   Yes.                                        10:25:19

 6        Q.   I know you don't know the number, what the 10:25:19

 7   budget was in 2021.   But is this 2022 budget an increase 10:25:23

 8   from 2021?                                            10:25:30

 9        A.   I don't know.                               10:25:32

10        Q.   So if you can just walk me through what    10:25:32

11   Burrell does specifically with respect to this       10:25:53

12   $56,000,000 African American budget?                 10:25:59

13        A.   We're responsible for determining where those 10:26:04

14   dollars should run.   Budgets are allocated to various 10:26:08

15   campaigns across the year.   And it is my team's      10:26:14

16   responsibility to determine which partners are the best 10:26:21

17   partners for a given campaign to accomplish the client's 10:26:25

18   goals or objectives.                                 10:26:32

19        Q.   So I kind of want to -- my questions are going 10:26:36

20   to be about just sort of process and timeline for that. 10:26:44

21   So is the first step in the process for McDonald's to 10:26:48

22   communicate to Burrell a potential African American   10:26:52

23   budget for the year?                                  10:26:57

24        MS. ANDREWS:   Object to the form.               10:26:58

25        THE WITNESS:   Yes.                              10:27:01
```

                                                  Page 19

EXHIBIT M
AOE0535

| | | |
|---|---|---|
| 1 | my understanding what was communicated to the previous | 10:33:40 |
| 2 | team. | 10:33:43 |
| 3 |     Q.  Okay.  The $64,000,000 estimated 2023 budget | 10:33:44 |
| 4 | is that what Burrell recommended? | 10:33:49 |
| 5 |     A.  Yes. | 10:33:51 |
| 6 |     Q.  Did McDonald's then agree with Burrell's | 10:33:51 |
| 7 | recommendation? | 10:33:54 |
| 8 |     A.  Yes. | 10:33:55 |
| 9 |     MS. ANDREWS:  Object to the form. | 10:33:56 |
| 10 |     Q.  (BY MR. SCHECTER)  Okay.  So Burrell makes a | 10:33:59 |
| 11 | recommendation.  I assume there is some dialog work | 10:34:04 |
| 12 | done.  Ultimately McDonald's would then approve a | 10:34:10 |
| 13 | particular size of the African American budget; is that | 10:34:14 |
| 14 | right? | 10:34:18 |
| 15 |     A.  Yes. | 10:34:18 |
| 16 |     MS. ANDREWS:  Object -- sorry.  Object to the | 10:34:19 |
| 17 | form. | 10:34:21 |
| 18 |     Q.  (BY MR. SCHECTER)  Okay.  So after McDonald's | 10:34:21 |
| 19 | communicates the approved budget, what does Burrell do? | 10:34:26 |
| 20 |     A.  At that point, nothing.  The budget -- once that | 10:34:34 |
| 21 | budget is approved by McDonald's corporate, it has to go | 10:34:37 |
| 22 | to OPNAD approval. | 10:34:44 |
| 23 |     Q.  Okay.  So once OPNAD approves the budget, then | 10:34:46 |
| 24 | what does Burrell do? | 10:34:56 |
| 25 |     A.  Once the planning starts for 2023, the team | 10:34:58 |

Page 24

EXHIBIT M
AOE0536

CONFIDENTIAL

```
 1           A.  No, not in the strategic recommendation.  The      10:38:21

 2   strategic recommendation is a media channels platforms,        10:38:24

 3   and then a sample, not a -- not a comprehensive list, but      10:38:29

 4   a sample of the types of partners we are looking to            10:38:32

 5   recommend.                                                     10:38:36

 6           Q.  I think I got it.  So strategic recommendation     10:38:41

 7   is how much in digital, how much in video, how much in         10:38:44

 8   print, things like that?                                       10:38:47

 9           A.  Yes.                                                10:38:49

10           Q.  Okay.  And then you give types of partners,        10:38:49

11   like here are the types of partners within each category       10:38:56

12   that we would be looking to; right?                            10:38:56

13           A.  Yes.                                                10:38:57

14           Q.  Okay.  So once you get approval from that from     10:38:57

15   McDonald's, then RFPs go out; right?                           10:39:00

16           A.  Yes, that's when the RFP process starts.           10:39:04

17           Q.  Then essentially Burrell sends out an RFP, and     10:39:08

18   then the media partners make a proposal for how much          10:39:12

19   spending that they should receive; is that right?             10:39:16

20           A.  Yes.                                                10:39:18

21           Q.  Okay.  Are those proposals from the media          10:39:18

22   partners, are those shared with McDonald's?                    10:39:23

23           A.  No.                                                 10:39:26

24           Q.  So Burrell makes the initial cut; is that          10:39:26

25   right?                                                          10:39:30
```

Page 27

EXHIBIT M
AOE0537

| | | |
|---|---|---|
| 1 | A. Yes. | 10:39:30 |
| 2 | Q. Burrell then I take it, makes another | 10:39:30 |
| 3 | recommendation to McDonald's? | 10:39:38 |
| 4 | A. Yes, that's what we call the tactical | 10:39:39 |
| 5 | recommendation. | 10:39:42 |
| 6 | Q. The tactical recommendation that's more | 10:39:44 |
| 7 | granular, it's got a particular media partner, in a | 10:39:52 |
| 8 | particular segment, with a particular amount of money; | 10:39:58 |
| 9 | right? | |
| 10 | A. Yes. | 10:40:00 |
| 11 | Q. So we're talking about cable television.  So | 10:40:00 |
| 12 | does the tactical recommendation include the particular | 10:40:05 |
| 13 | channel that McDonald's would advertise on? | 10:40:09 |
| 14 | A. When you say "channel," can you explain what you | 10:40:16 |
| 15 | mean? | 10:40:18 |
| 16 | Q. Yeah.  I mean is it easier to use the term | 10:40:20 |
| 17 | "network"? | 10:40:24 |
| 18 | A. Yes. | 10:40:25 |
| 19 | Q. Okay.  It includes the particular network that | 10:40:25 |
| 20 | McDonald's would advertise on? | 10:40:28 |
| 21 | A. Yes. | 10:40:30 |
| 22 | Q. Does it include a particular programming on | 10:40:30 |
| 23 | that network that McDonald's would advertise on? | 10:40:33 |
| 24 | A. In some cases, yes.  If it is special | 10:40:39 |
| 25 | programming, what we call a "TIP hole" or an awards show, | 10:40:40 |

Page 28

EXHIBIT M
AOE0538

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | then, yes, we include that specific detail.  But if it's | 10:40:44 |
| 2 | just if we're buying what we call ROS, rev of schedule, or | 10:40:48 |
| 3 | just a regular schedule on that network, we don't include | 10:40:55 |
| 4 | that level of detail. | 10:40:59 |
| 5 | Q.  The tactical recommendation is that | 10:41:02 |
| 6 | communicated to McDonald's in writing? | 10:41:04 |
| 7 | A.  Yes. | 10:41:06 |
| 8 | Q.  And then does McDonald's approve the tactical | 10:41:07 |
| 9 | recommendation? | 10:41:19 |
| 10 | A.  Yes. | 10:41:19 |
| 11 | Q.  So in your experience -- I take it you've done | 10:41:19 |
| 12 | more work for the McDonald's 2023 African American | 10:41:20 |
| 13 | budget; right? | 10:41:25 |
| 14 | A.  No, we're still in 2022. | 10:41:26 |
| 15 | Q.  Okay.  But -- | 10:41:28 |
| 16 | A.  We plan -- we plan as we go.  We don't | 10:41:28 |
| 17 | plan ahead.  I'm sorry.  Budgets are planned ahead, but | 10:41:34 |
| 18 | campaigns are planned about six weeks out. | 10:41:38 |
| 19 | Q.  Okay. | 10:41:40 |
| 20 | A.  Anywhere from -- anywhere from three months to | 10:41:41 |
| 21 | six weeks from this launch of the campaign. | 10:41:44 |
| 22 | Q.  So were you involved in the strategic phase | 10:41:46 |
| 23 | for McDonald's African American budget in 2022? | 10:41:50 |
| 24 | A.  Yes. | 10:41:51 |
| 25 | Q.  Okay.  And were you also involved in the | 10:41:55 |

Page 29

EXHIBIT M
AOE0539

```
 1   tactical recommendation phase for the African American   10:41:57

 2   budget in 2022?                                          10:42:05

 3        A.  Yes.                                            10:42:07

 4        Q.  So the strategic phase for 2022, again, the    10:42:16

 5   recommendation was sent to McDonald's and that's in     10:42:19

 6   writing?                                                 10:42:22

 7        A.  Yes.                                            10:42:22

 8        Q.  Who did you work with at McDonald's to discuss 10:42:24

 9   the strategic recommendation for 2022?                   10:42:29

10        A.  It's a team comprised of Sheila Hamilton,      10:42:35

11   Allison Ciccone, and Courtney Harris.                    10:42:39

12        Q.  I take it McDonald's -- well, strike that.     10:42:50

13            Did McDonald's approve the strategic           10:42:54

14   recommendation based on the original recommendation by  10:42:58

15   Burrell?                                                 10:43:02

16            MS. ANDREWS:  Object to the form.              10:43:03

17            THE WITNESS:  Well, we're -- so to provide     10:43:09

18   some context.  There are at least 25 campaigns.  So each 10:43:13

19   campaign is planned and presented three months to six   10:43:19

20   weeks out depending on -- McDonald's has certain leads  10:43:27

21   who lead the campaign internally on the media team.  So 10:43:31

22   when we are presenting a campaign to that camp -- to    10:43:38

23   that media lead, usually it involves questions.  They   10:43:43

24   ask for rationale.  They ask for -- they might have     10:43:51

25   follow-up questions for my team or the collective       10:43:54
```

Page 30

EXHIBIT M

AOE0540

```
 1    interagency team.  So, no, they don't typically approve    10:43:57

 2    campaigns when they are first presented, whether it's       10:44:02

 3    Burrell or another agency.                                  10:44:06

 4         Q.  (BY MR. SCHECTER)  I've got it.  It looks like     10:44:11

 5    it's not as simple as the way I'm characterizing it.  So    10:44:14

 6    there is --                                                 10:44:18

 7         A.  You've --                                          10:44:18

 8         Q.  So you are saying there are 25 strategic           10:44:19

 9    recommendations a year?                                     10:44:23

10         A.  Yes.                                               10:44:24

11         Q.  Okay.  So I'm just making sure I have this         10:44:24

12    right.  It's OPNAD that approves the strategic              10:44:25

13    recommendation; right?                                      10:44:30

14         A.  No.                                                10:44:31

15         Q.  No.  Okay.  I've got that wrong.                   10:44:33

16         All right.  So you work with McDonald's for           10:44:35

17    each strategic recommendation.  McDonald's will ask you     10:44:37

18    questions.  There is back and forth; right?                 10:44:44

19         A.  Yes.                                               10:44:46

20         Q.  Those questions are those over email?             10:44:46

21         A.  Yes, or sometimes in meetings.                     10:44:48

22         Q.  And nowadays, it's Zoom meetings?                 10:44:50

23         A.  Yes.                                               10:44:56

24         Q.  The tactical recommendations, is that also        10:44:56

25    25-plus tactical recommendations a year?                    10:45:07
```

Page 31

EXHIBIT M

AOE0541

```
 1          Q.  So you can't -- you don't really -- you don't    10:53:11

 2   know anything about the McDonald's account before           10:53:15

 3   December 2021; is that right?                               10:53:17

 4          A.  That's correct.                                  10:53:20

 5          Q.  So the work that Burrell does for McDonald's     10:53:21

 6   is to help McDonald's specifically target an African        10:54:01

 7   American audience; isn't that right?                        10:54:07

 8          A.  Yes.                                             10:54:08

 9          Q.  And the goal is to increase African American     10:54:09

10   spending at McDonald's restaurants; is that right?          10:54:18

11              MS. ANDREWS:  Object to the form.                10:54:24

12              THE WITNESS:  Yes.                               10:54:25

13          Q.  (BY MR. SCHECTER)  Sorry.  What's the answer?    10:54:25

14          A.  Yes, that's one of the objectives.              10:54:27

15          Q.  In fact, McDonald's comes to Burrell            10:54:29

16   specifically to target the African American audience;       10:54:33

17   isn't that right?                                           10:54:39

18              MS. ANDREWS:  Object to the form.                10:54:39

19              THE WITNESS:  Yes.                               10:54:40

20          Q.  (BY MR. SCHECTER)  Burrell specifically          10:54:41

21   creates advertisements, the actual 15 second, 30 second,    10:54:45

22   60 second advertisements that we all see on digital and     10:54:52

23   cable, McDonald's crea- -- or excuse me -- Burrell          10:54:57

24   creates those advertisements as well; is that right?        10:55:00

25          A.  Yes.                                             10:55:04
```

Page 38

EXHIBIT M

AOE0542

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.  And those, can we call those creatives? | 10:55:04 |
| 2 | A.  Yes. | 10:55:09 |
| 3 | Q.  Okay.  Those creatives that Burrell creates, | 10:55:09 |
| 4 | those are also designed to specifically target the | 10:55:15 |
| 5 | African American audience? | 10:55:19 |
| 6 | A.  Yes, that's correct. | 10:55:20 |
| 7 | Q.  And Burrell does that work, it makes creatives | 10:55:22 |
| 8 | specifically targeting the African American audience for | 10:55:28 |
| 9 | its client, McDonald's; isn't that right? | 10:55:32 |
| 10 | A.  Yes. | 10:55:35 |
| 11 | Q.  So your work for McDonald's, December '21 to | 10:55:48 |
| 12 | the present, Burrell is tracking how much of the African | 10:55:53 |
| 13 | American budget is being spent with Black-owned media | 10:55:58 |
| 14 | partners; isn't that right? | 10:56:04 |
| 15 | A.  Yes. | 10:56:04 |
| 16 | Q.  And Black-owned media partners isn't that | 10:56:05 |
| 17 | something that -- a definition that McDonald's has? | 10:56:10 |
| 18 | MS. ANDREWS:  Object to the form. | 10:56:13 |
| 19 | THE WITNESS:  I'm sorry.  Can you ask that | 10:56:15 |
| 20 | question again. | 10:56:22 |
| 21 | Q.  (BY MR. SCHECTER)  Sure.  So how does Burrell | 10:56:23 |
| 22 | find -- well, you are tracking this for McDonald's.  So | 10:56:25 |
| 23 | how does Burrell define a Black-owned media partner? | 10:56:28 |
| 24 | A.  It's defined based on the minority-owned | 10:56:33 |
| 25 | business enterprise standards, parameters.  Which means | 10:56:38 |

Page 39

EXHIBIT M

AOE0543

| | | |
|---|---|---|
| 1 | Q.  Do you know who Ms. Mason is? | 11:14:46 |
| 2 | A.  Yes. | 11:14:48 |
| 3 | Q.  She works at, at least at the time, she worked | 11:14:49 |
| 4 | at McDonald's media the department? | 11:14:53 |
| 5 | A.  Yes, I know who Alycia is. | 11:14:56 |
| 6 | Q.  Here she writes -- oh, sorry.  Mr. Manas | 11:14:59 |
| 7 | writes, "Alycia, Attached is the breakdown you requested | 11:15:04 |
| 8 | for minority-owned media."  Are you aware of McDonald's | 11:15:10 |
| 9 | asking its agencies to provide a breakdown of spending | 11:15:20 |
| 10 | with minority-owned media? | 11:15:21 |
| 11 | A.  No, not during this time frame.  I would have no | 11:15:23 |
| 12 | knowledge. | 11:15:26 |
| 13 | Q.  The attachment produced natively, but we have | 11:15:26 |
| 14 | it here.  It looks just like a printout of an Excel | 11:15:31 |
| 15 | spreadsheet.  I take it, you've never seen this before? | 11:15:37 |
| 16 | A.  It was one of the documents we reviewed | 11:15:40 |
| 17 | yesterday with my counsel.  But we didn't review it in | 11:15:43 |
| 18 | detail, no. | 11:15:48 |
| 19 | Q.  But apart from, you know, in this case with | 11:15:48 |
| 20 | your counsel, have you seen the document before? | 11:15:52 |
| 21 | A.  No. | 11:15:55 |
| 22 | Q.  Well, for your December '21 to the present, | 11:16:05 |
| 23 | are you providing McDonald's with breakdowns with its | 11:16:11 |
| 24 | spending of Black-owned media? | 11:16:16 |
| 25 | A.  Yes. | 11:16:20 |

Page 44

EXHIBIT M
AOE0544

CONFIDENTIAL

```
 1        Q.  And are you combining those -- that work with    11:16:20
 2   any other agency?                                         11:16:22
 3        A.  Yes.                                             11:16:24
 4        Q.  You were doing it with OMD and now Star.com?     11:16:27
 5        A.  Yes, correct.                                    11:16:31
 6             MR. SCHECTER:  Can everyone hear Ms. Hodge?  I  11:16:33
 7   think it's a little muted.                                11:16:41
 8             MS. ANDREWS:  I can hear.                        11:16:41
 9        Q.  (BY MR. SCHECTER)  Okay.  So just so I have      11:16:42
10   this.  From 2021 to the present, you are working with    11:16:44
11   McDonald's general marketing agency to report to         11:16:49
12   McDonald's its spending with Black-owned media?          11:16:53
13        A.  Yes, correct.                                   11:16:57
14        Q.  And do you know how much in terms of a percent  11:16:58
15   of McDonald's media spend is being spent on Black-owned  11:17:01
16   media?                                                   11:17:09
17        A.  Yes.                                            11:17:09
18        Q.  What percent?                                   11:17:10
19        A.  Right now, it is tracking towards ten percent?  11:17:14
20        Q.  Ten percent of McDonald's media spending is on  11:17:19
21   Black-owned media?                                       11:17:25
22        A.  Oh, I'm sorry.  Let me take a step back.  You   11:17:26
23   said McDonald's total spend?                             11:17:33
24        Q.  Yes.                                            11:17:37
25             MS. ANDREWS:  Object to the form.  Your        11:17:37
```

Page 45

EXHIBIT M
AOE0545

```
 1   question before was how much of their media spend was
 2   with Black-owned media partners?  That's the question      11:17:37
 3   she answered.  So let's just be clear on what exactly       11:17:38
 4   you are asking her, David, because those are two            11:17:42
 5   different numbers.  Total budget and media budget are       11:17:44
 6   not the same.                                               11:17:48
 7            THE WITNESS:  That's correct.                      11:17:50
 8        Q.  (BY MR. SCHECTER)  What's McDonald's current       11:17:51
 9   media spend?                                                11:17:53
10        A.  So -- I'm sorry.  Can you ask the question         11:17:55
11   again?                                                      11:18:04
12        Q.  Sure.  What's McDonald's total media spend         11:18:05
13   currently?                                                  11:18:09
14        A.  Total, across all audiences?                       11:18:09
15        Q.  Yes.                                               11:18:09
16        A.  All in.  It's about 700,000,000.                   11:18:14
17        Q.  Okay.  What percent of that 700,000,000 is         11:18:22
18   spent on Black-owned media?                                 11:18:26
19            MS. ANDREWS:  Object to the form.                  11:18:29
20            THE WITNESS:  About five percent.                  11:18:37
21        Q.  (BY MR. SCHECTER)  So using rough math, about      11:18:39
22   3.5 million dollars is being spent on Black-owned media?    11:18:42
23        A.  No, much more than that.                           11:18:47
24        Q.  So maybe I did the math wrong.  35,000,000?        11:18:51
25        A.  So approximately -- I'm sorry.  I don't have the   11:18:59
```

Page 46

EXHIBIT M

AOE0546

| | | |
|---|---|---|
| 1 | right? | 11:26:55 |
| 2 | MR. DOYLE:  Object to the form. | 11:26:56 |
| 3 | MS. ANDREWS:  The same objection. | 11:26:57 |
| 4 | Q.  (BY MR. SCHECTER)  You can answer. | 11:26:59 |
| 5 | A.  Yes. | 11:27:02 |
| 6 | Q.  And, in fact, because in your view, because | 11:27:03 |
| 7 | McDonald's does take so much money from the African | 11:27:06 |
| 8 | American community, they should be spending with Black- | 11:27:10 |
| 9 | owned businesses; right? | 11:27:13 |
| 10 | MR. DOYLE:  Object to the form. | 11:27:15 |
| 11 | MS. ANDREWS:  Object to the form. | 11:27:17 |
| 12 | THE WITNESS:  Yes. | 11:27:19 |
| 13 | Q.  (BY MR. SCHECTER)  Are you aware of the cable | 11:27:20 |
| 14 | networks that Entertainment Studios owns and operates? | 11:27:46 |
| 15 | A.  Yes. | 11:27:52 |
| 16 | Q.  The networks are Recipe.TV, Cars.TV, Justice | 11:27:52 |
| 17 | Central.TV, ES.TV, MyDestination.TV, Pets.TV, and I | 11:28:03 |
| 18 | believe that's it.  I may have missed one.  But those | 11:28:04 |
| 19 | are the networks that Entertainment Studios owns and | 11:28:06 |
| 20 | operates; right? | 11:28:10 |
| 21 | A.  Yes. | 11:28:11 |
| 22 | Q.  And to your knowledge, McDonald's does not | 11:28:11 |
| 23 | advertise on those networks; isn't that right? | 11:28:14 |
| 24 | A.  Yes, that's correct. | 11:28:17 |
| 25 | Q.  Have you, in your just -- in your work on the | 11:28:17 |

Page 51

EXHIBIT M
AOE0547

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | McDonald's account, have you talked to Ms. Hamilton | 11:28:20 |
| 2 | about Entertainment Studios networks? | 11:28:25 |
| 3 | A.  No. | 11:28:30 |
| 4 | Q.  Have you talked to anyone at McDonald's about | 11:28:30 |
| 5 | the networks? | 11:28:33 |
| 6 | A.  No. | 11:28:34 |
| 7 | Q.  Have you provided them, anyone at McDonald's | 11:28:35 |
| 8 | materials about those networks? | 11:28:39 |
| 9 | A.  No. | 11:28:42 |
| 10 | Q.  And is that because those networks don't | 11:28:46 |
| 11 | target the African American audience? | 11:28:49 |
| 12 | A.  No, no one from the network has contacted me or | 11:28:53 |
| 13 | my team about advertising with those networks. | 11:28:59 |
| 14 | Q.  Oh, I see.  So you have not received a | 11:29:02 |
| 15 | proposal from Entertainment Studios to advertise on | 11:29:05 |
| 16 | those networks? | 11:29:10 |
| 17 | A.  That is correct.  That's managed by the general | 11:29:10 |
| 18 | market agency. | 11:29:14 |
| 19 | Q.  The -- the -- | 11:29:16 |
| 20 | A.  Star.com. | 11:29:18 |
| 21 | Q.  So Star.com is the one that would evaluate | 11:29:20 |
| 22 | whether McDonald's should be advertising on | 11:29:24 |
| 23 | Entertainment Studios networks? | 11:29:27 |
| 24 | A.  Yes. | 11:29:30 |
| 25 | MS. ANDREWS:  Object to form. | 11:29:30 |

Page 52

EXHIBIT M

AOE0548

CONFIDENTIAL

```
 1          Q.  (BY MR. SCHECTER)  Are you familiar at all      11:29:34

 2   with the allegations made by my clients in this lawsuit?   11:29:36

 3          A.  Yes.                                            11:29:40

 4          Q.  You are familiar with one of the allegations    11:29:43

 5   is that Entertainment Studios was relegated to the         11:29:45

 6   African American market as opposed to being able to        11:29:51

 7   pitch for business with the general market agency.  Are    11:29:54

 8   you familiar with those allegations?                       11:29:58

 9          A.  Yes, I am.                                      11:29:59

10          Q.  Okay.  Do you know one way or another if this,  11:30:01

11   having Star.com evaluate those networks, is that a new     11:30:06

12   development?                                               11:30:09

13          A.  No.                                            11:30:09

14              MS. ANDREWS:  Object to form.                   11:30:11

15          Q.  (BY MR. SCHECTER)  So what makes you say that?  11:30:12

16          A.  Before the general market business transferred  11:30:16

17   from OMD to Star.com, OMD was also responsible for         11:30:21

18   evaluating those networks.                                 11:30:26

19          Q.  And you -- and that's from -- you are talking   11:30:28

20   about from December '21 to the present; right?            11:30:32

21          A.  Yes.                                            11:30:37

22          Q.  You don't know anything about prior to          11:30:37

23   December of 2021; right?                                  11:30:40

24          A.  No.                                            11:30:42

25          Q.  Well, just as you're -- you are aware of the    11:30:43
```

                                                     Page 53

EXHIBIT M
AOE0549

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 1 | | networks, though; right? | 11:30:58 |
| 2 | A. | Yes. | 11:31:01 |
| 3 | Q. | Have you watched them before? | 11:31:01 |
| 4 | A. | No. | 11:31:04 |
| 5 | Q. | Okay. | 11:31:06 |
| 6 | A. | Not as a consumer, no. | 11:31:06 |
| 7 | Q. | But you know that they don't target African | 11:31:08 |
| 8 | | American audiences; right? | 11:31:12 |
| 9 | A. | Yes, I'm aware of that. | 11:31:13 |
| 10 | Q. | They're the general lifestyle channels; right? | 11:31:14 |
| 11 | A. | Yes. | 11:31:19 |
| 12 | Q. | So is other than the fact that they are | 11:31:19 |
| 13 | | African American owned, they really, in your view, they | 11:31:25 |
| 14 | | should be evaluated with McDonald's general market | 11:31:28 |
| 15 | | budget; isn't that right? | 11:31:32 |
| 16 | | MS. ANDREWS:  Object to the form. | 11:31:34 |
| 17 | | THE WITNESS:  Yes. | 11:31:36 |
| 18 | Q. | (BY MR. SCHECTER)  And why is that? | 11:31:39 |
| 19 | A. | Because they are responsible for general | 11:31:42 |
| 20 | | audience, which is inclusive of all people and not -- and | 11:31:45 |
| 21 | | so therefore, those networks since they reach everyone, | 11:31:52 |
| 22 | | and they are not specifically programmed to reach an | 11:31:55 |
| 23 | | African American consumer, they should be evaluated by the | 11:32:00 |
| 24 | | general market agency. | 11:32:03 |
| 25 | Q. | So in your time working at Burrell, have you | 11:32:08 |

Page 54

Veritext Legal Solutions
866 299-5127

EXHIBIT M

AOE0550

```
 1        A.   Actually, no.  It's a general term that it's    11:57:31

 2   used by many advertisers.                                 11:57:36

 3        Q.   Okay.  And just generally speaking, what does    11:57:38

 4   "selection criteria" mean?                                11:57:43

 5        A.   It is specific information or minimum            11:57:44

 6   requirements for a partner to be considered as part of any 11:57:47

 7   given campaign or any particular campaign.                11:57:53

 8        Q.   So does McDonald's communicate to Burrell       11:57:56

 9   minimum requirements for particular media partners?       11:57:59

10        A.   So, yes.                                        11:58:03

11        Q.   And is that campaign by campaign?               11:58:04

12        A.   No, again, it can be for brand, brand           11:58:11

13   initiatives, which have different objectives and KPIs or   11:58:15

14   measurement criteria.  And then retail campaigns, again,  11:58:23

15   have based on whether they are relevance, or digital      11:58:27

16   acquisition, or affordability, they have their own set of 11:58:32

17   criteria.  So the criteria may change depending on the    11:58:37

18   objective of the campaign.                                11:58:41

19        Q.   And the minimum requirements from McDonald's    11:58:43

20   are communicated in writing?                              11:58:46

21        A.   No, it's not something that's written down      11:58:50

22   somewhere.  It's usually it's something just the teams    11:58:53

23   know from working on the accounts or working on the       11:58:56

24   campaigns.                                                11:59:00

25        Q.   So basically your work, you've been working on  11:59:01
```

Page 70

EXHIBIT M
AOE0551

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | the McDonald's account now for almost a year.  Do you | 11:59:05 |
| 2 | know what McDonald's minimum requirements are? | 11:59:09 |
| 3 | A.  Yes. | 11:59:14 |
| 4 | Q.  What are they? | 11:59:15 |
| 5 | A.  So have to have a certain minimum reach.  So | 11:59:17 |
| 6 | I'll use a digital property as an example.  So in order to | 11:59:23 |
| 7 | be considered, you have to have at least a million page | 11:59:29 |
| 8 | views -- I'm sorry -- a million uniques and a million page | 11:59:35 |
| 9 | views. | 11:59:42 |
| 10 | Q.  What about reach in terms of cable television? | 11:59:47 |
| 11 | A.  So for cable television, the minimum requirement | 11:59:53 |
| 12 | is that that network has at least, reaches 75 percent of | 11:59:57 |
| 13 | the U.S. households because we are responsible for | 12:00:03 |
| 14 | national advertising. | 12:00:07 |
| 15 | Q.  75 percent of the U.S. -- | 12:00:09 |
| 16 | A.  75 percent of the U.S. households, the U.S. | 12:00:12 |
| 17 | households. | 12:00:19 |
| 18 | Q.  The households, is that something that is | 12:00:20 |
| 19 | understood in the industry, it is sort of like the -- | 12:00:23 |
| 20 | A.  Yes. | 12:00:25 |
| 21 | Q.  Who defines households? | 12:00:25 |
| 22 | A.  That's a TV measurement term that's defined by | 12:00:27 |
| 23 | Nielsen. | 12:00:30 |
| 24 | Q.  So other than minimum reach, what are the | 12:00:31 |
| 25 | McDonald's minimum requirements? | 12:00:37 |

Page 71

EXHIBIT M
AOE0552

```
 1        A.  So those are the basics for us to be able to      12:00:38

 2   evaluate or include a partner for consideration.           12:00:41

 3        Q.  Okay.  So those are as far as your work on the     12:00:45

 4   McDonald's account, those are the minimum requirements?    12:00:48

 5        A.  Right.  So for -- to consider someone from an     12:00:52

 6   African American perspective, like there are additional    12:00:55

 7   criteria.  So for us it needs to be, they need to reach at 12:00:58

 8   least -- have at least 35 percent coverage of the African  12:01:04

 9   American consumer market, or reach at least 35 percent of  12:01:08

10   the African American consumer market, and that's at a      12:01:15

11   minimum.                                                   12:01:20

12        Q.  And again, that African American consumer         12:01:20

13   market, that's a Nielsen defined term?                     12:01:24

14        A.  No, that's an advertising term.                   12:01:30

15        Q.  Okay.  And just we talked a little bit about      12:01:40

16   the insertion order.  And then there is, you know,         12:01:43

17   things that Burrell does to make sure that you can keep    12:01:48

18   track of the advertisement.  Is there then a written       12:01:53

19   contract between either Burrell and the media partner or   12:01:57

20   McDonald's and the media partner?                          12:02:05

21        A.  So the contract is the insertion order, and that 12:02:08

22   is between Burrell and the media partner.                  12:02:12

23        Q.  And that insertion order, you, Burrell does       12:02:18

24   not provide an insertion order without McDonald's          12:02:22

25   approving a tactical recommendation first; right?          12:02:28
```

Page 72

EXHIBIT M
AOE0553

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | about what portion of, I think both the 2022 paid media | 12:47:52 |
| 2 | budget and the 2023 media budget we're allocated to | 12:47:57 |
| 3 | syndication?  And your answer was zero percent; is that | 12:47:59 |
| 4 | correct? | 12:48:03 |
| 5 | A.  Yes. | 12:48:03 |
| 6 | Q.  Do you have an understanding of why zero | 12:48:03 |
| 7 | percent of the paid -- and again, I'm talking about the | 12:48:07 |
| 8 | African American paid media budget that you are | 12:48:11 |
| 9 | responsible for -- why zero percent of that budget is | 12:48:13 |
| 10 | allocated to syndication? | 12:48:17 |
| 11 | A.  Yes. | 12:48:20 |
| 12 | Q.  And what is the reason for that? | 12:48:21 |
| 13 | A.  There are a few different factors.  Number one, | 12:48:25 |
| 14 | advertising tends to follow the consumer.  And so we look | 12:48:29 |
| 15 | at and we evaluate the consumers' habits.  And so we've | 12:48:34 |
| 16 | seen it over the years, we've seen a shift in consumer | 12:48:40 |
| 17 | media consumption.  And they are no longer, you know, | 12:48:44 |
| 18 | syndication is not a preferred platform that they are | 12:48:48 |
| 19 | engaging on.  And we know syndication is part of linear | 12:48:53 |
| 20 | TV, and TV in general, consumer behavior has shifted from | 12:49:03 |
| 21 | TV to more streaming platforms.  So that would have an | 12:49:08 |
| 22 | impact on the dollars that an advertiser like McDonald's | 12:49:13 |
| 23 | would dedicate to syndication and linear, in general. | 12:49:19 |
| 24 | Q.  And that's an industry-wide shift; right? | 12:49:22 |
| 25 | That's not unique to McDonald's? | 12:49:25 |

Page 91

EXHIBIT M
AOE0554

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.  Yes, that's correct, that's industry wide. | 12:49:27 |
| 2 | Q.  Do you have based on your experience in the | 12:49:30 |
| 3 | industry, a sense of when that shift took place or a | 12:49:33 |
| 4 | range of years in which that shift took place? | 12:49:37 |
| 5 | A.  Yes.  Just speaking holistically from an | 12:49:39 |
| 6 | industry perspective, we start to see the shift around | 12:49:44 |
| 7 | 2017 when again viewer patterns started to shift.  And | 12:49:49 |
| 8 | that's when you start to see advertisers start moving more | 12:49:53 |
| 9 | of their money to what we call OTT, over the top, or | 12:49:57 |
| 10 | streaming, or pod, which refers to premium on demand video | 12:50:02 |
| 11 | platforms, because that's where the consumer is starting | 12:50:09 |
| 12 | to consume that content. | 12:50:12 |
| 13 | Q.  And you said that started in about 2017.  Is | 12:50:15 |
| 14 | that still evolving or would you say that shift has | 12:50:21 |
| 15 | really taken place? | 12:50:25 |
| 16 | A.  The shift has really taken place.  We've seen a | 12:50:26 |
| 17 | dramatic decrease in viewership on traditional linear | 12:50:29 |
| 18 | platforms inclusive of broadcast, cable and syndication. | 12:50:36 |
| 19 | Consumers are really getting their video content on | 12:50:43 |
| 20 | streaming platforms. | 12:50:47 |
| 21 | Q.  Okay.  And so your job, I know you've talked | 12:50:49 |
| 22 | earlier about the recommendation portion of Burrell's | 12:50:52 |
| 23 | job for McDonald's; right?  Once there is sort of a | 12:50:58 |
| 24 | strategy, and then you make recommendations to the | 12:51:02 |
| 25 | company about media partners to use in order to execute | 12:51:05 |

Page 92

EXHIBIT M
AOE0555

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | just wanted to follow up on what you meant by that? | 12:58:52 |
| 2 | A.   Sure.   Agency of record is a term that an agency | 12:59:00 |
| 3 | for the industry would refer to when they are referring to | 12:59:03 |
| 4 | the agency or agencies that work with a particular brand | 12:59:08 |
| 5 | or client.  So we say "agency of record," Burrell is | 12:59:14 |
| 6 | considered McDonald's African American agency of record, | 12:59:18 |
| 7 | while Star.com is considered their general market agency | 12:59:23 |
| 8 | of record.  Navigation Boulevard is considered their | 12:59:26 |
| 9 | Hispanic agency of record and Admire Asia is their Asian | 12:59:33 |
| 10 | agency of record.  It's not a term that would be applied | 12:59:37 |
| 11 | to media partners. | 12:59:43 |
| 12 | Q.  Okay.  Thank you.  That's helpful.  So when | 12:59:45 |
| 13 | looking at media partners, it's not that a particular | 12:59:48 |
| 14 | agency says, you know, necessarily, hey, that's -- we're | 12:59:53 |
| 15 | the only point person for that media partner.  It's more | 12:59:56 |
| 16 | that the agency is looking at the media partners to see | 13:00:00 |
| 17 | if they match the criteria of what it is that you are | 13:00:04 |
| 18 | looking at to achieve; is that correct? | 13:00:07 |
| 19 | A.  That's correct. | 13:00:09 |
| 20 | Q.   Okay.  I want to follow up on some of the | 13:00:22 |
| 21 | documents that Mr. Schecter showed you as well.  Let me | 13:00:24 |
| 22 | see if I can do this.  If not, I'm going to have my tech | 13:00:31 |
| 23 | support online.  Let me share my screen. | 13:00:37 |
| 24 | Okay.  Are you able to see this is that "21-22 | 13:00:53 |
| 25 | Upfront Recommendation"?  Are you able to see that? | 13:00:59 |

Page 98

EXHIBIT M
AOE0556

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q. Is that like an after-the-fact evaluation | 13:07:54 |
| 2 | tool? | 13:07:58 |
| 3 | A. Yes, it is. | 13:07:59 |
| 4 | Q. And again, that is something that is used | 13:08:01 |
| 5 | across the board with all of the media partners that | 13:08:04 |
| 6 | they run advertising with to -- is that how effective it | 13:08:08 |
| 7 | was? | 13:08:13 |
| 8 | A. So to provide some context. ROMI/Sparklight, a | 13:08:13 |
| 9 | partner can only be measured as part of that process. | 13:08:20 |
| 10 | If -- it requires a minimum spend -- excuse me. Let me | 13:08:25 |
| 11 | back up. It requires a minimum quarterly spend of 250,000 | 13:08:34 |
| 12 | in order for a partner to be measured through | 13:08:38 |
| 13 | ROMI/Sparklight. If you don't -- if the partner has not | 13:08:42 |
| 14 | met that threshold, that spend threshold, they will not be | 13:08:52 |
| 15 | captured or measured via ROMI/Sparklight. | 13:08:52 |
| 16 | Q. And then the next bullet point that's here on | 13:08:56 |
| 17 | the scorecard underneath, it says "Reach/Frequency." | 13:09:02 |
| 18 | And the same question, do you have an understanding of | 13:09:03 |
| 19 | what that refers to? | 13:09:06 |
| 20 | A. Yes. | 13:09:07 |
| 21 | Q. Okay. And what is "Reach/Frequency"? | 13:09:07 |
| 22 | A. Reach refers to the total audience that is | 13:09:11 |
| 23 | reached by advertising on that particular partner, | 13:09:15 |
| 24 | platform. Frequency is usually just based on a period of | 13:09:20 |
| 25 | time, how often is a viewer or consumer seeing the | 13:09:25 |

Page 103

EXHIBIT M

AOE0557

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | messaging on that given platform. | 13:09:29 |
| 2 | Q.  So I would think of it I guess as the number | 13:09:39 |
| 3 | of eyeballs that are likely to get on the ad if it is | 13:09:41 |
| 4 | placed with that media partner? | 13:09:44 |
| 5 | A.  Yes. | 13:09:47 |
| 6 | Q.  And why is that an important consideration in | 13:09:47 |
| 7 | assessing a media partner? | 13:09:52 |
| 8 | A.  Because we want to reach as many eyeballs as | 13:09:54 |
| 9 | possible with that message. | 13:09:58 |
| 10 | Q.  And so the more eyeballs that you can reach | 13:09:58 |
| 11 | the better; correct? | 13:10:00 |
| 12 | A.  The more eyeballs we can reach, the better | 13:10:01 |
| 13 | chance we have of driving sales or driving the business | 13:10:04 |
| 14 | objective, in this case sales. | 13:10:11 |
| 15 | Q.  And do you know what factors are considered to | 13:10:13 |
| 16 | determine what the reach/frequency is of a particular | 13:10:16 |
| 17 | media partner's offering? | 13:10:20 |
| 18 | A.  So from a frequen- -- excuse me -- reach | 13:10:23 |
| 19 | standpoint, because it starts with reach, that's the total | 13:10:26 |
| 20 | audience.  So we're looking at the -- and I think I | 13:10:29 |
| 21 | mentioned earlier specifically as it relates to websites. | 13:10:33 |
| 22 | Page views, my page views being important, or the number | 13:10:38 |
| 23 | of unique visitors.  Unique visitors equates to reach. | 13:10:43 |
| 24 | So if a website is getting a million unique | 13:10:47 |
| 25 | visitors a month, that tells us that that's a very decent | 13:10:52 |

Page 104

EXHIBIT M

AOE0558

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | number.  And that tells us more than likely, we're going | 13:10:58 |
| 2 | to reach more of our consumer on that particular platform. | 13:11:00 |
| 3 | So that's how that's determined.  How many people are | 13:11:14 |
| 4 | viewing?  How many people are coming to the site and | 13:11:16 |
| 5 | engaging with content on that site?  How many people were | 13:11:19 |
| 6 | viewing the content on linear?  How many people are | 13:11:23 |
| 7 | listening.  That's how reach is determined. | 13:11:27 |
| 8 | MS. ANDREWS:  Okay.  Thanks, Rob.  Now, I | |
| 9 | can -- I finally can see it. | |
| 10 | Q.  (BY MS. ANDREWS)  And so you mentioned for a | 13:11:33 |
| 11 | digital partner, reach would be in terms of page views. | 13:11:35 |
| 12 | In terms of television programming, is that households | 13:11:41 |
| 13 | that are reviewing the programming? | 13:11:42 |
| 14 | A.  Households, and then we can get down to the | 13:11:45 |
| 15 | persons, number of people watching or viewing. | 13:11:48 |
| 16 | Q.  Which would come in like as a rating? | 13:11:50 |
| 17 | A.  That would equate to ratings, that's correct. | 13:11:53 |
| 18 | Q.  So if the ratings are low or don't match your | 13:11:57 |
| 19 | target demographic for that particular campaign, that | 13:12:01 |
| 20 | would be a consideration in the scorecard analysis? | 13:12:06 |
| 21 | A.  Yes, that's correct. | 13:12:09 |
| 22 | Q.  And in your experience in the advertising | 13:12:10 |
| 23 | industry, is that typical? | 13:12:12 |
| 24 | A.  That is standard operating procedure, yes. | 13:12:14 |
| 25 | Q.  And why is that standard operating procedure? | 13:12:16 |

Page 105

EXHIBIT M

AOE0559

| | | |
|---|---|---|
| 1 | than that.  It's critical.  It critical to their bottom | 13:24:19 |
| 2 | line. | 13:24:23 |
| 3 |      Q.  And based on your experience in the industry, | 13:24:24 |
| 4 | I know you were asked some questions earlier by | 13:24:29 |
| 5 | Mr. Schecter about the percentage of McDonald's overall | 13:24:33 |
| 6 | media budget that is devoted to the African American | 13:24:36 |
| 7 | consumer budget.  Do you have a sense of how the | 13:24:41 |
| 8 | percentage that McDonald's devotes to that segment | 13:24:43 |
| 9 | compares to other advertisers in the industry? | 13:24:48 |
| 10 |      A.  I do. | 13:24:51 |
| 11 |      Q.  Okay.  Can you tell me what that is? | 13:24:52 |
| 12 |      A.  So in my experience, McDonald's actually has one | 13:24:58 |
| 13 | of the highest, the largest budgets specifically allocated | 13:25:04 |
| 14 | to this African American consumer.  Having worked on other | 13:25:09 |
| 15 | brands who have African American dedicated budgets, | 13:25:17 |
| 16 | McDonald's is by far the largest budget that is | 13:25:23 |
| 17 | specifically allocated to this African American consumer. | 13:25:29 |
| 18 |      In terms of spend on Black-owned media, again, | 13:25:34 |
| 19 | McDonald's is one of the few who, number one, have | 13:25:40 |
| 20 | specific mandates, and a specific commitment to ensuring | 13:25:47 |
| 21 | dollars are put against diverse-owned media.  And that's | 13:25:58 |
| 22 | predating -- I can't speak for McDonald's predating 2020, | 13:26:03 |
| 23 | because we saw a shift in the marketplace.  But I know | 13:26:08 |
| 24 | now, having worked on other pieces of business prior, | 13:26:12 |
| 25 | that -- that, you know, they are one of the few who have | 13:26:16 |

Page 114

EXHIBIT M
AOE0560

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | see that? | 14:02:41 |
| 2 | A.   Yes. | 14:02:42 |
| 3 | Q.   And do you have an understanding of what that | 14:02:42 |
| 4 | refers to? | 14:02:44 |
| 5 | A.   Yes. | 14:02:45 |
| 6 | Q.   What is that? | 14:02:46 |
| 7 | A.   The Weather Channel network and then The Weather | 14:02:47 |
| 8 | Channel sponsorship, I'm assuming, non-advertise- -- | 14:02:52 |
| 9 | non-ad supported opportunities on that channel. | 14:02:55 |
| 10 | Q.   When you say "non-ad" what do you mean? | 14:02:59 |
| 11 | A.   So I'm assuming if it's a sponsorship, they want | 14:03:03 |
| 12 | the brand to have some type of custom content that is not | 14:03:06 |
| 13 | just what we call spots and dots or running, just airing | 14:03:11 |
| 14 | the commercials.  So this is above and beyond or in | 14:03:15 |
| 15 | addition to airing the commercials. | 14:03:19 |
| 16 | Q.   Okay.  And again, you know, the determination | 14:03:23 |
| 17 | on whether or not to move forward with the proposal like | 14:03:25 |
| 18 | this would be then using the criteria that we looked at | 14:03:29 |
| 19 | earlier; correct? | 14:03:34 |
| 20 | A.   Yes. | 14:03:35 |
| 21 | Q.   And again, with the assessment being against, | 14:03:35 |
| 22 | you know, with this hit on our strategy of as we were | 14:03:39 |
| 23 | talking about, the target demographic of the GenZ, and | 14:03:42 |
| 24 | then the adult, I think you said, 18 to 49 as the | 14:03:51 |
| 25 | targeted demographic? | 14:03:57 |

Page 125

EXHIBIT M
AOE0561

CONFIDENTIAL

```
 1        A.  That's correct.                            14:03:59

 2        Q.  And --                                     14:04:00

 3        A.  And, no --

 4        Q.  I'm sorry.  Go ahead.

 5        A.  I was going to say, and, no, based on the  14:04:01

 6   current ratings and audience composition for The Weather  14:04:04

 7   Channel, it would not align with the audience, target  14:04:11

 8   audience.                                           14:04:15

 9        Q.  And why is that?                           14:04:15

10        A.  The rat- -- the composition or the reach would  14:04:16

11   be low, specifically for the GenZ target.  The ratings  14:04:20

12   are -- the ratings are low, so that means that they are  14:04:29

13   not watching.                                       14:04:31

14           MS. ANDREWS:  Can you scroll down to the next  14:04:44

15   page, Rob.  Okay.  If you can go back up to the top.  I  14:04:46

16   have a question there.                              14:04:51

17        Q.  (BY MS. ANDREWS)  Do you have a sense -- I

18   mean, this is asking for an overall commitment of   14:04:53

19   $30,000,000.  Do you have a sense of the size of that  14:04:56

20   relative to, you know, overall spend with various media  14:04:59

21   partners?                                           14:05:02

22        A.  Can you explain what you mean by "sense of,"  14:05:03

23   like can you explain?                               14:05:05

24        Q.  Sure.  With the buys that Burrell makes, the  14:05:08

25   various media partners for the African American consumer  14:05:18
```

EXHIBIT M

AOE0562

CONFIDENTIAL

```
 1        Q.  Do you have any independent knowledge that      14:12:59

 2   there were media placements through Burrell in that time  14:13:01

 3   frame on behalf of McDonald's with Entertainment Studios  14:13:05

 4   properties?                                               14:13:10

 5        A.  Yes.                                             14:13:10

 6        Q.  And what is that knowledge?                      14:13:11

 7        A.  Based -- what is that knowledge that --          14:13:12

 8        Q.  Let me ask it this way.  Yes.  How do you know   14:13:15

 9   that, or what is it that you know?                        14:13:18

10        A.  So from information that was shared by that team 14:13:20

11   just wholistically across the department, the media       14:13:26

12   department, it was noted that Entertainment Studios was   14:13:31

13   one of their clients -- one of their media partners.      14:13:35

14        Q.  For the McDonald's account?                      14:13:39

15        A.  For the McDonald's account, yes.                 14:13:41

16        Q.  And so you were aware that that was an entity    14:13:42

17   that Burrell was buying with on behalf of McDonald's?     14:13:45

18        A.  Yes.                                             14:13:50

19        Q.  Do you know if that was true for other          14:13:50

20   advertisers via Burrell?                                  14:13:53

21        A.  Yes.                                             14:13:57

22        Q.  Including accounts that you worked on, was       14:13:57

23   that a property that you partnered with?                  14:14:00

24        A.  Not during my tenure.  But prior to me joining   14:14:02

25   that account in 2014, yes.                                14:14:06
```

Page 132

EXHIBIT M
AOE0563

CONFIDENTIAL

```
 1                    REPORTER'S CERTIFICATE

 2          I, COLLEEN P. DOHERTY, CSR No. 345, Certified

 3     Shorthand Reporter, certify:

 4          That the foregoing proceedings were taken before

 5     me at the time and place therein set forth, at which time

 6     the witness was put under oath by me;

 7          That the testimony and all objections made were

 8     recorded stenographically by me and transcribed by me or

 9     under my direction;

10          That the foregoing is a true and correct record

11     of all testimony given, to the best of my ability;

12          I further certify that I am not a relative or

13     employee of any attorney or party, nor am I financially

14     interested in the action.

15          IN WITNESS WHEREOF, I set my hand and seal this

16     13th day of October, 2022.

17

18

19

20

21          COLLEEN P. DOHERTY, CSR 345

22          Notary Public

23          P.O. Box 2636

24          Boise, Idaho  83701-2636

25     My commission expires September 7, 2023.
```

Page 135

EXHIBIT M
AOE0564

# EXHIBIT N

EXHIBIT N
AOE0565

Page 1

1

2           UNITED STATES DISTRICT COURT
    CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
3          Case No. 2:21-cv-04972-FMO-MAA
4   - - - - - - - - - - - - - - - - - -x
    ENTERTAINMENT STUDIOS NETWORKS,    :
5   INC., a California corporation;    :
    WEATHER GROUP, LLC, a Delaware     :
6   limited liability company,         :
                                       :
7                        Plaintiffs,   :
                                       :
8           - vs -                     :
                                       :
9   McDONALD'S USA, LLC, a Delaware    :
    limited liability company,         :
10                                     :
                         Defendant.    :
11  - - - - - - - - - - - - - - - - - -x
12
                            February 14, 2023
13                          10:05 a.m.
                            1285 6th Avenue
14                          New York, NY
15
16
17
18
19          VIDEOTAPED AND REMOTE DEPOSITION UPON
20  ORAL EXAMINATION OF NON-PARTY WITNESS, LYNNWOOD
21  BIBBENS, held at the above-mentioned time and
22  place, before Randi Friedman, a Registered
23  Professional Reporter, within and for the State
24  of New York.
25

```
                                          Page 2

 1              L. Bibbens - Non-Party Witness
 2    APPEARANCES:
 3              MILLER BARONDESS, LLP
                Attorneys for Plaintiffs
 4
                1999 Avenue of the Stars, Suite 1000
 5              Los Angeles, California 90067
 6              BY:  DAVID W. SCHECTER, ESQ.
 7
 8              RILEY SAFER HOLMES & CANCILA, LLP
                Attorneys for Defendant
 9
                100 Spectrum Drive, Suite 400
10              Irvine, California 92618
11              BY:  MATTHEW KENNISON, ESQ.
12
13              PAUL WEISS RIFKIND
                WHARTON & GARRISON, LLP
14              Attorneys for Defendant
15              1285 Avenue of the Americas
                New York, New York 10019
16
                BY:  KERISSA N. BARRON, ESQ.
17
                          * * *
18    ALSO PRESENT:
                Deverell Write - Videographer
19
20
21
22
23
24
25
```

```
                                          Page 12
  1              L. Bibbens - Non-Party Witness
  2      Q     So beginning of February 2022?        10:12:15
  3      A     Yes.                                   10:12:18
  4      Q     Do you have any communications with    10:12:19
  5  McDonald's or their agencies prior to that?      10:12:25
  6      A     Agencies, yes.  But McDonald's in      10:12:28
  7  particular, no.                                  10:12:31
  8      Q     And agencies -- let's just stick with  10:12:32
  9  agency communications.  How far back does that go 10:12:35
 10  in time?                                          10:12:39
 11      A     I mean, I've worked with Publicis      10:12:40
 12  before I launched ReachTV, so that goes back to  10:12:43
 13  2012.                                             10:12:47
 14      Q     I see.                                 10:12:49
 15      A     Yeah.                                  10:12:50
 16      Q     And so going back to 2012, you dealt   10:12:50
 17  with Publicis, who was representing McDonald's in 10:12:54
 18  some capacity?                                    10:12:58
 19      A     Well at that time, they weren't.  We   10:12:59
 20  weren't talking about McDonald's whatsoever.      10:13:02
 21  When they started talking to McDonald's was last  10:13:03
 22  year.                                             10:13:05
 23      Q     Publicis started last year?            10:13:06
 24      A     Yeah.  So when we did in '21, I guess  10:13:09
 25  it was, when we did our first upfront, McDonald's 10:13:11
```

Page 20

```
 1              L. Bibbens - Non-Party Witness
 2   the rooms with Comcast as kind of a consultant?   10:21:04
 3        A     No.  Just like they had a initiative.  10:21:08
 4   Strategy sessions.  Payne Brown was a really good  10:21:11
 5   friend of mine.  Always thought that I was always  10:21:16
 6   doing something creative.  So he said, come in     10:21:18
 7   and said sit down.                                 10:21:21
 8             It was at a time where Comcast was       10:21:22
 9   reviewing black-owned networks.  Bringing them     10:21:25
10   in.  So it was a help network, one of the guys I   10:21:30
11   was consulting where I was seeing Magic Johnson's  10:21:32
12   network was being pitched.  So it was right        10:21:36
13   around that same exact time.  I got to sit in the  10:21:38
14   room and see all the little things in there.       10:21:41
15             Actually learned how Comcast thinks,     10:21:43
16   which was, you know, with this idea of all these   10:21:45
17   verticals coming in.  Wait and buy the winner.     10:21:49
18   It's much easier.  And they just spent money on    10:21:52
19   the infrastructure.  So they bought up all the     10:21:54
20   broadband they could buy.                          10:21:56
21        Q     I see.  And then you talked a little    10:21:58
22   bit about you started Reach.  That was 2016?       10:22:02
23        A     Yeah.  April 2016 I founded it          10:22:06
24   officially.  I had been working on it a couple     10:22:09
25   months before.  And DLA was with me from the very  10:22:11
```

EXHIBIT N

AOE0569

```
                                              Page 21

 1              L. Bibbens - Non-Party Witness
 2   beginning.  Founded it.  Took about six, seven       10:22:16
 3   months to fix the tech to be able to actually        10:22:18
 4   deliver.  And we signed our first deal.  We went     10:22:22
 5   right to the biggest company, food and beverage      10:22:26
 6   which was HMSHost.  Started in three airports and    10:22:29
 7   quickly expanded into 62, and today we're in 90.     10:22:33
 8        Q     All right.  So Reach from the             10:22:41
 9   beginning really targeted airports?                  10:22:42
10        A     100 percent.                              10:22:44
11        Q     Okay.  And other -- were there other      10:22:45
12   venues, like hotels and things like that where       10:22:49
13   there's hardware there that you are targeting?       10:22:54
14        A     In '13 I tried to buy -- I think it       10:22:59
15   was '12 or '13, I tried to buy LodgeNet.             10:23:01
16   LodgeNet is the largest provider of content into     10:23:05
17   hotel rooms.  They're the only one that can          10:23:09
18   provide movies on demand, because they bought a      10:23:14
19   company called On Demand.  I raised $600 million      10:23:17
20   to buy it.  Lost the bid to Colony Capital.  But     10:23:21
21   in the process, my partner at the time became        10:23:25
22   their CRO, and I got access to all of their data.    10:23:27
23         So when I was going to launch Reach, I         10:23:31
24   remembered the ones that was most important.  The    10:23:34
25   average person that goes to an airport spends 30     10:23:37
```

EXHIBIT N
AOE0570

Page 22

```
 1              L. Bibbens - Non-Party Witness
 2    days a year in a hotel.  So -- now you can make      10:23:40
 3    that Airbnb.  But the idea was, that was such a      10:23:43
 4    target for hotel operators, such a target for        10:23:48
 5    everyone, the airport traveler.  And in my deal      10:23:51
 6    with them when they took my partner, I was able      10:23:54
 7    to launch a channel, so ReachTV was immediately     10:23:56
 8    in the hotel rooms.                                  10:23:59
 9        Q     Okay.                                      10:24:01
10        A     Pretty soon after we launched, by the     10:24:02
11    end of '17.                                          10:24:04
12        Q     So -- all right.  So tell me a little     10:24:05
13    bit about what ReachTV does as far as content.      10:24:07
14    What kind of content does it put out?  And if you   10:24:11
15    can start kind of where it was at the beginning     10:24:14
16    in 2016 through the present, that would be          10:24:16
17    helpful.                                            10:24:18
18        A     2016 we had a lot of partnerships         10:24:20
19    with, like, Hollywood Reporter, Billboard.  We      10:24:22
20    were focused on short-form programming.  Quick      10:24:25
21    moving, so that you can really change subjects      10:24:30
22    pretty quickly.  We had Hertz, Conde, a bunch of    10:24:32
23    different people who had a lot of their digital     10:24:38
24    content that was highly produced we would air.      10:24:40
25    We had our own studio that we started -- like       10:24:43
```

Page 23

L. Bibbens - Non-Party Witness

1

2    pretty soon right after we started, and that          10:24:45

3    allowed us to produce our own content.  And our        10:24:49

4    content was really about -- you know, we didn't        10:24:54

5    have live sports, so we focused on, you know, off      10:24:56

6    the field, you know, so we could really show           10:25:04

7    players and athletes in one light.  We focused on      10:25:09

8    food, obviously 'cause we're in the airports.  So      10:25:12

9    we focused on chefs.  And we focused on fashion,       10:25:15

10   beauty; hence, the reason went to Hertz, Conde.        10:25:19

11   And then, of course, celebrity, which is why we        10:25:22

12   went to Hollywood Reporter and Billboard.  Those       10:25:24

13   are my first eight contracts, and they were right      10:25:30

14   from the very beginning.                               10:25:33

15        Q    And then you said you really started         10:25:34

16   focusing on, like, off the field content because       10:25:37

17   there was no live sports.                              10:25:41

18             So, like, what would be an example of,       10:25:43

19   like, an off the field athlete?                        10:25:44

20        A    Like Rich Eisen interviews with              10:25:48

21   athletes, talking about other things.  We had a        10:25:52

22   partnership with CBS Sports, so we had CBS Sports      10:25:55

23   segments.  I think it was Phil Simms or Chris          10:25:58

24   Simms.                                                 10:26:04

25        Q    One of the Simms?                            10:26:06

EXHIBIT N
AOE0572

Page 24

1          L. Bibbens - Non-Party Witness

2     A     Yeah, one of the Simms on the podcast,     10:26:07

3  so that was cool.  CBS was a big partner when we     10:26:08

4  launched.  It gave us live updates at 5:00 a.m.,     10:26:10

5  12:00, 5:00 p.m., and we would rotate those in.     10:26:15

6  They created a specific brand for us called CBS     10:26:19

7  On The Go.                                          10:26:22

8     Q     I see.  And so all of this content was     10:26:23

9  being pushed out on airport screens?               10:26:26

10    A     Yeah.  Under our brand, under ReachTV      10:26:29

11 onto our screens.  And it was programmed like a    10:26:32

12 linear channel.  So as far as if you're a viewer,  10:26:35

13 it would feel like any other TV.                    10:26:39

14    Q     I see.  So because it was programmed       10:26:40

15 like linear TV, you would sell ad time on --        10:26:42

16 during that content?                                10:26:47

17    A     Correct.  When we launched CBS, local      10:26:48

18 news was selling our ad times.                      10:26:51

19    Q     So -- and that instance, CBS would be      10:26:54

20 contracting with agencies to sell ad times?         10:26:59

21    A     Correct.                                   10:27:02

22    Q     And then they would just put the whole     10:27:02

23 thing on your monitors?                             10:27:04

24    A     They would just give us the ads.  We       10:27:06

25 were doing all the programming.  They would give    10:27:08

EXHIBIT N
AOE0573

```
                                               Page 28
```

1              L. Bibbens - Non-Party Witness

2      the best content out there.  CNBC was also rated    10:29:59

3      No. 1 in the surveys.  Bloomberg, No. 2.            10:30:02

4      Cheddar, No. 3, so it kind of moved around.         10:30:04

5          Q      Okay.  And then at some point in 2021,   10:30:08

6      you correct me if I'm wrong, maybe April 2021,      10:30:12

7      ReachTV bought the CNN Airport Network?             10:30:15

8          A      Yeah.  We announced it in April.  We     10:30:18

9      did the -- we did the deal throughout January,      10:30:27

10     February, March.  It was a two and a half month     10:30:36

11     sprint to get all that done, and then that went     10:30:39

12     from January 10th they're announcing they're        10:30:42

13     leaving, and April 1st we were live.                10:30:45

14         Q      I see.  Okay.  And so as of April 1,      10:30:47

15     2021, CNN Airport Network was then ReachTV?         10:30:49

16         A      Correct.  And CNN Airport Network, all    10:30:54

17     the other people that we didn't bring on, we        10:30:58

18     offered jobs to them to come over.  We didn't       10:31:00

19     need the sales -- we had, like, one of the guys,    10:31:04

20     but we didn't really need a lot of their other      10:31:06

21     people.  They stayed with us, and they're still     10:31:09

22     with us to this day.                                10:31:12

23         Q      Okay.  And so presently, you said        10:31:13

24     Reach generates 99 percent of its revenue through   10:31:26

25     advertising; correct?                               10:31:30

EXHIBIT N
AOE0574

Page 35

L. Bibbens - Non-Party Witness

1

2     A     100 percent.                          10:38:12

3     Q     Okay.  So sort of a basic question,   10:38:13

4  sorry, but Nielsen ratings are important because  10:38:15

5  they're typically required in order to do        10:38:19

6  guarantees with advertiser clients; right?       10:38:21

7     A     Yeah, something like that.            10:38:24

8     Q     So what is Reach's target demographic  10:38:28

9  that it sells to its advertiser or potential     10:38:33

10 advertiser clients?                             10:38:36

11    A     Probably 25 to 54.  We have -- our     10:38:40

12 highest indexing network for people over 100    10:38:46

13 grand.  People who have second homes.  C level  10:38:49

14 jobs.  So if you're targeting people that have  10:38:52

15 disposable income, who actually buy certain     10:38:55

16 brands and are brand loyal, you know, we always 10:38:59

17 say we have the most desired audience.          10:39:03

18    Q     And those would be -- all right.  And  10:39:06

19 those are the people that are traveling through 10:39:07

20 airports frequently; correct?                   10:39:10

21    A     Yes.                                   10:39:12

22    Q     Okay.  So then when Reach pitches its  10:39:12

23 content to agencies, how does it guarantee its  10:39:23

24 buys?  Do you use the Nielsen ratings that come 10:39:32

25 from Epicenter or are converted to Epicenter?   10:39:36

EXHIBIT N
AOE0575

Page 51

L. Bibbens - Non-Party Witness

1

2    to our agencies, nobody at McDonald's directed          10:55:29

3    ReachTV to go talk to specific agencies about           10:55:33

4    your content; is that right?                            10:55:37

5          A      What are you talking about; in 2021?       10:55:39

6          Q      Yeah.  Well, let's start in 2022 and       10:55:42

7    then we'll go backwards.                                10:55:44

8          A      So in 2022, so McDonald's, that            10:55:46

9    conversation really came from me at the higher          10:55:50

10   level of, you know, how do we -- why don't we           10:55:52

11   have McDonald's.  And then that was pushed to           10:55:57

12   Starcom.  And then that conversation, Starcom           10:55:59

13   brought in Burrell.                                     10:56:04

14         Q      Let me back up there.  So you said         10:56:09

15   that was pushed to Starcom.                             10:56:11

16                Who pushed it to Starcom?                  10:56:14

17         A      So I was with Talia as the PMX CEO.        10:56:16

18   She said that money comes out of Starcom.  And          10:56:19

19   then we went to Starcom.  And Starcom -- I want         10:56:21

20   to say her name's Donna.  Maybe it's something          10:56:25

21   else, but then she brought on Burrell.                  10:56:27

22         Q      Okay.  So somebody at Starcom, and you     10:56:30

23   think her name was Donna, brought on Burrell            10:56:33

24   to --                                                   10:56:35

25         A      Or Donna's at Burrell.  One of the         10:56:36

EXHIBIT N
AOE0576

Page 52

1              L. Bibbens - Non-Party Witness

2     two; right.   There's an Angela and a Donna.          10:56:38

3     One's at Starcom.   One's at Burrell.                 10:56:43

4          Q      Okay.   And Talia works for who?          10:56:45

5          A      Publicis.   She's the CEO of -- they      10:56:47

6     call it PMX, but that's Publicis.                     10:56:49

7          Q      Okay.   And she was the one that --       10:56:51

8     when you say pushed it to Burrell, that she was       10:56:55

9     the one that brought in Burrell?                      10:56:58

10         A      No.   Talia brought said, Starcom runs    10:57:00

11    our McDonald's business.   You should be doing        10:57:03

12    business with them.   Let me get you connected to     10:57:07

13    Starcom.   Starcom brought in Burrell.                10:57:08

14         Q      Okay.   And the Starcom person was        10:57:10

15    somebody named Angela?                                10:57:12

16         A      Yes.                                      10:57:13

17         Q      And the Burrell person was somebody       10:57:14

18    named Donna?                                          10:57:16

19         A      Correct.                                  10:57:17

20         Q      Was it Donna Hodge?                       10:57:17

21         A      Yeah, I think so.   I have her email.     10:57:19

22    I can check.                                          10:57:21

23         Q      That's all right.   Okay.   And was this  10:57:22

24    all done via email?                                   10:57:23

25         A      Yeah.                                     10:57:25

EXHIBIT N
AOE0577

                                                    Page 53

1              L. Bibbens - Non-Party Witness

2    Q     And this was in the 2022 time period?   10:57:26

3    A     Correct.                                 10:57:28

4    Q     And what did Starcom say the purpose     10:57:28

5    of bringing Burrell in was?                    10:57:32

6    A     That Burrell was, I think in the email   10:57:35

7    it was that Burrell was focused on our         10:57:37

8    black-owned media partners and making sure     10:57:39

9    that -- there's a budget that's allocated.  So 10:57:41

10   that's -- I think it was pretty simple.        10:57:46

11   Q     But Burrell and Starcom were working     10:57:48

12   together as kind of like a combined agency team? 10:57:51

13   A     That's what it felt like.                10:57:55

14   Q     Yes?                                      10:57:58

15   A     Yes.                                      10:57:58

16   Q     And was this the same in 2021?  So we    10:58:00

17   just talked about 2022.  2021, what happened?  10:58:04

18   A     2021, there was really not that much     10:58:07

19   communication.  It was like a -- direct guys who 10:58:09

20   talked to, say, 500 brands.  It was more like  10:58:12

21   nothing there.  We didn't -- in our upfront buy 10:58:16

22   we didn't really -- they weren't on our list, so, 10:58:19

23   you know, it was new for us, the upfront.  And we 10:58:21

24   were just getting big six, seven.  Smaller      10:58:24

25   agencies.  We were just a little bit overwhelmed 10:58:28

EXHIBIT N
AOE0578

```
                                              Page 55

  1              L. Bibbens - Non-Party Witness

  2    what you're doing.  From that point it becomes    10:59:51

  3    the agency that's really making a lot of the      10:59:54

  4    decisions, except in these smaller upfront        10:59:57

  5    windows where they give you to present certain    11:00:00

  6    things, then maybe a person from the brand that   11:00:02

  7    comes there, but a lot of times that's not the    11:00:05

  8    case.                                             11:00:08

  9        Q     Right.  And that makes sense, right,    11:00:08

 10    because the agencies are hired to --              11:00:09

 11        A     Exactly, to execute this.               11:00:10

 12        Q     Okay.  Prior to you buying the CNN      11:00:13

 13    Airport Network, McDonald's did not advertise     11:00:18

 14    with that network; did they?                      11:00:20

 15        A     With who?                               11:00:22

 16        Q     The CNN Airport Network.                11:00:23

 17        A     They told me they did, but I don't      11:00:26

 18    have their confidential numbers.  We didn't --    11:00:28

 19    even in our acquisition, we weren't privy to      11:00:32

 20    those numbers.                                    11:00:35

 21        Q     When you say they told you that they    11:00:36

 22    did, who's "they"?                                11:00:37

 23        A     One of the sales guys.  I asked him     11:00:39

 24    for his top brands that he had before, and he     11:00:41

 25    said McDonald's -- he listed McDonald's as one of 11:00:42
```

EXHIBIT N

AOE0579

Page 56

1              L. Bibbens - Non-Party Witness

2      his brands.                                      11:00:45

3          Q       The sales guys at CNN Airport Network?   11:00:46

4          A       Correct.                              11:00:48

5          Q       Did he tell you whether or not it was  11:00:49

6      local buys or the national ad sales?            11:00:52

7          A       No, he didn't.  I mean, and they      11:00:54

8      had -- from a tech standpoint, they had a really  11:00:56

9      tough time doing local, because you had to       11:01:00

10     actually intercept an actual broadcast stream,   11:01:04

11     whereas ours is delivered a different way all by  11:01:08

12     IP.  I could do it from my phone right now into  11:01:12

13     Newark if I wanted to.                           11:01:16

14         Q       Okay.                                11:01:17

15         A       So they had a long time -- even if you  11:01:18

16     bought local in five markets, they would probably  11:01:20

17     give you national because it was easier.         11:01:21

18         Q       So it's fair to say you don't know for  11:01:26

19     sure one way or the other whether McDonald's was  11:01:29

20     or wasn't a client of CNN Airport Network before  11:01:32

21     you bought it?                                   11:01:35

22         A       Yeah.  It didn't affect if I was      11:01:36

23     buying it or not.                                11:01:39

24         Q       Okay.                                11:01:40

25         A       For us, that was a density.  It       11:01:43

EXHIBIT N
AOE0580

```
                                            Page 67
 1              L. Bibbens - Non-Party Witness
 2      license to broadcast the Super Bowl?          11:17:42
 3          A      Part of our NFL deal is we get the --  11:17:45
 4      not only do we get every game Thursday night,  11:17:48
 5      Sunday 1:00, Sunday 4:00, Sunday night, Monday  11:17:52
 6      night.  We get playoffs and Super Bowl.        11:17:53
 7          Q      Does ReachTV also have rights to show  11:18:00
 8      NBA games?                                     11:18:04
 9          A      Not yet.                            11:18:05
10          Q      Any other sporting events?          11:18:10
11          A      Not yet.                            11:18:13
12          Q      So it's NFL.  The Thursday game.    11:18:16
13      Sounds like three games on Sunday, the Monday  11:18:18
14      night game, and then all playoffs and the Super  11:18:22
15      Bowl; is that right?                           11:18:26
16          A      Yes, sir.                           11:18:28
17          Q      The other original and licensed     11:18:28
18      content that's apart from sports and news, can  11:18:30
19      you just give me an overview of the types of   11:18:33
20      programming, whether it's cooking shows, travel,  11:18:35
21      etc.?                                          11:18:37
22          A      Yeah.  It's a blend of travel.      11:18:38
23      There's an itinerary that we produce with our  11:18:43
24      production company.  There's about 50 episodes a  11:18:46
25      year.  We have a show on business called Ticket  11:18:48
```

EXHIBIT N
AOE0581

Page  68

L. Bibbens - Non-Party Witness

1

2   To Success, which highlights the minority-owned      11:18:52

3   concessions inside the airports and how they         11:18:56

4   became really successful.  To, you know, a           11:18:59

5   cooking show where we do where chefs eat.  We        11:19:02

6   have the top chefs.  We go back to their hometown    11:19:06

7   and places where they go to eat.  So it's a          11:19:10

8   mixture of travel, food, beauty, and also sports     11:19:11

9   from another angle.  Looking at what they do off     11:19:15

10  the field.  You know, so those type of shows         11:19:17

11  where we take NBA players.  The unknown thing        11:19:20

12  about NBA right now, it's the wine snob league.      11:19:25

13  Everybody in there loves wine, so we took them to    11:19:30

14  Consolation brands and kind of did a whole show      11:19:31

15  from their winery, so it's kind of cool.             11:19:35

16       Q     Would you describe ReachTV's content     11:19:39

17  as African-American targeted?                        11:19:42

18       A     No.  I think we use African-American     11:19:45

19  creators and producers, because African-American     11:19:48

20  and certain cultures right now are driving pop       11:19:51

21  culture.  Pop culture is what drives a lot of        11:19:55

22  revenue, and it gives our brands and partners an     11:19:58

23  ability to be at the creative side of that in the    11:20:02

24  beginning, so that when it gets really super         11:20:05

25  popular, they've already been in it from the         11:20:09

EXHIBIT N
AOE0582

Page 69

1              L. Bibbens - Non-Party Witness

2    whole start of it.                          11:20:11

3         Q     Obviously all racial demographics   11:20:13

4    travel through airports; right?            11:20:16

5         A     Yeah.  I mean, airports is probably   11:20:19

6    the least African-American destination you're   11:20:20

7    going to see.  We are obviously a general market.   11:20:23

8    We are black owned, but we are a general market   11:20:28

9    network.                                    11:20:31

10        Q     Right.  You're black owned, but a   11:20:31

11   general market network?                     11:20:36

12        A     Correct.  I would say general network,   11:20:37

13   we're probably at the higher end of that general   11:20:39

14   market.                                     11:20:43

15             But I will say one note just to   11:20:45

16   everybody here, this year we broke a record for   11:20:47

17   first-time travelers.  22 percent first-time   11:20:50

18   travelers as reported by Delta and United, which   11:20:52

19   meant younger, slightly less income, but it was   11:20:57

20   really cool, because it stimulated when we didn't   11:21:03

21   have that corporate travel.  That's why travel   11:21:05

22   now is above -- the busiest year on record was   11:21:07

23   2019.  The busiest year on record before 2019 was   11:21:12

24   '18.  Before '18 was '17.  So the airports were   11:21:13

25   growing every single year, and then '20 obviously   11:21:17

EXHIBIT N
AOE0583

```
                                              Page 74

 1              L. Bibbens - Non-Party Witness

 2                  THE WITNESS:  I would say yes very   11:26:10

 3        easily, but that wasn't where we were at       11:26:11

 4        that point.                                    11:26:14

 5   BY MR. SCHECTER:                                    11:26:15

 6        Q     Why do you say "Yes very easily"?        11:26:17

 7        A     'Cause we do it for other advertisers    11:26:22

 8   currently and in that timeframe.                    11:26:25

 9        Q     ReachTV has other major national         11:26:29

10   advertisers who spent above 1.2 million in 2022?    11:26:33

11        A     Correct.                                 11:26:38

12        Q     In fact, those advertisers who spent     11:26:41

13   more than 1.2 million on ReachTV, those have        11:26:42

14   become repeat customers?                            11:26:45

15        A     Yes.                                     11:26:47

16        Q     You say that the emails that you         11:26:53

17   exchanged with McDonald's ad agency were with       11:26:56

18   Burrell?                                            11:27:02

19        A     Starcom and Burrell.                     11:27:03

20        Q     Did you deal with one agency more than   11:27:05

21   another?                                            11:27:07

22                  MR. KENNISON:  Objection to form.    11:27:10

23        Sorry.  Go ahead.                              11:27:11

24                  THE WITNESS:  Starcom led the        11:27:12

25        conversation.  Well, Starcom was brought       11:27:13
```

Page 75

L. Bibbens - Non-Party Witness

1

2    into the conversation and then brought on          11:27:17

3    Burrell.  And then Burrell led the                 11:27:20

4    decision-making process from that point on.        11:27:22

5  BY MR. SCHECTER:                                      11:27:24

6    Q      You mentioned in the first session          11:27:29

7  that Burrell -- it was told to you that Burrell      11:27:33

8  was involved because Burrell was assisting           11:27:37

9  McDonald's with its spending on black-owned          11:27:40

10 media; is that right?                                 11:27:42

11   A      Yes.                                          11:27:44

12   Q      And so is it your understanding that         11:27:46

13 because you are an African-American and you own       11:27:47

14 ReachTV, that is why you were dealing with            11:27:51

15 Burrell?                                              11:27:54

16          MR. KENNISON:  Objection to                  11:27:54

17   foundation.                                         11:27:56

18          THE WITNESS:  I just figured their           11:27:57

19   budgets were there for black-owned media,           11:27:58

20   and that's where they were pulling the              11:28:00

21   budget from.                                        11:28:04

22 BY MR. SCHECTER:                                      11:28:05

23   Q    Did you have any idea the relative            11:28:05

24 size of the budgets that each agency was             11:28:08

25 responsible for?                                      11:28:10

EXHIBIT N
AOE0585

```
                                              Page 77
 1              L. Bibbens - Non-Party Witness
 2       A      I didn't know their budgets, and I was    11:29:05
 3   looking at the fact that agencies were dedicated      11:29:07
 4   to spending X percentage of their advertising        11:29:12
 5   dollars on black-owned media, and that this was      11:29:15
 6   going to be executed through that spend.             11:29:18
 7       Q      Is it your understanding that the CNN     11:29:23
 8   Airport Network was also placed with McDonald's      11:29:32
 9   black advertising agency to seek advertising         11:29:39
10   dollars from McDonald's?                             11:29:42
11              MR. KENNISON:   Objection to form         11:29:43
12       and foundation.   Asked and answered.            11:29:44
13              THE WITNESS:   I wouldn't think so,        11:29:48
14       no.                                              11:29:49
15   BY MR. SCHECTER:                                     11:29:49
16       Q      Why do you say that?                       11:29:54
17       A      Because it wasn't a black-owned           11:29:58
18   network, and it was very much -- everybody knew      11:30:00
19   what CNN was, so --                                  11:30:04
20       Q      When you were placed with Burrell, did    11:30:10
21   you feel like you were being marginalized because   11:30:13
22   you're African-American?                             11:30:18
23       A      I would say I felt that that's where      11:30:20
24   they had put their budget for black-owned media,     11:30:23
25   and that this was an execution strategy was my       11:30:26
```

EXHIBIT N

AOE0586

```
                                          Page 85

 1            L. Bibbens - Non-Party Witness

 2     Q     To your knowledge?              11:37:21

 3     A     Correct.                        11:37:21

 4     Q     Okay.  And you said that deal, that    11:37:22

 5  200,000-dollar deal was placed through Starcom;  11:37:27

 6  correct?                                 11:37:29

 7     A     It was placed by Starcom through Group  11:37:30

 8  Black.                                    11:37:33

 9     Q     Okay.  And then right there at the end  11:37:34

10  you said that -- something about this is just   11:37:37

11  going to take a little bit of education; you    11:37:41

12  remember that?                            11:37:44

13     A     Yes.                            11:37:44

14     Q     That refers to educating McDonald's    11:37:45

15  about ReachTV's capability; is that what you    11:37:48

16  meant?                                    11:37:51

17     A     Yeah.  I think if McDonald's knew our  11:37:51

18  capabilities or if someone would articulate it  11:37:54

19  better, we presented it this way, but I think   11:37:57

20  it's maybe repetitive.  You need to tell people 11:38:00

21  five, six, seven, eight times before they       11:38:03

22  understand it.  I don't see how we wouldn't bring 11:38:06

23  them extreme value.                       11:38:09

24     Q     Okay.                           11:38:10

25     A     That's all.                     11:38:11
```

Page 90

1          L. Bibbens - Non-Party Witness

2           C E R T I F I C A T I O N

3             I, Randi Friedman, Registered

4    Professional Reporter and Notary Public of the

5    State of New York, do hereby certify:

6       THAT, the witness whose testimony is herein

7    before set forth, was duly sworn by me, and

8    THAT, the within transcript is a true record of

9    the testimony given by said witness.

10      I further certify that I am not related

11   either by blood or marriage to any of the parties

12   to this action; and that I am in no way

13   interested in the outcome of this matter.

14      IN WITNESS WHEREOF, I have hereunto set my

15   hand this day, February 22, 2023.

16

17

18   *Randi C. Friedman*

19   Randi Friedman, RPR

20

21

22

23

24

25   *     *     *     *     *     *     *     *     *

# EXHIBIT O

Patricia Brown Holmes (*pro hac vice*)
Amy Andrews (*pro hac vice*)
Shalem Massey (SBN 143281)
Jennifer Steeve (SBN 308082)
RILEY SAFER HOLMES &
CANCILA LLP
100 Spectrum Center Drive, Suite 440
Irvine, CA  92618
smassey@rshc-law.com
jsteeve@rshc-law.com

Loretta E. Lynch (*pro hac vice*)
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
lelynch@paulweiss.com

John C. Hueston (SBN 164921)
Moez M. Kaba (SBN 257456)
HUESTON HENNIGAN LLP
523 West 6th Street, Suite 400
Los Angeles, CA 90014
jhueston@hueston.com
mkaba@hueston.com

*Attorneys for Defendant McDonald's USA, LLC*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

ENTERTAINMENT STUDIOS
NETWORKS, INC., a California
corporation; WEATHER GROUP, LLC,
a Delaware limited liability company,

Plaintiffs,

v.

McDONALD'S USA, LLC, a Delaware
limited liability company,

Defendant.

Case No. 2:21-cv-04972-FMO-MAA

**DECLARATION OF AMY
ANDREWS IN SUPPORT OF
DEFENDANT MCDONALD'S USA,
LLC'S MOTION FOR SUMMARY
JUDGMENT**

Assigned to the:
Hon. Fernando M. Olguin

Complaint Filed: May 20, 2021
Case Removed: June 18, 2021

Discovery Cut-Off:    Feb. 13, 2023
Final PTC:            Sept. 1, 2023
Trial Date:           Sept. 19, 2023

1    I, Amy Andrews, hereby declare and certify as follows pursuant to 28 U.S.C.

2    § 1746:

3    1.    I am a partner at the law firm Riley Safer Holmes & Cancila LLP,

4    counsel of record for Defendant McDonald's USA LLC ("McDonald's").

5    2.    I have personal knowledge of the matters set forth in this declaration,

6    and if called upon to testify, I could and would competently testify thereto.

7    3.    I am familiar with the documents this law firm possesses in the above-

8    captioned lawsuit, including documents that Plaintiffs Entertainment Studios

9    Networks, Inc. ("ESN") and Weather Group, LLC have produced in response to

10   McDonald's discovery requests, bearing the bates number prefix "ESN".

11   4.    I am also familiar with the documents this law firm possesses in the

12   above-captioned lawsuit that were produced by third-party Burrell Communications

13   Group, LLC ("Burrell") in response to subpoenas issued in this matter, bearing the

14   bates number prefix "Burrell".

15   5.    I am also familiar with the documents this law firm possesses in the

16   above-captioned lawsuit that were produced by third-party OMD USA, LLC

17   ("OMD") in response to subpoenas issued in this matter, bearing the bates number

18   prefix "OMD".

19   6.    I am also familiar with certain publicly available documents retrieved

20   by McDonald's, its counsel of record, and/or its other representatives in connection

21   with this lawsuit.

22   7.    The document attached hereto as Exhibit 1 is a true and correct copy of

23   an Organizational Chart summarizing the organizational structure of Allen Media

24   Group, as produced by Plaintiffs at the deposition of 30(b)(6) witness Syndie

25   Karras in this matter, and designated DX148.

26   8.    The document attached hereto as Exhibit 2 is a true and correct copy of

27   a Preliminary Bond Offering Memorandum issued by Allen Media, LLC and Allen

28   Media Co-Issuer, Inc. dated July 21, 2021, which was obtained by counsel at my

- 2 -

EXHIBIT O

AOE0591

direction.

9.      The document attached hereto as Exhibit 3 is a true and correct copy of Allen Media Holdings, LLC's 2020/2021 consolidated financial statements, as produced by Plaintiffs, bates stamped ESN0041976–42017 and designated DX119.

10.     The document attached hereto as Exhibit 4 is a true and correct copy of Allen Media Holdings, LLC's 2018/2019 consolidated financial statements, as produced by Plaintiffs, bates stamped ESN0041590–41632.

11.     The document attached hereto as Exhibit 5 is a true and correct copy of a Declaration of Mark DeVitre, which was publicly filed in the matter *CF Entertainment, Inc. v. The Nielsen Company (US), LLC*, No. 1:20-cv-2393 (N.D. Ill.) and designated DX121 in this matter.

12.     The document attached hereto as Exhibit 6 is a true and correct copy of Allen Media Holdings, LLC's 2017/2018 consolidated financial statements, as produced by Plaintiffs, bates stamped ESN0041498–41553.

13.     The document attached hereto as Exhibit 7 is a true and correct copy of the Complaint filed in the matter *CF Entertainment, Inc. v. The Nielsen Company (US), LLC*, No. 2022L002556 (Cook County, Illinois), which was publicly filed. This complaint has been designated DX123 in this matter.

14.     The document attached hereto as Exhibit 8 is a true and correct copy of a 2014 Entertainment Studios Syndication response to an RFP for McDonald's, as produced by Plaintiffs, bates stamped ESN0023761–23766 and designated as DX7.

15.     The document attached hereto as Exhibit 9 is a true and correct copy of a 2015 Entertainment Studios Syndication response to an RFP for McDonald's, as produced by Plaintiffs, bates stamped ESN0007341–7347 and designated as DX11.

16.     The document attached hereto as Exhibit 10 is a true and correct copy of a 2016 Entertainment Studios Syndication response to an RFP for McDonald's, as produced by Plaintiffs, bates stamped ESN0012605–12615 and designated as DX12.

- 3 -

EXHIBIT O
AOE0592

17.     The document attached hereto as Exhibit 11 is a true and correct copy of a 2013 Upfront Specials Contract between Burrell and CF Entertainment / Entertainment Studios, as produced by Plaintiffs, bates stamped ESN0014847–14856 and designated DX6.

18.     The document attached hereto as Exhibit 12 is a true and correct copy of a 2015 Upfront Contract between Burrell and CF Entertainment / Entertainment Studios, as produced by Plaintiffs, bates stamped ESN0029772–29776 and designated DX10.

19.     The document attached hereto as Exhibit 13 is a true and correct copy of a 2016 Upfront Contract between Burrell and CF Entertainment / Entertainment Studios, as produced by Plaintiffs, bates stamped ESN0032794–32800 and designated DX14.

20.     The document attached hereto as Exhibit 14 is a true and correct copy of a 2017 Upfront Contract between Burrell and CF Entertainment / Entertainment Studios, as produced by Plaintiffs, bates stamped ESN0024645–24647 and designated DX17.

21.     The document attached hereto as Exhibit 15 is a true and correct copy of an email dated October 21, 2016, as produced by Plaintiffs, bates stamped ESN0032997–33000.

22.     The document attached hereto as Exhibit 16 is a true and correct copy of a presentation titled "Entertainment Studios Can Help McDonald's Reach More Customers!", as produced by Plaintiffs, bates stamped ESN0032717–32725.

23.     The document attached hereto as Exhibit 17 is a true and correct copy of a chart depicting ESN's financials for the years 2018 to 2021, as produced by Plaintiffs at the deposition of 30(b)(6) witness Syndie Karras in this matter, designated DX151.

24.     The document attached hereto as Exhibit 18 is a true and correct copy of a chart depicting Weather Group, LLC's financials for the years 2018 to 2021, as

EXHIBIT O

AOE0593

produced by Plaintiffs at the deposition of 30(b)(6) witness Syndie Karras in this matter, designated DX156.

25.     The document attached hereto as Exhibit 19 is a true and correct copy of a Burrell presentation titled "21-22 Upfront Recommendation," dated August 12, 2021, as produced by Burrell, bates stamped Burrell_0008646–8691 and designated PX25.

26.     The document attached hereto as Exhibit 20 is a true and correct copy of a presentation titled "Ad Upfront Overview, Strategy and Plan Discussion," dated May 23, 2018, as produced by Plaintiffs, bates stamped ESN0003628–3653 and designated DX77.

27.     The document attached hereto as Exhibit 21 is a true and correct copy of an email dated December 4, 2019, and attached presentation, as produced by Plaintiffs, bates stamped ESN0022535–22554 and designated DX93.

28.     The document attached hereto as Exhibit 22 is a true and correct copy of a Burrell email dated August 6, 2019, as produced by Burrell, bates stamped Burrell_0001894.

29.     The document attached hereto as Exhibit 23 is a true and correct copy of a Burrell Q1 2018 Post Buy Analysis, as produced by Burrell, bates stamped Burrell_0006591–6625 and designated PX23.

30.     The document attached hereto as Exhibit 24 is a true and correct copy of a May 11, 2021 Burrell email, as produced by Burrell, bates stamped Burrell_0008781–8782 and designated PX41.

31.     The document attached hereto as Exhibit 25 is a true and correct copy of an ESN Bi-Weekly Sales Activity Spreadsheet, as produced by Plaintiffs, bates stamped ESN0018191.

32.     The document attached hereto as Exhibit 26 is a true and correct copy of an ESN Presentation titled "Reach More African-American Consumers With Entertainment Studios", as produced by Plaintiffs, bates stamped ESN0019635–

1    19641 and designated DX129.

2         33.    The document attached hereto as Exhibit 27 is a true and correct copy

3    of an ESN Presentation titled "Entertainment Studios April 2018," as produced by

4    Plaintiffs, bates stamped ESN0022135–22180 and designated DX92.

5         34.    The document attached hereto as Exhibit 28 is a true and correct copy

6    of a July 27, 2015 email, as produced by Plaintiffs, bates stamped ESN0002841–

7    2850 and designated DX134.

8         35.    The document attached hereto as Exhibit 29 is a true and correct copy

9    of an ESN presentation titled "2020 National Sales Conference," as produced by

10   Plaintiffs, bates stamped ESN0012078–12100.

11        36.    The document attached hereto as Exhibit 30 is a true and correct copy

12   of a May 2020 Burrell Minority Partner Review slide deck, as produced by Burrell,

13   bates stamped Burrell_0004911–4931 and designated DX3.

14        37.    The document attached hereto as Exhibit 31 is a true and correct copy

15   of ESN's BOM advertiser tracking spreadsheet, as produced by Plaintiffs, bates

16   stamped ESN0019410–19411 and designated DX140.

17        38.    The document attached hereto as Exhibit 32 is a true and correct copy

18   of a December 17, 2018 email, as produced by Plaintiffs, bates stamped

19   ESN0036007–36008.

20        39.    The document attached hereto as Exhibit 33 is a true and correct copy

21   of an April 15, 2016 email, as produced by Plaintiffs, bates stamped ESN0030244–

22   30246 and designated DX95.

23        40.    The document attached hereto as Exhibit 34 is a true and correct copy

24   of a March 16, 2017 email, as produced by Plaintiffs, bates stamped ESN0007869.

25        41.    The document attached hereto as Exhibit 35 is a true and correct copy

26   of a May 8, 2017 email, as produced by Plaintiffs, bates stamped ESN0024759–

27   24762.

28        42.    The document attached hereto as Exhibit 36 is a true and correct copy

- 6 -

EXHIBIT O

AOE0595

1  of a September 10, 2019 email, as produced by Plaintiffs, bates stamped

2  ESN0008399–8404 and designated DX137.

3       43.    The document attached hereto as Exhibit 37 is a true and correct copy

4  of a November 4, 2019 email, as produced by Plaintiffs, bates stamped

5  ESN0008425 and designated DX138.

6       44.    The document attached hereto as Exhibit 38 is a true and correct copy

7  of a March 9, 2020 email, as produced by Plaintiffs, bates stamped ESN0016403–

8  16405 and designated PX21.

9       45.    The document attached hereto as Exhibit 39 is a true and correct copy

10  of a January 13, 2021 email, as produced by Plaintiffs, bates stamped

11  ESN0037576–37578 and designated DX84.

12       46.    The document attached hereto as Exhibit 40 is a true and correct copy

13  of a November 16, 2020 email, as produced by Plaintiffs, bates stamped

14  ESN0033959–33960.

15       47.    The document attached hereto as Exhibit 41 is a true and correct copy

16  of an April 9, 2021 email, as produced by Plaintiffs, bates stamped ESN0001106–

17  1107.

18       48.    The document attached hereto as Exhibit 42 is a true and correct copy

19  of a June 28, 2017 email and attachments, as produced by Plaintiffs, bates stamped

20  ESN0003100–3103, ESN0003145, and ESN0003515 and designated DX30.

21       49.    The document attached hereto as Exhibit 43 is a true and correct copy

22  of a July 10, 2015 email, as produced by Plaintiffs, bates stamped ESN0012580–

23  12581 and designated DX37.

24       50.    The document attached hereto as Exhibit 44 is a true and correct copy

25  of a January 27, 2015 email, as produced by Plaintiffs, bates stamped

26  ESN0029697–29701 and designated DX32.

27       51.    The document attached hereto as Exhibit 45 is a true and correct copy

28  of a Burrell Entertainment Studios Delivered Impressions spreadsheet for the time

- 7 -

EXHIBIT O
AOE0596

period 2016 to 2018, as produced by Burrell, bates stamped Burrell_0005860.

52.     The document attached hereto as Exhibit 46 is a true and correct copy of a December 19, 2015 email, as produced by Plaintiffs, bates stamped ESN0032789 and designated DX13.

53.     The document attached hereto as Exhibit 47 is a true and correct copy of a February 1, 2017 email, as produced by Plaintiffs, bates stamped ESN0015477–15478 and designated DX135.

54.     The document attached hereto as Exhibit 48 is a true and correct copy of a December 11, 2017 Upfront Contract between Burrell and CF Entertainment / Entertainment Studios, as produced by Plaintiffs, bates stamped ESN0008039–8041 and designated DX19.

55.     The document attached hereto as Exhibit 49 is a true and correct copy of a February 3, 2017 email, as produced by Plaintiffs, bates stamped ESN0030314–30315 and designated DX110.

56.     The document attached hereto as Exhibit 50 is a true and correct copy of a September 1, 2017 email, as produced by Plaintiffs, bates stamped ESN0004644–4647 and designated DX102.

57.     The document attached hereto as Exhibit 51 is a true and correct copy of an August 11, 2016 email, as produced by Plaintiffs, bates stamped ESN0004319–4326 and designated DX15.

58.     The document attached hereto as Exhibit 52 is a true and correct copy of a September 11, 2020 email, as produced by Burrell, bates stamped Burrell_0005515–5517.

59.     The document attached hereto as Exhibit 53 is a true and correct copy of a February 6, 2019 email, as produced by Burrell, bates stamped Burrell_0008194–8196.

60.     The document attached hereto as Exhibit 54 is a true and correct copy of a May 7, 2021 email, as produced by Plaintiffs, bates stamped ESN0029493 and

- 8 -

EXHIBIT O
AOE0597

1   designated DX5.

2        61.    The document attached hereto as Exhibit 55 is a true and correct copy

3   of an October 22, 2019 email, as produced by Plaintiffs, bates stamped

4   ESN0019112–19113 and designated DX58.

5        62.    The document attached hereto as Exhibit 56 is a true and correct copy

6   of an article titled "Most-Watched Television Networks: Ranking 2018's Winners

7   and Losers," dated December 27, 2018, published on Indiewire.com, which is

8   publicly available and designated DX125.

9        63.    The document attached hereto as Exhibit 57 is a true and correct copy

10  of an article titled "Most-Watched Television Networks: Ranking 2019's Winners

11  and Losers," dated December 26, 2019, published on Variety.com, which is

12  publicly available and designated DX126.

13       64.    The document attached hereto as Exhibit 58 is a true and correct copy

14  of an article titled "Year in Review: Most-Watched Television Networks—Ranking

15  2020's Winners and Losers," dated December 28, 2020, published on Variety.com,

16  which is publicly available and designated DX127.

17       65.    The document attached hereto as Exhibit 59 is a true and correct copy

18  of an article titled "Most-Watched Television Networks: Ranking 2021's Winners

19  and Losers," dated December 30, 2021, published on Variety.com, which is

20  publicly available and designated DX128.

21       66.    The document attached hereto as Exhibit 60 is a true and correct copy

22  of a July 6, 2020 email, as produced by Plaintiffs, bates stamped ESN0003806–

23  3808 and designated DX54.

24       67.    The document attached hereto as Exhibit 61 is a true and correct copy

25  of Nielsen ratings data as produced by Plaintiffs, bates stamped ESN0044554.

26       68.    The document attached hereto as Exhibit 62 is a true and correct copy

27  of an April 16, 2021 email, as produced by Plaintiffs, bates stamped ESN0002596–

28  2598 and designated DX82.

EXHIBIT O

AOE0598

69.     The document attached hereto as Exhibit 63 is a true and correct copy of a November 15, 2019 email, as produced by Plaintiffs, bates stamped ESN0010350–10351 and designated DX83.

70.     The document attached hereto as Exhibit 64 is a true and correct copy of a June 28, 2018 email, as produced by Plaintiffs, bates stamped ESN0037325–37326 and designated DX56.

71.     The document attached hereto as Exhibit 65 is a true and correct copy of a memorandum titled "Allen Media Group Recommendation," as produced by OMD, bates stamped OMD_014109–14111.

72.     The document attached hereto as Exhibit 66 is a true and correct copy of a March 31, 2021 email, as produced by OMD, bates stamped OMD_001398–1401 and designated DX124.

73.     The document attached hereto as Exhibit 67 is a true and correct copy of ESN and Weather Group, LLC's Responses to McDonald's Requests for Admission, dated November 22, 2022.

74.     The document attached hereto as Exhibit 68 is a true and correct copy of a March 8, 2021 email, as produced by OMD, bates stamped OMD_014053–14059 and designated DX139.

75.     The document attached hereto as Exhibit 69 is a true and correct copy of a vendor spend data sheet showing spending for the years 2020/2021 and 2021/2022, as produced by Burrell, bates stamped Burrell_0008431.

76.     The document attached hereto as Exhibit 70 is a true and correct copy of an October 7, 2021 email, as produced by Plaintiffs, bates stamped ESN0010119–10125 and designated DX29.

77.     The document attached hereto as Exhibit 71 is a true and correct copy of an April 6, 2021 email, as produced by Plaintiffs, bates stamped ESN0029459–29462 and designated DX28.

78.     The document attached hereto as Exhibit 72 is a true and correct copy

EXHIBIT O
AOE0599

1  of a presentation titled "ES Syndication 2021 Ad Sales Plan," dated January 25,

2  2021, as produced by Plaintiffs, bates stamped ESN0028200–28228 and designated

3  DX64.

4      79.    The document attached hereto as Exhibit 73 is a true and correct copy

5  of a presentation titled "ES Syndication 2021 Ad Sales Business Plan," dated

6  January 21, 2021, as produced by Plaintiffs, bates stamped ESN0017961–17974

7  and designated DX63.

8      80.    The document attached hereto as Exhibit 74 is a true and correct copy

9  of March 2021 letters from Miller Barondess, LLP, as produced by Plaintiffs, bates

10  stamped ESN0041641–41736 and designated DX146.

11      81.    The document attached hereto as Exhibit 75 is a true and correct copy

12  of handwritten notes of Weather Group, LLC President Barbara Bekkedahl,

13  produced at her deposition in this matter and designated DX85.

14      82.    The document attached hereto as Exhibit 76 is a true and correct copy

15  of a February 22, 2021 email, as produced by Plaintiffs, bates stamped

16  ESN0025910 and designated DX69.

17      83.    The document attached hereto as Exhibit 77 is a true and correct copy

18  of a spreadsheet titled "Top 100 at 2%" updated February 2021, as produced by

19  Plaintiffs, bates stamped ESN0008768–8769 and designated DX44.

20      84.    The document attached hereto as Exhibit 78 is a true and correct copy

21  of an email dated September 2, 2020, as produced by Plaintiffs, bates stamped

22  ESN0039183–39184 and designated DX108.

23      85.    The document attached hereto as Exhibit 79 is a true and correct copy

24  of an email dated July 21, 2021, as produced by Plaintiffs, bates stamped

25  ESN0019532–19533, and an email dated June 5, 2021, bates stamped

26  ESN0002616–2629, designated DX75.

27      86.    The document attached hereto as Exhibit 80 is a true and correct copy

28  of an email dated February 11, 2021, as produced by Plaintiffs, bates stamped

EXHIBIT O
AOE0600

1  ESN0010652–10656 and designated DX68.

2      87.    The document attached hereto as Exhibit 81 is a true and correct copy

3  of a chart summarizing recipients of a March 3, 2021 letter from Miller Barondess,

4  produced by Plaintiffs at Byron Allen's deposition and designated DX142.

5      88.    The document attached hereto as Exhibit 82 is a true and correct copy

6  of an email dated February 10, 2016 with attachments, as produced by Plaintiffs,

7  bates stamped ESN0018661 and ESN0029493 and designated DX51.

8      89.    The document attached hereto as Exhibit 83 is a true and correct copy

9  of a presentation titled "UPFRONT 2021," as produced by Plaintiffs, bates stamped

10  ESN0002571–2589.

11      90.    The document attached hereto as Exhibit 84 is a true and correct copy

12  of an ES 2021 syndication slide presentation, as produced by Plaintiffs, bates

13  stamped ESN0026076-77.

14      91.    The document attached hereto as Exhibit 85 is a true and correct copy

15  of McDonald's Franchise Disclosure Document dated May 1, 2020.

16      92.    The document attached hereto as Exhibit 86 is a true and correct copy

17  of McDonald's Corporation's 2022 Annual Report, including McDonald's

18  Corporation's Form 10-K for the year ended December 31, 2022, and publicly

19  available at https://corporate.mcdonalds.com/corpmcd/investors/financial-

20  information.html#accordion-b6f12fe0aa-item-741ec16c6d.

21

22  I declare under penalty of perjury that the foregoing is true and correct.

23

24  Executed on May 16, 2023

25

26

27                             ***/s/ Amy C. Andrews***

28                             Amy C. Andrews

EXHIBIT O

AOE0601

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DECLARATION OF AMY ANDREWS

EXHIBIT O

AOE0602

# EXHIBIT O(1)

EXHIBIT O(1)

AOE0603



CONFIDENTIAL - DO NOT DISTRIBUTE WITHOUT AMG LEGAL PERMISSION

All ownership interests are 100% unless otherwise indicated.

LEGEND

Individual   LLC/S Corp   Corporation

Byron Allen

Allen Media Holdings II, LLC (DE, EIN 86-3699190)

Allen Media Holdings, LLC (DE, EIN 82-4386696)

Allen Media, LLC (DE, 82-4399344)

Entertainment Studios Media Holdings, Inc. (DE, EIN 82-4361824)

Entertainment Studios Networks, Inc. (CA, EIN 26-2701797)

TV Holdings 1, LLC (DE, EIN 35-2547150)

TV Holdings 2, LLC (DE, EIN 30-0889674)

CF ENTERTAINMENT INC. (CA, EIN 95-4432414)

75%   25%

Weather Group, LLC (DE, EIN 47-5615703)

Exhibit
DX 148
11/15/2022
Karras

EXHIBIT O(1)

AOE0604

# EXHIBIT O(2)

The information in this Preliminary Offering Memorandum is not complete and may be changed. This Preliminary Offering Memorandum is not an offer to sell these securities, nor a solicitation of an offer to buy these securities, in any jurisdiction where the offering is not permitted.

**SUBJECT TO COMPLETION, DATED JULY 21, 2021**

PRELIMINARY OFFERING MEMORANDUM                                                    CONFIDENTIAL

# $340,000,000



# Allen Media, LLC
# Allen Media Co-Issuer, Inc.

### 10.500% Senior Notes due 2028

Allen Media, LLC (the "Issuer") and Allen Media Co-Issuer, Inc. (the "Co-Issuer" and, together with Issuer, the "Issuers") are offering $340,000,000 aggregate principal amount of 10.500% senior notes due 2028 (the "notes"). The notes will bear interest at the rate of 10.500% per year. Interest on the notes is payable on February 15 and August 15 of each year, beginning on August 15, 2021. The notes will mature on February 15, 2028.

The notes are being offered as additional notes under the indenture (as amended, the "indenture"), dated as of February 10, 2020 among the Issuers, the guarantors party thereto and U.S. Bank National Association, as trustee, pursuant to which the Issuers previously issued $300,000,000 aggregate principal amount of 10.500% Senior Notes due 2028 (the "initial notes"). The notes will form a part of the same series as the initial notes for purposes of the indenture. Upon completion of this offering, the aggregate principal amount of outstanding notes under this series will be $640,000,000. The notes will have the same CUSIP number as, and trade together with, the initial notes (except that the notes issued pursuant to Regulation S will trade separately under a different CUSIP number until 40 days after the issue date of the notes, but thereafter any holders of any such new notes may transfer their notes issued pursuant to Regulation S into the same CUSIP number as the initial notes held under the Regulation S CUSIP number). The notes and the initial notes will vote as one class under the indenture.

Prior to February 15, 2023, the Issuers may redeem the notes, together with the initial notes, in whole at any time or in part from time to time, at a redemption price equal to 100% of the principal amount of the notes to be redeemed plus a "make-whole" premium set forth in this offering memorandum, plus accrued and unpaid interest, if any, to, but excluding, the redemption date. On or after February 15, 2023, the Issuers may redeem the notes, together with the initial notes, in whole at any time or in part from time to time, at the redemption prices set forth in this offering memorandum, plus accrued and unpaid interest, if any, to, but excluding, the redemption date. Until February 15, 2023, the Issuers may, at any time and from time to time, redeem up to 40% of the aggregate principal amount of the notes in an amount no greater than the aggregate cash proceeds received from one or more equity offerings at the redemption price set forth in this offering memorandum, plus accrued and unpaid interest, if any, to, but excluding, the redemption date.

The Issuers expect to use the net proceeds from this offering, together with drawings under the New Term Loan B (as defined herein) and cash on hand, to (i) pay the consideration in connection with the Acquisitions (as defined herein), (ii) refinance existing indebtedness of KITV (as defined herein), and (iii) pay fees and expenses of the Transactions (as defined herein). The closing of this offering is conditioned on the substantially concurrent closing of the Amendment of the Existing Senior Credit Facilities (as defined herein) and the New Term Loan B, the debt refinancing and the acquisition of the Quincy Assets (as defined herein).

The notes will be, and the initial notes are, the general senior unsecured obligations of the Issuers and will be, and the initial notes are, fully and unconditionally guaranteed (each a "guarantee" and together, the "guarantees"), jointly and severally, on a general senior unsecured basis by Allen Media Holdings, LLC, the Issuers' parent company, and each of the Issuers' subsidiaries that guarantee the Issuer's Term Loan, Revolving Credit Facility and New Term Loan B (each as defined herein) (together, the "Senior Credit Facilities") (each a "Guarantor" and together, the "Guarantors"). Upon completion of this offering, we expect all of our restricted subsidiaries to be Guarantors and that the only non-Guarantor subsidiaries will be unrestricted subsidiaries under the indenture. The notes will rank pari passu in right of payment with all existing and future indebtedness (including the Senior Credit Facilities) and all other obligations (other than subordinated indebtedness) of the Issuers and senior in right of payment to any existing and future subordinated indebtedness of the Issuers. The notes will be effectively subordinated to all existing and future secured indebtedness of the Issuers (including the Senior Credit Facilities) to the extent of the value of the assets securing such indebtedness. The notes will be structurally subordinated to all existing and future indebtedness, claims of holders of preferred stock and other liabilities of each of the Issuers' subsidiaries that do not guarantee the notes. Each of the guarantees will rank pari passu in right of payment with each Guarantor's existing and future indebtedness (including such Guarantor's guarantee of the Senior Credit Facilities) and all other obligations (other than subordinated indebtedness) of such Guarantor and senior in right of payment to each Guarantor's existing and future subordinated indebtedness. The guarantees will be effectively subordinated to all existing and future secured indebtedness of each Guarantor (including such Guarantor's guarantee of the Senior Credit Facilities) to the extent of the value of the assets securing such indebtedness. The guarantees of a Guarantor may be released under certain circumstances. The notes and the initial notes will rank equally with each other.

### Investing in the notes involves risks. See "Risk Factors" beginning on page 25.

**Price for the notes:**    % plus accrued interest, if any, from February 15, 2021.

The notes have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"). Prospective purchasers that are qualified institutional buyers are hereby notified that the sellers of the notes may be relying on an exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A under the Securities Act ("Rule 144A"). Outside the United States, the offering is being made in reliance on Regulation S under the Securities Act. See "Notice to Investors."

The notes are a new issue of securities with no established trading market. The Issuers do not intend to list the notes on any national securities exchange or automated quotation system.

EXHIBIT O(2)

AOE0606

The initial purchaser expects to deliver the notes to purchasers on or about                , 2021 only in book-entry form through the facilities of The Depository Trust Company.

*Book-Running Manager*

# RBC Capital Markets

**The date of this offering memorandum is                , 2021.**

EXHIBIT O(2)

AOE0607

# TABLE OF CONTENTS

DEFINED TERMS ................................................................ iv

DISCLOSURE REGARDING FORWARD-LOOKING
    STATEMENTS ................................................................ iv

MARKET AND INDUSTRY DATA AND
    FORECASTS ................................................................ v

BASIS OF PRESENTATION ................................................. v

NON-GAAP FINANCIAL MEASURES ........................... vi

TRADEMARKS ................................................................ vii

SUMMARY ................................................................ 1

THE OFFERING ................................................................ 14

SUMMARY CONSOLIDATED HISTORICAL
    FINANCIAL INFORMATION OF AMG ...................... 19

SUMMARY COMBINED HISTORICAL FINANCIAL
    INFORMATION OF QUINCY .................................... 21

SUMMARY UNAUDITED PRO FORMA CONDENSED
    COMBINED FINANCIAL INFORMATION ................. 22

RISK FACTORS ................................................................ 25

USE OF PROCEEDS ........................................................ 45

CAPITALIZATION ........................................................... 46

UNAUDITED PRO FORMA CONDENSED COMBINED
    FINANCIAL STATEMENTS ...................................... 47

MANAGEMENT'S DISCUSSION AND ANALYSIS OF
    FINANCIAL CONDITION AND RESULTS OF
    OPERATIONS OF AMG ........................................... 56

DESCRIPTION OF THE TRANSACTIONS ...................... 73

BUSINESS ................................................................ 75

MANAGEMENT ............................................................... 90

CERTAIN RELATIONSHIPS AND RELATED PARTY
    TRANSACTIONS ...................................................... 93

DESCRIPTION OF OTHER INDEBTEDNESS ................. 94

DESCRIPTION OF NOTES ................................................ 96

BOOK-ENTRY, DELIVERY AND FORM ....................... 140

NOTICE TO INVESTORS ................................................. 144

ERISA CONSIDERATIONS .............................................. 147

MATERIAL U.S. FEDERAL INCOME TAX
    CONSIDERATIONS ................................................. 149

PLAN OF DISTRIBUTION .............................................. 154

LEGAL MATTERS .......................................................... 158

INDEPENDENT ACCOUNTANTS .................................. 158

WHERE YOU CAN FIND MORE INFORMATION .......... 159

INDEX TO FINANCIAL STATEMENTS ....................... F-i

i

The initial purchaser may engage in transactions that stabilize, maintain or otherwise affect the price of the notes which, if commenced, may be discontinued. Specifically, the initial purchaser may over-allot in connection with the offering described herein and may bid for and purchase notes in the open market. For a description of these activities, see "Plan of Distribution."

This offering memorandum is highly confidential and has been prepared solely for use in connection with the offering of the notes. Its use for any other purpose is not authorized. This offering memorandum is personal to the offeree to whom it has been delivered by the initial purchaser and does not constitute an offer to any other person or to the public generally. Distribution of this offering memorandum to any person other than the offeree and any person retained to advise such offeree is unauthorized and any disclosure of the contents of this offering memorandum without the Issuers' prior written consent is prohibited. By accepting delivery of this offering memorandum, you agree to the foregoing and to make no photocopies of this offering memorandum or any documents referred to herein. If you do not purchase any notes or any of the offerings described herein is terminated for any reason, you must return this offering memorandum and all documents referred to herein to: RBC Capital Markets, LLC, 200 Vesey Street, New York, NY 10281, Attention: High Yield Capital Markets.

Upon receiving this offering memorandum, you acknowledge that (1) you have been afforded an opportunity to request from the Issuers, and to review, all additional information considered by you to be necessary to verify the accuracy of, or to supplement, the information contained herein, (2) you have not relied on the initial purchaser or any person affiliated with the initial purchaser in connection with any investigation of the accuracy of such information or your investment decision and (3) the Issuers have not authorized any person to deliver any information different from that contained in this offering memorandum. The offering is being made on the basis of this offering memorandum. Any decision to purchase the notes in the offering must be based on the information contained in this document. In making an investment decision, investors must rely on their own examination of the Issuers, as applicable, and the terms of the offerings, including the merits and risks involved.

The information contained in this offering memorandum has been furnished by the Issuers and other sources the Issuers believe to be reliable. The initial purchaser makes no representation or warranty, express or implied, as to the accuracy or completeness of any of the information set forth in this offering memorandum, and you should not rely on anything contained in this offering memorandum as a promise or representation, whether as to the past or the future. This offering memorandum contains summaries, believed to be accurate, of the terms the Issuers consider material of documents, but reference is made to the actual documents. All such summaries are qualified in their entirety by this reference. See "Where You Can Find More Information."

———————

The Issuers reserve the right to withdraw the offering described herein at any time and the Issuers and the initial purchaser reserves the right to reject any commitment to subscribe for the notes in whole or in part and to allot to you less than the full amount of notes subscribed for by you.

This offering memorandum does not constitute an offer to sell or a solicitation of an offer to buy the notes to any person in any jurisdiction where it is unlawful to make such offer or solicitation. You are not to construe the contents of this offering memorandum as investment, legal or tax advice. You should consult your own counsel, accountant and other advisors as to legal, tax, business, financial and related aspects of a purchase of the notes. The Issuers are not, and the initial purchaser is not, making any representation to you regarding the legality of an investment in the notes by you under appropriate legal investment or similar laws.

**None of the notes or the related guarantees have been registered with, recommended by or approved by the Securities and Exchange Commission (the "SEC") or any other federal or state securities commission or regulatory authority, nor has the SEC or any state securities commission or regulatory authority passed upon the accuracy or adequacy of this offering memorandum. Any representation to the contrary is a criminal offense.**

This offering of notes is being made in reliance upon an exemption from registration under the Securities Act for an offer and sale of securities that does not involve a public offering. In making your purchase, you will be deemed to have made acknowledgments, representations and agreements set forth in this offering memorandum under the section titled "Notice to Investors." The notes are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and applicable state securities laws pursuant to registration or an exemption from registration. You should be aware that you may be required to bear the financial risks of this investment for an indefinite period of time.

———————

The distribution of this offering memorandum and the offers and the sales of the notes may be restricted by law in certain jurisdictions. Persons into whose possession this offering memorandum or any of the notes comes must inform themselves about, and observe, any such restrictions. See "Plan of Distribution."

EXHIBIT O(2)

AOE0609

**Prohibition of Sales to Certain EEA Investors**

The notes are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the European Economic Area (the "EEA"). For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU (as amended, "MiFID II"); (ii) a customer within the meaning of Directive (EU) 2016/97 (as amended, the "Insurance Distribution Directive"), where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (iii) not a "qualified investor" within the meaning of Article 2(e) of Regulation (EU) 2017/1129 (as amended, the "Prospectus Regulation"). Consequently no key information document required by Regulation (EU) 1286/2014 (as amended, the "PRIIPs Regulation") for offering or selling the notes or otherwise making them available to retail investors in the EEA has been prepared and therefore offering or selling the notes or otherwise making them available to any retail investor in the EEA may be unlawful under the PRIIPs Regulation.

This offering memorandum has been prepared on the basis that any offer of the notes in any Member State of the EEA will be made pursuant to an exemption under the Prospectus Regulation from a requirement to publish a prospectus for offers of notes. This offering memorandum is not a prospectus for the purposes of the Prospectus Regulation.

**Prohibition of sales to UK retail investors**

The notes are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the United Kingdom (the "United Kingdom" or the "UK"). For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client, as defined in point (8) of Article 2 of Regulation (EU) No 2017/565 as it forms part of domestic law by virtue of the European Union (Withdrawal) Act 2018 (the "EUWA"); or (ii) a customer within the meaning of the provisions of the FSMA and any rules or regulations made under the FSMA to implement Directive (EU) 2016/97, where that customer would not qualify as a professional client, as defined in point (8) of Article 2(1) of Regulation (EU) No 600/2014 as it forms part of domestic law by virtue of the EUWA; or (iii) not a "qualified investor" as defined in Article 2 of Regulation (EU) 2017/1129 as it forms part of the domestic law by virtue of the EUWA (the "UK Prospectus Regulation"). Consequently, no key information document required by Regulation (EU) No 1286/2014 as it forms part of domestic law by virtue of the EUWA (the "UK PRIIPs Regulation") for offering or selling the notes or otherwise making them available to retail investors in the UK has been prepared and, therefore, offering or selling the notes or otherwise making them available to any retail investor in the UK may be unlawful under the UK PRIIPs Regulation.

This offering memorandum has been prepared on the basis that any offer of the notes in the UK will be made pursuant to an exemption under the UK Prospectus Regulation from a requirement to publish a prospectus for offers of notes. This offering memorandum is not a prospectus for the purpose of the UK Prospectus Regulation.

**Notice to Prospective Investors in the United Kingdom**

The Initial Purchaser has represented and agreed that it:

- has only communicated or caused to be communicated and will only communicate or cause to be communicated any invitation or inducement to engage in investment activity (within the meaning of Section 21 of Financial Services and Markets Act 2000, as amended (the "FSMA")) received by it in connection with the sale or issue of notes in circumstances in which section 21 of FSMA does not apply to the Issuers; and

- has complied, and will comply, with all applicable provisions of FSMA with respect to anything done by it in relation to the notes in, from, or otherwise involving the United Kingdom.

---

EXHIBIT O(2)

AOE0610

## DEFINED TERMS

In this offering memorandum, except as otherwise indicated, the terms "we," "us," "our," "ours" and "AMG" refer collectively to Allen Media, LLC and its consolidated subsidiaries, the term "Issuers" refers collectively to Allen Media, LLC and Allen Media Co-Issuer, Inc., the "Co-Issuer," the term "Gray" refers collectively to Gray Television, Inc., and the term "Quincy" refers to certain television stations (a carve-out of Quincy Media, Inc.), except where otherwise stated or indicated by context. With respect to the historical consolidated financial and related data presented herein, the terms "we," "us," "our," "ours," "AMG" and "the Company" refer to the historical consolidated financial and related data of Allen Media Holdings, LLC and its consolidated subsidiaries, except where otherwise stated or indicated by context. With respect to AMG, the term "fiscal year" refers to the twelve-month period ending on December 31 of such calendar year.

## DISCLOSURE REGARDING FORWARD-LOOKING STATEMENTS

This offering memorandum includes "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act, and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). All statements other than statements of historical facts included in this offering memorandum, including, without limitation, statements regarding the Issuers' future financial position, business strategy, cost savings, industry trends and plans and objectives of management for future operations, are forward-looking statements. In addition, forward-looking statements generally can be identified by the use of forward-looking terminology such as "may," "will," "expect," "intend," "estimate," "anticipate," "believe" or "continue" or the negative thereof or variations thereon or similar terminology. Although the Issuers believe that the expectations reflected in such forward-looking statements are reasonable, the Issuers can give no assurance that such expectations will prove to have been correct.

There are a number of risks and uncertainties that could cause the Issuers' actual results to differ materially from the forward-looking statements contained in this offering memorandum. Additionally, important factors could cause the Issuers' actual results to differ materially from such forward-looking statements. Such risks, uncertainties and other important factors include:

- changes in and the execution of our plans, initiatives and strategies;
- potential costs savings and synergies from the Acquisitions;
- the impact from the coronavirus ("Covid 19") pandemic;
- growth potential in geographic markets;
- recent and future changes in technology, including methods for the delivery of our content;
- changes in consumer behavior, including changes in spending behavior and consumer preferences, changes in when, where and how content is distributed and consumed;
- our ability to develop or acquire technologies that enable us to serve changing consumer behaviors and support our evolving business needs;
- competitive pressures;
- our ability to deal effectively with economic slowdowns or other economic or market difficulties;
- our ability to realize the anticipated synergies or cost savings in the time period expected or at all;
- changes in our relationships with suppliers or third parties;
- world, national, or local events that could disrupt broadcast television;
- changes in advertising market conditions or advertising expenditures due to, among other things, economic conditions, changes in consumer behavior, changes in advertising standards or the implementation of technologies that interfere with advertisements, pressure from public interest groups, changes in laws and regulations and other societal or political developments;
- changes in television network affiliation, syndication, carriage and retransmission consent agreements or changes to the ways in which subscribers access our networks through carriage and retransmission consent agreements;
- our ability to exploit and protect our intellectual property rights in and to our content and other products;
- lower than expected valuations associated with our cash flows and revenues, which could impair our ability to realize the value of recorded intangible assets and goodwill;
- increased volatility or decreased liquidity in the capital markets, including any limitation on our ability to access the capital markets, refinance our outstanding indebtedness or obtain bank financing on acceptable terms;

EXHIBIT O(2)

AOE0611

- the effect of any significant acquisitions, investments, dispositions and other similar transactions by us;

- the adequacy of our risk management framework;

- changes in applicable accounting policies or legal and regulatory frameworks and our ability to comply with them;

- the impact of terrorist acts, hostilities, natural disasters (including extreme weather) and pandemic viruses;

- a disruption, breach (including misappropriation or accidental release of data) or disruption of our programming services in connection with cybersecurity attacks;

- the outcome of litigation and other proceedings, including the matters described in the notes to our financial statements, as well as possible regulatory actions and civil claims involving privacy issues related to consumer data collection and use practices;

- our ability to remediate identified material weaknesses in internal control over financial reporting and to avoid future material weaknesses; and

- the other risks and uncertainties detailed herein under the section titled "Risk Factors."

There may be other factors not presently known to the Issuers or which the Issuers currently consider to be immaterial that could cause the Issuers' actual results to differ materially from those projected in any forward-looking statements the Issuers make. You should read carefully the factors described in the section titled "Risk Factors" of this offering memorandum to better understand the risks and uncertainties inherent in our business and underlying any forward-looking statements.

All forward-looking statements attributable to the Issuers or persons acting on the Issuers' behalf apply only as of the date hereof and are expressly qualified in their entirety by the cautionary statements included herein. The Issuers assume no obligation to update or revise these forward-looking statements for any reason, or to update the reasons actual results could differ materially from those anticipated in these forward-looking statements, even if new information becomes available in the future. Comparisons of results for current and any prior periods are not intended to express any future trends or indications of future performance, unless expressed as such, and should only be viewed as historical data.

## MARKET AND INDUSTRY DATA AND FORECASTS

This offering memorandum includes industry related and statistical information, which are based on information from independent industry organizations and other third party sources. Some industry and market information are also from the Issuers' internal analysis based upon data available from such independent and third party sources and the Issuers' internal research. The Issuers believe such information to be accurate as of the date of this offering memorandum. However, this information may prove to be inaccurate because this information cannot always be verified with complete certainty due to the limits on the availability and reliability of raw data, the voluntary nature of the data gathering process and other limitations and uncertainties. Neither the Issuers nor the initial purchaser can guarantee the accuracy or completeness of such information contained in this offering memorandum. Such information also involves risks and uncertainties and is subject to change based on various factors, including those discussed under the heading "Forward Looking Statements."

## BASIS OF PRESENTATION

This offering memorandum includes historical financial information of Allen Media Holdings, LLC, of which Allen Media, LLC, an Issuer of the notes, is a wholly owned direct subsidiary, as of and for the years ended December 31, 2020 and 2019 and as of March 31, 2021, and for the three months ended March 31, 2021 and 2020. These financial statements consolidate the financial results of AMG and include information related to unrestricted subsidiaries that are neither guarantors of the notes nor restricted by the covenants applicable to the notes. Allen Media Holdings, LLC owns no assets and conducts no business other than functioning as the 100% direct parent holding company of Allen Media, LLC and as a guarantor of the initial notes and the Senior Credit Facilities. Separate consolidated financial statements of Allen Media, LLC would not be materially different than those of Allen Media Holdings, LLC and have not been presented.

On April 29, 2021, AMG announced it had reached an agreement with Gray to acquire certain television stations (the "Quincy Assets") currently owned by Quincy for $398.0 million in cash (the "Quincy Acquisition"). On July 14, 2021, AMG entered into an agreement to acquire WJRT-TV, an ABC affiliate in Flint-Saginaw, Michigan (the "Flint Station") for $72.5 million in cash (the "Flint Acquisition"). Additionally, while there can be no assurance that the transactions will be consummated, AMG is in negotiations to acquire a FOX affiliate in the Southeast and a non-big four broadcast network affiliate station in Honolulu, Hawaii for a cumulative purchase price of approximately $32.0 million in cash (the "Other Acquisitions"). Collectively, all of the above mentioned stations

EXHIBIT O(2)

AOE0612

are referred to herein as the "Additional Stations" and such acquisitions, including the KITV Designation (as defined below), are referred to herein as the "Acquisitions." The Additional Stations consist of thirteen well-ranked stations with footprints in ten mid-sized markets across the Midwest, West Coast, and Southeast, including key political battleground states of Wisconsin, Arizona, Iowa and Michigan.

In addition, AMG's unrestricted subsidiary, Allen Media Broadcasting Evansville II, LLC, closed its acquisition of KITV, Inc. ("KITV"), a television broadcast company in Honolulu, Hawaii on January 20, 2021. As part of the Transactions, KITV will be designated as a restricted subsidiary and become a guarantor under the indenture and the Senior Credit Facilities and will repay its existing $20.5 million credit facility (such designation and repayment, the "KITV Designation").

This offering memorandum also includes historical information of Quincy, as of and for the years ended December 31, 2020 and 2019 and as of March 31, 2021 and for the three months ended March 31, 2021 and 2020.

This offering memorandum also includes pro forma financial information that makes adjustments that (i) eliminate the results of subsidiaries that will not guarantee the notes or be restricted by the covenants applicable to the notes, (ii) include two over-the-air ("OTA") broadcast television networks, TheGRIO.TV (formerly LIGHT-TV) and ThisTV, LLC, acquired by AMG from MGM Domestic Television Distribution LLC in October 2020, (iii) include KITV as a result of the KITV Designation and (iv) give effect to the other adjustments set forth under "Pro Forma Financial Information." The unaudited pro forma condensed combined financial statements reflect the AMG consolidated historical financial information, Quincy Assets historical financial information and certain pro forma adjustments. Other adjustments and the impacts of Other Acquisitions, including the KITV Designation are reflected in the summary unaudited pro forma condensed combined financial information.

The financial statements included in this offering memorandum do not contain financial data that would be required pursuant to Rule 3-10 and/or Rule 3-16 of Regulation S-X under the Securities Act if we were registering this offering with the SEC. The Issuers will provide the information required pursuant to Rule 144A(d)(4) under the Securities Act upon request.

## NON-GAAP FINANCIAL MEASURES

This offering memorandum includes non-GAAP financial measures and ratios, including Pro Forma Restricted Group Revenue and Pro Forma Restricted Group Adjusted EBITDA, with the meaning and as calculated as set forth in "Offering Summary— Summary Unaudited Pro Forma Condensed Combined Financial Information," that in each case are not recognized under accounting principles generally accepted in the United States ("GAAP").

The SEC has adopted rules to regulate the use in filings with the SEC and in public disclosures of "non-GAAP financial measures," such as those mentioned above and ratios related thereto. These measures are derived on the basis of methodologies other than in accordance with GAAP. These rules govern the manner in which non-GAAP financial measures are publicly presented and require, among other things:

- a presentation with equal or greater prominence of the most directly comparable financial measure or measures calculated and presented in accordance with GAAP; and

- a statement disclosing the purposes for which management uses the non-GAAP financial measure.

The rules prohibit in all filings with the SEC, among other things:

- the exclusion of charges or liabilities that require, will require or would have required cash settlement, absent an ability to settle in another manner, from a non-GAAP liquidity measure;

- the adjustment of a non-GAAP performance measure to eliminate or smooth items identified as nonrecurring, infrequent or unusual, when the nature of the charge or gain is such that it has occurred in the past two years or is reasonably likely to recur within the next two years; and

- the presentation of non-GAAP financial measures on the face of the GAAP financial statements or notes thereto or any pro forma financial information.

The non-GAAP financial measures presented in this offering memorandum may not comply with the SEC rules governing the presentation of non-GAAP financial measures.

EXHIBIT O(2)

AOE0613

Our non-GAAP financial measures are not measurements of our financial performance under GAAP and should not be considered as alternatives to net income (loss) or any other performance measures derived in accordance with GAAP or as alternatives to cash flow from operating activities as measures of our liquidity. Our non-GAAP financial measures have limitations as analytical tools, and you should not consider them in isolation or as a substitute for analysis of our operating results or cash flows as reported under GAAP. Some of these limitations include:

- Pro Forma Restricted Group Adjusted EBITDA does not reflect cash expenditures, or future requirements, for capital expenditures or contractual commitments;

- Pro Forma Restricted Group Adjusted EBITDA does not reflect changes in, or cash requirements for, working capital needs;

- Pro Forma Restricted Group Adjusted EBITDA does not reflect the significant interest expense, or the cash requirements necessary to service interest or principal payments, on debt;

- although depreciation and amortization are non-cash charges, the assets being depreciated and amortized will often have to be replaced in the future, and Pro Forma Restricted Group Adjusted EBITDA does not reflect any cash requirements for such replacements;

- Pro Forma Restricted Group Adjusted EBITDA does not reflect the impact of cash charges resulting from matters we consider not to be indicative of ongoing operations; and

- other companies in our industry may calculate Pro Forma Restricted Group Adjusted EBITDA differently than we do, limiting their usefulness as comparative measures.

Because of these limitations, our non-GAAP financial measures should not be considered as measures of discretionary cash available to us to invest in the growth of our business. We compensate for these limitations by also relying on our GAAP results and using our non-GAAP financial measures for supplemental purposes. See our consolidated financial statements elsewhere in this offering memorandum for our GAAP results. In calculating our non-GAAP financial measures, we make adjustments that are based on assumptions and estimates that may prove to have been inaccurate. In addition, in evaluating our non-GAAP financial measures, you should be aware that we may, in the future, incur expenses that are the same as or similar to those eliminated or adjusted for in this presentation. Our presentation of our non-GAAP financial measures should not be construed as an inference that our future results and cash flow will be unaffected by any such adjustments.

## TRADEMARKS

We and Quincy own or have rights to various trademarks, logos, service marks and trade names that we use in connection with the operation of our businesses. We and Quincy also own or have the rights to copyrights that protect the content of our products. Solely for convenience, the trademarks, service marks, trade names and copyrights referred to in this offering memorandum are listed without the TM, SM, ® and © symbols, but these references do not constitute a waiver of any rights that might be associated with the respective trademarks, service marks, trade names and copyrights included in this offering memorandum.

EXHIBIT O(2)

AOE0614

## SUMMARY

*This summary highlights information about the businesses of AMG, Quincy, Flint, and the Other Acquisitions and about this offering of notes. This is a summary of information contained elsewhere in this offering memorandum, is not complete and does not contain all of the information that you should consider before investing in the notes. For a more complete understanding of the business of AMG, Quincy, Flint, and the Other Acquisitions and this offering, you should read this entire offering memorandum, including the sections entitled "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations," AMG's and Quincy's historical financial statements and related notes, and our pro forma condensed combined financial information included elsewhere in this offering memorandum.*

*Unless otherwise indicated or the context otherwise requires, references in this offering memorandum to "we," "us," "our" and the "Company" refer to the Issuer and each of its consolidated subsidiaries after giving effect to the Quincy Acquisition, the Flint Acquisition, the Other Acquisitions and the KITV Designation described below under "—The Transactions." Unless otherwise indicated or the context otherwise requires, references to "pro forma" information give pro forma effect to the Transactions described under " —The Transactions" as if they had occurred on January 1, 2020 for income statement purposes and on March 31, 2021 for balance sheet purposes.*

### Our Company

We are a minority-owned, privately-held diversified media company that, pro forma for the Transactions, will own and operate 28 highly ranked broadcast television stations, The Weather Channel, 7 additional 24-hour high-definition television networks, and 2 over-the-air broadcast networks. We provide local news, weather, and sports content featuring Emmy Award-nominated shows and reach over 190 million subscribers. We produced approximately 5,000 hours of live weather programming and over 650 hours of weekly local news in 2020; distribute sports, primetime and entertainment content across our broadcast television markets through our affiliations with ABC, CBS, FOX and NBC networks (collectively, the "Big Four" networks); and own over 5,000 hours of original programming across multiple genres through Entertainment Studios, our television production and distribution business.

We were founded by Byron Allen in 1993 and are headquartered in Los Angeles, California. Over the last two years, we have significantly grown our business through a series of transformative acquisitions. We have made several broadcast television acquisitions, including Bayou City Broadcasting in July 2019, USA TV in February 2020, KITV in January 2021, and the potential purchase of 13 Additional Stations. In addition, we acquired two over-the-air broadcast television networks from MGM in October 2020. Pro forma for all transactions, broadcast television now represents a majority of our business, contributing 64% of Pro Forma Restricted Group Adjusted EBITDA for the twelve months ended March 31, 2021.  We have also added two veteran broadcast executives to our management team with experience navigating the evolving media ecosystem to further integrate and lead our businesses.

We believe these transactions have enhanced or will significantly enhance our offerings and as a result, we have been able to retain or expand the distribution of our portfolio of assets.  Following our inaugural acquisition of broadcast television stations, we successfully renewed several multichannel video programming distributor ("MVPD") agreements across our portfolio of assets at improved terms and without any service disruptions, including DirecTV in January 2020, Comcast in June 2020, Altice in December 2020 and Charter in February 2021. We have added $12 million of incremental subscription revenue and over 80 million of subscribers to our Entertainment Studios networks since 2019. As of March 2021, The Weather Channel is carried on every major U.S. MVPD and our portfolio of networks is the fastest growing group of television networks in the industry by subscriber growth according to Nielsen. With the addition of Big Four through the Acquisitions, we expect to continue enhancing our relationships with MVPDs.

We have executed several key initiatives to further monetize our assets. In January 2021, we rebranded and launched one of our broadcast networks, TheGrio.TV, which is the first broadcast network targeting African Americans. In addition, our two broadcast networks entered into distribution agreements with 11 FOX and 8 ABC owned and operated television station sub-channels in top U.S. markets. We also expanded syndication of our programming across our owned assets and with several broadcasters, including Weather Channel exclusive series, *Highway to Hell, SOS: How to Survive,* and *Top 10*, which will launch fall of 2021.

Over the past year, Byron Allen has also led the effort to address the imbalance of U.S. advertising spend on Black-owned media companies, which continues to under-index total economic impact of African Americans in the country. In the second quarter of 2021, several top brands and agencies pledged to increase their advertising commitments on Black-owned media to at least 2% of media budget in 2021, compared to less than 1% in the prior year.  Certain advertisers have also pledged multi-year commitment increases of up to 8% of media budget through 2025.  As one of the largest Black-owned media businesses, we believe we are well positioned to capture these incremental advertising dollars going forward.

EXHIBIT O(2)

AOE0615

For the twelve months ended March 31, 2021, we generated Pro Forma Restricted Group Revenue of $582 million and Pro Forma Restricted Group Adjusted EBITDA of $182 million. See "Summary historical and pro forma condensed combined financial information" for our definition of Pro Forma Restricted Group Adjusted EBITDA and a reconciliation to net income.

### Key Financial Highlights



Note: Reflects Restricted Group financials only. Combined 2019 and 2020 financials include AMG pro forma for full-year results from OTA and USA TV, Quincy, and Flint. Pro forma LTM 3/31/21 financials include all acquisitions and related synergy.
(1) Includes run-rate adjustment of $3.8mm for Comcast & Frndly TV carriage deals with Entertainment Studies networks in LTM 3/31/21 period.
(2) AMG EBITDA includes expense for amortization of television library and film rights.

***Broadcast television***

Pro forma for the Transactions, we will own and operate 28 broadcast television stations in 21 small and medium-sized television markets reaching 5% of total U.S. television households, and manage approximately 1,330 employees. Our stations are highly-ranked, well-recognized, and have considerable scale in the markets we serve due to the strength of our local news and programming. Our stations ranked #1 or #2 in 12 of our 21 markets, which contributes approximately 66% of our broadcast television revenue based on pro forma 2019 and 2020 average year revenue according to BIA Kelsey estimates. We have Big Four network affiliates in each of our markets, totaling 10 ABC, 5 FOX, 5 CBS and 5 NBC affiliates. On a pro forma basis, 44% of our broadcast revenues were contributed by ABC, 31% by NBC, 15% by CBS and 6% by FOX affiliated stations based on pro forma 2019 and 2020 average year revenue according to BIA Kelsey estimates. In addition, our broadcast television stations have award-winning newscasts and are well positioned in several key battleground states.

Our broadcast television business represented 57% of Pro Forma Restricted Group Revenue and 64% of Pro Forma Restricted Group Adjusted EBITDA for the twelve months ended March 31, 2021. For the twelve month period ended March 31, 2021 on a pro forma basis, our broadcast television revenue consisted of advertising, net (51%), subscription (45%) and other revenues (5%).

EXHIBIT O(2)

AOE0616

### Overview of Our Broadcast Television Stations

| DMA | TVHH Gross | TVHH Disc. | Market | Call Sign | Network Affiliates | '19/'20 BIA Ad Revenue Rank | '19/'20 BIA Revenue Share |
|---|---|---|---|---|---|---|---|
| 64 | 0.4% | 0.2% | Tucson, AZ | KVOA | NBC | #2 | 23.8% |
| 67 | 0.4% | 0.2% | Honolulu, HI | KITV[3] / Station X[3] | abc IND | #3 | 17.9% |
| 76 | 0.4% | 0.4% | Flint, MI | WJRT | abc | #2 | 28.7% |
| 79 | 0.3% | 0.2% | Huntsville, AL | WAAY-TV | abc | #3 | 18.6% |
| 81 | 0.3% | 0.2% | Madison, WI | WKOW | abc | #3 | 19.8% |
| 84 | 0.3% | 0.2% | Harrisburg, IL | WSIL / KPOB[1] | abc | #3 | 20.5% |
| 92 | 0.3% | 0.3% | Cedar Rapids, IA | KWWL | NBC | #2 | 27.8% |
| 106 | 0.2% | 0.1% | Evansville, IN | WEVV-TV, WEEV-LD | FOX CBS [2] | #3 | 22.0% |
| 111 | 0.2% | 0.1% | Ft. Wayne, IN | WFFT-TV | FOX | #3 | 12.5% |
| 113 | 0.2% | 0.2% | Eugene, OR | KEZI | abc | #2 | 33.0% |
| 122 | 0.2% | 0.1% | Lafayette, LA | KADN-TV, KLAF-LD | FOX NBC [2] | #3 | 17.5% |
| ~125 | 0.2% | 0.1% | Southeast Market | Station Y | FOX | #3 | 11.1% |
| 129 | 0.2% | 0.1% | La Crosse-Eau Claire, WI | WXOW / WQOW[1] | abc | #3 | 19.9% |
| 133 | 0.2% | 0.2% | Chico-Redding, CA | KHSL-TV, KNVN | CBS CW [2] | #2 | 28.2% |
| 133 | 0.2% | 0.2% | Tupelo, MS | WTVA, WLOV-TV | NBC abc [2] | #1 | 52.9% |
| 134 | 0.2% | 0.1% | Medford, OR | KDRV, KDKF | abc | #1 | 35.7% |
| 136 | 0.1% | 0.1% | Wausau-Rhinelander, WI | WAOW / WMOW[1] | abc | #2 | 33.2% |
| 139 | 0.1% | 0.1% | Rockford, IL | WREX | NBC | #2 | 34.4% |
| 150 | 0.1% | 0.1% | Rochester, MN / Mason City, IA | KIMT | CBS [2] | #2 | 35.7% |
| 156 | 0.1% | 0.1% | Terre Haute, IN | WTHI-TV | CBS FOX [2] | #1 | 69.6% |
| 188 | 0.1% | 0.1% | Lafayette, IN | WLFI-TV | CBS CW [2] | #1 | 77.1% |

Source: Company management, BIA Kelsey.  Note: Ad revenue rank based on market portfolio. Excludes KNVN and WLOV, which are owned by third parties and operated by Allen Media.  "DMA" represents Designated Market Area.
[1] Represents satellite stations.
[2] Denotes secondary channels.
[3] ABC station KITV currently owned by AMG at unrestricted subsidiary, which will be designated as a restricted subsidiary and become a guarantor under the indenture governing the notes and the Senior Credit Facilities upon the completion of this offering.

### Networks & Content

Our networks & content business represented 43% of Pro Forma Restricted Group Revenue and 36% of Pro Forma Restricted Group Adjusted EBITDA for the twelve months ended March 31, 2021. This business is comprised of the Weather Group and Entertainment Studios, which together generated Pro Forma Restricted Group Revenue of $250 million and Pro Forma Restricted Group Adjusted EBITDA of $66 million for the twelve months ended March 31, 2021 on a pro forma basis.

#### The Weather Group

The Weather Group is a multi-platform media business that is principally comprised of The Weather Channel, a national domestic live news network, along with simulcast The Weather Channel HD, Weatherscan, The Weather Channel Radio Network and additional video on-demand and interactive television products. As of March 31, 2021, The Weather Group has approximately 385 employees. The Weather Channel is a leading national news brand and source of weather information to the public and non-profit emergency response organizations and has remained the TV News Network Brand of the Year since 2010 by The Harris Poll. The Weather Channel produces continuous 24-hour national, regional and local weather-related television programming distributed by all major MVPDs in the U.S., reaching nearly 60 million pay television subscribers as of March 31, 2021. Weatherscan is an all-local weather network that provides complementary lifestyle information relating the weather for outdoor activities. The Weather Channel Radio Network provides weather information heard on U.S. radio stations and Sirius XM satellite radio.

Our world-class storm expertise and state-of-the-art technology enable us to supply accurate, timely and hyper-local weather forecasts and traffic information at scale across television, digital and other platforms. We produced approximately 3,500 localized versions of the channel and 5,000 hours of original, live, localized weather programming in 2020. We source much of our weather data from IBM through a long-term license agreement, which we have the sole discretion to renew. Additionally, we have access to various alternative data sources, such as the data provided by the National Oceanic and Atmospheric Administration. As a result, The

3

Weather Channel is a leading news channel in cumulative reach and the most consumed source of news during major storms, achieving year-over-year ratings growth in nine of eleven quarters since our acquisition, excluding impact of one-time pandemic from the first three quarters of 2020. Given the increasing frequency of severe weather events, such as earthquakes, wildfires, tornadoes, winter storms and flooding, we expect The Weather Channel will continue to be an important news outlet for consumers.

**Number of Billion Dollar Weather Disasters & Select Coverage by The Weather Channel (2010-2020)[1]**



Source: Company materials, Nielsen.
[1] Based on P2+ Viewer Reach.
[2] Represents ranking in delivery.
[3] Represents P2+ Viewer Reach on August 26, 2020.

*Entertainment Studios*

We own and operate a variety of networks distributed across cable, theatrical distribution and digital media through our Entertainment Studios business. With approximately 175 employees, we produce original television programming for the first-run television syndication markets and networks in the U.S. and foreign markets. We distribute our programs in exchange for advertising airtime that we then sell to national advertisers. Our library consists of over 5,000 hours of original programming, which are all produced in-house and owned by us. We currently produce 41 shows licensed to broadcast television stations in the United States, capturing over 57 million monthly viewers nationally. We also operate seven high-definition networks that utilize our library of television programs, which are carried by select MVPDs including DirecTV, AT&T U-verse, DISH, Verizon, Comcast, Charter and Altice. In aggregate, we reached nearly 130 million subscribers as of March 31, 2021.

**Key Programming and Overview of Entertainment Studios Networks**

| Key Programming | Q1 2021 Subscriber Reach[1,2] | |
|---|---|---|
| ES WEEKLY NETWORK | JUSTICE.NETWORK | 39M | +64% YoY |
| COURT COMBO | Comedy.tv | 27M | +64% YoY |
| ES DAILY NETWORK | Recipe.TV | 30M | +121% YoY |
| OTO SPECIAL | Pets.tv | 11M | +66% YoY |
| WEATHER PROGRAMMING | ESN.tv | 7M | +6% YoY |
| | Cars.tv | 11M | +67% YoY |
| GAME SHOW | MyDestination.tv | 5M | |

Source:  Company materials.
[1] Pro forma for carriage deals entered to date, including Charter, Altice, and Frndly TV.
[2] Includes both linear and visual MVPD ("vMVPD"). Company reported subscriber data as of March 2021.

**Our competitive strengths**

We believe we have a strong portfolio of media assets with the following attributes:

***Increased scale and further diversification towards broadcast television***

EXHIBIT O(2)

AOE0618

Over the past two years, we have significantly expanded our broadcast television portfolio through a series of transactions. Since we made our first acquisition in broadcast television in July 2019, we acquired 28 television stations through seven transactions, including the potential Other Acquisitions, and also purchased two over-the-air broadcast networks.  Our Pro Forma Restricted Group Adjusted EBITDA for the twelve months ended March 31, 2021 is now 64% broadcast television and 36% network and content, compared to 35% and 65% in 2020 and 0% and 100% in 2016, respectively.  In aggregate, our assets reach over 190 million subscribers, compared to 169 million in 2020 and 68 million in 2016.



| | 2016 | Standalone 2020 | Pro Forma LTM 3/31/21 |
|---|---|---|---|
| Revenue | $51mm | $386mm | $582mm |
| Adjusted EBITDA[1] | $13mm | $102mm | $182mm |
| Adj. EBITDA Mix | Network & Content 100% | Broadcast TV 35% / Network & Content 65% | Network & Content 36% / Broadcast TV 64% |
| # of TV Networks | 7 | 10 | 10 |
| # of Broadcast TV Stations | - | 14 | 28 |
| # of MVPD Subscribers | 68mm | 169mm | 194mm |
| o/w Network | 68mm | 167mm | 190mm |
| o/w TV Broadcast | | 2mm | 4mm |

Source:  Company materials.  Note: Reflects Restricted Group financials only. Combined 2020 financials include AMG pro forma for full-year results from OTA and USA TV, Quincy, and Flint. Pro forma LTM 3/31/21 financials include all acquisitions and related synergy.
[1] Represents AMG restricted group Adjusted EBITDA including expense for amortization of TV library and film rights. LTM 3/31/21 includes run-rate adjustment of $3.8mm for Comcast & Frndly TV carriage deals with Entertainment Studios networks.

*Attractive television broadcast portfolio with valuable local franchises*

Our portfolio of broadcast television stations carry considerable local scale in the markets they serve and are expected to become increasingly competitive to our larger peers pro forma for the Transactions. We own and operate a portfolio of market-leading television stations that are located in attractive small and mid-sized markets. All of our markets broadcast the Super Bowl in rotation and our stations are home to popular local sports teams such as the Indianapolis Colts, Green Bay Packers, Chicago Bears, Milwaukee Bucks, Phoenix Suns, and Arizona Cardinals, as well as local college sports teams.  Additionally, our broadcast television stations have award-winning local newscasts (including Murrow Awards, Emmy Awards, Midwest Broadcast Journalists Association, and AP Awards), which further establishes our brand and helps attract political advertising dollars. For average year 2019 and 2020, our stations ranked #1 or #2 in twelve markets by market revenue share, which markets contributed 66% of our 2019 and 2020 average year broadcast television revenue according to BIA Kelsey estimates, and rank top-three in all twenty-one markets.  Our 2019 and 2020 average market revenue share is 26% according BIA Kelsey estimates, which tie for second with our public peers.  Eight of our television stations are clustered in key political states, including Iowa, Arizona, Wisconsin, Illinois, Indiana and Michigan, and we generated significant political revenue given our rankings and strong news offerings. On a per household basis, our stations generated $14 of political revenue in 2020, which ranks third compared to our peers.

*Continued to strengthen and grow MVPD relationships*

Given the importance and quality of our content, we believe our broadcast television stations and The Weather Channel offer significant value to consumers and distributors, and remain anchor tenants for MVPDs' linear and TV Everywhere video offerings. We generate a substantial portion of our total revenue through contracted fees from retransmission consent agreements and carriage agreements with both MVPDs and virtual multichannel video programming distributors, or vMVPDs. These agreements are long-

EXHIBIT O(2)

AOE0619

dated, typically three to five years with staggered maturities out to 2028, and provide predictable and high-margin cash flow to our business.

For the twelve month period ended March 31, 2021 on a pro forma basis, we generated $253 million of subscription license and retransmission fees, which represents 44% of our Pro Forma Restricted Group Revenue. Of this, 93% is contributed by businesses delivering news and sports content. While broadcast television only represents 2% of our total subscriber reach, it contributes 58% of contracted fees for the twelve months ended March 31, 2021 on a pro forma basis, highlighting the value of Big Four programming and the opportunity to further monetize The Weather Channel and Entertainment Studios Networks.

### Pro Forma Contracted Revenue and Subscriber Mix by Business



| | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | Thereafter |
|---|---|---|---|---|---|---|---|
| **% Total Paying MVPD Subscribers Up for Renewal** | 3% | 13% | 17% | 28% | 3% | 33% | 4% |
| **% Contracted Revenue Up for Renewal** [2] | 36% | 10% | 9% | 28% | 2% | 14% | 2% |

Source: Company materials.  Note:  Subscriber count as of March 31, 2021 pro forma for recent negotiations. Subscription license fee and retransmission revenue as of LTM March 31, 2021.
[1] Pro forma for launch of Entertainment Studios networks on Charter and Altice, totaling 28 million subscribers.
[2] Implied contribution to total contracted revenue based on rate, subscriber count and expiration by MVPD as of March 31, 2021.

Our broadcast television business has considerable local scale, acting as a valuable source of local news, sports, weather and primetime programming. Big Four network affiliates aired 93 of the top 100 most watched programs in 2020 including sports programming and remain the primary source for major sports content including the NFL and in particular the Super Bowl, NBA, MLB and NHL. We have Big Four network affiliates in all of our markets and for average year 2019 and 2020 our stations ranked #1 or #2 in market revenue share in twelve of our twenty-one markets.  Our stations average 26% in market revenue share based on 2019 and 2020 average revenue according to BIA Kelsey estimates. We believe our high ratings and strong community ties make our stations attractive to advertisers and provide benefits to our distributors. As a result, our broadcast television stations generated significant growth in retransmission revenues over the last few years and are carried on every major MVPD basic television bundle in every market served. Despite the recent rise in retransmission revenue, there remains a significant value gap between television broadcast's share of audience viewership and its share of distribution fees in the television ecosystem. We believe there is a significant opportunity for potential additional revenues over the next several years and expect broadcast networks to take shares in total affiliate revenues from lower-quality basic networks.

EXHIBIT O(2)

AOE0620

## Broadcast Network Value



Source: SNL Kagan, Nielsen.
[1] Based on 2019 total U.S. television household delivery in aggregate per SNL Kagan and includes Nielsen rated networks only.
[2] Includes retransmission revenue for television broadcasters and subscription license fees for networks, apportioned by ownership. Broadcast owners include 21st Century Fox, ABC, Azteca, CBS, Estrella TV, ION, MyTV, NBC, Telemundo, CW, UniMás and Univision.

The Weather Channel has been a leading national news brand over the past forty years and continues to be a trusted source for weather information. The network consistently delivers accurate, hyper-localized content and outsized ratings during all major storm events. The Weather Channel is one of the leading news networks in cumulative reach at 75% for people aged 2 and up, a close second to CNN at 77%, and has been one of the Top TV News Brands since 2010. We delivered a 1.0 times power ratio (defined as average 24-hour ratings for 2019-2020 divided by 2021 monthly subscription rate per subscriber spent by distributors per SNL Kagan), compared to our news network peers, which averaged 0.6 times.

As both retransmission consent agreements and carriage agreements come up for renewal for each MVPD, we believe we are well-positioned to leverage our enhanced scale and further increase value for our content and for our viewership.  Since our acquisition of the Weather Group in March 2018, we have successfully renewed carriage agreements with several MVPDs and stabilized its subscription revenue. Monthly subscription rates have remained at approximately $0.12 per subscriber and are expected to grow as we intend to seek to improve economics upon renewal. Subscriber trends are in-line with industry average and we are looking to add additional vMVPD carriage of The Weather Channel in the near-term.  We have also been able to improve carriage and economics of Entertainment Studios networks to help bring these assets up to scale.  We have added over 80 million new subscribers over the past two years, making Entertainment Studios one of the fastest growing distributors in the industry.

### *Resilient financial performance*

Despite the secular disruption from the COVID-19 pandemic, we continued to deliver local news, weather and entertainment with no interruption and generate resilient financial performance and audience engagement. Our broadcast television business continued to deliver consistent rankings and market share, and generated political revenue of $81 million in 2020. The Weather Group has continued to deliver consistent quarterly CPM growth since our acquisition, further demonstrating the strength of the brand and our ability to execute. While the first three quarters of 2020 were negatively impacted by the height of the COVID-19 pandemic, The Weather Group resumed ratings growth since the fourth quarter of 2020 and its viewer time spent was up double digits in the fourth quarter of 2020 and first quarter of 2021. In addition, we continue to grow distribution of our Entertainment Studios networks, which continue to be the fastest growing portfolio in the sector.

EXHIBIT O(2)

AOE0621



Source: Company materials, Harris Poll, Morning Consult, Comscore. Nielsen Media Research 2020.
Note: Cost per mile ("CPM") is the dollar amount an advertiser pays for a website per one thousand visitors who see its advertisements.

Total net advertising revenue excluding political for our existing business have recovered from lows in the second quarter of 2020, when the industry had been materially disrupted by the pandemic. Based on pacing report as of June 15, 2021, second quarter of 2021 total net advertising revenue is expected to reach near pre-pandemic levels, driven by strong advertising demand as the economy reopens and increasing industry focus on reinvesting in Black-owned media.



Source: Company materials.
[1] Represents total advertising revenue excluding political for existing Allen Media assets only.

### Well-positioned to capture upside from increased focus on Black-owned media

Over the past year, our founder, Chairman and Chief Executive Officer, Byron Allen, has helped lead the effort to address the imbalance of U.S. advertising spend on Black-owned media companies, which continues to under-index total economic impact of African Americans in the country. As a result, several large advertisers and agencies have pledged to increase their advertising commitments on Black-owned media to at least 2% of media budget in 2021, compared to less than 1% in the prior year. Certain advertisers have also pledged multi-year commitment increases of up to 8% of media budget through 2025. As one of the largest Black-owned media businesses, we believe we are well positioned to capture these incremental advertising dollars going forward.

EXHIBIT O(2)

AOE0622



Source: Company materials, public news and press, SNL Kagan and Nielsen.
(1) Includes companies with over 50% economic ownership by African American individual only.
(2) Allen Media revenue based on last twelve months ended March 31, 2021. All others based on 2020 estimates according to SNL Kagan.

### Attractive growth opportunities

We have implemented several growth initiatives and will continue to seek opportunities to further enhance the distribution and monetization of our platforms as well as the value of our brands. As we further diversify towards television broadcast through the Additional Stations, we expect to continue generating meaningful growth across our businesses. We believe our recent carriage renewals demonstrate how our enhanced scale and value proposition position us well to negotiate legacy Weather Group and Entertainment Studios MVPD agreements at improved economics upon renewal. In addition, we plan to leverage our relationships with distributors to add The Weather Channel on new vMVPDs platforms and continue to bring our Entertainment Studios and broadcast networks to scale. Retransmission revenue is expected to continue to be a meaningful growth engine as broadcasters close the valuation gap relative to the size of their audience.

We also expect continued growth in non-political advertising revenue as the economy improves in second half of 2021. In addition, we expect accelerated growth starting in the second quarter of 2021 driven by increasing commitment from advertisers to Black-owned media, which we believe will provide a long-term benefit to our core business going forward. We will continue to drive pricing and volume across our assets by leveraging the strength of our programming, audience ratings and salesforce. With our highly ranked local news franchises and foothold in key battleground states, we are well-positioned to capture growth from political advertising, as shown by significant growth in candidate spending and nominees spending in 2020. In addition, political issue spending (which is typically independent from election cycle) is also expected to be a large contributor given the increasing polarization around key social issues. In 2020, we launched political advertising and climate issue programming at The Weather Channel. As we expand our audience base beyond traditional MVPDs to reach the rapidly increasing number of viewers who consume online content, we also expect to further monetize our viewership by selling targeted advertising on our digital feeds.

Furthermore, we expect to continue leveraging our existing programming and brands across various distribution platforms and focus on creating high-impact, must-have content. In January 2021, we launched TheGrio.TV, the first broadcast network targeting African Americans, and expanded its distribution to eleven major market Fox-owned and operated television station sub-channels. We announced the launch of three new series for syndication to broadcast television groups in fall of 2021: *Highway to Hell, SOS: How to Survive,* and *Top 10*. Through our focus on providing higher quality programming and multiplatform offerings, we believe we are well-positioned to capitalize on the ongoing transition of the media ecosystem and will be able to drive incremental improvements.

### Strong free cash flow generation

We believe our stable revenue base, high margin cash flow, modest working capital and capital expenditure requirements will help support meaningful de-leveraging after giving effect to the Transactions. On a pro forma basis for the twelve months ended March 31, 2021, 44% of our total revenues were contracted and we had a Pro Forma Restricted Group Adjusted EBITDA margin of 31%. Capital expenditures were only 3% of total revenues, resulting in a ratio of Pro Forma Restricted Group Adjusted EBITDA less

EXHIBIT O(2)

AOE0623

capital expenditures to Pro Forma Restricted Group Adjusted EBITDA of 89%. Combined, our Revolving Credit Facility and significant cash flow generation ability are expected to provide ample liquidity for the business. We also expect to generate additional cash flow within the first year following the Acquisitions as a result of continued momentum in advertising sales, including increased focus on Black-owned media, increased retransmission rates from 2021 contract renewals, expected increase in carriage of The Weather Channel and Entertainment Studios networks, and continued growth in political and digital revenues.

***Best-in-class management team supported by industry experts across all business lines***

Our management team is supported by industry experts with approximately 25 years of experience on average in the evolving media ecosystem, including executive roles at Nexstar Media Group, Inc., Gray Television, Cox Television, NBCUniversal, Fox Networks Group and Crown Media. With the acquisition of USA TV, we added broadcast veterans as CEO and COO of our broadcast television business, and their efforts have positioned our stations for long-term growth and value creation. Our management team has a proven track record of leading businesses through growth by executing initiatives across media platforms and managing the operations through various acquisitions. We intend to continue to leverage our industry insight and deep experience in growing media assets to drive value for our company.

## Our strategy

***Continue to focus on targeted local content to attract viewership and maintain and grow our leadership position***

Television remains the most consumed source of weather coverage, local news and sports. We intend to continue to capitalize on the favorable environment and invest in programming to maintain our leadership positions. Since our acquisition of the Weather Group, The Weather Channel has continued building its world class expertise and providing accurate, timely and in-depth weather reports across television, digital, and other platforms. In addition, we have enhanced the quality of our content with high-definition, modernized formats, immersive mixed reality visualization, and compelling programming. In 2019, we won two Emmy Awards in the News & Documentary and Outstanding Science, Medical or Environmental Report categories. In addition, we recently announced the launch of nationwide distribution of three additional original weekly series in fall of 2021, *Highway Thru Hell, SOS:  How to Survive,* and *Top 10*. With the Acquisitions, we will further strengthen our local advertising appeal. Our broadcast television team rigorously measures audience preferences to determine what viewers value most and consistently apply research results in local on-air news products. We intend to continue to innovate and deliver targeted, localized content across multiple products and maximize value for our advertisers.

***Expand our content library and enhance distribution on our owned and operated assets as well as to our broadcast television and network partners***

We expect to continue to leverage our content library, production capabilities, and intellectual properties at Entertainment Studios to increase the distribution of our content across our owned broadcast television stations and other networks and MVPDs. We have syndicated programming arrangements and content partnerships with major networks and broadcast television groups including CBS Television Network, Sinclair, Nexstar Media Group, Inc., TEGNA Inc., E.W. Scripps Company and Hearst Television, Inc. Through our acquisition of broadcast television stations, we have also rolled out our original programming on stations acquired and expect to implement the same strategy across the Additional Stations.

***Drive monetization of advertising opportunities***

We seek to optimize our pricing model and continue to drive growth in our advertising sales. The strength of our programming has helped drive audience ratings and allowed us to add new advertisers and increase our CPMs. We will also seek to expand the sale of political advertising on our broadcast television stations, which we believe will be a meaningful avenue of growth given the strength of our local news franchises. In addition, we have recently begun accepting political advertising on The Weather Channel. As we expand our viewership base beyond traditional MVPDs to reach the increasing number of viewers who consume online content, we expect to further monetize our viewership by selling targeted advertising on our digital feeds. Through our focus on providing higher quality programming and multiplatform offerings, we believe we are well-positioned to capitalize on the ongoing transition of the media ecosystem and will be able to drive incremental improvements in our advertising revenues.

***Leverage combined scale to drive enhanced negotiating position***

The combination of The Weather Channel with local broadcast television stations is expected to further enhance our relevance with distributors and leverage in carriage agreements and retransmission consent agreements negotiations. Upon renewal of our carriage agreements, we intend to seek additional fees per subscriber, as we believe that we are undercompensated compared to other networks.

We will work with MVPDs, vMVPDs, over-the-top-distributors, or OTTDs, and emerging technologies distributors to increase the value for our content and for the viewership we deliver. The Weather Group negotiated most of its MVPD carriage

EXHIBIT O(2)

AOE0624

agreements under prior ownership, and we believe there are opportunities to improve terms upon renewal. With the addition of Big Four network-affiliated stations through the Acquisitions, we believe our relevance to distributors are further enhanced. We believe the growth in retransmission revenues and carriage fees will continue to improve the resiliency and predictability of our business.



Source: SNL Kagan, Nielsen.
Note: Includes Nielsen rated basic networks only.
[1] People ages 2 years and up.
[2] Based on gross monthly subscription fee per subscriber per SNL Kagan estimate.
[3] Represented as Power Ratio, which is calculated by dividing 2019-2020 24-hour rating by 2021 subscription fees per subscriber per Kagan.
[4] Excludes MSNBC.

***Maintain prudent management of both operating and programming costs***

We plan to continue to manage our operating and programming costs in order to improve margins and increase our cash flow. We will keep looking for opportunities to increase our efficiency without jeopardizing our commitment to provide high quality content to our communities. As we integrate the Additional Stations, we believe that we can achieve cost and operational efficiencies by benefiting from our increased scale.

***Continue to diversify our revenue streams by prudently investing in innovation and high growth initiatives and strategic acquisitions***

We plan to continue diversifying our revenue base by prudently investing in new initiatives that complement our strong local brands and building scale. We launched TheGrio.TV, the first African American focused broadcast network in 2020 and in 2022 we expect to launch The Weather Channel en Español, the first Spanish-language weather streaming service, which will provide weather reports to the U.S. and its territories as well as in Mexico and Central America. We also intend to seek additional acquisition opportunities that are strategic and accretive to our content, networks and broadcast television stations.

**The Transactions**

**The Acquisitions and KITV Designation**

On April 29, 2021, we reached an agreement with Gray Television, Inc. to acquire certain television stations (the "Quincy Assets") (a carve-out of Quincy Media, Inc.) ("Quincy") for $398.0 million in cash (the "Quincy Acquisition"). On July 14, 2021, AMG entered into an agreement to acquire WJRT-TV, an ABC affiliate in Flint-Saginaw, Michigan (the "Flint Station") for $72.5 million in cash (the "Flint Acquisition"). Additionally, while there can be no assurance that the transactions will be consummated,

AMG is in negotiations to acquire a FOX affiliate in the Southeast and a non-big four broadcast network affiliate station in Honolulu, Hawaii for a cumulative purchase price of approximately $32.0 million in cash (the "Other Acquisitions").  Collectively, all of the above mentioned stations are referred to herein as the "Additional Stations" and such acquisitions, including the KITV Designation, are referred to herein as the "Acquisitions." The Additional Stations consist of thirteen well-ranked stations with footprints in ten mid-sized markets across the Midwest, West Coast, and Southeast, including key political battleground states of Wisconsin, Arizona, Iowa and Michigan.

In addition, the Company's unrestricted subsidiary, Allen Media Broadcasting Evansville II, LLC, closed on its acquisition of KITV, Inc. ("KITV"), a television broadcast company in Honolulu, Hawaii on January 20, 2021. As part of the transaction, KITV will be designated as a restricted subsidiary and become a guarantor under the indenture and the Senior Credit Facilities and will repay its existing $20.5 million credit facility.

For the twelve months ended March 31, 2021, the Additional Stations and KITV had revenue of approximately $195 million and Adjusted EBITDA of approximately $83 million. Pro forma for the twelve months ended March 31, 2021, the combined entity generated approximately $582 million and $182 million of pro forma revenue and pro forma Adjusted EBITDA.

**Financing**

We intend to pay the consideration in connection with the Quincy Acquisition, Flint Acquisition, and the Other Acquisitions, and refinance KITV's existing indebtedness in connection with the KITV Designation (the "KITV Refinancing"), and pay related costs and expenses with (i) $340.0 million from the issuance the notes offered hereby, (ii) an additional $210.0 million Add-On Term Loan B (the "New Term Loan B"), and (iii) cash from our balance sheet. The New Term Loan B will have a $100.0 million delayed draw component in connection with the closing of the Flint Acquisition and the Fox affiliate in the Southeast. In the event either of those two acquisitions are not successful, the related portion of the delayed draw component would be reduced accordingly.

This offering is conditioned on the substantially concurrent closing of the Quincy Acquisition, New Term Loan B, and the KITV Refinancing. This offering is not conditioned on the closing of the Flint Acquisition or the Other Acquisitions.  This offering, the Acquisitions (including the KITV Designation), the entry into the New Term Loan B, the KITV Refinancing and related transactions are referred to collectively as the "Transactions."

EXHIBIT O(2)

AOE0626

**Organizational Chart—Post-Transactions**



_____

(1) For additional information regarding our unrestricted subsidiaries, including our film-related subsidiaries, see "—The Offering—Guarantees."

(2) There can be no assurance that the acquisition of the Quincy Assets will be completed on the expected terms or at all.

### Corporate and Other Information

AMG was formed under the laws of the State of Delaware in 2018. The Co-Issuer was formed under the laws of the State of Delaware as a wholly-owned subsidiary of AMG in 2020. The Issuers' principal executive offices are located at 1925 Century Park East, Tenth Floor, Los Angeles, CA 90067. The Issuers' telephone number is (310)-277-3500. The Issuers' corporate website is www.entertainmentstudios.com. Information contained in, or accessible through, our website does not constitute a part of this offering memorandum.

EXHIBIT O(2)

AOE0627

**THE OFFERING**

The summary below describes the principal terms of the notes. Certain of the terms and conditions described below are subject to important limitations and exceptions. The following is not intended to be complete. You should carefully review the "Description of Notes" section of this offering memorandum, which contains a more detailed description of the terms and conditions of the notes.

| | |
|---|---|
| Issuers ........................................................ | Allen Media, LLC and Allen Media Co-Issuer, Inc. |
| Notes Offered ........................................... | $340,000,000 aggregate principal amount of additional 10.500% Senior Notes due 2028. The notes will be issued under the indenture, dated as of February 10, 2020, as amended, governing the $300,000,000 existing aggregate principal amount of 10.500% Senior Notes due 2028 and form a part of the same series as the initial notes for purposes of the Indenture. Upon completion of this offering, the aggregate principal amount of outstanding notes under this series will be $640,000,000. The notes will have the same CUSIP number as, and trade together with, the initial notes (except that the notes issued pursuant to Regulation S will trade separately under a different CUSIP number until 40 days after the issue date of the notes, but thereafter any holders of any such new notes may transfer their notes issued pursuant to Regulation S into the same CUSIP number as the initial notes held under the Regulation S CUSIP number). |
| Maturity Date ........................................... | February 15, 2028. |
| Interest ..................................................... | 10.500% per annum. |
| Interest Payment Dates ........................... | February 15 and August 15 of each year, commencing on August 15, 2021. |
| Guarantees ............................................... | The notes will be (and the initial notes are) fully and unconditionally guaranteed on a senior unsecured basis by Allen Media Holdings, LLC and each domestic subsidiary of Allen Media, LLC that guarantees the Senior Credit Facilities, which will be all domestic restricted subsidiaries. Upon completion of this offering, we expect all of our restricted subsidiaries to be guarantors and that the only non-Guarantor subsidiaries will be unrestricted subsidiaries under the indenture.

After giving pro forma effect to the Transactions, our non-Guarantor subsidiaries accounted for $3.5 million (prior to eliminations) of our pro forma total revenue, which represented approximately 0.6% of our pro forma total revenue for the twelve-month period ended March 31, 2021 on a pro forma basis. As of March 31, 2021 on a pro forma basis, our non-Guarantor subsidiaries held $28.3 million (prior to eliminations), or approximately 2.1%, of our total assets and $99.7 million (prior to eliminations), or approximately 5.6%, of our total liabilities, to which the notes would have been structurally subordinated.

Upon completion of this offering, we expect all non-Guarantor Subsidiaries to be unrestricted subsidiaries under the indenture. |
| Ranking ....................................................<br>.................................................................... | The notes and the guarantees will be (and the initial notes are) the general senior unsecured obligations of the Issuers and the Guarantors. The notes will rank:

• *pari passu* in right of payment with all existing and future senior indebtedness (including the Senior Credit Facilities and the initial notes) and all other obligations (other than subordinated indebtedness) of the Issuers;

• effectively subordinated to all existing and future secured indebtedness of the Issuers (including the Senior Credit Facilities) to the extent of the value of the assets securing such indebtedness; |

EXHIBIT O(2)

AOE0628

- senior in right of payment to any existing and future subordinated indebtedness of the Issuers;

- structurally subordinated to all existing and future indebtedness, claims of holders of preferred stock and other liabilities of each of the Issuers' Subsidiaries that is not a Guarantor; and

- guaranteed on a general senior unsecured basis by Allen Media Holdings, LLC and each of the restricted subsidiaries that guarantee the Senior Credit Facilities and the initial notes.

Each guarantee of a Guarantor will rank:

- *pari passu* in right of payment with all existing and future senior indebtedness (including such Guarantor's guarantee of the Senior Credit Facilities and the initial notes) and all other obligations (other than subordinated indebtedness) of such Guarantor;

- effectively subordinated to all existing and future secured indebtedness of such Guarantor (including such Guarantor's guarantee of the Senior Credit Facilities) to the extent of the value of the assets securing such indebtedness;

- senior in right of payment to any existing and future subordinated indebtedness of such Guarantor; and

- structurally subordinated to all existing and future indebtedness, claims of holders of preferred stock and other liabilities of the Subsidiaries of such Guarantor that do not guarantee the notes.

As of March 31, 2021 on a pro forma basis, we would have had $1,525.0 million of senior indebtedness, of which $885.0 million would have been secured indebtedness, and we would have had undrawn availability for additional secured indebtedness (in each case, excluding any outstanding letters of credit) under the Revolving Credit Facility of $42.5 million.

| | |
|---|---|
| Optional Redemption ................................. | Prior to February 15, 2023, the Issuers may redeem the notes (together with the initial notes), in whole at any time or in part from time to time, at a redemption price equal to 100% of the principal amount of the notes to be redeemed, *plus* the applicable "make-whole" premium *plus* accrued and unpaid interest, if any, to, but excluding, the date of redemption.<br><br>On and after February 15, 2023, the Issuers may redeem the notes, in whole at any time or in part from time to time, at the redemption prices as described under "Description of Notes—Optional Redemption" *plus* accrued and unpaid interest, if any, to, but excluding, the date of redemption.<br><br>Prior to February 15, 2023, the Issuers may, at any time and from time to time, redeem up to 40% of the aggregate principal amount of the notes at a redemption price of 110.500% of the aggregate principal amount thereof, *plus* accrued and unpaid interest, if any, to, but excluding, the date of redemption, in an amount no greater than the aggregate cash proceeds received from one or more public or private sales of equity; *provided* that (1) at least 60% of the aggregate principal amount of the notes issued under the indenture remains outstanding immediately after each such redemption and (2) each such redemption occurs within 150 days of the closing of such equity offering. See "Description of Notes—Optional Redemption." |
| Change of Control Offer ......................... | If the Issuers experience a change of control, the Issuers will be required to make an offer to repurchase all or any part of the notes at a purchase price of 101% of the aggregate principal amount of such notes, *plus* accrued and unpaid interest, if any, to, but excluding, the applicable repurchase date. If holders of not less than 90% of the aggregate principal amount of notes outstanding validly tender their |

EXHIBIT O(2)

AOE0629

notes in such offer, the Issuers will have the right to redeem all remaining notes following such purchase at a price equal to 101% of the aggregate principal amount of such notes, *plus* accrued and unpaid interest, if any, to, but excluding, the date of such redemption. See "Description of Notes—Change of Control."

EXHIBIT O(2)

AOE0630

| | |
|---|---|
| Asset Sale Offer ...................................... | If the Issuers or their restricted subsidiaries sell assets under certain circumstances and do not apply the proceeds as provided in "Description of Notes—Certain Covenants—Asset Sales," the Issuers or any of their restricted subsidiaries must use the excess proceeds from such asset sales to offer to repurchase the notes at a repurchase price equal to 100% of the principal amount of the notes repurchased, *plus* accrued and unpaid interest, if any, to, but excluding, the applicable repurchase date. See "Description of Notes—Certain Covenants—Asset Sales." |
| Certain Covenants ................................... | The indenture that will govern the notes will contain covenants that, among other things, limit our ability and the ability of our restricted subsidiaries to: |

- pay dividends on, repurchase or make distributions on account of capital stock or make other restricted payments;

- make investments or acquisitions;

- designate restricted subsidiaries as unrestricted subsidiaries;

- incur additional indebtedness, guarantee indebtedness or issue disqualified stock and, in the case of such subsidiaries, preferred stock;

- create liens;

- consolidate, merge, sell or otherwise dispose of all or substantially all of our or such subsidiary's assets;

- enter into transactions with affiliates;

- enter into agreements that restrict dividends or other payments from our restricted subsidiaries to us;

- sell, transfer or otherwise convey assets; and

- enter into sale/leaseback transactions.

These covenants are subject to a number of important exceptions and qualifications. Many of these covenants will cease to apply to the notes during any period in which the notes have investment grade ratings from both Moody's Investors Service, Inc. and Standard & Poor's Financial Services LLC and no default has occurred and is continuing under the indenture that will govern the notes.

For more details, see "Description of Notes—Certain Covenants."

| | |
|---|---|
| No Registration Rights ............................ | The Issuers will neither be required to, nor do the Issuers intend to, register the notes for resale under the Securities Act or register or qualify the resale of the notes under the securities laws of any other jurisdiction or offer to exchange the notes for notes registered or qualified under the Securities Act or the securities laws of any other jurisdiction. See "Notice to Investors." |
| Transfer Restrictions .............................. | The notes have not been registered under the Securities Act, or any state securities laws and may not be offered or sold, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act. The notes are subject to restrictions on transfer and may not be offered or sold except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act. See "Notice to Investors." |

17

No Established Trading Market ..............................    The Issuers do not intend to list the notes on any national securities exchange or automated quotation system. The Issuers cannot assure you that an active or liquid trading market for the notes will develop. If an active or liquid trading market for the notes does not develop, the market price and liquidity of the notes may be adversely affected.

Use of Proceeds ......................................................    The Issuers estimate that they will receive gross proceeds from this offering of approximately $350.0 million. We expect to use the proceeds from this offering, together with drawings under our Senior Credit Facilities, and cash on hand, to (i) pay the consideration in connection with the Acquisitions, including the KITV Designation and (ii) pay fees and expenses incurred in connection with the Transactions.

Trustee ...................................................................    U.S. Bank National Association

Governing Law ......................................................    The indenture and the notes will be governed by the law of New York.

Risk Factors ..........................................................    Investing in the notes involves risks. You should carefully read and consider the information set forth under "Risk Factors" beginning on page 25 and all other information included in this offering memorandum before investing in the notes.

EXHIBIT O(2)

AOE0632

## SUMMARY CONSOLIDATED HISTORICAL FINANCIAL INFORMATION OF AMG

The summary historical consolidated statements of operations data for the years ended December 31, 2020 and 2019, and the summary historical consolidated balance sheet data as of December 31, 2020 have been derived from the audited consolidated financial statements of Allen Media Holdings, LLC included elsewhere in this offering memorandum. See "Basis of Presentation" for additional information. The summary historical consolidated statements of operations data for the three months ended March 31, 2021 and 2020 and the selected historical consolidated balance sheet data as of March 31, 2021 have been derived from the unaudited consolidated financial statements of Allen Media Holdings, LLC included elsewhere in this offering memorandum. The unaudited consolidated financial statements have been prepared on the same basis as the audited consolidated financial statements, and the unaudited financial data include, in our opinion, all adjustments, consisting only of normal recurring adjustments that we consider necessary for a fair statement of its consolidated financial position and results of operations for these periods. Our historical results are not necessarily indicative of the results to be expected in the future and its operating results for the three months ended March 31, 2021 are not necessarily indicative of the results that may be expected for the entire fiscal year ending December 31, 2021.

Over the last two fiscal years, we have acquired a number of companies. The results of the acquired companies have been included in our consolidated financial statements since their respective dates of acquisition.

You should read this data together with our selected historical consolidated financial data and the historical consolidated financial statements and related notes to those statements, as well as "Basis of Presentation" and "Management's Discussion and Analysis of Financial Condition and Results of Operations," included elsewhere in this offering memorandum.

**Consolidated Statements of Operations Data:**

| (in millions) | Year Ended December 31, 2019 | Year Ended December 31, 2020 | Three Months Ended March 31, 2020 (Unaudited) | Three Months Ended March 31, 2021 (Unaudited) |
|---|---|---|---|---|
| Revenue | | | | |
| Networks and content revenue | $ 265.3 | $ 241.7 | $ 65.4 | $ 62.0 |
| Broadcast television revenues | 17.7 | 127.3 | 23.6 | 36.8 |
| Total revenue | 283.0 | 369.0 | 89.0 | 98.8 |
| Operating expenses | | | | |
| Programming and production expenses | 172.4 | 182.1 | 39.6 | 55.2 |
| Sales, general and administrative expenses | 97.9 | 120.5 | 36.5 | 32.0 |
| Depreciation and amortization of intangible assets and goodwill | 38.0 | 68.3 | 13.5 | 18.3 |
| Impairment of investment at cost and intangible assets | 7.5 | – | – | – |
| Total operating expenses | 315.8 | 370.9 | 89.6 | 105.5 |
| Operating (loss) income | (32.8) | (1.9) | (0.6) | (6.7) |
| Other income (expense) | | | | |
| Interest expense | (65.8) | (89.1) | (23.5) | (21.8) |
| Loss on derecognition of debt | – | (47.2) | (47.2) | – |
| Other income (expense), net | 0.4 | 2.6 | 0.2 | 0.4 |
| Total other expense, net | (65.4) | (133.7) | (70.5) | (21.4) |
| Income (loss) before income taxes | (98.2) | (135.6) | (71.1) | (28.1) |
| Income tax expense (benefit) | 4.4 | (5.0) | (0.8) | (0.2) |
| Net (loss) income attributable to AMG and minority interests | (102.6) | (130.6) | (70.3) | (27.9) |
| Net (loss) income attributable to minority interests | 3.5 | 0.4 | (0.4) | – |
| Net (loss) income attributable to AMG | (99.1) | $ (130.2) | $ (69.9) | $ (27.9) |

EXHIBIT O(2)

AOE0633

**Consolidated Balance Sheet Data:**

| | As of | | |
|---|---|---|---|
| (in millions) | December 31, 2019, | December 31, 2020 | March 31, 2021 (Unaudited) |
| Cash | $ 24.8 | $ 73.6 | $ 57.9 |
| Restricted cash | 0.2 | 0.2 | 0.2 |
| Borrowings, less current portion | 530.5 | 983.3 | 1,008.8 |
| Total Member's deficit | (207.0) | (337.1) | (369.2) |

EXHIBIT O(2)

AOE0634

## SUMMARY COMBINED HISTORICAL FINANCIAL INFORMATION OF QUINCY

The following tables present summary historical combined financial information of certain stations owned by Quincy Media, Inc. as of March 31, 2021 and for the three months ended March 31, 2021 and 2020 and years ended December 31, 2020 and 2019. The summary historical combined financial data contained in this section are derived from Quincy's combined financial statements included elsewhere in this offering memorandum. The unaudited combined financial statements have been prepared on the same basis as the audited combined financial statements, and the unaudited financial data include, in our opinion, all adjustments, consisting only of normal recurring adjustments that we consider necessary for a fair statement of its combined financial position and results of operations for these periods. Quincy's historical results are not necessarily indicative of the results to be expected in the future.

You should review this data together with the selected historical financial data and with Quincy's combined financial statements and the accompanying notes thereto included elsewhere in this offering memorandum.

**Combined Statements of Operations Data:**

| (in millions) | Year Ended December 31, 2019 | Year Ended December 31, 2020 | Three Months Ended March 31, 2020 (Unaudited) | Three Months Ended March 31, 2021 (Unaudited) |
|---|---|---|---|---|
| Revenue | | | | |
| Net revenue | $ 103.8 | $ 146.5 | $ 29.1 | $ 27.3 |
| Operating expenses | | | | |
| Programming and production expenses | 48.9 | 54.3 | 13.7 | 14.7 |
| Sales, general and administrative expenses | 23.7 | 27.5 | 6.8 | 6.1 |
| Depreciation and amortization | 7.0 | 8.0 | 3.6 | 1.8 |
| Total operating expenses | 79.6 | 89.7 | 24.0 | 22.6 |
| Other income (expense) | | | | |
| Other income (expense), net | (0.3) | 1.3 | 0.8 | 0.1 |
| Total other income, net | (0.3) | 1.3 | 0.8 | 0.1 |
| Income before income taxes | 23.9 | 58.1 | 5.9 | 4.8 |
| Income tax expense | 5.3 | 16.4 | 1.7 | 1.4 |
| Net income | $ 18.6 | $ 41.8 | $ 4.2 | 3.4 |

**Combined Balance Sheet Data:**

| | As of | | |
|---|---|---|---|
| (in millions) | December 31, 2019 | December 31, 2020 | March 31, 2021 (Unaudited) |
| Cash | $ 2.1 | $ 1.2 | $ 3.0 |
| Total liabilities | 52.4 | 53.9 | 52.1 |
| Invested equity | 245.6 | 239.4 | 242.6 |

EXHIBIT O(2)

AOE0635

## SUMMARY UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION

The unaudited pro forma condensed combined financial information for the year ended December 31, 2020 and the three months ended March 31, 2021, and as of March 31, 2021, for the twelve months ended March 31, 2021 has been derived from (i) the historical consolidated financial statements of AMG for the year ended December 31, 2020, for the three months ended March 31, 2021 and 2020 and as of March 31, 2021 and (ii) the historical consolidated financial statements of Quincy for the year ended December 31, 2020 and the three months ended March 31, 2021 and 2020 and as of March 31, 2021. See "Unaudited Pro Forma Condensed Combined Financial Statements."

The unaudited pro forma condensed combined financial statements should be read together with the historical consolidated financial statements of AMG and the historical consolidated financial statements of Quincy included elsewhere in this offering memorandum.

**Unaudited Pro Forma Condensed Combined Statements of Operations Data:**

| (in millions) | Year Ended December 31, 2020 (Unaudited) | Three Months Ended March 31, 2021 (Unaudited) | Twelve Months Ended March 31, 2021 (Unaudited) |
|---|---|---|---|
| Revenue | | | |
| Networks and content revenue | $ 241.7 | $ 62.0 | $ 238.3 |
| Broadcast television revenues | 270.0 | 63.1 | 281.3 |
| Total revenue | 511.7 | 125.1 | 519.6 |
| Operating expenses | | | |
| Programming and production expenses | 235.7 | 69.7 | 252.3 |
| Sales, general and administrative expenses | 136.5 | 36.6 | 139.9 |
| Depreciation and amortization of intangible assets and goodwill | 92.6 | 24.1 | 95.6 |
| Total operating expenses | 464.8 | 130.4 | 487.8 |
| Operating (loss) income | 46.9 | (5.3) | 31.8 |
| Other income (expense) | | | |
| Interest expense | (136.6) | (33.5) | (134.7) |
| Other income (expense), net | 3.9 | 0.5 | 3.4 |
| Total other expense, net | (132.7) | (33.0) | (131.3) |
| Income (loss) before income taxes | (85.8) | (38.3) | (99.5) |
| Income tax expense (benefit) | 9.2 | 0.2 | 7.2 |
| Net (loss) income attributable to combined company and minority interests | (95.0) | (38.5) | (106.7) |
| Net (loss) income attributable to minority interests | – | – | – |
| Net (loss) income | (95.0) | $ (38.5) | $ (106.7) |

**Other Pro Forma Condensed Combined Data:**

| (in millions) | Twelve Months Ended March 31, 2021 (Unaudited) |
|---|---|
| Pro Forma Restricted Group Adjusted EBITDA[1][2] | $ 181.9 |
| Ratio of Pro Forma Restricted Group Adjusted EBITDA to interest expense[3] | 1.5x |
| Ratio of net secured debt to Pro Forma Restricted Group Adjusted EBITDA[4] | 4.7x |
| Ratio of total net debt to Pro Forma Restricted Group Adjusted EBITDA[4] | 8.2x |
| Capital expenditures | 19.2 |

[1]   Restricted Group refers to the Issuers and their restricted subsidiaries, all of which are guarantors of the notes.

EXHIBIT O(2)

AOE0636

(2)    A reconciliation of pro forma net (loss) income to Pro Forma Restricted Group Adjusted EBITDA is set forth below. See also "Unaudited Pro Forma Condensed Combined Financial Statements."

(3)    Reflects pro forma cash interest expense, excluding amortization of debt issuance costs, debt discount and premium.

(4)    At March 31, 2021 on a pro forma basis, the Restricted Group would have $1,525 million of total debt and $885 million of total secured debt (excluding Payroll Protection Plan loans), and $36 million of cash.

| (in millions) | Year Ended December 31, 2020 (Unaudited) | Three Months Ended March 31, 2021 (Unaudited) | Twelve Months Ended March 31, 2021 (Unaudited) |
|---|---|---|---|
| Pro forma net (loss) | $ (95.0) | $ (38.5) | $ (106.7) |
| Provision for (benefit from) income taxes | 9.2 | 0.2 | 7.2 |
| Interest and other expense (income), net | 136.6 | 33.5 | 134.7 |
| Depreciation and amortization | 126.2 | 34.8 | 131.6 |
| Television library and film cost amortization | (33.6) | (10.6) | (36.0) |
| EBITDA | $ 143.4 | $ 19.4 | $ 130.8 |
| EBITDA losses in unrestricted subsidiaries[a] | 12.6 | 3.8 | 19.6 |
| Bad debt expense | 0.3 | – | 0.3 |
| M&A transaction expenses[b] | 1.2 | 0.2 | 1.0 |
| Purchase accounting adjustment | 1.2 | – | 1.1 |
| Restructuring costs | 0.9 | 0.1 | 0.7 |
| Casualty expense | (0.1) | – | (0.1) |
| Profit interest plan[c] | 1.4 | 0.6 | 1.5 |
| Minority interest expense | 0.4 | – | – |
| Non-cash gain from settlement, net[d] | 2.1 | 2.1 | 0.7 |
| Extraordinary cash gains | (1.7) | (0.1) | (1.7) |
| Non-ordinary dispositions of property | 0.9 | – | 0.9 |
| USA Television EBITDA[e] | 1.5 | – | – |
| OTA acquisition EBITDA | 0.3 | – | 0.1 |
| Quincy management services[f] | 5.1 | 1.2 | 5.0 |
| Quincy non recurring expenses | 0.3 | – | 0.3 |
| Flint Station EBITDA | 10.7 | 2.0 | 11.1 |
| Restricted Group Adjusted EBITDA | $ 180.4 | $ 29.3 | $ 171.3 |
| KITV EBITDA | | | 0.7 |
| Other Acquisition EBITDA[g] | | | 2.1 |
| Run-rate carriage adjustment[h] | | | 3.8 |
| Quincy cost savings[i] | | | 2.9 |
| Flint Station cost savings[j] | | | 0.8 |
| Other Acquisition net retransmission uplift[k] | | | 0.3 |
| Pro Forma Restricted Group Adjusted EBITDA | | | $ 181.9 |

(a)    Represents historical results from Local Now and other unrestricted subsidiaries of AMG primarily related to the film business.

(b)    Expenses of AMG related to certain acquisitions.

(c)    Profit interest plan for AMG employees paid at the discretion of AMG management.

(d)    Represents settlements of certain non-operating items including film tax credits and reimbursements from FCC repack.

(e)    Represents EBITDA relating to the acquired USA TV stations in the pre-acquisition period.

(f)    Quincy management fees paid by stations to previous owners.

(g)    EBITDA relating to potential acquisition of a Fox affiliate station in the Southeast.

(h)    Run-rate affiliate fee adjustment for Comcast channel and Frndly.TV agreements.

(i)    Represents anticipated cost savings at the Quincy Assets due to elimination of certain personnel costs, duplicative G&A costs, and a reduction in programming costs.

(j)    Represents anticipated cost savings at the Flint Station related to elimination of redundant headcount and duplicative back office support and anticipated programming efficiencies.

(k)    Represents anticipated run-rate retransmission uplift from step-up to AMG rates related to the potential acquisition of a Fox affiliate station in the Southeast.

EXHIBIT O(2)

AOE0637

**Pro Forma Condensed Combined Balance Sheet Data:**

| | As of |
|---|---|
| (in millions) | March 31, 2021 (Unaudited) |
| Cash | $ 39.6 |
| Borrowings, less current portion | 1,538.5 |
| Members' equity (deficit) | (414.9) |

**Pro Forma Restricted Group Revenue:**

A reconciliation of total revenue to Pro Forma Restricted Group Revenue is set forth below.

| | Twelve Months Ended |
|---|---|
| (in millions) | March 31, 2021 (Unaudited) |
| Total revenue | $ 519.6 |
| Revenue from unrestricted subsidiaries | (3.5) |
| Run-rate adjustment for new carriage agreements | 3.8 |
| Flint Station revenue | 27.5 |
| KITV revenue | 18.5 |
| Other Acquisition revenue | 8.0 |
| OTA acquisition revenue | 7.8 |
| Pro Forma Restricted Group Revenue | $ 581.7 |

EXHIBIT O(2)

AOE0638

# RISK FACTORS

*An investment in the notes involves significant risks. Prior to making a decision about investing in the notes, and in consultation with your own financial and legal advisors, you should carefully consider, among other matters, the following risk factors together with the other information in this offering memorandum and in any related term sheet that the Issuers deliver to you in connection with this offering. Any of these risks could seriously harm the Issuers' consolidated business, financial condition, results of operations or cash flow, resulting in the decline of the value of the notes and a loss of all or part of your investment.*

## Risks Relating to Our Business

***Our business previously incurred net losses and may incur losses in the future.***

Our business had a history of net losses through March 31. As of March 31, 2021, we had members' deficit of $369.2 million and for the three months ended March 31, 2021 we had net loss of $27.9 million. As of March 31, 2021 on a pro forma basis, we had members' deficit of $414.9 million. For the three months ended March 31, 2021 on a pro forma basis, we had net loss of $38.5 million.

We cannot provide assurance that we will become profitable or achieve positive cash flow. If we are not able to do so, we may not be able to meet our debt obligations, working capital requirements, capital expenditure plans, or other cash needs. Our inability to meet those needs could have a material adverse effect on our business, financial condition, operating results and liquidity.

We believe to be profitable and to generate a positive cash flow, we must maintain or increase the positive margin of our advertising and other revenue over our (i) programming expenses, (ii) selling, general and administrative expenses and (iii) marketing expenses. We expect this to require, among other things, maintaining or increasing the distribution of our content, attracting younger viewers to our networks and broadcast stations, attracting more advertisers, increasing our ratings and maintaining or increasing our subscriber and advertising rates.

***Our business is dependent on key agreements with MVPDs, of which the loss, failure to renew or renewal on less favorable terms, could cause our revenues and operating results to decline significantly in any given period or in specific markets.***

We maintain carriage agreements and retransmission consent agreements that enable our networks and broadcast stations to reach television households primarily through traditional MVPDs. Our carriage agreements generally provide for the level of carriage our networks will receive, such as channel placement and programming package inclusion and for payment of a license fee to us based on the number of subscribers that receive our networks. Our retransmission consent agreements permit MVPDs to retransmit our broadcast stations' signals to their subscribers in exchange for the payment of compensation to us from the system operators as consideration. Our success is dependent upon the existence and terms of such agreements.

Currently our major carriage and retransmission consent agreements have terms which expire at various times through December 2028. As these agreements expire, including agreements covering 36% of our contracted revenues, which are scheduled to expire by December 31, 2021, we may not be able to renegotiate renewals at terms similar to or more favorable than our current agreements, which may cause revenues or revenue growth from our retransmission consent and carriage fee agreements to decrease under the renegotiated terms. During the negotiation of an expiring agreement, we may experience disruption of service of our broadcast television stations provided through such MVPDs. For example, if we reach an impasse in contract renewal negotiations, our networks could become unavailable to the traditional MVPD subscribers (i.e., "go dark"), which, depending on the length of time and the size of the traditional MVPD, could have a negative impact on our revenues from affiliate fees and advertising. The loss of traditional favorable MVPD packaging, positioning, pricing or other marketing opportunities could also negatively impact our revenues from MVPDs. Additionally, continued consolidation within the industry could further reduce the number of distributors available to carry our content and increase the negotiating leverage of our distributors which could adversely affect our revenues from MVPDs and our ability to sell national and local advertising time.

The payments due to us under carriage agreements and retransmission consent agreements are customarily based on a price per subscriber of the MVPD. In recent years the subscribership of MVPDs has declined, as the growth of direct Internet streaming of video programming to televisions and mobile devices has incentivized consumers to "cut the cord" and discontinue their cable or satellite service subscriptions. Decreasing MVPD subscribership leads to less revenue under our agreements, which ultimately could have an adverse effect on our business, financial condition and results of operations. The reduced carriage of our networks or reduced

EXHIBIT O(2)

AOE0639

retransmission of our broadcast stations would adversely affect our subscriber fee revenue, and impact our ability to sell advertising or the rates we charge for such advertising.

The television industry is also highly concentrated, with a relatively small number of distributors serving a significant percentage of television subscribers that receive our programming networks, thereby affording the largest distributors significant leverage in their relationship with programming networks, including us. Further consolidation in the industry could reduce the number of distributors available to carry or retransmit our programming and increase the negotiating leverage of distributors, which could adversely affect our revenue. As a result of this industry consolidation, we face increasing pressure to lower the rates we charge distributors or may face reduced distribution of our networks. The majority of our subscriber revenues come from a handful of our largest distributors. Approximately 80% of our subscriptions revenues for the twelve months ended March 31, 2021 on a pro forma basis were from our five largest MVPD relationships, based on subscription licenses and retransmission fee rate and subscriber count as of March 31, 2021.

In some cases, if a distributor is acquired, the carriage or retransmission consent agreement of the acquiring distributor will govern following the acquisition. In those circumstances, the acquisition of a distributor that is party to one or more carriage or retransmission consent agreements with us on terms that are more favorable to us could adversely impact our business, financial condition and results of operations.

Occasionally, we may have disputes with MVPDs and vMVPDs, OTTDs and other distributors over the terms of our agreements. If not resolved through business discussions, such disputes could result in litigation or actual or threatened termination of an existing agreement.

***The COVID-19 pandemic and other widespread health emergencies or pandemics could materially adversely affect our business, financial condition or results of operations.***

The outbreak of the COVID-19 pandemic has resulted in widespread and continuing negative impacts on the macroeconomic environment and disruption to our business. In June 2020, the National Bureau of Economic Research declared that the United States economy has entered a recession. Weak economic conditions and increased volatility and disruption in the financial markets pose risks to us and our business partners, including advertisers whose expenditures tend to reflect overall economic conditions. The COVID-19 pandemic has caused some of our advertisers (including, in particular, local market advertisers) to reduce their spending, and future declines in the economic prospects of advertisers or the economy in general could negatively impact their advertising expenditures further. Depending on the duration and severity of the recession, it could lead to changes in consumer behavior, including increasing numbers of consumers canceling or foregoing subscriptions to MVPD services, that adversely affect our advertising revenues.

More information about these risks is presented below, as well as information about other risks the pandemic may exacerbate, such as those relating to data privacy, data security, legal and regulatory changes, damage to our brands and reputation, and the ability to realize the strategic goals of our investments. The COVID-19 pandemic also poses risks related to measures aimed at preventing the spread of the virus, such as shelter in place orders, business shutdowns, quarantines and travel bans and restrictions. These measures have affected and may further affect our workforce and operations, as well as those of its business partners. For example, where possible, Company employees began working remotely in March 2020. As and when employees return to their places of work, it poses various risks to us, including compliance and litigation risks, and subjects us to increased operating costs relating to efforts to safeguard our employees.

The magnitude of the impact of the COVID-19 pandemic on us is highly uncertain and subject to change and will depend on evolving factors beyond our control. These include the duration and extent of the pandemic, including whether there is a "second-wave," increases or spikes in the number of cases, or future mutations or related strains of the virus; the duration and extent of the recession, the pace of economic recovery and the economic and operating conditions facing us and others in the pandemic's aftermath; the effect of governmental actions; and potential changes in consumer behavior. The COVID-19 pandemic and other widespread health emergencies or pandemics could have a material adverse effect on our business, financial condition or results of operations.

***The loss of The Weather Channel carriage agreements, significant changes to the ways in which subscribers access our networks through those carriage agreements, or future changes in those agreements could cause our revenues and operating results to decline significantly in any given period or in specific markets.***

Our carriage fee arrangements between The Weather Channel and MVPDs constitute a significant majority of our revenues. Changes in carriage fee revenues result from a combination of changes in rates and/or changes in subscriber counts. Reductions in the carriage fees that we receive per subscriber or in the number of subscribers for which we are paid, including as a result of a loss of or reduction in carriage of our programming networks, would adversely affect our carriage fee revenue.

EXHIBIT O(2)

AOE0640

In addition, distributors have introduced, marketed and/or modified tiers or bundles of programming that have impacted the number of subscribers that receive our programming networks, including tiers or bundles of programming that exclude our programming networks. To the extent that subscribers opt to choose tiers or bundles of programming that exclude our programming networks such as The Weather Channel, our revenues and operating results may decline.

If MVPD service offerings are not attractive to consumers for any reason (including due to pricing, increased competition from vMVPD and OTTD services, increased dissatisfaction with the quality of MVPD services, poor economic conditions or other factors), more consumers may choose to cancel their MVPD service subscriptions or choose not to subscribe to traditional services, may elect to instead subscribe to OTTD services, which in some cases may be offered at lower prices, may elect to subscribe to vMVPDs with smaller bundles of programming which may not include our programming networks, or may elect not to subscribe to any subscription-based service. If the rate of decline in the number of MVPD service subscribers increases or if subscribers shift to OTTD services or vMVPDs and smaller bundles of programming that do not include our programming networks, this may have a material adverse effect on our revenues.

Many of our carriage agreements at The Weather Channel contain industry standard "most favored nation" clauses. These clauses typically provide that if we enter into an agreement with another distributor that contains more favorable terms, we must offer some or all of those terms to our existing distributors. While we believe that we have appropriately complied with the most favored nation clauses included in our distribution agreements, these agreements are complex and other parties could reach a different conclusion that, if correct, could have a material adverse effect on our results of operations and financial position.

***The costs of renewing our network affiliation agreements with Big Four networks, or the loss of such agreements altogether, could adversely affect the results of our broadcast television stations.***

Pro forma for the Transactions, ten of our broadcast television channels have affiliations with each of FOX and CBS, ten with ABC and five with NBC. These television networks produce and distribute programming that our stations commit to air at specified times. Networks sell commercial advertising time during their programming, and the Big Four networks require broadcast television stations to pay fees for the right to carry their programming. These fees may be a percentage of retransmission revenues that the stations receive or may be fixed amounts based on the number of households or subscribers in a market. These fees have been increasing from renewal to renewal over the past several years. There is no assurance that we will be able to reach agreements in the future with networks about the amount of these fees or other terms.

The national broadcast television networks have taken the position that they, as the owners or licensors of some of the programming we broadcast and provide for retransmission, are entitled to a portion of the compensation we receive from MVPDs under our retransmission consent agreements and are requiring their network affiliation agreements with us to provide for such payments. All of our affiliation agreements with the broadcast networks also include terms that limit our ability to grant retransmission consent rights both to traditional MVPDs and to OTTDs, services that provide multiple video streaming channels to consumers. The need to pay a portion of our retransmission consent revenue to networks along with network limitations on our ability to enter into retransmission consent agreements could materially reduce this revenue source to us and could have an adverse effect on our business, financial condition and results of operations.

Currently our major network affiliation agreements have terms which expire at various times through December 2022. The non-renewal or termination of our network affiliation agreements would prevent us from being able to carry programming of the respective network. Loss of a network affiliation would require us to obtain replacement programming, which may not be as attractive to target audiences and could result in lower advertising revenues. In addition, loss of any of the Big Four network affiliations would result in materially lower retransmission revenue.

***Syndication contracts are short term in length, and there can be no guarantee that our syndicated programs will continue to be carried on the stations on which they currently air.***

Our original programming is largely distributed through syndication agreements with local broadcast television stations pursuant to short term contracts. As a result, stations can and do change their syndicated television programs from time to time, and there can be no guarantee that we will continue to be able to renegotiate our syndication contracts on the same terms, or at all. In addition, regardless of the quality of our programming, stations may not renew our syndication contracts if they prefer to air programs that they own. Further, the syndication of our programming is time consuming, as each local station makes decisions about its own scheduling. As a result, the syndication process can be costly, and we may not be successful in maintaining or expanding the reach of our original programming.

EXHIBIT O(2)

AOE0641

***The success of our business is dependent upon advertising revenue, which is seasonal and cyclical, and will also fluctuate as a result of a number of other factors, some of which are beyond our control.***

We are dependent on advertising revenue. If we fail to maintain or increase our advertising revenue, we may be unable to achieve or sustain improved results or to expand our business. A failure to maintain or increase advertising revenue may be a result of any or all of the following, among other factors: (i) a decline in viewer ratings; (ii) uncertainty caused by the current economic environment regarding the condition of the advertising marketplace and the financial health of many industry segments and individual companies, including those which advertise on our networks and broadcast stations; (iii) inability to reduce our average viewer age to be within our target audience; (iv) inability to identify, attract and retain experienced sales and marketing personnel with relevant experience; (v) inability to successfully compete against the significantly more extensive and well-funded sales and marketing operations of our current or future competitors; (vi) shift in expenditures by advertisers triggered by advancement of new technologies; and (vii) inability to increase our advertising sales rates or obligation to run additional advertising spots to fulfill guaranteed delivery numbers which affect the availability of advertising inventory for future sales. Success in increasing our advertising revenue also depends upon the number and coverage of the distributors who carry our networks, the number of viewers of our broadcast stations and our number of subscribers.

Our advertising revenues are subject to seasonal advertising patterns and changes in viewership levels. Typically, our advertising rates, and, in turn, advertising revenues are highest during the second and fourth quarters, not including seasonal weather events, which are highest in the third quarter. While advertising revenue, net of agency commissions, is recognized in the period in which related commercial spots or long form programming are aired, we typically commit approximately 55% of the advertising for our networks via upfront sales up to nine months prior to airing. However, these are not guaranteed and may be subject to change. In addition, advertising rates also vary by time of year due to seasonal changes in television viewership. Due to the seasonality of our business, if a short term negative impact on our business occurs during the time of high seasonal demand, the effect could have a disproportionate effect on the results of our business for the year.

Consumers are increasingly turning to online sources for viewing and purchasing content, and an increasing number of companies offer subscription video-on-demand services, including some that offer exclusive high-quality original video programming and programming delivered directly to consumers over the Internet (such as Netflix, Amazon and Hulu). The increasing number of entertainment and news choices available to consumers has intensified audience fragmentation and reduced the viewing of content through traditional and virtual multichannel video providers, which has caused, and likely will continue to cause, audience ratings declines for our networks and broadcast stations and may adversely affect the pricing and volume of advertising.

Our ability to generate advertising revenue is also dependent on demand for our content, the consumers in our targeted demographics, advertising rates and results observed by advertisers. The pricing and volume of advertising may be affected by shifts toward new ways of purchasing advertising, such as through automated purchasing and advertising exchanges, some or all of which may not be as advantageous to us as current advertising methods.

These factors could have an adverse effect on our business, financial condition or results of operations.

***New distribution technologies may fundamentally change the way we distribute our content and could significantly decrease our revenue or require us to incur significant capital expenditures.***

Advances in technology have led to an increasing number of alternative methods for the delivery of content and have driven consumer demand and expectations in unanticipated directions. Our future success will depend, in part, on our ability to anticipate and adapt to technological changes and to offer, on a timely basis, services that meet customer demands and evolving industry standards. The pay television industry has been, and is likely to continue to be, subject to:

- rapid and significant technological change, including continuing developments in technology which do not presently have widely accepted standards; and

- frequent introductions of new services and alternative technologies, including new technologies for providing video services.

Technology developments also pose other challenges that could adversely affect our revenues and competitive position. New delivery platforms may lead to pricing restrictions, the loss of distribution control, and the loss of a direct relationship with consumers. We may also be adversely affected if the use of technology developed to block the display of advertising on websites proliferates. In addition, technologies such as subscription streaming media services and mobile video are increasing competition for household audiences and advertisers. This competition may make it difficult for us to grow or maintain our broadcasting revenues, which may challenge our ability to expand our digital businesses.

We also rely in part on third parties for the development of, and access to, communications and network technology. As a result, we may be unable to distribute our content via new technology on a timely basis or on satisfactory terms, which could harm our business and prospects.

Moreover, the increased capacity of digital distribution platforms, may reduce the competition for the right to carry networks and allow development of extra services at low incremental cost. These lower incremental costs could lower barriers to entry for competing networks, and place pressure on our operating margins and market position.

### We are subject to intense competition for marketing and carriage of our networks.

We operate in the television business, which is highly competitive. Our networks compete with other programming networks and other video programming services for marketing and distribution by distributors. We face intense competition from other providers of programming networks for the right to be carried by a particular distributor and for the right to be carried by such distributor on a particular "tier" or in a particular "package" of service. If we are unable to compete effectively with large diversified publicly traded entertainment companies that have substantially greater resources than we have, our operating margins and market share could be reduced, and the growth of our business inhibited. In particular, we compete for distribution with other television networks and, when distribution is obtained, for viewers and advertisers with television networks, broadcast television networks, radio, the Internet and other emerging media. We also compete, to varying degrees, with other leisure-time activities such as movie theaters, the Internet, radio, print media, electronic games and other alternative sources of entertainment and information. Future technological developments may affect competition within this business.

A continuing trend towards business consolidation and alliances in the entertainment industry may create significant new competitors for us or intensify existing competition. Many of these combined entities have multiple programming networks and resources far greater than ours. These combined entities may provide bundled packages of programming, delivery and other services that compete directly with the programming we offer. We cannot assure that we will be able to compete successfully in the future against existing or future competitors or that competition will not have a material adverse effect on our business.

Programming networks affiliated with "Big Four" broadcast networks, including ABC, CBS, FOX or NBC, or other programming networks affiliated with sports and general entertainment networks with strong viewer ratings have a competitive advantage over our networks in obtaining distribution through the "bundling" of carriage agreements for such programming networks with a distributor's right to carry the affiliated broadcast network. The inability of our programming networks to be carried by one or more distributors, or the inability of our programming networks to be placed on a particular tier or programming package could have a materially adverse effect on our business, financial condition, operating results, liquidity and prospects.

### We face intense, wide-ranging competition for viewers and advertisers.

We compete for viewers and advertisers with other programming networks, pay-per-view, video on demand, online streaming services, and other content offered by distributors. We also compete for viewers and advertisers with content offered over the Internet, mobile media, radio, motion picture, home video and other sources of information and entertainment and advertising services. Important competitive factors are the prices we charge for our programming networks, the quantity, quality and variety of the programming offered and the effectiveness of marketing efforts.

We may need to reduce our advertising prices or license additional programming to remain competitive. Our failure to achieve or sustain market acceptance of our programming at desired pricing levels could impair our ability to achieve profitability or positive cash flow, which would harm our business.

### We acquire and produce original television and film programming in advance based on expectations about consumer preferences, which may be unpredictable, and increased programming costs may have a material negative effect on our business and our results of operations.

The production, acquisition and distribution of original television programming and motion pictures require up-front investments and the revenues derived from the airing of original television programming and distribution of motion pictures primarily depends upon its acceptance by the public, which is difficult to predict. The commercial success of original content also depends upon the quality and acceptance of other competing content released into the marketplace at or near the same time, the availability of a growing number of alternative forms of entertainment, general economic conditions and their effects on consumer spending, and other tangible and intangible factors, all of which can change and cannot be predicted with certainty. Any of these factors could have a material adverse effect on our business, financial condition, operating results, liquidity and prospects.

Our success depends on the commercial success of our television programming and motion pictures, which is unpredictable. Generally, the popularity of our programs depends on many factors, including the critical acclaim they receive, their talent, their genre and their specific subject matter, audience reaction, the quality and acceptance of television content that our competitors release into

EXHIBIT O(2)

AOE0643

the marketplace at or near the same time, the availability of alternative forms of entertainment and leisure activities, general economic conditions and other tangible and intangible factors, many of which we do not control and all of which may change. Further, our results of operations also fluctuate due to the timing, mix, number and availability of our programs as well as license periods for content.

Low ratings for television programming produced by us may lead to the cancellation of such a program and can negatively affect future license fees for the cancelled program. If we decide to no longer air programming due to low ratings or other factors, we could incur significant programming impairments, which could have a material adverse effect on our results of operations in a given period.

Our success will depend on the experience and judgment of our management to select and develop new investment and production opportunities. We cannot assure that our television programming will obtain favorable ratings or reviews, or that broadcasters will license the rights to broadcast any of our television programs in development or renew licenses to broadcast programs in our library. Additionally, we cannot assure that any original programming content will appeal to our distributors and subscribers. The failure to achieve any of the foregoing could have a material adverse effect on our business, financial condition, operating results, liquidity and prospects.

We are required to amortize capitalized production or programming acquisition costs over the expected revenue streams as we recognize revenue from programming. The amount of production or programming acquisition costs that will be amortized each quarter depends on, among other things, how much future revenue we expect to receive from each project. Unamortized production or programming acquisition costs are evaluated for impairment each reporting period on a project-by-project basis. If estimated remaining revenue is not sufficient to recover the unamortized costs, those costs will be written down to fair value. In any given quarter, if we lower our previous forecast with respect to total anticipated revenue from or change our usage pattern of any program, we may be required to accelerate amortization or record impairment charges with respect to the unamortized costs, even if we previously recorded impairment charges for such a project. Such impairment charges could adversely impact our business, operating results and financial condition.

***Changes in public and consumer tastes and preferences, including changes resulting from new technologies and distribution platforms, could reduce demand for our services and programming and reduce profitability of our businesses.***

Our success depends partly upon unpredictable and volatile factors beyond our control, such as viewer preferences, competing programming and the availability of other entertainment activities. We may not be able to anticipate and react effectively to shifts in consumer tastes, behavior, and interests in our markets. While we aim to consistently create and distribute programming that appeals to our target consumer group at any point in time, some of our content and services may not be accepted by our target audience. Other factors, including the rapidly evolving technology and business models in our industry, the availability of alternative forms of entertainment or leisure time activities, general economic conditions and the growing competition for consumer discretionary spending may also affect our target audience's acceptance of our content and services.

Consumers are increasingly viewing content on a time-delayed or on-demand basis from traditional distributors, from connected apps and websites and on a wide variety of screens, such as televisions, tablets, mobile phones and other devices. Time-shifting technologies that enable users to fast-forward or skip programming, including commercials, affect the attractiveness of our programming to advertisers and could therefore adversely affect our revenues. All of these factors create uncertainty in the marketplace, and there can be no assurance that the strategies we develop to address them will be effective. If our networks and broadcast stations do not achieve sufficient consumer acceptance as a result of any of the foregoing factors, revenues may decline and adversely affect our profitability.

***Global economic turmoil and regional economic conditions in the U.S. could adversely affect our business.***

Our business is significantly affected by both prevailing economic conditions and disruption to financial markets. In particular, we derive substantial revenues from advertisers, which are sensitive to general economic conditions and consumer buying patterns. Financial instability or a general decline in economic conditions in areas where our networks are distributed or our broadcast stations are located could adversely affect advertising rates and volume, resulting in a decrease in our advertising revenues. The companies who purchase advertising on our networks and broadcast stations may reduce their spending on advertising or may default on obligations owed to us.

In addition, an increase in price levels generally could result in a shift in consumer demand away from the entertainment we offer, which could also adversely affect our revenues and, at the same time, increase our costs. For instance, lower household income and decreases in U.S. consumer discretionary spending, which is sensitive to general economic conditions, may affect cable television and other video service subscriptions, in particular with respect to digital programming packages on which our networks are typically carried and premium video programming packages and premium a la carte services on which our networks are typically carried. In addition, decreases in consumer discretionary spending may affect television subscriptions. This could lead to a decrease in the

EXHIBIT O(2)

AOE0644

number of subscribers receiving our programming from our distributors. Similarly, a decrease in viewing subscribers would also have a negative effect on our ratings, which may impact the rates we are able to charge our advertisers. A reduction in spending may cause a decrease in subscribers to our networks or advertisers on our broadcast stations, which could have a materially adverse impact on our business, financial condition, operating results, liquidity and prospects.

Global economic turmoil may cause a general tightening in the credit markets, lower levels of liquidity, increases in the rates of default and bankruptcy, levels of intervention from the U.S. federal government and other foreign governments, decreased consumer confidence, overall slower economic activity and extreme volatility in credit, equity and fixed income markets. A decrease in economic activity in the U.S. or in other regions of the world in which we do business could adversely affect demand for our content, thus reducing our revenues and earnings. There can be no assurance that our cash flows or access to capital, including our Senior Credit Facilities, will be sufficient to meet or near term financial needs or that future volatility and disruption in the global capital and credit markets will not impair our liquidity or increase our cost of borrowing.

Moreover, financial institution failures may cause us to incur increased expenses or make it more difficult to finance any future acquisitions, or engage in other financing activities. We cannot predict the timing or the duration of any downturn in the economy and we are not immune to the effects of general worldwide economic conditions.

### We could be adversely affected by disputes, strikes or other union actions.

We are indirectly dependent upon union members who are essential to the production of television content. We sometimes have disputes regarding payments owned to those organizations. For example, in September 2018, we expensed $3.5 million in settlement of arbitration with the Screen Actors Guild regarding a dispute over residual calculations for the series *Mr. Box Office* and *The First Family*. We are also impacted by their other union or guild activities. A strike by, or a lockout of, one or more of the unions that provide personnel essential to the production of content could delay or halt our ongoing production activities, or could cause a delay or interruption in our release of new content. A strike may result in increased costs and decreased revenue, which could have a material adverse effect on our business, financial condition, operation results, liquidity and prospects.

### Our media operations are subject to laws and regulations, including Federal Communications Commission regulations, and changes in these laws and regulations could have a material effect on our business.

Our programming, and the distributors of our networks and the operations of our broadcast stations are regulated by U.S. federal laws and regulations issued and administered by various federal agencies, including the Federal Communications Commission, or FCC, as well as by state and local governments. Our broadcasting stations operate under licenses granted by the FCC. The FCC regulates many aspects of television station operations including employment practices, political advertising, indecency and obscenity, programming, signal carriage, and various other technical matters. Violations of these regulations could result in penalties and fines. While we believe we are in material compliance with applicable laws, there can be no assurance that our operations will continue to materially comply with all applicable laws. In addition, Congress and the FCC may adopt new laws, regulations and policies in the future regarding a wide variety of matters that could, directly or indirectly, affect our operations. The FCC also regulates the ownership of television stations. Changes in the ownership rules could adversely affect our ability to execute future transactions or may favor our competitors. Any noncompliance with laws, regulations or policies currently applicable to our business or the enactment or adoption of new laws, regulations or policies applicable to our business could have a material adverse effect on our business.

### Evolving privacy and information security laws and regulations may impair our ability to market to consumers.

Our consumer database includes first-party data that is used to market our products to our customers and is also rented to or used on behalf of marketing and advertising clients. As public awareness shifts to data gathering and usage, privacy rights, and data protection, new laws and regulations may be passed that would restrict or prevent us from utilizing this data. Such restrictions could reduce or eliminate this resource for generating revenue for us.

### If our third-party suppliers fail to provide us with network infrastructure services on a timely basis, our costs could increase and our growth could be hindered.

We currently rely on third parties to supply key network infrastructure services, including uplink, playback, transmission and satellite services to our market, which are available only from limited sources. We have occasionally experienced outages, delays and other problems in receiving communications equipment, services and facilities and may, in the future, be unable to obtain such services, equipment or facilities on the scale and within the time frames required by us on terms we find acceptable, or at all. If we are unable to obtain, or if we experience a delay in the delivery of, such services, we may be forced to incur significant unanticipated expenses to secure alternative third party suppliers or adjust our operations, which could hinder our growth and reduce our revenue and potential profitability.

EXHIBIT O(2)

AOE0645

***Our success depends on attracting and retaining key personnel.***

Our success depends upon the continued efforts, abilities and expertise of our executive teams, and other key employees, including production, creative and technical personnel. Our success also depends on our ability to identify, attract, hire, train, and retain such personnel. We have entered into employment agreements with top executive officers and production executives but do not currently have significant "key person" life insurance policies for any employee. Although it is standard in the industry to rely on employment agreements as a method of retaining the services of key employees, these agreements cannot assure us of the continued services of such employees. In addition, competition for the limited number of business, production and creative personnel necessary to create and distribute our entertainment content is intense and may grow in the future. We cannot assure you that we will be successful in identifying, attracting, hiring, training and retaining such personnel in the future, and our inability to do so could have a material adverse effect on our business, financial condition, operating results, liquidity and prospects.

***Our business depends in part on Byron Allen, our Chief Executive Officer.***

Byron Allen, our chief executive officer and founder, has played a critical role in many aspects of our business, including in contract negotiations. To the extent we lose the services of Byron Allen, we may not be able to grow our business at existing levels. In addition, the FCC has recently announced initiatives aimed at increasing the number of minority-owned broadcast television networks. By virtue of Byron Allen's sole ownership of our company, we are currently a minority owned business and believe that this status will be beneficial to our ownership of broadcast television stations. If Byron Allen or his heirs were to cease to own or control us, we may no longer be able to obtain that expected benefit.

***Byron Allen, as our sole manager, has broad discretion over our business, operations and strategies.***

Byron Allen, as sole manager of our company, has broad discretion over our business, including the ability to direct our operations and business strategies. As is customary for a limited liability company, we do not have a board of directors or any independent directors and rely on Byron Allen, or a committee designated by him, to perform such roles. As a result, there are no independent directors to, among other things, approve affiliate transactions; perform other functions customarily performed by an audit committee; or otherwise provide independent oversight of our business and affairs.

***Business interruptions could adversely affect our operations.***

Our operations are vulnerable to outages and interruptions due to fire, floods, power loss, telecommunications failures and similar events beyond our control, as well as cyberattacks such as an April 2019 malicious software attack that rendered a number of broadcast and other information and business systems temporarily inoperable. Our headquarters are located in Southern California, which is subject to earthquakes. Although we have developed plans to respond in the event of a disaster, there can be no assurance that they will be effective in the event of a specific disaster. In the event of a short-term power outage, we have installed uninterrupted power source equipment designed to protect our equipment. A long-term power outage, however, could disrupt our operations. Although we currently carry business interruption insurance for potential losses (including earthquake-related losses), there can be no assurance that such insurance will be sufficient to compensate us for losses that may occur or that such insurance may continue to be available on affordable terms. Any losses or damages incurred by us could have a material adverse effect on our business, financial condition, operating results, liquidity and prospects.

***The amount of our goodwill may hinder our ability to achieve profitability.***

As a result of our acquisitions, we have recorded a significant amount of goodwill. As of March 31, 2021 on a pro forma basis, we had goodwill of $625.7 million and net intangible assets of $284.3 million. We are required to periodically review whether the value of our goodwill has been impaired. If we are required to write down our goodwill or intangible assets, our results of operations and members' equity could be materially adversely affected.

***If we are unable to protect or maintain intellectual property rights upon which our business relies, and if we lose intellectual property protection, our business could be materially harmed.***

Our business depends on our intellectual property. We attempt to protect these intellectual property rights through a combination of our copyright, trade secret, and trademark law and contractual restrictions, such as confidentiality agreements. We also depend on our trade names, domain names, software codes, informational databases and other components that make up our products and services. We have filed trademarks and other intellectual property registrations. Even if such registrations are issued, they may not fully protect important aspects of our business and there is no guarantee that our business does not or will not infringe upon intellectual property rights of others. We rely on a combination of laws and contractual restrictions with employees, customers, suppliers, affiliates and others to establish and protect these proprietary rights. Despite these precautions, it may be possible for a third party to copy or otherwise obtain and use our intellectual property without authorization which, if discovered, might require legal action to correct. In addition, third parties may independently and lawfully develop substantially similar intellectual properties.

EXHIBIT O(2)

AOE0646

Furthermore, intellectual property laws vary from country to country, and it may be more difficult to protect and enforce our intellectual property in some foreign jurisdictions. In addition, piracy, which encompasses the theft of our signal, and unauthorized use of our content in the digital environment continues to present a threat to our revenues. Piracy is extensive in many parts of the world and is made easier by the availability of digital copies of content and technological advances allowing conversion of films and television content into digital formats. As a result, it may be possible, for unauthorized third parties to copy and distribute our productions, which could have a material adverse effect on our business. Moreover, in the future, we may need to implement elaborate and costly security and anti-piracy measures to minimize piracy or litigate to enforce our intellectual property rights or determine the validity and scope of the proprietary rights of others. Any such security measures or litigation could affect our cash flows and divert the attention of our management. Further, we cannot assure you the success of litigation or that even the highest levels of security and anti-piracy measures will prevent piracy.

### *We rely on a license from IBM for the use of the brand name The Weather Channel.*

We do not own the brand name The Weather Channel, which is licensed to us by IBM under the terms of a license agreement. IBM controls the brand, and the continued integrity and strength of The Weather Channel brand will depend in part on how the brand is used, promoted and protected by IBM, which will be outside of our immediate control. Our license with IBM expires on January 31, 2022, at which point we will have the sole discretion to renew the agreement every year. Although our option to renew the agreement is perpetual, there are circumstances in which it may be terminated by IBM, including our breach of the license agreement. If we are no longer able to use the brand name, our reputation may suffer, which may lead to a loss of subscribers that elect bundles including the network or causing our revenues and operating results to otherwise decline.

### *We rely on third parties for data relating to our weather analysis.*

We rely on a contract with IBM, as well as other third parties and governmental sources, for a significant amount of the weather-related data that we use in our Weather Group programming. We do not own an exclusive license to the data, nor do we independently verify or audit all of such data. As a result, such data may be inaccurate, misleading or incomplete which could, in turn, adversely impact our viewership and reputation. Further, any interruption in or termination of service, or any change in the economics or terms of use of the data, by IBM or other third party sources could result in a delay or disruption in The Weather Channel programming. There can be no assurance that we would be successful in locating an alternative source of data or in negotiating acceptable terms with another prospective data provider.

### *We face cybersecurity and similar risks, which could result in the disclosure of confidential information, disruption of our programming services, damage to our brands and reputation, legal exposure and financial losses.*

Our online offerings, as well as our internal systems, involve the storage and transmission of our and our users' proprietary information, and we and our partners rely on various technology systems in connection with the production and distribution of our programming. The techniques used to attempt attacks are constantly changing and we cannot assure you that any actions we take to protect our data and business processes will be sufficient. Despite our efforts, our security measures may be breached due to employee error, computer malware, viruses, hacking and phishing attacks, or otherwise. For instance, in April 2019, the Weather Group experienced a malicious software attack whereby a significant number of broadcast and other information and business systems were rendered temporarily inoperable. After the attack was triggered, The Weather Channel network never ceased broadcasting and live programming was restored in under three hours. Substantially all information and business systems and related data were restored to at least nominal working order within a week of the attack. Additionally, outside parties may attempt to fraudulently induce employees or users to disclose sensitive or confidential information in order to gain access to our data or our users' data. Moreover, because the techniques used to obtain unauthorized access, disable or degrade service, or sabotage systems change frequently and often are not recognized until launched against a target, we may be unable to anticipate these techniques or to implement adequate preventative measures. Any such breach or unauthorized access could result in a loss of our or our users' proprietary information, a disruption of our services or a reduction of the revenues we are able to generate from such services, damage to our brands and reputation, a loss of confidence in the security of our offerings and services, and significant legal and financial exposure, each of which could potentially have a material adverse effect on our business.

### *Adverse litigation judgments or settlements resulting from legal proceedings in which we are currently and in the future may be involved could expose us to monetary damages or limit our ability to operate our business.*

We are currently involved in and may in the future become involved in private actions, collective actions, investigations, and various other legal proceedings by clients, employees, suppliers, competitors, government agencies, or others. As a distributor of media content, we may face potential liability for defamation, invasion of privacy, negligence, copyright or trademark infringement, and other claims based on the nature and content of the materials distributed. These types of claims have been brought, sometimes successfully, against producers and distributors of media content. Further, from time to time, we are subject to legal proceedings and claims in the ordinary course of business, including claims of alleged infringement of the intellectual property rights of third parties.

33

EXHIBIT O(2)

Others may claim that our productions or production techniques misappropriate or infringe the intellectual property rights of third parties. Our failure to protect our intellectual property rights in a meaningful manner or challenges to related contractual rights could result in erosion of brand names or other intellectual property and could adversely affect our business, financial condition and results of operations. Therefore, litigation may be necessary in the future to enforce our intellectual property rights, protect trade secrets or determine the validity and scope of proprietary rights claimed by others. Any litigation of this nature, regardless of outcome or merit, could result in substantial costs and diversion of management and technical resources, any of which could adversely affect our business, financial condition and results of operations. Any imposition of liability that is not covered by insurance or is in excess of insurance coverage could have a material adverse effect on our business, financial condition, operating results, liquidity and prospects.

The results of any such litigation, investigations, and other legal proceedings are inherently unpredictable and potentially expensive. Any claims against us, whether meritorious or not, could be time consuming, result in costly litigation, damage our reputation, require significant amounts of management time, and divert significant resources. If any of these legal proceedings were to be determined adversely to us, or we were to enter into a settlement arrangement, we could be exposed to monetary damages or limits on our ability to operate our business, which could have an adverse effect on our business, financial condition, and operating results.

***We will continue to evaluate opportunities and make acquisitions and investments, which involve inherent risks and uncertainties. To the extent that we pursue strategic acquisitions, we may fail to realize all of the anticipated benefits of such transactions, such benefits may take longer to realize than expected, and we may be unsuccessful in integrating acquired businesses without significant costs.***

We have grown significantly through acquisitions and expect to continue to make acquisitions and investments, which involve inherent risks and uncertainties, including:

- the difficulty in integrating newly acquired businesses and operations in an efficient and effective manner;

- the challenge in achieving strategic objectives, cost savings and other anticipated benefits;

- the potential loss of key employees of the acquired businesses;

- the potential diversion of senior management's attention from our operations;

- the risks associated with integrating financial reporting and internal control systems;

- the risks associated with the computing environment in which the acquired business operates, including security risks;

- the difficulty in adapting information technology systems and other business processes to incorporate the acquired businesses;

- potential future impairments of goodwill associated with the acquired businesses; and

- in some cases, the potential for increased regulation.

If an acquired business fails to operate as anticipated or generate anticipated returns, cannot be successfully integrated with our business or is not a good fit with our overall strategy, or one or more of the other risks and uncertainties identified occur in connection with the acquisitions, our business, results of operations and financial condition could be adversely affected.

**Risks Related to the Acquisitions**

***We cannot assure you that any of the Acquisitions will be completed on a timely basis or at all.***

There are a number of risks and uncertainties relating to the Acquisitions. For example, we have not entered into binding agreements with respect to the Other Acquisitions and there can be no assurance that we will be able to do so on the expected terms or at all. In addition, any or all of the Acquisitions may not be completed, or may not be completed in the time frames, on the terms or in the manner currently anticipated, as a result of a number of factors, including the failure of the parties to satisfy one or more of the conditions to closing. There can be no assurance that the conditions to closing of the Acquisitions will be satisfied or waived or that other events will not intervene to delay or result in the failure to close the Acquisitions. The definitive agreements related to the Quincy Acquisition and the Flint Acquisition may be terminated by the parties thereto under certain circumstances. This offering is contingent upon the completion of the Quincy Acquisition but is not contingent on the completion of the Other Acquisitions. As a result, we may consummate this offering but may be unable to consummate the Flint Acquisition and Other Acquisitions. In which case, the related portion of the delayed draw component of our New Term Loan B would be reduced accordingly.

EXHIBIT O(2)

AOE0648

***We may fail to realize all of the anticipated benefits of the Acquisitions or those benefits may take longer to realize than expected. We may also encounter significant difficulties in integrating Quincy's business into our operations.***

Our ability to realize the anticipated benefits of the Acquisitions, including anticipated synergies, will depend, to a large extent, on our ability to integrate the Additional Stations into our existing operations. The combination of independent businesses is a complex, costly and time-consuming process that will require significant management attention and resources. The integration process may disrupt the businesses and, if implemented ineffectively, would limit the expected benefits to us of the Acquisitions. The failure to meet the challenges involved in integrating the businesses and to realize the anticipated benefits of the Acquisitions could cause an interruption of, or a loss of momentum in, the activities of our business and could adversely affect our results of operations.

The overall integration of the businesses may result in material unanticipated problems, expenses, liabilities, competitive responses, loss of customer and other business relationships, and diversion of management's attention. The difficulties of combining the operations of the companies include, among others:

- the diversion of management's attention to integration matters;

- difficulties in achieving anticipated cost savings, synergies, business opportunities and growth prospects from the combination;

- difficulties in the integration of operations and systems;

- conforming standards, controls, procedures and accounting and other policies, business cultures and compensation structures between the two companies;

- difficulties in the assimilation of employees and corporate cultures;

- potential unknown liabilities, adverse consequences and unforeseen increased expenses associated with the Acquisitions; and

- challenges in attracting and retaining key personnel.

Many of these factors will be outside of our control and any one of these factors could result in increased costs, decreased expected revenues and additional diversion of management's time and energy, all of which could materially and adversely impact our business, financial condition and results of operations. In addition, we may not complete the Flint Acquisition and Other Acquisitions on the expected terms or at all and even if the operations of our business and the Additional Stations are integrated successfully, the full benefits of the Acquisitions may not be realized, including the synergies, cost savings, revenue growth or other benefits that are expected. These benefits may not be achieved within the anticipated time frame, or at all. Further, additional unanticipated costs may be incurred in the integration of our business with the Additional Stations. All of these factors could decrease or delay the expected accretive effect of the Acquisitions, and negatively impact our business, operating results and financial condition. As a result, we cannot provide any assurance that we will realize the full benefits anticipated from the Transactions.

***The successful execution of the post-Acquisition integration strategy will involve considerable risks and may not be successful.***

If our management is unable to minimize the potential disruption of the Transactions and distraction of the management during the integration process, the anticipated benefits of the Acquisitions may not be realized or realized as quickly as we anticipate. Realizing the benefits of the Acquisitions will depend in part on the successful integration of technology, operations and personnel while maintaining adequate focus on our business. We cannot assure you that any cost savings, greater economies of scale, other operational efficiencies, or revenue enhancement opportunities anticipated from the combination of the two businesses will occur. Our operating expenses may increase significantly over the near term due to the increased headcount, expanded operations and expense or changes related to the Acquisitions. To the extent that our expenses increase but our revenues do not, that there are unanticipated expenses related to the integration process, or that there are significant costs associated with presently unknown liabilities, our business, operating results and financial condition may be materially and adversely affected. In addition, failure to minimize the numerous risks associated with the post-Merger integration strategy also may adversely affect our business, operating results and financial condition.

***We will incur significant costs associated with the Transactions.***

We will incur substantial expenses in connection with and as a result of completing the Transactions and, over a period of time following the completion, we expect to incur substantial additional expenses in connection with coordinating the businesses, operations, policies and procedures of the companies. These expenses include investment banking, legal and accounting fees and expenses, expenses incurred in connection with achieving synergies and expenses associated with the new indebtedness that will be incurred in connection with the Transactions. While we have assumed that a level of transaction expenses will be incurred, factors beyond our control could affect the total amount or the timing of these expenses. Many of the expenses that will be incurred, by their nature, are difficult to estimate accurately.

EXHIBIT O(2)

AOE0649

*Employee uncertainty related to the Transactions could harm our business.*

Our employees may experience uncertainty about their future role with us until or after strategies with regard to the Transactions are announced or executed. The integration team that will be working on effectively combining the companies' businesses may streamline our operations to achieve cost savings or in response to general economic conditions. We cannot assure you that any such efforts will yield the intended effects. The integration process may cause disruptions among employees or erode employee morale. Employee uncertainty may adversely affect our ability to attract new personnel to fill key positions that may become available upon integration of the two businesses or to retain current employees necessary to implement our strategies, either of which may disrupt our operations. We cannot assure you that we will succeed in retaining current employees, nor can we assure you that our management will succeed in motivating continuing employees and keeping them focused on our strategies and goals during potential workforce reductions and other distractions relating to the Acquisitions.

*Our and Quincy's customers may delay or cancel business arrangements, or seek to modify existing relationships, as a result of concerns over the Acquisitions or to extract negotiation leverage.*

The announcement, pendency and closing of the Acquisitions could cause potential customers to delay or cancel contracts as a result of concerns over the Acquisitions. In particular, advertisers could reduce their purchases and other networks and broadcast stations could reduce their purchases of our content due to uncertainty about the direction of our business. Moreover, existing customers may seek to modify their relationships to extract leverage in connection with current or anticipated contract negotiations. A delay or cancellation of purchases by potential customers or modification of current arrangements by existing customers could have an adverse effect on our business, results of operations or financial condition.

*Our actual combined financial position and results of operations may differ materially from the unaudited pro forma financial data included in this offering memorandum.*

The pro forma financial information contained in this offering memorandum is presented for illustrative purposes only and may not be an indication of what our financial position or results of operations would have been had the Transactions been completed on the dates indicated. The pro forma financial information has been derived from our audited and unaudited historical financial statements and the audited and unaudited financial data of companies previously acquired by us and adjustments and assumptions have been made after giving effect to the indicated Transactions. The assets and liabilities of Quincy have been measured at fair value based on various preliminary estimates using assumptions that our management believes are reasonable utilizing information currently available. The process for estimating the fair value of acquired assets and assumed liabilities requires the use of judgment in determining the appropriate assumptions and estimates. These estimates may be revised as additional information becomes available and as additional analyses are performed and may differ materially from the information provided in this offering memorandum.

Other assumptions used in preparing the pro forma financial information may not prove to be accurate, including those assumptions underlying anticipated cost synergies and retransmission revenues increases. Additionally, other factors may affect our financial condition or results of operations following the closing of the Acquisitions and related Transactions. Any potential decline in our financial condition or results of operations could adversely affect our business and may impair our ability to make payments under the notes.

**Risks Related to this Offering and the Notes**

*Our substantial level of indebtedness and our ability to incur significant additional indebtedness could adversely affect our business, financial condition and results of operations.*

After giving effect to the Transactions, as of March 31, 2021, we would have had $1,525.0 million of total indebtedness outstanding (excluding any outstanding letters of credit) and $42.5 million of borrowing capacity under the Revolving Credit Facility with no letters of credit initially outstanding under the Revolving Credit Facility.

We have permitted additional borrowings under the Revolving Credit Facility, subject to the satisfaction of customary borrowing conditions. Additionally, the terms of the Senior Credit Facilities have permitted, and the indenture governing the notes have permitted, us to incur significant additional indebtedness, subject to obtaining commitments from lenders and the satisfaction of certain conditions. For example, the Senior Credit Facilities permit us to increase the Senior Credit Facilities by an aggregate principal amount not to exceed the sum of (x) the greater of (y) $180 million and 100% of LTM Consolidated Adjusted EBITDA (as defined in the Senior Credit Facilities) plus additional amounts based on voluntary prepayments of certain indebtedness plus further additional amounts so long as, on a pro forma basis at the time of incurrence, (a) if such indebtedness is secured on a pari passu basis with the debt under the Senior Credit Facilities, our first lien net leverage ratio does not exceed 2.90 to 1.00, (b) if such indebtedness is secured on a basis junior to the debt under the Senior Credit Facilities, our secured net leverage ratio does not exceed 3.40 to 1.00 or (c) if such indebtedness is unsecured, either (x) our total net leverage ratio does not exceed 4.50 to 1.00 or (y) our fixed charge coverage ratio is not less than 2.00 to 1.00.

EXHIBIT O(2)

AOE0650

Our level of indebtedness could have important consequences. For example, it could:

- increase our vulnerability to general adverse economic and industry conditions;

- limit our ability to obtain additional financing to fund future working capital, capital expenditures and other general corporate requirements or to carry out other aspects of our business;

- increase our cost of borrowing;

- make it more difficult for us to satisfy our obligations with respect to the notes and our other debt;

- require us to dedicate a substantial portion of our cash flow from operations to payments on indebtedness, thereby reducing the availability of such cash flow to fund working capital, capital expenditures and other general corporate requirements or to carry out other aspects of our business;

- limit our ability to make material acquisitions or take advantage of business opportunities that may arise;

- expose us to fluctuations in interest rates, to the extent our borrowings bear variable rates of interest;

- limit our flexibility in planning for, or reacting to, changes in our business and industry;

- place us at a potential disadvantage compared to our competitors that have less debt; and

- affect our credit ratings.

Our ability to make scheduled payments on and to refinance our indebtedness will depend on and be subject to our future financial and operating performance, which in turn is affected by general economic, financial, competitive, business and other factors beyond our control, including the availability of financing in the banking and capital markets. Our business may fail to generate sufficient cash flow from operations or we may be unable to borrow funds in an amount sufficient to enable us to make payments on our debt, to refinance our debt or to fund our other liquidity needs. If we were unable to make payments on or refinance our debt or obtain new financing under these circumstances, we would have to consider other options, such as asset sales, equity issuances or negotiations with our lenders to restructure the applicable debt. The terms of our debt agreements and market or business conditions may limit our ability to take some or all of these actions. In addition, if we incur additional debt, the related risks described above could be exacerbated.

***When the Senior Credit Facilities mature, we may not be able to refinance or replace them.***

The Senior Credit Facilities have an earlier maturity date than that of the notes offered hereby. When the Senior Credit Facilities mature, we may need to refinance them and may not be able to do so on favorable terms or at all. If we are able to refinance maturing indebtedness, the terms of any refinancing or alternate credit arrangements may contain terms and covenants that restrict our financial and operating flexibility.

Furthermore, if we were unable to repay the amounts due and payable under the Senior Credit Facilities, the lenders under the Senior Credit Facilities could proceed against the collateral that secures the indebtedness. In the event our creditors accelerate the repayment of our borrowings, we may not have sufficient assets to repay such indebtedness and we may not be able to access the capital markets to refinance such indebtedness on terms we find acceptable or at all.

***We may not be able to generate sufficient cash to service all of our indebtedness and ongoing investments in our business and may be forced to take other actions to satisfy such obligations that may not be successful.***

In addition to our debt service obligations, our operations require substantial investments on a continuing basis. Our ability to satisfy our debt obligations and to fund capital and non-capital expenditures necessary to maintain the condition of our operating assets and properties, as well as to provide capacity for the growth of our business, will depend upon, among other things, the following:

- our future financial and operating performance, which will be affected by prevailing economic conditions and financial, business, competitive, regulatory, legal and other factors, many of which are beyond our control; and

- our future ability to borrow under the credit agreement that governs the Senior Credit Facilities (the "Credit Agreement"), the availability of which depends on, among other things, our complying with the covenants in the Credit Agreement.

We cannot provide assurance that our business will generate sufficient cash flow from operations or that we will be able to draw under our Credit Agreement in an amount sufficient to fund our liquidity needs.

EXHIBIT O(2)

AOE0651

If our cash flows and capital resources are insufficient to service our indebtedness or other capital needs, we may be forced to reduce or delay capital expenditures, sell assets, seek additional capital or restructure or refinance our indebtedness. These alternative measures may not be successful and may not be adequate to meet our scheduled debt service obligations or other capital needs. Our ability to restructure or refinance our debt will depend on the condition of the capital markets and our financial condition at such time. Any refinancing of our debt could be at higher interest rates and may require us to comply with more onerous covenants, which could further restrict our business operations. In addition, the terms of existing or future debt agreements may restrict us from adopting some of these alternatives. If we are required to dispose of material assets or operations, sell equity, or negotiate with our lenders to restructure the applicable debt, in order to meet our debt service and other obligations, our liquidity would be diminished which could have a material adverse effect on our business. Furthermore, we may not be able to consummate those dispositions for fair market value or at all, which could have a material adverse effect on our financial condition.

Our ability to repay our indebtedness, including the notes, is largely dependent on the generation of cash flow by our operating subsidiaries and our operating subsidiaries' ability to make cash available to us by dividend, intercompany loans, advances and other transactions or otherwise. Our subsidiaries may not be able to, or may not be permitted to, transfer cash to us to enable us to make payments in respect of our indebtedness. Each of our subsidiaries is a distinct legal entity and legal and contractual restrictions, as well as the financial condition and operating requirements of our subsidiaries, may limit our ability to obtain cash from our subsidiaries.

***Our debt agreements contain restrictions that limit our flexibility in operating our business.***

The terms of the Credit Agreement that govern the Senior Credit Facilities and the indenture that will govern the notes offered hereby and that governs the initial notes may restrict our current and future operations, particularly our ability to incur debt that we may need to fund initiatives in response to changes in our business, the industries in which we operate, the economy and governmental regulations.

The Credit Agreement that governs the Senior Credit Facilities and the indenture that will govern the notes offered hereby and that governs the initial notes contains a number of restrictive covenants that impose significant operating and financial restrictions on us and our subsidiaries and limit our ability to engage in actions that may be in our long-term best interests, including restrictions on our and our subsidiaries' ability to:

- incur or guarantee additional indebtedness or sell disqualified or preferred stock;
- pay dividends on, make distributions in respect of, repurchase or redeem, capital stock;
- make investments or acquisitions;
- sell, transfer or otherwise dispose of assets out of the ordinary course of business, including restrictions on the use of proceeds of such sales;
- create liens;
- enter into sale/leaseback transactions;
- enter into agreements restricting the ability to pay dividends or make other intercompany transfers;
- consolidate, merge, sell or otherwise dispose of all or substantially all of our or our subsidiaries' assets;
- enter into transactions with affiliates;
- prepay, repurchase or redeem indebtedness;
- issue or sell stock of our subsidiaries; and
- significantly change the nature of our business.

In addition, the Revolving Credit Facility has a financial covenant that, in the event that on the last day of any fiscal quarter of the Issuers that the aggregate amount of all outstanding loans and letters of credit (other than those letters of credit that have been cash collateralized or otherwise backstopped) under the Revolving Credit Facility exceeds 30% of the revolving commitments thereunder, requires us to maintain a first lien net leverage ratio of no greater than 4.15 to 1.00. Our ability to meet this financial covenant may be affected by events beyond our control.

As a result of all of these restrictions, we may be:

- limited in how we conduct our business and pursue our strategy;
- unable to raise additional debt or equity financing to operate during general economic or business downturns; or
- unable to compete effectively or to take advantage of new business opportunities.

EXHIBIT O(2)

AOE0652

***Our indebtedness subjects us to interest rate risk, which could cause our debt service obligations to increase significantly or could prevent us from taking advantage of lower rates.***

A portion of our indebtedness consists of term loans and revolving credit facility borrowings with variable rates of interest that expose us to interest rate risk. If interest rates increase, our debt service obligations on the variable rate indebtedness will increase even though the amount borrowed remains the same, and our net income and cash flows will correspondingly decrease. Our term loans and our revolving credit facility borrowings under the Senior Credit Facilities are subject to variable interest rates but include a eurocurrency "floor" of 0.00%. At our expected level of variable rate indebtedness outstanding, after giving effect to the Transactions and the use of proceeds thereof, each 1% change in interest rates on our variable rate indebtedness would result in an approximate $8.7 million change in annual estimated interest expense under the Senior Credit Facilities assuming the Revolving Credit Facility is undrawn (or an approximate $0.6 million change assuming the Revolving Credit Facility was fully drawn). We will be exposed to the risk of rising interest rates to the extent that we fund our operations with short-term or variable-rate borrowings. Even if we enter into interest rate swaps in the future in order to reduce future interest rate volatility, we may not elect to maintain such interest rate swaps with respect to any of our variable rate indebtedness, and any swaps we enter into may not fully mitigate our interest rate risk. In addition, we have significant fixed rate indebtedness that includes prepayment penalties which could prevent us from taking advantage of any future decrease in interest rates that may otherwise be applicable to us.

***We and our subsidiaries may be able to incur substantially more indebtedness, including secured indebtedness. This could further exacerbate the risks to our financial condition described above.***

We and our subsidiaries may incur significant additional indebtedness in the future, including secured indebtedness. Although the indenture that will govern the notes will contain, and the Credit Agreement that governs the Senior Credit Facilities contains, restrictions on the incurrence of additional indebtedness and additional liens, these restrictions are subject to a number of qualifications and exceptions, and the additional indebtedness, including secured indebtedness, incurred in compliance with these restrictions could be substantial. The holders of our future indebtedness that ranks equally in right of payment with the notes, subject to any collateral arrangements in favor of such indebtedness, will be entitled to share ratably with holders of notes in any proceeds distributed in connection with any insolvency, liquidation, reorganization, dissolution or other winding up of our business. This could reduce the amount of proceeds paid to holders of notes. These restrictions also will not prevent us from incurring obligations that do not constitute indebtedness. If new debt is added to our current debt levels, the related risks that we now face would increase.

The calculation of Consolidated Adjusted EBITDA under the indenture that will govern the notes allows us to add estimated net retransmission revenue uplift, cost savings, operating expense reductions, other operating improvements initiatives and projected synergies related to various actions, including investments, acquisitions, dispositions, mergers and consolidations, including the Transactions. As a result of these and other adjustments that will be permitted by the indenture, we may be able to incur more debt or pay dividends or make other restricted payments in amounts greater than would be permitted without such adjustments.

Because the calculation of Consolidated Adjusted EBITDA under the indenture that will govern the notes will permit estimates and assumptions that may differ materially from actual results, we will be permitted to incur debt and pay dividends or make other restricted payments based on such estimates even if those estimates are not achieved in the timeframe anticipated or at all. Accordingly, you should carefully consider the calculation of Consolidated Adjusted EBITDA in accordance with the indenture that will govern the notes. See "Description of Notes—Certain Definitions."

***If we default on our obligations to pay our other indebtedness, we may not be able to make payments on the notes.***

Any default under the agreements governing our indebtedness, including the Senior Credit Facilities, that is not waived by the required lenders, and the remedies sought by the holders of such indebtedness, could prevent us from paying principal, premium, if any, and interest on the notes. In addition, if we are unable to generate sufficient cash flow or are otherwise unable to obtain funds necessary to meet required payments of principal, premium, if any, and interest on our indebtedness, or if we otherwise fail to comply with the various covenants in the instruments governing our indebtedness (including covenants in the Credit Agreement that governs the Senior Credit Facilities and the indenture that will govern the notes), we could be in default under the terms of the agreements governing such indebtedness. In this event, the holders of such indebtedness could elect to declare all the funds borrowed thereunder to be due and payable, together with accrued and unpaid interest; the lenders under the Senior Credit Facilities could elect to terminate their commitments thereunder, cease making further loans and institute foreclosure proceedings against our assets; and we could be forced into bankruptcy or liquidation. If our operating performance declines, we may need to obtain waivers from the required lenders under the Senior Credit Facilities to avoid being in default. If we breach these covenants and seek a waiver from the required lenders, we may not be able to obtain it. If this occurs, we would be in default under the Senior Credit Facilities, the lenders could exercise their rights, as described above, and we could be forced into bankruptcy or liquidation.

EXHIBIT O(2)

AOE0653

***The notes will be unsecured and effectively subordinated to our and the Guarantors' indebtedness under the Senior Credit Facilities and any other of our secured indebtedness or of the Guarantors' secured indebtedness, in each case, to the extent of the value of the assets securing that indebtedness.***

The notes will not be secured by any of our or the Guarantors' assets. As a result, the notes and the guarantees will be effectively subordinated to our and the Guarantors' indebtedness under the Senior Credit Facilities with respect to the assets that secure that indebtedness. In addition, we may incur additional secured debt in the future. The effect of the effective subordination of the notes to our secured indebtedness, to the extent of the collateral securing our secured indebtedness, is that upon a default in payment on, or the acceleration of, any of our secured indebtedness, or in the event of bankruptcy, insolvency, liquidation, dissolution or reorganization of us or the Guarantors, the proceeds from the sale of assets securing our secured indebtedness will be available to repay obligations on the notes only after all obligations under the Senior Credit Facilities and any other secured debt has been paid in full. As a result, the holders of the notes may receive less, ratably, than the holders of secured debt in the event of a bankruptcy, insolvency, liquidation, dissolution or reorganization of us or the Guarantors.

***Not all of our subsidiaries will guarantee the notes, and the notes will be structurally subordinated to all obligations of our existing and future subsidiaries that are not and do not become Guarantors of the notes.***

The notes will be fully and unconditionally guaranteed on a senior unsecured basis by Allen Media Holdings, LLC and each domestic subsidiary of Allen Media, LLC that guarantees the Senior Credit Facilities and the initial notes, which will be all domestic restricted subsidiaries. Upon completion of this offering, we expect all of our restricted subsidiaries to be guarantors and that the only non-Guarantor subsidiaries will be unrestricted subsidiaries under the indenture. However, the guarantee of the notes by a subsidiary will be automatically released under limited circumstances, including if such subsidiary does not ultimately guarantee the Senior Credit Facilities or if such subsidiary's guarantee of the Senior Credit Facilities is released or discharged. See "Description of Notes—Guarantees" for more information. In the future, other subsidiaries will be required to guarantee the notes only under limited circumstances. The indenture that will govern the notes will not limit the transfer of assets to, or the making of investments in, any of our restricted subsidiaries, including our non-Guarantor subsidiaries. Our subsidiaries that do not guarantee the notes, including the non-domestic, non-wholly owned and immaterial subsidiaries, will have no obligation, contingent or otherwise, to pay amounts due under the notes or to make any funds available to pay those amounts, whether by dividend, distribution, loan or other payment. In the event that any non-Guarantor subsidiary becomes insolvent or is liquidated, reorganized or dissolved, the assets of such non-Guarantor subsidiary will be used first to satisfy the claims of its creditors, including trade creditors, banks and other lenders followed by claims of any holders of preferred stock of such non-Guarantor subsidiary. Only the residual equity value will be available to us and our Guarantors, and only to the extent we or any Guarantor is a parent company of such non-Guarantor subsidiary. Consequently, each guarantee of the notes will be structurally subordinated to claims of creditors of non-Guarantor subsidiaries. The indenture that will govern the notes will permit our subsidiaries, including our non-Guarantor subsidiaries, to incur additional indebtedness, and will not limit their ability to incur trade payables and similar liabilities.

After giving pro forma effect to the Transactions, our non-Guarantor subsidiaries accounted for $3.5 million (prior to eliminations) of our pro forma total revenue, which represented approximately 0.6% of our pro forma total revenue for the twelve-month period ended March 31, 2021 on a pro forma basis. As of March 31, 2021 on a pro forma basis, our non-Guarantor subsidiaries held $28.3 million (prior to eliminations), or approximately 2.1%, of our total assets and $99.7 million (prior to eliminations), or approximately 5.6%, of our total liabilities, to which the notes would have been structurally subordinated.

In addition, our subsidiaries that provide, or will provide, guarantees of the notes will be automatically released from those guarantees upon (1) receipt by the trustee of a notification from us that such guarantee be released and (2) the occurrence of any of the following:

•   the release or discharge of the guarantee by such Guarantor of the Senior Credit Facilities or the guarantee which resulted in the creation of such Guarantee, except a discharge or release by or as a result of payment under such guarantee;

•   the sale or other disposition, including the sale of substantially all the assets, of that Guarantor, as permitted by the indenture that will govern the notes;

•   designation of such Guarantor as an unrestricted subsidiary in accordance with the terms of the indenture that will govern the notes; or

•   the achievement of investment grade status; provided that such guarantee will be reinstated if we subsequently fail to maintain investment grade status.

If any guarantee provided by a subsidiary is released, no holder of the notes will have a claim as a creditor against that subsidiary, and the indebtedness and other liabilities, including trade payables and preferred stock, if any, whether secured or unsecured, of that subsidiary will be effectively senior to the claim of any noteholders. See "Description of Notes—Guarantees."

EXHIBIT O(2)

AOE0654

***The lenders under the Senior Credit Facilities will have the discretion to release the Guarantors under the Senior Credit Facilities in a variety of circumstances, which will cause those Guarantors to be released from their guarantees of the notes.***

While any obligations under the Senior Credit Facilities remain outstanding, any guarantee of the notes by a Guarantor may be released without action by, or consent of, any holder of the notes or the trustee under the indenture that will govern the notes, if the release of the guarantee of the Senior Credit Facilities by such Guarantor is approved by the lenders under the Senior Credit Facilities or otherwise permitted under the Senior Credit Facilities. See "Description of Notes—Guarantees." The lenders under the Senior Credit Facilities will have the discretion to release the guarantees of Guarantors under the Senior Credit Facilities in all cases, and will be obligated to release the guarantees of Guarantors in a variety of circumstances. You will not have a claim as a creditor against any of our subsidiaries that is no longer a Guarantor of the notes, and the indebtedness and other liabilities, including trade payables, whether secured or unsecured, of those subsidiaries will effectively be senior to claims of noteholders.

***We may not be able to repurchase the notes upon a change of control.***

Upon the occurrence of specific kinds of change of control events, we will be required to offer to repurchase all outstanding notes at 101% of their principal amount, plus accrued and unpaid interest, if any, to (but not including) the applicable repurchase date. Additionally, under the Senior Credit Facilities, a change of control (as defined therein) will constitute an event of default that permits the lenders to accelerate the maturity of borrowings under the Senior Credit Facilities and terminate their commitments to lend. The source of funds for any purchase of the notes and repayment of borrowings under the Senior Credit Facilities would be our available cash or cash generated from our subsidiaries' operations or other sources, including borrowings, sales of assets or sales of equity. We may not be able to repurchase the notes upon a change of control repurchase event because we may not have sufficient financial resources to purchase all of the debt securities that are tendered upon a change of control repurchase event and repay the other indebtedness that will become due. We may require additional financing from third parties to fund any such purchases, and we may be unable to obtain such financing on satisfactory terms or at all. Further, our ability to repurchase the notes may be limited by law. In order to avoid the obligations to repurchase the notes and events of default and potential breaches of the Credit Agreement that governs the Senior Credit Facilities, we may have to avoid change of control transactions that would otherwise be beneficial to us.

***Some corporate events may not trigger a change of control, in which case we will not be required to repurchase the notes.***

The indenture that will govern the notes will permit us to engage in corporate events that would increase indebtedness or alter our business but would not constitute a "change of control" as defined in the indenture that will govern the notes. As a result of the definition of "change of control," extraordinary corporate events could take place without having the "change of control" provision of the notes apply.

In addition, if we effected a leveraged recapitalization or other transactions excluded from the definition of "change of control" that resulted in an increase in indebtedness, adversely affected our credit rating or fundamentally changed our business, our ability to make payments on the notes would be adversely affected. However, we would not be required to offer to repurchase the notes, despite our decreased ability to meet our obligations under the notes. See "Description of Notes—Change of Control."

***Holders of the notes may not be able to determine when a "change of control" giving rise to their right to have the notes repurchased has occurred following a sale of "substantially all" of our assets.***

The definition of "change of control" in the indenture that will govern the notes will include a phrase relating to the sale of "all or substantially all" of our assets. Although there is a limited body of case law interpreting the phrase "substantially all," there is no precise established definition of the phrase under applicable law. Accordingly, there may be a degree of uncertainty as to whether a particular transaction would involve a disposition of "substantially all" of our assets. As a result, it may be unclear as to whether a change of control has occurred and whether we are required to make an offer to repurchase the notes.

***Federal and state fraudulent transfer laws may permit a court to void the notes and/or the guarantees and, if that occurs, you may not receive any payments on the notes.***

Federal and state fraudulent transfer and conveyance statutes may apply to the issuance of the notes and the incurrence of the guarantees of the notes. Under federal bankruptcy law and comparable provisions of state fraudulent transfer or conveyance laws, which may vary from state to state, the notes or the guarantees thereof could be voided as a fraudulent transfer or conveyance if we or any of the Guarantors, as applicable, (1) issued the notes or incurred the guarantees with the intent of hindering, delaying or defrauding creditors or (2) received less than reasonably equivalent value or fair consideration in return for either issuing the notes or incurring the guarantees and, in the case of (2) only, one of the following were also true at the time thereof:

- we or any of the Guarantors, as applicable, were insolvent or rendered insolvent by reason of the issuance of the notes or the incurrence of the guarantees;

EXHIBIT O(2)

AOE0655

- the issuance of the notes or the incurrence of the guarantees left us or any of the Guarantors, as applicable, with an unreasonably small amount of capital or assets to carry on the business, in which we or the Guarantors, as applicable, are engaged; or

- we or any of the Guarantors intended to, or believed that we or such Guarantor would, incur debts beyond our or such Guarantor's ability to pay as they mature.

As a general matter, value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or a valid antecedent debt is secured or satisfied. A court would likely find that we or a Guarantor, as applicable, did not receive reasonably equivalent value or fair consideration for our issuance of the notes or its guarantee to the extent that we or such Guarantor did not obtain a reasonably equivalent benefit directly or indirectly from the issuance of the notes or the applicable guarantee. A debtor will generally not be considered to have received value in connection with a debt offering if the debtor uses the proceeds to make a dividend payment or otherwise retire or redeem equity interests of the debtor.

We cannot be certain as to the standards a court would use to determine whether or not we or the Guarantors were insolvent at the relevant time or, regardless of the standard that a court uses, whether the notes or the guarantees would be subordinated to any of our or the Guarantors' other debt. In general, however, a court would deem an entity insolvent if:

- the sum of its debts, including contingent liabilities, was greater than the present fair saleable value of all of its assets; or

- the present fair saleable value of its assets was less than the amount that would be required to pay its probable liability on its existing debts, including contingent liabilities, as they become absolute and mature.

If a court were to find that the issuance of the notes or the incurrence of a guarantee was a fraudulent transfer or conveyance, the court could void the payment obligations under the notes or that guarantee, could subordinate the notes or that guarantee to presently existing and future indebtedness of ours or of the related Guarantor or could require the noteholders to repay any amounts received with respect to that guarantee. If the notes or a guarantee is voided as a fraudulent conveyance or found to be unenforceable for any other reason, you will not have a claim against that obligor and will only be a creditor of the Issuers or any Guarantor whose obligation was not set aside or found to be unenforceable. In addition, the Guarantor's assets will be applied first to satisfy its other liabilities, before any portion of its assets might be available, directly or indirectly, to pay the notes. Sufficient funds to repay the notes may not be available from other sources, including the remaining Guarantors, if any. Furthermore, the loss of a guarantee will constitute a default under the indenture that will govern the notes and could result in the acceleration of the notes, if not otherwise accelerated due to our or our Guarantor's insolvency or bankruptcy filing. In the event of a finding that a fraudulent transfer or conveyance occurred, you may not receive any repayment on the notes.

The indenture that will govern the notes will contain a "savings clause" intended to limit each subsidiary Guarantor's liability under its guarantee to the maximum amount that it could incur without causing the guarantee to be a fraudulent transfer under applicable law. We cannot assure you that this provision will be upheld as intended.

Under the United States Bankruptcy Code, a bankruptcy court may subordinate claims in respect of the notes to other claims against us under the principle of equitable subordination if the court determines that (1) the holder of notes engaged in some type of inequitable conduct, (2) the inequitable conduct resulted in injury to the Issuers' other creditors or conferred an unfair advantage upon the holders of notes and (3) equitable subordination is not inconsistent with the provisions of the United States Bankruptcy Code.

***There are significant restrictions on your ability to transfer or resell your notes.***

The notes are being offered and sold pursuant to an exemption from registration under the Securities Act and applicable state securities laws. As a result, you may offer or resell the notes only in a transaction registered under or exempt from the registration requirements of the Securities Act and applicable state securities laws.

***Your ability to transfer the notes may be limited by the absence of an active trading market, and an active trading market may not develop for the notes.***

We expect the notes to be eligible for trading by "qualified institutional buyers" as defined under Rule 144A, but we do not intend to list the notes on any national securities exchange or include the notes in any automated quotation system. The initial purchaser of the notes has advised us that they intend to make a market in the notes, as permitted by applicable laws and regulations. However, the initial purchaser is not obligated to make a market in the notes and, if commenced, may discontinue their market-making activities at any time without notice.

Therefore, an active market for the notes may not develop or be maintained, which would adversely affect the market price and liquidity of the notes. In that case, the noteholders may not be able to sell their notes at a particular time or at a favorable price, if at all.

EXHIBIT O(2)

AOE0656

Even if an active trading market for the notes does develop, there is no guarantee that it will continue. Historically, the market for non-investment grade debt has been subject to severe disruptions that have caused substantial volatility in the prices of securities similar to the notes. The market, if any, for the notes may experience similar disruptions, and any such disruptions may adversely affect the liquidity in that market or the prices at which you may sell your notes. In addition, subsequent to their initial issuance, the notes may trade at a discount from their initial offering price, depending upon prevailing interest rates, the market for similar notes, our performance and other factors. You should not purchase any of the notes unless you understand and know you can bear all of the investment risks involving the notes.

### *A lowering or withdrawal of our credit ratings may increase our future borrowing costs and reduce our access to capital and may adversely affect the price of the notes.*

Our credit rating and any rating assigned to the notes, if any, could be lowered or withdrawn entirely by a rating agency if, in that rating agency's judgment, future circumstances relating to the basis of the rating, such as adverse changes, warrant. Consequently, real or anticipated changes in our credit ratings will generally affect the market value of the notes. Credit ratings are not recommendations to purchase, hold or sell securities. Additionally, our credit ratings may not reflect the potential effect of risks relating to our business or the structure or marketing of the notes.

Any future lowering of our ratings likely would make it more difficult or more expensive for us to obtain additional debt financing. If any credit rating initially assigned to the notes is subsequently lowered or withdrawn for any reason, you may not be able to resell your notes without a substantial discount.

### *We may choose to redeem the notes prior to maturity.*

We may redeem the notes, in whole or in part, at any time at the applicable redemption price set forth under "Description of Notes—Optional Redemption" for the notes redeemed plus, in each case, accrued and unpaid interest to but excluding the redemption date. If prevailing interest rates are lower at the time of redemption, holders of the notes may not be able to reinvest the redemption proceeds in a comparable security at an interest rate as high as the interest rate of the notes being redeemed. Our redemption right may also adversely affect holders' ability to sell their notes.

### *Most of the covenants in the indenture that will govern the notes will not apply during any period in which the notes are rated investment grade by both Moody's and S&P.*

Most of the covenants in the indenture that will govern the notes will not apply to us during any period in which the notes are rated investment grade by both Moody's and S&P, as long as at such time no default has occurred and is continuing. These covenants restrict, among other things, our ability to pay distributions, incur debt and enter into other transactions. We cannot assure you that the notes will ever be rated investment grade, or, if they are rated investment grade, that the notes will maintain these ratings. However, if the notes are rated investment grade and these covenants are therefore suspended, we would then be allowed to engage in transactions that would not be permitted while these covenants were in force. To the extent the covenants are subsequently reinstated, any such actions taken while the covenants were suspended would not result in an event of default under the indenture that will govern the notes. See "Description of Notes—Certain Covenants."

### *The restrictive covenants in the Credit Agreement that governs the Senior Credit Facilities and the indenture that will govern the notes offered hereby are subject to a number of qualifications, exceptions and limitations, and will be subject to amendment.*

The restrictive covenants in the Credit Agreement that governs the Senior Credit Facilities and the indenture that will govern the notes offered hereby will only apply to our restricted subsidiaries and will be subject to a number of other important qualifications, exceptions and limitations. This means that the restrictions will not be absolute prohibitions. We and our restricted subsidiaries may be able to engage in some of the restricted activities, such as incurring additional debt, securing assets in priority to the claims of the holders of the notes, paying dividends, making investments, selling assets and entering into mergers or other business combinations, notwithstanding the restrictive covenants. Our unrestricted subsidiaries will be permitted to engage in such activities without limitations under these agreements. These actions could be detrimental to our ability to make payments of principal and interest when due and to comply with our other obligations under the notes or the Senior Credit Facilities, and could reduce the amount of our assets that would be available to satisfy such claims should we default on the notes or the Senior Credit Facilities.

In addition, the restrictive covenants in the indenture that will govern the notes offered hereby generally can be amended with the consent of holders of a majority of the notes, and the restrictive covenants in the Credit Agreement that governs the Senior Credit Facilities generally can be amended or waived without the consent of the holders of the notes offered hereby and the lenders under the Senior Credit Facilities may have interests that are opposed to the interests of the holders of the notes offered hereby.

EXHIBIT O(2)

AOE0657

## USE OF PROCEEDS

We expect to use the net proceeds from this offering, together with proceeds from the New Term Loan B and cash on hand, to (i) pay the consideration in connection with the Acquisitions, (ii) fund the KITV Refinancing, and (iii) pay fees and expenses incurred in connection with the Transactions.

Below are the estimated sources and uses in connection with the Transactions. For a discussion of the consideration to be paid in connection with the Acquisitions, see "Capitalization" below.

Please note that the following table is subject to change based on actual amounts at the closing of the Transactions.

| Sources of Funds (in millions): | | Uses of Funds (in millions): | |
|---|---|---|---|
| New Term Loan B | $110.0 | Quincy Assets Purchase Price | $398.0 |
| New Term Loan B (Delayed Draw)[1] | 100.0 | Flint Acquisition Purchase Price | 72.5 |
| Notes offered hereby[3] | 350.2 | Purchase Price of Other Acquisitions | 32.0 |
| Cash from balance sheet | 18.3 | Refinance Existing Net debt of KITV[2] | 20.5 |
| | | Est. Fees and Expenses[4] | 55.5 |
| Total Sources | $578.5 | Total Uses | $578.5 |

---

[1] The New Term Loan B will have a $100.0 million delayed draw component in connection with the closing of Flint and the Fox affiliate in the Southeast. In the event either of those two contemplated acquisitions are not successful, the related portion of the delayed draw component would be reduced accordingly.

[2] Includes designation of KITV (Honolulu) as a restricted subsidiary and guarantor under the Senior Credit Facilities and the indenture governing the notes. As of March 31, 2021, the interest rate in effect on outstanding borrowings under the KITV credit agreement was 7.5% with a base rate of adjusted LIBOR with a floor of 1%. The borrowings under the KITV credit facility mature on March 4, 2026.

[3] Assumes issuance prices at premiums above par.

[4] Includes the debt discount, arrangement fees, redemption premiums and other fees and expenses incurred or to be incurred in connection with the Transactions.

EXHIBIT O(2)

AOE0658

## CAPITALIZATION

The following table sets forth our cash and cash equivalents and consolidated capitalization as of March 31, 2021:

- on an actual basis;

- on an as adjusted basis to give effect to the Transactions and the other adjustments described under "Pro Forma Financial Information" and "Use of Proceeds."

The following data are qualified in their entirety by our financial statements and other information included herein. You should read this table together with "The Transactions," "Risk Factors," "Use of Proceeds" and "Unaudited Pro Forma Condensed Combined Financial Statements."

| | (unaudited) | |
| --- | --- | --- |
| | As of March 31, 2021 | |
| | Actual | As Adjusted |
| | (in millions) | |
| Cash | $ 57.9 | $ 39.6 |
| Long-term debt, including current portion: | | |
| Senior Notes due 2028 | 300.0 | 640.0 |
| Revolving Credit Facility[1] | 17.5 | 17.5 |
| Term Loan[1] | 655.2 | 765.2 |
| New Delayed Draw Term Loan B | — | 100.0 |
| KITV Loan | 20.5 | — |
| Due to related party | 26.5 | 26.5 |
| Payroll Protection Plan loans | 8.6 | 8.6 |
| Line of credit (unrestricted subsidiaries) | 8.8 | 8.8 |
| Debt related to print & advertising (unrestricted subsidiaries) | 36.3 | 36.3 |
| Total long-term debt | 1,073.4 | 1,602.9 |
| Total members' equity (deficit) | (369.2) | (414.9) |
| Total capitalization | $ 704.2 | $ 1,188.0 |

_____

[1] Amounts do not give effect to net debt issuance costs.

EXHIBIT O(2)

AOE0659

## UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS

The unaudited pro forma condensed combined financial information for the year ended December 31, 2020, for the three months ended March 31, 2021, and as of March 31, 2021, has been derived from (i) the historical consolidated financial statements of Allen Media Holdings, LLC for the year ended December 31, 2020, for the three months ended March 31, 2021 and as of March 31, 2021 and (ii) the historical consolidated financial statements of the Quincy Assets for the year ended December 31, 2020, the three months ended March 31, 2021 and as of March 31, 2021.

The unaudited pro forma condensed combined statements of operations for the year ended December 31, 2020 and for the three months ended March 31, 2021 have been prepared as though the acquisition of the Quincy Assets and the KITV Designation occurred on January 1, 2020.

The unaudited pro forma condensed combined balance sheet information as of March 31, 2021 has been prepared as if the Quincy Acquisition and KITV Designation occurred on March 31, 2021. Therefore, the Allen Media Holdings, LLC historical balance sheet as of December 31, 2020 includes the acquisition of USA TV stations. In addition, the Allen Media Holdings, LLC historical statement of operations for the year ended December 31, 2020 and the three months ended March 31, 2021 include the results of USA TV stations subsequent to the acquisition date. However, the unaudited pro forma condensed combined statements of operations for the year ended December 31, 2020 do not reflect the results of operations from the historical USA TV stations operations during the pre-acquisition period from January 1, 2020 through February 10, 2020. Additionally, the loss on derecognition of debt resulting from the refinancing which occurred in conjunction with the USA TV stations acquisition, is adjusted in these pro forma statements as a non-recurring item.

The pro forma adjustments include transaction accounting adjustments to reflect the effects of the transaction as it relates to the entities' historical financial statements. The pro forma adjustments are based on available information and assumptions that we believe are reasonable. Such adjustments are estimates and are subject to change.

The unaudited pro forma condensed combined financial statements are provided for informational purposes only and do not purport to represent what the actual combined results of operations or the combined financial position would have been had the Quincy Acquisition occurred on the date assumed, nor are they necessarily indicative of future combined results of operations or combined financial position. The unaudited pro forma condensed combined financial statements do not reflect any cost savings or other synergies that we believe could have been achieved had the Quincy Acquisition been completed on the dates assumed.

The Quincy Acquisition will be accounted for using the acquisition method of accounting in accordance with ASC 805, *Business Combinations* ("ASC 805"). Our consideration to acquire the Quincy Assets will be allocated to the acquired assets, liabilities, and commitments based upon their estimated fair values. Any excess of the consideration transferred over the fair value of identified assets acquired and liabilities assumed will be recognized as goodwill. Such a valuation requires estimates and assumptions including, but not limited to, estimating future cash flows and direct costs in addition to developing the appropriate discount rates and current market profit margins. The allocation of the consideration transferred is preliminary and is dependent upon valuations that have not progressed to a stage where there is sufficient information to make a final allocation. In addition, the final consideration transferred in connection with our acquisition of the Quincy Assets will not be known until the date of closing of the Quincy Acquisition and could vary from the preliminary purchase price. In addition, we potentially have not yet identified all adjustments necessary to conform the Quincy Assets' accounting policies to our accounting policies. Accordingly, the adjustments necessary to conform accounting policies may be materially different from the preliminary unaudited pro forma adjustments presented.

The actual amounts recorded as of the completion of the Quincy Acquisition may differ materially from the information presented in the unaudited pro forma condensed combined financial statements as a result of several factors, including the following: changes in the Quincy Assets' assets and liabilities between the pro forma balance sheet as of March 31, 2021 and the closing of the Quincy Acquisition, which could impact the preliminary estimated purchase price or the preliminary estimated fair values as of the effective date of the Quincy Acquisition; and other changes in net assets that may have occurred prior to the completion of the Acquisition, which could cause material differences in the information presented.

The unaudited pro forma condensed combined financial statements should be read together with the historical consolidated financial statements of Allen Media Holdings, LLC and the Quincy Assets included elsewhere in this offering memorandum.

EXHIBIT O(2)

AOE0660

AMG
UNAUDITED PRO FORMA CONDENSED COMBINED BALANCE SHEET
AS OF MARCH 31, 2021

| (in millions) | AMG Historical | | Quincy Assets Historical | | Pro Forma Adjustments | | | Pro Forma Combined | |
|---|---|---|---|---|---|---|---|---|---|
| Current Assets | | | | | | | | | |
| Cash | $ | 57.9 | $ | 3.0 | $ | (21.3) | (a) | $ | 39.6 |
| Accounts receivable, net | | 96.3 | | 20.8 | | - | | | 117.1 |
| Television library, current portion | | 10.7 | | 2.4 | | - | | | 13.1 |
| Income tax receivables | | 1.3 | | 0.1 | | (0.1) | (b) | | 1.3 |
| Prepaid expense and other current assets | | 8.6 | | 3.4 | | - | | | 12.0 |
| Total Current Assets | | 174.8 | | 29.7 | | (21.4) | | | 183.1 |
| Tax credit receivable | | 3.1 | | - | | - | | | 3.1 |
| Restricted cash | | 0.2 | | - | | - | | | 0.2 |
| Property and equipment, net | | 70.5 | | 44.0 | | 10.0 | (c) | | 124.5 |
| Television library, less current portion | | 126.9 | | 2.5 | | - | | | 129.4 |
| Film rights, less current portion | | 9.8 | | - | | - | | | 9.8 |
| Intangible assets, net | | 34.2 | | 203.2 | | 46.9 | (d) | | 284.3 |
| Goodwill, net | | 447.8 | | 15.3 | | 162.6 | (e) | | 625.7 |
| Deferred tax assets | | - | | - | | - | | | - |
| Other noncurrent assets | | 4.0 | | - | | - | | | 4.0 |
| Total Assets | $ | 871.3 | $ | 294.7 | $ | 198.1 | | $ | 1,364.1 |
| Liabilities and Member's Equity | | | | | | | | | |
| Current Liabilities | | | | | | | | | |
| Accounts payable and accrued liabilities | | 139.5 | | 6.1 | | (1.4) | (f) | | 144.2 |
| Due to related parties | | 26.5 | | - | | - | | | 26.5 |
| Taxes payable | | 4.2 | | - | | - | | | 4.2 |
| Current portion of borrowings | | 11.8 | | - | | 1.6 | (g) | | 13.4 |
| Current portion of capital lease liabilities | | 2.1 | | - | | - | | | 2.1 |
| Deferred revenue | | 12.9 | | - | | - | | | 12.9 |
| Total Current Liabilities | | 197.0 | | 6.1 | | 0.2 | | | 203.3 |
| Borrowings, less current portion | | 1,008.8 | | - | | 529.7 | (g) | | 1,538.5 |
| Capital lease liabilities, less current portion | | 0.2 | | - | | - | | | 0.2 |
| Deferred tax liabilities | | 27.9 | | 43.5 | | (43.5) | (h) | | 27.9 |
| Other long-term liabilities | | 6.6 | | 2.5 | | - | | | 9.1 |
| Total Liabilities | $ | 1,240.5 | $ | 52.1 | $ | 486.4 | | $ | 1,779.0 |
| Member's Equity (Deficit) | | | | | | | | | |
| Member's deficit | $ | (369.2) | $ | 242.6 | $ | (288.3) | (i) | $ | (414.9) |
| Total Member's Equity (Deficit) | | (369.2) | | 242.6 | | (288.3) | | | (414.9) |
| Total Liabilities and Member's Deficit | | 871.3 | | 294.7 | | 198.1 | | | 1,364.1 |

Refer to accompanying notes

EXHIBIT O(2)

AOE0661

AMG
## UNAUDITED PRO FORMA CONDENSED COMBINED STATEMENT OF OPERATIONS
### FOR THE THREE MONTHS ENDED MARCH 31, 2021

| (in millions) | AMG Historical | | Quincy Assets As Adjusted (Note 2) | Pro Forma Adjustments | | Pro Forma Combined |
|---|---|---|---|---|---|---|
| Revenue | | | | | | |
| Networks and content revenue | $ | 62.0 | $ - | $ - | | $ 62.0 |
| Broadcast television revenue | | 36.8 | 26.3 | - | | 63.1 |
| Total revenues | | 98.8 | 26.3 | - | | 125.1 |
| Operating expense | | | | | | |
| Programming and production expenses | | 55.2 | 14.5 | - | | 69.7 |
| Sales, general and administrative expenses | | 32.0 | 6.1 | (1.5) | (aa) | 36.6 |
| Depreciation and amortization of intangible assets and goodwill | | 18.3 | 1.8 | 4.0 | (bb) | 24.1 |
| Total operating expenses, | | 105.5 | 22.4 | 2.5 | | 130.4 |
| Operating (loss) income | | (6.7) | 3.9 | (2.5) | | (5.3) |
| Other income (expense) | | | | | | |
| Interest expense | | (21.8) | - | (11.7) | (cc) | (33.5) |
| Loss on derecognition of debt | | - | - | - | | - |
| Other income (expense), net | | 0.4 | 0.1 | - | | 0.5 |
| Total other expense, net | | (21.4) | 0.1 | (11.7) | | (33.0) |
| Loss/Profit before Taxes | | (28.1) | 4.0 | (14.2) | | (38.3) |
| Income tax expense | | (0.2) | 1.2 | (0.8) | (ee) | 0.2 |
| Net loss/profit | | (27.9) | 2.8 | (13.4) | | (38.5) |
| Loss attributable to minority noncontrolling interest | | - | - | - | | - |
| Net loss attributable to AMG | | (27.9) | 2.8 | (13.4) | | (38.5) |

Refer to accompanying notes

EXHIBIT O(2)

AOE0662

AMG
## UNAUDITED PRO FORMA CONDENSED COMBINED STATEMENT OF OPERATIONS
### FOR THE TWELVE MONTHS ENDED DECEMBER 31, 2020

| (in millions) | AMG Historical | Quincy Assets as Adjusted (Note 2) | Pro Forma Adjustments | | Pro Forma Combined |
|---|---|---|---|---|---|
| Revenue | | | | | |
| Networks and content revenue | $ 241.7 | $ - | $ - | | $ 241.7 |
| Broadcast television revenue | 127.3 | 142.7 | - | | 270.0 |
| Total revenues | 369.0 | 142.7 | - | | 511.7 |
| Operating expense | | | | | |
| Programming and production expenses | 182.1 | 53.6 | - | | 235.7 |
| Sales, general and administrative | 120.5 | 27.3 | (11.3) | (aa) | 136.5 |
| Depreciation and amortization of intangible assets and goodwill | 68.3 | 8.0 | 16.3 | (bb) | 92.6 |
| Total operating expenses | 370.9 | 88.9 | 5.0 | | 464.8 |
| Operating (loss) income | (1.9) | 53.8 | (5.0) | | 46.9 |
| Other income (expenses) | | | | | |
| Interest expense | (89.1) | - | (47.5) | (cc) | (136.6) |
| Loss on derecognition of debt | (47.2) | - | 47.2 | (dd) | - |
| Other income (expense), net | 2.6 | 1.3 | - | | 3.9 |
| Total other expense, net | (133.7) | 1.3 | (0.3) | | (132.7) |
| Loss/profit before taxes | (135.6) | 55.1 | (5.3) | | (85.8) |
| Income tax expense | (5.0) | 15.5 | (1.3) | (ee) | 9.2 |
| Net loss/profit | (130.6) | 39.6 | (4.0) | | (95.0) |
| Loss attributable to minority noncontrolling interest | 0.4 | - | (0.4) | (ff) | - |
| Net loss attributable to AMG | (130.2) | 39.6 | (4.4) | | (95.0) |

Refer to accompanying notes

EXHIBIT O(2)

AOE0663

**Note 1 – The Acquisitions and Refinancing**

The Quincy Acquisition, the Flint Acquisition, and the Other Acquisitions, the offering of the notes, the KITV Refinancing and the term loan facility below and related transactions are referred to collectively as the "Transactions." The effects of the USA TV stations acquisition on February 10, 2020 are reflected in the unaudited pro forma condensed combined balance sheet and included in the AMG historical results in the unaudited pro forma condensed combined statements of operations for the period subsequent to the acquisition date.  In addition, certain transaction costs incurred by AMG for the acquisition of USA TV stations have been adjusted in the pro forma condensed combined statement of operations for the year ended December 31, 2020.

### *The Quincy Acquisition*

On April 29, 2021, we entered into the Purchase Agreement with Gray Television Inc. pursuant to which our subsidiary, AMG Broadcasting Evansville III, Inc., agreed to purchase the purchased assets and assume the assumed liabilities that are 100% owned by the Stations for a purchase price of approximately $398.0 million, subject to certain adjustments.

### *Senior Secured Credit Facilities*

The Company will obtain senior secured credit facilities in an aggregate principal amount of $210.0 million (as such aggregate principal amount may be reduced, if applicable) comprised of an incremental borrowing to our existing term loan B facility, in an aggregate principal amount of $210.0 million (the "Additional Term Loan B Facility"). For the avoidance of doubt, no portion of the Revolving Credit Facility will be drawn in connection with the consummation of the transactions contemplated by the Purchase Agreement.

### *Acquisition*

We intend to pay the consideration in connection with the Quincy Acquisition, effect the contemplated KITV Refinancing and pay related costs and expenses with the proceeds of (i) "Senior Credit Facilities" comprised of an incremental term loan B in an initial principal amount of $210.0 million with a five-year maturity (the "Term Loan"), and (ii) "Senior Unsecured Notes" comprised of $340.0 million with an seven-year maturity in this offering.

The aggregate proceeds of the KITV Refinancing, together with our available cash, will be sufficient for us to pay the purchase price for the Quincy Acquisition, to effect the KITV Refinancing and to pay all related fees and expenses payable in connection with the Quincy Acquisition and KITV Refinancing. See "Use of Proceeds".

The total purchase consideration for the Quincy Acquisition has been allocated to the assets acquired, liabilities assumed, for purposes of the unaudited pro forma condensed combined financial information based on their estimated relative fair values. The allocation of the purchase consideration herein is preliminary. The final allocation of the purchase consideration for the Quincy Acquisition will be determined after the completion of a thorough analysis to determine the fair value of all assets acquired and liabilities assumed but in no event later than one year following the completion of the Quincy Acquisition.

Accordingly, the final acquisition accounting adjustments could differ materially from the unaudited pro forma adjustments presented herein. Any increase or decrease in the fair value of the assets acquired and liabilities assumed, as compared to the information shown herein, could also change the portion of the purchase consideration allocable to goodwill and could impact the operating results of AMG following the Quincy Acquisition due to differences in the allocation of the purchase consideration, depreciation and amortization related to some of these assets and liabilities. The Other Acquisitions are contemplated herein only as it relates to the related financing and capital structure impacts, no purchase price allocation or transactional accounting effects specific to the Other Acquisitions are reflected.

The purchase consideration for the Quincy Acquisition was preliminarily allocated as follows:

| (in millions) | Quincy Assets |
|---|---|
| Accounts receivable | 20.8 |
| Prepaid expenses and other assets, current | 8.4 |
| Property and equipment | 54.0 |
| Intangible assets – FCC licenses | 200.0 |
| Other intangibles | 50.0 |
| Accounts payable and accrued expenses | (6.1) |
| Other liabilities, non-current | (2.5) |
| **Net Assets Acquired** | **324.6** |
| Purchase Price | 398.0 |
| **Goodwill** | **73.4** |

EXHIBIT O(2)

AOE0664

*Basis of the Pro Forma Presentation*

Upon consummation of the Quincy Acquisition, the Quincy Assets will adopt AMG's accounting policies. The Company has performed an initial analysis and any significant accounting policy differences identified to date have been addressed such that these pro forma statements reflect the accounting policies of AMG. AMG may identify differences between the accounting policies among the companies, that when conformed, could have a material impact on the consolidated financial statements of the combined entity.

**Note 2 – Adjustments to the Historical Financial Information of the Quincy Assets**

Certain balances and transactions presented in the historical financial statement of operations of the Quincy Assets have been adjusted to reflect certain divisions that are not part of the Quincy Acquisition and will therefore not be owned by AMG (the "Excluded divisions") as shown below:

### Quincy Assets for the year ended December 31, 2020

| (in millions) | Quincy Assets historical | Excluded divisions | Quincy Assets As adjusted |
|---|---|---|---|
| **Revenue** | | | |
| Broadcast television Revenue | 146.5 | (3.8) | 142.7 |
| **Total Revenues** | **146.5** | **(3.8)** | **142.7** |
| **Operating Expense** | | | |
| Programming and production expenses | 54.2 | (0.6) | 53.6 |
| Sales, general and administrative expenses | 27.5 | (0.2) | 27.3 |
| Depreciation and amortization of intangible assets and goodwill | 8.0 | - | 8.0 |
| **Total operating expenses** | **89.7** | **(0.8)** | **88.9** |
| **Operating income (loss)** | 56.8 | **(3.0)** | 53.8 |
| **Other Income (Expense)** | | | |
| Other income (expense), net | 1.3 | - | 1.3 |
| **Total other expense, net** | 1.3 | - | 1.3 |
| **Profit / Loss before Taxes** | **58.1** | **(3.0)** | **55.1** |
| Income tax expense | 16.3 | (0.8) | 15.5 |
| **NET PROFIT / LOSS** | **41.8** | **(2.2)** | **39.6** |

### For the three months ended March 31, 2021

| (in millions) | Quincy Assets historical | Excluded divisions | Quincy Assets As adjusted |
|---|---|---|---|
| **Revenue** | | | |
| Broadcast television Revenue | 27.3 | (1.0) | 26.3 |
| **Total Revenues** | **27.3** | **(1.0)** | **26.3** |
| **Operating Expense** | | | |
| Programming and production expenses | 14.7 | (0.2) | 14.5 |
| Sales, general and administrative expenses | 6.1 | (0.0) | 6.1 |
| Depreciation and amortization of intangible assets and goodwill | 1.8 | (0.0) | 1.8 |
| **Total operating expenses** | **22.6** | **(0.2)** | **22.4** |
| **Operating income (loss)** | **4.7** | **(0.8)** | **3.9** |
| **Other Income (Expense)** | | | |
| Other income (expense), net | 0.1 | - | 0.1 |
| **Total other expense, net** | 0.1 | - | 0.1 |
| **Profit / Loss before Taxes** | **4.8** | **(0.8)** | **4.0** |
| Income tax expense | 1.4 | (0.2) | 1.2 |
| **NET PROFIT / LOSS** | **3.4** | **(0.6)** | **2.8** |

EXHIBIT O(2)

AOE0665

**Note 3 – Pro Forma Adjustments**

*Adjustments to the Unaudited Pro Forma Condensed Combined Balance Sheet*

The pro forma adjustments included in the unaudited pro forma condensed combined balance sheet as of March 31, 2021 are as follows:

a)   See Note 1 – *The Acquisition and Refinancing* impact on the cash balance, resulted in a net cash decrease of $21.3 million to the balance sheet of the combined entity.

| (in millions) | |
|---|---:|
| Pre-combination business cash | 57.9 |
| Pre-Acquisition Quincy Assets cash | 3.0 |
| Cash inflow from issuance of term loan, net | 205.8 |
| Cash inflow from issue of senior unsecured notes, net | 346.0 |
| **Cash inflow from the Transactions** | **551.8** |
| Cash payment to Gray for Quincy Assets purchase price | (398.0) |
| Cash payment for Other Acquisitions | (104.5) |
| Retirement of pre-combination KITV debt | (20.5) |
| Net of cash retained by Quincy (cash free purchase) | (3.0) |
| Payment of transaction costs | (47.1) |
| **Cash outflow for the Transactions** | **(573.1)** |
| Net pro forma cash flow | (21.3) |
| **Post-Combination business Cash** | **39.6** |

b)   Represents the reduction to the Quincy Asset income tax receivables as a result of the Quincy Acquisition.

c)   Represents the net adjustment of $10.0 million to property and equipment, net based on the preliminary purchase price allocation of the Quincy Assets.

d)   Represents the net adjustment of $46.9 million to increase the historical intangible asset value of the Quincy Assets to the identified fair value based on the preliminary purchase price allocation.

e)   Represents the net adjustment to goodwill based on the elimination of the historical goodwill in the Quincy Assets and the adjusted goodwill related to the preliminary purchase price allocation of the Quincy Assets and the preliminary anticipated value of the Other Acquisitions.

f)   Represents the elimination of historical transaction costs accrued expected in conjunction with the KITV Refinancing and as a result of the Quincy Acquisition.

g)   In connection with the closing of the Quincy Acquisition, the following debt-related transactions are expected to take place:

| (in millions) | Debt, current portion | Debt, net of current portion and debt issuance costs |
|---|---:|---:|
| Term loan borrowing | 2.1 | 203.7 |
| Senior unsecured notes | - | 346.0 |
| Retirement of KITV debt | (0.5) | (20.0) |
| **Pro forma adjustment** | **1.6** | **529.7** |

h)   Represents the elimination of the Quincy Assets' deferred tax liability as a result of the Quincy Acquisition.

i)   Represents the elimination of the Quincy Assets' member's equity as a result of the Quincy Acquisition and the impact of transaction fee costs due to the KITV Refinancing and Quincy Acquisition.

EXHIBIT O(2)

AOE0666

***Adjustments to the Unaudited Pro Forma Condensed Combined Statements of Operations***

The pro forma adjustments included in the unaudited pro forma condensed combined statement of operations for the three months ended March 31, 2021 and for the year ended December 31, 2020 are as follows:

aa)  Represents the elimination of non-recurring transaction costs specifically incurred by AMG as part of the Acquisitions, and the acquisition of the USA TV stations in the first quarter of 2020. The transaction costs incurred during each year are noted below:

| (in thousands) | Pro Forma Three Months Ended March 31, 2021 | Pro Forma Year Ended December 31, 2020 |
|---|---|---|
| AMG transaction costs | - | 10.0 |
| USA TV Acquisition | 1.5 | 1.3 |
| Quincy Assets and Other Acquisitions | **1.5** | **11.3** |
| **Total transaction costs to be eliminated (non-recurring)** | **1.5** | **11.3\*** |

(*)  No acquire transaction costs are included within the Quincy Asset historical financials

bb)  Represents the increase in depreciation and increase in amortization expense resulting from the adjustments to fair values of assets acquired and liabilities assumed for each of the acquisitions. The pro forma adjustments reflect depreciation and amortization expense, including amortization of goodwill, for the Quincy Assets.

**Summary of Asset Values**

| (in millions) | Asset Fair Value | Average remaining useful life (in years) |
|---|---|---|
| **Quincy Assets** | | |
| Intangible asset – FCC licenses | 200.0 | Indefinite |
| Other intangible assets | 50.0 | 4.5 |
| Land | 6.0 | Not depreciated |
| Land improvements | 1.5 | 12 |
| Building and improvements | 18.0 | 23.2 |
| Personal property | 28.5 | 5.8 |

We depreciate both real property and personal property on a straight-line basis. Goodwill is amortized over 10 years on a straight-line basis.

| (in millions) | Pro Forma Three Months Ended March 31, 2021 | Pro Forma Year Ended December 31, 2020 |
|---|---|---|
| **Depreciation** | | |
| Quincy Assets | 1.0 | 6.0 |
| Total depreciation based on PPE fair value | 1.0 | 6.0 |
| Reversal of historical depreciation | (1.4) | (6.2) |
| **Net depreciation pro forma adjustment** | **(0.4)** | **(0.2)** |
| **Amortization of intangibles** | | |
| Quincy Assets | 3.0 | 11.0 |
| Total amortization based on PPE fair value | 3.0 | 11.0 |
| Reversal of historical amortization | **(0.4)** | **(1.8)** |
| **Net intangibles amortization adjustment** | 2.6 | 9.2 |
| **Amortization of goodwill** | | |
| Quincy Assets | 1.8 | 7.3 |
| Total amortization based on goodwill fair value | 1.3 | 7.3 |
| Reversal of historical amortization | - | - |

EXHIBIT O(2)

AOE0667

| (in millions) | Pro Forma Three Months Ended March 31, 2021 | Pro Forma Year Ended December 31, 2020 |
|---|---|---|
| **Net goodwill amortization pro forma adjustment** ........... | 1.8 | 7.3 |
| **Net Pro forma adjustment** ................................................ | 4.0 | 16.3 |

cc)  Represents interest expense related to the KITV debt redemption and recapitalization pursuant to the Quincy Acquisition.

**Debt Refinancing**

| (in millions) | Pro Forma Three Months Ended March 31, 2021 | Pro Forma Year Ended December 31, 2020 |
|---|---|---|
| Incremental interest expense ............................................. | 11.9 | 47.7 |
| Deferred financing and underwriting fees ........................ | (0.1) | (0.2) |
| **Debt refinancing adjustment** ........................................ | 11.8 | 47.5 |
| Reversal of historical interest expense ............................ | (0.1) | - |
| **Net Pro forma refinancing adjustment** ....................... | 11.7 | 47.5 |

An increase or decrease of 1/8 point in the interest rate on the New Term Loan Facility would increase or decrease the assumed interest expense for the year ended December 31, 2020 by $0.3 million and for the three months ended March 31, 2021 by $0.1 million.

dd)  Represents the elimination of AMG's losses on extinguishment of debt which resulted from a prior acquisition and is eliminated as a non-recurring item.

ee)  Adjustment to reflect the change in tax expense (benefit) of AMG and the Quincy Assets and to record the tax expense of the combined entities on a pro forma basis using a blended federal and state statutory effective tax rate of 27.0%. The adjustment reflects an expectation that the acquired goodwill will be deductible for tax purposes. Additionally, the actual effective tax rate of the combined company and corresponding tax impacts could be significantly different dependent upon post-Acquisition activities and results.

ff)  Represents the adjustment to the noncontrolling interest net loss as a result of Byron Allen's contribution of his noncontrolling interest in a subsidiary in conjunction with the USA TV acquisition in February 2020.

EXHIBIT O(2)

AOE0668

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS OF AMG**

*Our Management's Discussion and Analysis of Financial Condition and Results of Operations should be read together with the other sections of this Offering Memorandum, including "Business" "Risk Factors" and our consolidated financial statements and related notes thereto. For purposes of this section, references to "we," "us," "our" and the "Company" refer to Allen Media Holdings, LLC and its consolidated subsidiaries. This section contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Important information regarding such forward-looking statements and a discussion of risks, uncertainties and other important factors that could cause actual results to differ materially from those in the forward-looking statements are set forth in this Offering Memorandum, particularly in "Risk Factors." In addition, the discussion below does not give effect to the Transactions. The Transactions will have a material impact on our liquidity, financial condition and results of operations going forward.*

**Overview**

We are a minority-owned, privately-held diversified media company that, pro forma for the Transactions, will own and operate 28 highly ranked broadcast television stations, The Weather Channel, 7 additional 24-hour high-definition television networks, and 2 over-the-air broadcast networks. We provide local news, weather, and sports content featuring Emmy Award-nominated shows and reach over 190 million subscribers. We produced approximately 5,000 hours of live weather programming and over 650 hours of weekly local news in 2020; distribute sports, primetime and entertainment content across our broadcast television markets through our affiliations with ABC, CBS, FOX and NBC networks (collectively, the "Big Four" networks); and own over 5,000 hours of original programming across multiple genres through Entertainment Studios, our television production and distribution business.

We were founded by Byron Allen in 1993 and are headquartered in Los Angeles, California. Over the last two years, we have significantly grown our business through a series of transformative acquisitions. We have made several broadcast television acquisitions, including Bayou City Broadcasting in July 2019, USA TV in February 2020, KITV in January 2021, and the potential purchase of 13 Additional Stations. In addition, we acquired two over-the-air broadcast television networks from MGM in October 2020.

This discussion is based on the historical financial results of Allen Media Holdings, LLC for the years ended December 31, 2020 and 2019 and the three months ended March 31, 2021 and 2020 and should be read together with the historical financial statements of Allen Media Holdings, LLC appearing elsewhere in this offering memorandum.

**Pending Acquisitions**

We intend to acquire or own the operations of thirteen broadcast television stations across ten markets across the Midwest, West Coast, and Southeast, including key political battleground states of Wisconsin, Arizona, Iowa and Michigan. We expect to integrate the broadcast stations into our current broadcast television station business.

In addition, our unrestricted subsidiary, Allen Media Broadcasting Evansville II, LLC, closed on its acquisition of KITV, Inc., a television broadcast company in Honolulu, Hawaii on January 20, 2021. As part of the transaction, KITV will be designated as a restricted subsidiary and become a guarantor under the indenture and the Senior Credit Facilities and repay its existing $20.5 million credit facility. Additionally, while there can be no assurance that the transactions will be consummated, AMG entered into an agreement on July 14, 2021 to acquire WJRT-TV, an ABC affiliate in Flint-Saginaw, Michigan (the "Flint Station") for $72.5 million in cash (the "Flint Acquisition").

This offering is conditioned on the substantially concurrent closing of the Quincy Acquisition and the New Term Loan B.  This offering is not conditioned upon the closing of the Flint Acquisition or the Other Acquisitions.

**Other Factors Impacting Our Business**

Our business has undergone significant changes over the last several years, including acquisitions. The pro forma financial effects of those acquisitions on our business is set forth under "Pro Forma Financial Information." To the extent those changes have not been reflected in our historical financial statements, they would have significant impacts on our business going forward.

We also expect our results of operations to be impacted by the following, which are set forth in our calculation of Pro Forma Restricted Group Adjusted EBITDA under "Summary Unaudited Pro Forma Condensed Combined Financial Information":

- We adjusted our affiliate fees for our Comcast and Frndly.TV agreements, which is estimated to add an incremental $3.8 million in annual revenue.

EXHIBIT O(2)

AOE0669

- We anticipate cost savings of $2.9 million at the Quincy Assets due to headcount reduction, elimination of duplicative G&A costs and a reduction in programming costs.

- We anticipate cost savings of $0.8 million at the Flint Station due to headcount reduction and programming efficiencies.

- We anticipate other acquisition cost savings of $0.3 million from efficiencies relating to the potential acquisition of a Fox affiliate station in the Southeast.

We generate our revenues principally through affiliate subscription fees received in connection with the multi-year affiliation agreements we have with distributors and the advertising revenues we generate from the sale of advertising inventory, program sponsorships and other bundled advertising packages, with a major part of our advertising revenue generated through the upfront advertising season. Accordingly, changes in revenue are primarily driven by changes in contractual affiliate subscription fee rates charged for our service, changes in the number of our distributors' subscribers, which impacts the affiliate fees we receive, and changes in the prices and level of advertising on our channels. Changes in advertising revenues tend to correlate with changes in the level of economic activity in the United States and in the local markets in which we operate stations, and with the cyclical changes in political advertising as discussed in greater detail in the following paragraph. Programming content, audience share, audience demographics, and the advertising rates charged relative to other available advertising opportunities also affect advertising revenues. Our revenues are also impacted by changes in the availability, amount and timing of the development and distribution of our original programming. The cost to produce our live and original programming also impacts our profitability.

Our operating results are subject to cyclical fluctuations from political advertising. Political spending has been significantly higher in the even number years due to the cyclicality of political elections. In addition, every four years, political spending is typically elevated further due to the advertising related to the presidential election. Because of the political election cyclicality, there has been a significant difference in our operating results when comparing even-numbered years' performance to the odd numbered years' performance. Additionally, our operating results are impacted by the number and importance of individual political races and issues discussed on a national level as well as those within the local communities we serve. We believe political advertising will continue to be a strong advertising category in our industry. Political advertising levels may increase further as political-activism around social, political, economic and environmental causes, continues to draw attention and Political Action Committees, or PACs, continue to increase spending. We expect our financial results in 2022 and subsequent even years to be impacted by political spending.

*The Impact of COVID 19 on our Results of Operations*

We continue to monitor the impact of the COVID-19 pandemic on all aspects of our business, including how it has and will impact our advertisers and distributors. Beginning in mid-March 2020, we experienced adverse advertising sales impacts and had most of our employees working remotely. While we continue to evaluate the impact of COVID-19, we are unable to predict the extent of the impact that the pandemic will have on our financial condition, results of operations and cash flows in future periods due to numerous ongoing uncertainties.

**Key Components of Our Results of Operations**

*Revenue*

Our revenue is comprised of advertising, subscription license fees, license fees, distribution fees and other revenues.

We generate both our affiliate subscription fee and retransmission fee revenue from cable, satellite, and other MVPDs that generally pay us a "per-subscriber" fee on a monthly basis for the right to distribute our programming under the terms of long-term distribution contracts. Revenue from both subscription license fees and retransmission fees are recorded based on the monthly subscriber reports received from cable, satellite and other MVPDs and are recognized when the services are provided.

We generate advertising revenue mainly from national network advertising, direct response advertising, and local and national broadcast advertising. Our national network advertising is generated mainly from the Weather Group and the syndicated program business of Entertainment Studios. For the Weather Group, network advertising revenue is based on either audience delivery or a fixed price per spot. For advertising campaigns based on audience delivery, Weather Group and Entertainment Studios guarantee advertisers a minimum audience during the dayparts in which their advertisements are broadcast over the term of the advertising contracts. Weather Group provides the advertisers with additional advertising time if the guaranteed audience size and/or the minimum number of spots are not delivered. Advertising revenues are recorded, net of agency commissions, if applicable, at the estimated fair value of the advertising spot. Revenue is recognized when the television productions are transmitted via satellite (i.e., when the advertisements are run).

For our Entertainment Studios' syndicated program business, advertising revenue is derived through barter agreements with local broadcast affiliates. The barter agreements with local broadcast affiliates exchange our Entertainment Studios programming for advertising inventory in non-news and non-network time periods. We then sell that advertising inventory primarily to national

EXHIBIT O(2)

AOE0670

advertisers. For the seven Entertainment Studios television networks, the advertising sold is predominately direct response advertising. Direct response advertising is sold on a unit basis and revenue is recognized based on the number of customer responses received by providers of advertising that is shown during our programming. Our local and national broadcast advertising are sold by our broadcast television stations. Local advertising is sold by each station's local sales staff who call upon advertising agencies and local businesses, which include car dealerships, retail stores, restaurants, and others. National advertising time is sold through national sales representatives firms which call upon advertising agencies, whose clients typically include automobile manufacturers and dealer groups, telecommunications companies, and national retailers.

All national and political revenue is derived from advertisements placed through advertising agencies. All advertising revenue are affected by a number of factors, including the economic conditions of the markets in which we operate, the demographic makeup of those markets and the marketing strategy we employ in each market. Advertising contracts vary in length, from as short as one day to a full year, though most are short-term and generally are less than three months, or one quarter, in length.

We generate revenue from licensing our television and film library and other content. Revenue from broadcast licensing agreements, together with related costs, is recognized once the licensing period has commenced and the programs are delivered. In addition, we also generate revenue from royalties from the use and retransmission of our music and content aired on our digital cable and satellite channels. Royalties are recognized when the amounts are known, and the collectability of the royalties is reasonably assured.

We generate our distribution fee revenues from distribution agreements for the release of content such as movies on theatrical and digital platforms. We collect the money due under these arrangements and distribute the amounts payable to the producers of the content. In exchange for the performance of these services, we retain a commission from the amounts collected in the form of a distribution fee.

Other revenues are comprised principally of domestic and international licensing of our long-form programming.

### Operating Expenses

Our operating expenses are comprised of production costs, satellite distribution costs, television broadcast costs, distribution costs, advertising and promotion costs, residuals and general and administrative costs.

Production costs consist of costs to produce the content that we broadcast and distribute, including expenses related to the operations of our owned networks, content, and broadcast stations. The costs of internally produced long-form programming consist primarily of internal labor and benefits and third-party content, production, and editing costs. The costs of internally produced programming not intended for rebroadcast are expensed as incurred. In addition, it includes the fees paid to broadcast television networks for our TV broadcast stations.

Satellite distribution costs consist of costs to distribute our television programs and other content by satellite, including the use of satellite distributors.

Distribution costs consist of fees paid to third party distributors related to the different movie windows of our theatrical releases. We pay these fees to third party distributors in territories or markets where they have stronger relationships or provide improved cost efficiencies.

Residuals payable represent amounts payable to various unions or "guilds," such as the Screen Actors Guild, Directors Guild of America and Writers Guild of America, based on the performance of the television show in ancillary markets or based on the individual's (i.e., actor, director, writer) salary level in the television market.

General and administrative expenses consist of costs primarily in our broadcast segment related to management staffing and compensation expenses, real estate lease expenses, information technology costs, commissions and transaction processing costs related to advertising sales and employee compensation cost and retirement benefits.

### Depreciation and Amortization

Depreciation and amortization relates to the depreciation and amortization of our assets, including property and equipment, licensed films and television library, film rights, intangible assets, goodwill, disposal of assets, investments, deferred financing costs and extinguishment of debt. Depreciation and amortization is generally computed using the straight-line method over the estimated useful lives of the respective assets.

Depreciation of property and equipment relates to the depreciation of production equipment, office furniture and equipment, leasehold improvements, satellites and trucks and automobiles. We also have assets in the course of construction, which are

EXHIBIT O(2)

AOE0671

depreciated once the asset is completed and placed into service. Maintenance and repairs are charged to operations when incurred, while betterments and renewals are capitalized. Gains or losses are recognized upon the sale or disposal of the assets.

Amortization of licensed films and television library relates to the amortization of capitalized television production costs that are aired by broadcast television stations and satellite and cable service providers, as well as capitalized programming rights and costs for licensed, internally-produced and commissioned programming that is broadcast by Weather Group. Amortization of licensed films related to amortization of the cost to acquire programming under license agreements along with the related obligations, which are recorded at the contract value when a license agreement is executed, the license period begins, and the program is accepted and available for use. Capitalized costs are amortized on a straight-line basis, commencing on the first airing and over the respective license periods.

Amortization of intangible assets related to the amortization of internally developed technology and software (for internal use and that is held for sale, lease, or otherwise marketed), costs incurred to acquire the names of digital and satellite channels and localization technology ("STAR") conveyed to cable, satellite and other distributors. STAR technology allows distributors of a Weather Group network signal to receive the transmission of thousands of localized weather forecasts and extract the forecast for a specific geography. We also have intangible assets in the course of construction. Such assets are amortized once the asset is completed and placed into service. Intangible assets are capitalized and amortized on a straight-line basis over three to fifteen years.

Amortization of goodwill mostly relates to the amortization of the cost to acquire Weather Group. Goodwill is tested for impairment when a triggering event occurs that indicates that the fair value of an entity (or a reporting unit) may be below its carrying amount. If the goodwill is determined to be impaired, the goodwill is written down to its realizable value and the loss is recognized in consolidated statement of operations in the period when determination is made.

Loss on disposal of assets relates to the recognition of losses upon the sale or disposal of an asset, such as property and equipment.

Impairment of investment held at cost relates to the impairment amount accounted for in connection with Weather Group's minority investments held at cost, or the value of the investment on our balance sheet, such as Weather Group's minority interests in TrafficCast and Wibbitz.

Amortization of deferred financing costs relates to amortization of the costs incurred to acquire debt. These costs are deferred and amortized on a straight-line basis over the term of the related debt, which is considered to approximate to the same annual amortization charge as the interest yield method. We have presented deferred financing costs as a reduction of long-term debt in our consolidated balance sheets.

Loss on extinguishment of debt relates to nonrecurring costs and recognition of losses involved in the amendment, refinancing and/or modification of debt treated as an extinguishment.

### *Other Income/Expense*

Other expense (income) consists of interest expense, other interest income and other interest income.

Interest expense consists of the cost of interest payments on our debt, including interest on borrowings and one-time fees associated with the entering into of such borrowings.

Other interest income consists of interest payments received by us from our financing provided to related parties, such as special purpose vehicles, or SPVs.

### *Income Tax Expense*

Income tax expense (benefit) relates to the provision for or benefit from the valuation of our deferred tax assets and liabilities at the enacted rate for our taxable entity group.

EXHIBIT O(2)

AOE0672

## Results of Operations

### *Comparison of three months ended March 31, 2021 vs. 2020*

## Revenues:

The following table sets forth our revenue for our business segments for the periods presented:

| (in millions) | Three Months Ended March 31, 2021 | | 2020 | | Change Increase (decrease) $ | % |
|---|---|---|---|---|---|---|
| Revenues | | | | | | |
| Networks and content revenue | $ | 62.0 | $ | 65.4 | (3.4) | (5.2) |
| Broadcast television revenue | | 36.8 | | 23.6 | 13.2 | 55.7 |
| Total revenues | $ | 98.8 | $ | 89.0 | 9.8 | 11.0 |

The increase in total revenue was mostly due to the acquisitions of USA TV, KITV and the multicast broadcast television networks, offset by declines in film revenue.

Networks and content revenue was $62.0 million, which was 5.2% below the comparable period of the prior year. The decline was primarily due to the reduction of film revenue within Entertainment Studios P&A entities, which is an unrestricted subsidiary, offset by the acquisition of the multicast broadcast networks and improvements in advertising and subscription license fees. Entertainment Studios advertising revenues were $7.5 million, which was 9.0% above the comparable period of the prior year. This increase was due to growth in pharmaceuticals and numerous other industries within the syndication business. Entertainment Studios gross subscription license fee was $7.8 million, which was 43.2% and $2.4 million above the comparable period of the prior year. The increase was due to the new carriage agreement with Comcast for Comedy.TV. Marketing support payments were $0.2 million lower compared to the prior year.  Weather Group advertising revenues of $20.5 million were 3.6% and $0.8 million below the comparable period of the prior year. This decline was primarily due to seasonally lower January activity, offset by increased demand and pricing in February and March. National CPMs for the Weather Group increased 3.2% over the comparable period of the prior year. Weather Group's subscription license fee was $21.9 million, which was 5.2% and $1.2 million below the comparable period of the prior year. This decline was largely due to overall industry decline in pay-TV subscribers, offset by low single digit net average price increases.

Broadcast television revenue was $36.8 million, which was 55.7% above the comparable period of the prior year. The increase in revenue was primarily related to the aforementioned acquisitions.

## Operating Expenses

The following table sets forth our revenue for our operating expenses for the periods presented:

| | Three Months Ended March 31, 2021 | | 2020 | | Change Increase (decrease) $ | % |
|---|---|---|---|---|---|---|
| Operating expenses | | | | | | |
| Programming and production | $ | 55.2 | $ | 39.6 | 15.6 | 39.3 |
| Sales, general and administrative | | 32.0 | | 36.5 | (4.5) | (12.4) |
| Depreciation and amortization of intangible assets and goodwill | | 18.3 | | 13.5 | 4.8 | 35.6 |
| Total operating expenses | $ | 105.5 | $ | 89.6 | 15.9 | 17.7 |

EXHIBIT O(2)

AOE0673

The increase in programming and production expenses was due to increase in production and distribution cost from the recently acquired multicast broadcast television networks and due to the acquisition of KITV and USA TV.

The decrease in sales, general and administrative expenses was a result of reduced transaction expenses.

The increase in depreciation and amortization of intangible assets and goodwill was due to the acquisitions of the multicast broadcast television networks, KITV and USA TV.

## Other Expense (Income)

The following table sets forth a summary of our other income/expenses for each of the periods indicated.

| | Three Months Ended March 31, | | Change Increase (decrease) | |
|---|---|---|---|---|
| | 2021 | 2020 | $ | % |
| Other income (expense) | | | | |
| Interest expense | $ (21.8) | $ (23.5) | 1.7 | (7.5) |
| Loss on derecognition of debt | - | (47.2) | 47.2 | nm |
| Other income, net | 0.4 | 0.2 | 0.2 | 40.2 |
| Total other expense, net | $ (21.4) | $ (70.5) | 49.1 | (69.6) |

Interest expense decreased mainly as a result of the reduction of deferred financing cost. In addition, the Company did not recognize any expenses for the derecognition of debt compared to the prior period, which was a result of the refinancing that occurred on February 10, 2020.

## Income Tax Expense

The following table sets forth our interest tax expense (benefit) for each of the periods indicated.

| | Three Months Ended March 31, | | Change Increase (decrease) | |
|---|---|---|---|---|
| | 2021 | 2020 | $ | % |
| Income tax expense (benefit) | $ (0.2) | $ (0.8) | 0.6 | (71.4) |

For both periods, the provision for income taxes of the taxable-entity group differs from the amount of income tax determined by applying the applicable U.S. statutory income tax rate to pre-tax income primarily due to state and local income taxes and goodwill amortization that is not deductible for income tax purposes.

### Comparison of year ended December 31, 2021 vs. 2020

## Revenues:

The following table sets forth our revenue for our business segments, for the periods presented:

| (in millions) | Year Ended December 31, | | Change Increase (decrease) | |
|---|---|---|---|---|
| | 2020 | 2019 | $ | % |
| Revenue | | | | |
| Networks and content revenue | $ 241.7 | $ 265.3 | (23.6) | (8.9) |
| Broadcast television revenue | 127.3 | 17.7 | 109.6 | nm |
| Total revenue | $ 369.0 | $ 283.0 | 86.0 | 30.4 |

EXHIBIT O(2)

AOE0674

The increase in total revenue was mostly due to the acquisitions of Bayou City Broadcasting, USA TV and the multicast broadcast television networks, offset by declines in film revenue

Networks and content revenue was $241.7 million, which was 8.9% below the comparable period of the prior year. The decline was primarily due to the reduction of film revenue within Entertainment Studios P&A entities, which is an unrestricted subsidiary, offset by the acquisition of the multicast broadcast networks. Weather Group's advertising revenues of $89.4 million were 12.3% and $12.5 million below the comparable period of the prior year. This decline was primarily due to the result of lower impressions primarily related to the impact of the COVID-19 pandemic, offset by CPM growth. Weather Group's subscription license fee was $89.9 million, which was 9.8% and $9.8 million below the comparable period of the prior year. This decline was largely due to net contractual per subscriber rate decreases and overall industry decline in pay-TV subscribers. Entertainment Studios' advertising revenues of $30.8 million were 17.4% above the comparable period of the prior year. This growth was mainly due to the recently acquired multicast broadcast television networks, ThisTV and LightTV. Entertainment Studios' gross subscription license fee was $24.9 million, which was 15.9% and $3.4 million above the comparable period of the prior year. The increase was primarily due to the new carriage agreement with Comcast for Comedy.TV. The Entertainment Studios' subscription license fee revenues were offset by marketing support payments of $14.7 million.

Broadcast television revenue was $127.3 million, which was $109.5 million above the comparable period of the prior year. The increase in revenue was primarily related to the aforementioned acquisitions.

## Operating Expenses

The following table sets forth our operating expenses for the periods presented.

| (in millions) | Year Ended December 31, 2020 | | Year Ended December 31, 2019 | | Change Increase (decrease) $ | Change Increase (decrease) % |
|---|---|---|---|---|---|---|
| Operating expenses | | | | | | |
| Programming and production expenses | $ | 182.1 | $ | 172.4 | 9.7 | 5.6 |
| Sales, general and administrative expenses | | 120.5 | | 97.9 | 22.6 | 23.1 |
| Depreciation and amortization of intangible assets and goodwill | | 68.3 | | 38.0 | 30.3 | 79.7 |
| Impairment of investment at cost and intangible assets | | - | | 7.5 | (7.5) | nm |
| Total operating expenses | $ | 370.9 | $ | 315.8 | 55.1 | 17.5 |

### *Operating Expenses*

The increase in programming and production expenses, sales, general and administrative expenses and depreciation and amortization expenses was largely due to the acquisitions of Bayou City Broadcasting, USA TV and the multicast broadcast television networks.

The decrease in impairment of investment at cost and intangible assets was due to the impairment of capitalized software cost in the prior year.

## Other (Expense) Income

The following table sets forth a summary of our other income/expenses for each of the periods indicated.

| (in millions) | Year Ended December 31, 2020 | Year Ended December 31, 2019 | Change Increase (decrease) $ | Change Increase (decrease) % |
|---|---|---|---|---|
| Other (expense) income | | | | |
| Interest expense | $ (89.1) | $(65.8) | (23.3) | (35.4) |
| Loss on derecognition of debt | (47.2) | - | (47.2) | nm |
| Other income, net | 2.6 | 0.4 | 2.2 | nm |
| Total other expense, net | $(133.7) | $(65.4) | (68.3) | nm |

EXHIBIT O(2)

AOE0675

Interest expense for the fiscal year ended December 31, 2020 was $89.1 million, $23.3 million higher than the comparable period of the prior year. The increase was primarily due to the financing for the acquisition of Bayou City Broadcasting on July 3, 2019 and USA TV on February 10, 2020. In addition, as it relates to the refinancing on February 10, 2020, the Company recognized $47.2 million of expenses for the derecognition of debt.

## Income Tax Expense

The following table sets forth our interest tax expense (benefit) for each of the periods indicated.

| | Year Ended December 31, | | | Change Increase (decrease) | |
|---|---|---|---|---|---|
| (in millions) | **2020** | | **2019** | **$** | **%** |
| Income tax expense (benefit)............................................ | $ (5.0) | $ | 4.4 | (9.4) | nm |

Income tax benefit increased due to the tax effects of certain pre-tax book income items.

## Liquidity and Capital Resources

### Overview

Our primary sources of capital to date have been from cash provided by operating activities and amounts borrowed under term loans, credit facilities and senior notes. Our total debt as of March 31, 2021 was $1,020.6 million, $946.7 million of which was indebtedness of the restricted group.

Accordingly, we have significant debt, which could make us vulnerable to changes in general economic conditions. Our ability to repay or refinance our debt will depend on, among other things, financial, business, market, competitive and other conditions, some of which are beyond our control.

We continue to maintain a strong library of film and television content and broadcasting in key markets that we expect to provide positive returns in subsequent years. As of December 31, 2020, we were in compliance with our financial covenants contained in the credit agreements and indenture governing the initial notes and continue to be in compliance through our latest compliance reporting as of March 31, 2021. Based on current operations and forecasted results, we believe that available cash, anticipated cash flows from operations and available borrowings under the Senior Credit Facilities will be sufficient to finance operations and fund working capital, capital expenditure requirements, interest payments and scheduled debt principal payments for at least the next twelve months.

If these sources are insufficient to satisfy our liquidity requirements, however, we may seek to sell additional equity or make additional borrowings under a new term loan, credit facility or other financing source. Debt financing, if available, may involve covenants restricting our operations or our ability to incur additional debt. Any debt financing or additional equity that we raise may contain terms that are not favorable to us or our stockholders. Additional financing may not be available at all, or in amounts or on terms unacceptable to us. If we are unable to obtain additional financing, we may be required to delay the development or production of our content or future acquisitions. We will continue to evaluate the best use of our operating cash flow among our capital expenditures, acquisitions and debt reduction.

### Summary of Cash Flows

(in millions)

| | Three Months Ended March 31, | | Year Ended December 31, | |
|---|---|---|---|---|
| | **2021** | **2020** | **2020** | **2019** |
| Net cash (used in) provided by operating activities ...................................... | $ (1.7) | $ 9.4 | $ (28.3) | $ (10.6) |
| Net cash (used in) provided by investing activities...................................... | (33.6) | (302.3) | (318.1) | (171.7) |
| Net cash (used in) provided by financing activities ...................................... | 19.6 | 330.2 | 395.2 | 180.5 |
| Net increase (decrease) in cash ........................................................ | (15.7) | 37.3 | 48.8 | (1.8) |
| Cash paid for interest .................................................................. | 26.9 | 9.6 | 5.5 | 11.0 |
| Cash paid for taxes..................................................................... | 0.2 | 0.2 | 53.4 | 46.3 |

EXHIBIT O(2)

AOE0676

**Three months ended March 31, 2021 and 2020**

*Operating Activities*

Net cash flows provided by operating activities decreased $11. 0 million during the three months ended March 31, 2021 compared to the same period in 2020. For the three months ended March 31, 2021, cash flows used by operating activities were $1.7 million. The use of cash was primarily attributable to the changes in operating assets and liabilities, which includes the use of cash from television library and use of cash from film rights.

*Investing Activities*

Net cash flows used in investing activities for the three months ended March 31, 2021 increased $268.8 million compared to the same period in 2020. For the three months ended March 31, 2021, cash flows used by operating activities were $33.6 million. This use of cash was primarily attributable to our acquisition of KITV.

*Financing Activities*

Net cash flows provided by financing activities for the three months ended March 31, 2021 decreased $310.7 million compared to the same period in 2020. For the three months ended March 31, 2021, cash flows provided by financing activities were $19.6 million. This was due to the $48.5 million repayments of borrowings mostly for the revolving credit facility. In addition, we had borrowings of $73.2 million for the new credit facility at KITV, borrowings from our revolving credit facility, and borrowings under the Paycheck Protection Program.

**Years ended December 31, 2020 and 2019**

*Operating Activities*

Net cash flows used in operating activities increased $17.8 million during the fiscal year ended December 31, 2020 compared to the same period in 2019. For the fiscal year ended December 31, 2020, cash flows used in operating activities were $28.3 million. This use of cash was primarily attributable to the investment in television library assets, offset by the source of cash from changes in operating assets and liabilities (excluding television library assets).

*Investing Activities*

Net cash flows used in investing activities for the fiscal year ended December 31, 2020 increased $146.4 million compared to the same period in 2019. For the fiscal year ended December 31, 2020, cash flows used in operating activities were $318.1 million. This use of cash was primarily attributable our acquisition of USA TV.

*Financing Activities*

Net cash flows provided by financing activities for the fiscal year ended December 31, 2020 increased $214.7 million compared to the same period in 2019. For the fiscal year ended December 31, 2020, cash flows provided by financing activities were $395.2 million. This was due to increased borrowings, mostly from our refinancing in February 2020 with new credit facilities and senior unsecured notes, partially offset by the repayment of borrowings, mostly related to the repayment of our prior credit facilities. Following the February 2020 refinancing, we also incurred additional borrowings from our existing credit facilities.

*Long-term Debt*

As of March 31, 2021 and December 31, 2020, we have the following debt outstanding:

EXHIBIT O(2)

AOE0677

| (in millions) | March 31, 2021 | December 31, 2020 |
|---|---|---|
| 2020 Senior Notes | $ 300.0 | $ 300.0 |
| 2020 Term Loan | 655.2 | 656.9 |
| 2020 Revolver | 17.5 | 17.0 |
| PPP Loans | 7.6 | - |
| KITV Term Loan (unrestricted subsidiaries) | 20.5 | - |
| KITV PPP Loans (unrestricted subsidiaries) | 1.0 | - |
| Friend request loan (unrestricted subsidiaries) | 5.1 | 5.2 |
| Hostiles upsize loan (unrestricted subsidiaries) | 6.9 | 8.8 |
| Chappaquiddick loan (unrestricted subsidiaries) | - | 0.9 |
| Line of credit (unrestricted subsidiaries) | 8.8 | 8.6 |
| Notes payable to production company (unrestricted subsidiaries) | 24.3 | 24.3 |
| **Total** | $ 1,046.9 | $ 1,021.7 |
| Less: Outstanding debt issuance costs and original issue discount | (26.3) | (27.0) |
| **Net amounts due** | $ 1,020.6 | $ 994.7 |

In a prior year, the Company refinanced certain existing loans with a syndicated loan ("second syndicated loan") between various lenders, including certain lenders from the existing loans, and Allen Media, LLC. Certain fees from this refinancing were capitalized, based on the Company's analysis of the applicable accounting guidance, including under ASC 470-50 *Debt – Modifications and Extinguishments*.

The second syndicated loan bore interest, at the option of the Company, (i) at the base rate as defined in the Credit and Guaranty agreement which, in no event, can be lower than 2% plus a margin of 5.5%, or (ii) the Eurodollar rate as defined in the Credit and Guaranty Agreement which in no event can be lower than 1% plus a margin of 6.50%.

In a prior year, the Company entered into an amendment to the second syndicated loan ("first amendment") to increase the existing syndicated loan facility by $25.0 million. On June 27, 2019, the Company entered into an additional amendment to the second syndicated loan ("second amendment") to increase the existing syndicated loan facility by $20.0 million. As a result of this additional financing, quarterly principal payments due increased to $5.4 million through December 31, 2022 with a revised principal payment of $8.1 million per quarter thereafter until maturity, at which point a final balloon payment of all remaining principal was due.

As discussed below the second syndicated loan was refinanced on February 10, 2020.

Bayou Loans

In a prior year, to finance the acquisition of Bayou, Allen Media Broadcasting ("AMB") entered into a new term loan agreement (the "Senior Bayou loan") with an aggregate principal value of $100.0 million. The Senior Bayou loan bore interest, at the option of the Company at either (i) the base rate as defined in the loan agreement which, in no event, can be lower than 2.0% plus a margin of 5.25%, or (ii) the Eurodollar rate as defined in the loan agreement based primary on LIBOR rates with a margin of 6.25%.

Simultaneous to the Senior Bayou loan, AMB entered into a note purchase agreement with Bain Capital Credit, L.P. ("Bayou Note"), as lender for an aggregate principal amount of $36.0 million and a maturity date of October 3, 2020. This note bore interest at 16.0% per annum of which 12.0% was cash interest payable quarterly beginning on September 30, 2019 and 4.0% is paid-in-kind interest which accrues to the principal amount of the note on a quarterly basis.

As discussed below, the Bayou Senior Loan and Bayou Note were repaid on February 10, 2020.

2020 Syndicated Financing

On February 10, 2020, in conjunction with closing the acquisition of the USA TV stations, the Company entered into the indenture governing the initial notes and a term loan agreement for $530.0 million (the "Term Loans") and revolving line of credit (the "Revolving Credit Facility") with an available credit line of $40.0 million (collectively as the "2020 Syndicated Loans"). The Company drew $20.0 million on the Revolving Credit Facility at close and the Revolving Credit Facility credit limit was subsequently increased to $60.0 million. The funds were used to repay the second syndicated loan, Senior Bayou Loan, and Bayou Note, finance the acquisition of the USA TV stations, and pay certain transaction expenses associated to both the acquisition of the USA TV stations

EXHIBIT O(2)

AOE0678

and the refinancing. The initial notes bear interest at 10.5% and mature on February 10, 2028 at which point all principal is due in full. The Term Loans and Revolving Credit Facility bear interest at LIBOR plus a margin of 5.5%. The Term Loans requires principal payments on a quarterly basis of 1% per annum of the principal balance, with the remaining balance due upon maturity. The Term Loans and Revolving Credit Facility are due February 10, 2027, and February 10, 2025, respectively.

The Company analyzed the 2020 Syndicated refinancing on a lender-by-lender basis in accordance with applicable accounting guidance, including ASC 470-50. In cases where a lender participated in both the second syndicated loan and the 2020 Syndicated Loans, the refinancing of the lender-specific loan qualified as a debt modification resulting in capitalization of lender fees and expense treatment for third-party loan fees. In certain cases, lenders were fully repaid through the refinancing resulting in derecognition of the associated capitalized fees and costs. This resulted in $42.7 million of previously capitalized costs being written off through a loss on derecognition of the loans. Loan amounts associated to lenders which participated in the 2020 Syndicated Loans and who were not previously lenders of the Company, were treated as new loans with all associated costs capitalized. As a result, subsequent to close of the 2020 Syndicated refinancing the Company had $25.3 million in debt issuance costs capitalized. These costs are being amortized under the effective interest method over the term of the loan.

On February 21, 2020 the Company entered into an amendment ("first 2020 amendment") to increase the existing syndicated Term Loans by $25.0 million. On April 9, 2020 and July 9, 2020, the Company entered into amendments to provide an incremental $15.0 million and $5.0 million, respectively, of commitment under the existing Revolving Credit Facility.

On July 16, 2020 and July 21, 2020, the Company entered into two amendments to increase the syndicated Term Loans by an incremental $35.0 million and $15.0 million, respectively. On July 29, 2020, the Company entered into an amendment to increase the syndicated Term Loans by $55.0 million.

At December 31, 2020 the balances outstanding were $300.0 million, $656.9 million, and $17.0 million, for the initial notes, Term Loans, and Revolving Credit Facility, respectively. Additionally, accrued interest at December 31, 2020 was $12.0 million, $9.6 million, and $0.2 million, pertaining to the initial notes, Term Loans, and Revolving Credit Facility, respectively. The rate in effect at December 31, 2020 for the Term Loans and Revolving Credit Facility was 5.72%.

At March 31, 2021 the balances outstanding were $300.0 million, $655.2 million, and $17.5 million, for the initial notes, Term Loans, and Revolving Credit Facility, respectively. Additionally, accrued interest at March 31, 2021 was $4.1 million, $9.5 million, and $0.3 million, pertaining to the initial notes, Term Loans, and Revolving Credit Facility, respectively. The rate in effect at March 31, 2021 for the Term Loans and Revolving Credit Facility was 5.75%.

In conjunction with the 2020 Syndicated Financing, the Company entered into a financing commitment letter with a financial institution for bridge financing senior notes of $300.0 million and a term loan of $530.0 million. The fee associated with the financing commitment was recognized as an expense over the commitment period and included within Interest expense on the consolidated statements of operations. The corresponding bridge financing commitment terminated in accordance with the terms of the agreement upon close of the refinancing in February 2020.

Under the loan agreements, the Company is subject to certain financial and nonfinancial covenants including terms which require the Company to maintain certain metrics and ratios, limit certain payments, expenditures, or asset sales, and to report financial information to our lenders on a periodic basis. In addition, Allen Media Holdings, LLC and each direct and indirect wholly owned subsidiary of Allen Media, LLC (the "Guarantor Subsidiaries") have agreed to guarantee the Company's Term Loans by granting a lien on substantially all of their respective assets (subject to certain exceptions). Certain subsidiaries have been identified by the Company to be Unrestricted Subsidiaries, which do not guarantee the Company's obligations.

Additional Financings

In a prior year, Entertainment Studios P&A ("ESP&A") entered into a loan amendment with a certain lender ("CION") whereby an additional loan was added to an existing ESP&A facility ("additional loan" or "Friend Request loan"). The additional loan allowed for $7.5 million to be advanced to ESP&A by CION. The additional loan was set to mature in September 2037 and, subsequent to a March 9, 2018 amendment, carried interest at 10% per annum at December 31, 2019. Under the terms of the loan agreement, amortization payments, equal to 2% of the outstanding principal, were required to be made on the last day of every March, June, September, and December, commencing September 2017. At March 31, 2021 and December 31, 2020, the balances outstanding were $5.1 million and $5.2 million, respectively.

In a prior year, ESP&A entered into a loan agreement with CION to provide a draw of $11.0 million to fund the prints and advertising costs for the Chappaquiddick film. This loan bears interest at 10% per annum and matures on May 18, 2022. As of December 31, 2020, the balance outstanding was $0.9 million. As of March 31, 2021 the loan had been fully repaid.

In a prior year, ESP&A amended the loan to obtain an additional draw of $10.0 million. This loan bears interest at 10% and matures on March 9, 2038. As of both March 31, 2021 and December 31, 2020, the balance outstanding was $6.9 million and $8.8 million, respectively.

In a prior year, the Company entered into a loan and security agreement ("line of credit") with a financial institution for a senior, secured facility of up to $20.0 million, which can be increased to $30.0 million, in the aggregate, subject to a borrowing base of 90% of eligible receivables due from major distributors of the Company's films, as specifically named in the loan and security agreement. Borrowings on this loan and security agreement are secured by substantially all assets of a certain subsidiary. For purposes of this loan and security agreement, the assets of the subsidiary includes all of the distribution rights of Entertainment Studios Motion Pictures ("ESMP") in all films. Borrowings on the loan and security agreement bear interest at the prime rate plus 2.5% or LIBOR plus 3.5%. The interest rates in place at March 31, 2021 and December 31, 2020, were approximately 3.7% at both dates. Repayments on the line of credit are made as collections from the assigned receivables are received. On December 10, 2019, the Company entered into an amendment to the line of credit extending the maturity date to September 30, 2022. As of March 31, 2021 and December 31, 2020, $8.8 million and $8.6 million, respectively, remained outstanding on this line of credit.

During the first quarter of 2021, certain of our subsidiaries applied for and were granted Payroll Protection Plan ("PPP") loans under the provisions of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") and applicable Small Business Association ("SBA") rules. The loans bear interest at 1% per annum and any amounts not forgiven will require repayment on a monthly basis starting in 2022 with final maturity dates for all PPP loans in 2026. The balance outstanding on the PPP loans at March 31, 2021 was $8.6 million.

On March 4, 2021 KITV, Inc., a wholly-owned indirect subsidiary of the Issuer, as borrower, entered into a credit agreement with a certain lender, providing for a $20.5 million term loan. The loan bears interest at a base rate of the greater of i) an adjusted LIBOR, ii) prime rate, or iii) federal funds rate plus 0.5%, added to a spread of 6.5%. Alternatively, the Company may elect a spread of 7.5% with a base rate of adjusted LIBOR with a floor of 1%. The interest spread in both cases increases by 0.5% on the first and second anniversary of the loan closing date. The loan is due and payable in equal installments of $0.5 million on the last day of the first calendar quarter each year beginning in 2022 through 2025 with the remaining balance due on March 4, 2026. The proceeds of the financing were distributed to the Issuer. The interest rate in effect at March 31, 2021 was 8.5% and the balance outstanding was $20.5 million.  This loan is expected to be repaid in connection with the Transactions.

The aforementioned additional financings were all subject to certain financial and non-financial covenants with which the Company was in compliance at March 31, 2021. Management assessed the accounting treatment of the additional financings loan amendments and concluded that the amendments qualified as a debt modification and that the related debt issuance costs were not material.

### *Notes Payable to Production Company*

In a prior year, our subsidiary Friend Request LLC entered into a note payable agreement with the production company from which ESMP had originally acquired the film rights to the movie. The note payable agreement advanced funds of $6.6 million to be used for part of the media expenditures with respect to the promotion of the movie. The note carries interest of 15% per annum and is payable based on the film's gross receipts. As of March 31, 2021 and December 31, 2020, the total amount outstanding on the note was $6.6 million, which is included in Borrowings, current portion, and accrued interest was $3.5 million and $3.3 million, respectively. Accrued interest is included in accounts payable and accrued expenses.

In a prior year, our subsidiary Replicas, LLC entered into a note payable agreement with the same production company. The note payable agreement allowed for funds of $8.2 million to be advanced for use for part of the media expenditures with respect to the promotion of the movie. Interest on this note is calculated at 15% of a portion of the amounts advanced for the media spend, as defined in the agreement. The entire amount of $8.2 million was advanced on December 15, 2018 and is payable based on the film's gross receipts. As of March 31, 2021, and December 31, 2020, the total outstanding on the note was $8.2 million for both the periods included in Borrowings, net of current portion. Accrued interest was $2.8 million and $2.5 million, respectively, which is included in accounts payable and accrued expenses.

In a prior year, our subsidiary Arctic Dogs, LLC entered into a note payable agreement with the same production company. The note payable agreement allowed for funds of $9.5 million to be advanced for use for part of the media expenditures with respect to the

EXHIBIT O(2)

AOE0680

promotion of the movie. The note carries interest of 18% and is payable via receipts from the film. As of both March 31, 2021 and December 31, 2020, the total outstanding on the note was $9.5 million which is included in Borrowings, net of current portion. Accrued interest at March 31, 2021 and December 31, 2020 was $2.5 million and $2.0 million, respectively, which is included in accounts payable and accrued expenses.

### *Due to Related Party*

In a prior year, the Company entered into two loan agreements for an aggregate total of $5.4 million with the sole member of the Company to fund operating expenses. These borrowings bear interest at 18% per annum and matures on October 25, 2021. As of March 31, 2021 and December 31, 2020, the total balances outstanding on the notes was $5.4 million with $2.1 million of accrued interest.

In a prior year, Replicas LLC entered into a loan agreement for $10.7 million with the sole member of the Company to fund the prints and advertising costs for the Replicas movie. These borrowings bear interest at 16% per annum, matures on December 17, 2021, and will be repaid out of receipts from the exploitation of the Replicas movie. As of both March 31, 2021 and December 31, 2020, the total balance outstanding on the note were $6.3 million and accrued interest was $1.5 million.

In a prior year, 47 Meters Down II entered into a loan agreement for $3.8 million with the sole member of the Company to fund operating expenses. These borrowings bear interest at 18% per annum, and mature on July 17, 2023. As of March 31, 2021 and December 31, 2020, the total balance outstanding on the loan was $3.2 million and $3.8 million, respectively, and accrued interest was $1.1 million and $1.0 million, respectively.

In a prior year, Arctic Dogs LLC entered into a loan agreement for $19.5 million with the sole member of the Company to fund operating expenses. The loan bears interest at 16% per annum and matures on October 25, 2022. As of both March 31, 2021 and December 31, 2020, the total balance outstanding on the loan was $11.6 million and accrued interest was $2.5 million and $2.1 million, respectively.

### Contractual Obligations and Commitments

The following table sets forth our contractual obligations and commitments as of March 31, 2021 for the periods indicated below.

| | Total | 2021 (last 9 months) | 2022-2023 | 2024-2025 | Thereafter |
|---|---|---|---|---|---|
| Operating leases | 52.9 | 7.5 | 16.7 | 9.7 | 19.0 |
| Capital leases | 2.4 | 1.8 | 0.6 | - | - |
| Purchase commitments | 71.8 | 43.6 | 26.2 | 2.0 | - |
| Long-term debt | 1,047.0 | 5.0 | 26.7 | 36.5 | 978.9 |
| **Total** | 1,174.2 | 57.9 | 70.2 | 48.2 | 997.9 |

### Operating Lease Obligations

The Company leases office and studio facilities in Century City and Culver City, California, Chicago, Illinois, New York, New York, and Atlanta, Georgia, pursuant to agreements expiring through the year 2028. The Century City leases are personally guaranteed by Byron Allen.

Rent expense is charged ratably over the lives of the leases using the straight-line method. The Company has a standby letter of credit in respect of the New York facility. The term of the letter of credit is for five years, maturing in January 2022 and a restricted cash account has been established for this amount. At both March 31, 2021 and December 31, 2020, the restricted cash amount being held in respect of the letter of credit was $0.2 million.

Total rent expense for the three months ended March 31, 2021 and March 31, 2020 was approximately $2.2 million and $2.0 million, respectively.

EXHIBIT O(2)

AOE0681

**Capital Leases**

The Company has outstanding capital lease obligations related to satellite transponders and office and production equipment that expire at varying dates between 2020 and 2022. The implicit rates of interest on these leases range from 5.8% to 15.2%.

**Purchase Commitments**

Film Contract Rights: WG has commitments to purchase or license certain programming that is not yet available for broadcast, primarily purchased or licensed first-run episodic programming. Such programming is generally produced and delivered at or near its broadcast date. Such contracts generally require progress payments as certain production milestones are achieved, prior to the programming becoming available for broadcast. If programming is not produced, WG's commitment to purchase or license the programming would generally expire without obligation.

Employment and Talent Agreements: WG regularly enters into multi-year employment agreements with its on-air talent for the Company's national cable network, as well as with certain executives. Under certain circumstances, the agreements may be terminated prior to expiration.

Satellite and Video Transmission: In a previous year, the Company entered into an amendment with the provider whereby, upon the expiration of the original term in January 2019, a new arrangement ("subsequent term") began which expires in January 2023. Total payments under the subsequent term total $6.0 million which are payable in annual installments beginning during the year ended December 31, 2020.

Unconditional Purchase and Other Commitments: In the normal course of business, the Company enters into multi-year agreements for the provision of services including software licensing arrangements, audience ratings, syndication, advertising services, and certain other services. These arrangements are generally not cancelable prior to their expiration and represent unconditional purchase commitments of the Company that are payable over a number of years. The Company also purchases product components from a variety of suppliers and also has certain general commitments to make payments to certain customers under related agreements.

**Off-Balance Sheet Arrangements**

Off-balance sheet arrangements means any transaction, agreement or other contractual arrangement to which an entity unconsolidated with the registrant is a party, under which the registrant has: obligations under guarantees or contracts; retained or contingent interest in assets transferred to an unconsolidated entity or similar arrangements; obligations under derivative arrangements; and obligations arising out of a material variable interest in an unconsolidated entity. As of March 31, 2021, we did not have any material off balance sheet arrangements.

**Critical Accounting Policies**

Our consolidated financial statements are prepared in accordance with U.S. GAAP. Our significant accounting policies are summarized in Note 2 to our consolidated financial statements included elsewhere in this offering memorandum. The preparation of our consolidated financial statements requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. Some of these estimates and assumptions are inherently difficult to make and subjective in nature. We base our estimates on historical experience, recent trends, expectations for future performance, and other assumptions as appropriate. We reevaluate our estimates on an ongoing basis; actual results, however, may vary from these estimates.

The following are the accounting policies that management believes are most critical to the preparation of our consolidated financial statements and require management's most difficult, subjective, or complex judgments. In addition, there are other items within the consolidated financial statements that require estimation but are not deemed to be critical accounting policies. Changes in the estimates used in these and other items could have a material impact on the consolidated financial statements.

**Revenue Recognition**

We recognize revenue when it is realized or realizable and earned. We consider revenue realized or realizable and earned when it has persuasive evidence of an arrangement, delivery has occurred, the sales price is fixed and determinable and collectability is reasonably assured. Determining whether some or all of these criteria have been met involves assumptions and judgments.

EXHIBIT O(2)

AOE0682

*Advertising*

Advertising revenues are recorded, net of agency commissions. Revenue is recognized when the television productions are transmitted via satellite (such as when the advertisements are run).

Network advertising includes campaigns for which revenues are based on audience delivery or a fixed price per spot. For campaigns based on audience delivery, we guarantee advertisers a minimum audience during the dayparts in which their advertisements are broadcast over the term of the advertising contracts. We provide the advertisers with additional advertising time if the guaranteed audience size and/or the minimum number of spots are not delivered. If we determine the guaranteed audience has not been delivered, deferred revenue is recorded for audience delivery shortfalls that must be "made good."

*Affiliate Subscription Fees*

Cable, satellite, and other MVPDs generally pay us a "per-subscriber" fee for the right to distribute programming under the terms of long-term distribution contracts. Revenue from affiliate subscription fees is recorded based on the monthly subscriber reports received from the satellite and cable service providers and is recognized when the services are provided.

*Film Rentals*

For content owned or produced by us, we derive certain film rental revenues from a percentage of box office takings earned by the movie in theatrical release or revenues earned from secondary markets such as on digital platforms. Revenue is recognized when the revenue recognition criteria under FASB ASC Topic No. 606, "Revenue Recognition," are met and is reported net of fees distributed to film exhibitors.

*Other Revenues*

Distribution fee arrangements are accounted for on a net basis in accordance with FASB ASC Topic No. 606, "Revenue Recognition," and all distribution fees are reported net of amounts collected on behalf of, and paid over to, producers.

Other revenue which also includes license fee revenue from broadcast licensing agreements, together with related costs, is recognized once the licensing period has commenced and the programs are delivered. Royalty revenue is also included within other revenue and is recognized when the amounts are known and the collectability of the royalties is reasonably assured.

**Intangible Assets**

Intangible assets consist of acquired technology and software, costs incurred to acquire the names of digital and satellite channels and localization technology conveyed to cable, satellite and other distributors. We also have intangible assets in the course of construction ("Construction in process"). Amortization of such assets begins once the asset is completed and placed into service. Intangible assets are capitalized and amortized on a straight-line basis over 3 to 15 years. We test long-lived assets, including amortizable intangible assets, for impairment whenever events or changes in circumstances (triggering events) indicate that the carrying amount may not be recoverable.

**Goodwill**

We have applied the guidance under FASB Accounting Standards Update ("ASU") No. 2014-18, *Business Combinations (Topic 805): Accounting for Identifiable Assets in a Business Combination (a consensus of the Private Company Council)*, where certain assets, such as customer relationships or a covenant not to compete, are not recorded separately from goodwill. As such, in accordance with FASB ASU No. 2014-02, Intangibles—*Goodwill and Other (Topic 350): Accounting for Goodwill* ("ASU 2014-02"), management has assigned a life of 10 years to goodwill over which the amount allocated to goodwill is being amortized.

Pursuant to ASU 2014-02, goodwill should be tested for impairment when a triggering event occurs that indicates that the fair value of a reporting unit may be below its carrying amount. If the goodwill is determined to be impaired, the goodwill is written down to its realizable value and the loss is recognized in consolidated statement of operations in the period when determination is made.

Television Library, Licensed Films, Film Rights and Residuals Payable

Our television library consists of (i) capitalized television production costs incurred and then aired by broadcast television stations and satellite and cable service providers and (ii) capitalized programming rights and costs for licensed, internally-produced and commissioned programming that is broadcast on The Weather Channel.

EXHIBIT O(2)

AOE0683

Programming rights consisting of film licenses acquired are accounted for in accordance with FASB Accounting Standards Codification ("ASC") Topic No. 920, "Entertainment—Broadcasters," and capitalized television and film production costs are accounted for in accordance with FASB ASC Topic No. 926, "Entertainment—Films."

We internally produce programming, generally consisting of live programming that is not intended to be rebroadcast. We also produce long-form original programming that is intended to be rebroadcast over a period of years. The costs of internally produced programming not intended for rebroadcast are expensed as incurred. The costs of internally produced long-form programming consist primarily of internal labor and benefits and third-party content, production, and editing costs and are capitalized. The costs of owned original internally produced long-form programming are identified, accumulated, and capitalized during production. The costs of procured film rights for programming are capitalized as program costs are accumulated and the related obligation recorded when the production agreement is executed, milestones are met, and/or and the program is accepted and available for use. We also procure film rights for original long-form programming, which is produced entirely by third-party production companies.

In accordance with FASB ASC Topic No. 926, "Entertainment—Films," deferred production costs include capitalized television library and film production costs, overhead and capitalized interest costs. Film rights ("film costs") typically represent the cost to acquire the distribution rights of a motion picture for theatrical release and/or finance its production.

Deferred television library production costs are also incurred to produce television products that are in production and development or completed but not transmitted. Additionally, some capitalized film costs represent partial payments for film rights where the motion picture is still in production. Such television products and/or film costs are expected to be completed and either transmitted or released to the theatrical markets within one year.

Costs capitalized as part of the television or film library costs of owned original programming (internal and external production) are amortized to expense over their estimated useful lives which ranges from 4-10 years, commencing upon the first airing, generally based on revenue to date as a percentage of total projected attributable revenue, or ultimate revenue (film-forecast-computation method). In respect of capitalized costs for the television library, estimates for initial syndication revenues are not included in the estimated lifetime revenues of network series until such sales are probable. Television production costs incurred subsequent to the establishment of secondary markets are capitalized and amortized. In certain cases, we utilize a straight-line usage-based methodology to amortize capitalized costs. Projected attributable revenue can change based upon programming market acceptance, advertising revenue, and management decisions regarding planned program or content usage. These calculations require management to make assumptions and to apply judgment regarding revenue and planned usage. Accordingly, we periodically review revenue estimates and planned usage and revise our assumptions if necessary, which could impact the timing of amortization expense or result in a write-down to net realizable value. Marketing costs are charged as operating expenses as incurred.

Deferred costs for the television library production and film costs are stated at the lower of unamortized cost or estimated fair value on an individual television product or film. When estimates of total revenues and other events or changes in circumstances indicate that a television production or a film has a fair value that is less than unamortized cost, an impairment loss is recognized for the amount by which the unamortized cost exceeds the television production's or films' fair value. Estimates of future revenue involve measurements of uncertainty, and it is therefore possible that changes in anticipated amortization or reductions in the carrying value of unamortized production or film costs may be required as a consequence of changes in management's future revenue estimates.

Rights to programming acquired under license agreements along with the related obligations are recorded at the contract value when a license agreement is executed, the license period begins, and the program is accepted and available for use. Capitalized license costs are amortized on a straight- line basis, commencing on the first airing and over the respective license periods, not to exceed 36 months. Programming rights are stated at the lower of amortized cost or net realizable value. We periodically evaluate the net realizable value of film contract rights. Net realizable value is determined by estimating advertising revenues to be derived from the future airings of the programming for the respective dayparts, as well as an allocation of affiliate subscription fee revenue to the programming. An impairment charge may be necessary if our estimates of future cash flows of similar programming are insufficient or if programming is abandoned.

**Income Taxes**

Certain of our entities are combined to a taxable entity group (the "taxable entity group"). The remaining entities, which comprise the majority of the group, are treated as separate taxable entities for federal, state, or local income tax purposes for which the tax impacts have been excluded from these consolidated financial statements. Accordingly, the results of all other entities' operations outside of the taxable entity group have been included in the tax return of the stockholder. The taxable entity group has accounted for taxes under FASB ASC Topic No. 740, *Income Taxes* ("ASC 740"), and records deferred taxes on income for transactions that are reported in different years for financial reporting and tax purposes using an asset and liability method whereby assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to

EXHIBIT O(2)

AOE0684

be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

**Quantitative and Qualitative Disclosure About Market Risk**

*Interest Rate Risk*

Our exposure to market risk for changes in interest rates relates primarily to our long-term debt obligations.

The term loan borrowings under our existing credit facilities bear interest at rates ranging from 5.63% to 7.75% as of March 31, 2021, which represented the base rate, or LIBOR, plus the applicable margin, as defined. Interest is payable in accordance with the credit agreements.

If LIBOR were to increase by 100 basis points, or one percentage point, our annual interest expense would increase and cash flow from operations would decrease by approximately $6.7 million, based on the outstanding balances of our Senior Credit Facilities as of March 31, 2021. An increase of 50 basis points in LIBOR would result in a $3.4 million increase in annual interest expense and decrease in cash flow from operations. If LIBOR were to decrease either by 100 basis points or 50 basis points, our annual interest would decrease by $6.7 million and cash flow from operations would increase by $6.7 million. As of March 31, 2021, we had no financial instruments in place to hedge against changes in the benchmark interest rates on its senior credit facilities.

EXHIBIT O(2)

AOE0685

DESCRIPTION OF THE TRANSACTIONS

The Acquisition, the offering of the notes and the entry into the New Term Loan B described below and related transactions are referred to collectively as the "Transactions."

### The Acquisitions and KITV Designation

The closing of this offering is conditioned on the substantially concurrent closing of the New Term Loan B and the Quincy Acquisition.

On April 29, 2021, we reached an agreement with Gray to acquire certain television stations currently owned by Quincy for $398.0 million in cash. On July 14, 2021, AMG entered into an agreement to acquire WJRT-TV, an ABC affiliate in Flint-Saginaw, Michigan for $72.5 million in cash. Additionally, while there can be no assurance that the transactions will be consummated, the Company is in negotiations to acquire a FOX affiliate in the Southeast and a non-big four broadcast network affiliate station in Honolulu, Hawaii for a cumulative purchase price of approximately $32.0 million in cash. The Additional Stations consist of thirteen well-ranked stations with footprints in ten mid-sized markets across the Midwest, West Coast, and Southeast, including key political battleground states of Wisconsin, Arizona, Iowa and Michigan.

In addition, our unrestricted subsidiary, Allen Media Broadcasting Evansville II, LLC, closed its acquisition of KITV, a television broadcast company in Honolulu, Hawaii on January 20, 2021. As part of the transaction, KITV will be re-designated as a restricted subsidiary and become a guarantor under the indenture and the Senior Credit Facilities and will repay its existing $20.5 million credit facility.

The consummation of each of the Quincy Acquisition and the Flint Acquisition are subject to the satisfaction or waiver of customary conditions, including, among others: (i) FCC consent and (ii) the absence of certain legal impediments to the consummation of the Acquisition. The parties' obligations to consummate the Quincy Acquisition and the Flint Acquisition are also subject to additional customary conditions, including (i) accuracy of the representations and warranties of the other party, subject to specified materiality standards, (ii) performance by the other party of its covenants in all material respects, and (iii) since the date of the Purchase Agreements related to the Quincy Acquisition (the "Purchase Agreement") and the Flint Acquisition (collectively with the Purchase Agreement, the "Purchase Agreements"), no material adverse effect with respect to the companies and stations being acquired having occurred. Neither the Quincy Acquisition nor the Flint Acquisition is subject to any financing contingency.

The Purchase Agreements contain customary representations, warranties and covenants for a transaction of this nature. The Purchase Agreements also contain customary pre-closing covenants, including the obligation of Quincy and Gray to conduct the business of the companies and stations being acquired in the ordinary course consistent with past practices and to refrain from taking specified actions without our consent. The Purchase Agreements contain termination rights for us, Quincy and Gray. In addition to the foregoing termination rights, either party may terminate the Purchase Agreements if the Quincy Acquisition is not consummated on or before January 31, 2022 (subject to extension in certain circumstances) or the Flint Acquisition is not consummated on or before August 3, 2022.

The Other Acquisitions are in the process of being negotiated and there can be no assurances that we will be successful in entering into definitive agreements on the terms we currently expect or at all, or that we will be able to complete such acquisitions. This offering is not conditioned on the completion of the Flint Acquisition or the Other Acquisitions. If we fail to complete either or both of the Other Acquisitions the delayed draw portion of our New Term Loan B will be reduced accordingly.

### Senior Credit Facilities

We intend to pay the consideration in connection with the Quincy Acquisition, Flint Acquisition, and the Other Acquisitions, and fund the KITV Refinancing, and pay related costs and expenses with (i) $340.0 million from the issuance the notes offered hereby, (ii) an additional $210.0 million Add-On Term Loan B (the "New Term Loan B"), and (iii) cash from our balance sheet. The New Term Loan B will have a $100.0 million delayed draw component in connection with the closing of the Flint Acquisition and the Fox affiliate in the Southeast. In the event either of those two acquisitions are not successful, the related portion of the delayed draw component would be reduced accordingly.

The New Term Loan B will be an increase to our $530.0 million senior secured term loan B with a seven-year maturity, which, together with our $60.0 million senior secured revolving credit facility with a five-year maturity (the "Revolving Credit Facility"), comprises our "Senior Credit Facilities." The obligations under the Senior Credit Facilities are secured by a perfected first priority interest in substantially all of our tangible and intangible assets and of the Guarantors, subject to permitted liens and other agreed upon exceptions. See "Description of Other Indebtedness." This offering, the Acquisitions (including the KITV Designation), the entry into

EXHIBIT O(2)

AOE0686

the New Term Loan B, the KITV Refinancing and related transactions are referred to collectively as the "Transactions.". See "Use of Proceeds."

The Purchase Agreement is not subject to any financing condition, including the closing of any of the transactions to finance the Quincy Acquisition. This offering, however, is conditioned the on the substantially concurrent closing of the New Term Loan B and the Quincy Acquisition.

The aggregate proceeds of this offering and the New Term Loan B, together with our available cash, will be sufficient for us to pay the purchase price for the Acquisitions, fund the KITV Refinancing and to pay all related fees and expenses payable in connection with the Acquisitions and KITV Refinancing. See "Use of Proceeds."

EXHIBIT O(2)

AOE0687

**BUSINESS**

**Our Company**

We are a minority-owned, privately-held diversified media company that, pro forma for the Transactions, will own and operate 28 highly ranked broadcast television stations, The Weather Channel, 7 additional 24-hour high-definition television networks, and 2 over-the-air broadcast networks. We provide local news, weather, and sports content featuring Emmy Award-nominated shows and reach over 190 million subscribers. We produced approximately 5,000 hours of live weather programming and over 650 hours of weekly local news in 2020; distribute sports, primetime and entertainment content across our broadcast television markets through our affiliations with ABC, CBS, FOX and NBC networks (collectively, the "Big Four" networks); and own over 5,000 hours of original programming across multiple genres through Entertainment Studios, our television production and distribution business.

We were founded by Byron Allen in 1993 and are headquartered in Los Angeles, California. Over the last two years, we have significantly grown our business through a series of transformative acquisitions. We have made several broadcast television acquisitions, including Bayou City Broadcasting in July 2019, USA TV in February 2020, KITV in January 2021, and the potential purchase of 13 Additional Stations. In addition, we acquired two over-the-air broadcast television networks from MGM in October 2020. Pro forma for all transactions, broadcast television now represents a majority of our business, contributing 64% of Pro Forma Restricted Group Adjusted EBITDA for the twelve months ended March 31, 2021.  We have also added two veteran broadcast executives to our management team with experience navigating the evolving media ecosystem to further integrate and lead our businesses.

We believe these transactions have enhanced or will significantly enhance our offerings and as a result, we have been able to retain or expand the distribution of our portfolio of assets.  Following our inaugural acquisition of broadcast television stations, we successfully renewed several multichannel video programming distributor ("MVPD") agreements across our portfolio of assets at improved terms and without any service disruptions, including DirecTV in January 2020, Comcast in June 2020, Altice in December 2020 and Charter in February 2021. We have added $12 million of incremental subscription revenue and over 80 million of subscribers to our Entertainment Studios networks since 2019. As of March 2021, The Weather Channel is carried on every major U.S. MVPD and our portfolio of networks is the fastest growing group of television networks in the industry by subscriber growth according to Nielsen. With the addition of Big Four through the Acquisitions, we expect to continue enhancing our relationships with MVPDs.

We have executed several key initiatives to further monetize our assets. In January 2021, we rebranded and launched one of our broadcast networks, TheGrio.TV, which is the first broadcast network targeting African Americans. In addition, our two broadcast networks entered into distribution agreements with 11 FOX and 8 ABC owned and operated television station sub-channels in top U.S. markets.  We also expanded syndication of our programming across our owned assets and with several broadcasters, including Weather Channel exclusive series, *Highway to Hell, SOS: How to Survive,* and *Top 10*, which will launch fall of 2021.

Over the past year, Byron Allen has also led the effort to address the imbalance of U.S. advertising spend on Black-owned media companies, which continues to under-index total economic impact of African Americans in the country. In the second quarter of 2021, several top brands and agencies pledged to increase their advertising commitments on Black-owned media to at least 2% of media budget in 2021, compared to less than 1% in the prior year.  Certain advertisers have also pledged multi-year commitment increases of up to 8% of media budget through 2025.  As one of the largest Black-owned media businesses, we believe we are well positioned to capture these incremental advertising dollars going forward.

For the twelve months ended March 31, 2021, we generated Pro Forma Restricted Group Revenue of $582 million and Pro Forma Restricted Group Adjusted EBITDA of $182 million. See "Summary historical and pro forma condensed combined financial information" for our definition of Pro Forma Restricted Group Adjusted EBITDA and a reconciliation to net income.

**Key Financial Highlights**



EXHIBIT O(2)

AOE0688

Note: Reflects Restricted Group financials only. Combined 2019 and 2020 financials include AMG pro forma for full-year results from OTA and USA TV, Quincy, and Flint. Pro forma LTM 3/31/21 financials include all acquisitions and related synergy.

[1] Includes run-rate adjustment of $3.8mm for Comcast & Frndly TV carriage deals with Entertainment Studies networks in LTM 3/31/21 period.

[2] AMG EBITDA includes expense for amortization of television library and film rights.

### *Broadcast television*

Pro forma for the Transactions, we will own and operate 28 broadcast television stations in 21 small and medium-sized television markets reaching 5% of total U.S. television households, and manage approximately 1,330 employees. Our stations are highly-ranked, well-recognized, and have considerable scale in the markets we serve due to the strength of our local news and programming. Our stations ranked #1 or #2 in 12 of our 21 markets, which contributes approximately 66% of our broadcast television revenue based on pro forma 2019 and 2020 average year revenue according to BIA Kelsey estimates. We have Big Four network affiliates in each of our markets, totaling 10 ABC, 5 FOX, 5 CBS and 5 NBC affiliates. On a pro forma basis, 44% of our broadcast revenues were contributed by ABC, 31% by NBC, 15% by CBS and 6% by FOX affiliated stations based on pro forma 2019 and 2020 average year revenue according to BIA Kelsey estimates. In addition, our broadcast television stations have award-winning newscasts and are well positioned in several key battleground states.

Our broadcast television business represented 57% of Pro Forma Restricted Group Revenue and 64% of Pro Forma Restricted Group Adjusted EBITDA for the twelve months ended March 31, 2021. For the twelve month period ended March 31, 2021 on a pro forma basis, our broadcast television revenue consisted of advertising, net (51%), subscription (45%) and other revenues (5%).

EXHIBIT O(2)

AOE0689

## Overview of Our Broadcast Television Stations

| DMA | TVHH | | Market | Call Sign | Network Affiliates | '19/'20 BIA Ad Revenue Rank | '19/'20 BIA Revenue Share |
| | Gross | Disc. | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 64 | 0.4% | 0.2% | Tucson, AZ | KVOA | NBC | #2 | 23.8% |
| 67 | 0.4% | 0.2% | Honolulu, HI | KITV[3] / Station X[3] | ABC IND | #3 | 17.9% |
| 76 | 0.4% | 0.4% | Flint, MI | WJRT | ABC | #2 | 28.7% |
| 79 | 0.3% | 0.2% | Huntsville, AL | WAAY-TV | ABC | #3 | 18.6% |
| 81 | 0.3% | 0.2% | Madison, WI | WKOW | ABC | #3 | 19.8% |
| 84 | 0.3% | 0.2% | Harrisburg, IL | WSIL / KPOB[1] | ABC | #3 | 20.5% |
| 92 | 0.3% | 0.3% | Cedar Rapids, IA | KWWL | NBC | #2 | 27.8% |
| 106 | 0.2% | 0.1% | Evansville, IN | WEVV-TV, WEEV-LD | FOX CBS CW[2] | #3 | 22.0% |
| 111 | 0.2% | 0.1% | Ft. Wayne, IN | WFFT-TV | FOX | #3 | 12.5% |
| 113 | 0.2% | 0.2% | Eugene, OR | KEZI | ABC | #2 | 33.0% |
| 122 | 0.2% | 0.1% | Lafayette, LA | KADN-TV, KLAF-LD | FOX NBC CW[2] | #3 | 17.5% |
| ~125 | 0.2% | 0.1% | Southeast Market | Station Y | FOX | #3 | 11.1% |
| 129 | 0.2% | 0.1% | La Crosse-Eau Claire, WI | WXOW / WQOW[1] | ABC | #3 | 19.9% |
| 132 | 0.2% | 0.1% | Chico-Redding, CA | KHSL-TV, KNVN | CBS T CW[2] | #2 | 28.2% |
| 133 | 0.2% | 0.2% | Tupelo, MS | WTVA, WLOV-TV | NBC ABC[2] | #1 | 52.9% |
| 134 | 0.2% | 0.2% | Medford, OR | KDRV, KDKF | ABC | #1 | 35.7% |
| 136 | 0.1% | 0.1% | Wausau-Rhinelander, WI | WAOW / WMOW[1] | ABC | #2 | 33.2% |
| 139 | 0.1% | 0.1% | Rockford, IL | WREX | NBC CW | #2 | 34.4% |
| 150 | 0.1% | 0.1% | Rochester, MN / Mason City, IA | KIMT | CBS CW[2] | #2 | 35.7% |
| 156 | 0.1% | 0.1% | Terre Haute, IN | WTHI-TV | CBS FOX CW[2] | #1 | 69.6% |
| 188 | 0.1% | 0.1% | Lafayette, IN | WLFI-TV | CBS CW[2] | #1 | 77.1% |

Source: Company management, BIA Kelsey.  Note: Ad revenue rank based on market portfolio. Excludes KNVN and WLOV, which are owned by third parties and operated by Allen Media.  "DMA" represents Designated Market Area.
[1] Represents satellite stations.
[2] Denotes secondary channels.
[3] ABC station KITV currently owned by AMG at unrestricted subsidiary, which will be designated as a restricted subsidiary and become a guarantor under the indenture governing the notes and the Senior Credit Facilities upon the completion of this offering.

### Networks & Content

Our networks & content business represented 43% of Pro Forma Restricted Group Revenue and 36% of Pro Forma Restricted Group Adjusted EBITDA for the twelve months ended March 31, 2021. This business is comprised of the Weather Group and Entertainment Studios, which together generated Pro Forma Restricted Group Revenue of $250 million and Pro Forma Restricted Group Adjusted EBITDA of $66 million for the twelve months ended March 31, 2021 on a pro forma basis.

#### The Weather Group

The Weather Group is a multi-platform media business that is principally comprised of The Weather Channel, a national domestic live news network, along with simulcast The Weather Channel HD, Weatherscan, The Weather Channel Radio Network and additional video on-demand and interactive television products. As of March 31, 2021, The Weather Group has approximately 385 employees. The Weather Channel is a leading national news brand and source of weather information to the public and non-profit emergency response organizations and has remained the TV News Network Brand of the Year since 2010 by The Harris Poll. The Weather Channel produces continuous 24-hour national, regional and local weather-related television programming distributed by all major MVPDs in the U.S., reaching nearly 60 million pay television subscribers as of March 31, 2021. Weatherscan is an all-local weather network that provides complementary lifestyle information relating the weather for outdoor activities. The Weather Channel Radio Network provides weather information heard on U.S. radio stations and Sirius XM satellite radio.

Our world-class storm expertise and state-of-the-art technology enable us to supply accurate, timely and hyper-local weather forecasts and traffic information at scale across television, digital and other platforms. We produced approximately 3,500 localized versions of the channel and 5,000 hours of original, live, localized weather programming in 2020. We source much of our weather data from IBM through a long-term license agreement, which we have the sole discretion to renew. Additionally, we have access to various alternative data sources, such as the data provided by the National Oceanic and Atmospheric Administration. As a result, The

EXHIBIT O(2)

AOE0690

Weather Channel is a leading news channel in cumulative reach and the most consumed source of news during major storms, achieving year-over-year ratings growth in nine of eleven quarters since our acquisition, excluding impact of one-time pandemic from the first three quarters of 2020. Given the increasing frequency of severe weather events, such as earthquakes, wildfires, tornadoes, winter storms and flooding, we expect The Weather Channel will continue to be an important news outlet for consumers.

### Number of Billion Dollar Weather Disasters & Select Coverage by The Weather Channel (2010-2020)[1]



Source: Company materials, Nielsen.
[1] Based on P2+ Viewer Reach.
[2] Represents ranking in delivery.
[3] Represents P2+ Viewer Reach on August 26, 2020.

*Entertainment Studios*

We own and operate a variety of networks distributed across cable, theatrical distribution and digital media through our Entertainment Studios business. With approximately 175 employees, we produce original television programming for the first-run television syndication markets and networks in the U.S. and foreign markets. We distribute our programs in exchange for advertising airtime that we then sell to national advertisers. Our library consists of over 5,000 hours of original programming, which are all produced in-house and owned by us. We currently produce 41 shows licensed to broadcast television stations in the United States, capturing over 57 million monthly viewers nationally. We also operate seven high-definition networks that utilize our library of television programs, which are carried by select MVPDs including DirecTV, AT&T U-verse, DISH, Verizon, Comcast, Charter and Altice. In aggregate, we reached nearly 130 million subscribers as of March 31, 2021.

### Key Programming and Overview of Entertainment Studios Networks



Source: Company materials.
[1] Pro forma for carriage deals entered to date, including Charter, Altice, and Frndly TV.
[2] Includes both linear and visual MVPD ("vMVPD"). Company reported subscriber data as of March 2021.

### Our competitive strengths

We believe we have a strong portfolio of media assets with the following attributes:

***Increased scale and further diversification towards broadcast television***

EXHIBIT O(2)

AOE0691

Over the past two years, we have significantly expanded our broadcast television portfolio through a series of transactions. Since we made our first acquisition in broadcast television in July 2019, we acquired 28 television stations through seven transactions, including the potential Other Acquisitions, and also purchased two over-the-air broadcast networks.  Our Pro Forma Restricted Group Adjusted EBITDA for the twelve months ended March 31, 2021 is now 64% broadcast television and 36% network and content, compared to 35% and 65% in 2020 and 0% and 100% in 2016, respectively.  In aggregate, our assets reach over 190 million subscribers, compared to 169 million in 2020 and 68 million in 2016.



| | 2016 | Standalone 2020 | Pro Forma LTM 3/31/21 |
|---|---|---|---|
| Revenue | $51mm | $386mm | $582mm |
| Adjusted EBITDA[1] | $13mm | $102mm | $182mm |
| Adj. EBITDA Mix | Network & Content 100% | Broadcast TV 35% / Network & Content 65% | Network & Content 36% / Broadcast TV 64% |
| # of TV Networks | 7 | 10 | 10 |
| # of Broadcast TV Stations | - | 14 | 28 |
| # of MVPD Subscribers | 68mm | 169mm | 194mm |
| o/w Network | 68mm | 167mm | 190mm |
| o/w TV Broadcast | | 2mm | 4mm |

Source:  Company materials.  Note: Reflects Restricted Group financials only. Combined 2020 financials include AMG pro forma for full-year results from OTA and USA TV, Quincy, and Flint. Pro forma LTM 3/31/21 financials include all acquisitions and related synergy.
[1] Represents AMG restricted group Adjusted EBITDA including expense for amortization of TV library and film rights. LTM 3/31/21 includes run-rate adjustment of $3.8mm for Comcast & Frndly TV carriage deals with Entertainment Studios networks.

### *Attractive television broadcast portfolio with valuable local franchises*

Our portfolio of broadcast television stations carry considerable local scale in the markets they serve and are expected to become increasingly competitive to our larger peers pro forma for the Transactions. We own and operate a portfolio of market-leading television stations that are located in attractive small and mid-sized markets. All of our markets broadcast the Super Bowl in rotation and our stations are home to popular local sports teams such as the Indianapolis Colts, Green Bay Packers, Milwaukee Bucks, Phoenix Suns, and Arizona Cardinals, as well as local college sports teams.  Additionally, our broadcast television stations have award-winning local newscasts (including Murrow Awards, Emmy Awards, Midwest Broadcast Journalists Association, and AP Awards), which further establishes our brand and helps attract political advertising dollars. For average year 2019 and 2020, our stations ranked #1 or #2 in twelve markets by market revenue share, which markets contributed 66% of our 2019 and 2020 average year broadcast television revenue according to BIA Kelsey estimates, and rank top-three in all twenty-one markets.  Our 2019 and 2020 average market revenue share is 26% according BIA Kelsey estimates, which tie for second with our public peers.  Eight of our television stations are clustered in key political states, including Iowa, Arizona, Wisconsin, Illinois, Indiana and Michigan, and we generated significant political revenue given our rankings and strong news offerings. On a per household basis, our stations generated $14 of political revenue in 2020, which ranks third compared to our peers.

### *Continued to strengthen and grow MVPD relationships*

Given the importance and quality of our content, we believe our broadcast television stations and The Weather Channel offer significant value to consumers and distributors, and remain anchor tenants for MVPDs' linear and TV Everywhere video offerings. We generate a substantial portion of our total revenue through contracted fees from retransmission consent agreements and carriage agreements with both MVPDs and virtual multichannel video programming distributors, or vMVPDs. These agreements are long-

EXHIBIT O(2)

AOE0692

dated, typically three to five years with staggered maturities out to 2028, and provide predictable and high-margin cash flow to our business.

For the twelve month period ended March 31, 2021 on a pro forma basis, we generated $253 million of subscription license and retransmission fees, which represents 44% of our Pro Forma Restricted Group Revenue. Of this, 93% is contributed by businesses delivering news and sports content. While broadcast television only represents 2% of our total subscriber reach, it contributes 58% of contracted fees for the twelve months ended March 31, 2021 on a pro forma basis, highlighting the value of Big Four programming and the opportunity to further monetize The Weather Channel and Entertainment Studios Networks.

### Pro Forma Contracted Revenue and Subscriber Mix by Business



| | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | Thereafter |
|---|---|---|---|---|---|---|---|
| % Total Paying MVPD Subscribers Up for Renewal | 3% | 13% | 17% | 28% | 3% | 33% | 4% |
| % Contracted Revenue Up for Renewal [2] | 36% | 10% | 9% | 28% | 2% | 14% | 2% |

Source: Company materials.  Note:  Subscriber count as of March 31, 2021 pro forma for recent negotiations. Subscription license fee and retransmission revenue as of LTM March 31, 2021.
[1] Pro forma for launch of Entertainment Studios networks on Charter and Altice, totaling 28 million subscribers.
[2] Implied contribution to total contracted revenue based on rate, subscriber count and expiration by MVPD as of March 31, 2021.

Our broadcast television business has considerable local scale, acting as a valuable source of local news, sports, weather and primetime programming. Big Four network affiliates aired 93 of the top 100 most watched programs in 2020 including sports programming and remain the primary source for major sports content including the NFL and in particular the Super Bowl, NBA, MLB and NHL. We have Big Four network affiliates in all of our markets and for average year 2019 and 2020 our stations ranked #1 or #2 in market revenue share in twelve of our twenty-one markets.  Our stations average 26% in market revenue share based on 2019 and 2020 average revenue according to BIA Kelsey estimates. We believe our high ratings and strong community ties make our stations attractive to advertisers and provide benefits to our distributors. As a result, our broadcast television stations generated significant growth in retransmission revenues over the last few years and are carried on every major MVPD basic television bundle in every market served. Despite the recent rise in retransmission revenue, there remains a significant value gap between television broadcast's share of audience viewership and its share of distribution fees in the television ecosystem. We believe there is a significant opportunity for potential additional revenues over the next several years and expect broadcast networks to take shares in total affiliate revenues from lower-quality basic networks.

EXHIBIT O(2)

AOE0693

**Broadcast Network Value**



Source: SNL Kagan, Nielsen.
(1) Based on 2019 total U.S. television household delivery in aggregate per SNL Kagan and includes Nielsen rated networks only.
(2) Includes retransmission revenue for television broadcasters and subscription license fees for networks, apportioned by ownership. Broadcast owners include 21st Century Fox, ABC, Azteca, CBS, Estrella TV, ION, MyTV, NBC, Telemundo, CW, UniMás and Univision.

The Weather Channel has been a leading national news brand over the past forty years and continues to be a trusted source for weather information. The network consistently delivers accurate, hyper-localized content and outsized ratings during all major storm events. The Weather Channel is one of the leading news networks in cumulative reach at 75% for people aged 2 and up, a close second to CNN at 77%, and has been one of the Top TV News Brands since 2010. We delivered a 1.0 times power ratio (defined as average 24-hour ratings for 2019-2020 divided by 2021 monthly subscription rate per subscriber spent by distributors per SNL Kagan), compared to our news network peers, which averaged 0.6 times.

As both retransmission consent agreements and carriage agreements come up for renewal for each MVPD, we believe we are well-positioned to leverage our enhanced scale and further increase value for our content and for our viewership.  Since our acquisition of the Weather Group in March 2018, we have successfully renewed carriage agreements with several MVPDs and stabilized its subscription revenue. Monthly subscription rates have remained at approximately $0.12 per subscriber and are expected to grow as we intend to seek to improve economics upon renewal. Subscriber trends are in-line with industry average and we are looking to add additional vMVPD carriage of The Weather Channel in the near-term.  We have also been able to improve carriage and economics of Entertainment Studios networks to help bring these assets up to scale.  We have added over 80 million new subscribers over the past two years, making Entertainment Studios one of the fastest growing distributors in the industry.

### Resilient financial performance

Despite the secular disruption from the COVID-19 pandemic, we continued to deliver local news, weather and entertainment with no interruption and generate resilient financial performance and audience engagement. Our broadcast television business continued to deliver consistent rankings and market share, and generated political revenue of $81 million in 2020. The Weather Group has continued to deliver consistent quarterly CPM growth since our acquisition, further demonstrating the strength of the brand and our ability to execute. While the first three quarters of 2020 were negatively impacted by the height of the COVID-19 pandemic, The Weather Group resumed ratings growth since the fourth quarter of 2020 and its viewer time spent was up double digits in the fourth quarter of 2020 and first quarter of 2021. In addition, we continue to grow distribution of our Entertainment Studios networks, which continue to be the fastest growing portfolio in the sector.

EXHIBIT O(2)

AOE0694



Source: Company materials, Harris Poll, Morning Consult, Comscore. Nielsen Media Research 2020.
Note: Cost per mile ("CPM") is the dollar amount an advertiser pays for a website per one thousand visitors who see its advertisements.

Total net advertising revenue excluding political for our existing business have recovered from lows in the second quarter of 2020, when the industry had been materially disrupted by the pandemic. Based on pacing report as of June 15, 2021, second quarter of 2021 total net advertising revenue is expected to reach near pre-pandemic levels, driven by strong advertising demand as the economy reopens and increasing industry focus on reinvesting in Black-owned media.



Source: Company materials.
[1] Represents total advertising revenue excluding political for existing Allen Media assets only.

### Well-positioned to capture upside from increased focus on Black-owned media

Over the past year, our founder, Chairman and Chief Executive Officer, Byron Allen, has helped lead the effort to address the imbalance of U.S. advertising spend on Black-owned media companies, which continues to under-index total economic impact of African Americans in the country. As a result, several large advertisers and agencies have pledged to increase their advertising commitments on Black-owned media to at least 2% of media budget in 2021, compared to less than 1% in the prior year. Certain advertisers have also pledged multi-year commitment increases of up to 8% of media budget through 2025. As one of the largest Black-owned media businesses, we believe we are well positioned to capture these incremental advertising dollars going forward.

EXHIBIT O(2)

AOE0695



Source: Company materials, public news and press, SNL Kagan and Nielsen.
(1) Includes companies with over 50% economic ownership by African American individual only.
(2) Allen Media revenue based on last twelve months ended March 31, 2021. All others based on 2020 estimates according to SNL Kagan.

*Attractive growth opportunities*

We have implemented several growth initiatives and will continue to seek opportunities to further enhance the distribution and monetization of our platforms as well as the value of our brands. As we further diversify towards television broadcast through the Additional Stations, we expect to continue generating meaningful growth across our businesses. We believe our recent carriage renewals demonstrate how our enhanced scale and value proposition position us well to negotiate legacy Weather Group and Entertainment Studios MVPD agreements at improved economics upon renewal. In addition, we plan to leverage our relationships with distributors to add The Weather Channel on new vMVPDs platforms and continue to bring our Entertainment Studios and broadcast networks to scale. Retransmission revenue is expected to continue to be a meaningful growth engine as broadcasters close the valuation gap relative to the size of their audience.

We also expect continued growth in non-political advertising revenue as the economy improves in second half of 2021. In addition, we expect accelerated growth starting in the second quarter of 2021 driven by increasing commitment from advertisers to Black-owned media, which we believe will provide a long-term benefit to our core business going forward. We will continue to drive pricing and volume across our assets by leveraging the strength of our programming, audience ratings and salesforce. With our highly ranked local news franchises and foothold in key battleground states, we are well-positioned to capture growth from political advertising, as shown by significant growth in candidate spending and nominees spending in 2020. In addition, political issue spending (which is typically independent from election cycle) is also expected to be a large contributor given the increasing polarization around key social issues. In 2020, we launched political advertising and climate issue programming at The Weather Channel. As we expand our audience base beyond traditional MVPDs to reach the rapidly increasing number of viewers who consume online content, we also expect to further monetize our viewership by selling targeted advertising on our digital feeds.

Furthermore, we expect to continue leveraging our existing programming and brands across various distribution platforms and focus on creating high-impact, must-have content. In January 2021, we launched TheGrio.TV, the first broadcast network targeting African Americans, and expanded its distribution to eleven major market Fox-owned and operated television station sub-channels. We announced the launch of three new series for syndication to broadcast television groups in fall of 2021: *Highway to Hell, SOS: How to Survive,* and *Top 10*. Through our focus on providing higher quality programming and multiplatform offerings, we believe we are well-positioned to capitalize on the ongoing transition of the media ecosystem and will be able to drive incremental improvements.

*Strong free cash flow generation*

We believe our stable revenue base, high margin cash flow, modest working capital and capital expenditure requirements will help support meaningful de-leveraging after giving effect to the Transactions. On a pro forma basis for the twelve months ended March 31, 2021, 44% of our total revenues were contracted and we had a Pro Forma Restricted Group Adjusted EBITDA margin of 31%. Capital expenditures were only 3% of total revenues, resulting in a ratio of Pro Forma Restricted Group Adjusted EBITDA less

EXHIBIT O(2)

AOE0696

capital expenditures to Pro Forma Restricted Group Adjusted EBITDA of 89%. Combined, our Revolving Credit Facility and significant cash flow generation ability are expected to provide ample liquidity for the business. We also expect to generate additional cash flow within the first year following the Acquisitions as a result of continued momentum in advertising sales, including increased focus on Black-owned media, increased retransmission rates from 2021 contract renewals, expected increase in carriage of The Weather Channel and Entertainment Studios networks, and continued growth in political and digital revenues.

***Best-in-class management team supported by industry experts across all business lines***

Our management team is supported by industry experts with approximately 25 years of experience on average in the evolving media ecosystem, including executive roles at Nexstar Media Group, Inc., Gray Television, Cox Television, NBCUniversal, Fox Networks Group and Crown Media. With the acquisition of USA TV, we added broadcast veterans as CEO and COO of our broadcast television business, and their efforts have positioned our stations for long-term growth and value creation. Our management team has a proven track record of leading businesses through growth by executing initiatives across media platforms and managing the operations through various acquisitions. We intend to continue to leverage our industry insight and deep experience in growing media assets to drive value for our company.

## Our strategy

***Continue to focus on targeted local content to attract viewership and maintain and grow our leadership position***

Television remains the most consumed source of weather coverage, local news and sports. We intend to continue to capitalize on the favorable environment and invest in programming to maintain our leadership positions. Since our acquisition of the Weather Group, The Weather Channel has continued building its world class expertise and providing accurate, timely and in-depth weather reports across television, digital, and other platforms. In addition, we have enhanced the quality of our content with high-definition, modernized formats, immersive mixed reality visualization, and compelling programming. In 2019, we won two Emmy Awards in the News & Documentary and Outstanding Science, Medical or Environmental Report categories. In addition, we recently announced the launch of nationwide distribution of three additional original weekly series in fall of 2021, *Highway Thru Hell, SOS:  How to Survive,* and *Top 10*. With the Acquisitions, we will further strengthen our local advertising appeal. Our broadcast television team rigorously measures audience preferences to determine what viewers value most and consistently apply research results in local on-air news products. We intend to continue to innovate and deliver targeted, localized content across multiple products and maximize value for our advertisers.

***Expand our content library and enhance distribution on our owned and operated assets as well as to our broadcast television and network partners***

We expect to continue to leverage our content library, production capabilities, and intellectual properties at Entertainment Studios to increase the distribution of our content across our owned broadcast television stations and other networks and MVPDs. We have syndicated programming arrangements and content partnerships with major networks and broadcast television groups including CBS Television Network, Sinclair, Nexstar Media Group, Inc., TEGNA Inc., E.W. Scripps Company and Hearst Television, Inc. Through our acquisition of broadcast television stations, we have also rolled out our original programming on stations acquired and expect to implement the same strategy across the Additional Stations.

***Drive monetization of advertising opportunities***

We seek to optimize our pricing model and continue to drive growth in our advertising sales. The strength of our programming has helped drive audience ratings and allowed us to add new advertisers and increase our CPMs. We will also seek to expand the sale of political advertising on our broadcast television stations, which we believe will be a meaningful avenue of growth given the strength of our local news franchises. In addition, we have recently begun accepting political advertising on The Weather Channel. As we expand our viewership base beyond traditional MVPDs to reach the increasing number of viewers who consume online content, we expect to further monetize our viewership by selling targeted advertising on our digital feeds. Through our focus on providing higher quality programming and multiplatform offerings, we believe we are well-positioned to capitalize on the ongoing transition of the media ecosystem and will be able to drive incremental improvements in our advertising revenues.

***Leverage combined scale to drive enhanced negotiating position***

The combination of The Weather Channel with local broadcast television stations is expected to further enhance our relevance with distributors and leverage in carriage agreements and retransmission consent agreements negotiations. Upon renewal of our carriage agreements, we intend to seek additional fees per subscriber, as we believe that we are undercompensated compared to other networks.

We will work with MVPDs, vMVPDs, over-the-top-distributors, or OTTDs, and emerging technologies distributors to increase the value for our content and for the viewership we deliver. The Weather Group negotiated most of its MVPD carriage

EXHIBIT O(2)

AOE0697

agreements under prior ownership, and we believe there are opportunities to improve terms upon renewal. With the addition of Big Four network-affiliated stations through the Acquisitions, we believe our relevance to distributors are further enhanced. We believe the growth in retransmission revenues and carriage fees will continue to improve the resiliency and predictability of our business.



Source: SNL Kagan, Nielsen.
Note: Includes Nielsen rated basic networks only.
[1] People ages 2 years and up.
[2] Based on gross monthly subscription fee per subscriber per SNL Kagan estimate.
[3] Represented as Power Ratio, which is calculated by dividing 2019-2020 24-hour rating by 2021 subscription fees per subscriber per Kagan.
[4] Excludes MSNBC.

***Maintain prudent management of both operating and programming costs***

We plan to continue to manage our operating and programming costs in order to improve margins and increase our cash flow. We will keep looking for opportunities to increase our efficiency without jeopardizing our commitment to provide high quality content to our communities. As we integrate the Additional Stations, we believe that we can achieve cost and operational efficiencies by benefiting from our increased scale.

***Continue to diversify our revenue streams by prudently investing in innovation and high growth initiatives and strategic acquisitions***

We plan to continue diversifying our revenue base by prudently investing in new initiatives that complement our strong local brands and building scale. We launched TheGrio.TV, the first African American focused broadcast network in 2020 and in 2022 we expect to launch The Weather Channel en Español, the first Spanish-language weather streaming service, which will provide weather reports to the U.S. and its territories as well as in Mexico and Central America. We also intend to seek additional acquisition opportunities that are strategic and accretive to our content, networks and broadcast television stations.

**Competition**

Our businesses operate in highly competitive markets. We compete with companies within the television broadcast, entertainment and media business. We compete with the major television production companies, television networks, pay television services and digital media platforms for the production and acquisition of television programming properties, content, delivery of networks and delivery of content through various mediums, including new technology, all of which are essential to the success of our businesses. For instance, the Weather Group competes with other television networks and programs, including local channels, as well as online sources for weather information, including mobile phone applications. Moreover, our networks compete with other programming networks for viewing and subscribership by each distributor's customer base, as well as for carriage by such

EXHIBIT O(2)

AOE0698

distributors. As a result, the success of any of our television networks or broadcast stations is dependent not only on the quality and acceptance of our content, but also on the quality and acceptance of other competing content released into the marketplace at or near the same time as well as on the ability to license and produce content for the networks that is adequate in quantity and quality and will generate satisfactory subscriber levels.

Our broadcast television stations compete for audience share and advertising revenue with other broadcast television stations in their Designated Market Areas, or DMAs, as well as with other advertising media such as MVPDs, vMVPDs, OTTDs, networks, radio, newspapers, magazines, outdoor advertising, transit advertising, telecommunications providers, direct mail, internet, and other digital media. Some competitors are part of larger, publicly traded companies with substantially greater financial, technical, and other resources than we have. Other factors that are material to a television station's competitive position include signal coverage, local program acceptance, network affiliation or program service, audience characteristics, and assigned broadcast frequency.

Broadcast television stations compete for audience share primarily on the basis of program popularity, which has a direct effect on advertising rates. Our network affiliated stations are largely dependent upon the performance of network provided programs in order to attract viewers. Non-network time periods are programmed by the station primarily with syndicated programs purchased for cash, cash and barter, or barter-only, as well as through self-produced news, public affairs programs, live local sporting events, paid-programming, and other entertainment programming.

Specifically, competition in the television industry takes place on several levels: competition for audience, competition for programming and competition for advertising.

### Audience

We compete for audience share on the basis of program popularity. The popularity of a network's or station's programming has a direct effect on the advertising rates it can charge its advertisers. A portion of the daily programming on the stations on which our programs are shown, or stations that we own or provide services to, is supplied by the broadcast network with which each station is affiliated. In those periods, the stations are dependent upon the performance of the network programs in attracting viewers. Stations program non-network time periods with a combination of self-produced news, public affairs and other entertainment programming, including movies and syndicated programs. The major television networks have also begun to provide their programming directly to the consumer via portable digital devices, such as tablets and cell phones, which present an additional source of competition for television broadcaster audience share. Other sources of competition for audience include home entertainment systems (such as DVDs and DVRs), video-on-demand and pay-per-view, the Internet (including network distribution of programming through websites and mobile platforms) and gaming devices.

Although the commercial television network programs and broadcast industry historically has been dominated by the ABC, NBC, CBS and FOX television networks, other newer television networks and the growth in popularity of subscription systems, video streaming services, which air exclusive programming not otherwise available in a market, such as Netflix, Hulu and Amazon, have become significant competitors for the traditional television audience.

### Programming

Competition for programming involves negotiating with national program distributors or syndicators that sell first-run and rerun packages of programming. Stations compete against in-market broadcast station operators for exclusive access to off-network reruns and first-run product in their markets. Cable networks generally do not compete with local stations for programming, although various national networks from time to time have acquired programs that would have otherwise been offered to local television stations. Warner Media, LLC, Comcast Corporation, Viacom Inc., CBS Corporation, Fox Corporation, the Walt Disney Company and Discovery Networks each owns television networks and/or multiple networks and also owns or controls major production studios, which are the primary sources of programming for the networks. It is uncertain whether in the future such programming, which is generally subject to short-term agreements between the production companies and the networks, will be moved from or to the networks. Television broadcasters also compete for non-network programming unique to the markets they serve. As such, stations strive to provide exclusive news stories and unique features such as investigative reporting and coverage of community events and to secure broadcast rights for regional and local sporting events.

### Advertising

We compete for advertising revenue with other broadcast television stations in their markets and other advertising media such as newspapers, radio stations, magazines, outdoor advertising, transit advertising, yellow page directories, direct mail, MVPDs, vMVPDs, OTTDs and online media such as Google and Facebook. Competition for advertising dollars in the television business occurs primarily on a national basis and competition for the broadcasting industry occurs primarily within individual markets. Generally, a broadcast television station in a particular market does not compete with stations in other market areas.

EXHIBIT O(2)

AOE0699

Television networks and the broadcast industry in general is continually faced with technological change and innovation which increase the popularity of competing entertainment and communications media. Further advances in technology may increase competition for household audiences and advertisers. An increase in the popularity of OTTDs may result in popular product offerings that do not include broadcast television stations. The increased use of digital technology by MVPDs, along with video compression techniques, will reduce the bandwidth required for television signal transmission. These technological developments are applicable to all video delivery systems, including over-the-air broadcasting, and have the potential to provide vastly expanded programming to highly targeted audiences. Reductions in the cost of creating additional channel capacity could lower entry barriers for new channels and encourage the development of increasingly specialized "niche" programming. This ability to reach very narrowly defined audiences is expected to alter the competitive dynamics for advertising expenditures. We are unable to predict the effect that these or other technological changes will have on the broadcast television industry or on the future results of our operations or the operations of the stations to which we provide services.

**Employees**

As of March 31, 2021, we had approximately 1,270 employees and, on a pro forma basis after the Acquisition, we had approximately 1,890 full-time employees. We also utilize consultants in the ordinary course of our business and hire additional employees on a project-by-project basis in connection with the production of our content. Some of our employees are members of customary screen actors, writers and directors guilds. In addition, from time to time we employ individuals in connection with the development and production of original content who are members of customer screen actors, writers and directors guilds.

**Properties**

Our headquarters are located in Century City, California, where we lease approximately 25,387 square feet of space. We lease our studio in Culver City, California, which is an approximately 75,000 square feet complex where we produce many of our television programs.

The Weather Channel operates out of leased studios in Atlanta, Georgia, which is an approximately 88,626 square feet complex where it produces much of its live programming. Our broadcast television stations lease or own facilities in the cities in which they operate.

We also lease administrative offices in New York, New York and Chicago, Illinois. We consider our properties adequate for our present needs.

**Regulation**

Our businesses and the intellectual property they create or acquire are subject to and affected by laws and regulations of U.S. federal, state and local governmental authorities, as well as internationally. The laws and regulations affecting our businesses are constantly subject to change, as are the protections that those laws and regulations afford us. The discussion below describes some, but not all, present and proposed laws and regulations affecting our businesses.

*Federal Communications Commission*

In the U.S., the FCC regulates several aspects of our, and our distribution ecosystem's operations and programming. This includes FCC oversight in connection with communications satellites and related uplink/downlink equipment and transmissions, content-specific requirements such as closed captioning, messaging during children's programming, loudness of commercials, and program access requirements in connection with distributors and programmer services with shared attributable interests.

Our television broadcasting operations are subject to FCC jurisdiction under the Communications Act of 1934, as amended (the "Communications Act"). FCC rules, among other things, govern the term, renewal and transfer of radio and television broadcasting licenses and limit the number and type of media interests in a local market that may be owned by a single person or entity. Our stations must also adhere to various statutory and regulatory provisions that govern, among other things, political and commercial advertising, payola and sponsorship identification, contests and lotteries, television programming and advertising addressed to children, and obscene and indecent broadcasts. The FCC may impose substantial penalties for violation of its regulations, including fines, license revocations, denial of license renewal or renewal of a station's license for less than the normal term.

*Online Services*

To the extent that our programming services are distributed through online based platforms, we must comply with various federal and state laws and regulations applicable to online communications and commerce. Congress and individual states may consider additional legislation addressing online privacy and other issues.

EXHIBIT O(2)

AOE0700

*Proposed Changes in Regulation*

The regulation of programming services, cable television systems, direct broadcast satellite providers, broadcast television licensees and online distributed services is subject to the political process and has been in constant flux historically. Further material changes in the law and regulatory requirements must be anticipated and there can be no assurance that our business will not be materially adversely affected by future legislation, new regulation or deregulation.

*Closed Captioning*

Our networks must provide closed captioning of video programming for the hearing impaired and meet certain captioning quality standards. The FCC and certain of our carriage agreements and retransmission consent agreements require us to comply with and, in certain cases, certify compliance with such standards. We are also required to provide closed captioning on certain video content delivered via the Internet.

*Commercial Loudness*

FCC rules require MVPDs to ensure that all commercials comply with specified volume standards, and certain of our carriage agreements and retransmission consent agreements require us to certify compliance with such standards.

*Advertising Restrictions on Children's Programming*

Any programming and associated Internet websites intended primarily for children 12 years of age and under that we may offer must comply with limits on commercial content.

*Obscenity Restrictions*

Distributors are prohibited from transmitting obscene programming, and certain of our carriage agreements and retransmission consent agreements require us to refrain from including such programming on our networks.

*Packaging and Pricing*

The FCC periodically considers examining whether to adopt rules regulating how programmers package and price their networks, such as whether programming networks require distributors to purchase and carry undesired programming in return for the right to carry desired programming and, if so, whether such arrangements should be prohibited.

*Effect of "Must-Carry" Requirements*

The FCC's implementation of the statutory "must-carry" obligations requires cable and satellite distributors to give broadcasters preferential access to channel space. While this may be advantageous in the broadcast television station business, it may reduce the amount of channel space that is available for carriage of our networks and the amount of funds that Distributors have to pay us for our programming networks.

## Intellectual Property

We are, fundamentally, a content company, so the trademark, copyright, patent and other intellectual property laws that protect our brands and content are of paramount importance to us. It is our practice to protect our programs, content, films, brands, formats, characters and other original and acquired works, and ancillary goods and services.

Our business is dependent upon, among other things, the value of the name, The Weather Channel. We do not own the trademark and instead license it from IBM pursuant to an initial five-year agreement that expired in January 2021 but was renewed through January 2022. This IBM agreement also provides us with certain raw data relating to weather that we use in the Weather Channel. We have an option to renew the IBM agreement at the conclusion of the current term, and we may renew it at our sole discretion for successive one year terms. IBM does not have the right to terminate the IBM agreement.

The unauthorized reproduction, distribution, exhibition or other exploitation of copyrighted material interferes with the market for copyrighted works and disrupts our ability to distribute and monetize our content. The theft of films, television and other entertainment content presents a significant challenge to our industry, and we take a number of steps to address this concern. Where possible, we use technological protection tools, such as encryption, to protect our content. We are actively engaged in enforcement and other activities to protect our intellectual property, including: monitoring online destinations that distribute or otherwise infringe our content and sending takedown or cease and desist notices in appropriate circumstances; using filtering technologies employed by some user-generated content sites; and pursuing litigation and referrals to law enforcement with respect to websites and other online

EXHIBIT O(2)

AOE0701

platforms that distribute or facilitate the distribution and exploitation of our content without authorization. Through partnerships with various organizations, we also are actively involved in educational outreach to the creative community, state and federal government officials and other stakeholders in an effort to marshal greater resources to combat copyright theft. Additionally, we participate in various industry-wide enforcement initiatives, public relations programs and legislative activities on a worldwide basis. We have had notable success with site-blocking efforts in parts of Europe and Asia, which can be effective in diverting consumers from piracy platforms to legitimate platforms.

Notwithstanding these efforts and the many legal protections that exist to combat piracy, the proliferation of content theft and technological tools with which to carry it out continue to be a challenge. The failure to maintain enhanced legal protections and enforcement tools and to update those tools as threats evolve could make it more difficult for us to adequately protect our intellectual property, which could negatively impact its value and further increase the costs of enforcing our rights as we continue to expend substantial resources to protect our content.

**Legal Proceedings**

From time to time, we are involved in litigation that arises from the ordinary operations of business, such as contractual or employment disputes or other general actions. In the event of an adverse outcome of these proceedings, we believe the resulting liabilities would not have a material adverse effect on our financial condition or results of operations.

EXHIBIT O(2)

AOE0702

MANAGEMENT

The names of Allen Media Holdings, LLC's current executive officers, their ages as of March 31, 2021, and their biographical information are set forth below.

| Executive Officer | Age | Position(s) |
| --- | --- | --- |
| Byron Allen | 60 | Chairman and Chief Executive Officer |
| Ronnie Ng | 41 | Chief Financial Officer |
| Robert S. Prather, Jr. | 76 | Chief Executive Officer and President, Allen Media Broadcasting |
| Andrew S. Fisher | 73 | Chief Operating Officer, Allen Media Broadcasting |
| Thomas M. O'Brien | 59 | Executive Vice President and President of The Weather Channel |
| Janice A. Arouh | 59 | President, Network Distribution and Marketing |
| Eric Gould | 53 | Chief Investment Officer |
| Mark DeVitre | 54 | Executive Vice President and General Counsel |
| Terence Hill | 63 | Chief Operating Officer |

Allen Media Holdings, LLC is the sole member of Allen Media, LLC, the Issuer of the notes and direct parent of the Co-Issuer of the notes. The sole member of Allen Media Holdings, LLC is Allen Media Holdings II, LLC, of which Byron Allen is the sole member. We do not have a board of directors. The executive officers identified above form our Executive Management Committee, which is involved in all major decision making, advising and consulting with Byron Allen on all significant decisions for the business.

After the completion of the Acquisition, members of the management team of Quincy are expected to join us and participate in the major decisions of our business going forward.

*Byron Allen* founded Entertainment Studios in 1993 and serves as our Chairman and CEO. Byron Allen is a prominent business leader, content producer, comedian and television talk show host whose multimedia company now consists of ten television networks including The Weather Channel, fifteen broadcast television stations, and a theatrical motion picture production/distribution studio. Entertainment Studios currently produces and distributes Emmy® award-winning television programming for broadcast, cable, and digital global platforms. In 2018, Byron Allen was selected for the "Bloomberg 50" for his accomplishments as a visionary global business leader and was chosen for the "100 Most Intriguing Entrepreneurs" by Goldman Sachs. In 2019, Byron Allen received the 16th Annual "Brandon Tartikoff Legacy Award" from the National Association of Television Program Executives (NATPE) and was honored with the "Whitney M. Young Jr. Award" at the 46th Annual Los Angeles Urban League Awards. Additionally, Byron Allen in 2019 was inducted into the Broadcasting and Cable Hall of Fame. Byron Allen is a board member of the Children's Hospital Los Angeles and the Motion Picture Television Fund, which provides housing and healthcare primarily to elderly members of the entertainment industry.

*Ronnie Ng* was appointed Chief Financial Officer and Head of Corporate Development in October 2018. Before joining AMG, Mr. Ng served as Vice President at TCW Group ("TCW") from 2013 to 2018 where he invested in investment grade corporate bonds, high-yield corporate bonds, and leveraged loans. Prior to joining TCW, Mr. Ng was an investment banker for approximately 10 years where most recently from 2006 to 2012 he was an Executive Director at UBS Investment Bank's Global Media Group where he managed, advised and structured various financings and merger and acquisition transactions. Prior to UBS, Mr. Ng held similar investment banking positions from 2003 to 2006 at Deutsche Bank and Houlihan Lokey. Prior to Mr. Ng's investment banking career, he provided financial and accounting due diligence services for merger and acquisition and financing transactions at Arthur Andersen. In total, Mr. Ng has more than 16 years of financial, investing and investment banking experience. Mr. Ng received a Bachelor of Science in Finance from University of Illinois at Urbana-Champaign.

*Robert S. Prather, Jr.* joined Allen Media as President of Allen Media Broadcasting in February 2020. Mr. Prather and a business partner acquired Gray in 1993. Thereafter, Mr. Prather worked to expand Gray by acquiring broadcast stations – experience invaluable to Allen Media as it pursues its own growth strategy. Mr. Prather served as the Executive Vice President, Acquisitions of Gray, from 1996 to 2002, and then as the President and Chief Operating Officer of Gray from 2002 to 2013. Mr. Prather left Gray in 2013 to form Heartland Media, another owner of multiple broadcast stations. In his prior roles at Gray and Heartland Media, Mr. Prather has been instrumental in the acquisition of numerous broadcast stations and in successfully managing the operations of those stations following their acquisition. He was also an instrumental part of the Gray team chosen by a consortium of banks to manage the Young broadcasting stations that were in bankruptcy in 2009.

*Andrew S. Fisher* joined the Allen Media leadership team as Chief Operating Officer of Allen Media Broadcasting in February 2020. Mr. Fisher was previously Chief Operating Officer of Heartland Media, LLC from 2014 to 2019. Before his tenure at Heartland Media, Mr. Fisher worked at Cox Television for 24 years, starting as vice president and general manager of WSB-TV, Atlanta, in 1984. In 1990, he was named executive vice president of Cox Television Affiliates and subsequently served as executive vice

EXHIBIT O(2)

AOE0703

president and then president of Cox Television until 2008.  Mr. Fisher then worked on several consulting engagements on station acquisitions and operations before returning to fulltime employment and joining Heartland Media.

In addition to his broadcast experience, Mr. Fisher had an earlier career as a television news executive and journalist for which he received a number of industry honors, including a Peabody Award and eight regional Emmy awards.  Moreover, Mr. Fisher has been an active, leading member of industry organizations during his career.  He has served as chair and board member of the National Association of Broadcasters, and board member of the Association of Maximum Service Television, Television Operators Council and the Broadcaster's Foundation.  He has also chaired the boards of the ABC Affiliate Board of Governors, the Television Bureau of Advertising and Network Affiliated Stations Alliance.

*Thomas M. O'Brien* was appointed our Executive Vice President in January 2019. He also serves as President of Weather Group, LLC, our subsidiary. Prior to joining AMG, Mr. O'Brien served as Executive Vice President and Chief Revenue Officer of Nexstar Media Group ("Nexstar") from 2013 to 2017. Before joining Nexstar, he served as Executive Vice President and Chief Revenue Officer of NBCUniversal, CNBC from 2010 to 2012; and was a President and General Manager in NBC Universal's Television Stations Division from 1997 to 2010, including leading NBC's flagship station WNBC, KXAS (Dallas) and WVIT (Connecticut). Prior to NBC, Mr. O'Brien worked in revenue management roles in the Viacom Broadcasting Group from 1989 to 1997.

In addition to his work experience, Mr. O'Brien has served as Advisory Board Member of Transform Inc., in Seattle, Washington since 2017, serves on the Board of Directors of the International Radio and Television Foundation (IRTS), and the National Association of Broadcasters (NAB) Digital Officers Committee from 2015- 2017. Mr. O'Brien received the 2015 Technology Leadership Award from Broadcasting and Cable (B&C) Magazine and was named a 2014 Digital All-Star by B&C. He is a proud recipient of a regional Emmy Award for Overall (TV) Station Excellence, and an Award of Excellence for TV/Cable General Management from the American Women in Radio and Television.

In total, Mr. O'Brien has over 30 years of combined television and digital operating experience. Mr. O'Brien received a Bachelor of Science in Telecommunications Management and Marketing from the S.I. Newhouse School of Public Communications and the School of Management at Syracuse University.

*Janice A. Arouh* has served as President, Network Distribution and Marketing since May 2010. In her capacity, Ms. Arouh is at the helm of the content division leading strategic distribution and revenue growth, overseeing the distribution agreements for all Allen Media content by multi-channel video providers and new media distributors including the ten linear and streaming networks, broadcast stations, video on demand film, TV Everywhere, and television library products. Ms. Arouh is also focused on our business development initiatives. Before joining Entertainment Studios, Ms. Arouh was Executive Vice President of Affiliate Sales and Marketing at Crown Media where she was responsible for shepherding significant subscriber and revenue growth for Hallmark Channel and Hallmark Movie Channel. Prior to joining Crown Media in 2004, Ms. Arouh held key distribution and affiliate marketing positions throughout Fox Cable Networks since 1994 including Senior Vice President, National Accounts and Affiliate Marketing. Ms. Arouh was an integral part of the original FX Network's distribution launch team for News Corp's entry into basic cable, the largest cable network launch. Ms. Arouh is recognized as one of the top distribution players in the industry and holds many distinctive industry awards and tributes. She has been the recipient of the Women In Cable and Telecommunications Lifetime Achievement Award, she was inducted into the Class of Wonder Women by Multichannel News, and CableFax's Sales Hall of Fame. CableFax recognizes Ms. Arouh annually as one of the most powerful woman and executive in media. She is also the recipient of the LupusLA Woman of Achievement award. She has served as the LupusLA board advisor since 2009. Ms. Arouh graduated from John Carroll University, where she received a Bachelor of Arts in Communications. Ms. Arouh attended the Cable Executive Management at Harvard Business School.

*Eric Gould* was appointed Chief Investment Officer and Executive Vice President of Finance in August 2017. Before joining AMG, Mr. Gould was a Managing Director and Senior Portfolio Manager at Guggenheim Partners Asset Management from 2014 to 2017. Prior to joining Guggenheim, Mr. Gould was the Head of Portfolio Management at Munich Re Group/MEAG New York, where he was responsible for North American investment strategies, and served as an investment committee member and a corporate officer from 2007 to 2013. Before joining Munich Re in 2007, Mr. Gould was a Senior Vice President and Senior Portfolio Manager at GE Asset Management. Mr. Gould also serves as a Board Advisor to Wavelength Capital Management, an independent investment management firm. In total, Mr. Gould has more than 25 years of investment experience in portfolio management across multi-sector investment strategies, finance, capital markets and mergers and acquisitions. Mr. Gould earned his MBA from Loyola University of Chicago and B.A. from Indiana University.

*Mark DeVitre* is our Executive Vice President and General Counsel. Mr. DeVitre oversees business and legal affairs including broadcast syndication operations, cable networks, content, online strategies, financing, talent and programming license agreements. Before joining Entertainment Studios, Mr. DeVitre was Senior VP Business Affairs and Operations for Warner Bros. Domestic

EXHIBIT O(2)

AOE0704

Television Distribution. Prior to that he was Senior VP of Operations for the FX Network and General Manager of the Fox Movie Channel. Mr. DeVitre also held positions with Philips Interactive Media, Warner Home Video and Multimedia Entertainment.

*Terrence Hill* is the Chief Operating Officer of Allen Media, LLC and Entertainment Studios since joining the company in 1998. Mr. Hill is a media executive with over 35 years of experience in business operations, strategic planning, finance and corporate management. During his tenure, Mr. Hill was instrumental in transforming AMG into a diversified, fully integrated media and technology company. Prior joining Entertainment Studios, Mr. Hill was an investment banker at Merrill Lynch & Company and focused on institutional real estate, capital markets and debt structuring. He holds a degree in Business Administration in Finance from the University of Southern California

Byron Allen is the sole director, officer, president and secretary of Allen Media Co-Issuer, Inc., serving in such role since Allen Media Co-Issuer, Inc. was formed in January 2020 for the sole purpose of acting as Co-Issuer of the notes.

91

EXHIBIT O(2)

**CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS**

**Notes Payable to Byron Allen**

On October 25, 2018, the Company entered into two loan agreements for an aggregate total of $5.4 million with Byron Allen to fund operating expenses. These borrowings bear interest at 18% per annum and mature on October 25, 2021. As of March 31, 2021 and December 31, 2020, the total balances outstanding on the notes was $5.4 million with $2.1 million of accrued interest.

On December 17, 2018, one of our unrestricted subsidiaries entered into a loan agreement for $10.7 million with Byron Allen to fund the prints and advertising costs for a movie. These borrowings bear interest at 16% per annum, mature on December 17, 2021, and will be repaid out of receipts from the exploitation of the movie. As of both March 31, 2021 and December 31, 2020, the total balance outstanding on the note were $6.3 million and accrued interest was $1.5 million.

On July 17, 2019, one of our unrestricted subsidiaries entered into a loan agreement for $3.8 million with Byron Allen to fund operating expenses. These borrowings bear interest at 18% per annum, and mature on July 17, 2022. As of March 31, 2021 and December 31, 2020, the total balance outstanding on the loan was $3.2 million and $3.8 million, respectively, and accrued interest was $1.1 million and $1.0 million, respectively.

On October 25, 2019, one of our unrestricted subsidiaries entered into a loan agreement for $19.5 million with the sole member of the Company to fund operating expenses. The loan bears interest at 16% per annum and matures on October 25, 2022. As of both March 31, 2021 and December 31, 2020, the total balance outstanding on the loan was $11.6 million and accrued interest was $2.5 million and $2.1 million, respectively.

**Notes Receivable from Byron Allen**

We have entered into a note receivable with Byron Allen for a revolving line of credit in an aggregate amount of $11.5 million. As of March 31, 2021 and December 31, 2020, the note receivable was $9.1 million and $4.9 million, respectively. The note receivable accrues interest at 3% per annum and matures on December 31, 2021.

**Operating Leases**

In addition, we entered into a lease with Byron Allen, effective January 1, 2011 through the present for a property located in Los Angeles, California. We pay Byron Allen $10,000 per month in rent for the property. The property lease is terminable by us providing at least 30 days prior written notice of its termination date or by Byron Allen terminating the tenancy as otherwise permitted by law.

**Services to the Company**

Byron Allen provides services to the Company, including in certain production related roles, in exchange for compensation. Consistent with the Company's accounting policy and in accordance with the applicable accounting literature, a portion of the amounts paid to Mr. Allen are capitalized as costs of content. During the year ended December 31, 2020, the compensation totaled $35.0 million of which $31.5 million was capitalized as part of content costs in Television library. For the three-month period ended March 31, 2021, the compensation totaled $5.0 million of which $4.5 million was capitalized as part of content costs in Television library.

**Certain Officers of Our Company or Our Subsidiaries**

Terence Hill, uncle to Byron Allen, and Carolyn Folks, mother to Byron Allen, are each an officer of our company and certain of our subsidiaries.

EXHIBIT O(2)

AOE0706

**DESCRIPTION OF OTHER INDEBTEDNESS**

*We summarize below the principal terms of the Senior Credit Facilities and the initial notes. This summary is not a complete description of all of the terms of the Senior Credit Facilities or the Indenture governing the initial notes.*

**Senior Credit Facilities**

Our existing senior secured credit facility (the "Senior Credit Facilities") consists of (a) a senior secured term loan B in an initial principal amount of $530 million with a seven-year maturity, as amended by the first amendment dated as of February 21, 2020, the fourth amendment dated as of July 16, 2020, the fifth amendment dated as of July 21, 2020 and the sixth amendment dated as of July 29, 2020, which collectively increased the aggregate principal amount available under such facility to $660 million (the "Term Loans"); and (b) a senior secured $40 million revolving credit facility with a five-year maturity, of which $5 million is available for the issuance of letters of credit from time to time, as amended by the second amendment dated as of April 9, 2020 and the third amendment dated as of July 9, 2020, which collectively increased the aggregate principal amount available under such facility to $60 million (the "Revolving Credit Facility" and, together with the loans thereunder, the "Revolving Loans").

Concurrently with this offering, we expect to enter into the New Term Loan B of $210 million and borrow the entire principal amount of the New Term Loan B, which we intend to use together with the net proceeds of this offering and cash on hand, to consummate the Transactions.

The Credit and Guaranty Agreement, dated as February 10, 2020, among AMG, as borrower, Royal Bank of Canada, as Administrative Agent, Collateral Agent, Swingline Lender and L/C Issuer, the guarantors from time to time party thereto and the lenders from time to time party thereto that governs the Senior Credit Facilities (the "Credit Agreement") permits us to incur incremental term loan borrowings, and incremental revolving credit facilities, subject to the satisfaction of certain conditions, in an aggregate principal amount not to exceed the sum of (x) the greater of (i) $180 million and (ii) trailing four quarter consolidated EBITDA (as determined in accordance with the terms of the Credit Agreement) plus (y) additional amounts based on the voluntary prepayment of certain indebtedness plus (z) further additional amounts so long as, on a *pro forma* basis at the time of incurrence, (a) with respect to incremental term loan borrowings and incremental revolving credit facilities that are secured on a pari passu lien basis with the Senior Credit Facilities, our consolidated first lien net leverage ratio does not exceed 2.9 to 1.00, (b) with respect to incremental term loan borrowings and incremental revolving credit facilities that are secured on a junior lien basis with the Senior Credit Facilities, our consolidated secured net leverage ratio does not exceed 3.4 to 1.00 and (c) with respect to incremental term loan borrowings and incremental revolving credit facilities that are unsecured, either (i) our consolidated total net leverage ratio does not exceed 4.5 to 1.00 or (ii) our fixed charge coverage ratio is not less than 2.00 to 1.00.

All obligations under the Senior Credit Facilities, any interest rate protection or other hedging arrangement entered into with a lender and certain cash management arrangements entered into with a lender, agent, arranger or affiliate thereof will be unconditionally guaranteed by Holdings and our material direct and indirect wholly owned domestic subsidiaries, subject to certain exceptions. All obligations under the Senior Credit Facilities, any interest rate protection or other hedging arrangements entered into with any lender, certain cash management arrangements entered into with a lender, agent, arranger or affiliate thereof and the guarantees of those obligations, are secured, subject to certain permitted liens and other agreed upon exceptions, on a senior basis by a perfected security interest in all of Holdings', the Issuer's, the Co-Issuer's and each guarantor's existing or after-acquired personal property, including all of the capital stock directly held by Holdings, the Issuer, the Co-Issuer or any guarantor (limited, in the case of first-tier foreign subsidiaries of the Issuer or subsidiaries of the Issuer that are foreign subsidiary holding companies, to 100% of the non-voting equity interests (if any) and 65% of the voting equity interests of such subsidiaries).

The Term Loans will amortize at 1% per annum in equal quarterly installments until the final maturity date. All then outstanding principal and interest under the Term Loans will be due and payable on the seventh anniversary of the closing of the Term Loans. All then outstanding principal and interest under the Revolving Credit Facility are due and payable, and all commitments under the Revolving Credit Facility will terminate, on the fifth anniversary of the closing of the Revolving Loans. Term Loans that are repaid or prepaid may not be reborrowed, and amounts prepaid under the Revolving Credit Facility may be reborrowed.

We will be permitted to prepay amounts outstanding under the Senior Credit Facilities at any time without payment of a premium, except that with respect to the Term Loans, a 1% premium will apply to a repayment of the Term Loans in connection with a repricing of such loans effected on or prior to the date that is six months following the initial closing date of the New Term Loan B, subject to certain exceptions as set forth in the Credit Agreement. We will be required to prepay certain amounts outstanding under the Term Loans with a certain percentage of excess cash flow, the net cash proceeds of certain asset sales, certain casualty events, and certain issuances of debt, in each case subject to certain exceptions.

The Term Loans bear interest, at the Issuer's option, at a rate equal to either a eurocurrency rate, plus an applicable margin (subject to a 0.00% eurocurrency floor), or the prime lending rate, plus an applicable margin. Revolving Loans bear interest, at the

EXHIBIT O(2)

AOE0707

Issuer's option, at a rate equal to either a eurocurrency rate, plus an applicable margin (subject to a 0.00% eurocurrency floor), or the prime lending rate, plus an applicable margin. We will also be required to pay a quarterly commitment fee under the Revolving Credit Facility based on the average daily unused portion of the commitments during the applicable quarter, as well as a fee which accrues at a rate per annum equal to the applicable margin under the Revolving Credit Facility on the daily maximum amount available to be drawn under outstanding letters of credit under our Revolving Credit Facility, payable in arrears at the end of each quarter. In addition, we will be required to pay a fronting fee in respect of letters of credit issued under our Revolving Credit Facility at a rate of 0.125% per annum of the daily maximum amount available to be drawn under issued letters of credit, payable in arrears at the end of each quarter.

The Senior Credit Facilities contain certain customary affirmative and negative covenants, including, among other things, restrictions on indebtedness, investments, sales of assets, mergers and consolidations, prepayments of junior lien, unsecured and subordinated indebtedness, liens and dividends and other distributions, and customary events of default. With respect to the Revolving Credit Facility only, we will be required to maintain a first lien net leverage ratio levels set forth in the Credit Agreement (such levels to progressively step-down throughout the term of the Revolving Credit Facility), which will only be tested at the end of each fiscal quarter in which the aggregate amount of all outstanding Revolving Loans and letters of credit (other than letters of credit that have been cash collateralized) exceeds 30% of commitments under the Revolving Credit Facility.

**Existing 10.500% Senior Notes due 2028**

On February 10, 2020, we completed an offering of $300.0 million in aggregate principal amount of 10.500% senior notes that mature on February 15, 2028, pursuant to the indenture described under "Description of Notes."

EXHIBIT O(2)

AOE0708

## DESCRIPTION OF NOTES

The Notes will be issued under the indenture, dated as of February 10, 2020, between the Issuers, the Guarantors and U.S. Bank National Association, as trustee (the "Trustee"), as supplemented by that certain first supplemental indenture, dated as of February 24, 2021 and that certain second supplemental indenture, dated as of July 19, 2021 (the "indenture"). The following description is a summary of the material provisions of the indenture. It does not restate the indenture in its entirety and is qualified in its entirety by reference to the indenture, including the definitions therein of certain terms used below. We urge you to read the indenture and the notes (as used in this Description of Notes section only, the "Notes") because they, and not this description, will define your rights as a holder of the Notes. Copies of the proposed forms of the indenture and the Notes are available to you upon request.

The Notes will form a part of the same series as our outstanding 10.500% senior notes due 2028, issued on February 10, 2020 in the principal amount of $300 million (the "Initial Notes") and will have identical terms under the indenture. The Notes will have the same CUSIP number as, and trade together with, the Initial Notes (except that the notes issued pursuant to Regulation S will trade separately under a different CUSIP number until 40 days after the issue date of the notes, but thereafter any holders of any such new notes may transfer their notes issued pursuant to Regulation S into the same CUSIP number as the Initial Notes held under the Regulation S CUSIP number).

You can find the definitions of some of the capitalized terms used in this section under the subheading "—Certain Definitions." In this section of the offering memorandum:

- the terms "Issuer," "we," "us," "our" or similar terms refer only to Allen Media, LLC and not to Allen Media Co-Issuer, Inc. or any of our other subsidiaries;

- the term "Co-Issuer" refers only to Allen Media Co-Issuer, Inc. and not to any of its subsidiaries;

- the term "Issuers" refers to the Issuer and the Co-Issuer collectively;

- the term "Holdings" refers only to Allen Media Holdings, LLC and not to any of its subsidiaries; and

- references to "Guarantors" shall mean Holdings and our direct and indirect Restricted Subsidiaries that guarantee the Notes.

The Notes will be issued in a private transaction that is not subject to the registration requirements of the Securities Act. The terms of the Notes include those stated in the indenture and holders of Notes should refer to the indenture for a statement thereof. The indenture will not be qualified under the Trust Indenture Act of 1939 or subject to the terms of the Trust Indenture Act of 1939.

## Holding Company Structure

The Issuer is a holding company and does not have any material assets or operations other than ownership of the Capital Stock of its subsidiaries and joint ventures. All of its material operations are conducted through its Subsidiaries. As a result, the Issuer depends on the cash flow of its Subsidiaries to meet its obligations, including its obligations under the Notes. Claims of creditors of such Subsidiaries that are not Guarantors, including trade creditors, and claims of preferred stockholders, if any, of such Subsidiaries generally will have priority with respect to the assets and earnings of such Subsidiaries over the claims of the Issuer's creditors, including holders of the Notes. The Notes, therefore, are structurally subordinated to creditors, including trade creditors, and preferred stockholders, if any, of our Subsidiaries that are not Guarantors. Other than acting as co-issuer of the Notes, the Co-Issuer will not have any operations or assets and will not have any revenue.

## Brief Description of the Notes and the Guarantees

### The Notes

The Notes will be:

- senior unsecured obligations of the Issuers;

- ranked equally in right of payment with all of the Issuers' existing and future senior debt (including the Credit Agreement and the Initial Notes);

- ranked senior in right of payment to all of the Issuers' future Subordinated Indebtedness, if any;

- ranked effectively junior to (i) all debt and other liabilities (including trade payables) of our Subsidiaries that are not Guarantors and (ii) all secured obligations to the extent of the value of the collateral securing such obligations, including our obligations under the Credit Agreement; and

- fully and unconditionally guaranteed by the Guarantors.

The Notes will be issued in fully registered form only, without coupons, in minimum denominations of $2,000 and integral multiples of $1,000.

### *The Guarantees*

The Notes will be fully and unconditionally guaranteed on a senior unsecured basis by Allen Media Holdings, LLC and each domestic subsidiary of Allen Media, LLC that guarantees the Senior Credit Facilities, which will be all domestic restricted subsidiaries. Upon completion of this offering, we expect all of our restricted subsidiaries to be guarantors and that the only non-Guarantor subsidiaries will be unrestricted subsidiaries under the indenture.

After giving pro forma effect to the Transactions, our non-Guarantor subsidiaries accounted for $3.5 million (prior to eliminations) of our pro forma total revenue, which represented approximately 0.6% of our pro forma total revenue for the twelve-month period ended March 31, 2021 on a pro forma basis. As of March 31, 2021 on a pro forma basis, our non-Guarantor subsidiaries held $28.3 million (prior to eliminations), or approximately 2.1%, of our total assets and $99.7 million (prior to eliminations), or approximately 5.6%, of our total liabilities, to which the notes would have been structurally subordinated.

The Guarantees will:

* be senior unsecured obligations of each Guarantor;

* rank equally in right of payment with all existing and future senior debt of such Guarantor (including the Credit Agreement and the Initial Notes);

* rank senior in right of payment to all future Subordinated Indebtedness of such Guarantor, if any; and

* be effectively structurally subordinated to secured obligations of such Guarantor to the extent of the value of the collateral securing such obligations, including the secured guarantee by such Guarantor of our obligations under the Credit Agreement.

Under certain circumstances, we will be permitted to designate certain of our Subsidiaries as "Unrestricted Subsidiaries." Unrestricted Subsidiaries will not be subject to the restrictive covenants in the indenture. Unrestricted Subsidiaries will not guarantee the Notes. Restricted Subsidiaries that are not Domestic Subsidiaries will not be required to guarantee the Notes. Upon the completion of this offering, all Non-Guarantor Subsidiaries will be Unrestricted Subsidiaries.

### Principal, Maturity and Interest

The Notes will be issued in an aggregate principal amount of $340.0 million. Additional Notes may be issued under the indenture from time to time in an unlimited amount, subject to compliance with the restrictions set forth under "—Certain Covenants—Limitation on Incurrence of Indebtedness." Any additional Notes will be part of the same series as the Initial Notes and the Notes offered hereby and will vote on all matters as a single series with the Initial Notes and the Notes offered in this offering. All references to the Notes include additional Notes. The Notes will mature on February 15, 2028.

Interest on the Notes will accrue at the rate per annum set forth on the cover page of this offering memorandum, and will be payable semiannually in cash on each February 15 and August 15, commencing August 15, 2021, to holders of record on the immediately preceding February 1 and August 1, respectively. Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of issuance. Interest on the Notes will be computed on the basis of a 360-day year composed of twelve 30-day months. At maturity, the Issuers will pay accrued and unpaid interest from the most recent date for which interest has been paid or provided for.

The Notes will be payable both as to principal and interest at our office or agency maintained for such purpose or, at our option, payment of interest may be made by check mailed to the holders of the Notes at their respective addresses set forth in the register of holders of Notes. Until otherwise designated by us, our office or agency maintained for such purpose will be the office of the Trustee.

### Guarantees

The Notes will be fully and unconditionally guaranteed on a senior unsecured basis by Allen Media Holdings, LLC and each domestic subsidiary of Allen Media, LLC that guarantees the Senior Credit Facilities, which will be all domestic restricted subsidiaries. Upon completion of this offering, we expect all of our restricted subsidiaries to be guarantors and that the only non-guarantor subsidiaries will be unrestricted subsidiaries under the indenture. Each Guarantor will, jointly and severally with each other Guarantor, guarantee, on a senior unsecured basis, the performance and full and punctual payment when due, whether at maturity, acceleration or otherwise, of all obligations of the Issuers under the indenture and the Notes, whether for payment of principal of, or interest on, the Notes, expenses, indemnification or otherwise, on the terms set forth in the indenture. The obligations of each Guarantor under its Guarantee will be limited to the extent necessary to prevent such Guarantee from constituting a fraudulent

EXHIBIT O(2)

AOE0710

conveyance or fraudulent transfer under applicable law. See "Risk factors—Risks Related to this Offering and the Notes—Federal and state fraudulent transfer laws may permit a court to void the notes and/or the guarantees and, if that occurs, you may not receive any payments on the notes." Each Guarantor that makes a payment or distribution under a Guarantee will be entitled to a *pro rata* contribution from each other Guarantor based on the respective net assets of the Guarantors.

After giving pro forma effect to the Transactions, our non-Guarantor subsidiaries accounted for $3.5 million (prior to eliminations) of our pro forma total revenue, which represented approximately 0.6% of our pro forma total revenue for the twelve-month period ended March 31, 2021 on a pro forma basis. As of March 31, 2021 on a pro forma basis, our non-Guarantor subsidiaries held $28.3 million (prior to eliminations), or approximately 2.1%, of our total assets and $99.7 million (prior to eliminations), or approximately 5.6%, of our total liabilities, to which the notes would have been structurally subordinated. Each Guarantor may consolidate with or merge into or sell its assets to us or another Restricted Subsidiary, or with or to other Persons in a transaction that complies with the covenants described under "—Certain Covenants—Limitation on Asset Sales" or "—Certain Covenants—Merger, Consolidation or Sale of Assets," as applicable.

The Guarantee of a Guarantor will be deemed automatically discharged and released in accordance with the terms of the indenture:

(1)    in connection with any direct or indirect sale, conveyance or other disposition of the Capital Stock of that Guarantor (including by way of merger or consolidation) following which such Guarantor ceases to be a direct or indirect Subsidiary of the Issuer if such sale or disposition is made in compliance with the applicable provisions of the indenture (see "—Certain Covenants—Limitation on Asset Sales");

(2)    if such Guarantor is dissolved or liquidated in accordance with the provisions of the indenture;

(3)    if we designate any such Guarantor as an Unrestricted Subsidiary in compliance with the terms of the indenture;

(4)    upon the transfer of such Guarantor in a transaction that (i) qualifies as a Permitted Investment or as a Restricted Payment that is not prohibited under "—Certain Covenants—Limitation on Restricted Payments" if following such transfer such Guarantor ceases to be a direct or indirect Restricted Subsidiary of the Issuer or (ii) following such transaction, such Guarantor is a Restricted Subsidiary that is not a guarantor under any Credit Facility incurred under clause (2) of the second paragraph under "—Limitation on Incurrence of Indebtedness"; or

(5)    upon a discharge of the indenture in accordance with "—Satisfaction and Discharge" or upon any Legal Defeasance or Covenant Defeasance of the indenture.

## Optional Redemption

*General*. Except as provided below and under the heading "Change of Control", the Notes will not be redeemable at our option prior to February 15, 2023. Thereafter, the Notes will be subject to redemption at our option, in whole or in part, upon not less than 10 days' or more than 60 days' notice, at the redemption prices (expressed as percentages of principal amount) set forth below, together with accrued and unpaid interest thereon to the applicable redemption date (subject to the rights of holders of record of the Notes on the relevant record date to receive payments of interest on the related interest payment date), if redeemed during the 12-month period beginning on February 15 of the years indicated below:

| Year | Percentage |
|------|-----------|
| 2023 | 107.875% |
| 2024 | 105.250% |
| 2025 | 102.625% |
| 2026 and thereafter | 100.0000% |

*Equity sales*. Notwithstanding the foregoing, at any time and from time to time prior to February 15, 2023, we may redeem up to 40% of the aggregate principal amount of the Notes outstanding at a redemption price equal to 110.500% of the principal amount thereof on the repurchase date, together with accrued and unpaid interest to such redemption date (subject to the rights of holders of record of the Notes on the relevant record date to receive payments of interest on the related interest payment date), with the net cash proceeds of one or more public or private sales of Qualified Capital Stock (each an "Equity Offering"), other than proceeds from a sale to us or any of our Subsidiaries or any employee benefit plan in which we or any of our Subsidiaries participates; *provided* that:

•    at least 60% in aggregate principal amount of the Notes originally issued remains outstanding immediately after the occurrence of such redemption; and

•    such redemption occurs no later than the 150th day following such sale of Qualified Capital Stock.

EXHIBIT O(2)

AOE0711

*Make whole*. In addition, at any time and from time to time prior to February 15, 2023, we may redeem all or any portion of the Notes outstanding at a redemption price equal to:

- 100% of the aggregate principal amount of the Notes to be redeemed, together with accrued and unpaid interest to such redemption date (subject to the rights of holders of record of the Notes on the relevant record date to receive payments of interest on the related interest payment date), *plus*

- the Make Whole Amount.

"Make Whole Amount" means, with respect to any Note at any redemption date, as determined by us, the greater of (i) 1.0% of the principal amount of such Note and (ii) the excess, if any, of (A) an amount equal to the present value of (1) the redemption price of such Note at February 15, 2023 plus (2) the remaining scheduled interest payments on the Notes to be redeemed (subject to the right of holders on the relevant record date to receive interest due on the relevant interest payment date) to February 15, 2023 (other than interest accrued but unpaid to the redemption date), computed using a discount rate equal to the Treasury Rate plus 50 basis points, over (B) the principal amount of the Notes to be redeemed. The Trustee shall have no obligation to calculate or verify the calculation of the Make Whole Amount.

"Treasury Rate" means, at the time of computation as calculated by us, the weekly average for each business day during the most recent week that has ended at least two business days prior to the redemption date of the yield to maturity of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (or, if such statistical release is not so published or available, any publicly available source of similar market data selected by the Issuers in good faith)) most nearly equal to the period from the redemption date to February 15, 2023; provided, however, that if the period from the redemption date to February 15, 2023 is not equal to the constant maturity of a United States Treasury security for which a yield is given, the Treasury Rate shall be obtained by linear interpolation (calculated to the nearest one-twelfth of a year) from the yields of United States Treasury securities for which such yields are given, except that if the period from the redemption date to February 15, 2023 is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year shall be used.

In connection with any redemption of Notes described above, such redemption may, at the Issuers' discretion, be subject to one or more conditions precedent, including any related Equity Offering, issuance of Indebtedness or other transaction. If such redemption or notice is subject to satisfaction of one or more conditions precedent, such notice shall state that, in the Issuers' discretion, such redemption may not occur and such notice may be rescinded in the event that any or all such conditions shall not have been satisfied by the redemption date.

**Selection and Notice**

If less than all of the Notes are to be redeemed at any time, selection of Notes for redemption will be made on a *pro rata* basis, or, in the case of a redemption other than as described under "—Optional Redemption—Equity Sales," by lot; *provided* that all redemptions of interest in global notes held by the depositary shall be made in accordance with the procedures of the depositary; *provided* that no Notes with a principal amount of $2,000 or less shall be redeemed in part. Notice of redemption will be transmitted at least 10 but not more than 60 days before the redemption date to each holder of Notes to be redeemed at its registered address. If any Note is to be redeemed in part only, the notice of redemption that relates to such Note shall state the portion of the principal amount thereof to be redeemed. On and after the redemption date, so long as we do not default in the payment of the redemption price, interest will cease to accrue on Notes or portions thereof called for redemption.

**Change of Control**

Upon the occurrence of a Change of Control, we will be required to make an offer (a "Change of Control Offer") to each holder of Notes to repurchase all or any part (equal to $1,000 or an integral multiple thereof) of such holder's Notes at a purchase price equal to 101% of the aggregate principal amount thereof, together with accrued and unpaid interest thereon to the date of repurchase (subject to the rights of holders of record of the Notes on the relevant record date to receive payments of interest on the related interest payment date) (in either case, the "Change of Control Payment"). Within 30 days following any Change of Control, we will be required to send a notice to each holder with a copy to the Trustee stating:

(1) that the Change of Control Offer is being made pursuant to the covenant described under "—Change of Control" and that all Notes properly tendered pursuant to a Change of Control Offer will be accepted for payment by the Issuers;

(2) the purchase price and the purchase date, which shall be no earlier than 30 days and not later than 60 days after the date such notice is sent (the "Change of Control Payment Date");

(3) that any Notes not tendered will continue to accrue interest in accordance with the terms of the indenture;

EXHIBIT O(2)

AOE0712

(4)    that, unless we default in the payment of the Change of Control Payment, all Notes accepted for payment pursuant to the Change of Control Offer will cease to accrue interest on the Change of Control Payment Date;

(5)    that holders will be entitled to withdraw their election if the paying agent receives, not later than the close of business on the second business day preceding the Change of Control Payment Date, a telegram, telex, facsimile transmission or letter setting forth the name of the holder, the principal amount of Notes delivered for purchase, and a statement that such holder is unconditionally withdrawing its election to have such Notes purchased;

(6)    that holders whose Notes are being purchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered, which unpurchased portion must be equal to $2,000 in principal amount or an integral multiple of $1,000 in excess thereof; and

(7)    any other information material to such holder's decision to tender Notes.

We will be required to comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws and regulations are applicable in connection with the repurchase of the Notes required in the event of a Change of Control Offer. To the extent any provisions of any securities laws or regulations conflict with the provisions of the Indenture, the Issuers will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations described in the Indenture by virtue thereof. We will not be required to make a Change of Control Offer upon a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in the indenture applicable to Change of Control Offer made by us. Our obligations in respect of a Change of Control Offer can be modified with the consent of holders of a majority of the aggregate principal amount of Notes then outstanding at any time prior to the occurrence of a Change of Control. Notwithstanding anything to the contrary herein, a Change of Control Offer may be made in advance of a Change of Control, conditional upon such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making of the Change of Control Offer.

Due to our leveraged structure and the terms of other indebtedness to which we and our Subsidiaries are or may in the future be subject, we may not be able to repurchase all of the Notes tendered upon a Change of Control. See "Risk Factors—Risks Related to this Offering and the Notes—We may not be able to repurchase the notes upon a change of control." If we fail to repurchase all of the Notes tendered for purchase pursuant to a Change of Control Offer, such failure will constitute an Event of Default. In addition, the occurrence of certain of the events which would constitute a Change of Control would constitute an event of default under the Credit Agreement and may constitute an event of default under future Indebtedness. Moreover, the exercise by the holders of their right to require us to purchase the Notes could cause a default under such Indebtedness, even if the Change of Control itself does not, due to the financial effect of the repurchase on us. Finally, our ability to pay cash to the holders upon a Change of Control may be limited by our then existing financial resources.

The definition of "Change of Control" includes a phrase relating to the sale, assignment, conveyance, transfer, lease or other disposition of "all or substantially all" of our assets. Although there is a developing body of case law interpreting the phrase "substantially all," there is no precise established definition of the phrase under applicable law. Accordingly, if we dispose of less than all our assets by any of the means described above, the ability of a holder of Notes to require us to repurchase its Notes may be uncertain.

Except as described above with respect to a Change of Control, the indenture will not contain any provisions that permit the holders of the Notes to require that we repurchase or redeem the Notes in the event of a takeover, recapitalization or similar transaction.

If holders of not less than 90% in aggregate principal amount of the outstanding Notes validly tender and do not withdraw such Notes in a Change of Control Offer and the Issuers, or any third party making a Change of Control Offer in lieu of the Issuers, as described above, purchases all of the Notes validly tendered and not withdrawn by such holders, the Issuers or such third party will have the right, upon not less than 10 nor more than 60 days' prior notice, given not more than 10 days following such purchase pursuant to the Change of Control Offer described above, to redeem all Notes that remain outstanding following such purchase at a price in cash equal to 101% of the principal amount thereof plus accrued and unpaid interest to, but not including, the date of redemption.

## Certain Covenants

### *Limitation on Restricted Payments.*

The indenture will provide that neither we nor any of our Restricted Subsidiaries may, directly or indirectly:

(a)    pay any dividend or make any distribution on account of any Equity Interests of us other than dividends or distributions payable in Equity Interests (other than Disqualified Stock) of us;

EXHIBIT O(2)

AOE0713

(b)    purchase, redeem or otherwise acquire or retire for value any of our Equity Interests or any Subordinated Indebtedness, other than (i) Subordinated Indebtedness within one year of the stated maturity date thereof and (ii) any such Equity Interests or Subordinated Indebtedness owned by us or by any Restricted Subsidiary;

(c)    pay any dividend or make any distribution on account of any Equity Interests of any Restricted Subsidiary, other than:

    (i)    to us or any Restricted Subsidiary; or

    (ii)    to all holders of any class or series of Equity Interests of such Restricted Subsidiary on a *pro rata* basis; or

(d)    make any Restricted Investment.

(all such prohibited payments and other actions set forth in clauses (a) through (d) being collectively referred to as "Restricted Payments"), unless, at the time of such Restricted Payment:

    (i)    no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof;

    (ii)    the Total Net Leverage Ratio, on a *pro forma basis*, is less than or equal to 4.00 to 1.00; and

    (iii)    such Restricted Payment, together with the aggregate of all other Restricted Payments made after the Original Issue Date, is less than the sum of:

        (A)    100% of Consolidated Adjusted EBITDA for the period (taken as one accounting period) from January 1, 2020 to the end of our most recently ended fiscal quarter for which internal consolidated financial statements are available at the time of such Restricted Payment (or, if such Consolidated Adjusted EBITDA shall be a deficit, *minus* 100% of such aggregate deficit), *minus* 1.5 times Consolidated Fixed Charges for the same period; *plus*

        (B)    an amount equal to the sum of (x) 100% of the aggregate net cash proceeds and the Fair Market Value of any property or assets received by us from the issue or sale of Equity Interests (other than Disqualified Stock) of us (other than Equity Interests sold to any of our Subsidiaries), following the Original Issue Date and (y) the aggregate amount by which Indebtedness (other than any Indebtedness owed to the Issuer or a Subsidiary) incurred by the Issuer or any Restricted Subsidiary on or subsequent to the Original Issue Date is reduced on the Issuer's balance sheet upon the conversion or exchange into Qualified Capital Stock (less the amount of any cash, or the Fair Market Value of assets, distributed by the Issuer or any Restricted Subsidiary upon such conversion or exchange or expended pursuant to clause (8) of the following paragraph); *plus*

        (C)    if any Unrestricted Subsidiary is designated by us as a Restricted Subsidiary, an amount equal to the Fair Market Value of the net Investment by us or a Restricted Subsidiary in such Subsidiary at the time of such designation; *provided*, *however*, that the foregoing amount shall not exceed the amount of Restricted Investments made by us or any Restricted Subsidiary in any such Unrestricted Subsidiary following the Original Issue Date which reduced the amount available for Restricted Payments pursuant to this clause (iii) less amounts received by us or any Restricted Subsidiary from such Unrestricted Subsidiary that increased the amount available for Restricted Payments pursuant to clause (D) below; *plus*

        (D)    100% of any cash dividends and other cash distributions and the Fair Market Value of property or assets other than cash received by us and our Restricted Subsidiaries from an Unrestricted Subsidiary since the Original Issue Date to the extent not included in Consolidated Adjusted EBITDA and 100% of the net proceeds received by the Issuer or any of its Restricted Subsidiaries from the sale of any Unrestricted Subsidiary; *provided*, *however*, that the foregoing amount shall not exceed the amount of Restricted Investments made by us or any Restricted Subsidiary in any such Unrestricted Subsidiary following the Original Issue Date which reduced the amount available for Restricted Payments pursuant to this clause (iii); *plus*

        (E)    to the extent not included in clauses (A) through (D) above, an amount equal to the net reduction in Restricted Investments of us and our Restricted Subsidiaries following the Original Issue Date resulting from payments in cash of interest on Indebtedness, dividends, or repayment of loans or advances, or other transfers of property, in each case, to us or to a Restricted Subsidiary or from the net cash proceeds from the sale, conveyance, liquidation or other disposition of any such Restricted Investment; *plus*

        (F)    the greater of (x) $25.0 million and (y) 20% of LTM Consolidated Adjusted EBITDA.

        Clauses (A) through (F) above are collectively referred to herein as the "Restricted Payment Builder Basket".

The foregoing provisions will not prohibit the following (*provided* that with respect to clauses (6), (13), (14) and (16) below, no Default or Event of Default shall have occurred and be continuing):

(1)    the payment of any dividend or distribution or the consummation of any irrevocable redemption within 60 days after the date of declaration thereof or the giving of a redemption notice related thereto, if at the date of declaration or notice such payment would have complied with the provisions of the indenture;

(2)    the redemption, repurchase, retirement or other acquisition of (x) any Equity Interests of us in exchange for, or out of the net proceeds of the issue or sale within 60 days of, Equity Interests (other than Disqualified Stock) of us (other than Equity Interests (other than Disqualified Stock) issued or sold to any Subsidiary) or (y) Subordinated Indebtedness of us or any Restricted Subsidiary (a) in exchange for, or out of the proceeds of the issuance and sale within 60 days of, Qualified Capital Stock, (b) in exchange for, or out of the proceeds of the incurrence within 60 days of, Refinancing Indebtedness permitted to be incurred under clause (10) of the covenant described below under "—Certain Covenants—Limitation on Incurrence of Indebtedness" or other Indebtedness permitted to be incurred under such covenant or (c) with the Net Proceeds from an Asset Sale or upon a Change of Control, in each case, to the extent required by the agreement governing such Subordinated Indebtedness but only if the Issuers shall have previously applied such Net Proceeds to make an Excess Proceeds Offer or made a Change of Control Offer, as the case may be, in accordance with "—Certain Covenants—Limitation on Asset Sales" or "—Change of Control" and purchased all Notes validly tendered pursuant to the relevant offer prior to redeeming or repurchasing such Subordinated Indebtedness;

(3)    Restricted Payments from the net proceeds of the Notes, the initial borrowings under the Credit Agreement and the New Cash Equity as described in the February 2020 Offering Memorandum;

(4)    payments or distributions by the Issuer or any of its Restricted Subsidiaries to dissenting stockholders pursuant to applicable law in connection with any merger or acquisition consummated on or after the Original Issue Date and not prohibited by the indenture;

(5)    purchases, redemptions or acquisitions of fractional shares of Equity Interests arising out of stock dividends, splits or combinations or business combinations;

(6)    the declaration and payment of dividends or distributions to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) issued after the Original Issue Date; provided, however, that (a) the Consolidated Fixed Charge Coverage Ratio for the Issuer's most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such Designated Preferred Stock is issued, after giving effect to such issuance (and the payment of dividends or distributions) on a pro forma basis, would have been at least 2.00 to 1.00 and (b) the aggregate amount of dividends declared and paid pursuant to this clause (6) does not exceed the net cash proceeds actually received by the Issuer from any such sale of Designated Preferred Stock (other than Disqualified Stock) issued after the Original Issue Date;

(7)    to the extent constituting Restricted Payments, payments to counterparties under Hedging Obligations or other hedge, swap or option agreements entered into in connection with the issuance of convertible debt or upon the exercise thereof;

(8)    any "AHYDO catch-up payment" with respect to, and required by the terms of, any Indebtedness of the Issuer or any of its Restricted Subsidiaries permitted to be incurred under the indenture;

(9)    (i) payments to Holdings (or a Parent or Affiliate thereof, as applicable) on or after the Original Issue Date to pay the Transaction Costs, (ii) payments to Holdings (or a Parent or Affiliate thereof, as applicable) constituting Tax Payments and (iii) payments to Holdings (or a Parent or Affiliate thereof, as applicable) (A) to the extent necessary to permit Holdings (or Parent or Affiliate, as applicable) to pay operating costs and expenses (including, following the consummation of a Qualifying IPO, Public Company Costs) of Holdings or any Parent thereof that does not own any Subsidiaries other than Holdings, its Subsidiaries and any other such Parents of Holdings incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), in each case which are reasonable and customary and incurred in the ordinary course of business, attributable to the ownership or operations of Holdings, the Issuers and the Subsidiaries, (B) the proceeds of which shall be used to pay customary salary, bonus and other benefits payable to officers and employees of Holdings or any Parent thereof to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of Holdings, the Issuers and the Subsidiaries, or (C) the proceeds of which shall be used to pay franchise taxes and other fees, Taxes and expenses required to maintain its (or any of such Parent's) corporate or legal existence;

(10)    payments to Holdings (or any Parent thereof) to pay reasonable director fees and reasonable out-of-pocket expenses of directors payable by Holdings (or Parent thereof);

(11)    (i) redemptions and repurchases by the Issuer of Equity Interests of the Issuer or any Restricted Subsidiary of the Issuer (or payments to Holdings to enable Holdings to redeem or repurchase Capital Stock of Holdings) from officers, directors, employees, advisors or consultants or their respective estates, trusts, family members or former spouses of the Issuer or any Guarantor or any Subsidiary (or their Affiliates), upon termination of employment, in connection with the

EXHIBIT O(2)

AOE0715

exercise of stock options, stock appreciation rights or other equity incentives or equity based incentives or in connection with the death or disability of such officers, directors, employees, advisors or consultants (or Affiliate); provided that in all such cases the aggregate amount of such payments in respect of all such Equity Interest so redeemed or repurchased does not exceed in any Fiscal Year (with unused amounts in any Fiscal Year (which have not been rolled over from a previous Fiscal Year) rolled over to the immediately succeeding Fiscal Year) the greater of (1) $4.0 million and (2) an amount equal to 2.0% of LTM Consolidated Adjusted EBITDA, plus (A) an amount not to exceed the cash proceeds of key man life insurance policies received by the Issuer or any Guarantor (other than Holdings) after the Original Issue Date, (B) the amount of net cash proceeds from the sale of Capital Stock of Holdings or the Issuer (other than Disqualified Stock) to officers, directors, employees, advisors or consultants, to the extent not otherwise used under the indenture or applied to the Restricted Payment Builder Basket and (C) the amount of any cash bonuses or other compensation otherwise payable to any future, present or former director, employee, consultant or distributor of Holdings, the Issuer or any Subsidiary that are foregone in return for the redemption of Capital Stock of Holdings, the Issuer or any Restricted Subsidiary; and (ii) cashless repurchases of Equity Interests deemed to occur upon the exercise of stock options, warrants, settlements or vesting if such stock represents a portion of the exercise price thereof, or withholding taxes due upon such exercise or vesting;

(12) payments in lieu of the issuance of fractional shares in connection with the exercise of warrants, options or other securities convertible into or exchangeable for Equity Interest;

(13) any Restricted Payment if after giving effect to such Restricted Payment, the Total Net Leverage Ratio of the Issuer on a pro forma basis is less than 3.75 to 1.00;

(14) the Issuer or any Restricted Subsidiary may make additional Restricted Payments in an amount not to exceed $30.0 million in the aggregate;

(15) to the extent constituting Restricted Payments, the Issuer and its Restricted Subsidiaries may enter into and consummate transactions expressly permitted by any provision of the definition of "Permitted Investments", "—Certain Covenants—Merger, Consolidation or Sale of Assets" and "—Certain Covenants—Limitation on Transactions with Affiliates";

(16) after a Qualifying IPO, Restricted Payments not to exceed up to 6.00% per annum of the net cash proceeds received by (or contributed to) the Issuer and its Subsidiaries from such Qualifying IPO; and

(17) the Issuer or any Restricted Subsidiary may, in good faith, pay (or make Restricted Payments to allow any direct or indirect parent thereof to pay) for the repurchase, retirement or other acquisition or retirement for value of Equity Interests of it or any direct or indirect parent thereof held by any future, present or former employee, director, manager, officer or consultant (or any Affiliates, spouses, former spouses, other immediate family members, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing) of the Issuer (or any direct or indirect parent of each Issuer) or any of its Subsidiaries pursuant to any employee, management, director or manager equity plan, employee, management, director or manager stock option plan or any other employee, management, director or manager benefit plan or any agreement (including any stock subscription or shareholder agreement) with any employee, director, manager, officer or consultant of Holdings (or any direct or indirect parent thereof), the Issuer or any Subsidiary; provided that in all such cases the aggregate amount of such payments in respect of all such Capital Stock so repurchased, retired or redeemed does not exceed in any Fiscal Year the greater of (1) $3.0 million and (2) an amount equal to 2.0% of LTM Consolidated Adjusted EBITDA.

Restricted Payments made pursuant to the first paragraph of this covenant and clause (1) of the second paragraph of this covenant and, to the extent made with the proceeds of the issuance of Qualified Capital Stock, Investments made pursuant to clause (dd) of the definition of "Permitted Investments" shall be included as Restricted Payments in any computation made pursuant to clause (iii) of the first paragraph of this covenant. Restricted Payments made pursuant to clauses (2) through (17) of the second paragraph of this covenant shall not be included as Restricted Payments in any computation made pursuant to clause (iii) of the first paragraph of this covenant.

If we or any Restricted Subsidiary makes a Restricted Investment and the Person in which such Investment was made subsequently becomes a Restricted Subsidiary, to the extent such Investment resulted in a reduction in the amounts calculated under clause (iii) of the first paragraph of or under any other provision of this covenant (which was not subsequently reversed), then such amount shall be increased by the amount of such reduction.

For purposes of determining compliance with this covenant, in the event that a Restricted Payment meets the criteria of more than one of the categories described in clauses (1) through (17) above, or is permitted pursuant to the first paragraph of this covenant, we will be entitled to classify such Restricted Payment (or portion thereof) on the date of its payment or later reclassify such Restricted Payment (or portion thereof) in any manner that complies with this covenant.

*Limitation on Incurrence of Indebtedness.*

The indenture will provide that we shall not, and shall not permit any of our Restricted Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable with respect to (collectively, "incur") any Indebtedness (including Acquired Debt) or permit any of our Restricted Subsidiaries to issue any Preferred Equity Interests; *provided, however,* that, notwithstanding the foregoing, the Issuer and any Restricted Subsidiary may incur Indebtedness (including Acquired Debt) and any Guarantor may issue Preferred Equity Interests, if, after giving effect to the incurrence of such Indebtedness or the issuance of such Preferred Equity Interests and the application of the net proceeds thereof on a *pro forma* basis, (i) our Total Net Leverage Ratio will be less than 4.50 to 1.00 or (ii) our Consolidated Fixed Charge Coverage Ratio would have been at least 2.0 to 1.0, *provided* that Restricted Subsidiaries of the Issuer that are not Guarantors may not incur Indebtedness or issue any Preferred Equity Interests pursuant to this paragraph if, after giving *pro forma* effect to such incurrence or issuance (including a *pro forma* application of the net proceeds therefrom), the aggregate amount of outstanding Indebtedness or Preferred Equity Interests of Restricted Subsidiaries of the Issuer that are not Guarantors at any one time outstanding incurred pursuant to the foregoing proviso exceeds the greater of (x) $50.0 million or (y) 25.0% of LTM Consolidated Adjusted EBITDA at the time of incurrence.

The foregoing limitation will not apply to any of the following incurrences of Indebtedness:

(1)   Indebtedness represented by the Initial Notes and the Guarantees issued on the Original Issue Date;

(2)   Indebtedness of the Issuer or any Restricted Subsidiary under any Credit Facility in an aggregate principal amount at any one time outstanding not to exceed the sum of (i) $570.0 million, plus (ii) the greater of (x) $150.0 million and (y) 75% of LTM Consolidated Adjusted EBITDA, plus (iii) $40.0 million in the form of additional revolving credit indebtedness, plus (iv) the maximum amount of Secured Indebtedness that can be incurred, after giving effect to the incurrence of such Indebtedness and the use of proceeds therefrom (and after giving effect to any acquisition, disposition, Investment and other transactions contemplated in connection with such incurrence) and assuming the full draw of any revolving commitments in respect thereof and that all Indebtedness incurred under this clause (2) is Secured Indebtedness, so long as the Secured Net Leverage Ratio does not exceed 3.40 to 1.00;

(3)   Existing Indebtedness;

(4)   (x) among us and our Restricted Subsidiaries; *provided* that any such Indebtedness owed by us or a Guarantor to any Restricted Subsidiary that is not a Guarantor shall be subordinated to the prior payment in full when due of the Notes or the Guarantees, as applicable, and (y) Preferred Equity Interests of a Restricted Subsidiary held by us or a Restricted Subsidiary; *provided* that if such Preferred Equity Interests are issued by a Guarantor, such Preferred Equity Interests are held by us or a Guarantor;

(5)   Acquired Debt of a Person incurred prior to the date upon which such Person was acquired by us or any Restricted Subsidiary (and not created in contemplation of such acquisition); *provided* that after giving effect to the incurrence of such Acquired Debt on a *pro forma* basis, (i) our Total Net Leverage Ratio would be less than 4.75 to 1.00 or (ii) our Consolidated Fixed Charge Coverage Ratio either (A) would have been at least 2.0 to 1.0 or (B) would have been greater than immediately prior to such acquisition;

(6)   Indebtedness of the Issuer or any Restricted Subsidiary with respect to Capital Leases and Purchase Money Indebtedness in an aggregate amount when aggregated with the amount of Refinancing Indebtedness outstanding under clause (10) below in respect of Indebtedness incurred pursuant to this clause (6) at any time outstanding not to exceed the greater (1) $50.0 million and (2) an amount equal to 25.0% of LTM Consolidated Adjusted EBITDA, in each case determined at the time of incurrence; provided that (i) such Indebtedness is issued and any Liens securing such Indebtedness are created within three hundred sixty (360) days after the acquisition, construction, lease or improvement of the asset financed and (ii) any such Indebtedness is secured only by the asset acquired, constructed, leased or improved in connection with the incurrence of such Indebtedness or proceeds thereof and related property (and any improvements, accessions, proceeds, dividends or distributions in respect thereof and assets fixed or appurtenant thereto); provided, further, that individual financings provided by a lender or group of lenders may be cross collateralized to other financings provided by such lender or group;

(7)   Foreign Currency Obligations of us or any of our Restricted Subsidiaries entered into to manage exposure of us and our Restricted Subsidiaries to fluctuations in currency values and not for speculative purposes;

(8)   Indebtedness in respect of Rate Contracts entered into for non-speculative purposes;

(9)   Indebtedness arising solely as a result of the existence of Liens created by the filing of precautionary UCC-1 financing statements and copyright Lien filings with respect to the related Product contemplated by clauses (ll) and (mm) of the definition of "Permitted Liens" and not constituting Indebtedness for borrowed money;

(10)   the incurrence by us or any Restricted Subsidiary of Indebtedness issued in exchange for, or the proceeds of which are used to extend, refinance, renew, replace, substitute or refund in whole or in part, Indebtedness referred to in the first

paragraph of this covenant or in clause (1), (3), (5) or (6) above, this clause (10) or clauses (21) or (23) below ("Refinancing Indebtedness"); *provided*, *however*, that:

(A)    the principal amount of such Refinancing Indebtedness shall not exceed the principal amount and accrued interest of the Indebtedness so exchanged, extended, refinanced, renewed, replaced, substituted or refunded and any premiums payable and reasonable fees, expenses, commissions and costs in connection therewith;

(B)    the Refinancing Indebtedness shall have a final maturity equal to or later than, and a Weighted Average Life to Maturity equal to or greater than, the earlier of (i) 91 days after the final maturity date of the Notes and (ii) the final maturity and Weighted Average Life to Maturity, respectively, of the Indebtedness being exchanged, extended, refinanced, renewed, replaced, substituted or refunded;

(C)    the Refinancing Indebtedness shall be subordinated in right of payment to the Notes and the Guarantees, if at all, on terms at least as favorable to the holders of Notes as those contained in the documentation governing the Indebtedness being exchanged, extended, refinanced, renewed, replaced, substituted or refunded; and

(D)    if the Indebtedness to be exchanged, refinanced, renewed, replaced, substituted or refunded was the obligation of the Issuers or Guarantor, such Indebtedness shall not be incurred by any of our Restricted Subsidiaries other than a Guarantor or any Restricted Subsidiary that was an obligor under the Indebtedness so refinanced;

(11)    the guarantee by the Issuers or any Guarantor of Indebtedness of us or a Restricted Subsidiary that was permitted to be incurred by another provision of this covenant and the guarantee by any Restricted Subsidiary that is not a Guarantor of any Indebtedness of any Restricted Subsidiary that is not a Guarantor;

(12)    Indebtedness incurred by the Issuer or any Restricted Subsidiary in the form of indemnification, incentive, non-compete, consulting, adjustment of purchase price or similar obligations (including "earn-outs" or similar obligations in connection with acquisitions) and other contingent obligations (other than in respect of Indebtedness for borrowed money of another Person), or guaranty securing the performance of the Issuers or any Restricted Subsidiary (both before and after liability associated therewith becomes fixed), in each case, pursuant to any agreement entered into in connection with a dispositions or acquisitions (including acquisitions permitted by clause (j) of the definition "Permitted Investments" and other permitted Investments) of any business, assets or Restricted Subsidiary;

(13)    Indebtedness pursuant to any guaranties, performance, surety, statutory, appeal or similar bonds or obligations incurred in the ordinary course of business or any bankers' acceptance, bank guarantees, letter of credit, warehouse receipt or similar facilities (including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims) or tenant improvement loans incurred in the ordinary course of business;

(14)    guaranties of the obligations of suppliers, customers, franchisees, lessors and licensees of the Issuer or any Restricted Subsidiary incurred in the ordinary course of business;

(15)    the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms, and the payment of dividends on Disqualified Capital Stock in the form of additional shares of the same class of Disqualified Capital Stock;

(16)    Indebtedness owing to any unaffiliated insurance company in connection with the financing of insurance premiums;

(17)    Indebtedness incurred or assumed by the Issuers or any Restricted Subsidiary in connection with an acquisition permitted by clause (j) of the definition of "Permitted Investments"; provided that (i) in the case of such Indebtedness that is assumed, (x) the Total Net Leverage Ratio on a pro forma basis would not exceed 4.75 to 1.00 and (y) such Indebtedness was not created in anticipation or contemplation of such Investment and (ii) that in the case of any such Indebtedness that is incurred, such Indebtedness would satisfy the Total Net Leverage Ratio or Fixed Charge Coverage Ratio set forth in the first paragraph of this covenant;

(18)    Indebtedness incurred on behalf of, or representing guaranties of Indebtedness of, joint ventures; provided that the aggregate outstanding principal amount of such Indebtedness (including any permitted Refinancing Indebtedness in respect thereof) shall not at any time exceed the greater of (1) $25.0 million and (2) an amount equal to 20.0% of LTM Consolidated Adjusted EBITDA;

(19)    to the extent constituting Indebtedness, Permitted Investments (other than under clause (m) of the definition of "Permitted Investments");

(20)    overdrafts paid within 10 Business Days;

(21)    Indebtedness of Foreign Subsidiaries owed to a third party (other than the Issuers, a Guarantor or a Subsidiary) in an aggregate principal amount at any time outstanding not to exceed the greater of (1) $25.0 million and (2) an amount equal to 20.0% of LTM Consolidated Adjusted EBITDA;

EXHIBIT O(2)

AOE0718

(22) Indebtedness incurred in connection with deferred compensation or stock-based compensation;

(23) additional Indebtedness of the Issuer or any Restricted Subsidiary in an aggregate principal amount that, when taken together with all other Indebtedness incurred pursuant to this clause (23) and then outstanding, does not exceed the greater of (1) $75.0 million and (2) an amount equal to 25.0% of LTM Consolidated Adjusted EBITDA;

provided that, the aggregate principal amount of Indebtedness of Non-Guarantor Subsidiaries incurred in reliance on the first paragraph under "—Certain Covenants—Limitation on Incurrence of Indebtedness", clause (5), (17) or (23) will not exceed, at any one time outstanding, the greater of (1) $50,000,000 and (2) an amount equal to 25.0% of LTM Consolidated Adjusted EBITDA, and any permitted Refinancing Indebtedness of the foregoing;

(24) Indebtedness arising in connection with Bank Products or with endorsement of instruments for collection or deposit in the ordinary course of business;

(25) Replication Advances not to exceed $20.0 million outstanding in the aggregate at the time of incurrence thereof, which are otherwise entered into in the ordinary course of business and on terms and conditions materially no less favorable, taken as a whole, to the Issuers as similar transactions entered into by the Issuers or its Subsidiaries prior to the Original Issue Date; provided that, if any such Replication Advances are secured, any Lien in respect thereof will not be considered to be less favorable to the Issuers if such Lien (x) relates solely to the related assets and (y) is junior in right to the Lien on such assets which secures the term loans under the Credit Agreement;

(26) Negative Pick-up Obligations, Program Acquisition Guarantees and other customary liabilities of the Issuer and the Restricted Subsidiaries not constituting Indebtedness for borrowed money with respect to the production, distribution, acquisition or other exploitation of Product and Product Rights incurred by the Issuer and the Restricted Subsidiaries in the ordinary course of business and consistent with industry practice;

(27) Indebtedness the proceeds of which are applied to defease or discharge the Notes pursuant to the provisions of the indenture described under "—Satisfaction and Discharge" and "—Legal Defeasance and Covenant Defeasance";

(28) Preferred Equity Interests of any Restricted Subsidiary issued to the Issuers or another Restricted Subsidiary; *provided* that any subsequent issuance or transfer of any Capital Stock or any other event that results in any Restricted Subsidiary that holds such Preferred Equity Interests of another Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Preferred Equity Interests (except to the Issuers or another Restricted Subsidiary) shall be deemed, in each case, to be an issuance of Preferred Equity Interests not permitted by this clause (28); and

(29) (i) unsecured Indebtedness incurred in the form of additional Notes under the indenture in an aggregate principal amount not to exceed $340.0 million on terms that are no more favorable to the holders thereof than the terms of the Initial Notes and (ii) Indebtedness incurred in the form of "Incremental Term Facilities" pursuant to Section 2.24 of the Credit Agreement in an aggregate principal amount not to exceed $210.0 million, in each case, incurred in connection with the transactions contemplated by that certain Asset Purchase Agreement for the Sale of Television Stations KVOA, Tucson Arizona, KWOW, Madison, Wisconsin, WREX, Rockford Illinois, WSIL/KPOB, Harrisburg, Illinois, KWWL, Cedar Rapids, Iowa, WXOW/WQOW, La Crosse, Wisconsin and WAOW/WMOW, WAUSAU, Wisconsin, dated as of April 29, 2021, by and among Gray Television, Inc., Allen Media Broadcasting Evansville III, LLC and Allen Media Holdings II, LLC and/or any of the acquisition of the ABC affiliate in the Midwest, FOX affiliate in the Southeast and non-big four broadcast network affiliate station in Honolulu, Hawaii, to repay up to $22.0 million of outstanding Indebtedness of KITV, Inc. and to pay for fees and expenses incurred in connection with each of the foregoing (collectively, the "Gray and Other Acquisitions").

For purposes of determining compliance with this covenant, (a) the outstanding principal amount of any item of Indebtedness shall be counted only once, and any obligation arising under any guarantee, Lien, letter of credit or similar instrument supporting such Indebtedness incurred in compliance with this covenant shall be disregarded, and (b) if an item of Indebtedness meets the criteria of more than one of the categories described in clauses (1) through (28) above or is permitted to be incurred pursuant to the first paragraph of this covenant and also meets the criteria of one or more of the categories described in clauses (1) through (28) above, we shall, in our sole discretion, classify such item of Indebtedness in any manner that complies with this covenant and may from time to time reclassify such item of Indebtedness in any manner in which such item could be incurred at the time of such reclassification; *provided* that Indebtedness outstanding under the Credit Agreement on the Original Issue Date (and any Indebtedness secured by a Lien that refinances such Indebtedness) shall be deemed to be outstanding under clause (2) above and may not be reclassified.

Accrual of interest or dividends on Preferred Equity Interests, the accretion of original issue discount and the payment of interest or dividends on Preferred Equity Interests in the form of additional Indebtedness or Preferred Equity Interests of the same class will not be deemed to be an incurrence of Indebtedness for purposes of determining compliance with this covenant. Any increase in the amount of Indebtedness solely by reason of currency fluctuations will not be deemed to be an incurrence of Indebtedness for purposes of determining compliance with this covenant. A change in GAAP that results in an obligation existing at the time of such change, not

EXHIBIT O(2)

AOE0719

previously classified as Indebtedness, becoming Indebtedness will not be deemed to be an incurrence of Indebtedness for purposes of determining compliance with this covenant.

The amount of indebtedness outstanding as of any date shall be (1) the accreted value thereof, in the case of any Indebtedness issued with original issue discount, (2) the principal amount thereof, in the case of any other Indebtedness, (3) in the case of the guarantee by the specified Person of any Indebtedness of any other Person, the maximum liability to which the specified Person may be subject upon the occurrence of the contingency giving rise to the obligation and (4) in the case of Indebtedness of others guaranteed by means of a Lien on any asset of the specified Person, the lesser of (A) the Fair Market Value of such asset on the date on which Indebtedness is required to be determined pursuant to the indenture and (B) the amount of the Indebtedness so secured.

For purposes of determining compliance with any U.S. dollar-denominated restriction on the incurrence of Indebtedness, the U.S. dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated by us based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term Indebtedness, or first committed, in the case of revolving credit Indebtedness; *provided* that if such Indebtedness is incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. dollar-dominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. dollar-dominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced. The principal amount of any Indebtedness incurred to refinance other Indebtedness, (1) if incurred in a different currency from the Indebtedness being refinanced, shall be calculated by us based on the currency exchange rate applicable to the currencies in which such Refinancing Indebtedness is denominated that is in effect on the date of such refinancing and (2) shall be deemed to be outstanding only when the proceeds thereof are not applied to effect such refinancing (and to pay any fees, expenses, commissions and costs in connection therewith) substantially concurrently.

### *Limitation on Asset Sales.*

The indenture will provide that we will not, and will not permit any Restricted Subsidiary to, directly or indirectly, consummate any Asset Sale unless:

(1)   we or such Restricted Subsidiary receives consideration at the time of such Asset Sale at least equal to the Fair Market Value (determined as of the time of contractually agreeing to such Asset Sale) of the assets included in such Asset Sale (such Fair Market Value to be determined by (i) an executive officer of ours or such Subsidiary if the value is less than $25.0 million or (ii) in all other cases by a resolution of our Board of Directors (or of a committee appointed thereby for such purposes)); and

(2)   at least 75% of the total consideration in such Asset Sale consists of cash or Cash Equivalents or Marketable Securities.

For purposes of clause (2), the following shall be deemed to be cash:

(a)   the amount (without duplication) of any Indebtedness (other than Subordinated Indebtedness) of us or such Restricted Subsidiary that is expressly assumed by the transferee in such Asset Sale and with respect to which we or such Restricted Subsidiary, as the case may be, is unconditionally released by the holder of such Indebtedness,

(b)   the amount of any obligations or securities received from such transferee that are within 180 days converted by us or such Restricted Subsidiary to cash (to the extent of the cash actually so received),

(c)   the Fair Market Value of any assets (other than securities) received by us or any Restricted Subsidiary to be used by us or any Restricted Subsidiary in a Permitted Business, and

(d)   any Designated Non-cash Consideration having an aggregated Fair Market Value that, when taken together with all other Designated Non-cash Consideration previously received and then outstanding, does not exceed at the time of receipt of such Designated Non-cash Consideration (with the Fair Market Value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value) the greater of (i) $5.0 million and (ii) an amount equal to 2.0% of LTM Consolidated Adjusted EBITDA.

If we or any Restricted Subsidiary engages in an Asset Sale, we or such Restricted Subsidiary shall apply all or any of the Net Proceeds therefrom to:

(1)   repay Indebtedness under any Credit Facility, and in the case of any such repayment under any revolving credit facility, effect a permanent reduction in the availability under such revolving credit facility; or

(2)   (A) invest all or any part of the Net Proceeds thereof in capital expenditures or the purchase of assets to be used by us or any Restricted Subsidiary in a Permitted Business, (B) acquire Equity Interests in a Person that is a Restricted Subsidiary or in a Person engaged primarily in a Permitted Business that shall become a Restricted Subsidiary immediately upon the consummation of such acquisition or (C) a combination of (A) and (B).

EXHIBIT O(2)

AOE0720

Any Net Proceeds from any Asset Sale that are not applied or invested (or committed pursuant to a written agreement to be applied) as provided in the preceding paragraph within 365 days after the receipt thereof and, in the case of any amount committed to a reinvestment, which are not actually so applied within 180 days following such 365 day period shall constitute "Excess Proceeds" and shall be applied pursuant to the succeeding paragraph. Pending the final application of any such Net Proceeds, we or such Restricted Subsidiary may temporarily reduce revolving indebtedness under a Credit Facility, if any, or otherwise invest such Net Proceeds in any manner not prohibited by the Indenture.

When the cumulative amount of Excess Proceeds exceeds $20.0 million, the Issuers will be obligated to make an offer to all holders of the Notes (an "Excess Proceeds Offer") to purchase the maximum principal amount of Notes that may be purchased out of such Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof, together with accrued and unpaid interest to the date fixed for the closing of such offer in accordance with the procedures set forth in the indenture. To the extent we or a Restricted Subsidiary is required under the terms of Indebtedness of us or such Restricted Subsidiary (other than Subordinated Indebtedness), we shall also make a *pro rata* offer to the holders of such Indebtedness (including the Notes) with such proceeds. If the aggregate principal amount of Notes and other parity Indebtedness surrendered by holders thereof exceeds the amount of such Excess Proceeds, the Trustee shall select the Notes and the representative for the other parity Indebtedness shall select such other parity Indebtedness to be purchased on a *pro rata* basis, or by lot, and, in the case of global notes, in accordance with the procedures of the depositary. To the extent that the principal amount of Notes tendered pursuant to an Excess Proceeds Offer is less than the amount of such Excess Proceeds, the Issuers may use any remaining Excess Proceeds in any manner not prohibited by the indenture. Upon completion of an Excess Proceeds Offer, the amount of Excess Proceeds shall be reset at zero.

The Issuers will be required to comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws and regulations are applicable in connection with the repurchase of the Notes required in the event of an Excess Proceeds Offer and will not be deemed to have violated the "Excess Proceeds Offer" provisions of the indenture as a result thereof.

### Limitation on Liens.

The indenture will provide that the Issuers shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly, create, incur or assume any Lien on any asset now owned or hereafter acquired, or on any income or profits therefrom or assign or convey any right to receive income therefrom, except Permitted Liens.

### Additional Subsidiary Guarantees.

The indenture will provide that if any of the Issuer's Domestic Restricted Subsidiaries that is not a Guarantor guarantees or becomes otherwise obligated under a Credit Facility incurred under clause (2) of the second paragraph under "—Limitation on Incurrence of Indebtedness" or Indebtedness incurred in reliance on the first paragraph (other than under the second proviso thereto) under "—Limitation on Incurrence of Indebtedness," then in each case such guarantor or obligor shall (i) execute and deliver to the Trustee a supplemental indenture in form reasonably satisfactory to the Trustee pursuant to which such Restricted Subsidiary shall unconditionally guarantee all of the Issuers' obligations under the Notes and the indenture on the terms set forth in the indenture and (ii) deliver to the Trustee an officers' certificate and an opinion of counsel that such supplemental indenture has been duly authorized, executed and delivered by such Restricted Subsidiary and constitutes a legal, valid, binding and enforceable obligation of such Restricted Subsidiary. Thereafter, such Restricted Subsidiary shall be a Guarantor for all purposes of the indenture.

### Limitation on Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries.

The indenture will provide that we shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary to:

(a)   pay dividends or make any other distribution to us or any of our Restricted Subsidiaries on its Capital Stock or with respect to any other interest or participation in, or measured by, its profits, or pay any Indebtedness owed to us or any of our Restricted Subsidiaries;

(b)   make loans or advances to us or any of our Restricted Subsidiaries; or

(c)   transfer any of its properties or assets to us or any of our Restricted Subsidiaries;

except for such encumbrances or restrictions existing under or by reason of:

(i)   agreements evidencing Indebtedness permitted in accordance with the first paragraph under "—Certain Covenants—Limitation on Incurrence of Indebtedness" and clauses (1), (3), (5) (limited to such acquired Person or asset), (6) (that impose restrictions on the property so acquired, constructed, leased or improved and any improvements, accessions,

EXHIBIT O(2)

AOE0721

proceeds, dividends or distributions in respect thereof and assets fixed or appurtenant thereto), (17), (18), (21) and (23) under "—Certain Covenants—Limitation on Incurrence of Indebtedness";

(ii)    agreements evidencing permitted refinancing of Indebtedness permitted in accordance with clause (10) under "—Certain Covenants—Limitation on Incurrence of Indebtedness" or other Indebtedness issued or incurred (including by means of the extension or renewal of existing Indebtedness) to refinance, refund, extend, defease, discharge, renew or replace other Indebtedness; *provided* that any encumbrances, restrictions and conditions of a type described in this "—Certain Covenants—Limitation on Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries" under any such refinancing are not materially more restrictive, taken as a whole, than those contained in the documentation governing the Indebtedness being refinanced (as determined by the Issuers in good faith);

(iii)    by reason of customary provisions restricting assignments, subletting, or other transfers contained in leases, licenses, joint venture agreements and similar agreements entered into in the ordinary course of business;

(iv)    that are or were created by virtue of any transfer of, agreement to transfer or option or right with respect to any property, assets or Capital Stock not otherwise prohibited under the indenture;

(v)    Refinancing Indebtedness (as defined in the covenant described under "—Certain Covenants— Limitation on Incurrence of Indebtedness"); *provided* that the restrictions contained in the agreements governing such Refinancing Indebtedness are no more restrictive than those contained in the agreements governing the Indebtedness being refinanced;

(vi)    apply by reason of any applicable Law, rule, regulation or order or are required by any Governmental Authority having jurisdiction over the Issuers or any Subsidiary;

(vii)    the indenture and the Notes or by our other Indebtedness ranking *pari passu* with the Notes; *provided* that except as set forth in clause (viii) below such restrictions are no more restrictive taken as a whole than those imposed by the indenture and the Notes;

(viii)    any Credit Facility; *provided* that the restrictions therein are not (i) materially more restrictive than the agreements governing such Indebtedness as in effect on the Original Issue Date or (ii) will not affect the Issuers' ability to make principal or interest payments on the Notes (as determined by the Issuers in good faith);

(ix)    restrictions applicable to Non-Guarantor Subsidiaries or the assets of Non-Guarantor Subsidiaries (including Capital Stock held by Non-Guarantor Subsidiary) pursuant to Indebtedness permitted under "—Certain Covenants— Limitation on Incurrence of Indebtedness" and pursuant to restrictions in agreements related to Permitted Investments;

(x)    any agreement for the sale or other disposition of a Restricted Subsidiary or any of its assets in compliance with the terms of the indenture that restricts distributions by that Restricted Subsidiary pending such sale or other disposition;

(xi)    restrictions on Persons or property at the time such Person or property is acquired; provided such restrictions were existing at the time of such acquisition and were not created in anticipation or contemplation thereof;

(xii)    provisions limiting the disposition or distribution of assets or property (including cash) in joint venture agreements, asset sale agreements, sale-leaseback agreements, stock sale agreements and other similar agreements (including agreements entered into in connection with a Restricted Investment), and customary provisions in joint venture agreements and other similar agreements applicable to the Equity Interests or Indebtedness of such joint venture, which limitation is applicable only to the assets that are the subject of such agreements;

(xiii)    under licensing, sub-licensing, leasing or sub-leasing agreements entered into by the Issuer or any Subsidiary, in each case entered into in the ordinary course of business, and provisions restricting assignment of any such agreement entered into by the Issuer or any Subsidiary in the ordinary course of business;

(xiv)    Permitted Liens;

(xv)    restrictions that exist on the Original Issue Date;

(xvi)    restrictions imposed by any agreement governing (i) Indebtedness entered into after the Original Issue Date and permitted under "—Certain Covenants—Limitation on Incurrence of Indebtedness" that are, taken as a whole, in the good faith judgment of the Issuers, no more restrictive with respect to the Issuers or any Subsidiary than customary market terms for Indebtedness of such type (and, in any event, are no more restrictive than the restrictions contained in the indenture), so long as the Issuers shall have determined in good faith that such restrictions will not affect its obligation or ability to make any payments required under the indenture;

(xvii)    customary provisions restricting assignment of any agreement of the type not covered by clause (xiii);

(xiii)    Purchase Money Indebtedness that imposes restrictions of the type described in clause (c) above on the property so acquired;

EXHIBIT O(2)

AOE0722

(xix)    restrictions on cash or other deposits imposed by customers under contracts entered into the ordinary course of business and restrictions that arise in connection with cash or other deposits permitted hereunder;

(xx)    any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (i) through (xix) above; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in our good faith judgment, not materially more restrictive as a whole with respect to such encumbrances and restrictions than those prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing;

(xxi)    Indebtedness or other agreements including, without limitation, agreements described in clause (xii) of this paragraph, of any Non-Guarantor Subsidiary which imposes restrictions solely on such Non-Guarantor Subsidiary and its Subsidiaries; or

(xxii)    any restriction on cash or other deposits or net worth imposed by customers, licensors or lessors or required by insurance, surety or bonding companies, in each case under contracts entered into the ordinary course of business.

### *Merger, Consolidation or Sale of Assets.*

The indenture will provide that we shall not consolidate or merge with or into (whether or not we are the surviving entity), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of our properties or assets in one or more related transactions to, another Person unless:

(a)    we are the surviving Person or the Person formed by or surviving any such consolidation or merger (if other than us) or to which such sale, assignment, transfer, lease, conveyance or other disposition shall have been made is a corporation, limited partnership or limited liability company organized or existing under the laws of the United States, any state thereof or the District of Columbia;

(b)    the Person formed by or surviving any such consolidation or merger (if other than us) or the Person to which such sale, assignment, transfer, lease, conveyance or other disposition shall have been made assumes all our obligations pursuant to a supplemental indenture in form reasonably satisfactory to the Trustee, under the Notes and the indenture;

(c)    immediately after such transaction, no Default or Event of Default exists; and

(d)    we or the Person formed by or surviving any such consolidation or merger (if other than us) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made: (i) will have a Consolidated Fixed Charge Coverage Ratio immediately after the transaction (but prior to any purchase accounting adjustments or accrual of deferred tax liabilities resulting from the transaction) not less than our Consolidated Fixed Charge Coverage Ratio immediately preceding the transaction or (ii) would, at the time of such transaction after giving *pro forma* effect thereto as if such transaction had occurred at the beginning of the applicable four-quarter period, be permitted to incur at least $1.00 of additional Indebtedness pursuant to the first paragraph in the covenant described under "—Certain Covenants— Limitation on Incurrence of Indebtedness."

Notwithstanding the foregoing, any Restricted Subsidiary may consolidate with or merge into or transfer all or part of its properties and assets to us or another Restricted Subsidiary.

Notwithstanding the foregoing clauses (c) and (d), we may merge with a Restricted Subsidiary solely for the purpose of reorganizing ourselves in another jurisdiction of the United States or any State thereof or the District of Columbia so long as the amount of Indebtedness of us and the Restricted Subsidiaries is not increased thereby.

The indenture will provide that each Guarantor (other than any Guarantor whose Guarantee is to be released in accordance with the terms of such Guarantee and the indenture) will not, and we will not cause or permit any Guarantor to, consolidate or merge with or into (whether or not such Guarantor is the surviving entity) any Person other than us or a Guarantor (in each case, other than in accordance with the covenants described under "—Certain Covenants—Limitation on Asset Sales") unless:

(a)    the Guarantor is the surviving Person or the Person formed by or surviving any such consolidation or merger (if other than the Guarantor) is a corporation, limited partnership or limited liability company organized or existing under the laws of the United States, any state thereof or the District of Columbia;

(b)    the Person formed by or surviving any such consideration or merger (if other than the Guarantor) assumes all the obligations of the Guarantor, pursuant to a supplemental indenture in form reasonably satisfactory to the Trustee, under the Notes and the indenture; and

(c)    immediately after such transaction, no Default or Event of Default exists.

EXHIBIT O(2)

AOE0723

This section includes a phrase relating to the sale, assignment, conveyance, transfer, lease or other disposition of "all or substantially all" of our properties or assets. Although there is a developing body of case law interpreting the phrase "substantially all," there is no precise established definition of the phrase under applicable law. Accordingly, if we dispose of less than all our properties or assets by any of the means described above, the application of the covenant described in this section may be uncertain.

### *Limitation on Transactions with Affiliates.*

The indenture will provide that we shall not and shall not permit any Restricted Subsidiary to, directly or indirectly, sell, lease, transfer or otherwise dispose of any of our or their properties or assets to, or purchase any property or assets from, or enter into any contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate (including any Unrestricted Subsidiary) (each of the foregoing, an "Affiliate Transaction"), unless:

(a)  such Affiliate Transaction is on terms that are not materially less favorable, taken as a whole, to us or such Restricted Subsidiary than those that would have been obtained in a comparable transaction by us or such Restricted Subsidiary with an unrelated Person; *provided* that such transaction shall be deemed to be at least as favorable as the terms that could have been obtained in a comparable transaction with an unrelated Person if such transaction is approved by a majority of disinterested members of (x) the Board of Directors or (y) any duly constituted committee thereof; and

(b)  if such Affiliate Transaction involves aggregate payments in excess of $10.0 million, such Affiliate Transaction has been approved by a resolution of a majority of disinterested members of either (x) our Board of Directors or (y) any duly constituted committee thereof;

*provided*, *however*, that the following shall, in each case, not be deemed Affiliate Transactions:

(i)  customary indemnity provided to and reasonable and customary fees and expense reimbursement paid to members of the board of directors (or similar governing body) or officers, employees or agents of Holdings, the Issuers or any Subsidiary;

(ii)  (1) customary compensation, benefits and indemnification arrangements (including the payment of bonuses and other deferred compensation) for directors, officers and other employees of Holdings, the Issuers or any Subsidiary entered into in the ordinary course of business, (2) employment and severance agreements between Holdings, the Issuers or any Subsidiary and their respective employees, officers or directors, entered into in the ordinary course of business, (3) any issuance of securities pursuant to employment arrangements, stock options, stock ownership plans, including restricted stock plans, stock grants, directed share programs and other equity based plans and the granting of stockholder registration rights approved, and (4) payments or loans (or cancellation of loans) to officers, directors and employees that are approved by Holdings' or the Issuer's board of directors, subject to the limitations set forth the definition of "Permitted Investments";

(iii)  transactions between or among us and our Restricted Subsidiaries;

(iv)  the existence of, or the performance of obligations under the terms of, agreements entered into in connection with a Permitted Investment (including payments of earnouts and other similar payments);

(v)  Restricted Payments permitted under "—Certain Covenants—Limitation on Restricted Payments"; Indebtedness permitted under "—Certain Covenants—Limitation on Incurrence of Indebtedness"; and transactions permitted under "—Certain Covenants—Limitation on Asset Sales" (including as a result of exceptions to the definition of "Asset Sale");

(vi)  any transactions between us or any of our Restricted Subsidiaries and any Affiliate of us the Equity Interests of which Affiliate are owned solely by us or one of our Restricted Subsidiaries, on the one hand, and by Persons who are not Affiliates of us or Restricted Subsidiaries, on the other hand;

(vii)  purchase by Holdings or any other Parent of the Issuer of Capital Stock (other than Disqualified Stock) of the Issuer, or any contribution by Holdings or any other Parent of the Issuer to the equity capital of the Issuer;

(viii)  any agreements or arrangements in effect on the Original Issue Date and described or incorporated by reference in the February 2020 Offering Memorandum and any modifications, extensions or renewals thereof that are no less favorable to us or the applicable Restricted Subsidiary in any material respect than such agreement as in effect on the Original Issue Date;

(ix)  Liens permitted by clauses (ll) and (mm) of the definition "Permitted Liens";

(x)  transactions with Persons who are Affiliates of us solely as a result of our or a Restricted Subsidiary's Investment in such Person;

(xi)  sales of Equity Interests to Affiliates of the Issuer or its Restricted Subsidiaries not otherwise prohibited by the indenture and the granting of registration and other customary rights in connection therewith;

EXHIBIT O(2)

AOE0724

(xii)  transactions with an Affiliate where the only consideration paid is Equity Interests of the Issuer other than Disqualified Stock;

(xiii)  transactions in which the Issuer or any of its Restricted Subsidiaries, as the case may be, deliver to the Trustee a letter from an Independent Financial Advisor stating that such transaction is fair to the Issuers or such Restricted Subsidiary from a financial point of view or meets the requirements of this covenant;

(xiv)  transactions with joint ventures or Unrestricted Subsidiaries entered into in the ordinary course of business;

(xv)  transactions between the Issuer or any of its Restricted Subsidiaries and any Person, a director of which is also a director of the Issuer; *provided*, *however*, that such director abstains from voting as a director on any matter involving such other Person; and

(xvi)  any transaction or series of related transactions involving aggregate payments less than $5.0 million.

### *Reports.*

So long as any Notes are outstanding, the Issuers will furnish to the Trustee and the holders of Notes, within 60 days from the end of the first three fiscal quarters (the "FTFQ") and 90 days from the end of AMG's fiscal year, all FTFQ and annual financial statements in a form substantially similar to the form included in the February 2020 Offering Memorandum, including financial information with respect to the Non-Guarantor Restricted Subsidiaries in a form consistent with the presentation of such financial information included in the February 2020 Offering Memorandum, prepared in accordance with GAAP and together with a "Management's Discussion and Analysis of Financial Condition and Results of Operations" for each of the FTFQ or fiscal year (which shall include reasonable detail in accordance with GAAP the breakdown of assets and liabilities, and revenues and expenses, between Holdings, the Issuer, the Restricted Subsidiaries and the Unrestricted Subsidiaries as of the dates and for the periods covered by such financial statements) and, with respect to the annual information only, an opinion on the annual financial statements by the Issuer's certified independent accountants.

So long as any Notes are outstanding, the Issuers will furnish to the Trustee and the holders of Notes, within 10 business days after the occurrence of each event that would have been required to be reported in a Current Report on Form 8-K under Items 1.01, 1.02, 1.03, 2.01, 2.05, 2.06, 4.01, 4.02, 5.01 and 5.02(b) and (c) (other than with respect to information otherwise required or contemplated by Item 402 of Regulation S-K promulgated by the SEC) under the Exchange Act if the Issuer had been a reporting company under the Exchange Act (or such later time period provided for in such Form 8-K); provided that no such material change report will be required to be furnished if the Issuers determine in their good faith judgment that such event is not material to holders or the business, assets, operations, financial positions or prospects of the Issuer and its Restricted Subsidiaries, taken as a whole.

The Issuers shall be deemed to have satisfied its obligation to furnish such reports to holders of the Notes upon Issuers' posting of such reports to a website (which may be non-public) (the "Noteholder Website") to which holders of Notes, prospective investors that certify that they are qualified institutional buyers and market makers are given access.

For so long as any Notes are outstanding, the Issuers shall also:

(a)  within 15 business days after filing with the Trustee, the annual and quarterly information required pursuant to the first paragraph of this covenant, hold a conference call for holders of Notes, prospective investors and market makers to discuss such reports and the results of operations for the relevant reporting period; and

(b)  employ commercially reasonable means expected to reach Persons entitled to participate in such conference calls in accordance with the foregoing paragraph (it being understood that a posting on the Noteholder Website shall be sufficient) prior to the date of the conference call required to be held in accordance with clause (a) above, to announce the time and date of such conference call and either including all information necessary to access the call or directing such Persons to contact the appropriate contact at the Issuer to obtain such information.

Notwithstanding the foregoing, so long as the direct or indirect parent company of the Issuer becomes a guarantor of the Notes, the reports, information and other documents required to be filed and provided as described above may be those of such parent, rather than those of the Issuer, so long as the Issuer would be able to file financial statements of such parent under the SEC's requirements (assuming the Notes were registered under Section (13)(a) or Section 15(d) of the Exchange Act).

For the avoidance of doubt, (a) no certifications or attestations concerning the financial statements or disclosure controls and procedures or internal controls that would otherwise be required pursuant to the Sarbanes-Oxley Act of 2002 will be required and (b) nothing contained in the indenture shall otherwise require the Issuer to comply with the terms of the Sarbanes-Oxley Act of 2002 at any time when it would not otherwise be subject to such statute.

EXHIBIT O(2)

AOE0725

The indenture also provides that, so long as any of the Notes remain outstanding, the Issuer will make available to any prospective purchaser of Notes or beneficial owner of Notes in connection with any sale thereof the information required by Rule 144A(d)(4) under the Securities Act.

It is not expected that the Notes will be exchanged for similar notes in a transaction registered under the Securities Act, or that the resale of the Notes will be registered under the Securities Act. Additionally, it is not anticipated that the indenture will be qualified under the Trust Indenture Act and as a result the holders of the Notes will not receive the protections otherwise provided thereby.

**Suspension of Covenants**

During any period of time after the Original Issue Date that (i) the Notes are rated Investment Grade by both Rating Agencies and (ii) no Default has occurred and is continuing under the indenture (the occurrence of the events described in the foregoing clauses (i) and (ii) being collectively referred to as a "Covenant Suspension Event"), the Issuer and its Restricted Subsidiaries will not be subject to the covenants in the indenture specifically listed under the following captions in this "Description of Notes" section of this offering memorandum (the "Suspended Covenants"):

    (1)    "—Certain Covenants—Limitation on Restricted Payments";

    (2)    "—Certain Covenants—Limitation on Incurrence of Indebtedness";

    (3)    "—Certain Covenants—Limitation on Asset Sales";

    (4)    clause (d) of the first paragraph under "—Certain Covenants—Merger, Consolidation or Sale of Assets";

    (5)    "—Certain Covenants—Limitation on Transactions with Affiliates"; and

    (6)    "—Certain Covenants—Limitation on Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries."

Additionally, at such time as the above referenced covenants are suspended (a "Suspension Period"), we will no longer be permitted to designate any Restricted Subsidiary as an Unrestricted Subsidiary.

In the event that the Issuer and its Restricted Subsidiaries are not subject to the Suspended Covenants for any period of time as a result of the foregoing, and on any subsequent date (the "Reversion Date") one or both of the Rating Agencies withdraw their Investment Grade Rating or downgrade the rating assigned to the Notes below Investment Grade, then the Issuer and its Restricted Subsidiaries will thereafter again be subject to the Suspended Covenant with respect to future events.

On each Reversion Date, all Indebtedness incurred during the Suspension Period prior to such Reversion Date will be deemed to be Existing Indebtedness. For purposes of calculating the amount available to be made as Restricted Payments under clause (iii) of the first paragraph of the covenant described under "—Certain Covenants—Limitation on Restricted Payments," calculations under such covenant shall be made as though such covenant had been in effect during the entire period of time after the Original Issue Date (including the Suspension Period) and Restricted Payments made during the Suspension Period not otherwise permitted pursuant to any of clauses (1) through (18) under the second paragraph under the covenant described under "—Certain Covenants—Limitation on Restricted Payments" will reduce the amount available to be made as Restricted Payments under clause (iii) of the first paragraph of such covenant, *provided* that the amount available to be made as Restricted Payments on the Reversion Date shall not be reduced to below zero solely as a result of such Restricted Payments. For purposes of the covenant described under "—Certain Covenants— Limitation on Asset Sales," on the Reversion Date, the unutilized amount of Net Proceeds will be reset to zero. Notwithstanding the foregoing, neither (a) the continued existence, after the Reversion Date, of facts and circumstances or obligations that were incurred or otherwise came into existence during a Suspension Period nor (b) the performance of any such obligations, shall constitute a breach of any covenant set forth herein or cause a Default or Event of Default thereunder; *provided* that (1) the Issuer and its Restricted Subsidiaries did not incur or otherwise cause such facts and circumstances or obligations to exist in anticipation of a withdrawal or downgrade by the applicable Rating Agency below an Investment Grade Rating and (2) the Issuers reasonably believed that such incurrence or actions would not result in such withdrawal or downgrade.

The Issuer shall provide an officers' certificate to the Trustee indicating the occurrence of any Suspension Event, Suspension Period or Reversion Date. The Trustee shall have no obligation to monitor the ratings of the Notes, independently determine or verify if such events have occurred or notify the holders of Notes of any Suspension Event, Suspension Period or Reversion Date. The Trustee may provide a copy of such officers' certificate to any holder of Notes upon request.

There can be no assurance that the Notes will ever achieve or maintain Investment Grade Ratings.

EXHIBIT O(2)

AOE0726

**Events of Default**

The indenture will provide that each of the following constitutes an Event of Default:

(a)    default for 30 days in the payment when due of interest or additional interest, if any, on the Notes;

(b)    default in payment when due of principal of or premium, if any, on the Notes at maturity, upon repurchase, redemption or otherwise;

(c)    failure to comply for 30 days after notice with any obligations under the provisions described under "—Certain Covenants—Merger, Consolidation or Sale of Assets," "—Change of Control" or "—Certain Covenants—Limitation on Asset Sales" (other than a failure to purchase Notes duly tendered to the Issuers for repurchase pursuant to a Change of Control Offer or an Excess Proceeds Offer);

(d)    subject to the penultimate paragraph of this "Events of Default" section, default under any other provision of the indenture or the Notes, which default remains uncured for 60 days after notice from the Trustee or the holders of at least 30% of the aggregate principal amount then outstanding of the Notes;

(e)    default under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness for money borrowed by us and any of our Restricted Subsidiaries (or the payment of which is guaranteed by us and any of our Restricted Subsidiaries), which default is caused by a failure to pay the principal of such Indebtedness at the final stated maturity thereof within the grace period provided in such Indebtedness (a "Payment Default"), and the principal amount of any such Indebtedness, together with the principal amount of any other such Indebtedness under which there has been a Payment Default, aggregates $35.0 million or more;

(f)    default under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness for money borrowed by us and any of our Restricted Subsidiaries (or the payment of which is guaranteed by us or any of our Restricted Subsidiaries), which default results in the acceleration of such Indebtedness prior to its express maturity not rescinded or cured within 30 days after such acceleration, and the principal amount of any such Indebtedness, together with the principal amount of any other such Indebtedness under which there has been a Payment Default or the maturity of which has been so accelerated and remains undischarged after such 30 day period, aggregates $35.0 million or more;

(g)    failure by us and any of our Restricted Subsidiaries to pay final judgments (other than any judgment as to which a reputable insurance company has accepted full liability) aggregating $35.0 million or more, which judgments are not stayed within 60 days after their entry;

(h)    certain events of bankruptcy or insolvency with respect to the Issuer or any Subsidiary (other than an Immaterial Subsidiary) of the Issuer (including the filing of a voluntary case, the consent to an order of relief in an involuntary case, the consent to the appointment of a custodian, a general assignment for the benefit of creditors or an order of a court for relief in an involuntary case, appointing a custodian or ordering liquidation, which order remains unstayed for 60 days); and

(i)    any Guarantee of a Subsidiary (other than an Immaterial Subsidiary) shall be held in a judicial proceeding to be unenforceable or invalid or shall cease for any reason to be in full force and effect, or any Guarantor that qualifies as a Subsidiary (other than an Immaterial Subsidiary), or any Person acting on behalf of any Guarantor that qualifies as a Subsidiary (other than an Immaterial Subsidiary), shall deny or disaffirm its obligations under its Guarantee.

If any Event of Default (other than an Event of Default described in clause (h) above) occurs and is continuing, up to two years following the first public notice or notice to the Trustee of such event, the Trustee, by notice to the Issuers, or the holders of at least 30% of the aggregate principal amount then outstanding of the Notes, by notice to the Issuers and the Trustee, may declare all the Notes to be due and payable immediately. Notwithstanding the foregoing, in the case of an Event of Default arising from the events of bankruptcy or insolvency with respect to the Issuer described in clause (h) above, all outstanding Notes will become due and payable without further action or notice. Holders of the Notes may not enforce the indenture or the Notes except as provided in the indenture. Subject to certain limitations, holders of a majority in principal amount of the then outstanding Notes may direct the Trustee in its exercise of any trust or power. The Trustee may withhold from holders of the Notes notice of any continuing Default or Event of Default (except a Default or Event of Default relating to the payment of principal or interest) if it determines that withholding notice is in such holders' interest.

Subject to certain conditions, the holders of a majority in aggregate principal amount then outstanding of the Notes, by notice to the Trustee, may on behalf of the holders of all of the Notes waive any existing Default or Event of Default and its consequences under the indenture, except a continuing Default or Event of Default in the payment of interest or premium on, or principal of, the Notes.

EXHIBIT O(2)

AOE0727

Any failure to perform, or breach of, any covenant or agreement pursuant to "—Certain Covenants—Reports" shall not be a Default or an Event of Default until the 121st day after we have received the notice referred to in clause (d) of the first paragraph above (at which point, unless cured or waived, such failure to perform or breach shall constitute an Event of Default). Prior to such 121st day, remedies against the Issuers for any such failure or breach will be limited to additional interest at a rate per year equal to 0.25% of the principal amount of such Notes from the 60th day following such notice to and including the 121st day following such notice. A failure to perform, or breach of any covenant or agreement pursuant to "—Certain Covenants—Reports" shall automatically cease to be outstanding and shall be deemed cured at such time as we furnish or file the applicable information or report.

We will be required to deliver to the Trustee annually a statement regarding compliance with the indenture.

**No Personal Liability of Directors, Owners, Employees, Incorporators and Stockholders**

No director, owner, officer, employee, incorporator or stockholder of us or any of our Affiliates, as such, shall have any liability for any obligations of us or any of our Affiliates under the Notes, the Guarantees or the indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each holder of Notes by accepting a note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. Such waiver may not be effective to waive liabilities under the federal securities laws and it is the view of the Commission that such a waiver is against public policy.

**Legal Defeasance and Covenant Defeasance**

The indenture will provide that with respect to the Notes, we may, at our option and at any time, elect to have all obligations discharged with respect to the outstanding Notes ("Legal Defeasance"). Such Legal Defeasance means that we will be deemed to have paid and discharged the entire indebtedness, and satisfied all obligations and covenants under the indenture, except for:

(a)  the rights of holders of outstanding Notes to receive payments in respect of the principal of, premium, if any, and interest on the Notes when such payments are due, or on the redemption date, as the case may be;

(b)  our obligations with respect to the Notes concerning issuing temporary Notes, registration of Notes, mutilated, destroyed, lost or stolen Notes and the maintenance of an office or agency for payment and money for security payments held in trust;

(c)  the rights, powers, trust, duties and immunities of the Trustee, and our obligations in connection therewith; and

(d)  the Legal Defeasance provisions of the indenture.

In addition, the indenture will provide that with respect to the Notes, we may, at our option and at any time, elect to have all obligations released with respect to substantially all of the restrictive covenants that are described in the indenture, including, without limitation, under "—Change of Control" ("Covenant Defeasance") and thereafter any omission to comply with such obligations shall not constitute a Default or Event of Default with respect to the Notes. If Covenant Defeasance occurs, certain events (not including nonpayment, bankruptcy, receivership, rehabilitation and insolvency events) described under "—Events of Default" will no longer constitute an Event of Default with respect to the Notes.

In order to exercise either Legal Defeasance or Covenant Defeasance, the indenture will provide that with respect to the Notes:

(i)  we must irrevocably deposit with the Trustee, in trust, for the benefit of the holders of the Notes, cash in U.S. dollars, non-callable U.S. government obligations, or a combination thereof, in such amounts as will be sufficient, in the opinion of a nationally recognized firm of independent public accountants, to pay the principal of, premium, if any, and interest on the outstanding Notes on the stated maturity or on the applicable optional redemption date, as the case may be;

(ii)  in the case of Legal Defeasance, we shall have delivered to the Trustee an opinion of counsel in the United States confirming that:

(A)  we have received from, or there has been published by, the Internal Revenue Service a ruling or

(B)  since the Original Issue Date, there has been a change in the applicable federal income tax law,

in each case to the effect that, and based thereon such opinion of counsel shall confirm that, the holders of the Notes will not recognize income, gain or loss for federal income tax purposes as a result of such Legal Defeasance, and will be subject to federal income tax in the same amount, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(iii)  in the case of Covenant Defeasance, we shall have delivered to the Trustee an opinion of counsel confirming that the holders of the Notes will not recognize income, gain or loss for federal income tax purposes as a result of such Covenant Defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

EXHIBIT O(2)

AOE0728

(iv)    no Default or Event of Default shall have occurred and be continuing on the date of such deposit;

(v)    such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a default under, the indenture or any other material agreement or instrument to which we or any of our Subsidiaries is a party or by which we or any of our Subsidiaries is bound;

(vi)    we shall have delivered to the Trustee an officers' certificate stating that the deposit was not made by us with the intent of preferring the holders of the Notes over any of our other creditors or with the intent of defeating, hindering, delaying or defrauding any of its other creditors or others; and

(vii)    we shall have delivered to the Trustee an officers' certificate and opinion of counsel stating that all conditions precedent provided for or relating to the Legal Defeasance or the Covenant Defeasance relating to the Notes have been complied with.

## Satisfaction and Discharge

The indenture will be discharged and will cease to be of further effect (except as to surviving rights of registration of transfer or exchange of the Notes and the rights, powers, trust, duties and immunities of the Trustee, and our obligations in connection therewith, as expressly provided for in the indenture) as to all outstanding Notes when:

(1)    either:

    (a)    all the Notes, theretofore authenticated and delivered (except lost, stolen or destroyed Notes which have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Issuers and thereafter repaid to the Issuers or discharged from such trust) have been delivered to the Trustee for cancellation; or

    (b)    all Notes not theretofore delivered to the Trustee for cancellation have become due and payable or, within one year will become due and payable or subject to redemption as set forth above under the heading "—Optional Redemption" and the Issuers have irrevocably deposited or caused to be deposited with the Trustee funds in an amount sufficient to pay and discharge the entire Indebtedness on the Notes not theretofore delivered to the Trustee for cancellation, for principal of, premium, if any, and interest on the Notes to the date of deposit together with irrevocable instructions from the Issuers directing the Trustee to apply such funds to the payment thereof at maturity or redemption, as the case may be;

(2)    the Issuers have paid all other sums payable under the indenture by the Issuers; and

(3)    the Issuer has delivered to the Trustee an officers' certificate and an opinion of counsel stating that all conditions precedent under the Indenture relating to the satisfaction and discharge of the Indenture have been complied with; *provided*, *however*, that such counsel may rely, as to matters of fact, on a certificate or certificates of officers of the Issuer.

## Amendment, Supplement and Waiver

Except as provided in the next paragraph, the indenture and the Notes issued thereunder may be amended or supplemented with the written consent of the holders of at least a majority of the aggregate principal amount of Notes then outstanding (including consents obtained in connection with an exchange offer or tender offer for the Notes), and any existing Default and its consequences or compliance with any provision of the indenture or the Notes may be waived with the consent of the holders of a majority of the aggregate principal amount of Notes then outstanding (including consents obtained in connection with an exchange offer or tender offer for the Notes).

Without the consent of each holder affected, however, an amendment or waiver may not (with respect to any Note held by a non-consenting holder):

    (a)    reduce the aggregate principal amount of Notes whose holders must consent to an amendment, supplement or waiver;

    (b)    reduce the principal of or change the fixed maturity of any note or alter the provisions with respect to the redemption of the Notes (other than as provided in clause (h) below);

    (c)    reduce the rate of or change the time for payment of interest on any Notes;

    (d)    waive a Default or Event of Default in the payment of principal of or premium, if any, or interest on the Notes (except a rescission of acceleration of the Notes by the holders of at least a majority in aggregate principal amount of the Notes and a waiver of the payment default that resulted from such acceleration);

    (e)    make any Note payable in money other than that stated in the Notes;

(f)     make any change in the provisions of the indenture relating to waivers of past Defaults or the rights of holders of Notes to receive payments of principal of or interest on the Notes;

(g)     waive a redemption payment or mandatory redemption with respect to any Note (other than as provided in clause (h) below);

(h)     amend, change or modify in any material respect the obligation of the Issuers to make and consummate a Change of Control Offer in the event of a Change of Control after such Change of Control has occurred;

(i)     release all or substantially all of the Guarantees of the Guarantors other than in accordance with "—Guarantees" above;

(j)     make any change in the foregoing amendment and waiver provisions.

Notwithstanding the foregoing, without the consent of any holder of Notes, the Issuers, the Guarantors and the Trustee may amend or supplement the indenture or the Notes or the Guarantees to cure any ambiguity, defect or inconsistency (as determined by the Issuers in good faith), to provide for uncertificated Notes or Guarantees in addition to or in place of certificated Notes or Guarantees (*provided* that the uncertificated notes are issued in registered form for purposes of Section 163(f) of the Code, or in a manner such that the uncertificated notes are described in Section 163(f)(2)(B) of the Code), to provide for the assumption of the obligations of either or both Issuers or any Guarantor to holders of the Notes in the case of a merger, consolidation or sale of all or substantially all of our assets or such Guarantor's assets, to make any change that would provide any additional rights or benefits to the holders of Notes or that does not adversely affect the rights under the indenture of any such holder in any material respect, to provide for the issuance of additional Notes in accordance with the provisions set forth in the indenture, to evidence and provide for the acceptance of an appointment of a successor trustee, to comply with the rules of any applicable securities, depository, to add Guarantees with respect to the Notes, or to conform the indenture or the Notes to this "Description of notes.".

Our obligations in respect of Change of Control Offer can be modified with the consent of the holders of a majority in aggregate principal amount of the Notes then outstanding at any time prior to the occurrence of a Change of Control. The consent of the noteholders is not necessary under the indenture to approve the particular form of any proposed amendment. It is sufficient if such consent approves the substance of the proposed amendment.

## Concerning the Trustee

The indenture will contain certain limitations on the rights of the Trustee, if the Trustee becomes a creditor of us or our Subsidiaries, to obtain payment of claims in certain cases, or to realize on certain property received in respect of any such claim as security or otherwise. The Trustee will be permitted to engage in other transactions with the Issuer and its Subsidiaries; however, if the Trustee acquires any conflicting interest, it must eliminate such conflict within 90 days, apply to the Commission for permission to continue as Trustee or resign.

With respect to the Notes, the holders of a majority in principal amount of the then outstanding Notes will have the right to direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee, subject to certain exceptions. The indenture will provide that in case an Event of Default shall occur (which shall not be cured), the Trustee will be required, in the exercise of its power, to use the degree of care of a prudent person in the conduct of his or her own affairs. The Trustee will not be relieved from liabilities for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(i)     this sentence shall not limit the preceding sentence of this paragraph;

(ii)    the Trustee shall not be liable for any error of judgment made in good faith, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(iii)   the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to the first sentence of this paragraph.

Subject to such provisions, the Trustee will be under no obligation to exercise any of its rights or powers under the indenture at the request of any holder of Notes, unless such holder shall have offered to the Trustee security and indemnity satisfactory to it against any loss, liability or expense.

## Certain Definitions

Set forth below are certain defined terms used in the indenture. Reference is made to the indenture for a full disclosure of all such terms, as well as any other capitalized terms used herein for which no definition is provided.

EXHIBIT O(2)

AOE0730

"**Acquired Debt**" means, with respect to any specified Person, Indebtedness of any other Person existing at the time such other Person merges with or into or becomes a Subsidiary of such specified Person or is a Subsidiary of such other Person at the time of such merger or acquisition, or Indebtedness incurred by such Person in connection with the acquisition of assets.

"**Affiliate**" means, with respect to any Person, (a) each Person that, directly or indirectly, owns or controls, whether beneficially or as a trustee, guardian or other fiduciary, five percent (5%) or more of any class of Capital Stock of such Person (including such Person's estate, heirs, family members, spouse, or domestic partner and any of such Person's Controlled Entities or the Controlled Entities of such heirs, family members, spouse or domestic partner), (b) each Person that controls, is controlled by or is under common control with such Person or any Affiliate of such Person or (c) each of such Person's officers or directors. For the purpose of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by," and "under common control with") of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of its management or policies, whether through the ownership of voting securities, by contract or otherwise. For the purpose of this definition a "Controlled Entity" shall mean a trust, partnership, corporation or limited liability company of which a Person or one or more of his or her heirs, family members, spouse or domestic partner is (A) in the case of a trust, the beneficiary, trustor or trustee; (B) in the case of a partnership, the general partner or the partner with decision-making authority over major decisions; (C) in the case of a limited liability company, the managing member or the member with decision-making authority over major decisions; and (D) in the case of a corporation, the majority shareholder, in each case with decision-making authority over major decisions of such Controlled Entity.

"**Asset Acquisition**" means (1) an Investment by the Issuer or any Restricted Subsidiary of the Issuer in any other Person pursuant to which such Person shall become a Restricted Subsidiary of the Issuer or any Restricted Subsidiary of the Issuer, or shall be merged with or into the Issuer or any Restricted Subsidiary of the Issuer, or (2) the acquisition by the Issuer or any Restricted Subsidiary of the Issuer of the assets of any Person (other than a Restricted Subsidiary of the Issuer) which constitute all or substantially all of the assets of such Person or comprise any division or line of business of such Person.

"**Asset Sale**" means a sale, lease or sub-lease (as lessor or sublessor), sale and lease-back, assignment, conveyance, exclusive license (as licensor or sublicensor), transfer or other disposition to, or any exchange of property with (each, a "disposition"), any Person in one transaction or a series of related transactions, of all or any part of Holdings, the Issuer's any Restricted Subsidiary's assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, leased or licensed, including the Capital Stock of any Restricted Subsidiary. For purposes of this definition, the term "Asset Sale" shall not include:

(a) dispositions of inventory or goods in the ordinary course of business

(b) transfers of assets of the Issuer (including Equity Interests) that are governed by, and made in accordance with, the first paragraph of the covenant described under "—Certain Covenants—Merger, Consolidation or Sale of Assets";

(c) Permitted Investments and Restricted Payments not prohibited under the covenant described under "—Certain Covenants—Limitation on Restricted Payments";

(d) the creation of or realization on any Lien not prohibited under the indenture;

(e) dispositions of worn-out, obsolete or surplus property and property no longer used or useful in the Business;

(f) dispositions of assets that are made subject to a Capital Lease or Purchase Money Indebtedness within one hundred eighty (180) days after the acquisition, construction, lease or improvement of the asset financed;

(g) any transfer or series of related transfers that, but for this clause, would be Asset Sales, if the aggregate Fair Market Value of the assets transferred in such transaction or series of related transactions does not exceed $20.0 million;

(h) dispositions of cash or Cash Equivalents (or Investments that were cash or Cash Equivalents when made);

(i) dispositions of equipment or Real Estate Assets to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the net cash proceeds of such disposition are applied within one hundred eighty (180) days of the receipt thereof to the purchase price of replacement property;

(j) dispositions or discounts by the Issuer or any Subsidiary of accounts, receivables or notes receivable in connection with the collection or compromise thereof, including supplier financing arrangements without recourse to the Issuer or any Subsidiary that accelerate collection of receivables from clients or customers;

(k) (i) licenses or sub-licenses of Intellectual Property in the ordinary course of business and consistent with past practices, and (ii) the abandonment or other disposition of Intellectual Property that is, in the reasonable good faith judgment of the Issuer, no longer economically practicable to maintain or be used in the conduct of the business of the Issuer and the Guarantors;

(l) (i) any loss or destruction of or damage to any property or asset or receipt of insurance proceeds in connection therewith or (ii) any institution of a proceeding for, or actual condemnation, seizure or taking by exercise of the power of eminent

EXHIBIT O(2)

AOE0731

domain or otherwise of such property or asset, or confiscation of such property or asset or the requisition of the use of such property or asset or settlement in lieu of the foregoing;

(m)   leases, subleases, licenses or sub-licenses of real property or personal property (other than Intellectual Property) in the ordinary course of business;

(n)   dispositions of any business, asset or property between or among the Issuer and the Subsidiaries; provided that any such disposition outside the ordinary course of business (A) by any Subsidiary that is not a Guarantor Subsidiary to the Issuers or to another Guarantor Subsidiary or (B) by the Issuers or any Guarantor Subsidiary to a Subsidiary that is not a Guarantor Subsidiary is, in each case, on terms that are, taken as a whole, at least as favorable to the Issuers or such Guarantor Subsidiary, as the case may be, as the terms of an arm's length disposition of such business, asset or property, taken as a whole, between unaffiliated Persons; provided, further, that any such disposition as described in clause (B) shall not be permitted unless treated as a Permitted Investment;

(o)   dispositions of real property and related assets in connection with relocation of Executive Officers or employees of the Issuer or any Subsidiary;

(p)   unwinding of Rate Contracts;

(q)   issuance of Capital Stock by a Subsidiary to the Issuers or any other Subsidiary;

(r)   the issuance of directors' qualifying shares and shares of Capital Stock of Foreign Subsidiaries issued to foreign nationals as required by applicable Law; and

(s)   sales or licenses of Product in the ordinary course or business; and

(t)   the sale of any property in a sale leaseback transaction within six months of the acquisition of such property.

"**Bank Products**" means all facilities or services related to (a) cash management and related services, including automated clearinghouse of funds, treasury, depository, overdraft, electronic funds transfer, cash pooling, controlled disbursements and other cash management arrangements, (b) commercial credit card and merchant card services, credit or debit cards, stored value cards and purchase cards and the processing of related sales or receipts and (c) E-payables and comparable services.

"**Board of Directors**" means:

(1)   with respect to a corporation, the board of directors of the corporation or, except in the context of the definition of "Change of Control," a duly authorized committee thereof;

(2)   with respect to a partnership, the Board of Directors of the general partner of the partnership; and

(3)   with respect to any other Person, the board or committee of such Person serving a similar function.

"**Business**" means, at any time, a collective reference to (a) the business activities engaged in or proposed to be engaged in by the Issuer and the Subsidiaries on the Original Issue Date, after giving effect to the February 2020 Transactions, (b) all business activities that are similar, ancillary, incidental, complementary or related to the business activities identified in clause (a), and (c) all business activities that are a reasonable or logical extensions of the business activities identified in clauses (a) and (b).

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP as in effect as of December 31, 2018, is or should be accounted for as a capital lease on the balance sheet of that Person; provided that for all purposes hereunder the amount of obligations under any Capital Lease shall be the amount thereof accounted for as a liability in accordance with Accounting Standards Codification 840 (regardless of whether or not then in effect) and without giving effect to Accounting Standards Codification 842 requiring operating leases to be recharacterized or treated as capital leases.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing; provided that no Indebtedness of the Issuers will constitute Capital Stock by virtue of being convertible or exchangeable into Capital Stock prior to such conversion or exchange.

"**Cash Equivalents**" means, as at any date of determination:

(a)   United States dollars or such local currencies held by the Issuer and its Subsidiaries from time to time in the ordinary course of business;

(b)   marketable securities (i) issued or directly and unconditionally guaranteed or insured as to interest and principal by the United States Government or a member state of the European Union, Iceland, Liechtenstein or Norway or (ii) issued by

any agency or instrumentality of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one year after such date;

(c) marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision of any such state, commonwealth or territory or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's;

(d) commercial paper maturing no more than one year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency);

(e) certificates of deposit, time deposits or bankers' acceptances maturing within one year after such date and issued or accepted by any commercial bank organized under the laws of the United States, any State or Commonwealth thereof or the District of Columbia that (i) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (ii) has Tier 1 capital (as defined in such regulations) of not less than $250,000,000;

(f) marketable short-term money market and similar highly liquid funds having a rating of at least P-1 or A-1 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency); and

(g) investment funds investing substantially all of their assets in securities of the types described in clauses (a) through (f) above; and

(h) in the case of Investments by any Foreign Subsidiary or Investments made in a jurisdiction outside the United States, Cash Equivalents shall also include (i) investments of the type and maturity described in clauses (a) through (g) above of foreign obligors, which Investments or obligors (or the parents of such obligors) have ratings described in such clauses or equivalent ratings from comparable foreign rating agencies and (ii) other short-term investments in accordance with normal investment practices for cash management in investments analogous to the foregoing investments in clauses (a) through (g) and in this definition.

"**Casualty Event**" means any event that gives rise to the receipt by Holdings, the Issuer or any Restricted Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property.

"**Change of Control**" means an event or series of events by which:

(a) (i) at any time prior to consummation of a Qualifying IPO, Permitted Holders cease to beneficially own and control, directly or indirectly, on a fully-diluted basis more than 50% of the voting power represented by the issued and outstanding Equity Interests of the Issuer, or (ii) at any time after consummation of a Qualifying IPO, any Person or "group" (within the meaning of the Exchange Act and the rules of the Commission thereunder as in effect on the date of the indenture) (but excluding (x) any employee benefit plan of Holdings, the Issuer and the Subsidiaries and any Parent of Holdings or the Issuer and (y) any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) other than the Permitted Holders acquires beneficial ownership of 50% or more on a fully diluted basis of the voting power represented by the issued and outstanding Equity Interests of the Issuer;

(b) Holdings ceases to beneficially own and control, directly or indirectly, 100% on a fully diluted basis of the economic and voting interest in the Equity Interests of the Issuer;

(c) the sale, lease or transfer, in one or a series of related transactions, of all or substantially all of the assets of Holdings and its Subsidiaries or the Issuer and its Subsidiaries, in each case, taken as a whole, to any Person that is not Holdings, the Issuer or a Guarantor;

(d) after a Qualifying IPO, occupation of a majority of the seats (other than vacant seats) on the board of directors of Holdings or the Issuer by Persons who were neither (i) nominated by the board of directors of the Issuer nor (ii) appointed or approved by the directors so nominated; or

(e) there shall be consummated any share exchange, consolidation or merger of the Issuer pursuant to which the Issuer's Equity Interests entitled to vote in the election of the Board of Directors of the Issuer generally would be converted into cash, securities or other property, or the Issuer sells, assigns, conveys, transfers, leases or otherwise disposes of all or substantially all of its assets, in each case other than pursuant to a share exchange, consolidation or merger of the Issuer in which the holders of the Issuer's Equity Interests entitled to vote in the election of the Board of Directors of the Issuer generally immediately prior to the share exchange, consolidation or merger have, directly or indirectly, at least a majority of the total voting power in the aggregate of all classes of Equity Interests of the continuing or surviving entity entitled to vote in the election of the Board of Directors of such Person generally immediately after the share exchange, consolidation or merger;

EXHIBIT O(2)

AOE0733

Notwithstanding the foregoing, a transaction will not be deemed to involve a Change of Control if (1) the Issuer becomes a direct or indirect wholly-owned Subsidiary (the "Sub Entity") of a holding company and (2) holders of securities that represented 100% of the voting power of the Equity Interests of the Issuer immediately prior to such transaction (or other securities into which such securities are converted as part of such merger or consolidation transaction), other than holders receiving solely cash in lieu of fractional shares, own directly or indirectly at least a majority of the voting power of the Equity Interests of such holding company (and no Person or group owns, directly or indirectly, a majority of the voting power of the Equity Interests of such holding company); *provided* that, upon the consummation of any such transaction, "Change of Control" shall thereafter include any Change of Control of any direct or indirect parent of the Sub Entity.

"**Consolidated Adjusted EBITDA**" means, for any Measurement Period, an amount determined for the Issuer and its Restricted Subsidiaries on a consolidated basis and without duplication equal to:

(a) Consolidated Net Income for such period, plus

(b) the sum of, in each case (other than subclauses (x) and (xii) below) to the extent deducted (and not added back or excluded) in the calculation of Consolidated Net Income, but without duplication:

(i) Consolidated Interest Expense for such period;

(ii) consolidated tax expense for such Measurement Period based on income, profits or capital, including without limitation federal, state, franchise, capital and similar taxes and withholding taxes (including foreign withholding) paid or accrued during such period and including such penalties and related interest related to such or arising from any tax examinations;

(iii) amounts attributable to depreciation and amortization expense for such Measurement Period but, in any event, excluding amortization of television library, amortization of television production costs and film rights and amortization of programming rights;

(iv) non-cash charges or expenses reducing Consolidated Net Income for such Measurement Period including impairment charges or other asset write-offs, losses recorded from investments using the equity or cost methods, stock-based awards and compensation expense including charges arising from grants of stock appreciation rights, stock options, restricted stock, or other equity programs (provided, in connection with any non-cash charge or expense that is an accrual of a reserve for a cash expenditure or payment required to be made, or anticipated to be made, in a future period, (1) the Issuer may determine not to add back such non-cash charge or expense in the current Measurement Period and (2) to the extent the Issuer decides to add back such non-cash charge or expense, the cash payment in respect thereof in such future period will be subtracted from Consolidated Adjusted EBITDA to such extent);

(v) costs, fees and expenses associated with the February 2020 Transactions;

(vi) costs, fees, charges and expenses arising in connection with any acquisition, Investment, disposition, incurrence or repayment of Indebtedness (including a refinancing, amendment or other modification thereof) and/or equity offering (including any Qualifying IPO), in each case whether or not consummated and any amendment or modification to the terms of any such transactions (including such costs, fees, charges and expenses reimbursed or actually paid by a Person that is not the Issuer or a Restricted Subsidiary or covered by indemnification or reimbursement provisions);

(vii) restructuring, integration, transition or similar charges, expenses or reserves (including relocation and severance costs), whether or not classified as restructuring charges or expenses under GAAP (including restructuring costs related to acquisitions and closure or, consolidation, or relocation of branches, facilities or locations, any lease termination settlements (or remaining rental expense until the end of the applicable lease term), and any expense related to any reconstruction, recommissioning or reconfiguration of fixed assets for alternate use), costs incurred in connection with any non-recurring strategic initiatives, other business optimization initiatives (including costs and expenses relating to business optimization programs and new systems design and implementation costs), project start-up costs and restructuring charges or reserves;

(viii) extraordinary, unusual or non-recurring costs, fees, charges and other expenses, including severance costs and expenses (including such fees, charges and expenses incurred by the Issuer or any Subsidiary that are reimbursed or actually paid by a Person that is not the Issuer or a Subsidiary or covered by indemnification or reimbursement provisions);

(ix) expenses, losses (including lost revenues) or charges incurred during such period in connection with Casualty Events to the extent that any such amount is covered by business interruption or other insurance and which either has been reimbursed or as to which the Issuer has made a determination that there exists reasonable evidence that such amount will be reimbursed by the insurer and only to the extent that such amount is (a) not denied by the applicable insurance carrier in writing and (b) in fact

120

EXHIBIT O(2)

AOE0734

reimbursed within one hundred eighty (180) days of the date of such determination (with a deduction for any amount so added back to the extent not so reimbursed within one hundred eighty (180) days);

(x) expenses, charges and losses due to the effects of purchase accounting, as set forth in the Statement of Financial Accounting Standards 141(R), Business Combinations;

(xi) the amount of any expenses paid on behalf of any member of the board of directors or reimbursable to such member of the board of directors;

(xii) costs or expenses incurred by the Issuer or any Restricted Subsidiary pursuant to an equity-based compensation plan, profits interest or stock option plan or any other management or employee benefit plan or arrangement or any stock subscription or shareholder plan;

(xiii) any minority interest expense;

(xiv) cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Consolidated Net Income in any period to the extent non-cash gains relating to such income were deducted in the calculation of Consolidated Adjusted EBITDA pursuant to clause (c)(ii) of this definition for any previous period;

(xv) in connection with acquisitions of Foreign Subsidiaries, expenses recognized on conversion from IFRS to GAAP for items capitalized under IFRS but expensed under GAAP;

(xvi) costs relating to compliance with the Sarbanes-Oxley Act of 2002, as amended, and other expenses arising out of or incidental to the status of the Issuer as a reporting company, including costs, fees and expenses relating to compliance with provisions of the Securities Act and the Exchange Act and the rules of national securities exchange companies with listed equity securities;

(xvii) the amount of "run-rate" cost savings, operating expense reductions and synergies projected by the Issuer in good faith to result from (A) actions taken, (B) actions relating to any acquisition, disposition or operational change committed to be taken or expected to be taken no later than 12 months after such acquisition, disposition or operational change and (C) actions relating to the February 2020 Transactions and acquisitions that occurred prior to the Original Issue Date reasonably expected to be taken no later than 12 months after the Original Issue Date, in each case, which cost savings, operating expense reductions and synergies will be determined by the Issuer in good faith and calculated on a pro forma basis as though such cost savings, operating expense reductions and synergies had been realized on the first day of the Measurement Period for which Consolidated Adjusted EBITDA is being determined; and

(xviii) costs, fees and expenses associated with the acquisition of the Weather Channel and related corporate entities; _minus_

(c) the sum of, in each case to the extent included in the calculation of Consolidated Net Income, but without duplication:

(i) extraordinary, unusual or non-recurring cash gains of such Person for such Measurement Period increasing Consolidated Net Income; and

(ii) all non-cash gains or income items of such Person for such Measurement Period increasing Consolidated Net Income, including gains on cancellation of debt purchased at less than par (in each case of or by the Issuer and the Restricted Subsidiaries for such period), other than the accrual of revenue in the ordinary course and excluding any such items which represent the reversal in such Measurement Period of any accrual of, or cash reserve for, anticipated cash charges in any prior period to the extent such amount was deducted in determining Consolidated Adjusted EBITDA for such prior period. To the extent the determination of Consolidated Adjusted EBITDA of any other Person is required in connection with any transaction or pro forma calculations with respect thereto, the Issuer shall determine the Consolidated Adjusted EBITDA of such Person in a manner consistent with this definition but substituting such other Person and its Subsidiaries therein;

_provided_ that the amounts included in Consolidated Adjusted EBITDA for any Measurement Period pursuant to subclause (b)(xvii) above, when aggregated with any adjustments pursuant to clause (b) of the definition of "pro forma", will not exceed 20.0% of Consolidated Adjusted EBITDA for such Measurement Period (prior to giving effect to amounts added-back pursuant to such subclause, except in connection with (i) actions or activities taken in connection with the February 2020 Transactions and (ii) actions related to acquisitions that were consummated or with respect to which definitive documentation was executed on or prior to the Original Issue Date);

EXHIBIT O(2)

AOE0735

*provided further* that (i) the amounts included in Consolidated Adjusted EBITDA for any Measurement Period pursuant to subclause (b)(vii) above will not exceed $10.0 million for such Measurement Period, (ii) the amounts included in Consolidated Adjusted EBITDA for any Measurement Period pursuant to subclause (b)(viii) above will not exceed $20.0 million for such Measurement Period and (iii) the aggregate amounts included in Consolidated Adjusted EBITDA in connection with the Gray and Other Acquisitions for all Measurement Periods pursuant to clause (b) of the definition of "pro forma" and subclauses (b)(vi), (vii), (viii) and (xvii) shall not exceed $3.6 million.

To the extent the determination of Consolidated Adjusted EBITDA of any other Person is required in connection with any transaction or pro forma calculations with respect thereto, the Issuer shall determine the Consolidated Adjusted EBITDA of such Person in a manner consistent with this definition but substituting such other Person and its Subsidiaries therein.

"**Consolidated Fixed Charge Coverage Ratio**" means, as of any date, the ratio of (a) Consolidated Adjusted EBITDA during the most recently ended four full fiscal quarters (the "Measurement Period") ending prior to the date of the transaction giving rise to the need to calculate the Consolidated Fixed Charge Coverage Ratio for which financial statements are available to (b) Consolidated Fixed Charges for the most recently ended Measurement Period.

"**Consolidated Fixed Charges**" means, for any Measurement Period an amount determined for the Issuer and the Restricted Subsidiaries on a consolidated basis and without duplication equal to:

(a)     Consolidated Interest Expense of the Issuer and the Restricted Subsidiaries to the extent paid in cash for such Measurement Period, plus

(b)     the provision for income taxes made in cash by the Issuer and its Restricted Subsidiaries on a consolidated basis in respect of such Measurement Period, plus

(c)     scheduled payments made in cash during such Measurement Period on account of principal of Funded Debt of the Issuer and its Restricted Subsidiaries (including scheduled principal payments in respect of the term loans under the Credit Agreement).

"**Consolidated Interest Expense**" means, with respect to the Issuer and the Restricted Subsidiaries for any Measurement Period, the total consolidated interest expense for such Measurement Period determined on a consolidated basis in accordance with GAAP, *plus*, without duplication:

(a) imputed interest on Capital Leases for such Measurement Period;

(b) commissions, discounts and other fees, charges and expenses owed with respect to letters of credit securing financial obligations and bankers' acceptance financing for such Measurement Period;

(c) amortization of debt issuance costs, debt discount, or premium and other debt or equity financing fees and expenses incurred for such Measurement Period including net costs under Hedging Obligations or other derivative instruments entered into for the purpose of hedging interest rate risk and any commitment fees payable thereunder;

(d) cash contributions to any employee stock ownership plan or similar trust made to the extent such contributions are used by such plan or trust to pay interest or fees to any Person (other than the Issuer or any Wholly-owned Subsidiary) in connection with Indebtedness incurred by such plan or trust for such Measurement Period;

(e) the interest portion of any deferred payment obligations for such Measurement Period; and

(f) all interest on any Indebtedness that is (i) Indebtedness of others secured by any Lien on property owned or acquired by the Issuer or any Restricted Subsidiary, whether or not the obligations secured thereby have been assumed, but limited to the fair market value of such property or (ii) contingent obligations in respect of Indebtedness of the Issuer or any Restricted Subsidiary;

*provided* that Consolidated Interest Expense shall be calculated after giving effect to Hedging Obligations related to interest rates (including associated costs), but excluding unrealized gains and losses with respect to such Hedging Obligations; *provided, further*, that when determining Consolidated Interest Expense in respect of any Measurement Period ending prior to the first anniversary of the Original Issue Date, Consolidated Interest Expense will be calculated by multiplying the aggregate Consolidated Interest Expense accrued since the Original Issue Date by 365 and then dividing such product by the number of days from and including the Original Issue Date to and including the last day of such Measurement Period. For purposes of this definition, interest on Capital Leases will be deemed to accrue at the interest rate reasonably determined by an Authorized Officer of the Issuer to be the rate of interest implicit in such Capital Lease in accordance with GAAP as in effect on the Original Issue Date.

EXHIBIT O(2)

AOE0736

To the extent the determination of Consolidated Interest Expense of any other Person is required in connection with any transaction or pro forma calculations with respect thereto, the Issuer shall determine the Consolidated Interest Expense of such Person in a manner consistent with this definition but substituting such other Person and its Subsidiaries therein.

"**Consolidated Net Income**" means, for any Measurement Period an amount determined for the Issuer and the Restricted Subsidiaries on a consolidated basis and without duplication equal to:

(a) the net income (or loss) of the Issuer and the Restricted Subsidiaries on a consolidated basis for such Measurement Period taken as a single accounting period determined in conformity with GAAP, plus

(b) the income (or loss) of any joint venture or Unrestricted Subsidiary of the Issuer or any Restricted Subsidiary, solely, in the case of any income, to the extent of the amount of dividends or other distributions actually paid in cash to the Issuer or any Restricted Subsidiary by such joint venture or Unrestricted Subsidiary during such Measurement Period, minus

(c) to the extent included in clause (a) above, an amount equal to the sum of (without duplication):

(i) with respect to any Person that is not a wholly-owned Subsidiary of the Issuer but whose net income is consolidated in whole or in part with the net income of the Issuer, the income (or loss) of such Person solely to the extent attributable to that portion of the Capital Stock in such Person that is not owned, directly or indirectly, by the Issuer during such Measurement Period; *provided*, the Issuer's equity in the net income in such Person will be included in Consolidated Net Income up to the amount of dividends, distributions or other payments in respect of such equity that are paid in cash (or to the extent converted into cash) by such Person to the Issuer or any Subsidiary (and the Issuer's equity in the net loss of such Person shall be included to the extent of the aggregate Investment of the Issuer or any Subsidiary in such Person);

(ii) with respect to any Person that is not a wholly-owned Subsidiary of the Issuer but whose net income is consolidated in whole or in part with the net income of the Issuer, the income of such Person solely to the extent that the declaration or payment of dividends or similar distributions by such Person of that income is not permitted by operation of the terms of its organizational documents or any agreement, instrument or requirement of Law applicable to such Person during such Measurement Period; *provided* that Consolidated Net Income shall be increased by the amount of dividends or distributions or other payments that are actually paid by such Person to the Issuer or any Subsidiary in respect of such Measurement Period;

(iii) the income (or loss) of any Person accrued prior to the date (x) such Person becomes a Subsidiary of the Issuer or is merged into or consolidated with the Issuer or any Subsidiary or (y) such Person's assets are acquired by the Issuer or any Subsidiary;

(iv) any after-tax gains or losses attributable to non-ordinary course dispositions of property;

(v) earnings (or losses), including any non-cash impairment charge, resulting from any reappraisal, revaluation or write-up (or write-down) of assets during such Measurement Period;

(vi) (A) unrealized gains and losses with respect to Hedging Obligations for such Measurement Period and the application of Accounting Standards Codification 815 (Derivatives and Hedging) and (B) any after-tax effect of income (or losses) for such Measurement Period that result from the early extinguishment of (x) Indebtedness, (y) obligations under any Hedging Obligations or (z) other derivative instruments;

(vii) gains and losses due solely to fluctuations in currency values and the related tax effects determined in accordance with GAAP for such Measurement Period; and

(viii) the effects of adjustments (including the effects of such adjustments pushed down to such Person and its Subsidiaries) in the inventory, property and equipment, software, goodwill, other intangible assets, in-process research and development, deferred revenue, debt and unfavorable or favorable lease line items in such Person's consolidated financial statements pursuant to GAAP for such Measurement Period resulting from the application of purchase accounting in relation to the February 2020 Transactions or any acquisition consummated prior to the Original Issue Date and any acquisition or other Investment or the amortization or write-off of any amounts thereof, net of taxes, for such Measurement Period.

To the extent the determination of Consolidated Net Income of any other Person is required in connection with any transaction or pro forma calculations with respect thereto, the Issuer shall determine the Consolidated Net Income of such Person in a manner consistent with this definition but substituting such other Person therein.

"**Consolidated Total Debt**" means, as at any date of determination, the aggregate principal amount of all Indebtedness of the Issuer and the Restricted Subsidiaries referred to in the following clauses of the definition of "Indebtedness": clauses (a) (including,

for the avoidance of doubt, any Purchase Money Indebtedness), (b), (c), (e) (but only to the extent that any letter of credit has been drawn and not reimbursed) and (h) (to the extent relating to Indebtedness of the type described in clauses (a), (b), (c), and (e) of the definition thereof), in each case determined on a consolidated basis in accordance with GAAP; provided that Consolidated Total Debt shall not include (x) Indebtedness in respect of obligations under Rate Contracts, (y) any Indebtedness owed exclusively among the Issuers and the Guarantors and (z) any Indebtedness of any Unrestricted Subsidiary.

"**continuing**" means, with respect to any Default or Event of Default, that such Default or Event of Default has not been cured or waived.

"**Credit Agreement**" means that certain Credit and Guaranty Agreement, dated as of the Original Issue Date, among the Issuer, as borrower, Royal Bank of Canada, as Administrative Agent, Collateral Agent, Swingline Lender and L/C Issuer, the guarantors from time to time party thereto and the lenders from time to time party thereto (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, including any agreement exchanging, extending the maturity of, refinancing, renewing, replacing, substituting or otherwise restructuring, whether in the bank or debt capital markets (or combination thereof) (including increasing the amount of available borrowings thereunder or adding or removing Subsidiaries as borrowers or guarantors thereunder) all or any portion of the Indebtedness under such agreement or facility or any successor or replacement agreement or facility).

"**Credit Facilities**" means one or more credit agreements or debt facilities to which the Issuer and/or one or more of its Restricted Subsidiaries is party from time to time (including without limitation the Credit Agreement), in each case with banks, investment banks, insurance companies, mutual funds or other lenders or institutional investors providing for revolving credit loans, term loans, debt securities, bankers acceptances, receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from such lenders against such receivables) or letters of credit, in each case as such agreements or facilities may be amended (including any amendment and restatement thereof), supplemented or otherwise modified from time to time, including any agreement exchanging, extending the maturity of, refinancing, renewing, replacing, substituting or otherwise restructuring, whether in the bank or debt capital markets (or combination thereof) (including increasing the amount of available borrowings thereunder or adding or removing Subsidiaries as borrowers or guarantors thereunder) all or any portion of the Indebtedness under such agreement or facility or any successor or replacement agreement or facility.

"**Default**" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"**Designated Non-cash Consideration**" means the fair market value of non-cash consideration received by the Issuer or any Restricted Subsidiary in connection with an Asset Sale pursuant to "—Certain Covenants—Limitation on Asset Sales" that is designated as Designated Non-Cash Consideration pursuant to a certificate of an Executive Officer, setting forth the basis of such valuation (which amount will be reduced by the fair market value of the portion of the non-cash consideration converted to cash within one hundred eighty (180) days following the consummation of the applicable Asset Sale).

"**Designated Preferred Stock**" means Preferred Equity Interests of the Issuer (other than Disqualified Stock), that is issued for cash (other than to any of the Issuer's Restricted Subsidiaries or an employee stock plan or trust established by the Issuer or any of its Restricted Subsidiaries) and is so designated as Designated Preferred Stock, pursuant to an officers' certificate, on the date of issuance thereof, the cash proceeds of which are excluded from the calculation set forth in clause (iii) of the first paragraph of the covenant described under "—Certain Covenants—Limitation on Restricted Payments."

"**Disqualified Stock**" means any Capital Stock which, by its terms (or by the terms of any security or other Capital Stock into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely in exchange for Capital Stock that is not otherwise Disqualified Stock), pursuant to a sinking fund obligation or otherwise, (b) is redeemable at the option of the holder thereof (other than solely in exchange for Capital Stock that is not otherwise Disqualified Stock), in whole or in part, (c) provides for the scheduled payment of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Capital Stock that would constitute Disqualified Stock, in each case, prior to the date that is ninety-one (91) days after the date the Notes mature, except, in the case of clauses (a) and (b), if as a result of a change of control or asset sale, so long as any rights of the holders thereof upon the occurrence of such a change of control or asset sale event are subject to the prior payment in full in cash of all Notes; *provided*, if such Capital Stock is issued pursuant to a plan for the benefit of future, current or former employees, directors or officers of the Issuer or any Restricted Subsidiary or by any such plan to such employees, directors or officers, such Capital Stock will not constitute Disqualified Stock solely because Holdings, the Issuer or any Restricted Subsidiary may be required to repurchase such Capital Stock in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's or officer's termination, death or disability.

"**Domestic Restricted Subsidiaries**" shall mean all Restricted Subsidiaries that are Domestic Subsidiaries.

"**Domestic Subsidiary**" shall mean any Subsidiary other than a Foreign Subsidiary.

124

"**Eligible Institution**" means a commercial banking institution that has combined capital and surplus of not less than $500 million or its equivalent in foreign currency, whose debt is rated by at least two nationally recognized statistical rating organizations in one of each such organization's four highest generic rating categories at the time as of which any investment or rollover therein is made.

"**Equity Interests**" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock). For the avoidance of doubt, a debt security that is convertible into, or exchangeable for, any combination of cash and Capital Stock based on the value of such Capital Stock will satisfy the exclusion set forth in the parenthetical to the preceding sentence.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ESMP**" means Entertainment Studios Motion Pictures, LLC.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder, as amended.

"**Executive Officer**" means, as applied to any Person, any individual holding the position of chairman of the board of directors, chief executive officer, president, chief financial officer, chief operating officer, chief compliance officer, chief legal officer and any other executive officer having substantially the same authority and responsibility as any of the foregoing.

"**Existing Indebtedness**" means any Indebtedness (other than the Notes and the Guarantees) of the Issuer and its Restricted Subsidiaries in existence on the Original Issue Date.

"**Fair Market Value**" means the value (which, for the avoidance of doubt, will take into account any liabilities associated with related assets) that would be paid by a willing buyer to an unaffiliated willing seller in an arm's length transaction not involving distress or compulsion of either party, determined in good faith by the Board of Directors of the Issuer (unless otherwise provided in the indenture).

"**February 2020 Offering Memorandum**" means our offering memorandum dated February 6, 2020 related to the offering of the Initial Notes.

"**February 2020 Transactions**" means the transactions described in the February 2020 Offering Memorandum under the caption "Summary—The Transactions" and the issuance of the Initial Notes on February 10, 2020.

"**Foreign Currency Obligations**" means, with respect to any Person, the obligations of such Person pursuant to any foreign exchange contract, currency swap agreement or other similar agreement or arrangement designed to protect the Issuer or any Restricted Subsidiary of the Issuer against fluctuations in currency values.

"**Foreign Subsidiary**" shall mean (i) any Subsidiary that is not incorporated, formed or organized under the laws of the United States of America, any state thereof or the District of Columbia and (ii) any Subsidiary of a Subsidiary described in the foregoing clause (i).

"**Funded Debt**" means all Indebtedness of the Issuer and the Restricted Subsidiaries for borrowed money that matures more than one year from the date of its creation or matures within one year from such date that is renewable or extendable, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including Indebtedness in respect of the term loans under the Credit Agreement.

"**GAAP**" means United States generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession of the United States, which are applicable as of the date of determination; provided that, except as otherwise specifically provided, all calculations made for purposes of determining compliance with the terms of the provisions of the indenture shall utilize GAAP as in effect on the Original Issue Date.

"**Government Securities**" means direct obligations of, or obligations guaranteed or insured by, the United States or any agency or instrumentality thereof for the payment of which guarantee or obligations the full faith and credit of the United States is pledged.

EXHIBIT O(2)

AOE0739

"**Governmental Authority**" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity, officer or examiner exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government in a jurisdiction where the Issuer and the Subsidiaries operate, including any supra-national bodies (such as the European Union or the European Central Bank).

"**guarantee**" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner (including, without limitation, letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness.

"**Guarantee**" means a guarantee by a Guarantor of the Notes.

"**Guarantors**" means Holdings and each of our direct and indirect Domestic Restricted Subsidiaries that guarantee any Credit Facility incurred under clause (2) of the second paragraph under "—Limitation on Incurrence of Indebtedness" or Indebtedness incurred in reliance on the first paragraph (other than under the second proviso thereto) under "—Limitation on Incurrence of Indebtedness."

"**Hedging Obligations**" means, with respect to any Person, the obligations of such Person pursuant to any arrangement with any other Person, whereby, directly or indirectly, such Person is entitled to receive from time to time periodic payments calculated by applying either floating or a fixed rate of interest on a stated notional amount in exchange for periodic payments made by such other Person calculated by applying a fixed or a floating rate of interest on the same notional amount and shall include, without limitation, interest rate swaps, caps, floors, collars and similar agreements designed to protect such Person against fluctuations in interest rates.

"**holder**" means, with respect to any Note, the Person in whose name such Note is registered with the note registrar.

"**Holdings**" means our direct parent company, Allen Media Holdings, LLC.

"**Immaterial Subsidiary**" means on any date, any Subsidiary of the Issuer that has less than 5.0% of consolidated total assets on a Pro Forma Basis and generates less than 5.0% of annual consolidated revenues of Holdings, the Issuer and the Subsidiaries as reflected in the most recent financial statements have been delivered pursuant to the indenture (or, at any time prior to the first date that financial statements have been or are required to be delivered pursuant to the indenture, as reflected in the historical audited financial statements for the Fiscal Year ended December 31, 2018); provided that if, at any time and from time to time after the Original Issue Date, Domestic Subsidiaries that are not Guarantors solely because they meet the thresholds set forth above comprise in the aggregate more than (when taken together with the consolidated total assets of the Subsidiaries of such Domestic Subsidiaries at the last day of the most recent Measurement Period) 5% of consolidated total assets of Holdings, the Issuer and the Subsidiaries as of the end of the most recently ended Measurement Period or more than (when taken together with the revenues of the Subsidiaries of such Domestic Subsidiaries for such Measurement Period) 5% of Holdings, the consolidated revenues of Holdings, the Issuer and the Subsidiaries for such Measurement Period, then the Issuer shall, not later than forty-five (45) days after the date by which financial statements for such Measurement Period were required to be delivered pursuant to the indenture, cause one or more Domestic Subsidiaries to comply with the provisions under "—Certain Covenants—Additional Subsidiary Guarantors" with respect to any such Subsidiaries so that the foregoing condition ceases to be true.

"**Immediate Family Member**" means with respect to any natural Person, such Person's child, stepchild, grandchild or more remote descendant, parent, stepparent, grandparent, spouse, former spouse, qualified domestic partner, sibling, mother-in-law, father-in-law, son-in-law and daughter-in-law (including adoptive relationships) and any trust, partnership or other bona fide estate-planning vehicle the only beneficiaries of which are any of the foregoing Persons or any private foundation or fund that is controlled by any of the foregoing Persons or any donor-advised fund of which any such Person is the donor.

"**Indebtedness**" as applied to any Person, means, without duplication, (a) all indebtedness for borrowed money; (b) all obligations evidenced by bonds, debentures, notes or similar instruments; (c) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP as in effect of the date hereof; (d) any obligation owed for all or any part of the deferred purchase price of property or services, which purchase price is (A) due more than six months from the date of incurrence of the obligation in respect thereof or (B) evidenced by a note or similar written instrument (excluding (i) any such obligations incurred under ERISA, (ii) accounts payable, payroll and other liabilities and accrued expenses incurred in the ordinary course of business that are not overdue by more than one hundred eighty (180) days from the date of incurrence of the obligations in respect thereof and (iii) accruals for payroll and other liabilities in the ordinary course of business); (e) the face amount of any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (f) Disqualified Stock; (g) the direct or indirect guaranty of obligations, of the type in clauses (a) through (f) of this definition, of any other Person; (h) obligations, of the type in clauses (a) through (f) of this definition, that are secured by a Lien on

126

any property or asset owned or held by that Person regardless of whether such obligations are owed by or recourse to such Person; and (i) obligations of such Person in respect of any derivative transaction, including any Rate Contract, whether entered into for hedging or speculative purposes. Notwithstanding the foregoing, for all purposes of the indenture: (1) Indebtedness of any Person will include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included in the calculation of Consolidated Total Debt; (2) with respect to clause (e) above, to the extent any letter of credit issued for the benefit of the Issuer or any Subsidiary (a "Primary LC") is supported (including any "back-to-back" arrangement) by a another letter of credit also issued for the benefit of the Issuer or any Subsidiary (the "Supporting LC"), to the extent that both such Primary LC and the relevant Supporting LC would constitute "Indebtedness" for any purpose under the indenture, then the Primary LC and the relevant Supporting LC shall be deemed to be a single obligation in an amount equal to the amount of Indebtedness attributable to the Primary LC (and any corresponding amount of the Supporting LC that also would then constitute "Indebtedness" will be disregarded); (3) with respect to clause (h) above, the amount of Indebtedness of any Person will be deemed to be equal to the lesser of (x) the aggregate unpaid amount of such Indebtedness and (y) the fair market value (as determined by such Person in good faith) of the property encumbered thereby as determined by such Person in good faith; (4) the amount of any obligation under any Rate Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date; (5) with respect to clause (i) above, in no event will obligations under any Rate Contract be deemed "Indebtedness" for the purpose of calculating any ratio contemplated by the indenture and (6) any Indebtedness incurred pursuant to a Lien permitted under clauses (ll) and (mm) of the definition "Permitted Liens" will not constitute Indebtedness for any purpose.

"**Independent Financial Advisor**" means a Person or entity which, in the judgment of the Board of Directors of the Issuer, is independent and otherwise qualified to perform the task for which it is to be engaged.

"**Investment Grade**" designates a rating of BBB- or higher by S&P or Baa3 or higher by Moody's or the equivalent of such ratings by S&P or Moody's. In the event that the Issuer shall select any other Rating Agency, the equivalent of such ratings by such Rating Agency shall be used.

"**Investments**" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the forms of loans (including guarantees), advances or capital contributions, purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities and all other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP (excluding accounts receivable, deposits and prepaid expenses in the ordinary course of business, endorsements for collection or deposits arising in the ordinary course of business, guarantees and intercompany notes permitted by the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness," and commission, travel and similar advances to officers and employees made in the ordinary course of business). For purposes of the covenant described under "—Certain Covenants—Limitation on Restricted Payments," the sale of Equity Interests of a Person that is a Restricted Subsidiary following which such Person ceases to be a Subsidiary shall be deemed to be an Investment by the Issuer in an amount equal to the Fair Market Value of the Equity Interests of such Person held by the Issuer and its Restricted Subsidiaries immediately following such sale.

"**Intellectual Property**" means all rights, priorities and privileges relating to intellectual property, whether arising under United States, state, multinational or foreign laws or otherwise, including, without limitation: copyrights (including copyrights in software) whether registered or unregistered and all applications therefor, patents and certificates of invention, or similar industrial property rights, and applications therefor, software, trademarks (whether registered or unregistered and applications therefor), goodwill associated with trademarks, service-marks, domain names, technology, know-how and processes, formulas, trade secrets and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"**Lien**" means any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing; provided that in no event shall an operating lease in and of itself be deemed a Lien.

"**LTM Consolidated Adjusted EBITDA**" means, as of any date of determination, the Consolidated Adjusted EBITDA the four consecutive fiscal quarters most recently ended prior to such date for which financial statements have been delivered, on a pro forma basis.

"**Marketable Securities**" means: (a) Government Securities; (b) any certificate of deposit maturing not more than 365 days after the date of acquisition issued by, or time deposit of, an Eligible Institution; (c) commercial paper maturing not more than 365 days after the date of acquisition issued by a corporation (other than an Affiliate of us) with a rating by at least two nationally recognized statistical rating organizations in one of each such organization's four highest generic rating categories at the time as of

EXHIBIT O(2)

AOE0741

which any investment therein is made, issued or offered by an Eligible Institution; (d) any bankers' acceptances or money market deposit accounts issued or offered by an Eligible Institution; and (e) any fund investing exclusively in investments of the types described in clauses (a) through (d) above.

"**Negative Pick-up Obligation**" means, with respect to any item of Product produced by anyone other than Holdings, the Issuer or a Guarantor, a commitment to pay a certain sum of money or to make an Investment customary in the ordinary course of business in order to obtain ownership, distribution rights or sales agency rights in such item of Product.

"**Net Income**" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP.

"**Net Proceeds**" means the aggregate cash proceeds received by us or any of our Restricted Subsidiaries, as the case may be, in respect of any Asset Sale, net of the direct costs relating to such Asset Sale (including, without limitation, legal, accounting and investment banking fees, and sales commissions) and any relocation expenses incurred as a result thereof, taxes paid or payable as a result thereof (estimated reasonably and in good faith by us and after taking into account any available tax credits or deductions and any tax sharing arrangements), amounts required to be applied to the repayment of Indebtedness secured by a Lien on the asset or assets that are the subject of such Asset Sale, any reserve for adjustment in respect of the sale price of such asset or assets and any reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such Asset Sale and retained by us or any of our Restricted Subsidiaries after such Asset Sale, including pension and other post-employment benefit liabilities and liabilities related to environmental matters, or against any indemnification obligations associated with such Asset Sale. Net Proceeds shall exclude any non-cash proceeds received from any Asset Sale, but shall include such proceeds when and as converted by us or any Restricted Subsidiary to cash.

"**New Cash Equity**" means the proceeds of any cash equity contribution by a Permitted Holder on or after the Original Issue Date.

"**Non-Guarantor Subsidiary**" means any Restricted Subsidiary that is not a Guarantor.

"**Obligations**" means any principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness.

"**Original Issue Date**" means February 10, 2020.

"**Parent**" means, with respect to any Person, any other Person of which the first Person is a direct or indirect Subsidiary.

"**Permitted Business**" means the businesses of the Issuer and its Restricted Subsidiaries conducted (or proposed to be conducted) on the Original Issue Date and any business reasonably related, ancillary or complimentary thereto and any reasonable extension or evolution of any of the foregoing.

"**Permitted Holders**" means (i) Byron Allen, (ii) any Permitted Transferee of Byron Allen and (iii) any trust, partnership, corporation or limited liability company for estate planning purposes of which Bryon Allen is (w) in the case of a trust, the sole lifetime beneficiary and either the sole trustor or the sole trustee; (x) in the case of a partnership, the sole general partner or the partner with decision-making authority over all major decisions; (y) in the case of a limited liability company, the sole managing member or the member with decision-making authority over all major decisions and (z) in the case of a corporation, the majority shareholder, in each case with decision-making authority over all major decisions of such entity.

"**Permitted Investments**" means:

(a)   cash and Cash Equivalents; *provided* that any Investment which when made complies with the requirements of the definition of "Cash Equivalents" may continue to be held notwithstanding that such Investment if made thereafter would not comply with such requirements;

(b)   Investments by the Issuer in any Subsidiary and by any Subsidiary in the Issuer or any other Subsidiary; provided that to the extent any Investment is made by the Issuer or any Guarantor in any Non-Guarantor Subsidiary, the aggregate amount of all such Investments made after the Original Issue Date after giving effect to the February 2020 Transactions and in reliance on this clause (b) shall not exceed, together with any Investments made in reliance on the proviso in clause (j) below (in each case determined on a pro forma basis giving effect to the making any such Investment), the greater of (x) $75.0 million and (y) an amount equal to 25.0% of LTM Consolidated Adjusted EBITDA;

(c)   accounts receivable arising and trade credit granted in the ordinary course of business or consistent with past practice;

(d)   Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors or pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of such account debtors;

EXHIBIT O(2)

AOE0742

(e)     deposits, prepayments and other credits to suppliers made in the ordinary course of business;

(f)     capital expenditures in respect of the Issuer and the Subsidiaries in accordance with GAAP (other than any expenditure that involves the acquisition, whether by purchase, merger or otherwise, of all or a material portion of the assets of, all of the Capital Stock of, or a business line or unit or a division of, any Person);

(g)     (i) advances, loans or extensions of credit by the Issuer or any Subsidiary in compliance with applicable laws to officers, directors, and employees of the Issuer or any Subsidiary for reasonable and customary travel, entertainment or relocation, out-of-pocket or other business-related expenses and (ii) loans by the Issuer or any Subsidiary in compliance with applicable laws to officers, directors, and employees of the Issuer or any Subsidiary the proceeds of which are used to pay taxes owed in connection with the vesting of Capital Stock of the Issuer or any Subsidiary and (iii) advances, loans or extensions of credit by the Issuer or any Subsidiary to officers, directors, and employees of the Issuer or any Subsidiary for any other purpose; provided that, at any date of determination, the aggregate amount under clauses (i) and (iii) above does not exceed $15.0 million;

(h)     Investments by the Issuer and the Guarantors in Unrestricted Subsidiaries (i) existing as of the Original Issue Date and (ii) in an aggregate amount not to exceed the greater of (x) $25.0 million and (y) an amount equal to 20.0% of LTM Consolidated Adjusted EBITDA, plus the amount of any cash returns or other cash payments received by the Issuer and the Guarantors with respect to such Investments from such Unrestricted Subsidiaries;

(i)     advances of payroll payments to employees in the ordinary course of business;

(j)     the purchase or other acquisition of property and assets or the business of any Person or of assets constituting a business unit, a line of business or division of such Person, a facility or Capital Stock in a Joint Venture or other Capital Stock in another Person that, upon the consummation thereof, will be a Subsidiary (including as a result of a merger or consolidation) or, in the case of a purchase or acquisition of assets (other than Capital Stock), will be owned by the Issuer and/or any one or more Subsidiaries; provided that (i) no Event of Default has occurred and is continuing, (ii) the Person, assets or division acquired are in a similar business as the Business engaged in by the Issuer and the Subsidiaries on the Original Issue Date, after giving effect to the February 2020 Transactions, or other ancillary or related, or reasonable or logical extensions of, such Business and (iii) to the extent any acquired Person is required to become a Guarantor, the Issuer takes all actions required by the indenture, within the time periods specified thereunder; *provided* that the Issuer and the Guarantors shall not make acquire Persons pursuant to this clause (j) that do not become Guarantors (or pay for the purchase of assets that are acquired directly by Non-Subsidiary Guarantors) for aggregate consideration, together with any Investments made in reliance on the proviso in clause (b) (in each case determined as of the date of making any such Investment), in excess of the greater of (i) $75.0 million and (ii) an amount equal to 25.0% of LTM Consolidated Adjusted EBITDA;

(k)     Investments in existence on the Original Issue Date and any modification, replacement, renewal, reinvestment or extension of any of such Investments; provided that the amount of any Investment permitted pursuant to this clause (k) is not increased from the amount of such Investment on the Original Issue Date except pursuant to the terms of such Investment as of the Original Issue Date or as otherwise permitted by the indenture;

(l)     Investments of any Person that becomes a Subsidiary on or after the Original Issue Date; provided that (i) such Investments exist at the time such Person is acquired and (ii) such Investments are not made in anticipation or contemplation of such Person becoming a Subsidiary (it being understood and agreed that any consideration paid by the Issuer and the Guarantors in connection with an acquisition pursuant to clause (j) above that may be allocable directly or indirectly to Investments in Persons that are not the Issuer or a Guarantor (as determined in good faith by the Issuer at the time of closing such Investment and without taking into account purchase accounting adjustments) must be permitted by clause (iii) of the proviso to clause (j) above);

(m)     Indebtedness permitted under "—Certain Covenants—Limitation on Incurrence of Indebtedness" (other than Indebtedness permitted by clause (4)(x) or clause (17));

(n)     bank deposits in the ordinary course of business;

(o)     Investments made as a result of the receipt of non-cash consideration from a disposition made in compliance with "—Certain Covenants—Merger, Consolidation or Sale of Assets";

(p)     so long as no Event of Default has occurred and is continuing or would result therefrom, Investments made by the Issuer or any Subsidiary in exchange for Capital Stock (other than Disqualified Stock) of the Issuer, in each case to the extent not otherwise used under the indenture or applied to the Restricted Payment Builder Basket;

(q)     Guarantees by (i) the Issuer of obligations of any Subsidiary and (ii) any Subsidiary of obligations of the Issuer or any other Subsidiary, in each case which obligations are permitted by the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness";

(r)     Investments in Hedging Obligations;

(s)     Investments made to effect the February 2020 Transactions;

(t)     Investments (including debt obligations and Capital Stock) (i) received in connection with the bankruptcy, workout, recapitalization or reorganization of, or in settlement of delinquent obligations of, or other disputes with, the issuer of such Investment or an Affiliate thereof, (ii) arising in the ordinary course of business or consistent with past practice or upon the foreclosure with respect to any secured Investment, (iii) received in satisfaction of judgments against any other Person or (iv) as a result of the settlement, compromise or resolutions of litigation, arbitration or other disputes of the Issuer or any Subsidiary with Persons who are not Affiliates;

(u)     Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers consistent with past practices;

(v)     to the extent constituting Investments, purchases and acquisitions of inventory, supplies, materials and equipment or purchases of contract rights or licenses or leases of intellectual property, in each case in the ordinary course of business;

(w)     any Investment consisting of the licensing or contribution of intellectual property pursuant to joint marketing arrangements with other Persons;

(x)     Investments, so long as (i) no Event of Default has occurred and is continuing at such time or would result after giving effect to such Investment and (ii) the Total Net Leverage Ratio on a pro forma basis is less than or equal to 3.75 to 1.00;

(y)     Investments that do not exceed, when taken together with all other Investments made pursuant to this clause (y) at any time outstanding, in the aggregate at any date of determination, the greater of (i) $30.0 million and (ii) an amount equal to 20.0% of LTM Consolidated Adjusted EBITDA;

(z)     any contribution of any Investment in a joint venture or partnership that is not a Restricted Subsidiary to a Person that is not a Restricted Subsidiary in exchange for an Investment in the Person to whom such contribution is made;

(aa)    any Investment in any joint venture engaged in a Permitted Business, including without limitation by contribution of assets of any Restricted Subsidiary, not to exceed $20 million outstanding at any time for Investments made after the Original Issue Date (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(bb)    any Investment acquired after the Original Issue Date as a result of the acquisition by the Issuer or any of its Restricted Subsidiaries of another Person, including by way of a merger, amalgamation or consolidation with or into the Issuer or any of its Restricted Subsidiaries in a transaction that is not prohibited by the indenture after the Original Issue Date to the extent that such Investments were not made in contemplation of such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation; and

(cc)    any Investment solely in exchange for, or made with the proceeds of, the issuance of our Qualified Capital Stock.

"**Permitted Liens**" means:

(a)     Liens securing the Notes and Liens securing any Guarantee;

(b)     Liens securing (x) Indebtedness under any Credit Facility (and related Hedging Obligations and cash management obligations to the extent such Liens arise under the definitive documentation governing such Indebtedness and the incurrence of such obligations is not otherwise prohibited by the indenture) permitted by clause (2) of the second paragraph of the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness" and (y) other Indebtedness permitted under "—Certain Covenants—Limitation on Incurrence of Indebtedness"; *provided* that in the case of any such Indebtedness described in this subclause (y), after giving effect to the incurrence of such Indebtedness and the application of proceeds therefrom and the granting of such Liens, the Secured Net Leverage Ratio does not exceed 3.40 to 1.00 as of the last day of the most recent quarter for which internal financial statements are available on the date such Indebtedness is incurred;

(c)     Liens securing Hedging Obligations permitted to be incurred under the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness" and (ii) cash management obligations not otherwise prohibited by the indenture;

(d)     Liens securing Indebtedness in respect of Capital Leases and Purchase Money Indebtedness, in each case permitted pursuant to clause (6) of the second paragraph of the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness", and permitted Refinancing Indebtedness thereof; *provided* that such Liens do not extend to any assets of us or our Restricted Subsidiaries other than the assets so acquired, constructed, installed or improved, products and proceeds thereof and insurance proceeds with respect thereto;

(e)     Liens granted to (and in favor of) the Issuers or a Guarantor (other than Holdings) to secure intercompany Indebtedness permitted to be incurred under the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness";

(f)     [Reserved];

(g)     Liens on assets acquired, or on assets of a Person that is acquired, securing Indebtedness permitted pursuant to clause (4)(x) or clause (17) under "—Certain Covenants—Limitation on Incurrence of Indebtedness" (provided that such (i) Liens were existing at the time of such acquisition and were not created in anticipation or contemplation of such acquisition and (ii) do not extend to property not subject to such Liens at the time of such acquisition (other than improvements, accessions, proceeds or dividends or distributions in respect thereof and after-acquired property)) and permitted Refinancing Indebtedness thereof;

(h)     Liens solely on any cash earnest money deposits made by the Issuer or any Subsidiary in connection with any letter of intent or purchase agreement permitted hereunder;

(i)     Liens existing on the Original Issue Date;

(j)     (i) Liens of landlords, carriers, warehousemen, mechanics, repairmen, lessors, workmen and materialmen, and other Liens imposed by law (other than any Liens imposed pursuant to Section 430(k) of the Internal Revenue Code or by ERISA), in each case incurred in the ordinary course of business overdue for a period of more than sixty (60) days or, if more than sixty (60) days overdue, are unfiled and no other action has been taken to enforce such Lien or that are being contested in good faith and by appropriate actions, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(k)     Liens for Taxes not yet due or that are being contested in good faith by appropriate proceedings diligently conducted, so long as adequate reserve or other appropriate provision, as may be required pursuant to GAAP, has been made therefor;

(l)     deposits to secure the performance of (i) tenders, bids, trade contracts, governmental contracts, trade contracts, performance and return-of-money bonds and other similar contracts (other than obligations for the payment of Indebtedness for borrowed money) and (ii) leases, subleases, statutory obligations, surety, stay, judgment and appeal bonds, performance bonds and other obligations of a like nature, in each case incurred in the ordinary course of business;

(m)     Liens incurred by the Issuer or any Subsidiary in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security;

(n)     Liens created in the ordinary course of business on deposits to secure liability for premiums to insurance carriers or securing insurance premium financing arrangements;

(o)     (i) Liens that are contractual or common law rights of set-off or rights of pledge relating to (A) the establishment of depository relations in the ordinary course of business with banks or other deposit-taking financial institutions not given in connection with the incurrence of Indebtedness or (B) pooled deposit or sweep accounts of the Issuer or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Issuer and the Subsidiaries, or (C) purchase orders and other agreements entered into with customers of the Issuer or any Subsidiary in the ordinary course of business or consistent with past practice and (ii) Liens securing cash management obligations (that do not constitute Indebtedness) and obligations in respect of Bank Products incurred in the ordinary course of business;

(p)     Liens (i) of a collection bank arising under Section 4-208 or 4-210 of the UCC on the items in the course of collection, (ii) encumbering reasonable customary initial deposits and margin deposits, (iii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business or consistent with past practice and not for speculative purposes and (iv) in favor of a banking or other financial institution arising as a matter of law encumbering deposits or other funds maintained with a financial institution (including the right of set-off) and that are within the general parameters customary in the banking industry;

(q)     possessory Liens in favor of brokers and dealers arising in connection with the acquisition or disposition of Investments owned as of the Original Issue Date and in connection with Investments not otherwise prohibited by the indenture; provided that such Liens (i) attach only to such Investments and (ii) secure only obligations incurred in the ordinary course and arising in connection with the acquisition or disposition of such Investments and not any obligation in connection with margin financing or otherwise;

(r)     survey exceptions, encumbrances, ground leases, easements, encroachments, or reservations of, or rights of others for, licenses, rights-of-way, servitudes, sewers, electric lines, drains, telegraph and telephone, cable television lines and other similar utility lines, gas and oil pipelines and other similar purposes, reservations of rights, or zoning, building codes or other restrictions (including, without limitation, minor defects or irregularities in title and similar encumbrances) as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which do not and will not in the aggregate materially adversely interfere with the ordinary conduct of the business of the Issuer or any Subsidiary;

(s)     Liens not provided for in clauses (a) through (q) above so long as the Notes are secured by the assets subject to such Liens on an equal and ratable basis or on a basis prior to such Liens; *provided* that to the extent that such Lien secured Indebtedness that is subordinated to the Notes, such Lien shall be subordinated to and be later in priority than the Notes on the same basis;

(t)     any zoning or similar land use restrictions or rights reserved to or vested in any governmental office or agency, including without limitation, site plan agreements, development agreements and contractual zoning agreements, to control or regulate the use of any real property;

(u)     Liens in favor of the Issuers or any Guarantor;

(v)     leases, subleases, licenses, sublicenses, occupancy agreements or assignments of or in respect of real or personal property;

(w)     any interest or title of a lessor or sublessor under any lease of real estate permitted hereunder or any Liens on such interest or title that do not affect the Issuer's or applicable Subsidiary's leasehold or subleasehold estate in any Real Estate Asset;

(x)     leases, licenses, subleases or sublicenses granted to others in the ordinary course of business or consistent with past practice (or other agreement under which the Issuer or any Subsidiary has granted rights to end users to access and use the Issuer or any Subsidiary products, technologies, facilities or services) which do not (x) interfere in any material respect with the business of the Issuer and the Subsidiaries, taken as a whole, or (y) secure any Indebtedness;

(y)     non-exclusive outbound licenses or sub-licenses of patents, copyrights, trademarks and other Intellectual Property rights granted by the Issuer or any Subsidiary in the ordinary course of business and any interest or title in connection therewith, which do not interfere in any material respect with the ordinary conduct of business of the Issuer or any Subsidiary;

(z)     Liens arising in connection with conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by the Issuer or any Subsidiary in the ordinary course of business permitted by the indenture, purchase orders and other agreements entered into with customers of the Issuer or any Subsidiary in the ordinary course of business;

(aa)    purported Liens (i) evidenced by the filing of precautionary financing statements relating solely to operating leases of personal property entered into in the ordinary course of business or (ii) arising from equipment or other materials which are not owned by the Issuer or any Subsidiary located on the premises of the Issuer or a Subsidiary (but not in connection with, or as part of, the financing thereof) from time to time in the ordinary course of business and consistent with current practices of the Issuer and the Subsidiaries and precautionary financing statement filings in respect thereof;

(bb)    Liens on cash or Cash Equivalents used to defease or to satisfy and discharge Indebtedness; provided that such defeasance or satisfaction and discharge is not prohibited hereunder;

(cc)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods and Liens on specific items of inventory or other goods and proceeds thereof of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit permitted under "—Certain Covenants—Limitation on Incurrence of Indebtedness" issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods in the ordinary course of business;

(dd)    Liens on Capital Stock in joint ventures securing obligations of such joint venture;

(ee)    judgment Liens not constituting an Event of Default;

(ff)    Liens in favor of guilds or unions (whether pursuant to written security agreements, any producer's or distributor's assumption agreements or otherwise), in each case which are required in the ordinary course of business pursuant to collective bargaining agreements;

(gg)    Liens on assets of Non-Guarantors securing Indebtedness of Non-Guarantor Subsidiaries permitted to be incurred under "—Certain Covenants—Limitation on Incurrence of Indebtedness";

(hh)    Liens securing Indebtedness incurred in connection with an acquisition permitted by clause (j) of the definition of "Permitted Investments" in reliance on clause (17)(i) under "—Certain Covenants—Limitation on Incurrence of Indebtedness", and permitted Refinancing Indebtedness thereof;

(ii)    other Liens securing Indebtedness that is permitted by the terms of the indenture to be outstanding having an aggregate principal amount at any one time outstanding not to exceed the greater of (i) $50.0 million and (ii) 25.0% of LTM Consolidated Adjusted EBITDA, and permitted Refinancing Indebtedness thereof;

(jj)     Liens securing Indebtedness incurred pursuant to clause (26) under "—Certain Covenants—Limitation on Incurrence of Indebtedness" incurred in the ordinary course of business and consistent with industry practice; provided that such Lien is limited solely to such item of Product related to such permitted Indebtedness;

(kk)     Liens securing distribution, exhibition and/or exploitation rights of licensees pursuant to Distribution Agreements or of licensors from whom any of the Issuer or the Guarantors has (directly or indirectly) obtained any distribution rights or other exploitation rights to any item of Product (or of Persons providing financing to obtain such rights) or Liens securing production advances or an item of Product; provided, that such Liens are (i) incurred in the ordinary course of business and consistent with industry practice and (y) limited to such distribution, exhibition and/or exploitation rights and the applicable revenue therefrom;

(ll)     Liens customarily granted or incurred in the ordinary course of business and customary in the industry with regard to services rendered by laboratories and post-production houses, record warehouses and suppliers of materials and equipment which secure outstanding trade payables;

(mm)    protective UCC-1 financing statements and copyright filings consistent with industry practice with respect to Product Rights related to motion pictures, television programs and/or internet or streaming content of ESMP in favor of (x) the Unrestricted Subsidiary to which such Product Rights have been purported to be transferred, provided that such Unrestricted Subsidiary is a special purpose vehicle, the activity of which is the acquisition, production, financing, streaming and exploitation of such content and/or (y) the creditors of such Person;

(nn)     protective UCC-1 financing statements and copyright filings consistent with industry practice with respect to Product Rights or Product of ESMP in favor of any lender to a third-party licensor who licensed such Product Rights or Product through ESMP to a third-party distributor and who has requested ESMP to release its interest in such Product Rights in exchange for a contemporaneous payment of customary fees otherwise payable to ESMP in connection with the exploitation of the rights so released; provided that such payment is received by ESMP contemporaneously therewith;

(oo)     Liens on property of an Unrestricted Subsidiary at the time that it is designated as a Restricted Subsidiary pursuant to the definition of "Unrestricted Subsidiary"; provided that such Liens were not incurred in connection with, or contemplation of, such designation;

(pp)     Liens securing Indebtedness permitted under clause (10) of the second paragraph of the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness"; provided that such Liens shall not extend to assets other than the assets that secure such Indebtedness being refinanced;

(qq)     normal and customary rights of setoff upon deposits of cash in favor of banks or other depository institutions;

(rr)     extensions, renewals or refundings of any Liens referred to in clause (g) or (i) above; provided that any such extension, renewal or refunding does not extend to any assets or secure any Indebtedness not securing or secured by the Liens being extended, renewed or refinanced;

(ss)     trustees' Liens granted pursuant to any indenture governing any Indebtedness not otherwise prohibited by the indenture in favor of the trustee under such indenture and securing only obligations to pay compensation to such trustee, to reimburse such trustee of its expenses and to indemnify such trustee under the terms of such indenture;

(tt)     Liens securing Indebtedness incurred under clause (29)(ii) of the second paragraph of the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness" in connection with the Gray and Other Acquisitions.

"**Permitted Transferee**" means, with respect to any Person that is a natural person (and any Permitted Transferee of such Person), (a) such Person's Immediate Family Members, including his or her spouse, ex-spouse, children, step-children and their respective lineal descendants and (b) without duplication with any of the foregoing, such Person's heirs, legatees, executors trustees and/or administrators upon the death of such Person and any other Person who was an Affiliate of such Person upon the death of such Person and who, upon such death, directly or indirectly owns Capital Stock in Holdings.

"**Person**" means any natural person, corporation, limited partnership, general partnership, limited liability company, limited liability partnership, joint venture, association, joint stock company, trust, bank trust company, land trust, business trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity whether legal or not.

"**Preferred Equity Interest**" in any Person, means an Equity Interest of any class or classes (however designated) which is preferred as to the payment of dividends or distributions, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over Equity Interests of any other class in such Person.

"**pro forma**" or "**pro forma basis**" means, with respect to the calculation of the Consolidated Fixed Charge Coverage Ratio, Total Net Leverage Ratio, Secured Net Leverage Ratio or for any other pro forma calculation called for by the indenture to be made pro forma or on a pro forma basis, as of any time, that pro forma effect will be given to the February 2020 Transactions or any other transaction (including any such transaction prior to the Original Issue Date), as follows:

(a) with respect to any incurrence, assumption, guarantee, redemption or permanent repayment of Indebtedness, such ratio will be calculated giving pro forma effect thereto as if such incurrence, assumption, guarantee, redemption or permanent repayment of Indebtedness had occurred on the first day of such Measurement Period;

(b) with respect to the February 2020 Transactions, acquisitions or other Investment or the redesignation of an Unrestricted Subsidiary, such ratio or other calculation will be calculated giving pro forma effect thereto as if such action occurred on the first day of such Measurement Period in a manner consistent, where applicable, with the pro forma adjustments (along with the limitations pertaining thereto) set forth in the definition of "Consolidated Adjusted EBITDA" (including for the amount of "run-rate" cost savings, operating expense reductions and synergies projected by the Issuer in good faith to result from (A) actions taken, (B) actions relating to any acquisition, disposition or operational change committed to be taken no later than 12 months after the end of such acquisition, disposition or operational change and (C) actions related to the February 2020 Transactions and acquisitions that occurred prior to the Original Issue Date reasonably expected to be taken no later than 12 months after the Original Issue Date, in each case, which cost savings, operating expense reductions and synergies will be calculated as though such cost savings, operating expense reductions and synergies had been realized on the first day of the Measurement Period for which Consolidated Adjusted EBITDA is being determined); provided that the amounts so added back (other than (i) actions or activities taken in connection with the February 2020 Transactions and (ii) actions related to acquisitions that were consummated or with respect to which definitive documentation was executed on or prior to the Original Issue Date), when aggregated with amounts added back pursuant to subclause (b)(xvii) of the definition of "Consolidated Adjusted EBITDA", shall not exceed 20.0% of Consolidated Adjusted EBITDA for such Measurement Period (prior to giving effect to amounts so added back);

(c) with respect to any merger, sale, transfer or other disposition, and the designation of an "Unrestricted Subsidiary", such ratio will be calculated giving pro forma effect thereto as if such action had occurred on the first day of such Measurement Period; and

(d) all Indebtedness assumed to be outstanding pursuant to preceding clause (a) shall be deemed to have borne interest at (i) in the case of fixed rate Indebtedness, the rate applicable thereto, or (ii) in the case of floating rate Indebtedness, (x) with respect to any portion of the relevant Measurement Period that such Indebtedness was outstanding, the actual rates applicable thereto and (y) with respect to any portion of the relevant Measurement Period that such Indebtedness was not in fact outstanding (or if such Indebtedness was not outstanding at any time during the relevant Measurement Period), the rate applicable thereto as of the applicable date of determination as if such rate had been the applicable rate for such portion of the Measurement Period (or the entire Measurement Period), in any such case under this clause (ii), after giving effect to the operation of any Hedging Obligations applicable to such floating rate Indebtedness.

Notwithstanding the foregoing, for purposes of the calculation of the Total Net Leverage Ratio, such calculation shall be made on the last day of the applicable Measurement Period.

"**Product**" means any existing and any future motion picture, live event, film, music, internet content or video tape or other audio-visual work or episode thereof produced for theatrical, non-theatrical, television release, streaming or for exploitation in any other medium (including, without limitation, interactive media, multi-channel and digital platforms, stage plays, museum tours, theme parks or other location-based entertainment), in each case whether recorded on film, videotape, cassette, cartridge, disc or on or by any other means, method, process or device whether now known or hereafter devised, with respect to which the Holdings, the Issuer or any Subsidiary (1) is the copyright owner or (2) acquires an equity interest or distribution or sales agency rights. The term "item of Product" shall include, without limitation, the scenario, screenplay or script upon which such item of Product is based, all of the properties thereof, tangible and intangible, and whether now in existence or hereafter to be made or produced, whether or not in possession of Holdings, the Issuer and the Guarantors, and all rights therein and thereto, of every kind and character.

"**Product Rights**" means, with respect to a Product, (i) film rights, source rights, agency rights, options, production rights, participation rights or any similar such rights, (ii) intellectual property rights and (iii) distribution rights.

"**Program Acquisition Guarantees**" means any customary commitment of Holdings, the Issuer or any Guarantor to a producer or owner of Product in the ordinary course of business in conjunction with the acquisition of Product or Product Rights in Product by Holdings, the Issuer or such Guarantor to the effect that (1) the gross revenues to be generated in the future from the exploitation of such Product or the net revenues to be received by such producer or owner from the exploitation of such Product are reasonably anticipated by the Issuer to equal or exceed an amount specified in the acquisition agreement related to such Product or (2) otherwise requires payment by Holdings, the Issuer or such Guarantor of a minimum amount specified in the acquisition agreement related to such Product regardless of actual performance of such Product.

134

"**Public Company Costs**" shall mean costs relating to compliance with the Sarbanes-Oxley Act of 2002, as amended, and other expenses arising out of or incidental to the status of Holdings (or any Parent thereof that does not own any Subsidiaries other than Holdings, the Issuer, the Subsidiaries and any other Parents of Holdings) as a reporting company, including costs, fees and expenses (including legal, accounting and other professional fees) relating to compliance with provisions of the Securities Act and the Exchange Act, the rules of securities exchange companies with listed equity securities, directors' compensation, fees and expense reimbursement, shareholder meetings and reports to shareholders, directors' and officers' insurance and other executive costs, legal and other professional fees, and listing fees.

"**Purchase Money Indebtedness**" means Indebtedness of the Issuer or any Restricted Subsidiary incurred for the purpose of financing all or any part of the purchase price or cost of acquisition, repair, construction or improvement of property or assets used or useful in the business of the Issuer and the Restricted Subsidiaries, taken as a whole.

"**Qualified Capital Stock**" means any Capital Stock of the Issuer that is not Disqualified Stock.

"**Qualifying IPO**" means the issuance by the Issuer, Holdings or any Parent thereof of its Securities in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the U.S. Securities and Exchange Commission in accordance with the Securities Act (whether alone or in connection a secondary public offering) and generating net cash proceeds of not less than $150,000,000.

"**Rate Contracts**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, interest rate options, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, forward foreign exchange transactions, currency swap transactions, cross-currency rate swap transactions, currency options, derivative transactions, insurance transactions, cap transactions, floor transactions, collar transactions, spot contracts, or any other similar transactions or any combination of any of the foregoing whether relating to interest rates, commodities, investments, securities, currencies or any other reference measure (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"**Rating Agencies**" means:

(a)   S&P;

(b)   Moody's; or

(c)   if S&P or Moody's or both shall not make a rating of the Notes publicly available, a nationally recognized securities rating agency or agencies, as the case may be, selected by the Issuer, which shall be substituted for S&P or Moody's or both, as the case may be.

"**Restricted Investment**" means an Investment other than a Permitted Investment.

"**Restricted Subsidiary**" or "**Restricted Subsidiaries**" means any Subsidiary, other than Unrestricted Subsidiaries.

"**Replication Advances**" mean advances incurred pursuant to DVD replication, tape duplication or film processing transactions which require repayment if certain volume commitments are not fulfilled; provided that repayment of such advances (a) may not be accelerated or be required to be paid on demand unless such repayment obligation is completely unsecured, (b) do not require cash payments of interest and (c) if secured, such lien (i) shall relate solely to the related assets and (ii) is junior in right to the Lien on such assets which secures the Senior Credit Facilities.

"**SEC**" means the Securities and Exchange Commission or any successor thereto.

"**Secured Indebtedness**" means any Indebtedness secured by a Lien on any assets of the Issuer or any Domestic Subsidiary that is a Restricted Subsidiary.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder, as amended.

EXHIBIT O(2)

AOE0749

"**Secured Net Leverage Ratio**" means, as of any date, the ratio of (a) the sum of Consolidated Total Debt that is secured by a Lien on any asset or property of the Issuer or any Restricted Subsidiary, minus Unrestricted Cash as of such date to (b) Consolidated Adjusted EBITDA for the most recently ended Measurement Period, all of the foregoing determined on a pro forma basis.

"**Subordinated Indebtedness**" means Indebtedness of the Issuer or any Restricted Subsidiary that is expressly subordinated in right of payment to the Notes or the Guarantees, as the case may be.

"**Subsidiary**" or "**Subsidiaries**" means, with respect to any Person, any corporation, limited liability company, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any Person that is a consolidated subsidiary of the Issuer under GAAP and designated as a Subsidiary in a certificate to the Trustee by a responsible financial or accounting officer of the Issuer.

"**substantially concurrent**" shall mean any date within 45 days before or after the specified event.

"**Tax**" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding (including backup withholding) of any nature and whatever called, levied, collected, withheld or assessed by any Governmental Authority, together with any interest thereon, additions to tax or penalties imposed with respect thereto.

"**Tax Payments**" means (x) so long as the Issuer and Holdings are treated as flow-through entities for U.S. federal income Tax purposes, distributions (directly or indirectly) by the Issuer to Holdings and by Holdings to its direct or indirect owners to pay any U.S. federal, state and local income Taxes required to be paid by such owner on its taxable income attributable to the Issuer and any of its Subsidiaries that is treated as a flow-through entity for U.S. federal income Tax purposes; provided that such distributions shall (a) be calculated by multiplying such income by an assumed Tax rate equal to the combined U.S. federal, state, and local Tax rate of an individual resident in Los Angeles, California at the highest applicable marginal Tax rates in effect in each year, provided that such distributions or payments to such direct or indirect owners shall be in proportion to their respective indirect ownership percentages of the Issuer, (b) take into account the character of income or gain and any allowable federal income Tax deductions for state and local Taxes, and (c) take into account any carryovers of losses previously allocated to such direct or indirect owner, to the extent such losses would be deductible in determining such direct or indirect owner's Tax liability for such year if such direct or indirect owner's only items of income, gain or loss were those allocated to it by the Issuer and (y) with respect to any period during which (i) the Issuer and/or the Subsidiaries and (ii) Holdings are part of a consolidated, combined or unitary group for Tax purposes, those distributions made by the Issuer or the Subsidiaries to Holdings (or any Parent or Affiliate of Holdings that is the common parent of such consolidated, combined or unitary group for Tax purposes that includes (i) the Issuer and/or the Subsidiaries and (ii) Holdings) for the purpose of paying the income Taxes of Holdings (or such Parent or Affiliate) in an amount not to exceed the amount that the Issuer and the Subsidiaries would be required to pay in respect of such Taxes were the Issuer and the Subsidiaries to pay such Taxes as stand-alone taxpayers, to the extent such payments are actually used to pay such Taxes or to make distributions to Holdings (or such Parent or Affiliate) to pay such Taxes. For purposes of clauses (x) and (y), Tax Payments attributable to the income of an Unrestricted Subsidiary shall be allowed only to the extent of any actual cash distributions that such Unrestricted Subsidiary makes to the Issuer or any Restricted Subsidiary for the purpose of making Tax Payments. For purposes of this definition of "Tax Payments," references to "income Taxes" include any similar Taxes imposed in lieu of income Taxes.

"**Total Net Leverage Ratio**" means, as of any date, the ratio of (a) Consolidated Total Debt as of such date, *minus* Unrestricted Cash as of such date to (b) Consolidated Adjusted EBITDA for the most recently ended Measurement Period, all of the foregoing determined on a pro forma basis.

"**Transaction Costs**" means the fees, costs and expenses paid or payable by the Issuer or the Subsidiaries in connection with the February 2020 Transactions paid on or about the Original Issue Date.

"**Unrestricted Cash**" means the sum of the aggregate amount of cash and Cash Equivalents held in accounts of the Issuer and the Restricted Subsidiaries reflected in the combined consolidated balance sheet of the Issuer and the Restricted Subsidiaries to the extent that (a) it would not appear as "restricted" on the combined consolidated balance sheet of the Issuer and the Restricted Subsidiaries, (b) it is not subject to any Lien (other than Permitted Liens) or (c) for purposes of calculating either the Secured Net Leverage Ratio or the Total Net Leverage Ratio, it does not represent the cash proceeds of any Indebtedness then being incurred.

"**Unrestricted Subsidiary**" or "**Unrestricted Subsidiaries**" means: (A) any Subsidiary designated as an Unrestricted Subsidiary in a resolution of our Board of Directors in accordance with the instructions set forth below; and (B) any Subsidiary of an Unrestricted Subsidiary.

EXHIBIT O(2)

AOE0750

Our Board of Directors may designate any Subsidiary (including any newly acquired or newly formed Subsidiary) to be an Unrestricted Subsidiary so long as:

(a)   no portion of the Indebtedness or any other obligation (contingent or otherwise) thereof, immediately after such designation: (i) is guaranteed by the Issuer or any of its Restricted Subsidiaries; (ii) is recourse to the Issuer or any of its Restricted Subsidiaries; or (iii) subjects any property or asset of the Issuer or any of its Restricted Subsidiaries to satisfaction thereof;

(b)   except as otherwise permitted by the indenture (including by the covenant described under "—Certain Covenants— Limitation on Transactions with Affiliates"), neither we nor any other Subsidiary (other than another Unrestricted Subsidiary) has any contract, agreement, arrangement or understanding with such Subsidiary, written or oral, other than on terms no less favorable to us or such other Subsidiary than those that might be obtained at the time from Persons who are not our Affiliates; and

(c)   neither we nor any other Subsidiary (other than another Unrestricted Subsidiary) has any obligation: (i) to subscribe for additional shares of Capital Stock of such Subsidiary or other equity interests therein; or (ii) to maintain or preserve such Subsidiary's financial condition or to cause such Subsidiary to achieve certain levels of operating results.

If at any time after the Original Issue Date we designate an additional Subsidiary as an Unrestricted Subsidiary, we will be deemed to have made a Restricted Investment in an amount equal to the Fair Market Value (as determined in good faith by our Board of Directors evidenced by a resolution of our Board of Directors and set forth in an officers' certificate delivered to the Trustee) of such Subsidiary. An Unrestricted Subsidiary may be designated as a Restricted Subsidiary if, at the time of such designation after giving *pro forma* effect thereto, no Default or Event of Default shall have occurred or be continuing.

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years obtained by dividing (a) the total of the product obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment by (b) the then outstanding principal amount of such Indebtedness.

EXHIBIT O(2)

AOE0751

**BOOK-ENTRY, DELIVERY AND FORM**

The notes are being offered and sold to qualified institutional buyers in reliance on Rule 144A (the "Rule 144A Notes"). The notes also may be offered and sold in offshore transactions in reliance on Regulation S (the "Regulation S Notes"). Except as set forth below, the notes will be issued in registered, global form in minimum denominations of $2,000 and integral multiples of $1,000 in excess thereof.

Rule 144A Notes initially will be represented by one or more notes in registered, global form without interest coupons (collectively, the "Rule 144A Global Notes"). Regulation S Notes initially will be represented by one or more temporary notes in registered, global form without interest coupons (collectively, the "Regulation S Temporary Global Notes"). The Rule 144A Global Notes and the Regulation S Temporary Global Notes will be deposited upon issuance with the Trustee as custodian for DTC and registered in the name of DTC or its nominee, in each case, for credit to an account of a direct or indirect participant in DTC as described below. Through and including the 40th day after the later of the commencement of this Offering and the closing of this Offering (such period through and including such 40th day, the "Restricted Period"), beneficial interests in the Regulation S Temporary Global Notes may be held only through the Euroclear System ("Euroclear") and Clearstream Banking, S.A. ("Clearstream") (as indirect participants in DTC), unless transferred to a person that takes delivery through a Rule 144A Global Note in accordance with the certification requirements described below.

Within a reasonable time period after the expiration of the Restricted Period, the Regulation S Temporary Global Notes will be exchanged for one or more permanent notes in registered, global form without interest coupons (collectively, the "Regulation S Permanent Global Notes" and, together with the Regulation S Temporary Global Notes, the "Regulation S Global Notes;" the Regulation S Global Notes and the Rule 144A Global Notes collectively being the "Global Notes") upon delivery to DTC of certification of compliance with the transfer restrictions applicable to the notes and pursuant to Regulation S as provided in the Indenture. Beneficial interests in the Global Notes may not be exchanged for beneficial interests in the other Global Notes at any time except in the limited circumstances described below. See "—*Exchange Between Regulation S Notes and Rule 144A Notes*."

Except as set forth below, the Global Notes may be transferred, in whole and not in part, only to DTC or another nominee of DTC or to a successor of DTC or its nominee. Beneficial interests in the Global Notes may not be exchanged for notes in certificated form except in the limited circumstances described below. See "—*Exchange of Certificated Notes for Global Notes*." Except in the limited circumstances described below, owners of beneficial interests in the Global Notes will not be entitled to receive physical delivery of notes in certificated form.

The notes (including beneficial interests in the Global Notes) will be subject to restrictions on transfer and will bear a restrictive legend as described under "*Notice to Investors*." In addition, transfers of beneficial interests in the Global Notes will be subject to the applicable rules and procedures of DTC and its direct and indirect participants (including, if applicable, those of Euroclear and Clearstream), which may change from time to time.

**Depository Procedures**

The following description of the operations and procedures of DTC, Euroclear and Clearstream are provided solely as a matter of convenience. These operations and procedures are solely within the control of the respective settlement systems and are subject to change by them. Neither the Issuers nor the Trustee take any responsibility for these operations and procedures and urge investors to contact the system or their participants directly to discuss these matters.

DTC has advised the Issuers that DTC is a limited-purpose trust company organized under the laws of the state of New York, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act. DTC was created to hold securities for its participating organizations (collectively, the "participants") and to facilitate the clearance and settlement of transactions in those securities between such participants through electronic book-entry changes in accounts of its participants. The participants include securities brokers and dealers (including the Initial Purchaser), banks, trust companies, clearing corporations and other organizations. Access to DTC's system is also available to other entities such as banks, brokers and dealers and trust companies that clear through or maintain a custodial relationship with a participant, either directly or indirectly. Persons who are not participants may beneficially own securities held by or on behalf of DTC only through participants or indirect participants of DTC. The ownership interests in, and transfers of ownership interests in, each security held by or on behalf of DTC are recorded on the records of its participants and indirect participants.

EXHIBIT O(2)

AOE0752

DTC has also advised the Issuers that, pursuant to procedures established by it:

upon deposit of the Global Notes, DTC will credit the accounts of the participants designated by the Initial Purchaser with portions of the principal amount of the Global Notes; and

ownership of these interests in the Global Notes will be shown on, and the transfer of ownership of these interests will be effected only through, records maintained by DTC (with respect to participants) or by participants and indirect participants (with respect to other owners of beneficial interest in the Global Notes).

Investors in the Rule 144A Global Notes who are participants may hold their interests therein directly through DTC. Investors in the Rule 144A Global Notes who are not participants may hold their interests therein indirectly through organizations (including Euroclear and Clearstream) which are participants or indirect participants. Investors in the Regulation S Global Notes must initially hold their interests therein through Euroclear or Clearstream, if they are participants in such systems, or indirectly through organizations that are participants therein. After the expiration of the Restricted Period (but not earlier), investors may also hold interests in the Regulation S Global Notes through participants in the DTC system other than Euroclear and Clearstream. Euroclear and Clearstream will hold interests in the Regulation S Global Notes on behalf of their participants through customers' securities accounts in their respective names on the books of their respective depositories. All interests in a Global Note, including those held through Euroclear or Clearstream, may be subject to the procedures and requirements of DTC. Those interests held through Euroclear or Clearstream may also be subject to the procedures and requirements of such systems. The laws of some states require that some persons take physical delivery in definitive form of securities that they own. Consequently, the ability to transfer beneficial interests in a Global Note to such persons will be limited to that extent. Because DTC can act only on behalf of participants, which in turn act on behalf of indirect participants, the ability of a person holding a beneficial interest in a Global Note to pledge such interest to persons that do not participate in the DTC system, or otherwise take actions in respect of such interest, may be affected by the lack of a physical certificate evidencing such interest.

**Except as described below, owners of an interest in the Global Notes will not have notes registered in their names, will not receive physical delivery of notes in certificated form and will not be considered the registered owners or "holders" thereof under the Indenture for any purpose.**

Payments in respect of the principal of, and interest and premium, if any, on a Global Note registered in the name of DTC or its nominee will be payable to DTC in its capacity as the registered holder thereof. Under the terms of the Indenture, the Issuers and the Trustee will treat the persons in whose names the notes, including the Global Notes, are registered as the owners of the notes for the purpose of receiving payments and for all other purposes. Consequently, none of the Issuers, the Trustee or any agent of the Issuers or the Trustee has or will have any responsibility or liability for:

(1)  any aspect of DTC's records or any participant's or indirect participant's records relating to or payments made on account of beneficial ownership interests in the Global Notes or for maintaining, supervising or reviewing any of DTC's records or any participant's or indirect participant's records relating to beneficial ownership interests in the Global Notes; or

(2)  any other matter relating to the actions and practices of DTC or any of its participants or indirect participants.

DTC has advised the Issuers that its current practice, upon receipt of any payment in respect of securities such as the Notes (including principal and interest), is to credit the accounts of the relevant participants with the payment on the payment date unless DTC has reason to believe it will not receive payment on such payment date. Each relevant participant is credited with an amount proportionate to its beneficial ownership of an interest in the principal amount of the relevant security as shown on the records of DTC. Payments by participants and indirect participants to beneficial owners of notes will be governed by standing instructions and customary practices and will be the responsibility of such participants or indirect participants and will not be the responsibility of DTC, the Issuers or the Trustee. Neither the Issuers nor the Trustee will be liable for any delay by DTC or any participants or indirect participants in identifying the beneficial owners of the notes, and the Issuers and the Trustee may conclusively rely on and will be protected in relying on instructions from DTC or its nominee for all purposes.

Subject to the transfer restrictions set forth under "*Notice to Investors,*" transfers between participants will be effected in accordance with DTC's procedures, and will be settled in same-day funds, and transfers between participants in Euroclear and Clearstream will be effected in accordance with their respective rules and operating procedures.

Subject to compliance with the transfer restrictions applicable to the notes described herein, cross-market transfers between participants of DTC, on the one hand, and participants of Euroclear or Clearstream, on the other hand, will be effected through DTC in accordance with DTC's rules on behalf of Euroclear or Clearstream, as the case may be, by their respective depositaries; however, such cross-market transactions will require delivery of instructions to Euroclear or Clearstream, as the case may be, by the counterparty in such system in accordance with the rules and procedures and within the established deadlines of such system.

EXHIBIT O(2)

AOE0753

Euroclear or Clearstream, as the case may be, will, if the Transaction meets its settlement requirements, deliver instructions to its respective depositary to take action to effect final settlement on its behalf by delivering or receiving interests in the relevant Global Note in DTC, and making or receiving payment in accordance with normal procedures for same-day funds settlement applicable to DTC. Euroclear participants and Clearstream participants may not deliver instructions directly to the depositaries for Euroclear or Clearstream.

DTC has advised the Issuers that it will take any action permitted to be taken by a holder of notes only at the direction of one or more participants to whose account DTC has credited the interests in the Global Notes and only in respect of such portion of the aggregate principal amount of the notes as to which such participant or participants has or have given such direction. However, if there is an Event of Default under the notes (as defined in the Indenture), DTC reserves the right to exchange the Global Notes for legended notes in certificated form, and to distribute such notes to its participants.

Although DTC, Euroclear and Clearstream have agreed to the foregoing procedures to facilitate transfers of interests in the Rule 144A Global Notes and the Regulation S Global Notes among participants in DTC, Euroclear and Clearstream, they are under no obligation to perform or to continue to perform such procedures, and may discontinue such procedures at any time. Neither the Issuers nor the Trustee nor any of their respective agents will have any responsibility for the performance by DTC, Euroclear or Clearstream or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

## Exchange of Global Notes for Certificated Notes

A Global Note is exchangeable for definitive notes in registered certificated form ("Certificated Notes") if:

(1)   DTC (a) notifies the Issuers that it is unwilling or unable to continue as depositary for the Global Note or (b) has ceased to be a clearing agency registered under the Exchange Act and, in either case, a successor depositary is not appointed within 90 days;

(2)   the Issuers, at their option, notifies the Trustee in writing that it elects to cause the issuance of the Certificated Notes; *provided* that in no event will the Regulation S Temporary Global Note be exchanged for Certificated Notes prior to (a) the expiration of the Restricted Period and (b) the receipt of any certificates required under Regulation S; or

(3)   there has occurred and is continuing a Default (as defined in the Indenture) or Event of Default with respect to the notes and DTC has requested such exchange.

In all cases, Certificated Notes delivered in exchange for any Global Note or beneficial interests in Global Notes will be registered in the names, and issued in any approved denominations, requested by or on behalf of DTC (in accordance with its customary procedures) and will bear the applicable restrictive legend referred to in "*Notice to Investors*," unless that legend is not required by applicable law.

## Exchange of Certificated Notes for Global Notes

Certificated Notes may not be exchanged for beneficial interests in any Global Note unless the transferor first delivers to the Trustee a written certificate (in the form provided in the Indenture) stating that such transfer will comply with the appropriate transfer restrictions applicable to such notes. See "*Notice to Investors*."

## Exchange Between Regulation S Notes and Rule 144A Notes

Prior to the expiration of the Restricted Period, beneficial interests in the Regulation S Global Note may be exchanged for beneficial interests in the Rule 144A Global Note only if:

- such exchange occurs in connection with a transfer of the notes pursuant to Rule 144A; and

- the transferor first delivers to the registrar a written certificate (in the form provided in the Indenture) stating that the notes are being transferred to a person:

who the transferor reasonably believes to be a qualified institutional buyer within the meaning of Rule 144A;

purchasing for its own account or the account of a qualified institutional buyer in a transaction meeting the requirements of Rule 144A; and

in accordance with all applicable securities laws of the states of the United States and other jurisdictions.

EXHIBIT O(2)

AOE0754

Beneficial interests in a Rule 144A Global Note may be transferred to a person who takes delivery in the form of an interest in the Regulation S Global Note, whether before or after the expiration of the Restricted Period, only if the transferor first delivers to the registrar a written certificate (in the form provided in the Indenture) stating that such transfer is being made in accordance with Rule 903 or 904 of Regulation S or Rule 144 (if available) and that, if such transfer occurs prior to the expiration of the Restricted Period, the interest transferred will be held immediately thereafter through Euroclear or Clearstream.

Transfers involving exchanges of beneficial interests between the Regulation S Global Notes and the Rule 144A Global Notes will be effected by DTC by means of an instruction originated by the DTC participant through the DTC Deposit/Withdraw at Custodian system. Accordingly, in connection with any such transfer, appropriate adjustments will be made to reflect the changes in the principal amount of the Regulation S Global Note or the Rule 144A Global Note, as applicable. Any beneficial interest in one of the Global Notes that is transferred to a person who takes delivery in the form of an interest in the other Global Note will, upon transfer, cease to be an interest in such Global Note and will become an interest in the other Global Note and, accordingly, will thereafter be subject to all transfer restrictions and other procedures applicable to beneficial interests in such other Global Note for so long as it remains such an interest. The policies and practices of DTC may prohibit transfers of beneficial interests in the Regulation S Global Note prior to the expiration of the Restricted Period.

### Certifications by Holders of the Regulation S Temporary Global Notes

A holder of a beneficial interest in the Regulation S Temporary Global Notes must provide Euroclear or Clearstream, as the case may be, with a certificate as required by the Indenture certifying that the beneficial owner of the interest in the Regulation S Temporary Global Note is either a non-U.S. person or a U.S. person that has purchased such interest in a transaction that is exempt from the registration requirements under the Securities Act, and Euroclear or Clearstream, as the case may be, must provide to the registrar (or the paying agent if other than the Trustee) a certificate as required by the Indenture, prior to any exchange of such beneficial interest for a beneficial interest in the Regulation S Permanent Global Notes.

### Same Day Settlement and Payment

The Issuers through the paying agent will make payments in respect of any notes represented by a Global Note (including principal, interest and premium, if any) by wire transfer of immediately available funds to the account or accounts specified by DTC as the registered holder of such Global Note. The notes represented by the Global Notes are expected to be eligible to trade in DTC's Same-Day Funds Settlement System, and any permitted secondary market trading activity in such notes will, therefore, be required by DTC to be settled in immediately available funds.

Because of time zone differences, the securities account of a Euroclear or Clearstream participant purchasing an interest in a Global Note from a participant of DTC will be credited, and any crediting will be reported to the relevant Euroclear or Clearstream participant, during the securities settlement processing day (which must be a business day for Euroclear and Clearstream) immediately following the settlement date of DTC. DTC has advised the Issuers that cash received in Euroclear or Clearstream as a result of sales of interests in a Global Note by or through a Euroclear or Clearstream participant to a participant of DTC will be received with value on the settlement date of DTC but will be available in the relevant Euroclear or Clearstream cash account only as of the business day for Euroclear or Clearstream following DTC's settlement date.

EXHIBIT O(2)

AOE0755

## NOTICE TO INVESTORS

The Notes have not been, and will not be, registered under the Securities Act or the securities laws of any jurisdiction and may not be offered or sold within the United States or to U.S. Persons, as such term is defined under the Securities Act, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and such other securities laws. The Issuers are not required to register the notes for resale under the Securities Act or the securities laws of any other jurisdiction and are not required to offer to exchange the notes for notes registered under the Securities Act or the securities laws of any other jurisdiction and the Issuers do not have any present intention to do so. Accordingly, the notes are being offered hereby only to (a) persons reasonably believed to be "Qualified Institutional Buyers" (as defined in Rule 144A under the Securities Act) in reliance on the exemption from the registration requirements of the Securities Act provided by Rule 144A, and (b) outside the United States to "Non-U.S. Persons" (as defined in Regulation S under the Securities Act) in compliance with Regulation S.

Each Purchaser of the notes will be deemed to have represented and agreed as follows (terms used in this paragraph that are defined in Rule 144A are used herein as defined therein):

The Purchaser is not the Issuers' "Affiliate" (as defined in Rule 144A under the Securities Act) or acting on their behalf and is either: (a) a "Qualified Institutional Buyer" (as defined in Rule 144A under the Securities Act) (a "*QIB*") and is aware that the sale to it is being made in reliance on Rule 144A and such QIB is acquiring such notes for its own account or for the account of another QIB; or (b) not a U.S. person (as defined in Regulation S under the Securities Act) and is purchasing the notes in accordance with Regulation S under the Securities Act. The purchaser acknowledges that the initial purchaser of the notes may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A or other exemptions under the Securities Act.

The Purchaser understands that the notes are being offered in a transaction not involving any public offering in the United States within the meaning of the Securities Act, that the notes have not been registered under the Securities Act and that (a) the notes may be offered, resold, pledged or otherwise transferred only (i) (A) to a person who the seller reasonably believes is a QIB in a transaction meeting the requirements of Rule 144A, (B) in a transaction meeting the requirements of Rule 144 under the Securities Act, if available, (C) outside the United States to a person that is not a U.S. person (as defined in Regulation S under the Securities Act) in a transaction meeting the requirements of Regulation S under the Securities Act, (D) to an "accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act (an "*Institutional Accredited Investor*") that is purchasing at least $250,000 of notes for its own account or for the account of an Institutional Accredited Investor (and based upon an opinion of counsel if the Issuers so request) or (E) pursuant to another available exemption under the Securities Act, (ii) to the Issuers or any of their subsidiaries or (iii) under an effective registration statement and, in each case, in compliance with any applicable securities laws of any State of the United States or any other applicable jurisdiction, and (b) the Purchaser will, and each subsequent holder is required to, notify any later purchaser from it of the resale restrictions described in (a) above. If any resale or other transfer of any Note is proposed to be made under clause (i)(D) above while these transfer restrictions are in force, then the transferor shall deliver a letter from the transferee to the Issuers and the indenture trustee which shall provide, among other things, that the transferee is an Institutional Accredited Investor and that it is acquiring the notes for investment purposes and not for distribution in violation of the Securities Act.

You acknowledge that none of the Issuers or the Initial Purchaser, nor any person representing any of them, has made any representation to you with respect to the Issuers and their subsidiaries (including the Sub-Issuer) or the offer or sale of any of the notes other than the information contained in this offering memorandum, which offering memorandum has been delivered to you and upon which you are relying in making your investment decision with respect to the notes. You acknowledge that neither the Initial Purchaser nor any person representing the Initial Purchaser makes any representation or warranty as to the accuracy or completeness of this offering memorandum. You have had access to such financial and other information concerning the Issuers and their subsidiaries (including the Sub-Issuer) and the notes as you have deemed necessary in connection with your decision to purchase any of the notes, including an opportunity to ask questions of, and request information from, the Issuers and the Initial Purchaser.

The Purchaser understands that the certificates evidencing the notes will contain a legend substantially to the following effect:

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

THE HOLDER OF THIS NOTE BY ITS ACCEPTANCE HEREOF (1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT ("*RULE 144A*")) OR (B) IT IS ACQUIRING THIS NOTE IN AN "OFFSHORE TRANSACTION" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT), (2) IN THE CASE OF NOTES ISSUED UNDER RULE 144A, AGREES ON ITS OWN BEHALF AND ON

EXHIBIT O(2)

AOE0756

BEHALF OF ANY INVESTOR FOR WHICH IT HAS PURCHASED SECURITIES TO OFFER, SELL OR OTHERWISE TRANSFER SUCH NOTE, PRIOR TO THE DATE WHICH IS IN THE CASE OF RULE 144A NOTES: ONE YEAR IN THE CASE OF REGULATION S NOTES: 40 DAYS (OR SUCH SHORTER PERIOD OF TIME AS PERMITTED BY RULE 144A UNDER THE SECURITIES ACT OR ANY SUCCESSOR PROVISION THEREUNDER) AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE LAST DATE ON WHICH THE ISSUERS OR ANY AFFILIATE OF THE ISSUERS WAS THE OWNER OF THIS NOTE (OR ANY PREDECESSOR OF THIS NOTE) ONLY (A) TO THE ISSUERS OR ANY SUBSIDIARY THEREOF (INCLUDING THE SUB-ISSUER), (B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A, TO A PERSON IT, OR ANY PERSON ACTING ON ITS BEHALF, REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (D) TO NON-U.S. PERSONS IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT, OR (E) PURSUANT TO ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT IN EACH OF THE FOREGOING CASES TO ANY REQUIREMENT OF LAW THAT THE DISPOSITION OF ITS PROPERTY OR THE PROPERTY OF SUCH INVESTOR ACCOUNT OR ACCOUNTS BE AT ALL TIMES WITHIN ITS OR THEIR CONTROL AND IN COMPLIANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OR TERRITORY OF THE UNITED STATES OR ANY OTHER JURISDICTION, AND ANY APPLICABLE LOCAL LAWS AND REGULATIONS, AND FURTHER SUBJECT TO THE ISSUERS' AND THE INDENTURE TRUSTEE'S RIGHTS PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER (I) PURSUANT TO CLAUSES (D) AND (E) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM, AND (II) IN EACH OF THE FOREGOING CASES, TO REQUIRE THAT A CERTIFICATE OF TRANSFER IN THE FORM APPEARING ON THE OTHER SIDE OF THIS NOTE IS COMPLETED AND DELIVERED BY THE TRANSFEROR TO THE INDENTURE TRUSTEE AND (III) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS NOTE IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND.

The Purchaser confirms that (a) the Purchaser has requisite knowledge and experience in financial and business matters so that it is capable of evaluating the merits and risks of purchasing the notes, and the Purchaser and any accounts for which it is acting are each able to bear the economic risks of its or their investment, including a complete loss of the investment, (b) the Purchaser is not acquiring the notes with a view to any distribution of the notes in a transaction that would violate the Securities Act or the securities laws of any State of the United States or another applicable jurisdiction; provided that the disposition of the Purchaser's property and the property of any accounts for which the Purchaser is acting as fiduciary shall remain at all times within its control and (c) the Purchaser has received a copy of this offering memorandum and acknowledges that the Purchaser has had access to the financial and other information, and has been afforded the opportunity to ask questions of the Issuers' representatives and receive answers to those questions, as it deemed necessary in connection with its decision to purchase the notes.

The Purchaser will be deemed to have represented and warranted that either (i) it is neither a Plan nor a Non-ERISA Plan (as such terms are defined in "Certain ERISA Considerations") and no portion of the assets used by such Purchaser to acquire and hold the notes constitutes assets of any Plan or Non-ERISA Plan or (ii) the purchase and holding of the notes by such Purchaser will not constitute or result in a non-exempt prohibited transaction under Section 406 of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA") or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") or a similar violation under any applicable Similar Law (as such term is defined in "Certain ERISA Considerations"), and if it is a Plan, the decision to acquire and hold the notes has been made by a duly authorized fiduciary (each, a "Plan Fiduciary") who is independent of the Transaction Parties (as such term is defined in "Certain ERISA Considerations"), which Plan Fiduciary (A) is a fiduciary under ERISA or the Code, or both, with respect to the decision to acquire and hold the notes, (B) is not an individual retirement account ("IRA") owner (in the case of an IRA), (C) is capable of evaluating investment risks independently, both in general and with regard to the prospective investment in the notes, (D) has exercised independent judgment in evaluating whether to invest the assets of such Plan in the notes and (E) is either a bank, an insurance carrier, a registered investment advisor, a registered broker-dealer or an independent fiduciary with at least $50 million of assets under management or control as specified in 29 C.F.R. Section 2510.3-21(c)(1)(i).

The Purchaser acknowledges that the Issuers, the Sub-Issuers of the notes, the Initial Purchaser and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements and agrees that, if any of the foregoing acknowledgments, representations or agreements deemed to have been made by it are no longer accurate, it shall promptly notify the Issuers, the Sub-Issuers of the notes and the Initial Purchaser of the same. If such Purchaser is acquiring any notes as a fiduciary or agent for one or more investor accounts, such Purchaser represents that it has sole investment discretion with respect to each such account and that it has full power to make the foregoing acknowledgments, representations and agreements on behalf of each such account.

EXHIBIT O(2)

AOE0757

If it is a Purchaser in a sale that occurs outside the United States within the meaning of Regulation S under the Securities Act, it acknowledges that until the expiration of the "40-day distribution compliance period" within the meaning of Rule 903 of Regulation S, any offer or sale of the notes shall not be made by it to a U.S. person or for the account or benefit of a U.S. person within the meaning of Rule 902(k) of the Securities Act.

The Purchaser understands that no action has been taken in any jurisdiction (including the United States) by the Issuers that would result in a public offering of the notes or the possession, circulation or distribution of this offering memorandum or any other material relating to the Issuers or the notes in any jurisdiction where action for such purpose is required. Consequently, any transfer of the notes will be subject to the selling restrictions set forth under "Plan of Distribution."

The Purchaser acknowledges that the Indenture Trustee will not be required to accept for registration of transfer any notes acquired by it, except upon presentation of evidence satisfactory to the Issuers and the Indenture Trustee that the restrictions set forth herein have been complied with.

EXHIBIT O(2)

AOE0758

## ERISA CONSIDERATIONS

A fiduciary considering an investment in the notes using the "plan assets" of a pension, profit-sharing or other employee benefit plan subject to the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA") (each, an "ERISA Plan"), should consider the fiduciary standards of ERISA in the context of the ERISA Plan's particular circumstances before authorizing an investment in the notes. Among other factors, the fiduciary should consider whether the investment would satisfy the prudence and diversification requirements of ERISA and would be consistent with the documents and instruments governing the ERISA Plan, and whether the investment would involve a prohibited transaction under ERISA or the U.S. Internal Revenue Code, as amended (the "Code").

Section 406 of ERISA and Section 4975 of the Code prohibit ERISA Plans, as well as individual retirement accounts, Keogh plans or any other plans that are subject to Section 4975 of the Code (collectively with ERISA Plans, "Plans"), from engaging in transactions involving "plan assets" with persons who are "parties in interest" under ERISA or "disqualified persons" under the Code with respect to the Plan. A violation of these prohibited transaction rules may result in excise tax or other liabilities under ERISA or the Code for those persons, unless exemptive relief is available under an applicable statutory, regulatory or administrative exemption. Employee benefit plans that are governmental plans (as defined in Section 3(32) of ERISA), certain church plans (as defined in Section 3(33) of ERISA) and non-U.S. plans (as described in Section 4(b)(4) of ERISA), ("Non-ERISA Arrangements"), are not subject to the requirements of Section 406 of ERISA or Section 4975 of the Code but may be subject to similar provisions under applicable federal, state, local, non-U.S. or other laws that are substantially similar to the prohibited transaction provisions of ERISA or Section 4975 of the Code ("Similar Laws").

The acquisition and holding of the notes by a Plan or any entity whose underlying assets include "plan assets" by reason of any Plan's investment in the entity (a "Plan Asset Entity") with respect to which the Issuers, the Trustee or any of their respective affiliates is or becomes a party in interest or disqualified person may result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code, unless the notes are acquired and held pursuant to an applicable exemption. The U.S. Department of Labor has issued several prohibited transaction class exemptions, or "PTCEs," that may provide exemptive relief if required for direct or indirect prohibited transactions that may arise from the purchase or holding of the notes. These exemptions include PTCE 84-14 (for certain transactions determined by independent qualified professional asset managers), PTCE 90-1 (for certain transactions involving insurance company pooled separate accounts), PTCE 91-38 (for certain transactions involving bank collective investment funds), PTCE 95-60 (for transactions involving certain insurance company general accounts), and PTCE 96-23 (for transactions managed by in-house asset managers). In addition, Section 408(b)(17) of ERISA and Section 4975(d)(20) of the Code (the "Service Provider Exemption") may provide an exemption for the purchase and sale of the notes, provided that neither the Issuers nor any of its affiliates have or exercise any discretionary authority or control or render any investment advice with respect to the assets of any Plan involved in the Transaction, and provided further that the Plan pays no more and receives no less than "adequate consideration" in connection with the Transaction. There can be no assurance that all of the conditions of any such exemptions will be satisfied, that any class exemption or any other exemption will be available with respect to any particular transaction, or that, if an exemption is available, it will cover all aspects of any particular transaction involving the notes. Because of the foregoing, the notes should not be purchased or held by any person investing "plan assets" of any Plan, unless such purchase and holding will not constitute a non-exempt prohibited transaction under ERISA and the Code or a similar violation of any applicable Similar Laws.

Any purchaser or holder of the notes or any interest therein will be deemed to have represented by its purchase and holding of the notes or any interest therein that it either (1) is not a Plan, a Plan Asset Entity or a Non-ERISA Arrangement and is not purchasing the notes on behalf of or with the assets of any Plan, a Plan Asset Entity or Non-ERISA Arrangement or (2) the purchase and holding of the notes will not constitute a non-exempt prohibited transaction or a similar violation under any applicable Similar Laws.

Due to the complexity of these rules and the penalties that may be imposed upon persons involved in non-exempt prohibited transactions, it is important that fiduciaries or other persons considering purchasing the notes on behalf of or with the assets of any Plan, a Plan Asset Entity or Non-ERISA Arrangement consult with their counsel regarding the availability of exemptive relief under any of the PTCEs listed above, the Service Provider Exemption or the potential consequences of any purchase or holding under Similar Laws, as applicable. Purchasers of the notes have exclusive responsibility for ensuring that their purchase and holding of the notes do not violate the fiduciary or prohibited transaction rules of ERISA or the Code or any similar provisions of Similar Laws. The sale of any notes to a Plan, Plan Asset Entity or Non-ERISA Arrangement is in no respect a representation by the Issuers or any of their affiliates or representatives that such an investment meets all relevant legal requirements with respect to investments by any such Plans, Plan Asset Entities or Non-ERISA Arrangements generally or any particular Plan, Plan Asset Entity or Non-ERISA Arrangement or that such investment is appropriate for such Plans, Plan Asset Entities or Non-ERISA Arrangements generally or any particular Plan, Plan Asset Entity or Non-ERISA Arrangement.

The foregoing discussion is general in nature and is not intended to be all-inclusive. Due to the complexity of these rules and the penalties that may be imposed upon persons involved in non-exempt prohibited transactions, it is particularly important that fiduciaries, or other persons considering purchasing the notes on behalf of, or with the assets of, any Plan, consult with their counsel regarding the potential applicability of ERISA, Section 4975 of the Code and any Similar Laws to such investment and whether an exemption would be applicable to the purchase and holding of the notes.

EXHIBIT O(2)

AOE0759

## MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS

The following discussion is a summary of certain U.S. federal income tax considerations relevant to the purchase, ownership and disposition of the notes issued pursuant to this offering, but does not purport to be a complete analysis of all potential tax effects. The effects of other U.S. federal tax laws, such as estate and gift tax laws, and any applicable state, local or foreign tax laws are not discussed. This discussion is based on the U.S. Internal Revenue Code of 1986, as amended (the "Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the U.S. Internal Revenue Service (the "IRS"), in each case in effect as of the date hereof. These authorities may change or be subject to differing interpretations. Any such change or differing interpretation may be applied retroactively in a manner that could adversely affect a holder of the notes. We have not sought and will not seek any rulings from the IRS regarding the matters discussed below. There can be no assurance the IRS or a court will not take a contrary position to that discussed below regarding the tax consequences of the purchase, ownership and disposition of the notes.

This discussion is limited to holders who hold the notes as "capital assets" within the meaning of Section 1221 of the Code (generally, property held for investment). In addition, this discussion is limited to persons purchasing the notes for cash in the offering hereby at the offer price indicated on the cover page. This discussion does not address all U.S. federal income tax consequences relevant to a holder's particular circumstances, including the impact of the Medicare contribution tax on net investment income and the alternative minimum tax. In addition, it does not address consequences relevant to holders subject to special rules, including, without limitation:

- U.S. expatriates and former citizens or long-term residents of the United States;

- U.S. Holders (as defined below) whose functional currency is not the U.S. dollar;

- persons holding the notes as part of a hedge, straddle or other risk reduction strategy or as part of a conversion transaction or other integrated investment;

- banks, insurance companies, and other financial institutions;

- real estate investment trusts or regulated investment companies;

- brokers, dealers or traders in securities;

- "controlled foreign corporations," "passive foreign investment companies," and corporations that accumulate earnings to avoid U.S. federal income tax;

- S corporations, partnerships or other entities or arrangements treated as partnerships for U.S. federal income tax purposes (and investors therein);

- tax-exempt organizations or governmental organizations;

- persons deemed to sell the notes under the constructive sale provisions of the Code; and

- persons subject to special tax accounting rules as a result of any item of gross income with respect to the notes being taken into account in an applicable financial statement.

If an entity treated as a partnership for U.S. federal income tax purposes holds the notes, the tax treatment of a partner in the partnership will depend on the status of the partner, the activities of the partnership and certain determinations made at the partner level. Accordingly, partnerships holding the notes and the partners in such partnerships should consult their tax advisors regarding the U.S. federal income tax consequences to them.

**THIS DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. INVESTORS SHOULD CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE APPLICATION OF THE U.S. FEDERAL INCOME TAX LAWS TO THEIR PARTICULAR SITUATIONS AS WELL AS ANY TAX CONSEQUENCES OF THE PURCHASE, OWNERSHIP AND DISPOSITION OF THE NOTES ARISING UNDER OTHER U.S. FEDERAL TAX LAWS (INCLUDING ESTATE AND GIFT TAX LAWS), UNDER THE LAWS OF ANY STATE, LOCAL OR NON-U.S. TAXING JURISDICTION OR UNDER ANY APPLICABLE TAX TREATY.**

EXHIBIT O(2)

AOE0760

**Tax Considerations Applicable to U.S. Holders**

*Definition of a U.S. Holder*

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of a note that, for U.S. federal income tax purposes, is or is treated as:

- an individual who is a citizen or resident of the United States;

- a corporation created or organized under the laws of the United States, any state thereof, or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income tax regardless of its source; or

- a trust that (1) is subject to the primary supervision of a U.S. court and the control of one or more "United States persons" (within the meaning of Section 7701(a)(30) of the Code), or (2) has a valid election in effect to be treated as a United States person for U.S. federal income tax purposes.

*Payments of Interest*

Interest on a note (other than pre-issuance accrued interest) generally will be taxable to a U.S. Holder as ordinary income at the time such interest is received or accrued, in accordance with such U.S. Holder's method of tax accounting for U.S. federal income tax purposes.

*Pre-Issuance Accrued Interest*

A portion of the price paid for the notes will be allocable to interest that accrued prior to the date the notes are purchased (the "pre-issuance accrued interest"). We intend to take the position that a portion of the interest received on the first interest payment date equal to the pre-issuance accrued interest should be treated as a return of the pre-issuance accrued interest and not as a payment of interest on the note. Amounts treated as a return of pre-issuance accrued interest should not be taxable when received and should be excluded from the holder's adjusted tax basis in the applicable note.

*Amortizable Bond Premium*

Generally, if a U.S. Holder purchases a note for an amount (excluding any portion thereof allocable to pre-issuance accrued interest) that exceeds the amount payable at maturity of the note (other than payments of stated interest), such U.S. Holder may elect to amortize such excess (referred to as "amortizable bond premium") under the constant yield method over the period from the U.S. Holder's acquisition date to the note's maturity date. The notes are subject to call provisions at our option at various times. A U.S. Holder generally will calculate the amount of amortizable bond premium based on the amount payable at the applicable call date, but only if use of the call date (in lieu of the stated maturity date) results in a smaller amortizable bond premium for the period ending on the call date. Amortizable bond premium is treated as a reduction of interest on the note instead of as a deduction. Because we may call the notes under certain circumstances at a price in excess of their principal amount, any reduction to interest income for amortizable bond premium may be reduced or delayed. A U.S. Holder that elects to amortize bond premium must reduce its tax basis in the note by the amount of the amortized bond premium used to offset stated interest income as set forth above. Any election to amortize bond premium applies to all bonds (other than bonds the interest on which is excludible from gross income) held by the U.S. Holder during the first taxable year to which the election applies or thereafter acquired by the U.S. Holder. The election may not be revoked without the consent of the IRS. U.S. Holders should consult their own tax advisors as to the applicability of the amortizable bond premium rules to their purchase of the notes, including the effect of the early call option rules noted above.

*Sale or Other Taxable Disposition*

A U.S. Holder will recognize gain or loss on the sale, exchange, redemption, retirement or other taxable disposition of a note. The amount of such gain or loss will generally equal the difference between the amount received for the note in cash or other property valued at fair market value (less amounts attributable to any accrued but unpaid interest, which will be taxable as interest to the extent not previously included in income, and less amounts attributable to pre-issuance accrued interest) and the U.S. Holder's adjusted tax basis in the note. A U.S. Holder's adjusted tax basis in a note generally will be equal to the amount the U.S. Holder paid for the note, excluding any amount attributable to pre-issuance accrued interest (as discussed above under "—Pre-Issuance Accrued Interest") and decreased by the amount of amortized bond premium, if any. Any gain or loss will be capital gain or loss, and will be long-term capital gain or loss if the U.S. Holder has held the note for more than one year at the time of sale or other taxable disposition.

147

Otherwise, such gain or loss will be short-term capital gain or loss. Long-term capital gains recognized by certain non-corporate U.S. Holders, including individuals, generally will be taxable at a reduced rate. The deductibility of capital losses is subject to limitations.

### *Information Reporting and Backup Withholding*

A U.S. Holder may be subject to information reporting and backup withholding when such holder receives payments on a note or receives proceeds from the sale or other taxable disposition of a note (including a redemption or retirement of a note). Certain U.S. Holders are exempt from backup withholding, including corporations and certain tax-exempt organizations. A U.S. Holder will be subject to backup withholding if such holder is not otherwise exempt and:

- the holder fails to furnish the holder's taxpayer identification number, which for an individual is ordinarily his or her social security number;

- the holder furnishes an incorrect taxpayer identification number;

- the applicable withholding agent is notified by the IRS that the holder previously failed to properly report payments of interest or dividends; or

- the holder fails to certify under penalties of perjury that the holder has furnished a correct taxpayer identification number and that the IRS has not notified the holder that the holder is subject to backup withholding.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against a U.S. Holder's U.S. federal income tax liability, provided the required information is timely furnished to the IRS. U.S. Holders should consult their tax advisors regarding their qualification for an exemption from backup withholding and the procedures for obtaining such an exemption.

### Tax Considerations Applicable to Non-U.S. Holders

For purposes of this discussion, interest does not include any pre-issuance accrued interest, as discussed above under "—Tax Considerations Applicable to U.S. Holders—Pre-Issuance Accrued Interest." However, to the extent any interest is subject to U.S. federal withholding tax as described below, the applicable withholding agent may withhold on all payments of interest, including payment of pre-issuance accrued interest, if the withholding agent is unable to determine which portion of the payments is attributable to pre-issuance accrued interest.

### *Definition of a Non-U.S. Holder*

For purposes of this discussion, a "Non-U.S. Holder" is a beneficial owner of a note that is neither a U.S. Holder nor an entity treated as a partnership for U.S. federal income tax purposes.

### *Payments of Interest*

Interest paid on a note (including for this purpose the portion of the first interest payment allocable to pre-issuance accrued interest) to a Non-U.S. Holder that is not effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States generally will not be subject to U.S. federal income tax, or withholding tax of 30% (or such lower rate specified by an applicable income tax treaty), provided that:

- the Non-U.S. Holder does not, actually or constructively, own 10% or more of the Issuer's capital or profits;

- the Non-U.S. Holder is not a controlled foreign corporation related to the Issuer through actual or constructive stock ownership; and

- either (1) the Non-U.S. Holder certifies in a statement provided to the applicable withholding agent under penalties of perjury that it is not a United States person and provides its name and address; (2) a securities clearing organization, bank or other financial institution that holds customers' securities in the ordinary course of its trade or business and holds the note on behalf of the Non-U.S. Holder certifies to the applicable withholding agent under penalties of perjury that it, or the financial institution between it and the Non-U.S. Holder, has received from the Non-U.S. Holder a

148

statement under penalties of perjury that such holder is not a United States person and provides a copy of such statement to the applicable withholding agent; or (3) the Non-U.S. Holder holds its note directly through a "qualified intermediary" (within the meaning of applicable Treasury Regulations) and certain conditions are satisfied.

If a Non-U.S. Holder does not satisfy the requirements above, such Non-U.S. Holder may be entitled to a reduction in or an exemption from withholding on such interest as a result of an applicable tax treaty. To claim such entitlement, the Non-U.S. Holder must provide the applicable withholding agent with a properly executed IRS Form W-8BEN or W-8BEN-E (or other applicable documentation) claiming a reduction in or exemption from withholding tax under the benefit of an income tax treaty between the United States and the country in which the Non-U.S. Holder resides or is established.

If interest paid to a Non-U.S. Holder is effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, the Non-U.S. Holder maintains a permanent establishment in the United States to which such interest is attributable), the Non-U.S. Holder will be exempt from the U.S. federal withholding tax described above. To claim the exemption, the Non-U.S. Holder must furnish to the applicable withholding agent a valid IRS Form W-8ECI, certifying that interest paid on a note is not subject to withholding tax because it is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States.

Any such effectively connected interest generally will be subject to U.S. federal income tax at the regular rates. A Non-U.S. Holder that is a corporation also may be subject to a branch profits tax at a rate of 30% (or such lower rate specified by an applicable income tax treaty) on such effectively connected interest, as adjusted for certain items.

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and must be updated periodically. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

Non-U.S. Holders should consult their tax advisors regarding the possibility of claiming a refund with respect to any withholding imposed on the portion of the first interest payment allocable to pre-issuance accrued interest.

### *Sale or Other Taxable Disposition*

A Non-U.S. Holder will not be subject to U.S. federal income tax on any gain realized upon the sale, exchange, redemption, retirement or other taxable disposition of a note (such amount excludes any amount allocable to accrued and unpaid interest, which generally will be treated as interest and may be subject to the rules discussed above for interest payments in "—Tax Considerations Applicable to Non-U.S. Holders—Payments of Interest," and also excludes any pre-issuance accrued interest, which may be subject to the rules discussed above for payments allocable to pre-issuance accrued interest under "—Tax Considerations Applicable to Non-U.S. Holders—Payments of Interest") unless:

- the gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, the Non-U.S. Holder maintains a permanent establishment in the United States to which such gain is attributable); or

- the Non-U.S. Holder is a nonresident alien individual present in the United States for 183 days or more during the taxable year of the disposition and certain other requirements are met.

Gain described in the first bullet point above generally will be subject to U.S. federal income tax on a net income basis at the regular rates. A Non-U.S. Holder that is a foreign corporation also may be subject to a branch profits tax at a rate of 30% (or such lower rate specified by an applicable income tax treaty) on such effectively connected gain, as adjusted for certain items.

A Non-U.S. Holder described in the second bullet point above will be subject to U.S. federal income tax at a rate of 30% (or such lower rate specified by an applicable income tax treaty) on gain realized upon the sale, exchange, redemption, retirement or other taxable disposition of a note, which may be offset by U.S. source capital losses of the Non-U.S. Holder (even though the individual is not considered a resident of the United States), provided the Non-U.S. Holder has timely filed U.S. federal income tax returns with respect to such losses.

Non-U.S. Holders should consult their tax advisors regarding any applicable income tax treaties that may provide for different rules.

EXHIBIT O(2)

AOE0763

*Information Reporting and Backup Withholding*

Payments of interest generally will not be subject to backup withholding, provided the applicable withholding agent does not have actual knowledge or reason to know the holder is a United States person and the holder certifies its non-U.S. status as described above under "—Tax Considerations Applicable to Non-U.S. Holders—Payments of Interest." However, information returns are required to be filed with the IRS in connection with any interest paid to the Non-U.S. Holder, regardless of whether any tax was actually withheld. In addition, proceeds of the sale or other taxable disposition of a note (including a retirement or redemption of the note) within the United States or conducted through certain U.S.-related brokers generally will not be subject to backup withholding or information reporting, if the applicable withholding agent receives the statement described above and does not have actual knowledge or reason to know that such holder is a United States person or the holder otherwise establishes an exemption. Proceeds of a disposition of a note paid outside the United States and conducted through a non-U.S. office of a non-U.S. broker generally will not be subject to backup withholding or information reporting.

Copies of information returns that are filed with the IRS may also be made available under the provisions of an applicable treaty or agreement to the tax authorities of the country in which the Non-U.S. Holder resides or is established.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against a Non-U.S. Holder's U.S. federal income tax liability, provided the required information is timely furnished to the IRS.

**Additional Withholding Tax on Payments Made to Foreign Accounts**

Withholding taxes may be imposed under Sections 1471 to 1474 of the Code (such Sections commonly referred to as the Foreign Account Tax Compliance Act, or "FATCA") on certain types of payments made to non-U.S. financial institutions and certain other non-U.S. entities. Specifically, a 30% withholding tax may be imposed on payments of interest on, or (subject to the proposed Treasury Regulations discussed below) gross proceeds from the sale or other disposition of, a note paid to a "foreign financial institution" or a "non-financial foreign entity" (each as defined in the Code), unless (1) the foreign financial institution undertakes certain diligence and reporting obligations, (2) the non-financial foreign entity either certifies it does not have any "substantial United States owners" (as defined in the Code) or furnishes identifying information regarding each substantial United States owner, or (3) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules. If the payee is a foreign financial institution and is subject to the diligence and reporting requirements in clause (1) above, it must enter into an agreement with the U.S. Department of the Treasury requiring, among other things, that it undertake to identify accounts held by certain "specified United States persons" or "United States owned foreign entities" (each as defined in the Code), annually report certain information about such accounts, and withhold 30% on certain payments to non-compliant foreign financial institutions and certain other account holders. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.

Under the applicable Treasury Regulations and administrative guidance, withholding under FATCA generally applies to payments of interest on a note. While withholding under FATCA would have applied also to payments of gross proceeds from the sale or other disposition of a note on or after January 1, 2019, proposed Treasury Regulations eliminate FATCA withholding on payments of gross proceeds entirely. Taxpayers generally may rely on these proposed Treasury Regulations until final Treasury Regulations are issued.

**Prospective investors should consult their tax advisors regarding the potential application of withholding under FATCA to their investment in the notes.**

EXHIBIT O(2)

AOE0764

## PLAN OF DISTRIBUTION

Subject to the terms and conditions contained in a purchase agreement among the Issuers, the Guarantors and the Initial Purchaser, we have agreed to sell to the Initial Purchaser, and the Initial Purchaser has agreed to purchase, the entire principal amounts of notes.

The Initial Purchaser has agreed to purchase all of the notes being sold pursuant to the purchase agreement if any of the notes are purchased.

The Initial Purchaser has advised the Issuers that they propose initially to offer the notes at the price listed on the cover page of this offering memorandum. After the initial offering of the notes, the Initial Purchaser may from time to time vary the offering price and selling terms. The Initial Purchaser may offer and sell through certain of its affiliates.

The Issuers have agreed to indemnify the Initial Purchaser against certain liabilities, including liabilities under the Securities Act, or to contribute to payments the Initial Purchaser may be required to make in respect of those liabilities.

The Initial Purchaser is offering the notes, subject to prior sale, if, as and when issued to and accepted by it, subject to approval of legal matters by their counsel, including the validity of the notes, and other conditions contained in the purchase agreement, such as the receipt by the Initial Purchaser of officers' certificates and legal opinions. The Initial Purchaser reserves the right to withdraw, cancel or modify offers to investors and to reject orders in whole or in part.

The notes have not been registered under the Securities Act or any state securities laws and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except to persons reasonably believed to be qualified institutional buyers in reliance on Rule 144A under the Securities Act and to persons in offshore transactions in reliance on Regulation S under the Securities Act. In connection with sales outside the United States, the initial purchaser has agreed that, except as permitted by the purchase agreement, it will not offer, sell or deliver the notes (i) as part of its distribution at any time or (ii) otherwise until 40 days after the later of the commencement of the offering and the closing date, within the United States or to, or for the account or benefit of, U.S. persons, and it will have sent to each broker/dealer to which it sells notes in reliance on Regulation S during such 40-day period, a confirmation or other notice detailing the restrictions on offers and sales of the notes within the United States or to, or for the account or benefit of, U.S. persons. Terms used in this paragraph have the meanings given to them by Regulation S under the Securities Act. Resales of the notes are restricted as described under "*Notice to Investors*."

In addition, until 40 days after the commencement of the offering, an offer or sale of notes within the United States by a broker/dealer (whether or not it is participating in the offering) may violate the registration requirements of the Securities Act if such offer or sale is made otherwise than pursuant to Rule 144A or another exemption from registration under the Securities Act.

The Issuers have agreed that for a period of 90 days after the date of the purchase agreement, neither the Issuers nor any of the Guarantors, will, other than as contemplated by the purchase agreement, without the prior written consent of RBC Capital Markets, LLC, directly or indirectly, offer, sell, contract to sell, or otherwise transfer or dispose of (or enter into any transaction or devise that is designed to, or could be reasonably expected to, result in the disposition in the future of) any debt securities issued or guaranteed by the Issuers or any of the Guarantors other than those contemplated by the Transactions.

In addition, with respect to notes initially sold pursuant to Regulation S under the Securities Act, until 40 days after the commencement of this offering, an offer or sale of such notes within the U.S. by a dealer that is not participating in the offering may violate the registration requirements of the Securities Act.

There is no established trading market for the notes. The Issuers do not intend to list the notes on any securities exchange or to arrange for quotation on any automated dealer quotation system. The Initial Purchaser has advised the Issuers that they presently intend to make a market in the notes as permitted by applicable laws; however, they are not obligated to do so and may discontinue such market making at any time without providing any notice. Accordingly, no assurance can be given as to the liquidity of any trading market for the notes.

In connection with the offering, the Initial Purchaser may purchase and sell notes and/or the Issuers' other debt securities in the open market. These transactions may include short sales, stabilizing transactions and purchases to cover positions created by short sales. Short sales involve the sale by the Initial Purchaser of a greater number of notes (or such other securities) than they are required to purchase in the offering or which they hold in inventory. Stabilizing transactions consist of certain bids or purchases made for the purpose of preventing or retarding a decline in the market price of the notes while the offering is in progress.

These activities by the Initial Purchaser may stabilize, maintain or otherwise affect the market price of the notes and/or other of the Issuers' debt securities. As a result, the price of the notes (or such other securities) may be higher than the price that otherwise

EXHIBIT O(2)

AOE0765

might exist in the open market. If these activities are commenced, they may be discontinued by the Initial Purchaser at any time. These transactions may be effected in the over-the-counter market or otherwise.

The Initial Purchaser and certain of its affiliates are full service financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, investment research, principal investment, hedging, financing and brokerage activities. The Initial Purchaser and certain of its affiliates have, from time to time, performed, and may in the future perform, various financial advisory and investment banking services for the Issuers, for which they received or will receive customary fees and expenses. The Initial Purchaser and/or its affiliates are acting as arrangers, agents and/or lenders under the Senior Credit Facilities.

In the ordinary course of their various business activities, the Initial Purchaser and certain of its affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own account and for the accounts of their customers, and such investment and securities activities may involve securities and/or instruments of the Issuers. The Initial Purchaser and certain of its affiliates may also make investment recommendations and/or publish or express independent research views in respect of such securities or instruments and may at any time hold, or recommend to clients that they acquire, long and/or short positions in such securities and instruments.

The Issuers expect to deliver the notes against payment for the notes on or about the date specified on the cover page of this offering memorandum, which will be the                business day following the date of the pricing of the notes. Since trades in the secondary market generally settle in two business days, purchasers who wish to trade notes prior to the settlement date, will be required, by virtue of the fact that the notes initially will settle T+   , to specify alternative settlement arrangements to prevent a failed settlement.

## Notice to Prospective Investors in the European Economic Area

The notes are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the European Economic Area (the "EEA"). For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU (as amended, "MiFID II"); (ii) a customer within the meaning of Directive (EU) 2016/97 (as amended, the "Insurance Distribution Directive"), where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (iii) not a "qualified investor" within the meaning of Article 2(e) of Regulation (EU) 2017/1129 (as amended, the "Prospectus Regulation"). Consequently no key information document required by Regulation (EU) 1286/2014 (as amended, the "PRIIPs Regulation") for offering or selling the notes or otherwise making them available to retail investors in the EEA has been prepared and therefore offering or selling the notes or otherwise making them available to any retail investor in the EEA may be unlawful under the PRIIPs Regulation.

This offering memorandum has been prepared on the basis that any offer of the notes in any Member State of the EEA will be made pursuant to an exemption under the Prospectus Regulation from a requirement to publish a prospectus for offers of notes. This offering memorandum is not a prospectus for the purposes of the Prospectus Regulation.

For the purposes of this provision, the expression an "offer," "offer to the public" or "offer of securities to the public," (or similar wording) in each case in relation to any of the notes in any EEA Member State, or the UK means the communication in any form and by any means of sufficient information on the terms of the offer and the notes to be offered so as to enable an investor to decide to purchase or subscribe for the notes.

Neither we nor the Initial Purchaser or its affiliates have authorized, nor do authorize, the making of any offer of notes through any financial intermediary, other than offers made by the initial purchaser, which constitute the final placement of the notes contemplated in this offering memorandum.

## Prohibition of sales to UK retail investors

The notes are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the United Kingdom (the "United Kingdom" or the "UK"). For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client, as defined in point (8) of Article 2 of Regulation (EU) No 2017/565 as it forms part of domestic law by virtue of the European Union (Withdrawal) Act 2018 (the "EUWA"); or (ii) a customer within the meaning of the provisions of the FSMA and any rules or regulations made under the FSMA to implement Directive (EU) 2016/97, where that customer would not qualify as a professional client, as defined in point (8) of Article 2(1) of Regulation (EU) No 600/2014 as it forms part of domestic law by virtue of the EUWA; or (iii) not a "qualified investor" as defined in Article 2 of Regulation (EU) 2017/1129 as it forms part of the domestic law by virtue of the EUWA (the "UK Prospectus Regulation").  Consequently, no key information document required by Regulation (EU) No 1286/2014 as it forms part of domestic law by virtue of the EUWA (the "UK PRIIPs Regulation") for offering or selling the notes or otherwise making them available to retail investors in the UK has been

EXHIBIT O(2)

AOE0766

prepared and, therefore, offering or selling the notes or otherwise making them available to any retail investor in the UK may be unlawful under the UK PRIIPs Regulation.

This offering memorandum has been prepared on the basis that any offer of the notes in the UK will be made pursuant to an exemption under the UK Prospectus Regulation from a requirement to publish a prospectus for offers of notes. This offering memorandum is not a prospectus for the purpose of the UK Prospectus Regulation.

## Professional Investors and Eligible Counterparties Only Target Market

Solely for the purposes of each manufacturer's product approval process, the target market assessment in respect of the securities described in this offering memorandum has led to the conclusion that: (i) the target market for such securities is eligible counterparties and professional clients only, each as defined in Directive 2014/65/EU (as amended, "MiFID II"); and (ii) all channels for distribution of such securities to eligible counterparties and professional clients are appropriate. Any person subsequently offering, selling or recommending such securities (a "distributor") should take into consideration the manufacturers' target market assessment; however, a distributor subject to MiFID II is responsible for undertaking its own target market assessment in respect of such securities (by either adopting or refining the manufacturers' target market assessment) and determining appropriate distribution channels.

## Notice to Prospective Investors in Switzerland

This offering memorandum does not constitute an issue prospectus pursuant to Article 652a and/or Article 1156 of the Swiss Code of Obligations and the notes will not be listed on the SIX Swiss Exchange. Therefore, this offering memorandum may not comply with the disclosure standards of the listing rules (including any additional listing rules or prospectus schemes) of the SIX Swiss Exchange. Accordingly, the notes may not be publicly offered, sold or advertised, directly or indirectly, in, into or from Switzerland, but only to a selected and limited circle of investors who do not subscribe to the notes with a view to distribution. Any such investors will be individually approached by the Initial Purchasers from time to time. This offering memorandum, as well as any other material relating to the notes, is personal and confidential and does not constitute an offer to any other person. This offering memorandum, as well as any other material relating to the notes, may only be used by those investors to whom it has been sent in connection with the offering described herein and may neither directly nor indirectly be distributed or made available to other persons without the Issuers' express consent. This offering memorandum, as well as any other material relating to the notes, may not be used in connection with any other offer and shall in particular not be copied and/or distributed to the public in (or from) Switzerland.

## Notice to Prospective Purchasers in Hong Kong

This offering memorandum has not been approved by or registered with the Securities and Futures Commission of Hong Kong or the Registrar of Companies of Hong Kong. The securities to be sold under this offering memorandum may not be offered or sold by means of any document other than (a) to "professional investors" as defined in the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made under that Ordinance; or (b) in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong); or (c) in other circumstances which do not result in the document being a "prospectus" as defined in the Companies Ordinance (Cap. 32, Laws of Hong Kong), and no advertisement, invitation or document relating to the securities may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be accessed or read by, the public of Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to securities which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" as defined in the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made under that Ordinance.

## Notice to Prospective Purchasers in Japan

The notes have not been and will not be registered under the Financial Instruments and Exchange Act of Japan (Law No. 25 of 1948, as amended) (the "FIEA") and disclosure under the FIEA has not been and will not be made with respect to the notes. Accordingly, the notes may not be offered or sold, directly or indirectly, in Japan, or to, or for the benefit of, any Japanese Person or to others for re-offering or resale, directly or indirectly, in Japan or to, or for the benefit of, any Japanese Person, except pursuant to an exemption from the registration requirements of, and otherwise in compliance with, the FIEA and other relevant laws, regulations and ministerial guidelines promulgated by relevant Japanese governmental or regulatory authorities in effect at the relevant time. For the purposes of this paragraph, "Japanese Person" shall mean any person resident in Japan, including any corporation or other entity organized under the laws of Japan.

## Notice to Prospective Purchasers in Singapore

This offering memorandum has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this offering memorandum and any other document or material in connection with the offer or sale, or invitation for subscription or

EXHIBIT O(2)

AOE0767

purchase, of the notes have not and may not be circulated or distributed, nor may the notes be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA"), (ii) to a relevant person pursuant to Section 275(1) of the SFA, or any person pursuant to Section 275(1A) of the SFA, and in accordance with the conditions specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA, in each case subject to compliance with conditions set forth in the SFA.

Where the securities are subscribed or purchased under Section 275 of the SFA by a relevant person which is: (a) a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)), the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or (b) a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor; then securities (as defined in Section 239(1) of the SFA) of that corporation or the beneficiaries' rights and interest in that trust will not be transferable for 6 months after that corporation or that trust has acquired the securities under Section 275 of the SFA except: (i) to an institutional investor under Section 274 of the SFA, or to a relevant person under Section 275(2) of the SFA, or any person arising from an offer referred to in Section 275(1A) or Section 276(4)(i)(B) of the SFA; (ii) where no consideration is given for the transfer; (iii) by operation of law; or (iv) as specified in Section 276(7) of the SFA.

**Notice to Prospective Purchasers in Dubai International Financial Centre**

This document relates to an exempt offer in accordance with the Offered Securities Rules of the Dubai Financial Services Authority. This document is intended for distribution only to persons of a type specified in those rules. It must not be delivered to, or relied on by, any other person. The Dubai Financial Services Authority has no responsibility for reviewing or verifying any documents in connection with exempt offers. The Dubai Financial Services Authority has not approved this document nor taken steps to verify the information set out in it, and has no responsibility for it. The notes which are the subject of the Offering contemplated by this offering memorandum may be illiquid and/or subject to restrictions on their resale. Prospective purchasers of the notes offered should conduct their own due diligence on the notes. If you do not understand the contents of this document you should consult an authorized financial adviser.

EXHIBIT O(2)

AOE0768

**LEGAL MATTERS**

Latham & Watkins LLP, Los Angeles, California, is acting as counsel to the Issuers in connection with this offering. The Initial Purchaser is being represented by Paul Hastings LLP, New York, New York.

**INDEPENDENT ACCOUNTANTS**

The financial statements of Allen Media Holdings, LLC and its subsidiaries, as of and for the years ended December 31, 2020 and 2019, included in this offering memorandum, have been audited by PricewaterhouseCoopers LLP, independent accountants, as stated in their report appearing herein.

The combined financial statements of KVOA Television, Inc., WKOW Television, Inc., WSIL Television, Inc., KWWL Television, Inc., WXOW – WQOW Television, Inc. WAOW – WYOW Television, Inc., and WREX Television, LLC (a Carve-out of Quincy Media, Inc.) as of and for the years ended December 31, 2020 and 2019, included in this offering memorandum, have been audited by RSM US LLP, independent auditors, as stated in their report appearing herein.

EXHIBIT O(2)

AOE0769

**WHERE YOU CAN FIND MORE INFORMATION**

Each purchaser of the notes will be furnished a copy of this offering memorandum and any related amendments or supplements to this offering memorandum. Each person receiving this offering memorandum acknowledges that:

- such person has been afforded an opportunity to request from the Issuers, and to review and has received, all additional information considered by it to be necessary to verify the accuracy and completeness of the information herein;

- such person has not relied on the Initial Purchaser or any person affiliated with the Initial Purchaser in connection with its investigation of the accuracy of such information or its investment decision; and

- except as provided above, no person has been authorized to give any information or to make any representation concerning the notes offered hereby other than those contained herein and, if given or made, such other information or representation should not be relied upon as having been authorized by the Issuers or the Initial Purchaser.

This offering memorandum contains summaries of agreements that the Issuers or their affiliates have entered into or expect to enter into in connection with this offering and the Transactions such as are described in this offering memorandum. The descriptions contained in this offering memorandum of these agreements are not purported to be complete and are subject to, or qualified in their entirety by reference to, the definitive agreements.

The Issuers are not subject to the reporting requirements and other information requirements of the Exchange Act. While any notes remain outstanding, the Issuers will make available, upon request, to any holder and any prospective purchaser of notes the information required pursuant to Rule 144(d)(4) under the Securities Act to permit compliance with Rule 144A in connection with resales of the notes. See the section titled "Description of Notes—Certain Covenants—Reports." Such information and copies of the definitive agreements referenced in the prior paragraph will be made available without charge to you by making a written request to us at the following address:

Allen Media, LLC
1925 Century Park East, 10th Floor
Los Angeles, California 90067
Telephone: (310) 277-3500
Attention: General Counsel

156

## INDEX TO FINANCIAL STATEMENTS

**Financial Statements of Allen Media Holdings, LLC and Subsidiaries**      F-1

Report of Independent Auditors ......................................................................................... F-1

Consolidated Balance Sheets as of December 31, 2020 and 2019 ..................................... F-3

Consolidated Statements of Operations for the years ended December 31, 2020 and 2019............... F-4

Consolidated Statements of Member's Deficit for the years ended December 31, 2020 and 2019..... F-5

Consolidated Statements of Cash Flows for the years ended December 31, 2020 and 2019............... F-6

Notes to Consolidated Financial Statements........................................................................ F-8

Unaudited Consolidated Balance Sheets as of March 31, 2021 and December 31, 2020.................... F-43

Unaudited Consolidated Statement of Operations for the Three Months Ended March 31, 2021 and 2020........ F-44

Unaudited Consolidated Statement of Member's Deficit for the Three Months Ended March 31, 2021 and 2020 ........ F-45

Unaudited Consolidated Statement of Cash Flows for the Three Months Ended March 31, 2021 and 2020 ........ F-46

Notes to Unaudited Consolidated Financial Statements .......................................................... F-47

**Financial Statements of Certain Television Stations (A Carve-out of Quincy Media, Inc.)**      F-76

Independent Auditors Report............................................................................................ F-76

Combined Balance Sheets as of December 31, 2020 and 2019.......................................... F-77

Combined Statements of Operations for the years ended December 31, 2020 and 2019 .................... F-78

Combined Statements of Changes in Invested Equity for the years ended December 31, 2020 and 2019........ F-79

Combined Statements of Cash Flows for the years ended December 31, 2020 and 2019.................... F-80

Notes to the Combined Financial Statements .................................................................... F-81

Unaudited Condensed Combined Balance Sheets as of March 31, 2021 and December 31, 2020 .... F-94

Unaudited Condensed Combined Statements of Operations for the Three Months Ended March 31, 2021 and 2020 ........ F-95

Unaudited Condensed Combined Statements of Changes in Invested Equity for the Periods Ended March 31, 2021 and 2020........ F-96

Unaudited Condensed Combined Statements of Cash Flows for the Three Months Ended March 31, 2021 and 2020 ........ F-97

Notes to Unaudited Condensed Combined Financial Statements (unaudited) ................................... F-98

EXHIBIT O(2)

AOE0771

**Report of Independent Auditors**

To the Management of Allen Media Holdings, LLC

We have audited the accompanying consolidated financial statements of Allen Media Holdings, LLC and its subsidiaries, which comprise the consolidated balance sheets as of December 31, 2020 and 2019, and the related consolidated statements of operations, of member's deficit and of cash flows for the years then ended.

***Management's Responsibility for the Consolidated Financial Statements***

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

***Auditors' Responsibility***

Our responsibility is to express an opinion on the consolidated financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, we consider internal control relevant to the Company's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

*Opinion*

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Allen Media Holdings, LLC and its subsidiaries as of December 31, 2020 and 2019, and the results of their operations and their cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

*Emphasis of Matter*

As discussed in Notes 2 and 4 to the consolidated financial statements, the Company changed the manner in which it accounts for revenues from contracts with customers in 2019. Our opinion is not modified with respect to this matter.

*PricewaterhouseCoopers LLP*

PricewaterhouseCoopers LLP
April 30, 2021
Los Angeles, California

EXHIBIT O(2)

AOE0773

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES

## CONSOLIDATED BALANCE SHEETS
### As of December 31, 2020 and 2019

### ASSETS

| | 2020 (In millions) | 2019 (In millions) |
|---|---|---|
| **CURRENT ASSETS** | | |
| Cash | $73.6 | $24.8 |
| Accounts receivable, net | 98.2 | 80.7 |
| Television library, current portion | 11.2 | 5.3 |
| Income tax receivables | 1.1 | 0.7 |
| Prepaid expenses and other current assets | 8.8 | 7.5 |
| **Total Current Assets** | **$192.9** | **$119.0** |
| | | |
| Tax credit receivable | 5.1 | 6.0 |
| Restricted cash | 0.2 | 0.2 |
| Property and equipment, net | 72.4 | 37.4 |
| Television library, less current portion | 125.2 | 87.9 |
| Film rights, less current portion | 9.7 | 13.2 |
| Intangible assets, net | 19.1 | 15.8 |
| Goodwill, net | 441.9 | 228.3 |
| Deferred tax assets | - | 0.9 |
| Other noncurrent assets | 4.0 | 2.5 |
| **TOTAL ASSETS** | **$ 870.5** | **$ 511.2** |

### LIABILITIES AND MEMBER'S DEFICIT

| | | |
|---|---|---|
| **CURRENT LIABILITIES** | | |
| Accounts payable and accrued liabilities | 137.7 | 105.7 |
| Due to related parties | 27.1 | 25.0 |
| Taxes payable | 4.4 | 6.5 |
| Current portion of borrowings | 11.4 | 10.8 |
| Current portion of capital lease liabilities | 2.5 | 2.5 |
| Deferred revenue | 9.8 | 9.8 |
| **Total Current Liabilities** | **$ 192.9** | **$160.3** |
| | | |
| Borrowings, less current portion | 983.3 | 530.5 |
| Capital lease liabilities, less current portion | 0.6 | 2.5 |
| Deferred tax liabilities | 22.9 | 13.3 |
| Other long-term liabilities | 7.9 | 5.1 |
| **Total Liabilities** | **$ 1,207.6** | **$ 711.7** |
| | | |
| **MEMBER'S DEFICIT** | | |
| Member's deficit | (337.1) | (207.0) |
| Equity attributable to minority noncontrolling interest | - | 6.5 |
| | | |
| **TOTAL MEMBER'S DEFICIT ATTRIBUTABLE TO ALLEN MEDIA HOLDINGS, LLC** | **$(337.1)** | **$ (200.5)** |
| | | |
| **TOTAL LIABILITIES AND MEMBER'S DEFICIT** | **$870.5** | **$ 511.2** |

The accompanying notes are an integral part of these consolidated financial statements.

EXHIBIT O(2)

AOE0774

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF OPERATIONS
### For the years ending December 31, 2020 and 2019

| | 2020 (In millions) | 2019 (In millions) |
|---|---|---|
| **Revenues** | | |
| Networks and content revenue | 241.7 | 265.3 |
| Broadcast television revenue | 127.3 | 17.7 |
| **Total Revenues** | **369.0** | **283.0** |
| | | |
| **Operating Expenses** | | |
| Programming and production expenses | 182.1 | 172.4 |
| Sales, general and administrative expenses | 120.5 | 97.9 |
| Depreciation and amortization of intangible assets and goodwill | 68.3 | 38.0 |
| Impairment of investment at cost and intangible assets | - | 7.5 |
| | | |
| **Total operating expenses** | **370.9** | **315.8** |
| | | |
| **Operating (loss) income** | **$(1.9)** | **$(32.8)** |
| | | |
| **Other Income (Expense)** | | |
| Interest expense | (89.1) | (65.8) |
| Loss on derecognition of debt | (47.2) | - |
| Other income, net | 2.6 | 0.4 |
| **Total other expense, net** | **(133.7)** | **(65.4)** |
| | | |
| **Loss before income taxes** | **(135.6)** | **(98.2)** |
| | | |
| Income tax expense (benefit) | (5.0) | 4.4 |
| **Net loss attributable to Allen Media Holdings, LLC and minority interests** | **(130.6)** | **(102.6)** |
| | | |
| Net loss attributable to minority noncontrolling interest | 0.4 | 3.5 |
| | | |
| **Net Loss attributable to Allen Media Holdings, LLC** | **$ (130.2)** | **$ (99.1)** |

The accompanying notes are an integral part of these consolidated financial statements.

EXHIBIT O(2)

AOE0775

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF MEMBER'S DEFICIT
### For the years ended December 31, 2020 and 2019

| (amounts in millions) | Member Note Receivable | Minority Interest | Member's Deficit | Total |
|---|---|---|---|---|
| **Balance, December 31, 2018** | **(6.3)** | - | **(103.0)** | **(109.3)** |
| Advances to member | (13.8) | - | - | (13.8) |
| Repayment of member's note receivable | 15.2 | - | - | 15.2 |
| Issuance of equity in subsidiary to noncontrolling interest holder | - | 10.0 | - | 10 |
| Net loss for the period ended December 31, 2019 | - | (3.5) | (99.1) | (102.6) |
| **Balance, December 31, 2019** | **(4.9)** | **6.5** | **(202.1)** | **(200.5)** |
| Advances to member | (35.4) | - | | **(35.4)** |
| Repayment of member's note receivable | 35.4 | - | | **35.4** |
| Contribution of minority interest from noncontrolling interest holder | - | (6.1) | 6.1 | - |
| Contribution from member | - | - | 9.0 | **9.0** |
| Distribution to member | | | (15.0) | **(15.0)** |
| Net loss for the period ended December 31, 2020 | - | (0.4) | (130.2) | **(130.6)** |
| **Balance, December 31, 2020** | **(4.9)** | **-** | **(332.2)** | **(337.1)** |

The accompanying notes are an integral part of these consolidated financial statements.

EXHIBIT O(2)

AOE0776

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES

### CONSOLIDATED STATEMENTS OF CASH FLOWS
### For the years ended December 31, 2020 and 2019

|  | 2020 (In millions) | 2019 (In millions) |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** |  |  |
| Net loss | $ (130.6) | $ (102.6) |
| Adjustments to reconcile change in net loss to net cash used in operating activities. |  |  |
| Depreciation and amortization of intangible assets and goodwill | 68.3 | 38.0 |
| Loss (gain) on disposal of property and equipment | (0.8) | 0.3 |
| Amortization of deferred financing cost | 4.1 | 11.1 |
| Amortization of television library | 30.3 | 22.0 |
| Amortization of film rights | 3.3 | 10.1 |
| Deferred income taxes | (10.0) | (2.9) |
| Bad debt expense and other | 0.1 | 0.3 |
| Loss on debt extinguishment | 47.2 | - |
| Impairment of investment at cost and intangible assets |  | 7.5 |
| Changes in Operating Assets and Liabilities: |  |  |
| Receivables | 6.8 | 10.5 |
| Television library assets | (64.5) | (41.0) |
| Film rights assets | 0.2 | (6.5) |
| Prepaid expenses and other assets | 3.1 | 0.9 |
| Other noncurrent assets | (1.7) | (0.1) |
| Accounts payable and accrued expense | 17.5 | 46.6 |
| Deferred revenue | (1.0) | (1.0) |
| Taxes payable | (0.6) | (4.1) |
| Other noncurrent liabilities | - | 0.3 |
| **Net Cash used in Operating Activities** | **$ (28.3)** | **$ (10.6)** |
|  |  |  |
| **CASH FLOWS FROM INVESTING ACTIVITIES** |  |  |
| Acquisition of property and equipment | (7.8) | (3.4) |
| Purchase of intangible assets | (7.0) | (4.6) |
| Acquisition of business, net of cash acquired | (303.3) | (163.7) |
| **Net cash used in Investing Activities** | **$ (318.1)** | **$ (171.7)** |

The accompanying notes are an integral part of these consolidated financial statements.

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF CASH FLOWS
### For the years ended December 31, 2020 and 2019

|  | 2020 (In millions) | 2019 (In millions) |
|---|---|---|
| **CASH FLOWS FROM FINANCING ACTIVITIES** |  |  |
| Borrowings, net of discount and fees paid to lenders | $1,043.1 | $ 204.7 |
| Borrowings from related party | 2.0 | 14.6 |
| Repayments of borrowings | (614.9) | (46.9) |
| Repayments of borrowings from related party | - | (1.1) |
| Proceeds from issuance of equity in subsidiary to noncontrolling interest holder | - | 10.0 |
| Payment of debt issuance costs | (26.2) | - |
| Cash received from member, net | - | 1.4 |
| Member contribution | 9.0 | - |
| Member distribution | (15.0) | - |
| Payments on capital leases | (2.8) | (2.2) |
| **Net Cash provided by Financing Activities** | 395.2 | 180.5 |
| **NET CHANGE IN CASH AND RESTRICTED CASH** | 48.8 | (1.8) |
| **CASH AND RESTRICTED CASH AT BEGINNING OF PERIOD** | 25.0 | 26.8 |
| **CASH AND RESTRICTED CASH AT END OF PERIOD** | **$ 73.8** | **$ 25.0** |
| **Schedule of supplemental cash flow information** |  |  |
| Cash paid for taxes | $  5.5 | $ 11.0 |
| Cash paid for interest | $ 53.4 | $ 46.3 |
| **Supplemental disclosure of noncash investing and financing activity** |  |  |
| Equipment purchased under capital lease | $ 0.7 | $ 1.6 |

The accompanying notes are an integral part of these consolidated financial statements.

EXHIBIT O(2)

AOE0778

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended and as of December 31, 2020 and 2019

## NOTE 1 – NATURE OF BUSINESS

Allen Media Holdings, LLC ("AMH") was formed on January 17, 2018 and is owned by one member. AMH functions as a holding company for Allen Media, LLC ("AM") and its subsidiaries. AM and its wholly owned subsidiaries constitute a diversified media company that owns and operates television networks, including The Weather Channel, broadcast television stations and a production and distribution business, which creates original programming across multiple genres. Certain wholly owned subsidiaries existed and operated prior to the formation of AMH. A restructuring in 2018 resulted in substantially all companies being wholly owned subsidiaries of AM. AMH, AM, and the operating entities are collectively described in these consolidated financial statements as "AMH Group" "the Company", or "we".

The Company distributes its programming, mainly in exchange for advertising airtime that it sells to advertising agencies in the U.S. Also, we operate several digital cable and satellite channels which broadcast its television programs through our affiliates. We also produce and distribute motion picture content through our motion pictures division, specializing in production, distribution, and representation for independent companies, major studios and mini-major studios.

In March 2018, we purchased Weather Group, LLC ("WG"). WG is a multi-platform media company focused on providing weather information and programming on various platforms. The WG cable network produces continuous 24-hour national, regional, and local weather-related television programming distributed by cable, satellite, and telecommunications multichannel video programming distributors in the U.S. and Caribbean.

In April 2019, the Company, along with its member, formed Allen Media Broadcast Holdings ("AMBH") and Allen Media Broadcasting ("AMB"), which subsequently acquired Bayou City Broadcasting Evansville, Inc. and Bayou City Broadcasting Lafayette, Inc., (collectively referred to as "Bayou") on July 3, 2019 as further described in Note 3. Bayou is a television broadcast station group with stations affiliated with big four television networks such as CBS, FOX, and NBC.

In February 2020, a subsidiary of AMB, Allen Media Broadcasting Evansville, Inc., acquired nine television stations, the USA TV stations, as further described in Note 3. The stations acquired are affiliated with big four television networks such as CBS, FOX, and NBC.

During the years ended December 31, 2020 and 2019, the Company incurred a consolidated net loss of $130.6 million and $102.6 million, respectively, and a member's deficit of $337.1 million and $200.5 million, respectively. As of December 31, 2020, the Company had outstanding debt of $994.7 million, with required payments for these borrowings of $11.4 million plus interest in 2021, as further described in Notes 11 and 16.

The Company continues to maintain a strong library of film and television content and broadcasting assets in key markets that management expects to provide positive returns beginning in 2021. As of December 31, 2020, cash on hand was $73.6 million and our current assets of $192.9 million were equal to our current liabilities of $192.9 million, including $15.4 million of amounts due to our member which can but are not required to be repaid prior to third quarter of 2022. As of December 31, 2020, the Company was in compliance with its financial covenants contained in the credit agreements governing its outstanding debt.

EXHIBIT O(2)

AOE0779

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended and as of December 31, 2020 and 2019

## NOTE 1 – NATURE OF BUSINESS (Continued)

In accordance with Accounting Standards Update ("ASU") 2014-15, *Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern (Subtopic 205-40)*, the Company has evaluated whether there are conditions and events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern within one year from the date of the issuance of these consolidated financial statements. The Company is highly leveraged, which makes it vulnerable to changes in general economic conditions. The Company's ability to repay or refinance its debt will depend on, among other things, financial, business, market, competitive and other conditions, some of which are beyond the Company's control. However, based on current operations and forecasted results, the Company believes that its available cash as of the date of the issuance of these financial statements, anticipated cash flows from operations and available borrowings under existing credit facilities will be sufficient to finance its operations and fund working capital, capital expenditure requirements, interest payments and scheduled debt principal payments for at least the next twelve months. The accompanying financial statements have been prepared assuming that the Company will continue as a going concern.

## NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Presentation
The Company's consolidated financial statements are prepared using the accrual basis of accounting in accordance with accounting principles generally accepted in the United States.

### Principles of Consolidation
The consolidated financial statements of the Company as of December 31, 2020 and 2019 include the accounts of Allen Media Holdings, LLC and its subsidiaries, which is primarily Allen Media, LLC and its subsidiaries, including Entertainment Studios Media Holdings ("ESMH"), Entertainment Studios P&A ("ESP&A"), Entertainment Studios Motion Pictures ("ESMP"), the Weather Group ("WG") , and AMBH and its subsidiaries and other direct subsidiaries. All significant intercompany transactions have been eliminated in consolidation.

### Use of Estimates
The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make assumptions that affect the reported amounts of assets and liabilities and the reported amounts of revenues and expenses. The significant estimates in the accompanying financial statements include ultimate revenues for film rights and television library, impairment provisions for long-lived assets and intangible assets, allowances for doubtful accounts receivable, useful lives of property and equipment, television library and film rights, and intangible assets, deferred revenue, valuation and recoverability of goodwill, and contingencies. Although the Company regularly assesses these estimates, actual results could differ materially from these estimates. Changes in estimates are recorded in the period in which they become known. The Company bases its estimates on historical experience and various other assumptions that it believes reasonable under the circumstances. Actual results could differ from these estimates.

### Restricted Cash
Restricted cash consists of funds that are contractually restricted as to usage or withdrawal due to a standby letter of credit relating to the operating lease of our facility in New York. The Company has presented restricted cash separately from cash and cash equivalents on the consolidated balance sheet.

EXHIBIT O(2)

AOE0780

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2020 and 2019

## NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

### Accounts Receivables, Net

Accounts receivable comprise customers' outstanding balances in respect of advertising, license fees and subscriptions less any allowance for doubtful accounts including affiliate revenue reserves. An allowance for doubtful accounts on accounts receivable is charged to expense in amounts sufficient to maintain the allowance for uncollectible accounts at a level management believes is adequate to cover any probable losses. Management determines the adequacy of the allowance based on historical write-off percentages and information collected from individual customers. Accounts receivable are charged off against the allowance when collectability is determined to be permanently impaired.

Within accounts receivable, net, the Company has certain current royalties receivable relates to music and content aired on the Company's digital cable and satellite channels, together with retransmission royalties and are recorded at their net present value. An allowance for doubtful accounts on royalties receivable is charged to expense in amounts sufficient to maintain the allowance for uncollectible accounts at a level management believes is adequate to cover any probable losses. Management determines the adequacy of the allowance based on historical write-off percentages and information collected. Royalties receivable are charged off against the allowance when collectability is determined to be permanently impaired. Royalties receivable totaling $0.6 million and $0.7 million were included in accounts receivable, net, for the years ended December 31, 2020 and 2019, respectively.

### Property and Equipment

Property and equipment are carried at cost. Depreciation and amortization are computed using the straight-line method over the estimated useful lives of the respective assets, generally as follows:

| | |
|---|---|
| Production equipment | 2 - 10 years |
| Office furniture and equipment | 2 - 7 years |
| Leasehold improvements | Lesser of the useful life or the lease term |
| Satellites | 42 months |
| Trucks and automobiles | 2 - 7 years |

The Company also has assets in the course of construction ("Construction in progress") totaling $3.8 million and $2.6 million for the years ended December 31, 2020 and 2019, respectively. Such assets are depreciated once the asset is completed and placed into service. Maintenance and repairs are charged to operations when incurred, while betterments and renewals are capitalized. Gains or losses are recognized upon the sale or disposal of the assets.

EXHIBIT O(2)

AOE0781

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended and as of December 31, 2020 and 2019

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

Television Library and Film Rights

The Company's television library consists of i) capitalized television production costs for content produced by the Company and aired on the Company's broadcast or cable networks or licensed to customers and ii) programming rights for content licensed from third parties to air on the Company's broadcast and cable networks. Film rights ("film costs") represent the cost to acquire the distribution rights or finance the production of motion pictures for theatrical release and distribution.

Capitalized television production costs and film rights are accounted for in accordance with FASB ASC Topic No. 926, Entertainment—Films, and programming rights and related costs are accounted for in accordance with FASB Accounting Standards Codification ("ASC") Topic No. 920, Entertainment—Broadcasters.

Capitalized production costs include direct costs, production overhead and interest, and are stated at the lower of unamortized cost or fair value. Programming rights are recorded when the program is available for use and are stated at the lower of unamortized cost or net realizable value.

Capitalized television production costs and film rights are amortized to expense over their estimated useful lives which range from 4-10 years, commencing upon the first airing, based on estimated usage or revenue to date as a percentage of remaining total projected attributable revenue, or ultimate revenue (individual-film-forecast-computation method). In certain cases, the Company utilizes a straight-line usage-based methodology to amortize capitalized television production costs. When estimates of total revenues or other events or changes in circumstances indicate that a television production or film has a fair value that is less than unamortized cost, an impairment loss is recognized for the amount by which the unamortized cost exceeds the fair value. No impairments were recorded during the years ended December 31, 2020 and 2019.

Projected attributable revenue can change based on market conditions and management decisions regarding planned content usage. These calculations require management to make assumptions and apply judgment regarding revenue and planned usage. Accordingly, the Company periodically reviews revenue estimates and planned usage and revises its assumptions if necessary, which could impact the timing of amortization expense or result in an impairment.

Programming rights are amortized over the contract term based on estimated usage. The portion of the unamortized balance expected to be amortized in the succeeding year is classified as a current asset, with the remainder classified as noncurrent.

Intangible Assets

Intangible assets consist of acquired and internally developed technology and software, costs incurred to acquire the names of digital and satellite channels, Federal Communications Commission ("FCC") licenses, and localization technology (or STAR) conveyed to cable, satellite and other distributors. STAR technology allows distributors of a network signal to receive the transmission of thousands of localized weather forecasts and extract the forecast for a specific geography. Software consists primarily of a developed application, Local Now, and related technology acquired through the Weather Group acquisition which are primarily for internal use. The Company also has intangible assets in the course of construction ("Construction in process"). Amortization of such assets begins once the asset is completed and placed into service. Intangible assets are capitalized and amortized on a straight-line basis over 3 to 15 years except FCC licenses which are indefinite-lived and therefore not amortized.

EXHIBIT O(2)

AOE0782

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended and as of December 31, 2020 and 2019

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

Impairment tests for intangible assets not subject to amortization are performed annually or when events or circumstances indicate it is more likely than not that the asset is impaired. The impairment test involves a comparison of the estimated fair value of the intangible asset with its carrying value. If the carrying value of the intangible asset exceeds its fair value, an impairment loss is recognized in an amount equal to that excess.

Goodwill

Goodwill relates to the acquisitions of WG, Bayou, USA TV stations, TheGrio, and Freestyle and represents the excess of purchase price over the value assigned to the assets acquired. The acquisitions of Bayou and USA TV stations are further discussed in Note 3.

The Company has applied the guidance under FASB Accounting Standards Update ("ASU") No. 2014-18, *Business Combinations (Topic 805): Accounting for Identifiable Assets in a Business Combination (a consensus of the Private Company Council)*, where certain assets, such as customer relationships or a covenant not to compete, are not recorded separately from goodwill. As such, in accordance with FASB ASU No. 2014-02, Intangibles—*Goodwill and Other (Topic 350): Accounting for Goodwill* ("ASU 2014-02"), management has assigned a life of 10 years to goodwill over which the amount allocated to goodwill is being amortized.

Pursuant to ASU 2014-02, goodwill should be tested for impairment when a triggering event occurs that indicates that the fair value of a reporting unit may be below its carrying amount. If the goodwill is determined to be impaired, the goodwill is written down to its realizable value and the loss is recognized in the consolidated statement of operations in the period when determination is made. No impairment charges were recorded for the years ended December 31, 2020 and 2019.

Long-lived Assets

The Company reviews long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. An impairment loss would be recognized when estimated future cash flows expected to result from the use of the asset and its eventual disposition is less than its carrying amount. During the year ended December 31, 2019, the Company recorded an impairment loss of $7.5 million relating to capitalized software costs. Refer to Note 8. No impairment losses were recorded during the year ended December 31, 2020.

Deferred Financing Costs

Deferred financing costs represent costs incurred to acquire debt. These costs are deferred and amortized on an effective interest yield basis over the term of the related debt. The related amortization is included within interest expense on the consolidated statements of operations.

In accordance with ASU No. 2015-03, *Interest—Imputation of Interest (Topic 835): Simplifying the Presentation of Debt Issuance Costs* ("ASU 2015-03"), the Company has presented deferred financing costs as a reduction of long-term debt in the consolidated balance sheet. Refer to Note 11.

Capital Leases

Leases are classified as capital leases whenever the terms of the lease transfers substantially all the risks and rewards of ownership to the lessee. All other leases are classified as operating leases. Assets acquired and held under finance leases are recognized as assets of the Company at their fair value on the date of acquisition. The corresponding liability is included in the balance sheet as a finance lease

EXHIBIT O(2)

AOE0783

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**For the years ended and as of December 31, 2020 and 2019**

## NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

obligation. Interest costs, which represent the difference between the total leasing commitments and the fair values of the assets acquired, are charged to the income statement over the term of the relevant lease.

Revenue Recognition

The Company adopted the Financial Accounting Standards Board's (FASB) Accounting Standards Codification ("ASC") Topic 606 ("ASC 606") for the full annual period which ended December 31, 2019 using the modified retrospective method and applied the standard to all contracts open as of January 1, 2019. We recognize revenue when we have a legally enforceable approved contract with a customer when that contract indicates that collection of the amount to which we are entitled is probable, rights and obligations of each party can be identified, and the arrangement has commercial substance. Revenue is recognized upon the transfer of control of promised services to our customers in an amount that reflects the consideration we expect to receive in exchange for those services. Amounts received from customers in advance of providing services to our customers are recorded as contract liabilities, presented as deferred revenue on the consolidated balance sheet.

Our revenue primarily includes revenues from advertising, subscriptions, film rentals, and distribution services.

Advertising revenue is recognized as the Company fulfills its performance obligations to customers through airing customers' advertising content. The price of each individual commercial and digital advertisement is negotiated with each customer and is determined based on multiple factors, including, but not limited to, the programming and day-part selected, supply of available inventory, viewership ratings and overall market conditions (e.g., timing of the year and strength of U.S. economy). The Company measures the fulfillment of its performance obligations based on the airing of the individual television commercials or display of digital advertisements as those events occur. Advertising revenues are recorded net of agency commissions as the Company has determined that the advertising agency is the customer in these arrangements.

Network advertising includes campaigns for which revenues are based on audience delivery or a fixed price per spot. For campaigns based on audience delivery, the Company guarantees advertisers a minimum audience during the dayparts in which their advertisements are broadcast over the term of the advertising contracts. The Company provides the advertisers with additional advertising time if the guaranteed audience size and/or the minimum number of spots are not delivered. The Company has concluded that the performance obligation in these arrangements is the delivery of the minimum number of spots along with a guaranteed number of impressions against the targeted demographic as part of an overall campaign. Advertising revenue in connection with guaranteed campaigns is recognized using a measure of progress based on the number of impressions delivered during the period relative to the total guaranteed impressions. If the Company determines the guaranteed audience has not been delivered, an estimate of deferred revenue is recorded for audience delivery shortfalls that must be "made good." The remaining revenue is recognized proportionally until the guaranteed audience has been delivered and the performance obligation is satisfied. Our customers are generally on 60 to 120 day payment terms. Advertising revenue for the year ended December 31, 2020 within networks and content revenue and broadcast television revenue totaled $120.6 million and $61.9 million, respectively. Advertising revenue for the year ended December 31, 2019 within networks and content revenue and broadcast television revenue totaled $124.7 million and $6.5 million, respectively.

EXHIBIT O(2)

AOE0784

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended and as of December 31, 2020 and 2019

## NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

We earn subscription revenue from retransmission consent contracts with multichannel video programming distributors (e.g., cable and satellite providers) typically via multi-year contracts. Under these multi-year contracts, the Company has a performance obligation to deliver content or a signal to our customers. The revenue we earn in these contracts is primarily variable. The amount of revenue earned is based on the number of subscribers to which our customers retransmit our signal, and the negotiated fee per subscriber included in our contract agreement. Customers submit payments monthly, generally within 60-90 days after the month that the service was provided. Subscription revenue is recognized in accordance with the guidance for licensing intellectual property utilizing a usage based method. Performance obligations are satisfied, and revenue is recognized, as our customers utilize the content, network programming, or signal. Estimates of the revenue earned are recorded in each period, up to the amount not subject to significant reversal, and are adjusted as actual subscriber data is submitted to us. Subscription license and retransmission revenue for the year ended December 31, 2020 within networks and content revenue and broadcast television revenue totaled $100.1 million and $62.3 million, respectively. Subscription license and retransmission revenue for the year ended December 31, 2019 within networks and content revenue and broadcast television revenue totaled $105.8 million and $11.2 million, respectively.

For content owned or produced by the Company, we derive certain film rental revenues from a percentage of box office takings earned by the movie in theatrical release or revenues earned from secondary markets such as on digital platforms. Revenue for film rentals is recognized under ASC 606 as a functional license of intellectual property. When the transaction price is fixed, the revenue is recognized at the beginning of the license period after the content has been delivered to the Company's customer. In certain cases, the transaction price is variable and the Company utilizes the sales-and-usage based royalty exception to recognize revenue over time as sales occur, based on the customers' usage of the intellectual property. When estimation is required, external box office reporting is utilized to estimate the amount of revenue to which we will be entitled and is recorded up to the amount not subject to significant reversal. Payment is received up front upon contract execution as a minimum guarantee or periodically on a monthly or quarterly basis. Film rentals revenue within networks and content revenue for the year ended December 31 2019 totaled $12.6 million. Film rentals revenue for the year ended December 31, 2020 were immaterial.

Distribution revenues are earned through arrangements with distributors via the delivery of individual motion picture content files. We receive nonrefundable advances at the beginning of each distribution period which are considered fixed consideration related to the delivery of functional intellectual property. In some cases, additional variable consideration is earned as the content is utilized and is recognized in accordance with usage-based royalty guidance in the period in which the sales occur or when the performance obligation is satisfied (whichever is later) when it exceeds the amount of the nonrefundable advance or fixed consideration. In cases where payments received relate to multiple titles, the consideration is allocated to each title or performance obligation based on the estimated fair value of each title. As the distributor is our customer, the total transaction price is the amount we are entitled to receive from the distributor. Distribution revenue within networks and content revenue for the years ended December 31, 2020 and 2019 totaled $5.2 million and $16.0 million, respectively.

EXHIBIT O(2)

AOE0785

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**For the years ended and as of December 31, 2020 and 2019**

## NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

*Other Revenues*

ESMP enters into various distribution agreements for the release of content, such as movies, onto theatrical and digital platforms (such as Netflix, Hulu, and Amazon). ESMP acts as the distribution agent and collects all monies due under these arrangements and distributes the amounts payable to the producers of the content. In exchange for the performance of these services, ESMP retains a commission from the amounts collected in the form of a distribution fee. Distribution fee arrangements are accounted for on a net basis in accordance with ASC 606 and all distribution fees are reported net of amounts collected on behalf of, and paid over to, producers as the Company is an agent in these arrangements. Royalty revenue is also included within other revenue and is recognized based on best estimates available, primarily based on historical experience, of the amounts due to the Company in the period of the customer's sales or usage. Other revenues also include domestic radio revenues and domestic and international licensing of long-form programming. Other revenues included within networks and content revenue for the years ended December 31, 2020 and 2019 totaled $16.1 million and $5.8 million, respectively. Other revenues included within Broadcast television revenue totaled $3.0 million for the year ended December 31, 2020 and were immaterial for the year ended December 31, 2019.

Income Taxes

Certain entities of the Company are combined into a taxable entity group (the "taxable entity group"). The remaining entities, which comprise the majority of the group, are treated as separate taxable entities for federal, state, or local income tax purposes for which the tax impacts have been excluded from these consolidated financial statements. Accordingly, the results of all other entities' operations outside of the taxable entity group have been included in the tax return of the member. The taxable entity group has accounted for taxes under FASB ASC Topic No. 740, *Income taxes* ("ASC 740"), and records deferred taxes on income for transactions that are reported in different years for financial reporting and tax purposes using an asset and liability method whereby assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

In accordance with ASC 740, the Company recognizes the impact of a tax position in the financial statements if that position is more likely than not to be sustained on review, based on the technical merits of the position. At December 31, 2019 the taxable entity group had a reserve for uncertain tax positions of approximately $0.9 million and accrued interest of $0.1 million. In 2020 this was settled with the Internal Revenue Service. As of December 31, 2020 the company has no remaining uncertain tax positions. The Company's policy is to classify interest expense related to uncertain tax positions as income tax expense.

During 2020, the Internal Revenue Service completed its audit of the Company's 2016 tax year, which resulted in a settlement by the Company of approximately $1.1 million. Tax years 2017, 2018, and 2019 remain open for potential examination.

EXHIBIT O(2)

AOE0786

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended and as of December 31, 2020 and 2019

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

Advertising

Advertising and promotion costs are generally expensed in the period during which the costs are incurred. Advertising and promotion costs for the Company for the years ended December 31, 2020 and 2019 amounted to $14.9 million and $74.3 million, respectively and are included in programming and production expenses in the consolidated statements of operations.

Repack

During 2020, we recorded a gain of $2.7 million related to reimbursements from the FCC's National Broadband Plan spectrum repack process. The gain is recorded within Other income (expense), net, on our consolidated statement of operations.

Concentration of Credit Risk

The Company maintains its cash in various financial institutions which may, from time to time, exceed amounts insured by the Federal Deposit Insurance Corporation. For the years ended December 31, 2020 and 2019, the combined aggregate of all deposits held in noninterest-bearing transaction accounts and interest-bearing deposits within the same ownership category are insured up to $0.3 million per financial institution. The Company has not experienced any losses in such accounts and believes it is not exposed to any significant credit risk on cash.

For the years ended December 31, 2020 and 2019, one customer accounted for 10% or more of the Company's total revenue in each year. As of December 31, 2020 and 2019, no individual customer and one customer, respectively, accounted for 10% or more of the Company's accounts receivable balance.

Minority Interest

Minority noncontrolling interest presented in the Company's consolidated financial statements as of December 31, 2019 represents the 26% interest not owned by the Company in AMBH, the parent company of Bayou. The minority interest was held by the sole member of AMH and arose simultaneous to the Company's acquisition of Bayou on July 3, 2019. See Note 3. Since the Company controls this subsidiary, its financial statements are consolidated with those of the Company. In conjunction with the Acquisition of USA TV stations, on February 10, 2020, the minority interest owner's share in AMBH was contributed back to the Company. As of December 31, 2020, no minority ownership interest exists.

The minority interest owner's 26% share of the subsidiary's results of operations through February 10, 2020 is deducted and reported as net income attributable to minority noncontrolling interest in the consolidated statements of operations.

Recently Adopted Accounting Pronouncements

The Company and all subsidiaries adopted the guidance ASC 606 as of January 1, 2019 using the modified retrospective method. ASC 606 requires an entity to recognize the amount of revenue to which it expects to be entitled for the transfer of promised goods or services to customers. ASC 606 was applied only to contracts that were not completed at January 1, 2019. See Note 4—Revenue Recognition for the required disclosures of the impact of the adoption of ASC 606.

EXHIBIT O(2)

AOE0787

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended and as of December 31, 2020 and 2019

## NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

In August 2018, the FASB issued ASU No. 2018-15, *Intangibles – Goodwill and Other – Internal-Use Software*, which permits capitalization of certain costs for cloud-computing arrangements which do not contain a software license. Under legacy guidance these costs were expensed. The Company early adopted the guidance as of January 1, 2020 on a prospective basis and will capitalize all impacted costs from the date of adoption. As of December 31, 2020, the Company had $0.8 million of costs related to cloud computing arrangements capitalized.

Recently Issued Accounting Pronouncements
In February 2016, the FASB issued ASU No. 2016-02, *Leases (Topic 842)* ("ASU 2016-02"), which sets out the principles for the recognition, measurement, presentation and disclosure of leases for both parties to a contract (i.e., lessees and lessors). Subsequently, ASU No. 2020-05 has been issued that provides a limited deferral of the effective date. The new standard requires lessees to apply a dual approach, classifying leases as either finance or operating leases based on the principle of whether or not the lease is effectively a financed purchase by the lessee. A lessee is also required to record a right-of-use asset and a lease liability for all leases with a term of greater than 12 months regardless of their classification. Leases with a term of 12 months or less will be accounted for similar to existing guidance for operating leases today. ASU 2016-02 is effective for the Company on January 1, 2022. Early adoption of ASU 2016-02 is permitted. ASU 2016-02 provides optional practical expedients that the Company may or may not elect. The Company is in the process of evaluating the impact of this new guidance on its consolidated financial statements.

In June 2016, the FASB issued ASU No. 2016-13, *Financial Instruments—Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* ("ASU 2016-13"). Subsequently, ASU 2018-19 has been issued that amends and/or clarifies the application of ASU 2016-13. Among other provisions, the ASU introduces a new impairment model for most financial assets and certain other instruments. For trade and other receivables, held-to-maturity debt securities, loans and other instruments, entities will be required to use a forward-looking "expected loss" model that will replace the current "incurred loss" model and generally will result in earlier recognition of allowances for losses. The guidance will be effective for the Company beginning on January 1, 2023. The Company is currently evaluating the impact of this new guidance on its consolidated financial statements.

In October 2018, the FASB issued ASU 2018-17, *Consolidation (Topic 810): Targeted Improvements to Related Party Guidance for Variable Interest Entities* ("ASU 2018-17"), which effectively expands the private company alternative for common control leasing arrangements to all private company common control arrangements as long as both the parent and the legal entity being evaluated for consolidation are not public business entities. ASU 2018-17 also amends certain VIE guidance for related party arrangements. ASU 2018-17 is effective for the Company beginning on January 1, 2021. The Company is currently evaluating the impact of this new guidance on its consolidated financial statements and does not currently expect a material impact to its consolidated financial statements.

EXHIBIT O(2)

AOE0788

## ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended and as of December 31, 2020 and 2019

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

In March 2019, the FASB issued ASU 2019-02 - *Improvements to Accounting for Costs of Films and License Agreements for Program Materials* ("ASU 2019-02"). ASU 2019-02 aligns the accounting for production costs of an episodic television series with the accounting for production costs of films by removing the content distinction for capitalization. The guidance also requires that an entity test a film or license agreement for program material for impairment at a film group level when the film or license agreement is predominantly monetized with other films and/or license agreements. ASU 2019-02 and related amendments are effective for the Company beginning on January 1, 2021. The Company is currently evaluating the impact of the new standard on its consolidated financial statements.

In December 2019, the FASB issued ASU 2019-12, *Income Taxes* (Topic 740), *Simplifying the Accounting for Income Taxes*, ("ASU 2019-12"). The purpose of ASU 2019-12 is to improve the disclosures related to fair value measurements in the financial statements. The improvements in ASU 2019-12 include removing certain exceptions for recognizing deferred taxes for investments, performing intraperiod allocation and calculating income taxes in interim periods. ASU 2019-12 also adds guidance to reduce complexity in certain areas, including recognizing deferred taxes for tax goodwill and allocating taxes to members of a consolidated group. ASU 2019-12 is effective for the Company beginning on January 1, 2022 and early adoption is permitted. The Company is currently evaluating the impact of ASU 2019-12 on its consolidated financial statements.

In March 2020 and January 2021, the FASB issued ASU No. 2020-04 and ASU No. 2021-01, respectively, *Reference Rate Reform* (Topic 848) ("ASU 2020-04" and "ASU 2021-01", respectively). These updates are effective as of March 12, 2020 and can be adopted anytime during the period of January 1, 2020 through December 31, 2022. The update clarifies the transition away from Libor towards new interest rate benchmarks and provides optional expedients and exceptions for applying U.S. GAAP to contract modifications and hedging relationships that reference LIBOR or other reference rates expected to be discontinued in 2022. The updates also establish certain contract modification principles that entities can apply in other areas that may be affected by reference rate reform and certain elective hedge accounting expedients and exceptions. The Company can apply the ASU's prospectively and is currently evaluating the impact of this new guidance on its consolidated financial statements.

In March 2021, the FASB issued ASU No. 2021-03, *Intangibles – Goodwill and Other* (Topic 350), *Accounting Alternative for Evaluating Triggering Events* ("ASU 2021-03"). The update provides private companies an accounting alternative to assess goodwill triggering events only as of financial reporting date, instead of throughout the period. The Company is permitted to elect the alternative for fiscal years beginning January 1, 2020 or later. The Company is currently evaluating the impact of ASU 2019-12 on its consolidated financial statements, including whether the alternative will be utilized.

EXHIBIT O(2)

AOE0789

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**For the years ended and as of December 31, 2020 and 2019**

## NOTE 3 – ACQUISITIONS

Bayou

On May 2, 2019, the Company entered into a stock purchase agreement with the sellers of Bayou City Broadcasting Evansville, Inc. and Bayou City Broadcasting Lafayette, Inc., (collectively referred to as "Bayou"). AMB acquired 100% of the outstanding equity of Bayou for an aggregate purchase price of $165.0 million. Upon acquisition, AMB was 100% held by AMBH and AMBH was owned 74% and 26% by AM and the sole member of the Company, respectively. The 26% direct ownership of AMBH by the sole member resulted in a noncontrolling interest presented in these financial statements as of December 31, 2019. The minority interest was contributed to the Company during 2020 and no longer exists as of December 31, 2020. Refer to Note 17.

The purchase price was comprised entirely of cash. As further described in Note 11, in connection with the acquisition of Bayou and to finance the acquisition, the Company entered into a new term loan agreement ("Senior Bayou loan") with Brightwood as a lender with an aggregate principal value of $100.0 million. Additionally, simultaneous to the Senior Bayou loan, the Company entered into a note purchase agreement with Bain Capital Credit, L.P., as lender for an aggregate principal amount of $36.0 million.

The Company has determined that the transaction should be accounted for in accordance with FASB ASC Topic No. 805 – *Business Combinations*. The purchase price allocation of Bayou was initially deemed to be preliminary pending final determination of fair values and other adjustments. The purchase price was allocated to the tangible and intangible assets acquired and liabilities assumed based on their estimated fair values as of the acquisition date. The purchase price was final as of December 31, 2020.

In accordance with FASB ASU No. 2015-16 – *Simplifying the Accounting for Measurement-Period Adjustments* ("ASU 2015-16"), the financial statements were not retrospectively adjusted for any measurement-period adjustments that occurred in subsequent periods. Rather, any adjustments to provisional amounts that were identified during the measurement period were recorded in the reporting period in which the adjustment was determined.

EXHIBIT O(2)

AOE0790

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended and as of December 31, 2020 and 2019

## NOTE 3 – ACQUISITIONS (Continued)

During the year ended December 31, 2019, adjustments were recorded to decrease the fair values assigned to accounts receivable by $0.1 million, deferred tax assets by $1.8 million, accounts payable by $0.3 million, and property and equipment by $0.4 million. The adjustments resulted in a corresponding increase in goodwill. Any additional depreciation or amortization amounts as a result of the measurement period adjustments were not material. The following table summarizes the consideration paid for Bayou and the estimated fair value of the assets acquired and liabilities assumed at the acquisition date, which are adjusted for measurement-period adjustments through December 31, 2019:

|  | Amount ($) (In millions) |
|---|---|
| Cash | 1.5 |
| Accounts receivable | 6.5 |
| Prepaid and other current assets | 0.2 |
| Deferred tax assets | 0.3 |
| Property, plant and equipment | 6.1 |
| Intangible assets – FCC licenses | 7.5 |
| Accounts payable and other current liabilities | (2.3) |
| **Total net assets acquired** | **19.8** |
| **Purchase price** | **165.2** |
| **Goodwill** | **$ 145.4** |

No additional measurement period adjustments were recorded for the year ended December 31, 2020. The fair value of the current assets acquired includes accounts receivables with a fair value of $6.5 million. The gross amount due to the Company at acquisition was $6.6 million, of which $0.1 million was expected to be uncollectible.

The FCC licenses have an indefinite life. The goodwill is primarily attributable to expected post-acquisition synergies from integrating Bayou's assembled workforce and developed technologies as well as efficiencies in content creation and distribution. Approximately $39.2 million of the goodwill is expected to be deductible for tax purposes.

USA TV stations
On February 10, 2020, Allen Media Broadcasting Evansville, Inc ("AMBE") closed the acquisition of nine broadcast television stations (the "USA TV stations") from the sellers of USA Television Holdings, LLC, and USA Television MidAmerica Holdings, LLC  for a cash purchase price of approximately $303.3 million.

EXHIBIT O(2)

AOE0791

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2020 and 2019

**NOTE 3 – ACQUISITIONS (Continued)**

AMBE acquired 100% of the outstanding equity of the USA TV stations and, as further described in Note 11, the Company entered into new senior secured bonds arrangement and term loan agreement in connection with the acquisition.

The Company has determined that the transaction should be accounted for in accordance with FASB ASC Topic No. 805 – *Business Combinations*. The purchase price was allocated to the tangible and intangible assets acquired and liabilities assumed based on their estimated fair values as of the acquisition date. In accordance with ASU 2015-16, the financial statements were not retrospectively adjusted for any measurement-period adjustments that occurred in subsequent periods. Rather, any adjustments to provisional amounts that were identified during the measurement period were recorded in the reporting period in which the adjustment was determined.

The following table summarizes the consideration paid for the USA TV stations and the estimated fair value of the assets acquired and liabilities assumed at the acquisition date which are adjusted for measurement-period adjustments through December 31, 2020:

|  | Amount ($)<br>(In millions) |
|---|---|
| Cash | 4.0 |
| Accounts receivable | 20.2 |
| Prepaid and other current assets | 3.4 |
| Property, plant and equipment | 42.0 |
| Television library | 5.9 |
| Intangible assets – FCC licenses | 1.0 |
| Accounts payable and other current liabilities | (15.4) |
| Deferred tax liabilities | (20.6) |
| **Total net assets acquired** | **40.5** |
| **Purchase price** | **303.3** |
| **Goodwill** | **$ 262.8** |

The gross amount of accounts receivable due to the Company at acquisition was $20.4 million, of which $0.2 million was expected to be uncollectible.

The FCC licenses have an indefinite life. The goodwill is primarily attributable to expected post-acquisition synergies from integrating USA's assembled workforce and developed technologies as well as efficiencies in content creation and distribution. Approximately $31.0 million of the goodwill is expected to be deductible for tax purposes.

<u>OTA Networks</u>
On October 23, 2020, one of our subsidiaries, Weather Group Television, LLC closed the acquisition of two over-the-air properties (the "OTA Networks") from MGM Domestic Television Distribution LLC ("MGM"). The aggregate purchase price was $4 million and was comprised entirely of cash. Subsequent to the close, ownership of the OTA Networks was transferred to a newly created legal entity, Allen Media Broadcast Networks, LLC.

EXHIBIT O(2)

AOE0792

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

#### For the years ended and as of December 31, 2020 and 2019

## NOTE 3 – ACQUISITIONS (Continued)

The Company has determined that the transaction should be accounted for in accordance with FASB ASC Topic No. 805 – *Business Combinations*. The purchase price allocation of OTA Networks is deemed to be preliminary pending final determination of fair values and other adjustments. The purchase price was allocated to the tangible and intangible assets acquired and liabilities assumed based on their estimated fair values as of the acquisition date. The preliminary fair values of acquired assets and liabilities assumed represent our estimate of fair value and are subject to change if additional information, such as changes to deferred taxes and/or working capital, becomes available.

As of the acquisition date, we acquired accounts receivable of $4.7 million, program asset – television library of $3.0 million and assumed accounts payable and other accrued liabilities of $3.5 million resulting in an acquired net asset value of $4.2 million. This resulted in $0.2 million of negative goodwill which is reflected as a gain in Other Income on our consolidated statements of operations.

## NOTE 4 – REVENUE RECOGNITION

As discussed in Note 2, we adopted ASC 606 for the year ended December 31, 2019. Under the modified retrospective adoption method, we are required to adjust the beginning balance of retained earnings for the cumulative prior period effect of applying the guidance. Based on detailed analysis performed, we determined that no adjustment to the beginning balance of retained earnings was necessary. As part of our adoption, the new standard was applied only to those contracts that were not substantially completed as of the date of adoption. Further, we utilized the contract modification practical expedient for purposes of our adoption.

During 2019, certain line items in our financial statements were impacted by the adoption of ASC 606 due to an acceleration of revenue recognized in our film business when our performance obligation was satisfied, as described in Note 2. Historically, advances received were deferred and revenue was recognized based on royalty revenue earned in each period. In cases where a single advance is received for multiple titles, the consideration is allocated to each title proportionally based on an estimate of standalone selling price. Also as result of our adoption of ASC 606, certain amounts relating to ADU liabilities which were previously recorded as accounts receivables were identified as conditional obligations resulting in further performance. This resulted in a decrease in accounts receivable and a corresponding decrease in deferred revenue upon adoption.

EXHIBIT O(2)

AOE0793

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For the years ended and as of December 31, 2020 and 2019**

**NOTE 4 – REVENUE RECOGNITION (Continued)**

The following table presents how the adoption of ASC 606 affected certain line items in our consolidated statement of income for the year ended December 31, 2019:

| | Under previous guidance | Impact of adoption | As reported under ASC 606 |
|---|---|---|---|
| | | (In millions) | |
| Networks and content revenue | 261.5 | 3.8 | 265.3 |
| Programming and production expense | 171.1 | 1.3 | 172.4 |
| Operating (loss) income | (35.3) | 2.5 | (32.8) |
| Net loss attributable to Allen Media Holdings, LLC and Minority Interest | (105.1) | 2.5 | (102.6) |
| Net loss attributable to Allen Media Holdings, LLC | (101.6) | 2.5 | (99.1) |

The following table presents how the adoption of ASC 606 affected certain line items in our consolidated balance sheet as of December 31, 2019:

| | Under previous guidance | Impact of adoption | As reported under ASC 606 |
|---|---|---|---|
| | | (In millions) | |
| **Assets** | | | |
| Accounts receivable, net | 85.7 | (5.0) | 80.7 |
| Film rights, less current portion | 14.5 | (1.3) | 13.2 |
| **Liabilities** | | | |
| Deferred revenue | 18.6 | (8.8) | 9.8 |
| **Equity** | | | |
| Member's deficit | (203.0) | 2.5 | (200.5) |

The following table presents how the adoption of ASC 606 affected certain line items in our consolidated statement of cash flows for the year ended December 31, 2019:

| | Under previous guidance | Impact of adoption | As reported under ASC 606 |
|---|---|---|---|
| | | (In millions) | |
| **Cash flows from operating activities** | | | |
| Net loss | (105.1) | 2.5 | (102.6) |
| Receivables | 5.5 | 5.0 | 10.5 |
| Deferred revenue | 7.8 | (8.8) | (1.0) |
| Amortization of film rights | 8.8 | 1.3 | 10.1 |
| Net cash used by operating activities | (10.6) | - | (10.6) |

EXHIBIT O(2)

AOE0794

## ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended and as of December 31, 2020 and 2019

### NOTE 5 – ACCOUNTS RECEIVABLE

The Company has receivables from contracts with customers for both accounts and royalties receivables. On the accompanying consolidated balance sheets, accounts receivable is shown net of affiliate revenue reserves and allowances for bad debt. As of December 31, 2020 and 2019, the Company had reserves against receivables of $0.8 million and $2.1 million, respectively. Included in accounts receivable are unbilled receivables amounting to $1.3 million and $0.8 million at December 31, 2020 and 2019, respectively, representing revenue earned in the current period but which were billed in full subsequent to the year end, typically the following month.

The Company has a loan and security agreement with a financial institution that is an asset-based financing agreement in which up to 90% of the Company's receivables from certain film rentals are assigned with full recourse. In accordance with FASB ASC 860, "Accounting for Transfers and Servicing," the assigned accounts receivable remain assets on the Company's consolidated balance sheet and the advances are recognized as a long-term line of credit. Refer to Note 11.

### NOTE 6 – TAX CREDIT RECEIVABLE

The Company generated Georgia Film Tax Credits (GaFTC) and Georgia Research & Development Tax Credits (GaR&D), collectively referred to as Tax Credit Receivables. GaFTC may be used to offset Georgia payroll withholding tax remittances or are sold to third parties on the open market through brokers. GaR&D are used to offset Georgia payroll tax withholding tax remittances. Due to these utilization methodologies, assets separate and distinct from income tax assets are reflected on the balance sheet for the tax credit receivables at the net realizable value as they are generated. As of December 31, 2020 and 2019, the Company had current tax credit receivables of $0.6 million and $1.4 million, respectively, and tax credit receivables, net of current portion of $5.1 million and $6.0 million, respectively. Current tax credit receivables are included in Prepaid expenses and other current assets on our consolidated balance sheets.

Of the noncurrent tax credit receivables balance at December 31, 2020, $5.1 million relates primarily to GaFTC generated throughout 2020 for which the Company anticipates would take longer than one year to utilize if not immediately sold in 2021. The Company classifies these credits as noncurrent until all approvals to move forward with selling the credits are obtained from management, for which, at that time, the credits are classified as current when entering into arrangements with brokers to sell.

EXHIBIT O(2)

AOE0795

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended and as of December 31, 2020 and 2019

## NOTE 7 – PROPERTY AND EQUIPMENT

As of December 31, 2020 and 2019, property and equipment consisted of the following:

| | 2020 (In millions) | 2019 (In millions) |
|---|---|---|
| Production and other equipment | 66.3 | 39.9 |
| Office furniture and equipment | 12.0 | 7.0 |
| Buildings and improvements | 17.9 | 6.8 |
| Satellites | 3.3 | 2.8 |
| Trucks and automobiles | 2.0 | 0.6 |
| Land | 5.2 | 0.6 |
| | 106.7 | 57.7 |
| Less: Accumulated depreciation | 38.1 | 22.9 |
| Subtotal | 68.6 | 34.8 |
| Construction in progress | 3.8 | 2.6 |
| **Property and equipment, net** | **72.4** | **37.4** |

Depreciation expense was $15.4 million and $10.8 million for the years ended December 31, 2020 and 2019 respectively. As of both December 31, 2020 and 2019, the Company's total cost of property and equipment purchased under capital leases was $7.2 million. The accumulated depreciation corresponding to this property and equipment at December 31, 2020 and 2019 was $5.4 million and $4.2 million, respectively.

## NOTE 8 – GOODWILL AND INTANGIBLE ASSETS

Goodwill relates to the acquisition of Bayou which occurred during 2019, the acquisition of the USA TV stations which occurred during 2020, and the acquisitions of WG, TheGrio, and Freestyle which occurred in previous years.

Intangible assets consist of internally developed technology and software (for internal use and that is held for sale, lease, or otherwise marketed), costs incurred to acquire the names of digital and satellite channels, FCC licenses, and localization technology (or STAR) conveyed to cable, satellite and other distributors.

During 2019, the Company conducted an impairment analysis regarding internally developed and acquired software for its Local Now application and determined that the net book value at December 31, 2019 should be fully impaired based on near-term projected cash flows from the intangible asset. The Company valued the application's future cash flows using the net present value method. As a result of the valuation, during the year ended December 31, 2019, the Company recorded an impairment amount of $7.5 million which is recognized within impairment of investment at cost and intangible assets in the statement of operations. There were no impairments of intangible assets during 2020.

EXHIBIT O(2)

AOE0796

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For the years ended and as of December 31, 2020 and 2019**

### NOTE 8 – GOODWILL AND INTANGIBLE ASSETS (Continued)

As of December 31, 2020, Goodwill and Intangible Assets consisted of the following:

| | Weighted average amortization period (years) | Gross carrying amount | Accumulated amortization | Impairment | Net carrying amount |
|---|---|---|---|---|---|
| | | (In millions) | | | |
| Goodwill | 10 | 519.7 | (77.8) | - | 441.9 |
| **Intangible assets** | | | | | |
| Amortizing intangible assets: | | | | | |
| Tradenames | 10 | 0.6 | (0.2) | - | 0.4 |
| Software | 3 | 28.1 | (16.5) | (7.5) | 4.1 |
| STAR technology | 5 | 4.2 | (3.7) | - | 0.5 |
| Internet development | 15 | 1.3 | (0.5) | - | 0.8 |
| **Total definite-lived intangible assets** | | **34.2** | **(20.9)** | **(7.5)** | **5.8** |
| Indefinite-lived intangible assets: | | | | | |
| FCC license | | 8.5 | - | - | 8.5 |
| Other non-amortizing assets: | | | | | |
| Construction in progress | | 4.8 | - | - | 4.8 |
| **Total intangible assets** | | **47.5** | **(20.9)** | **(7.5)** | **19.1** |

As of December 31, 2019, Goodwill and Intangible Assets consisted of the following:

| | Weighted average amortization period (years) | Gross carrying amount | Accumulated amortization | Impairment | Net carrying amount |
|---|---|---|---|---|---|
| | | (In millions) | | | |
| Goodwill | 10 | 257.1 | (28.8) | - | 228.3 |
| **Intangible assets** | | | | | |
| Amortizing intangible assets: | | | | | |
| Tradenames | 10 | 0.6 | (0.1) | - | 0.5 |
| Software | 3 | 24.7 | (13.1) | (7.5) | 4.1 |
| STAR technology | 5 | 4.1 | (3.1) | - | 1.0 |
| Internet development | 15 | 1.3 | (0.5) | - | 0.8 |
| **Total definite-lived intangible assets** | | **30.7** | **(16.8)** | **(7.5)** | **6.4** |
| Indefinite-lived intangible assets: | | | | | |
| FCC license | | 7.5 | - | - | 7.5 |
| Other non-amortizing assets: | | | | | |
| Construction in progress | | 1.9 | - | - | 1.9 |
| **Total intangible assets** | | **40.1** | **(16.8)** | **(7.5)** | **15.8** |

EXHIBIT O(2)

AOE0797

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2020 and 2019

### NOTE 8 – GOODWILL AND INTANGIBLE ASSETS (Continued)

Amortization expense for goodwill was $49.0 million and $18.5 million for the years ended December 31, 2020 and 2019, respectively.

Amortization expense for intangible assets was $4.1 million and $8.7 million for the years ended December 31, 2020 and 2019, respectively.

As of December 31, 2020, expected future amortization of definite-lived intangible assets is as follows:

| Years Ending December 31, | Future amortization (In millions) |
|---|---|
| 2021 | 2.4 |
| 2022 | 1.4 |
| 2023 | 0.5 |
| 2024 | 0.3 |
| 2025 | 0.3 |
| Thereafter | 0.9 |
| Total | 5.8 |

### NOTE 9 – TELEVISION LIBRARY

As of December 31, 2020, the television library consisted of the following:

| | (In millions) |
|---|---|
| As capitalized under ASC 926 | |
| Completed and released | 229.2 |
| In process | 2.6 |
| | 231.8 |
| As capitalized under ASC 920 | |
| Completed and released | 32.9 |
| In-process | 2.2 |
| | 35.1 |
| | |
| Less: Accumulated amortization | 130.5 |
| | |
| Less: Television library, current portion | 11.2 |
| Television library, net of current portion | 125.2 |

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended and as of December 31, 2020 and 2019

**NOTE 9 – TELEVISION LIBRARY (Continued)**

As of December 31, 2019, the television library consisted of the following:

|  | (In millions) |
|---|---|
| As capitalized under ASC 926 |  |
| Completed and released | 176.6 |
| In process | 1.4 |
|  | 178.0 |
| As capitalized under ASC 920 |  |
| Completed and released | 17.2 |
| In-process | 0.3 |
|  | 17.5 |
|  |  |
| Less: Accumulated amortization | 102.3 |
|  |  |
| Less: Television library, current portion | 5.3 |
| **Television library, net of current portion** | **87.9** |

Amortization expense was $30.4 million and $22.0 million for the years ended December 31, 2020 and 2019, respectively.

As of December 31, 2020, expected future amortization of the capitalized television library is as follows:

| Years Ending December 31, | Completed and Released | In Progress not Released | Total |
|---|---|---|---|
|  | (In millions) | | |
| 2021 | 32.9 | 0.7 | 33.6 |
| 2022 | 25.6 | 1.0 | 26.6 |
| 2023 | 20.8 | 1.0 | 21.8 |
| 2024 | 13.9 | 0.7 | 14.6 |
| 2025 | 12.4 | 0.3 | 12.7 |
| Thereafter | 26.1 | 1.0 | 27.1 |
| **Total** | **131.7** | **4.7** | **136.4** |

**NOTE 10 – FILM RIGHTS**

Film rights represent the cost to acquire the distribution rights of a motion picture and/or the cost of production for motion pictures. Film rights in process represent film rights that are in the process of being acquired or a film in the process of production. During the year-ended December 31, 2019 the company acquired film rights for certain motion pictures and incurred production costs with respect to 47 Meters Down II.

As of both December 31, 2020 and 2019, film rights in process had a cost and net book value of $0.4 million. Film rights for completed films had a cost of $12.1 million and $34.3 million, as of December 31, 2020 and 2019, respectively, with accumulated amortization of $2.8 million and $21.5 million, resulting in a net book value of $9.3 million and $12.8 million, respectively. The films rights expected to be used within the next year is $1.3 million.

EXHIBIT O(2)

AOE0799

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended and as of December 31, 2020 and 2019

## NOTE 10 – FILM RIGHTS (Continued)

Amortization expense for film rights was $2.9 million and $10.1 million for the years ended December 31, 2020 and 2019, respectively.

The expected amortization period for the film rights above is as follows:

| Years Ending December 31, | (In millions) |
|---|---|
| 2021 | 1.3 |
| 2022 | 2.3 |
| 2023 | 1.0 |
| 2024 | 1.1 |
| 2025 | 1.5 |
| Thereafter | 2.5 |
| Total | 9.7 |

## NOTE 11 – LONG-TERM DEBT

In a prior year, the Company refinanced certain existing loans with a syndicated loan ("second syndicated loan") between various lenders, including certain lenders from the existing loans, and AM. Certain fees from this refinancing were capitalized, based on the Company's analysis of the applicable accounting guidance, including under ASC 470-50 *Debt – Modifications and Extinguishments*.

The second syndicated loan bore interest, at the option of the Company, (i) at the base rate as defined in the Credit and Guaranty agreement which, in no event, can be lower than 2% plus a margin of 5.5%, or (ii) the Eurodollar rate as defined in the Credit and Guaranty Agreement which in no event can be lower than 1% plus a margin of 6.50%.

On March 21, 2019, the Company entered into an amendment to the second syndicated loan ("first amendment") to increase the existing syndicated loan facility by $25.0 million. On June 27, 2019, the Company entered into an additional amendment to the second syndicated loan ("second amendment") to increase the existing syndicated loan facility by $20.0 million. As a result of this additional financing, quarterly principal payments due increased to $5.4 million through to December 31, 2022 with a revised principal payment of $8.1 million per quarter thereafter until maturity, at which point a final balloon payment of all remaining principal was due.

As discussed below the second syndicated loan was refinanced on February 10, 2020.

Bayou Loans
On July 3, 2019, to finance the acquisition of Bayou, AMB entered into a new term loan agreement (the "Senior Bayou loan") with an aggregate principal value of $100.0 million. The Senior Bayou loan bore interest, at the option of the Company at either (i) the base rate as defined in the loan agreement which, in no event, can be lower than 2.0% plus a margin of 5.25%, or (ii) the Eurodollar rate as defined in the loan agreement based primary on LIBOR rates with a margin of 6.25%.

EXHIBIT O(2)
AOE0800

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
**For the years ended and as of December 31, 2020 and 2019**

**NOTE 11 – LONG TERM DEBT (Continued)**

Simultaneous to the Senior Bayou loan, AMB entered into a note purchase agreement with Bain Capital Credit, L.P. ("Bayou Note"), as lender for an aggregate principal amount of $36.0 million and a maturity date of October 3, 2020. This note bore interest at 16.0% per annum of which 12.0% was cash interest payable quarterly beginning on September 30, 2019 and 4.0% is paid-in-kind interest which accrues to the principal amount of the note on a quarterly basis.

As discussed below, the Bayou Senior Loan and Bayou Note were repaid on February 10, 2020.

<u>2020 Syndicated Financing</u>

On February 10, 2020, in conjunction with closing the acquisition of the USA TV stations, the Company entered into an indenture agreement for $300.0 million of senior notes ("Senior Notes") and a term loan agreement for $530.0 million ("Term Loan") and revolving line of credit ("revolver") with an available credit line of $40.0 million (collectively as the "2020 Syndicated Loans"). The Company drew $20.0 million on the revolver at close and the revolver credit limit was subsequently increased to $60.0 million. The funds were used to repay the second syndicated loan, Senior Bayou Loan, and Bayou Note, finance the acquisition of the USA TV stations, and pay certain transaction expenses associated to both the acquisition of the USA TV stations and the refinancing. The Senior Notes bear interest at 10.5% and mature on February 10, 2028 at which point all principal is due in full. The Term Loan and revolver bear interest at LIBOR plus a margin of 5.5%. The Term Loan requires principal payments on a quarterly basis of 1% per annum of the principal balance, with the remaining balance due upon maturity. The Term Loan and revolver are due February 10, 2027, and February 10, 2025, respectively.

The Company analyzed the 2020 Syndicated refinancing on a lender-by-lender basis in accordance with applicable accounting guidance, including ASC 470-50. In cases where a lender participated in both the second syndicated loan and the 2020 Syndicated Loans, the refinancing of the lender-specific loan qualified as a debt modification resulting in capitalization of lender fees and expense treatment for third-party loan fees. In certain cases, lenders were fully repaid through the refinancing resulting in derecognition of the associated capitalized fees and costs. This resulted in $42.7 million of previously capitalized costs being written off through a loss on derecognition of the loans. Loan amounts associated to lenders which participated in the 2020 Syndicated Loans and who were not previously lenders of the Company, were treated as new loans with all associated costs capitalized. As a result, subsequent to close of the 2020 Syndicated refinancing the Company had $25.3 million in debt issuance costs capitalized. These costs are being amortized under the effective interest method over the term of the loan.

On February 21, 2020 the Company entered into an amendment ("first 2020 amendment") to increase the existing syndicated Term Loan by $25.0 million. On April 9, 2020 and July 9, 2020, the Company entered into amendments to provide an incremental $15.0 million and $5.0 million, respectively, of commitment under the existing revolver facility.

On July 16, 2020 and July 21, 2020, the Company entered into two amendments to increase the syndicated Term Loan by an incremental $35.0 million and $15.0 million, respectively.  On July 29, 2020, the Company entered into an amendment to increase the syndicated Term Loan by $55.0 million.

EXHIBIT O(2)

AOE0801

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2020 and 2019

**NOTE 11 – LONG TERM DEBT (Continued)**

At December 31, 2020 the balances outstanding are $300.0 million, $656.9 million, and $17.0 million, for the Senior Notes, Term Loan, and revolver, respectively. Additionally, accrued interest at December 31, 2020 was $12.0 million, $9.6 million, and $0.2 million, pertaining to the Senior Notes, Term Loan, and revolver, respectively. The rate in effect at December 31, 2020 for the Term Loan and revolver was 5.72%.

In conjunction with the 2020 Syndicated Financing, we entered into a financing commitment letter with a financial institution for bridge financing senior notes of $300.0 million and a term loan of $530.0 million. The fee associated with the financing commitment was recognized as an expense over the commitment period and included within Interest expense on the consolidated statements of operations. The corresponding bridge financing commitment terminated in accordance with the terms of the agreement upon close of the refinancing in February 2020.

Under the loan agreements, the Company is subject to certain financial and nonfinancial covenants including terms which require the Company to maintain certain metrics and ratios, limit certain payments, expenditures, or asset sales, and to report financial information to our lenders on a periodic basis. In addition, Allen Media Holdings, LLC and each direct and indirect wholly owned subsidiary of Allen Media, LLC (the "Guarantor Subsidiaries") have agreed to guarantee the Company's Term Loans by granting a lien on substantially all of their respective assets (subject to certain exceptions). Certain subsidiaries have been identified by the Company to be Unrestricted Subsidiaries, which do not guarantee the Company's obligations.

<u>Additional Financings</u>
In a prior year, ESP&A entered into a loan amendment with CION whereby an additional loan was added to an existing ESP&A facility ("additional loan" or "Friend Request loan"). The additional loan allowed for $7.5 million to be advanced to ESP&A by CION. The additional loan was set to mature in September 2037 and, subsequent to a March 9, 2018 amendment, carried interest at 10% per annum at December 31, 2019. Under the terms of the loan agreement, amortization payments, equal to 2% of the outstanding principal, were required to be made on the last day of every March, June, September, and December, commencing September 2017. At December 31, 2020 and 2019, the balances outstanding were $5.2 million and $5.3 million, respectively.

In a prior year, ESP&A entered into a loan agreement with CION to provide a draw of $11.0 million to fund the prints and advertising costs for the Chappaquiddick film. This loan bears interest at 10% per annum and matures on May 18, 2022. As of both December 31, 2020 and 2019, the balance outstanding was $0.9 million.

In a prior year, ESP&A amended the loan to obtain an additional draw of $10.0 million. This loan bears interest at 10% and matures on March 9, 2038. As of December 31, 2020 and 2019, the balance outstanding was $8.8 million and $9.2 million, respectively.

EXHIBIT O(2)

AOE0802

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2020 and 2019

**NOTE 11 – LONG TERM DEBT (Continued)**

On February 13, 2019, ESP&A entered into a loan agreement with Comerica Bank to provide a draw of $7.9 million to fund the prints and advertising costs for the 47 Meters Down II film. The loan was set to mature on June 30, 2020. On August 27, 2019, ESP&A entered into an amendment to the loan agreement which extended the maturity date to August 27, 2022 and increased the commitment to $20.0 million. The loan bears interest at a rate of LIBOR plus 2% or 3% dependent upon the Company's election of loan type. At December 31, 2019 the balance outstanding was $6.2 million and the interest rate was approximately 4.7%. At December 31, 2020, the interest rate was approximately 3.2% and the balance outstanding was $3.7 million.

In a prior year, the Company entered into a loan and security agreement ("line of credit") with a financial institution for a senior, secured facility of up to $20.0 million, which can be increased to $30.0 million, in the aggregate, subject to a borrowing base of 90% of eligible receivables due from major distributors of the Company's films, as specifically named in the loan and security agreement. Borrowings on this loan and security agreement are secured by substantially all assets of a certain subsidiary. For purposes of this loan and security agreement, the assets of the subsidiary includes all of the distribution rights of ESMP in all films. Borrowings on the loan and security agreement bear interest at the prime rate plus 2.5% or LIBOR plus 3.5%. The interest rates in place at December 31, 2020 and 2019, were approximately 3.7% and 5.0%. Repayments on the line of credit are made as collections from the assigned receivables are received. On December 10, 2019, the Company entered into an amendment to the line of credit extending the maturity date to September 30, 2022. As of December 31, 2020 and 2019, $4.4 million and $6.0 million, respectively, remained outstanding on this line of credit.

On November 7, 2019, our subsidiary, Arctic Dogs LLC entered into a loan agreement with Comerica Bank to provide a senior secured credit facility ("Arctic Dogs Loan") for up to $10.0 million to fund the prints and advertising costs for the Arctic Dogs film. The loan has a maturity date of November 7, 2022. The loan bears interest, at the option of the Company, (i) at the base rate as defined in the Arctic Dogs loan agreement which, in no event, can be lower than 1% plus the federal funds effective rate, plus applicable margin or (ii) 3% plus the LIBOR rate as defined in the loan agreement (approximately 3.2% at December 31, 2020). At December 31, 2019, the balance outstanding was $1.7 million. At December 31, 2020, the balance outstanding was $0.6 million.

The aforementioned additional financings were all subject to certain financial and non-financial covenants with which the Company was in compliance at December 31, 2020. Management assessed the accounting treatment of the additional financings loan amendments and concluded that the amendments qualified as a debt modification and that the related debt issuance costs were not material.

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**For the years ended and as of December 31, 2020 and 2019**

## NOTE 11 – LONG TERM DEBT (Continued)

As of December 31, 2020 and 2019, the Company has the following debt outstanding:

| | 2020 | 2019 |
|---|---|---|
| | (In millions) | |
| Second syndicated loan | - | 398.9 |
| Senior Bayou loan and Bayou note | - | 135.5 |
| 2020 Senior Notes | 300.0 | - |
| 2020 Term Loan | 656.9 | - |
| 2020 Revolver | 17.0 | - |
| Friend request loan | 5.2 | 5.3 |
| Hostiles upsize loan | 8.8 | 9.2 |
| Chappaquiddick loan | 0.9 | 0.9 |
| 47MD loan | 3.7 | 6.2 |
| Line of credit | 4.4 | 6.0 |
| Arctic Dogs Loan | 0.6 | 1.7 |
| Total | 997.5 | 563.7 |
| Less: Outstanding debt issuance costs and original issue discount | (27.0) | (46.7) |
| Net amounts due | 970.5 | 517.0 |

## NOTE 12 – NOTES PAYABLE TO PRODUCTION COMPANY

In a prior year, our subsidiary Friend Request LLC entered into a note payable agreement with the production company from which ESMP had originally acquired the film rights to the movie. The note payable agreement advanced funds of $6.6 million to be used for part of the media expenditures with respect to the promotion of the movie. The note carries interest of 15% per annum and is payable based on the film's gross receipts. As of December 31, 2020 and 2019, the total amount outstanding on the note was $6.6 million, which is included in Borrowings, current portion, and accrued interest was $3.3 million and $2.3 million, respectively. Accrued interest is included in accounts payable and accrued expenses in the accompanying consolidated balance sheet.

In a prior year, our subsidiary Replicas, LLC entered into a note payable agreement with the same production company. The note payable agreement allowed for funds of $8.2 million to be advanced for use for part of the media expenditures with respect to the promotion of the movie. Interest on this note is calculated at 15% of a portion of the amounts advanced for the media spend, as defined in the agreement. The entire amount of $8.2 million was advanced on December 15, 2018 and is payable based on the film's gross receipts. As of December 31, 2020 and 2019, the total outstanding on the note was $8.2 million for both years included in Borrowings, net of current portion. Accrued interest was $2.5 million and $1.3 million, respectively, which is included in accounts payable and accrued expenses in the accompanying consolidated balance sheet.

EXHIBIT O(2)

AOE0804

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2020 and 2019

**NOTE 12 – NOTES PAYABLE TO PRODUCTION COMPANY (Continued)**

On October 25, 2019, our subsidiary Arctic Dogs, LLC entered into a note payable agreement with the same production company. The note payable agreement allowed for funds of $9.5 million to be advanced for use for part of the media expenditures with respect to the promotion of the movie. The note carries interest of 18% and is payable via receipts from the film. As of both December 31, 2020 and 2019, the total outstanding on the note was $9.5 million which is included in Borrowings, net of current portion. Accrued interest at December 31, 2020 and 2019 was $2.0 million and $0.3 million, respectively, which is included in accounts payable and accrued expenses in the accompanying consolidated balance sheet.

**NOTE 13 – DUE TO RELATED PARTY**

In a prior year, the Company entered into two loan agreements for an aggregate total of $5.4 million with the sole member of the Company to fund operating expenses. These borrowings bear interest at 18% per annum and matures on October 25, 2021. As of both December 31, 2020 and 2019, the total balances outstanding on the notes was $5.4 million with $2.1 million and $1.1 million of accrued interest at December 31, 2020 and 2019, respectively.

In a prior year, Replicas LLC entered into a loan agreement for $10.7 million with the sole member of the Company to fund the prints and advertising costs for the Replicas movie. These borrowings bear interest at 16% per annum, matures on December 17, 2021, and will be repaid out of receipts from the exploitation of the Replicas movie. As of both December 31, 2020 and 2019, the total balances outstanding on the note were $6.3 million and accrued interest was $1.5 million and $0.5 million, respectively.

On July 17, 2019, 47 Meters Down II entered into a loan agreement for $3.8 million with the sole member of the Company to fund operating expenses. These borrowings bear interest at 18% per annum, and mature on July 17, 2023. As of both December 31, 2020 and 2019, the total balance outstanding on the loan was $3.8 million and accrued interest was $1.0 million and $0.3 million at December 31, 2020 and 2019, respectively.

On October 25, 2019, Arctic Dogs LLC entered into a loan agreement for $19.5 million with the sole member of the Company to fund operating expenses. The loan bears interest at 16% per annum and matures on October 25, 2022. As of December 31, 2019, the total balance outstanding on the loan was $9.6 million and accrued interest was $0.3 million. As of December 31, 2020, the total balance outstanding on the loan was $11.6 million and accrued interest was $2.1 million

EXHIBIT O(2)

AOE0805

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2020 and 2019

## NOTE 14 – ACCOUNTS PAYABLE AND ACCRUED EXPENSES

As of December 31, 2020 and 2019, the accounts payable and accrued expenses were comprised of the following:

|  | 2020 (In millions) | 2019 (In millions) |
|---|---|---|
| Accounts payable | 51.7 | 68.2 |
| Accrued interest | 43.1 | 11.4 |
| Accrued payroll | 5.4 | 6.4 |
| Accrued advertising | 5.2 | 3.3 |
| Accrued satellite and video transmission | 1.8 | 1.2 |
| Amounts owed to producers | 3.7 | 3.1 |
| Residuals payable, current portion | 2.1 | 4.4 |
| Other accrued expenses | 24.7 | 7.7 |
| Total accounts payable and accrued expenses | 137.7 | 105.7 |

## NOTE 15 – INCOME TAXES

Provision for income taxes for the years ended December 31, 2020 and 2019 for the taxable entity group consisted of the following:

|  | 2020 (In millions) | 2019 (In millions) |
|---|---|---|
| Current tax (benefit) |  |  |
| Federal | 3.4 | 5.8 |
| States | 1.4 | 1.4 |
| Foreign | 0.1 | 0.1 |
| Total current | 4.9 | 7.3 |
|  |  |  |
| Deferred tax (benefit) |  |  |
| Federal | (9.1) | (2.8) |
| States | (0.8) | (0.1) |
| Total deferred | (9.9) | (2.9) |
|  |  |  |
| Provision for income taxes | (5.0) | 4.4 |

For the period from January 1, 2020 to December 31, 2020, the provision for income taxes of the taxable entity group differs from the amount of income tax determined by applying the applicable U.S. statutory income tax rate to pretax income primarily due to state and local income taxes, nondeductible goodwill amortization, nondeductible transaction costs and nondeductible interest expense for which the company has a valuation allowance established.

EXHIBIT O(2)

AOE0806

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended and as of December 31, 2020 and 2019

## NOTE 15 – INCOME TAXES (Continued)

On March 27, 2020, the CARES Act was enacted in response to the COVID-19 global pandemic. The CARES Act, among other things, contains modifications on the limitation of business interest for tax years beginning in 2019 and 2020, and permits net operating loss carryovers and carrybacks to offset 100% of taxable income for taxable years beginning before 2021. In addition, the CARES Act allows NOLs incurred in 2018, 2019, and 2020 to be carried back to each of the five preceding taxable years to generate a refund of previously paid income taxes. We will continue to monitor and assess the impact the CARES Act may have on our business and financial results.  As of December 31, 2020, we have carried back NOLs to prior tax years under the CARES Act in aggregate of $0.8 million of which $0.5 million has been received to-date.  Additionally, the modifications to the interest expense limitation allowed for an increased deduction of interest expense in our tax provision for the year ending December 31, 2020.

Significant components of deferred tax assets and liabilities for the taxable entity group at December 31, 2020 and 2019 were as follows:

| | 2020 (In millions) | 2019 (In millions) |
|---|---|---|
| **Deferred tax assets** | | |
| Residuals | 0.7 | 0.4 |
| Deferred rent | 0.1 | 0.1 |
| Deferred revenue | 0.7 | 0.5 |
| Interest limitation | 0.7 | 2.5 |
| Book rights | 0.2 | 0.1 |
| Charitable contributions | - | 0.1 |
| Transaction costs | 0.3 | 0.2 |
| Accruals | 0.3 | - |
| Bad Debts | 0.1 | - |
| Net operating losses | 15.4 | 3.7 |
| Total deferred tax assets | 18.5 | 7.6 |
| | | |
| Valuation allowance | (2.1) | (5.5) |
| Total deferred tax assets, net | 16.4 | 2.1 |
| | | |
| **Deferred tax liabilities** | | |
| Deferred production costs | (2.6) | (3.0) |
| Prepaid Expenses | (0.1) | - |
| Fixed assets & intangibles | (28.4) | (1.1) |
| Outside basis difference in WG partnership interest | (8.2) | (10.4) |
| | | |
| Total deferred tax liabilities | (39.3) | (14.5) |
| | | |
| **Total deferred taxes, net** | **(22.9)** | **(12.4)** |

EXHIBIT O(2)

AOE0807

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**For the years ended and as of December 31, 2020 and 2019**

**NOTE 15 – INCOME TAXES (Continued)**

All deferred tax assets and liabilities are classified as long term. The taxable entity group measures deferred taxes associated with its interest in Weather Group based upon the outside basis difference of its investment in the partnership. The federal net operating loss carryforwards of the Company's subsidiaries total $59.3 million as of December 31, 2020, which is made up of $22.2 million of net operating losses generated as of December 31, 2017 that begin to expire in 2033 and $37.1 million of net operating losses generated after December 31, 2017 that have an indefinite carryforward period.

**NOTE 16 – COMMITMENTS, CONTINGENCIES AND RELATED PARTY TRANSACTIONS**

Operating Leases

The Company leases office and studio facilities in Century City and Culver City, California, Chicago, Illinois, New York, New York, and Atlanta, Georgia, pursuant to agreements expiring through the years ended December 2019 to 2028. The Century City leases are personally guaranteed by the sole member of the Company.

Rent expense is charged ratably over the lives of the leases using the straight-line method. The Company has a standby letter of credit in respect of the New York facility. The term of the letter of credit is for five years, maturing in January 2022 and a restricted cash account has been established for this amount. At both December 31, 2020 and 2019, the restricted cash amount being held in respect of the letter of credit was $0.2 million.

Total rent expense for the years ended December 31, 2020 and 2019 was approximately $5.9 million and $4.7 million, respectively.

Future minimum lease payments, by year and in aggregate, with initial or remaining terms of over one year are as follows:

| Years Ending December 31, | (In millions) |
|---|---|
| 2021 | 8.3 |
| 2022 | 8.0 |
| 2023 | 6.6 |
| 2024 | 5.7 |
| 2025 | 4.0 |
| Thereafter | 19.0 |
| **Total** | 51.6 |

EXHIBIT O(2)

AOE0808

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended and as of December 31, 2020 and 2019

**NOTE 16 – COMMITMENTS, CONTINGENCIES AND RELATED PARTY TRANSACTIONS (Continued)**

Capital Leases

The Company has outstanding capital lease obligations related to satellite transponders and office and production equipment that expire at varying dates between 2020 and 2022. The implicit rates of interest on these leases range from 5.8% to 15.2%. The following is a schedule by years of future minimum lease payments under capital leases, as of December 31, 2020:

| Years Ending December 31, | (In millions) |
|---|---|
| 2021 | 2.6 |
| 2022 | 0.6 |
| 2023 | 0.0 |
| Total | 3.2 |
| Less: imputed interest | (0.1) |
| Present value of net minimum lease payments | 3.1 |
| Less: Capital lease obligation, current portion | 2.5 |
| **Capital lease obligation, long-term portion** | **0.6** |

Long-term Debt

The Company has various debt agreements outstanding as of December 31, 2020 as described in Note 11. Required future payments for borrowings including notes payable to production company, by year and in aggregate, at the balance sheet date are as follows:

| Years Ending December 31, | (In millions) |
|---|---|
| 2021 | 6.6 |
| 2022 | 16.1 |
| 2023 | 6.6 |
| 2024 | 6.6 |
| 2025 | 23.6 |
| Thereafter | 962.2 |
| Total | 1,021.7 |

Purchase Commitments

*Film Contract Rights*

WG has commitments to purchase or license certain programming that is not yet available for broadcast, primarily purchased or licensed first-run episodic programming. Such programming is generally produced and delivered at or near its broadcast date. Such contracts generally require progress payments as certain production milestones are achieved, prior to the programming becoming available for broadcast. If programming is not produced, WG's commitment to purchase or license the programming would generally expire without obligation.

EXHIBIT O(2)

AOE0809

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2020 and 2019

**NOTE 16 – COMMITMENTS, CONTINGENCIES AND RELATED PARTY TRANSACTIONS (Continued)**

*Employment and Talent Agreements*
WG regularly enters into multi-year employment agreements with its on-air talent for the Company's national cable network, as well as with certain executives. Under certain circumstances, the agreements may be terminated prior to expiration.

*Satellite and Video Transmission*
In a prior year, the Company entered into an arrangement with a satellite link and video transmission provider that was set to expire in January 2019.

In a previous year, the Company entered into an amendment with the provider whereby, upon the expiration of the original term in January 2019, a new arrangement ("subsequent term") began which expires in January 2023. Total payments under the subsequent term total $6.0 million which are payable in annual installments beginning during the year ended December 31, 2020.

*Unconditional Purchase and Other Commitments*
In the normal course of business, the Company enters into multi-year agreements for the provision of services including software licensing arrangements, audience ratings, syndication, advertising services, and certain other services. These arrangements are generally not cancelable prior to their expiration and represent unconditional purchase commitments of the Company that are payable over a number of years. The Company also purchases product components from a variety of suppliers and also has certain general commitments to make payments to certain customers under related agreements.

The commitments arising from these purchase and customer agreements as of December 31, 2020 are as follows:

| Years Ending December 31, (amounts in millions) | Contract Film Rights | Employment and Talent | Satellite Links and Video Transmission | Unconditional Purchase and Other Commitments | Total |
|---|---|---|---|---|---|
| 2021 | 2.4 | 13.4 | 1.9 | 29.8 | 47.5 |
| 2022 | - | 9.0 | 1.8 | 8.2 | 19.0 |
| 2023 | - | 4.5 | 0.1 | 1.7 | 6.3 |
| 2024 | - | 1.2 | - | 0.3 | 1.5 |
| 2025 | - | 0.1 | - | - | 0.1 |
| Thereafter | - | - | - | - | - |
| Total | 2.4 | 28.2 | 3.8 | 40.0 | 74.4 |

EXHIBIT O(2)

AOE0810

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2020 and 2019

**NOTE 16 – COMMITMENTS, CONTINGENCIES AND RELATED PARTY TRANSACTIONS (Continued)**

<u>Contingencies</u>

In July 2014, pursuant to an action filed by talent ("the original claimant") in 2012, the Company reached a settlement with SAG-AFTRA for a class action lawsuit for $1.4 million. In February 2015, the original claimant filed two appeals in the Ninth Circuit Court of Appeals. Between March 2016 and June 2018, the appeals have been heard, complaints have been amended by the plaintiff and dismissed in part by the district and superior court. All causes of action and complaints that were dismissed have subsequently been appealed by the plaintiff and have been referred back to the Ninth Circuit Court of Appeals. In April 2019, an oral argument for both appeals was heard by the Ninth Circuit Court of Appeals and the cases were submitted for decision. The Ninth Circuit remanded one case to state court and one back to the district court. As of the date these consolidated financial statements were available to be issued, following a settlement between the plaintiffs and SAG/AFTRA, the two cases are both back in state court with only a handful of the claims remaining. The Company intends to seek dismissal or settle for nuisance value. The parties attended a mandatory settlement conference in the summer of 2020. Subsequent to the balance sheet date and prior to when these financials were available to be issued, the parties settled for an immaterial amount.

Beginning in 2014, four claims, each for an unspecified amount, were filed against the Company with respect to the productions of certain TV series'. These claims were filed by the SAG-AFTRA for unpaid residuals for television programming, late payment penalties and health and retirement contributions. Most of the claims are in various stages of arbitration. One claim has resulted in a payment of $0.1 million. As of December 31, 2019, the Company accrued a total of $5.0 million within Accounts payable and accrued liabilities and other long term liabilities which represents the settlement amount proposed at that date by SAG-AFTRA. During 2020, a settlement agreement was executed between the parties for the proposed settlement. At December 31, 2020 approximately $1.2 million is remaining to be paid across the next 18 months.

In addition to the above, from time to time, the Company is involved in claims and legal proceedings and other disputes that arise in the ordinary course of its business. In the opinion of the Company's management and legal counsel, such claims are without substantial merit and should not result in judgments which, in the aggregate, would have a material adverse effect on the Company's financial statements.

<u>Related Party Arrangements</u>

The company has a related party relationship with a sister television station whereby each station collects certain revenues and remits a portion of the revenues to the other station. The stations are under common management. The transactions create a related party receivable or payable, dependent upon timing of receipts and payments. As of December 31, 2020, the related party receivable was $2.4 million and is included in Prepaid expenses and other current assets on the consolidated balance sheet.

During the year-ended December 31, 2020, the Company entered into a 10-year lease for office space with the sole member of the Company. The Company accounted for the lease as a new lease agreement under ASC 840 and determined it should be classified as an operating lease. The minimum lease payments for this lease are captured within the operating lease minimum payments table above and total $28.9 million over the term of the lease.

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2020 and 2019

**NOTE 16 – COMMITMENTS, CONTINGENCIES AND RELATED PARTY TRANSACTIONS (Continued)**

The sole member of the Company provides services to the Company, including in certain production related roles, in exchange for compensation. Consistent with the Company's accounting policy and in accordance with the applicable literature, a portion of the amounts paid to the member are capitalized as costs of content. During the year ended December 31, 2020, the compensation totaled $35.0 million of which $31.5 million was capitalized as part of content costs in Television library, less current portion on the consolidated balance sheet.

**NOTE 17 – MEMBER'S DEFICIT**

Member's Note Receivable
During the years ended December 31, 2020 and 2019, there were $35.4 million and $13.8 million, respectively, in repayments and $35.4 million and $15.2 million, respectively, in advances on the member note receivable. As of December 31, 2020 and 2019, the member note receivable was $4.9 million. The member note receivable accrues interest at 3% per annum and matures on December 31, 2021.

During the years ended December 31, 2020 and 2019, interest income was $0.6 million and $0.4 million, respectively, as shown in the consolidated statement of operations. As of both December 31, 2020 and 2019, accrued interest income was an immaterial amount. These amounts are included in prepaid and other current assets in the accompanying consolidated balance sheet.

Minority Interest
During 2019, in conjunction with the acquisition of Bayou as further described in Note 3, the sole member of the Company contributed cash to AMBH in exchange for a 26% equity interest in AMBH. This created a noncontrolling interest relationship with a related party as the sole member holds equity directly in one of the Company's consolidated subsidiaries. The net loss attributable to the noncontrolling interest was determined based on the results of AMB.

On February 10, 2020, in conjunction with the 2020 refinancing, as described in Note 11, the non-controlling interest was contributed from the noncontrolling interest holder to the Company and as a result all subsidiaries are wholly owned subsequent to the transaction. The net loss attributable to the noncontrolling interest presented in the statement of operations reflects the results of AMB attributable to the noncontrolling interest holder for the period from January 1, 2020 to February 9, 2020. The remaining equity balance held by the noncontrolling interest holder upon contribution was $6.1 million.

Member contribution and distribution
During 2020, in conjunction with the acquisition of the USA TV stations and the 2020 Syndicated refinancing, as described in Note 3 and Note 11, the sole member of the Company contributed $9.0 million cash to the Company as additional equity. During 2020, the member received a distribution in cash of $15.0 million.

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**For the years ended and as of December 31, 2020 and 2019**

## NOTE 18 – SUBSEQUENT EVENTS

Management has evaluated all activity through April 30, 2021 (the date the consolidated financial statements are available to be issued) and, except for the matters below, concluded that no subsequent events have occurred that would require recognition or disclosure in the notes to consolidated financial statements.

On August 15, 2020 the Company entered into a purchase agreement to acquire all of the outstanding shares of KITV, Inc., a television broadcast company in Honolulu, Hawaii, which holds one television station, for a cash purchase price of approximately $30.0 million. The acquisition closed on January 20, 2021 by our unrestricted subsidiary Allen Media Broadcasting Evansville II, LLC.

On March 4, 2021 the Company, with KITV, Inc, as borrower, entered into a credit agreement with a certain lender, for $20.5 million in financing. The loan bears interest at a base rate of the greater of i) an adjusted LIBOR, ii) prime rate, or iii) federal funds rate plus 0.5%, added to a spread of 6.5%. Alternatively, the Company may elect a spread of 7.5% with a base rate of adjusted LIBOR. The interest spread in both cases increases by 0.5% on the first and second anniversary of the loan closing date. The loan is due and payable in equal installments of $0.5 million on the last day of the first calendar quarter each year beginning in 2022 through 2025 with the remaining balance due on March 4, 2026. The proceeds of the financing was distributed to Allen Media, LLC.

On April 29, 2021, the Company entered into an asset purchase agreement to acquire seven television broadcast stations for approximately $380.0 million. The Company has secured committed financing for the acquisition on a separate stand-alone entity, Allen Media Broadcasting Evansville III, LLC, formed for the purpose of the acquisition. It is anticipated that the transaction will close in the third quarter of this year and that the purchase price will be settled in cash upon closing.

EXHIBIT O(2)

AOE0813

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES

### UNAUDITED CONSOLIDATED BALANCE SHEETS
### As of March 31, 2021 and December 31, 2020

## ASSETS

| | March 31, 2021 (In millions) | December 31, 2020 (In millions) |
|---|---|---|
| **CURRENT ASSETS** | | |
| Cash | $57.9 | $73.6 |
| Accounts receivable, net | 96.3 | 98.2 |
| Television library, current portion | 10.7 | 11.2 |
| Income tax receivables | 1.3 | 1.1 |
| Prepaid expenses and other current assets | 8.6 | 8.8 |
| **Total Current Assets** | $ 174.8 | $ 192.9 |
| | | |
| Tax credit receivable | 3.1 | 5.1 |
| Restricted cash | 0.2 | 0.2 |
| Property and equipment, net | 70.5 | 72.4 |
| Television library, less current portion | 126.9 | 125.2 |
| Film rights, less current portion | 9.8 | 9.7 |
| Intangible assets, net | 34.2 | 19.1 |
| Goodwill, net | 447.8 | 441.9 |
| Other noncurrent assets | 4.0 | 4.0 |
| **TOTAL ASSETS** | $ 871.3 | $ 870.5 |

## LIABILITIES AND MEMBER'S DEFICIT

| | March 31, 2021 | December 31, 2020 |
|---|---|---|
| **CURRENT LIABILITIES** | | |
| Accounts payable and accrued liabilities | 139.5 | 137.7 |
| Due to related parties | 26.5 | 27.1 |
| Taxes payable | 4.2 | 4.4 |
| Current portion of borrowings | 11.8 | 11.4 |
| Current portion of capital lease liabilities | 2.1 | 2.5 |
| Deferred revenue | 12.9 | 9.8 |
| **Total Current Liabilities** | $ 197.0 | $ 192.9 |
| | | |
| Borrowings, less current portion | 1,008.8 | 983.3 |
| Capital lease liabilities, less current portion | 0.2 | 0.6 |
| Deferred tax liabilities | 27.9 | 22.9 |
| Other long-term liabilities | 6.6 | 7.9 |
| **Total Liabilities** | $ 1,240.5 | $ 1,207.6 |
| | | |
| **MEMBER'S DEFICIT** | | |
| Member's deficit | (369.2) | (337.1) |
| | | |
| **TOTAL MEMBER'S DEFICIT ATTRIBUTABLE TO ALLEN MEDIA HOLDINGS, LLC** | $ (369.2) | $ (337.1) |
| | | |
| **TOTAL LIABILITIES AND MEMBER'S DEFICIT** | $ 871.3 | $ 870.5 |

The accompanying notes are an integral part of these consolidated financial statements.

EXHIBIT O(2)

AOE0814

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## UNAUDITED CONSOLIDATED STATEMENTS OF OPERATIONS
### For the three months ended March 31, 2021 and March 31, 2020

| | Three months ended | |
| --- | --- | --- |
| | March 31, 2021 (In millions) | March 31, 2020 (In millions) |
| **Revenues** | | |
| Networks and content revenue | $ 62.0 | $ 65.4 |
| Broadcast television revenue | 36.8 | 23.6 |
| **Total Revenues** | **98.8** | **89.0** |
| | | |
| Operating Expenses | | |
| Programming and production expenses | 55.2 | 39.6 |
| Sales, general and administrative expenses | 32.0 | 36.5 |
| Depreciation and amortization of intangible assets and goodwill | 18.3 | 13.5 |
| | | |
| **Total operating expenses** | **105.5** | **89.6** |
| | | |
| **Operating (loss) income** | **$ (6.7)** | **$ (0.6)** |
| | | |
| Other Income (Expense) | | |
| Interest expense | (21.8) | (23.5) |
| Loss on derecognition of debt | - | (47.2) |
| Other income, net | 0.4 | 0.2 |
| **Total other expense, net** | **(21.4)** | **(70.5)** |
| | | |
| **Loss before income taxes** | **(28.1)** | **(71.1)** |
| | | |
| Income tax expense (benefit) | (0.2) | (0.8) |
| **Net loss attributable to Allen Media Holdings, LLC and minority interests** | **(27.9)** | **(70.3)** |
| | | |
| Net loss attributable to minority noncontrolling interest | - | (0.4) |
| | | |
| **Net Loss attributable to Allen Media Holdings, LLC** | **$ (27.9)** | **$ (69.9)** |

The accompanying notes are an integral part of these consolidated financial statements.

EXHIBIT O(2)

AOE0815

**ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES**
UNAUDITED CONSOLIDATED STATEMENTS OF MEMBER'S DEFICIT
For the three months ended March 31, 2021 and March 31, 2020

| (amounts in millions) | Member Note Receivable | Minority Interest | Member's Deficit | Total |
|---|---|---|---|---|
| Balance, December 31, 2019 | $ (4.9) | $ 6.5 | $ (202.1) | $ (200.5) |
| Advances to member | (5.1) | - | - | (5.1) |
| Repayment of member's note receivable | - | - | - | - |
| Contribution of minority interest from noncontrolling interest holder | - | (6.1) | 6.1 | - |
| Contribution from member | - | - | 9.0 | 9.0 |
| Net loss for the period | - | (0.4) | (69.9) | (70.3) |
| Balance, March 31, 2020 | $ (10.0) | - | $ (256.9) | $ (266.9) |
| | | | | |
| Balance, December 31, 2020 | $ (4.9) | - | $ (332.2) | $ (337.1) |
| Advances to member | (45.1) | - | - | (45.1) |
| Repayment of member's note receivable | 40.9 | - | - | 40.9 |
| Net loss for the period ended March 31, 2021 | - | - | (27.9) | (27.9) |
| Balance, March 31, 2021 | $ (9.1) | - | $ (360.1) | $ (369.2) |

The accompanying notes are an integral part of these consolidated financial statements.

EXHIBIT O(2)

AOE0816

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## UNAUDITED CONSOLIDATED STATEMENT OF CASH FLOWS
### For the three months ended March 31, 2021 and March 31, 2020

|  | Three months ended | |
|---|---|---|
|  | March 31, 2021 (In millions) | March 31, 2020 (In millions) |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net loss | $ (27.9) | $ (70.3) |
| Adjustments to reconcile change in net loss to net cash used in operating activities. | | |
| Depreciation and amortization of intangible assets and goodwill | 18.4 | 13.5 |
| Loss (Gain) on disposal of property and equipment | (0.1) | - |
| Amortization of deferred financing cost | 0.9 | 1.8 |
| Amortization of television library | 9.7 | 6.0 |
| Amortization of film rights | 0.9 | 2.3 |
| Loss on debt extinguishment | - | 47.2 |
| Changes in Operating Assets and Liabilities: | | |
| Receivables | 5.0 | 2.0 |
| Television library assets | (11.4) | (17.2) |
| Film rights assets | (1.0) | - |
| Prepaid expenses and other assets | 2.3 | 4.2 |
| Accounts payable and accrued expense | 0.2 | 20.2 |
| Deferred revenue | 1.8 | 1.0 |
| Taxes payable | (0.2) | (1.2) |
| Other noncurrent liabilities | (0.3) | (0.1) |
| **Net Cash (used in) provided by Operating Activities** | **$ (1.7)** | **$ 9.4** |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Acquisition of property and equipment | (1.5) | (3.4) |
| Purchase of intangible assets | (1.5) | (0.2) |
| Acquisition of business, net of cash acquired | (30.6) | (298.7) |
| **Net cash used in Investing Activities** | **$ (33.6)** | **$ (302.3)** |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Borrowings, net of discount and fees paid to lenders | $ 73.3 | $911.8 |
| Repayments of borrowings | (48.0) | (557.3) |
| Repayments of borrowings from related party | (0.6) | - |
| Payment of debt issuance costs | (0.2) | (26.2) |
| Cash from issuance of equity | - | 9.0 |
| Cash received from member, net | (4.2) | (5.1) |
| Payments on capital leases | (0.7) | (2.0) |
| **Net Cash provided by Financing Activities** | **$ 19.6** | **$ 330.2** |
| **NET CHANGE IN CASH AND RESTRICTED CASH** | **(15.7)** | **37.3** |
| **CASH AND RESTRICTED CASH AT BEGINNING OF PERIOD** | 73.8 | 25.0 |
| **CASH AND RESTRICTED CASH AT END OF PERIOD** | **$ 58.1** | **$ 62.3** |
| **Schedule of supplemental cash flow information** | | |
| Cash paid for taxes | $ 0.2 | $ 0.2 |
| Cash paid for interest | $ 26.9 | $ 9.6 |

The accompanying notes are an integral part of these consolidated financial statements.

EXHIBIT O(2)

AOE0817

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

## NOTE 1 – NATURE OF BUSINESS

Allen Media Holdings, LLC ("AMH") was formed on January 17, 2018 and is owned by one member. AMH functions as a holding company for Allen Media, LLC ("AM") and its subsidiaries. AM and its wholly owned subsidiaries constitute a diversified media company that owns and operates television networks, including The Weather Channel, broadcast television stations and a production and distribution business, which creates original programming across multiple genres. Certain wholly owned subsidiaries existed and operated prior to the formation of AMH. A restructuring in 2018 resulted in substantially all companies being wholly owned subsidiaries of AM. AMH, AM, and the operating entities are collectively described in these consolidated financial statements as "AMH Group" "the Company", or "we".

The Company distributes its programming, mainly in exchange for advertising airtime that it sells to advertising agencies in the U.S. Also, we operate several digital cable and satellite channels which broadcast its television programs through our affiliates. We also produce and distribute motion picture content through our motion pictures division, specializing in production, distribution, and representation for independent companies, major studios and mini-major studios.

In March 2018, we purchased Weather Group, LLC ("WG"). WG is a multi-platform media company focused on providing weather information and programming on various platforms. The WG cable network produces continuous 24-hour national, regional, and local weather-related television programming distributed by cable, satellite, and telecommunications multichannel video programming distributors in the U.S. and Caribbean.

In April 2019, the Company, along with its member, formed Allen Media Broadcast Holdings ("AMBH") and Allen Media Broadcasting ("AMB"), which subsequently acquired Bayou City Broadcasting Evansville, Inc. and Bayou City Broadcasting Lafayette, Inc., (collectively referred to as "Bayou") on July 3, 2019. Bayou is a television broadcast station group with stations affiliated with big four television networks such as CBS, FOX, and NBC.

In February 2020, a subsidiary of AMB, Allen Media Broadcasting Evansville, Inc., acquired nine television stations, the USA TV stations, as further described in Note 3. The stations acquired are affiliated with big four television networks such as CBS, FOX, and NBC.

During the three months ended March 31, 2021 and March 31, 2020, the Company incurred a consolidated net loss of $27.9 million and $69.9 million, respectively. At March 31, 2021 and December 31, 2020 the Company's member's deficit was $369.2 million and $337.1 million, respectively. As of March 31, 2021, the Company had outstanding debt of $1,020.6 million, with required payments for these borrowings of $5.0 million plus interest in 2021, as further described in Notes 10 and 15.

The Company continues to maintain a strong library of film and television content and broadcasting assets in key markets that management expects to provide positive returns beginning in 2021. As of March 31, 2021, cash on hand was $57.9 million and our current assets of $174.8 million were less than our current liabilities of $197.0 million, including $26.5 million of amounts due to our member which can but are not required to be repaid prior to the third quarter of 2022. As of March 31, 2021, the Company was in compliance with its financial covenants contained in the credit agreements governing its outstanding debt.

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

---

### NOTE 1 – NATURE OF BUSINESS (Continued)

In accordance with Accounting Standards Update ("ASU") 2014-15, *Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern (Subtopic 205-40)*, the Company has evaluated whether there are conditions and events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern within one year from the date of the issuance of these consolidated financial statements. The Company is highly leveraged, which makes it vulnerable to changes in general economic conditions. The Company's ability to repay or refinance its debt will depend on, among other things, financial, business, market, competitive and other conditions, some of which are beyond the Company's control. However, based on current operations and forecasted results, the Company believes that its available cash as of the date of the issuance of these financial statements, anticipated cash flows from operations and available borrowings under existing credit facilities will be sufficient to finance its operations and fund working capital, capital expenditure requirements, interest payments and scheduled debt principal payments for at least the next twelve months. The accompanying financial statements have been prepared assuming that the Company will continue as a going concern.

### NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Basis of Presentation
The Company's consolidated financial statements are prepared using the accrual basis of accounting in accordance with accounting principles generally accepted in the United States.

Principles of Consolidation
The consolidated financial statements of the Company as of March 31, 2021 and December 31, 2020 and for the three months ended March 31, 2021 and March 31, 2020 include the accounts of Allen Media Holdings, LLC and its subsidiaries, which is primarily Allen Media, LLC and its subsidiaries, including Entertainment Studios Media Holdings ("ESMH"), Entertainment Studios P&A ("ESP&A"), Entertainment Studios Motion Pictures ("ESMP"), the Weather Group ("WG") , and AMBH and its subsidiaries and other direct subsidiaries. All significant intercompany transactions have been eliminated in consolidation.

Use of Estimates
The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make assumptions that affect the reported amounts of assets and liabilities and the reported amounts of revenues and expenses. The significant estimates in the accompanying financial statements include ultimate revenues for film rights and television library, impairment provisions for long-lived assets and intangible assets, allowances for doubtful accounts receivable, useful lives of property and equipment, television library and film rights, and intangible assets, deferred revenue, valuation and recoverability of goodwill, and contingencies. Changes in estimates are recorded in the period in which they become known. The Company bases its estimates on historical experience and various other assumptions that it believes reasonable under the circumstances. Although the Company regularly assesses these estimates, actual results could differ materially from these estimates.

Restricted Cash
Restricted cash consists of funds that are contractually restricted as to usage or withdrawal due to a standby letter of credit relating to the operating lease of our facility in New York. The Company has presented restricted cash separately from cash and cash equivalents on the consolidated balance sheet.

EXHIBIT O(2)

AOE0819

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

Accounts Receivables, Net

Accounts receivable comprise customers' outstanding balances in respect of advertising, license fees and subscriptions less any allowance for doubtful accounts including affiliate revenue reserves. An allowance for doubtful accounts on accounts receivable is charged to expense in amounts sufficient to maintain the allowance for uncollectible accounts at a level management believes is adequate to cover any probable losses. Management determines the adequacy of the allowance based on historical write-off percentages and information collected from individual customers. Accounts receivable are charged off against the allowance when collectability is determined to be permanently impaired.

Within accounts receivable, net, the Company has certain current royalties receivable relates to music and content aired on the Company's digital cable and satellite channels, together with retransmission royalties and are recorded at their net present value. An allowance for doubtful accounts on royalties receivable is charged to expense in amounts sufficient to maintain the allowance for uncollectible accounts at a level management believes is adequate to cover any probable losses. Management determines the adequacy of the allowance based on historical write-off percentages and information collected. Royalties receivable are charged off against the allowance when collectability is determined to be permanently impaired. Royalties receivable totaling $0.6 million were included in accounts receivable, net, at March 31, 2021 and December 31, 2020.

Property and Equipment

Property and equipment are carried at cost. Depreciation and amortization are computed using the straight-line method over the estimated useful lives of the respective assets, generally as follows:

| | |
|---|---|
| Production equipment | 2 - 10 years |
| Office furniture and equipment | 2 - 7 years |
| Leasehold improvements | Lesser of the useful life or the lease term |
| Satellites | 42 months |
| Trucks and automobiles | 2 - 7 years |

The Company also has assets in the course of construction ("Construction in progress") totaling $3.8 million and $3.8 million as of both March 31, 2021 and December 31, 2020. Such assets are depreciated once the asset is completed and placed into service. Maintenance and repairs are charged to operations when incurred, while betterments and renewals are capitalized. Gains or losses are recognized upon the sale or disposal of the assets.

Television Library and Film Rights

The Company's television library consists of i) capitalized television production costs for content produced by the Company and aired on the Company's broadcast or cable networks or licensed to customers and ii) programming rights for content licensed from third parties to air on the Company's broadcast and cable networks. Film rights ("film costs") represent the cost to acquire the distribution rights or finance the production of motion pictures for theatrical release and distribution.

Capitalized television production costs and film rights are accounted for in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic No. 926, Entertainment—Films, and programming rights and related costs are accounted for in accordance with FASB Accounting Standards Codification ("ASC") Topic No. 920, Entertainment—Broadcasters.

EXHIBIT O(2)

AOE0820

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

---

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

Capitalized production costs include direct costs, production overhead and interest, and are stated at the lower of unamortized cost or fair value. Programming rights are recorded when the program is available for use and are stated at the lower of unamortized cost or net realizable value.

Capitalized television production costs and film rights are amortized to expense over their estimated useful lives which range from 4-10 years, commencing upon the first airing, based on estimated usage or revenue to date as a percentage of remaining total projected attributable revenue, or ultimate revenue (individual-film-forecast-computation method). In certain cases, the Company utilizes a straight-line usage-based methodology to amortize capitalized television production costs. Program content cost assets are generally amortized and analyzed for impairment on a title-specific basis. When estimates of total revenues or other events or changes in circumstances indicate that a television production or film has a fair value that is less than unamortized cost, an impairment loss is recognized for the amount by which the unamortized cost exceeds the fair value. In the case of an impairment analysis becoming necessary, a discounted cash flow model based on management's expectation of future advertising revenues, net of sales commissions, to be generated by the program material is expected to be used. No impairments were recorded during the three months ended March 31, 2021 or year ended December 31, 2020.

Projected attributable revenue can change based on market conditions and management decisions regarding planned content usage. These calculations require management to make assumptions and apply judgment regarding revenue and planned usage. Accordingly, the Company periodically reviews revenue estimates and planned usage and revises its assumptions if necessary, which could impact the timing of amortization expense or result in an impairment.

Programming rights are amortized over the contract term based on estimated usage. The portion of the unamortized balance expected to be amortized in the succeeding year is classified as a current asset, with the remainder classified as noncurrent. Amortization of program content assets is included in programming and production expenses on the consolidated statement of operations.

Intangible Assets

Intangible assets consist of acquired and internally developed technology and software, costs incurred to acquire the names of digital and satellite channels, Federal Communications Commission ("FCC") licenses, and localization technology (or STAR) conveyed to cable, satellite and other distributors. STAR technology allows distributors of a network signal to receive the transmission of thousands of localized weather forecasts and extract the forecast for a specific geography. Software consists primarily of a developed application, Local Now, and related technology acquired through the Weather Group acquisition which are primarily for internal use. The Company also has intangible assets in the course of construction ("Construction in process"). Amortization of such assets begins once the asset is completed and placed into service. Intangible assets are capitalized and amortized on a straight-line basis over 3 to 15 years except FCC licenses which are indefinite-lived and therefore not amortized.

The Company capitalizes certain cloud-computing arrangement costs pursuant to guidance in FASB subtopic No. ASC 350-40, *Intangibles – Goodwill and Other – Internal-Use Software*, which permits capitalization of certain costs for cloud-computing arrangements which do not contain a software license.

EXHIBIT O(2)

AOE0821

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

Impairment tests for intangible assets not subject to amortization are performed annually or when events or circumstances indicate it is more likely than not that the asset is impaired. The impairment test involves a comparison of the estimated fair value of the intangible asset with its carrying value. If the carrying value of the intangible asset exceeds its fair value, an impairment loss is recognized in an amount equal to that excess.

Goodwill

Goodwill relates to the acquisitions of KITV, WG, Bayou, USA TV stations, TheGrio, and Freestyle and represents the excess of purchase price over the value assigned to the assets acquired. The acquisitions of the USA TV stations and KITV are further discussed in Note 3.

The Company has applied the guidance under FASB ASC subtopic No. 805-20, *Business Combinations – Identifiable Assets and Liabilities, and Any Noncontrolling Interest,* where certain assets, such as customer relationships or a covenant not to compete, are not recorded separately from goodwill. As such, in accordance with FASB ASC subtopic No. 350-20, *Intangibles—Goodwill and Other – Goodwill ("ASC 350-20"),* management has assigned a life of 10 years to goodwill over which the amount allocated to goodwill is being amortized.

Pursuant to ASC 350-20, goodwill should be tested for impairment when a triggering event occurs that indicates that the fair value of a reporting unit may be below its carrying amount. If the goodwill is determined to be impaired, the goodwill is written down to its realizable value and the loss is recognized in the consolidated statement of operations in the period when determination is made. No impairment charges were recorded for the three months ended March 31, 2021 and year ended December 31, 2020.

Long-lived Assets

The Company reviews long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. An impairment loss would be recognized when estimated future cash flows expected to result from the use of the asset and its eventual disposition is less than its carrying amount. Refer to Note 7. No impairment losses were recorded during the three months ended March 31, 2021 or March 31, 2020.

Deferred Financing Costs

Deferred financing costs represent costs incurred to acquire debt. These costs are deferred and amortized on an effective interest yield basis over the term of the related debt. The related amortization is included within interest expense on the consolidated statements of operations.

In accordance with FASB ASC sub-topic No. 835-30 *Interest — Imputation of Interest* the Company has presented deferred financing costs as a reduction of long-term debt in the consolidated balance sheet. Refer to Note 10.

EXHIBIT O(2)

AOE0822

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

---

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

Capital Leases

Leases are classified as capital leases whenever the terms of the lease transfers substantially all the risks and rewards of ownership to the lessee. All other leases are classified as operating leases. Assets acquired and held under finance leases are recognized as assets of the Company at their fair value on the date of acquisition. The corresponding liability is included in the balance sheet as a finance lease obligation. Interest costs, which represent the difference between the total leasing commitments and the fair values of the assets acquired, are charged to the income statement over the term of the relevant lease.

Revenue Recognition

The Company applies FASB ASC Topic 606 – *Revenue from Contracts with Customers* for revenue recognition. We recognize revenue when we have a legally enforceable approved contract with a customer when that contract indicates that collection of the amount to which we are entitled is probable, rights and obligations of each party can be identified, and the arrangement has commercial substance. Revenue is recognized upon the transfer of control of promised services to our customers in an amount that reflects the consideration we expect to receive in exchange for those services. Amounts received from customers in advance of providing services to our customers are recorded as contract liabilities, presented as deferred revenue on the consolidated balance sheet.

Our revenue primarily includes revenues from advertising, subscriptions, film rentals, and distribution services.

Advertising revenue is recognized as the Company fulfills its performance obligations to customers through airing customers' advertising content. The price of each individual commercial and digital advertisement is negotiated with each customer and is determined based on multiple factors, including, but not limited to, the programming and day-part selected, supply of available inventory, viewership ratings and overall market conditions (e.g., timing of the year and strength of U.S. economy). The Company measures the fulfillment of its performance obligations based on the airing of the individual television commercials or display of digital advertisements as those events occur. Advertising revenues are recorded net of agency commissions as the Company has determined that the advertising agency is the customer in these arrangements.

Network advertising includes campaigns for which revenues are based on audience delivery or a fixed price per spot. For campaigns based on audience delivery, the Company guarantees advertisers a minimum audience during the dayparts in which their advertisements are broadcast over the term of the advertising contracts. The Company provides the advertisers with additional advertising time if the guaranteed audience size and/or the minimum number of spots are not delivered. The Company has concluded that the performance obligation in these arrangements is the delivery of the minimum number of spots along with a guaranteed number of impressions against the targeted demographic as part of an overall campaign. Advertising revenue in connection with guaranteed campaigns is recognized using a measure of progress based on the number of impressions delivered during the period relative to the total guaranteed impressions. If the Company determines the guaranteed audience has not been delivered, an estimate of deferred revenue is recorded for audience delivery shortfalls that must be "made good." The remaining revenue is recognized proportionally until the guaranteed audience has been delivered and the performance obligation is satisfied. Our customers are generally on 60 to 120 day payment terms.

EXHIBIT O(2)

AOE0823

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

Advertising revenue for the three months ended March 31, 2021 within networks and content revenue and broadcast television revenue totaled $33.0 million and $16.3 million, respectively. Advertising revenue for the three months ended March 31, 2020 within networks and content revenue and broadcast television revenue totaled $28.8 million and $11.3 million, respectively.

We earn subscription revenue from retransmission consent contracts with multichannel video programming distributors (e.g., cable and satellite providers) typically via multi-year contracts. Under these multi-year contracts, the Company has a performance obligation to deliver content or a signal to our customers. The revenue we earn in these contracts is primarily variable. The amount of revenue earned is based on the number of subscribers to which our customers retransmit our signal, and the negotiated fee per subscriber included in our contract agreement. Customers submit payments monthly, generally within 60-90 days after the month that the service was provided. Subscription revenue is recognized in accordance with the guidance for licensing intellectual property utilizing a usage based method. Performance obligations are satisfied, and revenue is recognized, as our customers utilize the content, network programming, or signal. Estimates of the revenue earned are recorded in each period, up to the amount not subject to significant reversal, and are adjusted as actual subscriber data is submitted to us. Subscription license and retransmission revenue for the three months ended March 31, 2021 within networks and content revenue and broadcast television revenue totaled $27.5 million and $19.3 million, respectively. Subscription license and retransmission revenue for the three months ended March 31, 2020 within networks and content revenue and broadcast television revenue totaled $26.0 million and $12.2 million, respectively.

For content owned or produced by the Company, we derive certain film rental revenues from a percentage of box office takings earned by the movie in theatrical release or revenues earned from secondary markets such as on digital platforms. Revenue for film rentals is recognized under ASC 606 as a functional license of intellectual property. When the transaction price is fixed, the revenue is recognized at the beginning of the license period after the content has been delivered to the Company's customer. In certain cases, the transaction price is variable and the Company utilizes the sales-and-usage based royalty exception to recognize revenue over time as sales occur, based on the customers' usage of the intellectual property. When estimation is required, external box office reporting is utilized to estimate the amount of revenue to which we will be entitled and is recorded up to the amount not subject to significant reversal. Payment is received up front upon contract execution as a minimum guarantee or periodically on a monthly or quarterly basis. Film rentals revenue for the three months ended March 31, 2021 and March 31, 2020 were immaterial.

Distribution revenues are earned through arrangements with distributors via the delivery of individual motion picture content files. We receive nonrefundable advances at the beginning of each distribution period which are considered fixed consideration related to the delivery of functional intellectual property. In some cases, additional variable consideration is earned as the content is utilized and is recognized in accordance with usage-based royalty guidance in the period in which the sales occur or when the performance obligation is satisfied (whichever is later) when it exceeds the amount of the nonrefundable advance or fixed consideration. In cases where payments received relate to multiple titles, the consideration is allocated to each title or performance obligation based on the estimated fair value of each title. As the distributor is our customer, the total transaction price is the amount we are entitled to receive from the distributor. Distribution revenue within networks and content revenue for the three months ended March 31, 2021 and March 31, 2020 totaled $0.5 million and $3.7 million, respectively.

EXHIBIT O(2)

AOE0824

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

*Other Revenues*

ESMP enters into various distribution agreements for the release of content, such as movies, onto theatrical and digital platforms (such as Netflix, Hulu, and Amazon). ESMP acts as the distribution agent and collects all monies due under these arrangements and distributes the amounts payable to the producers of the content. In exchange for the performance of these services, ESMP retains a commission from the amounts collected in the form of a distribution fee. Distribution fee arrangements are accounted for on a net basis in accordance with ASC 606 and all distribution fees are reported net of amounts collected on behalf of, and paid over to, producers as the Company is an agent in these arrangements. Royalty revenue is also included within other revenue and is recognized based on best estimates available, primarily based on historical experience, of the amounts due to the Company in the period of the customer's sales or usage. Other revenues also include domestic radio revenues and domestic and international licensing of long-form programming. Other revenues included within networks and content revenue for the three months ended March 31, 2021 and March 31, 2020 totaled $1.1 million and $6.9 million, respectively. Other revenues included within Broadcast television revenue totaled $1.2 million and $0.1 million for the three months ended March 31, 2021 and March 31, 2020.

<u>Income Taxes</u>

Certain entities of the Company are combined into a taxable entity group (the "taxable entity group"). The remaining entities, which comprise the majority of the group, are treated as separate taxable entities for federal, state, or local income tax purposes for which the tax impacts have been excluded from these consolidated financial statements. Accordingly, the results of all other entities' operations outside of the taxable entity group have been included in the tax return of the member. The taxable entity group has accounted for taxes under FASB ASC Topic No. 740, *Income taxes* ("ASC 740"), and records deferred taxes on income for transactions that are reported in different years for financial reporting and tax purposes using an asset and liability method whereby assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

In accordance with ASC 740, the Company recognizes the impact of a tax position in the financial statements if that position is more likely than not to be sustained on review, based on the technical merits of the position. The Company's policy is to classify interest expense related to uncertain tax positions as income tax expense.

During 2020, the Internal Revenue Service completed its audit of the Company's 2016 tax year, which resulted in a settlement by the Company of approximately $1.1 million. Tax years 2017, 2018, and 2019 remain open for potential examination.

<u>Advertising</u>

Advertising and promotion costs are generally expensed in the period during which the costs are incurred. Advertising and promotion costs for the Company for the three months ended March 31, 2021 and March 31, 2020 amounted to $2.2 million and $4.1 million, respectively and are included in programming and production expenses in the consolidated statements of operations.

EXHIBIT O(2)

AOE0825

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

---

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

Repack

For the three months ended March 31, 2021 we recorded a gain of $0.1 million related to reimbursements from the FCC's National Broadband Plan spectrum repack process. The gain is recorded within Other income (expense), net, on our consolidated statement of operations. The gain for the three months ended March 31, 2020 was immaterial.

Concentration of Credit Risk

The Company maintains its cash in various financial institutions which may, from time to time, exceed amounts insured by the Federal Deposit Insurance Corporation. As of March 31, 2021 and December 31, 2020, the combined aggregate of all deposits held in noninterest-bearing transaction accounts and interest-bearing deposits within the same ownership category are insured up to $0.3 million per financial institution. The Company has not experienced any losses in such accounts and believes it is not exposed to any significant credit risk on cash.

For the three months ended March 31, 2021 two customers accounted for 10% or more of the Company's total revenue and for the three months ended March 31, 2020 one customer accounted for 10% or more of the Company's total revenue. As of March 31, 2021 one customer accounted for 10% or more of the Company's accounts receivable balance and as of December 31, 2020, no individual customer accounted for 10% or more of the Company's accounts receivable balance.

Minority Interest

During a prior year, a minority noncontrolling interest in AMBH was held by the sole member of AMH and arose simultaneous to the Company's acquisition of Bayou on July 3, 2019. Since the Company controls this subsidiary, its financial statements are consolidated with those of the Company. In conjunction with the acquisition of USA TV stations, on February 10, 2020, the minority interest owner's share in AMBH was contributed back to the Company. As of both March 31, 2021 and December 31, 2020 no minority ownership interest exists.

The minority interest owner's 26% share of the subsidiary's results of operations through February 10, 2020 is deducted and reported as net income attributable to minority noncontrolling interest in the consolidated statements of operations for the three-months ended March 31, 2020.

Recently Adopted Accounting Pronouncements

In March 2019, the FASB issued ASU 2019-02 - *Improvements to Accounting for Costs of Films and License Agreements for Program Materials* ("ASU 2019-02"). ASU 2019-02 aligns the accounting for production costs of an episodic television series with the accounting for production costs of films by removing the content distinction for capitalization. The guidance also requires that an entity test a film or license agreement for program material for impairment at a film group level when the film or license agreement is predominantly monetized with other films and/or license agreements. ASU 2019-02 and related amendments were effective for the Company beginning on January 1, 2021. The adoption did not have a material impact on the Company's consolidated financial statements.

EXHIBIT O(2)

AOE0826

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

Recently Issued Accounting Pronouncements

In February 2016, the FASB issued ASU No. 2016-02, *Leases (Topic 842)* ("ASU 2016-02"), which sets out the principles for the recognition, measurement, presentation and disclosure of leases for both parties to a contract (i.e., lessees and lessors). Subsequently, ASU No. 2020-05 has been issued that provides a limited deferral of the effective date. The new standard requires lessees to apply a dual approach, classifying leases as either finance or operating leases based on the principle of whether or not the lease is effectively a financed purchase by the lessee. A lessee is also required to record a right-of-use asset and a lease liability for all leases with a term of greater than 12 months regardless of their classification. Leases with a term of 12 months or less will be accounted for similar to existing guidance for operating leases today. ASU 2016-02 is effective for the Company on January 1, 2022. Early adoption of ASU 2016-02 is permitted. ASU 2016-02 provides optional practical expedients that the Company may or may not elect. The Company is in the process of evaluating the impact of this new guidance on its consolidated financial statements.

In June 2016, the FASB issued ASU No. 2016-13, *Financial Instruments—Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* ("ASU 2016-13"). Subsequently, ASU 2018-19 has been issued that amends and/or clarifies the application of ASU 2016-13. Among other provisions, the ASU introduces a new impairment model for most financial assets and certain other instruments. For trade and other receivables, held-to-maturity debt securities, loans and other instruments, entities will be required to use a forward-looking "expected loss" model that will replace the current "incurred loss" model and generally will result in earlier recognition of allowances for losses. The guidance will be effective for the Company beginning on January 1, 2023. The Company is currently evaluating the impact of this new guidance on its consolidated financial statements.

In October 2018, the FASB issued ASU 2018-17, *Consolidation (Topic 810): Targeted Improvements to Related Party Guidance for Variable Interest Entities* ("ASU 2018-17"), which effectively expands the private company alternative for common control leasing arrangements to all private company common control arrangements as long as both the parent and the legal entity being evaluated for consolidation are not public business entities. ASU 2018-17 also amends certain VIE guidance for related party arrangements. ASU 2018-17 is effective for the Company for the full annual period ending December 31, 2021 and interim periods beginning January 1, 2022. The Company is currently evaluating the impact of this new guidance on its consolidated financial statements and does not currently expect a material impact to its consolidated financial statements.

In December 2019, the FASB issued ASU 2019-12, *Income Taxes* (Topic 740), *Simplifying the Accounting for Income Taxes*, ("ASU 2019-12"). The purpose of ASU 2019-12 is to improve the disclosures related to fair value measurements in the financial statements. The improvements in ASU 2019-12 include removing certain exceptions for recognizing deferred taxes for investments, performing intraperiod allocation and calculating income taxes in interim periods. ASU 2019-12 also adds guidance to reduce complexity in certain areas, including recognizing deferred taxes for tax goodwill and allocating taxes to members of a consolidated group. ASU 2019-12 is effective for the Company beginning on January 1, 2022 and early adoption is permitted. The Company is currently evaluating the impact of ASU 2019-12 on its consolidated financial statements.

EXHIBIT O(2)

AOE0827

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

---

### NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

In March 2020 and January 2021, the FASB issued ASU No. 2020-04 and ASU No. 2021-01, respectively, *Reference Rate Reform* (Topic 848) ("ASU 2020-04" and "ASU 2021-01", respectively). These updates are effective as of March 12, 2020 and can be adopted anytime during the period of January 1, 2020 through December 31, 2022. The update clarifies the transition away from Libor towards new interest rate benchmarks and provides optional expedients and exceptions for applying U.S. GAAP to contract modifications and hedging relationships that reference LIBOR or other reference rates expected to be discontinued in 2022. The updates also establish certain contract modification principles that entities can apply in other areas that may be affected by reference rate reform and certain elective hedge accounting expedients and exceptions. The Company can apply the ASU's prospectively and is currently evaluating the impact of this new guidance on its consolidated financial statements.

In March 2021, the FASB issued ASU No. 2021-03, *Intangibles – Goodwill and Other* (Topic 350), *Accounting Alternative for Evaluating Triggering Events* ("ASU 2021-03"). The update provides private companies an accounting alternative to assess goodwill triggering events only as of financial reporting date, instead of throughout the period. The Company is permitted to elect the alternative for fiscal years beginning January 1, 2020 or later. The Company is currently evaluating the impact of ASU 2019-12 on its consolidated financial statements, including whether the alternative will be utilized.

### NOTE 3 – ACQUISITIONS

USA TV stations

On February 10, 2020, Allen Media Broadcasting Evansville, Inc ("AMBE") closed the acquisition of nine broadcast television stations (the "USA TV stations") from the sellers of USA Television Holdings, LLC, and USA Television MidAmerica Holdings, LLC  for a cash purchase price of approximately $303.3 million.

AMBE acquired 100% of the outstanding equity of the USA TV stations and, as further described in Note 10 the Company entered into new senior secured bonds arrangement and term loan agreement in connection with the acquisition.

The Company has determined that the transaction should be accounted for in accordance with FASB ASC Topic No. 805 – *Business Combinations*. The purchase price was allocated to the tangible and intangible assets acquired and liabilities assumed based on their estimated fair values as of the acquisition date. In accordance with ASU 2015-16, the financial statements were not retrospectively adjusted for any measurement-period adjustments that occurred in subsequent periods. Rather, any adjustments to provisional amounts that were identified during the measurement period were recorded in the reporting period in which the adjustment was determined. The purchase accounting was finalized during the year ended December 31, 2020.

EXHIBIT O(2)

AOE0828

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

**NOTE 3 – ACQUISITIONS (Continued)**

The following table summarizes the consideration paid for the USA TV stations and the estimated fair value of the assets acquired and liabilities assumed at the acquisition date which are adjusted for measurement-period adjustments:

|  | Amount ($) (In millions) |
|---|---|
| Cash | 4.0 |
| Accounts receivable | 20.2 |
| Prepaid and other current assets | 3.4 |
| Property, plant and equipment | 42.0 |
| Television library | 5.9 |
| Intangible assets – FCC licenses | 1.0 |
| Accounts payable and other current liabilities | (15.4) |
| Deferred tax liabilities | (20.6) |
| **Total net assets acquired** | **40.5** |
| **Purchase price** | **303.3** |
| **Goodwill** | **$  262.8** |

The gross amount of accounts receivable due to the Company at acquisition was $20.4 million, of which $0.2 million was expected to be uncollectible.

The FCC licenses have an indefinite life. The goodwill is primarily attributable to expected post-acquisition synergies from integrating USA's assembled workforce and developed technologies as well as efficiencies in content creation and distribution. Approximately $31.0 million of the goodwill is expected to be deductible for tax purposes.

OTA Networks
On October 23, 2020, one of our subsidiaries, Weather Group Television, LLC closed the acquisition of two over-the-air properties (the "OTA Networks") from MGM Domestic Television Distribution LLC ("MGM"). The aggregate purchase price was $4.0 million and was comprised entirely of cash. Subsequent to the close, ownership of the OTA Networks was transferred to a newly created legal entity, Allen Media Broadcast Networks, LLC.

The Company has determined that the transaction should be accounted for in accordance with FASB ASC Topic No. 805 – *Business Combinations*. The purchase price allocation of OTA Networks is deemed to be preliminary pending final determination of fair values and other adjustments. The purchase price was allocated to the tangible and intangible assets acquired and liabilities assumed based on their estimated fair values as of the acquisition date. The preliminary fair values of acquired assets and liabilities assumed represent our estimate of fair value and are subject to change if additional information, such as changes to deferred taxes and/or working capital, becomes available.

EXHIBIT O(2)

AOE0829

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

### NOTE 3 – ACQUISITIONS (Continued)

As of the acquisition date, we acquired accounts receivable of $4.7 million, program asset – television library of $3.0 million and assumed accounts payable and other accrued liabilities of $3.5 million resulting in an acquired net asset value of $4.2 million. This resulted in $0.2 million of negative goodwill which is reflected as a gain in Other Income on our consolidated statements of operations recorded in the fourth quarter of 2020.

KITV

On January 20, 2021, Allen Media Broadcasting Evansville II, LLC ("AMBE II") closed the acquisition of all of the outstanding shares of KITV, Inc ("KITV") a broadcast television station in Hawaii for a cash purchase price of approximately $31.0 million.

AMBE II acquired 100% of the outstanding equity of KITV and initially financed the acquisition with cash on hand. In March 2021, as further described in Note 10, KITV, Inc. entered into new credit agreement for related financing.

The Company has determined that the transaction should be accounted for in accordance with FASB ASC Topic No. 805 – *Business Combinations*. The purchase price allocation of KITV is deemed to be preliminary pending determination of fair values and other adjustments, including relevant tax impacts. The purchase price was allocated to the tangible and intangible assets acquired and liabilities assumed based on their estimated fair values as of the acquisition date. The preliminary fair values of acquired assets and liabilities assumed represent our estimate of fair value and are subject to change if additional information, such as updates to the fair values determined or changes to deferred taxes and/or working capital, becomes available.

The following table summarizes the consideration paid for KITV stations and the preliminary estimated fair value of the assets acquired and liabilities assumed at the acquisition date:

| | Amount ($) (In millions) |
|---|---|
| Cash | 0.3 |
| Accounts receivable | 3.1 |
| FCC license | 13.3 |
| Income lease asset | 0.7 |
| Property, plant and equipment | 1.3 |
| Other assets | 0.5 |
| Accounts payable and accrued expenses | (1.0) |
| Deferred revenue | (1.3) |
| Deferred tax liabilities | (5.0) |
| | |
| **Total net assets acquired** | **11.9** |
| | |
| **Purchase price** | **31.0** |
| **Goodwill** | **$  19.1** |

The gross amount of accounts receivable due to the Company at acquisition was $3.2 million, of which $0.2 million was expected to be uncollectible.

EXHIBIT O(2)

AOE0830

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

---

**NOTE 3 – ACQUISITIONS (Continued)**

The goodwill is primarily attributable to expected post-acquisition synergies from integrating KITV's assembled workforce as well as efficiencies in content creation and distribution. An immaterial amount of the goodwill is expected to be deductible for tax purposes.

**NOTE 4 – ACCOUNTS RECEIVABLE**

The Company has receivables from contracts with customers for both accounts and royalties receivables. On the accompanying consolidated balance sheets, accounts receivable is shown net of affiliate revenue reserves and allowances for bad debt. As of March 31, 2021 and December 31, 2020, the Company had reserves against receivables of $1.1 million and $0.8 million, respectively. Included in accounts receivable are unbilled receivables amounting to $1.3 million at both March 31, 2021 and December 31, 2020 representing revenue earned in the current period but which were billed in full subsequent to the period end, typically the following month.

The Company has a loan and security agreement with a financial institution that is an asset-based financing agreement in which up to 90% of the Company's receivables from certain film rentals are assigned with full recourse. In accordance with FASB ASC 860, "Accounting for Transfers and Servicing," the assigned accounts receivable remain assets on the Company's consolidated balance sheet and the advances are recognized as a long-term line of credit. Refer to Note 10.

**NOTE 5 – TAX CREDIT RECEIVABLE**

The Company generated Georgia Film Tax Credits (GaFTC) and Georgia Research & Development Tax Credits (GaR&D), collectively referred to as Tax Credit Receivables. GaFTC may be used to offset Georgia payroll withholding tax remittances or are sold to third parties on the open market through brokers. GaR&D are used to offset Georgia payroll tax withholding tax remittances. Due to these utilization methodologies, assets separate and distinct from income tax assets are reflected on the balance sheet for the tax credit receivables at the net realizable value as they are generated. As of both March 31, 2021 and December 31, 2020, the Company had current tax credit receivables of $0.6 million, and tax credit receivables, net of current portion of $3.1 million and $5.1 million, respectively. Current tax credit receivables are included in Prepaid expenses and other current assets on our consolidated balance sheets.

Of the noncurrent tax credit receivables balance at March 31, 2021, $3.1 million relates primarily to GaFTC generated throughout 2020 for which the Company anticipates would take longer than one year to utilize if not immediately sold in 2021. The Company classifies these credits as noncurrent until all approvals to move forward with selling the credits are obtained from management, for which, at that time, the credits are classified as current when entering into arrangements with brokers to sell. During the three-months ended March 31, 2021 the Company sold tax credits for $3.4 million in cash.

EXHIBIT O(2)

AOE0831

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

## NOTE 6 – PROPERTY AND EQUIPMENT

As of March 31, 2021 and December 31, 2020, property and equipment consisted of the following:

| | March 31, 2021 (In millions) | December 31, 2020 (In millions) |
|---|---|---|
| Production and other equipment | 68.3 | 66.3 |
| Office furniture and equipment | 12.1 | 12.0 |
| Buildings and improvements | 17.7 | 17.9 |
| Satellites | 3.2 | 3.3 |
| Trucks and automobiles | 2.1 | 2.0 |
| Land | 5.6 | 5.2 |
| | 109.0 | 106.7 |
| Less: Accumulated depreciation | 42.3 | 38.1 |
| Subtotal | 66.7 | 68.6 |
| Construction in progress | 3.8 | 3.8 |
| Property and equipment, net | $ 70.5 | $ 72.4 |

Depreciation expense was $4.2 million and $3.9 million for the three months ended March 31, 2021 and March 31, 2020, respectively. As of both March 31, 2021 and December 31, 2020, the Company's total cost of property and equipment purchased under capital leases was $7.2 million. The accumulated depreciation corresponding to this property and equipment at March 31, 2021 and December 31, 2020 was $5.7 million and $5.4 million, respectively.

## NOTE 7 – GOODWILL AND INTANGIBLE ASSETS

Goodwill relates to the acquisition of KITV which occurred during 2021, the acquisition of the USA TV stations which occurred during 2020, and the acquisitions of WG, Bayou, TheGrio, and Freestyle which occurred in previous years.

Intangible assets consist of internally developed technology and software (for internal use and that is held for sale, lease, or otherwise marketed), costs incurred to acquire the names of digital and satellite channels, FCC licenses, and localization technology (or STAR) conveyed to cable, satellite and other distributors. There were no impairments of intangible assets during 2020 or 2021.

EXHIBIT O(2)

AOE0832

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

**NOTE 7 – GOODWILL AND INTANGIBLE ASSETS (Continued)**

As of March 31, 2021, goodwill and intangible assets consisted of the following:

| | Weighted average amortization period (years) | Gross carrying amount | Accumulated amortization | Accumulated impairment | Net carrying amount |
|---|---|---|---|---|---|
| | | (In millions) | | | |
| Goodwill | 10 | 538.8 | (91.0) | - | 447.8 |
| | | | | | |
| Intangible assets | | | | | |
| Amortizing intangible assets: | | | | | |
| Tradenames | 10 | 0.6 | (0.2) | - | 0.4 |
| Software | 3 | 29.2 | (17.4) | (7.5) | 4.3 |
| STAR technology | 5 | 4.2 | (3.8) | - | 0.4 |
| Internet development | 15 | 1.3 | (0.6) | - | 0.7 |
| **Total definite-lived intangible assets** | | **$ 35.3** | **$ (22.0)** | **$ (7.5)** | **$ 5.8** |
| Indefinite-lived intangible assets: | | | | | |
| FCC license | | 21.8 | - | - | 21.8 |
| Other non-amortizing assets: | | | | | |
| Construction in progress | | 5.9 | - | - | 5.9 |
| Income lease asset | | 0.7 | - | - | 0.7 |
| **Total intangible assets** | | **$ 63.7** | **$ (22.0)** | **$ (7.5)** | **$ 34.2** |

As of December 31, 2020, goodwill and intangible assets consisted of the following:

| | Weighted average amortization period (years) | Gross carrying amount | Accumulated amortization | Accumulated impairment | Net carrying amount |
|---|---|---|---|---|---|
| | | (In millions) | | | |
| Goodwill | 10 | 519.7 | (77.8) | - | 441.9 |
| | | | | | |
| Intangible assets | | | | | |
| Amortizing intangible assets: | | | | | |
| Tradenames | 10 | 0.6 | (0.2) | - | 0.4 |
| Software | 3 | 28.1 | (16.5) | (7.5) | 4.1 |
| STAR technology | 5 | 4.2 | (3.7) | - | 0.5 |
| Internet development | 15 | 1.3 | (0.5) | - | 0.8 |
| **Total definite-lived intangible assets** | | **$ 34.2** | **$ (20.9)** | **$ (7.5)** | **$ 5.8** |
| Indefinite-lived intangible assets: | | | | | |
| FCC license | | 8.5 | - | - | 8.5 |
| Other non-amortizing assets: | | | | | |
| Construction in progress | | 4.8 | - | - | 4.8 |
| **Total intangible assets** | | **$ 47.5** | **$ (20.9)** | **$ (7.5)** | **$ 19.1** |

EXHIBIT O(2)

AOE0833

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

## NOTE 7 – GOODWILL AND INTANGIBLE ASSETS (Continued)

Amortization expense for goodwill was $13.3 million and $8.7 million for the three months ended March 31, 2021 and March 31, 2020, respectively.

Amortization expense for intangible assets was $0.9 million and $1.0 million for the three months ended March 31, 2021 and March 31, 2020, respectively.

## NOTE 8 – TELEVISION LIBRARY

As of March 31, 2021, the television library consisted of the following:

|  | (In millions) |
| --- | --- |
| As capitalized under ASC 926 |  |
| Completed and released | 195.0 |
| In process | 2.9 |
|  | 197.9 |
| As capitalized under ASC 920 |  |
| Completed and released | 35.4 |
| In-process | 2.0 |
|  | 37.4 |
|  |  |
| Less: Accumulated amortization | 97.7 |
|  |  |
| Less: Television library, current portion | 10.7 |
| Television library, net of current portion | $ 126.9 |

As of December 31, 2020, the television library consisted of the following:

|  | (In millions) |
| --- | --- |
| As capitalized under ASC 926 |  |
| Completed and released | 229.2 |
| In process | 2.6 |
|  | 231.8 |
| As capitalized under ASC 920 |  |
| Completed and released | 32.9 |
| In-process | 2.2 |
|  | 35.1 |
|  |  |
| Less: Accumulated amortization | 130.5 |
|  |  |
| Less: Television library, current portion | 11.2 |
| Television library, net of current portion | $ 125.2 |

Amortization expense for the television library was $9.7 million and $4.7 million for the three months ended March 31, 2021 and March 31, 2020, respectively. Certain television programs were fully amortized as of December 31, 2020, resulting in a reduction in the related gross value and accumulated amortization, with an impact of zero on a net basis, during Q1 2021.

EXHIBIT O(2)

AOE0834

## ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

---

### NOTE 8 – TELEVISION LIBRARY (Continued)

As of March 31, 2021, we expect to amortize 80% of the deferred production costs capitalized as television library balance by 2026, amortizing between 9% and 21% of the current balance in each period based on usage of the content.

### NOTE 9 – FILM RIGHTS

Film rights represent the cost to acquire the distribution rights of a motion picture and/or the cost of production for motion pictures. Film rights in process represent film rights that are in the process of being acquired or a film in the process of production.

As of March 31, 2021 and December 31, 2020, film rights in process had a cost and net book value of $0.8 million and $0.4 million, respectively. Film rights for completed films had cost balance of $9.3 million and $12.1 million, as of March 31, 2021 and December 31, 2020, respectively, with accumulated amortization of $0.2 million and $2.8 million, resulting in a net book value of $9.1 million and $9.3 million, respectively. The films rights expected to be used within the next year is approximately $1.7 million.

Amortization expense for film rights was $0.9 million and $3.5 million for the three months ended March 31, 2021 and March 31, 2020, respectively.

As of March 31, 2021, the Company had $9.8 million of remaining unamortized costs which we anticipate will be amortized over the next 8-9 years based on ultimate revenues or the corresponding license period. We expect to amortize approximately 10% within the next year.

### NOTE 10 – LONG-TERM DEBT

In a prior year, the Company refinanced certain existing loans with a syndicated loan ("second syndicated loan") between various lenders, including certain lenders from the existing loans, and AM. Certain fees from this refinancing were capitalized, based on the Company's analysis of the applicable accounting guidance, including under ASC 470-50 *Debt – Modifications and Extinguishments*.

The second syndicated loan bore interest, at the option of the Company, (i) at the base rate as defined in the Credit and Guaranty agreement which, in no event, can be lower than 2% plus a margin of 5.5%, or (ii) the Eurodollar rate as defined in the Credit and Guaranty Agreement which in no event can be lower than 1% plus a margin of 6.50%.

In a prior year, the Company entered into an amendment to the second syndicated loan ("first amendment") to increase the existing syndicated loan facility by $25.0 million. On June 27, 2019, the Company entered into an additional amendment to the second syndicated loan ("second amendment") to increase the existing syndicated loan facility by $20.0 million. As a result of this additional financing, quarterly principal payments due increased to $5.4 million through December 31, 2022 with a revised principal payment of $8.1 million per quarter thereafter until maturity, at which point a final balloon payment of all remaining principal was due.

As discussed below the second syndicated loan was refinanced on February 10, 2020.

EXHIBIT O(2)

AOE0835

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

---

**NOTE 10 – LONG-TERM DEBT (Continued)**

Bayou Loans

In a prior year, to finance the acquisition of Bayou, AMB entered into a new term loan agreement (the "Senior Bayou loan") with an aggregate principal value of $100.0 million. The Senior Bayou loan bore interest, at the option of the Company at either (i) the base rate as defined in the loan agreement which, in no event, can be lower than 2.0% plus a margin of 5.25%, or (ii) the Eurodollar rate as defined in the loan agreement based primary on LIBOR rates with a margin of 6.25%.

Simultaneous to the Senior Bayou loan, AMB entered into a note purchase agreement with Bain Capital Credit, L.P. ("Bayou Note"), as lender for an aggregate principal amount of $36.0 million and a maturity date of October 3, 2020. This note bore interest at 16.0% per annum of which 12.0% was cash interest payable quarterly beginning on September 30, 2019 and 4.0% is paid-in-kind interest which accrues to the principal amount of the note on a quarterly basis.

As discussed below, the Bayou Senior Loan and Bayou Note were repaid on February 10, 2020.

2020 Syndicated Financing

On February 10, 2020, in conjunction with closing the acquisition of the USA TV stations, the Company entered into an indenture agreement for $300.0 million of senior notes ("Senior Notes") and a term loan agreement for $530.0 million ("Term Loan") and revolving line of credit ("revolver") with an available credit line of $40.0 million (collectively as the "2020 Syndicated Loans"). The Company drew $20.0 million on the revolver at close and the revolver credit limit was subsequently increased to $60.0 million. The funds were used to repay the second syndicated loan, Senior Bayou Loan, and Bayou Note, finance the acquisition of the USA TV stations, and pay certain transaction expenses associated to both the acquisition of the USA TV stations and the refinancing. The Senior Notes bear interest at 10.5% and mature on February 10, 2028 at which point all principal is due in full. The Term Loan and revolver bear interest at LIBOR plus a margin of 5.5%. The Term Loan requires principal payments on a quarterly basis of 1% per annum of the principal balance, with the remaining balance due upon maturity. The Term Loan and revolver are due February 10, 2027, and February 10, 2025, respectively.

The Company analyzed the 2020 Syndicated refinancing on a lender-by-lender basis in accordance with applicable accounting guidance, including ASC 470-50. In cases where a lender participated in both the second syndicated loan and the 2020 Syndicated Loans, the refinancing of the lender-specific loan qualified as a debt modification resulting in capitalization of lender fees and expense treatment for third-party loan fees. In certain cases, lenders were fully repaid through the refinancing resulting in derecognition of the associated capitalized fees and costs. This resulted in $42.7 million of previously capitalized costs being written off through a loss on derecognition of the loans. Loan amounts associated to lenders which participated in the 2020 Syndicated Loans and who were not previously lenders of the Company, were treated as new loans with all associated costs capitalized. As a result, subsequent to close of the 2020 Syndicated refinancing the Company had $25.3 million in debt issuance costs capitalized. These costs are being amortized under the effective interest method over the term of the loan.

On February 21, 2020 the Company entered into an amendment ("first 2020 amendment") to increase the existing syndicated Term Loan by $25.0 million. On April 9, 2020 and July 9, 2020, the Company entered into amendments to provide an incremental $15.0 million and $5.0 million, respectively, of commitment under the existing revolver facility.

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

**NOTE 10 – LONG-TERM DEBT (Continued)**

On July 16, 2020 and July 21, 2020, the Company entered into two amendments to increase the syndicated Term Loan by an incremental $35.0 million and $15.0 million, respectively.  On July 29, 2020, the Company entered into an amendment to increase the syndicated Term Loan by $55.0 million.

At December 31, 2020 the balances outstanding were $300.0 million, $656.9 million, and $17.0 million, for the Senior Notes, Term Loan, and revolver, respectively. Additionally, accrued interest at December 31, 2020 was $12.0 million, $9.6 million, and $0.2 million, pertaining to the Senior Notes, Term Loan, and revolver, respectively. The rate in effect at December 31, 2020 for the Term Loan and revolver was 5.72%.

At March 31, 2021 the balances outstanding were $300.0 million, $655.2 million, and $17.5 million, for the Senior Notes, Term Loan, and revolver, respectively. Additionally, accrued interest at March 31, 2021 was $4.1 million, $9.5 million, and $0.3 million, pertaining to the Senior Notes, Term Loan, and revolver, respectively. The rate in effect at March 31, 2021 for the Term Loan and revolver was 5.75%.

In conjunction with the 2020 Syndicated Financing, the Company entered into a financing commitment letter with a financial institution for bridge financing senior notes of $300.0 million and a term loan of $530.0 million. The fee associated with the financing commitment was recognized as an expense over the commitment period and included within Interest expense on the consolidated statements of operations. The corresponding bridge financing commitment terminated in accordance with the terms of the agreement upon close of the refinancing in February 2020.

Under the loan agreements, the Company is subject to certain financial and nonfinancial covenants including terms which require the Company to maintain certain metrics and ratios, limit certain payments, expenditures, or asset sales, and to report financial information to our lenders on a periodic basis. In addition, Allen Media Holdings, LLC and each direct and indirect wholly owned subsidiary of Allen Media, LLC (the "Guarantor Subsidiaries") have agreed to guarantee the Company's Term Loans by granting a lien on substantially all of their respective assets (subject to certain exceptions). Certain subsidiaries have been identified by the Company to be Unrestricted Subsidiaries, which do not guarantee the Company's obligations.

<u>Additional Financings</u>
In a prior year, ESP&A entered into a loan amendment with CION whereby an additional loan was added to an existing ESP&A facility ("additional loan" or "Friend Request loan"). The additional loan allowed for $7.5 million to be advanced to ESP&A by CION. The additional loan was set to mature in September 2037 and, subsequent to a March 9, 2018 amendment, carried interest at 10% per annum at December 31, 2019. Under the terms of the loan agreement, amortization payments, equal to 2% of the outstanding principal, were required to be made on the last day of every March, June, September, and December, commencing September 2017. At March 31, 2021 and December 31, 2020, the balances outstanding were $5.1 million and $5.2 million, respectively.

In a prior year, ESP&A entered into a loan agreement with CION to provide a draw of $11.0 million to fund the prints and advertising costs for the Chappaquiddick film. This loan bears interest at 10% per annum and matures on May 18, 2022. As of December 31, 2020, the balance outstanding was $0.9 million. As of March 31, 2021 the loan had been fully repaid.

EXHIBIT O(2)

AOE0837

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

**NOTE 10 – LONG-TERM DEBT (Continued)**

In a prior year, ESP&A amended the loan to obtain an additional draw of $10.0 million. This loan bears interest at 10% and matures on March 9, 2038. As of both March 31, 2021 and December 31, 2020, the balance outstanding was $6.9 million and $8.8 million, respectively.

In a prior year, ESP&A entered into a loan agreement with Comerica Bank to provide a draw of $7.9 million to fund the prints and advertising costs for the 47 Meters Down II film. The loan was set to mature on June 30, 2020. On August 27, 2019, ESP&A entered into an amendment to the loan agreement which extended the maturity date to August 27, 2022 and increased the commitment to $20.0 million. The loan bears interest at a rate of LIBOR plus 2% or 3% dependent upon the Company's election of loan type. At December 31, 2020, the interest rate was approximately 3.2% and the balance outstanding was $3.7 million. At March 31, 2021, the interest rate was approximately 3.1% and the balance outstanding was $3.0 million.

In a prior year, the Company entered into a loan and security agreement ("line of credit") with a financial institution for a senior, secured facility of up to $20.0 million, which can be increased to $30.0 million, in the aggregate, subject to a borrowing base of 90% of eligible receivables due from major distributors of the Company's films, as specifically named in the loan and security agreement. Borrowings on this loan and security agreement are secured by substantially all assets of a certain subsidiary. For purposes of this loan and security agreement, the assets of the subsidiary includes all of the distribution rights of ESMP in all films. Borrowings on the loan and security agreement bear interest at the prime rate plus 2.5% or LIBOR plus 3.5%. The interest rates in place at March 31, 2021 and  December 31, 2020, were approximately 3.7% at both dates. Repayments on the line of credit are made as collections from the assigned receivables are received. On December 10, 2019, the Company entered into an amendment to the line of credit extending the maturity date to September 30, 2022. As of March 31, 2021 and December 31, 2020, $5.3 million and $4.4 million, respectively, remained outstanding on this line of credit.

In a prior year, our subsidiary, Arctic Dogs LLC entered into a loan agreement with Comerica Bank to provide a senior secured credit facility ("Arctic Dogs Loan") for up to $10.0 million to fund the prints and advertising costs for the Arctic Dogs film. The loan has a maturity date of November 7, 2022. The loan bears interest, at the option of the Company, (i) at the base rate as defined in the Arctic Dogs loan agreement which, in no event, can be lower than 1% plus the federal funds effective rate, plus applicable margin or (ii) 3% plus the LIBOR rate as defined in the loan agreement (approximately 3.2% at December 31, 2020). At March 31, 2021, the balance outstanding was $0.4 million. At December 31, 2020, the balance outstanding was $0.6 million.

During the first quarter of 2021, certain of our subsidiaries in the AMB group, applied for and were granted Payroll Protection Plan ("PPP") loans under the provisions of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") and applicable Small Business Association ("SBA") rules. The Company may be eligible to apply for forgiveness of these loans in the future under such provisions. The loans bear interest at 1% per annum and any amounts not forgiven will require repayment on a monthly basis starting in 2022 with final maturity dates for all PPP loans in 2026. The balance outstanding on the PPP loans at March 31, 2021 was $8.7 million.

EXHIBIT O(2)

AOE0838

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

## NOTE 10 – LONG-TERM DEBT (Continued)

On March 4, 2021 the Company, with KITV, Inc, as borrower, entered into a credit agreement with a certain lender, for $20.5 million in financing (the "Unrestricted entity loan"). The loan bears interest at a base rate of the greater of i) an adjusted LIBOR, ii) prime rate, or iii) federal funds rate plus 0.5%, added to a spread of 6.5%. Alternatively, the Company may elect a spread of 7.5% with a base rate of adjusted LIBOR with a floor of 1%. The interest spread in both cases increases by 0.5% on the first and second anniversary of the loan closing date. The loan is due and payable in equal installments of $0.5 million on the last day of the first calendar quarter each year beginning in 2022 through 2025 with the remaining balance due on March 4, 2026. The proceeds of the financing was distributed to Allen Media, LLC. The interest rate in effect at March 31, 2021 was 8.5% and the balance outstanding was $20.5 million.

The aforementioned additional financings were all subject to certain financial and non-financial covenants with which the Company was in compliance at March 31, 2021. Management assessed the accounting treatment of the additional financings loan amendments and concluded that the amendments qualified as a debt modification and that the related debt issuance costs were not material.

As of March 31, 2021 and December 31, 2020, the Company has the following debt outstanding:

| | March 31, 2021 | December 31, 2020 |
|---|---|---|
| | (In millions) | |
| 2020 Senior Notes | 300.0 | 300.0 |
| 2020 Term Loan | 655.2 | 656.9 |
| 2020 Revolver | 17.5 | 17.0 |
| Friend request loan | 5.1 | 5.2 |
| Hostiles upsize loan | 6.9 | 8.8 |
| Chappaquiddick loan | - | 0.9 |
| 47MD loan | 3.0 | 3.7 |
| Line of credit | 5.4 | 4.4 |
| Arctic Dogs Loan | 0.4 | 0.6 |
| PPP loans | 8.7 | - |
| 2021 Unrestricted entity loan | 20.5 | - |
| Total | $ 1,022.7 | $ 997.5 |
| Less: Outstanding debt issuance costs and original issue discount | (26.3) | (27.0) |
| Net amounts due | $ 996.4 | $ 970.5 |

## NOTE 11 – NOTES PAYABLE TO PRODUCTION COMPANY

In a prior year, our subsidiary Friend Request LLC entered into a note payable agreement with the production company from which ESMP had originally acquired the film rights to the movie. The note payable agreement advanced funds of $6.6 million to be used for part of the media expenditures with respect to the promotion of the movie. The note carries interest of 15% per annum and is payable based on the film's gross receipts. As of March 31, 2021 and December 31, 2020, the total amount outstanding on the note was $6.6 million, which is included in Borrowings, current portion, and accrued interest was $3.5 million and $3.3 million, respectively. Accrued interest is included in accounts payable and accrued expenses in the accompanying consolidated balance sheet.

EXHIBIT O(2)

AOE0839

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

### NOTE 11 – NOTES PAYABLE TO PRODUCTION COMPANY (Continued)

In a prior year, our subsidiary Replicas, LLC entered into a note payable agreement with the same production company. The note payable agreement allowed for funds of $8.2 million to be advanced for use for part of the media expenditures with respect to the promotion of the movie. Interest on this note is calculated at 15% of a portion of the amounts advanced for the media spend, as defined in the agreement. The entire amount of $8.2 million was advanced on December 15, 2018 and is payable based on the film's gross receipts. As of March 31, 2021, and December 31, 2020, the total outstanding on the note was $8.2 million for both the periods included in Borrowings, net of current portion. Accrued interest was $2.8 million and $2.5 million, respectively, which is included in accounts payable and accrued expenses in the accompanying consolidated balance sheet.

In a prior year, our subsidiary Arctic Dogs, LLC entered into a note payable agreement with the same production company. The note payable agreement allowed for funds of $9.5 million to be advanced for use for part of the media expenditures with respect to the promotion of the movie. The note carries interest of 18% and is payable via receipts from the film. As of both March 31, 2021 and December 31, 2020, the total outstanding on the note was $9.5 million which is included in Borrowings, net of current portion. Accrued interest at March 31, 2021 and December 31, 2020 was $2.5 million and $2.0 million, respectively, which is included in accounts payable and accrued expenses in the accompanying consolidated balance sheet.

### NOTE 12 – DUE TO RELATED PARTY

In a prior year, the Company entered into two loan agreements for an aggregate total of $5.4 million with the sole member of the Company to fund operating expenses. These borrowings bear interest at 18% per annum and matures on October 25, 2021. As of March 31, 2021 and December 31, 2020, the total balances outstanding on the notes was $5.4 million with $2.1 million of accrued interest.

In a prior year, Replicas LLC entered into a loan agreement for $10.7 million with the sole member of the Company to fund the prints and advertising costs for the Replicas movie. These borrowings bear interest at 16% per annum, matures on December 17, 2021, and will be repaid out of receipts from the exploitation of the Replicas movie. As of both March 31, 2021 and December 31, 2020, the total balance outstanding on the note were $6.3 million and accrued interest was $1.5 million.

In a prior year, 47 Meters Down II entered into a loan agreement for $3.8 million with the sole member of the Company to fund operating expenses. These borrowings bear interest at 18% per annum, and mature on July 17, 2023. As of March 31, 2021 and December 31, 2020, the total balance outstanding on the loan was $3.2 million and $3.8 million, respectively, and accrued interest was $1.1 million and $1.0 million, respectively.

In a prior year, Arctic Dogs LLC entered into a loan agreement for $19.5 million with the sole member of the Company to fund operating expenses. The loan bears interest at 16% per annum and matures on October 25, 2022. As of both March 31, 2021 and December 31, 2020, the total balance outstanding on the loan was $11.6 million and accrued interest was $2.5 million and $2.1 million, respectively.

EXHIBIT O(2)

AOE0840

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

## NOTE 13 – ACCOUNTS PAYABLE AND ACCRUED EXPENSES

As of March 31, 2021 and December 31, 2020, the accounts payable and accrued expenses were comprised of the following:

|  | March 31, 2021 (In millions) | December 31, 2020 (In millions) |
|---|---|---|
| Accounts payable | 50.7 | 51.7 |
| Accrued interest | 37.2 | 43.1 |
| Accrued payroll | 8.8 | 5.4 |
| Accrued advertising | 5.0 | 5.2 |
| Accrued satellite and video transmission | 1.9 | 1.8 |
| Amounts owed to producers | 3.2 | 3.7 |
| Residuals payable, current portion | 3.5 | 2.1 |
| Other accrued expenses | 29.2 | 24.7 |
| Total accounts payable and accrued expenses | $ 139.5 | $ 137.7 |

## NOTE 14 – INCOME TAXES

The provision (benefit) for income taxes for the three months ended March 31, 2021 and March 31, 2020 were ($190) thousand and ($758) thousand, respectively. For both periods, the provision for income taxes of the taxable-entity group differs from the amount of income tax determined by applying the applicable U.S. statutory income tax rate to pre-tax income primarily due to state and local income taxes and goodwill amortization that is not deductible for income tax purposes.

On March 27, 2020, the CARES Act was enacted in response to the COVID-19 global pandemic. The CARES Act, among its other provisions, contains modifications on the limitation of business interest for tax years beginning in 2019 and 2020, and permits net operating loss ("NOL") carryovers and carrybacks to offset 100% of taxable income for taxable years beginning before 2021. In addition, the CARES Act allows NOLs incurred in 2018, 2019, and 2020 to be carried back to each of the five preceding taxable years to generate a refund of income taxes paid previously. We will continue to monitor and assess the impact the CARES Act may have on our business and financial results. As of March 31, 2021, we have carried back NOLs to prior tax years under the CARES Act in aggregate of $0.8 million of which $0.5 million has been received to date.

## NOTE 15 – COMMITMENTS, CONTINGENCIES AND RELATED PARTY TRANSACTIONS

Operating Leases

The Company leases office and studio facilities in Century City and Culver City, California, Chicago, Illinois, New York, New York, and Atlanta, Georgia, pursuant to agreements expiring through the year 2028. The Century City leases are personally guaranteed by the sole member of the Company.

Rent expense is charged ratably over the lives of the leases using the straight-line method. The Company has a standby letter of credit in respect of the New York facility. The term of the letter of credit is for five years, maturing in January 2022 and a restricted cash account has been established for this amount. At both March 31, 2021 and December 31, 2020, the restricted cash amount being held in respect of the letter of credit was $0.2 million.

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

**NOTE 15 – COMMITMENTS, CONTINGENCIES AND RELATED PARTY TRANSACTIONS (Continued)**

Total rent expense for the three months ended March 31, 2021 and March 31, 2020 was approximately $2.2 million and $2.0 million, respectively.

As of March 31, 2021, future minimum lease payments, by year and in aggregate, with initial or remaining terms of over one year are as follows:

| Years Ending December 31, | (In millions) |
|---|---|
| 2021 (remaining nine months) | 7.5 |
| 2022 | 9.1 |
| 2023 | 7.6 |
| 2024 | 5.7 |
| 2025 | 4.0 |
| Thereafter | 19.0 |
| **Total** | **$ 52.9** |

Capital Leases

The Company has outstanding capital lease obligations related to satellite transponders and office and production equipment that expire at varying dates between 2020 and 2022. The implicit rates of interest on these leases range from 5.8% to 15.2%. The following is a schedule by years of future minimum lease payments under capital leases, as of March 31, 2021:

| Years Ending December 31, | (In millions) |
|---|---|
| 2021 (remaining nine months) | 1.8 |
| 2022 | 0.5 |
| 2023 | 0.1 |
| Total | 2.4 |
| Less: imputed interest | (0.1) |
| Present value of net minimum lease payments | 2.3 |
| Less: Capital lease obligation, current portion | 2.1 |
| **Capital lease obligation, long-term portion** | **$ 0.2** |

EXHIBIT O(2)

AOE0842

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

---

**NOTE 15 – COMMITMENTS, CONTINGENCIES AND RELATED PARTY TRANSACTIONS (Continued)**

Long-term Debt

The Company has various debt agreements outstanding as of March 31, 2021 as described in Note 10. Required future payments for borrowings including notes payable to production company, by year and in aggregate, at the balance sheet date are as follows:

| Years Ending December 31, | (In millions) |
|---|---|
| 2021 (remaining 9 months) | 5.0 |
| 2022 | 17.2 |
| 2023 | 9.5 |
| 2024 | 9.5 |
| 2025 | 27.0 |
| Thereafter | 978.9 |
| **Total** | **$ 1,047.0** |

Purchase Commitments

*Film Contract Rights*

WG has commitments to purchase or license certain programming that is not yet available for broadcast, primarily purchased or licensed first-run episodic programming. Such programming is generally produced and delivered at or near its broadcast date. Such contracts generally require progress payments as certain production milestones are achieved, prior to the programming becoming available for broadcast. If programming is not produced, WG's commitment to purchase or license the programming would generally expire without obligation.

*Employment and Talent Agreements*

WG regularly enters into multi-year employment agreements with its on-air talent for the Company's national cable network, as well as with certain executives. Under certain circumstances, the agreements may be terminated prior to expiration.

*Satellite and Video Transmission*

In a previous year, the Company entered into an amendment with the provider whereby, upon the expiration of the original term in January 2019, a new arrangement ("subsequent term") began which expires in January 2023. Total payments under the subsequent term total $6.0 million which are payable in annual installments beginning during the year ended December 31, 2020.

*Unconditional Purchase and Other Commitments*

In the normal course of business, the Company enters into multi-year agreements for the provision of services including software licensing arrangements, audience ratings, syndication, advertising services, and certain other services. These arrangements are generally not cancelable prior to their expiration and represent unconditional purchase commitments of the Company that are payable over a number of years. The Company also purchases product components from a variety of suppliers and also has certain general commitments to make payments to certain customers under related agreements.

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

**NOTE 15 – COMMITMENTS, CONTINGENCIES AND RELATED PARTY TRANSACTIONS (Continued)**

The commitments arising from these purchase and customer agreements as of March 31, 2021 are as follows:

| Years Ending December 31, (amounts in millions) | Contract Film Rights | Employment and Talent | Satellite Links and Video Transmission | Unconditional Purchase and Other Commitments | Total |
|---|---|---|---|---|---|
| 2021 (remaining nine months) | 6.6 | 10.6 | 1.4 | 25.0 | 43.9 |
| 2022 | - | 8.4 | 1.8 | 9.2 | 19.4 |
| 2023 | - | 4.6 | 0.1 | 2.1 | 6.8 |
| 2024 | - | 1.3 | - | 0.6 | 1.9 |
| 2025 | - | 0.1 | - | - | 0.1 |
| Thereafter | - | - | - | - | - |
| Total | $ 6.6 | $ 25.0 | $ 3.3 | $ 36.9 | $ 71.8 |

Contingencies

In July 2014, pursuant to an action filed by talent ("the original claimant") in 2012, the Company reached a settlement with SAG-AFTRA for a class action lawsuit for $1.4 million. In February 2015, the original claimant filed two appeals in the Ninth Circuit Court of Appeals. Between March 2016 and June 2018, the appeals have been heard, complaints have been amended by the plaintiff and dismissed in part by the district and superior court. All causes of action and complaints that were dismissed have subsequently been appealed by the plaintiff and have been referred back to the Ninth Circuit Court of Appeals. In April 2019, an oral argument for both appeals was heard by the Ninth Circuit Court of Appeals and the cases were submitted for decision. The Ninth Circuit remanded one case to state court and one back to the district court. As of the date these consolidated financial statements were available to be issued, following a settlement between the plaintiffs and SAG/AFTRA, the two cases are both back in state court with only a handful of the claims remaining. The Company intends to seek dismissal or settle for nuisance value. The parties attended a mandatory settlement conference in the summer of 2020. Subsequent to the balance sheet date and prior to when these financials were available to be issued, the parties settled for an immaterial amount.

Beginning in 2014, four claims, each for an unspecified amount, were filed against the Company with respect to the productions of certain TV series'. These claims were filed by the SAG-AFTRA for unpaid residuals for television programming, late payment penalties and health and retirement contributions. Most of the claims are in various stages of arbitration. One claim has resulted in a payment of $0.1 million. During 2020, a settlement agreement was executed between the parties for the proposed settlement.

In addition to the above, from time to time, the Company is involved in claims and legal proceedings and other disputes that arise in the ordinary course of its business. In the opinion of the Company's management and legal counsel, such claims are without substantial merit and should not result in judgments which, in the aggregate, would have a material adverse effect on the Company's financial statements.

EXHIBIT O(2)

AOE0844

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

**NOTE 15 – COMMITMENTS, CONTINGENCIES AND RELATED PARTY TRANSACTIONS (Continued)**

Related Party Arrangements

The company has a related party relationship with a sister television station whereby each station collects certain revenues and remits a portion of the revenues to the other station. The stations are under common management. The transactions create a related party receivable or payable, dependent upon timing of receipts and payments. As of March 31, 2021, the related party receivable was $2.3 million and is included in Prepaid expenses and other current assets on the consolidated balance sheet.

During the year-ended December 31, 2020, the Company entered into a 10-year lease for office space with the sole member of the Company. The Company accounted for the lease as a new lease agreement under ASC 840 and determined it should be classified as an operating lease. The minimum lease payments for this lease are captured within the operating lease minimum payments table above and total $28.9 million over the term of the lease.

**NOTE 16 – MEMBER'S DEFICIT**

Member's Note Receivable

During the three months ended March 31, 2021 there were $40.9 million in repayments and $45.1 million, in advances on the member note receivable. During the three months ended March 31, 2020 there were $5.1 million in advances and no repayments on the member note receivable. As of March 31, 2021 and December 31, 2020, the member note receivable was $9.1 million and $4.9 million, respectively. The member note receivable accrues interest at 3% per annum and matures on December 31, 2021.

During the three months ended March 31, 2021 and March 31, 2020, interest income was $0.1 million and $0.2 million, respectively, as shown in the consolidated statement of operations. As of both March 31, 2021 and December 31, 2020, accrued interest income was an immaterial amount.

Minority Interest

During 2019, in conjunction with the acquisition of Bayou as further described in Note 3, the sole member of the Company contributed cash to AMBH in exchange for a 26% equity interest in AMBH. This created a noncontrolling interest relationship with a related party as the sole member holds equity directly in one of the Company's consolidated subsidiaries. The net loss attributable to the noncontrolling interest was determined based on the results of AMB.

On February 10, 2020, in conjunction with the 2020 refinancing, as described in Note 10, the non-controlling interest was contributed from the noncontrolling interest holder to the Company and as a result all subsidiaries are wholly owned subsequent to the transaction. The net loss attributable to the noncontrolling interest presented in the statement of operations reflects the results of AMB attributable to the noncontrolling interest holder for the period from January 1, 2020 to February 9, 2020. The remaining equity balance held by the noncontrolling interest holder upon contribution was $6.1 million.

Member contribution and distribution

During 2020, in conjunction with the acquisition of the USA TV stations and the 2020 Syndicated refinancing, as described in Note 3 and Note 10, the sole member of the Company contributed $9.0 million cash to the Company as additional equity. During 2020, the member received a distribution in cash of $15.0 million.

EXHIBIT O(2)

AOE0845

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - UNAUDITED

**NOTE 17 – SUBSEQUENT EVENTS**

Management has evaluated all activity through July 9, 2021 (the date the consolidated financial statements are available to be issued) and, except for the matters below, concluded that no subsequent events have occurred that would require recognition or disclosure in the notes to consolidated financial statements.

On April 29, 2021, the Company entered into an asset purchase agreement to acquire seven television broadcast stations for approximately $380.0 million. The Company has secured committed financing for the acquisition on a separate stand-alone entity, Allen Media Broadcasting Evansville III, LLC, formed for the purpose of the acquisition. It is anticipated that the transaction will close in the third quarter of this year and that the purchase price will be settled in cash upon closing.

EXHIBIT O(2)

AOE0846



RSM US LLP

**Independent Auditor's Report**

Board of Directors
Quincy Media, Inc.

**Report on the Financial Statements**

We have audited the accompanying combined financial statements of KVOA Television, Inc., WKOW Television, Inc., WSIL Television, Inc., KWWL Television, Inc., WXOW – WQOW Television, Inc. WAOW – WYOW Television, Inc., and WREX Television, LLC (a Carve-out of Quincy Media, Inc.) (collectively, Certain Television Stations or the Company), which comprise the combined balance sheets as of December 31, 2020 and 2019, the related combined statements of operations, changes in invested equity and cash flows for the years then ended, and the related notes to the combined financial statements (collectively, the financial statements).

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2020 and 2019, and the results of their operations and their cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

*RSM US LLP*

Atlanta, GA
July 9, 2021

**THE POWER OF BEING UNDERSTOOD**
AUDIT | TAX | CONSULTING

RSM US LLP is the U.S. member firm of RSM International, a global network of independent audit, tax, and consulting firms. Visit rsmus.com/aboutus for more information regarding RSM US LLP and RSM International.

EXHIBIT O(2)

AOE0847

**Certain Television Stations (A Carve-out of Quincy Media, Inc.)**
**Combined Balance Sheets**
**As of December 31, 2020 and 2019**

| ASSETS | *In thousands* | |
| --- | --- | --- |
| | December 31, 2020 | December 31, 2019 |
| **CURRENT ASSETS** | | |
| Cash | $ 1,218 | $ 2,085 |
| Accounts receivable, net | 19,935 | 20,546 |
| Television library, current portion | 2,471 | 2,468 |
| Taxes receivable | 89 | 100 |
| Prepaid expenses and other current assets | 2,492 | 2,221 |
| **Total Current Assets** | **26,205** | **27,420** |
| | | |
| Property and equipment, net | 45,246 | 44,831 |
| Television library, less current portion | 3,060 | 5,149 |
| Intangible assets, net | 203,519 | 205,267 |
| Goodwill, net | 15,305 | 15,305 |
| **TOTAL ASSETS** | $ **293,335** | $ **297,972** |

| LIABILITIES AND INVESTED EQUITY | | |
| --- | --- | --- |
| **CURRENT LIABILITIES** | | |
| Accounts payable and accrued liabilities | $ 7,419 | $ 7,233 |
| **Total Current Liabilities** | **7,419** | **7,233** |
| | | |
| Deferred income tax liabilities | 43,455 | 39,991 |
| Other long-term liabilities | 3,060 | 5,149 |
| **Total Liabilities** | **53,934** | **52,373** |
| | | |
| **Invested Equity** | | |
| Net parent investment | 239,401 | 245,599 |
| **Total Invested Equity** | **239,401** | **245,599** |
| **TOTAL LIABILITIES AND INVESTED EQUITY** | $ **293,335** | $ **297,972** |

The accompanying notes are an integral part of these financial statements.

EXHIBIT O(2)

AOE0848

**Certain Television Stations (A Carve-out of Quincy Media, Inc.)**
**Combined Statements of Operations**
**For the years ended December 31, 2020 and 2019**

| | In thousands | |
|---|---|---|
| | December 31, 2020 | December 31, 2019 |
| **Revenues** | | |
| Revenues, net | $ 146,500 | $ 103,753 |
| **Total Revenues** | **146,500** | **103,753** |
| | | |
| **Operating Expenses** | | |
| Programming and production expenses | 54,256 | 48,853 |
| Sales, general and administrative expenses | 27,465 | 23,737 |
| Depreciation and amortization | 7,957 | 7,038 |
| **Total Operating Expenses** | **89,678** | **79,628** |
| | | |
| **Other Income (Expense)** | | |
| Other income (expense), net | 1,308 | (266) |
| **Total Other Income, net** | **1,308** | **(266)** |
| | | |
| **Income before income taxes** | **58,130** | **23,859** |
| | | |
| Income tax expense | 16,352 | 5,272 |
| | | |
| **Net Income** | **$ 41,778** | **$ 18,587** |

The accompanying notes are an integral part of these financial statements.

EXHIBIT O(2)

AOE0849

**Certain Television Stations (A Carve-out of Quincy Media, Inc.)**
**Combined Statements of Changes in Invested Equity**
**For the years ended December 31, 2020 and 2019**

|  | *In thousands*<br>**Net Parent Investment** |
|---|---|
| **Balance, January 1, 2019** | $ 146,285 |
| Net income for the period | 18,587 |
| Net transfers from Parent | 80,727 |
| **Balance, December 31, 2019** | 245,599 |
| Net income for the period | 41,778 |
| Net transfers to Parent | (47,976) |
| **Balance, December 31, 2020** | $ 239,401 |

The accompanying notes are an integral part of these financial statements.

EXHIBIT O(2)

AOE0850

**Certain Television Stations (A Carve-out of Quincy Media, Inc.)**
**Combined Statements of Cash Flows**
**For the years ended December 31, 2020 and 2019**

|  | *In thousands* | |
|  | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Cash Flows from Operating Activities | | |
| Net income | $ 41,778 | $ 18,587 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation | 6,209 | 5,224 |
| Amortization | 1,748 | 1,814 |
| Provision for losses on accounts receivable | 4 | 23 |
| Loss on disposal of property and equipment | 378 | 432 |
| Gain on station repack | (1,687) | (166) |
| Deferred income taxes | 3,465 | 2,769 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 607 | (8,682) |
| Taxes receivable | 11 | (100) |
| Prepaid expenses and other assets | (271) | (1,201) |
| Television library asset | 2,087 | (4,392) |
| Accounts payable and accrued liabilities | 186 | 3,672 |
| Other long-term liabilities | (2,090) | 3,853 |
| Net cash provided by operating activities | 52,425 | 21,833 |
| | | |
| Cash Flows from Investing Activities | | |
| Acquisitions of businesses | - | (93,650) |
| Purchases of property and equipment | (7,128) | (7,912) |
| Proceeds on sale of property and equipment | 126 | 2 |
| Proceeds from repack reimbursements | 1,686 | 166 |
| Net cash used in investing activities | (5,316) | (101,394) |
| | | |
| Cash Flows from Financing Activities | | |
| Net transfers (to) from Parent | (47,976) | 80,727 |
| Net cash (used in) provided by financing activities | (47,976) | 80,727 |
| | | |
| (Decrease) Increase in cash | (867) | 1,166 |
| Cash at beginning of year | 2,085 | 919 |
| **Cash at end of year** | $ 1,218 | $ 2,085 |
| | | |
| Supplemental disclosure of cash flows information: | | |
| Cash paid during the period for: | | |
| Income taxes | 300 | 200 |
| Purchases of property and equipment with accounts payable | - | 293 |

The accompanying notes are an integral part of these financial statements.

EXHIBIT O(2)

AOE0851

### 1. Business and Basis of Presentation

**Nature of operations**

The accompanying combined financial statements include the historical accounts of certain television stations of Quincy Media, Inc. (the "Parent") which includes the following television broadcast stations: (i) KVOA, Tucson, Arizona, (ii) WKOW, Madison, Wisconsin, (iii) WREX, Rockford, Illinois, (iv) WSIL/KPOB, Harrisburg, Illinois, (v) KWWL, Cedar Rapids, Iowa, (vi) WXOW/WQOW, La Crosse, Wisconsin and (vii) WAOW/WMOW, Wausau, Wisconsin (collectively herein as the "Company" or the "Stations").

On January 31, 2021, the Parent entered into agreements to sell all of its outstanding shares of capital stock to Gray Television, Inc. ("Gray"). In order to facilitate regulatory approvals for this transaction, Gray intends to divest stations in certain markets where Gray currently has a presence and owns stations. These financial statements contain the historical financial information for those stations being divested. On April 29, 2021, Gray entered into agreement with Allen Media Broadcasting Evansville III, LLC ("AMB") a subsidiary of Allen Media Holdings, LLC ("AMG"), to sell the assets and transfer assumed liabilities associated with the Stations.

Gray's acquisition of the Parent and Gray's sale of the Stations to AMG will close simultaneously, and transaction is expected to close following receipt of regulatory and other approvals in the third quarter of 2021.

**Basis of presentation**

The accompanying combined financial statements have been prepared in accordance with accounting principles generally accepted in the United States (U.S. GAAP) from the consolidated financial statements and accounting records of the Parent using the historical results of operations and historical cost basis of the assets and liabilities that comprise the Company. Throughout the years ended December 31, 2020 and 2019, the Company operated as a part of Parent. Consequently, stand-alone financial statements have not been historically prepared for the Company. These financial statements have been prepared on a combined basis as the Stations represent a portion of the Parent's business. The accompanying combined financial statements are presented on a stand-alone basis as if the operations of the Company had been conducted independently from the Parent and present only the historical financial information of the economic activities that comprise the Company. The financial statements included herein may not necessarily be indicative of the Company's balance sheet, statement of operations, or statement of cash flows had the Company operated as a stand-alone entity during the periods presented.

These financial statements have been prepared solely to demonstrate the Company's historical results of operations, financial position, and cash flows for the indicated periods under the Parent's management. All intercompany balances and transactions within the Company have been eliminated. Balances between the Company and the Parent have been effectively settled through the net parent investment account. Refer to Note 6.

The accompanying combined financial statements include the assets, liabilities, revenues and expenses that are specifically identifiable to the Company. In addition, certain costs related to the Company have been allocated from the Parent as the Company receives service and support functions from the Parent. The costs associated with these services and support functions (indirect costs) have been allocated to the Company using allocation methodologies which were primarily based on proportionate revenue, proportionate headcount, or other systematic measures. These allocated costs are primarily related to corporate administrative expenses, employee related costs including benefits for corporate and shared employees for the following functional groups: information technology, legal services, accounting and finance services, human resources, and other corporate services.

EXHIBIT O(2)

AOE0852

2.  **Summary of Significant Accounting Policies**

Net Parent Investment
The net parent investment represents Parent's interest in the recorded net assets of the Company, the cumulative net investment by Parent in the Company through the dates presented and includes the Company's cumulative operating results. All transactions between the Company and Parent are considered to be effectively settled through the net parent investment at the time the transactions are recorded.

Use of Estimates
The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amount of revenues and expenses during the reporting period. Accordingly, actual results could differ from those estimates reported.

Property, Equipment, and Depreciation
Property and equipment are recorded at cost. Expenditures for major additions and improvements are capitalized and minor replacements, maintenance, and repairs are charged to expenses as incurred. When property and equipment are retired or otherwise disposed of, the cost and accumulated depreciation are removed from the accounts and any resulting gain or loss is included in the results of operations for the respective period. Depreciation is provided over the estimated useful lives of the related assets using the straight-line method for financial statement purposes. The estimated useful lives for significant property and equipment categories are as follows:

|  | Useful lives |
|---|---|
| Building and improvements | 40 years |
| Towers and antennas | 15 years |
| Broadcast Equipment | 6 years |
| Computer equipment | 5 years |
| All other equipment | 6 years |

Cash
Cash is primarily comprised of bank deposits over which the Company has legal ownership. The cash balance may include cash received from the Parent to support the Company's operations.

Accounts Receivable and Allowance for Doubtful Accounts
Trade accounts receivable are stated at the amount the Company expects to collect. The Company maintains allowances for doubtful accounts for estimated losses resulting from the inability of its customers to make required payments. Management considers the following factors when determining the collectability of specific customer accounts: customer credit worthiness, past transaction history, economic industry trends, and changes in customer payment trends. Past due accounts and other higher risk accounts are reviewed individually for collectability. Based on management's assessment, the Company provides for estimated uncollectible amounts through a charge to earnings and a credit to the allowance for doubtful accounts.  Deductions from the allowance for doubtful accounts represent write-offs of receivable balances not considered collectible.

The allowance for doubtful accounts was $0.1 million as of December 31, 2020 and 2019 and the amount of accounts receivable written off was $0.2 million and $0.1 million for the years ended December 31, 2020 and 2019, respectively.

**2.    Summary of Significant Accounting Policies (Continued)**

Fair Values of Financial Instruments

Financial Accounting Standards Board ("FASB") Accounting Standard Codification ("ASC") Topic 825, *Financial Instruments*, requires the Company to disclose estimated fair values for its financial instruments. Fair value estimates, methods, and assumptions are set forth below for the Company's financial instruments

The Company's financial assets and liabilities are valued using market prices on active markets (Level 1), less active markets (Level 2) and little or no market activity (Level 3). Level 1 instrument valuations are obtained from real-time quotes for transactions in active exchange markets involving identical assets. Level 2 instrument valuations are obtained from readily available pricing sources for comparable instruments, identical instruments in less active markets, or models using market observable inputs. Level 3 instrument valuations typically reflect management's estimate of assumptions that market participants would use in pricing the asset or liability. The carrying amounts of cash, accounts receivables, other current assets, accounts payable, and accrued expenses approximate fair value because of the short maturity of those instruments.

Intangible Assets and Goodwill

Intangible assets consist primarily of broadcast licenses issued by the Federal Communications Commission ("FCC"), network affiliations ("NA"), retransmission agreements, and goodwill, which are considered indefinite lived. The Company tests the impairment of its FCC licenses/NA at least annually. The impairment test consists of a comparison of the fair market value of FCC licenses/NA with their carrying amount using a discounted cash-flow valuation method, assuming a hypothetical start-up scenario. The future value of the Company's FCC licenses/NA could be significantly impaired by the loss or change of the corresponding network affiliation or retransmission agreements. Accordingly, such an event could trigger an assessment of the carrying value of an FCC license/NA.

The Company tests the impairment of goodwill at least annually. The Company defines its reporting unit as the market, which can be comprised of one or more individual stations serving the same region. The first step of the goodwill impairment test compares the fair value of a market with its carrying amount, including goodwill. The fair value of a market is determined through the use of a discounted cash flow analysis. The valuation assumptions used in the discounted cash flow model reflect historical performance of the market and prevailing values in the markets for broadcasting properties. If the fair value of a market exceeds its carrying amount, goodwill is not considered impaired. If the carrying amount of a market exceeds its fair value, the second step of the goodwill impairment test compares the implied fair value of goodwill with the carrying amount of that goodwill. The implied fair value of goodwill is determined by performing a hypothetical purchase price allocation, using the market's fair value (as determined in step one) as the purchase price.

If the carrying amount of goodwill exceeds the implied fair value, an impairment charge is recognized in an amount equal to that excess, but not more than the carrying value of the goodwill. An impairment assessment could be triggered by a significant reduction, or a forecast of such reductions, in operating results or cash flows at one or more of the Company's television stations, a significant adverse change in the national or local advertising marketplaces in which the television stations operate, or by adverse changes to FCC ownership rules, among other factors.

Certain of the Company's intangible assets, including retransmission agreements, are classified as finite-lived intangible assets and are amortized. The amortization period of the finite-lived intangible assets is equal to the shorter of their estimated useful life or the corresponding contract period.

Revenue Recognition

The Company's revenue is primarily derived from the sale of television advertising time and the compensation received from traditional multichannel video programming distributors ("MVPDs"), such as cable and satellite providers, as well as over-the-top video distributors ("OTTDs"), companies that provide video content through internet streaming.

EXHIBIT O(2)

AOE0854

**2.   Summary of Significant Accounting Policies (Continued)**

Advertising revenue for television time and interactive marketing is recognized in the period in which the advertising spots/impressions are delivered.

Retransmission revenue is generated through fees received from MVPDs and OTTDs providers in exchange for the right to distribute the Company's broadcast channels and cable networks on their distribution platforms. Distribution arrangements are generally governed by multi-year contracts and the underlying fees are based upon a contractual monthly rate per subscriber. These arrangements represent licenses of intellectual property; revenue is recognized as the signal is provided to the Company's customers (as usage occurs) which corresponds with the satisfaction of the Company's performance obligation. Revenue is calculated based upon the contractual rate multiplied by an estimated number of subscribers. Customers will remit payments based upon actual subscribers a short time after the conclusion of a month, which generally does not exceed 90 days. The Company also has other revenues which include revenue from trade transactions, digital services, certain production services.

Allocation of Corporate Expenses
The combined statements of operations include corporate expense allocations for services provided by the Parent. The corporate expenses that were allocated include expenses incurred for sales and marketing, information technology, finance, accounting, treasury and legal, real estate and facilities, human resources, procurement, and advertising related to the Company divestiture, and other corporate and infrastructure functions. These expenses have primarily been allocated on a pro rata basis using methodologies that management believes to be reasonable including revenue, headcount or other systematic measures. The allocations may not be necessarily indicative of actual costs for services or what the Company would have incurred on a stand-alone basis. The costs incurred by the Parent allocated to the Company was $5.1 million and $4.3 million for the years ended December 31, 2020 and 2019, respectively, and are included in sales, general and administrative expenses in the combined statements of operations.

Concentrations of Credit Risk
The Company maintains cash balances at financial institutions, which at times may exceed federal insured limits. The Company has not experienced any losses from these accounts and believes it is not exposed to any significant risk on such balances.

Trade and Barter Transactions
The Company accounts for trade transactions involving the exchange of tangible goods or services with customers as revenue. The revenue is recorded at the time the advertisement is broadcast and the expense is recorded at the time the goods or services are used. The revenue and expense associated with these transactions is based on the fair value of the assets or services involved in the transaction.

Trade revenue and expense recognized for each of the years ended December 31, 2020 and 2019 were as follows:

|  | In thousands | | | |
|  | 2020 | | 2019 | |
| Trade revenue | $ | 763 | $ | 955 |
| Trade expense | | 737 | | 942 |
| **Net trade income** | **$** | **26** | **$** | **13** |

Advertising Costs
Advertising costs are expensed as incurred. Advertising expense totaled $0.5 million and $0.6 million for the years ended December 31, 2020 and 2019, respectively.

EXHIBIT O(2)

AOE0855

**2.   Summary of Significant Accounting Policies (Continued)**

Television Library

Television Broadcast program licenses and rights and related liabilities are recorded when the license period begins and the program is available for use. The total fees payable for program license agreements are recorded at the beginning of the license period and charged to operating expense over the period that the programs are broadcast. The fees are included in accounts payable and other accrued liabilities and other long-term liabilities on the balance sheet based upon when the payment will become due.

**Recently adopted accounting pronouncements**

In May 2014, the FASB issued Accounting Standards Update ("ASU") 2014-09, *Revenue from Contracts with Customers (Topic 606)*. This standard outlines a single comprehensive model for companies to use in accounting for revenue arising from contracts with customers and supersedes most current revenue recognition guidance, including industry-specific guidance. The core principle of the revenue model is that revenue is recognized when a customer obtains control of a good or service. A customer obtains control when it has the ability to direct the use of and obtain the benefits from the good or service. Transfer of control is not the same as transfer of risks and rewards, as it is considered in legacy guidance. The adoption of ASU 2014-19 effective January 1, 2019 did not result in a material impact on the Company's current or historical financial results.

**Recently issued accounting pronouncements**

In February 2016, the FASB issued ASU 2016-02, *Leases (Topic 842)*, which requires lessees to classify leases as finance or operating, dictated by whether or not the lease is a financed purchase. Financed lease expense is based on the effective interest method while operating leases are expensed on a straight-line basis over the term of the lease. Lessees with a term over 12 months are required to record a right-of-use asset and a lease liability. Leases with a term under a year can be accounted for similar to existing guidance for operating leases. The standard is effective on January 1, 2022, with early adoption permitted. The Company is in the process of evaluating the impact of this new guidance on the combined financial statements.

In June 2016, the FASB issued ASU No. 2016-13, *Financial Instruments — Credit Losses (Topic 326)*: *Measurement of Credit Losses on Financial Instruments* ("ASU 2016-13"). Subsequently, ASU 2018-19 has been issued that amends and/or clarifies the application of ASU 2016-13. Among other provisions, the ASU introduces a new impairment model for most financial assets and certain other instruments. For trade and other receivables, held-to-maturity debt securities, loans and other instruments, entities will be required to use a forward-looking "expected loss" model that will replace the current "incurred loss" model and generally will result in earlier recognition of allowances for losses. The guidance will be effective for the Company beginning on January 1, 2023. The Company is in the process of evaluating the impact of this new guidance on the combined financial statements.

In January 2017, the FASB issued ASU 2017-04, *Intangibles — Goodwill and Other (Topic 350): Simplifying the Test for Goodwill Impairment*. This ASU eliminates Step 2 from the goodwill impairment test. The ASU also eliminates the requirements for any reporting unit with a zero or negative carrying amount to perform a qualitative assessment and, if it fails that qualitative test, to perform Step 2 of the goodwill impairment test. An entity still has the option to perform the qualitative assessment for a reporting unit to determine if the quantitative impairment test is necessary. The guidance will be effective for the Company beginning on January 1, 2022. Early adoption is permitted for interim or annual goodwill impairment tests performed on testing dates after January 1, 2017. ASU 2017-04 must be adopted on a prospective basis. The Company is in the process of evaluating the impact of this new guidance on the combined financial statements.

EXHIBIT O(2)

AOE0856

**2.   Summary of Significant Accounting Policies (Continued)**

In March 2019, the FASB issued ASU 2019-02, *Improvements to Accounting for Costs of Films and License Agreements for Program Materials* ("ASU 2019-02"). ASU 2019-02 aligns the accounting for production costs of an episodic television series with the accounting for production costs of films by removing the content distinction for capitalization. The guidance also requires that an entity test a film or license agreement for program material for impairment at a film group level when the film or license agreement is predominantly monetized with other films and/or license agreements. ASU 2019-02 and related amendments are effective for the Company beginning on January 1, 2021. The Company is in the process of evaluating the impact of this new guidance on the combined financial statements.

**3.   Acquisitions**

The Company has determined that the transactions below should be accounted for in accordance with FASB ASC Topic No. 805 – *Business Combinations*. The purchase price was allocated to the tangible and intangible assets acquired and liabilities assumed based on their estimated fair values as of the acquisition date. These amounts are based upon management's estimates of the fair values using valuation techniques including income, cost and market approaches. In determining the preliminary fair value of the acquired assets and assumed liabilities, the fair values were determined based on, among other factors, expected future revenue and cash flows, expected future growth rates, and estimated discount rates.

Goodwill represents the excess of acquisition cost over the fair value of assets acquired, identifiable intangible assets, less liabilities assumed. The goodwill for both business combinations is primarily attributable to expected post-acquisition synergies from assembled workforce and organizational systems and procedures set in place for effective operations.

WSIL-TV
On January 15, 2019, the Parent entered into an asset purchase agreement with WSIL-TV, Inc. (the "Seller") to acquire the operating assets of television station WSIL-TV, along with satellite station KPOB-TV and translator K10KM-D (collectively, "WSIL-TV"), for a cash purchase price of $23.7 million. The following table summarizes the consideration paid for WSIL-TV and the estimated fair value of the assets acquired at the acquisition date

|  | *In thousands* |
|---|---:|
| Property and equipment | $        5,543 |
| Intangibles – FCC licenses | 12,624 |
| Intangibles – Retransmission agreements | 3,454 |
| Intangibles – Other | 938 |
| **Total assets acquired** | 22,559 |
| | |
| Purchase price | 23,650 |
| **Goodwill** | **$        1,091** |

**3.  Acquisitions (Continued)**

KVOA
On May 1, 2019, the Parent entered into an asset purchase agreement with Cordillera Communications, Inc. and KVOA Communications, Inc. to acquire the operating assets of television station KVOA ("KVOA"), for a cash purchase price of $70.0 million. The following table summarizes the consideration paid for KVOA and the estimated fair value of the assets acquired at the acquisition date:

|  | *In thousands* |
|---|---|
| Property and equipment | $ 7,122 |
| Intangibles – FCC licenses | 49,064 |
| Intangibles – Retransmission agreements | 3,112 |
| Intangibles – Other | 982 |
| **Total assets acquired** | 60,280 |
| Purchase price | 70,000 |
| **Goodwill** | $ 9,720 |

For both acquisitions, there were no liabilities assumed and all of the goodwill is expected to be deductible for tax purposes. The retransmission agreements and other intangibles acquired are being amortized over their estimated useful lives of approximately 5.0 years and 4.8 years, respectively.

**4.  Goodwill and Intangible Assets**

The Company has acquired a significant portion of its assets in acquisition transactions. Among the assets acquired in these transactions were broadcast licenses issued by the FCC, goodwill, and other intangible assets.

Other intangible assets that the Company has acquired include network affiliation agreements, retransmission agreements, and customer relationships. A third party is utilized to value certain intangibles, and the income approach is used to estimate the fair value of the intangibles.

The following table presents a summary of the Company's identifiable intangible assets, goodwill, and accumulated amortization as of December 31, 2020:

|  | *In thousands* | | |
|---|---|---|---|
|  | **Gross carrying amount** | **Accumulated amortization** | **Net carrying amount** |
| Goodwill | $ 15,305 | $ - | $ 15,305 |
| *Indefinite-lived intangible assets* |  |  |  |
| FCC licenses | 193,543 | (2,316) | 191,227 |
| Network affiliation agreements | 8,901 | (1,541) | 7,360 |
| Other indefinite-lived intangible assets | 1,518 | (1,518) | - |
| *Finite-lived intangible assets* |  |  |  |
| Retransmission agreements | 6,567 | (2,050) | 4,517 |
| Other finite-lived intangible assets | 1,926 | (1,511) | 415 |
| **Total identifiable intangibles** | $ 212,455 | $ (8,936) | $ 203,519 |

EXHIBIT O(2)

AOE0858

**4.  Goodwill and Intangible Assets (Continued)**

The following table presents a summary of the Company's identifiable intangible assets, goodwill, and related accumulated amortization as of December 31, 2019:

|  | In thousands | | |
| --- | --- | --- | --- |
|  | Gross carrying amount | Accumulated amortization | Net carrying amount |
| Goodwill | $        15,305 | $                    - | $        15,305 |
|  |  |  |  |
| *Indefinite-lived intangible assets* |  |  |  |
| FCC licenses | 193,543 | (2,316) | 191,227 |
| Network affiliation agreements | 8,901 | (1,541) | 7,360 |
| Other indefinite-lived intangible assets | 1,518 | (1,518) | - |
| *Finite-lived intangible assets* |  |  |  |
| Retransmission agreements | 6,567 | (1,048) | 5,519 |
| Other finite-lived intangible assets | 1,926 | (765) | 1,161 |
| **Total identifiable intangibles** | $        212,455 | $        (7,188) | $        205,267 |

Certain acquired intangible assets which are now considered indefinite-lived were amortized prior to 2001 under accounting guidance applicable at that time. Amortization expense for the years ending December 31, 2020 and 2019 was $1.8 million and $1.7 million, respectively. As of December 31, 2020 the Company expects that amortization of intangible assets for the succeeding five years will be as follows:

| | In thousands |
| --- | --- |
| **Years ending** | **Amortization** |
| 2021 | 1,476 |
| 2022 | 1,476 |
| 2023 | 1,444 |
| 2024 | 379 |
| 2025 | 20 |
| Thereafter | 137 |
| Total | $        4,932 |

As of December 31, 2020 and 2019, the Company tested goodwill, FCC licenses and other intangible asset recorded values for potential impairment and concluded that the balances were not impaired. There were no impairment charges in the years ended December 31, 2020 or 2019.

Refer to Note 2 for further discussion of the Company's accounting policies regarding goodwill and intangible assets.

EXHIBIT O(2)

AOE0859

### 5.  Property and Equipment

As of December 31, 2020 and 2019, property and equipment consisted of the following:

|  | *In thousands* | |
|---|---|---|
|  | **2020** | **2019** |
| Land and land improvements | $        6,932 | $        6,940 |
| Building and improvements | 26,247 | 25,385 |
| Towers and antennas | 11,228 | 10,928 |
| Broadcast equipment | 70,757 | 77,105 |
| Office furniture and equipment | 4,180 | 5,111 |
| Autos and truck | 2,159 | 2,204 |
| Other equipment | 6,403 | 7,353 |
|  | 127,906 | 135,026 |
| Less: accumulated depreciation | (84,634) | (91,364) |
| Subtotal | 43,272 | 43,662 |
| Equipment in progress | 1,974 | 1,169 |
| **Property and equipment, net** | $      45,246 | $      44,831 |

Depreciation expense for the years ended December 31, 2020 and 2019 was $6.2 million and $5.2 million, respectively.

### 6.  Net Parent Investment

Parent's equity in the Company is presented as net parent investment on the combined balance sheets. Net parent investment includes certain related party receivables and payables between the Company and Parent of $148.0 million and $183.7 million as of December 31, 2020 and 2019 that are deemed effectively settled. All related party transactions effected through net parent investment in the accompanying balance sheets have been considered as cash receipts or payments for purposes of the combined statements of cash flows and are reflected in financing activities.

### 7.  Accounts Payable and Accrued Expenses

As of December 31, 2020 and 2019, the accounts payable and accrued expenses were comprised of the following:

| | *In thousands* | | | |
|---|---|---|---|---|
| | **2020** | | **2019** | |
| Accounts payable | $ | 1,992 | $ | 2,576 |
| Accrued salaries & wages | | 2,009 | | 1,352 |
| Television library payables | | 2,471 | | 2,468 |
| Other accrued expenses | | 947 | | 837 |
| **Total accounts payable and accrued expenses** | $ | 7,419 | $ | 7,233 |

### 8.  Income Taxes

The Company's income tax provision was prepared following the separate return method. The separate return method applies FASB ASC Topic No. 740, *Income Taxes, (*"ASC 740") to the stand-alone financial statements of each member of the consolidated group as if the group member were a separate tax payer and a stand-alone enterprise. Due to this treatment, tax transactions included in the consolidated financial statements of the Parent may not be included in the separate combined financial statements of the Company. Similarly, there may be certain tax treatments within the combined financial statements of the Company which would not be found in the consolidated financial statements and tax returns of the Parent. Examples of such items include net operating losses, credit carry forwards, and valuation allowances, which may exist in the stand-alone financial statements but not in the Parent's consolidated financial statements.

Furthermore, the combined financial statements do not reflect any amounts due to or due from the Parent for income tax related matters as it is assumed that all such amounts were settled through net parent investment at each balance sheet date.

The Company recognizes deferred tax assets and liabilities for future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. The Company measures deferred tax assets and liabilities using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to reverse. The Company recognizes the effect on deferred tax assets and liabilities resulting from a change in tax rates in income in the period that includes the enactment date. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion of all of the deferred tax assets will not be realized. Significant components of deferred tax assets and liabilities for the Company at December 31, 2020 and 2019 were as follows:

| | *In thousands* | | | |
|---|---|---|---|---|
| | **2020** | | **2019** | |
| Deferred tax liabilities: | | | | |
| Intangibles | $ | 41,035 | $ | 39,048 |
| Fixed assets | | 5,202 | | 5,247 |
| Total deferred tax liabilities | | 46,237 | | 44,295 |
| | | | | |
| Deferred tax assets: | | | | |
| Net operating loss | $ | 2,754 | $ | 3,915 |
| Repack | | - | | 362 |
| Allowance for bad debt | | 28 | | 27 |
| Total deferred tax assets | | 2,782 | | 4,304 |
| | | | | |
| **Deferred tax liabilities, net of deferred assets** | $ | 43,455 | $ | 39,991 |

EXHIBIT O(2)

AOE0861

8.   **Income Taxes (Continued)**

As of December 31, 2020, the Company's state net operating loss carryforwards for income tax purposes were approximately $44.1 million. If not utilized, the state net operating loss carryforwards will begin to expire in 2021.

The provision for income taxes for the years ended December 31, 2020 and 2019 consisted of the following:

| | In thousands | |
| | 2020 | 2019 |
| --- | --- | --- |
| Current | | |
| Federal | $ 9,929 | $ 1,901 |
| State | 2,958 | 602 |
| Total | 12,887 | 2,503 |
| | | |
| Deferred | | |
| Federal | 1,727 | 1,685 |
| State | 1,738 | 1,084 |
| Total | 3,465 | 2,769 |
| | | |
| **Total provision for income taxes** | **$ 16,352** | **$ 5,272** |

For the period January 1, 2020 to December 31, 2020, the provision for income taxes differs from the amount of income tax determined by applying the applicable U.S. statutory income tax rate to pretax income primarily due to state and local income taxes.

In accordance with ASC 740-10, the Company recognizes the impact of a tax position in the financial statements if that position is more likely than not to be sustained on review, based on the technical merits of the position. As of December 31, 2020, the Company has not recognized any reserves for uncertain tax positions. The tax years of 2017, 2018, and 2019 remain open for examination by the taxing authorities. The Company is not currently under audit by any taxing jurisdictions.

On March 27, 2020, the CARES Act was enacted in response to the COVID-19 global pandemic. The CARES Act, among its other provisions, contains modifications on the limitation of business interest for tax years beginning in 2019 and 2020, and permits net operating loss ("NOL") carryovers and carrybacks to offset 100% of taxable income for taxable years beginning before 2021. In addition, the CARES Act allows NOLs incurred in 2018, 2019, and 2020 to be carried back to each of the five preceding taxable years to generate a refund of income taxes paid previously. We will continue to monitor and assess the impact the CARES Act may have on our business and financial results.

9.   **Revenue Recognition**

The following table presents the Company's revenue from contracts with customers by type of service for the years ended December 31 2020 and 2019:

| | In thousands | |
| | 2020 | 2019 |
| --- | --- | --- |
| Advertising | $ 93,444 | $ 55,635 |
| Retransmission | 49,340 | 44,580 |
| Other | 3,716 | 3,538 |
| **Total revenue** | **$ 146,500** | **$ 103,753** |

EXHIBIT O(2)

AOE0862

## 10. Repack

The FCC is in the process of repurposing a portion of the broadcast television spectrum for wireless broadband use. Pursuant to federal legislation enacted in 2012, the FCC conducted an incentive auction for the purpose of making additional spectrum available to meet future wireless broadband needs. Under the auction statute and rules, certain television broadcasters accepted bids from the FCC to voluntarily relinquish all or part of their spectrum in exchange for consideration, and certain wireless broadband providers and other entities submitted successful bids to acquire the relinquished television spectrum. Over the next several years, television stations that are not relinquishing their spectrum are being "repacked" into the frequency band still remaining for television broadcast use.

Two of the Company's stations have been assigned to new channels in the reduced post-auction television band. These "repacked" stations are required to construct and license the necessary technical modifications to operate on their newly assigned channels and will need to cease operating on their existing channels by deadlines which the FCC has established. Congress has allocated up to an industry-wide total of $2.75 billion to reimburse television broadcasters, MVPDs, and other parties for costs reasonably incurred due to the repack. This allocation includes $1 billion added to the TV Broadcaster Relocation Fund as part of the Consolidated Appropriations Act, 2018. As of December 31, 2020, the Company has spent a total of $5.2 million in capital expenditures related to station repack, of which $5.0 million have been reimbursed.

The majority of the Company's costs associated with the repack qualify for capitalization. Upon receipt of funds, reimbursing the Company for its repack costs, the Company records those proceeds as a component of other income, net. The proceeds from repack recorded was $1.7 million and $0.2 million for the years ended December 31, 2020 and 2019, respectively.

## 11. Commitments and Contingencies

From time to time the Company may have various contractual and other commitments requiring future payments. These consist of commitments for various syndicated television programs and for commitments under affiliation agreements with networks as well as employment and talent. Estimated minimum payments for these commitments for the next five years and thereafter are as follows:

| | *In thousands* | | | | | | |
|---|---|---|---|---|---|---|---|
| | Syndicated Television Programming | | Network Affiliation Agreements | | Employment and Talent | | Total |
| 2021 | $ | 2,474 | $ | 30,088 | $ | 3,645 | $ 36,207 |
| 2022 | | 2,070 | | 30,205 | | 1,798 | 34,073 |
| 2023 | | 846 | | - | | 784 | 1,630 |
| 2024 | | - | | - | | 433 | 433 |
| 2025 | | - | | - | | 164 | 164 |
| Total | $ | 5,390 | $ | 60,293 | $ | 6,824 | $ 72,507 |

The network affiliation agreement amounts in the above table are estimates of commitments that are in addition to the liabilities accrued on the combined balance sheet as of December 31, 2020.

*Operating Leases*

The Company leases studio facilities and certain office locations pursuant to agreements expiring through 2025.

EXHIBIT O(2)

AOE0863

**11.  Commitments and Contingencies (Continued)**

Future minimum lease payments for the years ending December 31, are as follows:

| Year | In thousands |
|------|---:|
| 2021 | $ 226 |
| 2022 | 224 |
| 2023 | 150 |
| 2024 | 83 |
| 2025 | 46 |
| **Total** | **$ 729** |

Rent expense was $0.3 million and $0.2 million for the years ended December 31, 2020 and 2019, respectively.

*Legal Proceedings and Claims.*

The Company is involved in legal and regulatory proceedings. The Company expects and is to continue to be subject to legal actions, proceedings and claims that arise in the normal course of the Company's business. In the opinion of management, the amount of ultimate liability, if any, with respect to these known actions, proceedings and claims will not materially affect the Company's financial condition, results of operations or cash flows, although legal proceedings are subject to inherent uncertainties, and unfavorable rulings or events could result in materially adverse outcomes.

**12.  Subsequent Events**

On January 31, 2021, the Parent entered into an agreement with Gray to sell all of the outstanding shares of capital stock for $925.0 million in cash, subject to certain adjustments, including, among other things, adjustments based on a determination of net working capital, cash, transaction expenses and indebtedness, as provided in the purchase agreement.

On April 29, 2021, AMB a subsidiary of AMG, entered into an agreement with Gray to purchase the assets and assume liabilities associated with the Stations. Gray's acquisition of the Parent and Gray's sale of the Stations to AMG will close simultaneously, and the transaction is expected to close following receipt of regulatory and other approvals in the third quarter of 2021.

The completion of the transaction is subject to the satisfaction or waiver of certain customary conditions, including, among others: (i) the receipt of approval from the FCC and the expiration or early termination of the waiting period applicable to the transaction under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and (ii) the absence of certain legal impediments to the consummation of the transaction. The Company believes that the transaction will be completed during the third quarter of 2021. Either party may terminate the purchase agreement if the transaction is not consummated on or before January 31, 2022, with an automatic extension to May 1, 2022, if necessary, to obtain regulatory approval under the circumstances specified in the purchase agreement.

The Company has evaluated through the period from the balance sheet date through the date that the combined financial statements are available for issuance, July 9, 2021, and determined that there have been no additional events that have occurred that would require disclosure in these combined financial statements except for the transactions described above.

**Certain Television Stations (A Carve-out of Quincy Media, Inc.)**
**Unaudited Condensed Combined Balance Sheets**
**As of March 31, 2021 and December 31, 2020**

*In thousands*

| ASSETS | March 31, 2021 | | December 31, 2020 | |
|---|---|---|---|---|
| **CURRENT ASSETS** | | | | |
| Cash | $ | 2,972 | $ | 1,218 |
| Accounts receivable, net | | 20,802 | | 19,935 |
| Television library, current portion | | 2,434 | | 2,471 |
| Taxes receivable | | 91 | | 89 |
| Prepaid expenses and other current assets | | 3,401 | | 2,492 |
| **Total Current Assets** | | **29,700** | | **26,205** |
| | | | | |
| Property and equipment, net | | 44,023 | | 45,246 |
| Television library, less current portion | | 2,510 | | 3,060 |
| Intangible assets, net | | 203,150 | | 203,519 |
| Goodwill, net | | 15,305 | | 15,305 |
| **TOTAL ASSETS** | $ | **294,688** | $ | **293,335** |

**LIABILITIES AND INVESTED EQUITY**

| | March 31, 2021 | | December 31, 2020 | |
|---|---|---|---|---|
| **CURRENT LIABILITIES** | | | | |
| Accounts payable and accrued liabilities | $ | 6,070 | $ | 7,419 |
| **Total Current Liabilities** | | **6,070** | | **7,419** |
| | | | | |
| Deferred income tax liabilities | | 43,553 | | 43,455 |
| Other long-term liabilities | | 2,510 | | 3,060 |
| **Total Liabilities** | | **52,133** | | **53,934** |
| | | | | |
| **Invested Equity** | | | | |
| Net parent investment | | 242,555 | | 239,401 |
| **Total Invested Equity** | | **242,555** | | **239,401** |
| **TOTAL LIABILITIES AND INVESTED EQUITY** | $ | **294,688** | $ | **293,335** |

The accompanying notes are an integral part of these financial statements.

EXHIBIT O(2)

AOE0865

**Certain Television Stations (A Carve-out of Quincy Media, Inc.)**
**Unaudited Condensed Combined Statements of Operations**
**For the three months ended March 31, 2021 and 2020**

| | *In thousands* | |
|---|---|---|
| | **March 31, 2021** | **March 31, 2020** |
| **Revenues** | | |
| Revenues, net | $ 27,337 | $ 29,098 |
| **Total Revenues** | **27,337** | **29,098** |
| | | |
| **Operating Expenses** | | |
| Programming and production expenses | 14,700 | 13,687 |
| Sales, general and administrative expenses | 6,098 | 6,804 |
| Depreciation and amortization | 1,798 | 3,551 |
| **Total Operating Expenses** | **22,596** | **24,042** |
| | | |
| **Other Income** | | |
| Other income, net | 71 | 799 |
| **Total Other Income, net** | **71** | **799** |
| | | |
| **Income Before Income Taxes** | **4,812** | **5,855** |
| | | |
| Income tax expense | 1,365 | 1,667 |
| | | |
| **Net Income** | $ **3,447** | $ **4,188** |

The accompanying notes are an integral part of these financial statements.

EXHIBIT O(2)

AOE0866

**Certain Television Stations (A Carve-out of Quincy Media, Inc.)**
**Unaudited Condensed Combined Statements of Changes in Invested Equity**
**For the periods ended March 31, 2021 and 2020**

| *in thousands* | Net Parent Investment |
|---|---|
| **Balance, December 31, 2019** | $ 245,599 |
| Net income for the period | 4,188 |
| Net transfers to Parent | (5,850) |
| **Balance March 31, 2020** | $ 243,937 |
| | |
| **Balance, December 31, 2020** | $ 239,401 |
| Net income for the period | 3,447 |
| Net transfers to Parent | (293) |
| **Balance, March 31, 2021** | $ 242,555 |

The accompanying notes are an integral part of these financial statements.

EXHIBIT O(2)

AOE0867

**Certain Television Stations (A Carve-out of Quincy Media, Inc.)**
**Unaudited Condensed Combined Statements of Cash Flows**
**For the three months ended March 31, 2021 and 2020**

|  | In thousands | |
|---|---|---|
|  | March 31, 2021 | March 31, 2020 |
| Cash Flows from Operating Activities |  |  |
| Net income | $ 3,447 | $ 4,188 |
| Adjustments to reconcile net income to net cash provided by operating activities: |  |  |
| Depreciation | 1,429 | 2,976 |
| Amortization | 369 | 575 |
| Provision for losses on accounts receivable | 39 | 19 |
| Gain on station repack | (71) | (799) |
| Deferred income taxes | 98 | 155 |
| Changes in operating assets and liabilities: |  |  |
| Accounts receivable | (906) | 1,754 |
| Taxes receivable | (2) | (4) |
| Prepaid expenses and other assets | (909) | (305) |
| Television library asset | 587 | 601 |
| Accounts payable and accrued liabilities | (1,348) | (409) |
| Other long-term liabilities | (550) | (551) |
| Net cash provided by operating activities | 2,183 | 8,200 |
| Cash Flows from Investing Activities |  |  |
| Purchases of property and equipment | (219) | (3,371) |
| Proceeds on sale of property and equipment | 13 | - |
| Proceeds from repack reimbursements | 70 | 799 |
| Net cash used in investing activities | (136) | (2,572) |
| Cash Flows from Financing Activities |  |  |
| Net transfers to Parent | (293) | (5,850) |
| Net cash used in financing activities | (293) | (5,850) |
| Increase (decrease) in cash | 1,754 | (222) |
| Cash at beginning of period | 1,218 | 2,085 |
| Cash at end of period | $ 2,972 | $ 1,863 |
| Supplemental disclosure of cash flows information: |  |  |
| Purchases of property and equipment with accounts payable | $ - | $ 689 |

The accompanying notes are an integral part of these financial statements.

EXHIBIT O(2)

AOE0868

### 1.  Business and Basis of Presentation

**Nature of operations**

The accompanying unaudited condensed combined interim financial statements include the historical accounts of certain television stations of Quincy Media, Inc. (the "Parent") which includes the following television broadcast stations: KVOA Television, Inc., WKOW Television, Inc., WSIL Television, Inc., KWWL Television, Inc., WXOW-WQOW Television, Inc., WAOW-WYOW Television, Inc., and WREX Television, LLC (collectively herein as the "Company" or the "Stations").

On January 31, 2021, the Parent entered into agreements to sell all of its outstanding shares of capital stock to Gray Television, Inc. ("Gray"). In order to facilitate regulatory approvals for this transaction, Gray intends to divest stations in certain markets where Gray currently has a presence and owns stations. These unaudited condensed combined interim financial statements contain the historical financial information for those stations being divested.

On April 29, 2021, Gray entered into agreement with Allen Media Broadcasting Evansville III, LLC ("AMB") a subsidiary of Allen Media Holdings, LLC ("AMG"), to sell the assets and transfer assumed liabilities associated with the Stations.

Gray's acquisition of the Parent and Gray's sale of the Stations to AMG are anticipated to close simultaneously, and the transaction is expected to close following receipt of regulatory and other approvals in the third quarter of 2021.

**Basis of presentation**

The accompanying unaudited condensed combined interim financial statements have been prepared in accordance with accounting principles generally accepted in the United States (U.S. GAAP) the annual audited combined statements and from the consolidated financial statements and accounting records of the Parent using the historical results of operations and historical cost basis of the assets and liabilities that comprise the Company. During the three months ended March 31, 2021 and March 31, 2020, the Company operated as a part of Parent. Consequently, stand-alone financial statements have not been historically prepared for the Company. These financial statements have been prepared on a combined basis as the Stations represent a portion of the Parent's business. The accompanying combined financial statements are presented on a stand-alone basis as if the operations of the Company had been conducted independently from the Parent and present only the historical financial information of the economic activities that comprise the Company. The financial statements included herein may not necessarily be indicative of the Company's balance sheet, statement of operations, or statement of cash flows had the Company operated as a stand-alone entity during the periods presented.

These interim statements are presented on a condensed basis. Accordingly, certain information and note disclosures normally included in annual financial statements prepared in accordance with U.S. GAAP have been condensed or omitted, although the Company believes that the disclosures made are adequate to make the information not misleading. In the Company's opinion, all adjustments (consisting only of normal recurring adjustments) considered necessary for a fair presentation have been included.

These financial statements have been prepared solely to demonstrate the Company's historical results of operations, financial position, and cash flows for the indicated periods under the Parent's management. All intercompany balances and transactions within the Company have been eliminated. Balances between the Company and the Parent have been effectively settled through the Net Parent Investment account. Refer to Note 4.

**1. Business and Basis of Presentation (Continued)**

The accompanying unaudited condensed combined interim financial statements include the assets, liabilities, revenues and expenses that are specifically identifiable to the Company. In addition, certain costs related to the Company have been allocated from the Parent as the Company receives service and support functions from the Parent. The costs associated with these services and support functions (indirect costs) have been allocated to the Company using allocation methodologies which were primarily based on proportionate revenue, proportionate headcount, or other systematic measures. These allocated costs are primarily related to corporate administrative expenses, employee related costs including benefits for corporate and shared employees for the following functional groups: information technology, legal services, accounting and finance services, human resources, and other corporate services.

Use of Estimates
The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amount of revenues and expenses during the reporting period. Accordingly, actual results could differ from those estimates reported.

Recently Adopted Accounting Pronouncements
In October 2018, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2018-17, *Consolidation (Topic 810): Targeted Improvements to Related Party Guidance for Variable Interest Entities* ("ASU 2018-17"), which effectively expands the private company alternative for common control leasing arrangements to all private company common control arrangements as long as both the parent and the legal entity being evaluated for consolidation are not public business entities. ASU 2018-17 also amends certain VIE guidance for related party arrangements. ASU 2018-17 is effective for the Company beginning on January 1, 2021. The adoption did not result in a material impact on the Company's current or historical financial results.

In March 2019, the FASB issued ASU 2019-02, *Improvements to Accounting for Costs of Films and License Agreements for Program Materials* ("ASU 2019-02"). ASU 2019-02 aligns the accounting for production costs of an episodic television series with the accounting for production costs of films by removing the content distinction for capitalization. The guidance also requires that an entity test a film or license agreement for program material for impairment at a film group level when the film or license agreement is predominantly monetized with other films and/or license agreements. ASU 2019-02 and related amendments are effective for the Company beginning on January 1, 2021. The adoption did not result in a material impact on the Company's current or historical financial results.

**2. Goodwill and Intangible Assets**

The Company has acquired a significant portion of its assets in acquisition transactions. Among the assets acquired in these transactions were broadcast licenses issued by the Federal Communications Commission ("FCC"), goodwill, and other intangible assets.

Other intangible assets that were acquired include network affiliation agreements, retransmission agreements, and customer relationships. The Company utilizes a third party to value certain intangibles, and the income approach is used to estimate the fair value of the intangibles.

### 2. Goodwill and Intangible Assets (Continued)

The following table presents a summary of the Company's identifiable intangible assets, goodwill, and related accumulated amortization as of March 31, 2021:

| | *In thousands* | | |
| | Gross carrying amount | Accumulated amortization | Net carrying amount |
|---|---|---|---|
| Goodwill | $ 15,305 | $ - | $ 15,305 |
| | | | |
| *Indefinite-lived intangible assets* | | | |
| FCC licenses | 193,543 | (2,316) | 191,227 |
| Network affiliation agreements | 8,901 | (1,541) | 7,360 |
| Other indefinite-lived intangible assets | 1,518 | (1,518) | - |
| *Finite-lived intangible assets* | | | |
| Retransmission agreements | 6,567 | (2,378) | 4,189 |
| Other finite-lived intangible assets | 1,926 | (1,552) | 374 |
| **Total identifiable intangibles** | **$ 212,455** | **$ (9,305)** | **$ 203,150** |

The following table presents a summary of the Company's identifiable intangible assets, goodwill, and related accumulated amortization as of December 31, 2020:

| | *In thousands* | | |
| | Gross carrying amount | Accumulated amortization | Net carrying amount |
|---|---|---|---|
| Goodwill | $ 15,305 | $ - | $ 15,305 |
| | | | |
| *Indefinite-lived intangible assets* | | | |
| FCC licenses | 193,543 | (2,316) | 191,227 |
| Network affiliation agreements | 8,901 | (1,541) | 7,360 |
| Other indefinite-lived intangible assets | 1,518 | (1,518) | - |
| *Finite-lived intangible assets* | | | |
| Retransmission agreements | 6,567 | (2,050) | 4,517 |
| Other finite-lived intangible assets | 1,926 | (1,511) | 415 |
| **Total identifiable intangibles** | **$ 212,455** | **$ (8,936)** | **$ 203,519** |

Certain acquired intangible assets which are now considered indefinite-lived were amortized prior to 2001 under accounting guidance applicable at that time. Amortization expense for the three months ending March 31, 2021 and 2020 was $0.4 million and $0.6 million, respectively. As of March 31, 2021 the Company expects that amortization of intangible assets for the succeeding five years will be as follows:

| Years ending | *In thousands* Amortization |
|---|---|
| Remainder 2021 | 1,107 |
| 2022 | 1,476 |
| 2023 | 1,444 |
| 2024 | 379 |
| 2025 | 20 |
| Thereafter | 137 |
| Total | $ 4,563 |

EXHIBIT O(2)

AOE0871

2.  **Goodwill and Intangible Assets (Continued)**

As of March 31, 2021 and December 31, 2020, the Company tested goodwill, FCC licenses and other intangible asset recorded values for potential impairment and concluded that the balances were not impaired. There were no impairment charges in the three months ended March 31, 2021 or 2020.

3.  **Property and Equipment**

As of March 31, 2021 and December 31, 2020, the property and equipment consisted of the following:

|  | In thousands | |
|---|---|---|
|  | March 31, 2021 | December 31, 2020 |
| Land and land improvements | $ 6,932 | $ 6,932 |
| Building and improvements | 26,276 | 26,247 |
| Towers and antennas | 11,228 | 11,228 |
| Broadcast equipment | 72,200 | 70,757 |
| Office furniture and equipment | 4,186 | 4,180 |
| Autos and truck | 2,120 | 2,159 |
| Other equipment | 6,403 | 6,403 |
|  | 129,345 | 127,906 |
| Less: accumulated depreciation | (86,037) | (84,634) |
| Subtotal | 43,308 | 43,272 |
| Equipment in progress | 715 | 1,974 |
| **Property and equipment, net** | **$ 44,023** | **$ 45,246** |

Depreciation expense for the three months ended March 31, 2021 and 2020 were $1.4 million and $3.0 million, respectively.

4.  **Net Parent Investment**

Parent's equity in the Company is presented as net parent investment on the combined balance sheets. Net parent investment includes certain related party receivables and payables between the Company and Parent of $135.3 million and $148.0 million as of March 31, 2021 and December 31, 2020 that are deemed effectively settled. All related party transactions effected through Net Parent Investment in the accompanying balance sheets have been considered as cash receipts or payments for purposes of the combined statements of cash flows, and are reflected in financing activities.

5.  **Accounts Payable and Accrued Expenses**

As of March 31, 2021 and December 31, 2020, the accounts payable and accrued expenses were comprised of the following:

|  | In thousands | |
|---|---|---|
|  | March 31, 2021 | December 31, 2020 |
| Accounts payable | $ 843 | $ 1,993 |
| Accrued salaries & wages | 2,361 | 2,009 |
| Television library payables | 2,433 | 2,471 |
| Other accrued expenses | 433 | 946 |
| **Total accounts payable and accrued expenses** | **$ 6,070** | **$ 7,419** |

EXHIBIT O(2)

AOE0872

6.   **Income Taxes**

The Company's income tax provision was prepared following the separate-return method. The separate-return method applies FASB ASC Topic No. 740, *Income Taxes,* ("ASC 740") to the stand-alone financial statements of each member of the consolidated group as if the group member were a separate tax payer and a stand-alone enterprise. Due to this treatment, tax transactions included in the consolidated financial statements of the Parent may not be included in the separate unaudited condensed combined interim financial statements of the Company. Similarly, there may be certain tax treatments within the unaudited condensed combined interim financial statements of the Company which would not be found in the consolidated financial statements and tax returns of the Parent. Examples of such items include net operating losses, credit carry forwards, and valuation allowances, which may exist in the stand-alone financial statements but not in the Parent's consolidated financial statements.

Furthermore, the unaudited condensed combined interim financial statements do not reflect any amounts due to or due from the Parent for income tax related matters as it is assumed that all such amounts were settled through net parent investment at each balance sheet date.

Income tax expense for the three months ended March 31, 2021 and 2020 was $1.4 million and $1.7 million, respectively. For both periods, the provision for income taxes differs from the amount of income tax determined by applying the applicable U.S. statutory income tax rate to pretax income primarily due to state and local income taxes.

On March 27, 2020, the CARES Act was enacted in response to the COVID-19 global pandemic. The CARES Act, among its other provisions, contains modifications on the limitation of business interest for tax years beginning in 2019 and 2020, and permits net operating loss ("NOL") carryovers and carrybacks to offset 100% of taxable income for taxable years beginning before 2021. In addition, the CARES Act allows NOLs incurred in 2018, 2019, and 2020 to be carried back to each of the five preceding taxable years to generate a refund of income taxes paid previously. The Company will continue to monitor and assess the impact the CARES Act may have on our business and financial results.

7.   **Revenue Recognition**

The following table presents the Company's revenue from contracts with customers by type of service for the three months ended March 31, 2021 and 2020:

|  | *In thousands* | | | |
| --- | --- | --- | --- | --- |
|  | **March 31, 2021** | | **March 31, 2020** | |
| Advertising | $ | 12,530 | $ | 15,862 |
| Retransmission |  | 13,733 |  | 12,303 |
| Other |  | 1,074 |  | 933 |
| **Total revenue, net** | **$** | **27,337** | **$** | **29,098** |

EXHIBIT O(2)

AOE0873

## 8.  Repack

The FCC is in the process of repurposing a portion of the broadcast television spectrum for wireless broadband use. Pursuant to federal legislation enacted in 2012, the FCC conducted an incentive auction for the purpose of making additional spectrum available to meet future wireless broadband needs. Under the auction statute and rules, certain television broadcasters accepted bids from the FCC to voluntarily relinquish all or part of their spectrum in exchange for consideration, and certain wireless broadband providers and other entities submitted successful bids to acquire the relinquished television spectrum. Over the next several years, television stations that are not relinquishing their spectrum are being "repacked" into the frequency band still remaining for television broadcast use.

Two of the Company's stations have been assigned to new channels in the reduced post-auction television band. These "repacked" stations are required to construct and license the necessary technical modifications to operate on their newly assigned channels and will need to cease operating on their existing channels by deadlines which the FCC has established. Congress has allocated up to an industry-wide total of $2.75 billion to reimburse television broadcasters, Multichannel Video Programming Distributors, and other parties for costs reasonably incurred due to the repack. This allocation includes $1 billion added to the TV Broadcaster Relocation Fund as part of the Consolidated Appropriations Act, 2018. As of March 31, 2021, the Company has spent a total of $5.2 million in capital expenditures related to station repack, of which $5.1 million have been reimbursed.

The majority of the Company's costs associated with the repack qualify for capitalization. Upon receipt of funds, reimbursing the Company for its repack costs, the Company records those proceeds as a component of other income, net. The proceeds from repack recorded was $0.1 million and $0.8 million for the three months ended March 31, 2021 and 2020, respectively.

## 9.  Subsequent Events

On April 29, 2021, AMB a subsidiary of AMG, entered into an agreement with Gray to purchase the assets and assume liabilities associated with the Stations. Gray's acquisition of the Parent and Gray's sale of the Stations to AMG will close simultaneously, and the transaction is expected to close following receipt of regulatory and other approvals in the third quarter of 2021.

The completion of the transaction is subject to the satisfaction or waiver of certain customary conditions, including, among others: (i) the receipt of approval from the FCC and the expiration or early termination of the waiting period applicable to the transaction under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and (ii) the absence of certain legal impediments to the consummation of the transaction. The Company believes that the transaction will be completed during the third quarter of 2021. Either party may terminate the purchase agreement if the transaction is not consummated on or before January 31, 2022, with an automatic extension to May 1, 2022, if necessary, to obtain regulatory approval under the circumstances specified in the purchase agreement.

The Company has evaluated through the period from the balance sheet date through the date that the unaudited condensed combined interim financial statements are available for issuance, July 9, 2021, and determined that there have been no additional events that have occurred that would require adjustments to or disclosures in these unaudited condensed combined interim financial statements except for the transaction described above.

**$340,000,000**



# Allen Media, LLC
# Allen Media Co-Issuer, Inc.

### 10.500% Senior Notes due 2028

————————————

**PRELIMINARY OFFERING MEMORANDUM**

**, 2021**

————————————

## RBC Capital Markets

# EXHIBIT O(3)

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## CONSOLIDATED FINANCIAL STATEMENTS
### FOR THE YEARS ENDED
### DECEMBER 31, 2021 and 2020



Δ π EXHIBIT 119
Deponent Byron Allen
Date 11/2/22 Rptr. KM
WWW.DEPOBOOKPRODUCTS.COM

CONFIDENTIAL

EXHIBIT O(3)
ESN0041976
AOE0877

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## CONTENTS
### For the years December 31, 2021 and 2020

|  | Page |
|---|---|
| **CONSOLIDATED FINANCIAL STATEMENTS** | |

| | Page |
|---|---|
| Report of Independent Auditors | 3 |
| Consolidated Balance Sheets | 5 |
| Consolidated Statements of Operations | 6 |
| Consolidated Statements of Member's Deficit | 7 |
| Consolidated Statements of Cash Flows | 8 – 9 |
| Notes to Consolidated Financial Statements | 10 – 42 |

2

CONFIDENTIAL

EXHIBIT O(3)
ESN0041977
AOE0878



**Report of Independent Auditors**

To the Management of Allen Media Holdings, LLC

### *Opinion*

We have audited the accompanying consolidated financial statements of Allen Media Holdings, LLC and its subsidiaries (the "Company"), which comprise the consolidated balance sheets as of December 31, 2021 and 2020, and the related consolidated statements of operations, of member's deficit and of cash flows for the years then ended, including the related notes (collectively referred to as the "consolidated financial statements").

In our opinion, the accompanying consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2021 and 2020, and the results of its operations and its cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

### *Basis for Opinion*

We conducted our audit in accordance with auditing standards generally accepted in the United States of America (US GAAS). Our responsibilities under those standards are further described in the Auditors' Responsibilities for the Audit of the Consolidated Financial Statements section of our report. We are required to be independent of the Company and to meet our other ethical responsibilities, in accordance with the relevant ethical requirements relating to our audit. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### *Responsibilities of Management for the Consolidated Financial Statements*

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern for one year after the date the financial statements are available to be issued.

### *Auditors' Responsibilities for the Audit of the Consolidated Financial Statements*

Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditors' report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with US GAAS will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the financial statements.

In performing an audit in accordance with US GAAS, we:

- Exercise professional judgment and maintain professional skepticism throughout the audit.
- Identify and assess the risks of material misstatement of the consolidated financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures

3

EXHIBIT O(3)
**ESN0041978**
AOE0879



include examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements.

- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, no such opinion is expressed.
- Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the consolidated financial statements.
- Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control-related matters that we identified during the audit.

*PricewaterhouseCoopers LLP*

Atlanta, Georgia
March 31, 2022

4

EXHIBIT O(3)
ESN0041979
AOE0880

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## CONSOLIDATED BALANCE SHEETS
### As of December 31, 2021 and 2020

(amounts in millions)

### ASSETS

| | 2021 | 2020 |
|---|---|---|
| **CURRENT ASSETS** | | |
| Cash | 49.1 | 73.6 |
| Accounts receivable, net | 158.2 | 98.2 |
| Television library, net | 13.1 | 11.2 |
| Income tax receivables | 1.1 | 1.1 |
| Prepaid expenses and other current assets | 10.4 | 8.8 |
| **Total Current Assets** | **$231.9** | **$192.9** |
| | | |
| Tax credit receivable | 4.9 | 5.1 |
| Restricted cash | 0.2 | 0.2 |
| Property and equipment, net | 132.7 | 72.4 |
| Television library,net less current portion | 148.2 | 125.2 |
| Film rights, net | 8.7 | 9.7 |
| Intangible assets, net | 257.3 | 19.1 |
| Goodwill, net | 574.7 | 441.9 |
| Other noncurrent assets | 4.4 | 4.0 |
| **TOTAL ASSETS** | **$1,363.0** | **$870.5** |

### LIABILITIES AND MEMBER'S DEFICIT

| | 2021 | 2020 |
|---|---|---|
| **CURRENT LIABILITIES** | | |
| Accounts payable and accrued liabilities | 197.9 | 137.7 |
| Due to related parties | 23.4 | 27.1 |
| Taxes payable | 4.6 | 4.4 |
| Current portion of borrowings | 15.7 | 11.4 |
| Current portion of capital lease liabilities | 1.8 | 2.5 |
| Deferred revenue | 31.1 | 9.8 |
| **Total Current Liabilities** | **$274.5** | **$192.9** |
| | | |
| Borrowings, less current portion | 1,500.4 | 983.3 |
| Capital lease liabilities, less current portion | 4.8 | 0.6 |
| Due to related parties, less current portion | 3.2 | - |
| Deferred tax liabilities | 23.1 | 22.9 |
| Other long-term liabilities | 5.5 | 7.9 |
| **Total Liabilities** | **$1,811.5** | **$1,207.6** |
| | | |
| **MEMBER'S DEFICIT** | | |
| Member's deficit | (448.5) | (337.1) |
| | | |
| **TOTAL MEMBER'S DEFICIT ATTRIBUTABLE TO ALLEN MEDIA HOLDINGS, LLC** | **($448.5)** | **($337.1)** |
| | | |
| **TOTAL LIABILITIES AND MEMBER'S DEFICIT** | **$1,363.0** | **$870.5** |

The accompanying notes are an integral part of these consolidated financial statements.

CONFIDENTIAL

EXHIBIT O(3)
ESN0041980
AOE0881

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF OPERATIONS
### For the years ending December 31, 2021 and 2020

(amounts in millions)

| | 2021 | 2020 |
|---|---|---|
| **Revenues** | | |
| Networks and content revenue | 286.3 | 241.7 |
| Broadcast television revenue | 210.1 | 127.3 |
| **Total Revenues** | **$496.4** | **$369.0** |
| | | |
| **Operating Expenses** | | |
| Programming and production expenses | 273.1 | 182.1 |
| Sales, general and administrative expenses | 166.7 | 120.5 |
| Depreciation of property, plant, and equipment and amortization of intangible assets and goodwill | 83.2 | 68.3 |
| **Total operating expenses** | **$523.0** | **$370.9** |
| | | |
| **Operating loss** | **($26.6)** | **($1.9)** |
| | | |
| **Other Income (Expense)** | | |
| Interest expense | (117.4) | (89.1) |
| Loss on derecognition of debt | - | (47.2) |
| Other income, net | 8.6 | 2.6 |
| **Total other expense, net** | **($108.8)** | **($133.7)** |
| | | |
| **Loss before income taxes** | **($135.4)** | **($135.6)** |
| | | |
| Income tax benefit | (0.3) | (5.0) |
| **Net loss attributable to Allen Media Holdings, LLC and minority interests** | **($135.1)** | **($130.6)** |
| | | |
| Net loss attributable to minority noncontrolling interest | - | 0.4 |
| | | |
| **Net Loss attributable to Allen Media Holdings, LLC** | **($135.1)** | **($130.2)** |

The accompanying notes are an integral part of these consolidated financial statements.

CONFIDENTIAL

EXHIBIT O(3)
**ESN0041981**
AOE0882

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF MEMBER'S DEFICIT
### For the years ended December 31, 2021 and 2020

| (amounts in millions) | Member Note (Receivable) Payable | Minority Interest | Member's Deficit | Total |
|---|---|---|---|---|
| Balance, December 31, 2019 | (4.9) | 6.5 | (202.1) | (200.5) |
| Advances to member | (35.4) | - | | (35.4) |
| Repayment of member's note receivable | 35.4 | - | | 35.4 |
| Contribution of minority interest from noncontrolling interest holder | - | (6.1) | 6.1 | - |
| Contribution from member | - | - | 9.0 | 9.0 |
| Distribution to member | - | | (15.0) | (15.0) |
| Net loss for the period ended December 31, 2020 | - | (0.4) | (130.2) | (130.6) |
| Balance, December 31, 2020 | (4.9) | - | (332.2) | $(337.1) |
| Advances to member | (114.4) | - | - | (114.4) |
| Repayment of member's note receivable | 138.1 | - | - | 138.1 |
| Contribution from member | - | - | 15.0 | 15.0 |
| Distribution to member | - | - | (15.0) | (15.0) |
| Net loss for the period ended December 31, 2021 | - | - | (135.1) | (135.1) |
| Balance, December 31, 2021 | 18.8 | - | (467.3) | $(448.5) |

The accompanying notes are an integral part of these consolidated financial statements.

7

CONFIDENTIAL

EXHIBIT O(3)
ESN0041982
AOE0883

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF CASH FLOWS
### For the years ended December 31, 2021 and 2020

(amounts in millions)

|  | 2021 | 2020 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net loss | (135.1) | (130.6) |
| Adjustments to reconcile change in net loss to net cash used in operating activities. | | |
| Depreciation of property, plant, and equipment and amortization of intangible assets and goodwill | 83.2 | 68.3 |
| Loss (gain) on disposal of property and equipment | (0.2) | (0.8) |
| Amortization of deferred financing cost | 5.3 | 4.1 |
| Amortization of television library | 42.7 | 30.3 |
| Amortization of film rights | 1.6 | 3.3 |
| Deferred income taxes | (5.1) | (10.0) |
| Bad debt expense and other | 3.9 | 0.1 |
| Loss on debt extinguishment | - | 47.2 |
| Changes in Operating Assets and Liabilities: | | |
| Receivables | (35.1) | 6.8 |
| Television library assets | (41.5) | (64.5) |
| Film rights assets | (0.7) | 0.2 |
| Prepaid expenses and other assets | (0.7) | 3.1 |
| Other noncurrent assets | (0.4) | (1.7) |
| Accounts payable and accrued expense | 48.8 | 17.5 |
| Deferred revenue | 20.1 | (1.0) |
| Taxes payable | (1.1) | (0.6) |
| Other noncurrent liabilities | (2.4) | - |
| **Net Cash used in Operating Activities** | **$ (16.7)** | **$ (28.3)** |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Acquisition of property and equipment | (11.3) | (7.8) |
| Purchase of intangible assets | (5.2) | (7.0) |
| Acquisition of business, net of cash acquired | (501.0) | (303.3) |
| **Net Cash used in Investing Activities** | **$ (517.5)** | **$ (318.1)** |

The accompanying notes are an integral part of these consolidated financial statements.

CONFIDENTIAL

EXHIBIT O(3)
ESN0041983
AOE0884

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF CASH FLOWS
### For the years ended December 31, 2021 and 2020

|  | 2021 | 2020 |
|---|---|---|
| **CASH FLOWS FROM FINANCING ACTIVITIES** |  |  |
| Borrowings, net of discount and fees paid to lenders | 727.6 | $1,043.1 |
| Borrowings from related party | - | 2.0 |
| Repayments of borrowings | (205.3) | (614.9) |
| Repayments of borrowings from related party | (0.6) | - |
| Payment of debt issuance costs | (6.2) | (26.2) |
| Member contribution | - | 9.0 |
| Member distribution | - | (15.0) |
| Cash received from (loaned to) member, net | (3.9) | - |
| Payments on capital leases | (1.9) | (2.8) |
| **Net Cash provided by Financing Activities** | **$509.7** | **$395.2** |
| **NET CHANGE IN CASH AND RESTRICTED CASH** | **(24.5)** | **48.8** |
| **CASH AND RESTRICTED CASH AT BEGINNING OF PERIOD** | **73.8** | **25.0** |
| **CASH AND RESTRICTED CASH AT END OF PERIOD** | **$49.3** | **$73.8** |
|  |  |  |
| **Schedule of supplemental cash flow information** |  |  |
| Cash paid for taxes | $6.0 | $5.5 |
| Cash paid for interest | $95.3 | $53.4 |
|  |  |  |
| **Supplemental disclosure of noncash investing and financing activity** |  |  |
| Equipment purchased under capital lease | $5.8 | $0.7 |
| Deferred consideration for Quincy acquisition (See Note 3 - Acquisition) | $3.4 | $0.0 |

The accompanying notes are an integral part of these consolidated financial statements.

EXHIBIT O(3)
ESN0041984
AOE0885

CONFIDENTIAL

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended and as of December 31, 2021 and 2020

## NOTE 1 – NATURE OF BUSINESS

Allen Media Holdings, LLC ("AMH") was formed on January 17, 2018 and is owned by one member. AMH functions as a holding company for Allen Media, LLC ("AM") and its subsidiaries. AM and its wholly owned subsidiaries constitute a diversified media company that owns and operates television networks, including The Weather Channel®, broadcast television stations and a production and distribution business, which creates original programming across multiple genres. Certain wholly owned subsidiaries existed and operated prior to the formation of AMH. A restructuring in 2018 resulted in substantially all companies being wholly owned subsidiaries of AM. AMH, AM, and the operating entities are collectively described in these consolidated financial statements as "AMH Group" "the Company", or "we".

The Company distributes its programming, mainly in exchange for advertising airtime that it sells to advertising agencies in the U.S. Also, we operate several digital cable and satellite channels which broadcast its television programs through our affiliates and three national multicast networks. We also produce and distribute motion picture content through our motion pictures division, specializing in production, distribution, and representation for independent companies, major studios and mini-major studios.

In March 2018, we purchased Weather Group, LLC ("WG"). WG is a multi-platform media company focused on providing weather information and programming on various platforms. The WG cable network produces continuous 24-hour national, regional, and local weather-related television programming distributed by cable, satellite, and telecommunications multichannel video programming distributors in the U.S. and Caribbean.

In April 2019, the Company, along with its member, formed Allen Media Broadcast Holdings ("AMBH") and Allen Media Broadcasting ("AMB"), which subsequently acquired Bayou City Broadcasting Evansville, Inc. and Bayou City Broadcasting Lafayette, Inc., (collectively referred to as "Bayou") on July 3, 2019. Bayou is a television broadcast station group with stations affiliated with big four television networks such as CBS, FOX, and NBC.

Throughout 2020 and 2021, the Company, through its subsidiaries, closed on multiple acquisitions of additional broadcast television stations in order to grow its portfolio of assets as further described in Note 3 - Acquisitions.

During the years ended December 31, 2021 and 2020, the Company incurred a consolidated net loss of $135.1 million and $130.6 million, respectively, and a member's deficit of $448.5 million and $337.1 million, respectively. As of December 31, 2021, the Company had outstanding debt of $1,516.1 million, with required payments for these borrowings of $15.7 million plus interest in 2022.

The Company continues to maintain a strong library of film and television content and broadcasting assets in key markets. As of December 31, 2021, cash on hand was $49.1 million and we had current assets of $231.9 million. Our current liabilities of $274.5 million includes $23.4 million of amounts due to our member. As of December 31, 2021, the Company was in compliance with its financial covenants contained in the credit agreements governing its outstanding debt.

CONFIDENTIAL

EXHIBIT O(3)
ESN0041985
AOE0886

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2021 and 2020

**NOTE 1 – NATURE OF BUSINESS (Continued)**

In accordance with Accounting Standards Update ("ASU") 2014-15, *Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern (Subtopic 205-40)*, the Company has evaluated whether there are conditions and events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern within one year from the date of the issuance of these consolidated financial statements. The Company is highly leveraged, which makes it vulnerable to changes in general economic conditions. The Company's ability to repay or refinance its debt will depend on, among other things, financial, business, market, competitive and other conditions, some of which are beyond the Company's control. However, based on current operations and forecasted results, the Company believes that its available cash as of the date of the issuance of these financial statements, anticipated cash flows from operations and available borrowings under existing credit facilities will be sufficient to finance its operations and fund working capital, capital expenditure requirements, interest payments and scheduled debt principal payments for at least the next twelve months. The accompanying financial statements have been prepared assuming that the Company will continue as a going concern.

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

Basis of Presentation
The Company's consolidated financial statements are prepared using the accrual basis of accounting in accordance with accounting principles generally accepted in the United States.

Principles of Consolidation
The consolidated financial statements of the Company as of December 31, 2021 and 2020 include the accounts of Allen Media Holdings, LLC and its subsidiaries, which is primarily Allen Media, LLC and its subsidiaries, including Entertainment Studios Media Holdings ("ESMH"), Entertainment Studios P&A ("ESP&A"), Entertainment Studios Motion Pictures ("ESMP"), the Weather Group ("WG"), AMBH and its subsidiaries, and other direct subsidiaries. All significant intercompany transactions have been eliminated in consolidation.

Use of Estimates
The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make assumptions that affect the reported amounts of assets and liabilities and the reported amounts of revenues and expenses. The significant estimates in the accompanying financial statements include ultimate revenues for film rights and television library, impairment provisions for long-lived assets and intangible assets, allowances for doubtful accounts receivable, useful lives of property and equipment, television library and film rights, and intangible assets, deferred revenue, valuation and recoverability of goodwill, and contingencies. Although the Company regularly assesses these estimates, actual results could differ materially from these estimates. Changes in estimates are recorded in the period in which they become known. The Company bases its estimates on historical experience and various other assumptions that it believes reasonable under the circumstances. Actual results could differ from these estimates.

Restricted Cash
Restricted cash consists of funds that are contractually restricted as to usage or withdrawal due to a standby letter of credit relating to the operating lease of our facility in New York. The Company has presented restricted cash separately from cash and cash equivalents on the consolidated balance sheet.

CONFIDENTIAL

EXHIBIT O(3)
**ESN0041986**
AOE0887

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended and as of December 31, 2021 and 2020

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

Accounts Receivable, Net

Accounts receivable comprise customers' outstanding balances in respect of advertising, license fees and subscriptions less any allowance for doubtful accounts including affiliate revenue reserves. An allowance for doubtful accounts on accounts receivable is charged to expense in amounts sufficient to maintain the allowance for uncollectible accounts at a level management believes is adequate to cover any probable losses. Management determines the adequacy of the allowance based on historical write-off percentages and information collected. Accounts receivable are charged off against the allowance when collectability is determined to be permanently impaired.

Property and Equipment

Property and equipment are carried at cost. Depreciation and amortization are computed using the straight-line method over the estimated useful lives of the respective assets, generally as follows:

| | |
|---|---|
| Production equipment | 2 - 10 years |
| Office furniture and equipment | 2 - 7 years |
| Leasehold improvements | Lesser of the useful life or the lease term |
| Satellites | 42 months |
| Trucks and automobiles | 2 - 7 years |

The Company also has assets in the course of construction ("Construction in progress") totaling $11.0 million and $3.8 million for the years ended December 31, 2021 and 2020, respectively. Such assets are depreciated once the asset is completed and placed into service. Maintenance and repairs are charged to operations when incurred, while betterments and renewals are capitalized. Gains or losses are recognized upon the sale or disposal of the assets.

Television Library and Film Rights

The Company's television library consists of i) capitalized television production costs for content produced by or for the Company and aired on the Company's broadcast or cable networks or licensed to customers and ii) programming rights for content licensed from third parties to air on the Company's broadcast and cable networks. Film rights ("film costs") represent the cost to acquire the distribution rights or finance the production of motion pictures for theatrical release and distribution.

Capitalized television production costs and film rights are accounted for in accordance with FASB ASC Topic No. 926, Entertainment—Films, and programming rights and related costs are accounted for in accordance with FASB Accounting Standards Codification ("ASC") Topic No. 920, Entertainment—Broadcasters.

Capitalized production costs include direct costs, production overhead and interest, and are stated at the lower of unamortized cost or fair value. Programming rights are recorded when the program is available for use and are stated at the lower of unamortized cost or net realizable value.

Capitalized television production costs and film rights are amortized to expense over their estimated useful lives which range from 3-10 years, commencing upon the first airing, based on estimated usage or revenue to date as a percentage of remaining total projected attributable revenue, or ultimate revenue (individual-film-forecast-computation method). In certain cases, the Company utilizes a straight-line usage-based methodology to amortize capitalized television production costs.

CONFIDENTIAL

EXHIBIT O(3)
ESN0041987
AOE0888

**ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
For the years ended and as of December 31, 2021 and 2020

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

When estimates of total revenues or other events or changes in circumstances indicate that a television production or film has a fair value that is less than unamortized cost, an impairment loss is recognized for the amount by which the unamortized cost exceeds the fair value. No impairments were recorded during the years ended December 31, 2021 and 2020.

Projected attributable revenue can change based on market conditions and management decisions regarding planned content usage. These calculations require management to make assumptions and apply judgment regarding revenue and planned usage. Accordingly, the Company periodically reviews revenue estimates and planned usage and revises its assumptions if necessary, which could impact the timing of amortization expense or result in an impairment.

Programming rights are amortized over the contract term based on estimated usage. The portion of the unamortized balance expected to be amortized in the succeeding year is classified as a current asset, with the remainder classified as noncurrent.

Intangible Assets
Intangible assets consist of acquired and internally developed technology and software, costs incurred to acquire the names of digital and satellite channels, Federal Communications Commission ("FCC") licenses, and localization technology (or STAR) conveyed to cable, satellite and other distributors. STAR technology allows distributors of a network signal to receive the transmission of thousands of localized weather forecasts and extract the forecast for a specific geography. Software consists primarily of a developed application, Local Now, and related technology acquired through the Weather Group acquisition which are for internal use. The Company also has intangible assets in the course of construction ("Construction in process"). Amortization of such assets begins once the asset is completed and placed into service. Intangible assets are capitalized and amortized on a straight-line basis over 3 to 15 years except FCC licenses which are indefinite-lived and therefore not amortized.

Impairment tests for intangible assets not subject to amortization are performed annually or when events or circumstances indicate it is more likely than not that the asset is impaired. The impairment test involves a comparison of the estimated fair value of the intangible asset with its carrying value. If the carrying value of the intangible asset exceeds its fair value, an impairment loss is recognized in an amount equal to that excess. No impairment losses were recorded during the years ended December 31, 2021 or 2020.

Long-lived Assets
The Company reviews long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. An impairment loss would be recognized when estimated future cash flows expected to result from the use of the asset and its eventual disposition is less than its carrying amount. No impairment losses were recorded during the years ended December 31, 2021 or 2020.

Goodwill
Goodwill primarily relates to the acquisitions of various broadcast TV stations and represents the excess of purchase price over the value assigned to the assets acquired. The acquisitions of broadcast TV stations are further discussed in Note 3 - Acquisitions.

13

CONFIDENTIAL

EXHIBIT O(3)
**ESN0041988**
AOE0889

## ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended and as of December 31, 2021 and 2020

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

The Company has applied the guidance under FASB Accounting Standards Update ("ASU") No. 2014-18, *Business Combinations (Topic 805): Accounting for Identifiable Assets in a Business Combination (a consensus of the Private Company Council)*, where certain assets, such as customer relationships or a covenant not to compete, are not recorded separately from goodwill. As such, in accordance with FASB ASU No. 2014-02, *Intangibles—Goodwill and Other (Topic 350): Accounting for Goodwill* ("ASU 2014-02"), management has assigned a life of 10 years to goodwill over which the amount allocated to goodwill is being amortized.

Pursuant to ASC 350-20, goodwill should be tested for impairment when a triggering event occurs that indicates that the fair value of a reporting unit may be below its carrying amount as of the financial reporting date. If the goodwill is determined to be impaired, the goodwill is written down to its realizable value and the loss is recognized in the consolidated statement of operations in the period when determination is made. No impairment charges were recorded for the years ended December 31, 2021 and 2020.

Deferred Financing Costs

Deferred financing costs represent costs incurred to acquire debt. These costs are deferred and amortized on an effective interest yield basis over the term of the related debt. The related amortization is included within interest expense on the consolidated statements of operations.

In accordance with FASB ASC sub-topic No. 835-30 *Interest – Imputation of Interest* the Company has presented deferred financing costs as a reduction of long-term debt in the consolidated balance sheet. Refer to Note 10 – Long-Term Debt.

Capital Leases

Leases are classified as capital leases whenever the terms of the lease transfers substantially all the risks and rewards of ownership to the lessee. All other leases are classified as operating leases. Assets acquired and held under capital leases are recognized as assets of the Company at their fair value on the date of acquisition. The corresponding liability is included in the balance sheet as a capital lease obligation. Interest costs, which represent the difference between the total leasing commitments and the fair values of the assets acquired, are charged to the income statement over the term of the relevant lease.

Revenue Recognition

The Company applies FASB ASC Topic 606 – *Revenue from Contracts with Customers* for revenue recognition. We recognize revenue when we have a legally enforceable approved contract with a customer when that contract indicates that collection of the amount to which we are entitled is probable, rights and obligations of each party can be identified, and the arrangement has commercial substance. Revenue is recognized upon the transfer of control of promised services to our customers in an amount that reflects the consideration we expect to receive in exchange for those services. Amounts received from customers in advance of providing services to our customers (net of any related receivables) are recorded as contract liabilities, presented as deferred revenue on the consolidated balance sheet.

Our revenue primarily includes revenues from advertising, subscriptions, film rentals, content licensing fees, and distribution services.

CONFIDENTIAL

EXHIBIT O(3)
**ESN0041989**
AOE0890

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2021 and 2020

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

Advertising revenue is recognized as the Company fulfills its performance obligations to customers through airing customers' advertising content. The price of each individual commercial and digital advertisement is negotiated with each customer and is determined based on multiple factors, including, but not limited to, the programming and day-part selected, supply of available inventory, viewership ratings and overall market conditions (e.g., timing of the year and strength of U.S. economy). The Company measures the fulfillment of its performance obligations based on the airing of the individual television commercials or display of digital advertisements as those events occur. Advertising revenues are recorded net of agency commissions as the Company has determined that the advertising agency is the customer in these arrangements.

Network advertising includes campaigns for which revenues are based on audience delivery or a fixed price per spot. For campaigns based on audience delivery, the Company guarantees advertisers a minimum audience during the dayparts in which their advertisements are broadcast over the term of the advertising contracts. The Company provides the advertisers with additional advertising time if the guaranteed audience size and/or the minimum number of spots are not delivered. The Company has concluded that the performance obligation in these arrangements is the delivery of the minimum number of spots along with a guaranteed number of impressions against the targeted demographic as part of an overall campaign. Advertising revenue in connection with guaranteed campaigns is recognized using a measure of progress based on the number of impressions delivered during the period relative to the total guaranteed impressions. If the Company determines the guaranteed audience has not been delivered, an estimate of deferred revenue is recorded for audience delivery shortfalls that must be "made good." The remaining revenue is recognized proportionally until the guaranteed audience has been delivered and the performance obligation is satisfied. Our customers are generally on 60 to 120 day payment terms. Advertising revenue for the year ended December 31, 2021 within networks and content revenue and broadcast television revenue totaled $176.4 million and $85.5 million, respectively. Advertising revenue for the year ended December 31, 2020 within networks and content revenue and broadcast television revenue totaled $120.6 million and $61.9 million, respectively.

We earn subscription revenue from retransmission consent contracts with multichannel 0020 video programming distributors (e.g., cable and satellite providers) typically via multi-year contracts. Under these multi-year contracts, the Company has a performance obligation to deliver content or a signal to our customers. The revenue we earn in these contracts is primarily variable. The amount of revenue earned is based on the number of subscribers to which our customers retransmit our signal, and the negotiated fee per subscriber included in our contract agreement. Customers submit payments monthly, generally within 60-90 days after the month that the service was provided. Subscription revenue is recognized in accordance with the guidance for licensing intellectual property utilizing a usage based method. Performance obligations are satisfied, and revenue is recognized, as our customers utilize the content, network programming, or signal. Estimates of the revenue earned are recorded in each period, up to the amount not subject to significant reversal, and are adjusted as actual subscriber data is submitted to us. Subscription license and retransmission revenue for the year ended December 31, 2021 within networks and content revenue and broadcast television revenue totaled $99.3 million and $111.7 million, respectively. Subscription license and retransmission revenue for the year ended December 31, 2020 within networks and content revenue and broadcast television revenue totaled $100.1 million and $62.3 million, respectively.

CONFIDENTIAL

EXHIBIT O(3)
**ESN0041990**
AOE0891

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended and as of December 31, 2021 and 2020

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

Distribution revenues are earned through arrangements with distributors via the delivery of individual motion picture content files. We receive nonrefundable advances at the beginning of each distribution period which are considered fixed consideration related to the delivery of functional intellectual property. In some cases, additional variable consideration is earned as the content is utilized and is recognized in accordance with usage-based royalty guidance in the period in which the sales occur or when the performance obligation is satisfied (whichever is later) when it exceeds the amount of the nonrefundable advance or fixed consideration. In cases where payments received relate to multiple titles, the consideration is allocated to each title or performance obligation based on the estimated fair value of each title. As the distributor is our customer, the total transaction price is the amount we are entitled to receive from the distributor. Distribution revenue within networks and content revenue for the years ended December 31, 2021 and 2020 totaled $1.7 million and $5.2 million, respectively.

*Other Revenues*
ESMP enters into various distribution agreements for the release of content, such as movies, onto theatrical and digital platforms (such as Netflix, Hulu, and Amazon). ESMP acts as the distribution agent and collects all monies due under these arrangements and distributes the amounts payable to the producers of the content. In exchange for the performance of these services, ESMP retains a commission from the amounts collected in the form of a distribution fee. Distribution fee arrangements are accounted for on a net basis in accordance with ASC 606 and all distribution fees are reported net of amounts collected on behalf of, and paid over to, producers as the Company is an agent in these arrangements. Royalty revenue is also included within other revenue and is recognized based on best estimates available, primarily based on historical experience, of the amounts due to the Company in the period of the customer's sales or usage. Other revenues also include domestic radio revenues and domestic and international licensing of long-form programming. Other revenues included within networks and content revenue for the years ended December 31, 2021 and 2020 totaled $8.9 million and $16.1 million, respectively. Other revenues included within Broadcast television revenue for the years ended December 31, 2021 and 2020 totaled $12.9 million and $3.0 million, respectively.

Income Taxes
Certain entities of the Company are combined into a taxable entity group (the "taxable entity group"). The remaining entities, which comprise the majority of the group, are treated as separate taxable entities for federal, state, or local income tax purposes for which the tax impacts have been excluded from these consolidated financial statements. Accordingly, the results of all other entities' operations outside of the taxable entity group have been included in the tax return of the member. The taxable entity group has accounted for taxes under FASB ASC Topic No. 740, *Income taxes* ("ASC 740"), and records deferred taxes on income for transactions that are reported in different years for financial reporting and tax purposes using an asset and liability method whereby assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

CONFIDENTIAL

EXHIBIT O(3)
ESN0041991
AOE0892

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2021 and 2020

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

In accordance with ASC 740, the Company recognizes the impact of a tax position in the financial statements if that position is more likely than not to be sustained on review, based on the technical merits of the position. The Company's policy is to classify interest expense related to uncertain tax positions as income tax expense. The Company has no uncertain tax positions as of December 31, 2021 and December 31, 2020.

During 2020, the Internal Revenue Service completed its audit of the Company's 2016 tax year, which resulted in a settlement by the Company of approximately $1.3 million. Tax years 2018, 2019, and 2020 remain open for potential examination.

Advertising
Advertising and promotion costs are generally expensed in the period during which the costs are incurred. Advertising and promotion costs for the Company for the years ended December 31, 2021 and 2020 amounted to $20.7 million and $14.9 million, respectively and are included in programming and production expenses in the consolidated statements of operations.

Repack
During the year ended December 31, 2021, we recorded a gain of $0.2 million related to reimbursements from the FCC's National Broadband Plan spectrum repack process. The gain is recorded within Other expense, net, on our consolidated statement of operations. The gain for the year ended December 31, 2020 was $2.7 million.

Concentration of Credit Risk
The Company maintains its cash in various financial institutions which may, from time to time, exceed amounts insured by the Federal Deposit Insurance Corporation. For the years ended December 31, 2021 and 2020, the combined aggregate of all deposits held in noninterest-bearing transaction accounts and interest-bearing deposits within the same ownership category are insured up to $0.3 million per financial institution. The Company has not experienced any losses in such accounts and believes it is not exposed to any significant credit risk on cash.

For the year ended December 31, 2021, no individual customer accounted for 10% or more of the Company's total revenue and for the year-ended December 31, 2020 one customer accounted for 10% or more of the Company's total revenue. As of December 31, 2021 and 2020, no individual customer accounted for 10% or more of the Company's accounts receivable balance.

Recently Adopted Accounting Pronouncements
In October 2018, the FASB issued ASU 2018-17, *Consolidation (Topic 810): Targeted Improvements to Related Party Guidance for Variable Interest Entities* ("ASU 2018-17"), which effectively expands the private company alternative for common control leasing arrangements to all private company common control arrangements as long as both the parent and the legal entity being evaluated for consolidation are not public business entities. ASU 2018-17 also amends certain VIE guidance for related party arrangements. ASU 2018-17 is effective for the Company beginning on January 1, 2021. This new guidance does not currently have a material impact to the consolidated financial statements.

EXHIBIT O(3)
**ESN0041992**
AOE0893
**CONFIDENTIAL**

**ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
For the years ended and as of December 31, 2021 and 2020

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

In March 2019, the FASB issued ASU 2019-02 - *Improvements to Accounting for Costs of Films and License Agreements for Program Materials* ("ASU 2019-02"). ASU 2019-02 aligns the accounting for production costs of an episodic television series with the accounting for production costs of films by

removing the content distinction for capitalization. The guidance also requires that an entity test a film or license agreement for program material for impairment at a film group level when the film or license agreement is predominantly monetized with other films and/or license agreements. ASU 2019-02 and related amendments were effective for the Company beginning on January 1, 2021. The adoption did not have a material impact on the Company's consolidated financial statements.

In March 2021, the FASB issued ASU No. 2021-03, *Intangibles – Goodwill and Other (Topic 350), Accounting Alternative for Evaluating Triggering Events* ("ASU 2021-03"). The update provides private companies an accounting alternative to assess goodwill triggering events only as of financial reporting date, instead of throughout the period. The Company elected this alternative as of January 1, 2021. This new guidance does not currently have a material impact to the consolidated financial statements.

Recently Issued Accounting Pronouncements
In February 2016, the FASB issued ASU No. 2016-02, *Leases (Topic 842)* ("ASU 2016-02"), which sets out the principles for the recognition, measurement, presentation and disclosure of leases for both parties to a contract (i.e., lessees and lessors). Subsequently, ASU No. 2020-05 has been issued that provides a limited deferral of the effective date. The new standard requires lessees to apply a dual approach, classifying leases as either finance or operating leases based on the principle of whether or not the lease is effectively a financed purchase by the lessee. A lessee is also required to record a right-of-use asset and a lease liability for all leases with a term of greater than 12 months regardless of their classification. Leases with a term of 12 months or less will be accounted for similar to existing guidance for operating leases today. ASU 2016-02 is effective for the Company for the annual period beginning on January 1, 2022 and interim periods beginning January 1, 2023. Upon adoption, the Company plans to record a right of use asset and a corresponding lease liability for operating leases, resulting in an increase of assets and liabilities on the consolidated balance sheet. The Company plans to elect the package of practical expedients on adoption, which will retain the lease identification, classification, and initial direct costs for leases that commenced prior to the adoption date. The Company does not expect the adoption of ASU 2016-02 to have a material impact on the consolidated statement of operations or the consolidated statement of cash flows and is continuing to evaluate the balance sheet impact.

In December 2019, the FASB issued ASU 2019-12, *Income Taxes (Topic 740), Simplifying the Accounting for Income Taxes*, ("ASU 2019-12"). The purpose of ASU 2019-12 is to improve the disclosures related to fair value measurements in the financial statements. The improvements in ASU 2019-12 include removing certain exceptions for recognizing deferred taxes for investments, performing intraperiod allocation and calculating income taxes in interim periods. ASU 2019-12 also adds guidance to reduce complexity in certain areas, including recognizing deferred taxes for tax goodwill and allocating taxes to members of a consolidated group. ASU 2019-12 is effective for the Company beginning on January 1, 2022. The Company does not expect adoption of this standard to have a material impact on its consolidated financial statements.

CONFIDENTIAL

EXHIBIT O(3)
ESN0041993
AOE0894

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2021 and 2020

## NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

In June 2016, the FASB issued ASU No. 2016-13, *Financial Instruments—Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* ("ASU 2016-13"). Subsequently, ASU 2018-19 has been issued that amends and/or clarifies the application of ASU 2016-13. Among other provisions, the ASU introduces a new impairment model for most financial assets and certain other instruments. For trade and other receivables, held-to-maturity debt securities, loans and other instruments, entities will be required to use a forward-looking "expected loss" model that will replace the current "incurred loss" model and generally will result in earlier recognition of allowances for losses. The guidance will be effective for the Company beginning on January 1, 2023. The Company does not expect adoption of this standard to have a material impact on its consolidated financial statements.

In March 2020 and January 2021, the FASB issued ASU No. 2020-04 and ASU No. 2021-01, respectively, *Reference Rate Reform* (Topic 848) ("ASU 2020-04" and "ASU 2021-01", respectively). These updates are effective as of March 12, 2020 and can be adopted anytime during the period of January 1, 2020 through December 31, 2022. The update clarifies the transition away from LIBOR towards new interest rate benchmarks and provides optional expedients and exceptions for applying U.S. GAAP to contract modifications and hedging relationships that reference LIBOR or other reference rates expected to be discontinued in 2022. The updates also establish certain contract modification principles that entities can apply in other areas that may be affected by reference rate reform and certain elective hedge accounting expedients and exceptions. The Company can apply the ASU's prospectively and is currently evaluating the impact of this new guidance on its consolidated financial statements.

## NOTE 3 – ACQUISITIONS

USA TV stations
On February 10, 2020, Allen Media Broadcasting Evansville, Inc ("AMBE") closed the acquisition of nine broadcast television stations (the "USA TV stations") from the sellers of USA Television Holdings, LLC, and USA Television MidAmerica Holdings, LLC for a cash purchase price of approximately $303.3 million.

AMBE acquired 100% of the outstanding equity of the USA TV stations and, as further described in Note 10 – Long-Term Debt, the Company entered into new senior secured bonds arrangement and term loan agreement in connection with the acquisition.

The Company has determined that the transaction should be accounted for in accordance with FASB ASC Topic No. 805 – *Business Combinations*. The purchase price was allocated to the tangible and intangible assets acquired and liabilities assumed based on their estimated fair values as of the acquisition date. In accordance with ASU 2015-16, the financial statements were not retrospectively adjusted for any measurement-period adjustments that occurred in subsequent periods. Rather, any adjustments to provisional amounts that were identified during the measurement period were recorded in the reporting period in which the adjustment was determined. The purchase accounting was finalized during the year ended December 31, 2020.

The following table summarizes the consideration paid for the USA TV stations and the fair value of the assets acquired and liabilities assumed at the acquisition date which are adjusted for measurement-period adjustments:

CONFIDENTIAL

EXHIBIT O(3)
ESN0041994
AOE0895

**ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
For the years ended and as of December 31, 2021 and 2020

## NOTE 3 – ACQUISITIONS (continued)

| (amounts in millions) | Amount ($) |
|---|---|
| Cash | 4.0 |
| Accounts receivable, net | 20.2 |
| Prepaid and other current assets | 3.4 |
| Property, plant and equipment | 42.0 |
| Television library | 5.9 |
| FCC licenses | 1.0 |
| Accounts payable and other current liabilities | (15.4) |
| Deferred tax liabilities | (20.6) |
| **Total net assets acquired** | **40.5** |
| **Purchase price** | 303.3 |
| **Goodwill** | **$ 262.8** |

The gross amount of accounts receivable due to the Company at acquisition was $20.4 million, of which $0.2 million was expected to be uncollectible.

The FCC licenses have an indefinite life. The goodwill is primarily attributable to expected post-acquisition synergies from integrating USA's assembled workforce and developed technologies as well as efficiencies in content creation and distribution. Approximately $31.0 million of the goodwill is expected to be deductible for tax purposes.

OTA Networks
On October 23, 2020, one of our subsidiaries, Weather Group Television, LLC closed the acquisition of two over-the-air properties (the "OTA Networks") from MGM Domestic Television Distribution LLC ("MGM"). The aggregate purchase price was $4.0 million and was comprised entirely of cash. Subsequent to the close, ownership of the OTA Networks was transferred to a newly created legal entity, Allen Media Broadcast Networks, LLC.

The Company determined that the transaction should be accounted for in accordance with FASB ASC Topic No. 805 – *Business Combinations*. The purchase price was allocated to the tangible and intangible assets acquired and liabilities assumed based on their fair values as of the acquisition date. The purchase accounting was finalized during the year ended December 31, 2020.

As of the acquisition date, we acquired accounts receivable of $4.7 million, program asset – television library of $3.0 million and assumed accounts payable and other accrued liabilities of $3.5 million resulting in an acquired net asset value of $4.2 million. This resulted in $0.2 million of negative goodwill which is reflected as a gain in Other Expense, net on our consolidated statements of operations recorded in the fourth quarter of 2020.

CONFIDENTIAL

EXHIBIT O(3)
ESN0041995
AOE0896

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2021 and 2020

**NOTE 3 – ACQUISITIONS (continued)**

KITV

On January 20, 2021, Allen Media Broadcasting Evansville II, LLC ("AMBE II") closed the acquisition of all of the outstanding shares of KITV, Inc ("KITV") a broadcast television station in Hawaii for a cash purchase price of approximately $31.6 million.

AMBE II acquired 100% of the outstanding equity of KITV and initially financed the acquisition with cash on hand. In March 2021, as further described in Note 10- Long-Term Debt, KITV, Inc. entered into new credit agreement for related financing.

The Company determined that the transaction should be accounted for in accordance with FASB ASC Topic No. 805 – *Business Combinations*. The purchase price was allocated to the tangible and intangible assets acquired and liabilities assumed based on their fair values as of the acquisition date. The purchase accounting was finalized during the year ended December 31, 2021.

The following table summarizes the consideration paid for KITV stations and the fair value of the assets acquired and liabilities assumed at the acquisition date:

| (amounts in millions) | Amount ($) |
|---|---|
| Cash | 0.3 |
| Accounts receivable, net | 3.1 |
| FCC license | 13.3 |
| Income lease asset | 0.7 |
| Property, plant and equipment | 1.3 |
| Other assets | 0.5 |
| Accounts payable and accrued expenses | (1.0) |
| Deferred revenue | (1.3) |
| Deferred tax liabilities | (5.3) |
| **Total net assets acquired** | **11.6** |
| **Purchase price** | **31.6** |
| **Goodwill** | **$ 20.0** |

The gross amount of accounts receivable due to the Company at acquisition was $3.3 million, of which $0.2 million was expected to be uncollectible.

The goodwill is primarily attributable to expected post-acquisition synergies from integrating KITV's assembled workforce as well as efficiencies in content creation and distribution. An immaterial amount of the goodwill is expected to be deductible for tax purposes.

CONFIDENTIAL

EXHIBIT O(3)
ESN0041996
AOE0897

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2021 and 2020

**NOTE 3 – ACQUISITIONS (continued)**

Quincy Stations

On August 2, 2021, Allen Media Broadcasting Evansville III, LLC ("AMBE III") acquired seven television broadcast stations for a cash purchase price of approximately $400.7 million financed with cash on hand.

The Company determined that the transaction should be accounted for in accordance with FASB ASC Topic No. 805 – *Business Combinations*. The purchase price was allocated to the tangible and intangible assets acquired and liabilities assumed based on their fair values as of the acquisition date. The purchase accounting was finalized during the year ended December 31, 2021.

The following table summarizes the consideration paid for the Quincy stations and the fair value of the assets acquired and liabilities assumed at the acquisition date:

| (amounts in millions) | Amount ($) |
|---|---|
| Accounts receivable, net | 20.6 |
| FCC licenses | 175.1 |
| Property, plant and equipment | 51.3 |
| Other current and long-term assets | 5.1 |
| Accounts payable and accrued expenses | (4.9) |
| **Total net assets acquired** | **247.2** |
| **Purchase price** | **400.7** |
| **Goodwill** | **153.5** |

The gross amount of accounts receivable due to the Company at acquisition was $20.8 million, of which $0.2 million was expected to be uncollectible.

The goodwill is primarily attributable to expected post-acquisition synergies from integrating the stations assembled workforce as well as efficiencies in content creation and distribution. Approximately $67.0 million of the goodwill is expected to be deductible for tax purposes.

WJRT

On September 23, 2021, Allen Media Holdings II, LLC ("AMH II") closed the acquisition of WJRT-TV ("WJRT") a broadcast television station in Flint, Michigan for a cash purchase price of approximately $71.9 million.

The Company determined that the transaction should be accounted for in accordance with FASB ASC Topic No. 805 – *Business Combinations*. The purchase price was allocated to the tangible and intangible assets acquired and liabilities assumed based on their fair values as of the acquisition date. The purchase accounting was finalized during the year ended December 31, 2021.

CONFIDENTIAL

EXHIBIT O(3)
ESN0041997
AOE0898

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2021 and 2020

**NOTE 3 – ACQUISITIONS (continued)**

The following table summarizes the consideration paid for WJRT and the fair value of the assets acquired and liabilities assumed at the acquisition date:

| (amounts in millions) | Amount ($) |
|---|---|
| Accounts receivable | 2.1 |
| FCC license | 41.2 |
| Property, plant and equipment | 9.2 |
| Other current and long-term assets | 0.9 |
| Accounts payable and accrued expenses | (0.9) |
| **Total net assets acquired** | **52.5** |
| **Purchase price** | **71.9** |
| **Goodwill** | **19.4** |

The gross amount of accounts receivable due to the Company at acquisition was $2.1 million, substantially all of which was expected to be collectible.

The goodwill is primarily attributable to expected post-acquisition synergies from integrating WJRT's assembled workforce as well as efficiencies in content creation and distribution. Approximately $2.9 million of the goodwill is expected to be deductible for tax purposes.

The Company also incurred $20.2 million in acquisition costs during the year ended December 31, 2021 associated with the transactions which were expensed as incurred. The transaction costs are included in the Sales, General, and Administrative expenses line of the consolidated statements of operations.

**NOTE 4 – ACCOUNTS RECEIVABLE**

The Company has receivables from contracts with customers for both accounts and royalties receivables. On the accompanying consolidated balance sheets, accounts receivable is shown net of affiliate revenue reserves and allowances for bad debt. As of December 31, 2021 and 2020, the Company had reserves against receivables of $1.9 million and $0.8 million, respectively. Included in accounts receivable are unbilled receivables amounting to $4.2 million and $1.3 million at December 31, 2021 and 2020, respectively, representing revenue earned in the current period but which were billed in full subsequent to the year end, typically the following month.

The Company has a loan and security agreement with a financial institution that is an asset-based financing agreement in which up to 90% of the Company's receivables from certain film rentals are assigned with full recourse. In accordance with FASB ASC 860 *Accounting for Transfers and Servicing*, the assigned accounts receivable remain assets on the Company's consolidated balance sheet and the advances are recognized as a long-term line of credit. Refer to Note 10 – Long-Term Debt.

CONFIDENTIAL

EXHIBIT O(3)
**ESN0041998**
AOE0899

**ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
For the years ended and as of December 31, 2021 and 2020

## NOTE 5 – TAX CREDIT RECEIVABLE

The Company generated Georgia Film Tax Credits (GaFTC) and Georgia Research & Development Tax Credits (GaR&D), collectively referred to as Tax Credit Receivables. GaFTC may be used to offset Georgia payroll withholding tax remittances or are sold to third parties on the open market through brokers. GaR&D are used to offset Georgia payroll tax withholding tax remittances. Due to these utilization methodologies, assets separate and distinct from income tax assets are reflected on the balance sheet for the tax credit receivables at the net realizable value as they are generated. As of December 31, 2021 and 2020, the Company had current tax credit receivables of $0.1 million and $0.6 million, respectively, and long-term tax credit receivables, net of current portion of $4.9 million and $5.1 million, respectively. Current tax credit receivables are included in Prepaid expenses and other current assets on our consolidated balance sheets.

Of the noncurrent tax credit receivables balance at December 31, 2021, $4.9 million relates primarily to GaFTC generated throughout 2021 for which the Company anticipates would take longer than one year to utilize if not immediately sold in 2022. The Company classifies these credits as noncurrent until all approvals to move forward with selling the credits are obtained from management, for which, at that time, the credits are classified as current when entering into arrangements with brokers to sell. During the year ended December 31, 2021 the Company sold tax credits generated in prior years for $4.6 million in cash and utilized $1.8 million to reduce payroll taxes.

## NOTE 6 – PROPERTY AND EQUIPMENT

As of December 31, 2021 and 2020, property and equipment consisted of the following:

| (amounts in millions) | 2021 | 2020 |
|---|---|---|
| Production and other machinery and equipment | 71.5 | 54.1 |
| Office furniture and equipment | 12.5 | 12.0 |
| Buildings and improvements | 41.2 | 17.9 |
| Satellites | 7.8 | 3.3 |
| Trucks and automobiles | 4.4 | 2.0 |
| Land and improvements | 12.7 | 5.2 |
| Television transmitter equipment | 13.8 | 5.9 |
| Towers | 8.1 | 2.3 |
| Television Antenna System | 6.4 | 4.0 |
| Less: Accumulated depreciation | (56.7) | (38.1) |
| Subtotal | 121.7 | 68.6 |
| Construction in progress | 11.0 | 3.8 |
| **Property and equipment, net** | **132.7** | **72.4** |

Depreciation expense was $18.6 million and $15.4 million for the years ended December 31, 2021 and 2020 respectively. As of December 31, 2021 and 2020 the Company's total cost of property and equipment purchased under capital leases was $12.6 million and $7.2 million, respectively. The accumulated depreciation corresponding to this property and equipment at December 31, 2021 and 2020 was $7.2 million and $5.4 million, respectively.

24

CONFIDENTIAL

EXHIBIT O(3)
ESN0041999
AOE0900

**ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
For the years ended and as of December 31, 2021 and 2020

**NOTE 7 – GOODWILL AND INTANGIBLE ASSETS**

Goodwill primarily relates to the acquisitions of various broadcast TV stations, and the acquisitions of WG, Bayou, TheGrio, and Freestyle which occurred in previous years.

Intangible assets consist of internally developed technology and software (for internal use and that is held for sale, lease, or otherwise marketed), costs incurred to acquire the names of digital and satellite channels, FCC licenses, and localization technology (or STAR) conveyed to cable, satellite and other distributors.

There were no impairments of intangible assets during 2021 or 2020.

As of December 31, 2021, Goodwill and Intangible Assets consisted of the following:

|  | | (In millions) | | | |
| --- | --- | --- | --- | --- | --- |
| (amounts in millions) | Weighted average amortization period (years) | Gross carrying amount | Accumulated amortization | Impairment | Net carrying amount |
| Goodwill | 10 | 713.4 | (138.7) | - | 574.7 |
| | | | | | |
| Intangible assets | | | | | |
| Amortizing intangible assets: | | | | | |
| Tradenames | 10 | 0.6 | (0.2) | - | 0.4 |
| Software | 3 | 33.3 | (19.8) | - | 13.5 |
| STAR technology | 5 | 4.3 | (4.0) | - | 0.3 |
| Internet development | 15 | 1.3 | (0.6) | - | 0.7 |
| **Total definite-lived intangible assets** | | **39.5** | **(24.6)** | **-** | **14.9** |
| Indefinite-lived intangible assets: | | | | | |
| FCC license | | 238.0 | - | - | 238.0 |
| Other non-amortizing assets: | | | | | |
| Construction in progress | | 3.7 | - | - | 3.7 |
| Income lease asset | | 0.7 | - | - | 0.7 |
| **Total intangible assets** | | **281.9** | **(24.6)** | **-** | **257.3** |

CONFIDENTIAL

EXHIBIT O(3)
**ESN0042000**
AOE0901

## ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended and as of December 31, 2021 and 2020

### NOTE 7 – GOODWILL AND INTANGIBLE ASSETS (continued)

As of December 31, 2020, Goodwill and Intangible Assets consisted of the following:

| (amounts in millions) | Weighted average amortization period (years) | Gross carrying amount | Accumulated amortization | Impairment | Net carrying amount |
|---|---|---|---|---|---|
| Goodwill | 10 | 519.7 | (77.8) | - | 441.9 |
| Intangible assets | | | | | |
| Amortizing intangible assets: | | | | | |
| Tradenames | 10 | 0.6 | (0.2) | - | 0.4 |
| Software | 3 | 20.6 | (16.5) | - | 4.1 |
| STAR technology | 5 | 4.2 | (3.7) | - | 0.5 |
| Internet development | 15 | 1.3 | (0.5) | - | 0.8 |
| **Total definite-lived intangible assets** | | **26.7** | **(20.9)** | **-** | **5.8** |
| Indefinite-lived intangible assets: | | | | | |
| FCC license | | 8.5 | - | - | 8.5 |
| Other non-amortizing assets: | | | | | |
| Construction in progress | | 4.8 | - | - | 4.8 |
| **Total intangible assets** | | **40.0** | **(20.9)** | **-** | **19.1** |

Amortization expense for goodwill was $60.9 million and $49.0 million for the years ended December 31, 2021 and 2020, respectively.

Amortization expense for intangible assets was $3.7 million and $4.1 million for the years ended December 31, 2021 and 2020, respectively.

As of December 31, 2021, expected future amortization of definite-lived intangible assets is as follows:

| Years Ending December 31, | Future amortization (in millions) |
|---|---|
| 2022 | 5.8 |
| 2023 | 4.8 |
| 2024 | 3.2 |
| 2025 | 0.3 |
| 2026 | 0.3 |
| Thereafter | 0.5 |
| **Total** | **14.9** |

CONFIDENTIAL

EXHIBIT O(3)
ESN0042001
AOE0902

**ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
For the years ended and as of December 31, 2021 and 2020

## NOTE 8 – TELEVISION LIBRARY

As of December 31, 2021, the television library consisted of the following:

| (amounts in millions) | |
|---|---:|
| As capitalized under ASC 926 | |
| Completed and released | 235.7 |
| In process | 4.0 |
| | 239.7 |
| As capitalized under ASC 920 | |
| Completed and released | 46.7 |
| In-process | 1.7 |
| | 48.4 |
| Less: Accumulated amortization | (126.8) |
| Less: Television library, net | (13.1) |
| **Television library, net less current portion** | **148.2** |

As of December 31, 2020, the television library consisted of the following:

| (amounts in millions) | |
|---|---:|
| As capitalized under ASC 926 | |
| Completed and released | 229.2 |
| In process | 2.6 |
| | 231.8 |
| As capitalized under ASC 920 | |
| Completed and released | 32.9 |
| In-process | 2.2 |
| | 35.1 |
| Less: Accumulated amortization | (130.5) |
| Less: Television library, net | (11.2) |
| **Television library, net, less current portion** | **125.2** |

Amortization expense was $42.7 million and $30.3 million for the years ended December 31, 2021 and 2020, respectively.

CONFIDENTIAL

EXHIBIT O(3)
ESN0042002
AOE0903

**ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
For the years ended and as of December 31, 2021 and 2020

## NOTE 8 – TELEVISION LIBRARY (continued)

As of December 31, 2021, expected future amortization of the capitalized television library is as follows:

| Years Ending December 31, | Completed and Released | In Progress not Released | Total |
|---|---|---|---|
| (amounts in millions) | | | |
| 2022 | 39.9 | 0.8 | 40.7 |
| 2023 | 32.7 | 1.1 | 33.8 |
| 2024 | 22.6 | 1.1 | 23.7 |
| 2025 | 17.1 | 0.7 | 17.8 |
| 2026 | 15.5 | 0.5 | 16.0 |
| Thereafter | 27.8 | 1.5 | 29.3 |
| **Total** | **155.6** | **5.7** | **161.3** |

## NOTE 9 – FILM RIGHTS

Film rights represent the cost to acquire the distribution rights of a motion picture and/or the cost of production for motion pictures. Film rights in process represent film rights that are in the process of being acquired or a film in the process of production.

As of December 31, 2021, film rights in process had a cost of $0.2 million and no net book value. As of December 31, 2020, film rights in process had a cost and net book value of $0.4 million. Film rights for completed films had a cost balance of $34.5 million and $33.7 million, as of December 31, 2021 and 2020, respectively, with accumulated amortization of $25.8 million and $24.4 million, resulting in a net book value of $8.7 million and $9.3 million, respectively. The films rights expected to be used within the next year is $1.4 million.

Amortization expense for film rights was $1.6 million and $3.3 million for the years ended December 31, 2021 and 2020, respectively.

The expected amortization period for the film rights above is as follows:

| Years Ending December 31, | (In millions) |
|---|---|
| 2022 | 1.4 |
| 2023 | 1.7 |
| 2024 | 1.8 |
| 2025 | 0.8 |
| 2026 | 0.1 |
| Thereafter | 2.9 |
| **Total** | **8.7** |

56% of the unamortized film costs for released films are expected to be amortized within three years from December 31, 2021.

CONFIDENTIAL

EXHIBIT O(3)
ESN0042003
AOE0904

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2021 and 2020

## NOTE 10 – LONG-TERM DEBT

As of December 31, 2021 and 2020, the Company has the following debt outstanding:

| (amounts in millions) | December 31, 2021 | December 31, 2020 |
|---|---|---|
| Senior Notes | 650.0 | 300.0 |
| Term Loan | 859.7 | 656.9 |
| Revolver | 17.9 | 17.0 |
| Friend request loan | 5.0 | 5.2 |
| Hostiles upsize loan | 6.6 | 8.8 |
| Chappaquiddick loan | - | 0.9 |
| 47MD loan | 0.9 | 3.7 |
| Line of credit | 3.8 | 4.4 |
| Arctic Dogs Loan | - | 0.6 |
| PPP loans | 1.0 | - |
| Broadcast television real estate loan | 0.9 | |
| **Total** | **$ 1,545.8** | **$ 997.5** |
| Less: Outstanding debt issuance costs and original issue discount | (54.0) | (27.0) |
| **Net amounts due** | **$ 1,491.8** | **$ 970.5** |

In a prior year, the Company refinanced certain existing loans with a syndicated loan ("second syndicated loan") between various lenders, including certain lenders from the existing loans, and AM. Certain fees from this refinancing were capitalized, based on the Company's analysis of the applicable accounting guidance, including under ASC 470-50 *Debt – Modifications and Extinguishments*.

The second syndicated loan bore interest, at the option of the Company, (i) at the base rate as defined in the Credit and Guaranty agreement which, in no event, can be lower than 2% plus a margin of 5.5%, or (ii) the Eurodollar rate as defined in the Credit and Guaranty Agreement which in no event can be lower than 1% plus a margin of 6.50%.

In a prior year, the Company entered into an amendment to the second syndicated loan ("first amendment") to increase the existing syndicated loan facility by $25.0 million. On June 27, 2019, the Company entered into an additional amendment to the second syndicated loan ("second amendment") to increase the existing syndicated loan facility by $20.0 million. As a result of this additional financing, quarterly principal payments due increased to $5.4 million through to December 31, 2022 with a revised principal payment of $8.1 million per quarter thereafter until maturity, at which point a final balloon payment of all remaining principal was due.

As discussed below the second syndicated loan was refinanced on February 10, 2020.

Bayou Loans
On July 3, 2019, to finance the acquisition of Bayou, AMB entered into a new term loan agreement (the "Senior Bayou loan") with an aggregate principal value of $100.0 million. The Senior Bayou loan bore interest, at the option of the Company at either (i) the base rate as defined in the loan agreement which, in no event, can be lower than 2.0% plus a margin of 5.25%, or (ii) the Eurodollar rate as defined in the loan agreement based primary on LIBOR rates with a margin of 6.25%.

CONFIDENTIAL

EXHIBIT O(3)
ESN0042004
AOE0905

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2021 and 2020

**NOTE 10 – LONG TERM DEBT (Continued)**

Simultaneous to the Senior Bayou loan, AMB entered into a note purchase agreement with Bain Capital Credit, L.P. ("Bayou Note"), as lender for an aggregate principal amount of $36.0 million and a maturity date of October 3, 2020. This note bore interest at 16.0% per annum of which 12.0% was cash interest payable quarterly beginning on September 30, 2019 and 4.0% is paid-in-kind interest which accrues to the principal amount of the note on a quarterly basis.

As discussed below, the Bayou Senior Loan and Bayou Note were repaid on February 10, 2020.

2020 Syndicated Financing

On February 10, 2020, in conjunction with closing the acquisition of the USA TV stations, the Company entered into an indenture agreement for $300.0 million of senior notes ("Senior Notes") and a term loan agreement for $530.0 million ("Term Loan") and revolving line of credit ("revolver") with an available credit line of $40.0 million (collectively as the "2020 Syndicated Loans"). The Company drew $20.0 million on the revolver at close. The funds were used to repay the second syndicated loan, Senior Bayou Loan, and Bayou Note, finance the acquisition of the USA TV stations, and pay certain transaction expenses associated to both the acquisition of the USA TV stations and the refinancing. The Senior Notes bear interest at 10.5% and mature on February 10, 2028 at which point all principal is due in full. The Term Loan and revolver bear interest at LIBOR plus a margin of 5.5%. The Term Loan requires principal payments on a quarterly basis of 1% per annum of the principal balance, with the remaining balance due upon maturity. The Term Loan and revolver are due February 10, 2027, and February 10, 2025, respectively.

The Company analyzed the 2020 Syndicated refinancing on a lender-by-lender basis in accordance with applicable accounting guidance, including ASC 470-50. In cases where a lender participated in both the second syndicated loan and the 2020 Syndicated Loans, the refinancing of the lender-specific loan qualified as a debt modification resulting in capitalization of lender fees and expense treatment for third-party loan fees. In certain cases, lenders were fully repaid through the refinancing resulting in derecognition of the associated capitalized fees and costs. This resulted in $42.7 million of previously capitalized costs being written off through a loss on derecognition of the loans. Loan amounts associated to lenders which participated in the 2020 Syndicated Loans and who were not previously lenders of the Company, were treated as new loans with all associated costs capitalized. As a result, subsequent to the close of the 2020 Syndicated refinancing the Company had $25.3 million in debt issuance costs capitalized. These costs are being amortized under the effective interest method over the term of the loan.

On February 21, 2020 the Company entered into an amendment ("first 2020 amendment") to increase the existing syndicated Term Loan by $25.0 million. On April 9, 2020 and July 9, 2020, the Company entered into amendments to provide an incremental $15.0 million and $5.0 million, respectively, of commitment under the existing revolver facility, increasing the facility to $60.0 million.

On July 16, 2020 and July 21, 2020, the Company entered into two amendments to increase the syndicated Term Loan by an incremental $35.0 million and $15.0 million, respectively.  On July 29, 2020, the Company entered into an amendment to increase the syndicated Term Loan by $55.0 million.

CONFIDENTIAL

EXHIBIT O(3)
ESN0042005
AOE0906

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2021 and 2020

**NOTE 10 – LONG TERM DEBT (Continued)**

At December 31, 2020 the balances outstanding were $300.0 million, $656.9 million, and $17.0 million, for the Senior Notes, Term Loan, and revolver, respectively. Additionally, accrued interest at December 31, 2020 was $12.0 million, $9.6 million, and $0.2 million, pertaining to the Senior Notes, Term Loan, and revolver, respectively. The rate in effect at December 31, 2020 for the Term Loan and revolver was 5.72%.

*Senior Notes, Term Loan, and Revolver*
On July 16, 2021, the Company received the requisite consents from holders of the 10.5% Senior Notes due 2028 to issue additional senior notes under the existing indenture and paid $16.5 million to the consenting holders. After executing the Second Supplemental Indenture on July 19, 2021, the Company issued $350 million of additional 10.5% Senior Notes. As of December 31, 2021, the balance outstanding for the Senior Notes was $650.0 million and had accrued interest of $25.8 million. The rate in effective at December 31, 2021 was 10.5%.

On August 2, 2021 the Company executed the Eighth Amendment to Credit and Guaranty Agreement to issue an incremental $110 million term loan (2021 Incremental Term Loan) and a $100 million delayed draw term loan (2021 Delayed Draw Term Loan). The aforementioned financings were used to finance the Quincy and WJRT acquisitions. As of December 31, 2021, the balance outstanding for the Term Loan was $859.7 million and had accrued interest of $12.4 million. The rate in effective at December 31, 2021 was LIBOR plus 5.5%. As of December 31, 2021, the balance outstanding on the revolver was $17.9 million with accrued interest of $0.3 million and $42.1 million of borrowing capacity. The rate in effective on the revolver at December 31, 2021 was LIBOR plus 5.5%. This refinancing qualified as a debt modification resulting in capitalization of $32.1 million in lender fees and expense treatment for third-party loan fees ($10.4 million).

Under the loan agreements, the Company is subject to certain financial and nonfinancial covenants including terms which require the Company to maintain certain metrics and ratios, limit certain payments, expenditures, or asset sales, and to report financial information to our lenders on a periodic basis. In addition, Allen Media Holdings, LLC and each direct and indirect wholly owned subsidiary of Allen Media, LLC (the "Guarantor Subsidiaries") have agreed to guarantee the Company's Term Loans by granting a lien on substantially all of their respective assets (subject to certain exceptions). Certain subsidiaries have been identified by the Company to be Unrestricted Subsidiaries, which do not guarantee the Company's obligations.

Additional Financings

*Friend Request loan*
In a prior year, ESP&A entered into a loan amendment with CION whereby an additional loan was added to an existing ESP&A facility ("additional loan" or "Friend Request loan"). The additional loan allowed for $7.5 million to be advanced to ESP&A by CION. The additional loan was set to mature in September 2037 and, subsequent to a March 9, 2018 amendment, the interest rate was modified to 15%. Under the terms of the loan agreement, amortization payments, equal to 2% of the outstanding principal, were required to be made on the last day of every March, June, September, and December, commencing September 2017. At December 31, 2021 and 2020, the balances outstanding were $5.0 million and $5.2 million, respectively.

CONFIDENTIAL

EXHIBIT O(3)
**ESN0042006**
AOE0907

## ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended and as of December 31, 2021 and 2020

**NOTE 10 – LONG TERM DEBT (Continued)**

*Chappaquiddick loan*

In a prior year, ESP&A entered into a loan agreement with CION to provide a draw of $11.0 million to fund the prints and advertising costs for the Chappaquiddick film. This loan bears interest at 10% per annum and matures on May 18, 2022. As of December 31, 2020, the balance outstanding was $0.9 million. As of December 31, 2021 the loan had been fully repaid.

*Hostiles upsize loan*

In a prior year, ESP&A amended the loan to obtain an additional draw of $10.0 million. This loan bears interest at 10% and matures on March 9, 2038. As of December 31, 2021 and December 31, 2020, the principal balance outstanding was $6.6 million and $8.8 million, respectively.

*47MD loan*

In a prior year, ESP&A entered into a loan agreement with Comerica Bank to provide a draw of $7.9 million to fund the prints and advertising costs for the 47 Meters Down II film. The loan was set to mature on June 30, 2020. On August 27, 2019, ESP&A entered into an amendment to the loan agreement which extended the maturity date to August 27, 2022 and increased the commitment to $20.0 million. The loan bears interest at a rate of LIBOR plus 2% or 3% dependent upon the Company's election of loan type. At December 31, 2020, the interest rate was approximately 3.2% and the balance outstanding was $3.7 million. At December 31, 2021, the interest rate was approximately 3.1% and the balance outstanding was $0.9 million.

*Line of credit*

In a prior year, the Company entered into a loan and security agreement ("line of credit") with a financial institution for a senior, secured facility of up to $20.0 million, which can be increased to $30.0 million, in the aggregate, subject to a borrowing base of 90% of eligible receivables due from major distributors of the Company's films, as specifically named in the loan and security agreement. Borrowings on this loan and security agreement are secured by substantially all assets of a certain subsidiary. For purposes of this loan and security agreement, the assets of the subsidiary includes all of the distribution rights of ESMP in all films. Borrowings on the loan and security agreement bear interest at the prime rate plus 2.5% or LIBOR plus 3.5%. The interest rates in place at both December 31, 2021 and 2020, were approximately 3.7%. Repayments on the line of credit are made as collections from the assigned receivables are received. On December 10, 2019, the Company entered into an amendment to the line of credit extending the maturity date to September 30, 2022. As of December 31, 2021 and 2020, $3.8 million and $4.4 million, respectively, remained outstanding on this line of credit.

*Artic Dogs Loan*

In a prior year, our subsidiary Arctic Dogs LLC entered into a loan agreement with Comerica Bank to provide a senior secured credit facility ("Arctic Dogs Loan") for up to $10.0 million to fund the prints and advertising costs for the Arctic Dogs film. The loan has a maturity date of November 7, 2022. The loan bears interest, at the option of the Company, (i) at the base rate as defined in the Arctic Dogs loan agreement which, in no event, can be lower than 1% plus the federal funds effective rate, plus applicable margin or (ii) 3% plus the LIBOR rate as defined in the loan agreement (approximately 3.2% at December 31, 2020). At December 31, 2020, the balance outstanding was $0.6 million and at December 31, 2021, the balance has been substantially repaid.

CONFIDENTIAL

EXHIBIT O(3)
**ESN0042007**
AOE0908

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2021 and 2020

## NOTE 10 – LONG TERM DEBT (Continued)

*PPP Loans*

During the first quarter of 2021, certain of our subsidiaries in the AMB group, applied for and were granted Payroll Protection Plan ("PPP") loans under the provisions of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") and applicable Small Business Association ("SBA") rules. The Company may be eligible to apply for forgiveness of these loans in the future under such provisions. The loans bear interest at 1% per annum and any amounts not forgiven will require repayment on a monthly basis starting in 2022 with final maturity dates for all PPP loans in 2026. The balance outstanding on the PPP loans at December 31, 2021 was $1.0 million.

*KITV Loan*

On March 4, 2021 the Company, with KITV, Inc, as borrower, entered into a credit agreement with a certain lender, for $20.5 million in financing (the "2021 Unrestricted entity loan"). The loan bears interest at a base rate of the greater of i) an adjusted LIBOR, ii) prime rate, or iii) federal funds rate plus 0.5%, added to a spread of 6.5%. Alternatively, the Company may elect a spread of 7.5% with a base rate of adjusted LIBOR with a floor of 1%. The interest spread in both cases increases by 0.5% on the first and second anniversary of the loan closing date. The loan is due and payable in equal installments of $0.5 million on the last day of the first calendar quarter each year beginning in 2022 through 2025 with the remaining balance due on March 4, 2026. The proceeds of the financing was distributed to Allen Media, LLC. As of December 31, 2021 the loan had been fully repaid.

*Broadcast television real estate loan*

On October 1, 2021, a subsidiary in the AMB group entered into a financing transaction related to the purchase of a broadcast facility in Rochester, Minnesota. The principal balance of $0.9 million matures on October 10, 2028 and bears interest at 3.5% per annum. The balance outstanding at December 31, 2021 was $0.9 million

## NOTE 11 – NOTES PAYABLE TO PRODUCTION COMPANY

In a prior year, our subsidiary Friend Request LLC entered into a note payable agreement with the production company from which ESMP had originally acquired the film rights to the movie. The note payable agreement advanced funds of $6.6 million to be used for part of the media expenditures with respect to the promotion of the movie. The note carries interest of 15% per annum and is payable based on the film's gross receipts. As of December 31, 2021 and 2020, the total amount outstanding on the note was $6.6 million, which is included in Borrowings, net of current portion, and accrued interest was $4.3 million and $3.3 million, respectively. Accrued interest is included in accounts payable and accrued expenses in the accompanying consolidated balance sheet.

In a prior year, our subsidiary Replicas, LLC entered into a note payable agreement with the same production company. The note payable agreement allowed for funds of $8.2 million to be advanced for use for part of the media expenditures with respect to the promotion of the movie. Interest on this note is calculated at 15% of a portion of the amounts advanced for the media spend, as defined in the agreement. The entire amount of $8.2 million was advanced on December 15, 2018 and is payable based on the film's gross receipts. As of December 31, 2021 and 2020, the total outstanding on the note was $8.2 million for both years included in Borrowings, net of current portion. Accrued interest was $3.7 million and $2.5 million, respectively, which is included in accounts payable and accrued expenses in the accompanying consolidated balance sheet.

CONFIDENTIAL

EXHIBIT O(3)
**ESN0042008**
AOE0909

## ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended and as of December 31, 2021 and 2020

**NOTE 11 – NOTES PAYABLE TO PRODUCTION COMPANY (continued)**

In a prior year, our subsidiary Arctic Dogs, LLC entered into a note payable agreement with the same production company. The note payable agreement allowed for funds of $9.5 million to be advanced for use for part of the media expenditures with respect to the promotion of the movie. The note carries interest of 18% and is payable via receipts from the film.

As of both December 31, 2021 and December 31, 2020, the total outstanding on the note was $9.5 million which is included in Borrowings, net of current portion. Accrued interest at December 31, 2021 and December 31, 2020 was $3.3 million and $2.0 million, respectively, which is included in accounts payable and accrued expenses in the accompanying consolidated balance sheet.

**NOTE 12 – DUE TO RELATED PARTY**

In a prior year, the Company entered into two loan agreements for an aggregate total of $5.4 million with the sole member of the Company to fund operating expenses. These borrowings bear interest at 18% per annum and are payable on demand. As of both December 31, 2021 and 2020, the total balances outstanding on the notes was $5.4 million with $2.8 million and $2.1 million of accrued interest at December 31, 2021 and 2020, respectively.

In a prior year, Replicas LLC entered into a loan agreement for $10.7 million with the sole member of the Company to fund the prints and advertising costs for the Replicas movie. These borrowings bear interest at 16% per annum, matured on January 8, 2022, and will be repaid out of receipts from the exploitation of the Replicas movie. As of both December 31, 2021 and 2020, the total balances outstanding on the note were $6.3 million and accrued interest was $2.2 million and $1.5 million, respectively.

In a prior year, 47 Meters Down II entered into a loan agreement for $3.8 million with the sole member of the Company to fund operating expenses. These borrowings bear interest at 18% per annum, and mature on July 17, 2023. As of both December 31, 2021 and 2020, the total balance outstanding on the loan was $3.2 million and $3.8 million, respectively, and accrued interest was $1.6 million and $1.0 million, respectively.

In a prior year, Arctic Dogs LLC entered into a loan agreement for $19.5 million with the sole member of the Company to fund operating expenses. The loan bears interest at 16% per annum and matures on October 25, 2022. As of both December 31, 2021 and December 31, 2020, the total balance outstanding on the loan was $11.6 million and accrued interest was $3.9 million and $2.1 million, respectively.

CONFIDENTIAL

EXHIBIT O(3)
**ESN0042009**
AOE0910

**ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
For the years ended and as of December 31, 2021 and 2020

## NOTE 13 – ACCOUNTS PAYABLE AND ACCRUED EXPENSES

As of December 31, 2021 and 2020, the accounts payable and accrued expenses were comprised of the following:

| (amounts in millions) | 2021 | 2020 |
|---|---|---|
| Accounts payable | 76.3 | 51.7 |
| Accrued interest | 68.7 | 43.1 |
| Accrued payroll | 10.3 | 5.4 |
| Accrued advertising | 4.1 | 5.2 |
| Accrued satellite and video transmission | 1.9 | 1.8 |
| Amounts owed to producers | 2.1 | 3.7 |
| Residuals payable, current portion | 2.2 | 2.1 |
| Film contracts payable | 5.0 | 3.4 |
| Amounts owed to affiliates | 4.0 | 0.9 |
| Other accrued expenses | 23.3 | 20.4 |
| **Total accounts payable and accrued expenses** | **197.9** | **137.7** |

## NOTE 14 – INCOME TAXES

Provision for income taxes for the years ended December 31, 2021 and 2020 for the taxable entity group consisted of the following:

| (amounts in millions) | 2021 | 2020 |
|---|---|---|
| Current tax (benefit) | | |
| Federal | 3.0 | 3.4 |
| States | 1.6 | 1.4 |
| Foreign | 0.2 | 0.1 |
| Total current | 4.8 | 4.9 |
| | | |
| Deferred tax (benefit) | | |
| Federal | (4.3) | (9.1) |
| States | (0.8) | (0.8) |
| Total deferred | (5.1) | (9.9) |
| | | |
| **Benefit from Income taxes** | **(0.3)** | **(5.0)** |

For the period from January 1, 2021 to December 31, 2021, the provision for income taxes of the taxable entity group differs from the amount of income tax determined by applying the applicable U.S. statutory income tax rate to pretax income primarily due to state and local income taxes and nondeductible goodwill amortization and nontaxable income related to forgiveness of the Company's PPP loans. Based on the Company's structure, a significant pre-tax book loss is not included in the taxable entity group (see discussion on the Company's structure in Note 2 – Summary of Significant Accounting Policies).

CONFIDENTIAL

EXHIBIT O(3)
**ESN0042010**
AOE0911

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2021 and 2020

**NOTE 14 – INCOME TAXES (Continued)**

On March 27, 2020, the CARES Act was enacted in response to the COVID-19 global pandemic. The CARES Act, among other provisions, contains modifications on the limitation of business interest for tax years beginning in 2019 and 2020, and permits net operating loss carryovers and carrybacks to offset 100% of taxable income for taxable years beginning before 2021. In addition, the CARES Act allows NOLs incurred in 2018, 2019, and 2020 to be carried back to each of the five preceding taxable years to generate a refund of previously paid income taxes. As of December 31, 2021, we have carried back NOLs to prior tax years under the CARES Act in aggregate of $0.8 million of which $0.5 million has been received to-date.  Additionally, the modifications to the interest expense limitation allowed for an increased deduction of interest expense in our tax provision for the year ending December 31, 2021.

Significant components of deferred tax assets and liabilities for the taxable entity group at December 31, 2021 and 2020 were as follows:

| (amounts in millions) | 2021 | 2020 |
|---|---|---|
| **Deferred tax assets** | | |
| Deferred revenue | 2.6 | 0.7 |
| Accruals | 0.8 | 0.3 |
| Net operating losses | 21.0 | 15.4 |
| Other | 1.3 | 2.1 |
| Total deferred tax assets | 25.7 | 18.5 |
| Valuation allowance | (2.2) | (2.1) |
| Total deferred tax assets, net | 23.5 | 16.4 |
| | | |
| **Deferred tax liabilities** | | |
| Deferred production costs | (2.1) | (2.6) |
| Prepaid expenses | 0.0 | (0.1) |
| Fixed assets & intangibles | (36.4) | (28.4) |
| Investments in partnership interests | (8.1) | (8.2) |
| Total deferred tax liabilities | (46.6) | (39.3) |
| | | |
| **Total deferred taxes, net** | **(23.1)** | **(22.9)** |

CONFIDENTIAL

EXHIBIT O(3)
ESN0042011
AOE0912

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2021 and 2020

**NOTE 14 – INCOME TAXES (Continued)**

All deferred tax assets and liabilities are classified as long term. The taxable entity group measures deferred taxes associated with its interest in Weather Group based upon the outside basis difference of its investment in the partnership. The federal net operating loss carryforwards of the Company's subsidiaries total $84.4 million as of December 31, 2021, which is made up of $23.5 million of net operating losses generated as of December 31, 2017 that begin to expire in 2033 and $60.9 million of net operating losses generated after December 31, 2017 that have an indefinite carryforward period. The Company's federal valuation allowance at December 31, 2021 is established against definite-lived net operating losses generated as of December 31, 2017 ($0.8 million) and indefinite-lived net operating losses generated after December 31, 2017 ($2.2 million),

**NOTE 15 – COMMITMENTS, CONTINGENCIES AND RELATED PARTY TRANSACTIONS**

Operating Leases

The Company leases office and studio facilities in Century City and Culver City, California, Chicago, Illinois, New York, New York, and Atlanta, Georgia, pursuant to agreements expiring through 2037. The Century City leases are personally guaranteed by the sole member of the Company.

Rent expense is charged ratably over the lives of the leases using the straight-line method. The Company has a standby letter of credit in respect of the New York facility. The term of the letter of credit is for five years, matured in January 2022 and a restricted cash account has been established for this amount. At both December 31, 2021 and 2020, the restricted cash amount being held in respect of the letter of credit was $0.2 million.

Total rent expense for the years ended December 31, 2021 and 2020 was approximately $10.4 million and $5.9 million, respectively.

Future minimum lease payments, by year and in aggregate, with initial or remaining terms of over one year are as follows:

| Years Ending December 31, | (In millions) |
| --- | --- |
| 2022 | 10.4 |
| 2023 | 9.3 |
| 2024 | 7.7 |
| 2025 | 5.9 |
| 2026 | 4.9 |
| Thereafter | 21.0 |
| **Total** | **59.2** |

CONFIDENTIAL

EXHIBIT O(3)
**ESN0042012**
AOE0913

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2021 and 2020

**NOTE 15 – COMMITMENTS, CONTINGENCIES AND RELATED PARTY TRANSACTIONS (Continued)**

Capital Leases

The Company has outstanding capital lease obligations related to satellite transponders and office and production equipment that expire at varying dates between 2022 and 2026. The implicit rates of interest on these leases range from 3.5% to 11.6%. The following is a schedule by years of future minimum lease payments under capital leases, as of December 31, 2021:

| Years Ending December 31, | (In millions) |
|---|---|
| 2022 | 2.3 |
| 2023 | 1.7 |
| 2024 | 1.5 |
| 2025 | 1.1 |
| 2026 | 1.0 |
| Total | 7.6 |
| Less: imputed interest | 1.0 |
| Present value of net minimum lease payments | 6.6 |
| Less: Capital lease obligation, current portion | 1.8 |
| **Capital lease obligation, long-term portion** | **4.8** |

Long-term Debt

The Company has various debt agreements outstanding as of December 31, 2021 as described in Note 10 – Long-Term Debt. Required future payments for borrowings including notes payable to production company, by year and in aggregate, at the balance sheet date are as follows:

| Years Ending December 31, | (In millions) |
|---|---|
| 2022 | 15.7 |
| 2023 | 9.0 |
| 2024 | 9.0 |
| 2025 | 26.9 |
| 2026 | 8.8 |
| Thereafter | 1,500.7 |
| **Total** | **1,570.1** |

Purchase Commitments

*Film Contract Rights*

The Company has commitments to purchase or license certain programming that is not yet available for broadcast, primarily purchased or licensed first-run episodic programming. Such programming is generally produced and delivered at or near its broadcast date. Such contracts generally require progress payments as certain production milestones are achieved, prior to the programming becoming available for broadcast. If programming is not produced, the Company's commitment to purchase or license the programming would generally expire without obligation.

CONFIDENTIAL

EXHIBIT O(3)
ESN0042013
AOE0914

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2021 and 2020

## NOTE 15 – COMMITMENTS, CONTINGENCIES AND RELATED PARTY TRANSACTIONS (Continued)

*Employment and Talent Agreements*

The Company regularly enters into multi-year employment agreements with its on-air talent for the Company's national cable network, as well as with certain executives. Under certain circumstances, the agreements may be terminated prior to expiration.

*Satellite and Video Transmission*

In a previous year, the Company entered into an amendment with the provider whereby, upon the expiration of the original term in January 2019, a new arrangement ("subsequent term") began which expires in January 2023. Total payments under the subsequent term total $6.0 million which are payable in annual installments beginning during the year ended December 31, 2020.

*Unconditional Purchase and Other Commitments*

In the normal course of business, the Company enters into multi-year agreements for the provision of services including software licensing arrangements, audience ratings, syndication, advertising services, and certain other services. These arrangements are generally not cancelable prior to their expiration and represent unconditional purchase commitments of the Company that are payable over a number of years. The Company also purchases product components from a variety of suppliers and also has certain general commitments to make payments to certain customers under related agreements.

The commitments arising from these purchase and customer agreements as of December 31, 2021 are as follows:

**(amounts in millions)**

| Years Ending December 31, | Contract Film Rights | Employment and Talent | Satellite Links and Video Transmission | Unconditional Purchase and Other Commitments | Total |
|---|---|---|---|---|---|
| 2022 | 7.6 | 25.2 | 2.8 | 49.7 | 85.3 |
| 2023 | 0.1 | 14.9 | 1.0 | 16.7 | 32.7 |
| 2024 | - | 7.9 | 0.9 | 6.9 | 15.7 |
| 2025 | - | 2.5 | - | 0.1 | 2.6 |
| 2026 | - | 1.6 | - | - | 1.6 |
| Thereafter | - | - | - | - | - |
| Total | 7.7 | 52.1 | 4.7 | 73.4 | 137.9 |

CONFIDENTIAL

EXHIBIT O(3)
ESN0042014
AOE0915

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2021 and 2020

**NOTE 15 – COMMITMENTS, CONTINGENCIES AND RELATED PARTY TRANSACTIONS (Continued)**

Contingencies

In July 2014, pursuant to an action filed by talent ("the original claimant") in 2012, the Company reached a settlement with SAG-AFTRA for a class action lawsuit for $1.4 million. In February 2015, the original claimant filed two appeals in the Ninth Circuit Court of Appeals. Following court-supervised mediation, the parties have reached an informal resolution for an immaterial settlement amount. The parties hearing for preliminary approval of settlement was recently continued by the court from November 30, 2021 to May 10, 2022. Any settlement payment is anticipated to be immaterial.

Beginning in 2014, four claims, each for an unspecified amount, were filed against the Company with respect to the production of certain TV series. These claims were filed by the SAG-AFTRA for unpaid residuals for television programming, late payment penalties and health and retirement contributions. Most of the claims are in various stages of arbitration. During 2020, a settlement agreement was executed between the parties for the proposed settlement. At December 31, 2021 approximately $0.9 million is remaining to be paid over the subsequent six months.

In addition to the above, from time to time, the Company is involved in claims and legal proceedings and other disputes that arise in the ordinary course of its business. In the opinion of the Company's management and legal counsel, such claims are without substantial merit and should not result in judgments which, in the aggregate, would have a material adverse effect on the Company's financial statements.

Related Party Arrangements

The Company has a related party relationship with a sister television station whereby each station collects certain revenues and remits a portion of the revenues to the other station. The stations are under common management. The transactions create a related party receivable or payable, dependent upon timing of receipts and payments. As of December 31, 2021, the related party receivable was $2.6 million and is included in Prepaid expenses and other current assets on the consolidated balance sheet.

During the year-ended December 31, 2020, the Company entered into a 10-year lease for office space with a company controlled by the sole member of the Company. The Company accounted for the lease as a new lease agreement under ASC 840 and determined it should be classified as an operating lease. The minimum lease payments for this lease are captured within the operating lease minimum payments table above and total $26.3 million over the term of the lease.

The sole member of the Company provides services to the Company, including in certain production related roles, in exchange for compensation. Consistent with the Company's accounting policy and in accordance with the applicable literature, a portion of the amounts paid to the member are capitalized as costs of content. During the year ended December 31, 2021 and December 31, 2020, the compensation totaled $35.0 million of which $29.8 million was capitalized as part of content costs in Television library, less current portion and Intangible assets, net on the consolidated balance sheet.

CONFIDENTIAL

EXHIBIT O(3)
**ESN0042015**
AOE0916

# ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended and as of December 31, 2021 and 2020

## NOTE 16 – MEMBER'S DEFICIT

Member's Note Receivable

During the years ended December 31, 2021 and 2020, there were $114.4 million and $35.4 million, respectively, in advances to member and $138.1 million and $35.4 million, respectively, in repayments on the member note receivable. As of December 31, 2021 the member note payable was $18.8 million compared to a member note receivable of $4.9 million as of December 31, 2020. The member note receivable accrues interest at 3% per annum.

During the years ended December 31, 2021 and 2020, interest income was $0.4 million and $0.6 million, respectively, as shown in the consolidated statement of operations. As of both December 31, 2021 and 2020, accrued interest income was an immaterial amount. These amounts are included in prepaid and other current assets in the accompanying consolidated balance sheet.

Minority Interest

During 2019, in conjunction with the acquisition of Bayou as further described in Note 3 - Acquisitions, the sole member of the Company contributed cash to AMBH in exchange for a 26% equity interest in AMBH. This created a noncontrolling interest relationship with a related party as the sole member holds equity directly in one of the Company's consolidated subsidiaries. The net loss attributable to the noncontrolling interest was determined based on the results of AMB.

On February 10, 2020, in conjunction with the 2020 refinancing, as described in Note 10 - Long-Term Debt, the non-controlling interest was contributed from the noncontrolling interest holder to the Company and as a result all subsidiaries are wholly owned subsequent to the transaction. The net loss attributable to the noncontrolling interest presented in the statement of operations reflects the results of AMB attributable to the noncontrolling interest holder for the period from January 1, 2020 to February 9, 2020. The remaining equity balance held by the noncontrolling interest holder upon contribution was $6.1 million.

Member contribution and distribution

During 2020, in conjunction with the acquisition of the USA TV stations and the 2020 Syndicated refinancing, as described in Note 3 - Acquisitions and Note 10 - Long-Term Debt, the sole member of the Company contributed $9.0 million cash to the Company as additional equity. During 2020, the member received a distribution in cash of $15.0 million. During 2021, the member was entitled to receive a distribution of $15.0 million, however as of December 31, 2021, this amount was reinvested in the Company.

CONFIDENTIAL

EXHIBIT O(3)
AOE0917
ESN0042016

## ALLEN MEDIA HOLDINGS, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended and as of December 31, 2021 and 2020

**NOTE 17 – SUBSEQUENT EVENTS**

Management has evaluated all activity through March 31, 2022 (the date the consolidated financial statements are available to be issued) and, except for the matters below, concluded that no subsequent events have occurred that would require recognition or disclosure in the notes to consolidated financial statements.

On September 20, 2021, the Company entered into a purchase agreement to acquire KIKU, an independent television station in Honolulu, HI for $4 million and received full FCC approval on November 15, 2021. The acquisition closed on January 31, 2022.

On February 18, 2022, the Company received notification that its remaining Payment Protection Program (PPP) loan had been forgiven resulting in a $1.0 million reduction in borrowings, less current portion.

On December 15, 2021, the Company entered into a purchase agreement to acquire WCOV-TV, a FOX-affiliate in Montgomery, AL for $28.5 million. On February 28, 2022, the Company received full FCC approval for the acquisition.

On March 31, 2022, the Company effectuated the Ninth Amendment to its Credit and Guarantee Agreement that transitioned its credit agreement basis from LIBOR to Secured Overnight Financing Rate ("SOFR").

On March 31, 2022, the Company obtained an Incremental Revolver with Fifth Third Bank in an aggregate principal amount of $40,000,000, which has been added to the existing Class of Initial Revolving Credit Commitments and is fungible with the existing tranche of Initial Revolving Credit Commitments.

CONFIDENTIAL

EXHIBIT O(3)
**ESN0042017**
AOE0918

# EXHIBIT O(4)

# ALLEN MEDIA, LLC AND SUBSIDIARIES
### CONSOLIDATED FINANCIAL STATEMENTS
### FOR THE YEARS ENDED
### DECEMBER 31, 2019 and 2018

EXHIBIT O(4)

CONFIDENTIAL

AOE0920

ESN0041590

# ALLEN MEDIA, LLC AND SUBSIDIARIES
## CONTENTS
### For the years ended December 31, 2019 and 2018

|  | Page |
|---|---|
| **REPORT OF INDEPENDENT AUDITORS** | 3 – 4 |
| **CONSOLIDATED FINANCIAL STATEMENTS** |  |
| Consolidated Balance Sheets | 5 |
| Consolidated Statements of Operations | 6 |
| Consolidated Statements of Member's and Stockholder's Deficit | 7 |
| Consolidated Statements of Cash Flows | 8 – 9 |
| Notes to Consolidated Financial Statements | 10 – 43 |

EXHIBIT O(4)

CONFIDENTIAL

AOE0921 HSN0041591



# Report of Independent Auditors

To the Management of Allen Media, LLC

We have audited the accompanying consolidated financial statements of Allen Media, LLC and its subsidiaries, which comprise the consolidated balance sheets as of December 31, 2019 and 2018, and the related consolidated statements of operations, of member's and stockholder's deficit and of cash flows for the years then ended.

### *Management's Responsibility for the Consolidated Financial Statements*

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

### *Auditors' Responsibility*

Our responsibility is to express an opinion on the consolidated financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, we consider internal control relevant to the Company's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

PricewaterhouseCoopers LLP, *601 South Figueroa Street Suite 900 Los Angeles, California 90017*
T: 213 356 6000, *www.pwc.com/us*

EXHIBIT O(4)

CONFIDENTIAL

AOE0922ESN0041592



*Opinion*

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of  and its subsidiaries as of December 31, 2019 and 2018, and the results of their operations and their cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

*Emphasis of Matter*

As discussed in Notes 2 and 4 to the consolidated financial statements, the Company changed the manner in which it accounts for revenues from contracts with customers in 2019. Our opinion is not modified with respect to this matter.

*PricewaterhouseCoopers LLP*

PricewaterhouseCoopers LLP
Los Angeles, California
May 29, 2020

EXHIBIT O(4)

CONFIDENTIAL

AOE0923

ESN0041593

# ALLEN MEDIA, LLC AND SUBSIDIARIES
## CONSOLIDATED BALANCE SHEETS
### As of December 31, 2019 and 2018

### ASSETS

| | 2019 (In millions) | | 2018 (In millions) | |
|---|---|---|---|---|
| **CURRENT ASSETS** | | | | |
| Cash | $ | 24.8 | $ | 26.6 |
| Accounts receivable, net | | 80.7 | | 75.5 |
| Television library, current portion | | 5.3 | | 4.1 |
| Income tax receivables | | 0.7 | | 0.2 |
| Prepaid expenses and other current assets | | 7.5 | | 9.0 |
| **Total Current Assets** | **$ 119.0** | | **$** | **115.4** |
| | | | | |
| Tax credit receivable | | 6.0 | | 6.9 |
| Restricted Cash | | 0.2 | | 0.2 |
| Property and equipment, net | | 37.4 | | 36.1 |
| Television library, less current portion | | 87.9 | | 69.4 |
| Film rights, less current portion | | 13.2 | | 16.7 |
| Intangible assets, net | | 15.8 | | 18.9 |
| Goodwill, net | | 228.3 | | 101.3 |
| Deferred tax assets | | 0.9 | | - |
| Other noncurrent assets | | 2.5 | | 11.1 |
| **TOTAL ASSETS** | **$** | **511.2** | **$** | **376.0** |

### LIABILITIES AND MEMBER'S DEFICIT

| | 2019 | | 2018 | |
|---|---|---|---|---|
| **CURRENT LIABILITIES** | | | | |
| Accounts payable and accrued liabilities | | 105.7 | | 56.2 |
| Due to related parties | | 25.0 | | 11.6 |
| Taxes payable | | 6.5 | | 9.6 |
| Current portion of borrowings | | 10.8 | | 18.8 |
| Current portion of capital lease liabilities | | 2.5 | | 2.4 |
| Deferred revenue | | 9.8 | | 10.7 |
| **Total Current Liabilities** | **$** | **160.3** | **$** | **109.3** |
| | | | | |
| Borrowings, less current portion | | 530.5 | | 353.1 |
| Capital lease liabilities, less current portion | | 2.5 | | 3.3 |
| Deferred tax liabilities | | 13.3 | | 15.5 |
| Other long-term liabilities | | 5.1 | | 4.1 |
| **Total  Liabilities** | **$** | **711.7** | **$** | **485.3** |
| | | | | |
| **MEMBER'S DEFICIT** | | | | |
| Member's deficit | | (207.0) | | (109.3) |
| Equity attributable to minority noncontrolling interest | | 6.5 | | - |
| | | | | |
| **TOTAL MEMBER'S DEFICIT ATTRIBUTABLE TO ALLEN MEDIA, LLC** | **$** | **(200.5)** | **$** | **(109.3)** |
| | | | | |
| **TOTAL LIABILITIES AND MEMBER'S DEFICIT** | **$** | **511.2** | **$** | **376.0** |

The accompanying notes are an integral part of these consolidated financial statements.

5

EXHIBIT O(4)

CONFIDENTIAL                                                                          AOE092ESN0041594

# ALLEN MEDIA, LLC AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF OPERATIONS
### For the years ending December 31, 2019 and 2018

|  | 2019 (In millions) | 2018 (In millions) |
|---|---|---|
| **Revenues** |  |  |
| Networks and content revenue | 265.3 | 278.8 |
| Broadcast television revenue | 17.7 | - |
| **Total Revenues** | **283.0** | **278.8** |
|  |  |  |
| **Operating Expenses** |  |  |
| Programming and production expenses | 172.4 | 162.9 |
| Sales, general and administrative expenses | 97.9 | 81.5 |
| Depreciation and amortization of intangible assets and goodwill | 38.0 | 24.5 |
| Impairment of investment at cost and intangible assets | 7.5 | 2.0 |
| Other operating expenses | - | 7.4 |
|  |  |  |
| **Total operating expenses** | **315.8** | **278.3** |
|  |  |  |
| **Operating (loss) income** | $ (32.8) | $ 0.5 |
|  |  |  |
| **Other Income (Expense)** |  |  |
| Interest expense | (65.8) | (41.1) |
| Other income, net | 0.4 | 0.3 |
| **Total other expense, net** | **(65.4)** | **(40.8)** |
|  |  |  |
| **Loss before income taxes** | **(98.2)** | **(40.3)** |
|  |  |  |
| Income tax expense | 4.4 | 6.0 |
| **Net loss attributable to Allen Media, LLC and minority interests** | **(102.6)** | **(46.3)** |
|  |  |  |
| Net loss attributable to minority noncontrolling interest | 3.5 | - |
|  |  |  |
| **Net Loss attributable to Allen Media, LLC** | **$ (99.1)** | **$ (46.3)** |

The accompanying notes are an integral part of these consolidated financial statements.

6

EXHIBIT O(4)

AOE0925

ESN0041595

## ALLEN MEDIA, LLC AND SUBSIDIARIES
### CONSOLIDATED STATEMENTS OF MEMBER'S AND STOCKHOLDER'S DEFICIT
### For the years ended December 31, 2019 and 2018

| (amounts in millions, except shares) | Common Stock Shares | Common Stock Amount | Stockholder Note Receivable | Retained Earnings (Accumulated Deficit) | Member Note Receivable | Minority Interest | Member's Deficit | Total |
|---|---|---|---|---|---|---|---|---|
| Balance, December 31, 2017 | 100 | 0.1 | (7.7) | (26.7) | - | - | - | (34.4) |
| Advances to stockholder | | | (0.1) | | | | | (0.1) |
| Repayment of stockholder's note receivable | - | - | 3.8 | - | - | | - | 3.8 |
| | | | | | | | | |
| Balance at March 22, 2018 prior to re-organization | 100 | 0.1 | (4.0) | (26.7) | - | | - | (30.7) |
| Reclassification of equity upon re-organization | (100) | (0.1) | 4.0 | 26.7 | (4.0) | | (26.7) | - |
| Member distributions | - | - | - | - | - | - | (30.0) | (30.0) |
| Advances to member | - | - | - | - | (6.4) | - | - | (6.4) |
| Repayment of member's note receivable | - | - | - | - | 4.1 | - | - | 4.1 |
| Net loss for the period ended December 31, 2018 | - | - | - | - | - | | (46.3) | (46.3) |
| Balance, December 31, 2018 | - | - | - | - | (6.3) | - | (103.0) | (109.3) |
| | | | | | | | | |
| Advances to member | - | - | - | - | (13.8) | - | - | (13.8) |
| Repayment of member's note receivable | - | - | - | - | 15.2 | - | - | 15.2 |
| Issuance of equity in subsidiary to noncontrolling interest holder | | | | - | - | 10.0 | - | 10.0 |
| Net loss for the period ended December 31, 2019 | - | - | - | - | - | (3.5) | (99.1) | (102.6) |
| Balance, December 31, 2019 | - | - | - | - | (4.9) | 6.5 | (202.1) | (200.5) |

The accompanying notes are an integral part of these consolidated financial statements.

EXHIBIT O(4)

CONFIDENTIAL

AOE09226 SSN0041596

# ALLEN MEDIA, LLC AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF CASH FLOWS
### For the years ended December 31, 2019 and 2018

|  | 2019 (In millions) |  | 2018 (In millions) |
|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** |  |  |  |
| Net Loss | $ (102.6) | $ | (46.3) |
| Adjustments to reconcile change in net loss to net cash used in operating activities. |  |  |  |
| Depreciation and amortization of intangible assets and goodwill | 38.0 |  | 24.5 |
| Loss on disposal of property and equipment | 0.3 |  | 0.4 |
| Amortization of deferred financing cost | 11.1 |  | 4.0 |
| Amortization of television library | 22.0 |  | 19.8 |
| Amortization of film rights | 10.1 |  | 9.7 |
| Deferred income taxes | (2.9) |  | (1.0) |
| Bad debt expense | 0.3 |  | 0.2 |
| Impairment of investment at cost and intangible assets | 7.5 |  | 2.0 |
| Changes in Operating Assets and Liabilities: |  |  |  |
| Receivables | 10.5 |  | (19.9) |
| Television library assets | (41.0) |  | (33.5) |
| Film rights assets | (6.5) |  | (16.1) |
| Prepaid expenses and other assets | 0.9 |  | 12.5 |
| Other noncurrent assets | (0.1) |  | 0.1 |
| Accounts payable and accrued expense | 46.6 |  | (10.6) |
| Deferred revenue | (1.0) |  | 0.9 |
| Taxes payable | (4.1) |  | 0.6 |
| Other noncurrent liabilities | 0.3 |  | 0.6 |
| **Net Cash used in Operating Activities** | $ (10.6) | $ | (52.1) |
|  |  |  |  |
| **CASH FLOWS FROM INVESTING ACTIVITIES** |  |  |  |
| Acquisition of property and equipment | (3.4) |  | (5.7) |
| Purchase of intangible assets | (4.6) |  | (6.0) |
| Acquisition of business, net of cash acquired | (163.7) |  | (177.8) |
| **Net cash used in Investing Activities** | $ (171.7) | $ | (189.5) |

The accompanying notes are an integral part of these consolidated financial statements.

EXHIBIT O(4)

CONFIDENTIAL

AOE092 ESN0041597

# ALLEN MEDIA, LLC AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF CASH FLOWS
### For the years ended December 31, 2019 and 2018

|  | 2019 (In millions) | | 2018 (In millions) | |
|---|---|---|---|---|
| **CASH FLOWS FROM FINANCING ACTIVITIES** |  |  |  |  |
| Borrowings, net of debt issuance cost | $ | 204.7 | $ | 323.4 |
| Borrowings from related party |  | 14.6 |  | 11.6 |
| Repayments of borrowings |  | (46.9) |  | (62.6) |
| Repayments of borrowings from related party |  | (1.1) |  | - |
| Proceeds from issuance of equity in subsidiary to noncontrolling interest holder |  | 10.0 |  | - |
| Cash received from member, net |  | 1.4 |  | 1.4 |
| Member distribution |  | - |  | (30.0) |
| Payments on capital leases |  | (2.2) |  | (1.6) |
| **Net Cash provided by Financing Activities** |  | **180.5** |  | **242.2** |
|  |  |  |  |  |
| **NET CHANGE IN CASH AND RESTRICTED CASH** |  | **(1.8)** |  | **0.6** |
|  |  |  |  |  |
| **CASH AND RESTRICTED CASH AT BEGINNING OF PERIOD** |  | **26.8** |  | **26.2** |
|  |  |  |  |  |
| **CASH AND RESTRICTED CASH AT END OF PERIOD** | **$** | **25.0** | **$** | **26.8** |
|  |  |  |  |  |
|  |  |  |  |  |
| **Schedule of supplemental cash flow information** |  |  |  |  |
| Cash paid for taxes | $ | 11.0 | $ | 0.2 |
| Cash paid for interest | $ | 46.3 | $ | 26.8 |
|  |  |  |  |  |
| **Supplemental disclosure of noncash investing and financing activity** |  |  |  |  |
| Equipment purchased under capital lease | $ | 1.6 | $ | 0.5 |

The accompanying notes are an integral part of these consolidated financial statements.

9

EXHIBIT O(4)

CONFIDENTIAL

AOE092 BSN0041598

# ALLEN MEDIA, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended December 31, 2019 and 2018

## NOTE 1 – NATURE OF BUSINESS

Allen Media, LLC ("AM") was formed on January 17, 2018, and is wholly owned by Allen Media Holdings, LLC (AMH). AMH was formed on the same date as AM and is owned by one member. AM functions primarily as a holding company for its wholly owned subsidiaries which together constitute a diversified media company that owns and operates television networks, including The Weather Channel, broadcast television stations and a production and distribution business, which creates original programming across multiple genres. Certain wholly owned subsidiaries existed and operated prior to the formation of AM. A restructuring in 2018 resulted in substantially all companies being wholly owned subsidiaries of AM. AM and its operating entities are collectively described in these consolidated financial statements as "AM Group" "the Company", or "we".

The Company distributes its programming, mainly in exchange for advertising airtime that it sells to advertising agencies in the U.S. Also, we operate several digital cable and satellite channels which broadcast its television programs through our affiliates. We also produce and distribute motion picture content through our motion pictures division, specializing in production, distribution, and representation for independent companies, major studios and mini-major studios.

As disclosed in Note 3, on March 22, 2018, we purchased Weather Group, LLC, ("WG"). WG is a multi-platform media company focused on providing weather information and programming on various platforms. The WG cable network produces continuous 24-hour national, regional, and local weather-related television programming distributed by cable, satellite, and telecommunications multichannel video programming distributors in the U.S. and Caribbean.

In April 2019, the Company, along with its member, formed Allen Media Broadcast Holdings ("AMBH") and Allen Media Broadcasting ("AMB"), which subsequently acquired Bayou City Broadcasting Evansville, Inc. and Bayou City Broadcasting Lafayette, Inc., (collectively referred to as "Bayou") on July 3, 2019 as further described in Note 3. Bayou is a television broadcast station group with stations affiliated with big four television networks such as CBS, FOX, and NBC.

During the years ended December 31, 2019 and 2018, the Company incurred a consolidated net loss of $102.6 million and $46.3 million, respectively, and a member's deficit of $200.5 million and $109.3 million, respectively. As of December 31, 2019, the Company had outstanding debt of $588.0 million, with required payments for these borrowings of $163.6 million in 2020, as further described in Notes 11 and 16. Subsequent to December 31, 2019, on February 10, 2020, the Company refinanced a substantial portion of the debt obligation as described further in Note 18 such that the amount of debt due in 2020 is $10.8 million.

The Company continues to maintain a strong library of film and television content and broadcasting assets in key markets that management expects to provide positive returns beginning in 2020. As of December 31, 2019, cash on hand was $24.8 million and our current assets of $119.0 million were lower than our current liabilities of $160.3 million by $41.3 million, including $25.1 million of amounts due to our member which can but are not required to be repaid prior to the fourth quarter of 2021. As of December 31, 2019, the Company was in compliance with its financial covenants contained in the credit agreements governing its outstanding debt.

EXHIBIT O(4)

CONFIDENTIAL

AOE0929 2SN0041599

# ALLEN MEDIA, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended December 31, 2019 and 2018

## NOTE 1 – NATURE OF BUSINESS (Continued)

In accordance with Accounting Standards Update ("ASU") 2014-15, *Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern (Subtopic 205-40)*, the Company has evaluated whether there are conditions and events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern within one year from the date of the issuance of these consolidated financial statements. The Company is highly leveraged, which makes it vulnerable to changes in general economic conditions. The Company's ability to repay or refinance its debt will depend on, among other things, financial, business, market, competitive and other conditions, some of which are beyond the Company's control. However, based on current operations and forecasted results, the Company believes that its available cash as of the date of the issuance of these financial statements, anticipated cash flows from operations and available borrowings under existing credit facilities will be sufficient to finance its operations and fund working capital, capital expenditure requirements, interest payments and scheduled debt principal payments for at least the next twelve months. The accompanying financial statements have been prepared assuming that the Company will continue as a going concern.

## NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Presentation
The Company's consolidated financial statements are prepared using the accrual basis of accounting in accordance with accounting principles generally accepted in the United States.

### Principles of Consolidation
The consolidated financial statements of the Company as of December 31, 2019 and 2018 include the accounts of Allen Media LLC and its subsidiaries, which are primarily Entertainment Studios Media Holdings ("ESMH") and its subsidiaries, Entertainment Studios P&A ("ESP&A") and its subsidiaries, Entertainment Studios Motion Pictures ("ESMP"), the Weather Group ("WG") and its subsidiaries and AMBH and its subsidiaries and other direct subsidiaries. All significant intercompany transactions have been eliminated in consolidation.

### Use of Estimates
The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make assumptions that affect the reported amounts of assets and liabilities and the reported amounts of revenues and expenses. The significant estimates in the accompanying financial statements subject to such estimates and assumptions include ultimate revenues for film rights and television library, impairment provisions for long-lived assets and intangible assets, allowances for doubtful accounts receivable, useful lives of property and equipment, television library and film rights, and intangible assets, deferred revenue, valuation and recoverability of goodwill, and contingencies. Although the Company regularly assesses these estimates, actual results could differ materially from these estimates. Changes in estimates are recorded in the period in which they become known. The Company bases its estimates on historical experience and various other assumptions that it believes reasonable under the circumstances. Actual results could differ from these estimates.

### Reclassifications
Certain accounts, as originally presented in the consolidated financial statements for the year ended December 31, 2018, have been reclassified in the comparative consolidated financial statements to conform to the current year's financial statement presentation.

EXHIBIT O(4)

CONFIDENTIAL

AOE0939    ESN0041600

# ALLEN MEDIA, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended December 31, 2019 and 2018

## NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

### Restricted Cash
Restricted cash consists of funds that are contractually restricted as to usage or withdrawal due to a standby letter of credit relating to the operating lease of our facility in New York. The Company has presented restricted cash separately from cash and cash equivalents on the consolidated balance sheet. Restricted cash as of December 31, 2019 and 2018 was $0.2 million.

### Accounts Receivables, Net
Accounts receivable comprise customers' outstanding balances in respect of advertising, license fees and subscriptions less any allowance for doubtful accounts including affiliate revenue reserves. An allowance for doubtful accounts on accounts receivable is charged to expense in amounts sufficient to maintain the allowance for uncollectible accounts at a level management believes is adequate to cover any probable losses. Management determines the adequacy of the allowance based on historical write-off percentages and information collected from individual customers. Accounts receivable are charged off against the allowance when collectability is determined to be permanently impaired.

### Royalties Receivable
Royalties receivable relates to music and content aired on the Company's digital cable and satellite channels, together with retransmission royalties and are recorded at their net present value. An allowance for doubtful accounts on royalties receivable is charged to expense in amounts sufficient to maintain the allowance for uncollectible accounts at a level management believes is adequate to cover any probable losses. Management determines the adequacy of the allowance based on historical write-off percentages and information collected. Royalties receivable are charged off against the allowance when collectability is determined to be permanently impaired. There was no allowance for doubtful accounts pertaining to Royalties receivable as of December 31, 2019 and 2018 as management considered all balances fully collectible.

### Property and Equipment
Property and equipment are carried at cost. Depreciation and amortization is computed using the straight-line method over the estimated useful lives of the respective assets, generally as follows:

| | |
|---|---|
| Production equipment | 2 - 10 years |
| Office furniture and equipment | 2 - 7 years |
| Leasehold improvements | Lesser of the useful life or the lease term |
| Satellites | 42 months |
| Trucks and automobiles | 2 - 7 years |

The Company also has assets in the course of construction ("Construction in progress"). Such assets are depreciated once the asset is completed and placed into service. Maintenance and repairs are charged to operations when incurred, while betterments and renewals are capitalized. Gains or losses are recognized upon the sale or disposal of the assets.

EXHIBIT O(4)

CONFIDENTIAL

AOE093 ESN0041601

# ALLEN MEDIA, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended December 31, 2019 and 2018

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

Television Library and Film Rights

The Company's television library consists of i) capitalized television production costs for content produced by the Company and aired on the Company's broadcast or cable networks or licensed to customers and ii) programming rights for content licensed from third parties to air on the Company's broadcast and cable networks. Film rights ("film costs") represent the cost to acquire the distribution rights or finance the production of motion pictures for theatrical release and distribution.

Capitalized television production costs and film rights are accounted for in accordance with FASB ASC Topic No. 926, Entertainment—Films, and programming rights and related costs are accounted for in accordance with FASB Accounting Standards Codification ("ASC") Topic No. 920, Entertainment—Broadcasters.

Capitalized production costs include direct costs, production overhead and interest, and are stated at the lower of unamortized cost or fair value. Programming rights are recorded when the program is available for use and are stated at the lower of unamortized cost or net realizable value.

Capitalized television production costs and film rights are amortized to expense over their estimated useful lives which range from 4-10 years, commencing upon the first airing, based on estimated usage or revenue to date as a percentage of remaining total projected attributable revenue, or ultimate revenue (individual-film-forecast-computation method). In certain cases, the Company utilizes a straight-line usage-based methodology to amortize capitalized television production costs. When estimates of total revenues or other events or changes in circumstances indicate that a television production or film has a fair value that is less than unamortized cost, an impairment loss is recognized for the amount by which the unamortized cost exceeds the fair value. No impairments were recorded during the year-ended December 31, 2019 and 2018.

Projected attributable revenue can change based on market conditions and management decisions regarding planned content usage. These calculations require management to make assumptions and apply judgment regarding revenue and planned usage. Accordingly, the Company periodically reviews revenue estimates and planned usage and revises its assumptions if necessary, which could impact the timing of amortization expense or result in an impairment.No impairments were recorded during the year-ended December 31, 2019 and 2018.

Programming rights are amortized over the contract term based on estimated usage. The portion of the unamortized balance expected to be amortized in the succeeding year is classified as a current asset, with the remainder classified as noncurrent.

EXHIBIT O(4)

CONFIDENTIAL

AOE0932ESN0041602

# ALLEN MEDIA, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended December 31, 2019 and 2018

## NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

Intangible Assets

Intangible assets consist of acquired and internally developed technology and software, costs incurred to acquire the names of digital and satellite channels, Federal Communications Commission ("FCC") licenses, and localization technology (or STAR) conveyed to cable, satellite and other distributors. STAR technology allows distributors of a network signal to receive the transmission of thousands of localized weather forecasts and extract the forecast for a specific geography. Software consists primarily of a developed application, Local Now, and related technology acquired through the Weather Group acquisition which are primarily for internal use. The Company also has intangible assets in the course of construction ("Construction in process"). Amortization of such assets begins once the asset is completed and placed into service. Intangible assets are capitalized and amortized on a straight-line basis over 3 to 15 years except FCC licenses which are indefinite-lived and therefore not amortized. Impairment tests for intangible assets not subject to amortization are performed annually or when events or circumstances indicate it is more likely than not that the asset is impaired. The impairment test involves a comparison of the estimated fair value of the intangible asset with its carrying value. If the carrying value of the intangible asset exceeds its fair value, an impairment loss is recognized in an amount equal to that excess.

Goodwill

Goodwill relates to the acquisitions of WG, Bayou, TheGrio, and Freestyle and represents the excess of purchase price over the value assigned to the assets acquired. The acquisitions of WG and Bayou are further discussed in Note 3.

The Company has applied the guidance under FASB Accounting Standards Update ("ASU") No. 2014-18, *Business Combinations (Topic 805): Accounting for Identifiable Assets in a Business Combination (a consensus of the Private Company Council)*, where certain assets, such as customer relationships or a covenant not to compete, are not recorded separately from goodwill. As such, in accordance with FASB ASU No. 2014-02, Intangibles—*Goodwill and Other (Topic 350): Accounting for Goodwill* ("ASU 2014-02"), management has assigned a life of 10 years to goodwill over which the amount allocated to goodwill is being amortized.

Pursuant to ASU 2014-02, goodwill should be tested for impairment when a triggering event occurs that indicates that the fair value of a reporting unit may be below its carrying amount. If the goodwill is determined to be impaired, the goodwill is written down to its realizable value and the loss is recognized in the consolidated statement of operations in the period when determination is made. No impairment charges were recorded for the years ended December 31, 2019 and 2018.

Investments at Cost

At December 31, 2018, WG and certain subsidiaries held a 2% share in TrafficCast International Inc. and a 3% share in Wibbitz Ltd. Dividends are recorded as investment income when they are received. Impairments are recorded if other than temporary. During the year ended December 31, 2018, no dividends were received from either investment. The TrafficCast investment was previously fully impaired.  Additionally, during the year ended December 31, 2018, the Wibbitz investment was impaired in full. As such, a total impairment expense relating to investments at cost of $2.0 million was recorded within impairment of investment at cost and intangible assets on the consolidated statement of operations. The net investments at cost balance after impairment at both December 31, 2019 and 2018 is zero.

EXHIBIT O(4)

CONFIDENTIAL

BSN0041603

# ALLEN MEDIA, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended December 31, 2019 and 2018

## NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

### Long-lived Assets

The Company reviews long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. An impairment loss would be recognized when estimated future cash flows expected to result from the use of the asset and its eventual disposition is less than its carrying amount. During the year ended December 31, 2019, the Company recorded an impairment loss of $7.5M relating to capitalized software costs. Refer to Note 8. No impairments were recorded during the year-ended December 31, 2018.

### Deferred Financing Costs

Deferred financing costs represent costs incurred to acquire debt. These costs are deferred and amortized on an effective interest yield basis over the term of the related debt. The related amortization is included within interest expense on the consolidated statements of operations.

In accordance with ASU No. 2015-03, *Interest—Imputation of Interest (Topic 835): Simplifying the Presentation of Debt Issuance Costs* ("ASU 2015-03"), the Company has presented deferred financing costs as a reduction of long-term debt (see Note 11) in the consolidated balance sheet.

### Capital Leases

Leases are classified as capital leases whenever the terms of the lease transfers substantially all the risks and rewards of ownership to the lessee. All other leases are classified as operating leases. Assets acquired and held under finance leases are recognized as assets of the Company at their fair value on the date of acquisition. The corresponding liability is included in the balance sheet as a finance lease obligation. Interest costs, which represent the difference between the total leasing commitments and the fair values of the assets acquired, are charged to the income statement over the term of the relevant lease.

### Revenue Recognition

The Company adopted the Financial Accounting Standards Board's (FASB) Accounting Standards Codification ("ASC") Topic 606 ("ASC 606") for the full annual period which ended December 31, 2019 using the modified retrospective method and applied the standard to all contracts open as of January 1, 2019. We recognize revenue when we have a legally enforceable approved contract with a customer when that contract indicates that collection of the amount to which we are entitled is probable, rights and obligations of each party can be identified, and the arrangement has commercial substance. Revenue is recognized upon the transfer of control of promised services to our customers in an amount that reflects the consideration we expect to receive in exchange for those services. Amounts received from customers in advance of providing services to our customers are recorded as contract liabilities, presented as deferred revenue on the consolidated balance sheet.

Our revenue primarily includes revenues from advertising, subscriptions, film rentals, and distribution services.

EXHIBIT O(4)

CONFIDENTIAL

AOE093 HSN0041604

# ALLEN MEDIA, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended December 31, 2019 and 2018

## NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

Advertising revenue is recognized as the Company fulfills its performance obligations to customers through airing customers' advertising content. The price of each individual commercial and digital advertisement is negotiated with each customer and is determined based on multiple factors, including, but not limited to, the programming and day-part selected, supply of available inventory, viewership ratings and overall market conditions (e.g., timing of the year and strength of U.S. economy). The Company measures the fulfillment of its performance obligations based on the airing of the individual television commercials or display of digital advertisements as those events occur. Advertising revenues are recorded net of agency commissions as the Company has determined that the advertising agency is the customer in these arrangements.

Network advertising includes campaigns for which revenues are based on audience delivery or a fixed price per spot. For campaigns based on audience delivery, the Company guarantees advertisers a minimum audience during the dayparts in which their advertisements are broadcast over the term of the advertising contracts. The Company provides the advertisers with additional advertising time if the guaranteed audience size and/or the minimum number of spots are not delivered. The Company has concluded that the performance obligation in these arrangements is the delivery of the minimum number of spots along with a guaranteed number of impressions against the targeted demographic as part of an overall campaign. Advertising revenue in connection with guaranteed campaigns is recognized using a measure of progress based on the number of impressions delivered during the period relative to the total guaranteed impressions. If the Company determines the guaranteed audience has not been delivered, an estimate of deferred revenue is recorded for audience delivery shortfalls that must be "made good." The remaining revenue is recognized proportionally until the guaranteed audience has been delivered and the performance obligation is satisfied. Our customers are generally on 60 to 120 day payment terms. Advertising revenue for the year ended December 31, 2019 within networks and content revenue and broadcast television revenue totaled $124.7 million and $6.5 million, respectively. Advertising revenue for the year ended December 31, 2018 within networks and content revenue and broadcast television revenue totaled $104.5 million and zero, respectively.

We earn subscription revenue from retransmission consent contracts with multichannel video programming distributors (e.g., cable and satellite providers) typically via multi-year contracts. Under these multi-year contracts, the Company has a performance obligation to deliver content or a signal to our customers. The revenue we earn in these contracts is primarily variable. The amount of revenue earned is based on the number of subscribers to which our customers retransmit our signal, and the negotiated fee per subscriber included in our contract agreement. Customers submit payments monthly, generally within 60-90 days after the month that the service was provided. Subscription revenue is recognized in accordance with the guidance for licensing intellectual property utilizing a usage based method. Performance obligations are satisfied, and revenue is recognized, as our customers utilize the content, network programming, or signal. Estimates of the revenue earned are recorded in each period, up to the amount not subject to significant reversal, and are adjusted as actual subscriber data is submitted to us. Subscription license and retransmission revenue for the year ended December 31, 2019 within networks and content revenue and broadcast television revenue totaled $105.8 million and $11.2 million, respectively. Subscription license and retransmission revenue for the year ended December 31, 2018 within networks and content revenue and broadcast television revenue totaled $103.8 million and zero, respectively.

16

EXHIBIT O(4)

CONFIDENTIAL

AOE0935
ESN0041605

**ALLEN MEDIA, LLC AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
For the years ended December 31, 2019 and 2018

## NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

For content owned or produced by the Company, we derive certain film rental revenues from a percentage of box office takings earned by the movie in theatrical release or revenues earned from secondary markets such as on digital platforms. Revenue for film rentals is recognized under ASC 606 as a functional license of intellectual property. When the transaction price is fixed, the revenue is recognized at the beginning of the license period after the content has been delivered to the Company's customer. In certain cases, the transaction price is variable and the Company utilizes the sales-and-usage based royalty exception to recognize revenue over time as sales occur, based on the customers' usage of the intellectual property. When estimation is required, external box office reporting is utilized to estimate the amount of revenue to which we will be entitled and is recorded up to the amount not subject to significant reversal. Film rentals revenue within networks and content revenue for the years ended December 31, 2019 and 2018 totaled $12.6 million and $21.5 million, respectively.

Distribution revenues are earned through arrangements with distributors via the delivery of individual motion picture content files. We receive nonrefundable advances at the beginning of each distribution period which are considered fixed consideration related to the delivery of functional intellectual property. In some cases, additional variable consideration is earned as the content is utilized and is recognized in accordance with usage-based royalty guidance in the period in which the sales occur or when the performance obligation is satisfied (whichever is later) when it exceeds the amount of the nonrefundable advance or fixed consideration. In cases where payments received relate to multiple titles, the consideration is allocated to each title or performance obligation based on the estimated fair value of each title.  As the distributor is our customer, the total transaction price is the amount we are entitled to receive from the distributor. Distribution revenue within networks and content revenue for the years ended December 31, 2019 and 2018 totaled $16.0 million and $39.5 million, respectively.

*Other Revenues*
ESMP enters into various distribution agreements for the release of content, such as movies, onto theatrical and digital platforms (such as Netflix, Hulu, and Amazon). ESMP acts as the distribution agent and collects all monies due under these arrangements and distributes the amounts payable to the producers of the content. In exchange for the performance of these services, ESMP retains a commission from the amounts collected in the form of a distribution fee. Distribution fee arrangements are accounted for on a net basis in accordance with ASC 606 and all distribution fees are reported net of amounts collected on behalf of, and paid over to, producers as the Company is an agent in these arrangements. Royalty revenue is also included within other revenue and is recognized based on best estimates available, primarily based on historical experience, of the amounts due to the Company in the period of the customer's sales or usage. Other revenues also include domestic radio revenues and domestic and international licensing of long-form programming. Other revenues included within networks and content revenue for the years ended December 31, 2019 and 2018 totaled $5.8 million and $9.5 million, respectively.

EXHIBIT O(4)

CONFIDENTIAL

AOE0936

ESN0041606

**ALLEN MEDIA, LLC AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
For the years ended December 31, 2019 and 2018

## NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

Income Taxes

Certain entities of the Company are combined into a taxable entity group (the "taxable entity group"). The remaining entities, which comprise the majority of the group, are treated as separate taxable entities for federal, state, or local income tax purposes for which the tax impacts have been excluded from these consolidated financial statements. Accordingly, the results of all other entities' operations outside of the taxable entity group have been included in the tax return of the member. The taxable entity group has accounted for taxes under FASB ASC Topic No. 740, *Income taxes* ("ASC 740"), and records deferred taxes on income for transactions that are reported in different years for financial reporting and tax purposes using an asset and liability method whereby assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

In accordance with ASC 740, the Company recognizes the impact of a tax position in the financial statements if that position is more likely than not to be sustained on review, based on the technical merits of the position. At December 31, 2019, the taxable entity group had a reserve for uncertain tax positions of approximately $0.9 million and accrued interest of $0.1 million. At December 31, 2018, the taxable entity group had a reserve for uncertain tax positions of approximately $1.0 million and accrued interest of $0.1 million, of which $0.1 million was recorded to income tax expense during the period. The Company's policy is to classify interest expense related to uncertain tax positions as income tax expense.

Subsequent to the balance sheet date and prior to the date that these financial statements were available to be issued, the Internal Revenue Service completed its audit of the Company's 2016 tax year, which will result in a future settlement payment by the Company of approximately $1.1 million. Tax years 2017 and 2018 remain open for potential examination.

Advertising

Advertising and promotion costs are generally expensed in the period during which the costs are incurred. Expenses incurred for prints and advertising budgets for produced movies are expensed in accordance with ASC 720-35, *Other Expenses—Advertising*, and ASC 926 720-25, *Entertainment— Films—Other Expenses*. In these cases, advertising costs are expensed as incurred. Direct costs incurred in connection with the distribution of the films are expensed as incurred.

Advertising and promotion costs for the Company for the years ended December 31, 2019 and 2018 amounted to $74.3 million and $86.5 million, respectively and are included in programming and production expenses in the consolidated statements of operations

Concentration of Credit Risk

The Company maintains its cash in various financial institutions which may, from time to time, exceed amounts insured by the Federal Deposit Insurance Corporation. For the years ended December 31, 2019 and 2018, the combined aggregate of all deposits held in noninterest-bearing transaction accounts and interest-bearing deposits within the same ownership category are insured up to $0.3 million per financial institution. The Company has not experienced any losses in such accounts and believes it is not exposed to any significant credit risk on cash. As of December 31, 2019 and 2018, the uninsured portion aggregated to $21.5 million and $23.5 million, respectively.

EXHIBIT O(4)

CONFIDENTIAL

AOE0937 ESN0041607

## ALLEN MEDIA, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended December 31, 2019 and 2018

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

For the years ended December 31, 2019 and 2018, one customer accounted for 10% or more of the Company's total revenue in each year. As of December 31, 2019 and 2018, one customer and two customers, respectively, accounted for 10% or more of the Company's accounts receivable balance.

Minority Interest

Minority noncontrolling interest presented in the Company's consolidated financial statements represents the 26% interest not owned by the Company in AMBH the parent company of Bayou. The minority interest arose simultaneous to the Company's acquisition of Bayou on July 3, 2019. See Note 3. Since the Company controls this subsidiary, its financial statements are consolidated with those of the Company, and the minority interest owner's 26% share of the subsidiary's net assets and results of operations is deducted and reported as minority noncontrolling interest on the consolidated balance sheets and as net income attributable to minority noncontrolling interest in the consolidated statements of operations.

The 26% of AMB not held by the Company is held by the sole member of AM.

Other operating expenses

Other operating expenses in the consolidated income statements for the year ended December 31, 2018 includes loan fees of $6.2 million and a loss on extinguishment of debt of $1.2 million.

Recently Adopted Accounting Pronouncements

The Company and all subsidiaries adopted the guidance ASC 606 as of January 1, 2019 using the modified retrospective method. ASC 606 requires an entity to recognize the amount of revenue to which it expects to be entitled for the transfer of promised goods or services to customers. ASC 606 was applied only to contracts that were not completed at January 1, 2019. The comparative information in 2018 has not been adjusted and continues to be reported under ASC 605, Revenue Recognition, which was the accounting standard in effect during 2018. See Note 4—Revenue Recognition for the required disclosures of the impact of the adoption of ASC 606

In August 2016, the FASB issued ASU 2016-15, *Statement of Cash Flows (Topic 230): Classification of Certain Cash Receipts and Cash Payments* ("ASU 2016-15"), which clarifies how cash receipts and cash payments in certain transactions are presented in the statement of cash flows. Among other clarifications on the classification of certain transactions within the statement of cash flows, the amendments in ASU 2016-15 provide that cash proceeds received from the settlement of insurance claims should be classified on the basis of the related insurance coverage. In addition, the amendments in ASU 2016-15 provide that proceeds from the settlement of corporate owned life insurance policies are classified as cash inflows from investing activities, while cash payments for related premiums are cash outflows for either investing or operating activities, or both. The Company adopted ASU 2016-15 for the annual period ended December 31, 2019. The adoption of ASU 2016-15 did not have a material effect on the financial statements in either period.

EXHIBIT O(4)

CONFIDENTIAL

AOE0938 BSN0041608

**ALLEN MEDIA, LLC AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
For the years ended December 31, 2019 and 2018

## NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

In November 2016, the FASB issued ASU No. 2016-18, *Statement of Cash Flows (Topic 230): Restricted Cash (a consensus of the FASB Emerging Issues Task Force)* ("ASU 2016-18"), which provides guidance on the presentation of restricted cash or restricted cash equivalents in the statement of cash flows. ASU 2016-18 became effective beginning on January 1, 2019, and the Company adopted the guidance for the annual period ended December 31, 2019, including retrospective application for the comparative period presented. Restricted cash is presented in the beginning- and end-of-period total amounts on the statement of cash flows for the years-ended December 31, 2019 and 2018, where it was previously shown as a cash flow from investing activities.

Recently Issued Accounting Pronouncements

In February 2016, the FASB issued ASU No. 2016-02, *Leases (Topic 842)* ("ASU 2016-02"), which sets out the principles for the recognition, measurement, presentation and disclosure of leases for both parties to a contract (i.e., lessees and lessors). The new standard requires lessees to apply a dual approach, classifying leases as either finance or operating leases based on the principle of whether or not the lease is effectively a financed purchase by the lessee. A lessee is also required to record a right-of-use asset and a lease liability for all leases with a term of greater than 12 months regardless of their classification. Leases with a term of 12 months or less will be accounted for similar to existing guidance for operating leases today. ASU 2016-02 is effective for the Company on January 1, 2021. Early adoption of ASU 2016-02 is permitted. The Company is in the process of evaluating the impact of this new guidance on its consolidated financial statements.

In June 2016, the FASB issued ASU No. 2016-13, *Financial Instruments—Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* ("ASU 2016-13"), Subsequently, ASU 2018-19 has been issued that amends and/or clarifies the application of ASU 2016-13. Among other provisions, the ASU introduces a new impairment model for most financial assets and certain other instruments. For trade and other receivables, held-to-maturity debt securities, loans and other instruments, entities will be required to use a forward-looking "expected loss" model that will replace the current "incurred loss" model and generally will result in earlier recognition of allowances for losses. The guidance will be effective for the Company beginning January 2023. The Company is currently evaluating the impact of this new guidance on its consolidated financial statements.

In October 2018, the FASB issued ASU 2018-17, *Consolidation (Topic 810): Targeted Improvements to Related Party Guidance for Variable Interest Entities*, which effectively expands the private company alternative for common control leasing arrangements to all private company common control arrangements as long as both the parent and the legal entity being evaluated for consolidation are not public business entities. ASU 2018-17 also amends certain VIE guidance for related party arrangements. ASU 2018-17 is effective for the Company beginning on January 1, 2021, with early adoption permitted. The Company is currently evaluating the impact of this new guidance on its consolidated financial statements.

EXHIBIT O(4)

CONFIDENTIAL                                           AOE0939 SN0041609

## ALLEN MEDIA, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended December 31, 2019 and 2018

### NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

In March 2019, the FASB issued ASU 2019-02 - *Improvements to Accounting for Costs of Films and License Agreements for Program Materials* ("ASU 2019-02"). ASU 2019-02 aligns the accounting for production costs of an episodic television series with the accounting for production costs of films by removing the content distinction for capitalization. The guidance also requires that an entity test a film or license agreement for program material for impairment at a film group level when the film or license agreement is predominantly monetized with other films and/or license agreements. ASU 2019-02 and related amendments are effective for the Company beginning on January 1, 2021 with early adoption permitted. The Company is currently evaluating the impact of the new standard on its consolidated financial statements.

In December 2019, the FASB issued ASU 2019-12, *Income Taxes* (Topic 740), *Simplifying the Accounting for Income Taxes*, ("ASU 2019-12"). The purpose of ASU 2019-12 is to improve the disclosures related to fair value measurements in the financial statements. The improvements in ASU 2019-12 include removing certain exceptions for recognizing deferred taxes for investments, performing intraperiod allocation and calculating income taxes in interim periods. ASU 2019-12 also adds guidance to reduce complexity in certain areas, including recognizing deferred taxes for tax goodwill and allocating taxes to members of a consolidated group. ASU 2019-12 is effective for fiscal years beginning after December 15, 2021 and interim periods within fiscal years beginning after December 15, 2022, with early adoption permitted. The Company is currently evaluating the impact of ASU 2019-12 on its consolidated financial statements.

### NOTE 3 – ACQUISITIONS

#### Weather Group
On February 28, 2018, the Company entered into an Equity Purchase Agreement with the sellers of Weather Group LLC, and its parent holding companies, TV Holdings 1, LLC ("TVH1") and TV Holdings 2, LLC ("TVH2"), whereby we acquired all of the issued and outstanding equity of TVH1 and TVH2 for an aggregate purchase price of $181.2 million. The transaction closed on March 22, 2018.

The purchase price was comprised entirely of cash. In conjunction with the acquisition and as discussed in Note 11, AM Group entered into a new syndicated debt agreement for total borrowings of $310.0 million. This financing was used to acquire WG and its parent entities, refinance existing debt (which related mainly to the P&A entities), and to also provide additional working capital for the AM Group. The acquisition was primarily intended to deepen the Company's media presence in key content areas and markets and as part of strategic expansion plans.

The Company has determined that the transaction should be accounted for in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic No. 805, "Business Combinations." During the year ended December 31, 2019, no additional measurement period adjustments were recorded.

The following table summarizes the consideration paid for WG and the estimated fair value of the assets acquired and liabilities assumed at the acquisition date:

CONFIDENTIAL

EXHIBIT O(4)

AOE0940ESN0041610

# ALLEN MEDIA, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended December 31, 2019 and 2018

**NOTE 3 – ACQUISITIONS (Continued)**

|  | Amount ($)<br>(In millions) |
|---|---|
| Cash | 3.4 |
| Accounts receivable and unbilled receivables | 48.3 |
| Prepaid and other assets | 8.9 |
| Income taxes receivable | 6.3 |
| Tax credits receivables | 11.5 |
| Property, plant and equipment | 36.3 |
| Assets held for sale | 1.2 |
| Licensed films | 6.0 |
| Intangible assets – trade name | 0.6 |
| Intangible assets – internally developed software | 17.4 |
| Intangible assets – Intellistar technology | 3.8 |
| Investments at cost | 2.0 |
| Accounts payable, deferred revenues and accrued liabilities | (40.5) |
| Income taxes payable | (2.7) |
| Tax distribution payable | (6.3) |
| Deferred tax liabilities | (14.3) |
| Capital lease liabilities | (5.7) |
| **Total net assets acquired** | **76.2** |
| **Purchase Price** | **181.2** |
| **Goodwill** | **105.0** |

The fair value of the current assets acquired includes trade receivables with a fair value of $48.3 million. The gross amount due to the Company was $52.3 million, of which $4.0 million was expected to be uncollectible.

The acquired intangible assets, all of which are being amortized, have a weighted-average useful life of approximately 5 years. The intangible assets that make up that amount include internally developed software of $17.4 million (3-year weighted average useful life), Intellistar technology of $3.8 million (5-year weighted average useful life), and trade names of $0.6 million (10-year weighted average useful life). The goodwill is primarily attributable to expected post-acquisition synergies from integrating WGs assembled workforce and developed technologies as well as efficiencies in content creation and distribution. None of the goodwill is expected to be deductible for tax purposes. The deferred tax liabilities are a result of outside basis differences created primarily through a step-up in basis that occurred for US GAAP purposes.

Bayou

On May 2, 2019, the Company entered into a stock purchase agreement with the sellers of Bayou City Broadcasting Evansville, Inc. and Bayou City Broadcasting Lafayette, Inc., (collectively referred to as "Bayou"). AMB acquired 100% of the outstanding equity of Bayou for an aggregate purchase price of $165 million. AMB is 100% held by AMBH and AMBH is owned 74% and 26% by AM and the sole member of the Company, respectively. The 26% direct ownership of AMBH by the sole member results in a noncontrolling interest presented in these financial statements. Refer to Note 17.

22

EXHIBIT O(4)

CONFIDENTIAL

AOE094 HSN0041611

**ALLEN MEDIA, LLC AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
For the years ended December 31, 2019 and 2018

## NOTE 3 – ACQUISITIONS (Continued)

The purchase price was comprised entirely of cash. As further described in Note 11, in connection with the acquisition of Bayou and to finance the acquisition, the Company entered into a new term loan agreement ("Senior Bayou loan") with Brightwood as a lender with an aggregate principal value of $100 million. Additionally, simultaneous to the Senior Bayou loan, the Company entered into a note purchase agreement with Bain Capital Credit, L.P., as lender for an aggregate principal amount of $36 million.

The Company has determined that the transaction should be accounted for in accordance with FASB ASC Topic No. 805. The purchase price allocation of the Bayou is deemed to be preliminary pending final determination of fair values and other adjustments. The purchase price was allocated to the tangible and intangible assets acquired and liabilities assumed based on their estimated fair values as of the acquisition date. The preliminary fair values of acquired assets and liabilities assumed represent our estimate of fair value and are subject to change if additional information, such as changes to deferred taxes and/or working capital, becomes available.

In accordance with ASU 2015-16, the financial statements were not retrospectively adjusted for any measurement-period adjustments that occurred in subsequent periods. Rather, any adjustments to provisional amounts that were identified during the measurement period were recorded in the reporting period in which the adjustment was determined.

During the year ended December 31, 2019, adjustments were recorded to decrease the fair values assigned to accounts receivable by $0.1 million, deferred tax assets by $1.8 million, accounts payable by $0.3 million, and property and equipment by $0.4 million. The adjustments resulted in a corresponding increase in goodwill. Any additional depreciation or amortization as a result of the measurement period adjustments were not material. The following table summarizes the consideration paid for Bayou and the estimated fair value of the assets acquired and liabilities assumed at the acquisition date, which are adjusted for measurement-period adjustments through December 31, 2019:

|  | Amount ($) (In millions) |
| --- | --- |
| Cash | 1.5 |
| Accounts receivable | 6.5 |
| Prepaid and other current assets | 0.2 |
| Deferred tax assets | 0.3 |
| Property, plant and equipment | 6.1 |
| Intangible assets – FCC licenses | 7.5 |
| Accounts payable and other current liabilities | (2.3) |
| **Total net assets acquired** | **19.8** |
| **Purchase price** | **165.2** |
| **Goodwill** | **$    145.4** |

The fair value of the current assets acquired includes accounts receivables with a fair value of $6.5 million. The gross amount due to the Company at acquisition was $6.6 million, of which $0.1 million was expected to be uncollectible.

EXHIBIT O(4)

CONFIDENTIAL

AOE0942 ESN0041612

**ALLEN MEDIA, LLC AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
For the years ended December 31, 2019 and 2018

## NOTE 3 – ACQUISITIONS (Continued)

The FCC licenses have an indefinite life. The goodwill is primarily attributable to expected post-acquisition synergies from integrating Bayou's assembled workforce and developed technologies as well as efficiencies in content creation and distribution. Approximately $39.2 million of the goodwill is expected to be deductible for tax purposes.

## NOTE 4 – REVENUE RECOGNITION

As discussed in Note 2, we adopted ASC 606 for the year ended December 31, 2019. Under the modified retrospective adoption method, we are required to adjust the beginning balance of retained earnings for the cumulative prior period effect of applying the guidance. Based on detailed analysis performed, we determined that no adjustment to the beginning balance of retained earnings was necessary. As part of our adoption, the new standard was applied only to those contracts that were not substantially completed as of the date of adoption. Further, we utilized the contract modification practical expedient for purposes of our adoption.

During 2019, certain line items in our financial statements were impacted by the adoption of ASC 606 due to an acceleration of revenue recognized in our film business when our performance obligation was satisfied, as described in Note 2. Historically, advances received were deferred and revenue was recognized based on royalty revenue earned in each period. In cases where a single advance is received for multiple titles, the consideration is allocated to each title proportionally based on an estimate of standalone selling price. Also as result of our adoption of ASC 606, certain amounts relating to ADU liabilities which were previously recorded as accounts receivables were identified as conditional obligations resulting in further performance. This resulted in a decrease in accounts receivable and a corresponding decrease in deferred revenue upon adoption.

The following table presents how the adoption of ASC 606 affected certain line items in our consolidated statement of income for the year ended December 31, 2019:

| | Under previous guidance | Impact of adoption | As reported under ASC 606 |
|---|---|---|---|
| | (In millions) | | |
| Networks and content revenue | 261.5 | 3.8 | 265.3 |
| Programming and production expense | 171.1 | 1.3 | 172.4 |
| Operating (loss) income | (35.3) | 2.5 | (32.8) |
| Net loss attributable to Allen Media, LLC and Minority Interest | (105.1) | 2.5 | (102.6) |
| Net loss attributable to Allen Media, LLC | (101.6) | 2.5 | (99.1) |

The following table presents how the adoption of ASC 606 affected certain line items in our consolidated balance sheet as of December 31, 2019:

EXHIBIT O(4)

CONFIDENTIAL

AOE0943
ESN0041613

**ALLEN MEDIA, LLC AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
For the years ended December 31, 2019 and 2018

## NOTE 4 – REVENUE RECOGNITION (Continued)

| | Under previous guidance | Impact of adoption | As reported under ASC 606 |
|---|---|---|---|
| | | (In millions) | |
| **Assets** | | | |
| Accounts receivable, net | 85.7 | (5.0) | 80.7 |
| Film rights, less current portion | 14.5 | (1.3) | 13.2 |
| **Liabilities** | | | |
| Deferred revenue | 18.6 | (8.8) | 9.8 |
| **Equity** | | | |
| Member's deficit | (203.0) | 2.5 | (200.5) |

The following table presents how the adoption of ASC 606 affected certain line items in our consolidated statement of cash flows for the year ended December 31, 2019:

| | Under previous guidance | Impact of adoption | As reported under ASC 606 |
|---|---|---|---|
| | | (In millions) | |
| **Cash flows from operating activities** | | | |
| Net loss | (105.1) | 2.5 | (102.6) |
| Receivables | 5.5 | 5.0 | 10.5 |
| Deferred revenue | 7.8 | (8.8) | (1.0) |
| Amortization of film rights | 8.8 | 1.3 | 10.1 |
| Net cash used by operating activities | (10.6) | - | (10.6) |

## NOTE 5 – ACCOUNTS RECEIVABLE

The Company has receivables from contracts with customers for both accounts and royalties receivables. On the accompanying consolidated balance sheets, accounts receivable is shown net of affiliate revenue reserves and allowances for bad debt. As of December 31, 2019 and 2018, the Company had reserves against receivables of $2.1 million and $2.3 million, respectively. Included in accounts receivable are unbilled receivables amounting to $0.8 million and $0.3 million at December 31, 2019 and 2018, respectively, representing revenue earned in the current period but which were billed in full subsequent to the year end, typically the following month.

The Company has a loan and security agreement with a financial institution that is an asset-based financing agreement in which up to 90% of the Company's receivables from certain film rentals are assigned with full recourse. In accordance with FASB ASC 860, "Accounting for Transfers and Servicing," the assigned accounts receivable remain assets on the Company's consolidated balance sheet and the advances are recognized as a long-term line of credit (see Note 11).

EXHIBIT O(4)

CONFIDENTIAL

AOE094 ESN0041614

**ALLEN MEDIA, LLC AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
For the years ended December 31, 2019 and 2018

## NOTE 6 – TAX CREDIT RECEIVABLE

The Company generated Georgia Film Tax Credits (GaFTC) and Georgia Research & Development Tax Credits (GaR&D), collectively referred to as Tax Credit Receivables. GaFTC may be used to offset Georgia payroll withholding tax remittances or are sold to third parties on the open market through brokers. GaR&D are used to offset Georgia payroll tax withholding tax remittances. Due to these utilization methodologies, assets separate and distinct from income tax assets are reflected on the balance sheet for the Tax Credit Receivables at the net realizable value as they are generated. As of December 31, 2019 and 2018, the Company had current Tax Credit Receivables of $1.4 million and $1.9 million, respectively, and Tax Credit Receivables, net of current portion of $6.0 million and $6.9 million, respectively. Current Tax Credit Receivables are included in Prepaid expenses and other current assets on our consolidated balance sheets.

Of the noncurrent Tax Credit Receivables balance at December 31, 2019, $5.4 million relates primarily to GaFTC generated throughout 2019 for which the Company anticipates would take longer than one year to utilize if not immediately sold in 2020. The Company classifies these credits as noncurrent until all approvals to move forward with selling the credits are obtained from management, for which, at that time, the credits are classified as current when entering into arrangements with brokers to sell.

## NOTE 7 – PROPERTY AND EQUIPMENT

As of December 31, 2019 and 2018, property and equipment consisted of the following:

|  | 2019 (In millions) | 2018 (In millions) |
|---|---|---|
| Production and other equipment | 39.9 | 33.0 |
| Office furniture and equipment | 7.0 | 6.4 |
| Building and building improvements | 6.8 | 4.3 |
| Satellites | 2.8 | 2.8 |
| Trucks and automobiles | 0.6 | 0.5 |
| Land | 0.6 | - |
|  | 57.7 | 47.0 |
| Less: Accumulated depreciation | 22.9 | 12.1 |
| Subtotal | 34.8 | 34.9 |
| Construction in progress | 2.6 | 1.2 |
| **Property and equipment, net** | **37.4** | **36.1** |

Depreciation expense was $10.8 million and $7.7 million for the years ended December 31, 2019 and 2018 respectively. As of both December 31, 2019 and 2018, the Company's total cost of property and equipment purchased under capital leases was $7.2 million. The accumulated depreciation corresponding to property and equipment at December 31, 2019 and 2018 was $4.2 million and $3.1 million, respectively.

EXHIBIT O(4)

CONFIDENTIAL

AOE0945

ESN0041615

**ALLEN MEDIA, LLC AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
For the years ended December 31, 2019 and 2018

## NOTE 8 – GOODWILL AND INTANGIBLE ASSETS

As discussed in Note 3, Goodwill relates to the acquisition of WG which occurred during 2018, the acquisition of Bayou which occurred in 2019 and the acquisitions of TheGrio and Freestyle which occurred in previous years.

Intangible assets consist of internally developed technology and software (for internal use and that is held for sale, lease, or otherwise marketed), costs incurred to acquire the names of digital and satellite channels, FCC licenses, and localization technology (or STAR) conveyed to cable, satellite and other distributors.

The Company conducted an impairment analysis regarding internally developed and acquired software for its Local Now application and determined that the net book value should be fully impaired based on near-term projected cash flows from the intangible asset. The Company valued the application's future cash flows using the net present value method. As a result of the valuation, the Company recorded an impairment amount of $7.5 million which is recognized within impairment of investment at cost and intangible assets in the statement of operations.

As of December 31, 2019, Goodwill and Intangible Assets consisted of the following:

| | Weighted average amortization period (years) | (In millions) | | | |
| --- | --- | --- | --- | --- | --- |
| | | Gross carrying amount | Accumulated amortization | Impairment | Net carrying amount |
| Goodwill | 10 | 257.1 | (28.8) | - | 228.3 |
| | | | | | |
| Intangible assets | | | | | |
| Amortizing intangible assets: | | | | | |
| Tradenames | 10 | 0.6 | (0.1) | - | 0.5 |
| Software | 3 | 24.7 | (13.1) | (7.5) | 4.1 |
| STAR technology | 5 | 4.1 | (3.1) | - | 1.0 |
| Internet development | 15 | 1.3 | (0.5) | - | 0.8 |
| **Total definite-lived intangible assets** | | 30.7 | (16.8) | (7.5) | 6.4 |
| Indefinite-lived intangible assets: | | | | | |
| FCC license | | 7.5 | - | - | 7.5 |
| Other non-amortizing assets: | | | | | |
| Construction in progress | | 1.9 | - | - | 1.9 |
| **Total intangible assets** | | **40.1** | **(16.8)** | **(7.5)** | **15.8** |

27

EXHIBIT O(4)

CONFIDENTIAL                                                                 AOE094416 SN0041616

**ALLEN MEDIA, LLC AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
For the years ended December 31, 2019 and 2018

## NOTE 8 – GOODWILL AND INTANGIBLE ASSETS (Continued)

As of December 31, 2018, Goodwill and Intangible Assets consisted of the following:

| | Weighted average amortization period (years) | (In millions) | | |
| --- | --- | --- | --- | --- |
| | | Gross carrying amount | Accumulated amortization | Net carrying amount |
| Goodwill | 10 | 111.7 | (10.4) | 101.3 |
| | | | | |
| Intangible assets | | | | |
| Amortizing intangible assets: | | | | |
| Tradenames | 10 | 0.6 | - | 0.6 |
| Software | 3 | 20.5 | (6.0) | 14.5 |
| STAR technology | 5 | 3.9 | (1.8) | 2.1 |
| Internet development | 15 | 0.1 | - | 0.1 |
| Other | 15 | 0.9 | (0.3) | 0.6 |
| **Total definite-lived intangible assets** | | 26.0 | (8.1) | 17.9 |
| Other intangible assets: | | | | |
| Construction in progress | | 1.0 | - | 1.0 |
| **Total intangible assets** | | **27.0** | **(8.1)** | **18.9** |

Amortization expense for goodwill was $18.5 million and $9.0 million for the years ended December 31, 2019 and 2018, respectively.

Amortization expense for intangible assets was $8.7 million and $7.9 million for the years ended December 31, 2019 and 2018, respectively.

## NOTE 9 – TELEVISION LIBRARY

As of December 31, 2019, the Television Library consisted of the following:

| | (In millions) |
| --- | --- |
| As capitalized under ASC 926 | |
| Completed and released | 176.6 |
| In process | 1.4 |
| | 178.0 |
| As capitalized under ASC 920 | |
| Completed and released | 17.2 |
| In-process | 0.3 |
| | 17.5 |
| | |
| Less: Accumulated amortization | 102.3 |
| | |
| Less: Licensed films and television library, current portion | 5.3 |
| **Television library, Net of current portion** | **87.9** |

EXHIBIT O(4)

CONFIDENTIAL

AOE0947ESN0041617

## ALLEN MEDIA, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended December 31, 2019 and 2018

**NOTE 9 – TELEVISION LIBRARY (Continued)**

As of December 31, 2018, the Television Library consisted of the following:

|  | (In millions) |
|---|---|
| As capitalized under ASC 926 | |
| Completed and released | 143.2 |
| | |
| As capitalized under ASC 920 | |
| Completed and released | 10.2 |
| In-process | 0.6 |
| | 10.8 |
| | |
| Less: Accumulated amortization | 80.5 |
| | |
| Less: Licensed films and television library, current portion | 4.1 |
| **Television library, Net of current portion** | **69.4** |

Amortization expense was $22.0 million and $19.8 million for the years ended December 31, 2019 and 2018, respectively.

As of December 31, 2019, expected future amortization of the capitalized television library is as follows:

| Years Ending December 31, | Completed and Released | In Progress not Released | Total |
|---|---|---|---|
| | (In millions) | | |
| 2020 | 19.9 | 0.1 | 20.0 |
| 2021 | 17.2 | 0.3 | 17.5 |
| 2022 | 13.7 | 0.3 | 14.0 |
| 2023 | 11.0 | 0.2 | 11.2 |
| 2024 | 9.4 | 0.1 | 9.5 |
| Thereafter | 20.3 | 0.7 | 21.0 |
| **Total** | **91.5** | **1.7** | **93.2** |

EXHIBIT O(4)

CONFIDENTIAL

AOE0948

ESN0041618

**ALLEN MEDIA, LLC AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
For the years ended December 31, 2019 and 2018

## NOTE 10 – FILM RIGHTS

Film rights represent the cost to acquire the distribution rights of a motion picture and/or the cost of production for motion pictures. Film rights in process represent film rights that are in the process of being acquired or a film in the process of production. During the year-ended December 31, 2019 the company acquired film rights for certain motion pictures and incurred production costs with respect to 47 Meters Down II.

As of December 31, 2019 and 2018, film rights in process had a cost and net book value of $0.4 million and $8.7 million, respectively. Film rights for completed films had a cost of $34.3 million and $19.5 million, respectively with accumulated amortization of $21.5 million and $11.5 million, respectively, resulting in a net book value of $12.8 million and $8.0 million, respectively.

Amortization expense for film rights was $10.1 million and $9.7 million for the years ended December 31, 2019 and 2018, respectively.

The expected amortization period for the film rights above is as follows:

| Years Ending December 31, | (In millions) |
|---|---|
| 2020 | 5.5 |
| 2021 | 1.3 |
| 2022 | 1.1 |
| 2023 | 0.9 |
| 2024 | 0.6 |
| Thereafter | 3.8 |
| Total | 13.2 |

## NOTE 11 – LONG-TERM DEBT

In a prior year, one of our subsidiaries obtained a new loan agreement with a certain lender ("CION") for an initial term loan of $47.5 million ("initial term loan") and a delayed draw term loan (delayed draw loan") up to $12.5 million that the Company was able to draw upon through January 27, 2019. This loan was subsequently amended increasing the allowable draws and changing certain interest rates.

On March 22, 2018, the existing CION loans were refinanced with a syndicated loan ("first syndicated loan") between the Company and CION as well as other new lenders. The proceeds of $310.0 million of this first syndicated loan were used to finance the WG acquisition and related transaction costs (see Note 3), in addition to repaying a total of $84.3 million on previous loans outstanding. In accordance with ASC 470-50, *Debt—Modifications and Extinguishments*, the refinancing of previous debt with the first syndicated loan was accounted for as a debt modification resulting in capitalized debt issuance costs of $15.0 million.

The first syndicated loan carried interest at LIBOR, which in no event can be less than 1%, plus 9.25%. Principal repayments of $6.2 million per quarter began on June 30, 2018 and the loan was set to mature on March 22, 2025. The first syndicated loan was guaranteed by all subsidiaries of AM and was subject to financial and nonfinancial covenants.

EXHIBIT O(4)

CONFIDENTIAL

AOE0949

LSN0041619

**ALLEN MEDIA, LLC AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
For the years ended December 31, 2019 and 2018

## NOTE 11 – LONG-TERM DEBT (Continued)

On August 30, 2018, the first syndicated loan was refinanced with a second syndicated loan ("second syndicated loan") between various lenders, including certain lenders from the first syndicated loan, and AM. The proceeds of $375.0 million of this second syndicated loan were used to refinance $303.8 million remaining on the first syndicated loan, to pay a cash distribution to the member of AM of $30.0 million, and to provide additional working capital of $41.2 million.

The Company analyzed the second syndicated loan refinancing on a lender-by-lender basis in accordance with applicable accounting guidance, including ASC 470-50. In cases where a lender participated in both the first syndicated loan and second syndicated loan, the refinancing of the lender-specific loan qualified as a debt modification resulting in capitalization of lender fees and expense treatment for third-party loan fees. In one case, a lender was fully repaid through the refinancing resulting in derecognition of the associated capitalized fees and costs. Loan amounts associated to lenders which participated in the second syndicated loan and who were not previously lenders of the Company, were treated as new loans with all associated costs capitalized. As a result, the Company capitalized $39.8 million in debt issuance costs pertaining to the second syndicated loan. These costs are being amortized under the effective interest method over the term of the loan.

The second syndicated loan bears interest, at the option of the Company, (i) at the base rate as defined in the Credit and Guaranty agreement which, in no event, can be lower than 2% plus a margin of 5.5%, or (ii) the Eurodollar rate as defined in the Credit and Guaranty Agreement which in no event can be lower than 1% plus a margin of 6.50% (9.21% at December 31, 2018), and matures on August 30, 2023. Principal repayments of 1.25% of the loan amount ($4.7 million) are due per quarter, beginning March 31, 2019 until December 31, 2022, increasing to a payment of 1.875% of the loan amount for the payment due March 31, 2023. A final balloon payment of $286.0 million is then due August 30, 2023. As of December 31, 2018, $375.0 million of principal remained outstanding, together with $3.0 million of accrued interest.

On March 21, 2019, the Company entered into an amendment to the second syndicated loan ("first amendment") to increase the existing syndicated loan facility by $25.0 million. As a result of this additional financing, quarterly amortization payments due through December 31, 2022 increased by $0.3 million to $5.0 million a quarter, with a revised payment of $7.5 million due per quarter commencing March 31, 2023 until maturity at which point a final balloon payment of all remaining principal is due.

On June 27, 2019, the Company entered into an additional amendment to the second syndicated loan ("second amendment") to increase the existing syndicated loan facility by $20.0 million. As a result of this additional financing, quarterly principal payments due increased to $5.4 million through to December 31, 2022 with a revised principal payment of $8.1 million per quarter thereafter until maturity, at which point a final balloon payment of all remaining principal is due.

As of December 31, 2019, $398.9 million of principal remained outstanding on the second syndicated loan together with $0.4 million of accrued interest.

As discussed in Note 18, subsequent to December 31, 2019 the second syndicated loan was repaid in full. As a result, $4.2 million of the refinanced debt is included within Borrowing, current portion on our consolidated balance sheets reflecting the balances due in the current period based on the terms of the refinanced loans.

EXHIBIT O(4)

CONFIDENTIAL

AOE0959 ESN0041620

**ALLEN MEDIA, LLC AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
For the years ended December 31, 2019 and 2018

## NOTE 11 – LONG-TERM DEBT (Continued)

Bayou Loans

On July 3, 2019, to finance the acquisition of Bayou, AMB entered into a new term loan agreement (the "Senior Bayou loan") with an aggregate principal value of $100.0 million and a maturity date of July 3, 2020. The Senior Bayou loan bears interest, at the option of the Company at either (i) the base rate as defined in the loan agreement which, in no event, can be lower than 2.0% plus a margin of 5.25%, or (ii) the Eurodollar rate as defined in the loan agreement based primary on LIBOR rates with a margin of 6.25%. The rate at December 31, 2019 was 8.1%. The loan requires principal payments of $0.6 million on a quarterly basis beginning September 30, 2019, increasing to $1.3 million for the quarter ended September 30, 2021 with the final remaining principal balance due at maturity.

Additionally, simultaneous to the Senior Bayou loan, AMB entered into a note purchase agreement with Bain Capital Credit, L.P. ("Bayou Note"), as lender for an aggregate principal amount of $36.0 million and a maturity date of October 3, 2020. This note bears interest at 16.0% per annum of which 12.0% is cash interest payable quarterly beginning on September 30, 2019 and 4.0% is paid-in-kind interest which accrues to the principal amount of the note on a quarterly basis. At December 31, 2019 the total balance payable under the Bayou Note, was $36.7 million including $0.7 million of paid-in-kind interest had accrued and is included within Borrowings.

As discussed in Note 18, the Bayou Senior Loan and Bayou Note were repaid subsequent to December 31, 2019.

In conjunction with the subsequent refinancing described in Note 18, we entered into a financing commitment letter with a financial institution for bridge financing senior notes of $300.0 million and a term loan of $530.0 million. The fee associated with the financing commitment was recognized as an expense over the commitment period and included within Interest expense on the consolidated statements of operations. In February 2020, the syndicated financing was obtained and the corresponding bridge financing commitment terminated in accordance with the terms of the agreement.

Additional Financings

In a prior year, ESP&A entered into a loan amendment with CION whereby an additional loan was added to an existing ESP&A facility ("additional loan" or "Friend Request loan"). The additional loan allowed for $7.5 million to be advanced to ESP&A by CION. The additional loan was set to mature in September 2037 and, subsequent to a March 9, 2018 amendment, carried interest at 10% per annum at December 31, 2019. Under the terms of the loan agreement, amortization payments, equal to 2% of the outstanding principal, were required to be made on the last day of every March, June, September, and December, commencing September 2017. At December 31, 2019 and 2018, the balance outstanding was $5.3 million and $5.5 million, respectively.

On March 9, 2018, ESP&A entered into a loan amendment with CION whereby an additional draw of $20.0 million was provided to the Company to fund the prints and advertising costs for the Hurricane Heist film which matures on March 9, 2038. The loan was fully repaid during the year-ended December 31, 2019. At December 31, 2018 this loan bore interest at 5% per annum and the balance outstanding was $2.1 million.

EXHIBIT O(4)

CONFIDENTIAL

AOE095 HSN0041621

**ALLEN MEDIA, LLC AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
For the years ended December 31, 2019 and 2018

## NOTE 11 – LONG-TERM DEBT (Continued)

On May 18, 2018, ESP&A entered into a loan agreement with CION to provide a draw of $11.0 million to fund the prints and advertising costs for the Chappaquiddick film. This loan bears interest at 10% per annum and matures on May 18, 2022. As of December 31, 2019 and 2018, the balance outstanding was $0.9 million and $1.1 million, respectively.

On July 8, 2018, ESP&A amended the loan to obtain an additional draw of $10.0 million. This loan bears interest at 10% and matures on March 9, 2038. As of December 31, 2019 and 2018, the balance outstanding was $9.2 million and $9.8 million, respectively.

On February 13, 2019, ESP&A entered into a loan agreement with Comerica Bank to provide a draw of $7.9 million to fund the prints and advertising costs for the 47 Meters Down II film. The loan was set to mature on June 30, 2020. On August 27, 2019, ESP&A entered into an amendment to the loan agreement which extended the maturity date to August 27, 2022 and increased the commitment to $20.0 million. The loan bears interest at a rate of LIBOR plus 2% or 3% dependent upon the Company's election of loan type. At December 31, 2019, the interest rate was approximately 4.70% and the balance outstanding was $6.2 million.

On June 19, 2018, the Company entered into a loan and security agreement ("line of credit") with a financial institution for a senior, secured facility of up to $20.0 million, which can be increased to $30.0 million, in the aggregate, subject to a borrowing base of 90% of eligible receivables due from major distributors of the Company's films, as specifically named in the loan and security agreement. Borrowings on this loan and security agreement are secured by substantially all assets of a certain subsidiary. For purposes of this loan and security agreement, the assets of the subsidiary includes all of the distribution rights of ESMP in all films. Borrowings on the loan and security agreement bear interest at the prime rate plus 2.50% or LIBOR plus 3.50%. The interest rates in place at December 31, 2019 and 2018, were approximately 5.00% and 5.46%. Repayments on the line of credit are made as collections from the assigned receivables are received. The loan and security agreement matures on June 19, 2021, at which date all remaining outstanding amounts on this line of credit are due. On December 10, 2019, the Company entered into an amendment to the line of credit extending the maturity date to September 30, 2022. As of December 31, 2019 and 2018, $6.0 million and $14.1 million, respectively, remained outstanding on this line of credit.

On November 7, 2019, our subsidiary, Arctic Dogs LLC entered into a loan agreement with Comerica Bank to provide a senior secured credit facility ("Arctic Dogs Loan") for up to $10.0 million to fund the prints and advertising costs for the Arctic Dogs film. The loan has a maturity date of November 7, 2022. The loan bears interest, at the option of the Company, (i) at the base rate as defined in the Arctic Dogs loan agreement which, in no event, can be lower than 1% plus the federal funds effective rate, plus applicable margin or (ii) 3% plus the LIBOR rate as defined in the loan agreement (approximately 4.90% at December 31, 2019). At December 31, 2019, the balance outstanding was $1.7 million.

The aforementioned additional financings were all subject to certain financial and non-financial covenants with which the Company was in compliance at December 31, 2019. Management assessed the accounting treatment of the additional financings loan amendments and concluded that the amendments qualified as a debt modification and that the related debt issuance costs were not material.

EXHIBIT O(4)

CONFIDENTIAL

AOE0952 ESN0041622

## ALLEN MEDIA, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended December 31, 2019 and 2018

### NOTE 11 – LONG-TERM DEBT (Continued)

As of December 31, 2019 and 2018, the Company has the following debt outstanding:

| | 2019 | 2018 |
|---|---|---|
| | (In millions) | |
| Second syndicated loan | 398.9 | 375.0 |
| Senior Bayou loan and Bayou note | 135.5 | - |
| Friend request loan | 5.3 | 5.5 |
| Hurricane heist loan | - | 2.1 |
| Hostiles upsize loan | 9.2 | 9.8 |
| Chappaquiddick loan | 0.9 | 1.1 |
| 47MD loan | 6.2 | - |
| Line of credit | 6.0 | 14.1 |
| Arctic Dogs Loan | 1.7 | - |
| **Total** | **563.7** | **407.6** |
| Less: Outstanding debt issuance costs and original issue discount | (46.7) | (50.6) |
| **Net amounts due** | **517.0** | $ **357.0** |

### NOTE 12 – NOTES PAYABLE TO PRODUCTION COMPANY

In a prior year, our subsidiary Friend Request LLC entered into a note payable agreement with the production company from which ESMP had originally acquired the film rights to the movie. The note payable agreement advanced funds of $6.6 million to be used for part of the media expenditures with respect to the promotion of the movie. The note carries interest of 15% per annum and is due in full by September 22, 2020. As of December 31, 2019 and 2018, the total amount outstanding on the note was $6.6 million, which is included in Borrowings, current portion, and accrued interest was $2.3 million and $1.3 million, respectively. Accrued interest is included in accounts payable and accrued expenses in the accompanying consolidated balance sheet.

On October 22, 2018, our subsidiary Replicas, LLC entered into a note payable agreement with the same production company. The note payable agreement allowed for funds of $8.2 million to be advanced for use for part of the media expenditures with respect to the promotion of the movie. Interest on this note is calculated at 15% of a portion of the amounts advanced for the media spend, as defined in the agreement. The entire amount of $8.2 million was advanced on December 15, 2018. The note is due in full by January 11, 2022. As of December 31, 2019 and 2018, the total outstanding on the note was $8.2 million for both years included in Borrowings, net of current portion and accrued interest was $1.3 million and $0.1 million, respectively, which is included in accounts payable and accrued expenses in the accompanying consolidated balance sheet.

On October 25, 2019, our subsidiary Arctic Dogs, LLC entered into a note payable agreement with the same production company. The note payable agreement allowed for funds of $9.5 million to be advanced for use for part of the media expenditures with respect to the promotion of the movie. The note carries interest of 18% and is due in full by January 11, 2022. As of December 31, 2019, the total outstanding on the note was $9.5 million which is included in Borrowings, net of current portion, and accrued interest was $0.3 million which is included in accounts payable and accrued expenses in the accompanying consolidated balance sheet.

EXHIBIT O(4)

CONFIDENTIAL

ESN0041623

# ALLEN MEDIA, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended December 31, 2019 and 2018

## NOTE 13 – DUE TO RELATED PARTY

On October 25, 2018 the Company entered into two loan agreements for an aggregate total of $5.4 million with the sole member of AMH to fund operating expenses. These borrowings bear interest at 18% per annum and mature on October 25, 2021. As of both December 31, 2019 and 2018, the total balances outstanding on the notes was $5.4 million.

On December 17, 2018, Replicas LLC entered into a loan agreement for $10.7 million with the sole member of AMH to fund the prints and advertising costs for the Replicas movie. These borrowings bear interest at 16% per annum, matures on December 17, 2021, and will be repaid out of receipts from the exploitation of the Replicas movie. As of December 31, 2019 and 2018, the total balances outstanding on the note were $6.3 million and $6.2 million, respectively and accrued interest was $0.5 million and $0.1 million, respectively.

On July 17, 2019, 47 Meters Down II entered into a loan agreement for $3.8 million with the sole member of AMH to fund operating expenses. These borrowings bear interest at 18% per annum, and mature on July 17, 2023. As of December 31, 2019, the total balance outstanding on the loan was $3.8 million and accrued interest balance was $0.3 million.

On October 25, 2019, Arctic Dogs LLC entered into a loan agreement for $19.5 million with the sole member of AMH to fund operating expenses. The loan bears interest at 16% per annum and matures on October 25, 2022. As of December 31, 2019, the total balance outstanding on the loan was $9.6 million

## NOTE 14 – ACCOUNTS PAYABLE AND ACCRUED EXPENSES

As of December 31, 2019 and 2018, the accounts payable and accrued expenses were comprised of the following:

|  | 2019 (In millions) | 2018 (In millions) |
|---|---|---|
| Accounts payable | 68.2 | 27.2 |
| Accrued interest | 11.4 | 7.7 |
| Accrued payroll | 6.4 | 7.1 |
| Accrued advertising | 3.3 | 2.4 |
| Accrued satellite and video transmission | 1.2 | 1.6 |
| Amounts owed to producers | 3.1 | 3.6 |
| Residuals payable, current portion | 4.4 | 6.2 |
| Other accrued expenses | 7.7 | 0.4 |
| **Total accounts payable and accrued expenses** | **105.7** | **56.2** |

EXHIBIT O(4)

CONFIDENTIAL

AOE09-ESN0041624

**ALLEN MEDIA, LLC AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
For the years ended December 31, 2019 and 2018

**NOTE 15 – INCOME TAXES**

Provision for income taxes for the years ended December 31, 2019 and 2018 for the taxable entity group consisted of the following:

|  | 2019 (In millions) | 2018 (In millions) |
|---|---|---|
| Current tax (benefit) | | |
| Federal | 5.8 | 6.0 |
| States | 1.4 | 0.9 |
| Foreign | 0.1 | 0.1 |
| Total current | 7.3 | 7.0 |
| | | |
| Deferred tax (benefit) | | |
| Federal | (2.8) | (1.4) |
| States | (0.1) | 0.4 |
| Total deferred | (2.9) | (1.0) |
| | | |
| **Provision for income taxes** | **4.4** | **6.0** |

For the period from January 1, 2019 to December 31, 2019, the provision for income taxes of the taxable entity group differs from the amount of income tax determined by applying the applicable U.S. statutory income tax rate to pretax income primarily due to state and local income taxes, nondeductible goodwill amortization, nondeductible transaction costs and nondeductible interest expense for which the company has a valuation allowance established.

On December 22, 2017, the President of the United States signed into law the Tax Cuts and Jobs Act tax reform legislation. This legislation makes significant changes in U.S. tax law, including a reduction in the corporate tax rates, changes in net operating loss carryforwards and carrybacks, and a repeal of the corporate alternative minimum tax. The legislation reduced the U.S. corporate tax rate down to 21%, starting in the year ended December 31, 2018. As a result of the enacted law, the taxable entity group was required to revalue deferred tax assets and liabilities at the enacted rate.

EXHIBIT O(4)

CONFIDENTIAL

AOE095 ESN0041625

# ALLEN MEDIA, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended December 31, 2019 and 2018

## NOTE 15 – INCOME TAXES (Continued)

Significant components of deferred tax assets and liabilities for the taxable entity group at December 31, 2019 and 2018 were as follows:

|  | 2019 (In millions) | 2018 (In millions) |
|---|---|---|
| **Deferred tax assets** | | |
| Residuals | 0.4 | 0.4 |
| Deferred rent | 0.1 | 0.1 |
| Deferred revenue | 0.5 | 0.7 |
| Interest limitation | 2.5 | 0.4 |
| Book rights | 0.1 | 0.1 |
| Charitable contributions | 0.1 | 0.1 |
| Transaction costs | 0.2 | - |
| Tax credits | 0.0 | 0.1 |
| Net operating losses | 3.7 | 0.7 |
| Total deferred tax assets | 7.6 | 2.6 |
| | | |
| Valuation allowance | (5.5) | - |
| Total deferred tax assets, net | 2.1 | 2.6 |
| | | |
| **Deferred tax liabilities** | | |
| Deferred production costs | (3.0) | (3.8) |
| Fixed assets & intangibles | (1.1) | (0.2) |
| Outside basis difference in WG partnership interest | (10.4) | (14.1) |
| | | |
| Total deferred tax liabilities | (14.5) | (18.1) |
| | | |
| **Total deferred taxes, net** | **(12.4)** | **(15.5)** |

All deferred tax assets and liabilities are classified as long term. The taxable entity group measures deferred taxes associated with its interest in Weather Group based upon the outside basis difference of its investment in the partnership. One of our subsidiary's federal net operating loss carryforwards are $2.9 million as of December 31, 2019 and 2018, which is made up of $1.0 million of net operating losses generated as of December 31, 2017 that expire in 2038 and $1.9 million of net operating losses generated in the short tax period ended March 22, 2018 that have an indefinite carryforward period. Federal net operating loss carry forwards of AMB at December 31, 2019 are $11.1 million, comprised of $5.0 million of net operating losses generated as of December 31, 2017 that expire in 2038 and $6.1 million of net operating losses generated after December 31, 2017 that have an indefinite carryforward period.

## NOTE 16 – COMMITMENTS, CONTINGENCIES AND RELATED PARTY TRANSACTIONS

<u>Operating Leases</u>
The Company leases office and studio facilities in Century City and Culver City, California, Chicago, Illinois, New York, New York, and Atlanta, Georgia, pursuant to agreements expiring through the years ended December 2019 to 2028. The Century City leases are personally guaranteed by the member of AMH.

EXHIBIT O(4)

CONFIDENTIAL

AOE0956 SN0041626

**ALLEN MEDIA, LLC AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
For the years ended December 31, 2019 and 2018

**NOTE 16 – COMMITMENTS, CONTINGENCIES AND RELATED PARTY TRANSACTIONS (Continued)**

Rent expense is charged ratably over the lives of the leases using the straight-line method. The Company has a standby letter of credit in respect of the New York facility. The term of the letter of credit is for five years, maturing in January 2022 and a restricted cash account has been established for this amount. At both December 31, 2019 and 2018, the restricted cash amount being held in respect of the letter of credit was $0.2 million.

Total rent expense for the years ended December 31, 2019 and 2018 was approximately $4.7 million and $4.3 million, respectively.

Future minimum lease payments, by year and in aggregate, with initial or remaining terms of over one year are as follows:

| Years Ending December 31, | (In millions) |
|---|---|
| 2020 | 5.2 |
| 2021 | 4.9 |
| 2022 | 5.0 |
| 2023 | 4.1 |
| 2024 | 3.5 |
| Thereafter | 5.1 |
| **Total** | **27.8** |

Capital Leases

The Company has outstanding capital lease obligations related to satellite transponders and office and production equipment that expire at varying dates between 2020 and 2022. The implicit rates of interest on these leases range from 5.8% to 15.2%. The following is a schedule by years of future minimum lease payments under capital leases, as of December 31, 2019:

| Years Ending December 31, | (In millions) |
|---|---|
| 2020 | 2.8 |
| 2021 | 2.2 |
| 2022 | 0.4 |
| Total | 5.4 |
| Less: imputed interest | (0.4) |
| Present value of net minimum lease payments | 5.0 |
| Less: Capital lease obligation, current portion | (2.5) |
| **Capital lease obligation, long-term portion** | **2.5** |

EXHIBIT O(4)

CONFIDENTIAL

AOE09 ESN0041627

## ALLEN MEDIA, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended December 31, 2019 and 2018

---

**NOTE 16 – COMMITMENTS, CONTINGENCIES AND RELATED PARTY TRANSACTIONS (Continued)**

Long-term Debt

The Company has various debt agreements outstanding as of December 31, 2019 as described in Note 11. Future payments for borrowings including notes payable to production company, by year and in aggregate, at the balance sheet date are as follows:

| Years Ending December 31, | (In millions) |
|---|---|
| 2020 | 163.6 |
| 2021 | 22.0 |
| 2022 | 53.6 |
| 2023 | 334.3 |
| 2024 | - |
| Thereafter | 14.5 |
| **Total** | **588.0** |

Certain debt agreements with near term maturities were refinanced subsequent to December 31, 2019 resulting in debt due during 2020 of $10.8 million after the refinancing transaction as described in further detail in Note 18.

Purchase Commitments

*Film Contract Rights*

WG has commitments to purchase or license certain programming that is not yet available for broadcast, primarily purchased or licensed first-run episodic programming. Such programming is generally produced and delivered at or near its broadcast date. Such contracts generally require progress payments as certain production milestones are achieved, prior to the programming becoming available for broadcast. If programming is not produced, WG's commitment to purchase or license the programming would generally expire without obligation.

*Employment and Talent Agreements*

WG regularly enters into multi-year employment agreements with its on-air talent for the Company's national cable network, as well as with certain executives. Under certain circumstances, the agreements may be terminated prior to expiration.

*Satellite and Video Transmission*

In a prior year, the Company entered into an arrangement with a satellite link and video transmission provider that was set to expire in January 2019.

During the year ended December 31, 2018, the Company entered into an amendment with the provider whereby, upon the expiration of the original term in January 2019, a new arrangement ("subsequent term") began which expires in January 2023. Total payments under the subsequent term total $6.0 million which are payable in annual installments beginning during the year ended December 31, 2020.

EXHIBIT O(4)

CONFIDENTIAL

AOE0958

ESN0041628

# ALLEN MEDIA, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended December 31, 2019 and 2018

## NOTE 16 – COMMITMENTS, CONTINGENCIES AND RELATED PARTY TRANSACTIONS (Continued)

*Unconditional Purchase and Other Commitments*

In the normal course of business, the Company enters into multi-year agreements for the provision of services including software licensing arrangements, audience ratings, syndication, advertising services, and certain other services. These arrangements are generally not cancelable prior to their expiration and represent unconditional purchase commitments of the Company that are payable over a number of years. The Company also purchases product components from a variety of suppliers and also has certain general commitments to make payments to certain customers under related agreements.

The commitments arising from these purchase and customer agreements as of December 31, 2019 are as follows:

| Years Ending December 31, | Contract Film Rights | Employment and Talent | Satellite Links and Video Transmission | Unconditional Purchase and Other Commitments | Total |
|---|---|---|---|---|---|
| 2020 | 8.2 | 5.1 | 2.1 | 50.0 | 65.4 |
| 2021 | - | 4.1 | 1.9 | 13.2 | 19.2 |
| 2022 | - | 2.7 | 1.9 | 5.0 | 9.6 |
| 2023 | - | 1.8 | 0.1 | 1.0 | 2.9 |
| 2024 | - | 0.2 | - | - | 0.2 |
| Thereafter | - | - | - | 0.1 | 0.1 |
| Total | 8.2 | 13.9 | 6.0 | 69.3 | 97.4 |

Contingencies

In July 2014, pursuant to an action filed by talent ("the original claimant") in 2012, the Company reached a settlement with SAG-AFTRA for a class action lawsuit for $1.4 million. In February 2015, the original claimant filed two appeals in the Ninth Circuit Court of Appeals. Between March 2016 and June 2018, the appeals have been heard, complaints have been amended by the plaintiff and dismissed in part by the district and superior court. All causes of action and complaints that were dismissed have subsequently been appealed by the plaintiff and have been referred back to the Ninth Circuit Court of Appeals. In April 2019, an oral argument for both appeals was heard by the Ninth Circuit Court of Appeals and the cases were submitted for decision. The Ninth Circuit remanded one case to state court and one back to the district court. As of the date these consolidated financial statements were available to be issued, following a settlement between the plaintiffs and SAG/AFTRA, the two cases are both back in state court with only a handful of the claims remaining.  The Company intends to seek dismissal or settle for nuisance value.  The Court is setting a mandatory settlement conference for the summer 2020.  Management is unable to predict the outcome of these matters or estimate a possible range of loss for each, if any.

Beginning in 2014, four claims, each for an unspecified amount, were filed against the Company with respect to the productions of certain TV series'. These claims were filed by the SAG-AFTRA for unpaid residuals for television programming, late payment penalties and health and retirement contributions. Most of the claims are in various stages of arbitration. One claim has resulted in a payment of $0.1 million. For the year ended December 31, 2019, the Company has accrued a total of $5.0 million within Accounts payable and accrued liabilities and other long term liabilities which represents the settlement amount proposed at that date by SAG-AFTRA. Subsequent to the balance sheet date, a settlement agreement was executed between the parties for the amount of the proposed settlement.

EXHIBIT O(4)

CONFIDENTIAL

AOE0959 SN0041629

**ALLEN MEDIA, LLC AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**For the years ended December 31, 2019 and 2018**

**NOTE 16 – COMMITMENTS, CONTINGENCIES AND RELATED PARTY TRANSACTIONS (Continued)**

During 2015, an arbitration claim for an unspecified amount was filed against the Company and its stockholder. This claim was filed by the Writers Guild of America for unpaid residuals for television programming, late payment penalties and health and retirement contributions. In February 2018, the arbitrator issued an order to the Writers Guild of America to release certain amounts held in custody and simultaneously required the Company to make an additional payment to the Writers Guild of America of $0.1 million. In May 2018, the Writers Guild of America confirmed to the arbitrator that the required payments had been made and the arbitrator released jurisdiction over this matter and declared the case closed.

In addition to the above, from time to time, the Company is involved in claims and legal proceedings and other disputes that arise in the ordinary course of its business. In the opinion of the Company's management and legal counsel, such claims are without substantial merit and should not result in judgments which, in the aggregate, would have a material adverse effect on the Company's financial statements.

**NOTE 17 – MEMBER'S AND STOCKHOLDER'S DEFICIT**

Re-organization
As of March 22, 2018, as discussed in Note 1, the corporate structure was re-organized in conjunction with the acquisition of WG (see Note 3). This resulted in a reclassification of common stock of $100 and accumulated deficit of $26.7 million from stockholder's equity to member's equity. During the period between March 22, 2018 and December 31, 2018, and as discussed in Note 11, concurrent with the second syndicated financing, the member took a cash distribution of $30.0 million.

Stockholder's/Member's Note Receivable
The Company advances funds to the sole member of AMH on a periodic basis. Prior to the re-organization on March 22, 2018, all advances were reported as stockholder note receivable. Between January 1, 2018 and March 22, 2018, the date of the re-organization, there were $0.1 million in advances and $3.8 million of repayments made on the stockholder note receivable. As of March 22, 2018, the $4.0 million balance in the stockholder note receivable was reclassified to member note receivable.

During the period from March 22, 2018 through December 31, 2018, there were $6.4 million in advances and $4.1 million in repayments made on the member note receivable. During the period from January 1, 2019 to December 31, 2019 there were $13.8 million in repayments and $15.2 million in advances on the member note receivable. As of December 31, 2019, the member note receivable was $4.9 million. The member note receivable accrues interest at 3% per annum and matures on December 31, 2021.

During the years ended December 31, 2019 and 2018, interest income was $0.4 million and $0.3 million as shown in the consolidated statement of operations.  As of both December 31, 2019 and 2018, accrued interest income was an immaterial amount. These amounts are included in prepaid and other current assets in the accompanying consolidated balance sheet.

EXHIBIT O(4)

CONFIDENTIAL

AOE09669
ESN0041630

# ALLEN MEDIA, LLC AND SUBSIDIARIES
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### For the years ended December 31, 2019 and 2018

## NOTE 17 – MEMBER'S AND STOCKHOLDER'S DEFICIT (Continued)

Minority Interest

In conjunction with the acquisition of Bayou as further described in Note 3, the sole member of the Company contributed cash to AMBH in exchange for a 26% equity interest in AMBH. This created a noncontrolling interest relationship with a related party as the sole member holds equity directly in one of the Company's consolidated subsidiaries. There were no noncontrolling or minority interests applicable to the Company as of December 31, 2018. The net loss attributable to the noncontrolling interest is determined based on the results of AMB. The following table reconciles the shareholders equity attributable to the noncontrolling interest:

|  | As of December 31, 2019 (In millions) |
|---|---:|
| Minority Interest, beginning | - |
| Issuance of equity in subsidiary to noncontrolling interest holder | 10.0 |
| Non-cash transfer of minority interest | - |
| Net loss attributable to noncontrolling interest | (3.5) |
| **Total** | **$   6.5** |

## NOTE 18 – SUBSEQUENT EVENTS

Management has evaluated all activity through May 29, 2020 (the date the consolidated financial statements are available to be issued) and, except for the matters below, concluded that no subsequent events have occurred that would require recognition or disclosure in the notes to consolidated financial statements.

Acquisition

On February 11, 2020, AMB Evansville, Inc. closed the acquisition of 11 broadcast television stations from the sellers of USA Television Holdings, LLC, and USA Television MidAmerica Holdings, LLC (collectively, "USA TV") for a cash purchase price of approximately $302.7 million.

Loan Refinancing

On February 10, 2020, in conjunction with closing the acquisition of USA TV, the Company entered into an indenture agreement for $300.0 million of senior notes ("Senior Notes") and a term loan agreement for $530.0 million ("Term Loan") and revolving line of credit ("revolver") with an available credit line of $40.0 million. The Company drew $20.0 million on the revolver at close. The funds were used to repay the second syndicated loan, Senior Bayou Loan, and Bayou Note, finance the acquisition of USA TV, and pay certain transaction expenses associated to both the acquisition of USA TV and the refinancing. The Senior Notes bear interest at 10.5% and mature on February 10, 2028. The Term Loan and revolver bear interest at LIBOR plus a margin of 5.5%. The Term Loan requires principal payments on a quarterly basis of 1% per annum of the initial principal balance. The Term Loan and revolver are due February 10, 2027, and February 10, 2025, respectively. In conjunction with the refinancing, the non-controlling interest described in Note 17 was contributed from the noncontrolling interest holder to the Company and as a result all subsidiaries are wholly owned subsequent to the transaction.

Under the loan agreements, the Company is subject to certain financial and nonfinancial covenants including terms which require the Company to maintain certain metrics and ratios, limit certain payments, expenditures, or asset sales, and to report financial information to our lenders on a periodic basis.

EXHIBIT O(4)

CONFIDENTIAL

AOE09 ESN0004163141631

# ALLEN MEDIA, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### For the years ended December 31, 2019 and 2018

**NOTE 18 – SUBSEQUENT EVENTS (Continued)**

On February 21, 2020, the Company entered into an amendment of the Term Loan to increase the principal balance and received an additional $25.0 million of financing from a certain lender under the terms of the syndicated loan. As a result, the quarterly principal payment due under the agreement increased to $1.4 million.

On April 9, 2020, the Company entered into a second amendment to the Term Loan and revolver to increase the available credit line of the revolver to $55.0 million.

COVID-19

On March 11, 2020, the World Health Organization characterized the COVID-19 outbreak as a pandemic and public health emergency of international concern. The President of the United States declared a State of National Emergency due to the COVID-19 outbreak and several states in which we operate have adopted laws, rules, regulations or decrees intended to address the COVID-19 outbreak, including implementing travel restrictions, closing non-essential businesses and/or restricting daily activities. The development and impact of COVID-19 on the overall economy is uncertain and there might be impact to broadcasting and movie production. The Company's affiliate subscription revenue stream has not been significantly impacted due to the nature of the business and related revenue stream as described in Note 2. More than half of the Company's advertising fees are paid upfront by customers; customers that do not pay upfront and are contractually permitted to cancel, have increased their cancellations. Given the unprecedented and evolving nature of the pandemic, the Company is unable to quantify the potential impact and will continue to evaluate ongoing developments.

CARES Act

After the balance sheet date but prior to the issuance of these financial statements, the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) was enacted and signed into law on March 27, 2020 in response to the COVID-19 pandemic. The CARES Act, among other things, contains provisions that may increase liquidity.  The Company is currently evaluating the impact of the CARES Act, but does anticipate modifications on the limitation of business interest expense and the utilization of net operating losses ("NOLs") could be beneficial to the Company.

EXHIBIT O(4)

CONFIDENTIAL

AOE09662 ESN0041632