1   LOUIS R. MILLER (State Bar No. 54141)
    smiller@millerbarondess.com
2   DAVID W. SCHECTER (State Bar No. 296251)
    dschecter@millerbarondess.com
3   MURAD SALIM (State Bar No. 342747)
    msalim@millerbarondess.com
4   MILLER BARONDESS, LLP
    2121 Avenue of the Stars, Suite 2600
5   Los Angeles, California 90067
    Telephone:    (310) 552-4400
6   Facsimile:    (310) 552-8400

7   *Attorneys for PLAINTIFFS*

8   Patricia Brown Holmes (*pro hac vice*)      Loretta E. Lynch (*pro hac vice*)
    Amy Andrews (*pro hac vice*)                PAUL, WEISS, RIFKIND,
9   Shalem Massey (SBN 143281)                  WHARTON & GARRISON LLP
    Jennifer Steeve (SBN 308082)                1285 Avenue of the Americas
10  RILEY SAFER HOLMES &                        New York, New York 10019-6064
    CANCILA LLP                                 lelynch@paulweiss.com
11  100 Spectrum Center Drive, Suite 440
    Irvine, CA  92618                           John C. Hueston (SBN 164921)
12  smassey@rshc-law.com                        Moez M. Kaba (SBN 257456)
    jsteeve@rshc-law.com                        HUESTON HENNIGAN LLP
13                                              523 West 6th Street, Suite 400
                                                Los Angeles, CA 90014
14                                              jhueston@hueston.com
                                                mkaba@hueston.com
15
16          *Attorneys for Defendant McDonald's USA, LLC*

17
18          **UNITED STATES DISTRICT COURT**
            **CENTRAL DISTRICT OF CALIFORNIA**

19
20  ENTERTAINMENT STUDIOS              Case No. 2:21-cv-04972-FMO-MAA
    NETWORKS, INC., a California
21  corporation; WEATHER GROUP, LLC,   **JOINT EVIDENTIARY APPENDIX**
    a Delaware limited liability company,  **REGARDING CROSS FOR**
22                                     **SUMMARY JUDGMENT(VOL 7)**
            Plaintiffs,
23                                     Assigned to the:
        v.                             Hon. Fernando M. Olguin
24
    McDONALD'S USA, LLC, a Delaware
25  limited liability company,         Date:      October 19, 2023
                                       Time:      10:00 a.m.
26          Defendant.                 Location: Courtroom 690

27
28

          **JOINT EVIDENTIARY APPENDIX REGARDING CROSS FOR SUMMARY JUDGMENT**

# EXHIBIT O(83)

# UPFRONT 2021

**Gene Cunningham/Austin Anderson**

**ES COURT COMBO – *Cleared in 92% of the Country!***



EXHIBIT O(83)

AOE196
ESN0002571



**The Entertainment Studios Court Combo Out-Performs, or is Comparable to, Numerous Court, Talk and Entertainment Competitors. Here are just a few examples..**



| HH Rtg. – Season-to-Date: | |
|---|---|
| **ES Court Combo** | **.94** |
| | |
| Kelly Clarkson | .93 |
| Steve Wilkos | .80 |
| Tamron Hall | .80 |
| Rachel Ray | .78 |
| Judge Mathis | .77 |
| Judge Jerry | .69 |
| Wendy Williams | .68 |
| Extra | .67 |
| Dr. Oz | .62 |
| Daily Mail | .60 |
| Divorce Court | .60 |
| Drew Barrymore | .50 |
| Real | .38 |
| Protection Court | .28 |
| Doctors | .26 |

| Adult 25-54 Rtg. – Season-to-Date: | |
|---|---|
| **ES Court Combo** | **.24** |
| | |
| Judge Mathis | .26 |
| Tamron Hall | .26 |
| Right This Minute | .25 |
| Rachel Ray | .23 |
| Daily Mail | .23 |
| Judge Jerry | .23 |
| Divorce Court | .22 |
| Dr. Oz | .20 |
| Real | .19 |
| Drew Barrymore | .18 |
| Protection Court | .10 |
| Doctors | .08 |
| Forensic Files | .04 |

Source: Nielsen, C3. Season-to-Date = 9/21/20-1/24/21.





***Internal Use Only***

While the ES Court Combo slightly declined vs. last year, many of our competitors have experienced double-digit losses…

**Season-to-Date 2019/20 to 2020/21 to-date - Households:**

| | |
|---|---|
| **ES Court** | **-7%** |
| **Judge Jerry** | **-27** |
| **People's Court** | **-22** |
| **Hot Bench** | **-16** |
| **Judge Judy** | **-14** |
| **Relationship Court** | **-14** |
| **Judge Mathis** | **-13** |

Source: Nielsen C3. STD 2019/20 vs. STD 2020/2021 through 1/24/21.



EXHIBIT O(83)

AOE196 ESN0002573

**The ES Court Combo Has A Higher MEDIAN INCOME, or is comparable to, All Court Competitors...**

***Internal Use Only***

<u>Median Income:</u>

| | |
|---|---|
| Judge Judy | $51,200 |
| People's Court | 49,700 |
| Judge Mathis | 46,800 |
| ES Court Combo | 46,300 |
| Divorce Court | 43,200 |
| Hot Bench | 43,100 |
| Judge Jerry | 42,700 |
| Protection Court | 41,700 |
| Relationship Court | 39,900 |

Source: Nielsen National data, Season-to-Date, through 1/24/21. Adults 18+.



EXHIBIT O(83)

AOE196

ESN0002574



## New & Potentially Exiting Court Programs for Fall '21



### New:

**Beverly Hills Court**      **Litton**

**Relative Justice**        **D. Bulhack** *(Court show where family and the law collide. Prominent attorney Rhonda Wills presides.)*

**TBA Court Show**        **Black New Network**

### Potentially Exiting:

**Couple's Court**         **MGM**
**Paternity Court**        **MGM**  *(Relationship Court Combo)*
**Personal Injury Court** **MGM**

**Protection Court**       **Trifecta** *(Rumors say it is not coming back)*

**It's important to note that Judge Judy will now be all re-runs and is out of production.**





***Internal Use Only***

## The Same Declines Can Be Seen in Competitive Talk/Entertainment...

### Households - % Decline (Year-to-Year)

| | |
|---|---|
| Daily Mail | -24% |
| Doctors | -43 |
| Dr. Phil | -21 |
| Rachel Ray | -16 |
| Wendy | -33 |
| Jerry Springer | -44 |
| Kelly Clarkson | -26 |
| Maury | -14 |
| Steve Wilkos | -16 |
| Dr. Oz | -21 |
| Ellen | -41 |
| Extra | -41 |
| Real | -35 |
| Inside Edition | -13 |
| ET | -18 |

Source: Nielsen C3. STD 2019/20 vs. STD 2020/2021 through 1/24/21.



EXHIBIT O(83)

AOE196 ESN0002576

# Fall 2021 Competitive - Talk

For fall 2021, there are two new entries entering a crowded field of talk shows...

**The Nick Cannon Show -  Debmar-Mercury**

**Niecy Nash              -  CBS TV Distribution**

<u>**Last fall, Drew Barrymore premiered with a lack-luster performance...**</u>

**Decreased the Time Period Year-to-Year (N '19 to N '20)
By -45% in Household rating!**

**Was down -41% in both Women/Adult 25-54 rating
Year-to-year!**

**Only maintained 48% of its Household lead-in share during the Nov. '20
sweep!**

Source: WRAP Sweeps, 197 markets. Nielsen, Live + 7. Nov. '19 to Nov. '20.

EXHIBIT O(83)

AOE1970   CSN0002577

# The Entertainment Studios AD-Vantage

**Nielsen has reported that Black Buying Power is now at $1.3 Trillion Dollars and Growing!**

**The ES Court Combo Ranks 7th in African-American Household Rating among all M-F Syndicated Programs and out-delivered numerous court/talk competitors….**

| HH Rtg. - Head-of Household is African-American: | | |
|---|---|---|
| ES Court Combo | 3.68 | |
| Judge Mathis | 3.13 | |
| Blackish | 2.94 | |
| Live w/Kelly & Ryan | 2.52 | |
| Wendy Williams | 2.48 | |
| Divorce Court | 2.52 | |
| People's Court | | 2.41 |
| Dr. Phil | 2.28 | |
| Tamron Hall | 2.26 | |
| Judge Jerry | 2.11 | |
| Dateline | 2.11 | |
| Extra | 1.54 | |
| Kelly Clarkson | 1.44 | |
| Ellen | 1.41 | |
| Protection Court | 1.02 | |
| Rachel Ray | .96 | |
| Drew Barrymore | .84 | |

| Ad 25-54 Rtg. - HOH is African-American: | | |
|---|---|---|
| ES Court Combo | .89 | |
| Divorce Court | .86 | |
| People's Court | | .83 |
| Dateline | .75 | |
| Extra | .74 | |
| Tamron Hall | .72 | |
| Judge Jerry | .68 | |
| Real | .65 | |
| Dr. Phil | .62 | |
| Daily Mail | .48 | |
| Ellen | .45 | |
| Kelly Clarkson | .43 | |
| Dr. Oz | .37 | |
| Drew Barrymore | .35 | |
| Rachel Ray | .32 | |
| Protection Court | .32 | |
| Doctors | .15 | |

Source: Nielsen, Black Dollar Matter Report. Nielsen National data, Season-to-Date, through 1/24/21.

EXHIBIT O(83)

AOE197 ESN0002578





EXHIBIT O(83)

AOE1972

ESN0002579



THE VERDICT WITH JUDGE HATCHETT

| Aliments- Diabetes (Type 1-Insulin Dependent) | The Verdict with Judge Hatchett | Divorce Court | Hot Bench | Judge Jerry | Judge Judy | Judge Mathis | People's Court |
|---|---|---|---|---|---|---|---|
| Have/Had | 462 | 418 | 174 | 193 | 331 | 284 | 413 |
| Used a branded prescription remedy | 719 | 278 | 85 | - | 286 | 250 | 363 |

| Health Psychographics- Strongly Agree | The Verdict with Judge Hatchett | Divorce Court | Hot Bench | Judge Jerry | Judge Judy | Judge Mathis | People's Court |
|---|---|---|---|---|---|---|---|
| I prefer popular brand-name drugs, even if they cost more | 165 | 184 | 115 | 124 | 123 | 160 | 129 |

Source: GFK/ MRI Spring 2020, Index based on Total Adults

ENTERTAINMENT STUDIOS TELEVISION

EXHIBIT O(83)

AOE1973

ESN0002580



**Cleared in 94% of the Country!**



EXHIBIT O(83)

AOE1974

ESN0002581

***Internal Use Only***



**Funny You Should Ask has a younger Median Age than most of its Competitors and a Comparable Median Income to Family Feud...**



**Median Age:**

| | |
|---|---|
| **Funny You Should Ask** | **63** |
| **25 Words or Less** | **63** |
| **Family Feud** | **64** |
| **Jeopardy** | **67** |
| **Wheel of Fortune** | **67** |





**It's important to also not that Funny has a Median Income of $49,700 vs. Family Feud's $51,800. And, both have the same Audience Composition – 62% Female/38% Male.**



Source: Median Age based on STD 2020/21, Ad 18+. Composition based on P2+



EXHIBIT O(83)

AOE197 ESN0002582

# Fall 2021 Competitive

**Reboot of You Bet Your Life (Fox) Hosted by Jay Leno**



**It is difficult to launch a new game show…**

America Says, off the Game Show Network, has already been cancelled

25 Words or Less, hosted by another celebrity, Meredith Vieira, has only seen modest success:

-Down -20% in Adults 25-54 year-to-year

-Down -19% in Women 25-54 year-to-year

Jay Leno refers to You Bet Your Life as a Comedy wrapped around a Game Show. That show is **Funny You Should Ask, which also as the youngest host to date in the game show arena, Jon Kelley and a celebrity panel of comedians!**

Family Feud, with Steve Harvey, also offers humor and game. **You Bet Your Life offers nothing new to the game show genre.**

Source: Nielsen, C3. STD 2019/2020 to STD 2020/2021 through 1/24/21.



EXHIBIT O(83)

AOE1976

ESN0002583



THE ES WEATHER COMBO

Cleared in 96% of the Country!

STORM OF SUSPICION

WEATHER GONE VIRAL

EXHIBIT O(83)
AOE197    ESN0002584







## The ES WEATHER COMBO Continues to Grow…



**HH Rtg.**

.66    **+18%**    .78

Oct. 20        Jan. '21

**Women 25-54 Rtg.**

.26    **+15%**    .30

Oct. 20        Jan. '21

Source: Nielsen, Oct. 2020,  Jan. 2021 (through 1/24) . C3.



EXHIBIT O(83)

AOE1978



**The ES WEATHER COMBO, Storm of Suspicion and Weather Gone Viral, is a Strong Weekly combination out-rating/competitive with numerous competitors…**



**<u>Adult 25-54 Rtg.</u>**

**Out-deliver Castle, Wipeout and Major Crimes and competitive with the NCIS Franchise!**

| | |
|---|---|
| **NCIS: New Orleans** | **.30** |
| **NCIS** | **.30** |
| **ES Weather Combo** | **.29** |
| **Castle** | **.24** |
| **Wipeout** | **.21** |
| **Major Crimes** | **.16** |



Source: Nielsen, week of 1/23 & 1/24/2021.





EXHIBIT O(83)

AOE1979

CSN0002586

***Internal Use Only***







### The ES WEATHER COMBO – Similar Median Income to Competitors:

| | |
|---|---|
| **Major Crimes** | **$49,600** |
| **L & O: CI** | **48,600** |
| **ES Weather Combo** | **48,300** |
| **Chicago PD** | **48,000** |
| **NCIS: New Orleans** | **47,000** |

Source: Nielsen, week of 1/23 & 1/24/2021. Adults 18+.

EXHIBIT O(83)

AOE1980

ESN0002587

***Internal Use Only***







**These two great Weather Channel Dramas also air in National Syndication. The can now be seen in different markets on major affiliates throughout the day, and are available in 96% of U.S. TV Homes. *They now have exposure to a whole new audience*.  There is very little duplication between the syndication and cable viewings, so advertisers should be buying both!**

**Adults 25-54**

**Primary Duplication %/Watch in Syndication(ES) AND in Cable (TWC):**

**ES Weather Combo: SOS and WGV**

| | |
|---|---|
| **Watch SOS on the Weather Channel** | **.24%** |
| **Watch WGV on the Weather Channel** | **9.3%** |

Source: Nielsen, Duplication Study, 1ˢᵗ Qtr. 2021 to-date.



**WEATHER GONE VIRAL**

Coming Fall 2021



STORM OF SUSPICION

**Stay Tuned for More Riveting Programming from Our Weather Channel Cable Network - See Your Entertainment Studios Representative for more Information.**

Weekly



M-F Strip



Weekly







**HIGHWAY THRU HELL - the #1 Program on the Weather Channel!**

Source: Nielsen, C3. STD though 1/24/21. Long form programming. HHs and Adults 25-54.



# EXHIBIT O(84)

EXHIBIT O(84)

AOE1983



# NEW!



At Entertainment Studios Syndication, we have **over 25 years of producing & distributing** brand safe programming.

With our winning Court programming like *The Verdict with Judge Hatchett* and comedy shows like *Funny You Should Ask*, which is green lit up to its 520th episode, our slate of syndicated programs consistently delivers for advertisers.

This fall we are excited to add two new shows from The Weather Channel; *Weather Gone Viral & Storm of Suspicion*.

# BRAND SAFE PROGRAMMING

## ES Court Combo

 **33%** male     **67%** female

## Funny You Should Ask

 **39%** male     **61%** female

Source: Nielsen Media Research, C3, 4Q19 (9.23.19 -12.29.19). Median Age and Income based on P2+.

EXHIBIT O(84)
AOE1984
ESN0026076

# PERFORMANCE

 **96%** viewed live

**GROWTH** across entire portfolio

**OVER** Index w/ multicultural audiences

# SYNDICATION PROGRAMMING

| GAME | COURT COMBO | ES WEEKLY NETWORK | | OTO SPECIALS | WEATHER COMBO |
|---|---|---|---|---|---|



**ES DAILY NETWORK**





























Source: Viewed Live: (96% Court, 94% FYSA) Source: Nielsen, 4th Qtr 2019. C3.
Multicultural: Source: Nielsen, C3, 4Q19. AA Index & Comp based on AA HH (HOH Race = Black) v. Total US HH Composition.

EXHIBIT O(84)
AOE1985
ESN0026077

# EXHIBIT O(85)



**THIS VERSION IS FOR INFORMATIONAL PURPOSES ONLY**
**IT IS *NOT* FOR DISCLOSURE TO PROSPECTIVE FRANCHISEES**

**FRANCHISE DISCLOSURE DOCUMENT**

McDonald's USA, LLC
a Delaware limited liability company
110 N. Carpenter Street
Chicago, Illinois 60607
(630) 623-3000
www.mcdonalds.com

The franchisee will own and operate a quick service restaurant offering a limited menu of value-priced foods using the McDonald's System.

The total investment necessary to begin operation of a traditional McDonald's franchise ranges from $1,314,500 to $2,306,500 (see Item 7 for small town oil, small town retail, and Satellite locations). This includes an initial franchise fee of $45,000.00 (see Item 5 for small town oil, small town retail, and Satellite locations) that must be paid to the franchisor.

This disclosure document summarizes certain provisions of your franchise agreement and other information in plain English. Read this disclosure document and all accompanying agreements carefully. You must receive this disclosure document at least 14 calendar-days before you sign a binding agreement with, or make any payment to, the franchisor or an affiliate in connection with the proposed franchise sale. **Note, however, that no governmental agency has verified the information contained in this document**.

You may wish to receive your disclosure document in another format that is more convenient for you. To discuss the availability of disclosures in different formats, contact the Franchise Practice Group at 110 N. Carpenter Street, Chicago, IL 60607 and (630) 623-3000.

The terms of your contract will govern your franchise relationship. Don't rely on the disclosure document alone to understand your contract. Read all of your contract carefully. Show your contract and this disclosure document to an advisor, like a lawyer or an accountant.

Buying a franchise is a complex investment. The information in this disclosure document can help you make up your mind. More information on franchising, such as "A Consumer's Guide to Buying a Franchise," which can help you understand how to use this disclosure document, is available from the Federal Trade Commission. You can contact the FTC at 1-877-FTC-HELP or by writing to the FTC at 600 Pennsylvania Avenue, NW, Washington, D.C. 20580. You can also visit the FTC's home page at www.ftc.gov for additional information. Call your state agency or visit your public library for other sources of information on franchising.

There may also be laws on franchising in your state. Ask your state agencies about them.

Issuance Date:  May 1, 2020

EXHIBIT O(85)

AOE1987

### How to Use This Franchise Disclosure Document

Here are some questions you may be asking about buying a franchise and tips on how to find more information:

| QUESTION | WHERE TO FIND INFORMATION |
|---|---|
| **How much can I earn?** | Item 19 may give you information about outlet sales, costs, profits or losses.  You should also try to obtain this information from others, like current and former franchisees. You can find their names and contact information in Item 20 or Exhibits Q and R. |
| **How much will I need to invest?** | Items 5 and 6 list fees you will be paying to the franchisor or at the franchisor's direction. Item 7 lists the initial investment to open. Item 8 describes the suppliers you must use. |
| **Does the franchisor have the financial ability to provide support to my business?** | Item 21 or Exhibit A includes financial statements. Review these statements carefully. |
| **Is the franchise system stable, growing, or shrinking?** | Item 20 summarizes the recent history of the number of company-owned and franchised outlets. |
| **Will my business be the only McDonald's business in my area?** | Item 12 and the "territory" provisions in the franchise agreement describe whether the franchisor and other franchisees can compete with you. |
| **Does the franchisor have a troubled legal history?** | Items 3 and 4 tell you whether the franchisor or its management have been involved in material litigation or bankruptcy proceedings. |
| **What's it like to be McDonald's franchisee?** | Item 20 or Exhibits Q and R lists current and former franchisees. You can contact them to ask about their experiences. |
| **What else should I know?** | These questions are only a few things you should look for. Review all 23 Items and all Exhibits in this disclosure document to better understand this franchise opportunity. See the table of contents. |

EXHIBIT O(85)

AOE1988

## What You Need To Know About Franchising *Generally*

**Continuing responsibility to pay fees**. You may have to pay royalties and other fees even if you are losing money.

**Business model can change**. The franchise agreement may allow the franchisor to change its manuals and business model without your consent. These changes may require you to make additional investments in your franchise business or may harm your franchise business.

**Supplier restrictions**. You may have to buy or lease items from the franchisor or a limited group of suppliers the franchisor designates.  These items may be more expensive than similar items you could buy on your own.

**Operating restrictions**. The franchise agreement may prohibit you from operating a similar business during the term of the franchise. There are usually other restrictions. Some examples may include controlling your location, your access to customers, what you sell, how you market, and your hours of operation.

**Competition from franchisor**. Even if the franchise agreement grants you a territory, the franchisor may have the right to compete with you in your territory.

**Renewal**. Your franchise agreement may not permit you to renew.  Even if it does, you may have to sign a new agreement with different terms and conditions in order to continue to operate your franchise business.

**When your franchise ends.** The franchise agreement may prohibit you from operating a similar business after your franchise ends even if you still have obligations to your landlord or other creditors.


## Some States Require Registration

Your state may have a franchise law, or other law, that requires franchisors to register before offering or selling franchises in the state. Registration does not mean that the state recommends the franchise or has verified the information in this document.  To find out if your state has a registration requirement, or to contact your state, use the agency information in Exhibit O.

Your state also may have laws that require special disclosures or amendments be made to your franchise agreement.  If so, you should check the State Specific Addenda. See the Table of Contents for the location of the State Specific Addenda.

**Special Risks to Consider About *This* Franchise**

Certain states require that the following risk(s) be highlighted:

1. <u>**Out-of-State Dispute Resolution.**</u> The franchise agreement requires you to resolve disputes with the franchisor by mediation, arbitration and/or litigation only in Illinois. Out-of-state mediation, arbitration, or litigation may force you to accept a less favorable settlement for disputes. It may also cost more to mediate, arbitrate, or litigate with the franchisor in Illinois than in your own state.

2. The franchise agreement states that except under certain circumstances Illinois law governs the agreement. This law may not provide the same protections and benefits as local law. You may want to compare these laws.

3. You must pay a franchisee fee in addition to rent and a service fee. Your inability to make the payments may result in termination of your franchise and loss of your investment.

4. There may be other risks concerning this franchise.

   Certain states may require other risks to be highlighted. Check the "State Specific Addenda" (if any) to see whether your state requires other risks to be highlighted.

**THE FOLLOWING APPLY ONLY TO TRANSACTIONS GOVERNED BY
THE MICHIGAN FRANCHISE INVESTMENT LAW**

**THE STATE OF MICHIGAN PROHIBITS CERTAIN UNFAIR PROVISIONS THAT ARE SOMETIMES IN FRANCHISE DOCUMENTS. IF ANY OF THE FOLLOWING PROVISIONS ARE IN THESE FRANCHISE DOCUMENTS, THE PROVISIONS ARE VOID AND CANNOT BE ENFORCED AGAINST YOU.**

(a)      A prohibition on the right of a franchisee to join an association of franchisees.

(b)      A requirement that a franchisee assent to a release, assignment, novation, waiver, or estoppel which deprives a franchisee of rights and protections provided in the Michigan Franchise Investment Act.  This shall not preclude a franchisee, after entering into a franchise agreement, from settling any and all claims.

(c)      A provision that permits a franchisor to terminate a franchise prior to the expiration of its term except for good cause.  Good cause shall include the failure of the franchisee to comply with any lawful provision of the franchise agreement and to cure such failure after being given written notice thereof and a reasonable opportunity, which in no event need be more than 30 days, to cure such failure.

(d)      A provision that permits a franchisor to refuse to renew a franchise without fairly compensating the franchisee by repurchase or other means for the fair market value at the time of expiration of the franchisee's inventory, supplies, equipment, fixtures, and furnishings.  Personalized materials which have no value to the franchisor and inventory, supplies, equipment, fixtures, and furnishings not reasonably required in the conduct of the franchise business are not subject to compensation.  This subsection applies only if:  (i) the term of the franchise is less than 5 years and (ii) the franchisee is prohibited by the franchise or other agreement from continuing to conduct substantially the same business under another trademark, service mark, trade name, logotype, advertising, or other commercial symbol in the same area subsequent to the expiration of the franchise or the franchisee does not receive at least 6 months advance notice of franchisor's intent not to renew the franchise.

(e)      A provision that permits the franchisor to refuse to renew a franchise on terms generally available to other franchisees of the same class or type under similar circumstances.  This section does not require a renewal provision.

(f)      A provision requiring that arbitration or litigation be conducted outside this state.  This shall not preclude the franchisee from entering into an agreement, at the time of arbitration, to conduct arbitration at a location outside this state.

(g)      A provision which permits a franchisor to refuse to permit a transfer of ownership of a franchise, except for good cause.  This subdivision does not prevent a franchisor from exercising a right of first refusal to purchase the franchise.  Good cause shall include, but is not limited to:

(i)      The failure of the proposed transferee to meet the franchisor's then current reasonable qualifications or standards.

(ii)      The fact that the proposed transferee is a competitor of the franchisor or subfranchisor.

(iii)     The unwillingness of the proposed transferee to agree in writing to comply with all lawful obligations.

(iv)     The failure of the franchisee or proposed transferee to pay any sums owing to the franchisor or to cure any default in the franchise agreement existing at the time of the proposed transfer.

(h)     A provision that requires the franchisee to resell to the franchisor items that are not uniquely identified with the franchisor.  This subdivision does not prohibit a provision that grants to a franchisor a right of first refusal to purchase the assets of a franchise on the same terms and conditions as a bona fide third party willing and able to purchase those assets, nor does this subdivision prohibit a provision that grants the franchisor the right to acquire the assets of a franchise for the market or appraised value of such assets if the franchisee has breached the lawful provisions of the franchise agreement and has failed to cure the breach in the manner provided in subdivision (c).

(i)     A provision which permits the franchisor to directly or indirectly convey, assign, or otherwise transfer its obligations to fulfill contractual obligations to the franchisee unless provision has been made for providing the required contractual services.

If the franchisor's most recent financial statements are unaudited and show a net worth of less than $100,000, the franchisor shall, at the request of a franchisee, arrange for the escrow of initial investment and other funds paid by the franchisee until the obligations to provide real estate, improvements, equipment, inventory, training, or other items included in the franchise offering are fulfilled.  At the option of the franchisor, a surety bond may be provided in place of escrow.

**THE FACT THAT THERE IS A NOTICE OF THIS OFFERING ON FILE WITH THE ATTORNEY GENERAL DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION, OR ENDORSEMENT BY THE ATTORNEY GENERAL.**

Any questions regarding this notice should be directed to:

State of Michigan
Department of Attorney General
Consumer Protection Division
Attn:  Franchise Section
525 West Ottawa Street
G. Mennen Williams Building, 1st Floor
Lansing, Michigan 48913
Telephone Number:  (517) 373-7117

## Table Of Contents

**Item**                                                                                                    **Page No.**

1.   The Franchisor and any Parents, Predecessors, and Affiliates.................................................... 1

2.   Business Experience..................................................................................................................... 2

3.   Litigation...................................................................................................................................... 4

4.   Bankruptcy................................................................................................................................... 11

5.   Initial Fees................................................................................................................................... 11

6.   Other Fees.................................................................................................................................... 11

7.   Estimated Initial Investment ...................................................................................................... 19

8.   Restrictions on Sources of Products and Services ..................................................................... 20

9.   Franchisee's Obligations............................................................................................................. 23

10.  Financing..................................................................................................................................... 24

11.  Franchisor's Assistance, Advertising, Computer Systems, and Training ................................... 24

12.  Territory....................................................................................................................................... 30

13.  Trademarks................................................................................................................................... 31

14.  Patents, Copyrights, and Proprietary Information....................................................................... 32

15.  Obligation to Participate in the Actual Operation of the Franchise Business ............................. 33

16.  Restrictions on What the Franchisee May Sell ........................................................................... 33

17.  Renewal, Termination, Transfer, and Dispute Resolution .......................................................... 33

18.  Public Figures.............................................................................................................................. 36

19.  Financial Performance Representations........................................................................................ 36

20.  Outlets and Franchisee Information ............................................................................................. 39

21.  Financial Statements.................................................................................................................... 50

22.  Contracts...................................................................................................................................... 50

23.  Receipts........................................................................................................................................ 50

# Table of Contents (Continued)

**Exhibits**

A.      Financial Statements
B.      Franchise Agreement (Traditional)
C.      Franchise Agreement (Satellite)
D.      Franchise Agreement (Walmart)
E.      New Restaurant Rider
F.      BFL Rider
G.      Operator's Lease
H.      Assignment to an Entity
I.      Assignment Agreement
J.      Preliminary Agreement
K.      McDonald's Rewrite (New Term) Policy
L.      Rewrite (New Term) Offer Letter
M.      Loan and Related Documents
N.      List of Agents for Service of Process
O.      State Administrators
P.      McDonald's Affiliates
Q.      List of Franchised Restaurants
R.      List of franchisees who had an outlet terminated, canceled, not renewed, or otherwise voluntarily or involuntarily ceased to do business
S.      State Specific Addenda

**Item 1**
**The Franchisor and any Parents, Predecessors, and Affiliates**

The Franchisor is McDonald's USA, LLC, which will be referred to in this disclosure document as "McDonald's", "we", "us" or "our". A person who buys a franchise from McDonald's will be referred to in this disclosure document as "you".

We are a Delaware limited liability company. Our principal place of business is 110 N. Carpenter Street, Chicago, Illinois, 60607. We currently do business under the name of McDonald's USA, LLC. Our agents for service of process are disclosed in Exhibit N. We are a wholly-owned subsidiary of our parent and predecessor, McDonald's Corporation, a Delaware corporation. Our predecessor's principal place of business is 110 N. Carpenter Street, Chicago, Illinois, 60607. Our predecessor currently does not offer franchises. Neither we nor our predecessor have ever offered franchises in any other line of business.

We have domestic affiliates and international affiliates. Some of our international affiliates offer McDonald's franchises outside of the United States. None of them have offered franchises in any other line of business. These international affiliates are disclosed in Exhibit P.

We develop, operate, franchise, and service a system of restaurants that prepare, assemble, package, and sell a limited menu of value-priced foods under the McDonald's System in the U.S. The "McDonald's System" is a concept of restaurant operations that includes, among other things, certain rights in trademarks, manuals, and other confidential business information; operational, real estate, and marketing information; and the expertise and continuing information that we provide. All McDonald's restaurant businesses in the U.S. are operated under franchise agreements and are owned by franchisees who are independent third parties or by our wholly-owned subsidiaries ("McOpCo companies"). Currently, about 95% of all U.S. restaurants are franchised to independent franchisees and about 5% are franchised to McOpCo companies.

McDonald's restaurants offer the public a high standard of quality and uniformity in food, service, and decor. McDonald's restaurants are located in freestanding buildings, storefronts, food courts, and other locations that are appropriate to McDonald's image. A grant of a McDonald's franchise authorizes you to operate a McDonald's restaurant business at a specific location and to use the McDonald's System in the operation of that restaurant business for a specific period of time, usually 20 years. We also grant franchises for McDonald's restaurant businesses located in retail stores such as Walmart. We call these satellite ("Satellite") locations. McDonald's restaurants located in strip centers, airports, universities, shopping malls, hospitals, and other diverse locations may also be Satellites. Satellites may serve a scaled-down menu of a traditional McDonald's restaurant and, in some cases, will also serve non-McDonald's trademarked products. The term of the franchise for a Satellite depends on its location.

Some McDonald's restaurants that are located in fuel station/convenience store facilities are called small town oil ("STO") locations. STOs are full-menu restaurants that share building space with a convenience store and have a fuel station located outside of the building. At each STO, the fuel station/convenience store typically will be associated with a national or regional branded chain. Some McDonald's restaurants that anchor a small retail center in rural communities are called small town retail ("STR") locations. STOs and STRs are not Satellites. The term of the franchise for STOs and STRs is usually 10 years.

In certain limited cases, we may also grant franchises with leases that include the business facilities. We call these Business Facilities Lease ("BFL") franchises. A BFL is a special arrangement that we may offer when certain economic and other factors exist. The term of a BFL is usually 3 years. Under a BFL, you may have a conditional option to purchase certain restaurant assets after the first year and extend the franchise for up to 20 years after the beginning of the term. In this disclosure document, the word "restaurant" refers to each McDonald's restaurant business location generally, regardless of whether it is franchised as a traditional restaurant, Satellite, STO, STR, or BFL (unless otherwise provided).

All franchisees who operate a restaurant, whether a traditional, Satellite, STO, STR, or BFL location, will sign the applicable form of our standard franchise agreement attached as Exhibits B, C, and D (collectively "Franchise Agreement").

EXHIBIT O(85)

AOE1995

In 1955, our predecessor, McDonald's Corporation, began granting franchises to individuals for the operation of McDonald's restaurants.  In 1960, our predecessor began forming and granting franchises to McOpCo companies for the operation of McDonald's restaurants.  In 2004, our predecessor formed us as a subsidiary and in 2005, as part of a global company alignment, transferred to us a majority of the assets used in its U.S. business, including its interests in the McOpCo companies and the franchises for McDonald's restaurants in the U.S.  In 2007, restaurants in Puerto Rico and the Virgin Islands operated by McOpCo companies were sold to, and a master franchise to offer and sell franchises in Puerto Rico and the Virgin Islands was granted to, LatAm, LLC, a Delaware limited liability company, which is not an affiliate of McDonald's.

As a franchisee, you should not have any expectation that the economic and demographic factors that exist at your McDonald's restaurant location will remain constant.  In addition, other McDonald's restaurants (including those that we develop in the future) may have an effect on the sales of your McDonald's restaurant, since customers typically patronize various McDonald's restaurants depending on their travel patterns and other factors.  You also will be competing with other restaurants, food service businesses and convenience stores that offer the same types of products that you do.  These restaurants, food service businesses and convenience stores may be associated with national or regional chains (whether or not franchised) or may be local, single restaurant locations.  You will compete with other restaurants, food service businesses and convenience stores that feature products different from those in a McDonald's restaurant.  In certain STOs, the fuel station/convenience store operators will have the right to sell fountain drinks and hot beverages in the convenience store located within the same building as the McDonald's restaurant.  Your products and services will be offered primarily to individual consumers for on-site or off-site consumption.  The market for the products you will offer is developed in some areas and still developing in other areas, depending on the number of restaurants of this type operating in each particular area.

You will be required to comply with all local, state, and federal laws, including health and sanitation laws and menu-labeling requirements that apply to restaurant operations.  There are other laws that apply generally to all businesses, including, but not limited to, the Americans with Disabilities Act, and we encourage you to make further inquiries about these laws.

Commencing in December 2019 and continuing throughout the first quarter of 2020, the COVID-19 virus began spreading throughout the world including the first outbreak in the U.S. in February.  COVID-19 has and continues to significantly disrupt local, regional and global economies and businesses.  Because of the operating restrictions, limitations on group gatherings, forced closures, and other consequences of the outbreak, it is likely there will be significant disruptions in customer demand, the supply chain for products and services, employee availability, and other aspects of operating your franchised business.  The situation is also likely to affect operating costs in a material way.  You also must comply with all applicable laws, rules and orders of any government authority concerning the outbreak and your response.

## Item 2
## Business Experience

Except where noted below, all of the officers and directors listed below became employees of McDonald's on January 1, 2005.  However, all have long histories with our predecessor and the date they joined our predecessor is listed below.

| Title | Name | Start Date |
|---|---|---|
| Director and President | Joe Erlinger | April 22, 2002 |
| Director | Kevin M. Ozan | September 5, 1997 |
| Director | Jerry Krulewitch | March 20, 2002 |
| U.S. Chief Restaurant Operations Officer | Charles Robeson | August 6, 1976 |
| U.S. Chief Finance Officer | Spero Droulias | September 30, 1995 |
| U.S. Chief Field Officer | Charlie Strong | February 18, 1971 |
| U.S. Zone President – East | Mario Barbosa | January 11, 1999 |
| U.S. Zone President – West | Skye Anderson | April 12, 2000 |
| U.S. Vice President – Franchising Strategy | Mathew Ajayi | November 8, 1994 |

EXHIBIT O(85)

AOE1996

| Title | Name | Start Date |
|---|---|---|
| U.S. Field Vice President | William Armstrong | July 12, 2010 |
| U.S. Field Vice President | Brad Bogan | June 17, 2019 (1) |
| U.S. Field Vice President | Alvaro Bontá | October 20, 1991 |
| U.S. Field Vice President | Myra Doria | January 1, 1996 |
| U.S. Field Vice President | Ofelia Kumpf | June 17, 1992 |
| U.S. Field Vice President | Marcos Quesada | August 1, 1986 |
| U.S. Field Vice President | Luis Quintiliano | January 1, 2018 (2) |
| U.S. Field Vice President | Harish Ramalingam | May 17, 2012 |
| U.S. Field Vice President | Harry Thomas, Jr. | February 23, 1985 |
| U.S. Field Vice President | Remedios Valenzuela | January 16, 1984 |
| Sr. Director – Operations Officer | Marco Acevedo | December 1, 2011 |
| Sr. Director – Operations Officer | Jerry Angelotti | April 4, 1997 |
| Sr. Director – Operations Officer | Dan Camp | May 1, 1991 |
| Sr. Director – Operations Officer | Jorge Ferraz | June 9, 1997 |
| Sr. Director – Operations Officer | Tim Fisher | January 1, 1983 |
| Sr. Director – Operations Officer | David Garcia | July 31, 1999 |
| Sr. Director – Operations Officer | Victoria Guster-Hines | June 1, 1987 |
| Sr. Director – Operations Officer | Bridgette Hernandez | June 1, 2002 |
| Sr. Director – Operations Officer | Joe Kowal | October 2, 1978 |
| Sr. Director – Operations Officer | Christina Lewis-Cammack | September 1, 1994 |
| Sr. Director – Operations Officer | Jessie Lopez | July 21, 1992 |
| Sr. Director – Operations Officer | Doug Lorimer | November 1, 2007 |
| Sr. Director – Operations Officer | Brad Miles | June 23, 2003 |
| Sr. Director – Operations Officer | Lupe Morales-Christian | June 25, 1993 |
| Sr. Director – Operations Officer | Domineca Neal | November 16, 2012 |
| Sr. Director – Operations Officer | Charlie Newberger | July 20, 2009 |
| Sr. Director – Operations Officer | Allyson Peck | January 27, 1997 |
| Sr. Director – Operations Officer | Lynn Rudy | October 15, 1996 |
| Sr. Director – Operations Officer | Jim Schugars | December 1, 1995 |
| Sr. Director – Operations Officer | Steve Thatcher | June 27, 1986 |
| Sr. Director – Operations Officer | Robert Turner | April 15, 2019 (3) |
| Sr. Director – Operations Officer | Silvia Vergani | May 24, 1991 |
| Sr. Director – Operations Officer | Michelle Wherry | April 1, 1985 |
| Sr. Director – Operations Officer | Anand Yalamanchi | November 5, 2000 |

(1)  Brad Bogan is the U.S. Field Vice President for the Denver, Colorado Field Office effective June 2019.  From September 2015 to June 2019, he was the Managing Director – Consumer/Retail Strategy, Operations and M&A Advisory for Deloitte in Chicago, Illinois.  From January 2015 to March 2015, he was Divisional Vice President – Supply Chain, Private Brands, Replenishment and Supplier Collaboration in Deerfield, Illinois.

(2)  Luis Quintiliano is a U.S. Field Vice President for the Dallas, Texas Field Office effective August 1, 2018.  From January 2018 to July 2018, he was a Director in our Accelerated Development Program.  From August 2016 to October 2017, he was the Managing Director for the Domestic Markets LATAM Cargo division of LATAM Airlines located in Sao Paulo, Brazil.  From October 2014 to July 2016, he was the Managing Director for LATAM Cargo Brasil division of LATAM Airlines located in Sao Paulo, Brazil.  From April 2012 to October 2014, he was the Vice President of Handling Operations, LATAM Cargo division, for LATAM Airlines located in Miami, Florida.

(3)  Robert Turner is a Senior Director – Operations Officer for the Nashville, Tennessee Field Office effective April 2019.  From November 2015 to June 2018, he was Finance Director for Frito Lay located in Oak Brook

EXHIBIT O(85)

AOE1997

Terrace, Illinois.  From June 2018 to April 2019, he was Sales Director for Frito Lay located in Oak Brook Terrace, Illinois.

## Item 3
## Litigation

### Pending Cases

<u>AA&S Food Service Corp., et al. v. McDonald's Corporation, McDonald's Systems de Puerto Rico, Inc., Golden Arch Development Corporation, Inc., et al.</u> (Case No. KAC07-0725 (603)).  On January 29, 2007, the plaintiffs, franchisees of various McDonald's restaurants in Puerto Rico, filed a complaint against our predecessor, its Puerto Rican companies, and others in the Puerto Rico Court of First Instance, San Juan, Puerto Rico.  In 2008, plaintiffs amended their complaint seeking a determination that the Puerto Rico franchise distribution law (Law 75) governs the franchise agreements and relationships between the parties and that the defendants have violated the provisions of Law 75, an injunction prohibiting the defendants from denying rewrites except for just cause and from opening new McDonald's restaurants or kiosks within 3 miles of plaintiffs' restaurants, damages of up to $66,725,000, attorney's fees, and costs.  In 2009 and 2010, plaintiffs further amended their complaint to, among other things, include us as a named defendant.  In July 2011, the court ruled that Law 75 applies to the Puerto Rican franchises.  In September 2012, the trial commenced on an intermittent schedule, but in early 2018, the parties agreed to a stay of the trial to explore settlement, which is a process that continues.

<u>George Vazakas and Stamar Monoprosopi E.P.E. v. McDonald's Hellas M.E.P.E.</u> (Case No. 5283).  On September 2, 2010, the plaintiffs, former franchisees of McDonald's restaurants in Greece, filed a complaint against our affiliate, McDonald's Hellas M.E.P.E., with the Hellenic Competition Commission (HCC) alleging infringement of Article 1 of the Greek Competition Act and Article 101 TFEU.  The plaintiffs allege that our affiliate engaged in price fixing and violated competition rules by requiring franchisees to obtain food products from certain suppliers.  In their complaint, the plaintiffs ask the HCC to take actions to require our affiliate to cease the alleged violations and to impose fines for such conduct, and seek a declaration that any requirement of franchisees to use certain suppliers is illegal under Greek law.  Our affiliate intends to defend its interests vigorously in this case.

<u>Luis Canizares Gonzalez and Luis Canizares Restauracion, S.L., v. McDonald's Sistemas de España Inc, Sucursal en España (MSE) and McDonald's Corporation</u> (Case No. 559/2014).  On June 16, 2014, a franchisee in Spain and his operating entity filed a complaint against our affiliate, MSE, and our predecessor in Madrid's Civil Court No. 72 alleging promissory estoppel, breach of contract related to McDonald's alleged failure to meet its obligations under the franchise agreement and violations of Article 62 of the Ley de Ordenación del Comercio Minorista for the alleged failure to disclose pre-contractual information related to their franchise obligations.  The plaintiffs are seeking money damages, compensation for lost earnings and mental anguish, interest and costs.  On April 29, 2016, the court issued a judgment dismissing plaintiffs' claims against our affiliate and predecessor.  On September 29, 2016, the plaintiffs appealed the court's judgment and on March 20, 2018, our affiliate filed its answer.  The parties are awaiting the court's decision.  Our affiliate and predecessor intend to continue to defend their interests vigorously in this case.

<u>José Quijano and JCQ Foods, Inc. v. McDonald's USA, LLC, McDonald's Systems de Puerto Rico, Inc. h/n/c Arcos Dorados Puerto Rico, Inc., Golden Arch Development Corporation, Inc., et al.</u> (Case No. CAC 402-2014-3456).  On November 20, 2014, the owner of 14 McDonald's restaurants in Puerto Rico and his operating entity, filed a complaint against us, our predecessor's Puerto Rican companies, Arcos Dorados Puerto Rico LLC, and others in the Puerto Rico Court of First Instance, Arecibo, Puerto Rico, claiming that the defendants' conduct resulted in serious economic damage to the plaintiffs.  The plaintiffs are seeking injunctive relief, monetary damages, and a declaration that defendants' alleged actions breached their obligations under the plaintiffs' franchise agreements, constitute a violation of the Puerto Rico franchise distribution law (Law 75), caused damages and losses for non-fulfillment of contract and unfair competition, and constitute fault and negligence and willful intent under the Civil Code of Puerto Rico.  On February 10, 2015, the court granted the defendants' petition to transfer this lawsuit to San Juan Superior Court.  The defendants intend to defend their interests vigorously in this case.

EXHIBIT O(85)

AOE1998

<u>Farah Gohari v. McDonald's Corporation, et al.</u> (Case No.2016-CH-08261).  On June 20, 2016, plaintiff filed a complaint against our predecessor and our former franchisee of two O'Hare airport restaurants in the Circuit Court of Cook County, Illinois, County Department, Chancery Division.  Plaintiff alleges that the Digital Menu Board prices at the two restaurants were lower than the prices at the register.  Plaintiff's initial complaint asserted claims for common law fraud and violations of the Illinois Consumer Fraud Act ("ICFA") and sought class certification, injunctive relief, actual and compensatory damages, and attorneys' fees and costs.  On November 30, 2016, the court dismissed the common law fraud count with prejudice.  On December 28, 2016, plaintiff filed an amended complaint asserting claims under the ICFA and the Racketeer Influenced and Corrupt Organizations Act ("RICO") and seeking the same relief as the initial complaint.  On July 13, 2017, the court dismissed plaintiff's RICO claim.  As a result, the ICFA claim is the only remaining claim.  On April 23, 2019, after answering the complaint, our predecessor filed a motion for summary judgment.  The former franchisee joined this motion on May 1, 2019.  The Plaintiff then moved the court for leave to amend her complaint.  Those motions are currently pending.  Our former franchisee and predecessor intend to defend their interests vigorously in this case.

<u>Antonio Bramante v. Les Restaurants McDonald du Canada Limitée</u> (Case No. 500-06-000824-165).  On November 15, 2016, the plaintiff filed a complaint in the Superior Court, Province of Québec against our affiliate alleging it breached the Québec Consumer Protection Act with respect to advertising of the Happy Meal program.  The complaint was authorized to proceed as a class action on November 14, 2018.  On February 12, 2019, the plaintiff filed its Originating Application.  The plaintiff seeks injunctive relief, compensatory and punitive damages, interest and costs.  Our affiliate intends to defend its interests vigorously in this case.

<u>Gerald Collette d/b/a Truthinadvertisingenforcers.com v. McDonald's Corporation and Alexico, Inc.</u> (Case No. 2017 CC 1545WS).  On May 10, 2017, plaintiff, a consumer, filed a complaint against our predecessor and a franchisee in the County Court of the Sixth Judicial Circuit of Pasco County, Florida alleging that a local promotion constitutes misleading advertising as the offer of a free sandwich was allegedly not, in actuality, free, but instead required the purchase of another sandwich.  Plaintiff alleges the promotion was misleading and constitutes fraud, negligent misrepresentation, unjust enrichment, and deceptive and unfair trade practices under Florida statutes and seeks a declaratory judgment, injunctive relief and a finding of liability and leave to request punitive damages.  On August 17, 2017, plaintiff filed an amended complaint, and we filed our answer and affirmative defenses.  After plaintiff failed to take any action in nearly a year, on February 19, 2019, the court ordered that it would dismiss the case if no record activity occurred within 60 days.  On the 60th day, the plaintiff filed an amended complaint, but did not seek leave to do so.  Our franchisee moved to strike plaintiff's amended complaint, but the court denied that motion.  In October 2019, our franchisee filed a motion for summary judgment to dispose of the plaintiff's claims, which the court granted.  Our predecessor and franchisee intend to defend our interests vigorously in this case.

<u>Tadine Makran v. McDonald's France S.A.S.</u> (Case No. 3170042).  On May 26, 2017, plaintiff, a franchisee of our affiliate in France, filed a complaint against us in the Commercial Court of Paris asserting claims challenging our affiliate's decision to terminate the plaintiff's franchise agreement, seeking to reinstate plaintiff into the advertising co-op, and seeking summary disposition against McDonald's with respect to certain invoices.  On October 11, 2017, the court rejected plaintiff's claim seeking reinstatement into the co-op, finding that the franchise agreement had been terminated and that plaintiff was occupying the premises illegally.  On November 11, 2017, the court rejected plaintiff's claim with respect to the invoices and ordered him to pay €230,000.  The appeals court upheld the lower court's decisions.  The lower court has not ruled on whether our affiliate's decision to terminate the plaintiff's franchise agreement was lawful.  Separately, our affiliate moved for summary disposition regarding plaintiff's illegal occupation of the premises, and the court ruled in our affiliate's favor and ordered plaintiff to leave the premises by April 8, 2018.The plaintiff vacated the premises on April 7, 2018.  Our affiliate intends to defend its interests vigorously in this case.

<u>Leinani Deslandes, et al. v. McDonald's USA, LLC, and McDonald's Corporation and Does 1-10</u> (Case No. 1:17-cv-04857).  On June 28, 2017, plaintiff, a former franchisee employee, filed a complaint against us and our predecessor in the U.S. District Court, Northern District of Illinois, Eastern Division, alleging that a provision of McDonald's franchise agreement unlawfully prohibited her from obtaining a position at a nearby franchise that would have paid her more money and, as a consequence, she suffered reduced wages, loss of professional growth opportunities and illegal working conditions.  Plaintiff asserts we and our predecessor engaged in unlawful contracts and unfair competition in violation of the Sherman Antitrust Act, the Illinois Antitrust Act, and the

EXHIBIT O(85)

AOE1999

Illinois Consumer Fraud and Deceptive Business Practices Act.  Plaintiff seeks class certification, damages, restitution, attorneys' fees, costs and expenses and a permanent injunction enjoining McDonald's from enforcing the franchise agreement provision at issue in the complaint.  On September 18, 2017, plaintiff filed an amended complaint.  On October 2, 2017, McDonald's filed a motion to dismiss plaintiff's amended complaint, and on June 25, 2018 the court denied that motion.  We and our predecessor intend to defend our interests vigorously in this case.

Vikram Bakshi, et al. v. McDonald's India Private Limited, McDonald's Corporation, et al. (Company Appeal No. 280 of 2017).  On August 28, 2017, plaintiff, McDonald's India Private Limited's former joint venture partner in North & East India, filed an appeal in the National Company Law Appellate Tribunal in New Delhi seeking to modify a judgment that a lower court had entered as part of a prior contract dispute between the parties.  Specifically, plaintiff seeks an order requiring McDonald's India Private Limited to purchase his shares in the former joint venture entity at a valuation for his franchises based on a calculation methodology that defendants dispute.  We intend to vigorously defend our interests in this matter.

Vikram Bakshi, et al. v. McDonald's India Private Limited, McDonald's Corporation, et al. (Contempt Application No. 300 (PB) of 2017).  On August 31, 2017, plaintiff, McDonald's India Private Limited's former joint venture partner in North & East India, filed a contempt application in the National Company Law Tribunal in New Delhi, claiming that our predecessor, its affiliate and their respective officers violated an injunction that the court had issued as part of its judgment in a prior contract dispute between the parties.  Specifically, plaintiff claims that the defendants violated the injunction by issuing a notice to plaintiff terminating franchises held by the former joint venture entity.  Plaintiff is seeking an order that defendants rescind the notices terminating the franchises and other relief for the alleged violation of the order.  We intend to vigorously defend our interests in this matter.

Sebastian E. Lentini, et al. v. McDonald's USA, LLC, et al. (Case No. LCV2017217171).  On September 18, 2017, plaintiff, a current franchisee, and his operating companies, filed a complaint against us and certain current and former regional employees in Hudson County Superior Court, New Jersey.  The complaint alleges a pattern and practice of age discrimination, constructive termination of plaintiff's franchises, and the existence of a widespread, corporate policy aimed at terminating older, long-term franchisees.  Plaintiff alleges that he is being forced out of the McDonald's system due to unfeasible remodel requirements; the opening of new restaurants in close proximity to his existing restaurants; and denying him the opportunity to expand his organization by awarding him new restaurants.  Plaintiffs seek an injunction prohibiting us from continuing this alleged discriminatory conduct, unspecified compensatory, consequential, and exemplary or punitive damages, and attorneys' fees and costs.  Defendants filed a motion to dismiss on December 15, 2017.  On March 16, 2018, the court denied our motion to dismiss the complaint against us, but granted dismissal of certain counts against the individual employees named as defendants.  Thereafter, the plaintiff sought intervention from the court to preliminarily and permanently stop the rebuild of one of his restaurants alleging that the rebuild amounted to an unreasonable standard of performance in violation of the New Jersey Franchise Practices Act.  The trial court disagreed with the plaintiff and denied his request to stop the rebuild.   The New Jersey Appellate Court and New Jersey Supreme Court upheld the trial court's ruling.  Defendants answered the complaint and filed a two-count counterclaim seeking, among other things, declarations that plaintiff's refusal to reinvest in his restaurants constitutes a breach of contract.  Plaintiff's motion to dismiss the counterclaim was denied.  On November 28, 2018, the parties attended court-ordered mediation but were unable to reach an amicable settlement.  On January 11, 2019, the court granted plaintiff's motion for leave to file an amended complaint re-asserting his original claims and adding new claims for breach of contract, violation of federal and state RICO statutes, and civil conspiracy.  On February 5, 2019, Defendants removed the case to federal court and, on February 25, 2019, filed a partial motion to dismiss the amended complaint.  On September 30, 2019, the court granted our motion to dismiss plaintiffs' federal and state RICO claims and their civil conspiracy claim.  The court declined to review the state court's prior rulings on plaintiffs' original claims and, therefore, denied our motion to dismiss those claims.  The parties are currently engaged in written and oral discovery.  We will continue vigorously defending our interests in this case.

Olivia Robertson, et al. v. McDonald's Corporation, et al. (Case No. 2:19-cv-10266-RHC-EAS).  On January 25, 2019, plaintiffs, residents of the Cities of Detroit and Hamtramck, Michigan, filed a complaint against our predecessor, other local businesses, and a towing company in the United States District Court for the Eastern

EXHIBIT O(85)

AOE2000

District of Michigan.  The complaint alleges that the defendant towing company engages in illegal and predatory towing of vehicles and that the defendant businesses have conspired with the defendant towing company in its practice of illegally towing vehicles in exchange for compensation.  The complaint claims, among other things, that the defendants have violated federal racketeering laws and Michigan's consumer protection law and have engaged in fraud, misrepresentation, conversion, and trespass to chattels, as well as aiding and abetting the defendant towing company in these alleged actions.  On April 24, 2019, plaintiffs filed an amended complaint naming all of the same parties but adding various municipalities as defendants.  Our predecessor moved to dismiss this amended complaint.  On August 29, 2019, the Court dismissed the case as to our predecessor, and the plaintiffs subsequently moved the Court to reconsider that order.  That motion remains pending.  Our predecessor intends to vigorously defend its interests in this case.

Coby Morales v. Paschen Management Corporation, McDonald's USA, LLC, and Does 1-10 (Case No. 56-2019-00525405-CU-OE-VTA).  On February 27, 2019, the plaintiff, a former employee of a franchised restaurant, filed a lawsuit against us and a franchisee in the Superior Court of the State of California, County of Ventura, alleging violations of the California Labor Code and the California Business & Professions Code related to requiring off-the-clock work, failing to pay minimum and overtime wages, failing to provide required meal periods and rest breaks or pay missed, late, or interrupted meal period or rest break premiums, failing to timely pay all wages due to discharged and quitting employees, failing to keep accurate records and provide accurate itemized wage statements, failing to indemnify employees for necessary expenses, and unfair and unlawful business practices.  The plaintiff also alleges that we are joint employers of the employees working at the franchisee's restaurants.  The plaintiff seeks class certification, injunctive relief, actual and liquidated damages, interest, statutory penalties, declaratory judgment, disgorged profits and attorneys' fees and costs.  On April 3, 2019, the Defendants removed the case to the United States District Court for the Central District of California.  On April 22, 2019, Plaintiff filed his First Amended Class Action Complaint and, on June 3, 2019, we filed a Motion to Dismiss Plaintiff's First Amended Complaint.  On July 9, 2019, the Court granted our motion to dismiss, in part, without prejudice.  On July 29, 2019, plaintiff filed a second amended complaint, which we moved to dismiss on August 12, 2019.  On September 27, 2019, the court granted our motion to dismiss one count of plaintiff's complaint, and plaintiff's claim for reimbursement of laundry expenses and his request for injunctive and declaratory relief.  The Court denied our motion as to plaintiff's remaining claims.  The parties are currently engaged in discovery.  We intend to defend our interests vigorously in this case.

Stephanie Turner v. McDonald's USA, LLC and McDonald's Corporation (Case No. 1:19-cv-05524).  On August 15, 2019, plaintiff, who worked in corporate-owned and franchisee-owned restaurants, filed a complaint against us and our predecessor in the U.S. District Court, Northern District of Illinois, Eastern Division.  Her complaint alleges that a provision of McDonald's franchise agreement unlawfully prohibited her from obtaining a position at other McDonald's-brand restaurants that would have paid her more money and, as a consequence, she suffered reduced wages, loss of professional growth opportunities and illegal working conditions.  Plaintiff asserts that we and our predecessor engaged in unlawful contracts and unfair competition in violation of the Sherman Antitrust Act.  On October 15, 2019, we moved to dismiss plaintiff's claims, and we await the court's ruling.  We intend to defend our interests vigorously in this case.

On December 19, 2014, the National Labor Relations Board ("NLRB") Office of the General Counsel issued consolidated complaints against certain of our franchisees and us, claiming that we were joint employers of those franchisees' employees.  The NLRB alleges that we and certain of our franchisees violated rights of employees working at McDonald's restaurants at various locations by, among other things, making statements and taking actions against them for engaging in activities allegedly aimed at improving their wages and working conditions.  The NLRB has scheduled consolidated hearings in three regional offices, with litigation that commenced on March 10, 2016 in New York.  On January 19, 2018, the administrative law judge issued a stay until March 19, 2018, so that the parties could pursue settlement discussions.  On March 19, 2018, the General Counsel, us, and the franchisees presented settlement agreements resolving all of the complaints and moved for the administrative law judge to approve the settlements and dismiss the complaints.  The franchisee employees objected to these settlement agreements on various grounds, and the administrative law judge held a hearing to examine the fairness of these settlements on April 5, 2018.  On July 17, 2018, the administrative law judge denied our motion to approve the settlements.  The General Counsel of the NLRB, McDonald's, and the charged franchisees appealed the administrative law judge's decision to the full Board.  On December 12, 2019, the NLRB directed the administrative law judge to approve the settlement, which she did on December 30, 2019.  On

EXHIBIT O(85)

AOE2001

January 7, 2020, the charging parties filed a motion to the NLRB to reconsider their decision, stay the settlement, and re-open the record, which motion is currently pending.

Additionally, we and our predecessor have been named as defendants in numerous additional labor and employment lawsuits brought by employees of our franchisees on an individual, class and collective basis, alleging that we are joint employers with our franchisees. These lawsuits allege racial discrimination, sexual harassment, wrongful termination, constructive discharge, wage and hour violations, and similar claims under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. Section 1981, and the Fair Labor Standards Act or similar statutes. We strongly disagree with the joint employment allegations and intend to vigorously defend these actions.

Occasionally, disputes arise with our franchisees. If a dispute cannot be resolved through our internal processes such as appealing to higher level individuals (our "open door policy") or our formal Ombudsman process, then as a matter of common practice (not required by the Franchise Agreement) we will often agree to use mediation. Even though we follow these practices, occasionally lawsuits alleging the same or similar allegations to those listed in this Item 3 have been brought against us or our predecessor and could be brought against us in the future.

## Concluded Cases

<u>Primer Hispania, S.L. v. McDonald's Sistemas de España, Inc., Sucursal en España (MSE)</u> (Case No. 41/2012). On January 9, 2012, a franchisee in Spain, through his operating entity, filed a complaint against our affiliate, MSE, in the Commercial Court No. 10 of Madrid alleging violations of the Unfair/Disloyal Competition and Defense of the Competition laws for unequal treatment. The plaintiff sought an order that would have required our affiliate to cease the alleged violations and provide rent reductions and money damages. On January 25, 2013, the parties settled this litigation. The franchisee agreed to terminate his franchise and sell us the restaurant equipment for 420,000 Euros, and the parties exchanged mutual releases.

<u>Ahmed Ahmed, individually and on behalf of all similarly situated persons v. McDonald's Corporation, Finley's Management Co. D/B/A McDonald's #11663</u> (Case No. 11-014559-CZ). On November 23, 2011, the plaintiff filed a lawsuit against our predecessor and our franchisee in the Circuit Court of Wayne County, Michigan, alleging the defendants violated the Michigan consumer protection act by falsely advertising that certain chicken products sold at a Michigan restaurant conformed to Muslim dietary laws. On April 17, 2013, our predecessor agreed to settle the case by paying $700,000 in damages, $25,000 of which went to the plaintiff and the rest to community groups and to attorneys' fees.

<u>Dasmine Bell, et al. v. McDonald's USA, LLC, and McDonald's Restaurants of Florida, Inc.</u> (Case 8:14-cv-02742-JSM-EAJ). On October 10, 2014, the plaintiff, a former employee of our affiliate, filed a complaint against us and our affiliate in the U.S. District Court for the Middle District of Florida, alleging that our affiliate, along with McDonald's as a joint employer, violated the Fair Credit Reporting Act by performing background checks without the required authorizations and disclosures. On January 26, 2015, we and our affiliate agreed to settle the case by paying $4,000 in damages and in exchange received a general release from the plaintiff.

<u>Syed Ali Husain and Khursheed Husain v. McDonald's Corporation, McDonald's USA, LLC, Mwaffak Kanjee, and Does 1-20</u> (Case No. CIV 09-6177). On December 8, 2009, the plaintiffs, franchisees, filed a complaint against our predecessor, Mwaffak Kanjee, one of our officers, and us in the Superior Court of California, Marin County, California. The complaint asserted that we refused to grant new term franchises for 3 of the plaintiffs' restaurants after allegedly entering into agreements to do so and alleged breach of contract, fraudulent and negligent misrepresentation, promissory estoppel, breach of the implied covenant of good faith and fair dealing, unjust enrichment, equitable estoppel, unfair business practices, and violation of the Unruh Act. The plaintiffs sought an order directing McDonald's to grant new 20-year franchise terms for the 3 restaurants, compensatory damages, and costs. We and our predecessor filed a cross-complaint against the plaintiffs alleging that their rights to operate the 3 franchises expired, and seeking an order requiring the Husains to vacate the restaurants, compensatory damages, and attorneys' fees. On September 25, 2012, the court ordered the Husains to vacate the 3 restaurants and return possession to McDonald's. The case proceeded on the parties' remaining claims. In September 2014, the parties entered into a memorandum of understanding in which McDonald's agreed to pay

EXHIBIT O(85)

AOE2002

$22,375,000 for the plaintiffs' remaining franchises, in exchange for mutual releases of all claims, including resolution of this case.  In January 2015, McDonald's acquired the remaining franchises and the court dismissed the case with prejudice.  In addition, under the terms of the franchise agreements for the 3 expired franchises which were the subject of this case, McDonald's exercised its option to purchase the furniture, fixtures and equipment at those locations for the fair market value price of $270,015.

Zhuang Zhi-Xun and Qing-Yi Limited v. McDonald's Restaurants (Taiwan) Co., Ltd. (Case No. 105 Xu-Zhi No.710).  On December 25, 2015, the plaintiff, an operator of a McDonald's restaurant in Taiwan and his operating entity, filed in Taipei District Court a complaint against our affiliate, McDonald's Restaurants (Taiwan) Co., Ltd., alleging it failed to comply with the pre-contractual disclosure requirements set forth in the Taiwan Fair Trade Commission's Guidelines on Franchisors' Business Practice.  The plaintiff alleged our affiliate failed to disclose certain information related to our affiliate's plans to open new restaurants in the same business area as plaintiff's restaurant.  For such claims, plaintiff sought compensation of $700,000 New Taiwan dollars, plus interest, court fees, and rescission.  Plaintiff additionally requested the court to render the arbitration clause in the franchise agreement null and void based on the Taiwan Fair Trade Act and the Consumer Protection Act.  On March 22, 2016, our affiliate entered into a settlement agreement with the franchisee. The franchisee agreed to terminate all of the franchises for his McDonald's restaurants, sell our affiliate the assets of those restaurants, and settle all claims for $111,172,552 New Taiwan Dollars.

Chris Howe v. McDonald's Corporation and Does 1-100 (Case No. 5:16-cv-00176).  On January 29, 2016, plaintiff filed a complaint against our predecessor in the U.S. District Court, Central District of California – Eastern Division, on behalf of himself and purported classes of McDonald's customers in California and in 41 other states and the District of Columbia who purchased Mozzarella Cheese Sticks in McDonald's restaurants in California.  Plaintiff alleged that McDonald's advertising of Mozzarella Cheese Sticks violated California's Unfair Competition Law, California's False Advertising Law, California's Consumers Legal Remedies Act, and various state warranty laws.  Plaintiff also asserted a claim for unjust enrichment.  Plaintiff sought, on behalf of himself and the purported classes, monetary damages, attorney's fees, costs and expenses, pre- and post-judgment interest, and injunctive relief.  On October 10, 2016, our predecessor agreed to settle the case by paying $32,500 in damages, which included $30,500 in attorneys' fees and costs, and in exchange received a general release for us and our predecessor from the plaintiff.

Jade Berreau, as administrator of the Estate of Dashiell Snow v. McDonald's Corporation and Does 1-100 (Case No. 2:16-cv-07394).  On October 3, 2016, plaintiff, as the administrator of Estate of Dashiell Snow, filed a complaint against our predecessor in the U.S. District Court, Central District of California, Western Division, alleging that McDonald's unlawfully copied Dashiell Snow's artwork and installed it in hundreds of McDonald's graffiti-themed restaurants around the world.  Plaintiff asserts claims for copyright infringement, falsification of copyright management information, unfair competition under the Lanham Act and California law, and negligence, and seeks injunctive relief, monetary and punitive damages, attorney's fees, costs and expenses.  The accused artwork was not installed in any restaurants in the United States.  Our predecessor filed a motion to dismiss the case for lack of personal jurisdiction, which the court granted on January 30, 2017 without prejudice to the ability to refile the complaint in a different jurisdiction.  On or about March 24, 2017, our predecessor settled this case by agreeing to pay $650,000 and remove the accused artwork in one restaurant in the United Kingdom.  The parties exchanged releases.

Stephanie Ochoa, et al. v. McDonald's Corp., McDonald's USA, LLC, McDonald's Restaurants of California, Inc., The Edward J. Smith and Valerie S. Smith Family Limited Partnership d/b/a McDonald's and Does 1-100 (Case No. 3:14-cv-02098-JD). On March 12, 2014, the plaintiffs, various current and former employees of franchised restaurants, filed a lawsuit against us, our predecessor, an affiliate and franchisees in the Superior Court of the State of California, County of Alameda, alleging violations of the California Labor Code and the California Business & Professions Code related to altering time records, requiring off-the-clock work, failing to pay minimum and overtime wages, failing to provide required meal periods and rest breaks, failing to pay all wages due to discharged and quitting employees, failing to keep accurate records and provide accurate itemized wage statements, failing to indemnify employees for necessary expenses, negligence, unfair and unlawful business practices and retaliation for complaining about the alleged labor violations. The plaintiffs also alleged that the defendant McDonald's entities are joint employers of those employees. The plaintiffs sought class certification, injunctive relief, monetary and punitive damages, interest, statutory penalties, declaratory judgment,

EXHIBIT O(85)

AOE2003

disgorged profits, and attorneys' fees and costs.  On May 7, 2014, our franchisees removed this lawsuit to the U.S. District Court, Northern District of California.  On September 25, 2015, the court dismissed all of plaintiffs' joint employer theories against the McDonald's entities except one based on ostensible agency theory.  On November 14, 2016, the court granted final approval of a settlement of all claims between the plaintiffs and our franchisees. The defendant McDonald's entities and plaintiffs separately reached a settlement agreement wherein the McDonald's entities agreed to pay $3,750,000 and certain limited injunctive relief in exchange for dismissal of all remaining claims with prejudice.  The court granted final approval and dismissed all claims against the defendant McDonald's entities with prejudice on August 4, 2017.

Paul Bledsoe v. McDonald's USA, LLC and Does 1-10 (Case No. 2:18-cv-09354-JFW-GJS).  On September 28, 2018, plaintiff filed a complaint against us in California state court in Los Angeles County, on behalf of himself and purported classes of McDonald's customers in California who purchased extra value meals in McDonald's restaurants in California and were charged a "drink upcharge" for a drink advertised as being included in the extra value meal.  Plaintiff alleged McDonald's practice of charging extra for beverages advertised as already being included in an extra value meal violated California's Unfair Competition Law, California's False Advertising Law, and California's Consumers Legal Remedies Act. Plaintiff sought, on behalf of himself and the purported class, monetary damages, attorney's fees, costs and expenses, pre- and post-judgment interest, and injunctive relief. On February 11, 2019, we agreed to settle the case by paying $2,500 in damages in exchange received a general release from the plaintiff.

Il Ristorante del Centro (Pandya) v. McDonald's Development Italy LLC (Case No. R.G. 30320/2017).  On May 22, 2017, plaintiff, a franchisee of our affiliate in Italy, filed a complaint against us in the Court of Milan asserting claims for breach of the franchise agreement for abuse of dominant position and abuse of economic dependence. The plaintiff sought compensatory damages.  On June 20, 2018, the parties settled this litigation.  The plaintiff agreed to terminate his franchise and sell the restaurant to our affiliate for 1,671,680 Euros.  The purchase price was reduced by 910,272 Euros for outstanding fees owed to our affiliate.  Our affiliate also agreed to hire the plaintiff's employees, and the parties exchanged mutual releases..

Emily Knowles, et al. v. McDonald's USA, LLC, and McDonald's Corporation (Case 9:16-cv-81657-KAM).  On September 29, 2016, plaintiff filed a complaint against us and our predecessor in the U.S. District Court, Southern District of Florida, on behalf of herself and a purported class of nationwide McDonald's customers who have allegedly paid a drink upcharge fee for healthy drink options with their purchase of a Happy Meal.  Plaintiff asserted claims under the Florida Deceptive and Unfair Trade Practices Act or, in the alternative, under the Illinois Consumer Fraud Act if the court found that Illinois consumer laws apply to the allegations.  Plaintiff sought entry of an order certifying the case as a class action, monetary damages, civil penalties, attorneys' fees, costs and expenses.  In November 2018, McDonald's settled this case with Plaintiff by agreeing to pay $35,000 in exchange for a release of all claims.

Dieter Abt, et al. v. McDonald's Corp., McDonald's USA, LLC, The Marketing Store Worldwide, LLC, et al. (Case No. BC 552072).  On July 18, 2014, the plaintiffs filed a complaint in California state court against us, our predecessor, The Marketing Store Worldwide, LLC  and others, alleging the defendants used the plaintiffs' money and intellectual property to fund and further develop the McDonald's Channel, an in-store controlled television and media test, and made false representations that they intended to continue working with plaintiffs to implement the McDonald's Channel after McDonald's purportedly knew that it had no intention of doing so.  Plaintiffs amended their initial complaint four times since the commencement of the case in July 2014, and their fourth amended complaint, filed in November 2015, alleged eight counts against our predecessor and us for fraud, negligent misrepresentation, promissory fraud, fraudulent concealment and unjust enrichment. Plaintiffs sought actual and punitive damages and costs.  In March 2019, the defendants settled this case with plaintiffs by agreeing to pay $150,000 in exchange for a release of all claims.

Tavarua Restaurants, Inc. et al. v. McDonald's USA, LLC (Case No. 19-CV-0021-MMA-NLS).  On January 4, 2019, the plaintiffs, the estate of a recently deceased franchisee and that franchisee's operating companies, filed a complaint in the U.S. District Court, Southern District of California against us.  The complaint alleges that we improperly exercised a right of first refusal seeking to purchase the franchisee's restaurant franchises and violated California's franchise relations law.  The complaint seeks an order declaring that we did not properly exercise our right of first refusal and to enjoin us from stopping a transaction for the sale of the restaurant franchises between

EXHIBIT O(85)

AOE2004

the estate and another franchisee.  We have filed an answer and counterclaims as well as a motion seeking declaratory judgment that we validly exercised our right of first refusal.  On August 16, 2019, the Court ruled that we validly exercised our first option to purchase only the restaurant franchises.  Following the ruling, the parties entered into a settlement agreement and mutual release that provided for the sale of the eight franchises to us for $15.6M.

Other than these actions, no litigation is required to be disclosed in this Item.

## Item 4
## Bankruptcy

No person previously identified in Item 1 and no officer identified in Item 2 of this disclosure document has been involved as a debtor in proceedings under the U.S. Bankruptcy Code, or foreign bankruptcy laws, required to be disclosed in this Item.

## Item 5
## Initial Fees

All franchisees pay a $45,000 lump sum initial franchise fee on the opening of the restaurant, except for: (a) the McOpCo companies, which do not pay any initial franchise fee; (b) franchisees of locations having 10 years or less of real estate tenure will pay a prorated initial franchise fee based on the term of the franchise; (c) in situations where we and a franchisee mutually agree on a term of 10 years or less, after considering such factors as the restaurant location and its business potential, franchisees will pay a prorated initial franchise fee based on the term of the franchise; (d) franchisees who rebuild or relocate their restaurants will pay the initial franchise fee less a credit for a portion of the previously paid initial franchise fee, on the earlier of the first of the month after the seventh year after the opening of the rebuilt or relocated restaurant, or the end of the previous franchise term (see Item 7, note 1); (e) franchisees of Satellite locations, who are required to pay a $500 initial franchise fee upon opening of the Satellite (except franchisees of Walmart locations, who pay no initial franchise fee) and an annual fee (see Item 6); (f) franchisees of STO and STR locations pay a $22,500 lump sum initial franchise fee; and (g) franchisees who have an option to purchase assets under a BFL pay the $45,000 initial franchise fee when they exercise the option.  The entire initial franchise fee will be refunded if the restaurant construction is not completed within 1 year of the date the Franchise Agreement is signed.  There are no refunds under other circumstances.

## Item 6
## Other Fees

### OTHER FEES

| Type of fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Service Fee (1) | 4% of Gross Sales (2) | Payable monthly on the 10th day of the next month. | "Gross Sales" include all revenues from your sales based upon all business conducted at or from the restaurant, but exclude sales or use tax. |
| Rent (1) | Varies (3)(4) | Base Rent: Payable on the 1st day of the month.  Pass Thru Rent, if applicable: Payable on the 1st day of the month.  Percentage Rent: Payable monthly on the 10th day of the next month. | Where we lease the land and/or building, we will pass thru any rent escalations which occur throughout the lease term as pass thru rent. |

EXHIBIT O(85)

AOE2005

| Type of fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Advertising and Promotion (5) | Not less than 4% of Gross Sales | Spent during each calendar year. | Most franchisees participate in local advertising cooperatives and the national advertising fund ("OPNAD").  The contribution rates are established by the franchisees and, depending upon then-current advertising costs and needs, may or may not exceed the required 4% of Gross Sales.  "Grand Opening" promotions are strongly recommended. |
| Audit/Inspection Fee (1) | Cost of audit | Immediately upon billing. | Payable only if audit/inspection fee shows an understatement of at least 2% of Gross Sales. |
| Satellite Annual Fee (1) | $500 to $2,500 | On each anniversary of opening or on a fixed date annually. | |
| Satellite Rent (1) | Varies (6) | Payable monthly on the 10th day of the next month. | |
| STO and STR Rent (1) | Varies (3)(4)(7) | Same as Base, Pass Thru and Percentage Rent above. | |
| BFL Rent (1) | Varies (3)(8) | Same as Rent above. | |
| Relocation Contribution (1)(9) | $50,000 | On opening of the relocated restaurant. | |
| POS Releases Fee (1)(10) | $1,000 integration fee (one-time fee)(11)<br><br>$650 annual fee | Drafted in 12 monthly installments on the 25th day of each month through iReceivables. | You pay the annual fee to us for the POS integration to store system platform. |
| Back Office Integration and Support Fee (1)(10) | $500 integration fee (one-time fee)(11)<br><br>$1,002 annual fee | Drafted in 12 monthly installments on the 25th day of each month through iReceivables. | You pay the annual fee to us for the back office integration to store system platform. |
| Restaurant Deployment and Execution (1)(10) | $425 annual fee | Drafted in 12 monthly installments on the 25th day of each month through iReceivables. | You pay the annual fee to us for software deployment and execution services |
| Restaurant File Maintenance (RFM) (1)(10) | $195 annual fee | Drafted in 12 monthly installments on the 25th day of each month through iReceivables. | You pay this fee to us for the annual hosting and maintenance of RFM and we remit payment to our predecessor. |
| NewPOS NP$^6$ (1)(10) | $1,600 license fee (one-time fee)(11)<br><br>$650 annual fee | Drafted in 12 monthly installments on the 25th day of each month through iReceivables. | You pay the annual fee to us for NewPOS NP$^6$ software maintenance and support and we remit payment to our predecessor. |
| Integrated Cashless System Fee (1)(10) | $214 annual fee | Drafted in 12 monthly installments on the 25th day of each month through iReceivables. | You pay these fees to us and we remit payment to a third party supplier. |

EXHIBIT O(85)

AOE2006

| Type of fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Microsoft Subscription (1)(10) | $490 annual fee | Drafted in 12 monthly installments on the 25th day of each month through iReceivables. | You pay this fee to us and we remit payment to Microsoft. |
| Endpoint Security (1)(10) | $100 annual fee | Drafted in 12 monthly installments on the 25th day of each month through iReceivables. | You pay this fee to us and we remit payment to a third party supplier. |
| Employee Experience Platform (OurLounge) (1)(10) | $300 annual fee | Drafted in 12 monthly installments on the 25th day of each month through iReceivables. | You pay this fee to us for the annual support and maintenance of OurLounge solution. |
| Employee Experience Platform (Fred / Campus) (1)(10) | $209 annual fee | Drafted in 12 monthly installments on the 25th day of each month through iReceivables. | You pay this fee to us for the annual support and maintenance of Campus, Fred solution and we remit payment to our predecessor. |
| McDelivery POS Integration  (1)(10)(12) | $250 annual fee | Drafted in 12 monthly installments on the 25th day of each month through iReceivables. | You pay this fee to us for the annual support and maintenance of McDelivery orders integration into our POS software and we remit payment to our predecessor. |
| Restaurant Systems Management (RSM) (1)(10) | $250 annual fee | Drafted in 12 monthly installments on the 25th day of each month through iReceivables. | You pay this fee to us for the annual maintenance of RSM. |
| Restaurant Integrated Data Movement (RIDM) (1)(10) | $115 annual fee | Drafted in 12 monthly installments on the 25th day of each month through iReceivables. | You pay this fee to us for the annual maintenance of RIDM. |
| Identity Management (1)(10) | $200 annual fee | Drafted in 12 monthly installments on the 25th day of each month through iReceivables. | You pay this fee to us for the annual support and maintenance of restaurant crew identity security management software. |
| Store Mail (email accounts) Fee (10) | $73.80 annual fee | Payable annually within 30 days of billing. | You pay this fee to us for annual email account support for using the us.stores.mcd.com domain. |
| PCI Compliance / Security (1)(10) | $525 annual fee | Drafted in 12 monthly installments on the 25th day of each month through iReceivables. | You pay this fee to us to ensure your technology is secure and reliable. |
| Restaurant Support (1)(10) | $1,100 annual fee | Drafted in 12 monthly installments on the 25th day of each month through iReceivables. | You pay this fee to us for providing technology support. |
| Back Office (Cash / Inventory / DataPass) (1)(10)(12) | $498 annual fee | Drafted in 12 monthly installments on the 25th day of each month through iReceivables. | You pay this fee to us for back office cash, inventory and DataPass software maintenance and we remit payment to QSRSoft. |
| Digital Platform - Localization (1)(10) | $900 one-time fee (11)  $1,600 annual fee | Drafted in 12 monthly installments on the 25th day of each month through iReceivables. | You pay this fee to us for supporting, enhancing and localizing digital technology software. |
| Digital Platform – Core Product (1) (10) | $1,100 annual fee | Drafted in 12 monthly installments on the 25th day of each month through iReceivables. | You pay this fee to us for the annual maintenance, support and hosting of core digital technology software and we remit payment to our predecessor. |

EXHIBIT O(85)

AOE2007

| Type of fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Experience of the Future (EOTF) (1)(10)(12) | $1,000 one-time licensing fee (11)* | | |
| | $1,000 annual fee* | Drafted in 12 monthly installments on the 25th day of each month through iReceivables. | You pay this fee to us for EOTF technology integration and support. |
| | | | *For kiosk only restaurants without outdoor digital menu boards, the licensing fee and annual fees are each reduced to $500. |
| Kiosk – Core Product (1)(10)(12) | $1,500 one-time licensing fee (11) | | Kiosk licensing fee is paid to us as part of the standard construction billing process and we remit payment to our predecessor. |
| | $350 annual fee | Drafted in 12 monthly installments on the 25th day of each month through iReceivables. | You pay this fee to us for core kiosk technology software and we remit payment to our predecessor. |

(1)    All fees are imposed and collected by and payable to McDonald's.  All fees are non-refundable and uniform and we may draft miscellaneous receivables you may owe us.  We will automatically draft rent and service fees from your bank account according to the terms of the Franchise Agreement.

(2)    4.5% of Gross Sales in Alaska, Hawaii, Guam, and the Northern Mariana Islands.

(3)    The following is the rent structure for new restaurants:

**Fixed Percentage Rent with Monthly Base Rent and Pass Thru Rent, if applicable**
**Monthly Base Rent**
Most restaurants will have a Monthly Base Rent.  For a site where both the land and the building are owned by McDonald's or its affiliates, Monthly Base Rent is based upon the total amount invested by McDonald's in the acquisition and development of the land and the building.  A finance factor is applied to this amount to produce an appropriate return for McDonald's.  For a site where the land and/or building is leased by McDonald's from a third party, Monthly Base Rent is based upon the total amount invested by McDonald's in the acquisition and development of the land and the building as well as monthly rent paid in the first year to a third party landlord.  A finance factor is applied to each of these amounts to produce an appropriate return for McDonald's.  You must pay this amount every month of the franchise term.

**Pass Thru Rent**
For a site where the land and/or building is leased by McDonald's, there may be rent escalations for which McDonald's is responsible under the lease which are above and beyond the original monthly rent we paid to the landlord.  For these rent escalations, McDonald's will charge you pass thru rent which

must be paid every month the escalations are in effect.  We do not apply a finance factor to the pass thru rent.

**Fixed Percentage Rent**

The Fixed Percentage Rent for new restaurants that opened on or after July 1, 2013, is generally computed as follows:

| McDonald's Total Acquisition and Development Costs | | Franchisee's |
| More Than | Up to | Fixed Percentage Rent Rate |
| --- | --- | --- |
| $0.00 | $1,020,000 | 8.50% |
| $1,020,000.01 | $1,050,000 | 8.75% |
| $1,050,000.01 | $1,080,000 | 9.00% |
| $1,080,000.01 | $1,140,000 | 9.25% |
| $1,140,000.01 | $1,170,000 | 9.50% |
| $1,170,000.01 | $1,200,000 | 9.75% |
| $1,200,000.01 | $1,230,000 | 10.00% |
| $1,230,000.01 | $1,260,000 | 10.25% |
| $1,260,000.01 | $1,290,000 | 10.50% |
| $1,290,000.01 | $1,320,000 | 10.75% |
| $1,320,000.01 | $1,350,000 | 11.00% |
| $1,350,000.01 | $1,410,000 | 11.25% |
| $1,410,000.01 | $1,470,000 | 11.50% |
| $1,470,000.01 | $1,570,000 | 11.75% |
| $1,570,000.01 | $1,630,000 | 12.00% |
| $1,630,000.01 | $1,690,000 | 12.25% |
| $1,690,000.01 | $1,750,000 | 12.50% |
| $1,750,000.01 | $1,810,000 | 12.75% |
| $1,810,000.01 | $1,910,000 | 13.00% |
| $1,910,000.01 | $2,010,000 | 13.25% |
| $2,010,000.01 | $2,110,000 | 13.50% |
| $2,110,000.01 | $2,210,000 | 13.75% |
| $2,210,000.01 | $2,310,000 | 14.00% |
| $2,310,000.01 | $2,410,000 | 14.25% |
| $2,410,000.01 | $2,510,000 | 14.50% |
| $2,510,000.01 | $2,610,000 | 14.75% |
| $2,610,000.01 | $2,710,000 | 15.00% |
| $2,710,000.01 | and above | Established on a case by case basis |

The Fixed Percentage Rent is payable only if the monthly Gross Sales exceed the monthly base sales figure which is computed by dividing the dollar amount of the Monthly Base Rent by the Fixed Percentage Rent rate.  If you are purchasing an existing restaurant from a franchisee, the chart will not apply as you will be assuming the Monthly Base Rent and Fixed Percentage Rent paid by the selling franchisee (except for any rent relief which is personal to the selling franchisee).

As set forth in Item 17, you have no right to renew or extend your franchise.  However, if we offer you a new term franchise, the Fixed Percentage Rent associated with that franchise will be based on the then-current policies.  Under our current policy, the Fixed Percentage Rent for new term franchises will not be lower than the Fixed Percentage Rent in the previous franchise term.  Further, the Fixed Percentage Rent will remain the same unless the current Fixed Percentage Rent rate is below the lowest Fixed Percentage Rent rate in the chart above, in which case the rent for the new term franchise may be raised to match the lowest Fixed Percentage Rent rate.  The Fixed Percentage Rent may also increase if: 1) McDonald's has made additional investments outside of our standard contributions to institutional programs such as rebuilds, relocations and major remodels; 2) the Fixed Percentage Rent in the previous franchise term was temporarily reduced to provide financial assistance and that temporary reduction does not extend to the entirety of the new franchise term; or 3) you, or a previous franchisee while licensed to operate this location, and McDonald's entered into a separate agreement that includes scheduled Fixed Percentage

EXHIBIT O(85)

AOE2009

Rent increases during the new franchise term.  For sites leased by McDonald's, we may also charge you Pass Thru Rent for any additional lease costs charged to McDonald's in the new term franchise that are above the average lease costs over the previous 20 years.

While the table shown above references total acquisition and development costs, you should be aware that the table is the end result of a process by which McDonald's gives consideration to many economic factors including the amounts of typical franchisor and franchisee investments, the ratio between our investment and your investment, potential rates of return on investment, the ratio between what we think might be our potential return and yours, and the amount which we have at risk.

The percentages used in computing monthly payments based on Gross Sales are determined by McDonald's management in consideration of the rights being granted by the Franchise Agreement, the drawing power of the McDonald's restaurant, the value of the McDonald's System as a whole and McDonald's interests in obtaining a profit in light of competitive conditions.  All payments made by you to McDonald's constitute a single financial arrangement between you and McDonald's which, taken as a whole and without regard to any designation or description, reflect the value of the rights being made available to you by McDonald's and the services being rendered by McDonald's during the franchise term.  The percentages may vary among franchises depending upon when the franchise was sold as well as other factors.  In unusual circumstances that involve special costs, the fees paid by you may be higher than those outlined in this Item 6.

(4)     We have adopted a policy that allows co-investment in the building and site improvements of new and relocated traditional, STO and STR restaurants for a reduction in the Fixed Percentage Rent and Monthly Base Rent, if certain eligibility conditions are met.  You are not required to participate under this policy. If the eligibility conditions are met and you elect to co-invest, the co-invested amount is in addition to the initial investment described in Item 7.  The terms and criteria of this policy differ slightly for new and relocated traditional, STO and STR restaurants and are listed below.  We may apply, modify, or terminate this policy at any time at our discretion.

**Terms:**
For new and relocated traditional, STO and STR restaurants, the general terms are as follows:  (a) you have the ability to reduce your stated percentage rent in increments of .25% ("quarters"), down to the applicable co-investment minimum stated rent; (b) the cost to co-invest is determined using a standardized approach that blends the investment tiers and the related percentage rent rates of the applicable Fixed Percentage Rent Chart and will be no less than $30,000 per quarter for new and relocated traditional restaurants or no less than $30,000 in total for new and relocated STO and STR restaurants; (c) you must pay the additional investments to us; (d) you may pay the additional investments in cash or you may finance them, for up to 10 years, with your own lender (we do not arrange for any financing of these additional investments), but you may not use the building or leasehold improvements as collateral for your loan; and (e) we will retain full ownership of, and legal title to, the building and leasehold improvements, but you will get the tax benefits associated with your co-investment amount. For new and relocated traditional restaurants, if our investment is over $2,710,000, or for new and relocated STO and STR restaurants, if our investment is over $1,000,000, these terms will be decided on a case-by-case basis.

**Co-Investment Criteria and Calculation for New Traditional Restaurants:**
For new restaurants, the following criteria apply:  (a) our real estate tenure at the location is at least 20 years; (b) our development costs are more than $1,350,000; (c) the Fixed Percentage Rent is over 11%; (d) your franchise for the restaurant is 20 years; (e) if the restaurant is on property leased by us, we do not pay any percentage rent to our landlord; and (f) decision to co-invest must be made before the restaurant opens.

For new restaurants, the co-investment floor for the calculation (to determine the number of quarters available and maximum rent reduction) is 11%.  When you select the actual co-investment amount, the corresponding percentage rent reduction is applied to the rent structure that was established for the restaurant prior to the co-investment decision, but rent may not be reduced below 11%.

EXHIBIT O(85)

AOE2010

**Co-Investment Criteria and Calculation for Relocated Traditional Restaurants:**
For relocated restaurants, the following criteria apply:  (a) our real estate tenure at the location is at least 20 years; (b) your franchise for the restaurant is 20 years; and (c) if the restaurant is on property leased by us, we do not pay any percentage rent to our landlord.

For relocated restaurants, the co-investment floor (for the calculation to determine the number of quarters available and maximum rent reduction) is the existing restaurant's stated percentage rent or 11%, whichever is lower, but not below 8.50%.  When you select the actual co-investment amount, the corresponding percentage rent reduction is applied to the rent structure that was established for the restaurant prior to the co-investment decision, but rent may not be reduced below 8.50%.

**Co-Investment Criteria and Calculation for New and Relocated STO and STR Restaurants:**
For new and relocated STO and STR restaurants, the following criteria apply: (a) our real estate tenure at the location is at least 10 years; (b) our development costs are more than $640,000; (c) the Fixed Percentage Rent is over 9.0% for STR and 9.5% for STO; (d) your franchise for the restaurant is 10 years; and (e) if the restaurant is on property leased by us, we do not pay any uncapped percentage rent to our landlord.

For new and relocated STO and STR restaurants, the co-investment floor (for the calculation to determine the number of quarters available and maximum rent reduction) is 9.0% for STR and 9.5% for STO. When you select the actual co-investment amount, the corresponding percentage rent reduction is applied to the rent structure that was established for the restaurant prior to the co-investment decision, but the rent may not be reduced below 9.0% for STR and 9.5% for STO.

(5)     Not payable to us. While the McOpCo companies are voting members of the local advertising funds and OPNAD, they do not have controlling voting power.

(6)     All Satellite restaurants (other than McDonald's in Walmart (MIW) restaurants) will have an Annual or Monthly Base Rent.  The rent charged is determined on a case-by-case basis by our management.  The rent will vary depending on our investment, rent paid to the head landlord, length of term, projected profitability, and return on investment.  MIW restaurants will pay Fixed Percentage Rent, which generally ranges from 14% to 15½% of Gross Sales, and is based on the actual sales volume for the MIW restaurant.

(7)     The following is the rent structure for STO and STR locations:

**Small Town Oil and Small Town Retail Locations Fixed Percentage Rent with Monthly Base Rent**
**Monthly Base Rent**
All restaurants will have a Monthly Base Rent.  For STO and STR locations, Monthly Base Rent is calculated in the same manner as described in this Item, note 3.  You must pay this amount every month of the franchise term.

**Fixed Percentage Rent**
The Fixed Percentage Rent for STO and STR locations that opened on or after May 28, 2014, is generally computed as follows:

| McDonald's Total Acquisition and Development Costs | | Fixed Percentage Rent | |
| More Than | Up to | STO | STR |
| --- | --- | --- | --- |
| $0.00 | $640,000 | 9.50% | 9.00% |
| $640,000.01 | $670,000 | 9.75% | 9.25% |
| $670,000.01 | $700,000 | 10.00% | 9.50% |
| $700,000.01 | $730,000 | 10.25% | 9.75% |
| $730,000.01 | $760,000 | 10.50% | 10.00% |
| $760,000.01 | $820,000 | 10.75% | 10.25% |
| $820,000.01 | $880,000 | 11.00% | 10.50% |

EXHIBIT O(85)

AOE2011

| McDonald's Total Acquisition and Development Costs | | Fixed Percentage Rent | |
| More Than | Up to | STO | STR |
| --- | --- | --- | --- |
| $880,000.01 | $940,000 | 11.25% | 10.75% |
| $940,000.01 | $1,000,000 | 11.50% | 11.00% |
| $1,000,000.01 | and above | Established on a case by case basis | |

**Pass Thru Rent**
For leased locations, restaurants may have a monthly pass thru rent, which is calculated in the same manner as described above in Note 3.

(8)   The rent structure for BFLs is determined by us on a case-by-case basis.  A BFL franchise may be offered by McDonald's after considering various factors, including your personal financial net worth and liquidity, projected pre-opening and opening expenses at the proposed restaurant, and the projected sales volume and operating expenses at the proposed restaurant during the first 3 years of operation.  Under a BFL you may have a conditional option to purchase the franchise and the restaurant equipment, signs, and certain other assets after the first year of the franchise term.  The minimum option price for new and existing restaurants is determined by McDonald's on a case-by-case basis.

(9)   The relocation contribution is required if you relocate your restaurant to a new site.

(10)   These fees shall remain fixed through December 2020, but may increase thereafter.

(11)   One-time fees are paid for new and existing restaurants that adopt the specified technology.

(12)   Fees apply to participating restaurants only.

EXHIBIT O(85)

AOE2012

**Item 7**
**Estimated Initial Investment**

**YOUR ESTIMATED INITIAL INVESTMENT**

| Type of expenditure | Amount | Method of payment | When due | To whom payment is to be made |
|---|---|---|---|---|
| Initial Franchise Fee | $45,000 (1)<br>$22,500 (1) (2)<br>$0 to $500 (3) (4) | Lump Sum | On opening (1) | McDonald's |
| Real Estate and Building – 3 Months' rent (5) | Base Rent $0 to $229,000 (6)<br>$0 to $60,000 (2) (6)<br>$0 to $75,000 (3) (6)<br>Percentage Rent  0.00% to 28.00% (7)<br>0.00% to 15.00% (2)<br>0.00% to 20.25% (3) | Monthly | Base:<br>  Current month<br>  Base Rent due<br>  1st of the month<br>Percent:<br>  10th of following<br>  month | McDonald's |
| Signs, Seating, Equipment, and Decor | $950,000 to $1,550,000 (8)<br>$640,000 to $1,150,000 (2) (8)<br>$325,000 to $495,000 (3) (8) | Lump Sum | Before Opening | Vendors |
| Opening Inventory | $20,000 to $35,000<br>$13,500 to $29,000 (2)<br>$10,000 to $26,000 (3) | Lump Sum | Before Opening | Vendors |
| Miscellaneous Opening Expenses | $46,500 to $56,500 | As Incurred | As Incurred | Vendors<br>Utilities |
| Travel and Living Expenses While Traveling | $3,000 to $36,000 (9) | As Incurred | As Incurred | Airlines<br>Hotels<br>Restaurants |
| Additional Funds – 3 Months | $250,000 to $355,000 (10)<br>$185,000 to $225,000 (2) (10)<br>$80,000 to $110,000 (3) (10) | As Incurred | As Incurred | Employee<br>Suppliers<br>Utilities |
| TOTAL (11) | $1,314,500 to $2,306,500 (5) (11)<br>$910,500 to $1,579,000 (2) (11)<br>$464,500 to $799,000 (3) (11) | | | |

(1)     Franchisees who rebuild or relocate their restaurants will pay the initial franchise fee on the earlier of: (a) the first of the month after the seventh year after the opening of the rebuilt or relocated restaurant; or (b) the end of the previous franchise term.

(2)     Applies to STO and STR locations.

(3)     Applies to Satellites.

(4)     See Item 5.

(5)     McDonald's acquires real estate and building and franchises the right to operate at the location.  Amounts shown as rent are part of the overall economic package of fees as described in Item 6.

(6)     Special site restaurants may be higher.

(7)     See Item 6, note 4.

(8)     Varies due to size of building, location, estimated sales volume, transportation charges and sales tax.  If you request changes to the building, payment for the requested changes may be required before signing the Franchise Agreement.  The cost of current Store Systems range from $108,000 to $118,500, which includes the POS, Integrated Cashless System, kiosks, table locators, computer hardware, software, and related equipment.

EXHIBIT O(85)

AOE2013

(9)     Cost varies due to distances from Field Offices and headquarters in Chicago, Illinois, and costs of living in various areas of the country.

(10)    You may or may not need capital to support ongoing expenses, such as employee wages, utilities, payroll taxes, legal and accounting fees, travel, advertising, promotion, outside services, linen, operating supplies, small equipment, maintenance and repair, office supplies, cash shortages, insurance, debt service, and non-product purchases, as well as additional opening capital for other variable costs.  These figures are estimates and McDonald's cannot guarantee that you will not have additional expenses starting the business.  Your costs will depend on factors such as how well you follow McDonald's methods and procedures; the sales volume of your restaurant; your management skill, experience, and business acumen; local economic conditions; the local market for our product; the prevailing wage rate; competition; your rent structure; and whether your restaurant is an STO, STR, or a Satellite location.  Restaurants opening in cold weather months may be more likely to need capital in the initial 3-month period because restaurant sales are typically lower.

(11)    We have relied on the combined 65 years of restaurant business experience that we and our predecessor have to compile these estimates.  You should review these figures carefully with a business advisor before making any decision to purchase the franchise.  These figures do not include percentage rent or service fees.  We have offered and continue to offer for sale restaurants owned by McOpCo companies.  Of all of the sales of restaurants by McOpCo companies in 2019, one sale exceeded the high end of the initial investment range by $75,543.

## Item 8
## Restrictions on Sources of Products and Services

Except as noted below, McDonald's does not require that you purchase or lease goods, services, supplies, fixtures, equipment, inventory, or computer hardware and software from McDonald's or our designees in the establishment or operation of your McDonald's restaurant business.  As described below, we require that these items and sources of supply meet the specifications, requirements, and standards that McDonald's has, in its sole business judgment, formulated for use in the McDonald's System.  Except when an ongoing restaurant business is sold, or except as otherwise noted, neither McDonald's nor any affiliate sells fixtures, equipment, food, or supplies to our franchisees; and none of our officers own any interest in any of our approved suppliers.  McDonald's may negotiate with approved suppliers in an effort to seek favorable offers for the benefit of the McDonald's System (including offers on price and other purchasing terms).  However, our franchisees are free to negotiate their own purchasing terms with approved suppliers at any time.  In certain instances, if you participate in programs involving the test or early implementation of new products, equipment, software, or other items, we may install these items in your restaurant at our cost.  If these products, equipment, software, or other items are ultimately approved for use in your restaurant, you may be required to reimburse us for the items and related costs.  These obligations will be specified in the test or early implementation letter signed by you and McDonald's.

McDonald's strives for the maintenance of quality and uniformity throughout the McDonald's System by identifying standards for the purchasing, distribution, preparation, and service of goods, services, supplies, fixtures, equipment, inventory, and computer hardware and software.  We consider the specifications, requirements, and/or standards for food, equipment, information technology, purchasing, distribution, preparation, and service to be of critical importance to the success of the McDonald's System, and therefore require that you deal only with suppliers that have been approved by us.  If you desire to use a particular supplier not already approved by McDonald's and if that supplier meets the specifications and requirements of the McDonald's System, then that supplier may, under conditions described below, become an approved supplier for your specific restaurant.  Costs associated with gaining approval status may be your responsibility and/or the supplier's where existing suppliers are capable of providing an existing product.  Detailed food product specifications are not generally issued to franchisees, but may be made available upon your request to us and upon your agreeing to maintain certain confidentiality obligations.  Other food preparation and equipment requirements and standards are provided to you in our Operations and Training Manual and through other publications provided to our franchisees.

EXHIBIT O(85)

AOE2014

In order for a supplier to be accepted by McDonald's as an approved source of supply, a request for acceptance must be forwarded to our Supply Chain Management Department and other appropriate departments for consideration. The designated Supply Chain Management professional applies the following general criteria in considering whether the supplier will be designated as an approved source of supply:

(1)     Ability to consistently make the manufactured product to McDonald's standards, requirements, and/or specifications.

(2)     Agreement to protect McDonald's confidential information and the secrets behind the uniqueness of McDonald's products from dissemination to others, through production of private brand name products for McDonald's.

(3)     Production, delivery, and service capability, be it local or national, to meet supply and service commitments as well as to insure safe food as specified by McDonald's.

(4)     Integrity of ownership (to assure that its association with McDonald's would not bring ill will upon McDonald's or be inconsistent with McDonald's image).

(5)     Financially sound condition.

(6)     Compliance with all federal, state, and local laws and McDonald's Code of Conduct for Suppliers.

McDonald's may elect not to accept a supplier as an approved supplier if McDonald's determines, in its sole judgment, that there are a sufficient number of approved suppliers at that time for the McDonald's System. There may be instances in which alternative suppliers cannot be approved because the nature of the product or service requires use of one, or a limited number of, suppliers in order to realize efficiencies or protect the interests of the McDonald's System overall.

Approved suppliers must maintain standards in accordance with our written specifications and requirements. On a routine and continuing basis, McDonald's may visit and inspect the operations of approved suppliers and consult with them to ensure compliance with our standards, requirements, and specifications, as well as to assure compliance with federal, state, and local laws and McDonald's Code of Conduct for Suppliers. Termination of a supplier as an approved source of supply may occur by written notice to or personal meeting with the supplier. We advise our franchisees as soon as possible when a supplier is disapproved.

Insurance sources are approved upon submission of a policy meeting our specifications. Coverage must be at least as comprehensive as the minimum requirements of the Franchise Agreement, and in some cases may be higher if required by local law, landlords, property owners, or other third parties. The Franchise Agreement provides that all insurance be placed with a reputable insurance company licensed to do business in the state in which the restaurant premises are located, having both a financial size category equal to or greater than IX and a rating of "A+" or "A" as determined by Alfred M. Best and Company, Inc.

Except as noted below, neither we nor our affiliates derive revenue from your purchase or lease of property, goods, services, supplies, fixtures, equipment, inventory, or computer hardware and software from approved sources of supply. We have no purchasing or distribution cooperatives. We do not provide any material benefits to a franchisee based on your use of approved sources of supply.

Under the franchise you are required to lease the restaurant premises from us, under an Operator's Lease that is incorporated into the Franchise Agreement. Under the Operator's Lease, you are required to pay rent to McDonald's, along with the related occupancy costs, which include property taxes, insurance, maintenance, and structural repairs. McDonald's derives revenue from this leasing arrangement, as detailed in Item 6.

McDonald's requires new restaurants to use a standard POS platform, NP[6]. The computer hardware for NP[6] is purchased through our approved POS suppliers. The NP[6] computer software is owned and maintained by

EXHIBIT O(85)

AOE2015

our predecessor.  Included in the payments you make for the NP$^6$ computer software is a one-time license fee and a payment for the NP$^6$ software maintenance for the first year, both of which are paid to us and which we will pay to our predecessor.  After the first year, you are billed by McDonald's for an annual maintenance fee that is paid to our predecessor for providing periodic updates and enhancements to the NP$^6$ software (see Item 6).

McDonald's may allow, but does not require, franchisees to offer customers the ability to make purchases with certain credit and debit cards, using a specified system (the "Integrated Cashless System").  Almost all franchisees participate in this program.  The Integrated Cashless System is designed to work with the POS platform.  If you elect to use the Integrated Cashless System, it must be installed and linked to your POS system by installers that we approve.  In addition, your restaurant must have required hardware and software purchased from and installed by our designated suppliers.  Finally, you must sign an agreement with our designated transaction processor and pay the processor certain transaction processing fees.  We also recommend that your restaurant have McDonald's approved high-speed internet access.  If you elect to participate, the detailed terms will be provided to you.

McDonald's may allow, but does not require, franchisees to offer customers the ability to buy and make purchases with gift cards, using a specified system (the "Gift Card System").  The Gift Card System is designed to work with the POS platform and the Integrated Cashless System.  The Gift Card System is provided and managed by P2W, Inc. NFP ("P2W"), an independent non-profit corporation.  P2W is not our affiliate, but is managed by a board of directors that includes our employees and franchisees.  If you elect to use the Gift Card System, your restaurant must have the Integrated Cashless System and use designated equipment that is purchased from designated suppliers.  In addition, you must sign a subscription agreement with P2W, purchase training materials, and sign a contract with the transaction processor designated by P2W, under which you will be required to pay the processor certain transaction processing fees.  Currently, P2W pays for the production costs of the gift cards and certain other expenses.  If you elect to participate, the detailed terms will be provided to you.  The Gift Card System is not related to the gift certificate program described in Item 11.

In connection with implementing the Integrated Cashless and the Gift Card systems, we may negotiate and enter into agreements with suppliers, installers, and transaction processing companies under which we may receive certain payments.  We may use these payments to help support future technological innovation.  For convenience, these uses may be referred to internally as "technology funds."  However, we do not operate any actual legally segregated, dedicated, trust, or restricted-use funds for technology development.  With respect to the Gift Card System, we may also provide certain administrative services (such as accounting services) to P2W at our actual cost.  We do not derive any revenue from this arrangement.

In 2019, we and our predecessor received $31,960,326 in loan guarantee service fees, cashless incentives, and beverage supplier rebates.

In 2019, our total revenue was about $7.84 billion and revenue from the sale or lease of real estate and services to franchisees was about $5.35 billion.  This represents 68% of our total revenue.  These figures were derived from our audited financial statements and other financial information.  All of your required purchases (which includes items which must be purchased from us or our approved suppliers and items which must be purchased in accordance with specifications) represent approximately 90% to 95% of your total purchases in connection with the establishment of the restaurant and approximately 55% to 65% of your overall purchases in operating the restaurant.

Occasionally, we may incur additional costs and expenses to develop or improve certain products or services for the benefit of the McDonald's System (including but not limited to, goods, equipment, computer hardware and software, and support services), which ultimately may be provided to McDonald's restaurants by approved suppliers.  We may seek to recover all or a portion of these additional costs and expenses from our franchisees and/or the approved suppliers.  If that recovery is obtained from the approved suppliers, it may be reflected in the prices they quote for these products or services.

See Item 10 for disclosure on financing fees that may be received by McDonald's.

EXHIBIT O(85)

AOE2016

**Item 9**
**Franchisee's Obligations**

FRANCHISEE'S OBLIGATIONS

This table lists your principal obligations under the franchise and other agreements.  It will help you find more detailed information about your obligations in these agreements and in other items of this disclosure document.

| | Obligation | Section in agreement | Disclosure document item |
|---|---|---|---|
| a. | Site selection and acquisition/lease | Sections 1(a) and 1(b) of Franchise Agreement and Sections 2.01 and 2.04 of Operator's Lease | Items 7 & 11 |
| b. | Pre-opening purchase/leases | Section 12(b) of Franchise Agreement and Sections 2.04 and 2.06 of Operator's Lease | Items 7 & 8 |
| c. | Site development and other pre-opening requirements | Sections 12(b), 12(c) and 12(d) of Franchise Agreement | Items 6, 7, & 11 |
| d. | Initial and ongoing training | Sections 3 and 6 of Franchise Agreement | Item 11 |
| e. | Opening | Section 12(b) of Franchise Agreement and Section 2.06 of Operator's Lease | Item 7 |
| f. | Fees | Sections 8(a) and 9 of Franchise Agreement and Sections 3.01(A) and 3.01(B) of Operator's Lease | Items 5, 6, 7, & 11 |
| g. | Compliance with standards and policies/operating manual | Sections 1(c), 1(d), 4, and 12 of Franchise Agreement and Section 2.08 of Operator's Lease | Item 11 |
| h. | Trademarks and proprietary information | Sections 2(a)(iii), 4, 11(c), 11(d), 11(e), and 28(g) of Franchise Agreement | Items 13 & 14 |
| i. | Restrictions on products/services offered | Sections 1(c) and 12(i) of Franchise Agreement and Section 2.08 of Operator's Lease | Items 8 & 16 |
| j. | Warranty and customer service requirements | Sections 1(a), 1(c), 12(a), and 12(h)(iii) of Franchise Agreement | Not Applicable |
| k. | Territorial development and sales quotas | Not Applicable | Not Applicable |
| l. | Ongoing product/service purchases | Sections 12(a), 12(g), 12(i), and 12(j) of Franchise Agreement | Item 8 |
| m. | Maintenance, appearance, and remodeling requirements (1) | Sections 12(a), 12(d), and 12(e) of Franchise Agreement and Sections 2.06, 2.08, 4.02, 4.03, and 6.05 of Operator's Lease | Item 11 |
| n. | Insurance (1) | Section 17 of Franchise Agreement and Section 6 of Operator's Lease | Item 8 |
| o. | Advertising | Section 5 of Franchise Agreement | Items 6 & 11 |
| p. | Indemnification | Section 24 of Franchise Agreement and Section 7.02 of Operator's Lease | Item 9 |
| q. | Owner's participation/ management/staffing | Sections 1(e), 6, 12(g), and 13 of Franchise Agreement | Items 11 & 15 |
| r. | Records and reports | Section 10 of Franchise Agreement and Sections 3.02 and 3.03 of Operator's Lease. | Item 11 |
| s. | Inspections and audits | Sections 10 and 12 of Franchise Agreement and Sections 3.03 and 7.01 of Operator's Lease | Items 6 & 11 |
| t. | Transfer | Section 15 of Franchise Agreement and Section 4.06 of Operator's Lease | Item 17 |
| u. | Renewal | Not Applicable.  Section 28(a) of Franchise Agreement | Item 17 |
| v. | Post-termination obligations | Sections 11(b) and 20 of Franchise Agreement and Section 7.04 of Operator's Lease | Item 17 |
| w. | Non-competition covenants | Sections 11(a) and 11(b) of Franchise Agreement | Item 17 |
| x. | Dispute resolution | Not Applicable | Item 17 |

(1)     If your restaurant is located in an STO location, you may be required to maintain the common areas within the shared building and all external common areas for the fuel facility operator and to obtain certain utilities and insurance for the fuel facility operator, subject to reimbursement for a portion of all such costs from the fuel facility operator.  If your restaurant is located in an STR location, you may be

EXHIBIT O(85)

AOE2017

required to maintain a proportionate share of external common areas and obtain insurance for certain common areas.

# Item 10
## Financing

Typically, no financing arrangements are offered by McDonald's.  As part of the Franchise Agreement, McDonald's issues an Operator's Lease for each site owned or leased by McDonald's.  The Operator's Lease is a standard commercial lease under which you pay rent to McDonald's for use of the premises.  The Operator's Lease does not contain any financing terms.  For BFL franchises, the Operator's Lease provides for the lease of the restaurant's business facilities as well as the premises.  The BFL arrangement does not contain any financing terms but may provide a conditional option for you to purchase certain restaurant assets from us for a lump sum (see Item 6).  In that case, a BFL Rider which contains the option is attached to the Franchise Agreement.  The BFL Rider is attached as Exhibit F, and the Operator's Lease is attached as Exhibit G.

Our predecessor may, at its discretion, guarantee loans made by a third party lender, Bank of America, N.A., a National Banking Association (the "Lender"), to franchisees for remodeling existing restaurants, working capital, refinancing existing restaurant loans, acquiring restaurant businesses, purchasing restaurant assets by exercising the option under a BFL Rider, and for other reasons approved by McDonald's.  The Lender will prepare all the necessary documents and will handle the processing, payments, customer service, and collections according to standards developed by us.  Our predecessor will provide a guarantee to the Lender for these obligations and in return will receive a guarantee fee (currently equal to 1.25% of average outstanding balance) in consideration for the risks and costs associated with the guaranteed loans.  The rate on these loans will typically be 1 month LIBOR plus 2.50% per annum for floating rate loans which may be prepaid with no penalty.  As of January 31, 2020, 1 month LIBOR was 1.66%.  Loans typically will be for a maximum term of 3 years with a 7-year amortization and will be secured by restaurant equipment, seating, signage, decor, and inventory.  The loan amount will vary depending on the purpose for which the loan is to be used.  A personal guarantee from the franchisee and his or her spouse will be required and, should a legal dispute arise, the franchisee agrees to waive the right to a jury trial and agrees not to consolidate the action with others.  A default on these loans will be considered a default under the Franchise Agreement, and the franchisee will be required to sign an Operator Assistance Program Agreement with us (see Exhibit M).  As part of the Operator Assistance Program Agreement, the franchisee agrees to waive all claims against McDonald's.  As of January 31, 2020, the annual percentage rate (APR) was 4.16%. All loan participants will be required to permit electronic debiting of accounts for payment.  The financing documents are typically a Promissory Note, Security Agreement, Authorization for ACH Drafting of Loan Payments, and Operator Assistance Program Agreement similar to the documents in Exhibit M.

# Item 11
## Franchisor's Assistance, Advertising, Computer Systems, and Training

**Except as listed below, McDonald's is not required to provide you with any assistance.**

Our Pre-Opening Obligations:

Construct or have others construct, remodel, or otherwise prepare the premises for the McDonald's restaurant in accordance with our then-current plans and specifications and with local ordinances and building codes.  We will deliver the premises to you when they are sufficiently completed to allow you to install, at your sole cost and expense, the signs, trade fixtures, equipment, and other personal property and improvements necessary to complete the premises for operation of a McDonald's restaurant.  If the restaurant has not been constructed or is not ready for occupancy when the Franchise Agreement is executed, we will use our best efforts to expedite the construction.  We either own the premises or lease it from the owner and lease or sublease the premises to you (Franchise Agreement – Section 9, Operator's Lease – Section 2.06).

Prescribe detailed specifications for purchasing, preparation, and service, and make available to you names of approved sources of supply.  We do not sell or lease to you equipment, signs, fixtures, opening inventories, or

EXHIBIT O(85)

AOE2018

supplies or deliver or install these items except as noted in Item 8 or when we sell or lease an ongoing business to you (Franchise Agreement – Sections 3, 12(b), and 12(i), Operator's Lease – Section 2.04).  See Items 8 and 9.

Provide our training program to you, which includes your enrolling your managers at Hamburger University or other training centers.  The training program is more fully described in this Item (Franchise Agreement – Sections 4 and 6).

McDonald's will allow you to view McDonald's Operations and Training Manual (the "O&T Manual") before you purchase the franchise (Franchise Agreement – Section 4).

Our Operational Obligations:

Advise and consult with you periodically and at other reasonable times upon your request in connection with the operation of the restaurant.  We will communicate to you our knowledge of new developments, techniques, and improvements in areas of restaurant management, food preparation, and service which are pertinent to the operation of a restaurant using the McDonald's System.  The communications will be accomplished by visits by operations consultants, printed reports, seminars, newsletter mailings, emails, and online resources.  We will make available to you all additional services, facilities, rights, and privileges relating to the operation of the restaurant that we make generally available to all our franchisees operating McDonald's restaurants (Franchise Agreement – Section 3).

Make available to you the O&T Manual and any other business manuals prepared and modified by us for use by our franchisees in connection with the operation of a McDonald's restaurant.  These manuals contain detailed information including:  (a) required operations procedures; (b) methods of inventory control; (c) bookkeeping and accounting procedures; (d) business practices and policies; and (e) other management and advertising policies (Franchise Agreement – Section 4).

Advertising Programs:

We employ advertising and marketing consultants to participate in the formulation and production of concepts and materials for production and media placement of national programs for the McDonald's System.  Our in-house advertising and marketing departments develop overall direction and strategy for the national programs and recommend them to franchisees.  Advertising and marketing programs are placed in national and local media including, but not limited to, print, radio, television, outdoor, point of sale, direct mail, and the Internet.  We do not maintain an advertising or marketing fund nor do we have any obligation to make placement of programs in the media.  You must advertise and promote your restaurant to the general public and spend at least 4% of the restaurant Gross Sales each year for this purpose, unless otherwise agreed to by us.  For new, rebuilt, relocated, and remodeled restaurants, we strongly recommend the use of "grand opening" promotions.  You must use only advertising and marketing materials and programs that we have provided to you or approved in advance in writing.  All advertising and marketing must also conform to the standards and policies of the McDonald's System relating to the trademarks and service marks.  Advertising and marketing by cooperatives are subject to the same approval requirements.  Your expenditures for OPNAD and local cooperative advertising and/or marketing of the McDonald's System are credited to this required expenditure.  You are not required to participate in OPNAD or a local cooperative; however, your consistent involvement with OPNAD and local cooperatives is one of several factors used to measure your compliance with the Operator Involvement standard, which is one of the National Franchising Standards you must meet to be eligible for growth and rewrite.  Also, if you decide not to participate in a cooperative, you may not gain access to that cooperative's advertising and marketing programs (Franchise Agreement – Section 5).  See Items 6 and 9.

OPNAD and the local cooperatives are independent entities formed by franchisees.  The McOpCo companies that operate restaurants also participate in OPNAD and the local cooperatives.  These cooperatives carry out programs to advertise and market cooperative restaurants.  Each cooperative maintains and administers its own advertising and marketing fund, which is funded by its members.  The funds may be used for media placement and to develop and produce advertising and marketing concepts and materials for use by cooperative restaurants.  Individual franchisee and McOpCo-owned restaurants contribute to OPNAD and the local funds on the same basis.  Each franchisee member of OPNAD pledges the same contribution rate, currently 2.00% of sales, for a designated

EXHIBIT O(85)

AOE2019

period. Each local cooperative establishes its own separate contribution rate and time period for its fund. If you
join a local cooperative, you contribute at the same rate as each other member of the cooperative with similar
restaurants or restaurants located in the same general area.

Members of OPNAD elect or designate regional representatives with operating and decision making powers to
conduct cooperative business. Local cooperative members participate in cooperative business according to the
rules and procedures established by each cooperative. McOpCo companies that operate restaurants are members
of OPNAD and the local cooperatives. Neither McDonald's nor the McOpCo companies can change or dissolve
OPNAD or the local cooperatives.

The OPNAD fund is independently audited annually and its financial statements are available for review. The
local cooperatives generally audit their fund and prepare financial statements, which are available for review;
however, requirements vary among the cooperatives. The cooperative advertising and marketing funds are
intended for uses and allocated in varying percentages designated by each cooperative, including production,
media placement, and administrative expenses.

We provide the services of certain marketing, legal, and accounting personnel to the OPNAD fund without
charge. That fund administers a gift certificate program on behalf of all of its members for the redemption of gift
certificates sold to customers at McDonald's restaurants. Charges for certain other accounting personnel who
provide services to the fund and the gift certificate program are included in the administrative costs for the
OPNAD fund. The gift certificate program is not related to the Gift Card System described in Item 8.

We are not required to spend any amount to advertise or promote your restaurant in any manner. Since we do not
administer or maintain an advertising or marketing fund, there are no unexpended advertising fees used by us.
We do not use advertising or marketing funds in any manner to solicit the sale of McDonald's franchises.

Computer Systems:

The term "Store Systems" describes the combined hardware and software application suite deployed at the
restaurant. The Store Systems are generally used in the restaurant to efficiently and accurately process customer
orders by integrating production and service systems and to compile information including sales, transactions,
product mix, and cash control. The Store Systems also may be used to compile inventory, labor, and timekeeping
information about the restaurant. All new restaurants must install the current Store Systems except for the ISP as
described below, though usage of some functionality available through the Store Systems is optional and up to your
discretion. The cost of current Store Systems range from $108,000 to $118,500, which includes the POS, Integrated
Cashless System, kiosks, table locators, computer hardware, software, and related equipment. See Item 6 for
software-related fees.

Enhancements to hardware and software components of Store Systems are made available by McDonald's and
McDonald's-approved suppliers for purchase by you, and you may be required to update or upgrade the Store
Systems periodically to meet McDonald's standards. Normal Store Systems software upgrades based on an
established enhancement request process are included in your annual maintenance fee as determined by
McDonald's. However, you must pay a one-time fee if the Store Systems change significantly. You may choose
from an approved supplier or an approved independent third party for installation, maintenance, repair, and support
services of Store Systems at varying costs.

One component of Store Systems is the POS platform. McDonald's requires new restaurants to use the current
version of the POS platform, NP[6]. The hardware and software for NP[6] are purchased through McDonald's-approved
POS suppliers. The hardware and software components for NP[6] have been integrated into the service and production
systems of the restaurant. NP[6] is the proprietary property of McDonald's predecessor. Restaurants that are currently
operating older, previously-approved POS systems (such as Panasonic II+, PAR II, 386 based PcPOS, PcPOS
without ISP software, or PcPOS with ISP software but not running the current version of Store Systems) are required
to replace or upgrade to the current version of the POS platform.

EXHIBIT O(85)

AOE2020

The restaurant's transaction-level information generated by the POS, including sales, transactions, and product mix information, is stored on your server hardware and transmitted to McDonald's and held on its servers. McDonald's has independent access to this information and there are no contractual limits on its right to access such information.

Another component of the Store Systems is the Integrated Cashless System, which is used to accept credit and debit card purchases by customers. You must purchase the Integrated Cashless System hardware and software that McDonald's specifies (including card readers, cables, and related hardware) from its designated supplier. The required hardware and software, which is not proprietary to McDonald's or any affiliate, has been used continuously in McDonald's restaurants since June 2003. You must also sign an agreement with McDonald's designated transaction processor (see Item 8), and McDonald's recommends that the restaurant has McDonald's approved high-speed internet access. The Integrated Cashless System that is compatible with the current Store Systems is Cashless 3.0. McDonald's charges an annual fee for maintenance and hosting of cashless transaction data (see Item 6). Your POS system and the transaction processor will collect your cashless transaction information. McDonald's has independent access to aggregated transaction-level information, along with information on the number and dollar amount of specific cashless transactions.

The Gift Card System, which is a component of the Integrated Cashless System, is used to offer customers the ability to buy and make purchases with gift cards. To use the Gift Card System, you must sign a subscription agreement with P2W, Inc., which manages the system (see Item 8), and purchase specified hardware (including card readers, cables, and related hardware) from a designated supplier. This hardware, which is not proprietary to McDonald's or any affiliate, has been used continuously in McDonald's restaurants since June 2004. You also must sign an agreement with a designated transaction processor (see Item 8). No other hardware or suppliers are currently approved for the Gift Card System. Your POS system, the transaction processor, and P2W will collect your Gift Card System transaction information. McDonald's has independent access to aggregated transaction-level information, along with information on the number and dollar amount of specific gift card transactions.

With both the Integrated Cashless and Gift Card systems, you may need to upgrade or update your hardware or software during the term of your franchise. There are no contractual limitations on the frequency or cost of these upgrades or updates.

Another component of the Store Systems for existing restaurants is the In Store Processor (ISP) software, which runs on server hardware and operates with other software that is the proprietary property of McDonald's and other third-party software providers. McDonald's is currently in the process of transitioning from the ISP software and its server-based applications to web-based applications. As such, the ISP software will eventually be retired from all existing restaurants. However, restaurants will still be required to have the server hardware that runs the ISP software even after the ISP software is retired.

Beyond Store Systems, McDonald's makes the Regional Restaurant Data Diagnostics system (R2D2) available for those existing restaurants that have not yet transitioned away from ISP software. R2D2 provides you, at your option, with highly focused, actionable reports about the restaurant. If the restaurant has ISP software, you may elect to install R2D2 software, which runs on your server hardware and operates with the ISP software to collect and transmit sales and other information to McDonald's servers. McDonald's uses the information collected and transmitted via R2D2 software to provide the reports you request and also uses the sales data to verify the sales information you report through other means to McDonald's. If the restaurant has transitioned away from ISP software, McDonald's approved third-party web-based applications are available to provide you, at your option, with similar actionable reports about the restaurant that you may use.

Finally, pursuant to the franchise agreement, you must provide McDonald's with monthly statements of all receipts from the restaurant operation and additional financial, operating, and other information on forms and in the manner McDonald's reasonably requests. To that end, you must submit electronically each month your financial statements, including your consolidated balance sheet, consolidated general and administrative expense statement, consolidated debt summary, and individual restaurant profit and loss statement(s), using McDonald's web-based Franchisee Financial System (FFS).

EXHIBIT O(85)
AOE2021

Site Selection:

We select the site for location of the restaurant premises and negotiate the location's purchase or lease.  You do not select or approve restaurant sites.  You will not sign a Franchise Agreement unless we have already selected the site.

We utilize our judgment and experience in selecting locations for McDonald's restaurants based upon population density, traffic patterns, market statistics, proximity of shopping centers, schools, competition, accessibility of utility and public services, costs of purchasing or leasing the site, assessment of future demographic developments, our interest in developing an effective marketing network that will be convenient to consumers, and other factors.  Site locations are called to our attention through independent canvassing of highways and urban, suburban, small town, and other neighborhoods.

Restaurant Opening:

In the normal course of business, the Franchise Agreement is submitted to you for execution approximately 30 days before the restaurant is opened for business.  During this period, you are receiving shipments of restaurant equipment.  The initial franchise fee, if applicable, is payable on the opening of the restaurant.  No monthly fees accrue until the restaurant opens for business.  See Items 5 and 6.

The restaurant opening may occasionally be delayed by weather conditions, delayed delivery, or installation of equipment, fixtures and signs, labor disputes, governmental regulation, or other causes beyond our reasonable control.  You may not open the restaurant for business until you have executed the Franchise Agreement and have delivered the agreement to us with payment of the initial franchise fee, if applicable.

Training:

McDonald's operates Hamburger University (HU), the international training center for the McDonald's System.  The content and duration of all operations courses, which are offered at HU and various local sites, are revised and reconsidered from time to time to meet the needs of our franchisees.  All courses and learning events are offered at frequent intervals and are designed to give you specific skill sets in the various facets of the conduct of a McDonald's restaurant, including such areas as guest satisfaction, operational standards, financial controls, and leading people.  The basic minimum core training, which you must complete to be qualified to operate a McDonald's restaurant, is known as the Restaurant Leadership curriculum.  Existing franchisees will not be required to complete the curriculum to acquire an additional restaurant.

Our Restaurant Leadership curriculum is deployed through Campus and Fred, which allows you to complete and track the progress of your assigned learning online.  You are also assigned a coach who helps with your assigned learning, monitors your training, and verifies the skills acquired.  It takes approximately two years to complete all learning plans, from Shift Leader through Restaurant Leader.  The time needed to complete a learning plan may vary due to previous classes you have completed, and the amount of time you dedicate to training each week.

The complete training program and materials include many elements.  There are various instructor-led classes, computer-based learning (e-learning), coaching sessions, visual job aids, practical simulations, and verifications for all stations and positions.  The training method and manner are tailored to individual circumstances.  As part of the training program, you must perform and master all of the crew and management functions at the restaurant.  You do not receive compensation during the training program.  McDonald's does not charge you a fee to complete the basic minimum core training provided at our field office training centers.

You are required to complete all curricula, including the Leading Great Restaurants Class conducted at HU in Chicago, to McDonald's satisfaction to be qualified to operate a McDonald's restaurant.  You must be fully trained, in McDonald's sole judgment, before you operate a restaurant.

At the opening of your restaurant, a franchise business partner will spend time with you providing assistance and refinement of previous training and instruction.

EXHIBIT O(85)

AOE2022

You must complete the training program successfully before signing the Franchise Agreement or paying any money to McDonald's.

The experience of the instructors in the McDonald's restaurant business averages 5 or more years.  Instructors include HU-facilitators and field training consultants.  Rob Lauber, Senior Vice President and Chief Learning Officer, has been the head of our training program since July 2014.  Prior to this role, from March 2006 to July 2014, he was the Vice President of Yum! University at Yum! Brands in Louisville, Kentucky.

McDonald's bears the cost of maintaining HU and other designated training centers associated with providing basic and advanced instruction in the Restaurant Leadership curriculum, including the overhead cost of training, staff salaries, materials, and all technical training tools.  You are responsible for the costs of traveling, living, compensation, and other expenses incurred by you and your employees in connection with attendance at HU or other training facilities.  You may also be charged a fee to cover McDonald's costs of providing certain training and related materials other than those associated with the Restaurant Leadership curriculum.  You are not an employee of McDonald's and are not compensated by McDonald's for or during any training described in this Item.

There are no further mandatory training requirements for you.  However, annual meetings, conventions, various workshops, and other training sessions may be conducted on an ongoing basis within each field office, and McDonald's may require you to pay for the costs associated with that ongoing training or participation.  Additionally, optional courses may be offered to you or your employees for a fee.  You are responsible for the costs of traveling, living, compensation, and other expenses incurred by you and your employees in connection with attendance at all ongoing training.

In addition to HU and McDonald's other designated training centers, McDonald's occasionally may offer initial and ongoing training at temporary remote locations (such as hotel conference rooms) for the convenience of attendees.  These remote locations are not designated training centers, but you may attend them in lieu of designated training centers.  If you elect to attend training offered at a remote location, McDonald's may require you to pay for the costs associated with that training.

Before entering the training program, you must sign a Preliminary Agreement, which is attached to this disclosure document as Exhibit J.  The Preliminary Agreement contains the terms of our agreement, which allows you to participate in McDonald's franchise applicant training program.  It states, among other things, that there is no guarantee that you will be offered a McDonald's franchise, that McDonald's may remove you from the training program for any reason or no reason at all, and you may withdraw from the training program at any time.  The Preliminary Agreement also states you will not be compensated during your training and will not be an employee of McDonald's or any McDonald's franchisee.

The Restaurant Leadership curriculum is described in the following tables and includes, but is not limited to:

(1)     Self-Study Modules and Coaching:  Self-directed modules and coaching provide initial training, practice, and verification.

(2)     Facilitated Courses:  Hands-on training is supported and reinforced by facilitated courses that emphasize participant involvement. Interactive problem solving, small work group, and skill-building activities provide an opportunity to practice new skills and obtain feedback from peers and instructors.

(3)     Equipment Training:  Self-directed equipment training and instructor-led support is provided based on system needs.

The recommended methods and time frames for training, practice, and verification have been determined to ensure that you receive the right training at the right time.  The training program table generally describes the minimum classroom and in-restaurant training that you must complete to be considered qualified to operate a

EXHIBIT O(85)

AOE2023

McDonald's restaurant.  Since the entire curriculum is skill-based, the time necessary to complete the training varies from individual to individual.

| TRAINING PLAN SUBJECT | Classroom Training | Training in a Restaurant | Location |
|---|---|---|---|
| ***Shift Leadership Curriculum*** | | | |
| ➤  Shift Leadership Foundations | | | |
| -   ServSafe* | | Varies by State | Classroom/Online |
| -   Shift into Overdrive | | 7-8 hours | Restaurant, coaching |
| -   Journal | | 10-15 min per shift | Restaurant, self-study, coaching, e-learning |
| -   Shift Leadership Coach Guide | | 10-15 min per shift | Restaurant, coaching, |
| -   Shift Simulation | | 125 min total in 10-20 minute increments | Restaurant, self-study, coaching, e-learning |
| -   Shift leadership e-learning modules | | 3-4 hours | Restaurant, self-study, coaching, e-learning |
| ➤  Leadership Transitions Course | 2 days | | Classroom at Field Office or Remote facility |
| ***Department Leader Curriculum*** | | | |
| ➤  Leading Hospitality Functional Training | | 12 hours | Restaurant, self-study, coaching, e-learning |
| ➤  Leading Quality Functional Training | | 26 hours | Restaurant, self-study, coaching, e-Learning |
| ➤  Leading People Functional Training | | 26 hours | Restaurant, self-study, coaching, e-learning |
| ➤  Department Leader Getting Started | | 4 hours | Restaurant, self-study, coaching, e-learning |
| ➤  Leading Technology | | 4 hours | Restaurant, self-study, coaching, e-learning |
| ➤  Developing the Leader in Me Course | 3 days | | Classroom at Field Office or Remote facility |
| ***Restaurant Leader Curriculum*** | | | |
| ➤  Restaurant Leader Functional track | | 15-16 hours | Restaurant, self-study, coaching, e-learning |
| ➤  Leading Great Restaurants Course | 4 days | | Classroom at Hamburger University in Chicago, IL |

*ServSafe – administered by the National Restaurant Association (certification requirements vary by state/county – with regard to the instruction/delivery of the class)

## Item 12
## Territory

McDonald's franchises contain a limited grant of authority to use the McDonald's System in the operation of the specific restaurant developed by McDonald's at that address.  The Franchise Agreement does not contain any exclusive grant, exclusive area, exclusive territorial rights, protected territory, or any right to exclude,

EXHIBIT O(85)

AOE2024

control, or impose conditions on the location or development of future McDonald's restaurants at any time. You will not receive an exclusive territory. You may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control. The sales and customer trading patterns which a restaurant experiences at any particular time are subject to change by reason of many factors, including our ongoing development of the marketing network of McDonald's restaurant locations, and do not represent any continuing franchisee entitlement or expectation. McDonald's may establish other franchisee or McOpCo company-owned outlets that may alter customer trading patterns and affect the sales of, and compete with, your location. McDonald's reserves the right to use the Marks (as described in Item 13) in any other channel of distribution. For example, McCafe packaged coffee is being sold in supermarkets and other retail outlets and via e-commerce. McDonald's reserves the right to sell other similar goods and services under the Marks or under different trademarks and service marks. Internal policies which McDonald's may apply and modify periodically in connection with decisions to develop new restaurants are not part of the Franchise Agreement and do not involve any contract right granted to you.

## Item 13
## Trademarks

We grant you the right to use many commercially valuable trademarks, trade names, service marks, logos, and other commercial symbols (collectively "Marks") that are material to the operation of your restaurant.

The following Marks have been registered with the United States Patent and Trademark Office on the Principal Register. All required affidavits of use and applications for renewal have been filed and accepted. Those Marks which have been registered for more than 6 years have become incontestable.

We believe the following Marks are the principal marks you will use to identify your restaurant.

| Trade/Service Mark | Reg. No. | Reg. Date | Int. Class |
|---|---|---|---|
| THE GOLDEN ARCHES LOGO | 893,440 | 06/23/70 | 43 |
| McDONALD'S (Name) | 743,572 | 01/08/63 | 43 |
| McDONALD'S and GOLDEN ARCHES LOGO (Sign Design) | 1,287,408 | 07/24/84 | 43 |

The grant of rights under the McDonald's System includes the non-exclusive right to use all the Marks in connection with the operation of your restaurant.

We do not own the Marks. We are licensed by our affiliate, Restaurant Brands, LLC, to use and license the use of the Marks in the U.S. in connection with McDonald's restaurants. This license lasts for 20 years from the effective date of that license, with automatic renewals, and may be terminated only by agreement, if we become the subject of any insolvency proceedings or if we fail to use the Marks as prescribed by Restaurant Brands. Periodically, additional Marks may be adopted and/or registered that are considered important to our business, and we may incorporate some but not all of them into the McDonald's System.

There currently are no decisions of the United States Patent and Trademark Office, Trademark Trial and Appeal Board, or the trademark administrator of any state or any court which affect your right to use the Marks. There is currently no pending infringement, opposition, or cancellation proceeding nor any material litigation involving such Marks the outcome of which is relevant to their use in the state in which your restaurant is to be located.

Other than our license with Restaurant Brands, there currently are no agreements that significantly limit our rights to use or license the use of the Marks in the U.S. in a manner material to the franchise. You must follow our rules when you use the Marks. You cannot use our name or any Mark as part of the name of your operating company, or with any modifying words, designs, or symbols (except those we approve).

EXHIBIT O(85)
AOE2025

There is no obligation under the Franchise Agreement to notify us of any use by others of names or marks which are identical or confusingly or deceptively similar to any of the Marks.  While there is no obligation under the Franchise Agreement to take affirmative action, we consider the Marks to be a valuable property right and we continually work, in cooperation with our affiliates, to protect the Marks against infringement by others and to protect your right to use the Marks.  Restaurant Brands or our predecessor has the right to control administrative proceedings or litigation involving the Marks.  To our knowledge there currently are no superior prior rights or infringing uses of the Marks that would materially affect your use of the Marks in the operation of your restaurant.

We have no obligation under the Franchise Agreement to protect you against, participate in your defense of, or to reimburse you for, any damages which you are held liable for in any proceeding arising out of your use of the Marks.  We may at any time require you to limit and/or modify your use of the Marks.  In this event, we are not obligated under the Franchise Agreement to reimburse you for the cost incurred due to the modification or discontinuance of use of the Marks.

## Item 14
## Patents, Copyrights, and Proprietary Information

No patents are required to be disclosed in this Item.

We or our predecessor claim copyrights in the O&T Manual and various menus, advertising and marketing materials, and similar items used in operating your restaurant.  These copyrighted materials have not been registered with the U.S. Registrar of Copyrights, and do not need to be registered at this time.  Currently there are no decisions of the U.S. Copyright Office (Library of Congress), and no pending infringement proceedings or material litigation involving the copyrighted works that could affect your use of them.  Any copyrighted works that we do not own are licensed to us by our predecessor.  This license may be terminated only by agreement, if we become the subject of any insolvency proceedings, or if we breach the terms of our license agreement with our predecessor.  Other than our license with our predecessor, there currently are no agreements that significantly limit our rights to use or license the use of the copyrighted works in the U.S.

You have no obligation under the Franchise Agreement to notify us of any apparent infringement of or challenge to your use of any copyrighted works, or of any person's claim of any rights in any copyrighted works.  Although there is no obligation under the Franchise Agreement for us to take affirmative action, we consider the copyrighted works to be valuable property and we continually work, in cooperation with our predecessor, to protect against infringement by others and to protect your rights of use.  Our predecessor has the right to control all litigation involving the copyrighted works it licenses to us, including the O&T Manual.  We have no obligation under the Franchise Agreement to protect you against, participate in your defense of, or to reimburse you for, any damages that you are held liable for in any proceeding arising out of your use of any copyrighted works.

We may modify or discontinue using any copyrighted works, and/or use additional or substitute copyrighted works, and you must comply with our directions for any modification or discontinuance after receiving notice from us.  We are not obligated under the Franchise Agreement to reimburse you for any costs incurred due to any modification or discontinuance of any copyrighted works.

McDonald's O&T Manual and other materials in the McDonald's System contain trade secrets and confidential and proprietary information.  This information includes, but is not limited to:  methods, formats, specifications, standards, systems, procedures, sales and marketing techniques, knowledge and experience used in developing and operating McDonald's restaurants; real estate and development plans; marketing plans, research, advertising and promotional programs for McDonald's restaurants; knowledge of suppliers, methods of ordering and specifications for products, materials, and supplies; knowledge of the operating results, financial information, and financial performance information; customer communication and retention programs; graphic designs; intellectual property; recipes, formulae and food preparation processes; information generated by, or used or developed in, the operation of a restaurant; and any other information McDonald's may designate as confidential or proprietary.  You must follow our rules when you use the O&T Manual and any other confidential and proprietary information.  You must keep them absolutely confidential at all times, and you must take all reasonable steps to prevent improper disclosure to others.

EXHIBIT O(85)

AOE2026

In addition, you must not disclose (unless approved or required by McDonald's) financial performance, operating results, or sales information (collectively, the "Financial Information") relating to your McDonald's restaurant where:  (a) McDonald's has not publicly disclosed its financial performance for the period; (b) it is reasonably foreseeable that such Financial Information will be consolidated with the Financial Information of other McDonald's restaurants; and (c) it is reasonably foreseeable that the Financial Information or consolidated Financial Information will be made public and/or be used to influence investment decisions regarding McDonald's common stock.

Using McDonald's confidential and proprietary information or the Financial Information in an unauthorized manner is strictly prohibited.  Failure to maintain the confidentiality of this information and/or the unauthorized use or disclosure of this information may lead to civil or criminal prosecution as well as the termination of the Franchise Agreement.

## Item 15
## Obligation to Participate in the Actual Operation of the Franchise Business

We require you to provide full time and best efforts to, and personal on-premises supervision of, the day-to-day operation of your McDonald's restaurant business.  This duty is stated in paragraphs 1(e) and 13 of the Franchise Agreement.

## Item 16
## Restrictions on What the Franchisee May Sell

You may sell only products authorized by McDonald's and use the premises only as a McDonald's restaurant.  In the dispensing and sale of these products, you may use only packaging, paper goods, ingredients, and handling and preparation methods that meet the McDonald's System specifications and quality standards which we may designate and modify.  We have the right to add, delete, or change authorized products that you are required to offer.  There are no limits on our right to do so.  See Items 8 and 9.

The McDonald's System is a comprehensive restaurant system for the retailing of a limited menu of uniform and quality food and beverage products, which McDonald's may modify at any time at its discretion.  You must operate the restaurant in conformity with the entire McDonald's System at all times, including serving at the restaurant a designated menu of food and beverage products; uniformity of food specifications, preparation methods, quality, and appearance; and uniformity of facilities and service.  See Items 8 and 9.

We impose no limitations on the customers to whom you may sell goods and services, provided that you adopt and use the McDonald's System only at the specific restaurant developed by McDonald's and franchised to you.  See Item 12.

## Item 17
## Renewal, Termination, Transfer, and Dispute Resolution

### THE FRANCHISE RELATIONSHIP

**This table lists certain important provisions of the franchise and related agreements.  You should read these provisions in the agreements attached to this disclosure document.**

You should remember that the franchise consists of a Franchise Agreement and Exhibit A to that agreement, known as an Operator's Lease.  The summaries which appear below refer to each of these documents separately, but they should be read and considered as a whole.

EXHIBIT O(85)

AOE2027

| | Provision | Section in franchise or other agreement | Summary |
|---|---|---|---|
| a. | Length of the franchise term | Section 2 | Traditional term is generally 20 years except as otherwise described in Item 5. Satellite term varies. STO and STR terms are generally 10 years. BFL term is generally 3 years. |
| b. | Renewal or extension of the term | Section 28(a) See Exhibit K for explanation of McDonald's current Rewrite (New Term) Policy | You have no right to renew or extend. The Rewrite (New Term) Policy is not part of the Franchise Agreement. It is subject to change in McDonald's sole discretion. Its application will differ depending upon the facts and circumstances involved and is not a contract right between you and McDonald's. See Notes 2 and 3 and Exhibit K. |
| c. | Requirements for franchisee to renew or extend | Not Applicable | You have no right to renew or extend. |
| d. | Termination by franchisee | Not Applicable | Not Applicable |
| e. | Termination by franchisor without cause | Not Applicable | Not Applicable |
| f. | Termination by franchisor with cause | Sections 18 and 19 | McDonald's can terminate only if you commit any 1 of several listed violations or repeatedly breach the Franchise Agreement. |
| g. | "Cause" defined – curable defaults | Not Applicable | Not Applicable |
| h. | "Cause" defined – non-curable defaults | Sections 18 and 19 | Material Breaches include: failure to maintain the restaurant in a good, clean, wholesome manner and in compliance with McDonald's standards; you become bankrupt; any amount owing to McDonald's is not paid within 30 days of due date; judgment in excess of $5,000 outstanding against you for more than 30 days; right of possession of restaurant is lost; violation of franchise restrictions; knowing sale of foods other than those approved by McDonald's or which fail to conform to McDonald's standards; transfer of franchise without McDonald's prior consent; McDonald's is denied access to restaurant; failure to make prompt payment of undisputed invoices; misrepresentation relating to ownership or acquisition of franchise; conduct that damages McDonald's reputation; conviction of felony; intentional under-reporting of Gross Sales; repeated other breaches. |
| i. | Franchisee's obligations on termination/non-renewal | Section 20 | For 30 days and at McDonald's request you must: sell us the furniture, fixtures, signs, and equipment for fair market value (no payment for intangible assets); return business manuals and other confidential material; cease using the McDonald's System and trademarks (also see r). |
| j. | Assignment of contract by franchisor | Not Applicable | Assignable by McDonald's as a matter of common law; no separate provision required. |
| k. | "Transfer" by franchisee – defined | Sections 15 and 19 | Includes direct, indirect, or contingent transfer, in whole or in part, of any interest in the franchise. |
| l. | Franchisor approval of transfer by franchisee | Not Applicable | Transfers require McDonald's approval, subject to the terms stated in the Franchise Agreement, Assignment to an Entity, and Assignment Agreement (see Exhibits H and I). Also see Note 2. |

| | Provision | Section in franchise or other agreement | Summary |
|---|---|---|---|
| m. | Conditions for franchisor approval of transfer | Sections 15 and 19 | New franchisee qualifies; service fee increases to the current fee; new franchisee assumes full and unconditional liability; you remain personally liable for the remainder of the term; no current breach. |
| n. | Franchisor's right of first refusal to acquire franchisee's business | Section 15(c) | McDonald's can match any offer for your business. |
| o. | Franchisor's option to purchase franchisee's business | Sections 15(a) and 20 | Purchase business only if we have been managing your restaurant for 1 year after your death or disability; purchase certain assets upon termination. |
| p. | Death or disability of franchisee | Section 15(a) | Franchise may be assigned to any approved purchaser or spouse, heirs, or nearest blood relative who is a qualified franchisee (see m). Also see Note 1. |
| q. | Non-competition covenants during the term of the franchise | Section 11 | No involvement in competing or similar business. |
| r. | Non-competition covenants after the franchise is terminated or expires | Section 11 | No competing business for 18 months within 10 miles (including after assignment or sale). |
| s. | Modification of the agreement | Section 26 | No modifications generally but O&T Manual subject to change. |
| t. | Integration/merger clause | Sections 28(c), 28(e), 28(f), 28(h), and 28(i) | Only the terms of the Franchise Agreement are binding (subject to state law).  No other promises have been made, but nothing in the Franchise Agreement disclaims any representations made in this disclosure document. |
| u. | Dispute resolution by arbitration or mediation | Not Applicable | Not Applicable |
| v. | Choice of forum | Not Applicable | Not Applicable |
| w. | Choice of law | Section 27 | The Franchise Agreement is interpreted and governed by Illinois law (with specific exceptions stated in the Franchise Agreement). |

Note 1  We are not obligated by the Franchise Agreement to do so, but if your spouse wishes to train to become qualified after your death or disability, we will work with your spouse for up to 18 months (as long as we determine that adequate progress is being made) so that your spouse can attempt to become approved to operate the restaurant.

Note 2  Under a BFL franchise, if you have a conditional option to purchase certain restaurant assets, the conditions are met, and you exercise the option, your franchise will be extended for up to 20 years after the beginning of the term (based on available real estate tenure).

This table lists certain important provisions of the Operator's Lease.

| | Provision | Section in Operator's Lease | Summary |
|---|---|---|---|
| a. | Length of the franchise term | Section 1.01 | |
| b. | Renewal or extension of the term | Not Applicable | |
| c. | Requirements for franchisee to renew or extend | Not Applicable | |
| d. | Termination by franchisee | Not Applicable | |
| e. | Termination by franchisor without cause | Not Applicable | |
| f. | Termination by franchisor with cause | Section 7.04 | McDonald's can terminate only if franchisee defaults. |

EXHIBIT O(85)

AOE2029

| | Provision | Section in Operator's Lease | Summary |
|---|---|---|---|
| g. | "Cause" defined – curable defaults | Section 7.04 | You have 10 days to cure default of any covenant or agreement other than that listed in h. |
| h. | "Cause" defined – non-curable defaults | Sections 3.03(A) and 7.04 | Failure to pay rent; failure to submit required reports; failure to comply with Franchise Agreement; abandonment; bankruptcy. |
| i. | Franchisee's obligations on termination/non-renewal | Sections 5.02 and 7.04 | Subject to the option to purchase contained in the Franchise Agreement, remove all equipment and fixtures; continue to pay rent on termination. |
| j. | Assignment of contract by franchisor | Not Applicable | Assignable by McDonald's as a matter of common law; no separate provision required. |
| k. | "Transfer" by franchisee – defined | Not Applicable | |
| l. | Franchisor approval of transfer by franchisee | Section 4.06 | No assignment without McDonald's consent and only in accordance with the Franchise Agreement (see l and m under Franchise Agreement). |
| m. | Conditions for franchisor approval of transfer | Not Applicable | See l and m under Franchise Agreement. |
| n. | Franchisor's right of first refusal to acquire franchisee's business | Not Applicable | See n under Franchise Agreement. |
| o. | Franchisor's option to purchase franchisee's business | Not Applicable | See o under Franchise Agreement. |
| p. | Death or disability of franchisee | Not Applicable | See p under Franchise Agreement. |
| q. | Non-competition covenants during the term of the franchise | Not Applicable | See q under Franchise Agreement. |
| r. | Non-competition covenants after the franchise is terminated or expires | Not Applicable | See r under Franchise Agreement. |
| s. | Modification of the agreement | Section 8.07 | No modifications, except in writing. |
| t. | Integration/merger clause | Section 8.07 | Only the terms of the Franchise Agreement and Operator's Lease are binding (subject to state law). Any other promises may not be enforceable, but nothing in the Operator's Lease disclaims any representations made in this disclosure document. |
| u. | Dispute resolution by arbitration or mediation | Not Applicable | |
| v. | Choice of forum | Not Applicable | |
| w. | Choice of law | Section 8.06 | The Franchise Agreement and Operator's Lease are interpreted and governed by Illinois law (with specific exceptions stated in the Franchise Agreement). |

## Item 18
## Public Figures

McDonald's does not use any public figure to promote our franchise.

## Item 19
## Financial Performance Representations

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor-owned outlets, if there is a reasonable basis for the information, and if the information is included in the disclosure document. Financial performance information that differs from that included in Item 19 may be given only if: (1) a franchisor provides the actual records of an existing outlet you are considering buying; or (2) a franchisor supplements the information provided in this Item 19, for example, by providing information about possible performance at a particular location or under particular circumstances.

EXHIBIT O(85)

AOE2030

Of the approximately 12,032 domestic traditional McDonald's restaurants opened at least 1 year as of December 31, 2019, approximately 79% had annual sales volumes in excess of $2,300,000; approximately 70% had annual sales volumes in excess of $2,500,000; and approximately 60% had annual sales volumes in excess of $2,700,000. The average annual sales volume of domestic traditional McDonald's restaurants open at least 1 year as of December 31, 2019, was $3,009,000 during 2019. The highest and lowest annual sales volume in 2019 for these domestic traditional McDonald's restaurants was $12,654,000 and $654,000, respectively. The median annual sales volume of domestic traditional McDonald's restaurants open at least 1 year as of December 31, 2019, was $2,910,000 during 2019.

Of the approximately 11,435 domestic traditional franchised McDonald's restaurants opened at least 1 year as of December 31, 2019, approximately 78% had annual sales volumes in excess of $2,300,000; approximately 68% had annual sales volumes in excess of $2,500,000; and approximately 58% had annual sales volumes in excess of $2,700,000. The average annual sales volume of domestic traditional franchised McDonald's restaurants open at least 1 year as of December 31, 2019, was $2,970,000 during 2019. The highest and lowest annual sales volume in 2019 for these domestic traditional McDonald's restaurants was $12,654,000 and $654,000, respectively. The median annual sales volume of domestic traditional franchised McDonald's restaurants open at least 1 year as of December 31, 2019, was $2,867,000 during 2019.

Of the approximately 597 domestic traditional McOpCo restaurants opened at least 1 year as of December 31, 2019, approximately 99% had annual sales volumes in excess of $2,300,000; approximately 98% had annual sales volumes in excess of $2,500,000; and approximately 95% had annual sales volumes in excess of $2,700,000. The average annual sales volume of domestic traditional McOpCo restaurants open at least 1 year as of December 31, 2019, was $3,758,000 during 2019. The highest and lowest annual sales volume in 2019 for these domestic traditional McOpCo restaurants was $8,182,000 and $2,047,000, respectively. The median annual sales volume of domestic traditional McOpCo restaurants open at least 1 year as of December 31, 2019, was $3,629,000 during 2019.

The pro forma statements included below show annual sales volumes of $2,300,000, $2,500,000, and $2,700,000. These pro forma statements have been derived from independent franchisee traditional restaurant financial statements to provide information relevant to a prospective franchisee (see Note 1). Specific assumptions used in the presentation of these pro forma statements are indicated above and below each statement.

The pro forma statements are based upon a total of 10,676 independent franchisee traditional restaurants open and operated by a franchisee for at least 1 year and do not include restaurants operated by McOpCo companies, Satellites or the domestic traditional franchised restaurants that changed owners in 2019 and for which we had complete financial statements. A franchisee's individual financial results may differ from the results stated in the pro forma statements for the reasons described in this item or for other reasons. Substantiation of the data used in preparing the earnings claims, including computations of all actual or average profit or earnings, will be made available to prospective franchisees upon reasonable request.

It is anticipated that the information reported in these pro forma statements reflects the operating results before occupancy costs for independent franchisee restaurants open for at least 1 year. However, the operating income before occupancy cost figures appearing below should not be construed as the financial results or "profit" before occupancy costs which might be experienced by a franchisee with a similar sales volume or an indication that any particular sales volume will be obtained. An individual franchisee is likely to experience operating expense variations including, but not limited to, general insurance, legal and accounting fees, labor costs, and store management benefits (life and health insurance, etc.). Additionally, market conditions, operational and management methods employed by a franchisee, different geographic areas of the country, and menu price variations may significantly affect operating results. The nature of these variables makes it difficult to estimate the financial results for any particular franchisee or location.

EXHIBIT O(85)

AOE2031

| | | | | | |
|---|---:|---:|---:|---:|---:|
| PRODUCT SALES (see Note 2) | $2,300,000 | 100.0% | $2,500,000 | 100.0% | $2,700,000 | 100.0% |
| TOTAL COST OF SALES | 655,000 | 28.5% | 708,000 | 28.3% | 761,000 | 28.2% |
| GROSS PROFIT | 1,648,000 | 71.7% | 1,792,000 | 71.7% | 1,935,000 | 71.7% |
| OTHER OPERATING EXPENSES (excluding rent, service fees, depreciation and amortization (D&A), interest, and income taxes)* | 1,041,000 | 45.3% | 1,112,000 | 44.5% | 1,187,000 | 44.0% |
| OPERATING INCOME BEFORE OCCUPANCY COSTS (excluding rent, service fees, D&A, interest, and income taxes) (see Note 3)** | 607,000 | 26.4% | 680,000 | 27.2% | 748,000 | 27.7% |

Of the 10,676 independent franchisee traditional restaurants included in the pro forma statements above, approximately 75% had operating income before occupancy costs greater than $607,000; approximately 66% had operating income before occupancy costs greater than $680,000; and approximately 58% had operating income before occupancy costs greater than $748,000.

**\*   OTHER OPERATING EXPENSES —** Includes, but is not limited to, the following costs:  labor, franchisee's salary as manager, payroll taxes, advertising fee (as described in Item 6), promotion, outside services, linen, operating supplies, small equipment, maintenance and repair, utilities, office supplies, legal and accounting fees, insurance, real estate and personal property taxes, business operating licenses, and non-product income or expense.  This is a combination of the Total Controllable Expenses and Other Operating Expenses excluding rent, service fees, D&A, and interest included in our typical store financial statements.

**\*\* OPERATING INCOME BEFORE OCCUPANCY COSTS —** Represents Operating Income excluding rent, service fees, D&A, interest, and income taxes.  The rent paid to McDonald's will vary based upon sales and McDonald's investment in land, site improvements, and building costs.  Refer to Item 6 for information regarding franchise fees (including rent and service fees paid to McDonald's).  D&A and interest will vary based upon the purchase price and required reinvestment of the specific restaurant acquired.  Refer to Item 7 for a description of investment costs.

Additionally, organization overhead costs such as salaries and benefits of non-restaurant personnel (if any), cost of an automobile used in the business (if any), and other discretionary expenditures may significantly affect profits realized in any given operation.  The nature of these variables makes it difficult to estimate the performance for any particular restaurant with sales of any given volume.

Note 1 — Data for McOpCo company restaurants is not included in the pro forma statements because of certain expenses that are typically incurred by a McOpCo-operated restaurant that are not incurred by restaurants franchised to individuals.  If data for McOpCo-operated restaurants open for at least 1 year were included along with franchised restaurants, the percent of total restaurants in each category would not be statistically different and the range of Operating Income Before Occupancy Costs would be $606,000 to $743,000.

Note 2 — The description of this line, "Product Sales," is to clarify that only product sales are included.  Non-product sales and associated costs are included in Other Operating Expenses.  The Operating Income Before Occupancy Costs numbers were determined using restaurants with product sales between $2,200,000 to $2,400,000; $2,400,000 to $2,600,000; and $2,600,000 to $2,800,000, respectively.

Note 3 — We are not presenting average occupancy costs in the above calculation because a wide variety of rent charts and ownership options exist.  In addition, the effective rent paid by a franchisee may be more in any particular month than the stated percent rent indicated in the franchisee's lease because a portion of the rent may be fixed regardless of the sales level for a given month.  The range of effective rent percentages in 2019 for franchised restaurants was 0.00% to 31.54%.  Refer to Item 6 for a description of rents.

EXHIBIT O(85)

AOE2032

Some McDonald's restaurants have achieved these sales, profits or earnings.  Your individual results may differ.  There is no assurance that you will sell or earn as much.

## Item 20
## Outlets and Franchisee Information

Table No. 1
**Systemwide Outlet Summary**
**For years 2017 to 2019**

| Outlet Type | Year | Outlets at the Start of the Year | Outlets at the End of the Year | Net Change |
|---|---|---|---|---|
| Franchised | 2017 | 13,047 | 13,145 | +98 |
| | 2018 | 13,145 | 13,229 | +84 |
| | 2019 | 13,229 | 13,185 | -44 |
| Company-Owned | 2017 | 1,106 | 884 | -222 |
| | 2018 | 884 | 683 | -201 |
| | 2019 | 683 | 659 | -24 |
| Total Outlets | 2017 | 14,153 | 14,029 | -124 |
| | 2018 | 14,029 | 13,912 | -117 |
| | 2019 | 13,912 | 13,844 | -68 |

Table No. 2
**Transfers of Outlets from Franchisees to New Owners (other than the Franchisor)** (1)
**For years 2017 to 2019**

| State | Year | Number of Transfers |
|---|---|---|
| Alabama | 2017 | 20 |
| | 2018 | 3 |
| | 2019 | 51 |
| Alaska | 2017 | 4 |
| | 2018 | 0 |
| | 2019 | 2 |
| Arizona | 2017 | 23 |
| | 2018 | 17 |
| | 2019 | 4 |
| Arkansas | 2017 | 19 |
| | 2018 | 38 |
| | 2019 | 0 |
| California | 2017 | 95 |
| | 2018 | 82 |
| | 2019 | 63 |
| Colorado | 2017 | 14 |
| | 2018 | 21 |
| | 2019 | 21 |
| Connecticut | 2017 | 11 |
| | 2018 | 11 |
| | 2019 | 12 |
| Delaware | 2017 | 7 |
| | 2018 | 0 |
| | 2019 | 5 |
| District of Columbia | 2017 | 0 |
| | 2018 | 3 |
| | 2019 | 0 |
| Florida | 2017 | 54 |
| | 2018 | 78 |
| | 2019 | 20 |

EXHIBIT O(85)

AOE2033

| State | Year | Number of Transfers |
|---|---|---|
| Georgia | 2017 | 39 |
| | 2018 | 46 |
| | 2019 | 43 |
| Hawaii | 2017 | 0 |
| | 2018 | 0 |
| | 2019 | 5 |
| Idaho | 2017 | 9 |
| | 2018 | 7 |
| | 2019 | 14 |
| Illinois | 2017 | 71 |
| | 2018 | 26 |
| | 2019 | 47 |
| Indiana | 2017 | 18 |
| | 2018 | 20 |
| | 2019 | 16 |
| Iowa | 2017 | 10 |
| | 2018 | 12 |
| | 2019 | 13 |
| Kansas | 2017 | 8 |
| | 2018 | 22 |
| | 2019 | 14 |
| Kentucky | 2017 | 15 |
| | 2018 | 13 |
| | 2019 | 14 |
| Louisiana | 2017 | 23 |
| | 2018 | 36 |
| | 2019 | 0 |
| Maine | 2017 | 1 |
| | 2018 | 6 |
| | 2019 | 4 |
| Maryland | 2017 | 22 |
| | 2018 | 12 |
| | 2019 | 6 |
| Massachusetts | 2017 | 16 |
| | 2018 | 15 |
| | 2019 | 10 |
| Michigan | 2017 | 32 |
| | 2018 | 40 |
| | 2019 | 15 |
| Minnesota | 2017 | 18 |
| | 2018 | 10 |
| | 2019 | 12 |
| Mississippi | 2017 | 16 |
| | 2018 | 12 |
| | 2019 | 13 |
| Missouri | 2017 | 23 |
| | 2018 | 50 |
| | 2019 | 12 |
| Montana | 2017 | 5 |
| | 2018 | 7 |
| | 2019 | 1 |
| Nebraska | 2017 | 11 |
| | 2018 | 8 |
| | 2019 | 1 |
| Nevada | 2017 | 3 |
| | 2018 | 6 |
| | 2019 | 0 |

EXHIBIT O(85)

AOE2034

| State | Year | Number of Transfers |
|---|---|---|
| New Hampshire | 2017 | 9 |
| | 2018 | 0 |
| | 2019 | 0 |
| New Jersey | 2017 | 15 |
| | 2018 | 12 |
| | 2019 | 31 |
| New Mexico | 2017 | 6 |
| | 2018 | 8 |
| | 2019 | 4 |
| New York | 2017 | 39 |
| | 2018 | 19 |
| | 2019 | 27 |
| North Carolina | 2017 | 45 |
| | 2018 | 32 |
| | 2019 | 31 |
| North Dakota | 2017 | 6 |
| | 2018 | 2 |
| | 2019 | 2 |
| Ohio | 2017 | 33 |
| | 2018 | 60 |
| | 2019 | 37 |
| Oklahoma | 2017 | 19 |
| | 2018 | 15 |
| | 2019 | 6 |
| Oregon | 2017 | 17 |
| | 2018 | 9 |
| | 2019 | 4 |
| Pennsylvania | 2017 | 36 |
| | 2018 | 41 |
| | 2019 | 57 |
| Rhode Island | 2017 | 12 |
| | 2018 | 0 |
| | 2019 | 1 |
| South Carolina | 2017 | 25 |
| | 2018 | 23 |
| | 2019 | 18 |
| South Dakota | 2017 | 0 |
| | 2018 | 0 |
| | 2019 | 10 |
| Tennessee | 2017 | 53 |
| | 2018 | 84 |
| | 2019 | 11 |
| Texas | 2017 | 83 |
| | 2018 | 113 |
| | 2019 | 31 |
| Utah | 2017 | 11 |
| | 2018 | 24 |
| | 2019 | 8 |
| Vermont | 2017 | 0 |
| | 2018 | 0 |
| | 2019 | 0 |
| Virginia | 2017 | 24 |
| | 2018 | 8 |
| | 2019 | 9 |
| Washington | 2017 | 12 |
| | 2018 | 11 |
| | 2019 | 8 |

EXHIBIT O(85)

AOE2035

| State | Year | Number of Transfers |
|---|---|---|
| West Virginia | 2017 | 4 |
| | 2018 | 9 |
| | 2019 | 5 |
| Wisconsin | 2017 | 28 |
| | 2018 | 10 |
| | 2019 | 10 |
| Wyoming | 2017 | 2 |
| | 2018 | 7 |
| | 2019 | 0 |
| Guantanamo Bay | 2017 | 0 |
| | 2018 | 0 |
| | 2019 | 0 |
| Northern Mariana Islands | 2017 | 0 |
| | 2018 | 0 |
| | 2019 | 0 |
| Total | 2017 | 1066 |
| | 2018 | 1088 |
| | 2019 | 728 |

(1)    Included are "spin" transactions in which we or an affiliate acquired the restaurant from one franchisee and immediately sold the restaurant to another franchisee without our ever having operated the restaurant.

Table No. 3
**Status of Franchised Outlets**
**For years 2017 to 2019**

| State | Year | Outlets at Start of the Year | Outlets Opened | Terminations (1) | Non-Renewals (2) | Reacquired by Franchisor (3) | Ceased Operations - Other Reasons (4) | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| Alabama | 2017 | 254 | 0 | 5 | 2 | 0 | 0 | 247 |
| | 2018 | 247 | 0 | 0 | 2 | 0 | 0 | 245 |
| | 2019 | 245 | 0 | 1 | 0 | 0 | 0 | 244 |
| Alaska | 2017 | 31 | 0 | 0 | 0 | 0 | 0 | 31 |
| | 2018 | 31 | 0 | 0 | 0 | 0 | 0 | 31 |
| | 2019 | 31 | 0 | 0 | 0 | 0 | 0 | 31 |
| Arizona | 2017 | 280 | 1 | 1 | 0 | 0 | 1 | 279 |
| | 2018 | 279 | 0 | 0 | 1 | 0 | 0 | 278 |
| | 2019 | 278 | 1 | 0 | 5 | 0 | 0 | 274 |
| Arkansas | 2017 | 175 | 3 | 1 | 2 | 0 | 1 | 174 |
| | 2018 | 174 | 0 | 0 | 1 | 0 | 0 | 173 |
| | 2019 | 173 | 2 | 2 | 1 | 0 | 1 | 171 |
| California | 2017 | 1,216 | 15 | 6 | 18 | 0 | 0 | 1,207 |
| | 2018 | 1,207 | 14 | 9 | 2 | 0 | 0 | 1,210 |
| | 2019 | 1210 | 4 | 1 | 8 | 0 | 2 | 1203 |
| Colorado | 2017 | 200 | 14 | 1 | 1 | 0 | 0 | 212 |
| | 2018 | 212 | 0 | 0 | 1 | 0 | 0 | 211 |
| | 2019 | 211 | 1 | 0 | 3 | 0 | 0 | 209 |
| Connecticut | 2017 | 142 | 0 | 0 | 0 | 0 | 0 | 142 |
| | 2018 | 142 | 0 | 0 | 0 | 0 | 0 | 142 |
| | 2019 | 142 | 0 | 1 | 0 | 0 | 0 | 141 |
| Delaware | 2017 | 35 | 3 | 0 | 0 | 0 | 0 | 38 |
| | 2018 | 38 | 0 | 0 | 1 | 0 | 0 | 37 |
| | 2019 | 37 | 0 | 0 | 1 | 0 | 0 | 36 |
| District of Columbia | 2017 | 29 | 0 | 1 | 0 | 0 | 0 | 28 |
| | 2018 | 28 | 0 | 1 | 0 | 0 | 0 | 27 |
| | 2019 | 27 | 0 | 0 | 0 | 0 | 0 | 27 |

EXHIBIT O(85)

AOE2036

| State | Year | Outlets at Start of the Year | Outlets Opened | Terminations (1) | Non-Renewals (2) | Reacquired by Franchisor (3) | Ceased Operations - Other Reasons (4) | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| Florida | 2017 | 793 | 7 | 0 | 0 | 0 | 3 | 797 |
| | 2018 | 797 | 9 | 0 | 0 | 0 | 2 | 804 |
| | 2019 | 804 | 6 | 4 | 1 | 0 | 1 | 804 |
| Georgia | 2017 | 443 | 5 | 6 | 4 | 0 | 1 | 437 |
| | 2018 | 437 | 27 | 3 | 7 | 0 | 0 | 454 |
| | 2019 | 454 | 0 | 1 | 1 | 0 | 0 | 452 |
| Guam | 2017 | 6 | 0 | 0 | 0 | 0 | 0 | 6 |
| | 2018 | 6 | 1 | 0 | 0 | 0 | 1 | 6 |
| | 2019 | 6 | 0 | 0 | 0 | 0 | 0 | 6 |
| Hawaii | 2017 | 51 | 2 | 0 | 0 | 0 | 0 | 53 |
| | 2018 | 53 | 0 | 0 | 1 | 0 | 0 | 52 |
| | 2019 | 52 | 0 | 0 | 0 | 0 | 0 | 52 |
| Idaho | 2017 | 63 | 1 | 2 | 0 | 0 | 0 | 62 |
| | 2018 | 62 | 0 | 0 | 0 | 0 | 0 | 62 |
| | 2019 | 62 | 0 | 0 | 0 | 0 | 0 | 62 |
| Illinois | 2017 | 579 | 27 | 12 | 1 | 0 | 1 | 592 |
| | 2018 | 592 | 29 | 3 | 1 | 0 | 0 | 617 |
| | 2019 | 617 | 3 | 2 | 0 | 0 | 2 | 616 |
| Indiana | 2017 | 292 | 9 | 2 | 1 | 0 | 0 | 298 |
| | 2018 | 298 | 19 | 1 | 2 | 0 | 0 | 314 |
| | 2019 | 314 | 9 | 1 | 0 | 0 | 1 | 321 |
| Iowa | 2017 | 149 | 5 | 1 | 1 | 0 | 0 | 152 |
| | 2018 | 152 | 0 | 3 | 2 | 0 | 0 | 147 |
| | 2019 | 147 | 1 | 0 | 1 | 0 | 1 | 146 |
| Kansas | 2017 | 148 | 0 | 0 | 0 | 0 | 0 | 148 |
| | 2018 | 148 | 0 | 0 | 0 | 0 | 0 | 148 |
| | 2019 | 148 | 0 | 0 | 0 | 0 | 0 | 148 |
| Kentucky | 2017 | 227 | 13 | 1 | 1 | 0 | 1 | 237 |
| | 2018 | 237 | 10 | 0 | 5 | 0 | 0 | 242 |
| | 2019 | 242 | 0 | 0 | 1 | 0 | 0 | 241 |
| Louisiana | 2017 | 244 | 0 | 1 | 2 | 0 | 0 | 241 |
| | 2018 | 241 | 0 | 1 | 0 | 0 | 0 | 240 |
| | 2019 | 240 | 1 | 1 | 2 | 0 | 1 | 237 |
| Maine | 2017 | 62 | 0 | 0 | 0 | 0 | 0 | 62 |
| | 2018 | 62 | 0 | 0 | 0 | 0 | 0 | 62 |
| | 2019 | 62 | 0 | 0 | 0 | 0 | 0 | 62 |
| Maryland | 2017 | 233 | 3 | 2 | 2 | 0 | 0 | 232 |
| | 2018 | 232 | 1 | 3 | 0 | 0 | 0 | 230 |
| | 2019 | 230 | 4 | 0 | 0 | 0 | 0 | 234 |
| Massachusetts | 2017 | 240 | 0 | 2 | 0 | 0 | 0 | 238 |
| | 2018 | 238 | 1 | 4 | 0 | 0 | 1 | 234 |
| | 2019 | 234 | 0 | 0 | 0 | 0 | 0 | 234 |
| Michigan | 2017 | 458 | 27 | 3 | 1 | 0 | 0 | 481 |
| | 2018 | 481 | 5 | 5 | 1 | 0 | 0 | 480 |
| | 2019 | 480 | 10 | 1 | 1 | 0 | 0 | 488 |
| Minnesota | 2017 | 194 | 33 | 0 | 0 | 0 | 0 | 227 |
| | 2018 | 227 | 0 | 1 | 0 | 0 | 0 | 226 |
| | 2019 | 226 | 0 | 0 | 0 | 0 | 0 | 226 |
| Mississippi | 2017 | 148 | 0 | 1 | 2 | 0 | 0 | 145 |
| | 2018 | 145 | 0 | 1 | 0 | 0 | 0 | 144 |
| | 2019 | 144 | 1 | 2 | 0 | 0 | 0 | 143 |
| Missouri | 2017 | 316 | 1 | 1 | 0 | 0 | 0 | 316 |
| | 2018 | 316 | 2 | 1 | 1 | 0 | 1 | 315 |
| | 2019 | 315 | 1 | 1 | 0 | 0 | 0 | 315 |

EXHIBIT O(85)

AOE2037

| State | Year | Outlets at Start of the Year | Outlets Opened | Terminations (1) | Non-Renewals (2) | Reacquired by Franchisor (3) | Ceased Operations - Other Reasons (4) | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| Montana | 2017 | 48 | 0 | 0 | 0 | 0 | 0 | 48 |
| | 2018 | 48 | 0 | 0 | 0 | 0 | 0 | 48 |
| | 2019 | 48 | 0 | 0 | 0 | 0 | 0 | 48 |
| Nebraska | 2017 | 59 | 22 | 0 | 1 | 0 | 1 | 79 |
| | 2018 | 79 | 1 | 1 | 1 | 0 | 0 | 78 |
| | 2019 | 78 | 0 | 0 | 1 | 0 | 0 | 77 |
| Nevada | 2017 | 128 | 1 | 0 | 0 | 0 | 0 | 129 |
| | 2018 | 129 | 3 | 0 | 1 | 0 | 0 | 131 |
| | 2019 | 131 | 1 | 0 | 1 | 0 | 1 | 130 |
| New Hampshire | 2017 | 58 | 0 | 3 | 0 | 0 | 0 | 55 |
| | 2018 | 55 | 0 | 1 | 0 | 0 | 0 | 54 |
| | 2019 | 54 | 0 | 0 | 0 | 0 | 0 | 54 |
| New Jersey | 2017 | 260 | 4 | 1 | 0 | 0 | 1 | 262 |
| | 2018 | 262 | 4 | 2 | 0 | 0 | 0 | 264 |
| | 2019 | 264 | 1 | 2 | 0 | 0 | 0 | 263 |
| New Mexico | 2017 | 105 | 0 | 1 | 0 | 0 | 0 | 104 |
| | 2018 | 104 | 1 | 0 | 0 | 0 | 1 | 104 |
| | 2019 | 104 | 2 | 0 | 0 | 0 | 0 | 106 |
| New York | 2017 | 622 | 1 | 7 | 6 | 0 | 0 | 610 |
| | 2018 | 610 | 18 | 8 | 2 | 0 | 1 | 617 |
| | 2019 | 617 | 0 | 6 | 3 | 15 | 0 | 593 |
| North Carolina | 2017 | 454 | 4 | 2 | 0 | 0 | 1 | 455 |
| | 2018 | 455 | 20 | 4 | 5 | 0 | 0 | 466 |
| | 2019 | 466 | 2 | 1 | 7 | 0 | 1 | 459 |
| North Dakota | 2017 | 25 | 0 | 0 | 0 | 0 | 0 | 25 |
| | 2018 | 25 | 0 | 0 | 0 | 0 | 0 | 25 |
| | 2019 | 25 | 0 | 1 | 0 | 0 | 0 | 24 |
| Ohio | 2017 | 545 | 7 | 3 | 4 | 0 | 0 | 545 |
| | 2018 | 545 | 30 | 1 | 1 | 0 | 0 | 573 |
| | 2019 | 573 | 1 | 1 | 2 | 0 | 1 | 570 |
| Oklahoma | 2017 | 181 | 3 | 0 | 0 | 0 | 0 | 184 |
| | 2018 | 184 | 2 | 0 | 2 | 0 | 1 | 183 |
| | 2019 | 183 | 1 | 0 | 0 | 0 | 0 | 184 |
| Oregon | 2017 | 166 | 0 | 0 | 0 | 0 | 0 | 166 |
| | 2018 | 166 | 1 | 1 | 0 | 0 | 1 | 165 |
| | 2019 | 165 | 0 | 0 | 3 | 0 | 0 | 162 |
| Pennsylvania | 2017 | 500 | 5 | 2 | 2 | 0 | 0 | 501 |
| | 2018 | 501 | 7 | 5 | 9 | 0 | 0 | 494 |
| | 2019 | 494 | 2 | 2 | 3 | 0 | 0 | 491 |
| Rhode Island | 2017 | 31 | 0 | 0 | 0 | 0 | 0 | 31 |
| | 2018 | 31 | 0 | 0 | 0 | 0 | 0 | 31 |
| | 2019 | 31 | 0 | 0 | 0 | 0 | 0 | 31 |
| South Carolina | 2017 | 223 | 2 | 0 | 0 | 0 | 0 | 225 |
| | 2018 | 225 | 2 | 2 | 2 | 0 | 2 | 221 |
| | 2019 | 221 | 6 | 2 | 2 | 0 | 1 | 222 |
| South Dakota | 2017 | 30 | 0 | 0 | 0 | 0 | 0 | 30 |
| | 2018 | 30 | 0 | 0 | 0 | 0 | 0 | 30 |
| | 2019 | 30 | 0 | 0 | 0 | 0 | 0 | 30 |
| Tennessee | 2017 | 321 | 19 | 4 | 5 | 0 | 2 | 329 |
| | 2018 | 329 | 1 | 0 | 3 | 0 | 0 | 327 |
| | 2019 | 327 | 0 | 0 | 0 | 0 | 0 | 327 |
| Texas | 2017 | 1,131 | 16 | 5 | 8 | 0 | 0 | 1,134 |
| | 2018 | 1,134 | 16 | 8 | 7 | 0 | 1 | 1,134 |
| | 2019 | 1134 | 11 | 2 | 5 | 0 | 1 | 1137 |

EXHIBIT O(85)

AOE2038

| State | Year | Outlets at Start of the Year | Outlets Opened | Terminations (1) | Non-Renewals (2) | Reacquired by Franchisor (3) | Ceased Operations - Other Reasons (4) | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| Utah | 2017 | 118 | 0 | 1 | 1 | 0 | 0 | 116 |
| | 2018 | 116 | 1 | 0 | 1 | 0 | 0 | 116 |
| | 2019 | 116 | 0 | 1 | 2 | 0 | 0 | 113 |
| Vermont | 2017 | 28 | 0 | 0 | 0 | 0 | 0 | 28 |
| | 2018 | 28 | 0 | 2 | 0 | 0 | 0 | 26 |
| | 2019 | 26 | 0 | 0 | 0 | 0 | 0 | 26 |
| Virginia | 2017 | 371 | 5 | 4 | 3 | 0 | 2 | 367 |
| | 2018 | 367 | 2 | 4 | 2 | 0 | 1 | 362 |
| | 2019 | 362 | 3 | 0 | 0 | 0 | 1 | 364 |
| Washington | 2017 | 226 | 5 | 1 | 2 | 0 | 0 | 228 |
| | 2018 | 228 | 13 | 1 | 2 | 0 | 0 | 238 |
| | 2019 | 238 | 0 | 0 | 0 | 0 | 0 | 238 |
| West Virginia | 2017 | 102 | 1 | 0 | 0 | 0 | 0 | 103 |
| | 2018 | 103 | 0 | 0 | 0 | 0 | 0 | 103 |
| | 2019 | 103 | 0 | 0 | 0 | 0 | 0 | 103 |
| Wisconsin | 2017 | 275 | 2 | 0 | 0 | 0 | 0 | 277 |
| | 2018 | 277 | 0 | 1 | 0 | 0 | 0 | 276 |
| | 2019 | 276 | 4 | 1 | 1 | 0 | 0 | 278 |
| Wyoming | 2017 | 29 | 0 | 0 | 0 | 0 | 0 | 29 |
| | 2018 | 29 | 0 | 0 | 0 | 0 | 0 | 29 |
| | 2019 | 29 | 0 | 0 | 0 | 0 | 0 | 29 |
| Guantanamo Bay | 2017 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2018 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2019 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Northern Mariana Islands | 2017 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2018 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2019 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| Total Outlets | 2017 | 13,047 | 266 | 83 | 70 | 0 | 15 | 13,145 |
| | 2018 | 13,145 | 240 | 77 | 66 | 0 | 13 | 13,229 |
| | 2019 | 13,229 | 78 | 37 | 55 | 15 | 15 | 13,185 |

(1)     Substantially all of the Terminations are as a result of closings of restaurants by mutual agreement during the franchise term.

(2)     Franchisees are not given the right to renew or extend the franchise at the end of the term.  At McDonald's sole discretion, a franchisee may or may not be offered a new term franchise.  If we do not grant a new term franchise, the franchisee has the opportunity to sell the franchise during the remaining term, and a qualified purchaser is allowed to enter into a new term Franchise Agreement at the end of the remaining term.  These transactions are not included as Non-Renewals.  Substantially all of the Non-Renewals are as a result of closings of restaurants by mutual agreement at the end of the franchise term.

(3)     Reacquired by Franchisor does not include "spin" transactions, in which we or an affiliate acquired the restaurant from one franchisee and immediately sold the restaurant to another franchisee without our ever having operated the restaurant.

(4)     Ceased Operations includes Franchise Agreements that were mutually terminated because the franchisee relocated the restaurant to a new site.  The existing Franchise Agreement was terminated, and we entered into a Franchise Agreement for the new site with the franchisee.

EXHIBIT O(85)

AOE2039

Table No. 4
**Status of Company-Owned Outlets**
**For years 2017 to 2019**

| State | Year | Outlets at Start of the Year | Outlets Opened | Outlets Reacquired From Franchisee (1) | Outlets Closed | Outlets Sold to Franchisee | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| Arizona | 2017 | 11 | 0 | 0 | 0 | 0 | 11 |
| | 2018 | 11 | 0 | 0 | 0 | 0 | 11 |
| | 2019 | 11 | 0 | 0 | 0 | 0 | 11 |
| California | 2017 | 100 | 0 | 0 | 1 | 10 | 89 |
| | 2018 | 89 | 0 | 0 | 0 | 11 | 78 |
| | 2019 | 78 | 0 | 0 | 0 | 0 | 78 |
| Colorado | 2017 | 14 | 0 | 0 | 0 | 14 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delaware | 2017 | 3 | 0 | 0 | 0 | 3 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 2017 | 2 | 0 | 0 | 2 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida | 2017 | 107 | 1 | 0 | 1 | 0 | 107 |
| | 2018 | 107 | 0 | 0 | 0 | 3 | 104 |
| | 2019 | 104 | 0 | 0 | 0 | 6 | 98 |
| Georgia | 2017 | 31 | 0 | 0 | 1 | 3 | 27 |
| | 2018 | 27 | 0 | 0 | 0 | 27 | 0 |
| | 2019 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 2017 | 23 | 0 | 0 | 0 | 2 | 21 |
| | 2018 | 21 | 0 | 0 | 0 | 0 | 21 |
| | 2019 | 21 | 0 | 0 | 0 | 0 | 21 |
| Illinois | 2017 | 93 | 0 | 0 | 0 | 24 | 69 |
| | 2018 | 69 | 0 | 0 | 0 | 24 | 45 |
| | 2019 | 45 | 0 | 0 | 0 | 0 | 45 |
| Indiana | 2017 | 63 | 0 | 0 | 0 | 9 | 54 |
| | 2018 | 54 | 0 | 0 | 0 | 19 | 35 |
| | 2019 | 35 | 0 | 0 | 0 | 7 | 28 |
| Iowa | 2017 | 5 | 0 | 0 | 0 | 5 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky | 2017 | 30 | 0 | 0 | 0 | 11 | 19 |
| | 2018 | 19 | 0 | 0 | 0 | 10 | 9 |
| | 2019 | 9 | 0 | 0 | 0 | 0 | 9 |
| Maryland | 2017 | 62 | 0 | 0 | 0 | 3 | 59 |
| | 2018 | 59 | 0 | 0 | 0 | 1 | 58 |
| | 2019 | 58 | 0 | 0 | 0 | 4 | 54 |
| Michigan | 2017 | 95 | 0 | 0 | 0 | 27 | 68 |
| | 2018 | 68 | 0 | 0 | 0 | 3 | 65 |
| | 2019 | 65 | 0 | 0 | 0 | 8 | 57 |
| Minnesota | 2017 | 33 | 0 | 0 | 0 | 33 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 2017 | 21 | 0 | 0 | 0 | 21 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 2017 | 16 | 0 | 0 | 0 | 0 | 16 |
| | 2018 | 16 | 0 | 0 | 0 | 3 | 13 |
| | 2019 | 13 | 0 | 0 | 0 | 0 | 13 |

EXHIBIT O(85)

AOE2040

| State | Year | Outlets at Start of the Year | Outlets Opened | Outlets Reacquired From Franchisee (1) | Outlets Closed | Outlets Sold to Franchisee | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| New Jersey | 2017 | 5 | 0 | 0 | 0 | 2 | 3 |
| | 2018 | 3 | 0 | 0 | 0 | 3 | 0 |
| | 2019 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York | 2017 | 17 | 0 | 0 | 0 | 0 | 17 |
| | 2018 | 17 | 0 | 0 | 0 | 17 | 0 |
| | 2019 | 0 | 1 | 15 | 1 | 0 | 15 |
| North Carolina | 2017 | 41 | 0 | 0 | 0 | 1 | 40 |
| | 2018 | 40 | 0 | 0 | 0 | 17 | 23 |
| | 2019 | 23 | 0 | 0 | 0 | 1 | 22 |
| Ohio | 2017 | 79 | 0 | 0 | 0 | 7 | 72 |
| | 2018 | 72 | 0 | 0 | 0 | 30 | 42 |
| | 2019 | 42 | 0 | 0 | 0 | 0 | 42 |
| Oklahoma | 2017 | 24 | 0 | 0 | 0 | 2 | 22 |
| | 2018 | 22 | 0 | 0 | 0 | 1 | 21 |
| | 2019 | 21 | 0 | 0 | 0 | 1 | 20 |
| Pennsylvania | 2017 | 12 | 0 | 0 | 0 | 5 | 7 |
| | 2018 | 7 | 0 | 0 | 0 | 7 | 0 |
| | 2019 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 2017 | 9 | 0 | 0 | 0 | 0 | 9 |
| | 2018 | 9 | 0 | 0 | 0 | 0 | 9 |
| | 2019 | 9 | 0 | 0 | 0 | 5 | 4 |
| Tennessee | 2017 | 21 | 0 | 0 | 0 | 17 | 4 |
| | 2018 | 4 | 0 | 0 | 0 | 0 | 4 |
| | 2019 | 4 | 0 | 0 | 0 | 0 | 4 |
| Texas | 2017 | 78 | 0 | 0 | 0 | 9 | 69 |
| | 2018 | 69 | 0 | 0 | 1 | 11 | 57 |
| | 2019 | 57 | 1 | 0 | 0 | 3 | 55 |
| Virginia | 2017 | 41 | 0 | 0 | 0 | 2 | 39 |
| | 2018 | 39 | 0 | 0 | 0 | 0 | 39 |
| | 2019 | 39 | 0 | 0 | 0 | 1 | 38 |
| Washington | 2017 | 43 | 0 | 0 | 0 | 5 | 38 |
| | 2018 | 38 | 0 | 0 | 0 | 13 | 25 |
| | 2019 | 25 | 0 | 0 | 0 | 0 | 25 |
| West Virginia | 2017 | 2 | 0 | 0 | 0 | 1 | 1 |
| | 2018 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2019 | 1 | 0 | 0 | 0 | 0 | 1 |
| Wisconsin | 2017 | 25 | 0 | 0 | 0 | 2 | 23 |
| | 2018 | 23 | 0 | 0 | 0 | 0 | 23 |
| | 2019 | 23 | 0 | 0 | 0 | 4 | 19 |
| Total Outlets | 2017 | 1,106 | 1 | 0 | 5 | 218 | 884 |
| | 2018 | 884 | 0 | 0 | 1 | 200 | 683 |
| | 2019 | 683 | 2 | 15 | 1 | 40 | 659 |

(1) Reacquired from Franchisee does not include "spin" transactions, in which we or an affiliate acquired the restaurant from one franchisee and immediately sold the restaurant to another franchisee without our ever having operated the restaurant.

Table No. 5
**Projected Openings As Of December 31, 2019** (1)

| State | Franchise Agreement Signed But Outlet Not Opened | Projected New Franchised Outlet in the Next Fiscal Year | Projected New Company-Owned Outlet in the Next Fiscal Year |
|---|---|---|---|
| Alabama | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 |

EXHIBIT O(85)

AOE2041

| State | Franchise Agreement Signed But Outlet Not Opened | Projected New Franchised Outlet in the Next Fiscal Year | Projected New Company-Owned Outlet in the Next Fiscal Year |
|---|---|---|---|
| Arizona | 0 | 5 | 0 |
| Arkansas | 0 | 0 | 0 |
| California | 0 | 2 | 0 |
| Colorado | 0 | 2 | 0 |
| Connecticut | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 |
| District of Columbia | 0 | 0 | 0 |
| Florida | 0 | 9 | 0 |
| Georgia | 0 | 1 | 0 |
| Hawaii | 0 | 1 | 0 |
| Idaho | 0 | 1 | 0 |
| Illinois | 0 | 0 | 0 |
| Indiana | 0 | 2 | 0 |
| Iowa | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 |
| Kentucky | 0 | 1 | 0 |
| Louisiana | 0 | 1 | 0 |
| Maine | 0 | 0 | 0 |
| Maryland | 0 | 1 | 0 |
| Massachusetts | 0 | 0 | 0 |
| Michigan | 0 | 1 | 0 |
| Minnesota | 0 | 0 | 0 |
| Mississippi | 0 | 0 | 0 |
| Missouri | 0 | 4 | 0 |
| Montana | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 |
| Nevada | 0 | 2 | 0 |
| New Hampshire | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 |
| New Mexico | 0 | 1 | 0 |
| New York | 0 | 0 | 0 |
| North Carolina | 0 | 1 | 0 |
| North Dakota | 0 | 0 | 0 |
| Ohio | 0 | 2 | 0 |
| Oklahoma | 0 | 5 | 0 |
| Oregon | 0 | 1 | 0 |
| Pennsylvania | 0 | 0 | 0 |
| Rhode Island | 0 | 0 | 0 |
| South Carolina | 0 | 4 | 0 |
| South Dakota | 0 | 1 | 0 |
| Tennessee | 0 | 1 | 0 |
| Texas | 0 | 14 | 0 |
| Utah | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 |
| Virginia | 0 | 1 | 0 |
| Washington | 0 | 0 | 0 |
| West Virginia | 0 | 0 | 0 |
| Wisconsin | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 |
| Guantanamo Bay | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 |
| Total | 0 | 64 | 0 |

(1)    Reflects projections of gross restaurant openings.  As of the date of this disclosure document, McDonald's anticipates closing approximately 58 restaurants in 2020.

EXHIBIT O(85)

AOE2042

Attached to this disclosure document as Exhibit Q is a list of U.S. franchised restaurants as of December 31, 2019.

Attached to this disclosure document as Exhibit R is a list of the 353 franchisees who had a restaurant franchise terminated, canceled, not renewed, or otherwise voluntarily or involuntarily ceased to do business under the Franchise Agreement during the most recent completed fiscal year or who have not communicated with us within 10 weeks of the application date.  If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.

In some instances, current and former franchisees sign provisions restricting their ability to speak openly about their experience with McDonald's.  You may wish to speak with current and former franchisees, but be aware that not all such franchisees will be able to communicate with you.

Trademark-specific franchisee organizations created, sponsored, or endorsed by McDonald's:

1.      National Franchisee Leadership Alliance (NFLA)
        Address:           110 N. Carpenter Street
                           Chicago, IL 60607
        NFLA is endorsed by McDonald's.

2.      Asian McDonald's Operators Association (AMOA)
        Address:           c/o Carol Chin
                           150 Staniford Street, Suite #3
                           Boston, MA 02114
        E-Mail Address:  jimmy.ferguson@partners.mcd.com
        cc E-Mail:       carol.chin@partners.mcd.com
        AMOA is endorsed by McDonald's.

3.      McDonald's Hispanic Operators Association (MHOA)
        Address:           26605 Kelvin Ct., Suite A
                           Murrieta, CA 92562
        E-Mail Address:  ana.madan@partners.mcd.com
        MHOA is endorsed by McDonald's.

4.      National Black McDonald's Operators Association (NBMOA)
        Address:           401 N. Michigan Ave., Suite 1200
                           Chicago, IL 60611
        Telephone #:     (312) 822-3363
        E-Mail Address:  execdirector@nbmoa.org
        Web Address:     www.nbmoa.org
        NBMOA is endorsed by McDonald's.

5.      Women Operators Network (WON)
        Address:           CHAR, Inc.
                           811 Gunter Avenue
                           P.O. Box 878
                           Guntersville, AL 35976-0878
        Telephone #:     (256) 582-2849 Ext. 1
        E-Mail Address:  won.database@us.stores.mcd.com
        WON is endorsed by McDonald's.

6.      McDonald's Owner Operator Pride Network (MOOPN)
        Address:           2140 Hall Johnson Road
                           Suite 102-301
                           Grapevine, TX 76051

EXHIBIT O(85)

AOE2043

E-Mail Address:  martha.ball@partners.mcd.com
MOOPN is endorsed by McDonald's.

The following independent franchisee organization has asked to be included in this disclosure document:

National Owners Association (NOA)
Address:          4908 West Nassau Street
                  Tampa, FL 33607
Telephone #       (813) 769-4960
E-Mail Address:   info@nationalownersassociation.com
Web Address:      https://nationalownersassocation.com

## Item 21
## Financial Statements

Attached to this disclosure document as Exhibit A are the consolidated balance sheets of McDonald's USA, LLC as of December 31, 2019, and December 31, 2018, and the related consolidated statements of income, member's equity, and cash flows for the years ended December 31, 2019, December 31, 2018, and December 31, 2017.

## Item 22
## Contracts

All agreements used by us regarding the offering of a franchise are attached to this disclosure document as Exhibits B, C, D, E, F, G, H, I, J, and L.

## Item 23
## Receipts

See the Receipts at the end of this disclosure document.

EXHIBIT O(85)

AOE2044

# EXHIBITS

# EXHIBIT A

## Report of Independent Auditors

The Board of Directors
McDonald's USA, LLC

We have audited the accompanying consolidated financial statements of McDonald's USA, LLC, which comprise the consolidated balance sheets as of December 31, 2019 and 2018, and the related consolidated statements of income, cash flows and member's equity for each of the three years in the period ended December 31, 2019, and the related notes to the consolidated financial statements.

## Management's Responsibility for the Financial Statements

Management is responsible for the preparation and fair presentation of these financial statements in conformity with U.S. generally accepted accounting principles; this includes the design, implementation and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free of material misstatement, whether due to fraud or error.

## Auditor's Responsibility

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

## Opinion

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of McDonald's USA, LLC at December 31, 2019 and 2018, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2019, in conformity with U.S. generally accepted accounting principles.

*Ernst & Young LLP*

Chicago, Illinois

March 13, 2020

**McDonald's USA, LLC**
**Consolidated statement of income**

| *IN MILLIONS* | 2019 | 2018 | 2017 |
|---|---|---|---|
| | | Years ended December 31, | |
| REVENUES | | | |
| Sales by Company-operated restaurants | **$2,489.7** | $2,664.6 | $3,260.4 |
| Revenues from franchised restaurants | **5,353.0** | 5,001.2 | 4,745.9 |
| **Total revenues** | **7,842.7** | 7,665.8 | 8,006.3 |
| OPERATING COSTS AND EXPENSES | | | |
| Company-operated restaurant expenses | | | |
| Food & paper | **724.2** | 798.6 | 965.3 |
| Payroll & employee benefits | **828.5** | 907.1 | 1,082.7 |
| Occupancy & other operating expenses | **548.9** | 561.8 | 689.8 |
| Franchised restaurants – occupancy expenses | **1,125.7** | 930.9 | 833.4 |
| Selling, general & administrative expenses | **586.8** | 591.4 | 624.4 |
| Other operating (income) expense, net | **(40.1)** | (139.6) | (211.7) |
| **Total operating costs and expenses** | **3,774.0** | 3,650.2 | 3,983.9 |
| **Operating income before royalty to parent** | **4,068.7** | 4,015.6 | 4,022.4 |
| Royalty expense to parent | **811.6** | 770.5 | 752.7 |
| **Operating income** | **3,257.1** | 3,245.1 | 3,269.7 |
| Interest expense – net of capitalized interest of $3.5; $3.3 and $2.8 | **97.5** | 76.7 | 56.5 |
| Non-operating (income) expense, net | **(4.1)** | (3.0) | (0.6) |
| **Income before provision for income taxes** | **3,163.7** | 3,171.4 | 3,213.8 |
| Provision for income taxes | **782.7** | 744.0 | 614.9 |
| **Net income** | **$2,381.0** | $2,427.4 | $2,598.9 |

*See Notes to consolidated financial statements.*

EXHIBIT O(85)

AOE2047

**McDonald's USA, LLC**
**Consolidated balance sheet**

| *IN MILLIONS* | December 31, 2019 | 2018 |
|---|---|---|
| ASSETS | | |
| **Current assets** | | |
| Cash | **$42.0** | $51.5 |
| Accounts and notes receivable, net | **1,060.3** | 1,440.4 |
| Due from parent, net | **-** | - |
| Inventories, at cost, not in excess of market | **14.2** | 14.8 |
| Prepaid expenses and other current assets | **54.1** | 133.3 |
| Total current assets | **1,170.6** | 1,640.0 |
| **Other assets** | | |
| Investments in affiliates | **(2.1)** | (2.7) |
| Goodwill | **1,277.3** | 1,276.5 |
| Lease right of use assets | **6,257.4** | - |
| Miscellaneous | **180.1** | 189.8 |
| Total other assets | **7,712.7** | 1,463.6 |
| **Property and equipment** | | |
| Property and equipment, at cost | **19,392.8** | 17,952.2 |
| Accumulated depreciation and amortization | **(6,783.4)** | (6,596.8) |
| Net property and equipment | **12,609.4** | 11,355.4 |
| **Total assets** | **$21,492.7** | $14,459.0 |
| LIABILITIES AND MEMBER'S EQUITY | | |
| **Current liabilities** | | |
| Accounts payable | **$237.9** | $449.3 |
| Due to parent, net | - | 323.8 |
| Lease liability current | **170.1** | - |
| Other taxes | **29.1** | 27.1 |
| Accrued interest, due to parent | **55.7** | 45.7 |
| Accrued payroll and other liabilities | **217.1** | 193.1 |
| Total current liabilities | **709.9** | 1,039.0 |
| **Due to parent** | **2,400.0** | 2,400.0 |
| **Other long-term liabilities** | **706.4** | 744.1 |
| **Lease liability long term** | **6,138.6** | - |
| **Deferred income taxes** | **1,309.8** | 1,148.3 |
| **Member's equity** | | |
| Member's capital | **5,588.1** | 5,588.1 |
| Retained earnings | **4,639.9** | 3,539.5 |
| Total member's equity | **10,228.0** | 9,127.6 |
| **Total liabilities and member's equity** | **$21,492.7** | $14,459.0 |

*See Notes to consolidated financial statements.*

EXHIBIT O(85)

AOE2048

**McDonald's USA, LLC**
**Consolidated statement of cash flows**

| *IN MILLIONS* | 2019 | 2018 | 2017 |
|---|---|---|---|
| | | Years ended December 31, | |
| **Operating activities** | | | |
| Net income | **$2,381.0** | $2,427.4 | $2,598.9 |
| Adjustments to reconcile to cash provided by operations | | | |
| Charges and credits: | | | |
| Depreciation and amortization | **726.7** | 598.4 | 524.1 |
| Deferred income taxes | **151.2** | 158.6 | (511.8) |
| Other | **(137.8)** | (183.4) | (208.2) |
| Changes in working capital items: | | | |
| Accounts receivable | **121.7** | (465.1) | (332.6) |
| Inventories, prepaid expenses and other current assets | **25.7** | 3.1 | 3.5 |
| Accounts payable | **(26.3)** | 30.9 | 0.8 |
| Income taxes, state | **2.8** | (9.6) | 88.3 |
| Other accrued liabilities | **14.2** | (13.6) | 0.7 |
| Due (to) from parent, net | **(279.9)** | 236.4 | (67.7) |
| **Cash provided by operations** | **2,979.3** | 2,783.1 | 2,096.0 |
| **Investing activities** | | | |
| Property and equipment expenditures | **(1,480.5)** | (1,849.8) | (861.2) |
| Purchases of restaurant businesses | **(6.7)** | (57.6) | (12.5) |
| Sales of restaurant businesses and property | **126.7** | 361.3 | 341.6 |
| Other, net | **(333.5)** | (63.6) | (35.2) |
| **Cash used for investing activities** | **(1,694.0)** | (1,609.7) | (567.3) |
| **Financing activities** | | | |
| Long-term financing issuances | **0.1** | 0.1 | 0.2 |
| Long-term financing repayments | **(0.4)** | (0.5) | (0.3) |
| Other Financing | **(13.9)** | - | - |
| Dividends to parent | **(1,280.6)** | (1,178.8) | (1,524.2) |
| **Cash used for financing activities** | **(1,294.8)** | (1,179.2) | (1,524.3) |
| **Cash and equivalents increase (decrease)** | **(9.5)** | (5.8) | 4.4 |
| Cash and equivalents at beginning of year | **51.5** | 57.3 | 52.9 |
| **Cash and equivalents at end of year** | **$42.0** | $51.5 | $57.3 |
| **Supplemental cash flow disclosures** | | | |
| Interest paid (excluding amounts paid to parent) | **$0.3** | $0.3 | $0.6 |
| State income taxes paid (excluding amounts paid to parent) | **$64.8** | $77.7 | $55.1 |

*See Notes to consolidated financial statements.*

EXHIBIT O(85)

AOE2049

**McDonald's USA, LLC**
**Consolidated statement of member's equity**

| *IN MILLIONS* | Member's capital | | Retained earnings | | Total member's equity | |
|---|---|---|---|---|---|---|
| Balance at January 1, 2017 | $ | 5,588.1 | $ | 1,432.8 | $ | 7,020.9 |
| Net income | | -- | | 2,598.9 | | 2,598.9 |
| Dividends to parent | | -- | | (1,524.2) | | (1,524.2) |
| Balance at December 31, 2017 | $ | 5,588.1 | $ | 2,507.5 | $ | 8,095.6 |
| Net income | | -- | | 2,427.4 | | 2,427.4 |
| Dividends to parent | | -- | | (1,178.8) | | (1,178.8) |
| Adoption of ASC 606 | | -- | | (216.6) | | (216.6) |
| Balance at December 31, 2018 | $ | 5,588.1 | $ | 3,539.5 | $ | 9,127.6 |
| Net income | | -- | | 2,381.0 | | 2,381.0 |
| Dividends to parent | | -- | | (1,280.6) | | (1,280.6) |
| **Balance at December 31, 2019** | **$** | **5,588.1** | **$** | **4,639.9** | **$** | **10,228.0** |

*See Notes to consolidated financial statements.*

EXHIBIT O(85)

AOE2050

**McDonald's USA, LLC**

**Notes to consolidated financial statements**

### *Summary of significant accounting policies*

**Nature of business**

McDonald's USA, LLC (the "Company") is a limited liability company that franchises and operates McDonald's restaurants in the restaurant industry in the United States.

All restaurants are operated either by the Company or by franchisees, including conventional franchisees under franchise arrangements, and affiliates under license agreements.

The following table presents restaurant information by ownership type:

| *Restaurants at December 31,* | **2019** | 2018 | 2017 |
|---|---|---|---|
| Franchised | **13,185** | 13,229 | 13,149 |
| Company-operated | **661** | 685 | 887 |
| Systemwide restaurants | **13,846** | 13,914 | 14,036 |

The results of operations of restaurant businesses purchased and sold in transactions with franchisees, were not material either individually or in the aggregate to the consolidated financial statements for periods prior to purchase and sale.

The Company is a wholly-owned subsidiary of McDonald's Corporation (McDonald's).  On January 1, 2005, McDonald's contributed assets, net of liabilities, of $5,548.8 million to the Company.  McDonald's has retained legal title to certain of the property and equipment assets, which are in turn used by the Company in accordance with extended intercompany agreements. McDonald's or its affiliates directly own the intellectual property rights in the U.S. and license or sublicense such rights to the Company.

**Consolidation**

The consolidated financial statements include the accounts of the Company and its subsidiaries.  Investments in affiliates owned 50% or less are accounted for by the equity method.

On an ongoing basis, the Company evaluates its business relationships such as those with franchisees, joint partners, suppliers, and advertising cooperatives to identify potential variable interest entities.  Generally, these businesses qualify for a scope exception under the consolidation guidance.  The Company has concluded that consolidation of any such entity is not appropriate for the periods presented.

**Estimates in financial statements**

The preparation of financial statements in conformity with accounting principles generally accepted in the U.S. requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes.  Actual results could differ from those estimates.

**Recently issued accounting standards**

*Lease Accounting*

In February 2016, the FASB issued ASU 2016-02, "Leases (Topic 842)," to increase transparency and comparability among organizations by recognizing lease assets and lease liabilities on the balance sheet and disclosing key information about leasing arrangements. Most prominent among the amendments is the recognition of assets and liabilities by lessees for those leases classified as operating leases under current U.S. GAAP. ASU 2016-02 is effective for fiscal years beginning after December 15, 2020, therefore we have elected to early adopt.

As discussed further in the "Franchise Arrangements" and "Leasing Arrangements" footnotes, the Company is engaged in a significant amount of leasing activity, both from a lessee and a lessor perspective. The Company has adopted the provisions of the new standard effective January 1, 2019, using the required modified retrospective approach.

EXHIBIT O(85)

AOE2051

The Company has elected the package of practical expedients, which allows the Company to retain the classification of existing leases; therefore, there will be minimal initial impact on the Consolidated statement of income. Moving forward, as the Company enters into new leases or as leases are modified, the expectation is that many of the Company's ground leases may be reclassified from operating classification to financing classification, which will change the timing and classification of a portion of lease expense between operating income and interest expense. It is not possible to quantify the impact at this time, due to the unknown timing of new leases and lease modifications, however the Company does not expect the impact to be material to any given year.

ASU 2016-02 will have a material impact on the Consolidated balance sheet due to the significance of the Company's operating lease portfolio. The Company recorded a Right of Use Asset and Lease Liability of $6.3 billion upon adoption. The Lease Liability reflected the present value of the Company's estimated future minimum lease payments over the lease term, which includes options that are reasonably assured of being exercised, discounted using a collateralized incremental borrowing rate. The impact of the new lease guidance was non-cash in nature, therefore, it did not affect the Company's cash flows. The Company has also made an accounting policy election to keep leases with an initial term of 12 months or less off the balance sheet. It will continue to recognize those lease payments in the Consolidated statement of income on a straight-line basis over the lease term.

**Revenue recognition**

The Company's revenues consist of sales by Company-operated restaurants and fees from restaurants operated by franchisees and affiliates. Revenues from conventional franchised restaurants include rent and royalties based on a percent of sales with minimum rent payments, and initial fees. Revenues from restaurants licensed to affiliates include a royalty based on a percent of sales, and generally include initial fees.

Sales by Company-operated restaurants are recognized on a cash basis at the time of the underlying sale and are presented net of sales tax and other sales-related taxes. Royalty revenues are based on a percent of sales and recognized at the time the underlying sales occur. Rental income includes both minimum rent payments, which are recognized straight-line over the franchise term, and variable rent payments based on a percent of sales, which are recognized at the time the underlying sales occur. The Company's accounting policy through December 31, 2017, was to recognize initial franchise fees when received, upon a new restaurant opening and at the start of a new franchise term. Beginning in January 2018, initial fees are recognized as the Company satisfies the performance obligation over the franchise term, which is generally 20 years.

**Accounts and notes receivable, net**

The amounts included in accounts and notes receivable, net primarily represent obligations from franchisees for outstanding sales-based royalties due to the Company as well as obligations from franchisees related to ongoing construction projects. These amounts are recorded at their realizable value and are net of an allowance for bad debts. Historically, the allowance for bad debts and associated write-offs of uncollectible accounts have been immaterial to the financial statements.

**Advertising costs**

Advertising costs included in operating expenses of Company-operated restaurants primarily consist of contributions to advertising cooperatives and were (in millions): 2019—$75.8; 2018—$78.9; 2017—$120.4. Production costs for radio and television advertising are expensed when the commercials are initially aired. These production costs as well as other marketing-related expenses included in Selling, general & administrative expenses were (in millions): 2019—$49.5; 2018—$60.3; 2017—$69.8. In addition, significant advertising costs are incurred by franchisees through contributions to advertising cooperatives in individual markets.

**Share-based compensation**

Share-based compensation includes the portion vesting of all share-based awards granted based on the grant date fair value.

The Company is charged for the share-based compensation expense by McDonald's related to their employees, which was (in millions): 2019—$27.8; 2018—$32.1; 2017—$28.6. Compensation expense related to share-based awards is generally amortized on a straight-line basis over the vesting period in Selling, general & administrative expenses. As of December 31, 2019, there was $24.6 million of total unrecognized compensation cost related to non-vested share-based compensation that is expected to be recognized over a weighted-average period of 2.0 years.

EXHIBIT O(85)

AOE2052

The fair value of each stock option granted is estimated on the date of grant using a closed-form pricing model.  The following table presents the weighted-average assumptions used in the option pricing model for the 2019, 2018, and 2017 stock option grants.  The expected life of the options represents the period of time the options are expected to be outstanding and is based on historical trends.  Expected stock price volatility is generally based on the historical volatility of the Company's stock for a period approximating the expected life.  The expected dividend yield is based on the Company's most recent annual dividend rate.  The risk-free interest rate is based on the U.S. Treasury yield curve in effect at the time of grant with a term equal to the expected life.

*Weighted-average assumptions*

|  | **2019** | 2018 | 2017 |
|---|---|---|---|
| Expected dividend yield | **2.7%** | 2.6% | 3.1% |
| Expected stock price volatility | **18.9%** | 18.7% | 18.4% |
| Risk-free interest rate | **2.5%** | 2.7% | 2.2% |
| Expected life of options (*in years*) | **5.8** | 5.8 | 5.9 |
| Fair value per option granted | **$25.60** | $23.80 | $16.10 |
| Number of options granted | **406,588** | 641,841 | 971,661 |

The fair value of each RSU granted is equal to the market price of McDonald's stock at date of grant less the present value of expected dividends over the vesting period. Approximately 155,000, 127,000, and 150,000 RSUs were granted in 2019, 2018, and 2017, respectively. The fair value of each RSU granted is equal to the market price of the Company's stock at date of grant, and prior to 2019 included a reduction for the present value of expected dividends over the vesting period.

**Property and equipment**

Property and equipment are stated at cost, with depreciation and amortization provided using the straight-line method over the following estimated useful lives: buildings–up to 40 years; leasehold improvements–the lesser of useful lives of assets or lease terms which generally include certain option periods; and equipment–3 to 12 years.  McDonald's has retained legal title to certain of the property and equipment assets, which are in turn used by the Company in accordance with extended intercompany agreements.

**Long-lived assets**

Long-lived assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. When reviewing the Company's restaurant assets for potential impairment, assets are initially grouped together at a Field Office level.  The Company manages its restaurants as a group or portfolio with significant common costs and promotional activities; as such, an individual restaurant's cash flows are not generally independent of the cash flows of others in a market.  If an indicator of impairment (e.g., negative operating cash flows for the most recent trailing 24-month period) exists for any Field Office grouped assets, an estimate of undiscounted future cash flows produced by each individual restaurant within the Field Office level is compared to its carrying value.  If an individual restaurant is determined to be impaired, the loss is measured by the excess of the carrying amount of the restaurant over its fair value as determined by an estimate of discounted future cash flows.

Losses on assets held for disposal are recognized when management and McDonald's Board of Directors, as required, have approved and committed to a plan to dispose of the assets, the assets are available for disposal, the disposal is probable of occurring within 12 months, and the net sales proceeds are expected to be less than its net book value, among other factors. Generally, such losses relate to restaurants that have closed and ceased operations as well as other assets that meet the criteria to be considered "available for sale".

**Goodwill**

Goodwill represents the excess of cost over the net tangible assets and identifiable intangible assets of acquired restaurant businesses.  The Company's goodwill primarily results from purchases of McDonald's restaurants from franchisees.

EXHIBIT O(85)

AOE2053

If a Company-operated restaurant is sold within 24 months of acquisition, the goodwill associated with the acquisition is written off in its entirety.  If a restaurant is sold beyond 24 months from the acquisition, the amount of goodwill written-off is based on the relative fair value of the business sold compared to the fair value of the Company.

The Company conducts goodwill impairment testing in the fourth quarter of each year or whenever an indicator of impairment exists.  If an indicator of impairment exists (e.g., estimated earnings multiple value of the Company is less than its carrying value), the goodwill impairment test compares the fair value of the Company, generally based on discounted future cash flows, with its carrying amount including goodwill.  If the carrying amount of the Company exceeds its fair value, an impairment loss is measured as the difference between the implied fair value of the Company's goodwill and the carrying amount of goodwill.  Historically, goodwill impairment has not significantly impacted the consolidated financial statements.

The following table presents the 2019 activity in goodwill:

| IN MILLIONS | |
| --- | --- |
| Balance at December 31, 2018 | $ 1,276.5 |
| Net Restaurant purchases (sales) | 0.8 |
| **Balance at December 31, 2019** | **$ 1,277.3** |

## Income taxes

The Company's earnings will be included in McDonald's consolidated U.S. federal income tax return.  For state income tax returns, depending on the laws of each state, the Company's earnings may be combined with the earnings of the McDonald's consolidated group or the Company may file its own state income tax return.  The Company records its income tax provision on a separate-return basis and settlements are made through intercompany accounts with McDonald's.  Deferred assets and liabilities for the future tax consequences attributable to differences between the financial statement carrying amounts of assets and liabilities and their respective tax bases are recorded in the Company's consolidated balance sheets.

## Income tax uncertainties

McDonald's and the Company are regularly audited by federal and state tax authorities, and tax assessments may arise several years after tax returns have been filed.  Accordingly, tax liabilities are recorded when, in management's judgment, a tax position does not meet the more likely than not threshold for recognition.  For tax positions that meet the more likely than not threshold, a tax liability may still be recorded depending on management's assessment of how the tax position will ultimately be settled.

The Company records interest and penalties on unrecognized tax benefits in the provision for income taxes.

## Fair value measurements

The Company measures certain non-financial assets and liabilities on a nonrecurring basis.  Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in the principal or most advantageous market in an orderly transaction between market participants on the measurement date.  Fair value disclosures are reflected in a three-level hierarchy, maximizing the use of observable inputs and minimizing the use of unobservable inputs.

The valuation hierarchy is based upon the transparency of inputs to the valuation of an asset or liability on the measurement date.  The three levels are defined as follows:

- Level 1 – inputs to the valuation methodology are quoted prices (unadjusted) for an identical asset or liability in an active market

- Level 2 – inputs to the valuation methodology include quoted prices for a similar asset or liability in an active market or model-derived valuations in which all significant inputs are observable for substantially the full term of the asset or liability

- Level 3 – inputs to the valuation methodology are unobservable and significant to the fair value measurement of the asset or liability

EXHIBIT O(85)

AOE2054

*Non-financial assets and liabilities measured at fair value on a nonrecurring basis*

Certain assets and liabilities are measured at fair value on a nonrecurring basis; that is, the assets and liabilities are not measured at fair value on an ongoing basis but are subject to fair value adjustments in certain circumstances (e.g., when there is evidence of impairment).  For the year ended December 31, 2019, no material fair value adjustments or fair value measurements were required for non-financial assets or liabilities.

## Comprehensive income

The FASB Topic 220 – Comprehensive Income does not apply to the Company since there are no items of other comprehensive income in any period presented.

## Property and equipment

Net property and equipment consisted of:

| IN MILLIONS | December 31, 2019 | December 31, 2018 |
|---|---|---|
| Land | $3,661.2 | $3,267.1 |
| Buildings and improvements on owned land | 9,770.4 | 8,249.6 |
| Buildings and improvements on leased land | 4,830.0 | 5,192.3 |
| Equipment, signs and seating | 1,024.2 | 1,112.7 |
| Other | 107.0 | 130.5 |
| | 19,392.8 | 17,952.2 |
| Accumulated depreciation and amortization | (6,783.4) | (6,596.8) |
| Net property and equipment | | |
| | $12,609.4 | $11,355.4 |

Depreciation and amortization expense for property and equipment was (in millions): 2019—$687.8; 2018—$ 562.8; 2017—$492.3. McDonald's has retained legal title to certain of the property and equipment assets, which are in turn used by the Company in accordance with extended intercompany agreements.  Such assets are included in the amounts above.

## Other operating (income) expense, net

| IN MILLIONS | 2019 | 2018 | 2017 |
|---|---|---|---|
| Gains on sales of restaurant businesses | $(28.6) | $(179.6) | $(185.0) |
| Equity in earnings of unconsolidated affiliates | (0.2) | (0.2) | (0.3) |
| Asset dispositions and other (income) expense | (17.1) | (45.0) | (24.4) |
| Other charges (income) expense | 5.8 | 85.2 | (2.0) |
| Total | $(40.1) | $(139.6) | $(211.7) |

*Gains on sales of restaurant businesses*
The Company's purchases and sales of businesses with its franchisees are aimed at achieving an optimal ownership mix in each Field Office.  Resulting gains or losses on sales of restaurant businesses are recorded in operating income because the transactions are a recurring part of our business.

*Equity in earnings of unconsolidated affiliates*
Unconsolidated affiliates and partnerships are businesses in which the Company actively participates but does not control.  The Company records equity in earnings from these entities representing McDonald's share of results.  These results are reported before income taxes.  These partnership restaurants are operated under conventional franchise arrangements.

EXHIBIT O(85)

AOE2055

*Asset dispositions and other (income) expense*
Asset dispositions and other (income) expense, net consists of gains or losses on excess property and other asset dispositions, provisions for restaurant closings and uncollectible receivables, asset write-offs due to restaurant reinvestment, litigation settlements, and other miscellaneous income and expenses.

*Other charges*
These charges include costs associated with strategic initiatives, such as restructuring activities.

## Contingencies

In the ordinary course of business, the Company is subject to proceedings, lawsuits and other claims primarily related to competitors, customers, employees, franchisees, government agencies, intellectual property, shareholders and suppliers. The Company is required to assess the likelihood of any adverse judgments or outcomes to these matters as well as potential ranges of probable losses. A determination of the amount of accrual required, if any, for these contingencies is made after careful analysis of each matter. The required accrual may change in the future due to new developments in each matter or changes in approach such as a change in settlement strategy in dealing with these matters. The Company does not believe that any such matter currently being reviewed will have a material adverse effect on its financial condition or results of operations.

## Franchise arrangements

Conventional franchise arrangements generally include a lease and a license and provide for payment of initial fees, as well as continuing rent and royalties to the Company based upon a percent of sales with minimum rent payments that parallel the Company's underlying leases and escalations (on properties that are leased). Under this arrangement, franchisees are granted the right to operate a restaurant using the McDonald's System and, in most cases, the use of a restaurant facility, generally for a period of 20 years. These franchisees pay related occupancy costs including property taxes, insurance and maintenance.

Revenues from franchised and affiliated restaurants consisted of:

| IN MILLIONS | 2019 | 2018 | 2017 |
|-------------|------|------|------|
| Rents | $3,815.6 | $3,547.8 | $3,337.6 |
| Royalties | 1,518.0 | 1,435.3 | 1,376.0 |
| Initial fees | 19.4 | 18.1 | 32.3 |
| Revenues from franchised restaurants | $5,353.0 | $5,001.2 | $4,745.9 |

Future gross minimum rent payments due to the Company under existing franchise arrangements are:

| IN MILLIONS | Owned sites | Leased sites | Total |
|-------------|-------------|--------------|-------|
| 2020 | $941.7 | $666.7 | $1,608.4 |
| 2021 | 908.7 | 634.2 | 1,542.9 |
| 2022 | 868.3 | 600.4 | 1468.7 |
| 2023 | 833.0 | 571.5 | 1404.5 |
| 2024 | 807.6 | 551.5 | 1,359.1 |
| Thereafter | 6,173.5 | 4,062.1 | 10,235.6 |
| Total minimum payments | $10,532.7 | $7,086.4 | $ 17,619.1 |

At December 31, 2019, net property and equipment under franchise arrangements totaled $10.8 billion (including land of $3.3 billion) after deducting accumulated depreciation and amortization of $5.5 billion.

## Leasing arrangements

The Company is the lessee in a significant real estate portfolio, primarily through ground leases (the Company leases the land and generally owns the building) and through improved leases (the Company leases land and buildings). The Company determines whether an arrangement is a lease at inception. Lease terms for most restaurants, where market conditions allow,

EXHIBIT O(85)

AOE2056

are generally for 20 years and, in many cases, provide for rent escalations and renewal options. Renewal options are typically solely at the Company's discretion. Escalation terms vary by market with examples including fixed-rent escalations, escalations based on an inflation index and fair-value adjustments. The timing of these escalations generally ranges from annually to every five years.

The following table provides detail of rent expense:

| *IN MILLIONS* | **2019** | 2018 | 2017 |
|---|---|---|---|
| Company-operated restaurants | **$42.9** | $29.4 | $37.4 |
| Franchised restaurants | **575.3** | 504.9 | 488.6 |
| Other | **31.5** | 30.2 | 31.9 |
| Total rent expense | **$649.7** | $564.5 | $557.9 |

Rent expense included percent rents in excess of minimum rents (in millions) as follows—Company-operated restaurants: 2019—$3.7; 2018—$3.4; 2017—$4.8.  Franchised restaurants: 2019—$106.6; 2018—$105.8; 2017—$102.5.

The amount of the Right of Use Asset and Lease Liability recorded at transition included known escalations and renewal option periods reasonably assured of being exercised. Typically, renewal options are considered reasonably assured of being exercised if the associated asset lives of the building or leasehold improvements exceed that of the initial lease term, and the sales performance of the restaurant remains strong. Therefore, the Right of Use Asset and Lease Liability include an assumption on renewal options that have not yet been exercised by the Company, and are not currently a future obligation.

The Company has elected not to separate non-lease components from lease components in our lessee portfolio. To the extent that occupancy costs, such as site maintenance, are included in the Asset and Liability, the impact is immaterial and is generally limited to Company-owned restaurant locations. For franchised locations, which represent the majority of the restaurant portfolio, the related occupancy costs including property taxes, insurance and site maintenance are generally required to be paid by the franchisees as part of the franchise arrangement.

In addition, the Company is the lessee under non-restaurant related leases such as office buildings, vehicles and office equipment. These leases are not a material subset of the Company's lease portfolio.

As the rate implicit in each lease is not readily determinable, the Company uses an incremental borrowing rate to calculate the lease liability that represents an estimate of the interest rate the Company would incur to borrow on a collateralized basis over the term of a lease within a particular currency environment. The weighted average discount rate used for operating leases was 4.5% as of December 31, 2019.

As of December 31, 2019, maturities of lease liabilities for our operating leases were as follows:

| In millions | Total |
|---|---|
| 2020 | **$465.7** |
| 2021 | **453.3** |
| 2022 | **442.9** |
| 2023 | **435.0** |
| 2024 | **423.7** |
| Thereafter | **7,791.3** |
| Total lease payments | **10,011.9** |
| Less: imputed interest | **(3,703.2)** |
| Present value of lease liability | **$6,308.7** |

The increase in the present value of the lease liability since adoption of ASC 842 is approximately $29.9 million. The lease liability will continue to be impacted by new leases, lease modifications, lease terminations, reevaluation of likely-term due to new facts and circumstances, and foreign currency.

As of December 31, 2019, the Weighted Average Lease Term remaining that is included in the maturities of lease liabilities was 21 years.

As of December 31, 2018, prior to the adoption of ASC 842, future minimum payments required under existing operating leases with initial terms of one year or more were:

EXHIBIT O(85)

AOE2057

| IN MILLIONS | Restaurant | Other | Total |
|---|---|---|---|
| 2019 | $ 426.9 | $ 32.3 | $ 459.2 |
| 2020 | 400.9 | 31.7 | 432.6 |
| 2021 | 367.8 | 28.9 | 396.7 |
| 2022 | 330.7 | 24.7 | 355.4 |
| 2023 | 297.4 | 19.5 | 316.9 |
| Thereafter | 2,372.0 | 139.9 | 2,511.9 |
| Total minimum payments | $ 4,195.7 | $ 277.0 | $ 4,472.7 |

## _Income taxes_

The Tax Cuts and Jobs Act ("Tax Act") was enacted in the U.S. on December 22, 2017. The Tax Act reduced the U.S. federal corporate income tax rate to 21% from 35% effective in 2018. In 2017, the Company recorded provisional amounts for certain enactment-date effects of the Tax Act by applying the guidance in Staff Accounting Bulletin 118 ("SAB 118") because the Company had not yet completed its enactment-date accounting for these effects. In 2018, the Company completed its accounting for all of the enactment-date income tax effects of the Tax Act.

_SAB 118 measurement period_
As of December 31, 2017, the Company remeasured certain U.S. deferred tax assets and liabilities based on the rates at which they were expected to reverse in the future (generally 21%), by recording a provisional amount of approximately $600 million. No adjustment to the provisional amount was made in 2018.

The provision for income taxes, classified by the timing and location of payment, was as follows:

| IN MILLIONS | 2019 | 2018 | 2017 |
|---|---|---|---|
| U.S. federal | $ 495.6 | $ 438.0 | $ 972.4 |
| U.S. state | 142.1 | 148.8 | 154.3 |
| Current tax provision | 637.7 | 586.8 | 1,126.7 |
| U.S. federal | 133.9 | 146.3 | (537.9) |
| U.S. state | 11.1 | 10.9 | 26.1 |
| Deferred tax provision | 145.0 | 157.2 | (511.8) |
| Provision for income taxes | $ 782.7 | $ 744.0 | $ 614.9 |

Net deferred tax liabilities consisted of:

| IN MILLIONS | December 31, 2019 | December 31, 2018 |
|---|---|---|
| Property and equipment | $ 1,139.0 | $ 1,040.3 |
| Intangibles and tax-deductible goodwill | 320.0 | 290.1 |
| Lease right-of-use asset | 1,409.3 | -- |
| Other | 59.8 | 37.5 |
| Total deferred tax liabilities | 2,928.1 | 1,367.9 |
| Employee benefit plans | (58.6) | (77.3) |
| Deferred Revenue | (67.3) | (71.3) |
| Lease liability | (1,421.8) | -- |
| Other | (70.6) | (72.0) |
| Total deferred tax assets before valuation allowance | (1,618.3) | (220.6) |
| Valuation allowance | -- | 1.0 |
| Net deferred tax liabilities | $ 1,309.8 | $ 1,148.3 |

-13-

EXHIBIT O(85)

AOE2058

The statutory U.S. federal income tax rate reconciles to the effective income tax rate as follows:

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Statutory U.S. federal income tax rate | 21.0% | 21.0% | 35.0% |
| State income taxes, net of related federal income tax benefit | 3.8 | 4.0 | 3.6 |
| U.S. net deferred tax liability remeasurement | -- | -- | (18.5) |
| Other, net | (0.1) | (1.5) | (1.0) |
| Effective income tax rate | 24.7% | 23.5% | 19.1% |

As of December 31, 2019 and 2018, the Company's gross unrecognized tax benefits totaled $107.8 million and $115.8 million, respectively. After considering the federal impact on state issues, about $85 million of the total as of December 31, 2019 would favorably affect the effective tax rate if resolved in the Company's favor.

The following table presents a reconciliation of the beginning and ending amount of unrecognized tax benefits:

| IN MILLIONS | | 2019 | | 2018 |
|---|---|---|---|---|
| Balance at January 1 | $ | 115.8 | $ | 110.2 |
| Decreases for positions taken in prior years | | (12.4) | | (4.9) |
| Increases for positions taken in prior years | | 7.3 | | 1.1 |
| Increases for positions related to the current year | | 10.6 | | 17.6 |
| Settlements with taxing authorities | | (6.5) | | (2.9) |
| Lapsing of statutes of limitations | | (7.0) | | (5.3) |
| Balance at December 31[1] | $ | 107.8 | $ | 115.8 |

(1) *Of these amounts, $24.3 million and $9.3 million are included in current liabilities with the remainder in other long-term liabilities on the Consolidated balance sheet for 2019 and 2018, respectively.*

It is reasonably possible that the total amount of unrecognized tax benefits could decrease up to $24.3 million within the next 12 months, of which $2.8 million could favorably affect the effective tax rate. This decrease would result from the completion of tax audits in multiple tax jurisdictions and the expiration of the statute of limitations.

The Company is generally no longer subject to U.S. federal, state, and local income tax examinations by tax authorities for years before 2009.

The Company had $21.7 million and $19.3 million accrued for interest at December 31, 2019 and 2018 respectively, and no accrual for penalties in either year. The Company recognized interest and penalties (income)/expense related to tax matters of $2.4 million, $1.6 million, and $3.2 million of expense in 2019, 2018 and 2017 respectively, which are included in the provision for income taxes.

## *Employee benefit plans*

Effective January 1, 2018 the Company's Profit Sharing and Savings Plan was renamed the McDonald's 401(k) Plan. The 401(k) Plan is maintained for U.S.-based employees and includes a 401(k) feature, as well as an employer match. The 401(k) feature allows participants to make pretax contributions that are matched each pay period (with an annual true-up) from shares released under the leveraged Employee Stock Ownership Plan ("ESOP") and employer cash contributions.

All current account balances, future contributions and related earnings can be invested in eight investment alternatives as well as McDonald's stock in accordance with each participant's investment elections. Future participant contributions are limited to 20% investment in McDonald's common stock. Participants may choose to make separate investment choices for current account balances and for future contributions.

The Company also maintains certain nonqualified supplemental benefit plans that allow participants to (i) make tax-deferred contributions and (ii) receive Company-provided allocations that cannot be made under the 401(k) Plan because of IRS

EXHIBIT O(85)

AOE2059

limitations.  The investment alternatives and returns are based on certain market-rate investment alternatives under the 401(k) Plan.  Total liabilities were $190.4 million at December 31, 2019 and $200.5 million at December 31, 2018 and were primarily included in other long-term liabilities on the consolidated balance sheet.

McDonald's on behalf of McDonald's USA LLC has entered into derivative contracts to hedge market-driven changes in certain of the liabilities.  All changes in liabilities for these nonqualified plans and in the fair value of the derivatives are recorded in the Selling, general & administrative expenses.

Total U.S. costs for the 401(k) Plan, including nonqualified benefits and related hedging activities, were (in millions): 2019—$18.7; 2018—$10.7; 2017—$10.9.

### *Related party transactions*

In exchange for intellectual property license rights, the Company pays McDonald's a royalty equal to two percent of Company-operated and franchised restaurant sales. Royalty expense was (in millions): 2019— $811.6, 2018— $770.5; 2017—$752.7.

In addition, the Company paid dividends to McDonald's of (in millions): 2019—$1,280.6; 2018—$1,178.8, 2017—$1,524.2.

In 2019 and 2018, the Company had the following long-term payable arrangements with McDonald's, each of which accrue interest at Libor + 1% and mature on December 31, 2024.

| Lender | Line of credit December 31 | | Outstanding amount December 31 | |
| --- | --- | --- | --- | --- |
| *IN MILLIONS* | **2019** | 2018 | **2019** | 2018 |
| McDonald's | **$1,500.0** | $1,500.0 | **$1,500.0** | $1,500.0 |
| McDonald's | **900.0** | 900.0 | **900.0** | 900.0 |
| McDonald's | **1,000.0** | 1,000.0 | **-** | - |
| Total | **$3,400.0** | $3,400.0 | **$2,400.00** | $2,400.0 |

The Company incurred net interest related to the payables due to McDonald's as follows (in millions): 2019—$97.5; 2018—$76.7; 2017—$56.5. As of December 31, 2019 and 2018, the Company had accrued interest due to McDonald's, classified as a current liability of $55.7 million and $45.7 million respectively.

Additionally, the Company had a $675.0 million revolver available from McDonald's due in 2024, which may exceed $675.0 million from time to time but not on the maturity date, which accrues interest at LIBOR + 1% of which no amounts were outstanding at December 31, 2019 and 2018.

The Company did not have an intercompany balance as of December 31, 2019. The Company had a net intercompany payable balance of $323.8 million in the prior year ending December 31, 2018.

**Subsequent events**

The Company evaluated subsequent events through March 13, 2020, the date the financial statements were available to be issued.  There were no subsequent events that required recognition or disclosure.

EXHIBIT O(85)

AOE2060

# EXHIBIT B

## FRANCHISE AGREEMENT (TRADITIONAL)

[CITY, STATE]
[Address]
L/C: _____
File #: _____

## FRANCHISE AGREEMENT

**THIS FRANCHISE AGREEMENT** ("Franchise") made this _____ day of _____, for the operation of a McDonald's restaurant located at _____ (the "Restaurant") by and between:

### McDONALD'S USA, LLC,

a Delaware limited liability company,

("McDonald's")

and

_____

_____

(collectively "Franchisee")

for the purpose of granting the Franchisee the rights necessary to operate the Restaurant.

In consideration of the mutual rights and obligations contained herein McDonald's and Franchisee agree as follows:

1. ***Nature and Scope of Franchise***.

(a)  McDonald's operates a restaurant system ("McDonald's System"). The McDonald's System is a comprehensive system for the ongoing development, operation, and maintenance of McDonald's restaurant locations which have been selected and developed for the retailing of a limited menu of uniform and quality food products, emphasizing prompt and courteous service in a clean, wholesome atmosphere which is intended to be attractive to children and families and includes proprietary rights in certain valuable trade names, service marks, and trademarks, including the trade names "McDonald's" and "McDonald's Hamburgers," designs and color schemes for restaurant buildings, signs, equipment layouts, formulas and specifications for certain food products, methods of inventory and operation control, bookkeeping and accounting, and manuals covering business practices and policies. The McDonald's System is operated and is advertised widely within the United States of America and in certain foreign countries.

EXHIBIT O(85)

AOE2061

(b)      McDonald's holds the right to authorize the adoption and use of the McDonald's System at the Restaurant.  The rights granted to the Franchisee to operate the Restaurant are set forth in this Franchise, including the Operator's Lease ("Lease") which is attached hereto as Exhibit A, incorporated in this Franchise.

(c)      The foundation of the McDonald's System and the essence of this Franchise is the adherence by Franchisee to standards and policies of McDonald's providing for the uniform operation of all McDonald's restaurants within the McDonald's System including, but not limited to, serving only designated food and beverage products; the use of only prescribed equipment and building layout and designs; strict adherence to designated food and beverage specifications and to McDonald's prescribed standards of Quality, Service, and Cleanliness in the Restaurant operation.  Compliance by Franchisee with the foregoing standards and policies in conjunction with the McDonald's trademarks and service marks provides the basis for the valuable goodwill and wide family acceptance of the McDonald's System.  Moreover, the establishment and maintenance of a close personal working relationship with McDonald's in the conduct of Franchisee's McDonald's restaurant business, Franchisee's accountability for performance of the obligations contained in this Franchise, and Franchisee's adherence to the tenets of the McDonald's System constitute the essence of this Franchise.

(d)      The provisions of this Franchise shall be interpreted to give effect to the intent of the parties stated in this paragraph 1 so that the Restaurant shall be operated in conformity to the McDonald's System through strict adherence to McDonald's standards and policies as they exist now and as they may be from time to time modified.

(e)      Franchisee acknowledges Franchisee's understanding of McDonald's basic business policy that McDonald's will grant franchises only to those individuals who live in the locality of their McDonald's restaurant, actually own the entire equity interest in the business of the Restaurant and its profits, and who will work full time at their McDonald's restaurant business.  Franchisee represents, warrants, and agrees that Franchisee actually owns the complete equity interest in this Franchise and the profits from the operation of the Restaurant, and that Franchisee shall maintain such interest during the term of this Franchise except only as otherwise permitted pursuant to the terms and conditions of this Franchise.  Franchisee agrees to furnish McDonald's with such evidence as McDonald's may request, from time to time, for the purpose of assuring McDonald's that Franchisee's interest remains as represented herein.

(f)      Franchisee agrees to pay to McDonald's all required payments under this Franchise, including, without limitation, the payments set forth in paragraphs 8 and 9 herein and paragraph 3.01 of the Lease. All payments hereby required constitute a single financial arrangement between Franchisee and McDonald's which, taken as a whole and without regard to any designation or descriptions, reflect the value of the authorization being made available to the Franchisee by McDonald's in this Franchise and the services rendered by McDonald's during the term hereof.

2.      ***Franchise Grant and Term***.

(a)      McDonald's grants to Franchisee for the following stated term the right, license, and privilege:

EXHIBIT O(85)

AOE2062

(i)        to adopt and use the McDonald's System at the Restaurant;

(ii)       to advertise to the public that Franchisee is a franchisee of McDonald's;

(iii)     to adopt and use, but only in connection with the sale of those food and beverage products which have been designated by McDonald's at the Restaurant, the trade names, trademarks, and service marks which McDonald's shall designate, from time to time, to be part of the McDonald's System; and

(iv)      to occupy the Restaurant as provided herein.

The rights granted under this Franchise are limited to the Restaurant's location only.

(b)       The term of this Franchise shall begin on _____ and end on _____, unless terminated prior thereto pursuant to the provisions hereof.

3.      ***General Services of McDonald's***.  McDonald's shall advise and consult with Franchisee periodically in connection with the operation of the Restaurant and also, upon Franchisee's request, at other reasonable times.  McDonald's shall communicate to Franchisee know-how, new developments, techniques, and improvements in areas of restaurant management, food preparation, and service which are pertinent to the operation of a restaurant using the McDonald's System.  The communications shall be accomplished by visits by operations consultants, printed and filmed reports, seminars, and newsletter mailings.  McDonald's shall also make available to Franchisee all additional services, facilities, rights, and privileges relating to the operation of the Restaurant which McDonald's makes generally available, from time to time, to all its franchisees operating McDonald's restaurants.

4.      ***Manuals***.  McDonald's shall provide Franchisee with the business manuals prepared for use by franchisees of McDonald's restaurants similar to the Restaurant.  The business manuals contain detailed information including:  (a) required operations procedures; (b) methods of inventory control; (c) bookkeeping and accounting procedures; (d) business practices and policies; and (e) other management and advertising policies.  Franchisee agrees to promptly adopt and use exclusively the formulas, methods, and policies contained in the business manuals, now and as they may be modified from time to time.  Franchisee acknowledges that McDonald's or its affiliates own all proprietary rights in and to the McDonald's System and that the information revealed in the business manuals, in their entirety, constitute confidential trade secrets.  Without the prior written consent of McDonald's, Franchisee shall not disclose the contents of the business manuals to any person, except employees of Franchisee for purposes related solely to the operation of the Restaurant, nor shall Franchisee reprint or reproduce the manuals in whole or in part for any purpose except in connection with instruction of employees in the operation of the Restaurant.  Such manuals, as modified from time to time, and the policies contained therein, are incorporated in this Franchise by reference.

5.      ***Advertising***.  McDonald's employs both public relations and advertising specialists who formulate and carry out national and local advertising programs for the McDonald's System.

Franchisee shall use only advertising and promotional materials and programs provided by McDonald's or approved in advance, in writing, by McDonald's.  Neither the approval by McDonald's of

3

Franchisee's advertising and promotional material nor the providing of such material by McDonald's to Franchisee shall, directly or indirectly, require McDonald's to pay for such advertising or promotion.

Franchisee shall expend during each calendar year for advertising and promotion of the Restaurant to the general public an amount which is not less than four percent (4%) of Gross Sales (as that term is defined in paragraph 7) for such year.  Expenditures by Franchisee to national and regional cooperative advertising and promotion of the McDonald's System, or to a group of McDonald's restaurants which includes the Restaurant, shall be a credit against the required minimum expenditures for advertising and promotion to the general public.

6.      *Training*.  McDonald's shall make available to Franchisee the services of Hamburger University, the international training center for the McDonald's System.  Franchisee acknowledges the importance of quality of business operation among all restaurants in the McDonald's System and agrees to enroll Franchisee and Franchisee's managers, present and future, at Hamburger University or at such other training center as may be designated by McDonald's from time to time.  McDonald's shall bear the cost of maintaining Hamburger University and any other training centers, including the overhead costs of training, staff salaries, materials, and all technical training tools, and agrees to provide to Franchisee both basic and advanced instruction for the operation of a McDonald's System restaurant.  Franchisee shall pay all traveling, living, compensation, or other expenses incurred by Franchisee and Franchisee's employees in connection with attendance at Hamburger University or such other training centers.

7.      *Gross Sales*.  For the purposes of this Franchise, the term "Gross Sales" shall mean all revenues from sales of the Franchisee based upon all business conducted upon or from the Restaurant, whether such sales be evidenced by check, cash, credit, charge account, exchange, or otherwise, and shall include, but not be limited to, the amounts received from the sale of goods, wares, and merchandise, including sales of food, beverages, and tangible property of every kind and nature, promotional or otherwise, and for services performed from or at the Restaurant, together with the amount of all orders taken or received at the Restaurant, whether such orders be filled from the Restaurant or elsewhere.  Gross Sales shall not include sales of merchandise for which cash has been refunded, provided that such sales shall have previously been included in Gross Sales.  There shall be deducted from Gross Sales the price of merchandise returned by customers for exchange, provided that such returned merchandise shall have been previously included in Gross Sales, and provided that the sales price of merchandise delivered to the customer in exchange shall be included in Gross Sales.  Gross Sales shall not include the amount of any sales tax imposed by any federal, state, municipal, or other governmental authority directly on sales and collected from customers, provided that the amount thereof is added to the selling price or absorbed therein and actually paid by the Franchisee to such governmental authority.  Each charge or sale upon credit shall be treated as a sale for the full price in the month during which such charge or sale shall be made, irrespective of the time when the Franchisee shall receive payment (whether full or partial) therefor.

8.      (a)      *Service Fee*.  Franchisee shall pay a monthly service fee on or before the tenth (10th) day of the following month in an amount equal to four percent (4.0%) of the Gross Sales of the Restaurant for the preceding month immediately ended.

EXHIBIT O(85)

AOE2064

(b)     **Method of Payment**.  Franchisee shall at all times participate in the McDonald's automatic debit/credit transfer program as specified by McDonald's from time to time for the payment of all amounts due McDonald's pursuant to this Franchise.  Franchisee shall execute and deliver to McDonald's such documents and instruments as may be necessary to establish and maintain said automatic debit/credit transfer program.

(c)     **Interest on Delinquencies**.  In the event that the Franchisee is past due on the payment of any amount due McDonald's under this Franchise, including accrued interest, the Franchisee shall be required, to the extent permitted by law, to pay interest on the past due amount to McDonald's for the period beginning with the original due date for payment to the date of actual payment at an annual rate equal to the highest rate allowed by law or, if there is no maximum rate permitted by law, then fifteen percent (15%).  Such interest will be calculated on the basis of monthly compounding and the actual number of days elapsed divided by 365.

9.     **Initial Fee**.  Franchisee acknowledges that:  (a) the initial grant of this Franchise constitutes the sole consideration for the payment of an Initial Fee of Forty-Five Thousand Dollars ($45,000.00) paid by Franchisee to McDonald's; and (b) the fee has been earned by McDonald's (except where the construction of the Restaurant has not been completed within one (1) year from the date of the execution and delivery of this Franchise).  If the Restaurant has not been constructed or is not ready for occupancy at the time of the execution of this Franchise, McDonald's shall use its best efforts to expedite the construction and lease of the Restaurant to Franchisee. However, McDonald's shall not be liable to Franchisee in any manner for any delays in or lack of completion of such construction for any reason.  McDonald's shall be under no obligation to enforce performance or to seek other remedies for non-performance of any lease, clause, or contract necessary for the construction of the Restaurant and reserves the right, in case construction of the Restaurant should be abandoned, the lease assigned, or other interest in the premises be relinquished, to terminate this Franchise upon reimbursement to Franchisee of the Initial Fee.  At such time as the Restaurant is completed and ready for occupancy, the Initial Fee shall be deemed to be earned.  If the Restaurant is not ready for occupancy within one (1) year from the date of this Franchise, Franchisee shall have the right to terminate this Franchise and obtain an immediate refund of the Initial Fee upon written request to McDonald's.

10.     **Reports**.  On or before 11:00 a.m. Central Standard Time on the first business day of each month, Franchisee shall render, in a manner specified by McDonald's, a statement, in such form as McDonald's shall reasonably require from time to time, of all receipts from the operation of the Restaurant for the preceding month immediately ended.  On or before the twenty-fifth (25th) day of each month Franchisee shall submit to McDonald's an operating statement and a statistical report for the previous month in form satisfactory to McDonald's. Franchisee shall keep and preserve full and complete records of Gross Sales for at least three (3) years in a manner and form satisfactory to McDonald's and shall also deliver such additional financial and operating reports and other information as McDonald's may reasonably request on the forms and in the manner prescribed by McDonald's. Franchisee further agrees to submit within ninety (90) days following the close of each fiscal year of the Restaurant's operation, a profit and loss statement covering operations during such fiscal year and a balance sheet taken as of the close of such fiscal year, all prepared in accordance with generally accepted accounting principles.  The profit and

EXHIBIT O(85)

AOE2065

loss statement and the balance sheet shall, if McDonald's shall request certification, be certified by a certified public accountant.  Franchisee shall at Franchisee's expense cause Franchisee's public accountant and certified public accountant, if any, to consult with McDonald's concerning such statement and balance sheet.  The original of each such report required by this paragraph 10 shall be mailed to McDonald's at the address indicated in paragraph 22 herein.

McDonald's shall have the right to inspect and/or audit Franchisee's accounts, books, records, and tax returns at all reasonable times to ensure that Franchisee is complying with the terms of this Franchise.  If such inspection discloses that Gross Sales actually exceeded the amount reported by Franchisee as Gross Sales by an amount equal to two percent (2%) or more of Gross Sales originally reported to McDonald's, Franchisee shall bear the cost of such inspection and audit.

11.     ***Restrictions***.  Franchisee agrees and covenants as follows:

(a)     During the term of this Franchise, Franchisee shall not, without the prior written consent of McDonald's, directly or indirectly, engage in, acquire any financial or beneficial interest (including interests in corporations, partnerships, trusts, unincorporated associations, or joint ventures) in, or become a landlord for any restaurant business, which is similar to the Restaurant.

(b)     Franchisee shall not, for a period of eighteen (18) months after termination of this Franchise for any reason or the sale of the Restaurant, directly or indirectly, engage in or acquire any financial or beneficial interest (including any interest in corporations, partnerships, trusts, unincorporated associations, or joint ventures) in, or become a landlord of any restaurant business which is similar to the Restaurant within a ten-mile radius of the Restaurant.

(c)     Franchisee shall not appropriate, use, or duplicate the McDonald's System, or any portion thereof, for use at any other self-service, carry-out, or other similar restaurant business.

(d)     Franchisee shall not disclose or reveal any portion of the McDonald's System to a non-franchisee other than to Franchisee's Restaurant employees as an incident of their training.

(e)     Franchisee shall acquire no right to use, or to license the use of, any name, mark, or other intellectual property right granted or to be granted herein, except in connection with the operation of the Restaurant.

The restrictions contained in paragraphs 11(a) and 11(b) herein shall not apply to ownership of less than two percent (2%) of the shares of a company whose shares are listed and traded on a national or regional securities exchange.

12.     ***Compliance With Entire System***.  Franchisee acknowledges that every component of the McDonald's System is important to McDonald's and to the operation of the Restaurant as a McDonald's restaurant, including a designated menu of food and beverage products; uniformity of food specifications, preparation methods, quality, and appearance; and uniformity of facilities and service.

McDonald's shall have the right to inspect the Restaurant at all reasonable times to ensure that Franchisee's operation thereof is in compliance with the standards and policies of the McDonald's System.

EXHIBIT O(85)

AOE2066

Franchisee shall comply with the entire McDonald's System, including, but not limited to, the following:

(a)     Operate the Restaurant in a clean, wholesome manner in compliance with prescribed standards of Quality, Service, and Cleanliness; comply with all business policies, practices, and procedures imposed by McDonald's; serve at the Restaurant only those food and beverage products now or hereafter designated by McDonald's; and maintain the building, fixtures, equipment, signage, seating and decor, and parking area in a good, clean, wholesome condition and repair, and well lighted and in compliance with designated standards as may be prescribed from time to time by McDonald's;

(b)     Purchase kitchen fixtures, lighting, seating, signs, and other equipment in accordance with the equipment specifications and layout initially designated by McDonald's and, promptly after notice from McDonald's that the Restaurant premises are ready for occupancy, cause the installation thereof;

(c)     Keep the Restaurant constructed and equipped in accordance with the building blueprints and equipment layout plans that are standard in the McDonald's System or as such blueprints and plans may be reasonably changed from time to time by McDonald's;

(d)     Franchisee shall not, without the prior written consent of McDonald's:  (i) make any building design conversion or (ii) make any alterations, conversions, or additions to the building, equipment, or parking area;

(e)     Make repairs or replacements required:  (i) because of damage or wear and tear or (ii) in order to maintain the Restaurant building and parking area in good condition and in conformity to blueprints and plans;

(f)     Where parking is provided, maintain the parking area for the exclusive use of Restaurant customers;

(g)     Operate the Restaurant seven (7) days per week throughout the year and at least during the hours from 7:00 a.m. to 11:00 p.m., or such other hours as may from time to time be prescribed by McDonald's (except when the Restaurant is untenantable as a result of fire or other casualty), maintain sufficient supplies of food and paper products, and employ adequate personnel so as to operate the Restaurant at its maximum capacity and efficiency;

(h)     Cause all employees of Franchisee, while working in the Restaurant, to:  (i) wear uniforms of such color, design, and other specifications as McDonald's may designate from time to time; (ii) present a neat and clean appearance; and (iii) render competent and courteous service to Restaurant customers;

(i)     In the dispensing and sale of food products:  (i) use only containers, cartons, bags, napkins, other paper goods, and packaging bearing the approved trademarks and which meet the McDonald's System specifications and quality standards which McDonald's may designate from time to time; (ii) use only those flavorings, garnishments, and food and beverage ingredients which meet the McDonald's System specifications and quality standards which McDonald's may designate from time to time; and (iii) employ only those methods of food handling and preparation which McDonald's may designate from time to time;

7

EXHIBIT O(85)

AOE2067

(j)      To make prompt payment in accordance with the terms of invoices rendered to Franchisee on Franchisee's purchase of fixtures, signs, equipment, and food and paper supplies; and

(k)      At Franchisee's own expense, comply with all federal, state, and local laws, ordinances, and regulations affecting the operation of the Restaurant.

13.      **Best Efforts**.  Franchisee shall diligently and fully exploit the rights granted in this Franchise by personally devoting full time and best efforts and, in case more than one individual has executed this Franchise as the Franchisee, then _____ shall personally devote full time and best efforts to the operation of the Restaurant.  Franchisee shall keep free from conflicting enterprises or any other activities which would be detrimental to or interfere with the business of the Restaurant.

14.      ***INTENTIONALLY DELETED***.

15.      **Assignment**.  Without the prior written consent of McDonald's, Franchisee's interest in this Franchise shall not be assigned or otherwise transferred in whole or in part (whether voluntarily or by operation of law) directly, indirectly, or contingently, and then only in accordance with the terms of this paragraph 15.

(a)      Death or Permanent Incapacity of Franchisee.  Upon the death or permanent incapacity of Franchisee, the interest of Franchisee in this Franchise may be assigned either pursuant to the terms of paragraph 15(d) herein or to one or more of the following persons:  Franchisee's spouse, heirs, or nearest relatives by blood or marriage, subject to the following conditions:  (i) if, in the sole discretion of McDonald's, such person shall be capable of conducting the Restaurant business in accordance with the terms and conditions of this Franchise and (ii) if such person shall also execute an agreement by which the person personally assumes full and unconditional liability for and agrees to perform all the terms and conditions of this Franchise to the same extent as the original Franchisee.  If, in McDonald's sole discretion, such person cannot devote full time and best efforts to the operation of the Restaurant or lacks the capacity to operate the Restaurant in accordance with this Franchise, McDonald's shall have an option to operate and/or manage the Restaurant for the account of Franchisee or of Franchisee's estate until the deceased or incapacitated Franchisee's interest is transferred to another party acceptable to McDonald's in accordance with the terms and conditions of this Franchise.  However, in no event shall such McDonald's operation and management of the Restaurant continue for a period in excess of twelve (12) full calendar months without the consent of Franchisee or Franchisee's estate.  In the event that McDonald's so operates and/or manages the Restaurant, McDonald's shall make a complete account to and return the net income from such operation to the Franchisee or to Franchisee's estate, less a reasonable management fee and expenses.  If the disposition of the Restaurant to a party acceptable to McDonald's has not taken place within twelve (12) months from the date that McDonald's has commenced the operation or management of the Restaurant on behalf of the deceased or incapacitated Franchisee, then, in that event, McDonald's shall have the option to purchase the Restaurant at fair market value for cash or its common stock at its option.

(b)      Assignment to Franchisee's Corporation.  Upon Franchisee's compliance with such requirements as may from time to time be prescribed by McDonald's, including a Stockholders Agreement in the form prescribed by McDonald's, McDonald's shall consent to an assignment to a corporation whose shares are

EXHIBIT O(85)

AOE2068

wholly owned and controlled by Franchisee.  The corporate name of the corporation shall not include any of the names or trademarks granted by this Franchise.  Any subsequent assignment or transfer, either voluntarily or by operation of law, of all or any part of said shares shall be made in compliance with the terms and conditions set forth in paragraphs 15(a) and 15(d) herein.

(c)     First Option to Purchase.  Franchisee or Franchisee's representative shall, at least twenty (20) days prior to the proposed effective date, give McDonald's written notice of intent to sell or otherwise transfer this Franchise pursuant to paragraph 15(d).  The notice shall set forth the name and address of the proposed purchaser and all the terms and conditions of any offer.  McDonald's shall have the first option to purchase the Restaurant by giving written notice to Franchisee of its intention to purchase on the same terms as the offer within ten (10) days following McDonald's receipt of such notice.  However, if McDonald's fails to exercise its option and the Restaurant is not subsequently sold to the proposed purchaser for any reason, McDonald's shall continue to have, upon the same conditions, a first option to purchase the Restaurant upon the terms and conditions of any subsequent offer.

(d)     Other Assignment.  In addition to any assignments or contingent assignments contemplated by the terms of paragraphs 15(a) and 15(b), Franchisee shall not sell, transfer, or assign this Franchise to any person or persons without McDonald's prior written consent.  Such consent shall not be arbitrarily withheld.

In determining whether to grant or to withhold such consent, McDonald's shall consider of each prospective transferee, by way of illustration, the following:  (i) work experience and aptitude, (ii) financial background, (iii) character, (iv) ability to personally devote full time and best efforts to managing the Restaurant, (v) residence in the locality of the Restaurant, (vi) equity interest in the Restaurant, (vii) conflicting interests, and (viii) such other criteria and conditions as McDonald's shall then apply in the case of an application for a new franchise to operate a McDonald's restaurant.  McDonald's consent shall also be conditioned each upon such transferee's execution of an agreement by which transferee personally assumes full and unconditional liability for and agrees to perform from the date of such transfer all obligations, covenants, and agreements contained in this Franchise to the same extent as if transferee had been an original party to this Franchise.  Franchisee and each transferor shall continue to remain personally liable for all affirmative obligations, covenants, and agreements contained herein for the full term of this Franchise or for such shorter period as McDonald's may, in its sole discretion, determine.  Upon each assignment or other transfer of this Franchise to any person or persons under the terms and conditions of this paragraph 15(d), the percentage service fee charge owing to McDonald's after the date of such assignment or transfer shall be automatically adjusted to the then prevailing percentage service fee charge required under new Franchises issued by McDonald's for similar McDonald's restaurants at the time of such assignment or transfer.

16.     ***Franchisee Not an Agent of McDonald's***.  Franchisee shall have no authority, express or implied, to act as agent of McDonald's or any of its affiliates for any purpose.  Franchisee is, and shall remain, an independent contractor responsible for all obligations and liabilities of, and for all loss or damage to, the Restaurant and its business, including any personal property, equipment, fixtures, or real property connected therewith, and for all

EXHIBIT O(85)

AOE2069

claims or demands based on damage or destruction of property or based on injury, illness, or death of any person or persons, directly or indirectly, resulting from the operation of the Restaurant.  Further, Franchisee and McDonald's are not and do not intend to be partners, associates, or joint employers in any way and McDonald's shall not be construed to be jointly liable for any acts or omissions of Franchisee under any circumstances.

17. **Insurance**.  Franchisee shall, upon taking possession of the Restaurant, acquire and maintain in effect such insurance with such coverages as may be required by the terms of any lease of the Restaurant premises to McDonald's, and in any event, Franchisee shall acquire and maintain in effect not less than the following coverages in the following minimum amounts:

(a) Worker's Compensation insurance prescribed by law in the state in which the Restaurant is located and Employer's Liability Insurance with $100,000/$500,000/$100,000 minimum limit.  If the state in which the Restaurant is located allows the option of not carrying Worker's Compensation Insurance, and Franchisee chooses to exercise that option, Franchisee shall nonetheless carry and maintain other insurance with coverage and limits as approved by McDonald's.

(b) Commercial general liability insurance in a form approved by McDonald's with a limit of $5,000,000 per occurrence/$5,000,000 aggregate.

(c) All such insurance as may be required under the Lease.

All insurance policies required to be carried hereunder shall name McDonald's and any party designated by McDonald's as additional insureds, as their interests may appear in this Franchise.  All policies shall be effective on or prior to the date Franchisee is given possession of the Restaurant premises for the purpose of installing equipment or opening the Restaurant, whichever occurs first, and evidence of payment of premiums and duplicate copies of policies of the insurance required herein shall be delivered to McDonald's at least thirty (30) days prior to the date that Franchisee opens for business and/or thirty (30) days prior to the expiration date of an existing policy of insurance.  All policies of insurance shall include a provision prohibiting cancellations or material changes to the policy thereof until thirty (30) days prior written notice has been given to McDonald's.

In the event Franchisee shall fail to obtain the insurance required herein, McDonald's may, but is not obligated to, purchase said insurance, adding the premiums paid to Franchisee's monthly rent.  (Franchisee may authorize McDonald's to purchase and to administer the required minimum insurance on Franchisee's behalf.  However, McDonald's, by placement of the required minimum insurance, assumes no responsibility for premium expense nor guarantees payment for any losses sustained by Franchisee.)  McDonald's may relieve itself of all obligations with respect to the purchase and administration of such required insurance coverage by giving ten (10) days written notice to Franchisee.

All insurance shall be placed with a reputable insurance company licensed to do business in the state in which the Restaurant is located and having a Financial Size Category equal to or greater than IX and Policyholders Rating of "A+" or "A", as assigned by Alfred M. Best and Company, Inc., unless otherwise approved by McDonald's.

EXHIBIT O(85)

AOE2070

18.     ***Material Breach***.   The parties agree that the happening of any of the following events shall constitute a material breach of this Franchise and violate the essence of Franchisee's obligations and, without prejudice to any of its other rights or remedies at law or in equity, McDonald's, at its election, may terminate this Franchise upon the happening of any of the following events:

(a)     Franchisee shall fail to maintain and operate the Restaurant in a good, clean, wholesome manner and in compliance with the standards prescribed by the McDonald's System;

(b)     Franchisee shall be adjudicated a bankrupt, become insolvent, or a receiver, whether permanent or temporary, for all or substantially all of Franchisee's property, shall be appointed by any court, or Franchisee shall make a general assignment for the benefit of creditors, or a voluntary or involuntary petition under any bankruptcy law shall be filed with respect to Franchisee and shall not be dismissed within thirty (30) days thereafter;

(c)     Any payment owing to McDonald's is not paid within thirty (30) days after the date such payment is due;

(d)     Any judgment or judgments aggregating in excess of $5,000.00 against Franchisee or any lien in excess of $5,000.00 against Franchisee's property shall remain unsatisfied or unbonded of record in excess of thirty (30) days;

(e)     Franchisee shall cause, suffer, or permit (voluntarily or involuntarily) Franchisee's right of possession as lessee or sublessee of the premises on which the Restaurant is located to be terminated prematurely for any cause whatever;

(f)     Franchisee shall acquire any interest in a business in violation of paragraph 11(a);

(g)     Franchisee shall duplicate the McDonald's System in violation of paragraph 11(c);

(h)     Franchisee shall make or cause a disclosure of any portion of the McDonald's System in violation of paragraph 11(d) or shall make or cause a disclosure of part of the McDonald's System business manuals;

(i)     Franchisee shall violate paragraph 11(e) by use of any name, trademark, service mark, or other intellectual property right exceeding the restrictions of said paragraph 11;

(j)     Franchisee shall knowingly sell food or beverage products other than those designated by McDonald's or which fail to conform to McDonald's System specifications for those products, or which are not prepared in accordance with the methods prescribed by McDonald's, or fail to sell products designated by McDonald's;

(k)     Any assignment or other transfer of any interest of the Franchisee in this Franchise shall occur in violation of paragraph 15(d) herein;

(l)     Franchisee shall deny McDonald's the right to inspect the Restaurant at reasonable times;

(m)     Franchisee shall fail to make or make repeated delays in the prompt payment of undisputed invoices from suppliers or in the remittance of payments as required by this Franchise;

(n)     Franchisee makes any misrepresentations to McDonald's relating to the acquisition and/or ownership of this Franchise;

EXHIBIT O(85)

AOE2071

(o)    Franchisee engages in public conduct which reflects materially and unfavorably upon the operation of the Restaurant, the reputation of the McDonald's System, or the goodwill associated with the McDonald's trademarks; provided that engaging in legitimate political activity (including testifying, lobbying, or otherwise attempting to influence legislation) shall not be grounds for termination;

(p)    Franchisee is convicted of, pleads guilty or no contest to a felony, or any other crime that is reasonably likely to adversely affect the McDonald's System, the Restaurant, or the goodwill associated with the McDonald's trademarks; or

(q)    Franchisee intentionally understates Gross Sales reported to McDonald's.

19.    ***Other Breaches***.  If Franchisee fails in the performance of any of the terms and conditions of this Franchise (other than performance of the terms and conditions listed in paragraph 18), Franchisee shall be guilty of a breach of this Franchise which shall not (except in the case of repeated breaches of the same or of different terms and conditions of this Franchise) constitute grounds for termination of this Franchise.  McDonald's shall have the right to seek judicial enforcement of its rights and remedies, including, but not limited to, injunctive relief, damages, or specific performance.  Notwithstanding any of the provisions of this paragraph 19, any uncured breach of the terms of this Franchise (whether of paragraph 18 or 19) shall be sufficient reason for McDonald's to withhold approval of its consent to any assignment or transfer of Franchisee's interest in this Franchise provided for herein.

20.    ***Effect of Termination***.

(a)    In the event of any material breach of this Franchise, McDonald's shall have an immediate right to enter and take possession of the Restaurant in order to maintain continuous operation of the Restaurant, to provide for orderly change of management and disposition of personal property, and to otherwise protect McDonald's interest.

(b)    Upon termination of this Franchise due to any breach or breaches, Franchisee shall not, without the prior written consent of McDonald's, remove any furniture, fixtures, signs, equipment, other property, or leasehold improvements from the premises either prior to or for a period of thirty (30) days following such termination.  McDonald's shall have the option for thirty (30) days following any such termination to purchase Franchisee's furniture, fixtures, signs, equipment, other property, and leasehold improvements or any portion thereof for a sum equal to the fair market value of such property.  In the event of such a termination, there shall be no payment by McDonald's for intangible assets of Franchisee.

(c)    Upon termination of this Franchise due to the expiration of its term or as a result of any eminent domain proceedings affecting the premises upon which the Restaurant is situated, Franchisee shall not remove any furniture, fixtures, signs, equipment, other property, or leasehold improvements within sixty (60) days prior to the date specified for termination or the date specified for takeover by any public authority.  McDonald's shall, upon written notice of its intention to purchase said property at least thirty (30) days prior to such date of termination, have the option to purchase Franchisee's furniture, fixtures, signs, equipment, other property, and leasehold improvements or any portion thereof for a sum equal to the fair market value of such property.  In the event of such a termination, there shall be no payment by McDonald's for intangible assets of Franchisee.

EXHIBIT O(85)

AOE2072

(d)     Upon termination or expiration of this Franchise, Franchisee shall:  (i) forthwith return to McDonald's the business manuals furnished to Franchisee, together with all other material containing trade secrets, operating instructions, or business practices; (ii) discontinue the use of the McDonald's System and its associated trade names, service marks, and trademarks or the use of any and all signs and printed goods bearing such names and marks, or any reference to them; (iii) not disclose, reveal, or publish all or any portion of the McDonald's System; and (iv) not thereafter use any trade name, service mark, or trademark similar to or likely to be confused with any trade name, service mark, or trademark used at any time in the McDonald's System.

21.     ***Effect of Waivers***.  No waiver by McDonald's or any breach or a series of breaches of this Franchise shall constitute a waiver of any subsequent breach or waiver of the terms of this Franchise.

22.     ***Notices***.  Any notice hereunder shall be in writing and shall be delivered by personal service or by United States certified or registered mail, with postage prepaid, addressed to Franchisee at the Restaurant or to McDonald's at **110 N. CARPENTER STREET, CHICAGO, ILLINOIS 60607**.  Either party, by a similar written notice, may change the address to which notices shall be sent.

23.     ***Cost of Enforcement***.  If McDonald's institutes any action at law or in equity against Franchisee to secure or protect McDonald's rights under or to enforce the terms of this Franchise, in addition to any judgment entered in its favor, McDonald's shall be entitled to recover such reasonable attorneys' fees as may be allowed by the court together with court costs and expenses of litigation.

24.     ***Indemnification***.  If McDonald's shall be subject to any claim, demand, or penalty or become a party to any suit or other judicial or administrative proceeding by reason of any claimed act or omission by Franchisee or Franchisee's employees or agents, or by reason of any act occurring on the Restaurant premises, or by reason of an omission with respect to the business or operation of the Restaurant, Franchisee shall indemnify and hold McDonald's harmless against all judgments, settlements, penalties, and expenses, including attorneys' fees, court costs, and other expenses of litigation or administrative proceeding, incurred by or imposed on McDonald's in connection with the investigation or defense relating to such claim, litigation, or administrative proceeding and, at the election of McDonald's, Franchisee shall also defend McDonald's.

25.     ***Construction and Severability***.  All references in this Franchise to the singular shall include the plural where applicable.  If any part of this Franchise for any reason shall be declared invalid, such decision shall not affect the validity of any remaining portion, which shall remain in full force and effect.  In the event that any material provision of this Franchise shall be stricken or declared invalid, McDonald's reserves the right to terminate this Franchise.

26.     ***Scope and Modification of Franchise***.  This Franchise (including Exhibit A and any riders hereto) constitutes the entire agreement between the parties and supersedes all prior and contemporaneous, oral or written, agreements or understandings of the parties.  Nothing in this Franchise or in any related agreement, however, is intended to disclaim the representations made in the Franchise Disclosure Document furnished to Franchisee.  No interpretation, change, termination, or waiver of any of the provisions hereof shall be binding upon McDonald's unless in writing signed by an officer or franchising director of McDonald's, and which is specifically identified as

EXHIBIT O(85)

AOE2073

an amendment hereto.  No modification, waiver, termination, rescission, discharge, or cancellation of this Franchise shall affect the right of any party hereto to enforce any claim or right hereunder, whether or not liquidated, which occurred prior to the date of such modification, waiver, termination, rescission, discharge, or cancellation.

27.  ***Governing Laws***.  The terms and provisions of this Franchise shall be interpreted in accordance with and governed by the laws of the state of Illinois.

28.  ***Acknowledgment***.  Franchisee acknowledges that:

(a)  The term of this Franchise is set forth in paragraph 2(b) hereof with no promise or representation as to the renewal of this Franchise or the grant of a new franchise;

(b)  Franchisee hereby represents that Franchisee has received a copy of this Franchise, has read and understands all obligations being undertaken, and has had an opportunity to consult with Franchisee's attorney with respect thereto at least seven (7) calendar days prior to execution;

(c)  No representation has been made by McDonald's as to the future profitability of the Restaurant;

(d)  Prior to the execution of this Franchise, Franchisee has worked at a McDonald's restaurant and has had ample opportunity to contact existing franchisees of McDonald's and to investigate all representations made by McDonald's relating to the McDonald's System;

(e)  This Franchise establishes the Restaurant at the location specified on page 1 hereof only and that no "exclusive," "protected," or other territorial rights in the contiguous market area of such Restaurant is hereby granted or inferred;

(f)  This Franchise supersedes any and all other agreements and representations respecting the Restaurant and contains all the terms, conditions, and obligations of the parties with respect to the grant of this Franchise; however, nothing in this Franchise or in any related agreement is intended to disclaim the representations made in the Franchise Disclosure Document furnished to Franchisee;

(g)  McDonald's or its affiliates are the sole owner(s) of the trademarks, trade names, service marks, and goodwill associated therewith, respectively, and Franchisee acquires no right, title, or interest in those names and marks other than the right to use them only in the manner and to the extent prescribed and approved by McDonald's;

(h)  No future franchise or offers of franchises for additional McDonald's restaurants, other than this Franchise, have been promised to Franchisee and any other franchise offer shall only be in writing, executed by an officer or franchising director of McDonald's, and identified as a Franchise Agreement or Rewrite (New Term) Offer Letter;

(i)  Neither McDonald's nor anyone acting on its behalf has made any representations, inducements, promises, or agreements, orally or otherwise, respecting the subject matter of this Franchise, which is not embodied herein or set forth in the Franchise Disclosure Document; and

(j)  This Franchise is offered to Franchisee personally and to no others, and may not be accepted by any other person, partnership, or corporation, or transferred by assignment, will, or operation of law.

EXHIBIT O(85)

AOE2074

**IN WITNESS WHEREOF**, the parties hereto set their hands and seals, in duplicate, the day and year in this instrument first above written.

**McDONALD'S USA, LLC**                                        **Franchisee**


By: _____       _____
                                                                                                       Date



Prepared By: _____       _____
                                                                                                       Date

EXHIBIT O(85)

AOE2075

**The following changes are made to the Franchise Agreement in the following states:**

**Minnesota**       Paragraph 27 continues with, "Nothing in this Franchise or the Franchise Disclosure Document shall in any way abrogate or reduce any rights of the Franchisee as provided for in Minnesota Statutes, Chapter 80C, or Franchisee's rights to any procedure, forum, or remedies provided for by the laws of the jurisdiction."

A new Paragraph 28(h) is inserted (and remaining sub-paragraphs are renamed (i) through (k)) as follows:  "McDonald's considers the trademarks, trade names, logo types, service marks, and commercial symbols to be valuable property rights and continually protects against infringement of these assets.  It protects franchisees against claims of infringement or unfair competition to which the franchisees might become subjected because of their authorized use of the trademarks, service marks, logo types, or other commercial symbols in the United States."

Paragraph 28(l) is added as follows:  "With respect to franchises governed by Minnesota law, McDonald's will comply with Minnesota Statutes Section 80C.14, Subdivisions 3, 4, and 5 which require, except in certain specified cases, that the Franchisee be given ninety (90) days notice of termination (with sixty (60) days to cure) and 180 days notice for non-renewal of this Franchise; and that consent to the transfer of this Franchise will not be unreasonably withheld."

**North Dakota**       Paragraph 11(b) continues with, "Covenants not to compete such as those mentioned above are generally considered unenforceable in the State of North Dakota.  However, Franchisee and McDonald's agree to enforce these provisions to the extent allowed under law."

Paragraph 27 continues with, ", except that North Dakota law will govern with respect to claims arising under the North Dakota Franchise Investment Law."

**Washington**       Paragraph 28(k) is added as follows:  "In recognition of the requirements of the Washington Franchise Investment Protection Act (the "Act") and the rules and regulations promulgated thereunder, this Franchise shall be modified as follows:

The State of Washington has a statute, RCW 19.100.180, which might supersede this Franchise in Franchisee's relationship with McDonald's, including the areas of termination and renewal of this Franchise.  There also might be court decisions which supersede this Franchise in Franchisee's relationship with McDonald's, including the areas of termination and renewal of this Franchise.

In the event of a conflict of laws, to the extent required by the Act, the provisions of the Act, Chapter 19.100 RCW, shall prevail.

To the extent required by the Act, a release or waiver of rights executed by a franchisee shall not include rights under the Act except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel.  Provisions such as those which unreasonably restrict or limit the statute of limitations period for claims under the Act, rights or remedies under the Act, such as a right to a jury trial, might not be enforceable; however, McDonald's and Franchisee agree to enforce them to the maximum extent the law allows."

**EXHIBIT C**

**FRANCHISE AGREEMENT (SATELLITE)**

[CITY, STATE]
[Address]
L/C: _____
File #: _____

**FRANCHISE AGREEMENT**

     **THIS FRANCHISE AGREEMENT** ("Franchise") made this _____ day of _____, for the operation of a McDonald's restaurant located at _____ (the "Restaurant") by and between:

**McDONALD'S USA, LLC,**

a Delaware limited liability company,

("McDonald's")

and

_____

_____

(collectively "Franchisee")

for the purpose of granting the Franchisee the rights necessary to operate the Restaurant.

     In consideration of the mutual rights and obligations contained herein McDonald's and Franchisee agree as follows:

     1.    *Nature and Scope of Franchise*.

     (a)    McDonald's operates a restaurant system ("McDonald's System"). The McDonald's System is a comprehensive system for the ongoing development, operation, and maintenance of McDonald's restaurant locations which have been selected and developed for the retailing of a limited menu of uniform and quality food products, emphasizing prompt and courteous service in a clean, wholesome atmosphere which is intended to be attractive to children and families and includes proprietary rights in certain valuable trade names, service marks, and trademarks, including the trade names "McDonald's" and "McDonald's Hamburgers," designs and color schemes for restaurant buildings, signs, equipment layouts, formulas and specifications for certain food products, methods of inventory and operation control, bookkeeping and accounting, and manuals covering business practices and policies. The McDonald's System is operated and is advertised widely within the United States of America and in certain foreign countries.

     (b)    McDonald's holds the right to authorize the adoption and use of the McDonald's System at the Restaurant. The rights granted to the Franchisee to operate the Restaurant are set forth in this Franchise, including the Operator's Lease ("Lease") which is attached hereto as Exhibit A, incorporated in this Franchise.

EXHIBIT O(85)
AOE2077

(c)      The foundation of the McDonald's System and the essence of this Franchise is the adherence by Franchisee to standards and policies of McDonald's providing for the uniform operation of all McDonald's restaurants within the McDonald's System including, but not limited to, serving only designated food and beverage products; the use of only prescribed equipment and building layout and designs; strict adherence to designated food and beverage specifications and to McDonald's prescribed standards of Quality, Service, and Cleanliness in the Restaurant operation.  Compliance by Franchisee with the foregoing standards and policies in conjunction with the McDonald's trademarks and service marks provides the basis for the valuable goodwill and wide family acceptance of the McDonald's System.  Moreover, the establishment and maintenance of a close personal working relationship with McDonald's in the conduct of Franchisee's McDonald's restaurant business, Franchisee's accountability for performance of the obligations contained in this Franchise, and Franchisee's adherence to the tenets of the McDonald's System constitute the essence of this Franchise.

(d)      The provisions of this Franchise shall be interpreted to give effect to the intent of the parties stated in this paragraph 1 so that the Restaurant shall be operated in conformity to the McDonald's System through strict adherence to McDonald's standards and policies as they exist now and as they may be from time to time modified.

(e)      Franchisee acknowledges Franchisee's understanding of McDonald's basic business policy that McDonald's will grant franchises only to those individuals who live in the locality of their McDonald's restaurant, actually own the entire equity interest in the business of the Restaurant and its profits, and who will work full time at their McDonald's restaurant business.  Franchisee represents, warrants, and agrees that Franchisee actually owns the complete equity interest in this Franchise and the profits from the operation of the Restaurant, and that Franchisee shall maintain such interest during the term of this Franchise except only as otherwise permitted pursuant to the terms and conditions of this Franchise.  Franchisee agrees to furnish McDonald's with such evidence as McDonald's may request, from time to time, for the purpose of assuring McDonald's that Franchisee's interest remains as represented herein.

(f)      Franchisee agrees to pay to McDonald's all required payments under this Franchise, including, without limitation, the payments set forth in paragraphs 8 and 9 herein and paragraph 3.01 of the Lease. All payments hereby required constitute a single financial arrangement between Franchisee and McDonald's which, taken as a whole and without regard to any designation or descriptions, reflect the value of the authorization being made available to the Franchisee by McDonald's in this Franchise and the services rendered by McDonald's during the term hereof.

2.      ***Franchise Grant and Term***.

(a)      McDonald's grants to Franchisee for the following stated term the right, license, and privilege:

(i)      to adopt and use the McDonald's System at the Restaurant;

(ii)     to advertise to the public that Franchisee is a franchisee of McDonald's;

EXHIBIT O(85)
AOE2078

    (iii) to adopt and use, but only in connection with the sale of those food and beverage products which have been designated by McDonald's at the Restaurant, the trade names, trademarks, and service marks which McDonald's shall designate, from time to time, to be part of the McDonald's System; and

    (iv) to occupy the Restaurant as provided herein.

    The rights granted under this Franchise are limited to the Restaurant's location only.

  (b) The term of this Franchise shall begin on _____ and end on _____, unless terminated prior thereto pursuant to the provisions hereof.

  3. ***General Services of McDonald's***. McDonald's shall advise and consult with Franchisee periodically in connection with the operation of the Restaurant and also, upon Franchisee's request, at other reasonable times. McDonald's shall communicate to Franchisee know-how, new developments, techniques, and improvements in areas of restaurant management, food preparation, and service which are pertinent to the operation of a restaurant using the McDonald's System. The communications shall be accomplished by visits by operations consultants, printed and filmed reports, seminars, and newsletter mailings. McDonald's shall also make available to Franchisee all additional services, facilities, rights, and privileges relating to the operation of the Restaurant which McDonald's makes generally available, from time to time, to all its franchisees operating McDonald's restaurants.

  4. ***Manuals***. McDonald's shall provide Franchisee with the business manuals prepared for use by franchisees of McDonald's restaurants similar to the Restaurant. The business manuals contain detailed information including: (a) required operations procedures; (b) methods of inventory control; (c) bookkeeping and accounting procedures; (d) business practices and policies; and (e) other management and advertising policies. Franchisee agrees to promptly adopt and use exclusively the formulas, methods, and policies contained in the business manuals, now and as they may be modified from time to time. Franchisee acknowledges that McDonald's or its affiliates own all proprietary rights in and to the McDonald's System and that the information revealed in the business manuals, in their entirety, constitute confidential trade secrets. Without the prior written consent of McDonald's, Franchisee shall not disclose the contents of the business manuals to any person, except employees of Franchisee for purposes related solely to the operation of the Restaurant, nor shall Franchisee reprint or reproduce the manuals in whole or in part for any purpose except in connection with instruction of employees in the operation of the Restaurant. Such manuals, as modified from time to time, and the policies contained therein, are incorporated in this Franchise by reference.

  5. ***Advertising***. McDonald's employs both public relations and advertising specialists who formulate and carry out national and local advertising programs for the McDonald's System.

    Franchisee shall use only advertising and promotional materials and programs provided by McDonald's or approved in advance, in writing, by McDonald's. Neither the approval by McDonald's of Franchisee's advertising and promotional material nor the providing of such material by McDonald's to Franchisee shall, directly or indirectly, require McDonald's to pay for such advertising or promotion.

EXHIBIT O(85)

AOE2079

Franchisee shall expend during each calendar year for advertising and promotion of the Restaurant to the general public an amount which is not less than four percent (4%) of Gross Sales (as that term is defined in paragraph 7) for such year.  Expenditures by Franchisee to national and regional cooperative advertising and promotion of the McDonald's System, or to a group of McDonald's restaurants which includes the Restaurant, shall be a credit against the required minimum expenditures for advertising and promotion to the general public.

6.     *Training*.  McDonald's shall make available to Franchisee the services of Hamburger University, the international training center for the McDonald's System.  Franchisee acknowledges the importance of quality of business operation among all restaurants in the McDonald's System and agrees to enroll Franchisee and Franchisee's managers, present and future, at Hamburger University or at such other training center as may be designated by McDonald's from time to time.  McDonald's shall bear the cost of maintaining Hamburger University and any other training centers, including the overhead costs of training, staff salaries, materials, and all technical training tools, and agrees to provide to Franchisee both basic and advanced instruction for the operation of a McDonald's System restaurant.  Franchisee shall pay all traveling, living, compensation, or other expenses incurred by Franchisee and Franchisee's employees in connection with attendance at Hamburger University or such other training centers.

7.     *Gross Sales*.  For the purposes of this Franchise, the term "Gross Sales" shall mean all revenues from sales of the Franchisee based upon all business conducted upon or from the Restaurant, whether such sales be evidenced by check, cash, credit, charge account, exchange, or otherwise, and shall include, but not be limited to, the amounts received from the sale of goods, wares, and merchandise, including sales of food, beverages, and tangible property of every kind and nature, promotional or otherwise, and for services performed from or at the Restaurant, together with the amount of all orders taken or received at the Restaurant, whether such orders be filled from the Restaurant or elsewhere.  Gross Sales shall not include sales of merchandise for which cash has been refunded, provided that such sales shall have previously been included in Gross Sales.  There shall be deducted from Gross Sales the price of merchandise returned by customers for exchange, provided that such returned merchandise shall have been previously included in Gross Sales, and provided that the sales price of merchandise delivered to the customer in exchange shall be included in Gross Sales.  Gross Sales shall not include the amount of any sales tax imposed by any federal, state, municipal, or other governmental authority directly on sales and collected from customers, provided that the amount thereof is added to the selling price or absorbed therein and actually paid by the Franchisee to such governmental authority.  Each charge or sale upon credit shall be treated as a sale for the full price in the month during which such charge or sale shall be made, irrespective of the time when the Franchisee shall receive payment (whether full or partial) therefor.

8.     (a)     *Service Fee*.  Franchisee shall pay a monthly service fee on or before the tenth (10th) day of the following month in an amount equal to four percent (4.0%) of the Gross Sales of the Restaurant for the preceding month immediately ended.

(b)     *Method of Payment*.  Franchisee shall at all times participate in the McDonald's automatic debit/credit transfer program as specified by McDonald's from time to time for the payment of all amounts due

McDonald's pursuant to this Franchise.  Franchisee shall execute and deliver to McDonald's such documents and instruments as may be necessary to establish and maintain said automatic debit/credit transfer program.

(c)    ***Interest on Delinquencies***.  In the event that the Franchisee is past due on the payment of any amount due McDonald's under this Franchise, including accrued interest, the Franchisee shall be required, to the extent permitted by law, to pay interest on the past due amount to McDonald's for the period beginning with the original due date for payment to the date of actual payment at an annual rate equal to the highest rate allowed by law or, if there is no maximum rate permitted by law, then fifteen percent (15%).  Such interest will be calculated on the basis of monthly compounding and the actual number of days elapsed divided by 365.

9.    ***Initial Fee and Annual Fee***.  Franchisee acknowledges that: (a) the initial grant of this Franchise constitutes the sole consideration for the payment of (i) an Initial Fee of Five Hundred Dollars ($500.00) paid by Franchisee to McDonald's on the opening date of the Restaurant; and (ii) an Annual Fee of _____ ($_____) to be paid by Franchisee to McDonald's beginning on the first anniversary of the opening date of the Restaurant and on each subsequent anniversary; and (b) the fees have been earned by McDonald's (except where the construction of the Restaurant has not been completed within one (1) year from the date of the execution and delivery of this Franchise).  If the Restaurant has not been constructed or is not ready for occupancy at the time of the execution of this Franchise, McDonald's shall use its best efforts to expedite the construction and lease of the Restaurant to Franchisee.  However, McDonald's shall not be liable to Franchisee in any manner for any delays in or lack of completion of such construction for any reason.  McDonald's shall be under no obligation to enforce performance or to seek other remedies for non-performance of any lease, clause, or contract necessary for the construction of the Restaurant and reserves the right, in case construction of the Restaurant should be abandoned, the lease assigned, or other interest in the premises be relinquished, to terminate this Franchise upon reimbursement to Franchisee of the Initial Fee.  At such time as the Restaurant is completed and ready for occupancy, the Initial Fee shall be deemed to be earned.  If the Restaurant is not ready for occupancy within one (1) year from the date of this Franchise, Franchisee shall have the right to terminate this Franchise and obtain an immediate refund of the Initial Fee upon written request to McDonald's.

10.    ***Reports***.  On or before 11:00 a.m. Central Standard Time on the first business day of each month, Franchisee shall render, in a manner specified by McDonald's, a statement, in such form as McDonald's shall reasonably require from time to time, of all receipts from the operation of the Restaurant for the preceding month immediately ended.  On or before the twenty-fifth (25th) day of each month Franchisee shall submit to McDonald's an operating statement and a statistical report for the previous month in form satisfactory to McDonald's. Franchisee shall keep and preserve full and complete records of Gross Sales for at least three (3) years in a manner and form satisfactory to McDonald's and shall also deliver such additional financial and operating reports and other information as McDonald's may reasonably request on the forms and in the manner prescribed by McDonald's. Franchisee further agrees to submit within ninety (90) days following the close of each fiscal year of the Restaurant's operation, a profit and loss statement covering operations during such fiscal year and a balance sheet taken as of the close of such fiscal year, all prepared in accordance with generally accepted accounting principles.  The profit and

EXHIBIT O(85)

AOE2081

loss statement and the balance sheet shall, if McDonald's shall request certification, be certified by a certified public accountant.  Franchisee shall at Franchisee's expense cause Franchisee's public accountant and certified public accountant, if any, to consult with McDonald's concerning such statement and balance sheet.  The original of each such report required by this paragraph 10 shall be mailed to McDonald's at the address indicated in paragraph 22 herein.

McDonald's shall have the right to inspect and/or audit Franchisee's accounts, books, records, and tax returns at all reasonable times to ensure that Franchisee is complying with the terms of this Franchise.  If such inspection discloses that Gross Sales actually exceeded the amount reported by Franchisee as Gross Sales by an amount equal to two percent (2%) or more of Gross Sales originally reported to McDonald's, Franchisee shall bear the cost of such inspection and audit.

11.     *Restrictions*.  Franchisee agrees and covenants as follows:

(a)     During the term of this Franchise, Franchisee shall not, without the prior written consent of McDonald's, directly or indirectly, engage in, acquire any financial or beneficial interest (including interests in corporations, partnerships, trusts, unincorporated associations, or joint ventures) in, or become a landlord for any restaurant business, which is similar to the Restaurant.

(b)     Franchisee shall not, for a period of eighteen (18) months after termination of this Franchise for any reason or the sale of the Restaurant, directly or indirectly, engage in or acquire any financial or beneficial interest (including any interest in corporations, partnerships, trusts, unincorporated associations, or joint ventures) in, or become a landlord of any restaurant business which is similar to the Restaurant within a ten-mile radius of the Restaurant.

(c)     Franchisee shall not appropriate, use, or duplicate the McDonald's System, or any portion thereof, for use at any other self-service, carry-out, or other similar restaurant business.

(d)     Franchisee shall not disclose or reveal any portion of the McDonald's System to a non-franchisee other than to Franchisee's Restaurant employees as an incident of their training.

(e)     Franchisee shall acquire no right to use, or to license the use of, any name, mark, or other intellectual property right granted or to be granted herein, except in connection with the operation of the Restaurant.

The restrictions contained in paragraphs 11(a) and 11(b) herein shall not apply to ownership of less than two percent (2%) of the shares of a company whose shares are listed and traded on a national or regional securities exchange.

12.     *Compliance With Entire System*.  Franchisee acknowledges that every component of the McDonald's System is important to McDonald's and to the operation of the Restaurant as a McDonald's restaurant, including a designated menu of food and beverage products; uniformity of food specifications, preparation methods, quality, and appearance; and uniformity of facilities and service.

McDonald's shall have the right to inspect the Restaurant at all reasonable times to ensure that Franchisee's operation thereof is in compliance with the standards and policies of the McDonald's System.

EXHIBIT O(85)

AOE2082

Franchisee shall comply with the entire McDonald's System, including, but not limited to, the following:

(a)     Operate the Restaurant in a clean, wholesome manner in compliance with prescribed standards of Quality, Service, and Cleanliness; comply with all business policies, practices, and procedures imposed by McDonald's; serve at the Restaurant only those food and beverage products now or hereafter designated by McDonald's; and maintain the building, fixtures, equipment, signage, seating and decor, and parking area in a good, clean, wholesome condition and repair, and well lighted and in compliance with designated standards as may be prescribed from time to time by McDonald's;

(b)     Purchase kitchen fixtures, lighting, seating, signs, and other equipment in accordance with the equipment specifications and layout initially designated by McDonald's and, promptly after notice from McDonald's that the Restaurant premises are ready for occupancy, cause the installation thereof;

(c)     Keep the Restaurant constructed and equipped in accordance with the building blueprints and equipment layout plans that are standard in the McDonald's System or as such blueprints and plans may be reasonably changed from time to time by McDonald's;

(d)     Franchisee shall not, without the prior written consent of McDonald's:  (i) make any building design conversion or (ii) make any alterations, conversions, or additions to the building, equipment, or parking area;

(e)     Make repairs or replacements required:  (i) because of damage or wear and tear or (ii) in order to maintain the Restaurant building and parking area in good condition and in conformity to blueprints and plans;

(f)     Where parking is provided, maintain the parking area for the exclusive use of Restaurant customers;

(g)     Operate the Restaurant seven (7) days per week throughout the year and at least during the hours from 7:00 a.m. to 11:00 p.m., or such other hours as may from time to time be prescribed by McDonald's (except when the Restaurant is untenantable as a result of fire or other casualty), maintain sufficient supplies of food and paper products, and employ adequate personnel so as to operate the Restaurant at its maximum capacity and efficiency;

(h)     Cause all employees of Franchisee, while working in the Restaurant, to:  (i) wear uniforms of such color, design, and other specifications as McDonald's may designate from time to time; (ii) present a neat and clean appearance; and (iii) render competent and courteous service to Restaurant customers;

(i)     In the dispensing and sale of food products:  (i) use only containers, cartons, bags, napkins, other paper goods, and packaging bearing the approved trademarks and which meet the McDonald's System specifications and quality standards which McDonald's may designate from time to time; (ii) use only those flavorings, garnishments, and food and beverage ingredients which meet the McDonald's System specifications and quality standards which McDonald's may designate from time to time; and (iii) employ only those methods of food handling and preparation which McDonald's may designate from time to time;

7

(j)　　To make prompt payment in accordance with the terms of invoices rendered to Franchisee on Franchisee's purchase of fixtures, signs, equipment, and food and paper supplies; and

(k)　　At Franchisee's own expense, comply with all federal, state, and local laws, ordinances, and regulations affecting the operation of the Restaurant.

13.　　**_Best Efforts_**.　Franchisee shall diligently and fully exploit the rights granted in this Franchise by personally devoting full time and best efforts and, in case more than one individual has executed this Franchise as the Franchisee, then _____ shall personally devote full time and best efforts to the operation of the Restaurant.　Franchisee shall keep free from conflicting enterprises or any other activities which would be detrimental to or interfere with the business of the Restaurant.

14.　　**_INTENTIONALLY DELETED_**.

15.　　**_Assignment_**.　Without the prior written consent of McDonald's, Franchisee's interest in this Franchise shall not be assigned or otherwise transferred in whole or in part (whether voluntarily or by operation of law) directly, indirectly, or contingently, and then only in accordance with the terms of this paragraph 15.

(a)　　Death or Permanent Incapacity of Franchisee.　Upon the death or permanent incapacity of Franchisee, the interest of Franchisee in this Franchise may be assigned either pursuant to the terms of paragraph 15(d) herein or to one or more of the following persons:　Franchisee's spouse, heirs, or nearest relatives by blood or marriage, subject to the following conditions:　(i) if, in the sole discretion of McDonald's, such person shall be capable of conducting the Restaurant business in accordance with the terms and conditions of this Franchise and (ii) if such person shall also execute an agreement by which the person personally assumes full and unconditional liability for and agrees to perform all the terms and conditions of this Franchise to the same extent as the original Franchisee.　If, in McDonald's sole discretion, such person cannot devote full time and best efforts to the operation of the Restaurant or lacks the capacity to operate the Restaurant in accordance with this Franchise, McDonald's shall have an option to operate and/or manage the Restaurant for the account of Franchisee or of Franchisee's estate until the deceased or incapacitated Franchisee's interest is transferred to another party acceptable to McDonald's in accordance with the terms and conditions of this Franchise.　However, in no event shall such McDonald's operation and management of the Restaurant continue for a period in excess of twelve (12) full calendar months without the consent of Franchisee or Franchisee's estate.　In the event that McDonald's so operates and/or manages the Restaurant, McDonald's shall make a complete account to and return the net income from such operation to the Franchisee or to Franchisee's estate, less a reasonable management fee and expenses.　If the disposition of the Restaurant to a party acceptable to McDonald's has not taken place within twelve (12) months from the date that McDonald's has commenced the operation or management of the Restaurant on behalf of the deceased or incapacitated Franchisee, then, in that event, McDonald's shall have the option to purchase the Restaurant at fair market value for cash or its common stock at its option.

(b)　　Assignment to Franchisee's Corporation.　Upon Franchisee's compliance with such requirements as may from time to time be prescribed by McDonald's, including a Stockholders Agreement in the form prescribed by McDonald's, McDonald's shall consent to an assignment to a corporation whose shares are

EXHIBIT O(85)

AOE2084

wholly owned and controlled by Franchisee.  The corporate name of the corporation shall not include any of the names or trademarks granted by this Franchise.  Any subsequent assignment or transfer, either voluntarily or by operation of law, of all or any part of said shares shall be made in compliance with the terms and conditions set forth in paragraphs 15(a) and 15(d) herein.

(c)      First Option to Purchase.  Franchisee or Franchisee's representative shall, at least twenty (20) days prior to the proposed effective date, give McDonald's written notice of intent to sell or otherwise transfer this Franchise pursuant to paragraph 15(d).  The notice shall set forth the name and address of the proposed purchaser and all the terms and conditions of any offer.  McDonald's shall have the first option to purchase the Restaurant by giving written notice to Franchisee of its intention to purchase on the same terms as the offer within ten (10) days following McDonald's receipt of such notice.  However, if McDonald's fails to exercise its option and the Restaurant is not subsequently sold to the proposed purchaser for any reason, McDonald's shall continue to have, upon the same conditions, a first option to purchase the Restaurant upon the terms and conditions of any subsequent offer.

(d)      Other Assignment.  In addition to any assignments or contingent assignments contemplated by the terms of paragraphs 15(a) and 15(b), Franchisee shall not sell, transfer, or assign this Franchise to any person or persons without McDonald's prior written consent.  Such consent shall not be arbitrarily withheld.

In determining whether to grant or to withhold such consent, McDonald's shall consider of each prospective transferee, by way of illustration, the following:  (i) work experience and aptitude, (ii) financial background, (iii) character, (iv) ability to personally devote full time and best efforts to managing the Restaurant, (v) residence in the locality of the Restaurant, (vi) equity interest in the Restaurant, (vii) conflicting interests, and (viii) such other criteria and conditions as McDonald's shall then apply in the case of an application for a new franchise to operate a McDonald's restaurant.  McDonald's consent shall also be conditioned each upon such transferee's execution of an agreement by which transferee personally assumes full and unconditional liability for and agrees to perform from the date of such transfer all obligations, covenants, and agreements contained in this Franchise to the same extent as if transferee had been an original party to this Franchise.  Franchisee and each transferor shall continue to remain personally liable for all affirmative obligations, covenants, and agreements contained herein for the full term of this Franchise or for such shorter period as McDonald's may, in its sole discretion, determine.  Upon each assignment or other transfer of this Franchise to any person or persons under the terms and conditions of this paragraph 15(d), the percentage service fee charge owing to McDonald's after the date of such assignment or transfer shall be automatically adjusted to the then prevailing percentage service fee charge required under new Franchises issued by McDonald's for similar McDonald's restaurants at the time of such assignment or transfer.

16.      ***Franchisee Not an Agent of McDonald's***.  Franchisee shall have no authority, express or implied, to act as agent of McDonald's or any of its affiliates for any purpose.  Franchisee is, and shall remain, an independent contractor responsible for all obligations and liabilities of, and for all loss or damage to, the Restaurant and its business, including any personal property, equipment, fixtures, or real property connected therewith, and for all

claims or demands based on damage or destruction of property or based on injury, illness, or death of any person or persons, directly or indirectly, resulting from the operation of the Restaurant.  Further, Franchisee and McDonald's are not and do not intend to be partners, associates, or joint employers in any way and McDonald's shall not be construed to be jointly liable for any acts or omissions of Franchisee under any circumstances.

17.    *Insurance*.  Franchisee shall, upon taking possession of the Restaurant, acquire and maintain in effect such insurance with such coverages as may be required by the terms of any lease of the Restaurant premises to McDonald's, and in any event, Franchisee shall acquire and maintain in effect not less than the following coverages in the following minimum amounts:

(a)    Worker's Compensation insurance prescribed by law in the state in which the Restaurant is located and Employer's Liability Insurance with $100,000/$500,000/$100,000 minimum limit.  If the state in which the Restaurant is located allows the option of not carrying Worker's Compensation Insurance, and Franchisee chooses to exercise that option, Franchisee shall nonetheless carry and maintain other insurance with coverage and limits as approved by McDonald's.

(b)    Commercial general liability insurance in a form approved by McDonald's with a limit of $5,000,000 per occurrence/$5,000,000 aggregate.

(c)    All such insurance as may be required under the Lease.

All insurance policies required to be carried hereunder shall name McDonald's and any party designated by McDonald's as additional insureds, as their interests may appear in this Franchise.  All policies shall be effective on or prior to the date Franchisee is given possession of the Restaurant premises for the purpose of installing equipment or opening the Restaurant, whichever occurs first, and evidence of payment of premiums and duplicate copies of policies of the insurance required herein shall be delivered to McDonald's at least thirty (30) days prior to the date that Franchisee opens for business and/or thirty (30) days prior to the expiration date of an existing policy of insurance.  All policies of insurance shall include a provision prohibiting cancellations or material changes to the policy thereof until thirty (30) days prior written notice has been given to McDonald's.

In the event Franchisee shall fail to obtain the insurance required herein, McDonald's may, but is not obligated to, purchase said insurance, adding the premiums paid to Franchisee's monthly rent.  (Franchisee may authorize McDonald's to purchase and to administer the required minimum insurance on Franchisee's behalf. However, McDonald's, by placement of the required minimum insurance, assumes no responsibility for premium expense nor guarantees payment for any losses sustained by Franchisee.)  McDonald's may relieve itself of all obligations with respect to the purchase and administration of such required insurance coverage by giving ten (10) days written notice to Franchisee.

All insurance shall be placed with a reputable insurance company licensed to do business in the state in which the Restaurant is located and having a Financial Size Category equal to or greater than IX and Policyholders Rating of "A+" or "A", as assigned by Alfred M. Best and Company, Inc., unless otherwise approved by McDonald's.

EXHIBIT O(85)

AOE2086

18.    ***Material Breach***.   The parties agree that the happening of any of the following events shall constitute a material breach of this Franchise and violate the essence of Franchisee's obligations and, without prejudice to any of its other rights or remedies at law or in equity, McDonald's, at its election, may terminate this Franchise upon the happening of any of the following events:

(a)    Franchisee shall fail to maintain and operate the Restaurant in a good, clean, wholesome manner and in compliance with the standards prescribed by the McDonald's System;

(b)    Franchisee shall be adjudicated a bankrupt, become insolvent, or a receiver, whether permanent or temporary, for all or substantially all of Franchisee's property, shall be appointed by any court, or Franchisee shall make a general assignment for the benefit of creditors, or a voluntary or involuntary petition under any bankruptcy law shall be filed with respect to Franchisee and shall not be dismissed within thirty (30) days thereafter;

(c)    Any payment owing to McDonald's is not paid within thirty (30) days after the date such payment is due;

(d)    Any judgment or judgments aggregating in excess of $5,000.00 against Franchisee or any lien in excess of $5,000.00 against Franchisee's property shall remain unsatisfied or unbonded of record in excess of thirty (30) days;

(e)    Franchisee shall cause, suffer, or permit (voluntarily or involuntarily) Franchisee's right of possession as lessee or sublessee of the premises on which the Restaurant is located to be terminated prematurely for any cause whatever;

(f)    Franchisee shall acquire any interest in a business in violation of paragraph 11(a);

(g)    Franchisee shall duplicate the McDonald's System in violation of paragraph 11(c);

(h)    Franchisee shall make or cause a disclosure of any portion of the McDonald's System in violation of paragraph 11(d) or shall make or cause a disclosure of part of the McDonald's System business manuals;

(i)    Franchisee shall violate paragraph 11(e) by use of any name, trademark, service mark, or other intellectual property right exceeding the restrictions of said paragraph 11;

(j)    Franchisee shall knowingly sell food or beverage products other than those designated by McDonald's or which fail to conform to McDonald's System specifications for those products, or which are not prepared in accordance with the methods prescribed by McDonald's, or fail to sell products designated by McDonald's;

(k)    Any assignment or other transfer of any interest of the Franchisee in this Franchise shall occur in violation of paragraph 15(d) herein;

(l)    Franchisee shall deny McDonald's the right to inspect the Restaurant at reasonable times;

(m)    Franchisee shall fail to make or make repeated delays in the prompt payment of undisputed invoices from suppliers or in the remittance of payments as required by this Franchise;

(n)    Franchisee makes any misrepresentations to McDonald's relating to the acquisition and/or ownership of this Franchise;

EXHIBIT O(85)

AOE2087

(o)      Franchisee engages in public conduct which reflects materially and unfavorably upon the operation of the Restaurant, the reputation of the McDonald's System, or the goodwill associated with the McDonald's trademarks; provided that engaging in legitimate political activity (including testifying, lobbying, or otherwise attempting to influence legislation) shall not be grounds for termination;

(p)      Franchisee is convicted of, pleads guilty or no contest to a felony, or any other crime that is reasonably likely to adversely affect the McDonald's System, the Restaurant, or the goodwill associated with the McDonald's trademarks; or

(q)      Franchisee intentionally understates Gross Sales reported to McDonald's.

19.      ***Other Breaches***.  If Franchisee fails in the performance of any of the terms and conditions of this Franchise (other than performance of the terms and conditions listed in paragraph 18), Franchisee shall be guilty of a breach of this Franchise which shall not (except in the case of repeated breaches of the same or of different terms and conditions of this Franchise) constitute grounds for termination of this Franchise.  McDonald's shall have the right to seek judicial enforcement of its rights and remedies, including, but not limited to, injunctive relief, damages, or specific performance.  Notwithstanding any of the provisions of this paragraph 19, any uncured breach of the terms of this Franchise (whether of paragraph 18 or 19) shall be sufficient reason for McDonald's to withhold approval of its consent to any assignment or transfer of Franchisee's interest in this Franchise provided for herein.

20.      ***Effect of Termination***.

(a)      In the event of any material breach of this Franchise, McDonald's shall have an immediate right to enter and take possession of the Restaurant in order to maintain continuous operation of the Restaurant, to provide for orderly change of management and disposition of personal property, and to otherwise protect McDonald's interest.

(b)      Upon termination of this Franchise due to any breach or breaches, Franchisee shall not, without the prior written consent of McDonald's, remove any furniture, fixtures, signs, equipment, other property, or leasehold improvements from the premises either prior to or for a period of thirty (30) days following such termination.  McDonald's shall have the option for thirty (30) days following any such termination to purchase Franchisee's furniture, fixtures, signs, equipment, other property, and leasehold improvements or any portion thereof for a sum equal to the fair market value of such property.  In the event of such a termination, there shall be no payment by McDonald's for intangible assets of Franchisee.

(c)      Upon termination of this Franchise due to the expiration of its term or as a result of any eminent domain proceedings affecting the premises upon which the Restaurant is situated, Franchisee shall not remove any furniture, fixtures, signs, equipment, other property, or leasehold improvements within sixty (60) days prior to the date specified for termination or the date specified for takeover by any public authority.  McDonald's shall, upon written notice of its intention to purchase said property at least thirty (30) days prior to such date of termination, have the option to purchase Franchisee's furniture, fixtures, signs, equipment, other property, and leasehold improvements or any portion thereof for a sum equal to the fair market value of such property.  In the event of such a termination, there shall be no payment by McDonald's for intangible assets of Franchisee.

EXHIBIT O(85)

AOE2088

(d)     Upon termination or expiration of this Franchise, Franchisee shall:  (i) forthwith return to McDonald's the business manuals furnished to Franchisee, together with all other material containing trade secrets, operating instructions, or business practices; (ii) discontinue the use of the McDonald's System and its associated trade names, service marks, and trademarks or the use of any and all signs and printed goods bearing such names and marks, or any reference to them; (iii) not disclose, reveal, or publish all or any portion of the McDonald's System; and (iv) not thereafter use any trade name, service mark, or trademark similar to or likely to be confused with any trade name, service mark, or trademark used at any time in the McDonald's System.

21.     *Effect of Waivers*.  No waiver by McDonald's or any breach or a series of breaches of this Franchise shall constitute a waiver of any subsequent breach or waiver of the terms of this Franchise.

22.     *Notices*.  Any notice hereunder shall be in writing and shall be delivered by personal service or by United States certified or registered mail, with postage prepaid, addressed to Franchisee at the Restaurant or to McDonald's at **110 N. CARPENTER STREET, CHICAGO, ILLINOIS 60607**.  Either party, by a similar written notice, may change the address to which notices shall be sent.

23.     *Cost of Enforcement*.  If McDonald's institutes any action at law or in equity against Franchisee to secure or protect McDonald's rights under or to enforce the terms of this Franchise, in addition to any judgment entered in its favor, McDonald's shall be entitled to recover such reasonable attorneys' fees as may be allowed by the court together with court costs and expenses of litigation.

24.     *Indemnification*.  If McDonald's shall be subject to any claim, demand, or penalty or become a party to any suit or other judicial or administrative proceeding by reason of any claimed act or omission by Franchisee or Franchisee's employees or agents, or by reason of any act occurring on the Restaurant premises, or by reason of an omission with respect to the business or operation of the Restaurant, Franchisee shall indemnify and hold McDonald's harmless against all judgments, settlements, penalties, and expenses, including attorneys' fees, court costs, and other expenses of litigation or administrative proceeding, incurred by or imposed on McDonald's in connection with the investigation or defense relating to such claim, litigation, or administrative proceeding and, at the election of McDonald's, Franchisee shall also defend McDonald's.

25.     *Construction and Severability*.  All references in this Franchise to the singular shall include the plural where applicable.  If any part of this Franchise for any reason shall be declared invalid, such decision shall not affect the validity of any remaining portion, which shall remain in full force and effect.  In the event that any material provision of this Franchise shall be stricken or declared invalid, McDonald's reserves the right to terminate this Franchise.

26.     *Scope and Modification of Franchise*.  This Franchise (including Exhibit A and any riders hereto) constitutes the entire agreement between the parties and supersedes all prior and contemporaneous, oral or written, agreements or understandings of the parties.  Nothing in this Franchise or in any related agreement, however, is intended to disclaim the representations made in the Franchise Disclosure Document furnished to Franchisee.  No interpretation, change, termination, or waiver of any of the provisions hereof shall be binding upon McDonald's unless in writing signed by an officer or franchising director of McDonald's, and which is specifically identified as

an amendment hereto.  No modification, waiver, termination, rescission, discharge, or cancellation of this Franchise shall affect the right of any party hereto to enforce any claim or right hereunder, whether or not liquidated, which occurred prior to the date of such modification, waiver, termination, rescission, discharge, or cancellation.

27.     ***Governing Laws***.  The terms and provisions of this Franchise shall be interpreted in accordance with and governed by the laws of the state of Illinois.

28.     ***Acknowledgment***.  Franchisee acknowledges that:

(a)     The term of this Franchise is set forth in paragraph 2(b) hereof with no promise or representation as to the renewal of this Franchise or the grant of a new franchise;

(b)     Franchisee hereby represents that Franchisee has received a copy of this Franchise, has read and understands all obligations being undertaken, and has had an opportunity to consult with Franchisee's attorney with respect thereto at least seven (7) calendar days prior to execution;

(c)     No representation has been made by McDonald's as to the future profitability of the Restaurant;

(d)     Prior to the execution of this Franchise, Franchisee has worked at a McDonald's restaurant and has had ample opportunity to contact existing franchisees of McDonald's and to investigate all representations made by McDonald's relating to the McDonald's System;

(e)     This Franchise establishes the Restaurant at the location specified on page 1 hereof only and that no "exclusive," "protected," or other territorial rights in the contiguous market area of such Restaurant is hereby granted or inferred;

(f)     This Franchise supersedes any and all other agreements and representations respecting the Restaurant and contains all the terms, conditions, and obligations of the parties with respect to the grant of this Franchise; however, nothing in this Franchise or in any related agreement is intended to disclaim the representations made in the Franchise Disclosure Document furnished to Franchisee;

(g)     McDonald's or its affiliates are the sole owner(s) of the trademarks, trade names, service marks, and goodwill associated therewith, respectively, and Franchisee acquires no right, title, or interest in those names and marks other than the right to use them only in the manner and to the extent prescribed and approved by McDonald's;

(h)     No future franchise or offers of franchises for additional McDonald's restaurants, other than this Franchise, have been promised to Franchisee and any other franchise offer shall only be in writing, executed by an officer or franchising director of McDonald's, and identified as a Franchise Agreement or Rewrite (New Term) Offer Letter;

(i)     Neither McDonald's nor anyone acting on its behalf has made any representations, inducements, promises, or agreements, orally or otherwise, respecting the subject matter of this Franchise, which is not embodied herein or set forth in the Franchise Disclosure Document; and

(j)     This Franchise is offered to Franchisee personally and to no others, and may not be accepted by any other person, partnership, or corporation, or transferred by assignment, will, or operation of law.

EXHIBIT O(85)

AOE2090

**IN WITNESS WHEREOF**, the parties hereto set their hands and seals, in duplicate, the day and year in this instrument first above written.

**McDONALD'S USA, LLC**                                    **Franchisee**


By: _____        _____
                                                                                    Date


Prepared By: _____        _____
                                                                                    Date

15

**The following changes are made to the Franchise Agreement in the following states:**

**Minnesota**    Paragraph 27 continues with, "Nothing in this Franchise or the Franchise Disclosure Document shall in any way abrogate or reduce any rights of the Franchisee as provided for in Minnesota Statutes, Chapter 80C, or Franchisee's rights to any procedure, forum, or remedies provided for by the laws of the jurisdiction."

A new Paragraph 28(h) is inserted (and remaining sub-paragraphs are renamed (i) through (k)) as follows:  "McDonald's considers the trademarks, trade names, logo types, service marks, and commercial symbols to be valuable property rights and continually protects against infringement of these assets.  It protects franchisees against claims of infringement or unfair competition to which the franchisees might become subjected because of their authorized use of the trademarks, service marks, logo types, or other commercial symbols in the United States."

Paragraph 28(l) is added as follows:  "With respect to franchises governed by Minnesota law, McDonald's will comply with Minnesota Statutes Section 80C.14, Subdivisions 3, 4, and 5 which require, except in certain specified cases, that the Franchisee be given ninety (90) days notice of termination (with sixty (60) days to cure) and 180 days notice for non-renewal of this Franchise; and that consent to the transfer of this Franchise will not be unreasonably withheld."

**North Dakota**  Paragraph 11(b) continues with, "Covenants not to compete such as those mentioned above are generally considered unenforceable in the State of North Dakota.  However, Franchisee and McDonald's agree to enforce these provisions to the extent allowed under law."

Paragraph 27 continues with, ", except that North Dakota law will govern with respect to claims arising under the North Dakota Franchise Investment Law."

**Washington**   Paragraph 28(k) is added as follows:  "In recognition of the requirements of the Washington Franchise Investment Protection Act (the "Act") and the rules and regulations promulgated thereunder, this Franchise shall be modified as follows:

The State of Washington has a statute, RCW 19.100.180, which might supersede this Franchise in Franchisee's relationship with McDonald's, including the areas of termination and renewal of this Franchise.  There also might be court decisions which supersede this Franchise in Franchisee's relationship with McDonald's, including the areas of termination and renewal of this Franchise.

In the event of a conflict of laws, to the extent required by the Act, the provisions of the Act, Chapter 19.100 RCW, shall prevail.

To the extent required by the Act, a release or waiver of rights executed by a franchisee shall not include rights under the Act except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel.  Provisions such as those which unreasonably restrict or limit the statute of limitations period for claims under the Act, rights or remedies under the Act, such as a right to a jury trial, might not be enforceable; however, McDonald's and Franchisee agree to enforce them to the maximum extent the law allows."

# EXHIBIT D

## FRANCHISE AGREEMENT (WALMART)

[CITY, STATE]
[Address]
L/C: _____
File #:  _____

## FRANCHISE AGREEMENT

**THIS FRANCHISE AGREEMENT** ("Franchise") made this _____ day of _____, for the operation of a McDonald's restaurant at the Walmart store located at _____ (the "Restaurant") by and between:

### McDONALD'S USA, LLC,

a Delaware limited liability company,

("McDonald's")

and

_____

_____

(collectively "Franchisee")

for the purpose of granting the Franchisee the rights necessary to operate the Restaurant.

In consideration of the mutual rights and obligations contained herein McDonald's and Franchisee agree as follows:

1. ***Nature and Scope of Franchise***.

(a)    McDonald's operates a restaurant system ("McDonald's System").  The McDonald's System is a comprehensive system for the ongoing development, operation, and maintenance of McDonald's restaurant locations which have been selected and developed for the retailing of a limited menu of uniform and quality food products, emphasizing prompt and courteous service in a clean, wholesome atmosphere which is intended to be attractive to children and families and includes proprietary rights in certain valuable trade names, service marks, and trademarks, including the trade names "McDonald's" and "McDonald's Hamburgers," designs and color schemes for restaurant buildings, signs, equipment layouts, formulas and specifications for certain food products, methods of inventory and operation control, bookkeeping and accounting, and manuals covering business practices and policies.  The McDonald's System is operated and is advertised widely within the United States of America and in certain foreign countries.

(b)    McDonald's holds the right to authorize the adoption and use of the McDonald's System at the Restaurant.  McDonald's entered into a Master Lease Agreement with certain Wal-Mart entities (collectively "Walmart") dated February 1, 2011, as amended ("Master Lease"), a copy of which is attached hereto as Exhibit A

EXHIBIT O(85)
AOE2093

and made a part hereof.  The Master Lease provides McDonald's with the opportunity to operate the Restaurant within the Walmart store located at the above address ("Walmart Store").  The rights granted to the Franchisee to operate the Restaurant are set forth in this Franchise, including the Master Lease.  The rights granted to Franchisee are subject to the Master Lease.  Franchisee acknowledges receipt of a copy of the Master Lease, and Franchisee agrees to comply with all of the provisions of the Master Lease except for McDonald's rent, Utility Reimbursement, and Licensed Premise Improvement Charge obligations.

(c)	The foundation of the McDonald's System and the essence of this Franchise is the adherence by Franchisee to standards and policies of McDonald's providing for the uniform operation of all McDonald's restaurants within the McDonald's System including, but not limited to, serving only designated food and beverage products; the use of only prescribed equipment and building layout and designs; strict adherence to designated food and beverage specifications and to McDonald's prescribed standards of Quality, Service, and Cleanliness in the Restaurant operation.  Compliance by Franchisee with the foregoing standards and policies in conjunction with the McDonald's trademarks and service marks provides the basis for the valuable goodwill and wide family acceptance of the McDonald's System.  Moreover, the establishment and maintenance of a close personal working relationship with McDonald's in the conduct of Franchisee's McDonald's restaurant business, Franchisee's accountability for performance of the obligations contained in this Franchise, and Franchisee's adherence to the tenets of the McDonald's System constitute the essence of this Franchise.

(d)	The provisions of this Franchise shall be interpreted to give effect to the intent of the parties stated in this paragraph 1 so that the Restaurant shall be operated in conformity to the McDonald's System through strict adherence to McDonald's standards and policies as they exist now and as they may be from time to time modified.

(e)	Franchisee acknowledges Franchisee's understanding of McDonald's basic business policy that McDonald's will grant franchises only to those individuals who live in the locality of their McDonald's restaurant, actually own the entire equity interest in the business of the Restaurant and its profits, and who will work full time at their McDonald's restaurant business.  Franchisee represents, warrants, and agrees that Franchisee actually owns the complete equity interest in this Franchise and the profits from the operation of the Restaurant, and that Franchisee shall maintain such interest during the term of this Franchise except only as otherwise permitted pursuant to the terms and conditions of this Franchise.  Franchisee agrees to furnish McDonald's with such evidence as McDonald's may request, from time to time, for the purpose of assuring McDonald's that Franchisee's interest remains as represented herein.

(f)	Franchisee agrees to pay to McDonald's all required payments under this Franchise, including, without limitation, the payments set forth in paragraphs 8 and 9 herein.  All payments hereby required constitute a single financial arrangement between Franchisee and McDonald's which, taken as a whole and without regard to any designation or descriptions, reflect the value of the authorization being made available to the Franchisee by McDonald's in this Franchise and the services rendered by McDonald's during the term hereof.

EXHIBIT O(85)

AOE2094

2.       *Franchise Grant and Term*.

    (a)       McDonald's grants to Franchisee for the following stated term the right, license, and privilege:

        (i)       to adopt and use the McDonald's System at the Restaurant;

        (ii)      to advertise to the public that Franchisee is a franchisee of McDonald's;

        (iii)     to adopt and use, but only in connection with the sale of those food and beverage products which have been designated by McDonald's at the Restaurant, the trade names, trademarks, and service marks which McDonald's shall designate, from time to time, to be part of the McDonald's System; and

        (iv)      to occupy the Restaurant as provided herein.

        The rights granted under this Franchise are limited to the Restaurant's location only.

    (b)       The term of this Franchise shall begin on _____, and end on the earlier of: (i) _____, (ii) the termination of this Franchise pursuant to the provisions hereof, (iii) the closing of the Walmart Store, or (iv) the termination of the Master Lease.

3.       *General Services of McDonald's*.   McDonald's shall advise and consult with Franchisee periodically in connection with the operation of the Restaurant and also, upon Franchisee's request, at other reasonable times.  McDonald's shall communicate to Franchisee know-how, new developments, techniques, and improvements in areas of restaurant management, food preparation, and service which are pertinent to the operation of a restaurant using the McDonald's System.  The communications shall be accomplished by visits by operations consultants, printed and filmed reports, seminars, and newsletter mailings.  McDonald's shall also make available to Franchisee all additional services, facilities, rights, and privileges relating to the operation of the Restaurant which McDonald's makes generally available, from time to time, to all its franchisees operating McDonald's restaurants.

4.       *Manuals*.  McDonald's shall provide Franchisee with the business manuals prepared for use by franchisees of McDonald's restaurants similar to the Restaurant.  The business manuals contain detailed information including: (a) required operations procedures; (b) methods of inventory control; (c) bookkeeping and accounting procedures; (d) business practices and policies; and (e) other management and advertising policies.  Franchisee agrees to promptly adopt and use exclusively the formulas, methods, and policies contained in the business manuals, now and as they may be modified from time to time.  Franchisee acknowledges that McDonald's or its affiliates own all proprietary rights in and to the McDonald's System and that the information revealed in the business manuals, in their entirety, constitute confidential trade secrets.  Without the prior written consent of McDonald's, Franchisee shall not disclose the contents of the business manuals to any person, except employees of Franchisee for purposes related solely to the operation of the Restaurant, nor shall Franchisee reprint or reproduce the manuals in whole or in part for any purpose except in connection with instruction of employees in the operation of the Restaurant.  Such manuals, as modified from time to time, and the policies contained therein, are incorporated in this Franchise by reference.

EXHIBIT O(85)

AOE2095

5.     *Advertising*.  McDonald's employs both public relations and advertising specialists who formulate and carry out national and local advertising programs for the McDonald's System.

Franchisee shall use only advertising and promotional materials and programs provided by McDonald's or approved in advance, in writing, by McDonald's.  Neither the approval by McDonald's of Franchisee's advertising and promotional material nor the providing of such material by McDonald's to Franchisee shall, directly or indirectly, require McDonald's to pay for such advertising or promotion.

Franchisee shall expend during each calendar year for advertising and promotion of the Restaurant to the general public an amount which is not less than four percent (4%) of Gross Sales (as that term is defined in paragraph 7) for such year.  Expenditures by Franchisee to national and regional cooperative advertising and promotion of the McDonald's System, or to a group of McDonald's restaurants which includes the Restaurant, shall be a credit against the required minimum expenditures for advertising and promotion to the general public.

6.     *Training*.  McDonald's shall make available to Franchisee the services of Hamburger University, the international training center for the McDonald's System.  Franchisee acknowledges the importance of quality of business operation among all restaurants in the McDonald's System and agrees to enroll Franchisee and Franchisee's managers, present and future, at Hamburger University or at such other training center as may be designated by McDonald's from time to time.  McDonald's shall bear the cost of maintaining Hamburger University and any other training centers, including the overhead costs of training, staff salaries, materials, and all technical training tools, and agrees to provide to Franchisee both basic and advanced instruction for the operation of a McDonald's System restaurant.  Franchisee shall pay all traveling, living, compensation, or other expenses incurred by Franchisee and Franchisee's employees in connection with attendance at Hamburger University or such other training centers.

7.     *Gross Sales*.  For the purposes of this Franchise, the term "Gross Sales" shall mean all revenues from sales of the Franchisee based upon all business conducted upon or from the Restaurant, whether such sales be evidenced by check, cash, credit, charge account, exchange, or otherwise, and shall include, but not be limited to, the amounts received from the sale of goods, wares, and merchandise, including sales of food, beverages, and tangible property of every kind and nature, promotional or otherwise, and for services performed from or at the Restaurant, together with the amount of all orders taken or received at the Restaurant, whether such orders be filled from the Restaurant or elsewhere.  Gross Sales shall not include sales of merchandise for which cash has been refunded, provided that such sales shall have previously been included in Gross Sales.  There shall be deducted from Gross Sales the price of merchandise returned by customers for exchange, provided that such returned merchandise shall have been previously included in Gross Sales, and provided that the sales price of merchandise delivered to the customer in exchange shall be included in Gross Sales.  Gross Sales shall not include the amount of any sales tax imposed by any federal, state, municipal, or other governmental authority directly on sales and collected from customers, provided that the amount thereof is added to the selling price or absorbed therein and actually paid by the Franchisee to such governmental authority.  Each charge or sale upon credit shall be treated as

EXHIBIT O(85)

AOE2096

a sale for the full price in the month during which such charge or sale shall be made, irrespective of the time when the Franchisee shall receive payment (whether full or partial) therefor.

8.     (a)     ***System Fee***.  Franchisee shall pay a monthly system fee, based upon the Gross Sales of the Restaurant for the preceding month immediately ended, on or before the tenth (10th) day of the following month. The system fee consists of a four percent (4.0%) service fee plus the percent rent in the amount calculated using the chart attached hereto as Schedule B and made a part hereof.  Franchisee shall also pay a Common Area Maintenance Fee (as set forth in Master Lease).

(b)     ***Method of Payment***.  Franchisee shall at all times participate in the McDonald's automatic debit/credit transfer program as specified by McDonald's from time to time for the payment of all amounts due McDonald's pursuant to this Franchise.  Franchisee shall execute and deliver to McDonald's such documents and instruments as may be necessary to establish and maintain said automatic debit/credit transfer program.

(c)     ***Interest on Delinquencies***.  In the event that the Franchisee is past due on the payment of any amount due McDonald's under this Franchise, including accrued interest, the Franchisee shall be required, to the extent permitted by law, to pay interest on the past due amount to McDonald's for the period beginning with the original due date for payment to the date of actual payment at an annual rate equal to the highest rate allowed by law or, if there is no maximum rate permitted by law, then fifteen percent (15%).  Such interest will be calculated on the basis of monthly compounding and the actual number of days elapsed divided by 365.

9.     ***Annual Fee***.  Franchisee acknowledges that:  (a) the initial grant of this Franchise constitutes the sole consideration for the payment of an Annual Fee of One Thousand Dollars ($1,000.00) to be paid by Franchisee to McDonald's on January 10 of each year this Franchise is in effect; and (b) the fee has been earned by McDonald's.

10.     ***Reports***.  On or before 11:00 a.m. Central Standard Time on the first business day of each month, Franchisee shall render, in a manner specified by McDonald's, a statement, in such form as McDonald's shall reasonably require from time to time, of all receipts from the operation of the Restaurant for the preceding month immediately ended.  On or before the twenty-fifth (25th) day of each month Franchisee shall submit to McDonald's an operating statement and a statistical report for the previous month in form satisfactory to McDonald's. Franchisee shall keep and preserve full and complete records of Gross Sales for at least three (3) years in a manner and form satisfactory to McDonald's and shall also deliver such additional financial and operating reports and other information as McDonald's may reasonably request on the forms and in the manner prescribed by McDonald's. Franchisee further agrees to submit within ninety (90) days following the close of each fiscal year of the Restaurant's operation, a profit and loss statement covering operations during such fiscal year and a balance sheet taken as of the close of such fiscal year, all prepared in accordance with generally accepted accounting principles.  The profit and loss statement and the balance sheet shall, if McDonald's shall request certification, be certified by a certified public accountant.  Franchisee shall at Franchisee's expense cause Franchisee's public accountant and certified public accountant, if any, to consult with McDonald's concerning such statement and balance sheet.  The original of each

EXHIBIT O(85)

AOE2097

such report required by this paragraph 10 shall be mailed to McDonald's at the address indicated in paragraph 22 herein.

McDonald's shall have the right to inspect and/or audit Franchisee's accounts, books, records, and tax returns at all reasonable times to ensure that Franchisee is complying with the terms of this Franchise.  If such inspection discloses that Gross Sales actually exceeded the amount reported by Franchisee as Gross Sales by an amount equal to two percent (2%) or more of Gross Sales originally reported to McDonald's, Franchisee shall bear the cost of such inspection and audit.

11.     ***Restrictions***.  Franchisee agrees and covenants as follows:

(a)     During the term of this Franchise, Franchisee shall not, without the prior written consent of McDonald's, directly or indirectly, engage in, acquire any financial or beneficial interest (including interests in corporations, partnerships, trusts, unincorporated associations, or joint ventures) in, or become a landlord for any restaurant business, which is similar to the Restaurant.

(b)     Franchisee shall not, for a period of eighteen (18) months after termination of this Franchise for any reason or the sale of the Restaurant, directly or indirectly, engage in or acquire any financial or beneficial interest (including any interest in corporations, partnerships, trusts, unincorporated associations, or joint ventures) in, or become a landlord of any restaurant business which is similar to the Restaurant within a ten-mile radius of the Restaurant.

(c)     Franchisee shall not appropriate, use, or duplicate the McDonald's System, or any portion thereof, for use at any other self-service, carry-out, or other similar restaurant business.

(d)     Franchisee shall not disclose or reveal any portion of the McDonald's System to a non-franchisee other than to Franchisee's Restaurant employees as an incident of their training.

(e)     Franchisee shall acquire no right to use, or to license the use of, any name, mark, or other intellectual property right granted or to be granted herein, except in connection with the operation of the Restaurant.

The restrictions contained in paragraphs 11(a) and 11(b) herein shall not apply to ownership of less than two percent (2%) of the shares of a company whose shares are listed and traded on a national or regional securities exchange.

12.     ***Compliance With Entire System***.  Franchisee acknowledges that every component of the McDonald's System is important to McDonald's and to the operation of the Restaurant as a McDonald's restaurant, including a designated menu of food and beverage products; uniformity of food specifications, preparation methods, quality, and appearance; and uniformity of facilities and service.

McDonald's shall have the right to inspect the Restaurant at all reasonable times to ensure that Franchisee's operation thereof is in compliance with the standards and policies of the McDonald's System.

Franchisee shall comply with the entire McDonald's System, including, but not limited to, the following:

(a)     Operate the Restaurant in a clean, wholesome manner in compliance with prescribed standards of Quality, Service, and Cleanliness; comply with all business policies, practices, and procedures imposed

EXHIBIT O(85)

AOE2098

by McDonald's; serve at the Restaurant only those food and beverage products now or hereafter designated by McDonald's; and maintain the building, fixtures, equipment, signage, seating and decor, and parking area in a good, clean, wholesome condition and repair, and well lighted and in compliance with designated standards as may be prescribed from time to time by McDonald's;

(b)      Purchase kitchen fixtures, lighting, seating, signs, and other equipment in accordance with the equipment specifications and layout initially designated by McDonald's and, promptly after notice from McDonald's that the Restaurant premises are ready for occupancy, cause the installation thereof;

(c)      Keep the Restaurant constructed and equipped in accordance with the building blueprints and equipment layout plans that are standard in the McDonald's System or as such blueprints and plans may be reasonably changed from time to time by McDonald's;

(d)      Franchisee shall not, without the prior written consent of McDonald's:  (i) make any building design conversion or (ii) make any alterations, conversions, or additions to the building, equipment, or parking area;

(e)      Make repairs or replacements required:  (i) because of damage or wear and tear or (ii) in order to maintain the Restaurant building and parking area in good condition and in conformity to blueprints and plans;

(f)      Where parking is provided, maintain the parking area for the exclusive use of Restaurant customers;

(g)      Operate the Restaurant seven (7) days per week throughout the year and at least during the greater of:  (i) the hours from 7:00 a.m. to 11:00 p.m. or (ii) the hours of operation of the Walmart Store, or such other hours as may from time to time be prescribed by McDonald's (except when the Restaurant is untenantable as a result of fire or other casualty); maintain sufficient supplies of food and paper products; and employ adequate personnel so as to operate the Restaurant at its maximum capacity and efficiency;

(h)      Cause all employees of Franchisee, while working in the Restaurant, to:  (i) wear uniforms of such color, design, and other specifications as McDonald's may designate from time to time; (ii) present a neat and clean appearance; and (iii) render competent and courteous service to Restaurant customers;

(i)      In the dispensing and sale of food products:  (i) use only containers, cartons, bags, napkins, other paper goods, and packaging bearing the approved trademarks and which meet the McDonald's System specifications and quality standards which McDonald's may designate from time to time; (ii) use only those flavorings, garnishments, and food and beverage ingredients which meet the McDonald's System specifications and quality standards which McDonald's may designate from time to time; and (iii) employ only those methods of food handling and preparation which McDonald's may designate from time to time;

(j)      To make prompt payment in accordance with the terms of invoices rendered to Franchisee on Franchisee's purchase of fixtures, signs, equipment, and food and paper supplies; and

(k)      At Franchisee's own expense, comply with all federal, state, and local laws, ordinances, and regulations affecting the operation of the Restaurant.

EXHIBIT O(85)

AOE2099

13.     ***Best Efforts***.  Franchisee shall diligently and fully exploit the rights granted in this Franchise by personally devoting full time and best efforts and, in case more than one individual has executed this Franchise as the Franchisee, then _____ shall personally devote full time and best efforts to the operation of the Restaurant.  Franchisee shall keep free from conflicting enterprises or any other activities which would be detrimental to or interfere with the business of the Restaurant.

14.     ***INTENTIONALLY DELETED***.

15.     ***Assignment***.  Without the prior written consent of McDonald's, Franchisee's interest in this Franchise shall not be assigned or otherwise transferred in whole or in part (whether voluntarily or by operation of law) directly, indirectly, or contingently, and then only in accordance with the terms of this paragraph 15.

(a)     Death or Permanent Incapacity of Franchisee.  Upon the death or permanent incapacity of Franchisee, the interest of Franchisee in this Franchise may be assigned either pursuant to the terms of paragraph 15(d) herein or to one or more of the following persons:  Franchisee's spouse, heirs, or nearest relatives by blood or marriage, subject to the following conditions:  (i) if, in the sole discretion of McDonald's, such person shall be capable of conducting the Restaurant business in accordance with the terms and conditions of this Franchise and (ii) if such person shall also execute an agreement by which the person personally assumes full and unconditional liability for and agrees to perform all the terms and conditions of this Franchise to the same extent as the original Franchisee.  If, in McDonald's sole discretion, such person cannot devote full time and best efforts to the operation of the Restaurant or lacks the capacity to operate the Restaurant in accordance with this Franchise, McDonald's shall have an option to operate and/or manage the Restaurant for the account of Franchisee or of Franchisee's estate until the deceased or incapacitated Franchisee's interest is transferred to another party acceptable to McDonald's in accordance with the terms and conditions of this Franchise.  However, in no event shall such McDonald's operation and management of the Restaurant continue for a period in excess of twelve (12) full calendar months without the consent of Franchisee or Franchisee's estate.  In the event that McDonald's so operates and/or manages the Restaurant, McDonald's shall make a complete account to and return the net income from such operation to the Franchisee or to Franchisee's estate, less a reasonable management fee and expenses.  If the disposition of the Restaurant to a party acceptable to McDonald's has not taken place within twelve (12) months from the date that McDonald's has commenced the operation or management of the Restaurant on behalf of the deceased or incapacitated Franchisee, then, in that event, McDonald's shall have the option to purchase the Restaurant at fair market value for cash or its common stock at its option.

(b)     Assignment to Franchisee's Corporation.  Upon Franchisee's compliance with such requirements as may from time to time be prescribed by McDonald's, including a Stockholders Agreement in the form prescribed by McDonald's, McDonald's shall consent to an assignment to a corporation whose shares are wholly owned and controlled by Franchisee.  The corporate name of the corporation shall not include any of the names or trademarks granted by this Franchise.  Any subsequent assignment or transfer, either voluntarily or by operation of law, of all or any part of said shares shall be made in compliance with the terms and conditions set forth in paragraphs 15(a) and 15(d) herein.

EXHIBIT O(85)

AOE2100

(c)      First Option to Purchase.  Franchisee or Franchisee's representative shall, at least twenty (20) days prior to the proposed effective date, give McDonald's written notice of intent to sell or otherwise transfer this Franchise pursuant to paragraph 15(d).  The notice shall set forth the name and address of the proposed purchaser and all the terms and conditions of any offer.  McDonald's shall have the first option to purchase the Restaurant by giving written notice to Franchisee of its intention to purchase on the same terms as the offer within ten (10) days following McDonald's receipt of such notice.  However, if McDonald's fails to exercise its option and the Restaurant is not subsequently sold to the proposed purchaser for any reason, McDonald's shall continue to have, upon the same conditions, a first option to purchase the Restaurant upon the terms and conditions of any subsequent offer.

(d)      Other Assignment.  In addition to any assignments or contingent assignments contemplated by the terms of paragraphs 15(a) and 15(b), Franchisee shall not sell, transfer, or assign this Franchise to any person or persons without McDonald's prior written consent.  Such consent shall not be arbitrarily withheld.

In determining whether to grant or to withhold such consent, McDonald's shall consider of each prospective transferee, by way of illustration, the following:  (i) work experience and aptitude, (ii) financial background, (iii) character, (iv) ability to personally devote full time and best efforts to managing the Restaurant, (v) residence in the locality of the Restaurant, (vi) equity interest in the Restaurant, (vii) conflicting interests, and (viii) such other criteria and conditions as McDonald's shall then apply in the case of an application for a new franchise to operate a McDonald's restaurant.  McDonald's consent shall also be conditioned each upon such transferee's execution of an agreement by which transferee personally assumes full and unconditional liability for and agrees to perform from the date of such transfer all obligations, covenants, and agreements contained in this Franchise to the same extent as if transferee had been an original party to this Franchise.  Franchisee and each transferor shall continue to remain personally liable for all affirmative obligations, covenants, and agreements contained herein for the full term of this Franchise or for such shorter period as McDonald's may, in its sole discretion, determine.  Upon each assignment or other transfer of this Franchise to any person or persons under the terms and conditions of this paragraph 15(d), the percentage service fee charge owing to McDonald's after the date of such assignment or transfer shall be automatically adjusted to the then prevailing percentage service fee charge required under new Franchises issued by McDonald's for similar McDonald's restaurants at the time of such assignment or transfer.

16.      *Franchisee Not an Agent of McDonald's*.  Franchisee shall have no authority, express or implied, to act as agent of McDonald's or any of its affiliates for any purpose.  Franchisee is, and shall remain, an independent contractor responsible for all obligations and liabilities of, and for all loss or damage to, the Restaurant and its business, including any personal property, equipment, fixtures, or real property connected therewith, and for all claims or demands based on damage or destruction of property or based on injury, illness, or death of any person or persons, directly or indirectly, resulting from the operation of the Restaurant.  Further, Franchisee and McDonald's are not and do not intend to be partners, associates, or joint employers in any way and McDonald's shall not be construed to be jointly liable for any acts or omissions of Franchisee under any circumstances.

17.     ***Insurance***.  Franchisee shall, upon taking possession of the Restaurant, acquire and maintain in effect not less than the following coverages in the following minimum amounts:

(a)     Worker's Compensation insurance prescribed by law in the state in which the Restaurant is located and Employer's Liability Insurance with $1,000,000 minimum limit.  If the state in which the Restaurant is located allows the option of not carrying Worker's Compensation Insurance, and Franchisee chooses to exercise that option, Franchisee shall nonetheless carry and maintain other insurance with coverage and limits as approved by McDonald's.

(b)     Commercial general liability insurance in a form approved by McDonald's with a limit of $10,000,000 per occurrence/$10,000,000 aggregate.

(c)     All such insurance as may be required under the Master Lease.

All insurance policies required to be carried hereunder shall name McDonald's USA, LLC, the applicable Wal-Mart entity, and any party designated by McDonald's as additional insureds, as their interests may appear in this Franchise.  All policies shall be effective on or prior to the date Franchisee is given possession of the Restaurant premises for the purpose of installing equipment or opening the Restaurant, whichever occurs first, and evidence of payment of premiums and duplicate copies of policies of the insurance required herein shall be delivered to McDonald's at least thirty (30) days prior to the date that Franchisee opens for business and/or thirty (30) days prior to the expiration date of an existing policy of insurance.  All policies of insurance shall include a provision prohibiting cancellations or material changes to the policy thereof until thirty (30) days prior written notice has been given to McDonald's.

In the event Franchisee shall fail to obtain the insurance required herein, McDonald's may, but is not obligated to, purchase said insurance, adding the premiums paid to Franchisee's monthly rent.  (Franchisee may authorize McDonald's to purchase and to administer the required minimum insurance on Franchisee's behalf.  However, McDonald's, by placement of the required minimum insurance, assumes no responsibility for premium expense nor guarantees payment for any losses sustained by Franchisee.)  McDonald's may relieve itself of all obligations with respect to the purchase and administration of such required insurance coverage by giving ten (10) days written notice to Franchisee.

All insurance shall be placed with a reputable insurance company licensed to do business in the state in which the Restaurant is located and having a Financial Size Category equal to or greater than IX and Policyholders Rating of "A+" or "A", as assigned by Alfred M. Best and Company, Inc., unless otherwise approved by McDonald's.

18.     ***Material Breach***.  The parties agree that the happening of any of the following events shall constitute a material breach of this Franchise and violate the essence of Franchisee's obligations and, without prejudice to any of its other rights or remedies at law or in equity, McDonald's, at its election, may terminate this Franchise upon the happening of any of the following events:

(a)     Franchisee shall fail to maintain and operate the Restaurant in a good, clean, wholesome manner and in compliance with the standards prescribed by the McDonald's System;

EXHIBIT O(85)

AOE2102

(b)     Franchisee shall be adjudicated a bankrupt, become insolvent, or a receiver, whether permanent or temporary, for all or substantially all of Franchisee's property, shall be appointed by any court, or Franchisee shall make a general assignment for the benefit of creditors, or a voluntary or involuntary petition under any bankruptcy law shall be filed with respect to Franchisee and shall not be dismissed within thirty (30) days thereafter;

(c)     Any payment owing to McDonald's is not paid within thirty (30) days after the date such payment is due;

(d)     Any judgment or judgments aggregating in excess of $5,000.00 against Franchisee or any lien in excess of $5,000.00 against Franchisee's property shall remain unsatisfied or unbonded of record in excess of thirty (30) days;

(e)     Franchisee shall cause, suffer, or permit (voluntarily or involuntarily) Franchisee's right of possession as lessee or sublessee of the premises on which the Restaurant is located to be terminated prematurely for any cause whatever;

(f)     Franchisee shall acquire any interest in a business in violation of paragraph 11(a);

(g)     Franchisee shall duplicate the McDonald's System in violation of paragraph 11(c);

(h)     Franchisee shall make or cause a disclosure of any portion of the McDonald's System in violation of paragraph 11(d) or shall make or cause a disclosure of part of the McDonald's System business manuals;

(i)     Franchisee shall violate paragraph 11(e) by use of any name, trademark, service mark, or other intellectual property right exceeding the restrictions of said paragraph 11;

(j)     Franchisee shall knowingly sell food or beverage products other than those designated by McDonald's or which fail to conform to McDonald's System specifications for those products, or which are not prepared in accordance with the methods prescribed by McDonald's, or fail to sell products designated by McDonald's;

(k)     Any assignment or other transfer of any interest of the Franchisee in this Franchise shall occur in violation of paragraph 15(d) herein;

(l)     Franchisee shall deny McDonald's the right to inspect the Restaurant at reasonable times;

(m)     Franchisee shall fail to make or make repeated delays in the prompt payment of undisputed invoices from suppliers or in the remittance of payments as required by this Franchise;

(n)     Franchisee makes any misrepresentations to McDonald's relating to the acquisition and/or ownership of this Franchise;

(o)     Franchisee engages in public conduct which reflects materially and unfavorably upon the operation of the Restaurant, the reputation of the McDonald's System, or the goodwill associated with the McDonald's trademarks; provided that engaging in legitimate political activity (including testifying, lobbying, or otherwise attempting to influence legislation) shall not be grounds for termination;

(p)     Franchisee is convicted of, pleads guilty or no contest to a felony, or any other crime that is reasonably likely to adversely affect the McDonald's System, the Restaurant, or the goodwill associated with the McDonald's trademarks;

(q)     Franchisee intentionally understates Gross Sales reported to McDonald's; or

(r)     Any default under the Master Lease by the Franchisee.

19.     ***Other Breaches***.  If Franchisee fails in the performance of any of the terms and conditions of this Franchise (other than performance of the terms and conditions listed in paragraph 18), Franchisee shall be guilty of a breach of this Franchise which shall not (except in the case of repeated breaches of the same or of different terms and conditions of this Franchise) constitute grounds for termination of this Franchise.  McDonald's shall have the right to seek judicial enforcement of its rights and remedies, including, but not limited to, injunctive relief, damages, or specific performance.  Notwithstanding any of the provisions of this paragraph 19, any uncured breach of the terms of this Franchise (whether of paragraph 18 or 19) shall be sufficient reason for McDonald's to withhold approval of its consent to any assignment or transfer of Franchisee's interest in this Franchise provided for herein.

20.     ***Effect of Termination***.

(a)     In the event of any material breach of this Franchise, McDonald's shall have an immediate right to enter and take possession of the Restaurant in order to maintain continuous operation of the Restaurant, to provide for orderly change of management and disposition of personal property, and to otherwise protect McDonald's interest.

(b)     Upon termination of this Franchise due to any breach or breaches, Franchisee shall not, without the prior written consent of McDonald's, remove any furniture, fixtures, signs, equipment, other property, or leasehold improvements from the premises either prior to or for a period of thirty (30) days following such termination.  McDonald's shall have the option for thirty (30) days following any such termination to purchase Franchisee's furniture, fixtures, signs, equipment, other property, and leasehold improvements or any portion thereof for a sum equal to the fair market value of such property.  In the event of such a termination, there shall be no payment by McDonald's for intangible assets of Franchisee.

(c)     Upon termination of this Franchise due to the expiration of its term or as a result of any eminent domain proceedings affecting the premises upon which the Restaurant is situated, Franchisee shall not remove any furniture, fixtures, signs, equipment, other property, or leasehold improvements within sixty (60) days prior to the date specified for termination or the date specified for takeover by any public authority.  McDonald's shall, upon written notice of its intention to purchase said property at least thirty (30) days prior to such date of termination, have the option to purchase Franchisee's furniture, fixtures, signs, equipment, other property, and leasehold improvements or any portion thereof for a sum equal to the fair market value of such property.  In the event of such a termination, there shall be no payment by McDonald's for intangible assets of Franchisee.

(d)     Upon termination or expiration of this Franchise, Franchisee shall:  (i) forthwith return to McDonald's the business manuals furnished to Franchisee, together with all other material containing trade secrets, operating instructions, or business practices; (ii) discontinue the use of the McDonald's System and its associated

trade names, service marks, and trademarks or the use of any and all signs and printed goods bearing such names and marks, or any reference to them; (iii) not disclose, reveal, or publish all or any portion of the McDonald's System; and (iv) not thereafter use any trade name, service mark, or trademark similar to or likely to be confused with any trade name, service mark, or trademark used at any time in the McDonald's System.

21.     *Effect of Waivers*.  No waiver by McDonald's or any breach or a series of breaches of this Franchise shall constitute a waiver of any subsequent breach or waiver of the terms of this Franchise.

22.     *Notices*.  Any notice hereunder shall be in writing and shall be delivered by personal service or by United States certified or registered mail, with postage prepaid, addressed to Franchisee at the Restaurant or to McDonald's at **110 N. CARPENTER STREET, CHICAGO, ILLINOIS 60607**.  Either party, by a similar written notice, may change the address to which notices shall be sent.

23.     *Cost of Enforcement*.  If McDonald's institutes any action at law or in equity against Franchisee to secure or protect McDonald's rights under or to enforce the terms of this Franchise, in addition to any judgment entered in its favor, McDonald's shall be entitled to recover such reasonable attorneys' fees as may be allowed by the court together with court costs and expenses of litigation.

24.     *Indemnification*.  If McDonald's shall be subject to any claim, demand, or penalty or become a party to any suit or other judicial or administrative proceeding by reason of any claimed act or omission by Franchisee or Franchisee's employees or agents, or by reason of any act occurring on the Restaurant premises, or by reason of an omission with respect to the business or operation of the Restaurant, Franchisee shall indemnify and hold McDonald's harmless against all judgments, settlements, penalties, and expenses, including attorneys' fees, court costs, and other expenses of litigation or administrative proceeding, incurred by or imposed on McDonald's in connection with the investigation or defense relating to such claim, litigation, or administrative proceeding and, at the election of McDonald's, Franchisee shall also defend McDonald's.

25.     *Construction and Severability*.  All references in this Franchise to the singular shall include the plural where applicable.  If any part of this Franchise for any reason shall be declared invalid, such decision shall not affect the validity of any remaining portion, which shall remain in full force and effect.  In the event that any material provision of this Franchise shall be stricken or declared invalid, McDonald's reserves the right to terminate this Franchise.

26.     *Scope and Modification of Franchise*.  This Franchise (including Exhibit A and any riders hereto) constitutes the entire agreement between the parties and supersedes all prior and contemporaneous, oral or written, agreements or understandings of the parties.  Nothing in this Franchise or in any related agreement, however, is intended to disclaim the representations made in the Franchise Disclosure Document furnished to Franchisee.  No interpretation, change, termination, or waiver of any of the provisions hereof shall be binding upon McDonald's unless in writing signed by an officer or franchising director of McDonald's, and which is specifically identified as an amendment hereto.  No modification, waiver, termination, rescission, discharge, or cancellation of this Franchise shall affect the right of any party hereto to enforce any claim or right hereunder, whether or not liquidated, which occurred prior to the date of such modification, waiver, termination, rescission, discharge, or cancellation.

EXHIBIT O(85)

AOE2105

27.     *Governing Laws*.  The terms and provisions of this Franchise shall be interpreted in accordance with and governed by the laws of the state of Illinois.

28.     *Acknowledgment*.  Franchisee acknowledges that:

(a)     The term of this Franchise is set forth in paragraph 2(b) hereof with no promise or representation as to the renewal of this Franchise or the grant of a new franchise;

(b)     Franchisee hereby represents that Franchisee has received a copy of this Franchise, has read and understands all obligations being undertaken, and has had an opportunity to consult with Franchisee's attorney with respect thereto at least seven (7) calendar days prior to execution;

(c)     No representation has been made by McDonald's as to the future profitability of the Restaurant;

(d)     Prior to the execution of this Franchise, Franchisee has worked at a McDonald's restaurant and has had ample opportunity to contact existing franchisees of McDonald's and to investigate all representations made by McDonald's relating to the McDonald's System;

(e)     This Franchise establishes the Restaurant at the location specified on page 1 hereof only and that no "exclusive," "protected," or other territorial rights in the contiguous market area of such Restaurant is hereby granted or inferred;

(f)     This Franchise supersedes any and all other agreements and representations respecting the Restaurant and contains all the terms, conditions, and obligations of the parties with respect to the grant of this Franchise; however, nothing in this Franchise or in any related agreement is intended to disclaim the representations made in the Franchise Disclosure Document furnished to Franchisee;

(g)     McDonald's or its affiliates are the sole owner(s) of the trademarks, trade names, service marks, and goodwill associated therewith, respectively, and Franchisee acquires no right, title, or interest in those names and marks other than the right to use them only in the manner and to the extent prescribed and approved by McDonald's;

(h)     No future franchise or offers of franchises for additional McDonald's restaurants, other than this Franchise, have been promised to Franchisee and any other franchise offer shall only be in writing, executed by an officer or franchising director of McDonald's, and identified as a Franchise Agreement or Rewrite (New Term) Offer Letter;

(i)     Neither McDonald's nor anyone acting on its behalf has made any representations, inducements, promises, or agreements, orally or otherwise, respecting the subject matter of this Franchise, which is not embodied herein or set forth in the Franchise Disclosure Document; and

(j)     This Franchise is offered to Franchisee personally and to no others, and may not be accepted by any other person, partnership, or corporation, or transferred by assignment, will, or operation of law.

EXHIBIT O(85)

AOE2106

**IN WITNESS WHEREOF**, the parties hereto set their hands and seals, in duplicate, the day and year in this instrument first above written.

**McDONALD'S USA, LLC**                                    **Franchisee**

By: _____          _____
                                                                                    Date

Prepared By:_____          _____
                                                                                    Date

EXHIBIT O(85)

AOE2107

**The following changes are made to the Franchise Agreement in the following states:**

**Minnesota**        Paragraph 27 continues with, "Nothing in this Franchise or the Franchise Disclosure Document shall in any way abrogate or reduce any rights of the Franchisee as provided for in Minnesota Statutes, Chapter 80C, or Franchisee's rights to any procedure, forum, or remedies provided for by the laws of the jurisdiction."

A new Paragraph 28(h) is inserted (and remaining sub-paragraphs are renamed (i) through (k)) as follows:  "McDonald's considers the trademarks, trade names, logo types, service marks, and commercial symbols to be valuable property rights and continually protects against infringement of these assets.  It protects franchisees against claims of infringement or unfair competition to which the franchisees might become subjected because of their authorized use of the trademarks, service marks, logo types, or other commercial symbols in the United States."

Paragraph 28(l) is added as follows:  "With respect to franchises governed by Minnesota law, McDonald's will comply with Minnesota Statutes Section 80C.14, Subdivisions 3, 4, and 5 which require, except in certain specified cases, that the Franchisee be given ninety (90) days notice of termination (with sixty (60) days to cure) and 180 days notice for non-renewal of this Franchise; and that consent to the transfer of this Franchise will not be unreasonably withheld."

**North Dakota**     Paragraph 11(b) continues with, "Covenants not to compete such as those mentioned above are generally considered unenforceable in the State of North Dakota.  However, Franchisee and McDonald's agree to enforce these provisions to the extent allowed under law."

Paragraph 27 continues with, ", except that North Dakota law will govern with respect to claims arising under the North Dakota Franchise Investment Law."

**Washington**       Paragraph 28(k) is added as follows:  "In recognition of the requirements of the Washington Franchise Investment Protection Act (the "Act") and the rules and regulations promulgated thereunder, this Franchise shall be modified as follows:

The State of Washington has a statute, RCW 19.100.180, which might supersede this Franchise in Franchisee's relationship with McDonald's, including the areas of termination and renewal of this Franchise.  There also might be court decisions which supersede this Franchise in Franchisee's relationship with McDonald's, including the areas of termination and renewal of this Franchise.

In the event of a conflict of laws, to the extent required by the Act, the provisions of the Act, Chapter 19.100 RCW, shall prevail.

To the extent required by the Act, a release or waiver of rights executed by a franchisee shall not include rights under the Act except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel.  Provisions such as those which unreasonably restrict or limit the statute of limitations period for claims under the Act, rights or remedies under the Act, such as a right to a jury trial, might not be enforceable; however, McDonald's and Franchisee agree to enforce them to the maximum extent the law allows."

# EXHIBIT E

## NEW RESTAURANT RIDER

[CITY, STATE]
[Address]
L/C: _____
File #: _____

<u>New Restaurant Rider</u>

   This Rider is attached to and incorporated into that certain Franchise Agreement, dated _____ ("Franchise"), by and between **McDonald's USA, LLC**, a Delaware limited liability company ("McDonald's") and _____ and _____ (collectively "Franchisee").

   1.  Franchisee represents and warrants that all of the financial terms relating to Franchisee's acquisition of the Restaurant have been disclosed in writing to McDonald's and that McDonald's grant of the Franchise to Franchisee is based on its evaluation of these financial terms. Franchisee agrees that the failure to disclose all financial terms to McDonald's will constitute a material breach of the Franchise pursuant, among other provisions, to paragraph 18(n) of the Franchise, thereby entitling McDonald's to all rights and remedies under the Franchise including, but not limited to, the right to terminate the Franchise.

   2.  Prior to the opening date of the Restaurant, all construction extras ordered or authorized by Franchisee for which McDonald's has paid the parties constructing the Restaurant must be paid by Franchisee to McDonald's.

   3.  The amount of the monthly base rental payment in the Operator's Lease (Exhibit A to this Franchise) is computed based in part on McDonald's total current real estate costs and its estimated construction costs. If those costs increase within 180 days after the opening date of the Restaurant, the monthly base rental payment will be recomputed and increased based on the increased costs, but only to a maximum monthly base rental increase of $325.00. The corresponding monthly base sales will be adjusted accordingly. The effective date of the increase will be 180 days after the opening date of the Restaurant.

**[Additional paragraph to be used for Co-investment, if applicable.]**
   4.  On or before the opening date of the Restaurant, Franchisee will pay to McDonald's a one-time contribution in the amount of $_____ toward the costs of constructing the Restaurant ("Improvement Costs"). Improvement Costs means in the aggregate any and all costs associated with the design, permitting, materials, and construction of the building and site improvements (the building and site improvements are collectively referred to in this Rider as the "Improvements"), including, but not limited to, survey and design plans; zoning, subdivision, and other land use assessments, applications, permits, and approvals; title and other legal reviews; soil borings, environmental, and other physical studies and investigations; the demolition of the existing building and site improvements and proper disposal of any resulting debris; any interest expense incurred by McDonald's; and all fees, expenses, overhead, and profit payable to outside consultants (including attorneys, architects, engineers, contractors, suppliers, etc.) for services, labor, and materials in connection with the design, permitting, and construction of the Restaurant.

**[Additional paragraph to be used for Co-investment, if applicable.]**
   5.  Franchisee and McDonald's agree that Improvements attributable to Franchisee's share of total Improvement Costs will be treated for income tax purposes as lessee improvements; that Franchisee will be entitled to any cost recovery, depreciation, or amortization deductions available under

applicable income tax laws for Improvements; and that McDonald's will not claim any cost recovery, depreciation, or amortization deductions with respect to Improvements. Franchisee and McDonald's agree that Improvements attributable to McDonald's share of total Improvement Costs will be treated for income tax purposes as owned by McDonald's; that McDonald's will be entitled to any cost recovery, depreciation, or amortization deductions available under applicable income tax laws for Improvements; and that Franchisee will not claim any cost recovery, depreciation, or amortization deductions with respect to Improvements. Franchisee and McDonald's further agree that any Franchisee's share of total Improvement Costs is not intended to be, and will not be treated as, in whole or in part, a substitute for rent. Neither Franchisee nor McDonald's will take any position on any tax return or in any tax proceeding that is inconsistent with the tax treatment provided in this paragraph.

Franchisee and McDonald's will each be treated as incurring a pro rata portion of each cost item that constitutes an Improvement Cost. Franchisee's pro rata portion will be equal to the ratio of Franchisee's share to total Improvement Costs. McDonald's pro rata portion will be equal to the ratio of McDonald's share to total Improvement Costs. If Franchisee chooses to perform a cost segregation study with respect to Franchisee's share of Improvement Costs, Franchisee will be solely responsible for all costs and expenses incurred in connection with performing the study. Notwithstanding the preceding sentences, and except for any leasehold estate in the land granted Franchisee in connection with this Franchise, McDonald's will have the exclusive legal and equitable right, title, and interest in and to the land and Improvements.

Franchisee is solely responsible for preparing and filing all personal property, sales and use, and other tax returns and for paying all personal property, sales and use, and other taxes, if any, associated with Improvement Costs.

**[Additional paragraphs to be used for Co-investment, if applicable.]**
6.      In connection with Franchisee's payment of a share of the Improvement Costs, Section 3.07 is hereby added to the Lease:

3.07   **Allocations of Rent**. Each payment of Basic Rent payable hereunder on a monthly basis shall be allocated to and accrue during the calendar month in which such Basic Rent payment is due (i.e., the commencement date, in the case of the first payment, and thereafter the first day of each month). Each payment of Percentage Rent payable hereunder shall be allocated to and accrue during the same period as the Gross Sales period used to compute the amount of such Percentage Rent. Payments of rent with respect to real estate taxes, assessments, other expenses and other charges shall be allocated to and accrue during the periods to which such real estate taxes, assessments, other expenses and other charges relate. Any other rent paid or deemed paid to Landlord and not otherwise appropriately attributable to a specific period shall be allocated to and accrue during the period beginning on the date of such payment or deemed payment and ending at the scheduled termination date of the term of this Lease.

**[Additional paragraph to be used for Oil sites.]**
7.      Franchisee agrees to reimburse McDonald's each year for the premium to obtain pollution/environmental contamination insurance under the terms of Schedule A attached to this Rider.

Franchisee must obtain commercial general liability insurance as required by the Operator's Lease for the benefit of McDonald's and name the oil partner as an additional insured.

**[Schedule to be used for Oil sites.]**

SCHEDULE A

Pollution Coverage (rev. 6/19)

The standard commercial general liability insurance purchased by owner/operators excludes pollution and/or environmental contamination.  Since the oil alliance sites have a pollution exposure if contamination is caused by negligence of McDonald's or the owner/operator, an Environmental Impairment Liability Policy (Pollution) has been purchased by McDonald's for the protection of the owner/operators and McDonald's.

This coverage is being purchased on behalf of the owner/operators because, individually, such insurance is either not available or the cost is prohibitive.

<u>All Oil Alliance sites</u> are covered under this policy.

<u>A brief summary of the coverage follows</u>:

| | |
|---|---|
| Insurance Company: | Beazley Furlonge Ltd |
| Policy Period: | 6/1/19-6/1/20 (renewed annually) |
| Limit of Liability: | $10,000,000 each loss |
| Policy Aggregate Limit: | $10,000,000 |
| Deductible: | $50,000 per occurrence |
| Annual Premium: | $246.64 per location (includes taxes)* |

*This is the premium in effect as of the date of this Franchise and it may increase with the renewal of the policy.

Insurance premiums will be collected via the base rent draft on the third workday of each month.

Owner/operator will be drafted one twelfth of the premium per month except for the first three months of operation.  During the first three months of operation, the following will occur:

- The premium will not be charged for the month of store opening.
- The premium will be due but not drafted for the first full month of operation.
- The second full month's premium along with the first full month's premium will be drafted on the third workday of second month of operation.

Below is an example of how the premium will be drafted based on a June 15th open date and a $246.64 annual premium:

| Month | Amount Due | Amount Drafted on 3rd Workday |
|---|---|---|
| June | $0 | $0 |
| July | $20.55 | $0 |
| August | $20.55 | $41.10 |
| September | $20.55 | $20.55 |

THIS ADDITION TO THE DRAFT DOES NOT CHANGE BASE SALES CALCULATIONS.

Additional details of the coverage can be secured by contacting the McDonald's Insurance Department at 630-623-6594.  For questions on the premium collection procedures, contact a Home Office Representative at 630-623-5319.

3

**EXHIBIT F**

**BFL RIDER**

[CITY, STATE]
[Address]
L/C: _____
File #: _____

<u>BFL Rider</u>

     This Rider is attached to and incorporated into that certain Franchise Agreement, dated _____ ("Franchise"), by and between McDonald's USA, LLC, a Delaware limited liability company ("McDonald's") and _____ and _____ (collectively "Franchisee").

     1.    Franchisee is granted a conditional option to purchase the Business Facilities (as defined in the Operator's Lease, which is Exhibit A to this Franchise) for the Restaurant on the following terms:

**[Alternate paragraph to be used for Fixed Option Price.]**

     a)    After 12 months of operation of the Restaurant business and upon 60 days' notice to McDonald's, Franchisee may purchase: (i) the Business Facilities excluding real estate and building; (ii) the right to occupy the Restaurant premises and building in accordance with the Operator's Lease as amended by paragraph 1d); and (iii) the right to use the McDonald's System as defined in and in accordance with this Franchise (including payment of the initial franchise fee), as amended by paragraph 1d). The purchase price will be $_____.

**[Alternate paragraph and table to be used for Scale Option Price.]**

     a)    After 12 months of operation of the Restaurant business and upon 60 days' notice to McDonald's, Franchisee may purchase: (i) the Business Facilities excluding real estate and building; (ii) the right to occupy the Restaurant premises and building in accordance with the Operator's Lease as amended by paragraph 1d); and (iii) the right to use the McDonald's System as defined in and in accordance with this Franchise (including payment of the initial franchise fee), as amended by paragraph 1d). The purchase price will be the greater of either 1) $_____ or 2) the amount determined by the following table:

| If the trailing 12 months gross sales are between: | Purchase Price |
|---|---|
| $_____ or less | $_____ |
| $_____ and $_____ | $_____ |
| $_____ and up | $_____ |

     Any amounts paid by McDonald's for restaurant equipment or leasehold improvements (collectively add-ons) from the opening date of the Restaurant to the date of the exercise of the conditional option will be added to the purchase price determined above.

     b)    Franchisee will be responsible for payment of all taxes, including, but not limited to, state sales and bulk transfer taxes, which may be due as a result of the exercise of the conditional option.

EXHIBIT O(85)

AOE2112

c)     Franchisee may not exercise the conditional option unless McDonald's has determined to its satisfaction that: (i) Franchisee's operation of the Restaurant has been in compliance with this Franchise; (ii) Franchisee is eligible for growth and rewrite; (iii) Franchisee injects 25% of the purchase price in unencumbered funds; and (iv) the cash flow from the operations of the Restaurant is sufficient.

d)     Upon exercise of the conditional option, this Franchise will be amended to provide for the following term and rental:

(i)     The term will expire 20 years after the opening date of the Restaurant, unless terminated earlier in accordance with this Franchise.

(ii)     A monthly rental payment equal to the basic rent amount, plus the percentage of monthly gross sales in excess of the monthly gross sales amount, as shown on Schedule B1 attached to this Rider.

(iii)     The amount of the monthly base rental payment shown on Schedule B1 attached to this Rider is computed based in part on McDonald's total current real estate costs and its estimated construction costs.  If those costs increase within 180 days after the opening date of the Restaurant, the monthly base rental payment will be recomputed and increased based on the increased costs, but only to a maximum monthly base rental increase of $325.00.  The corresponding monthly base sales will be adjusted accordingly.  The effective date of the increase will be the date of the exercise of the conditional option.

e)     Upon exercise of the conditional option, Franchisee must execute a Business Facilities Lease Option Exercise Agreement with McDonald's on McDonald's standard forms.

f)     The conditional option will not survive the original term of this Franchise and is personal to Franchisee only.

**[Additional paragraph to be used for Oil sites.]**
2.     Franchisee agrees to reimburse McDonald's each year for the premium to obtain pollution/environmental contamination insurance under the terms of Schedule A attached to this Rider.

Franchisee must obtain commercial general liability insurance as required by the Operator's Lease for the benefit of McDonald's and name the oil partner as an additional insured.

EXHIBIT O(85)

AOE2113

[Schedule to be used for Oil sites.]

SCHEDULE A

Pollution Coverage (rev. 6/19)

The standard commercial general liability insurance purchased by owner/operators excludes pollution and/or environmental contamination.  Since the oil alliance sites have a pollution exposure if contamination is caused by negligence of McDonald's or the owner/operator, an Environmental Impairment Liability Policy (Pollution) has been purchased by McDonald's for the protection of the owner/operators and McDonald's.

This coverage is being purchased on behalf of the owner/operators because, individually, such insurance is either not available or the cost is prohibitive.

All Oil Alliance sites are covered under this policy.

A brief summary of the coverage follows:

| | |
|---|---|
| Insurance Company: | Beazley Furlonge Ltd |
| Policy Period: | 6/1/19-6/1/20 (renewed annually) |
| Limit of Liability: | $10,000,000 each loss |
| Policy Aggregate Limit: | $10,000,000 |
| Deductible: | $50,000 per occurrence |
| Annual Premium: | $246.64 per location (includes taxes)* |

*This is the premium in effect as of the date of this Franchise and it may increase with the renewal of the policy.

Insurance premiums will be collected via the base rent draft on the third workday of each month.

Owner/operator will be drafted one twelfth of the premium per month except for the first three months of operation.  During the first three months of operation, the following will occur:

- The premium will not be charged for the month of store opening.
- The premium will be due but not drafted for the first full month of operation.
- The second full month's premium along with the first full month's premium will be drafted on the third workday of second month of operation.

Below is an example of how the premium will be drafted based on a June 15th open date and a $246.64 annual premium:

| Month | Amount Due | Amount Drafted on 3rd Workday |
|---|---|---|
| June | $0 | $0 |
| July | $20.55 | $0 |
| August | $20.55 | $41.10 |
| September | $20.55 | $20.55 |

THIS ADDITION TO THE DRAFT DOES NOT CHANGE BASE SALES CALCULATIONS.

Additional details of the coverage can be secured by contacting the McDonald's Insurance Department at 630-623-6594.  For questions on the premium collection procedures, contact a Home Office Representative at 630-623-5319.

EXHIBIT O(85)

AOE2114

**EXHIBIT G**

**OPERATOR'S LEASE**

[CITY, STATE]
[Address]
L/C:  _____
File:  _____

**EXHIBIT A TO FRANCHISE AGREEMENT**

**OPERATOR'S LEASE**

**TABLE OF CONTENTS**

Article 1     **SUMMARY OF FUNDAMENTAL LEASE PROVISIONS**
Sec.     1.01   Term   1
1.02   Rent   1
1.03   Legal Description   1
1.04   Liability Insurance Limits   1
1.05   Attachments, Exhibits and Addenda   1

Article 2     **PREMISES AND TERM**
Sec.     2.01   Premises   1
2.02   Term   2
2.03   Quiet Enjoyment   2
2.04   Use of Premises   2
2.05   Rule Against Perpetuities   2
2.06   Construction and Delivery of Building and Other Improvements   2
2.07   Acceptance of Premises   2
2.08   Tenant's Compliance With Various Requirements   3

Article 3     **RENT, TAXES, RECORDS AND REPORTS**
Sec.     3.01   Rent   3
3.01   (A) Basic Rent and Pass Thru Rent   3
3.01   (B) Percentage Rent   3
3.01   (C) Definition of "Gross Sales"   3
3.01   (D) Taxes and Assessments   4
3.01   (E) Other Charges and Expenses   5
3.01   (F) Method and Proof of Payment   5
3.02   Records   5
3.03   Reports   5
3.03   (A) Default in Reporting   6
3.03   (B) Inspection of Records by Landlord   6
3.04   No Abatement of Rent   6
3.05   Interest on Delinquencies   6
3.06   Lien for Rent   6

# TABLE OF CONTENTS (Continued)

| | | | |
|---|---|---|---|
| Article 4 | **OBLIGATIONS OF TENANT** | | |
| Sec. | 4.01 | Utilities | 6 |
| | 4.02 | Maintenance and Repair | 6 |
| | 4.03 | Alterations | 7 |
| | 4.04 | Surety | 7 |
| | 4.05 | Liens Against Property | 7 |
| | 4.06 | Assignment by Tenant | 7 |
| | 4.07 | Franchise Agreement | 8 |
| | | | |
| Article 5 | **FIXTURES AND EQUIPMENT** | | |
| Sec. | 5.01 | Fixtures | 8 |
| | 5.02 | Removal of Tenant's Property | 8 |
| | | | |
| Article 6 | **INSURANCE AND DAMAGE TO PROPERTY** | | |
| Sec. | 6.01 | Liability Insurance | 8 |
| | 6.02 | Rental Insurance | 8 |
| | 6.03 | Property Insurance | 8 |
| | 6.04 | Placement and Policies of Insurance | 9 |
| | 6.05 | Repair and Replacement of Buildings | 9 |
| | | | |
| Article 7 | **RIGHTS OF LANDLORD** | | |
| Sec. | 7.01 | Inspection by Landlord | 10 |
| | 7.02 | Indemnity for Litigation | 10 |
| | 7.03 | Waiver of Claims | 10 |
| | 7.04 | Re-entry Upon Default | 10 |
| | 7.05 | Holding Over | 11 |
| | 7.06 | Remedies Cumulative | 12 |
| | 7.07 | Waiver | 12 |
| | 7.08 | Accord and Satisfaction | 12 |
| | 7.09 | Right to Perform for Tenant | 12 |
| | 7.10 | Condemnation | 12 |
| | 7.11 | Subordination and Non-Disturbance | 13 |
| | | | |
| Article 8 | **MISCELLANEOUS** | | |
| Sec. | 8.01 | No Agency Created | 14 |
| | 8.02 | Recording of Lease | 14 |
| | 8.03 | Force Majeure | 14 |
| | 8.04 | Paragraph Headings | 14 |
| | 8.05 | Invalidity of a Provision | 14 |
| | 8.06 | Law Governing | 14 |
| | 8.07 | Entire Agreement | 14 |
| | 8.08 | Parties Bound | 14 |
| | 8.09 | Notices or Demands | 15 |

EXHIBIT O(85)

AOE2116

## OPERATOR'S LEASE

**THIS LEASE** shall be considered effective the same date as the Franchise Agreement to which it is attached (the "Franchise Agreement").  The term "Landlord," when used in this Lease, shall refer to McDonald's USA, LLC, a Delaware limited liability company, and the term "Tenant," when used in this Lease, shall refer to the undersigned Tenant.

In consideration of the mutual promises contained in this Lease, the parties agree as follows:

## ARTICLE 1  SUMMARY OF FUNDAMENTAL LEASE PROVISIONS

1.01  **Term:**  (See Article 2.02)  The term of this Lease will begin on _____ and end on _____.

1.02  **Rent:**  See Article 3.01 and Schedule B, attached.

1.03  **Legal Description:**  See Schedule A and Article 2.01.

1.04  **Liability Insurance Limits:**  $5,000,000 per occurrence/$5,000,000 aggregate.

1.05  **Attachments, Exhibits and Addenda:**  This Lease includes the following Attachments, Schedules and Addenda which will take precedence over conflicting provisions (if any) of this Lease, and they are made an integral part of this Lease and are fully incorporated into it by this reference.

      (i)    Schedule A – Legal Description

      (ii)   Schedule B – Rent

      (iii)  Schedule C – Landlord's Interest Addendum

      (iv)  Schedule D – Head Lease dated _____ with amendments dated _____.

      (v)   Schedule E – _____

References in this Article to the other Articles in this Lease are for convenience and to designate some of the other Articles where references to particular Fundamental Lease Provisions will be made.  If there is any conflict between a Fundamental Lease Provision and the balance of the Lease, the former will control.

## ARTICLE 2  PREMISES AND TERM

2.01  **Premises:**  Landlord leases to Tenant the real estate described in Schedule A, attached, together with all easements and appurtenances and all buildings and improvements located on the real estate (all of which are collectively referred to in this Lease as "the Premises").  The Premises are subject to any easements, conditions, encumbrances, restrictions, and party wall agreements, if any, of record and roads and highways and zoning and building code restrictions existing on the date of this Lease.

EXHIBIT O(85)

AOE2117

2.02  **Term:**  The term of this Lease will be as indicated in Article 1.01, subject, however, to any rights set forth in this Lease for the earlier termination of the Lease term.  At the request of either party, a supplement establishing the beginning and ending dates of this Lease shall be executed.  Landlord may establish the beginning date by notifying the Tenant in writing of the date it recognizes as the beginning date of the term.

2.03  **Quiet Enjoyment:**  Landlord promises that Tenant, upon paying the rent and all other charges provided for in this Lease, and upon observing and keeping all Tenant's obligations, will lawfully and quietly hold, occupy and enjoy the Premises during the term of this Lease, without hindrance or interference by anyone claiming by, through or under Landlord, subject to the terms of this Lease and any mortgage or encumbrance now or hereafter placed on the Premises by Landlord.

2.04  **Use of Premises:**  Tenant will use and occupy the Premises solely for a McDonald's Restaurant selling only such products and operating in a manner that may be designated by McDonald's USA, LLC.  Tenant agrees to continuously occupy the Premises during the term of this Lease and agrees not to vacate them.  A breach of this provision will be deemed to be substantial.  If Tenant vacates the Premises during the term of this Lease, Landlord will have the right, in addition to its other rights and remedies, to enter the Premises for the purpose of continuing the operation of the McDonald's Restaurant; and, if Landlord so elects, Landlord shall be entitled to all profits, if any, from the operation of the restaurant.  Tenant further agrees to conduct its restaurant business in a manner that will maximize Gross Sales.  Tenant agrees to purchase, install and maintain, all at its own expense, signs and trade fixtures and equipment in accordance with the plans, specifications and layouts of McDonald's USA, LLC, or any of its subsidiaries, unless these items have been furnished by Landlord.

2.05  **Rule Against Perpetuities:**  If the term of this Lease or the accrual of rent have not commenced within one (1) year from date of execution of this Lease, this Lease will become null and void and of no further force and effect.  The sole remedy of Tenant in such case is the return of any monies paid to Landlord in anticipation of this Lease.

2.06  **Construction and Delivery of Building and Other Improvements:**  Landlord will construct or have others construct or remodel or otherwise prepare the Premises for a McDonald's Restaurant in accordance with the then current plans and specifications of McDonald's USA, LLC.  The Premises will be delivered to Tenant when they are sufficiently completed to allow Tenant to install, at Tenant's sole cost and expense, the signs, trade fixtures, equipment and other personal property and improvements necessary to complete the Premises for the operation of a McDonald's Restaurant, unless otherwise provided in Article 1.03.  Tenant will promptly and diligently perform its work in accordance with the plans and specifications previously submitted by or to Tenant and approved by Landlord and in compliance with all applicable federal, state and local statutes, codes and regulations.  Tenant will do all that is reasonably necessary to promptly open the restaurant as soon as possible after delivery of the Premises to the Tenant.

2.07  **Acceptance of Premises:**  By taking possession of the Premises, Tenant acknowledges that Tenant has inspected the Premises and the improvements thereon and found them to be in a safe, satisfactory, and completed condition, ready for occupancy and the installation of trade fixtures, equipment and signage.  All warranties as to the condition of the Premises or its fitness for use, either expressed or implied, are expressly waived by Tenant.  Tenant may, however, receive certain warranties and guarantees, by separate agreement, from McDonald's USA, LLC or one of its subsidiaries; but those warranties will be personal covenants, only, and will not be binding upon the successors and assigns of Landlord.

EXHIBIT O(85)

AOE2118

2.08 **Tenant's Compliance With Various Requirements:**  Tenant may not use or permit any person to use the Premises or any part of it for any use in violation of federal, state or local laws, including, but not limited to, present and future ordinances or other regulations of any municipality in which the Premises are situated.  Tenant will not use or permit any person to use the Premises or any building thereon for the manufacture or sale of intoxicating liquor of any kind whatsoever.  Except as provided below, Tenant may not operate any coin or token operated vending or similar device for the sale of any goods, wares, merchandise, food, beverages or services, including but not limited to, pay telephones, pay lockers, pay toilets, scales, amusement devices, and machines for the sale of beverages, foods, candy, cigarettes or other commodities.  One coin operated newspaper vending machine, Playplace games and one pay telephone may be installed, if they are in compliance with Landlord's current written policy on the installation and maintenance of these items.  During the term of this Lease, Tenant will keep the Premises and all buildings in a clean and wholesome condition and repair and will maintain the Premises so that they fully comply with all lawful health and police regulations.  Tenant will conduct the McDonald's Restaurant on the Premises strictly in accordance with the terms and provisions of the Franchise Agreement.  Tenant will minimize all cooking odors and smoke, maintain the highest degree of sanitation and comply with all ordinances, orders, directives, rules and regulations of all governmental bodies, bureaus and offices having jurisdiction over Tenant and over the Premises.  Landlord makes no warranties or representations as to the state of such ordinances, rules, orders and directives, regulations, and Tenant acknowledges that Tenant has independently investigated them and will comply with them.  Landlord makes no warranties or representations that the Premises, when accepted by Tenant, conform with the Federal, State or Industrial Safety Codes.  Tenant will obtain, keep in full force and effect, and strictly comply with, all governmental licenses and permits which may be required for Tenant's use and occupancy of the Premises and the operation of the McDonald's Restaurant.

## ARTICLE 3  RENT, TAXES, RECORDS AND REPORTS

3.01 **Rent:**  Tenant promises to pay rent to Landlord, without offset or deduction, as follows:

A. **Basic Rent and Pass Thru Rent:**  Tenant will pay monthly to Landlord the Basic Rent and any Pass Thru Rent, if applicable, as indicated in Schedule B, attached.  The first payment of Basic Rent and Pass Thru Rent, if applicable, will be due and payable on the commencement date of the term, and the subsequent monthly rental payments, including any Pass Thru Rent, will be due thereafter, in advance, on or before the first day of every succeeding calendar month.  If the date of commencement of rent occurs on a day other than the first day of the month, the first rental payment (of Basic Rent, Pass Thru Rent, if any, and Percentage Rent, if any) will be adjusted for the proportionate fraction of the whole month so that all rental payments, other than the first, will be made and become due and payable on the first day of each month.

B. **Percentage Rent:**  In addition to the Basic Rent and Pass Thru Rent, if applicable, Tenant promises to pay Percentage Rent to Landlord in the amount and during the periods set forth in Schedule B, attached, on all Gross Sales from the Premises in excess of the Monthly Base Sales set forth in Schedule B, attached.  See Article 3.03 for the manner of payment of Percentage Rent.

C. **Definition of "Gross Sales":**  For the purposes of this Lease, the term "Gross Sales" will mean all receipts (cash, cash equivalent, credit or redeemed gift certificates) or revenue from sales by Tenant, and of all others, from all business conducted upon or from the Premises, whether such sales be evidenced by check, cash, credit, charge account, exchange or otherwise,

EXHIBIT O(85)

AOE2119

and will include, but not be limited to, the amount received from the sale of goods, wares and merchandise, including sales of food, beverages and tangible property of every kind and nature, promotional or otherwise, and for services performed at the Premises, together with the amount of all orders taken or received at the Premises, all as may be prescribed or approved by the Franchise Agreement.  Gross Sales will not include sales of merchandise for which cash has been refunded, or allowances made on merchandise claimed to be defective or unsatisfactory, provided that such returned or exchanged  merchandise will have been previously included in Gross Sales. Gross Sales will not include the amount of any sales tax imposed by any federal, state or other governmental authority directly on sales and collected from customers, provided that the amount of the tax is added to the selling price and actually paid by Tenant to such governmental authority. Each charge or sale upon installment or credit will be treated as a sale for the full price in the month during which such charge or sale is made irrespective of the time when Tenant receives payment (whether full or partial).  In addition, Landlord may, from time to time, permit or allow certain other items to be excluded from Gross Sales.  However, any such permission or allowance may be revoked or withdrawn at the discretion of Landlord and will not stop Landlord from requiring strict compliance with the terms of this Lease.

D.    **Taxes and Assessments:**  In addition to the Basic Rent, the Pass Thru Rent, if applicable, and the Percentage Rent, Tenant will pay directly to the taxing authority, when due, all real estate taxes and special and general assessments that are levied or assessed against the Premises during the term or any extension of this Lease.  Tenant agrees to provide to Landlord, if requested, copies of paid invoices and such other documentation evidencing payment of taxes as may be reasonably requested by Landlord.  If Tenant shall default in the payment of any obligation herein required to be paid by Tenant, then Landlord may pay the same together with any penalty or interest levied on the tax bill, and Tenant will be obligated to repay Landlord on demand for such payment, together with interest on all past due obligations, including interest on the penalty and interest levied under this provision.

(a)    **First and Last Year**:  All real estate taxes and general and special assessment payments of every nature paid during the first and last year of the term of this Lease will be prorated.  This tax proration will be based upon the fiscal year of the taxing authority levying the tax, using the percentage of the taxes payable during the first or last tax fiscal year that Tenant actually occupies, or had the right to occupy, the demised Premises.  The party paying such taxes shall be entitled to reimbursement from the other party for its pro rata share upon demand and the presentation of an itemized statement with copies of all appropriate documentation evidencing payment.

(b)    **Rent Taxes:**  Tenant will also pay promptly, when due, any tax which is levied or assessed against the rental, real or tangible personal property, whether or not called a rental tax, excise tax, sales tax, gross receipts tax, tax on services or otherwise; and Tenant will promptly reimburse Landlord for any similar tax which Landlord is required to pay or, in fact, does pay.  Such payment or reimbursement will not be deducted from Gross Sales.

(c)    **Personal Property Taxes:**  Tenant agrees to pay all personal property taxes levied upon the fixtures, equipment and other improvements located on the Premises whether installed and paid for by Tenant or Landlord.  The personal property taxes for the first and last year of the term of this Lease will be prorated in the same manner as the real estate taxes and assessments.

(d)   **Appeal:**  Subject to Landlord's rights, Tenant, at Tenant's sole expense, is authorized and hereby permitted to contest and appeal property tax assessments on the demised Premises, and Landlord will cooperate with and assist Tenant in any reasonable manner.

E.   **Other Charges and Expenses:**   Any other charge or expense of any nature which Landlord may be required to pay by virtue of Landlord's interest in the Premises (including, but not limited to, common area maintenance charges, merchant's association's dues, utility charges, fees and taxes and security service fees – collectively referred to as "other charges") will be promptly paid by Tenant to the party to whom they are due as additional charges.  Landlord will provide Tenant with information necessary for Tenant to pay the other charges prior to, or as soon as possible after, the commencement of the term of this Lease.  Until Tenant receives this information, Tenant will not be responsible for the other charges.

F.   **Method and Proof of Payment:**

(a)   Tenant shall, at all times, participate in Landlord's automatic debit/credit transfer program as specified by Landlord from time to time for the payment of all amounts due Landlord pursuant to this Lease.   Tenant shall execute and deliver to Landlord such documents and instruments as may be necessary to establish and maintain said automatic debit/credit transfer program.

(b)   With respect to Articles 3.01(D) and (E), above, or any other provision in this Lease which requires or contemplates Tenant first paying other charges or expenses, Landlord may, at its exclusive option, elect to make such payments directly to the taxing authority, Head Landlord (if applicable), utility company or other party due a payment for which Tenant is liable under this Lease.  If Landlord wishes to exercise this option, Landlord will notify Tenant in writing of its election.  From that time on, Landlord shall make such payments directly, and all penalties and expenses thereafter accruing shall be the responsibility of Landlord. If Landlord elects to make any payment directly, Tenant shall, nonetheless, be responsible for making payment to Landlord for any payment Landlord will make, or makes, within ten (10) days of Tenant's receipt of a billing advice from Landlord.

3.02  **Records:**  Tenant will keep and preserve upon the Premises complete written records of all Gross Sales conducted in any calendar or business year for a period of three (3) years, in a manner and form satisfactory to Landlord.   Tenant will permit Landlord or Landlord's representatives to examine or audit the records at any and all reasonable times, and will, upon Landlord's request, explain the method of keeping records.  The books and records will include cash register tapes, properly identified, over-ring slips, sales journals, general ledger, profit and loss statements, balance sheets, purchase invoices, bank statements with canceled checks and deposit advices, corporate books and records, management company books, including, but not limited to, minute books and stock certificate books, state sales tax returns, federal income tax returns, retailer's occupation tax returns or similar returns required to be filed by the state in which the Premises are located.

3.03  **Reports:**  By 11:00 a.m. Central Standard Time of the first business day of each month, Tenant will deliver to Landlord, in the manner specified by Landlord from time to time, a statement by Tenant or Tenant's authorized representative, reflecting Gross Sales during the preceding month.  Tenant will pay to Landlord on or before ten (10) days after the end of each calendar month during this Lease all sums due based upon Gross Sales as shown in the statement for the period covered by the statement.  Within thirty (30) days following the expiration of each calendar year of the term of this Lease, Tenant will deliver to Landlord at the place last fixed for the payment

EXHIBIT O(85)

AOE2121

of rent, a statement of Gross Sales for the preceding calendar year (certified, at Tenant's expense, if requested by Landlord, by a Certified Public Accountant of good standing and reputation in the state in which the Premises are located) which will show Gross Sales separately for each monthly period during the preceding year.

A.  **Default in Reporting:**  Upon failure of Tenant to prepare and deliver promptly any monthly or annual statement required by this Lease or to make any required payment, Landlord may elect to treat Tenant's failure as a substantial breach of this Lease entitling Landlord to terminate this Lease and Tenant's right to possession of the Premises.

B.  **Inspection of Records by Landlord:**  If Landlord is dissatisfied with statements furnished by Tenant, Landlord may notify Tenant, and Landlord, at its option, may then examine Tenant's books or have a Certified Public Accountant selected by Landlord examine Tenant's books.  If such examination discloses any underpayment of Percentage Rent, Tenant will promptly pay the deficient amount.  If Tenant contests such deficiency, Landlord will then appoint an independent auditor to examine Tenant's books and records.  If the independent audit confirms that there has been an underpayment exceeding two percent (2%) of the Percentage Rent, as represented by Tenant, Tenant will, in addition to the above, reimburse Landlord for the cost of the auditor's examination.

3.04 **No Abatement of Rent:**  Except as provided in this Lease, damage to or destruction of any portion or all of the buildings, structures and fixtures upon the Premises, by fire, the elements or any other cause, whether with or without fault on the part of Tenant, will not terminate this Lease or entitle Tenant to surrender the Premises or entitle Tenant to any abatement of or reduction in the rent payable, or otherwise affect the respective obligations of the parties, any present or future law to the contrary notwithstanding, subject to Article 6.05 in this Lease.

3.05 **Interest on Delinquencies:**  If the Tenant is past due on the payment of any amount due Landlord, under this Lease, including accrued interest, the Tenant shall be required, to the extent permitted by law, to pay interest on the past due amount to the Landlord for the period beginning with the original due date for payment to the date of actual payment at an annual rate equal to the highest rate allowed by law or, if there is no maximum rate permitted by law, then fifteen percent (15%).  Such interest will be calculated on the basis of monthly compounding and the actual number of days elapsed divided by 365.

3.06 **Lien for Rent:**  Tenant grants to Landlord a lien upon all Tenant's property located on the Premises, from time to time, for all rent and other sums due from Tenant to Landlord under the provisions of this Lease.

## ARTICLE 4   OBLIGATIONS OF TENANT

4.01 **Utilities:**  Tenant will pay directly all charges for gas, electricity, or other utilities, sewer charges, taxes and driveway fees, if applicable, and for all water used on the Premises as such charges become due.  Tenant's obligation to pay the foregoing charges will commence five (5) days after Tenant's equipment is delivered to the Premises.

4.02 **Maintenance and Repair:**  Tenant will, at its expense, (a) keep the entire Premises, all improvements, utility lines and Tenant's or Landlord's fixtures and equipment at all times in good repair, order or condition; (b) replace all broken, damaged or missing personal property, fixtures or equipment; and (c) at the expiration of the term of this Lease, whether by lapse of time or otherwise, surrender the Premises in good repair, order and condition, ordinary wear and tear

6

excepted, and loss by fire and other casualty excepted to the extent that provision for such exception may elsewhere be made in this Lease.  Upon request of Landlord, Tenant will remove all signs and other identifying features from the Premises.  Tenant's obligation to make repairs to the Premises will include all repairs, whether ordinary or extraordinary, including structural repairs to the foundation, floors, walls and roof.

4.03  **Alterations:**  Tenant shall not make any change in, alteration of, or addition to any part of the Premises, or remove any of the buildings or building fixtures without, in each instance, obtaining the prior written consent of Landlord and complying with all governmental rules, ordinances and regulations.

4.04  **Surety:**  Before commencement of any construction or installation of any structure, fixture, equipment or other improvement on the Premises, or of any repairs, alterations, additions, replacement or restoration in, on or about the Premises, Tenant will give Landlord written notice specifying the nature and location of the intended work and the expected date of commencement. Tenant will deposit with Landlord, if requested by Landlord, a certificate or other evidence satisfactory to Landlord that Tenant has obtained a bond or that Tenant's building contractor, if any, has furnished a bond in favor of Landlord, with a surety approved by Landlord, guaranteeing the performance and completion of all work free and clear of all liens arising from such work. Landlord reserves the right to withhold its approval of any proposed construction, improvement, repair, alteration or replacement and, without limiting the generality of the foregoing, may require as a condition of its approval that it be permitted to review and approve any contract entered into by Tenant regarding such notices as may be necessary to protect Landlord against liability for liens and claims.

4.05  **Liens Against Property:**  Nothing in this Lease will authorize Tenant to do any act which will in any way encumber the title of Landlord to the Premises.  The interest or estate of Landlord or the fee owner in the Premises, if Landlord is not the fee owner, will not in any way be subject to any claim by lien or encumbrance, whether by operation of law or by virtue of any express or implied contract by Tenant.  Tenant will not permit the Premises to become subject to any mechanics', laborers' or materialsmen's lien for labor or material furnished to Tenant in connection with work of any character performed or claimed to have been performed on the Premises by or at the direction of, or sufferance of, Tenant.

If any lien is filed against the Premises or Tenant's interest in this Lease, at Landlord's option, Tenant will either pay the amount of the lien in full or will, upon demand of Landlord, provide and pay for a non-cancelable bond, placed with a reputable company, approved by Landlord, in an amount deemed sufficient by Landlord, insuring the interest of Landlord and any mortgagee from any loss by reason of the filing of such lien.  Tenant will immediately pursue in good faith its legal remedies to remove a lien on the Premises.

4.06  **Assignment by Tenant:**  Tenant will not allow or permit any transfer of this Lease or any interest in this Lease by operation of law, or assign, convey, mortgage, pledge or encumber this Lease or any interest in this Lease, or permit the use or occupancy of the Premises or any part thereof without, in each case, obtaining Landlord's prior written consent.  No assignment (with or without Landlord's consent) will release Tenant from any of its obligations in this Lease. Notwithstanding the foregoing, Landlord shall consent to an assignment by Tenant of his rights and interest in this Lease if the Tenant complies with the terms and conditions of the Franchise Agreement pertaining to the assignment of the Franchise Agreement.

EXHIBIT O(85)

AOE2123

4.07 **Franchise Agreement:** Tenant will comply with and perform all covenants contained in the Franchise Agreement. Tenant's breach of any of the terms and covenants of the Franchise Agreement will also constitute a breach of this Lease. Termination, expiration, default or revocation of the Franchise Agreement for any reason, either in whole or in part, will also terminate this Lease, without further notice being required.

## ARTICLE 5  FIXTURES AND EQUIPMENT

5.01 **Fixtures:** All buildings and improvements and all plumbing, heating, lighting, electrical and air conditioning fixtures and equipment and all other articles of property which, at the date Tenant takes possession of the Premises, are the property of Landlord or of the fee owner of the Premises are and will remain a part of the real estate and be considered to be leased in this Lease. Any additions, alterations or remodeling of improvements made to the Premises will immediately become the property of Landlord and will not be removed by Tenant at the termination of this Lease by lapse of time or otherwise.

5.02 **Removal of Tenant's Property:** At or prior to the termination of this Lease, whether by lapse of time or otherwise, Tenant will, subject to any rights of Landlord under the Franchise Agreement, remove all of its personal property and trade fixtures from the Premises and will repair any damage to the Premises which may have been caused by such removal.

## ARTICLE 6  INSURANCE AND DAMAGE TO PROPERTY

6.01 **Liability Insurance:** Tenant will pay for and maintain during the entire term of this Lease the following insurance:

A. Worker's Compensation Insurance prescribed by law in the state in which the Premises are located and Employer's Liability Insurance with $100,000/$500,000/$100,000 minimum limit. If the state in which the Premises are located allows the option of carrying no Worker's Compensation, and Tenant chooses to exercise that option, Tenant shall nonetheless carry and maintain other insurance with coverage and limits as approved by the Landlord.

B. Commercial General Liability Insurance in a form approved by Landlord, on an occurrence basis, with limits as described in Article 1.04.

C. Fire Legal Liability Insurance with minimum limits of $500,000 per occurrence.

6.02 **Rental Insurance:** Tenant will maintain and keep in force rental insurance in an amount equal to not less than the total of one (1) year's Basic Rent and Pass Thru Rent, if applicable, as specified in Article 1.02 of this Lease.

6.03 **Property Insurance:** Tenant will maintain and keep in force, all risk insurance, including flood, earthquake and earth movement coverage, upon the Premises, fixtures, operational equipment, signs, furnishings, decor, plate glass and supplies, in a full replacement cost form obligating the insurer to pay the full cost of repair or replacement. It is intended that neither Landlord nor Tenant will be a co-insurer, and to that end, if the insurance proceeds are not adequate to rebuild the building or other improvements located on the Premises, Tenant will be obligated for the difference between the proceeds obtained and the actual cost of the restoration of the Premises, fixtures, operational equipment, signs, furnishings, decor, plate glass and supplies.

EXHIBIT O(85)

AOE2124

6.04  **Placement and Policies of Insurance:**  All insurance policies required to be carried in this Lease will name Landlord and any party designated by Landlord as additional insured.  All policies will be effective on or prior to the date Tenant is given possession of the Premises for the purpose of installing equipment, and evidence of payment of Premiums and duplicate copies of policies of the insurance required in this Lease will be delivered to Landlord at least thirty (30) days prior to the date that Tenant opens for business or thirty (30) days prior to the expiration dates of an existing policy of insurance.  All policies of insurance will include as an additional insured any mortgagee, as its interest may appear, and will include provisions prohibiting cancellations or material changes to the policy until thirty (30) days prior written notice has been given to Landlord.

If Tenant should fail to obtain the required insurance, Landlord may, but is not obligated to, purchase the insurance, adding the premiums paid to Tenant's monthly rent.  Tenant may authorize Landlord to purchase and to administer the required minimum insurance on Tenant's behalf.  However, Landlord, by placement of the required minimum insurance, assumes no responsibility for premium expense nor guarantees payment for any losses sustained by Tenant.  Landlord may relieve itself of all obligations with respect to the purchase and administration of the required insurance coverage by giving ten (10) days written notice to Tenant.

All insurance will be placed with a reputable insurance company licensed to do business in the state in which the Premises are located and having a financial size category equal to or greater than IX and a policyholders rating of "A +" or "A", as assigned by Alfred M. Best and Company, Inc., unless otherwise approved by Landlord.  Tenant further agrees to increase the various insurance coverages specified above from time to time upon the written request of Landlord to meet changing economic conditions and requirements imposed upon Landlord under the Landlord's Head Lease (if applicable) and loan agreements, if any.

6.05  **Repair and Replacement of Buildings:**  If the building on the Premises is damaged by fire or any other casualty, Landlord will, within a reasonable time from the date of the damage or destruction, repair or replace the building so that Tenant may continue in occupancy.  Landlord's obligation to rebuild or restore the Premises will, however, be only to the extent of insurance proceeds recovered.  Basic Rent and any Pass Thru Rent required to be paid in this Lease will not abate during the period of untenantability.  If the building cannot be replaced or repaired within a reasonable time due to the inability of Landlord to obtain materials and labor, or because of strikes, acts of God or governmental restrictions that would prohibit, limit or delay the construction, then the time for completion of the repair or replacement will be extended accordingly.  However, in any event, if the repair or replacement of the building has not been commenced within a period of one (1) year from the date of the damage or destruction, Tenant or Landlord may, at their option, terminate this Lease.  If any damage or destruction occurs during the last five (5) years of the term of this Lease to the extent of fifty percent (50%) or more of the insurable value of the building, Landlord may, by notice to Tenant within forty (40) days after the occurrence of the damage or destruction, in lieu of repairing or replacing the building, elect to terminate this Lease as of the date of the damage or destruction.  Tenant hereby expressly waives and releases any and all claims against Landlord for damages in case of Landlord's failure to rebuild or restore the building in accordance with the provisions of this Article.  Tenant's sole remedy for any such failure will be to elect to terminate this Lease as of the date of occurrence of the damage or destruction.  If the building and other improvements are not repaired, restored or replaced, for any reason, all proceeds of the all risk coverage insurance applicable to the building and other permanent improvements will be paid and given to Landlord.  Tenant agrees to execute and deliver any release or other document Landlord may request to obtain the release or control of the proceeds.

EXHIBIT O(85)

AOE2125

If Landlord repairs and restores the Premises, as required above, Tenant agrees to promptly repair, replace, restore or rebuild Tenant's leasehold improvements, equipment and furnishings ("Tenant's Improvements") in accordance with the current standards and specifications for McDonald's Restaurants upon notice from Landlord that the Premises are ready for Tenant's Improvements.  Tenant agrees to submit for Landlord's approval, all plans and specifications for Tenant's Improvements to Landlord within thirty (30) days after Landlord delivers its plans and specifications for the restored Premises to Tenant.

## ARTICLE 7  RIGHTS OF LANDLORD

7.01  **Inspection by Landlord:**  Landlord or any authorized representative of Landlord may enter the Premises at all times during reasonable business hours for the purpose of inspecting the Premises.

7.02  **Indemnity for Litigation:**  If Landlord becomes subject to any claim, demand or penalty or becomes a party to any suit or other judicial or administrative proceeding by reason of any act occurring on the Premises, or by reason of an omission with respect to the business or operation of the McDonald's Restaurant, Tenant will indemnify and hold Landlord harmless against all judgments, settlements, penalties, and expenses, including reasonable attorney's fees, court costs and other expenses of litigation or administrative proceeding incurred by or imposed on Landlord in connection with the investigation or defense relating to such claim or litigation or administrative proceeding.  At the election of Landlord, Tenant will also defend Landlord.

Tenant will pay all costs and expenses, including reasonable attorney's fees, which may be incurred by Landlord in enforcing any of the covenants and agreements of this Lease.  All such costs, expenses and attorney's fees will, if paid by Landlord, together with interest, be additional rent due on the next rent date after such payment or payments.

7.03  **Waiver of Claims:**  Landlord and Landlord's agents and employees will not be liable for, and Tenant waives claims for, damage to persons or property sustained by Tenant or any person claiming through Tenant resulting from any accident or occurrence in or upon the Premises or the building of which they are a part, including, but not limited to, claims for damage resulting from: (a) equipment or appurtenances becoming out of repair; (b) Landlord's failure to keep the building or the Premises in repair; (c) injury done or occasioned by wind, water or other natural element; (d) any defect in or failure of plumbing, heating or air conditioning equipment, electric wiring or installation thereof, gas, water and steam pipes, stairs, porches, railings or walks; (e) broken glass; (f) the backing up of any sewer pipe or downspout; (g) the bursting, leaking or running of any tank, tub, washstand, water closet, waste pipe, drain or any other pipe or tank in, upon or about such building or Premises; (h) the escape of steam or hot water (it being agreed that all the foregoing are under the control of Tenant); (i) water being upon or coming through the roof, skylight, trapdoor, stairs, walks or any other place upon or near such building of the Premises or otherwise; (j) the falling of any fixture, plaster or stucco; (k) interruption of service of any utility.

7.04  **Re-entry Upon Default:**  If (a) Tenant defaults in the payment of any installment of Basic Rent, Pass Thru Rent or Percentage Rent or any additional sum due in this Lease; (b) Tenant defaults in any of the covenants, agreements, conditions or undertakings to be performed by Tenant other than the payment of rent (Basic Rent, Pass Thru Rent, Percentage Rent or additional charges) and such default continues for ten (10) days after notice in writing to Tenant; (c) Tenant defaults in any of the terms of the Franchise Agreement or if the Franchise Agreement should terminate, whether by lapse of time or otherwise; (d) proceedings in bankruptcy or for liquidation, reorganization or rearrangement of Tenant's affairs are instituted by or against Tenant; (e) a

EXHIBIT O(85)

AOE2126

receiver or trustee is appointed for all or substantially all of Tenant's business or assets on the grounds of Tenant's insolvency; (f) a trustee is appointed for Tenant after a petition has been filed for Tenant's reorganization under the Bankruptcy Act of the United States; (g) Tenant makes an assignment for the benefit of its creditors; or (h) Tenant vacates or abandons the Premises, then in any of the above events, Landlord, at its election, may declare the term of this Lease ended and, either with or without process of law, re-enter, expel, remove and put out Tenant and all persons occupying the Premises under Tenant, using such force as may be necessary in so doing, and repossess and enjoy the Premises.  Such re-entry and repossession will not work a forfeiture of the rents to be paid or terminate the covenants to be performed by Tenant during the full term of this Lease.

Upon the expiration of the term of this Lease by reason of any of the events described above, or in the event of the termination of this Lease or right to possession by summary dispossession proceedings or under any provision of law now or at any time in force, whether with or without legal proceedings, Landlord may, at its option, relet the Premises or any part for the account of Tenant and collect the rents therefor, applying them first to the payment of expenses Landlord may have in recovering possession of the Premises, including legal expenses and attorney's fees, and for putting the Premises into good order or condition or preparing or altering the same for re-rental, expenses, commissions and charges paid, assumed or incurred by Landlord in reletting the Premises, and then to the fulfillment of the covenants of Tenant in this Lease.  Any such reletting may be for the remainder of the term of this Lease or for a longer or shorter period.  In any case and whether or not the Premises or any part thereof is relet, Tenant will pay to Landlord the Basic Rent, Pass Thru Rent, if applicable, Percentage Rent, any additional charges, and all other charges required to be paid by Tenant up to the time of termination of this Lease, or of recovery of possession of the Premises by Landlord, as the case may be.  Thereafter, Tenant covenants and agrees, if required by Landlord, to pay to Landlord, until the end of the term of this Lease, the equivalent of the amount of all the Basic Rent and Pass Thru Rent, if applicable, reserved in this Lease, Percentage Rent, and all other charges required to be paid by Tenant, less the net income of reletting, if any.  These payments will be due and payable by Tenant to Landlord on the rent days above specified.  In any of the circumstances described above, Landlord will have the election to recover against Tenant, as damages for loss of the bargain and not as a penalty, an aggregate sum which, at the time of such termination of this Lease, or of such recovery of possession of the Premises by Landlord, represents the then present worth of the excess, if any, of the aggregate of the Basic Rent, Pass Thru Rent, if applicable, Percentage Rent, and all other charges payable by Tenant in this Lease that would have accrued for the balance of the term over the aggregate rental value of the Premises for the balance of the term.  Percentage Rent for purposes of this Article shall be deemed to mean the Percentage Rent which Landlord can show could be generated from the Premises but in no event less than the greatest amount of Percentage Rent paid by Tenant during any year.  Nothing in this Lease contained will limit or prejudice Landlord's right to prove and obtain as liquidated damages arising out of such breach or termination the maximum amount allowed by any statute or rule of law which may govern the proceeding in which such damages are to be proved.

7.05  **Holding Over:**  Tenant will not hold over beyond the expiration or sooner termination of the term of this Lease.  If Tenant does hold over, it will give rise to a tenancy at the sufferance of Landlord upon the same conditions as are provided for in this Lease with a monthly rental for the period of such holding over which is double the Basic Rent, Pass Thru Rent, if applicable, and Percentage Rent last paid by Tenant during the term of this Lease, and interest thereon, as liquidated damages, and not as a penalty.  Landlord's acceptance of any rent after holding over begins does not renew this Lease.  This provision does not waive Landlord's rights of re-entry or

11

any other right in this Lease resulting from Tenant's breach of the covenant not to hold over or any other breach in this Lease.

7.06 **Remedies Cumulative:**  The remedies in this Lease granted to Landlord will not be exclusive or mutually exclusive, and Landlord will have such other remedies against Tenant as may be permitted in law or in equity at any time.  Any exercise of a right of termination by Landlord will not be construed to eliminate any right of Landlord to damages on account of any default of Tenant.

7.07 **Waiver:**  No delay or omission of Landlord to exercise any right or power arising from any default will impair any such right or power or will be construed to be a waiver of any such default or an acquiescence under this Lease.  No waiver of any breach of any of the covenants of this Lease will be held to be a waiver of any other breach or waiver, acquiescence in or consent to any further or subsequent breach of the same covenant.  The rights in this Lease given to receive, collect or sue for any rent, monies or payments or to enforce the terms, provisions and conditions of this Lease, or to prevent the breach or non-observance thereof, or to exercise any right or remedy in this Lease, will not in any way affect the right or power of Landlord to declare the term ended and to terminate this Lease because of any default in or breach of any of the covenants, provisions or conditions of this Lease.

7.08 **Accord and Satisfaction:**  No payment by Tenant or receipt by Landlord of a lesser amount than the monthly rent in this Lease stipulated will be deemed to be other than on account of the earliest stipulated rent, nor will any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction.  Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy provided for in this Lease.

7.09 **Right to Perform for Tenant:**  If Tenant should fail to perform any of its obligations under the provisions of this Lease, Landlord, at its option, may (but will not be required to) do the same or cause the same to be done.  In addition to any and all other rights and remedies of Landlord, the cost incurred by Landlord in connection with such performance by Landlord will be an additional charge due from Tenant to Landlord, together with interest thereon at the maximum rate permitted by law in the state in which the Premises are located on the next rent date after such expenditure or, if there is no maximum rate permitted by law, at fifteen percent (15%) per annum.

7.10 **Condemnation:**  If the entire Premises are condemned under eminent domain, or acquired in lieu of condemnation, for any public or quasi-public use or purpose, all rentals and taxes or other charges will be paid to that date, and Tenant will have the right to make a claim for the value of its leasehold estate.  Tenant will, also, have the right to claim and recover such compensation as may be separately awarded for any and all damage to Tenant's business by reason of the condemnation and for any cost or loss to which Tenant might be put in removing Tenant's merchandise, furniture, equipment and other personal property.  Tenant specifically waives and releases any claim it may have, however, for the value of the building, fixtures and other improvements on the Premises whether or not installed or paid for by Tenant.  Tenant further agrees to subordinate any claim it may have to Landlord's claim for the value of the improvements.

If only a part of the Premises is taken or condemned and Landlord determines that the operation of a McDonald's Restaurant on the Premises is no longer economically feasible or desirable, Landlord may at any time, either prior to or within a period of sixty (60) days after the date when possession of the Premises will be required by the condemning authority, elect to

EXHIBIT O(85)

AOE2128

terminate this Lease.  If Landlord fails to exercise its option to terminate this Lease or will not have any such option, Landlord will (1) with reasonable promptness, make necessary repairs to and alterations of the improvements on the Premises for the purpose of restoring it to substantially the same use as that which was in effect immediately prior to such taking, to the extent that may be necessary by the condemnation; and (2) be entitled to the entire award for such partial taking.  If Landlord does not elect to terminate this Lease, Tenant's Basic Rent and Pass Thru Rent, if applicable, will be reduced by a fraction, the numerator of which will be the total condemnation award or settlement and the denominator of which will be the fair market value of the Premises, prior to the taking, as determined by an independent appraiser selected by the Landlord.

7.11 **Subordination and Non-Disturbance:**  This Lease and all of Tenant's rights, title and interest under the Lease will be subject, subordinated and inferior to the lien of any and all mortgages and to the rights of all parties under any sale and leaseback of the Premises and to any and all terms, conditions, provisions, extensions, renewals or modifications of any such mortgage or mortgages or sale and leaseback which Landlord or any grantee of Landlord (collectively hereafter called "Fee Owner") has or may place upon the Premises and the improvements thereon, in the same manner and to the same extent as if this Lease had been executed subsequent to the execution, delivery and recording of such mortgage or of the deed and lease under the sale and leaseback.  This provision is intended to include the right of any grantee or Landlord under a sale and leaseback to further encumber the property with one or more mortgages, all of which are declared to be superior to the interest of Tenant in this Lease.

If a mortgagee or any other person acquires title to the Premises pursuant to the exercise of any remedy provided for in such mortgage, or in the event of the default under the Lease related to a sale and leaseback of the Premises, Tenant's right of possession will not be disturbed provided (a) Tenant is not then in default under this Lease and (b) Tenant attorns to such title holder.  Tenant agrees that upon a mortgage foreclosure it will attorn to any mortgagee or assignee or any purchaser at the foreclosure sale (collectively called "Purchaser") as its Landlord and in the case of a default under the terms of the lease used in a sale and leaseback, it will attorn to the Fee Owner of the Premises as its new Landlord and, in either event, this Lease will continue in full force and effect as a direct Lease between Tenant and such party under all of the terms of this Lease.  If there is a foreclosure of a mortgage placed on the property by a grantee under a sale and leaseback, such attornment will be required only if, at the time of such foreclosure, the Lease used in the sale and leaseback is also in default.

The subordination of this Lease to any mortgagee of Fee Owner provided for in this Lease or to any Lease under a sale and leaseback arrangement will be automatic and self-operative, and no special instrument of subordination will be necessary.  Without limiting such automatic and self-operative subordinations, however, Tenant will, on demand, at any time or times, execute, acknowledge and deliver to Fee Owner, without expense to Fee Owner, any and all instruments that may be necessary or proper to evidence the subordination of this Lease and all rights in this Lease to the lien of any such mortgage, or to any such lease under a sale and leaseback arrangement.  If Tenant fails, at any time, to execute, acknowledge and deliver any such subordination instrument within five (5) days after receipt of the notice, in addition to any other remedies available, Landlord may execute, acknowledge and deliver the same as the attorney-in-fact on Tenant's behalf; and Tenant hereby irrevocably makes, constitutes and appoints Landlord, its successors and assigns, such attorney-in-fact for that purpose.

13

## ARTICLE 8  MISCELLANEOUS

8.01  **No Agency Created:**  Tenant will have no authority, express or implied, to act as agent of Landlord or any of its affiliates for any purpose.  Tenant is, and will remain, an independent contractor responsible for all obligations and liabilities of, and for all loss or damage to, the Premises, including any personal property, equipment, fixtures or real property connected with them and for all claims or demands based on damage or destruction of property or based on injury, illness or death of any person or persons, directly or indirectly, resulting from the operation of the McDonald's Restaurant located on the Premises.

8.02  **Recording of Lease:**  Tenant will not record this Lease without the written consent of Landlord.  However, upon the request of either party, the other party will join the execution of a memorandum or a so-called "short-form" of this Lease for the purpose of recordation.  The memorandum or short form of this Lease will describe the parties, the Premises and the term of this Lease and will incorporate this Lease by reference.  The party requesting execution of the memorandum will bear all costs for recording it.

8.03  **Force Majeure:**  Whenever a period of time is provided in this Lease for either party to do or perform any act or thing, except the payment of monies, neither party will be liable for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control or other causes beyond the reasonable control of the parties, and in any event the time period for the performance of an obligation in this Lease will be extended for the amount of time of the delay. This Article will not apply to, or result in, an extension of the term of this Lease.

8.04  **Paragraph Headings:**  Headings in this Lease are for convenience only and are not to be construed as part of this Lease and will not be construed as defining or limiting in any way the scope or intent of the provisions of this Lease.

8.05  **Invalidity of a Provision:**  If any term or provision of this Lease will to any extent be held invalid or unenforceable, the remaining terms and provisions of this Lease will not be affected, but each term and provision of this Lease will be valid and be enforced to the fullest extent permitted by law.  If any material term of this Lease is stricken or declared invalid, Landlord reserves the right to terminate this Lease at its sole option.

8.06  **Law Governing:**  The terms and provisions of this Lease will be governed by the laws of the State of Illinois.

8.07  **Entire Agreement:**  This Lease and the Franchise Agreement will be deemed to include the entire agreement between the parties, and it is agreed that neither Landlord nor anyone acting in its behalf has made any statement, promise or agreement or taken upon itself any engagement whatever, verbally or in writing, in conflict with the terms of this Lease, or that in any way modifies, varies, alters, enlarges, or invalidates any of its provisions, or extends the term of this Lease, and that no obligations of Landlord will be implied in addition to the obligations expressed in this Lease. This agreement cannot be changed orally but only by an agreement in writing signed by Landlord and Tenant.  Nothing in this Lease or in any related agreement, however, is intended to disclaim the representations made in the Franchise Disclosure Document furnished to Tenant.

8.08  **Parties Bound:**  The terms of this Lease will extend to and be binding upon the administrators, executors, heirs, assigns and successors of the parties, subject to the terms of Article 4.06.

EXHIBIT O(85)

AOE2130

8.09 **Notices or Demands:**  All notices to or demands upon Landlord or Tenant given under any of the provisions of this Lease will be in writing.  Any notices or demands from Landlord to Tenant will be deemed to have been duly and sufficiently given if a copy has been delivered personally or mailed by United States registered or certified mail in an envelope properly stamped and addressed to Tenant at the address of the Premises.  Any notices or demands from Tenant to Landlord will be deemed to have been duly and sufficiently given if mailed by registered or certified mail in an envelope properly stamped and addressed to Landlord at 110 N. Carpenter Street, Chicago, Illinois 60607, Attention:  Director, U.S. Legal Department.  Mailed notices shall be deemed received three (3) business days after being deposited in the U.S. Mail.  Either party, by notice, may change the address to which notice will be sent, but all notices mailed to Tenant at the address of the restaurant on the Premises will be deemed sufficient.

**To indicate their consent** to this Operator's Lease the parties, or their authorized representatives or officers, have signed this document.

**TENANT:**                                    **LANDLORD:  McDONALD'S USA, LLC**

_____        By: _____

                                               Date Signed: _____

                                               Location Code: _____

                                               Prepared by: _____

15

EXHIBIT O(85)

AOE2131

**Addition to Schedule A if there is excess property:**

[CITY, STATE]
[Address]
L/C:  _____
File #:  _____

## EXCESS PROPERTY ADDENDUM

1.  Landlord and Tenant acknowledge that the Premises includes excess property which will not be used in the operation of the McDonald's Restaurant developed on the Premises.  The excess property is included in the legal description described on Schedule A of this Lease.

2.  If the Landlord, in its sole discretion, is able to sell or lease the excess property during the term of this Lease, Tenant agrees to amend this Lease to accomplish the following:

    A.  The Premises shall be amended to delete the excess property so that it will no longer be leased to Tenant.

    B.  The Premises will be made subject and subordinate to easements that may be needed for access, utilities, drainage, signs or any other necessary use to properly or conveniently develop the excess property.  Landlord agrees that no such easements or reservations shall unreasonably interfere with the continuing operation of the McDonald's Restaurant, and all costs, expenses and liabilities associated with the easements or any other use of the Premises shall be assumed by the Landlord.

3.  Notwithstanding the deletion of the excess property from the Premises, the Tenant's rent shall remain as stated in this Lease and shall not be reduced.  However, Tenant shall be reimbursed by Landlord for an amount equal to approximately all of Tenant's costs for real estate taxes, insurance and maintenance of the excess property up to an amount not to exceed the Landlord's gain on any sale or disposition of the excess property.  The gain or loss on the disposition of the excess property shall be determined by subtracting the net book value of the excess property from the net proceeds of the Landlord's sale or other disposition of the excess property.  If the excess property is leased by Landlord, the gain or loss shall be determined by subtracting the net present value of the rental payments to be received by Landlord from the net present value of all of Landlord's rental payments or Landlord's net book value associated with the excess property.

4.  If the excess property is developed in such a manner as to provide for common access, parking, utilities or other easements that benefit both the Premises and the excess property, Tenant agrees to pay a pro rata share of the cost of maintaining and repairing such common access, parking, utilities or other easements as set forth in the written agreements.

5.  The effective date of the above described amendment shall be the date of closing of the sale of the excess property, if sold, or the date the rent commences, if it is leased.

**SCHEDULE A**

EXHIBIT O(85)

AOE2132

R3067 LT RBFL    1  0050 L

```
                                                SITE   :
     STORE:                                     FILE   :
                                                SEQ    :
                                                REGION :


     RE:   INITIAL          PROJECTED
```

<u>RENT TERMS</u>

| COMMENCEMENT DATE EXPIRATION DATE | MONTHLY BASIC RENT | PERCENT RENT | MONTHLY BASE SALES | PASS THRU RENT # | ADDL PROP RENT # | REACQUISITION/ RENEGOTIATION RENT # |
|---|---|---|---|---|---|---|
| COMMENCEMENT OF TERM REMAINDER OF TERM | | | | | | |

\# If rental amounts are shown in these columns, these amounts are to be paid monthly.

SCHEDULE B

EXHIBIT O(85)

AOE2133

[CITY, STATE]
[Address]
L/C: _____
File #: _____

## LANDLORD'S INTEREST ADDENDUM
(McDonald's USA, LLC Leased Property)

1. **LANDLORD'S INTEREST IN PREMISES:**  Landlord holds a leasehold interest in the Premises or a portion of the Premises under the Head Lease described in Article 1.05.

2. **COMPLIANCE WITH HEAD LEASE:**  Tenant acknowledges and agrees that the terms and conditions of this Lease are subject and subordinate to the terms and conditions of the Head Lease and any subsequent amendments to it.  If there are any inconsistencies between this Lease and the Head Lease, the more restrictive obligations of the Head Lease will prevail.  Tenant will not, in its use and enjoyment of the Premises, suffer or permit any condition to exist, or do, or omit to do, anything which would give rise to any right of the landlord under the Head Lease ("Head Landlord") to terminate the Head Lease or any rights of Landlord.  Tenant will perform, comply with and discharge all obligations which Landlord is required to comply with and discharge under the Head Lease, including, but not limited to, payment of all charges, costs and expenses as set forth in Article 3.01 of this Lease.  Such payments shall not, however, include payment of Landlord's basic monthly rental obligations under the Head Lease.

3. **TENANT'S STATEMENTS AND CERTIFICATES:**  Without limiting the generality of the foregoing, Tenant agrees to promptly provide to Landlord insurance policies or certificates, off-set statements, statements of sales, mechanic's lien waivers, notices, releases and any other statement, record or document which may be required, from time to time, by the Head Landlord under the terms of the Head Lease.  All certificates or policies of insurance so required will also name the Head Landlord as co-insured or additional insured, as the case may be.

4. **ENFORCEMENT OF LANDLORD'S RIGHTS UNDER HEAD LEASE:**  It is acknowledged that the Head Landlord may have certain obligations under the Head Lease to maintain and repair the Premises and adjoining areas, pay real estate taxes, assessments and special charges and impositions, restore, replace or rebuild the Premises and adjoining areas in the event of damage by fire and other causes, carry and pay for certain types of insurance policies and perform other obligations set forth in the Head Lease.  If these obligations exist, Landlord agrees to make a good faith effort to obtain the timely and faithful performance of Head Landlord's obligations, but Landlord will not be in default or breach of any of its covenants and duties under this Lease or be liable for any resulting loss or claim of Tenant if Landlord is not able to enforce its rights under the Head Lease.  With respect to Landlord's obligation to repair and restore the Premises in the event of damage or destruction by fire or any other cause, Landlord's obligations are conditioned upon Landlord obtaining the cooperation and approval of the Head Landlord, as it may be required, and the compliance of Head Landlord with all of Head Landlord's duties under the Head Lease; and Landlord will not be liable to Tenant for any damage, claim or injury resulting from Landlord's inability to repair or restore the Premises due to a default or breach of the Head Lease by the Head Landlord.

5. **INTENT OF THE PARTIES:**  It is the intent of the parties to enter into a sublease between Landlord and Tenant and not to make an assignment of the Head Lease.  The parties further acknowledge that it is their intent that there be no merger of either Landlord's or Tenant's interest in this Lease and fee title if either party acquires a fee interest in the Premises at any time after the execution of this Lease.  In such event, this Lease will remain in full force and effect and will determine the rights, duties and obligations of the parties.

**SCHEDULE C**

[CITY, STATE]
[Address]
L/C: _____
File #: _____

## LANDLORD'S INTEREST ADDENDUM
(McDonald's Corporation Leased Property)

1.  **LANDLORD'S INTEREST IN PREMISES:**  Landlord holds a leasehold interest in the Premises or a portion of the Premises through an internal lease(s) with McDonald's Corporation and/or its affiliated companies (McDonald's Corporation and/or its affiliated companies are hereafter referred to as "McDonald's") ("McDonald's Internal Lease Documentation") as may be amended from time to time.  The McDonald's Internal Lease Documentation does not increase Tenant's obligations under this Lease.  The McDonald's Internal Lease Documentation requires Landlord to meet all of the obligations of the tenant under the Head Lease described in Article 1.05.

2.  **COMPLIANCE WITH HEAD LEASE:**  Tenant acknowledges and agrees that the terms and conditions of this Lease are subject and subordinate to the terms and conditions of the Head Lease and any subsequent amendments to it.  If there are any inconsistencies between this Lease, McDonald's Internal Lease Documentation and the Head Lease, the more restrictive obligations of the Head Lease will prevail.  Tenant will not, in its use and enjoyment of the Premises, suffer or permit any condition to exist, or do, or omit to do, anything which would give rise to any right of the landlord under the Head Lease ("Head Landlord") to terminate the Head Lease or any rights of Landlord and/or McDonald's.  Tenant will perform, comply with and discharge all obligations which Landlord is required to comply with and discharge under the Head Lease, including, but not limited to, payment of all charges, costs and expenses as set forth in Article 3.01 of this Lease.  Such payments shall not, however, include payment of the basic monthly rental obligations under the Head Lease.

3.  **TENANT'S STATEMENTS AND CERTIFICATES:**  Without limiting the generality of the foregoing, Tenant agrees to promptly provide to Landlord, insurance policies or certificates, off-set statements, statements of sales, mechanic's lien waivers, notices, releases and any other statement, record or document which may be required, from time to time, by the Landlord or the Head Landlord under the terms of the Head Lease.  All certificates or policies of insurance so required will, in addition to Landlord, also name the Head Landlord and McDonald's as co-insureds or additional insureds, as the case may be.

4.  **ENFORCEMENT OF LANDLORD'S RIGHTS UNDER HEAD LEASE:**  It is acknowledged that the Head Landlord may have certain obligations under the Head Lease to maintain and repair the Premises and adjoining areas, pay real estate taxes, assessments and special charges and impositions, restore, replace or rebuild the Premises and adjoining areas in the event of damage by fire and other causes, carry and pay for certain types of insurance policies and perform other obligations set forth in the Head Lease.  If these obligations exist, Landlord agrees to make a good faith effort to obtain the timely and faithful performance of Head Landlord's obligations, but Landlord will not be in default or breach of any of its covenants and duties under this Lease or be liable for any resulting loss or claim of Tenant if Landlord is not able to enforce the rights of tenant under the Head Lease.  With respect to Landlord's obligation to repair and restore the Premises in the event of damage or destruction by fire or any other cause, Landlord's obligations are conditioned upon Landlord obtaining the cooperation and approval of the Head Landlord, as it may be required, and the compliance of Head Landlord with all of Head Landlord's duties under the Head Lease; and neither Landlord nor McDonald's will be liable to Tenant for any damage, claim or injury resulting from Landlord's inability to repair or restore the Premises due to a default or breach of the Head Lease by the Head Landlord.

5. **INTENT OF THE PARTIES:**  It is the intent of the parties to enter into a subleasing agreement between Landlord and Tenant and not to make an assignment of the Head Lease or McDonald's Internal Lease Documentation.  The parties further acknowledge that it is their intent that there be no merger of either Landlord's or Tenant's interest in this Lease and fee title if either party acquires a fee interest in the Premises at any time after the execution of this Lease.  In such event, this Lease will remain in full force and effect and will determine the rights, duties and obligations of the parties.

**SCHEDULE C**

EXHIBIT O(85)

AOE2136

[CITY, STATE]
[Address]
L/C: _____
File #: _____

## LANDLORD'S INTEREST ADDENDUM
(McDonald's Corporation or McRec Fee Owned Property)

1. **LANDLORD'S INTEREST IN PREMISES:**  Landlord holds a leasehold interest in the Premises or a portion of the Premises through an internal lease(s) with McDonald's Corporation and/or its affiliated companies (McDonald's Corporation and/or its affiliated companies are hereafter referred to as "McDonald's") ("McDonald's Internal Lease Documentation") as may be amended from time to time.  The McDonald's Internal Lease Documentation between McDonald's and Landlord does not increase Tenant's obligations under this Lease. Tenant acknowledges and agrees that under the terms of this Lease, Tenant will perform, comply with and discharge any and all obligations related to the Premises and its use, including, but not limited to, the payment of all charges, costs and expenses as set forth in Article 3.01 of this Lease.

2. **TENANT'S INSURANCE POLICIES AND CERTIFICATES:**  All certificates and policies of insurance so required under this Lease will, in addition to Landlord, name McDonald's as an additional insured.

3. **INTENT OF THE PARTIES:**  It is the intent of the parties to enter into a subleasing agreement between Landlord and Tenant and not to make an assignment of the McDonald's Internal Lease Documentation.  The parties further acknowledge that it is their intent that there be no merger of either Landlord's or Tenant's interest in this Lease and fee title if either party acquires a fee interest in the Premises at any time after the execution of this Lease.  In such event, this Lease will remain in full force and effect and will determine the rights, duties and obligations of the parties.

**SCHEDULE C**

EXHIBIT O(85)

AOE2137

[CITY, STATE]
[Address]
L/C: _____
File #: _____

**LANDLORD'S INTEREST ADDENDUM – OIL**

(Oil Partner as Head Landlord and McDonald's USA, LLC is tenant
under a Ground Lease and Operating Agreement with an oil partner)

1. **LANDLORD'S INTEREST IN PREMISES:**  Landlord holds a leasehold interest in the Premises or a portion of the Premises under the Head Lease described in Article 1.05.  The Head Lease provides for the joint operation of a fuel facility, McDonald's Restaurant and convenience store, and if provided for in the Head Lease, the operation of a car wash, at the property as defined in the Head Lease.

2. **COMPLIANCE WITH HEAD LEASE:**  Tenant acknowledges and agrees that the terms and conditions of this Lease are subject and subordinate to the terms and conditions of the Head Lease and any subsequent amendments to it.  If there are any inconsistencies between this Lease and the Head Lease, the more restrictive obligations of the Head Lease will prevail.  Tenant will not, in its use and enjoyment of the Premises, suffer or permit any condition to exist, or do, or omit to do, anything which would give rise to any right of the landlord under the Head Lease ("Head Landlord") to terminate the Head Lease or any rights of Landlord.  Tenant will perform, comply with and discharge all obligations which Landlord is required to comply with and discharge under the Head Lease, including but not limited to, payment of all charges, costs and expenses set forth in Article 3.01 of this Lease.  Such payments shall not, however, include payment of Landlord's monthly basic rental obligations under the Head Lease.

3. **TENANT'S STATEMENTS AND CERTIFICATES:**  Without limiting the generality of the foregoing, Tenant agrees to promptly provide to Landlord insurance policies or certificates, off-set statements, statements of sales, mechanic's lien waivers, notices, releases and any other statement, record or document which may be required, from time to time, by the Head Landlord under the terms of the Head Lease.  All certificates or policies of insurance so required will also name the Head Landlord as co-insured or additional insured, as the case may be.

4. **ENFORCEMENT OF LANDLORD'S RIGHTS UNDER HEAD LEASE:**  It is acknowledged that the Head Landlord may have certain obligations under the Head Lease to maintain and repair the Premises and adjoining areas, pay real estate taxes, assessments and special charges and impositions, restore, replace or rebuild the Premises and adjoining areas in the event of damage by fire and other causes, carry and pay for certain types of insurance policies and perform other obligations set forth in the Head Lease.  If these obligations exist, Landlord agrees to make a good faith effort to obtain the timely and faithful performance of Head Landlord's obligations, but Landlord will not be in default or breach of any of its covenants and duties under this Lease or be liable for any resulting loss or claim of Tenant if Landlord is not able to enforce its rights under the Head Lease.  With respect to Landlord's obligation to repair and restore the Premises in the event of damage or destruction by fire or any other cause, Landlord's obligations are conditioned upon Landlord obtaining the cooperation and approval of Head Landlord, as it may be required, and the compliance of Head Landlord with all of Head Landlord's duties under the Head Lease; and Landlord will not be liable to Tenant for any damage, claim or injury resulting from Landlord's inability to repair or restore the Premises due to a default or breach of the Head Lease by the Head Landlord.

1

5. **INTENT OF THE PARTIES:**  It is the intent of the parties to enter into a subleasing agreement between Landlord and Tenant and not to make an assignment of the Head Lease.  The parties further acknowledge that it is their intent that there be no merger of either Landlord's or Tenant's interest in this Lease and fee title if either party acquires a fee interest in the Premises at any time after the execution of this Lease.  In such event, this Lease will remain in full force and effect and will determine the rights, duties and obligations of the parties.

EXHIBIT O(85)

AOE2139

[CITY, STATE]
[Address]
L/C: _____
File #: _____

## LANDLORD'S INTEREST ADDENDUM – OIL

(Oil Partner as Head Landlord and McDonald's Corporation is tenant
under a Ground Lease and Operating Agreement with an oil partner)

1. **LANDLORD'S INTEREST IN PREMISES:** Landlord holds a leasehold interest in the Premises or a portion of the Premises through an internal lease(s) with McDonald's Corporation and/or its affiliated companies (McDonald's Corporation and/or its affiliated companies are hereafter referred to as "McDonald's") ("McDonald's Internal Lease Documentation") as may be amended from time to time. The McDonald's Internal Lease Documentation does not increase Tenant's obligations under this Lease. The McDonald's Internal Lease Documentation requires Landlord to meet all of the obligations of the tenant under the Head Lease described in Article 1.05. The Head Lease provides for the joint operation of a fuel facility, McDonald's Restaurant and convenience store, and if provided for in the Head Lease, the operation of a car wash, at the property as defined in the Head Lease.

2. **COMPLIANCE WITH HEAD LEASE:** Tenant acknowledges and agrees that the terms and conditions of this Lease are subject and subordinate to the terms and conditions of the Head Lease and any subsequent amendments to it. If there are any inconsistencies between this Lease, McDonald's Internal Lease Documentation and the Head Lease, the more restrictive obligations of the Head Lease will prevail. Tenant will not, in its use and enjoyment of the Premises, suffer or permit any condition to exist, or do, or omit to do, anything which would give rise to any right of the landlord under the Head Lease ("Head Landlord") to terminate the Head Lease or any rights of Landlord and/or McDonald's. Tenant will perform, comply with and discharge all obligations which Landlord is required to comply with and discharge under the Head Lease, including but not limited to, payment of all charges, costs and expenses set forth in Article 3.01 of this Lease. Such payments shall not, however, include payment of Landlord's monthly basic rental obligations under the Head Lease.

3. **TENANT'S STATEMENTS AND CERTIFICATES:** Without limiting the generality of the foregoing, Tenant agrees to promptly provide to Landlord insurance policies or certificates, off-set statements, statements of sales, mechanic's lien waivers, notices, releases and any other statement, record or document which may be required, from time to time, by the Landlord or the Head Landlord under the terms of the Head Lease. All certificates or policies of insurance so required will, in addition to Landlord, also name the Head Landlord and McDonald's as co-insureds or additional insureds, as the case may be.

4. **ENFORCEMENT OF LANDLORD'S RIGHTS UNDER HEAD LEASE:** It is acknowledged that the Head Landlord may have certain obligations under the Head Lease to maintain and repair the Premises and adjoining areas, pay real estate taxes, assessments and special charges and impositions, restore, replace or rebuild the Premises and adjoining areas in the event of damage by fire and other causes, carry and pay for certain types of insurance policies and perform other obligations set forth in the Head Lease. If these obligations exist, Landlord agrees to make a good faith effort to obtain the timely and faithful performance of Head Landlord's obligations, but Landlord will not be in default or breach of any of its covenants and duties under this Lease or be liable for any resulting loss or claim of Tenant if Landlord is not able to enforce its rights under the Head Lease. With respect to Landlord's obligation to repair and restore the Premises in the event of damage or destruction by fire or any other cause, Landlord's obligations are conditioned upon Landlord obtaining the cooperation and approval of the Head Landlord, as it may be required, and the compliance of Head Landlord with all of Head Landlord's duties under the Head Lease; and

EXHIBIT O(85)

AOE2140

neither Landlord nor McDonald's will be liable to Tenant for any damage, claim or injury resulting from Landlord's inability to repair or restore the Premises due to a default or breach of the Head Lease by the Head Landlord.

5. **INTENT OF THE PARTIES:**  It is the intent of the parties to enter into a subleasing agreement between Landlord and Tenant and not to make an assignment of the Head Lease or McDonald's Internal Lease Documentation.  The parties further acknowledge that it is their intent that there be no merger of either Landlord's or Tenant's interest in this Lease and fee title if either party acquires a fee interest in the Premises at any time after the execution of this Lease.  In such event, this Lease will remain in full force and effect and will determine the rights, duties and obligations of the parties.

EXHIBIT O(85)

AOE2141

[CITY, STATE]
[Address]
L/C: _____
File #: _____

# CO-BRANDED DEVELOPMENT ADDENDUM

(McDonald's entity is landlord under a Ground Lease and Operating Agreement with an oil partner)

1. **GROUND LEASE AND OPERATING AGREEMENT:**  Tenant acknowledges that Landlord or McDonald's Corporation or an affiliated company of McDonald's Corporation has entered into a Ground Lease and Operating Agreement ("Agreement") with that oil partner set forth in the Agreement.  The Agreement provides for the joint operation of a fuel facility, McDonald's Restaurant and convenience store, and if provided for in the Agreement, the operation of a car wash, at the property as defined in the Agreement.

2. **COMPLIANCE WITH THE AGREEMENT:**  Tenant acknowledges receipt of a copy of the Agreement, will abide by its terms and agrees that Tenant is obligated to perform any and all obligations of Landlord set forth in the Agreement.  Tenant further agrees that these obligations are in addition to any obligations that Tenant may have under the terms of this Lease or Franchise Agreement with Landlord.  If there are any inconsistencies between the Agreement and this Lease or Franchise Agreement, the more restrictive obligations of the Agreement will prevail.  If there are any inconsistencies between the Agreement and the Head Lease, if any, as described in Article 1.05, the more restrictive obligations of the Head Lease will prevail.

EXHIBIT O(85)

AOE2142

[CITY, STATE]
[Address]
L/C: _____
File #: _____

# McDONALD'S INTEREST ADDENDUM

(McDonald's USA, LLC holds interest in Master Agreement – interest is not a leasehold)

**THIS McDONALD'S INTEREST ADDENDUM** is attached to and made a part of the Operator's Lease ("Agreement") between **McDONALD'S USA, LLC,** a Delaware limited liability company ("McDonald's") and _____ (hereafter, for purposes of this Addendum, called "Grantee").

1. **McDONALD'S INTEREST IN PREMISES:**  McDonald's has obtained the right to use the Premises pursuant to the _____ described in Article 1.05 ("Master Agreement").

2. **COMPLIANCE WITH THE MASTER AGREEMENT:**  Grantee acknowledges and agrees that the terms and conditions of this Agreement are subject and subordinate to the terms and conditions of the Master Agreement and any subsequent amendments to it.  If there are any inconsistencies between this Agreement and the Master Agreement, the more restrictive obligations of the Master Agreement will prevail.  Grantee will not, in its use and enjoyment of the Premises, suffer or permit any condition to exist, or do, or omit to do, anything which would give rise to any right of the grantor of McDonald's interest under the Master Agreement ("Master Grantor") to terminate the Master Agreement or to prejudice or limit any rights of McDonald's under the Master Agreement.  Grantee will perform, comply with and discharge all obligations which McDonald's is required to perform, comply with and discharge pursuant to the Master Agreement including, but not limited to, the payment of all charges, costs and expenses as set forth in Article 3.01 of this Agreement.  Such payments shall not, however, include  payment of McDonald's basic monthly fee obligation for its interest under the Master Agreement.

3. **GRANTEE'S STATEMENTS AND CERTIFICATES:**   Without limiting the generality of the foregoing, Grantee agrees to promptly provide the insurance policies or certificates, off-set statements, statements of sales, mechanic's lien waivers, notices, releases and any other statement, record or document which may be required from time to time by McDonald's under the terms of the Master Agreement.  All certificates or policies of insurance so required will name the Master Grantor as co-insured or additional insured, as the case may be.

4. **ENFORCEMENT OF McDONALD'S RIGHTS UNDER MASTER AGREEMENT:**   It is acknowledged that the Master Grantor may have certain obligations under the Master Agreement to maintain and repair the Premises and adjoining areas, pay real estate taxes, assessments and special charges and impositions, restore, replace or rebuild the Premises and adjoining areas in the event of damage by fire and other causes, carry and pay for certain types of insurance policies and perform other obligations set forth in the Master Agreement.  If these obligations exist, McDonald's agrees to make a good faith effort to obtain the timely and faithful performance of the Master Grantor's obligations, but McDonald's will not be in default or breach of any of its covenants and duties under this Agreement or be liable for any resulting loss or claim of Grantee if McDonald's is not able to enforce its rights under the Master Agreement.  With respect to McDonald's obligation, if any, to repair and restore the Premises in the event of damage or destruction by fire or any other cause, McDonald's obligations are conditioned upon McDonald's obtaining the cooperation and approval of the Master Grantor, as it may be required, and the compliance of the Master Grantor with all of the Master Grantor's duties under the Master Agreement; and McDonald's will not be liable to Grantee for any damage, claim or injury resulting from McDonald's inability to repair or restore the Premises due to a default or breach of the Master Agreement by the Master Grantor.

EXHIBIT O(85)

AOE2143

5.  **INTENT OF THE PARTIES:**  It is the intent of the parties to enter into a sub-agreement between McDonald's and Grantee and not to make an assignment of the Master Agreement.  The parties further acknowledge that it is their intent that there be no merger of either McDonald's or Grantee's interest in this Agreement and the fee interest if either party acquires the fee interest in the Premises at any time after the execution of this Agreement.  In such event, this Agreement will remain in full force and effect and will determine the rights, duties, and obligations of the parties.  In addition, notwithstanding anything contained in this Agreement to the contrary, if McDonald's does not hold a leasehold interest in the Premises, this Agreement shall not be deemed a sublease but a sub-conveyance allowed by McDonald's rights under the Master Agreement.  It is further agreed that the designation of this document as an "Operator's Lease" is merely for convenience and does not purport to transfer greater rights to Grantee than those held by McDonald's pursuant to the Master Agreement.

EXHIBIT O(85)

AOE2144

[CITY, STATE]
[Address]
L/C: _____
File #:  _____

# McDONALD'S INTEREST ADDENDUM

(McDonald's Corporation holds interest in Master Agreement – interest is not a leasehold)

**THIS McDONALD'S INTEREST ADDENDUM** is attached to and made a part of the Operator's Lease ("Agreement") between **McDONALD'S USA, LLC,** a Delaware limited liability company ("McDonald's USA") and _____ (hereafter, for purposes of this Addendum, called "Grantee").

1. **McDONALD'S USA'S INTEREST IN PREMISES:**  McDonald's USA has obtained the right to use the Premises through an internal agreement(s) with McDonald's Corporation and/or its affiliated companies (McDonald's Corporation and/or its affiliated companies are hereafter referred to as "McDonald's") ("McDonald's Internal Agreement Documentation") as may be amended from time to time.  The McDonald's Internal Agreement Documentation does not increase Grantee's obligations under this Agreement.  The McDonald's Internal Agreement Documentation requires McDonald's USA to meet all of the obligations of McDonald's under the Master Agreement described in Article 1.05.

2. **COMPLIANCE WITH THE MASTER AGREEMENT:**  Grantee acknowledges and agrees that the terms and conditions of this Agreement are subject and subordinate to the terms and conditions of the Master Agreement and any subsequent amendments to it.  If there are any inconsistencies between this Agreement, McDonald's Internal Agreement Documentation and the Master Agreement, the more restrictive obligations of the Master Agreement will prevail.  Grantee will not, in its use and enjoyment of the Premises, suffer or permit any condition to exist, or do, or omit to do, anything which would give rise to any right of the grantor of McDonald's interest under the Master Agreement ("Master Grantor") to terminate the Master Agreement or to prejudice or limit any rights of McDonald's under the Master Agreement.  Grantee will perform, comply with and discharge all obligations which McDonald's is required to perform, comply with and discharge pursuant to the Master Agreement including, but not limited to, the payment of all charges, costs and expenses as set forth in Article 3.01 of this Agreement.  Such payments shall not, however, include payment of McDonald's basic monthly fee obligation for its interest under the Master Agreement.

3. **GRANTEE'S STATEMENTS AND CERTIFICATES:**  Without limiting the generality of the foregoing, Grantee agrees to promptly provide the insurance policies or certificates, off-set statements, statements of sales, mechanic's lien waivers, notices, releases and any other statement, record or document which may be required from time to time by McDonald's USA, McDonald's or the Master Grantor under the terms of the Master Agreement.  All certificates or policies of insurance so required will, in addition to McDonald's USA, also name the Master Grantor and McDonald's as co-insureds or additional insureds, as the case may be.

4. **ENFORCEMENT OF McDONALD'S RIGHTS UNDER MASTER AGREEMENT:**  It is acknowledged that the Master Grantor may have certain obligations under the Master Agreement to maintain and repair the Premises and adjoining areas, pay real estate taxes, assessments and special charges and impositions, restore, replace or rebuild the Premises and adjoining areas in the event of damage by fire and other causes, carry and pay for certain types of insurance policies and perform other obligations set forth in the Master Agreement.  If these obligations exist, McDonald's USA agrees to make a good faith effort to obtain the timely and faithful performance of the Master Grantor's obligations, but McDonald's USA will not be in default or breach of any of its covenants and duties under this Agreement or be liable for any resulting loss or claim of Grantee if McDonald's USA is not able to enforce its rights under the Master Agreement.  With respect to McDonald's

EXHIBIT O(85)

AOE2145

USA's obligation, if any, to repair and restore the Premises in the event of damage or destruction by fire or any other cause, McDonald's USA's obligations are conditioned upon McDonald's USA's obtaining the cooperation and approval of the Master Grantor, as it may be required, and the compliance of the Master Grantor with all of the Master Grantor's duties under the Master Agreement; and neither McDonald's USA nor McDonald's will be liable to Grantee for any damage, claim or injury resulting from McDonald's USA's inability to repair or restore the Premises due to a default or breach of the Master Agreement by the Master Grantor.

5. **INTENT OF THE PARTIES:**  It is the intent of the parties to enter into a sub-agreement between McDonald's USA and Grantee and not to make an assignment of the Master Agreement.  The parties further acknowledge that it is their intent that there be no merger of either McDonald's USA's or Grantee's interest in this Agreement and the fee interest if either party acquires the fee interest in the Premises at any time after the execution of this Agreement.  In such event, this Agreement will remain in full force and effect and will determine the rights, duties, and obligations of the parties.  In addition, notwithstanding anything contained in this Agreement to the contrary, if McDonald's USA does not hold a leasehold interest in the Premises, this Agreement shall not be deemed a sublease but a sub-conveyance allowed by McDonald's rights under the Master Agreement.  It is further agreed that the designation of this document as an "Operator's Lease" is merely for convenience and does not purport to transfer greater rights to Grantee than those held by McDonald's pursuant to the Master Agreement.

EXHIBIT O(85)

AOE2146

## OPERATOR EXTENSION OF TERM LANGUAGE

If Landlord extends its leasehold interest or acquires the fee interest in the Premises so that the Landlord's tenure extends beyond _____, the term of this Lease shall be automatically modified for a term consistent with the Landlord's real estate interest in the Premises, but in no event beyond _____.  This Lease shall also be amended to reflect any new terms and conditions in the new or extended Lease or in the acquisition documents executed by Landlord and its landlord or seller.  The Basic Rent and Percentage Rent may be increased to reflect Landlord's total real estate acquisition and development costs for the Premises by applying Landlord's then current rental formula using the Percentage Rent then in effect for similar McDonald's Restaurants.

## EARLY TERMINATION DUE TO NO ADDITIONAL REAL ESTATE TENURE

Tenant acknowledges that Landlord is in negotiations with the party that controls the real estate interest in the Premises ("Head Landlord") to obtain additional real estate tenure for the Premises (as defined below).  As of the date of this Lease, Landlord does not have real estate tenure at the Premises, but the Head Landlord has agreed to allow Landlord to occupy the Premises while negotiations continue.  The Head Landlord may revoke its agreement at any time; therefore, Landlord and Tenant agree that, notwithstanding the term in this Article, Landlord may terminate this Lease upon the following:  (i) negotiations with the Head Landlord cease or (ii) the Head Landlord requires Landlord to vacate the Premises.  In either case, this Lease will terminate when McDonald's right to occupy the Premises terminates.

EXHIBIT O(85)

AOE2147

**EXHIBIT H**

**ASSIGNMENT TO AN ENTITY**

ASSIGNMENT AND CONSENT TO ASSIGNMENT

OF FRANCHISE TO A [CORPORATION/PARTNERSHIP/LIMITED LIABILITY COMPANY]

This Assignment and Consent to Assignment of Franchise to a [Corporation/Partnership/Limited Liability Company], dated _____ ("Assignment"), is between **McDonald's USA, LLC**, a Delaware limited liability company ("McDonald's"); _____ and _____ (collectively "Assignor"); **[Corporation/Partnership/LLC Name]**, a _____ [corporation/partnership/limited liability company] ("Assignee"); and those [shareholders/partners/members] of Assignee (individually ["Shareholder"/"Partner"/"Member"] and collectively ["Shareholders"/"Partners"/"Members"]) listed on Exhibit A attached and incorporated into this Assignment.

<u>Background</u>

A.      McDonald's or its predecessor in interest issued to Assignor or its predecessor(s) in interest a Franchise Agreement and an Operator's Lease, both dated _____ (collectively "Franchise"), for the McDonald's restaurant located at _____ [L/C: _____] ("Restaurant").

B.      Assignor requests McDonald's consent to transfer the rights in the Franchise to Assignee.

C.      Assignor, Assignee, and [Shareholders/Partners/Members] acknowledge that McDonald's consent to this Assignment is required under the terms of the Franchise.

<u>Agreement</u>

The parties, intending to be legally bound and for good and valuable consideration, agree as follows:

1.      The effective date of this Assignment is _____ ("Effective Date").

2.      McDonald's consents to this Assignment subject to the provisions of the Franchise and this Assignment.

3.      On the Effective Date, Assignor assigns and transfers all the right, title, and interest of Assignor in the Franchise to Assignee, subject to the provisions of the Franchise.

4.      Assignee must pay all fees and perform all obligations under the Franchise.

5.      Assignor agrees to remain personally bound by, and personally liable for the breach of, each and every provision of the Franchise, both monetary obligations and obligations to take or refrain from taking specific actions or to engage or refrain from engaging in specific activities, and is not released from any obligations to McDonald's by this Assignment.  After the date of this Assignment, all

references to Franchisee in the Franchise shall refer to both Assignor and Assignee both jointly and severally.

**[Alternate paragraph to be used for Assignment to Corporation.]**

6.      Without the prior written consent of McDonald's, Assignor, Assignee, and Shareholders may not, either voluntarily or by operation of law, make or permit:

a)      any further transfer or assignment of the Franchise;
b)      any pledge or encumbrance of the Franchise;
c)      any assignment, transfer, or pledge of any equity interest in Assignee including, but not limited to, transfers in any entity that is a Shareholder;
d)      the creation of new or additional equity interests in Assignee; or
e)      any amendment of the terms of any organizational documents relating to Assignee.

Equity interests, as used in this Assignment, include direct or indirect equity or beneficial interests in Assignee and the business risks associated with the Restaurant including, but not limited to, interests stated as debt that include any type of risk-taking interest or any interest in the profits or appreciation of the Restaurant.

**[Alternate paragraph to be used for Assignment to Partnership.]**

6.      Without the prior written consent of McDonald's, Assignor, Assignee, and Partners may not, either voluntarily or by operation of law, make or permit:

a)      any further transfer or assignment of the Franchise;
b)      any pledge or encumbrance of the Franchise;
c)      any assignment, transfer, or pledge of any equity interest in Assignee including, but not limited to, transfers in any entity that is a Partner;
d)      the creation of new or additional equity interests in Assignee;
e)      the change of a limited partnership interest to a general partnership interest or of a general partnership interest to a limited partnership interest; or
f)      any amendment of the terms of any partnership agreement or other organizational documents relating to Assignee.

Equity interests, as used in this Assignment, include direct or indirect equity or beneficial interests in Assignee and the business risks associated with the Restaurant including, but not limited to, interests stated as debt that include any type of risk-taking interest or any interest in the profits or appreciation of the Restaurant.

**[Alternate paragraph to be used for Assignment to Limited Liability Company.]**

6.      Without the prior written consent of McDonald's, Assignor, Assignee, and Members may not, either voluntarily or by operation of law, make or permit:

a)      any further transfer or assignment of the Franchise;
b)      any pledge or encumbrance of the Franchise;
c)      any assignment, transfer, or pledge of any equity interest in Assignee including, but not limited to, transfers in any entity that is a Member;
d)      the creation of new or additional equity interests in Assignee; or
e)      any amendment of the terms of any operating agreement or other organizational documents relating to Assignee.

EXHIBIT O(85)

AOE2149

Equity interests, as used in this Assignment, include direct or indirect equity or beneficial interests in Assignee and the business risks associated with the Restaurant including, but not limited to, interests stated as debt that include any type of risk-taking interest or any interest in the profits or appreciation of the Restaurant.

7.     Assignor, Assignee, and [Shareholders/Partners/Members] represent and warrant that:

    a)     they are the only persons or entities with equity interests in Assignee and their ownership interests are as shown on Exhibit A; and

    b)     there is no obligation or intention to issue additional equity interests in Assignee.

8.     If any [Shareholders/Partners/Members] are trustees or trusts:

    a)     the beneficial interests in the trusts may not be assigned, transfers to successor trustees or special trustees may not be made even if the transfer is provided for in any trust agreement, and the trust agreement may not be amended without the prior written consent of McDonald's;

    b)     Exhibit A lists all persons who are trustees of any nature or have beneficial interests in any [Shareholder's/Partner's/Member's] trust(s);

    c)     this Assignment is not a consent to any future transfers of equity interest(s) of Assignee to any [Shareholder's/Partner's/Member's] trust beneficiaries based on any condition including, but not limited to, attainment of a certain age or occurrence of any event.  All future transfers or vesting of equity interest(s) of Assignee are subject to this Assignment; and

    d)     McDonald's has not reviewed any trust documents of any [Shareholder's/Partner's/Member's] trust; therefore, this Assignment does not constitute an approval by McDonald's of any documents relating to any [Shareholder's/Partner's/Member's] trust.  If any of those documents conflict with or contradict the provisions of this Assignment or McDonald's ownership policies, McDonald's will not be bound by those documents and the provisions of this Assignment will control.

9.     McDonald's has not reviewed any of Assignee's organizational documents; therefore, this Assignment does not constitute an approval by McDonald's of any documents relating to Assignee. If any of those documents conflict with or contradict the provisions of this Assignment or McDonald's ownership policies, McDonald's will not be bound by those documents and the provisions of this Assignment will control.

10.     Assignor, Assignee, and [Shareholders/Partners/Members] acknowledge that: (i) McDonald's has not provided any tax or other advice in connection with this Assignment; (ii) McDonald's approval of this Assignment does not constitute tax advice; and (iii) McDonald's has not reviewed or evaluated the validity of Assignee or of any trusts or entities with an equity interest in Assignee.

**[Additional paragraph to be used for Assignment to Corporation.]**

11.     a)     Assignor or Assignee must include the following legend on all issued and outstanding shares of stock of Assignee:

This stock may not be pledged, sold, assigned or otherwise transferred, in whole or in part, voluntarily or by operation of law, without the prior written consent of McDonald's USA, LLC.  Any and all transfers are also subject to the terms of the

EXHIBIT O(85)

AOE2150

Franchise, including the Franchise Agreement and Operator's Lease, or other applicable agreements, for each McDonald's restaurant operated by _____.

   b)   If McDonald's requests, Assignor or Assignee must send to McDonald's a copy of all outstanding certificates of stock of Assignee.

   12.   No [Shareholders/Partners/Members] are granted approved owner/operator status by this Assignment.  However, Assignee and [Shareholders/Partners/Members] must abide by those provisions of the Franchise relating to the maintenance and protection of the McDonald's System (as defined in the Franchise) including, but not limited to, those provisions requiring confidentiality and regulating involvement in other or similar restaurant businesses.  A breach of this covenant is a material breach of the Franchise and entitles McDonald's to enforce all remedies available including, but not limited to, the termination of the Franchise.

   13.   The parties' respective successors, assigns, heirs, and personal representatives are bound by this Assignment.  All obligations, agreements, representations, and warranties made by more than one party will be joint and several even if it is not so stated in the relevant paragraph.

   14.   At anytime during normal business hours, McDonald's may examine and copy any of Assignor's, Assignee's, or any [Shareholder's/Partner's/Member's] records, books, financial records, tax returns, or other documents for the purpose of insuring compliance with the Franchise and this Assignment.

   15.   If Assignor, Assignee, or any [Shareholder/Partner/Member] breaches any of the conditions, representations, agreements, or warranties contained in this Assignment, McDonald's will be entitled to all relief and remedies available by law, and to all relief and remedies granted to McDonald's by the Franchise.

   16.   Assignor has notified all of Assignor's lien holders and lenders of this Assignment.

   17.   All terms and conditions of the Franchise remain in full force and effect except as modified by this Assignment including, but not limited to, the terms and conditions of Paragraph 15(a) of the Franchise Agreement in the event of the death or permanent incapacity of Assignor. _____ must continue to personally devote full time and best efforts to the operation of the Restaurant business.

   18.   If Assignee's name or the name of any trust or entity with an equity interest in Assignee (collectively "Assignee's Name") contains "Mc", "Mac", a derivative of "Mc" or "Mac", or any other McDonald's trademark, then Assignor, Assignee, and [Shareholders/Partners/Members] covenant and agree (i) that if:  (a) Assignee ceases to be a McDonald's franchisee; or (b) Assignee or [Shareholders/Partners/Members] are notified by McDonald's that McDonald's desires to use Assignee's Name as a trade name, trademark, or internet domain name on a nationwide basis but is prohibited by any government authority or entity authorized to assign or register trade names, trademarks, or internet domain names from using or registering that trade name, trademark, or internet domain name because it is similar to Assignee's Name, then they will cause Assignee's Name to be changed, within 30 days of any of the above occurrences, to delete any reference to "Mc", "Mac", a derivative of "Mc" or "Mac", or any other McDonald's trademark, without further consideration from McDonald's; (ii) that they will not challenge McDonald's use of any trade name, trademark, or internet domain name on the grounds that it: (a) is similar to Assignee's Name; (b) is likely to cause confusion; or (c) dilutes the value of the trade name; and (iii) that Assignee's Name shall not be used in connection with any trade or business

4

conducted by Assignor, Assignee, or [Shareholders/Partners/Members] except the McDonald's restaurant business.

The parties have signed this Assignment evidencing that they have read, understand, and are bound by the terms of this Assignment.

McDonald's USA, LLC                                    Assignor

By: _____                  _____

                                                      _____

                                                      Assignee:

                                                      By: _____

                                                      _____

EXHIBIT A

Listing of Equity Interests of Franchise

| <u>Name</u> | Percentage <u>Ownership</u> |
|---|---|

EXHIBIT O(85)

AOE2153

# EXHIBIT I

## ASSIGNMENT AGREEMENT

ASSIGNMENT AND CONSENT TO ASSIGNMENT

OF FRANCHISE TO AN INDIVIDUAL PURCHASER

This Assignment and Consent to Assignment of Franchise to an Individual Purchaser, dated _____ ("Assignment"), is between **McDonald's USA, LLC**, a Delaware limited liability company ("McDonald's"); _____ and _____ (collectively "Assignor"); and _____ and _____ (collectively "Assignee").

<u>Background</u>

A.      McDonald's or its predecessor in interest issued to Assignor or its predecessor(s) in interest a License Agreement or Franchise Agreement and an Operator's Lease, both dated _____, including any amendments (collectively "Franchise"), for the McDonald's restaurant located at _____ [L/C: _____] ("Restaurant").

B.      Assignor requests McDonald's consent to transfer the rights in the Franchise to Assignee under the terms of the Purchase and Sale Agreement, dated _____, between Assignor and Assignee, including all amendments ("Agreement").

C.      Assignor and Assignee acknowledge that McDonald's consent to this Assignment is required under the terms of the Franchise.

<u>Agreement</u>

The parties, intending to be legally bound and for good and valuable consideration, agree as follows:

1.      The effective date of this Assignment is _____, at 12:01 a.m. ("Effective Date").

2.      McDonald's consents to this Assignment subject to the provisions of the Franchise and this Assignment.

3.      On the Effective Date, Assignor assigns and transfers all the right, title, and interest of Assignor in the Franchise to Assignee, subject to the provisions of the Franchise and this Assignment.

4.      On the Effective Date, the transfer of the Restaurant assets and assignment of the rights and obligations under the Franchise will be effective and complete.  Assignee must take possession of the Restaurant assets and begin operation of the Restaurant business on the Effective Date.

5.      Beginning on the Effective Date, Assignee (i) must pay all fees, (ii) assumes full and unconditional liability under the Franchise, and (iii) must perform all obligations under the Franchise. Beginning on the Effective Date, the service fee is _____%.

6.      McDonald's grants approved owner/operator status to _____ for the Restaurant, and he/she must personally devote full time and best efforts to the Restaurant business and adhere to the tenets of the McDonald's System (as defined in the Franchise) which are the essence of the Franchise.

7.      On the Effective Date, Assignee assumes Assignor's obligations listed on the attached Exhibit A.

8.      Without the prior written consent of McDonald's, Assignee may not, either voluntarily or by operation of law, make or permit:

     a)      any further transfer or assignment of the Franchise;

     b)      any pledge or encumbrance of the Franchise; or

     c)      the creation of new or additional interest in the Franchise.

9.      Assignee represents and warrants that:

     a)      Assignee is the only person with an interest in the Franchise and Assignee's ownership interest is as shown on Exhibit B; and

     b)      there is no obligation or intention to issue additional interests in the Franchise.

10.     If Assignor or Assignee breaches any of the conditions, representations, agreements, or warranties contained in this Assignment, McDonald's will be entitled to all relief and remedies available by law or in equity, including injunctive relief, and to all relief and remedies granted to McDonald's by the Franchise.

11.     Assignee is responsible for the Restaurant's entire real estate tax bill due on the next payment date.  Assignee must pay the entire amount due to McDonald's or, if on direct pay, to the appropriate taxing authority upon receipt of the invoice for the real estate tax bill from either McDonald's or the appropriate taxing authority.

12.     Assignor and Assignee each represents and warrants to McDonald's that (i) the Agreement is the entire agreement between Assignor and Assignee for the acquisition of the Restaurant by Assignee, (ii) a complete and true copy of the Agreement has been delivered to McDonald's, (iii) all of the financial terms relating to Assignee's acquisition of the Restaurant have been disclosed in writing to McDonald's, and (iv) the Agreement and this Assignment have been duly authorized, executed and delivered by such party, and constitute the enforceable obligations of such party.  Assignor and Assignee each agrees and acknowledges that (i) McDonald's consent to this Assignment is based on its evaluation of such financial terms, and (ii) a failure to disclose all financial terms to McDonald's will constitute a material breach of the Franchise pursuant, among other provisions, to paragraph 18(n) of the Franchise, thereby entitling McDonald's to all rights and remedies under the Franchise including, but not limited to, the right to terminate the Franchise.

13.     If Assignee pays all business creditors, including McDonald's, on a timely basis, Assignor will be automatically discharged from all liability under the Franchise upon the earlier of: (i) three years after the Effective Date or (ii) the end of the Franchise term.

14.     Assignor agrees to pay all liabilities owed to McDonald's relating to the Restaurant as estimated on the attached Exhibit C, including, but not limited to, rent and service fees through the standard automatic bank draft process.  Assignor agrees to leave a designated bank account open for sixty (60) days past the Effective Date and to ensure that sufficient funds remain in the bank account to satisfy all liabilities.  A partial payment of any receivable amount by Assignor to McDonald's will not relieve the parties from the obligation to pay to McDonald's any and all receivables in full and McDonald's acceptance of any monies from Assignor will not waive Assignor's obligation to make full payment or waive any rights of McDonald's.  McDonald's consent to this Assignment is expressly conditioned on McDonald's receipt from Assignor of all receivables owed to McDonald's.

15.     Assignor represents and warrants that neither Assignor, nor any member of the immediate family of Assignor, and to the best knowledge of Assignor, any other member of Assignor's family:

EXHIBIT O(85)

AOE2155

a)   owns, or has the right to use, directly or indirectly, any property used for or in connection with the operation of the Restaurant which is not a part of the assets being conveyed to Assignee;

b)   owns, directly or indirectly, all or part of any business which is a party to any business arrangements concerning the Restaurant; or

c)   owns or has an interest in any real estate located within a radius of 500 yards of the Restaurant, excluding real estate leased to Assignor by McDonald's.

16.   Assignee's failure to comply with National Restaurant Building and Equipment Standards ("NRBES") at the Restaurant before _____ may result in Assignee becoming ineligible for growth and rewrite under the National Franchising Standards.

17.   As of the Effective Date, Assignor agrees that if any Franchise contains a paragraph entitled "Interference with Employment Relations of Others," such Franchise is hereby amended to eliminate Paragraph 14.  If the Franchise does not contain a paragraph entitled "Interference with Employment Relations of Others," such Franchise shall remain unchanged.

18.   Assignor and Assignee hereby represent and warrant that they have executed the Bigger, Bolder Vision 2020 Commitment Letter, as amended (the "BBV2020 Letter").  Assignor and Assignee agree to abide by and perform all terms, conditions, and obligations outlined in the BBV2020 Letter.

19.   On the Effective Date, Assignor assigns, transfers, and sets over to Assignee all right, interest, duties, and obligations of Assignor in any commitment letter, letter agreement, contract or other similar agreement with McDonald's for the Restaurant in connection with the BBV2020 Letter, the Experience of the Future ("EOTF") or other construction or development project or test at the Restaurant (collectively, the "Commitment Letter").  Assignee accepts the assignment of the Commitment Letter and agrees to abide by and perform all terms, conditions, and obligations outlined in the Commitment Letter.  Assignee also assumes full and unconditional liability under the Commitment Letter.

20.   It is Assignor's obligation to provide, and Assignee's obligation to obtain, all project costs and payment records for any construction projects that are in progress or completed at the Restaurant(s).  Assignee shall be responsible for any remaining construction payments owed to McDonald's related to the Restaurant(s).

21.   The parties' respective successors, assigns, heirs, and personal representatives are bound by this Assignment.  All obligations, agreements, representations, and warranties made by more than one party will be joint and several even if it is not so stated in the relevant paragraph.

22.   At any time during normal business hours, McDonald's may examine and copy any of Assignor's or Assignee's records, books, financial records, tax returns, or other documents for the purpose of insuring compliance with the Franchise and this Assignment.

23.   All Exhibits to this Assignment are a part of this Assignment.

24.   This Assignment is not an approval by McDonald's of the Agreement or any other documents pertaining to it and McDonald's is not a party to the Agreement or bound by it.  Assignee acknowledges that Assignee is acquiring the Restaurant and the Franchise pursuant to an arms-length sale between operators in which Assignor and Assignee exercised their own, independent business judgment in arriving at the purchase price for the Restaurant and the Franchise.  McDonald's neither established nor negotiated that price.  Assignee entered into the Agreement voluntarily, with the advice of any attorneys, accountants, and valuation experts of its choosing, following a sales process that afforded Assignee a full and fair opportunity to visually inspect the Restaurant and Franchise, discuss the condition with Assignor, and conduct any other due diligence Assignee believed was necessary.  In connection with the Agreement and/or this Assignment, Assignee hereby acknowledges and agrees that McDonald's has not made, and is not making, any express or implied representations, warranties, guarantees, promises, or assurances,

whether orally or in writing, concerning the Restaurant or the Franchise, including without limitation the value, condition, use, profitability, or future performance of the Restaurant or the Franchise, and Assignee expressly disclaims any such representation, warranty, guarantee, promise or assurance (including merchantability and fitness for a particular purpose). Accordingly, and for the avoidance of doubt, Assignee hereby covenants not to sue McDonald's for fraudulent inducement or to bring any other claim or cause of action based in fraud, tort, equity, contract or otherwise against McDonald's relating to any alleged misrepresentations or omissions Assignee later may claim McDonald's made about the Restaurant or Franchise in connection with the sales process or the Agreement.

25.     All terms and conditions of the Franchise remain in full force and effect except as expressly modified by this Assignment.

26.     McDonald's and Assignee each acknowledge and warrant to each other that they wish to have all terms of their business relationship defined in the Franchise and this Assignment.  Neither McDonald's nor Assignee wishes to enter into a business relationship with the other in which any terms or obligations are the subject of alleged oral statements or in which oral statements serve as the basis for creating rights or obligations different from or supplementary to the rights and obligations in the Franchise or this Assignment.  McDonald's, Assignor, and Assignee agree that the Franchise and this Assignment supersede and cancel any prior and/or contemporaneous discussions or writings (whether described as representations, inducements, promises, agreements, understandings, or any other term), between McDonald's or anyone acting on its behalf, Assignor or anyone acting on Assignor's behalf, and Assignee or anyone acting on Assignee's behalf, with respect to the Restaurant or the relationship between the parties.  McDonald's, Assignor, and Assignee each agree that they have placed, and will place, no reliance on any such discussions or writings.  The Franchise and this Assignment constitute the entire agreement between the parties and contain all of the terms, conditions, rights, and obligations of the parties with respect to the Restaurant and the Franchise.  No future franchise or offer of franchises for additional McDonald's restaurants has been promised to Assignee and no such franchise or franchise offer will come into existence, except by means of a separate writing, executed by an officer or franchising director of McDonald's and specifically identified as a franchise agreement.  No change, modification, amendment, or waiver of any of the provisions of the Franchise or this Assignment will be effective and binding upon McDonald's unless it is in writing, specifically identified as an amendment to this Assignment, and signed by an officer or franchising director of McDonald's.

27.     The laws of the State of Illinois shall govern this Assignment, regardless of the laws that might otherwise govern under applicable principles of conflicts of law.

28.     WAIVER OF JURY TRIAL: EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING OUT OF THIS ASSIGNMENT.

29.     The parties will execute and deliver any other documents required by McDonald's which are reasonably necessary to carry out the purposes of this Assignment.

30.     The invalidity of any provision of this Assignment shall not impair the validity of any other provision.  If any provision of this Assignment is determined to be unenforceable by a court of competent jurisdiction, such provision shall be deemed severable and the remaining provisions of this Assignment shall be enforced.

31.     In the event that McDonald's initiates any legal proceeding to construe or enforce the terms, conditions and provisions of this Assignment (including without limitation, Section 21 herein), or to obtain damages or other relief to which it may be entitled by virtue of this Assignment, McDonald's shall be entitled to payment from Assignee and Assignor, jointly and severally, of its reasonable attorneys' fees and all other costs of enforcement and/or collection.

EXHIBIT O(85)

AOE2157

32.     This Assignment may be executed in one or more counterparts, all of which shall be considered one and the same instrument, and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered to the other parties hereto, it being understood that all parties hereto need not sign the same counterpart.  Executed signature pages delivered by facsimile or electronically will be treated in all respects as original signatures.

The parties have signed this Assignment evidencing that they have read, understand, and are bound by the terms of this Assignment.

McDonald's USA, LLC                          Assignor


By: _____          _____

                                             Assignee


                                             _____

EXHIBIT O(85)

AOE2158

EXHIBIT A

<u>Special Agreements and Notes Assumed by Assignee</u>

Assignor's obligation with OPNAD, Inc.

Assignor's obligation with Local Advertising Co-op

Assignor's obligation with Muzak or other Restaurant Music System

Assignor's obligation under any Test Letter or Test Agreement with McDonald's

Assignor's obligation under any contract for the purchase of electricity or natural gas and related services, and any ancillary agreements, including but not limited to contract administration and energy consulting service agreements

Assignor's obligation under the Leading with Solution's Program Participation Letter Agreement, if applicable

Assignor's obligations under any Commitment Letter with McDonald's, if applicable

6

EXHIBIT O(85)

AOE2159

EXHIBIT B

| Assignee | Percentage Ownership |
|----------|----------------------|

EXHIBIT O(85)

AOE2160

EXHIBIT C

(List of liabilities due McDonald's inserted here.)

EXHIBIT O(85)

AOE2161

# EXHIBIT J

## PRELIMINARY AGREEMENT

This Preliminary Agreement ("Agreement") is between _____ ("Candidate") and McDonald's USA, LLC, a Delaware limited liability company, having its principal office at 110 N. Carpenter Street, Chicago, Illinois ("McDonald's").

<u>Background</u>

A.    Candidate wishes to be considered by McDonald's for a McDonald's franchise to operate a McDonald's restaurant.

B.    Before McDonald's will consider Candidate for any McDonald's franchise opportunity, Candidate must first satisfactorily complete McDonald's Franchise Applicant Training and Evaluation Program consisting of McDonald's restaurant and classroom experience and training ("Training Program") with the understanding that Candidate's participation in the Training Program may exceed a period of two years on a part-time basis without any commitment or promise of a McDonald's franchise.

C.    The decision to offer Candidate any franchise opportunity rests in McDonald's sole discretion.

<u>Agreement</u>

The parties, intending to be legally bound and for good and valuable consideration, agree as follows:

1.    McDonald's authorizes Candidate to participate in the Training Program until further notice by McDonald's.

2.    McDonald's decision to consider Candidate for any franchise opportunity as well as the location and type of franchise opportunity to be offered, if any, and the terms of any contracts rest in McDonald's sole discretion.  McDonald's is unable, at this date, to determine the exact type of the franchise opportunity and contracts, if any, which may ultimately be offered to Candidate.  If McDonald's decides that it will offer Candidate the opportunity to operate a McDonald's restaurant, the franchise may be one of the following to be determined in McDonald's sole discretion:  (i) McDonald's conventional franchise for a new restaurant with the Candidate to invest cash from non-borrowed funds of at least 40% of the total cost; or (ii) McDonald's conventional franchise obtained by the purchase of an existing McDonald's restaurant, either from McDonald's or from an existing McDonald's franchisee, which requires the Candidate to invest cash from non-borrowed funds of at least 25% of the total purchase price, including any required reinvestment.  A detailed explanation of the conventional franchise is contained in the Franchise Disclosure Document ("Disclosure Document") previously provided to Candidate.

3.    Candidate may spend in excess of two years in the Training Program without a commitment from McDonald's that a franchise will be offered.  During the Training Program, Candidate's performance and qualifications to become a franchisee will be continuously evaluated by McDonald's.  Candidate is not an employee or agent of McDonald's or any parent, subsidiary, affiliate, or franchisee of McDonald's and is not entitled to and will not receive any compensation including, without limitation, salary, wages, or employee benefits for participation in the Training Program.  In addition, Candidate will not receive any reimbursement for costs and expenses.  Candidate waives any and all rights to damages, the

EXHIBIT O(85)

AOE2162

reimbursement of expenses or costs, as well as the payment of any compensation related directly or indirectly to Candidate's participation in the Training Program.

4.      The information, manuals, and materials acquired by Candidate during the Training Program contain and constitute McDonald's confidential information and trade secrets.  Candidate will not use or disclose any such information or any other McDonald's information gained by Candidate through participation in the Training Program without McDonald's prior written approval.

5.      This Agreement is personal to Candidate and it may not be transferred by assignment, will, or operation of law.

6.      No franchise offer by McDonald's will come into existence except by a written document executed by an officer or  franchising director of McDonald's, which is specifically identified as a Franchise Agreement.  This Agreement is not an offer of a franchise or a commitment or promise by McDonald's to offer Candidate a franchise and McDonald's decision to make any franchise offer rests in McDonald's sole discretion.

7.      Candidate acknowledges receipt of the Disclosure Document together with various attachments.  Candidate must hold the Disclosure Document for fourteen (14) calendar days before signing this Agreement.  Candidate further acknowledges being advised by McDonald's to read such material carefully.

8.      Upon termination of Candidate's participation in the Training Program by either party, or in the event McDonald's notifies Candidate that it will not offer a franchise to Candidate, with or without cause in either situation, Candidate shall immediately return all manuals and materials provided to or acquired by Candidate during the Training Program and discontinue the use of any such materials and other information.

9.      The terms of McDonald's letter to Candidate dated _____ are incorporated in this Agreement.  In the event of any inconsistency, the terms of this Agreement shall supersede said letter.

10.     This Agreement constitutes the entire agreement between the parties and supersedes any and all prior and/or contemporaneous oral agreements or understandings of the parties; however, nothing in this Agreement is intended to disclaim the representations made in the Disclosure Document furnished to Candidate.  No change, modification, amendment, or waiver of any of the provisions of this Agreement will be binding upon McDonald's unless in writing, specifically identified as an amendment, and signed by an officer or franchising director of McDonald's.  Candidate acknowledges that neither McDonald's nor anyone acting on behalf of McDonald's has made any representations, inducements, promises, or agreements, orally or otherwise, regarding the subject matter of this Agreement which are not embodied in this Agreement.

11.     If McDonald's institutes any action at law or in equity against Candidate and/or defends any action instituted by Candidate related in any way, directly or indirectly, to this Agreement and if a judgment is entered in McDonald's favor, McDonald's will be entitled to recover from Candidate reasonable attorney's fees together with court costs and expenses of litigation as may be allowed by the court.

12.     The terms and provisions of this Agreement will be interpreted in accordance with and governed by the laws of the State of Illinois.  If any part of this Agreement is, for any reason, ruled by a court to be invalid, such judicial ruling will not affect the validity of any remaining portion of this

EXHIBIT O(85)

AOE2163

Agreement which will remain in full force and effect.  In the event that any material provision of this Agreement is ruled invalid, McDonald's reserves the right to terminate this Agreement.

      13.    <u>McDONALD'S IS NOT OBLIGATED TO OFFER CANDIDATE A FRANCHISE AND CANDIDATE IS NOT OBLIGATED TO ACCEPT ANY FRANCHISE OFFER</u>.

      The parties have executed this Agreement this _____ day of _____, evidencing that they have read, understand, and are bound by the terms of this Agreement.

McDONALD'S USA, LLC

By: _____      _____

                                              *(Candidate)*                *Date*

Title: _____

EXHIBIT O(85)

AOE2164

**EXHIBIT K**

## McDONALD'S U.S. REWRITE (NEW TERM) POLICY

A McDonald's franchise is granted for a limited period of time, with no right to renew or extend. A new franchise decision must be made before the franchise term expires. McDonald's desires to enter into new business relationships with Owner/Operators who, as McDonald's alone determines, consistently meet all of the National Franchising Standards, contribute to the success of the System, comply with the Franchise Agreement and are eligible for growth and rewrite. In addition, in determining whether to enter into a new term franchise, McDonald's will evaluate the available real estate tenure and economic viability of the restaurant.

The Owner/Operator's performance will be assessed for his or her entire organization on a continuous basis throughout the franchise term. The Owner/Operator's eligibility status for growth and rewrite will be communicated at his or her Business Review.

The rewrite (new term) process typically begins in the third calendar year prior to the expiration of the franchise term for traditional restaurants. Rewrite recommendations are submitted by the Vice President of the Field Office to the Rewrite Committee, made up of members of U.S. management. Only the Rewrite Committee has the authority to offer or not to offer a new term franchise to an Owner/Operator.

If a new term franchise offer is approved, the terms will be outlined in a rewrite offer letter sent to the Owner/Operator. The offer of a new term franchise is conditioned upon the Owner/Operator's continued compliance with the National Franchising Standards, the Franchise Agreement and continued eligibility for growth and rewrite for the remainder of the current franchise term, and is subject to available real estate tenure. There may be additional conditions imposed as a part of the rewrite offer. Any conditions of the rewrite offer will be included in the rewrite offer letter and will vary from case to case, but most frequently relate to reinvestment, rebuilds, relocations, real estate issues or ownership issues. If the Owner/Operator owns or leases additional property that McDonald's determines is essential to the operation of the restaurant business, McDonald's will require, as a condition of the offer of the new franchise, that the Owner/Operator grant McDonald's a controlling interest, through purchase, lease or option, to ensure the availability of the property and the long-term operation of the restaurant. In some situations, due to the availability of real estate or questions about the long-term economic viability of the restaurant location, a shorter term franchise may be appropriate.

To accept the offer of a new term franchise, the Owner/Operator must sign the new franchise agreement prior to the expiration of the existing franchise term. The service fee and initial franchise fee for the new franchise will be those in effect for similar restaurants at the time the new franchise commences. The rent for the new term franchise will be calculated in accordance with the then-current rewrite rent policy. Owner/Operator rental of additional property will be treated in accordance with the additional property policy in effect at the time the new franchise commences.

In cases where McDonald's, through the Rewrite Committee, concludes that it will not offer a new term franchise to the Owner/Operator, the Owner/Operator will be advised of this decision in writing. The decision of the Rewrite Committee not to offer a new term franchise to the Owner/Operator is final. In these cases, McDonald's will extend an alternative offer, which will give the Owner/Operator the opportunity to sell the restaurant business to a qualified buyer prior to the expiration of the current franchise. Subject to the terms and conditions stated in the alternative offer, which include a release, McDonald's will commit to offer a new term franchise to the qualified buyer.

McDonald's may be required to defer from the aforementioned process when considering a new term for non-traditional venues.

If you have any questions concerning the Rewrite (New Term) Policy, please contact Mathew Ajayi, U.S. Vice President – Franchising Strategy, 559-916-0363.

This Rewrite (New Term) Policy is not part of the Franchise Agreement. It is subject to change as McDonald's alone determines. Its application will differ depending upon the various facts and circumstances involved and it is not a contract right between the Owner/Operators and McDonald's.

EXHIBIT O(85)

AOE2165

# EXHIBIT L

## REWRITE (NEW TERM) OFFER LETTER

PERSONAL & CONFIDENTIAL/VIA PARTNERS MAIL

RE: McDonald's Restaurant

L/C:
(the "Restaurant")

(Approved Operator(s) on Franchise):

As you know, your franchise for the Restaurant expires on (Expiration Date).

**OFFER OF A REWRITE (NEW TERM) FRANCHISE**
The Vice President of the Field Office has submitted a recommendation that you be offered a new term franchise for the Restaurant.  Members of the Rewrite Committee have reviewed the recommendation, including your compliance with the National Franchising Standards and Franchise Agreement and your contributions to the System.

Based on this information, the Company has approved the offer of a new term franchise to you upon the expiration of the existing franchise, subject to your continued compliance with the National Franchising Standards and Franchise Agreement throughout the remainder of the term of the existing franchise.

**FEES AND TERMS**
The new term franchise documents, including Franchise Agreement and Operator's Lease, will be those in use at the time the new franchise begins.

The terms of the new franchise are as follows:

| | |
|---|---|
| INITIAL FEE: | Initial fee in effect at the time the new franchise begins |
| SERVICE FEE: | Service fee in effect at the time the new franchise begins |
| FRANCHISE TERM: | Term will be consistent with McDonald's real estate tenure but not beyond 20 years |
| RENT: | Rent will be calculated in accordance with McDonald's rewrite rent policy in effect at the time the new term begins. |

**NEW TERM FRANCHISE OWNERSHIP**
The new franchise will be granted to (Approved Operator(s) on Franchise), individually.  (Approved Operator(s) on Franchise) will be required to personally devote full time and best efforts to the operation of the Restaurant business and will be the "approved operator(s)" of the Restaurant.  This offer may not be accepted by any other person or entity or transferred by assignment, will, or operation of law, without the prior written consent of McDonald's.

Please note the franchise is issued to you individually.  If you want to operate the restaurant business using an operating entity, you need to request an assignment of the franchise to your operating entity, including the name of your operating entity and the percentage breakdown of its equity ownership.  McDonald's USA, LLC must approve any assignment of the franchise, which will *not* release you from any obligations under the franchise.  For further information, refer to the *Basic Estate and Business Planning Booklet* on the Franchising page in @mcd.com (under Key Documents).   You may wish to consult with your attorney regarding the advantages and disadvantages of forming an operating entity.

EXHIBIT O(85)

AOE2166

**INITIAL FEE**
The initial fee will be due in full at the beginning of the new term.  The initial fee charged will be that in effect at the time the new term begins and may be higher than the $45,000.00 initial fee currently in effect.

(Paragraphs with specific conditions of the new term offer are inserted here.)

**NEW FRANCHISE DOCUMENTS**
Provided you remain eligible for the new term franchise, the new franchise documents will be forwarded to you for execution approximately one month before the expiration of your current franchise.

If you are not interested in receiving a new term franchise for this Restaurant as outlined above, please notify (Rewrite Manager Name), U.S. Franchising Strategy, at the number shown above within 30 days from the date of this letter.

Sincerely,

McDONALD'S USA, LLC

Mathew Ajayi
U.S. Vice President – Franchising Strategy

EXHIBIT O(85)

AOE2167

# EXHIBIT M

# FORM OF FLOATING RATE NOTE

## PROMISSORY NOTE, SECURITY AGREEMENT AND ACH AUTHORIZATION

This Promissory Note, Security Agreement and ACH Authorization (this "**Note**") is entered into this _____ day of_____, 20 _ by **[Company Name; First M Last, First I Last]** ("**Borrower**") in favor of Bank of America, N.A., a national banking association, with offices at 100 Federal Street, Boston, MA 02110, Mail Code MA5-100-09-04 , Attn: Dan Robson ("**Lender**").

## PART I:  PROMISSORY NOTE

**[FOR PAYMENTS OF PRINCIPAL AND INTEREST - FOR VALUE  RECEIVED**, Borrower (jointly and severally, if more than one signatory) promises to pay to the order of Lender the principal sum of [to be supplied] AND 00/100 DOLLARS ($_____) in _____more or less equal installments of principal each in the amount of $_____ (provided that the last installment on_____, 20 shall be in an amount equal to the balance owing hereunder plus interest accrued thereon), plus accrued interest in arrears on the amount  outstanding from time to time from the date hereof until paid at the per annum rate equal to the  LIBOR Rate (Adjusted Periodically), as defined below, plus [xxx percent (xxx%)] per annum, payable monthly  from the date funds are first advanced hereunder, commencing on____18,  20___ and on each Payment Date thereafter.]

**[FOR PAYMENTS OF INTEREST ONLY – FOR VALUE RECEIVED,** Borrower (jointly and severally, if more than one signatory) promises to pay to the order of Lender the principal sum of  [to be supplied] AND 00/100 DOLLARS ($_____) on ___18, ____plus interest at the per annum rate equal to the LIBOR Rate (Adjusted Periodically), as defined below,  plus [xxx percent (xxx%)] per annum, payable monthly from the date funds are first advanced  hereunder, commencing on___18, 20 and on each Payment Date thereafter.]

"**Business Day**" shall mean any day other than a Saturday, Sunday, or other day on which commercial banks in Chicago, Illinois are authorized or required to close under the laws of the State of Illinois, or federal laws.

"**Calculation Period**" shall mean the period from, and including, the Effective Date to,  but not including, the first Payment Date; and thereafter, for each successive period, the period  from, and including, a Payment Date to, but not including, the next succeeding Payment Date.

"**Credit Facilities**" shall mean all extensions of credit from Lender to Borrower, now  existing or hereafter arising.

"**Effective Date**" shall mean the date of this Note.

"**LIBOR Rate (Adjusted Periodically)**" shall mean, with respect to each Calculation Period, a rate of interest equal to the rate per annum equal to the London Interbank Offered Rate (or a comparable or successor rate which is approved by the Lender) for U.S. Dollar deposits for delivery on the date in question for a one-month term beginning on that date.  The Lender will use the London Interbank Offered Rate as published by Bloomberg (or other commercially available source providing quotations of such rate as selected by the Lender from time to time) as determined for each Payment Date at approximately 11:00 a.m. London time on the Rate Setting Day therefor, for U.S. Dollar deposits (for delivery on the first day of such Calculation Period) with a term of one month, as adjusted from time to time in the Lender's sole discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs.  If such rate is not available at such time for any reason, or adverse or unusual conditions, or changes, in the applicable law relating to the London Interbank Market make it illegal or, in the reasonable judgment of Lender, impracticable to fund  therein, or if it shall become unlawful for Lender to charge interest on a LIBOR Rate basis, then the rate for that interest period, and for so long as the conditions referred to in this sentence shall continue,  will be determined by such alternate method as is reasonably selected by the Lender after notice of such rate is given to McDonald's and the Borrower.  If at any time the LIBOR Rate (Adjusted Periodically) is less than zero, such rate shall be deemed to be zero for the purposes of this Note.

EXHIBIT O(85)

AOE2168

"**London Banking Day**" means a day on which banks in London are open for business and dealing in offshore dollars.

"**McDonald's**" shall mean McDonald's Corporation, a Delaware corporation.

"**Payment Date**" shall mean the 18th day of each month, or if such day is not a Business Day, the next succeeding day that is a Business Day;  provided that the final Payment Date shall be the date of maturity of this Note.

"**Prime Rate**" shall mean such rate as announced from time to time by Lender as its Prime Rate, changes in which rate shall take effect at the opening of business on the day specified in the public announcement of such change. The "Prime Rate" is a rate set by Lender based upon various factors including Lender's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate.

"**Rate Setting Day**" shall mean two (2) London Banking Days prior to each Payment Date.

Payments of principal and interest shall be made to Lender at 100 Federal Street, Boston, MA 02110, Mail Code MA5-100-09-04, or at such other place  as Lender or any subsequent holder of this Note from time to time directs in writing. Payments shall be by pre-authorized debits to Borrower's account pursuant to Part III hereof or such other  method for payment  designated by Lender from time to time including, but not limited to,  preauthorized debits to an alternate account identified by Borrower. Payments received shall be  first applied to fees and expenses, if any, then to accrued interest, and the balance to principal. All interest shall be calculated in arrears for the actual number of days elapsed based on a 360-day year.

Borrower may prepay the whole or any part of the unpaid balance of principal and accrued interest under this Note on any Payment Date, without penalty or fee, on notice to  Lender delivered not less than five (5) Business Days in advance of such Payment Date.

If as a result of any  prepayment of principal outstanding under this Note (whether  voluntary or involuntary as a result of an acceleration of the maturity hereunder or otherwise) on  any day other than a Payment Date, Borrower shall reimburse Lender for any losses (including  lost margins incurred by Lender in obtaining, liquidating or employing deposits from third parties) arising out of such prepayment, upon presentation by Lender of a statement setting  forth the amount and Lender's calculation thereof pursuant hereto, which statement shall be  deemed true and correct absent manifest error.

**[FOR USE WITH NOTES     SUBJECT TO A     PRIOR     LENDER'S SUBORDINATION AGREEMENT]** This Note is subject to the terms of that certain Subordination Agreement among [Senior Lender], Borrower, Lender and McDonald's dated  concurrently herewith.

THE FAILURE OR FORBEARANCE OF LENDER OR ANY OTHER HOLDER OF THIS NOTE FOR ANY PERIOD OF TIME TO EXERCISE ANY RIGHT HEREUNDER, OR OTHERWISE GRANTED BY LAW OR ANOTHER AGREEMENT, SHALL NOT AFFECT OR RELEASE THE LIABILITY OF BORROWER OR ANY OTHER OBLIGOR HEREUNDER, AND SHALL NOT CONSTITUTE A WAIVER OF SUCH RIGHT UNLESS  SO STATED BY LENDER OR SUCH OTHER HOLDER IN WRITING.  Borrower agrees that Lender or any other holder shall have no responsibility for the collection or protection of any  property securing this Note and may  waive its rights with respect to any property or indebtedness. Borrower hereby waives (i) presentment of payment, notice of nonpayment, notice  of  dishonor, protest and all other demands and notices in connection with the delivery,  acceptance, performance and enforcement of this Note, and (ii) the benefits of any law providing  that the release of any one of any obligors for this Note releases all others otherwise liable for  obligations outstanding hereunder.

Borrower agrees to pay reasonable and documented expenses of Lender, including  reasonable fees of outside counsel, in connection with the  preparation, execution and delivery of this  Note and any  related document prepared for Lender, or any amendments, modifications or waivers of the provisions hereof or thereof. The foregoing  fees may be paid from the proceeds of this Note. Furthermore, Borrower agrees to pay the  reasonable and documented costs of Lender relating to  the collection or enforcement of this   Note or any related document, including reasonable fees of outside counsel.

This Note is secured by the Collateral, as defined in Part II herein. Borrower shall pay, or  reimburse Lender, for any and all filing costs, documentary stamps, intangibles taxes, conveyance or transfer  taxes and/or similar fees or taxes required to be paid in connection with this Note, in order to effectuate the  filing of financing statements  and/or security agreements allowing Lender to perfect its security for this Note.

All payments not made when due shall bear interest from the date each payment is due  until the date payment is received by Lender, at Lender's option, at the Prime Rate, plus an additional two percent (2.0%) per annum. Irrespective  of the exercise or nonexercise of the foregoing option, in the event that any payment herein  provided for shall become overdue

EXHIBIT O(85)

AOE2169

for more than thirty (30) days, a "late charge" of three percent (3%) of the overdue payment shall, at Lender's option, become immediately due and payable to Lender as liquidated damages for failure to make prompt payment, and the same shall be secured by this Note, provided that Lender provided Borrower and Guarantor with written notice of such missed payment in the manner provided for in Part III, Section 6.2 of this Note within fifteen (15) days of such missed payment being due.

Lender shall provide Borrower with the following notifications regarding any missed payments: (a) as discussed above, written notice of such missed payment in the manner provided for in Part III, Section 6.2 of this Note within fifteen (15) days of such missed payment being due; (b) a phone call to Borrower within fifteen (15) days after such missed payment was due; (c) a regular monthly bill for principal and interest that includes the missed payment from the prior period and any interest accrued thirty (30) days after such missed payment was due (or on such schedule as is in accordance with the Lender's customary billing processes); and (d) a default notice on or after the date sixty (60) days after such missed payment was due. Lender's failure to provide Borrower with such notifications within the aforesaid timeframes does not constitute a waiver of Lender's right to collect interest at the rate described in the preceding paragraph or otherwise impair any of the Lender's rights or remedies hereunder or under applicable law, provided that Lender shall not exercise remedies hereunder until Lender provides Borrower with all such notifications.

This Note and any other indebtedness of Borrower to Lender, whether now existing or hereafter arising, are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration of the maturity of the indebtedness evidenced hereby or

otherwise, shall the amount paid or agreed to be paid to Lender for the use or the forbearance of the indebtedness hereunder exceed the maximum permissible rate under applicable law ("**Maximum Rate**"). As used herein, the term "applicable law" shall mean the law in effect as of the date of this Note, provided however that in the event there is a change in the applicable law which results in a higher permissible rate of interest, then this Note shall be governed by such new law as of its effective date. If due to any circumstance whatsoever, fulfillment of any provisions of this Note at the time performance of such provision shall be due shall exceed the Maximum Rate, then, automatically, the obligation to be fulfilled shall be modified or reduced to the extent necessary to limit such interest to the Maximum Rate. If Lender should ever receive anything of value deemed interest by applicable law which would exceed the Maximum Rate, such excess shall be applied to the reduction of principal then outstanding and not to the payment of interest, or, if such excess exceeds the principal then outstanding, such excess shall be repaid to Borrower.

Borrower understands and agrees that in making the loan evidenced by this Note, Lender and McDonald's have agreed on certain matters with respect to such loan. Borrower further understands that McDonald's has executed a guaranty ("**Guaranty**") which guaranties Borrower's obligations under this Note and that in connection with the Guaranty, McDonald's will receive a Guaranty fee to be paid by Lender. Lender may, and Borrower hereby authorizes Lender to, release to McDonald's such information about Borrower and the loan evidenced hereby as Lender deems necessary or appropriate, including without limitation, Borrower's financial statements and any information relating to Borrower's performance under this Note. McDonald's may release to Lender such information about Borrower or Borrower's affiliates and the Franchise (as hereinafter defined) or any other McDonald's franchise Borrower or Borrower's affiliates may own and operate. Lender may also condition its agreement to any waiver, modification or amendment with respect to this Note on obtaining McDonald's prior written consent. Lender may, without incurring any liability to Borrower, notify McDonald's of any Event of Default, as defined below, under this Note prior to notifying Borrower. McDonald's may, without incurring any liability to Borrower, notify Lender of any breach of the Franchise, prior to notifying Borrower. Lender shall not have any liability to Borrower as a result of any action taken or not taken by Lender with respect to the loan evidenced by this Note in accordance with the written instructions of a duly authorized officer, employee or agent of McDonald's. Borrower acknowledges that Lender's rights under Section 6.1 below shall include without limitation Lender's right to assign this Note to McDonald's at any time, whether or not there has occurred an Event of Default hereunder.

## PART II:  SECURITY AGREEMENT

All terms used and not otherwise defined in this Note shall have the meanings ascribed to such terms in the Uniform Commercial Code as adopted, and in effect from time to time, by the State of Illinois (the "**UCC**"). However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9. For purposes of this Note, "**Obligations**" means all loans, advances, indebtedness, notes, liabilities and amounts, liquidated or unliquidated, owing by Borrower or any affiliate of Borrower to Lender at any time, each of every kind, nature and description, whether arising under this Note or otherwise, direct or indirect (that is, whether the same are due directly or indirectly to Lender as endorser or guarantor, or as obligor of obligations due to third persons which have been

endorsed or assigned to Lender, or otherwise), absolute or contingent, due or to become due, now existing or hereafter arising or acquired, and shall also include all principal, interest and other charges due from Borrower or any affiliate of Borrower to Lender and all costs and expenses referred to in this Note and any interest, premium, fees, and other income accruing after the commencement of any proceeding or case commenced by or against the Borrower or any such affiliate under any bankruptcy, insolvency or other debtor relief laws, whether or not allowed under any such proceeding or case.

For value received, Borrower hereby grants to Lender a security interest in the Collateral as described below. This security interest is granted to secure payment of the Obligations on the following terms and conditions:

EXHIBIT O(85)

AOE2170

1.      Collateral.

    1.1      Security Interest Grant. Borrower hereby grants to Lender, to secure the payment and performance in full of all of the Obligations, a security interest in and pledges and assigns to Lender the following properties, assets and rights of Borrower, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof (all of the same being hereinafter called the "**Collateral**"): all personal and moveable property of every kind and nature including, without limitation, all goods (including inventory, equipment, and any accessions thereto), instruments (including promissory notes), documents, accounts (including health-care insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, supporting obligations, any other contract rights or rights to the payment of money, insurance claims and proceeds, tort claims, and all general intangibles (including all payment intangibles). The Collateral does not include Borrower's right, title and interest in the Franchise, as defined below.

    1.2      Location/Purpose. The Collateral will be kept at and used in the operation of the McDonald's restaurant businesses located at [insert addresses of restaurants where collateral is located] . These restaurant businesses, together with the License Agreement or Franchise Agreement and the Operator's Lease and any assignments pertaining thereto, will be referred to collectively as the "**Franchise**". Borrower agrees not to remove the Collateral from the Franchise premises except for purposes of repair or replacement in the normal course of business. In no event, however, will any such repair or replacement impair the value of the Collateral.

    1.3      Inspection/Records. Upon reasonable notice and at any reasonable time prior to an Event of Default as defined herein (and, after Event of Default, without notice and at any time), Borrower will allow Lender to inspect the Collateral. Borrower will keep accurate and complete records identifying the Collateral which will be available to Lender upon request.

    1.4      Maintenance. Borrower will maintain the Collateral in good condition; will repair or replace it, if necessary; and in general, deal with the Collateral in a manner that is considered good practice for a McDonald's restaurant business. Borrower will not knowingly use the Collateral in violation of any law, statute, ordinance or government regulation and will be responsible for payment of any taxes and/or assessments that may be imposed on the Collateral.

    1.5      Insurance. Borrower agrees to maintain insurance on the Collateral with a responsible company in such amounts and against such risks and hazards as are normally insured against by similar McDonald's restaurant businesses. Lender shall be named as an additional insured, or, alternatively, as loss payee under a lender loss payable endorsement in favor of Lender. Upon request, Borrower shall provide Lender with satisfactory evidence of insurance coverage.

    1.6      Reimbursement of Lender. At its option, Lender may discharge taxes and other liens at any time levied or placed on the Collateral, and place and pay for insurance thereon. Borrower agrees to reimburse Lender on demand for any and all expenditures so made, and until paid the amount thereof shall be a debt secured by the Collateral. Lender shall have no obligation to Borrower to make any such expenditures, nor shall the making thereof relieve Borrower of any default.

2.      Warranties, Representations and Covenants of Borrower.

    2.1      Representations and Warranties.                    Borrower warrants and represents to Lender that the following are true and correct on the date of this Note:

        (a)      Authorization. Borrower has full power and authority to enter into this Note which is a legal and binding obligation of Borrower and enforceable in accordance with its terms.

        (b)      Independent Legal Advice. Borrower has had a reasonable opportunity to consult with its own independently selected legal counsel concerning the meaning and terms of this Note and the consequences of entering into it. Borrower is entering into this Note freely, based on its own business judgment and is not relying on any representations or warranties by Lender or McDonald's except as specifically set forth in this Note.

        (c)      No Breach of Other Agreements. The execution and performance of this Note have been duly authorized by appropriate corporate or other organizational action, if necessary, and do not violate any material provision of any agreement of which Borrower is a party.

EXHIBIT O(85)

AOE2171

(d)      <u>Purpose of Loan</u>. This Note is issued in connection with a commercial transaction in which credit is being extended for general business purposes, including but not limited to (i) purchasing a building and any site and other improvements relating thereto which is used to operate a McDonald's restaurant, (ii) purchasing furniture, fixtures and equipment for the Franchise, (iii) financing the business of the Franchise, or (iv) refinancing any existing indebtedness incurred for any of the foregoing purposes. No portion of any proceeds of any advances made hereunder will be used for personal, family or household purposes.

2.2      <u>Affirmative Covenants</u>.  The Borrower shall:

(a)      <u>Existence</u>.  Maintain its existence and business operations as  presently in effect in accordance with all applicable laws and regulations, pay its debts and  obligations when due under normal terms, and pay on or before their due date, all taxes,  assessments, fees and other governmental monetary obligations, except as taxes, assessments, fees and other governmental monetary obligations may be contested in good faith if they have been properly reflected on its books and, at the Lender's request, adequate funds or security has  been pledged to insure payment.

(b)      <u>Financial Records</u>. Maintain proper books and records of account,  in accordance with generally accepted accounting principles, and consistent with financial  statements previously submitted to the Lender.

(c)      <u>Notices of Claims, Litigation, Defaults, etc</u>. Promptly inform  the Lender in writing of (1) all existing and all threatened litigation, claims, investigations,  administrative proceedings and similar actions affecting the Borrower which could materially   affect the financial condition of the Borrower; (2) the occurrence of any default hereunder or other event which gives rise to  the Lender's option to terminate any of the Credit Facilities; (3) any additions to or changes in  the locations of Borrower's McDonald's restaurant businesses; and (4) any alleged breach of any  provision of this agreement or of any other agreement related to the Credit Facilities by the  Lender.

(d)      <u>Additional Information</u>. Furnish such additional information and  statements as Lender may request, from time to time.

(e)      <u>Insurance Reports</u>. Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably  request.

(f)      <u>Other Agreements</u>. Comply with all terms and conditions of all  other agreements, whether now or hereafter existing, between Borrower and any other party.

(g)      <u>Title to Assets and Property</u>. Maintain good and marketable title to  all of Borrower's assets and properties that are Collateral hereunder.

(h)      <u>Further Assurances</u>. Deliver to Lender any additional documents that may reasonably be required to perfect the security interest granted herein. In  addition, Borrower will execute and deliver to Lender any additional documents or writings and  do all things requested by Lender to effectuate the provisions and intent of this Note, to correct  any inaccurate information reflected herein (e.g., borrower's name and address), or to comply  with applicable laws.

2.3      <u>Negative Covenants</u>.                Without the written consent of the Lender the Borrower will not:

(a)      <u>Sale of Collateral</u>. Sell or otherwise transfer the Collateral. Borrower shall be permitted to sell or otherwise dispose of Collateral in the ordinary course of  business or when obsolete, worn out, inadequate or unnecessary for use in the operation of the  Franchise, but only upon substituting other Collateral of equivalent value and utility.

(b)      <u>Debt</u>. Incur, or permit to remain outstanding any debt except debt  reflected in the latest financial statement of the Borrower furnished to the Lender prior to  execution of this Note and not to be paid with proceeds of borrowings under the Credit Facilities.
For purposes of this covenant, the sale of any accounts receivable is the incurring of debt  for borrowed money.

(c)      <u>Guaranties</u>. Guarantee or otherwise become or remain secondarily  liable on the undertaking of another, except for endorsement of drafts for deposit and collection   in the ordinary course of business.

(d)      <u>Liens</u>.  Create or permit to exist any lien on any of its property, real  or personal, except: liens existing on the date of this Note and known to the Lender; liens to the Lender; liens incurred in the   ordinary course of

F-8

business securing current nondelinquent liabilities for taxes, tax liens being actively contested in good faith, worker's compensation, unemployment insurance, social security and pension liabilities.

(e)    Continuity of Operations. (1) Engage in any business activities substantially different from those in which Borrower is presently engaged; (2) permanently cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve; or (3) enter into any arrangement with any person providing for the leasing by the Borrower to any subsidiary of real or personal property which has been sold or transferred by the Borrower or subsidiary to such person.

(f)    Limitation on Negative Pledge Clauses. Enter into any agreement with any person other than Lender which prohibits or limits the ability of the Borrower or any of its subsidiaries to create or permit to exist any lien on any of its property, assets or revenues, whether now owned or hereafter acquired.

(g)    Conflicting Agreements. Enter into any agreement containing any provision which would be violated or breached by the performance of Borrower's obligations under this agreement.

(h)    Change of Control. Permit a Change of Control to occur. Change of Control means the occurrence of any of the following events:_____shall (i) cease to own and control 100% of the outstanding capital stock and membership units of each Borrower, (ii) cease to possess the right to elect (through contract, ownership of voting securities or otherwise) at all times a majority of the board of directors (or similar governing body) of each Borrower, or (iii) cease to have the authority to direct the management policies and decisions of each Borrower.

3.    Events of Default. Upon the occurrence of any of the following events ("**Event of Default**"), at the option of Lender, or automatically without notice or any other action upon the occurrence of any event specified in Sections 3.4 or 3.5 below, the unpaid principal amount of this Note together with accrued interest and all other obligations owing by Borrower to Lender shall become immediately due and payable without presentment, demand, protest, or further notice of any kind, all of which are hereby expressly waived by Borrower:

3.1    Borrower shall fail to maintain sufficient funds in any automated clearing house deposit account ("ACH") to enable payment, or shall otherwise fail to make payment, of any installment of principal and/or interest or other amounts due and payable under this Note and such default remains uncured after the expiration of ten (10) days from receipt of notice of such default.

3.2    Any warranty or representation made by Borrower in this Note or any other writing delivered to Lender proves to have been false or inaccurate in any material respect when made. Borrower fails to perform or breaches any negative covenant or other material provision or covenant of this Note, and such failure or breach (with the exception of Sections 2.2(a) and 2.3 herein as to which such failure or breach shall constitute an immediate default hereunder) is not cured by Borrower or waived in writing by Lender within ten (10) days after receipt by Borrower of written notice from Lender identifying the non-performance or breach.

3.3    Borrower violates any of the covenants or agreements contained in the Franchise.

3.4    The filing of any petition or the commencement of any proceeding by Borrower for relief under bankruptcy or insolvency laws, or any laws relating to the relief of debtors, readjustment of indebtedness, debtor reorganization, or composition or extension.

3.5    The filing of any petition or the commencement of any involuntary proceeding against Borrower for relief under bankruptcy or insolvency laws, or any law relating to the relief of debtors, readjustment of indebtedness, debtor reorganization, or composition or extension.

Borrower hereby acknowledges and agrees that a default in the payment or performance of the obligations under this Note shall be deemed a material breach under the Franchise, allowing McDonald's to exercise all of its rights and remedies pursuant to said Franchise.

4.    Remedies with Respect to Collateral. Upon the occurrence of an Event of Default, Lender may exercise the following remedies, at its option, and demand and notice are waived by Borrower.

EXHIBIT O(85)

AOE2173

4.1     Possession. Lender shall have the right to take possession of the  Collateral in accordance with all applicable local and federal laws.

4.2     Collateral. Lender may sell any or all of the Collateral at public or private  sale, provided that, except for sales to persons approved by McDonald's, prior to such a sale,  Lender agrees to remove from the Collateral all trademark identification and all other  identification of McDonald's, its subsidiaries and affiliates. The method, manner, time, place  and terms of a sale pursuant to this section shall be commercially reasonable and shall be  specified in a written notice from Lender to be received by Borrower at least five (5) days prior  to such sale. Any proceeds from such a sale shall be applied by Lender to Borrower's  obligations under this Note. The balance, if any, shall be returned to Borrower. Borrower shall  remain liable for any deficiency.

4.3     Other Remedies. In addition, Lender shall have all rights and remedies  available at law or in equity, all of which shall be cumulative

5.      Reporting Requirements.  Borrower shall furnish to Lender:

5.1     Financial Statements. As soon as available, and in any event within forty-  five (45) days after the close of each fiscal quarter of Borrower, and at such other intervals as  Lender may request from time to time, the balance sheets, income statements, and statements of  cash flow of Borrower prepared by Borrower's independent accountants, which, if requested by  Lender, shall be on a consolidating and consolidated basis and/or audited by certified public  accountants satisfactory to Lender, together with an unqualified opinion by such certified public  accountants regarding such statements

6.      Miscellaneous.

6.1     Successors and Assigns. This Note is binding upon and shall inure to the  benefit of Borrower and Lender and their respective legal representatives, assigns and  successors; *provided*, that Borrower  shall have no right to assign its rights or obligations hereunder  without the prior written consent of Lender and McDonald's; and *provided* further, that Lender  may sell, assign, transfer, or grant participations, in whole or in part, in this Note without the  prior written consent of Borrower (*provided*, however, that such sale, assign, transfer, or grant of  participation has previously been approved by McDonald's), and Borrower agrees that any such  purchaser, assignee, transferee, or grantee shall be entitled to all rights, remedies and benefits of  Lender in, to, and under this Note, and such purchaser, assignee, transferee, or grantee shall be   and become the "Lender" hereunder for all purposes of this Note.

6.2     Notice. Any notice required to be given under this Note shall be  in writing and delivered in person or sent by certified or registered mail, postage prepaid. Notice to  Borrower shall be addressed to:_____, with a copy to McDonald's  Corporation, 110 North Carpenter Street, Dept. 200, Chicago, Illinois 60607 Attention:  Treasurer. Notice to Lender shall be addressed to Bank of America, N.A., 100 Federal Street, Boston, MA 02110, U.S.A., Mail Code MA5-100-09-04, Attention: Dan Robson.

6.3     Severability. The provisions of this Note are severable, and if any  provision of this Note shall be determined by a court of competent jurisdiction to be  unenforceable such determination shall not affect the validity of any other provision of this Note.

6.4     Waiver. Lender's failure or delay  in exercising any  right, power, or privilege under this Note shall not preclude its exercise of any other or further right, power or  privilege under this Note. Lender's waiver of any right, power, privilege, or default under this  Note shall neither constitute a waiver of any right, power, privilege, or default, nor shall it   constitute a waiver of any future default of the same or of any other term of this Note. All rights  and remedies in this Note are cumulative and not exclusive of any other legal rights or remedies.   No waiver of Borrower's breach of any term or condition of this Note shall be effective unless in   a writing signed by a duly authorized representative of Lender.

6.5     Governing Law. Borrower hereby acknowledges and agrees that this Note   and the obligations hereunder are to be governed by and under the internal laws of the State of  Illinois, without regard to its conflicts of law rules. Borrower agrees that any suit for the  enforcement of this Note may be brought in the courts of the State of Illinois or any Federal  Court sitting therein and consents to the non-exclusive jurisdiction of such court and to service of  process in  any such suit being made upon Borrower by mail at Borrower's address specified  herein. Borrower hereby waives any objection that it may now or hereafter have to the venue of  any such suit or any such court or that such suit was brought in an inconvenient court.

6.6     Section Headings. The various headings used in this Note are inserted for   convenience only and shall not affect the meaning or interpretations of this Note or any provision   hereof.

EXHIBIT O(85)

AOE2174

6.7     Agency. Borrower acknowledges and agrees that all of the rights and  remedies which may be exercised by Lender under this Note, and all demands and notices which  may be given by Lender under this Note, may be exercised and/or given (as the case may be) by  an agent appointed by Lender for such purposes and identified to Borrower in writing by Lender  from time to time.

6.8     Waivers, Amendments, Discharges. No provision or term of this Note may be waived, amended or otherwise modified except by an agreement in writing signed by  Lender in the case of a waiver, and, in the case of an amendment or other modification, by  Lender and Borrower, and, in each case, consented to in writing by McDonald's, and any oral  waiver, amendment or modification of any provision or term hereof shall be without authority  and of no force and effect. Any such waiver, amendment or modification shall be effective only   in the specific instances and for the purposes and to the extent therein specified.

6.9     Signature. Delivery of an executed signature page to this Note by fax transmission or e-mail transmission (e.g. "pdf" or "tif"), shall be effective as delivery of a manually executed counterpart of this Note.

6.10     JURY WAIVER. EACH OF BORROWER AND LENDER HEREBY IRREVOCABLY WAIVES TRIAL BY JURY AND AGREES THAT NEITHER, INCLUDING ANY ASSIGNEE OR SUCCESSOR, SHALL SEEK A JURY TRIAL IN ANY LAWSUIT, PROCEEDING, COUNTERCLAIM, OR ANY OTHER LITIGATION PROCEDURE BASED UPON, OR ARISING OUT OF, THIS NOTE AND OTHER RELATED AGREEMENTS, ANY COLLATERAL OR THE DEALINGS OR THE RELATIONSHIP BETWEEN OR AMONG THE PARTIES, OR ANY OF THEM. NEITHER BORROWER NOR LENDER WILL SEEK  TO CONSOLIDATE ANY SUCH ACTION, IN WHICH A JURY TRIAL HAS BEEN WAIVED, WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. THE PROVISIONS OF THIS SECTION HAVE BEEN FULLY  DISCUSSED BY THE PARTIES AND THESE PROVISIONS SHALL BE SUBJECT TO NO EXCEPTIONS. NEITHER BORROWER NOR LENDER HAS IN ANY WAY  AGREED  WITH OR REPRESENTED TO THE OTHER THAT THE PROVISIONS OF THIS SECTION  WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

EXHIBIT O(85)

AOE2175

## PART III:  AUTHORIZATION FOR ACH DRAFTING OF LOAN PAYMENTS

Borrower hereby authorizes Lender, or any agent of Lender, to debit the bank account described below on each Payment Date for regularly scheduled monthly payments of principal  and accrued interest and all other amounts due under this Note. Borrower agrees that such  account will have sufficient funds to cover such debits and that any disputes over the sufficiency  of such funds will be resolved strictly between Borrower and the depository institution  maintaining such account.

Please debit the following account (choose one):_____Checking Account _____Savings

Account  Bank Name:

_____

_____

Bank Location (City, State):

_____

Routing and Transit Number:

_____

Bank Account Number:

_____

(Attached is a voided check  verifying the Borrower's bank's routing number and the account  number)

Debits to the above account will be made on each Payment Date.

THE BORROWER UNDERSTANDS AND ACKNOWLEDGES THAT IT MUST REMIT  PAYMENTS UNTIL WRITTEN CONFIRMATION OF THE COMMENCEMENT OF  AUTOMATIC DEBITS IS RECEIVED FROM LENDER.

IN WITNESS WHEREOF, this Note has been executed and delivered by Borrower as an  instrument under seal this_____day of_____, 20_____.

BORROWER:

_____

Print Name:

_____

_____

**OPERATOR ASSISTANCE PROGRAM AGREEMENT**

This Operator Assistance Program Agreement (the "Agreement"), entered into the year and date indicated below, is between McDonald's USA, LLC and (Franchisee Name)_____, and (Any Operating Entities signing as guarantor)_____ (collectively, "Franchisee"), in reference to the Loan (as hereinafter defined) made by Bank of America, NA, its subsidiaries or affiliates ("Lender") to Franchisee.

**AGREEMENTS**

1.   Promissory Note. The Lender has concurrently made a loan (the "Loan") to the Franchisee, pursuant to a Promissory Note, Security Agreement and ACH Authorization (the "Note"). Franchisee understands that McDonald's Corporation has executed a guaranty as described in Section 2 below (the "Guaranty"). This Agreement will be effective and enforceable between the parties on the later of (i) the date of last execution of this Agreement, or (ii) the Effective Date of the Note.

2.   McDonald's Obligations. Pursuant to the terms of the Guaranty, McDonald's Corporation (together with McDonald's USA, LLC, "McDonald's") has guaranteed to the Lender the payment and performance obligations of Franchisee under the Note.

3.   Material Breach.  Pursuant to the terms of the Note, a default under the Note is a material breach under the terms of the Franchise (as defined in the Note), entitling McDonald's to exercise all of its rights and remedies as set forth in the Franchise.  Any amounts paid by McDonald's pursuant to the Guaranty shall become an accounts receivable balance owed to McDonald's by Franchisee. Presentment, demand, protest, notice of protest and dishonor are each waived by Franchisee.

4.   Notice.  Any notice required to be given under this Agreement shall be in writing and delivered in person or sent by certified or registered mail, postage prepaid.  Notice to Franchisee and McDonald's shall be addressed as set forth in the Franchise, with a copy to Lender at: Bank of America, 100 Federal St., Boston, MA 02360, Mail Code: MA5 100-09-04.

5.   Assignment. This Agreement is binding upon and shall inure to the benefit of Franchisee and McDonald's and their respective legal representatives, assigns and successors; however, Franchisee shall have no right to assign this Agreement without the prior written consent of McDonald's.

6.   Severability.  The provisions of this Agreement are severable, and if any provision of this Agreement shall be determined by a court of competent jurisdiction to be unenforceable such determination shall not affect the validity of any other provision of this Agreement.

7.   Waiver.  McDonald's failure or delay in exercising any right, power, or privilege under this Agreement shall not preclude its exercise of any other or further right, power or privilege under this Agreement.  McDonald's waiver of any right, power, privilege, or default under this Agreement shall neither constitute a waiver of any right, power, privilege, or default, nor shall it constitute a waiver of any future default of the same or of any other term of this Agreement.  All rights and remedies in this Agreement are cumulative and not exclusive of any other legal rights or remedies.  No alleged waiver of Franchisee's breach of any term or condition of this Agreement shall be effective unless in writing signed by a duly authorized representative of McDonald's.

8.   Release.  Franchisee fully, irrevocably and absolutely releases and forever discharges McDonald's from any and all claims, demands, suits, damages, losses, liabilities and causes of action or obligations of every kind, character or nature whatsoever, in law or in equity, known or unknown, suspected or unsuspected, fixed or contingent, pending or not pending, liquidated or unliquidated, that arose out of any actions, omissions, or events occurring in whole or in part prior to the execution of this Agreement, including, but not in any way limited to, losses, liabilities, claims (including but not limited to, by way of example only, those for fraud, misrepresentation, breach of warranty), and causes of action

EXHIBIT O(85)

AOE2177

arising from or in any way relating to this Agreement whether in writing or made through any alleged course of conduct, course of dealing, statements or actions of either McDonald's or Franchisee.

9.    <u>Governing Law</u>.  Franchisee hereby acknowledges and agrees that this Agreement and the obligations hereunder are to be governed by and under the internal laws of the State of Illinois, without regard to its conflicts of law rules.  Franchisee agrees that any suit for the enforcement of this Agreement may be brought in the courts of the State of Illinois or any Federal Court sitting therein and consents to the non-exclusive jurisdiction of such court and to service of process in any such suit being made upon Franchisee by mail at the Franchise restaurant location(s).  Franchisee hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or that such suit was brought in an inconvenient court.

10.    <u>Section Headings; Defined Terms</u>.  The various headings used in this Agreement are inserted for convenience only and shall not affect the meaning or interpretations of this Agreement or any provision hereof.

11.    <u>Waivers, Amendments, Discharges</u>.  No provision or term of this Agreement may be waived, amended or otherwise modified except by an agreement in writing signed by McDonald's in the case of a waiver, and, in the case of an amendment or other modification, by McDonald's and Franchisee, and any oral waiver, amendment or modification of any provision or term hereof shall be without authority and of no force and effect.  Any such waiver, amendment or modification shall be effective only in the specific instances and for the purposes and to the extent therein specified.

Intending to be legally bound, the parties to this Agreement have executed it the year and date written below.

FRANCHISEE(S)                                      FRANCHISEE(S)

Name:_____      Name:_____
         Individually, and on behalf of all operating              Individually, and on behalf of all operating
         entities                                                              entities

Name:_____(printe      Name:_____(printe
d)                                                                      d)

Date: _____      Date: _____

McDONALD'S USA, LLC

By: _____

Name: _____

Title: _____

# EXHIBIT N

## LIST OF AGENTS FOR SERVICE OF PROCESS

**ALABAMA**
Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, AL 36104

**ALASKA**
Corporation Service Company
9360 Glacier Highway, Suite 202
Juneau, AK 99801

**ARIZONA**
Corporation Service Company
8825 N. 23rd Avenue
Suite 100
Phoenix, AZ 85021

**ARKANSAS**
Corporation Service Company
300 Spring Building, Suite 900
300 S. Spring Street
Little Rock, AR 72201

**CALIFORNIA**
CSC-Lawyers Incorporating Service
2710 Gateway Oaks Dr., Suite 150N
Sacramento, CA 95833-3505

**COLORADO**
Corporation Service Company
1900 W. Littleton Boulevard
Littleton, CO 80120

**CONNECTICUT**
Corporation Service Company
50 Weston Street
Hartford, CT 06120-1537

**DELAWARE**
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

**DISTRICT OF COLUMBIA**
Corporation Service Company
1090 Vermont Avenue, N.W.
Washington, DC 20005

**FLORIDA**
Corporation Service Company
1201 Hays Street
Tallahassee, FL 32301

**GEORGIA**
Corporation Service Company
40 Technology Parkway South, Suite #300
Norcross, GA 30092

**HAWAII**
Commissioner of Securities
Department of Commerce and Consumer Affairs
Business Registration Division
Securities Compliance Branch
335 Merchant Street, Room 203
Honolulu, HI 96813
     *and*
CSC Services of Hawaii, Inc.
Pauahi Tower, Suite 1600
1003 Bishop Street
Honolulu, HI 96813

**IDAHO**
Corporation Service Company
12550 W. Explorer Drive, Suite 100
Boise, ID 83713

**ILLINOIS**
Illinois Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL 62703

**INDIANA**
Corporation Service Company
135 North Pennsylvania Street, Suite 1610
Indianapolis, IN 46204

**IOWA**
Corporation Service Company
505 5th Avenue, Suite 729
Des Moines, IA 50309

EXHIBIT O(85)

AOE2179

## EXHIBIT N – LIST OF AGENTS FOR SERVICE OF PROCESS (Continued)

**KANSAS**
Corporation Service Company
2900 SW Wanamaker Drive, Suite 204
Topeka, KS 66614

**KENTUCKY**
Corporation Service Company
421 West Main Street
Frankfort, KY 40601

**LOUISIANA**
Corporation Service Company
501 Louisiana Avenue
Baton Rouge, LA 70802-5921

**MAINE**
Corporation Service Company
45 Memorial Circle
Augusta, ME 04330

**MARYLAND**
CSC-Lawyers Incorporating Service Company
7 St. Paul Street, Suite 820
Baltimore, MD 21202

**MASSACHUSETTS**
Corporation Service Company
84 State Street
Boston, MA 02109

**MICHIGAN**
CSC-Lawyers Incorporating Service (Company)
601 Abbot Road
East Lansing, MI 48823

**MINNESOTA**
Corporation Service Company
2345 Rice Street, Suite 230
Roseville, MN 55113

**MISSISSIPPI**
Corporation Service Company
7716 Old Canton Road
Suite C
Madison, MS 39110

**MISSOURI**
CSC-Lawyers Incorporating Service Company
221 Bolivar Street
Jefferson City, MO 65101

**MONTANA**
Corporation Service Company
26 West Sixth Avenue
P.O. Box 1691
Helena, MT 59624-1691

**NEBRASKA**
CSC-Lawyers Incorporating Service Company
233 South 13th Street, Suite 1900
Lincoln, NE 68508

**NEVADA**
Corporation Service Company
112 North Curry Street
Carson City, NV 89703

**NEW HAMPSHIRE**
Corporation Service Company
10 Ferry Street, Suite 313
Concord, NH 03301

**NEW JERSEY**
Corporation Service Company
Princeton South Corporate Ctr, Suite 160
100 Charles Ewing Blvd
Ewing, NJ 08628

**NEW MEXICO**
Corporation Service Company
MC-CSC1, 726 East Michigan Drive, Suite 101
Hobbs, NM 88240-3465

**NEW YORK**
Corporation Service Company
80 State Street
Albany, NY 12207-2543

**NORTH CAROLINA**
Corporation Service Company
2626 Glenwood Avenue, Suite 550
Raleigh, NC 27608

**NORTH DAKOTA**
Corporation Service Company
1709 N. 19th Street, Suite 3
Bismarck, ND 58501-2121

EXHIBIT O(85)

AOE2180

## EXHIBIT N – LIST OF AGENTS FOR SERVICE OF PROCESS (Continued)

**OHIO**
Corporation Service Company
50 West Broad Street, Suite 1330
Columbus, OH 43215

**OKLAHOMA**
Corporation Service Company
10300 Greenbriar Place
Oklahoma City, OK 73159-7653

**OREGON**
Corporation Service Company
1127 Broadway Street NE
Suite 310
Salem, OR 97301

**PENNSYLVANIA**
Corporation Service Company
2595 Interstate Drive
Suite 103
Harrisburg, PA 17110

**RHODE ISLAND**
Corporation Service Company
222 Jefferson Blvd., Suite 200
Warwick, RI 02888

**SOUTH CAROLINA**
Corporation Service Company
1703 Laurel Street
Columbia, SC 29201

**SOUTH DAKOTA**
Division of Insurance
Securities Regulation
124 South Euclid, Suite 104
Pierre, SD 57501
*and*
Corporation Service Company
503 South Pierre Street
Pierre, SD 57501

**TENNESSEE**
Corporation Service Company
2908 Poston Avenue
Nashville, TN 37203

**TEXAS**
Corporation Service Company
d/b/a CSC-Lawyers Incorporating Service Company
211 E. 7th Street, Suite 620
Austin, TX 78701-3218

**UTAH**
Corporation Service Company
15 West South Temple, Suite 600
Salt Lake City, UT 84101

**VERMONT**
Corporation Service Company
100 N. Main Street, Suite 2
Barre, VT 05641

**VIRGINIA**
Corporation Service Company
100 Shockoe Slip, 2nd Floor
Richmond, VA 23219

**WASHINGTON**
Corporation Service Company
MC-CSC1, 300 Deschutes Way SW, Suite 208
Tumwater, WA 98501

**WEST VIRGINIA**
Corporation Service Company
209 West Washington Street
Charleston, WV 25302

**WISCONSIN**
Corporation Service Company
8040 Excelsior Drive, Suite 400
Madison, WI 53717

**WYOMING**
Corporation Service Company
1821 Logan Avenue
Cheyenne, WY 82001

EXHIBIT O(85)

AOE2181

# EXHIBIT O

## STATE ADMINISTRATORS

**CALIFORNIA**
Department of Business Oversight
(866) 275-2677

*Los Angeles*
320 West 4th Street, Suite 750
Los Angeles, California 90013-2344
(213) 576-7500

*Sacramento*
1515 K Street, Suite 200
Sacramento, California 95814-4052
(916) 445-7205

*San Diego*
1350 Front Street, Room 2034
San Diego, California 92101-3697
(619) 525-4233

*San Francisco*
One Sansome Street, Suite 600
San Francisco, California 94104-4428
(415) 972-8565

**HAWAII**
Commissioner of Securities
Department of Commerce and Consumer Affairs
Business Registration Division
Securities Compliance Branch
335 Merchant Street, Room 203
Honolulu, HI 96813
(808) 586-2722

**ILLINOIS**
Franchise Bureau
Office of the Attorney General
500 South Second Street
Springfield, Illinois 62706
(217) 782-4465

**INDIANA**
Securities Division
Secretary of State
302 West Washington Street, Room E-111
Indianapolis, Indiana 46204
(317) 232-6681

**MARYLAND**
Securities Division
Office of the Attorney General
200 St. Paul Place
Baltimore, Maryland 21202-2020
(410) 576-6360

**MICHIGAN**
Franchise Section
Consumer Protection Division
Department of Attorney General
G. Mennen Williams Building, 1st Floor
525 West Ottawa Street
Lansing, Michigan 48909
(517) 335-7567

**MINNESOTA**
Minnesota Department of Commerce
Securities-Franchise Registration
85 7th Place East, Suite 280
St. Paul, Minnesota 55101-2198
(651) 539-1500

**NEW YORK**
Investor Protection Bureau
Office of the Attorney General
28 Liberty Street, 21st Floor
New York, New York 10005-1495
(212) 416-8222

**NORTH DAKOTA**
North Dakota Securities Department
State Capitol, Fifth Floor
600 East Boulevard Avenue
Bismarck, North Dakota 58505-0510
(701) 328-4712

**RHODE ISLAND**
Securities Division
Department of Business Regulation
John O. Pastore Complex
1511 Pontiac Avenue, Building 69-1
Cranston, RI 02920
(401) 462-9500

EXHIBIT O(85)

AOE2182

**EXHIBIT O – STATE ADMINISTRATORS (Continued)**

**SOUTH DAKOTA**
Division of Insurance
Securities Regulation
124 South Euclid, Suite 104
Pierre, South Dakota 57501
(605) 773-3563

**VIRGINIA**
Division of Securities and Retail Franchising
State Corporation Commission
1300 E. Main Street, Ninth Floor
Richmond, Virginia 23219
(804) 371-9051

**WASHINGTON**
Securities Division
Department of Financial Institutions
P.O. Box 9033
Olympia, Washington 98507-9033
(360) 902-8760

**WISCONSIN**
Division of Securities
Department of Financial Institutions
4822 Madison Yards Way, North Tower
Madison, Wisconsin 53705
(608) 267-9140

EXHIBIT O(85)

AOE2183

# EXHIBIT P

## McDONALD'S AFFILIATES

| ENTITY NAME | BUSINESS ADDRESS | DATE OF FIRST COMPANY OWNED RESTAURANT | DATE OF FIRST FRANCHISE |
|---|---|---|---|
| McDonald's Australia Limited | 21-29 Central Ave., Thornleigh NSW 2120 Australia | 12/30/71 | 12/09/72 |
| McDonald's Franchise GmbH | Campus 21, Liebermannstrasse A01601, A-2345 Brunn am Gebirge, Austria | 11/11/93 | 8/2/93 |
| McDonald's Belgium, Inc. (Belgium Branch) | Airport Plaza, Stockhold Building – 5th floor, Leonardo da Vincilaan 19A, 1831 Diegem, Belgium | 3/1/93 | 3/1/93 |
| McDonald's Restaurants Belgium N.V. | Airport Plaza, Stockhold Building – 5th floor, Leonardo da Vincilaan 19A, 1831 Diegem, Belgium | 3/21/78 | 2/1/79 |
| McDonald's Restaurants of Canada Limited | 1 McDonald's Place, Toronto, Ontario, Canada M3C 3L4 | 2/5/71 | 6/1/67 |
| McDonald's ČR spol. s r.o. | Radlická 740/113c Praha 5 158 00, Czech Republic | 3/20/92 | 8/1/96 |
| McDonald's Dominicana, S.R.L. | HLB, Ave. 27 de Febrero #233, Edificio Corominas Pepin, 4 to. Piso, Ensanche, Naco, Santo Domingo, Dominican Republic | None | 11/30/96 |
| McDonald's France S.A.S. | 1, rue Gustave Eiffel, 78280 Guyancourt Cedex, France | 10/6/80 | 9/17/79 |
| McDonald's System of France, LLC (French Branch) | 1, rue Gustave Eiffel, 78280 Guyancourt Cedex, France | 12/16/83 | 11/15/82 |
| McDonald's Deutschland LLC Zweigniederlassung München (German Branch) | Drygalski-Allee 51, 81477 Munich, Germany | 12/4/71 | 8/1/75 |
| McDonald's (Gibraltar) Limited | Suite 1, Burns House, 19 Town Range, Gibraltar | 8/13/99 | 7/1/00 |
| McDonald's Restaurants of Ireland Limited | 7 Richview Office Park, Clonskeagh, Dublin 14, Ireland | 10/3/96 | 5/9/77 |
| McDonald's Development Italy LLC (Italian Branch) | Centro Direzionale Milanofiori Nord, Via del Bosco Rinnovato, 6 - Edificio U7, 20090 Assago, (MI), Italy | 10/15/85 | 3/20/86 |
| McDonald's Company (Japan), Ltd. | 5-1, Nishi-Shinjuku 6-Chome, Shinjuku-ku, Tokyo, Japan | 7/20/71 | 2/1/76 |
| HanGook McDonald's Co. Ltd. | Jongno Tower, 14F, 51 Jong-ro, Jongno-gu, Seoul, 03161, Korea | 3/23/88 | 6/7/92 |
| McDonald's Restaurants AG | Industriestrasse 9495 Triesen, Liechtenstein | None | 5/3/96 |
| McDonald's Nederland B.V. | Paasheuvelweg 14, 1105 BH, Amsterdam Z.O., The Netherlands | 9/13/71 | 10/1/76 |
| McDonald's Restaurants (New Zealand) Limited | 302 Great South Road Greenlane, Auckland, New Zealand | 6/7/76 | 11/27/84 |
| McDonald's Polska Sp.zo.o | ul. Marynarska 15, 02-674, Warsaw, Poland | 6/17/92 | 12/6/94 |
| Sistemas McDonald's Portugal Limitada | Sistemas McDonald's Portugal, Lda. Lagoas Park Edificio 7 - Piso 2 2740 - 244 Porto Salvo, Portugal | 7/12/96 | 5/23/91 |
| Moscow-McDonald's (CJSC) | 115054 Valovaya ulitsa, 26, Moscow, Russia | 1/30/90 | 3/28/12 |
| McDonald's Slovakia spol. sr.o. | Kralovske udolie 1, 811 02 Bratislava, Slovak Republic | 10/13/95 | 10/25/96 |

EXHIBIT O(85)

AOE2184

**EXHIBIT P – McDONALD'S AFFILIATES (Continued)**

| ENTITY NAME | BUSINESS ADDRESS | DATE OF FIRST COMPANY OWNED RESTAURANT | DATE OF FIRST FRANCHISE |
|---|---|---|---|
| Restaurantes McDonald's, S.A.U. | C/Somera 5, Edificio Margarita, Urb. La Florida, Madrid 28023, Spain | 3/9/81 | 6/5/85 |
| McDonald's Suisse Franchise Sàrl | Rue de Morges 23, 1023 Crissier, Lausanne, Switzerland | 10/20/76 | 7/2/79 |
| McDonald's Restaurants Limited | 11-59 High Road, East Finchley, London N2 8AW United Kingdom | 10/10/74 | 6/12/86 |
| MCD Global Franchising Limited | Cordy House, 91 Curtain Road, Shoreditch, London EC2A 3BS, United Kingdom | None | 11/30/2016 |
| McDonald's Latin America, LLC | 110 N. Carpenter Street, Chicago, Illinois 60607 USA | None | 9/16/91 |

EXHIBIT O(85)

AOE2185

**EXHIBIT Q**

**LIST OF FRANCHISED RESTAURANTS**
**AS OF DECEMBER 31, 2019**

**INTENTIONALLY DELETED**

# EXHIBIT R

## LIST OF FRANCHISEES WHO HAD AN OUTLET TERMINATED, CANCELED, NOT RENEWED, OR OTHERWISE VOLUNTARILY OR INVOLUNTARILY CEASED TO DO BUSINESS

If you buy a McDonald's franchise, your contact information may be disclosed to other buyers when you leave the franchise system.

| NAME | CITY AND STATE | PHONE |
|------|----------------|-------|
| SUSAN WAGNER | ANCHORAGE, AK | 907-248-0597 |
| RICHARD WALTER | DECATUR, AL | 256-355-8533 |
| WILLIAM R HAMILTON JR | GADSDEN, AL | 256-393-2965 |
| SANTIAGO J NEGRE | HOMEWOOD, AL | 205-206-5151 |
| WILLIAM E BARNES IV | MOBILE, AL | 251-478-3223 |
| PANTALEO LAFORGIA | MOBILE, AL | 201-759-4094 |
| EBRAHIM MAGHSOUD | SPANISH FORT, AL | 251-625-1716 |
| CHRISTOPHER BUCKLIEW | HERBER SPRINGS, AR | 501-362-8000 |
| GREGORY L COOK | FLAGSTAFF, AZ | 928-774-7324 |
| STEVE K LANINI | GLENDALE, AZ | 623-931-2153 |
| ABELARDO MARTINEZ, III | KINGMAN, AZ | 928-753-6074 |
| TRAVIS L HERIAUD | PHOENIX, AZ | 602-265-2834 |
| KERRY SCHULMAN | PHOENIX, AZ | 602-909-9584 |
| MICHELLE SLAYTON | PHOENIX, AZ | 480-785-5418 |
| BRADLEY E TEUFEL | SCOTTSDALE, AZ | 480-969-3485 |
| PATRICK D RICHARDS | SIERRA VISTA, AZ | 520-459-8111 |
| CAROLE BAHMANI | BAKERSFIELD, CA | 661-663-7863 |
| VICTOR CINQUEMANI | BAKERSFIELD, CA | 661-663-4060 |
| KEVIN MAZZU | BISHOP, CA | 760-873-4501 |
| PHILIP R PALUMBO | CARLSBAD, CA | 760-290-3763 |
| PATRICIA WILLIAMS | CARSON, CA | 310-886-5411 |
| DENNIS GRASPOINTNER | CERES, CA | 209-538-9500 |
| MARTIN RUBY ESTATE | COSTA MESA, CA | 714-662-5856 |
| ALAN RUBY ESTATE | CYPRESS, CA | 714-952-3821 |
| STEVEN ENG | DALY CITY, CA | 650-756-3079 |
| WAI LING ENG | DALY CITY, CA | 650-756-3079 |
| LESLIE MANNES | ENCINITAS, CA | 760-942-0867 |
| STEVEN TECK ESTATE | GRANADA HILLS, CA | 818-831-7000 |
| RANDELL S BAREMOR | HEMET, CA | 951-929-9934 |
| ROBIN SEDER ESTATE | IMPERIAL BEACH, CA | 619-575-7330 |
| ANTHONY N LARDAS | INGLEWOOD, CA | 310-396-1111 |
| LUCRETIA BECHGUENTURIAN | LA CRESCENTA, CA | 818-952-5653 |
| RICHARD BECHGUENTURIAN | LA CRESCENTA, CA | 818-249-6574 |
| TIMOTHY PAUL MORGAN | LIVERMORE, CA | 925-454-1987 |
| FRANK M SANCHEZ | LOS ANGELES, CA | 213-746-0525 |
| VERONICA SANCHEZ SOTO | LOS ANGELES, CA | 323-728-0772 |
| A. KENNETH BENDER | MADERA, CA | 559-447-0427 |
| CONRAD J FREEMAN JR. | MOUNTAIN VIEW, CA | 650-940-4200 |
| TERENCE P SOLON | NEWPORT BEACH, CA | 949-852-8874 |
| ARTHUR SANDOVAL | OCEANSIDE, CA | 760-439-4161 |
| RICHARD M SHALHOUB | PALM DESERT, CA | 760-674-3335 |
| DIANE L GROSS | REDDING, CA | 530-221-7414 |
| MICHAEL ROBIK ESTATE | REDDING, CA | 530-251-1825 |
| RAYMOND COSTA | SALINAS, CA | 831-262-4917 |
| COSME W FAGUNDO | SAN JOSE, CA | 408-955-0200 |
| DANIA FAGUNDO | SAN JOSE, CA | 408-955-0200 |
| ROGER P DELPH | VISALIA, CA | 559-738-8588 |
| MARTIN WRONSKI | VISTA, CA | 760-598-6938 |
| AARON HOLLAND | BOULDER, CO | 303-415-1805 |
| MARIA M REINERTH | CENTENNIAL, CO | 303-757-8787 |
| RONALD LESSNAU | DENVER, CO | 303-388-8145 |
| JUAN SAMOUR | GREENWOOD VILLAGE, CO | 303-884-8434 |
| RICHARD WLM BOSELLI | LAFAYETTE, CO | 303-499-9861 |
| KATHLEEN M LINNEMAN | LITTLETON, CO | 303-794-3540 |
| JAMES K MCAVOY | LONGMONT, CO | 303-666-9786 |
| DON ANTHONY BOSELLI | WESTMINSTER, CO | 303-427-0915 |
| RICHARD C HILL | WESTMINSTER, CO | 303-432-7267 |
| FRANK J SANDOVAL | WHEAT RIDGE, CO | 303-232-3390 |

EXHIBIT O(85)

AOE2187

| NAME | CITY AND STATE | PHONE |
|------|----------------|-------|
| CHRISTIAN C TREFZ | BRIDGEPORT, CT | 203-367-3621 |
| CHRISTIAN J TREFZ | BRIDGEPORT, CT | 203-367-3621 |
| PAUL D TREFZ | BRIDGEPORT, CT | 203-367-3621 |
| JAMES LEWIS | DARIEN, CT | 203-656-3661 |
| KIMBERLY LEWIS | DARIEN, CT | 203-656-3661 |
| RICHARD SPERO | MADISON, CT | 203-245-1604 |
| MARIANNE SPILLANE | MILFORD, CT | 718-967-8713 |
| JOSEPH A RODRIGUEZ | SOUTHBURY, CT | 203-262-8801 |
| MICHAEL LEE ADAMS | BONITA SPRINGS, FL | 239-591-8008 |
| DONAVON GROEN | CLEARWATER, FL | 728-461-3432 |
| PEDRO MENENDEZ | CORAL GABLES, FL | 305-670-7600 |
| JASON CORNET | DELRAY BEACH, FL | 443-838-0652 |
| STEPHEN CORNET | DELRAY BEACH, FL | 410-584-7479 |
| JACQUES GUSKE | JACKSONVILLE, FL | 904-249-4771 |
| STEVEN NISBET | LA BELLE, FL | 863-612-0333 |
| LANNY G SUMPTER | LAKELAND, FL | 863-937-6658 |
| ALEX C RODRIGUEZ | MIAMI, FL | 305-661-0024 |
| JOSE R HERNANDEZ | NEW PORT RICHEY, FL | 843-992-1068 |
| ALEXANDRA HERNANDEZ | PALM HARBOR, FL | 904-220-5412 |
| LAWRENCE HAGAN | PARKLAND, FL | 954-346-2110 |
| ANDREW VAN ZANTE | ST. AUGUSTINE, FL | 904-826-0384 |
| JUAN VAZQUEZ | TALLAHASSEE, FL | 727-461-3432 |
| BLAKE J CASPER | TAMPA, FL | 813-287-2231 |
| DAVID W HAMILTON | ACWORTH, GA | 770-319-7923 |
| MICHAEL HARRIS | ALBANY, GA | 229-431-2082 |
| LEON GOODRUM | ATLANTA, GA | 404-758-4125 |
| JENNIFER BONNESS | AUGUSTA, GA | 706-869-8023 |
| JOHN V TAMASI JR. | CLARKSTON, GA | 404-299-2300 |
| BEN ALSTON ESTATE | COLLEGE PARK, GA | 404-761-6666 |
| JOHN D PEZOLD | COLUMBUS, GA | 706-324-1650 |
| ALLEN STAFFORD | CONYERS, GA | 770-483-6564 |
| LEO PILLA | JASPER, GA | 706-692-3194 |
| ALAIN NKOUDOU | LAWRENCEVILLE, GA | 205-428-9768 |
| JOHN FOLSOM | MACON, GA | 478-742-5200 |
| BRUCE FREEMAN | MACON, GA | 478-784-0245 |
| JOSHUA FRANKEL | MARIETTA, GA | 770-928-6947 |
| CINDY LEVINE | MARIETTA, GA | 240-876-0111 |
| PATRICK DENNIS | PEACHTREE CITY, GA | 678-423-6244 |
| JOHNNY HURT | RIVERDALE, GA | 770-996-0996 |
| KELLIE VANDER VEUR | ROSWELL, GA | 801-573-9444 |
| ROBERT LEOPOLDINO | KAILUA-KONA, HI | 808-325-1088 |
| DONNA MANN | BURLINGTON, IA | 319-753-0722 |
| JERRY L MROZINSKI | CEDAR RAPIDS, IA | 319-364-3256 |
| SCOTT SOIFER | CHARLES CITY, IA | 641-228-2838 |
| TERI NELSON | PLEASANTVILLE, IA | 515-967-3344 |
| RICHARD M DARMODY | BOISE, ID | 208-345-9545 |
| MICHAEL L JOHNSON | POCATELLO, ID | 208-237-1998 |
| WILLIAM D KYLE | TWIN FALLS, ID | 208-734-5505 |
| EDWARD H SCHMITT, JR. | AURORA, IL | 630-892-4552 |
| LANCE JONES | CHICAGO, IL | 708-526-3739 |
| ESPERANZA MCSWEEN | CHICAGO, IL | 312-786-1857 |
| DERRICK TAYLOR | CHICAGO, IL | 773-468-3338 |
| KAREN O'KEEFE | ELK GROVE VILLAGE, IL | 847-330-0800 |
| GLENN J KARPINSKE | GALENA, IL | 815-777-8475 |
| CAROL KIRKENMEIER | GALESBURG, IL | 309-343-8340 |
| JOHN O'KEEFE | ILLINOIS, IL | 847-330-0800 |
| JOSEPH KASPRZYK | JACKSONVILLE, IL | 217-245-0009 |
| WILLIAM H MCESSY | LAKE FOREST, IL | 847-234-3427 |
| OSCAR N PERRETTA | LANSING, IL | 708-895-9244 |
| TINA SHORT | MT. VERNON, IL | 618-241-9469 |
| BENJAMIN FREEMAN | NEW LENOX, IL | 708-756-2218 |
| RANDY CONN | OAK LAWN, IL | 708-754-5753 |
| EILEEN KUSHNER | PALATINE, IL | 847-991-4262 |
| RYAN CLARK | PEORIA, IL | 309-689-1188 |
| DWIGHT MILLER | URBANA, IL | 217-328-0200 |
| SCOTT MILLER | URBANA, IL | 217-328-0200 |
| PAUL D BREZNAY | WASHBURN, IL | 309-246-4777 |
| NICHOLAS KARAVITES | WINNETKA, IL | 847-441-5093 |
| HARRY L SMITH | ELKHART, IN | 574-293-9895 |

EXHIBIT O(85)

AOE2188

| NAME | CITY AND STATE | PHONE |
|------|----------------|-------|
| PAUL SNIDER | EVANSVILLE, IN | 812-480-4770 |
| THEODORE WILLIAMS, JR. | FORT WAYNE, IN | 574-271-8556 |
| DAVID SPARKS | INDIANA, IN | 574-255-1933 |
| ERIC P MOORE | INDIANAPOLIS, IN | 317-723-3030 |
| JAMES K PROPS | INDIANAPOLIS, IN | 317-786-0768 |
| GLENN LUBEZNIK | MICHIGAN CITY, IN | 219-879-4200 |
| NICHOLAS R TERHUNE | MUNCIE, IN | 765-284-8708 |
| WALTER NOWAKOWSKI | VINCENNES, IN | 812-886-5511 |
| MARK MCCOY | FT. SCOTT, KS | 620-223-6760 |
| GLENDA KUEHL | HAYS, KS | 785-625-4144 |
| RICHARD KUEHL | HAYS, KS | 785-625-4144 |
| VICTOR WALTHER | HIAWATHA, KS | 785-742-1745 |
| RALPH KING | KANSAS, KS | 913-281-9800 |
| THOMAS DOBSKI | LAWRENCE, KS | 785-749-1800 |
| JOHN DEVERA | OVERLAND PARK, KS | 913-642-0577 |
| PAUL M BURRELL II | BOWLING GREEN, KY | 270-904-0597 |
| PAUL G GROEN | FLORENCE, KY | 859-371-8614 |
| VINCENT TANNER | HARTFORD, KY | 270-298-4646 |
| MARK R PRATER | LAWRENCEBURG, KY | 502-839-9637 |
| STEPHEN C STRATTON | LOUISVILLE, KY | 502-475-9739 |
| GEORGE SALIBA | UNION, KY | 859-866-2894 |
| JOHN C VALLUZZO | BATON ROUGE, LA | 225-300-8977 |
| EDWARD J KRAMPE, III | LAFAYETTE, LA | 337-981-4800 |
| RAYMOND E MASKER, JR. | SLIDELL, LA | 985-643-9971 |
| PETER S CRISAFI, JR. | FRANKLIN, MA | 508-541-2032 |
| ROBERT KING | MASSACHUSETTS, MA | 617-354-9027 |
| JORGE B GOMEZ | SOUTH HADLEY, MA | 413-237-3111 |
| MITCHELL MCPHERSON | BALTIMORE, MD | 410-866-3005 |
| ORVILLE D BENNING | ELLICOTT CITY, MD | 410-531-0995 |
| TIFFANY BEACH | SALISBURY, MD | 410-572-6035 |
| ANDREW WELBURN | WHITE PLAINS, MD | 202-236-2393 |
| STEPHEN GOBLE | LEWISTON, ME | 207-781-4516 |
| RALPH BODMAN | ADRIAN, MI | 517-265-2221 |
| TERESA HERNALSTEEN | AUBURN HILLS, MI | 248-880-1545 |
| JON M CAMPBELL, SR. | DETROIT, MI | 248-481-9797 |
| MARLA D THROWER | DETROIT, MI | 313-394-0436 |
| JAMES M MOLYNEUX | FLUSHING, MI | 810-487-9246 |
| MARKUS SCHULZ | FORT GRATIOT, MI | 810-385-1301 |
| ERIKA SCHULZ-ROGERS | FORT GRATIOT, MI | 810-385-1301 |
| ROBERT VAN POPPELEN | MICHIGAN, MI | 989-292-4441 |
| DEBORAH C VIRGILES ESTATE | SOUTHFIELD, MI | 313-832-2449 |
| NASSER JALLAD | TAYLOR, MI | 734-941-8618 |
| RANDELL G PRICE | ZEELAND, MI | 616-748-0909 |
| PETER KORMANIK | LITCHFIELD, MN | 320-593-5958 |
| KENNETH DARULA | MINNESOTA, MN | 763-557-0022 |
| KEVIN COOK | NEW LONDON, MN | 320-354-0059 |
| KEVIN L COOK | NEW LONDON, MN | 701-232-8636 |
| JAMES P DUVAL | OAKDALE, MN | 651-770-2988 |
| GERALD P HANSEN | BLUE SPRINGS, MO | 816-898-3451 |
| LAURANCE MCCURRY | BROOKFIELD, MO | 660-268-6010 |
| JOHN LANMAN | CHESTERFIELD, MO | 314-452-0812 |
| JOHN JELINEK | KANSAS CITY, MO | 816-753-3840 |
| WILLIAM C KRAMER | MOUNTAIN GROVE, MO | 417-926-5004 |
| FRANCIS RUIZ | ST. LOUIS, MO | 314-270-9624 |
| ROY WILLIAMS | ST. LOUIS, MO | 770-785-7855 |
| STEVE A MURRAY | COLLINSVILLE, MS | 601-483-8052 |
| MICHAEL L RETZER JR | GREENVILLE, MS | 662-335-7138 |
| MICHAEL L RETZER SR | GREENVILLE, MS | 662-335-7138 |
| CHAD WILLIAMS | HATTIESBURG, MS | 601-264-3107 |
| ANDREW SMITH | OXFORD, MS | 662-236-6600 |
| ELIZABETH SMITH | OXFORD, MS | 662-236-6600 |
| MARC A O'FERRALL | STARKVILLE, MS | 662-324-3127 |
| ROBERT HUDSON, II | TUPELO, MS | 662-841-7770 |
| THOMAS P HAYNIE | APEX, NC | 919-267-6843 |
| ANTHONY P DELLIGATTI | ARCHDALE, NC | 336-887-1864 |
| WILLIAM AUSTIN ESTATE | CHARLOTTE, NC | 704-598-5111 |
| ANN FOX BAUM | CHARLOTTE, NC | 704-341-3054 |
| MARTIN L RANFT, II | CHARLOTTE, NC | 704-523-6334 |
| JASON W SAYLOR | DUNN, NC | 815-210-5280 |

EXHIBIT O(85)

AOE2189

| NAME | CITY AND STATE | PHONE |
|------|----------------|-------|
| JOHN BRADLEY HUEBNER | GARNER, NC | 919-772-1677 |
| EDWARD ROETMAN | GASTONIA, NC | 518-572-5000 |
| SCOTT L LANG | GREENSBORO, NC | 336-601-6523 |
| WILLIAM H PURCELL | NEW BERN, NC | 252-638-3890 |
| ANDREA ENDRUSICK | OXFORD, NC | 919-693-7599 |
| AMBROSE KPADUWA | RALEIGH, NC | 907-452-8890 |
| CAROL MARTIN | RALEIGH, NC | 919-841-0042 |
| BARRY TRAUB | ROCKY MOUNT, NC | 252-443-0001 |
| DONALD RASNICK | SAWANNANOA, NC | 828-686-0703 |
| JOHN NASH, JR. | SUMMERFIELD, NC | 336-298-4583 |
| E CAISON, II | WALLACE, NC | 910-285-2848 |
| RONALD DILLINGHAM | WAYNESVILLE, NC | 828-734-0220 |
| KATE LIMA-RAPPS | WAYNESVILLE, NC | 908-387-9858 |
| RON BAILEY, JR. | WINSTON SALEM, NC | 336-768-9377 |
| WILLIAM O'KEEFE | GRAND FORKS, ND | 701-746-5493 |
| MICHAEL J DOHERTY | MINOT, ND | 608-576-0106 |
| STEVEN LEONARD | ELKHORN, NE | 402-727-5730 |
| ROBERT KOCH | NEBRASKA CITY, NE | 402-873-7783 |
| DIANE KOURY | ANNANDALE, NJ | 908-713-6243 |
| DOUGLAS F DAMIANO | FAIRLAWN, NJ | 201-794-7606 |
| HARRY H CHAPMAN III | FARMINGDALE, NJ | 732-370-2700 |
| KENNETH A HULLINGS | HOWELL, NJ | 732-842-9400 |
| ANTHONY J SCARI | LEDGEWOOD, NJ | 908-303-1403 |
| PETER J FONSECA | NEW BRUNSWICK, NJ | 732-210-2311 |
| ROBERT TRAA | PLEASANTVILLE, NJ | 609-645-1840 |
| LINDA H DUNHAM | RIVER EDGE, NJ | 201-489-7272 |
| THOMAS CORIALE | SADDLE BROOK, NJ | 201-845-8014 |
| THOMAS SMOLAR | TRENTON, NJ | 609-888-3532 |
| JESSICA QUINTANA | UNION CITY, NJ | 201-325-0999 |
| KENRIC GARCIA | ALBUQUERQUE, NM | 505-343-0066 |
| PEARLENE GARCIA | ALBUQUERQUE, NM | 505-299-4155 |
| JAMES CANTRALL | NEW MEXICO, NM | 505-823-0142 |
| BRENT BOHN | LAS VEGAS, NV | 702-384-3950 |
| ANTHONY C BROADBENT | LAS VEGAS, NV | 801-205-5675 |
| THOMAS A MCKENNIE | RENO, NV | 775-322-0414 |
| PAUL COTTRELL | CENTRAL VALLEY, NY | 845-928-2209 |
| ROGER GROUT | CLIFTON PARK, NY | 518-348-1840 |
| ANDREW JAMES | CLIFTON PARK, NY | 518-348-1575 |
| BRUCE D COLLEY | CROTON FALLS, NY | 914-277-4800 |
| HECTOR URENA III | FAIRPORT, NY | 585-734-2948 |
| GIOVANNA SOLIMEO | HARRISON, NY | 718-939-1881 |
| KATIE HUNT-ROTOLO | HAUPPAUGE, NY | 631-582-6665 |
| JONAH KAUFMAN | HUNTINGTON STATION, NY | 631-271-8055 |
| JACQUES E LAWRENCE | JAMAICA, NY | 718-656-4890 |
| PAUL GOODMAN | MELVILLE, NY | 631-858-1111 |
| CARLOS MORALES | MELVILLE, NY | 516-817-0892 |
| JOHN REEHER | REXFORD, NY | 518-630-6146 |
| BRIAN SPILLANE | STATEN ISLAND, NY | 718-967-8713 |
| HAROLD T CLARK JR. | UTICA, NY | 315-735-1240 |
| SANDRA J HAEFNER | WEST SENECA, NY | 716-674-2486 |
| MICHAEL J MCLAUGHLIN | WHITESBORO, NY | 315-736-2224 |
| JOHN C BLICKLE | AKRON, OH | 330-535-8400 |
| JAMES D RIVELLO | ARCHBOLD, OH | 419-445-8803 |
| JERRY A LEWIS | BLUFFTON, OH | 419-225-5916 |
| ANDREW PAYNE | BURNSWICK, OH | 440-686-1414 |
| JEFF MONFORT | CELINA, OH | 419-394-3988 |
| ALAN R HERZOG | DAYTON, OH | 937-454-1875 |
| STEPHEN R PAYNE | FAIRVIEW PARK, OH | 440-734-9504 |
| PATRICK PAWLING | HAMILTON, OH | 513-894-0800 |
| JAMES A HOLOWICKI | HILLIARD, OH | 614-876-3509 |
| STEPHEN CIELEC | IRONTON, OH | 740-532-1555 |
| RODNEY H BOESTER | MARYSVILLE, OH | 740-666-1703 |
| GAETANO CECCHINI | MASSILLON, OH | 330-833-6888 |
| JON D HARRIS | MAUMEE, OH | 419-794-0560 |
| TIMOTHY J MOSHER | NEW LEBANON, OH | 937-687-3334 |
| VIRGINIA LEWIS | NEW PHILADELPHIA, OH | 330-308-5018 |
| BENJAMIN SCOTT, JR. | PIQUA, OH | 937-773-7200 |
| STACY VORHEES | ST.MARY'S, OH | 419-305-2743 |
| HERBERT WASHINGTON | YOUNGSTOWN, OH | 330-783-5659 |

EXHIBIT O(85)

AOE2190

| NAME | CITY AND STATE | PHONE |
|------|----------------|-------|
| RYAN M THORLEY | ADA, OK | 580-436-1724 |
| THOMAS ROSSER, JR. | CATOOSA, OK | 918-810-3238 |
| KEVIN R HERN | TULSA, OK | 918-296-7700 |
| ALICIA M BEAULAURIER | ALBANY, OR | 541-928-1659 |
| NANETTE BITTLER | BEND, OR | 541-389-6479 |
| DOUG WACKER | DAMASCUS, OR | 503-698-7305 |
| DENNIS POULIN | FOREST GROVE, OR | 503-359-9336 |
| MANISH SHAH | BENSALEM, PA | 301-455-6260 |
| DAVID LEWANDOWSKI | BETHEL PARK, PA | 412-835-7022 |
| DEREK GIACOMANTONIO | COLLEGEVILLE, PA | 516-850-2505 |
| LUIS MARQUEZ | DOWININGTOWN, PA | 201-840-9736 |
| CURT RAYMOND | FAIRVIEW, PA | 814-833-1032 |
| JOSEPH CARONE | FINLEYVILLE, PA | 412-391-1384 |
| ROLAND KISSINGER | FRACKVILLE, PA | 570-449-9940 |
| R DOUGLAS CAPLAN | GILBERTSVILLE, PA | 610-367-1490 |
| JUDITH RUBIN | HONESDALE, PA | 570-253-5512 |
| H JAMES RIPPON | HUMMELSTOWN, PA | 717-566-5847 |
| FRANK FRANCO | IVYLAND, PA | 215-354-1566 |
| PETER CRUZ-ALVERIO | JENKINTOWN, PA | 407-724-1493 |
| JEREMY JAKUBOWSKI | JOHNSTOWN, PA | 814-255-1350 |
| PATRICIA STELLA | KINGSTON, PA | 570-718-6926 |
| GLEN MATTOX | LANCASTER, PA | 717-435-6575 |
| RONALD GALIANO | LAWRENCE, PA | 724-941-8282 |
| RICHARD WOODRUFF, II | MECHANICSBURG, PA | 717-791-9187 |
| RICHARD DOANE | NEWTOWN SQUARE, PA | 610-356-8775 |
| VEA CHENG | NORTH VERSAILLES, PA | 917-846-5674 |
| DANIEL J DELLIGATTI | PITTSBURGH, PA | 412-963-6550 |
| MELISSA RICE | PITTSBURGH, PA | 412-831-3784 |
| MARLENE ROHE | SAYRE, PA | 570-888-4048 |
| TIMOTHY REID | SCHNECKSVILLE, PA | 610-769-7640 |
| CHARLES EHLERS | WESTCHESTER, PA | 610-429-0548 |
| MICHAEL EGGERS | BEAUFORT, SC | 843-322-0156 |
| RICHARD B HOFF | FLORENCE, SC | 843-662-6755 |
| CAROLYN HUNTER | GOOSE CREEK, SC | 843-345-7800 |
| PHILLIP K WILKINS | GREENVILLE, SC | 352-854-5822 |
| ROBERT FARMER | IRMO, SC | 803-781-0025 |
| JOEL A PELLICCI, JR. | MYRTLE BEACH, SC | 843-293-3245 |
| JAMES BOOTH | NORTH CHARLESTON, SC | 843-553-4999 |
| LEOVICK MEDINA | PENDLETON, SC | 864-940-0707 |
| BENNY CLARK | SOUTH CAROLINA, SC | 803-739-6608 |
| DALE PORTER | MITCHELL, SD | 605-996-6200 |
| RICHARD A LESSNAU | SIOUX FALLS, SD | 605-336-1424 |
| MICHAEL HARTSHORN | WATERTOWN, SD | 605-882-6948 |
| HOWARD E LARSON, II | CLARKSVILLE, TN | 931-552-3000 |
| JOHN JUDE FARIS | CLINTON, TN | 865-457-9501 |
| DANNY HAILEY | JAMESTOWN, TN | 931-879-1771 |
| GEORGE JONES | MEMPHIS, TN | 901-257-1747 |
| VICTOR A DONISI | NASHVILLE, TN | 615-678-7538 |
| HASSAN DANA | AMARILLO, TX | 806-358-4845 |
| MATTHEW KADES | BAYTOWN, TX | 281-427-5357 |
| GARY L BOLEN | CONROE, TX | 713-416-7936 |
| CLIFTON C JOHNSON | COPPELL, TX | 214-458-7684 |
| DARON PACE | DALLAS, TX | 214-654-0106 |
| DANESHA D SMITH | DALLAS, TX | 917-370-5116 |
| JILL R CASAS | DAYTON, TX | 713-446-5548 |
| JEFFREY D SMITH | DESOTO, TX | 972-298-5655 |
| DENNIS MEYER ESTATE | GEORGETOWN, TX | 512-863-8334 |
| STUART W BROWN | HOUSTON, TX | 713-781-8085 |
| RONALD JAY YOUNG | INGRAM, TX | 830-367-3504 |
| STEVE MCKINNEY | MAGNOLIA, TX | 281-381-4054 |
| DAVID MAY | MONTGOMERY, TX | 936-449-6130 |
| LUIS ANTONIO A ACOSTA | SAN ANTONIO, TX | 210-227-5004 |
| CARLOS A RODRIGUEZ | SAN ANTONIO, TX | 210-481-1600 |
| SAM KANTAR | SOUTHLAKE, TX | 626-372-5383 |
| CHRISTOPHER SANCHEZ | TEXAS, TX | 817-624-2381 |
| JOHN TILLMAN, JR. | TEXAS, TX | 713-748-5550 |
| ALEKSANDER B HANSEN | CENTERVILLE, UT | 801-294-4361 |
| BOBBY J ROETZEL | CENTERVILLE, UT | 801-294-5810 |
| MARK PARRISH | EPHRAIM, UT | 435-283-5272 |

5

EXHIBIT O(85)

AOE2191

| NAME | CITY AND STATE | PHONE |
|------|----------------|-------|
| ALLEN N WATSON | LAYTON, UT | 801-771-0190 |
| N CLARK STRINGHAM ESTATE | SANDY, UT | 801-566-5300 |
| NEVA VAN VALKENBURG | CHANTILLY, VA | 703-273-9866 |
| AL HARRIS | CHESTERFIELD, VA | 434-447-2950 |
| THOMAS COLEMAN BISHOP | MECHANICSVILLE, VA | 804-746-4064 |
| WILLIAM D BARNES, JR. | NORTH CHESTERFIELD, VA | 804-320-2296 |
| JOHN HESSIAN III | RICHMOND, VA | 804-814-9010 |
| LARRY MCCARTY | ROCKY MOUNT, VA | 540-489-7963 |
| KRISTEN HARRIS | SOUTH HILL, VA | 434-447-2950 |
| LEONARD P GIANNOLA | BELLEVUE, WA | 425-454-3663 |
| MARK RAY | WASHINGTON, WA | 509-489-5531 |
| JOHN J PAVLIK | GREEN BAY, WI | 920-465-8440 |
| DONNA STOUT | GREEN BAY, WI | 920-465-8440 |
| ROBERT B PYLES | MILWAUKEE, WI | 414-760-8951 |
| SCOTT OUDINOT | MONROE, WI | 608-325-3413 |
| RICHARD T LOMMEN, JR. | ONALASKA, WI | 608-781-8080 |
| FRED HAUGHEY ESTATE | HURRICANE, WV | 304-757-7802 |
| EDWARD KILIANY | OAK HILL, WV | 304-469-2932 |
| THOMAS THOMPSON | PARKERSBURG, WV | 304-424-6491 |

EXHIBIT O(85)

AOE2192

# EXHIBIT S

## STATE SPECIFIC ADDENDA

### MINNESOTA ADDENDUM

The following language is in addition to Item 13 of the Franchise Disclosure Document:

McDonald's considers the trademarks, trade names, logo types, service marks and commercial symbols to be valuable property rights and continually protects against infringement of these assets. It protects franchisees against claims of infringement or unfair competition to which the franchisees might become subjected because of their authorized use of the trademarks, service marks, logo types or other commercial symbols in the United States.

The following language is in addition to Item 17 of the Franchise Disclosure Document:

Nothing in the Franchise Disclosure Document or the franchise agreement shall in any way abrogate or reduce any rights of the franchisee as provided for in Minnesota Statutes, Chapter 80C; or franchisee's rights to any procedure, forum, or remedies provided for by the laws of the jurisdiction.

With respect to franchises governed by Minnesota law, the franchisor will comply with Minn. Stat. Sec. 80C.14, Subds. 3, 4, and 5 which require, except in certain specified cases, that a franchisee be given 90 days' notice of termination (with 60 days to cure) and 180 days' notice for non-renewal of the franchise agreement; and that consent to the transfer of the franchise will not be unreasonably withheld.

### NORTH DAKOTA ADDENDUM

The following language is in addition to Item 17 of the Franchise Disclosure Document:

Covenants not to compete such as those mentioned above generally are considered unenforceable in the state of North Dakota. However, we will seek to enforce them to the extent enforceable.

North Dakota law will govern with respect to claims arising under the North Dakota Franchise Investment Law.

### WASHINGTON ADDENDUM

The following language is in addition to Item 17 of the Franchise Disclosure Document:

If any of the provisions in this Disclosure Document or the Franchise Agreement are inconsistent with the relationship provisions of Revised Code of Washington Section 19.100.180 or any other requirements of the Washington Franchise Investment Protection Act (the "Act"), then (if the Act applies by its terms) the provisions of the Act will prevail over the inconsistent terms of the Disclosure Document and agreement for any franchises sold in Washington. However, we and you agree to enforce the agreements' provisions to the extent the law allows.

**********

### ASSURANCE OF DISCONTINUANCE
### STATE OF WASHINGTON

To resolve an investigation by the Washington Attorney General and without admitting any liability, we have entered into an Assurance of Discontinuance ("AOD") with the State of Washington, where we have agreed to remove from our form franchise agreement a provision which restricts a franchisee from soliciting and/or hiring the employees of our other franchisees and/or our employees, which the Attorney General alleges violates Washington state and federal antitrust and unfair practices laws. We have agreed, as part of the AOD, to not enforce any such provisions in any existing franchise agreement, to request that our Washington franchisees amend their existing franchise agreements to remove such provisions, and to notify our franchisees about the entry of the AOD. In addition, the State of Washington did not assess any fines or other monetary penalties against us.

**State Effective Dates**

The following states have franchise laws that require that the Franchise Disclosure Document be registered or filed with the state, or be exempt from registration: California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Virginia, Washington, and Wisconsin.

This document is effective and may be used in the following states, where the document is filed, registered or exempt from registration, as of the Effective Date stated below:

| State | Effective Date |
|---|---|
| California | May 1, 2020 |
| Hawaii | April 1, 2020, as amended May 1, 2020 |
| Illinois | May 1, 2020 |
| Indiana | May 1, 2020 |
| Maryland | May 1, 2020 |
| Michigan | May 1, 2020 |
| Minnesota | May 1, 2020 |
| New York | May 1, 2020 |
| North Dakota | May 1, 2020 |
| Rhode Island | April 1, 2020, as amended May 1, 2020 |
| South Dakota | May 1, 2020 |
| Virginia | April 30, 2020 |
| Washington | May 1, 2020 |
| Wisconsin | April 15, 2020 |

Other states may require registration, filing, or exemption of a franchise under other laws, such as those that regulate the offer and sale of business opportunities or seller-assisted marketing plans.

**Receipt**

This disclosure document summarizes certain provisions of the franchise agreement and other information in plain language.  Read this disclosure document and all agreements carefully.

If McDonald's USA, LLC offers you a franchise, it must provide this disclosure document to you 14 calendar-days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale.

[New York and Rhode Island require that we give you this disclosure document at the earlier of the first personal meeting or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship.]

[Michigan requires that we give you this disclosure document at least 10 business days before the execution of any binding franchise or other agreement or the payment of any consideration, whichever occurs first.]

If McDonald's USA, LLC does not deliver this disclosure document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and the appropriate state agency listed on Exhibit O.

The name, principal business address, and telephone number of the franchise sellers offering the franchise are McDonald's USA, LLC and Mathew Ajayi, 110 N. Carpenter Street, Chicago, Illinois 60607 (630) 623-3000.

The issuance date of this Franchise Disclosure Document is May 1, 2020.

McDonald's USA, LLC authorizes the state agents listed in Exhibit N to receive service of process for it in the respective states.

I received a disclosure document dated May 1, 2020, that included the following Exhibits:

A.  Financial Statements
B.  Franchise Agreement (Traditional)
C.  Franchise Agreement (Satellite)
D.  Franchise Agreement (Walmart)
E.  New Restaurant Rider
F.  BFL Rider
G.  Operator's Lease
H.  Assignment to an Entity
I.  Assignment Agreement
J.  Preliminary Agreement
K.  McDonald's Rewrite (New Term) Policy

L.  Rewrite (New Term) Offer Letter
M.  Loan and Related Documents
N.  List of Agents for Service of Process
O.  State Administrators
P.  McDonald's Affiliates
Q.  List of Franchised Restaurants
R.  List of franchisees who had an outlet terminated, canceled, not renewed, or otherwise voluntarily or involuntarily ceased to do business
S.  State Specific Addenda

_____
Date Received

_____
Prospective Franchisee

_____
Prospective Franchisee

_____
Prospective Franchisee

Effective Date:  May 1, 2020

**Return electronically signed and dated Receipt via DocuSign; or fax signed and dated Receipt to (630) 568-6271; or mail signed and dated Receipt to Franchise Practice Group Dept. 088, McDonald's USA, LLC, 110 N. Carpenter Street, Chicago, IL 60607.**

**Receipt**

This disclosure document summarizes certain provisions of the franchise agreement and other information in plain language.  Read this disclosure document and all agreements carefully.

If McDonald's USA, LLC offers you a franchise, it must provide this disclosure document to you 14 calendar-days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale.

[New York and Rhode Island require that we give you this disclosure document at the earlier of the first personal meeting or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship.]

[Michigan requires that we give you this disclosure document at least 10 business days before the execution of any binding franchise or other agreement or the payment of any consideration, whichever occurs first.]

If McDonald's USA, LLC does not deliver this disclosure document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and the appropriate state agency listed on Exhibit O.

The name, principal business address, and telephone number of the franchise sellers offering the franchise are McDonald's USA, LLC and Mathew Ajayi, 110 N. Carpenter Street, Chicago, Illinois 60607 (630) 623-3000.

The issuance date of this Franchise Disclosure Document is May 1, 2020.

McDonald's USA, LLC authorizes the state agents listed in Exhibit N to receive service of process for it in the respective states.

I received a disclosure document dated May 1, 2020, that included the following Exhibits:

| | |
|---|---|
| A.  Financial Statements | L.  Rewrite (New Term) Offer Letter |
| B.  Franchise Agreement (Traditional) | M.  Loan and Related Documents |
| C.  Franchise Agreement (Satellite) | N.  List of Agents for Service of Process |
| D.  Franchise Agreement (Walmart) | O.  State Administrators |
| E.  New Restaurant Rider | P.  McDonald's Affiliates |
| F.  BFL Rider | Q.  List of Franchised Restaurants |
| G.  Operator's Lease | R.  List of franchisees who had an outlet terminated, |
| H.  Assignment to an Entity |      canceled, not renewed, or otherwise voluntarily |
| I.  Assignment Agreement |      or involuntarily ceased to do business |
| J.  Preliminary Agreement | S.  State Specific Addenda |
| K.  McDonald's Rewrite (New Term) Policy | |

_____

Date Received

_____

Prospective Franchisee

_____

Prospective Franchisee

_____

Prospective Franchise

Effective Date:  May 1, 2020

**Return electronically signed and dated Receipt via DocuSign; or fax signed and dated Receipt to (630) 568-6271; or mail signed and dated Receipt to Franchise Practice Group Dept. 088, McDonald's USA, LLC, 110 N. Carpenter Street, Chicago, IL 60607.**

EXHIBIT O(85)

AOE2198

# EXHIBIT O(86)



**We Are Stronger Than Ever**

**2022**

**Annual Report**

EXHIBIT O(86)

AOE2200

# Dear Shareholders, the Global McFamily and our Customers,



**I opened last year's letter** by stating that there was never a better time to be part of Brand McDonald's. Thanks to the System's hard work, that remains true today.

Despite facing external pressures in markets around the globe in 2022, we continue to build strong momentum in the business – a true testament to the ingenuity of our people, the resilience of our supply chain and the dedication of local franchisees and restaurant teams serving our customers.

It was incredibly energizing to bring our System together last April for our first Worldwide Convention since the start of the pandemic. On full display was what I love most about McDonald's – our restless energy and ambition. We're never satisfied, which is why McDonald's continues to be one of the world's leading corporations after almost 70 years. As Ray Kroc used to say, "you're either green and growing or you're ripe and rotting." In other words, we're only going to stay relevant to customers if we're consistently raising the bar.

Our Brand is more relevant than ever before, but we still have so much more we can do. I'm proud that as we operate from a position of strength, we are all pushing ourselves

**Annual Letter to Shareholders**

EXHIBIT O(86)

AOE2201



# Accelerating the Arches has put us in an advantageous position

to make the right moves to meet the needs of our communities and ensure enduring, profitable growth for all stakeholders.

## Growing market share through customer centricity

The System's alignment around our *Accelerating the Arches* growth strategy, which we put in place at the start of the pandemic, has put us in an advantageous position. We are growing market share in most of our markets; the Brand is more relevant to customers and stakeholders than it has been in years; and, since 2020, we've achieved an increase in Systemwide sales[1] of nearly $20 billion.

That momentum continued through 2022, as global comparable sales grew by almost 11% – and global guest counts grew by 5%. Our success is a direct result of our continued focus on our M, C, D growth pillars:

We continue to elevate our **Marketing** ("M") through creative excellence and by driving programs with cultural relevance that can be scaled across markets. Not only do our Famous Orders remain hugely popular, we also launched our largest global campaign ever for the FIFA World Cup, "Wanna go to McDonald's?"

We are also capitalizing on the strength of the 'billion-dollar brand equities' in our **Core** ("C") menu – 10 in total – and growing market share in chicken and beef.

Moreover, **Digital, Delivery and Drive Thru** (3-"Ds") continue to demonstrate huge growth potential. We remain focused on meeting customers where they are and providing more personalized experiences. We now have almost 50 million active loyalty users in our top six markets.

## Earning the right to meet customer needs in new ways

It's clear that our business plan is working. However, as we have throughout our history, we continue to push ourselves to keep our Brand relevant for future generations.

We asked ourselves two questions: Is there anything we should add to *Accelerating the Arches*? And is there anything that could get in the way of its continued success?

---

[1] Consists of both Company and franchised sales

 **Annual Letter to Shareholders**

EXHIBIT O(86)

AOE2202

The answer to these two questions led us to evolve our *Accelerating the Arches* strategy to set up a strong foundation for future growth. We'll continue to double down on our M, C, D growth pillars, while accelerating the pace of new restaurant openings where there is increased customer demand, alongside a diverse base of franchisees to run them. Additionally, we're implementing *Accelerating the Organization* to modernize the way we work as a company so that we're faster, more innovative and more efficient.

To drive these critical elements of our evolved strategy, we have created new leadership roles on our global Senior Leadership Team and appointed values-based leaders into new roles.

Morgan Flatley has been promoted to Executive Vice President, Global Chief Marketing Officer and New Business Ventures, where she will continue to oversee our award-winning marketing efforts and expand her scope to lead new business ventures with opportunities that extend the reach of the Brand in new ways.

Skye Anderson has been elevated to President, Global Business Services (GBS). Skye will oversee GBS, a new business unit of McDonald's that will make the organization more efficient, make it easier for teams to collaborate and free up time for our markets to focus on driving growth in the business.

These appointments were complemented by additional leadership moves: Kevin Ozan to Senior Executive Vice President, Strategic Initiatives; Ian Borden to Executive Vice President, Chief Financial Officer; Marion Gross to Executive Vice President, Global Chief Supply Chain Officer; and Jo Sempels to President, International Developmental Licensed Markets.

In addition to these moves, we were delighted for Jill McDonald to rejoin McDonald's last year as President, International Operated Markets. And we also welcomed Brian Rice as our new Executive Vice President, Global Chief Information Officer, and Jon Banner as our new Executive Vice President, Global Chief Impact Officer.

I am proud to work closely with such a dynamic team that collectively acts as a phenomenal steward of the Brand. Every single leader embodies our values and plays a crucial role in driving efforts that propel our growth.

## Taking meaningful action to advance equity of opportunity

Beyond meeting the changing needs of our customers, *Accelerating the Arches* is guiding our efforts to feed and foster communities and make the Golden Arches shine for more people.

As a first job for thousands and a first opportunity for many entrepreneurs to run their own businesses, we feel a special responsibility to offer even more meaningful opportunities.



# Meeting customers where they are

**Annual Letter to Shareholders** 

EXHIBIT O(86)

AOE2203

In the last year, this included advancing education and skill development opportunities. We awarded more than $20 million in tuition assistance, and access to education for more than 10,000 employees through our *Archways to Opportunity* program. Additionally, we launched support for 40 non-profits that provide pre-employment support and skills development primarily to Black and Latinx communities through the new *Chicago Community Impact Grants* program.

Key to building a talent pipeline of future leaders and expanding opportunity is fostering a culture of inclusivity. In 2022, as part of our *Allyship through Accountability* program, we introduced expectations that hold all Vice Presidents, Senior Vice Presidents and Managing Directors accountable for engaging in inclusive behaviors that support talent development and build a strong, diverse succession pipeline – with their performance against these expectations directly contributing to their compensation.

Moreover, we've taken additional steps to champion entrepreneurship and generational wealth across our System. This is of particular importance as we seek to increase our recruitment of first-time owners from underrepresented groups. Building on our 2021 commitment of $250 million to further diversify our franchisee base, we announced additional steps to bring clarity, transparency and consistency to our franchising processes.

These actions advance our efforts to keep equity of opportunity central to our business, while ensuring that our franchisee base better reflects the communities we serve.

### Raising the bar for the future

During one of McDonald's first Worldwide Conventions, Ray Kroc said: "We are living in a rapidly changing world, so McDonald's will change with it." McDonald's has a deep legacy of holding ourselves to the highest standards as the world around us



# Fostering a culture of care and opportunity

changes. And it's more important than ever that we raise our ambition to meet tomorrow's challenges and make the important decisions that go with them.

As we closed out 2022 and hit the ground running in 2023, we have a lot to be proud of and a lot to look forward to – not just in the year ahead, but in this next great chapter at McDonald's. Throughout this chapter and beyond, I am confident that we will continue to deliver sustained, long-term, profitable growth for our System and shareholders.

Thank you to our shareholders and valued customers for your continued support; thank you to our Board of Directors for their ongoing guidance and support; and thank you to the McDonald's System for making this another year of which I am immensely proud.

**Chris Kempczinski**
President and CEO
McDonald's Corporation

---

 **Annual Letter to Shareholders**

EXHIBIT O(86)

AOE2204

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

### FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2022
or
☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from                to

### Commission File Number 1-5231



# McDONALD'S CORPORATION
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **36-2361282** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **110 North Carpenter Street,  Chicago,   Illinois** | **60607** |
| (Address of principal executive offices) | (Zip code) |

### Registrant's telephone number, including area code: (630) 623-3000
### Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.01 par value | MCD | New York Stock Exchange |

### Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☒  No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).  Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒     Accelerated filer ☐     Non-accelerated filer ☐  Smaller reporting company ☐     Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b) ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).  Yes ☐  No ☒

The aggregate market value of the registrant's common stock held by non-affiliates as of June 30, 2022: $181,588,534,180.

The number of shares outstanding of the registrant's common stock as of January 31, 2023: 731,496,951.

## DOCUMENTS INCORPORATED BY REFERENCE

Part III of this Form 10-K incorporates information by reference from the registrant's 2023 definitive proxy statement, which will be filed no later than 120 days after December 31, 2022.

# McDONALD'S CORPORATION

## TABLE OF CONTENTS

### ORGANIZATION OF THIS ANNUAL REPORT ON FORM 10-K

The order and presentation of content in this Annual Report on Form 10-K ("Form 10-K") differs from the traditional U.S. Securities and Exchange Commission ("SEC") Form 10-K format. McDonald's Corporation believes the format used in this Form 10-K improves readability and better presents how it organizes and manages its business. See "Form 10-K Cross-Reference Index" for a cross-reference index to the traditional SEC Form 10-K format.

| | Page |
|---|---|
| **Forward-Looking Statements** | 3 |
| **About McDonald's** | 3 |
| Business Summary | 3 |
| **Management's Discussion and Analysis of Financial Condition and Results of Operations** | 8 |
| Management's View of the Business | 8 |
| 2022 Financial Performance | 8 |
| Strategic Direction | 9 |
| Outlook | 10 |
| Consolidated Operating Results | 11 |
| Cash Flows | 19 |
| Financial Position and Capital Resources | 22 |
| Other Matters | 24 |
| **Other Key Information** | 25 |
| Stock Performance Graph | 25 |
| Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 26 |
| Risk Factors | 27 |
| Legal Proceedings | 33 |
| Properties | 33 |
| Information About our Executive Officers | 34 |
| Availability of Company Information | 35 |
| **Financial Statements and Supplementary Data** | 35 |
| **Controls and Procedures** | 62 |
| **Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters** | 62 |
| **Exhibits and Financial Statement Schedules** | 63 |
| **Form 10-K Cross-Reference Index** | 65 |
| **Signatures** | 66 |

All trademarks used herein are the property of their respective owners and are used with permission.

EXHIBIT O(86)

AOE2206

## FORWARD-LOOKING STATEMENTS

The information in this Form 10-K contains forward-looking statements about future events and circumstances and their effects upon revenues, expenses and business opportunities. Generally speaking, any statement in this Form 10-K not based upon historical fact is a forward-looking statement. Forward-looking statements can also be identified by the use of forward-looking or conditional words, such as "could," "should," "can," "continue," "aim," "estimate," "forecast," "intend," "look," "may," "will," "expect," "believe," "anticipate," "plan," "remain," "confident" and "commit" or similar expressions. In particular, statements regarding the Company's plans, strategies, prospects and expectations regarding its business and industry, as well as environmental, social and governance ("ESG") and similar commitments, are forward-looking statements. They reflect expectations, are not guarantees of performance and speak only as of the dates the statements are made. Factors that could cause actual results to differ materially from those in the forward-looking statements include those reflected in the Risk Factors section on page 27 of this Form 10-K and elsewhere in the Company's filings with the SEC. Except as required by law, the Company does not undertake to update such forward-looking statements. You should not rely unduly on forward-looking statements.

## ABOUT McDONALD'S

McDonald's Corporation, the registrant, together with its subsidiaries, is referred to herein as the "Company." The Company, its franchisees and suppliers are referred to herein as the "System."

## BUSINESS SUMMARY

### GENERAL

For the year ended December 31, 2022, there were no material changes to the Company's corporate structure or in its method of conducting business. Refer to the Segment and Geographic Information section on page 48 of this Form 10-K for additional information.

### DESCRIPTION OF THE BUSINESS

The Company franchises and operates McDonald's restaurants, which serve a locally relevant menu of quality food and beverages in communities across more than 100 countries. Of the 40,275 McDonald's restaurants at year-end 2022, approximately 95% were franchised.

The Company's reporting segments are aligned with its strategic priorities and reflect how management reviews and evaluates operating performance. Significant reportable segments include the United States ("U.S.") and International Operated Markets. In addition, there is the International Developmental Licensed Markets & Corporate segment, which includes markets in over 80 countries, as well as Corporate activities.

McDonald's franchised restaurants are owned and operated under one of the following structures - conventional franchise, developmental license or affiliate. The optimal ownership structure for an individual restaurant, trading area or market (country) is based on a variety of factors, including the availability of individuals with entrepreneurial experience and financial resources, as well as the local legal and regulatory environment in critical areas such as property ownership and franchising. The business relationship between the Company and its independent franchisees is supported by adhering to standards and policies, including McDonald's Global Brand Standards, and is of fundamental importance to overall performance and to protecting the McDonald's brand.

The Company is primarily a franchisor and believes franchising is paramount to delivering great-tasting food, locally relevant customer experiences and driving profitability. Franchising enables an individual to be their own employer and maintain control over all employment related matters, marketing and pricing decisions, while also benefiting from the strength of McDonald's global brand, operating system and financial resources.

Directly operating McDonald's restaurants contributes significantly to the Company's ability to act as a credible franchisor. One of the strengths of the franchising model is that the expertise from operating Company-owned restaurants allows McDonald's to improve the operations and success of all restaurants while innovations from franchisees can be tested and, when viable, efficiently implemented across relevant restaurants. Having Company-owned and operated restaurants provides Company personnel with a venue for restaurant operations training experience. In addition, in our Company-owned and operated restaurants, and in collaboration with franchisees, the Company is able to further develop and refine operating standards, marketing concepts and product and pricing strategies that will ultimately benefit McDonald's restaurants.

The Company's revenues consist of sales by Company-operated restaurants and fees from restaurants operated by franchisees. Fees vary by type of site, amount of Company investment, if any, and local business conditions. These fees, along with occupancy and operating rights, are stipulated in franchise/license agreements that generally have 20-year terms. The Company's Other revenues are comprised of fees paid by franchisees to recover a portion of costs incurred by the Company for various technology platforms, revenues from brand licensing arrangements to market and sell consumer packaged goods using the McDonald's brand and, for periods prior to its sale on April 1, 2022, third-party revenues for the Company's Dynamic Yield business.

#### Conventional Franchise

Under a conventional franchise arrangement, the Company generally owns or secures a long-term lease on the land and building for the restaurant location and the franchisee pays for equipment, signs, seating and décor. The Company believes that ownership of real estate, combined with the co-investment by franchisees, enables it to achieve restaurant performance levels that are among the highest in the industry.

Franchisees are responsible for reinvesting capital in their businesses over time. In addition, to accelerate implementation of certain initiatives, the Company may co-invest with franchisees to fund improvements to their restaurants or operating systems. These investments, developed in collaboration with franchisees, are designed to cater to consumer preferences, improve local business performance and increase the value of the McDonald's brand through the development of modernized, more attractive and higher revenue generating restaurants.

EXHIBIT 13 (86)

The Company requires franchisees to meet rigorous standards and generally does not work with passive investors. The business relationship with franchisees is designed to facilitate consistency and high quality at all McDonald's restaurants. Conventional franchisees contribute to the Company's revenue, primarily through the payment of rent and royalties based upon a percent of sales, with specified minimum rent payments, along with initial fees paid upon the opening of a new restaurant or grant of a new franchise. The Company's heavily franchised business model is designed to generate stable and predictable revenue, which is largely a function of franchisee sales, and resulting cash flow streams.

*Developmental License or Affiliate*

Under a developmental license or affiliate arrangement, licensees are responsible for operating and managing their businesses, providing capital (including the real estate interest) and developing and opening new restaurants. The Company generally does not invest any capital under a developmental license or affiliate arrangement, and it receives a royalty based on a percent of sales, and generally receives initial fees upon the opening of a new restaurant or grant of a new license.

While developmental license and affiliate arrangements are largely the same, affiliate arrangements are used in a limited number of foreign markets (primarily China and Japan) within the International Developmental Licensed Markets segment as well as a limited number of individual restaurants within the International Operated Markets segment, where the Company also has an equity investment and records its share of net results in equity in earnings of unconsolidated affiliates.

## PURPOSE, MISSION AND VALUES

Through its size and scale, McDonald's embraces and prioritizes its role and commitment to the communities in which it operates through its *purpose* to feed and foster communities, and its *mission* to make delicious feel-good moments for everyone. The Company is guided by five *core values* that define who we are and how we run our business across the three-legged stool of McDonald's franchisees, suppliers, and employees:

1.  *Serve* – We put our customers and people first;
2.  *Inclusion* – We open our doors to everyone;
3.  *Integrity* – We do the right thing;
4.  *Community* – We are good neighbors; and
5.  *Family* – We get better together.

The Company believes that its people, all around the world, set it apart and bring these values to life on a daily basis.

## HUMAN CAPITAL MANAGEMENT

The Company's people strategies aim to create an environment grounded in diversity, equity, and inclusion ("DEI"). To do this, the Company continues to evaluate and evolve its compensation and benefits programs to remain locally relevant and competitive, while offering quality training and learning opportunities, and continues to uphold a high standard of health and safety for employees and customers alike.

You can find more information about the Company's human capital management and related initiatives in its "Purpose & Impact" report.

*Our People*

Company employees, which include those in the Company's corporate and other offices as well as in Company-owned and operated restaurants, totaled over 150,000 worldwide as of year-end 2022, of which approximately 70% were based outside of the U.S. In addition to Company employees, the over two million people who work in McDonald's franchised restaurants around the world are critical to the Company's success, enabling it to drive long-term value creation and further its purpose and mission. People are at the cornerstone of the Company's business and an essential part of the System.

*Diversity, Equity and Inclusion*

The Company's aspiration is that no matter where you are in the world, when you interact with McDonald's, DEI is as evident and familiar as the Arches themselves. A diverse workforce is and will continue to be critical to McDonald's success, and the Company is committed to making this a continued priority. The Company adheres to a global DEI strategy designed to drive accountability across the System to better represent the diverse communities in which McDonald's operates, to accelerate cultures of inclusion and belonging and to further dismantle barriers to economic opportunity.

The Company's DEI strategy reflects its commitment to deliver equitable treatment for all people and includes:

•   ongoing efforts to improve the representation of women and underrepresented groups at all levels of the Company;

•   a franchisee recruitment initiative to increase the number of new franchisees from all backgrounds, including underrepresented groups, particularly for those who may face socio-economic barriers to entry;

•   best practice sharing with franchisees and suppliers to support them in furthering DEI progress within their own organizations;

•   upholding human rights and cultivating a respectful workplace that is ethical, truthful and dependable; and

•   a commitment to equal pay among Company employees with comparable job responsibilities, experience, performance and contributions, as well as fair treatment in access, opportunity and advancement for all.

While McDonald's is proud of its more than 65-year history as an employer, its global DEI strategy is designed to facilitate continued growth in how the Company approaches equitable opportunity and its role in catalyzing it across the System and beyond. The Company is committed to accelerating representation, inclusion and opportunity for underrepresented groups, not only within the Company but across the System. This goal is underscored by the Company's Mutual Commitment to Diversity, Equity and Inclusion, a pledge that invites the Company's U.S. based suppliers to commit to accountability for DEI progress within their own organizations. Aligned with the Company's

EXHIBIT O(86)

AOE2208

purpose, mission and values, the Mutual Commitment draws on McDonald's size and scale and highlights its opportunity to accelerate meaningful change for employees, franchisees, suppliers, customers and communities.

To reinforce the importance of the Company's values, the Company's incentive plan includes quantitative human capital metrics that hold executives accountable for making progress on DEI goals. In addition to the Company's financial performance, executives are measured on quantitative metrics that include championing the Company's core values, improving representation within leadership roles (Senior Director and above) and assessing feelings of inclusion within the Company. In addition, in 2022, the Company introduced an owner/operator diversity metric into its incentive plan for certain key officers and managing directors.

For more information on employee, Board and franchisee representation, as well as diverse-owned supplier spend and equal pay, see the Company's Global Diversity, Equity, and Inclusion Report, including the Diversity Snapshot.

*Respectful Workplace Environment*

Fostering safe, inclusive and respectful workplaces, wherever McDonald's does business, has been integral to the Company for its more than 65-year history. The Company understands the importance of providing a positive experience and making everyone feel valued, both in its offices and in McDonald's restaurants. The Company's commitment to human rights is set forth in its Human Rights Policy and is furthered by its Standards of Business Conduct, which apply to Company employees, and its Supplier Code of Conduct, which sets forth human rights requirements for the Company's global suppliers. Company employees are trained on and are required to annually certify their understanding of, and commitment to upholding, the Standards of Business Conduct.

Further, the Company's Global Brand Standards (which apply to all McDonald's restaurants, whether Company-owned or franchised) prioritize action in four areas: harassment, discrimination, and retaliation prevention; workplace violence prevention; restaurant employee feedback; and health and safety. Beginning in 2022, the first full year in which the Global Brand Standards were in effect, all restaurants were assessed on the Global Brand Standards in accordance with the applicable McDonald's market's business evaluation processes.

As part of its commitment to a respectful workplace environment, the Company recognizes how important it is to provide channels for its employees to report human rights and similar concerns that may violate Company policies and standards. Employees can do so in many ways, including through an anonymous global channel, the Business Integrity Line, which is staffed by a live operator from an independent company and is available 24 hours a day, 365 days a year. This is complemented by additional reporting channels in many markets. The Company expects its employees and franchisees to uphold human rights and cultivate respectful workplaces, which builds trust, protects the integrity of the McDonald's brand and fuels Systemwide success.

*Compensation, Benefits, and Talent Development*

The compensation and benefits provided to Company employees, including both corporate staff and Company-owned restaurant employees, is established based upon competitive considerations in the relevant labor market. The amount and type of compensation varies by an employee's level and location, and typically includes some combination of the following (in addition to base pay): cash bonuses, stock-based awards, retirement savings programs, and health and welfare benefits. Company employees may also receive paid time off, family care resources, tuition assistance and flexible work schedules.

In 2021, the Company publicly communicated its ongoing commitment to equal pay, which is supported by an annual pay gap analysis that aims to ensure equitable pay practices are consistently implemented and executed across the Company. Results of the 2022 pay gap analysis showed that women globally in Company owned and operated markets were paid 99.91 cents on the dollar in base pay on average of what men were paid for similar work. Further, there was no base pay gap disfavoring underrepresented groups in the U.S. These results indicate the Company substantially attained equal pay, and by the end of the first quarter of 2023, intends to close the small gaps identified in line with the commitment to close pay gaps identified in annual equal pay analyses. In line with its core values, the Company continuously emphasizes the importance of pay that is competitive, non-discriminatory, performance-based, transparent and compliant with legal and regulatory standards.

Additionally, McDonald's has a long-standing commitment to providing training, education benefits and career path opportunities, which empower the people and communities it serves. Learning and development is a competitive advantage to McDonald's and a true differentiator to its employee value proposition. McDonald's Hamburger University has eight campuses around the world, as well as online and on-demand resources, that provide training for Company employees as well as franchisees and their eligible employees. The Company is committed to providing opportunities for people to enhance their skills and fulfill their potential through talent development programs, apprenticeship opportunities, language and technical skill training and support for continuing education, as it believes this helps to facilitate talent attraction, career development and retention.

*Communities*

McDonald's embraces its role and commitment to the communities it serves. Through its Youth Opportunity program, the Company aims to reduce barriers to employment for two million youth by 2025 through supporting pre-employment job readiness training, employment opportunities and workplace development programs. The Company is also proud to support the network of over 260 local chapters of Ronald McDonald House Charities ("RMHC") spanning over 60 countries and regions that creates, finds and supports programs that directly improve the health and well-being of children and their families. In 2020, the Company announced a five-year, $100 million commitment to RMHC.

In addition, the Company maintains a Global Food Disposition Policy to help support its suppliers and distributors around the world in disposing of food in alignment with McDonald's food waste hierarchy, including by enabling food donations wherever possible. The Policy, which aims to avoid food waste and loss while also allowing the System to meet the needs of local communities, is a critical part of the Company's sustainability work and its purpose to feed and foster communities.

The Company continues to bring its Community Impact strategy to life through enhanced support efforts because its business thrives when communities thrive. As a System, McDonald's creates opportunities that encourage Company employees, franchisees and their employees, suppliers and customers to get involved in philanthropic and volunteering opportunities.

EXHIBIT 3 (86)

AOE2209

## ENVIRONMENTAL MATTERS

The Company prioritizes action and progress across a range of environmental matters, and endeavors to improve its long-term sustainability and resiliency, which benefit the System and the communities McDonald's serves. The Company monitors environmental regulations and stakeholder expectations in order to be well-positioned to respond in a timely and appropriate manner, as it cannot predict the precise nature of how these matters will continue to evolve. Although any impact would likely vary by geographic region and/or market, the adoption of new environmental laws or regulations may increase costs and/or operational complexity for the Company.

To guide its management of environmental matters and to strengthen its resiliency, the Company has developed goals and commitments that are informed by relevant frameworks, including the Taskforce on Climate-Related Financial Disclosures (TCFD). These include initiatives to reduce Systemwide greenhouse gas emissions, support deforestation free sourcing throughout the Company's global supply chain, efficiently manage natural resources and support biodiversity, responsibly source ingredients and packaging and increase the availability of recycling in restaurants to reduce waste. These are areas of increasing importance to the Company and its stakeholders and where the Company believes it can have a significant impact and help to drive industry-wide change. In recent years, the Company has made significant progress on many of its global goals and commitments. You can find more information about these initiatives, as well as other environmental sustainability matters, in the Company's "Our Purpose & Impact" report. Information can also be found in the Company's annual Climate Change, Forests and Water reports submitted to CDP, an organization that helps companies manage their environmental impacts.

The Company monitors and manages the evolving environmental landscape to further understand potential risks and opportunities for the business in collaboration with expert partners. The Company believes taking action on environmental matters will drive long-term business value by ensuring that it is managing operational costs in its energy supply, improving the security of its raw material supply, stewarding the environment in its surrounding communities and reducing its exposure to increasing environmental risks, regulation and costs.

## SUPPLY CHAIN, FOOD SAFETY AND QUALITY

The Company and its franchisees purchase food, packaging, equipment and other goods from numerous independent suppliers. The Company has established and enforces high food safety and quality standards and maintains quality centers around the world designed to promote consistency of these quality standards and menu compliance. The quality management systems and processes involve ongoing product reviews, virtual supplier visits and third-party verifications. A Food Safety Advisory Council, comprised of the Company's internal food safety experts as well as suppliers and outside academics, supports our food safety risk management work and provides strategic global leadership for all aspects of food safety and quality. The Company also has ongoing programs to elevate food safety culture throughout the business by educating employees about food safety practices, including proper storage, handling and preparation of food for customers, and conducting trainings for its suppliers and restaurant operators to share best practices on food safety and quality.

The Company works closely with suppliers to encourage innovation and drive continuous improvement across its global supply chain. Leveraging its scale, supply chain infrastructure and risk management strategies, the Company collaborates with suppliers on contingency planning to achieve continuous supply and competitive, predictable costs over the long term. The Company also works closely with suppliers and other third-party experts to drive sustainable sourcing initiatives, including the environmental matters discussed above and improving the health and welfare of the animals within its supply chain. Led by its Chief Supply Chain Officer, the Company has developed and implemented a comprehensive strategy that its global supply chain organization leverages to identify, assess and manage risk in its supply chain.

To reinforce the importance of its values, the Company maintains a Supplier Code of Conduct that applies to all of its suppliers around the world. The Company expects all of its suppliers to meet the rigorous standards set forth in the Code, which cover areas including human rights, workplace environment, business integrity and environmental management. In addition, the Company has a comprehensive Supplier Workplace Accountability (SWA) program to help suppliers understand its expectations, verify compliance and work toward continuous improvement.

## PRODUCTS

McDonald's restaurants offer a substantially uniform menu, although there are geographic variations to suit local consumer preferences and tastes.

McDonald's menu features hamburgers and cheeseburgers, the Big Mac, the Quarter Pounder with Cheese, the Filet-O-Fish, the McChicken and other chicken sandwiches, Chicken McNuggets, World Famous Fries, salads, shakes, McFlurry frozen desserts, sundaes, soft serve cones, bakery items, soft drinks, coffee, McCafé beverages and other beverages.

McDonald's restaurants in the U.S. and many international markets offer a full or limited breakfast menu. Breakfast offerings may include breakfast sandwiches, such as the Egg McMuffin, Sausage McMuffin with Egg and McGriddles, biscuit and bagel sandwiches, oatmeal, hash browns, breakfast burritos and hotcakes.

In addition to these menu items, restaurants sell a variety of other products during limited-time promotions.

Taste, quality, choice, value and nutrition are important to customers, and the Company is continuously evolving its menu to meet its customers' needs, including testing new products on an ongoing basis.

## MARKETING

McDonald's global brand is well known. Marketing, promotional and public relations activities are designed with customers in mind and are focused on promoting the McDonald's brand and differentiating the Company from its competitors. Marketing and promotional efforts focus on value, quality, food taste, menu choice, nutrition, convenience, cultural relevance and the customer experience.

EXHIBIT O(86)

AOE2210

## INTELLECTUAL PROPERTY

The Company owns or is licensed to use valuable intellectual property, including trademarks, service marks, patents, copyrights, trade secrets and other proprietary information. The Company considers the "McDonald's" trademark and the Golden Arches Logo to be of material importance to its business. Depending on the jurisdiction, trademarks and service marks generally are valid as long as they are used and/or registered. The Company's patents, copyrights and licenses are of varying durations.

## COMPETITION

McDonald's restaurants compete with international, national, regional and local retailers of traditional, fast casual and other food service competitors. The Company measures its competitive position within the informal eating out ("IEO") segment, which is inclusive of the Company's primary competition of quick-service restaurants, but also includes 100% home delivery/takeaway providers, street stalls or kiosks, cafés, specialist coffee shops, self-service cafeterias and juice/smoothie bars. The Company competes among quick-service restaurants primarily on the basis of price, convenience, service, experience, menu variety and product quality.

## GOVERNMENT REGULATIONS

The Company has global operations and is therefore subject to the laws of the United States and many foreign jurisdictions in which it operates and the rules and regulations of various governing bodies, which may differ among jurisdictions. As discussed under "Legal Proceedings – Government Regulations" on page 33 of this Form 10-K, governments have adopted laws and regulations involving various aspects of the restaurant business, including, but not limited to, advertising, franchising, health, safety, environment, competition, zoning, employment and taxation.

In addition, during the last three years, markets experienced varying levels of governmental restrictions on restaurant operations in response to the COVID-19 pandemic, including restrictions related to operating hours, dine-in capacity, and dining room and restaurant closures. These restrictions affected the Company's revenues for all three years, with a more limited impact in 2022 due to the lesser extent of the restrictions.

While costs associated with legal and regulatory compliance have increased along with the number and scope of laws and regulations affecting our business, these costs are not expected to have a material effect on the Company's capital expenditures, earnings or competitive position.

EXHIBIT O (86)

AOE2211

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### MANAGEMENT'S VIEW OF THE BUSINESS

In analyzing business trends, management reviews results on a constant currency basis and considers a variety of performance and financial measures, some of which are considered to be non-GAAP, including comparable sales and guest count growth, Systemwide sales growth, after-tax return on invested capital from continuing operations, free cash flow and free cash flow conversion rate, as described below. Management believes these measures are important in understanding the financial performance of the Company.

- Constant currency results exclude the effects of foreign currency translation and are calculated by translating current year results at prior year average exchange rates. Management reviews and analyzes business results excluding the effect of foreign currency translation, impairment and other charges and gains, as well as material regulatory and other income tax impacts, and bases incentive compensation plans on these results because the Company believes this better represents underlying business trends.

- Comparable sales and comparable guest counts are compared to the same period in the prior year and represent sales and transactions, respectively, at all restaurants, whether operated by the Company or by franchisees, in operation at least thirteen months including those temporarily closed. Some of the reasons restaurants may be temporarily closed include reimaging or remodeling, rebuilding, road construction, natural disasters and acts of war, terrorism or other hostilities (including restaurants temporarily closed due to COVID-19, as well as those that remain closed in Ukraine). Restaurants in Russia were treated as permanently closed as of April 1, 2022 and therefore excluded from the calculation of comparable sales and comparable guest counts beginning in the second quarter of 2022. Comparable sales exclude the impact of currency translation and the sales of any market considered hyper-inflationary (generally identified as those markets whose cumulative inflation rate over a three-year period exceeds 100%), which management believes more accurately reflects the underlying business trends. Comparable sales are driven by changes in guest counts and average check, the latter of which is affected by changes in pricing and product mix.

- Systemwide sales include sales at all restaurants, whether operated by the Company or by franchisees. This includes sales from digital channels, which are comprised of the mobile app, delivery and kiosk at both Company-operated and franchised restaurants. While franchised sales are not recorded as revenues by the Company, management believes the information is important in understanding the Company's financial performance because these sales are the basis on which the Company calculates and records franchised revenues and are indicative of the financial health of the franchisee base. The Company's revenues consist of sales by Company-operated restaurants and fees from franchised restaurants operated by conventional franchisees, developmental licensees and affiliates. Changes in Systemwide sales are primarily driven by comparable sales and net restaurant unit expansion.

- The Company's after-tax return on invested capital ("ROIC") from continuing operations is a metric that management believes measures capital-allocation effectiveness over time. Other companies may calculate ROIC differently, limiting the usefulness of the measure for comparisons with other companies. Refer to the reconciliation in Exhibit 99.1 to this Form 10-K for further information on the Company's calculation of ROIC.

- Free cash flow, defined as cash provided by operations less capital expenditures, and free cash flow conversion rate, defined as free cash flow divided by net income, are measures reviewed by management in order to evaluate the Company's ability to convert net profits into cash resources, after reinvesting in the core business, that can be used to pursue opportunities to enhance shareholder value. Refer to the reconciliations in Exhibit 99.1 to this Form 10-K for further information on the Company's calculations of free cash flow and free cash flow conversion rate.

### 2022 FINANCIAL PERFORMANCE

In 2022, global comparable sales increased 10.9%, primarily due to strong sales performance across all segments from continued execution of the *Accelerating the Arches* strategy.

- Comparable sales in the U.S. increased 5.9%, benefiting primarily from strong average check growth driven by strategic menu price increases, successful menu and marketing promotions and continued digital and delivery growth.

- Comparable sales in the International Operated segment increased 13.3%, reflecting positive comparable sales across the segment, primarily driven by France, Germany and the U.K.

- Comparable sales in the International Developmental Licensed segment increased 16.0%, reflecting positive comparable sales across the segment, led by Japan and Brazil, partly offset by negative comparable sales in China due to continued COVID-19 related government restrictions.

Earnings and cash flow growth rates presented below were impacted in 2022 by charges from the sale of the Company's business in Russia, the settlement of a tax audit in France and a gain on the sale of the Company's Dynamic Yield business. Additionally, 2021 results were impacted by gains on the Company's sale of McDonald's Japan stock, the remeasurement of deferred taxes as a result of a change in the U.K. statutory income tax rate and charges from the sale of McD Tech Labs.

Current year and prior year charges and gains are detailed along with reconciliations to the non-GAAP measures in the Net Income and Diluted Earnings Per Share section on page 12 and Operating Income section on page 17 in this Form 10-K.

In addition to the comparable sales results above, the Company had the following financial results in 2022:

- Consolidated revenues were flat (increased 6% in constant currencies) at $23.2 billion.

- Systemwide sales increased 5% (11% in constant currencies) to $118.2 billion.

EXHIBIT O(86)

AOE2212

• Consolidated operating income decreased 10% (3% in constant currencies) to $9.4 billion.

• Operating margin, defined as operating income as a percent of total revenues, decreased from 44.6% in 2021 to 40.4% in 2022.

• Diluted earnings per share of $8.33 decreased 17% (12% in constant currencies).

• Cash provided by operations was $7.4 billion, a 19% decrease from the prior year.

• Capital expenditures of $1.9 billion were allocated approximately 50% to each of reinvestment in existing restaurants and new restaurant openings.

• Free cash flow was $5.5 billion, a 23% decrease from the prior year.

• Across the System, over 1,500 new restaurants (including those in our developmental licensee and affiliated markets) were opened.

• The Company increased its quarterly cash dividend per share by 10% to $1.52 for the fourth quarter, equivalent to an annual dividend of $6.08 per share. The Company returned a total of $8.1 billion to shareholders through dividends and share repurchases in 2022.

## STRATEGIC DIRECTION

In early 2023, the Company announced an evolution of its successful *Accelerating the Arches* strategy (the "Strategy"). The Strategy, which encompasses all aspects of McDonald's business as the leading global omni-channel restaurant brand, continues to reflect the Company's purpose, mission and values. Enhancements to the Strategy include the additions of Restaurant Development to the MCD growth pillars and an internal effort, *Accelerating the Organization*, both of which are aimed at elevating the Company's performance. The Company's guiding purpose, mission and values are discussed in a dedicated section on page 4 of this Form 10-K.

### GROWTH PILLARS

The following growth pillars, MCD, build on historic strengths and articulate areas of further opportunity. Under the Strategy, the Company will:

• **M**aximize our Marketing by investing in new, culturally relevant approaches, grounded in fan truths, to effectively communicate the story of our brand, food and purpose. This is exemplified by campaigns that elevate the entire brand, such as the Famous Orders platform that has been repeatedly adopted by markets across the globe, the FIFA World Cup campaign that debuted in 75 markets, the UK's Raise Your Arches campaign that was picked up by 30 markets around the globe and The Cactus Plant Flea Market Box in the U.S. The Company is committed to a marketing strategy that highlights value at every tier of the menu, as affordability remains a cornerstone of the McDonald's brand and is especially important to our customers in uncertain economic environments.

• **C**ommit to the Core menu by tapping into customer demand for the familiar and focusing on serving our iconic products such as our World Famous Fries, the Big Mac, our Chicken McNuggets and the McFlurry. Around the world, McDonald's possesses 10 of these "billion-dollar brand equities." The Company will continue to improve on its classics by implementing a series of operational and formulation changes designed to deliver hotter, juicer, tastier burgers across the globe. While leaning into core icons like Chicken McNuggets, ongoing focus will include scaling emerging equities such as the McSpicy and McCrispy Chicken Sandwiches. The Company also continues to see a significant opportunity with coffee, demonstrated by markets leveraging the McCafé brand, customer experience, value and quality to drive long-term growth.

• **D**ouble Down on the 4D's: Digital, Delivery, Drive Thru and the recent addition of Restaurant Development by leveraging competitive strengths and building a powerful digital experience growth engine to deliver a personalized and convenient customer experience. To unlock further growth, the Company expects to continue to accelerate the pace of restaurant openings and technology innovation so that whenever and however customers choose to interact with McDonald's, they can enjoy a fast, easy experience that meets their needs. In 2022, digital channels (the mobile app, delivery and kiosk) comprised nearly 35% of Systemwide sales in the Company's top six markets, representing over $25 billion in digital Systemwide sales.

  ◦ *Digital:* The Company's digital experience growth engine — "MyMcDonald's" — is transforming its offerings across drive thru, takeaway, delivery, curbside pick-up and dine-in with digital enhancements. Through the digital tools, customers can access personalized offers, participate in a loyalty program, order through the mobile app and receive McDonald's food through the channel of their choice. The Company has successful loyalty programs in over 50 markets around the world, including its top six markets. As of December 31, 2022, the Company's loyalty customers have proven to be highly engaged, with nearly 50 million active loyalty members across the top six markets in the last 90 days, including 28 million in the U.S.

  ◦ *Delivery:* The Company has continued to expand the number of restaurants offering delivery to nearly 35,000, representing over 85% of McDonald's restaurants. Delivery is available in about 100 markets, and the Company is continuing to build on and enhance the delivery experience for customers by adding the ability to place a delivery order on the McDonald's mobile app in some of its largest markets. This capability is now available in the U.S., the U.K., Canada and Australia. The Company has also put in place long-term strategic partnerships with UberEats, DoorDash, Just Eat Takeaway.com and Deliveroo. These partnerships are expected to benefit the Company, its customers and franchisees by optimizing operational efficiencies and creating a seamless customer experience.

  ◦ *Drive Thru:* The Company has drive thru locations in over 26,000 restaurants globally, including nearly 95% of the over 13,000 locations in the U.S. This channel remains a competitive advantage, and we expect that it will become even more critical to meeting customers' demand for flexibility and choice. The Company continues to build on its drive thru advantage, as the vast majority of new restaurant openings in the U.S. and International Operated Market segments will include a drive thru.

EXHIBIT Q (86)

AOE2213

◦ *Restaurant Development:* The Company will accelerate the pace of restaurant openings with the recent addition of this component to the MCD growth pillars. In 2023, the Company plans to open approximately 1,900 new restaurant units across the globe, which will contribute to nearly 4% net unit growth. The Company believes there is opportunity for further growth in many of its largest markets and to explore new formats under the McDonald's brand over the coming years.

**FOUNDATION**

Foundational to the Strategy is keeping the customer and restaurant crew at the center of everything we do, along with a relentless focus on running great restaurants, empowering our people and modernizing ways of working through *Accelerating the Organization.*

- **Running Great Restaurants:** The Company offers the speed, choice and personalization that its customers expect and serves delicious food people feel good about eating, with convenient locations and hours and affordable prices.

- **Empowering our People:** The Company believes the employee experience is critical to its success and, in 2022, implemented Global Brand Standards which are designed to create a culture of safety for both employees and customers in McDonald's restaurants around the world.

- **Accelerating the Organization**: The Company will unlock further growth as it modernizes the way it works by focusing on becoming faster, more innovative and more efficient at solving problems for its customers and people. This work is guided by a commitment to provide people with career paths for growth and development that capitalize on the global nature of the Company's business.

These efforts, coupled with investments in innovation, are designed to enhance the customer experience and deliver long-term profitable growth for all stakeholders. The Strategy is aligned with the Company's capital allocation philosophy of investing in opportunities to grow the business (through new restaurants and reinvesting in existing restaurants) and returning free cash flow to shareholders over time through dividends and share repurchases.

The Company believes the Strategy builds on its inherent strengths by harnessing its competitive advantages while leveraging its size, scale and agility to adapt and adjust to uncertain economic and operating environments to meet consumer demands. The Strategy is supported by a strong global senior leadership team aimed at executing against the MCD growth pillars and accelerating the Company's broad-based business momentum.

## OUTLOOK

Based on current conditions, the following is provided to assist in forecasting the Company's future results for 2023.

- The Company expects net restaurant unit expansion will contribute nearly 1.5% to 2023 Systemwide sales growth, in constant currencies.

- The Company expects full year 2023 selling, general and administrative expenses of about 2.2% to 2.3% of Systemwide sales.

- The Company expects 2023 operating margin percent to be about 45%.

- Based on current interest and foreign currency exchange rates, the Company expects interest expense for the full year 2023 to increase between 10% and 12%, driven primarily by higher average interest rates.

- The Company expects the effective income tax rate for the full year 2023 to be in the 20% to 22% range. Some volatility may result in a quarterly tax rate outside of the annual range.

- The Company expects 2023 capital expenditures to be between $2.2 and $2.4 billion, about half of which will be directed towards new restaurant unit expansion across the U.S. and International Operated Markets. Globally, the Company expects to open about 1,900 restaurants. The Company will open more than 400 restaurants in the U.S. and International Operated Markets segments, and developmental licensees and affiliates will contribute capital towards about 1,500 restaurant openings in their respective markets. The Company expects about 1,500 net restaurant additions in 2023.

- The Company expects to achieve a free cash flow conversion rate greater than 90%.

EXHIBIT O(86)

AOE2214

## CONSOLIDATED OPERATING RESULTS

The following discussion should be read in conjunction with the consolidated financial statements and accompanying notes beginning on page 35 of this Form 10-K. This section generally discusses 2022 and 2021 items and the year-to-year comparisons between the years ended December 31, 2022 and 2021. Discussions of 2020 items and the year-to-year comparisons between the years ended December 31, 2021 and 2020 are not included in their entirety in this Form 10-K and can be found in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of the Company's Annual Report on Form 10-K for the year ended December 31, 2021, filed with the SEC on February 24, 2022.

### *Impact of COVID-19 Restrictions*

During the last three years, markets experienced varying levels of governmental restrictions on restaurant operations in response to the COVID-19 pandemic, including restrictions related to operating hours, dine-in capacity, and dining room and restaurant closures. These restrictions affected the Company's revenues for all three years, with a more limited impact in 2022 due to the lesser extent of the restrictions. As most revenues and the Company's share of net results in equity investments are based on a percent of sales, consumer sentiment and government restrictions as a result of COVID-19 may continue to have an impact on results.

### *Impact of the War in Ukraine*

During the first quarter of 2022, McDonald's temporarily closed restaurants in Russia and Ukraine due to the ongoing war in the region. Restaurants remained closed in Russia through the Company's sale of its Russian business in the second quarter 2022.

Beginning in September 2022, the Company began reopening restaurants in Ukraine.

*Operating results*

| Dollars and shares in millions, except per share data | Amount **2022** | Increase/ (decrease) **2022** | Amount 2021 | Increase/ (decrease) 2021 | Amount 2020 |
|---|---|---|---|---|---|
| **Revenues** | | | | | |
| Sales by Company-operated restaurants | $ 8,748 | (11%) | $ 9,787 | 20% | $ 8,139 |
| Revenues from franchised restaurants | 14,106 | 8 | 13,085 | 22 | 10,726 |
| Other revenues | 329 | (6) | 351 | 2 | 343 |
| **Total revenues** | 23,183 | — | 23,223 | 21 | 19,208 |
| **Operating costs and expenses** | | | | | |
| Company-operated restaurant expenses | 7,381 | (8) | 8,047 | 15 | 6,981 |
| Franchised restaurants-occupancy expenses | 2,350 | 1 | 2,335 | 6 | 2,208 |
| Other restaurant expenses | 245 | (6) | 260 | (2) | 267 |
| Selling, general & administrative expenses | | | | | |
| Depreciation and amortization | 370 | 12 | 330 | 10 | 301 |
| Other | 2,492 | 5 | 2,378 | 6 | 2,245 |
| Other operating (income) expense, net | 974 | n/m | (483) | n/m | (118) |
| **Total operating costs and expenses** | 13,812 | 7 | 12,867 | 8 | 11,884 |
| **Operating income** | 9,371 | (10) | 10,356 | 41 | 7,324 |
| Interest expense | 1,207 | 2 | 1,186 | (3) | 1,218 |
| Nonoperating (income) expense, net | 339 | n/m | 42 | n/m | (35) |
| **Income before provision for income taxes** | 7,825 | (14) | 9,128 | 49 | 6,141 |
| Provision for income taxes | 1,648 | 4 | 1,583 | 12 | 1,410 |
| **Net income** | $ 6,177 | (18%) | $ 7,545 | 59% | $ 4,731 |
| **Earnings per common share—diluted** | $ 8.33 | (17%) | $ 10.04 | 59% | $ 6.31 |
| **Weighted-average common shares outstanding—diluted** | 741.3 | (1%) | 751.8 | —% | 750.1 |

*n/m Not meaningful*

### IMPACT OF FOREIGN CURRENCY TRANSLATION ON REPORTED RESULTS

The impact of foreign currency translation on consolidated operating results in 2022 reflected the weakening of all major currencies against the U.S. Dollar, driven by the Euro, British Pound, and Australian Dollar.

While changes in foreign currency exchange rates affect reported results, McDonald's mitigates exposures, where practical, by purchasing goods and services in local currencies, financing in local currencies and hedging certain foreign-denominated cash flows. Results excluding the effect of foreign currency translation (referred to as constant currency) are calculated by translating current year results at prior year average exchange rates.

EXHIBIT O (86)

AOE2215

*Impact of foreign currency translation on reported results*

| | | Reported amount | | | Currency translation benefit/(cost) | |
|---|---|---|---|---|---|---|
| *In millions, except per share data* | **2022** | *2021* | *2020* | **2022** | *2021* | *2020* |
| Revenues | **$23,183** | $23,223 | $19,208 | **$ (1,419)** | $    488 | $    (75) |
| Company-operated margins | **1,368** | 1,740 | 1,158 | **(99)** | 42 | (1) |
| Franchised margins | **11,756** | 10,750 | 8,519 | **(646)** | 223 | 32 |
| Selling, general & administrative expenses | **2,862** | 2,708 | 2,546 | **63** | (28) | (2) |
| Operating income | **9,371** | 10,356 | 7,324 | **(652)** | 231 | 35 |
| Net income | **6,177** | 7,545 | 4,731 | **(386)** | 150 | 26 |
| Earnings per common share—diluted | **8.33** | 10.04 | 6.31 | **(0.52)** | 0.20 | 0.04 |

### NET INCOME AND DILUTED EARNINGS PER COMMON SHARE

In 2022, net income decreased 18% (13% in constant currencies) to $6.2 billion and diluted earnings per common share decreased 17% (12% in constant currencies) to $8.33. Foreign currency translation had a negative impact of $0.52 on diluted earnings per share.

2022 results included:

- Net pre-tax charges of $1,281 million, or $1.44 per share, related to the sale of the Company's business in Russia
- Net pre-tax gain of $271 million, or $0.40 per share, related to the Company's sale of its Dynamic Yield business
- $537 million, or $0.73 per share, of nonoperating expense related to the settlement of a tax audit in France

2021 results included:

- Net pre-tax gains of $339 million, or $0.33 per share, primarily related to the sale of McDonald's Japan stock
- Pre-tax charges of $54 million, or $0.05 per share, primarily related to the sale of McD Tech Labs
- $364 million, or $0.48 per share, of income tax benefit related to the remeasurement of deferred taxes as a result of a change in the U.K. statutory income tax rate

Outlined below is additional information for the full year 2022 and 2021:

*Net Income Reconciliation*

| | Amount | | Increase/ (decrease) | Increase/(decrease) excluding currency translation |
|---|---|---|---|---|
| | **2022** | *2021* | **2022** | **2022** |
| GAAP net income | **$   6,177.4** | $   7,545.2 | **(18%)** | **(13%)** |
| (Gains) charges | **770.7** | (202.7) | | |
| Income tax (benefit) cost, net | **—** | (363.7) | | |
| France tax settlement | **537.2** | — | | |
| Non-GAAP net income | **$   7,485.3** | $   6,978.8 | **7 %** | **13 %** |

*Diluted Earnings Per Common Share Reconciliation*

| | Amount | | Increase/ (decrease) | Increase/(decrease) excluding currency translation |
|---|---|---|---|---|
| | **2022** | *2021* | **2022** | **2022** |
| GAAP earnings per share-diluted | **$   8.33** | $   10.04 | **(17%)** | **(12%)** |
| (Gains) charges | **1.04** | (0.28) | | |
| Income tax (benefit) cost, net | **—** | (0.48) | | |
| France tax settlement | **0.73** | — | | |
| Non-GAAP earnings per share-diluted | **$   10.10** | $   9.28 | **9 %** | **15 %** |

In constant currencies, after consideration of the adjustments to reconcile our GAAP to Non-GAAP results above, 2022 reflected strong operating performance driven by higher sales-driven Franchised margins. Company-operated margins were negatively impacted by the permanent restaurant closures as a result of the sale of the Company's business in Russia and the temporary restaurant closures in Ukraine, as well as by inflationary cost pressures. In addition, net income reflected an income tax benefit associated with global tax audit progression.

The Company repurchased 15.8 million shares of its stock for $3.9 billion in 2022 and 3.4 million shares of its stock for $846 million in 2021.

EXHIBIT O(86)

AOE2216

## REVENUES

The Company's revenues consist of sales by Company-operated restaurants and fees from restaurants operated by franchisees, developmental licensees and affiliates. Revenues from conventional franchised restaurants include rent and royalties based on a percent of sales with minimum rent payments, and initial fees. Revenues from restaurants licensed to developmental licensees and affiliates include a royalty based on a percent of sales, and generally include initial fees. The Company's Other revenues are comprised of fees paid by franchisees to recover a portion of costs incurred by the Company for various technology platforms, revenues from brand licensing arrangements to market and sell consumer packaged goods using the McDonald's brand and, for periods prior to its sale on April 1, 2022, third-party revenues for the Company's Dynamic Yield business.

Franchised restaurants represented 95% of McDonald's restaurants worldwide at December 31, 2022. The Company's heavily franchised business model is designed to generate stable and predictable revenue, which is largely a function of franchisee sales, and resulting cash flow streams.

*Revenues*

| Dollars in millions | 2022 | 2021 | 2020 | 2022 | 2021 | 2022 | 2021 |
|---|---|---|---|---|---|---|---|
| | | | *Amount* | *Increase/ (decrease)* | | *Increase/(decrease) excluding currency translation* | |
| Company-operated sales: | | | | | | | |
| U.S. | $ 2,836 | $ 2,617 | $ 2,395 | 8% | 9% | 8% | 9% |
| International Operated Markets | 5,179 | 6,456 | 5,114 | (20) | 26 | (11) | 23 |
| International Developmental Licensed Markets & Corporate | 733 | 715 | 630 | 3 | 13 | 16 | 10 |
| Total | $ 8,748 | $ 9,788 | $ 8,139 | (11%) | 20% | (4%) | 18% |
| Franchised revenues: | | | | | | | |
| U.S. | $ 6,585 | $ 6,094 | $ 5,261 | 8% | 16% | 8% | 16% |
| International Operated Markets | 5,985 | 5,638 | 4,348 | 6 | 30 | 18 | 24 |
| International Developmental Licensed Markets & Corporate | 1,536 | 1,353 | 1,117 | 14 | 21 | 22 | 20 |
| Total | 14,106 | 13,085 | 10,726 | 8 | 22% | 14% | 19% |
| Total Company-operated sales and Franchised revenues: | | | | | | | |
| U.S. | $ 9,421 | $ 8,711 | $ 7,656 | 8% | 14% | 8% | 14% |
| International Operated Markets | 11,164 | 12,094 | 9,462 | (8) | 28 | 2 | 23 |
| International Developmental Licensed Markets & Corporate | 2,269 | 2,068 | 1,747 | 10 | 18 | 20 | 16 |
| Total | 22,854 | 22,873 | 18,865 | — % | 21% | 6% | 19% |
| Total Other revenues | $ 329 | $ 350 | $ 343 | (6%) | 2% | (3%) | —% |
| Total Revenues | 23,183 | 23,223 | 19,208 | — % | 21% | 6% | 18% |

In 2022, total Company-operated sales and franchised revenues were flat (increased 6% in constant currencies). In the International Operated Markets segment, results reflected positive constant currency sales performance, driven by France, Germany and the U.K., offset by lower Company-operated sales due to permanent restaurant closures as a result of the sale of the Company's business in Russia and the temporary restaurant closures in Ukraine. The International Developmental Licensed Markets segment reflected strong sales performance across all geographic regions.

*TOTAL REVENUES BY SEGMENT*



The following tables present comparable sales and Systemwide sales increases/(decreases):

EXHIBIT 2 (86)

AOE2217

*Comparable sales increases/(decreases)\**

|  | **2022** | *2021* | *2020* |
|---|---|---|---|
| U.S. | **5.9%** | 13.8% | 0.4% |
| International Operated Markets | **13.3** | 21.6 | (15.0) |
| International Developmental Licensed Markets & Corporate | **16.0** | 16.6 | (10.5) |
| Total | **10.9%** | 17.0% | (7.7%) |

*For both International Operated Markets and Total comparable sales calculations for 2022, restaurants in Russia were treated as permanently closed starting April 1, 2022 and therefore excluded from the calculations beginning in the second quarter of 2022. Restaurants from Ukraine were treated as temporarily closed and therefore included in the calculations. Beginning in September 2022, the Company began reopening restaurants in Ukraine. Due to the more significant impact of COVID-19 in 2020, comparable sales growth from 2020 to 2021 may not be fully indicative of the Company's performance.

*Systemwide sales increases/(decreases)\*\**

|  |  |  | *Increase/(decrease) excluding currency translation* | |
|---|---|---|---|---|
|  | **2022** | *2021* | **2022** | *2021* |
| U.S. | **6%** | 13 % | **6%** | 13% |
| International Operated Markets | **—** | 29 | **11** | 24 |
| International Developmental Licensed Markets & Corporate | **10** | 21 | **21** | 20 |
| Total | **5%** | 21% | **11%** | 18% |

** Unlike comparable sales, the Company has not excluded sales from hyperinflationary markets from Systemwide sales as these sales are the basis on which the Company calculates and records revenues. 2022 results reflect the impact of the permanent restaurant closures as a result of the sale of the Company's business in Russia and the temporary restaurant closures in Ukraine.

Franchised sales are not recorded as revenues by the Company, but are the basis on which the Company calculates and records franchised revenues and are indicative of the financial health of the franchisee base. The following table presents franchised sales and the related increases/(decreases):

*Franchised sales*

| |  | *Amount* | | | *Increase/ (decrease)* | | *Increase/(decrease) excluding currency translation* | |
|---|---|---|---|---|---|---|---|---|
| *Dollars in millions* | **2022** | *2021* | *2020* | **2022** | *2021* | **2022** | *2021* |
| U.S. | **$ 45,898** | $ 43,344 | $ 38,123 | **6%** | 14% | **6%** | 14% |
| International Operated Markets | **34,537** | 33,097 | 25,446 | **4** | 30 | **15** | 24 |
| International Developmental Licensed Markets & Corporate | **29,038** | 26,234 | 21,609 | **11** | 21 | **21** | 21 |
| Total | **$109,473** | $102,675 | $ 85,178 | **7%** | 21% | **13%** | 18% |

| *Ownership type* |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
| Conventional franchised | **$ 80,066** | $ 75,956 | $ 63,297 | **5 %** | 20 % | **10 %** | 18 % |
| Developmental licensed | **18,444** | 15,151 | 11,781 | **22** | 29 | **31** | 28 |
| Foreign affiliated | **10,963** | 11,568 | 10,100 | **(5)** | 15 | **6** | 13 |
| Total | **$109,473** | $102,675 | $ 85,178 | **7%** | 21% | **13%** | 18% |

EXHIBIT O(86)

AOE2218

## RESTAURANT MARGINS

Franchised restaurant margins are measured as revenues from franchised restaurants less franchised restaurant occupancy costs. Franchised revenues include rent and royalties based on a percent of sales, and initial fees. Franchised restaurant occupancy costs include lease expense and depreciation, as the Company generally owns or secures a long-term lease on the land and building for the restaurant location.

Company-operated restaurant margins are measured as sales from Company-operated restaurants less costs for food & paper, payroll & employee benefits and occupancy & other operating expenses necessary to run an individual restaurant. Company-operated margins exclude costs that are not allocated to individual restaurants, primarily payroll & employee benefit costs of non-restaurant support staff, which are included in Selling, general and administrative expenses.

*Restaurant margins*

| Dollars in millions | Amount | | | Increase/(decrease) | | Increase/(decrease) excluding currency translation | |
|---|---|---|---|---|---|---|---|
| | **2022** | 2021 | 2020 | **2022** | 2021 | **2022** | 2021 |
| Franchised: | | | | | | | |
| U.S. | $ **5,341** | $ 4,906 | $ 4,097 | **9%** | 20% | **9%** | 20% |
| International Operated Markets | **4,900** | 4,516 | 3,329 | **8** | 36 | **20** | 29 |
| International Developmental Licensed Markets & Corporate | **1,515** | 1,328 | 1,093 | **14** | 22 | **23** | 20 |
| Total | $ **11,756** | $ 10,750 | $ 8,519 | **9%** | 26% | **15%** | 24% |
| Company-operated: | | | | | | | |
| U.S. | $ **429** | $ 511 | $ 405 | **(16%)** | 26% | **(16%)** | 26% |
| International Operated Markets | **913** | 1,208 | 748 | **(24)** | 61 | **(17)** | 56 |
| International Developmental Licensed Markets & Corporate | **n/m** | n/m | n/m | **n/m** | n/m | **n/m** | n/m |
| Total | $ **1,368** | $ 1,740 | $ 1,158 | **(21%)** | 50% | **(16%)** | 47% |
| Total restaurant margins: | | | | | | | |
| U.S. | $ **5,770** | $ 5,417 | $ 4,502 | **7%** | 20 % | **7%** | 20 % |
| International Operated Markets | **5,813** | 5,724 | 4,077 | **2** | 40 | **12** | 34 |
| International Developmental Licensed Markets & Corporate | **n/m** | n/m | n/m | **n/m** | n/m | **n/m** | n/m |
| Total | $ **13,124** | $ 12,490 | $ 9,677 | **5%** | 29 % | **11%** | 26 % |

*n/m Not meaningful*

In 2022, total restaurant margins increased 5% (11% in constant currencies), which reflected strong sales performance across all segments.

Franchised margins represented nearly 90% of restaurant margin dollars.

Total restaurant margin growth was negatively impacted in both periods by foreign currency translation due to the weakening of all major currencies against the U.S. Dollar.

Franchised margins in the U.S. reflected higher depreciation costs related to investments in restaurant modernization.

Company-operated margins in the U.S. and International Operated Markets segment reflected positive sales performance driven by strategic menu price increases, and the negative impact of inflationary pressures. Results in the International Operated Markets segment were also negatively impacted by the restaurant closures in Russia and Ukraine.

Total restaurant margins included $1,501 million of depreciation and amortization expenses in 2022.

*RESTAURANT MARGINS BY TYPE (In millions)*



EXHIBIT O (86)

AOE2219

**SELLING, GENERAL & ADMINISTRATIVE EXPENSES**

*Selling, general & administrative expenses*

| Dollars in millions | 2022 | 2021 | Amount 2020 | Increase/(decrease) 2022 | 2021 | Increase/(decrease) excluding currency translation 2022 | 2021 |
|---|---|---|---|---|---|---|---|
| U.S. | $ 692 | $ 696 | $ 625 | (1%) | 11% | (1%) | 11% |
| International Operated Markets | 629 | 692 | 700 | (9) | (1) | — | (5) |
| International Developmental Licensed Markets & Corporate[1] | 1,541 | 1,320 | 1,221 | 17 | 8 | 17 | 8 |
| Total Selling, General & Administrative Expenses | $2,862 | $2,708 | $2,546 | 6% | 6% | 8% | 5% |
| Less:  Incentive-Based Compensation[2] | 404 | 439 | 158 | (8) | n/m | (6) | n/m |
| Total Excluding Incentive-Based Compensation | $2,458 | $2,269 | $2,388 | 8% | (5%) | 11% | (6%) |

(1) Includes home office support costs in areas such as facilities, finance, human resources, investments in strategic technology initiatives, legal, marketing, restaurant operations, supply chain and training.

(2) Includes all cash incentives and share-based compensation expense.

In 2022, consolidated selling, general and administrative expenses increased 6% (8% in constant currencies), reflecting higher costs for investments in restaurant technology, incremental costs related to strategic initiatives, the Company's 2022 Worldwide Owner/Operator convention and proxy contest, as well as the impact of inflationary cost pressures.

Management believes that analyzing selling, general & administrative expenses as a percent of Systemwide sales is meaningful because these costs are incurred to support the overall McDonald's business.

*SELLING, GENERAL & ADMINISTRATIVE EXPENSES AS A PERCENT OF SYSTEMWIDE SALES*



**OTHER OPERATING (INCOME) EXPENSE, NET**

*Other operating (income) expense, net*

| In millions | 2022 | 2021 | 2020 |
|---|---|---|---|
| Gains on sales of restaurant businesses | $ (60) | $ (96) | $ (23) |
| Equity in earnings of unconsolidated affiliates | (113) | (177) | (117) |
| Asset dispositions and other (income) expense, net | 137 | 75 | 290 |
| Impairment and other charges (gains), net | 1,010 | (285) | (268) |
| Total | $ 974 | $ (483) | $ (118) |

EXHIBIT O(86)

AOE2220

- *Gains on sales of restaurant businesses*

In 2022, gains on sales of restaurant businesses decreased primarily due to a lower number of restaurant sales in the U.S.

- *Equity in earnings of unconsolidated affiliates*

In 2022, equity in earnings of unconsolidated affiliates decreased due to lower equity in earnings from China as a result of the continued impact of COVID-19 related government restrictions, and lower equity in earnings from the International Operated Markets segment, primarily as a result of dissolving a restaurant joint venture partnership. Results also reflected lower equity in earnings from Japan, due to the Company's reduced ownership in McDonald's Japan when compared to 2021.

- *Asset dispositions and other (income) expense, net*

Asset dispositions and other (income) expense, net reflected higher asset write-offs, costs incurred to support the Company's business in Ukraine, and the comparison to a prior year gain on the strategic sale of restaurant properties. Results also reflected a gain as a result of an increase to fair value of an existing restaurant joint venture in connection with the buyout of a joint venture partner within the International Operated Markets segment.

- *Impairment and other charges (gains), net*

In 2022, impairment and other charges (gains), net reflected $1,281 million of pre-tax charges related to the sale of the Company's business in Russia and a pre-tax gain of $271 million related to the Company's sale of its Dynamic Yield business.

Results in 2021 reflected net pre-tax gains of $339 million, primarily related to the sale of McDonald's Japan stock. These results were partly offset by $54 million of pre-tax charges, primarily related to the sale of McD Tech Labs.

**OPERATING INCOME**

*Operating income*

| Dollars in millions | 2022 | 2021 | 2020 | 2022 | 2021 | 2022 | 2021 |
|---|---|---|---|---|---|---|---|
| | | | *Amount* | *Increase/(decrease)* | | *Increase/(decrease) excluding currency translation* | |
| U.S. | $5,136 | $4,755 | $3,789 | 8% | 25% | 8% | 25% |
| International Operated Markets | 3,926 | 5,130 | 3,315 | (23) | 55 | (13) | 48 |
| International Developmental Licensed Markets & Corporate | 309 | 471 | 220 | (34) | n/m | (5) | n/m |
| Total | $9,371 | $10,356 | $7,324 | (10%) | 41% | (3%) | 38% |
| Operating margin | 40.4 % | 44.6 % | 38.1 % | | | | |

*Operating income reconciliation\**

| Dollars in millions | 2022 | 2021 | 2022 | 2022 |
|---|---|---|---|---|
| | | *Amount* | *Increase/ (decrease)* | *Increase/(decrease) excluding currency translation* |
| GAAP operating income | $    9,371 | $10,356 | (10%) | (3%) |
| Russia sale charge | 1,281 | — | | |
| Dynamic Yield sale gain | (271) | — | | |
| Japan stock sale gains | — | (339) | | |
| McD Tech Labs sale charge | — | 54 | | |
| Non-GAAP operating income | $10,381 | $10,071 | 3% | 10% |
| Non-GAAP operating margin | 44.8 % | 43.4 % | | |

*Refer to the Impairment and other charges (gains), net line within the Other Operating (Income) Expense, Net section above for details of the gains and charges in this table.

- *Operating Income:* Operating income decreased 10% (3% in constant currencies). Excluding the current year and prior year items in the table above, operating income increased 3% (10% in constant currencies) for 2022.

  - *U.S.:* Operating income increased due to sales-driven growth in Franchised margins, partly offset by inflationary pressures on labor and commodities in Company-operated restaurant margins.

  - *International Operated Markets:* Constant currency results reflected positive sales performance led by France, Germany, and the U.K. Results were partly offset by the impact of restaurant closures in Russia and Ukraine as well as inflationary pressures in Company-operated restaurant margins.

  - *International Developmental Licensed Markets & Corporate:* Results reflected strong sales performance, primarily in Brazil and Japan, and higher Corporate general and administrative expenses.

EXHIBIT O (86)

AOE2221

*OPERATING INCOME BY SEGMENT\**



U.S.

International Operated Markets

International Developmental Licensed Markets & Corporate*

*The IDL segment data in this graphic excludes Corporate activities, which is a Non-GAAP presentation.

- *Operating margin:* Operating margin is defined as operating income as a percent of total revenues. The contributions to operating margin by segment differ due to each segment's ownership structure, primarily due to the relative percentage of franchised versus Company-operated restaurants. Additionally, temporary restaurant closures, which vary by segment, impact the contribution of each segment to the consolidated operating margin.

*NON-GAAP OPERATING MARGIN PERCENT ROLL-FORWARD\**



*Refer to the Operating Income section on page 17 in this Form 10-K for details regarding operating margin percent for 2022.

EXHIBIT O(86)

AOE2222

**INTEREST EXPENSE**

Interest expense increased 2% (4% in constant currencies) and decreased 3% (4% in constant currencies) in 2022 and 2021, respectively. Results in 2022 reflected higher average interest rates.

**NONOPERATING (INCOME) EXPENSE, NET**

*Nonoperating (income) expense, net*

| In millions | 2022 | 2021 | 2020 |
|---|---|---|---|
| Interest income | $ (44) | $ (9) | $ (18) |
| Foreign currency and hedging activity | (134) | 37 | (3) |
| Other expense | 517 | 14 | (14) |
| Total | $ 339 | $ 42 | $ (35) |

In 2022, Interest income increased due to higher average interest rates.

Foreign currency and hedging activity includes net gains or losses on certain hedges that reduce the exposure to variability on certain intercompany foreign currency cash flow streams.

In 2022, Other (income) expense, net included $537 million of nonoperating expense related to the settlement of a tax audit in France.

**PROVISION FOR INCOME TAXES**

In 2022 and 2021, the reported effective income tax rates were 21.1% and 17.3%, respectively.

Results for 2022 reflected the tax impact of $537 million of nonoperating expense related to the settlement of a tax audit in France. During the year, the Company finalized and settled certain tax examinations and remeasured other income tax reserves based on audit progression.

Results for 2021 included $364 million of income tax benefits due to a change in the U.K. statutory income tax rate. Excluding the income tax benefits and the tax impact of net gains, the effective income tax rate for the year was 21.1%.

Consolidated deferred tax assets, net of valuation allowance, was $6.1 billion in 2022 and $6.6 billion in 2021. Substantially all of the net tax assets are expected to be realized in the U.S. and other profitable markets.

**RECENTLY ISSUED ACCOUNTING STANDARDS**

Recently issued accounting standards are included on page 41 of this Form 10-K.

# CASH FLOWS

The Company has a long history of generating significant cash from operations and has substantial credit capacity to fund operating and discretionary spending such as capital expenditures, debt repayments, dividends and share repurchases.

Cash provided by operations totaled $7.4 billion in 2022, a decrease of $1.7 billion or 19%. Free cash flow was $5.5 billion in 2022, a decrease of $1.6 billion or 23%. The Company's free cash flow conversion rate was 89% in 2022 and 94% in 2021. Cash provided by operations decreased in 2022 compared to 2021 primarily due to the settlement of a tax audit in France, changes in working capital, and the negative impact of foreign currency rates on operating results.

Cash used for investing activities totaled $2.7 billion in 2022, an increase of $512 million compared with 2021. The increase was primarily due to higher purchases of restaurant businesses, partly offset by proceeds from the sale of Dynamic Yield in 2022 and proceeds from the sale of McDonald's Japan stock in 2021.

Cash used for financing activities totaled $6.6 billion in 2022, an increase of $1.0 billion compared with 2021. The increase was primarily due to increased treasury stock purchases, partly offset by increased net debt issuances.

The Company's cash and equivalents balance was $2.6 billion and $4.7 billion at year end 2022 and 2021, respectively. In addition to cash and equivalents on hand and cash provided by operations, the Company can meet short-term funding needs through its continued access to commercial paper borrowings and line of credit agreements.

EXHIBIT O (86)

AOE2223

**RESTAURANT DEVELOPMENT AND CAPITAL EXPENDITURES**

In 2022, the Company opened 1,576 restaurants and closed 1,332 restaurants. In 2021, the Company opened 1,494 restaurants and closed 661 restaurants. The increase in closures in 2022 was primarily due to the closure of 855 restaurants as a result of the sale of the Company's business in Russia.

*Systemwide restaurants at year end*

|  | *2022* | *2021* | *2020* |
|---|---|---|---|
| U.S. | 13,444 | 13,438 | 13,682 |
| International Operated Markets | 10,103 | 10,785 | 10,560 |
| International Developmental Licensed Markets & Corporate | 16,728 | 15,808 | 14,956 |
| Total | 40,275 | 40,031 | 39,198 |

*RESTAURANTS BY OWNERSHIP TYPE*



Franchised restaurants   Company-operated restaurants

Approximately 95% of the restaurants at year-end 2022 were franchised, including 95% in the U.S., 89% in International Operated Markets and 98% in the International Developmental Licensed Markets.

Capital expenditures decreased $141 million or 7% in 2022 due to lower reinvestment in existing restaurants, primarily as a result of the sale of the Company's business in Russia and temporary restaurant closures in Ukraine.

EXHIBIT O(86)

AOE2224

*CAPITAL EXPENDITURES BY TYPE (In millions)*



\* *Primarily corporate equipment and other office-related expenditures.*

New restaurant investments in all years were concentrated in markets with strong returns and/or opportunities for long-term growth. Average development costs vary widely by market depending on the types of restaurants built and the real estate and construction costs within each market. These costs, which include land, buildings and equipment, are managed through the use of optimally-sized restaurants, construction and design efficiencies, as well as leveraging the Company's global sourcing network and best practices.

As of December 31, 2022 and 2021, the Company owned approximately 57% and 55%, respectively, of the land and 80% of the buildings for restaurants in its consolidated markets.

### SHARE REPURCHASES AND DIVIDENDS

In 2022, the Company returned approximately $8.1 billion to shareholders through a combination of dividends paid and shares repurchased.

*Shares repurchased and dividends*

| In millions, except per share data | 2022 | 2021 | 2020 |
|---|---|---|---|
| Number of shares repurchased | 15.8 | 3.4 | 4.3 |
| Shares outstanding at year end | 731 | 745 | 745 |
| Dividends declared per share | $ 5.66 | $ 5.25 | $ 5.04 |
| Treasury stock purchases *(in Shareholders' equity)* | $ 3,896 | $ 846 | $ 874 |
| Dividends paid | 4,168 | 3,919 | 3,753 |
| Total returned to shareholders | $ 8,064 | $ 4,765 | $ 4,627 |

In December 2019, the Company's Board of Directors approved a share repurchase program, effective January 1, 2020, that authorized the purchase of up to $15 billion of the Company's outstanding stock, with no specified expiration date. In 2022, approximately 15.8 million shares were repurchased for $3.9 billion, bringing total purchases under the program to approximately 23.5 million shares or $5.6 billion.

The Company has paid dividends on its common stock for 47 consecutive years and has increased the dividend amount every year. The 2022 full year dividend of $5.66 per share reflects the quarterly dividend paid for each of the first three quarters of $1.38 per share, with an increase to $1.52 per share paid in the fourth quarter. This 10% increase in the quarterly dividend equates to a $6.08 per share annual dividend and reflects the Company's confidence in the ongoing strength and reliability of its cash flow. As in the past, future dividend amounts will be considered after reviewing profitability expectations and financing needs, and will be declared at the discretion of the Company's Board of Directors.

EXHIBIT 20(86)
AOE2225

## FINANCIAL POSITION AND CAPITAL RESOURCES

### TOTAL ASSETS AND RETURN

Total assets decreased $3.4 billion or 6% in 2022, primarily due to a decrease in Cash and equivalents driven by lower cash from operations and increased treasury stock purchases, partly offset by increased net debt issuances. Net property and equipment decreased $0.9 billion in 2022, primarily due to the sale of the Company's business in Russia. Net property and equipment and the Lease right-of-use asset, net represented approximately 47% and approximately 25%, respectively, of total assets at year-end. Approximately 87% of total assets were in the U.S. and International Operated Markets at year-end 2022.

The Company's after-tax ROIC from continuing operations is a metric that management believes measures capital-allocation effectiveness over time and was 22.6%, 21.5% and 14.9% as of December 31, 2022, 2021 and 2020, respectively. The increase from 2020 to 2021 was primarily due to improved operating results and recovery from the impact of COVID-19 as well as lower average debt balances compared to the prior year. Refer to the reconciliation in Exhibit 99.1 to this Form 10-K.

### FINANCING AND MARKET RISK

The Company generally borrows on a long-term basis and is exposed to the impact of interest rate changes and foreign currency fluctuations. Debt obligations at December 31, 2022 totaled $35.9 billion, compared with $35.6 billion at December 31, 2021. The net increase in 2022 was due to net issuances of $1.2 billion, partly offset by the impact of changes in exchange rates on foreign currency denominated debt of $814 million.

*Debt highlights*[1]

|  | **2022** | *2021* | *2020* |
|---|---|---|---|
| Fixed-rate debt as a percent of total debt[2,3] | **96 %** | 95 % | 95 % |
| Weighted-average annual interest rate of total debt[3] | **3.5** | 3.2 | 3.2 |
| Foreign currency-denominated debt as a percent of total debt[2] | **36** | 36 | 36 |
| Total debt as a percent of total capitalization (total debt and total Shareholders' equity)[2] | **120** | 115 | 126 |
| Cash provided by operations as a percent of total debt[2] | **20** | 26 | 17 |

(1) *All percentages are as of December 31, except for the weighted-average annual interest rate, which is for the year. See reconciliation in Exhibit 99.1.*
(2) *Based on debt obligations before the effects of fair value hedging adjustments and deferred debt costs. These effects are excluded as they have no impact on the obligation at maturity. See the Debt Financing footnote on page 55 of this Form 10-K.*
(3) *Includes the effect of interest rate swaps used to hedge debt.*

Standard & Poor's and Moody's currently rate the Company's commercial paper A-2 and P-2, respectively, and its long-term debt BBB+ and Baa1, respectively. To access the debt capital markets, the Company relies on credit-rating agencies to assign short-term and long-term credit ratings.

Certain of the Company's debt obligations contain cross-acceleration provisions and restrictions on Company and subsidiary mortgages and the long-term debt of certain subsidiaries. There are no provisions in the Company's debt obligations that would accelerate repayment of debt as a result of a change in credit ratings or a material adverse change in the Company's business. In December 2022, the Company's Board of Directors authorized $15 billion of borrowing capacity with no specified expiration date, all of which remained outstanding as of December 31, 2022. These borrowings may include (i) public or private offering of debt securities; (ii) direct borrowing from banks or other financial institutions; and (iii) other forms of indebtedness. In addition to debt securities available through a medium-term notes program registered with the SEC and a Global Medium-Term Notes program, the Company is authorized to issue up to $5 billion of commercial paper, and has $3.5 billion available under a committed line of credit agreement (see the Debt Financing footnote on page 55 of this Form 10-K). As of December 31, 2022, the Company's subsidiaries also had $267 million of borrowings outstanding, primarily under uncommitted foreign currency line of credit agreements.

The Company uses major capital markets, bank financings and derivatives to meet its financing requirements. The Company manages its debt portfolio in response to changes in interest rates and foreign currency rates by periodically retiring, redeeming and repurchasing debt, terminating swaps and using derivatives. The Company does not hold or issue derivatives for trading purposes. All swaps are over-the-counter instruments.

In managing the impact of interest rate changes and foreign currency fluctuations, the Company uses interest rate swaps and finances in the currencies in which assets are denominated. The Company uses foreign currency debt and derivatives to hedge the foreign currency risk associated with certain royalties, intercompany financings and long-term investments in foreign subsidiaries and affiliates. This reduces the impact of fluctuating foreign currencies on cash flows and shareholders' equity. Total foreign currency-denominated debt was $13.0 billion and $12.8 billion for the years ended December 31, 2022 and 2021, respectively. In addition, where practical, the Company's restaurants purchase goods and services in local currencies resulting in natural hedges. See the Summary of significant accounting policies footnote related to financial instruments and hedging activities on page 45 of this Form 10-K for additional information regarding the accounting impact and use of derivatives.

The Company does not have significant exposure to any individual counterparty and has master agreements that contain netting arrangements. Certain of these agreements also require each party to post collateral if credit ratings fall below, or aggregate exposures exceed, certain contractual limits. At December 31, 2022, the Company was required to post $78 million of collateral due to the negative fair value of certain derivative positions. The Company's counterparties were not required to post collateral on any derivative position, other than on certain hedges of the Company's supplemental benefit plan liabilities where the counterparties were required to post collateral on their liability positions.

The Company's net asset exposure is diversified among a broad basket of currencies. The Company's largest net asset exposures (defined as foreign currency assets less foreign currency liabilities) at year end were as follows:

EXHIBIT O(86)

AOE2226

*Foreign currency net asset exposures*

| In millions of U.S. Dollars | 2022 | 2021 |
|---|---|---|
| British Pounds Sterling | $ 1,167 | $ 1,293 |
| Australian Dollars | 884 | 855 |
| Canadian Dollars | 575 | 904 |
| Polish Zloty | 444 | 427 |
| New Zealand Dollars | 275 | 267 |

The Company prepared sensitivity analyses of its financial instruments to determine the impact of hypothetical changes in interest rates and foreign currency exchange rates on the Company's results of operations, cash flows and the fair value of its financial instruments. The interest rate analysis assumed a one percentage point adverse change in interest rates on all financial instruments, but did not consider the effects of the reduced level of economic activity that could exist in such an environment. The foreign currency rate analysis assumed that each foreign currency rate would change by 10% in the same direction relative to the U.S. Dollar on all financial instruments; however, the analysis did not include the potential impact on revenues, local currency prices or the effect of fluctuating currencies on the Company's anticipated foreign currency royalties and other payments received from the markets. Based on the results of these analyses of the Company's financial instruments, neither a one percentage point adverse change in interest rates from 2022 levels nor a 10% adverse change in foreign currency rates from 2022 levels would materially affect the Company's results of operations, cash flows or the fair value of its financial instruments.

## LIQUIDITY AND USES OF CASH

The Company generates significant cash from operations and expects available cash and cash equivalents, future operating cash flows and its ability to issue debt to be sufficient to finance its foreseeable operating needs and other cash requirements.

Consistent with prior years, the Company expects existing domestic cash and equivalents, domestic cash flows from operations, the ability to issue domestic debt and repatriation of a portion of foreign earnings to continue to be sufficient to fund its domestic operating, investing and financing activities. The Company also continues to expect existing foreign cash and equivalents and foreign cash flows from operations to be sufficient to fund its foreign operating, investing and financing activities. In the future, should more capital be required to fund activities in the U.S. than is generated by domestic operations and is available through the issuance of domestic debt, the Company could elect to repatriate a greater portion of future periods' earnings from foreign jurisdictions.

The Company has significant operations outside the U.S. where it earns approximately 60% of its operating income. A significant portion of these historical earnings have been reinvested in foreign jurisdictions where the Company has made, and will continue to make, substantial investments to support the ongoing development and growth of its international operations.

### Sources of Liquidity

The Company has long-term revenue and cash flow streams that relate to its franchise arrangements. Minimum rent payments under franchise arrangements are based on the Company's underlying investment in owned sites and parallel the Company's underlying lease obligations and escalations on properties that are leased. The Company believes that control over the real estate enables it to achieve restaurant performance levels that are among the highest in the industry. Refer to the Franchise Arrangements footnote on page 49 of this Form 10-K for additional information on future gross minimum payments due to the Company under existing conventional franchise arrangements.

Additionally, the Company is authorized to utilize up to $15 billion of borrowing capacity in various forms by the Board of Directors, all of which remained outstanding as of December 31, 2022. The Company is also authorized to issue up to $5 billion of commercial paper, and has $3.5 billion available under a committed line of credit agreement. Refer to the Financing and Market Risk section on page 22 of this Form 10-K.

### Material Cash Requirements and Uses of Cash

Material cash requirements primarily consist of lease obligations (related to both Company-operated and franchised restaurants) and debt obligations. Refer to the Leasing Arrangements footnote on page 50 and the Debt Financing footnote on page 55 of this Form 10-K for more information.

The Company also records liabilities related to supplemental benefit plans maintained in the U.S. as well as liabilities for gross unrecognized tax benefits on certain tax positions. Details related to these obligations are provided in the Employee Benefit Plan footnote on page 54 and the Income Taxes footnote on page 52 of this Form 10-K.

The Company contracts with vendors and suppliers in the normal course of business. These contracts may include items related to construction projects, inventory, energy, marketing, technology and other services. Generally, these items are shorter term in nature and have no minimum payment requirements. These expenses, along with other standard operating expenses incurred, are funded from operating cash flows and reflected in other areas of this Form 10-K (e.g., franchised margins, Company-operated margins and selling, general & administrative expenses that are reflected in the Consolidated Statement of Income and capital expenditures that are reflected on the Consolidated Statement of Cash Flows).

Additionally, the Company has guaranteed certain loans totaling approximately $197 million at December 31, 2022. These guarantees are contingent commitments generally issued by the Company to support borrowing arrangements of the System. At December 31, 2022, there was no carrying value for obligations under these guarantees in the Consolidated Balance Sheet.

EXHIBIT O (86)
AOE2227

## OTHER MATTERS

### CRITICAL ACCOUNTING POLICIES AND ESTIMATES

Management's Discussion and Analysis of Financial Condition and Results of Operations is based upon the Company's consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the U.S. The preparation of these financial statements requires the Company to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues and expenses as well as related disclosures. On an ongoing basis, the Company evaluates its estimates and judgments based on historical experience and various other factors that are believed to be reasonable under the circumstances. Actual results may differ from these estimates.

The Company reviews its financial reporting and disclosure practices and accounting policies quarterly to confirm that they provide accurate and transparent information relative to the current economic and business environment. The Company believes that of its significant accounting policies, the following involve a higher degree of judgment and/or complexity:

- *Property and equipment*

Property and equipment are depreciated or amortized on a straight-line basis over their useful lives based on management's estimates of the period over which the assets will generate revenue (not to exceed lease term plus options for leased property). The useful lives are estimated based on historical experience with similar assets, taking into account anticipated technological or other changes. Refer to the Property and Equipment section in the Summary of Significant Accounting Policies footnote on page 42 of this Form 10-K and the Property and Equipment footnote on page 49 of this Form 10-K for additional information.

- *Leasing Arrangements*

The Lease right-of-use asset and Lease liability include an assumption on renewal options that have not yet been exercised by the Company. The Company also uses an incremental borrowing rate in calculating the Lease liability that represents an estimate of the interest rate the Company would incur to borrow on a collateralized basis over the term of a lease within a particular currency environment. Refer to the Leasing section in the Summary of Significant Accounting Policies footnote on page 42 of this Form 10-K and the Leasing Arrangements footnote on page 50 of this Form 10-K for additional information.

- *Long-lived assets impairment review*

Long-lived assets (including goodwill) are reviewed for impairment annually. If qualitative indicators of impairment are present, such as changes in global and local business and economic conditions, operating costs, inflation, competition, and consumer and demographic trends, the Company will use these and other factors in estimating future cash flows when testing for the recoverability of its long-lived assets. Estimates of future cash flows are highly subjective judgements based on the Company's experience and knowledge of its operations. A key assumption impacting estimated future cash flows is the estimated change in comparable sales. If the Company's estimates or underlying assumptions change in the future, it may be required to record impairment charges. Refer to the Long-lived Assets and Goodwill sections in the Summary of Significant Accounting Policies footnote on page 43 of this Form 10-K for additional information.

- *Litigation accruals*

In the ordinary course of business, the Company is subject to proceedings, lawsuits and other claims primarily related to competitors, customers, employees, franchisees, government agencies, intellectual property, shareholders and suppliers. The Company is required to assess the likelihood of any adverse judgments or outcomes to these matters as well as potential ranges of probable losses. Refer to the Contingencies footnote on page 51 of this Form 10-K for additional information.

- *Income taxes*

The Company records a valuation allowance to reduce its deferred tax assets if it is considered more likely than not that some portion or all of the deferred tax assets will not be realized.

The Company operates within, and is subject to audit in, multiple taxing jurisdictions. The Company records accruals for the estimated outcomes of these audits, and the accruals may change in the future due to new developments in each matter.

Refer to the Income Taxes section in the Summary of Significant Accounting Policies footnote on page 44 of this Form 10-K and the Income Taxes footnote on page 52 of this Form 10-K for additional information.

### EFFECTS OF CHANGING PRICES — INFLATION

Broader inflationary pressures in the economy are expected to continue to impact the restaurant industry through supply chain, labor and energy cost challenges. The Company has demonstrated an ability to manage these inflationary cost increases effectively through its rapid inventory turnover, ability to adjust menu prices, cost controls and substantial property holdings, many of which are at fixed costs.

EXHIBIT O(86)

AOE2228

Other Key Information

## STOCK PERFORMANCE GRAPH

At least annually, McDonald's considers which companies comprise a readily identifiable investment peer group. The Company is included in published restaurant indices; however, unlike most other companies included in these indices, which have no or limited international operations, McDonald's does business in more than 100 countries and a substantial portion of its revenues and income is generated outside the U.S. In addition, because of its size, McDonald's inclusion in those indices tends to skew the results. Therefore, the Company believes that such a comparison is not meaningful.

The Company's market capitalization, trading volume and importance in an industry that is vital to the U.S. economy have resulted in McDonald's inclusion in the Dow Jones Industrial Average ("DJIA") since 1985. Like McDonald's, many DJIA companies generate meaningful revenues and income outside the U.S. and some manage global brands. Thus, the Company believes that the use of the DJIA companies as the group for comparison purposes is appropriate.

The following performance graph shows McDonald's cumulative total shareholder returns (i.e., price appreciation and reinvestment of dividends) relative to the Standard & Poor's 500 Stock Index ("S&P 500 Index") and to the DJIA companies for the five-year period ended December 31, 2022. The graph assumes that the value of an investment in McDonald's common stock, the S&P 500 Index and the DJIA companies (including McDonald's) was $100 at December 31, 2017. For the DJIA companies, returns are weighted for market capitalization as of the beginning of each period indicated. These returns may vary from those of the DJIA Index, which is not weighted by market capitalization and may be composed of different companies during the period under consideration.



**Comparison of Cumulative Five-Year Total Return**

| Company/Index | 12/31/2017 | 12/31/2018 | 12/31/2019 | 12/31/2020 | 12/31/2021 | 12/31/2022 |
|---|---|---|---|---|---|---|
| McDonald's Corporation | $100 | $106 | $121 | $134 | $171 | $172 |
| S&P 500 Index | $100 | $96 | $126 | $149 | $192 | $157 |
| Dow Jones Industrials | $100 | $97 | $121 | $133 | $161 | $150 |

Source: S&P Capital IQ

## MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

### MARKET INFORMATION AND DIVIDEND POLICY

The Company's common stock trades under the symbol MCD and is listed on the New York Stock Exchange in the U.S.

The number of shareholders of record and beneficial owners of the Company's common stock as of January 31, 2023 was estimated to be 4,300,000.

Given the Company's returns on its capital investments and significant cash provided by operations, management believes it is prudent to reinvest in the business to drive profitable growth and use excess cash flow to return cash to shareholders over time through dividends and share repurchases. The Company has paid dividends on common stock for 47 consecutive years through 2022 and has increased the dividend amount at least once every year. As in the past, future dividend amounts will be considered after reviewing profitability expectations and financing needs, and will be declared at the discretion of the Company's Board of Directors.

### ISSUER PURCHASES OF EQUITY SECURITIES

The following table presents information related to repurchases of common stock the Company made during the quarter ended December 31, 2022*:

| Period | Total Number of Shares Purchased | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs[1] | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plans or Programs[1] |
|---|---|---|---|---|
| October  1-31, 2022 | 1,685,076 | 241.61 | 1,685,076 | $ 9,386,452,589 |
| November 1-30, 2022 | 6,873 | 270.40 | 6,873 | 9,384,594,115 |
| December 1-31, 2022 | 747 | 250.52 | 747 | 9,384,406,977 |
| Total | 1,692,696 | 241.74 | 1,692,696 | |

\*   Subject to applicable law, the Company may repurchase shares directly in the open market, in privately negotiated transactions, or pursuant to derivative instruments and plans complying with Rule 10b5-1, among other types of transactions and arrangements.

(1)   On December 31, 2019, the Company's Board of Directors approved a share repurchase program, effective January 1, 2020, that authorized the purchase of up to $15 billion of the Company's outstanding common stock.

EXHIBIT O(86)

AOE2230

## RISK FACTORS

Our business results are subject to a variety of risks, including those that are described below and elsewhere in our filings with the Securities and Exchange Commission. The risks described below are not the only risks we face. Additional risks not currently known to us or that we currently deem to be immaterial may also significantly adversely affect our business. If any of these risks were to materialize or intensify, our expectations (or the underlying assumptions) may change and our performance may be adversely affected.

### STRATEGY AND BRAND

**If we do not successfully evolve and execute against our business strategies, we may not be able to drive business growth.**

To drive Systemwide sales, operating income and free cash flow growth, our business strategies must be effective in maintaining and strengthening customer appeal and capturing additional market share. Whether these strategies are successful depends mainly on our System's continued ability to:

- capitalize on our global scale, iconic brand and local market presence to build upon our historic strengths and competitive advantages, including by maximizing our marketing, committing to our core menu items, and doubling down on digital, delivery, drive thru and restaurant development;
- innovate and differentiate the McDonald's experience, including by preparing and serving our food in a way that balances value and convenience to our customers with profitability;
- build upon our investments to transform and enhance the customer experience;
- run great restaurants by driving efficiencies and expanding capacities while continuing to prioritize health and safety;
- accelerate our existing strategies, including through growth opportunities ; and
- evolve and adjust our strategies in response to, among other things, changing consumer behavior, and other events impacting our results of operations and liquidity.

If we are delayed or unsuccessful in evolving or executing against our strategies, or if our strategies do not yield the desired results, our business, financial condition and results of operations may suffer.

**Failure to preserve the value and relevance of our brand could have an adverse impact on our financial results.**

To continue to be successful in the future, we believe we must preserve, enhance and leverage the value and relevance of our brand, including our corporate purpose, mission and values. Brand value is based in part on consumer perceptions, which are affected by a variety of factors, including the nutritional content and preparation of our food, the ingredients we use, the manner in which we source commodities and general business practices across the System, including the people practices at McDonald's restaurants. Consumer acceptance of our offerings is subject to change for a variety of reasons, and some changes can occur rapidly. For example, nutritional, health, environmental and other scientific studies and conclusions, which continuously evolve and may have contradictory implications, drive popular opinion, litigation and regulation (including initiatives intended to drive consumer behavior) in ways that affect the "informal eating out" ("IEO") segment or perceptions of our brand, generally or relative to available alternatives. Our business could also be impacted by business incidents or practices, whether actual or perceived, particularly if they receive considerable publicity or result in litigation, as well as by our position or perceived lack of position on environmental, social responsibility, public policy, geopolitical and similar matters. Consumer perceptions may also be affected by adverse commentary from third parties, including through social media or conventional media outlets, regarding the quick-service category of the IEO segment or our brand, culture, operations, suppliers or franchisees. If we are unsuccessful in addressing adverse commentary or perceptions, whether or not accurate, our brand and financial results may suffer.

**If we do not anticipate and address industry trends and evolving consumer preferences and effectively execute our pricing, promotional and marketing plans, our business could suffer.**

Our continued success depends on our System's ability to build upon our historic strengths and competitive advantages. In order to do so, we need to anticipate and respond effectively to continuously shifting consumer demographics and industry trends in food sourcing, food preparation, food offerings, and consumer behavior and preferences, including with respect to the use of digital channels and environmental and social responsibility matters. If we are not able to predict, or quickly and effectively respond to, these changes, or if our competitors are able to do so more effectively, our financial results could be adversely impacted.

Our ability to build upon our strengths and advantages also depends on the impact of pricing, promotional and marketing plans across the System, and the ability to adjust these plans to respond quickly and effectively to evolving customer behavior and preferences, as well as shifting economic and competitive conditions. Existing or future pricing strategies and marketing plans, as well as the value proposition they represent, are expected to continue to be important components of our business strategy. However, they may not be successful, or may not be as successful as the efforts of our competitors, which could negatively impact sales, guest counts and market share.

Additionally, we operate in a complex and costly advertising environment. Our marketing and advertising programs may not be successful in reaching consumers in the way we intend. Our success depends in part on whether the allocation of our advertising and marketing resources across different channels, including digital, allows us to reach consumers effectively, efficiently and in ways that are meaningful to them. If our advertising and marketing programs are not successful, or are not as successful as those of our competitors, our sales, guest counts and market share could  decrease.

EXHIBIT O (86)

AOE2231

**Our investments to enhance the customer experience, including through technology, may not generate the expected results.**

Our long-term business objectives depend on the successful Systemwide execution of our strategies. We continue to build upon our investments in restaurant development, technology, digital engagement and delivery in order to transform and enhance the customer experience. As part of these investments, we are continuing to place emphasis on improving our service model and strengthening relationships with customers, in part through digital channels and loyalty initiatives, mobile ordering and payment systems, and enhancing our drive thru technologies, which efforts may not generate expected results. We also continue to expand and refine our delivery initiatives, including through integrating delivery and mobile ordering. Utilizing a third-party delivery service may not have the same level of profitability as a non-delivery transaction, and may introduce additional food quality, food safety and customer satisfaction risks. If these customer experience initiatives are not successfully executed, or if we do not fully realize the intended benefits of these significant investments, our business results may suffer.

**We face intense competition in our markets, which could hurt our business.**

We compete primarily in the IEO segment, which is highly competitive. We also face sustained, intense competition from traditional, fast casual and other competitors, which may include many non-traditional market participants such as convenience stores, grocery stores, coffee shops and online retailers. We expect our environment to continue to be highly competitive, and our results in any particular reporting period may be impacted by a contracting IEO segment or by new or continuing actions, product offerings or consolidation of our competitors and third-party partners, which may have a short- or long-term impact on our results.

We compete primarily on the basis of product choice, quality, affordability, service and location. In particular, we believe our ability to compete successfully in the current market environment depends on our ability to improve existing products, successfully develop and introduce new products, price our products appropriately, deliver a relevant customer experience, manage the complexity of our restaurant operations, manage our investments in technology, restaurant modernization, digital engagement and delivery, and respond effectively to our competitors' actions or offerings or to unforeseen disruptive actions. There can be no assurance these strategies will be effective, and some strategies may be effective at improving some metrics while adversely affecting others, which could have the overall effect of harming our business.

**We may not be able to adequately protect our intellectual property or adequately ensure that we are not infringing the intellectual property of others, which could harm the value of the McDonald's brand and our business.**

Our success depends on our continued ability to use our existing trademarks and service marks in order to increase brand awareness and further develop our branded products in both domestic and international markets. We rely on a combination of trademarks, copyrights, service marks, trade secrets, patents and other intellectual property rights to protect our brand and branded products.

We have registered certain trademarks and have other trademark registrations pending in the U.S. and certain foreign jurisdictions. The trademarks that we currently use have not been, and may never be, registered in all of the countries outside of the U.S. in which we do business or may do business in the future. It may be costly and time consuming to protect our intellectual property, and the steps we have taken to do so in the U.S. and foreign countries may not be adequate. In addition, the steps we have taken may not adequately ensure that we do not infringe the intellectual property of others, and third parties may claim infringement by us in the future. In particular, we may be involved in intellectual property claims, including often aggressive or opportunistic attempts to enforce patents used in information technology systems, which might affect our operations and results. Any claim of infringement, whether or not it has merit, could be time consuming, result in costly litigation and harm our business.

In addition, we cannot ensure that franchisees and other third parties who hold licenses to our intellectual property will not take actions that adversely affect the value of our intellectual property.

**OPERATIONS**

**The global scope of our business subjects us to risks that could negatively affect our business.**

We encounter differing cultural, regulatory, geopolitical and economic environments within and among the more than 100 countries where McDonald's restaurants operate, and our ability to achieve our business objectives depends on the System's success in these environments. Meeting customer expectations is complicated by the risks inherent in our global operating environment, and our global success is partially dependent on our System's ability to leverage operating successes across markets and brand perceptions. Planned initiatives may not have appeal across multiple markets with McDonald's customers and could drive unanticipated changes in customer perceptions and market share.

Disruptions in operations or price volatility in a market can also result from governmental actions, such as price, foreign exchange or trade-related tariffs or controls, trade policies and regulations, sanctions and counter sanctions, government-mandated closure of our, our franchisees' or our suppliers' operations, and asset seizures. Such disruptions or volatility can also result from acts of war, terrorism or other hostilities. For example, the war between Russia and Ukraine has resulted in volatile and unpredictable conditions throughout the region, exacerbated volatile macroeconomic conditions and increased pressure on our supply chain and the availability and costs of commodities, including energy, which we expect to continue to impact our financial results. The broader impacts of the war and related sanctions, including on macroeconomic conditions, geopolitical tensions, consumer demand and the ability of us and our franchisees to operate in certain geographic areas, may also continue to have an adverse impact on our business and financial results.

While we may face challenges and uncertainties in any of the markets in which we operate, such challenges and uncertainties are often heightened in developing markets, which may entail a relatively higher risk of political instability, economic volatility, crime, corruption and social and ethnic unrest. In many cases, such challenges may be exacerbated by the lack of an independent and experienced judiciary and uncertainty in how local law is applied and enforced, including in areas most relevant to commercial transactions and foreign investment. An inability to manage effectively the risks associated with our international operations could adversely affect our business and financial results.

EXHIBIT O(86)

AOE2232

**Supply chain interruptions may increase costs or reduce revenues.**

We depend on the effectiveness of our supply chain management to assure a reliable and sufficient supply of quality products on favorable terms. Although many of the products we sell are sourced from a wide variety of suppliers in countries around the world, certain products have limited suppliers, which may increase our reliance on those suppliers. Supply chain interruptions and related price increases have in the past and may in the future adversely affect us as well as our suppliers and franchisees, whose performance may have a significant impact on our results. Such interruptions and price increases could be caused by shortages, inflationary pressures, unexpected increases in demand, transportation-related issues, labor-related issues, technology-related issues, weather-related events, natural disasters, acts of war, terrorism or other hostilities, or other factors beyond the control of us or our suppliers or franchisees. Interruptions in our System's supply chain or ineffective contingency planning can increase our costs and/or limit the availability of products critical to our System's operations.

**Our franchise business model presents a number of risks.**

Our success as a heavily franchised business relies to a large degree on the financial success and cooperation of our franchisees, including our developmental licensees and affiliates. Our restaurant margins arise from two sources: fees from franchised restaurants (e.g., rent and royalties based on a percentage of sales) and, to a lesser degree, sales from Company-operated restaurants. Our franchisees and developmental licensees manage their businesses independently and therefore are responsible for the day-to-day operation of their restaurants. The revenues we realize from franchised restaurants are largely dependent on the ability of our franchisees to grow their sales. Business risks affecting our operations also affect our franchisees.  If franchisee sales trends worsen, or any of such risks materialize or intensify, our financial results could be negatively affected, which may be material.

Our success also relies on the willingness and ability of our independent franchisees and affiliates to implement major initiatives, which may include financial investment, and to remain aligned with us on operating, value/promotional and capital-intensive reinvestment plans. The ability of franchisees to contribute to the achievement of our plans is dependent in large part on the availability to them of funding at reasonable interest rates and may be negatively impacted by the financial markets in general, by their or our creditworthiness or by banks' lending practices. If our franchisees are unwilling or unable to invest in major initiatives or are unable to obtain financing at commercially reasonable rates, or at all, our future growth and results of operations could be adversely affected.

Our operating performance could also be negatively affected if our franchisees experience food safety or other operational problems or project an image inconsistent with our brand and values, particularly if our contractual and other rights and remedies are limited, costly to exercise or subjected to litigation and potential delays. If franchisees do not successfully operate restaurants in a manner consistent with our required standards, our brand's image and reputation could be harmed, which in turn could hurt our business and operating results.

Our ownership mix also affects our results and financial condition. The decision to own restaurants or to operate under franchise or license agreements is driven by many factors whose interrelationship is complex. The benefits of our more heavily franchised structure depend on various factors, including whether we have effectively selected franchisees, licensees and/or affiliates that meet our rigorous standards, whether we are able to successfully integrate them into our structure and whether their performance and the resulting ownership mix supports our brand and financial objectives.

**Challenges with respect to labor, including availability and cost, could impact our business and results of operations.**

Our success depends in part on our System's ability to effectively attract, recruit, develop, motivate and retain qualified individuals to work in McDonald's restaurants and to maintain appropriately-staffed restaurants in an intensely competitive labor market. We and our franchisees have experienced and may continue to experience challenges in adequately staffing certain McDonald's restaurants, which can negatively impact operations, including speed of service to customers, and customer satisfaction levels. The System's ability to meet its labor needs is generally subject to external factors, including the availability of sufficient workforce, unemployment levels and prevailing wages in the markets in which we operate.

Further, our System has experienced increased costs and competition associated with attracting, recruiting, developing, motivating and retaining qualified employees, as well as with promoting awareness of the opportunities of working at McDonald's restaurants.  We and our franchisees also continue to be impacted by increasingly complex U.S. and international laws and regulations affecting our respective workforces.  These laws and regulations are increasingly focused on, and in certain cases impose requirements with respect to, employment matters such as wages and hours, healthcare, immigration, retirement and other employee benefits and workplace practices. Such laws and regulations can expose us and our franchisees to increased costs and other effects of compliance, including potential liability, and all such labor and compliance costs could have a negative impact on our Company-operated margins and franchisee profitability.

Our potential exposure to reputational and other harm regarding our workplace practices or conditions or those of our independent franchisees or suppliers, including those giving rise to claims of harassment or discrimination (or perceptions thereof) or workplace safety, could have a negative impact on consumer perceptions of us and our business. Additionally, economic action, such as boycotts, protests, work stoppages or campaigns by labor organizations, could adversely affect us (including our ability to attract, recruit, develop, motivate and retain talent) or our franchisees and suppliers, whose performance may have a significant impact on our results.

**Effective succession planning is important to our continued success.**

Effective succession planning for management is important to our long-term success. Failure to effectively attract, recruit, develop, motivate and retain qualified key personnel, or to execute smooth personnel transitions, could disrupt our business and adversely affect our results.

**Food safety concerns may have an adverse effect on our business.**

Our ability to increase sales and profits depends on our System's ability to meet expectations for safe food and on our ability to manage the potential impact on McDonald's of food-borne illnesses and food or product safety issues that may arise in the future, including in the supply chain, restaurants or delivery. Food safety is a top priority, and we dedicate substantial resources aimed at ensuring that our customers enjoy safe food products, including as our menu and service model evolve. However, food safety events, including instances of food-borne illness, occur within the food industry and our System from time to time and could occur in the future. Instances of food

EXHIBIT O (86)

AOE2233

tampering, food contamination or food-borne illness, whether actual or perceived, could adversely affect our brand, reputation and financial results.

**If we do not effectively manage our real estate portfolio, our operating results may be negatively impacted.**

We have significant real estate operations, primarily in connection with our restaurant business. We generally own or secure a long-term lease on the land and building for conventional franchised and Company-operated restaurant sites. We seek to identify and develop restaurant locations that offer convenience to customers and long-term sales and profit potential. As we generally secure long-term real estate interests for our restaurants, we have limited flexibility to quickly alter our real estate portfolio. The competitive business landscape continues to evolve in light of changing business trends, consumer preferences, trade area demographics, consumer use of digital, delivery and drive thru, local competitive positions and other economic factors. If our restaurants are not located in desirable locations, or if we do not evolve in response to these factors, it could adversely affect Systemwide sales and profitability.

Our real estate values and the costs associated with our real estate operations are also impacted by a variety of other factors, including governmental regulations, insurance, zoning, tax and eminent domain laws, interest rate levels, the cost of financing, natural disasters, acts of war, terrorism or other hostilities, or other factors beyond our control. A significant change in real estate values, or an increase in costs as a result of any of these factors, could adversely affect our operating results.

**Information technology system failures or interruptions, or breaches of network security, may impact our operations or cause reputational harm.**

We are increasingly reliant upon technology systems, such as point-of-sale, that support our business operations, including our digital and delivery solutions, and technologies that facilitate communication and collaboration with affiliated entities, customers, employees, franchisees, suppliers, service providers or other independent third parties to conduct our business, whether developed and maintained by us or provided by third parties. Any failure or interruption of these systems could significantly impact our or our franchisees' operations, or our customers' experiences and perceptions.

Security incidents or breaches have from time to time occurred and may in the future occur involving our systems, the systems of the parties with whom we communicate or collaborate (including franchisees) or the systems of third-party providers. These may include such things as unauthorized access, phishing attacks, account takeovers, denial of service, computer viruses, introduction of malware or ransomware and other disruptive problems caused by hackers. Certain of these technology systems contain personal, financial and other information of our customers, employees, franchisees and their employees, suppliers and other third parties, as well as financial, proprietary and other confidential information related to our business. Despite response procedures and measures in place in the event of an incident, a security breach could result in disruptions, shutdowns, or the theft or unauthorized disclosure of such information. The actual or alleged occurrence of any of these incidents could result in mitigation costs, reputational damage, adverse publicity, loss of consumer confidence, reduced sales and profits, complications in executing our growth initiatives and regulatory and legal risk, including criminal penalties or civil liabilities.

Despite the implementation of business continuity measures, any of these technology systems could become vulnerable to damage, disability or failures due to fire, power loss, telecommunications failure or other catastrophic events. Certain technology systems may also become vulnerable, unreliable or inefficient in cases where technology vendors limit or terminate product support and maintenance. Our increasing reliance on third-party systems also subjects us to risks faced by those third-party businesses, including operational, security and credit risks. If technology systems were to fail or otherwise be unavailable, or if business continuity or disaster recovery plans were not effective, and we were unable to recover in a timely manner, we could experience an interruption in our or our franchisees' operations.

## LEGAL AND REGULATORY

**Increasing regulatory and legal complexity may adversely affect our business and financial results.**

Our regulatory and legal environment worldwide exposes us to complex compliance, litigation and similar risks that could affect our operations and results in material ways. Many of our markets are subject to increasing, conflicting and highly prescriptive regulations involving, among other matters, restaurant operations, product packaging, marketing, the nutritional and allergen content and safety of our food and other products, labeling and other disclosure practices. Compliance efforts with those regulations may be affected by ordinary variations in food preparation among our own restaurants and the need to rely on the accuracy and completeness of information from third-party suppliers. We also are subject to increasing public focus, including by governmental and non-governmental organizations, on environmental, social responsibility and corporate governance ("ESG") matters. Our success depends in part on our ability to manage the impact of regulations and other initiatives that can affect our business plans and operations, which have increased and may continue to increase our costs of doing business and exposure to litigation, governmental investigations or other proceedings.

We are also subject to legal proceedings that may adversely affect our business, including, but not limited to, class actions, administrative proceedings, government investigations and proceedings, shareholder proceedings, employment and personal injury claims, landlord/tenant disputes, supplier-related disputes, and claims by current or former franchisees. Regardless of whether claims against us are valid or whether we are found to be liable, claims may be expensive to defend and may divert management's attention away from operations.

Litigation and regulatory action concerning our relationship with franchisees and the legal distinction between our franchisees and us for employment law or other purposes, if determined adversely, could increase costs, negatively impact our business operations and the business prospects of our franchisees and subject us to incremental liability for their actions. Similarly, although our commercial relationships with our suppliers remain independent, there may be attempts to challenge that independence, which, if determined adversely, could also increase costs, negatively impact the business prospects of our suppliers, and subject us to incremental liability for their actions.

Our results could also be affected by the following:

- the relative level of our defense costs, which vary from period to period depending on the number, nature and procedural status of pending proceedings;

EXHIBIT O(86)

AOE2234

- the cost and other effects of settlements, judgments or consent decrees, which may require us to make disclosures or take other actions that may affect perceptions of our brand and products; and

- adverse results of pending or future litigation, including litigation challenging the composition and preparation of our products, or the appropriateness or accuracy of our marketing or other communication practices.

A judgment significantly in excess of any applicable insurance coverage or third-party indemnity could materially adversely affect our financial condition or results of operations. Further, adverse publicity resulting from claims may hurt our business. If we are unable to effectively manage the risks associated with our complex regulatory and legal environment, it could have a material adverse effect on our business and financial condition.

**Changes in tax laws and unanticipated tax liabilities could adversely affect the taxes we pay and our profitability.**

We are subject to income and other taxes in the U.S. and foreign jurisdictions, and our operations, plans and results are affected by tax and other initiatives around the world. In particular, we are affected by the impact of changes to tax laws or policy or related authoritative interpretations. We are also impacted by settlements of pending or any future adjustments proposed by taxing and governmental authorities inside and outside of the U.S. in connection with our tax audits, all of which will depend on their timing, nature and scope. Any significant increases in income tax rates, changes in income tax laws or unfavorable resolution of tax matters could have a material adverse impact on our financial results.

**Changes in accounting standards or the recognition of impairment or other charges may adversely affect our future operations and results.**

New accounting standards or changes in financial reporting requirements, accounting principles or practices, including with respect to our critical accounting estimates, could adversely affect our future results. We may also be affected by the nature and timing of decisions about underperforming markets or assets, including decisions that result in impairment or other charges that reduce our earnings.

In assessing the recoverability of our long-lived assets, we consider changes in economic conditions and make assumptions regarding estimated future cash flows and other factors. These estimates are highly subjective and can be significantly impacted by many factors such as global and local business and economic conditions, operating costs, inflation, interest rate levels, competition, consumer and demographic trends and our restructuring activities. If our estimates or underlying assumptions change in the future, we may be required to record impairment charges. Any such changes could have a significant adverse effect on our reported results for the affected periods.

**If we fail to comply with privacy and data protection laws, we could be subject to legal proceedings and penalties, which could negatively affect our financial results or brand perceptions.**

We are subject to legal and compliance risks and associated liability related to privacy and data protection requirements, including those associated with our technology-related services and platforms made available to business partners, customers, employees, franchisees or other third parties. An increasing number of jurisdictions have enacted new privacy and data protection requirements (including the European Union's General Data Protection Regulation and various U.S. state-level laws), and further requirements are likely to be proposed or enacted in the future. Failure to comply with these privacy and data protection laws could result in legal proceedings and substantial penalties and materially adversely impact our financial results or brand perceptions.

**MACROECONOMIC AND MARKET CONDITIONS**

**Unfavorable general economic conditions could adversely affect our business and financial results.**

Our results of operations are substantially affected by economic conditions, including inflationary pressures, which can vary significantly by market and can impact consumer disposable income levels and spending habits. Economic conditions can also be impacted by a variety of factors, including hostilities, epidemics, pandemics and actions taken by governments to manage national and international economic matters, whether through austerity, stimulus measures or trade measures, and initiatives intended to control wages, unemployment, credit availability, inflation, taxation and other economic drivers. Sustained adverse economic conditions or periodic adverse changes in economic conditions put pressure on our operating performance and business continuity disruption planning, and our business and financial results may suffer as a result.

Our results of operations are also affected by fluctuations in currency exchange rates, and unfavorable currency fluctuations could adversely affect reported earnings.

**Health epidemics or pandemics could adversely affect our business and financial results.**

Health epidemics or pandemics – such as the global outbreak of COVID-19 in early 2020 – have in the past and may in the future impact macroeconomic conditions, consumer behavior, labor availability and supply chain management, as well as local operations in impacted markets, all of which can adversely affect our business, financial results and outlook. Governmental responses to health epidemics or pandemics, including operational restrictions, can also affect the foregoing items and adversely affect our business and financial results. The duration and scope of a health epidemic or pandemic can be difficult to predict and depends on many factors, including the emergence of new variants and the availability, acceptance and effectiveness of preventative measures. A health epidemic or pandemic may also heighten other risks disclosed in these Risk Factors, including, but not limited to, those related to the availability and costs of labor and commodities, supply chain interruptions, consumer behavior, and consumer perceptions of our brand and industry.

**Changes in commodity and other operating costs could adversely affect our results of operations.**

The profitability of our Company-operated restaurants depends in part on our ability to anticipate and react to changes in commodity costs, including food, paper, supplies, fuel, utilities, distribution and other operating costs, including labor. Volatility in certain commodity prices and fluctuations in labor costs have adversely affected and in the future could adversely affect our operating results by impacting restaurant profitability. The commodity markets for some of the ingredients we use, such as beef, chicken and pork, are particularly volatile due to factors such as seasonal shifts, climate conditions, industry demand and other macroeconomic conditions, international commodity markets, food safety concerns, product recalls, government regulation, and acts of war, terrorism or other hostilities, all of which are beyond our control and, in many instances, unpredictable. Our System can only partially address future price risk through hedging and other activities, and therefore increases in commodity costs could have an adverse impact on our profitability.

EXHIBIT O (86)

AOE2235

**A decrease in our credit ratings or an increase in our funding costs could adversely affect our profitability.**

Our credit ratings may be negatively affected by our results of operations or changes in our debt levels. As a result, our interest expense, the availability of acceptable counterparties, our ability to obtain funding on favorable terms, our collateral requirements and our operating or financial flexibility could all be negatively affected, especially if lenders were to impose new operating or financial covenants.

Our operations may also be impacted by regulations affecting capital flows, financial markets or financial institutions, which can limit our ability to manage and deploy our liquidity or increase our funding costs. Any such events could have a material adverse effect on our business and financial condition.

**The trading volatility and price of our common stock may be adversely affected by many factors.**

Many factors affect the trading volatility and price of our common stock in addition to our operating results and prospects. These factors, many of which are beyond our control, include the following:

- the unpredictable nature of global economic and market conditions;

- governmental action or inaction in light of key indicators of economic activity or events that can significantly influence financial markets, particularly in the U.S., which is the principal trading market for our common stock, and media reports and commentary about economic, trade or other matters, even when the matter in question does not directly relate to our business;

- trading activity in our common stock, in derivative instruments with respect to our common stock or in our debt securities, which can be affected by: market commentary (including commentary that may be unreliable or incomplete); unauthorized disclosures about our performance, plans or expectations about our business; our actual performance and creditworthiness; investor confidence, driven in part by expectations about our performance; actions by shareholders and others seeking to influence our business strategies; portfolio transactions in our common stock by significant shareholders; and trading activity that results from the ordinary course rebalancing of stock indices in which McDonald's may be included, such as the S&P 500 Index and the Dow Jones Industrial Average;

- the impact of our stock repurchase program or dividend rate; and

- the impact of corporate actions, including changes to our corporate structure, and market and third-party perceptions and assessments of such actions, including those we may take from time to time as we implement our business strategies in light of changing business, legal and tax considerations

**Our business is subject to an increasing focus on ESG matters.**

In recent years, there has been an increasing focus by stakeholders – including employees, franchisees, customers, suppliers, governmental and non-governmental organizations and investors – on ESG matters. A failure, whether real or perceived, to address ESG matters or to achieve progress on our ESG initiatives on the anticipated timing or at all, could adversely affect our business, including by heightening other risks disclosed in these Risk Factors, such as those related to consumer behavior, consumer perceptions of our brand, labor availability and costs, supply chain interruptions, commodity costs, and legal and regulatory complexity. Conversely, our taking a position, whether real or perceived, on ESG, public policy, geopolitical and similar matters could also adversely impact our business.

The standards we set for ourselves regarding ESG matters, and our ability to meet such standards, may also impact our business. For example, we are working to manage risks and costs to our System related to climate change, greenhouse gases, and diminishing energy and water resources, and we have announced initiatives relating to, among other things, climate action, sustainability, responsible sourcing and increasing diverse representation across our System. We have faced increased scrutiny related to reporting on and achieving these initiatives, as well as continued public focus on similar matters, such as packaging and waste, animal health and welfare, deforestation and land use. We have also experienced increased pressure from stakeholders to provide expanded disclosure and establish additional commitments, targets or goals, and take actions to meet them, which could expose us to additional market, operational, execution and reputational costs and risks. Moreover, addressing ESG matters requires Systemwide coordination and alignment, and the standards by which certain ESG matters are measured are evolving and subject to assumptions that could change over time.

**Events such as severe weather conditions, natural disasters, hostilities, social unrest and climate change, among others, can adversely affect our results and prospects.**

Severe weather conditions, natural disasters, acts of war, terrorism or other hostilities, social unrest or climate change (or expectations about them) can adversely affect consumer behavior and confidence levels, supply availability and costs and local operations in impacted markets, all of which can affect our results and prospects. Climate change may also increase the frequency and severity of weather-related events and natural disasters. Our receipt of proceeds under any insurance we maintain with respect to some of these risks may be delayed or the proceeds may be insufficient to cover our losses fully.

EXHIBIT O(86)

AOE2236

## LEGAL PROCEEDINGS

The Company has pending a number of claims and lawsuits that have been filed in various jurisdictions. These claims and lawsuits cover a broad variety of allegations spanning the Company's business. The following is a brief description of the more significant types of such claims and lawsuits. In addition, the Company is subject to various laws and regulations that impact its business, as discussed under "Government Regulations" below. While the Company does not believe that any such claims, lawsuits, laws or regulations will have a material adverse effect on its financial condition or results of operations, unfavorable rulings could occur. Were an unfavorable ruling to occur, it could result in a material adverse impact on the Company's net income for the period in which it occurs and/or future periods.

- *Franchising*

Most McDonald's restaurants are franchised to independent owner/operators and developmental licensees under contractual arrangements with the Company. In the course of the franchise relationship, occasional disputes arise between the Company and its current or former franchisees relating to a broad range of subjects, including, but not limited to, quality, service, cleanliness, menu pricing, alleged discrimination, delinquent payments of rents and fees, and franchise grants, renewals and terminations. Occasional disputes also arise between the Company and individuals or entities who claim they should be (or should have been) granted a franchise or who challenge the legal distinction between the Company and its franchisees for employment law purposes.

- *Suppliers*

The Company and its affiliates and subsidiaries generally do not supply food, paper or related items to any McDonald's restaurants. The Company relies upon numerous independent suppliers, including service providers, that are required to meet and maintain the Company's high standards and specifications. Occasional disputes arise between the Company and its current or former suppliers relating to, for example, compliance with product specifications and the Company's business relationship with suppliers. Occasional disputes also arise between the Company and individuals or entities who claim they should be (or should have been) granted the opportunity to supply products or services to the Company or its restaurants.

- *Employees*

Hundreds of thousands of people are employed by the Company and in restaurants owned and operated by its subsidiaries. In addition, thousands of people from time to time seek employment in such restaurants. In the ordinary course of business, occasional disputes arise relating to hiring, termination, promotion and pay practices, including, but not limited to, wage and hour disputes, alleged discrimination and compliance with labor and employment laws.

- *Customers*

McDonald's restaurants – whether owned by subsidiaries of the Company, independent owner/operators or developmental licensees – regularly serve a broad segment of the public around the world. In so doing, disputes occasionally arise relating to products, service, incidents, pricing, advertising, disclosures (including relating to nutrition) and other matters common to an extensive restaurant business such as that of the Company.

- *Intellectual Property*

The Company has registered trademarks, service marks, patents and copyrights, some of which it considers to be of material importance to its business. From time to time, the Company may become involved in litigation to protect its intellectual property and defend against the alleged use of third-party intellectual property.

- *Government Regulations*

National and local governments have adopted laws and regulations relating to various aspects of the restaurant business, including, but not limited to, advertising, franchising, health, safety, environment, competition, zoning, employment and taxation. The Company is occasionally involved in litigation or other proceedings regarding these matters. While the Company strives to comply with all applicable existing statutory and administrative requirements, it cannot predict the effect on its operations of these matters or the issuance or enactment of any future additional requirements.


## PROPERTIES

The Company owns and leases real estate primarily in connection with its restaurant business. The Company identifies and develops sites that offer convenience to customers and long-term sales and profit potential to the System. To assess potential, the Company analyzes traffic and walking patterns, census data and other relevant data. The Company's experience and access to advanced technology aid in evaluating this information. The Company generally owns or secures a long-term lease on the land and building for conventional franchised and Company-operated restaurant sites, which facilitates long-term occupancy rights and helps control related costs. Restaurant profitability for both the Company and franchisees is important; therefore, ongoing efforts are made to control average development costs through construction and design efficiencies, standardization and by leveraging the Company's global sourcing network.

In addition, the Company primarily leases real estate in connection with its corporate headquarters, field and other offices.

Additional information about the Company's properties is included in the Management's Discussion and Analysis of Financial Condition and Results of Operations section beginning on page 8 of this Form 10-K and in the Financial Statements and Supplementary Data section beginning on page 35 of this Form 10-K.

EXHIBIT O (86)

AOE2237

## INFORMATION ABOUT OUR EXECUTIVE OFFICERS

The following are the executive officers of the Company as of the date of this filing:

*Jonathan Banner*, 55, is Executive Vice President – Global Chief Impact Officer, a position he has held since September 2022. Prior to joining the Company, Mr. Banner served as Executive Vice President, Communications for PepsiCo, Inc., a food and beverage company, from 2014 to August 2022.

*Ian Borden*, 54, is Executive Vice President and Chief Financial Officer, a position he has held since September 2022. Prior to that, Mr. Borden served as President, International, from January 2020 to August 2022, as President – International Developmental Licensed Markets from January 2019 to December 2019 and as President – Foundational Markets from 2015 to December 2018. Mr. Borden has served the Company for 28 years.

*Heidi Capozzi*, 53, is Executive Vice President – Global Chief People Officer, a position she has held since April 2020. Prior to joining the Company, Ms. Capozzi served as Senior Vice President of Human Resources for The Boeing Company, a manufacturer of commercial jetliners and defense, space and security systems, from 2016 to April 2020.

*Joseph Erlinger*, 49, is President, McDonald's USA, a position he has held since November 2019. Prior to that, Mr. Erlinger served as President – International Operated Markets from January 2019 to October 2019 and as President – High Growth Markets from September 2016 to December 2018. From 2015 to January 2017, Mr. Erlinger served as Vice President and Chief Financial Officer – High Growth Markets (serving in dual roles from September 2016 to January 2017). Mr. Erlinger has served the Company for 20 years.

*Morgan Flatley*, 48, is Executive Vice President - Global Chief Marketing Officer and New Business Ventures, a position she has held since February 2023. Prior to that, Ms. Flatley served as Senior Vice President - Global Chief Marketing Officer from November 2021 to January 2023 and as Vice President - Chief Marketing and Digital Customer Experience Officer from 2017 to November 2021. Prior to joining the Company, Ms. Flatley served as Senior Vice President, Chief Marketing Officer, Nutrition for PepsiCo, Inc., a food and beverage company, from 2016 to 2017.

*Marion Gross*, 62, is Executive Vice President – Global Chief Supply Chain Officer, a position she has held since September 2022. Prior to that, Ms. Gross served as Senior Vice President – Chief Supply Chain Officer, North America from 2013 to August 2022. Ms. Gross has served the Company for nearly 30 years.

*Catherine Hoovel*, 52, is Senior Vice President – Corporate Controller, a position she has held since July 2021. Prior to that, Ms. Hoovel served as Vice President – Chief Accounting Officer from July 2021 and as Controller for the McDonald's restaurants owned and operated by McDonald's USA from 2014 to 2016. Ms. Hoovel has served the Company for 26 years.

*Christopher Kempczinski*, 54, is President and Chief Executive Officer, a position he has held since November 2019. Prior to that, Mr. Kempczinski served as President, McDonald's USA from October 2019 to October 2019 and as Executive Vice President – Strategy, Business Development and Innovation from 2015 to 2016. Mr. Kempczinski joined the Company from The Kraft Heinz Company, a packaged food company, where he most recently served as Executive Vice President of Growth Initiatives and President of Kraft International from 2014 to 2015. Mr. Kempczinski has served the Company for seven years.

*Jill McDonald*, 58, is Executive Vice President and President, International Operated Markets, a position she has held since September 2022. Prior to re-joining the Company, Ms. McDonald served as Chief Executive Officer for Costa Coffee, a beverage company, from December 2019 to July 2022, as Managing Director, Clothing, Home & Beauty for Marks and Spencer Group plc, a multinational clothing and home products retailer, from 2017 to July 2019, and as Chief Executive Officer for Halfords Group plc, an automotive and cycling products and services provider, from 2015 to 2017. Ms. McDonald previously worked at the Company from 2006 to 2015.

*Kevin Ozan*, 59, is Senior Executive Vice President, Strategic Initiatives, a position he has held since September 2022. Prior to that, Mr. Ozan served as Executive Vice President and Chief Financial Officer from 2015 to August 2022 and as Senior Vice President – Controller from 2008 to 2015. Mr. Ozan has served the Company for 25 years.

*Desiree Ralls-Morrison*, 56, is Executive Vice President, Chief Legal Officer and Corporate Secretary, a position she has held since April 2021. Prior to joining the Company, Ms. Ralls-Morrison served as Senior Vice President, General Counsel and Corporate Secretary for Boston Scientific Corporation, a medical device manufacturer, from 2017 to April 2021 and as Senior Vice President, General Counsel and Corporate Secretary for Boehringer Ingelheim USA Corporation, a pharmaceutical company, from 2013 to 2017.

*Brian Rice*, 59, is Executive Vice President – Global Chief Information Officer, a position he has held since August 2022. Prior to joining the Company, Mr. Rice served as Executive Vice President, Chief Information Officer and Global Business Services for Cardinal Health, Inc., a healthcare services company, from February 2019 to August 2022, and as Senior Vice President, Chief Information Officer and Global Business Services for the Kellogg Company, a food manufacturing company, from 2009 to February 2019.

*Jo Sempels*, 56, is Senior Vice President and President, International Developmental Licensed Markets, a position he has held since September 2022. Prior to that, Mr. Sempels served as Senior Vice President - International Developmental Licensed Markets from December 2019 to August 2022, as Vice President, Business Unit Lead International Developmental Licensed Markets Europe from January 2019 to December 2019 and as Vice President - Foundational Markets Europe from 2015 to December 2018. Mr. Sempels has served the Company for over 30 years.

*Manu Steijaert*, 52, is Executive Vice President – Chief Customer Officer, a position he has held since August 2021. Prior to that, Mr. Steijaert served as Vice President, International Operated Markets from January 2019 to July 2021 and as Managing Director, Netherlands from 2015 to January 2019. Mr. Steijaert has served the Company for 20 years.

EXHIBIT O(86)

AOE2238

**AVAILABILITY OF COMPANY INFORMATION**

The Company is subject to the requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and therefore files periodic reports, proxy statements and other information with the SEC. Such information may be obtained by visiting the SEC's website at www.sec.gov.

The Company also uses its investor website at www.investor.mcdonalds.com as a primary channel for disclosing key information to its investors, some of which may contain material and previously non-public information. The Company makes available on such website, free of charge, copies of its Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, as well as amendments to those reports, filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act as soon as reasonably practicable after filing or furnishing such material to the SEC. Copies of such information and reports are also available free of charge by calling (800) 228-9623.

The Company also posts the following documents on the "Corporate Governance" section of its investor website: the Company's Corporate Governance Principles; the charters for each standing committee of the Company's Board of Directors, including the Audit & Finance Committee, Compensation Committee, Governance Committee, Public Policy & Strategy Committee, and Sustainability & Corporate Responsibility Committee; the Code of Conduct for the Company's Board of Directors; and the Company's Standards of Business Conduct, which applies to all officers and employees. Copies of these documents are also available free of charge by calling (800) 228-9623. The Company intends to satisfy the disclosure requirements regarding any applicable amendment to, or waiver from, a provision of its Standards of Business Conduct by disclosing such information at the website address specified above.

The websites included in this Form 10-K, including those of the Company and the SEC, are provided for convenience only. Information contained on or accessible through such websites is not incorporated herein and does not constitute a part of this Form 10-K or the Company's other filings with the SEC.

## Financial Statements and Supplementary Data

| Index to consolidated financial statements | Page reference |
|---|---|
| Consolidated statement of income for each of the three years in the period ended December 31, 2022 | 36 |
| Consolidated statement of comprehensive income for each of the three years in the period ended December 31, 2022 | 37 |
| Consolidated balance sheet at December 31, 2022 and 2021 | 38 |
| Consolidated statement of cash flows for each of the three years in the period ended December 31, 2022 | 39 |
| Consolidated statement of shareholders' equity for each of the three years in the period ended December 31, 2022 | 40 |
| Notes to consolidated financial statements | 41 |
| Management's assessment of internal control over financial reporting | 58 |
| Report of independent registered public accounting firm-PCAOB ID:    42 | 59 |
| Report of independent registered public accounting firm on internal control over financial reporting | 61 |

## Consolidated Statement of Income

| In millions, except per share data | Years ended December 31, **2022** | 2021 | 2020 |
|---|---|---|---|
| REVENUES | | | |
| Sales by Company-operated restaurants | $ **8,748.4** | $ 9,787.4 | $ 8,139.2 |
| Revenues from franchised restaurants | **14,105.8** | 13,085.4 | 10,726.1 |
| Other revenues | **328.4** | 350.1 | 342.5 |
| **Total revenues** | **23,182.6** | 23,222.9 | 19,207.8 |
| OPERATING COSTS AND EXPENSES | | | |
| Company-operated restaurant expenses | | | |
| Food & paper | **2,737.3** | 3,096.8 | 2,564.2 |
| Payroll & employee benefits | **2,617.4** | 2,677.2 | 2,416.4 |
| Occupancy & other operating expenses | **2,026.2** | 2,273.3 | 2,000.6 |
| Franchised restaurants-occupancy expenses | **2,349.7** | 2,335.0 | 2,207.5 |
| Other restaurant expenses | **244.8** | 260.4 | 267.0 |
| Selling, general & administrative expenses | | | |
| Depreciation and amortization | **370.4** | 329.7 | 300.6 |
| Other | **2,492.2** | 2,377.8 | 2,245.0 |
| Other operating (income) expense, net | **973.6** | (483.3) | (117.5) |
| **Total operating costs and expenses** | **13,811.6** | 12,866.9 | 11,883.8 |
| **Operating income** | **9,371.0** | 10,356.0 | 7,324.0 |
| Interest expense-net of capitalized interest of $9.5, $6.8 and $6.0 | **1,207.0** | 1,185.8 | 1,218.1 |
| Nonoperating (income) expense, net | **338.6** | 42.3 | (34.8) |
| **Income before provision for income taxes** | **7,825.4** | 9,127.9 | 6,140.7 |
| Provision for income taxes | **1,648.0** | 1,582.7 | 1,410.2 |
| **Net income** | $ **6,177.4** | $ 7,545.2 | $ 4,730.5 |
| **Earnings per common share–basic** | $ **8.39** | $ 10.11 | $ 6.35 |
| **Earnings per common share–diluted** | $ **8.33** | $ 10.04 | $ 6.31 |
| **Dividends declared per common share** | $ **5.66** | $ 5.25 | $ 5.04 |
| **Weighted-average shares outstanding–basic** | **736.5** | 746.3 | 744.6 |
| **Weighted-average shares outstanding–diluted** | **741.3** | 751.8 | 750.1 |

*See Notes to consolidated financial statements.*

EXHIBIT O(86)

AOE2240

## Consolidated Statement of Comprehensive Income

| In millions | Years ended December 31, 2022 | 2021 | 2020 |
|---|---:|---:|---:|
| Net income | $ **6,177.4** | $7,545.2 | $4,730.5 |
| Other comprehensive income (loss), net of tax | | | |
| **Foreign currency translation adjustments:** | | | |
| Gain (loss) recognized in accumulated other comprehensive income (AOCI), including net investment hedges | **(354.1)** | (216.2) | 46.0 |
| Reclassification of (gain) loss to net income | **504.4** | 34.7 | 17.1 |
| **Foreign currency translation adjustments-net of tax benefit (expense) of $(207.6), $(186.5), and $204.8** | **150.3** | (181.5) | 63.1 |
| **Cash flow hedges:** | | | |
| Gain (loss) recognized in AOCI | **160.3** | 57.6 | (129.1) |
| Reclassification of (gain) loss to net income | **(104.8)** | 28.9 | 5.8 |
| **Cash flow hedges-net of tax benefit (expense) of $(16.0), $(24.9), and $36.6** | **55.5** | 86.5 | (123.3) |
| **Defined benefit pension plans:** | | | |
| Gain (loss) recognized in AOCI | **(118.7)** | 108.1 | (43.5) |
| Reclassification of (gain) loss to net income | **—** | — | (0.4) |
| **Defined benefit pension plans-net of tax benefit (expense) of $43.2, $(36.6), and $9.3** | **(118.7)** | 108.1 | (43.9) |
| Total other comprehensive income (loss), net of tax | **87.1** | 13.1 | (104.1) |
| **Comprehensive income** | $ **6,264.5** | $7,558.3 | $4,626.4 |

*See Notes to consolidated financial statements.*

EXHIBIT 20 (86)

AOE2241

## Consolidated Balance Sheet

| In millions, except per share data | December 31, **2022** | 2021 |
|---|---|---|
| **ASSETS** | | |
| **Current assets** | | |
| Cash and equivalents | **$ 2,583.8** | $ 4,709.2 |
| Accounts and notes receivable | **2,115.0** | 1,872.4 |
| Inventories, at cost, not in excess of market | **52.0** | 55.6 |
| Prepaid expenses and other current assets | **673.4** | 511.3 |
| Total current assets | **5,424.2** | 7,148.5 |
| **Other assets** | | |
| Investments in and advances to affiliates | **1,064.5** | 1,201.2 |
| Goodwill | **2,900.4** | 2,782.5 |
| Miscellaneous | **4,707.2** | 4,449.5 |
| Total other assets | **8,672.1** | 8,433.2 |
| Lease right-of-use asset, net | **12,565.7** | 13,552.0 |
| **Property and equipment** | | |
| Property and equipment, at cost | **41,037.6** | 41,916.6 |
| Accumulated depreciation and amortization | **(17,264.0)** | (17,196.0) |
| Net property and equipment | **23,773.6** | 24,720.6 |
| **Total assets** | **$ 50,435.6** | $ 53,854.3 |
| LIABILITIES AND SHAREHOLDERS' EQUITY | | |
| **Current liabilities** | | |
| Accounts payable | **$ 980.2** | $ 1,006.8 |
| Lease liability | **661.1** | 705.5 |
| Income taxes | **274.9** | 360.7 |
| Other taxes | **255.1** | 236.7 |
| Accrued interest | **393.4** | 363.3 |
| Accrued payroll and other liabilities | **1,237.4** | 1,347.0 |
| Total current liabilities | **3,802.1** | 4,020.0 |
| **Long-term debt** | **35,903.5** | 35,622.7 |
| **Long-term lease liability** | **12,134.4** | 13,020.9 |
| **Long-term income taxes** | **791.9** | 1,896.8 |
| **Deferred revenues - initial franchise fees** | **757.8** | 738.3 |
| **Other long-term liabilities** | **1,051.8** | 1,081.0 |
| **Deferred income taxes** | **1,997.5** | 2,075.6 |
| **Shareholders' equity (deficit)** | | |
| Preferred stock, no par value; authorized – 165.0 million shares; issued – none | **—** | — |
| Common stock, $0.01 par value; authorized – 3.5 billion shares; issued – 1,660.6 million | **16.6** | 16.6 |
| Additional paid-in capital | **8,547.1** | 8,231.6 |
| Retained earnings | **59,543.9** | 57,534.7 |
| Accumulated other comprehensive income (loss) | **(2,486.6)** | (2,573.7) |
| Common stock in treasury, at cost; 929.3 and 915.8 million shares | **(71,624.4)** | (67,810.2) |
| Total shareholders' equity (deficit) | **(6,003.4)** | (4,601.0) |
| **Total liabilities and shareholders' equity (deficit)** | **$ 50,435.6** | $ 53,854.3 |

*See Notes to consolidated financial statements.*

EXHIBIT O(86)

AOE2242

## Consolidated Statement of Cash Flows

| In millions | Years ended December 31, **2022** | 2021 | 2020 |
|---|---|---|---|
| **Operating activities** | | | |
| Net income | **$ 6,177.4** | $ 7,545.2 | $ 4,730.5 |
| Adjustments to reconcile to cash provided by operations | | | |
| Charges and credits: | | | |
| Depreciation and amortization | **1,870.6** | 1,868.1 | 1,751.4 |
| Deferred income taxes | **(345.7)** | (428.3) | 6.4 |
| Share-based compensation | **166.7** | 139.2 | 92.4 |
| Net (gain) loss on sale of restaurant and other businesses | **732.7** | (97.8) | (28.2) |
| Other | **(570.4)** | (339.1) | (75.2) |
| Changes in working capital items: | | | |
| Accounts receivable | **(264.1)** | 309.9 | (6.8) |
| Inventories, prepaid expenses and other current assets | **5.6** | (62.2) | (68.6) |
| Accounts payable | **31.3** | 225.0 | (137.5) |
| Income taxes | **(546.7)** | (302.5) | (43.6) |
| Other accrued liabilities | **129.3** | 284.0 | 44.4 |
| **Cash provided by operations** | **7,386.7** | 9,141.5 | 6,265.2 |
| **Investing activities** | | | |
| Capital expenditures | **(1,899.2)** | (2,040.0) | (1,640.8) |
| Purchases of restaurant businesses | **(807.0)** | (374.2) | (66.1) |
| Sales of restaurant and other businesses | **445.9** | 196.2 | 76.3 |
| Sales of property | **38.9** | 106.2 | 27.4 |
| Other | **(456.7)** | (53.9) | 57.4 |
| **Cash used for investing activities** | **(2,678.1)** | (2,165.7) | (1,545.8) |
| **Financing activities** | | | |
| Net short-term borrowings | **25.5** | 15.1 | (893.1) |
| Long-term financing issuances | **3,374.5** | 1,154.4 | 5,543.0 |
| Long-term financing repayments | **(2,202.4)** | (2,240.0) | (2,411.7) |
| Treasury stock purchases | **(3,896.0)** | (845.5) | (907.8) |
| Common stock dividends | **(4,168.2)** | (3,918.6) | (3,752.9) |
| Proceeds from stock option exercises | **248.2** | 285.7 | 295.5 |
| Other | **38.2** | (46.7) | (122.0) |
| **Cash used for financing activities** | **(6,580.2)** | (5,595.6) | (2,249.0) |
| **Effect of exchange rates on cash and equivalents** | **(253.8)** | (120.1) | 80.2 |
| **Cash and equivalents increase (decrease)** | **(2,125.4)** | 1,260.1 | 2,550.6 |
| Cash and equivalents at beginning of year | **4,709.2** | 3,449.1 | 898.5 |
| **Cash and equivalents at end of year** | **$ 2,583.8** | $ 4,709.2 | $ 3,449.1 |
| **Supplemental cash flow disclosures** | | | |
| Interest paid | **$ 1,183.5** | $ 1,197.3 | $ 1,136.0 |
| Income taxes paid | **3,023.5** | 2,403.9 | 1,441.9 |

*See Notes to consolidated financial statements.*

EXHIBIT O (86)

AOE2243

Consolidated Statement of Shareholders' Equity

| In millions, except per share data | Common stock issued Shares | Amount | Additional paid-in capital | Retained earnings | Pensions | Cash flow hedges | Foreign currency translation | Common stock in treasury Shares | Amount | Total shareholders' equity (deficit) |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2019 | 1,660.6 | 16.6 | 7,653.9 | 52,930.5 | (243.7) | 12.0 | (2,251.0) | (914.3) | (66,328.6) | (8,210.3) |
| Net income | | | | 4,730.5 | | | | | | 4,730.5 |
| Other comprehensive income (loss), net of tax | | | | | (43.9) | (123.3) | 63.1 | | | (104.1) |
| Comprehensive income | | | | | | | | | | 4,626.4 |
| Common stock cash dividends ($5.04 per share) | | | | (3,752.9) | | | | | | (3,752.9) |
| Treasury stock purchases | | | | | | | | (4.3) | (874.1) | (874.1) |
| Share-based compensation | | | 92.4 | | | | | | | 92.4 |
| Stock option exercises and other | | | 157.3 | | | | | 3.4 | 136.3 | 293.6 |
| Balance at December 31, 2020 | 1,660.6 | 16.6 | 7,903.6 | 53,908.1 | (287.6) | (111.3) | (2,187.9) | (915.2) | (67,066.4) | (7,824.9) |
| Net income | | | | 7,545.2 | | | | | | 7,545.2 |
| Other comprehensive income (loss), net of tax | | | | | 108.1 | 86.5 | (181.5) | | | 13.1 |
| Comprehensive income | | | | | | | | | | 7,558.3 |
| Common stock cash dividends ($5.25 per share) | | | | (3,918.6) | | | | | | (3,918.6) |
| Treasury stock purchases | | | | | | | | (3.4) | (845.5) | (845.5) |
| Share-based compensation | | | 139.2 | | | | | | | 139.2 |
| Stock option exercises and other | | | 188.8 | | | | | 2.8 | 101.7 | 290.5 |
| Balance at December 31, 2021 | 1,660.6 | 16.6 | 8,231.6 | 57,534.7 | (179.5) | (24.8) | (2,369.4) | (915.2) | (67,810.2) | (6,003.4) |
| Net income | | | | 6,177.4 | | | | | | 6,177.4 |
| Other comprehensive income (loss), net of tax | | | | | (118.7) | 55.5 | 150.3 | | | 87.1 |
| Comprehensive income | | | | | | | | | | 6,264.5 |
| Common stock cash dividends ($5.66 per share) | | | | (4,168.2) | | | | | | (4,168.2) |
| Treasury stock purchases | | | | | | | | (15.8) | (3,896.0) | (3,896.0) |
| Share-based compensation | | | 166.7 | | | | | | | 166.7 |
| Stock option exercises and other | | | 148.8 | | | | | 2.3 | 81.8 | 230.6 |
| Balance at December 31, 2022 | 1,660.6 | $ 16.6 | $8,547.1 | $59,543.9 | $ (298.2) | $ 30.7 | $(2,219.1) | (929.3) | $(71,624.4) | $ (6,003.4) |

*See Notes to consolidated financial statements.*

EXHIBIT O(86)

AOE2244

Notes to Consolidated Financial Statements

## Summary of Significant Accounting Policies

**NATURE OF BUSINESS**

The Company franchises and operates McDonald's restaurants in the global restaurant industry. All restaurants are operated either by the Company or by franchisees, including conventional franchisees under franchised arrangements, and developmental licensees or affiliates under license agreements.

The following table presents restaurant information by ownership type:

| Restaurants at December 31, | 2022 | 2021 | 2020 |
|---|---|---|---|
| Conventional franchised | 21,720 | 21,607 | 21,712 |
| Developmental licensed | 8,229 | 7,913 | 7,663 |
| Foreign affiliated | 8,220 | 7,775 | 7,146 |
| Total Franchised | 38,169 | 37,295 | 36,521 |
| Company-operated | 2,106 | 2,736 | 2,677 |
| **Total Systemwide restaurants** | **40,275** | 40,031 | 39,198 |

The results of operations of restaurant businesses purchased and sold in transactions with franchisees were not material either individually or in the aggregate to the consolidated financial statements for periods prior to purchase and sale.

**CONSOLIDATION**

The consolidated financial statements include the accounts of the Company and its subsidiaries. Investments in affiliates owned 50% or less (primarily McDonald's China and Japan) are accounted for by the equity method.

On an ongoing basis, the Company evaluates its business relationships such as those with franchisees, joint venture partners, developmental licensees, suppliers and advertising cooperatives to identify potential variable interest entities. Generally, these businesses qualify for a scope exception under the variable interest entity consolidation guidance. The Company has concluded that consolidation of any such entity is not appropriate for the periods presented.

**ESTIMATES IN FINANCIAL STATEMENTS**

The preparation of financial statements in conformity with accounting principles generally accepted in the U.S. requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. Actual results could differ from those estimates.

**FOREIGN CURRENCY TRANSLATION**

Generally, the functional currency of operations outside the U.S. is the respective local currency.

**RECENT ACCOUNTING PRONOUNCEMENTS**

*Recently Adopted Accounting Pronouncements*

*Leases*

In July 2021, the Financial Accounting Standards Board (the "FASB") issued Accounting Standards Update ("ASU") No. 2021-05, "Leases (Topic 842): Lessors—Certain Leases with Variable Lease Payments" ("ASU 2021-05"). The pronouncement amends the current guidance on classification for a lease that includes variable lease payments that do not depend on an index or rate. Under the amended guidance, a lessor must classify as an operating lease any lease that would otherwise be classified as a sales-type or direct financing lease and that would result in the recognition of a selling loss at lease commencement. ASU 2021-05 is effective for fiscal years beginning after December 15, 2021, including applicable interim periods. The Company adopted the new standard effective January 1, 2022. The adoption of this standard did not have a material effect on the Company's consolidated financial statements.

*Reference Rate Reform*

In March 2020, the FASB issued ASU No. 2020-04, "Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting" ("ASU 2020-04"). The pronouncement provides temporary optional expedients and exceptions to the current guidance on contract modifications and hedge accounting to ease the financial reporting burdens related to the expected market transition from the London Interbank Offered Rate and other interbank offered rates to alternative reference rates. The guidance was effective upon issuance and may be applied prospectively to contract modifications made and hedging relationships entered into or evaluated on or before December 31, 2022. The adoption of this standard did not have a material effect on the Company's consolidated financial statements.

EXHIBIT 20 (86)

AOE2245

## REVENUE RECOGNITION

The Company's revenues consist of sales by Company-operated restaurants and fees from restaurants operated by franchisees, developmental licensees and affiliates. Revenues from conventional franchised restaurants include rent and royalties based on a percent of sales with minimum rent payments, and initial fees. Revenues from restaurants licensed to developmental licensees and affiliates include a royalty based on a percent of sales, and generally include initial fees. The Company's Other revenues are comprised of fees paid by franchisees to recover a portion of costs incurred by the Company for various technology platforms, revenues from brand licensing arrangements to market and sell consumer packaged goods using the McDonald's brand and third-party revenues for the Dynamic Yield business, for periods prior to its sale on April 1, 2022.

Sales by Company-operated restaurants are recognized on a cash basis at the time of the underlying sale and are presented net of sales tax and other sales-related taxes. Royalty revenues are based on a percent of sales and recognized at the time the underlying sales occur. Rental income includes both minimum rent payments, which are recognized straight-line over the franchise term (with the exception of rent concessions as a result of COVID-19 – refer to the Leasing section that follows) and variable rent payments based on a percent of sales, which are recognized at the time the underlying sales occur. Initial fees are recognized as the Company satisfies the performance obligation over the franchise term, which is generally 20 years.

The Company provides goods or services related to various technology platforms to certain franchisees that are distinct from the franchise agreement because they do not require integration with other goods or services that the Company provides. The Company has determined that it is the principal in these arrangements. Accordingly, the related revenue is presented on a gross basis on the Consolidated Statement of Income. These revenues are recognized as the goods or services are transferred to the franchisee, and related expenses are recognized as incurred. Brand licensing arrangement revenues are based on a percent of sales and are recognized at the time the underlying sales occur. For periods prior to April 1, 2022, Dynamic Yield third party revenues were generated from providing software as a service solutions to customers and were recognized over the applicable subscription period as the service was performed.

## PROPERTY AND EQUIPMENT

Property and equipment are stated at cost, with depreciation and amortization provided using the straight-line method over the following estimated useful lives: buildings–up to 40 years; leasehold improvements–the lesser of useful lives of assets or lease terms, which generally include certain option periods; and equipment–3 to 12 years.

The Company periodically reviews these lives relative to physical factors, economic factors and industry trends. If there are changes in the planned use of property and equipment, or if technological changes occur more rapidly than anticipated, the useful lives assigned to these assets may need to be shortened, resulting in the accelerated recognition of depreciation and amortization expense or write-offs in future periods.

The Company may share in the cost of certain restaurant improvements with its franchisees, primarily in the U.S. Since McDonald's manages the project and provides up front funding in these instances, during the project the Company estimates which costs are the responsibility of McDonald's and which are the responsibility of the franchisee, and allocates the corresponding costs between Property and equipment and Accounts receivable. Upon the completion of the project, the allocation of costs is finalized and may result in immaterial adjustments to the balances and associated depreciation expense.

Refer to the Property and Equipment footnote on page 49 of this Form 10-K for additional information.

## LEASING

The Company is the lessee in a significant real estate portfolio, primarily through ground leases (the Company leases the land and generally owns the building) and through improved leases (the Company leases the land and buildings). The Lease right-of-use asset and Lease liability reflect the present value of the Company's estimated future minimum lease payments over the lease term, which includes options that are reasonably assured of being exercised, discounted using the rate implicit in each lease, if determinable, or a collateralized incremental borrowing rate considering the term of the lease and particular currency environment. Leases with an initial term of 12 months or less, primarily related to leases of office equipment, are not included in the Lease right-or-use asset or Lease liability and continue to be recognized in the Consolidated Statement of Income on a straight-line basis over the lease term.

The Company has elected not to separate non-lease components from lease components in its lessee portfolio. To the extent that occupancy costs, such as site maintenance, are included in the asset and liability, the impact is immaterial and is generally limited to Company-owned restaurant locations. For franchised locations, which represent the majority of the restaurant portfolio, the related occupancy costs including property taxes, insurance and site maintenance are generally required to be paid by the franchisees as part of the franchise arrangement. In addition, the Company is the lessee under non-restaurant related leases such as office buildings, vehicles and office equipment. These leases are not a material subset of the Company's lease portfolio.

In 2020, the Company elected the practical expedient to account for COVID-19 related rent concessions as if they were part of the enforceable rights and obligations of the parties under the existing lease contract. This was elected for the Company's entire lessee and lessor portfolio for any rent deferrals or rent abatements. For the lessee portfolio, the Company elected not to remeasure the Lease right- of- use asset and Lease liability if a rent deferral or a rent abatement was granted. Refer to the Leasing Arrangements footnote on page 50 of this Form 10-K for additional information on the Lease right-of-use asset and Lease liability.

Rental income includes both minimum rent payments and variable rent payments based on a percent of sales.

Refer to the Franchise Arrangements footnote on page 49 of this Form 10-K for additional information on deferred collections of rental income as well as royalties.

EXHIBIT O(86)

AOE2246

## CAPITALIZED SOFTWARE

Capitalized software is stated at cost and amortized using the straight-line method over the estimated useful life of the software, which primarily ranges from 2 to 10 years. Customer facing software is typically amortized over a shorter useful life, while back office and Corporate systems may have a longer useful life. Capitalized software less accumulated amortization is recorded within Miscellaneous other assets on the Consolidated Balance Sheet and was (in millions): 2022-$864.3; 2021-$795.0; 2020-$691.2.

The Company reviews capitalized software for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable or if an indicator of impairment exists, which occurs more regularly throughout the year, such as when new software may be ready for its intended use. The Company did not identify any indicators of material impairment of capitalized software for the years ended December 31, 2022 and 2021. Results for 2020 reflected write-offs of impaired software of $26.3 million.

## LONG-LIVED ASSETS

Long-lived assets are reviewed for impairment annually in the fourth quarter and whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. For purposes of annually reviewing McDonald's restaurant assets for potential impairment, assets are initially grouped together in the U.S. at a field office level, and internationally, at a market level. The Company manages its restaurants as a group or portfolio with significant common costs and promotional activities; as such, an individual restaurant's cash flows are not generally independent of the cash flows of others in a market. If an indicator of impairment exists for any grouping of assets, an estimate of undiscounted future cash flows produced by each individual restaurant within the asset grouping is compared to its carrying value. If an individual restaurant is determined to be impaired, the loss is measured by the excess of the carrying amount of the restaurant over its fair value as determined by an estimate of discounted future cash flows.

Losses on assets held for disposal are recognized when management and the Company's Board of Directors, as required, have approved and committed to a plan to dispose of the assets, the assets are available for disposal and the disposal is probable of occurring within 12 months, and the net sales proceeds are expected to be less than its net book value, among other factors. Generally, such losses are related to restaurants that have closed and ceased operations as well as other assets that meet the criteria to be considered "held for sale."

## GOODWILL

Goodwill represents the excess of cost over the net tangible assets and identifiable intangible assets of acquired restaurants and other businesses, and it is generally assigned to the reporting unit (defined as each individual market) expected to benefit from the synergies of the combination. The Company's goodwill primarily results from purchases of McDonald's restaurants from franchisees or transactions in which the Company obtains a controlling interest in subsidiaries or affiliates. When purchasing restaurants from a franchisee, the Company generally uses a discounted cash flow methodology (Level 3 inputs within the valuation hierarchy), which determines the fair value of restaurants acquired based on their expected profitability and cash flows. During 2022, the Company acquired restaurants from franchisees in order to expand its Company-operated restaurant footprint in key growth areas and to support key strategic franchising initiatives. In conjunction with these purchases, the Company recorded approximately $75 million of net tangible assets, $525 million of identifiable intangible assets (primarily consisting of reacquired franchise rights) and $190 million of goodwill.  These acquisitions did not have a material impact on the amount of recorded revenues or net income of the Company. If a Company-operated restaurant is sold within 24 months of acquisition, the goodwill associated with the acquisition is written off in its entirety. If a Company-operated restaurant is sold beyond 24 months months from the acquisition, the amount of goodwill written off is based on the relative fair value of the business sold compared to the reporting unit.

The following table presents the 2022 activity in goodwill by segment:

| In millions | U.S. | International Operated Markets | International Developmental Licensed Markets & Corporate | Consolidated |
|---|---|---|---|---|
| Balance at December 31, 2021 | $1,673.4 | $ 1,109.1 | $          — | $2,782.5 |
| Net restaurant purchases (sales) | 141.8 | 47.0 | — | 188.8 |
| Currency translation | — | (70.9) | — | (70.9) |
| Balance at December 31, 2022 | $1,815.2 | $ 1,085.2 | $          — | $2,900.4 |

The Company conducts goodwill impairment testing in the fourth quarter of each year or whenever indicators of impairment exist. If an indicator of impairment exists, the goodwill impairment test compares the fair value of a reporting unit, generally based on discounted future cash flows, with its carrying amount including goodwill. If the carrying amount of a reporting unit exceeds its fair value, an impairment loss is recorded for the difference. In the current period, the Company performed a qualitative assessment and did not identify any indicators of impairment. Historically, goodwill impairment has not significantly impacted the consolidated financial statements. Goodwill on the Consolidated Balance Sheet reflects accumulated impairment losses of $14.5 million as of December 31, 2022 and 2021.

## ADVERTISING COSTS

Advertising costs included in operating expenses of Company-operated restaurants primarily consist of contributions to advertising cooperatives based upon a percent of sales, and were (in millions): 2022—$334.5; 2021—$377.6; 2020—$325.5. The decrease in 2022 is primarily due to lower sales in the International Operated Markets as a result of the sale of the Company's business in Russia and the temporary restaurant closures in Ukraine.

In addition, significant advertising costs are incurred by conventional franchisees through contributions to advertising cooperatives in individual markets that are also based upon a percent of sales. In the markets that make up the vast majority of the Systemwide advertising spend, including the U.S., McDonald's is not the primary beneficiary of these entities, and therefore has concluded that consolidation would not be appropriate, as the Company does not have the power through voting or similar rights to direct the activities of the cooperatives that most significantly impact their economic performance.

EXHIBIT O (86)
AOE2247

Production costs for radio and television advertising are expensed when the commercials are initially aired. These production costs, primarily in the U.S., as well as other marketing-related expenses are included in Selling, general & administrative expenses and were (in millions): 2022–$63.8; 2021–$82.9; 2020–$329.2. Results for 2020 included about $175 million of incremental marketing contributions by the Company to the System's advertising cooperative arrangements across the U.S. and International Operated Markets, as well as higher investments in brand communications.

## INCOME TAXES

*Income Tax Uncertainties*

The Company, like other multi-national companies, is regularly audited by federal, state and foreign tax authorities, and tax assessments may arise several years after tax returns have been filed. Accordingly, tax liabilities are recorded when, in management's judgment, a tax position does not meet the more likely than not threshold for recognition. For tax positions that meet the more likely than not threshold, a tax liability may still be recorded depending on management's assessment of how the tax position will ultimately be settled. The Company records interest and penalties on unrecognized tax benefits in the provision for income taxes.

Deferred tax assets and liabilities are recognized for the tax consequences of temporary differences between the financial reporting basis and the tax basis of existing assets and liabilities. The Company records a valuation allowance to reduce its deferred tax assets if it is considered more likely than not that some portion or all of the deferred tax assets will not be realized. While the Company has considered future taxable income and ongoing prudent and feasible tax strategies, including the sale of appreciated assets, in assessing the need for the valuation allowance, if these estimates and assumptions change in the future, the Company may be required to adjust its valuation allowance. This could result in a charge to, or an increase in, income in the period such determination is made.

Refer to the Income Taxes footnote on page 52 of this Form 10-K for additional information.

*Accounting for Global Intangible Low-Taxed Income ("GILTI")*

The accounting policy of the Company is to record any tax on GILTI in the provision for income taxes in the year it is incurred.

## FAIR VALUE MEASUREMENTS

The Company measures certain financial assets and liabilities at fair value on a recurring basis, and certain non-financial assets and liabilities on a nonrecurring basis. Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in the principal or most advantageous market in an orderly transaction between market participants on the measurement date. Fair value disclosures are reflected in a three-level hierarchy, maximizing the use of observable inputs and minimizing the use of unobservable inputs.

The valuation hierarchy is based upon the transparency of inputs to the valuation of an asset or liability on the measurement date. The three levels are defined as follows:

▪   Level 1 – inputs to the valuation methodology are quoted prices (unadjusted) for an identical asset or liability in an active market.

▪   Level 2 – inputs to the valuation methodology include quoted prices for a similar asset or liability in an active market or model-derived valuations in which all significant inputs are observable for substantially the full term of the asset or liability.

▪   Level 3 – inputs to the valuation methodology are unobservable and significant to the fair value measurement of the asset or liability.

Certain of the Company's derivatives are valued using various pricing models or discounted cash flow analyses that incorporate observable market parameters, such as interest rate yield curves, option volatilities and foreign currency rates, classified as Level 2 within the valuation hierarchy. Derivative valuations incorporate credit risk adjustments that are necessary to reflect the probability of default by the counterparty or the Company.

▪   *Certain Financial Assets and Liabilities Measured at Fair Value*

The following tables present financial assets and liabilities measured at fair value on a recurring basis by the valuation hierarchy as defined in the fair value guidance:

*December 31, 2022*

| In millions | Level 1 [1] | | Level 2 | | Total Carrying Value |
|---|---|---|---|---|---|
| Derivative assets | $  200.5 | $ | 82.0 | $ | 282.5 |
| Derivative liabilities | | $ | (141.7) | $ | (141.7) |

*December 31, 2021*

| In millions | Level 1 [1] | | Level 2 | | Total Carrying Value |
|---|---|---|---|---|---|
| Derivative assets | $  209.8 | $ | 79.8 | $ | 289.6 |
| Derivative liabilities | | $ | (7.9) | $ | (7.9) |

(1)   *Level 1 is comprised of derivatives that hedge market driven changes in liabilities associated with the Company's supplemental benefit plans.*

EXHIBIT O(86)

AOE2248

• *Non-Financial Assets and Liabilities Measured at Fair Value on a Nonrecurring Basis*

Certain assets and liabilities are measured at fair value on a nonrecurring basis; that is, the assets and liabilities are not measured at fair value on an ongoing basis, but are subject to fair value adjustments in certain circumstances (e.g., when there is evidence of impairment). For the years ended December 31, 2022 and 2021, the Company did not record any material fair value adjustments to long-lived assets (including goodwill).

• *Certain Financial Assets and Liabilities not Measured at Fair Value*

At December 31, 2022, the fair value of the Company's debt obligations was estimated at $33.5 billion, compared to a carrying amount of $35.9 billion. The fair value was based on quoted market prices, Level 2 within the valuation hierarchy. The carrying amount of cash and equivalents and notes receivable approximate fair value.

### FINANCIAL INSTRUMENTS AND HEDGING ACTIVITIES

The Company is exposed to global market risks, including the effect of changes in interest rates and foreign currency fluctuations. The Company uses foreign currency denominated debt and derivative instruments to mitigate the impact of these changes. The Company does not hold or issue derivatives for trading purposes.

The Company documents its risk management objective and strategy for undertaking hedging transactions, as well as all relationships between hedging instruments and hedged items. The Company's derivatives that are designated for hedge accounting consist mainly of interest rate swaps, foreign currency forwards, and cross-currency interest rate swaps, and are classified as either fair value, cash flow or net investment hedges. Further details are explained in the "Fair Value," "Cash Flow" and "Net Investment" hedge sections.

The Company enters into certain derivatives that are not designated for hedge accounting. The Company has entered into equity derivative contracts, including total return swaps, to hedge market-driven changes in certain of its supplemental benefit plan liabilities. In addition, the Company uses foreign currency forwards to mitigate the change in fair value of certain foreign currency denominated assets and liabilities. Further details are explained in the "Undesignated Derivatives" section.

All derivatives (including those not designated for hedge accounting) are recognized on the Consolidated Balance Sheet at fair value and classified based on the instruments' maturity dates. Changes in the fair value measurements of the derivative instruments are reflected as adjustments to AOCI and/or current earnings.

The following table presents the fair values of derivative instruments included on the Consolidated Balance Sheet as of December 31, 2022 and 2021:

| | Derivative Assets | | | Derivative Liabilities | | |
|---|---|---|---|---|---|---|
| *In millions* | *Balance Sheet Classification* | *2022* | *2021* | *Balance Sheet Classification* | *2022* | *2021* |
| Derivatives designated as hedging instruments | | | | | | |
| Foreign currency | Prepaid expenses and other current assets | $ 53.3 | $ 42.4 | Accrued payroll and other liabilities | $ (17.9) | $ (3.3) |
| Interest rate | Prepaid expenses and other current assets | — | $ 0.3 | Accrued payroll and other liabilities | — | — |
| Foreign currency | Miscellaneous other assets | 28.7 | 28.0 | Other long-term liabilities | (30.7) | (0.5) |
| Interest rate | Miscellaneous other assets | — | 8.6 | Other long-term liabilities | (91.5) | (4.1) |
| Total derivatives designated as hedging instruments | | $ 82.0 | $ 79.3 | | $(140.1) | $ (7.9) |
| Derivatives not designated as hedging instruments | | | | | | |
| Equity | Prepaid expenses and other current assets | $ 200.5 | $ 9.5 | Accrued payroll and other liabilities | $ (1.6) | $ — |
| Foreign currency | Prepaid expenses and other current assets | — | 0.5 | Accrued payroll and other liabilities | — | — |
| Equity | Miscellaneous other assets | — | 200.3 | | | |
| Total derivatives not designated as hedging instruments | | $ 200.5 | $ 210.3 | | $ (1.6) | $ — |
| Total derivatives | | $ 282.5 | $ 289.6 | | $(141.7) | $ (7.9) |

The following table presents the pre-tax amounts from derivative instruments affecting income and AOCI for the year ended December 31, 2022 and 2021, respectively:

EXHIBIT 20 (86)
AOE2249

| In millions | Location of gain or loss recognized in income on derivative | Gain (loss) recognized in AOCI | | Gain (loss) reclassified into income from AOCI | | Gain (loss) recognized in income on derivative | |
|---|---|---|---|---|---|---|---|
| | | **2022** | 2021 | **2022** | 2021 | **2022** | 2021 |
| Foreign currency | Nonoperating income/expense | **$ 122.5** | $ 74.2 | **$ 137.8** | $ (30.9) | | |
| Interest rate | Interest expense | **83.9** | — | **(2.9)** | (6.3) | | |
| Cash flow hedges | | **$ 206.4** | $ 74.2 | **$ 134.9** | $ (37.2) | | |
| Foreign currency denominated debt | Nonoperating income/expense | **$ 902.8** | $ 725.8 | | 47.1 | | |
| Foreign currency derivatives | Nonoperating income/expense | **(12.0)** | 40.2 | | | | |
| Foreign currency derivatives[1] | Interest expense | | | | | **$ 11.2** | $ 14.7 |
| Net investment hedges | | **$ 890.8** | $ 766.0 | | $ 47.1 | **$ 11.2** | $ 14.7 |
| Foreign currency | Nonoperating income/expense | | | | | **$ 9.3** | $ 9.4 |
| Equity | Selling, general & administrative expenses | | | | | **(9.3)** | 99.3 |
| Equity | Other operating income/ expense, net | | | | | **—** | (11.3) |
| Undesignated derivatives | | | | | | **$ —** | $ 97.4 |

[1]*The amount of gain (loss) recognized in income related to components excluded from effectiveness testing.*

### Fair Value Hedges

The Company enters into fair value hedges to reduce the exposure to changes in fair values of certain liabilities. The Company enters into fair value hedges that convert a portion of its fixed rate debt into floating rate debt by use of interest rate swaps. At December 31, 2022, the carrying amount of fixed-rate debt that was effectively converted was an equivalent notional amount of $1.2 billion, which included a decrease of $91.5 million of cumulative hedging adjustments. For the year ended December 31, 2022, the Company recognized a $96.3 million loss on the fair value of interest rate swaps, and a corresponding gain on the fair value of the related hedged debt instrument to interest expense.

### Cash Flow Hedges

The Company enters into cash flow hedges to reduce the exposure to variability in certain expected future cash flows. To protect against the reduction in value of forecasted foreign currency cash flows (such as royalties denominated in foreign currencies), the Company uses foreign currency forwards to hedge a portion of anticipated exposures. The hedges cover up to the next 18 months for certain exposures and are denominated in various currencies. As of December 31, 2022, the Company had derivatives outstanding with an equivalent notional amount of $1.5 billion that hedged a portion of forecasted foreign currency denominated cash flows.

Based on market conditions at December 31, 2022, the $30.7 million in cumulative cash flow hedging gains, after tax, is not expected to have a significant effect on earnings over the next 12 months.

### Net Investment Hedges

The Company uses foreign currency denominated debt (third party and intercompany) as well as foreign currency derivatives to hedge its investments in certain foreign subsidiaries and affiliates. Realized and unrealized translation adjustments from these hedges are included in shareholders' equity in the foreign currency translation component of Other comprehensive income ("OCI") and offset translation adjustments on the underlying net assets of foreign subsidiaries and affiliates, which also are recorded in OCI. As of December 31, 2022, $12.2 billion of the Company's third party foreign currency denominated debt, $679 million of intercompany foreign currency denominated debt, and $585 million of foreign currency derivatives were designated to hedge investments in certain foreign subsidiaries and affiliates.

### Undesignated Derivatives

The Company enters into certain derivatives that are not designated for hedge accounting. Therefore, the changes in the fair value of these derivatives are recognized immediately in earnings together with the gain or loss from the hedged balance sheet position. As an example, the Company enters into equity derivative contracts, including total return swaps, to hedge market-driven changes in certain of its supplemental benefit plan liabilities. Changes in the fair value of these derivatives are recorded in Selling, general & administrative expenses together with the changes in the supplemental benefit plan liabilities. In addition, the Company uses foreign currency forwards to mitigate the change in fair value of certain foreign currency denominated assets and liabilities. The changes in the fair value of these derivatives are recognized in Nonoperating (income) expense, net, along with the currency gain or loss from the hedged balance sheet position.

### Credit Risk

The Company is exposed to credit-related losses in the event of non-performance by its derivative counterparties. The Company did not have significant exposure to any individual counterparty at December 31, 2022 and has master agreements that contain netting arrangements. For financial reporting purposes, the Company presents gross derivative balances in the financial statements and supplementary data, including for counterparties subject to netting arrangements. Some of these agreements also require each party to post collateral if credit ratings fall below, or aggregate exposures exceed, certain contractual limits. At December 31, 2022, the Company was required to post $78 million of collateral due to the negative fair value of certain derivative positions. The Company's counterparties were not required to post collateral on any derivative position, other than on certain hedges of the Company's supplemental benefit plan liabilities where the counterparties were required to post collateral on their liability positions.

EXHIBIT O(86)

AOE2250

**SHARE-BASED COMPENSATION**

The Company has a share-based compensation plan, which authorizes the granting of various equity-based incentives including stock options and restricted stock units ("RSUs") to employees and nonemployee directors.

Share-based compensation, which includes the portion vesting of all share-based awards granted based on the grant date fair value, is generally amortized on a straight-line basis over the vesting period in Selling, general & administrative expenses.

The fair value of each stock option granted is estimated on the date of grant using a closed-form pricing model. The pricing model requires assumptions, which impact the assumed fair value, including the expected life of the stock option, the risk-free interest rate, expected volatility of the Company's stock over the expected life and the expected dividend yield. The Company uses historical data to determine these assumptions and if these assumptions change significantly for future grants, share-based compensation expense will fluctuate in future years. In addition, the Company estimates forfeitures when determining the amount of compensation costs to be recognized each period.

The fair value of each RSU granted is equal to the market price of the Company's stock at date of grant. For performance-based RSUs, the Company includes a relative Total Shareholder Return ("TSR") modifier to determine the number of shares earned at the end of the performance period. The fair value of performance-based RSUs that include the TSR modifier is determined using a Monte Carlo valuation model.

Refer to the Share-based Compensation footnote on page 56 of this Form 10-K for additional information.

**PER COMMON SHARE INFORMATION**

Diluted earnings per common share is calculated using net income divided by diluted weighted-average shares. Diluted weighted-average shares include weighted-average shares outstanding plus the dilutive effect of share-based compensation calculated using the treasury stock method, of (in millions of shares): 2022–4.8; 2021–5.5; 2020–5.5. Share-based compensation awards that were not included in diluted weighted-average shares because they would have been antidilutive were (in millions of shares): 2022–1.5; 2021–2.2; 2020–1.8.

**CASH AND EQUIVALENTS**

The Company considers short-term, highly liquid investments with an original maturity of 90 days or less to be cash equivalents. As of December 31, 2022, Cash and equivalents was $2.6 billion of which $1.8 billion consisted of certificates of deposit.

EXHIBIT O (86)

AOE2251

## Segment and Geographic Information

McDonald's operates under an organizational structure with the following global business segments reflecting how management reviews and evaluates operating performance:

- U.S. - the Company's largest market. The segment is 95% franchised as of December 31, 2022.

- International Operated Markets - comprised of markets, or countries in which the Company operates and franchises restaurants, including Australia, Canada, France, Germany, Italy, the Netherlands, Spain and the U.K. The segment is 89% franchised as of December 31, 2022.

- International Developmental Licensed Markets & Corporate - comprised primarily of developmental licensee and affiliate markets in the McDonald's system. Corporate activities are also reported in this segment. The segment is 98% franchised as of December 31, 2022.

In December 2021 and April 2022, the Company completed the divestitures of Apprente (McD Tech Labs) and Dynamic Yield, respectively. Additionally, in June 2022, the Company sold its business in Russia. Prior to their respective dates of sale, financial performance relating to Dynamic Yield and McD Tech Labs is reflected within the International Developmental Licensed Markets & Corporate segment and financial performance relating to Russia is reflected in the International Operated Markets segment.

All intercompany revenues and expenses are eliminated in computing revenues and operating income. Corporate general and administrative expenses consist of home office support costs in areas such as facilities, finance, human resources, information technology, legal, marketing, restaurant operations, supply chain and training. Corporate assets include corporate cash and equivalents, asset portions of financial instruments and home office facilities.

| In millions | | 2022 | | 2021 | | 2020 |
|---|---|---|---|---|---|---|
| U.S. | $ | 9,588.4 | $ | 8,865.0 | $ | 7,828.5 |
| International Operated Markets | | 11,297.0 | | 12,219.8 | | 9,570.7 |
| International Developmental Licensed Markets & Corporate | | 2,297.2 | | 2,138.1 | | 1,808.6 |
| Total revenues | $ | 23,182.6 | $ | 23,222.9 | $ | 19,207.8 |
| U.S. | $ | 5,136.4 | $ | 4,754.7 | $ | 3,789.1 |
| International Operated Markets | | 3,926.0 | | 5,130.6 | | 3,315.1 |
| International Developmental Licensed Markets & Corporate | | 308.6 | | 470.7 | | 219.8 |
| Total operating income | $ | 9,371.0 | $ | 10,356.0 | $ | 7,324.0 |
| U.S. | $ | 21,793.0 | $ | 21,280.3 | $ | 21,010.0 |
| International Operated Markets | | 21,979.3 | | 24,186.1 | | 24,744.0 |
| International Developmental Licensed Markets & Corporate | | 6,663.3 | | 8,387.9 | | 6,872.8 |
| Total assets | $ | 50,435.6 | $ | 53,854.3 | $ | 52,626.8 |
| U.S. | $ | 860.0 | $ | 940.7 | $ | 890.4 |
| International Operated Markets | | 1,015.2 | | 1,050.6 | | 731.5 |
| International Developmental Licensed Markets & Corporate | | 24.0 | | 48.7 | | 18.9 |
| Total capital expenditures | $ | 1,899.2 | $ | 2,040.0 | $ | 1,640.8 |
| U.S. | $ | 912.4 | $ | 840.7 | $ | 813.8 |
| International Operated Markets | | 640.6 | | 726.4 | | 678.5 |
| International Developmental Licensed Markets & Corporate | | 317.6 | | 301.0 | | 259.1 |
| Total depreciation and amortization | $ | 1,870.6 | $ | 1,868.1 | $ | 1,751.4 |

Total long-lived assets, primarily property and equipment and the Company's Lease right-of-use asset, were (in millions)–Consolidated: 2022–$37,403.0; 2021–$39,267.0; U.S. based: 2022–$19,416.3; 2021–$19,600.1.

EXHIBIT O(86)

AOE2252

## Property and Equipment

Net property and equipment consisted of:

| In millions | December 31, 2022 | 2021 |
|---|---|---|
| Land | $ 6,686.3 | $ 6,487.6 |
| Buildings and improvements on owned land | 18,934.2 | 18,666.0 |
| Buildings and improvements on leased land | 12,492.0 | 13,283.3 |
| Equipment, signs and seating | 2,498.6 | 3,032.0 |
| Other | 426.5 | 447.7 |
| Property and equipment, at cost | 41,037.6 | 41,916.6 |
| Accumulated depreciation and amortization | (17,264.0) | (17,196.0) |
| Net property and equipment | $ 23,773.6 | $ 24,720.6 |

Depreciation and amortization expense for property and equipment was (in millions): 2022–$1,454.0; 2021–$1,530.7; 2020–$1,469.4. The decrease in both Buildings and improvements on leased land and Equipment, signs and seating from 2021 to 2022 was primarily driven by the Company's sale of the business in Russia.

## Franchise Arrangements

Conventional franchise arrangements generally include a lease and a license and provide for payment of initial fees, as well as continuing rent and royalties to the Company based upon a percent of sales with minimum rent payments. Minimum rent payments are based on the Company's underlying investment in owned sites and parallel the Company's underlying leases and escalations on properties that are leased. Under the franchise arrangement, franchisees are granted the right to operate a restaurant using the McDonald's System and, in most cases, the use of a restaurant facility, generally for a period of 20 years. At the end of the 20-year franchise arrangement, the Company maintains control of the underlying real estate and building and can either enter into a new 20-year franchise arrangement with the existing franchisee or a different franchisee, or close the restaurant. Franchisees generally pay related occupancy costs including property taxes, insurance and site maintenance.

Developmental licensees and affiliates operating under license agreements pay a royalty to the Company based upon a percent of sales, and generally pay initial fees.

McDonald's has elected to allocate consideration in the franchise contract among lease and non-lease components in the same manner that it has historically: rental income (lease), royalty income (non-lease) and initial fee income (non-lease). This disaggregation and presentation of revenue is based on the nature, amount, timing and certainty of the revenue and cash flows. The allocation has been determined based on a mix of both observable and estimated standalone selling prices (the price at which an entity would sell a promised good or service separately to a customer).

Revenues from franchised restaurants consisted of:

| In millions | 2022 | 2021 | 2020 |
|---|---|---|---|
| Rents | $ 9,045.7 | $ 8,381.1 | $ 6,844.7 |
| Royalties | 5,005.6 | 4,645.1 | 3,831.5 |
| Initial fees | 54.5 | 59.2 | 49.9 |
| Revenues from franchised restaurants | $ 14,105.8 | $ 13,085.4 | $ 10,726.1 |

As rent and royalties are based upon a percent of sales, government restrictions as a result of COVID-19 had a more significant negative impact on revenues in 2020. The Company granted the deferrals of cash collection for certain rent and royalties earned from franchisees in substantially all markets primarily in the first half of 2020. In total, the Company deferred collection of approximately $1 billion and has collected all of these deferrals as of December 31, 2022.

Future gross minimum rent payments due to the Company under existing conventional franchise arrangements are:

| In millions | Owned sites | Leased sites | Total |
|---|---|---|---|
| 2023 | $ 1,512.5 | $ 1,458.0 | $ 2,970.5 |
| 2024 | 1,471.5 | 1,394.8 | 2,866.3 |
| 2025 | 1,425.9 | 1,332.1 | 2,758.0 |
| 2026 | 1,375.0 | 1,275.5 | 2,650.5 |
| 2027 | 1,328.2 | 1,218.9 | 2,547.1 |
| Thereafter | 9,533.6 | 8,454.3 | 17,987.9 |
| Total minimum payments | $16,646.7 | $ 15,133.6 | $31,780.3 |

At December 31, 2022, net property and equipment under franchise arrangements totaled $20.2 billion (including land of $5.9 billion) after deducting accumulated depreciation and amortization of $14.3 billion.

AOE2253

## Leasing Arrangements

The Company is the lessee in a significant real estate portfolio, primarily through ground leases (the Company leases the land and generally owns the building) and through improved leases (the Company leases the land and buildings). The Company determines whether an arrangement is a lease at inception. Lease terms for most restaurants, where market conditions allow, are generally for 20 years and, in many cases, provide for rent escalations and renewal options. Renewal options are typically solely at the Company's discretion. Escalation terms vary by market with examples including fixed-rent escalations, escalations based on an inflation index and fair-value market adjustments. The timing of these escalations generally range from annually to every five years.

The following table provides detail of rent expense:

| In millions | 2022 | 2021 | 2020 |
|---|---|---|---|
| Restaurants | $1,416.4 | $1,486.3 | $1,399.5 |
| Other | 59.7 | 74.0 | 79.8 |
| Total rent expense | $1,476.1 | $1,560.3 | $1,479.3 |

Rent expense included percent rents in excess of minimum rents (in millions) as follows–Company-operated restaurants: 2022–$39.6; 2021–$69.2; 2020–$53.7. Franchised restaurants: 2022–$209.0; 2021–$160.0; 2020–$136.5. These variable rent payments are based on a percent of sales.

The Lease right-of-use asset and Lease liability reflect the present value of the Company's estimated future minimum lease payments over the lease term, which includes options that are reasonably assured of being exercised, discounted using a collateralized incremental borrowing rate. Typically, renewal options are considered reasonably assured of being exercised if the associated asset lives of the building or leasehold improvements exceed that of the initial lease term, and the sales performance of the restaurant remains strong. Therefore, the Lease right-of-use asset and Lease liability include an assumption on renewal options that have not yet been exercised by the Company, and are not currently a future obligation.

The Company's lease portfolio includes both operating and finance leases, however as of December 31, 2022, the vast majority of the portfolio was classified as operating leases.

As the rate implicit in each lease is not readily determinable, the Company uses an incremental borrowing rate to calculate the lease liability that represents an estimate of the interest rate the Company would incur to borrow on a collateralized basis over the term of a lease within a particular currency environment. The weighted average discount rate used for leases was 3.5% as of December 31, 2022 and 3.7% as of December 31, 2021.

As of December 31, 2022, maturities of lease liabilities for the Company's lease portfolio were as follows:

| In millions | Total * |
|---|---|
| 2023 | $ 1,161.6 |
| 2024 | 1,134.4 |
| 2025 | 1,096.2 |
| 2026 | 1,041.8 |
| 2027 | 1,003.3 |
| Thereafter | 12,799.5 |
| Total lease payments | 18,236.8 |
| Less: imputed interest | (5,441.3) |
| Present value of lease liability | $ 12,795.5 |

\*   Total lease payments include option periods that are reasonably assured of being exercised.

The decrease in the present value of the lease liability since December 31, 2021 is approximately $(0.9) billion. The lease liability will continue to be impacted by new leases, lease modifications, lease terminations, reevaluation of lease terms, and foreign currency.

The Weighted Average Lease Term remaining that is included in the maturities of lease liabilities was 19 years as of December 31, 2022 and 20 years as of December 31, 2021.

EXHIBIT O(86)

AOE2254

## Contingencies

In the ordinary course of business, the Company is subject to proceedings, lawsuits and other claims primarily related to competitors, customers, employees, franchisees, government agencies, intellectual property, shareholders and suppliers. The Company is required to assess the likelihood of any adverse judgments or outcomes to these matters as well as potential ranges of probable losses. A determination of the amount of accrual required, if any, for these contingencies is made after careful analysis of each matter. The required accrual may change in the future due to new developments in a particular matter or changes in approach such as a change in settlement strategy in dealing with these matters. The Company does not believe that any such matter currently being reviewed will have a material adverse effect on its financial condition or results of operations.

## Other Operating (Income) Expense, Net

| In millions | | **2022** | | 2021 | | 2020 |
|---|---|---|---|---|---|---|
| Gains on sales of restaurant businesses | $ | **(59.8)** | $ | (96.6) | $ | (23.3) |
| Equity in earnings of unconsolidated affiliates | | **(113.2)** | | (176.7) | | (117.4) |
| Asset dispositions and other (income) expense, net | | **136.8** | | 75.4 | | 290.7 |
| Impairment and other charges (gains), net | | **1,009.8** | | (285.4) | | (267.5) |
| Total | $ | **973.6** | $ | (483.3) | $ | (117.5) |

- ▪ *Gains on sales of restaurant businesses*

The Company's purchases and sales of businesses with its franchisees are aimed at maintaining an optimal ownership mix in each market. Resulting gains or losses on sales of restaurant businesses are recorded in operating income because these transactions are a recurring part of the Company's business.

- ▪ *Equity in earnings of unconsolidated affiliates*

Unconsolidated affiliates and partnerships are businesses in which the Company actively participates but does not control. The Company records equity in (earnings) losses from these entities representing McDonald's share of results for markets in both the International Operated Markets and International Developmental Licensed Markets segments. For foreign affiliated markets—primarily China and Japan —results are reported net of interest expense and income taxes.

- ▪ *Asset dispositions and other (income) expense, net*

Asset dispositions and other (income) expense, net consists of gains or losses on excess property and other asset dispositions, provisions for restaurant closings, reserves for bad debts, asset write-offs due to restaurant reinvestment, strategic sale of properties, and other miscellaneous income and expenses.

- ▪ *Impairment and other charges (gains), net*

Impairment and other charges (gains), net includes losses that result from the write down of goodwill and long-lived assets from their carrying value to their fair value, as well as charges associated with strategic initiatives, such as refranchising and restructuring activities. The realized gains/losses from the divestiture of ownership percentages of subsidiaries are reflected in this category, including the gains on sale of McDonald's Japan stock in 2020 and 2021, which reduced the Company's ownership in McDonald's Japan from 49% to 35%. Additionally, in 2022 this category includes $1.3 billion of charges related to the sale of the Company's business in Russia and a gain of $271 million related to the Company's sale of its Dynamic Yield business.

EXHIBIT O (86)

AOE2255

## Income Taxes

Income before provision for income taxes, classified by source of income, was as follows:

| In millions | 2022 | 2021 | 2020 |
|---|---|---|---|
| U.S. | $1,845.6 | $2,413.9 | $1,390.4 |
| Outside the U.S. | 5,979.8 | 6,714.0 | 4,750.3 |
| Income before provision for income taxes * | $7,825.4 | $9,127.9 | $6,140.7 |

*Income before provision for income taxes decreased in 2022 primarily due to current and prior year charges and gains detailed in the Net Income and Diluted Earnings Per Share section on page 12 of this Form 10-K, which offset strong operating performance.

The provision for income taxes, classified by the timing and location of payment, was as follows:

| In millions | 2022 | 2021 | 2020 |
|---|---|---|---|
| U.S. federal | $ 517.3 | $ 887.6 | $ 554.1 |
| U.S. state | 246.3 | 228.1 | 119.1 |
| Outside the U.S. | 1,230.1 | 895.3 | 730.6 |
| Current tax provision | 1,993.7 | 2,011.0 | 1,403.8 |
| U.S. federal | (80.0) | (177.4) | 870.3 |
| U.S. state | (46.2) | (24.1) | 73.3 |
| Outside the U.S. | (219.5) | (226.8) | (937.2) |
| Deferred tax provision | (345.7) | (428.3) | 6.4 |
| Provision for income taxes | $ 1,648.0 | $ 1,582.7 | $ 1,410.2 |

Net deferred tax (assets) liabilities consisted of:

| In millions | December 31, 2022 | 2021 |
|---|---|---|
| Lease right-of-use asset | $3,045.0 | $3,462.7 |
| Property and equipment | 1,706.3 | 1,648.6 |
| Intangible assets | 296.7 | 696.0 |
| Other | 595.4 | 490.8 |
| Total deferred tax liabilities | 5,643.4 | 6,298.1 |
| Lease liability | (3,099.9) | (3,516.9) |
| Intangible assets | (2,658.9) | (2,524.6) |
| Property and equipment | (676.3) | (647.1) |
| Deferred foreign tax credits | (74.5) | (311.5) |
| Employee benefit plans | (180.6) | (153.6) |
| Deferred revenue | (165.8) | (121.4) |
| Operating loss carryforwards | (76.6) | (96.1) |
| Other | (267.4) | (284.4) |
| Total deferred tax assets before valuation allowance | (7,200.0) | (7,655.6) |
| Valuation allowance | 1,077.1 | 1,076.1 |
| Net deferred tax (assets) liabilities | $ (479.5) | $ (281.4) |
| Balance sheet presentation: | | |
| Deferred income taxes | $1,997.5 | $2,075.6 |
| Other assets-miscellaneous | (2,477.0) | (2,357.0) |
| Net deferred tax (assets) liabilities | $ (479.5) | $ (281.4) |

EXHIBIT O(86)

AOE2256

At December 31, 2022, the Company had net operating loss carryforwards of $407.5 million, of which $174.6 million has an indefinite carryforward. The remainder will expire at various dates from 2023 to 2040.

The statutory U.S. federal income tax rate reconciles to the effective income tax rates as follows:

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Statutory U.S. federal income tax rate | 21.0 % | 21.0 % | 21.0 % |
| State income taxes, net of related federal income tax benefit | 2.0 | 1.8 | 1.8 |
| Foreign income taxed at different rates | 1.1 | 0.9 | 0.4 |
| Tax impact of intercompany transactions | 0.2 | 0.1 | 2.1 |
| Global intangible low-tax income ("GILTI") | 0.4 | 0.3 | 1.2 |
| Foreign-derived intangible income ("FDII") | (4.2) | (2.6) | (3.4) |
| U.S./Foreign tax law changes | — | (3.9) | (1.8) |
| Nonoperating expense related to France audit settlement | 1.4 | — | — |
| Other, net | (0.8) | (0.3) | 1.7 |
| Effective income tax rates | 21.1 % | 17.3 % | 23.0 % |

The 2022 effective income tax rate reflected the tax impact of $537 million of non-operating expense related to the settlement of the tax audit in France. In 2021, U.S./Foreign tax law changes included a $364 million income tax benefit related to the remeasurement of deferred taxes as a result of a change in the U.K. statutory income tax rate.

As of December 31, 2022 and 2021, the Company's gross unrecognized tax benefits totaled $647.0 million and $1,504.9 million, respectively. After considering the deferred tax accounting impact, it is expected that about $410 million of the total as of December 31, 2022 would favorably affect the effective tax rate if resolved in the Company's favor.

The following table presents a reconciliation of the beginning and ending amounts of unrecognized tax benefits:

| In millions | 2022 | 2021 |
|---|---|---|
| Balance at January 1 | $ 1,504.9 | $ 1,479.2 |
| Decreases for positions taken in prior years | (579.4) | (31.9) |
| Increases for positions taken in prior years | 49.8 | 26.1 |
| Increases for positions related to the current year | 100.3 | 60.7 |
| Settlements with taxing authorities | (428.1) | (16.8) |
| Lapsing of statutes of limitations | (0.5) | (12.4) |
| Balance at December 31[1] | $ 647.0 | $ 1,504.9 |

(1)   Of this amount, $619.6 million and $1,157.5 million are included in Long-term income taxes for 2022 and 2021, respectively, and $27.3 million and $332.0 million are included in Prepaid expenses and other current assets for 2022 and 2021, respectively, on the Consolidated Balance Sheet. The remainder is included in Deferred income taxes on the Consolidated Balance Sheet.

 In 2015, the U.S. Internal Revenue Service (the "IRS") issued a Revenue Agent Report ("RAR") that included certain disagreed transfer pricing adjustments related to the Company's U.S. Federal income tax returns for 2009 and 2010. Also in 2015, the Company filed a protest with the IRS related to these disagreed transfer pricing matters. During 2017, the Company received a response to its protest, and beginning in December 2018 the Company met with the IRS Appeals team regarding settlement of these issues. In February 2023, the Company finalized a settlement agreement with the IRS Appeals team related to the disagreed transfer pricing matters for the years 2009-2010.

In 2017, the IRS completed its examination of the Company's U.S. Federal income tax returns for 2011 and 2012. In 2018, the IRS issued a RAR for these years. As expected, the RAR included the same disagreed transfer pricing matters as the 2009 and 2010 RAR. Also in 2018, the Company filed a protest with the IRS related to these disagreed transfer pricing matters. The Company continues to meet with the IRS Appeals team regarding the settlement of these issues.

The Company is also under audit in multiple foreign tax jurisdictions for matters primarily related to transfer pricing, and the Company is under audit in multiple state tax jurisdictions. While the Company cannot estimate the impact to the effective tax rate, it is reasonably possible that the total amount of unrecognized tax benefits could decrease up to $70 million within the next 12 months. This would be due to the possible settlement of the IRS transfer pricing matters, completion of the aforementioned foreign and state tax audits and the expiration of the statute of limitations in multiple tax jurisdictions. In 2022, the Company settled an income tax audit with France, which resulted in $537 million of nondeductible non-operating expense and conclusion of income tax matters related to transfer pricing for the years 2009-2020.

During 2022, the Company finalized and settled certain tax examinations and remeasured other income tax reserves based on audit progression.  It is reasonably possible that, as a result of audit progression in both the U.S. and foreign tax audits within the next 12 months, there may be new information that causes the Company to reassess the total amount of unrecognized tax benefits recorded. While the Company cannot estimate the impact that new information may have on the unrecognized tax benefit balance, it believes that the liabilities recorded are appropriate and adequate.

The Company operates within multiple tax jurisdictions and is subject to audit in these jurisdictions.  With few exceptions, the Company is no longer subject to U.S. federal, state and local, or non-U.S. income tax examinations for years before 2009.

The Company had $24.7 million and $183.6 million accrued for interest and penalties related to tax matters at December 31, 2022 and 2021, respectively. The Company recognized interest and penalties related to tax matters of $90.5 million in 2022, $24.4 million in 2021, and $32.4 million in 2020, which are included in the provision for income taxes.

As of December 31, 2022, the Company has accumulated undistributed earnings generated by its foreign subsidiaries, which were predominantly taxed in the U.S. as a result of the transition tax provisions enacted under the Tax Cuts and Jobs Act of 2017. Management does not assert that these previously-taxed unremitted earnings are indefinitely reinvested in operations outside the U.S. Accordingly, the Company has provided deferred taxes for the tax effects incremental to the transition tax. The Company has not provided for deferred taxes on outside basis differences in its investments in its foreign subsidiaries that are unrelated to these accumulated undistributed earnings, as these outside basis differences are indefinitely reinvested. A determination of the unrecognized deferred taxes related to these other components of the outside basis differences is not practicable.

## Employee Benefit Plans

The Company's 401(k) Plan is maintained for U.S.-based employees and includes a 401(k) feature, as well as an employer match. The 401(k) feature allows eligible participants to make pre-tax contributions that are matched each pay period (with an annual true-up) through cash contributions.

All current account balances, future contributions and related earnings can be invested in nine investment alternatives (including a target date fund series), as well as McDonald's stock in accordance with each participant's investment elections. Future participant contributions are limited to 20% investment in McDonald's stock and participants may not transfer their existing account balance into McDonald's stock if the transfer would cause the value of their interest in the fund to exceed 20% of their total 401(k) Plan account balance. Participants may choose to make separate investment choices for current account balances and future contributions.

The Company also maintains certain unfunded nonqualified supplemental benefit plans that allow participants to (i) make tax-deferred contributions and (ii) receive an annual Company-match allocation that cannot be made under the 401(k) Plan because of IRS limitations. The investment alternatives and returns are based on certain market-rate investment alternatives under the 401(k) Plan, net of expenses. Total liabilities were $380.0 million and $456.8 million at December 31, 2022 and 2021, respectively, and were primarily included in Other long-term liabilities on the Consolidated Balance Sheet.

The Company has entered into derivative contracts to hedge market-driven changes in certain of the liabilities. At December 31, 2022, derivatives with a fair value of $200.5 million indexed to the Company's stock and a total return swap with a notional amount of $164.4 million indexed to certain market indices were included at their fair value in Prepaid expenses and other current assets on the Consolidated Balance Sheet. Changes in liabilities for these nonqualified plans and in the fair value of the derivatives are recorded primarily in Selling, general & administrative expenses. Changes in fair value of the derivatives indexed to the Company's stock are recorded in the income statement because the contracts provide the counterparty with a choice to settle in cash or shares.

Total U.S. costs for the 401(k) Plan and nonqualified benefits and related hedging activities, were (in millions): 2022–$54.2; 2021–$39.5; 2020–$37.0. Certain subsidiaries outside the U.S. also offer profit sharing, stock purchase or other similar benefit plans. Total plan costs outside the U.S. were (in millions): 2022–$44.4; 2021–$41.8; 2020–$36.6.

The total combined liabilities for international retirement plans were $36.6 million and $41.7 million at December 31, 2022 and 2021, respectively. Other post-retirement benefits and post-employment benefits were immaterial to the Consolidated Income Statement.

EXHIBIT O(86)

AOE2258

Debt Financing

**LINE OF CREDIT AGREEMENTS**

At December 31, 2022, the Company had a line of credit agreement of $3.5 billion, which expires in December 2024. The Company incurs fees of 0.08% per annum on the total commitment, which remained unused. Fees and interest rates on this line are primarily based on the Company's long-term credit rating assigned by Moody's and Standard & Poor's. In addition, the Company's subsidiaries had unused lines of credit that were primarily uncommitted, short-term and denominated in various currencies at local market rates of interest.

The weighted-average interest rate of short-term borrowings was 5.2% at December 31, 2022 (based on $264.5 million of foreign currency bank line borrowings) and 2.4% at December 31, 2021 (based on $263.1 million of foreign currency bank line borrowings).

**DEBT OBLIGATIONS**

The Company has incurred debt obligations principally through public and private offerings and bank loans. There are no provisions in the Company's debt obligations that would accelerate repayment of debt as a result of a change in credit ratings or a material adverse change in the Company's business. Certain of the Company's debt obligations contain cross-acceleration provisions, and restrictions on Company and subsidiary mortgages and the long-term debt of certain subsidiaries. Under certain agreements, the Company has the option to retire debt prior to maturity, either at par or at a premium over par. The Company has no current plans to retire a significant amount of its debt prior to maturity, but continues to look for ways to optimize its debt portfolio.

The following table summarizes the Company's debt obligations (interest rates and debt amounts reflected in the table include the effects of interest rate swaps used to hedge debt).

| In millions of U.S. Dollars | Maturity dates | Interest rates[1] December 31 | | Amounts outstanding December 31 | |
|---|---|---|---|---|---|
| | | **2022** | 2021 | **2022** | 2021 |
| Fixed | | **4.0 %** | 3.9 % | **$22,382.0** | $21,833.7 |
| Floating | | **6.6** | 1.6 | **750.0** | 1,150.0 |
| Total U.S. Dollar | 2023-2052 | | | **23,132.0** | 22,983.7 |
| Fixed | | **1.6** | 1.4 | **8,704.1** | 8,682.3 |
| Floating | | **5.1** | 2.1 | **321.2** | 341.1 |
| Total Euro | 2023-2034 | | | **9,025.3** | 9,023.4 |
| Fixed | | **3.4** | 3.4 | **748.7** | 797.9 |
| Floating | | **4.3** | 1.2 | **204.4** | 217.9 |
| Total Australian Dollar | 2024-2029 | | | **953.1** | 1,015.8 |
| Total British Pounds Sterling - Fixed | 2032-2054 | **4.1** | 4.2 | **1,504.1** | 1,145.0 |
| Total Canadian Dollar - Fixed | 2025 | **3.1** | 3.1 | **737.3** | 790.6 |
| Total Japanese Yen - Fixed | 2030 | **2.9** | 2.9 | **95.3** | 108.6 |
| Fixed | | **0.2** | 0.2 | **432.6** | 438.2 |
| Floating | | **5.2** | 2.4 | **262.7** | 257.1 |
| Total other currencies[2] | 2023-2024 | | | **695.3** | 695.3 |
| Debt obligations before fair value adjustments and deferred debt costs[3] | | | | **36,142.4** | 35,762.4 |
| Fair value adjustments[4] | | | | **(91.5)** | 4.8 |
| Deferred debt costs | | | | **(147.4)** | (144.5) |
| Total debt obligations | | | | **$35,903.5** | $35,622.7 |

(1)  Weighted-average effective rate, computed on a semi-annual basis.

(2)  Consists of Swiss Francs and Korean Won.

(3)  Aggregate maturities for 2022 debt balances, before fair value adjustments and deferred debt costs, are as follows (in millions): 2023–$0.0; 2024–$5,472.9; 2025–$3,060.5; 2026–$2,418.7; 2027–$2,487.2; Thereafter–$22,703.1. These amounts include a reclassification of short-term obligations totaling $2.7 billion to long-term obligations as they are supported by a long-term line of credit agreement expiring in December 2024.

(4)  The carrying value of underlying items in fair value hedges, in this case debt obligations, are adjusted for fair value changes to the extent they are attributable to the risk designated as being hedged. The related hedging instruments are also recorded at fair value on the Consolidated Balance Sheet.

EXHIBIT O(86)

AOE2259

## Share-based Compensation

The Company maintains a share-based compensation plan, which authorizes the granting of various equity-based incentives including stock options and RSUs to employees and nonemployee directors. The number of shares of common stock reserved for issuance under the plan was 34.4 million at December 31, 2022, including 21.8 million available for future grants.

Share-based compensation expense and the effect on diluted earnings per common share were as follows:

| In millions, except per share data | 2022 | 2021 | 2020 |
|---|---|---|---|
| Share-based compensation expense | $ 166.7 | $ 139.2 | $ 92.4 |
| After tax | $ 145.9 | $ 120.4 | $ 78.3 |
| Earnings per common share-diluted | $ 0.20 | $ 0.16 | $ 0.10 |

As of December 31, 2022, there was $161.1 million of total unrecognized compensation cost related to nonvested share-based compensation that is expected to be recognized over a weighted-average period of 2.0 years.

### STOCK OPTIONS

Stock options to purchase common stock are granted with an exercise price equal to the closing market price of the Company's stock on the date of grant. Substantially all of the options become exercisable in four equal installments, beginning a year from the date of the grant, and generally expire 10 years from the grant date.

The following table presents the weighted-average assumptions used in the option pricing model for the 2022, 2021 and 2020 stock option grants. The expected life of the options represents the period of time the options are expected to be outstanding and is based on historical trends. Expected stock price volatility is generally based on the historical volatility of the Company's stock for a period approximating the expected life. The expected dividend yield is based on the Company's most recent annual dividend rate. The risk-free interest rate is based on the U.S. Treasury yield curve in effect at the time of grant with a term equal to the expected life.

*Weighted-average assumptions*

| | 2022 | 2021 | 2020 |
|---|---|---|---|
| Expected dividend yield | 2.2 % | 2.4 % | 2.3 % |
| Expected stock price volatility | 21.3 % | 21.8 % | 19.1 % |
| Risk-free interest rate | 1.9 % | 0.7 % | 1.4 % |
| Expected life of options *(in years)* | 5.7 | 5.7 | 5.7 |
| Fair value per option granted | $ 42.12 | $ 30.91 | $ 29.40 |

Intrinsic value for stock options is defined as the difference between the current market value of the Company's stock and the exercise price. During 2022, 2021 and 2020, the total intrinsic value of stock options exercised was $242.2 million, $302.0 million and $290.4 million, respectively. Cash received from stock options exercised during 2022 was $248.2 million and the tax benefit realized from stock options exercised totaled $48.3 million. The Company uses treasury shares purchased under the Company's share repurchase program to satisfy share-based exercises.

A summary of the status of the Company's stock option grants as of December 31, 2022, 2021 and 2020, and changes during the years then ended, is presented in the following table:

| | 2022 | | | | 2021 | | 2020 | |
|---|---|---|---|---|---|---|---|---|
| Options | Shares in millions | Weighted-average exercise price | Weighted-average remaining contractual life in years | Aggregate intrinsic value in millions | Shares in millions | Weighted-average exercise price | Shares in millions | Weighted-average exercise price |
| Outstanding at beginning of year | 12.0 | $156.13 | | | 13.4 | $139.44 | 14.6 | $ 124.21 |
| Granted | 1.6 | 252.97 | | | 2.1 | 215.73 | 1.8 | 214.18 |
| Exercised | (1.9) | 128.08 | | | (2.4) | 115.29 | (2.8) | 104.58 |
| Forfeited/expired | (0.3) | 225.93 | | | (1.1) | 160.50 | (0.2) | 184.69 |
| Outstanding at end of year | 11.4 | $172.27 | 5.6 | $1,041.6 | 12.0 | $156.13 | 13.4 | $ 139.44 |
| Exercisable at end of year | 7.7 | $145.87 | 4.4 | $ 904.2 | 7.8 | | 8.8 | |

EXHIBIT O(86)

AOE2260

**RSUs**

RSUs generally vest 100% on the third anniversary of the grant and are payable in either shares of the Company's common stock or cash, at the Company's discretion. The fair value of each RSU granted is equal to the market price of the Company's stock at date of grant. Separately, Company officers have been awarded RSUs that vest based on Company performance. For performance-based RSUs, the Company includes a relative TSR modifier to determine the number of shares earned at the end of the performance period. The fair value of performance-based RSUs that include the TSR modifier is determined using a Monte Carlo valuation model.

A summary of the Company's RSU activity during the years ended December 31, 2022, 2021 and 2020 is presented in the following table:

| RSUs | 2022 | | 2021 | | 2020 | |
|---|---|---|---|---|---|---|
| | Shares in millions | Weighted-average grant date fair value | Shares in millions | Weighted-average grant date fair value | Shares in millions | Weighted-average grant date fair value |
| Nonvested at beginning of year | 1.3 | $197.10 | 1.3 | $176.81 | 1.4 | $150.95 |
| Granted | 0.5 | 242.82 | 0.6 | 206.92 | 0.6 | 201.92 |
| Vested | (0.4) | 173.31 | (0.4) | 153.55 | (0.6) | 127.99 |
| Forfeited | (0.2) | 205.61 | (0.2) | 168.38 | (0.1) | 172.45 |
| Nonvested at end of year | 1.2 | $222.32 | 1.3 | $197.10 | 1.3 | $176.81 |

The total fair value of RSUs vested during 2022, 2021 and 2020 was $110.3 million, $80.0 million and $119.4 million, respectively. The tax benefit realized from RSUs vested during 2022 was $18.5 million.

## SUBSEQUENT EVENTS

On January 6, 2023, the Company announced an evolution of its successful Accelerating the Arches strategy. Enhancements include the additions of Restaurant Development to the Company's growth pillars and an internal effort to modernize ways of working, *Accelerating the Organization*, both of which are aimed at elevating the Company's performance. The Company is currently evaluating the impact this will have on its business.

EXHIBIT 20 (86)

AOE2261

## Management's Assessment of Internal Control Over Financial Reporting

The financial statements were prepared by management, which is responsible for their integrity and objectivity and for establishing and maintaining adequate internal controls over financial reporting.

The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. The Company's internal control over financial reporting includes those policies and procedures that:

I.   pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;

II.   provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and

III.   provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

There are inherent limitations in the effectiveness of any internal control, including the possibility of human error and the circumvention or overriding of controls. Accordingly, even effective internal controls can provide only reasonable assurances with respect to financial statement preparation. Further, because of changes in conditions, the effectiveness of internal controls may vary over time.

Management assessed the design and effectiveness of the Company's internal control over financial reporting as of December 31, 2022. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control – Integrated Framework (2013 Framework).

Based on management's assessment using those criteria, as of December 31, 2022, management believes that the Company's internal control over financial reporting is effective.

Ernst & Young, LLP, independent registered public accounting firm, has audited the financial statements of the Company for the fiscal years ended December 31, 2022, 2021 and 2020 and the Company's internal control over financial reporting as of December 31, 2022. Their reports are presented on the following pages. The independent registered public accountants and internal auditors advise management of the results of their audits, and make recommendations to improve the system of internal controls. Management evaluates the audit recommendations and takes appropriate action.

McDONALD'S CORPORATION

February 24, 2023

EXHIBIT O(86)

AOE2262

Report of Independent Registered Public Accounting Firm

The Board of Directors and Shareholders of McDonald's Corporation

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of McDonald's Corporation (the Company) as of December 31, 2022 and 2021, the related consolidated statements of income, comprehensive income, shareholders' equity and cash flows for each of the three years in the period ended December 31, 2022, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2022 and 2021, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2022, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2022, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated February 24, 2023 expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of the critical audit matter does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosure to which it relates.

EXHIBIT O (86)
AOE2263

*Valuation of Unrecognized Tax Benefits and Related Regulatory Actions*

*Description of the Matter*

As described in the Income Taxes footnote to the consolidated financial statements, the Company's unrecognized tax benefits, which includes transfer pricing matters, totaled $647.0 million at December 31, 2022. The Company, like other multi-national companies, is regularly audited by federal, state and foreign tax authorities, and tax assessments may arise several years after tax returns have been filed. Accordingly, tax liabilities are recorded when, in management's judgment, a tax position does not meet the more likely than not threshold for recognition. For tax positions that meet the more likely than not threshold, a tax liability may still be recorded depending on management's assessment of how the tax position will ultimately be settled. The Company may also be subject to regulatory actions related to these tax matters. The Company accrues liabilities for regulatory actions when a loss is probable and the amount or range of loss is reasonably estimable.

Auditing the measurement of unrecognized tax benefits and liabilities arising from regulatory actions related to transfer pricing used in intercompany transactions was challenging because the measurement is based on judgmental interpretations of complex tax laws and legal rulings and because the pricing of the intercompany transactions is based on studies that may produce a range of outcomes (e.g., the price that would be charged in an arm's-length transaction).

*How We Addressed the Matter in Our Audit*

We obtained an understanding, evaluated the design, and tested the operating effectiveness of controls over the Company's process to assess the technical merits and measurement of these unrecognized tax benefits and related regulatory liabilities. For example, we tested management's review of the unrecognized tax benefit calculations, which included evaluation of the comparable transactions used to determine the ranges of outcomes, pricing conclusions reached in management's transfer pricing studies, the assessment of other third-party information, and settlement agreements with relevant tax and regulatory authorities.

With the assistance of our income tax professionals, we performed audit procedures that included, among others, evaluating the technical merits of the Company's position and assessing the recognition and measurement of unrecognized tax benefits and liabilities resulting from regulatory actions related to transfer pricing. For example, we assessed the inputs utilized and the pricing conclusions reached in the transfer pricing studies executed by management, and compared the methods used to alternative methods and industry benchmarks. We reviewed advice obtained by the Company from third-party advisors. In addition, we used our knowledge of historical settlement activity, income tax laws, and other market information to evaluate the technical merits of the Company's positions. For positions settled or effectively settled in the current year, we reviewed the Company's communications and agreements with the relevant tax and regulatory authorities. Where applicable, we requested and received an external legal counsel confirmation letter to independently verify our understanding of settlement agreements.

/s/ Ernst & Young LLP

We have served as the Company's auditor since 1964.

Chicago, Illinois
February 24, 2023

EXHIBIT O(86)

AOE2264

## Report of Independent Registered Public Accounting Firm on Internal Control Over Financial Reporting

The Board of Directors and Shareholders of McDonald's Corporation

**Opinion on Internal Control over Financial Reporting**

We have audited McDonald's Corporation's internal control over financial reporting as of December 31, 2022, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, McDonald's Corporation (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2022, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of McDonald's Corporation as of December 31, 2022 and 2021, and the related consolidated statements of income, comprehensive income, shareholders' equity and cash flows for each of the three years in the period ended December 31, 2022, and the related notes and our report dated February 24, 2023 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Assessment of Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP

Chicago, Illinois
February 24, 2023

EXHIBIT O (86)

AOE2265

## Controls and Procedures

**DISCLOSURE CONTROLS**

An evaluation was conducted under the supervision and with the participation of the Company's management, including the Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as that term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of December 31, 2022. Based on that evaluation, the CEO and CFO concluded that the Company's disclosure controls and procedures were effective as of such date to provide reasonable assurances that information required to be disclosed by the Company in the reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and is accumulated and communicated to the Company's management, including the CEO and CFO, as appropriate to allow timely decisions regarding required disclosure.

**INTERNAL CONTROL OVER FINANCIAL REPORTING**

The Company is in the process of implementing a comprehensive, multi-year finance and technology transformation initiative to migrate its general ledger, financial close and consolidation processes onto new financial systems. The Company is performing the implementation in the ordinary course of business to increase efficiency and to modernize the tools and technology used in its key financial processes. This is not in response to any identified deficiency or weakness in the Company's internal control over financial reporting. As the phased implementation of the systems continues, the Company has modified certain processes and procedures to enhance the quality of internal control over financial reporting. The Company will continue to monitor and modify, as needed, the design and operating effectiveness of key control activities to align with the updated business processes and capabilities of the new financial systems.

Except for these changes, the Company's management, including the CEO and CFO, confirm there has been no change in the Company's internal control over financial reporting during the fiscal year ended December 31, 2022 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

**MANAGEMENT'S REPORT**

Management's Report and the Report of Independent Registered Public Accounting Firm on Internal Control Over Financial Reporting are set forth in the consolidated financial statements.

## Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

The following table summarizes information about the Company's equity compensation plans as of December 31, 2022. All outstanding awards relate to the Company's common stock. Shares issued under all of the following plans may be from the Company's treasury, newly issued or both.

*Equity compensation plan information*

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted-average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| | (a) | (b) | (c) |
| Equity compensation plans approved by security holders | 12,635,775  (1) | $ 177.12 | 21,782,732 |
| Equity compensation plans not approved by security holders | — | — | — |
| Total | 12,635,775 | $ 177.12 | 21,782,732 |

(1)  Includes 1,432 stock options granted under the McDonald's Corporation 2001 Omnibus Stock Ownership Plan and 11,412,128 stock options and 1,222,215 restricted stock units granted under the McDonald's Corporation Amended and Restated 2012 Omnibus Stock Ownership Plan.

Additional matters are incorporated herein by reference from the Company's definitive proxy statement, which will be filed no later than 120 days after December 31, 2022.

EXHIBIT O(86)

AOE2266

## Exhibits and Financial Statement Schedules

**a.  (1)  All financial statements**

Consolidated financial statements are filed as part of this Form 10-K and begin on page 35 of this Form 10-K.

**(2)  Financial statement schedules**

No schedules are required because either the required information is not present or is not present in amounts sufficient to require submission of the schedule, or because the required information is included in the consolidated financial statements and accompanying notes filed as part of this Form 10-K.

**b.    Exhibits**

The exhibits below are filed as part of this Form 10-K.

## McDonald's Corporation Exhibit Index

| Exhibit Number | Description |
| --- | --- |
| (3) | Articles of incorporation; bylaws |
| (a) | Restated Certificate of Incorporation, effective as of May 23, 2019, incorporated herein by reference from Exhibit 3(a) of Form 10-Q (File No. 001-05231), for the quarter ended June 30, 2019. |
| (b) | By-Laws, as amended and restated with effect as of January 18, 2023, incorporated herein by reference from Exhibit 3.2 of Form 8-K (File No. 001-05231), filed January 19, 2023. |
| (4) | Instruments defining the rights of security holders, including indentures* |
| (a) | Senior Debt Securities Indenture, dated as of October 19, 1996, incorporated herein by reference from Exhibit (4)(a) of Form S-3 Registration Statement (File No. 333-14141), filed October 15, 1996. |
| (b) | Subordinated Debt Securities Indenture, dated as of October 18, 1996, incorporated herein by reference from Exhibit (4)(b) of Form S-3 Registration Statement (File No. 333-14141), filed October 15, 1996. |
| (c) | Description of Securities, incorporated herein by reference from Exhibit 4(c) of Form 10-K (File No. 001-05231), for the year ended December 31, 2019. |
| (10) | Material contracts |
| (a) | McDonald's Corporation Directors' Deferred Compensation Plan, amended and restated effective as of December 31, 2021, incorporated herein by reference from Exhibit 10(a) of Form 10-K (File No. 001-05231), for the year ended December 31, 2021.** |
| (b) | McDonald's Corporation Board of Directors Deferred Compensation Plan, effective as of January 1, 2022, incorporated herein by reference from Exhibit 10(b) of Form 10-K (File No. 001-05231), for the year ended December 31, 2021.** |
| (c) | McDonald's Deferred Compensation Plan, effective as of January 1, 2017, incorporated herein by reference from Exhibit 10(b) of Form 10-K (File No. 001-05231), for the year ended December 31, 2016.** |
| (i) | First Amendment to the McDonald's Deferred Compensation Plan, effective as of May 1, 2018, incorporated herein by reference from Exhibit 10(b)(i) of Form 10-Q (File No. 001-05231), for the quarter ended September 30, 2018.** |
| (d) | McDonald's Amended and Restated Deferred Compensation Plan, effective as of May 26, 2020, incorporated herein by reference from Exhibit 10(c) of Form 10-Q (File No. 001-05231), for the quarter ended June 30, 2020.** |
| (i) | First Amendment to the McDonald's Amended and Restated Deferred Compensation Plan, effective as of December 1, 2021, incorporated herein by reference from Exhibit 10(d)(i) of Form 10-K (File No. 001-05231), for the year ended December 31, 2021.** |
| (e) | McDonald's Corporation Supplemental Profit Sharing and Savings Plan, effective as of September 1, 2001, incorporated herein by reference from Exhibit 10(c) of Form 10-K (File No. 001-05231), for the year ended December 31, 2001.** |
| (i) | First Amendment to the McDonald's Corporation Supplemental Profit Sharing and Savings Plan, effective as of January 1, 2002, incorporated herein by reference from Exhibit 10(c)(i) of Form 10-K (File No. 001-05231), for the year ended December 31, 2002.** |
| (ii) | Second Amendment to the McDonald's Corporation Supplemental Profit Sharing and Savings Plan, as amended, effective as of January 1, 2005, incorporated herein by reference from Exhibit 10(c)(ii) of Form 10-K (File No. 001-05231), for the year ended December 31, 2004.** |
| (f) | McDonald's Corporation 2012 Omnibus Stock Ownership Plan, effective as of June 1, 2012, incorporated herein by reference from Exhibit 10(h) of Form 10-Q (File No. 001-05231), for the quarter ended September 30, 2012.** |
| (g) | McDonald's Corporation Amended and Restated 2012 Omnibus Stock Ownership Plan, effective as of May 21, 2020, incorporated herein by reference from Exhibit 10(g) of Form 10-Q (File No. 001-05231), for the quarter ended June 30, 2020.** |

(h)    Form of 2014 Executive Stock Option Award Agreement in connection with the 2012 Omnibus Stock Ownership Plan, incorporated herein by reference from Exhibit 10(z) of Form 10-Q (File No. 001-05231), for the quarter ended March 31, 2014.**

(i)    Form of Executive Confidentiality, Intellectual Property and Restrictive Covenant Agreement, incorporated herein by reference from Exhibit 10(o) of Form 10-Q (File No. 001-05231), for the quarter ended March 31, 2017.**

(j)    Form of 2018 Executive Stock Option Award Agreement in connection with the 2012 Omnibus Stock Ownership Plan, incorporated herein by reference from Exhibit 10(q) of Form 10-Q (File No. 001-05231), for the quarter ended March 31, 2018. **

(k)    McDonald's Corporation Target Incentive Plan, effective as of January 1, 2013, amended and restated effective as of February 13, 2019, incorporated herein by reference from Exhibit 10(p) of Form 10-Q (File No. 001-05231), for the quarter ended March 31, 2019.**

(l)    McDonald's Corporation Officer Severance Plan, amended and restated effective as of November 1, 2022, filed herewith.**

(m)    Form of 2019 Executive Stock Option Award Agreement in connection with the 2012 Omnibus Stock Ownership Plan, incorporated herein by reference from Exhibit 10(r) of Form 10-Q (File No. 001-05231), for the quarter ended March 31, 2019.**

(n)    Separation Agreement and General Release between Stephen Easterbrook and the Company, dated October 31, 2019, incorporated herein by reference from Exhibit 10.1 of Form 8-K (File No. 001-05231), filed November 4, 2019.**

(o)    Separation Agreement and General Release between Silvia Lagnado and the Company, dated August 14, 2019, incorporated herein by reference from Exhibit 10(t) of Form 10-Q (File No. 001-05231), for the quarter ended June 30, 2020.**

(p)    Separation Agreement and General Release between Silvia Lagnado and the Company, dated October 31, 2019, incorporated herein by reference from Exhibit 10(u) of Form 10-Q (File No. 001-05231), for the quarter ended June 30, 2020.**

(q)    Separation Agreement and General Release between Jerome N. Krulewitch and the Company, dated October 13, 2020, incorporated herein by reference from Exhibit 10(v) of Form 10-K (File No. 001-05231), for the year ended December 31, 2020.**

(r)    Form of Executive Time-Based Restricted Stock Unit Award Agreement in connection with the Amended and Restated 2012 Omnibus Stock Ownership Plan, incorporated herein by reference from Exhibit 10(v) of Form 10-Q (File No. 001-05231), for the quarter ended June 30, 2021.**

(21)    Subsidiaries of the Registrant.

(23)    Consent of Independent Registered Public Accounting Firm.

(24)    Power of Attorney.

(31.1)    Rule 13a-14(a) Certification of Chief Executive Officer.

(31.2)    Rule 13a-14(a) Certification of Chief Financial Officer.

(32.1)    Certification pursuant to 18 U.S.C. Section 1350 by the Chief Executive Officer, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

(32.2)    Certification pursuant to 18 U.S.C. Section 1350 by the Chief Financial Officer, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

(99.1)    Computation of Ratios.

(101.INS)    XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document.

(101.SCH)    Inline XBRL Taxonomy Extension Schema Document.

(101.CAL)    Inline XBRL Taxonomy Extension Calculation Linkbase Document.

(101.DEF)    Inline XBRL Taxonomy Extension Definition Linkbase Document.

(101.LAB)    Inline XBRL Taxonomy Extension Label Linkbase Document.

(101.PRE)    Inline XBRL Taxonomy Extension Presentation Linkbase Document.

(104)    Cover Page Interactive Data File - the cover page XBRL tags are embedded within the Inline XBRL document.

---

\*    Other instruments defining the rights of holders of long-term debt of the registrant, and all of its subsidiaries for which consolidated financial statements are required to be filed and which are not required to be registered with the Commission, are not included herein as the securities authorized thereunder, individually, do not exceed 10% of the total assets of the registrant and its subsidiaries on a consolidated basis. An agreement to furnish a copy of any such instruments to the Commission upon request has been filed with the Commission.

\*\*    Denotes compensatory plan.

EXHIBIT O(86)

AOE2268

# Form 10-K Cross-Reference Index

|  |  |  | Page reference |
|---|---|---|---|
| **Part I** |  |  |  |
| | Item 1 | Business | Pages 3-7, 9-10 |
| | Item 1A | Risk Factors | Pages 27-32 |
| | Item 1B | Unresolved Staff Comments | Not applicable |
| | Item 2 | Properties | Page 33 |
| | Item 3 | Legal Proceedings | Page 33 |
| | Item 4 | Mine Safety Disclosures | Not applicable |
| **Part II** |  |  |  |
| | Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | Page 26 |
| | Item 6 | [Reserved] | Not applicable |
| | Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | Pages 8-35 |
| | Item 7A | Quantitative and Qualitative Disclosures About Market Risk | Pages 22-23 |
| | Item 8 | Financial Statements and Supplementary Data | Pages 35-57 |
| | Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | Not applicable |
| | Item 9A | Controls and Procedures | Page 62 |
| | Item 9B | Other Information | Not applicable |
| | Item 9C | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | Not applicable |
| **Part III** |  |  |  |
| | Item 10 | Directors, Executive Officers and Corporate Governance | Page 34, (a) |
| | Item 11 | Executive Compensation | (a) |
| | Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | Page 62, (a) |
| | Item 13 | Certain Relationships and Related Transactions, and Director Independence | (a) |
| | Item 14 | Principal Accountant Fees and Services | (a) |
| **Part IV** |  |  |  |
| | Item 15 | Exhibits and Financial Statement Schedules | Pages 63-64 |
| | Item 16 | Form 10-K Summary | Not applicable |
| **Signatures** |  |  | Page 66 |

(a) - The information required by this item is incorporated herein by reference from the Company's definitive proxy statement, which will be filed no later than 120 days after December 31, 2022.

EXHIBIT O (86)

AOE2269

## Signatures

**Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.**

McDonald's Corporation
**(Registrant)**

*By*     /s/ Ian F. Borden
_____
Ian F. Borden
*Corporate Executive Vice President and Chief Financial Officer*

February 24, 2023

**Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities indicated below on the 24th day of February, 2023:**

| | |
|---|---|
| *By*   /s/ Ian F. Borden<br>Ian F. Borden<br>*Corporate Executive Vice President and Chief Financial Officer*<br>*(Principal Financial Officer)* | *By*   /s/ Christopher J. Kempczinski<br>Christopher J. Kempczinski<br>*President, Chief Executive Officer and Director*<br>*(Principal Executive Officer)* |
| *By*   /s/ Anthony G. Capuano<br>Anthony G. Capuano<br>*Director* | *By*   /s/ Richard H. Lenny<br>Richard H. Lenny<br>*Director* |
| *By*   /s/ Kareem Daniel<br>Kareem Daniel<br>*Director* | *By*   /s/ John J. Mulligan<br>John J. Mulligan<br>*Director* |
| *By*   /s/ Lloyd H. Dean<br>Lloyd H. Dean<br>*Director* | *By*   /s/ John W. Rogers, Jr.<br>John W. Rogers, Jr.<br>*Director* |
| *By*   /s/ Robert A. Eckert<br>Robert A. Eckert<br>*Director* | *By*   /s/ Jennifer L. Taubert<br>Jennifer L. Taubert<br>*Director* |
| *By*   /s/ Catherine M. Engelbert<br>Catherine M. Engelbert<br>*Director* | *By*   /s/ Paul S. Walsh<br>Paul S. Walsh<br>*Director* |
| *By*   /s/ Margaret H. Georgiadis<br>Margaret H. Georgiadis<br>*Director* | *By*   /s/ Amy E. Weaver<br>Amy E. Weaver<br>*Director* |
| *By*   /s/ Enrique Hernandez, Jr.<br>Enrique Hernandez, Jr.<br>*Chairman of the Board and Director* | *By*   /s/ Miles D. White<br>Miles D. White<br>*Director* |
| *By*   /s/ Catherine Hoovel<br>Catherine Hoovel<br>*Corporate Senior Vice President - Corporate Controller*<br>*(Principal Accounting Officer)* | |

EXHIBIT O(86)

AOE2270



EXHIBIT OR 507

AOE2271



EXHIBIT O(86)

AOE2272

# EXHIBIT P

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ENTERTAINMENT STUDIOS NETWORKS, INC., a California corporation; WEATHER GROUP, LLC, a Delaware limited liability company, | Case No. 2:21-cv-04972-FMO-MAA |
| Plaintiffs, | **DECLARATION OF CHERYL STROM IN SUPPORT OF DEFENDANT MCDONALD'S USA, LLC'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| McDONALD'S USA, LLC, a Delaware limited liability company, | Assigned to the: Hon. Fernando M. Olguin |
| Defendant. | |

I, Cheryl Strom, hereby declare and certify as follows pursuant to 28 U.S.C. § 1746:

1.    I am over 18 years of age. The statements herein are true based on my personal knowledge and I am competent to testify thereto.

2.    I have been the Records Information Sr. Manager for McDonald's Corporation since 2003. Among other things, my responsibilities include creating and maintaining business records kept by McDonald's Corporation and its subsidiary, McDonald's USA, LLC ("McDonald's"), in the ordinary course of regularly conducted business activities. Given those responsibilities, I am familiar with McDonald's record-keeping practices and could testify competently on that topic.

3.    Each of the documents attached hereto is a true and correct copy of a document that is kept in the course of McDonald's regularly conducted business activities. It is the regular practice of McDonald's to keep business records of documents such as these.

4.    The document attached hereto as Exhibit 1 is a true and correct copy of an August 10, 2015 email attaching an Upfront Contract, dated February 18, 2014,

---

DECLARATION OF CHERYL STROM

1  between Burrell Communications Group, LLC ("Burrell") and CF Entertainment /

2  Entertainment Studios, bates stamped McD_ESN00000698–702 and designated

3  DX8.

4      5.     The document attached hereto as Exhibit 2 is a true and correct copy of

5  a May 4, 2021 Statement of Work between OMD USA LLC ("OMD") and

6  McDonald's, bates stamped McD_ESN00023162–23209.

7      6.     The document attached hereto as Exhibit 3 is a true and correct copy of

8  an Amended and Restated Advertising Agency Agreement between McDonald's

9  Corporation and Burrell, dated January 1, 2012, bates stamped

10  McD_ESN00023113–23161.

11      7.     The document attached hereto as Exhibit 4 is a true and correct copy of

12  a September 4, 2020 Statement of Work between OMD and McDonald's, bates

13  stamped McD_ESN00023295–23366.

14      8.     The document attached hereto as Exhibit 5 is a true and correct copy of

15  a Second Amended and Restated Global Master Media Services Agreement

16  between McDonald's Corporation and OMD Worldwide Holdings Inc., dated

17  August 21, 2020, bates stamped McD_ESN00023210–23294.

18      9.     The document attached hereto as Exhibit 6 is a true and correct copy of

19  a presentation titled "21-22 Initial Upfront Allocations," dated May 9, 2021, bates

20  stamped McD_ESN00021595–21621.

21      10.    The document attached hereto as Exhibit 7 is a true and correct copy of

22  a memorandum titled "Media & Budget Subcommittee 1Q'18 Post Buy Analysis

23  All Media October 2018," bates stamped McD_ESN00006422–6456.

24      11.    The document attached hereto as Exhibit 8 is a true and correct copy of

25  an email dated July 23, 2015, bates stamped McD_ESN00000079–83 and

26  designated DX133.

27      12.    The document attached hereto as Exhibit 9 is a true and correct copy of

28  a spreadsheet entitled "McDonald's Global Partner Standards," bates stamped

- 2 -

DECLARATION OF CHERYL STROM

1   McD_ESN00016876 and designated PX28.

2       13.   The document attached hereto as Exhibit 10 is a true and correct copy

3   of a spreadsheet showing McDonald's 2019 Summary of Minority Owned

4   Spending, bates stamped McD_ESN00018473.

5       14.   The document attached hereto as Exhibit 11 is a true and correct copy

6   of an October 15, 2020 email, bates stamped McD_ESN00012884–12886.

7       15.   The document attached hereto as Exhibit 12 is a true and correct copy

8   of a July 31, 2015 email, bates stamped McD_ESN00000660–661.

9       16.   The document attached hereto as Exhibit 13 is a true and correct copy

10  of a September 17, 2020 email, bates stamped McD_ESN00001033–1046 and

11  designated PX15.

12      17.   The document attached hereto as Exhibit 14 is a true and correct copy

13  of a spreadsheet showing McDonald's advertising spend with Entertainment

14  Studios for the time period 2011 to 2014, bates stamped McD_ESN00000500.

15      18.   The document attached hereto as Exhibit 15 is a true and correct copy

16  of a February 20, 2015 email, bates stamped McD_ESN00000493.

17      19.   The document attached hereto as Exhibit 16 is a true and correct copy

18  of a 2015 presentation review of Entertainment Studios, bates stamped

19  McD_ESN00000494–499.

20      20.   The document attached hereto as Exhibit 17 is a true and correct copy

21  of a presentation titled "2021 Upfront Recap," dated January 29, 2021, bates

22  stamped McD_ESN00015936–16019.

23      21.   The document attached hereto as Exhibit 18 is a true and correct copy

24  of a presentation titled "2021 Video Strategy & Recommendation," dated

25  September 29, 2020, bates stamped McD_ESN00011671–11712.

26      22.   The document attached hereto as Exhibit 19 is a true and correct copy

27  of a spreadsheet titled "Entertainment Studios TV – Historical Ratings &

28  Investment," bates stamped McD_ESN00001046 and designated PX15.

EXHIBIT P

AOE2276

23.     The document attached hereto as Exhibit 20 is a true and correct copy of a February 26, 2015 email, bates stamped McD_ESN00000041–43 and designated DX131.

24.     The document attached hereto as Exhibit 21 is a true and correct copy of a March 3, 2015 email, bates stamped McD_ESN00000044, and a March 17, 2015 email and attachment, bates stamped McD_ESN00000045–47,  designated DX132.

25.     The document attached hereto as Exhibit 22 is a true and correct copy of a presentation titled "Entertainment Studios & The Grio Review," dated September 18, 2020, bates stamped McD_ESN00001037–1045.

26.     The document attached hereto as Exhibit 23 is a true and correct copy of a spreadsheet summarizing McDonald's media buying for 2018 and 2019, bates stamped McD_ESN00009009 and designated PX50.

27.     The document attached hereto as Exhibit 24 is a true and correct copy of a presentation titled "National Video Upfront Update," dated August 6, 2019, bates stamped McD_ESN00008876–8927.

28.     The document attached hereto as Exhibit 25 is a true and correct copy of a Burrell minority-owned overview presentation, bates stamped McD_ESN00007755–7767.

29.     The document attached hereto as Exhibit 26 is a true and correct copy of a March 9, 2021 email, bates stamped McD_ESN00002176–2186.

30.     The document attached hereto as Exhibit 27 is a true and correct copy of a May 4, 2020 email, bates stamped McD_ESN00012918–12921.

31.     The document attached hereto as Exhibit 28 is a true and correct copy of a March 4, 2020 email, bates stamped McD_ESN00010102–10104.

32.     The document attached hereto as Exhibit 29 is a true and correct copy of a February 24, 2020 email, bates stamped McD_ESN00012936–12943.

33.     The document attached hereto as Exhibit 30 is a true and correct copy

- 4 -

EXHIBIT P

AOE2277

1   of a presentation titled "2020 U.S. People Campaign Paid Media Plan," dated

2   February 2020, bates stamped McD_ESN00010092–10101.

3        34.    The document attached hereto as Exhibit 31 is a true and correct copy

4   of a July 2, 2020 email, bates stamped McD_ESN00011302–11304.

5        35.    The document attached hereto as Exhibit 32 is a true and correct copy

6   of an August 27, 2018 email, bates stamped McD_ESN00006421.

7        36.    The document attached hereto as Exhibit 33 is a true and correct copy

8   of a November 11, 2016 email, bates stamped McD_ESN00005085–5088.

9        37.    The document attached hereto as Exhibit 34 is a true and correct copy

10  of a memorandum titled "Media & Budget Subcommittee 2016 Purchases – July

11  20th Webcast," bates stamped McD_ESN00004516–4531.

12       38.    The document attached hereto as Exhibit 35 is a true and correct copy

13  of a presentation titled "McDonald's 2015-2016 Upfront: Target Segment

14  Allocations," dated May 2015, bates stamped McD_ESN00002448–2466.

15       39.    The document attached hereto as Exhibit 36 is a true and correct copy

16  of a spreadsheet showing McDonald's 2014/2015 vendor spending, bates stamped

17  McD_ESN00002661.

18       40.    The document attached hereto as Exhibit 37 is a true and correct copy

19  of a presentation containing a chart showing McDonald's 2015/2016 vendor

20  spending, bates stamped McD_ESN00004108–4124.

21       41.    The document attached hereto as Exhibit 38 is a true and correct copy

22  of a spreadsheet showing McDonald's 2016/2017 and 2017/2018 vendor spending,

23  bates stamped McD_ESN00005798.

24       42.    The document attached hereto as Exhibit 39 is a true and correct copy

25  of a spreadsheet showing McDonald's 2016/2017 and 2017/2018 vendor spending,

26  bates stamped McD_ESN00005246.

27       43.    The document attached hereto as Exhibit 40 is a true and correct copy

28  of a spreadsheet showing McDonald's 2018/2019 and 2019/2020 vendor spending,

- 5 -

EXHIBIT P

AOE2278

1    bates stamped McD_ESN00009590.

2        44.    The document attached hereto as Exhibit 41 is a true and correct copy

3    of a presentation containing a chart showing McDonald's 2018/2019 and

4    2019/2020 vendor spending, bates stamped McD_ESN00008053.

5        45.    The document attached hereto as Exhibit 42 is a true and correct copy

6    of a presentation titled "2018 Strategic Blueprint Updated May 2017," bates

7    stamped McD_ESN00005191–5235.

8        46.    The document attached hereto as Exhibit 43 is a true and correct copy

9    of a memorandum regarding 2018/2019 Long Term Purchases, bates stamped

10   McD_ESN00006234–6245.

11       47.    The document attached hereto as Exhibit 44 is a true and correct copy

12   of a presentation titled "July MBS | 2019 Long-Term Purchases ; National Video,"

13   dated July 12, 2019, bates stamped McD_ESN00006335–6370.

14       48.    The document attached hereto as Exhibit 45 is a true and correct copy

15   of an email, dated January 15, 2019, and attached power point, .pdf, and excel

16   documents, bates stamped McD_ESN00007748–7780.

17       49.    The document attached hereto as Exhibit 46 is a true and correct copy

18   of a presentation titled "Partnership Opportunities," bates stamped

19   McD_ESN00002136–2142.

20       50.    The document attached hereto as Exhibit 47 is a true and correct copy

21   of an email dated February 10, 2021, bates stamped McD_ESN00002118–2120.

22       51.    The document attached hereto as Exhibit 48 is a true and correct copy

23   of an email dated May 7, 2021, bates stamped McD_ESN00002282–2283.

24       52.    The document attached hereto as Exhibit 49 is a true and correct copy

25   of a spreadsheet regarding McDonald's 2021/2022 Upfront Partner allocation,

26   bates stamped McD_ESN00021870.

27       53.    The document attached hereto as Exhibit 50 is a true and correct copy

28   of a May 7, 2021 email, bates stamped McD_ESN00002274–2275.

DECLARATION OF CHERYL STROM

EXHIBIT P

AOE2279

54.     The document attached hereto as Exhibit 51 is a true and correct copy of a presentation titled "21-22 Initial Upfront Allocations; 5.9.2021 w/ updates," bates stamped McD_ESN00021595–21621.

55.     The document attached hereto as Exhibit 52 is a true and correct copy of a presentation titled "Executive Summary; Partner Recommendation," dated June 6, 2019, bates stamped McD_ESN00008188–8252.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  5/25/2023

Cheryl Strom

- 7 -

DECLARATION OF CHERYL STROM

EXHIBIT P
AOE2280

# EXHIBIT P(1)

EXHIBIT P(1)

AOE2281

| | |
|---|---|
| **From:** | Patrick Olson |
| **Sent:** | Monday, August 10, 2015 11:16 AM CDT |
| **To:** | Feldman Jennifer |
| **CC:** | alassere@burrell.com; cweaver@burrell.com |
| **Subject:** | 2014 CF Entertainment contracts |
| **Attachments:** | CF Entertainment Weekly Network 10 17 13.xlsx, CF Entertainment-Daily Network 10 17 13.xlsx, CF Entertainment-First Family 10 17 13.xlsx, CF Entertainment-Mr  Box Office 10 17 13.xlsx |

Hi Jen,

Per your request, 2014 CF Entertainment contracts.

Patrick

**B U R R E L L** | patrick olson | Associate Buying Director - mcdonald's | o 312.297.9806 | f 312.297. 9845 | 233 n. michigan ave., suite 2900, chicago, illinois 60601



CONFIDENTIAL



**Upfront Contract**

BURRELL
233 n. michigan avenue, suite 2900
chicago, Illinois 60601
p (312) 297-9600 f (312) 297-9601

February 18, 2014

| | |
|---|---|
| Company | **CF Entertainment /Entertainment Studios** |
| Address | **1925 Century Park East, Suite 1025** |
| City, State, Zip | **Los Angeles, CA  90067** |
| ATTN.: | **Darren Galatt** |

**RE:  MCDONALD'S CORPORATION 2014 ADVERTISING ORDER/CONFIRMATION
CLIENT CODE:  OPD**

| | | | |
|---|---|---|---|
| Network/Program: | **Daily Network** | Rev.# | **Original** |
| Medium: | **Syndication** | | |
| Broadcast Flight: | **December 30, 2013 - December 29, 2014** | | |
| Effort/Prod.: | **Various** | | |

The Television Purchase Package for the above program has recently been approved by McDonald's, which covers the broadcast period January-December, 2014.  On behalf of our Client, the following will confirm the negotiated terms and conditions, surrounding their participation in the program.

**Terms and Conditions**

| | | | | | |
|---|---|---|---|---|---|
| Avg. Unit Rate (gross): | $5,080 | **Paid Units:** | 106 | **Tot. Cost:** | $538,480 |
| Other Negotiated Units: | | **No Charge** | | **ADU's** | |

**Guarantees:**

| | |
|---|---|
| AA18-49* Rating: | 1.6 |
| AA18-49* CPM: | $17.93 |
| Tot. AA18-49 :30E* GRPs: | 169.6 |
| Tot. AA18-49* Impressions: | 30,036 |
| Ratings Source: | Nielsen |

Tab 162 - McD_ESN00000698 - Attachment 1 - McD_ESN00000699

1 of 3

EXHIBIT P(1)

AOE2283

**Makegood Policy:**        A Post Buy Analysis will be conducted on a quarterly basis. In the event of under-delivery, makegood units will not be accepted, but instead a "pay on delivery" policy is required to satisfy under-delivery against the guarantee.  If necessary, billing will be adjusted the last month of each quarter via adjusted invoicing or credit memo.

**\*Note:  Based on Nielsen's 2014 estimates of 14,860,000 AA homes and 17,710,000 AA18-49.**

**Other Terms/Conditions:**

**Signing & Return of Contract** - The agency will not issue any allocation instructions until this contract has been signed by an authorized approver and returned to the Burrell contact listed below.

**Station clearance list** - A station clearance list must be submitted to Media Agency on a monthly basis; specials must submit clearance list prior to integration to determine compliance with coverage guarantee.  A final clearance list must be submitted along with invoice(s) to Agency's Accounting Department.  **Changes from previous month must be highlighted.**

**Ratings Guarantee** - Nielsen's ratings service must be ordered for program to determine actual delivery against the CPM guarantee, specifically, the "NSS Weekly Transmittal" Custom Report against Black viewership.  These custom reports will be used to determine performance and stewardship.

**Weekly Program Logs** - As soon as possible after the completion of each broadcast week, Burrell must receive a program log for the McDonald's commercials that aired during that week.  Weekly logs are to be received no later than ten (10) days after the end of the broadcast week.

**Bonus units** - Any requests to add Bonus Units/ADUs must be submitted one (1) week in advance on the official Change Notification form.  Written consent and approval must be received prior to airing any McDonald's commercials beyond what has been ordered.  Airing bonus units/ADUs without proper consent and approval is unacceptable and may result in those units not being counted toward the guaranteed delivery.

**Change Notification** - Any changes to a previously approved schedule or execution must be requested as soon as possible on the official Change Notification form.  Written consent and approval must be received from Burrell prior to any changes being affected and aired.  Making changes without proper consent and approval is unacceptable and may result in refused payment for those units.

**Invoicing** - Please remit separate invoices for each effort/product; identify each unit by ISCI code and commercial name.  All invoices must be "notarized" and include the following statement:  **"I hereby certify that actual commercials for McDonald's aired uninterrupted in ("Program") as invoiced herewith, on the stations indicated on the clearance list attached."**

**Indemnity Clause** - As "Seller" of this program, you indemnify McDonald's Corporation and hold the Company or its Owner/Operators, harmless against any and all claims and/or liabilities which may arise from the airing of this program or its contents.

**Cancellation Policy:**  McDonald's reserves the right to cancel any portion of the contract upon written notice, Sixty (60) days prior to the start of a broadcast quarter.

Tab 162 - McD_ESN00000698 - Attachment 1 - McD_ESN00000699                                                    2 of 3

EXHIBIT P(1)

AOE2284

**Acceptance of Advertising Order, Terms/Conditions:**

Print Name    _____

Title    _____

Signature    _____

Date    _____

Please return signed copy within the specified timeframe.

**Signing this document certifies that you are in agreement with and agree to adhere to the terms and conditions laid out in this contract.  Please sign and forward back to my attention as soon as possible.**

Sincerely,

Patrick Olson
Senior Media Buyer

cc:  Adele Lassere, Meghan Holt, Courtney Weaver

Tab 162 - McD_ESN00000698 - Attachment 1 - McD_ESN00000699

3 of 3
EXHIBIT P(1)

AOE2285



## Upfront Contract

BURRELL
233 n. michigan avenue, suite 2900
chicago, Illinois 60601
p (312) 297-9600 F (312) 297-9601

February 18, 2014

| | |
|---|---|
| Company | **CF Entertainment /Entertainment Studios** |
| Address | **1925 Century Park East, Suite 1025** |
| City, State, Zip | **Los Angeles, CA  90067** |
| ATTN.: | **Darren Galatt** |

RE: MCDONALD'S CORPORATION 2014 ADVERTISING ORDER/CONFIRMATION
CLIENT CODE:  OPD

| | | |
|---|---|---|
| Network/Program: | **Mr. Box Office** | Rev.#   **Original** |
| Medium: | **Syndication** | |
| Broadcast Flight: | **December 30, 2013 - December 29, 2014** | |
| Effort/Prod.: | **Various** | |

The Television Purchase Package for the above program has recently been approved by McDonald's, which covers the broadcast period January-December, 2014.  On behalf of our Client, the following will confirm the negotiated terms and conditions, surrounding their participation in the program.

<u>Terms and Conditions</u>

| | | | | | |
|---|---|---|---|---|---|
| Avg. Unit Rate (gross): | $9,000 | Paid Units: | 21 | Tot. Cost: | $189,000 |
| Other Negotiated Units: | No Charge | | | ADU's | |

Guarantees:

| | |
|---|---|
| AA18-49* Rating: | 1.5 |
| AA18-49* CPM: | $33.88 |
| Tot. AA18-49 :30E* GRPs: | 32 |
| Tot. AA18-49* Impressions: | 5,579 |
| Ratings Source: | Nielsen |

<u>Upfront Audience Deficiency Units</u>
ADUs in Mr. Box Office only will be provided upfront to guarantee overall delivery of 2014 CY contract.  ADUs w
run until both CF Entertainment and Burrell agree program is delivering a 1.5 AA1849 rating.

Tab 162 - McD_ESN00000698 - Attachment 2 - McD_ESN00000700

1 of 4

EXHIBIT P(1)

AOE2286

**Makegood Policy:**   A Post Buy Analysis will be conducted on a quarterly basis. In the event of under-delivery, makegood units will not be accepted, but instead a "pay on delivery" policy is required to satisfy under-delivery against the guarantee.  If necessary, billing will be adjusted the last month of each quarter via adjusted invoicing or credit memo.

**\*Note:  Based on Nielsen's 2014 estimates of 14,860,000 AA homes and 17,710,000 AA18-49.**

**Other Terms/Conditions:**

**Signing & Return of Contract** - The agency will not issue any allocation instructions until this contract has been signed by an authorized approver and returned to the Burrell contact listed below.

**Station clearance list** - A station clearance list must be submitted to Media Agency on a monthly basis; specials must submit clearance list prior to integration to determine compliance with coverage guarantee.  A final clearance list must be submitted along with invoice(s) to Agency's Accounting Department.  **Changes from previous month must be highlighted.**

**Ratings Guarantee** - Nielsen's ratings service must be ordered for program to determine actual delivery against the CPM guarantee, specifically, the "NSS Weekly Transmittal" Custom Report against Black viewership.  These custom reports will be used to determine performance and stewardship.

**Weekly Program Logs** - As soon as possible after the completion of each broadcast week, Burrell must receive a program log for the McDonald's commercials that aired during that week.  Weekly logs are to be received no later than ten (10) days after the end of the broadcast week.

**Bonus units** - Any requests to add Bonus Units/ADUs must be submitted one (1) week in advance on the official Change Notification form.  Written consent and approval must be received prior to airing any McDonald's commercials beyond what has been ordered.  Airing bonus units/ADUs without proper consent and approval is unacceptable and may result in those units not being counted toward the guaranteed delivery.

**Change Notification** - Any changes to a previously approved schedule or execution must be requested as soon as possible on the official Change Notification form.  Written consent and approval must be received from Burrell prior to any changes being affected and aired.  Making changes without proper consent and approval is unacceptable and may result in refused payment for those units.

**Invoicing** - Please remit separate invoices for each effort/product; identify each unit by ISCI code and commercial name.  All invoices must be "notarized" and include the following statement:  **"I hereby certify that actual commercials for McDonald's aired uninterrupted in ("Program") as invoiced herewith, on the stations indicated on the clearance list attached."**

**Indemnity Clause** - As "Seller" of this program, you indemnify McDonald's Corporation and hold the Company or its Owner/Operators, harmless against any and all claims and/or liabilities which may arise from the airing of this program or its contents.

**Cancellation Policy:**  McDonald's reserves the right to cancel any portion of the contract upon written notice, Sixty (60) days prior to the start of a broadcast quarter.

Tab 162 - McD_ESN00000698 - Attachment 2 - McD_ESN00000700

2 of 4
EXHIBIT P(1)
AOE2287

**Acceptance of Advertising Order, Terms/Conditions:**

| | |
|---|---|
| **Print Name** | _____ |
| **Title** | _____ |
| **Signature** | _____ |
| **Date** | _____ |

**Please return signed copy within the specified timeframe.**

Signing this document certifies that you are in agreement with and agree to adhere to the terms and conditions laid out in this contract.  Please sign and forward back to my attention as soon as possible.

Sincerely,

Patrick Olson
Buying Supervisor

cc:  Adele Lassere, Meghan Holt, Courtney Weaver

Tab 162 - McD_ESN00000698 - Attachment 2 - McD_ESN00000700

3 of 4

EXHIBIT P(1)

AOE2288

ill



### Upfront Contract

BURRELL
233 n. michigan avenue, suite 2900
chicago, illinois 60601
p (312) 297-9600 f (312) 297-9601

February 18, 2014

| | |
|---|---|
| Company | **CF Entertainment /Entertainment Studios** |
| Address | 1925 Century Park East, Suite 1025 |
| City, State, Zip | Los Angeles, CA  90067 |
| ATTN.: | Darren Galatt |

RE: MCDONALD'S CORPORATION 2014 ADVERTISING ORDER/CONFIRMATION
CLIENT CODE:  OPD

| | | | |
|---|---|---|---|
| Network/Program: | **First Family** | Rev.# | **Original** |
| Medium: | **Syndication** | | |
| Broadcast Flight: | **December 30, 2013 - December 29, 2014** | | |
| Effort/Prod.: | **Various** | | |

The Television Purchase Package for the above program has recently been approved by McDonald's, which covers the broadcast period January-December, 2014.  On behalf of our Client, the following will confirm the negotiated terms and conditions, surrounding their participation in the program.

**Terms and Conditions**

| | | | | | |
|---|---|---|---|---|---|
| Avg. Unit Rate (gross): | $9,000 | Paid Units: | 21 | Tot. Cost: | $189,000 |
| Other Negotiated Units: | No Charge | ADU's | | | |

Guarantees:

| | |
|---|---|
| AA18-49* Rating: | 1.5 |
| AA18-49* CPM: | $33.88 |
| Tot. AA18-49 :30E* GRPs: | 32 |
| Tot. AA18-49* Impressions: | 5,579 |
| Ratings Source: | Nielsen |

**Upfront Audience Deficiency Units**

ADUs in First Family only will be provided upfront to guarantee overall delivery of 2014 CY contract.  ADUs will run until both CF Entertainment and Burrell agree program is delivering a 1.5 AA1849 rating.

Tab 162 - McD_ESN00000698 - Attachment 3 - McD_ESN00000701                                              1 of 3

EXHIBIT P(1)

AOE2290

**Makegood Policy:**   A Post Buy Analysis will be conducted on a quarterly basis. In the event of under-delivery, makegood units will not be accepted, but instead a "pay on delivery" policy is required to satisfy under-delivery against the guarantee.  If necessary, billing will be adjusted the last month of each quarter via adjusted invoicing or credit memo.

**\*Note:  Based on Nielsen's 2014 estimates of 14,860,000 AA homes and 17,710,000 AA18-49.**

**Other Terms/Conditions:**

**Signing & Return of Contract** - The agency will not issue any allocation instructions until this contract has been signed by an authorized approver and returned to the Burrell contact listed below.

**Station clearance list** - A station clearance list must be submitted to Media Agency on a monthly basis; specials must submit clearance list prior to integration to determine compliance with coverage guarantee.  A final clearance list must be submitted along with invoice(s) to Agency's Accounting Department.  **Changes from previous month must be highlighted.**

**Ratings Guarantee** - Nielsen's ratings service must be ordered for program to determine actual delivery against the CPM guarantee, specifically, the "NSS Weekly Transmittal" Custom Report against Black viewership.  These custom reports will be used to determine performance and stewardship.

**Weekly Program Logs** - As soon as possible after the completion of each broadcast week, Burrell must receive a program log for the McDonald's commercials that aired during that week.  Weekly logs are to be received no later than ten (10) days after the end of the broadcast week.

**Bonus units** - Any requests to add Bonus Units/ADUs must be submitted one (1) week in advance on the official Change Notification form.  Written consent and approval must be received prior to airing any McDonald's commercials beyond what has been ordered.  Airing bonus units/ADUs without proper consent and approval is unacceptable and may result in those units not being counted toward the guaranteed delivery.

**Change Notification** - Any changes to a previously approved schedule or execution must be requested as soon as possible on the official Change Notification form.  Written consent and approval must be received from Burrell prior to any changes being affected and aired.  Making changes without proper consent and approval is unacceptable and may result in refused payment for those units.

**Invoicing** - Please remit separate invoices for each effort/product; identify each unit by ISCI code and commercial name.  All invoices must be "notarized" and include the following statement:  **"I hereby certify that actual commercials for McDonald's aired uninterrupted in ("Program") as invoiced herewith, on the stations indicated on the clearance list attached."**

**Indemnity Clause** - As "Seller" of this program, you indemnify McDonald's Corporation and hold the Company or its Owner/Operators, harmless against any and all claims and/or liabilities which may arise from the airing of this program or its contents.

**Cancellation Policy:**  McDonald's reserves the right to cancel any portion of the contract upon written notice, Sixty (60) days prior to the start of a broadcast quarter.

Tab 162 - McD_ESN00000698 - Attachment 3 - McD_ESN00000701

2 of 3
EXHIBIT P(1)

AOE2291

**Acceptance of Advertising Order, Terms/Conditions:**

Print Name _____
Title _____
Signature _____
Date _____

**Please return signed copy within the specified timeframe.**

Signing this document certifies that you are in agreement with and agree to adhere to the terms and conditions laid out in this contract.  Please sign and forward back to my attention as soon as possible.

Sincerely,

Patrick Olson
Buying Supervisor

cc:  Adele Lassere, Meghan Holt, Courtney Weaver

Tab 162 - McD_ESN00000698 - Attachment 3 - McD_ESN00000701

EXHIBIT P(1)

AOE2292



**Upfront Contract**

BURRELL
233 n. michigan avenue, suite 2900
chicago, Illinois 60601
p (312) 297-9600 f (312) 297-9601

February 18, 2014

| | |
|---|---|
| Company | **CF Entertainment /Entertainment Studios** |
| Address | 1925 Century Park East, Suite 1025 |
| City, State, Zip | Los Angeles, CA 90067 |
| ATTN.: | Darren Galatt |

**RE: MCDONALD'S CORPORATION 2014 ADVERTISING ORDER/CONFIRMATION**
**CLIENT CODE: OPD**

| | | | |
|---|---|---|---|
| Network/Program: | **Weekly Network** | Rev.# | **Original** |
| Medium: | **Syndication** | | |
| Broadcast Flight: | **December 30, 2013 - December 29, 2014** | | |
| Effort/Prod.: | **Various** | | |

The Television Purchase Package for the above program has recently been approved by McDonald's, which covers the broadcast period January-December, 2014. On behalf of our Client, the following will confirm the negotiated terms and conditions, surrounding their participation in the program.

**Terms and Conditions**

| | | | | | |
|---|---|---|---|---|---|
| Avg. Unit Rate (gross): | $12,902 | Paid Units: | 29 | Tot. Cost: | $374,158 |
| Other Negotiated Units: | | No Charge | | ADU's | |

Guarantees:

| | |
|---|---|
| AA18-49* Rating: | 2.0 |
| AA18-49* CPM: | $36.43 |
| Tot. AA18-49 :30E* GRPs: | 58.0 |
| Tot. AA18-49* Impressions: | 10,272 |
| Ratings Source: | Nielsen |

Tab 162 - McD_ESN00000698 - Attachment 4 - McD_ESN00000702

EXHIBIT P(1)
1 of 3

AOE2293

| | |
|---|---|
| **Makegood Policy:** | A Post Buy Analysis will be conducted on a quarterly basis. In the event of under-delivery, makegood units will not be accepted, but instead a "pay on delivery" policy is required to satisfy under-delivery against the guarantee.  If necessary, billing will be adjusted the last month of each quarter via adjusted invoicing or credit memo. |

**\*Note:  Based on Nielsen's 2014 estimates of 14,860,000 AA homes and 17,710,000 AA18-49.**

**Other Terms/Conditions:**

**Signing & Return of Contract** - The agency will not issue any allocation instructions until this contract has been signed by an authorized approver and returned to the Burrell contact listed below.

**Station clearance list** - A station clearance list must be submitted to Media Agency on a monthly basis; specials must submit clearance list prior to integration to determine compliance with coverage guarantee.  A final clearance list must be submitted along with invoice(s) to Agency's Accounting Department.  **Changes from previous month must be highlighted.**

**Ratings Guarantee** - Nielsen's ratings service must be ordered for program to determine actual delivery against the CPM guarantee, specifically, the "NSS Weekly Transmittal" Custom Report against Black viewership.  These custom reports will be used to determine performance and stewardship.

**Weekly Program Logs** - As soon as possible after the completion of each broadcast week, Burrell must receive a program log for the McDonald's commercials that aired during that week.  Weekly logs are to be received no later than ten (10) days after the end of the broadcast week.

**Bonus units** - Any requests to add Bonus Units/ADUs must be submitted one (1) week in advance on the official Change Notification form.  Written consent and approval must be received prior to airing any McDonald's commercials beyond what has been ordered.  Airing bonus units/ADUs without proper consent and approval is unacceptable and may result in those units not being counted toward the guaranteed delivery.

**Change Notification** - Any changes to a previously approved schedule or execution must be requested as soon as possible on the official Change Notification form.  Written consent and approval must be received from Burrell prior to any changes being affected and aired.  Making changes without proper consent and approval is unacceptable and may result in refused payment for those units.

**Invoicing** - Please remit separate invoices for each effort/product; identify each unit by ISCI code and commercial name.  All invoices must be "notarized" and include the following statement:  **"I hereby certify that actual commercials for McDonald's aired uninterrupted in ("Program") as invoiced herewith, on the stations indicated on the clearance list attached."**

**Indemnity Clause** - As "Seller" of this program, you indemnify McDonald's Corporation and hold the Company or its Owner/Operators, harmless against any and all claims and/or liabilities which may arise from the airing of this program or its contents.

**Cancellation Policy:**  McDonald's reserves the right to cancel any portion of the contract upon written notice, Sixty (60) days prior to the start of a broadcast quarter.

Tab 162 - McD_ESN00000698 - Attachment 4 - McD_ESN00000702

2 of 3

EXHIBIT P(1)

AOE2294

**Acceptance of Advertising Order, Terms/Conditions:**

Print Name   _____
Title        _____
Signature    _____
Date         _____

Please return signed copy within the specified timeframe.

**Signing this document certifies that you are in agreement with and agree to adhere to the terms and conditions laid out in this contract.  Please sign and forward back to my attention as soon as possible.**

Sincerely,

Patrick Olson
Senior Media Buyer

cc:  Adele Lassere, Meghan Holt, Courtney Weaver

Tab 162 - McD_ESN00000698 - Attachment 4 - McD_ESN00000702

EXHIBIT P(1)

AOE2295

# EXHIBIT P(2)



# Cover Page

| SOW Information | |
|---|---|
| Agency Name, Legal Entity Name | OMD USA LLC |
| Parent Company | OMG |
| Agreement Date | May 4, 2021 |
| Adoption Agreement Date | January 31, 2017, superseded by 2nd Adoption Agreement dated September 4, 2020 |
| Budget Allocation | Corporate |
| | OPNAD |
| | IMS            X |
| | HAVI |
| | G&A |
| Agency SOW | US National 2021 |
| | |

| SOW & DocuSign Routing Information | |
|---|---|
| Agency Signing Officer | Kevin McEvoy |
| | kevin.mcevoy@omd.com |
| McDonald's Signing Officer | Alycia Mason |
| | Alycia.Mason@us.mcd.com |
| McDonald's Stakeholder (initial) | Sheila Hamilton |
| | Sheila.Hamilton@us.mcd.com |
| McDonald's Legal (initial) | Eric Carlson |
| | Eric.Carlson@us.mcd.com |
| McDonald's Strategic Sourcing Lead (initial) | Chris Graham |
| | chris.graham@au.mcd.com |

EXHIBIT P(2)

HIGHLY CONFIDENTIAL

MCD_2.0
MCD_ESN00023162



# Statement of Work

This Statement of Work (this "SOW"), dated May 4, 2021, is entered retroactively as of January 1, 2021, pursuant to that certain Adoption Agreement between McDonald's USA, LLC ("McDonald's") and OMD USA LLC ("Agency"), effective as of January 31, 2017, which adopted the terms and conditions of the Global Media Master Services Agreement, dated January 27, 2017, by and between McDonald's Corporation and OMD Worldwide Holdings Inc. (the "Original Agreement"), with such Original Agreement superseded and replaced by the Second Amended and Restated Global Media Services Agreement, dated August 21, 2020, by and between McDonald's Corporation and OMD Worldwide Holdings Inc., adopted by McDonald's and OMD pursuant to the Adoption Agreement between McDonald's and OMD dated September 4, 2020 (collectively, the "Agreement"). This SOW is entered into subject to the terms and conditions of the Agreement. All terms not specifically defined herein shall have the meaning set forth in the Agreement.

## 1.  Summary

Under this SOW, Agency will provide to McDonald's the Services described herein (the "Services") and all resulting deliverables (including those expressly set forth in Attachment 1) (the "Deliverables") according to the requirements and specifications set forth herein and such other instructions as may be provided by McDonald's during the course of Agency's performance hereunder. Agency acknowledges and agrees that the Services and resulting deliverables are provided herein to McDonald's for its benefit and for the benefit of its franchisees, franchisee organizations and advertising co-operatives. The following is a summary of basic information related to the Services:

| SOW Start Date | January 1, 2021 | |
|---|---|---|
| SOW End Date | December 31, 2021 | |
| SOW Summary | Total proposed fee: | $28,905,790 |
| | Less OMD Annalect India reporting: | $548,192 |
| | Adjusted fee: | $28,357,598 |
| | Less agency investment: | $9,960,241 |
| | **Agency Fee:** | **$18,397,358** |
| | **Estimated OOP / Pass-Thru:** | **$971,720** |
| | **Total:** | **$19,369,078** |
| "Pay for Performance" ("PFP") Structure | Yes (See Attachment 5 for detail) | |

EXHIBIT P(2)

HIGHLY CONFIDENTIAL

MCD2_OMD_2_ESN00023163

## 2. Description and Purposes of Services

As part of the Services, Agency shall provide the Deliverables detailed in Attachment 1 on or before the deadline(s), according to the requirements set forth in this SOW, the Agreement, and McDonald's reasonable instructions.   All Deliverables will be submitted to McDonald's for review and approval.  Agency shall promptly revise the Deliverables as requested by McDonald's.

## 3. Reporting

In addition to reporting defined in the Agreement, and at the specific written request of McDonald's, Agency will provide reports to facilitate tracking of deliverable completion and effort expended. Form and format to be agreed upon.

## 4. Fees and Expenses

**A. Fees:**

In consideration of Agency's performance of the Services, McDonald's (or a designee, including specifically, but not limited to OPNAD Fund) shall pay Agency fees in accordance to the Service Description and Pricing as provided in Attachment 1 and subject to PFP structure described in Attachment 5. Agency shall commit any and all resources and effort necessary to complete the Services, and irrespective of the resources and effort actually required, McDonald's shall not be obligated to pay any other fee beyond those agreed to in Attachments 1 and 4.

In no event shall the total fees invoiced by Agency hereunder exceed the agreed upon Fees without the prior written approval of McDonald's via a Change of Scope signed by an officer of McDonald's.

McDonald's may designate OPNAD Fund or another third party to pay all or some portion of the Agency fees set forth in Attachment 1, and payment by such designee of any undisputed amounts then due and owing shall constitute full satisfaction for payment of such fees.

**B. Expenses:**

McDonalds shall not be obligated to reimburse Agency for any travel or other expenses, except those already incurred through execution of this Statement of Work, unless authorized by McDonald's in advance in writing.  Expenses shall be incurred and invoiced only in accordance with McDonald's Travel & Expense Policy (Attachment 4) and the requirements of the Agreement. Only properly invoiced pre-approved out-of-pocket expenses, exclusive of any mark-up, will be reimbursed by McDonald's.

EXHIBIT P(2)

**HIGHLY CONFIDENTIAL**                                                                                                   MCD_2.0SN00023164

## 5. Operating Principles ("Attachment 2")

Under this SOW, Agency will adhere to and comply with terms as outline in the Operating Principles document.

## 6. Changes to SOW ("Attachment 3")

Any changes to the Services, Deliverables, timeline, fees, responsibilities, or milestones must be approved through a written Change of Scope ("Attachment 3") to this SOW, signed by an authorized representative of each Party (which, for McDonald's, is an officer of McDonald's), in accordance with the requirements of the Agreement.

## 7. Additional terms & Conditions

This SOW is subject to all terms and conditions of the Agreement.  However, in the case of a conflict between the terms of the Agreement and this SOW, the terms of the SOW shall control provided that it is signed by an officer of McDonald's.

[SIGNATURE PAGE FOLLOWS]

EXHIBIT P(2)

HIGHLY CONFIDENTIAL

AOP 309
MCD_ESN00023165

| Accepted By: | Accepted By: |
|---|---|
| MCDONALD'S USA, LLC | OMD USA, LLC |
| *Alycia Mason* | *Kevin McEvoy* |
| Name: Alycia Mason | Name: Kevin McEvoy |
| Title: VP, Digital Customer Experience and Media | Title: CFO |
| Date: May 28, 2021 | Date: June 1, 2021 |

*Privileged & Confidential*
Page **5** of **14**

EXHIBIT P(2)

HIGHLY CONFIDENTIAL

MCD_ESN00023166



# Attachment 1
# Service Description & Pricing

File – "OMD McD 2021 US National Scope_Revised_3.12.21"



OMD McD 2021 US
National Scope_Revi

File – "McDonald's US National 2021 SOW_Deliverables Checklist_3.26.21"



McDonald's US
National 2021 SOW_

File – "US National_McD Marketing Scope Template_OMD_2021 Final_5.5.21"



US National_McD
Marketing Scope Te

EXHIBIT P(2)

HIGHLY CONFIDENTIAL

MCD_ESN00023167



# Attachment 2
# Operating Principles

## Billing
- Agency and McDonald's Procurement agree to meet on a quarterly basis to review current progress and forecast for remainder of Term as compared to original scope.
- Agency and McDonald's Procurement agree to meet annually in Q1 of the year following the Term to reconcile billing.
- Agency will invoice McDonald's, at cost, for all actual out-of-pocket (OOP) and pass through costs incurred by Agency.
- Any work as part of this SOW that extends beyond the Term, will be paid for in full in the Term year.

## Travel
- McDonald's (or another designee) will reimburse Agency for reasonable out-of-pocket costs and expenses incurred by Agency in connection with a Project; provided, however, (a) that Agency must first obtain McDonald's pre-approval of all such costs and expenses in writing and (b) to the extent applicable, such costs and expenses must be in compliance with McDonald's Vendor Travel and Expense Policy ("Attachment 4"), as amended from time to time.
- Agency will invoice McDonald's, at cost, for all travel and related expenses (including registration fees) on each monthly invoice, when incurred. Travel and related expenses beyond what has been estimated within the *SOW Pass Thrus* tab of "Attachment 1" to be mutually agreed upon and submitted to McDonald's prior to when incurred and signed off by a McDonald's signing officer prior to billing, and in full adherence to McDonald's Travel & Expense Policy ("Attachment 4")

## Additional Projects/Services
- Any change in service and project provided outside of the scope of work detailed in this Statement of Work (i.e. additional initiative, media planning and buying for local marketing teams, research/focus groups) need to be an added deliverable to this official Statement of Work and approved via a Change of Scope (COS) ("Attachment 3") document.

EXHIBIT P(2)
APP_303
HIGHLY CONFIDENTIAL                                                                MCD_ESN00023168



# Attachment 3
# Change of Scope Template

[DATE] ("Change of Scope Effective Date")

[NUMBER] ("Change of Scope Number")

This Change of Scope (COS) is an amendment to the Statement of Work (the "Original SOW") entered into as of [DATE OF SOW] by McDonald's [Corporation/ USA, LLC/OTHER] ("McDonald's) and [_____] ("Agency") and is incorporated into the Original SOW by reference. This COS is subject to, made a part of, and governed by the [_____] ("Agreement") between Agency and McDonald's, dated [DATE OF AGREEMENT]. In the event of any conflict between the Agreement and this COS, the terms of this COS shall prevail. All other terms of the Agreement shall remain in full force and effect.

Below is a description of the changes and the effects on schedule and budget.

## Change Summary

ADDED TO THE ORIGINAL SOW:

[ADDITIONS]

REMOVED FROM ORIGINAL SOW:

[REMOVALS]

MODIFIED FROM ORIGINAL SOW:

[MODIFICATIONS]

SCHEDULE:[SCHEDULE UPDATES]

## COS Term

This COS Shall Not extend the term of the Original SOW from [ORIGINAL SOW EXPIRATION DATE] to [NEW EXPIRATION DATE] (except as earlier terminated in accordance with the Agreement or extended by mutual written agreement of McDonald's and Agency).

EXHIBIT P(2)

**HIGHLY CONFIDENTIAL**                                                                                   MCD_2:304
MCD_CSN00023169



# Attachment 4
# McDonald's Travel & Expense Policy

**McDonald's Travel Policy for Contractors & Vendors who have their own travel program but want to align with our travel policy.**

<u>Flights and Accommodation</u>

All flights must be booked at the lowest logical available airfare that meets the business requirements of the trip. For any travel, non-refundable/non-changeable tickets must be purchased.  This should be at least 14 days in advance to secure better rates.  Once purchased, every effort should be made to avoid changes to travel plans.

<u>Class of Service</u>

All flights, domestic or international*, with any one leg that is six (6) hours or longer may be booked one class higher than coach. Domestic or international business or first class travel for legs less than six (6) hours is <u>prohibited</u> unless priced with no increase between coach and premium (business or first class). If total travel time exceeds six (6) hours, but no one (1) leg is greater than six (6) hours, travel must be booked in coach class. Flights to South America may be booked in business class for trips totalling a minimum of six (6) hours.  Only two exceptions to this:
- Segment Presidents can fly business class with no minimum travel time
- Flights to/from Saudi Arabia, Pakistan, and India can be booked at Business Class with Officer Approval

Train / tube travel should be booked at economy/standard class unless approved by Officer.

Booking a higher airfare for the purpose of using any type of upgrade certificate or coupon in order to upgrade from Business to First class is prohibited.

Employees traveling on Southwest Airlines may purchase the Early Bird option guaranteeing boarding priority as a reimbursable expense (does not guarantee "A" boarding priority).

<u>Non-refundable Airline Tickets</u>

Travelers should always book non-refundable airline tickets particularly on preferred airlines:

<u>Airline Back to Back Ticketing</u>

McDonald's Corporation prohibits the use of back-to-back airline ticketing ("creative ticketing"). It runs contrary to our airline agreements and undermines our relationships with preferred carriers. Contact Travel Services if you have specific questions regarding back-to-back ticketing.

<u>Airport Club Rooms</u>

EXHIBIT P(2)

HIGHLY CONFIDENTIAL

MCD_ESN00023170

Airline club memberships are not a business expense and will be a personal expense of the employee should they choose to purchase one.

<u>Air phone charges</u>

Air phone costs are the responsibility of the employee and will not be reimbursed.

<u>In-flight Beverages and Snacks</u>

The cost of in-flight beverages and snacks are reimbursable business expenses. Employees should exercise good judgment in requesting reimbursement for beverages.

<u>Excess Baggage Charges</u>

Charges incurred for 1 checked bags while on a business trip are reimbursable. Charges incurred for excess baggage such as: overweight and over-sized luggage, golf clubs and other baggage not needed for company business shall be at the personal expense of the employee. Check airline website for baggage allowance policies.

<u>Frequent Flyer Programs</u>

Travelers are not permitted to alter travel plans in order to accumulate frequent flyer points or other benefits at the cost of the Company. Frequent flyer points or benefits earned by the traveller while on company business may be retained by the traveller for personal use. Any tax obligations arising from a taxable benefit for the use of frequent flyer points is the sole responsibility of the traveller.

<u>Selecting Hotel Accommodations</u>

Travelers should select accommodations from their company's preferred hotel program or at a hotel convenient to the place of business which minimizes the cost of local transportation and McDonald's G&A travel expenses. Hotels should be reasonable for the city of travel using mid-tier hotels.  Luxury hotel categories, such as the Ritz Carlton or Four Seasons, are not allowed. The traveller may also utilize McDonald's preferred hotel rates. Contact [mcd.trvl@us.mcd.com](mailto:mcd.trvl@us.mcd.com) for more information.

<u>The Hyatt Lodge at McDonald's Campus – Oak Brook, Illinois</u>

When staying or conducting meetings in the Chicago area, McDonald's employees, Owner-Operators, consultants and suppliers are should book the Hyatt Lodge first, if available. Free shuttle service is offered between The Lodge and McDonald's Oak Brook offices (COB, Plaza, 711 & Hamburger University).

<u>Ancillary Hotel Charges</u>

McDonald's does not permit the following lodging-related charges:

- Spa /salon/barber services
- Gift Shop/in-hotel convenience stores charges (i.e. sundries, magazines, and newspapers).

EXHIBIT P(2)

HIGHLY CONFIDENTIAL

MCD_ESN00023171

- Recreation charges including golfing, fishing, tennis, etc.
- Cash advances/wire transfers
- Babysitting

McDonald's permits the following lodging-related charges:

- Dry-cleaning/Laundry is considered a company expense only when an employee is traveling 7 or more days.
- In-room movies are limited to no more than one movie charge per hotel stay. Additional movie charges for extended business travel (greater than one week in duration) should be approved with the Department Head or equivalent.
- Reasonable in-room snack bar/room service mini-bar charges
- Exercise room/health club access charges
- Parking fees
- Internet access fees
- Business Center Services (fax, copy, printing, shipping) if FedEx/Kinko's is not convenient

## Car Rental

Rental vehicles normally should not be used unless the cost is less than that of other available transportation such as taxis or airport shuttle bus services, or when circumstances make a rental car the most reasonable means of transportation. Depending on the length of stay, taxis may be more cost-effective alternatives to car rental, especially in destinations where car park accommodations are limited and expensive (i.e., Chicago, New York City, Philadelphia).

### Car Type/Size

Travelers must rent mid-size cars unless the number of employees traveling together or the nature of the work requires a guaranteed larger vehicle. (See 8.3, Emerald Club Executive Program benefits for more details).

If circumstances do not allow you to reserve National or Enterprise through The McDonald's Approved Travel Management Company, please refer to our McDonald's Corporate I.D. number XZ15683 when making reservations. When booking online be sure to choose National or Enterprise and either book the best rate or the Preferred rate

### Car Rental Insurance

All business rentals through National or Enterprise in the 50 United States, District of Columbia and Puerto Rico using McDonald's Corporate ID# will include Loss Damage Waiver (LDW)/Collision Damage Waiver (CDW) insurance as well as Liability Protection ($300,000 combined single limit per occurrence for bodily injury, death and property damage). Insurance is NOT included when renting from any other car rental company.

EXHIBIT P(2)

**HIGHLY CONFIDENTIAL**



International business rentals through National or Enterprise may or may not include any insurance coverage depending on the country and therefore, you should purchase all insurance offered, if any. When renting a car from National or Enterprise for personal use, insurance coverage is NOT included regardless of whether the McDonald's Corporate ID# is used.

<u>Vehicle Return</u>

Rental car companies typically charge very inflated prices for refuelling rental cars returned without full gas tanks. Always decline the refuelling option and return the rental car with a full tank of gas.

<u>Accidents and Fines</u>

It is the traveller's responsibility to read the rental agreement, and to notify the local police in defined instances of accident or collision.  Fines and other expenses incurred as a result of traffic violations while on company business are the personal responsibility of the violator.

<u>Ground Transportation</u>

Travelers should use the lowest cost, most practical alternative for transportation to and from airports.

**UBER AND LYFT:**  Employees can use Uber and Lyft in the place of regular taxi services. Employees will be personally responsible for any user terms and conditions imposed by Uber and Lyft. The use of each companies' premium car service requires manager approval.  Surge rates are acceptable only if they present the most economical option. The use of each company's ridesharing car service (UberPool and Lyft Line) is not permitted.  Additional information about these services can be found at https://www.uber.com and https://www.lyft.com.

Limousines and "black cars" should be used only if other transportation, such as Uber, Lyft, hotel shuttles and taxis, are not available.  Limos to/from airports should be reserved at a "shared ride" rate versus private or single-ride rates. Outside of business-related travel, limo/taxi service is not allowed to be charged to the Company for Oak Brook-based employees attending Chicagoland events.  In instances of hotel stays that would incur parking charges in excess of taxi/limousines, a local taxi/limousine is an approved business expense.

Preferred Chicago/Oak Brook Vendors:

- West Suburban:  https://www.westsublimo.com/reservations
- American Taxi:  https://www.americantaxi.com/ATOnlineOrderWeb/main.htm
- Flag Limousine:  630-357-5255

EXHIBIT P(2)

HIGHLY CONFIDENTIAL

MCD_ESN00023173



## Meals & Entertainment

While out of town on business travel, employees may expense the actual, reasonable cost of meals. It is the responsibility of the department head to review these costs for reasonableness. Breakfast, lunch and dinner expenses for employees working at their normal place of employment within normal office hours are the personal responsibility of employee.

Meal Allowance When Traveling

- Non-travel related meals that only include Company employees (e.g. two or more employees dining together) are not allowed to be charged to the Company, whether the meal is at McDonald's or any other restaurant.
- Food should not be charged to the Company for meetings
- Travel-related meals must be reasonable for the city of travel, using mid-tier restaurants or lower.
- When non-U.S. based employees travel to Oakbrook, Officers must approve all employee group meals paid by the Company that include non-travellers.  Attendance by employees not traveling should be limited specifically to those with a required need to perform their role.
- No spouse or companion meals are allowed to be charged to the Company during regular business travel.


## Passports/Visas

Prior to your trip, you are responsible to verify required documentation and processing time for the countries you're visiting.  Documentation application and renewal fees are reimbursable business expenses when travel is driven by business need.

EXHIBIT P(2)

HIGHLY CONFIDENTIAL

MCD_ESN00023174



# Attachment 5
# Pay for Performance ("PFP")

<u>At risk component</u>

- 50% of agreed Jan-Jun 2021 fee at risk for Jan-Jun
- 30% of agreed Jul-Dec 2021 fee at risk for Jul-Dec

<u>At risk assessment criteria and scoring</u>

The questions for the Q1 and Q2 2021 evaluation for McDonald's on OMD are below.

Using the strongly agree to strongly disagree 5-point scale, assess each of the following statements:

Part A – McMedia Expectations - 25% weighting
1) OMD shares our passion and knowledge for the business in order to identify growth opportunities
2) OMD provides recommendations that keep pace with customers and the changing marketplace
3) OMD capitalises on available data to continuously increase plan effectiveness
4) OMD leverages media investment to unlock opportunities for the brand
5) OMD removes low value work to drive efficiency and more time spent on strategic thinking
6) OMD connects the dots across agencies, bringing a holistic customer experience

Part B – Brilliant Basics - 50% weighting
7) OMD displays attention to detail and provides the key deliverables as per the agreed timelines or communicates in advance if there are issues meeting them)

Part C – Deliverables - 25% weighting
8) OMD ensures that the quality of their key deliverables is at a standard that meets or exceeds McDonald's expectations

The "expectations" scoring system will be used to assess the above questions. Scores and impact on Jan-Jun fees are:

- 3.6 or higher = 100% of proposed fee retained
- 3.0-3.5 = 75% of proposed fee retained
- Less than 3.0 = 50% of proposed fee retained

Each evaluation will be undertaken at the conclusion of each quarter.

The same criteria and process may continue for Q3 and Q4 2021. This will be discussed post the Q2 evaluation. If it does continue, the scores and impact on Jul-Dec fees are:

- 3.6 or higher = 100% of proposed fee retained
- 3.0-3.5 = 85% of proposed fee retained
- Less than 3.0 = 70% of proposed fee retained

*Privileged & Confidential*

EXHIBIT P(2)

HIGHLY CONFIDENTIAL

## McDonald's US National 2021 Scope of Work

### Team Functions & Key Deliverables
Business Leadership
- The OMD McDonald's business lead develops and guides the team vision, provides strategic oversight of the integrated agency model, and delivers management of all related commercials and staff.
- OMD McDonald's dedicated practice leadership defines, tracks and shares enterprise-wide best practices, thought leadership, marketplace insights, and develops processes, playbooks, and new ways of working to drive excellence in critical capabilities.

*Key deliverables include: Overall account/relationship management, delivery of POVs/case studies/ industry research, conducting key leadership and IAT meetings, delivering on global requests, managing Scope of Work, and oversight of agency transformation plan.*

Media Planning
- Focused on understanding consumer needs and expectations to consistently deliver effective end-to-end communications.
- Develops and maintain strategic and tactical media plans for GCM and serves as media IAT lead/connection point for multicultural planning.

*Key deliverables include: Annual planning and budget allocation, campaign-level strategic and tactical plan recommendations, portfolio management (including budget maintenance) and cross-portfolio strategies, competitive reporting, cross-marketing IAT presentations, and management of MBS process.*

Investment
- Capturing consumer's attention in the places and moments that will deliver the greatest business effectiveness.
- Provide buying and implementation of agreed upon plans based on strategic recommendations.
- Run, develop, and implement key media negotiations with media owners.
- OMD Investment is responsible for executing video (linear TV and OLV), audio, programmatic, paid social and paid search media in accordance with set principles and operating processes for GCM and HCM. OMD will purchase and manage ACM and AACM media in specific instances as agreed upon with McDonald's and IAT partners.
- Execute SEO strategy to increase relevant organic traffic and share of voice to McDonald's EN-US website.

*Key deliverables include: campaign level pacing reports, purchase bible, DEI initiative deliverables, annual upfront negotiations, Strategic partner (BAR) meetings, POVs on new publishers and platforms, execution and management of linear TV, digital video, audio, social, programmatic, direct digital, paid social, paid search and sports investment, management of search engine optimization.*

Marketing Science
- Improve media efficiency by enabling data driven optimization, understanding what drives media effectiveness, elevating insights to be actionable across initiatives, and accelerating learning through media testing.

*Key deliverables include: campaign-level measurement framework and in-flight reporting, post-quarter analyses, ROMI data delivery, ROMI analysis (including creation and maintenance of the Learning Vault and Learning Agenda), custom data science services.*

Data & Tech
- Develop, execute and iterate a data and technology roadmap agreed upon with McDonald's to increase marketing effectiveness.

*Key deliverables include: tech road map development and management, oversight of Sparklight development, data source assessment, privacy and compliance oversight, and tests of emerging technology solutions.*

Operations
- Create an operational bedrock to manage the scale and complexity of the McDonald's business more efficiently

*Key deliverables include: Financial management (management of Master Budget Tracker, media authorizations, budget progression and cashflow), development of program and project plans, weekly status meetings and maintenance of status document, offshore team management, rollout and implementation of PlanIt, and development of Learning & Development roadmap*

EXHIBIT P(2)

EXHIBIT P(2)

HIGHLY CONFIDENTIAL

MUD_ESN00023177

the business and marketing objectives, supported by consumer insights and leveraging historical ROMI results, McDonald's or industry benchmarks and best practices. Work in partnership with creative agencies to marry creative and media strategies for an integrated and holistic consumer experience. Use of proprietary tools to facilitate the ask. Provide up to two rounds of revisions based on McDonald's feedback.

- Manage McDonald's total portfolio strategies and requests in partnership with media IAT
  - o Provide strategic oversight and execution of McDonald's calendar changes on an ongoing basis, including stewardship of McDonald's owned inventory within plan revisions
  - o Develop and execute cross-portfolio strategies to drive McDonald's business objectives as relevant (e.g. gaming, audience approach, performance strategy)
  - o Provide cross-campaign ad hoc summaries and roll ups (planning and budgetary)
- Marketing IAT engagement
  - o Co-leadership in developing campaign narratives tailored to key stakeholders in collaboration with broader marketing IAT, inclusive of content creation, IAT check-ins, McMedia + B&C check-ins/feedback, and senior level presentations in accordance with IMPACT process timelines.
- Tactical media plan
  - o For each campaign, in partnership with OMD investment and media IAT, develop a tactical media plan which details business and marketing objectives, target audience, communication objectives, role of touchpoints and channels, a detailed recommendation of media tactics per channel/touchpoint, executional KPIs, planned delivery, media mixes, and YOY comparisons. Provide up to two rounds of revisions based on McDonald's feedback.
  - o Develop, submit and upkeep detailed media planning and financial documents in accordance with McDonald's guidelines (e.g. master budget tracker, cost outs).
  - o For every campaign, prepare a media approval document (Media Authorization) in accordance with agreed upon process, detailing at minimum: campaign budget, media channels, and cost. McDonald's validation of approval document required to proceed to media buy/execution.
  - o For every campaign, provide instructions to McDonald's creative agencies relating to media submission of the advertising material with proper instructions to the media vendor (creative specs, trafficking instructions, facilitation of partner kick off calls for custom units)
  - o For every campaign, deliver a launch tracker indicating status of media launching and a launch memo showcasing the various activations across segments.
- MBS (Media Budget Subcommittee meetings)
  - o Management of MBS across media IAT, developing timelines, establishing status meetings and consolidation of information (data, budgets, materials).
  - o Develop pre-read and presentation content, revising as needed based on client feedback
  - o Provide financial documents to assist in plan assessment and sell-in within the context of MBS (e.g. plan summaries, budgets by ethnic audience segment, resource allocations, reach/frequencies, GRPs).
  - o Present in MBS in partnership with Media IAT and McDonald's team.
  - o MBS meeting cadence varies; quarterly at minimum; 6x/year at maximum.

<u>Investment</u>
**Portfolio Investment Management**
- Deliver campaign-level pacing reports bi-weekly
- Deliver Purchase Bible outlining media spend by partner on a quarterly basis
- Issue quarterly post buy analysis for all buys according to agreed-upon timeline with McDonald's.
- In partnership with media IAT, oversight and management of McDonald's DEI initiative, including monthly status updates, Quarterly Reports on RFP goals and Spending, and management of marketplace meetings (planning, execution and post-recaps).

**Annual Media Buying Negotiations**
- Set up annual media negotiation process, which keeps McDonald's clearly informed of most effective negotiation strategies with media vendors, involving feedback to McDonald's of outcomes through all

EXHIBIT P(2)

negotiation stages. McDonald's has the right to participate in any negotiations OMD does on behalf of McDonald's.

- Key negotiation strategy stages:
  o Calendar set up and alignment
  o Media brief / RFP set up and alignment
  o Strategy presented and approved
  o Negotiation with media vendors
  o Finalization of conditions
- OMD ensures at all stages that McDonald's is aware of the targeted discounts and negotiable value available to them, presented and detailed in a media plan.
  - Proactively compare offers in media prices and conditions made and against known (audit, media industry) benchmarks to ensure that all available negotiation routes are explored.
  - In purchasing media, target and seek to obtain the most advantageous buying conditions in both media pricing and campaign execution and actively seeks, evaluates and recommends any cross-platform opportunities offered by media vendors in line with agreed trading and media strategy.

**Publisher Vetting & Engagement**
- Keep McDonald's updated on the media landscape, including:
  o Development and maintenance of strategic partnerships with core partners (Bi-annual review 'BAR' meetings)
  o POVs on new publishers, platforms, and opportunities. Includes one detailed POV per month with write up of partner offering and McDonald's opportunities. Monthly digest of partners that have been submitted to the partner email alias and are worth consideration for future plans.
  o Ad hoc briefing of historical partner relationship and areas of opportunity in preparation for publisher sessions with McDonald's leadership.
  o Ongoing management and maintenance of relationships with partners to gain marketplace intelligence, foster relationships, and unlock new offerings and opportunities.
- Key components of partner engagement include:
  o Initiate live briefing sessions with core partners outlining objectives, strategic approach, brand guidelines and general plan parameters upon onset of planning cycle, as needed.
  o In alignment with overall data, tech, and marketing science test and learn plan, identify and devise new test and learn opportunities with partners, platforms, data providers.
  o Identify data partnerships and refine targeting opportunities to elevate and enhance media delivery.

**Video**
- Monitor and manage all linear TV schedules
  o Evaluate planned goals and contractual obligations quarterly, making any necessary adjustments.
  o Weekly goal evaluation of OLV pacing and expected linear over/under delivery to determine pacing towards GRP goal and execute any changes that need to be made to meet goal requirements.
  o Communicate and negotiate changes with vendors caused by network cancellations, preemptions, or changes in creative units, flight dates, etc. as necessary.
  o Communicate changes to schedule to creative team and traffic agency to facilitate changes as necessary.
  o Cancellation options
    ▪ Communicate cancellation due dates to McDonald's in weekly status meetings starting 4 weeks before due date and advise on cancellation strategies, track firm and cancellable dollars, negotiate extensions on cancellation due dates as needed.
- Manage and execute digital video buys
  o For each campaign, assess, plan, and allocate budgets by partner based on past performance and capabilities depending on goals.
  o Campaign execution, optimization, reporting and analysis of media executed on digital video platforms.
- Track all partner delivery vs. deal guarantees, keep McDonald's informed of outstanding liability via

EXHIBIT P(2)

monthly tracker, summarize liability applied back into campaigns using ADUs monthly and provide strategic recommendations on resolution beyond ADUs as required.
- Leverage media investment and partnerships to unlock vendor/platform specific creative/content when possible. Work with media partners on creative/content development, as needed.

**Audio**
Manage the national audio strategy, investment, and reporting across audio landscape, including but not limited to on-air, satellite, streaming, podcasts, and Radio Extensions (i.e. sponsorships, social, etc.).
- Negotiate all annual audio endeavor deals and JBPs and allocate impressions/customize schedules based on campaign needs
- For each campaign, develop cost and budget allocation, scenarios and channel/partner/platform mix and monitor and track audio campaigns for spend and delivery pacing.
- Negotiate and manage any sponsorships or custom programs where applicable.

**Programmatic**
- For each campaign:
  - Development of programmatic recommendations including strategic development, tactical approaches, innovation, test and learn roadmaps and evaluation of new opportunities.
  - Delivery of programmatic media buying to cover the execution of pre-negotiated deals (e.g., private deals) as well as all auction-based operations on open exchanges & walled gardens
- Across the portfolio:
  - Inventory curation development (inclusion/exclusion list), exchange curation and supply path development, negotiations with publisher partners, deal set up/activation, and troubleshooting.
  - Provide a clear brand safety approach in conjunction with programmatic strategy to be agreed between McDonald's and the Agency annually.
  - In partnership with Marketing Science, develop data activation strategies including but not limited to data utilization, audience segment, and audience frequency management.
  - Annual vetting of DSPs based on expected McDonald's needs for the year ahead and ongoing communication with marketplace to identify new capabilities.
- Introduction of additional programmatic channels as they develop (e.g., Radio, OOH, TV) where applicable.

**Direct Digital**
- For each campaign:
  - In partnership with OMD Planning and media IAT, organize briefing meetings and RFP document for partners
  - Review partner responses and provide feedback to ensure response meets campaign goals and RFP criteria.
  - Identify partners with the most suitable ideas and negotiate deal terms.
  - Execute Direct buys – liaise with creative agencies to ensure delivery of creative, traffic creative, supply creative to partners, QA delivery.
  - Ensure activity is pacing to goal on a weekly basis. Recommend shifts between partners as required.

**Paid Social**
- For each campaign:
  - Development of social recommendations including strategic development, tactical approaches, innovation, test and learn roadmaps and evaluation of new opportunities.
  - Campaign execution, optimization, reporting and analysis of media executed on social platforms.
  - Advise on content and ad creative to ensure best relevance and meet publisher specifications.
- Collaboration and integration with McDonald's Social teams & creative agencies to build an optimized paid-owned-earned approach.
- Assist in negotiation/activation on behalf of PR team where applicable

EXHIBIT P(2)

HIGHLY CONFIDENTIAL

**Paid Search**
- For annual always-on SEM and Navigation campaigns:
  - Set up in engines/platforms and bid management tool, keyword, targeting, copy and negative keyword creation, application of bids and budgets, tag or click tracker creation and liaison with ad ops, QA of all implementation, any back and forth with McDonald's for approval etc.
  - Creative / Content Development & Management for each campaign - Writing, coordinating, and optimizing ad copy for paid search and liaising with McDonald's for approvals. Also includes sitelink development and optimization and dealing with any disapprovals with publishers and compliance.
  - Daily campaign optimization - once the campaign is live, checking delivery, ensuring campaigns are performing well, and making changes to optimize the performance of the activity, including bid changes, copy rotations, keyword creation, SQRs, landing page optimization etc.

**Search Engine Optimization**
- Monthly SEO Report combing McDonald's analytics data and 3rd party data (ranking, clicks, impressions) to provide insights and actionable next steps.
- Quarterly Business Review to present findings and insights from the previous quarter, track progress towards goals, competitive intelligence and future opportunities
- Search Behavior Analysis 6x per year aligned with the main campaign windows. Provide content recommendations based on search trends, behaviors and historical performance.
- Content Gap Analysis (4 per year) identify content opportunities based on topics relating to promotional calendar, brand goals, competitor activity for net new and existing pages.
- Page Level Optimizations (10 per month) for web pages or content on 3rd party sites (Pinterest, Facebook, YouTube, blogs, etc.). Recommendations such as ALT tags, header tags, title tags, content editing and internal linking will be provided.
- Quarterly Ad Hoc Audits or ad hoc projects that are mutually agreed upon. The audit will serve as a way to provide SEO recommendations and best practices on particular topics, as well as support McDonald's with new initiatives or web-specific projects
- POV and Thought Leadership regarding SEO best practices as applied to strategic content considerations on an ad hoc basis, incorporating algorithm changes and other shifts in the SEO landscape
- Ad Hoc SEO recommendations for ad hoc requests (eg. McDonald's leadership page changes) to ensure timely application of best practices as needed
- SEO/SEM Media Integration Support. 4 Quarterly SEO/SEM Integration Tests. Keyword and landing page mapping. Identify new landing page content that can benefit SEM efforts.

**Sports (Optimum Sports)**
- Across the portfolio, represent, negotiate, and execute media/rights holder investments in the Sports Marketplace leveraging proprietary OS rates and relationships
- For relevant campaigns, participate in the planning, specifically tailoring overarching strategy to sports and develop holistic sports platforms and activation plans, including media positions, rights holder assets, content development, IP, etc.

<u>Marketing Science</u>
- For each campaign, develop a measurement framework that connects to business goals and media strategy, set campaign benchmarks, and traffic any measurement needs or associated tags.
- For each campaign, monitor performance and deliver in-flight campaign reporting and summary. Optimization reports containing media metrics, visitation lift, and creative optimization and final reports containing recap of all activity, media metrics, and end results against visitation KPIs.
  - 3-week campaign: 0 Optimization Report, 1 Final Report
  - 4-week campaign: 1 Optimization Report, 1 Final Report
  - 5-week campaign: 1 Optimization Report, 1 Final Report
  - 6-week campaign: 2 Optimization Report, 1 Final Report
  - 8-week campaign: 3 Optimization Report, 1 Final Report

EXHIBIT P(2)

- Post Quarterly Analysis (PQA) – on a quarterly basis, elevate learnings across campaigns based on campaign specific results, as well as recap of key media tests
- ROMI Data Delivery – OMD to provide data to be ingested in ROMI model
  - Monthly – Export of data from pacing documentation, QAed and transposed to meet AP needs.
  - Quarterly – Exported data from multiple platforms with deeper views, actualizations, QA, data mapping, and working with AP to ensure all media types are properly bucketed for analyses.
- ROMI Analyses - Workstream to maximize learnings from quarterly ROMI share-outs including maintenance of the Learning Vault (document that captures high-level learnings to date), Learning Agenda (testing plan translating key learning priorities into action plan to implement in market.
  - Quick wins results shared quarterly ~2 weeks after ROMI results shared
    - Containing how media tactical and strategic changes QoQ may have impacted and correlate to changes in ROMI performance to take quick action accordingly
  - Deep dives into McDonald's Big Rocks 2x per quarter
    - Specific analyses conducted on ROMI results to elevate partner ROMIs and quarterly results to answers to key business questions that will impact overarching strategic and tactical approach
- Custom Data Science Services - Provide custom analytics capabilities regarding areas such as 1PD, incrementality, and audience analytics as needed.

Data & Tech
- Tech Road map development and oversight, created annually and updated quarterly
- Oversee Sparklight omni-channel development with McDonald's media partners – managed through weekly sprints defined and reviewed in weekly status documents, bi-weekly status reviews and quarterly business reviews.
- Key areas of focus for Sparklight development and oversight in 2021
  - Cross-screen attribution
  - Cross-screen Loyalty attribution
  - Cross-screen reach and frequency
  - Utilization and ROI analysis
- Quarterly Assessment of existing data sources for alignment with current use cases to identify if new opportunities exist to expand data source usage, replace data sources, or recommend additional data sources
- Privacy and compliance oversight and thought leadership
  - Quarterly data audits and implications to our use cases
- Identify, source and design cookieless 1P activation tests to prepare for a cookie-less digital world
  - Ad Hoc activation tests of emerging technology solutions - Outputs include test design, project plan, oversight of execution, analysis and recommendations on future tests/utilization

Operations
- Establish efficient team processes, standardized practices, and rules of engagement
- Financial Management
  - Designated point of contact to work with McDonald's on oversight of financial and budget management processes
  - Establishment of Master Budget Tracker (MBT) as single source of truth for financial tracking
  - Issue revised MBT on a weekly basis, unless otherwise agreed upon, along with Media Authorizations reflecting any budgetary plan changes requiring approval
  - Deliver monthly cashflow and progression to OPNAD accounting
  - Oversee invoice management, including tracking of paid and unpaid invoices, and oversight of reconciliation process
  - Provide holistic view of reconciled spend across all partner agencies
- Process and end-to-end campaign workflow
  - Design structured, actionable programs that deliver against business initiatives by building roadmaps, developing rollout plans, and implementing change management principles

EXHIBIT P(2)

- o Work plan development for key strategic projects and deliverables to ensure frictionless and timely delivery of work, including creation of project plans and task timelines
- o Conduct weekly media status calls to discuss project status and outstanding needs, including maintenance of Mission Control (master status sheet) and delivery of action items
- o Collaborate with OMD leadership to ensure proper resources are in place, including quarterly resource assessment to anticipate future state needs and/or deliverables
- o Work with onshore team to identify work that can be offshored, develop the process to offshore work and manage the offshore relationship
- o Rollout and implementation of PlanIt (planning and budgeting tool) based on agreed upon timeline
- IAT engagement
  - o Instill integrated and collaborative processes and deliverables with partner agencies
  - o Identify and implement efficiencies to workflow and document collaboration
  - o Document process and workflow across partner agencies to define roles & responsibilities and key points of integration
- Media training & education resources
  - o Regular assessment of training needs and coordination of relevant trainings and education opportunities
  - o Development of Learning & Development roadmap and onboarding plans

EXHIBIT P(2)

**HIGHLY CONFIDENTIAL**                                                                                 **MDC_ESN00023183**

DocuSign Envelope ID: 73E4EA48-364C-4968-A075-F5FC22EAF1CE

**McDonald's US National 2021 Scope of Work: Deliverables Checklist**

**Ongoing** *(occurs at a regular, ongoing cadence)*

<u>Leadership:</u>
- ☐ Weekly status meeting with key client lead, bi-weekly top-to-top relationship management conversations, monthly top-to-top meetings with IAT leads
- ☐ Provide agency POVs, innovation opportunities, case studies and industry research at least 1x/month

<u>Planning:</u>
- ☐ Monthly category-wide competitive tracking
- ☐ MBS (Media Budget Subcommittee meetings) – *cadence varies, quarterly at minimum*
  - ☐ Operational management across media IAT
  - ☐ Develop pre-read document
  - ☐ Provide supporting financial documents
  - ☐ Present in MBS meeting

<u>Investment:</u>
- ☐ Bi-weekly campaign-level pacing reports
- ☐ Quarterly purchase bible issuance
- ☐ Post buy analysis (PBA) according to agreed-upon timeline with McDonalds
- ☐ Oversight and management of McDonald's DEI initiatives
  - ☐ Monthly status updates
  - ☐ Quarterly report on RFP goals and spending
  - ☐ Management of marketplace meetings
- ☐ Bi-annual review (BAR) meetings with key partners
- ☐ Monthly POV of new partner offering and digest of partners submitted to the partner email alias
- ☐ Video: monitor and manage all linear TV & OLV schedules
  - ☐ Quarterly evaluation of planned goals and contractual obligations
  - ☐ Weekly goal evaluation of OLV pacing and linear over/under delivery to determine pacing towards goal
  - ☐ Communicate cancellation dates in weekly status meetings starting 4 weeks before due date
  - ☐ Monthly liability tracker
  - ☐ Communicate and negotiation changes with networks as necessary
- ☐ SEO
  - ☐ Monthly SEO report
  - ☐ Quarterly business review
  - ☐ 6x/year search behavior analysis
  - ☐ 4x/year content gap analysis
  - ☐ 10x/month page level optimizations
  - ☐ Quarterly ad hoc audits
  - ☐ 4x Quarterly SEO/SEM integration tests

<u>Marketing Science:</u>
- ☐ Deliver Post Quarterly Analysis (PQA) on a quarterly basis
- ☐ ROMI
  - ☐ Monthly export of data from pacing documentation
  - ☐ Quarter export of data from multiple platforms
  - ☐ Quick wins ~2 weeks after ROMI results shared
  - ☐ ROMI Deep dives 2x / quarter

<u>Data & Tech:</u>
- ☐ Tech roadmap development and oversight, created annually and updated quarterly
- ☐ Oversee Sparklight development, managed through weekly sprints, bi-weekly status reviews and quarterly business reviews
- ☐ Quarterly Assessment of existing and potential new data sources
- ☐ Privacy and compliance oversight - quarterly data audiences

<u>Operations:</u>
- ☐ Issue revised MBT on a weekly basis, along with Media Authorizations reflecting any budgetary plan changes requiring approval
- ☐ Monthly cashflow and progression to OPNAD accounting

EXHIBIT P(2)

**HIGHLY CONFIDENTIAL**

- ☐ Conduct weekly media status calls to discuss project status and outstanding needs, including maintenance of Mission Control (master status sheet)

**Per Campaign** *(occurs within each campaign planning cycle)*
Planning:
- ☐ Strategic plan – *provide up to two rounds of feedback*
  - ☐ Consumer, category & cultural insights
  - ☐ Define audiences
  - ☐ Incorporation of communications strategy
  - ☐ Media strategy
  - ☐ Role of channels and formats
  - ☐ Campaign flighting
  - ☐ Budget allocation
  - ☐ How the campaign will deliver on business and marketing objectives
- ☐ Tactical media plan – *provide up to two rounds of feedback*
  - ☐ Detailed recommendation of media tactics per channel/touchpoints
  - ☐ Executional KPIs
  - ☐ Media mix
  - ☐ Planned delivery
- ☐ Develop, submit and upkeep detailed media planning and financial documents
- ☐ Prepare media approval document (Media Authorization)
- ☐ Provide instructions to McDonald's creative agencies
- ☐ Deliver a launch tracker and launch memo
- ☐ Integrated Marketing: Co-leadership in developing campaign narratives tailored to key stakeholders
Investment: *Note: not every campaign may execute every investment channel*
- ☐ Video
  - ☐ Assess, plan and allocate budgets by partner
  - ☐ Campaign execution, optimization, reporting and analysis of media executed
- ☐ Audio
  - ☐ Develop cost and budget allocation, scenarios and channel/partner/platform mix and monitor and track audio campaigns for spend and delivery pacing
- ☐ Programmatic
  - ☐ Strategic development, tactical approaches, innovation, test and learn roadmaps and evaluation of new opportunities.
  - ☐ Delivery of programmatic media buying to cover the execution of pre-negotiated deals (e.g., private deals) as well as all auction-based operations on open exchanges & walled gardens
- ☐ Digital Direct
  - ☐ Organize briefing meetings and RFP documents, review partner responses and provide feedback, identify partners for recommendation, and execute direct buys
- ☐ Social
  - ☐ Development of social recommendations including strategic development, tactical approaches, innovation, test and learn roadmaps and evaluation of new opportunities.
  - ☐ Campaign execution, optimization, reporting and analysis of media executed on social platforms.
- ☐ SEM
  - ☐ Set up in engines/platforms and bid management tool, keyword, targeting, copy and negative keyword creation, application of bids and budgets, tag or click tracker creation
  - ☐ Writing, coordinating, and optimizing ad copy for paid search
  - ☐ Once the campaign is live, checking delivery and making changes to optimize the performance of the activity
- ☐ Sports
  - ☐ Tailoring overarching strategy to sports and develop holistic sports platforms and activation plans, including media positions, rights holder assets, content development, IP, etc.
Marketing Science:
- ☐ Develop a measurement framework that connects to business goals and media strategy, set campaign benchmarks, and traffic any measurement needs or associated tags
- ☐ Monitor performance and deliver in-flight campaign reporting and summary

EXHIBIT P(2)

MCD_ESN00023185

- ☐   3-week campaign: 0 Optimization Report, 1 Final Report
- ☐   4-week campaign: 1 Optimization Report, 1 Final Report
- ☐   5-week campaign: 1 Optimization Report; 1 Final Report
- ☐   6-week campaign: 2 Optimization Report, 1 Final Report
- ☐   8-week campaign: 3 Optimization Report, 1 Final Report

**Annual** *(occurs once a year)*
Leadership:
- ☐   Delivery of scope of work

Planning:
- ☐   Annual strategic planning and budget allocation

Investment:
- ☐   Annual media buying negotiations
  - ☐   Calendar set up and alignment
  - ☐   Media brief set-up and alignment
  - ☐   Strategy presented and approved
  - ☐   Negotiation with media vendors
  - ☐   Finalization of conditions
- ☐   Programmatic
  - ☐   Provide a clear brand safety approach
  - ☐   Annual vetting of DSPs

**Ad Hoc** *(occurs at an undefined cadence)*
Leadership:
- ☐   Oversight of agency transformation plan, including engagement with 3rd party consultant and reporting on key milestones
- ☐   Regroups and responses to requests as needed
- ☐   Delivery of global requests

Planning: Total portfolio strategies and requests
- ☐   Execution of McDonald's calendar changes
- ☐   Develop and execute cross-portfolio strategies
- ☐   Cross-campaign and ad hoc summaries and roll ups (planning and budgetary)

Investment:
- ☐   Ongoing management and maintenance of relationships with partners
- ☐   Programmatic
  - ☐   Inventory curation development (inclusion/exclusion list), exchange curation and supply path development, negotiations with publisher partners, deal set up/activation, and troubleshooting.
  - ☐   In partnership with Marketing Science, develop data activation strategies including but not limited to data utilization, audience segment, and audience frequency management.
- ☐   Sports
  - ☐   Represent, negotiate, and execute media/rights holder investments in the Sports Marketplace leveraging proprietary OS rates and relationships

Marketing Science:
- ☐   Ongoing maintenance of Learning Vault (document that captures high-level learnings to date), Learning Agenda (testing plan translating key learning priorities into action plan to implement in market).
- ☐   Custom Data Science Services in areas such as 1PD, incrementality, and audience analytics as needed

Data & Tech:
- ☐   Ad Hoc activation tests of emerging technology solutions

Operations:
- ☐   Design structured, actionable programs that deliver against business initiatives by building roadmaps, developing rollout plans, and implementing change management principles
- ☐   Rollout and implementation of PlanIt (planning and budgeting tool) based on agreed upon timeline

EXHIBIT P(2)

| Examples of Deliverables | |
|---|---|
| *Background* | |
| McDonald's does not use defined Deliverables across all agencies, all scopes, and all markets. However, as guidance, refer to the list below for examples of the type of granularity we are seeking. Please work with your marketing contact on specific deliverables for your scope prior to returning the completed template. | |
| **POP printed material for Merchandising** | Develop and execute store specific Merchandising as approved and required (window clings, lawn signs, translates, door decals, etc.)  Identify print files required for each stores footprint and align with Marketing team, creative agency, and creative production house.  Manage sourcing of Print Production suppliers.  Execute print production sampling and quality control. Manage versions of print components at a unique store level. |
| **Digital Merchandising** | Identify digital files required for each stores footprint and align with creative agency, creative production house and CMS provider.  Process submission to CMS provider via online tool & upload each local promo into individual submission on CMS portal.  Confirm receipt of submission, run dates, run location on digital board to submitting entry.  Generate IDMB/ODMB Reporting & Metrics at a store level detail to share back with McDonald's. |
| **Campaigns: High Complexity, Origination** | Associated with a new strategy or platform launch for a new product, food event, usage occasion, promotion or new brand positioning. Highest level of complexity when considering number of required campaign territories, creative routes, etc. *Example: On Deliverables Tab, Deliverable would be listed as "High Complexity Origination Campaigns". Service Details would include expected # / list of campaigns* |
| **Campaigns: Medium Complexity, Origination** | Associated with a new strategy or platform launch for a new product, food event, usage occasion, promotion or new brand positioning. Medium level of complexity when considering number of required campaign territories, creative routes, etc. *Example: On Deliverables Tab, Deliverable would be listed as "Medium Complexity Origination Campaigns". Service Details would include expected # / list of campaigns* |
| **Campaigns: Low Complexity, Origination** | Associated with a new strategy or platform launch for a new product, food event, usage occasion, promotion or new brand positioning. Lowest level of complexity when considering number of required campaign territories, creative routes, etc. *Example: On Deliverables Tab, Deliverable would be listed as "Low Complexity Origination Campaigns". Service Details would include expected # / list of campaigns* |
| **Campaigns: High Complexity, Adaptation/Extension** | Ongoing messaging from an existing platform / product / strategy. Highest level of complexity when considering # of expected campaign creative ideas/routes delivering on continuation of platform / product / strategy. *Example: On Deliverables Tab, Deliverable would be listed as "High Complexity Adaptations/Extensions". Service Details would include expected # / list of campaigns* |
| **Campaigns: Medium Complexity, Adaptation/Extension** | Ongoing messaging from an existing platform / product / strategy. Medium level of complexity when considering # of expected campaign creative ideas/routes delivering on continuation of platform / product / strategy. *Example: On Deliverables Tab, Deliverable would be listed as "Medium Complexity Adaptations/Extensions". Service Details would include expected # / list of campaigns* |
| **Campaigns: Low Complexity, Adaptation/Extension** | Ongoing messaging from an existing platform / product / strategy. Lowest level of complexity when considering # of expected campaign creative ideas/routes delivering on continuation of platform / product / strategy. *Example: On Deliverables Tab, Deliverable would be listed as "Low Complexity Adaptations/Extensions". Service Details would include expected # / list of campaigns* |
| **Account Management** | Overall account management activities |
| **Strategic Planning** | Overall strategic planning & guidance outside of that inherent within the campaign process |
| **.com / GMA** | Strategy, Platform Management & Assets, Testing, Campaign Digital Assets, etc. |
| **Social** | Social Strategy, Social Listening & Analytics, Content Development, Social Publishing, etc. |
| **Talent Management** | Negotiation and management of talent and vendor costs ; Talent & Residuals management - including development of quarterly estimates based on projected talent use; management and coordination of holding fees including routing through client approvals and ongoing reporting |
| **Trafficking** | Agency to obtain network clearance as applicable for all creative > Agency to traffic all radio spots to networks: includes developing traffic instructions and uploading all spots to Ad Delivery Partner > Management of creative production storage > Communication and coordination with networks as necessary |
| **Media planning** | Develop media plan across all media channels, including flighting, weights, R&F setting, plan costing and preparing approval documentation for signing by McDonald's |
| **Media buying** | Media negotiations, execution of media plans, tracking, inflight optimising, post campaign analysis |
| **Media sponsorships** | Identifying appropriate properties, negotiations, working with producers to develop integration opportunities, creating assets, execution, optimisation, post campaign analysis |
| **Measurement & analytics** | Measurement & analytics to identify opportunities and fuse multiple data sets with DMP to inform addressable activity |

EXHIBIT P(2)

**HIGHLY CONFIDENTIAL**

| Deliverable | Agency Hours | FTEs | Agency Fee | Total |
|---|---|---|---|---|
| TOTAL | 223,200 | 124.0 | 28,357,598 | 28,357,598 |
| Media Planning, Buying, and Consultative Services | 223,200 | 124.0 | 28,357,598 | 28,357,598 |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |
| <Name> | - | 0.0 | - | - |

| Job Level | Agency Hours | % of Hours | FTEs | Direct Labor | Overhead | Margin | Agency Fee | % of Fees | Avg Fee/FTE |
|---|---|---|---|---|---|---|---|---|---|
| Total | 223,200 | 100.0% | 124.0 | 14,258,010 | 11,263,828 | 2,835,760 | 28,357,598 | 100.0% | 228,690 |
| 01_C_Suite_EVP | - | 0.0% | 0.0 | - | - | - | - | 0.0% | #DIV/0! |
| 02_SVP_Equivalent | 15,480 | 6.9% | 8.6 | 2,484,447 | 1,962,713 | 494,129 | 4,941,290 | 17.4% | 574,569 |
| 03_Director | 31,320 | 14.0% | 17.4 | 3,352,938 | 2,648,821 | 666,862 | 6,668,620 | 23.5% | 383,254 |
| 04_Manager | 47,340 | 21.2% | 26.3 | 3,212,430 | 2,537,820 | 638,917 | 6,389,167 | 22.5% | 242,934 |
| 05_Executive | 58,500 | 26.2% | 32.5 | 2,939,989 | 2,322,591 | 584,731 | 5,847,312 | 20.6% | 179,917 |
| 06_Support | 70,560 | 31.6% | 39.2 | 2,268,206 | 1,791,883 | 451,121 | 4,511,209 | 15.9% | 115,082 |

| Department | Agency Hours | % of Hours | FTEs | Direct Labor | Overhead | Margin | Agency Fee | % of Fees | Avg Fee/FTE |
|---|---|---|---|---|---|---|---|---|---|
| Total | 223,200 | 100.0% | 124.0 | 14,258,010 | 11,263,828 | 2,835,760 | 28,357,598 | 100.0% | 228,690 |
| Account_Management | 32,040 | 14.4% | 17.8 | 3,476,277 | 2,746,259 | 691,393 | 6,913,930 | 24.4% | 388,423 |
| Analytics | 48,060 | 21.5% | 26.7 | 2,877,509 | 2,273,232 | 572,304 | 5,723,045 | 20.2% | 214,346 |
| Creative | - | 0.0% | 0.0 | - | - | - | - | 0.0% | #DIV/0! |
| Production | - | 0.0% | 0.0 | - | - | - | - | 0.0% | #DIV/0! |
| Strategic_Planning | - | 0.0% | 0.0 | - | - | - | - | 0.0% | #DIV/0! |
| Technology | - | 0.0% | 0.0 | - | - | - | - | 0.0% | #DIV/0! |
| Digital_Database | - | 0.0% | 0.0 | | | | - | 0.0% | #DIV/0! |
| Media_Buying | 101,700 | 45.6% | 56.5 | 5,462,287 | 4,315,206 | 1,086,388 | 10,863,881 | 38.3% | 192,281 |
| Media_Planning | 41,400 | 18.5% | 23.0 | 2,441,937 | 1,929,130 | 485,674 | 4,856,742 | 17.1% | 211,163 |
| Public_Relations | - | 0.0% | 0.0 | - | | | - | 0.0% | #DIV/0! |

| Client Direct Costs | |
|---|---|
| Total | 971,720 |
| Ad/Content Delivery | - |
| Asset Storage | - |
| Copy testing | - |
| Data | - |
| Legal | - |
| Production | - |
| Research | - |
| Rights Management | - |
| Subscriptions | - |
| Technology | 971,720 |
| Travel | - |
| Other | - |

| CPI Initiatives | |
|---|---|
| Total savings/cost avoidance | 0 |

| Gender Race Team Make-up | | |
|---|---|---|
| Level | Female % | People of Color % |
| Total | 69% | 28% |
| Leadership | 60% | 20% |
| Management | 72% | 26% |
| Support | 68% | 31.5% |

EXHIBIT P(2)

HIGHLY CONFIDENTIAL

OMD_ESN00023188

| Date of SOW (MM/DD/YYYY): | 01/01/2021 - 12/31/2021 |
|---|---|
| Rate Validity Year: | 2021 |
| Agency Name: | OMD |
| SOW Name: | McDonalds National Media CY2021 |
| Account Contact Name / Contact Phone Nr. / Contact email address: | Danielle Sporkin/Danielle.Sporkin@omd.com |
| Finance Contact Name / Contact Phone Nr. / Contact email address: | Erica Nedelman/Erica.Nedelman@omd.com |
| Date Completed: | 5/5/2021 |

| Deliverables | Service Details |
|---|---|
| Deliverable 1 | |
| Media Planning, Buying, and Consultative Services | SOW shared separately |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| Deliverable 2 | |
| <Name> | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

EXHIBIT P(2)

HIGHLY CONFIDENTIAL

| Deliverable 3 |
| --- |
| *<Name>* |

| Deliverable 4 |
| --- |
| *<Name>* |

EXHIBIT P(2)

HIGHLY CONFIDENTIAL

| Deliverable 5 |
| --- |
| *<Name>* |

| Deliverable 6 |
| --- |
| *<Name>* |

EXHIBIT P(2)

**Deliverable 7**

*<Name>*

**Deliverable 8**

*<Name>*

EXHIBIT P(2)

HIGHLY CONFIDENTIAL

**Deliverable 9**

*<Name>*

**Deliverable 10**

*<Name>*

EXHIBIT P(2)

**HIGHLY CONFIDENTIAL**

MOD_ESN00023193

| Agency Discipline | Department | Job Level | Job Title | Fully Loaded Hourly Rate | EXP (Yrs.) | Description |
|---|---|---|---|---|---|---|
| Advertising | Account_Management | 01_C_Suite_EVP | Global_Account_Head | | 24 | The most senior person in account management agency-wide, globally. Responsible for all client activity. Selects and appoints specialists to account groups, and marketing services for specific clients. Top level client contact. |
| Advertising | Account_Management | 01_C_Suite_EVP | Head_of_Account_Management | | 19 | The most senior person in account management, agency-wide. Responsible for all client activity. Selects and appoints specialists to account groups, and may co-marketing services for specific clients. Top level client contact. |
| Advertising | Account_Management | 02_SVP_Equivalent | Group_Account_Director | | 16 | Responsible for overall agency service and activities on one or more groups of accounts. Supervises one or more Account Supervisors. Top level client contact. agency, reporting to either President or Director of Client Services. May be an Executive V.P. |
| Advertising | Account_Management | 03_Director | Account_Director | | 12 | Responsible for overall agency service and activities primarily on one account. Supervises one or more Account Managers or Supervisors. Top level client conta |
| Advertising | Account_Management | 03_Director | Associate_Account_Director | | 10 | Responsible for overall agency service and activities primarily on one account. Reports to an Account Director and supervises one or more Account Managers. |
| Advertising | Account_Management | 03_Director | Management_Supervisor | | 10 | Maintains overall responsibility for agency performance and the health of the agency/client relationship on all accounts for a particular client-focused team. |
| Advertising | Account_Management | 03_Director | Senior_Account_Director | | 14 | Responsible for overall agency service and activities on one or more accounts. Supervises one or more Account Supervisors. Top level client contact. |
| Advertising | Account_Management | 03_Director | Senior_Account_Group_Supervisor | | 10 | Maintains overall responsibility for agency performance and the health of the agency/client relationship on all accounts for a particular client-focused team. |
| Advertising | Account_Management | 04_Manager | Account_Manager | | 6 | Responsible for developing and coordinating advertising activities generally for one client. Frequent client contact to determine advertising requirements includin agency service level required. Meets internally with creative, media and production specialists to scope work and estimate costs. |
| Advertising | Account_Management | 04_Manager | Account_Supervisor | | 8 | Responsible for directing the daily activities of one or more Account Executives to insure proper agency service on one or more accounts. Maintains senior level |
| Advertising | Account_Management | 04_Manager | Senior_Account_Manager | | 8 | Individual performing primary account-handling responsibility usually on more than one account and has mid-level client contact and some senior level con |
| Advertising | Account_Management | 05_Executive | Account_Executive | | 3 | Responsible for day-to-day coordination of agency activities and client contact generally on one client account. |
| Advertising | Account_Management | 05_Executive | Junior_Account_Manager | | 2 | Responsible for supporting the development and coordination of advertising activities generally for one clients. Some client contact to determine advertising requ information and agency service level required. |
| Advertising | Account_Management | 05_Executive | Senior_Account_Executive | | 5 | Individual performing primary account-handling responsibility mainly on one account.  Mid-level client contact. |
| Advertising | Account_Management | 06_Support | Account_Coordinator | | 2 | An entry-level position with minimal prior business experience. Primarily handles scheduling of activities for one or more client accounts. |
| Advertising | Account_Management | 06_Support | Assistant_Account_Executive | | 2 | Frequently an entry-level position from college, or with minimal prior business experience. Works under close supervision on such things as budget controls, traf accounts. |
| Advertising | Creative | 01_C_Suite_EVP | Executive_Creative_Director | | 18 | Overall corporate responsibility and accountability for the management of the total creative function of the agency office. Participates in setting agency goals an the 'creative tone' and pace of the agency. Top level client contact. Typically a Vice President or above |
| Advertising | Creative | 01_C_Suite_EVP | Global_Chief_Creative_Officer | | 20 | Overall corporate responsibility and accountability for the management of the total creative function of the global agency. Participates in setting agency goals an Establishes the "creative tone" and pace of the global agency. Top level client contact. Typically an Executive Vice President or above |
| Advertising | Creative | 02_SVP_Equivalent | Group_Creative_Director | | 15 | Reports directly to the Executive Creative Director and is responsible for overseeing and approving all creative output of the agency office.  Top level client conta |
| Advertising | Creative | 03_Director | Associate_Creative_Director | | 10 | Reports to Creative Director. Supervises and guides the total creative effort of a number of copy and/or art supervisors or creative groups. Integrates art, copy a experienced presenter. Has client contact at brand level and above. |
| Advertising | Creative | 03_Director | Creative_Director | | 12 | Reports to Executive Creative Director or Group Creative Director. Responsible for the quality of all creative work produced by the agency office for either all cli activities of subordinates to maintain standards of creative excellence and insure achievement of goals. Senior level client contact and presentation. |
| Advertising | Creative | 03_Director | Group_Creative_Supervisor | | 10 | Responsible for supervising creative operations and creative development for a specific group of accounts: responsibilities include staff supervision/oversight. |
| Advertising | Creative | 03_Director | Senior_Art_Director | | 8 | An experienced specialist who is responsible for the visual creation of print, TV, digital and collateral material: supervises others and has some client contact.  R concepts and approaches with the project team, developing original design concepts as well as overseeing project design all the way through execution.  Typica |
| Advertising | Creative | 03_Director | Studio_Manager | | 7 | Overall responsibility and accountability for the management of the total creative function of the agency office. Responsible for ensuring that briefs are effectively and efficiently managed including preparing workflow structure, ensuring work is delivered on deadline, comp departments informed about project status. |
| Advertising | Creative | 04_Manager | Art_Director | | 6 | Responsible for the visual creation of print, TV, digital and collateral material: may or may not supervise others or have client contact. |
| Advertising | Creative | 04_Manager | Art_Supervisor | | 10 | Creates and supervises the visual creation of print, TV, digital and collateral material: supervises others and may have direct client contact. |
| Advertising | Creative | 04_Manager | Copy_Supervisor | | 10 | Writes and supervises all copy and creative pieces across communication forms including sales aids, promotional pieces, direct, etc.: Supervises others and ma |
| Advertising | Creative | 04_Manager | Copywriter | | 6 | Responsible for the creation of copy, usually under supervision, for print, TV/radio, digital, and collateral material: may or may not supervise others or have clien |
| Advertising | Creative | 04_Manager | Designer | | 5 | Involved in providing creative direction and developing visual concepts for use in print, digital and collateral work. |
| Advertising | Creative | 04_Manager | Senior_Copywriter | | 8 | An experienced specialist who is responsible for the creation of copy, usually under supervision, for print, TV/radio, digital and collateral material: supervises oth |
| Advertising | Creative | 04_Manager | Senior_Designer | | 7 | An experienced person involved in providing creative direction and developing visual concepts for use in print, digital and collateral work.  Some client contact a |
| Advertising | Creative | 04_Manager | Senior_Illustrator | | 8 | Produce visual content for Illustrate and animate Flash, HTML5, etc., based visuals for digital media.  Typically will utilize established designs and illustration sty and Creative Director. |
| Advertising | Creative | 05_Executive | Illustrator | | 6 | Produce visual content for Illustrate and animate Flash, HTML5, etc., based visuals for digital media.  Typically will utilize established designs and illustration sty and Creative Director. |
| Advertising | Creative | 05_Executive | Junior_Art_Director | | 4 | Responsible for the visual creation of print, TV, digital and collateral material. Typically has 3-4 years experience. |
| Advertising | Creative | 05_Executive | Junior_Copywriter | | 4 | Responsible for the creation of copy, usually under supervision, for print, TV/radio, digital, and collateral material.  Typically has 3-4 years experience. |
| Advertising | Creative | 05_Executive | Junior_Designer | | 3 | Responsible for the visual creation of print, TV, digital and collateral materials.  Typically has 2-3 years experience. |
| Advertising | Creative | 05_Executive | Studio_Artist | | 4 | Responsible for the preparation and refinement of creative materials including preparing electronic layouts for print, web deliverables, slide presentation media a |
| Advertising | Creative | 06_Support | Creative_Coordinator | | 2 | An entry-level position with minimal prior business experience.  Primarily handles scheduling of creative department activities. |
| Advertising | Production | 02_SVP_Equivalent | Executive_Producer | | 16 | Oversees all relationships between department and outside vendors, organizes traffic and helps ensure the efficient/timely/cost-effective production of televisio |
| Advertising | Production | 02_SVP_Equivalent | Head_of_Broadcast_Production | | 23 | Senior person responsible for supervision and administration of broadcast (commercial) production department and support sections including casting, audio-vis business affairs, etc. Maintains top level contact with agency creative and account management people: also with client production liaisons. |

HIGHLY CONFIDENTIAL

DocuSign Envelope ID: 73E4EA48-364C-4968-A075-F5FC22F4F51C5

| | | | | | | |
|---|---|---|---|---|---|---|
| Advertising | Production | 02_SVP_Equivalent | Head_of_Creative_Services | | 23 | Senior person responsible for print and digital production, creative development, project management, process and systems development and implementation a |
| Advertising | Production | 02_SVP_Equivalent | Head_of_Print_Production | | 20 | Senior person responsible for all aspects of agency's print production services. Knowledgeable in all aspects of graphic arts technology. Supervises print service supervisors, type director, etc. |
| Advertising | Production | 03_Director | Broadcast_Editor | | 12 | Responsible for editing television and long format videos, as well as recording scratch audio tracks. |
| Advertising | Production | 03_Director | Head_of_Business_Affairs | | 14 | Responsible for overall management of broadcast operations (cost controls, budget preparation, etc.). |
| Advertising | Production | 03_Director | Head_of_Traffic | | 16 | Supervises traffic department. Responsible for ensuring traffic department efficiently and effectively manages all external coordination, expediting, and schedule consistent direction to traffic department and oversee the flow of work on all products and accounts, from concept development to product completion. |
| Advertising | Production | 03_Director | Production_Supervisor | | 14 | Supervises production management team to ensure smooth and consistent work flow for projects including managing and tracking of edits, changes, proofreadi marketing assets being distributed and archived. |
| Advertising | Production | 03_Director | Senior_Broadcast_Editor | | 14 | Responsible for editing television and long format videos, as well as recording scratch audio tracks. |
| Advertising | Production | 03_Director | Senior_Business_Manager | | 12 | Responsible for business management of broadcast operations (cost controls, budget preparation, etc.). |
| Advertising | Production | 03_Director | Senior_Producer | | 12 | Responsible for day-to-day television and radio production activities, dealing with studios, participates in bid submission, pre-production, shooting, recording and |
| Advertising | Production | 03_Director | Senior_Production_Manager | | 12 | Coordinates the work of several team and works closely with creative department advising on ad prep costs in pre-production meetings: estimates production co production materials from outside sources and is responsible for quality of reproduction on assigned accounts. |
| Advertising | Production | 04_Manager | Art_Buyer | | 6 | Works closely with Creative Director to procure required art, coordinate pre-production planning and prepares for reproduction of all projects. |
| Advertising | Production | 04_Manager | Business_Manager | | 10 | Responsible for day-to-day management of broadcast operations (cost controls, budget preparation, etc.). |
| Advertising | Production | 04_Manager | Junior_Broadcast_Editor | | 5 | Supports broadcast editor in editing television and long format videos, as well as recording scratch audio tracks. |
| Advertising | Production | 04_Manager | Print_Producer | | 8 | Responsible for ensuring print quality is achieved within the clients budgets and timetables. Supervise, schedule and purchase all pre-press related materials an |
| Advertising | Production | 04_Manager | Producer | | 8 | Responsible for day to day production activities and dealing with commercial production studios, editorial companies: knowledgeable in bidding, pre-production, have client contact. |
| Advertising | Production | 04_Manager | Production_Manager | | 10 | Works closely with creative department advising on ad prep costs in pre-production meetings: estimates production costs and purchases necessary ad productio responsible for quality of reproduction on assigned accounts. |
| Advertising | Production | 04_Manager | Senior_Art_Buyer | | 12 | Works closely with Director of Production to procure required art, coordinate pre-production planning, prepares for reproduction of all projects, and manages the |
| Advertising | Production | 04_Manager | Senior_Print_Producer | | 12 | Responsible for ensuring the finest print quality is achieved within client budgets and timetables. Supervises, schedules and purchases all pre-press related mat |
| Advertising | Production | 04_Manager | Senior_Proofreader | | 8 | Checks proofs and manuscripts for typographical, grammatical, print and illustration inaccuracies. Checks executives and department heads on questions of aut |
| Advertising | Production | 04_Manager | Senior_Traffic_Manager | | 10 | Person Acts as liaison between Account Service and Creative to facilitate workflow. |
| Advertising | Production | 04_Manager | Traffic_Manager | | 7 | Person Acts as liaison between Account Service and Creative to facilitate workflow. |
| Advertising | Production | 04_Manager | Traffic_Supervisor | | 12 | Assist management in the daily operations within the Traffic Department and with traffic personnel. Assisting management in prioritization of department goals, c utilization of available tools to evaluate and process necessary reporting. Ensures all Traffic deadlines are met. |
| Advertising | Production | 05_Executive | Archivist | | 5 | Responsible for cataloging images in the collection through the identification and inputting of metadata into databases. Interacts with other departments to meet needs. Functions as an administrator of the digital asset management system, monitoring the use and population of the system. |
| Advertising | Production | 05_Executive | Assistant_Business_Manager | | 6 | Assists business manager on day-to-day work activity including budget preparation. |
| Advertising | Production | 05_Executive | Assistant_Producer | | 6 | Assists liaison with other departments and outside vendors as needed, executes on tasks, helps ensure the efficient/timely/cost-effective production of broadcas |
| Advertising | Production | 05_Executive | Assistant_Production_Manager | | 7 | Supports production manager in pre-production meetings: estimates production costs and purchases necessary ad production materials from outside sources, r on assigned accounts. |
| Advertising | Production | 05_Executive | Assistant_Traffic_Manager | | 4 | Assists traffic manager on day-to-day work activity. May fill in for Traffic Coordinator when necessary. May also handle own accounts. |
| Advertising | Production | 05_Executive | Junior_Art_Buyer | | 4 | Supports art buyer and may purchase artwork, prints, retouching, etc. |
| Advertising | Production | 05_Executive | Junior_Print_Producer | | 3 | Supports print producer to ensure print quality is achieved within the clients budgets and timetables. |
| Advertising | Production | 05_Executive | Junior_Proofreader | | 2 | Supports proofreader duties checking proofs and manuscripts for typographical, grammatical, print and illustration inaccuracies. |
| Advertising | Production | 05_Executive | Proofreader | | 4 | Checks proofs and manuscripts for typographical, grammatical, print and illustration inaccuracies. |
| Advertising | Production | 06_Support | Production_Assistant | | 2 | Under supervision, handles print production of ad work. Does mechanical buying, studies and visits plants to learn graphics manufacturing processes, and assis necessary. |
| Advertising | Production | 06_Support | Production_Coordinator | | 2 | An entry-level position with minimal prior business experience. Primarily handles scheduling of activities for the production department. |
| Advertising | Strategic_Planning | 02_SVP_Equivalent | Head_of_Research | | 22 | Overall responsibility for all agency research activities and the operation of the agency research department. Participates in setting agency goals and policy mak |
| Advertising | Strategic_Planning | 02_SVP_Equivalent | Head_of_Strategic_Planning | | 16 | The most senior member of the Account Planning structure. Overall responsibility for all agency planning activities and the operation of the planning & researc contact. |
| Advertising | Strategic_Planning | 02_SVP_Equivalent | Head_of_Strategic_Planning/Research | | 19 | The most senior member of the Account Planning structure. Overall responsibility for all agency planning activities and the operation of the planning & researc agency goals and policy making decisions. Top level client contact. |
| Advertising | Strategic_Planning | 03_Director | Associate_Planning_Director | | 10 | Responsible for leading the client and the management of their brand, including leading all strategic development decisions on the clients business. |
| Advertising | Strategic_Planning | 03_Director | Associate_Research_Director | | 10 | Responsible for developing and executing research projects to determine consumer attitudes and advertising effectiveness. Supervise analysts. |
| Advertising | Strategic_Planning | 03_Director | Group_Planning_Director | | 14 | Responsible to the Head of Planning and supervises the work and performance of one or more senior planners. Assists in overall management of the departmer contact. |
| Advertising | Strategic_Planning | 03_Director | Group_Research_Director | | 16 | Responsible to the Head of Research and supervises the work and performance of one or more Associate Research Directors. Assists Director in overall manag |
| Advertising | Strategic_Planning | 03_Director | Planning_Director | | 12 | Responsible for leading the client and the management of their brand, including leading all strategic development decisions on the clients business. |

HIGHLY CONFIDENTIAL

EXHIBIT P(2)

AOJP-ESN00023195

| | | | | | | |
|---|---|---|---|---|---|---|
| Advertising | Strategic_Planning | 03_Director | Research_Director | | 14 | Responsible for the development and management of primary research programs including research studies, surveys, as well as analytics and tools. |
| Advertising | Strategic_Planning | 04_Manager | Planner | | 6 | Responsible for the execution of specific research projects. Analysis and compilation of primary as well as secondary research, meeting client requirements. Hi. Manages all research pertaining to strategy and creative development. Provides insight to clients, regarding consumer preference. Assist in the development o |
| Advertising | Strategic_Planning | 04_Manager | Senior_Analyst | | 8 | Responsible for the overall analytics process and organization that delivers information, insight and recommendations that measure and optimize marketing com business intelligence process through alignment of performance metrics, analytics structure and reporting with overall business and marketing objectives. |
| Advertising | Strategic_Planning | 04_Manager | Senior_Planner | | 8 | Responsible for assessing the effectiveness of communication and advertising campaigns. Responsible for developing and executing research projects to deter advertising effectiveness. |
| Advertising | Strategic_Planning | 04_Manager | Senior_Strategist | | 8 | Responsible for assessing the effectiveness of communication, advertising, digital campaigns.  includes developing digital media strategies across multiple digit and Usability, SEO/SEM, Display/Rich Media, Social Media, Mobile, Email Marketing, etc.  Responsible for developing and executing research projects to deter |
| Advertising | Strategic_Planning | 04_Manager | Strategist | | 6 | Responsible for the execution of specific research projects.  Analysis and compilation of primary as well as secondary research, meeting client requirements. In strategizes across multiple digital marketing channels: Web Design and Usability, SEO/SEM, Display/Rich Media, Social Media, Mobile, Email Marketing, etc. |
| Advertising | Strategic_Planning | 05_Executive | Analyst | | 6 | Responsible for the overall analytics process and organization that delivers information, insight and recommendations that measure and optimize marketing com business intelligence process through alignment of performance metrics, analytics structure and reporting with overall business and marketing objectives. |
| Advertising | Strategic_Planning | 05_Executive | Junior_Planner | | 4 | Responsible for managing sources of information and core methodologies.  Accumulate and analyze secondary research data.  They draft rough questionnaires codes and edits completed questionnaires.  They liaise with the Account team formulate clear and coherent plans to implement  strategy and work closely with t |
| Advertising | Strategic_Planning | 05_Executive | Junior_Strategist | | 4 | Responsible for managing sources of information and core methodologies.  Accumulate and analyze secondary research data.  Draft rough questionnaires, write codes and edits completed questionnaires.  Liaise with the Account team formulate clear and coherent plans to implement  strategy and work closely with the A |
| Advertising | Strategic_Planning | 05_Executive | Librarian | | 6 | Conducts literature searches, correlates information from many sources, and analyzes information to solve research problems. Acquires and organizes (classific functional line consistent with the needs of the agency. |
| Advertising | Strategic_Planning | 06_Support | Junior_Analyst | | 2 | Support analysts in developing analytics and business intelligence process through alignment of performance metrics, analytics structure and reporting with over objectives. |
| Digital | Account_Management | 02_SVP_Equivalent | Head_of_Digital | 274.40 | 15 | The most senior person responsible for all digital activities and for all clients, globally. Selects and appoints specialists in account groups.  Selects and appoints services for specific clients. Top level client contact. |
| Digital | Account_Management | 03_Director | Account_Director | 205.33 | 12 | Responsible for overall agency service and activities primarily on one account. Responsible for all client activity. Selects and appoints Account Managers or Supervisors. Top level client conta |
| Digital | Account_Management | 03_Director | Director_of_Client_Services | 205.33 | 12 | The most senior person in account management at the digital agency. Responsible for all client activity. Selects and appoints specialists to account groups, and marketing services for specific clients. Top level client contact. |
| Digital | Account_Management | 03_Director | Director_of_Project_Management | 205.33 | 12 | Supervises the project management team that leads the coordination of advertising/digital activities across all clients. Frequent client contact to determine requir information and agency service level required. Maintains mid-level to senior level client contact |
| Digital | Account_Management | 03_Director | Social_Media_Director | 196.85 | 12 | Responsible for developing digital and social media strategies for clients and leading the implementation, maintenance and enhancement of these programs acr |
| Digital | Account_Management | 04_Manager | Account_Manager | 93.20 | 6 | Responsible for developing and coordinating advertising activities generally for one client. Frequent client contact to determine advertising requirements includin agency service level required. Meets internally with creative, media and production specialists to scope work and estimate costs. |
| Digital | Account_Management | 04_Manager | Account_Supervisor | 109.59 | 8 | Responsible for directing the daily activities of one or more Account Executives to insure proper agency service on one or more accounts. Maintains senior level |
| Digital | Account_Management | 04_Manager | Project_Manager | 119.22 | 6 | Responsible for developing and coordinating digital advertising activities generally for one client. Frequent client contact to determine requirements including bus service level required. |
| Digital | Account_Management | 04_Manager | Project_Supervisor | 119.22 | 8 | Ensures that project goals are delivered by analyzing timelines, production process and efficiency. Ensures a constant flow of communication to provide content engineers the information needed to complete project. |
| Digital | Account_Management | 04_Manager | Senior_Account_Manager | 118.67 | 8 | Individual performing primary account-handling responsibility usually on more than one account, and has mid-level client contact and some senior level client con |
| Digital | Account_Management | 04_Manager | Senior_Project_Manager | 119.22 | 8 | Responsible for developing and coordinating advertising digital activities for one or more clients. Frequent client contact to determine  requirements including bu service level required.  Maintains mid-level to senior level client contact |
| Digital | Account_Management | 04_Manager | Senior_Social_Media_Manager | 113.05 | 6 | Responsible for managing digital and social media strategies for one or more clients. |
| Digital | Account_Management | 04_Manager | Social_Media_Manager | 113.05 | 4 | Responsible for managing digital and social media strategies for clients. |
| Digital | Account_Management | 04_Manager | Social_Media_Supervisor | 113.05 | 8 | Responsible for managing digital and social media strategies for clients.  Supervises one or more managers. |
| Digital | Account_Management | 05_Executive | Junior_Account_Manager | 48.91 | 2 | Responsible for supporting the development and coordination of advertising activities generally for one clients. Some client contact to determine advertising requ information and agency service level required. |
| Digital | Account_Management | 05_Executive | Junior_Project_Manager | 48.91 | 2 | Responsible for supporting the development of digital advertising activities generally for one client. May have some client contact to determine requirements incl and agency service level required. |
| Digital | Account_Management | 05_Executive | Junior_Social_Media_Manager | 48.91 | 3 | Supports Social Media Manager in the day-to-day management of active Social Media campaigns and strategies including helping create and implement social c feedback. |
| Digital | Account_Management | 06_Support | Account_Coordinator | 48.91 | 2 | An entry-level position with minimal prior business experience. Primarily handles scheduling of activities for one or more client accounts. |
| Digital | Account_Management | 06_Support | Project_Coordinator | 48.91 | 2 | Under supervision, tracks and manages digital project budgets, plans meetings and works with internal stakeholders to monitor progress on various projects. |
| Digital | Account_Management | 06_Support | Social_Media_Coordinator | 55.28 | | Supports Social Media Manager in the day-to-day management of active Social Media campaigns and strategies including |
| Digital | Analytics | 01_C_Suite_EVP | Head_of_Analytics | | 22 | Responsible for the overall analytics process and organization that delivers information, insight and recommendations that measure and optimize marketing com business intelligence process through alignment of performance metrics, analytics structure and reporting with overall business and marketing objectives. |
| Digital | Analytics | 02_SVP_Equivalent | Analytics_Regional_Director | | 15 | Responsible for the full execution of analytics for an account or group of accounts: supervises analysts and assists in the analysis programs. Has client contact. |
| Digital | Analytics | 02_SVP_Equivalent | Analytics_Group_Director | | 12 | Responsible for analytics for an account or group of accounts: develops analysis for plan to achieve a given sales objective within a predetermined budget: supe client contacts. |
| Digital | Analytics | 03_Director | Analytics_Director | | 10 | Reports to the Head of Analytics, the Regional Head of analytical services or the Group Director: supervises the daily over-all analytical work and performance o agency. |
| Digital | Analytics | 03_Director | Analytics_Associate_Director | | 9 | Reports to the Head of Analytic services: supervises the regional (multi-office) work and performance of all analytics activities for the agency. |
| Digital | Analytics | 04_Manager | Analytics_Supervisor | | 8 | Responsible for the overall analytics process and organization that delivers information, insight and recommendations that measure and optimize marketing com business intelligence process through alignment of performance metrics, analytics structure and reporting with overall business and marketing objectives. |
| Digital | Analytics | 04_Manager | Analytics_Manager | | 7 | Responsible for the full execution of analytics for an account or group of accounts: supervises analysts and assists in the analysis programs. Has client contact. |
| Digital | Analytics | 05_Executive | Senior_Analyst | | 6 | An entry-level position with minimal prior business experience. Primarily handles scheduling of activities for one or more client accounts. |
| Digital | Analytics | 05_Executive | Analyst | | 4 | The most senior member of the data analytics group.  Overall responsibility for leading agency data analytics activities. Top level client contact. |
| Digital | Analytics | 06_Support | Analytics_Coordinator | | 2 | Reports to the Head or Regional Head of analytical services: supervises the local office analytical work and performance of all client analytics activities on behal and channel contact. |

| | | | | | | |
|---|---|---|---|---|---|---|
| Digital | Analytics | 06_Support | Junior_Analyst | | 2 | Support analysts in developing analytics and business intelligence process through alignment of performance metrics, analytics structure and reporting with ove objectives. |
| Digital | Creative | 02_SVP_Equivalent | Group_Creative_Director | | 15 | Reports directly to the Executive Creative Director and is responsible for overseeing and approving all creative output of the agency office.  Top level client conta |
| Digital | Creative | 03_Director | Associate_Creative_Director | | 10 | Reports to Creative Director. Supervises and guides the total creative effort of a number of copy and/or art supervisors or creative groups. Integrates art, copy a experienced presenter. Has client contact at brand level and above. |
| Digital | Creative | 03_Director | Creative_Director | | 12 | Reports to Executive Creative Director or Group Creative Director. Responsible for the quality of all creative work produced by the agency office for either all cli activities or subordinates to maintain standards of creative excellence and insure achievement of goals. Senior level client contact and presentation. |
| Digital | Creative | 03_Director | Group_Creative_Supervisor | | 10 | Responsible for supervising creative operations and creative development for a specific group of accounts: responsibilities include staff supervision/oversight. |
| Digital | Creative | 04_Manager | Animation_Artist | | 4 | Creates special effects, animation, or other visual images using film, video, computers, or other electronic tools and media for use in products or creations, such videos, and commercials. |
| Digital | Creative | 04_Manager | Art_Director | | 6 | Responsible for the visual creation of print, TV, digital and collateral material: may or may not supervise others or have client contact. |
| Digital | Creative | 04_Manager | Art_Supervisor | | 10 | Creates and supervises the visual creation of print, TV, digital and collateral material: supervises others and may have direct client contact. |
| Digital | Creative | 04_Manager | Copy_Supervisor | | 10 | Writes and supervises all copy and creative pieces across communication forms including sales aids, promotional pieces, direct, etc.: Supervises others and ma |
| Digital | Creative | 04_Manager | Copywriter | | 6 | Responsible for the creation of copy, usually under supervision, for print, TV/radio, digital, and collateral material: may or may not supervise others or have clien |
| Digital | Creative | 04_Manager | Creative_Supervisor | | 8 | Responsible for supervising creative operations and creative development for a specific account: responsibilities include staff supervision/oversight. |
| Digital | Creative | 04_Manager | Designer | | 5 | Involved in providing creative direction and developing visual concepts for use in print, digital and collateral work. |
| Digital | Creative | 04_Manager | Flash_Designer | | 8 | Responsible for storyboarding and wireframing, researching media production tools and techniques to suggest improvements, preparing and monitoring project maintaining a library of finished materials. |
| Digital | Creative | 04_Manager | Graphic_Designer | | 3 | Responsible for all aspects of client's advertising across print, digital, collateral material, logo development and typography. |
| Digital | Creative | 04_Manager | Group_Art_Supervisor | | 10 | Responsible for supervising art operations and creative development for a specific group of accounts: responsibilities include staff supervision/oversight. |
| Digital | Creative | 04_Manager | Group_Copy_Supervisor | | 10 | Responsible for supervising copy operations and creative development for a specific group of accounts: responsibilities include staff supervision/oversight. |
| Digital | Creative | 04_Manager | Senior_Animation_Artist | | 8 | Creates special effects, animation, or other visual images using film, video, computers, or other electronic tools and media for use in products or creations, such videos, and commercials. |
| Digital | Creative | 04_Manager | Senior_Art_Director | | 8 | An experienced specialist who is responsible for the visual creation of print, TV, digital and collateral material: supervises others and has some client contact.  R concepts and approaches with the project team, developing original design concepts as well as overseeing project design all the way through execution.  Typica |
| Digital | Creative | 04_Manager | Senior_Copywriter | | 8 | An experienced person involved in the creation of copy, usually under supervision, for print, TV/radio, digital and collateral material |
| Digital | Creative | 04_Manager | Senior_Designer | | 7 | An experienced person involved in providing creative direction and developing visual concepts for use in print, digital and collateral work.  Some client contact a |
| Digital | Creative | 04_Manager | Senior_Graphic_Designer | | 5 | Responsible for all aspects of client's advertising across print, digital, collateral material, logo development and typography. |
| Digital | Creative | 04_Manager | Senior_Illustrator | | 8 | Produce visual content for Illustrate and animate Flash, HTML5, etc., based visuals for digital media.  Typically will utilize established designs and illustration sty and Creative Director |
| Digital | Creative | 04_Manager | Senior_Web_Designer | | 8 | Responsible for design and production of online advertising, brand showcases, HTML emails, mobile promotions, social media promotions and other online med and visual prototypes (with and without wireframes) applying brand systems, typography, photography, color and other elements to create solutions that meet us |
| Digital | Creative | 04_Manager | Web_Designer | | 6 | Responsible for design and production of online advertising, brand showcases, HTML emails, mobile promotions, social media promotions and other online med and visual prototypes (with and without wireframes) applying brand systems, typography, photography, color and other elements to create solutions that meet us |
| Digital | Creative | 05_Executive | Illustrator | | 6 | Produce visual content for Illustrate and animate Flash, HTML5, etc., based visuals for digital media.  Typically will utilize established designs and illustration sty and Creative Director |
| Digital | Creative | 05_Executive | Junior_Art_Director | | 4 | Responsible for the visual creation of print, TV, digital and collateral material. Typically has 3-4 years experience. |
| Digital | Creative | 05_Executive | Junior_Copywriter | | 4 | Responsible for the creation of copy, usually under supervision, for print, TV/radio, digital, and collateral material.  Typically has 3-4 years experience. |
| Digital | Creative | 05_Executive | Junior_Designer | | 3 | Responsible for the creation of print, TV, digital and collateral materials. Typically has 2-3 years experience. |
| Digital | Creative | 05_Executive | Junior_Web_Designer | | 4 | Responsible for design and production of online advertising, brand showcases, HTML emails, mobile promotions, social media promotions and other online med and visual prototypes (with and without wireframes) applying brand systems, typography, photography, color and other elements to create solutions that meet us |
| Digital | Creative | 06_Support | Creative_Coordinator | | 2 | An entry-level position with minimal prior business experience. Primarily handles scheduling of creative department activities. |
| Digital | Production | 02_SVP_Equivalent | Director_Editorial_Services | | 15 | Responsible for managing a multi-disciplinary team including content producers, writers and community managers that review all written material produced by th |
| Digital | Production | 02_SVP_Equivalent | Head_of_Digital_Production | | 14 | Responsible for workload allocation, status meetings and ensuring process is reviewed within the agency. Works along with the creative services manager, crea and account teams to ensure all projects are running smoothly. Has overall responsibility of the delivery of all projects. |
| Digital | Production | 03_Director | Associate_Editorial_Director | | 8 | Responsible for ensuring all written documents are accurate and up to the standards:  develop the writing and editing skills of junior writer(s) and other staff consistent direction to traffic department and oversee the flow of work on all products and accounts, from concept development to product completion. |
| Digital | Production | 03_Director | Head_of_Traffic | | 16 | Supervises traffic department. Responsible for ensuring traffic department efficiently and effectively manages all external coordination, expediting, and schedulir consistent direction to traffic department and oversee the flow of work on all products and accounts, from concept development to product completion. |
| Digital | Production | 03_Director | Production_Supervisor | | 14 | Supervises production management team to ensure smooth and consistent work flow for projects including managing and tracking of edits, changes, proofreadin marketing assets being distributed and archived. |
| Digital | Production | 03_Director | Senior_Designer | | 12 | Manages the production of digital advertising assets including, but not limited to, display advertising, emails, landing pages, mobile apps, website builds using ri design/creative teams to create ad units from creative assets.  Provides direction to technical team regarding efficiency and monitors the quality of all deliverable |
| Digital | Production | 03_Director | Senior_Producer | | 12 | Responsible for day-to-day television and radio production activities, dealing with studios, participates in bid submission, pre-production, shooting, recording and |
| Digital | Production | 03_Director | Senior_Production_Manager | | 12 | Coordinates the work of several team and works closely with creative department advising on ad prep costs in pre-production meetings: estimates production co production materials from outside sources and is responsible for quality of reproduction on assigned accounts. |
| Digital | Production | 04_Manager | Editor | | 5 | Responsible for reviewing copy, proofing to detect and correct errors in spelling, punctuation, and syntax. Prepare, rewrite and edit copy to improve readability. \ using standard reference sources. |
| Digital | Production | 04_Manager | Editorial_Supervisor | | 6 | Responsible for reviewing copy, proofing to detect and correct errors in spelling, punctuation, and syntax. Supervises editorial staff. |
| Digital | Production | 04_Manager | Manager | | 10 | Manages the production of digital advertising assets including, but not limited to, display advertising, emails, landing pages, mobile apps, website builds using ri design/creative teams to create ad units from creative assets. |

HIGHLY CONFIDENTIAL

AMJD-ESN00023197

DocuSign Envelope ID: 73E4EA48-364C-4968-A075-F5FC22FA51CF

| Digital | Production | 04_Manager | Producer | | 8 | Responsible for day to day production activities and dealing with commercial production studios, editorial companies; knowledgeable in bidding, pre-production, have client contact. |
|---|---|---|---|---|---|---|
| Digital | Production | 04_Manager | Senior_Traffic_Manager | | 10 | Person Acts as liaison between Account Service and Creative to facilitate workflow. |
| Digital | Production | 04_Manager | Traffic_Manager | | 7 | Person Acts as liaison between Account Service and Creative to facilitate workflow. |
| Digital | Production | 05_Executive | Archivist | | 5 | Responsible for cataloging images in the collection through the identification and inputting of metadata into databases. Interacts with other departments to meet needs. Functions as an administrator of the digital asset management system, monitoring the use and population of the system. |
| Digital | Production | 05_Executive | Junior_Manager | | 4 | Supports the production of digital advertising assets including, but not limited to, display advertising, emails, landing pages, mobile apps, website builds using ri manager in working with agency design/creative teams to create ad units from creative assets. |
| Digital | Production | 05_Executive | Junior_Producer | | 8 | Responsible for supporting producers in developing proposals for new campaigns, ensuring that all projects are fully scoped, delivered on time, within budget an |
| Digital | Strategic_Planning | 03_Director | Planning_Director | 191.27 | 12 | Responsible for leading the client and the management of their brand, including leading all strategic development decisions on the business. |
| Digital | Strategic_Planning | 04_Manager | Planner | 70.73 | 6 | Responsible for the execution of specific research projects. Analysis and compilation of primary as well as secondary research, meeting client requirements. Ha Manages all research pertaining to strategy and creative development. Provides insight to clients, regarding consumer preference. Assist in the development o |
| Digital | Strategic_Planning | 04_Manager | Senior_Analyst | 83.62 | 8 | Responsible for the overall analytics process and organization that delivers information, insight and recommendations that measure and optimize marketing con business intelligence process through alignment of performance metrics, analytics structure and reporting with overall business and marketing objectives |
| Digital | Strategic_Planning | 04_Manager | Senior_Planner | 83.62 | 8 | Responsible for assessing the effectiveness of communication and advertising campaigns. Responsible for developing and executing research projects to defer advertising effectiveness. |
| Digital | Strategic_Planning | 04_Manager | Senior_Strategist | 83.62 | 8 | Responsible for assessing the effectiveness of communication, advertising, digital campaigns. involves developing digital media strategizers across multiple dig and Usability. SEO/SEM, Display/Rich Media, Social Media, Mobile, Email Marketing, etc. Responsible for developing and executing research projects to direct |
| Digital | Strategic_Planning | 04_Manager | Strategist | 70.73 | 6 | Responsible for the execution of specific research projects. Analysis and compilation of primary as well as secondary research, meeting client requirements. In strategizes across multiple digital marketing channels. Web Design and Usability. SEO/SEM, Display/Rich Media, Social Media, Mobile, Email Marketing, etc. |
| Digital | Strategic_Planning | 05_Executive | Analyst | 84.46 | 6 | Responsible for the overall analytics process and organization that delivers information, insight and recommendations that measure and optimize marketing con business intelligence process through alignment of performance metrics, analytics structure and reporting with overall business and marketing objectives. |
| Digital | Strategic_Planning | 05_Executive | Junior_Planner | 70.73 | 4 | Responsible for managing sources of information and core methodologies. Accumulate and analyze secondary research data. They draft rough questionnaires codes and edits completed questionnaires. They liaise with the Account formulate clear and coherent plans to implement strategy and work closely with the |
| Digital | Strategic_Planning | 05_Executive | Junior_Strategist | 48.91 | 4 | Responsible for managing sources of information and core methodologies. Accumulate and analyze secondary research data. Draft rough questionnaires, codes and edits completed questionnaires. Liaise with the Account team formulate clear and coherent plans to implement strategy and work closely with the Ac |
| Digital | Strategic_Planning | 06_Support | Junior_Analyst | 71.74 | 6 | Responsible for assisting analytics and business intelligence process through alignment of performance metrics, analytics structure and reporting with over objectives. |
| Digital | Strategic_Planning | 06_Support | Planning_Coordinator | 48.91 | 2 | An entry-level position with minimal prior business experience. Primarily handles scheduling of digital strategy department activities. |
| Digital | Technology | 03_Director | Database_Director | | 13 | Leads the team that is responsible for preparing analysis and presenting data that provides behavioral insights and data analysis that will inform strategy, creati the agency and the clients. |
| Digital | Technology | 03_Director | Director_of_Technology | | 14 | Most senior person responsible for managing all technology requirements at the agency. |
| Digital | Technology | 03_Director | Senior_Engineer | | 12 | Responsible for managing distributed software modules, managing networking and databases, monitoring and scaling system capacity. |
| Digital | Technology | 03_Director | Senior_Mobile_App_Developer | | 6 | Develops code for creating application software to be used on hand-held mobile devices like smartphones, iPads and PDAs. Typically creates 'native' applica system) or browser-based applications that run through the device's web browser. |
| Digital | Technology | 03_Director | Senior_User_Experience_Architect | | 8 | Responsible for translating creative work into a digital user interface/ user experience architecture. |
| Digital | Technology | 03_Director | Technical_Director | | 13 | Responsible for developing and managing the technology budget in support of projects and initiatives. Leads product management, strategic and operational pla resources. Manages partnerships with onshore and offshore work efforts. |
| Digital | Technology | 03_Director | Technical_Group_Supervisor | | 10 | Responsible for product management strategic managing partnerships with vendors and supervises teams for onshore and offshore work efforts. |
| Digital | Technology | 04_Manager | Architect | | 5 | Responsible for leading front-end digital design across various platforms (online, mobile, kiosk, etc.) and development and documenting user experience best pr |
| Digital | Technology | 04_Manager | Database_Manager | | 7 | Responsible for preparing analysis that provides behavioral insights and data analysis that will inform strategy, creative, and design teams within the ag |
| Digital | Technology | 04_Manager | Developer | | 4 | Develops coding utilizing HTML, Flash and other programming platforms for web interface/front-end architectures |
| Digital | Technology | 04_Manager | Engineer | | 8 | Responsible for supporting distributed software modules, managing networking and databases, monitoring and scaling system capacity. |
| Digital | Technology | 04_Manager | HTML/Flash_Developer | | 4 | Develops coding utilizing HTML, Flash and other programming platforms for web interface/front-end architectures |
| Digital | Technology | 04_Manager | HTML/Flash_Programmer | | 4 | Develops coding utilizing HTML, Flash and other programming platforms for web interface/front-end architectures |
| Digital | Technology | 04_Manager | Mobile_App_Developer | | 4 | Develops code for creating application software to be used on hand-held mobile devices like smartphones, iPads and PDAs. Typically creates 'native' applica system) or browser-based applications that run through the device's web browser. |
| Digital | Technology | 04_Manager | Network_Administrator | | 8 | Responsible for architecture and implementation of shared and cloud based technologies. Responsible for network services maintenance and performance and procedures for network related technologies cloud and cloud management technologies. Provide expert technical architectural support and guidance for networ |
| Digital | Technology | 04_Manager | Quality_Assurance_Manager | | 4 | Responsible for managing, testing, version control, and code releases for digital, web, mobile, etc., products. |
| Digital | Technology | 04_Manager | Senior_Architect | | 8 | Responsible for leading front-end digital design across various platforms (online, mobile, kiosk, etc.) and development and documenting user experience best pr |
| Digital | Technology | 04_Manager | Senior_CRM/Data_Analyst | | 5 | Responsible for the overall analytics process and organization that delivers information, insight and recommendations that measure and optimize marketing con business intelligence process through alignment of performance metrics, analytics structure and reporting with overall business and marketing objectives. |
| Digital | Technology | 04_Manager | Senior_Developer | | 6 | Develops coding utilizing HTML, Flash and other programming platforms for web interface/front-end architectures |
| Digital | Technology | 04_Manager | Senior_HTML/Flash_Developer | | 6 | Develops coding utilizing HTML, Flash and other programming platforms for web interface/front-end architectures |
| Digital | Technology | 04_Manager | Senior_HTML/Flash_Programmer | | 6 | Develops coding utilizing HTML, Flash and other programming platforms for web interface/front-end architectures |
| Digital | Technology | 04_Manager | User_Experience_Architect | | 5 | Responsible for translating creative work into a digital user interface/user experience architecture. |
| Digital | Technology | 05_Executive | CRM/Data_Analyst | | 2 | Responsible for the overall analytics process and organization that delivers information, insight and recommendations that measure and optimize marketing con business intelligence process through alignment of performance metrics, analytics structure and reporting with overall business and marketing objectives. |
| Digital | Technology | 05_Executive | Junior_Architect | | 3 | Responsible for supporting front-end digital design across various platforms (online, mobile, kiosk, etc.) and development and documenting user experience bes |

HIGHLY CONFIDENTIAL

EXHIBIT P(2)

| | | | | | | |
|---|---|---|---|---|---|---|
| Digital | Technology | 05_Executive | Junior_Developer | | 2 | Develops coding utilizing HTML, Flash and other programming platforms for web interface/front-end architectures |
| Digital | Technology | 05_Executive | Junior_Engineer | | 4 | Responsible for supporting distributed software modules, managing networking and databases, monitoring and scaling system capacity. |
| Digital | Technology | 05_Executive | Junior_HTML/Flash_Developer | | 2 | Develops coding utilizing HTML, Flash and other programming platforms for web interface/front-end architectures |
| Digital | Technology | 05_Executive | Junior_HTML/Flash_Programmer | | 2 | Develops coding utilizing HTML, Flash and other programming platforms for web interface/front-end architectures |
| Digital | Technology | 05_Executive | Junior_User_Experience_Architect | | 3 | Responsible for translating creative work into a digital user interface/ user experience architecture. |
| Digital | Technology | 05_Executive | Quality_Assurance_Analyst | | 3 | Responsible for the quality assurance testing and analysis of digital products. Includes analyzing requirements, testing in multiple environments, documenting a |
| Digital | Technology | 05_Executive | Quality_Assurance_Tester | | 3 | Responsible for the quality assurance testing and analysis of digital products. Includes analyzing requirements, testing in multiple environments, documenting a |
| Direct_Marketing | Account_Management | 02_SVP_Equivalent | Director_Client_Services | | 19 | The most senior person in account management, agency-wide. Responsible for all client activity. Selects and appoints specialists to account groups, and may co marketing services for specific clients. Top level client contact. |
| Direct_Marketing | Account_Management | 03_Director | Account_Director | | 12 | Responsible for overall agency service and activities primarily on one account. Supervises one or more Account Managers or Supervisors. Top level client conta |
| Direct_Marketing | Account_Management | 03_Director | Associate_Account_Director | | 10 | Responsible for overall agency service and activities primarily on one account. Reports to an Account Director and supervises one or more Account Managers. |
| Direct_Marketing | Account_Management | 03_Director | Senior_Account_Director | | 14 | Responsible for overall agency service and activities on one or more accounts. Supervises one or more Account Supervisors. Top level client contact. |
| Direct_Marketing | Account_Management | 04_Manager | Account_Manager | | 6 | Responsible for developing and coordinating advertising activities generally for one client. Frequent client contact to determine advertising requirements includin agency service level required. Meets internally with creative, media and production specialists to scope work and estimate costs. |
| Direct_Marketing | Account_Management | 04_Manager | Account_Supervisor | | 8 | Responsible for directing the daily activities of one or more Account Executives to insure proper agency service on one or more accounts. Maintains senior level |
| Direct_Marketing | Account_Management | 05_Executive | Account_Executive | | 3 | Responsible for day-to-day coordination of agency activities and client account generally on one client account. |
| Direct_Marketing | Account_Management | 05_Executive | Senior_Account_Executive | | 5 | Individual performing primary account-handling responsibility mainly on one account. Mid-level client contact. |
| Direct_Marketing | Creative | 02_SVP_Equivalent | Group_Creative_Director | | 15 | Reports directly to the Executive Creative Director and is responsible for overseeing and approving all creative output of the agency office. Top level client conta |
| Direct_Marketing | Creative | 03_Director | Associate_Creative_Director | | 10 | Reports to Creative Director. Supervises and guides the total creative effort of a number of copy and/or art supervisors or creative groups. Integrates art, copy a experienced presenter. Has client contact at brand level and above. |
| Direct_Marketing | Creative | 03_Director | Creative_Director | | 12 | Reports to Executive Creative Director or Group Creative Director. Responsible for the quality of all creative work produced by the agency office for either all clie activities of subordinates to maintain standards of creative excellence and insure achievement of goals. Senior level client contact and presentation. |
| Direct_Marketing | Creative | 03_Director | Senior_Art_Director | | 8 | An experienced specialist who is responsible for the visual creation of print, TV, digital and collateral material: supervises others and has some client contact. R concepts and approaches with the project team, developing original design concepts as well as overseeing project design all the way through execution. Typica |
| Direct_Marketing | Creative | 04_Manager | Art_Director | | 6 | Responsible for the visual creation of print, TV, digital and collateral material: may or may not supervise others or have client contact. |
| Direct_Marketing | Creative | 04_Manager | Copywriter | | 6 | Responsible for the creation of copy, usually under supervision, for print, TV/radio, digital, and collateral material: may or may not supervise others or have clien |
| Direct_Marketing | Creative | 04_Manager | Senior_Copywriter | | 8 | An experienced specialist who is responsible for the creation of copy, usually under supervision, for print, TV/radio, digital and collateral material: supervises oth |
| Direct_Marketing | Digital_Database | 03_Director | Database_Director | | 13 | Leads the team that is responsible for preparing analysis and presenting data that provides behavioral insights and data analysis that will inform strategy, creativ the agency and at clients. |
| Direct_Marketing | Digital_Database | 03_Director | Digital_Technical_Director | | 8 | Responsible for reviewing and approving proposed development releases and oversee the release process for tools/products. Conduct code reviews, and estab process, including integration and system testing, monitor tools usage/performance and resolve any failures. Oversee internal and external project dependencie |
| Direct_Marketing | Digital_Database | 03_Director | Director_Digital | | 14 | Responsible for reviewing and approving proposed development releases and oversee the release process for tools/products. Conduct code reviews, and estab process, including integration and system testing, monitor tools usage/performance and resolve any failures. Oversee internal and external project dependencie |
| Direct_Marketing | Digital_Database | 04_Manager | Database_Manager | | 7 | Responsible for preparing analysis that provides behavioral insights and data analysis that will inform strategy, creative, account and design teams within the ag |
| Direct_Marketing | Digital_Database | 04_Manager | Digital_Programmer | | 5 | Programmer experienced in developing applications for web-based, mobile, and/or tablet platforms utilizing multiple development platforms including LAMP, .NE expertise includes Flash Animation, Flash Flex, RUBY, ActionScript, Adobe Creative Suite, XML, XHTML, HTML, CSS, WordPress, PHP, Email Solutions, J |
| Direct_Marketing | Digital_Database | 04_Manager | Senior_Data_Analyst | | 5 | Responsible for the overall analytics process and organization that delivers information, insight and recommendations that measure and optimize marketing com business intelligence process through alignment of performance metrics, analytics structure and reporting with overall business and marketing objectives. |
| Direct_Marketing | Digital_Database | 04_Manager | Senior_Digital_Art_Director | | 8 | An experienced specialist who is responsible for the visual creation of print, TV, digital and collateral material: supervises others and has some client contact. R concepts and approaches with the project team, developing original design concepts as well as overseeing project design all the way through execution. Typica |
| Direct_Marketing | Digital_Database | 04_Manager | Senior_Digital_Producer | | 7 | Responsible for day-to-day digital production activities, dealing with studios, participates in bid submission, pre-production, shooting, recording and editing pro |
| Direct_Marketing | Digital_Database | 04_Manager | Systems_Engineer | | 7 | Responsible for research, design, develop and implement solutions for fault, performance, capacity, and configuration management for applications. Identify pro point and impact analysis. Design, develop, and implement documentation or tools appropriate to the maintenance of application platforms. |
| Direct_Marketing | Digital_Database | 04_Manager | Techincal_Programmer | | 4 | Responsible for developing, modifying and supporting a variety of software applications, data warehouse, interfaces, and reports including documentation and to requirements analysis, design, development, and maintenance of all source transactional systems and interfaces. |
| Direct_Marketing | Digital_Database | 05_Executive | Data_Analyst | | 2 | Responsible for the overall analytics process and organization that delivers information, insight and recommendations that measure and optimize marketing com business intelligence process through alignment of performance metrics, analytics structure and reporting with overall business and marketing objectives. |
| Direct_Marketing | Production | 03_Director | Digital_Production_Supervisor | | 8 | Ensures that project goals are delivered by analyzing timelines, production process and efficiency. Ensures a constant flow of communication to provide content engineers the information needed to complete project. |
| Direct_Marketing | Production | 04_Manager | Producer | | 8 | Responsible for day to day production activities and dealing with commercial production studios, editorial companies: knowledgeable in bidding, pre-production, have client contact. |
| Direct_Marketing | Production | 04_Manager | Project_Supervisor | | 8 | Ensures that project goals are delivered by analyzing timelines, production process and efficiency. Ensures a constant flow of communication to provide content engineers the information needed to complete project. |
| Direct_Marketing | Production | 04_Manager | Systems_Engineer | | 7 | Responsible for research, design, develop and implement solutions for fault, performance, capacity, and configuration management for applications. Identify pro point and impact analysis. Design, develop, and implement documentation or tools appropriate to the maintenance of application platforms. |
| Direct_Marketing | Production | 04_Manager | Techincal_Programmer | | 4 | Responsible for developing, modifying and supporting a variety of software applications, data warehouse, interfaces, and reports including documentation and to requirements analysis, design, development, and maintenance of all source transactional systems and interfaces. |
| Direct_Marketing | Strategic_Planning | 03_Director | Associate_Planning_Director | | 10 | Responsible for leading the client and the management of their brand, including leading all strategic development decisions on the clients business. |
| Direct_Marketing | Strategic_Planning | 03_Director | Group_Planning_Director | | 14 | Responsible to the Head of Planning and supervises the work and performance of one or more senior planners. Assists in overall management of the departme |
| Direct_Marketing | Strategic_Planning | 04_Manager | Senior_Strategic_Planner | | 8 | Responsible for assessing the effectiveness of communication and advertising campaigns. Responsible for developing and executing research projects to deter advertising effectiveness. |

HIGHLY CONFIDENTIAL

AMJUR_ESN00023199

| Direct_Marketing | Strategic_Planning | 05_Executive | Research_Analyst | | 4 | Responsible for the overall analytics process and organization that delivers information, insight and recommendations that measure and optimize marketing com business intelligence process through alignment of performance metrics, analytics structure and reporting with overall business and marketing objectives. |
| Events_Promotions | Account_Management | 02_SVP_Equivalent | Global_Account_Head | | 24 | The most senior person in account management agency-wide, globally. Responsible for all client activity. Selects and appoints specialists to account groups, an marketing services for specific clients. Top level client contact. |
| Events_Promotions | Account_Management | 02_SVP_Equivalent | Head_of_Account_Management | | 19 | The most senior person in account management agency-wide. Responsible for all client activity. Selects and appoints specialists to account groups, and may o marketing services for specific clients. Top level client contact. |
| Events_Promotions | Account_Management | 03_Director | Account_Director | | 12 | Responsible for overall agency service and activities primarily on one account. Supervises one or more Account Managers or Supervisors. Top level client conta |
| Events_Promotions | Account_Management | 03_Director | Associate_Account_Director | | 10 | Responsible for overall agency service and activities primarily on one account. Reports to an Account Director and supervises one or more Account Managers. |
| Events_Promotions | Account_Management | 03_Director | Senior_Account_Director | | 14 | Responsible for overall agency service and activities on one or more accounts. Supervises one or more Account Supervisors. Top level client contact. |
| Events_Promotions | Account_Management | 04_Manager | Account_Manager | | 6 | Responsible for developing and coordinating advertising activities generally for one client. Frequent client contact to determine advertising requirements includin agency service level required. Meets internally with creative, media and production specialists to scope work and estimate costs. |
| Events_Promotions | Account_Management | 04_Manager | Account_Supervisor | | 8 | Responsible for directing the daily activities of one or more Account Executives to insure proper agency service on one or more accounts. Maintains senior level |
| Events_Promotions | Account_Management | 04_Manager | Senior_Account_Manager | | 8 | Individual performing primary account-handling responsibility usually on more than one account and has mid-level client contact and some senior level client con |
| Events_Promotions | Account_Management | 05_Executive | Account_Executive | | 3 | Responsible for day-to-day coordination of agency activities and client contact generally on one client account. |
| Events_Promotions | Account_Management | 05_Executive | Junior_Account_Manager | | 2 | Responsible for supporting the development of advertising activities generally for one clients. Some client contact to determine advertising requ information and agency service level required. |
| Events_Promotions | Account_Management | 05_Executive | Senior_Account_Executive | | 5 | Individual performing primary account-handling responsibility mainly on one account. Mid-level client contact. |
| Events_Promotions | Account_Management | 06_Support | Account_Coordinator | | 2 | An entry-level position with minimal prior business experience. Primarily handles scheduling of activities for one or more client accounts. |
| Events_Promotions | Account_Management | 06_Support | Assistant_Account_Executive | | 2 | Frequently an entry-level position from college, or with minimal prior business experience. Works under close supervision on such things as budget controls, traf accounts. |
| Events_Promotions | Creative | 02_SVP_Equivalent | Executive_Creative_Director | | 18 | Overall corporate responsibility and accountability for the management of the total creative function of the agency office. Participates in setting agency goals an the "creative tone" and pace of the agency. Top level client contact. Typically a Vice President or above |
| Events_Promotions | Creative | 03_Director | Associate_Creative_Director | | 10 | Reports to Creative Director. Supervises and guides the total creative effort of a number of copy and/or art supervisors or creative groups. Integrates art, copy a experienced presenter. Has client contact at present level and above. |
| Events_Promotions | Creative | 03_Director | Creative_Director | | 12 | Reports to Executive Creative Director or Group Creative Director. Responsible for the quality of all creative work produced by the agency office for either all clic activities of subordinates to maintain standards of creative excellence and insure achievement of goals. Senior level client contact and presentation. |
| Events_Promotions | Creative | 03_Director | Studio_Manager | | 7 | Responsible that briefs are effectively and efficiently managed including preparing workflow structure, ensuring work is delivered on deadline, comp departments informed about project status. |
| Events_Promotions | Creative | 04_Manager | Art_Director | | 6 | Responsible for the visual creation of print, TV, digital and collateral material: may or may not supervise others or have client contact. |
| Events_Promotions | Creative | 04_Manager | Copywriter | | 6 | Responsible for the creation of copy, usually under supervision, for print, TV/radio, digital, and collateral material: may or may not supervise others or have clien |
| Events_Promotions | Creative | 04_Manager | Designer | | 5 | Involved in providing creative direction and developing visual concepts for use in print, digital and collateral work. |
| Events_Promotions | Creative | 04_Manager | Senior_Art_Director | | 8 | An experienced specialist who is responsible for the visual creation of print, TV, digital and collateral material: supervises others and has some client contact. R concepts and approaches with the project team, developing original design concepts as well as overseeing project design all the way through execution. Typica |
| Events_Promotions | Creative | 04_Manager | Senior_Copywriter | | 8 | An experienced specialist who is responsible for the creation of copy, usually under supervision, for print, TV/radio, digital and collateral material: supervises oth |
| Events_Promotions | Creative | 04_Manager | Senior_Designer | | 7 | An experienced person involved in providing creative direction and developing visual concepts for use in print, digital and collateral work.  Some client contact a |
| Events_Promotions | Creative | 05_Executive | Junior_Art_Director | | 4 | Responsible for print, TV, digital and collateral material. Typically has 3-4 years experience. |
| Events_Promotions | Creative | 05_Executive | Junior_Copywriter | | 4 | Responsible for the creation of copy, usually under supervision, for print, TV/radio, digital, and collateral material.  Typically has 3-4 years experience. |
| Events_Promotions | Creative | 05_Executive | Junior_Designer | | 3 | Responsible for print, TV, digital and collateral materials. Typically has 2-3 years experience. |
| Events_Promotions | Creative | 05_Executive | Studio_Artist | | 4 | Responsible for the preparation and refinement of creative materials including preparing electronic layouts for print, web deliverables, slide presentation media a |
| Events_Promotions | Creative | 06_Support | Creative_Coordinator | | 2 | An entry-level position with minimal prior business experience. Primarily handles scheduling of creative department activities. |
| Events_Promotions | Production | 02_SVP_Equivalent | Executive_Producer | | 16 | Oversees all relationships between department and outside vendors, supervises traffic and helps ensure the efficient/timely/cost-effective production of televisio |
| Events_Promotions | Production | 02_SVP_Equivalent | Head_of_Broadcast_Production | | 23 | Senior person responsible for supervision and administration of broadcast (commercial) production department and support sections including casting, audio-vis business affairs, etc. Maintains top level contact with agency creative and account management people: also with client production liaisons. |
| Events_Promotions | Production | 02_SVP_Equivalent | Head_of_Creative_Services | | 23 | Senior person responsible for print and digital production, creative development, project management, process and systems development and implementation a |
| Events_Promotions | Production | 02_SVP_Equivalent | Head_of_Print_Production | | 20 | Senior person responsible for all aspects of agency's print production. Knowledgeable in all aspects of graphic arts technology. Supervises print product supervisors, type director, etc. |
| Events_Promotions | Production | 03_Director | Broadcast_Editor | | 12 | Responsible for editing television and long format videos, as well as recording scratch audio tracks. |
| Events_Promotions | Production | 03_Director | Head_of_Business_Affairs | | 14 | Responsible for overall management of broadcast operations (cost controls, budget preparation, etc.). |
| Events_Promotions | Production | 03_Director | Head_of_Traffic | | 16 | Supervises traffic department. Responsible for ensuring traffic department efficiently and effectively manages all external coordination, expediting, and schedule consistent direction to traffic department and oversee the flow of work on all products and accounts, from concept development to product completion. |
| Events_Promotions | Production | 03_Director | Senior_Broadcast_Editor | | 14 | Responsible for editing television and long format videos, as well as recording scratch audio tracks. |
| Events_Promotions | Production | 03_Director | Senior_Business_Manager | | 12 | Responsible for business management of broadcast operations (cost controls, budget preparation, etc.). |
| Events_Promotions | Production | 03_Director | Senior_Producer | | 12 | Responsible for day-to-day television and radio production activities, dealing with studios, participates in bid submission, pre-production, shooting, recording and |
| Events_Promotions | Production | 03_Director | Senior_Production_Manager | | 12 | Coordinates the work of several team and works closely with creative department advising on ad prop costs in pre-production meetings: estimates production co production materials from outside sources and is responsible for quality of reproduction on assigned accounts. |
| Events_Promotions | Production | 04_Manager | Art_Buyer | | 6 | Works closely with Creative Director to procure required art, coordinate pre-production planning and prepares for purchase of all projects. |

HIGHLY CONFIDENTIAL

EXHIBIT P(2)

AND_ESN00023200

| | | | | | | |
|---|---|---|---|---|---|---|
| Events_Promotions | Production | 04_Manager | Business_Manager | | 10 | Responsible for day-to-day management of broadcast operations (cost controls, budget preparation, etc.). |
| Events_Promotions | Production | 04_Manager | Junior_Broadcast_Editor | | 5 | Supports broadcast editor in editing television and long format videos, as well as recording scratch audio tracks. |
| Events_Promotions | Production | 04_Manager | Print_Producer | | 8 | Responsible for ensuring print quality is achieved within the clients budgets and timetables. Supervise, schedule and purchase all pre-press related materials an |
| Events_Promotions | Production | 04_Manager | Producer | | 8 | Responsible for day to day production activities and dealing with commercial production studios, editorial companies: knowledgeable in bidding, pre-production, have client contact. |
| Events_Promotions | Production | 04_Manager | Production_Manager | | 10 | Works closely with creative department advising on ad prep costs in pre-production meetings: estimates production costs and purchases necessary ad productic responsible for quality of reproduction on assigned accounts. |
| Events_Promotions | Production | 04_Manager | Senior_Art_Buyer | | 12 | Works closely with Director of Production to procure required art, coordinate pre-production planning, prepares for reproduction of all projects, and manages the |
| Events_Promotions | Production | 04_Manager | Senior_Print_Producer | | 12 | Responsible for ensuring the finest print quality is achieved within client budgets and timetables. Supervises, schedules and purchases all pre-press related mat |
| Events_Promotions | Production | 04_Manager | Senior_Proofreader | | 8 | Checks proofs and manuscripts for typographical, grammatical, print and illustration inaccuracies. Checks executives and department heads on questions of aut |
| Events_Promotions | Production | 04_Manager | Senior_Traffic_Manager | | 10 | Person Acts as liaison between Account Service and Creative to facilitate workflow. |
| Events_Promotions | Production | 04_Manager | Traffic_Manager | | 7 | Person Acts as liaison between Account Service and Creative to facilitate workflow. |
| Events_Promotions | Production | 04_Manager | Traffic_Supervisor | | 12 | Assist management in the daily operations within the Traffic Department and with traffic personnel. Assisting management in prioritization of department goals, c utilization of available tools to evaluate and process necessary reporting. Ensures all Traffic deadlines are met. |
| Events_Promotions | Production | 05_Executive | Assistant_Business_Manager | | 6 | Assists business manager on day-to-day work activity including budget preparation. |
| Events_Promotions | Production | 05_Executive | Assistant_Producer | | 6 | Assists liaison with other departments and outside vendors as needed, executes on tasks, helps ensure the efficient/timely/cost-effective production of broadca |
| Events_Promotions | Production | 05_Executive | Assistant_Production_Manager | | 7 | Supports production manager in pre-production meetings: estimates production costs and purchases necessary production materials from outside sources, m on assigned accounts. |
| Events_Promotions | Production | 05_Executive | Assistant_Traffic_Manager | | 4 | Assists traffic manager on day-to-day work activity. May fill in for Traffic Coordinator when necessary. May also handle own accounts. |
| Events_Promotions | Production | 05_Executive | Junior_Art_Buyer | | 4 | Supports art buyer and may purchase artwork, prints, retouching, etc. |
| Events_Promotions | Production | 05_Executive | Junior_Print_Producer | | 3 | Supports print producer to ensure print quality is achieved within the clients budgets and timetables. |
| Events_Promotions | Production | 05_Executive | Junior_Proofreader | | 2 | Supports proofreader duties checking proofs and manuscripts for typographical, grammatical, print and illustration inaccuracies. |
| Events_Promotions | Production | 05_Executive | Proofreader | | 4 | Checks proofs and manuscripts for typographical, grammatical, print and illustration inaccuracies. |
| Events_Promotions | Production | 06_Support | Production_Assistant | | 2 | Under supervision, handles print production of ad work. Does mechanical buying, studies and visits plants to learn graphics manufacturing processes, and assis necessary. |
| Events_Promotions | Production | 06_Support | Production_Coordinator | | 2 | An entry-level position with minimal prior business experience. Primarily handles scheduling of activities for the production department. |
| Events_Promotions | Strategic_Planning | 02_SVP_Equivalent | Head_of_Research | | 22 | Overall responsibility for all agency research activities and the operation of the agency research department. Participates in setting agency goals and policy mak |
| Events_Promotions | Strategic_Planning | 02_SVP_Equivalent | Head_of_Strategic_Planning | | 16 | The most senior member of the Account Planning structure. Overall responsibility for all agency planning activities and the operation of the planning & research contact. |
| Events_Promotions | Strategic_Planning | 02_SVP_Equivalent | Head_of_Strategic_Planning/Research | | 19 | The most senior member of the Account Planning structure.  Overall responsibility for all agency planning activities and the operation of the planning & researcl agency goals and policy making decisions. Top level client contact. |
| Events_Promotions | Strategic_Planning | 03_Director | Associate_Planning_Director | | 10 | Responsible for leading the client and the management of their brand, including leading all strategic development decisions on the clients business. |
| Events_Promotions | Strategic_Planning | 03_Director | Associate_Research_Director | | 10 | Responsible for developing and executing research projects to determine consumer attitudes and advertising effectiveness. Supervise analysts. |
| Events_Promotions | Strategic_Planning | 03_Director | Group_Planning_Director | | 14 | Responsible to the Head of Planning and supervises the work and performance of one or more senior planners. Assists in overall management of the departmer |
| Events_Promotions | Strategic_Planning | 03_Director | Group_Research_Director | | 16 | Responsible to the Head of Research and supervises the work and performance of one or more Associate Research Directors. Assists Director in overall manag |
| Events_Promotions | Strategic_Planning | 03_Director | Planning_Director | | 12 | Responsible for leading the client and the management of their brand, including leading all strategic development decisions on the clients business. |
| Events_Promotions | Strategic_Planning | 03_Director | Research_Director | | 14 | Responsible for the development and management of primary research programs including research studies, surveys, as well as analysis and tools. |
| Events_Promotions | Strategic_Planning | 04_Manager | Planner | | 6 | Responsible for the execution of specific research projects. Analysis and compilation of primary as well as secondary research, meeting client requirements.  Hi Manages all research pertaining to strategy and creative development.  Provides insight to clients, regarding consumer preference.  Assist in the development o |
| Events_Promotions | Strategic_Planning | 04_Manager | Senior_Analyst | | 8 | Responsible for the overall analytics process and organization that delivers information, insight and recommendations that measure and optimize marketing com business intelligence process through alignment of performance metrics, analytics structure and reporting with overall business and marketing objectives. |
| Events_Promotions | Strategic_Planning | 04_Manager | Senior_Planner | | 8 | Responsible for assessing the effectiveness of communication and advertising campaigns.  Responsible for developing and executing research projects to deter advertising effectiveness. |
| Events_Promotions | Strategic_Planning | 05_Executive | Analyst | | 6 | Responsible for the overall analytics process and organization that delivers information, insight and recommendations that measure and optimize marketing com business intelligence process through alignment of performance metrics, analytics structure and reporting with overall business and marketing objectives. |
| Events_Promotions | Strategic_Planning | 05_Executive | Junior_Planner | | 4 | Responsible for managing sources of information and core methodologies.  Accumulate and analyze secondary research data.  They draft rough questionnaires codes and edits completed questionnaires.  They liaise with the Account team formulate clear and coherent plans to implement  strategy and work closely with tl |
| Events_Promotions | Strategic_Planning | 05_Executive | Librarian | | 6 | Conducts literature searches, correlates information from many sources, and analyzes information to solve research problems.  Acquires, organizes (classifie functional line consistent with the needs of the agency. |
| Events_Promotions | Strategic_Planning | 06_Support | Junior_Analyst | | 2 | Support analysts in developing analytics and business intelligence process through alignment of performance metrics, analytics structure and reporting with ove objectives. |
| Media | Account_Management | 01_C_Suite_EVP | Digital_Head_of_Media | 600.00 | 22 | Responsible for corporate media function. Establishes company-wide media objectives and goals and is involved in policy-making decisions. May coordinate mu consultant to region or division media directors and other top corporate officers. A senior officer of the agency. Usually reports to President of agency. |
| Media | Account_Management | 01_C_Suite_EVP | Head_of_Account_Management | 600.00 | 19 | The most senior person in Media account management, agency-wide. Responsible for all client activity. Selects and appoints specialists to account groups, and media services for specific clients. Top level client contact. |
| Media | Account_Management | 01_C_Suite_EVP | Head_of_Media | 600.00 | 22 | Responsible for corporate media function. Establishes company-wide media objectives and goals and is involved in policy-making decisions. May coordinate mu consultant to region or division media directors and other top corporate officers. A senior officer of the agency. Usually reports to President of agency. |
| Media | Account_Management | 01_C_Suite_EVP | Social_Head_of_Media | 600.00 | 22 | Responsible for corporate media function. Establishes company-wide media objectives and goals and is involved in policy-making decisions. May coordinate mu consultant to region or division media directors and other top corporate officers. A senior officer of the agency. Usually reports to President of agency. |

EXHIBIT P(2)

MJB_ESN00023201

| Media | Account_Management | 02_SVP_Equivalent | Digital_Regional_Director | 300.26 | 15 | Reports to the Head of Digital Media services: supervises the regional (multi-office) work and performance of all Media activities for the agency. |
|---|---|---|---|---|---|---|
| Media | Account_Management | 02_SVP_Equivalent | Group_Account_Director | 314.37 | 16 | Responsible for overall media service and activities on one or more groups of accounts. Supervises one or more Account Supervisors. Top level client contact. Reports to agency, reporting to either President or Director of Client Services. May be an Executive V.P. |
| Media | Account_Management | 02_SVP_Equivalent | Regional_Account_Director | 422.63 | 15 | Reports to the Head of Media services: supervises the regional (multi-office) work and performance of all Media activities for the agency. |
| Media | Account_Management | 02_SVP_Equivalent | Social_Group_Director | 274.40 | 16 | Responsible for overall media service and activities on one or more groups of accounts. Supervises one or more Account Supervisors. Top level client contact. Reports to agency, reporting to either President or Director of Client Services. May be an Executive V.P. |
| Media | Account_Management | 03_Director | Account_Director | 205.33 | 12 | Responsible for overall agency service and activities primarily on one account. Supervises one or more Account Managers or Supervisors. Top level client contact. |
| Media | Account_Management | 03_Director | Digital_Director | 196.85 | 12 | Responsible for overall agency service and activities primarily on one account. Supervises one or more Account Managers or Supervisors. Top level client contact. |
| Media | Account_Management | 03_Director | Digital_Group_Director | 252.05 | 16 | Responsible for overall Digital media service and activities on one or more accounts. Supervises one or more Account Supervisors. Top level client contact. Reports to agency, reporting to either President or Director of Client Services. May be an Executive V.P. |
| Media | Account_Management | 03_Director | Social_Director | 196.85 | 12 | Responsible for overall agency service and activities primarily on one account. Supervises one or more Account Managers or Supervisors. Top level client contact. |
| Media | Account_Management | 04_Manager | Account_Associate_Director | 149.03 | 10 | Responsible for overall Media service and activities primarily on one account. Reports to an Account Director and supervises one or more Account Managers. S |
| Media | Account_Management | 04_Manager | Account_Supervisor | 109.59 | 8 | Responsible for directing the daily activities of one or more Account Executives to insure proper media service on one or more accounts. Maintains senior level c |
| Media | Account_Management | 04_Manager | Digital_Associate_Director | 147.69 | 10 | Responsible for overall Digital Media service and activities primarily on one account. Reports to an Account Director and supervises one or more Account Manag |
| Media | Account_Management | 04_Manager | Digital_Supervisor | 113.05 | 8 | Responsible for directing the daily activities of one or more Account Executives to insure proper Digital media service on one or more accounts. Maintains senio |
| Media | Account_Management | 04_Manager | Social_Associate_Director | 147.69 | 10 | Responsible for overall Social Media service and activities primarily on one account. Reports to a Social Director and supervises one or more Account Managers. Senior |
| Media | Account_Management | 05_Executive | Account_Manager | 93.20 | 6 | Responsible for developing and coordinating Media activities generally for one client. Frequent client contact to determine media requirements including budgets service level required. Meets internally with specialists internally to scope work and estimate costs. |
| Media | Account_Management | 05_Executive | Digital_Associate | 55.28 | 4 | Responsible for managing digital and social media strategies and creating content for clients. |
| Media | Account_Management | 05_Executive | Digital_Junior_Associate | 55.28 | 2 | Responsible for supporting the development of digital advertising activities generally for one client. May have some client contact to determine requirements incl and agency service level required. |
| Media | Account_Management | 05_Executive | Digital_Manager | 113.05 | 6 | Responsible for developing and coordinating Digital Media activities generally for one client. Frequent client contact to determine media requirements including media service level required. Meets internally with specialists internally to scope work and estimate costs. |
| Media | Account_Management | 05_Executive | Senior_Account_Manager | 118.67 | 8 | Individual performing primary account-handling responsibility usually on more than one account and has mid-level client contact and some senior level client |
| Media | Account_Management | 05_Executive | Social_Junior_Associate | 55.28 | 2 | Responsible for supporting the development and coordination of Social Media activities generally for one clients. Some client contact to determine advertising re information and Media service level required. |
| Media | Account_Management | 05_Executive | Social_Manager | 113.05 | 6 | Responsible for developing and coordinating Social Media activities generally for one client. Frequent client contact to determine media requirements including media service level required. Meets internally with specialists internally to scope work and estimate costs. |
| Media | Account_Management | 05_Executive | Social_Senior_Manager | 113.05 | 8 | Individual performing primary Social media -handling responsibility usually on more than one account and has mid-level client contact and some senior level clie |
| Media | Account_Management | 05_Executive | Social_Supervisor | 113.05 | 8 | Responsible for directing the daily activities of one or more Social Executives to insure proper media service on one or more accounts. Maintains senior level cli |
| Media | Account_Management | 06_Support | Account_Coordinator | 48.91 | 2 | An entry-level position with minimal prior business experience. Primarily handles scheduling of activities for one or more client accounts. |
| Media | Account_Management | 06_Support | Digital_Coordinator | 55.28 | 2 | An entry-level position with minimal prior business experience. Primarily handles scheduling of activities for one or more client accounts. |
| Media | Account_Management | 06_Support | Junior_Manager | 70.73 | 2 | Responsible for supporting the development and coordination of Media activities generally for clients. Some client contact to determine advertising requirement information and Media service level required. |
| Media | Account_Management | 06_Support | Social_Coordinator | 30.69 | 2 | An entry-level position with minimal prior business experience. Primarily handles scheduling of activities for one or more client accounts. |
| Media | Analytics | 01_C_Suite_EVP | Head_of_Analytics | 600.00 | 22 | Reports to the Head of Media services: supervises the work and performance of all analytics activities for the agency |
| Media | Analytics | 02_SVP_Equivalent | Group_Director | 291.43 | 12 | Reports to the Head or Regional Head of analytical services: supervises the local office analytical work and performance of all client analytics activities on behal and channel contact. |
| Media | Analytics | 02_SVP_Equivalent | Regional_Director | 322.34 | 15 | Reports to the Head of Analytic services: supervises the regional (multi-office) work and performance of all Media activities for the agency. |
| Media | Analytics | 03_Director | Director | 211.62 | 10 | Reports to the Head of Analytics, the Regional Head of analytical services or the Group Director: supervises the daily over all analytical work and performance o and client contacts. |
| Media | Analytics | 04_Manager | Associate_Director | 161.72 | 9 | Responsible for media analytics for an account or group of accounts: develops analysis for plan to achieve a given sales objective within a predetermined budge and client contacts. |
| Media | Analytics | 05_Executive | Manager | 118.52 | 7 | Responsible for the full execution of analytics for an account or group of accounts: supervises analysts and assists in the analysis programs. Has client contact. |
| Media | Analytics | 05_Executive | Senior_Analyst | 83.62 | 6 | Responsible for the overall analytics process and organization that delivers information, insight and recommendations that measure and optimize marketing com business intelligence process through alignment of performance metrics, analytics structure and reporting with overall business and marketing objectives. |
| Media | Analytics | 05_Executive | Supervisor | 118.52 | 8 | Responsible for the full execution of analytics for an account or group of accounts: supervises analysts and assists in the analysis programs. Has client contact. |
| Media | Analytics | 06_Support | Analyst | 43.84 | 4 | Responsible for the overall analytics process and organization that delivers information, insight and recommendations that measure and optimize marketing com business intelligence process through alignment of performance metrics, analytics structure and reporting with overall business and marketing objectives. |
| Media | Analytics | 06_Support | Coordinator | 30.69 | 2 | An entry-level position with minimal prior business experience. Primarily handles scheduling of activities for one or more client accounts. |
| Media | Analytics | 06_Support | Junior_Analyst | 71.74 | 2 | Support analysts in developing analytics and business intelligence process through alignment of performance metrics, analytics structure and reporting with ove objectives. |
| Media | Media_Buying | 02_SVP_Equivalent | Broadcast_Head_of_Media_Buying | 353.69 | 20 | Reports to the Head of Media services: supervises the work and performance of all media buying activities for the agency. |
| Media | Media_Buying | 02_SVP_Equivalent | Broadcast_Regional_Director | 247.72 | 15 | Reports to the Head of Broadcast Media services: supervises the regional (multi-office) work and performance of all Media activities for the agency. |
| Media | Media_Buying | 02_SVP_Equivalent | Digital_Head_of_Media_Buying | 300.26 | 20 | Reports to the Head of Digital Media services: supervises the work and performance of all media buying activities for the agency. |
| Media | Media_Buying | 02_SVP_Equivalent | Digital_Regional_Director | 300.26 | 15 | Reports to the Head of Digital Media services: supervises the regional (multi-office) work and performance of all Media activities for the agency. |

EXHIBIT P(2)

| Media | Media_Buying | 02_SVP_Equivalent | Print_Outdoor_Head_of_Media_Buying | 353.69 | 20 | Reports to the Head of Media services: supervises the work and performance of all media buying activities for the agency. |
|---|---|---|---|---|---|---|
| Media | Media_Buying | 02_SVP_Equivalent | Print_Outdoor_Regional_Director | 247.72 | 15 | Reports to the Head of Outdoor Media services: supervises the regional (multi-office) work and performance of all Media activities for the agency. |
| Media | Media_Buying | 03_Director | Broadcast_Group_Director | 247.72 | 16 | Responsible for overall agency service and activities on one or more groups of accounts. Supervises one or more Account Supervisors. Top level client contact. I agency, reporting to either President or Director of Client Services. May be an Executive V.P. |
| Media | Media_Buying | 03_Director | Digital_Director | 196.85 | 12 | Responsible for overall agency service and activities primarily on one account. Supervises one or more Buying Managers or Supervisors. Top level client contac |
| Media | Media_Buying | 03_Director | Digital_Group_Director | 252.05 | 16 | Responsible for overall agency service and activities on one or more groups of accounts. Supervises one or more Account Supervisors. Top level client contact. I agency, reporting to either President or Director of Client Services. May be an Executive V.P. |
| Media | Media_Buying | 03_Director | Print_Outdoor_Director | 194.04 | 12 | Responsible for overall agency service and activities primarily on one account. Supervises one or more Buying Managers or Supervisors. Top level client contac |
| Media | Media_Buying | 03_Director | Print_Outdoor_Group_Director | 145.72 | 16 | Responsible for overall agency service and activities on one or more groups of accounts. Supervises one or more Account Supervisors. Top level client contact. I agency, reporting to either President or Director of Client Services. May be an Executive V.P. |
| Media | Media_Buying | 04_Manager | Broadcast_Associate_Director | 208.42 | 10 | Responsible for overall Media service and activities primarily on one account. Reports to a planning director and supervises one or more Buying Managers. Sen |
| Media | Media_Buying | 04_Manager | Broadcast_Director | 194.04 | 12 | Responsible for overall agency service and activities primarily on one account. Supervises one or more Buying Managers or Supervisors. Top level client contac |
| Media | Media_Buying | 04_Manager | Digital_Associate_Director | 147.69 | 10 | Responsible for overall Media service and activities primarily on one account. Reports to a buying director and supervises one or more Buying Managers. Senio |
| Media | Media_Buying | 04_Manager | Print_Outdoor_Associate_Director | 111.27 | 10 | Responsible for overall Media service and activities primarily on one account. Reports to a buying director and supervises one or more Buying Managers. Senio |
| Media | Media_Buying | 05_Executive | Broadcast_Senior_Buyer | 76.17 | 8 | Individual performing primary account-Planning responsibility usually on more than one account and has mid-level client contact and some senior level client co |
| Media | Media_Buying | 05_Executive | Broadcast_Supervisor | 89.46 | 8 | Responsible for directing the daily activities of one or more Account Planners to insure proper media service on one or more accounts. Maintains senior level cli |
| Media | Media_Buying | 05_Executive | Digital_Senior_Buyer | 93.89 | 8 | Individual performing primary account-buying responsibility usually on more than one account and has mid-level client contact and some senior level client conta |
| Media | Media_Buying | 05_Executive | Digital_Supervisor | 113.05 | 8 | Responsible for directing the daily activities of one or more Account buyers to insure proper media service on one or more accounts. Maintains senior level clien |
| Media | Media_Buying | 05_Executive | Print_Outdoor_Senior_Buyer | 76.17 | 8 | Individual performing primary account-buying responsibility usually on more than one account and has mid-level client contact and some senior level client conta |
| Media | Media_Buying | 05_Executive | Print_Outdoor_Supervisor | 90.08 | 8 | Responsible for directing the daily activities of one or more Account buyers to insure proper media service on one or more accounts. Maintains senior level clien |
| Media | Media_Buying | 06_Support | Broadcast_Buyer | 70.51 | 3 | Responsible for purchasing media in a specific medium (TV, radio, print, digital, etc.). |
| Media | Media_Buying | 06_Support | Broadcast_Coordinator | 48.91 | 2 | An entry-level position with minimal prior business experience. Primarily handles scheduling of activities for one or more client accounts. |
| Media | Media_Buying | 06_Support | Broadcast_Junior_Buyer | 48.91 | 2 | Responsible for purchasing media in specific mediums (TV, radio, print, digital, etc.). |
| Media | Media_Buying | 06_Support | Digital_Buyer | 86.47 | 3 | Responsible for purchasing media in a specific medium with some client contact |
| Media | Media_Buying | 06_Support | Digital_Coordinator | 55.28 | 2 | An entry-level position with minimal prior business experience. Primarily handles scheduling of activities for one or more client accounts. |
| Media | Media_Buying | 06_Support | Digital_Junior_Buyer | 55.28 | 2 | Responsible for purchasing media in specific mediums |
| Media | Media_Buying | 06_Support | Print_Outdoor_Buyer | 67.23 | 3 | Responsible for purchasing media in a specific medium with some client contact |
| Media | Media_Buying | 06_Support | Print_Outdoor_Coordinator | 46.36 | 2 | An entry-level position with minimal prior business experience. Primarily handles scheduling of activities for one or more client accounts. |
| Media | Media_Buying | 06_Support | Print_Outdoor_Junior_Buyer | 46.36 | 2 | Responsible for purchasing media in specific mediums |
| Media | Media_Planning | 02_SVP_Equivalent | Broadcast_Head_of_Media_Planning | 353.69 | 18 | Reports to the Head of Media services: supervises the work and performance of all media planning activities for the agency. |
| Media | Media_Planning | 02_SVP_Equivalent | Broadcast_Regional_Director | 247.72 | 15 | Reports to the Head of Media services: supervises the regional (multi-office) work and performance of all Media activities for the agency. |
| Media | Media_Planning | 02_SVP_Equivalent | Digital_Head_of_Media_Planning | 300.26 | 18 | Reports to the Head of Media services: supervises the work and performance of all media planning activities for the agency. |
| Media | Media_Planning | 02_SVP_Equivalent | Digital_Regional_Director | 300.26 | 15 | Reports to the Head of Digital Media services: supervises the regional (multi-office) work and performance of all Media activities for the agency. |
| Media | Media_Planning | 02_SVP_Equivalent | Print_Outdoor_Head_of_Media_Planning | 353.69 | 18 | Reports to the Head of Media services: supervises the work and performance of all media planning activities for the agency. |
| Media | Media_Planning | 02_SVP_Equivalent | Print_Outdoor_Regional_Director | 247.72 | 15 | Reports to the Head of Print/Outdoor Media services: supervises the regional (multi-office) work and performance of all Media activities for the agency. |
| Media | Media_Planning | 03_Director | Broadcast_Director | 194.04 | 12 | Responsible for media planning for a group of accounts: develops media plan to achieve a given sales objective within a predetermined budget: supervises othe contacts. |
| Media | Media_Planning | 03_Director | Broadcast_Group_Director | 247.72 | 16 | Responsible for overall media service and activities on one or more groups of accounts. Supervises one or more Account Supervisors. Top level client contact. I agency, reporting to either President or Director of Client Services. May be an Executive V.P. |
| Media | Media_Planning | 03_Director | Digital_Director | 196.85 | 12 | Responsible for Digital media planning for a group of accounts: develops media plan to achieve a given sales objective within a predetermined budget: supervise contacts. |
| Media | Media_Planning | 03_Director | Digital_Group_Director | 252.05 | 16 | Responsible for overall media service and activities on one or more groups of accounts. Supervises one or more Account Supervisors. Top level client contact. I agency, reporting to either President or Director of Client Services. May be an Executive V.P. |
| Media | Media_Planning | 03_Director | Print_Outdoor_Director | 194.04 | 12 | Responsible for Print/Outdoor media planning for a group of accounts: develops media plan to achieve a given sales objective within a predetermined budget: su client contacts. |
| Media | Media_Planning | 03_Director | Print_Outdoor_Group_Director | 145.72 | 16 | Responsible for overall media service and activities on one or more groups of accounts. Supervises one or more Account Supervisors. Top level client contact. I agency, reporting to either President or Director of Client Services. May be an Executive V.P. |
| Media | Media_Planning | 04_Manager | Broadcast_Associate_Director | 208.42 | 9 | Responsible for media planning for an account: develops media plan to achieve a given sales objective within a predetermined budget: supervises others: has p |
| Media | Media_Planning | 04_Manager | Broadcast_Supervisor | 89.46 | 8 | Reports to the Planning Director: supervises the work and performance of all media planning activities.  Senior level client and media channel contact. |
| Media | Media_Planning | 04_Manager | Digital_Associate_Director | 147.69 | 9 | Responsible for Digital media planning for an account: develops media plan to achieve a given sales objective within a predetermined budget: supervises others. |

| | | | | | | |
|---|---|---|---|---|---|---|
| Media | Media_Planning | 04_Manager | Digital_Supervisor | 113.05 | 8 | Reports to the Digital Planning Director: supervises the work and performance of all media planning activities.  Senior level client and media channel contact. |
| Media | Media_Planning | 04_Manager | Print_Outdoor_Associate_Director | 111.27 | 9 | Responsible for Print/Outdoor media planning for an account: develops media plan to achieve a given sales objective within a predetermined budget: supervises contacts. |
| Media | Media_Planning | 04_Manager | Print_Outdoor_Supervisor | 90.08 | 8 | Reports to the Print/Outdoor Planning Director: supervises the work and performance of all media planning activities.  Senior level client and media channel con |
| Media | Media_Planning | 05_Executive | Broadcast_Planner | 70.51 | 6 | Responsible for developing and coordinating Media planning generally for one client. Frequent client contact to determine media requirements including budgets service level required. Meets internally with  specialists internally to scope work and estimate costs. |
| Media | Media_Planning | 05_Executive | Broadcast_Senior_Planner | 76.17 | 7 | Individual performing primary planning responsibility usually on more than one account and has mid-level client contact and some senior level client contact. |
| Media | Media_Planning | 05_Executive | Digital_Planner | 86.47 | 6 | Responsible for developing and coordinating Media planning generally for one client. Frequent client contact to determine media requirements including budgets service level required. Meets internally with  specialists internally to scope work and estimate costs. |
| Media | Media_Planning | 05_Executive | Digital_Senior_Planner | 93.89 | 7 | Individual performing primary planning responsibility usually on more than one account and has mid-level client contact and some senior level client contact. |
| Media | Media_Planning | 05_Executive | Print_Outdoor_Planner | 67.23 | 6 | Responsible for developing and coordinating Media planning generally for one client. Frequent client contact to determine media requirements including budgets service level required. Meets internally with  specialists internally to scope work and estimate costs. |
| Media | Media_Planning | 05_Executive | Print_Outdoor_Senior_Planner | 76.17 | 7 | Individual performing primary planning responsibility usually on more than one account and has mid-level client contact and some senior level client contact. |
| Media | Media_Planning | 06_Support | Broadcast_Coordinator | 48.91 | 2 | An entry-level position with minimal prior business experience. Primarily handles scheduling of activities for one or more client accounts. |
| Media | Media_Planning | 06_Support | Broadcast_Junior_Planner | 48.91 | 2 | Responsible for planning media in specific mediums (TV, radio, print, digital, etc.). |
| Media | Media_Planning | 06_Support | Digital_Coordinator | 55.28 | 2 | An entry-level position with minimal prior business experience. Primarily handles scheduling of activities for one or more client accounts. |
| Media | Media_Planning | 06_Support | Digital_Junior_Planner | 55.28 | 2 | Responsible for planning media in specific mediums (TV, radio, print, digital, etc.). |
| Media | Media_Planning | 06_Support | Print_Outdoor_Coordinator | 46.36 | 2 | An entry-level position with minimal prior business experience. Primarily handles scheduling of activities for one or more client accounts. |
| Media | Media_Planning | 06_Support | Print_Outdoor_Junior_Planner | 46.36 | 2 | Responsible for planning media in specific mediums (TV, radio, print, digital, etc.). |
| Media | Strategic_Planning | 01_C_Suite_EVP | Head_of_Strategy_Research | 600.00 | 22 | Reports to the Head of Media services: supervises the work and performance of all analytics activities for the agency. |
| Media | Strategic_Planning | 02_SVP_Equivalent | Group_Director | 291.43 | 12 | Reports to the Head or Regional Head of analytical services: supervises the local office analytical work and performance of all client analytics work on behal and channel contact. |
| Media | Strategic_Planning | 03_Director | Director | 211.62 | 10 | Reports to the Head of Strategy, the Regional Head of Strategy or the Group Director: supervises the daily over-all research work and performance of all client a |
| Media | Strategic_Planning | 04_Manager | Associate_Director | 161.72 | 9 | Responsible for media strategy/research for an account: conducts research to support planning activities; supervises others: has professional and client contact |
| Media | Strategic_Planning | 04_Manager | Supervisor | 102.79 | 8 | Responsible for strategy and research for an account or group of accounts: supervises analysts and assists in the development of research and analysis progra |
| Media | Strategic_Planning | 05_Executive | Senior_Strategist | 83.62 | 7 | Responsible for media strategy/research for several accounts: conducts research to support planning activities: others: has professional and client co |
| Media | Strategic_Planning | 05_Executive | Strategist | 70.73 | 6 | Responsible for media strategy/research for an account: conducts research to support planning activities: supervises others. |
| Media | Strategic_Planning | 06_Support | Junior_Strategist | 48.91 | 4 | Responsible for managing sources of information and core methodologies.  Accumulate and analyze secondary research data.  Draft rough questionnaires, writ codes and edits completed questionnaires.  Liaise with the Account team formulate clear and coherent plans to implement  strategy and work closely with the A |
| Media | Strategic_Planning | 06_Support | Coordinator | 71.74 | 2 | An entry-level position with minimal prior business experience. Primarily handles scheduling of digital strategy department activities. |
| Public_Relations | Public_Relations | 01_C_Suite_EVP | CEO/President/Managing_Partner | | 20 | Responsible for running the agency.  Engaged in top level ("C-level") client contact. |
| Public_Relations | Public_Relations | 01_C_Suite_EVP | EVP_Senior_Managing_Director | | 18 | Responsible for all publicity and public relations activities for all clients of the agency. Supervises all public relations personnel. Top level client contact. |
| Public_Relations | Public_Relations | 02_SVP_Equivalent | Director_Editorial_Services | | 15 | Responsible for managing a multi-disciplinary team including content producers, writers and community managers that review all written material produced by th |
| Public_Relations | Public_Relations | 02_SVP_Equivalent | SVP/Managing_Director | | 16 | Has primary responsibility for profit and loss, management and development of accounts within area of business specialization, such as Marketing Group or Fina General Manager of office or division. |
| Public_Relations | Public_Relations | 03_Director | Account_Director | | 12 | Responsible for overall agency service and activities primarily on one account. Supervises one or more Account Managers or Supervisors. Top level client conta |
| Public_Relations | Public_Relations | 03_Director | Associate_Editorial_Director | | 8 | Responsible for ensuring all written documents are accurate and up to the standards:  develop the writing and editing skills of junior writer(s) and other staff |
| Public_Relations | Public_Relations | 03_Director | Editorial_Services_Director | | 12 | Responsible for the development of client marketing strategy and thinking and ensuring all written documents are accurate and up to the standards:  develop the writer(s) and other staff |
| Public_Relations | Public_Relations | 03_Director | Media_Director | | 14 | Supervises the work and performance of all media planning and buying activities at the agency.  Senior level client and media channel contact. |
| Public_Relations | Public_Relations | 03_Director | Research_Director | | 14 | Responsible for the development and management of primary research programs including research studies, surveys, as well as analytics and tools. |
| Public_Relations | Public_Relations | 03_Director | Senior_Account_Supervisor | | 10 | Responsible for agency service and activities on one or more accounts. Supervises one or more Account Supervisors, Account Managers. Senior level client co |
| Public_Relations | Public_Relations | 03_Director | Senior_Media_Manager/Specialist | | 12 | Responsible for the full execution of media plans for an account or group of accounts: supervises media specialists and assists in the planning of media program |
| Public_Relations | Public_Relations | 03_Director | Social_Media_Director | | 12 | Responsible for developing digital and social media strategies for clients and leading the implementation, maintenance and measurement of these programs acr |
| Public_Relations | Public_Relations | 03_Director | VP_Senior_Account_Director | | 14 | Individual managing a major unit of business comprising several accounts, assisting group manager in profit and loss analysis, new and existing business growt management strategy.  Very senior level client contact. |
| Public_Relations | Public_Relations | 04_Manager | Account_Manager | | 6 | Responsible for developing and coordinating advertising activities generally for one client.  Frequent client contact to determine advertising requirements includin agency service level required. Meets internally with creative, media and production specialists to scope work and estimate costs. |
| Public_Relations | Public_Relations | 04_Manager | Account_Supervisor | | 8 | Responsible for directing the daily activities of one or more Account Executives to insure proper agency service on one or more accounts. Maintains senior level |
| Public_Relations | Public_Relations | 04_Manager | Editor | | 5 | Responsible for reviewing copy, proofing to detect and correct errors in spelling, punctuation, and syntax. Prepare, rewrite and edit copy to improve readability. \ using standard reference sources. |
| Public_Relations | Public_Relations | 04_Manager | Editorial_Supervisor | | 6 | Responsible for reviewing copy, proofing to detect and correct errors in spelling, punctuation, and syntax. Supervises editorial staff. |

HIGHLY CONFIDENTIAL

MMD_ESN00023204

| Public_Relations | Public_Relations | 04_Manager | Media_Manager/Specialist | | 10 | Responsible for planning and placement of media and for the full execution of media plans for an account or group of accounts. |
| Public_Relations | Public_Relations | 04_Manager | Senior_Account_Manager | | 8 | Individual performing primary account-handling responsibility usually on more than one account and has mid-level client contact and some senior level client con |
| Public_Relations | Public_Relations | 05_Executive | Account_Executive | | 3 | Responsible for day-to-day coordination of agency activities and client contact generally on one client account. |
| Public_Relations | Public_Relations | 05_Executive | Media_Coordinator | | 3 | An entry-level position with minimal prior business experience. Primarily handles scheduling of activities for one or more client accounts. |
| Public_Relations | Public_Relations | 05_Executive | Senior_Account_Executive | | 5 | Individual performing primary account-handling responsibility mainly on one account.  Mid-level client contact. |
| Public_Relations | Public_Relations | 06_Support | Account_Coordinator | | 2 | An entry-level position with minimal prior business experience. Primarily handles scheduling of activities for one or more client accounts. |
| Public_Relations | Public_Relations | 06_Support | Assistant_Account_Executive/Manager/Associate | | 2 | Entry level for junior person, e.g., college graduate. Individual performing a variety of account-handling functions, yet without primary day-to-day client contact re |
| Public_Relations | Public_Relations | 06_Support | Intern | | 1 | A junior person still in university/college performing a variety of support functions without primary day-to-day client contact responsibilities. |

EXHIBIT P(2)

HIGHLY CONFIDENTIAL

AMJD_ESN00023205

DocuSign Envelope ID: 73E4EA48-364C-4968-A075-F5FC22F5A51C5

| | | | TV | 138434049.00 |
| | | | Radio | 43606668.00 |
| | | | OOH | 3568170202 |
| | | | Print | |
| | | | Digital | 216866910.00 |
| | | | Cinema | |
| | | | Supplemental | |
| | | | Total Media Spend, if applicable | 434588729.02 |

| Local Currency | US Dollar |
| Overhead Factor | 79% |
| Profit Margin (assuming fixed) | 10% |
| Payment Terms (in days) | 30 |
| Maximum Annual Hours / Resource | 1800 |

| | | | | | | | | | | | Total | | | Planning, Buying, and Consultative | | <Name> | |
| | | | | | | | | | | | 223,200 | 2,840.00 | 28,357,598 | 223,200 | 28,357,598 | - | - |
| Resource Name | Agency Discipline | Department | Job Level | Standardized Job Title | Band | Agency Job Title | Location | Fee covered in OH? | Fully loaded Hourly Rate | Hours | % FTE | Fee | Hours: Media Planning, Buying, and Consultative | Fee: Media Planning, Buying, and Consultative | Hours: <Name> | Fee: <Name> |
| Ellen Griffin | Media | Account_Management | 02_SVP_Equivalent | Group_Account_Director | 01_Senior | Executive Director | United States (New York) | NO | 314.37 | 900 | 50.0% | 282,933 | 900 | 282,933 | | |
| Danielle Sporkin | Media | Account_Management | 02_SVP_Equivalent | Regional_Account_Director | 01_Senior | Managing Director | United States (New York) | NO | 422.63 | 1,800 | 100.0% | 760,734 | 1800 | 760,734 | | |
| Josie Stadler | Media | Media_Planning | 04_Manager | Digital_Associate_Director | 02_Middle | Associate Director | United States (New York) | NO | 147.69 | 1,800 | 100.0% | 265,842 | 1800 | 265,842 | | |
| Chris Brockett | Media | Account_Management | 02_SVP_Equivalent | Group_Account_Director | 01_Senior | Executive Director | United States (New York) | NO | 314.37 | 1,800 | 100.0% | 565,866 | 1800 | 565,866 | | |
| Melinda Iosilli | Media | Media_Planning | 02_SVP_Equivalent | Digital_Regional_Director | 01_Senior | Senior Director | United States (New York) | NO | 300.26 | 1,800 | 100.0% | 540,468 | 1800 | 540,468 | | |
| TBH | Media | Media_Planning | 06_Support | Digital_Coordinator | 03_Junior | Associate | United States (New York) | NO | 55.28 | 1,800 | 100.0% | 99,504 | 1800 | 99,504 | | |
| Isabella Cirkovits | Media | Media_Planning | 06_Support | Digital_Coordinator | 03_Junior | Associate | United States (New York) | NO | 55.28 | 1,800 | 100.0% | 99,504 | 1800 | 99,504 | | |
| Jeff Wagner | Media | Media_Planning | 06_Support | Digital_Coordinator | 03_Junior | Associate | United States (New York) | NO | 55.28 | 1,800 | 100.0% | 99,504 | 1800 | 99,504 | | |
| Megan Conway | Media | Media_Planning | 06_Support | Digital_Coordinator | 03_Junior | Associate | United States (New York) | NO | 55.28 | 1,800 | 100.0% | 99,504 | 1800 | 99,504 | | |
| Pete Maroo | Media | Account_Management | 02_SVP_Equivalent | Digital_Regional_Director | 01_Senior | Senior Director | United States (New York) | NO | 300.26 | 1,800 | 100.0% | 540,468 | 1800 | 540,468 | | |
| Jenna Spadafora | Media | Media_Planning | 04_Manager | Digital_Associate_Director | 02_Middle | Associate Director | United States (New York) | NO | 147.69 | 1,800 | 100.0% | 265,842 | 1800 | 265,842 | | |
| Tayler Hoffman | Media | Media_Planning | 04_Manager | Digital_Associate_Director | 02_Middle | Associate Director | United States (New York) | NO | 147.69 | 1,800 | 100.0% | 265,842 | 1800 | 265,842 | | |
| Gordon Agunobi | Media | Media_Planning | 04_Manager | Digital_Associate_Director | 02_Middle | Associate Director | United States (New York) | NO | 147.69 | 1,800 | 100.0% | 265,842 | 1800 | 265,842 | | |
| TBH | Media | Media_Planning | 01_Director | Digital_Director | 02_Middle | Director | United States (New York) | TBH | 196.85 | 1,800 | 100.0% | 354,330 | 1800 | 354,330 | | |
| Carol Castillo-Frucher | Media | Account_Management | 02_SVP_Equivalent | Group_Account_Director | 01_Senior | Executive Director | United States (New York) | NO | 314.37 | 1,800 | 100.0% | 565,866 | 1800 | 565,866 | | |
| Lauren McCracken | Media | Account_Management | 02_SVP_Equivalent | Group_Account_Director | 01_Senior | Executive Director | United States (New York) | NO | 314.37 | 1,800 | 100.0% | 565,866 | 1800 | 565,866 | | |
| Kerri Stumpo | Media | Media_Planning | 01_Director | Digital_Director | 02_Middle | Director | United States (New York) | NO | 196.85 | 1,800 | 100.0% | 354,330 | 1800 | 354,330 | | |
| Ashley Weiner | Media | Media_Planning | 01_Director | Digital_Director | 02_Middle | Director | United States (New York) | NO | 196.85 | 1,800 | 100.0% | 354,330 | 1800 | 354,330 | | |
| Catherine Brady | Media | Media_Planning | 01_Director | Digital_Director | 02_Middle | Director | United States (New York) | NO | 196.85 | 1,800 | 100.0% | 354,330 | 1800 | 354,330 | | |
| Allison Gordon | Media | Media_Planning | 05_Executive | Digital_Senior_Planner | 03_Junior | Associate Manager | United States (New York) | NO | 93.89 | 1,800 | 100.0% | 169,002 | 1800 | 169,002 | | |
| Liza Berkelhamer | Media | Media_Planning | 05_Executive | Digital_Planner | 03_Junior | Senior Associate | United States (New York) | NO | 86.47 | 1,800 | 100.0% | 155,646 | 1800 | 155,646 | | |
| Lily O'Connell | Media | Media_Planning | 05_Executive | Digital_Planner | 03_Junior | Senior Associate | United States (New York) | NO | 86.47 | 1,800 | 100.0% | 155,646 | 1800 | 155,646 | | |
| Kels Hussain | Media | Media_Planning | 05_Executive | Digital_Senior_Planner | 03_Junior | Associate Manager | United States (New York) | NO | 93.89 | 1,800 | 100.0% | 169,002 | 1800 | 169,002 | | |
| TBH | Media | Media_Planning | 05_Executive | Digital_Planner | 03_Junior | Senior Associate | United States (New York) | NO | 86.47 | 1,800 | 100.0% | 155,646 | 1800 | 155,646 | | |
| TBH | Media | Media_Planning | 05_Executive | Digital_Planner | 03_Junior | Senior Associate | United States (New York) | NO | 86.47 | 1,800 | 100.0% | 155,646 | 1800 | 155,646 | | |
| TBH | Media | Media_Planning | 04_Manager | Digital_Supervisor | 02_Middle | Manager | United States (New York) | NO | 113.05 | 1,800 | 100.0% | 203,490 | 1800 | 203,490 | | |
| TBH | Media | Media_Planning | 04_Manager | Digital_Supervisor | 02_Middle | Manager | United States (New York) | NO | 113.05 | 1,800 | 100.0% | 203,490 | 1800 | 203,490 | | |
| TBH | Media | Media_Planning | 04_Manager | Digital_Supervisor | 02_Middle | Manager | United States (New York) | NO | 113.05 | 1,800 | 100.0% | 203,490 | 1800 | 203,490 | | |
| Chelsea Yablon | Media | Media_Planning | 04_Manager | Digital_Supervisor | 02_Middle | Manager | United States (New York) | NO | 113.05 | 1,800 | 100.0% | 203,490 | 1800 | 203,490 | | |
| | | | | | | | United States (New York) | | | | 0.0% | | | | | |
| Eshaan Samuel | Media | Analytics | 05_Executive | Senior_Analyst | 03_Junior | Senior Associate | United States (New York) | NO | 83.62 | 1,800 | 100.0% | 150,516 | 1800 | 150,516 | | |
| Ruiyu Hu | Media | Analytics | 05_Executive | Senior_Analyst | 03_Junior | Senior Associate | United States (New York) | NO | 83.62 | 1,800 | 100.0% | 150,516 | 1800 | 150,516 | | |
| Vivian W | Media | Analytics | 05_Executive | Senior_Analyst | 03_Junior | Senior Associate | United States (New York) | NO | 83.62 | 1,800 | 100.0% | 150,516 | 1800 | 150,516 | | |
| Sumeski, Dawn | Media | Analytics | 04_Manager | Associate_Director | 02_Middle | Associate Director | United States (New York) | NO | 161.72 | 1,800 | 100.0% | 291,096 | 1800 | 291,096 | | |
| Stephanie Bimbi | Media | Analytics | 04_Manager | Associate_Director | 02_Middle | Associate Director | United States (New York) | NO | 161.72 | 1,800 | 100.0% | 291,096 | 1800 | 291,096 | | |
| Sriram Balasubramanian | Media | Analytics | 04_Manager | Associate_Director | 02_Middle | Associate Director | United States (New York) | NO | 161.72 | 1,800 | 100.0% | 291,096 | 1800 | 291,096 | | |
| Rebecca Pop | Media | Analytics | 04_Manager | Associate_Director | 02_Middle | Associate Director | United States (New York) | NO | 161.72 | 1,800 | 100.0% | 291,096 | 1800 | 291,096 | | |
| TBH | Media | Analytics | 05_Executive | Senior_Analyst | 03_Junior | Associate Manager | United States (New York) | NO | 83.62 | 1,800 | 100.0% | 150,516 | 1800 | 150,516 | | |
| Jason Pang | Media | Analytics | 05_Executive | Senior_Analyst | 03_Junior | Associate Manager | United States (New York) | NO | 83.62 | 1,800 | 100.0% | 150,516 | 1800 | 150,516 | | |
| Taryn Stewart | Media | Analytics | 03_Director | Director | 02_Middle | Director | United States (New York) | NO | 211.62 | 1,800 | 100.0% | 380,916 | 1800 | 380,916 | | |
| TBH | Media | Analytics | 03_Director | Director | 02_Middle | Director | United States (New York) | NO | 211.62 | 1,800 | 100.0% | 380,916 | 1800 | 380,916 | | |
| Grant Dudgeon | Media | Analytics | 03_Director | Director | 02_Middle | Director | United States (New York) | NO | 211.62 | 1,800 | 100.0% | 380,916 | 1800 | 380,916 | | |
| Russ Merritt | Media | Analytics | 02_SVP_Equivalent | Group_Director | 01_Senior | Senior Director | United States (New York) | NO | 291.43 | 1,800 | 100.0% | 524,574 | 1800 | 524,574 | | |
| Frank Xinyu Meng | Media | Analytics | 05_Executive | Supervisor | 01_Junior | Manager | United States (New York) | NO | 118.52 | 1,800 | 100.0% | 213,336 | 1800 | 213,336 | | |
| Mario Mason | Media | Analytics | 05_Executive | Supervisor | 01_Junior | Manager | United States (New York) | NO | 118.52 | 1,800 | 100.0% | 213,336 | 1800 | 213,336 | | |
| Mehul Karnavat | Media | Analytics | 05_Executive | Supervisor | 01_Junior | Manager | United States (New York) | NO | 118.52 | 1,800 | 100.0% | 213,336 | 1800 | 213,336 | | |
| James Fung | Media | Analytics | 05_Executive | Supervisor | 01_Junior | Manager | United States (New York) | NO | 118.52 | 1,800 | 100.0% | 213,336 | 1800 | 213,336 | | |
| Arpana Chekuranayana | Media | Analytics | 05_Executive | Supervisor | 01_Junior | Manager | United States (New York) | NO | 118.52 | 1,800 | 100.0% | 213,336 | 1800 | 213,336 | | |
| Sydney Layne | Media | Analytics | 05_Executive | Supervisor | 01_Junior | Manager | United States (New York) | NO | 118.52 | 1,800 | 100.0% | 213,336 | 1800 | 213,336 | | |
| | | | | | | | | | | | 0.0% | | 0 | | | |
| Morgan Schrage | Media | Analytics | 05_Executive | Supervisor | 01_Junior | Manager | United States (New York) | NO | 118.52 | 1,800 | 100.0% | 213,336 | 1800 | 213,336 | | |
| Jake LaDuke | Media | Analytics | 03_Director | Director | 02_Middle | Director | United States (New York) | NO | 211.62 | 1,260 | 70.0% | 266,641 | 1260 | 266,641 | | |
| | | | | | | | | | | | 0.0% | | 0 | | | |
| Various | Media | Analytics | 06_Support | Analyst | 03_Junior | Senior Associate | United States (New York) | NO | 43.84 | 3,600 | 100.0% | 157,824 | 3600 | 157,824 | | |
| Various | Media | Analytics | 06_Support | Coordinator | 03_Junior | Associate | United States (New York) | NO | 30.69 | 5,400 | 100.0% | 165,706 | 5400 | 165,706 | | |
| | | | | | | | | | | | 0.0% | | 0 | | | |
| Various | Media | Account_Management | 06_Support | Coordinator | 03_Junior | Associate | United States (New York) | NO | 30.69 | 1,800 | 100.0% | 55,235 | 1800 | 55,235 | | |
| | | | | | | | | | | | 0.0% | | 0 | | | |
| Frida Taylor | Media | Account_Management | 03_Director | Digital_Group_Director | 02_Middle | Senior Director | United States (New York) | NO | 252.05 | 1,800 | 100.0% | 453,690 | 1800 | 453,690 | | |
| Linda Hanlon | Media | Account_Management | 04_Manager | Account_Supervisor | 02_Middle | Manager | United States (New York) | NO | 109.59 | 1,800 | 100.0% | 197,262 | 1800 | 197,262 | | |
| TBH | Media | Account_Management | 04_Manager | Account_Supervisor | 02_Middle | Manager | United States (New York) | NO | 109.59 | 1,800 | 100.0% | 197,262 | 1800 | 197,262 | | |
| TBH | Media | Account_Management | 04_Manager | Account_Supervisor | 02_Middle | Manager | United States (New York) | NO | 109.59 | 1,800 | 100.0% | 197,262 | 1800 | 197,262 | | |
| Greg Mitteman | Media | Account_Management | 04_Manager | Account_Associate_Director | 02_Middle | Associate Director | United States (New York) | NO | 149.03 | 1,800 | 100.0% | 268,254 | 1800 | 268,254 | | |
| Jennifer Pavanazzi | Media | Account_Management | 04_Manager | Account_Associate_Director | 02_Middle | Associate Director | United States (New York) | NO | 149.03 | 1,800 | 100.0% | 268,254 | 1800 | 268,254 | | |
| Taryn Wheeler | Media | Account_Management | 03_Director | Digital_Group_Director | 02_Middle | Executive Director | United States (New York) | NO | 252.05 | 1,800 | 100.0% | 453,690 | 1800 | 453,690 | | |
| Amanda Kovos | Media | Account_Management | 04_Manager | Account_Associate_Director | 02_Middle | Associate Director | United States (New York) | NO | 149.03 | 900 | 50.0% | 134,127 | 900 | 134,127 | | |
| Kristin Kodor | Media | Account_Management | 04_Manager | Account_Supervisor | 02_Middle | Manager | United States (New York) | NO | 109.59 | 450 | 25.0% | 49,316 | 450 | 49,316 | | |
| Cristina Ovalles | Media | Account_Management | 01_Director | Account_Director | 02_Middle | Director | United States (New York) | NO | 205.33 | 1,800 | 100.0% | 369,594 | 1800 | 369,594 | | |
| TBH | Media | Account_Management | 04_Manager | Account_Supervisor | 02_Middle | Manager | United States (New York) | NO | 109.59 | 1,800 | 100.0% | 197,262 | 1800 | 197,262 | | |
| Various - Media Roc | Media | Account_Management | 04_Manager | Account_Supervisor | 02_Middle | Manager | United States (New York) | NO | 109.59 | 2,700 | 150.0% | 295,893 | 2700 | 295,893 | | |
| Various - Media Roc | Media | Account_Management | 04_Manager | Account_Supervisor | 02_Middle | Manager | United States (New York) | NO | 109.59 | 90 | 5.0% | 9,863 | 900 | 9,863 | | |

EXHIBIT P(2)

HIGHLY CONFIDENTIAL

| Name | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | 0.0% | | | | | |
| Naomi Smolevitz | Media | Media_Buying | 05_Executive | Broadcast_Supervisor | 01_Junior | Manager | United States (New York) | NO | 89.46 | 270 | 15.0% | 24,154 | 270 | 24,154 | - |
| Kato Cunningham | Media | Media_Buying | 05_Executive | Broadcast_Supervisor | 01_Junior | Manager | United States (New York) | NO | 89.46 | 720 | 40.0% | 64,411 | 720 | 64,411 | - |
| Kathyrn White | Media | Media_Buying | 06_Support | Broadcast_Buyer | 01_Junior | Senior Associate | United States (New York) | NO | 70.51 | 720 | 40.0% | 50,767 | 720 | 50,767 | - |
| Pamela Klahr | Media | Media_Buying | 06_Support | Broadcast_Buyer | 01_Junior | Senior Associate | United States (New York) | NO | 70.51 | 1,080 | 60.0% | 76,151 | 1080 | 76,151 | - |
| Various | Media | Media_Buying | 06_Support | Broadcast_Coordinator | 01_Junior | Associate | United States (New York) | NO | 48.91 | - | | - | 0 | - | - |
| Mia Kaminsky | Media | Media_Buying | 06_Support | Broadcast_Coordinator | 01_Junior | Associate | United States (New York) | NO | 48.91 | 360 | 20.0% | 17,608 | 360 | 17,608 | - |
| Lauren LaManna | Media | Media_Buying | 04_Manager | Digital_Associate_Director | 02_Middle | Associate Director | United States (New York) | NO | 147.69 | 1,800 | 100.0% | 265,842 | 1800 | 265,842 | - |
| Melissa DiPasquale | Media | Media_Buying | 06_Support | Digital_Buyer | 01_Junior | Senior Associate | United States (New York) | NO | 86.47 | 1,800 | 100.0% | 155,646 | 1800 | 155,646 | - |
| TBH | Media | Media_Buying | 05_Executive | Digital_Senior_Buyer | 01_Junior | Manager | United States (New York) | NO | 93.89 | 1,800 | 100.0% | 169,002 | 1800 | 169,002 | - |
| TBH | Media | Media_Buying | 05_Executive | Digital_Senior_Buyer | 01_Junior | Associate Manager | United States (New York) | NO | 93.89 | 1,800 | 100.0% | 169,002 | 1800 | 169,002 | - |
| Latarria Coy | Media | Media_Buying | 03_Director | Digital_Director | 02_Middle | Director | United States (New York) | NO | 196.85 | 1,800 | 100.0% | 354,330 | 1800 | 354,330 | - |
| Julia Levin | Media | Media_Buying | 06_Support | Digital_Buyer | 01_Junior | Senior Associate | United States (New York) | NO | 86.47 | 1,800 | 100.0% | 155,646 | 1800 | 155,646 | - |
| Sarah Scott | Media | Media_Buying | 06_Support | Digital_Buyer | 01_Junior | Senior Associate | United States (New York) | NO | 86.47 | 1,800 | 100.0% | 155,646 | 1800 | 155,646 | - |
| Alexander Hernandez | Media | Media_Buying | 06_Support | Digital_Coordinator | 01_Junior | Associate | United States (New York) | NO | 55.28 | 1,800 | 100.0% | 99,504 | 1800 | 99,504 | - |
| Dean Wagner | Media | Media_Buying | 04_Manager | Digital_Associate_Director | 02_Middle | Associate Director | United States (New York) | NO | 147.69 | 1,800 | 100.0% | 265,842 | 1800 | 265,842 | - |
| Mark Carpenter | Media | Media_Buying | 04_Manager | Digital_Associate_Director | 02_Middle | Associate Director | United States (New York) | NO | 147.69 | 1,800 | 100.0% | 265,842 | 1800 | 265,842 | - |
| TBH | Media | Media_Buying | 05_Executive | Digital_Supervisor | 01_Junior | Manager | United States (New York) | NO | 113.05 | 1,800 | 100.0% | 203,490 | 1800 | 203,490 | - |
| TBH | Media | Media_Buying | 05_Executive | Digital_Supervisor | 01_Junior | Manager | United States (New York) | NO | 113.05 | 1,800 | 100.0% | 203,490 | 1800 | 203,490 | - |
| Seth Payne | Media | Media_Buying | 06_Support | Digital_Buyer | 01_Junior | Senior Associate | United States (New York) | NO | 86.47 | 1,800 | 100.0% | 155,646 | 1800 | 155,646 | - |
| Catherine Dankmyer | Media | Media_Buying | 06_Support | Digital_Buyer | 01_Junior | Senior Associate | United States (New York) | NO | 86.47 | 1,800 | 100.0% | 155,646 | 1800 | 155,646 | - |
| Matt Gonzalez | Media | Media_Buying | 06_Support | Digital_Coordinator | 01_Junior | Associate | United States (New York) | NO | 55.28 | 1,800 | 100.0% | 99,504 | 1800 | 99,504 | - |
| Joseph McSpadden | Media | Media_Buying | 06_Support | Digital_Coordinator | 01_Junior | Associate | United States (New York) | NO | 55.28 | 1,800 | 100.0% | 99,504 | 1800 | 99,504 | - |
| Molly Mayhew | Media | Media_Buying | 04_Manager | Digital_Associate_Director | 02_Middle | Associate Director | United States (New York) | NO | 147.69 | 1,800 | 100.0% | 265,842 | 1800 | 265,842 | - |
| Will Mulane | Media | Media_Buying | 04_Manager | Digital_Associate_Director | 02_Middle | Associate Director | United States (New York) | NO | 147.69 | 1,800 | 100.0% | 265,842 | 1800 | 265,842 | - |
| Rachel Hall | Media | Media_Buying | 06_Support | Digital_Buyer | 01_Junior | Senior Associate | United States (New York) | NO | 86.47 | 1,800 | 100.0% | 155,646 | 1800 | 155,646 | - |
| Kelly Liederbach | Media | Media_Buying | 06_Support | Digital_Buyer | 01_Junior | Senior Associate | United States (New York) | NO | 86.47 | 1,800 | 100.0% | 155,646 | 1800 | 155,646 | - |
| Alyson Lemmer | Media | Media_Buying | 05_Executive | Digital_Supervisor | 01_Junior | Manager | United States (New York) | NO | 113.05 | 1,800 | 100.0% | 203,490 | 1800 | 203,490 | - |
| Kelly Martin | Media | Media_Buying | 05_Executive | Digital_Supervisor | 01_Junior | Manager | United States (New York) | NO | 113.05 | 1,800 | 100.0% | 203,490 | 1800 | 203,490 | - |
| Hannah Doherty | Media | Media_Buying | 06_Support | Digital_Coordinator | 01_Junior | Associate | United States (New York) | NO | 55.28 | 1,800 | 100.0% | 99,504 | 1800 | 99,504 | - |
| Emma Ruskauja | Media | Media_Buying | 06_Support | Digital_Coordinator | 01_Junior | Associate | United States (New York) | NO | 55.28 | 1,800 | 100.0% | 99,504 | 1800 | 99,504 | - |
| Kali Casper | Media | Media_Buying | 06_Support | Digital_Buyer | 01_Junior | Senior Associate | United States (New York) | NO | 86.47 | 1,800 | 100.0% | 155,646 | 1800 | 155,646 | - |
| Brittany Halberg | Media | Media_Buying | 06_Support | Digital_Buyer | 01_Junior | Senior Associate | United States (New York) | NO | 86.47 | 1,800 | 100.0% | 155,646 | 1800 | 155,646 | - |
| Mari Bonadonna | Media | Media_Buying | 06_Support | Digital_Buyer | 01_Junior | Senior Associate | United States (New York) | NO | 86.47 | 1,800 | 100.0% | 155,646 | 1800 | 155,646 | - |
| Liz Wendt | Media | Media_Buying | 05_Executive | Digital_Supervisor | 01_Junior | Manager | United States (New York) | NO | 113.05 | 1,800 | 100.0% | 203,490 | 1800 | 203,490 | - |
| TBH | Media | Media_Buying | 05_Executive | Digital_Supervisor | 01_Junior | Manager | United States (New York) | NO | 113.05 | 1,800 | 100.0% | 203,490 | 1800 | 203,490 | - |
| Faith Andors | Media | Media_Buying | 03_Director | Digital_Director | 02_Middle | Director | United States (New York) | NO | 196.85 | 1,800 | 100.0% | 354,330 | 1800 | 354,330 | - |
| Ilana Rosin | Media | Media_Buying | 03_Director | Digital_Group_Director | 02_Middle | Senior Director | United States (New York) | NO | 252.05 | 1,800 | 100.0% | 453,690 | 1800 | 453,690 | - |
| Ashwin Khurchandani | Media | Media_Buying | 02_SVP_Equivalent | Digital_Regional_Director | 01_Senior | Managing Director | United States (New York) | NO | 300.26 | 1,800 | 100.0% | 540,468 | 1800 | 540,468 | - |
| Emily Adams | Media | Media_Buying | 01_Director | Broadcast_Group_Director | 02_Middle | Senior Director | United States (New York) | NO | 247.72 | 1,800 | 100.0% | 445,896 | 1800 | 445,896 | - |
| Jonathan Tanenbaum | Media | Media_Buying | 01_Director | Digital_Director | 02_Middle | Director | United States (New York) | NO | 196.85 | 1,800 | 100.0% | 354,330 | 1800 | 354,330 | - |
| Nache, Molly | Media | Media_Buying | 01_Director | Digital_Director | 02_Middle | Director | United States (New York) | NO | 196.85 | 1,800 | 100.0% | 354,330 | 1800 | 354,330 | - |
| Margaret Tibbitts | Media | Media_Buying | 05_Executive | Broadcast_Supervisor | 01_Junior | Manager | United States (New York) | NO | 89.46 | 1,800 | 100.0% | 161,028 | 1800 | 161,028 | - |
| Madison Welsh | Media | Media_Buying | 05_Executive | Broadcast_Supervisor | 01_Junior | Manager | United States (New York) | NO | 89.46 | 1,800 | 100.0% | 161,028 | 1800 | 161,028 | - |
| Patricia Moore | Media | Media_Buying | 05_Executive | Broadcast_Supervisor | 01_Junior | Manager | United States (New York) | NO | 89.46 | 1,800 | 100.0% | 161,028 | 1800 | 161,028 | - |
| Karl Evans | Media | Media_Buying | 05_Executive | Broadcast_Supervisor | 01_Junior | Manager | United States (New York) | NO | 89.46 | 1,800 | 100.0% | 161,028 | 1800 | 161,028 | - |
| Abrams, Andrew | Media | Media_Buying | 05_Executive | Broadcast_Supervisor | 01_Junior | Manager | United States (New York) | NO | 89.46 | 1,800 | 100.0% | 161,028 | 1800 | 161,028 | - |
| TBH | Media | Media_Buying | 06_Support | Broadcast_Buyer | 01_Junior | Senior Associate | United States (New York) | NO | 70.51 | 1,800 | 100.0% | 126,918 | 1800 | 126,918 | - |
| Femi Adedoyin | Media | Media_Buying | 06_Support | Broadcast_Buyer | 01_Junior | Senior Associate | United States (New York) | NO | 70.51 | 1,800 | 100.0% | 126,918 | 1800 | 126,918 | - |
| Ben Waller | Media | Media_Buying | 06_Support | Broadcast_Buyer | 01_Junior | Senior Associate | United States (New York) | NO | 70.51 | 1,800 | 100.0% | 126,918 | 1800 | 126,918 | - |
| Rebecca Deitch | Media | Media_Buying | 06_Support | Broadcast_Buyer | 01_Junior | Senior Associate | United States (New York) | NO | 70.51 | 1,800 | 100.0% | 126,918 | 1800 | 126,918 | - |
| Herschlein,Matthew J | Media | Media_Buying | 06_Support | Broadcast_Coordinator | 01_Junior | Associate | United States (New York) | NO | 48.91 | 1,800 | 100.0% | 88,038 | 1800 | 88,038 | - |
| Julia Sprong | Media | Media_Buying | 06_Support | Broadcast_Coordinator | 01_Junior | Associate | United States (New York) | NO | 48.91 | 1,800 | 100.0% | 88,038 | 1800 | 88,038 | - |
| Jarod Fink | Media | Media_Buying | 06_Support | Broadcast_Buyer | 01_Junior | Senior Associate | United States (New York) | NO | 70.51 | 1,800 | 100.0% | 126,918 | 1800 | 126,918 | - |
| Sodonberg,Rachel A | Media | Media_Buying | 06_Support | Broadcast_Buyer | 01_Junior | Senior Associate | United States (New York) | NO | 70.51 | 1,800 | 100.0% | 126,918 | 1800 | 126,918 | - |
| Mendelson, Andrew | Media | Media_Buying | 06_Support | Broadcast_Coordinator | 01_Junior | Associate | United States (New York) | NO | 48.91 | 1,800 | 100.0% | 88,038 | 1800 | 88,038 | - |
| | | | | | | | | | | 0.0% | | | | | |
| James Theodorson | Media | Media_Buying | 03_Director | Digital_Director | 02_Middle | Director | United States (New York) | NO | 196.85 | 180 | 10.0% | 35,433 | 180 | 35,433 | - |
| Amy Adelbush | Media | Media_Buying | 03_Director | Digital_Director | 02_Middle | Associate Director | United States (New York) | NO | 196.85 | 180 | 10.0% | 35,433 | 180 | 35,433 | - |
| Elise Perazzini | Media | Media_Buying | 05_Executive | Digital_Senior_Buyer | 01_Junior | Associate Manager | United States (New York) | NO | 93.89 | 270 | 15.0% | 25,350 | 270 | 25,350 | - |
| Goodell, Samuel | Media | Media_Buying | 06_Support | Digital_Buyer | 01_Junior | Senior Associate | United States (New York) | NO | 86.47 | 1,800 | 100.0% | 155,646 | 1800 | 155,646 | - |
| Connors, Michael | Media | Media_Buying | 01_Director | Digital_Director | 02_Middle | Director | United States (New York) | NO | 196.85 | 900 | 50.0% | 177,165 | 900 | 177,165 | - |
| Carey, Jeremy | Media | Media_Buying | 02_SVP_Equivalent | Digital_Regional_Director | 01_Senior | Managing Director | United States (New York) | NO | 300.26 | 180 | 10.0% | 54,047 | 180 | 54,047 | - |
| Meghan Barron | Media | Media_Buying | 05_Executive | Digital_Supervisor | 01_Junior | Manager | United States (New York) | NO | 113.05 | 1,440 | 80.0% | 162,792 | 1440 | 162,792 | - |
| | | | | | | | | | | 0.0% | | | | | |
| SEO - Mathew Sieracki | Media | Media_Buying | 04_Manager | Digital_Associate_Director | 02_Middle | Associate Director | United States (New York) | NO | 147.69 | 1,800 | 100.0% | 265,842 | 1800 | 265,842 | - |
| SEO - Julia Balling | Media | Media_Buying | 06_Support | Digital_Buyer | 01_Junior | Senior Associate | United States (New York) | NO | 86.47 | 1,800 | 100.0% | 155,646 | 1800 | 155,646 | - |
| SEO - Ciara Gaffney | Media | Media_Buying | 06_Support | Digital_Junior_Buyer | 01_Junior | Associate | United States (New York) | NO | 55.28 | 1,800 | 100.0% | 99,504 | 1800 | 99,504 | - |
| | | | | | | | | | | 0.0% | | | | | |
| | | | | | | | | | | 0.0% | | | | | |
| | | | | | | | | | | 0.0% | | | | | |
| | | | | | | | | | | 0.0% | | | | | |
| | | | | | | | | | | 0.0% | | | | | |
| | | | | | | | | | | 0.0% | | | | | |
| | | | | | | | | | | 0.0% | | | | | |
| | | | | | | | | | | 0.0% | | | | | |
| | | | | | | | | | | 0.0% | | | | | |
| | | | | | | | | | | 0.0% | | | | | |
| | | | | | | | | | | 0.0% | | | | | |

EXHIBIT P(2)

HIGHLY CONFIDENTIAL

EXHIBIT P(2)

HIGHLY CONFIDENTIAL

| Background |
|---|
| At McDonald's, we are committed to Diversity, Equity & Inclusion. It is important to us that the representation on our teams, both internally at McDonald's and our agencies, is representative of our customers. Our three year goal between 2021-2023 is to reach 50% Female representation and 40% racial diversity. Please indicate the make-up of the resources proposed for this scope of work using the following definitions that are aligned to the job levels as indicated on the Agency_Rate Card worksheet:<br>Leadership = EVPs and SVPs<br>Management = Directors and Managers<br>Support = Executives and Support |

| Level | Female % | People of Color % |
|---|---|---|
| Leadership | 60% | 20% |
| Management | 72% | 26% |
| Support | 68% | 31.5% |
| Total | 69% | 28% |

EXHIBIT P(2)

HIGHLY CONFIDENTIAL

AMJD_HSN00023209