1
2
3
4
5
6 **UNITED STATES DISTRICT COURT**
7 **CENTRAL DISTRICT OF CALIFORNIA**
8

9 ENTERTAINMENT STUDIOS
NETWORKS, INC., et al.,          )    Case No. CV 21-4972 FMO (MAAx)
10                                )
             Plaintiffs,          )    **ORDER RE: PENDING MOTIONS**
11                                )
        v.                        )
12                                )
MCDONALD'S USA, LLC,              )
13                                )
             Defendant.           )
14 _____    )

15        Having reviewed and considered all the briefing filed with respect to the parties' Cross-

16 Motions for Summary Judgment and Partial Summary Judgment (Dkt. 136, "Motion"), the court

17 finds that oral argument is not necessary to resolve the Motions, see Fed. R. Civ. P. 78(b); C.D.

18 Cal. L. R. 7-15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001), and concludes

19 as follows.

20                              **INTRODUCTION**

21        On December 23, 2021, Entertainment Studios Networks, Inc. ("Entertainment Studios" or

22 "ESN") and the Weather Group, LLC ("Weather Group") (collectively, "plaintiffs") filed their Third

23 Amended Complaint ("TAC") against McDonald's USA, LLC ("defendant" or "McDonald's"),

24 alleging that defendant discriminated against them on the basis of race in violation of: (1) 42

25 U.S.C. § 1981 ("§ 1981"); and (2) California's Unruh Civil Rights Act, Cal. Civ. Code § 51.5, et seq.

26 ("Unruh Act").  (See Dkt. 45, TAC at ¶¶ 120-34).

27        Defendant moves for summary judgment on all of plaintiffs' claims.  (See Dkt. 136-1, Joint

28 Memorandum of Points and Authorities in Support of Cross-Motions for Summary Judgment

("Joint Br.") at 9).  Defendant argues that plaintiffs' claims fail because: "(1) Plaintiffs have no proof of intentional discrimination; (2) Plaintiffs' networks are objectively inferior to their purported 'comparators'; (3) McDonald's has legitimate business reasons for its decisions; and (4) Plaintiffs cannot establish causation."  (Id.).  ESN seeks partial summary judgment as to a portion of its § 1981 claim.  (See id. at 25-29).

## STATEMENT OF FACTS[1]

Plaintiffs are solely owned by Byron Allen ("Allen"), an African American media entrepreneur.  (See Dkt. 136-2, Joint Statement of Genuine Disputes of Material Facts ("SMF") at P1); (Dkt. 136-3, Exh. I, Deposition of Byron Allen ("Allen Depo.") at 14 & 41).  Allen owns a conglomerate of media properties, including plaintiffs and other non-party entities, often referred to collectively as the "Allen Media Group" or "AMG."  (See Dkt. 136-2, SMF at D1-D10); (Dkt. 136-3, Exh. O(1)) (AMG organizational chart); (Dkt. 136-3, Exh. H, Deposition of Cynthia Kelly ("Kelly Depo.") at 13-14).

Around 2009, ESN launched seven television networks featuring lifestyle programming ("Lifestyle Networks").  (See Dkt. 136-2, SMF at P2); (Dkt. 136-3, Exh. F, Deposition of Darren Galatt ("Galatt Depo.") at 18, 88-89 & 91).  The Lifestyle Networks feature content that includes courtroom drama, comedy, travel, food, pets, and automotive programming.  (See Dkt. 136-2, SMF at P2); (Dkt. 136-3, Exh. F, Galatt Depo. at 89); (Dkt. 136-3, Exh. H, Kelly Depo at 12-13 & 23).  According to plaintiffs, their content targets a general audience, rather than any particular demographic group.  (See Dkt. 136-2, SMF at P2-P3); (Dkt. 136-3, Exh. F, Galatt Depo. at 268); (Dkt. 136-1, Joint Br. at 11-12).

In 2018, Allen acquired the Weather Group, the parent company of The Weather Channel ("TWC").  (See Dkt. 136-2, SMF at D8 & D10); (Dkt. 136-3, Exh. F, Galatt Depo. at 18.  Nonparty CF Entertainment, Inc. licensed some of AMG's syndicated programming to ESN and the Weather

---

[1]  At the summary judgment stage, the court considers the evidence in the light most favorable to the nonmoving party.  See Barlow v. Ground, 943 F.2d 1132, 1134 (9th Cir. 1991).  The facts in this section are thus presented in the light most favorable to plaintiffs.

Group for broadcast on ESN's Lifestyle Networks and the Weather Channel.[2]  (See Dkt. 136-2,
SMF at D16-D17); (Dkt. 136-14, Exh. Y, Deposition of Sydnie Karras ("Karras Depo.") at 174 &
220); (Dkt. 136-1, Joint Br. at 81).  It is unclear whether ESN owns or produces any of the relevant
syndicated programming.  (See Dkt. 136-2, SMF at P2 & D16-17) (indicating that "ES licensed
certain of AMG's syndicated programming" and "syndicated properties" to ESN and Weather
Group).

McDonald's spends hundreds of millions of dollars each year to advertise its products in
national media.  (See Dkt. 136-3, Exh. A, Deposition of Alycia Mason ("Mason Depo.") at 29-30);
(Dkt. 136-3, Exh. D, Deposition of Anja Carroll ("Carroll Depo.") at 112-13).  It works with several
advertising agencies to plan and buy advertising on television programs.  (See Dkt. 136-2, SMF
at P4); (Dkt. 136-3, Exh. D, Carroll Depo. at 19-20).  Two of those agencies – OMD Worldwide,
Inc. ("OMD") and Burrell Communications ("Burrell") – are at issue here.  (See Dkt. 136-2, SMF
at P5 & P6).  From 2006 to 2021, OMD was the advertising agency responsible for evaluating
general market media advertising opportunities, and allocating the vast majority of McDonald's
advertising budget.[3]  (See Dkt. 136-2, SMF at P5, P7 & P10); (Dkt. 136-3, Exh. C, Jennifer
Feldman ("Feldman Depo.") at 10) (testifying that OMD was McDonald's general market
advertising agency as far back as 2006); (Dkt. 136-3, Exh. L, Calabrese Depo. at 10-11 & 15)
(testifying that OMD was responsible for recommending general audience advertising
opportunities to McDonald's until 2021).

Burrell was the advertising agency tasked with evaluating and making recommendations
to McDonald's regarding advertising that targets the African American consumer market ("AACM").
(See Dkt. 136-2, SMF at P8 & D27); (Dkt. 136-3, Exh. C, Feldman Depo. at 168) (Burrell is "an
agency of record that is focused on African-American [sic]."); (Dkt. 136-3, Exh. A, Mason Depo.

---

[2]  Although plaintiffs use the term "Entertainment Studios" to refer collectively to plaintiff
Entertainment Studios Networks, Inc. and nonparty CF Entertainment, Inc., (see, e.g., Dkt. 136-1,
Joint Br. at 11); (Dkt. 136-2, SMF at P1), the court will refer to these entities separately.

[3]  McDonald's replaced OMD with Starcom in 2021.  (See Dkt. 136-2, SMF at D24); (Dkt.
136-3, Exh. L, Deposition of Geoff Calabrese ("Calabrese Depo.") at 11-12); (Dkt. 136-3, Exh. M,
Deposition of Donna Hodge ("Hodge Depo.") at 45); (Dkt. 136-1, Joint Br. at 40, n. 23).

at 112) ("Burrell is 100 percent responsible for planning the media buy that is targeted to African Americans.").  As such, Burrell was responsible for deploying a smaller fraction of McDonald's national advertising budget.  (See Dkt. 136-2, SMF at P11); (Dkt. 136-3, Exh. C, Feldman Depo. at 177); (Dkt. 136-3, Exh. M, Deposition of Donna Hodge ("Hodge Depo.") at 38 & 46).  In addition to being McDonald's "agency of record" for the AACM, (see Dkt. 136-3, Exh. C, Feldman Depo. at 168-170), Burrell was the agency assigned to plaintiffs and was responsible for facilitating any purchases of AMG properties for McDonald's.  (See Dkt. 136-3, Exh. D, Carroll Depo. at 164) (testifying that McDonald's made the decision to have Burrell be the agency responsible for any deals with plaintiffs "over a decade ago"); (Dkt. 136-23, Exh. BBB, Declaration of Darren Galatt ("Galatt Decl.") ¶ 2 & Exh. 1) (email confirming Burrell was Entertainment Studios' agency of record).

Although plaintiffs met with OMD to present advertising opportunities with their networks, (see Dkt. 136-2, SMF at D49), OMD never recommended to McDonald's that it consider purchasing advertising time with plaintiffs.  (See Dkt. 136-2, SMF at D130); (Dkt. 136-3, Exh. L, Calabrese Depo. at 116-17).  Plaintiffs claim that they were only considered by, and forced to contract through, Burrell for any advertising opportunities with McDonald's.  For instance, Darren Galatt, the Chief Revenue Officer of AMG, (see Dkt. 136-3, Exh. F, Galatt Depo. at 7), testified that, "regardless of an annual plea to be taken and considered out of OMD, [plaintiffs] were forced into a relationship with the black agency, even though [plaintiffs' content was] not exclusively black targeted[,]" and that OMD told plaintiffs "consistently that [they] had to go and deal with Burrell." (Id. at 179-80).  Anja Carroll, McDonald's former Vice-President of U.S. Marketing, (see Dkt. 136-3, Exh. D, Carroll Depo. at 17-18), testified that "there would be some analyses done of whatever Entertainment Studios was proposing to advertise on in a given year" and that "analysis would have been done at Burrell . . . alone or in conjunction with McDonald's[.]"  (Id. at 172). Plaintiffs also allege that another African American-owned network, which features generally targeted content, was similarly forced to contract through Burrell.  (See Dkt. 136-2, SMF at P13); (Dkt. 136-3, Exh. N, Deposition of Lynnwood Bibbens ("Bibbens Depo.") at 28, 35, 51-52, 68-69 & 74-75); (Dkt. 136-1, Joint Br. at 16).  According to plaintiffs, ESN was effectively shut out of the

1  much larger general market budget and forced to bid for advertising in the less favorable African

2  American tier because ESN is African American-owned, not because its content was targeted

3  towards the African American community.  (See Dkt. 136-2, SMF at P12); (Dkt. 136-3, Exh. F,

4  Galatt Depo. at 179-80 & 185); (Dkt. 136-1, Joint Br. at 14-16).

5                                     **LEGAL STANDARD**

6        Federal Rule of Civil Procedure 56(a)[4] authorizes the court to grant summary judgment "if

7  the movant shows that there is no genuine dispute as to any material fact and the movant is

8  entitled to judgment as a matter of law."  The standard for granting a motion for summary

9  judgment is essentially the same as for granting a directed verdict.  See Anderson v. Liberty

10 Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986).  Judgment must be entered "if,

11 under the governing law, there can be but one reasonable conclusion as to the verdict."  Id.  By

12 contrast, summary judgment is improper if a reasonable fact finder "could find by a preponderance

13 of the evidence that the plaintiff is entitled to a verdict" in his favor.  See id. at 252, 106 S.Ct. at

14 2512.

15       The moving party has the initial burden of identifying relevant portions of the record that

16 demonstrate the absence of a fact or facts necessary for one or more essential elements of each

17 cause of action upon which the moving party seeks judgment.  See Celotex Corp. v. Catrett, 477

18 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986).  If the "moving party fails to carry its initial burden of

19 production, the nonmoving party has no obligation to produce anything." Nissan Fire & Marine Ins.

20 Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102-03 (9th Cir. 2000).

21       If the moving party has sustained its burden, the burden then shifts to the nonmovant to

22 identify specific facts, drawn from materials in the file, that demonstrate that there is a dispute as

23 to material facts on the elements that the moving party has contested.  See Celotex, 477 U.S. at

24 324, 106 S.Ct. at 2553; Anderson, 477 U.S. at 256, 106 S.Ct. at 2514 ("[A] party opposing a

25 properly supported motion for summary judgment . . . must set forth specific facts showing that

26 there is a genuine issue for trial.").  A factual dispute is material only if it "affects the outcome of

27 _____

28       [4] Unless otherwise indicated, all "Rule" references are to the Federal Rules of Civil Procedure.

1  the litigation and requires a trial to resolve the parties' differing versions of the truth." <u>SEC v.</u>

2  <u>Seaboard Corp.</u>, 677 F.2d 1301, 1306 (9th Cir. 1982).  Summary judgment must be granted for

3  the moving party if the nonmoving party "fails to make a showing sufficient to establish the

4  existence of an element essential to that party's case, and on which that party will bear the burden

5  of proof at trial." <u>Celotex</u>, 477 U.S. at 322, 106 S.Ct. at 2552.

6        In determining whether a triable issue of material fact exists, the evidence must be

7  considered in the light most favorable to the nonmoving party.  <u>See</u> <u>Barlow</u>, 943 F.2d at 1134.

8  However, summary judgment cannot be avoided by relying solely on "conclusory allegations [in]

9  an affidavit." <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188 (1990); <u>see</u>

10  <u>also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356

11  (1986) (more than a "metaphysical doubt" is required to establish a genuine issue of material fact).

12  "The mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to

13  survive summary judgment; "there must be evidence on which the [fact finder] could reasonably

14  find for the plaintiff." <u>Anderson</u>, 477 U.S. at 252, 106 S.Ct. at 2512.

15        **DISCUSSION**

16        Plaintiffs contend that: (1) "because Entertainment Studios is African American-owned,

17  McDonald's relegates Entertainment Studios to McDonald's African American ad agency and its

18  minuscule ad budget" ("relegation theory"), (Dkt. 136-1, Joint Br. at 1); (<u>see</u> <u>id.</u> at 25-29 & 52)

19  (describing relegation theory); and (2) "McDonald's employees or officers made the decisions not

20  to contract with Plaintiffs" in favor of similar "white-owned competitors" because Entertainment

21  Studios is owned by an African American man ("passing over theory").  (<u>See</u> Dkt. 45, TAC at

22  ¶¶ 88-89); (Dkt. 136-1, Joint Br. at 59).  Before addressing the merits of plaintiffs' theories, the

23  court will address threshold challenges raised by defendant.

24  I.     THRESHOLD CHALLENGES.

25       A.    <u>Real Party-in-Interest</u>.

26        Defendant argues that plaintiffs lack standing to bring claims related to AMG's syndicated

27  programming and JusticeCentral.TV because these properties are not owned by plaintiffs but by

28  non-party entities.  (<u>See</u> Dkt. 136-1, Joint Br. at 75).  Plaintiffs respond that defendant raises a

1 | real-party-in-interest issue, rather than a true standing argument. (See id. at 78). The court

2 | agrees.

3 | To the extent plaintiffs seek to assert claims about McDonald's refusal to advertise on

4 | AMG's syndicated programming and JusticeCentral.TV, (see Dkt. 45, TAC at ¶¶ 42, 53 & 91),

5 | those claims must be brought by the relevant entities who own them. See Domino's Pizza, Inc.

6 | v. McDonald, 546 U.S. 470, 480, 126 S.Ct. 1246, 1252 (2006) ("Section 1981 plaintiffs must

7 | identify injuries flowing from a racially motivated breach of their own contractual relationship, not

8 | of someone else's."). JusticeCentral.TV is owned by nonparty Justice Central Networks, Inc.

9 | ("JCN"), which is owned by Allen. (See Dkt. 136-24, Exh. HHH, Deposition of Mark DeVitre

10 | ("DeVitre Depo.") at 20-21 & 50-51); (Dkt. 136-1, Joint Br. at 78) ("Plaintiffs and non-parties CFE

11 | and JCN are all owned by African American media entrepreneur Byron Allen[.]"). Similarly,

12 | nonparty CF Entertainment, Inc., ("CFE"), a subsidiary of Allen Media Holdings, is owned by Allen,

13 | (see Dkt. 136-2, SMF at D12); (Dkt. 136-24, Exh. HHH, DeVitre Depo. at 16-17, 20-21, 28-30 &

14 | 49-50), and appears to own at least some of AMG's syndicated programming. (See Dkt. 136-2,

15 | SMF at D16) (CFE "licensed certain of AMG's syndicated programming to ESN for broadcast on

16 | ESN's Lifestyle Networks."); (Dkt. 136-3, Exh. J, Karras Depo. at 39-41, 66-67 & 83) (indicating

17 | that ESN financial statements show intercompany payments for use of CFE's syndicated

18 | programming); (Dkt. 136-5, Exh. O(17)) (ESN financials from 2018 to 2021 referring to

19 | "intercompany payments" made from ESN to CFE "for use of the syndicated content").

20 | Plaintiffs offer evidence of an agreement that assigns CFE's interests in the litigation to

21 | plaintiffs, and agreements in which CFE and JCN ratify ESN's prosecution of the action on their

22 | behalf. (See Dkt. 136-23, Exh. DDD, Declaration of Mark DeVitre ("DeVitre Decl.") ¶¶ 2 & 4 &

23 | Exh. 1, Assignment of Claims by CFE); (Dkt. 136-23, Exh. DDD, DeVitre Decl. ¶¶ 2 & 4 & at Exh.

24 | 2, Ratification by CFE); (Dkt. 136-24, Exh. III, Supplemental Declaration of David W. Schecter

25 | ("Supp. Schecter Decl.") ¶ 5 & at Exh. 4, Ratification by JCN). But plaintiffs cite no caselaw

26 | suggesting that a corporation can validly assign its § 1981 or Unruh Act claim or ratify such an

27 |

28 |

action on its behalf.[5]  (See, generally, Dkt. 136-1, Joint Br. at 78-80 & 82-83).  Although the relevant entities appear to be owned by Allen and may have been represented collectively in attempting to contract with McDonald's, the nature of plaintiffs' claims counsels against sanctioning assignment or ratification.  See Domino's Pizza, 546 U.S. at 480, 126 S.Ct. at 1252; Pony v. Cnty. of Los Angeles, 433 F.3d 1138, 1143 (9th Cir. 2006) (finding that "[t]he right to sue in tort for personal injury is non-assignable under California law" and that "plaintiff cannot assign her Section 1983 action").  In other words, neither the assignment nor ratification agreements resolve the issue of plaintiffs seeking to assert claims regarding properties they do not own.

Rule 19 "tells us whether the appropriate parties are before the court."  U-Haul Int'l, Inc. v. Jartran, Inc., 793 F.2d 1034, 1038 (9th Cir. 1986).  Under Rule 19, a party must be joined if, "in that person's absence, the court cannot accord complete relief among the existing parties" or if "that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest."  Fed. R. Civ. P. 19(a)(1)(A) & (B).  Here, given plaintiffs' claims that defendant refused to advertise on various AMG properties, the court will not be able to provide complete relief regarding some of the properties at issue if the non-parties are not joined.  See E.E.O.C. v. Peabody W. Coal Co., 610 F.3d 1070, 1081 (9th Cir. 2010) (discussing standard for required joinder).  Additionally, defendant faces a substantial risk of incurring inconsistent obligations if the non-parties are not joined.  See id.  In short, the court finds that CFE and JCN are necessary parties within the meaning of Rule 19.  The court also finds that their joinder is feasible, given the ratification agreements indicating that CFE and JCN are prepared to join the lawsuit if necessary.  (See Dkt. 136-23, Exh. DDD,

---

[5]  None of the out-of-circuit cases plaintiffs cite, (see Dkt. 136-1, Joint Br. at 81), support the notion that ESN can assert claims related to programming it does not own. Plaintiffs' contentions that "ESN suffered economic injury due to McDonald's refusal to advertise on the syndicated programming" because plaintiffs receive programming from CFE, (id.), are insufficient to support their right to assert claims about AMG's syndicated programming. See Domino's Pizza, 546 U.S. at 480, 126 S.Ct. at 1252.

1    DeVitre Decl. ¶ 4 & Exh. 2, Ratification by CFE) ("[I]f the Court deems necessary, CFE is prepared

2    to join as a Plaintiff in the Lawsuit."); (Dkt. 136-24, Exh. III, Supp. Schecter Decl. at ¶ 5 & at Exh.

3    4, Ratification by JCN) ("[I]f the Court deems necessary, JCN is prepared to join as a Plaintiff in

4    the Lawsuit.").

5            B.    Statute of Limitations.

6            Claims that arise under § 1981 as originally enacted are subject to a two-year statute of

7    limitations, while claims made possible by the 1991 amendments to the statute are covered by a

8    four-year statute of limitations.  See 28 U.S.C. § 1658(a); Johnson v. Lucent Techs. Inc., 653 F.3d

9    1000, 1005-06 (9th Cir. 2011) (explaining the statute of limitations for § 1981 claims and analyzing

10   whether claim arose under the 1991 amendments or the original version of the statute); Jones v.

11   R.R. Donnelley & Sons Co., 541 U.S. 369, 382, 124 S.Ct. 1836, 1845 (2004) ("[A] cause of action

12   aris[es] under an Act of Congress enacted after December 1, 1990 – and therefore is governed

13   by § 1658's 4-year statute of limitations – if the plaintiff's claim against the defendant was made

14   possible by a post-1990 enactment.") (cleaned up).

15           Defendant contends that because plaintiffs allege racial discrimination in contract formation,

16   their § 1981 claim is governed by the two-year limit.  (See Dkt. 136-1, Joint Br. at 71-72).  Plaintiffs

17   respond that because they allege discrimination in the contracting process, a cause of action

18   added by the 1991 amendments, the four-year statute of limitations applies to their § 1981 claim.

19   (See id. at 73-75).

20           Plaintiffs' relegation theory concerns racial discrimination in the contracting process, and

21   such claims were made possible by the 1991 amendments.  See Comcast Corp. v. Nat'l Ass'n of

22   Afr. Am.-Owned Media ("Comcast"), 589 U.S. 327, 342-44, 140 S.Ct. 1009, 1020-21 (2020)

23   (Ginsburg, J., concurring).  Plaintiffs' passing over theory is about contract formation, a claim

24   available under § 1981 as originally enacted.  See Yi Tai Shao v. McManis Faulkner, LLP, 2014

25   WL 4773981, *3-4 (N.D. Cal. 2014), aff'd, 670 F.Appx. 575 (9th Cir. 2016).  Thus, plaintiffs'

26   relegation theory is subject to the four-year statute of limitations, while plaintiffs' passing over

27   theory is subject to the two-year statute of limitations.  See, e.g., Elmatboly v. Arizona State Univ.,

28

1  297 F.Appx. 654, 655 (9th Cir. 2008) (analyzing "the essence" of § 1981 claim to determine the

2  applicable statute of limitations).

3       As for plaintiffs' Unruh Act claim, defendant argues that the two-year statute of limitations

4  in Cal. Civ. Proc. Code § 335.1 for personal injuries applies, while plaintiffs contend that the

5  three-year limitations period in Cal. Civ. Proc. Code § 338(a) for liability created by statute applies

6  instead.  (See Dkt. 136-1, Joint Br. at 71-75).  Because plaintiffs' Unruh Act claim arises under Cal.

7  Civ. Code § 51.5, (see Dkt. 45, TAC at ¶¶ 129-33), the court finds that the applicable statute of

8  limitations is the three-year limitations period for state statutory claims.  See Olympic Club v.

9  Those Interested Underwriters at Lloyd's London, 991 F.2d 497, 501, n. 11 (9th Cir. 1993) (noting

10 that a claim under Cal. Civ. Code § 51 would be subject to the statute of limitations in Cal. Civ.

11 Proc. Code § 338(a)).

12      Finally, defendant disputes the timeliness of plaintiffs' claims, arguing that the alleged

13 relegation occurred years before the statute of limitations expired and cannot be construed as a

14 continuing violation.[6]  (See Dkt. 136-1, Joint Br. at 71-73).  Plaintiffs learned of the decision to

15 assign Burrell as their agency of record by at least 2016.  (See Dkt. 136-19, Exh. ZZ(3) (2016

16 email from McDonald's executive stating:  "Just a reminder that Burrell is the agency of record for

17 McDonald's and Entertainment Studios").  Thus, this decision falls outside the scope of the

18 applicable statute of limitations.[7]

19

20    [6]  It is unclear whether or how the continuing violations doctrine applies to this case given that

21 the doctrine is "most frequently seen in the context of employment discrimination suits[.]"  Bird v.

22 Dep't of Hum. Servs., 935 F.3d 738, 747 (9th Cir. 2019).  To the extent the continuing violations doctrine is applicable, plaintiffs allege a discriminatory contracting process akin to a hostile work

23 environment, rather than a discrete discriminatory act.  See Nat'l R.R. Passenger Corp. v. Morgan,

24 536 U.S. 101, 115, 122 S.Ct. 2061, 2073 (2002) (Hostile work environment "claims are based on the cumulative effect of individual acts" that "cannot be said to occur on any particular day.").

25 Here, several of the discrete discriminatory acts plaintiffs allege (contract rejection) occurred during the statutory period, e.g., plaintiffs continued to seek advertising revenue between 2019

26 and 2022.  (See Dkt. 136-3, SMF at D73).

27    [7]  "Although not actionable, conduct occurring outside of the statutory period may inform the

28 court's analysis of whether a question of fact exists that employment discrimination occurred."
45C Am. Jur. 2d "Job Discrimination" § 2259 (2024).

1    However, according to plaintiffs, McDonald's, on an annual basis, precluded them from

2    consideration and evaluation by the general advertising agency (relegation theory) and ultimately,

3    from selection (passing over theory). (See Dkt. 45, TAC at ¶¶ 67-88); Kotev v. First Colony Life

4    Ins. Co., 927 F.Supp. 1316, 1319 (C.D. Cal. 1996) (Under California law, "[r]epetition of a wrongful

5    act can be a new act supporting a new cause of action."). There is conflicting evidence, which

6    must be presented to a jury, as to whether the decision to relegate plaintiffs to Burrell was made

7    annually, and whether the relegation was a discrete decision or a process resulting from the

8    cumulative effect of individual decisions. (See, e.g., Dkt. 136-3, Exh. F, Galatt Depo. at 179-80

9    (describing "an annual plea to be taken and considered out of OMD"); (Dkt. 136-2, SMF at D28)

10   (describing annual process by which agencies would make recommendations to McDonald's);

11   (Dkt. 136-2, SMF at D49) (documenting "multiple" presentations to OMD over the course of the

12   relevant time period). Plaintiffs challenge discrimination in the overall contracting process, not just

13   the initial decision to assign plaintiffs to Burrell. (See, e.g., Dkt. 136-1, Joint Br. at 62) (referencing

14   the "racially segregated contracting process"). Moreover, there is conflicting evidence over the

15   nature of the alleged relegation – that is, how and when it occurred. See infra at § II. In short,

16   summary judgment is improper because "there are genuine issues of material fact regarding

17   whether Plaintiffs knew or should have known of their claims within the limitations period."

18   OConnor v. Boeing N. Am., Inc., 311 F.3d 1139, 1144 (9th Cir. 2002); id. at 1150 ("Critical factual

19   disputes that govern when Plaintiffs knew or should have known of their claims preclude summary

20   judgment here.").

21   II.    SECTION 1981.

22          Title 42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States

23   shall have the same right in every State and Territory to make and enforce contracts . . . as is

24   enjoyed by white citizens[.]"  42 U.S.C. § 1981(a).  The statute defines "make and enforce

25   contracts" as "the making, performance, modification, and termination of contracts, and the

26

27

28

1  enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."[8] Id. at

2  § 1981(b).

3      "Section 1981 offers relief when racial discrimination blocks the creation of a contractual

4  relationship[.]"   Domino's Pizza, 546 U.S. at 476, 126 S.Ct. at 1250; Saint Francis Coll. v.

5  Al-Khazraji, 481 U.S. 604, 609, 107 S.Ct. 2022, 2026 (1987) ("Although § 1981 does not itself use

6  the word 'race,' the [Supreme] Court has construed the section to forbid all 'racial' discrimination

7  in the making of private as well as public contracts.").   To state a § 1981 claim, a plaintiff must

8  allege that it "attempted to contract for certain services," Lindsey v. SLT Los Angeles, LLC, 447

9  F.3d 1138, 1145 (9th Cir. 2006), that such services remained available to "similarly-situated"

10  individuals who were not members of the plaintiff's protected class, id., and that, but for racial

11  animus, the defendant would have contracted with plaintiff.[9]  See Comcast, 589 U.S. at 331, 140

12  S.Ct. at 1013 (holding that a § 1981 plaintiff must "plausibly show[] that, but for racial animus,

13  [defendant] would have contracted with [plaintiff]"); Knight v. Wells Fargo Bank NA, 459 F.Supp.3d

14  1288, 1291 (N.D. Cal. 2019) ("To state a claim under Section 1981, a plaintiff must identify an

15  impaired contractual relation by showing that intentional racial discrimination prevented the

16

17

---

18      [8] As noted earlier, Congress amended § 1981 in 1991 to make clear "that § 1981's prohibition
   against racial discrimination in the making and enforcement of contracts applies to all phases and
19  incidents of the contractual relationship[.]"  Rivers v. Roadway Exp., Inc., 511 U.S. 298, 302, 114
   S.Ct. 1510, 1514 (1994); see id. at 302 n. 2, 114 S.Ct. at 1514 n. 2 (language amending § 1981);
20  Garrett v. Tandy Corp., 295 F.3d 94, 100 (1st Cir. 2002) ("The 1991 expansion of the definition
   of 'make and enforce contracts' in section 1981 . . . extends the reach of the statute to situations
21  beyond the four corners of a particular contract[.]").

22

23      [9] The Ninth Circuit has not decided whether, outside of the employment context, a plaintiff
   must prove that services remained available to "similarly-situated" individuals who were not
24  members of the protected class.  See Lindsey, 447 F.3d at 1145 (discussing a split between the
   Sixth and Seventh Circuits and declining to decide whether "modification of the fourth element of
25  a prima facie case under section 1981 is required in many or all cases arising in a commercial,
   non-employment context").  While "the majority of courts within the Ninth Circuit apply this fourth
26  element[,]" others have declined to do so.  See, e.g., Yoshikawa v. City & Cnty. of Honolulu, 542
   F.Supp.3d 1099, 1110 (D. Haw. 2021), vacated on other grounds by Yoshikawa v. Seguirant, 74
27  F.4th 1042 (9th Cir. 2023) (declining to apply the fourth element).  For the sake of completeness,
28  the court will assume that proof of "similarly situated" comparators is a required element.

creation of a contractual relationship or impaired an existing contractual relationship.") (internal quotation marks omitted).

Where, as here, "the plaintiff relies on indirect proof of discrimination[,]" Comcast, 589 U.S. at 340, 140 S.Ct. at 1019, the court evaluates plaintiffs' § 1981 claim under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973). See Lindsey, 447 F.3d at 1144 (utilizing framework in a similar context); see also Comcast, 589 U.S. at 340, 140 S.Ct. at 1019 ("Whether or not [the] McDonnell Douglas [burden-shifting framework] has some useful role to play in § 1981 cases," it is "a tool for assessing [discrimination] claims."). Under the McDonnell Douglas framework, "if the plaintiff satisfies the initial burden of establishing a prima facie case of racial discrimination, the burden shifts to the defendant to prove it had a legitimate non-discriminatory reason for the adverse action." Lindsey, 447 F.3d at 1144. "If the defendant meets that burden, the plaintiff must prove that such a reason was merely a pretext for intentional discrimination." Id. The ultimate inquiry is whether, "[a]fter examining all of the evidence in the light most favorable to the non-moving party," the plaintiff has "presented evidence creating genuine issues of fact for each material inquiry in the burden-shifting analysis." Id. at 1153; see also Gay v. Waiters' & Dairy Lunchmen's Union, Loc. No. 30, 694 F.2d 531, 538 (9th Cir. 1982) (In a Title VII disparate treatment case, "[t]he plaintiff's immediate burden of production may be discharged by proof of the four elements articulated in McDonnell Douglas[,] . . . or by an alternative presentation of evidence supporting an inference of discrimination.").

Finally, the Ninth Circuit has "repeatedly held that it should not take much for a plaintiff in a discrimination case to overcome a summary judgment motion." France v. Johnson, 795 F.3d 1170, 1175 (9th Cir. 2015) (collecting cases). "This is because the ultimate question is one that can only be resolved through a searching inquiry – one that is most appropriately conducted by a factfinder, upon a full record." Id. With these principles in mind, the court considers the parties' arguments.

Defendant contends that summary judgment is warranted on plaintiffs' § 1981 claim because: "(1) Plaintiffs have no proof of intentional discrimination; (2) Plaintiffs' networks are

1    objectively inferior to their purported 'comparators'; (3) McDonald's has legitimate business

2    reasons for its decisions; and (4) Plaintiffs cannot establish causation." (Dkt. 136-1, Joint Br. at

3    9).

4              A.    <u>Prima Facie Case</u>.

5              "The requisite degree of proof necessary to establish a prima facie case for [§ 1981] claims

6    on summary judgment is minimal and does not even need to rise to the level of a preponderance

7    of the evidence." <u>Shokri v. Boeing Co.</u>, 311 F.Supp.3d 1204, 1211 (W.D. Wash. 2018), <u>aff'd</u>, 777

8    F.Appx. 886 (9th Cir. 2019) (quoting <u>Wallis v. J.R. Simplot Co.</u>, 26 F.3d 885, 889 (9th Cir. 1994));

9    <u>see Gay</u>, 694 F.2d at 538 (The "initial burden of production [to support an inference of racial

10   discrimination] is not onerous[.]") (internal quotation marks omitted).  Failure to put forth "specific

11   facts" that establish the existence of a prima facie case, however, renders a grant of summary

12   judgment appropriate.  See <u>Jurado v. Eleven-Fifty Corp.</u>, 813 F.2d 1406, 1409 (9th Cir. 1987).

13              1.    **Relegation Theory**.[10]

14              As an initial matter, it is undisputed that plaintiffs are African American-owned media

15   companies. (See Dkt. 136-2, SMF at P1 & D8-9).  To support their contention that plaintiffs were

16   relegated to a less favorable contracting tier because they are African American-owned, (<u>see</u> Dkt.

17   136-1, Joint Br. at 27-29), plaintiffs submit the testimony of Galatt, AMG's Chief Revenue Officer.

18   (<u>See</u> Dkt. 136-3, Exh. F, Galatt Depo. at 7).  Galatt testified that "regardless of an annual plea to

19   be taken and considered out of OMD, [plaintiffs] were forced into a relationship with the black

20   agency, even though [plaintiffs' content was] not exclusively black targeted[,]" and OMD,

21   McDonald's general advertising agency, told plaintiffs "consistently that [they] had to go and deal

22   with Burrell." (<u>Id.</u> at 179-80).

23

24   _____

25              [10] Defendant notes the lack of caselaw to support plaintiffs' relegation theory. (<u>See</u> Dkt. 136-1,
     Joint Br. at 42-43).  But, as noted above, § 1981 "applies to all phases and incidents of the

26   contractual relationship."  <u>Rivers</u>, 511 U.S. at 302, 114 S.Ct. at 1514.  This includes "injuries
     inflicted during the contract-formation process."  <u>Comcast</u>, 589 U.S. at 344, 140 S.Ct. at 1021

27   (Ginsburg, J., concurring). Section 1981's guarantee that all persons enjoy the same rights in the
     "making" of contracts can thus be reasonably interpreted to encompass plaintiffs' relegation

28   theory.

Further, there is evidence – much of which is undisputed – that plaintiffs sought to be evaluated by OMD.  (See, e.g., Dkt. 136-3, Exh. F, Galatt Depo. at 179).  Although plaintiffs met with OMD on a near-annual basis, these meetings were often general, and only a few concerned advertising with McDonald's in particular.  (See Dkt. 136-6, Exh. O(33)) (April 2016 meeting with Deborah Innes of OMD); (Dkt. 136-3, Exh. H, Kelly Depo. at 85-86) (testifying that Entertainment Studios presented to OMD in 2016); (Dkt. 136-6, Exh. O(34)) (March 2017 meeting with OMD); (Dkt. 136-6, Exh. O(35)) (same); (Dkt. 136-7, Exh. O(36)) (September 2019 general request from OMD); (Dkt. 136-7, Exh. O(37)) (November 2019 meeting with OMD); (Dkt. 136-5, Exh. O(21)) (December 2019 meeting with OMD); (Dkt. 136-3, Exh. G, Deposition of Barbara Bekkedahl ("Bekkedahl Depo.") at 244) (testifying that plaintiffs met with OMD in 2020); (Dkt.136-9, Exh. O(83, Upfront 2021) (general presentation); (Dkt. 136-7, Exh. O(38)) (March 2020 McDonald's-specific presentation to OMD); (Dkt. 136-7, Exh. O(39)) (January 2021 McDonald's-specific discussion with OMD); (Dkt. 136-7, Exh. O(41)) (April 2021 email stating: "we had a great conversation with McDonald's out of OMD[.]").

The evidence is thus disputed as to whether plaintiffs were precluded from serious consideration by McDonald's general advertising agency or were otherwise relegated to a less desirable contracting tier.  In effect, plaintiffs claim that despite meeting with OMD regularly, they were not seriously considered for an advertising contract with McDonald's because McDonald's had relegated them to Burrell.  (See e.g., Dkt. 136-3, Exh. I, Allen Depo. at 262) ("I do know we presented to OMD.  Now, how they evaluated it, I don't know[.]").  For instance, there are emails suggesting that OMD executives told plaintiffs that they were expected to go through Burrell to seek advertising from McDonald's.  (See Dkt. 136-1, Joint Br. at 15-16 & 53); (Dkt. 136-2, SMF at P9 & P12).  Geraci, OMD's Chief Investment Officer, (see Dkt. 136-12, Exh. T, Declaration of Chris Geraci ("Geraci Decl.") at ¶ 2), wrote an email to plaintiffs, stating:  "I have been trying to help to get you more business beyond Hershey, and I know that PepsiCo is considering.  McDonald's will consider, but not through OMD."  (Id. & Exh. T(1)).  Innes, OMD's Group Director, (see Dkt. 136-12, Exh. U, Declaration of Deborah Innes ("Innes Decl.") at ¶ 2), wrote to Galatt,

1  "[j]ust a reminder that Burrell is the agency of record for McDonald's and Entertainment Studios[.]"

2  (Dkt. 136-19, Exh. ZZ(3)).

3        Defendant submitted declarations from Geraci and Innes attempting to clarify their emails,

4  and explain what it meant for Burrell to be McDonald's agency of record for plaintiffs.    For

5  example, Geraci states that "[t]he email was not meant to communicate to Entertainment Studios

6  that OMD had not evaluated and considered Entertainment Studios' syndication programming for

7  investment on the McDonald's GCM plan, or that it would not do so in the future."  (Dkt. 136-12,

8  Exh. T, Geraci Decl. ¶ 6).  Innes similarly states that McDonald's never instructed her "to direct

9  ESN or Mr. Allen to work exclusively with Burrell."  (See Dkt. 136-12, Exh. U, Innes Decl. at ¶ 5).

10  But Carroll, McDonald's former Vice President of U.S. Marketing, testified that the evaluation of

11  plaintiffs' proposals would have gone through Burrell.  (See Dkt. 136-3, Exh. D, Carroll Depo. at

12  11-18) (discussing her positions); (id. at 172) (testifying that an analysis of plaintiffs' proposals

13  would have been done at Burrell).

14        Plaintiffs also put forth evidence from Lynnwood Bibbens, an African American media

15  entrepreneur, indicating that he, too, was forced to contract through Burrell, even though his

16  network features generally targeted content.  (See Dkt. 136-1, Joint Br. at 16).  Bibbens testified

17  that his network, formerly the CNN Airport Network, features generally targeted content, not

18  AACM-targeted content.  (See Dkt. 136-3, Exh. N, Bibbens Depo. at 28, 35 & 68-69).  When

19  Bibbens sought to have McDonald's advertise on his network in 2022, he initially spoke to the

20  general advertising agency, but Burrell was brought in to "le[a]d the decision-making process from

21  that point on."  (See id. at 51-52 & 74-75).

22        Viewing the evidence in the light most favorable to plaintiffs and drawing all reasonable

23  inferences in their favor, there are questions of fact as to the meaning and significance of

24  relegating plaintiffs to Burrell and whether OMD was simply going through the motions in meeting

25  with plaintiffs.  (See e.g., Dkt. 136-3, Exh. H, Kelly Depo. at 137) ("we just had no feedback from

26  McDonald's at all"); (Dkt. 136-12, Exh. T(1)) (2012 email in which Geraci writes to plaintiffs, "I have

27  been trying to help to get you more business beyond Hershey, and I know that PepsiCo is

28  considering.  McDonald's will consider, but not through OMD."); (Dkt. 136-23, Exh. BBB, Galatt

Decl. ¶ 8 & Exh. 7) (Burrell telling Entertainment Studios that it is "constantly asking for feedback from McD's, radio silence").  In evaluating these factual questions, the jury will have to assess the credibility of Geraci and Innes who will have to convince a jury as to the significance and meaning of the emails and whether the declarations they submitted in this case – several years after the emails – were a true clarification or an attempt to avoid liability for their employer.[11]  See, e.g., Cal. Expanded Metal Prod. Co. v. Klein, 2018 WL 6065644, *9 (W.D. Wash. 2018) (finding that disputes over meaning of email, among other things, rendered summary judgment inappropriate).  Additionally, in evaluating the various questions of fact, the jury will consider whether Bibbens's testimony supports plaintiffs' claim that the race of the media company's owner influenced defendant's decision as to which agency evaluated a company's advertising proposals.  See, e.g., Intervention911 v. City of Palm Springs, 2014 WL 12853165, *18 (C.D. Cal. 2014) (finding that evidence of past practices was probative of discriminatory intent).  In short, plaintiffs have put forth sufficient evidence to raise triable issues of material fact as to their relegation theory.

    2.    **Passing Over Theory**.

    To resist summary judgment on their passing over theory, plaintiffs must put forth sufficient evidence to raise an issue of fact as to the "similarly situated" element.[12]  The question of whether comparators are "similarly situated is ordinarily a question of fact."  Hawn v. Exec. Jet Mgmt., Inc., 615 F.3d 1151, 1157 (9th Cir. 2010); Earl v. Nielsen Media Research, Inc., 658 F.3d 1108, 1116 (9th Cir. 2011) (same).  While comparators need not be "identically situated," Bowden v. Potter, 308 F.Supp.2d 1108, 1117 (N.D. Cal. 2004), they must be similar "in all material respects."  Moran v. Selig, 447 F.3d 748, 756 (9th Cir. 2006).

    McDonald's, relying on its expert's opinion, argues that it uses objective criteria to evaluate media partners and that plaintiffs are not similarly situated to other comparator networks.  (See

_____

    [11]  Even assuming the declarations clarify what Geraci and Innes's emails were intended to convey, the evidence indicates that plaintiffs were, at a minimum, given the impression that they were supposed to go through and would primarily, if not exclusively, be evaluated by Burrell.

    [12]  Again, it is not clear whether plaintiffs must demonstrate that services remained available to similarly situated comparators as a required element of a § 1981 claim.  See supra at note 9.

Dkt. 136-1, Joint Br. at 31 & 68-69); (Dkt. 136-12, Exh. Q, Declaration of Lawrence Blasius ("Blasius Decl.") & Exh. Q(1), Expert Report by Lawrence Blasius ("Blasius Report") at ¶¶ 3, 18-19, 27 & 30). According to McDonald's, it chose not to advertise with plaintiffs because they did not meet its criteria. (See Dkt. 136-3, Exh. L, Calabrese Depo. at 116-17) (On whether plaintiffs' 2021 proposal to McDonald's was reasonable, OMD said "[t]he answer was – was no. That's why we didn't make that recommendation."); (Dkt. 136-3, Exh. B, Deposition of Sheila Hamilton ("Hamilton Depo.") at 30) (testifying that the reasons McDonald's declined to advertise included viewer age demographics, ratings and the cost associated with ratings); (Dkt. 136-10, Exh. P(13)) (Burrell informed McDonald's that "[p]artnership with Entertainment Studios proves to be challenging to negotiate. Their programming skews older and provides no value-added elements to overall investment. Plus, cost vs. ratings ratio is very inefficient. The partner continues to experience double digit ratings erosion; exception Teen audience.").

Plaintiffs put forth their own expert, Tom Nunan ("Nunan"), to counter defendant's evidence. (See Dkt. 136-1, Joint Br. at 59-62); (Dkt. 136-23, Exh. FFF, Declaration of Tom Nunan ("Nunan Decl.") & Exh. 2, Expert Report by Tom Nunan ("Nunan Report")). Nunan, an expert in network and television programming, identifies comparator networks that are similarly situated to plaintiffs' networks "based on the media environment and content of the network" as well as median age of viewership.[13] (Dkt. 136-23, Exh. FFF, Nunan Decl. at ¶¶ 1 & 12-15). For instance, Nunan posits that "news networks like CNN, MSNBC, Fox News, HLN and The Weather Channel are similarly situated from an advertiser's perspective because their content and programming is similar[,]" and that "a courtroom drama-focused network like JusticeCentral.TV is similarly situated to true crime networks like Oxygen and HLN in that they feature courtroom shows that target and reach the same audience." (Id. at ¶¶ 14-15). "Looking at McDonald's advertising partners," he also opines that ESN's "Recipe.TV is similarly situated with Food Network and Cooking Channel[,]" ESN's "Comedy.TV is similarly situated to TruTV," and that "[t]he programming run on WE tv

---

[13] McDonald's expert agrees that advertisers consider media environment and content as part of their decision-making process. (See Dkt. 136-12, Exh. Q, Blasius Decl. & Exh. Q(1), Blasius Report at ¶ 27).

1  provides a similar environment to an advertiser to these syndicated programs that ESN offers."

2  (Dkt. 136-23, Exh. FFF, Nunan Decl. & Exh. 2, Nunan Report at 12-14). Finally, Nunan discusses

3  the qualitative factors that advertisers consider in deciding where to invest, and suggests that

4  these decisions are not always based on objective criteria. (See Dkt. 136-23, Exh. FFF, Nunan

5  Decl. & Exh. 2, Nunan Report at 8-10).

6        Plaintiffs' expert's opinion raises factual disputes on the question of whether the

7  comparators are similarly situated.  For instance, in response to defendant's explanation that

8  plaintiffs' networks had insufficient viewership and did not meet "McDonald's usual threshold of

9  60 million viewers," ( Dkt. 136-1, Joint Br. at 22); (see id. at 31 & 63); (Dkt. 136-2, SMF at D87),

10  plaintiffs note that TWC does meet the threshold and they cite evidence that defendant advertises

11  on content that is not rated by Nielsen, the metric McDonald's uses to determine demographic

12  audience viewership.  (See Dkt. 136-23, Exh. FFF, Nunan Decl. at ¶¶ 16-30); (Dkt. 136-14, Exh.

13  X, Deposition of Dominique Hanssens ("Hanssens Depo.") at 197) (confirming that The Weather

14  Channel reaches more than 60 million households); (Dkt. 136-2, SMF at D109); (Exh. B, Hamilton

15  Depo. at 104) (conceding that Revolt was not measured by Nielsen prior to 2022).  Plaintiffs also

16  put forth evidence that McDonald's did not tell them that it had a 60 million viewer threshold

17  requirement or otherwise provide feedback as to its decisions not to advertise with plaintiffs. (See

18  Dkt. 136-3, Exh. H, Kelly Depo. at 137) ("[W]e just had no feedback from McDonald's at all"); (Dkt.

19  136-23, Exh. BBB, Galatt Decl. ¶ 8 & Exh. 7) (Burrell telling Entertainment Studios that it is

20  "constantly asking for feedback from McD's, radio silence").  As for McDonald's claims that

21  plaintiffs' older audience did not align with its target audience, Nunan identifies comparators on

22  which McDonald's advertises which have a similarly older audience. (See Dkt. 136-23, Exh. FFF,

23  Nunan Report at 12-15).  Finally, although McDonald's claims it has a "no news" restriction that

24  prevented it from advertising on TWC, plaintiffs counter that McDonald's advertised on CNN, HLN,

25  MSNBC and Fox News during the relevant period. (See Dkt. 136-23, Exh. FFF, Nunan Decl. at

26  ¶ 20 & Exh. 2, Nunan Report at 14-15).

27        Viewing the evidence in the light most favorable to plaintiffs, the court is persuaded that

28  genuine issues of fact exist as to whether plaintiffs and their comparators are similarly situated.

1  See Hawn, 615 F.3d at 1157 (noting that the similarly situated inquiry "is ordinarily a question of

2  fact"); Earl, 658 F.3d at 1116.

3       B.     Legitimate Non-Discriminatory Reasons.

4       Having found triable issues of fact as to plaintiffs' prima facie case, the court next considers

5  whether defendant has proffered legitimate non-discriminatory reasons for its conduct.  See

6  Lindsey, 447 F.3d at 1147.  Defendant's "burden is one of production, not persuasion, thereby

7  involving no credibility assessment."  Id.

8       Defendant articulates the following legitimate non-discriminatory reasons to support its

9  actions.   First, defendant claims that plaintiffs failed to establish that "its networks have

10 'widespread appeal among all races' (TAC ¶ 19), such that it plausibly should have been

11 considered for the GCM."  (Dkt. 136-1, Joint Br. at 31).  McDonald's disputes that plaintiffs were

12 "assigned" to Burrell, stating that, although "McDonald's had the sensible and nondiscriminatory

13 practice of having a single agency handle negotiations with media entities whenever possible," that

14 would not preclude plaintiffs from being considered for the general market.  (See id. at 33); (id. at

15 33-37); (Dkt. 136-3, Exh. C, Feldman Depo. at 177-178) (testifying that Burrell's relationship with

16 plaintiffs was "based off the audience composition, concentration, evaluation" and the fact that

17 "there was an overdevelopment of African-American [sic] within these properties"); (id. at 179) ("To

18 that point all of our investment with Entertainment Studios had been through Burrell so they would

19 have been point to do that" but that "would not preclude OMD from analyzing that as a property

20 and making a recommendation.  It is more of who would negotiate with that vendor.").  McDonald's

21 also claims that "Burrell frequently worked with Allen's companies not because of Allen's race, but

22 because at times, they indexed well with the AACM."  (Dkt. 136-1, Joint Br. at 37).

23      Second, as for defendant's decisions not to contract with plaintiffs on various occasions,

24 McDonald's contends that the ESN networks were not selected because they:  (1) were not

25 Nielsen-rated until 2017, (see Dkt. 136-3, SMF at D36); (2) had insufficient viewership; and (3) did

26 not index well with McDonald's target demographic.  (See Dkt. 136-1, Joint Br. at 62-64).  As to

27 TWC, it was not selected because:  (1) McDonald's has a "no news" restriction for its product

28

1  advertisement placements; (2) TWC has low viewership except during extreme weather events;

2  and (3) TWC did not perform well with McDonald's target demographic.  (See id.).

3       C.    Pretext.

4       Once the defendant has articulated legitimate, nondiscriminatory reasons for its decision,

5  the burden shifts to the plaintiff "to raise a genuine dispute of material fact as to pretext to avoid

6  summary judgment."  France, 795 F.3d at 1175.  "[A] plaintiff can prove pretext in two ways: (1)

7  indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because

8  it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful

9  discrimination more likely motivated the employer."  Lindsey, 447 F.3d at 1148.

10       "[A] plaintiff's burden to raise a triable issue of pretext is hardly an onerous one."  Earl, 658

11  F.3d at 1113 (internal quotation marks omitted).  To establish pretext, a plaintiff must provide

12  "specific and substantial evidence" that the defendant's stated reasons were a pretext for

13  discrimination.  France, 795 F.3d at 1175.  A plaintiff may "rely on the same evidence used to

14  establish his prima facie case, or he may introduce additional evidence."  Merrick v. Hilton

15  Worldwide, Inc., 867 F.3d 1139, 1147 (9th Cir. 2017); see Chuang v. Univ. of California Davis, Bd.

16  of Trustees, 225 F.3d 1115, 1127 (9th Cir. 2000) ("A disparate treatment plaintiff can survive

17  summary judgment without producing any evidence of discrimination beyond that constituting his

18  prima facie case, if that evidence raises a genuine issue of material fact regarding the truth of the

19  employer's proffered reasons.").

20       1.   **Relegation Theory**.

21       McDonald's contends that plaintiffs were assigned primarily to Burrell for purposes of

22  negotiations.  (See Dkt. 136-1, Joint Br. at 32-33).  But questions of fact remain about whether

23  plaintiffs' assignment to Burrell affected plaintiffs' opportunity to be considered more generally, and

24  whether plaintiffs' properties were regularly and seriously evaluated by McDonald's general

25  advertising agency.  (Compare Dkt. 136-3, Exh. D, Carroll Depo. at 172) (McDonald's executive

26  testifying that an analysis of plaintiffs' proposals would have been done at Burrell) and (Dkt. 136-3,

27  Exh. F, Galatt Depo. at 180) ("OMD told us consistently that we had to go and deal with Burrell.")

28  with (Dkt. 136-3, Exh. A, Mason Depo. at 98) (McDonald's executive testifying that ESN's "general

1  market media" offerings were not required to go through Burrell, and "when Byron Allen's media

2  group would submit proposals that are broad, broad in nature, that both OMD and Burrell were

3  reviewing them"); (id. at 100) (testifying that AMG properties that were considered for the general

4  market did not meet the general market buy criteria) and (Dkt. 136-3, Exh. M, Hodge Depo. at 52-

5  53) (Burrell executive testifying that at least since 2021, the general advertising agency would

6  evaluate advertising on plaintiffs' properties). The evidence is unclear or, at a minimum, disputed

7  as to whether the general advertising agency regularly evaluated proposals – including plaintiffs'

8  proposals – regarding generally targeted content; plaintiffs have thus identified sufficient evidence

9  to support their relegation theory.[14] (See Dkt. 136-3, Exh. D, Carroll Depo. at 172) (McDonald's

10  executive testifying that an analysis of plaintiffs' proposals would have been done at Burrell); (Dkt.

11  136-3, Exh. L, Calabrese Depo. at 118-19) (OMD executive testifying that he does not have

12  knowledge about whether plaintiffs were evaluated regularly by OMD prior to 2021 or whether

13  there was an assumption that "they were not fits").

14       Moreover, given the disputed evidence regarding the evaluation of plaintiffs' general

15  proposals prior to 2021, there remains a factual dispute as to which agency was responsible for

16  evaluating plaintiffs' generally targeted content – and whether McDonald's precluded plaintiffs from

17  serious and consistent consideration by the general advertising agency.  Given these factual

18  issues, and plaintiffs' prima facie evidence of relegation, see supra at § II.A.1., plaintiffs have put

19  forth sufficient evidence to raise material factual disputes as to pretext and plaintiffs' alleged

20  relegation.

21  / / /

22

23  _____

24       [14]  McDonald's attempts to make a distinction between content that is "targeted to general audiences" and content that has "widespread appeal," implying that only the latter would have been evaluated by the general advertising agency. (See Dkt. 136-1, Joint Br. at 30-32).  It will be up to a jury to assess factual disputes as to relegation.  For instance, one McDonald's executive testified that generally targeted content would have been evaluated by the general agency.  (See Dkt. 136-3, Exh. A, Mason Depo. at 97) (McDonald's executive testifying that "[a]nything that'd be general market target such as The Weather Channel would have gone through OMD"); (see also Dkt. 136-3, Exh. M, Hodge Depo. at 53-54) (Burrell executive opining that generally-targeted content would be evaluated by general agency).

2.   **Passing Over Theory**.

In response to plaintiffs' claim that their networks are similarly situated to white comparator networks on which McDonald's did advertise, defendant, like plaintiffs, cites its own expert to support its contention that the comparator networks are not similarly situated with respect to viewership ratings.  (See Dkt. 136-1, Joint Br. at 58-59); (Dkt. 136-12, Exh. Q, Blasius Decl. & Exh. 1, Blasius Report at ¶ 19).  The difference in ratings between plaintiffs' properties and the alleged comparator networks appears to be significant, (see, e.g., Dkt. 136-12, Exh. Q, Blasius Decl. & Exh. 1, Expert Blasius Report at ¶¶ 28-37), but it is not the court's role to weigh the evidence at this stage, see France, 795 F.3d at 1172-73, especially where, as here, it is unclear which factors are most relevant to identifying similarly situated comparators.  See Nat'l Ass'n of Afr. Am.-Owned Media v. Charter Commc'ns, Inc., 915 F.3d 617, 626 n. 8 (9th Cir. 2019), judgment vacated on other grounds by Comcast, 589 U.S. 327, 140 S.Ct. 1009 (noting that "television networks can vary widely" with respect to "objective metric[s] relevant to a carriage decision" such as "content, quality, popularity, viewer demand").  Indeed, the conflicting experts' opinions raise material factual disputes as to whether plaintiffs are similarly situated to their comparator networks.  See Hawn, 615 F.3d at 1157 (noting that the similarly situated inquiry "is ordinarily a question of fact"); Sooner v. Schwabe North America, Inc., 911 F.3d 989, 992-93 (9th Cir. 2018) (Arguments regarding the "bases underlying the opinion of the opposing party's expert . . . go to the weight the fact-finder should give to the evidence, an inquiry that is not proper at the summary judgment stage."); DeLaw v. Adamson, 293 F.Appx. 504, 506 (9th Cir. 2008) ("The existence of conflicting expert assessments suggests that neither party is entitled to summary judgment."); Viasat, Inc. v. Space Sys./Loral, Inc., 2014 WL 11889459,*2 (S.D. Cal. 2014) ("A conflict between the experts' opinions on a material issue defeats summary judgment.").

## CONCLUSION

Overall, the question of whether plaintiffs have raised a genuine dispute of material fact on both of their discrimination theories is a close call.  But given that "[a] plaintiff's burden to raise a triable issue of pretext is hardly an onerous one," France, 795 F.3d at 1175, and that "it should not take much for a plaintiff in a discrimination case to overcome a summary judgment motion[,]" id.,

1    the court is persuaded that plaintiffs have put forth sufficient evidence to raise triable issues of

2    material fact as to their § 1981 and Unruh Act claims.[15]  See Lowe v. City of Monrovia, 775 F.2d

3    998, 1009 (9th Cir. 1985), amended by 784 F.2d 1407 (1986) ("Once a prima facie case is

4    established either by the introduction of actual evidence or reliance on the McDonnell Douglas

5    presumption, summary judgment for the defendant will ordinarily not be appropriate on any ground

6    relating to the merits because the crux of a [discrimination] dispute is the 'elusive factual question

7    of intentional discrimination.'") (citation omitted).  "Intentional discrimination cases such as this one

8    present precisely the kinds of complex factual questions best addressed by juries." Lindsey, 447

9    F.3d at 1153.  At a minimum, this is the type of case where the "trial court is permitted, in its

10   discretion, to deny even a well-supported motion for summary judgment, if it believes the case will

11   benefit from a full hearing."  United States v. Real and Personal Prop. Belonging to Hayes, 943

12   F.2d 1292, 1297 (11th Cir. 1991); see also Anderson, 477 U.S. at 255, 106 S.Ct. at 2513 ("Neither

13   do we suggest . . . that the trial court may not deny summary judgment in a case where there is

14   reason to believe that the better course would be to proceed to a full trial."); Andrew v. Clark, 561

15   F.3d 261, 271 (4th Cir. 2009) (The district court may exercise its discretion to deny summary

16   judgment "even when the standard appears to have been met."); Veillon v. Exploration Servs.,

17   Inc., 876 F.2d 1197, 1200 (5th Cir. 1989) ("A district judge has the discretion to deny a Rule 56

18   motion even if the movant otherwise successfully carries its burden of proof if the judge has doubt

19   as to the wisdom of terminating the case before a full trial.").

20        Based on the foregoing, IT IS ORDERED THAT:

21        1.  The parties Cross-Motions for Summary Judgment **(Document No. 136)** are **denied**.

22

23

---

24        [15]  Plaintiffs' Unruh Act claim, which is based on the same allegations regarding defendant's

25   refusal to contract on the basis of race, (see Dkt. 45, TAC at ¶¶ 128-134), is subject to the
     "substantial reason" standard, see Grant v. Starbucks Corp., 2019 WL 8112465, *6 (C.D. Cal.

26   2019), which is less stringent than § 1981's intentional discrimination standard.  See Harris v. City
     of Santa Monica, 56 Cal.4th 203, 226 (2013) (distinguishing between the "substantial motivating

27   factor" and more stringent "but-for" standard in discrimination cases).  Accordingly, the court finds
     that plaintiffs have presented sufficient evidence to raise a triable issue of fact as to their Unruh

28   Act claim.

2.  Plaintiffs shall, no later than 14 days from the filing date of this Order, file a stipulation or a motion to add any necessary parties to this case.

Dated this 30th day of November, 2024.

                                                    /s/
                                            _____
                                            Fernando M. Olguin
                                            United States District Judge